# EXHIBIT 18

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR-18-00258-EJD |
| | ) | |
| PLAINTIFF, | ) | SAN JOSE, CALIFORNIA |
| | ) | |
| VS. | ) | VOLUME 36 |
| | ) | |
| ELIZABETH A. HOLMES, | ) | NOVEMBER 19, 2021 |
| | ) | |
| DEFENDANT. | ) | PAGES 7014 - 7287 |
| _____ | ) | |


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                       BY:  JOHN C. BOSTIC
                            JEFFREY B. SCHENK
                       150 ALMADEN BOULEVARD, SUITE 900
                       SAN JOSE, CALIFORNIA 95113

                       BY:  ROBERT S. LEACH
                            KELLY VOLKAR
                       1301 CLAY STREET, SUITE 340S
                       OAKLAND, CALIFORNIA 94612

     (APPEARANCES CONTINUED ON THE NEXT PAGE.)


OFFICIAL COURT REPORTERS:
                         IRENE L. RODRIGUEZ, CSR, RMR, CRR
                         CERTIFICATE NUMBER 8074
                         LEE-ANNE SHORTRIDGE, CSR, CRR
                         CERTIFICATE NUMBER 9595

     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
          TRANSCRIPT PRODUCED WITH COMPUTER

```
 1          A P P E A R A N C E S: (CONT'D)

 2

 3     FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                                BY:  KEVIN M. DOWNEY
 4                                   LANCE A. WADE
                                     KATHERINE TREFZ
 5                                   SEEMA ROPER
                                     J.R. FLEURMONT
 6                                   RICHARD CLEARY
                                     ANDREW LEMENS
 7                                   PATRICK LOOBY
                                     AMY SAHARIA
 8                              725 TWELFTH STREET, N.W.
                                WASHINGTON, D.C. 20005
 9
                                LAW OFFICE OF JOHN D. CLINE
10                              BY:  JOHN D. CLINE
                                ONE EMBARCADERO CENTER, SUITE 500
11                              SAN FRANCISCO, CALIFORNIA 94111

12
       ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
13                              BY:  ADELAIDA HERNANDEZ

14                              OFFICE OF THE U.S. ATTORNEY
                                BY:  LAKISHA HOLLIMAN, PARALEGAL
15                                   MADDI WACHS, PARALEGAL

16                              WILLIAMS & CONNOLLY
                                BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL
17
                                TBC
18                              BY:  BRIAN BENNETT, TECHNICIAN

19
       FOR ROGER PARLOFF:      JOSHUA KOLTUN
20

21

22

23

24

25
```

INDEX OF PROCEEDINGS

GOVERNMENT'S:


**ROGER PARLOFF**
CROSS-EXAM BY MR. CLINE (RES.)          P. 7052
REDIRECT EXAM BY MR. BOSTIC            P. 7078



DEFENDANT'S:

**TRENT MIDDLETON**
DIRECT EXAM BY MS. TREFZ              P. 7126
CROSS-EXAM BY MR. LEACH              P. 7162


**FABRIZIO BONANNI**
DIRECT EXAM BY MS. TREFZ              P. 7181
CROSS-EXAM BY MR. SCHENK             P. 7223
REDIRECT EXAM BY MS. TREFZ            P. 7234


**ELIZABETH HOLMES**
DIRECT EXAM BY MR. DOWNEY            P. 7237

```
1                          INDEX OF EXHIBITS

2
                                    IDENT.      EVIDENCE
3       GOVERNMENT'S:

4       4859                                    7082

5

6       DEFENDANT'S:

7       14271                                   7063
        10592                                   7070
8       10691, PAGES 1 - 3                      7129
        10684                                   7132
9       10685                                   7135
        10686 AND 10692                         7140
10      10689, PAGE 1                           7144
        10687, PAGE 1                           7150
11      10689, PAGES 2 AND 3                    7153
        10688                                   7158
12      10312                                   7184
        7051                                    7244
13      9501                                    7251
        15015                                   7254
14      15026                                   7257, 7258
        12027, PAGES 1 AND 2                    7262
15      15016                                   7265
        15024                                   7268
16      14111 AND 14112                         7271
        15017                                   7273
17      13762                                   7275
        15013                                   7277
18

19

20

21

22

23

24

25
```

```
          1      SAN JOSE, CALIFORNIA              NOVEMBER 19, 2021

08:31AM   2                    P R O C E E D I N G S

08:31AM   3           (COURT CONVENED AT 8:31 A.M.)

08:31AM   4           (JURY OUT AT 8:31 A.M.)

08:31AM   5               THE COURT:  THANK YOU.  PLEASE BE SEATED.

08:31AM   6         WE ARE ON THE RECORD IN THE HOLMES MATTER.  ALL COUNSEL

08:32AM   7    ARE PRESENT.  MS. HOLMES IS PRESENT.

08:32AM   8         WE ARE OUTSIDE OF THE PRESENCE OF THE JURY.

08:32AM   9         I HAVE DOCUMENT 1150 IN FRONT OF ME THAT WAS FILED LAST

08:32AM  10    NIGHT.  SHOULD WE TALK ABOUT THAT?

08:32AM  11               MR. SCHENK:  YES.  THANK YOU.  GOOD MORNING,

08:32AM  12    YOUR HONOR.

08:32AM  13         YOUR HONOR, THE UNITED STATES FILED A MOTION TO EXCLUDE

08:32AM  14    THE TESTIMONY OF A WITNESS THAT THE DEFENSE DISCLOSED TO US

08:32AM  15    RECENTLY.

08:32AM  16         MAY I?

08:32AM  17               THE COURT:  YES, YES.  THANK YOU.

08:32AM  18               MR. SCHENK:  THE WITNESS'S NAME IS DR. BONANNI,

08:32AM  19    B-O-N-A-N-N-I, AND THERE ARE REALLY SORT OF TWO ARGUMENTS THAT

08:32AM  20    I THINK ARE WORTH THE COURT'S ATTENTION.

08:32AM  21         THE FIRST IS A RELEVANCE ARGUMENT.  THIS INDIVIDUAL JOINED

08:32AM  22    THE THERANOS BOARD AROUND MAY OF 2016.  THE COURT HEARD

08:32AM  23    TESTIMONY FROM DR. DAS THAT THE DECISION TO VOID THE TESTS THAT

08:32AM  24    WERE RUN ON THE EDISON OCCURRED EARLIER IN 2016.

08:32AM  25         WE'RE NOT SURE WHAT THE RELEVANCE COULD BE.  THE COURT HAS
```

08:32AM  1    CERTAINLY HEARD PRIOR ARGUMENT THROUGHOUT THIS CASE ABOUT THE

08:32AM  2    RELEVANCE OF 2016 AND BEYOND TESTIMONY, AND WHILE IN CERTAIN

08:33AM  3    INSTANCES IT IS RELEVANT, WE DON'T SEE WHAT POSSIBLE RELEVANCE

08:33AM  4    THERE COULD BE FOR THIS WITNESS.

08:33AM  5         SO THAT'S SORT OF ISSUE ONE.

08:33AM  6         ISSUE TWO INVOLVES THE TIMING OF CERTAIN DISCLOSURES

08:33AM  7    RELATED TO THIS WITNESS.  THE DEFENSE INTENDS TO OFFER SOME

08:33AM  8    VIDEO CLIPS THROUGH THIS WITNESS.  THEY DISCLOSED THOSE CLIPS

08:33AM  9    TO US AT 10:00 O'CLOCK LAST NIGHT.

08:33AM  10        THE DEFENSE INTENDS TO OFFER SOME EXHIBITS THROUGH THIS

08:33AM  11   WITNESS.  AND MY UNDERSTANDING IS THAT ONE OF THE EXHIBITS, AT

08:33AM  12   LEAST, WAS DISCLOSED TO US FOR THE FIRST TIME THIS MORNING.

08:33AM  13   AND THAT WAS NOT THE ONLY ONE.  THERE WERE SOME THAT WE DIDN'T

08:33AM  14   HAVE UNTIL YESTERDAY WHEN THEY PROVIDED THEM TO US.

08:33AM  15        SO I'M NOT SURE HOW WE CAN MEANINGFULLY MAKE 106 ARGUMENTS

08:33AM  16   ABOUT THE VIDEO WHEN WE ACTUALLY RECEIVED THE CLIPS AT

08:33AM  17   10:00 O'CLOCK LAST NIGHT.

08:33AM  18        BUT, AGAIN, THAT'S REALLY SECONDARY.  THE PRIMARY POINT IS

08:33AM  19   THAT I'M NOT SURE WHAT THIS WITNESS COULD PROVIDE OF VALUE TO

08:33AM  20   THE JURY AS IT'S DELIBERATING, AND I THINK THE COURT COULD JUST

08:34AM  21   EXCLUDE IT ON THAT BASIS.

08:34AM  22             THE COURT:  ALL RIGHT.  THANK YOU.

08:34AM  23        WHO IS GOING TO SPEAK TO THIS?

08:34AM  24        GOOD MORNING, MS. SAHARIA.  NICE TO SEE YOU AGAIN.

08:34AM  25             MS. SAHARIA:  IT'S NICE TO BE HERE, YOUR HONOR.

08:34AM 1    BEFORE I ADDRESS THE MOTION ON ITS SUBSTANCE, I JUST DO

08:34AM 2    WANT TO ADDRESS THE FACT THAT IT IS SOMEWHAT AWKWARD FOR US TO

08:34AM 3    BE ARGUING ABOUT THE CONTENT OF THE DEFENSE CASE BEFORE THE

08:34AM 4    GOVERNMENT HAS RESTED.

08:34AM 5        I'M HAPPY TO ADDRESS IT NOW IF THE GOVERNMENT IS WILLING

08:34AM 6    TO COMMIT THAT IT'S NOT GOING TO ALTER THE CONTENT OF ITS

08:34AM 7    CASE-IN-CHIEF BASED ON WHAT I SAY TODAY ABOUT WHAT WE EXPECT

08:34AM 8    WILL COME OUT IN THE DEFENSE CASE.

08:34AM 9        THE COURT:  SO THANK YOU.

08:34AM 10       WELL, LET ME ASK YOU THE THRESHOLD QUESTION.  IS THIS

08:34AM 11   WITNESS -- IS IT ANTICIPATED THAT THIS WITNESS WILL TESTIFY

08:34AM 12   THIS MORNING, BE CALLED BY YOUR TEAM THIS MORNING?

08:34AM 13       MS. SAHARIA:  I EXPECT THAT HE WILL BE OUR SECOND

08:34AM 14   WITNESS.  I DON'T KNOW THE TIMING OF WHETHER IT WILL BE THIS

08:34AM 15   MORNING.  I WOULD EXPECT THAT IT WILL BE AFTER THE MORNING

08:34AM 16   BREAK, SO WE COULD TAKE THIS UP WHEN THE GOVERNMENT RESTS SINCE

08:34AM 17   WE'RE GOING TO HAVE TO EXCUSE THE JURY BRIEFLY ANYWAY AT THAT

08:35AM 18   MOMENT.  I WOULD DEFER TO THE COURT.

08:35AM 19       BUT I WOULD WANT THAT COMMITMENT FROM THE GOVERNMENT

08:35AM 20   BEFORE TALKING ABOUT THE CONTENT OF THE DEFENSE CASE.

08:35AM 21       THE COURT:  ALL RIGHT.  THANK YOU.

08:35AM 22       I'M JUST CURIOUS, THERE WERE A COUPLE OF ISSUES THAT

08:35AM 23   MR. SCHENK RAISED, AND ONE OF THEM WAS THE TIMING OF THESE,

08:35AM 24   WHATEVER IT IS THAT YOUR TEAM GAVE TO THE GOVERNMENT, AND THAT

08:35AM 25   CAUSES ME SOME CONCERN ABOUT THE OPPORTUNITY FOR THE GOVERNMENT

08:35AM 1   TO PREPARE IF THIS WITNESS DOES TESTIFY TODAY.  AND THAT MIGHT

08:35AM 2   SUGGEST THAT THE COURT WOULD -- IF THE WITNESS DOES TESTIFY

08:35AM 3   ULTIMATELY, OR IS PERMITTED TO TESTIFY, THAT THE COURT WOULD

08:35AM 4   GIVE, UPON REQUEST BY THE GOVERNMENT, AN OPPORTUNITY TO REVIEW

08:35AM 5   THE DOCUMENTS THAT YOUR TEAM PROVIDES.

08:35AM 6        MS. SAHARIA:  SURE.  I'LL LET MS. TREFZ SPEAK AS TO

08:35AM 7   PARTICULAR EXHIBITS.

08:35AM 8        BUT AS TO THE CLIPS, I WOULD JUST NOTE THEY'RE NOT AUDIO

08:35AM 9   CLIPS, IT'S JUST VIDEO.  THERE IS NOT GOING TO BE ANY AUDIO

08:35AM 10  PLAYED WITH THOSE CLIPS, SO THEREFORE, THERE ARE NO RULE 106

08:36AM 11  ISSUES.  RULE 106 APPLIES TO STATEMENTS AND THERE ARE NO

08:36AM 12  STATEMENTS THAT ACCOMPANY THOSE CLIPS.

08:36AM 13       THE COURT:  ALL RIGHT.

08:36AM 14       MR. SCHENK, DO YOU WANT TO WAIT FOR THE DISCUSSION, OR DO

08:36AM 15  YOU WANT TO MAKE A COMMITMENT NOW AT MS. SAHARIA'S SUGGESTION?

08:36AM 16  OR WHAT ARE YOUR THOUGHTS?

08:36AM 17       MR. SCHENK:  YOUR HONOR, TWO THOUGHTS IN RESPONSE TO

08:36AM 18  THAT.

08:36AM 19       FIRST, I WOULD BE HAPPY TO COMMIT TO NOT AFFECTING OR

08:36AM 20  CHANGING THE GOVERNMENT'S CASE BASED ON STATEMENTS MADE THIS

08:36AM 21  MORNING.

08:36AM 22       I WILL NOTE, THOUGH, THAT THE DEFENSE HAS BEEN PUTTING ON

08:36AM 23  ITS CASE SINCE THE CROSS-EXAMINATION OF THE GOVERNMENT'S FIRST

08:36AM 24  WITNESS THE FIRST TIME MS. SPIVEY TESTIFIED.

08:36AM 25       I HAVEN'T DONE THE CALCULATION IN A COUPLE OF DAYS, BUT I

08:36AM 1    THINK THAT THE DEFENSE HAS HAD ABOUT 65 HOURS OF TRIAL

08:36AM 2    TRANSCRIPT TIME THROUGHOUT THE TRIAL, AND THE GOVERNMENT HAS

08:36AM 3    HAD ABOUT 53 HOURS.  THEY HAVE GONE WELL BEYOND THE SCOPE OF

08:36AM 4    THE DIRECT MANY TIMES AND THE COURT HAS ALLOWED THAT.

08:36AM 5        BUT THE DEFENSE CASE HAS BEGUN.  AND TO SUGGEST THAT THE

08:36AM 6    DEFENSE IS NOW GOING TO START PUTTING ON WITNESSES I THINK IS

08:36AM 7    DIFFERENT THAN WHAT THE RECORD SHOWS.

08:36AM 8        BUT I'M HAPPY TO AGREE TO NOT CHANGE THE GOVERNMENT'S CASE

08:37AM 9    BASED UPON ARGUMENT THIS MORNING.

08:37AM 10           THE COURT:  ALL RIGHT.  WELL, THANK YOU.

08:37AM 11       MS. SAHARIA, YOU HAVE THAT ASSURANCE.

08:37AM 12           MS. SAHARIA:  GREAT.

08:37AM 13           THE COURT:  WHAT WOULD YOU LIKE ME TO KNOW?

08:37AM 14           MS. SAHARIA:  GREAT.

08:37AM 15       WELL, LET ME DISCUSS THE RELEVANCE OF DR. BONANNI'S

08:37AM 16   TESTIMONY AND, MORE GENERALLY, EVENTS OCCURRING IN 2016 AND

08:37AM 17   LATER.

08:37AM 18       JUST FOR THE COURT'S BACKGROUND, DR. BONANNI WAS A BOARD

08:37AM 19   MEMBER AT THERANOS.  HE JOINED THE BOARD IN MAY 2016 AND HE

08:37AM 20   STAYED UNTIL THE END OF THE COMPANY IN 2018.  HE HELPED GUIDE

08:37AM 21   THE COMPANY AND MS. HOLMES THROUGH THE BUSINESS CHALLENGES THAT

08:37AM 22   THEY WERE FACING AT THE TIME.

08:37AM 23       HE OVERLAPPED ON THE BOARD WITH THE ONLY DIRECTOR THE

08:37AM 24   GOVERNMENT HAS CALLED IN THIS CASE, WHICH WAS GENERAL MATTIS.

08:37AM 25   THEY SERVED ON THE BOARD TOGETHER AT THE SAME TIME.

08:37AM 1     AND HE SERVED ON THE BOARD AT THE TIME THAT THE GOVERNMENT

08:37AM 2     ALLEGES AT LEAST ONE OF THE CONSPIRACIES TOOK PLACE.  THE

08:37AM 3     GOVERNMENT'S ALLEGATIONS AND THE INDICTMENT IN PARAGRAPH 22 IS

08:37AM 4     THAT THE PATIENT FOCUSSED CONSPIRACY LASTED THROUGH 2016 AT A

08:38AM 5     TIME WHEN DR. BONANNI WAS ON THE BOARD.

08:38AM 6          THAT'S JUST BACKGROUND ON WHO HE IS.

08:38AM 7          THE GOVERNMENT HAS AT TIMES SUGGESTED THROUGHOUT THIS CASE

08:38AM 8     THAT EVENTS IN 2016 ARE NOT RELEVANT.  AS I'M GOING TO SHOW THE

08:38AM 9     COURT, THAT IS NOT A CONSISTENT POSITION THAT THEY HAVE TAKEN.

08:38AM 10    THEY HAVE THEMSELVES INJECTED THOSE EVENTS INTO THE CASE

08:38AM 11    THEMSELVES.

08:38AM 12         WE HAVE SOUGHT TO WORK AROUND THAT IN THEIR CASE AS -- IN

08:38AM 13    ORDER TO MOVE THE CASE ALONG, BUT AS WE'RE NOW ENTERING THE

08:38AM 14    DEFENSE CASE, IT IS CRITICAL THAT WE ARE PERMITTED TO PRESENT

08:38AM 15    WHAT WE VIEW AS CRITICAL DEFENSE EVIDENCE RELEVANT TO THE

08:38AM 16    CAPACITY OF THERANOS'S TECHNOLOGY AND RELEVANT TO MS. HOLMES'S

08:38AM 17    INTENT, AND THAT DIRECTLY REBUTS EVIDENCE THE GOVERNMENT

08:38AM 18    ELICITED IN ITS CASE.

08:38AM 19         LET ME START WITH HOW DR. BONANNI'S TESTIMONY WILL BE

08:38AM 20    RELEVANT TO THE CAPABILITIES OF THERANOS'S TECHNOLOGY.  THIS IS

08:38AM 21    AN ALLEGATION IN PARAGRAPH 12(A) OF THE INDICTMENT.  THAT

08:39AM 22    PARAGRAPH ALLEGES THAT MS. HOLMES KNOWINGLY MADE FALSE

08:39AM 23    STATEMENTS CONCERNING THE CAPABILITIES OF THERANOS'S

08:39AM 24    PROPRIETARY ANALYZER, THE TSPU, EDISON, OR MINILAB.

08:39AM 25         DR. BONANNI WE EXPECT WILL TESTIFY ABOUT THE CAPABILITIES

OF THE MINILAB.

THE GOVERNMENT ALSO PUT THIS AT ISSUE IN ITS OPENING

STATEMENT.  THIS IS AT PAGE 539 OF THE TRANSCRIPT.

"THE DEFENDANT DECEIVED INVESTORS ABOUT THE CAPABILITIES

AND READINESS OF THE THERANOS MINIATURE BLOOD ANALYZER.

THERANOS'S BLOOD ANALYZER WENT BY MANY NAMES, EDISON 3.5, 4.0,

4S MINILAB, AND THERANOS SAMPLE PROCESSING UNIT."

DURING THE ENTIRETY OF THE CONSPIRACY PERIOD IN THIS CASE,

THE MINILAB IS THE PRODUCT THAT THE COMPANY WAS WORKING ON.  IT

IS THE DEVICE THAT ROGER PARLOFF DESCRIBED YESTERDAY SEEING IN

THE BOIES SCHILLER OFFICES AND HAD HIS BLOOD TESTED ON.  IT IS

THE TECHNOLOGY THAT THERANOS OBTAINED AN FDA APPROVAL FOR IN

2015.  THAT EVIDENCE CAME INTO THE RECORD THROUGH MR. EDLIN.

IT IS THE SAME FUNDAMENTAL TECHNOLOGY THAT MS. HOLMES WAS

DESCRIBING TO INVESTORS DURING THE ALLEGED CONSPIRACY.

NOW, THE GOVERNMENT OFTEN MERGES THESE VARIOUS FORMS OF

TECHNOLOGY, AS THEY DID IN THAT PORTION OF THE OPENING

STATEMENT THAT I JUST READ.

SO WHEN MS. HOLMES IS DESCRIBING THERANOS TECHNOLOGY TO

INVESTORS AND THE CAPACITY OF THAT TECHNOLOGY, THE GOVERNMENT

WANTS TO LINK THAT TO THE EDISON DEVICE THAT WAS OPERATING IN

THE CLIA LAB WHICH, AS WE BY NOW KNOW, OPERATED A SMALL NUMBER

OF TESTS.

BUT, IN FACT, THE MINILAB TECHNOLOGY THAT THERANOS WAS

WORKING ON THROUGHOUT THE ENTIRE CONSPIRACY PERIOD HAD A MUCH

08:40AM  1     GREATER CAPACITY.

08:40AM  2          DR. BONANNI IS FAMILIAR WITH THAT CAPACITY.  HE'S FAMILIAR

08:41AM  3     WITH THE MINILAB.  AND HE WILL COME IN AND TESTIFY ABOUT THE

08:41AM  4     CAPACITY OF THE MINILAB.

08:41AM  5          THE GOVERNMENT INVITED THIS TESTIMONY ITSELF DURING AN

08:41AM  6     ARGUMENT ABOUT THE ADMISSIBILITY OF MS. HOLMES'S STATEMENTS IN

08:41AM  7     2016 AT THE AAC CONFERENCE.  YOU PROBABLY REMEMBER THERE WAS A

08:41AM  8     LOT OF DISCUSSION ABOUT WHETHER WE COULD PRESENT HER ORAL

08:41AM  9     STATEMENTS AT THAT CONFERENCE, AND THE GOVERNMENT OBJECTED ON

08:41AM  10    THE GROUND THAT IT WAS HEARSAY AT TRANSCRIPT 4591.

08:41AM  11         "WE CERTAINLY OBJECT TO WHOLESALE STATEMENTS BY THE

08:41AM  12    DEFENDANT UNSWORN ABOUT WHAT HER TECHNOLOGY CAN DO.  IF SHE

08:41AM  13    WANTS TO STAND BY THOSE STATEMENTS, SHE SHOULD TAKE THE STAND

08:41AM  14    AND SAY IT UNDER OATH SUBJECT TO CROSS-EXAMINATION."

08:41AM  15         WE ARE BRINGING A WITNESS WHO WILL BE SUBJECT TO OATH,

08:41AM  16    SUBJECT TO CROSS-EXAMINATION TO DESCRIBE WHAT THAT TECHNOLOGY

08:41AM  17    CAN DO.

08:41AM  18         AND, AGAIN, THE TECHNOLOGY THAT DR. BONANNI WILL DESCRIBE

08:41AM  19    THAT HE BECAME FAMILIAR WITH IS THE SAME FUNDAMENTAL TECHNOLOGY

08:41AM  20    THAT THERANOS WAS WORKING ON THROUGHOUT THE CONSPIRACY PERIOD

08:42AM  21    AND THAT MS. HOLMES WAS DESCRIBING TO INVESTORS.

08:42AM  22              THE COURT:  WILL HE TESTIFY TO THAT, THE LAST POINT

08:42AM  23    THAT YOU JUST MADE?  DOES HE HAVE KNOWLEDGE OF THAT?

08:42AM  24              MS. SAHARIA:  I DON'T KNOW IF HE HIMSELF HAS

08:42AM  25    KNOWLEDGE OF THAT, BUT WE EXPECT THE DEFENSE CASE WILL

08:42AM 1    ESTABLISH THAT FACT.

08:42AM 2         NOW, THE GOVERNMENT --

08:42AM 3              THE COURT:  PARDON ME.  IS IT PREMATURE FOR HIM TO

08:42AM 4    TESTIFY ABOUT THAT IF IT'S OUTSIDE OF HIS KNOWLEDGE?

08:42AM 5              MS. SAHARIA:  WELL, I DON'T BELIEVE SO, BECAUSE THE

08:42AM 6    GOVERNMENT ITSELF HAS PUT AT ISSUE THE CAPABILITY OF THE

08:42AM 7    MINILAB TECHNOLOGY IN 2016 IN ITS OWN CASE-IN-CHIEF.  IT DID

08:42AM 8    THAT THROUGH MR. EDLIN, AND IT DID THAT THROUGH SECRETARY

08:42AM 9    MATTIS.

08:42AM 10             THE COURT:  BUT THIS WITNESS WILL, YOU'RE SAYING HE

08:42AM 11   HAS THAT KNOWLEDGE AND HE WILL TESTIFY ABOUT HIS KNOWLEDGE OF

08:42AM 12   THE CAPABILITIES OF MINILAB, NOT EDISON, BUT MINILAB?

08:42AM 13             MS. SAHARIA:  CORRECT.

08:42AM 14             THE COURT:  AND HE WILL TESTIFY ABOUT THAT GIVEN HIS

08:42AM 15   TENURE ON THE BOARD?

08:42AM 16             MS. SAHARIA:  ABSOLUTELY, YOUR HONOR.

08:42AM 17             THE COURT:  OKAY.

08:42AM 18             MS. SAHARIA:  AND LET ME JUST POINT THE COURT TO THE

08:43AM 19   TESTIMONY OF MR. EDLIN AND SECRETARY MATTIS.  THE GOVERNMENT

08:43AM 20   TWICE ASKED MR. EDLIN IN DIRECT EXAMINATION, AND THEN IN

08:43AM 21   REDIRECT, WHY HE LEFT THE COMPANY, AND HE PROVIDED TESTIMONY

08:43AM 22   THAT HE LEFT THE COMPANY BECAUSE HE LOST CONFIDENCE IN THE

08:43AM 23   COMPANY'S REPRESENTATIONS ABOUT THE CAPACITY OF THE TECHNOLOGY.

08:43AM 24        HE LEFT THE COMPANY IN DECEMBER OF 2016.  AND I'LL JUST

08:43AM 25   READ INTO THE RECORD THE SECOND OF THESE COLLOQUIES BECAUSE I

08:43AM 1   THINK IT'S QUITE RELEVANT AT PAGE 3304.  THIS IS ON REDIRECT.

08:43AM 2   THIS WAS THE LAST Q AND A OF THE ENTIRE REDIRECT.

08:43AM 3       "QUESTION:  REMIND US WHEN YOU DECIDED TO LEAVE THERANOS.

08:43AM 4       "ANSWER:  DECEMBER OF 2016.

08:43AM 5       "QUESTION:  AND WHEN YOU MENTIONED THAT PART OF YOUR

08:43AM 6   REASON TO LEAVE WAS ABOUT THE DESIRE TO ATTEND BUSINESS SCHOOL?

08:43AM 7       "ANSWER:  YES.

08:43AM 8       "QUESTION:  AND WERE THERE ALSO THINGS ABOUT THERANOS OR

08:43AM 9   THINGS THAT YOU UNDERSTOOD THAT CAUSED YOU TO NO LONGER WANT TO

08:43AM 10  WORK THERE?

08:43AM 11      "ANSWER.  YES.

08:43AM 12      "QUESTION:  CAN YOU SUMMARIZE THOSE FOR US?

08:43AM 13      "ANSWER:  WELL, IN THE YEAR AFTER THE INITIAL

08:44AM 14  "WALL STREET JOURNAL" ARTICLES CAME OUT, THE COMPANY CLAIMED

08:44AM 15  THAT IT WOULD BE ABLE TO PROVE THAT THE TECHNOLOGY WORKED, AND

08:44AM 16  PROVE THAT THOSE CLAIMS WERE NOT TRUE, AND THAT THE COMPANY WAS

08:44AM 17  UNABLE TO CONVINCE ANYONE THAT THOSE CLAIMS WERE UNTRUE AND

08:44AM 18  THAT ITS TECHNOLOGY AND SCIENCE WORKED, AND THAT GAVE ME

08:44AM 19  SERIOUS DOUBTS AS TO WHETHER THE COMPANY WAS CAPABLE OF PROVING

08:44AM 20  THAT THE TECHNOLOGY WORKED.

08:44AM 21      "AND THERE WERE A NUMBER OF DIFFERENT OPPORTUNITIES THAT

08:44AM 22  THE COMPANY HAD TO PROVE ITSELF, AND THEY WERE ALL UNSUCCESSFUL

08:44AM 23  AND I ULTIMATELY REACHED THE CONCLUSION THAT THOSE ATTEMPTS

08:44AM 24  WERE UNSUCCESSFUL BECAUSE THEY COULDN'T HAPPEN AND THEY WERE

08:44AM 25  NEVER GOING TO HAPPEN."

08:44AM  1       DR. BONANNI WILL REBUT THAT TESTIMONY.  HE WILL, WE

08:44AM  2  EXPECT, SAY THAT HE BELIEVED THE TECHNOLOGY AND SCIENCE WORKED.

08:44AM  3  HE WILL DESCRIBE THE EFFORTS THE COMPANY TOOK TO PROVE ITSELF,

08:44AM  4  AND HE WILL DESCRIBE WHAT HE VIEWED AS THE SUCCESSES IN THOSE

08:44AM  5  EFFORTS TO PROVE ITSELF.

08:44AM  6       THE COURT:  THOSE EFFORTS, WHAT IS THE TIMING OF

08:44AM  7  THOSE EFFORTS THAT HE WILL TESTIFY TO?

08:44AM  8       MS. SAHARIA:  I BELIEVE THEY ARE IN 2016, AND THEN

08:45AM  9  PERHAPS EVEN INTO 2017.  I'M NOT SURE ABOUT THE SPECIFIC TIMING

08:45AM 10  OF THOSE.

08:45AM 11       BUT THESE ARE THE SAME EFFORTS THAT MR. EDLIN WAS SAYING

08:45AM 12  WERE UNSUCCESSFUL AND MR. BONANNI IS GOING TO REBUT THE

08:45AM 13  TESTIMONY FROM MR. EDLIN.

08:45AM 14       THE COURT:  WELL, FIRST OF ALL, MR. EDLIN DIDN'T

08:45AM 15  TALK ABOUT 2017.

08:45AM 16       MS. SAHARIA:  THAT'S CORRECT.  HE WENT THROUGH THE

08:45AM 17  END OF DECEMBER OF 2016.

08:45AM 18       THE COURT:  RIGHT.  SO THERE SHOULD BE A LIMITATION

08:45AM 19  AS TO THE REBUTTAL.

08:45AM 20       MS. SAHARIA:  WELL, IF ALL HE'S DOING IS REBUTTING,

08:45AM 21  I WOULD -- PERHAPS.

08:45AM 22       BUT WE THINK HIS TESTIMONY MORE BROADLY SPEAKS TO

08:45AM 23  MS. HOLMES'S INTENT, WHICH I'M GOING TO REACH IN A MINUTE, AS

08:45AM 24  WELL AS THE CAPACITY OF THE TECHNOLOGY IN GENERAL.

08:45AM 25       AND WE'RE ALLOWED TO REBUT PARAGRAPH 12(A) OF THE

08:45AM 1    INDICTMENT WITH OUR OWN EVIDENCE, AND HIS TESTIMONY WILL SPEAK

08:45AM 2    TO THAT, TO THAT ALLEGATION.

08:45AM 3            THE COURT:  WHERE -- WHAT IS THE ISSUE AS TO

08:45AM 4    MS. HOLMES'S INTENT?

08:45AM 5            MS. SAHARIA:  SURE.

08:45AM 6            THE COURT:  AND WHAT IS THE INTENT ISSUE?

08:46AM 7            MS. SAHARIA:  WELL, SO THE INTENT ISSUE IS THAT THE

08:46AM 8    GOVERNMENT HAS, AGAIN, PUT INTO EVIDENCE THROUGH A SERIES OF

08:46AM 9    WITNESSES EVIDENCE INTENDING TO SUGGEST THAT MS. HOLMES'S

08:46AM 10   EFFORTS TO ADDRESS CONCERNS AFTER THOSE CONCERNS WERE RAISED

08:46AM 11   WERE NOT GENUINE.

08:46AM 12       THE GOVERNMENT HAS ARGUED THAT THOSE -- AND I'LL SPEAK TO

08:46AM 13   THOSE -- THAT THOSE ARE EVIDENCE OF CONSCIOUSNESS OF GUILT.

08:46AM 14   THEY HAVE SPECIFICALLY ARGUED THAT THE LACK OF GENUINENESS IS

08:46AM 15   EVIDENCE THAT SHE DID NOT BELIEVE THAT THE TECHNOLOGY WORKED,

08:46AM 16   AND THAT IT GOES TO HER STATE OF MIND.

08:46AM 17       AND LET ME JUST GIVE THE COURT THREE EXAMPLES.

08:46AM 18       FIRST OF ALL, GENERAL MATTIS.  THE GOVERNMENT ELICITED

08:46AM 19   TESTIMONY FROM GENERAL MATTIS -- THIS IS AT 1593 OF THE

08:46AM 20   TRANSCRIPT -- THAT HE AND OTHER MEMBERS OF THE BOARD

08:46AM 21   RECOMMENDED THAT THE COMPANY ENGAGED IN COMPARATIVE TESTING OR

08:46AM 22   BLIND TESTING OF THE DEVICES, AND THAT THAT DIDN'T HAPPEN.

08:47AM 23       THIS IS AN ALLEGATION IN THE GOVERNMENT'S 404(B) NOTICE

08:47AM 24   THAT THEY SERVED ON US A LONG TIME AGO WHERE THEY ARGUE THAT

08:47AM 25   THAT IS EVIDENCE OF CONSCIOUSNESS OF GUILT.

08:47AM 1    DR. BONANNI, WHO SERVED ON THE BOARD AT THE SAME TIME AS

08:47AM 2    GENERAL MATTIS, WILL REBUT THAT TESTIMONY.  WE EXPECT HIM TO

08:47AM 3    DESCRIBE TO THE COMPANY -- TO DESCRIBE TO THE JURY THE

08:47AM 4    DIFFERENT OPTIONS AVAILABLE TO THERANOS FOLLOWING "THE

08:47AM 5    WALL STREET JOURNAL" ARTICLE, THE PROS AND CONS OF THOSE

08:47AM 6    APPROACHES, WHAT HE RECOMMENDED TO THE COMPANY, WHY HE

08:47AM 7    RECOMMENDED THAT THE COMPANY PURSUE FDA APPROVAL AS OPPOSED TO

08:47AM 8    THE COMPARATIVE TESTING THAT GENERAL MATTIS WAS SUGGESTING, AND

08:47AM 9    WHY THE COMPANY ULTIMATELY AGREED WITH DR. BONANNI'S APPROACH

08:47AM 10   AND NOT WITH GENERAL MATTIS'S APPROACH.

08:47AM 11       SO THAT TESTIMONY DIRECTLY REBUTS THE SUGGESTION FROM THE

08:47AM 12   GOVERNMENT THAT THE LACK OF ENGAGEMENT AND COMPARATIVE TESTING

08:47AM 13   SOMEHOW SHOWS CONSCIOUSNESS OF GUILT.

08:47AM 14       DR. DAS.

08:48AM 15       THE GOVERNMENT ELICITED TESTIMONY FROM DR. DAS AT 5824 AND

08:48AM 16   5834 ABOUT SUPPOSED PUSH BACK FROM MS. HOLMES THAT HE RECEIVED

08:48AM 17   WHEN HE RAISED ISSUES IN THE CLINICAL LAB.

08:48AM 18       AND WHEN WE HAD ARGUMENT ABOUT THAT AND ARGUMENT ABOUT THE

08:48AM 19   VOIDING ISSUE IN PARTICULAR, THE GOVERNMENT ARGUED, THIS IS A

08:48AM 20   QUOTE, DR. DAS WILL SAY THAT WHEN HE TOLD MS. HOLMES WE NEED TO

08:48AM 21   VOID THE TESTS, HE GOT PUSH BACK.  SHE DID NOT WANT TO DO THAT.

08:48AM 22   SHE CAME UP WITH ALTERNATIVE REASONS FOR IT, AND THAT PUSH BACK

08:48AM 23   IS CONSCIOUSNESS OF GUILT.  IT GOES TO HER STATE OF MIND ABOUT

08:48AM 24   THERANOS'S TECHNOLOGY."  THAT'S AT 5589 AND -90.

08:48AM 25       AND THEN ON THE NEXT PAGE AGAIN THE GOVERNMENT SAYS, "THE

08:48AM 1    WHOLE TRUTH HERE IS THEY CAME UP WITH AN EXPLANATION FOR WHY

08:48AM 2    THEY WERE VOIDING THE TESTS, THEY MINIMIZED THOSE ISSUES TO

08:48AM 3    THEIR INVESTORS, AND WHEN SHE'S GOING TO ACC AND THESE OTHER

08:48AM 4    THINGS, IT'S A PR SPIN, NOT GENUINE INDICATION OF CONFIDENCE IN

08:49AM 5    HER TECHNOLOGY.  IT GOES RIGHT TO HER STATE OF MIND."  THAT'S

08:49AM 6    AT 5590.

08:49AM 7        AND THEN WE HEARD FROM LISA PETERSON THE SAME TYPE OF

08:49AM 8    EVIDENCE, THAT SHE BELIEVED THAT MS. HOLMES WAS NOT BEING

08:49AM 9    FORTHCOMING, THAT SHE WAS DOWNPLAYING THE ISSUES THAT WERE

08:49AM 10   OCCURRING IN THE PRESS THAT SUGGESTED THAT MS. HOLMES WAS NOT

08:49AM 11   TAKING THESE ISSUES SERIOUSLY, AGAIN, AS EVIDENCE OF

08:49AM 12   CONSCIOUSNESS OF GUILT.

08:49AM 13       DR. BONANNI WILL REBUT ALL OF THIS TESTIMONY.  HE WILL

08:49AM 14   SPEAK TO MS. HOLMES'S STATE OF MIND IN, IN SEEKING PROACTIVELY

08:49AM 15   TO CORRECT ISSUES IN THE COMPANY.  HE WILL TESTIFY TO HER

08:49AM 16   ACTIONS IN 2016 AND BRINGING OUTSIDERS INTO THE COMPANY TO

08:49AM 17   EXAMINE THE TECHNOLOGY, NEW DIRECTORS, LIKE HIMSELF, WITH

08:49AM 18   RELEVANT EXPERTISE IN THE AREA OF MEDICAL TECHNOLOGY, MEMBERS

08:49AM 19   OF THE SCIENTIFIC AND MEDICAL ADVISORY BOARD, AND MEMBERS OF

08:50AM 20   THE TECHNOLOGY ADVISORY BOARD.

08:50AM 21       HE WAS TESTIFY TO HER EFFORTS TO OBTAIN FDA APPROVAL FOR

08:50AM 22   THE MINILAB TECHNOLOGY DURING THIS TIME, TO PRESENT THAT

08:50AM 23   TECHNOLOGY TO THE FDA FOR REVIEW.

08:50AM 24       HE, WE EXPECT, WILL BE TESTIFYING TO HER WILLINGNESS TO

08:50AM 25   EXPOSE THE TECHNOLOGY TO INDUSTRY SCRUTINY AT THE AAC

08:50AM 1    CONFERENCE.

08:50AM 2         AND HE WILL TESTIFY THAT SHE BELIEVED IN THE TECHNOLOGY

08:50AM 3    UNTIL THE VERY END.

08:50AM 4              THE COURT:  AND SO, MS. SAHARIA, LET ME ASK YOU, HOW

08:50AM 5    WILL HE TESTIFY AS TO THOSE ISSUES?  IS HE GOING TO SAY

08:50AM 6    "ELIZABETH HOLMES TOLD ME X"?  IS THAT THE PROPOSED TESTIMONY?

08:50AM 7              MS. SAHARIA:  NO.  HE HAS PERSONAL KNOWLEDGE OF ALL

08:50AM 8    OF THOSE ACTIONS.

08:50AM 9              THE COURT:  WELL, HE COULD -- IF SHE SAID THAT TO

08:50AM 10   HIM, THAT'S PERSONAL KNOWLEDGE.

08:50AM 11        SO I'M JUST TRYING TO DETERMINE WHAT, WHAT IS THE NATURE

08:50AM 12   OF THAT?  WILL HE BE TALKING ABOUT HIS OBSERVATIONS?

08:50AM 13             MS. SAHARIA:  OF COURSE, YOUR HONOR.  HE WAS THERE

08:50AM 14   AT THE COMPANY ADVISING MS. HOLMES, INTERACTING WITH OTHER,

08:50AM 15   OTHER MEMBERS OF THE COMPANY.

08:51AM 16        HE HAS PERSONAL KNOWLEDGE NOT JUST BECAUSE SHE TOLD HIM.

08:51AM 17   HE HAS PERSONAL KNOWLEDGE FROM HIS OWN ACTIONS AT THE COMPANY.

08:51AM 18             THE COURT:  DO YOU SEE WHAT I'M PROBING AS TO

08:51AM 19   WHETHER OR NOT THERE'S GOING TO BE HEARSAY OBJECTIONS AS TO

08:51AM 20   WHAT SHE TOLD HIM?

08:51AM 21             MS. SAHARIA:  THE GOVERNMENT, IN MY VIEW, HAS AN

08:51AM 22   OVERLY BROAD VIEW OF HEARSAY, SO WE MAY VERY WELL MAY HAVE

08:51AM 23   OBJECTIONS.  BUT I THINK THAT'S AN ISSUE TO TAKE UP ON A

08:51AM 24   QUESTION BY QUESTION BASIS.

08:51AM 25        RIGHT NOW WE'RE JUST HERE TALKING ABOUT RELEVANCE, AND HE

08:51AM 1    DOES HAVE PERSONAL KNOWLEDGE OF THESE ISSUES.

08:51AM 2           THE COURT:  NO, THAT'S RIGHT.  JUST BECAUSE THE

08:51AM 3    JUDGE TYPICALLY GETS TO MANAGE THE COURSE OF EVIDENCE.

08:51AM 4           MS. SAHARIA:  UNDERSTOOD.

08:51AM 5           THE COURT:  AND WE HAVE LIMITED DAYS AVAILABLE TO US

08:51AM 6    AS THE HOLIDAYS LOOM, I'M TRYING TO DETERMINE HOW MUCH TIME WE

08:51AM 7    NEED TO SET ASIDE FOR ANY PROPOSED TESTIMONY AND ANTICIPATE

08:51AM 8    WHETHER OR NOT THERE'S GOING TO BE LENGTHY DISCUSSION ABOUT

08:51AM 9    ADMISSIBILITY ISSUES.

08:51AM 10          MS. SAHARIA:  I WOULD HOPE NOT, YOUR HONOR.

08:51AM 11          THE COURT:  THAT'S WHY I'M ASKING THE QUESTION.  BUT

08:51AM 12   HOPE SPRINGS ETERNAL, DOESN'T IT?  AND WE'VE LEARNED THAT.

08:51AM 13      SO TO THE EXTENT THAT WE CAN RESOLVE THOSE ISSUES IN

08:52AM 14   ADVANCE, I WOULD BE GRATEFUL.  I KNOW THE JURY WOULD BE

08:52AM 15   GRATEFUL.

08:52AM 16          MS. SAHARIA:  UNDERSTOOD, YOUR HONOR.

08:52AM 17          THE COURT:  THAT ALSO POINTS TO -- PARDON ME FOR

08:52AM 18   INTERRUPTING YOU.  BUT THAT ALSO POINTS TO RESOLVING ANY

08:52AM 19   EVIDENTIARY ISSUES IN ADVANCE, LIKE WE'RE DOING NOW IN THE

08:52AM 20   MORNING, INCLUDING, FROM THE GOVERNMENT'S PERSPECTIVE, LATE

08:52AM 21   DISCLOSURES WHICH CAUSES DELAY AS WE KNOW.

08:52AM 22      I'M NOT BEING CRITICAL HERE.  I'M POINTING OUT WHAT HAS

08:52AM 23   BEEN BROUGHT TO MY ATTENTION THIS MORNING.

08:52AM 24          MS. SAHARIA:  I THINK ALL PARTIES HAVE OPERATED IN

08:52AM 25   GOOD FAITH DURING TRIAL.  I KNOW WE HAVE RECEIVED NEW EXHIBITS

08:52AM 1    FROM THE GOVERNMENT LATE THE NIGHT BEFORE.  IT'S A FACT OF

08:52AM 2    TRIAL, YOUR HONOR.

08:52AM 3              THE COURT:  IT'S A PHENOMENON OF TRIALS, THAT'S

08:52AM 4    RIGHT.

08:52AM 5              MS. SAHARIA:  YES, IT IS.

08:52AM 6              THE COURT:  I RECOGNIZE THAT.

08:52AM 7              MS. SAHARIA:  LET ME JUST, IF I MAY MAKE CLEAR, YOUR

08:52AM 8    HONOR, IRRESPECTIVE OF THE FACT THAT WE THINK THE GOVERNMENT

08:52AM 9    HAS PUT INTO ISSUE HER STATE OF MIND IN 2016, DR. BONANNI WE

08:52AM 10   EXPECT WILL TESTIFY TO ACTIONS OF SOMEONE THAT, THAT GENUINELY

08:52AM 11   BELIEVES IN THE CAPABILITIES OF HER TECHNOLOGY.

08:53AM 12        IF MS. HOLMES DID NOT BELIEVE IN THE CAPABILITY OF THE

08:53AM 13   MINILAB, OF THERANOS'S TECHNOLOGY, OUR ARGUMENT IS THAT SHE

08:53AM 14   WOULD NOT HAVE BROUGHT IN INDUSTRY EXPERTS TO SCRUTINIZE THAT

08:53AM 15   TECHNOLOGY.  SHE WOULD NOT HAVE EXPOSED IT TO INDUSTRY PUBLICLY

08:53AM 16   AT A CONFERENCE.  SHE WOULD NOT HAVE CONTINUED ENGAGING WITH

08:53AM 17   THE FDA TO OBTAIN FDA APPROVAL FOR THAT TECHNOLOGY.

08:53AM 18        THAT IS A CORE ELEMENT OF OUR DEFENSE.  IT GOES DIRECTLY

08:53AM 19   TO HER STATE OF MIND, AND IMPOSING SOME SORT OF ARBITRARY TIME

08:53AM 20   LIMIT ON DEFENSE EVIDENCE, INCLUDING MR. BONANNI, WOULD DEPRIVE

08:53AM 21   US OF OUR CONSTITUTIONAL RIGHT TO PRESENT THE DEFENSE OF OUR

08:53AM 22   CHOOSING.

08:53AM 23              THE COURT:  ALL RIGHT.  THANK YOU.

08:53AM 24              MR. SCHENK:  A FEW RESPONSES.

08:53AM 25         FIRST, YOUR HONOR, THE DEFENSE HAS SUGGESTED TO THE COURT

08:53AM 1   THAT THEY ANTICIPATE DR. BONANNI TO TESTIFY IN CERTAIN WAYS.  I

08:53AM 2   FIND THAT SURPRISING.  WE HAVE NOT RECEIVED ANY JENCKS

08:53AM 3   STATEMENTS REGARDING WHAT DR. BONANNI WOULD TESTIFY TO.

08:53AM 4        MY UNDERSTANDING IS THAT THEY HAVEN'T MET WITH HIM AND

08:54AM 5   ASKED HIM THESE QUESTIONS.  OTHERWISE I'M SURE WE WOULD HAVE

08:54AM 6   RECEIVED THOSE STATEMENTS.

08:54AM 7        SO I'M SURPRISED TO HEAR THAT THEY HAVE A VIEW ON WHAT HIS

08:54AM 8   TESTIMONY WOULD BE.

08:54AM 9        SECOND, MS. SAHARIA STARTED HER ARGUMENT BY SAYING TO THE

08:54AM 10  COURT THAT THE PATIENT CONSPIRACY WENT INTO 2016, AND THEN SHE

08:54AM 11  PIVOTED TO TELLING THE COURT REPRESENTATIONS THAT MS. HOLMES

08:54AM 12  MADE TO INVESTORS ARE WHAT MAKES DR. BONANNI'S TESTIMONY

08:54AM 13  RELEVANT.

08:54AM 14       THE GOVERNMENT ALLEGED THAT THE INVESTOR CONSPIRACY ENDED

08:54AM 15  IN 2015.  MS. HOLMES'S LULLING STATEMENTS AFTER THE FACT ARE

08:54AM 16  RELEVANT AND THE GOVERNMENT HAS ALWAYS BEEN CONSISTENT WITH THE

08:54AM 17  COURT ON THAT POSITION.

08:54AM 18       BUT TO SUGGEST THAT THE PATIENT CONSPIRACY WENT INTO 2016

08:54AM 19  AND DR. BONANNI SHOULD NOW BE ALLOWED TO TESTIFY BECAUSE HE CAN

08:54AM 20  PROVIDE USEFUL INSIGHT INTO WHAT MS. HOLMES'S INTENT WAS FOR

08:54AM 21  THE INVESTOR SCHEME FOR STATEMENTS MADE TO INVESTORS IN 2013 OR

08:54AM 22  2014 DOES NOT CONNECT.  AND I THINK WE NOW SEE WHY THE COURT

08:55AM 23  CAN EXCLUDE THIS TESTIMONY.

08:55AM 24       ONE FINAL POINT.  THE REPRESENTATIONS REGARDING THE

08:55AM 25  RELEVANCE OF DR. BONANNI'S TESTIMONY, INCLUDING STATEMENTS SUCH

08:55AM 1 AS THERE WAS A DISPUTE AT THERANOS ABOUT WHETHER YOU SHOULD,

08:55AM 2 ACCORDING TO GENERAL MATTIS, SEEK COMPARATIVE TESTING.

08:55AM 3 DR. BONANNI'S PREFERENCE WAS FDA.

08:55AM 4 I'M NOT SURE HOW DR. BONANNI GETTING ON THE STAND AND

08:55AM 5 SAYING, "MY PREFERENCE WAS TO PURSUE THE FDA PATH" SAYS

08:55AM 6 ANYTHING ABOUT MS. HOLMES'S STATE OF MIND.

08:55AM 7 AGAIN, DR. BONANNI'S STATEMENTS, IF THE COURT ALLOWED THEM

08:55AM 8 IN, WON'T SPEAK TO WHAT WAS IN MS. HOLMES'S MIND VIS-A-VIS

08:55AM 9 PREFERENCES, WHAT SHE WANTED TO DO VERSUS AN AVENUE OF FUTURE

08:55AM 10 PURSUANT FOR THERANOS THAT SHE DIDN'T WANT TO DO.

08:55AM 11 THEY'RE GOING TO CALL SOMEONE WHO CAME ON TO THE SCENE

08:55AM 12 AFTER THE CRIME HAD BEEN COMMITTED TO SAY WHAT THE LANDSCAPE

08:55AM 13 LOOKED LIKE AT THAT TIME.

08:55AM 14 HE WON'T HAVE ANYTHING RELEVANT TO SAY ABOUT THE INVESTOR

08:55AM 15 SIDE, WHICH, AGAIN, IS WHAT HE REALLY DOES SPEAK TO, EVEN TO

08:56AM 16 THE EXTENT THAT THE DEFENSE PROFFERS IT. IT'S INVESTOR SIDE

08:56AM 17 TESTIMONY, IT'S NOT PATIENT SIDE TESTIMONY.

08:56AM 18 AND AS MS. SAHARIA JUST CORRECTLY POINTED OUT TO THE

08:56AM 19 COURT, IT'S THE PATIENT SIDE CONSPIRACY THAT GOES INTO 2016.

08:56AM 20 THAT'S WHY I STARTED MY ARGUMENT THIS MORNING WITH YOUR HONOR

08:56AM 21 FOCUSSING ON DR. DAS, WHO DESCRIBED THE VOIDING OF THE TESTS OF

08:56AM 22 THERANOS IN THE MARCH TIMEFRAME OF 2016.

08:56AM 23 MS. SAHARIA: JUST I THINK THREE POINTS,

08:56AM 24 YOUR HONOR -- FOUR POINTS.

08:56AM 25 WE HAVE COMPLIED WITH OUR JENCKS OBLIGATION. WE HAVE NO

08:56AM 1   WRITTEN STATEMENTS FROM MR. BONANNI TO PRODUCE OTHER THAN WHAT

08:56AM 2   WE HAVE PRODUCED TO THE GOVERNMENT.  I DON'T KNOW WHAT ELSE TO

08:56AM 3   SAY.  WE'RE IN COMPLIANCE WITH OUR JENCKS OBLIGATION.

08:56AM 4       I HEARD MR. SCHENK ARGUE THAT LULLING STATEMENTS THAT

08:56AM 5   OCCURRED IN 2016 ARE RELEVANT.

08:56AM 6       IF THAT'S THE CASE, I DON'T SEE HOW THE GOVERNMENT CAN

08:56AM 7   ARGUE THAT MR. BONANNI CAN'T TESTIFY TO SIMILAR ACTIONS BY

08:56AM 8   MS. HOLMES THAT SHOW THAT SHE WAS NOT INTENDING TO LULL

08:56AM 9   INVESTORS, THAT SHE WAS NOT INTENDING TO DECEIVE THE PUBLIC IN

08:57AM 10  2016, THAT SHE WAS ENGAGED IN GOOD FAITH IN TRYING TO CORRECT

08:57AM 11  ISSUES AT THE COMPANY.

08:57AM 12      WITH RESPECT TO THE ISSUE OF HIS PREFERENCE AS TO WHAT

08:57AM 13  ACTIONS THE COMPANY SHOULD TAKE WITH RESPECT TO FDA APPROVAL

08:57AM 14  VERSUS COMPARATIVE TESTING, THE GOVERNMENT ELICITED FROM

08:57AM 15  GENERAL MATTIS WHAT HIS PREFERENCE WAS, AND THEY WANT TO USE

08:57AM 16  THAT, AS THEY'VE MADE VERY CLEAR IN THEIR 404(B) NOTICE, TO

08:57AM 17  ARGUE TO THE JURY THAT MS. HOLMES HAD THE INTENT TO DECEIVE

08:57AM 18  BECAUSE SHE DIDN'T PUT HER TECHNOLOGY TO COMPARATIVE TESTING

08:57AM 19  AND THAT REFLECTS HER KNOWLEDGE THAT THE TECHNOLOGY WAS NOT

08:57AM 20  CAPABLE OF DOING WHAT SHE HAD SAID.

08:57AM 21      IT'S HIGHLY RELEVANT TO HER STATE OF MIND THAT SHE

08:57AM 22  RECEIVED COMPETING ADVICE FROM ANOTHER MEMBER OF HER BOARD.

08:57AM 23      AND THAT, BY THE WAY, IS THE ADVICE THAT THE COMPANY

08:57AM 24  ULTIMATELY TOOK.  THAT'S, OF COURSE, RELEVANT TO HER STATE OF

08:57AM 25  MIND AND TO REBUTTING THE GOVERNMENT'S THEORY.

08:58AM  1        AND THEN ON THE POINT OF THE INVESTOR CONSPIRACY, AS I

08:58AM  2   SAID, HE WILL TESTIFY TO THE CAPACITY OF THE MINILAB

08:58AM  3   TECHNOLOGY.  IT'S CLEARLY RELEVANT TO THE INVESTOR CONSPIRACY.

08:58AM  4   IT'S ALLEGED IN THE INDICTMENT AT PARAGRAPH 12(A), AND WE'RE

08:58AM  5   ENTITLED TO BRING A WITNESS TO DESCRIBE TO THE JURY WHAT THAT

08:58AM  6   TECHNOLOGY WAS CAPABLE OF DOING.

08:58AM  7        MR. SCHENK:  JUST BRIEFLY ON THE JENCKS ISSUE,

08:58AM  8   YOUR HONOR.

08:58AM  9        IT SOUNDS LIKE THE DEFENSE HAS MET WITH WITNESSES, BUT

08:58AM 10   JUST IS NOT WRITING THINGS DOWN.  I CANNOT IMAGINE THAT THE

08:58AM 11   DEFENSE WOULD HAVE FOUND THAT AN ACCEPTABLE POSITION FOR THE

08:58AM 12   GOVERNMENT TO TAKE IN THIS CASE.  THAT TROUBLES ME.  AND I'M

08:58AM 13   SURPRISED TO HEAR THAT THAT'S AN OKAY POSITION ONE WAY WHEN

08:58AM 14   JENCKS OBLIGATIONS ARE RECIPROCAL.

08:58AM 15        MS. SAHARIA:  JENCKS APPLIES TO WRITTEN STATEMENTS.

08:58AM 16   THE GOVERNMENT HAS BRADY OBLIGATION THAT APPLY TO ORAL

08:58AM 17   STATEMENTS.  SO HE'S COMPARING APPLES TO ORANGES, YOUR HONOR.

08:58AM 18        THE COURT:  WELL, THE COMPARISON REALLY IS ABOUT

08:58AM 19   WHAT THE SEARCH FOR TRUTH IN A TRIAL IS, ISN'T IT?  IT'S

08:59AM 20   RESPONSIBILITY, IT'S ACCURACY, IT'S FAIRNESS.

08:59AM 21        AND SOMETIMES WE GET, IN TRIALS, WE GET INTO THESE ISSUES

08:59AM 22   ABOUT FAIRNESS.  IS IT FAIR FOR ONE SIDE TO INTERVIEW A WITNESS

08:59AM 23   FOR 30 HOURS, BUT YET NOT WRITE ANYTHING DOWN SUCH THAT THEY DO

08:59AM 24   AVOID ANY OBLIGATION THAT THE STATUTE REQUIRES TO PROVIDE

08:59AM 25   WRITTEN -- I SUPPOSE SOMEONE COULD DO THAT.

08:59AM  1        MS. SAHARIA:  I THINK THAT'S DONE ALL THE TIME,

08:59AM  2   YOUR HONOR, TO BE HONEST.

08:59AM  3        THE COURT:  YES, I THINK IT IS.

08:59AM  4        AND IT'S SUPPOSEDLY -- I GUESS WE CAN LOOK AT IT AND SAY,

08:59AM  5   WELL, IT'S NOT IN THE TRUE SPIRIT OF RECIPROCAL DISCOVERY, IS

08:59AM  6   IT?  IT DOESN'T ALLOW WHAT JENCKS AND RECIPROCAL JENCKS SOUGHT

08:59AM  7   TO DO, WHICH IS TO ALLOW EACH SIDE AN OPPORTUNITY TO PREPARE

08:59AM  8   ACCORDINGLY SO THE TRIAL AND THE JURY CAN BE APPROPRIATELY

08:59AM  9   INFORMED.

08:59AM  10       BUT --

08:59AM  11       MS. SAHARIA:  YOUR HONOR, JENCKS REQUIRES PRODUCTION

09:00AM  12   OF WRITTEN STATEMENTS OF A WITNESS.

09:00AM  13       THE COURT:  I'M --

09:00AM  14       MS. SAHARIA:  WE HAVE PRODUCED ANY WRITTEN

09:00AM  15   STATEMENTS WE HAVE FROM MR. BONANNI.

09:00AM  16       THE COURT:  I UNDERSTAND.

09:00AM  17       MS. SAHARIA:  THE GOVERNMENT HAS PROTOCOLS THAT IT,

09:00AM  18   IT --

09:00AM  19       THE COURT:  YOU DON'T HAVE TO --

09:00AM  20       MS. SAHARIA:  OKAY.

09:00AM  21       THE COURT:  PERHAPS YOU'RE RESPONDING TO MY HIGH

09:00AM  22   LEVEL OBSERVATIONS.  WE KNOW WHAT JENCKS SAYS.  YOU HAVE TO

09:00AM  23   GIVE WRITTEN STATEMENTS.

09:00AM  24       AND AS I SAID, SOMETIMES PEOPLE INTERVIEW A WITNESS FOR

09:00AM  25   DAYS AND THEY DON'T TAKE A NOTEPAD, THEY DON'T TAKE A LAPTOP.

09:00AM 1    THEY SOMEHOW AVOID WRITING SOMETHING DOWN SUCH THAT THEY DON'T

09:00AM 2    HAVE AN OBLIGATION.  THAT HAPPENS.  I UNDERSTAND.

09:00AM 3        ALL RIGHT.  WHAT ELSE?

09:00AM 4            MR. SCHENK:  SUBMITTED.  THANK YOU.

09:00AM 5            THE COURT:  WHAT ELSE?

09:00AM 6            MS. SAHARIA:  THAT'S IT.

09:00AM 7            THE COURT:  LET ME ASK YOU, MS. SAHARIA, I'M

09:00AM 8    CONCERNED ABOUT THE TIMING MAYBE, THE INVESTORS AND THE PATIENT

09:00AM 9    DISTINCTION AND WHAT THE WITNESS WOULD TESTIFY ABOUT THAT, AND

09:00AM 10   IF THERE'S A CROSSOVER BLENDING OF THOSE TWO.

09:00AM 11           MS. SAHARIA:  WELL, THERE ABSOLUTELY IS BECAUSE THE

09:01AM 12   INTENT ISSUES THAT HE WILL SPEAK TO WE THINK GO ACROSS THE

09:01AM 13   ENTIRE INDICTMENT.

09:01AM 14       HE WILL SPEAK TO MS. HOLMES'S GOOD FAITH EFFORTS AT THE

09:01AM 15   COMPANY AFTER ISSUES WERE RAISED, WHICH SPEAK TO HER STATE OF

09:01AM 16   MIND BOTH WITH RESPECT TO WHAT SHE BELIEVED ABOUT THE

09:01AM 17   TECHNOLOGY AND THE REPRESENTATIONS THAT SHE WAS MAKING TO

09:01AM 18   INVESTORS, BUT ALSO I THINK SPEAK JUST AS EASILY TO WHAT SHE

09:01AM 19   BELIEVED ABOUT THE CAPACITIES OF THE LABORATORY.

09:01AM 20       AS I SAID, ONE OF THE THINGS THAT HE WILL TALK ABOUT IS

09:01AM 21   THE FACT THAT SHE BROUGHT IN A SCIENTIFIC AND MEDICAL ADVISORY

09:01AM 22   BOARD, AND THOSE PEOPLE WERE PEOPLE WITH EXPERTISE IN

09:01AM 23   LABORATORY SCIENCE AND MEDICINE IN PARTICULAR.

09:01AM 24       AND SO THE FACT THAT SHE BROUGHT THAT -- THOSE PEOPLE IN

09:01AM 25   TO EXAMINE THE WORK OF THE LABORATORY SPEAKS JUST AS HIGHLY TO

09:01AM  1   HER, TO HER INTENT TO FIX ISSUES AFTER THEY CAME TO LIGHT AND

09:01AM  2   HER LACK OF KNOWLEDGE THAT THOSE ISSUES EXISTED BEFORE.

09:01AM  3   OTHERWISE SHE WOULDN'T HAVE BROUGHT IN THESE HIGHLY QUALIFIED

09:01AM  4   PEOPLE, INCLUDING DR. DAS FOR THAT MATTER, TO TURN OVER THOSE

09:02AM  5   ROCKS.

09:02AM  6        SO DR. BONANNI -- MR. BONANNI'S TESTIMONY ON INTENT WILL

09:02AM  7   GO ACROSS THE INDICTMENT TO BOTH THE PATIENT CONSPIRACY AND THE

09:02AM  8   INVESTOR CONSPIRACY.

09:02AM  9           THE COURT:  AND I SUPPOSE YOU'RE SAYING, AND THE

09:02AM 10   GOVERNMENT, JUDGE, COULD ARGUE JUST THE CONTRARY.  THE

09:02AM 11   GOVERNMENT COULD ARGUE ONCE SHE FOUND OUT THAT THE LID WAS OFF

09:02AM 12   AND EVERYTHING WAS IN PUBLIC EYE, SHE SCRAMBLED, SHE DID

09:02AM 13   EVERYTHING SHE COULD TO COVER UP, TO MAKE HERSELF LOOK LIKE IT

09:02AM 14   WAS LEGITIMATE, AND THAT, IN FACT, WOULD BE A JURY QUESTION.

09:02AM 15           MS. SAHARIA:  FOR SURE, YOUR HONOR.

09:02AM 16           THE COURT:  AND THE GOVERNMENT IS PREPARED TO MAKE

09:02AM 17   THAT ARGUMENT, THAT ONCE SOMEBODY IS FOUND OUT TO HAVE DONE

09:02AM 18   WRONG AND THEY'RE IN THE DARK, THEY START TO LIGHT CANDLES.

09:02AM 19           MS. SAHARIA:  THAT'S AN ARGUMENT THAT THEY CAN MAKE

09:02AM 20   TO THE JURY AND WE THINK WE'RE ENTITLED TO MAKE A COMPETING

09:02AM 21   ARGUMENT TO THE JURY, BUT WE NEED THIS EVIDENCE TO MAKE OUR

09:03AM 22   DEFENSE.

09:03AM 23           THE COURT:  LET ME ASK YOU THE QUESTION ABOUT THIS

09:03AM 24   FROM MR. SCHENK'S POSITION.  RECEIPT OF INFORMATION AS LATE AS

09:03AM 25   10:00 P.M. LAST NIGHT, IT SEEMS TO ME THAT IT WOULD ONLY BE

09:03AM  1    FAIR TO ALLOW THE GOVERNMENT SOME TIME TO REVIEW THIS BEFORE

09:03AM  2    THIS WITNESS TESTIFIES.

09:03AM  3            MS. SAHARIA:  YOUR HONOR, I'M GOING TO DEFER THAT TO

09:03AM  4    MS. TREFZ WHO KNOWS WHAT THE PARTICULAR EXHIBITS ARE.  I'M JUST

09:03AM  5    NOT PREPARED TO SPEAK TO THAT ISSUE.

09:03AM  6            THE COURT:  OKAY.  THANK YOU.

09:03AM  7            MS. TREFZ:  GOOD MORNING.

09:03AM  8            THE COURT:  GOOD MORNING.

09:03AM  9            MS. TREFZ:  GOOD MORNING, YOUR HONOR.

09:03AM 10            THE COURT:  SO LET ME ASK YOU THE QUESTION I ASKED

09:03AM 11    YOUR COLLEAGUE.  SHOULD I GIVE THE GOVERNMENT SOME TIME TO

09:03AM 12    REVIEW THESE DOCUMENTS THAT WERE REVEALED AS LATE AS 10:00 P.M.

09:03AM 13    LAST NIGHT?

09:03AM 14            MS. TREFZ:  WE FREQUENTLY RECEIVED DOCUMENTS DURING

09:03AM 15    THE GOVERNMENT'S CASE THAT WERE PROVIDED TO US LATE THE NIGHT

09:03AM 16    BEFORE.

09:03AM 17            THE COURT:  IS THAT A YES OR A NO?  I'M SORRY.

09:03AM 18            MS. TREFZ:  I'M SORRY, YOUR HONOR.

09:03AM 19        IT DEPENDS.  I'M NOT SURE WHICH DOCUMENTS THEY'RE

09:03AM 20    PARTICULARLY CONCERNED ABOUT.  THERE ARE MANY OF THE ISSUES --

09:04AM 21    MANY OF THE ITEMS THAT WE DISCLOSED TO THEM THROUGHOUT THIS FOR

09:04AM 22    DR. BONANNI MAY ONLY BE OFFERED FOR DEMONSTRATIVE PURPOSES AS

09:04AM 23    OPPOSED TO EVIDENCE.

09:04AM 24            THE COURT:  SURE.

09:04AM 25            MS. TREFZ:  SO I'M HAPPY TO DISCUSS IT WITH THEM.  I

09:04AM 1    HAVEN'T YET RECEIVED AN INDICATION OF WHAT THAT IS.

09:04AM 2         THE COURT:  WELL, MY CONCERN IS THAT WHEN THIS

09:04AM 3    HAPPENS, AND I RECOGNIZE -- YOU KNOW, AS MS. SAHARIA POINTS

09:04AM 4    OUT, THIS IS THE PHENOMENON OF TRIALS, THINGS HAPPEN AND IT'S A

09:04AM 5    MOVEABLE FEAST.

09:04AM 6         BUT WHEN WE'RE ON THE EVE OF A POTENTIAL WITNESS'S

09:04AM 7    TESTIMONY -- AND I DON'T KNOW HOW MUCH LONGER MR. CLINE HAS.

09:04AM 8    I'M NOT SURE WHAT VALUE I CAN GIVE THE TIME ESTIMATES ANYMORE,

09:04AM 9    BUT I DON'T KNOW HOW MUCH TIME MR. CLINE HAS LEFT, AND THEN

09:04AM 10   THERE WILL BE SOME REDIRECT, AND THEN WE'LL SEE WHETHER THE

09:04AM 11   GOVERNMENT WISHES TO PUT ADDITIONAL EVIDENCE ON, OR WHETHER

09:04AM 12   IT'S YOUR TEAMS TURN TO PUT EVIDENCE ON IF YOU WISH.

09:04AM 13        IT SOUNDS LIKE, IF THE GOVERNMENT RESTS THIS MORNING, THAT

09:05AM 14   IT WILL BE YOUR TURN TO PUT SOME -- A WITNESS ON.

09:05AM 15        IT SOUNDS LIKE THIS WITNESS THAT WE'RE TALKING ABOUT WOULD

09:05AM 16   BE THE SECOND WITNESS THAT YOU WOULD CALL.

09:05AM 17        MS. TREFZ:  CORRECT.

09:05AM 18        THE COURT:  AND THAT'S WHY I'M SAYING IF THE

09:05AM 19   GOVERNMENT NEEDS AN OPPORTUNITY TO REVIEW SOMETHING THAT THEY

09:05AM 20   RECEIVED LATE IN THE EVENING, I'M INCLINED TO GIVE IT TO THEM.

09:05AM 21        MS. TREFZ:  IF THE GOVERNMENT IS GOING TO ASK FOR AN

09:05AM 22   ADJOURNMENT IN ORDER TO DO SO, YOUR HONOR, WE'RE HAPPY TO

09:05AM 23   PROVIDE THEM THAT OPPORTUNITY.

09:05AM 24        WHAT I WOULD --

09:05AM 25        THE COURT:  I'M NOT ASKING FOR AN ADJOURNMENT.  I'M

```
09:05AM  1      SAYING CALL ANOTHER WITNESS.

09:05AM  2              MS. TREFZ:  WELL, YOUR HONOR, I WOULD PUSH BACK IN

09:05AM  3      TWO WAYS, RESPECTFULLY.

09:05AM  4          ONE IS THAT I DON'T BELIEVE THAT THE PARTICULAR -- AGAIN,

09:05AM  5      I DON'T KNOW WHAT PARTICULAR EVIDENCE THEY'RE CONCERNED ABOUT.

09:05AM  6      I'D LIKE TO KNOW WHAT IT IS.

09:05AM  7          SECOND, I WOULD JUST NOTE THAT IT SHOULD NOT BE -- THE

09:05AM  8      GOVERNMENT SHOULD NOT BE ABLE TO DETERMINE THE ORDER THAT THE

09:05AM  9      DEFENSE CALLS WITNESSES IN.

09:06AM  10             THE COURT:  I GET TO DO THAT TO SOME EXTENT, DON'T

09:06AM  11     I?

09:06AM  12             MS. TREFZ:  I'M -- IT DEPENDS, YOUR HONOR.  IT

09:06AM  13     DEPENDS ON --

09:06AM  14             THE COURT:  RIGHT.  I DON'T WANT TO MESS WITH EITHER

09:06AM  15     OF YOUR CASES.  I REALLY DON'T.

09:06AM  16             MS. TREFZ:  YES.

09:06AM  17             THE COURT:  MY CONCERN IS TO KEEP THE TRIAL MOVING

09:06AM  18     IN AN ORDERLY FASHION SUCH THAT UNNECESSARY TIME IS TAKEN FROM

09:06AM  19     THE JURY.

09:06AM  20         AND WE'VE HAD A LOT OF TIME.  I COMMENTED ON SOME

09:06AM  21     STATISTICS THE OTHER DAY.  YOU KNOW, I JUST POINT THOSE OUT.

09:06AM  22     THAT'S SOMETHING THAT -- YOU KNOW, MR. SCHENK TOLD US ABOUT

09:06AM  23     SOME OTHER STATISTICS.

09:06AM  24         I DON'T WANT TO BREAK UP THE TRIAL.  I DON'T WANT TO

09:06AM  25     INTERFERE WITH THE DEFENSE CASE.  I RECOGNIZE THIS.  THAT'S
```

09:06AM 1    SACROSANCT.  JUDGES SHOULD NOT INTERFERE IN EITHER SIDE'S CASE.

09:06AM 2    WE SHOULDN'T DO THAT.

09:06AM 3         THERE'S TENSION BETWEEN THE JUDGE TRYING TO MANAGE A CASE

09:06AM 4    WHEN SHE IS TRYING TO GET ALL OF THE EVIDENCE IN AND THEN ALLOW

09:06AM 5    A JURY TO HEAR THE CASE AND TO BE MINDFUL OF THE JURY, THEIR

09:06AM 6    INCONVENIENCE SUCH THAT THEY HAVE CLARITY, SUCH THAT THEY DO

09:06AM 7    NOT LOSE INTEREST, THEY BECOME DISINTERESTED IN BOTH SIDES IN

09:07AM 8    THE TRIAL.

09:07AM 9         AND IT BECOMES DIFFICULT TO MANAGE THAT WHEN THESE TYPES

09:07AM 10   OF ISSUES COME UP.  SO IF THERE'S A WITNESS PROBLEM HERE -- AND

09:07AM 11   YOU SAID ADJOURNMENT.  IF THERE'S AN ADJOURNMENT, YOU KNOW, I

09:07AM 12   MAY HAVE TO TELL THEM, "LADIES AND GENTLEMEN, THERE WAS A LATE

09:07AM 13   DISCLOSURE ABOUT A PIECE OF EVIDENCE AND I NEED TO, IN ALL

09:07AM 14   FAIRNESS, I NEED TO ALLOW ONE SIDE TO LOOK AT THIS BEFORE

09:07AM 15   ANOTHER WITNESS IS CALLED."

09:07AM 16        THAT'S THE TYPE OF THING WHEN WE HAVE BACK-UP WITNESSES

09:07AM 17   WHERE WE CAN SAY, ALL RIGHT, WE CAN PUT THIS WITNESS ON.

09:07AM 18        IT'S NOT AN INVITATION TO CONTINUE AN EXAMINATION TO

09:07AM 19   STRETCH TIME AS THEY DO IN RADIO.  AND I'M PULLING MY HANDS

09:07AM 20   APART FROM LEFT TO RIGHT, WHICH IS A SIGN IN THE RADIO BUSINESS

09:07AM 21   OF STRETCH THINGS OUT AS MUCH AS YOU CAN.

09:07AM 22        IT'S NOT AN INVITATION TO DO THAT.  IT'S AN INVITATION TO

09:07AM 23   CONTINUE WITH EFFICIENCY WITHOUT DISRUPTING, WITHOUT DISRUPTING

09:08AM 24   THE PRESENTATION OF EITHER CASE IN A NEGATIVE WAY.

09:08AM 25             MS. TREFZ:  I COMPLETELY UNDERSTAND, YOUR HONOR.

09:08AM 1      MY POINT WAS SIMPLY THAT I WOULD LIKE TO KNOW WHAT THEIR

09:08AM 2   CONCERN ACTUALLY IS.  I'M NOT SURE WHAT MR. SCHENK WAS

09:08AM 3   REFERRING TO THAT WAS PROVIDED THIS MORNING.

09:08AM 4      IT MAY BE THAT THE EVIDENCE THAT THEY'RE POINTING TO OR

09:08AM 5   THE PARTICULAR EXHIBIT, IT MAY BE THAT IT'S SOMETHING THAT WE

09:08AM 6   ACTUALLY WILL NOT OFFER AND SO IT MAY NOT BE AN ISSUE.  I JUST,

09:08AM 7   I DO NOT KNOW WHAT IT IS.

09:08AM 8      THE VIDEO CLIPS, YOU KNOW, I CAN EXPLAIN THAT, YOU KNOW,

09:08AM 9   WHAT THEY ARE ARE VIDEOS OF THE TECHNOLOGY THAT'S BEEN

09:08AM 10  DESCRIBED MULTIPLE TIMES IN THE CASE.  THE GOVERNMENT HAS LONG

09:08AM 11  HAD NOTICE OF THE PARTICULAR VIDEO, ON THE -- THE FULL VIDEO ON

09:08AM 12  THE WITNESS LIST, OR THE EXHIBIT LIST.

09:08AM 13     WE ARE ONLY PLAYING SMALL -- WE INTEND TO PLAY FOR

09:08AM 14  DEMONSTRATIVE PURPOSES SMALL CLIPS THAT DR. BONANNI CAN, YOU

09:09AM 15  KNOW, EXPLAIN WHAT IS HAPPENING SO THAT THE JURY UNDERSTANDS

09:09AM 16  HOW THIS TECHNOLOGY WORKS AND PROVIDE VISUAL EVIDENCE AND --

09:09AM 17  YOU KNOW, RATHER THAN SIMPLY A WITNESS DESCRIPTION.

09:09AM 18     SO MANY OF THE VIDEOS -- THERE ARE FOUR VERY SHORT CLIPS,

09:09AM 19  AND THEY WILL -- MY INTENTION WAS TO OFFER THEM FOR

09:09AM 20  DEMONSTRATIVE PURPOSES.

09:09AM 21     AGAIN, I'M HAPPY TO HEAR WHAT THE CONCERNS ARE.  I THINK A

09:09AM 22  GENERAL STATEMENT THAT THERE WAS LATE DISCLOSURE IS A LITTLE

09:09AM 23  BIT -- IS PERHAPS AN OVERSTATEMENT, AND I WOULD LIKE THE

09:09AM 24  OPPORTUNITY TO ADDRESS WITH THE GOVERNMENT WHAT THE PARTICULAR

09:09AM 25  CONCERNS THEY HAVE ARE BECAUSE WE MAY BE ABLE TO ADDRESS THEM.

09:09AM 1      AND SO I JUST -- I DON'T WANT THE COURT TO BE LEFT WITH

09:09AM 2  THE MISIMPRESSION THAT THERE WAS SOMEHOW NO DISCLOSURE HERE.

09:10AM 3  THE MAJORITY OF THE EXHIBITS THAT WE HAVE PROVIDED HAVE BEEN ON

09:10AM 4  OUR LIST SINCE ONE OF THE VERY FIRST DISCLOSURES IN THE CASE,

09:10AM 5  AND THERE ARE OTHER ITEMS THAT HAVE COME UP AS THE TRIAL

09:10AM 6  PROGRESSES, AS IS ALWAYS THE CASE.

09:10AM 7      AND SO I, I DIDN'T MEAN TO SUGGEST THAT, YOU KNOW, THAT

09:10AM 8  THERE SHOULD BE SOME KIND OF, YOU KNOW, ADJOURNMENT.

09:10AM 9      MY INITIAL POINT, AND STILL MY POSITION, IS THAT WE --

09:10AM 10  WHAT WE SHOULD HAVE THE OPPORTUNITY TO DO IS TO TALK WITH THE

09:10AM 11  GOVERNMENT AND TO UNDERSTAND WHAT THEIR CONCERNS ARE.

09:10AM 12      ANOTHER OPTION WOULD BE, YOU KNOW, IF THEY'RE ACTUALLY --

09:10AM 13  IF THEY HAVE CONCERNS AND THEY WOULD LIKE THE OPPORTUNITY TO

09:10AM 14  RECALL THE WITNESS ON CROSS TO PUT IN MORE -- PUT IN MORE

09:10AM 15  EVIDENCE, THAT COULD POTENTIALLY BE SOMETHING TO DO AS WELL.

09:10AM 16      I JUST -- I'M HESITANT TO ACCEPT THE REPRESENTATION THAT

09:10AM 17  THERE IS SOME KIND OF UNFAIRNESS HERE BECAUSE I DON'T BELIEVE

09:10AM 18  THAT THAT'S THE CASE.

09:11AM 19          THE COURT:  ALL RIGHT.  WELL, WE'RE TEN AFTER 9:00.

09:11AM 20  MR. SCHENK, DO YOU WANT TO SAY ANYTHING BEFORE --

09:11AM 21          MR. SCHENK:  I CAN QUICKLY SUPPLEMENT THE RECORD.

09:11AM 22  10679 WAS DISCLOSED THIS MORNING, 7673B AND C WERE NOT

09:11AM 23  PREVIOUSLY DISCLOSED, 9819A THROUGH D ARE THE VIDEOS.

09:11AM 24      AND PART OF THE PROBLEM HERE IS THAT WITHOUT ANY JENCKS

09:11AM 25  STATEMENTS, WE CAN'T READ WHAT THE WITNESS WOULD SAY.  SO WE

09:11AM  1    HAVE NO INSIGHT INTO HOW THESE EXHIBITS WOULD BE USED.

09:11AM  2        AND WITH THAT I WOULD SUBMIT.  IT'S AFTER 9:00 AND WE

09:11AM  3    SHOULD GET STARTED.

09:11AM  4            THE COURT:  OKAY.  ALL RIGHT.  THANK YOU FOR THIS

09:11AM  5    COLLOQUY.

09:11AM  6        WE HAVE -- LET'S SEE.  I THINK MR. CLINE IS STILL IN HIS

09:11AM  7    CROSS-EXAMINATION.  I DON'T KNOW HOW LONG THAT'S GOING TO BE.

09:12AM  8        FOLLOWING THAT, WE'LL SEE IF THE GOVERNMENT HAS ANY

09:12AM  9    REDIRECT AND WHETHER OR NOT THE GOVERNMENT HAS ANY ADDITIONAL

09:12AM 10    EVIDENCE.

09:12AM 11        WE'LL THEN TURN TO THE DEFENSE TO SEE IF THEY HAVE ANY

09:12AM 12    EVIDENCE TO OFFER.

09:12AM 13        WE'LL PROBABLY TAKE A BREAK BECAUSE THE DEFENSE MAY HAVE A

09:12AM 14    MOTION OR WISH TO PUT SOMETHING ON THE RECORD, AND WE CAN

09:12AM 15    CERTAINLY DO THAT.

09:12AM 16        MY COMMENTS ABOUT TIME ARE -- LET ME JUST SAY, YOU'RE ALL

09:12AM 17    EXPERIENCED TRIAL LAWYERS.  YOU ALL KNOW THIS.  I DON'T THINK

09:12AM 18    ANY OF YOU -- I HOPE NONE OF YOU ARE BEING STRATEGIC AS FAR AS

09:12AM 19    TIMING.

09:12AM 20        AND I SAY THAT BECAUSE MY SENSE IS THAT NONE OF YOU WANT

09:12AM 21    THIS JURY TO BE DELIBERATING THIS CASE ON THE HOLIDAY WEEK IN

09:12AM 22    DECEMBER, THE THIRD WEEK IN DECEMBER OR ANY WEEK LIKE THAT.  MY

09:12AM 23    SENSE IS THAT YOU DON'T WANT THAT.

09:12AM 24        AND I -- LET ME JUST CALL YOUR ATTENTION TO THAT.  I'M NOT

09:12AM 25    SUGGESTING -- I HAVEN'T TALKED TO THE JURY AT ALL.  WE JUST SEE

```
09:12AM  1    THEM WHEN THEY COME IN, OF COURSE.

09:12AM  2         JURORS DON'T -- I DON'T THINK THEY ASCRIBE BLAME TO

09:13AM  3    THINGS.  THEY MIGHT LOOK AT RESPONSIBILITY, WHY ARE WE TAKING

09:13AM  4    SO LONG, AND WHAT IS THIS, AND WHY ARE THINGS GOING?  I DON'T

09:13AM  5    KNOW.  I DON'T TALK TO THEM.

09:13AM  6         WE ALL KNOW THAT, THOUGH.  WE'RE CONCERNED ABOUT THE JURY

09:13AM  7    AND THEIR COMFORT LEVEL AND KEEPING THEM ENGAGED.  I THINK YOU

09:13AM  8    ALL KNOW WHAT HAPPENS WHEN WE HAVE A JURY THAT GOES OUT ON A

09:13AM  9    HOLIDAY WEEK.  THAT DOESN'T BENEFIT EITHER SIDE.

09:13AM  10        AND I KNOW THAT BOTH SIDES ARE DOING EVERYTHING THAT YOU

09:13AM  11   CAN TO AVOID THAT AND NOT INCONVENIENCE THE JURY.

09:13AM  12        IT SEEMS LIKE WE'RE GOING TO GO -- WE'RE GOING TO EXCEED

09:13AM  13   OUR SCHEDULE.  I THINK WE TOLD THEM WE WOULD BE FINISHED BY THE

09:13AM  14   6TH.  MY SENSE IS THAT WE'RE GOING TO HAVE TO GO AT LEAST

09:13AM  15   ANOTHER WEEK BEYOND THAT BASED ON MY UNDERSTANDING OF WHERE

09:13AM  16   THINGS ARE.

09:13AM  17        AND SO I THINK THIS JURY HAS BEEN ENGAGED.  I THINK

09:13AM  18   THEY'RE THOROUGHLY INVESTED IN THIS CASE.  THEY'RE A GOOD JURY.

09:13AM  19   I'VE SEEN NO HANDS WHEN I ASK THAT QUESTION EVERY DAY, WHICH

09:14AM  20   TELLS ME THAT THEY'RE -- THEY OWE FIDELITY TO THE COURT AND TO

09:14AM  21   YOU AND TO THE TRIAL AND TO ALL OF YOU.  SO I HOPE WE CAN

09:14AM  22   CONTINUE THAT TRUST IN A RECIPROCAL MANNER.

09:14AM  23        THANK YOU VERY MUCH.  I'LL STEP DOWN AND WE'LL BRING THEM

09:14AM  24   IN AND WE'LL SEE WHERE WE GO THIS MORNING.

09:14AM  25             MR. SCHENK:  THANK YOU.
```

09:14AM 1     THE CLERK:  COURT IS IN RECESS.

09:14AM 2    (RECESS FROM 9:14 A.M. UNTIL 9:21 A.M.)

09:21AM 3    (JURY IN AT 9:21 A.M.)

09:21AM 4     THE COURT:  THANK YOU.  GOOD MORNING.

09:21AM 5    WE'RE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT

09:21AM 6  ARE PRESENT AGAIN.

09:21AM 7    ALL COUNSEL ARE PRESENT.  OUR JURY IS PRESENT.

09:21AM 8    GOOD MORNING, LADIES AND GENTLEMEN.  LET ME ASK YOU THAT

09:21AM 9  QUESTION AGAIN.

09:21AM 10    DURING THE EVENING, DID ANY OF YOU HAVE CAUSE TO COME

09:21AM 11 ACROSS, DISCUSS, READ, INVESTIGATE, OR LEARN ABOUT ANYTHING

09:21AM 12 ABOUT THIS CASE OTHER THAN WHAT YOU'VE BEEN LEARNING HERE IN

09:21AM 13 THE COURTROOM?

09:21AM 14    IF SO, PLEASE RAISE YOUR HAND.

09:21AM 15    I SEE NO HANDS.

09:21AM 16    THANK YOU VERY MUCH.

09:21AM 17    LET ME -- WE'RE GOING TO CALL OUR WITNESS, MR. PARLOFF,

09:21AM 18 BACK IN IN JUST A MOMENT.

09:21AM 19    I DO WANT TO TALK A LITTLE BIT ABOUT SCHEDULING, AND I

09:22AM 20 THINK MS. KRATZMANN PROVIDED YOU WITH A CALENDAR TODAY.

09:22AM 21    LET ME SAY THAT I'VE BEEN WORKING WITH THE LAWYERS.  THE

09:22AM 22 LAWYERS HAVE BEEN VERY COOPERATIVE.  WE'RE LOOKING AT

09:22AM 23 SCHEDULING.  I HAVE TO TELL YOU, I DO THINK THAT I'M NOT GOING

09:22AM 24 TO BE ABLE TO MEET THE DECEMBER 6TH DEADLINE THAT I TOLD YOU

09:22AM 25 ABOUT.

09:22AM 1      IT LOOKS LIKE WE'RE GOING TO EXCEED THAT DEADLINE, JUST

09:22AM 2  OUT OF NECESSITY.  AND THAT'S THE WAY TRIALS ARE SOMETIMES.  I

09:22AM 3  JUST WANT TO LET YOU KNOW THAT.

09:22AM 4      WE'RE GOING TO CONTINUE TO WORK, BOTH TEAMS ARE GOING TO

09:22AM 5  CONTINUE TO WORK WITH ME TO ENSURE THAT THINGS HAPPEN

09:22AM 6  EFFICIENTLY SO THAT WE CAN MANAGE THE CASE AS BEST AS WE CAN

09:22AM 7  AND GET WHAT NEEDS TO BE DONE ACCOMPLISHED IN AN EFFICIENT

09:22AM 8  MANNER FOR YOU.

09:22AM 9      SO I JUST WANT TO LET YOU KNOW THAT AND GIVE YOU A HEADS

09:22AM 10 UP.  WE MAY HAVE TO EXTEND A FEW DAYS, AND I'LL KEEP YOU

09:22AM 11 APPRISED OF THAT THROUGH MS. KRATZMANN AND OUR OTHER

09:22AM 12 DISCUSSIONS.

09:22AM 13     SO ON BEHALF OF THE LAWYERS, LET ME SAY, AND ON BEHALF OF

09:23AM 14 MYSELF AND OUR STAFF, I WANT TO THANK YOU SO MUCH FOR YOUR

09:23AM 15 CONSIDERATION, AND WE'LL KEEP YOU INFORMED OF HOW THINGS ARE

09:23AM 16 GOING.

09:23AM 17     OKAY.  THANK YOU.  LET'S BRING IN THE WITNESS.

09:23AM 18     GOOD MORNING, MR. PARLOFF.  I'LL INVITE YOU TO TAKE A SEAT

09:23AM 19 AGAIN.

09:23AM 20     AGAIN, MAKE YOURSELF COMFORTABLE.  YOU HAVE SOME -- I

09:23AM 21 THINK THERE'S A HOT BEVERAGE THERE FOR YOU.

09:23AM 22          THE WITNESS:  YES.  THANK YOU.

09:23AM 23          THE COURT:  AND -- NO, YOU CAN TAKE THAT OFF.

09:23AM 24 THAT'S FINE.  THANK YOU.

09:23AM 25     WHEN YOU ARE COMFORTABLE, WOULD YOU JUST STATE YOUR NAME,

| | | |
|---|---|---|
| 09:23AM | 1 | PLEASE. |
| 09:23AM | 2 | THE WITNESS: ROGER PARLOFF. |
| 09:23AM | 3 | THE COURT: THANK YOU. |
| 09:23AM | 4 | THE WITNESS: P-A -- |
| 09:24AM | 5 | THE COURT: OH, THAT'S OKAY. |
| 09:24AM | 6 | **(GOVERNMENT'S WITNESS, ROGER PARLOFF, WAS PREVIOUSLY** |
| 09:24AM | 7 | **SWORN.)** |
| 09:24AM | 8 | THE COURT: MR. CLINE. |
| 09:24AM | 9 | **CROSS-EXAMINATION (RESUMED)** |
| 09:24AM | 10 | BY MR. CLINE: |
| 09:24AM | 11 | Q.   GOOD MORNING.  I HOPE YOU'RE FEELING BETTER AND THE |
| 09:24AM | 12 | ALLERGIES ARE A LITTLE BETTER THIS MORNING. |
| 09:24AM | 13 | A.   THEY'RE GOOD.  THANK YOU. |
| 09:24AM | 14 | Q.   I JUST HAVE A FEW -- BY THE WAY, DO YOU STILL HAVE THE TWO |
| 09:24AM | 15 | NOTEBOOKS UP THERE? |
| 09:24AM | 16 | A.   YES. |
| 09:24AM | 17 | Q.   OKAY.  GOOD.  I HAVE A FEW TOPICS I WANT TO COVER WITH YOU |
| 09:24AM | 18 | BEFORE WE FINISH UP FOR TODAY. |
| 09:24AM | 19 | THE FIRST ONE HAS TO DO WITH YOUR DISCUSSIONS WITH |
| 09:24AM | 20 | MS. HOLMES ABOUT THE MILITARY. |
| 09:24AM | 21 | A.   YEAH. |
| 09:24AM | 22 | Q.   DO YOU REMEMBER THAT SUBJECT COMING UP -- |
| 09:24AM | 23 | A.   UH-HUH, YES. |
| 09:24AM | 24 | Q.   -- YESTERDAY? |
| 09:24AM | 25 | TO BE CLEAR, YOU AND MS. HOLMES AGREED THAT NOTHING THAT |

09:24AM 1    SHE SAID TO YOU ABOUT THERANOS AND THE MILITARY WOULD APPEAR IN

09:24AM 2    THE ARTICLE; CORRECT?

09:24AM 3    A.    THAT'S RIGHT.

09:24AM 4    Q.    AND, IN FACT, YOU DIDN'T -- EXCUSE ME.  NOW I'VE GOT THE

09:24AM 5    ALLERGIES.

09:24AM 6         IN FACT, YOU DIDN'T USE ANYTHING THAT SHE OR OTHERS AT

09:24AM 7    THERANOS TOLD YOU ABOUT THERANOS AND THE MILITARY IN THE

09:24AM 8    ARTICLE; RIGHT?

09:24AM 9    A.    CORRECT, ABOUT THE ACTUAL DEPLOYMENTS, YEAH.

09:25AM 10   Q.    AND WHAT YOU SAID IN THE ARTICLE -- AND I'M GOING TO QUOTE

09:25AM 11   IT TO YOU, AND IF YOU NEED ME TO REFER IT TO YOU, I CAN -- YOU

09:25AM 12   SAID, "THE SMALL THERANOS DEVICE MAKES IT POSSIBLE TO IMAGINE

09:25AM 13   ONE DAY PLACING HOLMES'S LABS RIGHT BY THE OPERATING ROOMS IN

09:25AM 14   HOSPITALS OR IN MILITARY EVACUATION HELICOPTERS, OR ON SHIPS

09:25AM 15   AND SUBMARINES OR IN REFUGEE CAMPS OR IN TENTS IN THE AFRICAN

09:25AM 16   BUSH."

09:25AM 17        RIGHT?

09:25AM 18   A.    THAT'S CORRECT.

09:25AM 19   Q.    SO WHAT YOU TALKED ABOUT IN THE ARTICLE IS THAT THE

09:25AM 20   THERANOS DEVICE MAKES IT POSSIBLE TO IMAGINE ONE DAY DOING

09:25AM 21   THOSE THINGS; RIGHT?

09:25AM 22   A.    THAT'S RIGHT.

09:25AM 23   Q.    NOW, YOU TESTIFIED YESTERDAY, I BELIEVE, THAT MS. HOLMES

09:25AM 24   TOLD YOU, OFF THE RECORD AND NOT FOR USE IN YOUR ARTICLE, THAT

09:26AM 25   THE THERANOS DEVICE HAD BEEN USED IN AFGHANISTAN.

| 09:26AM | 1 | A. YES. |

09:26AM 1   A.  YES.

09:26AM 2   Q.  NOW, YOU MET -- WE TALKED YESTERDAY ABOUT THAT FIRST

09:26AM 3   MEETING YOU HAD WITH THE GOVERNMENT IN NEW YORK.

09:26AM 4       DO YOU REMEMBER THAT?

09:26AM 5   A.  YES.

09:26AM 6   Q.  DO YOU REMEMBER THE TOPIC COMING UP YESTERDAY?

09:26AM 7   A.  I THINK SO, YES.

09:26AM 8   Q.  ALL RIGHT.  AND THIS WAS YOUR FIRST INTERACTION WITH THE

09:26AM 9   GOVERNMENT, AT LEAST FACE TO FACE; RIGHT?

09:26AM 10  A.  YES.

09:26AM 11  Q.  AND YOU MET WITH THEM IN NEW YORK AT THE U.S. ATTORNEY'S

09:26AM 12  OFFICE THERE?

09:26AM 13  A.  YEAH, YES.

09:26AM 14  Q.  AND MR. BOSTIC WAS THERE AND AN FBI AGENT WAS THERE;

09:26AM 15  RIGHT?

09:26AM 16  A.  YES.

09:26AM 17  Q.  ALL RIGHT.  AND IN THAT MEETING, THAT FIRST MEETING, THE

09:26AM 18  SUBJECT CAME UP OF THERANOS AND THE MILITARY; RIGHT?

09:26AM 19  A.  YES.

09:26AM 20  Q.  AND WHAT YOU TOLD THE GOVERNMENT IN THAT MEETING IN APRIL

09:26AM 21  WAS THAT MS. HOLMES HAD ADVISED YOU IN ONE OF YOUR

09:26AM 22  CONVERSATIONS WITH HER BACK BEFORE YOU WROTE YOUR ARTICLE THAT

09:26AM 23  SHE CANNOT DISCUSS ACTUAL USE IN AFGHANISTAN, BUT SHE COULD

09:27AM 24  DISCUSS OTHER THINGS, AND THAT THAT GAVE YOU THE IMPRESSION

09:27AM 25  THAT SOMETHING WAS HAPPENING; RIGHT?

09:27AM    1      A.   THAT MAY BE RIGHT.  THAT MUST BE WHAT I SAID.

09:27AM    2      Q.   ALL RIGHT.  WOULD IT HELP YOU IF I SHOWED YOU THAT PART OF

09:27AM    3   THE MEMORANDUM, OR CAN YOU ACCEPT THAT AS WHAT YOU TOLD THE

09:27AM    4   GOVERNMENT?

09:27AM    5      A.   I CAN ACCEPT THAT'S WHAT I SAID THEN.

09:27AM    6      Q.   ALL RIGHT.  AND THE FIRST TIME YOU TOLD THE GOVERNMENT

09:27AM    7   THAT MS. HOLMES HAD TOLD YOU THAT THERE WAS ACTUAL USE IN

09:27AM    8   AFGHANISTAN WAS TWO DAYS AGO; RIGHT?

09:27AM    9      A.   NO, I DON'T THINK SO.

09:27AM   10      Q.   WELL, YOU, YOU MET WITH THE GOVERNMENT TWO DAYS AGO;

09:27AM   11   RIGHT?

09:27AM   12      A.   YES.

09:27AM   13      Q.   OR MET -- HAD A VIDEO CONFERENCE WITH THEM; RIGHT?

09:27AM   14      A.   YEAH.

09:27AM   15      Q.   AND IN THAT VIDEO CONFERENCE, YOU TOLD THEM THAT

09:27AM   16   MS. HOLMES HAD MADE THAT COMMENT; RIGHT?

09:27AM   17      A.   YES.

09:27AM   18      Q.   YOU HADN'T TOLD THEM THAT IN ANY OF YOUR PREVIOUS

09:28AM   19   DISCUSSIONS WITH THEM, HAD YOU?

09:28AM   20      A.   I THOUGHT WE HAD HAD -- I THOUGHT IT HAD COME UP IN

09:28AM   21   PREVIOUS DISCUSSIONS.

09:28AM   22      Q.   SHALL WE GO THROUGH THOSE?

09:28AM   23      A.   OKAY.

09:28AM   24      Q.   THE FIRST ONE WAS APRIL 2018; RIGHT?

09:28AM   25      A.   YES.

09:28AM   1    Q.   AND THAT'S THE MEETING WHERE YOU TOLD THE GOVERNMENT THAT

09:28AM   2    MS. HOLMES HAD TOLD YOU THAT SHE COULDN'T DISCUSS USE IN

09:28AM   3    AFGHANISTAN, AND YOU HAD THE IMPRESSION THAT THERE WAS USE

09:28AM   4    GOING ON; RIGHT?

09:28AM   5    A.   YES.

09:28AM   6    Q.   ALL RIGHT.  THE NEXT TIME YOU SPOKE WITH THE GOVERNMENT

09:28AM   7    WAS A VIDEO CONFERENCE ON SEPTEMBER THE 3RD, 2021, THIS YEAR;

09:28AM   8    RIGHT?

09:28AM   9    A.   YES.

09:28AM  10    Q.   AND MR. BOSTIC AND OTHERS PARTICIPATED FOR THE GOVERNMENT;

09:28AM  11    RIGHT?

09:28AM  12    A.   YES.

09:28AM  13    Q.   AND FOR THAT ONE YOU HAD A LAWYER WHO PARTICIPATED; RIGHT?

09:28AM  14    A.   YES.

09:28AM  15    Q.   AND IN THAT FIRST MEETING, YOU DIDN'T HAVE A LAWYER, BUT

09:29AM  16    NOW YOU DID; RIGHT?

09:29AM  17    A.   YEAH, UH-HUH.

09:29AM  18    Q.   AND THAT'S NOT MR. KOLTUN, THE LAWYER WHO HAS BEEN HERE IN

09:29AM  19    COURT WITH YOU, THAT WAS A MR. KORZENIK; RIGHT?

09:29AM  20    A.   YES.

09:29AM  21    Q.   AND AGAIN, THE SUBJECT OF MILITARY USE OF THERANOS

09:29AM  22    TECHNOLOGY CAME UP; RIGHT?

09:29AM  23    A.   I CAN'T REMEMBER.

09:29AM  24    Q.   LET ME HELP YOU WITH THAT.

09:29AM  25         MAY I APPROACH?

09:29AM  1          THE COURT:  YES.

09:29AM  2     BY MR. CLINE:

09:29AM  3     Q.  (HANDING.)

09:29AM  4          I'M GOING TO HAND YOU A MEMORANDUM OF THAT INTERVIEW, AND

09:29AM  5     I'M GOING TO REFER YOU TO PAGE 7, WHICH I THINK IS THE LAST

09:29AM  6     PAGE, AND ASK YOU TO READ THE LAST PARAGRAPH TO YOURSELF.

09:29AM  7     DON'T READ IT ALOUD.

09:30AM  8     A.  OKAY.

09:30AM  9     Q.  HAVE YOU HAD A CHANCE TO READ THAT?

09:30AM 10     A.  YEAH.

09:30AM 11     Q.  ALL RIGHT.  AND DOES THAT REFRESH YOUR RECOLLECTION THAT

09:30AM 12     ON SEPTEMBER 3RD, 2021, YOU AGAIN TOLD THE GOVERNMENT THAT

09:30AM 13     MS. HOLMES'S COMMENTS LEFT YOU WITH THE IMPRESSION THAT THERE

09:30AM 14     WAS USE IN AFGHANISTAN?

09:30AM 15     A.  YES.

09:30AM 16     Q.  ALL RIGHT.  AND THEN YOU TALKED AGAIN WITH THE GOVERNMENT?

09:31AM 17     A.  IT'S A PRETTY STRONG INFERENCE.  I MEAN, SHE WAS STATING,

09:31AM 18     DON'T TELL GENERAL MATTIS ABOUT THE DEPLOYMENTS IN AFGHANISTAN.

09:31AM 19          YOU KNOW, IT'S AN INFERENCE, BUT IT'S -- I MEAN, WHY -- TO

09:31AM 20     ME, IT'S, IT'S A, IT'S A VERY STRONG INFERENCE.  IT'S DON'T

09:31AM 21     TELL THEM ABOUT -- WELL --

09:31AM 22     Q.  MR. PARLOFF --

09:31AM 23     A.  YEAH.

09:31AM 24     Q.  -- MS. HOLMES TOLD YOU THAT SHE COULDN'T DISCUSS USE IN

09:31AM 25     AFGHANISTAN; RIGHT?

09:31AM    1        A.   RIGHT.

09:31AM    2        Q.   AND THAT LEFT YOU WITH THE IMPRESSION THAT SOMETHING WAS

09:31AM    3   GOING ON; RIGHT?

09:31AM    4        A.   YES, AND THE FACT THAT SHE TOLD ME NOT TO -- THAT HE WOULD

09:31AM    5   NOT BE ABLE TO DISCUSS THAT AND I SHOULDN'T ASK HIM ABOUT IT.

09:31AM    6        Q.   SHE NEVER ACTUALLY TOLD YOU THAT THERE WAS USE IN

09:32AM    7   AFGHANISTAN, DID SHE?

09:32AM    8        A.   I THOUGHT SHE DID.

09:32AM    9        Q.   SO YOU THOUGHT YOU HAD MORE THAN JUST THE IMPRESSION THAT

09:32AM   10   YOU DESCRIBED TO THE GOVERNMENT IN THOSE FIRST TWO MEETINGS?

09:32AM   11        A.   WELL, IT IS SEVEN YEARS AGO.  IT MIGHT HAVE BEEN A VERY

09:32AM   12   STRONG IMPRESSION.  I, I -- I'M NOT CERTAIN.

09:32AM   13        Q.   ALL RIGHT.  I WANT TO TURN NOW TO THE QUESTION OF THE

09:32AM   14   NUMBER OF TESTS.

09:32AM   15             MAY I RETRIEVE THAT FROM YOU, THAT DOCUMENT?  I JUST DON'T

09:32AM   16   WANT IT TO BE DISTRACTING.

09:32AM   17             MAY I APPROACH?

09:32AM   18                  THE COURT:  YES.

09:32AM   19                  THE WITNESS:  (HANDING.)

09:32AM   20   BY MR. CLINE:

09:32AM   21        Q.   THANKS.

09:32AM   22             DO YOU REMEMBER -- MR. PARLOFF, WE ARE SWITCHING TOPICS A

09:32AM   23   LITTLE BIT HERE.

09:32AM   24             THERE WAS DISCUSSION YESTERDAY ABOUT THE NUMBER OF TESTS

09:33AM   25   THAT THERANOS COULD PERFORM.

09:33AM  1          DO YOU REMEMBER THAT?

09:33AM  2      A.  YES.

09:33AM  3      Q.  AND DO YOU REMEMBER THE NUMBERS 200 AND 1,000?

09:33AM  4      A.  YES.

09:33AM  5      Q.  NOW, IN YOUR JUNE 2014 ARTICLE -- AND, AGAIN, I'M GOING TO

09:33AM  6      QUOTE IT TO YOU, BUT IF YOU NEED TO LOOK AT IT, NO PROBLEM --

09:33AM  7      YOU SAID THAT THERANOS, AND I'M QUOTING NOW, "CURRENTLY

09:33AM  8      OFFERING MORE THAN 200 AND IS RAMPING UP TO OFFER MORE THAN

09:33AM  9      1,000 OF THE MOST COMMONLY ORDERED BLOOD DIAGNOSTIC TESTS, ALL

09:33AM 10      WITHOUT NEED FOR A SYRINGE."

09:33AM 11          THAT'S WHAT YOU SAID IN THE ARTICLE; RIGHT?

09:33AM 12      A.  YES.

09:33AM 13      Q.  ALL RIGHT.  NOW, THE GOVERNMENT PLAYED YESTERDAY FOR YOU A

09:33AM 14      CLIP FROM MAY 21, 2014, AN AUDIO CLIP OF ONE OF YOUR

09:33AM 15      CONVERSATIONS WITH MS. HOLMES WHERE THE 200 AND 1,000 NUMBERS

09:34AM 16      CAME UP.

09:34AM 17      A.  YES.

09:34AM 18      Q.  AND I WANT TO JUST PLAY FOR YOU THE FIRST PART OF THAT

09:34AM 19      CLIP WHERE THOSE NUMBERS ARE FIRST BROACHED.  SO JUST HOLD ON A

09:34AM 20      SECOND AND I'M GOING TO PLAY IT FOR YOU.  OKAY?

09:34AM 21          THIS IS EXHIBIT 5474AB2 STARTING AT THE BEGINNING OF THE

09:34AM 22      CLIP THE GOVERNMENT PLAYED, AND THEN WE'LL STOP IT WHEN WE GET

09:34AM 23      TO THE POINT.

09:34AM 24          GO AHEAD.

09:34AM 25          (AUDIO RECORDING PLAYED OFF THE RECORD.)

| 09:35AM | 1 | MR. CLINE: STOP, STOP. |

09:35AM    2    Q.   NOW, MR. PARLOFF, DID YOU HEAR YOUR REFERENCE THERE TO

09:35AM    3    MORE THAN 1,000 CPT'S?

09:35AM    4    A.   YES.

09:35AM    5    Q.   BACK IN MAY OF 2014, DID YOU KNOW WHAT A CPT WAS?

09:35AM    6    A.   UH, SHE TOLD ME.

09:35AM    7    Q.   IT'S A BILLING CODE; RIGHT?

09:35AM    8    A.   YES.

09:35AM    9    Q.   AND IN MAY OF 2014, DID YOU UNDERSTAND THE DIFFERENCE

09:35AM    10   BETWEEN A TEST AND A CPT?

09:35AM    11   A.   ROUGHLY.

09:35AM    12   Q.   DID YOU UNDERSTAND IN MAY OF 2014 THAT A SINGLE TEST COULD

09:35AM    13   BE PART OF MANY DIFFERENT CPT CODES?

09:35AM    14   A.   I THINK I, I THINK I -- I KNEW THAT SOME CPT CODES WERE

09:35AM    15   FOR PANELS AND SOME WERE FOR INDIVIDUAL TESTS.

09:36AM    16        SO, YES.

09:36AM    17   Q.   IN YOUR ARTICLE, THE LANGUAGE THAT YOU USE IN THE ARTICLE,

09:36AM    18   YOU DON'T DISTINGUISH WHEN YOU'RE USING THAT 1,000 FIGURE

09:36AM    19   BETWEEN TESTS AND CPT'S, DO YOU?

09:36AM    20   A.   NO.

09:36AM    21        BUT I DON'T THINK I KNEW WHICH WAY IT -- WHICH DIRECTION.

09:36AM    22   I KNEW IT WOULDN'T BE AN IDENTICAL NUMBER, BUT I DIDN'T KNOW IF

09:36AM    23   THE CPT'S WOULD BE MORE THAN A THOUSAND.

09:36AM    24        I THINK THAT WAS MY IMPRESSION THAT, BECAUSE THEY COULD --

09:36AM    25   BUT ANYWAY.

09:36AM  1    Q.   WELL, WHAT YOU SAID IN THE ARTICLE --

09:36AM  2    A.   YEAH, RIGHT.

09:36AM  3    Q.   -- WAS A THOUSAND TESTS; RIGHT?

09:36AM  4    A.   RIGHT.

09:36AM  5    Q.   YOU DIDN'T SAY A THOUSAND CPT'S?

09:36AM  6    A.   RIGHT.

09:36AM  7    Q.   I WANT TO MOVE NOW TO A DIFFERENT TOPIC.

09:36AM  8    A.   AND SHE HAD ALSO SAID THERE WAS SOME FUZZINESS ABOUT, WAS

09:36AM  9    IT A THOUSAND, WAS IT 1200?

09:36AM  10   Q.   YOU'RE TALKING ABOUT CPT'S; RIGHT?

09:37AM  11   A.   YES.

09:37AM  12   Q.   NOW, I WANT TO GET BACK A LITTLE BIT TO THE RESEARCH THAT

09:37AM  13   YOU DID.

09:37AM  14   A.   AND SHE NEVER TRIED TO CORRECT IT AFTERWARDS AS WELL.  SHE

09:37AM  15   DIDN'T CALL ME AND SAY, "OH, TERRIFIC ARTICLE, BUT YOU GOT ONE

09:37AM  16   LITTLE THING WRONG, IT WAS REALLY A THOUSAND CPT'S, NOT A

09:37AM  17   THOUSAND TESTS."

09:37AM  18   Q.   ARE WE FINISHED WITH THAT TOPIC?

09:37AM  19   A.   UP TO YOU.

09:37AM  20   Q.   ALL RIGHT.  LET'S MOVE TO A DIFFERENT TOPIC, WHICH IS YOUR

09:37AM  21   RESEARCH LEADING UP TO THE JUNE 2014 ARTICLE.

09:37AM  22   A.   YES.

09:37AM  23   Q.   WE TALKED ABOUT THAT YESTERDAY, AND THERE ARE JUST A FEW

09:37AM  24   ADDITIONAL POINTS THAT I WANT TO TOUCH ON THERE.

09:37AM  25        FIRST OF ALL, I WANT TO SHOW YOU AN EXHIBIT THAT IS NOT IN

09:37AM   1    YOUR BOOK AND SO I'M GOING TO HAVE TO HAND IT UP TO YOU, WHICH

09:37AM   2    IS EXHIBIT 14271.

09:38AM   3         MAY I APPROACH?

09:38AM   4              THE COURT:  YES.

09:38AM   5    BY MR. CLINE:

09:38AM   6    Q.   (HANDING.)

09:38AM   7         MR. PARLOFF, TAKE A MOMENT AND LOOK AT THAT.

09:38AM   8         (PAUSE IN PROCEEDINGS.)

09:39AM   9    BY MR. CLINE:

09:39AM  10    Q.   I DON'T MEAN TO RUSH YOU, BUT HAVE YOU HAD A CHANCE TO

09:39AM  11    LOOK AT THIS?

09:39AM  12    A.   I'M SORRY, I'M STILL --

09:39AM  13    Q.   OH, TAKE YOUR TIME.  TAKE YOUR TIME.

09:39AM  14         (PAUSE IN PROCEEDINGS.)

09:39AM  15              THE WITNESS:  YEAH.  YES.

09:39AM  16    BY MR. CLINE:

09:39AM  17    Q.   ALL RIGHT.  THIS IS A MAY 9TH, 2014 EMAIL FROM YOU TO

09:39AM  18    MS. HOLMES?

09:39AM  19    A.   YES.

09:39AM  20    Q.   AND THE SUBJECT IS UPDATE?

09:39AM  21    A.   YES.

09:39AM  22    Q.   AND YOU'RE DESCRIBING TO HER SORT OF WHERE THINGS ARE ON A

09:39AM  23    NUMBER OF FRONTS --

09:39AM  24    A.   YES.

09:39AM  25    Q.   -- IN YOUR RESEARCH; RIGHT?

09:39AM   1        A.    UH-HUH.

09:39AM   2               MR. CLINE:  YOUR HONOR, I OFFER 14271.

09:39AM   3               MR. BOSTIC:  NO OBJECTION.

09:39AM   4               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:39AM   5        (DEFENDANT'S EXHIBIT 14271 WAS RECEIVED IN EVIDENCE.)

09:39AM   6    BY MR. CLINE:

09:39AM   7    Q.    LET'S JUST BLOW UP THE WHOLE THING, AND WE'LL QUICKLY WORK

09:39AM   8    OUR WAY THROUGH IT.

09:39AM   9          CAN YOU SEE THAT OKAY?

09:40AM  10    A.    YES.  THANKS.

09:40AM  11    Q.    ALL RIGHT.  THIS WAS ONE OF A NUMBER OF EMAILS THAT YOU

09:40AM  12    EXCHANGED WITH MS. HOLMES IN THE COURSE OF -- BETWEEN APRIL AND

09:40AM  13    JUNE OF 2014 AS YOU WORKED ON YOUR ARTICLE; RIGHT?

09:40AM  14    A.    YES.

09:40AM  15    Q.    AND WE LOOKED AT A FEW YESTERDAY, BUT THERE WERE A

09:40AM  16    SIGNIFICANT NUMBER OF EMAILS BACK AND FORTH AS YOU ATTEMPTED TO

09:40AM  17    GATHER INFORMATION.

09:40AM  18          FAIR?

09:40AM  19    A.    YES.

09:40AM  20    Q.    SO LET'S JUST QUICKLY TICK THROUGH WHAT YOU'RE UPDATING

09:40AM  21    HER ON HERE.

09:40AM  22          TO BEGIN, YOU SAY YOU HAD LENGTHY DISCUSSIONS YESTERDAY --

09:40AM  23    I'M SORRY, WEDNESDAY WITH OFFICIALS AT A CERTAIN SIGNIFICANT

09:40AM  24    PLAYER IN THE BLOOD ANALYTICS INDUSTRY.

09:40AM  25          DO YOU SEE THAT?

09:40AM  1    A.   YES.

09:40AM  2    Q.   AND THAT REFERS TO ONE OF THERANOS'S COMPETITORS?

09:40AM  3    A.   IT REFERS TO A SIGNIFICANT PLAYER IN THE BLOOD ANALYTICS

09:40AM  4    INDUSTRY.

09:40AM  5    Q.   WAS THAT ONE OF THERANOS'S COMPETITORS?

09:40AM  6    A.   THIS IS -- I THINK THIS IS -- I DON'T THINK IT'S

09:41AM  7    APPROPRIATE FOR ME TO ANSWER.

09:41AM  8    Q.   DO YOU HAVE YOUR LAWYER HERE TODAY?

09:41AM  9    A.   YES.

09:41AM  10         MR. CLINE:  YOUR HONOR, COULD WE HAVE A BRIEF SECOND

09:41AM  11   HERE FOR HIM TO CHAT WITH HIS LAWYER?

09:41AM  12         THE COURT:  DO YOU FEEL YOU NEED TO TALK TO YOUR

09:41AM  13   LAWYER, SIR, ABOUT THE --

09:41AM  14         THE WITNESS:  I GUESS VERY BRIEFLY.

09:41AM  15         THE COURT:  SURE.  OKAY.  WE'LL TAKE A STANDING

09:41AM  16   BREAK.

09:41AM  17         MR. CLINE:  SURE, YOUR HONOR.

09:41AM  18      (STANDING BREAK.)

09:41AM  19         MR. KOLTUN:  DO YOU HAVE A COPY OF IT?

09:41AM  20      (STANDING BREAK.)

09:42AM  21         THE COURT:  FOLKS, FEEL FREE TO STAND FOR A MOMENT

09:42AM  22   AND STRETCH IF YOU WOULD LIKE.

09:42AM  23      (STRETCHING.)

09:42AM  24      (PAUSE IN PROCEEDINGS.)

09:42AM  25         THE COURT:  MR. CLINE, DO YOU WANT TO STEP OUT AND

09:42AM  1      JUST SEE IF THEY NEED ANY OF YOUR ASSISTANCE?

09:42AM  2              MR. CLINE:  I'LL BE OF LIMITED VALUE, BUT I'M HAPPY

09:42AM  3      TO TRY.

09:42AM  4              THE COURT:  OH, YOU UNDERESTIMATE YOUR SKILLS,

09:42AM  5      MR. CLINE.

09:42AM  6          (LAUGHTER.)

09:43AM  7          (PAUSE IN PROCEEDINGS.)

09:43AM  8              MR. CLINE:  I'LL TAKE FULL CREDIT FOR THAT,

09:43AM  9      YOUR HONOR.

09:43AM  10             THE COURT:  ALL RIGHT.  THANK YOU.

09:43AM  11         MR. PARLOFF, YOU'RE BACK ON THE STAND.  YOU'VE HAD

09:43AM  12     OCCASION TO SPEAK WITH YOUR ATTORNEY?

09:43AM  13             THE WITNESS:  YES, YOUR HONOR.  THANK YOU.

09:43AM  14             THE COURT:  YOU'RE WELCOME.

09:43AM  15         YOU CAN TAKE YOUR MASK OFF IF YOU WOULD LIKE.

09:43AM  16             THE WITNESS:  THANK YOU.

09:43AM  17             THE COURT:  MR. CLINE.

09:43AM  18     BY MR. CLINE:

09:43AM  19     Q.   MR. PARLOFF, ARE YOU ABLE TO ANSWER MY QUESTION?

09:43AM  20     A.   YEAH.  TO THE EXTENT THAT ANY SIGNIFICANT PLAYER IN THE

09:43AM  21     BLOOD ANALYTICS INDUSTRY WOULD BE CONSIDERED A COMPETITOR, YES.

09:43AM  22     Q.   ALL RIGHT.  SO YOU HAD HAD, AS YOU DESCRIBED, LENGTHY

09:43AM  23     DISCUSSIONS WITH AN ENTITY THAT YOU CONSIDERED TO BE A

09:43AM  24     COMPETITOR OF THERANOS; RIGHT?

09:43AM  25     A.   YES.

09:44AM  1    Q.   AND YOU WANTED TO GET TOGETHER AND TALK WITH MS. HOLMES;

09:44AM  2    RIGHT?

09:44AM  3    A.   YES.

09:44AM  4    Q.   AND --

09:44AM  5    A.   WELL, A PHONE CALL.

09:44AM  6    Q.   YES.   AND AT LEAST PART OF YOUR REASON FOR WANTING TO TALK

09:44AM  7    WITH HER WAS TO DISCUSS ISSUES THAT THIS COMPETITOR HAD RAISED?

09:44AM  8    A.   YES, UH-HUH.

09:44AM  9    Q.   ALL RIGHT.   AND SO THEN THERE ARE A SERIES OF SORT OF

09:44AM  10   SPECIFIC ITEMS, AND LET'S JUST VERY QUICKLY TICK THROUGH THOSE.

09:44AM  11        YOU WANTED TO TALK TO GENERAL MATTIS; RIGHT?

09:44AM  12   A.   YES.

09:44AM  13   Q.   AND YOU WERE LOOKING FOR CONTACT INFORMATION FROM

09:44AM  14   MS. HOLMES; RIGHT?

09:44AM  15   A.   YES.

09:44AM  16   Q.   WHICH SHE PROVIDED AND THEN YOU TALKED TO GENERAL MATTIS;

09:44AM  17   RIGHT?

09:44AM  18   A.   THAT'S RIGHT.   THERE ARE CERTAIN LIMITATIONS ON WHAT I

09:44AM  19   COULD ASK.

09:44AM  20   Q.   AND THEN YOU NOTE THAT YOU WERE BOOKED TO SEE

09:44AM  21   HENRY KISSINGER; RIGHT?

09:44AM  22   A.   YES.

09:44AM  23   Q.   AND DID YOU ACTUALLY MEET FACE TO FACE WITH

09:44AM  24   HENRY KISSINGER?

09:44AM  25   A.   I DID.

| | | |
|---|---|---|
| 09:44AM | 1 | Q.   AND THAT'S, AGAIN, SOMETHING THAT THERANOS AND MS. HOLMES |
| 09:44AM | 2 | HELPED ARRANGE? |
| 09:44AM | 3 | A.   YES. |
| 09:44AM | 4 | Q.   AND THEN ITEM 2, YOU SAY IT WOULD BE GREAT IF I COULD |
| 09:44AM | 5 | VISIT YOUR FUNCTIONING LAB IN PHOENIX. |
| 09:45AM | 6 | DO YOU SEE THAT? |
| 09:45AM | 7 | A.   YES. |
| 09:45AM | 8 | Q.   AND WAS THIS AT A TIME WHEN THE LAB WASN'T UP AND RUNNING? |
| 09:45AM | 9 | A.   THAT'S RIGHT. |
| 09:45AM | 10 | Q.   ALL RIGHT.  AND SO THAT VISIT DIDN'T HAPPEN; RIGHT? |
| 09:45AM | 11 | A.   THAT'S RIGHT. |
| 09:45AM | 12 | Q.   AND THEN THIRD YOU SAY, I'D LIKE TO CONTACT INTERMOUNTAIN |
| 09:45AM | 13 | TO DISCUSS HOW FAR ALONG THEY ARE AND THEIR PLANS. |
| 09:45AM | 14 | AND INTERMOUNTAIN WAS ANOTHER HOSPITAL CHAIN? |
| 09:45AM | 15 | A.   YES. |
| 09:45AM | 16 | Q.   AND WITH WHICH THERANOS WAS IN DISCUSSIONS; IS THAT RIGHT? |
| 09:45AM | 17 | A.   YES. |
| 09:45AM | 18 | Q.   AND YOU SAY, YOU COULD JUST CALL THEIR PR PEOPLE, BUT IF |
| 09:45AM | 19 | YOU WOULD RATHER I APPROACH IT A DIFFERENT WAY, LET ME KNOW; |
| 09:45AM | 20 | RIGHT? |
| 09:45AM | 21 | A.   YES. |
| 09:45AM | 22 | Q.   AND DID MS. HOLMES PROVIDE A CONTACT AT INTERMOUNTAIN? |
| 09:45AM | 23 | A.   YES. |
| 09:45AM | 24 | Q.   AND DID THAT CONTACT OCCUR? |
| 09:45AM | 25 | A.   YES. |

09:45AM   1    Q.   ALL RIGHT.  YOU DON'T HAVE TO NAME NAMES, BUT YOU TALKED

09:45AM   2    TO SOMEONE AT INTERMOUNTAIN ABOUT THE RELATIONSHIP WITH

09:45AM   3    THERANOS; RIGHT?

09:45AM   4    A.   YES.

09:45AM   5    Q.   AND THEN THE FINAL POINT IS YOU SAY, I FOUND SOME HELPFUL

09:45AM   6    STUFF ON THE CMS AND FDA SITES REGARDING REGULATORY MATTERS.

09:46AM   7         DO YOU SEE THAT?  ITEM 4?

09:46AM   8    A.   YEAH, UH-HUH, YES.

09:46AM   9    Q.   AND THAT GOES BACK TO THE INTERNET RESEARCH THAT WE WERE

09:46AM  10    TALKING ABOUT BRIEFLY YESTERDAY; RIGHT?

09:46AM  11    A.   YES.

09:46AM  12    Q.   AND THEN YOU SAY, "AND SOMEBODY AT THE FDA HAS ALSO BEEN

09:46AM  13    HELPFUL IN ORIENTING ME THERE."

09:46AM  14         DO YOU SEE THAT?

09:46AM  15    A.   YES.

09:46AM  16    Q.   AND THAT --

09:46AM  17    A.   THAT WAS JUST A PR PERSON.

09:46AM  18    Q.   ALL RIGHT.  BUT YOU DID HAVE SOME SORT OF CONTACT AT THE

09:46AM  19    FDA; RIGHT?

09:46AM  20    A.   WELL, VIRTUALLY MINIMAL.  I MEAN, IT WAS JUST SHE SAID, I

09:46AM  21    CAN'T TELL YOU ANYTHING.  I CAN SHOW YOU WHAT IS ON THE SITE.

09:46AM  22    Q.   ALL RIGHT.  AND SO SHE HELPED YOU NAVIGATE THE SITE?

09:46AM  23    A.   EXACTLY.

09:46AM  24    Q.   ALL RIGHT.

09:46AM  25    A.   AND SHE GAVE ME THE LINKS.

09:46AM  1    Q.  YES.  ALL RIGHT.  SO WE COULD PUT THAT ONE ASIDE.

09:46AM  2        AND I WANT TO GO TO ANOTHER ONE.  I'M HOPING THIS WON'T

09:46AM  3    PRESENT A PROBLEM, BUT IT MIGHT.

09:47AM  4        MAY I APPROACH?  YOUR HONOR, MAY I APPROACH?

09:47AM  5            THE COURT:  YES.

09:47AM  6    BY MR. CLINE:

09:47AM  7    Q.  (HANDING.)

09:47AM  8        MR. PARLOFF, I'VE HANDED YOU WHAT HAS BEEN MARKED AS

09:47AM  9    EXHIBIT 10592.  DO YOU HAVE THAT?

09:47AM 10    A.  YES.

09:47AM 11    Q.  AND IF YOU START -- IT ACTUALLY STARTS ON THE BACK.

09:47AM 12    A.  YES.

09:47AM 13    Q.  IT'S DOUBLE SIDED.

09:47AM 14        AND THERE'S AN EMAIL THERE BETWEEN YOU AND A

09:47AM 15    DR. ERIC TOPOL.

09:47AM 16        DO YOU SEE THAT?

09:47AM 17    A.  YES.

09:47AM 18    Q.  AND THEN IF YOU WORKED YOUR WAY UP THE CHAIN, YOU SEE THAT

09:47AM 19    DR. TOPOL HAS RESPONDED TO YOUR EMAIL; RIGHT?

09:47AM 20    A.  YES.

09:48AM 21    Q.  AND THEN YOU SEE THAT DR. TOPOL HAS FORWARDED HIS EXCHANGE

09:48AM 22    WITH YOU ON TO MS. HOLMES; RIGHT?

09:48AM 23    A.  YES.

09:48AM 24    Q.  ALL RIGHT.  I WILL -- AND THIS IS MAY 9TH AND 10TH, 2014;

09:48AM 25    RIGHT?

09:48AM  1      A.   YES.

09:48AM  2      Q.   DURING THE PERIOD THAT YOU'RE DOING THE RESEARCH FOR YOUR

09:48AM  3      JUNE 2014 ARTICLE?

09:48AM  4      A.   THAT'S RIGHT.

09:48AM  5           MR. CLINE:  YOUR HONOR, I OFFER 10592.

09:48AM  6           BY THE WAY, ONE THING I WANT TO MAKE CLEAR, AFTER

09:48AM  7      DISCUSSING THIS WITH MR. BOSTIC, THE PORTION AT THE BOTTOM

09:48AM  8      WHERE DR. TOPOL IS RESPONDED TO QUESTIONS, IT'S NOT BEING

09:48AM  9      OFFERED FOR ITS TRUTH.

09:48AM  10          MR. BOSTIC:  AND, YOUR HONOR, I APPRECIATE THAT.  I

09:48AM  11     WOULD SAY 801 AS TO THAT PORTION.

09:48AM  12          I WOULD JUST LIKE TO BETTER UNDERSTAND WHY IT IS COMING IN

09:48AM  13     AND THE PURPOSE.

09:48AM  14          MR. CLINE:  AND I'M HAPPY TO EXPLAIN.

09:48AM  15          WE'RE OFFERING THIS, YOUR HONOR, TO SHOW A COUPLE OF

09:49AM  16     THINGS:  THE INDEPENDENT RESEARCH THAT MR. PARLOFF UNDERTOOK AS

09:49AM  17     HE DID THIS ARTICLE, IN OTHER WORDS, HE WASN'T JUST TALKING TO

09:49AM  18     MS. HOLMES, HE WAS TALKING TO A VARIETY OF OTHER PEOPLE,

09:49AM  19     INCLUDING EXPERTS; AND ALSO TO SHOW MS. HOLMES'S AWARENESS OF

09:49AM  20     THOSE EFFORTS AS THE ARTICLE PROGRESSED.

09:49AM  21          SO IT'S NOT BEING OFFERED FOR THE TRUTH OF ANYTHING THAT

09:49AM  22     DR. TOPOL TELLS HIM.  SIMPLY FOR STATE OF MIND AND TO SHOW THE

09:49AM  23     EXTENT OF DR. PARLOFF'S -- NOT DR. PARLOFF'S -- MR. PARLOFF'S

09:49AM  24     RESEARCH.

09:49AM  25          THE COURT:  ISN'T IT IN EVIDENCE ALREADY THAT

09:49AM   1        MS. HOLMES SUGGESTED HE SPEAK WITH OTHER PEOPLE?

09:49AM   2                MR. CLINE:  THAT IS.  THIS PARTICULAR PERSON IS NOT,

09:49AM   3    AND THIS IS AN INDEPENDENT EXPERT, A MEDICAL DOCTOR AT A

09:49AM   4    PRESTIGIOUS INSTITUTION, AND THAT'S WHY WE WANTED TO PUT THAT

09:49AM   5    IN.

09:49AM   6                THE COURT:  YOU JUST DID.

09:49AM   7                MR. CLINE:  WELL, UNFORTUNATELY WHAT I SAY IS NOT

09:50AM   8    EVIDENCE.  I WISH IT WERE.

09:50AM   9                THE COURT:  ALL RIGHT.  I'LL ALLOW THIS TO COME IN.

09:50AM  10        LADIES AND GENTLEMEN, IT'S ONLY COMING IN NOT FOR THE

09:50AM  11    TRUTH OF THE MATTER ASSERTED.

09:50AM  12        IS THAT WHAT YOU'RE TELLING THE JURY?

09:50AM  13                MR. CLINE:  YES.

09:50AM  14                THE COURT:  BUT ONLY TO SHOW KNOWLEDGE THAT

09:50AM  15    MS. HOLMES KNEW THAT THIS WITNESS WAS DOING ADDITIONAL RESEARCH

09:50AM  16    AT HER SUGGESTION?

09:50AM  17                MR. CLINE:  WELL, ON THIS PARTICULAR PERSON, I'M NOT

09:50AM  18    SURE.  WE'LL FIND OUT.

09:50AM  19        BUT IN GENERAL, YES.

09:50AM  20                THE COURT:  OKAY.  SO, LADIES AND GENTLEMEN, THIS IS

09:50AM  21    OFFERED NOT FOR THE TRUTH OF THE MATTER ASSERTED, BUT ONLY TO

09:50AM  22    SHOW THE STATE OF MIND OF MS. HOLMES, THAT IS, AS TO KNOWLEDGE

09:50AM  23    OF THIS WITNESS'S ENGAGING IN ADDITIONAL RESEARCH.

09:50AM  24        (DEFENDANT'S EXHIBIT 10592 WAS RECEIVED IN EVIDENCE.)

09:50AM  25                THE COURT:  ALL RIGHT.

09:50AM  1          MR. CLINE:  THANK YOU.

09:50AM  2     Q.   ALL RIGHT.  MR. PARLOFF, IF YOU LOOK AT THIS DOCUMENT --

09:50AM  3     WE CAN PUT IT UP NOW.  IF WE CAN GO TO THE BOTTOM EMAIL THERE.

09:50AM  4          THIS, THIS RUNS OVER ON TO THE BACK PAGE, AND I'M NOT SURE

09:51AM  5     IF THERE'S ANYTHING THAT YOU CAN DO ABOUT THAT TO DISPLAY IT.

09:51AM  6          DO YOU SEE THAT THIS IS -- YOU'VE HAD AN EXCHANGE WITH A

09:51AM  7     DR. ERIC TOPOL.

09:51AM  8          DO YOU SEE THAT?

09:51AM  9     A.   YES.

09:51AM 10     Q.   AND WAS HE SOMEONE THAT MS. HOLMES HAD REFERRED YOU TO?

09:51AM 11     A.   YES.

09:51AM 12     Q.   AND DR. TOPOL IS -- HE'S A MEDICAL DOCTOR; RIGHT?

09:51AM 13     A.   YES.

09:51AM 14     Q.   AND HE'S AT THE SCRIPPS -- HE'S A -- AT THE SCRIPPS

09:51AM 15     TRANSLATIONAL SCIENCE INSTITUTE; RIGHT?

09:51AM 16     A.   YEAH, HE CERTAINLY WAS THEN.

09:51AM 17     Q.   I'M SORRY?

09:51AM 18     A.   AND HE MAY STILL BE THERE.

09:51AM 19     Q.   OF COURSE.  WE'RE TALKING ABOUT MAY OF 2014 WHEN YOU WERE

09:51AM 20     TALKING WITH HIM; RIGHT?

09:51AM 21     A.   YES.

09:51AM 22     Q.   HE'S A PROFESSOR OF GENOMICS AT THE SCRIPPS RESEARCH

09:51AM 23     INSTITUTE; IS THAT RIGHT?

09:51AM 24     A.   YES.

09:51AM 25     Q.   AND HE IS AN EXPERT THAT YOU WERE TALKING TO, ALONG WITH

09:51AM 1    DR. HELFET WHO WE WERE DISCUSSING YESTERDAY, TO GET A READ ON

09:52AM 2    THERANOS'S WORK; RIGHT?

09:52AM 3    A.   YES.

09:52AM 4    Q.   AND YOU SENT HIM AN EMAIL, THIS IS THE BOTTOM EMAIL IN

09:52AM 5    THIS CHAIN; RIGHT?

09:52AM 6    A.   YES.

09:52AM 7    Q.   AND YOU SAY, "ERIC --

09:52AM 8         "I'M THE 'FORTUNE' REPORTER YOU SPOKE WITH A COUPLE OF

09:52AM 9    WEEKS," I THINK YOU MEANT TO SAY AGO, "ABOUT THERANOS AND

09:52AM 10   ELIZABETH HOLMES."  YOU GO ON, "I HAVE HAD SOME BACKGROUND

09:52AM 11   DISCUSSION WITH SOME OFFICIALS WITH AN INCUMBENT BLOOD

09:52AM 12   ANALYTICS COMPANY."

09:52AM 13        RIGHT?

09:52AM 14   A.   YES.

09:52AM 15   Q.   AND CAN WE SAY THAT THAT IS ONE OF THERANOS'S COMPETITORS?

09:52AM 16   A.   YES.

09:52AM 17   Q.   AND YOU SAY, "NOT SURPRISINGLY, THEY WERE POOH-POOH'ING

09:52AM 18   WHAT THEY UNDERSTAND TO BE THERANOS'S ACCOMPLISHMENTS IN A

09:52AM 19   NUMBER OF WAYS."

09:52AM 20        RIGHT?

09:52AM 21   A.   YES.

09:52AM 22   Q.   AND YOU LIST A NUMBER OF WAYS THAT THEY WERE POOH-POOH'ING

09:52AM 23   THE ACCOMPLISHMENTS IN NUMBER POINTS; RIGHT?

09:52AM 24   A.   YES.

09:53AM 25   Q.   AND DR. TOPOL RESPONDS TO YOU; RIGHT?

09:53AM   1    A.   YES.

09:53AM   2    Q.   AND THAT'S THE NEXT EMAIL UP?

09:53AM   3    A.   IT LOOKS LIKE -- OH, YEAH, UH-HUH.

09:53AM   4    Q.   ALSO ON MAY 9TH, 2014; RIGHT?

09:53AM   5    A.   YES.

09:53AM   6    Q.   AND HE SAYS, "HI ROGER,

09:53AM   7         "THANKS FOR YOUR NOTE - NOT SURPRISING THAT THE THREATENED

09:53AM   8    ENTITIES WOULD COME BACK WITH THESE POINTS."

09:53AM   9         AND THEN HE INTERLINEATES HIS RESPONSES TO YOUR COMMENTS;

09:53AM  10    RIGHT?

09:53AM  11    A.   YES.

09:53AM  12    Q.   AND ALTHOUGH YOU'RE NOT COPIED ON THE EMAIL, THIS GETS

09:53AM  13    FORWARDED ON TO MS. HOLMES; RIGHT?

09:53AM  14         DO YOU SEE THAT?

09:53AM  15    A.   YES.

09:54AM  16    Q.   ALL RIGHT.  WE CAN TAKE THAT DOWN.

09:54AM  17         THE LAST THING I WANT TO DO -- AND I'M HOPING THAT WE CAN

09:54AM  18    TICK THROUGH THESE QUICKLY -- I WANT TO GET THESE DATES IN THE

09:54AM  19    RECORD.

09:54AM  20         IF YOU CAN REFER TO YOUR DOCUMENT, IT WILL BE TAB 1646 IN

09:54AM  21    THE NOTEBOOK THERE, AND I CAN POINT YOU TO PARTICULAR PAGES IF

09:54AM  22    YOU NEED ME TO REFRESH YOUR RECOLLECTION.

09:54AM  23         WE TALKED YESTERDAY ABOUT THE NUMBER OF HOURS TOTAL THAT

09:54AM  24    YOU SPENT TALKING WITH MS. HOLMES; RIGHT?

09:54AM  25    A.   YES.

PARLOFF CROSS BY MR. CLINE (RES.)

09:54AM 1   Q.   AND WHAT I WANT TO DO HERE IS QUICKLY TICK THROUGH THE

09:54AM 2   DATES, THE NUMBER OF INTERACTIONS THAT YOU HAD BETWEEN THE

09:54AM 3   FIRST ONE ON APRIL THE 7TH AND THE PUBLICATION OF YOUR ARTICLE

09:54AM 4   IN JUNE OF 2014.

09:54AM 5   A.   OKAY.

09:54AM 6   Q.   ALL RIGHT.  LET'S RUN THROUGH THESE DATES AND SEE IF WE

09:54AM 7   CAN JUST AGREE ON THEM QUICKLY.  OKAY?

09:54AM 8   A.   OKAY.

09:54AM 9   Q.   THE FIRST INTERVIEW WAS APRIL THE 7TH; RIGHT?

09:54AM 10  A.   YES.

09:54AM 11  Q.   AND YOU TALKED WITH MS. HOLMES FOR A COUPLE OF HOURS THAT

09:54AM 12  DAY?

09:54AM 13  A.   WHATEVER IS -- YEAH.

09:54AM 14  Q.   ALL RIGHT.  WE DON'T HAVE TO NAIL IT DOWN --

09:55AM 15  A.   YEAH.

09:55AM 16  Q.   -- BUT YOU RECORDED SOME OF THAT INTERACTION; RIGHT?

09:55AM 17  A.   YEAH.

09:55AM 18  Q.   AND YOU HAD DINNER WITH MS. HOLMES THAT EVENING; RIGHT?

09:55AM 19  A.   YES.

09:55AM 20  Q.   AND THEN APRIL THE 8TH YOU SPOKE AGAIN WITH MS. HOLMES?

09:55AM 21  A.   YES, UH-HUH.

09:55AM 22  Q.   AND THE 7TH AND THE 8TH, THOSE ARE THE TWO DAYS THAT YOU

09:55AM 23  WERE ACTUALLY AT THERANOS; RIGHT?

09:55AM 24  A.   YES.  I THINK I WAS THERE THE 10TH AS WELL.

09:55AM 25  Q.   OKAY.

09:55AM  1    A.   AND I MIGHT HAVE SHOWN UP FOR PARTS OF THE 9TH, BUT TO SEE

09:55AM  2    OTHER PEOPLE.

09:55AM  3    Q.   ALL RIGHT.  SO YOU THINK A TOTAL OF FOUR DAYS --

09:55AM  4    A.   YEAH.

09:55AM  5    Q.   -- IN WHOLE OR IN PART YOU WERE IN CAMPUS THERE AT

09:55AM  6    THERANOS?

09:55AM  7    A.   YEAH, UH-HUH.

09:55AM  8    Q.   AND THAT'S WHEN YOU HAD THE TOUR THAT YOU DESCRIBED;

09:55AM  9    RIGHT?

09:55AM  10   A.   I DON'T KNOW WHICH DAY IT WAS.

09:55AM  11   Q.   BUT SOMEWHERE IN THAT FOUR DAY STRETCH?

09:55AM  12   A.   YES.

09:55AM  13   Q.   AND YOU ALSO SAT IN ON A PRODUCT MEETING OF SOME KIND?

09:55AM  14   A.   YES.

09:55AM  15   Q.   AND THAT WAS SOMETHING, EVEN THOUGH YOU WERE ABLE TO SIT

09:55AM  16   ON IT, IT WAS OFF THE RECORD AND YOU WERE NOT ABLE TO REPORT IT

09:55AM  17   IN YOUR ARTICLE; RIGHT?

09:55AM  18   A.   THAT'S RIGHT.

09:56AM  19   Q.   AM I REMEMBERING THAT RIGHT?

09:56AM  20   A.   AND THERE WERE NO NOTES OR TAPES.

09:56AM  21   Q.   AND THIS IS A MEETING WHERE MS. HOLMES IS MEETING WITH HER

09:56AM  22   TEAM AND THEY'RE TALKING ABOUT SOME ISSUE WITH THE TECHNOLOGY;

09:56AM  23   RIGHT?

09:56AM  24   A.   YES.

09:56AM  25   Q.   SO WE HAVE THE 7TH AND THE 8TH.

09:56AM  1           AND THEN YOU SPOKE AGAIN WITH MS. HOLMES ON THE 10TH;

09:56AM  2   RIGHT?

09:56AM  3   A.   YES.

09:56AM  4   Q.   APRIL 10TH, 2014, JUST SO THE RECORD IS CLEAR HERE.

09:56AM  5           AND YOU SPOKE WITH HER AGAIN ON APRIL 22ND, 2014?

09:56AM  6   A.   UM --

09:56AM  7   Q.   THIS IS AT PAGE 60 OF THAT DOCUMENT IF YOU WANT TO REFER

09:56AM  8   TO IT.

09:56AM  9   A.   PAGE 60.  YES.

09:56AM 10   Q.   APRIL 29TH, 2014.  THAT'S AT PAGE 61?

09:56AM 11   A.   YES.

09:56AM 12   Q.   MAY 5TH, 2014.  THAT'S AT PAGE 65?

09:56AM 13   A.   YES.

09:56AM 14   Q.   MAY 12TH, 2014.  THAT'S AT PAGE 67?

09:56AM 15   A.   YES.

09:56AM 16   Q.   MAY 14TH, 2014.  THAT'S AT 84?

09:56AM 17   A.   YES.

09:57AM 18   Q.   MAY 21ST, 2014.  THAT'S AT 85?

09:57AM 19   A.   YES.

09:57AM 20   Q.   MAY 20 --

09:57AM 21   A.   MAY 21ST?  YES.

09:57AM 22   Q.   MAY 28TH, 2014.  THAT'S ALSO AT 85?

09:57AM 23   A.   YEAH.

09:57AM 24   Q.   AND THEN AGAIN ON JUNE THE 2ND, 2014.  AND UNFORTUNATELY,

09:57AM 25   I'M GOING TO RELY ON YOUR MEMORY FOR THAT ONE.  I DON'T HAVE A

09:57AM   1    NOTE THAT I CAN POINT YOU TO.

09:57AM   2    A.   WHICH ONE WAS IT?

09:57AM   3    Q.   JUNE 2ND, 2014.

09:57AM   4    A.   THAT SOUNDS RIGHT.

09:57AM   5    Q.   AND AS WE DISCUSSED, IN ADDITION TO THESE CALLS AND

09:57AM   6    MEETINGS, THERE WERE A WHOLE SERIES OF EMAIL EXCHANGES, SOME OF

09:57AM   7    WHICH WE'VE SEEN; RIGHT?

09:57AM   8    A.   YES.

09:57AM   9    Q.   ALL RIGHT.

09:57AM   10        THAT'S ALL OF MY QUESTIONS, YOUR HONOR.  THANK YOU.

09:57AM   11             THE COURT:  REDIRECT?

09:57AM   12             MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

09:57AM   13                    **REDIRECT EXAMINATION**

09:57AM   14   BY MR. BOSTIC:

09:58AM   15   Q.   GOOD MORNING, MR. PARLOFF.

09:58AM   16   A.   GOOD MORNING.

09:58AM   17             MR. BOSTIC:  YOUR HONOR, A BRIEF HOUSEKEEPING MATTER

09:58AM   18   FROM YESTERDAY AND TODAY.  THE PARTIES HAVE PLAYED AUDIO

09:58AM   19   EXCERPTS INTO THE RECORD.  WOULD THE COURT ORDER THAT THE

09:58AM   20   TRANSCRIPTS OF THOSE RECORDS BE APPENDED TO THE RECORD IN THIS

09:58AM   21   CASE?

09:58AM   22        I HAVE SPOKEN TO MR. CLINE AND I UNDERSTAND THERE'S NO

09:58AM   23   OBJECTION.

09:58AM   24             MR. CLINE:  NO OBJECTION TO IT BEING APPENDED TO THE

09:58AM   25   RECORD.  IT WILL NOT BE EVIDENCE IN THE CASE.

09:58AM  1          MR. BOSTIC:  AGREED, YOUR HONOR.

09:58AM  2          THE COURT:  YOU HAVE TRANSCRIPTS, INDEPENDENT

09:58AM  3    TRANSCRIPTS YOU'RE SPEAKING OF?

09:58AM  4          MR. BOSTIC:  YES, YOUR HONOR.  THE PARTIES CAN AGREE

09:58AM  5    ON THEM AND PROVIDE THEM IN DUE COURSE.

09:58AM  6          THE COURT:  ALL RIGHT.  THANK YOU.

09:58AM  7          MR. BOSTIC:  THANK YOU, YOUR HONOR.

09:58AM  8          THE COURT:  AND THAT'S APPROVED, YES.

09:58AM  9    BY MR. BOSTIC:

09:58AM  10   Q.   MR. PARLOFF, DO YOU RECALL DISCUSSIONS WITH MR. CLINE

09:59AM  11   ABOUT YOUR CONVERSATIONS WITH MS. HOLMES ABOUT USE OF THE

09:59AM  12   THERANOS TECHNOLOGY BY THE U.S. MILITARY?

09:59AM  13   A.   YES.

09:59AM  14   Q.   MR. CLINE PLAYED FOR YOU A CLIP YESTERDAY WHERE THAT TOPIC

09:59AM  15   CAME UP.

09:59AM  16        DO YOU REMEMBER THAT CLIP GENERALLY?

09:59AM  17   A.   YES.

09:59AM  18   Q.   AND IN THAT CLIP, IN RESPONSE TO A QUESTION BY YOU ABOUT

09:59AM  19   THE MILITARY, MS. HOLMES SAID SOMETHING TO THE EFFECT OF THAT

09:59AM  20   THE BEST WAY TO SAY THAT WAS IN TERMS OF DECENTRALIZING AND

09:59AM  21   THAT THE APPLICATION OF THAT MIGHT INCLUDE THE MILITARY.

09:59AM  22        DO YOU RECALL THAT?

09:59AM  23   A.   YES.

09:59AM  24   Q.   IN YOUR --

09:59AM  25   A.   IT MIGHT INCLUDE A MILITARY.

09:59AM  1    Q.   THAT THE APPLICATION, ONE OF THE APPLICATIONS MIGHT BE THE

09:59AM  2    MILITARY?

09:59AM  3    A.   YES, YEAH.

09:59AM  4    Q.   THAT STATEMENT BY MS. HOLMES WAS CONSISTENT WITH WHAT

09:59AM  5    ENDED UP IN YOUR ARTICLE, CORRECT, THAT USE OF THE TECHNOLOGY

09:59AM  6    BY THE MILITARY IS SOMETHING THAT ONE COULD IMAGINE?

09:59AM  7    A.   YES.

10:00AM  8    Q.   THAT CONVERSATION WAS RECORDED; IS THAT RIGHT?

10:00AM  9    A.   I BELIEVE SO.

10:00AM  10   Q.   AND WE LISTENED TO A CLIP FROM IT?

10:00AM  11   A.   YEAH.

10:00AM  12   Q.   WHEN YOU RECORDED CONVERSATIONS WITH MS. HOLMES, DID YOU

10:00AM  13   MAKE A POINT OF MAKING SURE SHE KNEW THAT THAT RECORDING WAS

10:00AM  14   TAKING PLACE?

10:00AM  15   A.   YES, UH-HUH.

10:00AM  16   Q.   DID THAT HAPPEN EACH TIME?

10:00AM  17   A.   YES.

10:00AM  18   Q.   AND DID THE TOPIC OF THERANOS'S USE -- EXCUSE ME, THE

10:00AM  19   MILITARY USE OF THERANOS'S TECHNOLOGY ALSO COME UP IN

10:00AM  20   UNRECORDED CONVERSATIONS?

10:00AM  21   A.   YES.

10:00AM  22   Q.   LET ME ASK YOU A QUESTION ABOUT -- OR A COUPLE OF

10:00AM  23   QUESTIONS ABOUT YOUR SHORTHAND AND SPEED WRITING TECHNIQUES.

10:00AM  24   A.   YES.

10:00AM  25   Q.   DO YOU RECALL DISCUSSING THAT BOTH ON DIRECT AND CROSS?

10:00AM  1    A.   YES.

10:00AM  2    Q.   AND JUST TO CLARIFY, THE TECHNIQUE THAT YOU USE, ARE YOU

10:00AM  3    JUST WRITING DOWN YOUR IMPRESSIONS OF WHAT THE SUBJECT IS

10:00AM  4    TELLING YOU, OR ARE YOU MAKING YOUR BEST EFFORTS TO ACTUALLY

10:00AM  5    CAPTURE THE WORDS THAT ARE BEING USED?

10:00AM  6    A.   IT ATTEMPTS TO BE VERBATIM, THE WORDS, THE EXACT WORDS.

10:01AM  7    Q.   THANK YOU.

10:01AM  8    A.   YEP.

10:01AM  9    Q.   AND YOU USED THAT PRACTICE IN RECORDING AND MEMORIALIZING

10:01AM  10   YOUR CONVERSATIONS WITH MS. HOLMES AND THE STATEMENTS THAT SHE

10:01AM  11   MADE TO YOU?

10:01AM  12   A.   YES.

10:01AM  13   Q.   AND YOU PRESERVE THOSE NOTES AFTERWARDS?

10:01AM  14   A.   YES.

10:01AM  15   Q.   AND HAVE YOU REVIEWED THOSE NOTES SINCE YOUR CONVERSATIONS

10:01AM  16   WITH MS. HOLMES AND BEFORE TESTIFYING IN THIS TRIAL?

10:01AM  17   A.   YES.

10:01AM  18   Q.   MULTIPLE TIMES?

10:01AM  19   A.   YES.

10:01AM  20   Q.   NO FURTHER QUESTIONS.

10:01AM  21        THANK YOU, MR. PARLOFF.

10:01AM  22             MR. CLINE:  NOTHING MORE, YOUR HONOR.

10:01AM  23             THE COURT:  MAY THIS WITNESS BE EXCUSED?

10:01AM  24             MR. BOSTIC:  YES.

10:01AM  25             MR. CLINE:  YES.

| | | |
|---|---|---|
| 10:01AM | 1 | THE COURT: SIR, YOU'RE EXCUSED. YOU CAN JUST LEAVE |
| 10:01AM | 2 | ALL OF THAT THERE ON THE COUNTER. |
| 10:02AM | 3 | ALL RIGHT. THANK YOU. THE RECORD SHOULD REFLECT THAT |
| 10:02AM | 4 | MR. PARLOFF HAS LEFT THE COURTROOM NOW. |
| 10:02AM | 5 | DOES THE GOVERNMENT HAVE AN ADDITIONAL WITNESS TO CALL? |
| 10:02AM | 6 | MR. SCHENK: YOUR HONOR, MAY I? |
| 10:02AM | 7 | THE COURT: PLEASE. |
| 10:02AM | 8 | MR. SCHENK: A COUPLE OF THINGS FIRST. |
| 10:02AM | 9 | THE GOVERNMENT MOVES INTO EVIDENCE EXHIBIT 4859. I |
| 10:02AM | 10 | BELIEVE THE DEFENSE AGREES. |
| 10:02AM | 11 | MR. WADE: THIS IS THE CONDITIONAL? |
| 10:02AM | 12 | NO OBJECTION. |
| 10:02AM | 13 | THE COURT: THAT'S ADMITTED WITHOUT OBJECTION. |
| 10:02AM | 14 | (GOVERNMENT'S EXHIBIT 4859 WAS RECEIVED IN EVIDENCE.) |
| 10:02AM | 15 | MR. SCHENK: SECOND, AS THE COURT KNOWS, BECAUSE ONE |
| 10:02AM | 16 | PATIENT WILL NOT TESTIFY IN THIS TRIAL, THE GOVERNMENT MOVES TO |
| 10:02AM | 17 | DISMISS, WITHOUT PREJUDICE, COUNT NINE AS TO THIS DEFENDANT. |
| 10:02AM | 18 | THE COURT: ALL RIGHT. COUNT NINE OF THE THIRD |
| 10:02AM | 19 | SUPERSEDING INDICTMENT AS TO THIS DEFENDANT, MS. HOLMES? |
| 10:02AM | 20 | MR. SCHENK: YES, YOUR HONOR. |
| 10:02AM | 21 | THE COURT: ANY OBJECTION? |
| 10:03AM | 22 | MR. DOWNEY: NO OBJECTION, YOUR HONOR. |
| 10:03AM | 23 | THE COURT: ALL RIGHT. THANK YOU. THAT'S GRANTED. |
| 10:03AM | 24 | THEN COUNT NINE, COUNT NINE, LADIES AND GENTLEMEN, THE |
| 10:03AM | 25 | GOVERNMENT HAS MOVED TO DISMISS COUNT NINE OF THE THIRD |

10:03AM 1    SUPERSEDING INDICTMENT.  THAT IS GRANTED, AND THAT WILL NOT BE

10:03AM 2    BEFORE YOU FOR DECISION.

10:03AM 3         THANK YOU.

10:03AM 4            MR. SCHENK:  THANK YOU, YOUR HONOR.

10:03AM 5         AND FINALLY, THE UNITED STATES RESTS.

10:03AM 6            THE COURT:  ALL RIGHT.  THANK YOU.  THE GOVERNMENT

10:03AM 7    RESTS.

10:03AM 8         LADIES AND GENTLEMEN, WHAT THAT MEANS IS THAT THE

10:03AM 9    GOVERNMENT HAS PRESENTED THEIR ENTIRE CASE TO YOU NOW.

10:03AM 10        AT THIS TIME, LET ME CALL ON THE DEFENSE.

10:03AM 11        MR. DOWNEY, DO YOU HAVE A WITNESS TO CALL?

10:03AM 12           MR. DOWNEY:  YOUR HONOR, BEFORE THAT BEGINS, THE

10:03AM 13   DEFENSE HAS SOME MOTIONS TO RAISE WITH THE COURT.

10:03AM 14           THE COURT:  OKAY.

10:03AM 15           MR. DOWNEY:  WE WILL NOT NEED THE PRESENCE OF THE

10:03AM 16   JURY FOR THAT.

10:03AM 17           THE COURT:  ALL RIGHT.

10:03AM 18           MR. DOWNEY:  SO IF WE CAN TAKE A BRIEF ADJOURNMENT

10:03AM 19   AND BEGIN WITH THAT?

10:03AM 20           THE COURT:  LET'S DO THAT.

10:03AM 21        WE'LL TAKE A BREAK, LADIES AND GENTLEMEN.  I NEED TO TALK

10:03AM 22   WITH THE LAWYERS ABOUT THE NEXT STEPS, SO WE'LL TAKE A BREAK.

10:04AM 23        THIS WILL PROBABLY BE ABOUT -- WELL, I DON'T KNOW.  I'M

10:04AM 24   NOT GOING TO MAKE ANY TIMING PROMISES, BUT WE'LL TAKE A BREAK

10:04AM 25   AND WE'LL CALL YOU BACK IN WHEN NECESSARY.

| | | |
|---|---|---|
| 10:04AM | 1 | THANK YOU. |
| 10:04AM | 2 | (JURY OUT AT 10:04 A.M.) |
| 10:04AM | 3 | THE COURT:  PLEASE BE SEATED.  THANK YOU. |
| 10:04AM | 4 | THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT THE |
| 10:04AM | 5 | COURTROOM.  ALL PARTIES REMAIN.  COUNSEL AND MS. HOLMES REMAIN. |
| 10:04AM | 6 | MR. DOWNEY, SHOULD I HEAR FROM MS. SAHARIA NOW? |
| 10:04AM | 7 | MR. DOWNEY:  YES, YOUR HONOR.  MS. SAHARIA IS GOING |
| 10:04AM | 8 | TO SPEAK TO THE COURT ABOUT ISSUES UNDER RULE 29, AS WELL AS |
| 10:05AM | 9 | SOME OTHER ISSUES RELATED TO THE RECORD TO DATE IN THE CASE. |
| 10:05AM | 10 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 10:05AM | 11 | GOOD MORNING AGAIN, MS. SAHARIA. |
| 10:05AM | 12 | MS. SAHARIA:  GOOD MORNING AGAIN, YOUR HONOR. |
| 10:05AM | 13 | WE DO INTEND TO MOVE FOR JUDGMENT OF ACQUITTAL UNDER |
| 10:05AM | 14 | RULE 29, BUT BEFORE I DO THAT -- AND I THINK THE INTENT TODAY |
| 10:05AM | 15 | IS TO DO THAT GENERALLY AND IN THE INTEREST OF MOVING ALONG, |
| 10:05AM | 16 | AND THEN WE CAN TAKE UP THE ARGUMENT AT A LATER DATE IF THAT'S |
| 10:05AM | 17 | THE COURT'S PREFERENCE. |
| 10:05AM | 18 | BUT BEFORE I DO THAT, WE HAVE THREE HOUSEKEEPING MATTERS |
| 10:05AM | 19 | TO RAISE WITH RESPECT TO THE EVIDENCE THAT HAS COME INTO THE |
| 10:05AM | 20 | GOVERNMENT'S CASE, AND MR. LOOBY IS GOING TO ADDRESS THE FIRST |
| 10:05AM | 21 | OF THOSE HOUSEKEEPING MATTERS. |
| 10:05AM | 22 | THE COURT:  OKAY. |
| 10:05AM | 23 | MS. SAHARIA:  AND THEN I'LL RETURN FOR THE OTHER |
| 10:05AM | 24 | TWO. |
| 10:05AM | 25 | THE COURT:  ALL RIGHT.  THANK YOU. |

10:05AM 1    MR. LOOBY?  SHOULD I SAY IT'S NICE TO SEE YOU AGAIN AS

10:05AM 2  WELL, MR. LOOBY?

10:05AM 3    MR. LOOBY:  YES, YOUR HONOR, IT'S WONDERFUL TO BE

10:06AM 4  BACK UP HERE.  GOOD MORNING.

10:06AM 5    WE'RE DISCUSSING THE CMS REPORT AGAIN.

10:06AM 6    SO THIS EVIDENTIARY RULING THE DEFENSE IS MOVING TO

10:06AM 7  STRIKE, UNDER RULE 403 AND THE CONFRONTATION CLAUSE, THE

10:06AM 8  PORTIONS OF THE JANUARY 25, 2016 CMS FORM 2567 AND COVER LETTER

10:06AM 9  AND RELATED TESTIMONY THAT WERE ADMITTED DURING THE TESTIMONY

10:06AM 10  OF DR. DAS, AND THAT'S EXHIBIT 4621 AS REDACTED, AND I BELIEVE

10:06AM 11  IT CAME IN AS 4621A AND 4621B.

10:06AM 12    WE MAKE THIS MOTION NOW THAT THE GOVERNMENT HAS RESTED.

10:06AM 13  THERE ARE TWO REASONS WHY THE GOVERNMENT'S CASE, NOW THAT WE

10:06AM 14  HAVE SEEN IT, THE COMPLETE CASE, CANNOT JUSTIFY ADMISSION OF

10:06AM 15  THE REPORT.

10:06AM 16    THE FIRST AND PROBABLY THE MOST IMPORTANT IS THE

10:06AM 17  GOVERNMENT HAS RESTED WITHOUT CALLING A CMS WITNESS.  THIS

10:06AM 18  RAISES 403 AND CONFRONTATION CLAUSE CONCERNS.

10:06AM 19    THE GOVERNMENT HAD PREVIOUSLY NOTED THAT THIS TESTIMONY IS

10:07AM 20  A NECESSARY PREREQUISITE TO THE REPORT'S ADMISSION.  THE FACT

10:07AM 21  THAT A CMS INSPECTOR WOULD TESTIFY WAS THE PRIMARY REASON WHY

10:07AM 22  THE GOVERNMENT ASKED THE COURT TO REJECT OUR RULE 403 ARGUMENTS

10:07AM 23  WHEN WE FIRST LITIGATED THIS MATTER PRETRIAL, AND THAT'S AT

10:07AM 24  DOCKET 675.

10:07AM 25    SO THEY SAID FUNDAMENTALLY THE EVIDENCE IS NOT EXCLUDABLE

10:07AM 1    BECAUSE IT'S SUBJECTIVE.  THE REMEDY IS CROSS-EXAMINATION.  AND

10:07AM 2    THAT'S AT PAGE 8 OR 9, 8 TO 9.  AND AGAIN AT PAGE 8, MS. HOLMES

10:07AM 3    REMAINS FREE TO CROSS-EXAMINE THE CMS WITNESSES AND ATTEMPT TO

10:07AM 4    UNDERCUT THEIR OBSERVATIONS.

10:07AM 5        THIS CONCESSION FROM THE GOVERNMENT PRETRIAL, IT MAKES

10:07AM 6    SENSE, THE CMS REPORT POSES SEVERAL ISSUES AS A PIECE OF

10:07AM 7    EVIDENCE, MANY OF WHICH WE HAVE ALREADY DISCUSSED, THAT MAKE IT

10:07AM 8    DANGEROUS WITHOUT CONTEXT FROM ITS AUTHORS.  THAT'S THE

10:08AM 9    TECHNICAL NATURE, THE FACT THAT IT SETS FORTH OBSERVATIONS OF

10:08AM 10   REGULATORY VIOLATIONS THAT ARE DETERMINED BY THE INSPECTORS

10:08AM 11   THEMSELVES, AND ALSO THAT WE WOULD PROFFER THAT THE CMS

10:08AM 12   INSPECTORS WOULD HAVE TESTIFIED THAT A LOT OF THOSE

10:08AM 13   OBSERVATIONS, INCLUDING WHETHER OR NOT A LAB PRACTICE IS

10:08AM 14   DEFICIENT, WHETHER A LAB, DEFICIENT LAB PRACTICE RISES TO A

10:08AM 15   STANDARD OR A CONDITION LEVEL, AND WHETHER IMMEDIATE JEOPARDY

10:08AM 16   IS FOUND OR INHERENTLY SUBJECTIVE OBSERVATIONS.

10:08AM 17       THE REPORT HAS BEEN ADMITTED AND MS. HOLMES DID NOT HAVE

10:08AM 18   AN OPPORTUNITY TO CONFRONT THE AUTHORS ON THOSE POINTS.

10:08AM 19       AND I'LL BE BRIEF ON THIS POINT, BUT THE SECOND REASON,

10:08AM 20   AND IT DOVETAILS WITH THE FIRST, IS THAT THE GOVERNMENT MOVED

10:08AM 21   TO ADMIT THE REPORT AS BEARING ON MS. HOLMES'S STATE OF MIND

10:08AM 22   AND NOTICE TO HER, AND THAT IS AT -- THE FIRST OF THOSE

10:08AM 23   EXCHANGES WITH THE COURT AND MR. LEACH WAS AT 5810 OF THE

10:08AM 24   TRANSCRIPT.

10:09AM 25       THE ISSUE THAT THIS PRESENTS IS THAT IT'S ONLY NOTICE AND

10:09AM  1    STATE OF MIND AS OF JANUARY 25TH, 2016, AND THE GOVERNMENT HAS

10:09AM  2    NOT IDENTIFIED WHAT STATEMENTS OR ACTIONS THE DEFICIENT LAB

10:09AM  3    PRACTICES IN THE REPORT ARE RELEVANT TO AND WHETHER OR NOT

10:09AM  4    MS. HOLMES MADE STATEMENTS ABOUT THESE PARTICULAR ISSUES ON THE

10:09AM  5    PORTIONS THAT WERE ADMITTED AFTERWARDS.

10:09AM  6         OF COURSE, NONE OF THE KNOWLEDGE THAT WOULD HAVE COME IN

10:09AM  7    THE JANUARY 25TH, 2016 REPORT CAN BE TRANSPORTED BACK IN TIME.

10:09AM  8    SO I DON'T THINK THAT THE GOVERNMENT HAS ACTUALLY LINKED UP THE

10:09AM  9    NOTICE PORTION FOR WHAT IT ADMITTED IT FOR TO ANY RELEVANT

10:09AM  10   STATEMENT OR POINT IN ITS CASE.

10:09AM  11        AND SO GIVEN THAT ITS PROBATIVE VALUE ON THIS POINT IS

10:09AM  12   EITHER ZERO OR AT THE MINIMUM VERY LOW AND THAT THE 403

10:09AM  13   CONCERNS ARE NOW HEIGHTENED GIVEN THE WAY THAT IT CAME IN,

10:09AM  14   WITHOUT CONTEXT AND WITHOUT THE TESTIMONY OF A SMS WITNESS, WE

10:10AM  15   MOVE TO STRIKE THE REPORT AND THE RELATED TESTIMONY.

10:10AM  16        WE'RE PREPARED TO IDENTIFIED FOR THE COURT EXACTLY WHAT

10:10AM  17   PORTIONS OF THOSE TESTIMONY FROM DR. DAS THAT WOULD BE.  IT'S

10:10AM  18   SOME OF HIS TESTIMONY ABOUT THIS, BUT NOT ALL OF IT.

10:10AM  19        AND IT WOULD BE, YOU KNOW, QUESTIONS WHERE THE GOVERNMENT

10:10AM  20   READ PORTIONS OF THE REPORT INTO EVIDENCE AND ASKED DR. DAS IF

10:10AM  21   HE HAD SAW AND READ THEM; QUESTIONS WHERE THE GOVERNMENT ASKED

10:10AM  22   DR. DAS IF HE EVER TOLD CMS THAT HE DISAGREED WITH A PARTICULAR

10:10AM  23   FINDING; AND QUESTIONS WHERE THE GOVERNMENT ASKED DR. DAS TO

10:10AM  24   EXPLAIN WHAT HE HAD UNDERSTOOD CERTAIN TERMS IN THE REPORT TO

10:10AM  25   MEAN.

10:10AM  1        SO UNLESS THE COURT HAS FURTHER QUESTIONS?

10:10AM  2            THE COURT:  NO.

10:10AM  3        LET ME ASK THE GOVERNMENT TO RESPOND IF THEY WISH.

10:10AM  4            MR. LEACH:  BRIEFLY, YOUR HONOR.

10:10AM  5        ALL OF THE ARGUMENTS I JUST HEARD FROM MR. LOOBY WERE

10:10AM  6    RAISED AND REJECTED BY THE COURT ON MULTIPLE OCCASIONS.  I

10:11AM  7    THINK THIS MIGHT BE THE FOURTH OR FIFTH MOTION RELATING TO THE

10:11AM  8    CMS REPORT.

10:11AM  9        THERE WAS AN OBJECTION IN THE MOMENT.  IT WAS OVERRULED.

10:11AM 10    THE RULING WAS CORRECT.

10:11AM 11        DR. DAS -- IT WAS RELEVANT TO MS. HOLMES'S STATE OF MIND,

10:11AM 12    THE SPEED AND ATTENTION WITH WHICH SHE RESPONDS TO THE REPORT,

10:11AM 13    HER CONVERSATIONS WITH DR. DAS ABOUT WHETHER THE FINDINGS ARE

10:11AM 14    CORRECT OR INCORRECT, DR. DAS'S TESTIMONY ABOUT THE REASON FOR

10:11AM 15    THE VOIDING AND WHETHER MS. HOLMES WAS TRYING TO MINIMIZE IT OR

10:11AM 16    NOT MINIMIZE IT, THE STATEMENTS MS. HOLMES MAKES TO

10:11AM 17    MS. PETERSON ATTEMPTING TO MINIMIZE WHAT CMS IS FINDING

10:11AM 18    SUGGESTS THAT SHE DIDN'T TAKE THE REGULATORY ISSUES SERIOUSLY.

10:11AM 19        SO FOR ALL OF THOSE REASONS IT WAS RELEVANT AND

10:11AM 20    APPROPRIATE TO COME IN.

10:11AM 21        THIS IS THE FIRST TIME THAT I'M HEARING ABOUT A RENEWED

10:11AM 22    MOTION, AND I THINK IT'S QUITE PREJUDICIAL TO DO IT AT THIS

10:11AM 23    POINT RATHER THAN WHEN DR. DAS HAD COMPLETED HIS TESTIMONY.

10:11AM 24        I WOULD ALSO SAY THE IDEA OF IMMEDIATE JEOPARDY FIRST CAME

10:12AM 25    INTO EVIDENCE DURING THE PLAYING OF THE "TODAY SHOW" INTERVIEW,

10:12AM 1    WHICH WAS ADDED IN RESPONSE TO THE DEFENDANT'S RULE OF

10:12AM 2    COMPLETENESS ARGUMENTS.

10:12AM 3         SO I DON'T THINK THERE'S SOMETHING PARTICULARLY

10:12AM 4    PREJUDICIAL ABOUT THE LETTER OR DR. DAS'S REVIEW, REPORT TO

10:12AM 5    MS. HOLMES, AND ULTIMATE CONCURRENCE WITH THE OBSERVATIONS BY

10:12AM 6    CMS.

10:12AM 7         I'M HAPPY TO RESPOND MORE FULSOMELY IN WRITING IF THE

10:12AM 8    COURT WISHES, BUT FOR ALL OF THOSE REASONS AND OTHERS, THE

10:12AM 9    MOTION SHOULD BE DENIED.

10:12AM 10           THE COURT:  THANK YOU.

10:12AM 11        DO YOU WISH TO COMMENT NOW OR AT SOME OTHER TIME ON THE

10:12AM 12   CONFRONTATION ISSUE?

10:12AM 13           MR. LEACH:  YES, YOUR HONOR.

10:12AM 14        FIRST, THE CMS REPORT IS NOT TESTIMONIAL, SO THE

10:12AM 15   CONFRONTATION CLAUSE DOESN'T COME INTO PLAY AT ALL.  THAT'S THE

10:12AM 16   FIRST REASON.

10:12AM 17        THE SECOND REASON IS IT CAME IN FOR ITS STATE OF MIND ON

10:12AM 18   MS. HOLMES, AND WE ASKED QUESTIONS OF DR. DAS THAT TOUCHED ON

10:12AM 19   HER STATE OF MIND.

10:12AM 20        SO IT CAME IN FOR A NONHEARSAY PURPOSE.  THERE'S NO POINT

10:13AM 21   TO CROSS-EXAMINING THE CMS WITNESS ABOUT IT, AND IT'S REALLY

10:13AM 22   DR. DAS'S AGREEMENT AND, FRANKLY, MS. HOLMES'S AGREEMENT ON

10:13AM 23   SOME LEVEL TO VOID THE TESTS THAT MADE ALL OF THIS RELEVANT,

10:13AM 24   AND DR. DAS'S SUBSEQUENT INVESTIGATION TO SEE IF THESE WERE

10:13AM 25   ABERRATIONS OR NOT ABERRATIONS.

10:13AM   1        SO THERE WOULD HAVE BEEN NO POINT TO CROSS-EXAMINING

10:13AM   2   SARAH BENNETT FOR THE PURPOSE FOR WHICH IT CAME IN.

10:13AM   3        BUT THE CONFRONTATION CLAUSE DOESN'T COME INTO PLAY AT ALL

10:13AM   4   BECAUSE THE CMS REPORT IS NOT TESTIMONIAL, WHICH IS ONE OF THE

10:13AM   5   REQUIREMENTS FOR THE SIXTH AMENDMENT ANALYSIS.

10:13AM   6              THE COURT:  THANK YOU.

10:13AM   7              MR. LOOBY:  YOUR HONOR, AND THE DEFENSE BELIEVES

10:13AM   8   THAT THE CMS REPORT AND ITS OBSERVATIONS WERE TESTIMONIAL

10:13AM   9   BECAUSE THEY WERE PREPARED IN ADVANCE WITH AN EYE TOWARDS

10:13AM  10   LITIGATION AND POTENTIAL CRIMINAL LITIGATION.

10:13AM  11        THIS IS AN ISSUE, YOU KNOW, THAT WE DISCUSSED AS IT

10:13AM  12   RELATED TO THE HEARSAY ISSUES.  INITIALLY THE DEFENSE JUST

10:13AM  13   REITERATES AND PRESERVES ITS POSITION ON THAT.

10:14AM  14        AND THEN AS FOR THE NONHEARSAY PURPOSE IN WHICH IT CAME

10:14AM  15   IN, I THINK, YOU KNOW, EVEN IF -- THE REPORT ITSELF CAME IN FOR

10:14AM  16   NONHEARSAY, BUT THEN THE GOVERNMENT ASKED DR. DAS WHETHER OR

10:14AM  17   NOT HE AGREED WITH CERTAIN PORTIONS OF IT.

10:14AM  18        SO I THINK THE 403 CONCERNS ARE STILL PRESENT, AND WE

10:14AM  19   DISAGREE THAT THEY CAN BE ALLEVIATED OR ADDRESSED WITHOUT THE

10:14AM  20   TESTIMONY OF A CMS INSPECTOR, THE PEOPLE WHO MADE THE FINDINGS.

10:14AM  21        AND SO WE SUBMIT THAT IT'S BOTH THE 403 AND THE

10:14AM  22   CONFRONTATION REASONS ARE WHY THE REPORT MUST BE EXCLUDED.

10:14AM  23        AND WE'RE MAKING THIS MOTION NOW AT THE CONCLUSION OF THE

10:14AM  24   GOVERNMENT'S CASE JUST BECAUSE WE HAVE SEEN HOW IT WAS USED AND

10:14AM  25   WHICH EVIDENCE DID AND DIDN'T COME IN.

10:14AM  1          THE COURT:  UNDERSTOOD.  ALL RIGHT.  THANK YOU.

10:14AM  2      ANYTHING FURTHER, MR. LEACH?

10:14AM  3          MR. LEACH:  NO, YOUR HONOR.

10:14AM  4          THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  THANK

10:14AM  5  YOU FOR THAT.

10:15AM  6      MS. SAHARIA.

10:15AM  7          MS. SAHARIA:  THANK YOU, YOUR HONOR.

10:15AM  8      JUST TWO MORE BRIEF HOUSEKEEPING MATTERS.  I HOPE THE

10:15AM  9  COURT CAN APPRECIATE THAT WE FEEL COMPELLED TO MAKE THE RECORD

10:15AM  10  NOW TO PRESERVE THESE ARGUMENTS NOW THAT THE GOVERNMENT HAS

10:15AM  11  RESTED.

10:15AM  12      SO A SECOND POINT IS THAT WE MOVE TO STRIKE THE TESTIMONY

10:15AM  13  OF E.T., THIS IS THE PATIENT THAT TESTIFIED THIS WEEK, NOW THAT

10:15AM  14  THE GOVERNMENT HAS RESTED WITHOUT CALLING THE CORRESPONDING

10:15AM  15  DOCTOR, DR. ASIN.  E.T. IS NOT QUALIFIED TO INTERPRET THE

10:15AM  16  COMPLEX HIV TEST REPORT THAT SHE RECEIVED, THEREFORE, IT POSES

10:15AM  17  ISSUES WITH RESPECT TO LAY OPINION THAT IS NOT -- FOR SOMEONE

10:15AM  18  WHO IS NOT QUALIFIED TO OFFER THAT OPINION.

10:15AM  19      AND IT ALSO POSES VERY SEVERE 403 CONCERNS WHERE A WITNESS

10:15AM  20  WHO DOES NOT KNOW HOW TO INTERPRET THIS REPORT HAS OFFERED

10:15AM  21  ESSENTIALLY AN OPINION THAT SHE RECEIVED INACCURATE TEST

10:16AM  22  RESULTS WITHOUT A PERSON QUALIFIED TO OFFER THAT OPINION TO THE

10:16AM  23  JURY.

10:16AM  24      I'LL JUST NOTE A COUPLE OF THINGS FROM THE HISTORY OF THE

10:16AM  25  LITIGATION OF THIS ISSUE.  I KNOW YOUR HONOR KNOWS THAT WE'VE

10:16AM 1   BEEN LITIGATING THESE ISSUES AROUND THESE PATIENTS AND DOCTORS

10:16AM 2   NOW FOR QUITE A LONG TIME, AND THE, THE GOVERNMENT PREVIOUSLY

10:16AM 3   RECOGNIZED THE IMPORTANCE OF CALLING DOCTORS FOR THE PURPOSE OF

10:16AM 4   EXPLAINING WHETHER A TEST WAS INACCURATE.  THIS IS AT ECF 660.

10:16AM 5       AT TRIAL, THE GOVERNMENT WILL PRESENT TESTIMONY FROM

10:16AM 6   SEVERAL OF THE PATIENT VICTIMS, ALONG WITH PATIENT TESTIMONY.

10:16AM 7   THE GOVERNMENT PLANS TO INTRODUCE TESTIMONY FROM TREATING

10:16AM 8   PHYSICIANS.  SUCH TESTIMONY WILL BE AN ESSENTIAL PART OF THE

10:16AM 9   GOVERNMENT'S PROOF AT TRIAL BECAUSE THOSE PHYSICIANS ARE

10:16AM 10  QUALIFIED AND EQUIPPED TO DELIVER RELIABLE OPINIONS THAT

10:16AM 11  CERTAIN THERANOS TEST RESULTS WERE DEMONSTRABLY INACCURATE.

10:16AM 12      AGAIN, AT THE HEARING ON THAT MOTION -- THIS IS MAY 4TH,

10:17AM 13  2021 -- AT PAGES 130 AND 131, THE GOVERNMENT DISTINGUISHED

10:17AM 14  PATIENT TESTIMONY FROM DOCTOR TESTIMONY.  THE GOVERNMENT SAID,

10:17AM 15  A PATIENT CAN TESTIFY ABOUT THE PROMOTIONAL MATERIALS OR THE

10:17AM 16  MARKETING MATERIALS THAT THEY WERE EXPOSED TO FROM THERANOS,

10:17AM 17  ABOUT THEIR REASONS FOR CHOOSING THERANOS, ABOUT THEIR

10:17AM 18  EXPERIENCES WITH THE COMPANY, THE REASONS -- THE RESULTS THAT

10:17AM 19  THEY GOT.  BUT HER DOCTOR IS THE ONE WHO IS IN THE BEST

10:17AM 20  POSITION TO TESTIFY REGARDING WHAT AN HCG TEST WAS -- THEY WERE

10:17AM 21  DISCUSSING THERE THE PREGNANCY TEST -- HOW IT WAS USED, WHY IT

10:17AM 22  WAS ORDERED IN THIS SPECIFIC PATIENT'S CASE, AND ALSO TO

10:17AM 23  EXPLAIN WHAT RESULTS MEAN, SO INCLUDING THE SIGNIFICANCE OF THE

10:17AM 24  SPECIFIC RESULTS RECEIVED BY THAT PARTICULAR PATIENT AT ISSUE.

10:17AM 25      AND THEN JUST EARLIER THIS WEEK IN AN ARGUMENT ON THE

| | | |
|---|---|---|
| 10:17AM | 1 | CUSTOMER SPREADSHEETS THAT WE DISCUSSED, THE GOVERNMENT |
| 10:17AM | 2 | EXPLAINED TO THE COURT, I SHOULD SAY, THAT EVEN AFTER A PATIENT |
| 10:17AM | 3 | RECEIVES A RESULT, I THINK THE EVIDENCE IN THE CASE HAS SHOWN |
| 10:18AM | 4 | THAT IT IS NOT ALWAYS CLEAR WHETHER THE RESULT IS ACCURATE OR |
| 10:18AM | 5 | NOT.  A PATIENT LOOKING AT A SHEET OF RESULTS CANNOT BE COUNTED |
| 10:18AM | 6 | ON TO SAY, HERE'S AN INACCURATE ONE, I'M THEREFORE NOT GOING TO |
| 10:18AM | 7 | GIVE THERANOS A POSITIVE REVIEW WHEN I FILL OUT THIS SURVEY. |
| 10:18AM | 8 | WE JUST DON'T HAVE ACCURATE AND RELIABLE TESTIMONY IN THIS |
| 10:18AM | 9 | RECORD THAT E.T. RECEIVED AN INACCURATE RESULT.  THE TEST |
| 10:18AM | 10 | RESULT THAT SHE RECEIVED HAD A SERIES OF DIFFERENT RESULTS. |
| 10:18AM | 11 | ONE WAS REACTIVE, OTHERS WERE NONREACTIVE. |
| 10:18AM | 12 | NO ONE QUALIFIED HAS COME BEFORE THE JURY TO EXPLAIN WHAT |
| 10:18AM | 13 | THAT MEANS, AND FOR THAT REASON WE MOVE TO EXCLUDE HER |
| 10:18AM | 14 | TESTIMONY. |
| 10:18AM | 15 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 10:18AM | 16 | MR. BOSTIC? |
| 10:18AM | 17 | MR. BOSTIC:  THANK YOU, YOUR HONOR. |
| 10:18AM | 18 | THE GOVERNMENT OPPOSES THIS MOTION.  THE TESTIMONY OF -- |
| 10:18AM | 19 | I'LL USE HER NAME BECAUSE SHE TESTIFIED UNDER HER NAME. |
| 10:18AM | 20 | THE TESTIMONY OF MS. TOMPKINS SHOULD REMAIN IN THE RECORD. |
| 10:18AM | 21 | FIRST OF ALL, THE DEFENSE IS ARGUING ABOUT LAY OPINIONS AS |
| 10:19AM | 22 | TO THE ACCURACY OF THE TEST IN THIS CASE, BUT TO MY MEMORY, |
| 10:19AM | 23 | THIS WITNESS DID NOT OFFER ANY LAY OPINIONS OR CONCLUSIONS |
| 10:19AM | 24 | ABOUT THE ACCURACY OF THE TEST. |
| 10:19AM | 25 | I IMAGINE THAT SUCH TESTIMONY, HAD IT BEEN OFFERED, WOULD |

10:19AM 1    HAVE DRAWN AN OBJECTION FROM THE DEFENSE THAT THIS WITNESS DID

10:19AM 2    NOT HAVE A BASIS TO REACH A CONCLUSION ON THAT ULTIMATE ISSUE.

10:19AM 3        SO I THINK THE DEFENSE IN THAT RESPECT IS POINTING TO A

10:19AM 4    PROBLEM THAT DOESN'T EXIST WITH THIS TESTIMONY.

10:19AM 5        THIS PATIENT WAS QUALIFIED TO TALK ABOUT HER EXPERIENCE

10:19AM 6    WITH THE THERANOS TEST AND PRESENT TO THE JURY THE RESULTS THAT

10:19AM 7    SHE OBTAINED.

10:19AM 8        IN THE PAST THE GOVERNMENT HAS NOTED THAT IN NOT EVERY

10:19AM 9    CASE IS IT POSSIBLE TO TELL WHETHER TEST RESULTS ARE ACCURATE

10:19AM 10   OR NOT.

10:19AM 11       IN SOME CASES, EVEN A DOCTOR OR AN EXPERT CANNOT TELL

10:20AM 12   AFTER THE FACT AND AT THE TIME WHETHER RESULTS ARE ACCURATE OR

10:20AM 13   NOT.

10:20AM 14       OTHER RESULTS REQUIRE THE TESTIMONY AND THE EXPERT OPINION

10:20AM 15   OF SOMEONE WHO KNOWS HOW THAT TEST WORKS AND WHO CAN PROVIDE

10:20AM 16   THE JURY WITH BACKGROUND INFORMATION ABOUT THE SIGNIFICANCE OF

10:20AM 17   CERTAIN RESULTS VERSUS OTHER RESULTS AND WHAT THEY CORRESPOND

10:20AM 18   TO IN THE BODY OF THE PATIENT.

10:20AM 19       OTHER TEST RESULTS SPEAK FOR THEMSELVES.  A RESULT THAT

10:20AM 20   TELLS THE PATIENT THAT THERE ARE HIV ANTIBODIES PRESENT IN HER

10:20AM 21   BLOODSTREAM IS INCOMPATIBLE WITH ANOTHER TEST RESULT THAT SAYS

10:20AM 22   THE OPPOSITE.  THEY CANNOT BOTH BE CORRECT.

10:20AM 23       EXPERT TESTIMONY IS NOT NECESSARY TO, YOU KNOW, EXPLAIN

10:20AM 24   HOW THE VIRUS WORKS OR HOW THE TEST IS PERFORMED IN ORDER FOR

10:20AM 25   THOSE TWO CONFLICTING RESULTS TO HAVE PROBATIVE VALUE FOR THE

10:20AM 1    JURY.  AND THAT'S WHAT THIS IS ABOUT.

10:20AM 2        I WOULD ALSO ADD ON THAT, THOUGH, THAT THE TESTIMONY OF

10:21AM 3    MS. TOMPKINS IS ADMISSIBLE AND THE COUNT THAT IS BASED ON HER

10:21AM 4    WIRE IS STILL A VALID COUNT EVEN IF THAT TEST RESULT WAS NOT

10:21AM 5    INACCURATE.

10:21AM 6        THIS WAS A WIRE IN FURTHERANCE OF THE SCHEME TO DEFRAUD

10:21AM 7    PATIENTS, SO IT IS NOT NECESSARY THAT IT RELATE TO A TEST

10:21AM 8    RESULT THAT THE JURY MUST FIND TO BE INACCURATE.  THAT'S NOT A

10:21AM 9    FINDING THAT THE JURY IS REQUIRED TO MAKE IN ORDER TO RULE ON

10:21AM 10   ANY OF THESE COUNTS.

10:21AM 11       AS THE COURT KNOWS, THE WIRE UNDERLYING A WIRE FRAUD COUNT

10:21AM 12   DOES NOT NEED TO CONVEY ANY FALSE OR FRAUDULENT INFORMATION.

10:21AM 13   IT MERELY NEEDS TO BE IN FURTHERANCE OF THE SCHEME TO DEFRAUD.

10:21AM 14       SO THAT IS, I THINK, A FINAL REASON WHY I THINK THIS

10:21AM 15   MOTION SHOULD NOT BE GRANTED.

10:21AM 16            THE COURT:  OKAY.  THANK YOU.

10:21AM 17       MS. SAHARIA?

10:21AM 18            MS. SAHARIA:  HER TEST RESULT DOES NOT SPEAK FOR

10:22AM 19   ITSELF, YOUR HONOR.  THERE WERE MULTIPLE LEVELS OF TEST RESULTS

10:22AM 20   ON THE DOCUMENT THAT WAS PUT INTO EVIDENCE.  IT WAS A DIFFERENT

10:22AM 21   WAY OF TESTING FOR HIV THAN THE ONE THAT MS. TOMPKINS RECEIVED

10:22AM 22   RECENTLY WHERE THE TEST WAS A DIFFERENT KIND OF TEST.

10:22AM 23       MS. TREFZ TRIED TO WALK THROUGH WITH THE WITNESS THE CDC

10:22AM 24   ALGORITHM THAT THERE IS A SCREENING STEP THAT PROMPTS YOU TO

10:22AM 25   FURTHER ANALYSES.

10:22AM 1      OF COURSE THAT WITNESS WAS NOT QUALIFIED TO TALK ABOUT

10:22AM 2   THAT SCREENING ALGORITHM, BUT THERE'S NO ONE QUALIFIED IN THIS

10:22AM 3   COURTROOM TO TELL US WHAT THAT TEST RESULT MEANS OR WHETHER

10:22AM 4   THAT TEST RESULT CONFLICTS WITH HER LATER ONE.

10:22AM 5      SO AT A MINIMUM, HER TESTIMONY ABOUT THAT TEST RESULT

10:22AM 6   SHOULD NOT BE A PART OF THIS RECORD BECAUSE THE ONLY IMPRESSION

10:22AM 7   THAT IT WILL LEAVE THE JURY WITH IS A MISLEADING ONE, THAT

10:22AM 8   THERE WAS IN FACT AN INACCURATE HIV TEST RESULT, WHICH IS

10:22AM 9   SOMETHING THAT WE JUST DON'T KNOW FROM THE CURRENT RECORD.

10:22AM 10         THE COURT:  IS IT SUFFICIENT THEN FOR HER TO -- FOR

10:22AM 11  THE JURY TO HAVE THESE TWO DIFFERENT TESTS AND THEN THEY

10:23AM 12  DETERMINE?

10:23AM 13         MS. SAHARIA:  I DON'T THINK THEY'RE QUALIFIED TO

10:23AM 14  MAKE THAT DETERMINATION EITHER, YOUR HONOR.

10:23AM 15         THE COURT:  WITHOUT EXPERT TESTIMONY --

10:23AM 16         MS. SAHARIA:  EXACTLY.

10:23AM 17         THE COURT:  -- TO SAY WHAT IT IS.

10:23AM 18      THE DOCUMENTS, I THINK MR. BOSTIC SUGGESTS, THEY SPEAK FOR

10:23AM 19  THEMSELVES.

10:23AM 20      IS THAT SUFFICIENT?

10:23AM 21         MS. SAHARIA:  I DON'T BELIEVE THAT A COMPLICATED LAB

10:23AM 22  REPORT THAT DOESN'T SAY, YES, YOU HAVE HIV, NO, YOU DON'T HAVE

10:23AM 23  HIV, THAT'S NOT WHAT THAT REPORT SAYS.

10:23AM 24      IT SAID ONE WAS REACTIVE, OTHERS WERE NONREACTIVE.  IT

10:23AM 25  DIDN'T SAY, YES, YOU HAVE HIV, NO, YOU DON'T.

10:23AM  1       I DON'T KNOW HOW THE JURY COULD INTERPRET THOSE RESULTS

10:23AM  2   WITHOUT AN EXPERT TO TELL THEM WHAT THEY MEAN.

10:23AM  3       THE COURT:  THANK YOU.

10:23AM  4       AND THEN FURTHER TO MR. BOSTIC'S POINT, THAT MIGHT NOT BE

10:23AM  5   RELEVANT IF IT'S IN FURTHERANCE OF THE SCHEME.

10:23AM  6       MS. SAHARIA:  SO I DO THINK THAT RAISES SOME ISSUES

10:23AM  7   THAT WE CAN DISCUSS WHEN WE ARGUE THE MOTION FOR JUDGMENT OF

10:23AM  8   ACQUITTAL, BUT I THINK AT A MINIMUM SHE CAN -- I THINK HER

10:23AM  9   TESTIMONY ABOUT WHY SHE CAME TO THERANOS AND WHAT WAS IMPORTANT

10:23AM 10   TO HER MAY STILL BE RELEVANT TESTIMONY.

10:24AM 11       BUT I, I DON'T BELIEVE THAT IT IS PROPER TO LEAVE IN HER

10:24AM 12   TESTIMONY ABOUT THE TEST RESULTS THEMSELVES AND THE

10:24AM 13   CORRESPONDING EXHIBITS BECAUSE THE JURY IS JUST AS EQUALLY

10:24AM 14   UNQUALIFIED TO INTERPRET THOSE EXHIBITS AS SHE WAS.

10:24AM 15       AND WE CAN PROVIDE THOSE EXHIBIT NUMBERS FOR THE RECORD.

10:24AM 16   I'M NOT SURE I HAVE THEM IN FRONT OF ME, YOUR HONOR.

10:24AM 17       THE COURT:  THE TEST RESULTS?

10:24AM 18       MS. SAHARIA:  THE TWO TEST RESULTS, YOUR HONOR.

10:24AM 19       THE COURT:  RIGHT.  THEY WERE ADMITTED WITHOUT

10:24AM 20   OBJECTION IF I RECALL.

10:24AM 21       MS. SAHARIA:  WELL, WE OBJECTED IN ADVANCE OF HER

10:24AM 22   TESTIMONY TO THE FACT THAT THE GOVERNMENT HAD INDICATED THAT

10:24AM 23   THEY MAY NOT CALL MR. ASIN.  MS. TREFZ DID RAISE THAT ISSUE AND

10:24AM 24   OUR OBJECTION TO CALLING THE WITNESS WITHOUT THE DOCTOR.  THAT

10:24AM 25   WAS AN OBJECTION THAT WAS MADE ON THE RECORD.

10:24AM 1     THE GOVERNMENT REFUSED AT THAT TIME TO COMMIT TO WHETHER

10:24AM 2 THEY WERE CALLING HIM OR NOT.

10:24AM 3     NOW THAT WE KNOW THAT THEY'RE NOT CALLING HIM, THAT'S WHY

10:24AM 4 I'M MAKING THIS MOTION.

10:24AM 5          THE COURT:  OKAY.  THANK YOU.

10:24AM 6          MR. BOSTIC:  YOUR HONOR?

10:24AM 7          THE COURT:  YES.

10:24AM 8          MR. BOSTIC:  THE COURT IS CORRECT THEY WERE ADMITTED

10:24AM 9 WITHOUT OBJECTION.  THE DEFENSE COULD HAVE MADE A REQUEST THAT

10:24AM 10 THEY BE CONDITIONALLY ADMITTED AT THAT TIME.  THEY DID NOT DO

10:25AM 11 SO.

10:25AM 12     MS. SAHARIA JUST SAID THAT THE REPORTS DON'T SAY THAT YOU

10:25AM 13 DON'T HAVE HIV OR YOU DO HAVE HIV.  THAT'S NOT HOW THESE

10:25AM 14 REPORTS WERE PRESENTED TO THE JURY IN THE MOMENT, AND THAT'S

10:25AM 15 NOT HOW THEY'LL BE ARGUED BECAUSE, THAT'S CORRECT, THEY DO NOT

10:25AM 16 SAY THOSE THINGS.

10:25AM 17     HOWEVER, THEY ARE TWO TESTS FOR HIV ANTIBODIES.  ONE CAME

10:25AM 18 BACK REACTIVE.  THE OTHER CAME BACK NEGATIVE.  THOSE ARE TWO

10:25AM 19 CONFLICTING RESULTS.

10:25AM 20     THIS IS NOT THE ONLY TIME IN THIS CASE THAT SPECIFIC

10:25AM 21 INSTANCES OF INCONSISTENT OR CONFLICTING RESULTS HAVE BEEN PUT

10:25AM 22 IN FRONT OF THE JURY WITHOUT THE DEFENSE OBJECTING.

10:25AM 23     THE JURY HAS SEEN EMAILS INTERNAL AT THERANOS RELATING TO

10:25AM 24 RESULTS THAT CAME BACK ON DIFFERENT ASSAYS WHERE THE PATIENT

10:25AM 25 GOT ONE RESULT FROM THERANOS AND A DIFFERENT RESULT FROM

10:25AM 1    ANOTHER LAB.

10:25AM 2        IN THOSE CASES -- LET'S BE CLEAR.  IN EACH OF THOSE CASES,

10:25AM 3    WE WOULD HAVE BEEN COMPARING TEST RESULTS GENERATED BY

10:26AM 4    DIFFERENT METHODS OF RUNNING THE TESTS BY DEFINITION.  THAT'S

10:26AM 5    THE POINT OF THIS EVIDENCE IS THAT THE THERANOS TEST METHOD

10:26AM 6    WAS, AS SHOWN BY THESE CASES, PROBLEMATIC OR HAD ACCURACY

10:26AM 7    PROBLEMS NOT EXPERIENCED BY TRADITIONAL METHODS.

10:26AM 8        SO WHEN THE EDISON MACHINE PRODUCED A RESULT THAT WAS

10:26AM 9    INCONSISTENT WITH A RESULT PRODUCED BY A CONVENTIONAL MACHINE

10:26AM 10   FROM ANOTHER LAB, THAT'S THE SAME KIND OF I THINK WHAT

10:26AM 11   MS. SAHARIA WOULD CALL HERE AN APPLES TO ORANGES COMPARISON,

10:26AM 12   BUT IT'S NOT.

10:26AM 13       THESE ARE TWO DIFFERENT METHODS AIMED AT MEASURING THE

10:26AM 14   SAME THING, AIMED AT TESTING THE SAME THING, AND IF THEY

10:26AM 15   PRODUCE CONFLICTING RESULTS, THEY CAN'T BOTH BE CORRECT.

10:26AM 16       IT'S FAIR FOR THE JURY TO INFER THAT, BASED ON ALL OF THE

10:26AM 17   EVIDENCE IN THE CASE, THE THERANOS RESULTS WERE INCORRECT.

10:26AM 18   EXPERT TESTIMONY IS NOT REQUIRED FOR THAT.

10:26AM 19       BUT I'LL ALSO POINT OUT ONE MORE TIME THAT THE JURY IS NOT

10:26AM 20   REQUIRED TO MAKE A FINDING AS TO THE ACCURACY OF EACH TEST

10:26AM 21   PRESENTED TO THEM, EVEN IF THOSE ARE TESTS IN CONNECTION WITH

10:27AM 22   COUNTS ALLEGED IN THE INDICTMENT.

10:27AM 23           THE COURT:  THANK YOU.

10:27AM 24           MS. SAHARIA:  JUST VERY BRIEFLY.

10:27AM 25       IF THAT'S THE CASE, THEN THERE'S NO REASON TO HAVE THESE

10:27AM 1    MISLEADING TEST RESULTS IN FRONT OF THE JURY WITHOUT AN EXPERT

10:27AM 2    TO INTERPRET THEM.

10:27AM 3         I'LL NOTE THAT THE HIV TEST WAS NOT RUN ON THE EDISON

10:27AM 4    TECHNOLOGY, SO THAT COMPARISON DOES NOT WORK.

10:27AM 5         BUT PUTTING THAT ASIDE, THE EMAILS THAT MR. BOSTIC

10:27AM 6    REFERRED TO WERE ADMITTED THROUGH KNOWLEDGEABLE WITNESSES AT

10:27AM 7    THE COMPANY WITH PERCIPIENT KNOWLEDGE OF THEM WHO DEALT WITH

10:27AM 8    THOSE EVERY DAY AND KNEW HOW TO INTERPRET THOSE EMAILS.

10:27AM 9         MS. TOMPKINS DOES NOT KNOW HOW TO INTERPRET THOSE HIV

10:27AM 10   REPORTS AND THEY JUST DON'T SPEAK FOR THEMSELVES.

10:27AM 11        THE COURT:  OKAY.  ALL RIGHT.

10:27AM 12   THANK YOU VERY MUCH.  THANK YOU.

10:27AM 13        MS. SAHARIA:  JUST ONE FINAL HOUSEKEEPING MATTER,

10:27AM 14   YOUR HONOR, AND THIS ONE IS TRULY IN AN ABUNDANCE OF CAUTION

10:27AM 15   AND TO PRESERVE OUR RIGHTS GOING FORWARD ON THIS ISSUE.

10:28AM 16        WE RESPECTFULLY RENEW OUR MOTION TO SUPPRESS EVIDENCE OF

10:28AM 17   CUSTOMER COMPLAINTS AND TESTING RESULTS, AS WELL AS FINDINGS IN

10:28AM 18   THE CMS REPORT WHICH WAS FILED AT ECF 810.

10:28AM 19        THE COURT HAS DENIED THIS MOTION.  THIS WAS A PRETRIAL

10:28AM 20   MOTION THAT WAS SUBMITTED TO THE COURT BASED ON A PAPER RECORD.

10:28AM 21   THE COURT DENIED THAT AT 886 AND 887.

10:28AM 22        WE INCORPORATE BY REFERENCE ALL OF OUR PRIOR ARGUMENTS AND

10:28AM 23   THE PRIOR EVIDENCE.

10:28AM 24        AND JUST TO BE COMPLETE, THAT'S AT 810, 811, 850, 851, AS

10:28AM 25   WELL AS AT THE ORAL ARGUMENT ON JULY 7TH.

10:28AM 1      I'LL JUST STATE FOR THE RECORD THAT THAT MOTION AND THE

10:28AM 2      REQUESTED RELIEF, WHICH WAS THE MOTION TO SUPPRESS, AND NOW WE

10:28AM 3      RENEW THAT AND MOVE TO STRIKE THE FOLLOWING CATEGORIES OF

10:28AM 4      EVIDENCE:  TESTIMONY AND EXHIBITS OFFERED BY PATIENTS

10:28AM 5      RELATED TO THEIR SPECIFIC TESTING RESULTS; TESTIMONY AND

10:28AM 6      EXHIBITS OFFERED BY DOCTORS OR OTHER MEDICAL PROFESSIONALS

10:29AM 7      RELATED TO CUSTOMER'S SPECIFIC RESULTS; THE CMS REPORTS

10:29AM 8      DISCUSSION OF QUALITY CONTROL RESULTS AND OTHER TESTING DATA

10:29AM 9      MAINTAINED IN THE LIS; ALL OTHER CUSTOMER COMPLAINTS AND

10:29AM 10     TESTING RESULTS OFFERED THROUGH THERANOS WITNESSES; AND ALL

10:29AM 11     TESTIMONY AND EXHIBITS RELATING TO QUALITY CONTROL DATA AND

10:29AM 12     OTHER DATA IN THE LIS OFFERED BY THERANOS WITNESSES.

10:29AM 13     I'LL NOTE FOR THE RECORD THAT THAT MOTION WAS MADE UNDER

10:29AM 14     BOTH THE DUE PROCESS CLAUSE AND THE BALANCING TESTS SET FORTH

10:29AM 15     IN UNITED STATES VERSUS LOUD HAWK, WHICH IS A NINTH CIRCUIT

10:29AM 16     CASE FROM 1979.

10:29AM 17     AS THE COURT WILL RECALL, THE LOUD HAWK CASE INVOLVED A

10:29AM 18     BALANCING TEST BETWEEN THE QUALITY OF THE GOVERNMENT'S CONDUCT

10:29AM 19     AND THE PREJUDICE TO THE DEFENDANT AND THE NATURE OF THAT

10:29AM 20     EVIDENCE.

10:29AM 21     WE HAVE NOT CURRENTLY PUT AT ISSUE AT TRIAL THE

10:30AM 22     GOVERNMENT'S CONDUCT.  WE HAVE NOT PUT ANY EVIDENCE FORWARD ON

10:30AM 23     THAT PRONG OF THAT ANALYSIS.

10:30AM 24     SO THAT RECORD IS EXACTLY WHERE IT WAS AT THE TIME THAT WE

10:30AM 25     FIRST MADE THIS MOTION.

10:30AM 1      HOWEVER, ON THE OTHER SIDE OF THE LEDGER, THERE HAS BEEN

10:30AM 2  EVIDENCE ADDUCED AT TRIAL THAT GOES TO THE POTENTIALLY

10:30AM 3  EXCULPATORY NATURE OF THE LIS AND THE AMOUNT OF PREJUDICE TO

10:30AM 4  MS. HOLMES ASSOCIATED WITH THE LOSS OF THAT DATABASE.

10:30AM 5      I WOULD RESPECTFULLY INCORPORATE THAT EVIDENCE INTO OUR

10:30AM 6  MOTION JUST TO PRESERVE THE RECORD AS IT NOW STANDS.  THAT

10:30AM 7  TESTIMONY INCLUDES THE TESTIMONY OF MS. CHEUNG, DR. ROSENDORFF,

10:30AM 8  AND DR. SAWYER, AS WELL AS EXHIBIT 13655, WHICH PROVIDE

10:30AM 9  EVIDENCE ABOUT THE WAY THE LIS DATABASE COULD BE USED TO

10:30AM 10 INVESTIGATE BOTH PARTICULAR PATIENT OR DOCTOR INQUIRIES, BUT

10:30AM 11 ALSO TO CONDUCT MORE STATISTICAL ANALYSES ACROSS PATIENTS AND

10:30AM 12 TESTS, AND DR. ROSENDORFF IN PARTICULAR TESTIFIED TO THAT.

10:31AM 13     A SIGNIFICANT AMOUNT OF EVIDENCE HAS COME OUT AT TRIAL

10:31AM 14 BASED ON THE LIS DATA.  AS THE COURT KNOWS, THAT DATA IS

10:31AM 15 UNAVAILABLE.  WE'VE BEEN UNABLE TO USE THAT DATA TO CHECK THE

10:31AM 16 PATIENT ASSESSMENT WORK OF DR. DAS.  WE HAVE BEEN UNABLE TO

10:31AM 17 PROBE THE ANECDOTAL EMAILS SENT BY DR. ROSENDORFF WITH RESPECT

10:31AM 18 TO CERTAIN TESTS OR TO CONFRONT OTHER ANECDOTAL EVIDENCE

10:31AM 19 WITHOUT THAT DATABASE.

10:31AM 20     SO WE JUST RESPECTFULLY RENEW THAT MOTION TO PRESERVE IT

10:31AM 21 BASED ON THE CURRENT RECORD.

10:31AM 22          THE COURT:  ALL RIGHT.  THANK YOU.

10:31AM 23     MR. BOSTIC?

10:31AM 24          MR. BOSTIC:  YOUR HONOR, JUST BRIEFLY.

10:31AM 25     THE UNITED STATES OPPOSES THIS MOTION AS WELL, OF COURSE.

10:31AM 1    THE RULINGS MADE BY THE COURT PREVIOUSLY ON THESE ISSUES ARE

10:31AM 2    CORRECT AND SHOULD STAND.

10:31AM 3        THE EVIDENCE AT TRIAL HAS NOT ALTERED THE ANALYSIS IN THE

10:31AM 4    DEFENSE'S FAVOR.  IF ANYTHING, IT HAS DONE THE OPPOSITE,

10:31AM 5    ESPECIALLY WHEN IT COMES TO THE IMPORTANCE OF THE LIS.

10:32AM 6        SEVERAL TIMES DURING THE TRIAL THE DEFENSE HAS ASKED A

10:32AM 7    WITNESS TO CONFIRM THAT THEY RELIED ON THE LIS FOR ONE THING OR

10:32AM 8    ANOTHER, AND I RECALL INSTANCES WHERE WITNESSES HAVE COME BACK

10:32AM 9    AND SAID, NO, I DIDN'T USE THE LIS FOR THAT, OR NO, I'M NOT

10:32AM 10   SURE WHETHER THAT WAS IN THE LIS.

10:32AM 11       SO IF ANYTHING, I THINK THE EVIDENCE AT TRIAL HAS

10:32AM 12   UNDERMINED THE DEFENSE'S ARGUMENT THAT THE LIS WAS A CRITICAL

10:32AM 13   PIECE OF EVIDENCE IN THIS CASE WHOSE ABSENCE SEVERELY

10:32AM 14   PREJUDICES THE DEFENSE.

10:32AM 15       I THINK, AS PREVIOUSLY SHOWN BY THE GOVERNMENT, IT'S MORE

10:32AM 16   LIKELY, FAR MORE LIKELY THAT THE EVIDENCE IN THE LIS WOULD HAVE

10:32AM 17   BEEN INCULPATORY OF THIS DEFENDANT RATHER THAN EXCULPATORY.

10:32AM 18       I THINK THE EVIDENCE SHOWS THAT.

10:32AM 19       AND THEN FINALLY, WHEN IT COMES TO THE LOUD HAWK STANDARD

10:32AM 20   AND THE OTHER CASES ADDRESSING THE GOVERNMENT'S OBLIGATION TO

10:32AM 21   OBTAIN AND PRESERVE EVIDENCE, THE FACTS OF THIS CASE REALLY

10:33AM 22   AREN'T CLOSE TO THE STANDARD THAT WOULD REQUIRE OR SUPPORT ANY

10:33AM 23   KIND OF SUPPRESSION OF EVIDENCE HERE.

10:33AM 24       AS THE COURT KNOWS, THE GOVERNMENT SOUGHT AND OBTAINED, OR

10:33AM 25   BELIEVED IT OBTAINED, A COPY OF THE LIS DATABASE.  THE

10:33AM 1    GOVERNMENT WAS INFORMED BY MS. HOLMES'S COMPANY, BY THERANOS,

10:33AM 2    THAT THE GOVERNMENT HAD IN ITS POSSESSION A COPY OF THE LIS

10:33AM 3    DATABASE.

10:33AM 4        WITHIN DAYS OF PROVIDING THAT COPY TO THE GOVERNMENT -- A

10:33AM 5    COPY THAT TURNED OUT TO BE DOUBLE ENCRYPTED AND INACCESSIBLE --

10:33AM 6    WITHIN DAYS OF PROVIDING THAT COPY, THERANOS ITSELF DISMANTLED

10:33AM 7    THE LIS DATABASE HARDWARE IN A WAY THAT MADE THAT INFORMATION

10:33AM 8    PERMANENTLY IRRETRIEVABLE.

10:33AM 9        ON THOSE FACTS, IT SIMPLY CANNOT BE SAID THAT WE'RE

10:33AM 10   ANYWHERE CLOSE TO THE LOUD HAWK STANDARD OR THE STANDARDS

10:33AM 11   ADOPTED BY THE OTHER CASES ALONG THOSE LINES.

10:34AM 12        THE COURT:  ALL RIGHT.

10:34AM 13        MS. SAHARIA:  I'M CONTENT TO REST ON OUR PRIOR

10:34AM 14   SUBMISSIONS AND OUR PRIOR STATEMENTS.

10:34AM 15        THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  THANK

10:34AM 16   YOU FOR THAT.

10:34AM 17        MS. SAHARIA:  SO WITH THAT, YOUR HONOR, MS. HOLMES

10:34AM 18   RESPECTFULLY MOVES FOR JUDGMENT OF ACQUITTAL UNDER RULE 29.  WE

10:34AM 19   RESPECTFULLY SUBMIT THAT THE EVIDENCE PRESENTED BY THE

10:34AM 20   GOVERNMENT IS INSUFFICIENT ON EVERY ELEMENT OF EVERY COUNT, AND

10:34AM 21   WE ARE HAPPY TO ADDRESS THAT IN MORE DETAIL WHENEVER IS

10:34AM 22   CONVENIENT FOR THE COURT AT A LATER TIME.

10:34AM 23        THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

10:34AM 24        FIRST OF ALL, LET ME NOTE THAT THE RECORD SHOULD REFLECT

10:34AM 25   THAT YOU HAVE TIMELY RESERVED AND MADE YOUR MOTION UNDER

10:34AM 1    RULE 29.

10:34AM 2         THE COURT WILL RESERVE JUDGMENT ON THAT AND WILL INFORM

10:34AM 3    THE PARTIES WHETHER OR NOT THE COURT WISHES ADDITIONAL BRIEFLY

10:34AM 4    AS TO THE RULE 29 MOTION.

10:34AM 5         BUT YOU HAVE PRESERVED IT TIMELY FOR YOUR CLIENT AND FOR

10:34AM 6    YOUR TEAM.  I'LL NOTE THAT.

10:34AM 7         FOR PURPOSES OF THE RECORD, AS I SAID, I'LL RESERVE

10:35AM 8    JUDGMENT AND TAKE IT UNDER SUBMISSION AT THIS POINT, AND THEN

10:35AM 9    WE'LL TAKE UP PROCEEDINGS AS IS NECESSARY.

10:35AM 10             MS. SAHARIA:  THANK YOU, YOUR HONOR.

10:35AM 11             THE COURT:  YOU'RE WELCOME.

10:35AM 12        LET'S TAKE A BREAK.

10:35AM 13        YOU HAVE A WITNESS?  I ASSUME YOU HAVE A WITNESS HERE.

10:35AM 14             MR. DOWNEY:  WE DO.  I THINK WE CAN APPROACH IT

10:35AM 15   EITHER WAY.  I THINK WE CAN BEGIN FOR HALF AN HOUR WITH THAT

10:35AM 16   WITNESS, OR WE CAN BREAK NOW, WHATEVER SUITS THE COURT.

10:35AM 17             MR. LEACH:  YOUR HONOR, I UNDERSTAND THE WITNESS THE

10:35AM 18   DEFENSE IS REFERRING TO IS TRENT MIDDLETON --

10:35AM 19             MR. DOWNEY:  THAT'S RIGHT.

10:35AM 20             MR. LEACH:  -- WHO IS GOING TO PRESENT SOME SUMMARY

10:35AM 21   CHARTS.

10:35AM 22        THERE WERE SOME ISSUES RELATING TO THAT THAT I WANTED TO

10:35AM 23   RAISE WITH THE COURT.  I DON'T KNOW WHEN IT'S GOING TO COME UP

10:35AM 24   ON THE EXAMINATION, AND I JUST WANTED AN OPPORTUNITY TO DO THAT

10:35AM 25   OUTSIDE OF THE PRESENCE OF THE JURY.

10:35AM 1        MR. DOWNEY:  THAT'S RIGHT.  WHY DON'T WE DO THAT

10:35AM 2   BEFORE WE BRING THE JURY BACK IN AND GET THAT RESOLVED.

10:35AM 3        THE COURT:  SURE.  DO YOU WANT TO TALK?

10:35AM 4        MR. CLINE:  MAYBE WE SHOULD BREAK AND HAVE THAT

10:35AM 5   DISCUSSION.

10:35AM 6        THE COURT:  LET'S DO THAT.  LET'S DO THAT, SO WE

10:36AM 7   DON'T HAVE MULTIPLE BREAKS.

10:36AM 8        MR. DOWNEY:  YES.

10:36AM 9        THE COURT:  THAT REQUIRES THE TWO OF YOU TO TALK

10:36AM 10  ABOUT, UNDER 1006, WHETHER THIS WITNESS IS GOING TO TESTIFY AS

10:36AM 11  A SUMMARY WITNESS, OR?

10:36AM 12       MR. DOWNEY:  I THINK -- IS THIS THAT ISSUE OR --

10:36AM 13  MS. TREFZ IS GOING TO HANDLE THIS WITNESS, YOUR HONOR.

10:36AM 14       THE COURT:  OKAY.  OKAY.

10:36AM 15       MR. LEACH:  IT RELATES TO SOME OF THE SUMMARY

10:36AM 16  CHARTS, YOUR HONOR, AND IT INVOLVES EVIDENCE FROM 2018, 2019,

10:36AM 17  2021 THAT THE GOVERNMENT VIEWS AS IRRELEVANT AND 403.

10:36AM 18       THE COURT:  I TRUST THAT THE SUMMARY WITNESS IS

10:36AM 19  GOING TO SPEAK ABOUT, IF HE OR SHE SPEAKS AT ALL, EVIDENCE THAT

10:36AM 20  IS IN EVIDENCE IN THIS CASE.

10:36AM 21       MR. DOWNEY:  EVIDENCE THAT IS EITHER ADMISSIBLE IN

10:36AM 22  THE CASE OR HAS BEEN ADMITTED, YOUR HONOR, YES.

10:36AM 23       THE COURT:  ALL RIGHT.  LET'S TAKE A BREAK FOR ABOUT

10:36AM 24  30 MINUTES THEN AND LET YOU DO THAT.

10:36AM 25       MR. DOWNEY:  THANK YOU, YOUR HONOR.

| | | |
|---|---|---|
| 10:36AM | 1 | (RECESS FROM 10:36 A.M. UNTIL 11:09 A.M.) |
| 11:09AM | 2 | THE COURT: WE'RE ON THE RECORD. ALL PARTIES ARE |
| 11:09AM | 3 | PRESENT. WE'RE OUTSIDE OF THE PRESENCE OF THE JURY. |
| 11:09AM | 4 | MR. LEACH. |
| 11:10AM | 5 | MR. LEACH: THANK YOU, YOUR HONOR. |
| 11:10AM | 6 | MAY I REMOVE MY MASK? |
| 11:10AM | 7 | THE COURT: YES, PLEASE. THANK YOU. |
| 11:10AM | 8 | MR. LEACH: AND DOES YOUR HONOR HAVE THE BINDER FOR |
| 11:10AM | 9 | THE EXHIBITS FOR THE EXAMINATION OF TRENT MIDDLETON? |
| 11:10AM | 10 | THE COURT: I THINK I DO, YES. |
| 11:10AM | 11 | MR. LEACH: OKAY. THE GOVERNMENT'S OBJECTION |
| 11:10AM | 12 | RELATES TO EXHIBIT 10684, WHICH PURPORTS TO BE A SUMMARY OF |
| 11:10AM | 13 | U.S. PATENTS ISSUED. |
| 11:10AM | 14 | WE HAVE NO OBJECTION TO PATENTS THAT WERE APPLIED FOR AND |
| 11:10AM | 15 | ISSUED DURING THE CONSPIRACY TIME PERIOD, SO UP THROUGH 2016. |
| 11:10AM | 16 | THIS EXHIBIT PURPORTS TO SUMMARIZE A NUMBER OF PATENTS |
| 11:10AM | 17 | THAT WERE BOTH APPLIED FOR AND ISSUED IN 2017, 2018, AND 2019, |
| 11:10AM | 18 | ALL OF THE WAY UP THROUGH 2021. |
| 11:10AM | 19 | THE SUMMARY ALSO MAKES REFERENCE, OR THE EXHIBIT THAT IT |
| 11:10AM | 20 | SUMMARIZES ALSO INCLUDES REFERENCE TO ENTITIES SUCH AS |
| 11:10AM | 21 | LABRADOR DIAGNOSTICS LLC, THERANOS IP COMPANY LLC, ALL OF WHICH |
| 11:11AM | 22 | TOUCH ON, YOU KNOW, ENTITIES RELATED TO THE BANKRUPTCY THAT |
| 11:11AM | 23 | HAPPENED IN 2018 AND 2019. |
| 11:11AM | 24 | I THINK IT'S IRRELEVANT TO THE ISSUES IN THE INDICTMENT. |
| 11:11AM | 25 | IT RAISES A NUMBER OF 403 ISSUES IN TERMS OF ARE WE GOING TO |

```
11:11AM   1    HAVE A MINI TRIAL ON WHAT HAPPENED AT THERANOS ALL OF THE WAY

11:11AM   2    UP THROUGH 2021?

11:11AM   3         THERE ALSO PURPORTS TO BE A COMPARISON BETWEEN THE NUMBER

11:11AM   4    OF PATENTS ISSUED PRIOR TO 2016 AND PATENTS ISSUED AFTER THE

11:11AM   5    INDICTMENT, WHICH I DON'T SEE HOW THAT COULD BE RELEVANT.

11:11AM   6         SO WE HAVE A NUMBER OF 401 AND 403 OBJECTIONS TO THIS

11:11AM   7    SUMMARY EXHIBIT.

11:11AM   8              THE COURT:  MS. TREFZ.

11:11AM   9              MS. TREFZ:  GOOD AFTERNOON, YOUR HONOR.  OR MORNING.

11:11AM  10    I GUESS WE'RE STILL IN THE MORNING.

11:11AM  11         WITH RESPECT TO THE PATENTS, JUST TO MAKE SURE THAT IT'S

11:11AM  12    CLEAR, THE PATENTS ARE -- WE BELIEVE THAT THEY ARE ADMISSIBLE

11:11AM  13    AND THEREFORE APPROPRIATE FOR A SUMMARY CHART.

11:12AM  14         I HEAR MR. LEACH -- IF I UNDERSTAND IT CORRECTLY, THEN THE

11:12AM  15    ISSUE IS NOT WITH PATENTS APPLIED FOR IN ADVANCE OF THE -- BY

11:12AM  16    THE END OF 2016; IS THAT CORRECT?

11:12AM  17              MR. LEACH:  WITHIN THE TIME OF THE CONSPIRACY

11:12AM  18    COUNTS, YOUR HONOR.  WE HAVE NO OBJECTION TO THOSE -- I MEAN,

11:12AM  19    I'M NOT SURE THEY'RE RELEVANT, BUT WE AREN'T OBJECTING TO THEM.

11:12AM  20              THE COURT:  RIGHT.  RIGHT.

11:12AM  21              MS. TREFZ:  AND DOES THAT GO THROUGH THE END OF

11:12AM  22    2016?

11:12AM  23              MR. LEACH:  YES.

11:12AM  24              MS. TREFZ:  SO WITH RESPECT TO THAT, I THINK -- WE

11:12AM  25    BELIEVE THAT THE PATENTS ARE RELEVANT TO A NUMBER OF DIFFERENT
```

11:12AM 1      PURPOSES.

11:12AM 2           ONE IS THAT WE BELIEVE THAT THE PATENTS ARE RELEVANT TO

11:12AM 3      MS. HOLMES'S STATE OF MIND, THE AWARD OF PATENTS FOR THERANOS'S

11:12AM 4      INVENTIONS IS RELEVANT TO HER GOOD FAITH BELIEF THAT THE

11:12AM 5      TECHNOLOGY WORKED AND HER CONTINUED GOOD BELIEF THAT THE

11:12AM 6      TECHNOLOGY WORKED, HER GOOD FAITH BELIEF.

11:12AM 7           THE COURT:  HOW DO THOSE CONNECT?  HOW DO THOSE

11:12AM 8      CONNECT?

11:12AM 9           MS. TREFZ:  HOW DO THEY?

11:13AM 10          THE COURT:  HOW DOES IT PROVE HER STATE OF MIND FOR

11:13AM 11     THAT PURPOSE?

11:13AM 12          MS. TREFZ:  BECAUSE THESE ARE -- WHEN YOU DO A

11:13AM 13     PATENT APPLICATION, YOU NEED TO PUT IN INFORMATION ABOUT THE

11:13AM 14     INVENTION AND WHAT WAS INVENTED, AND IT GOES TO HER

11:13AM 15     UNDERSTANDING THAT THE, THAT THE INFORMATION APPLIED FOR OR THE

11:13AM 16     PATENTS APPLIED FOR WERE NOVEL INVENTIONS, AND THAT THEY WERE

11:13AM 17     THINGS ACTUALLY INVENTED BY THERANOS.

11:13AM 18          BUT I --

11:13AM 19          THE COURT:  HOW DOES THAT GO TO HER STATE OF MIND?

11:13AM 20     WHAT DOES THAT SAY?

11:13AM 21          MS. TREFZ:  WELL, WE BELIEVE THAT AN ALLEGATION IN

11:13AM 22     THE CASE IS THAT MS. HOLMES UNDERSTOOD THAT THE TECHNOLOGY AT

11:13AM 23     ISSUE, THAT SHE HAD CERTAIN UNDERSTANDINGS ABOUT THE TECHNOLOGY

11:13AM 24     AT ISSUE IN THE CASE THAT WERE INCONSISTENT WITH REALITY, AND

11:14AM 25     WE BELIEVE THAT THAT IS -- WE SHOULD HAVE THE OPPORTUNITY TO

11:14AM 1    MEET THAT ALLEGATION OF HER KNOWLEDGE ABOUT THE STATE OF THE

11:14AM 2    TECHNOLOGY WITH --

11:14AM 3                THE COURT:  DO THESE PATENTS RELATE TO THE

11:14AM 4    TECHNOLOGY AT ISSUE?

11:14AM 5                MS. TREFZ:  IN THE SENSE THAT THEY WERE ALL APPLIED

11:14AM 6    FOR -- IN THE SENSE THAT THEY WERE ALL INVENTED AT THERANOS AND

11:14AM 7    ALL REPRESENT THERANOS DEVELOPED TECHNOLOGY, YES.

11:14AM 8        IF I MAY, THOUGH, WE MAY BE ACTUALLY -- IT MAY TAKE US A

11:14AM 9    MOMENT TO ADDRESS THIS IN THE SUMMARY CHART, BUT I BELIEVE THAT

11:14AM 10   WE DO HAVE A NATIVE EXCEL SPREADSHEET THAT CAN BE SORTED.  WE

11:14AM 11   WOULD WANT THE CHANCE TO JUST ADDRESS IT WITH OUR WITNESS

11:14AM 12   QUICKLY.

11:14AM 13       BUT, YOU KNOW --

11:14AM 14               THE COURT:  SO I GUESS I'M -- I'M SORRY, I DON'T

11:14AM 15   MEAN TO BE THICK ON THIS.  BUT WE'RE TALKING ABOUT THE

11:14AM 16   MACHINES.  IS THAT THE ALLEGATION IN THE TSI, THAT THE MACHINES

11:14AM 17   DIDN'T OPERATE AS REPRESENTED?

11:15AM 18               MR. LEACH:  CORRECT, YOUR HONOR.

11:15AM 19       AND PART OF MY ISSUE WITH JUST DUMPING 176 PATENTS ALL OF

11:15AM 20   THE WAY THROUGH 2021 INTO EVIDENCE IS JUST FROM THE PATENT -- I

11:15AM 21   MEAN, SOME OF THESE SAY SYSTEMS AND METHODS FOR FLUID AND

11:15AM 22   COMPONENT HANDLING.

11:15AM 23       THERE'S NO PROFFER, AND NOT GOING TO BE ONE FROM THIS

11:15AM 24   WITNESS, ABOUT WHAT THESE ARE AND HOW THEY RELATE TO PARTICULAR

11:15AM 25   THINGS WITHIN THE TECHNOLOGY.

11:15AM  1    THESE ARE ALSO PATENTS.  THEY'RE PIECES OF PAPER.  THEY'RE

11:15AM  2    NOT PROOF THAT THE TECHNOLOGY WORKS.

11:15AM  3        SO I THINK IT HAS VERY LIMITED RELEVANCE.  IT COULD

11:15AM  4    INVOLVE WORK FROM 2017, 2018, 2019, 2021, AND I JUST THINK

11:15AM  5    IT'S -- TO DUMP A LIST OF PATENTS WITHOUT TYING THEM TO

11:15AM  6    PARTICULAR THINGS RELATING TO THE MINILAB, THE EDISON, OR THE

11:15AM  7    TSPU REALLY SERVES NO PURPOSE THAT I CAN SEE FROM A RELEVANCE

11:15AM  8    POINT OF VIEW.

11:15AM  9             THE COURT:  IF IT'S THE -- WE'RE TALKING ABOUT THE

11:15AM 10    TESTING THAT WAS DONE ON COMPLETED MACHINES; IS THAT RIGHT?

11:16AM 11             MS. TREFZ:  IN, IN --

11:16AM 12             THE COURT:  THE MINILAB AND THE EDISON, AND THEN THE

11:16AM 13    ITERATION OF EACH OF THOSE, I THINK THERE'S BEEN TESTIMONY

11:16AM 14    ABOUT THAT.

11:16AM 15             MS. TREFZ:  THE THERANOS TECHNOLOGY WAS BROADER THAN

11:16AM 16    THAT, YOUR HONOR.

11:16AM 17        BUT I DID JUST WANT TO SAY I THINK WE CAN LIMIT -- LIKE I

11:16AM 18    SAID, WE WILL HAVE TO CHANGE THE EXHIBIT, BUT I THINK WE CAN

11:16AM 19    LIMIT IT TO THE APPLICATIONS FILED BY THE END OF 2016, AND IT

11:16AM 20    SOUNDS LIKE THAT WILL RESOLVE THE GOVERNMENT'S CONCERN.  IT WAS

11:16AM 21    RAISED NOW, AND I'M HAPPY TO ADDRESS IT QUICKLY.

11:16AM 22             THE COURT:  IS THIS WITNESS GOING TO TESTIFY ABOUT

11:16AM 23    THE PATENT PROSECUTION PROCESS AND HOW LONG --

11:16AM 24             MS. TREFZ:  NO.

11:16AM 25             THE COURT:  -- AND HOW LONG THAT TAKES?

11:16AM 1           MS. TREFZ: WE DID INTEND FOR -- THE SECOND PAGE, OR

11:16AM 2  ACTUALLY THE THIRD PAGE OF EXHIBIT 10684 DOES SHOW THE

11:16AM 3  DIFFERENCE BETWEEN WHEN A PATENT WAS APPLIED FOR AND WHEN IT

11:16AM 4  WAS ISSUED.

11:17AM 5       WE CAN DO THAT IN A SLIGHTLY DIFFERENT WAY. SO HE'S NOT

11:17AM 6  GOING TO TESTIFY SUBSTANTIVELY ABOUT, ABOUT THAT PROCESS, WHAT,

11:17AM 7  WHAT HE WAS -- WHAT WE WOULD LIKE HIM TO BE ABLE TO IDENTIFY IS

11:17AM 8  THAT SOMETIMES PATENTS APPLIED FOR IN A -- YOU KNOW, OBVIOUSLY

11:17AM 9  A PATENT IS APPLIED FOR AS A PARTICULAR DATE, AND THEN IT'S

11:17AM 10  ISSUED LATER.

11:17AM 11      AND SO WE WOULD LIKE TO BE ABLE TO SAY THAT, WHICH YOU CAN

11:17AM 12  SEE FROM THE FACE OF THE PATENTS, THE APPLICATION DATE.

11:17AM 13          THE COURT: IS HE GOING TO PUT THE WRAPPER IN AS TO

11:17AM 14  THE PATENT?

11:17AM 15          MS. TREFZ: HE'S NOT GOING TO PUT IN THE WRAPPER.

11:17AM 16  WE'RE NOT OFFERING THE PATENTS, WE'RE OFFERING THE SUMMARY.

11:17AM 17  THE PATENTS ARE ON OUR EXHIBIT LIST, BUT WE'RE OFFERING THE

11:17AM 18  SUMMARY.

11:17AM 19      THEY COULD COME IN FROM A DIFFERENT WITNESS, BUT --

11:17AM 20          THE COURT: THIS GOES TO -- WHAT YOU'RE SAYING IS

11:17AM 21  THIS GOES TO HER STATE OF MIND, PARDON ME, YOUR CLIENT'S STATE

11:17AM 22  OF MIND TO SHOW THAT SHE, WHAT, CONTINUED TO BELIEVE IN THE

11:17AM 23  PRODUCT?

11:17AM 24      I'M SORRY, I DON'T UNDERSTAND THAT.

11:17AM 25          MS. TREFZ: RIGHT. SO IS THE COURT'S QUESTION WITH

| | | |
|---|---|---|
| 11:18AM | 1 | RESPECT TO PATENTS AFTER -- APPLIED FOR AFTER THE CONSPIRACY? |
| 11:18AM | 2 | THE COURT:  LET'S ASSUME THAT THOSE AREN'T COMING |
| 11:18AM | 3 | IN, AND I THINK THERE'S AGREEMENT THAT THEY WON'T. |
| 11:18AM | 4 | BUT WHAT DO THE ONES THAT ARE GOING TO COME IN, WHAT DO |
| 11:18AM | 5 | THOSE -- STATE OF MIND YOU SAID.  I'VE BEEN HEARING THAT A LOT, |
| 11:18AM | 6 | AND I'M NOT SURE WHAT IT'S FOR. |
| 11:18AM | 7 | MS. TREFZ:  I APOLOGIZE FOR -- |
| 11:18AM | 8 | THE COURT:  NO, NO. |
| 11:18AM | 9 | MS. TREFZ:  THERE ARE ACTUALLY, TO BE CLEAR, FIVE |
| 11:18AM | 10 | REASONS WHY WE THINK THEY ARE RELEVANT. |
| 11:18AM | 11 | BUT WITH RESPECT TO STATE OF MIND, MS. HOLMES IS AN |
| 11:18AM | 12 | INVENTOR ON MANY OF THESE PATENTS.  SHE OVERSAW THE PATENT -- |
| 11:18AM | 13 | SHE OVERSAW THE INVENTION PROCESS AT THERANOS IN SOME WAY. |
| 11:18AM | 14 | WE BELIEVE THAT THERE HAS BEEN KIND OF EVIDENCE, I THINK |
| 11:18AM | 15 | FROM MR. EDLIN, THAT SHE WAS INVOLVED MORE IN THE TECHNOLOGY. |
| 11:18AM | 16 | SO THE IDEA OF, THE IDEA THAT SHE -- THAT THESE PATENTS |
| 11:18AM | 17 | WERE PATENTS APPLIED FOR BY THERANOS, MANY OF WHICH SHE'S THE |
| 11:19AM | 18 | INVENTOR ON, AND WHICH I THINK IN FACT DO COVER THE TECHNOLOGY |
| 11:19AM | 19 | THAT THERANOS DEVELOPED AND THE ALLEGATIONS IN THE CASE ARE |
| 11:19AM | 20 | ABOUT THE TECH -- ARE NOT JUST ABOUT THE DEVICE ITSELF, BUT -- |
| 11:19AM | 21 | THE COURT:  WHAT IS THE STATE OF MIND?  IS IT THAT |
| 11:19AM | 22 | SHE'S SMART? |
| 11:19AM | 23 | MS. TREFZ:  NO, YOUR HONOR. |
| 11:19AM | 24 | THE COURT:  WHAT IS THE STATE OF MIND? |
| 11:19AM | 25 | MS. TREFZ:  WELL, IT'S THAT SHE UNDERSTOOD THAT THE |

11:19AM 1    COMPANY HAD, IN FACT, DEVELOPED NOVEL TECHNOLOGY, WHICH IS ONE

11:19AM 2    OF THE THINGS THAT YOU DO WHEN YOU APPLY FOR -- IF A PATENT IS

11:19AM 3    ISSUED, IT HAS TO BE NOVEL.

11:19AM 4         AND, YOU KNOW, THERE IS A WHOLE PROCESS.  WE'RE NOT

11:19AM 5    INTENDING TO GO INTO THE WHOLE PROCESS.  WE'RE NOT TRYING TO

11:19AM 6    MAKE THIS A PATENT CASE.

11:19AM 7              THE COURT:  I'M SORRY.  AND AGAIN, I DON'T MEAN TO

11:19AM 8    BE THICK ON THIS, BUT STATE OF MIND AS TO AN ISSUE OF?

11:19AM 9              MS. TREFZ:  OF HER UNDERSTANDING OF THE STATE OF

11:19AM 10   THERANOS'S TECHNOLOGY THROUGHOUT THE CONSPIRACY PERIOD.

11:19AM 11             THE COURT:  AT THE TIME THE PATENT WAS ISSUED?

11:20AM 12             MS. TREFZ:  AT THE TIME IT WAS APPLIED FOR IS WHAT I

11:20AM 13   BELIEVE WE'RE -- AND THEN ISSUED.  MANY OF THESE WERE ISSUED

11:20AM 14   DURING THE ALLEGED CONSPIRACY AS WELL.

11:20AM 15             THE COURT:  SO IT GOES TO HER KNOWLEDGE OF THE

11:20AM 16   TECHNOLOGY?

11:20AM 17             MS. TREFZ:  YES, HER UNDERSTANDING OF THE TECHNOLOGY

11:20AM 18   AND THAT IT WAS NOVEL.

11:20AM 19        AND THERE ARE OTHER REASONS THAT IT'S ADMISSIBLE THAT I'M

11:20AM 20   HAPPY TO EXPLAIN.  I DON'T WANT US TO GET TOO FOCUSSED ON ONE

11:20AM 21   REASON.

11:20AM 22             THE COURT:  SURE.

11:20AM 23             MS. TREFZ:  THE SECOND IS THAT -- I THINK KIND OF

11:20AM 24   RELATED IS THAT THE PATENTS REFLECT RESEARCH AND DEVELOPMENT

11:20AM 25   WORK, AND FOR THAT REASON THEY'RE RELEVANT TO ALLEGATIONS OF

11:20AM 1    FALSITY.  THEY MAKE IT MORE LIKELY THAT HER STATEMENTS

11:20AM 2    CONCERNING THE CAPABILITY OF THE TECHNOLOGIES WERE TRUE.

11:20AM 3        NOW, AGAIN, WE'RE NOT INTENDING TO MAKE THIS -- TO GO INTO

11:20AM 4    ALL OF THE DETAILS OF THE PATENTS THROUGH THIS WITNESS, BUT

11:20AM 5    IT'S POSSIBLE THAT, YOU KNOW, THE STATE OF THE TECHNOLOGY MAY

11:20AM 6    COME IN IN OTHER AREAS OF THE CASE.

11:21AM 7        THE COURT:  IS SHE THE INVENTOR IN EACH OF THESE

11:21AM 8    PATENTS?

11:21AM 9        MS. TREFZ:  THERE ARE MANY INVENTORS ON THE PATENTS.

11:21AM 10   SHE'S AN INVENTOR ON MANY, BUT NOT ALL OF THEM.

11:21AM 11       AND THERE ARE THREE REASONS I JUST WANTED TO IDENTIFY.

11:21AM 12       THIRD IS THAT THERANOS'S PATENTS AND IP RELATES TO THE

11:21AM 13   MATERIALITY OF THE INVESTOR CONSPIRACY.  MULTIPLE INVESTOR

11:21AM 14   WITNESSES HAVE TESTIFIED THAT THEY WERE SENT PATENT PORTFOLIOS

11:21AM 15   BY THERANOS AND THAT THERANOS'S IP WAS IMPORTANT TO PROSPECTIVE

11:21AM 16   INVESTORS.  THAT INCLUDES MR. MOSLEY.

11:21AM 17       AND INVESTOR -- AND MR. MOSLEY ALSO, YOU KNOW, IDENTIFIED

11:21AM 18   THAT HE VIEWED PATENT APPLICATIONS, NOT THE FINALIZED PATENTS,

11:21AM 19   AS IMPORTANT.  HE TESTIFIED TO THAT.

11:21AM 20       FOURTH, THE GOVERNMENT PUT AT ISSUE I THINK PROPRIETARY

11:21AM 21   PATENTED TECHNOLOGY BY INTRODUCING EXHIBITS THROUGH WITNESSES,

11:22AM 22   INCLUDING, INCLUDING THE PRESENTATION THAT WAS ADMITTED THROUGH

11:22AM 23   MS. PETERSON.  THAT'S EXHIBIT 4858 AND THE TRANSCRIPT AT 4664.

11:22AM 24       AND SO WE BELIEVE THAT IT'S ESSENTIAL TO, YOU KNOW, MAKE

11:22AM 25   SURE THAT THERE'S NO MISIMPRESSION THAT THIS WAS SOME SORT OF

11:22AM  1    MISREPRESENTATION THAT SHE SAID THERE WERE A LOT OF PATENTS

11:22AM  2    BECAUSE IT'S HIGHLIGHTED, BECAUSE IT'S INCLUDED IN THESE

11:22AM  3    PRESENTATIONS THAT THE GOVERNMENT, I UNDERSTAND, WILL LIKELY

11:22AM  4    ARGUE, YOU KNOW, CONTAINED MISLEADING STATEMENTS.

11:22AM  5         AND THEN --

11:22AM  6              THE COURT:  SO WHAT IS THE RELEVANCE OF THE PATENTS

11:22AM  7    TO THAT?  TO SHOW THAT THE PATENTS ACTUALLY EXISTED?

11:22AM  8              MS. TREFZ:  CORRECT, THAT THEY WERE APPLIED FOR AND

11:22AM  9    ISSUED, AND THAT IT'S FROM THE FACE OF THE PATENT.

11:23AM  10        I MEAN, THE INVESTOR MATERIALS INCLUDE A THICK SET OF

11:23AM  11   PATENT, OF INTELLECTUAL PROPERTY DISCLOSURES.

11:23AM  12             THE COURT:  IS THAT IN DISPUTE THAT THEY'RE PATENTS?

11:23AM  13             MR. LEACH:  NO, YOUR HONOR.

11:23AM  14             THE COURT:  IT'S NOT IN DISPUTE.  THEY'RE NOT GOING

11:23AM  15   TO SAY, OH, NO, THERE WEREN'T PATENTS ISSUED.  THEY SAID IN

11:23AM  16   THEIR CASE THAT THERE WERE PATENTS.

11:23AM  17        I GUESS THERE IS EVIDENCE THAT INVESTORS RECEIVED THE

11:23AM  18   PATENTS, AND YOU WANT TO SHOW THAT, YEAH, THE PATENTS ACTUALLY

11:23AM  19   EXIST.

11:23AM  20             MS. TREFZ:  EXACTLY, YOUR HONOR.

11:23AM  21        AND I THINK THAT'S IMPORTANT TO JUST PROVIDE THE CONTEXT

11:23AM  22   FOR THE KINDS OF INFORMATION THAT WAS BEING PROVIDED FOR

11:23AM  23   INVESTORS.

11:23AM  24        AND, YOU KNOW, I DON'T -- I WOULD DISPUTE THE, THE CONCEPT

11:23AM  25   THAT THE DEFENSE IS ONLY REQUIRED TO KIND OF TAKE AT ISSUE IN

| | | |
|---|---|---|
| 11:23AM | 1 | ITS CASE, YOU KNOW, PURELY WHAT THE GOVERNMENT HAS KIND OF |
| 11:23AM | 2 | IDENTIFIED AS, YOU KNOW, AND EXPLICITLY SUGGESTED WAS A |
| 11:24AM | 3 | REPRESENTATION. |
| 11:24AM | 4 | SO I -- MY HOPE IS THAT THE -- YOU KNOW, IF WE CAN LIMIT |
| 11:24AM | 5 | THIS EXHIBIT TO 2016, THE PATENTS APPLIED FOR THROUGH 2016, |
| 11:24AM | 6 | THAT WE WILL RESOLVE THE GOVERNMENT'S CONCERN. |
| 11:24AM | 7 | AND, AND -- |
| 11:24AM | 8 | THE COURT:  ARE ALL OF THESE PATENTS RELATED TO THE |
| 11:24AM | 9 | TECHNOLOGY OF THE MACHINES, OR ARE THERE PATENTS THAT ARE HERE |
| 11:24AM | 10 | IN THESE CHARTS THAT ARE OUTSIDE OF THAT? |
| 11:24AM | 11 | MS. TREFZ:  THERE ARE MULTIPLE, OBVIOUSLY MULTIPLE |
| 11:24AM | 12 | INVENTIONS USUALLY THAT GO INTO A MACHINE LIKE THIS.  SO I |
| 11:24AM | 13 | WOULD SAY MANY OF THEM ARE RELATED TO THE SYSTEMS THAT THERANOS |
| 11:24AM | 14 | DEVELOPED, INCLUDING THE DIFFERENT PIECES OF THOSE SYSTEMS. |
| 11:24AM | 15 | I THINK IF YOU LOOK AT THE TITLES OF THE PATENTS, WHICH |
| 11:24AM | 16 | ARE -- THE FULL LIST IS AT 10691 IN THE COURT'S BINDER, YOU CAN |
| 11:25AM | 17 | SEE A NUMBER OF DIFFERENT -- |
| 11:25AM | 18 | THE COURT:  SO HOW MANY OF THESE ARE SOFTWARE |
| 11:25AM | 19 | PATENTS? |
| 11:25AM | 20 | MS. TREFZ:  THERE ARE, THERE ARE PROBABLY A FEW OF |
| 11:25AM | 21 | THEM.  I'M NOT SURE OFF THE TOP OF MY HEAD. |
| 11:25AM | 22 | THE COURT:  DOES THAT MATTER?  SHOULD WE GO INTO |
| 11:25AM | 23 | THAT? |
| 11:25AM | 24 | MS. TREFZ:  WELL, I DO BELIEVE THAT SOFTWARE WAS |
| 11:25AM | 25 | PART OF THE THERANOS TECHNOLOGY, AND I THINK THAT THAT'S AT |

11:25AM 1     ISSUE IN THE CASE.

11:25AM 2             THE COURT:  AND I ASK THAT BECAUSE, YOU KNOW, IT'S A

11:25AM 3     RABBIT HOLE, ISN'T IT?  DO WE WANT TO GO DOWN EVERY PATENT AND

11:25AM 4     ASK, WHAT WAS THIS PATENT FOR?  THIS WAS A SYSTEMS PATENT,

11:25AM 5     SOFTWARE PATENT TO ALLOW FOR THE MACHINES TO TALK TO THEMSELVES

11:25AM 6     WITH GREATER EFFICIENCY.

11:25AM 7         THIS IS A PATENT FOR A KNOB.

11:25AM 8         THIS IS A PATENT FOR A WIRE THAT CONNECTS THE CIRCUIT

11:25AM 9     BOARDS.

11:25AM 10        DO WE -- ARE WE GOING TO GET GRANULAR ON THIS?

11:25AM 11            MS. TREFZ:  I WAS NOT INTENDING TO GO THROUGH THIS

11:25AM 12    WITH THIS WITNESS, YOUR HONOR.

11:25AM 13        HOWEVER, I WOULD JUST NOTE THAT THE PATENTS FOR SOFTWARE

11:26AM 14    FOR THE MACHINES TO BE ABLE TO TALK TO EACH OTHER IS ACTUALLY A

11:26AM 15    CORE PART OF THE THERANOS TECHNOLOGY, AND SO I WOULDN'T WANT, I

11:26AM 16    WOULDN'T WANT TO LEAVE THE MISIMPRESSION THAT IT IS NOT.  IT

11:26AM 17    IS.

11:26AM 18            THE COURT:  WELL, I UNDERSTAND THE IMPORTANCE OF

11:26AM 19    THIS.

11:26AM 20            MS. TREFZ:  OKAY.

11:26AM 21            THE COURT:  I JUST -- I DON'T KNOW WHAT THE VALUE OF

11:26AM 22    THIS IS.  YOU TELL ME IT'S INCREDIBLY VALUABLE TO YOUR CASE,

11:26AM 23    AND I'LL TAKE YOU AT YOUR WORD.

11:26AM 24        SO WE'RE GOING TO LIMIT IT TO THE 2016 TIME PERIOD.

11:26AM 25            MR. LEACH:  THAT WAS ALL MY CONCERN, YOUR HONOR.  I

11:26AM  1    THINK YOU'RE HITTING ON A LOT OF THE RELEVANCE POINTS THAT I

11:26AM  2    SEE WITH THIS AND THE LIMIT OF THIS EVIDENCE, BUT THE NATURE OF

11:26AM  3    MY 403 OBJECTION WAS REALLY THIS BECOMES A MINI TRIAL ABOUT

11:26AM  4    LATER YEARS THAT I DON'T THINK IS APPROPRIATE.

11:26AM  5            THE COURT:  OKAY.  WELL, AT A MINIMUM -- AND THANK

11:26AM  6    YOU, MS. TREFZ.

11:26AM  7        SO YOU'LL REDO YOUR CHARTS AND YOU'LL TELL YOUR WITNESS

11:26AM  8    AND YOU'RE NOT GOING TO ASK YOUR WITNESS QUESTIONS ABOUT THE

11:26AM  9    2017 PATENTS.

11:26AM  10            MS. TREFZ:  THAT'S CORRECT, YOUR HONOR.  I WILL NEED

11:26AM  11   A MOMENT TO ADDRESS THAT.

11:26AM  12            THE COURT:  RIGHT.

11:26AM  13            MS. TREFZ:  IT WILL NOT BE A PROBLEM.  THESE ARE

11:27AM  14   CHARTS RUN.

11:27AM  15            THE COURT:  WE'RE NOT GOING TO HAVE MARKMAN HEARINGS

11:27AM  16   THIS MORNING ABOUT ANY OF THESE PATENTS.

11:27AM  17            MS. TREFZ:  I HOPE NOT.

11:27AM  18            THE COURT:  NO, WE'RE NOT.

11:27AM  19        (LAUGHTER.)

11:27AM  20            MS. TREFZ:  I KNOW.  I KNOW.  I AM NOT PREPARED TO

11:27AM  21   DO SO AND I WAS NOT INTENDING TO DO SO.

11:27AM  22            THE COURT:  OKAY.  FAIR ENOUGH.

11:27AM  23            MS. TREFZ:  THANK YOU, YOUR HONOR.

11:27AM  24            THE COURT:  IS THAT IT?

11:27AM  25            MR. LEACH:  THAT WAS IT, YOUR HONOR.

```
11:27AM   1            THE COURT:  WE WERE JUST GETTING STARTED TALKING
11:27AM   2     ABOUT PATENTS.
11:27AM   3            ALL RIGHT.  SO IS THIS YOUR FIRST WITNESS THEN?  HE'S A
11:27AM   4     SUMMARY WITNESS?
11:27AM   5            MS. TREFZ:  YES, HE IS OUR FIRST WITNESS.  I THINK
11:27AM   6     IT WOULD -- IT'S NOT GOING TO TAKE US A LONG TIME TO ADDRESS
11:27AM   7     THIS PARTICULAR ISSUE.
11:27AM   8            YOU KNOW, THERE ARE A LOT OF NUMBERS IN THIS BINDER, BUT
11:27AM   9     AS THE COURT KNOWS, WE DON'T ALWAYS USE THE NUMBERS IN THE
11:27AM  10     BINDER AND SOME OF THEM WILL --
11:27AM  11            THE COURT:  WHAT ABOUT THIS?  ARE WE GOING TO GO
11:27AM  12     THROUGH THIS (INDICATING)?
11:27AM  13            MS. TREFZ:  IF YOU WANT TO.
11:27AM  14            I'M JOKING, YOUR HONOR.  EXCUSE ME.
11:27AM  15            WE'RE NOT INTENDING TO GO THROUGH THAT EXHIBIT.
11:27AM  16            HOWEVER, WE DO HAVE IT IN THE EVENT THAT --
11:28AM  17            THE COURT:  AN INTEREST ARISES SOMEHOW IN THE CASE?
11:28AM  18            MS. TREFZ:  NO, YOUR HONOR.  BUT THERE IS A SUMMARY
11:28AM  19     BASED ON THAT EXHIBIT.
11:28AM  20            THE COURT:  OKAY.
11:28AM  21            MS. TREFZ:  AND WE DO WANT TO HAVE THE OPPORTUNITY
11:28AM  22     FOR THE GOVERNMENT OR THE WITNESS TO BE ABLE TO LOOK AT THAT
11:28AM  23     DOCUMENT IF THEY NEED TO.
11:28AM  24            THE COURT:  ALL RIGHT.  THANK YOU.
11:28AM  25            AND JUST TIMING WISE, THIS WITNESS WILL TESTIFY, THIS
```

11:28AM 1    SUMMARY WITNESS.

11:28AM 2        WHERE DO YOU THINK WE'LL BE AT THE CONCLUSION -- IN OUR

11:28AM 3    DAY AT THE CONCLUSION OF THIS WITNESS'S DIRECT?

11:28AM 4        MS. TREFZ:  I ANTICIPATE THAT THIS DIRECT WILL TAKE

11:28AM 5    AN HOUR OR LESS.

11:28AM 6        THE COURT:  OKAY.

11:28AM 7        MS. TREFZ:  AS THE COURT KNOWS, IT'S A LITTLE

11:28AM 8    DIFFICULT TO PLAN EXACTLY, BUT THAT IS -- BASED ON OUR

11:28AM 9    UNDERSTANDING, THAT IS ABOUT HOW LONG IT WOULD TAKE.

11:28AM 10       THE COURT:  OKAY.  OKAY.

11:28AM 11       AND CROSS IS PROBABLY GOING TO BE -- ARE WE GOING TO FLIP

11:28AM 12   THEN?  WILL YOU HAVE SIX AND A HALF HOURS OF CROSS?

11:28AM 13       MR. LEACH:  I ASPIRE TO BE SHORTER THAN THE DIRECT,

11:28AM 14   AND SIGNIFICANTLY SHORTER, BUT I'M NOT ENTIRELY SURE WHERE IT'S

11:28AM 15   GOING.

11:28AM 16       THE COURT:  AND THEN YOUR NEXT WITNESS WILL BE THE

11:28AM 17   NEXT WITNESS THAT WE SPOKE ABOUT THIS MORNING.  SHOULD WE TALK

11:29AM 18   MORE ABOUT THAT THEN NOW, OR SHOULD WE DO THAT AT A BREAK?

11:29AM 19   WHAT ARE YOUR THOUGHTS?

11:29AM 20       MS. TREFZ:  I'M HAPPY TO TALK ABOUT IT NOW.

11:29AM 21       I DID GIVE MR. SCHENK THE BINDER AND I EXPLAINED TO HIM

11:29AM 22   THAT WE WON'T ACTUALLY SEEK TO INTRODUCE MOST OF THE EXHIBITS,

11:29AM 23   AND I EXPLAINED WHAT -- FOR SOME OF THE DEMONSTRATIVES WHAT WE

11:29AM 24   INTEND TO DO WITH THAT.

11:29AM 25       SO HOPEFULLY -- I DON'T KNOW IF HE'S HAD A CHANCE TO

11:29AM 1    CONSIDER THAT, BUT I WANTED TO MAKE HIM AWARE.

11:29AM 2            MR. SCHENK:  YES, THE DEFENSE DID DO THAT.  WE MET

11:29AM 3    AND CONFERRED AND I WAS SHOWN THE EXHIBITS AND HOW THEY'RE

11:29AM 4    INTENDED TO BE USED, AND I'M FINE WITH PROCEEDING WITH THIS AS

11:29AM 5    THE SECOND WITNESS.

11:29AM 6        WE MAY HAVE RELEVANCE CONCERNS AS THE TESTIMONY COMES IN,

11:29AM 7    BUT I DON'T THINK WE NEED TO ADJOURN OR DELAY.

11:29AM 8            THE COURT:  THANK YOU.

11:29AM 9        AND THANK YOU FOR MEETING AND CONFERRING ON THAT.  SO MUCH

11:29AM 10   GETS DONE THAT WAY.  I APPRECIATE IT.  THANK YOU.

11:29AM 11       LET ME DO TALK, BEFORE I STEP DOWN AND WE BRING OUR JURY

11:29AM 12   IN, AND THIS IS SOMETHING, MR. SCHENK, YOU AND I HAD, AND

11:29AM 13   MR. DOWNEY TALKED ABOUT, THIS IS THE MEDIA MOTION.

11:29AM 14       I JUST WANTED TO SAY -- I'LL INVITE YOUR COLLEAGUE UP.

11:30AM 15           THANK YOU, MS. TREFZ.

11:30AM 16       WE HAD SOME DISCUSSION, THE THREE OF US, ABOUT TIMING OF

11:30AM 17   THIS.

11:30AM 18       I THINK, MR. DOWNEY, YOU SUGGESTED THAT THE COURT ISSUE

11:30AM 19   ITS ORDER AT THE END OF THE GOVERNMENT'S CASE, AND PROBABLY AT

11:30AM 20   THE END OF THE DAY TODAY I THINK.

11:30AM 21       LET ME JUST SAY THAT WOULD BE MY INTENT.  I'M WORKING ON

11:30AM 22   FINALIZING THAT.  IT WOULD BE MY INTENT TO INFORM THE JURY, AS

11:30AM 23   I PROMISED THEM I WOULD DO, OF THE COURT'S RULING AND WHAT THE

11:30AM 24   COURT'S INTENT WOULD BE ON THE RULING AND TO LET THEM KNOW

11:30AM 25   THAT.

| 11:30AM | 1 | AND I THINK YOUR SUGGESTION, MR. DOWNEY, TO DO IT AT THE |
| 11:30AM | 2 | END OF TODAY IS ONE THAT I'D LIKE TO FOLLOW. |
| 11:30AM | 3 | MR. DOWNEY:  WELL, I'D JUST BE HAPPY FOR IT TO |
| 11:30AM | 4 | HAPPEN NOW AND WOULD PREFER IT TO HAPPEN IN BETWEEN THE CASES, |
| 11:30AM | 5 | BUT IT DOESN'T SOUND LIKE THE JUDGE IS READY, SO -- THE COURT |
| 11:30AM | 6 | IS READY QUITE YET, SO I THINK WITH THE END OF THE DAY YOU'LL |
| 11:30AM | 7 | DO SO. |
| 11:30AM | 8 | THE COURT:  YES. |
| 11:30AM | 9 | MR. DOWNEY:  AND I DON'T KNOW IF YOU WANT TO GIVE US |
| 11:31AM | 10 | A HINT AS TO WHAT IS IN IT, BUT -- |
| 11:31AM | 11 | (LAUGHTER.) |
| 11:31AM | 12 | THE COURT:  IS THAT STEAL OR IS IT STAY? |
| 11:31AM | 13 | MR. DOWNEY:  AS THE COURT KNOWS, OUR POSITION IS |
| 11:31AM | 14 | THAT THERE'S A SIGNIFICANT FIFTH AND SIXTH AMENDMENT ISSUE AT |
| 11:31AM | 15 | STAKE, AND WE PREFER THAT THE JURY BE TOLD OF A PARTICULAR |
| 11:31AM | 16 | RESULT, BUT WE'VE ALREADY DISCUSSED THAT. |
| 11:31AM | 17 | THE COURT:  RIGHT.  AND I WILL, I WILL.  I TOLD THEM |
| 11:31AM | 18 | I WOULD DO THAT PRIOR TO THE COURT ISSUING ITS ORDER, AND I |
| 11:31AM | 19 | INTEND TO TELL THEM THAT. |
| 11:31AM | 20 | AND I WANT TO GET IT FILED CONCURRENT WITH ME INFORMING |
| 11:31AM | 21 | THEN -- AND YOU'VE SHARED WITH ME BOTH OF YOUR POSITIONS.  I |
| 11:31AM | 22 | DON'T THINK YOU'LL BE DISAPPOINTED.  IS THAT INFORMATIVE? |
| 11:31AM | 23 | MR. DOWNEY:  THANK YOU, YOUR HONOR. |
| 11:31AM | 24 | THE COURT:  OKAY.  THANK YOU. |
| 11:32AM | 25 | ANYTHING ELSE BEFORE WE GET STARTED? |

11:32AM 1    MR. SCHENK:  NO.  THANK YOU, YOUR HONOR.

11:32AM 2    THE COURT:  OKAY.  IS MR. CLINE HERE NOW?

11:32AM 3    MR. CLEARY:  YES.

11:32AM 4    THE COURT:  YEAH, DID MR. CLINE SHARE WITH YOU THE

11:32AM 5    COURT'S COMMENTS?

11:32AM 6    MR. CLEARY:  HE DID CONVEY THOSE COMMENTS AND THE

11:32AM 7    COURT WAS MOST GENEROUS.

11:32AM 8    THE COURT:  WELL, I JUST WANTED TO MAKE SURE.  I

11:32AM 9    DIDN'T HAVE ANY DOUBT IN MR. CLINE'S ABILITY TO DO THAT.  HE

11:32AM 10   HAD A LOT ON HIS MIND, AND I JUST WANTED TO MAKE SURE THAT HE

11:32AM 11   SHARED THAT WITH YOU.  SO THANK YOU, SIR.  THANK YOU.

11:32AM 12   IT'S NICE TO SEE YOU.

11:32AM 13   MR. CLEARY:  THANK YOU, YOUR HONOR.

11:32AM 14   THE COURT:  YOU'RE WELCOME.  THANK YOU.

11:32AM 15   OKAY.  I'LL STEP DOWN AND THEN WE'LL BRING IN OUR JURY.

11:32AM 16   THE CLERK:  COURT IS IN RECESS.

11:32AM 17   (RECESS FROM 11:32 A.M. UNTIL 11:52 A.M.)

11:53AM 18   (JURY IN AT 11:53 A.M.)

11:53AM 19   THE COURT:  ALL RIGHT.  WE'RE BACK ON THE RECORD.

11:53AM 20   ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

11:53AM 21   COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.

11:53AM 22   LADIES AND GENTLEMEN, THAT BREAK WAS A LITTLE LONGER THAN

11:53AM 23   ANTICIPATED.  I WANT YOU TO KNOW THAT WE DID USE THE TIME.  I

11:53AM 24   NEEDED TO ASK THESE LAWYERS SOME QUESTIONS AND I NEEDED SOME

11:53AM 25   HELP ON THESE ISSUES, AND SOMETIMES THAT TAKES A LITTLE LONGER.

11:53AM 1        SO YOU SHOULD KNOW THAT BY SPENDING THE TIME THAT WE DID

11:53AM 2   DURING THIS BREAK, IT DID INCREASE THE EFFICIENCY OF THE TRIAL.

11:53AM 3   WE WERE ABLE TO NARROW DOWN SOME ISSUES, SO I THINK THE

11:54AM 4   EVIDENCE WILL BE ABLE TO COME IN, AT LEAST INITIALLY, WITH

11:54AM 5   GREATER EFFICIENCY.

11:54AM 6        WHICH IS TO SAY THAT WE SAVED SOME TIME DOING -- SPENDING

11:54AM 7   THIS TIME TOGETHER.  SO THANK YOU FOR THAT.

11:54AM 8        THE GOVERNMENT HAS RESTED.  I'VE TOLD YOU THAT, LADIES AND

11:54AM 9   GENTLEMEN, WHICH IS TO SAY THAT THE GOVERNMENT HAS PRESENTED

11:54AM 10  ALL OF THEIR EVIDENCE IN THEIR CASE-IN-CHIEF THAT THEY FEEL

11:54AM 11  THAT THEY'RE GOING TO PRESENT.

11:54AM 12       AND NOW I TURN TO THE DEFENSE.

11:54AM 13       DOES THE DEFENSE HAVE A WITNESS TO CALL?

11:54AM 14           MS. TREFZ:  WE DO, YOUR HONOR.

11:54AM 15       THE DEFENSE CALLS TRENT MIDDLETON.

11:54AM 16           THE COURT:  ALL RIGHT.  THANK YOU.

11:54AM 17       IF YOU WOULD COME FORWARD AND FACE OUR COURTROOM DEPUTY

11:54AM 18  WHILE YOU RAISE YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU.

11:54AM 19       **(DEFENDANT'S WITNESS, TRENT MIDDLETON, WAS SWORN.)**

11:54AM 20           THE WITNESS:  YES.

11:55AM 21           THE COURT:  PLEASE HAVE A SEAT THERE, SIR.

11:55AM 22       FEEL FREE TO MAKE YOURSELF COMFORTABLE, ADJUST THAT CHAIR

11:55AM 23  AND MICROPHONE AS YOU NEED.

11:55AM 24       WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

11:55AM 25  AND THEN SPELL IT, PLEASE.

11:55AM 1          THE WITNESS:  SURE.  MY NAME IS TRENT MIDDLETON.

11:55AM 2     T-R-E-N-T.  M-I-D-D-L-E-T-O-N.

11:55AM 3          THE COURT:  THANK YOU.  COUNSEL.

11:55AM 4                    **DIRECT EXAMINATION**

11:55AM 5     BY MS. TREFZ:

11:55AM 6     Q.   MR. MIDDLETON, IF ARE YOU ARE FULLY VACCINATED AND

11:55AM 7     COMFORTABLE TESTIFYING WITHOUT YOUR MASK, YOU MAY REMOVE IT,

11:55AM 8     AND I WILL DO THE SAME.

11:55AM 9     A.   THANK YOU.  I AM.

11:55AM 10    Q.   HELLO.  THERE'S A WATER UP THERE.

11:55AM 11         AND I'VE ALSO, JUST FOR YOUR REFERENCE, PLACED A BINDER UP

11:55AM 12    THERE FOR YOU AS WELL, AND WE MAY REFER TO IT DURING THE EXAM.

11:55AM 13    A.   PERFECT.

11:55AM 14    Q.   CAN YOU DESCRIBE YOUR EDUCATIONAL BACKGROUND FOR US?

11:55AM 15    A.   SURE.  I HAVE A BACHELOR'S DEGREE IN ECONOMICS, AND A

11:55AM 16    MASTER'S DEGREE IN POLITICAL SCIENCE FROM MICHIGAN STATE

11:55AM 17    UNIVERSITY.

11:55AM 18    Q.   AND WHERE ARE YOU EMPLOYED?

11:56AM 19    A.   I'M EMPLOYED WITH WILLIAMS & CONNOLLY.

11:56AM 20    Q.   AND IS THAT THE LAW FIRM REPRESENTING MS. HOLMES?

11:56AM 21    A.   THAT IS.

11:56AM 22    Q.   AND WHAT IS YOUR ROLE AT WILLIAMS & CONNOLLY?

11:56AM 23    A.   I'M A PARALEGAL FOR THE COMPANY.

11:56AM 24    Q.   AND HOW LONG HAVE YOU WORKED FOR THE FIRM?

11:56AM 25    A.   I HAVE WORKED FOR 12 YEARS AT WILLIAMS & CONNOLLY.

11:56AM  1    Q.   AND HAVE -- OTHER THAN THE WORK THAT YOU'VE DONE THAT IS

11:56AM  2    THE SUBJECT OF YOUR TESTIMONY TODAY, HAVE YOU WORKED ON THIS

11:56AM  3    MATTER FOR MS. HOLMES?

11:56AM  4    A.   NO, I HAVE NOT.

11:56AM  5    Q.   AND OTHER THAN IN CONNECTION WITH THE WORK THAT YOU HAVE

11:56AM  6    DONE THAT WE'LL TALK ABOUT TODAY, HAVE YOU EVER WORKED DIRECTLY

11:56AM  7    WITH ANY OF THE LAWYERS ON OUR TEAM?

11:56AM  8    A.   I HAVE NOT.

11:56AM  9    Q.   WHAT WERE YOU ASKED TO DO?

11:56AM  10   A.   I WAS ASKED TO REVIEW SOME VOLUMINOUS DOCUMENTS IN THIS

11:56AM  11   CASE AND TO PROVIDE SOME SUMMARIES TO HELP EVERYONE OUT IN

11:56AM  12   TERMS OF TIME, AS WELL AS TO PROVIDE SOME SIMPLE STATISTICS

11:56AM  13   FROM THOSE DOCUMENTS.

11:56AM  14   Q.   OKAY.  DO YOU HAVE A SENSE OF THE VOLUME OF THE MATERIAL

11:57AM  15   THAT YOU REVIEWED IN TERMS OF CAN YOU GIVE US A SENSE OF

11:57AM  16   WHETHER IT WAS HUNDREDS OF PAGES, THOUSANDS OF PAGES?

11:57AM  17   A.   EASILY THOUSANDS OF PAGES.  YES, JUST ONE SET OF DOCUMENTS

11:57AM  18   WAS HUGE IN TERMS OF PATIENT RECORDS.

11:57AM  19   Q.   OKAY.  AND WE'RE GOING TO GO THROUGH THE DIFFERENT

11:57AM  20   CATEGORIES THAT ARE -- THAT WILL BE THE SUBJECT OF YOUR

11:57AM  21   TESTIMONY.

11:57AM  22        AND LET'S START FIRST WITH THE QUESTION, DID YOU REVIEW A

11:57AM  23   SET OF U.S. ISSUED PATENTS THAT WERE ASSIGNED TO THERANOS?

11:57AM  24   A.   I DID.

11:57AM  25   Q.   AND WHAT DID YOU DO WITH THAT INFORMATION?

11:57AM  1    A.   SO I REVIEWED THOSE PATENTS FOR THE DATE THAT THEY WERE

11:57AM  2    ISSUED, THE DATE THAT THEY WERE APPLIED FOR, AS WELL AS THE

11:57AM  3    INVENTOR AND THE ASSIGNEE ON THE PATENT, AND THE DESCRIPTION OF

11:57AM  4    THE PATENT.

11:57AM  5         THESE ALL CAME FROM THE U.S.A. PATENT OFFICE.

11:57AM  6    Q.   OKAY.  AND DID YOU ENSURE THAT A CHART THAT CONTAINED THE

11:58AM  7    INFORMATION THAT YOU JUST DESCRIBED WAS ACCURATE?

11:58AM  8    A.   THAT'S CORRECT, YES.

11:58AM  9    Q.   AND IF YOU'LL LOOK IN YOUR BINDER, IT'S IN THE FRONT LEFT

11:58AM  10   POCKET, AND IF YOU'LL LOOK FOR EXHIBIT 10691.

11:58AM  11   A.   OKAY.  YEP.

11:58AM  12   Q.   AND WHAT IS EXHIBIT 10691?

11:58AM  13   A.   SO 10691 IS THE DOCUMENT THAT I USED TO COMPILE ALL OF THE

11:58AM  14   INFORMATION FROM THE FACE OF THE PATENTS, SO THAT HAS THE

11:58AM  15   JURISDICTION, THE PATENT NUMBER, THE TITLE OF THE PATENT, AS

11:58AM  16   WELL AS THE ASSIGNEE, THE INVENTORS, AND THEN THE DATE THE

11:58AM  17   APPLICATION WAS FILED WITH THE U.S. PATENT OFFICE, AS WELL AS

11:58AM  18   THE DATE IT WAS ISSUED FROM THE PATENT OFFICE.

11:58AM  19   Q.   AND DOES EXHIBIT 10691 FAIRLY AND ACCURATELY RELATE THE

11:58AM  20   INFORMATION THAT YOU REVIEWED, THAT IT PURPORTS TO SUMMARIZE?

11:59AM  21   A.   YES.

11:59AM  22        MS. TREFZ:  YOUR HONOR, WE WOULD MOVE TO ADMIT

11:59AM  23   10691.

11:59AM  24        MR. LEACH:  YOUR HONOR, NO OBJECTION, CONSISTENT

11:59AM  25   WITH THE DISCUSSION THAT WE'VE HAD.

11:59AM   1          I'M NOTING, GOING THROUGH THE EXHIBIT, THERE'S A COUPLE OF

11:59AM   2    PAGES WITH -- ON THE FAR RIGHT COLUMN THAT --

11:59AM   3          THE COURT:  I'M NOTING PAGE 3.  PARDON ME FOR

11:59AM   4    INTERRUPTING YOU.  I SEE SOME ISSUES WITH PAGE 3, BEGINNING ON

11:59AM   5    PAGE 3.

11:59AM   6          MR. LEACH:  YES.  BUT IF WE LIMIT THE DISPLAY TO 1

11:59AM   7    AND 2, THAT WOULD BE FINE.

11:59AM   8          MS. TREFZ:  WE DON'T NECESSARILY -- WE'LL START WITH

11:59AM   9    PAGE 1 AND WE WILL ONLY DISPLAY PAGE 1, YOUR HONOR.

11:59AM  10          THE COURT:  SO FOR PURPOSES OF YOUR MOTION TO ADMIT,

11:59AM  11    YOU'RE ASKING THAT THIS DOCUMENT BE ADMITTED UP TO 13 LINES AND

12:00PM  12    13 COLUMNS ON PAGE 3, AND EVERYTHING ELSE YOU'RE NOT ASKING TO

12:00PM  13    BE ADMITTED?

12:00PM  14          MS. TREFZ:  THAT'S FINE, YOUR HONOR.  IT'S MOSTLY

12:00PM  15    FOR THE PURPOSES OF DISPLAY.

12:00PM  16          THE COURT:  OKAY.

12:00PM  17          MS. TREFZ:  AND SO IF WE CAN --

12:00PM  18          THE COURT:  SO IT WILL BE ADMITTED.  THOSE THREE

12:00PM  19    PAGES WILL BE ADMITTED.  THE BALANCE IS NOT ADMITTED.

12:00PM  20          MS. TREFZ:  OKAY.

12:00PM  21       (DEFENDANT'S EXHIBIT 10691, PAGES 1 - 3 WAS RECEIVED IN

12:00PM  22    EVIDENCE.)

12:00PM  23          MS. TREFZ:  MR. BENNETT, IF YOU COULD DISPLAY THE

12:00PM  24    FIRST PAGE OF THE CHART FOR US.

12:00PM  25    Q.   AND, MR. MIDDLETON, IS THIS, IS THIS THE FIRST PAGE OF

12:00PM  1    10691 THAT YOU WERE JUST DESCRIBING?

12:00PM  2    A.   IT IS NOT, IN FACT, THE FIRST PAGE OF 10691 THAT I HAVE IN

12:00PM  3    FRONT OF ME.

12:00PM  4    Q.   OKAY.  WELL, THEN LET'S -- WHILE WE WORK OUT THAT ISSUE,

12:01PM  5    LET US JUST MOVE ON.

12:01PM  6         I THINK YOU TESTIFIED A MOMENT AGO THAT YOU -- THAT YOU

12:01PM  7    REVIEWED CERTAIN INFORMATION FROM THE FACE OF THE PATENT.

12:01PM  8    A.   THAT'S CORRECT.

12:01PM  9    Q.   AND WHAT I WOULD LIKE TO PULL UP IS THE -- AN ISSUED

12:01PM  10   PATENT THAT IS IN EVIDENCE AS 96453.

12:01PM  11        SORRY, 9645.

12:01PM  12        AND IS THIS -- JUST FOR THE UNDERSTANDING OF THE JURY, IS

12:01PM  13   THIS AN EXAMPLE OF THE FORMAT OF THE PATENTS THAT YOU REVIEWED?

12:01PM  14   A.   THAT IS CORRECT.

12:01PM  15   Q.   AND IS THIS PATENT CONTAINED IN 10691?

12:01PM  16   A.   ALLOW ME TO DOUBLE-CHECK THAT REAL QUICK.

12:02PM  17        YES, IT IS CONTAINED.

12:02PM  18   Q.   ALL RIGHT.  AND CAN YOU IDENTIFY FOR US WHERE -- CAN YOU

12:02PM  19   IDENTIFY FOR US THE INFORMATION FROM THE FACE OF THE PATENT

12:02PM  20   THAT YOU SUMMARIZED?

12:02PM  21   A.   SURE.  SO AT THE TOP OF THE PATENT -- I'M TOLD THIS IS

12:02PM  22   TOUCHSCREEN, SO WE'LL SEE IF THAT WORKS.  ANYTHING?  NOPE.

12:02PM  23             THE CLERK:  I DON'T BELIEVE OUR ANNOTATION IS

12:02PM  24   WORKING.  WE HAD AN ISSUE WITH THE COMPONENT.

12:02PM  25             THE WITNESS:  SO AT THE VERY TOP THERE'S A 10 AND A

12:02PM  1    PATENT NUMBER.  AND THAT IS THE PATENT NUMBER THAT IS CAPTURED

12:02PM  2    IN THE DATA CHART.

12:02PM  3         THANK YOU.

12:02PM  4         AND THEN IF WE GO TO THE TITLE OF THE PATENT, YOU'LL FIND

12:02PM  5    THAT RIGHT UNDERNEATH WHERE THERE'S 54, DEVICES, METHODS AND

12:02PM  6    SYSTEMS FOR REDUCING SAMPLE VOLUME.

12:02PM  7         ASSIGNEE CAN BE FOUND UNDERNEATH THE INVENTORS, RIGHT

12:03PM  8    THERE, THERE YOU GO, TO THERANOS.

12:03PM  9         INVENTORS ARE RIGHT ABOVE THAT IN 72, THANK YOU.

12:03PM  10        AND FINALLY YOU CAN FIND THE DATE THE APPLICATION WAS

12:03PM  11   FILED AS 22.

12:03PM  12        AND THE DATE THE PATENT WAS ISSUED IS RIGHT UP THERE AT

12:03PM  13   THE TOP UNDERNEATH THE PATENT NUMBER.

12:03PM  14   Q.   OKAY.  THANK YOU.

12:03PM  15        AND DID YOU USE THE EXHIBIT 10691 TO FURTHER QUANTIFY AND

12:03PM  16   IDENTIFY VARIOUS ASPECTS OF THE SET OF MATERIALS THAT YOU

12:03PM  17   REVIEWED?

12:03PM  18   A.   I DID.  AFTER PUTTING THEM INTO THIS CHART, I THEN SORTED

12:03PM  19   THEM BY THE DATE THAT THEY WERE ISSUED AND DETERMINED HOW MANY

12:03PM  20   WERE ISSUED IN A CERTAIN TIMEFRAME.

12:03PM  21   Q.   OKAY.  AND IF I COULD HAVE YOU -- IF I COULD DIRECT YOUR

12:03PM  22   ATTENTION TO WHAT HAS BEEN MARKED AS 10684, WHICH IS ALSO IN

12:03PM  23   THE LEFT POCKET OF YOUR BINDER.

12:03PM  24        HAVE -- IS 10684 -- HAVE YOU HAD THE OPPORTUNITY TO

12:04PM  25   CONFIRM THAT 10684 IS AN ACCURATE REPRESENTATION OF THE

12:04PM 1    MATERIAL IT PROVIDES?

12:04PM 2    A.   I HAVE.

12:04PM 3    Q.   AND IS ALL OF THAT INFORMATION CONTAINED IN 10691, WHICH

12:04PM 4    WAS YOUR ORIGINAL SUMMARY CHART?

12:04PM 5    A.   YES, THAT INFORMATION IS CORRECT.

12:04PM 6         MS. TREFZ:  YOUR HONOR, I WOULD MOVE TO ADMIT 10684.

12:04PM 7         MR. LEACH:  NO OBJECTION, YOUR HONOR.

12:04PM 8         THE COURT:  IT'S ADMITTED.

12:04PM 9    AND JUST FOR THE RECORD THIS WITNESS IS TESTIFYING

12:04PM 10   PURSUANT TO 1006 AS A SUMMARY WITNESS; CORRECT?

12:04PM 11        MS. TREFZ:  CORRECT, YOUR HONOR.

12:04PM 12        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:04PM 13        (DEFENDANT'S EXHIBIT 10684 WAS RECEIVED IN EVIDENCE.)

12:04PM 14   BY MS. TREFZ:

12:04PM 15   Q.   AND MR. MIDDLETON, CAN YOU WALK US THROUGH WHAT WE CAN

12:04PM 16   FIND ON THE FIRST PAGE OF 10684?

12:04PM 17   A.   SURE.  SO 10684 HAS THE TOTAL NUMBER OF ISSUED PATENTS,

12:04PM 18   THE DATE THAT THE PATENT WAS FIRST ISSUED ON THE CHART, AS WELL

12:04PM 19   AS THE TOTAL NUMBER OF PATENTS ISSUED BETWEEN 2010 AND 2016, AS

12:05PM 20   WELL AS THOSE THAT WERE APPLIED FOR BETWEEN 2010 AND 2016.

12:05PM 21   Q.   AND JUST TO UNDERSTAND THE LAST BULLET, THE NUMBER OF

12:05PM 22   ISSUED PATENTS WITH APPLICATION IN 2010 TO 2016, CAN YOU

12:05PM 23   EXPLAIN THE DISTINCTION BETWEEN THAT FOURTH BULLET AND THE

12:05PM 24   THIRD BULLET?

12:05PM 25   A.   SURE.  SO NUMBER OF PATENTS ISSUED IS LITERALLY A PATENT

12:05PM  1    WAS ISSUED FROM THE U.S. PATENT OFFICE, WHEREAS THE LAST BULLET

12:05PM  2    IS DEALING WITH THE APPLICATIONS MADE TO THE U.S. PATENT

12:05PM  3    OFFICE.  SO THEY MAY NOT HAVE RECEIVED YET AN ISSUED PATENT.

12:05PM  4    Q.   THE APPLICATION WAS MADE BEFORE THE PATENT WAS ISSUED?

12:05PM  5    A.   THAT'S CORRECT, YES.  YOU MAKE AN APPLICATION TO THE U.S.

12:05PM  6    PATENT OFFICE, AND THEN YOU GET YOUR OFFICIAL U.S. PATENT.

12:05PM  7    Q.   OKAY.  AND IF WE CAN TURN TO PAGE 2 OF EXHIBIT 10684.

12:05PM  8         WHAT IS PAGE 2 OF EXHIBIT 10684?

12:05PM  9    A.   SO PAGE 2 IS A BAR CHART SHOWING THE NUMBER OF

12:05PM  10   APPLICATIONS MADE IN EACH YEAR FROM 2004 TO 2016.

12:05PM  11   Q.   AND DOES THIS -- HAVE YOU HAD AN OPPORTUNITY TO CHECK THE

12:06PM  12   DATA ON 10684?

12:06PM  13   A.   I HAVE.

12:06PM  14   Q.   AND DOES IT ACCURATELY REFLECT THE DATA THAT WAS

12:06PM  15   SUMMARIZED -- THE CORRESPONDING DATA THAT WAS SUMMARIZED IN

12:06PM  16   10691?

12:06PM  17   A.   THAT IS CORRECT, IT IS AN ACCURATE REPRESENTATION.

12:06PM  18   Q.   AND IN WHAT YEARS WERE THERE THE MOST PATENT APPLICATIONS

12:06PM  19   FILED?

12:06PM  20   A.   2014 AND 2015 HAD THE MOST APPLICATIONS.

12:06PM  21   Q.   OKAY.  AND WE CAN PUT THAT EXHIBIT ASIDE AND WE CAN TAKE

12:06PM  22   IT DOWN.

12:06PM  23        I'D LIKE TO CALL UP EXHIBIT 5172, WHICH IS IN EVIDENCE,

12:06PM  24   AND I WOULD LIKE TO SEE THE NATIVE VERSION IF WE CAN, PLEASE.

12:06PM  25        THANK YOU.

12:06PM   1         MR. MIDDLETON, AS PART OF YOUR WORK, WERE YOU ASKED TO

12:06PM   2    REVIEW TRIAL EXHIBIT 5172 AND MAKE SOME CALCULATIONS FROM THE

12:07PM   3    DATA IN THAT EXHIBIT?

12:07PM   4    A.    THAT IS CORRECT.

12:07PM   5    Q.    AND JUST TO UNDERSTAND A LITTLE BIT ABOUT 5172, IS -- CAN

12:07PM   6    YOU EXPLAIN THE FORMAT OF THE EXHIBIT?

12:07PM   7    A.    SURE.  SO THE FORMAT IS A VERY, VERY LARGE EXCEL.  IT HAS

12:07PM   8    MANY, MANY COLUMNS.

12:07PM   9    Q.    AND HOW MANY COLUMNS DOES IT HAVE?

12:07PM  10    A.    I BELIEVE TOTAL 312 COLUMNS.

12:07PM  11    Q.    AND OUT OF THAT 312 COLUMNS, HOW MANY OF THEM HAVE DATA IN

12:07PM  12    THEM?

12:07PM  13    A.    311 HAVE DATA IN THEM.

12:07PM  14    Q.    IS THAT BECAUSE THE FIRST COLUMN IS THE -- WELL, WHAT IS

12:07PM  15    IN THE FIRST COLUMN?

12:07PM  16    A.    THE FIRST COLUMN HAS THE DESCRIPTIONS FOR EACH ROW.  SO

12:07PM  17    THAT WOULDN'T HAVE DATA IN IT.

12:07PM  18    Q.    OKAY.

12:07PM  19    A.    SO 311 WITH DATA.

12:07PM  20    Q.    OKAY.  AND USING 5172, WHAT WERE YOU ASKED TO DO FROM

12:07PM  21    5172?

12:07PM  22    A.    FOR 5172 I WAS ASKED TO REVIEW ROWS 26 AND 27, THE

12:08PM  23    CUSTOMER RECEIPTS AND OPTION/STOCK PROCEEDS FOR CERTAIN TIME

12:08PM  24    PERIODS.

12:08PM  25    Q.    OKAY.  AND DID YOU THEN -- IF I COULD DRAW YOUR ATTENTION

12:08PM 1    TO 10685, WHICH IS A TAB IN YOUR BINDER.

12:08PM 2         DO YOU HAVE THAT IN FRONT OF YOU?

12:08PM 3    A.   I DO.

12:08PM 4    Q.   AND ARE THE CALCULATIONS THAT YOU MADE FROM THE ROWS THAT

12:08PM 5    YOU CAPTURED IN 10685?

12:08PM 6    A.   THAT IS CORRECT.

12:08PM 7    Q.   AND DO YOU BELIEVE THAT 10685 IS A FAIR AND ACCURATE

12:08PM 8    REPRESENTATION OF THE DATA AND CALCULATIONS THAT YOU PERFORMED?

12:08PM 9    A.   IT IS.

12:08PM 10        MS. TREFZ:  YOUR HONOR, WE WOULD MOVE THE ADMISSION

12:08PM 11   OF 10685 UNDER 1006.

12:08PM 12        MR. LEACH:  NO OBJECTION, YOUR HONOR.

12:08PM 13        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:08PM 14   (DEFENDANT'S EXHIBIT 10685 WAS RECEIVED IN EVIDENCE.)

12:08PM 15        MS. TREFZ:  ALL RIGHT.  LET'S START WITH THE FIRST

12:08PM 16   PAGE.  THANK YOU.

12:08PM 17   Q.   EXPLAIN WHAT THIS FIRST PAGE OF 10685 REPRESENTS.

12:08PM 18   A.   SURE.  SO THIS IS CAPTURING I BELIEVE ROW 26, THE CUSTOMER

12:09PM 19   RECEIPTS BETWEEN JANUARY 17TH, 2011, UNTIL THE BEGINNING OF

12:09PM 20   2014.

12:09PM 21        AND IN IT YOU CAN FIND THE LISTING OF EACH COLUMN THAT HAD

12:09PM 22   DATA DURING THAT TIMEFRAME AND THE SPECIFIC WEEK THAT THAT

12:09PM 23   COLUMN WAS ASSIGNED TO, AS WELL AS A TOTAL VALUE AMOUNT THAT

12:09PM 24   WAS LISTED IN THAT COLUMN FOR THAT WEEK.

12:09PM 25   Q.   AND THE -- ON THAT THIRD COLUMN THE TITLE CUSTOMER

12:09PM 1     RECEIPTS, WHERE DOES THAT TITLE COME FROM?

12:09PM 2     A.   THAT COMES FROM THE ROW ITSELF, ROW 26 IS LABELED CUSTOMER

12:09PM 3     RECEIPTS.

12:09PM 4     Q.   IN COLUMN A?

12:09PM 5     A.   IN COLUMN A, THAT'S CORRECT.

12:09PM 6     Q.   AND DID YOU DO ANY SUBSEQUENT ANALYSIS TO UNDERSTAND WHAT

12:09PM 7     THE VARIOUS CUSTOMER RECEIPTS -- THE SOURCE OF THE VARIOUS

12:09PM 8     CUSTOMER RECEIPTS?

12:09PM 9     A.   NO.

12:09PM 10    Q.   AND IS IT FAIR TO SAY THAT ALL YOU DID WAS TITLE, OR SUM

12:09PM 11    THE AMOUNTS IN THESE PARTICULAR --

12:10PM 12    A.   THAT IS EXACTLY RIGHT.  I PURELY TOOK THE VALUES THAT WERE

12:10PM 13    PROVIDED IN THE EXCEL AND ADDED THEM UP AND CAME UP WITH A

12:10PM 14    NUMBER.

12:10PM 15    Q.   AND THEN WHAT WAS, WHAT WAS THE TOTAL?

12:10PM 16    A.   THE GRAND TOTAL WAS 217,817,591.

12:10PM 17    Q.   IS THAT IN DOLLARS?

12:10PM 18    A.   THAT IS IN DOLLARS.

12:10PM 19    Q.   THANK YOU.

12:10PM 20         IF WE CAN TURN TO PAGE 2 OF EXHIBIT 10685.

12:10PM 21         DESCRIBE FOR THE JURY WHAT IS CAPTURED IN PAGE 2 OF 10685.

12:10PM 22    A.   SO PAGE 2 IS AN EXCERPT OF ROW 27, WHICH WAS THE

12:10PM 23    OPTION/STOCK PROCEEDS FOR THE YEAR 2013, AND SO IT CAPTURES

12:10PM 24    EVERY COLUMN FOR 2013 THAT HAS A VALUE, THE WEEK THAT THAT

12:10PM 25    VALUE OCCURRED, AS WELL AS THE TOTAL VALUE AMOUNT FOR THAT

12:10PM   1   WEEK.

12:10PM   2   Q.   AND I JUST NOTE ON COLUMN FB, WHICH IS THE LAST ROW BEFORE

12:10PM   3   THE TOTAL, I JUST WANTED TO POINT OUT IT GOES THROUGH

12:11PM   4   JANUARY 5TH, 2014.

12:11PM   5        WHY IS THAT?

12:11PM   6   A.   I BELIEVE IT IS FOR CARRY-OVER.  IT'S TO HELP CAPTURE THE

12:11PM   7   VERY LAST END OF THE YEAR PROCEEDS.

12:11PM   8   Q.   OKAY.  AND THEN IT SAYS AT THE TOP OPTION/STOCK PROCEEDS

12:11PM   9   2013.

12:11PM  10        I NOTICE THAT IT BEGINS WITH COLUMN DR, WHICH BEGINS

12:11PM  11   APRIL 22ND, 2013.

12:11PM  12        WHY DOES IT BEGIN ON APRIL 22ND?

12:11PM  13   A.   SO I DID NOT INCLUDE ANY WEEKS THAT DID NOT HAVE VALUES,

12:11PM  14   SO THERE WERE NO VALUES BEFORE 4-22-2013.

12:11PM  15   Q.   THANK YOU.

12:11PM  16        AND WHAT WERE THE OPTION/STOCK PROCEEDS, WHAT WAS THE

12:11PM  17   TOTAL AMOUNT THAT YOU HAD CALCULATED?

12:11PM  18   A.   THE TOTAL AMOUNT WAS $58,579,988.

12:11PM  19   Q.   OKAY.  I'D NOW LIKE TO, IF WE CAN, MR. BENNETT, BRING UP

12:12PM  20   EXHIBIT 14206, WHICH IS IN EVIDENCE, AND IN PARTICULAR I WANT

12:12PM  21   TO DRAW -- IF WE CAN BRING UP PAGE, I BELIEVE IT'S 482, BATES

12:12PM  22   ENDED 482.

12:12PM  23        THANK YOU.

12:12PM  24        AND, MR. MIDDLETON, THIS EXHIBIT IS IN EVIDENCE, AND I'M

12:12PM  25   NOT GOING TO ASK YOU TO DESCRIBE THE EXHIBIT OR ANYTHING LIKE

| | | |
|---|---|---|
| 12:12PM | 1 | THAT. |
| 12:12PM | 2 | WHAT I DID WANT TO ASK YOU, HOWEVER, IS UNDER PROCEEDS |
| 12:12PM | 3 | FROM EQUITY TRANSACTIONS ON THIS EXHIBIT, WHAT NUMBER DO YOU |
| 12:12PM | 4 | SEE? |
| 12:12PM | 5 | A.   I SEE 59 MILLION. |
| 12:12PM | 6 | Q.   YEAH, SORRY.  FOR THE PERIOD ENDING 12-31-2013? |
| 12:13PM | 7 | A.   THAT'S CORRECT. |
| 12:13PM | 8 | Q.   AND HOW DOES THAT COMPARE TO THE TOTAL IN PAGE 2 OF 10685? |
| 12:13PM | 9 | A.   VERY SIMILAR.  IT LOOKS LIKE IT'S A ROUNDED VERSION OF |
| 12:13PM | 10 | THAT 58.5 MILLION THAT I CALCULATED. |
| 12:13PM | 11 | Q.   IT COULD BE AROUND THAT? |
| 12:13PM | 12 | A.   IT COULD BE. |
| 12:13PM | 13 | Q.   YOU DON'T HAVE ANY KNOWLEDGE OF WHAT HAPPENED WITH -- |
| 12:13PM | 14 | A.   I DO NOT. |
| 12:13PM | 15 | Q.   -- THIS OTHER EXHIBIT? |
| 12:13PM | 16 | ALL RIGHT.  WE CAN MOVE ON. |
| 12:13PM | 17 | THE NEXT -- DID YOU ALSO REVIEW A SPREADSHEET THAT LISTED |
| 12:13PM | 18 | THE NAMES OF INDIVIDUALS AND ENTITIES THAT RECEIVED THERANOS |
| 12:13PM | 19 | STOCK? |
| 12:13PM | 20 | A.   I DID. |
| 12:13PM | 21 | Q.   AND IF YOU CAN JUST TAKE A LOOK AT EXHIBIT 10692. |
| 12:13PM | 22 | A.   OKAY. |
| 12:13PM | 23 | Q.   THIS HAS BEEN MARKED FOR IDENTIFICATION PURPOSES, AND CAN |
| 12:13PM | 24 | YOU -- IS THIS THE EXHIBIT THAT YOU REVIEWED? |
| 12:14PM | 25 | A.   IT IS. |

12:14PM  1    Q.   AND CAN YOU -- WHAT IS THE NATIVE -- THERE'S AN ATTACHMENT

12:14PM  2    HERE.  WHAT IS THE NATIVE FILE FORMAT IS IT IN?

12:14PM  3    A.   IT IS A NATIVE EXCEL.

12:14PM  4    Q.   OKAY.  AND WHAT DID YOU DO WITH THE INFORMATION IN THAT

12:14PM  5    TABLE?

12:14PM  6    A.   SURE.  SO THE SECOND TAB OF THE NATIVE EXCEL LISTS THE

12:14PM  7    NUMBER OF INVESTMENTS BY ROUND OR SERIES, AND SO I REVIEWED THE

12:14PM  8    SECOND TAB OF THAT EXCEL AND CALCULATED HOW MANY INVESTMENTS

12:14PM  9    WERE MADE FOR EACH SERIES.

12:14PM  10   Q.   AND DID YOU THEN SUMMARIZE THAT INFORMATION INTO A CHART?

12:14PM  11   A.   I DID.

12:14PM  12   Q.   AND IF YOU CAN LOOK, I DRAW YOUR ATTENTION TO 10686.

12:14PM  13   A.   OKAY.  I'M THERE.

12:14PM  14   Q.   AND IS 10686 THE CHART THAT YOU SUMMARIZED FROM 10692?

12:14PM  15   A.   THAT IS CORRECT.

12:14PM  16        MS. TREFZ:  YOUR HONOR, I MOVE INTO EVIDENCE 1068 --

12:15PM  17   OH, ONE MORE QUESTION.

12:15PM  18   Q.   IS IT A FAIR AND ACCURATE REPRESENTATION OF THE

12:15PM  19   CALCULATIONS THAT YOU PERFORMED?

12:15PM  20   A.   IT IS FAIR AND ACCURATE.

12:15PM  21        MS. TREFZ:  YOUR HONOR, I WOULD MOVE INTO EVIDENCE,

12:15PM  22   PURSUANT TO 1006, 10686.

12:15PM  23        MR. LEACH:  YOUR HONOR, NO OBJECTION TO 10686.

12:15PM  24        I WOULD REQUEST ALSO THAT EXHIBIT 10692 ALSO COME INTO

12:15PM  25   EVIDENCE.

12:15PM 1        MS. TREFZ:  THAT'S FINE, YOUR HONOR.

12:15PM 2        THE COURT:  BOTH OF THOSE ARE ADMITTED AND MAY BE

12:15PM 3    PUBLISHED.

12:15PM 4        (DEFENDANT'S EXHIBITS 10686 AND 10692 WERE RECEIVED IN

12:15PM 5    EVIDENCE.)

12:15PM 6    BY MS. TREFZ:

12:15PM 7    Q.   LOOKING AT 10686, CAN YOU EXPLAIN TO THE JURY WHAT THIS

12:15PM 8    REPRESENTS?

12:15PM 9    A.   SURE.  SO THIS TABLE IS SUMMARIZING THE TOTAL NUMBER OF

12:15PM 10   INVESTMENTS MADE FOR EACH SERIES, STARTING WITH SERIES A AND

12:15PM 11   GOING THROUGH SERIES C-2.

12:15PM 12   Q.   OKAY.  AND HOW MANY TOTAL INVESTMENTS WERE THERE?

12:15PM 13   A.   TOTAL NUMBER OF INVESTMENTS ACROSS ALL OF THE SERIES WAS

12:16PM 14   275.

12:16PM 15   Q.   AND JUST, JUST SO THAT WE'RE CLEAR, THIS -- I THINK YOU'VE

12:16PM 16   BEEN SAYING THE NUMBER OF INVESTMENTS, AND THAT'S WHAT IT SAYS

12:16PM 17   ON THE RIGHT COLUMN OF THE CHART.

12:16PM 18       TO BE CLEAR, IS THIS THE TOTAL NUMBER OF INVESTORS OR

12:16PM 19   INVESTMENTS THAT IS REFLECTED?

12:16PM 20   A.   TOTAL NUMBER OF INVESTMENTS.

12:16PM 21   Q.   SO THERE COULD BE DUPLICATES FROM THE SAME ENTITY?

12:16PM 22   A.   THAT IS CORRECT.

12:16PM 23   Q.   OR THE SAME INDIVIDUAL?

12:16PM 24   A.   THAT IS CORRECT.

12:16PM 25   Q.   AND DID YOU MAKE AN EFFORT TO DEDUPLICATE THEM?

12:16PM  1    A.   I DID NOT.

12:16PM  2    Q.   AND WHY NOT?

12:16PM  3    A.   IT'S JUST -- IT SEEMED LIKE SOMETHING I DIDN'T WANT TO GET

12:16PM  4    INTO.  IT SEEMED MUCH EASIER TO JUST COUNT THE NUMBER OF

12:16PM  5    INVESTMENTS FOR EACH SERIES SO IT WAS A MUCH MORE

12:16PM  6    STRAIGHTFORWARD NUMBER TO CALCULATE.

12:16PM  7    Q.   AND IN ORDER TO CALCULATE THAT, HOW DID YOU DO THAT IN THE

12:16PM  8    EXCEL?

12:16PM  9    A.   SURE.  SO THERE'S A COLUMN ON THE FAR LEFT THAT JUST LISTS

12:16PM 10    THE SERIES, AND I FILTERED THAT COLUMN TO SHOW JUST SERIES A

12:17PM 11    AND COUNTED THE TOTAL NUMBER OF INVESTMENTS MADE FOR THAT

12:17PM 12    SERIES, AND THEN REPEATED THE PROCESS FOR SERIES B, SERIES C,

12:17PM 13    SERIES C-1, SERIES C-2.  THEY'RE ALL LISTED IN THAT COLUMN.

12:17PM 14    Q.   THEY'RE ALL SEPARATELY LISTED?

12:17PM 15    A.   THEY'RE ALL SEPARATELY LISTED, YES, THAT'S CORRECT.  EACH

12:17PM 16    INVESTMENT HAS A SERIES NEXT TO IT.

12:17PM 17    Q.   AND IN YOUR REVIEW, DID YOU SEE MS. HOLMES'S NAME?

12:17PM 18    A.   I DID.

12:17PM 19    Q.   DID YOU ALSO SEE AN ENTRY FOR CHRIS AND NOEL HOLMES?

12:17PM 20    A.   I DID.

12:17PM 21    Q.   ALL RIGHT.  LET'S MOVE ON TO THE NEXT SECTION HERE.

12:17PM 22       IF WE CAN BRING UP WHAT IS IN EVIDENCE AS EXHIBIT 3741A.

12:17PM 23    AND IF YOU CAN TURN THERE IN YOUR BINDER AS WELL?

12:17PM 24    A.   UH-HUH.  OKAY, I'M THERE.

12:17PM 25    Q.   DID YOU -- WAS ONE OF THE THINGS THAT YOU DID WAS REVIEW

| | | |
|---|---|---|
| 12:17PM | 1 | THE THERANOS -- REVIEW EXHIBIT 3741A? |
| 12:18PM | 2 | A.   I DID. |
| 12:18PM | 3 | Q.   AND WHAT DID YOU DO WITH THIS EXHIBIT? |
| 12:18PM | 4 | A.   SO THIS EXHIBIT, I WENT THROUGH THE TOTAL NUMBER A THROUGH |
| 12:18PM | 5 | Z OF ALL OF THE TESTS OFFERED ON THIS TEST MENU AND CALCULATED |
| 12:18PM | 6 | TOTAL NUMBER OF TESTS PROVIDED, AS WELL AS HOW MANY TESTS AND |
| 12:18PM | 7 | INDIVIDUAL BUCKETS OF PRICING. |
| 12:18PM | 8 | Q.   OKAY.  AND EXHIBIT 3741A IS, I BELIEVE IS A FIVE PAGE |
| 12:18PM | 9 | EXHIBIT. |
| 12:18PM | 10 | AT WHAT PAGES OF THE EXHIBIT DID YOU USE FOR YOUR |
| 12:18PM | 11 | CALCULATIONS? |
| 12:18PM | 12 | A.   I FOCUSSED ON PAGES 1 THROUGH 3, WHICH IS THE LISTING A |
| 12:18PM | 13 | THROUGH Z OF ALL OF THE TESTS OFFERED BY THERANOS. |
| 12:18PM | 14 | Q.   OKAY.  AND DID YOU MAKE FURTHER -- FROM THAT, DID YOU |
| 12:18PM | 15 | SUMMARIZE THE INFORMATION IN 3741A INTO ANOTHER CHART? |
| 12:19PM | 16 | A.   I DID.  SO I TOOK THOSE SUMMARIES AND PUT THEM INTO |
| 12:19PM | 17 | ANOTHER CHART. |
| 12:19PM | 18 | Q.   SO IF YOU CAN TURN TO EXHIBIT 10689. |
| 12:19PM | 19 | AND WHAT IS 10689? |
| 12:19PM | 20 | A.   ACTUALLY, HOLD ON.  I DON'T THINK I HAVE IT IN MY BINDER, |
| 12:19PM | 21 | BUT IF YOU WANT TO PUT IT UP ON THE SCREEN. |
| 12:19PM | 22 | Q.   OH, WELL, WE CAN'T DO THAT UNTIL WE PUT IT IN YOUR BINDER. |
| 12:19PM | 23 | A.   OH, OKAY. |
| 12:19PM | 24 | Q.   GIVE ME ONE SECOND. |
| 12:19PM | 25 | DO YOU HAVE IT IN YOUR BINDER? |

12:19PM 1                  MR. LEACH:  I DO.

12:19PM 2                  MS. TREFZ:  MAY I APPROACH, YOUR HONOR?

12:19PM 3                  THE COURT:  YES.

12:19PM 4        BY MS. TREFZ:

12:19PM 5        Q.   (HANDING.)

12:19PM 6        A.   THANK YOU.

12:19PM 7        Q.   ARE YOU NOW LOOKING AT EXHIBIT 10689?

12:19PM 8        A.   I AM.

12:19PM 9        Q.   AND WHAT IS 10689?

12:19PM 10       A.   SO 10689 IS SOME SUMMARY CHARTS DEPICTING THE TOTAL NUMBER

12:20PM 11       OF TESTS OFFERED, AS WELL AS IT'S BREAKING THEM DOWN INTO PRICE

12:20PM 12       BUCKETS.

12:20PM 13       Q.   OKAY.  AND DID YOU -- DOES 10689 FAIRLY AND ACCURATELY

12:20PM 14       REPRESENT OR REFLECT THE WORK THAT YOU PERFORMED FROM

12:20PM 15       EXHIBIT 3741A?

12:20PM 16       A.   THAT IS CORRECT.

12:20PM 17                  MS. TREFZ:  YOUR HONOR, I MOVE UNDER 1006 FOR THE

12:20PM 18       ADMISSION OF 10689.

12:20PM 19                  MR. LEACH:  RELEVANCE, YOUR HONOR.

12:20PM 20                  MS. TREFZ:  YOUR HONOR, WE BELIEVE THAT THE NUMBER

12:20PM 21       OF TESTS OFFERED BY THERANOS HAS BEEN AN ISSUE IN THE CASE

12:20PM 22       BEFORE.

12:20PM 23            WE BELIEVE THAT THE PRICE OF THE TEST IS MATERIAL TO

12:20PM 24       PATIENTS, AND WE'VE HEARD TESTIMONY AND DOCTORS -- AND WE'VE

12:20PM 25       HEARD TESTIMONY AS TO THAT.

12:20PM   1          THE COURT:  WE HAVE.  I JUST DON'T KNOW WHAT THIS

12:21PM   2   HAS TO DO WITH THAT.  WHY DOES THIS ADD ANYTHING TO THAT?

12:21PM   3          I COULD SEE ON PAGE 1.  I DON'T THINK THERE'S BEEN ANY

12:21PM   4   CONTROVERSY ABOUT PERCENTAGE OF COST BREAKDOWNS.

12:21PM   5          MS. TREFZ:  YOUR HONOR, THIS IS -- THE INITIAL

12:21PM   6   EXHIBIT IS ALREADY IN EVIDENCE.  WE ARE TRYING TO PROVIDE

12:21PM   7   HELPFUL PERSPECTIVES ON HOW TO VIEW THAT EXHIBIT, AND WE

12:21PM   8   BELIEVE THAT THE -- THAT THE MATERIALITY ISSUE IS RELEVANT TO

12:21PM   9   COUNT TWO.

12:21PM  10          MR. LEACH:  RELEVANCE, YOUR HONOR.  403.

12:21PM  11          THE COURT:  I'LL ALLOW THE FIRST PAGE.  BUT THE

12:21PM  12   WHEEL AND THE OTHER MENU PRICE, I DON'T THINK THAT'S REALLY

12:22PM  13   RELEVANT.  I DON'T THINK IT GOES TO AN ISSUE REALLY.  I DON'T

12:22PM  14   SEE IT.

12:22PM  15          SO UNDER 403 AND UNDER 401.

12:22PM  16          (DEFENDANT'S EXHIBIT 10689, PAGE 1 WAS RECEIVED IN

12:22PM  17   EVIDENCE.)

12:22PM  18          MS. TREFZ:  OKAY.  LET'S OFFER EXHIBIT 1 -- I

12:22PM  19   BELIEVE THEN -- CAN WE JUST DISPLAY PAGE 1 OF EXHIBIT 10689?

12:22PM  20          THE COURT:  YES.  YES.

12:22PM  21   BY MS. TREFZ:

12:22PM  22   Q.   WHAT IS PAGE 1 OF EXHIBIT 10689?

12:22PM  23   A.   SO PAGE 1 HAS THE TOTAL NUMBER OF TESTS OFFERED UNDER

12:22PM  24   THERANOS'S TEST MENU, AND IT ALSO SHOWS THE TOTAL NUMBER OF

12:22PM  25   REFLEX TESTS THAT CAN BE FOUND ON THE TESTING MENU.

12:22PM  1    Q.   AND HOW MANY TESTS WERE OFFERED BY THERANOS?

12:22PM  2    A.   THERE'S A GRAND TOTAL OF 269 TESTS UNDER THE TESTING MENU.

12:22PM  3    Q.   OKAY.  AND IF WE CAN GO BACK TO EXHIBIT 3741.

12:23PM  4         I WANT TO UNDERSTAND WHAT YOU IDENTIFIED AS REFLEX TEST,

12:23PM  5    HOW YOU CAME TO THAT NUMBER.

12:23PM  6    A.   SURE.

12:23PM  7    Q.   SO CAN YOU -- IS THERE AN EXAMPLE ON 3741A?

12:23PM  8    A.   SURE.  SO THE FIRST EXAMPLE OF A REFLEX TEST SHOWING UP ON

12:23PM  9    THE TESTING MENU IS UNDER THESE ANTINUCLEAR ANTIBODIES SCREEN,

12:23PM  10   ANA, YOU'LL FIND A LITTLE INDENTATION THAT SAYS REFLEX TO ANA

12:23PM  11   CONFIRMATORY, AND THE PRICE IS $7.68.  YEP.

12:23PM  12   Q.   OKAY.  AND HOW MANY REFLEX TESTS DID YOU FIND ON THIS

12:23PM  13   MENU?

12:23PM  14   A.   THE GRAND TOTAL ON THIS MENU IS 23 REFLEX TESTS.

12:23PM  15   Q.   OKAY.  LET'S MOVE ON TO THE NEXT CATEGORY.

12:23PM  16        DID YOU ALSO REVIEW COMPILATIONS OF TESTING DATA, OR,

12:23PM  17   YEAH, TESTING REPORTS FROM CERTAIN HEALTH CARE PROVIDERS?

12:24PM  18   A.   I DID.

12:24PM  19   Q.   LET'S START WITH, LET'S START WITH DATA RELATED TO

12:24PM  20   PROVIDER DR. GERALD ASIN.

12:24PM  21   A.   OKAY.

12:24PM  22   Q.   DID YOU -- WHAT DID YOU DO WITH RESPECT TO -- FIRST OF

12:24PM  23   ALL, DID YOU REVIEW LAB REPORTS -- THERANOS LAB REPORTS

12:24PM  24   CONTAINED IN DR. ASIN'S MEDICAL FILES?

12:24PM  25   A.   THAT IS CORRECT.

12:24PM  1     Q.  AND WHAT FORMAT WERE THEY IN?

12:24PM  2     A.  I REVIEWED PDF SCANS OF THE FILES.

12:24PM  3     Q.  AND WHAT DID YOU, WHAT DID YOU DO IN YOUR REVIEW?

12:24PM  4     A.  SO BASICALLY I WENT THROUGH EACH OF THE PDF SCANS AND

12:24PM  5     REVIEWED THEM FOR THERANOS LAB RESULTS, AND THEN NOTED THAT IN

12:24PM  6     TERMS OF DATE THAT THE VISIT OCCURRED AND OTHER STATISTICS FROM

12:24PM  7     THOSE LAB RESULTS.

12:25PM  8     Q.  OKAY.  AND WERE ALL OF THE, WERE ALL OF THE LAB REPORTS

12:25PM  9     THAT YOU REVIEWED FROM THERANOS?

12:25PM  10    A.  NO, THAT IS NOT CORRECT.

12:25PM  11    Q.  BUT WERE YOU -- AND THEN SO HOW DID YOU DISTINGUISH

12:25PM  12    BETWEEN WHAT WAS A -- WHAT SHOULD BE -- I'M SORRY.  LET ME

12:25PM  13    STRIKE THAT AND START OVER.

12:25PM  14        DID YOU DISTINGUISH BETWEEN A THERANOS LAB REPORT AND

12:25PM  15    ANOTHER ENTITY'S LAB REPORT?

12:25PM  16    A.  I DID.  I DID.

12:25PM  17        SO THE SCAN HAS ALL OF THE LAB REPORTS FOR A CUSTOMER, BUT

12:25PM  18    I ONLY FOCUSSED ON THE THERANOS LAB REPORTS AND IGNORED THE

12:25PM  19    OTHER PROVIDERS.

12:25PM  20    Q.  AND HOW MANY, HOW MANY OF THESE PDF FILES DID YOU REVIEW?

12:25PM  21    A.  I BELIEVE SOMETHING AROUND 277 PDF'S.

12:25PM  22    Q.  AND DID ALL OF THEM HAVE THERANOS LAB REPORTS IN THEM?

12:25PM  23    A.  NO.

12:25PM  24    Q.  AND DID YOU THEN SUMMARIZE THE INFORMATION THAT YOU, THAT

12:26PM  25    YOU WERE SEEING INTO A, INTO A CHART?

12:26PM  1      A.   I DID.

12:26PM  2      Q.   AND CAN YOU DRAW YOUR ATTENTION TO 10690?

12:26PM  3      A.   OKAY.

12:26PM  4      Q.   AND --

12:26PM  5           MS. TREFZ:  YOUR HONOR, I WOULD JUST NOTE FOR THE

12:26PM  6      COURT THAT I DON'T INTEND TO ADMIT THIS EXHIBIT, BUT WE DO HAVE

12:26PM  7      A REDACTED VERSION, BUT I WANTED TO MAKE SURE THAT THE COURT

12:26PM  8      AND THE WITNESS AND THE GOVERNMENT HAVE THE FULL MATERIAL HERE.

12:26PM  9           THE COURT:  OKAY.  THANK YOU.

12:26PM 10      BY MS. TREFZ:

12:26PM 11      Q.   AND WHAT, WHAT INFORMATION IS CONTAINED IN 10690?

12:26PM 12      A.   SO THE EXHIBIT HAS THE CONTROL NUMBER OR THE IDENTIFYING

12:26PM 13      DOCUMENT THAT HAD A THERANOS LAB RESULT IN IT, THE PATIENT'S

12:26PM 14      FULL NAME, THE PATIENT'S INITIALS, THE TOTAL NUMBER OF VISITS

12:26PM 15      THAT WERE FOUND IN THE LAB RECORDS, THE DATE OF THE VISIT TO A

12:27PM 16      THERANOS LAB, OR DATES IF THERE WERE MULTIPLE VISITS, THE TOTAL

12:27PM 17      NUMBER OF TESTS FOR EACH VISIT, AS WELL AS THE TOTAL NUMBER OF

12:27PM 18      VISITS AFTER MAY 11TH OF 2015, TOTAL NUMBER OF VISITS BY THAT

12:27PM 19      PATIENT IN OCTOBER 15TH OF 2015, AND TOTAL NUMBER OF VISITS BY

12:27PM 20      THAT CUSTOMER AFTER JANUARY 25TH, 2016.

12:27PM 21      Q.   AND DID YOU CALCULATE THE SUM OF CERTAIN OF THE -- OF

12:27PM 22      CERTAIN OF THE COLUMNS IN THIS -- IN 106?

12:27PM 23      A.   YES.  SO THEN I SUMMED UP THE TOTAL NUMBER OF VISITS MADE,

12:27PM 24      AS WELL AS THE TOTAL NUMBER OF TESTS ORDERED, AS WELL AS THE

12:27PM 25      TOTAL NUMBER OF VISITS AFTER THOSE DATES DESCRIBED.

12:27PM  1    Q.   OKAY.  AND WAS THAT INFORMATION THEN SUMMARIZED IN 10687?

12:27PM  2    A.   IT WAS.

12:27PM  3    Q.   CAN YOU TAKE A -- CAN I DRAW YOUR ATTENTION TO 10687.

12:27PM  4    A.   OKAY.  I'M THERE.

12:27PM  5    Q.   AND IS THIS THE DOCUMENT THAT YOU SUMMARIZED?  OR IS THIS

12:28PM  6    THE SUMMARY OF THE -- THAT YOU CREATED FROM THE CHART THAT WE,

12:28PM  7    THAT WE WERE JUST LOOKING AT AT 10690?

12:28PM  8    A.   YES, THIS IS A TABLE SUMMARIZING THE INFORMATION FOUND IN

12:28PM  9    THE DOCUMENT.

12:28PM  10   Q.   I'M SORRY.  AND DOES 10687 FAIRLY AND ACCURATELY REPRESENT

12:28PM  11   THE INFORMATION THAT IS PURPORTS TO CONVEY?

12:28PM  12   A.   IT DOES.

12:28PM  13          MS. TREFZ:  YOUR HONOR, PURSUANT TO RULE 1006, I

12:28PM  14   WOULD OFFER 10687.

12:28PM  15          THE COURT:  THE SECOND PAGE AS WELL?

12:28PM  16          MS. TREFZ:  I WOULD OFFER THE SECOND PAGE.

12:28PM  17          MR. LEACH:  401, 403 TO PAGE 2, YOUR HONOR.

12:28PM  18          THE COURT:  I THINK THERE'S A LACK OF FOUNDATION ON

12:28PM  19   THE SECOND PAGE.

12:28PM  20          MS. TREFZ:  ON THE SECOND PAGE?  OKAY.

12:28PM  21          THE COURT:  BUT I'LL ADMIT 10687, THE FIRST PAGE.

12:29PM  22          MS. TREFZ:  MAY I TRY TO LAY A FOUNDATION FOR THE

12:29PM  23   SECOND PAGE?

12:29PM  24          THE COURT:  SURE.

12:29PM  25   BY MS. TREFZ:

12:29PM  1    Q.   SO WE JUST DISCUSSED PAGE 1 OF 10687.  IS THERE A SECOND

12:29PM  2    PAGE TO 10687?

12:29PM  3    A.   I'M SORRY.  ALLOW ME TO GET BACK THERE.

12:29PM  4         THERE IS A SECOND PAGE TO 10687.

12:29PM  5    Q.   AND WHAT IS 10687, PAGE 2?  WHAT DOES THAT REPRESENT?

12:29PM  6    A.   SO PAGE 2 SHOWS THE TOTAL NUMBER OF VISITS THAT WAS

12:29PM  7    CALCULATED ACROSS ALL OF THE MEDICAL RECORDS THAT ARE VIEWED

12:29PM  8    FOR DR. ASIN'S MEDICAL RECORDS, AND THEN IT PROVIDES THE FIRST

12:29PM  9    DATE I FOUND, AND THE MEDICAL RECORDS THAT A CUSTOMER VISITED A

12:29PM  10   CUSTOMER LAB.

12:29PM  11   Q.   AND WHAT DATE WAS THAT, THE FIRST DATE?

12:29PM  12   A.   THE FIRST DATE WAS DECEMBER 30TH OF 2013.

12:29PM  13   Q.   OKAY.

12:29PM  14   A.   AND THEN IT ALSO SHOWS THE LAST DATE THAT I FOUND IN THE

12:29PM  15   MEDICAL RECORDS OF SOMEBODY VISITING A THERANOS LAB, AND THAT

12:29PM  16   DATE WAS OCTOBER 3RD, 2016.

12:30PM  17        AND THEN IT BREAKS OUT THOSE 490 VISITS IN TERMS OF WHEN

12:30PM  18   THOSE VISITS OCCURRED BY CERTAIN DATES THAT WE HAD DESCRIBED

12:30PM  19   PREVIOUSLY.

12:30PM  20   Q.   AND IS IT SHOWN IN A DIFFERENT FORMAL THAN THE ORIGINAL

12:30PM  21   SUMMARY THAT YOU CREATED?

12:30PM  22   A.   YES.  SO THE ORIGINAL FORMAT WAS PURELY A DATA SHEET, WAS

12:30PM  23   ALMOST TALLYING THE NUMBERS.  THIS IS MORE GRAND TOTAL FOR EACH

12:30PM  24   DATE.

12:30PM  25        MS. TREFZ:  YOUR HONOR, I WOULD OFFER PAGE 2 OF

12:30PM  1        10687.

12:30PM  2              MR. LEACH:  401, 403, AND I DON'T THINK THIS IS

12:30PM  3        PROPER 1006.

12:30PM  4              THE COURT:  THERE'S SOME -- I'M GOING TO SUSTAIN THE

12:30PM  5        OBJECTION.  THERE'S SOME MATERIAL BRACKETED HERE THAT THERE'S

12:30PM  6        NO FOUNDATION FOR.  SO I'LL SUSTAIN THE OBJECTION.

12:30PM  7              MS. TREFZ:  UNDERSTOOD, YOUR HONOR.  I BELIEVE THAT

12:30PM  8        THOSE DATES ARE IN THE RECORD, BUT I UNDERSTAND THE COURT'S

12:30PM  9        ORDER.

12:30PM  10             THE COURT:  PURSUANT TO 1006, THIS IS A 1006

12:31PM  11       WITNESS, NOT AN OTHERWISE FACT WITNESS.

12:31PM  12             MS. TREFZ:  I UNDERSTAND, YOUR HONOR.

12:31PM  13             THE COURT:  PAGE 1 IS ADMITTED.

12:31PM  14          ARE YOU STILL ON THIS TOPIC?

12:31PM  15          (DEFENDANT'S EXHIBIT 10687, PAGE 1 WAS RECEIVED IN

12:31PM  16       EVIDENCE.)

12:31PM  17             MS. TREFZ:  I WAS GOING TO ASK TO DISPLAY PAGE 1 IF

12:31PM  18       WE CAN.

12:31PM  19             THE COURT:  SURE.

12:31PM  20             MS. TREFZ:  DID THE COURT HAVE AN INQUIRY?

12:31PM  21             THE COURT:  NOT ON THIS.  ON SOMETHING ELSE.

12:31PM  22             MS. TREFZ:  OKAY.

12:31PM  23       Q.  MR. MIDDLETON, CAN YOU EXPLAIN WHAT 10687, PAGE 1, IS?

12:31PM  24       A.  YEAH.  SO IT'S A SUMMARY OF THE TEST RESULTS FROM

12:31PM  25       DR. ASIN, AND IT'S A SUMMARY OF MY REVIEW OF THOSE TEST RESULTS

12:31PM 1    FOR THERANOS LABS.

12:31PM 2    Q.   OKAY.  AND BY THAT YOU MEAN THERANOS LAB REPORTS?

12:31PM 3    A.   THAT'S CORRECT, YES.

12:31PM 4    Q.   AND JUST TO BE CLEAR, IS ALL OF THE INFORMATION IN TERMS

12:31PM 5    OF THE VISIT DATE, WAS IT CONTAINED ON THE FACE OF THE LAB

12:32PM 6    REPORT?

12:32PM 7    A.   YES.  THE DATE OF THE VISIT CAN BE FOUND ON -- WHEN YOU

12:32PM 8    REVIEW THE LAB RESULTS, IT'S ON THE FIRST PAGE OF THE -- THE

12:32PM 9    DATE OF THE VISIT.

12:32PM 10   Q.   AND WHEN YOU WERE CALCULATING THOSE NUMBERS, DID YOU FOCUS

12:32PM 11   ON THE VISIT DATE OR THE REPORT DATE?

12:32PM 12   A.   I FOCUSSED ON THE DATE OF VISIT.

12:32PM 13   Q.   OKAY.

12:32PM 14   A.   THE SPECIFIC DATE CALLED OUT.

12:32PM 15   Q.   OKAY.  AND HOW MANY TOTAL THERANOS CUSTOMERS DID YOU SEE

12:32PM 16   LAB REPORTS FOR IN THE FILES THAT YOU'VE REVIEWED?

12:32PM 17   A.   SO A GRAND TOTAL OF 233 PEOPLE I FOUND HAD VISITED

12:32PM 18   THERANOS LABS FROM DR. ASIN'S MEDICAL RECORDS.

12:32PM 19   Q.   OKAY.  AND HOW MANY CUSTOMERS HAD MULTIPLE VISITS TO

12:32PM 20   THERANOS?

12:32PM 21   A.   OF THOSE, I FOUND 110 HAD VISITED AT LEAST TWICE TO

12:32PM 22   THERANOS LABS.

12:32PM 23   Q.   AND THE -- AND HOW MANY TOTAL VISITS WERE REFLECTED IN --

12:32PM 24   AMONG THOSE THERANOS CUSTOMERS?

12:32PM 25   A.   SO ACROSS ALL OF THOSE 233 CUSTOMERS, THEY MADE A GRAND

12:33PM   1    TOTAL OF 490 VISITS TO THERANOS.

12:33PM   2    Q.   AND WHAT WAS THE TOTAL NUMBER OF TESTS ORDERED IN THOSE

12:33PM   3    LAB REPORTS?

12:33PM   4    A.   THE GRAND TOTAL NUMBER OF TESTS ORDERED FOR ALL OF THOSE

12:33PM   5    CUSTOMERS WAS 1969 TESTS.

12:33PM   6    Q.   AND THE JURY HAS PREVIOUSLY SEEN THESE LAB REPORTS BEFORE.

12:33PM   7         AND JUST TO UNDERSTAND HOW YOU CALCULATED THE TESTS, WERE

12:33PM   8    THERE ANY TESTS THAT YOU EXCLUDED FROM YOUR CALCULATION, OR ANY

12:33PM   9    RESULTS THAT YOU EXCLUDED FROM YOUR CALCULATION?

12:33PM  10    A.   WELL, THERE WAS -- IF YOU -- WHEN YOU REVIEW THE LAB

12:33PM  11    RESULTS, YOU WILL SEE AT THE TOP IT WILL LIST OUT ABNORMAL

12:33PM  12    RESULTS.

12:33PM  13         I DID NOT INCLUDE THOSE IN THE COUNT BECAUSE THAT WOULD BE

12:33PM  14    DUPLICATIVE.  I SKIPPED THAT SECTION AND WENT TO PURELY THE

12:33PM  15    TOTAL LISTING OF TESTS THAT WERE ORDERED AND THE RESULTS.

12:33PM  16    Q.   AND HOW DID YOU DO THAT?

12:33PM  17    A.   IN TERMS OF -- I REVIEWED THE PDF AND SKIPPED OVER THE

12:34PM  18    ABNORMAL RESULTS SECTION.

12:34PM  19    Q.   I'M SORRY.  HOW DID YOU CALCULATE THE NUMBER OF TESTS?

12:34PM  20    A.   OH.  LITERALLY JUST SCROLLING THROUGH THE LAB REPORT AND

12:34PM  21    COUNTING ONE, TWO, THREE, AND SO ON AND SO FORTH.

12:34PM  22    Q.   OKAY.  ALL RIGHT.

12:34PM  23         I'M GOING TO MOVE TO ANOTHER EXHIBIT WITHIN THE SAME

12:34PM  24    TOPIC.  SO WAS THERE AN ISSUE THAT YOU WANTED TO --

12:34PM  25              THE COURT:  THERE WAS.  I SUSTAINED THE OBJECTION TO

12:34PM  1    10689, AND I THINK I ONLY ALLOWED PAGE 1 AS TO THAT EXHIBIT.

12:34PM  2         I'VE REVISITED 3741A, FROM WHICH -- I THINK THAT IS THE

12:34PM  3    GENESIS OF 10689.

12:34PM  4         I NOTE THAT 3741A HAS PRICES IN THE COLUMNS.

12:34PM  5              MS. TREFZ:  IT DOES.

12:34PM  6              THE COURT:  AND THEREFORE, I'M GOING TO CHANGE MY

12:34PM  7    RULING ON THAT AND THOSE PAGES, 2 AND 3, THAT SHOW THE

12:35PM  8    BREAKDOWN, THAT IS APPROPRIATE PRESENTATION FOR THE PRICING

12:35PM  9    THAT IS LISTED ON 3741A.

12:35PM 10         SO THOSE TWO PAGES ARE ADMITTED.  THEY DO ENCOMPASS THE

12:35PM 11    MATERIAL THERE.  SO I'LL CHANGE THE COURT'S RULING.  THOSE ARE

12:35PM 12    ADMITTED.  THEY CAN BE PUBLISHED IF YOU WANT TO DO THAT.

12:35PM 13              MS. TREFZ:  THANK YOU, YOUR HONOR.  I APPRECIATE THE

12:35PM 14    OPPORTUNITY TO DO SO.

12:35PM 15         (DEFENDANT'S EXHIBIT 10689, PAGES 2 AND 3 WAS RECEIVED IN

12:35PM 16    EVIDENCE.)

12:35PM 17    BY MS. TREFZ:

12:35PM 18    Q.   IF WE CAN GO BACK, MR. MIDDLETON, AND MR. BENNETT, TO

12:35PM 19    10689, AND PULL UP PAGE 2 OF 10689.

12:35PM 20         AND, MR. MIDDLETON, WHAT -- CAN YOU EXPLAIN WHAT IS

12:35PM 21    REFLECTED IN PAGE 2 OF 10689?

12:35PM 22    A.   SO PAGE 2 IS -- I MENTIONED BEFORE THAT I REVIEWED THE

12:35PM 23    TESTING MENU AND BROKE OUT THE TESTS INTO VARIOUS BUCKETS OF

12:35PM 24    PRICING, SO PAGE 2 SUMMARIZES THE NUMBER OF TESTS IN VARIOUS

12:35PM 25    PRICE BUCKETS.

12:35PM 1    Q.   OKAY. AND, AND WE SEE THERE -- WHY DON'T YOU TELL US

12:36PM 2    WHICH PRICE BUCKETS YOU USED?

12:36PM 3    A.   SURE. SO I FOCUSSED ON NUMBER OF TESTS UNDER $5, THE

12:36PM 4    TOTAL NUMBER OF TESTS UNDER $10, THE TOTAL NUMBER OF TESTS

12:36PM 5    UNDER $20, THE TOTAL NUMBER OF TESTS UNDER $50, AND FINALLY,

12:36PM 6    THE TOTAL NUMBER OF TESTS UNDER $100.

12:36PM 7    Q.   AND JUST SO WE'RE CLEAR, IS THIS -- FOR THIS PAGE 2 OF

12:36PM 8    10689, DO THE TESTS UNDER $100 AT 265 TESTS INCLUDE ALL OF THE

12:36PM 9    TESTS THAT WERE ABOVE?

12:36PM 10   A.   THAT IS CORRECT. IT'S CUMULATIVE.

12:36PM 11   Q.   OKAY. SO UNDER $10 INCLUDES THE TESTS UNDER $5 AND ALSO

12:36PM 12   THE TESTS BETWEEN $5 AND $10?

12:36PM 13   A.   THAT'S CORRECT.

12:36PM 14   Q.   OKAY. AND THEN DID -- WHAT IS REFLECTED IN THE -- IN THE

12:36PM 15   THIRD COLUMN?

12:36PM 16   A.   SO THE THIRD COLUMN BASICALLY SHOWS THE PERCENTAGE OF

12:36PM 17   TAKING -- SO UNDER $5, THERE WERE 64 TESTS THAT WERE UNDER $5.

12:37PM 18   IF YOU DIVIDE THAT BY THE TOTAL NUMBER OF TESTS OF 269 TESTS,

12:37PM 19   THAT'S THE PERCENTAGE OF TESTS THAT ARE AVAILABLE UNDER $5

12:37PM 20   UNDER THE TESTING MENU.

12:37PM 21   Q.   AND JUST SO WE'RE CLEAR ON THE PERCENTAGE THERE, THAT'S OF

12:37PM 22   THE TESTS OFFERED THAT ARE LISTED -- THE TOTAL NUMBER OF TESTS

12:37PM 23   LISTED ON PAGE 1 OF THIS EXHIBIT; RIGHT?

12:37PM 24   A.   THAT'S CORRECT, YES.

12:37PM 25   Q.   AND THEN LET'S GO TO PAGE 3 OF THE EXHIBIT.

12:37PM   1        AND WHAT IS REFLECTED ON PAGE 3 OF THE EXHIBIT?

12:37PM   2   A.   SO PAGE 3 IS A PIE CHART SHOWING THE BREAKDOWN OF THE TEST

12:37PM   3   PRICES, AND THIS IS A LITTLE BIT DIFFERENT JUST BECAUSE IT'S

12:37PM   4   NOT CUMULATIVE.  YOU CAN ACTUALLY SEE HOW MANY ARE ATTRIBUTED

12:37PM   5   TO EACH BUCKET IN THIS CASE.

12:37PM   6   Q.   AND WHAT WAS THE LARGEST BUCKET?

12:37PM   7   A.   IT WAS THE $5 TO $10 RANGE, CLOSELY FOLLOWED BY 10 TO 20

12:37PM   8   AND -- YEAH.

12:37PM   9   Q.   OKAY.  WE CAN MOVE ON.

12:38PM  10        WE'RE GOING TO GO BACK TO YOUR REVIEW OF TEST RECORDS.

12:38PM  11        THE NEXT ITEM I'D LIKE TO DISCUSS IS, CAN I DRAW YOUR

12:38PM  12   ATTENTION TO EXHIBIT 13781.

12:38PM  13   A.   OKAY.  I'M THERE.

12:38PM  14   Q.   AND DID YOU HAVE AN UNDERSTANDING OF WHAT EXHIBIT 13781

12:38PM  15   IS?

12:38PM  16   A.   YES.

12:38PM  17   Q.   OH.  AND WHAT WAS YOUR UNDERSTANDING?

12:38PM  18   A.   MY UNDERSTANDING IS THAT THIS IS THE LAB -- THIS IS THE

12:38PM  19   SWC BLOOD TESTING ORDERS AFTER AUGUST OF 2015.

12:38PM  20   Q.   AND IF I CAN DRAW YOUR ATTENTION TO 10693, THAT IS ALSO IN

12:38PM  21   YOUR BINDER FOR IDENTIFICATION PURPOSES.

12:39PM  22        AND IS THE -- AND IS YOUR UNDERSTANDING OF THE RECORDS

12:39PM  23   CONTAINED IN EXHIBIT 13781 INFORMED BY 10693?

12:39PM  24   A.   THAT'S CORRECT.

12:39PM  25   Q.   OKAY.  AND WHAT DID YOU -- WHAT DID YOU DO WITH THE

Case 5:18-cr-00258-EJD Document 1702 Filed 01/18/22 Page 144 of 275

12:39PM 1    INFORMATION IN 13781?

12:39PM 2    A.   SO FOR 13781, I REVIEWED FOR THE GRAND TOTAL NUMBER OF

12:39PM 3    TESTS THAT WERE ORDERED, AS WELL AS I ALSO LOOKED FOR HOW MANY

12:39PM 4    TESTS WERE ASKED FOR HCG.

12:39PM 5    Q.   OKAY.  AND DID YOU ALSO COUNT THE NUMBER OF PROVIDERS

12:39PM 6    THAT --

12:39PM 7    A.   I ALSO -- THAT IS CORRECT, YES.  I ALSO COUNTED THE NUMBER

12:39PM 8    OF PROVIDERS THAT WERE LISTED.

12:39PM 9    Q.   AND ARE ALL OF THOSE DIFFERENT PIECES IDENTIFIED OR

12:39PM 10   IDENTIFIABLE FROM 13781?

12:40PM 11   A.   THAT IS CORRECT.

12:40PM 12   Q.   AND CAN YOU JUST EXPLAIN, HOW DID YOU CALCULATE THE, THE

12:40PM 13   NUMBER OF VISITS?

12:40PM 14   A.   SURE.  SO THE TOTAL NUMBER OF VISITS, I BOTH HAND COUNTED

12:40PM 15   STARTING AT 1 AND GOING TO THE END OF THE ROWS HOW MANY VISITS,

12:40PM 16   AS WELL AS I COPIED OVER THE ORDER NUMBERS INTO AN EXCEL, AND I

12:40PM 17   SAW HOW MANY ROWS THEY TOOK UP.

12:40PM 18   Q.   OKAY.  AND HOW MANY VISITS DID YOU IDENTIFY?

12:40PM 19   A.   OVER 1100.

12:40PM 20   Q.   AND WHAT ABOUT HCG TESTS ORDERED AFTER AUGUST 2015?

12:40PM 21   A.   SO PAGES 1 TO 22 OF THE DOCUMENT HAS THE ORDER

12:40PM 22   DESCRIPTION, AND SO I HAD ADOBE DRAW A BOX AROUND EVERY

12:40PM 23   INSTANCE WHERE THERE WAS HCG IN THE TEXT, AND THEN I REVIEWED

12:41PM 24   MANUALLY STARTING FROM THE VERY TOP ROW GOING ALL OF THE WAY

12:41PM 25   UNTIL THE END OF PAGE 22 FOR -- TO MAKE SURE THAT IT CORRECTLY

12:41PM  1    COUNTED HCG, AND ALSO TO MAKE SURE THAT NOTHING WAS MISSED AND

12:41PM  2    NOTHING WAS INCORRECTLY INCLUDED IN THAT COUNT.

12:41PM  3    Q.   SO IS IT FAIR TO SAY THAT FOR BOTH OF THOSE -- BOTH

12:41PM  4    COUNTING THE NUMBER OF VISITS AND THE NUMBER OF TESTS ORDERED,

12:41PM  5    YOU MANUALLY COUNTED AND ALSO DID SOME KIND OF ELECTRONIC CHECK

12:41PM  6    FOR YOURSELF?

12:41PM  7    A.   THAT'S CORRECT.

12:41PM  8    Q.   AND THEN WITH RESPECT TO THE NUMBER OF PROVIDERS, HOW DID

12:41PM  9    YOU CALCULATE THAT NUMBER?

12:41PM 10    A.   SO NUMBER OF PROVIDERS.  SO THE PROVIDERS ARE LISTED ON

12:41PM 11    PAGES 23 TO 46 OF THE DOCUMENT, AND SO I COPIED THOSE PROVIDERS

12:41PM 12    INTO AN EXCEL, USED THE DEDUPE FUNCTION AND THEN KIND OF -- TO

12:42PM 13    BASICALLY COME UP WITH UNIQUE VALUES.

12:42PM 14       I ALSO MANUALLY REVIEWED TO MAKE SURE THAT FUNCTION DIDN'T

12:42PM 15    DO ANYTHING STRANGE.

12:42PM 16    Q.   SO YOU ALSO MANUALLY REVIEWED?

12:42PM 17    A.   I -- YES.  I ORDERED THEM ALPHABETICALLY AND LOOKED FOR

12:42PM 18    UNIQUE VALUES MYSELF.

12:42PM 19    Q.   BUT IN ADDITION TO WHATEVER REVIEW YOU DID IN THE EXCEL,

12:42PM 20    DID YOU ALSO DOUBLE-CHECK ON THE HARD -- ON THE PDF COPY OF THE

12:42PM 21    EXHIBIT THAT YOU HAD?

12:42PM 22    A.   I USED MY COPYING METHOD INTO AN EXCEL.

12:42PM 23    Q.   OKAY.  DID YOU -- AND SO DOES EXHIBIT -- I'D LIKE TO DRAW

12:42PM 24    YOUR ATTENTION TO 10688.

12:42PM 25    A.   OKAY.

12:42PM 1    Q.   AND DOES EXHIBIT 10688 ACCURATELY SUMMARIZE CERTAIN -- THE

12:43PM 2    INFORMATION THAT YOU CALCULATED THAT WE WERE JUST DISCUSSING?

12:43PM 3    A.   IT DOES.

12:43PM 4            MS. TREFZ:  YOUR HONOR, I WOULD OFFER, PURSUANT TO

12:43PM 5    1006, EXHIBIT 10688.

12:43PM 6            MR. LEACH:  NO OBJECTION, YOUR HONOR.

12:43PM 7            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:43PM 8        (DEFENDANT'S EXHIBIT 10688 WAS RECEIVED IN EVIDENCE.)

12:43PM 9    BY MS. TREFZ:

12:43PM 10   Q.   MR. MIDDLETON, CAN YOU EXPLAIN TO US WHAT WE ARE SEEING IN

12:43PM 11   EXHIBIT 10688?

12:43PM 12   A.   SO THIS SUMMARIZES THE TOTAL NUMBER OF VISITS MADE AS

12:43PM 13   LISTED IN THE ORDER FORM, THE HCG TESTS ORDERED AND THOSE BLOOD

12:43PM 14   TEST ORDERS, AS WELL AS THE UNIQUE NUMBER OF PROVIDERS THAT

12:43PM 15   WERE FOUND THAT HAD ORDERED THERANOS TESTS.

12:43PM 16   Q.   OKAY.  AND HOW MANY VISITS DID YOU IDENTIFY?

12:43PM 17   A.   OVER 1100.

12:43PM 18   Q.   AND HOW MANY HCG TESTS DID YOU IDENTIFY?

12:44PM 19   A.   OVER 270.

12:44PM 20   Q.   AND HOW MANY PROVIDERS DID YOU IDENTIFY?

12:44PM 21   A.   OVER 20.

12:44PM 22   Q.   OKAY.  WE ARE DONE WITH THIS EXHIBIT.

12:44PM 23       I HAVE ONE LAST TOPIC FOR YOU.

12:44PM 24   A.   OKAY.

12:44PM 25   Q.   AND I WOULD LIKE TO DRAW YOUR ATTENTION IN YOUR BINDER TO

12:44PM  1    EXHIBIT 14259.

12:44PM  2         AND, MR. MIDDLETON, THIS IS NOT A DOCUMENT THAT YOU --

12:44PM  3    THAT YOU'RE ON; CORRECT?

12:44PM  4    A.   NO.

12:44PM  5    Q.   CAN YOU IDENTIFY THE DATE OF THE TOP EMAIL IN THIS

12:44PM  6    DOCUMENT?

12:44PM  7    A.   SURE.  THE TOP EMAIL WAS SENT ON MAY 12TH OF 2015.

12:44PM  8    Q.   AND CAN YOU IDENTIFY -- IS THERE A BATES NUMBER ON THE

12:44PM  9    BOTTOM RIGHT OF THE DOCUMENT?

12:45PM 10    A.   YES.

12:45PM 11    Q.   AND WHAT IS?

12:45PM 12    A.   THE BATES IS HOLMES 0019255.

12:45PM 13         MS. TREFZ:  YOUR HONOR, I WOULD MOVE TO ADMIT 14259

12:45PM 14    PURSUANT TO RULE 803(6).

12:45PM 15         MR. LEACH:  HEARSAY, FOUNDATION, YOUR HONOR.  HE'S

12:45PM 16    NOT SUMMARIZING ANYTHING.  401.

12:45PM 17         THE COURT:  IS THIS EMAIL IN EVIDENCE, OR PART OF IT

12:45PM 18    IN EVIDENCE?

12:45PM 19         MS. TREFZ:  IT IS NOT, YOUR HONOR.  I AM ATTEMPTING

12:45PM 20    TO MOVE IT INTO EVIDENCE.  IT WAS SHOWN YESTERDAY TO THE

12:45PM 21    PATIENT.

12:45PM 22         THE COURT:  UNDERSTOOD.

12:45PM 23         MS. TREFZ:  I'M SORRY?

12:45PM 24         THE COURT:  IT WAS NOT ADMITTED, THOUGH?

12:45PM 25         MS. TREFZ:  CORRECT, IT WAS NOT.

12:45PM 1      AND SINCE THEN THE GOVERNMENT MOVED TO ADMIT OVER OUR

12:45PM 2  OBJECTION 4415, AND WE BELIEVE NOW THAT THIS CAN BE ADMITTED.

12:45PM 3            THE COURT:  MR. LEACH, 4415?

12:45PM 4            MR. LEACH:  THE COURT HASN'T HEARD FROM A SINGLE ONE

12:46PM 5  OF THE WITNESSES ON THIS DOCUMENT.  I DON'T KNOW HOW THAT WOULD

12:46PM 6  SATISFY 803(6).

12:46PM 7            MS. TREFZ:  AND IF I COULD JUST RESPOND, YOUR HONOR?

12:46PM 8            THE COURT:  SURE.

12:46PM 9            MS. TREFZ:  THE GOVERNMENT ADMITTED DURING ITS

12:46PM 10 CASE-IN-CHIEF A NUMBER OF DOCUMENTS FOR WHICH THERE WAS NO

12:46PM 11 WITNESS, AND IN PARTICULAR I NOTE, AS I DID BEFORE,

12:46PM 12 EXHIBIT 4415 WAS ADMITTED BY THE GOVERNMENT YESTERDAY OVER OUR

12:46PM 13 OBJECTION DURING THE TESTIMONY OF DR. BURNES, AND IT WAS

12:46PM 14 ADMITTED PURSUANT TO 803(6), AND WE BELIEVE THIS IS

12:46PM 15 SUBSTANTIALLY SIMILAR AND FOR SUBSTANTIALLY SIMILAR REASONS.

12:46PM 16           THE COURT:  DO YOU NEED TO MAKE A FOUNDATION, AN

12:46PM 17 803(6) FOUNDATION FOR THIS?

12:46PM 18           MS. TREFZ:  I CAN THROUGH ASKING THE WITNESS WHAT IS

12:46PM 19 IDENTIFIED IN THE DOCUMENT, YOUR HONOR, BUT OBVIOUSLY HE'S NOT

12:46PM 20 THERE.

12:46PM 21           THE COURT:  RIGHT.  SO I'M NOT SURE -- ON THE FACE,

12:46PM 22 I DON'T THINK IT QUALIFIES UNDER 803(6).

12:46PM 23           MS. TREFZ:  IF I COULD DRAW THE COURT'S ATTENTION TO

12:46PM 24 THE CONTEXT OF THE EMAIL AND JUST MAKE A COMPARISON?  AND I CAN

12:47PM 25 DO THIS OUTSIDE OF THE PRESENCE OF THE JURY LATER ON IF THE

| | | |
|---|---|---|
| 12:47PM | 1 | COURT -- |
| 12:47PM | 2 | THE COURT: OKAY. WELL, I'LL SUSTAIN THE OBJECTION. |
| 12:47PM | 3 | MS. TREFZ: OKAY. |
| 12:47PM | 4 | Q. AND IF I COULD JUST DRAW YOUR ATTENTION TO 13609 AS WELL. |
| 12:47PM | 5 | AND I ASSUME THAT WE'RE GOING TO HAVE THE SAME ISSUE, |
| 12:47PM | 6 | YOUR HONOR, SO I JUST WANTED TO MAKE A RECORD -- |
| 12:47PM | 7 | THE COURT: SURE. |
| 12:47PM | 8 | MS. TREFZ: -- OF THIS. |
| 12:47PM | 9 | Q. MR. MIDDLETON, CAN YOU IDENTIFY THE DATE SENT ON |
| 12:47PM | 10 | EXHIBIT 13069? |
| 12:47PM | 11 | A. THE DATE SENT WAS MAY 12TH OF 2015. |
| 12:47PM | 12 | Q. AND THE -- WHAT IS THE BATES NUMBER ON THE BOTTOM RIGHT? |
| 12:47PM | 13 | A. THE BATES NUMBER IS THER-3090166. |
| 12:48PM | 14 | Q. AND IF I COULD JUST DRAW YOUR ATTENTION TO THE BOTTOM |
| 12:48PM | 15 | EMAIL, THE FIRST EMAIL IN THE CHAIN. |
| 12:48PM | 16 | WHAT, WHAT DO YOU SEE IN THE TO LINE OF 13069? |
| 12:48PM | 17 | A. THE TO LINE ON THE VERY BOTTOM EMAIL IS LAB ESCALATE. |
| 12:48PM | 18 | Q. THANK YOU. |
| 12:48PM | 19 | I HAVE NO FURTHER QUESTIONS, YOUR HONOR. |
| 12:48PM | 20 | THE COURT: OKAY. THANK YOU. |
| 12:48PM | 21 | MS. TREFZ: OH, ACTUALLY, I'M SORRY, YOUR HONOR. |
| 12:48PM | 22 | MAY I MOVE THE ADMISSION OF THAT DOCUMENT? |
| 12:48PM | 23 | MR. LEACH: SAME OBJECTION, YOUR HONOR. |
| 12:48PM | 24 | THE COURT: ALL RIGHT. THE OBJECTION IS SUSTAINED. |
| 12:48PM | 25 | MS. TREFZ: ALL RIGHT. |

12:48PM  1          THE CLERK:  COUNSEL, CAN YOU STATE THAT EXHIBIT

12:48PM  2     NUMBER AGAIN, PLEASE?

12:48PM  3          MS. TREFZ:  YES, I CAN.

12:48PM  4        IT IS 13609.

12:48PM  5          THE COURT:  13069.

12:48PM  6          MS. TREFZ:  13069.  I'VE SAID IT PROBABLY FOUR

12:48PM  7     DIFFERENT WAYS, AND I APOLOGIZE TO MS. RODRIGUEZ AND TO THE

12:48PM  8     COURT.

12:48PM  9          THE CLERK:  THANK YOU.

12:48PM 10          THE COURT:  ALL RIGHT.  THANK YOU.

12:48PM 11          MS. TREFZ:  WITH THAT, NO FURTHER QUESTIONS,

12:49PM 12     YOUR HONOR.

12:49PM 13          THE COURT:  ALL RIGHT.  CROSS-EXAMINATION?

12:49PM 14          MR. LEACH:  THANK YOU, YOUR HONOR.

12:49PM 15                    **CROSS-EXAMINATION**

12:49PM 16     BY MR. LEACH:

12:49PM 17     Q.   GOOD AFTERNOON, MR. MIDDLETON.

12:49PM 18     A.   GOOD AFTERNOON.

12:49PM 19     Q.   MY NAME IS BOB LEACH.  I'M ONE OF THE PROSECUTORS ON THE

12:49PM 20     CASE.

12:49PM 21        YOU WORK FOR THE LAW FIRM WILLIAMS & CONNOLLY LLP?

12:49PM 22     A.   THAT'S CORRECT.

12:49PM 23     Q.   AND YOU LIVE IN WASHINGTON, D.C.?

12:49PM 24     A.   THAT'S CORRECT.

12:49PM 25     Q.   AND THAT'S WHERE WILLIAMS & CONNOLLY'S OFFICES ARE?

12:49PM   1    A.   YES, THEIR ONE OFFICE.

12:49PM   2    Q.   AND YOU SUPPORT ATTORNEYS FROM WILLIAMS & CONNOLLY IN

12:49PM   3    THEIR WORK REPRESENTING CLIENTS; IS THAT CORRECT?

12:49PM   4    A.   THAT IS CORRECT.

12:49PM   5    Q.   DO YOU DO LITIGATION WORK?

12:49PM   6    A.   I DO.

12:49PM   7    Q.   OKAY.  AND DO YOU TAKE DIRECTION FROM THE ATTORNEYS WHO

12:50PM   8    SUPERVISE YOU?

12:50PM   9    A.   I TAKE DIRECTION FROM, YES, THE ATTORNEYS THAT ARE IN MY

12:50PM  10    CASE.

12:50PM  11    Q.   OKAY.  SO THE ATTORNEYS DIRECT YOU AND GUIDE YOU IN THE

12:50PM  12    WORK THAT YOU DO AS A PARALEGAL?

12:50PM  13    A.   THAT'S CORRECT.

12:50PM  14    Q.   OKAY.  AND IN THE TRIAL CONTEXT, THAT MIGHT INVOLVE

12:50PM  15    ORGANIZING AND REVIEWING DOCUMENTS LIKE ONE OF THE BINDERS THAT

12:50PM  16    YOU HAVE IN FRONT OF YOU?

12:50PM  17    A.   YES, YES.  I'VE MADE MANY A BINDER IN MY TIME.

12:50PM  18    Q.   AND SOME DAYS IT MIGHT ASSIST PULLING EXHIBITS OR

12:50PM  19    DOCUMENTS FROM DATABASES; IS THAT RIGHT?

12:50PM  20    A.   THAT IS CORRECT.

12:50PM  21    Q.   AND ON DAYS LIKE TODAY IT MEANS YOU GIVE TESTIMONY HERE IN

12:50PM  22    FEDERAL COURT?

12:50PM  23    A.   I WILL SAY THIS IS UNIQUE, BUT YES.

12:50PM  24    Q.   HAVE YOU EVER TESTIFIED BEFORE?

12:50PM  25    A.   NO.

12:50PM    1    Q.   OKAY.  HOW DID YOU GET THIS ASSIGNMENT?

12:50PM    2    A.   I GOT THIS ASSIGNMENT -- I GOT CALLED BY MY FELLOW

12:50PM    3    PARALEGAL THAT THEY WERE LOOKING FOR SOMEONE TO PROVIDE SOME

12:50PM    4    SUMMARIES, SO --

12:50PM    5    Q.   OKAY.  WHEN DID YOU GET THIS ASSIGNMENT?

12:50PM    6    A.   I BELIEVE MAYBE THE BEGINNING OF AUGUST THIS YEAR.

12:50PM    7    Q.   OKAY.  AND YOU'VE BEEN WORKING HARD ON THAT SINCE AUGUST?

12:50PM    8    A.   THAT'S CORRECT, OFF AND ON.

12:51PM    9    Q.   OKAY.  WILLIAMS & CONNOLLY PAYS YOUR SALARY I PRESUME?

12:51PM   10    A.   THAT IS CORRECT.

12:51PM   11    Q.   OKAY.  ARE PARALEGALS AT WILLIAMS & CONNOLLY ELIGIBLE FOR

12:51PM   12    SOME TYPE OF BONUS?

12:51PM   13    A.   NO.  THERE IS A VERY SMALL YEAR END BONUS, YES, I GUESS

12:51PM   14    THERE IS.  THAT WAS NEWLY INSTITUTED, SO YES.

12:51PM   15    Q.   THAT'S GREAT NEWS FOR YOU.

12:51PM   16         AND HOW IS YOUR BONUS CALCULATED?

12:51PM   17    A.   I BELIEVE IT IS PURELY JUST A MERITS BASED BONUS.

12:51PM   18    Q.   OKAY.  AND BY MERIT, THAT MEANS YOUR PERFORMANCE?

12:51PM   19    A.   THAT IS CORRECT.

12:51PM   20    Q.   SO IN THE TRIAL CONTEXT, HOW WELL YOU'RE ORGANIZING AND

12:51PM   21    REVIEWING DOCUMENTS?

12:51PM   22    A.   AH, YES.

12:51PM   23    Q.   AND IN THE TRIAL CONTEXT -- AND DO THE ATTORNEYS WHO

12:51PM   24    SUPERVISE YOU HAVE A SAY IN YOUR PERFORMANCE REVIEWS?

12:51PM   25    A.   YES, THE ATTORNEYS WRITE PERFORMANCE REVIEWS, YES.

12:51PM 1    Q.   OKAY.  AND THAT PERFORMANCE -- OR THE -- SO THE BONUS IS

12:51PM 2    BASED IN SOME PART ON THE QUALITY OF YOUR WORK?

12:51PM 3    A.   YES, UH-HUH.

12:51PM 4    Q.   AND THE ATTORNEYS HAVE INPUT INTO THAT PROCESS?

12:52PM 5    A.   THAT WOULD BE CORRECT.

12:52PM 6    Q.   AND WILLIAMS & CONNOLLY CAN HIRE OR FIRE YOU IF THEY WANT

12:52PM 7    TO?

12:52PM 8    A.   YES.  I CAN'T SAY LEGALLY IT'S AN AT-WILL STATE, BUT I

12:52PM 9    ASSUME, YES, THEY CAN FIRE ME ANY TIME.

12:52PM 10   Q.   OKAY.  WHAT DO YOU MEAN BY "AT-WILL"?

12:52PM 11   A.   I'M OFFERING SOMETHING THAT I DON'T KNOW ANYTHING ABOUT.

12:52PM 12        I KNOW THAT THERE'S AT-WILL LEGAL STATES, AND YEAH.

12:52PM 13   Q.   OKAY.  BUT THE ATTORNEYS WHO YOU WORK FOR HAVE SOME SAY IN

12:52PM 14   YOUR CONTINUED EMPLOYMENT AT WILLIAMS & CONNOLLY; IS THAT FAIR?

12:52PM 15   A.   YES.

12:52PM 16   Q.   OKAY.  YOU NEVER WORKED AT THERANOS; RIGHT?

12:52PM 17   A.   NO.

12:52PM 18   Q.   YOU HAVE NO PERSONAL KNOWLEDGE ABOUT THE FACTS OF THIS

12:52PM 19   CASE; CORRECT?

12:52PM 20   A.   NO.

12:52PM 21   Q.   YOU'RE WHAT IS CALLED A SUMMARY WITNESS; IS THAT YOUR

12:52PM 22   UNDERSTANDING?

12:52PM 23   A.   THAT'S CORRECT.

12:52PM 24   Q.   SO YOU REVIEW DOCUMENTS AND YOU ADD UP NUMBERS AND YOU

12:52PM 25   PRESENT THEM AS BEST AS YOU CAN?

12:52PM  1   A.   THAT IS CORRECT.

12:52PM  2   Q.   OKAY.  IN ADVANCE OF YOUR TESTIMONY TODAY, DID YOU MEET

12:52PM  3   WITH THE WILLIAMS & CONNOLLY LAWYERS REPRESENTING MS. HOLMES?

12:52PM  4   A.   I DID.

12:52PM  5   Q.   AND DID THEY GO THROUGH THE QUESTIONS THAT THEY WOULD ASK

12:52PM  6   YOU HERE TODAY?

12:52PM  7   A.   YES, WE REVIEWED THE QUESTIONS.

12:53PM  8   Q.   OKAY.  HOW MANY MEETINGS DID YOU HAVE?

12:53PM  9   A.   I GOT IN TUESDAY EVENING, AND I BELIEVE I MET WITH AT

12:53PM 10   LEAST ONE ATTORNEY EVERY DAY SINCE.  SO FOUR MEETINGS.

12:53PM 11   Q.   OKAY.  DID YOU MEET WITH MR. DOWNEY?

12:53PM 12   A.   NO.

12:53PM 13   Q.   OKAY.  DID YOU MEET WITH MR. WADE?

12:53PM 14   A.   NO.

12:53PM 15   Q.   DID YOU MEET WITH --

12:53PM 16   A.   CORRECTION.  I BELIEVE MR. WADE MIGHT HAVE BEEN IN THE

12:53PM 17   ROOM.

12:53PM 18   Q.   OKAY.  AND DID YOU MEET WITH JOHN CLINE, ONE OF

12:53PM 19   MS. HOLMES'S OTHER ATTORNEYS?

12:53PM 20   A.   NO.

12:53PM 21   Q.   DID YOU MEET WITH ANY OF THE ASSOCIATES WORKING ON THIS

12:53PM 22   CASE WITH MR. DOWNEY AND HIS TEAM?

12:53PM 23   A.   YES.

12:53PM 24   Q.   OKAY.  WHICH ONES DID YOU MEET WITH?

12:53PM 25   A.   J.R.

12:53PM   1        Q.   J.R?

12:53PM   2        A.   YES, RIGHT THERE.

12:53PM   3        Q.   YOU'RE POINTING TO A GENTLEMAN IN THE COURTROOM?

12:53PM   4        A.   THAT'S CORRECT, YES.

12:53PM   5        Q.   OKAY.  DID YOU MEET WITH AMY SAHARIA?

12:53PM   6        A.   NO.

12:53PM   7        Q.   AND DO YOU KNOW WHO MS. SAHARIA IS?

12:53PM   8        A.   YES.

12:53PM   9        Q.   WHO IS SHE?

12:53PM  10        A.   SHE IS AN ATTORNEY WITH WILLIAMS & CONNOLLY.

12:53PM  11        Q.   REPRESENTING MS. HOLMES?

12:54PM  12        A.   YES.

12:54PM  13        Q.   AND DID YOU MEET WITH PATRICK LOOBY?

12:54PM  14        A.   NO.

12:54PM  15        Q.   AND WHO IS PATRICK LOOBY?

12:54PM  16        A.   I CAN'T SAY.

12:54PM  17        Q.   OKAY.  YOU DON'T KNOW HIM AS AN ATTORNEY AT

12:54PM  18   WILLIAMS & CONNOLLY?

12:54PM  19        A.   NO.

12:54PM  20        Q.   OKAY.  HOW ABOUT RICH CLEARY?  DID YOU MEET WITH HIM?

12:54PM  21        A.   NO.

12:54PM  22        Q.   YOU DON'T KNOW WHO HE IS?

12:54PM  23        A.   NO.

12:54PM  24        Q.   AND YOU DON'T KNOW HIM AS AN ATTORNEY AT

12:54PM  25   WILLIAMS & CONNOLLY?

12:54PM 1    A.   NO.

12:54PM 2    Q.   HOW ABOUT ANDREW LEMENS?  DO YOU KNOW WHO THAT IS?

12:54PM 3    A.   I KNOW THAT NAME.

12:54PM 4    Q.   AND WHO IS HE?

12:54PM 5    A.   I BELIEVE AN ATTORNEY AT WILLIAMS & CONNOLLY.

12:54PM 6    Q.   AND DID YOU MEET WITH HIM IN CONNECTION WITH THIS?

12:54PM 7    A.   NO.

12:54PM 8    Q.   AND SO IN YOUR MEETING WITH MS. TREFZ AND MR. WADE AND

12:54PM 9    MAYBE OTHERS, DID YOU SEE ANYBODY TAKING NOTES AS THEY WERE

12:54PM 10   ASKING YOU QUESTIONS?

12:54PM 11   A.   I DON'T RECALL THEM TAKING NOTES.

12:54PM 12   Q.   OKAY.  DID YOU SHOW THEM THE SUMMARY CHARTS THAT YOU

12:54PM 13   PREPARED HERE TODAY?

12:54PM 14   A.   YES.

12:54PM 15   Q.   AND DID YOU MAKE ANY CHANGES BASED ON THEIR FEEDBACK?

12:54PM 16   A.   NO.

12:54PM 17   Q.   YOU GOT IT RIGHT THE FIRST TIME?

12:54PM 18   A.   YES.  THEY, THEY WERE VERY -- WHATEVER I MADE IN THE

12:54PM 19   SUMMARY CHARTS, THAT IS THE CHART.

12:54PM 20   Q.   OKAY.  SO THE CHARTS THAT WE'RE LOOKING AT TODAY ARE THE

12:54PM 21   ONE AND ONLY CHARTS IN EXISTENCE?  THERE WEREN'T DRAFTS, THERE

12:54PM 22   WEREN'T ITERATIONS, THERE WASN'T FEEDBACK OR NONE OF THAT?

12:55PM 23   A.   THE CHARTS WE'RE LOOKING AT TODAY ARE THE FINAL CHARTS.

12:55PM 24   I'M SURE THE NUMBERS MAY HAVE SHIFTED SLIGHTLY.

12:55PM 25   Q.   TELL ME ABOUT HOW THE NUMBERS SHIFTED.

12:55PM 1    A.   UH, SO BASICALLY OCCASIONALLY SOME OF CHARTS, SOMEONE

12:55PM 2    WOULD HELP FILL OUT THE CHART TO SPEED UP THE PROCESS, AND THEN

12:55PM 3    I WOULD REVIEW IT TO MAKE SURE IT WAS ACCURATE, AND I WOULD

12:55PM 4    FIND INACCURACIES AND CORRECT THE DATE TO MAKE SURE THAT WAS,

12:55PM 5    IN FACT, THE TRUE AND FINAL COUNT.

12:55PM 6    Q.   AND WHO IS THE SOMEBODY WHO WOULD DO THAT?

12:55PM 7    A.   I'M NOT SURE.

12:55PM 8    Q.   YOU'RE NOT SURE?

12:55PM 9    A.   I'M NOT SURE.

12:55PM 10   Q.   OKAY.  DID YOU DRAFT THE SLIDES WE'RE LOOKING AT?

12:55PM 11   A.   I EDITED THE SLIDES THAT WE LOOKED AT.

12:55PM 12   Q.   SO SOMEONE ELSE DRAFTED THEM?

12:55PM 13   A.   SOMEONE MADE THE TEMPLATE.

12:55PM 14   Q.   OKAY.  WHO MADE THE TEMPLATE?

12:55PM 15   A.   I CANNOT SAY.

12:55PM 16   Q.   YOU DON'T KNOW?

12:55PM 17   A.   I DO NOT KNOW.

12:55PM 18   Q.   OKAY.  HOW DID YOU GET IT?

12:55PM 19   A.   I WAS PROVIDED TO THEM BY THE ATTORNEYS AT

12:55PM 20   WILLIAMS & CONNOLLY.

12:55PM 21   Q.   OKAY.  SO MS. TREFZ, MR. WADE, THEY GAVE YOU A TEMPLATE

12:55PM 22   AND YOU WORKED WITH THAT?

12:55PM 23   A.   AND THEN I FILLED IN THE DATA THAT I FOUND, YEP.

12:56PM 24   Q.   OKAY.  AND THE ONES THAT WE'RE LOOKING AT ARE THE ONE AND

12:56PM 25   ONLY DRAFTS OUT THERE?

12:56PM   1       A.   I MEAN, IT WAS A LIVE DOCUMENT, SO, YEAH.

12:56PM   2       Q.   WOULD YOU EMAIL IT BACK AND FORTH?

12:56PM   3       A.   NO, WE DIDN'T EMAIL IT BACK AND FORTH.

12:56PM   4       Q.   YOU HAD IT ON A SHARED DRIVE AND YOU WOULD MAKE IT OUT --

12:56PM   5              THE COURT:  ASK YOUR QUESTION AGAIN.

12:56PM   6       BY MR. LEACH:

12:56PM   7       Q.   YOU HAD IT ON A SHARED DRIVE AND YOU MADE EDITS TO THAT

12:56PM   8       ONE AND ONLY DOCUMENT?

12:56PM   9       A.   THAT'S CORRECT, YEAH.

12:56PM   10      Q.   HOW LONG DID YOUR MEETING WITH MS. TREFZ AND MR. WADE GO

12:56PM   11      AS YOU WERE OUT HERE IN SAN FRANCISCO?

12:56PM   12      A.   THEY WERE USUALLY ABOUT AN HOUR.

12:56PM   13      Q.   OKAY.  AND THEY WENT THROUGH THE QUESTIONS THAT THEY WERE

12:56PM   14      ASKING, SOME OF THE QUESTIONS THAT THEY WERE ASKING YOU HERE

12:56PM   15      TODAY?

12:56PM   16      A.   THAT'S CORRECT.

12:56PM   17      Q.   OKAY.  I'D LIKE TO LOOK AT SOME OF THE SLIDES THAT YOU

12:56PM   18      WENT THROUGH ON YOUR DIRECT EXAMINATION.

12:56PM   19      A.   SURE.

12:56PM   20      Q.   THE FIRST ONE HAD TO DO WITH PATENTS.

12:56PM   21          DO YOU RECALL THAT SLIDE?

12:56PM   22      A.   I DO.

12:56PM   23      Q.   NOW, YOU'RE NOT A PATENT LAWYER; RIGHT?

12:57PM   24      A.   NO.

12:57PM   25      Q.   NEVER WORKED FOR THE U.S. PATENT AND TRADEMARK OFFICE?

12:57PM  1    A.   I HAVE NOT.

12:57PM  2    Q.   AND YOU'RE NOT FAMILIAR WITH THE WORK THAT THEY DO THERE?

12:57PM  3    A.   NO.

12:57PM  4    Q.   AND DID YOU READ ANY OF THE PATENTS?

12:57PM  5    A.   NO.

12:57PM  6    Q.   DO YOU UNDERSTAND ANY OF THE PATENTS?

12:57PM  7    A.   NO.

12:57PM  8    Q.   YOU'RE JUST TAKING DATA ON THE FRONT PAGE AND PUTTING THEM

12:57PM  9    INTO A SPREADSHEET?

12:57PM 10    A.   YOU'VE GOT IT.

12:57PM 11    Q.   AND YOU -- AND YOU HAVE NO IDEA WHETHER WHAT'S DESCRIBED

12:57PM 12    IN THE PATENT ACTUALLY WORKS, DO YOU?

12:57PM 13    A.   NO.

12:57PM 14    Q.   NO IDEA WHATSOEVER?

12:57PM 15    A.   NO.

12:57PM 16    Q.   IT'S JUST A PIECE OF PAPER YOU WERE LOOKING AT?

12:57PM 17    A.   THAT IS CORRECT.

12:57PM 18    Q.   OKAY.  IF WE COULD PLEASE DISPLAY EXHIBIT 5172.

12:57PM 19         IS THIS ONE OF THE DOCUMENTS, MR. MIDDLETON, THAT YOU WERE

12:57PM 20    ASKED TO SUMMARIZE?

12:57PM 21    A.   THAT'S CORRECT.

12:57PM 22    Q.   AND CAN YOU TELL US AGAIN WHICH ROWS YOU WERE ATTEMPTING

12:58PM 23    TO SUMMARIZE?

12:58PM 24    A.   SURE.  I FOCUSSED ON ROWS 26 AND 27.

12:58PM 25    Q.   OKAY.  SO THE ONE SAYING CUSTOMER RECEIPTS AND THEN

12:58PM  1    OPTION/STOCK PROCEEDS; CORRECT?

12:58PM  2    A.   THAT IS CORRECT.

12:58PM  3    Q.   AND YOU DON'T KNOW WHO THE CUSTOMER RECEIPTS COME FROM;

12:58PM  4    CORRECT?

12:58PM  5    A.   I DO NOT.

12:58PM  6    Q.   YOU DON'T KNOW WHETHER THEY COME FROM WALGREENS?

12:58PM  7    A.   NO, I DO NOT.

12:58PM  8    Q.   YOU DON'T KNOW WHETHER THEY CAME FROM SAFEWAY?

12:58PM  9    A.   NO.

12:58PM  10   Q.   THIS IS THE SOLE SOURCE OF YOUR INFORMATION?

12:58PM  11   A.   THAT IS THE SOLE SOURCE OF MY INFORMATION.

12:58PM  12   Q.   OKAY.  AND IF WE CAN ZOOM TO THE LEFT, MS. HOLLIMAN, TO

12:58PM  13   THE COLUMN FOR SEPTEMBER OF 2013, AND MAYBE MOVE TO THE RIGHT

12:58PM  14   IF WE COULD, OR MAYBE MY RIGHT.  TO THE LEFT.  THERE WE GO.

12:59PM  15        AND I DRAW YOUR ATTENTION, MR. MIDDLETON, TO THE COLUMN

12:59PM  16   FOR TOTAL CASH BALANCES.

12:59PM  17        ACTUALLY IF WE CAN KEEP GOING TO 2013, MS. HOLLIMAN.  A

12:59PM  18   LITTLE FURTHER.  THERE WE GO.  THANK YOU.

12:59PM  19        MR. MIDDLETON, I'M DRAWING YOUR ATTENTION TO COLUMN EN.

12:59PM  20        DO YOU SEE A TOTAL CASH BALANCE THERE OF $14,463,111?

12:59PM  21   A.   YES, I BELIEVE COLUMN EN IS $14,463,111.

12:59PM  22   Q.   OKAY.  AND WILLIAMS & CONNOLLY DIDN'T ASK YOU TO REVIEW

12:59PM  23   ANY CHANGES IN THE THERANOS CASH BALANCE FOR PARTICULAR

01:00PM  24   PERIODS?

01:00PM  25   A.   NO, I DID NOT FOCUS ON THIS ROW.

| | | |
|---|---|---|
| 01:00PM | 1 | Q.   AND YOU HAVE NO REASON TO DOUBT THE DATA IN THIS COLUMN? |
| 01:00PM | 2 | A.   I HAVE NO REASON TO. |
| 01:00PM | 3 | Q.   THE SECOND PAGE OF 10685 IS TITLED OPTION/STOCK PROCEEDS. |
| 01:00PM | 4 | DO YOU SEE THAT? |
| 01:00PM | 5 | A.   HOLD ON. |
| 01:00PM | 6 | YES, I SEE THAT. |
| 01:00PM | 7 | Q.   AND YOU DON'T KNOW WHETHER THESE COME FROM OPTIONEES |
| 01:00PM | 8 | EXERCISING THEIR OPTIONS AND GIVING MONEY TO THE COMPANY OR |
| 01:00PM | 9 | INVESTORS PUTTING NEW MONEY INTO THE COMPANY, DO YOU? |
| 01:00PM | 10 | A.   I DO NOT. |
| 01:00PM | 11 | Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO WHAT WAS MARKED |
| 01:00PM | 12 | DURING YOUR DIRECT EXAMINATION AS EXHIBIT 10685.  I'M SORRY, |
| 01:01PM | 13 | 10686. |
| 01:01PM | 14 | A.   OKAY. |
| 01:01PM | 15 | Q.   DO YOU RECALL BEING ASKED QUESTIONS ABOUT THIS SLIDE? |
| 01:01PM | 16 | A.   I DO. |
| 01:01PM | 17 | Q.   THE TITLE OF THIS SLIDE IS ENTITY THAT INVESTED IN |
| 01:01PM | 18 | THERANOS. |
| 01:01PM | 19 | DO YOU SEE THAT? |
| 01:01PM | 20 | A.   I DO. |
| 01:01PM | 21 | Q.   AND WHERE DO YOU GET THAT TERM, "ENTITIES"? |
| 01:01PM | 22 | A.   WELL, ENTITIES IN TERMS OF THERE'S, LIKE, TRUSTS, AS WELL |
| 01:01PM | 23 | AS INDIVIDUALS, AND SO ENTITIES. |
| 01:01PM | 24 | Q.   IS THAT A WORD THAT YOU CAME UP WITH, OR WAS THAT |
| 01:01PM | 25 | SOMETHING FROM THE LAWYERS AT WILLIAMS & CONNOLLY? |

01:01PM  1      A.   WILLIAMS & CONNOLLY PROVIDED THE TERM.

01:01PM  2      Q.   OKAY.  IT'S MORE THAN ENTITIES THAT INVESTED IN THERANOS;

01:01PM  3   ISN'T THAT RIGHT, MR. MIDDLETON?

01:01PM  4      A.   I CANNOT SAY.

01:01PM  5      Q.   WELL, LET'S LOOK AT THE DOCUMENT THAT YOU SUMMARIZE HERE.

01:01PM  6      A.   OKAY.

01:01PM  7      Q.   IF WE COULD GO TO EXHIBIT 10692.

01:02PM  8           YOU MIGHT NEED THE NATIVE FILE FOR THIS ONE, MS. HOLLIMAN.

01:02PM  9           IF WE COULD SCROLL DOWN TO THE, IF WE COULD SCROLL DOWN TO

01:02PM 10   THE BOTTOM, MS. HOLLIMAN, OF THE SHEET.

01:02PM 11           ACTUALLY, I THINK IT WILL BE EASIER IF I USE THE ELMO.

01:02PM 12           MAY I USE THE ELMO, MS. KRATZMANN?

01:02PM 13              THE CLERK:  YES.

01:02PM 14   BY MR. LEACH:

01:02PM 15      Q.   ARE YOU ABLE TO SEE THIS, MR. MIDDLETON?

01:02PM 16      A.   I AM.

01:02PM 17              MS. TREFZ:  MR. LEACH, I WASN'T SURE ABOUT THE

01:02PM 18   POTENTIAL REDACTIONS.  I'M HAPPY WITH YOU DISPLAYING THIS, I

01:03PM 19   JUST WANTED TO FLAG FOR YOU I WASN'T SURE WHETHER YOU WERE

01:03PM 20   GOING TO IDENTIFY INDIVIDUALS -- I JUST WANTED TO FLAG IT.

01:03PM 21              MR. LEACH:  THIS IS IN EVIDENCE, YOUR HONOR.  I

01:03PM 22   DON'T SEE ANY PII IN HERE.

01:03PM 23        SOME OF THESE ARE INDIVIDUALS WHO INVESTED IN THERANOS,

01:03PM 24   AND THAT'S THE --

01:03PM 25              THE COURT:  NO.  GO RIGHT AHEAD.  YOU MAY CONTINUE.

01:03PM   1    BY MR. LEACH:

01:03PM   2    Q.   UP AT THE TOP, MR. MIDDLETON, DO YOU SEE THE NAMES

01:03PM   3    ALAN EISENMAN, SHERRIE EISENMAN, AND KENDRA FADIL?

01:03PM   4    A.   I DO.

01:03PM   5    Q.   AND THOSE APPEAR TO BE INDIVIDUALS TO YOU, NOT ENTITIES;

01:03PM   6    CORRECT?

01:03PM   7    A.   THAT APPEARS TO BE INDIVIDUALS, YES.

01:03PM   8    Q.   AND YOU HAVE NO IDEA WHY KENDRA FADIL INVESTED $75,000

01:03PM   9    INTO THERANOS?

01:03PM  10    A.   I CANNOT SAY.

01:03PM  11    Q.   YOU DON'T KNOW WHETHER THAT WAS -- WHAT THE PURPOSE OF

01:03PM  12    THAT INVESTMENT WAS OR WHY SHE WAS COMMITTING $75,000 TO

01:03PM  13    THERANOS?

01:03PM  14    A.   I HAVE NO KNOWLEDGE ABOUT THAT.

01:03PM  15    Q.   AND YOU DON'T KNOW WHY MR. EISENMAN INVESTED IN THERANOS?

01:03PM  16    A.   I DO NOT.

01:03PM  17    Q.   AND YOU WOULD AGREE WITH ME THAT THESE LOOK LIKE

01:04PM  18    INDIVIDUALS, NOT ENTITIES?

01:04PM  19    A.   THEY APPEAR TO BE INDIVIDUALS.

01:04PM  20    Q.   OKAY.  AND IF WE LOOK AT THE NEXT PAGE, IN THE MIDDLE

01:04PM  21    THERE'S A REFERENCE TO NANCY MINNIG, MELISSA FINDLEY.

01:04PM  22         DO YOU KNOW WHETHER THEY WERE ADMINISTRATIVE ASSISTANTS AT

01:04PM  23    PARTICULAR FIRMS?

01:04PM  24    A.   I CANNOT SAY.

01:04PM  25    Q.   YOU DON'T KNOW WHO THEY ARE?

01:04PM 1      A.   I HAVE NO IDEA.

01:04PM 2      Q.   AND YOU DON'T KNOW WHY THEY INVESTED THE AMOUNTS THAT THEY

01:04PM 3      INVESTED LISTED HERE, DO YOU?

01:04PM 4      A.   I CANNOT KNOW.  I DON'T SAY.

01:04PM 5      Q.   AND WHY DID YOU USE THE TERM "ENTITIES"?

01:04PM 6      A.   BECAUSE THERE ARE VARIOUS TRUSTS, ALONG WITH INDIVIDUALS,

01:04PM 7      AND SO IT'S MORE THAN JUST INDIVIDUALS.

01:04PM 8      Q.   OKAY.  YOU WEREN'T TRYING TO SUGGEST THAT AN ENTITY, IF

01:04PM 9      THEY LOSE MONEY, THAT DOESN'T MATTER; BUT AN INDIVIDUAL, IF

01:04PM 10     THEY LOSE MONEY, THAT MATTERS MORE?  THAT WASN'T WHAT YOU WERE

01:04PM 11     TRYING TO DO?

01:04PM 12     A.   THAT ALL SOUNDS WELL BEYOND MY SCOPE, YEAH.

01:05PM 13     Q.   BECAUSE YOU GOT THAT FROM THE LAWYERS AT

01:05PM 14     WILLIAMS & CONNOLLY?

01:05PM 15     A.   IN TERMS OF WHAT DID I GET?

01:05PM 16     Q.   WHAT TO PUT ON THE SLIDE.

01:05PM 17     A.   THEY SUGGESTED IT, YES.

01:05PM 18     Q.   OKAY.  LET'S LOOK AT 10689.

01:05PM 19     A.   OKAY.

01:05PM 20     Q.   AND I'LL DISPLAY THIS.

01:05PM 21          DO YOU RECALL TESTIMONY ABOUT THE THERANOS TEST MENU?

01:05PM 22     A.   I DO.

01:05PM 23     Q.   AND YOU TOOK THAT PIECE OF PAPER AND COUNTED UP THE NUMBER

01:05PM 24     OF TESTS THAT WERE DONE ON ANY GIVEN PERIOD OF TIME, OR IN THAT

01:05PM 25     PERIOD OF TIME; CORRECT?

01:05PM   1    A.   I COUNTED THE NUMBER OF TESTS THAT APPEARED ON THAT TEST

01:05PM   2    MENU.

01:05PM   3    Q.   AND THERE'S A NUMBER FOR REFLEX TESTS, 23.

01:06PM   4         DO YOU SEE THAT?

01:06PM   5    A.   I DO.

01:06PM   6    Q.   AND DO YOU KNOW WHETHER THOSE WERE TESTS THAT WERE RUN ON

01:06PM   7    EDISON OR AN FDA APPROVED MACHINE?

01:06PM   8    A.   I HAVE NO IDEA.

01:06PM   9    Q.   BEYOND WHAT YOU WERE ASKED TO DO?

01:06PM  10    A.   YEAH, UH-HUH.

01:06PM  11    Q.   AND WITH RESPECT TO 10687, THE SUMMARY OF VISITS RELATING

01:06PM  12    TO DR. ASIN, DO YOU RECALL BEING ASKED QUESTIONS ABOUT THAT?

01:06PM  13    A.   I DO.

01:06PM  14    Q.   AND YOU DON'T HAVE ANY IDEA WHY PARTICULAR PATIENTS WERE

01:06PM  15    GOING TO THERANOS ON ANY GIVEN DAY?

01:06PM  16    A.   I DO NOT.

01:06PM  17    Q.   YOU DON'T KNOW WHETHER THAT WAS SOMETHING THAT DR. ASIN

01:06PM  18    TOLD THEM TO DO, OR SOMEBODY ELSE TOLD THEM TO DO, OR ANYBODY

01:06PM  19    TOLD THEM TO DO?

01:06PM  20    A.   I DO NOT HAVE THAT KNOWLEDGE.

01:06PM  21    Q.   YOU JUST COUNTED UP NUMBERS AND YOU DIDN'T KNOW ANYTHING

01:06PM  22    BEHIND THE REASONS?

01:06PM  23    A.   YOU'VE GOT IT.

01:06PM  24    Q.   YOU WERE NOT ASKED TO -- I'M SORRY.  I HAVE ONE QUESTION

01:06PM  25    ON 10688.  IF I COULD DISPLAY THAT ONE.

01:07PM 1        DO YOU RECALL BEING ASKED SOME QUESTIONS ABOUT HCG TESTS

01:07PM 2    IN CONNECTION WITH THIS EXHIBIT?

01:07PM 3    A.   I DO.

01:07PM 4    Q.   AND THIS IS FOR THE TIME PERIOD AFTER AUGUST OF 2015; IS

01:07PM 5    THAT CORRECT?

01:07PM 6    A.   THAT'S CORRECT.

01:07PM 7    Q.   AND YOU DON'T KNOW WHETHER THERANOS STOPPED RUNNING THE

01:07PM 8    HCG TESTS ON THE EDISON DEVICE EARLIER IN 2015, DO YOU?

01:07PM 9    A.   I CANNOT SAY.

01:07PM 10   Q.   YOU'VE NEVER SEEN ANY DOCUMENTS ABOUT WHETHER THERANOS WAS

01:07PM 11   RUNNING THE HCG TEST ON ITS PROPRIETARY DEVICE?

01:07PM 12   A.   I DO NOT KNOW ANYTHING ABOUT THAT.

01:07PM 13   Q.   OKAY.  AND THE SUMMARIES THAT YOU WERE ASKED TO PROVIDE,

01:07PM 14   THE IDEAS FOR THESE COME FROM THE LAWYERS AT

01:07PM 15   WILLIAMS & CONNOLLY; CORRECT?

01:07PM 16   A.   THE IDEAS OF WHAT SUMMARIES TO PROVIDE?  YES, THAT IS

01:07PM 17   CORRECT.

01:07PM 18   Q.   THESE WEREN'T YOUR IDEAS?

01:07PM 19   A.   NO, NO.

01:07PM 20   Q.   OKAY.  AND YOU WERE NEVER ASKED TO SUMMARIZE HOW MANY

01:07PM 21   ASSAYS WERE RUN ON THERANOS'S SAMPLE PROCESSING UNIT IN THE

01:08PM 22   CLIA LAB?

01:08PM 23   A.   NO.

01:08PM 24   Q.   I'M GOING TO VENTURE TO GUESS YOU DON'T KNOW WHAT THE CLIA

01:08PM 25   LAB IS.

01:08PM   1      A.   I HAVE NO IDEA WHAT YOU SAID.

01:08PM   2      Q.   OKAY.  AND YOU WERE NEVER ASKED TO SUMMARIZE TEXT MESSAGES

01:08PM   3      BETWEEN MS. HOLMES AND MR. BALWANI ABOUT THINGS THAT WERE GOING

01:08PM   4      ON AT THERANOS?

01:08PM   5      A.   NO, I'VE NEVER SEEN TEXT MESSAGES.

01:08PM   6      Q.   AND YOU WERE NEVER ASKED TO SUMMARIZE EMAILS BETWEEN

01:08PM   7      ADAM ROSENDORFF AND MS. HOLMES ABOUT WHAT WAS GOING ON?

01:08PM   8      A.   NO, I DIDN'T REVIEW ANY EMAILS.

01:08PM   9      Q.   AND YOU WERE NOT ASKED TO SUMMARIZE MEDIA ARTICLES WITH

01:08PM  10      STATEMENTS BY MS. HOLMES?

01:08PM  11      A.   NO, I DIDN'T REVIEW MEDIA ARTICLES.

01:08PM  12      Q.   AND YOU WERE NOT ASKED TO SUMMARIZE THE NUMBER OF TESTS

01:08PM  13      THAT WERE VOIDED BY THERANOS IN 2016, WERE YOU?

01:08PM  14      A.   NO.

01:08PM  15      Q.   THEY NEVER ASKED YOU TO DO THAT?

01:08PM  16      A.   NO.

01:08PM  17      Q.   OKAY.

01:08PM  18           MAY I HAVE A MOMENT, YOUR HONOR?

01:09PM  19           (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

01:09PM  20                MR. LEACH:  NO FURTHER QUESTIONS, YOUR HONOR.

01:09PM  21                THE COURT:  MS. TREFZ?

01:09PM  22                MS. TREFZ:  NO FURTHER QUESTIONS, YOUR HONOR.

01:09PM  23                THE COURT:  MAY THIS WITNESS BE EXCUSED?

01:09PM  24                MS. TREFZ:  YES, YOUR HONOR.

01:09PM  25                THE COURT:  YOU'RE EXCUSED.

01:09PM 1          THE WITNESS:  THANK YOU.

01:09PM 2          THE COURT:  DOES THE DEFENSE HAVE ANOTHER WITNESS TO

01:09PM 3   CALL?

01:09PM 4          MS. TREFZ:  WE DO, YOUR HONOR.  WE'RE JUST MAKING

01:09PM 5   SURE HE'S ON HIS WAY.

01:09PM 6          THE COURT:  DOES THE DEFENSE REST?

01:09PM 7          MS. TREFZ:  NO, YOUR HONOR.  WE WERE JUST MAKING

01:09PM 8   SURE THEY WERE IN THE BUILDING, AND WE'RE GETTING THE WITNESS

01:09PM 9   HERE.

01:09PM 10         YES, YOUR HONOR, THE DEFENSE CALLS DR. FABRIZIO BONANNI.

01:10PM 11         (PAUSE IN PROCEEDINGS.)

01:10PM 12         THE COURT:  GOOD AFTERNOON, SIR.  IF YOU WOULD JUST

01:10PM 13  WALK OVER HERE AND FACE OUR COURTROOM DEPUTY WHILE YOU RAISE

01:10PM 14  YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU.

01:10PM 15         THE CLERK:  GOOD AFTERNOON.

01:10PM 16         THE WITNESS:  GOOD AFTERNOON.

01:10PM 17         **(DEFENDANT'S WITNESS, FABRIZIO BONANNI, WAS SWORN.)**

01:10PM 18         THE WITNESS:  YES.

01:10PM 19         THE COURT:  PLEASE HAVE A SEAT UP HERE.  I'LL INVITE

01:10PM 20  YOU TO MAKE YOURSELF COMFORTABLE.  FEEL FREE TO ADJUST THE

01:10PM 21  CHAIR AND MICROPHONE.

01:10PM 22         I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

01:10PM 23         WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

01:10PM 24  AND THEN SPELL IT, PLEASE.

01:10PM 25         THE WITNESS:  FABRIZIO BONANNI.  F-A-B-R-I-Z-I-O,

```
01:11PM   1        B-O-N-A-N-N-I.

01:11PM   2              THE COURT:  THANK YOU.

01:11PM   3        COUNSEL.

01:11PM   4                   DIRECT EXAMINATION

01:11PM   5   BY MS. TREFZ:

01:11PM   6   Q.  GOOD MORNING -- GOOD AFTERNOON, DR. BONANNI.

01:11PM   7   A.  GOOD AFTERNOON.

01:11PM   8   Q.  IF YOU ARE FULLY VACCINATED AND YOU'RE COMFORTABLE DOING

01:11PM   9   SO, YOU CAN TESTIFY WITHOUT YOUR MASK.

01:11PM  10   A.  THANK YOU.

01:11PM  11   Q.  AND I WILL AS WELL.

01:11PM  12        YOUR HONOR, I'M GOING TO APPROACH AND HAND THE WITNESS THE

01:11PM  13   BINDER.

01:11PM  14              THE COURT:  YES.

01:11PM  15   BY MS. TREFZ:

01:11PM  16   Q.  (HANDING.)

01:11PM  17   A.  THANK YOU.

01:11PM  18   Q.  WE MAY OR MAY NOT REFER TO EXHIBITS IN THAT BINDER DURING

01:11PM  19   YOUR EXAMINATION HERE TODAY.

01:11PM  20        DR. BONANNI, IN MAY 2016, DID YOU AGREE TO JOIN THE BOARD

01:11PM  21   OF DIRECTORS OF THERANOS?

01:11PM  22   A.  I DID.

01:11PM  23   Q.  AND HOW LONG DID YOU SERVE IN THAT ROLE?

01:11PM  24   A.  UNTIL SEPTEMBER 2018.  ABOUT TWO AND A HALF YEARS.

01:12PM  25   Q.  AND WE'LL COME BACK TO THAT.
```

01:12PM 1          BUT JUST FOR THE PURPOSES OF INTRODUCTION, CAN YOU

01:12PM 2    DESCRIBE YOUR EDUCATIONAL BACKGROUND FOR US?

01:12PM 3    A.   I HAVE A DOCTORATE IN CHEMISTRY FROM THE UNIVERSITY OF

01:12PM 4    FLORENCE, MY HOME TOWN; AND I SPENT TWO YEARS AT M.I.T. ON A

01:12PM 5    POST DOC ASSIGNMENT; AND I'VE HAD EXECUTIVE COURSES AT HARVARD

01:12PM 6    BUSINESS SCHOOL AND NORTHWESTERN KELLOGG SCHOOL.

01:12PM 7    Q.   AND WHAT DID YOU DO AFTER YOUR POST DOC?

01:12PM 8    A.   I SERVED MY TIME IN THE ITALIAN ARMY, AND THEN I JOINED

01:12PM 9    BAXTER INTERNATIONAL IN A SMALL PLANT THAT THEY HAVE OUTSIDE OF

01:12PM 10   FLORENCE.

01:12PM 11   Q.   AND WHAT IS BAXTER INTERNATIONAL?

01:12PM 12   A.   BAXTER INTERNATIONAL AT THE TIME WAS A VERY DIVERSIFIED

01:12PM 13   MANUFACTURER, DEVELOPER, SUPPLIER OF HEALTH CARE PRODUCTS.

01:12PM 14        IT HAD DIVISIONS THAT COVERED BLOOD PLASMA PROTEINS, BLOOD

01:13PM 15   TRANSFUSION, RENAL THERAPY PRODUCTS, GENERAL PHARMACEUTICALS,

01:13PM 16   CARDIO VASCULAR DEVICES, AND THEN A LARGE DIAGNOSTICS GROUP.

01:13PM 17   Q.   AND HOW LONG DID YOU WORK AT BAXTER?

01:13PM 18   A.   TWENTY-FIVE YEARS.

01:13PM 19   Q.   WHAT --

01:13PM 20   A.   AND THREE MONTHS.

01:13PM 21   Q.   AND WHAT ROLES DID YOU SERVE THERE?

01:13PM 22   A.   IN MANUFACTURING, QUALITY, OPERATIONS IN GENERAL, AND

01:13PM 23   REGULATORY AFFAIRS AS WELL.

01:13PM 24   Q.   AND DID YOU LEAVE BAXTER IN 1999?

01:13PM 25   A.   I DID LEAVE BAXTER IN 1999 TO JOIN AMGEN, WHICH IS THE

01:13PM 1    LARGEST INDEPENDENT BIOTECHNOLOGY COMPANY BASED IN

01:13PM 2    THOUSAND OAKS, CALIFORNIA.

01:13PM 3    Q.   AND HOW LONG DID YOU WORK AT AMGEN?

01:13PM 4    A.   ABOUT 14 YEARS.

01:13PM 5    Q.   AND WHAT ROLES DID YOU HOLD THERE?

01:13PM 6    A.   I JOINED THE COMPANY AS HEAD OF QUALITY AND COMPLIANCE AND

01:13PM 7    SERVED AS THE FIRST CORPORATE COMPLIANCE OFFICER; AND THEN HEAD

01:13PM 8    OF MANUFACTURING; AND THEN FINALLY HEAD OF OPERATIONS, WHICH

01:13PM 9    INCLUDES MANUFACTURING, QUALITY, ENGINEERING, PROCESS

01:14PM 10   DEVELOPMENT, DRUG DELIVERY DEVICES, ENVIRONMENT HEALTH AND

01:14PM 11   SAFETY, THINGS LIKE THAT.

01:14PM 12   Q.   AND WHAT DID YOU DO BETWEEN THE TIME THAT YOU RETIRED FROM

01:14PM 13   AMGEN AND THE TIME THAT YOU JOINED THE THERANOS BOARD?

01:14PM 14   A.   I JOINED TWO BOARDS OF TWO COMPANIES.  ONE, STEVANATO

01:14PM 15   GROUP, IS BASED, A COMPANY THAT IS JUST LISTED ON THE NEW YORK

01:14PM 16   STOCK EXCHANGE; AND I ALSO JOINED THE BOARD OF A SMALL BIOTECH

01:14PM 17   COMPANY, XBIOTECH BASED IN TEXAS; AND MENARINI BIOTECH, ANOTHER

01:14PM 18   ITALIAN COMPANY.

01:14PM 19   Q.   SO DID YOU SERVE ON THE BOARD OF VARIOUS BIOTECH COMPANIES

01:14PM 20   BETWEEN THE TIME THAT YOU --

01:14PM 21   A.   YEAH, TWO, TWO.

01:14PM 22   Q.   -- RETIRED?

01:15PM 23        AND CAN YOU TURN IN YOUR BINDER TO 10312.

01:15PM 24   A.   I'M WITH YOU.

01:15PM 25   Q.   AND LET ME ASK A QUESTION.  ARE YOU AT 10312?

01:15PM   1      A.   YES.

01:15PM   2      Q.   AND WHAT IS 10312?

01:15PM   3      A.   IT'S MY CURRICULUM.

01:15PM   4      Q.   AND IS THIS A DOCUMENT THAT YOU PROVIDED TO MS. HOLMES?

01:15PM   5      A.   I DID.

01:15PM   6      Q.   AND WHAT IS THE DATE OF -- THIS IS YOUR CURRICULUM VITAE,

01:15PM   7      IS THAT WHAT YOU'RE --

01:15PM   8      A.   YES.

01:15PM   9      Q.   AND AS OF AROUND WHAT DATE?

01:15PM  10      A.   APRIL 2016.

01:15PM  11             MS. TREFZ:  YOUR HONOR, I WOULD MOVE THE ADMISSION

01:15PM  12      OF 10312.

01:15PM  13             MR. SCHENK:  NO OBJECTION.

01:15PM  14             THE COURT:  IS THIS GOING TO BE REDACTED WITH

01:15PM  15      PERSONAL IDENTIFIERS?

01:15PM  16             MS. TREFZ:  IT SHOULD BE.  IS IT?  YES.

01:15PM  17             THE COURT:  IT'S ADMITTED WITH THOSE REDACTIONS.

01:16PM  18         (DEFENDANT'S EXHIBIT 10312 WAS RECEIVED IN EVIDENCE.)

01:16PM  19      BY MS. TREFZ:

01:16PM  20      Q.   IF WE CAN PUBLISH IT, PLEASE.

01:16PM  21         AND, DR. BONANNI, DOES THIS CURRICULUM VITAE ACCURATELY

01:16PM  22      SUMMARIZE YOUR EXPERIENCE AS OF APRIL 2016?

01:16PM  23      A.   YES, IT DOES.

01:16PM  24      Q.   WE CAN MOVE ON FROM THERE.  YOU CAN TAKE THAT DOWN.

01:16PM  25         DR. BONANNI, WERE YOU FIRST INTRODUCED TO THE COMPANY

01:16PM 1     THERANOS IN LATE APRIL 2016?

01:16PM 2     A.   I WAS.

01:16PM 3     Q.   AND DESCRIBE HOW YOU WERE INTRODUCED TO THE COMPANY.

01:16PM 4     A.   MY FORMER BOSS AT AMGEN, KEVIN SHARER, THE CEO OF AMGEN,

01:16PM 5     WHO AT THE TIME WAS A PROFESSOR AT THE HARVARD BUSINESS SCHOOL,

01:16PM 6     CALLED ME UP AND ASKED ME TO TAKE A CALL FROM SOMEONE IN THIS

01:16PM 7     COMPANY THERANOS BECAUSE HE HAD MET ELIZABETH HOLMES THAT HAD

01:16PM 8     COME TO HARVARD TO SPEAK WITH HIM AND ASK FOR HIS ADVICE, AND

01:17PM 9     HE HAD RECOMMENDED ME AS ONE OF THE PERSONS THAT THEY COULD

01:17PM 10    TALK TO.  AND SO THAT WAS THE CONNECTION.

01:17PM 11    Q.   DID YOU HAVE AN UNDERSTANDING OF WHY MR. SHARER RECOMMEND

01:17PM 12    THAT THERANOS TALK TO YOU?

01:17PM 13    A.   IN VERY BROAD TERMS.

01:17PM 14         AT THE TIME THAT THERE WERE SOME REGULATORY COMPLIANCE

01:17PM 15    DIFFICULTIES AND SOME OTHER DIFFICULTIES ORIGINATING FROM

01:17PM 16    ARTICLES IN NEWSPAPERS, AND THAT HE THOUGHT THAT I COULD HELP

01:17PM 17    OUT.

01:17PM 18    Q.   AND DID YOU, SOON AFTER THAT INTRODUCTION, DID YOU VISIT

01:17PM 19    THERANOS FOR A MEETING?

01:17PM 20    A.   I DID.  I THINK IT WAS THE 2ND OF MAY, THE MONDAY.  I

01:17PM 21    REMEMBER A MONDAY.

01:17PM 22    Q.   OF 2016?

01:17PM 23    A.   2016, YES.

01:17PM 24    Q.   AND AT THAT MEETING, DID YOU MEET MS. HOLMES?

01:17PM 25    A.   I DID.

01:17PM   1    Q.   AND DESCRIBE -- HOW LONG DID YOU SPEND -- WAS THAT MEETING

01:17PM   2    AT THERANOS?

01:17PM   3    A.   THE MEETING WAS AT THERANOS IN PALO ALTO.

01:17PM   4    Q.   AND HOW LONG DID YOU SPEND AT THERANOS?

01:18PM   5    A.   I SPENT THE WHOLE DAY THERE FROM, I DON'T KNOW, 9:30, 9:00

01:18PM   6    IN THE MORNING UNTIL 4:30 IN THE AFTERNOON, YEAH.

01:18PM   7    Q.   AND CAN YOU DESCRIBE WHAT -- DESCRIBE AT A HIGH LEVEL WHAT

01:18PM   8    HAPPENED AT THAT MEETING, AND THEN WE MAY BREAK IT DOWN.

01:18PM   9    A.   YOU KNOW, I WAS INTRODUCED TO WHAT THE COMPANY WAS ABOUT,

01:18PM   10   WHAT THE TECHNOLOGY LOOKED LIKE.  I VISITED THE FACILITY AND

01:18PM   11   TOURED THE DIFFERENT AREAS, AND WE HAD DISCUSSIONS ABOUT WHAT

01:18PM   12   THE VISION WAS ABOUT THE DEPLOYMENT OF THE TECHNOLOGY INTO THE

01:18PM   13   HEALTH CARE SYSTEM.  AND THEN, YOU KNOW, WE HAD GENERAL

01:18PM   14   DISCUSSIONS ABOUT THE COMPANY.

01:18PM   15   Q.   DID YOU LEARN ABOUT THE CHALLENGES THAT THE COMPANY WAS

01:18PM   16   FACING?

01:18PM   17   A.   I DID, YES.

01:18PM   18   Q.   AND AT THE MEETING, DID YOU HAVE A CHANCE TO SEE THE

01:18PM   19   THERANOS DEVICE?

01:19PM   20   A.   I DID.

01:19PM   21   Q.   AND WERE YOU ABLE TO SEE OTHER ASPECTS OF THE TECHNOLOGY

01:19PM   22   THAT THEY HAD DEVELOPED?

01:19PM   23   A.   NOT REALLY, NO.  NO.  JUST THE DEVICE AND THE ANCILLARY

01:19PM   24   COMPONENTS OF THE TECHNOLOGY, YES.

01:19PM   25   Q.   AND BY "ANCILLARY COMPONENTS," WHAT DO YOU MEAN?

01:19PM  1     A.   WELL, I MEAN THE TECHNOLOGY CONSISTED AT A VERY HIGH LEVEL

01:19PM  2     OF FOUR COMPONENTS IN MY, IN MY ESTIMATE.

01:19PM  3          ONE IS THE COLLECTION DEVICE FOR THE SAMPLES OF BLOOD FROM

01:19PM  4     A PATIENT, THE CARTRIDGE THAT CONTAINED THE REAGENTS INTO WHICH

01:19PM  5     THE SAMPLE WOULD FIT.  AND THEN THE CARTRIDGE ITSELF WOULD GO

01:19PM  6     INSIDE THE MINILAB, MINIATURIZED, YOU KNOW, MACHINE.

01:19PM  7          AND THE MACHINE WOULD BE RUN BY A REMOTE COMPUTER THAT

01:20PM  8     WOULD GIVE IT INSTRUCTIONS ON THE TESTS TO BE PERFORMED AND

01:20PM  9     INTERPRET THE OUTPUT OF THE DATA.

01:20PM 10          SO I DID NOT GET TO SEE THE COMPUTER, FOR INSTANCE, BUT I

01:20PM 11     SAW THE COLLECTION DEVICE AND THE CARTRIDGE AND THE MINILAB.

01:20PM 12     Q.   AND THE MINILAB THAT YOU SAW, DID YOU UNDERSTAND THAT IT

01:20PM 13     WAS THE 4 SERIES MINILAB?

01:20PM 14     A.   YES.

01:20PM 15     Q.   OKAY.  OVER THE YEARS -- WELL, HOW ABOUT LET ME LIMIT IT

01:20PM 16     TO 2016.

01:20PM 17          DURING 2016, DID YOU LEARN MORE -- DID YOU CONTINUE TO

01:20PM 18     LEARN MORE ABOUT THE CAPABILITIES OF THE DEVICE THAT YOU SAW?

01:20PM 19     A.   YES, INDEED, YES.

01:20PM 20     Q.   AND DID YOU FORM AN INITIAL IMPRESSION AT THAT MEETING

01:20PM 21     ABOUT THE, ABOUT THE CAPABILITIES OF THE DEVICE?

01:20PM 22     A.   I DID.  AND I, I WAS VERY IMPRESSED BY THOSE CAPABILITIES,

01:20PM 23     YES.

01:20PM 24          MR. SCHENK:  OBJECTION.  RELEVANCE.

01:20PM 25          THE COURT:  I'LL ALLOW THAT TO REMAIN.

01:20PM   1          YOU CAN MOVE ON.

01:20PM   2               MS. TREFZ:  I WILL.

01:21PM   3     Q.   I BELIEVE YOU TESTIFIED THAT YOU MET MS. HOLMES AT THAT

01:21PM   4     FIRST MEETING.

01:21PM   5     A.   I DID.

01:21PM   6     Q.   AND WHAT, WHAT WAS YOUR IMPRESSION OF MS. HOLMES AT THAT

01:21PM   7     MEETING?

01:21PM   8               MR. SCHENK:  OBJECTION.  RELEVANCE.

01:21PM   9               THE COURT:  SUSTAINED.

01:21PM  10     BY MS. TREFZ:

01:21PM  11     Q.   DID MS. HOLMES ASK YOU QUESTIONS DURING THAT MEETING?

01:21PM  12     A.   VERY MUCH SO.

01:21PM  13     Q.   AND DID YOU PROVIDE ANSWERS -- DID YOU -- HOW LONG WERE

01:21PM  14     YOUR INTERACTIONS WITH MS. HOLMES?

01:21PM  15     A.   OH, SEVERAL HOURS.

01:21PM  16     Q.   AT THAT MEETING, DID MS. HOLMES ASK YOU TO TAKE ON A ROLE

01:21PM  17     AT THE COMPANY?

01:21PM  18     A.   SHE DID.

01:21PM  19     Q.   AND WHAT, WHAT DID YOU UNDERSTAND HER TO BE ASKING YOU TO

01:21PM  20     TAKE ON?

01:21PM  21     A.   THE QUESTION WAS, WOULD I BE WILLING TO JOIN THE COMPANY

01:21PM  22     AND HAVE A SENIOR EXECUTIVE ROLE IN THE COMPANY?

01:21PM  23     Q.   DID SHE -- DID -- WAS A PARTICULAR ROLE COMMUNICATED TO

01:22PM  24     YOU?

01:22PM  25     A.   COO.

01:22PM  1    Q.   AND WHAT DID YOU SAY?

01:22PM  2    A.   I SAID I WAS TOO OLD FOR THAT.

01:22PM  3         (LAUGHTER.)

01:22PM  4    BY MS. TREFZ:

01:22PM  5    Q.   DID YOU, DID YOU NEVERTHELESS OFFER TO TAKE ON A ROLE IN

01:22PM  6    THE COMPANY OTHER THAN COO?

01:22PM  7    A.   I DID.

01:22PM  8    Q.   AND DESCRIBE WHAT ROLE YOU OFFERED TO TAKE ON.

01:22PM  9    A.   I PROPOSED THAT I JOIN THE BOARD AS A MECHANISM FOR ME TO

01:22PM  10   STAY DIRECTLY INVOLVED WITH THE COMPANY AND OFFER ADVICE ON THE

01:22PM  11   PROPER, YOU KNOW, CONDUCT OF THE COMPANY.

01:22PM  12   Q.   AND DID YOU BELIEVE THAT YOU HAD PARTICULAR EXPERTISE THAT

01:22PM  13   THERANOS WAS IN NEED OF?

01:22PM  14   A.   I DID.

01:22PM  15   Q.   WHAT TYPES OF EXPERTISE WAS THAT?

01:22PM  16        MR. SCHENK:  OBJECTION.  RELEVANCE.

01:22PM  17        THE COURT:  SUSTAINED WITHOUT A FOUNDATION.

01:22PM  18   BY MS. TREFZ:

01:23PM  19   Q.   I BELIEVE YOU TESTIFIED BEFORE THAT YOU, THAT YOU LEARNED

01:23PM  20   ABOUT CERTAIN CHALLENGES THAT THE COMPANY WAS FACING IN THAT

01:23PM  21   MEETING THAT YOU HAD ON MAY 2ND; CORRECT?

01:23PM  22   A.   YES.

01:23PM  23   Q.   AND WERE THE CHALLENGES -- DID THOSE CHALLENGES INCLUDE

01:23PM  24   REGULATORY CHALLENGES?

01:23PM  25   A.   THEY DID.

01:23PM  1    Q.   AND DID THEY INCLUDE OPERATIONAL CHALLENGES?

01:23PM  2    A.   THEY DID.

01:23PM  3    Q.   AND WERE BOTH REGULATORY AND OPERATIONAL MATTERS, MATTERS

01:23PM  4    THAT YOU HAD EXPERIENCE IN?

01:23PM  5    A.   YES.

01:23PM  6    Q.   AND DID YOU BELIEVE THAT THERANOS WAS IN NEED, OR THAT YOU

01:23PM  7    COULD PROVIDE ADVICE TO THERANOS ON THE -- BASED ON YOUR

01:23PM  8    EXPERIENCE?

01:23PM  9    A.   I DID, YES.

01:23PM  10   Q.   WERE YOU PAID FOR YOUR SERVICE ON THE BOARD?

01:23PM  11   A.   NO.

01:23PM  12   Q.   AND I'M SORRY, JUST TO BACK UP.

01:24PM  13        I THINK WE ESTABLISHED YOU SUGGESTED THAT YOU MIGHT BE

01:24PM  14   ABLE TO SERVE AS A BOARD MEMBER.  AND WAS THAT -- DID YOU

01:24PM  15   ULTIMATELY AGREE TO JOIN THE BOARD OF DIRECTORS?

01:24PM  16   A.   I DID, YES.

01:24PM  17   Q.   AND WAS YOUR APPOINTMENT TO THE BOARD OF DIRECTORS

01:24PM  18   ANNOUNCED SHORTLY AFTER THIS MEETING?

01:24PM  19   A.   IT WAS ANNOUNCED SHORTLY AFTER I THINK THE CONSENT.  THE

01:24PM  20   DECISION BY THE BOARD WAS ON JUNE 3RD, SO A FEW WEEKS LATER.

01:24PM  21   Q.   DO YOU RECALL WHEN YOUR APPOINTMENT TO THE BOARD OF

01:24PM  22   DIRECTORS WAS ANNOUNCED?

01:24PM  23   A.   ON THE 11TH.  I THINK THERE WAS A PRESS RELEASE ON THE

01:24PM  24   11TH OF MAY.

01:24PM  25   Q.   OKAY.  AND IF YOU CAN LOOK AT -- IF I COULD JUST DRAW YOUR

01:24PM  1    ATTENTION TO EXHIBIT 7664.  ACTUALLY, WE DON'T NEED TO DO THAT.

01:24PM  2         IN ADDITION TO YOU, WAS ANYBODY ELSE ANNOUNCED AS BEING

01:24PM  3    APPOINTED TO THE BOARD OF DIRECTORS AT THE SAME TIME?

01:25PM  4    A.   YES.  DR. BILL FOEGE AND MR. KOVACEVICH.

01:25PM  5    Q.   AND WHAT WAS DR. FOEGE'S BACKGROUND, IF YOU KNOW?

01:25PM  6    A.   HE'S A WELL-KNOWN EPIDEMIOLOGIST WHO WAS A DIRECTOR OF THE

01:25PM  7    CDC FOR A TIME.

01:25PM  8    Q.   AND WHAT WAS MR. KOVACEVICH'S BACKGROUND, IF YOU KNOW?

01:25PM  9    A.   HE HAD BEEN THE CEO OF WELLS FARGO BANK.

01:25PM  10   Q.   OKAY.  AND DID YOU UNDERSTAND -- DID YOU HAVE AN

01:25PM  11   UNDERSTANDING OF WHETHER EITHER OR BOTH OF THEM HAD A PRIOR

01:25PM  12   RELATIONSHIP WITH THERANOS BEFORE THE ANNOUNCEMENT OF THEIR

01:25PM  13   APPOINTMENT TO THE BOARD OF DIRECTORS?

01:25PM  14   A.   YES.  DR. FOEGE HAD SERVED ON THE ADVISORY BOARD OF THE

01:25PM  15   COMPANY BEFORE.

01:25PM  16   Q.   AND DO YOU KNOW WHETHER MR. KOVACEVICH HAD?

01:25PM  17   A.   I DON'T.

01:25PM  18   Q.   OKAY.  DID YOU EVER MEET SUNNY BALWANI?

01:25PM  19   A.   NO.

01:25PM  20   Q.   DID YOU HAVE AN UNDERSTANDING OF THE ROLE THAT

01:25PM  21   SUNNY BALWANI HAD PLAYED AT THE COMPANY PRIOR TO YOUR ARRIVAL?

01:25PM  22   A.   YES.

01:25PM  23   Q.   AND WHAT WAS THAT ROLE?

01:26PM  24   A.   HE WAS COO OF THE COMPANY.

01:26PM  25   Q.   AND WHAT WAS THE STATUS OF MR. BALWANI'S RELATIONSHIP WITH

01:26PM 1    THERANOS AS YOU UNDERSTOOD IT WHEN YOU WERE APPOINTED TO THE

01:26PM 2    BOARD OF DIRECTORS?

01:26PM 3    A.   THAT HE WAS LEAVING THE COMPANY OR HAD LEFT THE COMPANY.

01:26PM 4    Q.   OKAY.  I THINK WE TALKED BEFORE ABOUT HOW YOU BECAME

01:26PM 5    FAMILIAR WITH THERANOS'S TECHNOLOGY OVER THE COURSE OF 20 -- IN

01:26PM 6    THAT INITIAL MEETING AND THEN OVER THE COURSE OF 2016; IS THAT

01:26PM 7    RIGHT?

01:26PM 8    A.   YES.

01:26PM 9    Q.   AND I WANT TO -- AND I THINK YOU DESCRIBED CERTAIN

01:26PM 10   COMPONENTS OF THAT.

01:26PM 11       I WANT TO DRAW YOUR ATTENTION TO EXHIBIT -- WHAT HAS BEEN

01:26PM 12   MARKED AS 7673B, WHICH IS IN YOUR BINDER.

01:27PM 13   A.   OKAY.

01:27PM 14   Q.   AND IS 7673B REPRESENTATIVE OF THE DIFFERENT TYPES OF

01:27PM 15   TECHNOLOGY THAT YOU UNDERSTOOD THERANOS HAD DEVELOPED BY THE

01:27PM 16   TIME YOU GOT TO THERANOS?

01:27PM 17   A.   YES.

01:27PM 18         MS. TREFZ:  YOUR HONOR, I WOULD OFFER 7673B AS A

01:27PM 19   DEMONSTRATIVE SIMPLY FOR THE PURPOSES OF HELPING EXPLAIN THE

01:27PM 20   DIFFERENT PIECES.

01:27PM 21         THE COURT:  NOT INTO EVIDENCE?

01:27PM 22         MS. TREFZ:  CORRECT, JUST AS A DEMONSTRATIVE.

01:27PM 23         THE COURT:  ALL RIGHT.  THIS CAN BE DISPLAYED AS A

01:27PM 24   DEMONSTRATIVE.

01:27PM 25         MS. TREFZ:  CORRECT.

01:27PM  1    Q.   AND, DR. BONANNI, CAN YOU EXPLAIN YOUR UNDERSTANDING OF

01:27PM  2    THE ROLE OF THE TECHNOLOGIES IDENTIFIED ON 73 -- 7673B IN THE

01:27PM  3    SUITE OF THE THERANOS TECHNOLOGIES, MAYBE PERHAPS FROM THE

01:27PM  4    PERSPECTIVE OF PATIENT EXPERIENCE?

01:28PM  5    A.   YES.  SO ASSUMING I WOULD GO TO MY PHYSICIAN AND AS I, AS

01:28PM  6    I ENTERED THE OFFICE A NURSE WOULD TAKE A SAMPLE OF A FEW DROPS

01:28PM  7    OF BLOOD THROUGH A FINGERTIP PRICK, AND THEY WOULD BE COLLECTED

01:28PM  8    IN THE SAMPLE COLLECTION DEVICE, THE APPROPRIATE AMOUNT OF

01:28PM  9    ANTICOAGULANT WOULD BE DELIVERED, AND THE BLOOD WOULD COLLECT

01:28PM  10   INTO THOSE SMALL TUBES CALLED NANOTAINER TUBES.

01:28PM  11        THEN THEY WOULD BE PLACED IN A CARTRIDGE, THE SPECIFIC

01:28PM  12   CARTRIDGE FOR THE SET OF TESTS THAT THE DOCTOR WOULD ORDER FOR

01:28PM  13   ME.

01:28PM  14        AND THE CARTRIDGE WOULD BE PUT INTO THE MINILAB WHERE THE

01:28PM  15   TESTS WOULD BE PERFORMED RECEIVING INSTRUCTIONS FROM THE

01:28PM  16   VIRTUAL ANALYZER.  THAT'S THE CENTRAL COMPUTER.

01:28PM  17        AND THEN AFTER THE PROTOCOLS ARE RUN, THE COMPUTER WOULD

01:29PM  18   ANALYZE THE OUTPUT AND CONVERT THAT INTO CLINICAL INFORMATION

01:29PM  19   THAT WOULD REACH THE DOCTOR, AND THEN 45 MINUTES LATER WHEN I

01:29PM  20   WOULD SEE THE PHYSICIAN, SHE WOULD HAVE THE APPROPRIATE

01:29PM  21   DIAGNOSTIC INFORMATION AND WE WOULD HAVE A VERY MEANINGFUL

01:29PM  22   CLINICAL DISCUSSION AT THAT POINT.

01:29PM  23        IN ADDITION, THERE WERE ADAPTIONS MADE TO COMMERCIAL

01:29PM  24   ANALYZERS, LIKE THOSE BY SIEMENS AND OTHERS, TO PROCESS THE,

01:29PM  25   THE MINI SAMPLES IN THE NANOTAINER TUBES.

01:29PM  1              SO THAT WAS MY UNDERSTANDING OF THE SITUATION.

01:29PM  2      Q.   OKAY.  AND DID -- YOU MENTIONED THE MINILAB.

01:29PM  3           DO YOU SEE THE MINILAB ON THIS DEMONSTRATIVE?

01:29PM  4      A.   YES, IT'S THE BOX ON THE BOTTOM RIGHT.

01:29PM  5      Q.   AND WERE YOU FAMILIAR WITH THE COMPONENTS INSIDE OF THE

01:30PM  6      MINILAB, ITS ARCHITECTURE?

01:30PM  7      A.   I BECAME FAMILIAR WITH THEM AS IT WAS DEMONSTRATED HOW

01:30PM  8      THEY WORKED OUT, YEAH.

01:30PM  9      Q.   AND WAS THAT DURING 2016 THAT YOU BECAME FAMILIAR?

01:30PM  10     A.   YES, YES.

01:30PM  11     Q.   AND IF I COULD DRAW YOUR ATTENTION TO 7673C.

01:30PM  12          DO YOU HAVE THAT IN FRONT OF YOU?

01:30PM  13     A.   YES, I DO.

01:30PM  14     Q.   AND IS EXHIBIT 7673C AN ACCURATE REPRESENTATION OF THE

01:30PM  15     4 SERIES MINILAB AS YOU UNDERSTOOD IT IN 2016?

01:30PM  16     A.   YES.

01:30PM  17              MS. TREFZ:  YOUR HONOR, I WOULD ASK AGAIN TO DISPLAY

01:30PM  18     FOR DEMONSTRATIVE PURPOSES EXHIBIT 7673C.

01:30PM  19              THE COURT:  NOT INTO EVIDENCE, JUST FOR

01:30PM  20     DEMONSTRATIVE PURPOSES?

01:30PM  21              MS. TREFZ:  AGAIN, YES, YOUR HONOR.

01:30PM  22              THE COURT:  IT MAY BE DISPLAYED FOR THAT PURPOSE.

01:31PM  23     BY MS. TREFZ:

01:31PM  24     Q.   ALL RIGHT.  DR. BONANNI, WHAT I WOULD LIKE TO DO HERE IS

01:31PM  25     THAT I WOULD LIKE TO WALK THROUGH THE DIFFERENT COMPONENTS THAT

01:31PM 1    WE SEE ON THE SCREEN.

01:31PM 2         IN PARTICULAR, LET'S START WITH THE BOTTOM LEFT WITH THE

01:31PM 3    CARTRIDGE.  WHAT DID YOU UNDERSTAND THAT TO BE?

01:31PM 4    A.  SO THE CARTRIDGE IS CUSTOMIZED FOR A SPECIFIC SET OF TESTS

01:31PM 5    TO BE PERFORMED ON THE SAMPLE.

01:31PM 6         SO IT WOULD CONTAIN THE REAGENTS TO PERFORM THOSE TESTS,

01:31PM 7    THE PIPET TIPS, AND OTHER COMPONENTRY THAT MAY BE NEEDED TO RUN

01:31PM 8    THOSE ASSAYS INSIDE OF THE MACHINE.

01:31PM 9    Q.  OKAY.  AND WERE THERE COMPONENTS INSIDE OF THE MINILAB

01:31PM 10   THAT WERE -- WOULD ALLOW THE MINILAB TO PERFORM HEMATOLOGY

01:31PM 11   ASSAYS?

01:31PM 12   A.  YES, INDEED.  YOU KNOW, THERE IS A MINIATURIZED CENTRIFUGE

01:32PM 13   TO THE FAR RIGHT, THERE'S A CYTOMETER, WHICH IS A SPECIALIZED

01:32PM 14   INSTRUMENT TO IMAGE THE CELLS COMPONENT OF THE BLOOD.

01:32PM 15   Q.  AND WERE THERE COMPONENTS THAT WOULD ALLOW THE MINILAB TO

01:32PM 16   PERFORM IMMUNOASSAYS?

01:32PM 17   A.  THERE ARE, INDEED.

01:32PM 18   Q.  AND WHICH ARE THOSE?

01:32PM 19   A.  THEY WOULD INCLUDE THE -- WELL, THERE IS A ROBOT INSIDE

01:32PM 20   THAT WOULD MAKE IT PERFORM A NUMBER OF MIXINGS AND REACTIONS.

01:32PM 21   THERE'S AN LUMINOMETER HERE.  THAT IS SOMETHING THAT WOULD

01:32PM 22   MEASURE THE LIGHT EMITTED THROUGH CHEMILUMINESCENCE DURING

01:32PM 23   CERTAIN REACTIONS, AND IT'S A HIGH SENSITIVITY INSTRUMENT.

01:32PM 24   Q.  AND WERE THERE COMPONENTS THAT WOULD ALLOW THE MINILAB TO

01:33PM 25   PERFORM CLINICAL CHEMISTRY ASSAYS?

01:33PM 1    A.   YES, INDEED.  AGAIN, THE ROBOT AND THE VARIOUS PROCESSING

01:33PM 2    AND THE MIXING OF REAGENTS, AND THEN THEY WOULD BE TAKEN TO THE

01:33PM 3    SPECTROPHOTOMETER, WHICH IS A VISUAL -- A VISIBLE AND

01:33PM 4    ULTRAVIOLENT LIGHT SPECTROPHOTOMETER THAT WOULD MEASURE THE

01:33PM 5    INTENSITY OF COLORS GENERATED DURING THE REACTIONS DURING THOSE

01:33PM 6    ASSAYS AND CORRELATE THAT TO THE AMOUNT OF THE ANALYTES IN THE

01:33PM 7    SAMPLE.

01:33PM 8    Q.   AND WERE THERE COMPONENTS THAT WOULD ALLOW THE MINILAB TO

01:33PM 9    PERFORM MICROBIOLOGY ASSAYS?  WERE THERE COMPONENTS IN THAT --

01:33PM 10   A.   THEY'RE NOT MICROBIOLOGY.  MOLECULAR BIOLOGY.

01:33PM 11   Q.   I'M SORRY.  MOLECULAR BIOLOGY.

01:33PM 12   A.   MOLECULAR BIOLOGY, YES.

01:33PM 13       THERE WOULD BE THINGS LIKE THE THERMOCYCLER THAT WOULD

01:33PM 14   ALLOW THE NUCLEIC ACIDS TO EXPAND, AND THE DETECTOR, THE

01:33PM 15   FLUORESCENCE-BASED DETECTOR OVER THERE, YES.

01:34PM 16   Q.   AND I THINK YOU MENTIONED A ROBOT.  WE CAN'T SEE IT ON THE

01:34PM 17   SCREEN, BUT WAS THERE ALSO A ROBOT INSIDE OF THE MINILAB?

01:34PM 18   A.   RIGHT, THERE'S A ROBOT THAT HANDLES, THAT PERFORMS THE

01:34PM 19   DIFFERENT OPERATIONS THAT ARE NEEDED FOR THE ASSAYS.

01:34PM 20       THERE IS ALSO A CAMERA THERE THAT WE HAVE NOT MENTIONED

01:34PM 21   THAT WAS SOMETHING THAT WAS USED TO VERIFY THE INTEGRITY OF THE

01:34PM 22   SAMPLES, MAKE SURE THERE WAS NOTHING THAT WAS WRONG.  YOU KNOW,

01:34PM 23   IF YOU DO HEMATOLOGY, THERE WOULD BE NO HEMOLYSIS IN THE

01:34PM 24   THINGS.

01:34PM 25       SO THERE WAS AN INSIDE, YOU KNOW, CONTROL CHECK FOR THE

01:34PM  1    VARIOUS OPERATIONS OF THE MACHINE.

01:34PM  2    Q.   AND WHILE YOU WERE A BOARD MEMBER AT THERANOS, IN

01:34PM  3    PARTICULAR IN 2016, DID YOU HAVE THE OPPORTUNITY TO SEE THE

01:34PM  4    MINILAB IN ACTION, TO SEE IT RUNNING ASSAYS?

01:34PM  5    A.   YES, YES, I DID.

01:34PM  6    Q.   AND HAVE YOU HAD THE CHANCE, PRIOR TO YOUR TESTIMONY

01:34PM  7    TODAY, TO REVIEW CERTAIN CLIPS THAT I'M MARKING FOR

01:34PM  8    IDENTIFICATION PURPOSES AS 9819A THROUGH 9819D?

01:35PM  9    A.   I DID.  THEY'RE ON YOUTUBE, SO I SAW THEM, YES.

01:35PM  10   Q.   AND DID YOU REVIEW THESE SPECIFIC CLIPS THAT, THAT I'M

01:35PM  11   GOING TO INTRODUCE TODAY?

01:35PM  12   A.   YES, I DID.

01:35PM  13   Q.   ATTEMPT TO INTRODUCE?

01:35PM  14   A.   YES, I DID.

01:35PM  15   Q.   AND DID 9819A THROUGH 9819D ACCURATELY REFLECT YOUR MEMORY

01:35PM  16   OF HOW THE TSPU PERFORMED CERTAIN FUNCTIONS?

01:35PM  17   A.   I DON'T HAVE THAT.

01:35PM  18   Q.   IT'S THE CLIPS.

01:35PM  19   A.   OH, THE CLIPS.  YES.

01:35PM  20        MS. TREFZ:  AND AGAIN, FOR DEMONSTRATIVE PURPOSES,

01:35PM  21   YOUR HONOR, WE WOULD PURPORT TO -- OR WE WOULD REQUEST TO BE

01:35PM  22   ABLE TO DISPLAY FOR THE JURY, NOT ADMITTED INTO EVIDENCE, BUT

01:35PM  23   DISPLAY FOR THE JURY CERTAIN CLIPS, AND I'LL ASK QUESTIONS

01:35PM  24   ABOUT EACH ONE.

01:35PM  25        BUT I JUST WANTED TO LET THE COURT KNOW WHAT I'M INTENDING

01:36PM 1    TO DO.

01:36PM 2               THE COURT:  ARE THESE -- HOW MANY ARE THERE?

01:36PM 3               MS. TREFZ:  THERE ARE FOUR.  THEY ARE A TOTAL OF

01:36PM 4    1 MINUTE AND 51 SECONDS.  THEY'RE CLIPS OF 11 SECONDS,

01:36PM 5    12 SECONDS, 49 SECONDS, AND 38 SECONDS.

01:36PM 6               THE COURT:  AND YOU INTEND TO PLAY EACH ONE AND TALK

01:36PM 7    THE WITNESS THROUGH THE CLIP; RIGHT?

01:36PM 8               MS. TREFZ:  THE WITNESS WILL EXPLAIN IT TO US, BUT

01:36PM 9    YES.

01:36PM 10              THE COURT:  ALL RIGHT.  ALL RIGHT.  THAT'S FINE.

01:36PM 11   THEY'RE DEMONSTRATIVE ONLY, AND YOU'LL IDENTIFY WHICH ONE IS

01:36PM 12   PLAYING.

01:36PM 13              MS. TREFZ:  CORRECT.

01:36PM 14        AND LET'S FIRST START WITH 9819A IF WE CAN.  THIS IS AN 11

01:36PM 15   SECOND VIDEO, AND THERE'S NO SOUND.

01:36PM 16        AND IF WE CAN PLAY THAT?

01:36PM 17              MR. DOWNEY:  YOUR HONOR, MAY I JUST ASK MS. TREFZ

01:36PM 18   SOMETHING?

01:36PM 19              THE COURT:  YES.

01:36PM 20              MS. TREFZ:  I GUESS THE QUESTION IS, SHOULD WE DO

01:37PM 21   THIS OR SHOULD WE TAKE A BREAK NOW, YOUR HONOR?

01:37PM 22              THE COURT:  DO WE NEED A BREAK NOW?  IS NOW A TIME

01:37PM 23   FOR A BREAK?

01:37PM 24              MS. TREFZ:  IT APPEARS WE DO.

01:37PM 25              THE COURT:  SO LET'S DO THAT AND WE'LL HOLD OFF THE

| | | |
|---|---|---|
| 01:37PM | 1 | MOVIES UNTIL AFTER OUR BREAK.  WE'LL TAKE 30 MINUTES, A 30 |
| 01:37PM | 2 | MINUTE BREAK.  OKAY. |
| 01:37PM | 3 | (RECESS FROM 1:37 P.M. UNTIL 2:10 P.M.) |
| 02:10PM | 4 | THE COURT:  PLEASE BE SEATED.  THANK YOU. |
| 02:10PM | 5 | WE'RE BACK ON THE RECORD.  ALL COUNSEL ARE PRESENT. |
| 02:10PM | 6 | MS. HOLMES IS PRESENT.  THE JURY IS PRESENT.  THE WITNESS IS ON |
| 02:10PM | 7 | THE STAND. |
| 02:10PM | 8 | MS. TREFZ, YOU WOULD LIKE TO CONTINUE? |
| 02:10PM | 9 | MS. TREFZ:  I WOULD.  THANK YOU, YOUR HONOR. |
| 02:10PM | 10 | Q.  DR. BONANNI, I BELIEVE WHEN WE TOOK OUR BREAK WE WERE |
| 02:10PM | 11 | ABOUT TO WATCH THE FIRST CLIP THAT I'M PLAYING FOR |
| 02:10PM | 12 | DEMONSTRATIVE PURPOSES, WHICH IS 9819A. |
| 02:11PM | 13 | MR. BENNETT. |
| 02:11PM | 14 | AND WE'RE GOING TO WATCH THE CLIP, AND THEN, DR. BONANNI, |
| 02:11PM | 15 | I'D LIKE TO ASK YOU WHAT WE HAVE SEEN IN THE CLIP AFTER IT'S |
| 02:11PM | 16 | DONE. |
| 02:11PM | 17 | (VIDEO PLAYING OFF THE RECORD.) |
| 02:11PM | 18 | THE WITNESS:  SO WE SEE A TECHNICIAN TOUCHING THE |
| 02:11PM | 19 | SCREEN AND INDICATING TO THE MACHINE THAT A CASSETTE IS READY |
| 02:11PM | 20 | TO BE LOADED. |
| 02:11PM | 21 | THE CASSETTE IS DRAWN IN, THE CARTRIDGE IS DRAWN IN |
| 02:11PM | 22 | AUTOMATICALLY BY THE MINILAB.  AND AS SOON AS IT'S IN, THE BAR |
| 02:11PM | 23 | CODE IS READ SO THAT THE MACHINE CAN RECEIVE THE INSTRUCTIONS |
| 02:11PM | 24 | FROM THE CENTRAL COMPUTER, THE VIRTUAL ANALYZER, AND THE LID IS |
| 02:11PM | 25 | OPENED. |

BY MS. TREFZ:

02:11PM 1

02:11PM 2    Q.   OKAY.  AND --

02:11PM 3          THE COURT:  I'M SORRY TO INTERRUPT YOU.

02:11PM 4    PARDON ME.  I'M SORRY, MS. TREFZ.

02:12PM 5          MS. TREFZ:  THAT'S OKAY, YOUR HONOR.  THANK YOU.

02:12PM 6    (PAUSE IN PROCEEDINGS.)

02:12PM 7          THE COURT:  ALL RIGHT.  MS. TREFZ, WOULD YOU LIKE TO

02:12PM 8    CONTINUE?  THANK YOU.

02:12PM 9          MS. TREFZ:  YES, PLEASE.

02:12PM 10   Q.   IF YOU DON'T MIND, I'D LIKE TO PLAY THE CLIP ONE MORE TIME

02:12PM 11   NOW THAT WE UNDERSTAND WHAT WAS HAPPENING IN THE CLIP.

02:12PM 12        AND, MR. BENNETT, IF YOU COULD JUST PAUSE IT WHEN IT'S --

02:12PM 13   I'LL TELL YOU WHEN TO PAUSE IT ACTUALLY.

02:12PM 14        GO AHEAD.

02:12PM 15        (VIDEO PLAYING OFF THE RECORD.)

02:12PM 16        MS. TREFZ:  GO AHEAD.  AND CAN YOU PAUSE IT HERE.

02:12PM 17   Q.   SO, DR. BONANNI, WHAT DO WE SEE DEPICTED IN THIS

02:12PM 18   DEMONSTRATIVE?

02:12PM 19   A.   THE TECHNICIAN TOUCHING THE SCREEN INDICATING THAT A

02:12PM 20   CARTRIDGE IS ABOUT TO ARRIVE.

02:12PM 21   Q.   AND DID YOU HAVE AN UNDERSTANDING OF WHETHER THE, OF

02:13PM 22   WHETHER THE TECHNICIAN WOULD TYPE ANY INSTRUCTIONS ON THE

02:13PM 23   SCREEN?

02:13PM 24   A.   NO.  THERE WERE NO INSTRUCTIONS TO BE TYPED.

02:13PM 25   Q.   THE INSTRUCTIONS -- WELL, WHERE WOULD THE INSTRUCTIONS

02:13PM 1    COME FROM?

02:13PM 2    A.   THE INSTRUCTIONS COME FROM THE CENTRAL COMPUTER ONCE THE

02:13PM 3    BAR CODE IS READ ON THE CARTRIDGE.

02:13PM 4    Q.   AND THE CARTRIDGE, JUST SO WE UNDERSTAND IT, IS THAT WHAT

02:13PM 5    THE INDIVIDUAL HAS AND IS HOLDING IN THEIR RIGHT HAND?

02:13PM 6    A.   YES.

02:13PM 7    Q.   AND IF YOU COULD FINISH THE CLIP.

02:13PM 8        (VIDEO PLAYING OFF THE RECORD.)

02:13PM 9            MS. TREFZ:  THANK YOU.

02:13PM 10       THE -- WE'RE GOING TO -- THE NEXT CLIP THAT I'D LIKE TO

02:13PM 11   PLAY, YOUR HONOR, IS 9819B.  AGAIN, WE'RE PLAYING THIS FOR

02:14PM 12   DEMONSTRATIVE PURPOSES.

02:14PM 13           THE COURT:  ALL RIGHT.

02:14PM 14           MS. TREFZ:  AND IT'S 12 SECONDS.

02:14PM 15   Q.   AND, DR. BONANNI, I WOULD -- LET'S WATCH THE CLIP, AND

02:14PM 16   THEN I WANT -- THEN I'M GOING TO ASK YOU SOME QUESTIONS ABOUT

02:14PM 17   WHAT WE'VE SEEN IN THE CLIP.

02:14PM 18       GO AHEAD.

02:14PM 19       (VIDEO PLAYING OFF THE RECORD.)

02:14PM 20           MS. TREFZ:  ALL RIGHT.  IF YOU COULD PAUSE THERE,

02:14PM 21   MR. BENNETT.

02:14PM 22   Q.   SO, DR. BONANNI, CAN YOU DESCRIBE WHAT WE JUST SAW IN

02:14PM 23   9819B?

02:14PM 24   A.   THE COVER IS REMOVED TO SHOW THE INTERNAL PARTS OF THE

02:14PM 25   DEVICE, AND YOU CAN SEE THE CARTRIDGE WITH THE LID OPENED UP AS

02:14PM  1      I SAID BEFORE.

02:14PM  2      Q.  AND SO JUST SO WE UNDERSTAND IT, IS THIS THE INSIDE OF THE

02:14PM  3      MINILAB?

02:14PM  4      A.  YES.

02:14PM  5      Q.  AND ARE -- I THINK A FEW MINUTES AGO, OR EARLIER IN YOUR

02:14PM  6      EXAMINATION WE WERE LOOKING AT DIFFERENT -- AT A DEMONSTRATIVE

02:15PM  7      THAT SHOWED DIFFERENT COMPONENTS OF THE MINILAB THAT YOU

02:15PM  8      DESCRIBED FOR US.

02:15PM  9          DO YOU RECALL THAT?

02:15PM  10     A.  YES.

02:15PM  11     Q.  AND DO YOU SEE ANY OF THE COMPONENTS THAT WERE DESCRIBED

02:15PM  12     IN THE EXHIBIT HERE, OR IN THIS DEMONSTRATIVE?

02:15PM  13     A.  I CAN SEE THE TOP OF THE MATERIAL HANDLING ROBOT TOWARD

02:15PM  14     THE CENTER OF THIS IMAGE.

02:15PM  15     Q.  OKAY.  AND THE ITEM THAT'S OPENED, WHAT IS THAT?

02:15PM  16     A.  THAT IS THE CARTRIDGE, THE WHITE THING.

02:15PM  17     Q.  OKAY.  AND IS YOUR UNDERSTANDING THAT THE OTHER

02:15PM  18     INSTRUMENTS THAT WE IDENTIFIED BEFORE WOULD BECOME PART OF --

02:15PM  19     EXCUSE ME, WOULD RESIDE IN THE ARCHITECTURE OF THE MINILAB?

02:15PM  20     A.  YES.

02:15PM  21     Q.  LET'S MOVE ON TO THE -- WELL, LET'S FINISH THAT CLIP FIRST

02:15PM  22     OF ALL JUST TO MAKE SURE THAT WE'VE SEEN THE WHOLE THING.

02:16PM  23          (VIDEO PLAYING OFF THE RECORD.)

02:16PM  24     BY MS. TREFZ:

02:16PM  25     Q.  NOW LET'S MOVE ON TO 9819C.

02:16PM  1        AND, DR. BONANNI, BEFORE WE PLAY 9819C, WE MENTIONED

02:16PM  2   EARLIER -- YOU MENTIONED EARLIER HEMATOLOGY ASSAYS.

02:16PM  3        DO YOU RECALL THAT?

02:16PM  4   A.   YES.

02:16PM  5   Q.   AND WHAT -- CAN YOU GIVE AN EXAMPLE OF THE TYPES OF ASSAYS

02:16PM  6   THAT, OR THE TYPES OF TESTS THAT ARE INCLUDED IN HEMATOLOGY?

02:16PM  7   A.   IT WOULD BE MEASURING THE CELLS, THE NATURE AND THE NUMBER

02:16PM  8   OF CELLS THAT ARE IN THE BLOOD SAMPLE THROUGHOUT THE PATIENT.

02:16PM  9   Q.   SUCH AS?

02:16PM  10  A.   RED BLOOD CELLS, HEMATOCRIT, WHITE CELLS, PLATELETS, AND

02:16PM  11  SO FORTH.

02:16PM  12        MS. TREFZ:  MR. BENNET, IF WE COULD PLAY 9819C.

02:16PM  13        AND, YOUR HONOR, WITH THE COURT'S PERMISSION, AGAIN, FOR

02:16PM  14  DEMONSTRATIVE PURPOSES.

02:17PM  15        THE COURT:  YES.

02:17PM  16        MS. TREFZ:  THIS IS A TOTAL OF 49 SECONDS, AND WHAT

02:17PM  17  I'D LIKE TO DO IS FIRST WATCH THE CLIP AND I WOULD LIKE TO HAVE

02:17PM  18  DR. BONANNI EXPLAIN WHAT WE'RE SEEING IN THE CLIP.

02:17PM  19        (VIDEO PLAYING OFF THE RECORD.)

02:17PM  20        MS. TREFZ:  ACTUALLY, CAN WE GO BACK, MR. BENNETT,

02:17PM  21  TO THE BEGINNING OF THE CLIP.  PAUSE THERE.  ONE MORE SECOND.

02:17PM  22  PAUSE THERE.  THANK YOU.

02:17PM  23  Q.   DR. BONANNI, CAN YOU IDENTIFY -- CAN YOU WALK US THROUGH

02:17PM  24  WHAT WE'RE SEEING IN THE DIFFERENT PIECES OF -- ON THE SCREEN

02:17PM  25  HERE?

02:17PM 1    A.   SO WHAT WE SEE, THE BIG WHITE THING IS THE CARTRIDGE

02:17PM 2    OPENED UP WITH THE DIFFERENT REAGENTS IN IT, THE PIPET TIPS,

02:17PM 3    THE SLIDES THAT WILL GO INTO THE CYTOMETER.

02:18PM 4         AND REALIZE THAT THE PERSPECTIVE IS ODD, BECAUSE THIS

02:18PM 5    WHOLE THING IS ABOUT 12 INCHES WIDE.  SO THIS IS, YOU KNOW,

02:18PM 6    THIS IS DISTORTED, ENLARGED.

02:18PM 7         BEHIND THE CARTRIDGE WE SEE THE MINIATURIZED CENTRIFUGE

02:18PM 8    WITH FIVE BUCKETS.

02:18PM 9         OVER IT IS THE MATERIAL HANDLING ROBOT THAT WE WILL SEE IN

02:18PM 10   ACTION.

02:18PM 11        AND TO THE LEFT WE HAVE AT THE BOTTOM THE

02:18PM 12   SPECTROPHOTOMETER, AND IN THE CENTER THE CAMERA, THE

02:18PM 13   LUMINOMETER, AND SOME OTHER THINGS.

02:18PM 14   Q.   OKAY.  LET'S GO AHEAD AND PLAY THE CLIP, AND AS WE PLAY

02:18PM 15   IT, DR. BONANNI, IF YOU CAN EXPLAIN TO THE JURY WHAT IS -- HOW

02:18PM 16   THE MINILAB IS WORKING ON THESE HEMATOLOGY ASSAY.

02:18PM 17        (VIDEO PLAYING OFF THE RECORD.)

02:18PM 18          THE WITNESS:  SO THE ROBOT IS PICKING UP THE SLIDE

02:19PM 19   THAT IT WILL BRING TO THE CYTOMETER, WHICH IS A FLUORESCENCE

02:19PM 20   MICROSCOPY INSTRUMENT, AND NOW IT IS CENTERED AND ADJUSTED AND

02:19PM 21   WILL DO ITS MEASUREMENT TO IMAGE THE CELLS.

02:19PM 22        THEN IT PICKS UP THE SAMPLE OF THE BLOOD FROM THE

02:19PM 23   NANOTAINER, TAKES IT TO THE CAMERA FOR A QUICK CHECK THAT THERE

02:19PM 24   IS NO HEMOLYSIS, PUTS THE SAMPLE INTO A CENTRIFUGE VESSEL,

02:19PM 25   MOVES IT CAREFULLY INTO THE CENTRIFUGE BUCKET WHERE IT IS GOING

02:19PM  1    TO BE SPUN DOWN FOR, I DON'T KNOW, A FEW MINUTES AT 1300G.

02:19PM  2    THAT'S TO MEASURE THE HEMATOCRIT, THE AMOUNT OF RED CELLS.

02:19PM  3    BY MS. TREFZ:

02:19PM  4    Q.   AND THAT'S ONE OF THE ASSAYS IN THE --

02:19PM  5    A.   THAT'S ONE OF THE ASSAYS IN THE HEMATOLOGY, YES.

02:19PM  6    Q.   THANK YOU.

02:19PM  7         I'M GOING TO SHOW YOU ONE MORE CLIP, WHICH IS 9819D, AND

02:19PM  8    THAT'S GOING TO BE 38 SECONDS.

02:20PM  9         WITH THE COURT'S PERMISSION?

02:20PM  10             THE COURT:  YES.

02:20PM  11             MS. TREFZ:  BEFORE I DO, YOUR HONOR, MAY --

02:20PM  12   Q.   OR BEFORE I DO, DR. BONANNI, LET ME ASK YOU, CAN YOU

02:20PM  13   REMIND US WHAT CLINICAL CHEMISTRY MEANS?

02:20PM  14   A.   THESE ARE THE, THE BASIC METABOLIC PANEL ASSAYS THAT ARE

02:20PM  15   DONE, YOU KNOW, GLUCOSE AND POTASSIUM AND CALCIUM AND OTHER

02:20PM  16   THINGS THAT YOU DO IN A REGULAR TEST, YOU KNOW, CLINICAL TEST.

02:20PM  17   Q.   AND IS THAT SOMETIMES REFERRED TO AS COLOR CHEMISTRY?

02:20PM  18   A.   COLOR CHEMISTRY IS A GOOD ELEMENT OF IT, YES.

02:20PM  19   Q.   OKAY.  AND MR. BENNETT, IF WE CAN START ON 9819D.

02:20PM  20        AND, DR. BONANNI, WHAT I'D LIKE TO HAVE YOU DO IS TO

02:20PM  21   EXPLAIN WHAT WE'RE SEEING AS WE SEE IT.

02:20PM  22        (VIDEO PLAYING OFF THE RECORD.)

02:20PM  23             THE WITNESS:  SO THE ROBOT IS DISPENSING REAGENTS,

02:21PM  24   MIXING THEM UP.  I THINK THE VIDEO IS ACCELERATED HERE.

02:21PM  25             AND EVENTUALLY PUTS THE SAMPLES INTO A CUVETTE, A REACTION

02:21PM 1   CUVETTE, THAT IS THEN TAKEN TO THE SPECTROPHOTOMETER AND THE

02:21PM 2   INTENSITY OF THOSE COLORS IN EACH ONE OF THE WELLS IS MEASURED

02:21PM 3   BY THE SPECTROPHOTOMETER, AND THEN THE CUVETTE IS BROUGHT BACK

02:21PM 4   INTO THE CARTRIDGE, WHICH IS ONE ELEMENT OF THIS TECHNOLOGY IS

02:21PM 5   THAT ALL OF THE WASTE IS COLLECTED BACK INTO THE CARTRIDGE.

02:21PM 6   NOTHING IS LEFT INTO THE MINILAB, WHICH CAN THEN BE USED FOR

02:21PM 7   THE NEXT SAMPLE, AND THE NEXT PATIENT.

02:21PM 8   Q.   CAN YOU REMIND US WHAT THE SPECTROPHOTOMETER DOES?

02:21PM 9   A.   IT'S AN INSTRUMENT THAT MEASURES THE INTENSITY OF LIGHT

02:21PM 10  THAT GOES THROUGH THE SAMPLE AT DIFFERENT COLORS AND CORRELATES

02:21PM 11  THAT TO THE AMOUNT OF ANALYTE THAT IS PRESENT IN THE SAMPLE.

02:22PM 12  Q.   AS A PERSON WHO HAD WORKED IN THE MEDICAL DEVICE AND BIO

02:22PM 13  PHARMA INDUSTRY FOR QUITE A WHILE, DID YOU HAVE A VIEW IN 2016

02:22PM 14  AS TO WHETHER THE THERANOS DEVICE AND TECHNOLOGY HAD POTENTIAL

02:22PM 15  COMMERCIAL USES?

02:22PM 16        MR. SCHENK:  OBJECTION.  IMPROPER OPINION TESTIMONY.

02:22PM 17        THE COURT:  SUSTAINED.

02:22PM 18  BY MS. TREFZ:

02:22PM 19  Q.   DID YOU HAVE -- DID YOU HAVE ANY, NOT BASED ON -- STRIKE

02:22PM 20  THAT, YOUR HONOR.

02:22PM 21       DID YOU PERSONALLY ENVISION ANY POTENTIAL USES FOR THE

02:22PM 22  COMMERCIAL -- FOR THE TECHNOLOGY?

02:22PM 23        MR. SCHENK:  OBJECTION.  SAME OBJECTION AND

02:22PM 24  RELEVANCE.

02:22PM 25        THE COURT:  SUSTAINED.

02:23PM   1              (PAUSE IN PROCEEDINGS.)

02:23PM   2    BY MS. TREFZ:

02:23PM   3    Q.   DO YOU RECALL WHETHER THE COMPANY HAD ANY PERSPECTIVE ON

02:23PM   4    THE POTENTIAL COMMERCIAL USES FOR THE TECHNOLOGY?

02:23PM   5              MR. SCHENK:  OBJECTION.  RELEVANCE, AND IT CALLS FOR

02:23PM   6    HEARSAY.

02:23PM   7              THE COURT:  SUSTAINED WITHOUT A FURTHER FOUNDATION.

02:23PM   8    BY MS. TREFZ:

02:23PM   9    Q.   DURING YOUR TIME ON THE BOARD OF DIRECTORS, DID YOU COME

02:23PM  10    TO UNDERSTAND, DID YOU COME TO UNDERSTAND -- DID YOU EVER COME

02:23PM  11    TO UNDERSTAND THE POTENTIAL COMMERCIAL USES THAT THE COMPANY

02:23PM  12    WAS DEVELOPING FOR THE TECHNOLOGY?

02:23PM  13              MR. SCHENK:  OBJECTION.

02:23PM  14              THE COURT:  SUSTAINED.

02:23PM  15              MS. TREFZ:  OKAY.

02:23PM  16    Q.   DR. BONANNI, WHEN YOU FIRST JOINED THE BOARD IN JUNE 2016,

02:23PM  17    WHAT WAS THE MAKEUP OF THE BOARD?

02:23PM  18    A.   AT THAT TIME, SO THERE WAS DR. FOEGE, MR. BOIES,

02:24PM  19    GENERAL MATTIS, RILEY BECHTEL, MR. KOVACEVICH,

02:24PM  20    ELIZABETH HOLMES, AND I.  YEAH, I THINK THAT'S IT.

02:24PM  21    Q.   AND DESCRIBE WHAT BOARD MEETINGS WERE LIKE BETWEEN JUNE

02:24PM  22    AND DECEMBER OF 2016 AT A HIGH LEVEL.

02:24PM  23    A.   THEY WERE LIVELY DISCUSSIONS.  TYPICALLY THE CHAIRMAN,

02:24PM  24    ELIZABETH HOLMES, WOULD INTRODUCE -- YOU KNOW, CALLED THE

02:24PM  25    MEETING TO ORDER AND INTRODUCED THE SUBJECTS AND THE AGENDA,

02:24PM 1    AND THEN DIFFERENT PEOPLE FROM THE COMPANY, AND SOMETIMES

02:24PM 2    OUTSIDE OF THE COMPANY, WOULD COME IN AND MAKE PRESENTATIONS,

02:24PM 3    AND THE BOARD MEMBERS WOULD ASK QUESTIONS, AND HAVE GOOD

02:24PM 4    DISCUSSIONS ABOUT THE SUBJECTS.

02:24PM 5    Q.   WERE -- WAS MS. HOLMES THE ONLY SPEAKER IN THE MEETINGS?

02:24PM 6    A.   NO.

02:24PM 7    Q.   WAS THERE SPIRITED DISCUSSION IN YOUR EXPERIENCE?

02:25PM 8    A.   YES, LIVELY DISCUSSIONS.

02:25PM 9    Q.   WERE THERE SOMETIMES DEBATES OVER STRATEGY?

02:25PM 10   A.   THERE WERE.

02:25PM 11   Q.   WERE THERE AREAS OF THE COMPANY BETWEEN JUNE AND DECEMBER

02:25PM 12   OF 2016 THAT YOU WERE PARTICULARLY ACTIVE IN?

02:25PM 13   A.   YES, THE STRENGTHENING OF THE QUALITY MANAGEMENT SYSTEM

02:25PM 14   AND THE CREATION OF A CORPORATE COMPLIANCE PROGRAM IN

02:25PM 15   PARTICULAR.

02:25PM 16   Q.   DID YOU UNDERSTAND MS. HOLMES TO SEEK YOUR ADVICE ON THOSE

02:25PM 17   AREAS?

02:25PM 18   A.   SHE DID.

02:25PM 19   Q.   IN YOUR OPINION, DID MS. HOLMES LISTEN TO AND IMPLEMENT

02:25PM 20   YOUR ADVICE?

02:25PM 21   A.   SHE DID.

02:25PM 22   Q.   DID YOU ALSO UNDERSTAND THAT OTHERS ON THE BOARD OF

02:25PM 23   DIRECTORS ADVISED MS. HOLMES ON VARIOUS ASPECTS OF THE COMPANY?

02:26PM 24   A.   YES.

02:26PM 25   Q.   AND WHAT ROLE DID YOU UNDERSTAND THAT MR. BOIES HAD?

02:26PM  1    A.   OH, MR. BOIES, SPECIFICALLY, HIS FIRM WAS REPRESENTING

02:26PM  2    THERANOS ON A NUMBER OF SUBJECTS, YES.

02:26PM  3    Q.   DID -- WAS MR. BECHTEL A MENTOR TO MS. HOLMES AS FAR AS

02:26PM  4    YOU UNDERSTOOD?

02:26PM  5    A.   FROM MY STANDPOINT HE WAS, YES.

02:26PM  6    Q.   AND WHAT ABOUT GENERAL MATTIS, DID HE -- WAS HE A MENTOR

02:26PM  7    TO MS. HOLMES DURING THIS TIME PERIOD AS WELL?

02:26PM  8    A.   I THINK SO, YES.

02:26PM  9    Q.   WHEN YOU JOINED THE BOARD, DID YOU UNDERSTAND THAT

02:26PM  10   THERANOS WAS FACING PUBLIC CRITICISM AND QUESTIONS ABOUT THE

02:26PM  11   STATE OF ITS TECHNOLOGY?

02:26PM  12   A.   YES.

02:26PM  13   Q.   AND WAS THERE DEBATE ABOUT HOW TO -- HOW BEST TO RESPOND

02:26PM  14   TO THOSE CRITICISMS IN THE BOARD OF DIRECTORS?

02:26PM  15   A.   YES.

02:26PM  16   Q.   DESCRIBE THE NATURE OF THE DEBATE AS YOU UNDERSTOOD IT.

02:26PM  17   A.   THE NATURE -- A NUMBER OF DIRECTORS WERE CONVINCED THAT

02:27PM  18   THE COMPANY SHOULD COUNTER THE ALLEGATIONS MADE IN THE PRESS

02:27PM  19   WITH DISCLOSURES, PRESS RELEASES, AND WITH A GENERATION OF DATA

02:27PM  20   SUPPORTING THE EFFECTIVENESS OF THE TECHNOLOGY BY REPUTABLE

02:27PM  21   INSTITUTIONS LIKE THE CLEVELAND CLINIC AND UCSF AND SO FORTH.

02:27PM  22   Q.   IS THAT A VIEW THAT YOU SHARED?

02:27PM  23   A.   NO.  MY VIEW WAS THAT THE VALIDATION THAT MATTERED IN THIS

02:27PM  24   WHOLE DISCUSSION WAS THAT OBTAINED BY FDA AND OTHER REGULATORY

02:27PM  25   AGENCIES, AND THAT THE COMPANY SHOULD PURSUE -- WITH A VERY

02:27PM  1    HIGH FOCUS ON THE PURSUIT OF CLEARANCE BY FDA AND BY THE

02:27PM  2    EUROPEANS IN PARTICULAR.

02:27PM  3    Q.   IS THAT THE APPROACH THAT THERANOS DECIDED TO FOLLOW?

02:28PM  4    A.   YES.

02:28PM  5    Q.   DID THERANOS END UP PUBLISHING ANY PEER REVIEWED ARTICLES?

02:28PM  6    A.   YES, THEY DID.

02:28PM  7    Q.   TOWARD THE END OF 2016, WERE THERE SOME CHANGES TO THE

02:28PM  8    MAKEUP OF THE BOARD OF DIRECTORS?

02:28PM  9    A.   YES.

02:28PM  10   Q.   DID YOU UNDERSTAND THAT MR. BECHTEL STEPPED DOWN?

02:28PM  11   A.   HE DID, YES.

02:28PM  12   Q.   AND DID YOU HAVE AN UNDERSTANDING AS TO WHY, AT A HIGH

02:28PM  13   LEVEL, HE STEPPED DOWN?

02:28PM  14            MR. SCHENK:  OBJECTION.  RELEVANCE.

02:28PM  15            THE COURT:  SUSTAINED.

02:28PM  16   BY MS. TREFZ:

02:28PM  17   Q.   DID YOU HAVE AN UNDERSTANDING OF WHETHER MR. BECHTEL

02:28PM  18   REMAINED SUPPORTIVE OF THE COMPANY AND MS. HOLMES AFTER HIS

02:28PM  19   DEPARTURE?

02:28PM  20            MR. SCHENK:  OBJECTION.  RELEVANCE AND HEARSAY.

02:28PM  21            THE COURT:  SUSTAINED.

02:28PM  22   BY MS. TREFZ:

02:28PM  23   Q.   DID YOU HAVE AN UNDERSTANDING AS TO WHY GENERAL MATTIS

02:28PM  24   STEPPED DOWN AT THE END OF 2016?

02:28PM  25            MR. SCHENK:  OBJECTION.  SAME.

02:29PM  1           MS. TREFZ:  YOUR HONOR, I WOULD SAY IN THIS

02:29PM  2   PARTICULAR CIRCUMSTANCE WE HAVE HAD TESTIMONY ABOUT THIS.

02:29PM  3           THE COURT:  AND IF HE'S AWARE OF THE REASONS FOR

02:29PM  4   GENERAL MATTIS LEAVING?  IS THAT WHAT YOU'RE ASKING?

02:29PM  5           MS. TREFZ:  YEAH, DID HE HAVE AN UNDERSTANDING.

02:29PM  6           THE COURT:  OKAY.

02:29PM  7       DO YOU UNDERSTAND THAT QUESTION, SIR?

02:29PM  8           THE WITNESS:  I DO.

02:29PM  9           THE COURT:  YOU CAN ANSWER THAT.

02:29PM 10           THE WITNESS:  MY UNDERSTANDING WAS THAT IT WAS PART

02:29PM 11   OF HIS GETTING PREPARED FOR THE CONFIRMATION HEARINGS IN THE

02:29PM 12   SENATE, AND THAT PART OF THAT PREPARATION WAS TO DISENGAGE

02:29PM 13   HIMSELF FROM ACTIVITIES SUCH AS THE PRESENCE AS A DIRECTOR OF

02:29PM 14   THERANOS.

02:29PM 15   BY MS. TREFZ:

02:29PM 16   Q.   DID GENERAL MATTIS, OR LATER SECRETARY MATTIS, EVER TELL

02:29PM 17   YOU THAT HE LEFT OVER CONCERNS ABOUT INTEGRITY?

02:29PM 18   A.   NO.

02:29PM 19   Q.   DID HE EVER TELL YOU THAT HE WAS CONCERNED MS. HOLMES HAD

02:29PM 20   MISREPRESENTED TO HIM THE CAPABILITY OF THE TECHNOLOGY?

02:29PM 21   A.   NO.

02:29PM 22   Q.   DID HE EVER TELL YOU THAT HE WAS CONCERNED THAT MS. HOLMES

02:29PM 23   HAD MISREPRESENTED TO HIM WHAT TECHNOLOGY WAS IN THE CLINICAL

02:29PM 24   LABORATORY?

02:30PM 25   A.   NO.

02:30PM  1    Q.   DID ANY OF THE BOARD MEMBERS THAT PREDATED YOUR ARRIVAL

02:30PM  2    TELL YOU THAT THEY WERE CONCERNED THAT MS. HOLMES HAD

02:30PM  3    MISREPRESENTED TO THEM THE CAPABILITIES OF THERANOS'S

02:30PM  4    TECHNOLOGY?

02:30PM  5    A.   NO.

02:30PM  6    Q.   COMING INTO AND EARLY IN YOUR SERVICE ON THE BOARD, WHAT

02:30PM  7    DID YOU UNDER -- STRIKE THAT.

02:30PM  8         BEGINNING IN JUNE OF 2016 WHEN YOU JOINED THE BOARD OF

02:30PM  9    DIRECTORS AND THROUGHOUT AT LEAST THE FOLLOWING SIX MONTHS,

02:30PM  10   WERE EFFORTS MADE TO STRENGTHEN THE POLICIES, SYSTEMS, AND

02:30PM  11   PERSONNEL AT THERANOS?

02:30PM  12   A.   MAJOR EFFORTS, YES.

02:30PM  13   Q.   WAS MS. HOLMES SUPPORTIVE OF THOSE EFFORTS?

02:30PM  14   A.   YES, VERY MUCH.

02:30PM  15   Q.   DID SHE ENSURE THAT THESE EFFORTS COULD PROCEED WITHOUT

02:30PM  16   DELAY?

02:30PM  17   A.   DEFINITELY.

02:30PM  18   Q.   DID SHE COMMIT RESOURCES TO THOSE EFFORTS?

02:31PM  19   A.   YES.

02:31PM  20   Q.   I'D LIKE TO TALK ABOUT A FEW PARTICULAR CHANGES THAT WERE

02:31PM  21   MADE BETWEEN JUNE AND DECEMBER OF 2016.

02:31PM  22        ACTUALLY, BEGINNING A LITTLE BEFORE THAT, WERE YOU AWARE

02:31PM  23   WHEN YOU JOINED THE BOARD THAT JUST BEFORE YOU JOINED,

02:31PM  24   THERANOS, THE COMPANY, HAD CREATED A SCIENTIFIC AND MEDICAL

02:31PM  25   ADVISORY BOARD?

02:31PM 1    A.   YES.

02:31PM 2    Q.   AND DID YOU HAVE AN UNDERSTANDING OF WHO WAS ON THAT

02:31PM 3    BOARD?

02:31PM 4    A.   I DID.  PARTICULARLY I KNEW ONE PERSON, DR. SUE EVANS, SHE

02:31PM 5    HAD BEEN A COLLEAGUE OF MINE AT BAXTER WHERE SHE WAS IN CHARGE

02:31PM 6    OF R&D FOR DIAGNOSTICS AND HAD PLAYED A LEADERSHIP ROLE IN THE

02:31PM 7    PROFESSIONAL ASSOCIATION FOR CLINICAL CHEMISTRY.  AND OTHER

02:31PM 8    MEMBERS WERE SIMILAR, YOU KNOW, EXPERTS EITHER FROM ACADEMIA OR

02:31PM 9    INDUSTRY, IN THE BROAD AREAS OF CLINICAL CHEMISTRY.

02:31PM 10   Q.   AND DID YOU HAVE AN UNDERSTANDING OF THE -- AS A BOARD

02:31PM 11   MEMBER OF THE PURPOSE OF THE SCIENTIFIC AND MEDICAL ADVISORY

02:31PM 12   BOARD?

02:31PM 13   A.   TO SERVE AS A SOUNDING BOARD FOR THE INTERNAL DEVELOPMENT

02:32PM 14   OF THE TECHNOLOGIES INSIDE OF THERANOS, TO HELP IN THE

02:32PM 15   PREPARATION OF PEER REVIEWED ARTICLES, AND BE GENERAL, YOU

02:32PM 16   KNOW, SCIENTIFIC ADVISORS TO THE COMPANY.

02:32PM 17   Q.   AND DID YOU UNDERSTAND THAT THE MEMBERS OF THE SCIENTIFIC

02:32PM 18   AND MEDICAL ADVISORY BOARD WERE OUTSIDERS TO THERANOS?

02:32PM 19   A.   YES.

02:32PM 20   Q.   WAS DR. FOEGE ALSO INVOLVED IN THE SCIENTIFIC AND MEDICAL

02:32PM 21   ADVISORY BOARD?

02:32PM 22   A.   HE WAS, YES.

02:32PM 23   Q.   AND SO HE WAS --

02:32PM 24   A.   AND SO HE WAS AN INTERNAL PERSON I GUESS, YES.

02:32PM 25   Q.   OTHERWISE WERE THE PEOPLE ON THE BOARD OUTSIDERS FROM THE

02:32PM  1    COMPANY?

02:32PM  2    A.   YES.

02:32PM  3    Q.   AND WERE YOU AWARE THAT LATER IN 2016 THERANOS DEVELOPED A

02:32PM  4    TECHNICAL ADVISORY BOARD?

02:32PM  5    A.   YES.

02:32PM  6    Q.   AND WHAT IS YOUR UNDERSTANDING OF THE FOCUS OF THAT BOARD?

02:32PM  7    A.   THEY WERE MORE -- IT WAS MORE COMPOSED FROM EXPERTS IN

02:33PM  8    ENGINEERING AND BIOENGINEERING AND PEOPLE THAT WOULD BE

02:33PM  9    ADVISORS IN THE DEVELOPMENT OF THE ENGINEERING ELEMENTS OF THE

02:33PM 10    TECHNOLOGY ITSELF, NOT THE MEDICAL PART.

02:33PM 11    Q.   AND FOR THE MOST PART, WERE THE MEMBERS OF THE TECHNICAL

02:33PM 12    ADVISORY BOARD ALSO OUTSIDERS TO THERANOS?

02:33PM 13    A.   YES.

02:33PM 14    Q.   WAS DR. CHANNING ROBERTSON ALSO A MEMBER?

02:33PM 15    A.   HE WAS.

02:33PM 16    Q.   AND DID YOU UNDERSTAND WHETHER DR. ROBERTSON HAD A PRIOR

02:33PM 17    ASSOCIATION WITH THERANOS?

02:33PM 18    A.   I UNDERSTOOD HE HAD, YES, FROM THE VERY BEGINNING, YES.

02:33PM 19    Q.   WAS ONE MAJOR TASK YOU ADVISED ON INCREASING QUALITY AND

02:33PM 20    COMPLIANCE FUNCTIONS AT THERANOS?

02:33PM 21    A.   YES.

02:33PM 22    Q.   AND I WANT TO, I WANT TO EXPLORE EACH OF THOSE DIFFERENT

02:33PM 23    PIECES.

02:33PM 24         FIRST, CAN YOU DESCRIBE WHAT YOU MEAN BY COMPLIANCE

02:33PM 25    FUNCTION?

02:33PM 1      A.   SO IN GENERAL TERMS?

02:33PM 2      Q.   CORRECT.

02:33PM 3      A.   THAT WOULD LEAD ME TO THE CORPORATE COMPLIANCE PROGRAM.

02:34PM 4           THAT IS A COLLECTION OF PROCESSES AND PROCEDURES TO MAKE

02:34PM 5      SURE THAT EVERYBODY IN A COMPANY UNDERSTANDS THE EXPECTATIONS

02:34PM 6      AND THE REQUIREMENTS ON HOW TO COMPLY WITH LAWS AND REGULATIONS

02:34PM 7      THAT APPLY TO THAT COMPANY, TO THAT BUSINESS.

02:34PM 8           AND PEOPLE ARE TRAINED IN THOSE REQUIREMENTS; THAT THEY

02:34PM 9      ARE AUDITED; THAT THEY PERFORM AS INTENDED; AND THAT THERE ARE

02:34PM 10     CHANNELS OF COMMUNICATION BETWEEN STAFF AND MANAGEMENT ABOUT

02:34PM 11     OBSERVATIONS OF NONCONFORMANCE, NONCOMPLIANCE BEHAVIORS THAT

02:34PM 12     ARE AGAINST LAWS AND REGULATIONS, AND THAT THOSE REPORTS ARE

02:34PM 13     ACTED UPON BY AN APPROPRIATE MECHANISM OF INVESTIGATIONS AND SO

02:34PM 14     FORTH.

02:34PM 15          SO THAT'S THE BROADER ELEMENT OF COMPLIANCE THAT WE DID

02:34PM 16     START IN THE COMPANY DURING THAT SUMMER.

02:34PM 17     Q.   AND WHAT SUMMER WAS THAT?

02:34PM 18     A.   2016.

02:34PM 19     Q.   THANK YOU.

02:34PM 20          AND WITH RESPECT TO QUALITY FUNCTIONS OF THE COMPANY, WHAT

02:35PM 21     ARE THOSE AS FAR AS YOU UNDERSTAND?

02:35PM 22     A.   I REFER TO THE QUALITY MANAGEMENT SYSTEM, WHICH IS A

02:35PM 23     COLLECTION OF, AGAIN, PROCESSES AND PROCEDURES THAT ARE

02:35PM 24     DESIGNED TO MAKE SURE THAT THE OUTPUT OF THE COMPANY IS

02:35PM 25     RELIABLE, THAT THE DATA GENERATED HAVE INTEGRITY AND CAN BE

BONANNI DIRECT BY MS. TREFZ                                    7216

02:35PM  1    RELIED UPON.

02:35PM  2         I'LL GIVE YOU EXAMPLES.  THE SIMPLEST THING TO THINK ABOUT

02:35PM  3    IS EVERY INSTRUMENT THAT IS USED TO TAKE ANY MEASUREMENT SHOULD

02:35PM  4    BE CALIBRATED AGAINST RECOGNIZED STANDARDS, AND THAT THEN THOSE

02:35PM  5    DATA GENERATED SHOULD BE DOCUMENTED IN A CERTAIN FASHION; THAT

02:35PM  6    PEOPLE SHOULD BE TRAINED IN WHAT THEY DO, AND IF THEY'RE NOT

02:35PM  7    TRAINED, THEY SHOULD NOT BE ALLOWED TO PERFORM THOSE TASKS.

02:35PM  8         FOR DEVICES, THE REGULATION -- SO THIS AREA IS COVERED BY

02:35PM  9    SOMETHING CALLED QUALITY SYSTEM REGULATION IN THE U.S. THAT

02:35PM 10    COVERS ALSO ASPECTS OF DEVELOPMENT, NOT JUST MANUFACTURING.  SO

02:36PM 11    THERE ARE DESIGN CONTROLS ON HOW THE DEVICE SHOULD BE DESIGNED,

02:36PM 12    DEVELOPED, AND THE OUTPUT DOCUMENTED AND VERIFIED AND VALIDATED

02:36PM 13    AND SO FORTH.

02:36PM 14         SO THAT BODY -- THERE WERE ELEMENTS OF THAT SYSTEM IN

02:36PM 15    PLACE AT THERANOS AS I FIRST VISITED.  THEY NEEDED TO BE

02:36PM 16    STRENGTHENED AND MADE MORE COMPLETE.

02:36PM 17    Q.   AND DID YOU HAVE EXPERIENCE WITH THOSE TYPES OF FUNCTIONS

02:36PM 18    FROM YOUR PRIOR WORK AT AMGEN AND BAXTER?

02:36PM 19    A.   I DID.

02:36PM 20    Q.   AS PART OF YOUR EFFORTS TO STRENGTHEN THESE ASPECTS OF THE

02:36PM 21    COMPANY, DID THERANOS HIRE ADDITIONAL PERSONNEL?

02:36PM 22    A.   YES.  IMMEDIATELY THERANOS HIRED A HEAD OF QUALITY AND

02:36PM 23    REGULATORY AFFAIRS, AND ALSO A HEAD OF CORPORATE COMPLIANCE.

02:36PM 24         AND IN RECORD TIME I SHOULD ADD, BECAUSE BY MID-JULY, MID,

02:36PM 25    END JULY 2016 THEY WERE RECRUITED AND ON BOARD.

02:36PM  1     Q.   AND DID THERANOS ALSO HIRE OUTSIDE CONSULTANTS TO ASSIST

02:37PM  2     IN THOSE EFFORTS AS WELL?

02:37PM  3     A.   YES, IN TWO WAYS.  CONSULTANTS TO SERVE AS CONSULTANTS TO

02:37PM  4     THE COMPANY, BUT WE ADDED TWO PROFESSIONALS IN THOSE FIELDS TO

02:37PM  5     PUT INTO A COMMITTEE OF THE BOARD THAT WE CREATED TO COVER

02:37PM  6     QUALITY AND COMPLIANCE.

02:37PM  7     Q.   AND WAS -- DO YOU RECALL WHEN THAT QUALITY AND COMPLIANCE,

02:37PM  8     OR COMPLIANCE AND QUALITY COMMITTEE OF THE BOARD OF DIRECTORS

02:37PM  9     WAS ANNOUNCED?

02:37PM  10    A.   I DO NOT.

02:37PM  11    Q.   LET ME SEE IF I CAN JUST REFRESH YOUR RECOLLECTION.

02:37PM  12         CAN YOU TURN TO 7671 IN YOUR BINDER.  AND DON'T READ IT

02:37PM  13    OUTSIDE -- OR OUT LOUD.  I'M JUST TRYING TO REFRESH YOUR

02:37PM  14    RECOLLECTION.

02:37PM  15    A.   YES.  SO IT IS ON THE 20TH OF JULY.  IT'S THE SAME

02:37PM  16    ANNOUNCEMENT THAT ANNOUNCED THE JOINING OF MR. WURTZ AND

02:38PM  17    MR. GUGGENHEIM INTO THE COMPANY.

02:38PM  18         IT ALSO ANNOUNCED THE CREATION OF THE COMMITTEE, OF THE

02:38PM  19    BOARD, AND THAT WAS COMPOSED OF DR. FOEGE AND ME, WITH TWO

02:38PM  20    EXTERNAL EXPERTS TO HELP US.

02:38PM  21    Q.   AND YOU MENTIONED MR. WURTZ.  WHAT ROLE DID HE SERVE?

02:38PM  22    A.   HE JOINED IN AS SENIOR VICE PRESIDENT, QUALITY AND

02:38PM  23    REGULATORY.

02:38PM  24    Q.   AND WHAT ABOUT MR. GUGGENHEIM?

02:38PM  25    A.   AS CHIEF COMPLIANCE OFFICER.

02:38PM  1    Q.   WAS ONE OF THE STEPS -- I BELIEVE YOU ALLUDED TO THIS

02:38PM  2    EARLIER, BUT JUST TO IDENTIFY IT IN A LITTLE BIT MORE DETAIL,

02:38PM  3    WAS ONE OF THE STEPS YOU WERE INVOLVED IN HELPING TO CREATE A

02:38PM  4    ROBUST QUALITY MANAGEMENT PROGRAM AT THERANOS?

02:38PM  5    A.   YES.

02:38PM  6    Q.   AND DID THIS EFFORT TAKE AWHILE TO COMPLETE?

02:38PM  7    A.   IT DID.  IT IS A COMPLICATED THING TO PUT TOGETHER.  SO

02:38PM  8    THE HIGH LEVEL DOCUMENTATION CORPORATE QUALITY MANUAL WAS

02:39PM  9    CREATED RATHER RAPIDLY, WITHIN TWO OR THREE MONTHS, AND THEN IT

02:39PM  10   TOOK, YOU KNOW, THE REST OF A YEAR TO PUT TOGETHER ALL OF THE

02:39PM  11   POLICIES AND PROCEDURES, TRAIN PEOPLE INTO THEM, AND MAKE SURE

02:39PM  12   THAT THEY WERE USED IN PRACTICE IN DAILY OPERATIONS, YES.

02:39PM  13   Q.   AND WAS MS. HOLMES SUPPORTIVE OF THAT EFFORT?

02:39PM  14   A.   YES.

02:39PM  15   Q.   DID -- WERE YOU ALSO AWARE THAT UPON YOUR ARRIVAL AT

02:39PM  16   THERANOS, UPON THE TIME YOU JOINED THE BOARD AT THERANOS, WERE

02:39PM  17   YOU AWARE THAT NEW LAB DIRECTORS HAD BEEN HIRED WITHIN THE PAST

02:39PM  18   SIX MONTHS?

02:39PM  19   A.   YES.

02:39PM  20   Q.   AND WERE THERE OTHER EFFORTS TO HIRE MEMBERS OF THE

02:39PM  21   MANAGEMENT TEAM OUTSIDE OF THE COMPANY, IN PARTICULAR I WANT TO

02:39PM  22   FOCUS ON LATE -- FROM THE TIME THAT YOU JOINED THE BOARD TO THE

02:39PM  23   END OF 2016.

02:39PM  24   A.   YES, THERE WERE.  THE COMPANY ENDED UP HIRING A HEAD OF

02:39PM  25   OPERATIONS, MCCHESNEY; CHANGED THE GENERAL COUNSEL; AND WAS

02:40PM 1    SEARCHING FOR A CHIEF FINANCIAL OFFICER.  THAT DID NOT SUCCEED,

02:40PM 2    BUT INTERVIEWED A NUMBER OF CANDIDATES FOR THAT.

02:40PM 3    Q.  IN WORKING ON THESE EFFORTS, WERE YOU EVER DENIED ACCESS

02:40PM 4    TO INFORMATION THAT WAS IN THERANOS'S FILES?

02:40PM 5    A.  NO.

02:40PM 6    Q.  WERE YOU EVER DENIED THE OPPORTUNITY TO TALK TO SOMEONE

02:40PM 7    THAT YOU WANTED TO SPEAK WITH?

02:40PM 8    A.  NO.

02:40PM 9    Q.  AND WAS -- TO YOUR IMPRESSION, WAS MAKING THESE

02:40PM 10   IMPROVEMENT A FOCUS OF MS. HOLMES?

02:40PM 11   A.  IT WAS.

02:40PM 12   Q.  IN AUGUST OF 2016, DID MS. HOLMES PRESENT AT THE ACC

02:40PM 13   CONFERENCE?

02:40PM 14   A.  SHE DID.

02:40PM 15          MR. SCHENK:  OBJECTION.  RELEVANCE.

02:40PM 16          MS. TREFZ:  THE RELEVANCE IS INTENT AND STATE OF

02:40PM 17   BELIEF OF THE TECHNOLOGY.

02:40PM 18       IF I COULD ASK A COUPLE MORE QUESTIONS, IT MAY BECOME

02:41PM 19   CLEARER.

02:41PM 20          THE COURT:  ALL RIGHT.  OKAY.

02:41PM 21   BY MS. TREFZ:

02:41PM 22   Q.  DID YOU UNDERSTAND -- DID YOU HAVE AN UNDERSTANDING AS TO

02:41PM 23   THE PURPOSE OF PRESENTING AT THIS CONFERENCE?

02:41PM 24   A.  I DO.

02:41PM 25   Q.  WHAT IS YOUR UNDERSTANDING?

02:41PM  1    A.   IT WAS TO OVERCOME THE CRITICISM OF LACK OF TRANSPARENCY

02:41PM  2    THAT THERANOS HAD RECEIVED AT THAT TIME AND TO SHOW WHAT THE

02:41PM  3    TECHNOLOGY WAS ALL ABOUT IN A SCIENTIFIC CONTEXT, AS THAT

02:41PM  4    SCIENTIFIC MEETING WAS.

02:41PM  5    Q.   AND IS YOUR UNDERSTANDING THAT PART OF THIS EFFORT WAS

02:41PM  6    RELATED TO THAT DEBATE THAT YOU WERE DISCUSSING ON THE BOARD OF

02:41PM  7    DIRECTORS -- THAT WAS OCCURRING ON THE BOARD OF DIRECTORS?

02:41PM  8    A.   IN A WAY.  IN A WAY IT WAS, YES, YES.

02:41PM  9    Q.   DID YOU ASSIST IN THE PREPARATION FOR THE AACC

02:41PM  10   PRESENTATION?

02:41PM  11   A.   I DID.

02:42PM  12   Q.   AND DID YOU, DID YOU WATCH IT?

02:42PM  13   A.   YES.

02:42PM  14   Q.   DID YOU HAVE A VIEW ON HOW IT WAS RECEIVED?

02:42PM  15            MR. SCHENK:  OBJECTION.  RELEVANCE.

02:42PM  16            THE COURT:  SUSTAINED.

02:42PM  17   BY MS. TREFZ:

02:42PM  18   Q.   OVER YOUR TIME AS A BOARD MEMBER, DID YOU FORM AN

02:42PM  19   IMPRESSION OF MS. HOLMES'S STRENGTHS AND WEAKNESSES AS A CEO?

02:42PM  20   A.   I DID.

02:42PM  21   Q.   AND WHAT WERE HER STRENGTHS?

02:42PM  22   A.   HER VISION FOR THE COMPANY; HER TECHNOLOGY SAVVY AND

02:42PM  23   MASTERING OF ALL ASPECTS THAT RELATED TO THE SYSTEM OF

02:42PM  24   TECHNOLOGIES THAT HAD BEEN DEVELOPED; AMOUNT OF ENERGY,

02:42PM  25   ENTHUSIASM, DRIVE THAT SHE HAD TO, TO, YOU KNOW, BRING THIS

02:42PM 1    COMPLICATED THING FORWARD.

02:42PM 2        I ADMIRED HER LACK OF DEFENSIVENESS AND HER WILLINGNESS TO

02:43PM 3    LISTEN TO OTHER PEOPLE'S OPINIONS THAT I THOUGHT WAS

02:43PM 4    REMARKABLE.

02:43PM 5    Q.   CAN YOU EXPLAIN WHAT YOU MEAN BY THAT?

02:43PM 6    A.   WHEN PEOPLE HAVE A STRONG SENSE OF OWNERSHIP OVER WHAT

02:43PM 7    THEY'VE DONE AND YOU VENTURE OTHER OPINIONS AND CRITIQUES AND

02:43PM 8    OTHER VIEWS, THEY TEND TO LISTEN AND THEN TO SAY, "YES, BUT"

02:43PM 9    AND DEFEND THEIR PAST DOINGS.

02:43PM 10       AND I NEVER HAD A "BUT" FROM ELIZABETH HOLMES.  SHE WAS

02:43PM 11   DILIGENT IN LISTENING AND INTERNALIZING WHAT SHE RECEIVED AS

02:43PM 12   ADVICE FROM A NUMBER OF PEOPLE, INCLUDING ME.

02:43PM 13   Q.   SO WE TALKED ABOUT HER STRENGTHS.

02:43PM 14       WHAT WERE HER WEAKNESSES, IN YOUR VIEW, AS A CEO?

02:43PM 15   A.   PERHAPS THE AREA OF FOCUSSING; PERHAPS THE AREA OF BEING

02:44PM 16   INCREDIBLY PERSEVERING IN ACHIEVING -- IN BRINGING ONE ELEMENT

02:44PM 17   OF THE HUNDREDS OF ONES THAT WERE IN DEVELOPMENT, BRINGING ONE

02:44PM 18   THROUGH THE GOAL AND THE TARGET OF REGULATORY APPROVAL, AND THE

02:44PM 19   FACT THAT THERE WERE SO MANY DIFFERENT COMPLEX THINGS BEING

02:44PM 20   WORKED ON THAT I THOUGHT COULD HAVE BEEN IMPROVED.

02:44PM 21   Q.   DID YOU HAVE A VIEW ABOUT MS. HOLMES'S SKILLS IN TERMS OF

02:44PM 22   OPERATIONAL MANAGEMENT?

02:44PM 23   A.   WELL, THAT'S WHAT I'M REFERRING TO.

02:44PM 24       AND WE BROUGHT IN PEOPLE THAT WOULD HELP IN CREATING THE

02:44PM 25   STRUCTURES THAT ALLOW YOU TO MANAGE DIFFERENT PROGRAMS

02:44PM  1    REQUIRING MULTIDISCIPLINARY EXPERTS TO BE INVOLVED, AND WE

02:44PM  2    BROUGHT IN PEOPLE FROM AMGEN THAT HAD LIVED THROUGH THAT KIND

02:45PM  3    OF PROBLEMATIC, SO --

02:45PM  4    Q.   AND BETWEEN JUNE AND DECEMBER OF 2016, WAS IT YOUR VIEW

02:45PM  5    THAT THERANOS -- DID YOU HAVE A VIEW AS TO WHETHER THERANOS

02:45PM  6    FACED HURDLES IN ITS FUTURE SUCCESS?

02:45PM  7              MR. SCHENK:  OBJECTION.  OPINION AND RELEVANCE.

02:45PM  8              THE COURT:  IF YOU WANT TO REPHRASE THIS AS TO HIS

02:45PM  9    TIME ON THE BOARD AND HIS SERVICE?  IS THAT WHAT YOU'RE --

02:45PM  10             MS. TREFZ:  THAT WAS THE TIME PERIOD THAT I WAS

02:45PM  11   REFERRING TO, YOUR HONOR.

02:45PM  12             THE COURT:  WHY DON'T YOU REPEAT THE QUESTION?

02:45PM  13   BY MS. TREFZ:

02:45PM  14   Q.   BASED ON YOUR EXPERIENCE ON THE BOARD BETWEEN JUNE AND

02:45PM  15   DECEMBER OF 2016, DID YOU HAVE A VIEW AT THAT TIME ABOUT THE

02:45PM  16   HURDLES THAT THERANOS FACED IN MOVING FORWARD AS A COMPANY?

02:45PM  17   A.   YES.

02:45PM  18   Q.   WHAT WAS YOUR VIEW?

02:46PM  19   A.   WELL, THERE WERE, THERE WERE TWO CATEGORIES FOR ME.  ONE

02:46PM  20   WAS THEY -- ENSURING THE FINANCING AND THE FINANCIAL WELL BEING

02:46PM  21   OF THE COMPANY GOING FORWARD; AND THE OTHER ONE WAS, AGAIN, THE

02:46PM  22   ACHIEVEMENT OF REGULATORY EXPERIENCE FOR THE TECHNOLOGY.

02:46PM  23   Q.   AND DID YOU HAVE THE -- DID YOU VIEW -- HAVE A VIEW AS TO

02:46PM  24   WHETHER THE COMPANY HAD A FOUNDATION TO OVERCOME THOSE HURDLES?

02:46PM  25   A.   IT DID.  YES, I DID.

02:46PM 1    Q.   AND WHAT WAS THE FOUNDATION IN YOUR VIEW?

02:46PM 2    A.   WELL, THE FOUNDATION WAS THAT THERE WERE, YOU KNOW,

02:46PM 3    SPECIFIC ASSAYS BEING DEVELOPED AND THE COMPANY FOCUSSED IN ON

02:46PM 4    ONE SPECIFICALLY, THE ONE FOR ZIKA; AND THAT THE COMPANY HAD

02:46PM 5    THE LARGE PORTFOLIO OF PATENTS THAT HAD BEEN CREATED THAT WERE

02:46PM 6    VALUABLE; AND THAT, WITH THE DEMONSTRATION OF COMMERCIAL

02:46PM 7    ABILITY OF THE DEVICE, THE COMPANY WAS IN A GOOD POSITION TO

02:47PM 8    ATTRACT EITHER ADDITIONAL FUNDING OR PARTNERSHIPS WITH

02:47PM 9    INDUSTRIAL PARTNERS.

02:47PM 10   Q.   AND YOU JUST -- YOU WORKED AT THE COMPANY UNTIL ITS END;

02:47PM 11   IS THAT RIGHT?

02:47PM 12   A.   YES.

02:47PM 13   Q.   AND WOULD YOU HAVE WORKED AT THERANOS IF YOU DID NOT

02:47PM 14   BELIEVE THAT THE TECHNOLOGY WAS SOUND?

02:47PM 15          MR. SCHENK:  OBJECTION.  RELEVANCE.

02:47PM 16          THE COURT:  SUSTAINED.

02:47PM 17          MS. TREFZ:  ONE MOMENT, YOUR HONOR.

02:47PM 18       (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

02:47PM 19          MS. TREFZ:  NO FURTHER QUESTIONS AT THIS TIME.

02:47PM 20          THE COURT:  CROSS-EXAMINATION?

02:48PM 21                    **CROSS-EXAMINATION**

02:48PM 22   BY MR. SCHENK:

02:48PM 23   Q.   GOOD AFTERNOON, DOCTOR.  MY NAME IS JEFF SCHENK.  IT'S

02:48PM 24   NICE TO MEET YOU.

02:48PM 25   A.   GOOD AFTERNOON.  IT'S NICE TO MEET YOU.

02:48PM  1    Q.   THERE'S A COUPLE OF TOPICS I'D LIKE TO COVER WITH YOU, BUT

02:48PM  2    THE FIRST IS I'D LIKE TO PICK UP ON A CONVERSATION THAT YOU

02:48PM  3    WERE HAVING WITH MS. TREFZ A MOMENT AGO.

02:48PM  4        SHE WAS ASKING YOU ABOUT THE OPINIONS OF CERTAIN BOARD

02:48PM  5    MEMBERS REGARDING INTEGRITY AND WHETHER THEY HAD DEPARTED THE

02:48PM  6    COMPANY OR THE BOARD BECAUSE OF INTEGRITY CONCERNS.

02:48PM  7        DO YOU RECALL THAT LINE OF QUESTIONING?

02:48PM  8    A.   I DO, I DO.

02:48PM  9    Q.   AND I JUST WANT TO BE VERY CLEAR.  WHAT YOU WERE

02:48PM  10   TESTIFYING WAS THAT GENERAL MATTIS NEVER TOLD YOU THAT HE HAD

02:48PM  11   THOSE CONCERNS; IS THAT RIGHT?

02:48PM  12   A.   YES.

02:48PM  13   Q.   YOU WERE NOT SAYING THAT GENERAL MATTIS DID NOT HAVE THOSE

02:48PM  14   CONCERNS?  YOU DON'T KNOW WHETHER HE HAD THOSE CONCERNS, HE

02:48PM  15   JUST DIDN'T EXPRESS THEM TO YOU; CORRECT?

02:48PM  16   A.   CORRECT.

02:48PM  17   Q.   OKAY.  I WANT TO BE VERY CLEAR ABOUT THAT.

02:49PM  18       YOU SPENT TIME ON THE BOARD BEGINNING IN 2016; IS THAT

02:49PM  19   RIGHT?

02:49PM  20   A.   YES.

02:49PM  21   Q.   AND THAT STAYED THROUGH YOUR, YOUR SERVICE -- YOUR SERVICE

02:49PM  22   REMAINED THROUGH 2018?

02:49PM  23   A.   YES.

02:49PM  24   Q.   SO YOU DID NOT COME HERE TO TESTIFY ABOUT EVENTS THAT

02:49PM  25   OCCURRED AT THERANOS FROM ITS FOUNDING IN 2003 UNTIL MAY OF

```
02:49PM  1    2016; IS THAT CORRECT?

02:49PM  2    A.   CORRECT.

02:49PM  3    Q.   YOU DON'T HAVE PERSONAL KNOWLEDGE OF THOSE EVENTS; IS THAT

02:49PM  4    CORRECT?

02:49PM  5    A.   NO.

02:49PM  6    Q.   YOU TESTIFIED ABOUT A DEVICE, THE MINILAB, TODAY; IS THAT

02:49PM  7    CORRECT?

02:49PM  8    A.   YES.

02:49PM  9    Q.   AND ALL OF YOUR TESTIMONY TODAY WAS ABOUT A DEVICE CALLED

02:49PM 10    A MINILAB; IS THAT RIGHT?

02:49PM 11    A.   YES.

02:49PM 12    Q.   AND WHICH VERSION OF THE MINILAB WAS THAT AGAIN?

02:49PM 13    A.   IT WAS, I THINK, 4.2.

02:49PM 14    Q.   OKAY.  THAT WAS NEVER USED TO TEST PATIENTS; IS THAT

02:49PM 15    CORRECT?

02:49PM 16    A.   COMMERCIALLY?  NO.

02:49PM 17    Q.   CORRECT.  IT WAS NOT FDA CLEARED; IS THAT RIGHT?

02:49PM 18    A.   NO, IT WAS NOT.

02:49PM 19    Q.   SO WHEN THERANOS -- YOU'RE AWARE THAT THERANOS WAS TESTING

02:50PM 20    PATIENTS' BLOOD IN ITS PARTNERSHIP WITH WALGREENS; RIGHT?

02:50PM 21    A.   YES.

02:50PM 22    Q.   YOU'RE AWARE THAT THAT HAPPENED EVEN BEFORE YOU ARRIVED;

02:50PM 23    RIGHT?

02:50PM 24    A.   YES.

02:50PM 25    Q.   THERANOS DIDN'T USE THE DEVICE THAT YOU TALKED ABOUT
```

|          |    |                                                                      |
|----------|----|----------------------------------------------------------------------|
| 02:50PM  | 1  | TODAY; CORRECT?                                                       |
| 02:50PM  | 2  | A.   NOT TO MY KNOWLEDGE.                                             |
| 02:50PM  | 3  | Q.   CORRECT.  THE DEVICE THAT YOU TALKED ABOUT TODAY WAS NEVER       |
| 02:50PM  | 4  | USED COMMERCIALLY TO TEST PATIENTS' BLOOD; CORRECT?                   |
| 02:50PM  | 5  | A.   CORRECT.                                                         |
| 02:50PM  | 6  | Q.   AND NO MEDICAL DECISIONS WERE BASED UPON RESULTS GENERATED       |
| 02:50PM  | 7  | FROM THE DEVICE THAT YOU TESTIFIED ABOUT TODAY, THE 4.2?              |
| 02:50PM  | 8  | A.   TO MY KNOWLEDGE, NO.                                             |
| 02:50PM  | 9  | Q.   BECAUSE THAT WOULD HAVE BEEN INAPPROPRIATE.  IT WASN'T FDA       |
| 02:50PM  | 10 | APPROVED?                                                            |
| 02:50PM  | 11 | A.   RIGHT.                                                           |
| 02:50PM  | 12 | Q.   CORRECT.  THERANOS DIDN'T HAVE A CLIA LAB WHEN YOU WERE          |
| 02:50PM  | 13 | THERE; CORRECT?                                                       |
| 02:50PM  | 14 | A.   CAN YOU REPEAT THAT?                                             |
| 02:50PM  | 15 | Q.   DO YOU KNOW WHAT A CLIA LAB IS?                                  |
| 02:50PM  | 16 | A.   YES.                                                             |
| 02:50PM  | 17 | Q.   DID THERANOS OPERATE A CLIA LAB WHILE YOU WERE THERE?            |
| 02:50PM  | 18 | A.   YES.                                                             |
| 02:50PM  | 19 | Q.   AND DID YOU TALK TO AN INDIVIDUAL NAMED DR. DAS ABOUT            |
| 02:50PM  | 20 | THAT?                                                                 |
| 02:50PM  | 21 | A.   I DID.                                                           |
| 02:50PM  | 22 | Q.   AND HIS ROLE WAS LAB DIRECTOR; CORRECT?                          |
| 02:50PM  | 23 | A.   YES.                                                             |
| 02:50PM  | 24 | Q.   AND DR. DAS MADE A DECISION TO VOID PATIENT TESTS, THE          |
| 02:50PM  | 25 | RESULTS THAT THERANOS HAD PROVIDED TO PATIENTS IN THE PERIOD OF       |

02:50PM  1    TIME WHEN IT WAS OPERATING THAT CLIA LAB; CORRECT?

02:51PM  2    A.   YES.

02:51PM  3    Q.   AND YOU THOUGHT THAT WAS THE CORRECT DECISION.  YOU DIDN'T

02:51PM  4    DISAGREE WITH DR. DAS ABOUT THAT?

02:51PM  5              MS. TREFZ:  OBJECTION.  FOUNDATION.

02:51PM  6              THE COURT:  WELL, HE TESTIFIED HE KNEW ABOUT THAT.

02:51PM  7    OVERRULED.

02:51PM  8         YOU CAN ANSWER, SIR.

02:51PM  9              THE WITNESS:  I DID NOT DISAGREE.

02:51PM  10   BY MR. SCHENK:

02:51PM  11   Q.   YOU THOUGHT IT WAS AN APPROPRIATE DECISION?

02:51PM  12   A.   THE DECISION WAS HIS TO MAKE.

02:51PM  13   Q.   DID YOU THINK IT WAS WRONG?

02:51PM  14   A.   NO.

02:51PM  15   Q.   AND THAT WAS BECAUSE THE TECHNOLOGY THAT THERANOS WAS

02:51PM  16   USING, NOT THE 4.2, BUT THE TECHNOLOGY THAT THERANOS WAS USING

02:51PM  17   WAS NOT CAPABLE OF ACCURATELY TESTING PATIENTS; CORRECT?

02:51PM  18              MS. TREFZ:  OBJECTION.  FOUNDATION.

02:51PM  19              THE COURT:  DO YOU WANT TO JUST LAY SOME FOUNDATION

02:51PM  20   AS TO --

02:51PM  21              MR. SCHENK:  SURE.

02:51PM  22              THE COURT:  -- THAT MACHINE THAT YOU'RE TALKING

02:51PM  23   ABOUT?

02:51PM  24   BY MR. SCHENK:

02:51PM  25   Q.   YOU TOLD ME THAT YOU DIDN'T DISAGREE WITH DR. DAS'S

02:51PM   1    DECISION TO VOID TESTS; CORRECT?

02:51PM   2    A.   YES.

02:51PM   3    Q.   AND YOU TOLD ME THAT TESTS WERE CONDUCTED ON A DIFFERENT

02:52PM   4    DEVICE, NOT THE 4.2; CORRECT?

02:52PM   5    A.   YES.

02:52PM   6    Q.   AND YOU ALSO KNOW THAT THE REASON THAT THE TESTS WERE

02:52PM   7    VOIDED HAD TO DO WITH CONCERNS ABOUT WHETHER THOSE TESTS WERE

02:52PM   8    ACCURATE, WHETHER THEY WERE APPROPRIATE FOR PATIENTS AND

02:52PM   9    DOCTORS TO BE MAKING MEDICAL DECISIONS BASED UPON.

02:52PM  10         DO YOU ALSO KNOW THAT?

02:52PM  11    A.   YES.

02:52PM  12    Q.   SO THEN MY QUESTION IS, YOU AGREE WITH THE FACT THAT THE

02:52PM  13    OTHER DEVICE, NOT THE 4.2, BUT THE THERANOS DEVICE THAT WAS

02:52PM  14    USED TO TEST PATIENTS BEFORE YOU ARRIVED ON THE BOARD WAS NOT

02:52PM  15    SUITABLE FOR PATIENT TESTING, COULD NOT GENERATE ACCURATE

02:52PM  16    RESULTS.

02:52PM  17         WE BOTH AGREE ON THAT; CORRECT?

02:52PM  18    A.   NO.  THIS IS A GENERAL STATEMENT THAT YOU'RE MAKING THAT I

02:52PM  19    AM NOT COMFORTABLE AGREEING OR DISAGREEING WITH.

02:52PM  20    Q.   WHICH --

02:52PM  21    A.   RESULTS ARE VOIDED FOR SPECIFIC REASONS.  IT DOESN'T MEAN

02:52PM  22    THAT THE WHOLE THING IS WRONG.

02:52PM  23    Q.   DID THERANOS VOID EVERY SINGLE EDISON TEST, NOT SPECIFIC

02:52PM  24    REASONS ON IT, BUT IT VOIDED EVERY SINGLE ONE; RIGHT?

02:53PM  25    A.   I DON'T KNOW THAT.

02:53PM   1      Q.   HOW LONG WERE YOU ON THE BOARD?

02:53PM   2      A.   HOW LONG?

02:53PM   3      Q.   HOW LONG WAS YOUR BOARD SERVICE?

02:53PM   4      A.   TWO AND A HALF YEARS.

02:53PM   5      Q.   AND WHEN YOU JOINED THE BOARD, YOU TESTIFIED THAT YOU WERE

02:53PM   6      AWARE OF SOME REGULATORY, AND I THINK YOU ALSO SAID OPERATIONAL

02:53PM   7      CHALLENGES?

02:53PM   8      A.   YES.

02:53PM   9      Q.   AND WAS ONE OF THOSE CHALLENGES THAT THERANOS VOIDED ALL

02:53PM  10      OF ITS TESTS?  WERE YOU AWARE OF THAT FACT?

02:53PM  11      A.   I WAS NOT AWARE THAT THERANOS VOIDED ALL OF ITS TESTS.

02:53PM  12      Q.   EDISON TESTS.  YOU WERE NOT AWARE THAT THERANOS VOIDED ALL

02:53PM  13      OF ITS EDISON TESTS?

02:53PM  14      A.   NO, I WAS NOT.

02:53PM  15      Q.   DOES NOW KNOWING THAT FACT CHANGE SOME OF THE TESTIMONY

02:53PM  16      THAT YOU GAVE ON DIRECT?

02:53PM  17      A.   NO.

02:53PM  18      Q.   HELP ME UNDERSTAND THAT.  WHAT DO YOU STILL FEEL --

02:54PM  19      A.   I JOINED THE COMPANY TO INFLUENCE THE FUTURE OF THE

02:54PM  20      COMPANY.  I DID NOT -- WHAT YOU CALL THE EDISON DEVICE, I

02:54PM  21      REALLY HAVE NO KNOWLEDGE OF AN EDISON DEVICE.

02:54PM  22           ALL I WAS -- ALL I SAW WAS THE MINILAB AND THE EFFORTS

02:54PM  23      WERE TO COMMERCIALIZE THE MINILAB.

02:54PM  24           AND I HAVE SEEN IN THE NEWSPAPERS, ET CETERA, THE TERM

02:54PM  25      EDISON.  THAT IS NOT SOMETHING THAT I'M FAMILIAR WITH, AND I AM

02:54PM  1    NOT COMFORTABLE TESTIFYING ABOUT IT ONE WAY OR THE OTHER.

02:54PM  2    Q.   AND YOU SPENT YOUR TIME FOCUSSING ON THE FUTURE WHEN YOU

02:54PM  3    WERE ON THE BOARD?

02:54PM  4    A.   YES.

02:54PM  5    Q.   YOU KNEW THERANOS HAD A LOT OF CHALLENGES, AND YOU WERE

02:54PM  6    TRYING TO GET THEM THROUGH THAT; IS THAT RIGHT?

02:54PM  7    A.   YES.

02:54PM  8    Q.   AND YOU SAID YOU WERE NEVER DENIED INFORMATION.  IF YOU

02:54PM  9    HAD A QUESTION OR WANTED TO SEE DOCUMENTS, MS. HOLMES, OR

02:54PM  10   SOMEONE ELSE AT THERANOS, NEVER SAID, YOU CAN'T SEE THIS

02:54PM  11   DOCTOR; CORRECT?

02:54PM  12   A.   CORRECT.

02:54PM  13   Q.   AND I GUESS WHAT I'M WONDERING IS, ISN'T IT A BIG FACT

02:55PM  14   THAT WAS HIDDEN FROM YOU THAT THEY VOIDED ALL OF THOSE EDISON

02:55PM  15   TESTS?  HOW DOESN'T THAT CHANGE YOUR VIEW NOW?

02:55PM  16        (PAUSE IN PROCEEDINGS.)

02:55PM  17            THE WITNESS:  I, I, I DON'T KNOW WHAT TO SAY.

02:55PM  18   BY MR. SCHENK:

02:55PM  19   Q.   LET'S MOVE ON THEN.

02:55PM  20        YOU ALSO -- HELP ME UNDERSTAND HOW MANY HOURS YOU WORKED.

02:55PM  21        YOUR ROLE ON THE BOARD WAS AS AN ADVISOR; IS THAT RIGHT?

02:55PM  22   A.   YES.

02:55PM  23   Q.   AND WAS THAT A FULL-TIME JOB?

02:55PM  24   A.   NO, NO.

02:55PM  25   Q.   HOW -- DO YOU HAVE AN ESTIMATE?  CAN YOU HELP ME SORT OF

02:55PM 1    FIGURE OUT HOW MUCH TIME YOU SPENT AT THERANOS OR WORKING ON

02:55PM 2    THERANOS PROJECTS?

02:55PM 3    A.   MAYBE A DAY A WEEK AT ONE POINT.

02:55PM 4    Q.   EIGHT HOURS PER WEEK, SO ROUGHLY -- I DON'T KNOW, CAN YOU

02:56PM 5    HELP ME FIGURE OUT WHAT YOU WOULD HAVE DONE A MONTH?  WHAT IS

02:56PM 6    THAT, FOUR DAYS A MONTH?

02:56PM 7    A.   MAYBE THREE OR FOUR DAYS A MONTH, YES.

02:56PM 8    Q.   AND AS A RESULT, IT ONLY TOOK YOU, WHAT, ABOUT FOUR MONTHS

02:56PM 9    TO FIGURE OUT THAT EVEN CURRENT DATA AT THERANOS, NOT 2013,

02:56PM 10   2010 TIME, BUT THE TIME YOU WERE THERE, 2016 DATA, YOU

02:56PM 11   DISCOVERED THAT THERE WERE PROBLEMS WITH THAT DATA ALSO,

02:56PM 12   CORRECT, JUST WORKING ONE DAY A WEEK?

02:56PM 13       DO YOU REMEMBER THAT?

02:56PM 14   A.   YES.

02:56PM 15   Q.   AND YOU WARNED MS. HOLMES ABOUT THAT; RIGHT?

02:56PM 16   A.   NO, NO.  YOU'RE REFERRING TO THE DATA THAT WAS GENERATED

02:56PM 17   BY THE CLINICAL LABS.

02:56PM 18   Q.   I'M REFERRING TO DATA WITH REGARD TO ZIKA.

02:56PM 19   A.   I DID NOT HAVE TO DISCOVER ANYTHING ABOUT THE DATA ON THE

02:57PM 20   ZIKA.  THE COMPANY ITSELF WAS TRYING TO DEVELOP A ZIKA ASSAY,

02:57PM 21   AND OF THE FOUR ELEMENTS OF THE TECHNOLOGY, THREE WERE

02:57PM 22   DEVELOPED FULLY AND IN A FALLIBLE VERSION.

02:57PM 23       THE CASSETTE, THE CARTRIDGE, AND THE REAGENTS HAD

02:57PM 24   DIFFICULTIES ACHIEVING THE RIGHT STATISTICS FOR THE THING AND

02:57PM 25   THEY KEPT BEING DEVELOPED.

02:57PM  1          I DIDN'T HAVE TO POINT THAT OUT.  THAT WAS COMING OUT

02:57PM  2     THROUGH THE COMPANY.

02:57PM  3     Q.   YOU RAISED SOME CONCERNS ABOUT THERANOS'S ABILITY TO

02:57PM  4     GENERATE DATA THAT THE FDA WOULD ACCEPT; RIGHT?

02:57PM  5          DO YOU REMEMBER DOING THAT?

02:57PM  6     A.   YES, IN THE CONTEXT OF STRENGTHENING THE QUALITY

02:57PM  7     MANAGEMENT SYSTEM THAT WAS NECESSARY, YES.

02:57PM  8     Q.   AND YOU ADVISED MS. HOLMES OF THAT FACT?

02:57PM  9     A.   YES.

02:57PM  10    Q.   SO WHEN YOU TESTIFIED THAT YOU WERE FORWARD LOOKING, THE

02:57PM  11    CONCERNS THAT SORT OF PREDATED YOUR ARRIVAL WERE NOT SOMETHING

02:58PM  12    THAT YOU CONCERNED YOURSELF AS MUCH WITH, YOU DIDN'T HAVE TO,

02:58PM  13    THERE WERE ALREADY NEW CONCERNS THAT YOU HAD TO CONCERN

02:58PM  14    YOURSELF WITH; CORRECT?  THAT EVEN NEW PROJECTS WITH THIS NEW

02:58PM  15    SCIENTIFIC ADVISORY BOARD, WITH NEW EMPLOYEES, THERE WERE STILL

02:58PM  16    CHALLENGES WITH THE ZIKA DATA?

02:58PM  17    A.   YES.

02:58PM  18    Q.   FROM WHAT YOU LEARNED BEGINNING IN 2016 WHEN YOU JOINED

02:58PM  19    THE THERANOS BOARD, WOULD YOU HAVE TOLD ANY INVESTORS, ANY

02:58PM  20    PEOPLE INTERESTED IN GIVING MONEY TO THERANOS, THAT THERANOS

02:58PM  21    WAS PRESENTLY CAPABLE OF TESTING ABOUT 200 ASSAYS ON A THERANOS

02:58PM  22    DEVICE?  WOULD YOU HAVE MADE THAT STATEMENT?

02:58PM  23    A.   I WOULD NOT HAVE MADE THAT STATEMENT.

02:58PM  24    Q.   BECAUSE IT WOULD NOT HAVE BEEN ACCURATE EVEN IN 2016;

02:58PM  25    CORRECT?

02:58PM  1    A.   CORRECT.

02:58PM  2    Q.   AND IN 2016, YOU WOULD NOT HAVE MADE A STATEMENT ABOUT A

02:59PM  3    DEVICE BEING DEPLOYED TO THE BATTLEFIELD IN AFGHANISTAN?  YOU

02:59PM  4    NEVER WOULD HAVE MADE THAT STATEMENT?

02:59PM  5    A.   NO.

02:59PM  6    Q.   MS. HOLMES HAD -- WERE YOU AWARE MS. HOLMES HAD MEETINGS

02:59PM  7    WITH VARIOUS INVESTORS BEFORE YOU ARRIVED?  I'M TALKING ABOUT

02:59PM  8    IN THE 2010 THROUGH 2013 OR '14 TIMEFRAME.

02:59PM  9    A.   YES.

02:59PM  10   Q.   YOU'RE AWARE THAT THAT HAPPENED; CORRECT?

02:59PM  11   A.   YES.

02:59PM  12   Q.   BUT YOU DON'T KNOW WHAT WAS SAID DURING THOSE MEETINGS?

02:59PM  13   A.   NO.

02:59PM  14   Q.   YOU DON'T KNOW WHAT SHE SAID TO GET ALAN EISENMAN TO

02:59PM  15   INVEST $100,000; CORRECT?

02:59PM  16   A.   I DON'T.

02:59PM  17   Q.   AND YOU DON'T KNOW WHAT SHE SAID TO GET CHRIS LUCAS TO

02:59PM  18   INVEST ABOUT $5.3 MILLION?

02:59PM  19   A.   NO.

02:59PM  20   Q.   YOU DON'T KNOW WHAT SHE SAID TO GET CRAIG HALL OR

02:59PM  21   BRYAN TOLBERT TO INVEST ABOUT $4.8 MILLION?

02:59PM  22   A.   I DON'T.

02:59PM  23   Q.   YOU DON'T KNOW WHAT MS. HOLMES SAID TO GET AN INVESTMENT

02:59PM  24   FIRM NAMED PFM TO INVEST ABOUT $38 MILLION; CORRECT?

02:59PM  25   A.   NO.

03:00PM  1    Q.   YOU DON'T KNOW WHAT SHE SAID TO GET RDV TO INVEST ABOUT A

03:00PM  2    HUNDRED MILLION DOLLARS?

03:00PM  3    A.   NO.

03:00PM  4    Q.   YOU DON'T KNOW WHAT SHE SAID TO GET DAN MOSLEY TO INVEST

03:00PM  5    ABOUT $6 MILLION; CORRECT?

03:00PM  6    A.   NO.

03:00PM  7    Q.   THANK YOU.

03:00PM  8         NO FURTHER QUESTIONS.

03:00PM  9            MS. TREFZ:  JUST VERY BRIEFLY, YOUR HONOR.

03:00PM  10                    **REDIRECT EXAMINATION**

03:00PM  11   BY MS. TREFZ:

03:00PM  12   Q.   DR. BONANNI, JUST ON THE TOPIC OF VOIDED TESTS, I WANT TO

03:00PM  13   MAKE SURE THE RECORD IS CLEAR.

03:00PM  14        THE DECISION TO VOID THERANOS TESTS WAS MADE BEFORE YOU

03:00PM  15   ARRIVED AT THERANOS; CORRECT?

03:00PM  16   A.   YES.

03:00PM  17   Q.   AND DID YOU UNDERSTAND THAT WAS A DECISION MADE BY

03:00PM  18   DR. DAS?

03:00PM  19   A.   YES.

03:00PM  20   Q.   AND DID YOU -- WHY DID YOU DEFER TO DR. DAS ON THE REASONS

03:01PM  21   FOR THAT DECISION?

03:01PM  22   A.   IT'S THE RESPONSIBILITY OF THE MEDICAL DIRECTOR OF A

03:01PM  23   CLINICAL LAB TO VOID ASSAYS.  HE HAS THE AUTHORITY TO DO THAT.

03:01PM  24        IT WOULD CERTAINLY BE INAPPROPRIATE FOR A BOARD MEMBER OF

03:01PM  25   ALL THINGS TO HAVE SOMETHING TO SAY ABOUT THAT.

03:01PM   1    Q.   DID MS. HOLMES EVER TELL YOU THAT RESULTS WERE NOT VOIDED

03:01PM   2    AT THERANOS?

03:01PM   3              MR. SCHENK:  OBJECTION.  CALLS FOR HEARSAY.

03:01PM   4              THE COURT:  SUSTAINED.

03:01PM   5    BY MS. TREFZ:

03:01PM   6    Q.   DID YOU EVER INVESTIGATE THE REASONS FOR THE TESTS BEING

03:01PM   7    VOIDED BEFORE YOU GOT THERE?

03:01PM   8    A.   I DID NOT.

03:01PM   9              MS. TREFZ:  JUST ONE MOMENT, YOUR HONOR.

03:01PM  10              THE COURT:  YES.

03:01PM  11         (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

03:02PM  12    BY MS. TREFZ:

03:02PM  13    Q.   DID YOU SPEAK WITH DAS REGARDING THE VOIDING OF THE TESTS?

03:02PM  14    A.   NO.

03:02PM  15    Q.   DID YOU EVER DO AN EXAMINATION OF THE EDISON DEVICE?

03:02PM  16    A.   NO.

03:02PM  17    Q.   DID YOU EVER RE-REVIEW THE RESULTS THAT -- AND DATA THAT

03:02PM  18    DR. DAS HAD LOOKED AT?

03:02PM  19    A.   NO.

03:02PM  20    Q.   DID ANYONE EVER ASK YOU TO DO THAT?

03:02PM  21    A.   NO.

03:02PM  22              MS. TREFZ:  NO FURTHER QUESTIONS, YOUR HONOR.

03:02PM  23              THE COURT:  MR. SCHENK?

03:02PM  24              MR. SCHENK:  NOTHING FURTHER.

03:02PM  25              THE COURT:  MAY THIS WITNESS BE EXCUSED?

| | | |
|---|---|---|
| 03:02PM | 1 | MR. SCHENK:  YES, YOUR HONOR. |
| 03:02PM | 2 | MS. TREFZ:  YES, YOUR HONOR. |
| 03:02PM | 3 | THE COURT:  YOU'RE EXCUSED, SIR. |
| 03:02PM | 4 | THE WITNESS:  THANK YOU. |
| 03:03PM | 5 | THE COURT:  MR. DOWNEY? |
| 03:03PM | 6 | MR. DOWNEY:  YES, SIR. |
| 03:03PM | 7 | THE DEFENSE CALLS ELIZABETH HOLMES. |
| 03:03PM | 8 | THE COURT:  MS. HOLMES, IF YOU WOULD WALK OVER HERE |
| 03:03PM | 9 | AND GIVE MS. KRATZMANN JUST A MOMENT. |
| 03:03PM | 10 | IF YOU WOULD RAISE YOUR RIGHT HAND WHILE YOU FACE HER, SHE |
| 03:03PM | 11 | HAS A QUESTION. |
| 03:03PM | 12 | **(DEFENDANT'S WITNESS, ELIZABETH HOLMES, WAS SWORN.)** |
| 03:03PM | 13 | THE WITNESS:  YES. |
| 03:03PM | 14 | THE CLERK:  THANK YOU. |
| 03:03PM | 15 | THE COURT:  I'LL INVITE YOU TO HAVE A SEAT HERE. |
| 03:03PM | 16 | MAKE YOURSELF COMFORTABLE. |
| 03:03PM | 17 | THE WITNESS:  YES, THANK YOU. |
| 03:03PM | 18 | THE COURT:  YOU'RE WELCOME. |
| 03:03PM | 19 | FEEL FREE TO ADJUST THE CHAIR AND THE MICROPHONE AS YOU |
| 03:03PM | 20 | NEED.  THERE'S REFRESHMENTS THERE AS I THINK YOU'RE AWARE. |
| 03:03PM | 21 | FEEL FREE TO HELP YOURSELF. |
| 03:03PM | 22 | THE WITNESS:  OKAY.  THANK YOU. |
| 03:03PM | 23 | THE COURT:  WHEN YOU ARE COMFORTABLE, WOULD YOU |
| 03:03PM | 24 | PLEASE STATE YOUR NAME AND THEN SPELL IT, PLEASE. |
| 03:03PM | 25 | THE WITNESS:  YES.  MY NAME IS ELIZABETH HOLMES. |

03:04PM   1        E-L-I-Z-A-B-E-T-H, H-O-L-M-E-S.

03:04PM   2                    THE COURT:  THANK YOU.

03:04PM   3                    MR. DOWNEY:  YOUR HONOR, MAY I APPROACH?

03:04PM   4                    THE COURT:  YES.

03:04PM   5                            **DIRECT EXAMINATION**

03:04PM   6        BY MR. DOWNEY:

03:04PM   7        Q.   (HANDING.)

03:04PM   8             MS. HOLMES, WILL YOU CONFIRM FOR US THAT YOU ARE

03:04PM   9        VACCINATED SO YOU MIGHT REMOVE YOUR MASK IF YOU PREFER?

03:04PM  10        A.   I AM VACCINATED, YES.

03:04PM  11        Q.   DID YOU FOUND THERANOS?

03:04PM  12        A.   YES.

03:04PM  13        Q.   HOW LONG DID YOU WORK THERE?

03:04PM  14        A.   I WORKED THERE FROM 2004 TO 2018.

03:04PM  15        Q.   WHILE YOU WERE THERE, DID YOU BELIEVE THAT THERANOS

03:04PM  16        DEVELOPED TECHNOLOGY THAT WAS CAPABLE OF RUNNING ANY BLOOD

03:05PM  17        TEST?

03:05PM  18        A.   I DID.

03:05PM  19        Q.   EXPLAIN THAT.

03:05PM  20        A.   WE WORKED FOR YEARS WITH TEAMS OF SCIENTISTS AND ENGINEERS

03:05PM  21        TO MINIATURIZE ALL OF THE TECHNOLOGIES IN A LABORATORY.

03:05PM  22             THE CORE PART OF THAT WAS A FORMULA FOR BEING ABLE TO RUN

03:05PM  23        TESTS ON SMALL SAMPLES AND RUN THAT FORMULA.  WE MINIATURIZED

03:05PM  24        THE TOOLS IN A LAB, LIKE A CENTRIFUGE OR A MICROSCOPE, TO

03:05PM  25        EXECUTE IT.

03:05PM  1          BY 2009, 2010, WE HAD A BREAKTHROUGH IN WHICH WE FIGURED

03:05PM  2    OUT HOW TO APPLY THE FORMULA NOT JUST TO ONE METHOD OF TESTS,

03:05PM  3    BUT TO FOUR.

03:05PM  4          AND ACROSS THOSE FOUR METHODS WE COULD RUN ANY TEST.

03:05PM  5    Q.   AND IS IT THAT WORK THAT LED YOU TO CONCLUDE THAT THE

03:05PM  6    COMPANY WAS CAPABLE OF PERFORMING ANY BLOOD TEST ESSENTIALLY?

03:06PM  7    A.   YES.

03:06PM  8    Q.   HOW MANY SMALL SAMPLE ASSAYS DID THERANOS DEVELOP AND

03:06PM  9    VALIDATE IN ITS RESEARCH LABORATORY WHILE YOU WERE AT THE

03:06PM  10   COMPANY?

03:06PM  11   A.   OVER 300.

03:06PM  12   Q.   HOW MANY SMALL -- AND DO YOU KNOW THAT THERE WAS A TIME

03:06PM  13   THAT THERANOS OPERATED A CLINICAL LABORATORY OFFERING BLOOD

03:06PM  14   TESTING SERVICES TO THE PUBLIC?

03:06PM  15   A.   YES.

03:06PM  16   Q.   HOW MANY SMALL SAMPLE ASSAYS DID THERANOS OFFER IN ITS

03:06PM  17   CLINICAL LABORATORY?

03:06PM  18   A.   OVER 70 OR SO.

03:06PM  19   Q.   HOW MANY OF THOSE ASSAYS WERE OFFERED WHERE THE ANALYSIS

03:06PM  20   WAS PERFORMED ON A MINIATURIZED THERANOS DEVICE?

03:06PM  21   A.   TWELVE.

03:06PM  22   Q.   WHEN YOU SPOKE PUBLICLY ABOUT THE CAPABILITIES OF

03:06PM  23   THERANOS'S TECHNOLOGY, WERE YOU ALWAYS LIMITING YOUR COMMENTS

03:06PM  24   TO WHAT WAS AVAILABLE IN THERANOS'S CLINICAL LAB?

03:06PM  25   A.   NO.

03:06PM  1    Q.   I'D LIKE TO TAKE A STEP BACK AND ASK YOU ABOUT YOUR

03:06PM  2    BACKGROUND.

03:06PM  3         WHEN WERE YOU BORN?

03:06PM  4    A.   I WAS BORN ON FEBRUARY 3RD, 1984.

03:06PM  5    Q.   WHERE WERE YOU BORN?

03:07PM  6    A.   IN WASHINGTON, DC.

03:07PM  7    Q.   DID YOU GROW UP THERE?

03:07PM  8    A.   I DID FOR A FEW YEARS.  I MOVED TO CALIFORNIA.  I MOVED

03:07PM  9    BACK TO DC AND THEN TO HOUSTON, TEXAS.

03:07PM  10   Q.   DID YOU GO TO HIGH SCHOOL IN HOUSTON?

03:07PM  11   A.   I DID.

03:07PM  12   Q.   DID YOU ATTEND COLLEGE?

03:07PM  13   A.   FIRST YEAR AND A HALF.

03:07PM  14   Q.   AND WHERE DID YOU ATTEND COLLEGE?

03:07PM  15   A.   I WENT TO STANFORD UNIVERSITY.

03:07PM  16   Q.   SO TELL US, IN YOUR FRESHMAN YEAR AT STANFORD, WHAT DID

03:07PM  17   YOU STUDY?

03:07PM  18   A.   I WAS STUDYING CHEMICAL ENGINEERING AND STARTING TO

03:07PM  19   EXPLORE ELECTRICAL ENGINEERING.

03:07PM  20   Q.   DURING YOUR FIRST YEAR AT STANFORD, DID YOU MEET A

03:07PM  21   PROFESSOR NAMED CHANNING ROBERTSON?

03:07PM  22   A.   I DID.

03:07PM  23   Q.   AND WHO WAS DR. ROBERTSON AT THAT TIME?

03:07PM  24   A.   I THINK HE WAS THE CHAIR OF THE CHEMICAL ENGINEERING

03:07PM  25   DEPARTMENT AT THAT TIME AND A CHEMICAL ENGINEERING PROFESSOR

03:07PM   1    WHO HAD BEEN INVOLVED IN A LOT OF COMPANIES IN THE LIFE SCIENCE

03:07PM   2    SPACE.

03:07PM   3    Q.   AND HOW DID YOU COME TO MEET DR. ROBERTSON?

03:08PM   4    A.   WHEN I GOT TO STANFORD, I WENT THROUGH THE HANDBOOK OF

03:08PM   5    PROFESSORS LOOKING FOR EVERY PROFESSOR WHO WAS INVOLVED IN BOTH

03:08PM   6    HEALTH TECHNOLOGY, AS WELL AS TRADITIONAL TECHNOLOGY, AND THERE

03:08PM   7    WAS ONLY THREE OR SO OF THEM, SO I SHOWED UP AT HIS OFFICE AND

03:08PM   8    ASKED IF I COULD TAKE HIS CLASS.

03:08PM   9    Q.   AND DID YOU TAKE HIS CLASS?

03:08PM  10    A.   YES.

03:08PM  11    Q.   OUTSIDE OF CLASS, DID PROFESSOR ROBERTSON ALSO HAVE A

03:08PM  12    RESEARCH LABORATORY?

03:08PM  13    A.   HE DID.

03:08PM  14    Q.   DID YOU COME TO WORK IN THAT RESEARCH LABORATORY DURING

03:08PM  15    YOUR FIRST YEAR AT STANFORD?

03:08PM  16    A.   YES.

03:08PM  17    Q.   WHO WORKED WITH YOU IN THAT RESEARCH LABORATORY?

03:08PM  18    A.   SEVERAL OF DR. ROBERTSON'S STUDENTS.  I WORKED FOR

03:08PM  19    DR. SHAUNAK ROY.

03:08PM  20    Q.   AND WHAT KIND OF WORK DID YOU DO IN THAT RESEARCH

03:08PM  21    LABORATORY DURING YOUR FRESHMAN YEAR AT STANFORD?

03:08PM  22    A.   I WORKED ON WHAT IS CALLED MICROFLUIDICS.

03:08PM  23    Q.   AND WHAT ARE MICROFLUIDICS?

03:08PM  24    A.   IT'S THE HANDLING OF VERY SMALL VOLUMES OF FLUID, SO HOW

03:08PM  25    THEY MOVE AND HOW TO PROCESS THEM.

03:09PM  1    Q.   AND AFTER YOUR FIRST YEAR AT STANFORD, DID YOU CONTINUE TO

03:09PM  2    WORK IN THE SUMMER DURING OR AROUND THE SUBJECTS OF

03:09PM  3    ENGINEERING?

03:09PM  4    A.   YES.

03:09PM  5    Q.   AND WHERE DID YOU WORK?

03:09PM  6    A.   I WORKED AT THE GENOME INSTITUTE IN SINGAPORE.

03:09PM  7    Q.   AND WHAT IS THE GENOME INSTITUTE?

03:09PM  8    A.   IT IS THE RESEARCH INSTITUTE THAT STUDIES THE HUMAN

03:09PM  9    GENOME, SO DNA, MEDICINES THAT CAN AFFECT IT, AND TESTS BASED

03:09PM  10   ON GENETICS.

03:09PM  11   Q.   AND WHAT DID YOU DO WHEN YOU WERE WORKING AT THE GENOME

03:09PM  12   INSTITUTE?

03:09PM  13   A.   I WAS A RESEARCHER WORKING ON WHAT IS CALLED A MICROARRAY,

03:09PM  14   WHICH IS A TEST SYSTEM FOR THE DETECTION OF THE SARS VIRUS.

03:09PM  15   Q.   CAN YOU REMIND US WHAT THE SARS VIRUS WAS?

03:09PM  16   A.   YES.  IT WAS A PRECURSOR TO COVID IN SOME WAYS.  IT WAS AN

03:09PM  17   INFLUENZA-LIKE VIRUS THAT WAS BREAKING OUT AT THAT TIME.

03:09PM  18   Q.   AND WHILE YOU WERE WORKING AT THE GENOME INSTITUTE, DID

03:09PM  19   YOU COME TO DEVELOP A MENTOR AT THE GENOME INSTITUTE AS WELL?

03:10PM  20   A.   I DID.

03:10PM  21   Q.   AND WHO WAS THAT?

03:10PM  22   A.   DR. EDISON LIU.

03:10PM  23   Q.   AND WHO WAS DR. EDISON LIU AS OF -- WHAT YEAR WAS THIS

03:10PM  24   APPROXIMATELY?

03:10PM  25   A.   THIS WAS 2003.

03:10PM  1     Q.   AND WHO WAS DR. EDISON LIU AS OF 2003?

03:10PM  2     A.   HE WAS A RESEARCHER IN THE BREAST CANCER SPACE.  HE HAD

03:10PM  3     BEEN A LEADER AT THE NATIONAL CANCER INSTITUTE, AND HE HAD COME

03:10PM  4     TO SINGAPORE TO RUN THE GENOME INSTITUTE IN SINGAPORE.

03:10PM  5     Q.   NOW, IN YOUR TIME WORKING AT THE GENOME INSTITUTE, DID YOU

03:10PM  6     BEGIN TO, TO DEVELOP AN IDEA THAT LED YOU TO FILE A PATENT

03:10PM  7     APPLICATION?

03:10PM  8     A.   I DID.

03:10PM  9     Q.   AND IS THE INVENTION THAT WAS THE SUBJECT OF THAT PATENT

03:10PM  10    APPLICATION SOMETHING THAT ULTIMATELY FORMED PART OF THE BASIS

03:10PM  11    OF THE TECHNOLOGIES THAT WERE USED AT THERANOS?

03:10PM  12    A.   YES.

03:10PM  13    Q.   DID YOU WORK ON THAT PATENT APPLICATION WHILE YOU WERE AT

03:10PM  14    THE GENOME INSTITUTE OR AFTER YOU RETURNED?

03:10PM  15    A.   BOTH.

03:10PM  16    Q.   OKAY.  NOW, TELL US BEFORE -- I WANT TO ASK YOU ABOUT WHAT

03:11PM  17    IDEA IT IS THAT YOU HAD, BUT BEFORE I DO THAT, CAN YOU TELL US

03:11PM  18    WHAT WAS HAPPENING IN YOUR HEAD THAT GENERATED THE IDEA THAT

03:11PM  19    YOU MIGHT FILE A PATENT APPLICATION?

03:11PM  20    A.   I HAD BEEN WORKING AT STANFORD ON THE HANDLING OF SMALL

03:11PM  21    VOLUMES OF FLUID.  I HAD BEEN WORKING IN SINGAPORE ON THESE

03:11PM  22    MICROARRAY MACHINES, WHICH ARE BIG DIAGNOSTIC MACHINES, AND I

03:11PM  23    HAD ALSO HAD THE OPPORTUNITY TO DO SOME RESEARCH ON DRUG

03:11PM  24    DELIVERY TECHNOLOGIES.

03:11PM  25         AND I THOUGHT I COULD COMBINE THEM AND MINIATURIZE SOME OF

03:11PM  1    THE TECHNOLOGY THAT I HAD SEEN IN THE LAB IN SINGAPORE.

03:11PM  2    Q.   AND DID YOU THINK OF A PARTICULAR INVENTION?

03:11PM  3    A.   I DID.

03:11PM  4    Q.   AND WHAT WAS THAT?

03:11PM  5    A.   I THOUGHT ABOUT MINIATURIZING THOSE TECHNOLOGIES TO THE

03:11PM  6    POINT THAT THEY COULD BE PUT IN A PILL THAT SOMEONE COULD

03:11PM  7    SWALLOW AND DO TESTING THROUGH THE PILL WHILE IT'S GOING

03:12PM  8    THROUGH YOUR BODY, OR IN A PATCH THAT SOMEONE COULD WEAR.

03:12PM  9    Q.   DID YOU DISCUSS THE IDEA THAT YOU WERE CONSIDERING WITH

03:12PM  10   ANYONE IN SINGAPORE?

03:12PM  11   A.   I DID.

03:12PM  12   Q.   AND WITH WHOM DID YOU DISCUSS IT?

03:12PM  13   A.   I DISCUSSED IT WITH DR. LIU.

03:12PM  14   Q.   AND TELL US ABOUT THAT CONVERSATION.

03:12PM  15   A.   DR. LIU WAS VERY ENCOURAGING.  HE WAS EXCITED ABOUT THE

03:12PM  16   IDEA.  HE THOUGHT IT WAS POSSIBLE AND ENCOURAGED ME TO PURSUE

03:12PM  17   IT.

03:12PM  18   Q.   AND AT THE TIME THAT YOU WERE FILING THIS PATENT

03:12PM  19   APPLICATION, WERE THERE ANY TECHNOLOGIES THAT EXISTED THAT

03:12PM  20   ALLOWED SOMEONE AT THE POINT OF THE BODY TO RECEIVE AN

03:12PM  21   IMMEDIATE DIAGNOSIS, OR A READING OF THEIR BLOOD OR OTHER

03:12PM  22   BODILY FLUID?

03:12PM  23   A.   NOT THAT I KNEW OF IN THE SAME WAY.  THERE WAS GLUCOSE

03:12PM  24   METERS THAT COULD DO GLUCOSE TESTING, OR CHOLESTEROL METERS

03:12PM  25   THAT COULD DO CHOLESTEROL TESTING.  THESE ARE MOSTLY

03:12PM 1      TECHNOLOGIES FOR A SINGLE OR A FEW TESTS.  BUT THEY WEREN'T

03:13PM 2      INGESTIBLES OR WEARABLES.

03:13PM 3      Q.   WHEN YOU RETURNED FROM SINGAPORE, DID YOU WORK ON THAT

03:13PM 4      PATENT APPLICATION?

03:13PM 5      A.   I DID.

03:13PM 6      Q.   AND WHERE DID YOU DO THAT?

03:13PM 7      A.   AT MY PARENTS' HOME IN HOUSTON.

03:13PM 8      Q.   AND DID YOU ULTIMATELY FILE THAT PATENT APPLICATION?

03:13PM 9      A.   YES.

03:13PM 10     Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7051.

03:13PM 11          THAT SHOULD BE IN YOUR NOTEBOOK NEXT TO A TAB THAT SAYS

03:13PM 12     7051.

03:13PM 13     A.   OH.  OKAY.

03:13PM 14     Q.   AND JUST TAKE A MOMENT TO LOOK AT THAT.

03:13PM 15          AND CAN YOU TELL US, IS THIS THE PATENT APPLICATION THAT

03:13PM 16     YOU FILED IN SEPTEMBER OF 2003?

03:13PM 17     A.   YES.

03:13PM 18          MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:13PM 19     7051.

03:13PM 20          MR. LEACH:  NO OBJECTION.

03:13PM 21          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:13PM 22     (DEFENDANT'S EXHIBIT 7051 WAS RECEIVED IN EVIDENCE.)

03:13PM 23     BY MR. DOWNEY:

03:13PM 24     Q.   NOW, AT THE TIME THAT YOU -- LET'S GET THE DATE FOR WHEN

03:14PM 25     YOU FILED THIS APPLICATION.

03:14PM 1          DID YOU FILE THIS IN SEPTEMBER OF 2003?

03:14PM 2    A.   I DID.

03:14PM 3    Q.   OKAY.  AND AT THE TIME THAT YOU FILED IT, DID YOU HAVE A

03:14PM 4    PROTOTYPE OF AN ACTUAL PILL OR PATCH THAT YOU WERE SEEKING A

03:14PM 5    PATENT ON?

03:14PM 6    A.   NO.

03:14PM 7    Q.   AND DID THE APPLICATION THAT YOU FILED DESCRIBE THE

03:14PM 8    INVENTION THAT REFLECTED THE IDEA THAT YOU HAD?

03:14PM 9    A.   YES.

03:14PM 10   Q.   LET ME ASK YOU TO LOOK AT PAGE 30 WITHIN EXHIBIT 7051.

03:14PM 11   AND WE CAN PUT THAT UP ON THE SCREEN.

03:14PM 12        I'D ASK YOU JUST TO EXPLAIN FROM THIS -- THIS IS A DIAGRAM

03:14PM 13   THAT WAS CONTAINED WITHIN YOUR PATENT APPLICATION?

03:14PM 14   A.   IT IS.

03:14PM 15   Q.   AND DOES THIS DIAGRAM REFLECT THE INVENTIONS THAT YOU WERE

03:15PM 16   FILING AN APPLICATION ON?

03:15PM 17   A.   YES.

03:15PM 18   Q.   AND TAKING -- USING THIS DIAGRAM, CAN YOU EXPLAIN THE IDEA

03:15PM 19   FOR THE INVENTION?

03:15PM 20   A.   YES.  AND IT SOUNDS LIKE I CAN'T POINT.  NO?  OKAY.

03:15PM 21            THE COURT:  I DON'T THINK IT'S WORKING.

03:15PM 22        IS THIS OPERATIONAL, MS. KRATZMANN?  THE TOUCH SCREEN?

03:15PM 23            THE CLERK:  NO, THAT FEATURE IS NOT WORKING,

03:15PM 24   YOUR HONOR.

03:15PM 25            MR. DOWNEY:  WELL, MAYBE I CAN ASK MR. BENNETT TO

03:15PM   1    HIGHLIGHT THE RELEVANT PORTIONS AS SHE DISCUSSES THEM.

03:15PM   2    Q.   SO WHERE ON THIS DIAGRAM SHOULD WE START TO UNDERSTAND THE

03:15PM   3    INVENTION?

03:15PM   4    A.   YEAH.  SO START AT THE TOP.

03:15PM   5         SO FIRST OF ALL, THIS IS A PILL.

03:15PM   6    Q.   IS THAT WITH THE CIRCULAR PART ON THE TOP?

03:15PM   7    A.   YES, IT'S THE CIRCULAR PART ON THE TOP.

03:15PM   8    Q.   LET ME JUST ASK MR. BENNETT TO HIGHLIGHT THAT SO WE --

03:15PM   9    A.   AND WHAT WE'RE LOOKING AT IS A PILL THAT COULD BE

03:15PM  10    SWALLOWED WHERE FLUID COULD FLOW IN AND OUT OF THE PILL AS IT

03:15PM  11    GOES THROUGH THE BODY.

03:16PM  12         SO THE IDEA WAS THOSE LITTLE HOLES THAT ARE CALLED

03:16PM  13    MEMBRANES WOULD ALLOW FLUID TO MOVE IN, RUN OVER THOSE BEADS,

03:16PM  14    WHICH ARE SENSORS, TO REACT --

03:16PM  15    Q.   ARE THE BEADS THE BLACK DOTS UNDERNEATH?

03:16PM  16    A.   EXACTLY.

03:16PM  17    Q.   I INTERRUPTED YOU.  I'M SORRY.

03:16PM  18         WHAT ARE THE SENSORS?

03:16PM  19    A.   THE BEADS THEMSELVES ARE SENSORS.  SO THERE'S CHEMISTRY

03:16PM  20    THERE THAT WOULD INTERACT WITH THE SAMPLE, AND THE SAMPLE WOULD

03:16PM  21    FLOW OUT THE OTHER SIDE.

03:16PM  22         WHEN THE CHEMISTRY INTERACTED WITH THE SAMPLE, IT WOULD

03:16PM  23    RUN A TEST.

03:16PM  24         AND THE SIGNAL, OR THE DATA FROM THAT TEST WOULD BE

03:16PM  25    TRANSFERRED WIRELESSLY TO SOME TYPE OF HANDHELD DEVICE WHERE

03:16PM  1    PROCESSING OF THAT DATA WOULD BE DONE, AND THEN INFORMATION

03:16PM  2    WOULD BE TRANSFERRED BACK TO THE PILL WHICH HAD DRUGS LOADED

03:16PM  3    INTO THOSE LITTLE RESERVOIRS OR CHANNELS.

03:17PM  4    Q.   ARE THEY THE FLAT LINES IN THE -- NEXT TO NUMBER 10 AND

03:17PM  5    11?

03:17PM  6    A.   EXACTLY, YES.

03:17PM  7         AND THE IDEA WAS THAT THE DRUG COULD BE RELEASED BASED ON

03:17PM  8    WHAT IS MEASURED IN THE BODY.

03:17PM  9         SO, FOR EXAMPLE, IF YOU WERE SICK WITH AN INFECTION, THE

03:17PM  10   PILL COULD PICK IT UP AND DELIVER A MEDICATION, LIKE AN

03:17PM  11   ANTIBIOTIC, IN REALTIME.

03:17PM  12   Q.   AND DID YOU GET THIS APPLICATION FOR A PATENT ON FILE

03:17PM  13   BEFORE YOU RETURNED TO YOUR SOPHOMORE YEAR AT STANFORD?

03:17PM  14   A.   I DID.

03:17PM  15   Q.   WHEN YOU RETURNED TO STANFORD, DID YOU DISCUSS WITH

03:17PM  16   PROFESSOR ROBERTSON THE IDEA OF THE PATENT AND THE PATENT

03:17PM  17   APPLICATION THAT YOU FILED?

03:17PM  18   A.   YES.

03:17PM  19   Q.   AND WHAT WAS HIS REACTION?

03:17PM  20   A.   I THINK HE WAS A BIT SKEPTICAL AT FIRST.  I GAVE HIM A

03:17PM  21   COPY OF THE PROVISIONAL APPLICATION.  HE READ IT.  HE SAID IT

03:17PM  22   WAS SOMETHING THAT HAD NOT BEEN DONE BEFORE, AND HE ENCOURAGED

03:18PM  23   ME TO CONTINUE MY RESEARCH.

03:18PM  24   Q.   DURING YOUR SOPHOMORE YEAR, DID YOU CONTINUE TO WORK IN

03:18PM  25   DR. ROBERTSON'S RESEARCH LABORATORY?

03:18PM  1    A.   I DID.

03:18PM  2    Q.   AND DID YOU CONTINUE TO WORK ON MICROFLUIDICS?

03:18PM  3    A.   YES.

03:18PM  4    Q.   AND DID YOU ALSO BEGIN TO DO INDEPENDENT RESEARCH AT

03:18PM  5    STANFORD IN THE AREAS OF MICROFLUIDICS AND NANO FABRICATION?

03:18PM  6    A.   I DID.

03:18PM  7    Q.   AND TELL US WHAT NANO FABRICATION IS.

03:18PM  8    A.   IT'S LITERALLY THE FABRICATION OR THE MAKING OF NANO SCALE

03:18PM  9    TECHNOLOGY, SO VERY SMALL TECHNOLOGIES, OFTEN CHIPS, LIKE

03:18PM  10   SILICON CHIPS, THAT CAN BE BUILT IN A FAB.

03:18PM  11   Q.   AND WERE BOTH OF THOSE DISCIPLINES RELEVANT TO THE

03:18PM  12   INVENTION ON WHICH YOU FILED A PATENT APPLICATION?

03:18PM  13   A.   YES.

03:18PM  14   Q.   HOW MUCH TIME DID YOU SPEND WORKING IN -- BETWEEN THE

03:18PM  15   INDEPENDENT RESEARCH AND YOUR WORK IN DR. ROBERTSON'S RESEARCH

03:18PM  16   LABORATORY, HOW MUCH TIME DID YOU SPEND ON THAT RELATIVE TO

03:19PM  17   YOUR CLASS WORK?

03:19PM  18   A.   I SPENT ALMOST ALL OF MY TIME ON THAT.

03:19PM  19   Q.   OKAY.  DID THAT ULTIMATELY CAUSE YOU -- IS THAT ONE OF THE

03:19PM  20   REASONS THAT YOU DECIDED TO LEAVE STANFORD UNIVERSITY?

03:19PM  21   A.   THAT'S ONE OF THE REASONS, YES.

03:19PM  22   Q.   WHEN DID YOU ACTUALLY END UP LEAVING STANFORD AS A

03:19PM  23   STUDENT?

03:19PM  24   A.   I LEFT IN MARCH OF 2004.

03:19PM  25   Q.   DID YOU HAVE ANY CONVERSATIONS WITH PROFESSOR ROBERTSON

03:19PM  1    ABOUT YOUR DECISION TO LEAVE?

03:19PM  2    A.   I DID.

03:19PM  3    Q.   AND TELL US ABOUT THAT CONVERSATION.

03:19PM  4    A.   I TOLD HIM I WANTED TO TAKE A LEAVE OF ABSENCE.  HE

03:19PM  5    EXPRESSED SOME CONCERN ABOUT ME NOT FINISHING COLLEGE, BUT I

03:19PM  6    WAS ALWAYS ABLE TO GO BACK.

03:19PM  7         AND HE ULTIMATELY WAS SUPPORTIVE AND SAID HE WOULD HELP ME

03:20PM  8    BUILD.

03:20PM  9    Q.   AND WHEN YOU HAD THE PATENT APPLICATION ON FILE, WAS THE

03:20PM  10   NEXT STEP TO TRY TO BUILD A PROTOTYPE OF THE INVENTION?

03:20PM  11   A.   YES.

03:20PM  12   Q.   IS THAT WHAT YOU BEGAN TO DO AFTER YOU LEFT STANFORD?

03:20PM  13   A.   YES.

03:20PM  14   Q.   AND TELL US ABOUT HOW YOU DID THAT.  DID YOU START THE

03:20PM  15   COMPANY, OR DID YOU DO IT ON YOUR OWN AT FIRST?

03:20PM  16   A.   I WAS DOING IT ON MY OWN.  I DID THEN START A COMPANY AND

03:20PM  17   TRIED TO RAISE THE MONEY TO GET A LAB AND TO BE ABLE TO HIRE

03:20PM  18   SCIENTISTS TO WORK WITH TO BUILD.

03:20PM  19   Q.   OKAY.  AND TELL US ABOUT JUST THE FIRST FEW MONTHS OF THAT

03:20PM  20   COMPANY'S -- FIRST OF ALL, WHAT WAS THAT COMPANY CALLED?

03:20PM  21   A.   I CALLED IT REAL-TIME CURES.

03:20PM  22   Q.   OKAY.  AND THEN LATER HOW DID IT COME TO BE CALLED

03:20PM  23   THERANOS?

03:20PM  24   A.   CHANGED THE NAME TO THERANOS.

03:20PM  25   Q.   OKAY.  AND WHEN WAS THAT?

03:20PM  1    A.   IN 2005, I THINK.

03:20PM  2    Q.   OKAY.  SO LET'S TALK ABOUT THE EARLY PART OF THE COMPANY

03:20PM  3    WHEN IT WAS STILL REAL-TIME CURES.  WHAT -- OTHER THAN BUILDING

03:21PM  4    THE TEAM AND TRYING TO FIND SPACE FOR A LAB, WHAT ELSE WERE YOU

03:21PM  5    DOING WITH RESPECT TO THE PRODUCT OR THE INVENTION?

03:21PM  6    A.   WE, WE WERE PROTOTYPING.  SO WE WERE TRYING TO BUILD THE

03:21PM  7    COMPONENTS OF THE TECHNOLOGY IN THIS LITTLE LAB THAT WE

03:21PM  8    ULTIMATELY GOT SET UP.

03:21PM  9    Q.   YOU MENTIONED YOU WERE TRYING TO HIRE EMPLOYEES.  WERE YOU

03:21PM  10   ULTIMATELY ABLE TO HIRE SOME EMPLOYEES TO WORK WITH YOU ON IT?

03:21PM  11   A.   YES.

03:21PM  12   Q.   AND WHO WERE THEY?

03:21PM  13   A.   I HAD THE OPPORTUNITY TO HIRE SOME OF THE PEOPLE THAT I

03:21PM  14   WAS WORKING FOR AND WITH AT STANFORD, TWO OF DR. ROBERTSON'S

03:21PM  15   STUDENTS AND TWO PEOPLE THAT I HAD MET IN THE FAB, THE

03:21PM  16   FABRICATION FACILITY, WHO HAD WORKED AT I.B.M. FOR A LONG TIME.

03:21PM  17   Q.   AND DID DR. ROBERTSON HAVE ANY ROLE WITH REGARD TO THE NEW

03:21PM  18   COMPANY, REAL-TIME CURES?

03:21PM  19   A.   HE DID.

03:21PM  20   Q.   AND WHAT ROLE DID HE HAVE?

03:21PM  21   A.   HE BECAME OUR FIRST BOARD MEMBER.

03:22PM  22   Q.   NOW, DID THERE COME A TIME WHEN YOU -- I BELIEVE YOU SAID

03:22PM  23   YOU HAD FILED A PATENT APPLICATION IN 2003; IS THAT RIGHT?

03:22PM  24   A.   I DID.

03:22PM  25   Q.   AND WAS THAT AN APPLICATION FOR A FINAL PATENT OR WAS IT

03:22PM  1    WHAT IS KNOWN AS A PROVISIONAL PATENT APPLICATION?

03:22PM  2    A.   IT WAS A PROVISIONAL PATENT.

03:22PM  3    Q.   AND CAN YOU EXPLAIN WHAT THAT MEANS?

03:22PM  4    A.   IT'S THE VERY FIRST STEP IN THE PATENT PROCESS WHERE YOU

03:22PM  5    PUT YOUR IDEA ON FILE TO MARK THE DATE OF THE INVENTION.

03:22PM  6    Q.   OKAY.  DID YOU ULTIMATELY -- WERE YOU ULTIMATELY

03:22PM  7    SUCCESSFUL IN OBTAINING A PATENT ON THE APPLICATION THAT YOU

03:22PM  8    FILED IN 2003 BEFORE YOUR SOPHOMORE YEAR AT STANFORD?

03:22PM  9    A.   YES.

03:22PM  10   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 9501.

03:22PM  11   A.   OKAY.

03:22PM  12   Q.   CAN YOU TELL US WHAT THIS IS?

03:23PM  13   A.   THIS IS THE ACTUAL PATENT THAT WAS ISSUED ON THAT IDEA.

03:23PM  14          MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 9501.

03:23PM  15          MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:23PM  16          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:23PM  17      (DEFENDANT'S EXHIBIT 9501 WAS RECEIVED IN EVIDENCE.)

03:23PM  18   BY MR. DOWNEY:

03:23PM  19   Q.   I'D LIKE TO JUST HIGHLIGHT THE FIRST PAGE OF THIS PATENT.

03:23PM  20      WHEN WAS THIS GRANTED?

03:23PM  21   A.   IT WAS GRANTED ON NOVEMBER 6TH OF 2007.

03:23PM  22   Q.   OKAY.  AND DO YOU SEE ON THE LEFT-HAND SIDE THERE'S AN

03:23PM  23   ITEM, INVENTORS, AND THEN THERE'S YOUR NAME AND SOME OTHERS?

03:23PM  24   A.   YES.

03:23PM  25   Q.   AND WHY ARE THE OTHERS LISTED AS INVENTORS ON THE PATENT?

03:23PM  1    A.   BECAUSE THEY CAME UP WITH SOME OF THE KEY IDEAS IN

03:23PM  2    DEVELOPING THE PROTOTYPE.

03:23PM  3    Q.   NOW, YOU WERE ULTIMATELY ABLE TO BUILD A PROTOTYPE?

03:23PM  4    A.   YES.

03:23PM  5    Q.   AND WHEN DID THAT HAPPEN?

03:24PM  6    A.   STARTING IN 2004 AND OVER THE COURSE OF THE YEAR.

03:24PM  7    Q.   ABOUT A YEAR AFTER YOU FILED THE APPLICATION?

03:24PM  8    A.   YES.

03:24PM  9    Q.   AND ONCE YOU HAD A PROTOTYPE, DID YOU BEGIN TO START TO

03:24PM 10    THINK ABOUT HOW YOU MIGHT TURN THIS INVENTION INTO SOME KIND OF

03:24PM 11    A PRODUCT THAT MIGHT BE USED BY SOMEONE WHO MIGHT PAY YOU MONEY

03:24PM 12    FOR IT?

03:24PM 13    A.   YES.

03:24PM 14    Q.   TELL US ABOUT THAT PROCESS.

03:24PM 15    A.   I KNEW A PROFESSOR AT STANFORD WHO HAD AN ENTREPRENEURSHIP

03:24PM 16    CLASS AND HE SAID I COULD WORK WITH HIS CLASS ON A PROJECT TO

03:24PM 17    COME UP WITH A BUSINESS PLAN, AND I DID THAT.

03:24PM 18    Q.   AND WERE YOU ULTIMATELY ABLE TO COME UP WITH A BUSINESS

03:24PM 19    PLAN FOR THE INVENTION?

03:24PM 20    A.   YES.

03:24PM 21    Q.   AND TELL US ABOUT THAT BUSINESS PLAN.

03:24PM 22    A.   THE BUSINESS PLAN FOCUSSED ON INTRODUCING OUR TECHNOLOGY

03:24PM 23    TO PHARMACEUTICAL COMPANIES FOR USE IN CLINICAL TRIALS WHERE WE

03:24PM 24    COULD DEVELOP A LIBRARY OF TESTS AND TRY TO HELP PHARMA

03:25PM 25    COMPANIES GET DRUGS TO MARKET FASTER.

03:25PM  1    Q.   WE'VE HEARD SOME TESTIMONY IN THE CASE ABOUT CLINICAL

03:25PM  2    TRIALS AND PHARMACEUTICAL COMPANIES.

03:25PM  3         IS THIS PERIOD OF 2004 REALLY THE FIRST TIME THAT YOU

03:25PM  4    STARTED WORKING ON A PRODUCT THAT COULD BE USED BY

03:25PM  5    PHARMACEUTICAL COMPANIES?

03:25PM  6    A.   YES.

03:25PM  7    Q.   NOW, WITH THE BUSINESS PLAN IN MIND, DID YOU GO ABOUT

03:25PM  8    TRYING TO INTEREST PHARMACEUTICAL COMPANIES?

03:25PM  9    A.   I DID, YES.

03:25PM  10   Q.   AND TELL US ABOUT THAT.

03:25PM  11   A.   I MET WITH EVERYONE I COULD WHO KNEW SOMEONE WHO WORKED IN

03:25PM  12   PHARMA OR WAS IN PHARMA TO TRY TO UNDERSTAND WHAT THEY DID AND

03:25PM  13   WHAT THEY WOULD BE INTERESTED IN.

03:25PM  14   Q.   OKAY.  LET ME SHOW YOU EXHIBIT 15015.

03:25PM  15   A.   OKAY.

03:25PM  16   Q.   TAKE A MOMENT TO REVIEW THAT.

03:26PM  17   A.   OKAY.

03:26PM  18   Q.   WHO IS -- DO YOU KNOW WHO THE RECIPIENT OF THIS EMAIL IS,

03:26PM  19   TOW CHONG?

03:26PM  20   A.   I DO GENERALLY, YES.

03:26PM  21   Q.   AND WHO IS HE?

03:26PM  22   A.   I BELIEVE HE EITHER LED OR WAS ONE OF THE LEADERS AT A

03:26PM  23   RESEARCH INSTITUTE IN SINGAPORE.

03:26PM  24   Q.   AND WHO -- AND YOU SENT HIM THIS EMAIL IN CONNECTION WITH

03:26PM  25   YOUR EFFORTS TO OBTAIN PHARMACEUTICAL BUSINESS?

03:26PM 1    A.   I THINK THIS IS AN EMAIL FROM DR. LIU TO HIM TO FACILITATE

03:26PM 2    AN INTRODUCTION SO I COULD TALK TO HIM ABOUT THAT AND BUILDING

03:26PM 3    OUR PRODUCT.

03:26PM 4    Q.   OKAY.

03:26PM 5         YOUR HONOR, I MOVE THE ADMISSION OF 15015.

03:26PM 6              MR. LEACH:  NO OBJECTION.

03:26PM 7              THE COURT:  IT'S ADMITTED.

03:26PM 8         (DEFENDANT'S EXHIBIT 15015 WAS RECEIVED IN EVIDENCE.)

03:26PM 9    BY MR. DOWNEY:

03:26PM 10   Q.   IF WE CAN JUST SHOW THE FIRST PARAGRAPH OF 15015.

03:27PM 11        SO AS YOU SAID HERE, DR. LIU IS WRITING TO TOW CHONG --

03:27PM 12   AND JUST AS A REMINDER, DR. LIU WAS THE MENTOR THAT YOU HAD

03:27PM 13   DEVELOPED WHILE YOU WERE IN SINGAPORE?

03:27PM 14   A.   YES.

03:27PM 15   Q.   AND IS WHAT IS REFLECTED IN THIS EMAIL AN EXAMPLE OF YOU

03:27PM 16   REACHING OUT TO EVERYONE YOU KNEW TO SEE IF YOU COULD FIND A

03:27PM 17   WAY TO GET SOME ENTRE TO PHARMACEUTICAL COMPANIES?

03:27PM 18   A.   YES.

03:27PM 19   Q.   AND HOW MUCH WORK DID YOU DO DOING THAT KIND OF EFFORT?

03:27PM 20   A.   I STARTED WORKING ALL OF THE TIME.  I WAS, I WAS TALKING

03:27PM 21   TO MY FAMILY, TALKING TO THEIR FRIENDS, TALKING TO PEOPLE I HAD

03:27PM 22   KNOWN AT STANFORD, TRYING TO MEET PEOPLE WHO COULD HELP ME

03:27PM 23   BUILD THIS.

03:27PM 24   Q.   NOW, IN THE FIRST YEAR OR SO OF THE COMPANY, HOW DID YOU

03:27PM 25   GO ABOUT FINANCING WORK ON THE TECHNOLOGY, YOUR EMPLOYEES, AN

03:28PM  1    OFFICE AND SO FORTH?  HOW DID YOU DO THAT?

03:28PM  2    A.   I STARTED WITH TALKING TO MY PARENTS, AND THEY LET ME TAKE

03:28PM  3    THE MONEY THAT THEY HAD SAVED FOR ME TO BE ABLE TO GO TO

03:28PM  4    COLLEGE TO WORK ON MY PATENT.

03:28PM  5         AND THEN I WENT TO TRY TO RAISE OR BORROW MONEY.

03:28PM  6    Q.   OKAY.  AND WERE YOU ABLE TO BORROW MONEY?

03:28PM  7    A.   I WAS.

03:28PM  8    Q.   OKAY.  AND WERE YOU ABLE TO RAISE ENOUGH MONEY THROUGH

03:28PM  9    THOSE KIND OF STEPS TO KEEP THE COMPANY GOING?

03:28PM  10   A.   YES.

03:28PM  11   Q.   I'D LIKE TO ASK YOU ABOUT ONCE YOU HAD A PROTOTYPE AND

03:28PM  12   TRYING TO DEVELOP IT INTO A PRODUCT.  DID YOU STRUCTURE THE

03:28PM  13   COMPANY TO TRY TO BUILD AN ACTUAL PRODUCT OUT OF THE, OUT OF

03:28PM  14   THE PROTOTYPE THAT YOU HAD?

03:28PM  15   A.   YES.

03:28PM  16   Q.   HOW DID YOU STRUCTURE THE COMPANY TO TRY TO DO THAT?

03:28PM  17   A.   I STRUCTURED IT AROUND THREE CORE AREAS:  THE FIRST WAS

03:29PM  18   CHEMISTRY OR THE ASSAYS; THE SECOND WAS HARDWARE; AND THE THIRD

03:29PM  19   WAS SOFTWARE.

03:29PM  20   Q.   AND CAN YOU JUST REMIND US, WHEN YOU SAY CHEMISTRY OR

03:29PM  21   ASSAYS, ARE THEY SYNONYMS IN YOUR MIND?

03:29PM  22   A.   THEY ARE, YES.

03:29PM  23   Q.   OKAY.  EXPLAIN WHY THAT IS AND WHAT THAT IS FOR THE

03:29PM  24   BENEFIT OF THE JURY, WHO HAS HEARD ABOUT IT BEFORE, BUT JUST

03:29PM  25   EXPLAIN THAT, PLEASE.

03:29PM  1    A.   YES.  THE ASSAYS ARE WHAT WE HAVE BEEN TALKING ABOUT AS

03:29PM  2    TESTS.  ASSAYS IS THE TECHNICAL WORD THAT WE WOULD USE IN OUR

03:29PM  3    LAB TO DESCRIBE THE TESTS.

03:29PM  4         THE CHEMISTRY IS WHAT THE ASSAY ACTUALLY IS.  SO IT'S

03:29PM  5    CHEMICALS THAT MAKE UP THE TESTS.  SO I SOMETIMES SAY CHEMISTRY

03:29PM  6    OR ASSAY OR TEST.

03:29PM  7    Q.   NOW, YOU MENTIONED THAT YOU BROKE THE TEAMS INTO A GROUP

03:29PM  8    WORKING ON THE ASSAYS; RIGHT?

03:29PM  9    A.   YES.

03:29PM 10    Q.   AND A GROUP WORKING ON THE HARDWARE; CORRECT?

03:29PM 11    A.   YES.

03:29PM 12    Q.   AND A GROUP WORKING ON THE SOFTWARE; CORRECT?

03:30PM 13    A.   YES.

03:30PM 14    Q.   NOW, AT SOME POINT DID THE -- YOUR IDEA AS TO WHAT THE

03:30PM 15    HARDWARE SHOULD BE CHANGE?

03:30PM 16    A.   YES.

03:30PM 17    Q.   AND I THINK YOU SAID THAT, IN CONNECTION WITH THE ORIGINAL

03:30PM 18    PATENT APPLICATION, THAT YOU HAD BEEN THINKING ABOUT A PILL

03:30PM 19    THAT WOULD BE SWALLOWED.

03:30PM 20    A.   I WAS.

03:30PM 21    Q.   TELL US HOW THE IDEAS ABOUT THE HARDWARE EVOLVED AND WHY

03:30PM 22    THEY EVOLVED?

03:30PM 23    A.   THE IDEA STARTED WITH THE PILL WITH THE IDEA THAT SOMEONE

03:30PM 24    COULD LITERALLY SWALLOW A TECHNOLOGY LIKE THAT AND NOT HAVE TO

03:30PM 25    TAKE ANY OTHER ACTIONS AND A TEST COULD BE DONE AND A DRUG

03:30PM 1    COULD BE DELIVERED.

03:30PM 2        THAT SAME TECHNOLOGY IDEA EXPANDED TO A PATCH THAT COULD

03:30PM 3    BE WORN AND BLOOD COULD BE MEASURED AND DELIVERED.

03:30PM 4        AS I STARTED TALKING TO PEOPLE ABOUT WHAT COULD BE USEFUL

03:30PM 5    FOR A PHARMACEUTICAL CLINICAL TRIAL, I LEARNED THAT PEOPLE WERE

03:30PM 6    INTERESTED IN A BENCHTOP OR A TABLETOP DEVICE, AND WE MOVED TO

03:31PM 7    TRYING TO BUILD THAT.

03:31PM 8    Q.   OKAY.  AND WERE YOU SUCCESSFUL IN BUILDING THAT?

03:31PM 9    A.   YES.

03:31PM 10   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 15026.

03:31PM 11   A.   OKAY.

03:31PM 12   Q.   AND IS THIS A PROTOTYPE OF THE DEVICE THAT YOU JUST

03:31PM 13   DESCRIBED?

03:31PM 14   A.   YES.

03:31PM 15       MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:31PM 16   15026.

03:31PM 17       MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:31PM 18       THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:31PM 19       (DEFENDANT'S EXHIBIT 15026 WAS RECEIVED IN EVIDENCE.)

03:31PM 20   BY MR. DOWNEY:

03:31PM 21   Q.   AND CAN YOU, IN BRIEF TERMS, JUST EXPLAIN THIS TECHNOLOGY

03:31PM 22   AND HOW THE VARIOUS COMPONENTS OF WHAT YOU HAVE BEEN

03:31PM 23   MENTIONING, THAT IS, THE SOFTWARE AND THE HARDWARE AND THE

03:31PM 24   ASSAYS, WERE DESIGNED TO WORK ON THIS TECHNOLOGY?

03:31PM 25   A.   YES.

03:31PM  1          MR. LEACH:  YOUR HONOR, I DON'T MEAN TO INTERRUPT.

03:31PM  2     THE IMAGE OF MY 15026 IS DIFFERENT FROM WHAT IS BEING DISPLAYED

03:32PM  3     ON THE SCREEN.

03:32PM  4          MR. DOWNEY:  OH, I BEG YOUR PARDON.

03:32PM  5          (DISCUSSION AMONGST COUNSEL OFF THE RECORD.)

03:32PM  6          MR. DOWNEY:  HAS THAT BEEN CORRECTED?

03:32PM  7          MR. LEACH:  I NOW HAVE A DIFFERENT COPY, YOUR HONOR.

03:32PM  8     THANK YOU.

03:32PM  9          MR. DOWNEY:  YES.  SO I MOVE THAT IN.

03:32PM 10          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:32PM 11          (DEFENDANT'S EXHIBIT 15026 WAS RECEIVED IN EVIDENCE.)

03:32PM 12          THE WITNESS:  WOULD YOU MIND REPEATING THE QUESTION

03:32PM 13     JUST SO I CAN --

03:32PM 14     BY MR. DOWNEY:

03:32PM 15     Q.   THE QUESTION WAS, CAN YOU EXPLAIN HOW THE HARDWARE AND THE

03:32PM 16     SOFTWARE AND THE ASSAYS WERE DESIGNED TO WORK IN CONNECTION

03:32PM 17     WITH THIS PROTOTYPE?  EXPLAIN HOW EACH PIECE WORKS.

03:33PM 18     A.   I CAN.

03:33PM 19          SO WHAT WE DID, IT WAS MOVED FROM SOMETHING LIKE A PATCH

03:33PM 20     WHERE YOU COULD MONITOR AND RUN A CHEMISTRY AND DETECT

03:33PM 21     SOMETHING ALL IN ONE DESIGN TO A NEW IDEA, WHICH IS YOU WOULD

03:33PM 22     HAVE A DISPOSABLE THAT COULD CONTAIN THE CHEMISTRIES THAT YOU

03:33PM 23     MIGHT RUN AND A DEVICE THAT COULD READ THAT DISPOSABLE.

03:33PM 24          THIS IS THE INSIDE OF ONE OF THOSE EARLY DEVICES THAT

03:33PM 25     WOULD RECEIVE WHAT WE CALLED A CARTRIDGE, THE PIECE OF PLASTIC

03:33PM  1      THAT HOLDS THE CHEMISTRY.

03:33PM  2          YOU SEE HERE ARE THESE LITTLE WHITE PUMPS AND VALVES ON

03:33PM  3      TOP --

03:33PM  4      Q.   LET ME JUST SLOW YOU DOWN THERE.

03:33PM  5          ARE THOSE WHERE THE ARROW IS RIGHT NOW IN THE DISPLAY?

03:33PM  6      A.   THOSE ARE THE VALVES, YEAH, EXACTLY.

03:33PM  7          AND RIGHT ABOVE IT, THE ROUND CIRCULAR TECHNOLOGY IS A

03:33PM  8      PUMP.

03:34PM  9          AND A CARTRIDGE COULD BE INTRODUCED TO THIS DEVICE.

03:34PM  10          THAT PUMP AND THOSE VALVES WOULD ACTIVATE THE CARTRIDGE

03:34PM  11      AND FLUID WOULD START TO MOVE THROUGH THE CARTRIDGE TO RUN A

03:34PM  12      CHEMISTRY.

03:34PM  13          YOU CAN SEE THE ELECTRONICS OR THE BOARD ON THE RIGHT SIDE

03:34PM  14      THAT WOULD CONTROL THAT PROCESS, ANALYZE DATA, AND TRANSMIT IT

03:34PM  15      WIRELESSLY.

03:34PM  16      Q.   OKAY.  NOW, WE TALKED ABOUT PHARMACEUTICAL COMPANIES AND

03:34PM  17      YOUR EFFORTS THERE, AND WE TALKED ABOUT BUILDING THIS

03:34PM  18      PROTOTYPE.

03:34PM  19          DID YOU ULTIMATELY DEVELOP THIS INTO AN ACTUAL PRODUCT?

03:34PM  20      A.   YES.

03:34PM  21      Q.   AND TO BUILD THAT PRODUCT, DID YOU GO OUT AND TRY TO RAISE

03:34PM  22      SOME ADDITIONAL MONEY TO TRY TO FINANCE THAT RESEARCH AND THE

03:34PM  23      EMPLOYEES AND THE OFFICE AND ALL OF THE THINGS THAT IT TAKES TO

03:34PM  24      RUN A BUSINESS?

03:34PM  25      A.   I DID.

03:34PM 1    Q.   AND WAS THAT SERIES OF FUND RAISING CALLED A SERIES B FUND

03:35PM 2    RAISING OF THERANOS?

03:35PM 3    A.   YES.

03:35PM 4    Q.   AND WE TALKED EARLIER ABOUT THE MONEY THAT YOU RAISED AT

03:35PM 5    THE OUTSET THROUGH LOANS AND SO FORTH AND FROM EARLY

03:35PM 6    INVESTMENTS INTO THE COMPANY.

03:35PM 7         WAS THAT THE SERIES A?

03:35PM 8    A.   YES.

03:35PM 9    Q.   OKAY.  SO WITHIN THE SERIES B, DID YOU BEGIN TO TRY TO

03:35PM 10   TALK TO VENTURE CAPITALISTS ABOUT FINANCING THE COMPANY?

03:35PM 11   A.   I DID.

03:35PM 12   Q.   AND WAS DON LUCAS, SENIOR ONE OF THOSE INDIVIDUALS?

03:35PM 13   A.   YES.

03:35PM 14   Q.   WHO WAS DON LUCAS?  TELL US ABOUT HIM AS OF 2005 WHEN YOU

03:35PM 15   MET HIM.

03:35PM 16   A.   DON LUCAS WAS ONE OF THE EARLY VENTURE CAPITALISTS IN

03:35PM 17   SILICON VALLEY.  HE HAD HELPED BUILD A NUMBER OF TECHNOLOGY

03:35PM 18   COMPANIES LIKE ORACLE AND NATIONAL SEMICONDUCTOR, ADOBE, AND I

03:35PM 19   KNEW HIM AS SOMEONE WHO FOCUSSED ON BUILDING GREAT COMPANIES

03:36PM 20   FOR THE LONG-TERM.

03:36PM 21   Q.   AND HOW DID YOU COME TO MEET HIM?

03:36PM 22   A.   I WAS INTRODUCED TO HIM BY SOMEONE WHO HAD GONE TO COLLEGE

03:36PM 23   WITH MY DAD.

03:36PM 24   Q.   AND DID YOU HAVE A PITCH MEETING WITH HIM?

03:36PM 25   A.   I HAD AN INTRODUCTORY MEETING WITH HIM, YES.

03:36PM 1     Q.   OKAY.  AND WHAT WAS HIS REACTION TO YOUR DESCRIPTION OF

03:36PM 2     THE BUSINESS YOU WERE TRYING TO BUILD?

03:36PM 3     A.   HE HAD A LOT OF QUESTIONS.  HE BEGAN A VERY COMPREHENSIVE

03:36PM 4     DILIGENCE PROCESS.

03:36PM 5     Q.   AND WHAT DID THAT DILIGENCE PROCESS CONSIST OF?

03:36PM 6     A.   IT CONSISTED OF GIVING HIM A LOT OF INFORMATION ABOUT OUR

03:36PM 7     PATENTS.  HE HIRED A LAW FIRM TO REVIEW OUR PATENTS.  HE ASKED

03:36PM 8     US TO GET AN AUDIT OF OUR FINANCIALS.  HE WANTED COPIES OF

03:36PM 9     CONTRACTS AND OTHER INFORMATION ABOUT THE BUSINESS.  HE WANTED

03:36PM 10    TO SPEAK TO PEOPLE THAT WE WERE TALKING TO AND INTERACTING

03:36PM 11    WITH.

03:36PM 12    Q.   I WANT TO SHOW YOU EXHIBIT 12027.

03:37PM 13         AND MY QUESTION IN THE FIRST INSTANCE IS JUST WHETHER THIS

03:37PM 14    IS AN EMAIL EXCHANGE BETWEEN YOU AND MR. LUCAS AND OTHERS

03:37PM 15    DURING THE DUE DILIGENCE PROCESS ASSOCIATED WITH HIS INVESTING

03:37PM 16    IN THERANOS?

03:37PM 17    A.   YES.

03:37PM 18              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:37PM 19    12027.

03:37PM 20              MR. LEACH:  401, YOUR HONOR.

03:37PM 21              THE COURT:  INCLUDING ALL OF THE PAGES, MR. DOWNEY?

03:37PM 22              MR. DOWNEY:  WELL, I WAS JUST GOING TO SHOW ONE OF

03:37PM 23    THE PAGES.  I'M HAPPY TO EXPLAIN THE RELEVANCE, BUT NOT OUT

03:37PM 24    LOUD.

03:37PM 25              THE COURT:  SURE.  I UNDERSTAND.

| | | |
|---|---|---|
| 03:37PM | 1 | YOU WANT TO DISPLAY TO THE WITNESS JUST THIS FIRST PAGE |
| 03:37PM | 2 | AND SPEAK ON THE FIRST PAGE WITHOUT -- CAN YOU DO THAT WITHOUT |
| 03:37PM | 3 | THE SECONDARY PAGES? |
| 03:38PM | 4 | MR. DOWNEY: SURE. YOUR HONOR, I THINK THAT THERE |
| 03:38PM | 5 | IS A -- I CAN CERTAINLY DO THAT. |
| 03:38PM | 6 | I JUST WANTED TO DISPLAY, AND I DON'T HAVE TO ADMIT IT -- |
| 03:38PM | 7 | BUT I THINK I WILL NEED TO DO THAT TO DISPLAY IT -- JUST AN |
| 03:38PM | 8 | ATTACHMENT WHICH RELATES TO THE FINANCIAL INFORMATION THAT HE |
| 03:38PM | 9 | ASKED FOR AND GOT AS PART OF THE DUE DILIGENCE PROCESS WHEN HE |
| 03:38PM | 10 | WAS LOOKING INTO AN INVESTMENT IN THERANOS. |
| 03:38PM | 11 | THE COURT: THAT MS. HOLMES SENT HIM? |
| 03:38PM | 12 | MR. DOWNEY: THAT MS. HOLMES SENT HIM, YES. |
| 03:38PM | 13 | THE COURT: IS THAT THE LAST TWO PAGES? |
| 03:38PM | 14 | MR. DOWNEY: NO. IT'S THE LAST PAGE OF THE |
| 03:38PM | 15 | ATTACHMENT. |
| 03:38PM | 16 | LET ME SEE IF I CAN MAKE THIS EASIER. |
| 03:38PM | 17 | THE COURT: IT'S ALWAYS HELPFUL. |
| 03:38PM | 18 | MR. DOWNEY: YOUR HONOR, I THINK I CAN DO IT JUST BY |
| 03:38PM | 19 | WAY OF EXAMPLE. |
| 03:38PM | 20 | SO WHAT I REALLY WANT TO DO IS IF I CAN JUST ADMIT THE |
| 03:38PM | 21 | FIRST AND SECOND PAGE, I DON'T NEED TO ADMIT THE ENTIRE -- |
| 03:39PM | 22 | THE COURT: THAT'S FINE. THAT'S FINE. THOSE WILL |
| 03:39PM | 23 | BE ADMITTED. |
| 03:39PM | 24 | (DEFENDANT'S EXHIBIT 12027, PAGES 1 AND 2 WAS RECEIVED IN |
| 03:39PM | 25 | EVIDENCE.) |

BY MR. DOWNEY:

Q.   FIRST OF ALL, LET ME JUST DISPLAY, IF I MIGHT, THE EMAIL
THAT IS THE FIRST PAGE OF 12027.

     AND WHY ARE YOU SENDING THIS EMAIL TO MR. LUCAS AT THIS
TIME?

A.   THIS IS A RESPONSE TO ONE OF HIS DILIGENCE REQUESTS.

Q.   OKAY.  AND LET ME ASK YOU TO LOOK AT THE SECOND PAGE.

     AND WHAT IS LISTED HERE ON THE SECOND PAGE OF THE EXHIBIT?

A.   THIS IS EVERY EXPENSE WE HAD IN THE COMPANY.

Q.   DID YOU SEND THAT IN RESPONSE TO HIS REQUEST TO UNDERSTAND
THE FINANCIAL CONDITION OF THE COMPANY?

A.   YES.

Q.   OKAY.  DID MR. LUCAS ULTIMATELY DECIDE TO INVEST IN
THERANOS AS PART OF THE SERIES B ROUND OF THERANOS?

A.   HE DID.

Q.   AND AFTER HE INVESTED, DID HE PLAY A ROLE OTHER THAN BEING
AN INVESTOR IN THE COMPANY?

A.   YES.  HE BECAME THE CHAIRMAN OF OUR BOARD.

Q.   AND HOW LONG DID HE SERVE IN THAT ROLE?

A.   HE SERVED IN THAT ROLE FROM I THINK EITHER END OF 2005 OR
EARLY 2006 TO JANUARY OF 2013.

Q.   IN ADDITION TO MR. LUCAS, DID ANOTHER VENTURE CAPITALIST,
PETE THOMAS, INVEST IN THE SERIES B ROUND IN THERANOS?

A.   HE DID.

Q.   AND WHO WAS MR. THOMAS?

03:40PM 1    A.   MR. THOMAS WAS ALSO A SILICON VALLEY VENTURE CAPITALIST.

03:40PM 2    HE HAD BEEN A PARTNER AT A VENTURE CAPITAL FIRM CALLED IVP FOR

03:40PM 3    A LONG TIME, AND THEN LEFT TO BUILD HIS OWN VENTURE CAPITAL

03:41PM 4    FIRM CALLED ATA VENTURES.

03:41PM 5    Q.   AND DID MR. LUCAS -- OR MR. THOMAS ALSO CONDUCT DUE

03:41PM 6    DILIGENCE IN CONNECTION WITH HIS INVESTMENT INTO THERANOS?

03:41PM 7    A.   HE DID.

03:41PM 8    Q.   LET ME ASK YOU TO LOOK AT 14219.

03:41PM 9    A.   OKAY.

03:41PM 10   Q.   AND IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND MR. THOMAS?

03:41PM 11   A.   YES.

03:41PM 12   Q.   AND I WOULD JUST ASK YOU, IS IT ACCURATE THAT HE ASKED TO

03:41PM 13   REVIEW ALL OF THE INTELLECTUAL PROPERTY RECORDS OF THE COMPANY?

03:41PM 14   A.   YES.

03:41PM 15   Q.   AND DID HE ALSO LOOK AT ALL OF THE FINANCIAL RECORDS OF

03:41PM 16   THE COMPANY?

03:41PM 17   A.   HE DID.

03:42PM 18   Q.   AND DID HE ALSO LOOK AT THE AGREEMENTS THAT THE COMPANY

03:42PM 19   HAD MADE WITH THIRD PARTIES?

03:42PM 20   A.   YES.

03:42PM 21   Q.   NOW, WE'VE HEARD SOME TESTIMONY IN THE CASE ABOUT

03:42PM 22   RELATIONSHIPS WITH PHARMACEUTICAL COMPANIES.  AS PART OF THE

03:42PM 23   SERIES B ROUND, WERE YOU TALKING TO INVESTORS ABOUT THE

03:42PM 24   POTENTIAL FOR THERANOS TO MARKET ITS PRODUCT TO PHARMACEUTICAL

03:42PM 25   COMPANIES?

03:42PM  1    A.   I WAS.

03:42PM  2    Q.   AND DID SOME OF THE INVESTORS TELL YOU THAT THEY WANTED TO

03:42PM  3    UNDERSTAND BETTER THE POTENTIAL RELATIONSHIP THAT THERANOS

03:42PM  4    MIGHT HAVE WITH PHARMACEUTICAL COMPANIES?

03:42PM  5    A.   YES.

03:42PM  6    Q.   WAS MR. THOMAS ONE OF THOSE INVESTORS?

03:42PM  7    A.   HE WAS.

03:42PM  8    Q.   AND WHAT DID YOU DO IN RESPONSE TO REQUESTS FROM INVESTORS

03:42PM  9    ABOUT THE PHARMACEUTICAL BUSINESS AT THAT TIME OF THERANOS?

03:42PM 10    A.   I OFFERED TO PUT THEM IN TOUCH WITH THE PEOPLE WE WERE

03:42PM 11    WORKING WITH IN THE PHARMACEUTICAL COMPANIES DIRECTLY.

03:42PM 12    Q.   LET ME SHOW YOU EXHIBIT 15016.

03:43PM 13    A.   OKAY.

03:43PM 14    Q.   IS THIS AN EMAIL EXCHANGE ON WHICH YOURSELF AND MR. THOMAS

03:43PM 15    APPEAR RELATED TO HIS POTENTIAL INVESTMENT IN THERANOS?

03:43PM 16    A.   YES.

03:43PM 17            MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:43PM 18    15016.

03:43PM 19            MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:43PM 20            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:43PM 21        (DEFENDANT'S EXHIBIT 15016 WAS RECEIVED IN EVIDENCE.)

03:43PM 22    BY MR. DOWNEY:

03:43PM 23    Q.   LET ME LOOK FIRST AT THE BOTTOM EMAIL EXCHANGE.

03:43PM 24        DO YOU SEE WHERE YOU INDICATE THAT YOU'RE INTRODUCING

03:43PM 25    MR. THOMAS TO SOMEONE NAMED DAVID LESTER?

03:43PM    1      A.   I DO.

03:43PM    2      Q.   AND WHO WAS DAVID LESTER?  WHERE WAS HE WORKING AS OF

03:43PM    3      2005?

03:43PM    4      A.   DR. LESTER WAS OUR POINT PERSON AT PFIZER, AND HE LED SOME

03:44PM    5      OF THE TECHNOLOGY AND INNOVATION GROUPS AT PFIZER.

03:44PM    6      Q.   AND HAD MR. THOMAS SPECIFICALLY ASKED TO SPEAK TO SOMEONE

03:44PM    7      FROM PFIZER?

03:44PM    8      A.   HE DID.

03:44PM    9      Q.   AND DOES THIS EMAIL JUST REFLECT YOUR PUTTING THE TWO IN

03:44PM   10      TOUCH SO THEY COULD TALK?

03:44PM   11      A.   YES.

03:44PM   12      Q.   AND DO YOU KNOW IF THEY SPOKE?

03:44PM   13      A.   YES.

03:44PM   14      Q.   AND LET ME ASK YOU TO LOOK AT THE EMAIL AT THE TOP OF THE

03:44PM   15      PAGE.  THIS IS AN EMAIL FROM DAVID LESTER TO YOU AND TO

03:44PM   16      MR. THOMAS.

03:44PM   17           DO YOU SEE THAT?

03:44PM   18      A.   YES, I DO.

03:44PM   19      Q.   AND DO YOU SEE THAT HE INDICATES THAT HE'S WILLING TO TALK

03:44PM   20      TO MR. THOMAS?

03:44PM   21      A.   YES.

03:44PM   22      Q.   WAS THIS TYPICAL OF YOUR INTRODUCTIONS OF POTENTIAL

03:44PM   23      INVESTORS TO PHARMACEUTICAL COMPANIES AS OF THIS TIME?

03:44PM   24      A.   YES.

03:44PM   25      Q.   OKAY.  NOW, WE TALKED A MOMENT AGO ABOUT DON LUCAS,

03:45PM  1    SENIOR.

03:45PM  2         I'D LIKE TO ASK YOU ABOUT CHRIS LUCAS, WHO THE JURY HAS

03:45PM  3    HEARD TESTIMONY FROM IN THIS CASE.

03:45PM  4         WAS CHRIS LUCAS MR. DON LUCAS, SENIOR'S NEPHEW?

03:45PM  5    A.   YES.

03:45PM  6    Q.   AND DID CHRIS LUCAS ALSO BECOME AN INVESTOR IN THERANOS AS

03:45PM  7    PART OF THE SERIES B INVESTMENT?

03:45PM  8    A.   HE DID.

03:45PM  9    Q.   AND HOW DID YOU COME TO MEET CHRIS LUCAS?

03:45PM 10    A.   I MEET HIM THROUGH HIS UNCLE, DON.

03:45PM 11    Q.   AND DID YOU AT SOME POINT COME TO SPEAK TO HIM ABOUT A

03:45PM 12    POTENTIAL INVESTMENT FOR HIS FIRM IN THERANOS?

03:45PM 13    A.   I DID.  I DON'T KNOW IF I INITIALLY SPOKE TO HIM DIRECTLY

03:45PM 14    OR IF HIS UNCLE DID.

03:45PM 15    Q.   OKAY.  DID YOU -- DID HE ASK FOR ANY OF THE ACCESS TO

03:45PM 16    INFORMATION THAT HIS UNCLE AND MR. THOMAS HAD REQUESTED?

03:45PM 17    A.   NO.

03:45PM 18    Q.   DO YOU KNOW IF HE REQUESTED TO SPEAK TO ANY PHARMACEUTICAL

03:46PM 19    COMPANIES AT THAT TIME?

03:46PM 20    A.   I DON'T THINK SO.

03:46PM 21    Q.   WOULD YOU HAVE BEEN WILLING AT THAT TIME TO PERMIT HIM TO

03:46PM 22    SPEAK TO PHARMACEUTICAL COMPANIES WITH WHOM PFIZER -- OR WITH

03:46PM 23    WHOM THERANOS POTENTIALLY WOULD HAVE A RELATIONSHIP?

03:46PM 24    A.   YES.

03:46PM 25    Q.   OKAY.  WERE YOU SUCCESSFUL IN RAISING SOME MONEY AS PART

03:46PM  1    OF THIS SERIES B ROUND OF INVESTMENT?

03:46PM  2    A.   I WAS.

03:46PM  3    Q.   AND DID YOU HIRE SOME ADDITIONAL SCIENTISTS AND ENGINEERS

03:46PM  4    WITH THAT MONEY?

03:46PM  5    A.   I DID.

03:46PM  6    Q.   AND AT THIS TIME, WHAT DID THE RESEARCH AND DEVELOPMENT OF

03:46PM  7    THE COMPANY REALLY FOCUS ON?  WAS IT CONTINUING TO FOCUS ON THE

03:46PM  8    ASSAYS AND THE HARDWARE AND THE SOFTWARE?

03:46PM  9    A.   YES, THE ASSAYS, THE HARDWARE, THE SOFTWARE, FIGURING OUT

03:46PM  10   HOW TO BUILD THE TECHNOLOGY, THE MANUFACTURING THAT WENT INTO

03:46PM  11   THAT, AND HOW TO GROW THE COMPANY.

03:46PM  12   Q.   AND I'D LIKE TO SHOW YOU EXHIBIT 15024.

03:47PM  13        IS 15024 THE FIRST ACTUAL VERSION OF AN ACTUAL DEVICE THAT

03:47PM  14   WAS BUILT OUT OF THE PROTOTYPE?

03:47PM  15   A.   YES.

03:47PM  16        MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:47PM  17   15024.

03:47PM  18        MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:47PM  19        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:47PM  20        (DEFENDANT'S EXHIBIT 15024 WAS RECEIVED IN EVIDENCE.)

03:47PM  21   BY MR. DOWNEY:

03:47PM  22   Q.   AND CAN YOU IDENTIFY AND JUST TELL THE JURY WHAT IS SHOWN

03:47PM  23   IN THIS DEVICE, WHAT DEVICE THIS IS, AND WHAT OTHER MATERIALS

03:47PM  24   ARE SHOWN IN THE PICTURE?

03:47PM  25   A.   THIS IS THE THERANOS 1.0.  IT WAS OUR FIRST SYSTEM.  AND

03:47PM  1    YOU SEE ON THE LEFT THE CARTRIDGE, WHICH IS THE DISPOSABLE THAT

03:48PM  2    CONTAINED THE CHEMICALS OR THE CHEMISTRY.

03:48PM  3        AT THE TOP RIGHT, IT'S REALLY SMALL, BUT THERE'S A LITTLE

03:48PM  4    FINGER WHERE YOU COULD TOUCH THE CARTRIDGE AND BLOOD WOULD FLOW

03:48PM  5    IN.

03:48PM  6        AND ON THE RIGHT IS THE DEVICE THAT YOU COULD PUT THE

03:48PM  7    CARTRIDGE INTO.  IT WOULD PROCESS THE SAMPLE.

03:48PM  8        AND THEN THE BIG ANTENNA ON THE BACK WAS TO CONNECT TO A

03:48PM  9    CELL NETWORK AND HAVE DATA TRANSFERRED TO THE CLOUD.

03:48PM 10    Q.   OKAY.  AND IS THIS THE PRODUCT THAT YOU WERE TALKING TO

03:48PM 11    PHARMACEUTICAL COMPANIES ABOUT DURING THIS TIMEFRAME?

03:48PM 12    A.   IT IS.

03:48PM 13    Q.   OKAY.  NOW, WERE THERE -- DURING 2006 AND 2007, DO YOU

03:48PM 14    RECALL WHICH PHARMACEUTICAL COMPANIES YOU HAD CONVERSATIONS

03:48PM 15    WITH ABOUT USING THIS DEVICE AND THE OTHER TECHNOLOGIES OF

03:48PM 16    THERANOS?

03:48PM 17    A.   I DO, SOME OF THEM.

03:49PM 18    Q.   OKAY.  CAN YOU TELL US WHAT COMPANIES THEY WERE?

03:49PM 19    A.   WE WERE TALKING TO PFIZER, TO GLAXOSMITHKLINE, TO

03:49PM 20    NOVARTIS, AND TO BRISTOL MYERS SQUIBB.

03:49PM 21    Q.   OKAY.  DID YOU ULTIMATELY SUCCEED IN SIGNING A CONTRACT

03:49PM 22    WITH GLAXOSMITHKLINE --

03:49PM 23    A.   YES.

03:49PM 24    Q.   -- RELATED TO THERANOS'S TECHNOLOGY?

03:49PM 25    A.   WE DID.

03:49PM 1      Q.   AND WHEN DID YOU SIGN THAT AGREEMENT?

03:49PM 2      A.   IN 2006.

03:49PM 3      Q.   OKAY.  DO YOU KNOW WHEN IN 2006?

03:49PM 4      A.   I THINK TOWARD THE END OF THE YEAR, PROBABLY THE SECOND

03:49PM 5      HALF OF 2006.

03:49PM 6      Q.   AND JUST SO WE GET THESE DATES DOWN RELATIVE TO INVESTMENT

03:49PM 7      PERIODS, LET ME ASK YOU TO LOOK AT EXHIBIT 14111, WHICH IS

03:49PM 8      ALREADY IN EVIDENCE.

03:49PM 9           AND DID YOU ENTER INTO THAT AGREEMENT IN 2006?

03:49PM 10     A.   I'M SORRY, I WAS LOOKING AT THE SCREEN.  14111.

03:50PM 11          YES.

03:50PM 12     Q.   AND DID YOU ALSO IN 2006 ENTER INTO AN AGREEMENT WITH

03:50PM 13     PFIZER RELATED TO THEIR USE OF THERANOS TECHNOLOGY?

03:50PM 14     A.   YES.

03:50PM 15     Q.   LET ME ASK YOU TO LOOK FOR A MOMENT AT EXHIBIT 14112.

03:50PM 16     THAT'S ALSO ALREADY IN EVIDENCE.

03:50PM 17     A.   YES.

03:50PM 18     Q.   AND DID YOU -- WHEN DID YOU ENTER INTO THAT AGREEMENT WITH

03:50PM 19     PFIZER?

03:50PM 20               THE COURT:  I'M NOT SURE THIS IS IN EVIDENCE,

03:50PM 21     COUNSEL.

03:50PM 22               MR. DOWNEY:  14112?

03:50PM 23               THE COURT:  I DON'T BELIEVE IT IS.

03:50PM 24               THE CLERK:  NEITHER 14111 NOR 14112 ARE IN EVIDENCE.

03:50PM 25               MR. DOWNEY:  WELL, IN THAT CASE I WILL MOVE 14111

| | | |
|---|---|---|
| 03:50PM | 1 | AND THEN I'LL MOVE THE OTHER. |
| 03:50PM | 2 | MR. LEACH:  NO OBJECTION TO EITHER, YOUR HONOR. |
| 03:50PM | 3 | THE COURT:  THEY'RE ADMITTED. |
| 03:50PM | 4 | (DEFENDANT'S EXHIBITS 14111 AND 14112 WERE RECEIVED IN |
| 03:50PM | 5 | EVIDENCE.) |
| 03:50PM | 6 | BY MR. DOWNEY: |
| 03:50PM | 7 | Q.  DID YOU SIGN THE AGREEMENT WITH PFIZER IN NOVEMBER OF |
| 03:51PM | 8 | 2006? |
| 03:51PM | 9 | A.  YES, NOVEMBER 2ND OF 2006. |
| 03:51PM | 10 | Q.  NOW, WERE THE AGREEMENTS WITH GSK AND THE AGREEMENTS WITH |
| 03:51PM | 11 | PFIZER SOMETHING THAT YOU TALKED TO INVESTORS ABOUT WHEN YOU |
| 03:51PM | 12 | WERE RAISING MONEY FOR THE COMPANY IN 2006? |
| 03:51PM | 13 | A.  YES. |
| 03:51PM | 14 | Q.  ALSO IN 2006, DID THE COMPANY CONDUCT DEMONSTRATIONS |
| 03:51PM | 15 | FOR -- OF ITS TECHNOLOGY FOR CERTAIN PHARMACEUTICAL COMPANIES? |
| 03:51PM | 16 | A.  WE DID. |
| 03:51PM | 17 | Q.  WHAT COMPANIES DID YOU CONDUCT DEMONSTRATIONS FOR? |
| 03:51PM | 18 | A.  FOR NOVARTIS AND FOR ELI LILLY. |
| 03:51PM | 19 | Q.  TELL US ABOUT THE DEMONSTRATION THAT YOU CONDUCTED FOR |
| 03:51PM | 20 | NOVARTIS OF THE THERANOS TECHNOLOGY. |
| 03:51PM | 21 | A.  WE RAN OUR TECHNOLOGY IN SWITZERLAND AT ONE OF THEIR |
| 03:51PM | 22 | OFFICES AND PROCESSED SAMPLES ON CARTRIDGES THAT WE BROUGHT |
| 03:51PM | 23 | THERE, AND THEN HAD DATA WIRELESSLY TRANSMITTED BACK TO OUR |
| 03:52PM | 24 | SITE IN CALIFORNIA. |
| 03:52PM | 25 | Q.  OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 15017. |

03:52PM 1    A.   150 -- OKAY.

03:52PM 2    Q.   IS 15017 AN EMAIL CONCERNING THE DEMONSTRATION THAT YOU

03:52PM 3    CONDUCTED FOR NOVARTIS IN 2006?

03:52PM 4    A.   YES.

03:52PM 5          MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:52PM 6    BOTH PAGES OF THIS EXHIBIT.

03:52PM 7          MR. LEACH:  YOUR HONOR, FOUNDATION, HEARSAY.

03:52PM 8    I ALSO DON'T BELIEVE THIS WAS PRODUCED IN DISCOVERY UNTIL

03:52PM 9    LAST NIGHT.

03:52PM 10         MR. DOWNEY:  YOUR HONOR, THIS IS A FIVE LINE EMAIL

03:52PM 11   WITH A PICTURE ATTACHED.

03:52PM 12         THE COURT:  I SEE THAT.

03:52PM 13   CAN YOU LAY A FOUNDATION AS TO -- A LITTLE MORE FOUNDATION

03:53PM 14   ON THIS.

03:53PM 15   BY MR. DOWNEY:

03:53PM 16   Q.   WHEN YOU WERE TALKING TO INVESTORS IN 2006, DID YOU

03:53PM 17   DISCUSS A POTENTIAL RELATIONSHIP BETWEEN NOVARTIS AND THERANOS?

03:53PM 18   A.   I DID.

03:53PM 19   Q.   AND DID YOU SAY TO SOME OF THOSE POTENTIAL INVESTORS THAT

03:53PM 20   THERANOS WAS GOING TO CONDUCT A DEMONSTRATION OF ITS TECHNOLOGY

03:53PM 21   AT NOVARTIS?

03:53PM 22   A.   YES.

03:53PM 23         MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:53PM 24   15017.

03:53PM 25         THE COURT:  JUST LAY A FOUNDATION ON WHAT THE

| | | |
|---|---|---|
| 03:53PM | 1 | PHOTOGRAPH IS AND WHAT THE IMAGE IS. |
| 03:53PM | 2 | MR. DOWNEY:  OH, I'M SORRY.  YES. |
| 03:53PM | 3 | Q.  DO YOU RECOGNIZE THE INDIVIDUALS IN THE PHOTOGRAPH THAT IS |
| 03:53PM | 4 | ATTACHED TO 15017? |
| 03:53PM | 5 | A.  I DO. |
| 03:53PM | 6 | Q.  AND WHO ARE THEY? |
| 03:53PM | 7 | A.  THEY ARE SCIENTISTS AND ENGINEERS FROM THERANOS. |
| 03:53PM | 8 | Q.  AND DO YOU KNOW WHEN THIS PHOTOGRAPH WAS TAKEN? |
| 03:53PM | 9 | A.  I BELIEVE IN NOVEMBER OF 2006, YES. |
| 03:54PM | 10 | Q.  AND WHAT WAS -- WHAT WERE THEY DOING IN THIS PHOTOGRAPH, |
| 03:54PM | 11 | IF YOU KNOW? |
| 03:54PM | 12 | A.  THEY ARE MONITORING THE RESULTS COMING IN FROM THE |
| 03:54PM | 13 | PROCESSING OF THE SAMPLES IN SWITZERLAND. |
| 03:54PM | 14 | MR. DOWNEY:  OKAY.  YOUR HONOR, I MOVE THE ADMISSION |
| 03:54PM | 15 | OF THE EXHIBIT. |
| 03:54PM | 16 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 03:54PM | 17 | (DEFENDANT'S EXHIBIT 15017 WAS RECEIVED IN EVIDENCE.) |
| 03:54PM | 18 | BY MR. DOWNEY: |
| 03:54PM | 19 | Q.  LET'S LOOK FIRST AT THE EMAIL. |
| 03:54PM | 20 | AND IF WE JUST LOOK AT THE ADDRESS ON TOP, THIS IS AN |
| 03:54PM | 21 | EMAIL FROM AN INDIVIDUAL NAMED JOHN HOWARD TO YOU IN NOVEMBER |
| 03:54PM | 22 | OF 2006. |
| 03:54PM | 23 | DO YOU SEE THAT? |
| 03:54PM | 24 | A.  I DO. |
| 03:54PM | 25 | Q.  AND WHO WAS JOHN HOWARD? |

03:54PM 1    A.   JOHN HOWARD WAS LEADING OUR R&D AT THIS POINT.  HE WAS ONE

03:54PM 2    OF THE EXECUTIVES FROM I.B.M. THAT I HAD MET AT STANFORD.

03:54PM 3    Q.   AND LET'S GO DOWN TO THE BOTTOM OF THE EMAIL.

03:54PM 4         AND HE SAYS TO YOU, "WHAT A GRATIFYING MORNING.  THIS HAS

03:55PM 5    BEEN OUR FIRST LIVE DEMO."

03:55PM 6         WAS THE DEMONSTRATION THAT THERANOS CONDUCTED FOR NOVARTIS

03:55PM 7    IN SWITZERLAND THE FIRST DEMONSTRATION OF THE COMPANY'S

03:55PM 8    TECHNOLOGY?

03:55PM 9    A.   OF THAT ONE SERIES SYSTEM, YES.

03:55PM 10   Q.   AND THEN HE GOES ON TO SAY, "THE ABCS TEAM WAS ALL OVER

03:55PM 11   EVERY KEYSTROKE AND LOG ENTRY AS THE DATA CAME BACK."

03:55PM 12        CAN YOU TELL US WHAT THE ABCS TEAM WAS?

03:55PM 13   A.   YES.  THAT IS WHAT WE WERE CALLING OUR SOFTWARE AT THE

03:55PM 14   TIME, THE SOFTWARE THAT WOULD TELL THE INSTRUMENT WHAT TO DO.

03:55PM 15        SO YOU WOULD PUT A CARTRIDGE IN A DEVICE, THE BAR CODE ON

03:55PM 16   THE CARTRIDGE WOULD CALL THE CLOUD, AND THE CLOUD WOULD SEND

03:55PM 17   COMMANDS BACK TO THE DEVICE TO TELL IT WHAT TO RUN, AND THEN

03:55PM 18   THE DATA WOULD GO BACK TO THE CLOUD.

03:55PM 19        SO THAT CLOUD TECHNOLOGY WAS WHAT WE CALLED THE ABCS.

03:55PM 20   Q.   AND DID YOU UNDERSTAND THAT OTHERS AT THERANOS THOUGHT

03:55PM 21   THAT THE DEMONSTRATION OF THERANOS'S TECHNOLOGY IN 2006 WAS

03:56PM 22   SUCCESSFUL?

03:56PM 23   A.   I DID.

03:56PM 24   Q.   AND DID YOU FEEL THAT WAY?

03:56PM 25   A.   I DID.

03:56PM 1    Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 13762.

03:56PM 2        IS THIS AN EMAIL THAT YOU SENT TO ALL THERANOS EMPLOYEES

03:56PM 3    AFTER THE DEMONSTRATION AT NOVARTIS?

03:56PM 4    A.   YES.

03:56PM 5            MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:56PM 6    13762.

03:56PM 7            MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:56PM 8            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:56PM 9        (DEFENDANT'S EXHIBIT 13762 WAS RECEIVED IN EVIDENCE.)

03:56PM 10   BY MR. DOWNEY:

03:56PM 11   Q.   LET ME JUST DISPLAY IT.

03:56PM 12       DO YOU SEE WHERE YOU SAY, "WE NAILED THIS ONE.  YOU ALL

03:56PM 13   DID AN INCREDIBLE JOB IN MAKING THIS HAPPEN - THIS IS THE

03:56PM 14   THERANOS WAY."

03:56PM 15       IS THAT A COMMENT ON THE DEMONSTRATION THAT HAD BEEN

03:56PM 16   CONDUCTED IN SWITZERLAND?

03:56PM 17   A.   YES.

03:56PM 18   Q.   BY THE WAY, WHEN YOU WENT TO SWITZERLAND, WHO WAS WITH

03:56PM 19   YOU?

03:56PM 20   A.   SOME OF OUR ENGINEERS AND SCIENTISTS AND THE BUSINESS

03:56PM 21   PEOPLE THAT WE HAD WHO WERE WORKING WITH PHARMACEUTICAL

03:57PM 22   COMPANIES.

03:57PM 23   Q.   NOW, AROUND THE SAME TIME THAT YOU WERE SIGNING THESE

03:57PM 24   CONTRACTS AND CONDUCTING THESE DEMONSTRATIONS, DID YOU DECIDE

03:57PM 25   TO CONDUCT ANOTHER SERIES OF FUND RAISING FOR THERANOS TO FUND

03:57PM  1      SOME OF THESE ACTIVITIES?

03:57PM  2      A.   YES.

03:57PM  3      Q.   AND WAS THAT IN LATE 2006?

03:57PM  4      A.   IT WAS.

03:57PM  5      Q.   DID MR. LUCAS AND MR. THOMAS ALSO INVEST IN THE SERIES C

03:57PM  6      ROUND OF THERANOS?

03:57PM  7      A.   THEY DID.

03:57PM  8      Q.   AND WHO ELSE?  DID MR. CHRIS LUCAS INVEST IN THAT ROUND?

03:57PM  9      A.   YES.

03:57PM 10      Q.   AND WHO ELSE INVESTED IN THE SERIES C ROUND AT THERANOS?

03:57PM 11      A.   LARRY ELLISON INVESTED, AND SOME OF THE FRIENDS AND

03:57PM 12      FAMILY, OR PEOPLE THAT I HAD MET THROUGH FRIENDS AND FAMILY IN

03:57PM 13      THE EARLIER ROUNDS INVESTED AS WELL.

03:58PM 14      Q.   OKAY.  AND HOW DID YOU COME TO BE IN TOUCH WITH

03:58PM 15      MR. ELLISON?

03:58PM 16      A.   THROUGH DON LUCAS.

03:58PM 17      Q.   AND DID YOU ALSO HAVE THE EXPERIENCE, AS PART OF THIS

03:58PM 18      ROUND OF FUND RAISING, THAT SOME POTENTIAL INVESTORS WANTED TO

03:58PM 19      TALK TO THE PHARMACEUTICAL COMPANIES THAT THERANOS WAS SIGNING

03:58PM 20      CONTRACTS WITH AND HOPING TO WORK WITH?

03:58PM 21      A.   YES.

03:58PM 22      Q.   OKAY.  LET ME SHOW YOU EXHIBIT 15013.  I'M NOT GOING TO

03:58PM 23      INTRODUCE THIS FOR THE TIME BEING.

03:58PM 24           IF YOU'LL JUST TAKE A MOMENT TO REVIEW THAT.

03:58PM 25           WELL, YOU KNOW, IT MIGHT JUST BE EASIER TO ADMIT IT.

03:58PM  1    LET'S -- IS THIS AN EMAIL FROM YOU TO A POTENTIAL INVESTOR IN

03:58PM  2    CONNECTION WITH RAISING MONEY FOR THE SERIES C INVESTMENT?

03:58PM  3    A.   IT IS.

03:59PM  4              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:59PM  5    15013.

03:59PM  6              MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:59PM  7              THE COURT:  IT'S ADMITTED.

03:59PM  8         (DEFENDANT'S EXHIBIT 15013 WAS RECEIVED IN EVIDENCE.)

03:59PM  9    BY MR. DOWNEY:

03:59PM  10   Q.   IF WE COULD DISPLAY THAT.

03:59PM  11        IF YOU WOULD LOOK AT THE BOTTOM EMAIL, IT'S AN EMAIL FROM

03:59PM  12   YOU TO BOB GRADY IN JULY OF 2006.

03:59PM  13        WHO WAS BOB GRADY?

03:59PM  14   A.   HE WAS A PARTNER AT AN INVESTMENT FIRM CALLED CARLYLE.

03:59PM  15   Q.   AND WAS HE EVALUATING A POTENTIAL INVESTMENT IN THERANOS

03:59PM  16   AS OF THIS TIME?

03:59PM  17   A.   HE WAS.

03:59PM  18   Q.   AND WOULD THAT INVESTMENT ULTIMATELY HAVE BEEN AS PART OF

03:59PM  19   THE SERIES C INVESTMENT IN THERANOS?

03:59PM  20   A.   YES.

03:59PM  21   Q.   AND IS THAT THE SAME ROUND OF INVESTMENT THAT -- WHEN

03:59PM  22   ALAN EISENMAN FIRST INVESTED IN THERANOS?

03:59PM  23   A.   YES.

03:59PM  24   Q.   AND ALSO CHRIS LUCAS INVESTED IN THAT ROUND AGAIN;

03:59PM  25   CORRECT?

03:59PM 1    A.   HE DID.

03:59PM 2    Q.   AND ALSO DID MR. HALL, CRAIG HALL INVESTED IN THAT ROUND

03:59PM 3    OF INVESTMENT?

03:59PM 4    A.   HE DID.  I THINK HE INVESTED IN CHRIS'S FUND, WHICH

04:00PM 5    INVESTED IN THAT ROUND OF INVESTMENT.

04:00PM 6    Q.   OKAY.  SO I SHOULD ASK YOU, WAS MR. HALL AN INDIRECT

04:00PM 7    INVESTOR IN THERANOS AS PART OF THAT ROUND?

04:00PM 8    A.   YES.

04:00PM 9    Q.   IF YOU TAKE A LOOK AT THE EMAIL BETWEEN YOURSELF AND

04:00PM 10   MR. GRADY, YOU LIST A NUMBER OF NAMES, AND THEY APPEAR TO BE

04:00PM 11   INDIVIDUALS AT, AMONG OTHER COMPANIES, PFIZER, GLAXOSMITHKLINE,

04:00PM 12   BRISTOL MYERS, NOVARTIS.

04:00PM 13        CAN YOU -- IS THAT, IN FACT, WHO THESE INDIVIDUALS ARE?

04:00PM 14   A.   YES.

04:00PM 15   Q.   AND CAN YOU TELL US WHY YOU'RE GIVING THE NAMES OF THOSE

04:00PM 16   INDIVIDUALS TO THIS POTENTIAL INVESTOR?

04:00PM 17   A.   YES.  HE HAD ASKED FOR THE ABILITY TO SPEAK WITH PEOPLE

04:00PM 18   THAT WE WERE WORKING WITH IN PHARMACEUTICAL COMPANIES, AND I

04:00PM 19   WAS CONNECTING HIM TO THOSE PEOPLE.

04:00PM 20   Q.   AND DID SOME -- WERE THERE SOME OCCASIONS WHERE THERE WERE

04:01PM 21   INVESTORS WHO WOULD NOT ASK FOR THIS INFORMATION?

04:01PM 22   A.   YES.

04:01PM 23   Q.   BUT IF INDIVIDUALS ASKED FOR THIS INFORMATION, DID YOU

04:01PM 24   PROVIDE THEM INFORMATION ABOUT CONTACTS AT THE PHARMACEUTICAL

04:01PM 25   COMPANIES SO THAT THEY COULD TALK TO THEM?

04:01PM 1    A.   I DID.

04:01PM 2    Q.   WHY DID YOU DO THAT?

04:01PM 3    A.   BECAUSE I THOUGHT THAT THE PEOPLE THAT WE WERE WORKING

04:01PM 4    WITH IN THE PHARMA COMPANIES COULD EXPLAIN THE IMPACT AND THE

04:01PM 5    POTENTIAL OF OUR WORK DIRECTLY.

04:01PM 6    Q.   OKAY.

04:01PM 7         YOUR HONOR, I'M GOING TO MOVE TO ABOUT A 20 MINUTE SECTION

04:01PM 8    NOW, SO --

04:01PM 9              THE COURT:  LET'S TAKE OUR WEEKEND BREAK NOW, LADIES

04:01PM 10   AND GENTLEMEN.

04:01PM 11        THANK YOU, MR. DOWNEY.

04:01PM 12        I THINK MONDAY, MS. KRATZMANN, THAT'S A HALF DAY; IS THAT

04:01PM 13   RIGHT?

04:01PM 14             THE CLERK:  YES, YOUR HONOR.

04:01PM 15             THE COURT:  SO WE'LL BE IN SESSION AT 9:00 O'CLOCK,

04:01PM 16   9:00 O'CLOCK, AND WE'LL END PROBABLY AT ABOUT 1:00 O'CLOCK.

04:01PM 17        SO, LADIES AND GENTLEMEN, LET ME REMIND YOU OF THE

04:01PM 18   ADMONITION, PLEASE.  DO NOT DO ANY RESEARCH.  DO NOT READ,

04:01PM 19   LISTEN TO, TALK ABOUT OR MAKE ANY DECISIONS ABOUT ANYTHING IN

04:02PM 20   THIS CASE.

04:02PM 21        BEFORE YOU LEAVE -- MS. HOLMES, YOU CAN STAND DOWN,

04:02PM 22   PLEASE.  THANK YOU.

04:02PM 23        LADIES AND GENTLEMEN, I DO WANT TO TALK TO YOU.

04:02PM 24        YOU RECALL THAT WE HAD SOME DISCUSSION ABOUT THE MEDIA

04:02PM 25   MOTION AND YOUR INFORMATION REGARDING THE QUESTIONNAIRES.

04:02PM 1    PLEASE RECALL THAT I HAD INTERVIEWS WITH YOU, EACH OF YOU,

04:02PM 2  WITH COUNSEL IN MY OFFICE REGARDING YOUR SPECIFIC COMMENTS AND

04:02PM 3  THOUGHTS ABOUT THOSE QUESTIONNAIRES.

04:02PM 4    I THINK I TOLD YOU ABOUT FIVE WEEKS AGO THAT I WAS GOING

04:02PM 5  TO REVIEW THE MOTION AND I WAS GOING TO KEEP YOU INFORMED ABOUT

04:02PM 6  THE COURT'S DECISION.  I THINK YOU HAD EXPRESSED SOME QUESTIONS

04:02PM 7  ABOUT THAT.

04:02PM 8    I JUST WANT TO TELL YOU NOW --

04:02PM 9    MR. DOWNEY, I JUST WANT TO CONFIRM, IS THIS A GOOD TIME?

04:02PM 10  SHOULD WE WAIT FOR ANOTHER TIME FOR THIS?  I'M SORRY, SIR.

04:03PM 11    MR. DOWNEY:  WHATEVER SUITS THE COURT.

04:03PM 12    MR. SCHENK:  YES, THIS IS FINE.  THANK YOU.

04:03PM 13    THE COURT:  ALL RIGHT.  THANK YOU.

04:03PM 14    SO, LADIES AND GENTLEMEN, I DO WANT TO TELL YOU THAT I

04:03PM 15  HAVE MADE A DECISION ON THAT MOTION.  IT IS GOING TO BE POSTED,

04:03PM 16  THAT MEANS IT WILL BE POSTED ON OUR ECF DOCKET THIS AFTERNOON.

04:03PM 17  IT WILL BE A PUBLIC POSTING SO EVERYONE WILL HAVE ACCESS TO IT.

04:03PM 18    I DO WANT TO LET YOU KNOW THAT IN REGARDS TO THE MOTION

04:03PM 19  FROM THE MEDIA COALITION, I HAVE GRANTED IN PART AND DENIED IN

04:03PM 20  PART THAT MOTION.

04:03PM 21    AND I JUST WANT TO TELL YOU, I AM GOING TO MAINTAIN THE

04:03PM 22  COMPLETED JUROR QUESTIONNAIRES UNDER SEAL FOR THE REMAINDER OF

04:03PM 23  THE TRIAL.  THEY WILL REMAIN UNDER SEAL.

04:03PM 24    AFTER THERE'S A VERDICT IN THIS CASE, OR AFTER THIS

04:03PM 25  EVIDENCE AND THIS CASE IS FINISHED, THE COURT -- AND AFTER I

04:03PM  1    HAVE RELEASED YOU FROM YOUR JURY SERVICE -- I WILL THEN

04:03PM  2    PARTIALLY UNSEAL THE QUESTIONNAIRES WITH LIMITED REDACTIONS,

04:04PM  3    WHICH IS TO SAY INFORMATION IS GOING TO BE REDACTED, NAMES AND

04:04PM  4    ADDRESSES.

04:04PM  5         SOME OF YOU HAVE EXPRESSED TO ME IN CHAMBERS SPECIFIC

04:04PM  6    ISSUES, AND I'VE ADDRESSED THOSE IN THE ORDER.

04:04PM  7         SOME OF THEM -- SOME OF YOU HAVE ALSO INDICATED THAT YOU

04:04PM  8    HAVE LESS FEELINGS ABOUT REDACTIONS.

04:04PM  9         AND I'M MINDFUL OF THOSE REQUESTS AND THOSE FEELINGS, AND

04:04PM 10    THE ORDER WILL REFLECT THAT ACCORDINGLY AS WELL.

04:04PM 11         BUT I JUST WANT YOU TO KNOW THAT NONE OF THIS INFORMATION

04:04PM 12    IS GOING TO BE RELEASED WHILE YOU'RE STILL IN TRIAL AND YOU'RE

04:04PM 13    STILL SERVING AS JURORS IN THIS TRIAL.

04:04PM 14         I JUST WANT TO LET YOU KNOW THAT.  THOSE QUESTIONNAIRES

04:04PM 15    WILL REMAIN CONFIDENTIAL PURSUANT TO THIS ORDER UNTIL YOUR

04:04PM 16    TRIAL SERVICE IS FINISHED.

04:04PM 17         AND THEN, AGAIN, AS I SAID, THERE WILL BE LIMITED, LIMITED

04:04PM 18    REDACTIONS.

04:04PM 19         (PAUSE IN PROCEEDINGS.)

04:04PM 20            THE COURT:  LET ME SAY, I DON'T -- AND I'M TELLING

04:05PM 21    YOU THIS NOW BECAUSE I DON'T WANT YOU TO -- YOU'VE RAISED A

04:05PM 22    CONCERN ABOUT IT.  I DON'T WANT YOU TO BE THINKING ABOUT THIS

04:05PM 23    OR LET THIS IN ANY WAY INTERFERE WITH YOUR, AS I TOLD YOU IN

04:05PM 24    CHAMBERS WHEN WE MET, INTERFERE IN ANY WAY WITH YOUR ABILITY TO

04:05PM 25    CONTINUE TO FOCUS AS YOU HAVE BEEN DOING ON THE ISSUES IN THIS

04:05PM 1    CASE.

04:05PM 2         I SHOULD TELL YOU THAT ADDRESSES, THOSE ARE GOING TO

04:05PM 3    REMAIN REDACTED, THAT TYPE OF PERSONAL INFORMATION.

04:05PM 4         BUT I JUST WANT TO LET YOU KNOW THAT TODAY SO YOU'LL HAVE

04:05PM 5    THAT INFORMATION.

04:05PM 6         ALL RIGHT.  LET ME REMIND YOU OF THE ADMONITION THAT

04:05PM 7    REMAINS IN PLACE.

04:05PM 8         LADIES AND GENTLEMEN, LET ME TELL YOU THIS, TOO, AND I

04:05PM 9    APOLOGIZE I DIDN'T GET THIS DONE NOW, BUT WHEN YOU COME BACK

04:05PM 10   MONDAY, I WILL HAVE A COPY OF THIS ORDER FOR EACH OF YOU, AND

04:05PM 11   YOU'LL HAVE A COPY OF IT.

04:05PM 12        AND MS. KRATZMANN WILL PROVIDE YOU A COPY OF MY ORDER THAT

04:05PM 13   IS A LITTLE MORE INFORMATIVE THAN WHAT I'M TELLING YOU NOW.

04:05PM 14        BUT NOTHING IS GOING TO BE RELEASED UNTIL THE TRIAL IS

04:06PM 15   OVER.

04:06PM 16        ALL RIGHT.  THANK YOU VERY MUCH.  HAVE A GREAT WEEKEND,

04:06PM 17   AND WE'LL SEE YOU MONDAY MORNING.  THANK YOU.

04:06PM 18        (JURY OUT AT 4:06 P.M.).

04:06PM 19          THE COURT:  THANK YOU.  PLEASE BE SEATED.

04:06PM 20        THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT FOR THE

04:06PM 21   WEEKEND.

04:06PM 22        COUNSEL, I JUST WANT TO CHECK IN, ANYTHING FURTHER BEFORE

04:06PM 23   WE BREAK?

04:06PM 24          MR. LEACH:  VERY BRIEFLY, YOUR HONOR.  I JUST WANT

04:06PM 25   TO NOTE.

04:06PM 1          THE COURT:  YOU CAN TAKE YOUR MASK OFF.  THANK YOU.

04:06PM 2     I APPRECIATE IT.

04:06PM 3          MR. LEACH:  I DON'T HAVE THE EXACT NUMBER, BUT

04:06PM 4     THERE'S AT LEAST 20 TO 25 EXHIBITS IN THE DIRECT EXAMINATION

04:06PM 5     BINDER FROM MS. HOLMES THAT WERE PRODUCED TO US LAST NIGHT.

04:07PM 6     MOST OF THEM WE DIDN'T OBJECT TO BECAUSE WE DIDN'T WANT TO DO

04:07PM 7     THAT IN FRONT OF THE JURY.

04:07PM 8          THE COURT HAS SET MULTIPLE RULE 16 DEADLINES IN THIS CASE.

04:07PM 9     THESE ARE DOCUMENTS THAT SHOULD HAVE BEEN PRODUCED IN DISCOVERY

04:07PM 10    AND ARE BEING PRODUCED IN ADVANCE OF THE EXAMINATION THE NIGHT

04:07PM 11    BEFORE.

04:07PM 12         WE'LL HAVE AN OPPORTUNITY TO GO THROUGH THOSE OVER THE

04:07PM 13    WEEKEND, AND THAT PART I'M NOT RAISING AN OBJECTION TO.

04:07PM 14         AND I DO THINK THERE ARE MORE COMING.  I JUST NEED TO

04:07PM 15    NOTE, THESE AREN'T PRODUCED IN DISCOVERY.  WE'RE GETTING THEM

04:07PM 16    LITERALLY FOR THE FIRST TIME THE NIGHT BEFORE.

04:07PM 17         SO IT'S NOT A MATTER OF TAKING A DOCUMENT THAT WAS

04:07PM 18    PRODUCED AND MAKING AN ASSESSMENT AND WE'RE GOING TO ACTUALLY

04:07PM 19    USE THAT IN THE TRIAL.

04:07PM 20         WE'RE GETTING THIS IN REALTIME.  IT'S NOT CONSISTENT WITH

04:07PM 21    THE COURT'S ORDERS.

04:07PM 22         I'M NOT ASKING FOR ANYTHING NOW.  I JUST DON'T WANT THIS

04:07PM 23    TO CONTINUE.

04:07PM 24         THE COURT:  THIS IS SORT OF WHAT WE WERE TALKING

04:07PM 25    ABOUT THIS MORNING, MR. DOWNEY.

04:07PM 1          MR. DOWNEY:  LET ME --

04:07PM 2          THE COURT:  YOU CAN TAKE YOUR MASK OFF, MR. DOWNEY.

04:07PM 3          MR. DOWNEY:  LET ME CUT THROUGH THIS.

04:07PM 4     I MEAN, I OBVIOUSLY HAVE SOME CONCERNS, AND HAD SOME

04:08PM 5  CONCERNS UNTIL THE CASE RESTED.

04:08PM 6     BUT I WILL GET -- I DON'T KNOW IF THERE ARE MATERIALS THAT

04:08PM 7  WILL BE RELEVANT TO MONDAY AND TUESDAY'S EXAMINATION THAT

04:08PM 8  MR. LEACH DOESN'T HAVE, BUT IF THERE ARE, I WILL MAKE SURE HE

04:08PM 9  GETS THEM SO HE CAN LOOK AT THEM ALL DAY SUNDAY AND SEE WHAT

04:08PM 10  VIEW HE HAS.

04:08PM 11     I DON'T KNOW ALL OF WHAT THEY ARE, YOUR HONOR, TO BE

04:08PM 12  CANDID.  SO I'M NOT SITTING ON SOME TROVE OF DOCUMENTS, BUT

04:08PM 13  I --

04:08PM 14          THE COURT:  I APPRECIATE THAT.

04:08PM 15     BUT YOUR TEAM MIGHT HAVE SOME KNOWLEDGE ABOUT THAT THAT

04:08PM 16  THEY COULD SHARE WITH YOU.

04:08PM 17          MR. DOWNEY:  WELL, YOUR HONOR, IN FAIRNESS, I MEAN,

04:08PM 18  THEY JUST RESTED.  YOU KNOW, SOME OF THESE -- AND I GAVE THEM

04:08PM 19  THE DOCUMENTS BEFORE THEY RESTED.  I WANT TO BE COOPERATIVE

04:08PM 20  WITH HIM SO THAT WE CAN HAVE GOOD ORDER IN COURT.

04:08PM 21     I DON'T THINK THE WITNESS WILL BE ON CROSS-EXAMINATION

04:08PM 22  PROBABLY EVEN UNTIL NEXT WEEK, BUT IF HE HAS ISSUES RELATIVE TO

04:09PM 23  THE ADMISSIBILITY OR HE WANTS TO RAISE THOSE IN ADVANCE, I'LL

04:09PM 24  GET THEM TO HIM IN ADVANCE SO HE CAN --

04:09PM 25          THE COURT:  WELL, THANK YOU.

| | | |
|---|---|---|
| 04:09PM | 1 | LET ME JUST SAY, YOU KNOW, YOU'VE BEEN -- BOTH SIDES HAVE |
| 04:09PM | 2 | BEEN COOPERATIVE -- |
| 04:09PM | 3 | MR. DOWNEY:  YES. |
| 04:09PM | 4 | THE COURT:  -- NOTWITHSTANDING MY COMMENTS.  AND MY |
| 04:09PM | 5 | COMMENTS, YOU UNDERSTAND THE GENESIS OF MY COMMENTS IN TRYING |
| 04:09PM | 6 | TO KEEP THE TRIAL GOING AND THAT TYPE OF THING. |
| 04:09PM | 7 | BUT YOU BOTH HAVE BEEN VERY COOPERATIVE. |
| 04:09PM | 8 | THE TRIALS HAVE -- AS MS. SAHARIA REMINDED ME THIS |
| 04:09PM | 9 | MORNING, TRIALS ARE, THEY'RE A MOVEABLE FEAST.  AND THINGS |
| 04:09PM | 10 | HAPPEN IN TRIALS.  WE ALL UNDERSTAND THAT. |
| 04:09PM | 11 | AND SO I APPRECIATE YOUR EFFORTS, BOTH SIDES' EFFORTS TO |
| 04:09PM | 12 | TAKE CARE OF THESE ISSUES AS BEST YOU CAN OUTSIDE OF COURT, |
| 04:09PM | 13 | OUTSIDE OF THE JURY'S TIME, AND THAT'S REALLY WHAT WE'RE AFTER. |
| 04:09PM | 14 | MR. DOWNEY:  I UNDERSTAND THAT, YOUR HONOR. |
| 04:09PM | 15 | AND JUST IN THE -- A COMMENT ON SORT OF A CASE MANAGEMENT |
| 04:09PM | 16 | NATURE FOR YOUR HONOR.  I DON'T -- I HAVE IN MY MIND, WHICH I |
| 04:09PM | 17 | WON'T SAY TO THE COURT, BUT I HAVE IN MIND HOW LONG I THINK THE |
| 04:09PM | 18 | DEFENSE CASE WILL GO. |
| 04:09PM | 19 | I THINK SORT OF CONSISTENT WITH THAT, MY EXPECTATION HAS |
| 04:10PM | 20 | BEEN NOW THAT, YOU KNOW, THE DIRECT EXAMINATION MAY CONTINUE |
| 04:10PM | 21 | THROUGH NEXT WEEK.  WE JUST HAVE, YOU KNOW, A DAY AND A HALF. |
| 04:10PM | 22 | THE COURT:  SURE.  RIGHT. |
| 04:10PM | 23 | MR. DOWNEY:  BUT IT DOESN'T -- I THINK WHERE WE ARE |
| 04:10PM | 24 | DOES NOT CHANGE MY BASIC ESTIMATE OF HOW LONG THE DEFENSE CASE |
| 04:10PM | 25 | IS LIKELY TO LAST. |

| | | |
|---|---|---|
| 04:10PM | 1 | THE COURT: OKAY. THANK YOU. I APPRECIATE THAT. |
| 04:10PM | 2 | THANK YOU. |
| 04:10PM | 3 | ANYTHING FURTHER FROM YOUR SIDE, MR. LEACH? |
| 04:10PM | 4 | MR. LEACH: NO, YOUR HONOR. |
| 04:10PM | 5 | MR. DOWNEY: NOTHING FURTHER, YOUR HONOR. |
| 04:10PM | 6 | THE COURT: OKAY. HAVE A GOOD WEEKEND. |
| 04:10PM | 7 | MR. DOWNEY: YOUR HONOR, CAN I JUST SAY ON THE |
| 04:10PM | 8 | QUESTIONNAIRE ISSUE -- |
| 04:10PM | 9 | THE COURT: YEAH. |
| 04:10PM | 10 | MR. DOWNEY: -- I WOULD LIKE TO LOOK AT THE ORDER. |
| 04:10PM | 11 | THE ONLY QUESTION THAT REMAINS IN MY MIND IS -- AND I |
| 04:10PM | 12 | DON'T KNOW IF THIS CONCERN WAS EXPRESSED OR NOT, BUT I JUST |
| 04:10PM | 13 | WANT TO LOOK AT THE TRANSCRIPT -- I DON'T WANT TO TAKE THE |
| 04:10PM | 14 | JURY'S TIME OR OUR TIME TO HAVE TO TALK TO THE JURY AGAIN, BUT |
| 04:10PM | 15 | I HAVE THAT CONCERN. |
| 04:10PM | 16 | SO I WANT TO SEE IF, ON ONE READING OF THE TRANSCRIPT |
| 04:10PM | 17 | THAT'S UNNECESSARY, BUT LET ME TAKE A LOOK, AND IF THERE IS, |
| 04:10PM | 18 | I'LL LET THE COURT KNOW ON MONDAY AND WE CAN DO IT AT SOME |
| 04:10PM | 19 | POINT I SUPPOSE. |
| 04:10PM | 20 | THE COURT: ARE YOU AND MR. SCHENK BUSY JUST NOW? |
| 04:11PM | 21 | MR. DOWNEY: NO, NO, I'M AVAILABLE, YEAH. |
| 04:11PM | 22 | THE COURT: ALL RIGHT. THANK YOU. |
| 04:11PM | 23 | MAYBE -- YOU CAN CHECK WITH MR. SCHENK TO SEE HIS |
| 04:11PM | 24 | AVAILABILITY, AND MR. LEACH, BECAUSE I MIGHT HAVE COPIES |
| 04:11PM | 25 | AVAILABLE. LET ME CHECK AND SEE. |

04:11PM  1          MR. DOWNEY:  NO, NO.  I HAVE THE -- MAYBE I'M NOT

04:11PM  2  MAKING MYSELF CLEAR.  MY RECOLLECTION OF THE --

04:11PM  3          THE COURT:  NO, I'M GOING TO GIVE YOU A COPY OF THE

04:11PM  4  ORDER.

04:11PM  5          MR. DOWNEY:  FAIR ENOUGH.  I'LL TAKE A LOOK AT IT

04:11PM  6  AND WE CAN SEE.

04:11PM  7          THE COURT:  ALL RIGHT.  THANK YOU.

04:11PM  8          MR. DOWNEY:  YES.

04:11PM  9          MR. LEACH:  THANK YOU.

04:11PM 10          THE CLERK:  COURT IS ADJOURNED.

04:11PM 11      (COURT ADJOURNED AT 4:11 P.M.)

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

1

2

3                   CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16         _____
           IRENE RODRIGUEZ, CSR, CRR
17         CERTIFICATE NUMBER 8076

18

19         _____
           LEE-ANNE SHORTRIDGE, CSR, CRR
20         CERTIFICATE NUMBER 9595

21         DATED:  NOVEMBER 19, 2021

22

23

24

25