# EXHIBIT 36

```
 1

 2                    UNITED STATES DISTRICT COURT

 3                   NORTHERN DISTRICT OF CALIFORNIA

 4                        SAN JOSE DIVISION

 5
        UNITED STATES OF AMERICA,        )  CR-18-00258-EJD
 6                                       )
                       PLAINTIFF,        )  SAN JOSE, CALIFORNIA
 7                                       )
                 VS.                     )  VOLUME 15
 8                                       )
        ELIZABETH A. HOLMES,             )  OCTOBER 5, 2021
 9                                       )
                       DEFENDANT.        )  PAGES 2544 - 2774
10      _____ )

11
                    TRANSCRIPT OF TRIAL PROCEEDINGS
12              BEFORE THE HONORABLE EDWARD J. DAVILA
                    UNITED STATES DISTRICT JUDGE
13
        A P P E A R A N C E S:
14
        FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
15                             BY:  JOHN C. BOSTIC
                                    JEFFREY B. SCHENK
16                             150 ALMADEN BOULEVARD, SUITE 900
                               SAN JOSE, CALIFORNIA 95113
17
                               BY:  ROBERT S. LEACH
18                                  KELLY VOLKAR
                               1301 CLAY STREET, SUITE 340S
19                             OAKLAND, CALIFORNIA 94612

20          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21
        OFFICIAL COURT REPORTERS:
22                             IRENE L. RODRIGUEZ, CSR, RMR, CRR
                               CERTIFICATE NUMBER 8074
23                             LEE-ANNE SHORTRIDGE, CSR, CRR
                               CERTIFICATE NUMBER 9595
24
            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25               TRANSCRIPT PRODUCED WITH COMPUTER
```

```
 1        A P P E A R A N C E S:  (CONT'D)

 2

 3     FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                                BY:  KEVIN M. DOWNEY
 4                                   LANCE A. WADE
                                     KATHERINE TREFZ
 5                                   RICHARD CLEARY
                                     J.R. FLEURMONT
 6                                   ANDREW LEMENS
                                725 TWELFTH STREET, N.W.
 7                              WASHINGTON, D.C. 20005

 8                              LAW OFFICE OF JOHN D. CLINE
                                BY:  JOHN D. CLINE
 9                              ONE EMBARCADERO CENTER, SUITE 500
                                SAN FRANCISCO, CALIFORNIA 94111
10

11     ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
                                BY:  ADELAIDA HERNANDEZ
12
                                OFFICE OF THE U.S. ATTORNEY
13                              BY:  LAKISHA HOLLIMAN, PARALEGAL
                                     MADDI WACHS, PARALEGAL
14
                                WILLIAMS & CONNOLLY
15                              BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL

16                              TBC
                                BY:  BRIAN BENNETT, TECHNICIAN
17

18

19

20

21

22

23

24

25
```

```
1                        INDEX OF PROCEEDINGS

2        GOVERNMENT'S:

3

4      ADAM ROSENDORFF
       CROSS-EXAM BY MR. WADE (RES.)              P. 2590
5      REDIRECT EXAM BY MR. BOSTIC                P. 2721

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        INDEX OF EXHIBITS

2
                                    IDENT.      EVIDENCE
3         GOVERNMENT'S:

4         1541                                    2603
          1556                                    2611
5         1559                                    2612
          1562                                    2613
6         5419                                    2748
          5418                                    2751
7         5420                                    2758
          5421                                    2765
8         5422                                    2768

9

10

11        DEFENDANT'S:

12        12607                                   2626
          13891                                   2631
13        13893                                   2633
          12764                                   2638
14        7490                                    2640
          9907                                    2648
15        12587                                   2652
          13888                                   2659
16        13887                                   2666
          13756                                   2675
17        13753                                   2676
          13754                                   2677
18        12913                                   2681
          12916                                   2686
19

20

21

22

23

24

25
```

```
 1    SAN JOSE, CALIFORNIA                    OCTOBER 5, 2021

 2                    P R O C E E D I N G S

 3         (COURT CONVENED AT 8:13 A.M.)

 4         (JURY OUT AT 8:13 A.M.)

 5             THE COURT:  LET'S CALL OUR MATTER 18-58,

 6    UNITED STATES VERSUS HOLMES.

 7         GOOD MORNING.  WE'RE WITH COUNSEL OUTSIDE OF THE PRESENCE

 8    OF THE JURY.

 9         LET ME HAVE COUNSEL IDENTIFY HIMSELF, PLEASE.

10             MR. BOSTIC:  GOOD MORNING, YOUR HONOR.

11         JOHN BOSTIC FOR THE UNITED STATES.  I'M JOINED BY

12    JEFF SCHENK, ROBERT LEACH, AND KELLY VOLKAR.

13             THE COURT:  THANK YOU.

14             MR. WADE:  GOOD MORNING, YOUR HONOR.

15         LANCE WADE ON BEHALF OF MS. HOLMES.  WITH ME THIS MORNING

16    ARE MR. DOWNEY, MS. TREFZ, MR. CLEARY, MR. CLINE, AND

17    MS. HOLMES IS PRESENT AS WELL.

18             THE COURT:  THANK YOU.  GOOD MORNING EVERYONE.

19         SO WE'RE MEETING THIS MORNING REGARDING SOME EVIDENTIARY

20    QUESTIONS.  I THINK, MR. BOSTIC, YOU EMAILED MS. KRATZMANN AND

21    SAID WE SHOULD MEET.

22             MR. BOSTIC:  YES, YOUR HONOR.  AND WE PREVIOUSLY

23    FLAGGED THESE ISSUES FOR THE COURT AND INDICATED WE MIGHT NEED

24    THE COURT'S GUIDANCE ON HOW TO HANDLE THEM.

25         THESE ARE ISSUES RELATING TO DR. ROSENDORFF'S
```

08:14AM 1    POST-THERANOS EMPLOYMENT.  SINCE LEAVING THERANOS, HE HAS BEEN

08:14AM 2    EMPLOYED BY A NUMBER OF LABORATORIES, INCLUDING THREE IN

08:14AM 3    PARTICULAR THAT I UNDERSTAND THE DEFENSE MIGHT SEEK TO ELICIT

08:14AM 4    TESTIMONY FROM HIM ABOUT DURING CROSS.

08:14AM 5        IT'S THE GOVERNMENT'S POSITION THAT, FOR VARIOUS REASONS,

08:14AM 6    THAT TESTIMONY IS NOT ADMISSIBLE AND THE EVIDENCE THAT THE

08:14AM 7    DEFENSE SEEKS TO INTRODUCE IS NOT ADMISSIBLE UNDER 403, 608 AND

08:14AM 8    401.

08:14AM 9        I'M HAPPY TO ADDRESS THOSE DIFFERENT CATEGORIES OF

08:14AM 10   EVIDENCE IN TURN, BUT I'M NOT SURE WHETHER THE COURT WOULD FIND

08:14AM 11   THAT MORE HELPFUL OR HEARING FROM THE DEFENSE ON WHY, AS THE

08:15AM 12   PROPONENT, THE EVIDENCE IS --

08:15AM 13            THE COURT:  SURE.  WHY DON'T YOU TELL ME WHAT IT IS

08:15AM 14   YOU WANT TO DO, MR. WADE.

08:15AM 15            MR. WADE:  SURE, YOUR HONOR.

08:15AM 16        THERE ARE SEVERAL AVENUES BY WHICH THIS EVIDENCE CAN BE

08:15AM 17   ADMITTED, AND I CAN SET FORTH EACH OF THEM.  LET ME JUST FIRST

08:15AM 18   GIVE A LITTLE BIT OF A FACTUAL, RELEVANT FACTUAL OVERVIEW.

08:15AM 19            THE COURT:  LET ME ASK A PRELIMINARY QUESTION.

08:15AM 20        LAST NIGHT WE RECEIVED IN CHAMBERS AN EMAIL, I THINK IT

08:15AM 21   WAS AFTER 5:00 O'CLOCK, AND IT PERHAPS CONTAINED SOME

08:15AM 22   DOCUMENTS.

08:15AM 23        IS THIS WHAT WE'RE TALKING ABOUT?

08:15AM 24            MR. WADE:  IT'S NOT CLEAR, YOUR HONOR, THAT WE WOULD

08:15AM 25   ACTUALLY SEEK TO OFFER ANY OF THE DOCUMENTS DEPENDING UPON --

08:15AM  1          THE COURT:  LET ME START FROM THE BEGINNING.  ARE

08:15AM  2   THESE THE DOCUMENTS THAT WE'RE TALKING ABOUT NOW?  THE

08:15AM  3   DOCUMENTS THAT THE COURT RECEIVED AFTER 5:00 O'CLOCK LAST

08:15AM  4   NIGHT?  THE COLLECTION?

08:15AM  5       I'M NOT ASKING IF YOU'RE GOING TO INTRODUCE THEM.

08:15AM  6          MR. WADE:  YES.

08:15AM  7          THE COURT:  I THINK YOUR EMAIL SAID WE WILL ADDRESS

08:15AM  8   TOMORROW WHY WE THINK THIS TESTIMONY IS ADMISSIBLE UNDER 401,

08:16AM  9   608(B), AND FOR BIAS.  FOR PLANNING PURPOSES, WE CAN AVOID

08:16AM 10   ADDRESSING THESE ISSUES UNTIL AFTER THE LUNCH BREAK IF THAT

08:16AM 11   MAKES MATTERS EASIER FOR THE COURT.

08:16AM 12       YOU SAID IN THE EMAIL, WE WILL LIKELY, UNDERLINED, NOT

08:16AM 13   SEEK TO OFFER MANY OF THESE DOCUMENTS INTO EVIDENCE.

08:16AM 14       DOES THAT MEAN MORE THAN ONE OR LESS THAN ONE?

08:16AM 15          MR. WADE:  IT'S NOT CLEAR THAT WE'LL OFFER ANY,

08:16AM 16   YOUR HONOR.

08:16AM 17       WHAT WE WANTED TO DO, WITHOUT LAYING OUT OUR WHOLE

08:16AM 18   CROSS-EXAMINATION IN A SHORT PERIOD OF TIME, WE WANTED TO GIVE

08:16AM 19   SOME RELEVANT FACTUAL BACKGROUND TO THE COURT SO THE COURT CAN

08:16AM 20   CONSIDER SOME TESTIMONY THAT WE SEEK.

08:16AM 21       THE TESTIMONY REALLY RELATES TO -- IF I COULD GIVE THE

08:16AM 22   COURT JUST A VERY QUICK OVERVIEW.

08:16AM 23          THE COURT:  THERE'S EIGHT DOCUMENTS HERE.

08:16AM 24          MR. WADE:  THERE ARE EIGHT DOCUMENTS, BUT, FRANKLY,

08:16AM 25   YOUR HONOR, WHAT IS REALLY AT ISSUE WOULD BE THE QUESTIONS AND

08:16AM 1    ANSWERS THAT WE SEEK TO ELICIT FROM DR. ROSENDORFF.

08:16AM 2        IF HE ANSWERS THE QUESTIONS TRUTHFULLY, AS WE UNDERSTAND

08:17AM 3    HE PROBABLY WOULD BASED UPON THE DOCUMENTS, IT'S UNCLEAR TO US

08:17AM 4    THAT WE REALLY NEED TO ADMIT THE DOCUMENTS THEMSELVES IN THE

08:17AM 5    CASE.  SO IT'S NOT CLEAR THAT EXTRINSIC EVIDENCE WOULD BE

08:17AM 6    NEEDED.

08:17AM 7        IT MAY BE NEEDED TO IMPEACH OR REFRESH.

08:17AM 8        THERE ARE SEVERAL DIFFERENT POST-EMPLOYMENT ISSUES WITH

08:17AM 9    DR. ROSENDORFF THAT WE WOULD SEEK TO QUESTION HIM ABOUT.

08:17AM 10        LET ME GIVE AN OVERVIEW OF WHAT THEY ARE AND THEN I'LL

08:17AM 11    EXPLAIN WHY THEY'RE RELEVANT.

08:17AM 12        THE FIRST IS HIS EMPLOYMENT AT A COMPANY IMMEDIATELY

08:17AM 13    FOLLOWING HIS EMPLOYMENT WITH THERANOS.  HE WENT TO WORK AT A

08:17AM 14    COMPANY CALLED INVITAE.

08:17AM 15        WHILE HE WAS AT INVITAE --

08:17AM 16            THE COURT:  IT'S SPELLED?

08:17AM 17            MR. WADE:  I-N-V-I-T-A-E.

08:17AM 18        WHILE HE WAS AT THAT COMPANY, THE COMPANY HAD A MAJOR

08:18AM 19    ISSUE WITH RESPECT TO A QUALITY CONTROL FAILURE THAT RESULTED

08:18AM 20    IN INACCURATE AND UNRELIABLE PATIENT TEST RESULTS BEING SENT TO

08:18AM 21    50,000 PATIENTS RELATED TO GENETIC CANCER SCREENING.

08:18AM 22            THE COURT:  AND WHAT WAS THE TIMING OF THAT, THE

08:18AM 23    YEAR?

08:18AM 24            MR. WADE:  I BELIEVE THAT WAS IN 2016 OR '17.  LET

08:18AM 25    ME -- THE COURT'S INDULGENCE FOR A SECOND.

08:18AM 1      2017 IS WHEN IT CAME TO LIGHT, BUT THE RESULTS WERE THE

08:18AM 2  11 MONTHS PRIOR TO THAT.  SO IT WAS THE PERIOD 2016 TO '17 WHEN

08:18AM 3  THERE WERE INACCURATE RESULTS.  THE COMPANY CAME TO THE

08:18AM 4  CONCLUSION THAT THOSE RESULTS WERE, WERE DUE TO QUALITY CONTROL

08:18AM 5  FAILURES WITHIN THE LAB.

08:18AM 6      DR. ROSENDORFF LEFT THE COMPANY ALMOST IMMEDIATELY AFTER

08:19AM 7  THAT, I BELIEVE THE MONTH FOLLOWING THE ANNOUNCEMENT OR THE

08:19AM 8  DISCLOSURE OF THOSE ERRONEOUS RESULTS AND QUALITY CONTROL

08:19AM 9  FAILURES.  THAT'S ISSUE NUMBER ONE.

08:19AM 10      ISSUE NUMBER TWO IS WHILE HE WAS AT -- WORKING AT INVITAE,

08:19AM 11  HE ALSO WORKED AT A COMPANY CALLED UBIOME.  HE WAS A LAB

08:19AM 12  DIRECTOR THERE.  HE WAS FIRED FOR FAILING TO MEET HIS

08:19AM 13  PROFESSIONAL OBLIGATIONS, INCLUDING FOR NOT SHOWING UP IN THE

08:19AM 14  OFFICE AND NOT MAKING HIMSELF SUFFICIENTLY AVAILABLE.

08:19AM 15      THERE WERE ALSO VALIDATION REPORT ISSUES POTENTIALLY WITH

08:19AM 16  RESPECT TO VALIDATION REPORTS HE SIGNED.  HE WAS QUESTIONED BY

08:19AM 17  FEDERAL AGENTS AND PROSECUTORS ABOUT THOSE ACTS IN I BELIEVE IT

08:20AM 18  WAS NOVEMBER OR DECEMBER OF 2020.

08:20AM 19      AND TWO PEOPLE FROM UBIOME, THE CEO, I BELIEVE, AND THE

08:20AM 20  NUMBER TWO EXECUTIVE WERE INDICTED IN THAT CASE.

08:20AM 21      THE FOURTH ISSUE --

08:20AM 22          THE COURT:  THE THIRD ISSUE.

08:20AM 23          MR. WADE:  I'M SORRY, THIRD ISSUE.

08:20AM 24      AND MAYBE THERE'S ONLY THREE BECAUSE ONE RELATES TO HIS

08:20AM 25  COMPETENCE AT THERANOS, AND THEN WE HAVE INVITAE, UBIOME, AND

08:20AM 1   THE LAST IS PERKIN ELMER, WHICH IS A MATTER THAT DR. ROSENDORFF

08:20AM 2   HIMSELF ACTUALLY RAISED IN HIS TESTIMONY THE OTHER DAY.  HE

08:20AM 3   MENTIONED THAT HE STILL DEALS WITH INQUIRIES THERE AND

08:20AM 4   MENTIONED WHERE HE WORKS.  PERKIN ELMER HAS BEEN THE SUBJECT OF

08:21AM 5   ONGOING INVESTIGATIONS RELATING TO THE ACCURACY OF ITS TEST

08:21AM 6   RESULTS.  IT WAS INSPECTED BY CMS, THE VERY SAME INSPECTORS WHO

08:21AM 7   ARE -- THREE OF WHOM ARE WITNESSES IN THIS CASE CONDUCTED THAT

08:21AM 8   INSPECTION.

08:21AM 9       THEY ISSUED A NOTICE OF DEFICIENCIES THAT INDICATED THAT

08:21AM 10  THERE WERE SERIOUS DEFICIENCIES WITHIN THE LAB.  THOSE

08:21AM 11  DEFICIENCIES INCLUDED INACCURATE TEST RESULTS, AND THEY ALSO

08:21AM 12  INCLUDED DEFICIENT PERFORMANCE OF THE LABORATORY DIRECTOR IN

08:21AM 13  NUMEROUS RESPECTS.

08:21AM 14      THERE WAS AN OPPORTUNITY, MULTIPLE OPPORTUNITIES FOR THE

08:21AM 15  LABORATORY DIRECTOR TO ADDRESS THOSE DEFICIENCIES AND TO SHOW

08:21AM 16  COMPLIANCE IN REMEDIATION.  THOSE EFFORTS, AS OF THE SPRING AND

08:21AM 17  SUMMER, WERE UNSUCCESSFUL.

08:21AM 18          THE COURT:  SPRING AND SUMMER OF?

08:22AM 19          MR. WADE:  OF 2021.

08:22AM 20      THERE WAS A PROPOSED SANCTION AND NOTICE OF SANCTIONS

08:22AM 21  ISSUED.  THAT NOTICE OF SANCTIONS INDICATES THAT DR. ROSENDORFF

08:22AM 22  COULD BE SUSPENDED FROM HIS ABILITY TO SERVE AS A LABORATORY

08:22AM 23  DIRECTOR AS A RESULT OF THE IMMEDIATE JEOPARDY NOTICE AND HIS

08:22AM 24  INABILITY TO CURE THOSE DEFICIENCIES.

08:22AM 25      HE'S HAD COMMUNICATIONS WITH WITNESSES IN THIS CASE.

08:22AM 1      MR. YAMAMOTO FROM CMS WHO WE UNDERSTAND THE GOVERNMENT MAY

08:22AM 2   CALL IN THIS CASE.  HE SPECIFICALLY RAISED CONCERN ABOUT THE

08:22AM 3   CONSEQUENCES THAT COULD RESULT TO HIM PERSONALLY AS A RESULT OF

08:23AM 4   THESE DEFICIENCIES AND THE NOTICE OF SANCTIONS.

08:23AM 5      I NOTE THAT THIS WITNESS HAS PREVIOUSLY TESTIFIED IN THE

08:23AM 6   GRAND JURY EVEN BEFORE THESE ISSUES, AND I'LL QUOTE --

08:23AM 7           THE COURT:  WHICH WITNESS ARE YOU TALKING ABOUT?

08:23AM 8           MR. WADE:  MR. ROSENDORFF.

08:23AM 9      AND I'LL QUOTE, "IF CMS SEES THAT THERE ARE CONSISTENT

08:23AM 10  PROBLEMS WITH LABORATORY DIRECTOR JUDGMENT OR CONSISTENT ERRORS

08:23AM 11  BY THE LABORATORY DIRECTOR, THEY CAN TAKE AWAY YOUR LICENSE TO

08:23AM 12  BE A LAB DIRECTOR," CLOSED QUOTE.

08:23AM 13     THOSE ARE THE INCIDENTS.  WE THINK THERE ARE SEVERAL BASES

08:23AM 14  TO ADMIT THESE AND TO QUESTION THE WITNESS WITH RESPECT TO

08:23AM 15  THESE.

08:23AM 16     ONE IS THE WITNESS'S COMPETENCE HAS BEEN PUT INTO QUESTION

08:24AM 17  IN THIS CASE.  ON NUMEROUS OCCASIONS HE'S BEEN OFFERED TO

08:24AM 18  PROVIDE HIS OPINION WITH RESPECT TO CERTAIN ISSUES AND THE

08:24AM 19  STANDARDS AND THE PROPRIETY OF SOME OF THE CONDUCT THAT

08:24AM 20  OCCURRED AT THERANOS.

08:24AM 21     HE SET HIMSELF FORTH AS COMPETENT WHEN HE WAS INTERVIEWED

08:24AM 22  AND HIRED TO DO THE JOB AND HE MAINTAINS HIS COMPETENCE

08:24AM 23  THROUGHOUT.

08:24AM 24     MUCH OF THE TESTIMONY THAT WAS OFFERED ON DIRECT

08:24AM 25  EXAMINATION AND SUBSEQUENTLY ON CROSS-EXAMINATION RELATES TO

2555

08:24AM 1   702 TYPE OF ISSUES, WHETHER IT WAS SPECIFICALLY -- AND RELATE

08:24AM 2   TO HIS SPECIALIZED SKILL AND EXPERIENCE, WHETHER IT WAS

08:24AM 3   SPECIFICALLY NOTICED AS SUCH OR WHETHER HE WAS SPECIFICALLY

08:24AM 4   CERTIFIED AS SUCH, HE WAS OFFERING OPINIONS ABOUT LAB

08:24AM 5   PRACTICES.

08:24AM 6       HE WAS ALSO OFFERING OPINIONS THAT PEOPLE OTHER THAN

08:24AM 7   HIMSELF WERE RESPONSIBLE FOR SOME OF THESE DEFICIENCIES THAT

08:24AM 8   HE'S IDENTIFIED AT THERANOS.  HE'S POINTED THE FINGER AT MANY

08:24AM 9   OTHER PEOPLE, INCLUDING MY CLIENT, WHO STANDS HERE CHARGED

08:25AM 10  TODAY AS THE COURT WELL KNOWS.

08:25AM 11      TO THE EXTENT THAT FAILURES WITHIN THE LAB ARE THE RESULT

08:25AM 12  OF INCOMPETENCE OF SOMEONE OTHER THAN MY CLIENT, IT'S

08:25AM 13  EXCULPATORY OF MY CLIENT.

08:25AM 14      AND HIS -- HE HAS INDICATED THAT THE FAILURES ARE THE

08:25AM 15  RESULT OF, ARE THE RESULT OF AN UNWILLINGNESS OR AN INABILITY

08:25AM 16  TO ACT BY MS. HOLMES, MR. BALWANI, AND OTHERS.

08:25AM 17      WE THINK THE FACTS BELIE THAT, YOUR HONOR.  INDEED, IN

08:25AM 18  THIS VERY CASE THE GOVERNMENT HAS PUT AT ISSUE MR. ROSENDORFF,

08:25AM 19  DR. ROSENDORFF'S COMPETENCE.  THEY ACTUALLY NOTICED AN EXPERT

08:25AM 20  IN THE CASE WHO HAS -- WHO WE UNDERSTAND INTENDS TO OFFER

08:25AM 21  TESTIMONY, THEY'VE NOTICED TESTIMONY THAT HE WAS, IN FACT,

08:26AM 22  INCOMPETENT AND THAT ALL OF THE VALIDATION REPORTS THAT HE

08:26AM 23  SIGNED SHOULD HAVE NEVER BEEN ISSUED.

08:26AM 24      THAT IS THE TESTIMONY OF DR. MASTER THAT THEY'VE NOTICED,

08:26AM 25  AND IT'S ALSO THE TESTIMONY OF, WE UNDERSTAND, OF DR. DAS WHO

08:26AM 1    THEY'VE IDENTIFIED AS A WITNESS WHO THEY INTEND TO CALL.

08:26AM 2         IN OTHER WORDS, TO THE EXTENT THAT THERE WERE DEFICIENCIES

08:26AM 3    THAT WERE IDENTIFIED IN THE LAB, THEY RESULT FROM INCOMPETENCE

08:26AM 4    OF DR. ROSENDORFF.

08:26AM 5         SECONDLY, DR. ROSENDORFF WAS INTERVIEWED BY THE GOVERNMENT

08:26AM 6    AND WAS IDENTIFIED AND DISCLOSED AS AN EXPERT IN THIS CASE.

08:26AM 7         IN CONNECTION WITH HIS INTERVIEW IN 2020, HE PROVIDED A

08:26AM 8    RESUME.  HE WAS QUESTIONED ABOUT HIS PERSONAL EXPERIENCE AND HE

08:26AM 9    WAS QUESTIONED ABOUT ITEMS ON HIS RESUME.  HIS RESUME WAS

08:27AM 10   ATTACHED TO THE MEMORANDUM OF INTERVIEW.  HIS RESUME WAS

08:27AM 11   SUBSEQUENTLY ATTACHED TO THE EXPERT DISCLOSURE THAT WAS MADE TO

08:27AM 12   COUNSEL IN THIS CASE.  I BELIEVE IT'S THE ONLY EXPERT

08:27AM 13   DISCLOSURE THAT WE HAVE NOT CHALLENGED IN THIS CASE.

08:27AM 14        THAT, THAT INTERVIEW -- AND IN THAT INTERVIEW AND IN THAT

08:27AM 15   RESUME DR. ROSENDORFF CONCEALED MATERIAL INFORMATION FROM

08:27AM 16   FEDERAL AGENTS AND INDIRECTLY FROM THE DEFENSE BY FAILING TO

08:27AM 17   DISCLOSE THAT HE WORKED AT UBIOME AT ALL, AND IT'S OMITTED

08:27AM 18   COMPLETELY FROM HIS RESUME.

08:27AM 19        HE ALSO FAILED TO DISCLOSE HIS NUMEROUS PROFESSIONAL

08:27AM 20   FAILURES AT UBIOME AND INVITAE.

08:27AM 21             THE COURT:  IS THAT SOMETHING THAT PEOPLE TYPICALLY

08:27AM 22   PUT ON THEIR RESUME, THEIR FAILURES?

08:27AM 23        (LAUGHTER.)

08:27AM 24             MR. WADE:  I'M SORRY?

08:27AM 25             THE COURT:  IS THAT TYPICALLY SOMETHING WE SEE ON

08:27AM 1      PEOPLE'S RESUMES, THEIR CAREER FAILURES?

08:28AM 2              MR. WADE:  WHEN WITNESS ARE TOLD THAT THEY'RE GOING

08:28AM 3      TO BE DISCLOSED AS EXPERTS IN THE FIELD, YES.

08:28AM 4          IF I HIRED AN EXPERT AND IT TURNED OUT THE EXPERT HAD WHAT

08:28AM 5      COULD BE PERCEIVED AS FOUR DIFFERENT SIGNIFICANT DEFICIENCIES

08:28AM 6      OUT OF FIVE PERFORMANCES AS A LABORATORY DIRECTOR AND THAT

08:28AM 7      EXPERT DID NOT DISCLOSE THAT, I WOULD CONSIDER THAT A MATERIAL

08:28AM 8      CONCEALMENT AND I WOULD FIRE THAT EXPERT BECAUSE WHEN I'M --

08:28AM 9      WHEN THAT EXPERT IS BEING ASSESSED AND DISCLOSED AS AN EXPERT,

08:28AM 10     WHICH DR. ROSENDORFF WAS IN THIS CASE, YOU HAVE TO DISCLOSE THE

08:28AM 11     MATERIAL FACTS.

08:28AM 12         HE KNEW EXACTLY WHAT THE GOVERNMENT WAS DOING, AND HE

08:28AM 13     DIDN'T DISCLOSE THOSE FACTS, AND AS A RESULT WE BELIEVE HE HAS

08:28AM 14     EXPOSURE UNDER 18 U.S.C. 1001 FOR CONCEALING MATERIAL

08:28AM 15     INFORMATION FROM THE GOVERNMENT.

08:28AM 16         FINALLY, I THINK HE KNOWS PRESENTLY, UNLESS THERE'S BEEN

08:29AM 17     SUBSEQUENT EVENTS THAT THE GOVERNMENT HAS FAILED TO DISCLOSE TO

08:29AM 18     US, HIS, HIS CAREER CURRENTLY SITS IN THE BALANCE.  AND THE

08:29AM 19     DECISION AS TO WHETHER HIS CAREER WILL BE -- HE'LL CONTINUE TO

08:29AM 20     BE ABLE TO SERVE AS A LABORATORY DIRECTOR RESTS IN THE HANDS OF

08:29AM 21     THE FEDERAL GOVERNMENT REGULATORS, FEDERAL GOVERNMENT

08:29AM 22     REGULATORS THAT ARE PART OF THIS CASE AND THAT COOPERATE

08:29AM 23     EXTENSIVELY WITH THIS TEAM, AND THAT GIVES HIM BIAS TO TESTIFY

08:29AM 24     IN FAVOR OF THE FEDERAL GOVERNMENT AND TO AVOID THE

08:29AM 25     DEFICIENCIES THAT HE'S IDENTIFIED IN HIS OWN TESTIMONY AS BEING

08:29AM 1    THE TYPE OF DEFICIENCIES THAT COULD RESULT IN HIS INABILITY TO

08:29AM 2    SERVE AS A LABORATORY DIRECTOR.

08:29AM 3             THE COURT:  AND THIS IS ADMISSIBLE UNDER 608(B)

08:29AM 4    YOU'RE SAYING?

08:29AM 5             MR. WADE:  I THINK THERE ARE -- IT'S ADMISSIBLE

08:30AM 6    UNDER 608(B) FOR CHARACTER FOR TRUTHFULNESS.

08:30AM 7             THE COURT:  AND WHAT IS THE CHARACTER FOR

08:30AM 8    TRUTHFULNESS IN THIS?  TELL ME.

08:30AM 9             MR. WADE:  HIS CONCEALMENT OF TWO OF THE INCIDENTS

08:30AM 10   FROM GOVERNMENT AGENTS WHEN HE WAS QUESTIONED ABOUT HIS

08:30AM 11   PROFESSIONAL EXPERIENCE.

08:30AM 12        I BELIEVE THAT HE CONCEALED -- HE PROBABLY CONCEALED

08:30AM 13   THESE, THESE INCIDENTS FROM PERKIN ELMER WHEN HE WAS HIRED TO

08:30AM 14   SERVE AS A COVID DIRECTOR.  THAT GOES TO HIS CHARACTER FOR

08:30AM 15   TRUTHFULNESS.

08:30AM 16        IF HE'S NOT CANDID -- I UNDERSTAND, YOUR HONOR, THAT

08:30AM 17   PEOPLE NORMALLY DON'T PUT THEIR FAILURES.

08:30AM 18        BUT IF THEY'RE REPRESENTING THEMSELVES FOR AN IMPORTANT

08:30AM 19   POSITION TO BE QUALIFIED AND IF THEY'VE ACTUALLY BEEN

08:30AM 20   TERMINATED FROM SEVERAL JOBS FOR NOT BEING QUALIFIED, THAT'S

08:30AM 21   ARGUABLY -- NOT ARGUABLY -- THAT IS MISLEADING.

08:30AM 22        BUT AS TO BIAS, UNDER THE SUPREME COURT DECISION IN

08:30AM 23   UNITED STATES VERSUS ABEL, 469 U.S. 45, THE RELATIONSHIP

08:30AM 24   BETWEEN A PARTY AND A WITNESS WHICH MAY LEAD THE WITNESS TO

08:31AM 25   SLANT, UNCONSCIOUSLY OR OTHERWISE, HIS TESTIMONY IN FAVOR OR

08:31AM  1      AGAINST A PARTY IS BIAS, AND IT'S APPROPRIATE FOR INQUIRY IN

08:31AM  2      THIS CASE.

08:31AM  3            DR. ROSENDORFF --

08:31AM  4            THE COURT:  THE BIAS HERE IS, AS YOU SAY, BECAUSE

08:31AM  5      HE'S CONCERNED, HE HAS CAREER CONCERNS THAT IF HE DOES NOT

08:31AM  6      TESTIFY IN A WAY THAT IS OTHERWISE AGREEABLE TO THE GOVERNMENT,

08:31AM  7      THAT THE GOVERNMENT HAS SOME CONNECTION WITH HIS CAREER?

08:31AM  8            MR. WADE:  HIS TESTIMONY IS ON THE FRONT PAGE OF

08:31AM  9      MANY NEWSPAPERS.

08:31AM 10            THE COURT:  WHAT DOES THAT HAVE TO DO WITH THE

08:31AM 11      GOVERNMENT?  THAT'S THE BIAS ISSUE I'M TRYING TO EXPLORE.

08:31AM 12            MR. WADE:  IT HAS DIRECTLY TO DO WITH THE FEDERAL

08:31AM 13      GOVERNMENT.  THE FEDERAL GOVERNMENT, INCLUDING THERE'S AN AGENT

08:31AM 14      WHO WORKS UNDER HHS WHICH -- WHO IS SITTING IN THE BACK OF THIS

08:31AM 15      COURTROOM.  THEY'VE BEEN DEALING EXTENSIVELY WITH CMS AS THE

08:32AM 16      COURT KNOWS FROM DISCOVERY MATTERS IN THIS CASE.  THEY INTEND

08:32AM 17      TO CALL THREE OF THE WITNESSES IN THIS CASE WHO ARE INVOLVED IN

08:32AM 18      THAT JUDGMENT.

08:32AM 19            SO IF HE DOESN'T SATISFY THE GOVERNMENT THAT -- OR IF HE

08:32AM 20      DOESN'T BLAME OTHERS AND TAKES RESPONSIBILITY ON TO HIMSELF,

08:32AM 21      THAT INCREASES THE LIKELIHOOD THAT HE COULD BE SUBJECT TO

08:32AM 22      ADVERSE PENALTIES AND LOSE HIS ABILITY TO TESTIFY -- TO SERVE

08:32AM 23      AS A LABORATORY DIRECTOR.

08:32AM 24            THAT IS PRESENT RIGHT NOW IN THIS CASE.

08:32AM 25            BUT FUNDAMENTALLY, YOUR HONOR, HIS COMPETENCE HAS BEEN PUT

08:32AM 1    AT ISSUE BY THE EVIDENCE.  THE GOVERNMENT HAS SAID HE'S

08:32AM 2    COMPETENT.

08:32AM 3             THE COURT:  IS COMPETENCE AN ISSUE UNDER 608(B)?

08:32AM 4    608(B) REALLY TALKS ABOUT CHARACTER FOR TRUTHFULNESS, DOESN'T

08:32AM 5    IT?

08:32AM 6             MR. WADE:  COMPETENCE IS AN ISSUE IN THIS CASE UNDER

08:32AM 7    401.

08:32AM 8             THE COURT:  WE'RE TALKING ABOUT 608(B) HERE, AND I

08:32AM 9    THINK THAT'S WHAT YOU'VE SUGGESTED THIS WOULD BE ADMISSIBLE

08:32AM 10   FOR.

08:32AM 11            MR. WADE:  I THINK IT'S ADMISSIBLE UNDER 401.

08:33AM 12        JUST SO THE RECORD IS CLEAR, AND MAYBE I HAVEN'T DONE A

08:33AM 13   SUFFICIENTLY A GOOD JOB OF ADDRESSING THIS WITH THE COURT, I

08:33AM 14   BELIEVE ALL OF THE EVIDENCE, GIVEN THE THEORY THAT THE

08:33AM 15   GOVERNMENT HAS OFFERED WITH RESPECT TO THE THEORY OF

08:33AM 16   DR. ROSENDORFF, IS ADMISSIBLE UNDER 401 BECAUSE IT GOES TO HIS

08:33AM 17   COMPETENCE WHICH THE GOVERNMENT HAS PUT AT ISSUE IN THIS CASE,

08:33AM 18   PERIOD, FULL STOP.

08:33AM 19        WE DON'T NEED TO GO TO THE NEXT BRANCHES AT ALL.

08:33AM 20        UNDER THE NEXT BRANCHES WITH RESPECT TO BIAS AND HIS

08:33AM 21   CONCEALING INFORMATION FROM THE GOVERNMENT, WE THINK IT'S

08:33AM 22   ADMISSIBLE AS WELL.  IT'S ADMISSIBLE FOR BIAS ALSO BECAUSE IF

08:33AM 23   THE GOVERNMENT -- HE HAS A MOTIVE, HE HAS CONCEALED MATERIAL

08:33AM 24   INFORMATION FROM THE GOVERNMENT.  HE HAS 18 U.S.C. 1001

08:33AM 25   EXPOSURE.

08:33AM  1        TO THE EXTENT THAT HE TESTIFIES FAVORABLY FOR THE

08:33AM  2  GOVERNMENT, THAT MAY DECREASE THE LIKELIHOOD THAT THEY, THAT

08:34AM  3  THEY BRING CHARGES AGAINST HIM FOR THAT CONDUCT.  THAT'S A BIAS

08:34AM  4  BASIS.

08:34AM  5        THERE'S A BIAS BASIS FOR THE PERKIN ELMER BECAUSE HIS

08:34AM  6  CAREER HANGS IN THE BALANCE AT THE HANDS OF THE FEDERAL

08:34AM  7  GOVERNMENT.

08:34AM  8        AND SO -- AND THEN SEPARATE AND APART FROM THAT, THERE IS

08:34AM  9  608(B) BECAUSE WE DON'T THINK HE WAS CANDID AND TRUTHFUL IN

08:34AM 10  STATEMENTS THAT HE HAS MADE TO THESE POTENTIAL EMPLOYERS.

08:34AM 11        THE COURT:  UNDER 608(B), SHOULD WE ALLOW EXTRINSIC

08:34AM 12  EVIDENCE TO COME IN?

08:34AM 13        MR. WADE:  NO, UNDER THE 608(B) THEORY WE SHOULD

08:34AM 14  NOT.  AS THE COURT KNOWS, WE CAN INQUIRE OF THE WITNESS, BUT WE

08:34AM 15  CAN'T OFFER EXTRINSIC EVIDENCE.

08:34AM 16        AND I WANT TO BE CLEAR, I DON'T INTEND TO NECESSARILY

08:34AM 17  OFFER EXTRINSIC EVIDENCE.  I INTEND --

08:34AM 18        THE COURT:  RIGHT.  I THINK YOU'RE ON THAT PATH NOW

08:34AM 19  TO TELL ME WHAT IS IT THAT YOU INTEND TO DO WITH THE EVIDENCE

08:34AM 20  THAT YOU'VE TALKED ABOUT THIS MORNING WITH THIS WITNESS.

08:34AM 21        MR. WADE:  I INTEND TO QUESTION HIM ABOUT THE

08:34AM 22  EVENTS -- HIS COMPETENCE ABOUT THE FACT THAT THESE EVENTS

08:35AM 23  HAPPENED AND THESE RESULTS HAPPENED, HE HAD QUALITY CONTROL

08:35AM 24  FAILURES AT THIS COMPANY, AND IT RESULTED IN 50,000 INACCURATE

08:35AM 25  RESULTS, AND HE WAS TERMINATED AS A RESULT.

08:35AM 1     WITH RESPECT TO PERKIN ELMER, THERE WERE NUMEROUS

08:35AM 2     DEFICIENCIES WITH RESPECT TO HIS RESPONSIBILITIES, THERE WERE

08:35AM 3     QUALITY CONTROL FAILURES, THERE WERE INADEQUATE VALIDATION

08:35AM 4     REPORTS.

08:35AM 5         THE COURT:  AND THESE ARE ALL EMPLOYMENTS

08:35AM 6     POST-THERANOS?

08:35AM 7         MR. WADE:  THEY ARE, YES.

08:35AM 8         THE COURT:  AND WHAT IS THE RELEVANCE OF THAT?  WHY

08:35AM 9     IS HE -- LET'S JUST STAY ON YOUR TRACK.

08:35AM 10        MR. WADE:  YES.

08:35AM 11        THE COURT:  IF HE'S INCOMPETENT POST-THERANOS, WHAT

08:35AM 12    IS THE RELEVANCE TO HIS TIME AT THERANOS?

08:35AM 13        MR. WADE:  BECAUSE HE WAS INCOMPETENT AT THERANOS,

08:35AM 14    TOO, AND THAT'S THE REASON WHY MANY OF THE FAILURES WITHIN THE

08:36AM 15    LAB HAPPENED.

08:36AM 16     THE GOVERNMENT INTENDS TO OFFER THAT EVIDENCE ITSELF IN

08:36AM 17    THIS CASE, SO THE IDEA THAT -- THE GOVERNMENT'S EXPERT HAS

08:36AM 18    BASICALLY SAID THAT DR. ROSENDORFF IS INCOMPETENT, AND SO THE

08:36AM 19    LABORATORY DIRECTOR WHO MS. HOLMES HIRED AFTER CMS CAME IN AND

08:36AM 20    INSPECTED AND STARTED IDENTIFYING ISSUES, HE, TOO HAS SAID THAT

08:36AM 21    DR. ROSENDORFF IS INCOMPETENT AND THAT THE VALIDATION REPORTS

08:36AM 22    THAT HE SIGNED WERE DEFICIENT, AND SEVERAL OF THEM.

08:36AM 23     ALL OF THE VALIDATION REPORTS FOR THE EDISON DEVICE WERE

08:36AM 24    DEFICIENT.

08:36AM 25     TWO OF THE GOVERNMENT'S WITNESSES INTEND TO OFFER THAT.

2563

| | |
|---|---|
| 08:36AM | 1 |
| 08:36AM | 2 |
| 08:36AM | 3 |
| 08:36AM | 4 |
| 08:36AM | 5 |
| 08:36AM | 6 |
| 08:36AM | 7 |
| 08:37AM | 8 |
| 08:37AM | 9 |
| 08:37AM | 10 |
| 08:37AM | 11 |
| 08:37AM | 12 |
| 08:37AM | 13 |
| 08:37AM | 14 |
| 08:37AM | 15 |
| 08:37AM | 16 |
| 08:37AM | 17 |
| 08:37AM | 18 |
| 08:37AM | 19 |
| 08:37AM | 20 |
| 08:37AM | 21 |
| 08:37AM | 22 |
| 08:37AM | 23 |
| 08:38AM | 24 |
| 08:38AM | 25 |

1  THERE WAS EVERY REASON FOR THESE FOLKS TO BELIEVE THAT HE

2  WAS COMPETENT.  HE REPRESENTED HIMSELF TO BE COMPETENT, AND --

3        THE COURT:  WE DON'T HAVE TO GET INTO A CLOSING

4  ARGUMENT HERE.

5        MR. WADE:  YEAH.

6        THE COURT:  I'M TRYING TO GLEAN WHAT IS THE

7  RELEVANCE OF THE FACT THAT SOMEBODY IS INCOMPETENT POST HIS

8  TIME AT THERANOS, AND I'M TRYING TO GAUGE THE RELEVANCE THAT

9  AND MAYBE MR. BOSTIC CAN SHARE HIS OPINIONS.

10        MR. WADE:  FUNDAMENTALLY, I BELIEVE THE TESTIMONY

11  BEFORE THE COURT IS HE IS THE PERSON ULTIMATELY RESPONSIBLE

12  WITHIN THE LABORATORY.  HE'S THE PERSON UPON WHOM EVERYONE IS

13  LEGALLY ENTITLED TO RELY.

14        THE COURT:  I UNDERSTAND.

15        MR. WADE:  SO IF HE'S -- IF HE WAS INCOMPETENT AND

16  DIDN'T DO HIS JOB, THAT IS EXCULPATORY OF MS. HOLMES.

17     AND THE FACT THAT HE APPEARS TO HAVE ALMOST NEVER

18  COMPETENTLY DONE HIS JOB IS HIGHLY RELEVANT.

19        THE COURT:  THAT'S CHARACTER EVIDENCE OF A DIFFERENT

20  TYPE, ISN'T IT?

21        MR. WADE:  THE GOVERNMENT HAS ELICITED HIS VIEWS AS

22  TO THE RIGHT WAY AND WRONG WAY TO DO THINGS.

23     HE APPEARS NOT TO BE QUALIFIED TO DO THIS BASED UPON HIS

24  PERFORMANCE AT THESE MANY COMPANIES.

25        THE COURT:  THIS SOUNDS LIKE CHARACTER EVIDENCE FOR

08:38AM 1       A DIFFERENT TRAIT.

08:38AM 2               MR. WADE:  NO.  IT GOES DIRECTLY TO COMPETENCE WHICH

08:38AM 3       THE GOVERNMENT HAS PUT AT ISSUE IN THIS CASE.

08:38AM 4           THE GOVERNMENT INTENDS TO OFFER EVIDENCE OF HIS

08:38AM 5       INCOMPETENCE, SO I DON'T KNOW HOW IT WOULDN'T BE RELEVANT.

08:38AM 6               THE COURT:  LET ME ASK MR. BOSTIC ABOUT THAT.

08:38AM 7           MR. BOSTIC?

08:38AM 8               MR. BOSTIC:  THANK YOU, YOUR HONOR.

08:38AM 9           THE COURT WON'T BE SURPRISED THAT I DISAGREE WITH A NUMBER

08:38AM 10      OF THE REPRESENTATIONS AND CHARACTERIZATIONS THAT DEFENSE

08:38AM 11      COUNSEL HAS MADE.

08:38AM 12          LET ME START WITH THE FACTS, AS MR. WADE DID, AND JUST

08:38AM 13      CLARIFY A FEW THINGS.

08:38AM 14          FIRST, WHEN IT COMES TO THE INCIDENT AT INVITAE, FIRST OF

08:38AM 15      ALL, THE DOCUMENT THAT THE DEFENSE HAS PROVIDED AS PROOF FOR

08:38AM 16      THIS IS AN ARTICLE FROM A PUBLICATION CALLED "THE DARK REPORT,"

08:38AM 17      WHICH I HAVEN'T HEARD OF BEFORE.  OBVIOUSLY THIS DOCUMENT

08:38AM 18      ITSELF IS HEARSAY, SO NOT COMPETENT TO ACTUALLY PROVE THE TRUTH

08:38AM 19      OF ANY OF THOSE FACTS.

08:38AM 20          BUT SUBJECT TO THAT, I NOTE THAT, AS REPORTED IN THAT

08:38AM 21      ARTICLE, IT DOES TALK ABOUT THE NEED, OR THE COMPANY'S DECISION

08:39AM 22      TO RETEST 50,000 PATIENTS AFTER THE COMPANY DISCOVERED THAT

08:39AM 23      THEY WEREN'T RUNNING A CERTAIN TEST, A TEST FOR WHAT I

08:39AM 24      UNDERSTAND TO BE A VERY RARE GENETIC VARIATION THAT UNDERLIES A

08:39AM 25      VERY TINY SLIVER OF GENETIC CANCERS.

08:39AM 1       THE COMPANY ESTIMATES THAT APPROXIMATELY 2 TO 15 PATIENTS

08:39AM 2    WOULD HAVE BEEN AFFECTED BY THAT FAILURE TO INCLUDE THAT

08:39AM 3    PARTICULAR TEST IN THEIR PANEL OF TESTS THAT THEY WERE RUNNING.

08:39AM 4       THEY'VE DECIDED TO RETEST 50,000 PATIENTS AS A REMEDIAL

08:39AM 5    MEASURE -- WHICH BY THE WAY, BRINGS THIS UNDER RULE 407 AND IT

08:39AM 6    SHOULD BE KEPT OUT FOR THAT REASON -- BUT BESIDES WHICH, THAT

08:39AM 7    NUANCE, I THINK, ILLUSTRATES WHY IT'S DANGEROUS TO ALLOW THE

08:39AM 8    DEFENSE TO GO INTO THESE ISSUES HERE BECAUSE THE WAY THAT

08:39AM 9    MR. WADE JUST CHARACTERIZED IT, YOU KNOW, INACCURATE RESULTS

08:39AM 10   FOR 50,000 PATIENTS IS SIMPLY NOT CORRECT, AND ALLOWING FULL

08:39AM 11   REIN FOR DR. ROSENDORFF TO BE QUESTIONED ON THESE ISSUES

08:40AM 12   INVITES -- I HESITATE TO EVEN CALL THEM MINI-TRIALS BECAUSE

08:40AM 13   THEY'RE TRIALS IN THEIR OWN RIGHT -- OF OUTSIDE THERANOS

08:40AM 14   COMPLICATED SITUATIONS THAT WE SIMPLY DON'T HAVE THE COMPLETE

08:40AM 15   RECORD TO LITIGATE AT THIS POINT.  THAT'S INVITAE.

08:40AM 16      I'LL ALSO POINT OUT ON UBIOME, MY UNDERSTANDING IS THAT

08:40AM 17   DR. ROSENDORFF WORKED AT UBIOME FOR A NUMBER OF MONTHS.  DUE TO

08:40AM 18   A MEDICAL ISSUE HE WAS ABSENT FOR PART OF THAT.  HE EVENTUALLY

08:40AM 19   SEPARATED FROM THE COMPANY.  IT'S UNCLEAR FROM THE DOCUMENTS

08:40AM 20   THAT I'VE SEEN THAT HE WAS FIRED FOR FAILURE TO PERFORM HIS

08:40AM 21   DUTIES AS MR. WADE DESCRIBED, SO I THINK THAT'S ANOTHER FACT

08:40AM 22   THAT MIGHT BE IN DISPUTE.

08:40AM 23      AS TO THE GOVERNMENT'S INVESTIGATION OF UBIOME, LET ME

08:40AM 24   RAISE THAT DR. ROSENDORFF WAS NEVER A TARGET OF THAT

08:40AM 25   INVESTIGATION.  HE WAS INTERVIEWED AS A WITNESS FAIRLY LATE IN

08:40AM 1    THE INVESTIGATION.  THAT CASE HAS SINCE BEEN CHARGED.  TWO

08:41AM 2    PEOPLE WERE CHARGED IN THAT CASE.  DR. ROSENDORFF WAS NOT ONE

08:41AM 3    OF THEM.

08:41AM 4        THE GOVERNMENT'S VIEW IS THAT THE CASE AND THE CONDUCT AT

08:41AM 5    ISSUE IN THAT CASE, WHICH REALLY RELATES TO BILLING BY THE WAY,

08:41AM 6    INSURANCE BILLING AND NOT THE ACCURACY OF THE TESTS THEMSELVES

08:41AM 7    AS THIS CASE DOES.

08:41AM 8            THE COURT:  THAT CASE DOES NOT REVOLVE AROUND

08:41AM 9    LABORATORY PRACTICES OR INACCURACIES IN THE LAB.  IT SOUNDS

08:41AM 10   LIKE IT'S A HEALTH FRAUD TYPE OF A SITUATION.

08:41AM 11           MR. BOSTIC:  THAT'S CORRECT, YOUR HONOR.  THE

08:41AM 12   ALLEGATIONS IN THAT CASE WERE THAT PATIENTS, AND THE INSURANCE

08:41AM 13   COMPANIES ACTUALLY, WERE BILLED FOR TESTS BEFORE THEY WERE

08:41AM 14   VALIDATED.

08:41AM 15       OF COURSE DR. ROSENDORFF, AS THE LABORATORY DIRECTOR, HAD

08:41AM 16   NOTHING TO DO WITH THE BILLING PRACTICES.  HE TOLD THE

08:41AM 17   GOVERNMENT THAT HE WAS UNAWARE OF THAT FRAUDULENT BILLING

08:41AM 18   PRACTICE.  THERE'S NO EVIDENCE TO THE CONTRARY.

08:41AM 19       IN FACT, I UNDERSTAND THAT THE PREVIOUS LAB DIRECTOR AT

08:41AM 20   UBIOME QUIT WHEN HE FOUND OUT ABOUT THE BILLING PRACTICES OF

08:42AM 21   THAT COMPANY.

08:42AM 22       SO THERE WOULD HAVE BEEN REASON FOR THE ACTUAL DEFENDANTS

08:42AM 23   IN THAT CASE TO CONCEAL WHAT THEY WERE DOING FROM

08:42AM 24   DR. ROSENDORFF.

08:42AM 25       THE DANGER OF GETTING INTO THAT TOPIC IS THAT

08:42AM 1    DR. ROSENDORFF WILL BE DEEMED GUILTY BY ASSOCIATION FOR HAVING

08:42AM 2    BEEN PART OF THAT COMPANY, PART OF THE COMPANY THAT WAS

08:42AM 3    SUBSEQUENTLY INVESTIGATED BY THE GOVERNMENT AGAIN, PART OF THE

08:42AM 4    COMPANY THAT RESULTED IN THE PRINCIPALS BEING INDICTED AS THIS

08:42AM 5    COMPANY DID.

08:42AM 6        THAT KIND OF GUILT BY ASSOCIATION WE THINK IS

08:42AM 7    INAPPROPRIATE AND EXCLUDABLE UNDER 403.

08:42AM 8        FINALLY, AS TO THE PERKIN ELMER SITUATION, THE CMS

08:42AM 9    INSPECTION IN THAT CASE OBVIOUSLY HAS NOTHING TO DO WITH THE

08:42AM 10   CONDITION OF THE LABORATORY AT THERANOS.  I AGREE WITH THE

08:42AM 11   COURT THAT THIS IS CHARACTER EVIDENCE.

08:42AM 12       IF WE'RE TALKING ABOUT DR. ROSENDORFF'S COMPETENCY,

08:43AM 13   ANOTHER WAY TO SAY THAT IS HIS CHARACTER FOR BEING A COMPETENT

08:43AM 14   OR INCOMPETENT LABORATORY DIRECTOR, AND I THINK WHAT THE

08:43AM 15   DEFENSE IS TRYING TO DO HERE IS TO BRING IN UNRELATED CONDUCT

08:43AM 16   TO SHOW THAT HE HAS THAT CHARACTER TRAIT, AND THE CHARACTER

08:43AM 17   TRAIT BEING A CARELESS LAB DIRECTOR.

08:43AM 18       THAT IS NOT A PROPER USE OF THAT KIND OF EVIDENCE UNDER

08:43AM 19   404, AND I DON'T THINK THAT THE DEFENSE CAN SALVAGE THE

08:43AM 20   ADMISSIBILITY BY RELYING ON RULE 608 BECAUSE I DON'T THINK IT'S

08:43AM 21   CLEAR AT ALL THAT DR. ROSENDORFF ACTUALLY CONCEALED THIS

08:43AM 22   INFORMATION FROM THE GOVERNMENT OR SAID ANYTHING INCONSISTENT

08:43AM 23   WITH THE TRUTH IN THIS CASE.

08:43AM 24       THE DEFENSE CHARACTERIZES THAT INTERVIEW AND THAT

08:43AM 25   INTERACTION WITH DR. ROSENDORFF AS DR. ROSENDORFF HOLDING

08:43AM 1    HIMSELF OUT AS AN EXPERT.  THE DEFENSE COMPARED IT TO A

08:43AM 2    SITUATION WHERE A LITIGATING PARTY SELECTS AND HIRES AN EXPERT.

08:43AM 3        THAT'S NOT AT ALL WHAT HAPPENED HERE.

08:44AM 4        THE GOVERNMENT HAS ALWAYS VIEWED DR. ROSENDORFF'S

08:44AM 5    TESTIMONY AS PRIMARILY, IF NOT ENTIRELY, PERCIPIENT TESTIMONY.

08:44AM 6        OUT OF AN ABUNDANCE OF CAUTION, WE DID DISCLOSE SOME OF

08:44AM 7    HIS OPINIONS AS EXPERT OPINIONS.

08:44AM 8        HE DIDN'T END UP TESTIFYING AS AN EXPERT, HOWEVER.

08:44AM 9        AND THE MEETING THAT WE HAD IN SEPTEMBER OF 2020 WITH

08:44AM 10   DR. ROSENDORFF WAS FOR THE PURPOSE OF US ASKING HIM INFORMATION

08:44AM 11   ABOUT WHAT HIS OPINIONS WERE SO WE COULD SUMMARIZE THEM AND

08:44AM 12   PROVIDE THAT NOTICE TO THE DEFENSE.

08:44AM 13       IT WAS NOT SO THAT DR. ROSENDORFF COULD CONVINCE US OF HIS

08:44AM 14   QUALIFICATIONS OR PROVIDE US WITH A COMPREHENSIVE LIST OF

08:44AM 15   EVERYTHING THAT HE HAS DONE.

08:44AM 16       AND THROUGH THAT LENS, I JUST DON'T THINK IT HOLDS WATER

08:44AM 17   TO SAY THAT HE CONCEALED INFORMATION OR LIED TO THE GOVERNMENT

08:44AM 18   AND HAS ANY EXPOSURE UNDER 1001.

08:44AM 19           MR. WADE:  YOUR HONOR --

08:44AM 20           THE COURT:  EXCUSE ME.

08:44AM 21       MR. WADE SUGGESTS THAT HE FALSIFIED INFORMATION ON HIS

08:44AM 22   RESUME, AND THEN HE ALSO SUGGESTS THAT HE IS, IN ESSENCE, UNDER

08:45AM 23   YOUR CONTROL BECAUSE OF THE BIAS AND HIS CAREER FEARS RELATED

08:45AM 24   TO UNSATISFACTORY TESTIMONY AS JUDGED BY THE GOVERNMENT.

08:45AM 25       CAN YOU COMMENT ON THAT?

08:45AM  1          MR. BOSTIC:  YES, YOUR HONOR.

08:45AM  2          AS TO BIAS FIRST, I THINK THERE'S THE, THE KIND OF CORE

08:45AM  3    SITUATION THAT WE ALL HAVE IN MIND WHERE THERE'S A COOPERATING

08:45AM  4    WITNESS WHO ALSO HAS SOME CRIMINAL LIABILITY FOR SIMILAR

08:45AM  5    CONDUCT.  THE COOPERATING WITNESS HAS ENTERED INTO AN AGREEMENT

08:45AM  6    WITH THE GOVERNMENT, PERHAPS A PLEA AGREEMENT.

08:45AM  7          ON CROSS, THE DEFENDANT'S LAWYER IS ENTITLED TO GET INTO

08:45AM  8    THAT RELATIONSHIP, ANY PROMISES THAT HAVE BEEN MADE.  THERE'S

08:45AM  9    ENOUGH OF A NEXUS THERE TO MAKE THAT RELEVANT, NOT EXCLUDABLE

08:45AM  10   UNDER 403.

08:45AM  11         HERE I THINK THE BIAS ARGUMENT IS TOO ATTENUATED.  IT'S

08:45AM  12   COMPLETELY SPECULATIVE TO THINK THAT DR. ROSENDORFF'S TESTIMONY

08:45AM  13   IN THIS CRIMINAL CASE WILL ACTUALLY HAVE ANY EFFECT ON WHAT

08:45AM  14   ANOTHER GOVERNMENT REGULATORY BODY DOES WHEN VIEWING THE

08:46AM  15   LABORATORY VIOLATIONS.  THE NEXUS JUST HASN'T BEEN ESTABLISHED.

08:46AM  16         THE COURT:  MR. WADE SUGGESTS THAT THERE ARE

08:46AM  17   WITNESSES IN THIS CASE WHO PERHAPS HAVE DONE THE INVESTIGATIONS

08:46AM  18   IN THE LABS THAT THIS DOCTOR HAS WORKED AT, AND HE SUGGESTS

08:46AM  19   THAT THAT INTIMACY AND CONNECTION BETWEEN THOSE TWO CASES

08:46AM  20   SUGGESTS SOMETHING.  IS THAT A CONCERN?

08:46AM  21         MR. BOSTIC:  I DON'T THINK SO, YOUR HONOR.  I THINK

08:46AM  22   THE CMS WITNESSES HAVE A RELATIONSHIP TO THIS CASE THAT

08:46AM  23   DR. ROSENDORFF ALSO DOES AND THAT THEY BOTH HAVE RELEVANT

08:46AM  24   INFORMATION TO SHARE ABOUT THERANOS.

08:46AM  25         I DON'T THINK THAT LINKS THOSE WITNESSES TO

08:46AM  1      DR. ROSENDORFF.  HIS LINK TO THEM IS THROUGH THE REGULATORY

08:46AM  2      ACTIVITIES THAT AREN'T TIED TO THIS CASE.

08:46AM  3          I THINK LOOKING AT THE ABEL DECISION, IT'S CLEAR HOW FAR

08:46AM  4      AFIELD WE ARE HERE FROM WHAT HAPPENED THERE.  THERE WE'RE

08:46AM  5      TALKING ABOUT A WITNESS BEING IN THE SAME GANG AS THE DEFENDANT

08:46AM  6      AND A GANG THAT REQUIRES THEM TO LIE AND DO ANYTHING TO HELP

08:47AM  7      EACH OTHER.  THAT KIND OF THING OBVIOUSLY IS CRITICAL TO

08:47AM  8      EXPLORE ON CROSS-EXAMINATION.  THAT IS COMPETENT BIAS EVIDENCE.

08:47AM  9          THIS, THIS -- THE RELATIONSHIP THAT DR. ROSENDORFF HAS

08:47AM  10     WITH THE FEDERAL GOVERNMENT IS ONE THAT MANY PEOPLE HAVE WITH

08:47AM  11     THE FEDERAL GOVERNMENT, ANYONE WHO HAS DEALINGS WITH THE I.R.S.

08:47AM  12     OR OTHER BRANCHES OF THE NUMEROUS GOVERNMENT WHICH IS NOT

08:47AM  13     MONOLITHIC, YOU COULD MAKE THE SAME KIND OF ARGUMENT FOR.  I

08:47AM  14     THINK THE CONNECTION IS JUST NOT STRONG ENOUGH HERE.

08:47AM  15               THE COURT:  OKAY.

08:47AM  16               MR. WADE:  YOUR HONOR, IF I COULD JUST CLARIFY A FEW

08:47AM  17     FACTS.

08:47AM  18         THE WITNESS SAYS IN HIS INTERVIEW WITH THE GOVERNMENT ON

08:47AM  19     UBIOME THAT HE WAS FIRED.  OKAY?  SO THERE'S NO AMBIGUITY AS TO

08:47AM  20     THAT.  HE SAID HE WAS FIRED IN STATEMENTS TO THE GOVERNMENT.

08:47AM  21         SO -- AND HE WAS FIRED ESSENTIALLY PROBABLY BECAUSE, I

08:47AM  22     BELIEVE HE SAID IN HIS INTERVIEW, BECAUSE HE WASN'T SHOWING UP

08:47AM  23     AND HE WASN'T DISPATCHING HIS PROFESSIONAL OBLIGATIONS.

08:47AM  24               THE COURT:  MR. BOSTIC SUGGESTS THAT THERE WAS A

08:47AM  25     HEALTH ISSUE.

08:48AM 1          MR. WADE:  THERE WAS A HEALTH ISSUE WITH RESPECT TO

08:48AM 2     ONE ABSENCE, BUT NOT WITH RESPECT TO OTHER ABSENCES.

08:48AM 3          THE COURT:  SO WHEN WE GO INTO THIS -- AND THIS IS

08:48AM 4     WHAT 608(B) TEACHES -- THE REASON FOR 608(B) AND EXTRINSIC

08:48AM 5     EVIDENCE, AS YOU KNOW, IS TO AVOID MINI TRIALS, TO AVOID

08:48AM 6     GETTING INTO THESE OFF RAMPS THAT TALK ABOUT PERHAPS HELPFUL

08:48AM 7     INFORMATION, BUT LIKE YOU JUST HEARD ABOUT UBIOME, THEIR

08:48AM 8     PROBLEMS WERE NOT LAB PROBLEMS APPARENTLY, THEY WERE BILLING

08:48AM 9     PROBLEMS AT A DIFFERENT LEVEL.

08:48AM 10         THIS IS THE ISSUE WE COME INTO THEN.  IT BECOMES A 403

08:48AM 11    TYPE OF ISSUE.  SHOULD WE ALLOW -- SHOULD THE COURT ALLOW

08:48AM 12    ADDITIONAL EVIDENCE IN TO CLEAR THE RECORD TO SHOW THAT, WELL,

08:48AM 13    THERE WERE PROBLEMS THERE, HE WAS THERE, THE PROBLEMS WERE NOT

08:48AM 14    IN THE LAB, THEY WERE BECAUSE OF SOME ALLEGED INCOMPETENCE OR

08:48AM 15    ALLEGED THEFT IN THE BILLING THAT HE HAD NOTHING TO DO WITH.

08:49AM 16         THAT'S A DIFFERENT -- I THINK YOU'LL AGREE, THAT'S A

08:49AM 17    DIFFERENT CIRCUMSTANCE.

08:49AM 18         MR. WADE:  I SEE IT A BIT DIFFERENTLY, YOUR HONOR.

08:49AM 19         THE COURT:  OTHERWISE YOU'RE SAYING, WELL, HE'S A

08:49AM 20    BAD GUY AND, YOU KNOW, BAD GUYS, THEY SEEM TO COLLECT TOGETHER.

08:49AM 21         MR. WADE:  YOUR HONOR, WHAT I'M SAYING IS THAT BIAS

08:49AM 22    IS NOT SOMETHING THAT THE, THAT THE COURT -- THAT THE

08:49AM 23    GOVERNMENT GETS TO DECIDE, WELL, HE'S BIASSED OR HE'S NOT

08:49AM 24    BIASSED.  IT'S IN THE EYES OF THE WITNESS.

08:49AM 25         I READ HIS GRAND JURY TESTIMONY AS TO THE CONCERNS THAT HE

08:49AM  1     HAS ABOUT THE ABILITY TO PRACTICE IF THINGS ARE SHOWN TO BE

08:49AM  2     DEFICIENT.

08:49AM  3          HE KNOWS THAT HIS ABILITY TO PRACTICE IS CURRENTLY AT

08:49AM  4     ISSUE AND IN THE HANDS OF THE FEDERAL GOVERNMENT.  HE KNOWS

08:49AM  5     THAT.

08:49AM  6          HE KNOWS THAT THOSE PEOPLE ARE THE SAME PEOPLE INVOLVED IN

08:49AM  7     THIS CASE.  HE KNOWS THAT.

08:49AM  8          AND SO -- BUT THERE'S A MORE FUNDAMENTAL BIAS, YOUR HONOR.

08:49AM  9     THE GOVERNMENT JUST SAID THAT HE WASN'T A TARGET AND HE WASN'T

08:49AM  10    CHARGED, BUT HE WAS -- HE WAS ALMOST CERTAINLY A SUBJECT, WHICH

08:50AM  11    MEANS THAT HE WAS WITHIN THE ZONE OF DANGER WITHIN THAT AND HE

08:50AM  12    GOES IN TO INTERVIEW WITH THE GOVERNMENT AND THE FACT THAT THEY

08:50AM  13    DON'T CHARGE HIM IS MAYBE EVIDENCE OF WHY HE WANTS TO COOPERATE

08:50AM  14    WITH THIS OFFICE.  IT'S THE SAME U.S. ATTORNEY'S OFFICE,

08:50AM  15    YOUR HONOR.

08:50AM  16              THE COURT:  HOW LONG AGO WAS THAT?

08:50AM  17              MR. WADE:  LAST YEAR, LESS THAN A YEAR AGO.

08:50AM  18              MR. BOSTIC:  THE INTERVIEW, YOUR HONOR, WAS IN

08:50AM  19    DECEMBER OF 2020.  I BELIEVE THE CASE WAS CHARGED IN MARCH OF

08:50AM  20    2021.  BUT THE INVESTIGATION BEGAN IN 2019, I BELIEVE.

08:50AM  21          AND I CAN ALSO REPRESENT TO THE COURT THAT THE, THE

08:50AM  22    GOVERNMENT TEAM INVESTIGATING UBIOME WAS WELL AWARE OF

08:50AM  23    DR. ROSENDORFF'S INVOLVEMENT IN THAT CASE IN 2019, WELL IN

08:50AM  24    ADVANCE OF HIS INTERVIEW IN 2020 WITH THE THERANOS TEAM.

08:50AM  25          SO THERE WOULDN'T BE A POINT IN HIM TRYING TO CONCEAL THAT

08:50AM   1    FACT FROM THE GOVERNMENT AT THAT TIME.

08:50AM   2              THE COURT:  IS THAT A CASE THAT IS IN THIS DISTRICT?

08:50AM   3              MR. BOSTIC:  IT IS, YOUR HONOR.

08:51AM   4              THE COURT:  ALL RIGHT.  WELL, WE'RE CLOSING IN ON

08:51AM   5    9:00 O'CLOCK.  I APPRECIATE YOUR EMAIL LAST NIGHT, MR. WADE,

08:51AM   6    SAYING THAT THESE ISSUES ARE NOT LIKELY TO COME UP IN THE

08:51AM   7    MORNING SESSION.

08:51AM   8              MR. WADE:  YEAH.  YES, YOUR HONOR.

08:51AM   9        I HAVE OTHER TOPICS THAT I CAN RAISE AND WE'RE HAPPY,

08:51AM  10    WE'RE HAPPY TO DISCUSS THIS AT LUNCH.

08:51AM  11        I WOULD NOTE, AGAIN, FOR THE COURT'S CONSIDERATION AND

08:51AM  12    FOCUS, IN CONSIDERING THE TESTIMONY THAT HE OFFERED MANY TIMES

08:51AM  13    OVER DEFENSE OBJECTION THAT WENT INTO HIS COMPETENCE, I THINK

08:51AM  14    THAT'S AN INDEPENDENT BASIS AND UNDER 403 -- I DON'T THINK WE

08:51AM  15    NEED TO GET INTO -- THE BIAS IS AN APPROPRIATE REASON TO

08:51AM  16    INQUIRE.  I THINK 608 IS AN APPROPRIATE REASON, BUT I THINK

08:51AM  17    IT'S ACTUALLY -- GIVEN WHAT HE HAS TESTIFIED AS TO HIS

08:51AM  18    COMPETENCE AND HIS BLAMING OTHER PEOPLE, I THINK 401 IS THE

08:51AM  19    MOST STRAIGHTFORWARD ANALYSIS, AND IF THE GOVERNMENT THINKS

08:51AM  20    THAT WE'VE REPRESENTED THESE THINGS UNFAIRLY, THEY CAN GO INTO

08:51AM  21    IT AND STRAIGHTEN THOSE ISSUES OUT WITHIN REDIRECT.

08:52AM  22        BUT I WILL SAY THAT WE DID PROVIDE THAT ARTICLE FOR THE

08:52AM  23    COURT'S BENEFIT BECAUSE IT WAS EASILY DIGESTIBLE.  THOSE EVENTS

08:52AM  24    ARE NOT THE SUBJECT OF DISPUTE.  THEY'RE ALSO IN S.E.C. FILINGS

08:52AM  25    OF THE COMPANY WHERE THEY DISCLOSE ESSENTIALLY THE SAME FACTS.

|          |    |                                                                      |
|----------|----|----------------------------------------------------------------------|
| 08:52AM  | 1  | THE COURT:  WELL, I SEE -- THANK YOU.                                 |
| 08:52AM  | 2  | FIRST OF ALL, I SEE SOME 403 ISSUES ABOUT GETTING INTO               |
| 08:52AM  | 3  | THIS, AND THERE ARE SOME 611 ISSUES AS TO THIS WITNESS AND WHAT       |
| 08:52AM  | 4  | SHOULD HAPPEN HERE.  SOME OF THIS IS CUMULATIVE.                      |
| 08:52AM  | 5  | HOW MUCH -- AND I'M JUST CURIOUS, WHAT IS IT YOU WANT TO              |
| 08:52AM  | 6  | DO?  YOU TOLD ME YOU WANT TO RAISE ALL OF THESE ISSUES, BUT I         |
| 08:52AM  | 7  | DON'T THINK ALL OF THESE ISSUES NECESSARILY UNDER A 403               |
| 08:52AM  | 8  | ANALYSIS, PARTICULARLY THE UBIOME ISSUE, I HAVE SOME QUALMS           |
| 08:52AM  | 9  | ABOUT THAT, AND I'LL LET YOU KNOW.                                    |
| 08:52AM  | 10 | MR. WADE:  ON THE UBIOME ISSUE, YOUR HONOR, I THINK                   |
| 08:52AM  | 11 | WE CAN ADDRESS THAT WITHOUT GOING INTO THE FACT THAT HE ENGAGED       |
| 08:52AM  | 12 | WITH THE GOVERNMENT.                                                  |
| 08:52AM  | 13 | I THINK THE FACT THAT -- THE FACT THAT HE CONCEALED THAT             |
| 08:52AM  | 14 | FROM HIS RESUME BECAUSE HE WAS FIRED FOR INCOMPETENCE I THINK         |
| 08:53AM  | 15 | IS A FAIR AVENUE OF INQUIRY.                                          |
| 08:53AM  | 16 | THE COURT:  IS THERE A DOCUMENT THAT SAYS YOU ARE                     |
| 08:53AM  | 17 | FIRED BECAUSE YOU'RE INCOMPETENT?                                     |
| 08:53AM  | 18 | MR. WADE:  THERE'S A DOCUMENT THAT SAYS THAT WE'VE                    |
| 08:53AM  | 19 | DECIDED TO MAKE A CHANGE.  IN HIS INTERVIEW REPORT WITH THE           |
| 08:53AM  | 20 | GOVERNMENT, HE SAYS HE WAS FIRED, AND I BELIEVE HE SAYS BECAUSE       |
| 08:53AM  | 21 | HE SUSPECTS BECAUSE HE WASN'T MEETING HIS PROFESSIONAL                |
| 08:53AM  | 22 | OBLIGATIONS.                                                          |
| 08:53AM  | 23 | THE COURT:  I DIDN'T HERE COMPETENCE IN ANY OF THAT.                  |
| 08:53AM  | 24 | MR. WADE:  WELL, HE WASN'T SHOWING UP.                                |
| 08:53AM  | 25 | THE COURT:  AND I HEARD THERE WERE SOME HEALTH                        |

08:53AM 1    ISSUES.

08:53AM 2          MR. WADE:  THAT WAS A DIFFERENT ISSUE.  THEY'RE

08:53AM 3    CONFLATING THE TWO.

08:53AM 4          THE COURT:  THAT'S THE PROBLEM WITH THIS TYPE OF

08:53AM 5    EVIDENCE.  YOU TRY TO PARSE IT TOGETHER AND PUT IT TOGETHER.

08:53AM 6      I THINK I UNDERSTAND WHAT YOU WANT TO DO.  YOU TOLD ME HOW

08:53AM 7    VALUABLE THIS EVIDENCE IS TO YOUR CASE AND I APPRECIATE THAT.

08:53AM 8      SO I'LL HAVE TO LOOK AT THIS.  I'VE JUST GOT THESE

08:53AM 9    DOCUMENTS.  I'LL LOOK AT THESE AND WE'LL HAVE SOME FURTHER

08:54AM 10   DISCUSSION.

08:54AM 11     I DO HAVE SOME CONCERNS ABOUT THE CUMULATIVE NATURE OF

08:54AM 12   THIS AND HOW MUCH OF THIS IS GOING TO -- IF IT COMES IN AT ALL,

08:54AM 13   WHAT I'LL ALLOW YOU TO INQUIRE ON.

08:54AM 14     HIS COMPETENCY MIGHT BE AT ISSUE.  I THINK THERE ARE

08:54AM 15   REASONS TO PROBE SOMEBODY'S COMPETENCY.

08:54AM 16     BUT HOW FAR YOU GO WITH THAT AND WHAT TYPE OF EXTRINSIC

08:54AM 17   EVIDENCE THAT IS PERMITTED FOR THAT I THINK IS A REAL ISSUE

08:54AM 18   HERE, AND I'M NOT CERTAIN THAT I WOULD PERMIT YOU TO RAISE ALL

08:54AM 19   OF THESE ISSUES AS YOU'VE SAID.

08:54AM 20     PERHAPS HE HAD ISSUES AFTER HIS EMPLOYMENT, AND IF YOU

08:54AM 21   WANT TO SUGGEST THAT HE HAD SOME PROBLEMS AT THERANOS AND THAT

08:54AM 22   THEY CONTINUED.

08:54AM 23     I DON'T KNOW EXACTLY WHAT IT IS.  I WANT TO LOOK AT THESE

08:54AM 24   AND SEE.  I DO HAVE SOME ISSUES ABOUT GOING INTO EVERYTHING

08:54AM 25   THAT YOU'VE TALKED ABOUT THIS MORNING, MR. WADE.  I THINK

08:54AM 1    THAT'S A LITTLE TOO BROAD.

08:55AM 2         MR. WADE:  AS I TOLD THE COURT I WOULD, WE BASICALLY

08:55AM 3    PUT ALL OF OUR CARDS ON THE TABLE WITH THE GOVERNMENT AT THE

08:55AM 4    APPROPRIATE TIME AND WE WANT TO GIVE THEM THE OPPORTUNITY TO

08:55AM 5    RAISE THIS, BUT WE BELIEVE THESE ARE APPROPRIATE AVENUES FOR

08:55AM 6    INQUIRY AND WE'RE HAPPY TO ANSWER ANY FURTHER QUESTIONS IF THE

08:55AM 7    COURT HAS ANY AS IT GOES ALONG HERE.

08:55AM 8         MR. BOSTIC:  LIKEWISE, YOUR HONOR.  JUST FOR NOW, IN

08:55AM 9    CASE IT'S HELPFUL TO THE COURT, I DO HAVE A CASE I WOULD LIKE

08:55AM 10   TO BRING TO THE COURT'S ATTENTION.  I HAVE PROVIDED THE DEFENSE

08:55AM 11   WITH A COPY.

08:55AM 12       IT'S UNITED STATES VERSUS CANDOLI.  I HAVE A COPY HERE.

08:55AM 13   IT'S A NINTH CIRCUIT, AND IT'S BEEN HIGHLIGHTED ON PAGE 8.

08:55AM 14            THE COURT:  THANK YOU.

08:55AM 15       MR. BOSTIC:  IN ESSENCE, IT DEALS WITH THE COURT

08:55AM 16   EXCLUDING EVIDENCE THAT WOULD GO TO BIAS BECAUSE IT WOULD BE

08:55AM 17   DIVERSIONARY AND COLLATERAL.

08:55AM 18            THE COURT:  HOW FAR -- HOW MUCH LONGER DO YOU THINK

08:55AM 19   YOU HAVE, MR. WADE, NOT INCLUDING THIS INFORMATION THAT WE'VE

08:55AM 20   DISCUSSED?

08:55AM 21            MR. WADE:  AS I BELIEVE I HAVE TOLD THE COURT, I

08:55AM 22   HESITATE TO EVER MAKE SUCH REPRESENTATIONS BECAUSE I'M TERRIBLE

08:55AM 23   AT PREDICTING.  I WOULD THINK WE PROBABLY HAVE ABOUT THE

08:56AM 24   MORNING BEFORE WE WOULD GET INTO THIS GENERAL AREA, AND THEN IN

08:56AM 25   THE AFTERNOON I WOULD THINK SOMETIME, MAYBE THE LATER PART OF

08:56AM  1    THE AFTERNOON WE WOULD GET INTO THIS.  BUT I WOULD BE HAPPY TO

08:56AM  2    UPDATE THE COURT ON HOW I'M DOING ON THE BREAK.

08:56AM  3         THE COURT:  ARE WE GOING TO BE FINISHED WITH THIS

08:56AM  4    WITNESS THIS WEEK?

08:56AM  5         MR. WADE:  IT WAS OUR HOPE, AS I TOLD COUNSEL, THAT

08:56AM  6    WE WOULD PASS THE WITNESS AT SOME POINT IN THE AFTERNOON AND

08:56AM  7    SOMETIMES --

08:56AM  8         THE COURT:  TODAY?

08:56AM  9         MR. WADE:  TODAY.  SOMETIMES IT'S HARD TO PREDICT.

08:56AM 10    I BELIEVE --

08:56AM 11         THE COURT:  SO DO I NEED TO -- I'M STARTING TO

08:56AM 12    RETHINK.  MAYBE WE NEED TO BE IN SESSION FRIDAY.

08:56AM 13         MR. WADE:  I BELIEVE THIS WITNESS HAS LIMITATIONS IN

08:56AM 14    TERMS OF HIS ABILITY TO BE HERE PAST WEDNESDAY, AND I BELIEVE

08:56AM 15    WE CAN, WE CAN FINISH THIS WITNESS.

08:56AM 16       MY UNDERSTANDING IS THAT THE GOVERNMENT MAYBE HAS --

08:57AM 17         THE COURT:  WELL, HE'S BEEN HERE FOR WHAT, THREE OR

08:57AM 18    FOUR DAYS?

08:57AM 19         MR. WADE:  HE HAS, YEAH.

08:57AM 20         THE COURT:  SO MAYBE HE'S EAGER TO STAY.  I DON'T

08:57AM 21    KNOW.

08:57AM 22         MR. WADE:  WE'VE BEEN ADVISED -- BOTH PARTIES HAVE

08:57AM 23    BEEN ADVISED BY BOTH COUNSEL THAT HE HAS COMMITMENTS AND

08:57AM 24    TOMORROW IS HIS LAST -- HE WOULD HAVE TO GO MEET THOSE

08:57AM 25    OBLIGATIONS AFTER TOMORROW.

08:57AM 1    I DON'T THINK THERE WILL BE ANY ISSUE CERTAINLY WITH

08:57AM 2    COMPLETING HIM TOMORROW.

08:57AM 3         THE COURT:  FROM YOUR SIDE?

08:57AM 4         MR. WADE:  FROM OUR SIDE.  MY HOPE IS --

08:57AM 5         THE COURT:  THAT'S VERY GENEROUS FOR YOU TO GIVE

08:57AM 6    HALF A DAY TO THE GOVERNMENT.

08:57AM 7         MR. WADE:  I BELIEVE MR. BOSTIC SUGGESTED THERE HE

08:57AM 8    THOUGHT -- AGAIN, UNDERSTANDING IT'S JUST AN ESTIMATE -- MAYBE

08:57AM 9    90 MINUTES IS WHAT WE DISCUSSED LAST NIGHT, BUT I DON'T WANT TO

08:57AM 10   SPEAK FOR MR. BOSTIC.

08:57AM 11        MR. BOSTIC:  THAT WAS MY BEST ESTIMATE AT THE TIME,

08:57AM 12   YOUR HONOR.

08:57AM 13        AS MR. WADE'S CROSS GOES ON, THE REDIRECT GETS A LITTLE

08:57AM 14   LONGER, AS THE COURT MIGHT IMAGINE.  BUT MY INTENTION IS TO

08:57AM 15   HAVE A REDIRECT MUCH SHORTER THAN THE CROSS.

08:57AM 16        AS TO THE WITNESS'S AVAILABILITY, I APOLOGIZE, BUT IT

08:58AM 17   WASN'T CLEAR TO ME FROM THE EMAIL WHETHER HE WAS UNAVAILABLE

08:58AM 18   AFTER WEDNESDAY OR SIMPLY UNAVAILABLE STARTING NEXT WEEK.

08:58AM 19        MR. WADE MIGHT HAVE A SHARPER MEMORY OF THAT THAN I DO.

08:58AM 20        THE COURT:  SO, MR. WADE, SHOULD I KEEP YOU FRIDAY

08:58AM 21   THEN TO DO OTHER WITNESSES BECAUSE WE NEED TO MOVE?  SHOULD WE

08:58AM 22   HAVE A SESSION ON FRIDAY TO CAPTURE SOME ADDITIONAL EVIDENCE?

08:58AM 23        MR. WADE:  I DEFER TO THE COURT.  I KNOW THAT THE

08:58AM 24   SCHEDULE HAS BEEN OUT THERE, AND THE JURORS MAY HAVE MADE

08:58AM 25   PLANS.

08:58AM 1          THE COURT:  YOU MAYBE HAVE MADE PLANS.  MAYBE YOU'VE

08:58AM 2    MADE PLANS.

08:58AM 3          MR. WADE:  WE'RE HERE TO MEET OUR OBLIGATIONS TO THE

08:58AM 4    COURT, SO WE'LL DO WHATEVER IS NECESSARY.

08:58AM 5          THE COURT:  LET ME, LET ME, I DO WANT TO TURN MY

08:58AM 6    ATTENTION TO ONE OTHER TOPIC WHICH IS VERY IMPORTANT AND

08:58AM 7    SOMEWHAT TROUBLING.

08:58AM 8       WE -- THAT IS, MY CHAMBERS -- MY CAREER CLERK RECEIVED A

08:58AM 9    PHONE CALL YESTERDAY FROM AN INDIVIDUAL, DR. KRAL, K-R-A-L.

08:59AM 10   SHE INFORMED MY CAREER CLERK -- SHE PHONED BECAUSE THE DOCTOR

08:59AM 11   RECEIVED A CALL FROM A JOURNALIST, AND THE JOURNALIST TOLD THE

08:59AM 12   DOCTOR THAT THERE WAS AN EXHIBIT, A DEFENSE EXHIBIT DX 12846

08:59AM 13   WHICH WAS SUBMITTED BY THE DEFENSE AND ADMITTED AT THEIR

08:59AM 14   REQUEST, AND THIS DOCUMENT CONTAINED WAS NOT REDACTED.  IT

08:59AM 15   CONTAINED THE NAME OF THE PATIENT, AND THE DOCTOR INFORMED MY

08:59AM 16   CAREER CLERK THAT THIS WAS CLEARLY A HIPAA VIOLATION.

08:59AM 17      I DON'T KNOW WHO THE JOURNALIST WAS, I DON'T KNOW WHAT THE

08:59AM 18   CONVERSATION WAS, BUT IT WAS A JOURNALIST WHO CONTACTED THE

08:59AM 19   DOCTOR AND INFORMED HER OF THIS.

08:59AM 20      OUR STAFF, MY WONDERFUL CHAMBERS STAFF, IMMEDIATELY

08:59AM 21   CONTACTED THE COMMUNICATIONS DIRECTOR IN CHARGE OF PRESS

09:00AM 22   RELATIONS FOR THE COURT, THE NORTHERN DISTRICT, AND SAW THAT

09:00AM 23   THAT EXHIBIT WAS TAKEN DOWN.

09:00AM 24      I THINK WE CONTACTED YOUR FOLKS, MR. WADE.  I'M NOT SURE

09:00AM 25   IF THAT HAS HAPPENED YET, BUT WHAT WE WILL NEED TO DO IS FOR

09:00AM 1    YOU TO SUBMIT A PROPERLY REDACTED EXHIBIT FOR THE RECORD SUCH

09:00AM 2    THAT THERE IS NOT ANOTHER HIPAA VIOLATION OF A DISINTERESTED

09:00AM 3    PARTY IN THIS PARTICULAR CASE.

09:00AM 4        AND WHAT I AM GOING TO REQUIRE PARTIES TO DO IS TO SCREEN

09:00AM 5    THOROUGHLY ANY EXHIBITS THAT ARE PLACED INTO EVIDENCE AND MAKE

09:00AM 6    SURE AND ENSURE THAT THERE ARE APPROPRIATE AND PROPER

09:00AM 7    REDACTIONS SUCH THAT A MEMBER OF THE PUBLIC DOES NOT HAVE FEAR

09:00AM 8    THAT HIS OR HER PROPRIETARY AND PRIVATE HEALTH INFORMATION IS

09:00AM 9    MADE PUBLIC IN A CASE.  THAT'S WHAT HAPPENED HERE.

09:01AM 10       OF COURSE THE DOCTOR WAS OF GREAT CONCERN FOR HER PATIENT

09:01AM 11   AND SHE DID WHAT SHE FELT WAS APPROPRIATE.  I DON'T KNOW WHO

09:01AM 12   THE JOURNALIST WAS.  I DON'T HAVE THAT INFORMATION.  I DON'T

09:01AM 13   KNOW.

09:01AM 14       MY SENSE IS THAT THE JOURNALIST WILL RESPECT THE PRIVACY

09:01AM 15   OF THIS PATIENT AND KEEP THAT CONFIDENTIAL, BUT I DON'T HAVE

09:01AM 16   ANY CONTROL OVER THAT EITHER.

09:01AM 17           MR. WADE:  YOUR HONOR, OBVIOUSLY WE -- THIS IS AN

09:01AM 18   ISSUE THAT HAS COME UP A COUPLE OF TIMES DURING COURT.  I KNOW

09:01AM 19   I REPRESENT TO THE COURT WE ARE MAKING DILIGENT EFFORTS AS

09:01AM 20   WE'RE MOVING QUICKLY WITH A LOT OF DOCUMENTS TO TRY TO DO THAT,

09:01AM 21   BUT THAT'S NOT AN ACCEPTABLE RESULT AND WE WILL ADDRESS THAT

09:01AM 22   IMMEDIATELY AND REDOUBLE OUR EFFORTS ON CONTROL.

09:01AM 23       I KNOW THERE'S A DESIRE BY THE COURT TO TRY TO MAKE

09:01AM 24   INFORMATION PUBLIC QUICKLY.  MAYBE SEPARATELY WE CAN WORK WITH

09:01AM 25   THE COURT AND JUST ALLOW US A LITTLE MORE TIME TO DO AN EXTRA

09:02AM 1    LEVEL OF REVIEW GIVEN THE SENSITIVITY OF SOME OF THIS

09:02AM 2    INFORMATION, GIVEN THAT IT'S GOING UP ONTO THE INTERNET AND

09:02AM 3    JOURNALISTS ARE GOING THROUGH IT.  MAYBE WE NEED TO MAKE IT --

09:02AM 4    TAKE ANOTHER DAY OR SO JUST TO DOUBLE-CHECK.

09:02AM 5             THE COURT:  WELL, THAT SHOULD BE DONE, SHOULDN'T IT,

09:02AM 6    AT THE TIME THE EXHIBIT IS OFFERED?  SHOULDN'T THE REDACTIONS

09:02AM 7    BE ON THE DOCUMENTS?

09:02AM 8             MR. WADE:  THEY ARE.  AS THE COURT IS SEEING

09:02AM 9    SOMETIMES WHEN THE DOCUMENT IS PUBLISHED, I BELIEVE BOTH

09:02AM 10   PARTIES HAVE PUT UP DOCUMENTS AND THEY INADVERTENTLY INCLUDED

09:02AM 11   THAT, AND SO THERE'S AN EFFORT ON THE BACK END TO MAKE SURE

09:02AM 12   THAT THAT INFORMATION IS REMOVED.

09:02AM 13            THE COURT:  I KNOW DOCUMENTS HAVE COME UP ON MY

09:02AM 14   SCREEN AND I'VE INTERRUPTED YOUR EXAMINATION TO SAY I THINK

09:02AM 15   THERE'S SOME REDACTIONS.

09:02AM 16       I'VE BEEN INFORMED THAT, WELL, JUDGE, YOU'RE SEEING THE

09:02AM 17   UNREDACTED FORM, BUT THE DOCUMENT HAS ALREADY BEEN REDACTED AND

09:02AM 18   THE JURORS AND THE PUBLIC ARE SEEING THE REDACTED FORM.

09:02AM 19       SO I ASSUME THAT THAT CAN BE DONE AND I ASSUME THAT THAT

09:02AM 20   HAS BEEN DONE ONGOING.  I WAS QUITE SURPRISED, AS I'M SURE YOU

09:03AM 21   WERE, TO HEAR ABOUT IT.

09:03AM 22            MR. WADE:  VERY SURPRISED, YEAH.  IT'S NOT

09:03AM 23   ACCEPTABLE.

09:03AM 24            THE COURT:  WE CAN'T DO THIS.  THIS IS A TRIAL THAT

09:03AM 25   INVOLVES OBVIOUSLY A LOT OF EXHIBITS, AND PERSONAL EXHIBITS

09:03AM 1    REGARDING HEALTH, PROPRIETARY INFORMATION OF INDIVIDUALS WHO

09:03AM 2    ARE NOT CONNECTED TO THIS CASE OTHER THAN THEY HAPPEN TO HAVE

09:03AM 3    HEALTH ISSUES THAT SOMEHOW CAME TO BE DURING THEIR CONTACT WITH

09:03AM 4    EITHER THERANOS OR OTHER MEDICAL PROVIDERS, AND IT'S

09:03AM 5    INAPPROPRIATE FOR THEIR PRIVACY TO BE INVADED LIKE THIS WHEN

09:03AM 6    HIPAA GUARANTEES THAT IT WON'T BE.

09:03AM 7        SO I DON'T HAVE TO REMIND YOU ABOUT THIS.  WE JUST NEED TO

09:03AM 8    EXERCISE MORE CAUTION.

09:03AM 9            MR. WADE:  WE AGREE, YOUR HONOR.

09:03AM 10           THE COURT:  THE OTHER ISSUE THAT COMES UP -- WE'RE

09:03AM 11   ALREADY PAST 9:00 O'CLOCK -- BUT THERE WAS A MEDIA COALITION

09:03AM 12   THAT FILED A MOTION TO UNSEAL QUESTIONNAIRES OF THE JURY.

09:03AM 13       WE HAD A HEARING LAST WEEK.  I THINK REPRESENTATIVES OF

09:04AM 14   THE GOVERNMENT, MR. CLINE WAS A PARTICIPATE ON BEHALF OF

09:04AM 15   MS. HOLMES.

09:04AM 16       AS A RESULT OF THAT HEARING, I INFORMED THE PARTIES TO

09:04AM 17   THAT MOTION THAT I WOULD ENGAGE A CONVERSATION WITH THE JURORS

09:04AM 18   AND SPEAK WITH EACH OF THEM PRIVATELY IN CHAMBERS, IN CAMERA,

09:04AM 19   WITH A COURT REPORTER, OF COURSE, TO ASK THEIR OPINIONS ABOUT

09:04AM 20   THE ISSUE OF UNSEALING.

09:04AM 21       I'M GOING TO INFORM THE JURORS OF THIS JUST BEFORE OUR

09:04AM 22   BREAK.  I DON'T WANT TO TELL THEM THAT AS WE START.  I WANT

09:04AM 23   THEM TO BE FOCUSSED ON THE TESTIMONY AND EVIDENCE HERE.

09:04AM 24       BUT JUST BEFORE OUR BREAK, WHAT I BELIEVE I'LL DO -- AND

09:04AM 25   I'M THINKING I'LL DO THIS TODAY, BUT IN LIGHT OF ALL OF THESE

09:04AM 1     OTHER ISSUES IT MAY HAVE TO WAIT UNTIL NEXT WEEK -- BUT WHAT I

09:04AM 2     WANT TO DO IS TO PROVIDE THE JURORS WITH THEIR QUESTIONNAIRES

09:04AM 3     TODAY, OR AT SOME POINT DURING OUR TRIAL, SO THEY CAN REVIEW

09:04AM 4     THEM OVER THE BREAK.

09:04AM 5         I WILL THEN ASK THEM AT THE END OF OUR SESSION WHETHER OR

09:05AM 6     NOT ANY OF THEM WISH TO STAY.  THEY CAN STAY AFTER OUR COURT TO

09:05AM 7     TALK WITH ME.  IF THEY PREFER TO TAKE THEIR QUESTIONNAIRE HOME,

09:05AM 8     REVIEW IT, AND COME BACK THE NEXT DAY, WE CAN HAVE A

09:05AM 9     CONVERSATION AND ACCOMMODATE THEM IN THAT REGARD ALSO.

09:05AM 10        SO THAT MIGHT INTERRUPT SOME OF OUR COURT TIME.

09:05AM 11        MR. WADE, DO YOU NEED A MOMENT?

09:05AM 12            MR. WADE:  I'LL DEFER TO MR. DOWNEY ON THE ISSUES

09:05AM 13    RELATING TO THE JURY.

09:05AM 14            THE COURT:  SURE.

09:05AM 15            MR. DOWNEY:  JUDGE, I THINK IF THERE'S TO BE AN

09:05AM 16    EXERCISE WHERE THE JURORS HAVE THAT CONVERSATION WITH

09:05AM 17    YOUR HONOR, WE WOULD BE INCLINED TO WAIVE THE PRESENCE OF THE

09:05AM 18    DEFENDANT PERSONALLY FOR THAT.  BUT I ASSUME -- WILL COUNSEL --

09:05AM 19    DOES THE COURT INTEND TO HAVE ONE COUNSEL FROM EACH SIDE

09:05AM 20    PRESENT?

09:05AM 21            THE COURT:  NO.

09:05AM 22            MR. DOWNEY:  I THINK UNDER RULE 24 THAT WOULD BE

09:05AM 23    APPROPRIATE, SO WE WOULD REQUEST THAT COUNSEL HAVE THE

09:05AM 24    OPPORTUNITY TO BE PRESENT.

09:05AM 25            THE COURT:  MY, MY INTENT WAS TO HAVE, AS I SAID AT

09:06AM  1      THE MOTION, WAS TO HAVE AN INDIVIDUAL IN CAMERA CONVERSATION

09:06AM  2      WITH EACH JUROR WITHOUT COUNSEL.  WE'LL HAVE A REPORTER THERE

09:06AM  3      THAT WILL REPORT MY QUESTIONS.

09:06AM  4           I'M GOING TO ENDEAVOR TO ASK EACH JUROR THE SAME

09:06AM  5      QUESTIONS.  I'M NOT GOING TO DEVIATE FROM THAT.

09:06AM  6           BUT MY SENSE IS THAT THIS IS AN ISSUE THAT IS COLLATERAL

09:06AM  7      TO THE TRIAL -- THAT IS, THE EVIDENCE OF THE TRIAL -- AND IT

09:06AM  8      INVOLVES THEIR QUESTIONNAIRES AND THE PRESS DESIRE TO HAVE

09:06AM  9      ACCESS TO THOSE QUESTIONNAIRES.

09:06AM 10           YOU HAVE ALREADY -- YOU AND THE GOVERNMENT HAVE ALREADY

09:06AM 11      BEEN PARTICIPANTS IN THE VOIR DIRE PROCESS, OF COURSE, SO

09:06AM 12      YOU'VE HAD AN OPPORTUNITY TO ASK THOSE QUESTIONS.

09:06AM 13           THIS IS RELATED -- THIS ISSUE RELATES TO WHETHER OR NOT

09:06AM 14      AND UNDER WHAT CIRCUMSTANCES THAT INFORMATION IN THOSE

09:06AM 15      QUESTIONNAIRES WOULD BE PROVIDED.

09:06AM 16           AS I SAID IN THE MOTION, AT THE MOTION, THE COURT INTENDS

09:06AM 17      TO INVITE EACH JUROR IN, IN CAMERA WITH ME, AND I MAY HAVE A

09:07AM 18      LAW CLERK THERE AS WELL, AND I'M GOING TO ASK THEM THE

09:07AM 19      QUESTIONS.  IN ESSENCE, I'M GOING TO ASK THEM THEIR FEELINGS

09:07AM 20      ABOUT THE RECENT INFORMATION AND THEIR CONCERNS WITH ANY

09:07AM 21      PRIVATE INFORMATION, AND THAT'S WHAT I INTEND TO DO.

09:07AM 22           I DON'T THINK COUNSEL NEEDS TO BE PRESENT FOR THAT.  IT'S

09:07AM 23      NOT GOING TO BE AN EXAMINATION.  THEY'RE NOT GOING TO BE PUT

09:07AM 24      UNDER OATH.  I'M NOT GOING TO ADMINISTER AN OATH TO THEM.

09:07AM 25           I'LL ASK THEM THEIR FEELINGS.  WE'LL HAVE A TRANSCRIPT OF

09:07AM 1    IT AND COUNSEL MAY BE ABLE TO REVIEW THE TRANSCRIPT IF THEY

09:07AM 2    WISH.  BUT THE TRANSCRIPT, LET ME JUST SAY, WILL OTHERWISE BE

09:07AM 3    SEALED PENDING RESOLUTION OF THE ISSUE.

09:07AM 4         BUT THAT'S WHAT I TOLD THE LAWYER FOR THE MOTION.

09:07AM 5         I ALSO INTEND TO IDENTIFY THE MEMBERS OF THE MEDIA

09:07AM 6    COALITION TO THE JURORS AND THE MOVING PARTIES SO THEY HAVE

09:07AM 7    THAT INFORMATION AS WELL.

09:07AM 8              MR. DOWNEY:  WELL, I AGREE WITH THE COURT, IT'S A

09:08AM 9    SENSITIVE PROCESS, AND MY PROPOSAL TO SIMPLY HAVE ONE COUNSEL

09:08AM 10   PRESENT I THINK REFLECTS THAT.

09:08AM 11        BUT WITH RESPECT, YOUR HONOR, I DON'T THINK THAT IT'S

09:08AM 12   COLLATERAL TO THE TRIAL AND WE WOULD ASSERT OUR RIGHT TO HAVE

09:08AM 13   AT LEAST COUNSEL PRESENT FOR THAT TYPE OF A DIALOGUE WHERE

09:08AM 14   ISSUES AFFECTING THE TRIAL MAY BE RAISED BY THE JURORS.

09:08AM 15        SO I UNDERSTAND YOUR HONOR'S INTENDED APPROACH, BUT WOULD

09:08AM 16   OBJECT TO THE COLLOQUY HAPPENING OUTSIDE OF THE PRESENCE OF

09:08AM 17   COUNSEL.

09:08AM 18              THE COURT:  AND MY THOUGHT ON THAT IS THAT HAVING

09:08AM 19   COUNSEL PRESENT WOULD SERVE A CONTRADICTORY PURPOSE FOR THE

09:08AM 20   INTERVIEW.  MY SENSE IS THAT IT WOULD BE INTIMIDATING TO HAVE

09:08AM 21   COUNSEL PRESENT WHEN I ASK THEM THOSE QUESTIONS, AND I WANT THE

09:08AM 22   JURORS TO NOT BE INTIMIDATED OR FEEL UNDUE PRESSURE ABOUT THIS.

09:08AM 23   THIS IS A QUESTION ABOUT THE QUESTIONNAIRES.

09:09AM 24        MY SENSE IS THAT THE CONVERSATION WILL BE THEIR COMFORT

09:09AM 25   LEVEL IN ALLOWING ANY INFORMATION TO BE REVEALED.

09:09AM 1    I'M NOT GOING TO ASK THEM ABOUT THEIR THOUGHTS ABOUT THE

09:09AM 2    CASE.  I'M NOT GOING TO ASK THEM ABOUT THE EVIDENCE IN THE CASE

09:09AM 3    AT ALL.  THAT'S INAPPROPRIATE.  IT'S INAPPROPRIATE, AND I DON'T

09:09AM 4    INTEND TO DO THAT.

09:09AM 5        AGAIN, MY INTENT IS TO ASK THEM QUESTIONS JUST ABOUT THIS

09:09AM 6    QUESTIONNAIRE AND THAT'S IT.

09:09AM 7        IF YOU WANT TO BE PRESENT, I'LL ASK THE GOVERNMENT IF THEY

09:09AM 8    WANT TO BE PRESENT, THEN MAYBE WE WILL HAVE TO COME FRIDAY TO

09:09AM 9    TAKE CARE OF THIS.

09:09AM 10            MR. DOWNEY:  THAT WOULD BE FINE, YOUR HONOR.

09:09AM 11            THE COURT:  WE'LL HAVE TO DO THIS ON SOME OTHER DAY.

09:09AM 12            MR. DOWNEY:  YEAH.

09:09AM 13            MR. LEACH:  YOUR HONOR.

09:09AM 14            MR. BOSTIC:  YOUR HONOR, FOR THE GOVERNMENT, I THINK

09:09AM 15    WE DEFER TO THE COURT ON WHETHER COUNSEL'S PRESENCE IS

09:09AM 16    NECESSARY.

09:09AM 17        I THINK THE COURT'S POINT ABOUT FACILITATING THAT WITH THE

09:09AM 18    JURORS IS WELL TAKEN AND SO WE DEFER TO THE COURT ON THAT.

09:09AM 19        WE WILL MAKE OURSELVES AVAILABLE AT ANOTHER TIME IF THE

09:09AM 20    COURT DECIDES TO PROCEED WITH COUNSEL PRESENT.

09:09AM 21            MR. DOWNEY:  I WELL UNDERSTAND YOUR HONOR'S INTENT

09:10AM 22    AND I THINK THE NATURE OF THE EXERCISE -- I THINK YOUR HONOR'S

09:10AM 23    QUESTIONS WILL BE ALONG THE LINES THAT YOU'VE DESCRIBED.  BUT

09:10AM 24    THE NATURE OF THE EXERCISE IS A DIALOGUE AND WE DON'T KNOW WHAT

09:10AM 25    WILL RESULT FROM THAT DIALOGUE.  THAT'S WHAT ANIMATES MY

09:10AM 1   QUESTION.

09:10AM 2          THE COURT:  SO WHAT WOULD HAPPEN IF WE'RE IN THERE

09:10AM 3   AND IF I SAY, COME ON IN, AND I'D LIKE YOU TO JOIN ME, WHAT

09:10AM 4   WILL YOU DO?  IF YOU HAVE A CONCERN ABOUT A QUESTION, YOU'LL

09:10AM 5   OBJECT AND YOU WOULD LIKE TO RAISE AN OBJECTION IN FRONT OF THE

09:10AM 6   JURORS?  IS THAT WHAT YOU WANT TO DO, MR. DOWNEY?

09:10AM 7          MR. DOWNEY:  WELL, NO.  BUT I THINK THE REACTIONS OF

09:10AM 8   JURORS IN AN ONGOING TRIAL TO THEIR INFORMATION THAT THEY WERE

09:10AM 9   TOLD WOULD BE CONFIDENTIAL BEING UNSEALED MAY AFFECT THEIR

09:10AM 10  ATTITUDES IN A NUMBER OF WAYS.

09:10AM 11      I DON'T KNOW THAT WE WOULD NEED TO QUESTION THEM, BUT I

09:10AM 12  THINK WE HAVE A RIGHT TO BE PRESENT AT LEAST AND OBSERVE.

09:11AM 13      IF ISSUES COME UP THAT WE WANTED TO ADDRESS WITH

09:11AM 14  YOUR HONOR, WE WOULD PROBABLY DO IT WITHOUT THAT JUROR PRESENT

09:11AM 15  AND PREVIEW TO YOUR HONOR ANYTHING THAT WE THOUGHT NECESSITATED

09:11AM 16  THAT INQUIRY.

09:11AM 17      SO I DON'T WANT TO -- IT'S NOT TO OUR ADVANTAGE TO MAKE

09:11AM 18  THE JURORS UNCOMFORTABLE.  BUT IT IS, I THINK, NECESSARY TO

09:11AM 19  OBSERVE THE DIALOGUE WHEN IT'S IN PROCESS.

09:11AM 20          THE COURT:  I SEE.  SO IF I WERE TO ENGAGE JURORS IN

09:11AM 21  THIS COURTROOM AND TREAT THIS COURTROOM AS MY CHAMBERS, THAT

09:11AM 22  IS, SEAL THE COURTROOM, AND INVITE THE JURORS IN, AND YOU AND

09:11AM 23  THE GOVERNMENT WERE INVITED TO MY CHAMBERS AND I EXTENDED MY

09:11AM 24  CHAMBERS TO THE VIEWING ROOM THAT WE HAVE AND YOU COULD WATCH

09:11AM 25  IT ON A CLOSED CIRCUIT T.V., WOULD THAT SUFFICE FOR YOU?

09:11AM 1          MR. DOWNEY:  WELL, YOUR HONOR, IT REALLY DEPENDS.

09:12AM 2      IT SEEMS TO ME THAT WHAT I'M SUGGESTING WITH ONE COUNSEL

09:12AM 3  BEING PRESENT IS MINIMALLY INVASIVE, AS WELL AS I THINK

09:12AM 4  DEFERRING ANY ISSUES THAT COME UP SO THE JUROR IS NOT IN THE

09:12AM 5  PROCESS OF BEING QUESTIONED.  I THINK IT ELIMINATES THE CONCERN

09:12AM 6  THAT THE COURT HAS.

09:12AM 7      FUNDAMENTALLY, I THINK OUR DISAGREEMENT IS I DON'T AGREE

09:12AM 8  THAT THIS IS COLLATERAL TO THE TRIAL.  I THINK THAT'S THE

09:12AM 9  ISSUE, AND I THINK FOR DEFENSE COUNSEL TO ABSENT ITSELF JUST IS

09:12AM 10 NOT AN APPROPRIATE DISCHARGE OF COUNSEL'S DUTY.

09:12AM 11         THE COURT:  SO WHAT I HEAR YOU SAYING IS THAT THE

09:12AM 12 TRANSCRIPT, YOUR OPINION IS THE TRANSCRIPT IS NOT SUFFICIENT

09:12AM 13 FOR THAT PURPOSE?

09:12AM 14         MR. DOWNEY:  THAT'S CORRECT, YOUR HONOR.

09:12AM 15         THE COURT:  AND WHAT ABOUT YOUR PARTICIPATION VIA

09:12AM 16 VIDEO, WATCHING THE PROCEEDINGS VIA VIDEO?

09:12AM 17         MR. DOWNEY:  GENERALLY THAT'S NOT APPROPRIATE,

09:12AM 18 YOUR HONOR, AND I WOULDN'T WANT TO CONSENT TO THAT.  BUT

09:13AM 19 OBVIOUSLY IT'S BETTER THAN NOT BEING PRESENT.

09:13AM 20     WE WOULDN'T HAVE THE OPPORTUNITY, I THINK, IN THE WAY THAT

09:13AM 21 IS NORMAL TO OBSERVE THOSE INTERACTIONS, AND I DON'T THINK --

09:13AM 22 I'M NOT INSULTED THAT YOU THINK THAT MR. SCHENK AND I WOULD BE

09:13AM 23 INTIMIDATING, BUT I DON'T THINK IT'S INTIMIDATING TO THE

09:13AM 24 JURORS.

09:13AM 25         THE COURT:  WELL, YOU KNOW, A COUPLE OF BLUE SUITS

09:13AM 1    NEXT TO THEM SITTING AND LOOKING AT THEM IN A JUDGE'S CHAMBERS,

09:13AM 2    WHAT COULD BE INTIMIDATING ABOUT THAT?

09:13AM 3        ALL RIGHT.  WELL, WE SHOULD GET OUR JURY AND GET STARTED

09:13AM 4    WITH THE EVIDENCE.

09:13AM 5            MR. DOWNEY:  THANK YOU.

09:13AM 6            THE COURT:  THANK YOU, YOUR HONOR.

09:16AM 7        (RECESS FROM 9:16 A.M. UNTIL 9:24 A.M.)

09:24AM 8        (JURY IN AT 9:24 A.M.)

09:24AM 9            THE COURT:  ALL RIGHT.  GOOD MORNING.  WE'RE BACK ON

09:24AM 10   THE RECORD IN THE HOLMES MATTER.  ALL COUNSEL IS PRESENT.

09:24AM 11   MS. HOLMES IS PRESENT.

09:24AM 12       DR. ROSENDORFF IS ON THE STAND.

09:24AM 13       GOOD MORNING, LADIES AND GENTLEMEN OF OUR JURY.  IT'S NICE

09:24AM 14   TO SEE YOU AGAIN.  I APOLOGIZE FOR THE DELAY.  I NEEDED SOME

09:24AM 15   ASSISTANCE FROM THE LAWYERS THIS MORNING ON SOME ISSUES.

09:24AM 16       BEFORE WE BEGIN THE CONTINUED EXAMINATION DR. ROSENDORFF,

09:24AM 17   I DO NEED TO ASK YOU, OVER THE LONG WEEKEND, LADIES AND

09:24AM 18   GENTLEMEN, HAVE ANY OF YOU HAD OCCASION TO COME ACROSS, BE

09:24AM 19   EXPOSED TO OR SPEAK ABOUT THIS CASE, ANY OF THE PARTIES OR

09:24AM 20   ANYTHING TO DO WITH THIS CASE IN ANY FASHION?  HAS ANYONE HAD

09:24AM 21   THAT EXPERIENCE?

09:24AM 22       AGAIN, IF YOU WANT TO SPEAK PRIVATELY, WE CAN DO THAT.

09:24AM 23       I SEE NO HANDS.

09:24AM 24       THANK YOU VERY MUCH.

09:25AM 25       MR. WADE, YOU HAVE QUESTIONS?

09:25AM  1              MR. WADE:  I DO, YOUR HONOR.  THANK YOU.

09:25AM  2              THE COURT:  DOCTOR, IF YOU COULD JUST STATE YOUR

09:25AM  3      NAME, PLEASE.

09:25AM  4              THE WITNESS:  ADAM ROSENDORFF.

09:25AM  5              THE COURT:  THANK YOU.  AND I'LL REMIND YOU, SIR,

09:25AM  6      YOU'RE STILL UNDER OATH.

09:25AM  7              THE WITNESS:  THANK YOU.

09:25AM  8              THE COURT:  YOU'RE WELCOME.

09:25AM  9              **(GOVERNMENT'S WITNESS, ADAM ROSENDORFF, WAS PREVIOUSLY**

09:25AM  10     **SWORN.)**

09:25AM  11                      **CROSS-EXAMINATION (RESUMED)**

09:25AM  12     BY MR. WADE:

09:25AM  13     Q.   GOOD MORNING, DR. ROSENDORFF.

09:25AM  14     A.   GOOD MORNING.

09:25AM  15     Q.   I'D LIKE TO ASK YOU SOME MORE QUESTIONS ABOUT SOME OF THE

09:25AM  16     ASSAYS THAT YOU TESTIFIED ABOUT ON DIRECT EXAMINATION.

09:25AM  17     A.   OKAY.

09:25AM  18     Q.   AND BEFORE I DO THAT, I WOULD JUST -- WE -- YOU GAVE SOME

09:25AM  19     TESTIMONY ABOUT YOUR INTERACTIONS WITH THE GOVERNMENT; CORRECT?

09:25AM  20     A.   YES.

09:25AM  21     Q.   AND THE MEETINGS THAT YOU HAD IN ADVANCE OF YOUR

09:25AM  22     TESTIMONY?

09:25AM  23     A.   YES.

09:25AM  24     Q.   THREE MEETINGS; CORRECT?

09:25AM  25     A.   CORRECT.

09:25AM  1      Q.    AND I JUST WANT TO MAKE A COUPLE OF POINTS CLEAR.   IN

09:25AM  2      THOSE MEETINGS, YOU DIDN'T DECIDE WHICH DOCUMENTS YOU WOULD

09:26AM  3      LOOK AT; CORRECT?   THEY SHOWED YOU DOCUMENTS?

09:26AM  4      A.    CORRECT.

09:26AM  5      Q.    AND THEY CHOSE WHICH ONES TO ASK YOU QUESTIONS ABOUT?

09:26AM  6      A.    CORRECT.

09:26AM  7      Q.    OKAY.  AND IN YOUR DIRECT EXAMINATION, YOU DIDN'T DECIDE

09:26AM  8      THE ORDER IN WHICH YOU WOULD GO THROUGH THE DOCUMENTS; CORRECT?

09:26AM  9      A.    NO.

09:26AM  10     Q.    THE GOVERNMENT FOCUSSED YOU ON SPECIFIC PORTIONS OF

09:26AM  11     DOCUMENTS AND ASKED YOU QUESTIONS ABOUT THAT?

09:26AM  12     A.    CORRECT.

09:26AM  13     Q.    I WANT TO LOOK AT A FEW OF THOSE DOCUMENTS.

09:26AM  14            SPECIFICALLY I WANT TO TURN TO HDL.  AND I'M GOING -- DO

09:26AM  15     YOU RECALL THAT YOU GAVE SOME TESTIMONY ABOUT HDL?

09:26AM  16     A.    YES.

09:26AM  17     Q.    OKAY.  AND YOU TALKED ABOUT AN HDL ISSUE THAT AROSE IN

09:26AM  18     FEBRUARY OF 2014.

09:26AM  19            DO YOU RECALL THAT?

09:26AM  20     A.    I DON'T RECALL THE EXACT DATE.

09:26AM  21     Q.    WELL, LET ME PULL UP THE DOCUMENT.  IT'S EXHIBIT 1543.

09:26AM  22     IT'S IN EVIDENCE AND WE'LL PUT -- WE'LL PUT THE PORTION OF THE

09:27AM  23     DOCUMENT THAT YOU WERE ASKED ABOUT BY THE GOVERNMENT UP ON TO

09:27AM  24     THE SCREEN.

09:27AM  25            DO YOU SEE UP ON THE SCREEN TWO PORTIONS OF THE

| 09:27AM | 1 | DOCUMENT 1543? |
| 09:27AM | 2 | AND THE ENTIRE DOCUMENT I BELIEVE IS IN THE WHITE BINDER. |
| 09:27AM | 3 | FEEL FREE TO LOOK AT IT ANY TIME. |
| 09:27AM | 4 | A.  YES. |
| 09:27AM | 5 | MR. WADE:  SHOULD WE WAIT A SECOND, YOUR HONOR? |
| 09:27AM | 6 | THE CLERK:  MY APOLOGIES, BUT IT WAS POINTING TO THE |
| 09:27AM | 7 | CEILING, YOUR HONOR. |
| 09:27AM | 8 | MY APOLOGIES, COUNSEL. |
| 09:27AM | 9 | MR. WADE:  MY BEST ANGLE. |
| 09:27AM | 10 | Q.  DO YOU HAVE 1543 IN FRONT OF YOU, SIR? |
| 09:27AM | 11 | A.  YES. |
| 09:27AM | 12 | Q.  OKAY.  AND DO YOU RECALL BEING QUESTIONED BY THE |
| 09:28AM | 13 | GOVERNMENT ABOUT THESE PORTIONS OF THE DOCUMENTS? |
| 09:28AM | 14 | A.  YES. |
| 09:28AM | 15 | Q.  AND IT WAS A PRETTY LENGTHY SERIES OF QUESTIONS.  YOU WERE |
| 09:28AM | 16 | ASKED ABOUT THE CAUSE OF THIS ISSUE. |
| 09:28AM | 17 | DO YOU RECALL THAT? |
| 09:28AM | 18 | A.  YES. |
| 09:28AM | 19 | Q.  AND YOU SAID THAT YOU SUSPECTED IT WAS A PROBLEM WITH THE |
| 09:28AM | 20 | ASSAY; RIGHT? |
| 09:28AM | 21 | A.  YES. |
| 09:28AM | 22 | Q.  OKAY.  AND THEY ASKED YOU ABOUT THE SPATE -- DO YOU SEE UP |
| 09:28AM | 23 | THERE, THE SPATE OF LOW HDL VALUES? |
| 09:28AM | 24 | A.  YES. |
| 09:28AM | 25 | Q.  AND THEY TALKED ABOUT HOW YOU NOTED IN THERE THAT THE |

09:28AM  1     ASSAY HAD FAILED; RIGHT?

09:28AM  2     A.   YES.

09:28AM  3     Q.   OKAY.

09:28AM  4     A.   I SAID I SUSPECT THAT OUR HDL ASSAY HAD FAILED.

09:28AM  5     Q.   RIGHT.  AND THAT'S THE TESTIMONY THAT THE GOVERNMENT

09:28AM  6     ELICITED.

09:28AM  7          DO YOU RECALL THAT?  DO YOU RECALL QUESTIONS ABOUT THE

09:28AM  8     FACT THAT THE ASSAY HAD FAILED?

09:28AM  9     A.   YES.

09:28AM  10    Q.   AND THAT YOU ACTUALLY DESCRIBED SOME CIRCUMSTANCES

09:29AM  11    RELATING TO THAT THAT ARE REFERENCED IN THESE PORTIONS OF THE

09:29AM  12    EXHIBITS RELATING TO QC.

09:29AM  13         DO YOU RECALL THAT?

09:29AM  14    A.   YES.

09:29AM  15    Q.   THIS HAD ACTUALLY PASSED QC AND THE GOVERNMENT ASKED IF

09:29AM  16    THIS WAS AN OCCASION WHERE QC COULD PASS BUT THERE WOULD STILL

09:29AM  17    BE A PROBLEM.

09:29AM  18         DO YOU RECALL THAT?

09:29AM  19    A.   YES, YES.

09:29AM  20    Q.   AND YOU SAID YES; RIGHT?

09:29AM  21    A.   YES.

09:29AM  22    Q.   AND THEY ASKED YOU ABOUT TECAN USAGE.

09:29AM  23         DO YOU RECALL THAT?

09:29AM  24    A.   NOT SPECIFICALLY, NO.

09:29AM  25    Q.   AND THEY ASKED YOU ABOUT THE CTN PROBLEM THAT IS

09:29AM  1    IDENTIFIED THERE.

09:29AM  2         DO YOU SEE THAT?

09:29AM  3    A.   YES.

09:29AM  4    Q.   OKAY.  THEY ASKED YOU ABOUT THAT AND THEY ASKED YOU

09:29AM  5    WHETHER THIS -- YOU THOUGHT THIS WAS A BASIS FOR THE PROBLEM;

09:29AM  6    RIGHT?

09:29AM  7    A.   YES.

09:29AM  8    Q.   AND YOU SAID YOU THOUGHT IT WAS; RIGHT?

09:29AM  9    A.   YES.

09:29AM  10   Q.   AS REFLECTED IN THE EMAIL?

09:29AM  11   A.   YES.

09:29AM  12   Q.   AND THEY NOTED, THE GOVERNMENT NOTED THAT THERE WERE NO

09:29AM  13   CTN'S USED ON COMMERCIAL ASSAYS; RIGHT?

09:29AM  14   A.   CORRECT.

09:29AM  15   Q.   OKAY.  AND THEN THEY ASKED YOU ABOUT THE FACT THAT THIS

09:30AM  16   WAS SENT TO MS. HOLMES.

09:30AM  17        DO YOU RECALL THAT?

09:30AM  18        ACTUALLY THEY SWITCHED DOCUMENTS.  AT THIS POINT I THINK

09:30AM  19   THEY SWITCHED TO 1555.  LET'S PULL THAT UP.  AND LET'S FOCUS ON

09:30AM  20   THAT PIECE THERE.

09:30AM  21        DO YOU RECALL THAT THEY NOTED THAT YOU RAISED THIS WITH

09:30AM  22   MS. HOLMES?

09:30AM  23        DO YOU RECALL THAT?

09:30AM  24   A.   YES.

09:30AM  25   Q.   AND THEY ASKED YOU WHY, AND YOU TESTIFIED THAT YOU THOUGHT

09:30AM  1    IT WAS IMPORTANT BECAUSE THAT WOULD BE SURE TO GET THE

09:30AM  2    ATTENTION; RIGHT?

09:30AM  3    A.   YES.

09:30AM  4    Q.   AND THERE WAS A SUGGESTION THAT MAYBE MR. BALWANI AND

09:30AM  5    DR. YOUNG MIGHT BE RELUCTANT WITHOUT MS. HOLMES BEING INVOLVED;

09:30AM  6    RIGHT?

09:30AM  7         DO YOU RECALL THAT?

09:30AM  8    A.   I THOUGHT IT WAS IMPORTANT THAT ELIZABETH WAS AWARE OF

09:30AM  9    THESE ISSUES AS THE CEO OF THE COMPANY.

09:30AM  10   Q.   AND I BELIEVE YOU TESTIFIED SOMETHING TO THE EFFECT OF IT

09:30AM  11   WOULD ENSURE THAT THE APPROPRIATE RESOURCES WOULD BE DEVOTED TO

09:30AM  12   IT; RIGHT?

09:31AM  13        DO YOU RECALL THAT?

09:31AM  14   A.   I DON'T RECALL THAT SPECIFICALLY, NO.

09:31AM  15   Q.   OKAY.  AND SO IF I CAN TAKE THAT DOWN AND PUT THE ELMO UP

09:31AM  16   IF I COULD.

09:31AM  17             THE CLERK:  IS THIS ADMITTED?

09:31AM  18             MR. WADE:  IT'S JUST A DEMONSTRATIVE THAT I NORMALLY

09:31AM  19   WOULD PUT ON A WHITE BOARD, YOUR HONOR, BUT I WANT EVERYONE TO

09:31AM  20   SEE IT.

09:31AM  21        IF WE CAN ZOOM --

09:31AM  22             MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT COUNSEL HAS

09:31AM  23   NOT SEEN THIS DEMONSTRATIVE YET.

09:31AM  24             MR. WADE:  I WOULD PUT IT ON A WHITE BOARD.  I

09:31AM  25   NORMALLY DON'T SHOW MY WHITE BOARD, BUT I'M HAPPY TO GIVE --

09:32AM  1             THE COURT:  IF YOU HAVE A COPY, I'M SURE MR. BOSTIC

09:32AM  2    WOULD WELCOME IT.

09:32AM  3    BY MR. WADE:

09:32AM  4    Q.   SO THIS JUST SUMMARIZED WHAT WE TALKED ABOUT.  THE QC

09:32AM  5    PASSED, BUT THE GOVERNMENT ELICITED TESTIMONY THAT THAT DID NOT

09:32AM  6    PROVIDE PROTECTION IN THIS CIRCUMSTANCE?

09:32AM  7    A.   CORRECT.

09:32AM  8    Q.   AND THIS WAS A THERANOS ASSAY PROBLEM THAT YOU THOUGHT AT

09:32AM  9    THE TIME; RIGHT?

09:32AM  10   A.   YES.

09:32AM  11   Q.   AND THAT THERE WAS A CTN PROBLEM; RIGHT?

09:32AM  12   A.   YES.

09:32AM  13   Q.   AND THAT DIDN'T RELATE TO -- THAT WOULDN'T BE PRESENT IF

09:32AM  14   THERE WAS A COMMERCIAL MACHINE?

09:32AM  15   A.   CORRECT.

09:32AM  16   Q.   AND MAYBE MR. BALWANI AND DR. YOUNG MAY BE RELUCTANT TO

09:32AM  17   ADDRESS THAT, AND SO YOU RAISED IT TO MS. HOLMES; RIGHT?

09:32AM  18   A.   I REMEMBER TESTIFYING THAT I THOUGHT IT WAS IMPORTANT THAT

09:32AM  19   ELIZABETH WAS AWARE OF THESE ISSUES.

09:33AM  20   Q.   OKAY.

09:33AM  21   A.   I DID, I DID FACE PUSHBACK FROM MR. BALWANI AND DR. YOUNG

09:33AM  22   FREQUENTLY ABOUT THESE ISSUES, YEAH.

09:33AM  23   Q.   AND SOMETIMES THEY WERE RELUCTANT; RIGHT?

09:33AM  24   A.   YES.

09:33AM  25   Q.   OKAY.  NOW -- AND THEN AFTER THE GOVERNMENT WENT THROUGH

09:33AM 1     THAT TESTIMONY, THEY MOVED ON TO A DIFFERENT ASSAY.

09:33AM 2         DO YOU RECALL THAT?

09:33AM 3     A.   I DON'T RECALL WHICH ASSAY THEY MOVED ON TO.

09:33AM 4     Q.   OKAY.  NONE OF THESE ISSUES IS TRUE, RIGHT, SIR, WITH

09:33AM 5     RESPECT TO HDL IN FEBRUARY OF 2014?

09:33AM 6         IT WAS NOT AN ISSUE WHERE QC PASSED; RIGHT?  QC FAILED.

09:33AM 7         DO YOU RECALL THAT?

09:33AM 8     A.   NO.  I RECALL THAT QC WAS 10 PERCENT BELOW HOW IT HAD BEEN

09:33AM 9     TRENDING AND THAT WAS WITHIN THE ACCEPTABILITY CRITERIA.

09:33AM 10    Q.   OKAY.  WE'LL GET TO THAT.

09:33AM 11        AND IT WAS NOT THE CASE THAT IT WAS A THERANOS ASSAY

09:33AM 12    PROBLEM, IT WAS ACTUALLY AN ISSUE WITH VARIABILITY BETWEEN TWO

09:33AM 13    COMMERCIAL MACHINES, WAS IT NOT?

09:34AM 14    A.   THERE WAS A SMALL AMOUNT OF VARIABILITY BETWEEN TWO

09:34AM 15    COMMERCIAL MACHINES THAT WAS GREATLY EXACERBATED WHEN THOSE

09:34AM 16    MACHINES WERE MODIFIED FOR THE THERANOS METHOD.

09:34AM 17    Q.   AND IT WAS NOT --

09:34AM 18    A.   AND THAT'S WHAT THE DATA WILL REFLECT.

09:34AM 19    Q.   AND IT WAS NOT A CTN PROBLEM; RIGHT?

09:34AM 20    A.   IT COULD HAVE BEEN.

09:34AM 21    Q.   OKAY.  WELL, WE'LL TALK ABOUT WHAT ACTUALLY HAPPENED,

09:34AM 22    BECAUSE THE GOVERNMENT DIDN'T ACTUALLY GO THROUGH WHAT ACTUALLY

09:34AM 23    HAPPENED AND FOLLOW UP ON THAT, DID THEY?

09:34AM 24    A.   NO, SIR.

09:34AM 25    Q.   THEY DIDN'T SHOW YOU THOSE DOCUMENTS, DID THEY?

09:34AM   1    A.   WHICH DOCUMENTS?

09:34AM   2    Q.   THE DOCUMENTS THAT FOLLOW UP ON THIS.  THEY DIDN'T SHOW

09:34AM   3    YOU A PIECE OF THE DOCUMENTS THAT WOULD ADDRESS THOSE ISSUES.

09:34AM   4    LET'S LOOK AT THEM.

09:34AM   5        LET'S GO TO 1543.  AND IF WE CAN SWITCH.  LET'S GO TO THE

09:35AM   6    SECOND PAGE.

09:35AM   7        DO YOU SEE IN THE MIDDLE THERE YOU RAISE THE ISSUE; RIGHT?

09:35AM   8    DO YOU SEE THAT?

09:35AM   9    A.   YES.

09:35AM  10    Q.   AND YOU'RE DIGGING IN ON THE ISSUE, AND YOU'RE RAISING IT

09:35AM  11    WITH DR. YOUNG AND YOU'RE RAISING IT WITH MR. BALWANI; RIGHT?

09:35AM  12    A.   YES.

09:35AM  13    Q.   AND THIS IS THE SAME EXHIBIT THAT THE GOVERNMENT WAS

09:35AM  14    EXAMINING YOU ABOUT, BUT JUST DIFFERENT PORTIONS OF IT; RIGHT?

09:35AM  15    A.   YES.

09:35AM  16    Q.   AND THEY RAISE THAT ISSUE AT 2:37; CORRECT?

09:35AM  17    A.   YES.

09:35AM  18    Q.   AND LET'S GO TO THE NEXT PAGE SO YOU CAN SEE THE DATE AND

09:35AM  19    TIME OF MR. BALWANI'S RESPONSE.

09:35AM  20        IT WAS TWO MINUTES LATER; RIGHT?

09:35AM  21    A.   I SEE THE ORIGINAL EMAIL AND IT WAS 2:37 P.M.

09:35AM  22        THE NEXT EMAIL FROM MR. BALWANI IS 2:39 P.M.

09:36AM  23    Q.   DO YOU SEE -- SO TWO MINUTES LATER HE RESPONDED?

09:36AM  24    A.   YES.

09:36AM  25    Q.   AND THAT DOESN'T LOOK LIKE RELUCTANCE, DOES IT?

| | | |
|---|---|---|
| 09:36AM | 1 | A.   I'M REFERRING TO RELUCTANCE WHEN I HAD MY DISCUSSIONS, MY |
| 09:36AM | 2 | PERSONAL DISCUSSIONS WITH HIM. |
| 09:36AM | 3 | Q.   LET'S LOOK AT THE SUBSTANCE OF THE EMAIL. |
| 09:36AM | 4 | DO YOU SEE THERE IT SAYS, DANIEL, CAN YOU HAVE NISHIT AND |
| 09:36AM | 5 | TINA LEAD AN INVESTIGATION ON THIS? |
| 09:36AM | 6 | DO YOU SEE THAT? |
| 09:36AM | 7 | A.   YES. |
| 09:36AM | 8 | Q.   AND TWO MINUTES LATER HE SAID THAT; RIGHT? |
| 09:36AM | 9 | A.   YES. |
| 09:36AM | 10 | Q.   AND THEN HE COPIED YOU IN AND SAYS HE'S NOT SURE WHY THIS |
| 09:36AM | 11 | WOULD BE A CTN ISSUE, BUT HE'S HAPPY TO LOOK AT IT; RIGHT? |
| 09:36AM | 12 | A.   YES. |
| 09:36AM | 13 | Q.   OKAY.  AND THE GOVERNMENT DIDN'T YOU ASK ABOUT THAT PIECE |
| 09:36AM | 14 | OF THE DOCUMENT WHEN THEY WERE ASKING YOU ABOUT THAT, DID THEY? |
| 09:37AM | 15 | A.   CORRECT. |
| 09:37AM | 16 | Q.   AND LET'S GO TO THE PORTION OF THE DOCUMENT -- LET'S GO TO |
| 09:37AM | 17 | THE OTHER DOCUMENT THAT THE GOVERNMENT SHOWED YOU, 1555.  OKAY? |
| 09:37AM | 18 | DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?  IT'S IN THE |
| 09:37AM | 19 | WHITE BINDER, 1555. |
| 09:37AM | 20 | A.   OKAY. |
| 09:37AM | 21 | Q.   AND LET'S GO, LET'S GO TO THE END FIRST. |
| 09:37AM | 22 | AND THIS BOTTOM EMAIL IS THE EMAIL IN WHICH YOU RAISE THE |
| 09:37AM | 23 | ISSUE; RIGHT? |
| 09:37AM | 24 | A.   YES. |
| 09:37AM | 25 | Q.   AND THAT'S THE PORTION OF THE DOCUMENT THAT THE GOVERNMENT |

| | | |
|---|---|---|
| 09:37AM | 1 | ASKED YOU ABOUT; RIGHT? |
| 09:37AM | 2 | A.   YES. |
| 09:37AM | 3 | Q.   OKAY.  LET'S GO UP TO THE NEXT EMAIL. |
| 09:38AM | 4 | DO YOU SEE THAT? |
| 09:38AM | 5 | A.   YES. |
| 09:38AM | 6 | Q.   AND IT SAYS, "ADAM, CAN WE COMPLETE A MINI-STUDY TOMORROW |
| 09:38AM | 7 | MORNING?" |
| 09:38AM | 8 | DO YOU SEE THAT? |
| 09:38AM | 9 | A.   YES. |
| 09:38AM | 10 | Q.   AND HE RESPONDED THE SAME DAY, AN HOUR OR SO LATER? |
| 09:38AM | 11 | A.   YES. |
| 09:38AM | 12 | Q.   AND HE WANTS TO ADDRESS IT RIGHT AWAY; RIGHT? |
| 09:38AM | 13 | A.   YES, YES. |
| 09:38AM | 14 | Q.   OKAY.  HE THEN SAYS HE PULLED SOME DATA, DO YOU SEE THAT, |
| 09:38AM | 15 | AND HE'S STARTING TO LOOK AT IT ALREADY? |
| 09:38AM | 16 | A.   YES. |
| 09:38AM | 17 | Q.   AND INCLUDING THE CTN ISSUE? |
| 09:38AM | 18 | A.   WELL, HE COMPARED CTN'S TO STANDARD PROTOCOL USING VENOUS |
| 09:38AM | 19 | SAMPLES. |
| 09:38AM | 20 | Q.   RIGHT.  BUT YOU SAID IT MIGHT BE A CTN ISSUE -- |
| 09:38AM | 21 | A.   IT COULD HAVE BEEN, YES. |
| 09:38AM | 22 | Q.   AND HE'S LOOKING AT DATA RELATING TO WHETHER IT'S A |
| 09:39AM | 23 | CTN ISSUE; RIGHT? |
| 09:39AM | 24 | A.   HE'S LOOKING AT HISTORICAL DATA. |
| 09:39AM | 25 | Q.   ON CTN'S? |

09:39AM  1      A.   YES.

09:39AM  2      Q.   RIGHT AWAY?

09:39AM  3      A.   HISTORICAL DATA, PREVIOUS DATA.

09:39AM  4      Q.   TO ASSESS WHETHER IT SUGGESTED IT WAS A CTN PROBLEM;

09:39AM  5      RIGHT?

09:39AM  6      A.   SO IN THE CTN'S THERE'S DIFFERENT AMOUNTS OF ANTICOAGULANT

09:39AM  7      THAT IS SPRAYED ON TO THE CTN'S THAT COULD IMPACT AN HDL

09:39AM  8      MEASUREMENT.  THAT MANUFACTURING PROCESS WAS NOT STANDARDIZED

09:39AM  9      AT THERANOS.

09:39AM  10          SO JUST BECAUSE IT LOOKS GOOD IN RUN TIME PERIOD, IT

09:39AM  11     DOESN'T GUARANTEE IT'S GOING TO LOOK GOOD IN A SUBSEQUENT TIME

09:39AM  12     PERIOD.

09:39AM  13     Q.   I UNDERSTAND, SIR.  BUT MY POINT IS THAT YOU RAISED THAT

09:39AM  14     IT COULD BE A CTN ISSUE AND THEY WERE LOOKING AT DATA RELATING

09:39AM  15     TO CTN'S; RIGHT?

09:39AM  16     A.   YES.

09:39AM  17     Q.   OKAY.  AND LET'S GO, LET'S GO UP AND GET THE NEXT TWO

09:39AM  18     EMAILS IN THE CHAIN.

09:39AM  19          YOU'RE WORKING TOGETHER AND YOU'RE ATTACKING THE PROBLEM;

09:39AM  20     RIGHT?

09:39AM  21     A.   CORRECT.

09:39AM  22     Q.   OKAY.  AND THE STUDY WAS GOING TO START THE NEXT MORNING;

09:40AM  23     RIGHT?

09:40AM  24     A.   CORRECT.

09:40AM  25     Q.   OKAY.  IN FACT, DR. YOUNG -- YOU RAISED -- THE GOVERNMENT

09:40AM   1    ASKED IF THIS WAS AN INDICATION OF WHERE QC CAN PASS AND THERE

09:40AM   2    IS STILL A PROBLEM; RIGHT?

09:40AM   3    A.   CORRECT.

09:40AM   4    Q.   OKAY.  AND YOU SAID YES.  BUT DR. YOUNG HAD ALREADY PULLED

09:40AM   5    THE QC DATA; RIGHT?

09:40AM   6    A.   SO THE QC SAMPLES DO NOT GO INTO A CTN, JUST TO CLARIFY.

09:40AM   7         SO IF THERE'S A PROBLEM WITH THE CTN, THAT WOULD NEVER BE

09:40AM   8    REFLECTED IN THE QC.

09:40AM   9    Q.   SIR, MY POINT IS THAT THE GOVERNMENT ASKED YOU -- YOU

09:40AM  10    NOTED THE QC PASSED; RIGHT?

09:40AM  11    A.   YES.

09:40AM  12    Q.   AND THAT'S THE DAILY QC; CORRECT?

09:40AM  13    A.   YES.

09:40AM  14    Q.   AND THEY ASKED YOU, IS THIS AN INDICATION WHERE QC CAN

09:40AM  15    PASS AND THERE CAN STILL BE A PROBLEM WITH THE ASSAY, AND YOU

09:40AM  16    SAID YES?

09:40AM  17    A.   THAT'S CORRECT.

09:40AM  18    Q.   DO YOU RECALL THAT?

09:40AM  19    A.   YES.

09:40AM  20    Q.   YEAH.  BUT, IN FACT, DR. YOUNG PULLED THE HISTORICAL

09:41AM  21    LEVEY-JENNINGS DATA AND HE FOUND THAT THE QC HAD ACTUALLY

09:41AM  22    FAILED, BUT THAT YOUR STAFF HAD NOT CAUGHT THAT QC FAILURE;

09:41AM  23    CORRECT?

09:41AM  24    A.   WE HAD DISCUSSED IMPLEMENTING LEVEY-JENNINGS PROCEDURES.

09:41AM  25    IT HAD NOT BEEN FORMALIZED IN AN SOP.

|          |    |                                                                        |
|----------|----|------------------------------------------------------------------------|
| 09:41AM  | 1  | Q.   LET'S GO TO 1541.  THAT'S IN THE GOVERNMENT'S BOOK.                |
| 09:41AM  | 2  |      DO YOU HAVE THAT?                                                  |
| 09:41AM  | 3  |            THE COURT:  HAS THIS BEEN ADMITTED?                          |
| 09:41AM  | 4  |            THE WITNESS:  I DON'T HAVE IT, SIR.                          |
| 09:41AM  | 5  |            MR. WADE:  YOU DON'T HAVE 1541?                              |
| 09:41AM  | 6  |            THE WITNESS:  NO.                                            |
| 09:41AM  | 7  |            MR. WADE:  THE COURT'S INDULGENCE FOR ONE SECOND.            |
| 09:42AM  | 8  | Q.   LOOK IN BLACK EXHIBIT BINDER, VOLUME 1.  IT SHOULD BE              |
| 09:42AM  | 9  | ABOUT THE FOURTH DOCUMENT.                                              |
| 09:42AM  | 10 | A.   I HAVE IT.                                                         |
| 09:42AM  | 11 | Q.   OKAY.  AND THIS IS AN EMAIL BETWEEN YOU, MR. BALWANI,              |
| 09:42AM  | 12 | DR. PANDORI, AND DR. YOUNG ON THE SAME SUBJECT?                         |
| 09:42AM  | 13 | A.   CORRECT.                                                           |
| 09:42AM  | 14 |            MR. WADE:  MOVE TO ADMIT 1541.                               |
| 09:42AM  | 15 |            MR. BOSTIC:  NO OBJECTION.                                    |
| 09:42AM  | 16 |            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.             |
| 09:42AM  | 17 |      (GOVERNMENT'S EXHIBIT 1541 WAS RECEIVED IN EVIDENCE.)              |
| 09:42AM  | 18 | BY MR. WADE:                                                           |
| 09:42AM  | 19 | Q.   AND THE GOVERNMENT DIDN'T ASK YOU QUESTIONS ABOUT THIS ON          |
| 09:42AM  | 20 | YOUR DIRECT TESTIMONY; CORRECT?                                         |
| 09:42AM  | 21 | A.   NO.                                                                |
| 09:42AM  | 22 | Q.   LET'S GO TO THIRD PAGE AND GRAB THE BOTTOM HALF.                   |
| 09:43AM  | 23 | A.   OKAY.                                                              |
| 09:43AM  | 24 | Q.   DO YOU SEE THAT?                                                   |
| 09:43AM  | 25 | A.   YES.                                                               |

09:43AM  1    Q.   AND DO YOU SEE THAT'S AN INDICATION THAT, JUST AS YOU WERE

09:43AM  2    RAISING THIS ISSUE, DR. YOUNG GRABBED THE QC RESULTS TO LOOK AT

09:43AM  3    THE HDL QC RESULTS AND HE SAID THIS SHOULD HAVE RAISED AN ALARM

09:43AM  4    SEVERAL WEEKS AGO; RIGHT?

09:43AM  5    A.   THAT'S DANIEL YOUNG'S ASSERTION.

09:43AM  6    Q.   OKAY.  WELL, DID YOU AGREE WITH THAT ASSERTION OR NOT?

09:43AM  7    A.   NO.  IF THE QC PASSES, THE TEST IS CLEARED FOR PATIENT

09:43AM  8    USE.

09:43AM  9    Q.   IT'S CLEARED FOR PATIENT USE AT THAT POINT, BUT YOU NEED

09:43AM  10   TO GO BACK AND LOOK.

09:43AM  11       DO YOU RECALL THE TESTIMONY THAT YOU NEED TO GO AND LOOK

09:43AM  12   AT THE LEVEY-JENNINGS DATA AND LOOK AT THE WESTGARD RULES AND

09:43AM  13   LOOK AT THE TRENDS OVER TIME AND SEE WHAT THE TRENDS LOOK LIKE

09:43AM  14   OVER TIME?

09:43AM  15   A.   MR. WADE, THERE ARE A NUMBER OF WESTGARD RULES THAT RELY

09:43AM  16   ON STANDARD DEVIATIONS AND A SERIES OF STANDARD DEVIATIONS

09:44AM  17   FALLING ON ONE OR OTHER SIDE OF A MEAN.  IT'S A COMPLICATED SET

09:44AM  18   OF RULES.  WE DISCUSSED THEM MANY TIMES AND THEY WERE NOT

09:44AM  19   IMPLEMENTED IN THE LABORATORY.

09:44AM  20   Q.   LET'S LOOK AT YOUR EMAIL ON THIS, ON THE SECOND PAGE ON

09:44AM  21   THE BOTTOM.  LET'S BLOW THAT UP.

09:44AM  22       THIS IS YOUR EMAIL, RIGHT, SIR?

09:44AM  23   A.   YES.

09:44AM  24   Q.   AND THIS IS IN RESPONSE TO THIS QC DATA; RIGHT?

09:44AM  25   A.   YES.

09:44AM  1    Q.   AND YOU'RE COPIED IN ON THE FACT THAT THE QC'S SHOULD HAVE

09:44AM  2    CAUGHT THIS ISSUE WEEKS AGO; RIGHT?

09:44AM  3    A.   YES.

09:44AM  4    Q.   OKAY.  AND YOU WRITE THAT YOU REVIEWED THE DATA REGULARLY;

09:44AM  5    RIGHT?

09:44AM  6    A.   YES.

09:44AM  7    Q.   AND THAT YOU WERE LOOKING AT LEVEY-JENNINGS QC --

09:45AM  8    A.   YES.

09:45AM  9    Q.   RIGHT?

09:45AM 10    A.   YES.

09:45AM 11    Q.   AND YOU WERE LOOKING AT THOSE COMPLICATED RULES?

09:45AM 12    A.   YES.

09:45AM 13    Q.   BUT ESSENTIALLY THIS WAS MISSED; RIGHT?

09:45AM 14    A.   IT WAS NOT PART OF OUR FORMAL PROCEDURE.

09:45AM 15    Q.   OKAY.  BUT IT SHOULD HAVE BEEN UNDER YOUR POLICY; RIGHT?

09:45AM 16    A.   I DON'T BELIEVE SO.

09:45AM 17    Q.   OKAY.  SO WHEN THE GOVERNMENT SAID THIS IS AN ISSUE WHERE

09:45AM 18    THE QC PASSED, THE QC, AS DR. YOUNG NOTES, APPLYING YOUR POLICY

09:45AM 19    SAID THAT IT SHOULD HAVE RAISED THE ISSUE A LONG TIME AGO, BUT

09:45AM 20    YOU JUST FAILED TO CATCH IT; RIGHT?

09:45AM 21    A.   I'M SORRY.  COULD YOU POINT ME TO THE POLICY REGARDING THE

09:45AM 22    WESTGARD RULES, REFRESH MY MEMORY ON THAT.

09:45AM 23    Q.   WELL, YOU RECALL THAT YOU FOLLOWED WESTGARD RULES; RIGHT?

09:45AM 24    A.   NO.  WE DISCUSSED THEM ON MANY OCCASIONS, BUT THEY WERE

09:45AM 25    NOT IMPLEMENTED IN THE LABORATORY.

09:45AM  1    Q.   YOU NEVER FOLLOWED THE WESTGARD RULES?

09:45AM  2    A.   WE DISCUSSED WITH A NUMBER OF PEOPLE THE APPROPRIATENESS

09:45AM  3    OF APPLYING WESTGARD RULES TO QC DATA.  IT WAS NOT SIGNED OFF

09:45AM  4    AS PART OF A FORMAL POLICY.

09:46AM  5    Q.   WELL, YOU WERE RESPONSIBLE FOR THE POLICY.

09:46AM  6         DID YOU OR DID YOU NOT IMPLEMENT WESTGARD RULES?

09:46AM  7    A.   WE DID NOT.

09:46AM  8    Q.   DO YOU SEE HERE IT SAYS, "LOOKING AT LEVEY-JENNINGS QC FOR

09:46AM  9    JANUARY AND FEBRUARY SO FAR, INDEED WE WOULD HAVE FAILED

09:46AM  10   WESTGARD BASED ON THE 10 1S RULE FOR LEVEL 1 AT LEAST."

09:46AM  11        DO YOU SEE THAT?

09:46AM  12   A.   YES.

09:46AM  13   Q.   AND THEN DO YOU SEE DOWN BELOW IT SAYS, "I HAVE BEEN

09:46AM  14   ASKING THE SUPERVISORS TO COLLECT THE ADVIA QC DATA AND PRESENT

09:46AM  15   IT TO ME MONTHLY SINCE OUR CLIA INSPECTION."

09:46AM  16        DO YOU SEE THAT?

09:46AM  17   A.   YES.

09:46AM  18   Q.   BECAUSE THESE ARE ISSUES THAT COME UP IN THE CLIA

09:46AM  19   INSPECTION; RIGHT?

09:46AM  20   A.   I DON'T RECALL.

09:46AM  21   Q.   AND THAT WAS ONE OF THE ISSUES THAT MS. HOLMES AND

09:46AM  22   MR. BALWANI WERE UNHAPPY THAT THERE WAS AN ISSUE; RIGHT?

09:46AM  23   A.   THEY EXPECTED THERE TO BE NO DEFICIENCIES.

09:46AM  24   Q.   AND I ASSUME IF YOU EXPECTED THERE WAS ONE, YOU WOULD HAVE

09:46AM  25   ADDRESSED IT; RIGHT?

09:47AM   1    A.   CORRECT.

09:47AM   2    Q.   AND IT SAYS, "IT SEEMS THIS IS NOT HAPPENING."

09:47AM   3         DO YOU SEE THAT?

09:47AM   4    A.   YES.

09:47AM   5    Q.   AND THOSE ARE YOUR WORDS; RIGHT, SIR?

09:47AM   6    A.   YES.

09:47AM   7    Q.   AND WHEN IT SAYS THIS IS NOT HAPPENING, IT'S YOUR BELIEF

09:47AM   8    AT THIS TIME THAT THAT SHOULD BE HAPPENING; RIGHT?

09:47AM   9    A.   YES.

09:47AM  10    Q.   AND YOU SAY, "I WILL IMPRESS UPON THEM THE IMPORTANCE OF

09:47AM  11    COLLECTING THIS DATA."

09:47AM  12         RIGHT?

09:47AM  13    A.   YES.

09:47AM  14    Q.   OKAY.  AND SO THE QC POLICY AND THE PRACTICES THAT YOU

09:47AM  15    THOUGHT SHOULD HAVE BEEN HAPPENING WOULD HAVE CAUGHT THIS;

09:47AM  16    RIGHT?

09:47AM  17    A.   AGAIN, I'D LIKE TO REVIEW THE QC POLICY TO SEE WHAT WAS

09:47AM  18    FORMALLY IMPLEMENTED.

09:47AM  19         ANOTHER THING THAT I'LL ADD IS THAT I'M NOT QUITE SURE

09:47AM  20    WHAT MY MEANING HERE IS IN TERMS OF THE MONTHLY QC.  I WAS

09:47AM  21    REVIEWING THAT WITH LANGLY GEE ON A MONTHLY BASIS.

09:47AM  22    Q.   SIR, YOU SAY RIGHT HERE THAT WHAT YOU WERE EXPECTING TO

09:47AM  23    HAPPEN WAS NOT HAPPENING; RIGHT?

09:47AM  24    A.   CORRECT.

09:47AM  25    Q.   AND YOU SAY THAT YOU WERE GOING TO IMPRESS UPON THEM THE

09:47AM  1    IMPORTANCE OF DOING THAT AS A RESULT OF THIS ISSUE; RIGHT?

09:47AM  2    A.   YES.

09:47AM  3    Q.   OKAY.  NOW, SIR, IF YOU GO UP THE CHAIN TO THE NEXT

09:48AM  4    EMAIL -- AND JUST SO WE'RE ALL CLEAR, WHEN THIS ISSUE IS BEING

09:48AM  5    RAISED, THERE ARE NOT TESTS GOING OUT, RIGHT?  YOU PUT A PAUSE

09:48AM  6    ON THE TEST, ON THE RESULTS?

09:48AM  7    A.   I BELIEVE I COMMUNICATED TO MANAGEMENT THAT THE LIPID TEST

09:48AM  8    SHOULD HAVE GONE ONTO A VACUTAINER AT THIS TIME.

09:48AM  9    Q.   RIGHT.  AND YOU HELD THE RESULTS UNTIL YOU FIGURED OUT

09:48AM  10   WHAT WAS GOING ON?

09:48AM  11   A.   YES.

09:48AM  12   Q.   AND THEN EVERYONE, IT LOOKS LIKE ON FRIDAY AND GOING

09:48AM  13   FORWARD, IS WORKING REALLY HARD TO FIGURE OUT WHAT THE ISSUE

09:48AM  14   IS; RIGHT?

09:48AM  15   A.   YES.

09:48AM  16   Q.   OKAY.  INCLUDING DR. YOUNG AND MR. BALWANI?

09:48AM  17   A.   I DON'T KNOW WHAT THEY WERE DOING DURING THIS TIME PERIOD.

09:48AM  18   Q.   TAKE A LOOK AT THE EMAILS UP AND DOWN THIS CHAIN.  THEY'RE

09:48AM  19   ENGAGED ACTIVELY DURING THIS PERIOD, ARE THEY NOT?

09:48AM  20   A.   I CAN'T ANSWER THAT YES OR NO.

09:48AM  21   Q.   CAN YOU LOOK AT THE DATES ON THE EMAIL AND TELL ME WHETHER

09:48AM  22   YOU CAN INFER FROM THAT WHETHER THEY WERE WORKING ACTIVELY AT

09:49AM  23   THIS TIME?

09:49AM  24   A.   I WOULD BE SPECULATING.

09:49AM  25   Q.   OKAY.  IF WE GO UP TO MR. PANDORI'S EMAIL, DO YOU SEE

09:49AM   1    THAT, HE ACTUALLY DISCUSSED THAT HE HAD ASSIGNED THIS QC

09:49AM   2    PROJECT FOR SOMEONE TO IMPLEMENT; RIGHT?

09:49AM   3    A.   YES.

09:49AM   4    Q.   OKAY.  AND SO THE POLICY SHOULD HAVE GOT THIS?

09:49AM   5    A.   AGAIN, I'M NOT SURE OF THE DETAILS OF THE POLICY THAT

09:49AM   6    YOU'RE REFERENCING SO I CAN'T REALLY COMMENT.

09:49AM   7    Q.   OKAY.  LET'S GO UP ONE MORE AND SEE IF WE CAN BRING YOU TO

09:49AM   8    THAT.

09:49AM   9         DR. YOUNG SAYS ON THE BOTTOM, "REGARDING WESTGARD RULES --

09:49AM  10    I THINK THERE IS SOME CONFUSION.  THERE ARE ACTUALLY TWO RULES

09:49AM  11    THAT I THINK OUR QC DATA FAILED."

09:50AM  12         DO YOU SEE THAT?

09:50AM  13    A.   YES.

09:50AM  14    Q.   AND LET'S GO TO THE NEXT PAGE.

09:50AM  15         HE LOOKS AT THAT DATA AND HE LAYS OUT THOSE RULES; RIGHT?

09:50AM  16    A.   YES.

09:50AM  17    Q.   OKAY.  AND THEN AT THE BOTTOM HE SAYS, "I'M LOOKING INTO

09:50AM  18    OTHER POTENTIAL CAUSES FOR THE LOW HDL VALUES."

09:50AM  19    A.   YES.

09:50AM  20    Q.   DO YOU SEE THAT?

09:50AM  21         AND SO THEY'RE LOOKING AT ANY ISSUE; RIGHT?

09:50AM  22    A.   YES.

09:50AM  23    Q.   INCLUDING REAGENTS OR CALIBRATION?

09:50AM  24    A.   YES.

09:50AM  25    Q.   AND EVERYONE WAS TRYING TO ADDRESS THIS; RIGHT?

09:50AM 1    A.   IT APPEARS THAT DANIEL WAS TRYING TO ADDRESS THIS AT THIS

09:50AM 2    TIME.

09:50AM 3    Q.   OKAY.  OKAY.  LET'S GO UP TO THE FIRST PAGE.

09:50AM 4        MR. BALWANI AS WELL, RIGHT, IS SAYING WE SHOULD TRY NEW

09:50AM 5    REAGENTS AND SEE IF THAT IS THE ISSUE BECAUSE IF THAT'S A

09:50AM 6    POSSIBLE CAUSE; CORRECT?

09:50AM 7    A.   YES.

09:50AM 8    Q.   AND LET'S GO TO THE NEXT EMAIL.

09:51AM 9        DO YOU SEE THAT?

09:51AM 10   A.   YES.

09:51AM 11   Q.   THERE'S A SUGGESTION, LET'S LOOK AT EVEN MORE QC DATA TO

09:51AM 12   SEE IF THAT SHEDS ANY LIGHT; RIGHT?

09:51AM 13   A.   RIGHT.  SO WHAT DANIEL IS SAYING IS THAT THE -- MY EMAIL

09:51AM 14   ABOUT THE 1 SD RULING -- FAILING WAS BASED ON DATA FROM OCTOBER

09:51AM 15   TO DECEMBER OF 2013, AND DANIEL WAS LOOKING AT DIFFERENT DATA

09:51AM 16   FROM JANUARY 2ND, 2014 TO FEBRUARY 18TH, 2014.

09:51AM 17   Q.   AND, IN FACT, LET'S GO TO EXHIBIT 1556, WHICH SHOULD BE IN

09:52AM 18   YOUR BLACK BOOK, VOLUME 1.

09:52AM 19   A.   I HAVE IT.

09:52AM 20   Q.   OKAY.  THIS IS ANOTHER EMAIL THAT INVOLVES YOU AND OTHERS

09:52AM 21   RELATING TO THIS ISSUE; CORRECT?

09:52AM 22   A.   YES.

09:52AM 23            MR. WADE:  MOVE THE ADMISSION OF 1556.

09:52AM 24            MR. BOSTIC:  NO OBJECTION.

09:52AM 25            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:52AM 1        (GOVERNMENT'S EXHIBIT 1556 WAS RECEIVED IN EVIDENCE.)

09:52AM 2            MR. WADE:  AND IF WE CAN BLOW UP THE TOP HALF.

09:52AM 3    Q.   THIS EMAIL WITH MR. HAASE --

09:52AM 4    A.   YES.

09:52AM 5    Q.   -- REFLECTS THAT THERE IS EVEN MORE ANALYSIS BEING DONE IN

09:52AM 6    THIS PERIOD; RIGHT?

09:52AM 7    A.   YES.

09:52AM 8    Q.   AND DO YOU RECALL FROM THE EMAIL AT THE TOP THERE WERE

09:53AM 9    ISSUES THAT CAME UP AS TO WHETHER THIS MIGHT BE AN ISSUE WITH

09:53AM 10   RESPECT TO VARIABILITY IN THE ADVIA'S?

09:53AM 11   A.   SUNNY IS RAISING THAT ISSUE.

09:53AM 12   Q.   YEAH.

09:53AM 13   A.   YES.

09:53AM 14   Q.   AND DO YOU RECALL INVESTIGATING THAT ISSUE DURING THIS

09:53AM 15   TIME PERIOD?

09:53AM 16   A.   THERE WAS A STUDY LOOKING AT VENOUS AND FINGERSTICK LIPIDS

09:53AM 17   ON THE TWO DIFFERENT ADVIA'S AND COMPARING THE BIAS USING THE

09:53AM 18   TWO DIFFERENT METHODS.  THERE WAS A LONG DISCUSSION OF THAT.

09:53AM 19       AS I TESTIFIED, THERE WAS A DIFFERENCE BETWEEN THE TWO

09:53AM 20   ADVIA'S USING THE SAME REAGENTS, BUT THAT DIFFERENCE WAS

09:53AM 21   MARKEDLY EXACERBATED WHEN THE LDT WAS IMPLEMENTED.

09:53AM 22   Q.   AND WE'LL GET TO THAT.

09:53AM 23       BUT THE ASSAY DIDN'T FAIL, DID IT?

09:54AM 24   A.   NOT BASED ON QC.  IN MY MIND THE ASSAY WAS FAILING BECAUSE

09:54AM 25   WE HAD A SPATE OF HDL VALUES THAT DIDN'T SEEM BIOLOGICALLY

09:54AM   1    PLAUSIBLE AS WE'VE LOOKED AT BEFORE.

09:54AM   2    Q.   OKAY.  LET'S KEEP GOING.

09:54AM   3         AND THE GOVERNMENT DIDN'T SHOW YOU THIS DOCUMENT; RIGHT?

09:54AM   4    A.   CORRECT.

09:54AM   5    Q.   AND LET'S GO TO 1559.

09:54AM   6    A.   I HAVE IT.

09:54AM   7    Q.   YOU HAVE THAT?

09:54AM   8         AND THAT'S ANOTHER EMAIL ON THE SAME SUBJECT; RIGHT?

09:54AM   9    A.   YES.

09:54AM  10    Q.   AND IT INVOLVES YOU AND OTHERS?

09:54AM  11    A.   YES.

09:54AM  12         MR. WADE:  MOVE THE ADMISSION OF 1559.

09:54AM  13         MR. BOSTIC:  NO OBJECTION.

09:55AM  14         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:55AM  15         (GOVERNMENT'S EXHIBIT 1559 WAS RECEIVED IN EVIDENCE.)

09:55AM  16         MR. WADE:  LET'S START ON THE SECOND PAGE WITH

09:55AM  17    DR. PANDORI'S EMAIL.

09:55AM  18    Q.   AND DO YOU SEE DOWN ON THE BOTTOM IT NOTES, ANYHOW, WE

09:55AM  19    NEED TO DECIDE WHAT TO DO BECAUSE THESE ARE PILING UP.

09:55AM  20         DO YOU SEE THAT?

09:55AM  21    A.   YES.

09:55AM  22    Q.   AND THAT MEANT THE TESTS WERE ON HOLD; RIGHT?

09:55AM  23    A.   YES.

09:55AM  24    Q.   AND THAT WAS APPROPRIATE; RIGHT?

09:55AM  25    A.   YES.

09:55AM 1    Q.   LET'S GO TO 1562, WHICH I THINK IS IN THE GOVERNMENT'S

09:56AM 2    BINDER.

09:56AM 3    A.   I HAVE IT.

09:56AM 4    Q.   AND THIS IS ANOTHER EMAIL WITH YOU AND OTHERS ON THE SAME

09:56AM 5    TOPIC, IS THAT RIGHT, ON HDL?

09:56AM 6    A.   JUST GIVE ME A SECOND.

09:56AM 7         IT APPEARS, YES, YES.

09:56AM 8              MR. WADE:  MOVE THE ADMISSION OF 1562.

09:56AM 9              MR. BOSTIC:  NO OBJECTION.

09:56AM 10             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:56AM 11        (GOVERNMENT'S EXHIBIT 1562 WAS RECEIVED IN EVIDENCE.)

09:56AM 12             MR. WADE:  THANK YOU, YOUR HONOR.

09:56AM 13   Q.   THIS WAS IN THE GOVERNMENT'S BINDER, BUT THEY DIDN'T SHOW

09:56AM 14   YOU THIS ON DIRECT TESTIMONY; RIGHT?

09:56AM 15   A.   NO.

09:56AM 16   Q.   AND LET'S GO TO THE LAST -- THE BOTTOM EMAIL ON PAGE 5.

09:57AM 17   IF WE CAN BLOW UP THE WHOLE BOTTOM HALF, PLEASE.

09:57AM 18        DO YOU SEE THIS IS THE STUDY THAT YOU SUGGESTED, THE

09:57AM 19   CONCLUSIONS FROM THAT STUDY YOU SUGGESTED; RIGHT?

09:57AM 20   A.   THESE ARE DANIEL'S CONCLUSIONS.

09:57AM 21   Q.   RIGHT.  YOU HAD SUGGESTED A STUDY AND YOU WERE WORKING

09:57AM 22   COLLABORATIVELY AS A TEAM TO PERFORM THAT STUDY; CORRECT?

09:57AM 23   A.   WE HAVE TO LOOK AT THE DATA, SIR, TO SORT THROUGH THESE

09:57AM 24   ISSUES.

09:57AM 25   Q.   AND WE'LL LOOK AT SOME OF THAT DATA, SIR.

09:57AM    1                   BUT MY QUESTION TO YOU IS, DO YOU RECALL THAT YOU ASKED

09:57AM    2          FOR INQUIRIES TO BE MADE ON THIS?

09:57AM    3          A.   YES.

09:57AM    4          Q.   AND INQUIRIES WERE MADE ALMOST IMMEDIATELY; RIGHT?

09:57AM    5          A.   YES.

09:57AM    6          Q.   INCLUDING BY DR. YOUNG?

09:57AM    7          A.   YES.

09:57AM    8          Q.   AND OTHERS?

09:57AM    9          A.   YES.

09:57AM   10          Q.   AND MR. BALWANI WAS WEIGHING IN; RIGHT?

09:57AM   11          A.   YES.

09:57AM   12          Q.   OKAY.  AND IN THIS EMAIL HE REPORTS OUT THE RESULTS OF

09:57AM   13          THAT STUDY.

09:57AM   14               DO YOU SEE THAT?

09:57AM   15               OR AT LEAST A STUDY.  DO YOU SEE HE REPORTS THAT OUT?

09:58AM   16          A.   YEAH.  I DO NOT AGREE WITH P-HDL ON FINGERSTICK AND VENOUS

09:58AM   17          ARE VERY COMPARABLE.  THE DATA WILL SHOW THAT THAT'S NOT IN

09:58AM   18          FACT TRUE.

09:58AM   19          Q.   OKAY.  SO HE'S REPORTING HERE BASICALLY THAT THE

09:58AM   20          FINGERSTICK AND VENOUS ARE VERY COMPARABLE.

09:58AM   21               DO YOU SEE THAT?

09:58AM   22          A.   CORRECT, CORRECT.

09:58AM   23          Q.   AND YOU DISAGREE WITH THAT?

09:58AM   24          A.   CORRECT.

09:58AM   25          Q.   AND LET'S LOOK AT WHAT HE'S REPORTING FIRST AND THEN WE'LL

09:58AM  1    GET TO YOU.  OKAY?

09:58AM  2         THE SECOND LINE THERE, HE REPORTS THAT THE FINGERSTICK

09:58AM  3    COMPARES VERY WELL TO PREDICATE ON VENOUS; RIGHT?

09:58AM  4    A.   YES.

09:58AM  5    Q.   AND THAT MEANS THE GOLD STANDARD; RIGHT?

09:58AM  6    A.   YES.

09:58AM  7    Q.   AND SO THE FINGERSTICK COMPARES WELL TO THE GOLD STANDARD?

09:58AM  8    A.   YES, THAT'S WHAT HE'S SAYING.

09:58AM  9    Q.   OKAY.  AND THEN IT SAYS, WE DO NOT SEE A PROBLEM OF

09:58AM  10   ABNORMALLY LOW HDL RESULTS.

09:58AM  11        DO YOU SEE THAT?

09:58AM  12   A.   YES.

09:58AM  13   Q.   OKAY.  LET'S GO TO YOUR RESPONSE.

09:59AM  14        DO YOU SEE THIS STARTS ON THE THIRD PAGE?

09:59AM  15   A.   YES.

09:59AM  16   Q.   AND DO YOU SEE THAT EMAIL IS YOUR RESPONSE TO DR. YOUNG'S

09:59AM  17   CONCLUSIONS; RIGHT?

09:59AM  18   A.   YES.

09:59AM  19   Q.   OKAY.  LET'S GO TO THE SECOND PAGE.

09:59AM  20   A.   SO YOU'LL SEE THAT THE BIAS ON THE HDL FOR FINGERSTICK IS

09:59AM  21   MUCH GREATER THAN THE BIAS FOR HDL USING VENOUS.

09:59AM  22             MR. WADE:  MOVE TO STRIKE.

09:59AM  23             THE WITNESS:  THAT'S THE ISSUE WE'RE DISCUSSING,

09:59AM  24   SIR.

09:59AM  25             THE COURT:  YES, BUT HE'LL ASK THE QUESTION.

09:59AM  1              THE WITNESS:  OKAY.

09:59AM  2              THE COURT:  SO THAT'S STRICKEN.

09:59AM  3         YOU CAN ASK YOUR QUESTION.

09:59AM  4              MR. WADE:  THANK YOU.

09:59AM  5    Q.   LET'S START ON THE SECOND PAGE.

09:59AM  6         DO YOU SEE WHERE IT SAYS METHOD BIAS?

09:59AM  7         I'M SORRY, IT'S THE BOTTOM OF PAGE 4.  IT'S THE SECOND

10:00AM  8    ITEM THERE.

10:00AM  9         DO YOU SEE THAT?  THERE'S A HEADING IN YOUR EMAIL THAT

10:00AM 10    SAYS METHOD BIAS?

10:00AM 11    A.   YES.

10:00AM 12    Q.   OKAY.  AND THAT SAYS, "THE P-PROTOCOL VALUES (FINGERSTICK

10:00AM 13    AND VENOUS), FOR CHOLESTEROL AND HDL MATCH VERY WELL WITH THE

10:00AM 14    PREDICATE VALUES."

10:00AM 15         RIGHT?

10:00AM 16    A.   YES.

10:00AM 17    Q.   THOSE ARE YOUR WORDS, RIGHT, SIR?

10:00AM 18    A.   YES.

10:00AM 19    Q.   OKAY.  AND THEN LET'S LOOK AT NUMBER 1, THE INSTRUMENT

10:00AM 20    BIAS.

10:00AM 21         AND BY THE WAY, WHEN YOU SAY THEY MATCH VERY WELL, THAT

10:00AM 22    MEANS THE FINGERSTICK MATCHES WELL AGAINST THE GOLD STANDARD

10:00AM 23    ASSAY; RIGHT?

10:00AM 24    A.   YES.

10:00AM 25    Q.   OKAY.  LET'S -- AND AGAIN, THOSE ARE YOUR WORDS, RIGHT,

10:00AM   1    SIR?

10:00AM   2    A.   YES.

10:00AM   3    Q.   OKAY.  LET'S GO TO NUMBER 1, INSTRUMENT BIAS.

10:00AM   4         DO YOU SEE THAT?

10:00AM   5    A.   YES.

10:00AM   6    Q.   AND IT SAYS, "IN GENERAL, INSTRUMENT BIAS IS GREATER THAN

10:00AM   7    METHOD BIAS."

10:00AM   8         DO YOU SEE THAT?

10:00AM   9    A.   YES.

10:00AM  10    Q.   AND THAT BIAS IS THE BIAS BETWEEN TWO COMMERCIAL MACHINES,

10:01AM  11    TWO DIFFERENT ADVIA'S; RIGHT?

10:01AM  12    A.   YES.

10:01AM  13    Q.   AND SO THERE'S VARIABILITY BETWEEN TWO COMMERCIAL

10:01AM  14    MACHINES; RIGHT?

10:01AM  15    A.   CORRECT.

10:01AM  16    Q.   AND THAT HAPPENS SOMETIMES; RIGHT?

10:01AM  17    A.   YES.

10:01AM  18    Q.   OKAY.  AND THOSE ARE THE CONCLUSIONS THAT WERE THE RESULT

10:01AM  19    OF THIS STUDY; RIGHT?

10:01AM  20    A.   YES.

10:01AM  21    Q.   OKAY.  AND IF YOU GO TO THE END OF THAT EMAIL, SAME EMAIL,

10:01AM  22    NEXT PAGE.  WE CAN BLOW UP THE LAST PARAGRAPH THERE.

10:01AM  23         DO YOU SEE YOU THANK EVERYONE FOR LOOKING INTO THIS;

10:01AM  24    RIGHT?  DO YOU SEE THAT?

10:01AM  25    A.   YES.

10:01AM  1    Q.   AND YOU ATTACH THE DATA AND THE ANALYSIS AND YOU WELCOME

10:01AM  2    COMMENTS; RIGHT?

10:01AM  3    A.   YES.

10:01AM  4    Q.   OKAY.  AND THAT'S A GOOD TEAM COLLABORATIVE EFFORT; RIGHT?

10:01AM  5    A.   YES.

10:01AM  6    Q.   AND THE GOVERNMENT DIDN'T SHOW YOU THIS, DID THEY?

10:01AM  7    A.   NO.

10:01AM  8    Q.   OKAY.  AND BASED ON THIS STUDY, DR. PANDORI RECOMMENDS

10:02AM  9    THAT YOU RELEASE RESULTS; RIGHT?

10:02AM 10    A.   I'M SORRY, WHERE ARE YOU READING THAT?

10:02AM 11    Q.   LET'S GO TO 1559.

10:02AM 12    A.   THAT'S NOT IN THE GOVERNMENT'S BINDER.

10:02AM 13    Q.   IT WILL BE IN YOUR BLACK BINDER, VOLUME 1.

10:03AM 14    A.   OKAY.

10:03AM 15    Q.   OKAY.  AND DO YOU SEE ON THE FIRST PAGE OF THIS EMAIL THAT

10:03AM 16    DR. PANDORI SUGGESTS THAT THESE BE RESULTED OUT?

10:03AM 17    A.   YES.

10:03AM 18    Q.   AND THIS IS AFTER THAT STUDY?

10:03AM 19    A.   YES.

10:03AM 20    Q.   OKAY.  AND SO IF I CAN GO BACK TO THE ELMO.

10:04AM 21        IN FACT, DR. YOUNG AND MR. BALWANI JUMPED ON THIS PROBLEM;

10:04AM 22    RIGHT?

10:04AM 23    A.   YES.

10:04AM 24    Q.   AND THE QC SHOULD HAVE CAUGHT THE ISSUE IF IT WAS DONE AS

10:04AM 25    YOU HAD DIRECTED; RIGHT?

10:04AM   1    A.   NO.  THE WESTGARD WAS NOT PART OF OUR SOP.

10:04AM   2    Q.   SIR, THAT WAS THE POLICY IN THE EMAIL THAT YOU SAID SHOULD

10:04AM   3    HAVE HAPPENED AND DIDN'T; RIGHT?

10:04AM   4    A.   I NOTED IN THE EMAIL THAT IF WE WERE TO APPLY THAT

10:04AM   5    WESTGARD RULE, IT WOULD HAVE BEEN A FAILURE.

10:04AM   6    Q.   OKAY.  AND THIS WAS NOT A THERANOS ASSAY PROBLEM; RIGHT?

10:04AM   7    THIS WAS AN ASSAY VARIABILITY PROBLEM?

10:04AM   8    A.   NO, SIR, I DISAGREE.

10:04AM   9    Q.   OKAY.

10:04AM  10    A.   IF YOU -- I CAN CLARIFY THAT COMMENT IF NEEDED.

10:04AM  11    Q.   SIR, I'M LOOKING AT YOUR WORDS IN YOUR EMAIL WHERE YOU SAY

10:05AM  12    THAT THE THERANOS ASSAY AND THE GOLD STANDARD COMPARED WELL;

10:05AM  13    CORRECT?

10:05AM  14    A.   RIGHT.  I'M LOOKING AT THE DATA NOW --

10:05AM  15    Q.   THAT'S THE QUESTION THAT I HAVE PENDING TO YOU.

10:05AM  16    A.   YES, THAT WAS MY STATEMENT THEN.

10:05AM  17    Q.   AND DO YOU STAND BY THOSE WORDS?

10:05AM  18    A.   NO.  LOOKING AT THE DATA NOW.

10:05AM  19    Q.   I'M NOT INTERESTING IN YOUR ANALYSIS NOW.  I'M INTERESTED

10:05AM  20    IN WHAT YOU SAID AT THE TIME, SIR.

10:05AM  21    A.   AT THE TIME, YES.

10:05AM  22    Q.   OKAY.  I'D LIKE TO SWITCH TOPICS TO DISCUSS THE ICE'S.

10:06AM  23         DO YOU RECALL TESTIMONY -- ISE'S, I'M SORRY, NOT ICE.

10:06AM  24    A.   YES.

10:06AM  25    Q.   DO YOU RECALL THE TESTIMONY THAT YOU GAVE RELATING TO THAT

10:06AM   1      TOPIC?

10:06AM   2      A.   YES.

10:06AM   3      Q.   AND DO YOU RECALL INITIALLY THAT THE GOVERNMENT SHOWED YOU

10:06AM   4      A DOCUMENT THAT RELATED TO SOME QUESTIONS THAT CAME UP IN LATE

10:06AM   5      AUGUST OF 2013 RELATING TO ISE'S?

10:06AM   6      A.   I DON'T RECALL THE DATE, BUT THEY WERE ASKING ME ABOUT

10:06AM   7      ISE'S, YES.

10:06AM   8      Q.   YEAH.  AND IT WAS LATE AUGUST THEN AND THE IDEA WAS THAT

10:06AM   9      IT WAS RIGHT ON THE EVE OF THE LAUNCH.

10:06AM  10          DO YOU RECALL THAT?

10:06AM  11      A.   YES.

10:06AM  12      Q.   WHICH WE'VE ESTABLISHED WAS THE SOFT LAUNCH; RIGHT?

10:06AM  13      A.   IT WAS PATIENT TESTING.

10:06AM  14      Q.   IT WAS THE SOFT LAUNCH FOR FRIENDS AND FAMILY; RIGHT?

10:06AM  15      A.   THOSE ARE PATIENTS.

10:07AM  16      Q.   I UNDERSTAND.  BUT THAT'S NOT MY QUESTION.  MY QUESTION

10:07AM  17      WAS, THAT WAS THE SOFT LAUNCH.

10:07AM  18          DO YOU RECALL THAT?

10:07AM  19      A.   CORRECT.

10:07AM  20      Q.   AND DO YOU RECALL THAT SPREADSHEET OF ALL OF THE TESTS

10:07AM  21      THAT WE LOOKED AT?

10:07AM  22      A.   YES.

10:07AM  23      Q.   AND THERE WERE SOME DAYS THAT THERE WERE NO TESTS.

10:07AM  24          DO YOU RECALL THAT?

10:07AM  25      A.   I DON'T RECALL.

10:07AM  1   Q.   OKAY.  DO YOU RECALL THE TESTIMONY ABOUT THE PUBLIC

10:07AM  2   LAUNCH?

10:07AM  3   A.   YES.

10:07AM  4   Q.   AND THAT WAS TWO MONTHS LATER; RIGHT?

10:07AM  5   A.   YES.

10:07AM  6   Q.   OKAY.  AND IF THERE ARE QUESTIONS THAT ARE RAISED IN

10:07AM  7   AUGUST AND THEN YOU SIGN A VALIDATION REPORT AT A LATER DATE,

10:07AM  8   IS IT A FAIR CONCLUSION THAT WHATEVER THAT ISSUE WAS OR

10:07AM  9   QUESTION WAS, YOU WOULD HAVE ADDRESSED IT BEFORE YOU SIGNED THE

10:07AM  10  VALIDATION REPORT; RIGHT?

10:07AM  11  A.   I SIGNED THE VALIDATION REPORT ON THE BASIS OF THE DATA

10:07AM  12  THAT IS IN THE VALIDATION.

10:07AM  13  Q.   RIGHT.  WITHOUT ANY CONCERNS AT THAT POINT AS TO WHETHER

10:07AM  14  IT'S APPROPRIATE FOR PATIENT USE?

10:08AM  15  A.   NO.  OF COURSE I'M CONCERNED ABOUT APPROPRIATENESS FOR

10:08AM  16  PATIENT USE.

10:08AM  17  Q.   MY POINT IS, AT THE POINT -- I BELIEVE YOU TESTIFIED ABOUT

10:08AM  18  THIS MANY TIMES WITH RESPECT TO MANY DOCUMENTS.  AT THE POINT

10:08AM  19  THAT YOU'RE PUTTING YOUR SIGNATURE ON THAT DOCUMENT, YOU

10:08AM  20  BELIEVED THAT THAT ASSAY IS APPROPRIATE FOR PATIENT USE?

10:08AM  21  A.   YES.

10:08AM  22  Q.   OKAY.  AND LET'S JUST LOOK AT -- LET'S BRING UP, IT'S IN

10:08AM  23  EVIDENCE, 9099.

10:08AM  24       DO YOU SEE THAT?

10:08AM  25  A.   YES.

10:08AM   1    Q.   AND THIS IS A VALIDATION REPORT RELATING TO ONE OF THE ISE

10:08AM   2    ASSAYS.

10:08AM   3         DO YOU SEE THAT?

10:08AM   4    A.   YES.

10:08AM   5    Q.   AND THIS IS ACTUALLY THE FIRST REVISION.

10:08AM   6         DO YOU SEE THAT?

10:08AM   7    A.   YES.

10:08AM   8    Q.   AND IT SAYS THE DATE, THE INITIAL DATE WAS 9-26-2013;

10:09AM   9    RIGHT?

10:09AM  10    A.   YES.

10:09AM  11    Q.   AND THEN YOU SIGNED THIS UPDATED DOCUMENT IN MARCH OF

10:09AM  12    2014; CORRECT?

10:09AM  13    A.   YES.

10:09AM  14    Q.   OKAY.  AND LET'S GO TO 9352, WHICH IS IN EVIDENCE.

10:09AM  15         THIS IS FOR THE SODIUM ASSAY; CORRECT?

10:09AM  16    A.   YES.

10:09AM  17    Q.   OKAY.  AND SAME THING, IT WAS INITIALLY EFFECTIVE

10:09AM  18    SEPTEMBER 26TH, 2013; RIGHT?

10:09AM  19    A.   YES.

10:09AM  20    Q.   AND THAT'S AFTER AUGUST OF 2013; CORRECT?

10:09AM  21    A.   YES, SIR, SEPTEMBER IS AFTER AUGUST.

10:09AM  22    Q.   THANK YOU, DOCTOR.

10:09AM  23         AND YOU SIGNED IT AGAIN ON MARCH 24TH, 2014; RIGHT?

10:09AM  24    A.   YES.

10:09AM  25    Q.   THAT'S AN UPDATED VERSION?

10:10AM  1    A.   CORRECT.

10:10AM  2    Q.   OKAY.  AND LET'S GO TO ONE MORE.  THIS IS ONE OF THE ISE

10:10AM  3    ASSAYS; CORRECT?

10:10AM  4    A.   YES.

10:10AM  5    Q.   AND LET'S GO TO 9315.

10:10AM  6         THIS IS FOR THE POTASSIUM ASSAY; CORRECT?

10:10AM  7    A.   YES.

10:10AM  8    Q.   AND THAT'S ONE OF THE ICE ASSAYS?

10:10AM  9    A.   YES.

10:10AM 10    Q.   SAME THING HERE, 9-26-2013?

10:10AM 11    A.   YES.

10:10AM 12    Q.   AND YOU SIGNED IT AGAIN IN MARCH OF 2014; CORRECT?

10:10AM 13    A.   YES.

10:10AM 14    Q.   AND YOU -- THERE WAS SOME ONGOING WORK THAT WAS DONE ON

10:10AM 15    THE ISE ASSAYS; CORRECT?

10:10AM 16    A.   YES, THERE WERE TERRIBLE PROBLEMS WITH THE ISE'S AND

10:10AM 17    CONTINUOUS WORK TO TRY TO TROUBLESHOOT.

10:10AM 18    Q.   YOU NEVER PULLED THE ASSAYS, CORRECT, SIR?

10:10AM 19    A.   NO.  WELL, I ORDERED POTASSIUM THAT WAS ABOVE THE -- THE

10:11AM 20    POTASSIUM RESULTS THAT WERE OUT OF RANGE WERE NOT REPORTED, AND

10:11AM 21    SO THE RESULTS THAT WERE OUT OF RANGE WERE NOT REPORTED.

10:11AM 22    Q.   RIGHT.  BUT I WANT TO MAKE SURE WE HAVE YOUR TESTIMONY

10:11AM 23    CLEAR, BECAUSE IT'S YOUR JOB TO DETERMINE WHETHER AN ASSAY IS

10:11AM 24    SAFE FOR PATIENT USE; RIGHT?

10:11AM 25    A.   YES.

| | | |
|---|---|---|
| 10:11AM | 1 | Q. AND YOU NEVER REMOVED THESE ASSAYS FROM THE LABORATORY; |
| 10:11AM | 2 | CORRECT? |
| 10:11AM | 3 | A. CORRECT. |
| 10:11AM | 4 | Q. AND THERE WAS ONGOING -- MY INITIAL QUESTION WAS THERE WAS |
| 10:11AM | 5 | ONGOING RESEARCH AND DISCUSSIONS THAT WAS HAPPENING WITH |
| 10:11AM | 6 | RESPECT TO THESE ASSAYS; CORRECT? |
| 10:11AM | 7 | A. YES. |
| 10:11AM | 8 | Q. AND YOU TESTIFIED ABOUT SOME DISAGREEMENTS THAT YOU HAD |
| 10:11AM | 9 | ACTUALLY WITH DR. YOUNG ABOUT THESE ASSAYS; CORRECT? |
| 10:11AM | 10 | A. I DON'T RECALL. |
| 10:11AM | 11 | Q. OKAY. LET'S LOOK AT 12607 WHICH SHOULD BE -- DO YOU SEE |
| 10:12AM | 12 | THAT IN YOUR SECOND BINDER? |
| 10:12AM | 13 | A. YES. |
| 10:12AM | 14 | Q. AND THIS IS SOME WORK THAT WAS DONE IN CONNECTION WITH -- |
| 10:12AM | 15 | A. YES. |
| 10:12AM | 16 | Q. -- THOSE ASSAYS? |
| 10:13AM | 17 | LET'S TAKE A LOOK AT THAT. |
| 10:13AM | 18 | I'M SORRY. I MOVE TO ADMIT EXHIBIT 12607. |
| 10:13AM | 19 | MR. BOSTIC: OBJECTION. HEARSAY. |
| 10:13AM | 20 | (PAUSE IN PROCEEDINGS.) |
| 10:13AM | 21 | THE COURT: THE ENTIRETY OF THE DOCUMENT YOU'RE |
| 10:13AM | 22 | ASKING? |
| 10:13AM | 23 | MR. WADE: I WAS ASKING, YOUR HONOR. I CAN ADMIT |
| 10:14AM | 24 | FOR PRESENT PURPOSES EVERYTHING FROM THE MIDDLE OF THE FIRST |
| 10:14AM | 25 | PAGE BELOW FOR A LIMITED PURPOSE IF THAT'S EASIER. |

Case 5:21-cr-00258-EJD Document 1297, Filed 01/18/22, Page 82 of 232

10:14AM  1          THE COURT:  STRIKING THE TOP?

10:14AM  2          MR. WADE:  YEAH, AND I WOULD NOT PUBLISH THAT.  I

10:14AM  3   MAY REFRESH THE WITNESS'S RECOLLECTION WITH THOSE PORTIONS OF

10:14AM  4   THE DOCUMENT.

10:14AM  5          THE COURT:  I'LL SUSTAIN THE OBJECTION FOR NOW.  WHY

10:14AM  6   DON'T YOU ASK YOUR QUESTIONS?

10:14AM  7          MR. WADE:  OKAY.

10:14AM  8   Q.   DO YOU RECALL BEING CALLED BY MS. HOLMES FROM HER OFFICE

10:14AM  9   IN APRIL OF 2014 TO ENGAGE IN A DISCUSSION WITH HER AND

10:14AM 10   DR. YOUNG ABOUT THE POTASSIUM ASSAYS?

10:14AM 11   A.   NO.

10:14AM 12   Q.   TAKE A LOOK AT THE BOTTOM OF THE FIRST PAGE OF 12607.

10:14AM 13   A.   OKAY.

10:14AM 14   Q.   AND THEN ON TO THE SECOND PAGE.

10:15AM 15   A.   GOT IT.

10:15AM 16   Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT YOU WERE CALLED

10:15AM 17   BY MS. HOLMES TO HAVE A DISCUSSION WITH HER AND MR. YOUNG --

10:15AM 18   DR. YOUNG WITH RESPECT TO THE POTASSIUM ASSAYS?

10:15AM 19   A.   I DON'T HAVE AN INDEPENDENT RECOLLECTION OF THAT OTHER

10:15AM 20   THAN READING IT TODAY HERE IN THE DOCUMENTS.

10:15AM 21   Q.   OKAY.  DO YOU RECALL THAT -- A DISCUSSION THAT YOU ENGAGED

10:15AM 22   IN WITH DR. YOUNG AND MS. HOLMES ABOUT THE POTASSIUM ASSAY AND

10:15AM 23   YOU FELT AS THOUGH MS. HOLMES WAS SIDING WITH DR. YOUNG?

10:15AM 24   A.   I DO NOT RECALL.

10:15AM 25   Q.   OKAY.  DO YOU RECALL WRITING AN EMAIL TO MS. HOLMES IN

10:16AM  1    APRIL OF 2014 DISCUSSING YOUR VIEWS WITH RESPECT TO THESE

10:16AM  2    MATTERS?

10:16AM  3    A.   YES, I'M READING THAT NOW.  I DON'T INDEPENDENTLY RECALL.

10:16AM  4    THAT WAS SEVEN YEARS AGO.  I'M SORRY.

10:16AM  5              MR. WADE:  I MOVE TO ADMIT EVERYTHING BELOW THAT,

10:16AM  6    YOUR HONOR, FOR LIMITED PURPOSE OF MY CLIENT'S STATE OF MIND.

10:16AM  7              THE COURT:  EVERYTHING BELOW?  EVERYTHING BELOW

10:16AM  8    WHAT?

10:16AM  9              MR. WADE:  EVERYTHING FROM THE MARCH 18TH, 2014

10:16AM  10   EMAIL BELOW.

10:16AM  11             MR. BOSTIC:  DO YOU MEAN APRIL, COUNSEL?

10:16AM  12             MR. WADE:  I'M SORRY, APRIL.  THANK YOU.

10:16AM  13             MR. BOSTIC:  WHICH EMAIL?

10:16AM  14             MR. WADE:  THE 10:39 A.M. AND THEN BELOW.

10:16AM  15             MR. BOSTIC:  YOUR HONOR, NO OBJECTION TO THAT.

10:17AM  16        (PAUSE IN PROCEEDINGS.)

10:17AM  17             THE COURT:  ALL RIGHT.  THAT PORTION WILL BE

10:17AM  18   ADMITTED, AND IT MAY BE PUBLISHED.

10:17AM  19        CAN YOU REDACT THE OTHER PORTIONS?

10:17AM  20        (DEFENDANT'S EXHIBIT 12607 WAS RECEIVED IN EVIDENCE.)

10:17AM  21             MR. WADE:  WE'LL REDACT EVERYTHING ABOVE.

10:17AM  22        LET'S GO TO THE SECOND PAGE.

10:17AM  23   Q.   THIS IS 12607.

10:17AM  24   A.   I SEE IT.

10:17AM  25   Q.   AND DO YOU SEE THE EMAIL THERE WHERE YOU'RE SAYING THAT

10:17AM  1    YOU'LL CALL MS. HOLMES AND TOUCH BASE TOMORROW MORNING?

10:17AM  2    A.   YES.

10:17AM  3    Q.   DO YOU SEE THAT?

10:17AM  4    A.   YES.

10:17AM  5    Q.   AND SHE ASKED YOU TO DROP IN IF YOU'RE AROUND?

10:17AM  6    A.   YES.

10:17AM  7    Q.   BUT IT WAS KIND OF LATE; RIGHT?

10:17AM  8    A.   YES.

10:18AM  9    Q.   LET'S GO UP TO THE NEXT PAGE.

10:18AM  10       DO YOU SEE SHE ASKS YOU TO CALL IN, AND IT SAYS, WE'RE ON

10:18AM  11   THE LINE WITH DANIEL?

10:18AM  12   A.   YES.

10:18AM  13   Q.   DO YOU SEE THAT?

10:18AM  14   A.   YES.

10:18AM  15   Q.   AND, AND DO YOU SEE UP ABOVE THERE'S AN EMAIL WHERE YOU'RE

10:18AM  16   WEIGHING IN ON THE POTASSIUM ASSAY?

10:18AM  17       DO YOU SEE THAT?

10:18AM  18   A.   YES.

10:18AM  19   Q.   AND DOES THAT REFRESH YOUR RECOLLECTION THAT YOU AND

10:18AM  20   DR. YOUNG WERE WEIGHING IN WITH MS. HOLMES ABOUT THE POTASSIUM

10:18AM  21   ASSAY IN THIS PERIOD?

10:18AM  22   A.   I DON'T HAVE AN INDEPENDENT RECOLLECTION OF IT.

10:18AM  23   Q.   DO YOU RECALL HAVING DISAGREEMENTS WITH MR. YOUNG ABOUT

10:18AM  24   THESE MATTERS?

10:18AM  25   A.   I RECALL ME REPEATEDLY RAISING PROBLEMS WITH POTASSIUM,

10:19AM  1   DR. YOUNG BEING ASKED TO FIX THOSE PROBLEMS, HIM ASSERTING THE

10:19AM  2   PROBLEMS HAD BEEN FIXED, BUT THEN THE PROBLEMS RECURRING.

10:19AM  3   Q.   RIGHT.  AND THERE WERE TIMES WHERE YOU FOUND SOLUTIONS TO

10:19AM  4   THE PROBLEMS AS WELL; RIGHT?

10:19AM  5   A.   I WASN'T REALLY IN THE R&D SIDE INVOLVED IN THE PARTICULAR

10:19AM  6   ASPECTS OF THE ASSAY.  SO I WAS IN A POSITION TO POINT OUT

10:19AM  7   PROBLEMS WITH THE ASSAY AND SUGGEST ROOT CAUSES, RIGHT, BUT I

10:19AM  8   WAS FAIRLY LIMITED IN TERMS OF TROUBLESHOOTING.  THAT REALLY

10:19AM  9   WASN'T MY AREA OF EXPERTISE.

10:19AM  10  Q.   THAT'S PART OF THE REASON WHY DR. YOUNG WAS ON A LOT OF

10:19AM  11  THESE EMAILS; RIGHT?

10:19AM  12  A.   CORRECT.

10:19AM  13  Q.   THAT'S BECAUSE HE WAS MORE INVOLVED IN SOME OF THE

10:19AM  14  RESEARCH AND DEVELOPMENT ON THE ASSAYS?

10:19AM  15  A.   MORE OF THE TECHNICAL HARDWARE ASPECTS, YES.

10:19AM  16  Q.   AND HE COULD DRAW UPON OTHER RESOURCES TO HELP PROVIDE

10:19AM  17  INSIGHTS; RIGHT?

10:19AM  18  A.   YES, YES.

10:19AM  19  Q.   AND WHEN YOU WOULD RAISE ISSUES OR CONCERNS, HE WAS GOING

10:19AM  20  TO WORK TO TRY TO FIGURE OUT A SOLUTION; RIGHT?

10:19AM  21  A.   YES.

10:19AM  22  Q.   AND MANY TIMES HE CAME UP WITH WHAT APPEARED TO BE

10:20AM  23  SOLUTIONS; RIGHT?

10:20AM  24  A.   CORRECT.

10:20AM  25  Q.   AND THAT DIDN'T ALWAYS TAKE HOLD; CORRECT?

10:20AM 1    A.   CORRECT.

10:20AM 2    Q.   OKAY.  AND LET'S LOOK -- BUT I THINK THERE ARE SOMETIMES

10:20AM 3    WHEN YOU CAME UP WITH SOLUTIONS.

10:20AM 4         DO YOU RECALL THAT -- YOU PROPOSING THAT YOU RUN THE

10:20AM 5    THERANOS ASSAYS NEAT?

10:20AM 6    A.   YES.  DANIEL DIDN'T FEEL THAT WAS A GOOD SOLUTION.  I

10:20AM 7    BELIEVE HE SAID NOT A GOOD SOLUTION CLEARLY.

10:20AM 8    Q.   OKAY.  LET'S LOOK AT -- LET'S LOOK AT 1717, WHICH IS IN

10:20AM 9    EVIDENCE, I BELIEVE.

10:20AM 10        I THINK THIS IS THE DOCUMENT THAT YOU WERE TALKING ABOUT;

10:20AM 11   RIGHT?

10:20AM 12   A.   YES.

10:21AM 13   Q.   AND ON YOUR DIRECT TESTIMONY, YOU WERE ASKED ABOUT

10:21AM 14   DR. YOUNG'S RESPONSE TO YOUR SUGGESTION ON RUNNING THESE NEAT.

10:21AM 15        DO YOU RECALL THAT?

10:21AM 16   A.   NO.

10:21AM 17   Q.   I BELIEVE YOU JUST TESTIFIED A MINUTE AGO THAT DR. YOUNG

10:21AM 18   DIDN'T LIKE THAT SOLUTION?

10:21AM 19   A.   WELL, HE SAID -- IN THE EMAIL, HE SAID, NOT A VERY GOOD

10:21AM 20   ONE CLEARLY.  HE DIDN'T LIKE THE SOLUTION.

10:21AM 21   Q.   HE DIDN'T LIKE THE SOLUTION?

10:21AM 22   A.   NO.

10:21AM 23   Q.   BUT YOU ACTUALLY ADOPTED THE SOLUTION; RIGHT?

10:21AM 24   A.   I DO NOT RECALL.

10:21AM 25   Q.   WELL, LET'S LOOK.

10:21AM  1    A.   I MEAN THE -- ANYWAY.

10:21AM  2    Q.   LET'S TAKE A LOOK AT EXHIBIT 13891, WHICH SHOULD BE IN

10:22AM  3    YOUR BLACK BINDER.

10:22AM  4         PROBABLY SECOND VOLUME, DOCTOR.

10:22AM  5    A.   I'M SORRY, I DON'T SEE IT.

10:22AM  6    Q.   13891.

10:22AM  7    A.   CORRECT.

10:22AM  8         OH, I HAVE IT NOW.

10:22AM  9    Q.   DO YOU HAVE THAT IN FRONT OF YOU?

10:22AM 10    A.   YES.

10:22AM 11    Q.   AND 13891 ARE MINUTES FROM YOUR LAB DIRECTOR MEETING

10:22AM 12    MAY 20TH, 2014.

10:23AM 13         DO YOU SEE THAT?

10:23AM 14    A.   I'M SORRY.  COULD SOMEBODY COME AND HELP ME WITH THE

10:23AM 15    BINDER.  IT'S JUST BECOME -- IT'S JUST OPENED UP AND PAGES

10:23AM 16    HAVE --

10:23AM 17              MR. WADE:  SURE.  WITH THE COURT'S INDULGENCE FOR A

10:23AM 18    MOMENT?

10:23AM 19              THE WITNESS:  CAN WE TAKE A SMALL RECESS FOR THAT?

10:23AM 20              THE COURT:  WELL, WHY DON'T YOU SEE IF YOU CAN SOLVE

10:23AM 21    THE PROBLEM, MR. WADE.

10:23AM 22    BY MR. WADE:

10:23AM 23    Q.   IF YOU COULD TAKE OUT 13891, IF IT'S OPEN, AND THEN I'LL

10:23AM 24    HAVE YOU HOLD ON TO THAT DOCUMENT AND I'LL BRING THE BINDER

10:23AM 25    BACK AND WE'LL WORK ON IT WHILE WE'RE TALKING ABOUT 13891.

| | | |
|---|---|---|
| 10:23AM | 1 | I'LL TELL YOU WHAT?  WHY DON'T YOU GIVE IT TO ME, I'LL |
| 10:23AM | 2 | TAKE IT OUT AND HAND IT BACK UP. |
| 10:24AM | 3 | MAY I APPROACH, YOUR HONOR? |
| 10:24AM | 4 | THE COURT:  YES. |
| 10:24AM | 5 | MR. WADE:  (HANDING.) |
| 10:24AM | 6 | THE WITNESS:  THANK YOU. |
| 10:24AM | 7 | BY MR. WADE: |
| 10:24AM | 8 | Q.  DO YOU HAVE 13891 IN FRONT OF YOU, DOCTOR? |
| 10:24AM | 9 | A.  THE -- YES. |
| 10:24AM | 10 | Q.  AND THESE ARE THE LABORATORY DIRECTOR MEETING MINUTES FOR |
| 10:24AM | 11 | MAY 20TH, 2014? |
| 10:24AM | 12 | A.  YES. |
| 10:24AM | 13 | MR. WADE:  MOVE THE ADMISSION OF 13891. |
| 10:24AM | 14 | MR. BOSTIC:  NO OBJECTION. |
| 10:24AM | 15 | THE COURT:  IT MAY BE PUBLISHED.  IT'S ADMITTED. |
| 10:24AM | 16 | (DEFENDANT'S EXHIBIT 13891 WAS RECEIVED IN EVIDENCE.) |
| 10:24AM | 17 | MR. WADE:  AND IF WE CAN GO TO THE SECOND PAGE. |
| 10:25AM | 18 | Q.  DO YOU SEE ITEM 7? |
| 10:25AM | 19 | A.  YES. |
| 10:25AM | 20 | Q.  AND THAT'S THE ISE'S. |
| 10:25AM | 21 | DO YOU SEE THAT? |
| 10:25AM | 22 | A.  YES. |
| 10:25AM | 23 | Q.  AND IT SAYS, "WITH NEAT TESTING, SODIUM AND CHLORIDE HAS |
| 10:25AM | 24 | SETTLED DOWN." |
| 10:25AM | 25 | DO YOU SEE THAT? |

| | | |
|---|---|---|
| 10:25AM | 1 | A.   YES. |
| 10:25AM | 2 | Q.   AND IT SOUNDS LIKE YOUR SUGGESTION WAS FOLLOWED, RIGHT, |
| 10:25AM | 3 | DOCTOR? |
| 10:25AM | 4 | A.   IT LOOKS THAT WAY, YES. |
| 10:25AM | 5 | Q.   AND EVEN THOUGH IT MIGHT NOT HAVE BEEN A PERMANENT |
| 10:25AM | 6 | SOLUTION, IT WAS A SOLUTION THAT WAS FOLLOWED ON A TEMPORARY |
| 10:25AM | 7 | BASIS? |
| 10:25AM | 8 | A.   YEAH, THE COMPANY DIDN'T REALLY LIKE THAT SOLUTION. |
| 10:25AM | 9 | Q.   AND THEY KEPT WORKING ON OTHER SOLUTIONS; RIGHT? |
| 10:25AM | 10 | A.   I GUESS SO. |
| 10:25AM | 11 | Q.   WELL, LET'S LOOK AT -- |
| 10:25AM | 12 | MAY I APPROACH AGAIN, YOUR HONOR? |
| 10:26AM | 13 | (HANDING.) |
| 10:26AM | 14 | DR. ROSENDORFF, TURN IN YOUR BIND TO 13893. |
| 10:26AM | 15 | DO YOU SEE THAT? |
| 10:26AM | 16 | A.   YES. |
| 10:26AM | 17 | Q.   AND THIS IS AN EMAIL RELATING TO A SOLUTION THAT DR. YOUNG |
| 10:26AM | 18 | HAD IN CONNECTION WITH THE ISE -- |
| 10:26AM | 19 | A.   YES. |
| 10:26AM | 20 | Q.   -- ISSUE? |
| 10:26AM | 21 | A.   YES. |
| 10:26AM | 22 | Q.   AND THIS IS THE ITEM THAT WE'VE JUST BEEN TALKING ABOUT; |
| 10:27AM | 23 | RIGHT? |
| 10:27AM | 24 | A.   YES. |
| 10:27AM | 25 | MR. WADE:  MOVE THE ADMISSION OF 13893. |

10:27AM  1              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:27AM  2              (DEFENDANT'S EXHIBIT 13893 WAS RECEIVED IN EVIDENCE.)

10:27AM  3     BY MR. WADE:

10:27AM  4     Q.   LET'S GO TO THE SECOND PAGE.

10:27AM  5              DO YOU SEE THERE IT SAYS -- DR. YOUNG SAYS YOU'RE NOT ON

10:27AM  6     THIS EMAIL, BUT IT'S FORWARDED TO YOU LATER.

10:27AM  7              DO YOU SEE THAT?

10:27AM  8     A.   I SEE THAT I'M NOT ON IT.  I DON'T SEE WHERE IT WAS

10:27AM  9     FORWARDED TO ME LATER.

10:27AM  10    Q.   WELL, YOU SEE YOU'RE ON THE CHAIN LATER UP THE CHAIN.

10:27AM  11             DO YOU SEE THAT?

10:27AM  12    A.   OH, OKAY.

10:27AM  13    Q.   YEAH.

10:27AM  14    A.   YES.

10:27AM  15    Q.   OKAY.  LET'S -- DR. YOUNG SAYS IN THIS EMAIL TO MS. HOLMES

10:27AM  16    AND MR. BALWANI, "I WANTED TO UPDATE YOU ON THE ISE STUDIES IN

10:27AM  17    PREPARATION FOR SWITCHING BACK TO THE DILUTED ISE PROTOCOLS ON

10:27AM  18    TUESDAY."

10:27AM  19             DO YOU SEE THAT?

10:27AM  20    A.   YES.

10:27AM  21    Q.   AND SUGGESTING THAT BEFORE THEY WERE BEING RUN NEAT;

10:27AM  22    CORRECT?

10:27AM  23    A.   YES.

10:27AM  24    Q.   AND THEN HE SAYS, "WITH OUR NEW APPROACH, WE HAVE NOW

10:28AM  25    SHOWN THAT WE CAN PROCESS AND RUN ISE'S WITH DILUTED VENOUS

10:28AM  1    SAMPLES WITH GREAT ACCURACY AND PRECISION."

10:28AM  2         DO YOU SEE THAT?

10:28AM  3    A.   YES.

10:28AM  4    Q.   AND DO YOU SEE HE NOTES THAT OVER 10 DAYS, 48 SUBJECTS

10:28AM  5    WERE RUN ON THAT PROJECT THAT HE WAS WORKING ON?

10:28AM  6    A.   YES.

10:28AM  7    Q.   OKAY.  AND HE SAYS NEVERTHELESS -- IF WE GO DOWN TO THE

10:28AM  8    NEXT PARAGRAPH --

10:28AM  9    A.   SO IN PRACTICE VENOUS BLOOD WAS NEVER DILUTED ON THE

10:28AM 10    THERANOS METHODS.

10:28AM 11              MR. WADE:  MOVE TO STRIKE, YOUR HONOR.

10:28AM 12              THE COURT:  OVERRULED.  OVERRULED.  YOU CAN ASK

10:28AM 13    ANOTHER QUESTION.

10:28AM 14    BY MR. WADE:

10:28AM 15    Q.   DO YOU SEE THE NEXT HEADING THERE WHERE IT SAYS

10:28AM 16    ADDITIONAL ISSUES THAT HE PLANS TO ADDRESS WITH THE TEAM?  HE

10:28AM 17    MENTIONS THAT?

10:28AM 18    A.   YES.

10:28AM 19    Q.   AND SO HE'S GOING TO CONTINUE TO WORK ON IT?

10:28AM 20    A.   YES.

10:28AM 21    Q.   BUT HE WAS ANNOUNCING THIS UPDATE.

10:28AM 22         DO YOU SEE THAT?

10:28AM 23    A.   YES.

10:28AM 24    Q.   OKAY.  LET'S GO TO THE NEXT PAGE.

10:29AM 25         DO YOU SEE AT THE BOTTOM MR. BALWANI WRITES HOW THIS IS

10:29AM 1    GREAT PROGRESS AND A BIG COMPETITIVE ADVANTAGE?

10:29AM 2    A.   YES.

10:29AM 3    Q.   AND THEN HE NOTES, "WE NEED TO KEEP THIS PROJECT, THE

10:29AM 4    CODE, CALIBRATION, AND EVERYTHING WE LEARNED HERE AS THERANOS

10:29AM 5    TRADE SECRET."

10:29AM 6        DO YOU SEE THAT?

10:29AM 7    A.   YES.

10:29AM 8    Q.   BECAUSE THIS WAS PROPRIETARY INFORMATION; RIGHT?

10:29AM 9    A.   I CAN'T COMMENT ON WHAT THE STATE OF THE ART WAS IN TERMS

10:29AM 10   OF DR. YOUNG'S FIX AND WHAT OTHER FOLKS WERE DOING, WHETHER

10:29AM 11   THAT WOULD QUALIFY AS PROPRIETARY, YOU KNOW -- GO AHEAD.  I'M

10:29AM 12   SORRY.

10:29AM 13   Q.   WELL, YOU RECOGNIZE THAT THE COMPANY CONSIDERED IT

10:29AM 14   PROPRIETARY INFORMATION HERE?

10:29AM 15   A.   MR. BALWANI DID, YES.

10:29AM 16   Q.   OKAY.  AND HE SAYS, "EVERYONE WHO IS WORKING ON THIS NEEDS

10:29AM 17   TO UNDERSTAND THIS."

10:29AM 18       DO YOU SEE THAT?

10:29AM 19   A.   YES.

10:29AM 20   Q.   AND PART OF THE REASON THAT I THINK YOU'RE COPIED IN IT

10:30AM 21   SAYS, "BESIDES ADAM, NO ONE IN CLIA NEEDS TO KNOW OUR SECRET

10:30AM 22   SAUCE."

10:30AM 23       DO YOU SEE THAT?

10:30AM 24   A.   YES.

10:30AM 25   Q.   AND IF ADAM THINKS ANYONE ELSE NEEDS TO KNOW THIS, THEN WE

10:30AM  1    NEED TO GET THEM UNDER SAME AGREEMENT TO KEEP THIS

10:30AM  2    CONFIDENTIAL; RIGHT?

10:30AM  3    A.   YES.

10:30AM  4    Q.   BECAUSE HE SAYS THEY'RE TRADE SECRETS; RIGHT?

10:30AM  5    A.   YES.

10:30AM  6    Q.   AND THEN DR. YOUNG THEN SAYS THAT HE'LL ADDRESS THIS WITH

10:30AM  7    MONA RAMAMURTHY.

10:30AM  8        DO YOU SEE THAT?

10:30AM  9    A.   YES.

10:30AM  10   Q.   AND THEN YOU WEIGH IN AND YOU CONGRATULATE DANIEL ON THE

10:30AM  11   WORK THAT HE HAD DONE; RIGHT?

10:30AM  12   A.   YES.

10:30AM  13   Q.   BECAUSE THAT SEEMED LIKE A SUCCESS AT THE TIME; RIGHT?

10:30AM  14   A.   IT SEEMED LIKE IT.

10:30AM  15   Q.   AND THEN OTHERS CONGRATULATED DANIEL AS WELL; RIGHT?

10:31AM  16   A.   CORRECT.

10:31AM  17   Q.   OKAY.  NOW, LET ME BRING UP 1953, WHICH IS IN EVIDENCE,

10:31AM  18   AND IT'S IN YOUR BINDER IF YOU WOULD LIKE TO LOOK AT IT.

10:32AM  19   A.   I HAVE IT.

10:32AM  20   Q.   OKAY.  AND 1953 WAS AN EMAIL BETWEEN -- THAT YOU'RE NOT

10:32AM  21   ON; RIGHT?

10:32AM  22   A.   CORRECT.

10:32AM  23   Q.   AND THAT WAS AN EMAIL BETWEEN CHRISTIAN HOLMES AND

10:32AM  24   ELIZABETH HOLMES; RIGHT?

10:32AM  25   A.   CORRECT.

| | | |
|---|---|---|
| 10:32AM | 1 | Q.  AND HE WAS DISCUSSING ISSUES WITH RESPECT TO EXPERIENCES |
| 10:32AM | 2 | THAT PEOPLE WERE HAVING WITH THE ISE ASSAYS; CORRECT? |
| 10:32AM | 3 | A.  YES. |
| 10:32AM | 4 | Q.  AND YOU WERE ASKED QUESTIONS ABOUT THIS; RIGHT? |
| 10:32AM | 5 | A.  YES. |
| 10:32AM | 6 | Q.  BUT THE GOVERNMENT DIDN'T SHOW YOU ANY FOLLOWUP ON THIS; |
| 10:32AM | 7 | RIGHT? |
| 10:32AM | 8 | A.  I DO NOT RECALL. |
| 10:32AM | 9 | Q.  AND YOU DON'T KNOW WHAT ELSE MS. HOLMES WAS DEALING WITH |
| 10:32AM | 10 | ON THESE ISSUES; RIGHT?  BECAUSE YOU'RE NOT ON THE EMAIL; |
| 10:32AM | 11 | RIGHT? |
| 10:32AM | 12 | A.  RIGHT, RIGHT. |
| 10:32AM | 13 | Q.  WELL, LET'S GO TO 12764. |
| 10:33AM | 14 | DO YOU SEE THAT'S AN EMAIL OF THE SAME DATE? |
| 10:33AM | 15 | A.  I'M SORRY, CAN YOU PLEASE GIVE ME A MINUTE? |
| 10:33AM | 16 | Q.  YEAH, SURE. |
| 10:33AM | 17 | A.  12764, AND IT'S STILL IN THE WHITE BINDER? |
| 10:33AM | 18 | Q.  NO.  MY APOLOGIES.  WE'RE PROBABLY BACK TO THE BLACK |
| 10:33AM | 19 | BINDER NOW. |
| 10:33AM | 20 | A.  OKAY. |
| 10:33AM | 21 | Q.  OKAY.  DO YOU HAVE THAT IN FRONT OF YOU? |
| 10:33AM | 22 | A.  YES. |
| 10:33AM | 23 | Q.  AND THIS IS AN EMAIL UP AT THE TOP ON THAT SAME DATE, |
| 10:33AM | 24 | SEPTEMBER 23RD, 2014? |
| 10:33AM | 25 | A.  YES. |

10:33AM 1    Q.   DO YOU SEE THAT?

10:33AM 2         AND IT RELATES TO THAT SAME TOPIC THAT -- MANY OF THE SAME

10:34AM 3    ASSAYS THAT CHRISTIAN HOLMES WAS REFERRING TO; CORRECT?

10:34AM 4    A.   THIS ONE LOOKS LIKE IT'S ABOUT C02, AND CHRISTIAN WAS

10:34AM 5    TALKING ABOUT SODIUM, POTASSIUM, AND CHLORIDE, I BELIEVE.

10:34AM 6    Q.   AND DO YOU SEE THE REFERENCE TO POTASSIUM THERE AS WELL?

10:34AM 7    A.   I'M SORRY, WHICH EMAIL ARE YOU REFERENCING?

10:34AM 8    Q.   THE THIRD ONE DOWN.

10:34AM 9    A.   YES.

10:34AM 10   Q.   OKAY.

10:34AM 11        YOUR HONOR, I WOULD MOVE THE ADMISSION OF 12764.

10:34AM 12             MR. BOSTIC:  NO OBJECTION.

10:34AM 13             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:34AM 14        (DEFENDANT'S EXHIBIT 12764 WAS RECEIVED IN EVIDENCE.)

10:34AM 15   BY MR. WADE:

10:34AM 16   Q.   AND THIS IS AN EMAIL WHERE MS. HOLMES IS GETTING SOME

10:34AM 17   UPDATES ON THESE ASSAYS ON THE SAME DATE, ON SEPTEMBER 23RD,

10:34AM 18   2014; RIGHT?

10:34AM 19   A.   YES.

10:34AM 20   Q.   OKAY.  I DON'T HAVE ANY OTHER QUESTIONS ABOUT THIS.

10:35AM 21        LET ME BRING UP 2228, WHICH SHOULD BE IN THE GOVERNMENT'S

10:35AM 22   BINDER.

10:35AM 23   A.   I HAVE IT.

10:35AM 24   Q.   YOU HAVE THAT?  LET'S GO TO THE SECOND PAGE.

10:35AM 25        DO YOU RECALL THIS EMAIL WHERE YOU FORWARDED ON

| | | |
|---|---|---|
| 10:36AM | 1 | NOVEMBER 21ST AN EMAIL ABOUT THE ISE'S AND YOU SAID -- AND THE |
| 10:36AM | 2 | VOIDING OF CERTAIN RESULTS. |
| 10:36AM | 3 | DO YOU SEE THAT? |
| 10:36AM | 4 | A.   YES. |
| 10:36AM | 5 | Q.   AND YOU'RE ASKING THEM, ARE YOU COMFORTABLE WITH THAT; |
| 10:36AM | 6 | RIGHT? |
| 10:36AM | 7 | A.   YES. |
| 10:36AM | 8 | Q.   AND NOW IN THE EMAIL UP THE CHAIN, MR. BALWANI SUGGESTS |
| 10:36AM | 9 | THAT MAYBE YOU JUMPED THE GUN; RIGHT? |
| 10:36AM | 10 | DO YOU SEE THAT? |
| 10:36AM | 11 | A.   YES. |
| 10:36AM | 12 | Q.   BUT MORE FUNDAMENTALLY, YOU SAID THAT YOU WEREN'T |
| 10:36AM | 13 | COMFORTABLE WITH TAKING THIS APPROACH; RIGHT?  WITH VOIDING THE |
| 10:36AM | 14 | RESULT?  THAT'S WHAT YOU SAID IN THE PRIOR EMAIL? |
| 10:36AM | 15 | A.   IT WAS THE BEST I COULD DO TO PROTECT PATIENTS. |
| 10:36AM | 16 | Q.   RIGHT, RIGHT. |
| 10:36AM | 17 | BUT YOU'RE ASKING, ARE THEY BOTH COMFORTABLE WITH THIS; |
| 10:36AM | 18 | RIGHT? |
| 10:36AM | 19 | A.   CORRECT. |
| 10:36AM | 20 | Q.   THE VOIDING OF THE RESULTS WAS ACTUALLY SOMETHING THAT YOU |
| 10:36AM | 21 | AND YOUR GROUP CAME UP WITH -- |
| 10:36AM | 22 | A.   YES. |
| 10:36AM | 23 | Q.   -- A COUPLE WEEKS EARLIER; RIGHT? |
| 10:36AM | 24 | A.   A LONG TIME BEFORE THIS EMAIL, YES. |
| 10:37AM | 25 | Q.   RIGHT. |

10:37AM  1        AND, IN FACT, MR. BALWANI AND MS. HOLMES DIDN'T KNOW ABOUT

10:37AM  2   IT; RIGHT?  YOU MADE THAT DECISION INDEPENDENT OF THEM?

10:37AM  3   A.   THEY KNEW ABOUT IT.

10:37AM  4   Q.   OKAY.  LET'S GO TO 7490.

10:37AM  5        DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?

10:37AM  6   A.   YES.

10:37AM  7   Q.   AND THIS IS AN EMAIL INVOLVING YOU, MR. BALWANI AND

10:38AM  8   MS. HOLMES IN LATE OCTOBER 2014?

10:38AM  9   A.   YES.

10:38AM  10  Q.   ON THE SAME TOPIC, THE CRITICAL ISE'S?

10:38AM  11  A.   YES.

10:38AM  12          MR. WADE:  MOVE THE ADMISSION OF 7490.

10:38AM  13          MR. BOSTIC:  NO OBJECTION.

10:38AM  14          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:38AM  15      (DEFENDANT'S EXHIBIT 7490 WAS RECEIVED IN EVIDENCE.)

10:38AM  16          MR. WADE:  LET'S BLOW UP THE TOP HALF OF THAT EMAIL.

10:38AM  17  Q.   ACTUALLY, LET'S START -- DO YOU SEE THERE IT SAYS -- LET'S

10:38AM  18  START DOWN THE CHAIN.  I'M SORRY.  LET'S GO TO THE LAST EMAIL

10:38AM  19  ON THIS PAGE.

10:38AM  20       YOU SAY HERE, "I WANTED TO BRING THIS IMPORTANT ISSUE TO

10:38AM  21  YOUR ATTENTION.  RIGHT NOW, AFTER MUCH COOPERATIVE DISCUSSION

10:38AM  22  BETWEEN CLIA AND R&D AND THOUGHT, IF THE CTN --" YOU TALK ABOUT

10:38AM  23  VOIDING CRITICAL RESULTS; RIGHT?

10:38AM  24  A.   THAT'S THE SODIUM THAT I'M REFERRING TO --

10:38AM  25  Q.   RIGHT.

10:38AM  1    A.   -- IN THAT EMAIL, YES.

10:38AM  2    Q.   AND THE RESPONSE FROM MR. BALWANI IS, LET'S TOUCH BASE,

10:39AM  3    WHEN DO WE START THIS POLICY?  RIGHT?

10:39AM  4    A.   SO THE VOIDING OF THE POTASSIUM RESULTS OUT OF RANGE HAD

10:39AM  5    BEGUN MUCH, MUCH EARLIER THAN THAT.

10:39AM  6    Q.   RIGHT.  YOU SEE HE DIDN'T KNOW ABOUT THIS; RIGHT?

10:39AM  7    A.   THAT'S WHAT HE'S ASSERTING.

10:39AM  8    Q.   OKAY.  LET'S LOOK AT YOUR EMAIL UP THE CHAIN.

10:39AM  9         YOU EXPLAIN, "WE HAD A MEETING WITH TINA, NISHIT, AND CLIA

10:39AM  10   LEADERSHIP ABOUT 6 WEEKS AGO TO COME UP WITH A CONSISTENT

10:39AM  11   PRACTICE."

10:39AM  12        DO YOU SEE THAT?

10:39AM  13   A.   YES.

10:39AM  14   Q.   AND THAT WAS YOUR DECISION; RIGHT?

10:39AM  15   A.   YES.

10:39AM  16   Q.   AND YOU MADE IT IN CONJUNCTION WITH OTHERS?

10:39AM  17   A.   YES.

10:39AM  18   Q.   AND IT LOOKS LIKE -- AND MR. BALWANI SAYS HE DIDN'T EVEN

10:39AM  19   KNOW ABOUT IT; RIGHT?

10:39AM  20   A.   THAT'S WHAT HE'S SAYING.

10:39AM  21   Q.   SO WHEN YOU'RE ASKING THEM IF THEY'RE COMFORTABLE WITH

10:39AM  22   THAT PRACTICE IN NOVEMBER TWO WEEKS LATER, YOU'RE TALKING ABOUT

10:39AM  23   A PRACTICE THAT YOU IMPLEMENTED; CORRECT?

10:39AM  24   A.   CORRECT.

10:39AM  25   Q.   AND A PRACTICE THAT THEY DIDN'T EVEN KNOW ABOUT FOR SIX

10:40AM  1    WEEKS UNTIL AFTER YOU WERE DOING IT; RIGHT?

10:40AM  2    A.   WELL, THEY KNEW ABOUT IT IN NOVEMBER.

10:40AM  3    Q.   WELL, THEY LEARNED ABOUT IT RIGHT HERE; RIGHT?

10:40AM  4    A.   THAT'S WHAT HE'S SAYING, YEAH.

10:40AM  5    Q.   AND IT WAS YOUR PRACTICE?

10:40AM  6    A.   CORRECT.

10:40AM  7    Q.   OKAY.  AND YOU DID IT IN CONJUNCTION WITH A TEAM OF OTHER

10:40AM  8    PEOPLE; RIGHT?

10:40AM  9    A.   CORRECT.

10:40AM  10   Q.   DO YOU RECALL GIVING TESTIMONY ON DIRECT EXAMINATION ABOUT

10:40AM  11   THE FREQUENCY OF DOCTOR QUESTIONS?

10:40AM  12   A.   YES.

10:40AM  13   Q.   OKAY.  I WANT TO MAKE SURE THAT I UNDERSTAND YOUR

10:41AM  14   TESTIMONY.

10:41AM  15        DO YOU RECALL THAT MR. BOSTIC ASKED YOU ABOUT THE

10:41AM  16   FREQUENCY OF THE PROBLEMS AND ASKED YOU TO COMPARE THEM WITH

10:41AM  17   THE FREQUENCY OF PROBLEMS AT UNIVERSITY OF PITTSBURGH?

10:41AM  18        DO YOU RECALL THAT?

10:41AM  19   A.   YES, YES.

10:41AM  20   Q.   AND YOUR ANSWER WAS THAT THEY WERE MUCH MORE FREQUENT AT

10:41AM  21   THERANOS; RIGHT?

10:41AM  22   A.   YES.

10:41AM  23   Q.   YOU PREVIOUSLY TESTIFIED ON EXACTLY THIS TOPIC, HAVE YOU

10:41AM  24   NOT?

10:41AM  25   A.   I BELIEVE SO.

10:41AM  1    Q.   YEAH.  AND YOU GAVE EXACTLY THE OPPOSITE ANSWER

10:41AM  2    ESSENTIALLY; RIGHT?

10:41AM  3    A.   I DON'T RECALL.

10:41AM  4    Q.   OKAY.  WELL, LET'S SEE IF WE CAN CLARIFY THIS.  IF YOU GO

10:41AM  5    IN THE YELLOW BINDER TO EXHIBIT 11000.

10:42AM  6         DO YOU HAVE THAT IN FRONT OF YOU?

10:42AM  7    A.   YES.

10:42AM  8    Q.   AND IF YOU COULD LOOK AT PAGE 122?

10:42AM  9    A.   OKAY.

10:42AM  10   Q.   DO YOU HAVE THAT IN FRONT OF YOU?

10:42AM  11   A.   YES.

10:42AM  12   Q.   OKAY.  AND THERE -- AND THAT WAS A DEPOSITION THAT YOU

10:42AM  13   GAVE IN THE ARIZONA MATTER?

10:42AM  14   A.   YES.

10:42AM  15   Q.   AND WE'VE TALKED ABOUT THIS BEFORE.  YOU WERE UNDER OATH;

10:43AM  16   RIGHT?

10:43AM  17   A.   YES.

10:43AM  18   Q.   AND THERE WAS A COURT REPORTER THERE TAKING DOWN YOUR

10:43AM  19   ANSWERS?

10:43AM  20   A.   YES.

10:43AM  21   Q.   UNDER THE PAINS AND PENALTIES OF PERJURY; CORRECT?

10:43AM  22   A.   YES.

10:43AM  23   Q.   OKAY.  YOU WERE ASKED, "WERE THESE TYPE OF PHYSICIAN

10:43AM  24   COMPLAINTS COMMON DURING YOUR TIME AT THERANOS?"

10:43AM  25        AND YOU ANSWERED, "THEY WEREN'T MORE COMMON THAN WHAT ONE

10:43AM  1    USUALLY SEES IN A -- SOME LABS WITH HIGH VOLUME."

10:43AM  2         CORRECT?

10:43AM  3              THE COURT:  EXCUSE ME.

10:43AM  4              MR. BOSTIC:  YOUR HONOR, THIS EXHIBIT IS NOT IN

10:43AM  5    EVIDENCE.  COUNSEL IS READING FROM IT.

10:43AM  6              MR. WADE:  I'M IMPEACHING THE WITNESS, YOUR HONOR.

10:43AM  7              THE COURT:  YES, YOU ARE IMPEACHING THE WITNESS.

10:43AM  8         DO YOU WANT TO ASK HIM WHETHER OR NOT -- I THINK YOU LAID

10:43AM  9    A FOUNDATION FOR THIS, BUT YOU CAN ASK HIM WHETHER -- TO READ

10:43AM 10    IT HIMSELF AND ASK IF THAT'S HIS RESPONSE.

10:43AM 11         SO WHY DON'T YOU ASK YOUR QUESTION AGAIN?

10:43AM 12              MR. WADE:  YOUR HONOR, I BELIEVE I ASKED --

10:43AM 13              THE COURT:  DO IT AGAIN.

10:44AM 14              MR. WADE:  OKAY.  OKAY.

10:44AM 15    Q.   SIR, ON LINE 12 OF THIS TRANSCRIPT, YOU WERE ASKED, "WERE

10:44AM 16    THESE TYPES OF PHYSICIAN COMPLAINTS COMMON DURING YOUR TIME AT

10:44AM 17    THERANOS?"

10:44AM 18    A.   YES.

10:44AM 19    Q.   AND YOU WERE ASKED THAT; RIGHT?

10:44AM 20    A.   YES.

10:44AM 21    Q.   AND YOU ANSWERED, "THEY WEREN'T MORE COMMON THAN WHAT ONE

10:44AM 22    USUALLY SEES IN A -- SOME LABS WITH HIGH VOLUME."

10:44AM 23         CORRECT?

10:44AM 24    A.   YES.  WE'VE SEEN BEFORE THAT THERANOS WAS NOT A HIGH

10:44AM 25    VOLUME LAB.

10:44AM 1     Q.   DO YOU SEE WHAT THAT SAYS THERE?

10:44AM 2     A.   YES, I DO.

10:44AM 3     Q.   DID I READ IT CORRECTLY?

10:44AM 4     A.   YOU DID.

10:44AM 5     Q.   AND THEN YOU WERE ASKED, CAN YOU EXPLAIN THAT A LITTLE BIT

10:44AM 6     MORE.

10:44AM 7          DO YOU SEE THAT?

10:44AM 8     A.   YES.

10:44AM 9     Q.   AND YOU WERE ASKED THAT; CORRECT?

10:44AM 10    A.   YES.

10:44AM 11    Q.   AND YOU ANSWERED, YOU, YOU ALWAYS GET QUESTIONS AS LAB

10:44AM 12    DIRECTOR?

10:44AM 13    A.   YES.

10:44AM 14    Q.   YOU CAN RUN A THOUSAND TESTS, AND THEN ONE OR TWO ARE

10:44AM 15    SEEMINGLY PROBLEMATIC OR ANOMALOUS?

10:44AM 16    A.   YES.

10:44AM 17    Q.   THEY'RE FLYERS.  YOU DON'T KNOW WHY THERE'S A DIFFERENCE

10:45AM 18    BETWEEN THAT TEST AND A TEST DONE AT A DIFFERENT CENTER AND

10:45AM 19    YOU -- I DON'T THINK THE TESTS, I DON'T THINK I HAD A GREATER

10:45AM 20    NUMBER OF TESTS THAT, THAT WERE ANOMALOUS, THAT I HAD TO REVIEW

10:45AM 21    AS LAB DIRECTOR AT THERANOS THAN AT OTHER PLACES THAT I'VE BEEN

10:45AM 22    LIKE AT UNIVERSITY OF PITTSBURGH.

10:45AM 23         CORRECT?

10:45AM 24    A.   YES.

10:45AM 25    Q.   OKAY.  AND THAT WAS TRUTHFUL TESTIMONY ON THAT DAY; RIGHT?

| | | |
|---|---|---|
| 10:45AM | 1 | A.   YES. |
| 10:45AM | 2 | Q.   AND THAT WAS 180 DEGREES FROM WHAT YOU ANSWERED IN YOUR |
| 10:45AM | 3 | DIRECT TESTIMONY; RIGHT? |
| 10:45AM | 4 | A.   YES, IT SEEMS TO BE DIFFERENT. |
| 10:45AM | 5 | Q.   NOW, THESE RESULTS WERE -- EVERY ONCE IN A WHILE PROBLEMS |
| 10:45AM | 6 | COME UP IN LABS; RIGHT? |
| 10:45AM | 7 | A.   YES. |
| 10:45AM | 8 | Q.   AND EVERY LAB IN AMERICA PROBABLY?  PROBABLY EVERY LAB IN |
| 10:46AM | 9 | THE WORLD; RIGHT? |
| 10:46AM | 10 | A.   YES. |
| 10:46AM | 11 | Q.   IT'S NOT GOING TO BE PERFECT; CORRECT? |
| 10:46AM | 12 | A.   CORRECT. |
| 10:46AM | 13 | Q.   OKAY.  AND -- |
| 10:46AM | 14 | A.   SO KEEP IN MIND THAT UNIVERSITY OF PITTSBURGH HAD A MUCH, |
| 10:46AM | 15 | MUCH HIGHER VOLUME, SO THERANOS HAD A MUCH, MUCH LOWER VOLUME, |
| 10:46AM | 16 | SO ACTUALLY THE NUMBER OF COMPLAINTS AND ISSUES WERE |
| 10:46AM | 17 | COMPARABLE; RIGHT? |
| 10:46AM | 18 | SO I JUST WANTED TO POINT OUT.  ACTUALLY THE HIGHER THE |
| 10:46AM | 19 | VOLUME, THE MORE ISSUES YOU WOULD EXPECT, BUT THERANOS WAS LOW |
| 10:46AM | 20 | VOLUME. |
| 10:46AM | 21 | Q.   SIR, YOU TESTIFIED ON YOUR DIRECT EXAMINATION THAT THERE |
| 10:46AM | 22 | WERE MUCH MORE FREQUENT ISSUES AT THERANOS; RIGHT? |
| 10:46AM | 23 | A.   YES. |
| 10:46AM | 24 | Q.   AND YOU TESTIFIED EXACTLY THE OPPOSITE IN YOUR DEPOSITION; |
| 10:46AM | 25 | RIGHT? |

| | | |
|---|---|---|
| 10:46AM | 1 | A.   I CAN'T ANSWER YES OR NO. |
| 10:47AM | 2 | Q.   OKAY.  WHEN AN ISSUE DID COME UP, DID YOU INVESTIGATE IT? |
| 10:47AM | 3 | A.   YES, OF COURSE. |
| 10:47AM | 4 | Q.   AND, IN FACT, THERE'S A REGULATION THAT REQUIRES YOU TO |
| 10:47AM | 5 | INVESTIGATE IT; RIGHT? |
| 10:47AM | 6 | A.   I'M NOT SURE EXACTLY WHICH ONE YOU'RE REFERRING TO, BUT -- |
| 10:47AM | 7 | Q.   A STANDARD FOR COMPLAINT INVESTIGATIONS? |
| 10:47AM | 8 | A.   OKAY. |
| 10:47AM | 9 | Q.   ARE YOU FAMILIAR WITH THAT UNDER CLIA? |
| 10:47AM | 10 | A.   YES. |
| 10:47AM | 11 | Q.   AND WOULD YOU FOLLOW THAT? |
| 10:47AM | 12 | A.   YES. |
| 10:47AM | 13 | Q.   AND YOU HAD SOP'S ON THAT; CORRECT? |
| 10:47AM | 14 | A.   I BELIEVE SO. |
| 10:47AM | 15 | Q.   LET'S LOOK AT 9907. |
| 10:48AM | 16 | A.   I HAVE IT. |
| 10:48AM | 17 | Q.   AND THIS IS THE COMPLAINT INVESTIGATION AND COMMUNICATION |
| 10:48AM | 18 | POLICY AT THERANOS? |
| 10:48AM | 19 | A.   OH, OKAY, 2011. |
| 10:48AM | 20 | Q.   IS THAT RIGHT? |
| 10:48AM | 21 | A.   IT'S DATED 2011. |
| 10:48AM | 22 | Q.   AND THIS IS THE STANDARD FORMAT IN WHICH THESE CONTROLLED |
| 10:48AM | 23 | DOCUMENTS WERE MAINTAINED? |
| 10:48AM | 24 | A.   YES. |
| 10:48AM | 25 | MR. WADE:  I MOVE THE ADMISSION OF EXHIBIT 9907. |

10:48AM  1              MR. BOSTIC:  NO OBJECTION.

10:48AM  2              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:48AM  3              (DEFENDANT'S EXHIBIT 9907 WAS RECEIVED IN EVIDENCE.)

10:48AM  4      BY MR. WADE:

10:48AM  5      Q.  AND IF WE COULD JUST GO TO THE THIRD PAGE, THERE'S A

10:48AM  6      SPECIFIC PROCESS THAT IS SET FORTH IN HERE FOR HOW THESE THINGS

10:49AM  7      ARE TO BE HANDLED; CORRECT?

10:49AM  8      A.  YES.

10:49AM  9      Q.  AND RESPONSIBILITIES; CORRECT?

10:49AM  10     A.  YES.

10:49AM  11     Q.  AND THERE IT SAYS, LIKE MANY OF THESE RESPONSIBILITIES IN

10:49AM  12     THE CLIA LAB, THAT YOU'RE ULTIMATELY RESPONSE; CORRECT?

10:49AM  13     A.  YES.

10:49AM  14     Q.  I DON'T HAVE ANY MORE QUESTIONS ON THAT DOCUMENT.

10:49AM  15         DO YOU RECALL BEING ASKED SOME QUESTIONS ABOUT C02 OR

10:49AM  16     BICARBONATE?

10:49AM  17     A.  YES.

10:49AM  18     Q.  AND LET'S GO THROUGH THAT TESTIMONY.  THAT IS

10:49AM  19     EXHIBIT 4116, WHICH I BELIEVE IS IN EVIDENCE.

10:50AM  20     A.  I SEE IT.

10:50AM  21     Q.  DO YOU RECALL THIS?  YOU WERE ASKING -- THE GOVERNMENT

10:50AM  22     ASKED YOU ABOUT THIS PORTION OF THE DOCUMENT IN THE MIDDLE

10:50AM  23     HERE.

10:50AM  24         DO YOU RECALL THIS?

10:50AM  25     A.  YES.

10:50AM 1    Q.   AND YOU WERE ASKED IF THIS COULD BE A PROBLEM, RIGHT, THE

10:50AM 2    LEAKAGE OF C02?  YOU WERE ASKED THAT?

10:50AM 3    A.   THE GOVERNMENT --

10:50AM 4    Q.   YEAH, DO YOU REMEMBER THE GOVERNMENT ASKING YOU ABOUT

10:50AM 5    THAT?

10:50AM 6    A.   YEAH.

10:50AM 7    Q.   AND ASKED YOU TO EXPLAIN THE KIND OF PROBLEMS?

10:50AM 8    A.   YEAH.

10:50AM 9    Q.   AND YOU SAID -- YOU INDICATED THAT IT COULD BE A LUNG

10:50AM 10   PROBLEM; RIGHT?

10:50AM 11        DO YOU RECALL THAT?

10:50AM 12   A.   THEY WERE ASKING ME ABOUT THE MEDICAL IMPORTANCE OF

10:50AM 13   BICARBONATE, AND I SAID IT COULD INDICATE A LUNG PROBLEM, YEAH.

10:50AM 14   Q.   AND YOU NOTED THAT THIS WAS A HIGH IMPORTANCE DOCUMENT;

10:51AM 15   RIGHT?

10:51AM 16   A.   YES.

10:51AM 17   Q.   OKAY.  AND YOU TALKED ABOUT SOME INFORMATION THAT HAD COME

10:51AM 18   UP AS A RESULT OF CURTIS SCHNEIDER'S STUDY.

10:51AM 19        DO YOU RECALL THAT?

10:51AM 20   A.   YES.

10:51AM 21   Q.   AND DO YOU RECALL -- YOU WERE ASKED WHETHER YOU VIEWED

10:51AM 22   THIS AS A PROBLEM?

10:51AM 23   A.   YES.

10:51AM 24   Q.   AND YOU SAID, I THOUGHT IT WAS A PROBLEM, AND YOU DIDN'T

10:51AM 25   RECALL IF MANAGEMENT THOUGHT IT WAS A PROBLEM; RIGHT?

| | | |
|---|---|---|
| 10:51AM | 1 | A.   CORRECT. |
| 10:51AM | 2 | Q.   DO YOU RECALL THAT? |
| 10:51AM | 3 | OKAY.  DO YOU SEE -- LET'S SEE IF MANAGEMENT THOUGHT IT |
| 10:51AM | 4 | WAS A PROBLEM.  GO UP ONE EMAIL. |
| 10:51AM | 5 | DO YOU SEE MR. BALWANI FORWARDS THIS TO DR. PATEL AND |
| 10:52AM | 6 | MR. ANEKAL? |
| 10:52AM | 7 | DO YOU SEE THAT? |
| 10:52AM | 8 | A.   YES. |
| 10:52AM | 9 | Q.   AND YOU HAD ACTUALLY SUGGESTED THAT YOU WERE WONDERING IF |
| 10:52AM | 10 | DR. PATEL HAD ANY DATA ON THIS. |
| 10:52AM | 11 | DO YOU RECALL THAT FROM THE EMAIL BELOW? |
| 10:52AM | 12 | A.   I'M SORRY, I DON'T RECALL. |
| 10:52AM | 13 | Q.   WELL, TAKE A LOOK. |
| 10:52AM | 14 | A.   OH, I SEE.  I SEE.  OKAY. |
| 10:52AM | 15 | Q.   DO YOU SEE THAT? |
| 10:52AM | 16 | A.   YEP. |
| 10:52AM | 17 | Q.   AND YOU WERE ASKING IF THERE WAS ANY WORK, RIGHT -- |
| 10:52AM | 18 | A.   UH-HUH. |
| 10:52AM | 19 | Q.   -- DONE ON THAT? |
| 10:52AM | 20 | AND MR. BALWANI WAS FOLLOWING UP; RIGHT? |
| 10:52AM | 21 | A.   YES. |
| 10:52AM | 22 | Q.   OKAY.  AND LET'S LOOK ACTUALLY DOWN AT YOUR EMAIL BELOW. |
| 10:52AM | 23 | LET'S BLOW UP THE BOTTOM THIRD OF YOUR EMAIL BELOW, SOME PIECES |
| 10:52AM | 24 | THE GOVERNMENT DIDN'T FOCUS ON. |
| 10:52AM | 25 | YOU SEE WHERE IT SAYS THAT PHYSICIANS ARE AWARE THAT IF |

10:52AM  1    THEY WANT AN ACCURATE BICARB READING, THEY NEED TO GET THE

10:53AM  2    SAMPLE TO THE LAB STAT.

10:53AM  3         DO YOU SEE THAT?

10:53AM  4    A.   YES.

10:53AM  5    Q.   AND THAT'S BECAUSE THERE CAN BE LEAKAGE OVER TIME AND IF A

10:53AM  6    DOCTOR WANTS -- HAS A CONCERN THAT IS FOCUSSED ON BICARBONATE,

10:53AM  7    THEY MIGHT GO TO A STAT LAB; RIGHT?

10:53AM  8    A.   THAT'S WHAT I SAID AT THE TIME, YES.

10:53AM  9    Q.   THAT'S WHAT YOU SAID.

10:53AM  10        AND THEN IN THE NEXT SENTENCE YOU SAID, "SO FAR WE HAVE

10:53AM  11   NOT HAD ANY CALLS REGARDING BICARB VALUES."

10:53AM  12        DO YOU SEE THAT?

10:53AM  13   A.   YES.

10:53AM  14   Q.   AND YOU SAY YOU THINK DOCTORS KNOW THAT IT'S HIGHLY

10:53AM  15   CONTEXT-DEPENDENT ASSAY.

10:53AM  16        DO YOU SEE THAT?

10:53AM  17   A.   YES.

10:53AM  18   Q.   OKAY.  LET'S GO TO EXHIBIT 12587.

10:54AM  19   A.   I HAVE IT.

10:54AM  20   Q.   AND DO YOU RECOGNIZE THAT THIS IS A DIFFERENT EMAIL CHAIN

10:54AM  21   ON THE SAME ISSUE?

10:54AM  22   A.   YES.

10:54AM  23   Q.   AND THE GOVERNMENT DIDN'T SHOW YOU THIS CHAIN, DID THEY?

10:54AM  24   A.   NO.

10:54AM  25   Q.   OKAY.  LET'S GO TO THE BACK.

| 10:54AM | 1  | A.   I SEE IT. |
| 10:54AM | 2  | Q.   DO YOU SEE IT? |
| 10:54AM | 3  | A.   YES. |
| 10:54AM | 4  | Q.   OH, I'M SORRY.  THIS IS NOT IN EVIDENCE. |
| 10:54AM | 5  | YOUR HONOR, I MOVE THE ADMISSION OF 12587. |
| 10:54AM | 6  | MR. BOSTIC:  NO OBJECTION. |
| 10:54AM | 7  | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:54AM | 8  | (DEFENDANT'S EXHIBIT 12587 WAS RECEIVED IN EVIDENCE.) |
| 10:54AM | 9  | MR. WADE:  WE'LL GO TO THE LAST PAGE. |
| 10:54AM | 10 | Q.   SO WE CAN ORIENT YOU AND THE JURY, THIS IS THE EMAIL THAT |
| 10:54AM | 11 | WE WERE JUST TALKING ABOUT, EXHIBIT 4116; RIGHT? |
| 10:55AM | 12 | A.   YES. |
| 10:55AM | 13 | Q.   IT'S THE SAME EMAIL; RIGHT? |
| 10:55AM | 14 | A.   YES. |
| 10:55AM | 15 | Q.   OKAY.  AND THEN IF YOU GO -- AND THIS IS MARCH 31ST, 2014 |
| 10:55AM | 16 | AT 12:38 P.M. |
| 10:55AM | 17 | DO YOU SEE THAT? |
| 10:55AM | 18 | A.   YES. |
| 10:55AM | 19 | Q.   OKAY.  AND IF YOU GO UP, YOU SEE MR. BALWANI RESPONDS IN |
| 10:55AM | 20 | ABOUT 11 MINUTES. |
| 10:55AM | 21 | DO YOU SEE THAT? |
| 10:55AM | 22 | A.   YES. |
| 10:55AM | 23 | Q.   AND HE TALKS ABOUT ALL OF THE DATA AND SUGGESTS DIGGING |
| 10:55AM | 24 | INTO THE ISSUE; IS THAT FAIR? |
| 10:55AM | 25 | A.   YES. |

10:55AM  1    Q.   AND YOU DO, TOO.  YOU RESPOND ALMOST IMMEDIATELY.  AND YOU

10:55AM  2    NOTE THAT YOU WERE GOING TO HAVE LANGLY REVIEW YOUR

10:55AM  3    LEVEY-JENNINGS DATA.

10:55AM  4         DO YOU SEE THAT?

10:55AM  5    A.   YES.

10:55AM  6    Q.   FOR BOTH ADVIA'S.  DO YOU SEE THAT?

10:55AM  7    A.   YES.

10:55AM  8    Q.   AND THAT'S TO LOOK IF THERE'S A TREND IN THE QC; RIGHT?

10:56AM  9    A.   YES.

10:56AM  10   Q.   LET'S GO UP THE CHAIN.

10:56AM  11        YOU THEN REPORT THAT YOU'VE DUG IN SOME MORE; RIGHT?

10:56AM  12   A.   YES.

10:56AM  13   Q.   AND YOU'VE ACTUALLY GONE BACK AND COMPARED SOME OF THAT

10:56AM  14   DATA TO THE DATA IN THE VALIDATION REPORT; RIGHT?

10:56AM  15   A.   YES.

10:56AM  16   Q.   AND YOU SAY IN THAT SECOND PARAGRAPH, "BASED ON THIS

10:56AM  17   INFORMATION, I SUGGEST A NEW BICARBONATE REFERENCE RANGE FOR

10:56AM  18   OUR METHOD."

10:56AM  19        DO YOU SEE THAT?

10:56AM  20   A.   YES.

10:56AM  21   Q.   AND THEN THIS IS THE SAME DAY; RIGHT?

10:56AM  22   A.   YES.

10:56AM  23   Q.   EIGHT HOURS LATER?

10:56AM  24   A.   YES.

10:56AM  25   Q.   OKAY.  AND THEN YOU ACTUALLY THEN CLARIFY IN THE EMAIL

| | | |
|---|---|---|
| 10:56AM | 1 | RIGHT ABOVE. |
| 10:56AM | 2 | OKAY.  IT SAYS, "PARDON ME I MEANT 'BIAS OBSERVED BETWEEN |
| 10:56AM | 3 | PREDICATE AND THERANOS METHODS.'" |
| 10:56AM | 4 | DO YOU SEE THAT? |
| 10:56AM | 5 | A.  YES. |
| 10:56AM | 6 | Q.  AND SO THIS IS ONE OF THE AREAS WHERE THERE'S A BIAS THAT |
| 10:56AM | 7 | YOU CAN CORRECT FOR; RIGHT? |
| 10:57AM | 8 | A.  IT DEPENDS ON THE REPRODUCIBILITY OF THE ASSAY. |
| 10:57AM | 9 | Q.  OKAY. |
| 10:57AM | 10 | A.  IF THE ASSAY IS NOT REPRODUCIBLE, THEN BIAS CORRECTION IS |
| 10:57AM | 11 | NOT APPROPRIATE. |
| 10:57AM | 12 | Q.  BUT YOU WERE DIGGING IN ON THIS AND YOU WERE MAKING A |
| 10:57AM | 13 | SUGGESTION ON HOW TO DEAL WITH THIS TO THE TEAM; RIGHT? |
| 10:57AM | 14 | A.  YES. |
| 10:57AM | 15 | Q.  OKAY.  AND LET'S GO UP THE CHAIN.  DR. YOUNG REPORTS SOME |
| 10:57AM | 16 | INFORMATION, TOO, BASED ON HIS WORK; RIGHT? |
| 10:57AM | 17 | A.  YES. |
| 10:57AM | 18 | Q.  AND THEN IT SAYS, "THE DATA FROM OUR IN-HOUSE AAP DRY RUNS |
| 10:57AM | 19 | (NOW 7 DAYS OF TESTING) LOOKS OK OVERALL." |
| 10:57AM | 20 | DO YOU SEE THAT? |
| 10:57AM | 21 | A.  YES. |
| 10:57AM | 22 | Q.  AND THIS IS MARCH 31ST, 2014? |
| 10:57AM | 23 | A.  YES. |
| 10:57AM | 24 | Q.  AND WITH ABOUT A 90 PERCENT RECOVERY. |
| 10:57AM | 25 | DO YOU SEE THAT? |

10:57AM  1    A.   YES.

10:57AM  2    Q.   AND THEN IT SAYS, "WITH A FEW MORE DAYS OF TESTING, I

10:58AM  3    THINK WE WILL HAVE A GOOD DATA SET FROM WHICH TO MAKE A

10:58AM  4    DECISION."

10:58AM  5         DO YOU SEE THAT?

10:58AM  6    A.   THE ISSUE WITH CO2 IS THE DELAY BETWEEN THE COLLECTION AND

10:58AM  7    WHEN IT ARRIVES IN THE LAB.  SO WHEN YOU DO A STUDY, THERE IS

10:58AM  8    NO DELAY.

10:58AM  9    Q.   AND I'M JUST ASKING IF YOU SEE WHAT HE WROTE THERE IN

10:58AM  10   TERMS OF WHAT HE WAS REPORTING OUT.

10:58AM  11        DO YOU SEE THAT?

10:58AM  12   A.   YES.

10:58AM  13   Q.   AND DO YOU SEE THAT HE SAYS, MOVING FORWARD, "WE WILL

10:58AM  14   APPLY A BIAS CORRECTION FOR CO2 FINGERSTICK SAMPLES SUCH THAT

10:58AM  15   WE REPORT THE RESULTS IN THE VENOUS EQUIVALENT CONCENTRATION."

10:58AM  16        DO YOU SEE THAT?

10:58AM  17   A.   I SEE IT.

10:58AM  18   Q.   OKAY.  LET'S GO UP THE CHAIN.

10:58AM  19   A.   I DON'T KNOW WHAT IT MEANS, BUT I SEE IT, YEAH.

10:58AM  20   Q.   WELL, LET'S SEE HOW YOU RESPOND.

10:58AM  21   A.   OKAY.

10:58AM  22   Q.   AND YOU SAY "OK THANKS -- SO I GUESS THE 90 PERCENT

10:58AM  23   RECOVERY IS AFTER BIAS CORRECTION -- IF THIS IS THE CASE THEN

10:58AM  24   20 NORMALS MOST LIKELY WOULD BE IN THE PREDICATE RANGE."

10:59AM  25        DO YOU SEE THAT?

10:59AM  1    A.   YES.

10:59AM  2    Q.   AND IF YOU GO UP ONE MORE TIME, YOU RESPOND AGAIN.

10:59AM  3         YOU ASK DANIEL TO LET YOU KNOW WHEN THIS CORRECTION IS

10:59AM  4    IMPLEMENTED; RIGHT?

10:59AM  5    A.   YES.

10:59AM  6    Q.   AND SO THIS ISSUE WAS ADDRESSED IN ABOUT 24 HOURS?

10:59AM  7    A.   I DON'T KNOW.

10:59AM  8    Q.   WELL, LOOK AT THE TIME OF THE EMAIL ON THE LAST PAGE.  IT

10:59AM  9    WAS 12:38.

10:59AM 10         DO YOU SEE THAT?

10:59AM 11    A.   YES.

10:59AM 12    Q.   OKAY.  AND ON MARCH 31ST, DO YOU SEE THAT?

10:59AM 13         AND THEN MAYBE IT WAS 32 HOURS.  YOU CAN LOOK AT THE EMAIL

10:59AM 14    ON THE FIRST PAGE.

10:59AM 15    A.   OKAY.

10:59AM 16    Q.   OKAY.  SO JUST SO WE'RE CLEAR, NO DOCTORS RAISE ISSUES ON

10:59AM 17    THIS; RIGHT?

10:59AM 18    A.   RIGHT.

10:59AM 19    Q.   AND THE ASSAY IS VERY CONTEXT DEPENDENT ACCORDING TO YOU;

11:00AM 20    RIGHT?

11:00AM 21    A.   RIGHT.

11:00AM 22    Q.   AND DOCTORS KNOW THAT IT'S IMPORTANT THAT A STAT LAB WILL

11:00AM 23    PROBABLY BE USED.

11:00AM 24         THAT'S WHAT YOU SAID; RIGHT?

11:00AM 25    A.   RIGHT.

11:00AM   1    Q.   AND YOU AND DR. YOUNG WORKED TOGETHER TO RESOLVE THIS IN

11:00AM   2    ABOUT A DAY; RIGHT?

11:00AM   3    A.   I CAN'T SAY THAT IT WAS RESOLVED.  I CAN'T ANSWER YOU YES

11:00AM   4    OR NO.

11:00AM   5    Q.   DO YOU SEE THAT HE'S ASKING IN THE EMAIL WHEN IS HE GOING

11:00AM   6    TO PUT THAT FIX INTO THE SYSTEM?

11:00AM   7    A.   YES.

11:00AM   8    Q.   AND THAT MEANS SO THAT YOU CAN REPORT RESULTS; RIGHT?

11:00AM   9    A.   YES.

11:00AM   10   Q.   AND SO YOU THOUGHT AT THAT POINT, WITHIN A DAY, IT WAS

11:00AM   11   SAFE AND APPROPRIATE TO REPORT RESULTS --

11:00AM   12   A.   BASED ON THE DATA -- I'M SORRY.

11:00AM   13   Q.   LET ME FINISH THE QUESTION AND THEN WE'LL LET YOU ANSWER

11:00AM   14   MY QUESTION.  OKAY?

11:00AM   15   A.   UH-HUH.

11:00AM   16   Q.   JUST SO THE COURT REPORTER DOESN'T GO CRAZY HERE.

11:00AM   17        OKAY.  SO ON THAT DAY, YOU WERE COMFORTABLE WITH THE

11:01AM   18   APPROACH AND YOU ASKED WHEN IT WAS GOING TO BE IMPLEMENTED SO

11:01AM   19   RESULTS COULD BE REPORTED; CORRECT?

11:01AM   20   A.   I WAS REVIEWING DANIEL'S STUDY, AND BASED ON HIS STUDY, I

11:01AM   21   BELIEVED THAT IT WAS NOW FIXED.

11:01AM   22   Q.   AND YOU WERE ASKING WHEN IT WAS GOING TO BE IMPLEMENTED

11:01AM   23   BECAUSE YOU BELIEVED IT WAS SAFE TO REPORT RESULTS AS A RESULT

11:01AM   24   OF THAT APPROACH; CORRECT?

11:01AM   25   A.   YES.

11:01AM  1    Q.   OKAY.  AND THAT WAS DONE IN PART REFERENCING THE IN-HOUSE

11:01AM  2    AAP DRY RUNS; CORRECT?

11:01AM  3    A.   YES.

11:01AM  4    Q.   I'D LIKE TO SHOW YOU EXHIBIT 1772.  IT'S ON YOUR SCREEN,

11:02AM  5    AND IT'S IN EVIDENCE.

11:02AM  6         IF WE CAN BLOW UP THE TOP TWO EMAILS.

11:02AM  7         THIS RELATES TO SOME BACKLOGS THAT EXISTED ON EDISONS.

11:02AM  8         DO YOU RECALL THAT?

11:02AM  9    A.   YES.

11:02AM  10   Q.   AND YOU WERE ASKED SOME QUESTIONS ABOUT THIS AND ABOUT

11:02AM  11   SUNNY'S RESPONSE.

11:02AM  12        DO YOU RECALL THAT?

11:02AM  13   A.   YES.

11:02AM  14   Q.   OKAY.  DID YOU BELIEVE THE RESPONSE WAS A LITTLE CURT?

11:02AM  15   A.   I DON'T REMEMBER HOW SUNNY RESPONDED.

11:03AM  16   Q.   OKAY.  BUT YOU -- THE GOVERNMENT ASKED YOU ABOUT THIS

11:03AM  17   DOCUMENT.

11:03AM  18        DO YOU RECALL THEM ASKING ABOUT THIS?

11:03AM  19   A.   YES.

11:03AM  20   Q.   OKAY.  LET'S -- AND THIS IS AN EMAIL -- YOU SEE YOUR EMAIL

11:03AM  21   IS JUNE 11TH, 2014, 5:25 P.M.?

11:03AM  22   A.   YES.

11:03AM  23   Q.   DO YOU SEE THAT?

11:03AM  24        LET'S LOOK AT 13888.

11:03AM  25        THAT'S NOT IN EVIDENCE, SO I'LL HAVE TO IMPOSE UPON YOU TO

11:03AM  1    FIND THAT ONE IN THE BINDER.

11:04AM  2              MR. DOWNEY:  YOUR HONOR, MAY I JUST CONSULT WITH

11:04AM  3    MR. WADE FOR JUST A MOMENT?

11:04AM  4         (DISCUSSION OFF THE RECORD.)

11:04AM  5              MR. DOWNEY:  THANK YOU, YOUR HONOR.

11:04AM  6              THE WITNESS:  OKAY, I HAVE IT.

11:04AM  7    BY MR. WADE:

11:04AM  8    Q.   DO YOU RECOGNIZE THIS TO BE A DIFFERENT EMAIL ON THAT SAME

11:04AM  9    ISSUE?

11:04AM  10   A.   YES.

11:04AM  11   Q.   OKAY.

11:04AM  12        I MOVE THE ADMISSION OF 13888.

11:04AM  13             MR. BOSTIC:  NO OBJECTION.

11:04AM  14             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:04AM  15        (DEFENDANT'S EXHIBIT 13888 WAS RECEIVED IN EVIDENCE.)

11:04AM  16   BY MR. WADE:

11:04AM  17   Q.   AND DO YOU SEE YOUR EMAIL RAISING THIS DOWN AT THE BOTTOM?

11:04AM  18   A.   YES.

11:04AM  19   Q.   OKAY.  BUT THERE'S A DIFFERENT RESPONSE UP AT THE TOP;

11:04AM  20   RIGHT?  DIFFERENT FROM EXHIBIT 1772 THAT THE GOVERNMENT ASKED

11:04AM  21   YOU ABOUT; RIGHT?

11:04AM  22   A.   I'M SORRY.  ARE YOU --

11:05AM  23   Q.   WELL, LET'S BLOW UP THE TOP HERE.

11:05AM  24        DO YOU RECALL THAT IN THE PRIOR VERSION OF THIS DOCUMENT

11:05AM  25   THERE WAS AN EMAIL WHERE THEY SAID THAT WE NEED TO RESOLVE

11:05AM   1    THIS -- WE NEED THIS MESS RESOLVED ASAP.

11:05AM   2         DO YOU RECALL THAT?

11:05AM   3    A.   YES, YES.

11:05AM   4    Q.   OKAY.  THIS ACTUALLY IS A DIFFERENT RESPONSE TO YOUR

11:05AM   5    EMAIL, ISN'T IT, A SEPARATE RESPONSE?

11:05AM   6    A.   YES.

11:05AM   7    Q.   AND IT'S JUST TO YOU PERSONALLY; CORRECT?

11:05AM   8    A.   YES.

11:05AM   9    Q.   AND THE GOVERNMENT DIDN'T SHOW YOU THIS ONE, DID THEY?

11:05AM  10    A.   NO.

11:05AM  11    Q.   AND I JUST WANT TO DRAW YOUR ATTENTION, DO YOU SEE IN THE

11:05AM  12    END THERE HE SAYS, MR. BALWANI SAYS, "IN THE MEANTIME WE WILL

11:05AM  13    PUSH TO GET MORE DEVICES DONE."

11:05AM  14         DO YOU SEE THAT?

11:05AM  15    A.   YES.

11:05AM  16    Q.   "AND THE DRIVING FACTOR WILL BE NO BACKLOG OR DELAY IN

11:05AM  17    PATIENT SAMPLES."

11:05AM  18         DO YOU SEE THAT?

11:05AM  19    A.   YES.

11:05AM  20    Q.   AND HE WAS GOING TO DO WHAT YOU ASKED HIM TO DO, RIGHT, TO

11:05AM  21    STOP ALIQUOTING THE SAMPLES; RIGHT?

11:05AM  22    A.   YES.

11:05AM  23    Q.   AND YOU THANKED HIM FOR THAT?

11:05AM  24    A.   YES.

11:05AM  25              MR. WADE:  YOUR HONOR, NOW MIGHT BE A GOOD TIME FOR

11:06AM   1    A BREAK.

11:06AM   2              THE COURT:  LET'S DO THAT.  LET'S TAKE OUR BREAK,

11:06AM   3    LADIES AND GENTLEMEN.  LET'S TAKE ABOUT 45 MINUTES.  I THINK

11:06AM   4    45 MINUTES WILL BE GOOD NOW.

11:06AM   5        WE'LL TAKE OUR BREAK.  I THINK I MENTIONED WE WOULD GO

11:06AM   6    UNTIL 3:00 P.M. THIS AFTERNOON.  THAT'S MY RECOLLECTION.

11:06AM   7        DOES THAT CAUSE A PROBLEM FOR ANYONE?  IF SO, LET ME SEE A

11:06AM   8    HAND.

11:06AM   9        THANKS SO MUCH.  ENJOY YOUR BREAK.  WE'LL SEE YOU IN ABOUT

11:06AM  10    45 MINUTES.

11:07AM  11        (JURY OUT AT 11:07 A.M.)

11:07AM  12              THE COURT:  THANK YOU.  DOCTOR, YOU CAN STAND DOWN

11:07AM  13    AND TAKE A BREAK AS WELL.

11:07AM  14        PLEASE BE SEATED.  THANK YOU.

11:07AM  15        OUR JURY HAS LEFT THE COURTROOM.  ALL COUNSEL ARE PRESENT.

11:07AM  16        THE WITNESS HAS LEFT THE COURTROOM.

11:07AM  17        ANYTHING FURTHER BEFORE WE TAKE OUR BREAK?

11:07AM  18        FROM THE PROSECUTION?

11:07AM  19              MR. BOSTIC:  NO, YOUR HONOR.

11:07AM  20              MR. DOWNEY:  NO, YOUR HONOR.

11:07AM  21              THE COURT:  ALL RIGHT.  THANK YOU.

11:07AM  22        IT MAY BE THAT I WON'T BE ABLE TO ENGAGE THE JURY AS I

11:07AM  23    SAID REGARDING THEIR QUESTIONNAIRES.  AS YOU RECALL, MY PLAN

11:07AM  24    WAS TO LET THEM KNOW THAT PRIOR TO THE BREAK AND GIVE THEM

11:07AM  25    THEIR QUESTIONNAIRES SO THEY CAN LOOK AT THEM OVER THE COURSE

11:07AM   1        OF THEIR BREAK.

11:07AM   2             GIVEN OUR TIMING AND OUR DISCUSSION THIS MORNING, I DON'T

11:07AM   3        THINK THAT'S GOING TO BE APPROPRIATE TODAY.  I DON'T THINK

11:07AM   4        WE'LL HAVE TIME TO DO THAT TODAY.  I'M GOING TO HAVE TO ENGAGE

11:08AM   5        THAT NEXT WEEK IN A DIFFERENT SCHEDULE, I THINK.  I DON'T THINK

11:08AM   6        WE CAN GET IT DONE TOMORROW AS WELL.

11:08AM   7             BUT WE'LL SEE WHAT TOMORROW BRINGS.  OKAY.  THANK YOU.

11:08AM   8                  MR. DOWNEY:  THANK YOU.

11:08AM   9                  THE CLERK:  COURT IS IN RECESS.

11:08AM  10             (LUNCH RECESS TAKEN AT 11:08 A.M.)

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 11:08AM  | 1  | **AFTERNOON SESSION**                                        |
| 11:56AM  | 2  | (JURY IN AT 11:56 A.M.)                                      |
| 11:56AM  | 3  | THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD.           |
| 11:56AM  | 4  | ALL OF THE PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN. |
| 11:56AM  | 5  | OUR JURY IS PRESENT.  DR. ROSENDORFF IS ON THE STAND        |
| 11:56AM  | 6  | AGAIN.                                                       |
| 11:56AM  | 7  | YOU HAVE QUESTIONS?                                          |
| 11:56AM  | 8  | MR. WADE:  I DO, YOUR HONOR.  THANK YOU.                    |
| 11:57AM  | 9  | Q.  DR. ROSENDORFF, I HAVE A COUPLE OF QUESTIONS ABOUT THE  |
| 11:57AM  | 10 | T PROTOCOLS.                                                 |
| 11:57AM  | 11 | A.  OKAY.                                                    |
| 11:57AM  | 12 | Q.  SO WE'RE ALL ON THE SAME PAGE, THOSE WERE THE MODIFIED  |
| 11:57AM  | 13 | ADVIA ASSAYS?                                                |
| 11:57AM  | 14 | A.  CORRECT.                                                 |
| 11:57AM  | 15 | Q.  AND THOSE WERE LAB DEVELOPED TESTS?                     |
| 11:57AM  | 16 | A.  CORRECT.                                                 |
| 11:57AM  | 17 | Q.  AND THE SIEMENS ADVIA HAD OPEN CHANNELS FOR LAB DEVELOPED |
| 11:57AM  | 18 | TESTS?                                                       |
| 11:57AM  | 19 | A.  CORRECT.                                                 |
| 11:57AM  | 20 | Q.  AND AT THE TIME THESE WERE BEING PUT ON TO THE ADVIA,   |
| 11:57AM  | 21 | THERE WERE NO COMMERCIALLY AVAILABLE FINGERSTICK TESTS THAT  |
| 11:57AM  | 22 | COULD BE RUN ON THE ADVIA; CORRECT?                         |
| 11:57AM  | 23 | A.  CORRECT.                                                 |
| 11:57AM  | 24 | Q.  AND THERE WERE SOME QUESTIONS ASKED ON DIRECT EXAMINATION |
| 11:57AM  | 25 | ABOUT THESE PROTOCOLS.                                       |

| | | |
|---|---|---|
| 11:57AM | 1 | DO YOU RECALL SOME OF THOSE QUESTIONS GENERALLY? |
| 11:57AM | 2 | A.   YES. |
| 11:57AM | 3 | Q.   OKAY.  BUT WITH THE EXCEPTION OF POTASSIUM, THOSE ADVIA |
| 11:58AM | 4 | PROTOCOLS WORKED REMARKABLY WELL, DIDN'T THEY? |
| 11:58AM | 5 | A.   ARE YOU REFERRING TO THE PREDICATE OR THE THERANOS ASSAYS? |
| 11:58AM | 6 | Q.   THE T PROTOCOLS RUNNING ON THE ADVIA'S WORKED REMARKABLY |
| 11:58AM | 7 | WELL, WITH THE EXCEPTION OF POTASSIUMS; CORRECT? |
| 11:58AM | 8 | A.   NO. |
| 11:58AM | 9 | Q.   DO YOU RECALL TELLING THE GOVERNMENT, THE S.E.C., ONE OF |
| 11:58AM | 10 | THE PROSECUTORS AND SOME OF THE AGENTS IN THIS CASE IN JUNE OF |
| 11:58AM | 11 | 2017 THAT WITH THE EXCEPTION OF POTASSIUM, THE T PROTOCOLS WITH |
| 11:58AM | 12 | THE FINGERSTICK DRAW WORKED REMARKABLY WELL? |
| 11:58AM | 13 | A.   NO, I DON'T RECALL. |
| 11:58AM | 14 | Q.   IF YOU COULD GO TO THE YELLOW BINDER, EXHIBIT 11004. |
| 11:59AM | 15 | DO YOU HAVE THAT MEMORANDUM OF INTERVIEW IN FRONT OF YOU? |
| 11:59AM | 16 | A.   YES, YES. |
| 11:59AM | 17 | Q.   IF YOU COULD GO TO THE FIFTH PAGE AND GO TO THE LAST |
| 11:59AM | 18 | PARAGRAPH ON THE BOTTOM OF THAT PAGE AND READ IT TO YOURSELF |
| 11:59AM | 19 | AND JUST TELL ME WHEN YOU'RE DONE READING IT. |
| 11:59AM | 20 | A.   YES, I'M DONE READING IT. |
| 11:59AM | 21 | Q.   DOES READING THAT PARAGRAPH REFRESH YOUR RECOLLECTION THAT |
| 11:59AM | 22 | YOU TOLD THE S.E.C. AND THESE GOVERNMENT LAWYERS THAT THE |
| 11:59AM | 23 | T PROTOCOL AND FINGERSTICK DRAW WORK REMARKABLY WELL FOR MOST |
| 11:59AM | 24 | ANALYTES? |
| 11:59AM | 25 | A.   I DON'T HAVE AN INDEPENDENT RECOLLECTION.  I'M READING IT |

12:00PM  1      NOW.

12:00PM  2      Q.   DOES IT REFRESH YOUR RECOLLECTION, SIR, THAT YOU TOLD THEM

12:00PM  3      THAT?

12:00PM  4      A.   NO.

12:00PM  5      Q.   I'D LIKE TO ASK YOU SOME QUESTIONS ABOUT YOUR DEPARTURE

12:00PM  6      FROM THE COMPANY.

12:00PM  7           I BELIEVE THAT YOUR TESTIMONY WAS THAT YOU STARTED LOOKING

12:00PM  8      FOR A JOB IN THE MIDDLE OF 2013; CORRECT?

12:00PM  9      A.   I WAS LOOKING AROUND, YES.

12:00PM 10      Q.   YEAH.  YOU WERE LOOKING AROUND FOR OTHER JOBS IN THE

12:00PM 11      MIDDLE OF 2013; RIGHT?

12:00PM 12      A.   YES.

12:00PM 13      Q.   AND YOU WENT ON THE CLIA LAB CERTIFICATE AS A LAB DIRECTOR

12:00PM 14      STARTING IN JUNE OF 2013; RIGHT?

12:01PM 15      A.   YES.

12:01PM 16      Q.   RIGHT.  LET'S JUST -- SO WE HAVE IT IN EVIDENCE, LET'S

12:01PM 17      LOOK AT 13887, WHICH SHOULD BE IN ONE OF YOUR BLACK EXHIBIT

12:01PM 18      BINDERS.

12:01PM 19      A.   I HAVE IT.

12:01PM 20      Q.   AND THIS IS A COPY OF YOUR CLINICAL LABORATORY LICENSE?

12:01PM 21      A.   YES.

12:01PM 22      Q.   FOR THERANOS?

12:01PM 23      A.   YES.

12:01PM 24           MR. WADE:  I MOVE THE ADMISSION OF 13887.

12:01PM 25           MR. BOSTIC:  NO OBJECTION.

| 12:01PM | 1 | THE COURT:  IT'S ADMITTED AND IT MAY BE PUBLISHED. |
|---|---|---|

12:01PM  1          THE COURT:  IT'S ADMITTED AND IT MAY BE PUBLISHED.

12:01PM  2          (DEFENDANT'S EXHIBIT 13887 WAS RECEIVED IN EVIDENCE.)

12:01PM  3          MR. WADE:  IF WE CAN PULL UP THE BOTTOM HALF.

12:01PM  4     Q.   THIS NOTES THAT IN JUNE OF 2013 YOU WENT ON TO THE CLIA

12:02PM  5     CERTIFICATE ALONG WITH SPENCER HIRAKI; CORRECT?

12:02PM  6     A.   CORRECT.

12:02PM  7     Q.   AND A LITTLE BIT LATER THAT YEAR, YOU BECAME THE ONLY

12:02PM  8     PERSON ON THE CLIA CERTIFICATE; RIGHT?

12:02PM  9     A.   CORRECT.

12:02PM  10    Q.   AND I THINK WE DISCUSSED THAT THE SOFT LAUNCH AT WALGREENS

12:02PM  11    FOR FRIENDS AND FAMILY WAS IN SEPTEMBER OF 2013?

12:02PM  12    A.   CORRECT.

12:02PM  13    Q.   AND SO YOU STARTED LOOKING FOR A JOB BEFORE ANY PATIENT

12:02PM  14    TESTS WERE PERFORMED AT THERANOS?

12:02PM  15    A.   YES.

12:02PM  16    Q.   YOU ESSENTIALLY HAD A FOOT OUT THE DOOR THE WHOLE TIME; IS

12:02PM  17    THAT RIGHT?

12:02PM  18    A.   I CAN'T ANSWER YES OR NO.  I WAS VERY COMMITTED TO MY JOB

12:02PM  19    AS LAB DIRECTOR AT THERANOS.

12:03PM  20    Q.   BUT YOU WERE DEDICATED TO TRYING TO FIND A DIFFERENT JOB;

12:03PM  21    CORRECT?

12:03PM  22    A.   ON OCCASION I WOULD LOOK AT WHAT JOBS WERE AVAILABLE.

12:03PM  23    Q.   AND THAT WAS BEFORE ANY OF THESE ISSUES THAT YOU TALKED

12:03PM  24    ABOUT ON DIRECT EXAMINATION; CORRECT?

12:03PM  25    A.   CORRECT.

12:03PM 1     Q.   AND I BELIEVE YOU ALSO TESTIFIED THAT STARTING IN MAY OF

12:03PM 2     2013, OR THEREABOUTS, YOU WERE CONSIDERING A QUI TAM LAWSUIT;

12:03PM 3     IS THAT CORRECT?

12:03PM 4     A.   CORRECT.

12:03PM 5     Q.   AND JUST SO -- THAT'S KIND OF AN INTERESTING WORD.  JUST

12:03PM 6     FOR THE BENEFIT OF THE JURY, A QUI TAM LAWSUIT IS ONE WHERE YOU

12:03PM 7     WOULD TRY TO RECOVER MONEY FROM THERANOS; RIGHT?

12:03PM 8     A.   IT'S A LAWSUIT WHERE I WOULD BE ALERTING THE GOVERNMENT TO

12:03PM 9     A FALSE CLAIM ON BEHALF OF -- I WOULD BE A RELATOR AND WOULD BE

12:03PM 10    ALERTING THE GOVERNMENT TO WRONGDOING AT THERANOS.

12:03PM 11    Q.   RIGHT.  AND IN EXCHANGE FOR YOUR FILING A QUI TAM LAWSUIT,

12:04PM 12    IF THERE'S A RECOVERY, YOU WOULD GET BETWEEN 15 AND 25 PERCENT

12:04PM 13    OF THE MONEY FROM THAT RECOVERY; RIGHT?

12:04PM 14    A.   YES.  BUT I KNEW THAT THERANOS DIDN'T HAVE A LOT OF

12:04PM 15    MEDICARE WORK.

12:04PM 16    Q.   OKAY.

12:04PM 17    A.   IT WAS A WAY OF ALERTING THE GOVERNMENT TO WHAT WAS GOING

12:04PM 18    ON.  THAT'S HOW I VIEWED IT.

12:04PM 19    Q.   SIR, YOU'RE AWARE THAT A QUI TAM LAWSUIT IS A LAWSUIT

12:04PM 20    WHERE YOU WOULD GET 15 TO 25 PERCENT?

12:04PM 21    A.   I DON'T KNOW THE EXACT PERCENTAGES.  I DIDN'T LOOK INTO

12:04PM 22    THAT.

12:04PM 23    Q.   BUT YOU KNOW THAT YOU GET A PERCENTAGE OF RECOVERY OF

12:04PM 24    MONEY THAT WOULD COME BACK?

12:04PM 25    A.   RIGHT, YES, THERE'S A FINANCIAL AWARD.

12:04PM  1    Q.   AND YOU WERE TALKING TO LAWYERS ABOUT THAT LAWSUIT; RIGHT?

12:04PM  2    A.   CORRECT.

12:04PM  3    Q.   AND THOSE LAWYERS ARE NOT PAID ON AN HOURLY BASIS;

12:04PM  4    CORRECT?

12:04PM  5    A.   I PAID THE LAWYERS, PAID THOSE LAWYERS OUT OF MY OWN

12:04PM  6    POCKET.

12:04PM  7    Q.   OKAY.  BUT THEY GENERALLY GET A PERCENTAGE OF THE RECOVERY

12:04PM  8    AS WELL; RIGHT?

12:04PM  9    A.   I DON'T KNOW HOW THAT ARRANGEMENT WORKS.

12:04PM 10    Q.   OKAY.  AND THEY NEVER FILED A QUI TAM LAWSUIT; CORRECT?

12:05PM 11    A.   NO.

12:05PM 12    Q.   AND YOU SAY THAT YOU WANTED TO ALERT THE GOVERNMENT.

12:05PM 13         YOU ACTUALLY HAD A CONVERSATION IN OCTOBER OF 2014, OR IN

12:05PM 14    THE FALL OF 2014, WITH GARY YAMAMOTO OF CMS; CORRECT?

12:05PM 15    A.   YES, THAT'S CORRECT.

12:05PM 16    Q.   AND MR. YAMAMOTO IS ONE OF THE SENIOR PEOPLE FOR THE STATE

12:05PM 17    OF CALIFORNIA AT CMS?

12:05PM 18    A.   HE'S THE INSPECTOR, YES, AND I DON'T KNOW HIS SENIORITY

12:05PM 19    LEVEL.

12:05PM 20    Q.   OKAY.  AND YOU HAD A CONVERSATION WITH HIM WHERE YOU

12:05PM 21    SOUGHT GUIDANCE FOR HOW TO REPORT RESULTS FOR THERANOS'S LDT'S;

12:05PM 22    RIGHT?

12:05PM 23    A.   I BELIEVE THE DISCUSSION WAS ABOUT PROFICIENCY TESTING.

12:06PM 24    I -- YEAH.

12:06PM 25    Q.   AND YOU -- WAS THAT IN SEPTEMBER OF 2014?

| | | |
|---|---|---|
| 12:06PM | 1 | A. I DON'T RECALL. |
| 12:06PM | 2 | Q. OKAY. AND YOU CALLED TO CONSULT WITH HIM ON THERANOS'S |
| 12:06PM | 3 | WORK ON THAT; RIGHT? |
| 12:06PM | 4 | A. YES. |
| 12:06PM | 5 | Q. AND YOU SOUGHT GUIDANCE FROM HIM ON THAT? |
| 12:06PM | 6 | A. YES. |
| 12:06PM | 7 | Q. AND CMS TOLD YOU, JUST WAIT UNTIL THE NEXT INSPECTION; |
| 12:06PM | 8 | RIGHT? |
| 12:06PM | 9 | A. YES. |
| 12:06PM | 10 | Q. AND IN THAT MEETING WHERE YOU HAD GARY YAMAMOTO ON THE |
| 12:06PM | 11 | PHONE, DID YOU RAISE ANY OF THESE OTHER ISSUES WITH HIM? |
| 12:06PM | 12 | A. NO. |
| 12:06PM | 13 | Q. NO. OKAY. THAT WOULD HAVE BEEN A PRETTY EASY WAY TO |
| 12:06PM | 14 | ALERT THE GOVERNMENT; RIGHT? YOU HAD HIM ON THE PHONE, RIGHT, |
| 12:06PM | 15 | SIR? |
| 12:06PM | 16 | A. YES. |
| 12:06PM | 17 | Q. WE TALKED ABOUT YOUR SAYING THE REASON THAT YOU LEFT |
| 12:06PM | 18 | RELATED TO AAP; CORRECT? |
| 12:07PM | 19 | A. YES. |
| 12:07PM | 20 | Q. DO YOU REMEMBER THAT? |
| 12:07PM | 21 | AND LAST WEEK WE WALKED THROUGH THAT CHRONOLOGY A BIT IN |
| 12:07PM | 22 | THE FALL OF 2014. |
| 12:07PM | 23 | DO YOU RECALL THAT? |
| 12:07PM | 24 | A. YES. |
| 12:07PM | 25 | Q. AND THERE WAS A MEETING IN 2014; RIGHT? |

12:07PM 1    A.   YES.

12:07PM 2    Q.   AND I BELIEVE YOU TESTIFIED AT SOME POINT YOU LEFT

12:07PM 3    UNSATISFIED.  YOU THOUGHT IT WAS LIP SERVICE?

12:07PM 4    A.   CORRECT.

12:07PM 5    Q.   OKAY.  THAT WAS, THAT WAS THE MEETING THAT YOU ASKED FOR;

12:07PM 6    RIGHT?

12:07PM 7    A.   CORRECT.

12:07PM 8    Q.   OKAY.  AND THAT WAS THE MEETING THAT WAS SET FOR THE DAY

12:07PM 9    AFTER YOU ASKED FOR IT, RIGHT, ON OCTOBER 10TH?

12:07PM 10   A.   I BELIEVE SO.

12:07PM 11   Q.   OKAY.  AND YOU WERE GIVEN -- YOUR TESTIMONY, I BELIEVE,

12:07PM 12   WAS A CHANCE TO RAISE ALL OF YOUR CONCERNS IN THAT MEETING;

12:07PM 13   CORRECT?

12:07PM 14   A.   YES.

12:07PM 15   Q.   AND THERE WERE NO LIMITATIONS PLACED ON YOU IN THAT

12:07PM 16   MEETING; RIGHT?

12:07PM 17   A.   NO.

12:07PM 18   Q.   AND, IN FACT, YOU WERE -- YOU ACTUALLY RESCHEDULED THAT

12:08PM 19   MEETING FOR A WEEK AFTER?

12:08PM 20   A.   YES.

12:08PM 21   Q.   AND THERE WAS A FOLLOW-UP MEETING THAT YOU CANCELLED

12:08PM 22   BECAUSE YOU DIDN'T HAVE ANYTHING ELSE TO RAISE.

12:08PM 23       DO YOU RECALL THAT?

12:08PM 24   A.   YES.

12:08PM 25   Q.   AND DO YOU RECALL THAT THERE WERE ACTIONS --

12:08PM 1    A.   I DIDN'T THINK ANYTHING FURTHER WOULD BE ACCOMPLISHED WITH

12:08PM 2    ANOTHER MEETING.

12:08PM 3    Q.   BUT YOU RECALL THAT THERE WERE ACTIONS ALMOST IMMEDIATELY

12:08PM 4    COMING OUT OF THAT MEETING WHERE YOU WERE ENGAGING WITH

12:08PM 5    MR. ARINGTON ON THOSE ISSUES?

12:08PM 6         DO YOU RECALL THAT?

12:08PM 7    A.   MR. ARINGTON WAS PRESENT AT THAT MEETING.  I DON'T KNOW

12:08PM 8    WHAT YOU MEAN BY ACTIONS.

12:08PM 9    Q.   WELL, DO YOU RECALL SENDING AN EMAIL AFTER THAT SET FORTH

12:08PM 10   EXACTLY WHAT NEEDED TO BE DONE WITH RESPECT TO THE ANALYTES?

12:08PM 11        DO YOU RECALL THAT?

12:08PM 12   A.   I BELIEVE SO.

12:08PM 13   Q.   OKAY.  AND THAT WAS THE DAY AFTER THE MEETING?

12:08PM 14   A.   YES.

12:08PM 15   Q.   OR TWO DAYS.  WITHIN A DAY OR TWO AFTER THE MEETING;

12:08PM 16   RIGHT?

12:08PM 17   A.   YES.

12:08PM 18   Q.   BUT YOU MAINTAINED THE VIEW THAT THERE WEREN'T ENOUGH

12:08PM 19   RESOURCES THAT WERE DEDICATED TO THAT; RIGHT?

12:08PM 20   A.   CORRECT.

12:08PM 21   Q.   AND YOU'VE SEEN A LOT OF EMAILS IN YOUR NINE OR SO

12:09PM 22   APPEARANCES IN THIS CASE.

12:09PM 23        HAVE YOU EVER SEEN A SINGLE EMAIL WHERE YOU ASKED FOR

12:09PM 24   RESOURCES ON AAP FROM MS. HOLMES OR MR. BALWANI AND YOU WERE

12:09PM 25   TOLD, NO, YOU CAN'T HAVE THEM?  HAVE YOU SEEN A SINGLE EMAIL,

12:09PM   1    SIR?

12:09PM   2    A.   ON -- IT WASN'T MY PLACE TO BE DIRECTING THE COMPANY

12:09PM   3    REGARDING ALLOCATION OF RESOURCES.

12:09PM   4    Q.   SIR, YOU WERE RESPONSIBLE TO ENSURE THAT AAP WAS DONE

12:09PM   5    WITHIN THE COMPANY; CORRECT?

12:09PM   6    A.   CORRECT.

12:09PM   7    Q.   OKAY.  AND YOUR COMPLAINT WAS THAT THERE WASN'T ENOUGH

12:09PM   8    RESOURCES DEDICATED TO IT; RIGHT?

12:09PM   9    A.   CORRECT.

12:09PM  10    Q.   AND YOU SENT A LOT OF EMAILS WHILE AT THERANOS; CORRECT?

12:09PM  11    A.   CORRECT.

12:09PM  12    Q.   AND WAS THERE EVER A SINGLE EMAIL THAT YOU'VE SEEN WHERE

12:09PM  13    YOU ASKED FOR THAT AND YOU WERE DENIED RESOURCES FOR AAP, A

12:09PM  14    SINGLE EMAIL?

12:09PM  15    A.   I DON'T RECALL.

12:09PM  16    Q.   YEAH.  DO YOU RECALL IN THE FALL OF 2014 THERE WERE SOME

12:09PM  17    ACTIONS ON YOUR PART THAT WERE SOMEWHAT ERRATIC OR

12:10PM  18    UNCHARACTERISTIC.

12:10PM  19         DO YOU RECALL THAT?

12:10PM  20    A.   COULD YOU CLARIFY?

12:10PM  21    Q.   SURE.  DO YOU RECALL THERE WAS AN OCCASION WHERE YOU

12:10PM  22    FAILED TO RETURN THE CALL OF A DOCTOR FOR A WEEK?  DO YOU

12:10PM  23    RECALL THAT?

12:10PM  24    A.   I SPOKE TO THE DOCTOR ONCE.  I WAS RELUCTANT TO JUSTIFY

12:10PM  25    DISCREPANT RESULTS TO THE DOCTOR ON A SUBSEQUENT PHONE CALL.  I

12:10PM   1    COMMUNICATED THAT TO THE COMPANY.

12:10PM   2    Q.   WE'LL TALK ABOUT THAT ISSUE WHICH I BELIEVE WAS NOVEMBER

12:10PM   3    20TH OR 21ST.

12:10PM   4         BUT THERE WAS ACTUALLY AN EMAIL THAT YOU WERE SENT ON

12:10PM   5    OCTOBER 10TH WHERE YOU WERE ASKED TO CALL THE DOCTOR, YOU SAID

12:10PM   6    YOU WERE, YOU WOULD, AND YOU DIDN'T RETURN THE CALL FOR A WEEK

12:10PM   7    AND THEY HAD TO FOLLOW UP AGAIN.

12:10PM   8         DO YOU RECALL THAT?

12:10PM   9    A.   YES.

12:10PM  10    Q.   AND I BELIEVE YOU SAID IT WAS A MISTAKE?

12:10PM  11    A.   I WAS REALLY SWAMPED WITH DEALING WITH ISSUES AND PROBLEMS

12:10PM  12    AT THE COMPANY.  THAT MAY HAVE SKIPPED MY ATTENTION.

12:11PM  13    Q.   THAT'S WHAT YOU WERE SWAMPED WITH ON OCTOBER 10TH?

12:11PM  14    A.   I BELIEVE SO.

12:11PM  15    Q.   OKAY.  THAT WAS THE SAME DAY THAT YOU CANCELLED THE

12:11PM  16    MEETING THAT YOU REQUESTED WITH SENIOR LEADERSHIP TO DISCUSS

12:11PM  17    AAP?

12:11PM  18         DO YOU RECALL THAT, OCTOBER 10TH?

12:11PM  19    A.   NO.  SUNNY ASKED ME IF A FOLLOW-UP MEETING WAS NEEDED AND

12:11PM  20    I SAID NO.

12:11PM  21    Q.   NO.  BUT DO YOU RECALL THERE WAS A MEETING SET FOR

12:11PM  22    OCTOBER 10TH -- HERE, LET'S PULL IT UP.

12:11PM  23         EXHIBIT 13923.  IT'S IN EVIDENCE.  LET'S GO TO THE SECOND

12:11PM  24    PAGE.

12:11PM  25         IT WAS INITIALLY SET FOR THE 10TH, AND THEN IT WAS MOVED

12:11PM  1    PER ADAM'S REQUEST?

12:11PM  2    A.   YES, I SEE THAT.

12:11PM  3    Q.   DO YOU SEE THAT?

12:11PM  4    A.   YES.

12:12PM  5    Q.   AND SO THERE WAS INITIALLY -- SO YOU WERE ASKED TO CALL

12:12PM  6    THE DOCTOR ON THE 10TH AND YOU DIDN'T CALL THE DOCTOR; RIGHT?

12:12PM  7         AND THEN YOU ASKED TO SCHEDULE A MEETING -- IT WAS

12:12PM  8    SCHEDULED WITH THE SENIOR LEADERSHIP THE NEXT DAY ON

12:12PM  9    OCTOBER 10TH, AND YOU ASKED TO MOVE IT FIVE DAYS; CORRECT?

12:12PM  10   A.   YES.

12:12PM  11   Q.   OKAY.  AND THE REASON THAT YOU DID THAT, SIR, IS BECAUSE

12:12PM  12   YOU WERE INTERVIEWING FOR ANOTHER JOB THAT DAY; RIGHT?

12:12PM  13   A.   I DON'T RECALL.

12:12PM  14   Q.   WELL, LET'S LOOK AT THE DOCUMENT.

12:12PM  15        LET'S GO TO 13756.

12:13PM  16        IF YOU CAN REVIEW THE EMAILS DOWN AT THE BOTTOM OF THE

12:13PM  17   PAGE AND LET ME KNOW WHEN YOU'VE HAD A CHANCE TO REVIEW THAT.

12:13PM  18   A.   ARE YOU TALKING ABOUT THE SECOND PAGE OR ARE YOU --

12:13PM  19   Q.   YOU CAN REVIEW THE FIRST PAGE, AND I CALL YOUR ATTENTION

12:13PM  20   IN PARTICULAR TO THE BOTTOM OF THE PAGE.

12:13PM  21   A.   YES.

12:13PM  22   Q.   AND DO YOU RECALL THESE EMAILS BETWEEN YOU AND PEOPLE AT

12:13PM  23   INVITAE?

12:13PM  24   A.   YES.

12:13PM  25   Q.   AND A HEAD HUNTER?

12:13PM 1      A.   YES.

12:13PM 2      Q.   OKAY.

12:13PM 3           MOVE THE ADMISSION OF 13756.

12:13PM 4                MR. BOSTIC:  NO OBJECTION.

12:13PM 5                THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:14PM 6           (DEFENDANT'S EXHIBIT 13756 WAS RECEIVED IN EVIDENCE.)

12:14PM 7      Q.   DO YOU SEE WHERE IT TALKS ABOUT CONFIRMING A MEETING IN

12:14PM 8      SAN FRANCISCO FROM 12:00 TO 5:00 ON OCTOBER 10?

12:14PM 9           DO YOU SEE THAT?

12:14PM 10     A.   YES.

12:14PM 11     Q.   DO YOU SEE THAT?

12:14PM 12          AND, IN FACT, YOU WENT TO SAN FRANCISCO ON OCTOBER 10TH

12:14PM 13     AND YOU SPENT THE AFTERNOON INTERVIEWING WITH EXECUTIVES AT

12:14PM 14     INVITAE; CORRECT?

12:14PM 15     A.   I DO NOT RECALL THE EXACT DAY THAT I WENT THERE.  I DON'T

12:14PM 16     RECALL THAT INDEPENDENTLY FROM READING THIS.

12:14PM 17     Q.   OKAY.  WE'LL COME BACK TO THAT.

12:14PM 18          DO YOU RECALL THAT YOU STARTED APPLYING FOR THIS POSITION

12:14PM 19     IN AUGUST?

12:14PM 20     A.   I DON'T RECALL.

12:14PM 21     Q.   DO YOU RECALL THAT YOU WERE CONTACTED BY THAT HEADHUNTER

12:14PM 22     VIA LINKEDIN IN LATE AUGUST 2014?

12:15PM 23     A.   I DON'T RECALL.

12:15PM 24     Q.   LET'S LOOK AT EXHIBIT 13751.

12:15PM 25          DO YOU HAVE THAT IN FRONT OF YOU?

12:15PM   1     A.   YES.

12:15PM   2     Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT YOU ACCEPTED A

12:15PM   3     LINKEDIN INVITATION FROM THAT HEADHUNTER IN AUGUST OF 2014?

12:15PM   4     A.   YES.

12:15PM   5     Q.   AND --

12:15PM   6     A.   I'M SORRY, CORRECTION.  I'M READING IT HERE.  I DON'T HAVE

12:15PM   7     AN INDEPENDENT RECOLLECTION.

12:15PM   8     Q.   OKAY.  LET'S GO TO EXHIBIT 13753.

12:16PM   9          DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?

12:16PM  10     A.   YES.

12:16PM  11     Q.   AND THAT'S AN EMAIL FROM YOU TO THE HEADHUNTER WITH A COPY

12:16PM  12     OF YOUR RESUME?

12:16PM  13     A.   YES.

12:16PM  14          MR. WADE:  MOVE THE ADMISSION OF 13753.

12:16PM  15          MR. BOSTIC:  NO OBJECTION.

12:16PM  16          THE COURT:  IT'S ADMITTED AND MAY BE PUBLISHED.

12:16PM  17     (DEFENDANT'S EXHIBIT 13753 WAS RECEIVED IN EVIDENCE.)

12:16PM  18     BY MR. WADE:

12:16PM  19     Q.   AND HERE YOU'RE SENDING A COPY OF YOUR RESUME TO

12:16PM  20     MOLLY RYAN AT DOUBLE-HELIX; CORRECT?

12:16PM  21     A.   YES.

12:16PM  22     Q.   AND THAT WAS IN PURSUIT OF THAT INVITAE POSITION?

12:16PM  23     A.   YES.

12:16PM  24     Q.   OKAY.  AND LET'S GO TO 13754.

12:17PM  25          DO YOU HAVE THAT IN FRONT OF YOU?

12:17PM  1    A.   YES.

12:17PM  2    Q.   THAT'S YOUR RESUME DURING THIS TIME PERIOD; CORRECT?

12:17PM  3    A.   YES.

12:17PM  4            MR. WADE:  MOVE THE ADMISSION OF 13754.

12:17PM  5            MR. BOSTIC:  NO OBJECTION.

12:17PM  6            THE COURT:  IT'S ADMITTED AND MAY BE PUBLISHED.

12:17PM  7         (DEFENDANT'S EXHIBIT 13754 WAS RECEIVED IN EVIDENCE.)

12:17PM  8    BY MR. WADE:

12:17PM  9    Q.   LET'S BLOW UP THE SECTION RELATING TO THERANOS.

12:17PM  10        IS THIS A TRUE, ACCURATE, AND COMPLETE DESCRIPTION OF YOUR

12:17PM  11   WORK AT THERANOS?

12:17PM  12   A.   IT'S A SELECTION OF THE THINGS THAT I WAS WORKING ON AT

12:17PM  13   THERANOS.

12:17PM  14   Q.   IS IT TRUTHFUL AND ACCURATE?

12:17PM  15   A.   I BELIEVE SO.

12:17PM  16        I'M SORRY, I WAS NOT INVOLVED IN NEW YORK STATE

12:17PM  17   INSPECTIONS.

12:17PM  18   Q.   SO IT'S INACCURATE?

12:17PM  19   A.   THE NEW YORK STATE IS NOT ACCURATE, CORRECT.

12:17PM  20   Q.   OKAY.  IS IT OTHERWISE ACCURATE?

12:17PM  21   A.   YES.

12:17PM  22   Q.   AND IT TALKS ABOUT MUCH OF THE GOOD WORK YOU WERE DOING

12:17PM  23   THERE.

12:17PM  24        DO YOU SEE THAT?

12:17PM  25   A.   SO I DON'T KNOW IF YOU'VE EVER TRIED TO APPLY FOR A JOB,

12:17PM  1    BUT IT GENERALLY DOESN'T SERVE YOU IF YOU TALK ABOUT A COMPANY

12:17PM  2    THAT HAS BEEN ACCUSED OF FRAUDULENT PRACTICES OR IS UNDER

12:18PM  3    INVESTIGATION.

12:18PM  4              MR. WADE:  OKAY.  MOVE TO STRIKE THAT ANSWER,

12:18PM  5    YOUR HONOR.

12:18PM  6              THE COURT:  OVERRULED.

12:18PM  7    BY MR. WADE:

12:18PM  8    Q.  DO YOU SEE WHERE IT TALKS ABOUT SOME OF THE WORK THAT YOU

12:18PM  9    PERFORMED --

12:18PM  10   A.  YES.

12:18PM  11   Q.  -- AS A LABORATORY DIRECTOR AT THERANOS?

12:18PM  12   A.  YES.

12:18PM  13   Q.  OKAY.  AND DO YOU SEE WHERE IT TALKS ABOUT HOW YOU WORKED

12:18PM  14   EXTENSIVELY WITH R&D LEADS AND DIRECTED LABORATORY STAFF?

12:18PM  15       DO YOU SEE THAT?

12:18PM  16   A.  YES.

12:18PM  17   Q.  AND DO YOU SEE HOW IT SAYS YOU ESTABLISHED THE TECHNICAL

12:18PM  18   PERFORMANCE OF OVER 70 NOVEL ASSAY METHODS?

12:18PM  19   A.  YES.

12:18PM  20   Q.  AND YOU BELIEVED THAT AT THE TIME; CORRECT?

12:18PM  21   A.  YES.

12:18PM  22   Q.  OKAY.  AND DO YOU SEE WHERE IT SAYS THAT YOU SUCCESSFULLY

12:18PM  23   LED LABORATORY THROUGH STATE AND FEDERAL INSPECTIONS?

12:18PM  24       DO YOU SEE THAT?

12:18PM  25   A.  YES, YES.

12:18PM 1    Q.  AND WITH THE EXCEPTION OF NEW YORK, YOU BELIEVE THAT TO BE

12:18PM 2    TRUE; CORRECT?

12:18PM 3    A.  YES.

12:18PM 4    Q.  AND DO YOU SEE WHERE IT SAYS THAT YOU'VE PROVIDED

12:18PM 5    REGULATORY GUIDANCE ON CLIA AND STATE LABORATORY COMPLIANCE?

12:18PM 6    A.  YES.

12:18PM 7    Q.  DO YOU SEE THAT?

12:19PM 8    A.  YES.

12:19PM 9    Q.  AND YOU BELIEVED THAT TO BE TRUE?

12:19PM 10   A.  YES.

12:19PM 11   Q.  OKAY.  AND YOU CONDUCTED AN INTERVIEW IN SEPTEMBER WITH A

12:19PM 12   GENTLEMAN BY THE NAME OF SWAROOP ARADHYA?

12:19PM 13   A.  ARADHYA.

12:19PM 14   Q.  ARADHYA.  HE WORKED AT INVITAE?

12:19PM 15   A.  YES.

12:19PM 16   Q.  AND IT WAS AFTER -- THAT WAS IN SEPTEMBER OF 2014?

12:19PM 17   A.  I REMEMBER MEETING WITH HIM AT A CAFE IN PALO ALTO.

12:19PM 18   Q.  DURING THE WORK DAY; RIGHT?

12:19PM 19   A.  YEAH.

12:19PM 20   Q.  OKAY.

12:19PM 21   A.  I DON'T REMEMBER THE DATE.

12:19PM 22   Q.  OKAY.  AND THEN YOU LATER SPENT OCTOBER 10TH WITH THE

12:19PM 23   EXECUTIVE TEAM AS SET FORTH IN THAT EMAIL; RIGHT?

12:19PM 24   A.  AGAIN, I DON'T REMEMBER THE DATE.

12:19PM 25   Q.  OKAY.  BUT IT WAS UP IN SAN FRANCISCO.

12:19PM  1         YOU RECALL THAT?

12:20PM  2    A.   CORRECT.

12:20PM  3    Q.   AND IT WAS IN THE AFTERNOON FROM 12:00 TO 5:00?

12:20PM  4    A.   CORRECT.

12:20PM  5    Q.   AND DO YOU HAVE ANY REASON TO QUESTION THAT IT WAS ON

12:20PM  6    OCTOBER 10TH AS SET FORTH IN THAT EMAIL?

12:20PM  7    A.   I HAVE -- I DO NOT RECALL WHEN IT WAS.

12:20PM  8    Q.   OKAY.  DO YOU RECALL THAT YOU WERE -- WITH RESPECT TO SOME

12:20PM  9    OF YOUR ACTS AT THE COMPANY, YOU ALSO ASKED THE COMPANY TO SEND

12:20PM  10   A COMPANY-WIDE EMAIL IN RESPONSE TO A RUMOR ABOUT EBOLA

12:20PM  11   TESTING?

12:20PM  12   A.   YES.

12:20PM  13   Q.   AND THERE WAS A RUMOR GOING AROUND AND YOU WERE DEMANDING

12:20PM  14   THAT A COMPANY-WIDE RUMOR -- THAT A COMPANY-WIDE EMAIL BE SENT

12:20PM  15   TO QUASH THAT RUMOR?

12:20PM  16   A.   I HAD BEEN INFORMED BY MEMBERS OF THE CLIA TEAM THAT THE

12:20PM  17   LABORATORY WAS PLANNING OR IN THE PROCESS OF VALIDATING A TEST

12:21PM  18   FOR EBOLA.  I HAD NOT BEEN INFORMED OF THIS.

12:21PM  19   Q.   YOU ASKED AND SENIOR LEADERSHIP TOLD YOU THAT'S NOT TRUE;

12:21PM  20   RIGHT?

12:21PM  21   A.   ELIZABETH TOLD ME THAT WAS NOT TRUE.

12:21PM  22   Q.   BUT YOU STILL WANT THEM TO SEND A COMPANY-WIDE EMAIL;

12:21PM  23   CORRECT?

12:21PM  24   A.   CORRECT.

12:21PM  25   Q.   AND YOU THEN RECEIVED -- AFTER THOSE EVENTS OF THE FALL

12:21PM  1    THAT WE JUST DISCUSSED, YOU RECEIVED AN OFFER TO JOIN INVITAE

12:21PM  2    AS LAB DIRECTOR ON NOVEMBER 12TH, 2014; RIGHT?

12:21PM  3    A.   I DON'T RECALL THE DATE.

12:21PM  4    Q.   OKAY.  LET'S LOOK AT EXHIBIT 12913.

12:22PM  5    A.   OKAY.

12:22PM  6    Q.   OKAY.  DO YOU HAVE THAT IN FRONT OF YOU?

12:22PM  7    A.   YES.

12:22PM  8    Q.   OKAY.  AND DOES THAT REFRESH YOUR RECOLLECTION -- IS THIS

12:22PM  9    YOUR OFFER LETTER FROM INVITAE?

12:22PM 10    A.   IT APPEARS TO BE, YES.

12:22PM 11    Q.   OKAY.  IF YOU LOOK AT THE THIRD PAGE, IS THAT YOUR

12:22PM 12    SIGNATURE THERE?

12:22PM 13    A.   YES.

12:22PM 14              MR. WADE:  MOVE THE ADMISSION OF 12913.

12:22PM 15              MR. BOSTIC:  NO OBJECTION.

12:22PM 16              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:22PM 17         (DEFENDANT'S EXHIBIT 12913 WAS RECEIVED IN EVIDENCE.)

12:22PM 18    BY MR. WADE:

12:22PM 19    Q.   OKAY.  SO YOU WERE OFFERED AT SOME POINT ON OR ABOUT

12:22PM 20    NOVEMBER 12TH, 2014 A JOB AT INVITAE?

12:22PM 21    A.   YES.

12:22PM 22    Q.   AND YOU ACCEPTED IT ON NOVEMBER 12TH, 2014?

12:22PM 23    A.   YES.

12:22PM 24    Q.   AND THEY WANTED YOU TO START SOON; RIGHT?

12:22PM 25    A.   YES.

| 12:22PM | 1 | Q.  AND YOU WERE OFFERED MORE MONEY TO GO THERE; RIGHT? |
| 12:22PM | 2 | A.  NOT A LOT MORE. |
| 12:23PM | 3 | I ALSO WANT TO POINT OUT THAT ELIZABETH GAVE ME STOCK |
| 12:23PM | 4 | OPTIONS.  IN VIEW OF THE RISKS AND MY CONCERNS WITH THERANOS, I |
| 12:23PM | 5 | WALKED AWAY FROM THOSE STOCK OPTIONS AT THERANOS.  I DIDN'T |
| 12:23PM | 6 | THINK IT WAS WORTH IT TO STAY AT THE COMPANY FOR THE ISSUES |
| 12:23PM | 7 | THAT WE HAVE BEEN DISCUSSING IN THIS TRIAL. |
| 12:23PM | 8 | Q.  ALL RIGHT, SIR.  I UNDERSTAND THAT. |
| 12:23PM | 9 | BUT MY QUESTION TO YOU WAS THAT YOU WERE GOING TO BE PAID |
| 12:23PM | 10 | MORE MONEY? |
| 12:23PM | 11 | A.  $15,000 MORE. |
| 12:23PM | 12 | Q.  HOW MUCH? |
| 12:23PM | 13 | A.  $15,000 MORE. |
| 12:23PM | 14 | Q.  OKAY.  YOU WERE GOING TO BE PAID $260,000 A YEAR? |
| 12:23PM | 15 | A.  CORRECT. |
| 12:23PM | 16 | Q.  AND DO YOU KNOW HOW MUCH YOU WERE MAKING AT THIS TIME AT |
| 12:23PM | 17 | THERANOS? |
| 12:23PM | 18 | A.  I HAVE -- I'VE REVIEWED MY OFFER LETTER RECENTLY FROM |
| 12:23PM | 19 | THERANOS, AND ALSO WE HAVE DISCUSSED IT DURING THIS TRIAL, AND |
| 12:23PM | 20 | I BELIEVE I WAS BEING PAID 240,000 A YEAR. |
| 12:23PM | 21 | Q.  OKAY.  SO YOU WERE OFFERED MORE MONEY; CORRECT? |
| 12:23PM | 22 | A.  NOT A LOT MORE. |
| 12:23PM | 23 | Q.  OKAY.  BUT YOU WERE OFFERED -- |
| 12:23PM | 24 | A.  I DON'T KNOW WHAT WE'RE DISCUSSING HERE. |
| 12:23PM | 25 | Q.  YOU WERE OFFERED 75,000 STOCK OPTIONS; CORRECT? |

12:24PM 1     A.   CORRECT.

12:24PM 2          SO THAT WAS ACTUALLY DIVIDED BY FIVE AND THOSE STOCK

12:24PM 3     OPTIONS WERE FOR A LONG PERIOD.  THEY WERE NEVER IN THE MONEY.

12:24PM 4     I BELIEVE I MADE JUST A FEW THOUSAND DOLLARS OFF OF THOSE STOCK

12:24PM 5     OPTIONS AT INVITAE.

12:24PM 6          MR. WADE:  MOVE TO STRIKE EVERYTHING AFTER

12:24PM 7     "CORRECT."

12:24PM 8          THE COURT:  THE LAST PORTION WILL BE STRICKEN AFTER

12:24PM 9     "CORRECT."

12:24PM 10    BY MR. WADE:

12:24PM 11    Q.   IF I CALL YOUR ATTENTION TO PAGE 3, YOU WERE ACTUALLY

12:24PM 12    OFFERED 75,000 OPTIONS THAT WERE GOING TO VEST OVER FOUR YEARS;

12:24PM 13    CORRECT?

12:24PM 14    A.   YES.

12:24PM 15    Q.   OKAY.  AND INVITAE WAS ABOUT TO GO PUBLIC EARLY THE NEXT

12:24PM 16    YEAR; RIGHT?

12:24PM 17    A.   CORRECT.

12:24PM 18    Q.   AND YOU WANTED TO BE A PART OF THAT; CORRECT?

12:24PM 19    A.   CAN YOU CLARIFY?  CAN YOU CLARIFY THE QUESTION?

12:25PM 20    Q.   YEAH.  YOU WANTED, YOU WANTED TO HAVE -- YOU WANTED YOUR

12:25PM 21    INTEREST TO BE ALIGNED WITH THE SUCCESS OF THE COMPANY GOING

12:25PM 22    IN; RIGHT?

12:25PM 23    A.   I WANTED TO JOIN A REPUTABLE COMPANY WHOSE MISSION I

12:25PM 24    BELIEVED IN.

12:25PM 25    Q.   RIGHT.  I UNDERSTAND.

12:25PM  1          AND YOU WERE BEING GIVEN 75,000 OPTIONS IN A COMPANY WHO

12:25PM  2     WAS ABOUT TO GO PUBLIC AS PART OF THAT?

12:25PM  3     A.   YEAH, BUT I HAD NO IDEA WHAT THE VALUE OF THOSE OPTIONS

12:25PM  4     WERE.

12:25PM  5     Q.   OKAY.  AND IN ADDITION TO THAT, WHEN YOU WERE AT INVITAE,

12:25PM  6     YOU HAD THE ABILITY TO ALSO WORK AS A PART-TIME LAB DIRECTOR;

12:25PM  7     RIGHT?

12:25PM  8     A.   CORRECT.

12:25PM  9     Q.   AND THAT WAS ADDITIONAL MONEY THAT YOU COULD GET ON THE

12:25PM 10     SIDE; RIGHT?

12:25PM 11     A.   CORRECT.

12:25PM 12     Q.   AND YOU DID THAT; RIGHT?

12:25PM 13     A.   CORRECT.

12:25PM 14     Q.   AND YOU MADE A LOT OF MONEY DOING THAT?

12:25PM 15     A.   NO.

12:25PM 16     Q.   HOW MUCH DID YOU MAKE AS A PART-TIME LAB DIRECTOR?

12:25PM 17     A.   I DON'T REMEMBER FOR SURE.  I THINK IT WAS AROUND $2,000

12:25PM 18     PER MONTH.

12:25PM 19     Q.   WAS IT AROUND $4,500 A MONTH?

12:25PM 20     A.   IT MAY HAVE BEEN.  I DON'T RECALL.

12:26PM 21     Q.   AND HOW MANY POSITIONS DID YOU HAVE?

12:26PM 22     A.   I ALSO WAS WORKING FOR PRECISION TOXICOLOGY AT THE TIME AS

12:26PM 23     A PART-TIME LAB DIRECTOR, SO IT WOULD HAVE BEEN THREE.

12:26PM 24     Q.   WHEN YOU SAY AT THE TIME, YOU STARTED THAT WHEN?

12:26PM 25     A.   PRECISION?

12:26PM 1    Q.   YES.  AT THE BEGINNING OF 2015?

12:26PM 2    A.   I THINK IT WAS AROUND THE SAME TIME I STARTED AT INVITAE,

12:26PM 3    YES.

12:26PM 4    Q.   AND I'M SORRY, WITH PRECISION, DO YOU KNOW HOW MUCH MONEY

12:26PM 5    YOU WERE GOING TO MAKE?

12:26PM 6    A.   I DON'T REMEMBER.

12:26PM 7    Q.   OKAY.  AND SO YOU ACCEPTED THIS OFFER THE VERY SAME DAY;

12:26PM 8    CORRECT?  THAT LETTER IS DATED NOVEMBER 12TH AND YOU SIGNED IT

12:26PM 9    NOVEMBER 12TH?

12:26PM 10   A.   YES.

12:26PM 11   Q.   YOU WROTE THERE THAT THEY -- THAT THE START DATE WAS GOING

12:26PM 12   TO BE NO LATER THAN JANUARY 12TH, 2015; CORRECT?

12:27PM 13   A.   CORRECT.

12:27PM 14   Q.   THEY WANTED YOU TO START QUICKLY, BUT YOU HAD A 60-DAY

12:27PM 15   NOTICE PERIOD; RIGHT?

12:27PM 16   A.   I BELIEVE I SENT AN EMAIL TO SUNNY AND ELIZABETH THE SAME

12:27PM 17   DAY, NOVEMBER 12TH, INFORMING THEM THAT I FOUND OTHER

12:27PM 18   EMPLOYMENT AND GIVING THEM A GOOD AMOUNT OF TIME TO FIND A

12:27PM 19   REPLACEMENT LAB DIRECTOR.

12:27PM 20   Q.   RIGHT.  IF YOU GO TO 12916.

12:28PM 21   A.   I'M THERE.  I'M THERE.

12:28PM 22   Q.   DO YOU HAVE THAT IN FRONT OF YOU?

12:28PM 23   A.   YES.

12:28PM 24   Q.   AND IS THIS THE EMAIL THAT YOU WERE JUST REFERRING TO?

12:28PM 25   A.   YES.

12:28PM 1                      MR. WADE:  OKAY.  I MOVE 12916.

12:28PM 2                      MR. BOSTIC:  NO OBJECTION.

12:28PM 3                      THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:28PM 4              (DEFENDANT'S EXHIBIT 12916 WAS RECEIVED IN EVIDENCE.)

12:28PM 5                      MR. WADE:  IF WE BLOW UP THE BOTTOM.

12:28PM 6      Q.   DO YOU SEE THERE IT SAYS -- THIS IS 7:52 ON NOVEMBER 12TH;

12:28PM 7      CORRECT?

12:28PM 8      A.   YES.

12:28PM 9      Q.   AND THAT'S THE VERY EVENING THAT YOU SIGNED THE OFFER

12:28PM 10     LETTER; CORRECT?

12:28PM 11     A.   YES.

12:28PM 12     Q.   AND WHEN YOU SAID NO LATER THAN JANUARY 12TH, THAT WAS

12:28PM 13     BECAUSE YOU NEEDED TO GIVE TWO MONTHS NOTICE UNDER YOUR

12:28PM 14     CONTRACT?

12:28PM 15     A.   YES.

12:28PM 16     Q.   OKAY.  AND YOU RESIGNED.  YOU SAID YOU APPRECIATED THE

12:28PM 17     OPPORTUNITY AND THE ABILITY TO INTERACT WITH SO MANY TALENTED

12:28PM 18     AND DEDICATED INDIVIDUALS OVER THE LAST YEAR AND A HALF;

12:28PM 19     CORRECT?

12:28PM 20     A.   CORRECT.

12:28PM 21     Q.   AND YOU SAID IT'S BEEN A TREMENDOUS EXPERIENCE; CORRECT?

12:28PM 22     A.   CORRECT.

12:28PM 23     Q.   AND THEN YOU GAVE THE NOTICE -- THE 60-DAY NOTICE;

12:28PM 24     CORRECT?

12:28PM 25     A.   YES.

12:28PM  1    Q.   AND MR. BALWANI, WHO IS YOUR DIRECT REPORT, RESPONDED;

12:29PM  2    CORRECT?

12:29PM  3    A.   YES.

12:29PM  4    Q.   OKAY.  AND HE SAID -- HE THANKED YOU FOR THE COMMITMENT

12:29PM  5    AND SAID HE APPRECIATED IT AND THAT HE WOULD SWING BY AND

12:29PM  6    DISCUSS THIS WITH YOU; CORRECT?

12:29PM  7    A.   YES.

12:29PM  8    Q.   OKAY.  AND THIS IS ON NOVEMBER 13TH?

12:29PM  9    A.   CORRECT.

12:29PM  10   Q.   OKAY.  AND IT WAS NOVEMBER 14TH WHERE YOU SEND THE EMAIL

12:29PM  11   DEMANDING THE EBOLA RETRACTION; CORRECT?

12:29PM  12   A.   I DON'T RECALL THE DATE ON THE EBOLA EMAIL.  I'M SORRY.

12:29PM  13   Q.   OKAY.  AND IT'S EXHIBIT 4330.  I BELIEVE IT'S IN EVIDENCE.

12:30PM  14   WE HAVE IT ON THE SCREEN.  IF WE CAN GO TO THE LAST PAGE.

12:30PM  15   A.   YES, I HAVE IT.

12:30PM  16   Q.   RIGHT.  DO YOU SEE THAT?  THE LAST PAGE, DO YOU SEE THAT

12:30PM  17   YOU HAD SENT AN EMAIL LATE THE NIGHT WEDNESDAY, NOVEMBER 12TH

12:30PM  18   RESIGNING; CORRECT?

12:30PM  19   A.   YES.

12:30PM  20   Q.   AND THEN THIS IS NOVEMBER 14TH, 2014?

12:30PM  21   A.   YES.

12:30PM  22   Q.   AND YOU'RE DIRECTING THE EMAIL TO THE TWO SENIOR

12:30PM  23   EXECUTIVES IN THE COMPANY?

12:30PM  24   A.   YES.

12:30PM  25   Q.   ABOUT A RUMOR ABOUT EBOLA; RIGHT?

12:30PM  1            AND THAT RUMOR WAS DENIED; CORRECT?

12:30PM  2       A.   ELIZABETH DENIED IT.

12:30PM  3       Q.   RIGHT.  AND YOU ASKED FOR A COMPANY-WIDE EMAIL; RIGHT?

12:31PM  4       A.   YES.

12:31PM  5       Q.   AND SHE RESPONDED THAT NO ONE ELSE REALLY HAD THAT

12:31PM  6       IMPRESSION.

12:31PM  7            CAN YOU SEE THAT?

12:31PM  8       A.   YES.

12:31PM  9       Q.   AND DIDN'T SEEM INCLINED TO SEND THE EMAIL?

12:31PM 10       A.   SHE'S ACKNOWLEDGING THAT FOLKS AT THE SITE ARE UNDER THIS

12:31PM 11       IMPRESSION.

12:31PM 12       Q.   BUT SHE'S NOT AGREEING TO SEND THE EMAIL TO QUASH THE

12:31PM 13       RUMOR; RIGHT?

12:31PM 14       A.   CORRECT.

12:31PM 15       Q.   AND THEN YOU RESPOND THAT DAY, "I FEEL REALLY

12:31PM 16       UNCOMFORTABLE WITH WHAT IS HAPPENING RIGHT NOW IN THIS

12:31PM 17       COMPANY."

12:31PM 18            DO YOU SEE THAT?

12:31PM 19       A.   YES.

12:31PM 20       Q.   AND YOU ASKED TO BE OFF THE CLIA LICENSE; RIGHT?

12:31PM 21       A.   YES.

12:31PM 22       Q.   AND YOU WANTED TO BE OFF OF THE CLIA LICENSE SO YOU COULD

12:31PM 23       GO AND START YOUR OTHER JOB; RIGHT?

12:31PM 24       A.   NO.

12:31PM 25       Q.   YOU WERE ESCALATING ISSUES WITHIN THIS COMPANY IN THIS

| | | |
|---|---|---|
| 12:32PM | 1 | TIME PERIOD BECAUSE YOU'RE TRYING TO GET THEM TO RELEASE YOU |
| 12:32PM | 2 | FROM YOUR 60-DAY PERIOD; CORRECT? |
| 12:32PM | 3 | A.   NO. |
| 12:32PM | 4 | Q.   OKAY.   IN THIS SAME TIME PERIOD -- |
| 12:32PM | 5 | A.   THE EBOLA WAS THE FINAL -- I MEAN, IT WAS ONE OF THE FINAL |
| 12:32PM | 6 | STRAWS FOR ME. |
| 12:32PM | 7 | Q.   THAT RUMOR REALLY GOT TO YOU, SIR? |
| 12:32PM | 8 | A.   NO.   MULTIPLE FOLKS TOLD ME ABOUT THIS. |
| 12:32PM | 9 | Q.   OKAY. |
| 12:32PM | 10 | A.   I DIDN'T BELIEVE IT TO BE A RUMOR. |
| 12:32PM | 11 | Q.   WELL, THAT WAS A FINAL STRAW? |
| 12:32PM | 12 | A.   ONE OF THEM. |
| 12:32PM | 13 | Q.   YOU'VE NEVER TESTIFIED THAT THAT WAS A FINAL STRAW IN ANY |
| 12:32PM | 14 | OF YOUR PRIOR TESTIMONY?   YOU'VE NEVER IDENTIFIED IT AS THE |
| 12:32PM | 15 | FINAL STRAW, BUT NOW IT'S YOUR TESTIMONY THAT IT WAS THE FINAL |
| 12:32PM | 16 | STRAW? |
| 12:32PM | 17 | A.   WELL, I WASN'T ASKED ABOUT -- I'VE NEVER BEEN ASKED ABOUT |
| 12:32PM | 18 | THIS EBOLA ISSUE OR WHAT THE FINAL DISSATISFACTION WAS AT |
| 12:32PM | 19 | THERANOS.   THERE WERE MANY. |
| 12:32PM | 20 | Q.   OKAY.  AT THE SAME TIME YOU RAISED THAT ISSUE, THE SAME |
| 12:33PM | 21 | DAY, YOU RAISED AN ISSUE -- IF WE CAN BRING UP 4314, IF WE GO |
| 12:33PM | 22 | TO THE SECOND PAGE -- LET'S GO TO THE THIRD PAGE JUST SO WE |
| 12:33PM | 23 | HAVE THE CONTEXT. |
| 12:33PM | 24 | THAT SAME DAY, NOVEMBER 14TH, AFTER YOU SENT THE EBOLA |
| 12:33PM | 25 | EMAIL, YOU THEN WERE ASKED TO CALL A DOCTOR; RIGHT? |

12:33PM  1     A.   YES.

12:33PM  2     Q.   AND YOU REFUSED TO CALL THE DOCTOR; RIGHT?

12:33PM  3     A.   NO.  I SAID I WILL HAPPILY SPEAK TO A CLINICIAN, BUT I

12:33PM  4     WILL NOT DEFEND THE RESULTS.

12:33PM  5     Q.   IF I CAN FOCUS YOU ON THE EMAIL ON PAGE 3.  OKAY.

12:33PM  6          DO YOU SEE YOU'RE ASKED TO CALL THE DOCTOR?  DO YOU SEE

12:34PM  7     THAT?

12:34PM  8          IN MR. HOLMES'S EMAIL AT 12:54 P.M. YOU'RE ASKED TO CALL

12:34PM  9     THE DOCTOR.

12:34PM  10         DO YOU SEE THAT ONE?

12:34PM  11    A.   YES.

12:34PM  12    Q.   AND YOU SAY, I'M GOING TO PASS ON THIS ONE?

12:34PM  13    A.   WELL, MR. HOLMES WAS TRYING TO COME UP WITH A SCRIPT FOR

12:34PM  14    ME IN MESSAGING AND I WAS RELUCTANT TO FOLLOW THAT SCRIPT.

12:34PM  15    Q.   AND MR. HOLMES WASN'T GOING TO GO ON THAT CALL; RIGHT?

12:34PM  16    A.   CORRECT.

12:34PM  17    Q.   YOU WERE GOING TO CALL THE DOCTOR?

12:34PM  18    A.   THAT WAS THE EXPECTATION.

12:34PM  19    Q.   RIGHT.  AND YOU HAVE YOUR OWN ABILITY TO EXERCISE YOUR OWN

12:34PM  20    PROFESSIONAL JUDGMENT ON WHAT YOU'RE GOING TO SAY TO THAT

12:34PM  21    DOCTOR; RIGHT?

12:34PM  22    A.   YES.

12:34PM  23    Q.   OKAY.  BUT YOU DIDN'T PICK UP THE PHONE AND SAY WHATEVER

12:34PM  24    YOU THOUGHT WAS APPROPRIATE, YOU SAID YOU'RE GOING TO PASS ON

12:34PM  25    THIS ONE; RIGHT?

12:34PM   1      A.   YES.

12:34PM   2      Q.   OKAY.  LET'S GO UP THE CHAIN.

12:34PM   3           AND YOU'RE ASKED WHAT THIS MEANS.

12:34PM   4           AND IF WE GO UP AGAIN.

12:34PM   5           AND HE SAYS, "IF YOU'RE ASKING ME TO DEFEND THESE VALUES

12:34PM   6      THEN THE ANSWER IS NO."

12:35PM   7           RIGHT?

12:35PM   8      A.   THAT WAS MY CLARIFICATION.

12:35PM   9      Q.   THAT WAS YOUR CLARIFICATION.

12:35PM  10           AND IF YOU GO UP THE CHAIN AGAIN, HE'S TELLING YOU THAT

12:35PM  11      HE'S NOT ASKING YOU TO DO THAT.  HE'S JUST ASKING YOU TO CALL

12:35PM  12      THE DOCTOR BACK; RIGHT?

12:35PM  13      A.   NO, HE'S NOT ADDRESSING THE EXPECTED MESSAGING IN HIS

12:35PM  14      EMAIL.

12:35PM  15      Q.   OKAY.  WELL, HE'S ASKING YOU TO CALL THE DOCTOR; RIGHT?

12:35PM  16      A.   CORRECT.

12:35PM  17      Q.   OKAY.  AND JUST SO WE'RE ALL CLEAR, THIS IS THE FIRST

12:35PM  18      INSTANCE, THIS TEST RIGHT HERE IS THE FIRST INSTANCE OF AN

12:35PM  19      OBVIOUSLY INCORRECT VALUE BEING REPORTED TO A PATIENT DURING

12:35PM  20      YOUR TENURE AT THERANOS; CORRECT?

12:35PM  21      A.   NO.

12:35PM  22      Q.   OKAY.  DO YOU RECALL GIVING TESTIMONY PREVIOUSLY WITH

12:35PM  23      RESPECT TO THIS EMAIL?

12:35PM  24      A.   YES.

12:35PM  25      Q.   OKAY.  AND THAT WAS IN THAT DEPOSITION IN ARIZONA;

| | | |
|---|---|---|
| 12:36PM | 1 | CORRECT? |
| 12:36PM | 2 | A.   I BELIEVE SO. |
| 12:36PM | 3 | Q.   AND DO YOU RECALL TESTIFYING THAT THIS WAS THE FIRST |
| 12:36PM | 4 | INSTANCE OF AN OBVIOUSLY INCORRECT VALUE BEING REPORTED TO THE |
| 12:36PM | 5 | PATIENT? |
| 12:36PM | 6 | A.   I DON'T RECALL. |
| 12:36PM | 7 | Q.   OKAY.  LET'S LOOK AT THAT TESTIMONY. |
| 12:36PM | 8 | GO TO 171.  IT'S THAT SAME ARIZONA EXHIBIT 11000. |
| 12:37PM | 9 | A.   11000? |
| 12:37PM | 10 | Q.   IT'S IN THE YELLOW BINDER. |
| 12:37PM | 11 | A.   WHAT VOLUME? |
| 12:37PM | 12 | Q.   VOLUME 1. |
| 12:37PM | 13 | A.   OKAY. |
| 12:37PM | 14 | Q.   OKAY.  IF YOU LOOK AT PAGE 168. |
| 12:37PM | 15 | A.   YES. |
| 12:37PM | 16 | Q.   YOU'RE WELCOME TO READ PAGE 168 WHICH INTRODUCES THAT |
| 12:37PM | 17 | DOCUMENT, BUT I'M FOCUSSED ON THE QUESTION AND ANSWER ON |
| 12:38PM | 18 | PAGE 171. |
| 12:38PM | 19 | A.   OKAY, I'VE READ PAGE 168. |
| 12:38PM | 20 | Q.   READ THROUGH 171 AND LET ME KNOW WHEN YOU GET TO LINE 15 |
| 12:38PM | 21 | ON 171. |
| 12:38PM | 22 | (PAUSE IN PROCEEDINGS.) |
| 12:39PM | 23 | THE WITNESS:  YES, I READ IT. |
| 12:39PM | 24 | BY MR. WADE: |
| 12:39PM | 25 | Q.   DO YOU SEE THAT? |

12:39PM 1        AND DRAWING YOUR ATTENTION TO LINE 3, YOU WERE ASKED, "HAD

12:39PM 2   YOU BEEN ASKED TO DEFEND RESULTS IN THIS MANNER AT OTHER POINTS

12:39PM 3   IN YOUR TIME AT THERANOS?"

12:39PM 4   A.   THIS ISN'T -- I'M SORRY.

12:39PM 5   Q.   YOU WERE ASKED THAT QUESTION, CORRECT, SIR?

12:39PM 6   A.   YES, YES.

12:39PM 7   Q.   AND YOU GAVE THIS ANSWER, "NOT REALLY, NO.  I MEAN, THIS

12:39PM 8   IS THE FIRST INSTANCE OF AN OBVIOUSLY INCORRECT VALUE BEING

12:39PM 9   REPORTED TO THE PATIENT."

12:39PM 10       DO YOU SEE THAT?

12:39PM 11  A.   YES.

12:39PM 12  Q.   AND THAT'S WHAT YOU ANSWERED IN THAT SWORN TESTIMONY;

12:39PM 13  CORRECT?

12:39PM 14  A.   THAT'S WHAT I'M READING HERE.

12:39PM 15  Q.   AND THEN YOU WERE ASKED, "DO YOU REMEMBER OTHER INSTANCES

12:39PM 16  WHERE AN OBVIOUSLY INCORRECT VALUE WAS REPORTED TO THE

12:39PM 17  PATIENT?"

12:39PM 18       AND YOU SAID, "NO."

12:40PM 19       CORRECT?

12:40PM 20  A.   CORRECT.

12:40PM 21  Q.   YOU WERE TRYING IN THIS EMAIL TO GET THEM TO TAKE YOU OFF

12:40PM 22  THE LICENSE AND TO LET YOU GO START YOUR OTHER JOB, WERE YOU

12:40PM 23  NOT?

12:40PM 24  A.   NO.  I WANTED TO BE OFF THE LICENSE BECAUSE I WAS

12:40PM 25  UNCOMFORTABLE WITH THE LEGAL RESPONSIBILITY THAT I HELD AT

12:40PM   1    THERANOS AT THAT TIME.

12:40PM   2    Q.   AND IT DIDN'T WORK IN NOVEMBER 14TH, DID IT?  AND SO YOU

12:40PM   3    RAISED AN ISSUE AGAIN IN NOVEMBER 21ST.

12:40PM   4        LET'S GO TO THAT.  THIS IS 228.

12:40PM   5    A.   I'M SORRY, WHICH EXHIBIT IS IT?

12:40PM   6    Q.   IT'S EXHIBIT 228.  I BELIEVE IT'S IN THE GOVERNMENT'S

12:40PM   7    BINDER.

12:41PM   8    A.   OKAY.

12:41PM   9    Q.   AND WE WERE JUST LOOKING AT THIS.  WE WILL GO TO THE NEXT

12:41PM  10    PAGE.

12:41PM  11        SO A WEEK HAD GONE BY SINCE THAT LAST EMAIL, AND THIS IS

12:41PM  12    THE EMAIL THAT YOU REPORT UP, WE'RE STILL VOIDING CRITICAL ISE

12:41PM  13    RESULTS FOR THE REDRAW; CORRECT?

12:41PM  14    A.   YES.

12:41PM  15    Q.   AND THAT WAS THE PLAN THAT YOU HAD PUT IN PLACE TWO WEEKS

12:41PM  16    BEFORE THEN; CORRECT?

12:41PM  17    A.   THE VOIDING OF THE CRITICAL POTASSIUMS HAD STARTED WAY

12:41PM  18    BEFORE THAT.

12:41PM  19    Q.   RIGHT?

12:41PM  20    A.   IT WAS THE SODIUMS THAT WE WERE DISCUSSING.

12:41PM  21    Q.   YOU HAD DISCUSSED THE VOIDING OF THE ISE RESULTS JUST A

12:41PM  22    COUPLE WEEKS AGO.

12:41PM  23        DO YOU RECALL THAT?

12:41PM  24    A.   OF THE SODIUM RESULTS.

12:41PM  25    Q.   RIGHT.  AND DO YOU RECALL THAT MR. BALWANI AND MS. HOLMES

| | | |
|---|---|---|
| 12:41PM | 1 | WERE UNAWARE OF THAT AT THAT TIME? |
| 12:41PM | 2 | DO YOU RECALL THAT? |
| 12:42PM | 3 | A.   THEY WERE CLAIMING TO BE UNAWARE, YES.  THEY WERE CLAIMING |
| 12:42PM | 4 | TO BE. |
| 12:42PM | 5 | Q.   BUT IT WAS ENACTED UNDER YOUR PROTOCOL; RIGHT? |
| 12:42PM | 6 | THE COURT:  IS THIS IN EVIDENCE, 228? |
| 12:42PM | 7 | THE CLERK:  NO, AND IT'S NOT ON THE JURORS' DISPLAY. |
| 12:42PM | 8 | MR. WADE:  I'M SORRY.  IT'S NOT 228, IT'S 2228.  I'M |
| 12:42PM | 9 | SORRY.  AND IT IS IN EVIDENCE. |
| 12:42PM | 10 | THE COURT:  THANK YOU. |
| 12:42PM | 11 | BY MR. WADE: |
| 12:42PM | 12 | Q.   DO YOU SEE THAT?  AND THIS WAS THE PLAN YOU PUT IN PLACE |
| 12:42PM | 13 | AS THE CLIA LAB DIRECTOR; CORRECT? |
| 12:42PM | 14 | A.   WHICH PLAN? |
| 12:42PM | 15 | Q.   THE HANDLING OF THESE RESULTS IN THIS MANNER WAS SOMETHING |
| 12:42PM | 16 | THAT YOU HAD PUT IN PLACE AS THE CLIA LAB DIRECTOR; CORRECT? |
| 12:42PM | 17 | A.   YES. |
| 12:42PM | 18 | Q.   OKAY.  AND LET'S GO TO THE NEXT EMAIL. |
| 12:42PM | 19 | AND MR. BALWANI RESPONDS TO YOU; RIGHT? |
| 12:43PM | 20 | DO YOU SEE THAT? |
| 12:43PM | 21 | A.   YES. |
| 12:43PM | 22 | Q.   OKAY.  AND HE SAYS HE HAS VERY HIGH CONFIDENCE IN ALL OF |
| 12:43PM | 23 | THE RESULTS. |
| 12:43PM | 24 | DO YOU SEE THAT? |
| 12:43PM | 25 | A.   YES. |

12:43PM  1    Q.   AND YOU FORWARD HIS RESPONSE WHERE HE EXPLAINS HIS

12:43PM  2    POSITION UP TO --

12:43PM  3    A.   HIS RESPONSE IS NOT ACCURATE.

12:43PM  4    Q.   I UNDERSTAND YOUR VIEW, SIR.

12:43PM  5         YOU SENT HIS RESPONSE UP TO MS. HOLMES; CORRECT?

12:43PM  6    A.   YES.

12:43PM  7    Q.   AND YOU SAY YOU FIND IT DISINGENUOUS AND THAT HE SHOULD

12:43PM  8    APOLOGIZE; CORRECT?

12:43PM  9    A.   YES, YES.

12:43PM 10    Q.   AND ON THE DAY YOU WERE SENDING THIS, YOU WERE NOT EVEN IN

12:43PM 11    THE OFFICE, WERE YOU, SIR?

12:43PM 12    A.   I BELIEVE I WAS IN THE NEWARK FACILITY.  I DON'T RECALL

12:43PM 13    EXACTLY WHERE I WAS.

12:43PM 14    Q.   YOU ARE AWARE THAT THEY HAVE BADGES AT THERANOS; CORRECT?

12:43PM 15    A.   YES.

12:43PM 16    Q.   AND THEY'RE ABLE TO CHECK WHEN YOU GO IN AND OUT; RIGHT?

12:43PM 17    A.   OH, THE DOOR WAS PROPPED OPEN NEXT TO MY OFFICE SO I

12:43PM 18    WOULDN'T HAVE NEEDED TO BADGE IN.

12:43PM 19    Q.   OKAY.  AND, IN FACT, AFTER THIS DAY --

12:43PM 20    A.   I BELIEVE I WAS IN THE OFFICE ACTUALLY, YEAH.

12:44PM 21    Q.   AND AFTER THIS DAY, YOU DIDN'T GO INTO THE OFFICE AGAIN

12:44PM 22    UNTIL DECEMBER; CORRECT?

12:44PM 23    A.   I DON'T RECALL.  I REMEMBER VISITING FAMILY FOR

12:44PM 24    THANKSGIVING, AND THEN I REMEMBER ANOTHER VISIT AND IT WAS

12:44PM 25    ESSENTIALLY MY LAST DAY, BUT THAT WAS AT THE PALO ALTO OFFICE.

12:44PM  1    Q.   RIGHT.  YOU WERE CALLED IN SPECIFICALLY TO HAVE A MEETING

12:44PM  2    WITH MR. BALWANI AND MONA RAMAMURTHY; CORRECT?

12:44PM  3    A.   CORRECT.

12:44PM  4    Q.   AND IN BETWEEN THIS DAY WHEN YOU SENT THIS EMAIL AND THAT

12:44PM  5    DAY, YOU WEREN'T IN THE OFFICE; RIGHT?

12:44PM  6    A.   I RECALL -- AS I SAID, I RECALL TAKING SOME TIME OFF AT

12:44PM  7    THANKSGIVING, AND I INFORMED MANAGEMENT OF MY PLANS.

12:44PM  8    Q.   OKAY.

12:44PM  9    A.   I DON'T REMEMBER THE EXACT DATES.

12:44PM  10   Q.   LET'S LOOK AT 5 --

12:44PM  11        I'D ASK TO DISPLAY 5387C, WHICH IS IN EVIDENCE.

12:45PM  12             THE CLERK:  COUNSEL.

12:45PM  13             MR. WADE:  OH, IT ISN'T.  MY APOLOGIES.  I WOULD

12:45PM  14   MOVE THE ADMISSION OF 5387C, WHICH IS A SUBSET OF THE TEXT

12:45PM  15   MESSAGES THAT THE GOVERNMENT HAS BEEN DISPLAYING.

12:45PM  16             MR. BOSTIC:  HEARSAY, YOUR HONOR, ESPECIALLY WITHOUT

12:45PM  17   KNOWING WHICH SUBSET WE ARE TALKING ABOUT.

12:45PM  18             THE COURT:  MAYBE YOU SHOULD LAY A FOUNDATION.

12:45PM  19             MR. WADE:  WELL, THE FOUNDATION WAS LAID WITH THE

12:45PM  20   OTHER WITNESS, YOUR HONOR.  I CAN'T LAY A FOUNDATION WITH THIS

12:45PM  21   WITNESS.

12:45PM  22             THE COURT:  WELL, I'LL SUSTAIN AN OBJECTION.  I'M

12:45PM  23   NOT SURE WHAT YOU'RE GOING TO.

12:45PM  24             MR. WADE:  OKAY.

12:45PM  25   Q.   ARE YOU AWARE THAT IN THIS TIME PERIOD MR. BALWANI WAS

```
12:45PM   1    MAKING REPEATED TRIPS OVER TO THE NEWARK FACILITY?

12:45PM   2    A.   WHAT TIME PERIOD ARE YOU REFERENCING?

12:45PM   3    Q.   THE TIME PERIOD ESSENTIALLY IMMEDIATELY AFTER THIS EMAIL?

12:45PM   4    A.   AFTER NOVEMBER 14TH?

12:45PM   5    Q.   21ST?

12:45PM   6    A.   NOVEMBER 21ST?

12:46PM   7    Q.   YEAH.

12:46PM   8    A.   I SAW HIM MAYBE ONCE --

12:46PM   9    Q.   OKAY.

12:46PM  10    A.   -- WHILE I WAS IN NEWARK, YEAH.

12:46PM  11    Q.   OKAY.  DO YOU RECALL HIM HAVING TO COME OVER AND BRING NEW

12:46PM  12    STAFF INTO NEW POSITIONS IN THIS EXACT TIME PERIOD AND START TO

12:46PM  13    ADDRESS PROBLEMS WITHIN YOUR LAB?

12:46PM  14    A.   NO.

12:46PM  15    Q.   BECAUSE YOU WEREN'T IN THE LAB, WERE YOU?

12:46PM  16    A.   I DON'T RECALL.

12:46PM  17    Q.   OKAY.

12:46PM  18    A.   ARE YOU SUGGESTING THAT MY ABSENCE SOMEWHAT SHOWS MY LACK

12:46PM  19    OF COMMITMENT AS A LAB DIRECTOR?

12:46PM  20    Q.   I'M ASKING WHETHER YOU OBSERVED MR. BALWANI GO IN THERE TO

12:46PM  21    CLEAN UP WHAT HE BELIEVED TO BE A DISASTER ZONE IN YOUR LAB.

12:46PM  22         DO YOU RECALL THAT?

12:46PM  23    A.   I DON'T RECALL.

12:46PM  24    Q.   OKAY.

12:46PM  25    A.   THE NEWARK LAB HAD ONLY BEEN OPEN FOR MAYBE A FEW WEEKS AT
```

12:46PM   1        THIS POINT.

12:46PM   2        Q.   OKAY.  AND YOU TESTIFIED THAT IN YOUR MEETING WITH

12:46PM   3    MR. BALWANI HE ASKED YOU TO STAY AT THE COMPANY; RIGHT?

12:46PM   4        A.   YES.

12:46PM   5        Q.   OKAY.  IN FACT, HE HAD PAPERWORK, HE HAD EXIT PAPERWORK

12:47PM   6    AND CLIA TRANSITION DOCUMENTS THERE FOR YOU AT THAT MEETING;

12:47PM   7    CORRECT?

12:47PM   8        A.   YES.

12:47PM   9        Q.   AND HE TOOK YOU OFF THE LICENSE AT THAT MEETING; CORRECT?

12:47PM  10        A.   HE DID NOT TAKE ME OFF THE ARIZONA LICENSE.

12:47PM  11        Q.   OKAY.

12:47PM  12        A.   I HAD TO FOLLOW UP WITH LFS TO GET MYSELF OFF THE ARIZONA

12:47PM  13    LICENSE.

12:47PM  14        Q.   AND THE POINT WAS, HE WANTED YOU OUT; RIGHT?

12:47PM  15        A.   NO.  HE WAS, HE WAS -- IT WAS CONCILIATORY.  HE WANTED TO

12:47PM  16    CHAT.  AS I TESTIFIED, I REFUSED TO SHAKE HIS HAND.  AT ONE

12:47PM  17    POINT HE SAID THAT I COULD STAY ON IF I WANTED TO AND I SAID

12:47PM  18    NO, IT WASN'T WORTH THE RISK TO MY REPUTATION.

12:47PM  19        AND THEN THE WHOLE TONE OF THE CONVERSATION CHANGED.

12:48PM  20        Q.   SIR, HE HAD THE TERMINATION CERTIFICATE IN HIS HAND TO

12:48PM  21    REMOVE YOU AS CLIA LAB DIRECTOR; CORRECT?

12:48PM  22        A.   I DON'T RECALL.

12:48PM  23        Q.   OKAY.  AND BY THE TIME YOU GOT THERE, SIR, THE COMPANY HAD

12:48PM  24    DISCOVERED THAT YOU HAD STOLEN OVER 150 EMAILS THAT YOU HAD

12:48PM  25    SENT TO YOURSELF; CORRECT?

12:48PM  1    A.   I DID FORWARD MYSELF, CORRECT.

12:48PM  2    Q.   TO YOUR GMAIL ACCOUNT; CORRECT?

12:48PM  3    A.   CORRECT.

12:48PM  4    Q.   AND INCLUDING EXTENSIVE PATIENT HEALTH INFORMATION;

12:48PM  5    CORRECT?

12:48PM  6    A.   I DON'T RECALL.

12:48PM  7    Q.   YOU DON'T RECALL?

12:48PM  8         IF YOU TAKE A LOOK AT 13926.

12:49PM  9    A.   IN THE GOVERNMENT'S BINDER?

12:49PM  10   Q.   ACTUALLY -- I'M SORRY.  LOOK AT 13927 IN THE DEFENSE

12:49PM  11   BINDER.

12:49PM  12   A.   THE VOLUME 2 ENDS AT 13923.

12:49PM  13   Q.   TAKE A LOOK AT THE BACK OF IT.  I THINK YOU'LL FIND IT

12:49PM  14   THERE.  WE ADDED IT TO YOUR BINDER.

12:50PM  15   A.   OKAY.

12:50PM  16   Q.   OKAY.  DO YOU SEE, DO YOU SEE THIS IS AN EMAIL THAT YOU

12:50PM  17   SENT TO YOURSELF IN OCTOBER OF 2014?

12:50PM  18   A.   YES.

12:50PM  19   Q.   AND DO YOU SEE ATTACHED TO IT IS A SPREADSHEET?

12:50PM  20   A.   YES.

12:50PM  21   Q.   AND DO YOU SEE THAT THAT SPREADSHEET CONTAINS EXTENSIVE

12:50PM  22   PATIENT HEALTH INFORMATION?

12:50PM  23   A.   IT CONTAINS PATIENT INFORMATION, YES.

12:50PM  24   Q.   IT CONTAINS TWO PAGES OF DETAILED HEALTH INFORMATION FOR

12:50PM  25   MAYBE 100 PATIENTS?

12:50PM   1      A.   I DELETED THESE EMAILS THE SAME DAY.

12:50PM   2      Q.   WE'LL GET TO THAT.

12:50PM   3      A.   I SEE THAT IT HAS PATIENT INFORMATION, YES.

12:50PM   4      Q.   AND MANY OF THE OTHER EMAILS THAT YOU SENT HAD LAB -- HAD

12:50PM   5      PATIENT LAB INFORMATION RELATING TO THEIR HEALTH; CORRECT?

12:50PM   6      A.   YES.

12:50PM   7      Q.   AND YOU DIDN'T REDACT THEM WHEN YOU SENT THEM TO YOUR

12:50PM   8      GMAIL ACCOUNT, DID YOU?

12:51PM   9      A.   NO.

12:51PM   10     Q.   AND THAT'S A HIPAA VIOLATION, IS IT NOT?

12:51PM   11     A.   I DON'T KNOW.

12:51PM   12     Q.   AND YOU WERE SENDING THIS INFORMATION TO USE IT FOR YOUR

12:51PM   13     COMMERCIAL BENEFIT?

12:51PM   14     A.   NO, NOT AT ALL.

12:51PM   15     Q.   YOU WERE SENDING IT SO YOU COULD TRY TO GET MONEY IN THAT

12:51PM   16     LAWSUIT?

12:51PM   17     A.   NO, NOT AT ALL.

12:51PM   18     Q.   OKAY.  YOU ALSO STOLE SOME TRADE SECRET INFORMATION;

12:51PM   19     RIGHT?

12:51PM   20     A.   I DON'T BELIEVE, NO.

12:51PM   21     Q.   AND YOU STOLE INFORMATION THAT RELATED TO THE COMPANY'S

12:51PM   22     VALIDATION OF CERTAIN METHODS; RIGHT?

12:51PM   23     A.   I DON'T RECALL.

12:51PM   24     Q.   OKAY.  YOU STOLE INFORMATION THAT DESCRIBED THEIR PRIMARY

12:51PM   25     TESTING METHODS?

12:51PM  1    A.   I DON'T RECALL.

12:51PM  2    Q.   OKAY.  AND ARE YOU AWARE THAT THE COMPANY, WHEN THEY

12:51PM  3    DISCOVERED THIS, HAD TO GO THROUGH SPECIAL PROCEDURES WITH

12:51PM  4    SPECIAL COUNSEL TO MAKE -- TO DEAL WITH THE HIPAA ISSUES?

12:51PM  5    A.   I WAS NOT AWARE.

12:51PM  6    Q.   THEY DIDN'T TELL YOU THAT?

12:51PM  7    A.   NO.

12:51PM  8    Q.   OKAY.  AND THEY WERE AWARE OF THIS ON THE DAY THAT YOU

12:51PM  9    WALKED IN THE DOOR; RIGHT?  YOU DISCUSSED THOSE EMAILS WITH

12:51PM 10    MS. RAMAMURTHY; RIGHT?

12:51PM 11    A.   YES.

12:51PM 12    Q.   BUT IT'S YOUR TESTIMONY THAT THEY OFFERED YOU TO COME BACK

12:51PM 13    IN; RIGHT?

12:51PM 14    A.   YES, WHEN I CHATTED WITH SUNNY IN THE BEGINNING, YES.

12:52PM 15    Q.   OKAY.  AND THEY ASKED YOU IF YOU DELETED THE INFORMATION;

12:52PM 16    RIGHT?

12:52PM 17    A.   YES.

12:52PM 18    Q.   BECAUSE THEY WERE DEALING WITH AN IMPORTANT HIPAA

12:52PM 19    VIOLATION HERE; CORRECT?

12:52PM 20    A.   I CAN'T SPECULATE AS TO WHAT THEIR REASONS WERE FOR ME

12:52PM 21    WANTING TO DELETE THE EMAILS.

12:52PM 22    Q.   WELL, THEY TOLD YOU THEY WERE VERY CONCERNED ABOUT THIS;

12:52PM 23    RIGHT?

12:52PM 24    A.   NO, THEY DIDN'T MENTION HIPAA AT THE TIME.

12:52PM 25    Q.   OKAY.  THEY TOLD YOU THAT THEY WERE VERY CONCERNED THAT

| 12:52PM | 1 | YOU HAD THIS INFORMATION; CORRECT? |
| 12:52PM | 2 | A.   CORRECT.  THEY WERE VERY WORRIED. |
| 12:52PM | 3 | Q.   AND THEY ASKED YOU IF YOU DELETED IT; RIGHT? |
| 12:52PM | 4 | A.   SO WHAT HAPPENED -- I CAN EXPLAIN. |
| 12:52PM | 5 | SO WHAT HAPPENED IS SUNNY VERY AGGRESSIVELY ORDERED ME TO |
| 12:52PM | 6 | SIT WITH MONA AND TO GO INTO MY GMAIL ACCOUNT AND DELETE THESE |
| 12:52PM | 7 | EMAILS WHILE STILL IN THE OFFICE. |
| 12:52PM | 8 | Q.   HE WANTED YOU TO REMOVE THAT INFORMATION BECAUSE THEY WERE |
| 12:52PM | 9 | VERY CONCERNED ABOUT IT; RIGHT? |
| 12:52PM | 10 | A.   YES, THEY WERE. |
| 12:52PM | 11 | Q.   AND YOU REFUSED TO DO THAT; RIGHT? |
| 12:52PM | 12 | A.   AT THAT MOMENT, YES. |
| 12:52PM | 13 | Q.   RIGHT.  AND WHEN YOU WENT BACK, THERE WAS FOLLOWUP ON THIS |
| 12:53PM | 14 | ISSUE, THIS IMPORTANT ISSUE; RIGHT? |
| 12:53PM | 15 | A.   WENT BACK WHERE? |
| 12:53PM | 16 | Q.   WHEN YOU LEFT?  YOU LEFT SHORTLY AFTER THIS; CORRECT? |
| 12:53PM | 17 | A.   YES, YES. |
| 12:53PM | 18 | Q.   AND YOU WOULDN'T SIGN A CERTIFICATE THAT YOU HAD COMPLIED |
| 12:53PM | 19 | WITH HIPAA AND OTHER COMPANY POLICIES AT THAT TIME; RIGHT? |
| 12:53PM | 20 | A.   I DON'T RECALL. |
| 12:53PM | 21 | Q.   OKAY.  AND YOU GOT A LAWYER; RIGHT? |
| 12:53PM | 22 | A.   I ALREADY HAD A LAWYER, RIGHT. |
| 12:53PM | 23 | Q.   AND YOU REPRESENTED -- YOU ACTUALLY SENT AN EMAIL AFTER |
| 12:53PM | 24 | THAT TO MS. RAMAMURTHY IN WHICH YOU REPRESENTED THAT YOU |
| 12:53PM | 25 | DELETED ALL OF THE EMAILS; RIGHT? |

12:53PM   1    A.   I BELIEVE I DELETED THEM THE SAME EVENING.  I WENT INTO

12:53PM   2    THE APPLE STORE AND WENT INTO MY GMAIL ACCOUNT AND DELETED ALL

12:53PM   3    OF THE EMAILS.

12:53PM   4    Q.   YOU HAD NOT DELETED ALL OF THE EMAILS AS OF THAT DATE, HAD

12:53PM   5    YOU, SIR?

12:53PM   6    A.   I DON'T RECALL.

12:53PM   7    Q.   YOU DON'T RECALL?

12:53PM   8         YOU DON'T RECALL THAT IT CAME UP WHERE YOU LIED AGAIN AND

12:53PM   9    AGAIN ABOUT HAVING DELETED THOSE EMAILS THROUGH YOUR LAWYER?

12:53PM  10    YOU DON'T RECALL THAT COMING UP?

12:53PM  11    A.   NO, SIR.

12:53PM  12    Q.   OKAY.

12:54PM  13         YOUR HONOR, THIS MAY BE A GOOD TIME FOR COUNSEL TO

12:54PM  14    APPROACH TO DISCUSS THE ISSUE THAT WE DISCUSSED THIS MORNING.

12:54PM  15              THE COURT:  ARE YOU AT THE CONCLUSION OF YOUR

12:54PM  16    EXAMINATION, SAVE FOR THOSE ISSUES?

12:54PM  17              MR. WADE:  YES.

12:54PM  18              THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, LET ME

12:54PM  19    ASK THE JURY TO -- WE'LL TAKE A BRIEF RECESS.  I NEED TO TALK

12:54PM  20    TO THESE LAWYERS ABOUT SOMETHING.  SO WE'LL TAKE A RECESS.

12:54PM  21         LADIES AND GENTLEMEN OF THE JURY, YOU CAN GO TO THE

12:54PM  22    DELIBERATION ROOM AND WE'LL CALL YOU BACK.

12:55PM  23         DR. ROSENDORFF, YOU MAY STEP DOWN.

12:55PM  24         (JURY OUT AT 12:55 P.M.)

12:55PM  25              THE COURT:  PLEASE BE SEATED.  THE RECORD SHOULD

|         |    |                                                                      |
|---------|----|----------------------------------------------------------------------|
| 12:55PM | 1  | REFLECT THAT OUR JURY HAS LEFT THE COURTROOM.                         |
| 12:55PM | 2  |       DR. ROSENDORFF HAS LEFT THE COURTROOM.                          |
| 12:55PM | 3  |       ALL COUNSEL AND THE DEFENDANT ARE PRESENT.                     |
| 12:55PM | 4  |       MR. WADE.                                                      |
| 12:55PM | 5  |              MR. WADE:  THANK YOU, YOUR HONOR.                       |
| 12:55PM | 6  |       WE'RE AT THAT POINT WHERE I'VE GONE THROUGH EVERYTHING BUT     |
| 12:55PM | 7  | THE ISSUES THAT WE DISCUSSED THIS MORNING.  I THINK I MADE THE       |
| 12:55PM | 8  | COMMITMENT TO THE COURT THAT I WOULDN'T DO IT IN THE MORNING,        |
| 12:56PM | 9  | BUT WE'RE NOW AT THE POINT WHERE THAT'S ESSENTIALLY ALL I HAVE       |
| 12:56PM | 10 | LEFT.                                                                |
| 12:56PM | 11 |              THE COURT:  SO WHAT YOU HAVE LEFT IS THAT YOU WOULD     |
| 12:56PM | 12 | LIKE TO INQUIRE, AS YOU'VE TOLD ME THIS MORNING, REGARDING          |
| 12:56PM | 13 | THESE THREE ISSUES, INVITAE, UBIOME -- IS THAT WHAT IT'S            |
| 12:56PM | 14 | CALLED?                                                              |
| 12:56PM | 15 |              MR. WADE:  UBIOME.                                     |
| 12:56PM | 16 |              THE COURT:  -- AND PERKIN ELMER; IS THAT RIGHT?        |
| 12:56PM | 17 |              MR. WADE:  YES.                                        |
| 12:56PM | 18 |              THE COURT:  ANYTHING FURTHER ON THOSE TOPICS?          |
| 12:56PM | 19 |              MR. WADE:  I HAVE NOTHING FURTHER APART FROM WHAT WE   |
| 12:56PM | 20 | DISCUSSED THIS MORNING.                                              |
| 12:56PM | 21 |              THE COURT:  OKAY.                                      |
| 12:56PM | 22 |       MR. BOSTIC.                                                   |
| 12:56PM | 23 |              MR. BOSTIC:  YOUR HONOR, JUST VERY BRIEFLY.            |
| 12:56PM | 24 |       I THINK IN LIGHT OF THE BREADTH AND THE STYLE OF THE         |
| 12:56PM | 25 | CROSS-EXAMINATION HERE, IT JUST UNDERLIES THE GOVERNMENT'S          |

12:56PM  1    CONCERNS ABOUT WHAT IT WOULD LOOK LIKE TO GO INTO THESE TOPICS.

12:56PM  2         I THINK PROBING THESE TOPICS REALLY IS ASKING FOR

12:56PM  3    EXTRANEOUS ISSUES TO BE LITIGATED IN A WAY THAT THIS TRIAL JUST

12:56PM  4    IS NOT SET UP TO DO.

12:56PM  5         I ALSO, WHEN IT COMES TO EXTRINSIC EVIDENCE AND WHETHER

12:56PM  6    DOCUMENTS THEMSELVES WILL BE ADMITTED INTO EVIDENCE, I HEARD

12:57PM  7    MR. WADE SAY THAT HE DOESN'T NECESSARILY INTEND TO ADMIT MANY

12:57PM  8    OR ANY OF THE DOCUMENTS THAT THE COURT HAS SEEN.

12:57PM  9         BUT THAT DOESN'T ALLEVIATE THE GOVERNMENT'S CONCERNS IN

12:57PM  10   LIGHT OF AN APPROACH THAT MR. WADE HAS BEEN TAKING TO

12:57PM  11   REFRESHING THE WITNESS'S RECOLLECTION WHEREIN HE ASKS THE

12:57PM  12   WITNESS A QUESTION AND THEN TAKES OUT A DOCUMENT AND

12:57PM  13   ESSENTIALLY READS IT INTO EVIDENCE.  THAT IS AS GOOD AS

12:57PM  14   PUBLISHING THE CONTENTS OF THAT DOCUMENT TO THE JURY AND

12:57PM  15   REPRESENTING TO THE JURY THAT THERE IS A PIECE OF EVIDENCE THAT

12:57PM  16   CONTAINS THIS INFORMATION.

12:57PM  17        GIVEN THAT APPROACH, THERE'S NOT MUCH DIFFERENCE BETWEEN I

12:57PM  18   THINK THE ANTICIPATED STYLE OF QUESTIONING AND JUST ADMITTING

12:57PM  19   THOSE DOCUMENTS.

12:57PM  20        SO THAT ONLY INCREASES THE GOVERNMENT'S CONCERNS.

12:57PM  21             THE COURT:  ANYTHING FURTHER?

12:57PM  22             MR. WADE:  I DON'T HAVE ANYTHING FURTHER TO WHAT WE

12:57PM  23   RAISED THIS MORNING APART FROM THERE'S BEEN 702 TYPE OF

12:57PM  24   EVIDENCE THAT HAS BEEN COMING OUT OF THIS WITNESS THROUGHOUT

12:57PM  25   HIS DIRECT EXAMINATION.  THAT PUTS SQUARELY AT ISSUE HIS

12:58PM  1    COMPETENCE, AND I THINK IT'S NECESSARY FOR MS. HOLMES TO BE

12:58PM  2    ABLE TO CONFRONT THAT.

12:58PM  3            THE COURT:  I THINK SHE'S DONE THAT THROUGH YOU,

12:58PM  4    SIR, FOUR AND A HALF DAYS OF IT.  I THINK THAT'S WHAT YOUR

12:58PM  5    EXAMINATION HAS DONE.

12:58PM  6        YOU WERE GRILLING HIM AND I THINK YOUR EXAMINATION SHOWS

12:58PM  7    THAT YOU WERE CHALLENGING HIS COMPETENCY IN SEVERAL REGARDS.

12:58PM  8    WE'VE HAD FOUR DAYS OF THAT.  I THINK YOU'VE DONE THAT.  YOU'VE

12:58PM  9    ACCOMPLISHED THAT.

12:58PM 10        I THINK WHAT YOU'RE ASKING TO DO IS TO CONTINUE WITH THAT

12:58PM 11    BECAUSE THE COMPETENCY IS AN ISSUE, AS YOU SAY.

12:58PM 12        I LOOK AT THE ISSUES THAT WE DISCUSSED THIS MORNING AND IT

12:58PM 13    DOES SEEM TO BE THAT IT'S REALLY CHARACTER EVIDENCE THAT YOU'RE

12:58PM 14    SEEKING TO ADMIT HERE, AND THAT IS THE CHARACTER FOR COMPETENCY

12:58PM 15    OR LACK THEREOF.

12:58PM 16        WE TALKED ABOUT 608(B) AND SOME OF THESE OTHER AREAS OF

12:58PM 17    ADMISSION FOR THIS TYPE OF EVIDENCE.

12:59PM 18        FIRST OF ALL, LET ME JUST -- I'M SORRY, WAS IT UBIOME,

12:59PM 19    UBIOME?

12:59PM 20            MR. BOSTIC:  UBIOME.

12:59PM 21            THE COURT:  THANK YOU.  AS TO THAT EVIDENCE, AS WE

12:59PM 22    DISCUSSED THIS MORNING, THE EVIDENCE THAT DR. ROSENDORFF WAS

12:59PM 23    THERE, THERE WAS -- I THINK IS THIS THE LAB WHERE THERE WAS A

12:59PM 24    FEDERAL INVESTIGATION, INDICTMENTS, AND A PENDING CRIMINAL

12:59PM 25    CASE.

12:59PM   1          MR. BOSTIC:  CORRECT, YOUR HONOR.

12:59PM   2          THE COURT:  UNDER 403, I THINK THAT'S MORE

12:59PM   3   PREJUDICIAL THAN PROBATIVE TO ALLOW YOU TO EXAMINE ON THAT.

12:59PM   4          THE ISSUES INVOLVED IN THAT CASE, AS I UNDERSTAND FROM OUR

12:59PM   5   CONVERSATION THIS MORNING, WERE CRIMINAL IN NATURE.  IT SOUNDS

12:59PM   6   LIKE THAT WAS A HEALTH CARE FRAUD IN REBILLING THAT DID NOT

12:59PM   7   RELATE TO OR DID NOT HAVE, AT LEAST BASED ON WHAT YOU TOLD ME,

12:59PM   8   DID NOT HAVE ANYTHING TO DO WITH THE OPERATION OF THE LAB PER

12:59PM   9   SE.

12:59PM  10          THE INDICTMENT -- UNLESS YOU TELL ME DIFFERENTLY,

12:59PM  11   MR. BOSTIC AND MR. WADE, THE INDICTMENT WAS NOT AN INDICTMENT

01:00PM  12   ALLEGING ANY FRAUD INVOLVING THE LABORATORY OR ANYTHING ABOUT

01:00PM  13   THE LAB.

01:00PM  14          SO I DO SEE THAT THAT, UNDER A 403 ANALYSIS, THAT -- TO

01:00PM  15   ALLOW YOU, MR. WADE, TO PROBE ON THAT ISSUE AND HIS INVOLVEMENT

01:00PM  16   THERE IS MORE PREJUDICIAL THAN PROBATIVE.

01:00PM  17          IT WOULD CALL THE JURY THEN TO CONJECTURE AND TO SPECULATE

01:00PM  18   THAT PERHAPS HE'S INVOLVED IN A FEDERAL CRIMINAL INVESTIGATION,

01:00PM  19   WHICH FROM WHAT YOU'VE TOLD ME, HE'S NOT.  HE'S NOT, OTHER THAN

01:00PM  20   HIS EMPLOYMENT THERE.  HE'S NOT A SUBJECT TO IT.  I THINK YOU

01:00PM  21   TOLD ME HE MIGHT HAVE BEEN A WITNESS.

01:00PM  22          BUT EVEN IF HE WAS, MR. WADE, THAT'S 403.  THAT'S MORE

01:00PM  23   PREJUDICIAL THAN PROBATIVE.

01:00PM  24          AGAIN, LOOKING AT THE JOB THAT YOU'VE DONE OVER THE LAST

01:00PM  25   FOUR DAYS WITH THIS WITNESS, YOU HAVE CHALLENGED HIS COMPETENCY

01:00PM   1    OVER THOSE DAYS WITH THE VARIOUS DOCUMENTS THAT WE HAVE IN

01:01PM   2    EVIDENCE HERE.

01:01PM   3         SO AS TO THAT, I WOULD NOT ALLOW YOU TO GO INTO ANY

01:01PM   4    EXAMINATION ON THAT.

01:01PM   5         THE INVITAE -- I THINK I'M PRONOUNCING THAT CORRECTLY, I

01:01PM   6    HOPE I AM -- IT SEEMS LIKE YOU WANT TO GO INTO THAT ALSO, AND

01:01PM   7    THAT'S ANOTHER AREA WHERE YOU WISH TO PROBE HIS COMPETENCY OF

01:01PM   8    THE -- OF HIS PERFORMANCE THERE AS LAB DIRECTOR, EITHER

01:01PM   9    PART-TIME OR NOT, WHATEVER HIS ENGAGEMENT IS.

01:01PM  10         AGAIN, THIS GOES TO THE -- I BELIEVE IT GOES TO A

01:01PM  11    CHARACTER QUALITY AND IT'S, FROM THE COURT'S PERSPECTIVE, I

01:01PM  12    BELIEVE IT'S INAPPROPRIATE CHARACTER EVIDENCE FOR WHAT YOU'RE

01:01PM  13    SEEKING TO ACCOMPLISH.

01:01PM  14         LET ME TURN, THOUGH, TO THE -- IS IT PERKIN ELMER?

01:01PM  15              MR. WADE:  CORRECT.

01:01PM  16              THE COURT:  THAT INVOLVES THE CMS INSPECTION.

01:01PM  17         AND THIS IS A CLOSER CASE.  AND THIS IS SOMETHING THAT,

01:02PM  18    MR. WADE, AN AREA, PARDON ME, WHERE I DO THINK THE COURT WOULD

01:02PM  19    PERMIT YOU SOME LIMITED, LIMITED EXAMINATION.

01:02PM  20         THE FACTORS HERE ARE THE FACT THAT AS I UNDERSTAND IT, THE

01:02PM  21    CMS INSPECTORS IN THERANOS WERE THE SAME INSPECTORS WHO WERE

01:02PM  22    INVOLVED IN THE PERKIN ELMER SITUATION.

01:02PM  23         THIS GOES, MR. WADE, TOWARDS YOUR BIAS, YOUR BIAS ISSUE.

01:02PM  24         I DO THINK THERE MIGHT BE SOME RELEVANCE AS TO POTENTIAL

01:02PM  25    ISSUE OF BIAS.  I DO BELIEVE THAT THE DEFENSE WOULD BE

01:02PM   1    PERMITTED AND IT'S APPROPRIATE TO ALLOW THE DEFENSE TO PROBE,

01:02PM   2    TO PROBE AN ISSUE OF BIAS.

01:02PM   3         WE'VE TALKED AND WE ALL KNOW THAT BIAS IS ALWAYS RELEVANT,

01:02PM   4    BUT -- AND I DO THINK FOR MS. HOLMES TO PRESENT HER DEFENSE, IF

01:02PM   5    SHE WISHES TO DO THAT, I DO THINK IT'S APPROPRIATE TO ALLOW THE

01:02PM   6    DEFENSE TO PROBE ANY ISSUES OF BIAS THAT MAY EXIST.

01:03PM   7         THE BIAS THAT IS REPRESENTED BY MR. WADE IS THAT THESE TWO

01:03PM   8    INSPECTORS ARE THE SAME INSPECTORS THAT WERE INVOLVED IN

01:03PM   9    THERANOS AND THEY'RE ALSO INVOLVED IN THE INSPECTION AT

01:03PM  10    PERKIN ELMER.

01:03PM  11         BUT, MR. WADE, THIS IS AN AREA WHERE YOU'LL, YOU'LL BE

01:03PM  12    PERMITTED TO PROBE, BUT YOU HAVE TO PROBE LIGHTLY.  THE ISSUE

01:03PM  13    REALLY IS WHETHER OR NOT DR. ROSENDORFF, WHETHER HIS TESTIMONY

01:03PM  14    HERE IS IN ANY WAY SHAPED, FOCUSSED, HIS ANSWERS TO YOUR

01:03PM  15    QUESTIONS AND THE GOVERNMENT QUESTIONS ARE IN ANY WAY FOCUSSED

01:03PM  16    OR SHAPED BY A PERSONAL INTEREST, BIAS, SUCH THAT AS YOU TOLD

01:03PM  17    ME THIS MORNING, SUCH THAT IT MIGHT IMPAIR EITHER HIS FUTURE

01:03PM  18    CAREER OR ANY LIABILITY HE MIGHT HAVE.  THAT'S A BROAD, A BROAD

01:04PM  19    AREA.

01:04PM  20         BUT I'M NOT GOING TO PERMIT YOU TO GET INTO, GET INTO THE

01:04PM  21    NATURE OF ANY INVESTIGATION, THE QUALITY OF THE INVESTIGATION,

01:04PM  22    HIS SPECIFIC ROLE IN IT.

01:04PM  23         I THINK THEN WE GET INTO WHAT 608(B), AND I DON'T MEAN TO

01:04PM  24    CONFLATE THESE TWO, BUT WHAT 608(B) -- THE PURPOSE OF 608(B) IS

01:04PM  25    TO AVOID MINI TRIALS AND TO AFFORD EFFICIENCY OF THE

01:04PM   1    PRESENTATION OF THE EVIDENCE.

01:04PM   2        SO I WILL PERMIT YOU TO PROBE THE BIAS ISSUE, BUT NOT TO

01:04PM   3    GET INTO -- I'M GOING TO -- I'M JUST GOING TO BE CANDID WITH

01:04PM   4    YOU.  I'M GOING TO SHUT YOU DOWN IF YOU GO A LITTLE TOO FAR AS

01:04PM   5    TO ANY SPECIFICS.

01:04PM   6        I'M GOING TO GIVE YOU SOME LATITUDE, AND I THINK YOU'RE

01:04PM   7    PERMITTED SOME LATITUDE ABOUT THAT TO DEVELOP THE BIAS, AND

01:04PM   8    WE'LL TAKE ANOTHER TEN MINUTES AND ALLOW YOU TO COLLECT YOUR

01:04PM   9    THOUGHTS ON THAT AND HOW YOU WANT TO APPROACH THAT.

01:05PM  10            MR. WADE:  AND IF I COULD JUST INQUIRE SO I DO NOT

01:05PM  11    CROSS THE LINE THAT THE COURT HAS IN MIND.

01:05PM  12            THE COURT:  SURE.

01:05PM  13            MR. WADE:  THERE ARE CERTAIN CONCLUSIONS THAT WERE

01:05PM  14    REACHED AND NOTICES GIVEN BY THE REGULATORS THAT SORT OF

01:05PM  15    TRIGGER THOSE CONSEQUENCES AND HIS RECOGNITION OF THOSE

01:05PM  16    CONSEQUENCES, AND SO MY INTENT WOULD BE TO NOT GO IN DETAIL

01:05PM  17    INTO ANY OF THOSE.

01:05PM  18        MY INTENT WOULD BE TO NOT INTRODUCE THE DOCUMENTS

01:05PM  19    THEMSELVES, BUT JUST TO NOTE THAT -- BECAUSE THAT'S THE REASON

01:05PM  20    WHY HE -- THAT'S THE REASON WHY HE IS IN JEOPARDY RIGHT NOW.

01:05PM  21            THE COURT:  WELL, MAYBE, MAYBE NOT.  YOUR

01:05PM  22    PERSPECTIVE IS HE'S IN JEOPARDY.  MAYBE HE FEELS HE'S IN

01:05PM  23    JEOPARDY.  THAT'S THE REASON FOR THE QUESTIONS, ISN'T IT?

01:05PM  24        AND THAT IS -- PERHAPS THAT IS THE WAY TO ASK THE

01:05PM  25    QUESTIONS.  I'M NOT GOING TO TELL A SEASONED VETERAN LIKE YOU

01:06PM  1    HOW TO PUT YOUR CASE ON.

01:06PM  2              MR. WADE:  UNDERSTOOD.

01:06PM  3              THE COURT:  BUT THE QUESTION WAS, DO YOU HAVE

01:06PM  4    CONCERNS?  WAS THERE AN INVESTIGATION FROM CMS AT PERKINS?  DID

01:06PM  5    IT INVOLVE THE SAME INSPECTORS HERE?  I DON'T KNOW, MAYBE

01:06PM  6    THAT'S EVEN A LITTLE CLOSER.  BUT THAT'S THE ISSUE.

01:06PM  7              MR. WADE:  OKAY.

01:06PM  8              THE COURT:  AND THEN AS A RESULT OF THAT INSPECTION,

01:06PM  9    DO YOU FEEL SOME ANXIETY ABOUT -- HAS THAT DIRECTED YOU?  HAS

01:06PM 10    THAT FOCUSSED YOU?

01:06PM 11         AGAIN, I AM NOT TELLING YOU WHAT QUESTIONS TO ASK.  I HOPE

01:06PM 12    YOU SEE THE GENERAL AREA, THOUGH.

01:06PM 13              MR. WADE:  I DO.

01:06PM 14              THE COURT:  BECAUSE THAT'S REALLY THE ISSUE.  THE

01:06PM 15    FACT THAT THERE WAS AN INSPECTION AT THIS LAB AND THE FACT THAT

01:06PM 16    THE SAME INSPECTORS WERE INVOLVED IN THERANOS, THERE'S SOME

01:06PM 17    SYMBIOSIS, SOME SYMBIOTIC RELATIONSHIP AT LEAST BY EMPLOYMENT.

01:06PM 18    MAYBE IT'S JUST PURE COINCIDENCE.

01:06PM 19         BUT NONETHELESS, I THINK BECAUSE OF WHAT IT IS, I'M GOING

01:06PM 20    TO ALLOW YOU TO PROBE THAT, BUT NOT TO GET INTO, ISN'T IT A

01:06PM 21    FACT THAT THE LAB WAS ALSO ENGAGED IN X, Y, Z?  OR THEIR LAB

01:07PM 22    WAS THIS?

01:07PM 23         YOU USED THE WORD "CHAOS" I THINK EARLIER TO DESCRIBE

01:07PM 24    NEWARK OR SOMETHING.

01:07PM 25              MR. WADE:  NOT NEWARK.  I THINK I WAS DESCRIBING

01:07PM  1     WHAT THE TEXT MESSAGES WITH WHICH MY UNDERSTANDING WAS THAT WE

01:07PM  2     HAD THE FOUNDATION.

01:07PM  3               THE COURT:  I'M JUST USING THAT AS AN EXAMPLE.  I'M

01:07PM  4     NOT CRITICIZING YOUR WORD CHOICE.

01:07PM  5               MR. WADE:  NO.  I UNDERSTAND.

01:07PM  6               THE COURT:  BUT I AM GOING TO PERMIT YOU TO DO THAT.

01:07PM  7     I THINK THAT'S RELEVANT FOR EXPLORATION OF WHETHER OR NOT THIS

01:07PM  8     WITNESS HAS ANY BIAS, WHETHER OR NOT THIS WITNESS'S RESPONSES

01:07PM  9     OVER THE LAST DAYS HAVE BEEN THE RESULT OF CONCERN.

01:07PM 10          THAT'S -- AND HIS ANSWERS WILL BE WHAT THEY ARE, AND THE

01:07PM 11     JURY CAN CERTAINLY GIVE IT WHATEVER WEIGHT THEY FEEL IS

01:07PM 12     APPROPRIATE.  THAT'S THE PURPOSE FOR BIAS.

01:07PM 13          LET ME ALSO INDICATE THERE ON THE RECORD -- AND I

01:07PM 14     MENTIONED I STARTED MY COMMENTS WITH YOUR FOUR AND A HALF DAYS

01:08PM 15     OF EXAMINATION, THE ISSUE OF CUMULATIVE COMES UP ALSO.  THE

01:08PM 16     PURPOSE TO EXAMINE ON THESE ISSUES WAS TO DIMINISH THE

01:08PM 17     CREDIBILITY OF THIS PARTICULAR WITNESS.

01:08PM 18          I THINK YOU'VE ACCOMPLISHED THAT FOR THE JURY OVER THE

01:08PM 19     LAST FOUR DAYS, AT LEAST SUCH THAT THEY CAN WEIGH IT AND GIVE

01:08PM 20     IT WHATEVER WEIGHT THEY THINK IS APPROPRIATE.

01:08PM 21          SO THERE IS SOME CUMULATIVE NATURE AS WELL IN ALL OF THIS,

01:08PM 22     WHICH ALSO IMPARTS A 403 ANALYSIS AS TO THE ADDITIONAL TIME

01:08PM 23     THAT WOULD BE REQUIRED TO PROBE INTO OTHER MATTERS, AND THAT'S

01:08PM 24     REALLY MORE TOWARDS THE OTHER TWO EXAMPLES WE TALKED ABOUT, BUT

01:08PM 25     IT ALSO TOUCHES ON THIS AS WELL, THOUGH.

01:08PM  1        SO THAT IS MY POSITION ON THIS AREA.

01:08PM  2        IS THAT HELPFUL TO YOU?

01:08PM  3              MR. WADE:  I DO UNDERSTAND, YOUR HONOR.

01:08PM  4        OBVIOUSLY WITH RESPECT TO THE BREADTH OF THE EXAMINATION,

01:08PM  5   YOU KNOW, WE HAVE SUBSTANTIAL CONCERNS ABOUT WHAT WAS PULLED

01:08PM  6   OUT ABOUT IN DIRECT UNDER NAPUE, N-A-P-U-E, AND OTHERWISE, AND

01:09PM  7   SO WE FELT WE NEEDED THE BREADTH THAT WE DID IN ORDER TO

01:09PM  8   CLARIFY THE RECORD.

01:09PM  9              THE COURT:  I HOPE YOU DON'T TAKE ME BEING CRITICAL

01:09PM 10   OF YOU DOING WHAT YOU DID, BUT -- AND I'M NOT.  I'M JUST

01:09PM 11   OBSERVING THAT WE HAD FOUR DAYS AND YOU WERE, YOU KNOW, YOU

01:09PM 12   WERE VERY THOROUGH WITH YOUR EXAMINATION, YOUR

01:09PM 13   CROSS-EXAMINATION.

01:09PM 14        SO THAT'S A FACTOR ALSO IN THIS ANALYSIS, AGAIN, GOING TO

01:09PM 15   THE CUMULATIVE NATURE OF IT, THE 403 TIME ISSUE.

01:09PM 16        MR. BOSTIC, ANYTHING FURTHER?

01:09PM 17              MR. BOSTIC:  NOTHING FURTHER, YOUR HONOR, EXCEPT TO

01:09PM 18   SAY THAT I ANTICIPATE, HAVING NOT DISCUSSED THESE ISSUES WITH

01:09PM 19   THIS WITNESS AT LENGTH, OR PERHAPS AT ALL, I'M NOT SURE WHAT

01:09PM 20   THE WITNESS WILL ANSWER IN RESPONSE TO MR. WADE'S QUESTIONS.

01:09PM 21        BUT I ANTICIPATE THAT THEY WILL NOT BE THE ANSWERS THAT

01:09PM 22   ARE SATISFACTORY TO MR. WADE, TO BE FRANK.

01:09PM 23        I UNDERSTAND THE COURT'S RULING TO FORECLOSE ANY EFFORT BY

01:10PM 24   THE DEFENSE TO HIGHLIGHT OR EMPHASIZE THE SEVERITY OF THE CMS

01:10PM 25   INSPECTION OR FINDINGS AT PERKIN ELMER IN AN EFFORT TO IMPEACH

01:10PM    1        THAT ANSWER.

01:10PM    2             BUT I'M GUIDED BY THE COURT, AS I'M SURE THE DEFENSE IS.

01:10PM    3             MR. WADE:  HE FACES THOSE CONSEQUENCES BECAUSE OF

01:10PM    4        THE CIRCUMSTANCES THAT THEY'RE IN AS A MATTER OF LAW, SO --

01:10PM    5        WHICH HE CLARIFIED IN A DIFFERENT CONVERSATION WITH

01:10PM    6        MR. YAMAMOTO, NOT THE ONE THAT I EXPLORED WITH HIM HERE, BUT

01:10PM    7        WITH RESPECT TO PERKIN ELMER.  THERE'S AN EMAIL THAT DOCUMENTS

01:10PM    8        HIS AWARENESS AND CONCERN ABOUT THE FACT THAT HE COULD LOSE HIS

01:10PM    9        LICENSE.

01:10PM   10             THE COURT:  SURE.  AND THAT'S -- BUT, MR. WADE, YOU

01:10PM   11        DON'T HAVE TO GET INTO ALL OF THE NUANCES OF WHAT IT WAS.

01:10PM   12        ISN'T IT A FACT THAT THE LAB HAD 47, 50 DEFICIENCIES?  YOU WERE

01:10PM   13        AWARE OF IT?  YOU KNEW, ET CETERA, ET CETERA.  THAT'S PILING

01:10PM   14        ON.  THAT'S NOT WHAT THIS IS ABOUT.

01:11PM   15             THIS IS CMS DID AN INVESTIGATION, MR. YAMAMOTO WAS THERE,

01:11PM   16        HE'S THE SAME GENTLEMAN THAT YOU TALKED WITH AT THERANOS, AND

01:11PM   17        NOW HE WAS INVOLVED IN AN INSPECTION OF SOME SORT.  HE WAS

01:11PM   18        INVOLVED WITH YOUR CURRENT EMPLOYER, DOES THAT CAUSE YOU ANY --

01:11PM   19        AND THEN YOU'LL FILL IN THE BLANK, I'M SURE, WITH THE

01:11PM   20        APPROPRIATE QUESTION.

01:11PM   21             BUT NOT GOING TO GET INTO THE DETAILS OF THAT.  I

01:11PM   22        UNDERSTAND THAT YOU WOULD LIKE TO GET INTO THE FOUNDATION OF

01:11PM   23        ALL OF THAT, BUT WHAT IS REALLY INVOLVED HERE IS THE CMS

01:11PM   24        CHARACTERS ARE THE SAME AS IN THERANOS.  HE HAS SOME INTIMACY

01:11PM   25        WITH THEM IN HIS FORMER EMPLOYMENT, HE NOW HAS RENEWED THAT

01:11PM  1    INTIMACY IN HIS CURRENT EMPLOYMENT.

01:11PM  2         HE MAY HAVE CONCERNS ABOUT HIS FUTURE EMPLOYMENT, AND HAS

01:11PM  3    THAT IN ANY WAY SHAPED ANY OF THE TESTIMONY THAT HE'S GIVEN

01:11PM  4    TODAY SUCH THAT HE FAVORS THE GOVERNMENT, SUCH THAT HE FAVORS

01:11PM  5    THERANOS?

01:11PM  6         I THINK IT'S PRETTY STRAIGHTFORWARD, I HOPE.  I THINK IT

01:12PM  7    IS.

01:12PM  8              MR. WADE:  I UNDERSTAND THE DIRECTION OF THE COURT.

01:12PM  9              THE COURT:  BUT WE'LL GIVE YOU TEN MINUTES TO PUT IT

01:12PM  10   ALL TOGETHER.

01:12PM  11             MR. WADE:  GREAT.  THANK YOU, YOUR HONOR.

01:12PM  12             THE COURT:  GREAT.  THANK YOU.

01:12PM  13             THE CLERK:  COURT IS IN RECESS.

01:12PM  14             THE COURT:  AND THEN -- I'M SORRY.

01:12PM  15        MR. BOSTIC, DO YOU THEN BEGIN YOUR REDIRECT EXAMINATION

01:12PM  16   THIS AFTERNOON?

01:12PM  17             MR. BOSTIC:  YES, YOUR HONOR.

01:12PM  18             THE COURT:  GREAT.  THANK YOU VERY MUCH.

01:12PM  19        (RECESS FROM 1:12 P.M. UNTIL 1:39 P.M.)

01:39PM  20        (JURY IN AT 1:39 P.M.)

01:39PM  21             THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE BACK ON

01:39PM  22   THE RECORD.

01:39PM  23        ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

01:39PM  24   THE WITNESS IS ON THE STAND.

01:39PM  25        DO YOU HAVE SOME ADDITIONAL QUESTIONS, MR. WADE?

01:39PM  1              MR. WADE:  YES, YOUR HONOR, JUST A FEW MORE

01:39PM  2   QUESTIONS.

01:39PM  3              THE COURT:  SURE.

01:39PM  4   BY MR. WADE:

01:39PM  5   Q.   DR. ROSENDORFF, I BELIEVE YOU'VE BEEN A LAB DIRECTOR FOR

01:39PM  6   ABOUT 13 YEARS.

01:39PM  7   A.   CORRECT.

01:39PM  8   Q.   SINCE ABOUT 2008?

01:39PM  9   A.   CORRECT.

01:39PM  10  Q.   AND DURING THAT TIME, WE'VE TALKED ABOUT HOW YOU

01:39PM  11  FREQUENTLY WORKED IN THE CLIA ENVIRONMENT; RIGHT?

01:40PM  12  A.   YES.

01:40PM  13  Q.   WHERE THE REGULATORS ASSESS THE PERFORMANCE OF THE LAB

01:40PM  14  UNDER THE CLIA REGULATIONS?

01:40PM  15  A.   CORRECT.

01:40PM  16  Q.   AND WE'VE TALKED ABOUT THOSE REGULATIONS AT LENGTH IN THIS

01:40PM  17  EXAMINATION; CORRECT?

01:40PM  18  A.   YES.

01:40PM  19  Q.   AND AS PART OF THE WORK -- AS PART OF THE ENFORCEMENT OF

01:40PM  20  THESE CLIA REGULATIONS, OCCASIONALLY THE CENTER FOR THE CMS

01:40PM  21  WILL DO INSPECTIONS; RIGHT?

01:40PM  22  A.   YES.

01:40PM  23  Q.   AND YOU'VE HAD EXPERIENCE WITH DIFFERENT INSPECTIONS OVER

01:40PM  24  THE YEARS; CORRECT?

01:40PM  25  A.   YES.

01:40PM  1      Q.   AND ON OTHER OCCASIONS YOU'D INTERACT WITH REGULATORS;

01:40PM  2      CORRECT?

01:40PM  3      A.   YES.

01:40PM  4      Q.   LIKE WE JUST TALKED ABOUT YOUR INTERACTIONS WITH

01:40PM  5      MR. YAMAMOTO.

01:40PM  6           DO YOU RECALL?

01:41PM  7      A.   I RECALL PLACING A PHONE CALL TO CMS AND SPEAKING TO

01:41PM  8      MR. YAMAMOTO WHILE I WAS AT THERANOS.

01:41PM  9      Q.   RIGHT, RIGHT.  WE WERE JUST TALKING ABOUT THAT IN YOUR

01:41PM 10      PRIOR TESTIMONY.

01:41PM 11           DO YOU RECALL THAT?

01:41PM 12      A.   YES.

01:41PM 13      Q.   OKAY.  THE CURRENT LAB, I THINK YOU MENTIONED YESTERDAY,

01:41PM 14      IS A LAB THAT IS ALSO IN CALIFORNIA; IS THAT RIGHT?

01:41PM 15      A.   CORRECT.

01:41PM 16      Q.   AND REMIND ME WHERE THAT LAB IS LOCATED?

01:41PM 17      A.   IT IS LOCATED IN VALENCIA, CALIFORNIA.

01:41PM 18      Q.   OKAY.  AND VALENCIA, IS THAT JUST NORTH OF L.A.?

01:41PM 19      A.   CORRECT.

01:41PM 20      Q.   AN HOUR, HOUR AND A HALF OR SO?

01:41PM 21      A.   CORRECT.

01:41PM 22      Q.   AND AS PART OF -- AND YOU SERVE AS THE CLIA LAB DIRECTOR?

01:41PM 23      A.   CORRECT.

01:41PM 24      Q.   AND AS PART OF YOUR SERVICE AS THE CLIA LAB DIRECTOR, CMS

01:41PM 25      SUBJECTED THAT LAB TO A COMPLAINT SURVEY?

01:42PM  1    A.   CORRECT.

01:42PM  2    Q.   AND AS PART OF THAT, THEY CAME IN AND DID THE KIND OF

01:42PM  3    INVESTIGATION THAT WE'VE TALKED ABOUT THE OTHER DAY, IS THAT

01:42PM  4    FAIR, WHEN WE TALKED ABOUT THE 2013 INSPECTION AT THERANOS?

01:42PM  5    A.   NO.

01:42PM  6         CMS CAME IN EARLIER THIS YEAR.  MOST OF THE PROCEEDINGS

01:42PM  7    WERE DOCUMENT REVIEW AND REVIEW OF THE LIS.

01:42PM  8         IT WAS MR. YAMAMOTO AND ANOTHER INDIVIDUAL WHO WAS

01:42PM  9    ASSISTING HIM.

01:42PM 10    Q.   IS THAT JOSHUA COHEN?

01:42PM 11    A.   YES.

01:42PM 12    Q.   OKAY.  AND YOU UNDERSTAND THE HEAD OF THE REGION IS

01:42PM 13    KAREN FULLER?

01:42PM 14    A.   YES.

01:42PM 15    Q.   AND SHE'S SOMEONE WHO YOU AT LEAST RECEIVE CORRESPONDENCE

01:42PM 16    FROM IN CONNECTION WITH THAT SURVEY?

01:43PM 17    A.   THE CORRESPONDENCE WAS FROM -- YES, YES, YES.

01:43PM 18    Q.   AND SHE'S THE REGIONAL DIRECTOR FOR THE WESTERN STATES?

01:43PM 19    A.   OKAY.

01:43PM 20    Q.   OKAY.  AFTER THAT -- AFTER THAT INSPECTION, THEY PROVIDED

01:43PM 21    YOU, THEY PROVIDED YOU A NOTICE IDENTIFYING SOME MATTERS; IS

01:43PM 22    THAT RIGHT?

01:43PM 23    A.   YES.

01:43PM 24    Q.   AND THAT WAS IN JULY -- INITIALLY THEY PROVIDED A NOTICE

01:43PM 25    IN MAY OF '21?

01:43PM   1    A.   I BELIEVE SO.

01:43PM   2    Q.   MAY 6TH.  DOES THAT SOUND FAMILIAR?

01:43PM   3         AND THERE WAS SOME RESPONSES WHERE YOU PROVIDED

01:43PM   4    INFORMATION TO CMS?

01:43PM   5    A.   YES.

01:43PM   6    Q.   AND THEN THEY PROVIDED ANOTHER NOTICE IN JULY OF 2021.

01:43PM   7         DO YOU RECALL THAT?

01:44PM   8    A.   YES.

01:44PM   9    Q.   AND YOU'RE AWARE THAT IF -- LET ME STRIKE THAT.

01:44PM  10         IN CONNECTION WITH THAT NOTICE, THAT CREATED SOME

01:44PM  11    IMPLICATIONS FOR YOU PERSONALLY; IS THAT RIGHT?

01:44PM  12    A.   I DON'T HAVE THE TEXT OF THE JULY NOTICE IN FRONT OF ME SO

01:44PM  13    I CAN'T COMMENT ON THAT, YEAH.

01:44PM  14              THE COURT:  I DON'T THINK YOU NEED THAT.

01:44PM  15              MR. WADE:  I DON'T THINK WE NEED THAT.

01:44PM  16    Q.   DO YOU RECALL AFTER YOU GOT THE NOTICE YOU HAD A TELEPHONE

01:44PM  17    CONVERSATION WITH MR. YAMAMOTO ABOUT POSSIBLE IMPLICATIONS --

01:44PM  18    A.   YES, YES.

01:44PM  19    Q.   -- FOR YOU PERSONALLY?

01:44PM  20    A.   YES, I DID.  YEAH.

01:44PM  21    Q.   AND IN CONNECTION WITH THAT CONVERSATION WITH

01:45PM  22    MR. YAMAMOTO, DID YOU UNDERSTAND DEPENDING UPON THE FINAL

01:45PM  23    OUTCOME OF THOSE MATTERS THAT YOU COULD -- YOUR LICENSE TO BE A

01:45PM  24    LAB DIRECTOR COULD BE SUSPENDED?

01:45PM  25    A.   YES, FOR AT LEAST TWO YEARS, CORRECT.

01:45PM  1          MR. WADE:  I HAVE NO FURTHER QUESTIONS.

01:45PM  2          THE COURT:  THANK YOU.

01:45PM  3      MR. BOSTIC, DO YOU HAVE REDIRECT?

01:45PM  4          MR. BOSTIC:  I DO, YOUR HONOR.

01:45PM  5      MAY I PROCEED, YOUR HONOR?

01:45PM  6          THE COURT:  YES, PLEASE.

01:45PM  7                    **REDIRECT EXAMINATION**

01:45PM  8  BY MR. BOSTIC:

01:45PM  9  Q.   GOOD AFTERNOON, DR. ROSENDORFF.

01:45PM  10  A.   GOOD AFTERNOON, SIR.

01:45PM  11  Q.   I'D LIKE TO ASK YOU SOME FOLLOW-UP QUESTIONS ABOUT SOME

01:45PM  12  TOPICS THAT YOU DISCUSSED WITH MR. WADE.

01:46PM  13      FIRST, DO YOU RECALL QUESTIONS THAT MR. WADE ASKED YOU

01:46PM  14  ABOUT PREVIOUS MEETINGS THAT YOU HAD WITH THE GOVERNMENT?

01:46PM  15  A.   YES.

01:46PM  16  Q.   AND WHEN YOU MET WITH THE GOVERNMENT, WERE THOSE MEETINGS

01:46PM  17  VOLUNTARY OR WERE YOU FORCED TO MEET WITH THE GOVERNMENT?

01:46PM  18  A.   VOLUNTARY.

01:46PM  19  Q.   AND WHY DID YOU DECIDE TO MEET WITH THE GOVERNMENT AND

01:46PM  20  SHARE INFORMATION ABOUT THERANOS?

01:46PM  21  A.   I WANTED TO BE FULLY COOPERATIVE WITH THE GOVERNMENT AND

01:46PM  22  THEIR INVESTIGATION.  I WANTED THE STORY TO COME OUT.  I WANTED

01:46PM  23  JUSTICE TO BE SERVED, AND I BASICALLY SAW IT AS A PUBLIC

01:46PM  24  SERVICE IN ESSENCE TO COOPERATE WITH THE GOVERNMENT AND IN ANY

01:46PM  25  WAY THAT I COULD, YEAH.

01:46PM  1    Q.   I WANT YOU TO THINK ABOUT ALL OF THOSE MEETINGS AS A

01:46PM  2    WHOLE.

01:46PM  3         DO YOU HAVE THOSE MEETINGS IN YOUR MIND?

01:46PM  4    A.   YES.

01:46PM  5    Q.   AT ANY POINT DURING THOSE MEETINGS DID ANY REPRESENTATIVE

01:46PM  6    OF THE GOVERNMENT TELL YOU HOW TO TESTIFY AT TRIAL OR ATTEMPT

01:47PM  7    TO SHAPE YOUR TESTIMONY?

01:47PM  8    A.   NO, NOT AT ALL.

01:47PM  9    Q.   DID ANYONE FROM THE GOVERNMENT AT ANY OF THOSE MEETINGS

01:47PM  10   MAKE ANY PROMISES TO YOU ABOUT BENEFITS THAT YOU MIGHT OBTAIN

01:47PM  11   IF YOU TESTIFIED IN A CERTAIN WAY DURING THIS TRIAL?

01:47PM  12   A.   NO, NOT AT ALL.

01:47PM  13        ON THE CONTRARY, I'VE MADE SACRIFICES IN THE PROCESS.

01:47PM  14   Q.   AND WHAT SACRIFICES ARE YOU REFERRING TO?

01:47PM  15   A.   THE STRESS OF MEETING WITH THE GOVERNMENT, TRAVELLING TO

01:47PM  16   MEET WITH THE GOVERNMENT FROM SAN DIEGO TO TALK TO THE S.E.C.

01:47PM  17   IN SAN FRANCISCO, ESSENTIALLY HAVING THIS ISSUE ON MY MIND,

01:47PM  18   HAVING TO RELIVE VERY UNPLEASANT EXPERIENCES WHILE AT THERANOS,

01:48PM  19   ET CETERA, THE MEDIA ATTENTION, ET CETERA, YEAH.

01:48PM  20   Q.   OKAY.  WE CAN MOVE ON FROM THAT TOPIC.

01:48PM  21        DURING THE CROSS-EXAMINATION YOU WERE ASKED SOMETHING TO

01:48PM  22   THE EFFECT OF WHETHER YOU KNOWINGLY RELEASED TEST RESULTS AT

01:48PM  23   THERANOS.

01:48PM  24        DO YOU REMEMBER THAT QUESTION?

01:48PM  25   A.   YES.

01:48PM 1    Q.   AND WHAT WAS YOUR ANSWER TO THAT QUESTION?

01:48PM 2    A.   NO.

01:48PM 3    Q.   IN YOUR EXPERIENCE AS A LAB DIRECTOR, IS IT ALWAYS

01:48PM 4    POSSIBLE TO IDENTIFY INACCURATE TEST RESULTS BEFORE THEY WENT

01:48PM 5    OUT?

01:48PM 6    A.   NO.  IN THE VAST, VAST MAJORITY OF THE CASES PROBLEMS COME

01:48PM 7    TO LIGHT AFTER THE RESULTS HAVE BEEN REPORTED.

01:48PM 8         AS A LAB DIRECTOR ONE IMPLEMENTS ALL OF THE SAFEGUARDS AND

01:48PM 9    QUALITY CONTROL PROCEDURES TO ENSURE THE HIGHEST ACCURACY AND

01:48PM 10   INTEGRITY OF THE RESULTS, BUT IN THE CASE OF THERANOS THE

01:49PM 11   PROBLEMS EMERGED AFTER THOSE RESULTS WERE RELEASED.

01:49PM 12   Q.   IN OTHER WORDS, RESULTS CAN ONLY BE IDENTIFIED AS

01:49PM 13   INACCURATE AFTER THEY HAD GONE OUT THE DOOR?

01:49PM 14   A.   FOR THE MOST PART, YES.

01:49PM 15   Q.   HOW ABOUT EVEN AFTER THE LAB RESULTS GO OUT, IS IT

01:49PM 16   POSSIBLE AT THAT POINT TO IDENTIFY EACH AND EVERY INACCURATE

01:49PM 17   TEST RESULT THAT A LAB HAS PUT OUT?

01:49PM 18   A.   NO, NOT DEFINITIVELY, NO.

01:49PM 19   Q.   WHY NOT?

01:49PM 20   A.   YOU -- FOR ONE THING, YOU DON'T KNOW WHAT THE ACTUAL VALUE

01:49PM 21   IS.  YOU DON'T KNOW WHAT THE BIOLOGICAL VALUE SHOULD BE.

01:49PM 22        YOU RELY ON A ROBUST TESTING METHOD AND TECHNOLOGY -- YOU

01:49PM 23   RELY ON TECHNOLOGY TO A HUGE EXTENT.  IT'S REALLY -- AS I SAID,

01:50PM 24   ONE PUTS SAFEGUARDS IN PLACE SUCH AS PROFICIENCY TESTING AND QC

01:50PM 25   TO MITIGATE THE POTENTIAL FOR ERROR.  IT DOES NOT ELIMINATE THE

01:50PM   1    POTENTIAL FOR ERROR.

01:50PM   2         I DON'T KNOW IF THAT ANSWERS YOUR QUESTION.  YEAH.

01:50PM   3    Q.  I THINK IT DOES.  AND LET ME ASK A FOLLOWUP, WHICH IS,

01:50PM   4    WHAT ARE THE WAYS IN WHICH IT'S POSSIBLE TO IDENTIFY AN

01:50PM   5    INACCURATE TEST RESULT AFTER THE FACT?  WHAT ARE THE DIFFERENT

01:50PM   6    WAYS?

01:50PM   7    A.  SO, FOR INSTANCE, A FREE T4 COULD BE VERY HIGH, BUT THE

01:50PM   8    TSH COULD BE VERY NORMAL, AND WE KNOW FROM PHYSIOLOGY THAT TSH

01:50PM   9    COULD BE LOW AND THAT SUGGESTS A PROBLEM WITH TSH.

01:50PM  10    Q.  SO, IN OTHER WORDS, YOU MIGHT HAVE A SITUATION WHERE ONE

01:50PM  11    TEST RESULT IS INCOMPATIBLE WITH ANOTHER TEST RESULT FROM THE

01:50PM  12    SAME --

01:50PM  13    A.  CORRECT, CORRECT.

01:50PM  14         ANOTHER EXAMPLE WOULD BE THE CHOLESTEROL WHERE JUST THE

01:51PM  15    MATH -- WHAT IS MEASURED DOESN'T COMPUTE WITH THE MATH OF WHAT

01:51PM  16    THE ACTUAL RESULT SHOULD BE.

01:51PM  17    Q.  UH-HUH.  SO AGAIN, INTERNAL INCONSISTENCE BETWEEN TWO

01:51PM  18    DIFFERENT RESULTS?

01:51PM  19    A.  YES, OR A SPATE OF ABNORMALLY LOW RESULTS THAT IS

01:51PM  20    STATISTICALLY VERY UNLIKELY.

01:51PM  21    Q.  HOW ABOUT COMPARISON BETWEEN A RESULT OBTAINED FROM ONE

01:51PM  22    METHOD VERSUS A RESULT OBTAINED FROM ANOTHER PROVEN METHOD?  IS

01:51PM  23    THAT A METHOD THAT COULD BE USED TO IDENTIFY AN INACCURATE

01:51PM  24    RESULT?

01:51PM  25    A.  WELL, AT THERANOS THOSE KINDS OF TROUBLESHOOTING FOR THE

01:51PM  1    MOST PART WOULD RELY ON VENOUS BLOOD SAMPLES THAT WOULD BE RUN

01:52PM  2    ON A THERANOS METHOD AND A PREDICATE METHOD.  IT DID NOT TAKE

01:52PM  3    INTO ACCOUNT ISSUES WITH THE ACTUAL CTN TECHNOLOGY OR INDEED

01:52PM  4    DIFFERENCES BETWEEN CAPILLARY BLOOD AND VENOUS BLOOD.

01:52PM  5    Q.  IN YOUR EXPERIENCE AT THERANOS, DID YOU EVER ENCOUNTER

01:52PM  6    SITUATIONS WHERE YOU CAME TO DOUBT A THERANOS LAB RESULT

01:52PM  7    BECAUSE OF A RESULT FROM ANOTHER LAB AROUND THE SAME TIME

01:52PM  8    PERIOD?

01:52PM  9    A.  YES.  I BELIEVE THE TESTOSTERONE IS AN EXAMPLE OF THAT,

01:52PM  10   YEAH.

01:52PM  11   Q.  HOW ABOUT PATIENT FACTORS?

01:52PM  12       IS THERE SOMETIMES -- OR IS THERE EVER INFORMATION ABOUT

01:52PM  13   THE WAY A PATIENT PRESENTS OR WHAT IS GOING ON WITH A PATIENT

01:52PM  14   THAT CAN CALL INTO QUESTION LABORATORY RESULTS?

01:52PM  15   A.  UM, YES.  IN THE CASE OF A PATIENT TAKING COUMADIN, FOR

01:53PM  16   INSTANCE, YOU EXPECT THE PT TO BE PROLONGED.  IF YOU SEE A

01:53PM  17   SHORT PT, THAT'S INCONSISTENT WITH A PATIENT TAKING COUMADIN.

01:53PM  18   Q.  HOW ABOUT WITH THE HCG TEST, FOR EXAMPLE, ARE THERE

01:53PM  19   PATIENT FACTORS THERE THAT COULD CAST DOUBT ON THE ACCURACY OF

01:53PM  20   AN INDIVIDUAL HCG RESULT?

01:53PM  21   A.  YES.  THERE WAS AN INSTANCE WHERE THE ORIGINAL HCG RESULTS

01:53PM  22   SUGGESTED A MISCARRIAGE AS COMPARED TO A QUEST RESULT, AND THEN

01:53PM  23   A REPEAT THERANOS RESULT WAS MUCH HIGHER, AND IT IS NOT

01:53PM  24   PHYSIOLOGICALLY POSSIBLE TO HAVE THAT, YEAH.

01:53PM  25   Q.  ON DIRECT DO YOU RECALL REVIEWING SOME INDIVIDUAL

01:54PM   1     INCIDENTS BY REFERENCE TO EXHIBITS AT THIS TRIAL?

01:54PM   2     A.   YES.

01:54PM   3     Q.   AND DID SOME OF THOSE EXHIBITS INVOLVE TEST RESULTS FROM

01:54PM   4     THERANOS THAT YOU CONCLUDED WERE INACCURATE?

01:54PM   5     A.   AFTER THE FACT, YEAH.

01:54PM   6     Q.   DO YOU RECALL DURING YOUR CROSS-EXAMINATION THERE WAS A

01:54PM   7     DISCUSSION ABOUT ALL OF THE THINGS THAT COULD GO WRONG DURING

01:54PM   8     THE LAB TESTING PROCESS?

01:54PM   9     A.   YES.

01:54PM   10    Q.   AND THE DIFFERENT WAYS FOR ERROR TO CREEP INTO THE SYSTEM?

01:54PM   11         DO YOU RECALL THAT?

01:54PM   12    A.   YOU'RE REFERRING TO THE GOVERNMENT'S DIRECT?

01:54PM   13    Q.   I'M REFERRING TO YOUR CROSS-EXAMINATION.

01:54PM   14    A.   OH, I'M SORRY.  YES, I DO RECALL THAT, YEP.

01:54PM   15    Q.   AND YOU DISCUSSED PREANALYTIC SOURCES OF ERROR, ANALYTIC

01:54PM   16    SOURCES OF ERROR, AND POST ANALYTIC; IS THAT RIGHT?

01:54PM   17    A.   YES, YES.

01:54PM   18    Q.   AND I'D LIKE TO ASK YOU SOME FOLLOW-UP QUESTIONS ABOUT

01:54PM   19    THAT TOPIC.

01:54PM   20         FIRST, SOME OF THOSE TYPES OF ERROR HAVE NOTHING TO DO

01:55PM   21    WITH THE ACCURACY OF THE TEST METHOD ITSELF; CORRECT?

01:55PM   22    A.   CORRECT.

01:55PM   23    Q.   AND WHAT ARE SOME OF THOSE SOURCES OF ERROR THAT HAVE

01:55PM   24    NOTHING TO DO WITH THE ACTUAL TEST METHOD?

01:55PM   25    A.   ANTICOAGULANT, NOT BEING STANDARDIZED IN THE CTN'S FROM

01:55PM  1    ONE DEVICE TO ANOTHER, CAPILLARY BLOOD SHOOTING VERY RAPIDLY

01:55PM  2    INTO A CTN AND CAUSING HEMOLYSIS DURING BLOOD COLLECTION,

01:55PM  3    CLOTTING OF THE BLOOD SAMPLE IN THE CTN, TEMPERATURE EXCURSIONS

01:55PM  4    DURING TRANSPORTATION FROM ARIZONA TO CALIFORNIA.

01:55PM  5        THOSE ARE SOME OF THE THINGS I CAN THINK OF, YEAH.

01:55PM  6    Q.   AND DOES LAB TECHNICIAN ERROR GO INTO THAT CATEGORY ALSO?

01:55PM  7    A.   THAT WOULD BE ANALYTIC, YEAH.

01:55PM  8    Q.   AS A LAB DIRECTOR, IF YOU BELIEVE THAT TEMPERATURE

01:56PM  9    PROBLEMS, FOR EXAMPLE, ARE THE SOURCE OF ERRONEOUS RESULTS, HOW

01:56PM  10   DO YOU ADDRESS THAT?

01:56PM  11   A.   ONE CAN SIMULATE THE TEMPERATURE VARIATIONS THAT YOU GET

01:56PM  12   DURING TRANSPORTATION EXPERIMENTALLY IN THE LAB BY SUBJECTING A

01:56PM  13   SAMPLE TO, TO SIMILAR -- TO THE EXPECTED TEMPERATURE

01:56PM  14   VARIATIONS.

01:56PM  15   Q.   AND IF YOU BELIEVE THAT -- IF YOU CONCLUDE THAT THOSE

01:56PM  16   TEMPERATURE FLUCTUATIONS ARE THE SOURCE OF THE PROBLEM, WHAT

01:56PM  17   WOULD YOU DO IN RESPONSE?

01:56PM  18   A.   YOU WOULD REACH OUT TO THE COLLECTION SITES TO MAKE SURE

01:56PM  19   THAT AN ICE PACK WAS INCLUDED IN EACH SHIPMENT, FOR INSTANCE,

01:56PM  20   IF IT NEEDS TO BE REFRIGERATED.  YOU WOULD DO AN INVESTIGATION

01:56PM  21   AS TO HOW THESE SAMPLES ARE BEING STORED IN ARIZONA, WHETHER

01:57PM  22   THEY'RE BEING IMMEDIATELY REFRIGERATED OR SITTING OUT ON A

01:57PM  23   BENCH TOP, YOU WOULD NEED TO KNOW HOW MUCH TIME HAD ELAPSED

01:57PM  24   BETWEEN COLLECTION AND ARRIVAL IN THE LAB WOULD BE AN IMPORTANT

01:57PM  25   THING TO KNOW.

01:57PM 1    Q.   AND HOW ABOUT IF SAMPLING MISHANDLING WAS DETERMINED TO BE

01:57PM 2    THE SOURCE OF ERROR, HOW WOULD A LAB DIRECTOR ADDRESS THAT

01:57PM 3    PROBLEM?

01:57PM 4    A.   CAN YOU BE MORE SPECIFIC ABOUT SAMPLE MISHANDLING.  I'M

01:57PM 5    SORRY.

01:57PM 6    Q.   SURE.  WHAT IF A SAMPLE IS NOT BEING HANDLED GENTLY ENOUGH

01:57PM 7    IN THE LAB, WOULD THAT CAUSE POTENTIAL LAB ERROR IN THE RESULT?

01:57PM 8    A.   DEFINITELY IF A SAMPLE IS DROPPED AND CONTAMINATED OR IF

01:57PM 9    IT CROSS-CONTAMINATES OTHER SAMPLES OR -- THE OTHER THING ABOUT

01:57PM 10   PREANALYTIC I FORGOT TO MENTION IS THAT FREQUENTLY PATIENT

01:58PM 11   FINGERS WOULD BE SQUEEZED PRETTY HARD TO GET THE DROP OF BLOOD

01:58PM 12   OUT AND THAT COULD CAUSE BREAKAGE OF RED BLOOD CELLS.

01:58PM 13   Q.   ON THE TOPIC OF MISHANDLING OR CONTAMINATION?

01:58PM 14   A.   YES.

01:58PM 15   Q.   IF YOU BELIEVED THAT WAS THE SOURCE OF ERROR IN A LAB THAT

01:58PM 16   YOU WERE SUPERVISING, WHAT STEPS WOULD YOU TAKE TO ADDRESS IT?

01:58PM 17   A.   SO YOU DO WHAT IS CALLED A QUALITY EXCEPTION REPORT IF

01:58PM 18   THIS OCCURRED DOCUMENTING EXACTLY WHAT OCCURRED AND WHAT

01:58PM 19   PATIENT SAMPLE IT INVOLVED, YOU DO A ROOT CAUSE ANALYSIS, AND

01:58PM 20   THEN YOU DO PREVENTATIVE AND CORRECTIVE ACTIONS TO FIGURE OUT

01:58PM 21   WHAT CHANGES TO IMPLEMENT TO PREVENT THIS FROM HAPPENING IN THE

01:58PM 22   FUTURE.

01:58PM 23   Q.   NOW I WANT TO TALK SPECIFICALLY ABOUT YOUR EXPERIENCE AT

01:58PM 24   THERANOS.

01:58PM 25   A.   OKAY.

01:58PM  1    Q.   WHEN YOU WERE AT THE COMPANY, DID YOU COME TO CONCLUDE

01:58PM  2    THAT THE COMPANY'S TEST HAD ACCURACY AND RELIABILITY PROBLEMS?

01:58PM  3    A.   YES.

01:58PM  4    Q.   DID YOU COME TO AN UNDERSTANDING OF WHAT THE SOURCE OF

01:59PM  5    THOSE PROBLEMS WAS, IN OTHER WORDS, AT WHAT STAGE IN THE

01:59PM  6    PROCESS THE ERROR WAS POPPING UP?

01:59PM  7    A.   SOME OF THEM WERE PREANALYTIC AND SOME WERE ANALYTIC.

01:59PM  8    Q.   AND HOW WERE YOU ABLE TO DETERMINE THAT SOME OF THE ERRORS

01:59PM  9    THAT YOU WERE SEEING WERE ANALYTIC.

01:59PM  10   A.   UM, SO IN TERMS OF MY EXPERIENCE IN DEALING WITH PATIENTS,

01:59PM  11   IT WOULD BE REPEAT VALUES, VALUES NOT REPEATING FROM ONE SAMPLE

01:59PM  12   TO ANOTHER, NOT REPEATING ON THE SAME SAMPLE.

01:59PM  13   Q.   AND DOES QUALITY PERFORMANCE HAVE ANYTHING TO DO WITH THE

01:59PM  14   ASSESSMENT OF WHETHER THERE IS ANALYTIC ERROR OCCURRING?

02:00PM  15   A.   YES.

02:00PM  16   Q.   AND HOW DOES THAT FIT IN?

02:00PM  17   A.   IF THERE'S A VERY HIGH RATE OF QC FAILURE, IT COULD RAISE

02:00PM  18   DOUBTS ABOUT THE ACCURACY OF THE ACTUAL ASSAY BECAUSE QC

02:00PM  19   MATERIAL IS STABLE, IT'S NOT SUBJECT TO THE PREANALYTIC ISSUES

02:00PM  20   THAT REAL SAMPLES ARE.

02:00PM  21   Q.   MS. HOLMES'S LAWYER ASKED YOU IF SHE HAD EVER INSISTED

02:00PM  22   THAT YOU USE AN UNRELIABLE TEST METHOD.

02:00PM  23        DO YOU RECALL THAT QUESTION?

02:00PM  24   A.   YES.

02:00PM  25   Q.   AND WHAT IS YOUR ANSWER TO THAT QUESTION?

02:00PM  1    A.   NO.

02:00PM  2    Q.   WHAT WAS YOUR OVERALL VIEW WHEN YOU WERE AT THE COMPANY OF

02:00PM  3    THE RELIABILITY OF THE EDISON ANALYZER?

02:00PM  4    A.   INITIALLY I WAS ENTHUSIASTIC ABOUT THE TECHNOLOGY, AND I

02:00PM  5    REALLY TRIED TO MAKE IT WORK, AND I GAVE THE COMPANY A LOT OF

02:00PM  6    BENEFIT OF THE DOUBT, BUT I CAME TO REALLY UNDERSTAND DURING MY

02:00PM  7    TENURE AT THERANOS THAT MANY OF THOSE TESTS WERE INACCURATE.

02:01PM  8    Q.   AND SPEAKING OF THE EDISON TESTS SPECIFICALLY?

02:01PM  9    A.   YES.

02:01PM  10   Q.   AND HOW DID YOU COME TO REACH THAT UNDERSTANDING?

02:01PM  11   A.   DIFFICULTY GETTING QC TO FALL IN, FREQUENT TECHNICAL

02:01PM  12   MALFUNCTIONS IN THE ACTUAL EQUIPMENT, UM, SINCE WE HAD A VERY

02:01PM  13   INCOMPLETE AND POORLY IMPLEMENTED AAP PROGRAM, I WASN'T ABLE TO

02:01PM  14   COMPREHENSIVELY ASSESS THE ACCURACY OF THOSE TESTS.

02:01PM  15   Q.   DURING YOUR TIME AT THE COMPANY, DID YOU COME TO

02:01PM  16   UNDERSTAND MS. HOLMES'S POSITION ON THE COMPANY'S USE OF THE

02:01PM  17   EDISON ANALYZER?

02:01PM  18   A.   YES.

02:01PM  19   Q.   AND WHAT WAS THAT POSITION AS YOU UNDERSTOOD IT?

02:01PM  20   A.   SHE WANTED, SHE WANTED TO RAPIDLY EXPAND THE USE OF

02:01PM  21   EDISONS FROM THE TIME OF ROLLOUT THROUGH THE REST OF THE TIME

02:02PM  22   THAT I WAS AT THE COMPANY.

02:02PM  23        AND, IN FACT, MR. BALWANI WANTED TO ALIQUOT BLOOD FROM

02:02PM  24   VACUTAINERS TO CTN'S SO THAT THEY COULD BE RUN ON THE EDISON

02:02PM  25   TECHNOLOGY, SO YES.

02:02PM  1    Q.   SO, IN OTHER WORDS, THAT WOULD BE USING THE EDISON EVEN TO

02:02PM  2    RUN VEIN DRAW SAMPLES?

02:02PM  3    A.   CORRECT.

02:02PM  4    Q.   AND THAT UNDERSTANDING THAT MS. HOLMES WANTED THERANOS TO

02:02PM  5    USE THE EDISON, WHAT MADE YOU THINK THAT?

02:02PM  6    A.   IT WAS MEETINGS WITH DANIEL AND OTHER PROJECT MANAGERS

02:02PM  7    WHERE THAT WAS THE SENSE THAT I WAS GETTING.

02:02PM  8         IT WASN'T ANYTHING IN PARTICULAR THAT MS. HOLMES HAD SAID

02:02PM  9    TO ME OR ANY EMAIL THAT I COULD POINT TO, YEAH.

02:02PM  10   Q.   DID YOU EVER HAVE CONVERSATIONS WITH MS. HOLMES ABOUT

02:02PM  11   TAKING AN ASSAY OFF OF A FINGERSTICK AND CEASE USING THE EDISON

02:03PM  12   FOR THAT ASSAY?

02:03PM  13   A.   WELL, I REMEMBER SENDING THE EMAIL ABOUT HCG AND SAYING IT

02:03PM  14   SHOULD BE RUN ON -- WITH THE FDA APPROVED TECHNIQUE.  I BELIEVE

02:03PM  15   SHE WAS AWARE OF THAT DECISION, YES.

02:03PM  16   Q.   OKAY.  WE'LL TALK ABOUT THAT SPECIFICALLY IN A LITTLE BIT.

02:03PM  17        DID YOU EVER ASK MS. HOLMES WHETHER THERANOS WOULD

02:03PM  18   CONSIDER CEASING USE OF THE EDISON ALTOGETHER?

02:03PM  19   A.   NO.

02:03PM  20   Q.   WHY NOT?

02:03PM  21   A.   THERE WAS TREMENDOUS PRESSURE AT THE COMPANY TO SHOW THAT

02:03PM  22   THIS TECHNOLOGY WAS SUCCESSFUL.  IT CAME FROM THE TOP.  IT

02:03PM  23   PERMEATED R&D.

02:04PM  24   Q.   AND WHY DID THAT DISSUADE YOU FROM MAKING THAT SUGGESTION

02:04PM  25   IF THAT'S THE CASE?

02:04PM 1    A.   IT WAS CREATING CONFLICT FOR ME.  AT VARIOUS POINTS I

02:04PM 2    THOUGHT I MIGHT BE FIRED IF I TOOK TOO STRONG A POSITION ON IT.

02:04PM 3    Q.   AND WHO AT THERANOS HAD THE AUTHORITY TO FIRE YOU?

02:04PM 4    A.   SUNNY.

02:04PM 5    Q.   ANYONE ELSE AT THERANOS WHO COULD FIRE YOU?

02:04PM 6    A.   WELL, HE WOULD HAVE CONSULTED WITH ELIZABETH ON IT, YEAH.

02:04PM 7    Q.   ANYONE ELSE BESIDES MR. BALWANI AND MS. HOLMES WHO COULD

02:04PM 8    HAVE FIRED YOU AT THERANOS?

02:04PM 9    A.   NO, NO.

02:04PM 10   Q.   BESIDES HCG SPECIFICALLY, WERE THERE OTHER INSTANCES AT

02:04PM 11   THERANOS WHERE THE TOPIC OF TAKING AN ASSAY OFF A FINGERSTICK

02:04PM 12   AND MOVING IT BACK TO VENOUS WAS PART OF THE DISCUSSION?

02:04PM 13   A.   YES.  AS DISCUSSED DURING CROSS FOR THE ISE'S, I SUGGESTED

02:04PM 14   RUNNING THEM NEAT WHICH WOULD BE WITHOUT ESSENTIALLY RUNNING

02:05PM 15   THEM BY A PREDICATE ASSAY, YEAH.

02:05PM 16   Q.   AND WAS THAT KIND OF DISCUSSION SOMETHING THAT YOU HAD

02:05PM 17   EXPERIENCED ROUTINELY AT YOUR OTHER LAB DIRECTOR POSITIONS?

02:05PM 18   A.   NO.

02:05PM 19   Q.   IN OTHER WORDS --

02:05PM 20   A.   I'M SORRY, I DIDN'T GIVE YOU A CHANCE.

02:05PM 21   Q.   NO.

02:05PM 22   A.   OKAY.

02:05PM 23   Q.   AND IN OTHER WORDS, A DISCUSSION ABOUT TAKING AN ASSAY OFF

02:05PM 24   OF A PARTICULAR PIECE OF EQUIPMENT BECAUSE IT WASN'T WORKING

02:05PM 25   PROPERLY AND MOVING IT BACK TO SOMETHING MORE ESTABLISHED?

02:05PM  1      A.   NO.

02:05PM  2      Q.   BY THE TIME YOU LEFT THE COMPANY IN NOVEMBER OF 2014, WHAT

02:05PM  3      WAS YOUR OVERALL IMPRESSION OF THE ACCURACY AND RELIABILITY OF

02:05PM  4      THE THERANOS TESTING PLATFORM?

02:05PM  5      A.   I HAD -- I WAS VERY SKEPTICAL.

02:05PM  6      Q.   AND WAS THAT A FACTOR IN YOUR DECISION TO LEAVE THE

02:05PM  7      COMPANY?

02:05PM  8      A.   YES, ABSOLUTELY.

02:06PM  9      Q.   OKAY.  AND WHY IS THAT?

02:06PM  10     A.   I FELT THAT IT WAS A QUESTION OF MY INTEGRITY AS A

02:06PM  11     PHYSICIAN NOT TO REMAIN THERE AND TO CONTINUE TO ENDORSING

02:06PM  12     RESULTS THAT I ESSENTIALLY DIDN'T HAVE FAITH IN.

02:06PM  13          I CAME TO UNDERSTAND THAT MANAGEMENT WAS NOT SINCERE IN

02:06PM  14     DIVERTING RESOURCES TO SOLVE ISSUES.  OTHER THAN HAVING R&D PUT

02:06PM  15     PATCHES ON THINGS, SUNNY WAS HEAVILY INVOLVED IN ACTUALLY

02:06PM  16     DIRECTING THE CLIA LAB.

02:06PM  17     Q.   ON CROSS YOU WERE ASKED A QUESTION ABOUT WHETHER OR NOT

02:06PM  18     YOU HAD EVER SEEN AN EMAIL WHERE YOU HAD ASKED FOR RESOURCES

02:06PM  19     AND BEEN TOLD NO?

02:06PM  20     A.   YES.

02:06PM  21     Q.   DO YOU RECALL THAT TESTIMONY?

02:06PM  22     A.   YES.

02:06PM  23     Q.   HOW DO YOU SQUARE THAT WITH WHAT YOU JUST SAID THAT YOU

02:06PM  24     FELT MANAGEMENT WASN'T SINCERE ABOUT DEVOTING THOSE RESOURCES?

02:07PM  25     A.   SO THE WAY I SAW IT A PROFICIENCY PROGRAM WOULD REQUIRE A

02:07PM 1      MAJOR OPERATIONAL OVERHAUL.  AS DR. PANDORI'S EMAIL INDICATED,

02:07PM 2      IT WOULD TIE UP MULTIPLE EDISONS, FOR INSTANCE, AND ESSENTIALLY

02:07PM 3      WOULD BECOME A BUSINESS DECISION REGARDING RESOURCES AND NOT A

02:07PM 4      LAB DIRECTOR DECISION.

02:07PM 5      Q.   AND IF THERE WEREN'T EMAILS WHERE YOU WERE TOLD NO ON THAT

02:07PM 6      ISSUE, HOW DID YOU KNOW WHAT MANAGEMENT'S POSITION WAS?

02:07PM 7      A.   BECAUSE I SAW VARIOUS EFFORTS BY R&D TO DO SOME KIND OF

02:07PM 8      IQP OR AAP, ET CETERA.  THEY WEREN'T FOLLOWING A PROTOCOL.

02:08PM 9      THEY WERE INCONSISTENT WITH HOW THEY WERE EXECUTING.

02:08PM 10     FREQUENTLY THEY WEREN'T SHOWING THE DATA TO ME SO I SUSPECTED

02:08PM 11     THAT DIRECTION WAS BEING GIVEN TO THEM ON THIS MATTER.

02:08PM 12     Q.   AND BESIDES EMAIL, DID YOU EVER DISCUSS THE NEED FOR AAP

02:08PM 13     WITH MS. HOLMES IN PERSON?

02:08PM 14     A.   NO.

02:08PM 15     Q.   HOW ABOUT MR. BALWANI?  DID YOU HAVE DISCUSSIONS WITH HIM

02:08PM 16     ABOUT THE NEED FOR AAP IN PERSON?

02:08PM 17     A.   I DON'T BELIEVE SO, NO.

02:08PM 18     Q.   DO YOU RECALL ON CROSS-EXAMINATION YOU WERE ASKED

02:08PM 19     QUESTIONS ABOUT THE LABORATORY INFORMATION SYSTEM, OR LIS?

02:08PM 20     A.   YES.

02:08PM 21     Q.   YOU TALKED A FEW MINUTES AGO ABOUT THE WAYS TO IDENTIFY A

02:08PM 22     TEST RESULT IS INACCURATE.

02:08PM 23          DO YOU REMEMBER THAT?

02:08PM 24     A.   YES.

02:08PM 25     Q.   YOU TALKED ABOUT, FOR EXAMPLE, HOW THERE MIGHT BE

02:09PM 1    INCONSISTENT RESULTS FROM THERANOS LAB TESTS AND LAB TESTS FROM

02:09PM 2    A DIFFERENT LABORATORY?

02:09PM 3    A.   YES.

02:09PM 4    Q.   AND WOULD THAT INFORMATION BE INCLUDED IN THE THERANOS

02:09PM 5    LABORATORY INFORMATION SYSTEM?

02:09PM 6    A.   NO, BUT REPEAT TESTING WOULD BE INCLUDED.

02:09PM 7    Q.   REPEAT TESTING WITHIN THERANOS?

02:09PM 8    A.   YES.

02:09PM 9    Q.   TESTING OUTSIDE OF THE COMPANY, THOUGH, FOR EXAMPLE, IF A

02:09PM 10   PATIENT WENT TO THERANOS ONE DAY AND THEN WENT TO SONORA QUEST

02:09PM 11   THE FOLLOWING DAY AND GOT ANOTHER RESULT, WOULD THAT SONORA

02:09PM 12   QUEST RESULT BE LOGGED INTO THE THERANOS LIS?

02:09PM 13   A.   NO.  IT'S ONLY IF THERANOS SENT OUT A SAMPLE TO A

02:09PM 14   REFERENCE LAB IS THEN THOSE RESULTS FROM THE OUTSIDE REFERENCE

02:09PM 15   LAB WOULD BE RECORDED IN THE LIS.

02:09PM 16   Q.   ONLY TESTING AT THERANOS OR THROUGH THERANOS ENDS UP IN

02:09PM 17   THAT DATABASE?

02:09PM 18   A.   CORRECT.

02:09PM 19   Q.   YOU ALSO TALKED ABOUT BEING ABLE TO IDENTIFY INACCURATE

02:10PM 20   TEST RESULTS BASED ON PATIENT FACTORS AND THE WAY A PATIENT

02:10PM 21   PRESENTS?

02:10PM 22   A.   YES.

02:10PM 23   Q.   AND ARE THOSE PATIENT FACTORS LOGGED IN LIS?

02:10PM 24   A.   NO.

02:10PM 25   Q.   FOR EXAMPLE, IF A PATIENT RECEIVED AN HCG TEST RESULT THAT

02:10PM  1    SHOWED THAT HER PREGNANCY WAS NONVIABLE AND THEN SHE CARRIED

02:10PM  2    HER BABY TO TERM AND SUCCESSFULLY GAVE BIRTH, WOULD THAT FACT

02:10PM  3    AUTOMATICALLY BE ENTERED IN THE LABORATORY INFORMATION SYSTEM?

02:10PM  4    A.   NO.

02:10PM  5    Q.   AND, FOR EXAMPLE, IF SOMEONE RECEIVED A POSITIVE TEST

02:10PM  6    SAYING THAT THEY WERE SUFFERING FROM A CERTAIN DISEASE AND THEN

02:10PM  7    THEY LATER RECEIVED A NEGATIVE TEST INDICATING THAT THEY

02:10PM  8    WEREN'T SUFFERING FROM THAT DISEASE FROM ANOTHER LABORATORY,

02:10PM  9    WOULD THAT INFORMATION BE LOGGED IN LABORATORY INFORMATION

02:10PM  10   SYSTEM?

02:10PM  11   A.   NO.

02:10PM  12   Q.   THE INFORMATION THAT WE'VE BEEN TALKING ABOUT, THE OUTSIDE

02:11PM  13   INFORMATION THAT CAN INDICATE OR REVEAL A TEST RESULT TO BE

02:11PM  14   INACCURATE, HOW WOULD THAT INFORMATION COME TO THERANOS, IF AT

02:11PM  15   ALL?

02:11PM  16   A.   THROUGH PHYSICIAN COMPLAINTS OR PHYSICIAN ASSISTANT --

02:11PM  17   ESSENTIALLY THROUGH A HEALTH CARE PROVIDER COMPLAINT OR QUERY.

02:11PM  18   Q.   AND AS LAB DIRECTOR, DID YOU RELY ON PHYSICIAN AND PATIENT

02:11PM  19   COMPLAINTS TO ASSESS THE ACCURACY OF TEST RESULTS IN SOME

02:11PM  20   CASES?

02:11PM  21   A.   YES.

02:11PM  22   Q.   IS THAT A STANDARD PRACTICE AMONG LAB DIRECTORS IN YOUR

02:11PM  23   EXPERIENCE?

02:11PM  24        MR. WADE:  YOUR HONOR, 702.

02:11PM  25        THE COURT:  WELL, YOU'RE ASKING ABOUT HIS BUSINESS

02:12PM  1    AND PROFESSIONAL EXPERIENCE?

02:12PM  2              MR. BOSTIC:  I CAN REPHRASE, YOUR HONOR.

02:12PM  3              THE COURT:  YES, WHY DON'T YOU.

02:12PM  4    BY MR. BOSTIC:

02:12PM  5    Q.   THAT PRACTICE OF RELYING ON DOCTOR OR PATIENT COMPLAINTS

02:12PM  6    TO ASSESS THE ACCURACY OF TESTS, IS THAT SOMETHING THAT YOU'VE

02:12PM  7    DONE THROUGHOUT YOUR CAREER AS A LAB DIRECTOR?

02:12PM  8    A.   YES.

02:12PM  9              MR. WADE:  SAME OBJECTION.  MOVE TO STRIKE.

02:12PM  10             THE COURT:  OVERRULED.

02:12PM  11   BY MR. BOSTIC:

02:12PM  12   Q.   ON CROSS-EXAMINATION YOU WERE SHOWN MANY VALIDATION

02:12PM  13   REPORTS FROM THERANOS.

02:12PM  14        DO YOU RECALL THAT?

02:12PM  15   A.   YES.

02:12PM  16   Q.   AND I WANT TO MAKE SURE THAT WE'RE CLEAR ON THE

02:12PM  17   RELATIONSHIP ON THE VALIDATION PROCESS AND THE ONGOING QUALITY

02:12PM  18   OF EVALUATION THAT GOES ON AFTER TESTING BEGINS.

02:12PM  19   A.   YES.

02:12PM  20   Q.   CAN YOU BRIEFLY EXPLAIN THAT DISTINCTION FOR US?

02:12PM  21   A.   VALIDATION OCCURS BEFORE PATIENT TESTING IS AUTHORIZED,

02:12PM  22   PERFORMANCE SPECIFICATIONS OF THE ASSAY ARE DEMONSTRATED UNDER

02:13PM  23   IDEAL CONDITIONS, PREANALYTIC FACTORS ARE NOT CONSIDERED FOR

02:13PM  24   THE MOST PART.

02:13PM  25        ONE HAS TO DEMONSTRATE ACCURACY, PRECISION, LINEARITY,

02:13PM   1    ET CETERA, ACCORDING TO THE CFR REGULATIONS.

02:13PM   2         SO THE VALIDATION REPORT IS APPROVED ON THE BASIS OF THE

02:13PM   3    STRENGTH OF THAT DATA ALONE.

02:13PM   4    Q.   AND ALL OF THAT DATA IS GENERATED BEFORE A SINGLE CLINICAL

02:13PM   5    PATIENT SAMPLE IS RUN?

02:13PM   6    A.   CORRECT.

02:13PM   7    Q.   HOW DO THINGS CHANGE THEN ONCE VALIDATION IS COMPLETED AND

02:13PM   8    PATIENT TESTING ACTUAL BEGINS?  HOW IS QUALITY MONITORED FROM

02:13PM   9    THAT POINT ON?

02:13PM   10   A.   WELL, NOW YOU HAVE QC DATA, YOU HAVE RATES OF TEST RESULTS

02:13PM   11   THAT ARE OUTSIDE OF THE REFERENCE RANGE THAT I WOULD REVIEW

02:13PM   12   FREQUENTLY AT THERANOS, YOU HAVE PHYSICIAN QUERIES AND

02:14PM   13   COMPLAINTS.

02:14PM   14   Q.   WHEN A TEST COMPLETES VALIDATION AND IT QUALIFIES FOR USE

02:14PM   15   ON ACTUAL PATIENTS, DOES THAT SETTLE THE RECORD FOREVER AS TO

02:14PM   16   ITS ACCURACY AND RELIABILITY?

02:14PM   17   A.   NO, IT DOES NOT.

02:14PM   18   Q.   AND WHY NOT?

02:14PM   19   A.   BECAUSE OF PREANALYTIC ISSUES THAT ARE NOT CAPTURED IN THE

02:14PM   20   VALIDATION, VARIATION BETWEEN INSTRUMENTS AND REAGENTS THAT ARE

02:14PM   21   NOT CAPTURED IN THE VALIDATION, THERE COULD BE SERIOUS

02:14PM   22   DIFFERENCES IN THE PERFORMANCE OF DIFFERENT INSTRUCTIONS,

02:14PM   23   DIFFERENT REAGENTS, KITS, INTERFERING SUBSTANCES, THAT'S

02:14PM   24   ANOTHER PREANALYTIC CONSIDERATION, ET CETERA.

02:14PM   25   Q.   AND ALL OF THOSE FACTORS ARE FACTORS THAT COULD ADVERSELY

02:14PM  1    AFFECT THE ACCURACY OF THE TEST?

02:14PM  2    A.    YES.

02:14PM  3    Q.    AND THOSE FACTORS AREN'T 100 PERCENT ACCOUNTED FOR DURING

02:15PM  4    THE VALIDATION PROCESS?

02:15PM  5    A.    NO.

02:15PM  6    Q.    AT THERANOS --

02:15PM  7    A.    ALSO THE ASSUMPTION DURING THE VALIDATION IS THAT VENOUS

02:15PM  8    BLOOD WOULD BEHAVE IDENTICALLY TO CAPILLARY BLOOD.  SO THE

02:15PM  9    MAJORITY OF VALIDATION WAS DONE ON VENOUS BLOOD AND ONLY THE

02:15PM  10   REFERENCE RANGE VERIFICATION WAS DONE USING CAPILLARY BLOOD.

02:15PM  11   Q.    AND CAN YOU EXPLAIN THAT, WHAT STEPS OF THE VALIDATION

02:15PM  12   PROCESS WERE DONE RELYING SOLELY ON BLOOD FROM THE VEIN INSTEAD

02:15PM  13   OF THE FINGERSTICK?

02:15PM  14   A.    REPRODUCIBILITY, ACCURACY, LINEARITY, UPPER LIMIT OF

02:15PM  15   QUANTITATION, LOWER LIMIT OF QUANTITATION, INTERFERING

02:15PM  16   SUBSTANCES.

02:15PM  17   Q.    THOSE ARE DONE ON VEIN BLOOD ONLY?

02:15PM  18   A.    CORRECT.

02:15PM  19   Q.    AND WHAT STEPS IN VALIDATION INCLUDED FINGERSTICK SAMPLES?

02:15PM  20   A.    THE REFERENCE RANGE VERIFICATION.

02:15PM  21   Q.    AND HOW DID THAT WORK?

02:15PM  22   A.    ONE RUNS A NUMBER OF CLINICAL SAMPLES -- ONE RUNS OLD

02:16PM  23   SAMPLES IN THE VALIDATION TO COME UP WITH A PROVISIONAL

02:16PM  24   REFERENCE RANGE AND THEN YOU RUN I THINK IT WAS 20 FINGERSTICK

02:16PM  25   SAMPLES AND YOU ENSURE THAT ALL OF THEM FALL WITHIN THAT

02:16PM  1    REFERENCE RANGE FOLLOWING CLSI GUIDANCE.

02:16PM  2         I'M SORRY, I HAVE TO BREAK FOR A FEW MINUTES FOR THE

02:16PM  3    RESTROOM.

02:16PM  4              THE COURT:  LET'S TAKE ABOUT SEVEN MINUTES.  LADIES

02:16PM  5    AND GENTLEMEN, LET'S TAKE ABOUT A SEVEN MINUTE BREAK.

02:17PM  6         (JURY OUT AT 2:17 P.M.)

02:17PM  7              THE COURT:  THE JURY AND THE WITNESS JUST LEFT THE

02:17PM  8    COURTROOM.

02:17PM  9         I JUST WANT TO ASK, AND I'M NOT PRESSURING ANYONE, BUT DO

02:17PM  10   WE ANTICIPATE THE GOVERNMENT WILL FINISH THIS WITNESS TODAY?

02:17PM  11             MR. BOSTIC:  THE COURT WOULD LIKE TO STOP AT

02:17PM  12   3:00 P.M.?

02:17PM  13             THE COURT:  THAT'S WHAT I THOUGHT WE WOULD DO, BUT

02:17PM  14   I'M HAPPY TO RECEIVE YOUR BEST ESTIMATES.

02:17PM  15        I COULD ASK THEM TO STAY UNTIL 4:00 O'CLOCK IF YOU THINK

02:17PM  16   THAT'S PRODUCTIVE.

02:17PM  17             MR. BOSTIC:  I THINK IF WE STAY UNTIL 4:00 IT'S

02:17PM  18   LIKELY WE WILL COMPLETE THE REDIRECT BUT NOT LEAVE MUCH TIME

02:17PM  19   FOR RECROSS.

02:17PM  20             THE COURT:  WELL, YOU WON'T HAVE ANYTHING, MR. WADE?

02:17PM  21             MR. WADE:  TO BE DETERMINED.  IT SOUNDS LIKE WE

02:17PM  22   WON'T GET THE WITNESS IN GIVEN -- WE WOULD HAVE ANOTHER HOUR

02:17PM  23   AND A HALF.  I WOULD ANTICIPATE AT SOME POINT HAVING SOME

02:17PM  24   RECROSS.

02:17PM  25             THE COURT:  SURE.  WELL, WE'LL HAVE HIM BACK

02:18PM 1    TOMORROW, I THINK, AND THEN FINISH HIM TOMORROW MORNING MOST

02:18PM 2    LIKELY.

02:18PM 3         AND YOU'LL HAVE ANOTHER WITNESS AVAILABLE I TAKE IT?

02:18PM 4              MR. BOSTIC:  YES, YOUR HONOR.  THAT'S OUR GOAL AND

02:18PM 5    EXPECTATION.

02:18PM 6              THE COURT:  OKAY.  LET'S DO THAT.  THANK YOU.

02:18PM 7         (RECESS FROM 2:18 P.M. UNTIL 2:25 P.M.)

02:25PM 8         (JURY IN AT 2:25 P.M.)

02:25PM 9              THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE BACK ON

02:25PM 10   THE RECORD.

02:26PM 11        THANK YOU.  PLEASE BE SEATED.  ALL PARTIES PREVIOUSLY

02:26PM 12   PRESENT ARE PRESENT ONCE AGAIN.

02:26PM 13        THE DOCTOR IS ON THE STAND.

02:26PM 14        MR. BOSTIC.

02:26PM 15              MR. BOSTIC:  THANK YOU, YOUR HONOR.

02:26PM 16   Q.   DR. ROSENDORFF, BEFORE THE BREAK WE WERE TALKING ABOUT

02:26PM 17   VALIDATION REPORTS.

02:26PM 18        DO YOU RECALL THAT?

02:26PM 19   A.   YES.

02:26PM 20   Q.   ON CROSS-EXAMINATION YOU WERE SHOWN A NUMBER OF VALIDATION

02:26PM 21   REPORTS THAT BORE YOUR SIGNATURE; CORRECT?

02:26PM 22   A.   YES.

02:26PM 23   Q.   CAN YOU EXPLAIN FOR THE JURY ONE MORE TIME WHAT

02:26PM 24   SIGNIFICANCE IT HAS WHEN A LABORATORY DIRECTOR SIGNS A

02:26PM 25   VALIDATION REPORT?

02:26PM  1    A.   SO THE VALIDATION REPORT IS SIGNED ON THE BASIS OF STUDIES

02:26PM  2    THAT ARE PERFORMED IN THE LABORATORY THAT SHOW EVIDENCE THAT

02:26PM  3    THE TEST IS ACCURATE, REPRODUCIBLE, ET CETERA, AND FULFILL THE

02:26PM  4    PERFORMANCE SPECIFICATIONS AS OUTLINED IN THE CLIA REGULATIONS.

02:27PM  5    Q.   AND I THINK YOU STARTED TO ANSWER WHAT WAS GOING TO BE MY

02:27PM  6    NEXT QUESTION ALSO WHICH IS, ARE THE STANDARDS FOR VALIDATION

02:27PM  7    SOMETHING THAT EACH LABORATORY DIRECTOR KIND OF EYEBALLS OR

02:27PM  8    RELIES ON THEIR GUT FOR OR ARE THERE A SET OF OBJECTIVE

02:27PM  9    STANDARDS?

02:27PM  10   A.   NO.  THEY'RE OUTLINED IN THE CLIA REGULATIONS.

02:27PM  11   Q.   AND --

02:27PM  12   A.   THAT'S A MINIMUM.

02:27PM  13   Q.   AND IF A GIVEN ASSAY MEETS THOSE STANDARDS, IS THERE ANY

02:27PM  14   REASON OR WOULD THERE BE ANY REASON NOT TO SIGN A VALIDATION

02:27PM  15   REPORT FOR THAT ASSAY?

02:27PM  16   A.   NO.

02:27PM  17   Q.   WHEN YOU WERE AT THERANOS, FOR EACH OF THE VALIDATION

02:27PM  18   REPORTS THAT YOU SIGNED, HAD THE ASSAY PERFORMED WELL ENOUGH IN

02:27PM  19   YOUR VIEW TO MEET THE STANDARDS FOR VALIDATION?

02:27PM  20   A.   YES.

02:27PM  21   Q.   AND THE VALIDATION REQUIREMENTS, DO THEY HAVE ANYTHING TO

02:28PM  22   DO WITH TESTING ACCURACY?

02:28PM  23   A.   YES.

02:28PM  24   Q.   AND ARE THEY THE END OF THE QUESTION WHEN IT COMES TO

02:28PM  25   ASSAY ACCURACY?

02:28PM   1    A.   NO.

02:28PM   2    Q.   FOR THE VALIDATION REPORTS THAT YOU SIGNED AND THE ASSAYS

02:28PM   3    THAT MOVED INTO THE CLINICAL LAB AT THERANOS --

02:28PM   4    A.   YES.

02:28PM   5    Q.   -- IN EVERY CASE DID THEY CONTINUE TO PERFORM AS WELL IN

02:28PM   6    THE CLINICAL LAB AS THEY HAD IN VALIDATION?

02:28PM   7    A.   NO, NOT AT ALL.

02:28PM   8    Q.   EXPLAIN THAT.

02:28PM   9    A.   PARTICULARLY WITH -- SO IN THE CASE OF THE EDISON TESTS

02:28PM  10    THE -- MY ASSESSMENT WAS THAT THE ACCURACY AND REPRODUCIBILITY

02:28PM  11    WERE NOT ANYWHERE CLOSE TO WHAT WAS SHOWN TO ME IN THE

02:28PM  12    VALIDATION REPORTS.

02:28PM  13    Q.   IN WHAT WAY SPECIFICALLY?

02:28PM  14    A.   REPEAT TESTING ON SAMPLES GIVING DIFFERENT RESULTS,

02:28PM  15    SAMPLES RUN ON DIFFERENT INSTRUMENTS GIVING DIFFERENT RESULTS,

02:29PM  16    DISCREPANT RESULTS BETWEEN OURSELVES AND OUTSIDE LABORATORIES.

02:29PM  17    SOMETIMES IT'S A REASONABLE APPROACH IN VALIDATION TO ACTUALLY

02:29PM  18    SPLIT SAMPLES AND SEND OUT SOME OF THE SAMPLE TO AN OUTSIDE LAB

02:29PM  19    SO THAT YOU CAN COMPARE YOUR RESULTS TO AN OUTSIDE LABORATORY.

02:29PM  20         A SIMILAR THING I WAS OBSERVING AS A PHYSICIAN, AS A

02:29PM  21    LABORATORY DIRECTOR, WAS THAT THE OUTSIDE RESULTS WERE NOT

02:29PM  22    MATCHING OURS.

02:29PM  23    Q.   AND ALL OF THE FACTORS THAT YOU JUST LISTED, WERE ANY OF

02:29PM  24    THOSE FACTORS APPARENT DURING THE VALIDATION STAGE FOR THESE

02:29PM  25    ASSAYS?

02:29PM   1    A.   NO.

02:29PM   2    Q.   DO YOU KNOW WHETHER MS. HOLMES WAS GENERALLY FAMILIAR WITH

02:29PM   3    THE VALIDATION REPORTS?

02:29PM   4    A.   YES, SHE WAS FAMILIAR WITH THEM.

02:29PM   5    Q.   AND WHAT IS YOUR BASIS FOR SAYING THAT?

02:30PM   6    A.   SHE -- AS WE SAW DURING THE TRIAL, SHE HAD EMAILED SUREKHA

02:30PM   7    TO ASK HOW MANY OF THE TESTS HAD BEEN VALIDATED.  IT WAS

02:30PM   8    GENERALLY SOMETHING THAT SHE KEPT TABS ON, YEAH.

02:30PM   9    Q.   DURING YOUR TIME AS LABORATORY DIRECTOR AT THERANOS, DID

02:30PM  10    YOU HAVE CONVERSATIONS WITH MS. HOLMES ABOUT ACCURACY AND

02:30PM  11    RELIABILITY PROBLEMS OF THE ASSAYS?

02:30PM  12    A.   YES.

02:30PM  13    Q.   AND DURING ANY OF THOSE CONVERSATIONS DID MS. HOLMES CITE

02:30PM  14    THE VALIDATION REPORTS BACK TO YOU?

02:30PM  15    A.   NO.

02:30PM  16    Q.   IN ANY OF THOSE CONVERSATIONS DID SHE SAY, NO, WE CAN

02:30PM  17    DISMISS THESE PROBLEMS THAT WE'RE SEEING NOW BECAUSE WE SAW

02:30PM  18    GOOD PERFORMANCE AT THE VALIDATION STAGE?

02:30PM  19    A.   NO, SHE DID NOT.

02:30PM  20    Q.   DID MS. HOLMES EVER ASK YOU ABOUT THE INCONSISTENCY

02:31PM  21    BETWEEN GOOD PERFORMANCE IN VALIDATION AND POOR PERFORMANCE IN

02:31PM  22    THE LAB?

02:31PM  23    A.   NO, BUT I JUST -- DANIEL AND I DISCUSSED IT.

02:31PM  24    Q.   AND WHAT DID YOU TELL DANIEL YOUNG DURING THOSE

02:31PM  25    CONVERSATIONS?

02:31PM  1   A.   I TOLD HIM THAT THE ASSAY PERFORMANCE WAS NOT CONSISTENT

02:31PM  2   WITH THE VALIDATION ON THE EDISONS, AND HE AGREED.

02:31PM  3   Q.   SO THERE WAS NO DISPUTE AS TO THAT?

02:31PM  4   A.   NO.

02:31PM  5   Q.   AS TIME WENT BY AT THERANOS, IS IT FAIR TO SAY THAT YOU

02:31PM  6   SAW MORE AND MORE PROBLEMS WITH ACCURACY AND RELIABILITY?

02:31PM  7   A.   YES.

02:31PM  8   Q.   ON CROSS-EXAMINATION MR. WADE ASKED YOU ABOUT VALIDATION

02:31PM  9   REPORTS THAT YOU SIGNED OVER A SERIES OF MONTHS DURING YOUR

02:31PM  10  TIME AT THE COMPANY.

02:31PM  11       DO YOU RECALL THAT?

02:31PM  12  A.   YES.

02:31PM  13  Q.   AND WHY DID YOU CONTINUE TO SIGN VALIDATION REPORTS FOR

02:31PM  14  THE EDISON, FOR EXAMPLE, AFTER SEEING THE ACCURACY AND

02:32PM  15  RELIABILITY PROBLEMS THAT WE HAVE BEEN TALKING ABOUT?

02:32PM  16  A.   I WAS ASSESSING THE PERFORMANCE OF THE ASSAY FOR

02:32PM  17  INDIVIDUAL ANALYTES BASED ON THE DATA IN THE VALIDATION REPORT.

02:32PM  18  Q.   WHEN A VALIDATION REPORT WAS PRESENTED TO YOU FOR

02:32PM  19  SIGNATURE, WOULD THAT BE FOR AN ASSAY THAT WAS ALREADY BEING

02:32PM  20  RUN IN THE CLINICAL LAB?

02:32PM  21  A.   NO.

02:32PM  22  Q.   AND DOES THAT MEAN THAT THERE WERE KINDS OF INFORMATION

02:32PM  23  THAT YOU WOULDN'T HAVE ABOUT THAT ASSAY THAT YOU WOULD HAVE IF

02:32PM  24  IT HAD BEEN RUN ON ACTUAL PATIENT SAMPLES?

02:32PM  25  A.   YES.

02:32PM   1    Q.   AND WHAT KINDS OF INFORMATION ARE WE TALKING ABOUT THERE?

02:32PM   2    A.   AS I MENTIONED, INCONSISTENCIES WITH THE MEDICAL PICTURE

02:32PM   3    OF THE PATIENT, OUTSIDE LAB RESULTS THAT DON'T MATCH UP, REPEAT

02:32PM   4    TESTING ON, YOU KNOW, CLINICAL SAMPLES, PREANALYTIC ISSUES SUCH

02:33PM   5    AS DURING COLLECTION TRANSPORTATION THAT WE'VE SPOKEN ABOUT, A

02:33PM   6    HOST OF ISSUES THAT WOULD NOT BE CAPTURED IN THE VALIDATION

02:33PM   7    REPORT.

02:33PM   8    Q.   AS A LAB DIRECTOR, WOULD YOU EVER REFUSE TO SIGN A

02:33PM   9    VALIDATION REPORT FOR ONE ASSAY BASED ON THE PERFORMANCE THAT

02:33PM  10    YOU HAD SEEN OF ANOTHER ASSAY?

02:33PM  11    A.   NO.

02:33PM  12    Q.   WHY NOT?

02:33PM  13    A.   I WAS ASSESSING EACH VALIDATION ON ITS OWN MERITS BASED ON

02:33PM  14    THE DATA IN THE VALIDATION.  THERE WOULD BE NO, THERE WOULD BE

02:33PM  15    NO RIGOROUS SCIENTIFIC WAY OF REFUSING TO SIGN A VALIDATION

02:33PM  16    OTHER THAN WHAT WAS PRESENTED IN TERMS OF DATA IN THE

02:33PM  17    VALIDATION REPORT.

02:33PM  18    Q.   ALL OF THE VALIDATION WORK THAT YOU WITNESSED AT THERANOS,

02:33PM  19    THAT YOU WERE INVOLVED IN, I'M CURIOUS ABOUT HOW YOU VIEWED

02:34PM  20    THAT WORK AND THOSE DOCUMENTS AT THE TIME THAT YOU DECIDED TO

02:34PM  21    LEAVE THE COMPANY?

02:34PM  22         HOW DID THAT FACTOR INTO YOUR DECISION?

02:34PM  23    A.   I STARTED TO LOSE FAITH THAT THE VALIDATION DATA ACTUALLY

02:34PM  24    REFLECTED WHAT HAD BEEN DONE IN R&D DURING THEIR VALIDATION

02:34PM  25    WORK.

02:34PM  1     Q.   I'D LIKE TO TALK SOME MORE ABOUT HCG.

02:34PM  2     A.   YES.

02:34PM  3     Q.   DO YOU RECALL SOME QUESTIONS DURING DIRECT ABOUT HCG?

02:34PM  4     A.   YES.

02:34PM  5     Q.   AND ON CROSS-EXAMINATION YOU WERE ASKED SOME QUESTIONS

02:34PM  6     ABOUT THE HCG TEST?

02:34PM  7     A.   YES.

02:34PM  8     Q.   IF WE CAN PUT UP THE EXHIBIT 4147, PLEASE, WHICH HAS BEEN

02:34PM  9     ADMITTED.

02:34PM  10         DR. ROSENDORFF, DO YOU SEE ON THE SCREEN IN FRONT OF YOU

02:34PM  11    AN EMAIL FROM YOU ON MAY 3RD, 2014?

02:34PM  12    A.   YES.

02:34PM  13    Q.   AND YOU RECALL DISCUSSING THIS EMAIL ON DIRECT AND CROSS;

02:35PM  14    CORRECT?

02:35PM  15    A.   YES.

02:35PM  16    Q.   LET'S LOOK AT THE TEXT BELOW THAT BOX.

02:35PM  17         DR. ROSENDORFF, THIS IS THE EMAIL WHERE YOU TESTIFIED THAT

02:35PM  18    YOU DECIDED TO HALT ALL HCG TESTING ON THE EDISON.

02:35PM  19         DO YOU RECALL THAT?

02:35PM  20    A.   YES.

02:35PM  21    Q.   AND THERE WAS SOME DISCUSSION WITH MR. WADE ABOUT THE

02:35PM  22    EVENTS THAT FOLLOWED THIS AND WHAT HAPPENED NEXT.

02:35PM  23         DO YOU RECALL THAT?

02:35PM  24    A.   YES.

02:35PM  25    Q.   I'D LIKE TO SHOW YOU WHAT WE'LL MARK AS EXHIBIT 5419.

02:35PM  1          MAY I APPROACH, YOUR HONOR?

02:35PM  2                  THE COURT:  YES.

02:35PM  3     BY MR. BOSTIC:

02:35PM  4     Q.   (HANDING.)

02:36PM  5     A.   THANK YOU.

02:36PM  6     Q.   DR. ROSENDORFF, I DON'T HAVE BINDERS FOR YOU TODAY.  I

02:36PM  7     KNOW YOU'LL BE DISAPPOINTED.

02:36PM  8          DO YOU HAVE EXHIBIT 5419 IN FRONT OF YOU?

02:36PM  9     A.   THE ONE YOU JUST HANDED ME?

02:36PM 10     Q.   UH-HUH.

02:36PM 11     A.   YES.

02:36PM 12     Q.   IS IT AN EMAIL DATED JUNE 5TH, 2014?

02:36PM 13     A.   YES.

02:36PM 14     Q.   AND IF YOU TURN TO PAGE 2 OF THE EXHIBIT, IS IT A

02:36PM 15     CONTINUATION OF THE EMAIL CHAIN THAT WE WERE JUST LOOKING AT?

02:36PM 16     A.   YES.

02:36PM 17                  MR. BOSTIC:  YOUR HONOR, MOVE TO ADMIT EXHIBIT 5419.

02:36PM 18                  MR. WADE:  NO OBJECTION, YOUR HONOR.

02:36PM 19                  THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:36PM 20          (GOVERNMENT'S EXHIBIT 5419 WAS RECEIVED IN EVIDENCE.)

02:36PM 21     BY MR. BOSTIC:

02:36PM 22     Q.   SO IF WE CAN FLIP BRIEFLY TO PAGE 2.

02:36PM 23          DR. ROSENDORFF, DO YOU SEE YOUR EMAIL ON MAY 30TH HALTING

02:36PM 24     ALL TESTING ON THE EDISON; CORRECT?

02:36PM 25     A.   YES.

02:36PM 1    Q.   AND YOU SAY IT'S TO BE RUN ON THE IMMULITE; IS THAT RIGHT?

02:37PM 2    A.   YES.

02:37PM 3    Q.   AND THE IMMULITE WAS A NON-THERANOS THIRD PARTY DEVICE?

02:37PM 4    A.   CORRECT.

02:37PM 5    Q.   AND LET'S GO BACK TO PAGE 1 AND MOVE UP THE CHAIN.

02:37PM 6         AT THE BOTTOM OF PAGE 1 -- LET'S ZOOM IN ON THE BOTTOM

02:37PM 7    COUPLE OF MESSAGES THERE.

02:37PM 8         DO YOU SEE AT THE VERY BOTTOM THERE'S AN EMAIL FROM

02:37PM 9    HODA ALAMDAR ASKING YOU WHETHER SHE CAN RELEASE RESULTS FOR A

02:37PM 10   GIVEN PATIENT WHO HAD HCG TESTING ON EDISON?

02:37PM 11   A.   YES.

02:37PM 12   Q.   AND DO YOU SEE ABOVE THAT THERE'S AN EMAIL FROM

02:37PM 13   DANIEL YOUNG TO SUNNY BALWANI AND CHINMAY PANGARKAR WHERE

02:37PM 14   DANIEL YOUNG SAYS, "I WAS JUST SPEAKING WITH ADAM ABOUT THIS.

02:37PM 15   WE WILL HOLD THE RESULT UNTIL THE STUDY WE ARE RUNNING TODAY ON

02:37PM 16   THE EDISON ASSAY IS DONE.  DATA SHOULD BE READY TONIGHT TO

02:38PM 17   REVIEW."

02:38PM 18        DO YOU SEE THAT?

02:38PM 19   A.   YES, YES.

02:38PM 20   Q.   AND DO YOU RECALL THERE WAS A STUDY DONE AROUND THIS TIME

02:38PM 21   TO TRY AND RESOLVE THE ISSUES AROUND THE HCG AND EDISON?

02:38PM 22   A.   I DO NOT RECALL INDEPENDENTLY, NO.

02:38PM 23   Q.   LET'S ZOOM IN ON THE TOP HALF OF PAGE 1.

02:38PM 24        DO YOU SEE AN EMAIL FROM CHINMAY PANGARKAR AT THE BOTTOM

02:38PM 25   OF THE COLLECTION THERE, "WE ARE DOING A STUDY TO ESTABLISH THE

02:38PM   1    CUT-OFF BETWEEN OORL AND INVALID RESULTS."

02:38PM   2    A.   YES.

02:38PM   3    Q.   AND THE SECOND LINE THERE SAYS, "ALSO, AS PART OF THIS, WE

02:38PM   4    WILL BE RE-DOING IQP FOR HCG."

02:38PM   5         DO YOU SEE THAT?

02:38PM   6    A.   YES.

02:38PM   7    Q.   AND WHAT WAS IQP?

02:38PM   8    A.   I DON'T KNOW ALL OF THE -- I BELIEVE IQP IS AN

02:38PM   9    INDIVIDUALIZED QUALITY CONTROL PROGRAM THAT IS -- IT'S A CAP.

02:39PM  10    IT'S AN ALTERNATIVE METHOD OF ASSESSING PROFICIENCY OR QUALITY

02:39PM  11    THAT CAP ALLOWS, AND THAT'S ABOUT ALL I KNOW ABOUT IT NOW.

02:39PM  12    Q.   AND WAS THE GOAL OF THIS ACTIVITY TO TRY TO FIGURE OUT

02:39PM  13    WHAT WAS GOING WRONG WITH HCG?

02:39PM  14    A.   YES.

02:39PM  15    Q.   AND WAS THIS ALL CONSISTENT WITH YOUR INITIAL EMAIL TO

02:39PM  16    HALT EDISON TESTING ON HCG FOR THE TIME BEING?

02:39PM  17    A.   WELL, HODA'S EMAIL SAYS I SEE SOME RESULTS IN LIS FOR HCG.

02:39PM  18         WHY WOULD THERE BE RESULTS IN THE LIS FOR HCG FOR THE

02:39PM  19    EDISON IF I'D INSTRUCTED THE LABORATORY TO HALT TESTING ON THE

02:39PM  20    EDISON?  THAT'S WHAT I DON'T UNDERSTAND.

02:39PM  21    Q.   DO YOU SEE ITEM NUMBER 2 IN YOUR THREE POINT LIST?

02:39PM  22    A.   YES.

02:39PM  23    Q.   AND IT READS HOLD ALL EDISON CTN RESULTS, DO NOT RELEASE?

02:39PM  24    A.   YES.

02:39PM  25    Q.   AND COULD THOSE HAVE BEEN RESULTS THAT HAD BEEN RUN

02:40PM 1    PREVIOUSLY BUT NOT YET RELEASED?

02:40PM 2    A.   I DO NOT KNOW.

02:40PM 3    Q.   I'D LIKE TO SHOW YOU NOW WHAT WE HAVE MARKED AS

02:40PM 4    EXHIBIT 5418.

02:40PM 5         MAY I APPROACH, YOUR HONOR?

02:40PM 6            THE COURT:   YES.

02:40PM 7    BY MR. BOSTIC:

02:40PM 8    Q.   (HANDING.)

02:40PM 9         DOCTOR, DO YOU NOW HAVE IN FRONT OF YOU EXHIBIT 5418?

02:40PM 10   A.   YES, I HAVE THE PAPER YOU JUST HANDED TO ME.

02:40PM 11   Q.   AND IS THIS ANOTHER EMAIL IN THE SAME CHAIN REGARDING HCG

02:40PM 12   TESTING?

02:40PM 13   A.   YES, IT IS.

02:40PM 14   Q.   BETWEEN INDIVIDUALS AT EMPLOYEES AT THERANOS INCLUDING AT

02:40PM 15   THE TOP OF THE MESSAGE SUNNY BALWANI AND ELIZABETH HOLMES?

02:41PM 16   A.   YES.

02:41PM 17            MR. BOSTIC:   YOUR HONOR, MOVE TO ADMIT EXHIBIT 5418.

02:41PM 18            MR. WADE:   NO OBJECTION.

02:41PM 19            THE COURT:   IT'S ADMITTED.   IT MAY BE PUBLISHED.

02:41PM 20        (GOVERNMENT'S EXHIBIT 5418 WAS RECEIVED IN EVIDENCE.)

02:41PM 21   BY MR. BOSTIC:

02:41PM 22   Q.   AND IF WE CAN ZOOM IN ON THE BOTTOM HALF OF PAGE 1.   FROM

02:41PM 23   THERE DOWN IS PERFECT.   THANKS.

02:41PM 24        DR. ROSENDORFF, DO YOU SEE THIS IS THE SAME EMAIL CHAIN

02:41PM 25   THAT WE WERE JUST LOOKING AT?

02:41PM 1      A.   YES.

02:41PM 2      Q.   AND LET'S ZOOM IN ON THE TOP HALF OF THE PAGE NOW.

02:41PM 3           DO YOU SEE AN EMAIL FROM DANIEL YOUNG TO SUNNY BALWANI AND

02:41PM 4      CHINMAY PANGARKAR ON JUNE 4TH, 2014, AT 5:12 P.M.?

02:41PM 5      A.   YES.

02:41PM 6      Q.   AND THIS IS A FEW DAYS AFTER YOUR EMAIL ORDERING THAT HCG

02:41PM 7      TESTING ON EDISON BE STOPPED; CORRECT?

02:41PM 8      A.   CORRECT.

02:41PM 9      Q.   DANIEL YOUNG IN HIS EMAIL -- FIRST OF ALL, YOU WERE NOT

02:42PM 10     INCLUDED ON THAT EMAIL; RIGHT?

02:42PM 11     A.   CORRECT.

02:42PM 12     Q.   AND HE WRITES TO CHINMAY PANGARKAR AND SUNNY BALWANI AND

02:42PM 13     SAYS, "BY THE WAY, WE NEVER SWITCHED TO IMMULITE IN LIS -- IT

02:42PM 14     WAS NOT CLEAR TO ME THAT THIS DECISION WAS MADE.

02:42PM 15          "WE ARE LOOKING AT THE TIMING OF SWITCHING TO IMMULITE NOW

02:42PM 16     AS A FALLBACK DEPENDING ON THE STUDY RESULTS TODAY."

02:42PM 17          DO YOU SEE THAT?

02:42PM 18     A.   YES.

02:42PM 19     Q.   AND WHAT WOULD IT MEAN TO SWITCH TO IMMULITE IN LIS?

02:42PM 20     A.   IT WOULD MEAN THAT IT WOULD NOT BE RECORDED IN THE LIS

02:42PM 21     THAT THE IMMULITE WAS ACTIVE AS A METHOD FOR DOING THE HCG

02:42PM 22     TEST.  THAT REFERENCE RANGES WOULD BE THE IMMULITE REFERENCE

02:42PM 23     RANGES.  THE LIS WOULD BE ACCURATELY RECORDING WHAT METHOD WAS

02:43PM 24     USED AND WHAT THE SAMPLE TYPE WAS.

02:43PM 25          LIS IS THE SYSTEM OF RECORD FOR WHAT IS OCCURRING IN THE

02:43PM 1    CLINICAL LABORATORY.

02:43PM 2    Q.   AND DOES LIS GUIDE THE WORKFLOW IN THE CLINICAL

02:43PM 3    LABORATORY?

02:43PM 4    A.   CAN YOU EXPLAIN A BIT?  I'M SORRY.

02:43PM 5    Q.   LET ME ASK A MORE SPECIFIC QUESTION.

02:43PM 6         IS MAKING THIS CHANGE IN LIS A NECESSARY STEP TO

02:43PM 7    IMPLEMENTING YOUR DIRECTION --

02:43PM 8    A.   YES.

02:43PM 9    Q.   -- TO MOVE HCG FROM EDISON ONTO THE IMMULITE?

02:43PM 10   A.   YES.

02:43PM 11   Q.   SITTING HERE TODAY, ARE YOU SURPRISED TO READ THAT ON

02:43PM 12   JUNE 4TH, 2014, DAYS AFTER YOUR EMAIL, DANIEL YOUNG WAS

02:43PM 13   EMAILING SUNNY BALWANI SAYING THAT IT WAS NOT CLEAR THAT THE

02:43PM 14   DECISION TO TAKE HCG OFF OF EDISON HAD ACTUALLY HAPPENED?

02:43PM 15   A.   YES, I AM SURPRISED.

02:43PM 16   Q.   IN YOUR VIEW WAS IT CLEAR THAT THAT DECISION HAD BEEN

02:43PM 17   MADE?

02:43PM 18   A.   YES.  IN FACT, DANIEL MAY HAVE BEEN ON THE CLS

02:44PM 19   DISTRIBUTION LIST.  I'D HAVE TO CHECK.

02:44PM 20   Q.   IN ANY CASE, DANIEL YOUNG IS RESPONDING TO THIS EMAIL

02:44PM 21   CHAIN THAT INCLUDES YOURS; CORRECT?

02:44PM 22   A.   SORRY, CAN YOU SAY AGAIN.

02:44PM 23   Q.   THE EMAIL IN FRONT OF YOU HAS DANIEL YOUNG RESPONDING IN

02:44PM 24   THE EMAIL CHAIN THAT INCLUDES YOUR INITIAL INSTRUCTIONS; IS

02:44PM 25   THAT RIGHT?

02:44PM   1    A.   YES.

02:44PM   2    Q.   THERE WAS SOME DISCUSSION DURING CROSS ABOUT THE ROLE OF

02:44PM   3    THE LABORATORY DIRECTOR.

02:44PM   4         DO YOU RECALL THAT?

02:44PM   5    A.   YES.

02:44PM   6    Q.   AND THE AUTHORITY OF THE LABORATORY DIRECTOR WITHIN THE

02:44PM   7    LAB?

02:44PM   8    A.   YES.

02:44PM   9    Q.   THIS KIND OF DECISION, THE DECISION TO CHANGE TESTING

02:44PM  10    METHODS FOR A GIVEN ASSAY BASED ON ACCURACY PROBLEMS, WHOSE

02:44PM  11    DECISION SHOULD THAT HAVE BEEN TO MAKE AT A CLINICAL LAB?

02:44PM  12    A.   THE LABORATORY DIRECTOR.

02:44PM  13    Q.   AND DID YOU FEEL AT THE TIME THAT THERE WAS ANY LACK OF

02:44PM  14    CLARITY AROUND THIS DECISION?

02:44PM  15    A.   NO.

02:44PM  16    Q.   YOU SEE AT THE TOP OF THE PAGE THAT THAT EMAIL WAS

02:45PM  17    FORWARDED BY SUNNY BALWANI TO ELIZABETH HOLMES; CORRECT?

02:45PM  18    A.   YES, I DO.

02:45PM  19    Q.   LET'S LOOK NEXT AT EXHIBIT 13875.  I BELIEVE THAT'S IN

02:45PM  20    EVIDENCE.

02:45PM  21         LOOK AT THE BOTTOM OF PAGE 1.  SO WE'RE STILL ON THAT SAME

02:45PM  22    DAY, DR. ROSENDORFF, JUNE 4TH, 2014.

02:45PM  23         DO YOU SEE THAT?

02:45PM  24    A.   YES.

02:45PM  25    Q.   AND STILL DISCUSSING HCG WITH OTHERS AT THERANOS?

02:45PM   1    A.   YES.

02:45PM   2    Q.   AND YOUR EMAIL SAYS THAT YOU HAD DISCUSSED THE PLAN FOR

02:45PM   3    HCG WITH DANIEL AND CHINMAY; CORRECT?

02:45PM   4    A.   YES.

02:45PM   5    Q.   UNDER NUMBER 2 YOU WRITE THAT THAT STEP INCLUDES ASSUMING

02:46PM   6    THAT THE INCONSISTENCIES WITH FRIDAY'S PATIENT HCG VALUES WAS

02:46PM   7    DUE TO SAMPLE MISHANDLING, AND THEN YOU PUT A QUESTION MARK.

02:46PM   8        DO YOU SEE THAT?

02:46PM   9    A.   YES.

02:46PM   10   Q.   HAD THAT BEEN ESTABLISHED AT THAT POINT THAT THE HCG

02:46PM   11   VALUES WAS DUE TO SAMPLE MISHANDLING?

02:46PM   12   A.   NO.

02:46PM   13   Q.   AND WHY WERE YOU WRITING THIS ASSUMPTION IN THIS EMAIL IF

02:46PM   14   YOU RECALL?

02:46PM   15   A.   I DON'T RECALL.

02:46PM   16   Q.   UNDERNEATH GOING FORWARD IN YOUR EMAIL.

02:46PM   17        DO YOU SEE THAT SECTION?

02:46PM   18   A.   YES.

02:46PM   19   Q.   ITEM NUMBER 1 SAYS, "CHANGE HCG TO VACUTAINER (SST OR

02:46PM   20   GOLD-TOP), AND RUN ON IMMULITE."

02:46PM   21        DO YOU SEE THAT?

02:46PM   22   A.   YES.

02:46PM   23   Q.   AND AS OF JUNE 4TH, 2014, DAYS AFTER YOUR MAY 30TH EMAIL,

02:46PM   24   WAS YOUR POSITION STILL THAT HCG SHOULD BE RUN ON THE THIRD

02:46PM   25   PARTY DEVICE AND NOT THE THERANOS DEVICE?

02:46PM  1    A.   YES.

02:46PM  2    Q.   LET'S GO TO PAGE 2 AND ZOOM IN ON THE TOP MESSAGE THERE.

02:47PM  3         DO YOU SEE ITEM 3 IN YOUR LIST CONTINUES, "RESUME CTN HCG

02:47PM  4    WHEN WE HAVE RESOLVED THESE ISSUES."

02:47PM  5    A.   YES.

02:47PM  6    Q.   FAIR TO SAY THAT ON JUNE 4TH AT THE TIME YOU WROTE THIS

02:47PM  7    EMAIL THAT THOSE ISSUES WERE NOT YET RESOLVED?

02:47PM  8    A.   CORRECT.

02:47PM  9    Q.   AND REMIND US WHAT THE CTN IS?

02:47PM  10   A.   CAPILLARY TUBE AND NANOTAINER.  IT'S THE COLLECTION DEVICE

02:47PM  11   FOR THERANOS TESTS.

02:47PM  12   Q.   LET'S GO BACK TO PAGE 1 OF THIS EMAIL AND ZOOM IN ON THE

02:47PM  13   MIDDLE MESSAGE ON THE PAGE FROM DANIEL YOUNG.

02:47PM  14        OKAY.  DR. ROSENDORFF, DO YOU SEE MORE REFERENCE HERE TO

02:48PM  15   REPEATING THE IQP STUDY?

02:48PM  16   A.   YES.

02:48PM  17   Q.   AND HE SAYS, "AT THIS TIME WE WILL BE READY TO SWITCH TO

02:48PM  18   IMMULITE TOMORROW NIGHT."

02:48PM  19        DO YOU SEE THAT?

02:48PM  20   A.   YES.

02:48PM  21   Q.   AND DOES THAT MEAN THAT THE SWITCH TO IMMULITE STILL HAD

02:48PM  22   NOT HAPPENED?

02:48PM  23   A.   THAT'S HOW I UNDERSTAND THIS EMAIL, YES.

02:48PM  24   Q.   AND THERE'S A NOTE BELOW THAT THAT SAYS, "IF WE NEED TO

02:48PM  25   COLLECT VACUTAINERS TOMORROW, WE WOULD NEED TO SEND SPECIAL

02:48PM 1    INSTRUCTIONS TO THE PSC'S."

02:48PM 2        DO YOU SEE THAT?

02:48PM 3    A.   YES.

02:48PM 4    Q.   AND DO YOU HAVE AN UNDERSTANDING AS TO WHY THAT WOULD BE

02:48PM 5    NECESSARY?

02:48PM 6    A.   THE SERVICE CENTERS THAT DO THE BLOOD COLLECTION WOULD

02:48PM 7    NEED TO KNOW WHAT KIND OF SAMPLE WAS REQUIRED FOR THIS TEST.

02:48PM 8        HOWEVER, THERE WAS ALSO A PIECE OF SOFTWARE THAT WAS

02:48PM 9    AVAILABLE TO THE PHLEBOTOMIST AT THE PSC'S THAT WOULD TELL THEM

02:48PM 10   EXACTLY -- OR CTN WAS REQUIRED FOR ANY GIVEN TEST.

02:48PM 11   Q.   AND DOES THIS MEAN THAT IN ORDER TO FOLLOW THROUGH WITH

02:48PM 12   THE CHANGE TO THE THIRD PARTY DEVICE, THE PSC'S WOULD NEED TO

02:49PM 13   RECEIVE THESE INSTRUCTIONS?

02:49PM 14   A.   YES.

02:49PM 15   Q.   DANIEL YOUNG'S EMAIL SAYS, "RIGHT NOW WE ARE NOT PLANNING

02:49PM 16   ON DOING THIS."

02:49PM 17       DO YOU SEE THAT?

02:49PM 18   A.   YES.

02:49PM 19   Q.   AND WHAT DOES THAT TELL YOU ABOUT THE LIKELIHOOD OR

02:49PM 20   WHETHER EVENTS WERE IN MOTION ALREADY TO ACTUALLY CARRY OUT

02:49PM 21   THIS CHANGE?

02:49PM 22   A.   IT INDICATES THAT HE'S NOT WILLING TO PERFORM THE STEPS TO

02:49PM 23   MOVE THE ASSAY ONTO THE IMMULITE.

02:49PM 24       I DON'T KNOW WHO HE MEANS BY "WE."

02:49PM 25   Q.   WHO WOULD BE RESPONSIBLE FOR SENDING THOSE INSTRUCTIONS TO

02:49PM  1    THE PSC'S?

02:49PM  2    A.   I BELIEVE MAX FOSQUE WAS IN CHARGE OF COORDINATION WITH

02:49PM  3    THE PSC'S.

02:50PM  4    Q.   I'D LIKE TO SHOW YOU ANOTHER EXHIBIT.

02:50PM  5         MAY I APPROACH, YOUR HONOR?

02:50PM  6              THE COURT:  YES.

02:50PM  7    BY MR. BOSTIC:

02:50PM  8    Q.   (HANDING.)

02:50PM  9         DR. YOUNG, I'VE HANDED YOU WHAT HAS BEEN MARKED AS EXHIBIT

02:50PM  10   5420?

02:50PM  11   A.   SORRY, YOU SAID DR. YOUNG.  IT'S DR. ROSENDORFF.

02:50PM  12   Q.   I'M SORRY.  DR. ROSENDORFF, I'M SORRY.

02:50PM  13   A.   NO PROBLEM.

02:50PM  14   Q.   DO YOU HAVE EXHIBIT 5420?

02:50PM  15   A.   YES.

02:50PM  16   Q.   AND IS IT AN EMAIL DATED AT THE TOP JUNE 13TH, 2014, FROM

02:50PM  17   CHRISTIAN HOLMES TO DANIEL YOUNG?

02:50PM  18   A.   YES.

02:50PM  19   Q.   AND IS THE SUBJECT LINE HCG DELAYS IN LAB?

02:50PM  20   A.   YES.

02:50PM  21              MR. BOSTIC:  YOUR HONOR, MOVE TO ADMIT EXHIBIT 5420.

02:50PM  22              MR. WADE:  NO OBJECTION, YOUR HONOR.

02:50PM  23              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:51PM  24        (GOVERNMENT'S EXHIBIT 5420 WAS RECEIVED IN EVIDENCE.)

02:51PM  25   BY MR. BOSTIC:

02:51PM  1     Q.   OKAY.  LET'S START ON PAGE 2 OF THIS EXHIBIT, PLEASE.  YOU

02:51PM  2     CAN ZOOM IN ON THE TEXT.

02:51PM  3          DO YOU SEE AT THE BOTTOM THERE AN EMAIL FROM

02:51PM  4     CHRISTIAN HOLMES TO DANIEL YOUNG ON JUNE 12TH, 2014?

02:51PM  5     A.   YES.

02:51PM  6     Q.   AND THIS IS A FEW DAYS AFTER THE EMAILS THAT WE WERE JUST

02:51PM  7     LOOKING AT; CORRECT?

02:51PM  8     A.   YES.

02:51PM  9     Q.   THIS EMAIL SAYS, "SEEMS LIKE THERE HAVE BEEN MULTIPLE

02:51PM 10     INSTANCES OF HCG TAKING MORE THAN 48 HOURS TO RUN IN THE LAB."

02:51PM 11          DO YOU SEE THAT?

02:51PM 12     A.   YES.

02:51PM 13     Q.   "THE LAB MENTIONS THAT QC CONTINUES TO FAIL PREVENTING

02:51PM 14     RESULTS GENERATION."

02:51PM 15          DO YOU SEE THAT?

02:51PM 16     A.   YES.

02:51PM 17     Q.   WHY WOULD QC FAILURE PREVENT RESULTS GENERATION?

02:51PM 18     A.   THE REGULATIONS IN GOOD LABORATORY PRACTICE PREVENT

02:51PM 19     RESULTS FROM BEING RELEASED UNLESS QC PASSES ON THEIR

02:51PM 20     INSTRUMENT FOR THAT DAY AT LEAST.

02:51PM 21     Q.   AND SO, IN OTHER WORDS, CHRISTIAN HOLMES IS SAYING HERE

02:52PM 22     THAT HCG IS TAKING A LONG TIME AND IT SEEMS LIKE A CONTRIBUTING

02:52PM 23     FACTOR IS CONTINUED FAILING OF QC?

02:52PM 24     A.   YES.

02:52PM 25     Q.   AND DO YOU RECALL THIS BEING AN ISSUE WITH HCG AT

| | | |
|---|---|---|
| 02:52PM | 1 | THERANOS? |
| 02:52PM | 2 | A.   I RECALL QC FAILURES BEING AN ISSUE WITH MULTIPLE ASSAYS. |
| 02:52PM | 3 | Q.   INCLUDING HCG? |
| 02:52PM | 4 | A.   YES. |
| 02:52PM | 5 | Q.   LET'S GO TO PAGE 1 OF THIS EXHIBIT. |
| 02:52PM | 6 | AND AT THE BOTTOM OF THE PAGE.  IF WE CAN ZOOM IN ON THE |
| 02:52PM | 7 | BOTTOM HALF. |
| 02:52PM | 8 | CHRISTIAN HOLMES RESPONDS TO AN ANSWER THAT THESE ARE NEW |
| 02:52PM | 9 | REPORTS AND THE SAMPLES ARE CURRENTLY BEING RUN. |
| 02:52PM | 10 | HE SAID "HAD TWO DOCS JUST CALL ABOUT HCG DELAYS -- CS |
| 02:52PM | 11 | CHECKED ON STATUS AND THE LAB SAID THEY ARE FAILING QC AND |
| 02:52PM | 12 | DON'T HAVE AN EXPECTED TURN AROUND TIME." |
| 02:52PM | 13 | DO YOU SEE THAT? |
| 02:52PM | 14 | A.   YES. |
| 02:52PM | 15 | Q.   AND IF WE CAN ZOOM IN ON THE TOP HALF OF PAGE 1, PLEASE. |
| 02:53PM | 16 | DO YOU SEE ON THE PAGE THERE AT THE BOTTOM OF THAT |
| 02:53PM | 17 | COLLECTION, "WE ARE WORKING IN PARALLEL TO RUN SAMPLE ON EDISON |
| 02:53PM | 18 | AS WELL AS IMMULITE"? |
| 02:53PM | 19 | A.   YES. |
| 02:53PM | 20 | Q.   AND DR. YOUNG GOES ON TO SAY, "BUT FOUND OUT THIS MORNING |
| 02:53PM | 21 | THAT REAGENTS FOR IMMULITE ARE ON ORDER AND BACK ORDERED." |
| 02:53PM | 22 | DO YOU SEE THAT? |
| 02:53PM | 23 | A.   YES. |
| 02:53PM | 24 | Q.   AND SO HE SAYS, "SO WE ARE PUSHING EVEN HARDER TO GET THEM |
| 02:53PM | 25 | RUN ON EDISONS." |

02:53PM 1        DO YOU SEE THAT?

02:53PM 2    A.   YES.

02:53PM 3    Q.   AND LET'S CALL UP EXHIBIT 4840 IF WE CAN.  I BELIEVE IT'S

02:53PM 4    IN EVIDENCE.  AND IF WE CAN ZOOM IN ON THE BOTTOM HALF OF

02:53PM 5    PAGE 1.

02:54PM 6        DR. ROSENDORFF, DO YOU RECALL REVIEWING THIS EMAIL DURING

02:54PM 7    CROSS-EXAMINATION?

02:54PM 8    A.   YES.

02:54PM 9    Q.   DO YOU RECALL DISCUSSING WITH MR. WADE A SUPPLY PROBLEM

02:54PM 10   INVOLVING THE COMMERCIAL REAGENT THAT WAS USED FOR HCG?

02:54PM 11   A.   YES.

02:54PM 12   Q.   MY QUESTION FOR YOU IS WAS THE PROBLEM AT THAT TIME

02:54PM 13   LIMITED TO REAGENT SUPPLY OR WERE THERE ALSO ISSUES WITH EDISON

02:54PM 14   TEST ACCURACY FOR HCG?

02:54PM 15   A.   REVIEWING THE EMAILS TODAY IT SEEMS THAT HCG WAS BEING RUN

02:54PM 16   BOTH ON THE IMMULITE AND ON THE EDISON.

02:54PM 17       THE EDISON RESULTS COULD NOT BE RELEASED BECAUSE OF QC

02:54PM 18   FAILURE, AND IT APPEARS THAT THERE WAS A SUPPLY CHAIN PROBLEM

02:54PM 19   WITH THE IMMULITE REAGENTS.

02:54PM 20   Q.   AND ARE THOSE TWO DIFFERENT THINGS OR ARE THEY ONE AND THE

02:54PM 21   SAME PROBLEM?

02:54PM 22   A.   TWO DIFFERENT THINGS.

02:54PM 23   Q.   DO YOU SEE THAT CHRISTIAN HOLMES'S EMAIL TO

02:55PM 24   ELIZABETH HOLMES IN THE MIDDLE OF THE PAGE THERE SAYS, "JUST

02:55PM 25   FYI -- HCG RIGHT NOW CAUSING SOME SERIOUS ISSUES AND PATIENT

02:55PM 1     COMPLAINTS."

02:55PM 2         DO YOU SEE THAT?

02:55PM 3     A.   YES.

02:55PM 4     Q.   HE SAYS, "BEEN SPENDING ALL MORNING TALKING TO DOCS JUST

02:55PM 5     ABOUT HCG AND WILL CONTINUE TO DO SO."

02:55PM 6         DO YOU SEE THAT?

02:55PM 7     A.   YES.

02:55PM 8     Q.   AND THE EMAIL ABOVE THAT CHRISTIAN HOLMES FOLLOWS UP AND

02:55PM 9     SAYS, "SEEMS LIKE WE ALSO HAVE A CAPACITY ISSUE RIGHT NOW WITH

02:55PM 10    EDISONS AT FULL CAPACITY AND VENOUS SAMPLES IN A SERIOUS QUEUE

02:55PM 11    NOT BEING RUN."

02:55PM 12        DO YOU SEE THAT?

02:55PM 13    A.   YES.

02:55PM 14    Q.   AND DOES THAT CONFIRM YOUR UNDERSTANDING THAT THE ACCURACY

02:55PM 15    PROBLEMS WITH HCG WERE SEPARATE FROM THE BACKLOG PROBLEM?

02:55PM 16    A.   YES, ABSOLUTELY.

02:55PM 17    Q.   AND JUST TO BE CLEAR, YOU MENTIONED THAT THIS TOLD YOU

02:55PM 18    THAT THE HCG TEST WAS BEING RUN ON THE EDISON AS WELL AS THE

02:55PM 19    IMMULITE; CORRECT?

02:55PM 20    A.   SORRY.  THESE EMAILS INDICATE THAT, YES.

02:56PM 21    Q.   AND WHY WAS THE IMMULITE BEING USED IN THE FIRST PLACE FOR

02:56PM 22    THE HCG TEST?

02:56PM 23    A.   WELL, I -- ON MAY 30TH, I HAD ORDERED THE HCG TEST TO BE

02:56PM 24    TRANSFERRED FROM THE EDISON TO THE IMMULITE.

02:56PM 25    Q.   AND WHY WAS THAT NECESSARY?

02:56PM  1    A.   BECAUSE OF CONCERNS ABOUT -- AROUND ACCURACY THAT STEMMED

02:56PM  2    FROM PATIENT COMPLAINTS.

02:56PM  3    Q.   LET'S MOVE FORWARD A LITTLE BIT IN TIME.  LET'S LOOK AT

02:56PM  4    EXHIBIT 13876, WHICH IS ALSO IN EVIDENCE.

02:56PM  5         LET'S GO TO PAGE 2.  ZOOM IN THERE.

02:56PM  6         AND, DR. ROSENDORFF, DO YOU RECALL THAT THIS IS AN EMAIL

02:56PM  7    FROM YOU TO CHINMAY PANGARKAR AND SURAJ SAKSENA AND

02:57PM  8    SUNNY BALWANI?

02:57PM  9    A.   YES.

02:57PM 10    Q.   AND YOU ASKED FOR A STATUS UPDATE ON THE HCG AND THE

02:57PM 11    EDISON; CORRECT?

02:57PM 12    A.   YES.

02:57PM 13    Q.   AND LET'S GO TO THE BOTTOM OF PAGE 1, PLEASE.  LET'S ZOOM

02:57PM 14    IN.

02:57PM 15         DO YOU SEE AN EMAIL FROM CHINMAY PANGARKAR SAYING, "BASED

02:57PM 16    ON REPORTS SINCE FRIDAY, WE HAVE BEEN CONSISTENTLY PASSING

02:57PM 17    QC -- SO WE DON'T HAVE A PROBLEM WITH THE CURRENT BUILD."

02:57PM 18         DO YOU SEE THAT?

02:57PM 19    A.   YES.

02:57PM 20    Q.   LET'S ZOOM OUT.

02:57PM 21         LET'S LOOK AT THE TOP HALF OF PAGE 1.  AND IN THE SECOND

02:57PM 22    TO THE TOP EMAIL YOU ASK, "SO HCG IS BACK ON VACUTAINERS?"

02:57PM 23    A.   YES.

02:57PM 24    Q.   AND MR. BALWANI ANSWERS YOU, "NO.  IT IS ON NANOTAINER'S

02:57PM 25    PER CHINMAY'S EMAIL BELOW."

02:57PM  1          DO YOU SEE THAT?

02:57PM  2     A.   YES.

02:57PM  3     Q.   AND IN THIS EMAIL ARE YOU ASKING WHAT WAS BEING USED TO

02:57PM  4     RUN HCG AT THIS POINT?

02:57PM  5     A.   YES.

02:57PM  6     Q.   AND AS LAB DIRECTOR, WHOSE DECISION SHOULD IT HAVE BEEN

02:58PM  7     WHAT DEVICE WAS BEING USED FOR A GIVEN ASSAY AT THERANOS?

02:58PM  8     A.   100 PERCENT THE LABORATORY DIRECTOR.

02:58PM  9     Q.   IF IT WORKED THAT WAY AT THERANOS, WOULD YOU HAVE HAD TO

02:58PM 10     ASK WHAT METHOD WAS BEING USED FOR A GIVEN ASSAY?

02:58PM 11     A.   NO, THERE WOULD HAVE BEEN NO CONFUSION IN MY MIND.

02:58PM 12     Q.   WE JUST SAW AN EMAIL IN THIS CHAIN INDICATING THAT HCG HAD

02:58PM 13     BEEN EXPERIENCING SOME GOOD QC PERFORMANCE.

02:58PM 14          DO YOU REMEMBER THAT?

02:58PM 15     A.   FROM CHINMAY?

02:58PM 16     Q.   YES.

02:58PM 17     A.   YES.

02:58PM 18     Q.   I'D LIKE TO SHOW YOU WHAT WE HAVE MARKED AS EXHIBIT 5421.

02:58PM 19          YOUR HONOR, I THINK I HAVE MORE THAN TWO MINUTES, BUT IF I

02:58PM 20     COULD HAVE THE COURT'S INDULGENCE, I'LL WRAP UP SOON.

02:58PM 21               THE COURT:  YES, PLEASE.  PLEASE.

02:58PM 22               MR. BOSTIC:  MAY I APPROACH, YOUR HONOR?

02:58PM 23               THE COURT:  YES.

02:58PM 24     BY MR. BOSTIC:

02:58PM 25     Q.   (HANDING.)

02:59PM 1        DR. ROSENDORFF, DO YOU HAVE IN FRONT OF YOU EXHIBIT 5421,

02:59PM 2    AN EMAIL DATED JUNE 25TH, 2014?

02:59PM 3    A.   YES.

02:59PM 4    Q.   AND THIS IS JUST A FEW DAYS AFTER THE EMAILS THAT WE WERE

02:59PM 5    JUST LOOKING AT; CORRECT?

02:59PM 6    A.   YES.

02:59PM 7    Q.   AND DO YOU SEE THE SUBJECT IS INSTRUMENT BREAKUP?

02:59PM 8    A.   YES.

02:59PM 9    Q.   AND THIS IS AN EMAIL FROM LANGLY GEE TO SUNNY BALWANI AND

02:59PM 10   YOURSELF?

02:59PM 11   A.   YES.

02:59PM 12        MR. BOSTIC:  YOUR HONOR, MOVE TO ADMIT EXHIBIT 5421.

02:59PM 13        MR. WADE:  NO OBJECTION.

02:59PM 14        THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

02:59PM 15   (GOVERNMENT'S EXHIBIT 5421 WAS RECEIVED IN EVIDENCE.)

02:59PM 16        MR. BOSTIC:  IF WE CAN ZOOM IN ON THE TEXT.

02:59PM 17   Q.   DR. ROSENDORFF, DO YOU SEE THAT THIS IS AN EMAIL ABOUT QC

02:59PM 18   PERFORMANCE ON THE EDISONS --

02:59PM 19   A.   YES.

02:59PM 20   Q.   -- ON THIS DATE IN 2014?

02:59PM 21   A.   YES.

02:59PM 22   Q.   THE EMAIL FROM LANGLY GEE NOTES, "33 EDISONS QC 6/24

02:59PM 23   EVENING, 20 EDISONS PASSED."

02:59PM 24        DOES THIS MEAN THAT ONLY 20 OUT OF 33 EDISONS PASSED

03:00PM 25   QUALITY CONTROL ON THAT OCCASION?

03:00PM  1    A.   CORRECT.

03:00PM  2    Q.   LESS THAN TWO-THIRDS?

03:00PM  3    A.   CORRECT, SLIGHTLY LESS THAN TWO-THIRDS, CORRECT.

03:00PM  4    Q.   AND THE EMAIL THEN GOES ON TO NOTE, "9 EDISONS FOR TES,

03:00PM  5    TSH, HCG, FT4, AND VITAMIN D FAILED LEVEL 1 AND/OR LEVEL 2 QC."

03:00PM  6         DO YOU SEE THAT?

03:00PM  7    A.   YES.

03:00PM  8    Q.   AND HAVING MULTIPLE EDISONS FAIL QC FOR HCG, WOULD THAT

03:00PM  9    GIVE YOU CONFIDENCE IN THE ACCURACY OF THE EDISON HCG TEST?

03:00PM  10   A.   NO.

03:00PM  11   Q.   BY THE WAY, THIS EMAIL, THE FIRST LINE OF LANGLY GEE'S

03:00PM  12   EMAIL SAYS AT THE END THERE, "ALL QC'S PASSED UPSTAIRS."

03:00PM  13        DO YOU SEE THAT?

03:00PM  14   A.   YES.

03:00PM  15   Q.   AND WHAT WAS THE UPSTAIRS PORTION OF THE LAB AT THERANOS?

03:00PM  16   A.   THAT'S WHERE THE IMMULITE WAS STATIONED.

03:00PM  17   Q.   AND WHAT OTHER EQUIPMENT WAS STORED OR USED IN THE

03:00PM  18   UPSTAIRS PORTION OF THE LAB?

03:00PM  19   A.   ADVIA 1800'S FOR GENERAL CHEMISTRIES, THE DIASORIN FOR

03:01PM  20   VITAMIN D, AN INSTRUMENT FOR ORDER ANTIBODIES, AN INSTRUMENT

03:01PM  21   FOR PT AND INR.  ALL OF THEM WERE PREDICATE FDA APPROVED

03:01PM  22   INSTRUMENTS.

03:01PM  23   Q.   AND ALL DEVICES BOUGHT BY THIRD PARTIES NOT MANUFACTURED

03:01PM  24   BY THERANOS; CORRECT?

03:01PM  25   A.   YES.

03:01PM  1    Q.   NOT MODIFIED BY THERANOS?

03:01PM  2    A.   YES.

03:01PM  3    Q.   WERE THEY FDA APPROVED?

03:01PM  4    A.   YES.

03:01PM  5    Q.   AND THIS INDICATES THAT FOR THOSE MACHINES ALL QC'S WERE

03:01PM  6    PASSED; CORRECT?

03:01PM  7    A.   YES.

03:01PM  8    Q.   LET ME SHOW YOU ONE MORE EXHIBIT, WHICH WE'VE MARKED AS

03:01PM  9    5422.

03:01PM  10        MAY I APPROACH, YOUR HONOR?

03:01PM  11            THE COURT:   YES.

03:01PM  12   BY MR. BOSTIC:

03:01PM  13   Q.   (HANDING.)

03:02PM  14        DR. ROSENDORFF, IN FRONT OF YOU IS AN EMAIL MARKED

03:02PM  15   EXHIBIT 5422 DATED JUNE 28TH, 2014?

03:02PM  16   A.   YES.

03:02PM  17   Q.   AND SO JUST A FEW DAYS AFTER THE LAST EMAIL THAT WE LOOKED

03:02PM  18   AT; CORRECT?

03:02PM  19   A.   YES.

03:02PM  20   Q.   AND NOT QUITE A MONTH AFTER YOUR EMAIL WHERE YOU ATTEMPTED

03:02PM  21   TO HALT EDISON HCG TESTING; CORRECT?

03:02PM  22   A.   YES.

03:02PM  23   Q.   AND IS THIS ANOTHER EMAIL DISCUSSING QC PERFORMANCE ON THE

03:02PM  24   EDISON?

03:02PM  25   A.   YES.

| | | |
|---|---|---|
| 03:02PM | 1 | MR. BOSTIC: YOUR HONOR, MOVE TO ADMIT EXHIBIT 5422. |
| 03:02PM | 2 | MR. WADE: NO OBJECTION. |
| 03:02PM | 3 | THE COURT: IT'S ADMITTED. IT MAY BE PUBLISHED. |
| 03:02PM | 4 | (GOVERNMENT'S EXHIBIT 5422 WAS RECEIVED IN EVIDENCE.) |
| 03:02PM | 5 | THE WITNESS: I'M SORRY, I HAVE TO GO TO THE |
| 03:02PM | 6 | BATHROOM AGAIN. I'M SORRY. |
| 03:02PM | 7 | THE COURT: OKAY. |
| 03:02PM | 8 | MR. BOSTIC: OKAY. |
| 03:02PM | 9 | THE COURT: IF YOU NEED TO TAKE A BREAK, WE'LL TAKE |
| 03:02PM | 10 | A BREAK. |
| 03:02PM | 11 | LADIES AND GENTLEMEN, LET'S TAKE ABOUT A FIVE MINUTE |
| 03:02PM | 12 | BREAK, AND THEN WE'LL COME BACK. |
| 03:03PM | 13 | (JURY OUT AT 3:03 P.M.) |
| 03:03PM | 14 | THE COURT: PLEASE BE SEATED. THANK YOU. |
| 03:03PM | 15 | THE JURY HAS LEFT. THE WITNESS HAS STEPPED DOWN. |
| 03:03PM | 16 | ALL COUNSEL AND MS. HOLMES IS PRESENT. |
| 03:03PM | 17 | YOU'RE JUST GOING TO FINISH WITH THIS DOCUMENT AND THEN |
| 03:03PM | 18 | WE'LL WRAP IT UP I TAKE IT? |
| 03:03PM | 19 | MR. BOSTIC: I HAVE ABOUT 30 SECONDS LEFT, |
| 03:03PM | 20 | YOUR HONOR. |
| 03:03PM | 21 | THE COURT: ALL RIGHT. GREAT. WE'LL TAKE A FIVE |
| 03:03PM | 22 | MINUTE RECESS. THANK YOU. |
| 03:04PM | 23 | (RECESS FROM 3:04 P.M. UNTIL 3:09 P.M.) |
| 03:09PM | 24 | (JURY IN AT 3:09 P.M.) |
| 03:09PM | 25 | THE COURT: PLEASE BE SEATED. THANK YOU. WE'RE |

03:09PM 1    BACK ON THE READY.

03:09PM 2         ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

03:09PM 3         MR. BOSTIC -- OH, WE'RE MISSING ONE.  MR. BOSTIC, YOU HAD

03:09PM 4    A NICE PIC THERE AND I COULDN'T SEE, WHICH IS TO SAY BASKETBALL

03:09PM 5    SEASON IS UPON US, RIGHT?

03:09PM 6         MR. BOSTIC:  I'LL RELY ON THE OTHER MEMBERS OF MY

03:09PM 7    TEAM FOR SPORTS REFERENCE EXPLANATIONS.

03:09PM 8         (LAUGHTER.)

03:10PM 9         THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE

03:10PM 10   SEATED.

03:10PM 11        OUR JURY IS PRESENT.  ALL PARTIES PREVIOUSLY PRESENT ARE

03:10PM 12   PRESENT ONCE AGAIN.

03:10PM 13        MR. BOSTIC.

03:10PM 14   BY MR. BOSTIC:

03:10PM 15   Q.   DR. ROSENDORFF, JUST TWO FINAL QUESTIONS ABOUT THE

03:10PM 16   DOCUMENT IN FRONT OF YOU.

03:10PM 17        DO YOU SEE AN EMAIL ON JUNE 29TH, 2014?

03:10PM 18   A.   JUNE 28TH.

03:10PM 19   Q.   JUNE 28TH, 2014?

03:10PM 20   A.   YES.

03:10PM 21   Q.   AND WE JUST LOOKED AT AN EMAIL REPORTING THAT ABOUT

03:10PM 22   TWO-THIRDS, NOT QUITE TWO-THIRDS OF EDISONS HAD PASSED QC A FEW

03:10PM 23   DAYS EARLIER; IS THAT CORRECT?

03:10PM 24   A.   YES, THAT WAS THE PREVIOUS EMAIL ON JUNE 25TH.

03:10PM 25   Q.   THIS EMAIL ON JUNE 28TH INDICATES THAT ONLY 17 OUT OF 35

03:10PM   1    EDISONS PASSED QC FOR THE PRECEDING NIGHT.

03:10PM   2        DO YOU SEE THAT?

03:10PM   3    A.   YES.

03:10PM   4    Q.   AND IS THAT LESS THAN HALF OF THE EDISONS?

03:10PM   5    A.   YES.

03:10PM   6    Q.   AND THE FOLLOWING SENTENCE NOTES THAT HCG WAS NOT

03:11PM   7    AVAILABLE FOR TESTING ON THAT DAY.

03:11PM   8        DO YOU SEE THAT?

03:11PM   9    A.   YES.

03:11PM  10    Q.   MY QUESTION FOR YOU IS AT THERANOS WERE YOUR CONCERNS

03:11PM  11    ABOUT HCG TESTING ACCURACY EVER ADDRESSED TO YOUR SATISFACTION?

03:11PM  12    A.   NO.

03:11PM  13    Q.   WE SAW A MAY 30TH EMAIL FROM YOU IN ALL CAPS DIRECTING

03:11PM  14    THAT TESTING STOP ON THE EDISON?

03:11PM  15    A.   YES.

03:11PM  16    Q.   WHY DON'T WE SEE MORE ALL CAPS EMAILS FROM YOU ABOUT THIS

03:11PM  17    ISSUE FOLLOWING THAT DATE?

03:11PM  18    A.   AS SHOWN IN THE PREVIOUS EMAIL, THERE WAS SOME UNCERTAINTY

03:11PM  19    IN MY MIND WHAT METHOD WAS BEING RUN FOR HCG.

03:11PM  20        I TRUSTED MY COLLEAGUES THAT THEY WOULD FOLLOW MY

03:11PM  21    INSTRUCTIONS.

03:11PM  22    Q.   FOLLOWING THIS INCIDENT, DID YOU CONTINUE TO TRUST THAT

03:11PM  23    THE COMPANY WOULD FOLLOW YOUR DIRECTION WHEN IT CAME TO THESE

03:12PM  24    KINDS OF DECISIONS?

03:12PM  25        LET ME ASK IT A DIFFERENT WAY.

03:12PM 1          DID THIS INCIDENT HAVE ANY EFFECT ON YOUR TRUST IN THE

03:12PM 2    COMPANY TO FOLLOW THROUGH ON YOUR DIRECTIONS?

03:12PM 3    A.   YES.

03:12PM 4          MR. BOSTIC:  NO FURTHER QUESTIONS FOR TODAY.  THIS

03:12PM 5    MIGHT BE A GOOD TIME FOR A BREAK, YOUR HONOR.

03:12PM 6          THE COURT:  LET'S -- WE'LL TAKE OUR EVENING RECESS

03:12PM 7    NOW, LADIES AND GENTLEMEN.  THANK YOU.

03:12PM 8          AND BEFORE WE DO THAT, I DO NEED TO ADVISE YOU ONCE AGAIN,

03:12PM 9    REMIND YOU OF THE ADMONITION, PLEASE DO NOT DO ANY RESEARCH ON

03:12PM 10   THIS CASE OR ANYONE ATTACHED TO IT.

03:12PM 11         DO NOT PAY ATTENTION AND PLEASE IGNORE ANY INFORMATION

03:12PM 12   THAT YOU MIGHT COME ACROSS IN ANY MEDIA, YOUR SOCIAL MEDIA, ANY

03:12PM 13   CONVERSATIONS YOU MIGHT HAVE WITH OTHER INDIVIDUALS.

03:12PM 14         IF YOU SHOULD INADVERTENTLY COME ACROSS ANY OF THAT

03:12PM 15   MATERIAL, I WOULD ASK YOU TO PLEASE TURN AWAY, TURN OFF THE

03:12PM 16   DEVICE, WHATEVER IT IS, AND YOU CAN TELL ME ABOUT IT TOMORROW

03:13PM 17   MORNING WHEN I ASK THE QUESTION.

03:13PM 18         BUT I APPRECIATE YOUR CONTINUED FIDELITY TO THIS

03:13PM 19   ADMONITION.  WE'RE ALL GRATEFUL FOR IT.

03:13PM 20         SO WE'LL TAKE OUR RECESS.  WE'LL SEE YOU TOMORROW MORNING

03:13PM 21   AT 9:00 O'CLOCK, 9:00 O'CLOCK.

03:13PM 22         MY SENSE IS THAT WE'LL BE ABLE TO FINISH WITH

03:13PM 23   DR. ROSENDORFF IN THE MORNING, I THINK, AND THEN THE GOVERNMENT

03:13PM 24   WILL HAVE AN ADDITIONAL WITNESS, AND WE CAN PROCEED.

03:13PM 25         ALL RIGHT.  THANK YOU VERY MUCH.  WE'LL SEE YOU TOMORROW.

03:13PM 1    THANK YOU.

03:13PM 2            (JURY OUT AT 3:13 P.M.)

03:13PM 3                THE COURT:  THANK YOU, DOCTOR.  YOU CAN STAND DOWN.

03:13PM 4    WE'LL SEE YOU IN THE MORNING.

03:13PM 5                THE WITNESS:  THANK YOU, YOUR HONOR.

03:13PM 6                THE COURT:  YOU'RE WELCOME.

03:14PM 7        PLEASE BE SEATED.  THANK YOU.

03:14PM 8        ALL RIGHT.  THE RECORD SHOULD REFLECT THAT THE JURY HAS

03:14PM 9    LEFT FOR THE DAY.  DR. ROSENDORFF HAS LEFT THE COURTROOM.

03:14PM 10       ALL COUNSEL AND MS. HOLMES ARE PRESENT.

03:14PM 11       ANYTHING BEFORE WE END FOR THE DAY?

03:14PM 12       MR. LEACH, YES?

03:14PM 13               MR. LEACH:  VERY BRIEFLY, YOUR HONOR.  JUST ONE

03:14PM 14   HOUSEKEEPING MATTER.

03:14PM 15       TOMORROW THE GOVERNMENT ANTICIPATES ABOUT ANOTHER HOUR OF

03:14PM 16   REDIRECT OF DR. ROSENDORFF.  WE'RE BUDGETING IN SOME TIME FOR

03:14PM 17   RECROSS.

03:14PM 18       WE HAVE ANOTHER LOCAL WITNESS WHO I ANTICIPATE THE DIRECT

03:14PM 19   WILL BE SOMEWHERE IN THE NEIGHBORHOOD WILL BE AN HOUR AND A

03:14PM 20   HALF TO TWO HOURS.

03:14PM 21       I'M ADVISED BY MR. DOWNEY THE CROSS WOULD BE AN EQUIVALENT

03:14PM 22   LENGTH.

03:14PM 23       BASED ON THAT WE DON'T ANTICIPATE A NEED FOR A THIRD

03:14PM 24   WITNESS TOMORROW, BUT IF THE COURT HAS A PREFERENCE?  WE DIDN'T

03:15PM 25   FLY WITNESSES OUT THIS WEEK BECAUSE OF THE SHORT WEEK.

03:15PM 1          IF THE COURT HAS A PREFERENCE, WE CAN FIND SOMEONE ELSE TO

03:15PM 2     FILL WHATEVER VERY SMALL AMOUNT OF TIME WE COULD HAVE.

03:15PM 3          BUT I JUST WANT TO MAKE SURE THAT WE'RE MANAGING THE

03:15PM 4     COURT'S TIME.

03:15PM 5               THE COURT:  THANK YOU FOR ADVISING ME OF THAT.

03:15PM 6          MR. DOWNEY, ANY COMMENT?  OBSERVATION?

03:15PM 7               MR. DOWNEY:  I THINK PROJECTING LENGTHS SIMILAR TO

03:15PM 8     MR. LEACH AND THEN CONTROLLING FOR THEM A LITTLE BIT.  I DON'T

03:15PM 9     THINK THERE'S ANY LIKELIHOOD THAT ANOTHER WITNESS WOULD BE

03:15PM 10    NEEDED BY THE GOVERNMENT.  SO I ADVISED MR. LEACH OF THAT, AND

03:15PM 11    I THINK -- I DON'T THINK WE'LL BE PROVEN WRONG IN THAT REGARD.

03:15PM 12              THE COURT:  ALL RIGHT.  THANK YOU FOR LETTING ME

03:15PM 13    KNOW.

03:15PM 14         MY SENSE IS THAT WE'LL JUST HAVE THIS ONE WITNESS AFTER

03:15PM 15    DR. ROSENDORFF, AND WE'LL SEE HOW FAR WE GET WITH THAT WITNESS,

03:15PM 16    AND THAT WILL BE OUR WEEK I PRESUME.

03:15PM 17              MR. LEACH:  VERY WELL.

03:15PM 18              MR. DOWNEY:  YOUR HONOR, I THINK THERE WILL BE ONE

03:15PM 19    SMALL 403 TYPE WITNESS WITH RESPECT TO THE NEW WITNESS

03:15PM 20    TOMORROW.  I DON'T THINK IT INVOLVES ANY DOCUMENTS.  I THINK IT

03:16PM 21    WOULD PROBABLY JUST BE A DISCUSSION WITH THE COURT.

03:16PM 22              THE COURT:  SURE.

03:16PM 23              MR. DOWNEY:  BUT JUST TO APPRISE YOU WE MIGHT NEED

03:16PM 24    THE 8:30 SEGMENT TOMORROW.

03:16PM 25              THE COURT:  ALL RIGHT.  WE'LL PLAN ON THAT THEN.

03:16PM 1    YOU CAN LET ME KNOW TOMORROW MORNING WHETHER YOU NEED TO CHAT

03:16PM 2    OR NOT OR WHATEVER.

03:16PM 3         OKAY.  THAT SOUNDS GOOD.

03:16PM 4              MR. LEACH:  THANK YOU, YOUR HONOR.

03:16PM 5              MR. DOWNEY:  THANK YOU, YOUR HONOR.

03:16PM 6              THE COURT:  HAVE A GOOD EVENING EVERYONE.

03:16PM 7              THE CLERK:  COURT IS ADJOURNED.

03:16PM 8         (COURT ADJOURNED AT 3:16 P.M.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2

 3                    CERTIFICATE OF REPORTERS

 4

 5

 6

 7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

 8   UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

 9   CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   _____
     IRENE RODRIGUEZ, CSR, CRR
17   CERTIFICATE NUMBER 8076

18

19   _____
     LEE-ANNE SHORTRIDGE, CSR, CRR
20   CERTIFICATE NUMBER 9595

21        DATED:  OCTOBER 5, 2021

22

23

24

25
```