# EXHIBIT 43

1   STEPHANIE M. HINDS (CABN 154284)
    United States Attorney

2

3   THOMAS S. COLTHURST (CABN 99493)
    Chief, Criminal Division

4   JEFFREY B. SCHENK (CABN 234355)
    JOHN C. BOSTIC (CABN 264367)

5   ROBERT S. LEACH (CABN 196191)
    KELLY I. VOLKAR (CABN 301377)

6   Assistant United States Attorneys

7        150 Almaden Boulevard, Suite 900
         San Jose, California 95113

8        Telephone: (408) 535-5061
         Fax: (408) 535-5066

9        Kelly.Volkar@usdoj.gov

10  Attorneys for United States of America

11                  UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13                        SAN JOSE DIVISION

14  UNITED STATES OF AMERICA,              )   Case No. 18-CR-00258 EJD
                                           )
15          Plaintiff,                     )   UNITED STATES' OPPOSITION TO
                                           )   DEFENDANT ELIZABETH HOLMES' ORAL
16      v.                                 )   MOTION FOR ACQUITTAL PURSUANT TO
                                           )   FEDERAL RULE OF CRIMINAL PROCEDURE 29
17  ELIZABETH HOLMES,                      )
                                           )
18          Defendant.                     )
                                           )   Court:  Hon. Edward J. Davila
19                                         )
                                           )
20  _____)

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION……………………………………………………………………………...1

BACKGROUND……………………………………………………………………………...1

ARGUMENT………………………………………………………………………………...2

  A. The Legal Standard Under Federal Rule of Criminal Procedure 29………………………………2

  B. The Evidence at Trial Was Sufficient to Support the Jury's Verdict Convicting Defendant of Count 1—Conspiracy to Defraud Theranos Investors………………………………………………4

  C. The Evidence at Trial Was Sufficient to Support the Jury's Verdict Convicting Defendant Holmes of Counts 6, 7, and 8—Wire Fraud Against Theranos Investors………………………...6

    1. Defendant Knowingly Participated in a Scheme to Defraud Investors………………………8

      (i) Misrepresentations Regarding Validation by Pharmaceutical Companies…………...8

      (ii) Misrepresentations Regarding Theranos' Work with the Department of Defense…..10

      (iii) Misrepresentations Regarding the Use of Modified and Unmodified Third-Party Devices for the September 2013 Launch of Theranos Tests Available for Patients at Walgreens Stores………………………………………………………………………10

    2. Defendant Intended to Defraud—That Is, to Deceive and Cheat—Investors………………14

      (i) Misrepresentations Regarding the Capabilities of Theranos' Proprietary Analyzer...14

      (ii) Misrepresentations Regarding the Walgreens Partnership Expanding………………20

      (iii) Misrepresentations Regarding Theranos' Financial Stability…………………………21

    3. Defendant's False Misrepresentations Were Material………………………………..……22

    4. Defendant's Scheme to Defraud Involved Interstate Wire Communications………………22

CONCLUSION…………………………………………………………………………...….23

# TABLE OF AUTHORITIES

## Cases

*Jackson v. Virginia*,
    443 U.S. 307 (1979).................................................................................... 3

*United States v. Bunker*,
    532 F.2d 1262 (9th Cir. 1976) ................................................................... 3

*United States v. Del Toro-Barboza*,
    673 F.3d 1136 (9th Cir. 2012) ................................................................... 3

*United States v. Gudino*,
    432 F.2d 433 (9th Cir. 1970) ..................................................................... 3

*United States v. Jinian*,
    725 F.3d 954 (9th Cir. 2013) ............................................................. 6, 7, 9

*United States v. Lindsey*,
    850 F.3d 1009 (9th Cir. 2017) ......................................................... 6, 7, 22

*United States v. Miller*,
    953 F.3d 1095 (9th Cir. 2020) ................................................................... 6

*United States v. Nevils*,
    598 F.3d 1158 (9th Cir. 2010) ................................................................... 3

*United States v. Rocha*,
    598 F.3d 1144 (9th Cir. 2010) ................................................................... 3

*United States v. Stapleton*,
    293 F.3d 1111 (9th Cir. 2002) ................................................................... 2

*United States v. Woods*,
    335 F.3d 993 (9th Cir. 2003) ..................................................................... 7

*United States v. Yossunthorn*,
    167 F.3d 1267 (9th Cir. 1999) ................................................................... 3

## Statutes

18 U.S.C. § 1343 ............................................................................................... 2
18 U.S.C. § 1349.................................................................................................2

## Rules

Fed. R. Crim. P. 29.....................................................................................1, 2, 3
Fed. R. Crim. P. 29(a) ...................................................................................... 3
Fed. R. Crim. P. 29(b)....................................................................................... 1
.

# INTRODUCTION

The government opposes Defendant Elizabeth Holmes's Motion for Acquittal pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29 Motion"). The government respectfully submits the Court should deny her Rule 29 Motion because the evidence at trial overwhelmingly supports the jury's conviction of Defendant Holmes on Counts 1, 6, 7, and 8.

# BACKGROUND

On August 31, 2021, jury selection began for the trial against Defendant Holmes on twelve counts of conspiring to commit and committing wire fraud against investors in, and paying patients of, the company she founded—Theranos. *See* ECF Nos. 469 (Third Superseding Indictment), 993 (minute order), 1256 (official trial transcript). The trial spanned four months and more than 50-trial-related transcripts, covering 36 days of witness testimony and over 900 admitted exhibits. *See generally United States v. Holmes*, ECF Nos. 1256–1306, 1324.[1] The government presented testimony from 29 witnesses during its case-in-chief. *See* ECF No. 1152. Defendant chose to present a case-in-chief with three witnesses and to testify herself. *See generally* 11/19/21, 11/22/21, 11/23/21, 11/29/21, 11/30/21, 12/07/21, 12/08/21 Tr. The relevant facts as presented to the jury at trial will be discussed within the argument section below.

At the close of the government's case-in-chief, Defendant orally made a Rule 29 Motion without any accompanying argument. *See* 11/19/21 Tr. at 7084:7–25, 7104:17–7105:11. Defendant simply asserted that "the evidence presented by the government is insufficient on every element of every count[.]" *Id.* at 7104:19–20. At the close of all evidence, Defendant timely renewed her Rule 29 Motion orally and offered to file a written submission supporting her argument. *See* 12/08/21 Tr. at 8646:13–8648:9. At the Court's suggestion for purposes of trial efficiency, the parties both agreed to file written arguments regarding Defendant's Rule 29 Motion after the jury's verdict. *Id.* at 8647:22–8648:7. On both occasions, the Court reserved ruling on Defendant's Rule 29 Motion and took it under submission. *See id.*; 11/19/21 Tr. at 7105:2–9; *see also* Fed. R. Crim. P. 29(b).

---

[1] Throughout this opposition, the government will refer to the trial transcript using the day of testimony and relevant page and line numbers from the official transcript, all of which are available at ECF Nos. 1256–1306. The government will refer to admitted Trial Exhibits as "TX" and they are all briefly described at ECF No. 1324.

On January 3, 2022, the jury reached a partial verdict. ECF No. 1235. The jury unanimously found Defendant Holmes guilty of four counts, Counts 1, 6, 7, and 8 of the Third Superseding Indictment ("TSI"), charging conspiracy to commit wire fraud and wire fraud against investors in Theranos, in violation of 18 U.S.C. §§ 1343, 1349. *Id.* The jury did not reach a unanimous verdict with respect to Counts 3, 4, and 5; accordingly, the Court declared a mistrial as to those counts. *Id.*; 01/03/22 Tr. at 9429:11–24.[2] The jury acquitted Defendant Holmes of Counts 2, 10, 11, and 12, charging conspiracy to commit wire fraud and wire fraud against Theranos paying patients. ECF No. 1235.

On January 12, 2022, the Court adopted an extended briefing schedule, stipulated to by the parties, allowing Defendant until March 4, 2022, to file her written Rule 29 Motion, as well as other potential post-verdict motions. ECF No. 1252. Defendant did not file any post-verdict motions by the Court-ordered deadline of March 4, 2022, and the government now responds solely to the pending oral Rule 29 Motion made by Defendant at the close of evidence. *See* 11/19/21 Tr. at 7084:7–25, 7104:17–7105:11; 12/08/21 Tr. at 8646:13–8648:9.

## ARGUMENT

The overwhelming weight of the evidence admitted at trial supports the jury's conviction of Defendant Holmes as to each and every element of Counts 1, 6, 7, and 8 of the TSI, namely conspiracy to commit wire fraud and wire fraud against Theranos investors. A sampling of that evidence is summarized below. While the government uses subheadings for convenience, the government maintains that all evidence included in this opposition as well as additional evidence admitted at trial may support more than one element and/or more than one conviction count. Indeed, the Ninth Circuit has noted that certain essential elements overlap between a conspiracy and substantive scheme to defraud. *See*, *e.g.*, *United States v. Stapleton*, 293 F.3d 1111, 1116–17 (9th Cir. 2002) (internal citation omitted).

### A. The Legal Standard Under Federal Rule of Criminal Procedure 29

Federal Rule of Criminal Procedure 29 ("Rule 29") permits a court to set aside a jury's guilty verdict and enter a judgment of acquittal only if "the evidence is insufficient to sustain a conviction."

---

[2] The government subsequently dismissed without prejudice all the charges that resulted in a mistrial. ECF No. 1255. The government also dismissed Count 9 with respect to Defendant Holmes at the close of its case-in-chief. ECF No. 1152.

Fed. R. Crim. P. 29(a).  Where a jury has returned a verdict, however, courts must accord great

deference to the jury's determination.  *See Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979).  Indeed,

"[t]he hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high."

*United States v. Rocha*, 598 F.3d 1144, 1153 (9th Cir. 2010).

The Ninth Circuit employs "a two-step inquiry for considering a challenge to a conviction based

on sufficiency of the evidence."  *United States v. Nevils*, 598 F.3d 1158, 1163–65 (9th Cir. 2010)

(en banc) (citing *Jackson*).  First, the evidence as presented at trial must be viewed "in the light most

favorable to the prosecution."  *Id.* at 1164.  This "standard gives full play to the responsibility of the trier

of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable

inferences from basic facts to ultimate facts."  *Jackson*, 443 U.S. at 319.  As such, the Court "must

presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer

to that resolution."  *Nevils*, 598 F.3d at 1164 (quoting *Jackson*, 443 U.S. at 326).  Second, the Court

must "determine whether this evidence, so viewed, is adequate to allow '*any* rational trier of fact [to

find] the essential elements of the crime beyond a reasonable doubt.'"  *Id.* (quoting *Jackson*, 443 U.S. at

319) (emphasis in original).  "At this second step, however, a reviewing court may not 'ask itself

whether *it* believes that the evidence at the trial established guilt[,]' . . . only whether '*any*' rational trier

of fact could have made that finding[.]"  *Id.* (quoting *Jackson*, 443 U.S. at 318–19); *see also United*

*States v. Del Toro-Barboza*, 673 F.3d 1136, 1143–46 (9th Cir. 2012).

With respect to the weight of the evidence, the Ninth Circuit has held that the testimony of only a

single witness can be sufficient when reviewing a Rule 29 motion for acquittal.  "The testimony of the

one witness, if believed, was sufficient to support the conviction, and the resolution of any question as to

his credibility was properly entrusted to the jury."  *United States v. Gudino*, 432 F.2d 433, 434 (9th Cir.

1970); *see also United States v. Yossunthorn*, 167 F.3d 1267, 1270 (9th Cir. 1999), *as amended* (Mar.

31, 1999) (holding that "uncorroborated testimony of an accomplice is enough to sustain a conviction

unless the testimony is incredible or unsubstantial on its face" (quotation omitted)); *United States v.*

*Bunker*, 532 F.2d 1262, 1264 (9th Cir. 1976) ("Credibility is exclusively within the jury's province.").

**B. The Evidence at Trial Was Sufficient to Support the Jury's Verdict Convicting Defendant of Count 1—Conspiracy to Defraud Theranos Investors**

The evidence admitted at trial unquestionably proved beyond a reasonable doubt that Defendant Holmes knowingly entered an agreement with numerous individuals—including co-Defendant Ramesh "Sunny" Balwani and others—to commit wire fraud by misleading investors in Theranos during the period 2010 to 2015 regarding several topics related to the maturity of the company, its main product, and its prior business relationships. *See* ECF No. 1206 at 17 (final jury instructions defining elements of conspiracy charge). The evidence demonstrated that Defendant became a member of a conspiracy with at least co-Defendant Balwani knowing that Theranos needed financial support in order to continue operating as a company and used many different types of knowingly false misrepresentations or half-truths to obtain investments, some of which are summarized in the next section.

The record is replete with examples of Defendant Holmes and co-Defendant Balwani working together and conspiring to effectuate a scheme to defraud investors. Defendants were constantly in communication via email, text message, and in-person meetings regarding, *inter alia*, the state of the lab and patient testing, Theranos' financials, the Walgreens relationship, progress with investors, and visits to Theranos by state and federal regulators. *See, e.g.*, TX 1287; TX 1828; TX 2228; TX 4145; TX 4181; TX 4189; TX 4222; TX 4292; TX 4840; TX 5663; 10/19/21 Tr. at 3927:4–23, 4056:12–4059:22 (Daniel Edlin observed Defendants working together and in personal settings and described how Defendants always had next-door offices with a door between, often ate lunch together "and were in discussion with one another"); *see also* 09/22/21 Tr. at 1555:1–19; 09/24/21 Tr. at 1725:6–17, 1732:8–1733:3, 1818:7–1819:9; 09/28/21 Tr. at 1883:6–14, 1912:19–1913:18; 10/06/21 Tr. at 2858:5–2861:1, 2978:22–2981:16; 10/12/21 Tr. at 3167:10–23, 3196:11–22; 11/30/21 Tr. at 7987:10–7991:13 (Defendant commenting on co-Defendant Balwani's response—before it was sent—to Tyler Shultz's concerns regarding testing on Edison devices in spring 2014); *see generally* TX 5387D.

The private and contemporaneous messages between Defendants during the charged period, alone, are strong evidence that they communicated regularly and openly about, among other topics: (i) the financial health of the company, *see* TX 5387D at 3, 7, 10 (discussing in May 2012 "later in [the] year once we get revenue flowing in"), 17 (Defendant said in November 2013 she will "get [ ]

comfortable" with financial models to present to investors while Balwani was in India), 18, 20 ("We are at $15m as of today / Free cash" in late November 2013), 34–35, 54, 68;

(ii) potential investors, including what materials to send them and the amounts they might invest, *see id.* at 16, 26–28 (Defendant sharing that Waltons and Rupert Murdoch intend to invest more than $100 million each), 31–32, 34–35;

(iii) the status of the CLIA laboratory and Theranos' devices' capabilities or lack thereof, *see id.* at 12 (stating in April 2013 "once we get our device perfected"), 14–15, 22 (Defendant asking whether certain tests are available on fingerstick ("fs") in November 2014, showing knowledge that not all tests are available on fingerstick), 23–26 ("Everyone complaining" in November 2014, Defendant said "fundamentally we need to stop fighting fires by not creating them" and co-Defendant said need to "operationalize Normandy"), 29 (co-Defendant said "Normandy lab is a fucking disaster zone"), 30 (discussing how to describe automation), 38, 42, 45–48 (describing fingerstick as "risky" in April 2015), 52, 54 ("I am worried about over exposure without solid substance which is lacking right now."), 56–60 ("Got to succeed in fs [fingerstick]"), 64, 78 ("For a long time to come we will have hybrid solutions" in May 2015), 83, 86, 117 (after negative *Wall Street Journal* article in October 2015, co-Defendant said to Defendant "[w]orried about your 'all fingersticks on our technology' comment");

(iv) the Walgreens relationship, *see id.* at 24–26 ("we can't scale with wag"), 37, 39–42, 65, 73–75, 91, 114, 116 (in October 2015 "WAG freaking out. Lack of transparency");

(v) how to prevent a reporter from writing a negative story and which former employees may be confidential sources, *see id.* at 50–51, 53, 60–61, 63, 76–79 (discussing legal action against Carreyrou's sources, co-Defendant said "I am narrowing this down in CLIA. Down to 5 people. Will nail this mother fucker" and then "[i]t is Tyler Erika and Adam"), 82, 84–86, 110–113; and

(vi) how poorly fall 2015 visits from regulators were going, *see id.* at 93–105 (during August 2015 surprise FDA inspection, Defendant said "[r]emember tspu [Theranos sample processing unit] not listed or in use"), 106–108 (during September 2015 CMS inspection co-Defendant said "[v]ery hostile so far" and "[g]oing bad so far. Pray" and Defendant responded "[p]raying continually"), 118–119 (during November 2015 CMS follow up inspection).

In their private messages, Defendants described joint ownership of decisions at Theranos: in May 2012, co-Defendant Balwani said "no on[e] but you and I can build this business together" and Defendant Holmes responded "I know"; in December 2014, Defendant Holmes said "We together decide what sounds best"; and in July 2015, co-Defendant Balwani admitted "I am responsible for everything at Theranos. All have been my decisions too." *See id.* at 7, 30, 33, 36, 87–89, 109.

By 2015, the end of the conspiracy period, Defendants' private messages show that they knew the entire time that their technology was not what they claimed externally: co-Defendant Balwani said he was "worried about over exposure without solid substance which is lacking right now" and later suggested that they "should think about sharing we have a large reference lab" because "[t]his will shock people"; Defendant Holmes said in April 2015 "***when*** we have FS [fingerstick] live" (emphasis added) and a few months later "[w]e need explicit plan and timeline to being 100% tech" rather than in the CLIA lab; and co-Defendant Balwani said in September 2015 while discussing issues with the FDA inspection "people will talk about our fingerstick[ w]ithout us talking about it[.]" *See id.* at 46–47, 54, 60, 83, 102.

In sum, the evidence referenced above and the evidence in below sections support the jury's verdict convicting Defendant Holmes of conspiracy to commit wire fraud against Theranos investors.

### C. The Evidence at Trial Was Sufficient to Support the Jury's Verdict Convicting Defendant Holmes of Counts 6, 7, and 8—Wire Fraud Against Theranos Investors

The evidence at trial overwhelmingly proved beyond a reasonable doubt that Defendant Holmes committed wire fraud against Theranos investors as charged in Counts 6 (re: PFM Health Sciences), 7 (re: RDV Corporation), and 8 (re: Daniel Mosley) of the TSI. *See* ECF No. 1235. The elements of wire fraud are: (1) the existence of a scheme to defraud, (2) material false statements, misrepresentations, or half-truths, (3) an intent to defraud, meaning an intent to deceive and cheat, and (4) the use of an interstate wire communication to further the scheme. *See* ECF No. 1206 at 23–25 (final jury instructions defining elements of wire fraud); *United States v. Lindsey*, 850 F.3d 1009, 1013–14 (9th Cir. 2017); *United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013). A scheme to defraud is a deceptive scheme or plan to "obtain money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020) (internal

quotation omitted). "The element of materiality is evaluated under an objective test," examining "the intrinsic capabilities of the false statement itself" and "the propensity or capacity to influence or affect a lender's decision[,]" rather than "actual reliance upon the defendant's misrepresentations[.]" *Lindsey*, 850 F.3d at 1014 (internal quotations and citations omitted). However, the government is not required "to prove a specific material false statement on which the jury unanimously agreed" so long as the evidence shows that the scheme as a whole was "reasonably calculated to deceive." *United States v. Woods*, 335 F.3d 993, 998 (9th Cir. 2003). Finally, the wire communication itself "need not be an essential element of the scheme, just a step in the plot[.]" *Jinian*, 725 F.3d at 960 (quotation omitted).

Defendant Holmes secured dozens of investors in Theranos over several years by falsely claiming that Theranos had manufactured one single, proprietary blood analyzer device that could run any blood test that was run by conventional labs, all from a blood sample drawn via a fingerstick rather than the traditional draw from a vein, with higher accuracy and less variability than traditional methods, due in part to its more automated process that reduced human error inherent in running blood tests in a laboratory. To support her bold claims, Defendant repeatedly told potential investors that Theranos' technology had been comprehensively validated by multiple major pharmaceutical companies and was being used in the battlefield by the Department of Defense to treat wounded soldiers. Defendant also asserted that Theranos was a profitable company and had a healthy ongoing relationship with retail pharmacy company Walgreens, through which it provided blood tests to patients beginning in September 2013.

As described below, these statements were made to Theranos investors, including PFM Health Care, RDV Corporation, and Daniel Mosley whose investments form the basis for Counts 6, 7, and 8 of the TSI, respectively, in addition to other investors or potential investors during the same time periods. Indeed, many of these false statements as described in more detail below were also included in written materials that were provided to investors, and a former Theranos employee testified that Defendant Holmes approved the material for binders sent to investors. *See*, *e.g.*, TX 3387; TX 4077; TX 4858; 10/19/21 Tr. at 3993:15–4001:25.

In truth, Theranos' proprietary device could never complete more than 12 types of blood tests, often with less accuracy, less automation, and more variability than traditional "predicate" machines

1  manufactured by third-party companies, such as Siemens AG.  Because of these shortcomings,

2  pharmaceutical companies did very little work with Theranos and did not validate its technology, and

3  the Department of Defense never used Theranos' analyzer to clinically treat soldiers.  Theranos had zero

4  revenue in 2012 and 2013 and desperately needed new sources of cash.  Defendants hid the

5  shortcomings of Theranos' proprietary device by using—without telling potential investors—modified

6  and unmodified third-party machines to fulfill the remainder of Theranos' available blood test menu to

7  patients at Walgreens stores.  As a result, Theranos' relationship with Walgreens was faltering because

8  the percentage of traditional venous draws was too high.  But none of this information was shared with

9  PFM Health Care, RDV Corporation, and Daniel Mosley, or other investors.

10  The government presented a plethora of trial testimony and exhibits demonstrating Defendant

11  Holmes knowingly made false or misleading statements or misrepresentations to investor-victims with

12  the intent to deceive and cheat Theranos investors.  A small sampling of the evidence introduced at trial

13  demonstrating these facts is summarized below by juxtaposing what insiders at Theranos knew—and

14  were telling Defendant—with what Defendant was saying externally to investors at certain key times.

15  **1.  Defendant Knowingly Participated in a Scheme to Defraud Investors**

16  Below is a non-exhaustive list of select examples from a few categories of misrepresentations

17  showing that Defendant Holmes knowingly participated in, devised, or intended to devise a scheme or

18  plan to defraud investors, for the purpose of obtaining money or property through deceptive means.  As

19  previously stated, the government includes subheadings for convenience, but the excerpts of evidence

20  frequently support more than one element and more than one count.

21

22  **(i)  Misrepresentations Regarding Validation by Pharmaceutical Companies**

23  Theranos did some limited work for a handful of pharmaceutical companies but, by 2010, the

24  work and resulting revenue was drying up.  *See* TX 7753.  In January 2009, Shane Weber spoke

25  telephonically with Defendant to inform her that "Pfizer did not have at this time a foreseeable use for

26  the Theranos immunoassay device" and Mr. Weber was "polite, clear, crisp and patiently firm as she

27  pushed back."  TX 0174.  Also in early 2009, Theranos was having difficulty paying vendors and at one

28  point struggled to make payroll.  09/08/21 Tr. at 633:2–635:8.  Co-Defendant Balwani personally

1    guaranteed a loan to help keep the company afloat.  *See id.*; *but see* TX 5387D (co-Defendant Balwani

2    in June 2011 said "we will get a [private] plane for these short journeys after C2" fundraising).

3          Theranos prepared purported validation reports of its work for Pfizer and Schering Plough, but

4    neither pharmaceutical company endorsed the conclusions in those reports or authorized Theranos to

5    affix the company's logo to the reports.  10/22/21 Tr. at 4396:12–4402:25; 11/02/21 Tr. at 5039:14–

6    5048:3; *see also* 09/29/21 Tr. at 2336:19–2340:7 (discussing TX 3893).

7          Nevertheless, in April 2010, Defendant Holmes emailed representatives of Walgreens—

8    attaching the same reports Theranos sent to pharmaceutical companies but now altered to include

9    Pfizer's and Schering Plough's logo and with enhanced conclusions—and referred to the reports as

10   "three independent due diligence reports on Theranos systems."  TX 0291; 10/22/21 Tr. at 4396:12–

11   4402:25; 11/02/21 Tr. at 5039:14–5048:3.  *Compare* TX 0143, *and* TX 0259, *with* TX 0291.  Defendant

12   further described the reports as "*from* GlaxoSmithKline, Pfizer, and Schering Plough after their own

13   technical validation and experience with Theranos Systems in the field[,]" TX 0291 (emphasis added),

14   and the Walgreens executive who received these reports understood that to mean either that Pfizer

15   authored the report or approved what was written.  10/12/21 Tr. at 3186:6–3190:6.[3]

16         Years later, in 2013 and 2014, Defendant continued to share these altered reports—including the

17   Pfizer-related report—with other investors, such as RDV Corporation and Mr. Mosley, who testified at

18   trial that they had believed Pfizer authored the report, not Theranos, and that added credibility to

19   Defendant's claims about Theranos' technology.  *See*, *e.g.*, 10/26/21 Tr. at 4681:11-4683:20, 4667:3–12;

20   11/02/21 Tr. at 5108:4–5110:2, 5126:12–5128:14; *see also* TX 5387D at 16 (Defendant texting co-

21   Defendant that she is planning to include the Pfizer report to send to investors).

22         This evidence, along with additional evidence presented at trial, was sufficient to show that

23   Defendant Holmes knowingly participated in a scheme to defraud investors—including Walgreens,

24   PFM Health Care, RDV Corporation, and Daniel Mosley—by falsely suggesting that Pfizer,

25   Schering Plough, and other pharmaceutical companies comprehensively validated Theranos' technology

26   when, in truth, they had not.

27

28   _____

[3] During her testimony, Defendant Holmes admitted to adding the logos to these reports and altering the
conclusions shortly before sending to Walgreens in April 2010.  11/23/21 Tr. at 7478:15–23.

### (ii) Misrepresentations Regarding Theranos' Work with the Department of Defense

Defendant also lied to investors about use of the Theranos analyzer by the Department of Defense on medevac helicopters, "in the battlefield[,]" or to treat soldiers in Afghanistan or Iraq. 11/16/21 Tr. at 6379:12–22, 6382:25–6383:11, 6383:22–6384:6; *see, e.g.*, 10/06/21 Tr. at 2995:18–2998:7; 10/26/21 Tr. at 4658:9–4659:4; 11/04/21 Tr. at 5441:13–5442:10; 11/18/21 Tr. at 6930:1–6933:19 (discussing audio recording in TX 5478A2).[4] In truth, Defendant knew that Theranos' proprietary analyzer was never used by the Department of Defense to clinically treat patients or for anything other than minimal studies with predetermined outcomes. *See* 09/22/21 Tr. at 1542:3–1543:8; 10/19/21 Tr. at 4018:17–4019:18, 4053:1–4054:3, 10/20/21 Tr. at 4267:4–16; *see also* TX 0588.

### (iii) Misrepresentations Regarding the Use of Modified and Unmodified Third-Party Devices for the September 2013 Launch of Theranos Tests Available for Patients at Walgreens Stores

From 2010 to 2013, Walgreens and Safeway worked with Defendant in an attempt to get Theranos' miniaturized blood testing device in their respective stores. Former Walgreens executive Wade Miquelon testified that, as of June 2012, he understood that Theranos would be using its own analyzer to test patient blood samples—not modified third party devices—and it would use unmodified third-party machines for esoteric tests at most, but "the vast majority of tests would be done on a Theranos machine." 10/13/21 Tr. at 3399:11–3400:8. Steve Burd, former CEO of Safeway, who also partnered with Theranos beginning in 2010, testified that modified third-party machines would not be as interesting because the device "has to be sufficiently different from everybody else in the market." 10/06/21 Tr. at 2977:12–2978:13. By May 2013, Theranos' partnership with Safeway was waning as Defendant did not deliver the device she promised and thus Safeway did not make its final payment. *See, e.g.*, 10/12/21 Tr. at 3046:5–3047:15. Defendant promised Walgreens that Theranos would be ready to launch by September 2013. *See* 09/17/21 Tr. at 1215:1–1216:12.

---

[4] While transcripts of Mr. Parloff's recordings were not provided to the jury, the official transcript does not capture the audio discussion, and thus the government submits them for the Court's convenience. *See* Declaration of Kelly I. Volkar in support of United States' Opposition to Defendant's Motion for Acquittal, Exhibit 1 at 17 (Bates TR-002425).

Throughout the summer of 2013, insiders at Theranos reported consistent problems with the various iterations of Theranos' device. Former Theranos scientist Surekha Gangakhedkar testified that, in July 2013, the research and development team was focused on preparing Theranos' 4.0 device for clinical use but there was not any imminent plan to launch the device for use on patients. 09/17/21 Tr. at 1184:3–1185:24; *see also* TX 0860. However, when Ms. Gangakhedkar returned from a vacation on August 17, 2013, she learned Defendant changed the plan, Theranos would modify third-party devices, and Theranos was going to launch tests for use on patients, using an older version, Edison 3.0 and 3.5, which was a "stopgap method" until the 4.0 device was ready. 09/17/21 Tr. at 1184:24–1187:14; *see also* TX 1020 (communicating Defendant's priority in August 2013 to validate 61 assays on the 3.x (Edison) and 27 on the Siemens Advia). Defendant pressured and rushed the scientists to quickly validate assays for clinical use on these older devices. 09/17/21 Tr. at 1187:15–1188:12; 09/24/21 Tr. at 1722:6–1725:17 (discussing TX 3231).

On August 29, 2013, Theranos' then-CLIA laboratory director, Dr. Adam Rosendorff, raised concerns to Defendant Holmes about the timing of the launch. 09/24/21 Tr. at 1726:1–1733:3; TX 1049. He testified at trial that, in response, Defendant Holmes "was very nervous" and "not her usual composed self. She was trembling a little bit, her knee was tapping, her voice was breaking up. She was clearly upset. . . . She didn't seem surprised to me. She just seemed nervous and upset." 09/24/21 Tr. at 1726:1–1733:3. Ms. Gangakhedkar also consistently raised issues with testing on Theranos devices to Defendant throughout the end of August and early September 2013. *See* 09/17/21 Tr. at 1184:24–1187:14; TX 0972.

However, also in August 2013, Theranos was running out of money and sought to receive an advanced payment from Walgreens, but the Walgreens payment was contingent on a consumer launch. 10/13/21 Tr. at 3402:2–3406:3 (discussing TX 0971), 3397:6–3400:22 (discussing TX 0617); 09/14/21 Tr. at 717:2–720:22 (discussing TX 5172). That month, Defendant and other Theranos employees provided a demonstration to Walgreens representatives with a Theranos device present, and one of those representatives, Nimesh Jhaveri, testified that he understood the demonstration to represent "the experience that potentially a patient would" have; in reality, the Walgreens representatives' samples

1  were run on a third-party machine.  10/14/21 Tr. at 3694:24–3696:1; 10/19/21 Tr. at 3933:2–3938:11

2  (discussing TX 0957 and TX 0966).

3       By September 2013, Defendant Holmes had promised investor-victim Walgreens that Theranos

4  would be ready to start providing blood tests to Walgreens' customers in certain stores, but Theranos

5  had not validated a single assay for clinical (patient) use on any version of its proprietary blood analyzer

6  device (the Edison, 3.0, 3.5, 4.0, TSPU, etc.).  09/24/21 Tr. at 1722:6–1725:17; *see, e.g.*, TX 3959

7  (no assays validated on Theranos system for clinical use as of August 31, 2013); TX 3231; TX 4533.

8  Instead, without telling Walgreens, Theranos began using third party machines—modified and

9  unmodified—to run the vast majority of tests received from patients at Walgreens.  *See, e.g.*, 09/24/21

10  Tr. at 1774:4–1776:13; TX 3959 (Defendant asking for number of assays validated on Siemens Advia

11  and "other platforms"); *cf.* 10/14/21 Tr. at 3694:24–3696:1.

12       On September 5, 2013, Ms. Gangakhedkar resigned because of her concerns with the reliability

13  of running patient tests on Theranos' 3.0 and 3.5 devices, and when she expressed these concerns to

14  Defendant, Holmes responded that "she has a promise to deliver to the customer [Walgreens], she

15  doesn't have much of a choice but to go ahead with the launch."  09/17/21 Tr. at 1215:1–1216:12,

16  1219:12–24.  Ms. Gangakhedkar also "felt that it was not the right thing to do" to launch when Theranos

17  was not ready to provide fingerstick testing to patients because she "believed that the launch was based

18  on using the nanotainers [collecting from a fingerstick] instead of using samples drawn by venous

19  blood."  *Id.* at 1216:13–1218:10.  The same day Ms. Gangakhedkar resigned due to accuracy concerns,

20  Defendant also received feedback from lawyers on changes to the website, including "[r]eplace highest

21  levels of accuracy with high levels of accuracy[,]" "remove references to 'all' tests and replace with

22  statements such as 'multiple' or 'several' [i]t is highly unlikely that the laboratory can perform every

23  conceivable test[,]" and "[e]nsure substantiation for claim '1/1000 the size of' typical blood draw[.]"

24  TX 3981.  *But see* TX 3387; TX 4077; TX 4858 (PowerPoints later provided to investors still contain

25  these statements).

26       On September 8, 2013, the *Wall Street Journal* published a piece about Theranos that claimed

27  that Theranos "devices [ ] automate and miniaturize more than 1,000 laboratory tests" and that

28  "Theranos's processes are faster, cheaper and more accurate than the conventional methods and require

only microscopic blood volumes, not vial after vial of the stuff." TX 1106.  Defendant Holmes had the

opportunity to review and edit the substance of the article in the days prior to its release.  TX 1090.  The

next day, Theranos and Walgreens issued a joint press release stating that samples would be "taken from

a tiny finger stick or micro-sample taken from traditional methods, eliminating the need for larger

needles and numerous vials of blood required for most diagnostic lab testing."  TX 1113.  At the time,

Theranos had not validated a single assay for clinical use on its devices.  *See* TX 4533; 09/24/21 Tr. at

1722:6–1725:17.  Nevertheless, Defendant shared the *Wall Street Journal* article and Walgreens press

release with potential investors.  *See* TX 1102; 11/02/21 Tr. at 5085:2–7, 5114:20–5116:4 (shared with

investor-victim Daniel Mosley); 11/16/21 Tr. at 6417:4–6418:23 (shared with investor-victim PFM and

representative Brian Grossman testified it was "critical" because "[i]t represented a transition for this

business from being a risky early stage company to being a commercial business, and it changed the

nature of the investment and the risks of the investment"); *see also* 09/14/21 Tr. at 717:2–720:22

(describing incoming investments in late September 2013 and in February 2014); TX 1770 (sharing

June 2014 *Fortune* article with investors).

When former Theranos employees attempted to expose the truth to John Carreyrou, a reporter

from the *Wall Street Journal*, Defendants retaliated by threatening expensive lawsuits against the former

employees and attempted to shield the truth from Mr. Carreyrou while he was investigating the claims.

*See, e.g.*, 09/15/21 Tr. at 981:19–986:5; TX 5387D at 50–51, 60–61, 63, 76–79 (discussing legal action

against Carreyrou's sources, co-Defendant said "I am narrowing this down in CLIA.  Down to 5 people.

Will nail this mother fucker" and then "[i]t is Tyler Erika and Adam"), 82, 84–86 (discussing sending

lawyer's letter to Erika Cheung and "Adam 100% the source to JC").

The evidence described above, and throughout this opposition, demonstrates that Defendant

Holmes knew Theranos' proprietary device could not do what she claimed externally to investors, and

she hid that fact by using modified and unmodified third-party devices to perform patient tests without

telling Walgreens or other investors.  Indeed, Defendant went to great lengths to prevent former

employees from telling the public that Theranos used third-party machines.  Thus, the jury's conclusion

that Defendant knowingly devised or participated in a scheme to defraud investors was well-supported.

**2.      Defendant Intended to Defraud—That Is, to Deceive and Cheat—Investors**

In addition to the evidence described above, the government presented ample additional evidence to demonstrate that Defendant intentionally defrauded individual investors PFM Health Care (Count 6), RDV Corporation (Count 7), Daniel Mosley (Count 8), and others, by lying about, among other things, the capabilities of Theranos' proprietary analyzer, the status of Theranos' relationship with Walgreens, and Theranos' financial state.  Externally, to investors, the public, and the press, Defendant Holmes falsely claimed that Theranos had manufactured one single, proprietary blood analyzer device that could run any blood test that was run by conventional labs, all from a blood sample drawn via a fingerstick rather than the traditional draw from a vein, with higher accuracy and less variability than traditional methods, due in part to its more automated process that reduced human error inherent in running blood tests in a laboratory.  Internally, scientists and lab employees kept both Defendants informed that Theranos' proprietary device could never complete more than 12 types of blood tests, often with less accuracy, less automation, and more variability than traditional "predicate" machines manufactured by third-party companies, such as Siemens AG.  In turn, these shortcomings increasingly negatively impacted Theranos' relationship with Walgreens.  Below are select examples of Defendant's intent to defraud individual investors.

**(i)      Misrepresentations Regarding the Capabilities of Theranos' Proprietary Analyzer**

The problems that former Theranos scientists identified for Defendant prior to the Walgreens launch, and beginning patient testing, continued throughout the winter of 2013 and spring of 2014.  But Theranos was running out of money again—Defendants discussed via text message how they had only $15 million in cash remaining in late November 2013.  TX 5387D at 20; *see also* 09/14/21 Tr. at 719:15–720:2 (describing burn rate of $1–2 million per week in fall 2013).

Erika Cheung, a lab associate at Theranos from October 2013 until April 2014 who regularly ran tests on the Edison 3.0 or 3.5 device first in research and development and then for live patient samples, testified at trial how quality control or QC was important to know whether a device was working—but QC constantly failed on Theranos' Edison device.  09/14/21 Tr. at 789:15–791:4, 841:7–845:4; 09/15/21 Tr. at 910:8–918:14, 920:17–925:3, 957:19–971:19; 09/17/21 Tr. at 1134:14–1135:22; *see also* TX 4943

1    (patient impact assessment re QC failures).  Defendant Holmes knew of these problems and

2    recommended switching to using "traditional methods" as a solution.  *See, e.g.*, TX 1287; 09/14/21 Tr.

3    at 845:17–847:3; 09/15/21 Tr. at 973:1–981:18 (discussing TX 1660).  Indeed, Defendant hid the issues

4    in the lab from government regulators by directing them on a path that included FDA-approved

5    machines and did not include Theranos' proprietary devices.  *See* TX 4047; 10/15/21 Tr. at 3866:2–8;

6    *see also* TX 1295; 09/15/21 Tr. at 944:11–946:12, 953:7–23.

7          Ms. Cheung testified that Theranos used its proprietary analyzer for no more than seven assays

8    while she worked at Theranos, used modified third-party machines for several more tests, but used

9    unmodified third-party machines for the bulk of its testing.  09/14/21 Tr. at 810:15–814:21 (discussing

10   TX 3741A, Theranos' menu of tests); *see also* 09/15/21 Tr. at 901:7–904:16, 938:19–939:25, 944:11–

11   946:12, 955:1–11; 09/17/21 Tr. at 1081:21–1083:22; TX 4533; *cf.* 11/16/21 Tr. at 6416:7–6417:1,

12   6426:23–6427:10 (references to hundreds of tests on Theranos' menu that investor was led to believe

13   were all run on Theranos' minilab).  Ms. Cheung described the 4.0, also known as the minilab, "which

14   was essentially a device that was meant to be able to process all of the different types of tests" but "it

15   was still in development [and] didn't have that capacity while [Ms. Cheung] was working for the

16   company."  09/14/21 Tr. at 804:21–806:7; 09/17/21 Tr. at 1181:12–14; *cf.* 11/16/21 Tr. at 6396:2–23

17   (investor testifying that Defendant held out the minilab as the device that was being used to test patient

18   samples).  Ms. Cheung testified that the unmodified third-party machines were more automated than

19   Theranos' proprietary device, which always required the use of a non-Theranos manufactured machine

20   called the Tecan.  09/14/21 Tr. at 800:2–810:14; 09/15/21 Tr. at 901:7–907:1, 929:22-932:9; 09/17/21

21   Tr. at 1140:3–19; *cf.* 11/16/21 Tr. at 6432:17–20, 6434:1–5 (Defendant told investor that Theranos was

22   "vertically integrated").

23         Ms. Cheung also testified that the Edison had greater variability than the third-party machines

24   and discussed two specific examples of Vitamin D and HDL.  09/14/21 Tr. at 817:5–818:11, 836:21–

25   837:9, 844:8–850:10; 09/15/21 Tr. at 926:5–929:5, 949:10–951:11, 954:2–955:21, 964:15–965:6,

26   975:8–978:24; *see also* 09/17/21 Tr. at 1131:8–1134:20, 1195:18–1196:24; 09/24/21 Tr. at 1810:6–

27   1819:6; TX 1543; TX 1555; TX 1432; *cf.* 11/16/21 Tr. at 6380:19–25, 6419:13–6421:13 (Defendant told

28   investor that coefficient of variation for Vitamin D and HDL was 25-30% higher on conventional

1    equipment).  Theranos employed a practice of removing two out of six results—deemed "outliers"—in

2    an attempt to reduce this variability.  *See* 09/14/21 Tr. at 849:9–850:10; 09/15/21 Tr. at 911:24–914:8,

3    933:25–935:21; 09/17/21 Tr. at 1141:13–1142:3; 09/24/21 Tr. at 1751:3–1753:15.

4            That's not what Defendant Holmes told Brian Grossman, the managing partner and chief

5    investment officer at PFM Health Sciences ("PFM"), a regulated investment entity, who had over twenty

6    years of experience covering the BioTech sector as an analyst or investor.  *See* 11/16/21 Tr. at 6374:10–

7    6376:12.  Mr. Grossman, on behalf of PFM, met with Defendant Holmes and co-Defendant Balwani for

8    approximately an hour in December 2013, and again in early January 2014 after Mr. Grossman sent

9    more than two pages of due diligence questions to discuss as PFM considered investing in Theranos.  *Id.*

10   at 6377:5–6385:23, 6391:22–6392:9, 6400:23–6404:18; TX 1404.  Mr. Grossman testified that

11   Defendant did most of the talking during the December 2013 meeting and they mostly discussed

12   Theranos' technology.  11/16/21 Tr. at 6378:22–6379:11, 6385:1–5.  Specifically, Defendant told PFM

13   that Theranos "could do all – over a thousand CPT codes with their technology," that Theranos'

14   "technology was actually better than conventional laboratory equipment, which suffered from a huge

15   amount of variability . . . due to humans" processing the samples, and Theranos' automation "eliminated

16   the human aspect of that, and as a result it had dramatically less variability from test to test, from

17   machine to machine[,]" and that Theranos' analyzer was a comprehensive "laboratory shrunk down into

18   a [small] box" named the minilab.  11/16/21 Tr. at 6379:8–11, 6380:9–18, 6381:1–6382:24, 6384:7–25,

19   6396:20–6398:9.  Defendant also told PFM that Theranos was "vertically integrated"—"meaning that

20   they made their own analyzers as opposed to using third parties"—"which was unusual for companies in

21   the diagnostic space[.]"  11/16/21 Tr. at 6432:17–20, 6434:1–5.

22           Similar statements were repeated to Mr. Grossman and other PFM representatives during their

23   January 10, 2014, meeting with Defendant after asking due diligence questions that PFM intended to

24   ensure "there was no ambiguity" and "no confusion about what the technology was capable of doing"—

25   Mr. Grossman testified that "[t]he answer was that there were no limitations."  11/16/21 Tr. at 6394:19–

26   6395:13, 6405:19–6406:14, 6407:17–6408:18; *see also* TX 1404.  Defendant Holmes told PFM that

27   Theranos "had waited this long to launch a retail product [because] they wanted to make sure that they

28   had complete coverage, 100 percent coverage of what Quest and LabCorp could offer" and the company

had accomplished that by this meeting in January 2014. 11/16/21 Tr. at 6404:19–6405:25; *see also id.* at 6381:5–24. Mr. Grossman testified that Defendant held out the minilab as Theranos' proprietary device that was running patient samples collected at Walgreens (*id.* at 6396:20–23), and Defendant never told PFM that its analyzer was only being used to run a handful of tests in the CLIA lab, never told PFM that Theranos was using modified third-party machines, and never told PFM that Siemens or other third-party machines were used to do the blood testing. 11/16/21 Tr. at 6395:22–6396:23, 6400:23–6403:1, 6413:5–9, 6414:7–6415:23, 6442:18–6443:15, 6448:1–10.

Indeed, Mr. Grossman had his blood tested at a Walgreens offering Theranos' services, received a venous draw rather than fingerstick, and was never told that some of the tests he ordered were run on a third-party machine—Immulite—rather than a Theranos analyzer. *See* 11/16/21 Tr. at 6455:12–6457:14; TX 1491; *see also* 09/24/21 Tr. at 1739:3–1741:5. Finally, Mr. Grossman received written materials from Defendants that repeated the same misrepresentations they told him orally during their first two meetings: "Theranos runs any test available in central laboratories, and processes all sample types"; references 800+ test menu; "all 1,000 plus currently run tests/CPT codes are available through Theranos"; and "the unprecedented lack of variation from system to system yields higher integrity data." 11/16/21 Tr. at 6408:19–6429:5; TX 4077. PFM invested in Theranos in early February 2014. *Id.* at 6460:1–6461:24; TX 1506. There was thus ample evidence from which the jury could infer that Defendant intended to deceive and cheat PFM out of something valuable.

Problems within Theranos' lab—including trying to run patient samples on Theranos' proprietary device and modified third-party devices—continued throughout 2014. *See, e.g.,* 09/24/21 Tr. at 1765:6–1766:22, 1790:1–14, 1825:10–1828:24 (discussing TX 4189); TX 1717; TX 2228; TX 4124; TX 4145; TX 4181; TX 4189; TX 4222; TX 4292; TX 5413; *see also* TX 3070.

By September 2014, Defendant's brother, Christian Holmes who also worked at Theranos, wanted to have "a candid conversation" with Defendant because "it's pretty obvious we have issues with calcium, potassium and sodium specifically" and asked for Defendant's thoughts on "considering to stop reporting these tests" until resolved. TX 1953. Dr. Adam Rosendorff, the lab director at the time, expressed increasing concerns and dismay at the "number and severity of issues" and "high frequency of doctor complaints." 09/28/21 Tr. at 1939:4–24. Dr. Rosendorff escalated his concerns to management,

including Defendant, but he felt "management was paying lip service to this issue[.]"  *Id.* at 1913:4–18.  Theranos could perform no more than 12 tests on its own device.  TX 4533.  Defendant even asked then-member of Theranos' Board of Directors, General James Mattis, not to discuss "on the record" with a reporter from *The New Yorker* "that there is a single device that does all tests" (TX 4196), which General Mattis testified "was rather strange because I thought we had been kind of out front that there's a single device and why would we want to hide that."  09/22/21 Tr. at 1575:11–1578:5.

But Defendant told a different story externally to investors throughout fall 2014.  *See*, *e.g.*, TX 2223 (early investor Alan Eisenman emailed Defendants in early October 2014 about claims that Theranos' tests are being processed in a central lab and are less reliable, co-Defendant responds "sounds like an uninformed consultant").  Daniel Mosley, then a trusts and estates partner at Cravath, Swaine, and Moore LLP, learned of Theranos in summer 2014 through one of his long-time clients, Dr. Henry Kissinger, who was on the Board of Directors of Theranos.  11/02/21 Tr. at 5071:11–5073:22.  On August 18, 2014, Defendant Holmes sent Mr. Mosley a cover letter and binder of materials about Theranos, which Mr. Mosley reviewed at Dr. Kissinger's request to evaluate the company as an investment opportunity.  *Id.* at 5078:8–5083:22, 5092:10–5116:13, 5119:10–5120:5; TX 4173; TX 3387; TX 4197.  Mr. Mosley understood from Defendant and the written materials that Theranos' technology could currently run "comprehensive blood tests" from a finger stick "without having to use a large needle" with the exception of tests that might require a throat swab or other bodily fluids besides blood.  11/02/21 Tr. at 5097:10–5100:9, 5102:4–5104:1; 11/03/21 Tr. at 5375:6–5379:13.  Mr. Mosley did not know that Theranos used third party machines to run the majority of its tests.  *Id.* at 5097:10–5100:9, 5104:2–19.  In October 2014, Mr. Mosley met with Defendant Holmes in person and "had a long conversation about Theranos and the technology" during which everything he learned was consistent with what he had read in the materials she provided to him earlier, in August 2014.  *Id.* Tr. at 5141:7–5142:17.  Mr. Mosley personally invested in Theranos on October 31, 2014.  TX 4845.

Mr. Mosley introduced Defendant to other potential investors, including RDV Corporation ("RDV").[5]  10/26/21 Tr. at 4644:5–10; 11/02/21 Tr. at 5120:6–5122:21.  In fall 2014, both members of

---

[5] RDV Corporation is the family office for the DeVos family and an investment advisor.  10/26/21 Tr. at 4634:16–25.

RDV and Daniel Mosley received copies of a *Fortune* cover article about Defendant Holmes and Theranos, which asserted that Theranos did not use third party machines. TX 1776; TX 1944; 10/26/21 Tr. at 4640:1–4643:4, 4680:21–4681:5; 11/02/21 Tr. at 5104:20–5107:8, 5116:5–13. Roger Parloff, the author of that *Fortune* article, testified that the source of that information was Defendant, herself. 11/18/21 Tr. at 6944:1–6947:10, 6953:20–6956:8.

On October 3 and 14, 2014, representatives of RDV, including Lisa Peterson who works in the investment group, participated first in a phone call with Defendant Holmes and then flew out to Theranos' headquarters in person to discuss potentially investing in Theranos. *See* 10/26/21 Tr. at 4634:16–25, 4645:11–4650:25, 4660:7–4662:22, 4668:2–25. Ms. Peterson testified that she learned from Defendant Holmes and the materials she provided that Theranos could run hundreds of tests from "a pinprick and a drop of blood," those tests were purportedly more accurate and "100 percent automated, no manual handling of the sample," and that "Theranos uses their own analyzer equipment[.]" 10/26/21 Tr. at 4653:11–4658:25. Ms. Peterson testified that Defendant told RDV multiple times that Theranos could perform hundreds of tests from a fingerstick and showed RDV representatives the Theranos analyzer when they were in person at Theranos. 10/26/21 Tr. at 4660:7–4662:22, 4668:2–25. RDV was given written materials that repeated similar claims. *See* TX 4858; TX 1853; 10/26/21 Tr. at 4663:11–4670:17, 4678:11–4689:14. From this information, RDV understood Theranos was a "game changer for health care." 10/26/21 Tr. at 4654:10–17. Defendant Holmes never told RDV that Theranos used third party machines for testing and never told RDV that Theranos' analyzer could not run more than 12 assays. 10/26/21 Tr. at 4693:14–4697:6. RDV invested in Theranos on October 31, 2014. 10/26/21 Tr. at 4697:7–4698:20; TX 4845.

Indeed, the pattern continued in November 2014. Dr. Rosendorff, Theranos' lab director, resigned because, as he told Defendant, he felt "really uncomfortable with the [sic] what is happening right now in this company. . . . I am feeling pressured to vouch for results that I cannot be confident in[.]" TX 4330; *see also* 09/24/21 Tr. at 1703:2–9; 09/28/21 Tr. at 1948:13–1958:17. Nevertheless, on November 27, 2014, Defendant Holmes and co-Defendant Balwani sent texts to each other about securing a $150 million investment from the Walton family, who own Walmart, and Rupert Murdoch

for over $100 million.  TX 5387D at 28.  The next day, co-Defendant Balwani texted Defendant Holmes "Normandy lab is a fucking disaster zone[.]"  TX 5387D at 29; *see also id.* at 22–26.

In sum, the above evidence amply supports the jury's conclusion that Defendant Holmes intended to defraud—that is to deceive and cheat—Theranos investors by misrepresenting the capabilities of Theranos' proprietary technology and hiding the use of third-party machines.

### (ii)    Misrepresentations Regarding the Walgreens Partnership Expanding

By August 2014, Walgreens decreased the goal for 2015 from opening 500 stores with Theranos testing services available to only 200 such stores, in part because Theranos was not meeting Walgreens' goal of having less than 10% of patients receive venous draws; indeed, approximately 40% of patients were still receiving venous draws rather than fingerstick tests.  10/14/21 Tr. at 3588:3–3591:10 (describing plan to decrease percentage of vein draws, which was 43% in February 2014, to less than 10% by August 2014 but Theranos did not meet that goal), 3600:15–3609:13 (discussing TX 1884), 3610:3–3615:2 (discussing TX 1896), 3620:11–21; TX 5663.  Former Walgreens representative Nimesh Jhaveri testified that Walgreens was focused on the percentage of vein draw tests versus fingerstick tests because the latter was the "innovation" of getting lab tests done from "a few drops of blood with a fingerstick" and run on the Theranos device that Defendant Holmes and co-Defendant Balwani had shown to Walgreens representatives back in August 2013 before the consumer launch.  10/14/21 Tr. at 3598:4–20, 3694:24–3696:1 (describing initial demonstration); *see also* TX 5387D at 24–26 (in November 2014 co-Defendant said "we can't scale with wag"), 40–42, 116.

Yet, approximately one month later, Defendant Holmes was painting a different picture for investors.  Ms. Peterson participated in a phone call with Defendant Holmes during which Defendant discussed projections based on Theranos providing testing at 900 Walgreens locations and described the risk as "execution" not any issue with the technology or its capabilities.  10/26/21 Tr. at 4634:16–25, 4645:11–4650:25 (discussing TX 2015).  Defendant Holmes never told RDV that Walgreens was scaling back the number of stores it would have Theranos operate within.  10/26/21 Tr. at 4680:4–19.  This is further evidence supporting the jury's verdict necessarily finding that Defendant Holmes intended to defraud investors, including RDV.

### (iii)  Misrepresentations Regarding Theranos' Financial Stability

The evidence presented to the jury at trial demonstrated that Defendant made additional misrepresentations to investors beyond those captured herein. As but a few parting examples, among others, Defendant consistently misrepresented the financial health of Theranos to investors, *e.g.*:

- In 2010, Defendant Holmes told Steve Burd, then-CEO of Safeway, that Theranos was cash flow neutral and projected revenue for 2011 of $223 million. 10/06/21 Tr. at 2938:21–2939:18, 2953:8–2955:15, 2963:6–2964:17; TX 0370. In truth, Theranos' revenue was steadily declining as work with the pharmaceutical companies dried up—from approximately $2,800,000 in 2009 to less than $600,000 in 2011—at the same time the company's accumulated deficit rose dramatically. 09/08/21 Tr. at 623:15–626:8, 640:4–9; 09/14/21 Tr. at 687:4–689:5; *see also* TX 5387D at 7, 10 (discussing in May 2012 need to work on revenue and get "revenue flowing in"). Thus, there was no basis for the projections Defendant provided to Safeway to induce them to invest in Theranos.

- In January 2014, Defendants told investor-victim PFM that Theranos had historically earned over $200 million in revenue, primarily from the company's work with the Department of Defense, when, in reality, Theranos had only ever earned approximately $290 *thousand* from a short study with the American Burn Association. *Compare* 11/16/21 Tr. at 6383:22–6384:6, *with* 09/14/21 Tr. at 716:1–17. In truth, Theranos earned *zero* revenue in 2012 and 2013, and only ever received approximately $9.6 million from pharmaceutical companies. 09/14/21 Tr. at 692:8–693:3, 696:3–14; TX 7753 (second attachment); *see also* TX 5387D at 7, 10, 17–18 (Defendant will get comfortable with financial model), 20.

- Investor-victim Daniel Mosley testified that he would have been surprised if Theranos had had very little revenue by August 2014 given three-quarters of the fiscal year had passed and Defendant provided financial projections that projected $140 million of revenue for Theranos by December 31, 2014. 11/02/21 Tr. at 5092:10–5095:11, 5111:8–5114:18 (discussing TX 3387 at pg. 512), 5118:9–5119:9; *see also* 10/26/21 Tr. at 4683:21–4687:18; TX 1853 (Lisa Peterson testifying similarly as of October 2014); 11/02/21 Tr. at 4978:13–24, 4984:6–4985:16. In truth,

Theranos' revenue in 2014 was $150 *thousand*—nowhere near the projections that Defendant provided investors in the third fiscal quarter of that same year. *See* 09/14/21 Tr. at 705:6–19.

In sum, the evidence at trial, including the excerpts described above, overwhelmingly supports the jury's conclusion that Defendant Holmes intentionally defrauded Theranos investors, including PFM, RDV, and Mr. Mosley, by intentionally deceiving them with respect to the capabilities of Theranos' proprietary blood testing analyzer, the status of Theranos' relationship with Walgreens, the extent of the historical relationships Theranos had with pharmaceutical companies and the Department of Defense, and Theranos' financial status, among other categories, and thereby intentionally cheated and deprived those investors of their money through deceptive means.

### 3. Defendant's False Misrepresentations Were Material

Representatives of the investor-victims repeatedly testified that the statements referenced above were important or material to them. *See, e.g.*, 10/14/21 Tr. at 3696:22–3697:5, 3600:15–3601:2; 10/26/21 Tr. at 4642:2–10, 4656:14–4659:4; 11/02/21 Tr. at 5108:4–5110:2, 5126:12–5128:14; 11/16/21 Tr. at 6382:7–6383:11, 6409:23–6411:13, 6426:14–22; *see also* TX 3387; TX 4077; TX 4858. From an objective perspective, viewing the excerpts of evidence included above in the light most favorable to the prosecution—in addition to the rest of evidence introduced at trial—a rational juror could find beyond a reasonable doubt that the Defendant's misrepresentations were material. *See Lindsey*, 850 F.3d at 1014.

### 4. Defendant's Scheme to Defraud Involved Interstate Wire Communications

The evidence also clearly demonstrated the use of interstate wire communications to further the scheme. On February 6, 2014, three legal entities managed by PFM, representing different groups of investors, invested a total of over $96.1 million in Theranos. 11/16/21 Tr. at 6460:1–6461:24; TX 1506. One entity, PFM Healthcare Master Fund L.P., alone invested $38,336,632 in Theranos and represents Count 6 of the TSI. *See id.*; TX 4845; ECF No. 469. On October 31, 2014, a legal entity on behalf of RDV invested $99,999,984 in Theranos. 10/26/21 Tr. at 4697:7–4698:20; TX 4845. That same day, a legal entity on behalf of Daniel Mosley invested $5,999,997 in Theranos. 11/02/21 Tr. at 5152:14–5153:8; TX 4845. The investments by RDV and Mr. Mosley represent Counts 7 and 8 of the TSI, respectively. *See* ECF Nos. 469, 1235.

At trial, an employee of Fedwire testified that all wire transfers of money in 2013 and 2014 necessarily crossed state lines to Texas and New Jersey—regardless of where the wire transfers originated. *See* 10/13/21 Tr. at 3523:16–3526:4; 10/14/21 Tr. at 3562:5–3563:18, 3565:18–3567:18 (discussing TX 4845). Thus, PFM's, RDV's, and Mr. Mosley's wire transfers necessarily crossed state lines when they made their respective investments in Theranos. *See id.*

***

In sum, the evidence referenced above and otherwise admitted at trial overwhelmingly supports the jury's verdict convicting Defendant Holmes of conspiracy to commit wire fraud—Count 1—and three substantive wire fraud counts—Counts 6 (re: PFM), 7 (re: RDV), and 8 (re: Mr. Mosley)—against Theranos investors.

**CONCLUSION**

For the reasons stated above, the government respectfully requests that the Court deny Defendant Holmes' Rule 29 Motion and reaffirm the jury's proper verdict.


DATED: April 8, 2022

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney


   */s/ Kelly I. Volkar*
JEFFREY B. SCHENK
JOHN C. BOSTIC
ROBERT S. LEACH
KELLY I. VOLKAR
Assistant United States Attorneys