# EXHIBIT 46

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR-18-00258-EJD |
| | ) | |
| PLAINTIFF, | ) | SAN JOSE, CALIFORNIA |
| | ) | |
| VS. | ) | VOLUME 33 |
| | ) | |
| ELIZABETH A. HOLMES, | ) | NOVEMBER 16, 2021 |
| | ) | |
| DEFENDANT. | ) | PAGES 6302 - 6573 |
| _____ | ) | **SEALED PAGES 6566 - 6573** |


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                       BY:  JOHN C. BOSTIC
                            JEFFREY B. SCHENK
                       150 ALMADEN BOULEVARD, SUITE 900
                       SAN JOSE, CALIFORNIA 95113

                       BY:  ROBERT S. LEACH
                            KELLY VOLKAR
                       1301 CLAY STREET, SUITE 340S
                       OAKLAND, CALIFORNIA 94612

        (APPEARANCES CONTINUED ON THE NEXT PAGE.)


OFFICIAL COURT REPORTERS:
                       IRENE L. RODRIGUEZ, CSR, RMR, CRR
                       CERTIFICATE NUMBER 8074
                       LEE-ANNE SHORTRIDGE, CSR, CRR
                       CERTIFICATE NUMBER 9595

        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
           TRANSCRIPT PRODUCED WITH COMPUTER

```
 1        A P P E A R A N C E S: (CONT'D)

 2

 3     FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                               BY:  KEVIN M. DOWNEY
 4                                  LANCE A. WADE
                                    KATHERINE TREFZ
 5                                  PATRICK LOOBY
                                    SEEMA ROPER
 6                                  RICHARD CLEARY
                                    J.R. FLEURMONT
 7                             725 TWELFTH STREET, N.W.
                               WASHINGTON, D.C. 20005
 8
                               LAW OFFICE OF JOHN D. CLINE
 9                             BY:  JOHN D. CLINE
                               ONE EMBARCADERO CENTER, SUITE 500
10                             SAN FRANCISCO, CALIFORNIA 94111

11
       ALSO PRESENT:          FEDERAL BUREAU OF INVESTIGATION
12                            BY:  ADELAIDA HERNANDEZ

13                            OFFICE OF THE U.S. ATTORNEY
                              BY:  LAKISHA HOLLIMAN, PARALEGAL
14                                 MADDI WACHS, PARALEGAL

15                            WILLIAMS & CONNOLLY
                              BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL
16
                              TBC
17                            BY:  BRIAN BENNETT, TECHNICIAN

18

19

20

21

22

23

24

25
```

1

2                        INDEX OF PROCEEDINGS

3        GOVERNMENT'S:

4        **SO-HAN (DANISE) SPIVEY**
         DIRECT EXAM BY MR. LEACH                P. 6355
5        CROSS-EXAM BY MR. WADE                  P. 6364

6

7        **BRIAN GROSSMAN**
         DIRECT EXAM BY MR. LEACH                P. 6374
8        CROSS-EXAM BY MR. WADE                  P. 6462

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXHIBITS

2

3       GOVERNMENT'S:                     IDENT.      EVIDENCE

4       5454                                          6358
        1396                                          6371
5       1404                                          6387
        4077                                          6410
6       1443                                          6430
        5441                                          6444
7       1482                                          6453
        1505                                          6458
8       1506                                          6459
        4052                                          6500
9       1434                                          6509
        1422                                          6511
10      1360                                          6521
        4036                                          6536

11

12

13      DEFENDANT'S:

14      7353                                          6484
        7354                                          6486
15      7358                                          6490
        7376                                          6514
16      14025                                         6523
        7378                                          6529
17      14021                                         6541
        7390                                          6544

18

19

20

21

22

23

24

25

|   | SAN JOSE, CALIFORNIA                    NOVEMBER 16, 2021 |
|---|---|

1      SAN JOSE, CALIFORNIA                    NOVEMBER 16, 2021

08:17AM   2                    P R O C E E D I N G S

08:17AM   3           (COURT CONVENED AT 8:17 A.M.)

08:17AM   4           (JURY OUT AT 8:17 A.M.)

08:17AM   5               THE COURT:  LET'S GO ON THE RECORD IN THE HOLMES

08:17AM   6      MATTER.  ALL COUNSEL ARE PRESENT AND MS. HOLMES IS PRESENT.

08:17AM   7           WE'RE OUTSIDE OF THE PRESENCE OF THE JURY THIS MORNING.

08:17AM   8      WE WERE GOING TO TAKE UP -- I THINK THERE WAS A MATTER, THE

08:17AM   9      MOTION FILED BY THE DEFENSE.

08:17AM  10           I JUST WANTED TO TOUCH BASE.  LAST WEEK WE -- WHEN WE LEFT

08:17AM  11      COUNSEL, I THINK YOU WERE GOING TO HAVE SOME DISCUSSION ABOUT

08:17AM  12      SOME IDENTIFICATION OF DECISIONS MADE BY 4:00 P.M. LAST WEEK.

08:17AM  13           IS THAT SOMETHING THAT I SHOULD KNOW ABOUT, OR CAN I JUST

08:17AM  14      KNOW, HAVE YOU HAD THAT DISCUSSION?  I THINK THIS --

08:17AM  15               MR. DOWNEY:  YOUR HONOR, ARE YOU REFERRING TO

08:17AM  16      YESTERDAY?

08:17AM  17               THE COURT:  NO.  I THINK IT WAS LAST WEEK THERE WAS

08:18AM  18      A DISCUSSION ABOUT THE LIS, AND IS THAT SOMETHING THAT WE

08:18AM  19      SHOULD TALK ABOUT THIS MORNING?

08:18AM  20               MR. SCHENK:  I'M NOT SURE THERE'S AN ISSUE THAT

08:18AM  21      NEEDS THE COURT'S ATTENTION.  THE DEFENSE DID SEND US A LETTER

08:18AM  22      BY 4:00 P.M.  THE LETTER INDICATED THAT THEY DID NOT BELIEVE

08:18AM  23      THAT THE DOOR WAS OPEN FOR THE GOVERNMENT TO INTRODUCE FACTS

08:18AM  24      REGARDING THE LIS DATABASE, AND THEY ALSO MAINTAIN THEIR

08:18AM  25      ABILITY TO MAKE ANY ARGUMENTS, IF I'M SUMMARIZING THEIR

08:18AM 1     POSITION CORRECTLY.

08:18AM 2         THE COURT:  OKAY.

08:18AM 3         MR. SCHENK:  I DON'T KNOW -- THE POINT THE

08:18AM 4 GOVERNMENT WAS MAKING WAS THAT WE DON'T KNOW WHETHER THE

08:18AM 5 DEFENSE IS GOING TO PUT A CASE ON OR NOT, AND WHEN WE ARE IN

08:18AM 6 THAT POSITION, WHAT WE ARE FACED WITH IS ASKING THE COURT, HAS

08:18AM 7 THE DOOR BEEN OPENED SO THAT WE CAN PUT IN THE FACTS AS WE SEE

08:18AM 8 THEM WITH REGARD TO LIS?

08:18AM 9     BECAUSE THE CURRENT STATE OF THE RECORD IS A LITTLE BIT

08:18AM 10 UNCLEAR ON WHAT ARGUMENTS THE DEFENSE CAN MAKE BASED UPON THE

08:19AM 11 FACTS THAT HAVE BEEN INTRODUCED.  FOR INSTANCE, THE

08:19AM 12 CAPABILITIES OF LIS IS IN THE RECORD.

08:19AM 13     SO FROM THAT THE DEFENSE MIGHT ARGUE, IF THEY PUT ON NO

08:19AM 14 CASE, THEY MIGHT ARGUE IN CLOSING THAT THE GOVERNMENT FAILED TO

08:19AM 15 GET VERY IMPORTANT EVIDENCE.

08:19AM 16     FROM THE GOVERNMENT'S PERSPECTIVE, IT WOULD BE UNFAIR TO

08:19AM 17 HAVE THAT ARGUMENT BASED UPON THIS RECORD WITHOUT THE

08:19AM 18 GOVERNMENT IN ITS CASE-IN-CHIEF GETTING TO INTRODUCE ADDITIONAL

08:19AM 19 EVIDENCE REGARDING LIS TO CONFRONT THAT TYPE OF ARGUMENT.

08:19AM 20     THAT'S WHAT THE GOVERNMENT WAS GETTING AT BY RAISING THIS

08:19AM 21 TO THE COURT'S ATTENTION LAST WEEK BY ASKING FOR SOME NOTICE

08:19AM 22 REGARDING HOW THE DEFENSE VIEWS THE STATE OF THE EVIDENCE.

08:19AM 23     AND WHAT WE DETERMINED IS THAT THE DEFENSE DOESN'T BELIEVE

08:19AM 24 THAT THE DOOR IS OPEN, WHICH WE TAKE TO MEAN THAT THEY WILL NOT

08:19AM 25 MAKE THAT ARGUMENT BECAUSE IT CAN'T BE -- BOTH CAN'T EXIST.

08:19AM  1    THE DOOR CAN'T BE CLOSED AND ALSO THE DEFENSE GETS TO ARGUE

08:20AM  2    MISSING EVIDENCE HERE.  THAT WOULD BE UNFAIR.

08:20AM  3        AND WE'RE FINE WITH THE RECORD AS IT IS ON THAT ISSUE,

08:20AM  4    UNLESS SORT OF HEARING THAT THE COURT HAS FURTHER GUIDANCE FOR

08:20AM  5    THE PARTIES.

08:20AM  6            THE COURT:  AND THIS IS WHAT I WANTED TO TOUCH ON.

08:20AM  7        I THINK THERE WAS SOME DISCUSSION ABOUT THIS, AND I

08:20AM  8    THOUGHT, MR. WADE, YOUR TEAM HAD SAID WE'RE GOING TO LOOK AT

08:20AM  9    THIS AND MAKE A DECISION OR GIVE SOME INFORMATION.

08:20AM 10        SO --

08:20AM 11            MR. WADE:  YOUR HONOR, IF I MIGHT, WE DID SEND A

08:20AM 12    LETTER TO THE COUNSEL.

08:20AM 13        IF I MIGHT PASS THAT UP, ALONG WITH --

08:20AM 14            THE COURT:  SURE.

08:20AM 15            MR. WADE:  -- THERE'S AN EXCERPT OF THE PORTION OF

08:20AM 16    DOCKET 798 WHICH, OF COURSE, IS THE COURT'S MOTION IN LIMINE

08:20AM 17    RULING THAT RELATES TO THE LIS ISSUE.

08:20AM 18        I'M SURE THE COURT HAS A DOG-EARED COPY OF 798 THAT IT

08:20AM 19    KEEPS UP ON THE BENCH, BUT I HAVE JUST COPIED THE RELEVANT

08:20AM 20    PORTIONS THERE.

08:20AM 21        YOU'LL SEE, YOUR HONOR, WHAT WE DID IN THE LETTER IS WE

08:20AM 22    TOOK MR. SCHENK'S INQUIRY TO BE AN INQUIRY AS TO WHETHER WE

08:21AM 23    WISHED TO TELL HIM WHAT DEFENSES WE WANT TO PRESENT BEFORE HIS

08:21AM 24    CASE CLOSES.  WE DECLINED THE INVITATION.

08:21AM 25        WE RESERVE OUR RIGHT TO OFFER ANY DEFENSE.

08:21AM 1    WE DID NOTE IN THE COURT'S ORDER, AS MR. SCHENK SUGGESTED,

08:21AM 2    WE DID NOTE THAT WE DON'T BELIEVE THAT WE HAVE OPENED THE DOOR.

08:21AM 3    THE COURT'S ORDER SPECIFICALLY DISCUSSED ISSUES THAT WE COULD

08:21AM 4    ADDRESS WITH RESPECT TO LIS, AND IT ADDRESSED -- IT NOTED THE

08:21AM 5    CONCEPT THAT IF WE, THAT IF WE ARGUE THAT THE LIS DATABASE IS

08:21AM 6    UNAVAILABLE BECAUSE OF THE GOVERNMENT'S FAILURE TO OBTAIN IT,

08:21AM 7    THAT THAT COULD OPEN THE DOOR.

08:21AM 8    I THINK THE COURT ALSO NOTED IN THE ORDER THAT IF WE

08:21AM 9    SOUGHT A JURY INSTRUCTION THAT RELATED TO SPOLIATION -- I

08:22AM 10   ALWAYS HAVE TROUBLE WITH THAT WORD, YOUR HONOR -- AND WE

08:22AM 11   PRESENTLY DON'T INTEND TO OFFER THAT, BUT, OF COURSE, WE'LL SEE

08:22AM 12   WHERE WE ARE AFTER THE GOVERNMENT RESTS AND WHAT DEFENSE WE

08:22AM 13   NEED TO PROVE.

08:22AM 14   THE GOVERNMENT HAS A REBUTTAL CASE IF WE END UP OPENING

08:22AM 15   THAT DOOR IN THE DEFENSE CASE, AND AS ALWAYS, IT HAS THE

08:22AM 16   ABILITY TO ADDRESS WHATEVER DEFENSES WE MIGHT RAISE IN ITS

08:22AM 17   REBUTTAL.

08:22AM 18   THE COURT:  OKAY.  WELL, ONE OF THE OBSERVATIONS,

08:22AM 19   LET ME JUST SAY, IS THERE'S BEEN MENTION OF THE LIS THROUGH

08:22AM 20   CROSS-EXAMINATION, AND TWO OR THREE WITNESSES WERE ASKED ABOUT

08:22AM 21   IT, THE LAB DIRECTORS AND THE EXISTENCE OF IT, AND IT WAS, I'LL

08:22AM 22   USE THE WORD INTERESTING, TO LISTEN TO THOSE QUESTIONS AS TO

08:22AM 23   THE RELEVANCY OF THE TOPICS AND RAISING THE LIS, WHICH CAUSED

08:23AM 24   ME, PARDON ME, SOME QUESTION ABOUT WHETHER OR NOT THAT IS GOING

08:23AM 25   TO BE AN ISSUE IN THE CASE.

08:23AM 1        AND I UNDERSTAND WE'RE TREADING LIGHTLY BECAUSE I'M NOT

08:23AM 2    ASKING THE DEFENSE TO REVEAL WHAT THEIR DEFENSE IS IN ADVANCE.

08:23AM 3    I'M NOT DOING THAT.  NEITHER IS THE GOVERNMENT.

08:23AM 4        BUT THERE IS THIS ISSUE.  IT'S BEEN PROBED BY YOU, WHICH,

08:23AM 5    TO THE GOVERNMENT, PERHAPS SUGGESTS THAT, WELL, WHAT DO WE NEED

08:23AM 6    TO DO ABOUT IT?  IF WE SIT ON OUR HANDS ABOUT IT AND THEN THIS

08:23AM 7    BECOMES AN ISSUE, THEN IT'S PART OF THE REBUTTAL CASE.  I

08:23AM 8    UNDERSTAND THAT'S HOW THE SYSTEM WORKS AND THEY CAN PUT THAT

08:23AM 9    ON.

08:23AM 10       THE OTHER REASON FOR ME TO MAKE INQUIRY ON THIS IS THE

08:23AM 11   TIMING OF THINGS.  IF THE LIS COMES IN, IT COULD OPEN THE DOOR

08:23AM 12   TO -- IF YOUR TEAM IS GOING TO ARGUE THAT THE GOVERNMENT

08:23AM 13   DESTROYED IT AND IT'S THEIR FAULT, OR SOMEHOW THE JURY SHOULD

08:23AM 14   LOOK AT THAT, THEN THAT OPENS THE DOOR TO SIGNIFICANT OTHER

08:24AM 15   ISSUES ABOUT RESPONSIBILITY FOR THAT.

08:24AM 16       AND YOU KNOW WHAT THE HISTORY IS.  YOU KNOW WHAT THE

08:24AM 17   EVIDENCE IS AND THAT, AND WHAT TESTIMONY IS LIKELY TO COME IN

08:24AM 18   FRONT OF ALL OF THAT.

08:24AM 19       SO MY THOUGHT IN DOCKET 798 WAS THE LIS IS NOT GOING TO BE

08:24AM 20   RELEVANT IN THE CASE, BUT THAT'S WHAT THE COURT'S THOUGHT WAS

08:24AM 21   AFTER LOOKING AT YOUR MOTIONS.

08:24AM 22       BUT IT COULD COME IN.  AND, OF COURSE, IF THE DOOR IS

08:24AM 23   OPENED, THEN IT IS PART OF THE CASE AND THE JURY IS ENTITLED TO

08:24AM 24   HEAR BOTH SIDES OF IT.

08:24AM 25       SO YOU'RE KIND OF DRIVING THIS, MR. WADE.  YOU'RE KIND OF

08:24AM 1    DRIVING THIS.  BUT, YOU KNOW, YOU'RE IN THE DRIVER'S SEAT ON

08:24AM 2    THIS, BUT QUERY AS TO, YOU KNOW, ARE YOU ON THE FREEWAY YET?

08:24AM 3         MR. WADE:  I'M NOT EVEN SURE WE'VE TURNED ONTO THE

08:25AM 4    ENTRY RAMP, YOUR HONOR.

08:25AM 5         OF COURSE THE LIS IS IN THE CASE.  AS WE NOTED AT THE

08:25AM 6    OUTSET IN THE MOTIONS PRACTICE, THE LIS IS THE CENTRAL HUB OF

08:25AM 7    INFORMATION WITHIN THE CASE.

08:25AM 8         THE GOVERNMENT CALLED WITNESS AND THEY ASKED A LOT OF

08:25AM 9    QUESTIONS RELATING TO RESULTS.  THEY ASKED DR. DAS, FOR

08:25AM 10   EXAMPLE, ABOUT DIFFERENT THINGS HE DID WHEN HE CAME INTO THE

08:25AM 11   COMPANY.  ALL OF THAT RELATED TO DATA WITHIN THE LIS.

08:25AM 12        AND OF COURSE THE COURT IN ITS ORDER IN 798 DIDN'T

08:25AM 13   PRECLUDE US FROM QUESTIONING ON LIS.  THE LINE THAT WE TOOK THE

08:25AM 14   COURT TO BE DRAWING THERE, AND WHICH WE'VE SOUGHT TO BE MINDFUL

08:25AM 15   OF AS WE'VE ASKED QUESTIONS, IS WHETHER WE ARGUE OR WHETHER WE

08:25AM 16   SEEK EVIDENCE RELATING TO THE LIS BEING UNAVAILABLE BECAUSE OF

08:25AM 17   THE GOVERNMENT'S FAILURE TO OBTAIN IT.

08:25AM 18        AND I DON'T BELIEVE THAT WE'VE ASKED ANY QUESTIONS WITH

08:25AM 19   RESPECT TO THE GOVERNMENT'S FAILURE TO OBTAIN IT.  I DON'T

08:26AM 20   BELIEVE AT THIS POINT THAT WE'VE ASKED ANY QUESTIONS -- YOU

08:26AM 21   KNOW, AN AGENT HASN'T TESTIFIED, FOR EXAMPLE, THERE'S BEEN NO

08:26AM 22   INQUIRY ABOUT THE GOVERNMENT'S FAILURE TO OBTAIN IT.

08:26AM 23        BUT WE DID RAISE THIS VERY ISSUE IN 798 ABOUT PRESERVING

08:26AM 24   OUR ABILITY TO MAKE ARGUMENTS ABOUT THE GOVERNMENT'S FAILURE TO

08:26AM 25   MEET ITS BURDEN.

08:26AM 1          THE COURT:  WELL, HOW IS THAT DIFFERENT FROM THE

08:26AM 2     GOVERNMENT'S FAILURE TO MAINTAIN IT, TO MAINTAIN THE EVIDENCE

08:26AM 3     AND MAINTAIN IT?

08:26AM 4          THIS IS THE -- YOU KNOW, THIS IS THE ISSUE HERE, AND IF

08:26AM 5     THERE'S -- IF THERE'S SOME OPAQUENESS ABOUT THIS, THEN THE

08:26AM 6     GOVERNMENT IS JUST GOING TO HAVE TO DO WHAT THEY NEED TO DO IN

08:26AM 7     THEIR CASE-IN-CHIEF I SUPPOSE.

08:26AM 8          MR. WADE:  WELL, YOUR HONOR, OF COURSE, CONSIDERED

08:26AM 9     THIS AT LENGTH WITH LENGTHY BRIEFING AND ARGUMENT IN THE MOTION

08:26AM 10    IN LIMINE STAGE.

08:26AM 11         AND YOU'LL RECALL AT 58 OF THE COURT'S ORDER, IT DECLINED

08:27AM 12    TO PRECLUDE MS. HOLMES FROM RAISING THE LACK OF STATISTICAL OR

08:27AM 13    SCIENTIFIC EVIDENCE AS A DEFENSE, FROM CHARACTERIZING THAT

08:27AM 14    MISSING EVIDENCE AS CRITICAL TO THE GOVERNMENT'S CASE, OR FROM

08:27AM 15    ARGUING ABOUT THE STATISTICAL INSIGNIFICANCE OF INDIVIDUAL

08:27AM 16    PATIENT OR PHYSICIAN TESTIMONY.

08:27AM 17         SO TO THE EXTENT THAT THE GOVERNMENT WAS SEEKING TO

08:27AM 18    EXCLUDE THAT, THE COURT SAID NO.

08:27AM 19         THE COURT ALSO SAID IN THAT ORDER THAT THERE IS NO

08:27AM 20    EVIDENCE TYING ANY OF THE UNAVAILABILITY OF LIS TO MS. HOLMES,

08:27AM 21    AND SO THE GOVERNMENT COULDN'T GO INTO THAT UNLESS WE OPENED

08:27AM 22    THE DOOR TO THE -- BY BLAMING THE GOVERNMENT FOR THE FAILURE TO

08:27AM 23    OBTAIN OR PRESERVE THE EVIDENCE.

08:27AM 24         AND I DON'T BELIEVE YET WE'VE DONE THAT, SO I DON'T THINK

08:27AM 25    THE DOOR HAS BEEN OPENED IN THE GOVERNMENT'S CASE.

08:27AM  1      THIS IS SOMETHING THAT WE CAN DISCUSS AS THE DEFENSE CASE,

08:28AM  2   IF THERE IS ONE, MOVES FORWARD.  BUT I DON'T SEE ANYTHING THAT

08:28AM  3   WE'VE DONE TO DATE AS CHANGING THE STATUS QUO.

08:28AM  4      THE LIS IS THE CENTRAL HUB OF ALL OF THE DATA AND ALL OF

08:28AM  5   THE PATIENT INFORMATION, AND THAT'S JUST A FACT OF THE CASE.

08:28AM  6   BUT WE HAVEN'T ARGUED ABOUT THE GOVERNMENT'S FAILURE TO

08:28AM  7   PRESERVE IT IN ANY WAY TO MY KNOWLEDGE.

08:28AM  8      IF WE HAVE, I WELCOME, YOU KNOW, THE REFERENCES IN THE

08:28AM  9   TRANSCRIPT.  WE CAN CONSIDER IT AND COME BACK AND, YOU KNOW,

08:28AM  10   ADDRESS THE SIGNIFICANCE OF IT WITH THE COURT IN LIGHT OF THE

08:28AM  11   ORDER.

08:28AM  12      OF COURSE, YOU KNOW, IF THE COURT WANTS TO REVISIT ITS

08:28AM  13   ORDER AND THE GOVERNMENT WANTS TO GO INTO THAT, WE CAN

08:28AM  14   ENTERTAIN THAT, TOO.  IT WAS MY UNDERSTANDING THEY DIDN'T

08:28AM  15   INTEND TO CALL WITNESSES ON THAT IN THEIR CASE-IN-CHIEF.

08:28AM  16      THE COURT:  WELL, IT SOUNDS TO ME LIKE -- AND YOU

08:28AM  17   DON'T HAVE TO CORRECT ME -- BUT IT SOUNDS TO ME LIKE THE LIS IS

08:28AM  18   IMPORTANT TO THE DEFENSE AND IT SOUNDS LIKE IF THERE WAS

08:29AM  19   NOTHING ELSE, IF THE CASE ENDED NOW AND WE ARGUED TOMORROW, YOU

08:29AM  20   WOULD BE PREPARED TO ARGUE THAT THE GOVERNMENT HASN'T PROVEN

08:29AM  21   THE CASE BECAUSE THE LIS THAT YOU EXAMINED ON IS THE REPOSITORY

08:29AM  22   OF ALL THE INFORMATION, AND YOU HAVE NO INFORMATION FROM THE

08:29AM  23   GOVERNMENT AS TO THAT INFORMATION.

08:29AM  24      IT SOUNDS LIKE THAT'S THE ARGUMENT THAT YOU'RE GOING TO

08:29AM  25   MAKE.  I'M NOT ASKING YOU TO REVEAL OR NOT, BUT I'M JUST

08:29AM 1    TELLING YOU, GENERALLY IT SOUNDS LIKE YOU'RE PREPARED TO MAKE

08:29AM 2    THAT ARGUMENT.

08:29AM 3           MR. WADE:  WE, OF COURSE, ARE PREPARED TO ARGUE THE

08:29AM 4    EVIDENCE IN THE CASE.

08:29AM 5       WE HAVEN'T MADE ANY SPECIFIC -- WE'VE GOT SOME ROAD TO

08:29AM 6    COVER HERE --

08:29AM 7           THE COURT:  SURE.

08:29AM 8           MR. WADE:  -- USING THE FREEWAY METAPHOR.

08:29AM 9           THE COURT:  SURE.

08:29AM 10          MR. WADE:  AND WE DON'T KNOW IF THERE'S A DEFENSE

08:29AM 11   CASE AND, IF THERE IS, WHAT THE CONTOURS OF THAT MIGHT BE.

08:29AM 12      SO WE'RE STILL IN THE GOVERNMENT'S CASE.

08:29AM 13      I UNDERSTOOD THE LITIGATION OF THIS ISSUE.  I THINK WE

08:29AM 14   STILL UNDERSTAND THE LITIGATION OF THIS ISSUE AS RELATING TO

08:29AM 15   WHAT IS FAIR GAME WITHIN THE GOVERNMENT'S CASE-IN-CHIEF.

08:30AM 16      I DON'T THINK -- WHO WAS RESPONSIBLE FOR NOT GETTING THE

08:30AM 17   LIS OR NOT PRESERVING THE LIS, THE COURT KNOWS THERE COULD BE

08:30AM 18   A 10 DAY TRIAL, PROBABLY, ON THAT ISSUE, AND 10 OR 15

08:30AM 19   WITNESSES.

08:30AM 20      WE HAVEN'T SOUGHT TO BURDEN THE COURT WITH THOSE ISSUES,

08:30AM 21   BUT WE HAVE PRESENTED ISSUES WITH RESPECT TO THE SIGNIFICANCE

08:30AM 22   OF THE ROLE THAT THE LIS PLAYED WITHIN THE LAB, THE ROLE -- THE

08:30AM 23   GOVERNMENT'S WITNESSES, DR. DAS IN PARTICULAR, BROUGHT THAT

08:30AM 24   ISSUE INTO THE CASE BASED UPON THE -- THEIR EXAMINATION OF THE

08:30AM 25   WITNESS.

08:30AM 1          MR. SCHENK:  ON THAT LAST POINT, I DISAGREE.

08:30AM 2    DR. DAS, HIS TESTIMONY, MY RECOLLECTION IS, WAS THAT HE DIDN'T

08:30AM 3    GATHER THE INFORMATION THAT HE ENDED UP REVIEWING TO REACH HIS

08:30AM 4    CONCLUSIONS.

08:30AM 5          OTHER PEOPLE AT THERANOS GATHERED INFORMATION, AND HE

08:30AM 6    WASN'T SURE WHERE THAT INFORMATION CAME FROM.

08:31AM 7          SO FOR THE DEFENSE TO SUGGEST THAT THE GOVERNMENT'S DIRECT

08:31AM 8    OR THE GOVERNMENT'S CHOICE OF WITNESSES IN THIS CASE HAS

08:31AM 9    INJECTED OR CAUSED LIS TO BE AN ISSUE IS DISINGENUOUS.  IT'S

08:31AM 10   NOT TRUE.

08:31AM 11         AND ALL THE GOVERNMENT IS CONCERNED ABOUT IS BEING PUT IN

08:31AM 12   A POSITION WHERE THE DEFENSE DOES NOT PUT ON A CASE.  OF COURSE

08:31AM 13   IF THEY PUT ON A CASE, WE HAVE REBUTTAL AND WE HAVE AN

08:31AM 14   OPPORTUNITY TO COME BACK TO THE COURT AND SAY, CAN WE HAVE

08:31AM 15   DIRECTION NOW, YOUR HONOR, ON WHETHER THE DOOR IS OPEN?

08:31AM 16         THERE IS NO ISSUE AT THAT POINT.  THEN WE ALL KNOW, AND

08:31AM 17   THE GOVERNMENT IS IN A POSITION WHERE IT COULD CALL NEW

08:31AM 18   WITNESSES ON LIS.

08:31AM 19         THE GOVERNMENT'S CONCERN IS THAT AT THIS STAGE, ONE, WE

08:31AM 20   DON'T KNOW IF THE DEFENSE IS GOING TO PUT ON A CASE, AND TWO,

08:31AM 21   WE DON'T KNOW IF, BASED UPON THE RECORD THAT THE DEFENSE HAS

08:31AM 22   ELICITED THROUGH CROSS, THEY INTEND TO MAKE ARGUMENTS

08:31AM 23   SUGGESTING LIS IS MISSING.

08:31AM 24         AND WHEN THE GOVERNMENT BEARS THE BURDEN OF PROOF, IT'S

08:31AM 25   IMPLICIT IN THAT ARGUMENT THAT THE MISSING EVIDENCE SHOULD BE

08:32AM 1    HELD AGAINST THE GOVERNMENT.  IT IS IMPLICIT IN THAT ARGUMENT

08:32AM 2    THAT THE JURY SHOULD FAULT THE GOVERNMENT FOR THIS EVIDENCE TO

08:32AM 3    BE LACKING.

08:32AM 4        AND ALL WE'RE ASKING FOR IS, BASED UPON THE CURRENT STATE

08:32AM 5    OF THE RECORD, IS THE DOOR OPEN AND SHOULD WE TELL THE COMPLETE

08:32AM 6    STORY ABOUT LIS?

08:32AM 7        IF THE ANSWER IS NO, THAT'S FINE.  I'M NOT ASKING FOR THE

08:32AM 8    COURT TO FIND THAT THE DOOR HAS BEEN OPENED.

08:32AM 9        BUT I GUESS WHAT I'M ASKING IS THAT IF THE DOOR ISN'T

08:32AM 10   OPEN, WHEN WE OBJECT TO THIS ARGUMENT IN CLOSING, THAT

08:32AM 11   OBJECTION SHOULD BE SUSTAINED.

08:32AM 12       THE DEFENSE SHOULDN'T BE ABLE TO HAVE IT BOTH WAYS.  THAT

08:32AM 13   REALLY IS THE SUM OF IT.

08:32AM 14       THE COURT:  I THINK THAT'S WHAT I UNDERSTAND FROM

08:32AM 15   LAST WEEK'S CONVERSATION.

08:32AM 16       AND I WAS APPRECIATIVE OF, MR. WADE, YOUR TEAM SAYING

08:32AM 17   WE'LL LET THEM KNOW BY 4:00 O'CLOCK, WE'LL MAKE THAT DECISION

08:32AM 18   AT 4:00 O'CLOCK.

08:32AM 19       I THINK THE GOVERNMENT ASKED, WELL, YOU KNOW, WE'RE

08:32AM 20   PROBABLY GOING TO FINISH OUR CASE MID NEXT WEEK AND SO WE'VE

08:32AM 21   HAD THIS ENGAGEMENT OF RECIPROCITY ABOUT WITNESSES, AND MAYBE

08:33AM 22   THEY CAN LET US KNOW SO WE CAN PREPARE, AND I THINK YOU SAID

08:33AM 23   WE'LL BE IN COMMUNICATION BY 4:00 P.M., WHICH WOULD INCLUDE

08:33AM 24   THIS LIS ISSUE.

08:33AM 25       MR. WADE:  WE DID, YOUR HONOR.  WE DID EXCHANGE

| | | |
|---|---|---|
| 08:33AM | 1 | WITNESSES EVEN AS WE AGREED TO BEFORE THE CASE BEGAN. |
| 08:33AM | 2 | THE COURT:  SURE. |
| 08:33AM | 3 | MR. WADE:  OF COURSE WE'RE NOT SAYING WE'RE |
| 08:33AM | 4 | PRESENTING A DEFENSE CASE BY -- |
| 08:33AM | 5 | THE COURT:  RIGHT. |
| 08:33AM | 6 | MR. WADE:  -- GIVING THEM A SENSE OF THE WITNESSES. |
| 08:33AM | 7 | I DON'T THINK IT WAS ANYONE'S UNDERSTANDING THAT WE WERE, |
| 08:33AM | 8 | YOU KNOW, COMMITTING TO THAT BEFORE THE GOVERNMENT RESTS ITS |
| 08:33AM | 9 | CASE, BUT WE DID PROVIDE WITNESSES. |
| 08:33AM | 10 | AND, YOUR HONOR, I DON'T THINK I'VE EVER BEEN ASKED TO |
| 08:33AM | 11 | RULE IN OR OUT A DEFENSE BEFORE THE GOVERNMENT CASE CLOSED, AND |
| 08:33AM | 12 | I KNOW -- |
| 08:33AM | 13 | THE COURT:  I'M NOT ASKING. |
| 08:33AM | 14 | MR. WADE:  -- THE COURT IS NOT ASKING THAT. |
| 08:33AM | 15 | I'M JUST VERY MINDFUL OF THE COURT'S ORDER ON THIS ISSUE, |
| 08:33AM | 16 | WHICH WAS AFTER CONSIDERED BRIEFING, WHICH WAS THE COURT |
| 08:33AM | 17 | DECLINES TO PRECLUDE HOLMES FROM RAISING THE LACK OF |
| 08:34AM | 18 | STATISTICAL OR SCIENTIFIC EVIDENCE AS A DEFENSE, FROM |
| 08:34AM | 19 | CHARACTERIZING THAT MISSING EVIDENCE AS CRITICAL TO THE |
| 08:34AM | 20 | GOVERNMENT'S CASE, OR FROM ARGUING ABOUT THE STATISTICAL |
| 08:34AM | 21 | INSIGNIFICANCE OF INDIVIDUAL PATIENT OR PHYSICIAN TESTIMONY. |
| 08:34AM | 22 | THAT'S WHAT THE COURT CONTEMPLATED IN ITS ORDER.  I DON'T |
| 08:34AM | 23 | THINK -- WE TAKE THAT ORDER SERIOUSLY, AS I KNOW THE COURT |
| 08:34AM | 24 | DOES, AND I KNOW THE GOVERNMENT DOES. |
| 08:34AM | 25 | AS TO BLAMING THE GOVERNMENT FOR THE LIS OR SEEKING A |

08:34AM 1    DESTRUCTION OF EVIDENCE INSTRUCTION OF SOME SORT, THAT'S A

08:34AM 2    TOTALLY DIFFERENT ISSUE, AND IT MAY BE THAT -- I WOULD IMAGINE

08:34AM 3    IF WE WERE TO SEEK SUCH AN INSTRUCTION BASED UPON THE EVIDENCE

08:34AM 4    WE HAVE ELICITED DURING THE GOVERNMENT'S CASE, THAT THE COURT

08:34AM 5    PROBABLY WOULDN'T PERMIT US TO OFFER THAT INSTRUCTION, BECAUSE

08:34AM 6    I DON'T THINK THERE HAS YET BEEN EVIDENCE OF THE GOVERNMENT'S

08:34AM 7    DESTRUCTION OF THE EVIDENCE OR NEGLIGENT FAILURE TO GET THE

08:35AM 8    EVIDENCE.  I KNOW THERE ARE A COUPLE OF NINTH CIRCUIT

08:35AM 9    INSTRUCTIONS ON THAT.

08:35AM 10        AND SO --

08:35AM 11            THE COURT:  WELL, NOT IN THE EVIDENCE, BUT CERTAINLY

08:35AM 12   IN THE MOTIONS THAT HAVE PRECLUDED -- OR EXCUSE ME, THAT HAVE

08:35AM 13   COME UP EARLIER IN THE TRIAL.  YOUR TEAM HAS MADE THAT

08:35AM 14   ALLEGATION, AND WE HAD SOME, WE HAD SOME MOTION PRACTICE ON

08:35AM 15   THAT.

08:35AM 16        AND I THINK THAT'S THE GOVERNMENT'S CONCERN, AND THAT'S --

08:35AM 17   FROM A TRIAL MANAGEMENT POSITION, THAT'S MY CONCERN, TOO.

08:35AM 18        IF WE NEED TO DO THAT LITIGATION, WE'LL DO IT.  WE'LL DO

08:35AM 19   IT.

08:35AM 20        BUT WHETHER OR NOT IT BECOMES AN ISSUE IN THIS CASE IS

08:35AM 21   SOMETHING THAT I'M JUST TRYING TO PROBE RIGHT NOW.

08:35AM 22        AND YOU KNOW WHAT THE EVIDENCE IS.  YOU KNOW WHAT THAT

08:35AM 23   EVIDENCE IS GOING TO LOOK LIKE, WE ALL DO, ABOUT THE LIS.  WE

08:35AM 24   HAD MOTIONS ON THAT, AND YOU HAD THE COURT'S OPINION ON THAT,

08:35AM 25   AND THE COURT HAD EXPRESSED ITS OPINION.  SO I THINK YOU KNOW

08:35AM 1   WHAT IS COMING.

08:35AM 2          MR. WADE:  WE DO, YOUR HONOR.

08:35AM 3      AND AGAIN, LIKE I SAID, I DON'T WANT TO -- I DON'T KNOW

08:36AM 4   THAT WE WOULD OFFER, I DON'T KNOW THAT WE WOULD OFFER ANY KIND

08:36AM 5   OF INSTRUCTION OF THAT NATURE AT THIS POINT.

08:36AM 6      AND AS I SAID, BASED ON THE PRIOR LITIGATION, BASED ON THE

08:36AM 7   RECORD EVIDENCE TO DATE, MY GUESS IS -- AND I HATE TO GUESS HOW

08:36AM 8   THE COURT IS GOING TO RULE -- BUT IF WE SOUGHT SUCH AN

08:36AM 9   INSTRUCTION BASED ON THE EVIDENCE THAT HAS BEEN ELICITED SO

08:36AM 10  FAR, YOU WOULDN'T LET US OFFER IT BECAUSE I DON'T THINK THERE

08:36AM 11  IS ANY EVIDENCE THAT GOES TO THAT AT THIS POINT.

08:36AM 12     THAT'S KIND OF MY POINT.  AND SO -- NOW, OF COURSE IF WE

08:36AM 13  CHOOSE TO GO INTO THAT IN OUR DEFENSE CASE, THEN THE GOVERNMENT

08:36AM 14  HAS THAT REBUTTAL CASE THAT THEY'RE FOCUSSED ON AND THEY COULD

08:36AM 15  GO INTO THAT.

08:36AM 16     BUT I THINK IT'S A LITTLE PREMATURE.  MAYBE WE CAN HAVE

08:36AM 17  THIS DISCUSSION, YOU KNOW, A LITTLE BIT LATER IN THE WEEK OR

08:36AM 18  EARLY NEXT WEEK --

08:36AM 19          THE COURT:  SURE.

08:36AM 20          MR. WADE:  -- YOU KNOW, AS IT RELATES TO HOW WE'RE

08:36AM 21  GOING TO PROCEED IN THIS.

08:36AM 22     WE'RE MINDFUL OF THE SCHEDULE, YOUR HONOR, AND, YOU KNOW,

08:36AM 23  ARE WORKING TO TRY TO CONTINUE TO MOVE FORWARD.

08:37AM 24          THE COURT:  WELL, THANK YOU.

08:37AM 25     I JUST WANTED TO RAISE THIS BECAUSE I THINK FROM THE

08:37AM 1    GOVERNMENT'S SIDE THEIR CONCERN IS IF WE, IF WE DO NOTHING ON

08:37AM 2    THIS, BUT YET THE ARGUMENT IS THAT THEY HAVEN'T PROVEN THEIR

08:37AM 3    CASE BECAUSE THE LIS IS THERE AND THEY DIDN'T PUT IT ON, THEY

08:37AM 4    HAD ACCESS TO THE LIS, OR SOMETHING LIKE THAT.

08:37AM 5        AND MR. SCHENK SAYS, WELL, AT A MINIMUM, YOU NEED TO STOP

08:37AM 6    THAT ARGUMENT BECAUSE.  I THINK THAT'S WHAT I HEARD HIM SAY.

08:37AM 7        YOU KNOW, THAT MAY BE AN ISSUE.  IT MIGHT BE AN ISSUE AS

08:37AM 8    TO HOW DOES THE LIS COME INTO THE CASE AND WHAT IS IT?

08:37AM 9        THERE'S BEEN EVIDENCE IN ABOUT THE EXISTENCE OF A LIS.

08:37AM 10       AND I'M CONCERNED THAT IF THE DOOR IS NOT OPENED, THE

08:37AM 11   LIGHT IS CERTAINLY COMING THROUGH THE CRACK IN THE DOOR.  SO WE

08:37AM 12   NEED TO BE MINDFUL OF THAT.

08:37AM 13           MR. WADE:  WELL, IF THAT'S THE CONCERN -- I WANT TO

08:37AM 14   BE VERY CLEAR, YOUR HONOR.  THE DEFENSE BELIEVES THAT IT CAN

08:37AM 15   ARGUE THE EVIDENCE IN THE CASE, OKAY?

08:37AM 16           THE COURT:  SURE.

08:37AM 17           MR. WADE:  SO IF THE GOVERNMENT FEELS THAT IT NEEDS

08:37AM 18   TO CALL WITNESSES TO MEET THAT EVIDENCE, IT SHOULD CALL THE

08:38AM 19   WITNESSES.  THAT'S OUR POSITION, BECAUSE WE'RE NOT GOING TO

08:38AM 20   LIMIT OUR ABILITY TO ARGUE THE EVIDENCE THAT HAS BEEN ELICITED

08:38AM 21   AT THIS POINT.

08:38AM 22       YOU KNOW, WITH RESPECT TO THE COURT, WE'RE MINDFUL OF THE

08:38AM 23   TIME, AND WITH RESPECT TO THE GOVERNMENT, WE'RE JUST NOT GOING

08:38AM 24   TO DO THAT.

08:38AM 25       SO I THINK THERE HAS BEEN SOME EVIDENCE WITH RESPECT TO

08:38AM 1    LIS.  I THINK WE'VE BEEN MINDFUL OF THE LINE THAT THE COURT

08:38AM 2    DREW IN ITS ORDER, BUT I THINK WE HAVE THE RIGHT TO ARGUE THE

08:38AM 3    EVIDENCE THAT HAS BEEN ELICITED.

08:38AM 4         AND IF THE GOVERNMENT WANTS TO CALL WITNESSES AND THINKS

08:38AM 5    THAT IT NEEDS TO -- THAT SOME LINE HAS BEEN CROSSED, IT SHOULD

08:38AM 6    SAY WHO IT WANTS TO CALL AND WE SHOULD ADDRESS WHETHER THAT IS

08:38AM 7    ADMISSIBLE UNDER 401 OR 403.

08:38AM 8         THE COURT:  OKAY.  I THINK THOSE LAST COMMENTS ARE

08:38AM 9    VERY INFORMATIVE.

08:38AM 10        ALL RIGHT.  WELL, LET'S MOVE ON TO THE MOTION THAT WE HAVE

08:38AM 11   THIS MORNING.  THANK YOU.

08:38AM 12        ANYTHING ELSE, MR. SCHENK?

08:38AM 13        MR. SCHENK:  NO.  THANK YOU.

08:38AM 14        THE COURT:  ALL RIGHT.  LET'S SEE.  THIS IS

08:39AM 15   DOCUMENT 1140, I THINK, MS. HOLMES'S RENEWED MOTION TO ADMIT.

08:39AM 16        MR. DOWNEY:  GOOD MORNING, YOUR HONOR.

08:39AM 17        I HAVE ASKED ONE OF OUR YOUNG COLLEAGUES, MR. CLEARY, TO

08:39AM 18   ADDRESS THIS MOTION WITH YOU.

08:39AM 19        THE COURT:  YES.

08:39AM 20        MR. DOWNEY:  AND HE HASN'T BEEN HERE BEFORE AND SO I

08:39AM 21   JUST WANTED TO INTRODUCE THE COURT TO RICHARD CLEARY.  HE'S

08:39AM 22   BEEN ADMITTED PRO HAC FOR SOME TIME AND HAS BEEN WORKING ON THE

08:39AM 23   MATTER.

08:39AM 24        THE COURT:  GREAT, THANK YOU.  WE'RE ALWAYS HAPPY TO

08:39AM 25   HAVE NEW COUNSEL APPEAR.

08:39AM  1       GOOD MORNING, MR. CLEARY.

08:39AM  2               MR. CLEARY:  GOOD MORNING, YOUR HONOR.

08:39AM  3               THE COURT:  I THINK YOU ROSE TO YOUR FEET YESTERDAY

08:39AM  4   JUST AS THE MENTION OF THIS MOTION.

08:39AM  5       (LAUGHTER.)

08:39AM  6               MR. CLEARY:  YES.  I'M ALMOST AS ENTHUSIASTIC AS THE

08:39AM  7   CUSTOMERS APPEAR TO BE IN THESE REPORTS.

08:39AM  8               THE COURT:  ALL RIGHT.  WELL, WE WON'T NEED A

08:39AM  9   PHLEBOTOMIST TO TELL US ABOUT YOUR ENTHUSIASM.

08:39AM  10              MR. CLEARY:  THAT'S RIGHT, YOUR HONOR.

08:39AM  11      TO BEGIN, WE VIEW THESE REPORTS AS VERY IMPORTANT EVIDENCE

08:39AM  12  IN THIS CASE.  THEY'RE POWERFUL EVIDENCE OF MS. HOLMES'S INTENT

08:40AM  13  AND HER KNOWLEDGE.

08:40AM  14      MR. EDLIN LAID A FOUNDATION FOR THEIR ADMISSION SUBJECT TO

08:40AM  15  THE GOVERNMENT'S OBJECTION, WHICH WAS SUSTAINED BY THE COURT.

08:40AM  16      WE UNDERSTOOD THAT THE COURT HAD EXPRESSED AN OPENNESS TO

08:40AM  17  REVISITING THIS ISSUE.  THAT WOULD BE AT TRANSCRIPT PAGE 4263.

08:40AM  18      FOR FOUR REASONS, WE BELIEVE THAT THIS EVIDENCE IS

08:40AM  19  RELEVANT TO CORE ISSUES IN THIS CASE, INCLUDING THREE SEPARATE

08:40AM  20  ISSUES IDENTIFIED IN THE INDICTMENT.

08:40AM  21      SO THE FIRST IS WALGREENS, THE WALGREENS ALLEGATIONS IN

08:40AM  22  PARAGRAPH 12(D).

08:40AM  23      THE SECOND IS THE ACCURACY AND RELIABILITY ALLEGATIONS IN

08:40AM  24  PARAGRAPH 16.

08:40AM  25      THE THIRD ARE ALLEGATIONS CONCERNING PRICE AND THE ROLE OF

08:40AM 1    PRICE AND THE REPRESENTATIONS THAT WERE ALLEGEDLY MADE BY

08:40AM 2    MS. HOLMES TO CUSTOMERS.

08:40AM 3         AND THEN THE FOURTH, THIS IS CRITICAL CONTEXT FOR

08:41AM 4    MS. HOLMES'S VISION AND HER UNDERSTANDING THAT THE THERANOS

08:41AM 5    BUSINESS WAS WORKING.

08:41AM 6         SO I'M HAPPY TO TAKE THOSE IN TURN.

08:41AM 7              THE COURT:  ALL RIGHT.  THAT'S FINE.

08:41AM 8              MR. CLEARY:  FIRST WITH WALGREENS, THE ALLEGATION IN

08:41AM 9    THE INDICTMENT GOES TO THE STATUS AND PROSPECTS OF THE

08:41AM 10   RELATIONSHIP DURING THE CONSPIRACY PERIOD; SPECIFICALLY,

08:41AM 11   WHETHER REPRESENTATIONS WERE MADE THAT THE RELATIONSHIP WITH

08:41AM 12   WALGREENS WAS EXPANDING OR WHETHER -- WHEN ALLEGEDLY THE

08:41AM 13   RELATIONSHIP WAS STALLING.

08:41AM 14        SO THESE ARE STATEMENTS ABOUT THE BUSINESS PERFORMANCE.

08:41AM 15   THEY ARE NOT STATEMENTS ABOUT THE TECHNOLOGY ITSELF.

08:41AM 16        AND THESE REPORTS GIVE INSIGHT INTO THE MARKETPLACE

08:41AM 17   RESPONSE TO THIS INNOVATIVE PARTNERSHIP.  THESE ARE

08:41AM 18   ENTHUSIASTIC RESPONSES.  THEY GIVE A SENSE OF THE MARKET

08:41AM 19   POSITION.  THEY EXPLAIN THE COMPETITIVE ADVANTAGES THAT MIGHT

08:41AM 20   EXIST.

08:42AM 21        AND TO BE CLEAR, WE ARE OFFERING THIS EVIDENCE FOR THE

08:42AM 22   NONHEARSAY PURPOSE OF ITS INTENT -- OF MS. HOLMES'S INTENT, ITS

08:42AM 23   EFFECT ON HER STATE OF MIND.

08:42AM 24        WE ARE NOT OFFERING THEM FOR THE TRUTH OF THE MATTER

08:42AM 25   ASSERTED.

08:42AM 1      THE COURT:  AND JUST SO I'M CLEAR -- PARDON ME,

08:42AM 2  MR. CLEARY.

08:42AM 3      MR. CLEARY:  SURE.

08:42AM 4      THE COURT:  YOU'RE ASKING THAT ALL OF THE CUSTOMER,

08:42AM 5  ALL OF THE CUSTOMER SURVEYS BE ADMITTED AS IS, WITHOUT ANY

08:42AM 6  REDACTIONS, WITHOUT ANY CHANGES, ANYTHING LIKE THAT; IS THAT

08:42AM 7  CORRECT?

08:42AM 8      MR. CLEARY:  THAT'S CORRECT, YOUR HONOR.  AND I'M

08:42AM 9  HAPPY TO DISCUSS THE REDACTION ISSUE.

08:42AM 10     WE BELIEVE THAT REDACTIONS WOULD BE INAPPROPRIATE BECAUSE

08:42AM 11  ALL OF THE SURVEY RESPONSES ARE RELEVANT TO DIFFERENT

08:42AM 12  ALLEGATIONS IN THE CASE.

08:42AM 13     MR. JHAVERI TALKED ABOUT PATIENT EXPERIENCE AND TALKED

08:42AM 14  ABOUT HOW IT WAS ESSENTIAL TO THE WALGREENS/THERANOS

08:42AM 15  PARTNERSHIP, AND ALL OF THESE GO TO THAT PATIENT EXPERIENCE IN

08:42AM 16  ONE WAY OR ANOTHER.

08:42AM 17     SO --

08:42AM 18     THE COURT:  HE DID.  HE TALKED ABOUT -- HE WAS

08:43AM 19  ASKED, I THINK BY ONE OF YOUR COLLEAGUES, WHETHER OR NOT THERE

08:43AM 20  WAS POSITIVE CUSTOMER INFORMATION, AND I THINK HIS TESTIMONY

08:43AM 21  WAS THAT THERE WAS GENERALLY POSITIVE CUSTOMER REACTION TO

08:43AM 22  THERANOS IN WALGREENS AND THEIR EXPERIENCE.

08:43AM 23     MR. CLEARY:  SO, YES, YOUR HONOR.

08:43AM 24     BUT THIS IS NOT CUMULATIVE WITH THAT TESTIMONY FOR A

08:43AM 25  COUPLE OF REASONS.

08:43AM  1          FIRST, THESE ARE REPORTS THAT WENT DIRECTLY TO MS. HOLMES.

08:43AM  2     THEY SPAN -- THEY BEGIN IN THE FALL OF 2014.  THEY CONTINUE IN

08:43AM  3     REALLY THE -- THE FIRST ONE IS REALLY FROM FALL OF 2014, AND

08:43AM  4     THE REMAINING NINE ARE FROM SUMMER OF 2015.

08:43AM  5          AND BECAUSE THEY GO TO MS. HOLMES, THEY'RE DIRECTLY

08:43AM  6     RELEVANT TO HER INTENT, AND THEREFORE, NOT CUMULATIVE WITH

08:43AM  7     OTHER POSITIVE FEEDBACK THAT WALGREENS MAY HAVE OBTAINED.  THEY

08:44AM  8     GO TO MS. HOLMES, NOT TO WALGREENS.

08:44AM  9          AND MR. JHAVERI, ON PAGE 3587 OF THE TRANSCRIPT, SPEAKS

08:44AM 10     ABOUT THE ENTIRE SERVICE WAS TO CREATE A NEW PATIENT

08:44AM 11     EXPERIENCE, ONE THAT IS EFFICIENT, ONE THAT IS LESS PAINFUL,

08:44AM 12     ONE THAT IS LESS COST.

08:44AM 13          AND WHEN MS. HOLMES RECEIVES THESE REPORTS, THESE REPORTS

08:44AM 14     SUPPORT A REASONABLE BELIEF THAT NOT ONLY IS THE RELATIONSHIP

08:44AM 15     WITH WALGREENS, LIKE, WORKING, IT IS THRIVING, AND IT'S

08:44AM 16     POWERFUL EVIDENCE FOR THAT REASON.

08:44AM 17          SO THAT'S PARAGRAPH 12(D).

08:44AM 18          NOW, LET'S MOVE TO PARAGRAPH 16, WHICH IS THE ACCURACY AND

08:44AM 19     RELIABILITY ALLEGATIONS.  I THINK THERE ARE FOUR DIFFERENT

08:44AM 20     CATEGORIES OF TESTIMONIALS IN THESE REPORTS THAT ARE RELEVANT

08:44AM 21     TO THOSE ALLEGATIONS.

08:44AM 22          THE FIRST ARE THE COMPARISONS BETWEEN LABS.  SO YOUR HONOR

08:45AM 23     WILL RECALL THE TESTIMONIAL BY THE DOCTOR WHO COMPARED HIS LAB

08:45AM 24     RESULT WITH LAB RESULTS -- HIS LAB RESULT FROM THERANOS WITH

08:45AM 25     LAB RESULTS FROM STANFORD.

08:45AM 1          THE SECOND ARE REPEAT CUSTOMERS WHO GENERALLY GIVE THESE

08:45AM 2     GLOWING REVIEWS.  YOU WOULD EXPECT REPEAT CUSTOMERS NOT TO GIVE

08:45AM 3     GLOWING REVIEWS IF THEY HAD SOME REASON TO DOUBT THE SOUNDNESS

08:45AM 4     OF THE RESULTS THAT THEY RECEIVED.

08:45AM 5          AND I WILL SAY THAT, AS YOUR HONOR KNOWS, THE DEFENSE DOES

08:45AM 6     NOT CONCEDE THAT INDIVIDUAL ANECDOTES ARE, IN FACT, PROBATIVE

08:45AM 7     OF ACCURACY AND RELIABILITY.

08:45AM 8          BUT ONCE THE GOVERNMENT HAS PUT ANECDOTES INTO THE CASE,

08:45AM 9     WE BELIEVE THAT WE CAN PRESENT ANECDOTES OF OUR OWN AS THEY

08:45AM 10    RELATE TO MS. HOLMES'S UNDERSTANDING OF THE PERFORMANCE OF THE

08:45AM 11    TECHNOLOGY.

08:45AM 12         YOU ALSO HAVE CUSTOMERS WHO ARE REFERRED BY OTHER

08:46AM 13    CUSTOMERS.  SO I THINK THAT'S A FAIR INFERENCE THAT A CUSTOMER

08:46AM 14    WOULD NOT REFER, IN ONE CASE, A PATIENT.  THERE'S AN M.P., FOR

08:46AM 15    EXAMPLE, WHO WAS A REGULAR PATIENT -- A REGULAR CUSTOMER OF

08:46AM 16    THERANOS WHO REFERRED ANOTHER CUSTOMER TO THERANOS.  THAT

08:46AM 17    CUSTOMER HAD A GOOD EXPERIENCE AND EXPLAINED THE SOURCE OF THE

08:46AM 18    REFERRAL.

08:46AM 19         YOU ALSO HAD FAMILY MEMBERS, LIKE, YOU KNOW, PARENTS

08:46AM 20    BRINGING THEIR CHILDREN BACK, FOR EXAMPLE.

08:46AM 21         AND THEN LAST YOU HAVE SOME -- AN INTERESTING COMMENT

08:46AM 22    ABOUT THE POTENTIAL FOR PRE-ANALYTIC ERROR.  YOUR HONOR WILL

08:46AM 23    CALL THAT DR. ROSENDORFF DISCUSSED THIS ISSUE.

08:46AM 24         SO IN THIS CASE, FOR EXAMPLE, THERE IS AN ANECDOTE BY A

08:46AM 25    PHLEBOTOMIST ABOUT HOW SHE MESSED UP THE LABELS ON THE TUBES OF

08:46AM 1    THE -- CONTAINING BLOOD THAT WOULD NEED TO BE SENT FOR

08:47AM 2    PROCESSING AT THE THERANOS FACILITY.

08:47AM 3        WELL, THAT'S AN EXAMPLE OF HUMAN ERROR AT THE PRE-ANALYTIC

08:47AM 4    PHASE THAT WOULD NOT RELATE TO THERANOS TECHNOLOGY AND ITS

08:47AM 5    PERFORMANCE, AND, THEREFORE, GIVES REASON TO BELIEVE THAT

08:47AM 6    THERE'S A POTENTIAL FOR THIS ERROR THAT HAS NOTHING TO DO WITH

08:47AM 7    THERANOS TECHNOLOGY.

08:47AM 8        SO THE THIRD IS THE PRICE.  AND I APPRECIATE THE

08:47AM 9    GOVERNMENT'S REPRESENTATION, AT LEAST AS I UNDERSTAND IT, IN

08:47AM 10   THEIR PLEADING THAT THEY'RE NOT ALLEGING FALSITY OF PRICE.

08:47AM 11       BUT THE INDICTMENT DOES ALLEGE IN PARAGRAPHS 15, 16, AND

08:47AM 12   17 THAT PRICE -- REPRESENTATIONS AS TO PRICE WERE PART OF THE

08:47AM 13   ALLEGED SCHEME TO DEFRAUD.

08:47AM 14       PARAGRAPH 17 IN PARTICULAR SAYS THE PRICE WAS USED TO

08:47AM 15   INDUCE CUSTOMERS TO PURCHASE THERANOS BLOOD TESTS.  PRICE IS IN

08:47AM 16   THE CASE.

08:48AM 17       YOUR HONOR WILL REMEMBER THE TESTIMONY OF B.G. AND THE

08:48AM 18   TESTIMONY OF MR. JHAVERI.

08:48AM 19       WE BELIEVE THAT WE ARE ENTITLED TO PUT ON EVIDENCE SHOWING

08:48AM 20   THAT THERE WAS A BASIC GOOD FAITH BELIEF AND GOOD FAITH REASON

08:48AM 21   FOR THESE PRICES.

08:48AM 22       AND THEN FINALLY, WE BELIEVE THAT THIS IS CRITICAL CONTEXT

08:48AM 23   FOR MS. HOLMES'S VISION AND HER UNDERSTANDING THAT THE THERANOS

08:48AM 24   BUSINESS WAS WORKING, HER UNDERSTANDING OF WHAT PATIENTS,

08:48AM 25   CUSTOMERS WANTED IN THE MARKET, AND WHAT THEY VALUED.

08:48AM  1          YOUR HONOR WILL RECALL THAT MR. MOSLEY DISCUSSED THE

08:48AM  2     IMPORTANCE OF VISION, INCLUDING THE VISION WITH RESPECT TO

08:48AM  3     WALGREENS'S DECISION IN MAKING THE DECISION TO INVEST, AND WE

08:48AM  4     BELIEVE THIS EVIDENCE IS CONSISTENT WITH THAT.

08:48AM  5          AND THEN I'LL GIVE MR. BOSTIC AN OPPORTUNITY TO SPEAK, BUT

08:48AM  6     I JUST WANTED TO ADDRESS BRIEFLY THE 403 ARGUMENT THAT THE

08:48AM  7     GOVERNMENT MADE.

08:49AM  8          WE BELIEVE THAT THE REPORTS THAT WE SEEK TO ADMIT AND THE

08:49AM  9     CUSTOMER SERVICE SPREADSHEETS THAT THE GOVERNMENT PREVIOUSLY

08:49AM  10    SOUGHT TO ADMIT AND THAT WERE EXCLUDED ARE FUNDAMENTALLY

08:49AM  11    DIFFERENT.

08:49AM  12         THESE REPORTS WERE SENT TO MS. HOLMES.  THE CUSTOMER

08:49AM  13    SERVICE SPREADSHEETS WERE NOT SENT TO MS. HOLMES.  THESE

08:49AM  14    REPORTS ARE RELEVANT TO MS. HOLMES'S INTENT AND HER KNOWLEDGE

08:49AM  15    AND HER STATE OF MIND.  THE SPREADSHEETS ARE NOT RELEVANT TO

08:49AM  16    THOSE ISSUES.

08:49AM  17         FURTHERMORE, AS THE COURT WILL RECALL, IN ITS RULING AT

08:49AM  18    ECF 798 THAT WE'VE BEEN DISCUSSING THIS MORNING, THE COURT

08:49AM  19    RULED THAT THE CONTENTS OF THE SPREADSHEETS THEMSELVES COULD

08:49AM  20    NOT BE ADMITTED, AND THE GOVERNMENT HAS NEVER PROFFERED A BASIS

08:49AM  21    CONNECTING THOSE DOCUMENTS TO MS. HOLMES.

08:49AM  22            THE COURT:  THANK YOU.  SO LET ME ASK YOU, IT SEEMS

08:49AM  23    LIKE, MR. CLEARY, THAT THE VALUE OR THE REASON THAT YOU WOULD

08:49AM  24    LIKE, YOUR TEAM WOULD LIKE THESE IN, ALL OF THESE SURVEYS IN,

08:50AM  25    IS BECAUSE THEY SHOW MS. HOLMES'S STATE OF MIND.

08:50AM  1          YOU'RE NOT OFFERING THEM FOR THE TRUTH OF THE MATTER

08:50AM  2     ASSERTED, WHETHER OR NOT SOMEBODY ENJOYED THEIR VISIT OR NOT,

08:50AM  3     BUT YOU'RE SAYING THAT THESE THEN WOULD ALLOW YOU TO ARGUE THAT

08:50AM  4     MS. HOLMES'S STATE OF MIND AT THE TIME IN QUESTION INFORMED HER

08:50AM  5     THAT, OR THESE DOCUMENTS INFORMED HER THAT THINGS WERE GOING

08:50AM  6     WELL AT WALGREENS, AND THAT'S HER STATE OF MIND SUCH THAT THE

08:50AM  7     JURY CAN CONSIDER THAT AS SHE ENGAGED WITH INVESTORS DURING

08:50AM  8     THIS TIME PERIOD.

08:50AM  9          IS THAT, IS THAT THE PURPOSE FOR THESE?

08:50AM 10          MR. CLEARY:  YOUR HONOR IS ABSOLUTELY RIGHT THAT WE

08:50AM 11     SEEK TO ADMIT THESE ONLY FOR THE NONHEARSAY PURPOSE, NONHEARSAY

08:50AM 12     PURPOSE OF THEIR EFFECT ON MS. HOLMES'S STATE OF MIND.

08:50AM 13          WE BELIEVE THAT THESE REPORTS ARE RELEVANT FOR HER STATE

08:50AM 14     OF MIND IN THE PARAGRAPH 12 ALLEGATIONS AS SHE ALLEGEDLY MADE

08:51AM 15     CERTAIN REPRESENTATIONS ABOUT THE WALGREENS RELATIONSHIP TO

08:51AM 16     INVESTORS.

08:51AM 17          WE BELIEVE THAT THEY'RE RELEVANT TO THE OTHER PARAGRAPHS

08:51AM 18     IDENTIFIED IN THE INDICTMENT AS WELL.

08:51AM 19          THE COURT:  OKAY.  ALL RIGHT.

08:51AM 20          IN LOOKING AT THESE, I HAD ASKED PREVIOUSLY WHEN WE WERE

08:51AM 21     DISCUSSING THESE IF THE DEFENSE WISHED TO PARSE OUT -- I THINK

08:51AM 22     I USED THE PHRASE PARSE -- TO PARSE OUT ANY OF THESE SURVEYS

08:51AM 23     THAT WOULD SPEAK TO TEST RESULTS.

08:51AM 24          AND THAT'S WHY MY THRESHOLD QUESTION THIS MORNING WAS, YOU

08:51AM 25     WANT ALL OF THESE IN, NOT ANY PARSE OF THEM?

08:51AM 1          WHEN I LOOK AT THESE, I WAS TRYING TO FIND WHETHER ANY OF

08:51AM 2    THESE HAD RESULTS JUST TO SEE, AND MY REVIEW OF THE RECORDS

08:51AM 3    DIDN'T COME UP WITH ANY.

08:51AM 4          I DID SEE AN INDIVIDUAL WHO SAID THAT THEY CAN'T -- THIS

08:52AM 5    WAS IN THE TWO PATIENTS ON JULY 4TH AND JULY 6TH OF 2015, AND

08:52AM 6    THEIR RESPONSES WERE "I CAN'T WAIT TO GET THE RESULTS."

08:52AM 7          MR. BOSTIC:  UH-HUH.

08:52AM 8          THE COURT:  THOSE WERE THE ONLY -- AND, AGAIN, I

08:52AM 9    DIDN'T DO AS THOROUGH A JOB AS YOU DID WITH YOUR ENTHUSIASM,

08:52AM 10   BUT THOSE WERE THE ONLY RESULTS THAT I COULD FIND THAT TALK

08:52AM 11   ABOUT RESULTS, AND THEY SEEM TO TALK ABOUT A FUTURE EVENT.

08:52AM 12   "CAN'T WAIT TO GET THE APP."  APPARENTLY THERE WAS AN APP THAT

08:52AM 13   WAS CREATED AND THE PATIENTS, FOR EASE OF CUSTOMER SERVICE --

08:52AM 14   THERE'S AN APP FOR EVERYTHING.  THERE WAS AN APP.  THEY PUT IN

08:52AM 15   WHATEVER THEIR INFORMATION WAS, AND IT SOUNDS LIKE THEY WOULD

08:52AM 16   GET THEIR TEST RESULTS BACK THROUGH THIS APP ON THEIR MOBILE

08:52AM 17   DEVICE OR WHATEVER, AND THEY WERE VERY EXCITED ABOUT THAT.

08:52AM 18          BUT THOSE WERE THE ONLY REFERENCES THAT I COULD FIND THAT

08:52AM 19   ACTUALLY SPEAK TO RESULTS.

08:52AM 20          AND, OF COURSE, THEY'RE NOT TEST RESULTS.  IT'S

08:53AM 21   ANTICIPATION OF RECEIVING.

08:53AM 22          SO THAT'S SOMETHING THAT I WAS -- AGAIN, THIS GETS TO --

08:53AM 23   THE ISSUE, AS I TALKED ABOUT PREVIOUSLY, WAS THE TECHNOLOGY,

08:53AM 24   THE TECHNOLOGY BEING THE RESULTS AND HOW THAT IS AN ISSUE IN

08:53AM 25   THE CASE.

08:53AM 1        THE MAJORITY OF THE COMMENTS, A SIGNIFICANT MAJORITY OF

08:53AM 2   THE COMMENTS, AS YOU KNOW, TALK ABOUT PRICING.  THEY ALL TALK

08:53AM 3   ABOUT PRICING.  AND THEY SEEM TO SAY THAT ONE OF THE DRAWS OF

08:53AM 4   THE TECHNOLOGY OF THE WALGREENS RELATIONSHIP WAS MANY OF THE

08:53AM 5   PATIENTS, THE CUSTOMERS, HAD NO INSURANCE, AND THEY WERE, THEY

08:53AM 6   WERE VERY HAPPY THAT THEY COULD FIND AFFORDABLE TESTING, AND

08:53AM 7   THEY EXPRESSED THAT IN THEIR COMMENTS.

08:53AM 8        THAT WAS A CONCURRENT THEME THROUGHOUT.  THEY WERE -- WHAT

08:54AM 9   WE LEARNED FROM READING THE -- AND I THINK THESE ALL HAVE SOME

08:54AM 10   QUESTIONS ABOUT YOU -- IT SEEMS LIKE THESE WERE ALL THE

08:54AM 11   PHLEBOTOMIST COMMENTS.  I COULDN'T DISCERN WHICH WERE APPS AND

08:54AM 12   WHICH WERE PHLEBOTOMISTS, OTHER THAN THE PRELIMINARY PAGES THAT

08:54AM 13   HAVE THE GRAPHS AND THINGS THAT TALK ABOUT CUSTOMER SERVICE.

08:54AM 14   MY SENSE IS THAT THOSE ARE CUSTOMERS WHO RESPONDED THROUGH AN

08:54AM 15   APP.

08:54AM 16        THE WRITINGS, THE LITTLE COMMENTS, THOSE ARE ALL, MY SENSE

08:54AM 17   IS, COMMENTS FROM THE PHLEBOTOMISTS WHO WERE EMPLOYEES OF THE

08:54AM 18   COMPANY, NOT OF WALGREENS, BUT OF YOUR CLIENT'S COMPANY, AND SO

08:54AM 19   THEY WERE MAKING THOSE NOTES.  MANY OF THE NOTES HAVE SIMILAR

08:54AM 20   COMMENTS AND OBSERVATIONS.

08:54AM 21        BUT IT APPEARS, IT APPEARS THAT THE MAJORITY OF THOSE

08:54AM 22   COMMENTS RELATE TO PRICING AND THE RELIEF OF FINDING AFFORDABLE

08:54AM 23   TESTING THROUGH WALGREENS, THROUGH YOUR CLIENT'S COMPANY.

08:54AM 24        WHAT WE ALSO LEARNED IN LOOKING AT THAT IS THAT THERE WAS

08:54AM 25   A MENTION OF GIFT CARDS.  AND IT SEEMS LIKE DOCTORS GAVE $100

08:55AM  1    GIFT CARDS TO INDIVIDUALS TO USE AT WALGREENS TO OBTAIN TESTING

08:55AM  2    THROUGH YOUR CLIENT'S COMPANY.  MAYBE THAT WAS PART OF THE

08:55AM  3    BUSINESS PLAN.  I DON'T KNOW.  BUT IT SEEMS LIKE THAT APPEARED

08:55AM  4    THROUGHOUT.

08:55AM  5        THERE WERE MANY REFERENCES TO "THE DOCTOR GAVE ME A GIFT

08:55AM  6    CARD SO I COULD GET THE TESTING DONE."  I DON'T KNOW WHAT THAT

08:55AM  7    IS RELEVANT TO OTHER THAN THAT'S A FAVORABLE COMMENT, I

08:55AM  8    SUPPOSE, OF THE EXPERIENCE.

08:55AM  9        AND THAT WOULD -- THAT WAS A CONCERN THAT I HAD PREVIOUSLY

08:55AM  10   ALSO.

08:55AM  11       THE OTHER THING THAT WAS -- I THINK WAS THE GENESIS OF THE

08:55AM  12   ARGUMENT HERE WAS MR. EDLIN TESTIFIED THAT THESE SURVEYS WERE

08:55AM  13   SHARED, AND HE USED THE WORD "SHARED," THEY WERE SHARED WITH

08:55AM  14   HIM, HE RECEIVED THEM.

08:55AM  15       AND I THINK YOUR CLIENT, THEY WERE SHARED WITH YOUR

08:56AM  16   CLIENT.

08:56AM  17       HE DID NOT TESTIFY, AND I HAVEN'T HEARD ANY WITNESS

08:56AM  18   TESTIFY, THAT THESE WERE ACTUALLY READ BY YOUR CLIENT.

08:56AM  19       WE KNOW AT LEAST FROM THE TESTIMONY THAT THEY WERE SENT TO

08:56AM  20   HER, BUT I'M CURIOUS WHETHER OR NOT THERE NEEDS TO BE SOME

08:56AM  21   FOUNDATIONAL EVIDENCE THAT SHE READ THEM, YOU KNOW?  JUST

08:56AM  22   BECAUSE IT WAS SENT DOESN'T MEAN IT WAS READ AND DOESN'T MEAN

08:56AM  23   THAT IT HAD THAT EFFECT.

08:56AM  24       SO I'M JUST CURIOUS WHETHER OR NOT THERE'S A FOUNDATIONAL

08:56AM  25   GAP HERE THAT NEEDS TO -- BUT LET ME TURN TO MR. BOSTIC.

08:56AM 1          MR. BOSTIC?

08:56AM 2               MR. BOSTIC:  THANK YOU, YOUR HONOR.  WOULD THE COURT

08:56AM 3     MIND IF I REMOVED MY MASK?

08:56AM 4               THE COURT:  THANK YOU.

08:56AM 5               MR. BOSTIC:  MOSTLY FOR THE COURT REPORTER'S SAKE.

08:56AM 6          SO, FIRST OF ALL, JUST TO BE CLEAR ABOUT WHAT WE'RE

08:56AM 7     TALKING ABOUT HERE, I THINK FOCUS NEEDS TO BE KEPT ON THE SCOPE

08:56AM 8     OF THE DEFENSE'S REQUEST AND HOW MUCH EVIDENCE THEY'RE SEEKING

08:56AM 9     TO ADMIT IN THIS CASE.

08:56AM 10         THESE PATIENT STATEMENTS CONSTITUTE A MOUNTAIN OF HEARSAY

08:57AM 11    STATEMENTS.  THEY'RE ALL OUT OF COURT STATEMENTS BY

08:57AM 12    NONTESTIFYING WITNESSES.  THEY ARE GENERALLY FAVORABLE TO

08:57AM 13    THERANOS.  THEY'RE POSITIVE ABOUT THE EXPERIENCE THAT THE

08:57AM 14    PATIENTS AND CUSTOMERS HAD WITH THERANOS, BUT OTHERWISE THEY'RE

08:57AM 15    REALLY NOT RELEVANT TO THE ISSUES IN THE CASE, AND THAT'S WHY

08:57AM 16    THEY SHOULD BE EXCLUDED.

08:57AM 17         I THINK THE, YOU KNOW, THE POTENTIAL IMPACT OF THIS KIND

08:57AM 18    OF EVIDENCE ON THE JURY OR THE WAY THE DEFENSE MIGHT USE IT IS

08:57AM 19    TO BALANCE OUT THE SCALES AS IT WERE BETWEEN, YOU KNOW, THE

08:57AM 20    NEGATIVE EVIDENCE THAT THE JURY HAS HEARD ABOUT PROBLEMS WITH

08:57AM 21    THE THERANOS ASSAYS, INCORRECT AND QUESTIONABLE PATIENT

08:57AM 22    RESULTS, INFORMATION WITHHELD WITH PATIENTS AND DOCTORS.

08:57AM 23         I THINK THIS EVIDENCE, YOU KNOW, COULD BE PLACED ON THE

08:57AM 24    OTHER SIDE OF A SCALE AND THE DEFENSE COULD SEEK TO SHOW, WELL,

08:57AM 25    THERE WERE ALSO POSITIVE REPORTS COMING IN ABOUT THERANOS.

08:58AM  1          BUT THAT EVIDENCE DOESN'T REALLY BELONG ON THE OTHER SIDE

08:58AM  2     OF THE SCALE WEIGHED AGAINST THE EVIDENCE THAT ACTUALLY GOES TO

08:58AM  3     THE ISSUES HERE, AND THOSE ISSUES ARE THE ACCURACY AND

08:58AM  4     RELIABILITY OF THE TESTS AND MS. HOLMES'S KNOWLEDGE OF THE

08:58AM  5     ACCURACY AND RELIABILITY.

08:58AM  6          THE COURT PREVIOUSLY RULED, CORRECTLY IN THE GOVERNMENT'S

08:58AM  7     VIEW, THAT THIS EVIDENCE WAS NOT ADMISSIBLE.

08:58AM  8          TO THE EXTENT THAT THE COURT WAS OPEN TO THE ISSUE BEING

08:58AM  9     RAISED AGAIN, WE UNDERSTOOD THAT TO MEAN TO THE EXTENT THE

08:58AM  10    RECORD WAS DEVELOPED FURTHER IN A WAY THAT SUPPORTED THE

08:58AM  11    ADMISSION OF THIS EVIDENCE, OR TO THE EXTENT THAT THE DEFENSE

08:58AM  12    TOOK THE COURT'S SUGGESTION TO TRY TO IDENTIFY INDIVIDUAL

08:58AM  13    STATEMENTS AMONG THIS MOUNTAIN OF HEARSAY THAT WERE ACTUALLY

08:58AM  14    RELEVANT SOMEHOW TO AN ISSUE IN DISPUTE IN THE CASE, AND

08:58AM  15    NEITHER OF THOSE THINGS HAVE HAPPENED.

08:58AM  16         SO WE THINK THE SAME RULING SHOULD APPLY TO THE MOTION FOR

08:58AM  17    RECONSIDERATION.

08:58AM  18         THE COURT HIT ON SOME TIMING ISSUES WITH RESPECT TO THESE

08:59AM  19    PATIENT STATEMENTS, AND I THINK THAT'S IMPORTANT TO FOCUS ON

08:59AM  20    ALSO.  THESE STATEMENTS ARE INADMISSIBLE FOR TIMING REASONS,

08:59AM  21    TWO DIFFERENT KINDS OF TIMING PROBLEMS.

08:59AM  22         ONE IS THE STAGE IN THE PROCESS AT WHICH THESE CUSTOMER

08:59AM  23    REPORTS WERE COLLECTED, AND THE COURT NOTED THAT MANY OF THEM

08:59AM  24    WERE COLLECTED BY PHLEBOTOMISTS AT THE TIME OF THE SAMPLE DRAW.

08:59AM  25    THAT WOULD HAVE BEEN BEFORE THE PATIENTS RECEIVED THEIR

RESULTS.

BY DEFINITION THEN, THOSE PATIENT STATEMENTS CAN'T HAVE
ANYTHING TO DO WITH THE ACCURACY OR INACCURACY OF THE RESULTS
THAT HAVEN'T EVEN BEEN CREATED YET, MUCH LESS PROVIDED TO THE
PATIENTS.

I SHOULD ALSO SAY, THOUGH, THAT EVEN AFTER A PATIENT
RECEIVES A RESULT, I THINK THE EVIDENCE IN THE CASE HAS SHOWN
THAT IT'S NOT ALWAYS CLEAR WHETHER A RESULT IS ACCURATE OR NOT.

DR. ROSENDORFF TESTIFIED ABOUT HOW TO IDENTIFY INACCURATE
RESULTS, AND I THINK THAT'S MADE CLEAR THAT A PATIENT LOOKING
AT A SHEET OF RESULTS CANNOT BE COUNTED ON TO SAY, HERE'S AN
INACCURATE ONE, I'M THEREFORE NOT GOING TO GIVE THERANOS A
POSITIVE REVIEW WHEN I FILL OUT THIS SURVEY.

SO THE SURVEY COMMENTS EXPRESSING FAVORABLE EXPERIENCES BY
PATIENTS, AGAIN, REALLY JUST DON'T GO TO THE ACCURACY OF THE
RESULTS, AND THAT MAKES THEM UNLIKE THE INDIVIDUAL ACCOUNTS
THAT THE GOVERNMENT HAS SUBMITTED, WHICH ACTUALLY DO CONSTITUTE
PROOF OF INACCURATE OR UNRELIABLE PATIENT RESULTS SENT OUT BY
THERANOS.

SO THAT'S ONE TIMING ISSUE.

THE OTHER TIMING ISSUE RELATES TO WHEN THESE BATCHES OF
PATIENT STATEMENTS WERE ACTUALLY SENT TO MS. HOLMES.  IF I'M
READING THEM CORRECTLY, THE MANY BATCHES OF REPORTS THAT THE
DEFENSE SEEKS TO ADMIT WERE SENT TO THE DEFENDANT MOSTLY IN
2015.  I THINK THERE WAS ONE THAT WAS SENT TO HER IN EARLY

09:01AM 1    OCTOBER 2014, ONE INITIAL BATCH.

09:01AM 2        TO THE EXTENT THAT THE DEFENSE IS TRYING TO USE THIS AS

09:01AM 3    EVIDENCE OF MS. HOLMES'S MENTAL STATE ON THE INVESTOR SIDE OF

09:01AM 4    THE CASE, THAT REALLY MATTERS BECAUSE THE MAJORITY OF THE

09:01AM 5    INVESTMENTS CHARGED IN THE INDICTMENT OCCURRED BEFORE

09:01AM 6    OCTOBER 2014.  SO THERE ARE NO PATIENT REPORTS THAT THE DEFENSE

09:01AM 7    IS TRYING TO ADMIT DURING THE TIME PERIOD WHEN THE MAJORITY OF

09:01AM 8    THE INVESTMENTS WERE TAKING PLACE.

09:01AM 9        THERE ARE TWO INVESTMENTS THAT TOOK PLACE THAT ARE CHARGED

09:01AM 10   IN THE INDICTMENT IN LATE OCTOBER 2014.

09:01AM 11       SO ARGUABLY, YOU KNOW, IF THE SUBSTANCE WERE DIFFERENT,

09:01AM 12   THE CONTENT OF THAT FIRST BATCH MIGHT BE RELEVANT TO HER MENTAL

09:01AM 13   STATE AS TO THOSE INVESTMENTS.

09:01AM 14       BUT THE 2015 REPORTS CAN'T HAVE ANYTHING TO DO WITH WHAT

09:01AM 15   SHE WAS THINKING WHEN SHE ENCOURAGED AND ACCEPTED THOSE

09:02AM 16   INVESTMENTS THAT ARE CHARGED IN THE INDICTMENT.

09:02AM 17       I'D LIKE TO BRIEFLY JUST GO THROUGH THE CATEGORIES FOR

09:02AM 18   WHICH THE DEFENSE SAID THAT THIS EVIDENCE WOULD BE ADMISSIBLE.

09:02AM 19       FIRST, ON THE TOPIC OF WALGREENS, THIS EVIDENCE MISSES THE

09:02AM 20   POINT, AND I THINK THAT'S THE THEME HERE.

09:02AM 21       I THINK IT WAS CLEAR FROM MR. JHAVERI'S TESTIMONY THAT

09:02AM 22   WALGREENS EXECUTIVES HAD CONCERNS ABOUT THERANOS'S PERFORMANCE,

09:02AM 23   SPECIFICALLY WHEN IT CAME TO THE COMPANY'S RELIANCE ON

09:02AM 24   VENIPUNCTURE AND THE COMPANY'S FAILURE TO DELIVER ON ITS

09:02AM 25   PROMISE TO CONDUCT ITS TESTS USING THIS REVOLUTIONARY

09:02AM 1    FINGERSTICK TECHNOLOGY.

09:02AM 2        THE INDICTMENT, BY THE WAY, DOES NOT SAY ANYTHING ABOUT

09:02AM 3    CUSTOMER DISSATISFACTION.  IT SPECIFICALLY SAYS WALGREENS

09:02AM 4    EXECUTIVES HAD CONCERNS ABOUT THERANOS'S PERFORMANCE, AND

09:02AM 5    THAT'S WHAT THE EVIDENCE AT TRIAL HAS SHOWN.

09:02AM 6        THIS EVIDENCE DOESN'T COUNTER THAT OR RELATE TO IT IN ANY

09:02AM 7    WAY.

09:03AM 8        THE COURT NOTED THAT MR. JHAVERI WAS AWARE, OR THAT

09:03AM 9    WALGREENS GENERALLY WAS AWARE OF POSITIVE CUSTOMER FEEDBACK

09:03AM 10   FROM THERANOS.

09:03AM 11       SO THIS EVIDENCE HAS NOTHING TO DO WITH WALGREENS'S

09:03AM 12   DISSATISFACTION.  THAT MEANS IT WOULD HAVE GIVEN MS. HOLMES NO

09:03AM 13   REASON TO SUSPECT THAT ONCE WALGREENS FOUND OUT ABOUT THESE

09:03AM 14   POSITIVE CUSTOMER STATEMENTS, THE RELATIONSHIP WOULD HAVE

09:03AM 15   TURNED AROUND.

09:03AM 16       SHE UNDERSTOOD AT THE TIME THAT THIS DID NOT ADDRESS

09:03AM 17   WALGREENS'S CONCERNS, WHICH AGAIN RELATED TO THE COMPANY'S

09:03AM 18   RELIANCE ON VENIPUNCTURE AND THE ABILITY TO DO ALL OF ITS

09:03AM 19   TESTING BY FINGERSTICK.

09:03AM 20       SO IN THAT SENSE IT'S NOT ABOUT WHETHER THESE POSITIVE

09:03AM 21   RESULTS ARE CUMULATIVE OR NOT.  IT'S ABOUT THE FACT THAT

09:03AM 22   THEY'RE SIMPLY NOT RELEVANT TO WALGREENS'S CONCERNS AS SHOWN IN

09:03AM 23   THE RECORD.

09:03AM 24       WHEN IT COMES TO THE ACCURACY OF THE TESTS, FIRST OF ALL,

09:03AM 25   IF THE DEFENSE IS SEEKING TO USE THIS AS ACTUAL EVIDENCE OF

1    WHETHER THE TESTS WERE ACCURATE OR NOT, THAT'S A HEARSAY USE.

2         AND I DON'T THINK THE DEFENSE IS SEEKING TO USE THEM THAT

3    WAY, BUT THERE'S STILL DANGER THAT THEY COULD CREATE CONFUSION

4    ON THE PART OF THE JURY AND THAT THE JURY MIGHT VIEW THEM AS

5    EVIDENCE OF THE ACCURACY OR INACCURACY OF THE TESTS.

6         THESE REPORTS AREN'T CAPABLE OF SPEAKING TO THAT FACT.

7         AND THAT GOES FOR THE SUBCATEGORIES THAT THE DEFENSE

8    MENTIONED ALSO.

9         THE FACT THAT THERE WERE REPEAT CUSTOMERS, CUSTOMERS CAME

10   BACK OR REFERRED OTHERS, CAN'T SPEAK TO THE ACCURACY OF THE

11   TESTS BECAUSE PATIENTS DIDN'T ALWAYS KNOW WHETHER THEY WERE

12   GETTING ACCURATE TEST RESULTS OR NOT.

13        SO THE FACT THAT THEY MIGHT HAVE COME BACK MIGHT SUGGEST

14   THAT THEY DIDN'T HAVE ANY SUBJECTIVE CONCERNS ABOUT ACCURACY,

15   BUT IT HAS NOTHING TO DO WITH THE ACTUAL ACCURACY OF THE TESTS.

16        AND MS. HOLMES HAD BETTER SOURCES OF INFORMATION BECAUSE

17   SHE HAD LAB PERSONNEL WHO WERE TELLING HER, WE HAVE PROBLEMS

18   WITH THE TESTS.  ACCURACY PROBLEMS WERE BEING RAISED TO HER AND

19   SHE WAS BEING KEPT IN THE LOOP ON THOSE.

20        THAT'S HOW SHE KNEW ABOUT THE ACCURACY PROBLEMS WITH

21   THERANOS'S TESTS, NOT FROM READING EXPERIENCE RATINGS FROM

22   SURVEYS OF WALGREENS'S PATIENTS.

23        SO AGAIN, IT'S JUST --

24             THE COURT:  MS. VOLKAR TELLS US IN THE PLEADING THAT

25   WAS SUBMITTED FOR YOUR TEAM THAT THERE WAS A CONCURRENT EMAIL

09:05AM 1    EXCHANGE WITH MR. BALWANI ABOUT ACCURACY, ABOUT PROBLEMS AT THE

09:05AM 2    LAB AT THIS TIME PERIOD.

09:05AM 3            MR. BOSTIC:  YES, YOUR HONOR, THAT'S EXACTLY THE

09:05AM 4    POINT.

09:05AM 5        THE CONVERSATION -- THE CONVERSATIONS ABOUT THE ACCURACY

09:05AM 6    OF THE THERANOS'S TESTS THAT MS. HOLMES WAS INVOLVED IN WERE

09:05AM 7    SEPARATE FROM THIS INFORMATION.  THIS WAS NOT PART OF THAT

09:05AM 8    ANALYSIS.

09:05AM 9        AND THERE HASN'T BEEN ANY SUGGESTION IN THE RECORD THAT

09:05AM 10   CUSTOMER EXPERIENCE SCORES SOMEHOW RELATE TO THE ACCURACY OF

09:05AM 11   TESTS.  NONE OF THE LAB DIRECTORS HAVE SAID, FOR EXAMPLE, THAT

09:05AM 12   THEY RELY ON SURVEY RESULTS TO DETERMINE WHETHER THEIR LAB IS

09:05AM 13   FUNCTIONING CORRECTLY OR NOT, OR WHETHER A GIVEN ASSAY IS

09:06AM 14   RELIABLE, NOR WOULD WE EXPECT THEM TO.  THIS IS JUST NOT THAT

09:06AM 15   KIND OF EVIDENCE, AND THAT'S THE POINT.

09:06AM 16       THE DEFENSE POINTS TO A COUPLE EXAMPLES.  APPARENTLY THERE

09:06AM 17   MAY BE AN EXAMPLE OR TWO WHERE A PATIENT COMPARES THERANOS LAB

09:06AM 18   RESULTS TO A THIRD PARTY LAB.

09:06AM 19       BUT, AGAIN, THERE'S BEEN NO EFFORT TO PARSE OUT THOSE

09:06AM 20   POTENTIALLY RELEVANT STATEMENTS FROM THE WHOLE.  AND THE

09:06AM 21   EXISTENCE OF THOSE, YOU KNOW, REALLY MINORITY OF EXAMPLES THAT

09:06AM 22   MIGHT RELATE TO SOME KIND OF OBJECTIVE COMPARISON DON'T MAKE

09:06AM 23   THE ENTIRE BATCH ADMISSIBLE.

09:06AM 24       I'LL ALSO POINT OUT JUST ON THE TOPIC OF REPEAT CUSTOMERS,

09:06AM 25   ON THE FACE OF THE DOCUMENTS, THE MAJORITY OF THE COMMENTS DO

09:06AM 1    COME FROM FIRST-TIME USERS.  THE COMMENTS ARE EXPLICIT IN THAT

09:06AM 2    RESPECT, SO I THINK EVE THAT WOULD BE A MINORITY HERE.

09:06AM 3        FINALLY, WHEN IT COMES TO PRICE, PRICE IS MENTIONED IN THE

09:06AM 4    INDICTMENT, BUT IT'S NOT A DISPUTED ISSUE IN THE CASE.  THERE'S

09:07AM 5    EVIDENCE IN THE CASE ALREADY THAT THE THERANOS PRICES WERE LOW.

09:07AM 6    PEOPLE LIKED LOW PRICES.  THAT'S NOT A CONTROVERSIAL POINT

09:07AM 7    EITHER.

09:07AM 8        SO THE FACT THAT INDIVIDUAL PATIENTS SENT IN COMMENTS

09:07AM 9    PRAISING THE PRICES IS NOT RELEVANT TO ANY QUESTION BEFORE THE

09:07AM 10   JURY.

09:07AM 11       AND ALTHOUGH THE INDICTMENT MENTIONS PRICE, THE GOVERNMENT

09:07AM 12   HAS NOT INTRODUCED EVIDENCE AND DOESN'T INTEND TO ARGUE THAT

09:07AM 13   ANY REPRESENTATIONS ABOUT PRICES WERE DISHONEST TO PATIENTS; IN

09:07AM 14   OTHER WORDS, THAT THERANOS WASN'T CHARGING THE LOW PRICES THAT

09:07AM 15   IT WAS ADVERTISING OR SOMETHING IN THAT RESPECT.

09:07AM 16       SO THERE'S NO NEED TO INTRODUCE EVIDENCE THAT PATIENTS

09:07AM 17   APPRECIATED LO9W PRICES.  THAT'S BESIDE THE POINT OF THE

09:07AM 18   PATIENT SCHEME AND THE INVESTOR SCHEME.

09:07AM 19       AND REALLY FINALLY, ON MS. HOLMES'S VISION AND HER OVERALL

09:07AM 20   UNDERSTANDING OF HOW WELL THE BUSINESS WAS GOING, I THINK,

09:07AM 21   AGAIN, IT'S -- MS. HOLMES HAD BETTER INFORMATION AND ACTUAL

09:08AM 22   RELEVANT INFORMATION WHEN IT CAME TO THE PERFORMANCE OF THE

09:08AM 23   TECHNOLOGY AND THE STATE OF THE BUSINESS WITH WALGREENS.

09:08AM 24       SHE WAS IN CONVERSATIONS WITH LAB STAFF.  SHE WAS IN

09:08AM 25   CONVERSATIONS WITH WALGREENS EXECUTIVES.

09:08AM 1      THIS IS NOT THE EVIDENCE THAT WOULD HAVE INFORMED HER

09:08AM 2   UNDERSTANDING THERE.

09:08AM 3      THE REAL POTENTIAL IMPACT OF THIS EVIDENCE ON THE JURY IS

09:08AM 4   TO SHOW THERE WERE FAVORABLE REPORTS ABOUT THERANOS, BUT THAT'S

09:08AM 5   A HEARSAY PURPOSE AND AN IRRELEVANT ONE.

09:08AM 6      IF THE TEST FOR ADMISSIBILITY HERE IS -- ESPECIALLY IN THE

09:08AM 7   2015 TIME PERIOD, IS THAT ANYTHING THAT WENT TO MS. HOLMES OR

09:08AM 8   ANYTHING THAT SHE WAS AWARE OF IS ADMISSIBLE FOR HER MENTAL

09:08AM 9   STATE, THAT WOULD ALSO INCLUDE THINGS THAT THE DEFENSE HAS

09:08AM 10  SOUGHT TO EXCLUDE, LIKE "THE WALL STREET JOURNAL" ARTICLE IN

09:08AM 11  OCTOBER OF 2015.

09:08AM 12     IF THIS POSITIVE INFORMATION ABOUT THERANOS IS ADMISSIBLE

09:08AM 13  JUST BECAUSE MS. HOLMES SAW IT, THEN IS NEGATIVE INFORMATION,

09:08AM 14  LIKE "THE WALL STREET JOURNAL" ARTICLE, ALSO ADMISSIBLE,

09:09AM 15  BECAUSE THAT WOULD HAVE INFORMED HER UNDERSTANDING OF HOW

09:09AM 16  THINGS WERE GOING?

09:09AM 17     I'M NOT RAISING THAT TO SAY THAT IT ALL SHOULD COME IN.

09:09AM 18  I'M SAYING THAT I THINK THE COURT KNOWS HOW TO DRAW THE PROPER

09:09AM 19  LINE THERE.

09:09AM 20         THE COURT:  ALL RIGHT.  THANK YOU.

09:09AM 21     MR. CLEARY?

09:09AM 22         MR. CLEARY:  YOUR HONOR, IF I MAY, THERE ARE A

09:09AM 23  NUMBER OF THINGS TO RESPOND TO HERE.

09:09AM 24     SO FIRST, IN THE PLEADING AND AGAIN HERE THE GOVERNMENT

09:09AM 25  HAS SUGGESTED THAT WE MAY SEEK TO ADMIT THIS, OR ASK THAT THIS

09:09AM  1     BE ADMITTED FOR A HEARSAY PURPOSE.

09:09AM  2          THAT'S NOT TRUE.  THIS IS SOLELY NONHEARSAY AS THE

09:09AM  3     COURT -- A NONHEARSAY PURPOSE AS THE COURT EXPRESSED EARLIER.

09:09AM  4          THE POINT THAT THERE MAY BE AN ISSUE UNDER 403 WITH

09:09AM  5     RESPECT TO A BALANCING OF THE SCALES, WE BELIEVE THAT IT WOULD

09:09AM  6     BE VERY MISLEADING TO THE JURY AND UNFAIRLY PREJUDICIAL TO OUR

09:09AM  7     CASE TO EXCLUDE THIS EVIDENCE BECAUSE -- THIS EVIDENCE WHICH

09:09AM  8     WENT TO MS. HOLMES BECAUSE THERE IS OTHER EVIDENCE IN THE CASE

09:10AM  9     THAT DID NOT GO TO MS. HOLMES.

09:10AM  10         IN FACT, AS THE COURT KNOWS, ONE OF THE STARTING POINTS

09:10AM  11    FOR ANY FULL AND FAIR ASSESSMENT OF MS. HOLMES'S STATE OF MIND

09:10AM  12    IS THE INFORMATION THAT WAS SENT TO HER, THE INFORMATION THAT

09:10AM  13    WAS TRANSMITTED TO HER, THE INFORMATION THAT SHE HAD AVAILABLE.

09:10AM  14         AND FOR THAT REASON, THE FACT THAT CERTAIN CUSTOMER

09:10AM  15    SERVICE SPREADSHEETS WERE NOT SHARED WITH HER, BUT THESE

09:10AM  16    REPORTS WERE, JUST MAKES THE REPORTS THAT MUCH MORE PROBATIVE.

09:10AM  17         AND TO THE COURT'S EARLIER QUESTION, MY UNDERSTANDING --

09:10AM  18    CONCERNING WHETHER THERE WOULD NEED TO BE A SPONSORING WITNESS

09:10AM  19    FOR THESE DOCUMENTS, WE BELIEVE, CONSISTENT WITH THE COURT'S

09:10AM  20    RULING, THAT MR. EDLIN AUTHENTICATED THESE, HE LAID A

09:10AM  21    FOUNDATION FOR THEM.  AND WE WOULD COMMIT TO ADMITTING THESE

09:10AM  22    THROUGH A WITNESS, BUT WE DON'T BELIEVE THAT SOMEONE WITH

09:11AM  23    KNOWLEDGE OF THE REPORTS WOULD BE NEEDED TO TESTIFY.

09:11AM  24         IN THIS CASE A NUMBER OF EMAILS HAVE BEEN ADMITTED THAT

09:11AM  25    WENT TO MS. HOLMES WITHOUT ANY TESTIMONY AS TO WHETHER

09:11AM  1      MS. HOLMES ACTUALLY READ THE EMAILS.

09:11AM  2              THE COURT:  WELL, MANY OF THOSE HAD RESPONSES FROM

09:11AM  3      HER.

09:11AM  4              MR. CLEARY:  SO IN THE CASE --

09:11AM  5              THE COURT:  SO THEY WERE SELF-AUTHENTICATING IN THAT

09:11AM  6      REGARD.

09:11AM  7              MR. CLEARY:  IN THE CASE OF EMAILS WITH THE

09:11AM  8      RESPONSES IN WHICH MS. HOLMES RESPONDED, THAT IS THE INFERENCE.

09:11AM  9      FOR OTHER EMAILS WHERE SHE WAS CC'D OR WHERE SHE WAS THE

09:11AM 10      RECIPIENT, THE INFERENCE IS THAT THIS IS RELEVANT BECAUSE IT

09:11AM 11      WAS SHARED WITH HER AND IS THEREFORE RELEVANT TO HER STATE OF

09:11AM 12      MIND.

09:11AM 13          THERE ARE A COUPLE OF POINTS ABOUT TIMING.

09:11AM 14          THE -- I'LL TAKE THEM IN REVERSE ORDER.

09:11AM 15          THE INDICTMENT CHARGES A CONSPIRACY UNDER COUNT ONE AND A

09:11AM 16      SCHEME TO DEFRAUD UNDER COUNTS THREE THROUGH EIGHT THROUGH

09:12AM 17      2015.

09:12AM 18          THE GOVERNMENT HAS NOT DISCLAIMED THAT TIME PERIOD.  WE'RE

09:12AM 19      ENTITLED TO PUT ON EVIDENCE RELATING TO MS. HOLMES'S INTENT

09:12AM 20      DURING THAT TIME PERIOD.

09:12AM 21          SEPARATELY, THE GOVERNMENT HAS HAD SUCCESSFULLY ADMITTED

09:12AM 22      CERTAIN EVIDENCE THAT ACTUALLY POST-DATES THESE REPORTS AND IS

09:12AM 23      PRESUMABLY RELEVANT TO THE INVESTOR COUNTS.  THAT WOULD BE,

09:12AM 24      JUST TO TAKE A COUPLE OF EXAMPLES, THE "MAD MONEY" CLIP THAT

09:12AM 25      THE COURT WILL RECALL FROM OCTOBER OF 2015, AND THEN "THE TODAY

09:12AM 1    SHOW" CLIP FROM 2016.

09:12AM 2         WITH RESPECT TO TIMING, I THINK THAT THE TIMING OF THE

09:12AM 3    RETURN OF THE REPORTS, THE CUSTOMER TESTIMONIALS AND FEEDBACK,

09:12AM 4    IT IS CERTAINLY TRUE THAT FOR MANY THEY WERE FILLED OUT BEFORE

09:12AM 5    ANY THERANOS RESULT WAS TRANSMITTED TO THE INDIVIDUAL CUSTOMER

09:13AM 6    OR -- IN THE CASE WHERE THE PHLEBOTOMIST WAS MAKING AN ENTRY

09:13AM 7    BEFORE THE CUSTOMER HAD HAD A CHANCE TO REVIEW THE RESULT.

09:13AM 8         BUT I DO THINK THAT IT IS A FAIR INFERENCE THAT, FOR

09:13AM 9    REPEAT VISITORS, FOR VISITORS WHO WERE REFERRED BY FAMILY AND

09:13AM 10   FRIENDS WHO WERE PRIOR CUSTOMERS, FOR VISITORS WHO MADE EXPRESS

09:13AM 11   COMPARISONS BETWEEN THEIR EXPERIENCES AT THESE DIFFERENT LABS,

09:13AM 12   ALL OF THAT SUPPORTS THE INFERENCE THAT THEY BELIEVED THAT THE

09:13AM 13   RESULTS THAT THEY HAD RECEIVED WERE SOUND.

09:13AM 14        AND IN THIS CASE WE HAVE HEARD LAY OPINION TESTIMONY ABOUT

09:13AM 15   THE ACCURACY OR INACCURACY OF THE RESULTS.

09:13AM 16        MS. B.G. EXPLICITLY TESTIFIED TO THAT.  AND -- SO WE

09:13AM 17   BELIEVE THAT --

09:13AM 18            THE COURT:  BUT NONE OF THESE DO -- NONE OF THESE

09:13AM 19   SPEAK TO THE RESULTS.

09:13AM 20        THEY SPEAK TO -- THE REFERRALS, THE MAJORITY, IF NOT ALL,

09:14AM 21   OF THE REFERRALS ARE BASED ON EITHER CONVENIENCE, BUT THE

09:14AM 22   MAJORITY OF THOSE ARE BASED ON PRICING, AT LEAST FROM MY REVIEW

09:14AM 23   OF THIS.  THEY'RE GOING TO TELL THEIR FAMILY, THEY'RE GOING TO

09:14AM 24   TELL THEIR FRIENDS, FINALLY THERE'S A LOW COST AVAILABILITY FOR

09:14AM 25   TESTING FOR THEIR MEDICAL NEEDS.  THAT SEEMS TO BE THE

09:14AM 1    CONCURRENT THEME THROUGHOUT ALL OF THAT.

09:14AM 2         AS I SAID EARLIER, I DID NOT SEE, AND I INVITE YOU TO

09:14AM 3    POINT ME, PLEASE, TO ANYONE SAYING "MY TEST RESULTS WERE GREAT"

09:14AM 4    OR ANYTHING ABOUT THE RESULTS.  IT'S ABOUT THE EXPERIENCE.

09:14AM 5         AND, YOU KNOW, A LOT OF IT IS, WHICH I SUPPOSE GOES TO

09:14AM 6    RELIABILITY, I SUPPOSE, YOU KNOW, IT'S THE PHLEBOTOMIST GIVING

09:14AM 7    THEIR COMMENTS, THEIR INTERPRETATION OF THE COMMENTS OF THEIR

09:14AM 8    PATIENTS AND THEY'RE POSITIVE AND, YOU KNOW, THEY ENJOYED THE

09:14AM 9    EXPERIENCE, ALL OF THAT.

09:14AM 10        BUT I DON'T SEE ANY REALLY RESULTS, AS I SAID.  I DIDN'T

09:15AM 11   SEE ANY OF THOSE.  TWO PEOPLE I POINT OUT WHO ARE EAGER TO GET

09:15AM 12   THEIR RESULTS, THOSE ARE -- THAT'S WHAT I FOUND.  IF YOU HAVE

09:15AM 13   OTHERS, I'M HAPPY TO HEAR ABOUT THEM.

09:15AM 14        ONE PERSON, I THINK THIS IS JUNE 9, 2015, SAID, "I CAME IN

09:15AM 15   BECAUSE I SAW" -- I'M QUOTING HERE -- "ELIZABETH ON T.V.,"

09:15AM 16   THAT'S WHAT THE PATIENT SAID, "SO I CAME IN AFTER HAVING SEEN

09:15AM 17   HER ON T.V.  THAT'S WHY I'M HERE."

09:15AM 18        AND ON JUNE 26TH, I THINK I POINT OUT ANOTHER PATIENT SAID

09:15AM 19   "I CAME IN FOR A PREGNANCY TEST," AND THAT'S VERY CLOSE IN TIME

09:15AM 20   TO B.G.'S TEST.  I THINK SHE WAS IN MAY, WAS IT?  OR PERHAPS

09:15AM 21   JULY.  I CAN'T RECALL.

09:15AM 22        SO THE RESULTS IS SOMETHING THAT I'M LOOKING AT HERE.  IT

09:15AM 23   SEEMS LIKE THESE ARE CUSTOMER REVIEWS THAT ARE POSITIVE ABOUT

09:15AM 24   THE EXPERIENCE, AND THEY ALL ARE.  THERE'S A FEW CRITICISMS

09:16AM 25   ABOUT WAITING IN LINES AND BATHROOMS BEING UNCLEAN AND THOSE

09:16AM 1    KINDS OF THINGS, BUT THE MAJORITY OF THEM ARE POSITIVE.

09:16AM 2         AND YOU WANT THEM TO COME IN TO SHOW, NOT FOR THE TRUTH OF

09:16AM 3    THE MATTER ASSERTED THAT THEY HAD A POSITIVE EXPERIENCE, BUT

09:16AM 4    RATHER TO SHOW THAT YOUR CLIENT SOMEHOW READ ALL OF THESE

09:16AM 5    DOCUMENTS, CONSUMED THE INFORMATION IN THEM, AND THAT THAT

09:16AM 6    INFORMED HER AS TO HER STATE OF MIND THAT THINGS WERE GOING

09:16AM 7    WELL AT WALGREENS AND DURING THE RELATIONSHIP.

09:16AM 8         MR. CLEARY:  YOUR HONOR, A COUPLE OF THINGS.

09:16AM 9         SO WE ARE SEEKING TO ADMIT THESE BECAUSE THEY WERE SHARED

09:16AM 10   WITH MS. HOLMES.  THEY WERE TRANSMITTED TO HER.

09:16AM 11        I DON'T WANT TO LOSE SIGHT OF PARAGRAPH 12(D) WITH RESPECT

09:16AM 12   TO WALGREENS.  YOUR HONOR IS CERTAINLY RIGHT THAT THE VAST

09:16AM 13   MAJORITY OF THE EXPLICIT TESTIMONIALS HAVE TO DO WITH FACETS OF

09:16AM 14   THE EXPERIENCE AND DO NOT EXPRESSLY MENTION THE BLOOD TEST

09:17AM 15   RESULTS.

09:17AM 16        THERE ARE EXAMPLES OF COMMENTARY ON THE BLOOD TEST RESULT

09:17AM 17   ITSELF.  JUST TO READ ONE, THIS IS DOCKET NUMBER 1142-4.  "I'VE

09:17AM 18   HAD SOME OTHER ROUTINE BLOOD TESTS DONE AT YOUR LAB AND

09:17AM 19   CROSS-CHECKED THEM WITH STANFORD, THEY WERE ALL CONGRUENT."

09:17AM 20        BUT TO YOUR HONOR -- YOUR HONOR IS ABSOLUTELY CORRECT THAT

09:17AM 21   MANY OF THESE RELATE TO PRICE.  MANY RELATE TO OTHER FEATURES

09:17AM 22   OF THE CUSTOMER EXPERIENCE, ACCESSIBILITY, THE ABILITY TO TRACK

09:17AM 23   AND MONITOR TESTS OVER TIME, WHICH IS SOMETHING THAT WE'VE

09:17AM 24   HEARD ABOUT.  THAT WAS ONE OF THE REAL VISIONS OF MS. HOLMES

09:17AM 25   AND OF THE COMPANY.

09:17AM 1     AND ALL OF THESE DIFFERENT FEATURES -- ANOTHER ASPECT

09:17AM 2     ACTUALLY WOULD BE THE ENTHUSIASM ASSOCIATED WITH RECEIVING A

09:17AM 3     FINGERSTICK TEST, BUT ALSO THE WILLINGNESS OF CUSTOMERS TO SAY

09:18AM 4     VERY POSITIVE THINGS AFTER RECEIVING A VENOUS BLOOD DRAW.

09:18AM 5         THERE ARE A NUMBER OF ACCOUNTS IN HERE THAT SAY THAT THE

09:18AM 6     CUSTOMER RECEIVED A VENOUS BLOOD DRAW AND, FOR A VARIETY OF

09:18AM 7     REASONS, EXPECTS TO COME BACK TO THERANOS.

09:18AM 8         THIS BRINGS ME TO THE WALGREENS ALLEGATION, AND I THINK

09:18AM 9     THAT THE GOVERNMENT HAS NARROWED THAT ALLEGATION SUBSTANTIALLY.

09:18AM 10    IT DOES NOT JUST RELATE TO THE SUBJECTIVE OPINIONS OF WALGREENS

09:18AM 11    EXECUTIVES.  IN THE CASE OF ONE EXECUTIVE, MR. JHAVERI, HE HAD

09:18AM 12    VERY LIMITED CONTACT WITH MS. HOLMES.

09:18AM 13        THE ALLEGATION ITSELF, AND JUST READING FROM PARAGRAPH

09:18AM 14    12(D) OF THE INDICTMENT, IS THAT MS. HOLMES ALLEGEDLY

09:18AM 15    REPRESENTED TO INVESTORS THAT THERANOS PRESENTLY HAD AN

09:18AM 16    EXPANDING PARTNERSHIP WITH WALGREENS, THAT IS, THAT THERANOS

09:19AM 17    WOULD SOON DRAMATICALLY INCREASE THE NUMBER OF WELLNESS CENTERS

09:19AM 18    WITHIN WALGREENS STORES, WHEN, IN TRUTH, HOLMES AND BALWANI

09:19AM 19    KNEW BY LATE 2014 THAT THERANOS'S RETAIL WALGREENS ROLLOUT HAD

09:19AM 20    STALLED BECAUSE OF SEVERAL ISSUES, INCLUDING THAT WALGREENS

09:19AM 21    EXECUTIVES HAD CONCERNS WITH THERANOS'S PERFORMANCE.

09:19AM 22        SO I JUST WANT THE RECORD TO BE CLEAR ABOUT THE NATURE OF

09:19AM 23    THAT ALLEGATION AND OUR ABILITY TO MEET THAT ALLEGATION.

09:19AM 24        JUST A FEW OTHER THINGS.  AS THE COURT KNOWS, WE WOULD BE

09:19AM 25    HAPPY TO CONSENT TO A LIMITING INSTRUCTION INFORMING THE JURY

09:19AM 1    OF THE PURPOSE FOR WHICH THESE DOCUMENTS ARE ADMITTED.

09:19AM 2         THERE WERE A NUMBER OF ARGUMENTS THAT MR. BOSTIC MADE

09:19AM 3    CONCERNING HIS VIEW THAT MS. HOLMES HAD BETTER SOURCES OF

09:19AM 4    INFORMATION.

09:19AM 5         THAT'S A FACT ARGUMENT THAT THE GOVERNMENT CAN CERTAINLY

09:19AM 6    MAKE IN CLOSING.  IT GOES TO WEIGHT.  IN MY VIEW IT DOES NOT GO

09:20AM 7    TO ADMISSIBILITY.

09:20AM 8         AGAIN, I APPRECIATE THE GOVERNMENT'S COMMENTS CONCERNING

09:20AM 9    PRICE, BUT I RESPECTFULLY DISAGREE.  PRICE IS VERY MUCH AT

09:20AM 10   ISSUE IN THIS CASE BECAUSE THE GOVERNMENT HAS ALLEGED THAT

09:20AM 11   THERE WAS A SCHEME TO DEFRAUD COMMITTED BY WAY OF

09:20AM 12   REPRESENTATIONS AS TO PRICE AMONG OTHER THINGS.

09:20AM 13        THAT'S PART OF THE CASE.  THERE'S BEEN TESTIMONY ABOUT

09:20AM 14   PRICE, AND THE GOVERNMENT CAN CHARACTERIZE THE NATURE OF THOSE

09:20AM 15   REPRESENTATIONS, BUT WE'RE ABLE TO PUT ON EVIDENCE OF OUR OWN

09:20AM 16   AS TO THE GOOD FAITH REASONS FOR THE THERANOS PRICE AND THE WAY

09:20AM 17   IT FIT INTO THE THERANOS BUSINESS MODEL.

09:20AM 18        I DON'T WANT TO TAKE UP ANY MORE OF THE COURT'S TIME.  I

09:20AM 19   THINK THE COURT IS AWARE OF OUR POSITIONS, AND I'M HAPPY TO

09:20AM 20   RESPOND TO ANY MORE SPECIFIC QUESTIONS THAT YOU MIGHT HAVE.

09:20AM 21        THE COURT:  WELL, THANK YOU.

09:20AM 22        MR. BOSTIC, MR. CLEARLY GETS THE LAST WORD, BUT ANYTHING

09:21AM 23   YOU WANT TO SAY?

09:21AM 24        MR. BOSTIC:  A FINAL POINT.

09:21AM 25        IMAGINE THAT THE GOVERNMENT WAS SEEKING TO ADMIT HUNDREDS

09:21AM 1  OF PAGES OF CUSTOMER REPORTS THAT WERE GENERALLY NEGATIVE ABOUT

09:21AM 2  THERANOS, RELATING TO THINGS LIKE DISTANCE BETWEEN A CUSTOMER'S

09:21AM 3  HOME AND A STORE, THE AMOUNT OF TIME THAT THEY HAD TO WAIT IN

09:21AM 4  LINE, HOW CLEAN THE FACILITIES WERE, HOW FRIENDLY PEOPLE WERE,

09:21AM 5  A LOT OF NEGATIVE INFORMATION ON THOSE ANCILLARY UNRELATED

09:21AM 6  POINTS.

09:21AM 7      THE DEFENSE WOULD BE MAKING THE SAME ARGUMENTS THAT I AM

09:21AM 8  MAKING HERE TODAY, AND THEY WOULD BE RIGHT TO DO SO.

09:21AM 9      CUSTOMER FEEDBACK ON THESE ISSUES IS NOT RELEVANT TO THE

09:21AM 10 CASE, REGARDLESS OF WHETHER IT'S FAVORABLE OR NOT.  THE FACT

09:21AM 11 THAT IT'S FAVORABLE RAISES 403 CONCERNS WITH THE GOVERNMENT,

09:21AM 12 AND IT'S INADMISSIBLE FOR THE REASONS THAT I'VE DESCRIBED.

09:21AM 13      THE COURT:  THANK YOU.

09:21AM 14   MR. CLEARY, THE LAST WORD.

09:21AM 15      MR. CLEARY:  THIS IS POWERFUL EVIDENCE OF

09:21AM 16 MS. HOLMES'S STATE OF MIND.  WE BELIEVE THAT IT SHOULD BE

09:21AM 17 ADMITTED, AND WE BELIEVE THAT EXCLUDING IT FOR THE REASONS THAT

09:21AM 18 THE GOVERNMENT INVITES THE COURT TO DO SO WOULD SERIOUSLY

09:22AM 19 MISLEAD THE JURY AS TO THE INFORMATION SENT AND SHARED TO

09:22AM 20 MS. HOLMES ABOUT CRITICAL ALLEGATIONS IN THE CASE AND WOULD

09:22AM 21 UNFAIRLY PREJUDICE OUR DEFENSE.

09:22AM 22      THE COURT:  THANK YOU VERY MUCH.  THANK YOU.

09:22AM 23   AND THANK YOU FOR YOUR PLEADINGS AND THE ARGUMENT THIS

09:22AM 24 MORNING.

09:22AM 25      MR. CLEARY, I DON'T SEE ANYTHING THAT CAUSES ME TO DISTURB

09:22AM 1    THE COURT'S PREVIOUS RULING IN THIS MATTER.  I UNDERSTAND YOUR

09:22AM 2    VIEW AND YOUR TEAM'S VIEW THAT THIS IS CRITICALLY IMPORTANT TO

09:22AM 3    SHOW YOUR CLIENT'S STATE OF MIND AS TO THE NEGOTIATION THAT SHE

09:22AM 4    HAD, AND THIS WOULD BETTER INFORM HER OF THE INFORMATION RATHER

09:22AM 5    THAN THE INFORMATION THAT SHE RECEIVED FROM WALGREENS, ET

09:22AM 6    CETERA.  I KNOW YOU COMMENTED ON THAT'S A FACT ISSUE AND THAT'S

09:22AM 7    AN ISSUE THAT THE JURY COULD WRESTLE WITH IF THIS INFORMATION

09:22AM 8    IS ADMITTED.

09:22AM 9        BUT AS A THRESHOLD ISSUE, I JUST DON'T SEE THAT IT'S

09:22AM 10    RELEVANT TO THE ISSUES IN THE INDICTMENT, NOTWITHSTANDING THE

09:22AM 11    FACT THAT PRICE IS MENTIONED.  THIS IS NOT A PRICING CASE,

09:22AM 12    QUOTE-UNQUOTE.

09:22AM 13        IT'S NOT A -- THE ALLEGATIONS ARE NOT SPECIFIC THAT ONE

09:23AM 14    PRICE WAS PROMISED AND A DIFFERENT PRICE WAS OBTAINED.  IT'S

09:23AM 15    NOT BAIT AND SWITCH.

09:23AM 16        PRICE IS PERHAPS AN ANCILLARY PART OF THE CASE, AND I

09:23AM 17    APPRECIATE THAT.

09:23AM 18        BUT THE REAL ISSUES IN THE CASE I THINK ARE CONTAINED IN

09:23AM 19    12(D), WHICH TALK ABOUT THE ACCURACY OF THE TEST RESULTS.

09:23AM 20    THAT'S REALLY WHAT THE FOCUS OF THE PROSECUTION IS.

09:23AM 21        I DON'T HEAR THE GOVERNMENT SAYING THAT THEY'RE GOING TO

09:23AM 22    ARGUE THAT PRICING IN ANY WAY, THE FALSITY OF PRICING WAS AN

09:23AM 23    ISSUE.

09:23AM 24        I JUST DON'T SEE ANYTHING THAT CAUSES ME TO DISTURB THE

09:23AM 25    COURT'S PREVIOUS RULING ON THIS MATTER, AND I'M GOING TO

09:23AM  1    RESPECTFULLY DECLINE YOUR INVITATION TO CHANGE THAT POSITION.

09:23AM  2         I AM INFORMED WHEN I LOOK AT THE TIMING AND THE RANGES OF

09:23AM  3    THIS INFORMATION, I THINK THAT'S IMPORTANT ALSO.  THAT WAS

09:23AM  4    POINTED OUT DURING OUR DISCUSSION.  I JUST DON'T SEE THE

09:23AM  5    RELEVANCE OF THIS.

09:23AM  6         AND EVEN UNDER A 403 ANALYSIS, I DO THINK THAT THIS

09:24AM  7    INFORMATION, THE PROBATIVE VALUE IS OUTWEIGHED BY ANY

09:24AM  8    PREJUDICIAL VALUE, AS WELL AS ANY TIME CONSUMPTION THAT IS

09:24AM  9    GOING TO BE REQUIRED TO LOOK THROUGH THESE DOCUMENTS FOR THAT

09:24AM  10   PROBATIVE, MINIMAL, MINIMAL PROBATIVE VALUE.

09:24AM  11        SO I'M GOING TO RESPECTFULLY DECLINE YOUR INVITATION TO

09:24AM  12   DISTURB THE COURT'S PREVIOUS RULING ON THESE MATTERS.  THESE

09:24AM  13   WILL CONTINUE TO BE EXCLUDED.

09:24AM  14        SO THANK YOU VERY MUCH.

09:24AM  15        THANK YOU, MR. CLEARY.

09:24AM  16        THANK YOU, MR. BOSTIC.

09:24AM  17             MR. BOSTIC:  THANK YOU, YOUR HONOR.

09:24AM  18             THE COURT:  I APPRECIATE IT.

09:24AM  19        ANYTHING ELSE BEFORE WE BRING IN THE JURY?

09:24AM  20             MR. BOSTIC:  YOUR HONOR, I'M NOT SURE WHETHER THE

09:24AM  21   COURT WANTED TO DO THIS IN THE JURY'S PRESENCE OR NOT, BUT I

09:24AM  22   UNDERSTAND FROM THE DEFENSE THAT THEY HAD NO OBJECTION TO

09:24AM  23   EXCUSING MR. EISENMAN.

09:24AM  24        WE SO INFORMED HIM, AND I BELIEVE HE HAS TRAVELLED OUT OF

09:24AM  25   TOWN.  WE JUST WANTED TO PUT THAT ON THE RECORD.

|  |  |  |
|---|---|---|
| 09:24AM | 1 | THE COURT: YES. THANK YOU. |
| 09:24AM | 2 | IS THAT CORRECT, MR. DOWNEY? |
| 09:24AM | 3 | MR. DOWNEY: YOUR HONOR, I THINK THE SIMPLEST, MOST |
| 09:25AM | 4 | SUCCINCT STATEMENT IS THAT WE DON'T OBJECT TO HIS EXCUSAL. I |
| 09:25AM | 5 | WOULDN'T WANT THE COURT TO TAKE THAT AS AN INDICATION THAT WE |
| 09:25AM | 6 | DIDN'T CONTINUE TO HAVE SOME OF THE CONCERNS AFTER WE'VE HAD |
| 09:25AM | 7 | THE OPPORTUNITY TO REVIEW. |
| 09:25AM | 8 | BUT FOR PURPOSES OF WHERE WE ARE, WE DON'T OBJECT TO HIS |
| 09:25AM | 9 | EXCUSAL. |
| 09:25AM | 10 | THE COURT: ALL RIGHT. THANK YOU THEN. HE IS |
| 09:25AM | 11 | EXCUSED. I WILL MENTION THAT IN FRONT OF THE PRESENCE OF THE |
| 09:25AM | 12 | JURY. I THINK THAT'S APPROPRIATE. |
| 09:25AM | 13 | AND YOU OTHERWISE HAVE A WITNESS, THE GOVERNMENT HAS |
| 09:25AM | 14 | ANOTHER WITNESS? |
| 09:25AM | 15 | MR. BOSTIC: YES, YOUR HONOR, WE DO. |
| 09:25AM | 16 | THE COURT: OKAY. |
| 09:25AM | 17 | MR. BOSTIC: AND THE LAST ISSUE RELATED TO |
| 09:25AM | 18 | MR. EISENMAN. THE GOVERNMENT HAS POSSESSION CURRENTLY OF THE |
| 09:25AM | 19 | ORIGINAL NOTES THAT WERE SUBPOENAED BY THE DEFENSE. |
| 09:25AM | 20 | I UNDERSTAND FROM CONVERSATIONS WITH MR. DOWNEY THAT HE'S |
| 09:25AM | 21 | FINE WITH THE GOVERNMENT SENDING THOSE BACK TO MR. EISENMAN. I |
| 09:25AM | 22 | WANTED TO MAKE SURE THAT WAS OKAY WITH THE COURT. |
| 09:25AM | 23 | THE COURT: THAT'S FINE. YOU'LL DO THAT. AND YOU |
| 09:25AM | 24 | HAVE THE MECHANISMS AND THE KNOWLEDGE AND THE ABILITY TO GET |
| 09:25AM | 25 | THOSE BACK TO HIM UNDISTURBED? |

09:25AM 1          MR. BOSTIC:  I THINK WE CAN HANDLE THAT, YES, YOUR

09:25AM 2    HONOR.

09:25AM 3          THE COURT:  OKAY.

09:25AM 4       THAT'S OKAY WITH YOU, MR. DOWNEY?

09:25AM 5          MR. DOWNEY:  THAT'S FINE.

09:25AM 6          THE COURT:  ALL RIGHT.  WE'LL TAKE OUR BREAK NOW.

09:25AM 7       YOU CAN -- MR. DOWNEY, IF YOU WOULD NOTIFY MS. DIBBLE AS

09:26AM 8    TO YOUR SUGGESTED BREAKS, THAT WOULD BE HELPFUL.

09:26AM 9          MR. DOWNEY:  WE'LL DO THAT, YOUR HONOR.  THANK YOU.

09:26AM 10         THE COURT:  YOU'RE WELCOME.

09:26AM 11      (RECESS FROM 9:26 A.M. UNTIL 9:39 A.M.)

09:39AM 12      (JURY IN AT 9:39 A.M.)

09:42AM 13         THE COURT:  ALL RIGHT.  WE'RE ON THE RECORD IN THE

09:42AM 14   HOLMES MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS

09:42AM 15   PRESENT.

09:42AM 16      OUR JURY IS PRESENT.  GOOD MORNING, LADIES AND GENTLEMEN.

09:42AM 17   I APOLOGIZE FOR THE DELAY.  I NEEDED TO GET SOME ASSISTANCE AND

09:42AM 18   DISCUSS SOME THINGS WITH THE LAWYERS.

09:42AM 19      SO WE'RE GETTING STARTED NOW.  LET ME ASK THAT QUESTION

09:42AM 20   AGAIN.  DURING OUR BREAK, DID ANY MEMBER OF THE JURY HAVE CAUSE

09:42AM 21   OR COME ACROSS ANY INFORMATION, CONVERSATION, READ, OR LISTEN

09:42AM 22   TO ANYTHING THAT HAD ANYTHING TO DO WITH THIS CASE?

09:42AM 23      I SEE NO HANDS.

09:42AM 24      THANK YOU AGAIN.  THANK YOU VERY MUCH, LADIES AND

09:42AM 25   GENTLEMEN.

09:42AM 1      SCHEDULING, I THINK WE'RE GOING TO END AT 4:00 TODAY.  I

09:42AM 2  THINK TODAY IS A 4:00 O'CLOCK DAY.

09:42AM 3      TOMORROW WE'LL END AT 3:30.  WE'LL START AT 9:00.  THAT'S

09:42AM 4  OUR SCHEDULE SO FAR.

09:42AM 5      SO LET ME ASK A QUESTION REGARDING THE LAST WITNESS,

09:43AM 6  MR. EISENMAN, IS HE EXCUSED?  MAY THAT WITNESS BE EXCUSED?

09:43AM 7          MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

09:43AM 8          MR. DOWNEY:  HE MAY, YOUR HONOR.

09:43AM 9          THE COURT:  ALL RIGHT.  THANK YOU.

09:43AM 10     DOES THE GOVERNMENT HAVE A WITNESS TO CALL?

09:43AM 11         MR. LEACH:  THE UNITED STATES RECALLS SO-HAN SPIVEY.

09:43AM 12         THE COURT:  GOOD MORNING, MS. SPIVEY.  IF YOU WOULD

09:43AM 13 COME AND FACE OUR COURTROOM DEPUTY WHILE YOU RAISE YOUR RIGHT

09:43AM 14 HAND, SHE HAS A QUESTION FOR YOU.

09:43AM 15         THE CLERK:  GOOD MORNING.

09:43AM 16     **(GOVERNMENT'S WITNESS, SO-HAN SPIVEY, WAS SWORN.)**

09:43AM 17         THE WITNESS:  YES.

09:43AM 18         THE CLERK:  THANK YOU.  PLEASE HAVE A SEAT.

09:43AM 19         THE COURT:  PLEASE HAVE A SEAT.  I'LL INVITE YOU TO

09:43AM 20 MAKE YOURSELF COMFORTABLE AGAIN.  FEEL FREE TO ADJUST THE CHAIR

09:43AM 21 AND THE MICROPHONE.

09:43AM 22     I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

09:43AM 23     IF YOU HAVE BEEN VACCINATED, I THINK -- IF YOU HAVE BEEN,

09:44AM 24 YOU MAY REMOVE YOUR MASK IF YOU WISH.

09:44AM 25     BUT WOULD YOU PLEASE STATE YOUR NAME AND THEN SPELL IT,

09:44AM  1    PLEASE.

09:44AM  2              THE WITNESS:  SO-HAN SPIVEY.  S-O-H-A-N,

09:44AM  3    S-P-I-V-E-Y.

09:44AM  4              THE COURT:  THANK YOU.

09:44AM  5         COUNSEL.

09:44AM  6              MR. LEACH:  THANK YOU, YOUR HONOR.

09:44AM  7                        **DIRECT EXAMINATION**

09:44AM  8    BY MR. LEACH:

09:44AM  9    Q.   WELCOME BACK, MS. SPIVEY.  YOU PREVIOUSLY TESTIFIED IN

09:44AM  10   THIS CASE, DO YOU RECALL THAT?

09:44AM  11   A.   YES.

09:44AM  12   Q.   AND YOU SERVED AS THE CONTROLLER FOR THERANOS FOR A NUMBER

09:44AM  13   OF YEARS, 2010 UP THROUGH 2016 OR '17?

09:44AM  14   A.   FROM 2006.

09:44AM  15   Q.   OKAY.  I HAVE ONE BRIEF TOPIC I WANTED TO COVER WITH YOU,

09:44AM  16   MS. SPIVEY.

09:44AM  17        MAY I APPROACH THE WITNESS, YOUR HONOR?

09:44AM  18              THE COURT:  YES.

09:45AM  19   BY MR. LEACH:

09:45AM  20   Q.   (HANDING.)

09:45AM  21        MS. SPIVEY, I'VE PLACED BEFORE YOU WHAT HAS BEEN MARKED AS

09:45AM  22   EXHIBIT 5454.

09:45AM  23        DO YOU HAVE THAT IN FRONT OF YOU?

09:45AM  24   A.   YES.

09:45AM  25   Q.   DOES THIS APPEAR TO BE AN EMAIL FROM YOU TO

09:45AM  1    ELIZABETH HOLMES AND SUNNY BALWANI DATED JULY 25TH, 2015?

09:45AM  2    A.   YES.

09:45AM  3    Q.   AND DOES THIS RELATE TO A COMPANY CALLED HORIZON MEDIA?

09:45AM  4    A.   YES.

09:45AM  5    Q.   AND DOES IT RELATE TO POTENTIAL ADVERTISING IN MEDIA THAT

09:45AM  6    THERANOS WAS CONTEMPLATING PURCHASING?

09:45AM  7    A.   YES.

09:45AM  8    Q.   AND WERE YOU SENDING THIS TO MS. HOLMES AND MR. BALWANI TO

09:45AM  9    OBTAIN THEIR APPROVAL FOR CERTAIN PAYMENTS SUGGESTED IN THIS

09:45AM  10   EMAIL?

09:45AM  11   A.   YES.

09:45AM  12        MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5454 INTO

09:45AM  13   EVIDENCE.

09:45AM  14        MR. WADE:  802, YOUR HONOR.

09:45AM  15        THE COURT:  IS THIS A FOUR-PAGE, A FOUR-PAGE

09:46AM  16   DOCUMENT?

09:46AM  17        MR. LEACH:  IT'S A FIVE-PAGE DOCUMENT, YOUR HONOR.

09:46AM  18        THE COURT:  THIS IS OFFERED, MR. LEACH, FOR?

09:46AM  19        MR. LEACH:  A BUSINESS RECORD.

09:46AM  20        THE COURT:  OKAY.  DO YOU WANT TO LAY A FOUNDATION?

09:46AM  21        MR. LEACH:  SURE.

09:46AM  22   Q.   MS. SPIVEY, DID YOU, IN THE ORDINARY COURSE OF BUSINESS,

09:46AM  23   DID YOU OBTAIN APPROVALS FROM MS. HOLMES AND MR. BALWANI FOR

09:46AM  24   EXPENSES OVER A CERTAIN THRESHOLD?

09:46AM  25   A.   YES.

09:46AM   1    Q.   AND WHAT WAS THAT THRESHOLD?

09:46AM   2    A.   SO FOR SUNNY -- SO ALL OF THE EXPENSES WOULD GO THROUGH

09:46AM   3    THE APPROVAL OF EITHER SUNNY BALWANI OR ELIZABETH HOLMES.

09:46AM   4    Q.   OKAY.  SO WHATEVER THE DOLLAR VALUE?

09:47AM   5    A.   YES.

09:47AM   6    Q.   AND DO THE EXPENSES IN HERE RELATE TO THE DOLLAR VALUE IN

09:47AM   7    THE MANY MILLIONS OF DOLLARS?

09:47AM   8    A.   YES.

09:47AM   9    Q.   AND DID YOU SEND THIS EMAIL IN THE ORDINARY COURSE OF

09:47AM  10    BUSINESS?

09:47AM  11    A.   YES.

09:47AM  12    Q.   AND IS THE INFORMATION IN EXHIBIT 5454 PREPARED AT OR

09:47AM  13    AROUND THE TIME BASED ON INFORMATION FROM PEOPLE WITH

09:47AM  14    KNOWLEDGE?

09:47AM  15    A.   YES.

09:47AM  16    Q.   AND WAS IT YOUR PRACTICE TO KEEP AND RETAIN THE EMAILS

09:47AM  17    THAT YOU WOULD SEND TO MS. HOLMES AND MR. BALWANI RESPECTING

09:47AM  18    CERTAIN APPROVALS FOR CERTAIN EXPENSES?

09:47AM  19    A.   WHAT DO YOU MEAN?

09:47AM  20    Q.   WOULD YOU RETAIN EMAILS IN THE COURSE OF YOUR BUSINESS TO

09:47AM  21    MAKE SURE THAT YOU HAD A RECORD OF WHAT MS. HOLMES OR

09:47AM  22    MR. BALWANI WERE APPROVING FOR EXPENSES?

09:47AM  23    A.   YES.

09:47AM  24    Q.   AND WOULD -- AFTER OBTAINING THE APPROVAL, WOULD THOSE

09:47AM  25    EXPENSES BE ENTERED INTO THE GENERAL LEDGER?

09:47AM 1      A.   YES.

09:47AM 2      Q.   AND IN THE EMAIL THERE'S TWO ATTACHMENTS.  WERE YOU

09:48AM 3      SENDING THESE ATTACHMENTS SO THAT MR. BALWANI AND MS. HOLMES

09:48AM 4      WOULD KNOW WHAT YOU WERE SEEKING APPROVAL OF?

09:48AM 5      A.   YES.

09:48AM 6           MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5454.

09:48AM 7           MR. WADE:  SAME OBJECTION.

09:48AM 8           THE COURT:  ALL RIGHT.  THANK YOU.  THIS IS

09:48AM 9      ADMITTED, 803(6), IT IS ADMITTED AS A BUSINESS RECORD, AND IT

09:48AM 10     MAY BE PUBLISHED.

09:48AM 11          (GOVERNMENT'S EXHIBIT 5454 WAS RECEIVED IN EVIDENCE.)

09:48AM 12          MR. LEACH:  THANK YOU, YOUR HONOR.

09:48AM 13     Q.   MS. SPIVEY, I'D LIKE TO DRAW YOUR ATTENTION TO THE EMAIL

09:48AM 14     AT THE BOTTOM OF THE CHAIN.  THIS APPEARS -- THE BOTTOM EMAIL

09:48AM 15     APPEARS TO BE FROM CARISA BIANCHI.

09:48AM 16          ARE YOU FAMILIAR WITH HER?

09:48AM 17     A.   YES.

09:48AM 18     Q.   AND WHO IS SHE?

09:48AM 19     A.   SHE IS THE HEAD OF THE MARKETING DEPARTMENT.

09:48AM 20     Q.   AND THE SUBJECT IS HORIZON MEDIA.  WHAT IS HORIZON MEDIA?

09:49AM 21     A.   THAT'S THE COMPANY THAT HANDLES A MAJORITY OF THE

09:49AM 22     MARKETING AND ADVERTISING ACTIVITIES FOR THE COMPANY.

09:49AM 23     Q.   AND WHEN YOU SAY MARKETING AND ADVERTISING ACTIVITIES,

09:49AM 24     DOES THAT INCLUDE TELEVISION ADVERTISEMENTS?

09:49AM 25     A.   YES.

09:49AM  1    Q.   AND DOES IT INCLUDE PRINTED MEDIA ADVERTISEMENTS?

09:49AM  2    A.   YES.

09:49AM  3    Q.   AND IN THIS EMAIL, AT THE BOTTOM MS. BIANCHI IS WRITING

09:49AM  4    "HI SUNNY,

09:49AM  5         "HERE IS THE DETAILED LIST OF WHAT IS INCLUDED IN THE

09:49AM  6    PHOENIX MEDIA PLAN FOR 3TH," I THINK SHE MEANT 3RD, "AND 4TH

09:49AM  7    QUARTER.  ALL INVOICES REFLECT DATES THROUGH END OF YEAR."

09:49AM  8         DO YOU SEE THAT LANGUAGE?

09:49AM  9    A.   YES.

09:49AM  10   Q.   AND THE 3RD AND 4TH QUARTER, THAT WOULD BE OF 2015?

09:49AM  11   A.   YES.

09:49AM  12   Q.   IN NUMBER 2 -- WELL, IN NUMBER 1, DO YOU SEE WHERE THERE

09:49AM  13   ARE SOME EXPENSES RELATING TO OOH/CINEMA, PEOPLE MAGAZINE

09:49AM  14   COVER, AZ REPUBLIC, DIGITAL/MOBILE ACTIVITY?

09:50AM  15        DO YOU SEE THAT LAID OUT IN NUMBER 1?

09:50AM  16   A.   YES.

09:50AM  17   Q.   AND AZ REPUBLIC, IS THAT THE ARIZONA REPUBLIC?

09:50AM  18   A.   I BELIEVE SO.

09:50AM  19   Q.   THAT'S THE NEWSPAPER IN ARIZONA?

09:50AM  20   A.   I THINK SO.

09:50AM  21   Q.   IN NUMBER 2 IT SAYS, "WIRE FUNDS DUE 7/31 -- $1,126,661."

09:50AM  22        DO YOU SEE THAT?

09:50AM  23   A.   YES.

09:50AM  24   Q.   AND BENEATH THAT IS THERE THE WORDS 3Q AND 4Q, T.V. AND

09:50AM  25   ANOTHER NUMBER IN THE 800,000?

09:50AM 1    A.   YES.

09:50AM 2    Q.   AND BENEATH THAT DO YOU SEE WHERE IT SAYS, "I WILL HAVE

09:50AM 3    THE 3Q AND 4Q BUYS READY FOR YOUR AND ELIZABETH'S REVIEW NEXT

09:50AM 4    TUESDAY"?

09:50AM 5    A.   YES.

09:50AM 6    Q.   AND DOES THAT RELATE TO POTENTIAL MEDIA EXPENSES FOR THE

09:50AM 7    3RD AND 4TH QUARTER OF 2015?

09:50AM 8    A.   YES.

09:50AM 9         MR. WADE:  YOUR HONOR, 602.  602.

09:50AM 10        THE COURT:  CAN YOU LAY A FOUNDATION FOR HER

09:51AM 11   KNOWLEDGE?

09:51AM 12   BY MR. LEACH:

09:51AM 13   Q.   YOU ULTIMATELY REVIEWED AND FORWARD THIS EMAIL TO

09:51AM 14   MS. HOLMES AND MR. BALWANI; IS THAT CORRECT?

09:51AM 15   A.   YES.

09:51AM 16   Q.   SO WHEN YOU'RE SENDING THIS TO MS. HOLMES AND MR. BALWANI,

09:51AM 17   WAS IT IMPORTANT FOR YOU TO HAVE A GENERAL UNDERSTANDING OF

09:51AM 18   WHAT YOU WERE SEEKING APPROVAL FOR?

09:51AM 19   A.   YES.

09:51AM 20        THE COURT:  AND DID SHE --

09:51AM 21   BY MR. LEACH:

09:51AM 22   Q.   WHEN YOU'RE EMAILING MS. HOLMES AND MR. BALWANI, "I WILL

09:51AM 23   HAVE THE 3Q AND 4Q BUYS READY FOR YOUR AND ELIZABETH'S REVIEW

09:51AM 24   NEXT TUESDAY," WHAT DID YOU UNDERSTAND MS. BIANCHI TO MEAN BY

09:51AM 25   THAT?

09:51AM 1    A.    SHE IS SEEKING APPROVAL FROM ELIZABETH HOLMES AND

09:51AM 2    SUNNY BALWANI FOR THE T.V. SPEND FOR 3Q AND 4Q.

09:52AM 3    Q.    THANK YOU.  LET'S LOOK AT PAGE 2, PLEASE.

09:52AM 4            THE COURT:  I'LL ALLOW THAT.

09:52AM 5            MR. LEACH:  THANK YOU, YOUR HONOR.

09:52AM 6    Q.    DO YOU SEE WHERE IT SAYS "3Q AND 4Q RADIO ($282,570).

09:52AM 7          "I WILL HAVE THE 3Q AND 4Q BUYS READY FOR YOUR AND

09:52AM 8    ELIZABETH'S REVIEW NEXT TUESDAY."

09:52AM 9          DO YOU SEE THAT LANGUAGE?

09:52AM 10   A.    YES.

09:52AM 11   Q.    AND DID YOU UNDERSTAND THIS TO BE MS. BIANCHI SEEKING

09:52AM 12   APPROVAL FOR RADIO ADVERTISEMENTS IN THE SECOND HALF OF 2015?

09:52AM 13   A.    YES.

09:52AM 14   Q.    THE LAST ENTRY UNDER 2 IS "SEPTEMBER DJ AND T.V. HOST

09:52AM 15   ON-AIR SEGMENTS $24,920.

09:52AM 16         "FINALIZING TIMING AND DETAILS, TARGETING FOR SEPTEMBER.

09:52AM 17         "ATTACHING PROPOSED DJ COPY POINTS."

09:52AM 18         DO YOU SEE THAT?

09:52AM 19   A.    YES.

09:53AM 20   Q.    AND ARE THOSE COPY POINTS ONE OF THE ATTACHMENTS TO THE

09:53AM 21   EMAIL THAT YOU FORWARDED TO MS. HOLMES AND MR. BALWANI?

09:53AM 22   A.    I AM NOT SURE.

09:53AM 23   Q.    LET ME DRAW YOUR ATTENTION TO THE --

09:53AM 24         IF WE CAN ZOOM OUT, PLEASE, MS. HOLLIMAN, AND GO BACK TO

09:53AM 25   PAGE 1, PLEASE.

Case 5:18-cr-00258-EJD Document 1702, Filed 01/18/22, Page 62 of 266

09:53AM  1          IF WE CAN ZOOM IN ON THE TOP HALF OF THIS PARAGRAPH, DO

09:53AM  2    YOU SEE THE MIDDLE EMAIL, MS. SPIVEY, WHERE CARISA EMAILS YOU,

09:53AM  3    "HI DANISE,

09:53AM  4          "PER MY EARLIER EMAIL, HERE IS THE RECAP I SENT TO

09:53AM  5    ELIZABETH AND SUNNY EARLIER TODAY WHICH RECAPS ALL MEDIA

09:54AM  6    ACTIVITY, WIRE DATES AND AMOUNTS."

09:54AM  7          DO YOU SEE THAT LANGUAGE?

09:54AM  8    A.   YES.

09:54AM  9    Q.   AND THEN ABOVE YOU WRITE TO MS. HOLMES AND MR. BALWANI,

09:54AM  10   "HI SUNNY/ELIZABETH,

09:54AM  11         "CARISA GAVE MORE DETAILS ABOUT THE WIRE REQUEST.  DO YOU

09:54AM  12   WANT ME TO SUBMIT A WIRE FOR MONDAY DELIVERY?"

09:54AM  13         DO YOU SEE THAT?

09:54AM  14   A.   YES.

09:54AM  15   Q.   AND DO YOU SEE THERE ARE TWO ATTACHMENTS IN THE SUBJECT

09:54AM  16   MATTER EMAIL PX OOH AND DJ COPY POINTS?

09:54AM  17   A.   YES.

09:54AM  18   Q.   AND WERE THOSE MATERIALS THAT YOU WERE SEEKING TO HAVE

09:54AM  19   MS. HOLMES AND MR. BALWANI APPROVE?

09:54AM  20   A.   YES.

09:54AM  21   Q.   AND YOU BELIEVED THOSE TO BE THE ATTACHMENTS TO THE EMAIL?

09:54AM  22   A.   YES.

09:54AM  23   Q.   IF WE CAN ZOOM OUT AGAIN, MS. HOLLIMAN.

09:54AM  24         I WANT TO DRAW YOUR ATTENTION BACK TO THE BOTTOM OF THE

09:54AM  25   EMAIL, MS. SPIVEY, THERE'S A NUMBER "WIRE FUNDS DUE 7/31 --

09:54AM  1    $1,126,661."

09:55AM  2         DO YOU SEE THAT NUMBER?

09:55AM  3    A.   YES.

09:55AM  4    Q.   KEEP THAT NUMBER IN MIND.  AND I'D LIKE TO DRAW YOUR

09:55AM  5    ATTENTION TO WHAT IS EXHIBIT 5248.

09:55AM  6         AND PERMISSION TO DISPLAY, YOUR HONOR?

09:55AM  7              THE COURT:  YES.

09:55AM  8    BY MR. LEACH:

09:55AM  9    Q.   MS. SPIVEY, DO YOU SEE THE NAME -- DOES THIS APPEAR TO BE

09:55AM 10    A RECORD OF A WIRE TRANSFER?

09:55AM 11    A.   YES.

09:55AM 12    Q.   AND DO YOU SEE THE NAME HORIZON MEDIA, INC. DOWN AT THE

09:55AM 13    BOTTOM?

09:55AM 14    A.   YES.

09:55AM 15    Q.   AND DO THEY APPEAR TO BE THE BENEFICIARY OF THIS

09:55AM 16    PARTICULAR WIRE?

09:55AM 17    A.   YES.

09:55AM 18    Q.   AND IF I COULD DRAW YOUR ATTENTION TO THE MIDDLE PORTION

09:55AM 19    OF THE PAGE THERE'S AN AMOUNT OF $1,126,661.

09:55AM 20         DO YOU SEE THAT?

09:55AM 21    A.   YES.

09:55AM 22    Q.   AND WAS THAT THE SAME DOLLAR AMOUNT THAT YOU WERE SEEKING

09:55AM 23    APPROVAL OF FROM MS. HOLMES AND MR. BALWANI?

09:55AM 24    A.   YES.

09:55AM 25    Q.   AND BASED ON THESE TWO DOCUMENTS, ARE YOU SATISFIED THAT

09:56AM 1    YOU ULTIMATELY OBTAINED AN APPROVAL IN ONE FORM OR ANOTHER?

09:56AM 2    A.   YES.

09:56AM 3    Q.   I ALSO DRAW YOUR ATTENTION TO THE DATE TO THE RIGHT OF THE

09:56AM 4    LINE OMAD.

09:56AM 5         DO YOU SEE 20150803?

09:56AM 6    A.   YES.

09:56AM 7    Q.   AND THAT'S A WEEK OR SO AFTER THE JULY 25TH EMAIL THAT WE

09:56AM 8    LOOKED AT IN EXHIBIT 5454?

09:56AM 9    A.   CORRECT.

09:56AM 10        MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR?

09:56AM 11        THE COURT:  YES.

09:56AM 12   (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

09:56AM 13        MR. LEACH:  I HAVE NO FURTHER QUESTIONS.

09:56AM 14   THANK YOU, MS. SPIVEY.

09:56AM 15        THE COURT:  CROSS?

09:56AM 16                    **CROSS-EXAMINATION**

09:56AM 17   BY MR. WADE:

09:57AM 18   Q.   GOOD MORNING, MS. SPIVEY.

09:57AM 19        MY NAME IS LANCE WADE, AND I REPRESENT MS. HOLMES.

09:57AM 20        I'M GOING TO ASK YOU A FEW QUESTIONS THIS MORNING, OKAY?

09:57AM 21   A.   SURE.

09:57AM 22   Q.   IT'S NICE TO SEE YOU AGAIN.

09:57AM 23        IF I COULD PULL UP EXHIBIT 5454, AND JUST BLOW UP THE

09:57AM 24   BOTTOM EMAIL.

09:57AM 25        YOU'VE TESTIFIED THAT THIS EMAIL RELATES TO SOME MEDIA

09:57AM  1   ACTIVITY OF HORIZON MEDIA; CORRECT?

09:57AM  2   A.   YES.

09:57AM  3   Q.   DID YOU HAVE ANY ROLE WITH RESPECT TO MEDIA CONTENT OR THE

09:57AM  4   PREPARATION OF ANY ADVERTISING FOR THE COMPANY?

09:57AM  5   A.   NO.

09:57AM  6   Q.   OKAY.  AND WAS THAT MS. BIANCHI AND OTHERS WHO WERE

09:58AM  7   INVOLVED IN THOSE EFFORTS?

09:58AM  8   A.   YES.

09:58AM  9   Q.   AND WHEN THERE IS APPROVAL OF THIS SOUGHT, DO YOU FOCUS ON

09:58AM 10   THE CONTENT OF THE APPROVAL, OR DO YOU JUST MAKE SURE THERE'S

09:58AM 11   ENOUGH INFORMATION NECESSARY FOR THE EXPENSE TO BE APPROVED?

09:58AM 12   A.   YEAH, I FOCUS ON WHAT'S -- WELL, INFORMATION THAT

09:58AM 13   SUNNY BALWANI AND ELIZABETH HOLMES NEEDS IN ORDER TO APPROVE

09:58AM 14   THE PAYMENT.

09:58AM 15   Q.   RIGHT.  SO IN THIS CASE FOR ADVERTISING, FOR EXAMPLE, YOU

09:58AM 16   WEREN'T FOCUSSED ON WHAT THE ADVERTISING WOULD SAY, FOR

09:58AM 17   EXAMPLE?

09:58AM 18   A.   CORRECT.

09:58AM 19   Q.   OKAY.  AND YOU DIDN'T PLAY ANY ROLE IN THAT ADVERTISING;

09:58AM 20   CORRECT?

09:58AM 21   A.   CORRECT.

09:58AM 22   Q.   AND IF WE LOOK AT THE BOTTOM -- IF WE LOOK AT ITEM 2, AND

09:59AM 23   CAN WE BRING UP THE TOP OF THE NEXT PAGE AS WELL SO WE CAN SEE

09:59AM 24   THE FULL ITEM.

09:59AM 25        AND I'D LIKE TO JUST ASK YOU A COUPLE OF QUESTIONS ABOUT

09:59AM 1    ITEM 2.  DO YOU SEE IN THE FIRST HEADING UNDER ITEM 2 IT SAYS,

09:59AM 2    "3Q AND 4Q T.V. ($819,171)."

09:59AM 3         DO YOU SEE THAT?

09:59AM 4    A.   YES.

09:59AM 5    Q.   AND IT NOTES THAT THE BUYS WOULD BE READY FOR REVIEW IN

09:59AM 6    THE FUTURE; CORRECT?

09:59AM 7    A.   YES.

09:59AM 8    Q.   SO AS YOU UNDERSTOOD IT AT THIS TIME THERE HAD BEEN

10:00AM 9    NOTHING CONCRETE FINALIZED IN TERMS OF WHAT WOULD BE BOUGHT;

10:00AM 10   RIGHT?

10:00AM 11   A.   BASED ON THIS EMAIL, YES.

10:00AM 12   Q.   YES, THIS WAS SOME KIND OF FUTURE ACTIVITY?

10:00AM 13   A.   YES.

10:00AM 14   Q.   AND DID YOU PLAY ANY ROLE IN THAT FUTURE ACTIVITY AT ALL?

10:00AM 15   A.   NO.

10:00AM 16   Q.   OKAY.  AND WITH RESPECT TO THE SECOND ITEM, ARE THE

10:00AM 17   ANSWERS THE SAME FOR THAT, FUTURE ACTIVITY THAT YOU DIDN'T PLAY

10:00AM 18   A ROLE IN?

10:00AM 19   A.   YES.

10:00AM 20   Q.   OKAY.  AND IF WE LOOK AT THE THIRD ITEM THERE IT SAYS,

10:00AM 21   "FINALIZING TIMING AND DETAILS."

10:00AM 22        DO YOU SEE THAT?

10:00AM 23   A.   YES.

10:00AM 24   Q.   AND SO YOU UNDERSTOOD THAT THE DETAILS WEREN'T YET

10:00AM 25   FINALIZED; CORRECT?

10:00AM   1    A.   CORRECT.

10:00AM   2    Q.   AND YOU DIDN'T PLAY ANY ROLES IN THE DETAILS AFTER THIS

10:00AM   3    EMAIL, DID YOU?

10:00AM   4    A.   NO.

10:00AM   5    Q.   OKAY.  AND IT NOTES TARGETING FOR SEPTEMBER.  THAT'S A

10:00AM   6    COUPLE OF MONTHS IN THE FUTURE AFTER JULY; CORRECT?

10:00AM   7    A.   CORRECT.

10:00AM   8    Q.   AND YOU DON'T KNOW WHAT ULTIMATELY HAPPENED WITH RESPECT

10:01AM   9    TO ANY OF THIS, DO YOU?

10:01AM  10    A.   NO.

10:01AM  11    Q.   DO YOU KNOW WHETHER THESE ADS EVER -- THAT ARE IDENTIFIED

10:01AM  12    IN ITEM 2 WERE EVER RAN?

10:01AM  13    A.   I DON'T KNOW.

10:01AM  14    Q.   OKAY.  IT SAYS, "ATTACHING PROPOSED DJ COPY POINTS."

10:01AM  15         DO YOU SEE THAT THERE?

10:01AM  16    A.   YES.

10:01AM  17    Q.   AND THERE WAS AN ATTACHMENT TO THE EMAIL.  MR. LEACH NOTED

10:01AM  18    THAT; CORRECT?

10:01AM  19    A.   YES.

10:01AM  20    Q.   BUT YOU DIDN'T PLAY ANY ROLE IN FINALIZING THE PROPOSED

10:01AM  21    TALKING POINTS, DID YOU?

10:01AM  22    A.   NO.

10:01AM  23    Q.   OKAY.  LET'S TURN TO PAGE 4 OF THE EXHIBIT, AND LET'S BLOW

10:01AM  24    UP THE FIRST SECTION THERE.

10:01AM  25         AND THIS HERE TALKS ABOUT "SMALLER SAMPLES.  SMALLER

10:02AM  1      NEEDLES.  A BETTER EXPERIENCE."

10:02AM  2           DO YOU SEE THAT?

10:02AM  3      A.   YES.

10:02AM  4      Q.   AND YOU HAD SEEN PROMOTIONS FROM THE COMPANY ALONG THOSE

10:02AM  5      LINES PREVIOUSLY I TAKE IT?

10:02AM  6      A.   SOMETHING LIKE THAT.

10:02AM  7      Q.   DO YOU SEE THE NEXT LINE IT SAYS, "MANY OF THERANOS TESTS

10:02AM  8      REQUIRE ONLY A FEW DROPS OF BLOOD."

10:02AM  9           DO YOU SEE THAT?

10:02AM 10      A.   YES.

10:02AM 11      Q.   AND YOU UNDERSTOOD THAT TO BE THE MICRO-SAMPLE THAT THE

10:02AM 12      COMPANY WOULD USE FOR SMALL SAMPLE TESTING?

10:02AM 13      A.   YES.

10:02AM 14      Q.   OKAY.  SOMETIMES REFERRED TO AS THE NANOTAINER; IS THAT

10:02AM 15      RIGHT?

10:02AM 16      A.   CORRECT.

10:02AM 17      Q.   OKAY.  AND THEN IT SAYS, "ALL OF OUR TESTS, INCLUDING

10:02AM 18      VENOUS DRAWS, REQUIRE SMALLER SAMPLES THAN TRADITIONAL LABS."

10:02AM 19           RIGHT?

10:02AM 20      A.   YES.

10:02AM 21      Q.   AND SO -- AND YOU UNDERSTOOD THAT AT THIS TIME THAT THE

10:02AM 22      VENOUS DRAWS WOULD SOMETIMES BE USED IN THERANOS LABS?

10:02AM 23      A.   YOU MEAN BASED ON THIS DOCUMENT?

10:03AM 24      Q.   YEAH.

10:03AM 25      A.   YES.

10:03AM  1    Q.   AND THAT THEY TRIED TO USE A SMALLER SAMPLE VENOUS DRAW

10:03AM  2    WHEN THEY DID THAT?

10:03AM  3    A.   YES.

10:03AM  4    Q.   OKAY.  AND, IN FACT, IN THE NEXT LINE THERE IT ACTUALLY

10:03AM  5    TALKS ABOUT THE SMALLEST VENOUS DRAW SAMPLE POSSIBLE.

10:03AM  6         DO YOU SEE THAT?

10:03AM  7    A.   YES.

10:03AM  8    Q.   AND HOW THERANOS TESTS MEAN LESS BLOOD.

10:03AM  9         DO YOU SEE THAT?

10:03AM  10   A.   YES.

10:03AM  11   Q.   OKAY.  AND YOU UNDERSTOOD THAT AT THE TIME; RIGHT?

10:03AM  12   A.   YES.

10:03AM  13   Q.   OKAY.  LET'S GO TO -- IF WE CAN BOLD BACK OUT AND LOOK AT

10:03AM  14   THE SECOND SENTENCE.

10:03AM  15        YOU UNDERSTOOD THAT THESE PROPOSED TALKING POINTS ALSO --

10:03AM  16   AND AGAIN, THESE WERE -- THIS WAS SOMETHING THAT MS. HOLMES

10:03AM  17   APPROVED; CORRECT?  I BELIEVE THAT WAS YOUR TESTIMONY,

10:03AM  18   MS. HOLMES APPROVED THIS OR MR. BALWANI?

10:03AM  19   A.   THEY APPROVED THE WIRE.

10:04AM  20   Q.   THEY APPROVED THE WIRE.

10:04AM  21        AND YOU HAD SENT THEM THIS INFORMATION; RIGHT?

10:04AM  22   A.   YES.

10:04AM  23   Q.   AND INCLUDING THIS INFORMATION ABOUT THE VENOUS TESTING;

10:04AM  24   RIGHT?

10:04AM  25   A.   RIGHT.

10:04AM  1    Q.   OKAY.  AND THERE'S ALSO AN EMPHASIS HERE ON AFFORDABLE

10:04AM  2    PRICING.

10:04AM  3         DO YOU SEE THAT?

10:04AM  4    A.   YES.

10:04AM  5    Q.   AND YOU UNDERSTOOD THAT THAT WAS THE FOCUS OF THE

10:04AM  6    COMPANY'S ADVERTISING AT THE TIME; RIGHT?

10:04AM  7    A.   WHAT DOES THAT MEAN?

10:04AM  8    Q.   YOU REMEMBER THE COMPANY WAS FOCUSSED ON TRYING TO PROVIDE

10:04AM  9    ITS SERVICES AT LOW PRICES?

10:04AM  10   A.   YES.

10:04AM  11   Q.   AND IF WE GO TO THE NEXT HEADING YOU SEE THE THERANOS

10:04AM  12   EXPERIENCE.

10:04AM  13        AND THE COMPANY WAS VERY FOCUSSED OF TRYING TO PROVIDE A

10:04AM  14   VERY GOOD EXPERIENCE TO ITS CUSTOMERS, WAS IT NOT?

10:04AM  15   A.   YES.

10:04AM  16   Q.   OKAY.  AND THERE'S ALSO DISCUSSION WITHIN THIS DOCUMENT

10:05AM  17   ABOUT CONVENIENT LOCATION AND HOURS; RIGHT?

10:05AM  18   A.   YES.

10:05AM  19   Q.   AND HOW TO GO -- THERE'S SOME DISCUSSION AT THE BOTTOM OF

10:05AM  20   HOW TO GET SERVICES WORKING WITH THE PHYSICIAN.

10:05AM  21        DO YOU SEE THAT?

10:05AM  22   A.   YES.

10:05AM  23   Q.   OKAY.  I'D LIKE TO SHOW YOU ONE OTHER DOCUMENT FROM THE

10:05AM  24   GOVERNMENT THAT I CAN HAND UP.

10:05AM  25        MAY I APPROACH, YOUR HONOR?

| 10:05AM | 1  | THE COURT:  YES. |
| 10:05AM | 2  | BY MR. WADE: |
| 10:05AM | 3  | Q.  (HANDING.) |
| 10:05AM | 4  | AND DO YOU RECALL WHEN YOU TESTIFIED PREVIOUSLY THAT YOU |
| 10:06AM | 5  | TALKED ABOUT HOW SOMETIMES AT MR. BALWANI'S REQUEST YOU WOULD |
| 10:06AM | 6  | PREPARE BALANCE SHEETS FOR HIM? |
| 10:06AM | 7  | A.  YES. |
| 10:06AM | 8  | Q.  AND YOU WOULD FREQUENTLY EMAIL THOSE TO HIM WHEN HE WOULD |
| 10:06AM | 9  | MAKE REQUESTS? |
| 10:06AM | 10 | A.  YES. |
| 10:06AM | 11 | Q.  AND IS THIS ONE OF THOSE OCCASIONS WHERE YOU DID THAT? |
| 10:06AM | 12 | A.  YES. |
| 10:06AM | 13 | Q.  AND WHEN I SAY "THIS," THIS IS EXHIBIT 1396; CORRECT? |
| 10:06AM | 14 | A.  YES. |
| 10:06AM | 15 | MR. WADE:  I MOVE THE ADMISSION OF 1396. |
| 10:06AM | 16 | MR. LEACH:  NO OBJECTION. |
| 10:06AM | 17 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:06AM | 18 | (GOVERNMENT'S EXHIBIT 1396 WAS RECEIVED IN EVIDENCE.) |
| 10:06AM | 19 | BY MR. WADE: |
| 10:06AM | 20 | Q.  AND THE TIME PERIOD FOR THIS PARTICULAR BALANCE SHEET IS |
| 10:06AM | 21 | JANUARY 8TH, 2014; CORRECT? |
| 10:06AM | 22 | A.  CORRECT. |
| 10:06AM | 23 | Q.  AND IF WE GO TO THE NEXT PAGE, YOU UNDERSTOOD THIS TO BE A |
| 10:07AM | 24 | TRUE AND CORRECT BALANCE SHEET AS OF THAT DATE? |
| 10:07AM | 25 | A.  FROM THIS EMAIL IT SEEMS LIKE WE'RE MAKING SOME |

10:07AM 1    ASSUMPTIONS, SO I'M NOT SURE IF THAT WAS AN ACCURATE NUMBER AT

10:07AM 2    THAT TIME.

10:07AM 3    Q.   OKAY.  WELL, LET'S LOOK BACK AT THAT EMAIL.

10:07AM 4         IN THE REQUEST MR. BALWANI ASKED FOR A BALANCE SHEET,

10:07AM 5    ASSUMING THE EQUITY TRANSACTION DOLLARS IS IN AND THE

10:07AM 6    $75 MILLION FROM WAG BY THEN.

10:07AM 7         DO YOU SEE THAT?

10:08AM 8    A.   YES.

10:08AM 9    Q.   AND DO YOU RECALL THAT THOSE WERE PAYMENTS THAT CAME IN

10:08AM 10   LATE IN THE PRIOR YEAR AND HE WAS ASKING HERE WHETHER THEY HAD

10:08AM 11   BEEN ENTERED INTO THE BOOKS?

10:08AM 12   A.   I AM NOT SURE.

10:08AM 13   Q.   YOU DON'T RECALL AS YOU SIT HERE?

10:08AM 14   A.   I DON'T RECALL WHEN THE MONEY WAS IN AND WHAT THIS

10:08AM 15   ASSUMPTION WAS MADE BY, WHAT THAT MEANS.

10:08AM 16   Q.   OKAY.  WHATEVER IT WAS DURING THIS TIME PERIOD, WHEN HE

10:08AM 17   ASKED YOU FOR THE BALANCE SHEET, YOU DID YOUR BEST TO PROVIDE

10:08AM 18   THE MOST ACCURATE BALANCE SHEET THAT YOU COULD AT THE TIME

10:08AM 19   BASED UPON THE STATE OF THE BOOKS AND SENT IT BACK TO

10:08AM 20   MR. BALWANI?

10:08AM 21   A.   YES.

10:08AM 22   Q.   OKAY.

10:08AM 23        NO FURTHER QUESTIONS, YOUR HONOR.

10:08AM 24            THE COURT:  MR. LEACH?

10:08AM 25            MR. LEACH:  NOTHING FURTHER, YOUR HONOR.

10:08AM 1              THE COURT:  MAY THIS WITNESS BE EXCUSED?

10:08AM 2              MR. LEACH:  YES, YOUR HONOR.

10:08AM 3              MR. WADE:  SHE MAY.

10:08AM 4              THE COURT:  THANK YOU, MS. SPIVEY.  YOU MAY GO.

10:08AM 5     YOU'RE EXCUSED.

10:09AM 6         DOES THE GOVERNMENT HAVE ANOTHER WITNESS TO CALL?

10:09AM 7              MR. LEACH:  YES, YOUR HONOR.

10:09AM 8         THE GOVERNMENT CALLS BRIAN GROSSMAN.

10:09AM 9              THE COURT:  SIR, IF YOU COULD JUST STAND THERE FOR

10:09AM 10    JUST A MOMENT.

10:09AM 11             THE CLERK:  EXCUSE ME.

10:09AM 12             THE COURT:  AND IF YOU WOULD RAISE YOUR RIGHT HAND

10:09AM 13    IN A MOMENT WHILE YOU FACE OUR COURTROOM DEPUTY, SHE WILL HAVE

10:09AM 14    A QUESTION FOR YOU.

10:09AM 15             THE CLERK:  GOOD MORNING.

10:09AM 16        **(GOVERNMENT'S WITNESS, BRIAN GROSSMAN, WAS SWORN.)**

10:09AM 17             THE WITNESS:  I DO.

10:09AM 18             THE CLERK:  THANK YOU.  PLEASE HAVE A SEAT.

10:09AM 19             THE COURT:  PLEASE HAVE A SEAT HERE, SIR.  I'LL

10:09AM 20    INVITE YOU TO MAKE YOURSELF COMFORTABLE.  FEEL FREE TO ADJUST

10:09AM 21    THE CHAIR AND MICROPHONE AS YOU NEED.

10:09AM 22        I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

10:09AM 23        WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

10:10AM 24    AND THEN SPELL IT, PLEASE.

10:10AM 25             THE WITNESS:  BRIAN GROSSMAN, B-R-I-A-N,

10:10AM  1     G-R-O-S-S-M-A-N.

10:10AM  2                THE COURT:  THANK YOU.

10:10AM  3          COUNSEL.

10:10AM  4                MR. LEACH:  THANK YOU, YOUR HONOR.

10:10AM  5                        **DIRECT EXAMINATION**

10:10AM  6     BY MR. LEACH:

10:10AM  7     Q.    MR. GROSSMAN, I UNDERSTAND YOU'RE FULLY VACCINATED AND ARE

10:10AM  8     COMFORTABLE TESTIFYING WITHOUT A MASK.

10:10AM  9     A.    YES, I AM.

10:10AM  10    Q.    OKAY.  WHERE DO YOU WORK, SIR?

10:10AM  11    A.    I WORK AT A FIRM CALLED PFM HEALTH SCIENCES.

10:10AM  12    Q.    WHAT IS PFM HEALTH SCIENCES?

10:10AM  13    A.    WE ARE AN S.E.C. REGISTERED INVESTMENT ADVISOR.  WE HAVE

10:10AM  14    TWO PRINCIPAL STRATEGIES.  WE HAVE A HEDGE FUND STRATEGY AND A

10:10AM  15    GROWTH EQUITY STRATEGY THAT WE MANAGE.

10:10AM  16    Q.    WHEN YOU SAY AN S.E.C. REGISTERED INVESTMENT ADVISOR, WHAT

10:10AM  17    DO YOU MEAN?

10:10AM  18    A.    WE ARE AN INVESTMENT FIRM THAT REGISTERS WITH THE S.E.C.,

10:10AM  19    FILES REGULATORY UPDATES, HOLDINGS.  WE'RE A REGULATED ENTITY.

10:11AM  20    Q.    IF YOU'RE COMFORTABLE AND WOULD LIKE SOME WATER, LET ME

10:11AM  21    GIVE YOU THE OPPORTUNITY TO POUR THAT.

10:11AM  22          ARE YOU COMFORTABLE NOW?

10:11AM  23    A.    YES.

10:11AM  24    Q.    AND WHAT DO YOU DO FOR PFM?

10:11AM  25    A.    I AM THE MANAGING PARTNER FOR THE FIRM.  I AM THE

10:11AM  1    PORTFOLIO MANAGER FOR BOTH STRATEGIES AND THE CHIEF INVESTMENT

10:11AM  2    OFFICER.

10:11AM  3    Q.   WHEN YOU SAY THE CHIEF INVESTMENT OFFICER, WHAT ARE SOME

10:11AM  4    OF YOUR RESPONSIBILITIES?

10:11AM  5    A.   PORTFOLIO MANAGEMENT, RISK MANAGEMENT ARE THE TWO MAIN

10:11AM  6    ONES.

10:11AM  7    Q.   OKAY.  IN OR ABOUT FEBRUARY OF 2014, DID PFM INVEST IN A

10:11AM  8    COMPANY CALLED THERANOS?

10:11AM  9    A.   WE DID.

10:11AM  10   Q.   AND WERE YOU INVOLVED IN MAKING THAT INVESTMENT DECISION?

10:11AM  11   A.   I WAS.

10:11AM  12   Q.   WE'LL COME BACK TO THAT.  BUT FOR NOW COULD YOU BRIEFLY

10:12AM  13   DESCRIBE YOUR EDUCATIONAL BACKGROUND?

10:12AM  14   A.   YES.  I GRADUATED FROM THE UNIVERSITY OF PENNSYLVANIA IN

10:12AM  15   1996.

10:12AM  16       I JOINED JP MORGAN ASSET MANAGEMENT IN SUMMER OF 1996 AND

10:12AM  17   WORKED THERE FOR FIVE YEARS.  THE FIRST TWO I WAS A -- I WORKED

10:12AM  18   IN THE EQUITY PORTFOLIO MANAGEMENT GROUP, AND THE LAST THREE I

10:12AM  19   WAS PROMOTED TO BE A RESEARCH ANALYST COVERING THE HEALTH CARE

10:12AM  20   SECTOR.

10:12AM  21       IN THE MIDDLE OF 2001 I LEFT JP MORGAN TO JOIN A FIRM

10:12AM  22   CALLED PEQUOT CAPITAL, THEY WERE A HEDGE FUND BASED IN

10:12AM  23   CONNECTICUT, NEW YORK, AND MY ROLE AT THAT POINT WAS TO COVER

10:12AM  24   THE BIOTECHNOLOGY SECTOR.  I DID THAT AT PEQUOT FOR A FEW

10:12AM  25   MONTHS.

10:12AM 1          PEQUOT THEN SPLIT INTO TWO FIRMS.  THE FIRM THAT LEFT AND

10:12AM 2     SPLIT OUT AND SPUN OUT OF PEQUOT WAS A FIRM CALLED ANDOR

10:13AM 3     CAPITAL.  I JOINED -- I WAS PART OF THE GROUP THAT LEFT PEQUOT

10:13AM 4     AND JOINED ANDOR.  THAT WAS IN 2001.

10:13AM 5          FROM NOVEMBER OF 2001 UNTIL THE MIDDLE OF 2004 I WAS THE

10:13AM 6     BIOTECH ANALYST AT ANDOR CAPITAL MANAGEMENT.

10:13AM 7          AND THEN ANDOR HAD A SIMILAR SPLIT IN THE MIDDLE OF 2004,

10:13AM 8     AND AT THAT POINT MYSELF AND A FEW OF THE OTHER -- MY

10:13AM 9     COLLEAGUES STARTED OUR CURRENT FIRM, PFM.

10:13AM 10    Q.   SO YOU'VE HAD OVER 20 YEARS EXPERIENCE COVERING THE

10:13AM 11    BIOTECH SECTOR EITHER AS ANALYST OR AN INVESTOR?

10:13AM 12    A.   THAT IS CORRECT.

10:13AM 13    Q.   OKAY.  AND PFM IS AN INVESTMENT PARTNERSHIP?

10:13AM 14    A.   WE ARE -- YES, WE ARE A, WE ARE A PARTNERSHIP.  WE ARE NOT

10:13AM 15    A C CORP, AND SO WE HAVE, WE HAVE PARTNERS AND THEN WE HAVE

10:14AM 16    NON-PARTNERED EMPLOYEES.

10:14AM 17    Q.   OKAY.  DO YOU INVEST JUST FOR YOURSELF OR DO YOU INVEST

10:14AM 18    FOR CLIENTS?  WHAT DO YOU DO?

10:14AM 19    A.   THE PRINCIPAL CAPITAL BASE, THE VAST MAJORITY OF THAT IS

10:14AM 20    NON-EMPLOYEE CAPITAL.

10:14AM 21    Q.   SO INDIVIDUALS WHO INVEST IN YOUR FUND?

10:14AM 22    A.   THAT'S CORRECT.

10:14AM 23    Q.   OKAY.  DO YOU ALSO MAKE INVESTMENTS ON BEHALF OF PENSION

10:14AM 24    FUNDS?

10:14AM 25    A.   YES, WE DO.  WE HAVE A BROAD RANGE OF DIFFERENT INVESTORS

10:14AM  1    IN OUR FUNDS.

10:14AM  2    Q.   AND ARE THOSE PENSION FUNDS PRIVATE COMPANIES?  PUBLIC

10:14AM  3    COMPANIES?  STATES?  WHAT ARE THEY?

10:14AM  4    A.   THEY REPRESENT BOTH.

10:14AM  5    Q.   I'D LIKE TO DRAW YOUR ATTENTION, PLEASE, TO THE TIME

10:14AM  6    PERIOD DECEMBER OF 2013.  IN OR AROUND THAT TIME, DID YOU MEET

10:14AM  7    WITH INDIVIDUALS FROM THERANOS ABOUT A POSSIBLE INVESTMENT IN

10:15AM  8    THE COMPANY?

10:15AM  9    A.   YES.

10:15AM 10    Q.   OKAY.  WHO DID YOU MEET WITH?

10:15AM 11    A.   WE MET WITH MS. HOLMES AND MR. BALWANI.

10:15AM 12    Q.   AND WAS IT JUST YOU ON BEHALF OF PFM OR WAS THERE SOMEBODY

10:15AM 13    ELSE?

10:15AM 14    A.   IN THAT FIRST MEETING IT WAS MYSELF AND MY PARTNER,

10:15AM 15    CHRIS JAMES.

10:15AM 16    Q.   WHERE DID YOU MEET WITH MS. HOLMES AND MR. BALWANI?

10:15AM 17    A.   WE MET AT THEIR OFFICES ON CALIFORNIA AVENUE IN PALO ALTO.

10:15AM 18    Q.   APPROXIMATELY HOW LONG DID YOU MEET WITH THEM FOR?

10:15AM 19    A.   I BELIEVE IT WAS ROUGHLY AN HOUR MEETING.

10:15AM 20    Q.   OKAY.  WERE YOU SHOWN ANY DOCUMENTS IN THIS HOUR LONG

10:15AM 21    MEETING?

10:15AM 22    A.   I BELIEVE THERE WAS A LAPTOP WITH A PRESENTATION IN THAT

10:15AM 23    MEETING.

10:15AM 24    Q.   OKAY.  DESCRIBE FOR US WHAT HAPPENED, YOUR EXPERIENCE IN

10:15AM 25    GOING TO THERANOS AND RECEIVING INFORMATION FROM MS. HOLMES AND

10:15AM  1    MR. BALWANI.

10:15AM  2    A.   WELL, WE SCHEDULED THE MEETING FOR MID-DECEMBER.  I

10:16AM  3    REMEMBER DRIVING DOWN FROM SAN FRANCISCO WHERE OUR OFFICES ARE

10:16AM  4    WITH MY PARTNER.

10:16AM  5        I REMEMBER ARRIVING AT THE COMPANY'S HEADQUARTERS AND

10:16AM  6    GOING THROUGH THE LOBBY WHERE THEY HAD SECURITY, AND WE HAD TO

10:16AM  7    SIGN SOME DOCUMENTS THAT I WAS A LITTLE SURPRISED THAT WE HAD

10:16AM  8    TO SIGN DOCUMENTS TO GET INTO THE BUILDING.

10:16AM  9        THEN WE WERE USHERED THROUGH AN AREA THAT WAS A LOBBY AREA

10:16AM  10   WITH SOME EQUIPMENT, KIND OF A DEMONSTRATION AREA, BACK THROUGH

10:16AM  11   A KITCHEN, PASSED A WHOLE BUNCH OF PEOPLE WORKING, AND INTO A

10:16AM  12   CONFERENCE ROOM IN THE BACK OF THE BUILDING, AND THAT'S WHERE

10:16AM  13   WE MET WITH MS. HOLMES AND MR. BALWANI.

10:16AM  14   Q.   YOU MENTIONED THE LEVEL OF SECURITY GETTING IN THERANOS.

10:16AM  15   WAS IT UNUSUALLY HIGH IN YOUR EXPERIENCE?

10:16AM  16   A.   IT WAS A LITTLE UNUSUAL.  WE HAD -- I DON'T REMEMBER -- I

10:17AM  17   DON'T RECALL THAT FOR EITHER A PUBLIC OR PRIVATE COMPANY,

10:17AM  18   BUT -- SO I DO REMEMBER THAT ASPECT OF IT.

10:17AM  19   Q.   OKAY.  AND YOU MET WITH MS. HOLMES AND MR. BALWANI IN THIS

10:17AM  20   DECEMBER 2013 MEETING?

10:17AM  21   A.   YES.

10:17AM  22   Q.   OKAY.  TAKE A MOMENT AND DESCRIBE FOR US THE SUBSTANCE OF

10:17AM  23   WHAT WAS SAID.

10:17AM  24   A.   OKAY.  WELL, THE MEETING STARTED OUT, AND THE FIRST THING

10:17AM  25   WE TALKED ABOUT WAS THE TECHNOLOGY.  WE KNEW WHAT WAS PUBLICLY

10:17AM 1   AVAILABLE, WHAT HAD BEEN PUBLICLY DISCLOSED ABOUT THE COMPANY

10:17AM 2   AT THAT POINT.  WE KNEW THAT THEY HAD A PARTNERSHIP WITH

10:17AM 3   WALGREENS THAT HAD BEEN ANNOUNCED I THINK IN SEPTEMBER OF 2013.

10:17AM 4   BUT BEYOND THAT WE REALLY KNEW NOTHING ABOUT THERANOS.

10:17AM 5        SO THIS WAS OUR FIRST OPPORTUNITY TO REALLY HEAR THEIR

10:17AM 6   STORY AND UNDERSTAND WHAT THEIR, WHAT THEIR BUSINESS, THEIR

10:18AM 7   BUSINESS WAS.

10:18AM 8        THE FIRST THING WE TALKED ABOUT WAS THE TECHNOLOGY, AND

10:18AM 9   THEY TOLD US THAT THEY COULD DO ALL -- OVER A THOUSAND CPT

10:18AM 10  CODES WITH THEIR TECHNOLOGY.  THAT WAS A PRETTY PROFOUND

10:18AM 11  STATEMENT.

10:18AM 12       SO THEY THEN EXPLAINED HOW IT HAD TAKEN THEM TEN YEARS TO

10:18AM 13  GET TO THAT POINT, AND OVER THAT TEN YEAR PERIOD OF TIME THEY

10:18AM 14  DESCRIBED HOW THEY HAD WORKED WITH BOTH THE MILITARY, THE

10:18AM 15  DEPARTMENT OF DEFENSE, AND PHARMACEUTICAL COMPANIES DOING

10:18AM 16  CLINICAL TRIAL RESEARCH.

10:18AM 17       ON THE DEPARTMENT OF DEFENSE, THEY TOLD US THAT THE

10:18AM 18  TECHNOLOGY HAD BEEN USED IN THE BATTLEFIELD ON MEDEVACS, FOR

10:18AM 19  EXAMPLE, AND THAT GETTING DIAGNOSTIC INFORMATION TO MEDICAL

10:19AM 20  PERSONNEL IN THE -- IN THAT SETTING WAS A MATTER OF LIFE AND

10:19AM 21  DEATH.  AND THEY EMPHASIZED HOW THEIR TECHNOLOGY HAD BEEN ABLE

10:19AM 22  TO DO THAT IN THOSE DIFFICULT CONDITIONS.

10:19AM 23       ON THE PHARMACEUTICAL SIDE, THEY TALKED ABOUT THE

10:19AM 24  PARTNERSHIPS THAT THEY HAD WITH A VARIETY OF DIFFERENT

10:19AM 25  PHARMACEUTICAL COMPANIES, AND THEY SAID OVER THE YEARS THEY HAD

10:19AM   1    BEEN ASKED TO DO A VARIETY OF DIFFERENT TESTS.  THE IDEA WAS

10:19AM   2    THAT YOU COULD GIVE SOMEONE A REAL -- A TEST IN THEIR HOUSE

10:19AM   3    WITHIN 20, 30 MINUTES FOR AN EXPERIMENTAL DRUG, AND IT WAS

10:19AM   4    THE -- IT WAS THOSE RELATIONSHIPS WHICH OPENED THEIR EYES TO

10:19AM   5    THE FACT THAT THERE WERE REALLY WERE NO LIMITATIONS TO THE

10:19AM   6    TECHNOLOGY.

10:19AM   7        SO THAT'S WHAT KIND OF STARTED THEIR THINKING ABOUT A

10:19AM   8    RETAIL-LIKE STRATEGY WITH SOMEONE LIKE WALGREENS.

10:20AM   9        THEY THEN DESCRIBED HOW THE TECHNOLOGY WAS ACTUALLY BETTER

10:20AM  10    THAN CONVENTIONAL LABORATORY EQUIPMENT, WHICH SUFFERED FROM A

10:20AM  11    HUGE AMOUNT OF VARIABILITY.

10:20AM  12        AND VARIABILITY WAS DUE TO HUMANS, INTERACTING WITH BIG

10:20AM  13    VENOUS DRAWS, SAMPLES THAT WERE TAKEN CONVENTIONALLY, AND THEN

10:20AM  14    MANIPULATING THOSE SAMPLES IN A LABORATORY ENVIRONMENT.  IT

10:20AM  15    CREATED -- IT INTRODUCED A SIGNIFICANT AMOUNT OF VARIABILITY.

10:20AM  16        AND THEY EXPLAINED THAT THEIR TECHNOLOGY ELIMINATED THE

10:20AM  17    HUMAN ASPECT OF THAT, AND AS A RESULT IT HAD DRAMATICALLY LESS

10:20AM  18    VARIABILITY FROM TEST TO TEST, FROM MACHINE TO MACHINE.

10:20AM  19        I THINK IN THAT MEETING THEY TALKED ABOUT A NUMBER THAT

10:20AM  20    WAS LESS THAN 5 PERCENT, AND THEY COMPARED THAT TO SOMETHING

10:20AM  21    LIKE HIGH DENSITY -- HDL, WHICH IS THE GOOD CHOLESTEROL, SO

10:20AM  22    HIGH DENSITY LIPID PROTEIN, AND THEY EXPLAINED THAT THAT TEST,

10:21AM  23    WHICH IS PROBABLY A TEST THAT EVERYONE IN THIS COURTROOM HAS

10:21AM  24    HAD, YOU CAN SEE VARIABILITY OF UPWARDS OF 30 PERCENT OR MORE

10:21AM  25    FROM THE SAME MACHINE IN THE SAME LAB.

10:21AM  1        SO THEY REALLY EMPHASIZED HOW NOT ONLY WAS THIS A MORE

10:21AM  2   CONVENIENT TECHNOLOGY, BUT, YOU KNOW, IT HAD VERY, VERY

10:21AM  3   SIGNIFICANT ADVANTAGES IN TERMS OF THE RELIABILITY AND

10:21AM  4   REPRODUCIBILITY.

10:21AM  5        WE CIRCLED BACK TO THE TECHNOLOGY AT THAT POINT AND SAID

10:21AM  6   THAT WE WANTED TO COME BACK TO UNDERSTAND AND -- COME BACK TO

10:21AM  7   THE OPENING STATEMENTS IN THAT MEETING AND UNDERSTAND IF THERE

10:21AM  8   WERE ANY LIMITATIONS.

10:21AM  9        AND, AGAIN, THEY WERE VERY CLEAR.  MS. HOLMES WAS ACTUALLY

10:21AM 10   VERY CLEAR THAT THEY COULD MATCH EVERY TEST ON THE LABCORP AND

10:21AM 11   QUEST MENU OF TESTS.

10:21AM 12        THOSE WERE THE TWO LABORATORIES THAT ARE PROBABLY MOST

10:21AM 13   WELL-KNOWN IN THE CLINICAL DIAGNOSTIC SPACE AS BEING

10:22AM 14   INDEPENDENT, WHAT WE REFER TO AS REFERENCE LABORATORIES.

10:22AM 15        BUT SHE DID HIGHLIGHT THAT THERE WAS ONE LIMITATION THAT

10:22AM 16   THEY HAD WITH THE TECHNOLOGY AT FIRST, WHICH WAS AROUND

10:22AM 17   CULTURES, AND CULTURES, BY THAT SHE WAS REFERRING TO THE IDEA

10:22AM 18   OF HOW YOU GROW A LITTLE MICROORGANISMS AND IDENTIFY THOSE, AND

10:22AM 19   IT'S SOMETHING THAT HAPPENS ALL THE TIME IN HOSPITALS.

10:22AM 20        SHE DESCRIBED A TECHNOLOGY THAT THEY HAD DEVELOPED

10:22AM 21   INTERNALLY TO DO THAT TYPE OF TESTING ON THEIR PROPRIETARY

10:22AM 22   EQUIPMENT.  IT INVOLVED A DIFFERENT TYPE OF NUCLEIC ACID

10:22AM 23   AMPLIFICATION THAT WAS MUCH FASTER, MEANINGFULLY FASTER THAN

10:22AM 24   ANYTHING THAT WAS AVAILABLE AT THAT POINT IN TIME.

10:22AM 25        SO WE TALKED ABOUT THIS NUCLEIC ACID AMPLIFICATION

10:22AM  1    TECHNOLOGY.

10:22AM  2         FROM THERE --

10:22AM  3    Q.   MR. GROSSMAN, LET ME PAUSE YOU BRIEFLY BECAUSE --

10:23AM  4    A.   YEAH.

10:23AM  5    Q.   -- BECAUSE I WANT TO BREAK DOWN SOME OF THE ELEMENTS OF

10:23AM  6    YOUR ANSWER AND I DON'T MEAN TO INTERRUPT YOU.

10:23AM  7         YOU STARTED WITH THE REFERENCE TO THE NUMBER OF CPT CODES

10:23AM  8    THAT THERANOS COULD PERFORM.

10:23AM  9         DO YOU RECALL THAT?

10:23AM 10    A.   YES.

10:23AM 11    Q.   AND WHAT WAS THE NUMBER THAT YOU RECALL MS. HOLMES AND

10:23AM 12    MR. BALWANI PROVIDING YOU?

10:23AM 13    A.   IT WAS OVER A THOUSAND.

10:23AM 14    Q.   OKAY.  AND WAS THAT IMPRESSIVE TO YOU?

10:23AM 15    A.   VERY.

10:23AM 16    Q.   OKAY.  WHY WAS THAT IMPRESSIVE TO YOU?

10:23AM 17    A.   WELL, THIS WAS A COMPANY THAT WE REALLY HAD NEVER HEARD

10:23AM 18    OF, AND TO BE ABLE TO MATCH THE ENTIRE MENU OF TESTS, A

10:23AM 19    THOUSAND CPT CODES, WAS A REALLY BIG STATEMENT ABOUT HOW MUCH

10:23AM 20    THEY HAD ACCOMPLISHED, WHERE THE TECHNOLOGY WAS AT THAT POINT

10:23AM 21    IN TIME.

10:23AM 22         AND THEN IT WAS KIND OF ALSO SUPPORTED BY HOW IT HAD BEEN

10:23AM 23    USED IN BOTH THE MILITARY AND IN THE PHARMACEUTICAL CLINICAL

10:24AM 24    TRIAL SETTING.

10:24AM 25    Q.   OKAY.  YOU TALKED A LITTLE BIT ABOUT THE MILITARY

10:24AM  1    APPLICATIONS THAT WERE DESCRIBED TO YOU IN THIS MEETING, AND I

10:24AM  2    THINK I HEARD YOU SAY YOU WERE TOLD IT WAS BEING USED IN THE

10:24AM  3    BATTLEFIELD.

10:24AM  4    A.   CORRECT.

10:24AM  5    Q.   AND IT WAS BEING USED ON MEDEVAC HELICOPTERS?

10:24AM  6    A.   CORRECT.

10:24AM  7    Q.   AND WAS THAT IMPRESSIVE TO YOU?

10:24AM  8    A.   I MEAN, WHAT, WHAT -- YES.  WHAT BETTER APPLICATION FOR A

10:24AM  9    TECHNOLOGY LIKE THIS THAN IN A MILITARY SETTING UNDER HARSH

10:24AM 10    CONDITIONS LIKE ONE WOULD EXPECT IN A PLACE LIKE AFGHANISTAN OR

10:24AM 11    IRAQ.

10:24AM 12    Q.   YOU ALSO DESCRIBED WORK THAT THE COMPANY HAD BEEN DOING

10:24AM 13    WITH PHARMACEUTICAL COMPANIES.

10:24AM 14         DO YOU RECALL THAT?

10:24AM 15    A.   I DO, YES.

10:24AM 16    Q.   AND DID MS. HOLMES OR MR. BALWANI GIVE YOU A SENSE OF HOW

10:24AM 17    LARGE AND ROBUST THAT BUSINESS WAS?

10:24AM 18    A.   I DON'T RECALL SPECIFICALLY, ONLY THAT THAT HAD BEEN A BIG

10:24AM 19    PART OF WHAT HAD SUSTAINED, ALONG WITH THE MILITARY, THE

10:24AM 20    COMPANY OVER THE TEN YEARS THAT THEY WERE, THEY WERE IN STEALTH

10:25AM 21    MODE.

10:25AM 22    Q.   DID EITHER OF THEM MAKE REFERENCE TO HISTORICAL REVENUE

10:25AM 23    NUMBERS ABOUT THE WORK WITH PHARMA AND THE MILITARY?

10:25AM 24    A.   TOWARDS THE END OF THE MEETING THEY TALKED ABOUT HOW THEY

10:25AM 25    HAD -- I WANT TO SAY SOMETHING, A LITTLE OVER 200 MILLION OF

10:25AM 1    REVENUES FROM THE DEPARTMENT OF DEFENSE, MOSTLY FROM THE

10:25AM 2    DEPARTMENT OF DEFENSE, THAT HAD SUSTAINED THE COMPANY THROUGH

10:25AM 3    THIS PERIOD, THIS PERIOD THAT THEY WERE BUILDING THEIR MENU OF

10:25AM 4    TESTS FOR THE RETAIL SETTING.

10:25AM 5    Q.   AND WAS THAT IMPRESSIVE TO YOU?

10:25AM 6    A.   YEAH, IT WAS VERY IMPRESSIVE, YES.

10:25AM 7    Q.   I THINK I ALSO HEARD YOU SAY THAT THEY TALKED ABOUT THE

10:25AM 8    LACK OF VARIABILITY FROM MACHINE TO MACHINE AND HOW THAT

10:25AM 9    ELIMINATED ERROR IN TRADITIONAL LABS.

10:25AM 10   A.   CORRECT.

10:25AM 11   Q.   AND WAS THAT IMPRESSIVE TO YOU?

10:25AM 12   A.   VERY.

10:25AM 13   Q.   AND WHY WAS THAT?

10:25AM 14   A.   WELL, WE KNEW THAT IN THE CONVENTIONAL LABORATORY

10:26AM 15   ENVIRONMENT THERE WERE MANY DIFFERENT TYPES OF EQUIPMENT, AND

10:26AM 16   HUMANS HAD -- HUMAN LAB TECHNICIANS HAD A BIG ROLE AND OFTEN

10:26AM 17   ONLY HAD A NARROW JOB WITHIN THE LABORATORY TO WORK ONE PIECE

10:26AM 18   OF EQUIPMENT.

10:26AM 19        AND SO, YOU KNOW, THAT IS THE WAY THAT THE INDUSTRY HAD

10:26AM 20   BEEN FOR THE LAST 30, 40 YEARS.  SO THE IDEA THAT YOU COULD

10:26AM 21   ELIMINATE THE HUMAN PART OF THE LABORATORY INDUSTRY HAD

10:26AM 22   PROFOUND IMPLICATIONS FOR THE ECONOMICS OF THAT INDUSTRY, THE

10:26AM 23   PROFITABILITY, THE COSTS.

10:26AM 24        SO THAT WAS, THAT WAS A VERY KIND OF IMPORTANT PART OF

10:26AM 25   THAT MEETING.

10:26AM 1    Q.   WHO DID MOST OF THE TALKING IN THIS DECEMBER 2013 MEETING?

10:26AM 2    A.   MS. HOLMES.

10:26AM 3    Q.   AT ANY POINT DID MS. HOLMES OR MR. BALWANI DISAGREE WITH

10:27AM 4    EACH OTHER ABOUT INFORMATION THAT WAS BEING PROVIDED TO YOU?

10:27AM 5    A.   NO.

10:27AM 6    Q.   WAS THERE ANY DISCUSSION OF THE WALGREENS RELATIONSHIP IN

10:27AM 7    THIS DECEMBER 2013 MEETING?

10:27AM 8    A.   YES, THERE WAS.

10:27AM 9         WE -- THEY TALKED -- THEY TOLD US THAT WALGREENS HAD 8100

10:27AM 10   STORES.  THEY WOULD BE COMMERCIALLY ROLLING THIS TECHNOLOGY OUT

10:27AM 11   IN ALL OF THE WALGREENS STORES, AND THAT AT THAT POINT IN TIME

10:27AM 12   THEY WERE ACTUALLY USING THE PROPRIETARY TECHNOLOGY, TESTING

10:27AM 13   HUMAN SAMPLES, AND BILLING FOR THOSE TESTS, BEING REIMBURSED,

10:27AM 14   TO USE A TERM WE USE A LOT, AN INVESTMENT TERM THAT WE USE.

10:27AM 15        SO THAT WAS -- THEY WERE USING THE TECHNOLOGY ON ACTUAL

10:27AM 16   HUMANS AT THAT POINT IN TIME, OR NOT HUMANS, BUT HUMAN SAMPLES.

10:27AM 17   Q.   AND WAS THAT IMPRESSIVE TO YOU?

10:28AM 18   A.   VERY.

10:28AM 19   Q.   AT THE CONCLUSION OF THIS DECEMBER 2013 MEETING WITH

10:28AM 20   MS. HOLMES AND MR. BALWANI, WERE YOU INTERESTED IN PURSUING A

10:28AM 21   POSSIBLE INVESTMENT IN THERANOS?

10:28AM 22   A.   WE WERE INTERESTED IN LEARNING MORE ABOUT THE COMPANY,

10:28AM 23   YES.

10:28AM 24   Q.   OKAY.

10:28AM 25        MAY I APPROACH THE WITNESS, YOUR HONOR?

10:28AM   1                    THE COURT:  YES.

10:28AM   2    BY MR. LEACH:

10:28AM   3    Q.   (HANDING.)

10:28AM   4         MR. GROSSMAN, I'VE PLACED BEFORE YOU A BINDER OF DOCUMENTS

10:28AM   5    AND I'D LIKE TO DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS

10:28AM   6    TRIAL EXHIBIT 1404.

10:28AM   7                    THE COURT:  DOES THE DEFENSE HAVE A COPY OF YOUR

10:28AM   8    BINDER?

10:28AM   9                    MR. LEACH:  YOUR HONOR, I BELIEVE THE DEFENSE DOES,

10:28AM  10    BUT I NEGLECTED TO TENDER THE BINDER TO THE COURT.

10:29AM  11                    THE COURT:  THANK YOU.

10:29AM  12                    MR. LEACH:  (HANDING.)

10:29AM  13         THANK YOU, YOUR HONOR.

10:29AM  14    Q.   DO YOU HAVE 1404 IN FRONT OF YOU, SIR?

10:29AM  15    A.   I DO.

10:29AM  16    Q.   IS THIS A TRUE AND CORRECT COPY OF AN EMAIL EXCHANGE AMONG

10:29AM  17    YOU, SUNNY BALWANI, CHRIS JAMES, AND ELIZABETH HOLMES?

10:29AM  18    A.   IF I COULD JUST TAKE A MINUTE TO REVIEW IT?

10:29AM  19    Q.   PLEASE.

10:29AM  20    A.   THANK YOU.

10:29AM  21         (PAUSE IN PROCEEDINGS.)

10:29AM  22                    THE WITNESS:  OKAY.

10:29AM  23    BY MR. LEACH:

10:29AM  24    Q.   IS THIS A TRUE AND CORRECT COPY OF AN EMAIL INVOLVING YOU,

10:29AM  25    MR. BALWANI, CHRIS JAMES, AND ELIZABETH HOLMES IN OR ABOUT

| | | |
|---|---|---|
| 10:30AM | 1 | JANUARY 7TH, 2014? |
| 10:30AM | 2 | A.   YES. |
| 10:30AM | 3 | Q.   AND DO YOU SEE THE SUBJECT LINE "DUE DILIGENCE QUESTIONS"? |
| 10:30AM | 4 | A.   YES. |
| 10:30AM | 5 | Q.   OKAY.  AND IS THIS EMAIL -- DOES THIS EMAIL EXCHANGE |
| 10:30AM | 6 | INCLUDE DUE DILIGENCE QUESTIONS THAT YOU SENT TO MS. HOLMES AND |
| 10:30AM | 7 | MR. BALWANI TO BETTER UNDERSTAND THE THERANOS OPPORTUNITY? |
| 10:30AM | 8 | A.   YES. |
| 10:30AM | 9 | MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 1404 INTO |
| 10:30AM | 10 | EVIDENCE. |
| 10:30AM | 11 | MR. WADE:  NO OBJECTION. |
| 10:30AM | 12 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:30AM | 13 | (GOVERNMENT'S EXHIBIT 1404 WAS RECEIVED IN EVIDENCE.) |
| 10:30AM | 14 | BY MR. LEACH: |
| 10:30AM | 15 | Q.   MR. GROSSMAN, I'D LIKE TO DRAW YOUR ATTENTION TO THE |
| 10:30AM | 16 | BOTTOM EMAIL ON PAGE 1. |
| 10:30AM | 17 | DO YOU SEE YOUR NAME ON THE FROM LINE? |
| 10:30AM | 18 | A.   YES. |
| 10:30AM | 19 | Q.   AND YOU MENTIONED CHRIS JAMES.  HE WAS YOUR PARTNER AT THE |
| 10:30AM | 20 | TIME? |
| 10:30AM | 21 | A.   YES. |
| 10:30AM | 22 | Q.   AND THE SUBJECT OF THIS IS DUE DILIGENCE QUESTIONS. |
| 10:30AM | 23 | DO YOU SEE THAT? |
| 10:31AM | 24 | A.   YES. |
| 10:31AM | 25 | Q.   AND IN THE PARAGRAPH YOU WROTE, "ELIZABETH AND SUNNY. |

10:31AM 1       "I HOPE YOU BOTH HAD AN ENJOYABLE FINISH TO WHAT WAS

10:31AM 2   OBVIOUSLY A TREMENDOUSLY SUCCESSFUL YEAR FOR THE COMPANY."

10:31AM 3       FURTHER ON YOU SAY, "BELOW IS OUR LIST OF DUE DILIGENCE

10:31AM 4   QUESTIONS.  WE WERE HOPING TO START THE PROCESS AS SOON AS

10:31AM 5   POSSIBLE."

10:31AM 6       WHY WERE YOU SENDING THESE QUESTIONS TO MS. HOLMES AND

10:31AM 7   MR. BALWANI?

10:31AM 8   A.   WELL, AFTER OUR FIRST MEETING, WE DIGESTED THAT THE -- THE

10:31AM 9   MATERIAL THAT THE, THE INFORMATION THE COMPANY PROVIDED US, AND

10:31AM 10  WE AS A GROUP CAME UP WITH QUESTIONS THAT WE WANTED TO

10:31AM 11  UNDERSTAND, OR WE WANTED ANSWERS TO THAT WE WANTED TO BETTER

10:31AM 12  UNDERSTAND THE BUSINESS.

10:31AM 13      SO THIS IS -- THIS IS THE RESULT OF THAT EFFORT TO PUT

10:31AM 14  TOGETHER A MORE COMPREHENSIVE LIST OF QUESTIONS SO THAT THE

10:31AM 15  NEXT TIME WE MET WITH THEM IT WOULD BE A PRODUCTIVE MEETING AND

10:31AM 16  THEY WOULD KNOW WHAT ISSUES WE WANTED TO ADDRESS BEFORE WE GOT

10:32AM 17  TO THE -- BEFORE THE MEETING STARTED.

10:32AM 18  Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 2.  AND UP AT

10:32AM 19  THE TOP --

10:32AM 20      IF YOU CAN ZOOM IN ON THE TOP HALF, MS. HOLLIMAN?

10:32AM 21      YOU WROTE, "DEAL TEAM, BRIAN GROSSMAN, PORTFOLIO

10:32AM 22  MANAGER/HEAD OF HEALTH CARE TEAM."

10:32AM 23      DO YOU SEE THAT?

10:32AM 24  A.   YES.

10:32AM 25  Q.   AND THERE ARE SOME OTHERS LISTED BELOW YOU?

10:32AM 1    A.   YES.

10:32AM 2    Q.   AND CAN YOU EXPLAIN WHO THESE OTHER FOLKS ARE?

10:32AM 3    A.   ALEX RABODZEY WAS ONE OF OUR BIOTECH ANALYSTS AT THAT

10:32AM 4    POINT AND HE HAD DONE SOME WORK FOR US IN THE DIAGNOSTIC SPACE

10:32AM 5    AND SO HE WAS GOING TO, HE WAS GOING TO BE PART OF THE

10:32AM 6    ANALYSIS, PART OF THE DUE DILIGENCE TEAM.

10:32AM 7         VIVEK KHANNA WAS OUR HEALTH CARE SERVICES.  HEALTH CARE IS

10:32AM 8    A BROAD TERM THAT REFERS TO BUSINESSES THAT ARE INVOLVED IN THE

10:32AM 9    DELIVERY OF HEALTH CARE, SO HOSPITALS, INSURANCE COMPANIES,

10:32AM 10   LABORATORIES, DIALYSIS COMPANIES.  SO THERE'S QUITE AN ECLECTIC

10:33AM 11   GROUP OF BUSINESSES THAT FALL UNDER THAT HEADING.

10:33AM 12        BUT HE'S BEEN COVERING THE HEALTH CARE SPACE, INCLUDING

10:33AM 13   THE REFERENCE LABORATORIES, FOR AT THAT POINT I THINK MORE THAN

10:33AM 14   25 YEARS.

10:33AM 15        AND THEN SRI BALASURYAN WAS OUR JUNIOR ANALYST WHO WORKED

10:33AM 16   WITH VIVEK.  HIS JOB WAS MORE ANALYTIC SUPPORT.  HE DID A LOT

10:33AM 17   OF THE MODELING AND WAS AVAILABLE TO HELP VIVEK, AND ACTUALLY

10:33AM 18   HE WORKED WITH ANOTHER ANALYST AS WELL.

10:33AM 19        SO THOSE WERE THE INDIVIDUALS LISTED THERE AT THE TOP OF

10:33AM 20   THIS EMAIL.

10:33AM 21   Q.   OKAY.  YOU MENTIONED MODELING.  WHAT DID YOU MEAN BY THAT?

10:33AM 22   A.   WHEN WE INVEST IN COMPANIES, WE LIKE TO UNDERSTAND

10:33AM 23   QUALITATIVELY WHAT THEY DO, WHAT IS INTERESTING ABOUT THE

10:33AM 24   BUSINESS.

10:33AM 25        BUT WE ALWAYS MAKE AN EFFORT TO TRANSLATE THAT INTO AN

10:33AM  1    ACTUAL FORECAST FOR THE BUSINESS.  WE DO THAT FOR EVERYTHING --

10:33AM  2    EVERY INVESTMENT THAT WE MAKE.

10:34AM  3        SO AS ANALYST AT OUR FIRM, THERE'S A LOT OF ANALYTIC LABOR

10:34AM  4    THAT GOES INTO BUILDING THOSE MODELS, SO FOR OUR SENIOR PEOPLE

10:34AM  5    OVER THE YEARS WE'VE USED -- WE'VE HIRED JUNIOR ANALYSTS TO

10:34AM  6    HELP WITH THE MODEL BUILDING AND UPDATING MODELS EVERY TIME WE

10:34AM  7    REPORT.  SO IT'S SOMETHING NOW THAT WE'VE BEEN DOING FOR OVER A

10:34AM  8    DECADE.

10:34AM  9    Q.   BENEATH THE DEAL TEAM THAT YOU'VE LISTED HERE, THERE'S AN

10:34AM  10   OUTLINE:  TECHNOLOGY, INTELLECTUAL PROPERTY AND BARRIERS TO

10:34AM  11   ENTRY, WALGREENS'S PARTNERSHIP AND COMMERCIAL STRATEGY, AND SO

10:34AM  12   ON.

10:34AM  13       DO YOU SEE THAT?

10:34AM  14   A.   YES.

10:34AM  15   Q.   AND IS THIS AN OUTLINE OF THE QUESTIONS THAT YOU WERE

10:34AM  16   PROPOSING TO MS. HOLMES AND MR. BALWANI TO BETTER UNDERSTAND

10:34AM  17   THE THERANOS OPPORTUNITY?

10:34AM  18   A.   YES.

10:34AM  19   Q.   I'D LIKE TO BETTER LOOK AT SOME OF YOUR QUESTIONS THAT YOU

10:34AM  20   PUT TO MS. HOLMES AND MR. BALWANI.

10:34AM  21       LET'S START WITH NUMBER 1, TECHNOLOGY.

10:34AM  22       DO YOU SEE THAT ON THE SCREEN?

10:34AM  23   A.   YES.

10:34AM  24   Q.   AND THE VERY FIRST QUESTION, "HOW DOES YOUR ACCURACY AND

10:34AM  25   SPEED STACK UP AGAINST TRADITIONAL TESTS."

10:35AM  1          DO YOU SEE THAT?

10:35AM  2     A.   YES.

10:35AM  3     Q.   AND WHY WERE YOU ASKING THAT?

10:35AM  4     A.   WELL, IT WAS, IT WAS A FUNDAMENTAL PART OF UNDERSTANDING

10:35AM  5     WHAT THEIR TECHNOLOGY WAS CAPABLE OF DOING, AND WHAT THEIR

10:35AM  6     COMPETITIVE ADVANTAGE -- WHAT COMPETITIVE ADVANTAGE THAT THEY

10:35AM  7     HAD AGAINST THE CONVENTIONAL LABORATORY EQUIPMENT.

10:35AM  8     Q.   AND OVER THE COURSE OF YOUR DECISION MAKING PROCESS, DID

10:35AM  9     MS. HOLMES AND MR. BALWANI MAKE STATEMENTS TO YOU RESPONSIVE TO

10:35AM  10    THIS QUESTION?

10:35AM  11    A.   YES.

10:35AM  12    Q.   AND WHAT DID THEY TELL YOU?

10:35AM  13    A.   THEY TOLD US MULTIPLE TIMES OVER --

10:35AM  14          MR. WADE:  YOUR HONOR, OBJECTION, JUST TO THE

10:35AM  15    COMPOUND QUESTION.

10:35AM  16          THE COURT:  COMPOUND QUESTION?  DO YOU WANT TO BREAK

10:35AM  17    IT --

10:35AM  18          MR. WADE:  TWO PEOPLE ARE REFERENCED IN THE QUESTION

10:35AM  19    AND THE ANSWER.

10:35AM  20          THE COURT:  OKAY.  SURE.

10:35AM  21    BY MR. LEACH:

10:35AM  22    Q.   SITTING HERE TODAY, MR. GROSSMAN, HOW MANY MEETINGS DID

10:35AM  23    YOU HAVE WITH MS. HOLMES?

10:35AM  24    A.   I BELIEVE WE HAD TWO MEETINGS WITH MS. HOLMES.

10:35AM  25    Q.   SO THE FIRST ONE IN DECEMBER OF 2013?

10:35AM  1    A.   YES.

10:35AM  2    Q.   AND A SECOND ONE AT SOME POINT SUBSEQUENT TO PROPOSING

10:36AM  3    THESE QUESTIONS?

10:36AM  4    A.   YES.

10:36AM  5    Q.   AND DID YOU ALSO HAVE ADDITIONAL -- AND WAS MR. BALWANI

10:36AM  6    THERE FOR THE SECOND MEETING?

10:36AM  7    A.   YES.

10:36AM  8    Q.   WITH MS. HOLMES?

10:36AM  9    A.   YES.

10:36AM  10   Q.   AND DID YOU ALSO HAVE FOLLOW-UP CONVERSATIONS WITH

10:36AM  11   MR. BALWANI?

10:36AM  12   A.   YES.

10:36AM  13   Q.   OKAY.  SITING HERE TODAY, ARE YOU ABLE TO DISSECT EVERY

10:36AM  14   SINGLE CONVERSATION AS TO WHO SAID WHAT IN EACH ONE?

10:36AM  15   A.   NO.

10:36AM  16   Q.   DO YOU RECALL -- WHAT DO YOU RECALL MS. HOLMES TELLING YOU

10:36AM  17   ABOUT "HOW DOES YOUR ACCURACY AND SPEED STACK UP AGAINST

10:36AM  18   TRADITIONAL TESTS"?

10:36AM  19   A.   I RECALL FROM OUR FIRST MEETING THAT THEY TOLD US FROM AN

10:36AM  20   ACCURACY STANDPOINT THEIR MACHINES WERE MORE ACCURATE, HAD LESS

10:36AM  21   VARIABILITY THAN CONVENTIONAL LAB EQUIPMENT BOTH INSIDE OF A

10:36AM  22   LAB, TWO DIFFERENT MACHINES SIDE BY SIDE, DIFFERENT RESULTS,

10:36AM  23   AND THEN INTRA LAB VARIABILITY, OR THE RESULTS BETWEEN

10:36AM  24   DIFFERENT LABS USING THE SAME TYPE OF EQUIPMENT.

10:37AM  25        AND AGAIN, THAT GOES BACK TO THE FACT THAT THEY DIDN'T

10:37AM 1      HAVE THE HUMAN INTERACTION AND EVERYTHING WAS MINIATURIZED

10:37AM 2      INSIDE OF THE SAMPLE PROCESSING UNIT.

10:37AM 3          IN TERMS OF SPEED, THEY TOLD US THAT THEY COULD HAVE

10:37AM 4      RESULTS FOR THE RETAIL SETTING WITHIN FOUR HOURS.  THEY COULD

10:37AM 5      GUARANTEE TEST RESULTS WITHIN FOUR HOURS.  THAT HAD IMPORTANT

10:37AM 6      IMPLICATIONS FOR HOW PHYSICIANS INTERACT -- AND THEY EXPLAINED

10:37AM 7      HOW THAT HAD IMPORTANT IMPLICATIONS FOR HOW PHYSICIANS INTERACT

10:37AM 8      WITH THEIR PATIENTS.

10:37AM 9          YOU COULD ACTUALLY HAVE YOUR LAB WORK DONE THE SAME DAY

10:37AM 10     YOU VISIT YOUR PHYSICIAN, WHICH WAS A PARADIGM SHIFT IN TERMS

10:37AM 11     OF PRODUCTIVITY FOR PHYSICIAN PRACTICES.

10:37AM 12         AND SO -- AND THEN WHEN THE TECHNOLOGY WAS USING THE

10:37AM 13     NUCLEIC ACID AMPLIFICATION TECHNOLOGY ON THEIR PROPRIETARY

10:37AM 14     SYSTEMS IN A HOSPITAL SETTING, THEY COULD IDENTIFY A VIRAL OR A

10:37AM 15     BACTERIAL PATHOGEN IN I BELIEVE IT WAS LESS THAN AN HOUR, AND

10:38AM 16     THAT COMPARED TO A DAY OR TWO USING CONVENTIONAL CULTURED

10:38AM 17     TECHNOLOGIES THAT WERE PROCESSES.

10:38AM 18         SO, SO, YOU KNOW, THOSE WERE STATEMENTS THAT I RECALL FROM

10:38AM 19     BOTH OF THOSE FIRST TWO MEETINGS.

10:38AM 20     Q.   THANK YOU.  THE NEXT BULLET IS, "WHAT ARE THE KEY TESTS

10:38AM 21     FROM A COMMERCIAL STANDPOINT AND HOW DOES ACCURACY AND SPEED

10:38AM 22     COMPARE SPECIFICALLY ON THOSE."

10:38AM 23         DO YOU SEE THAT QUESTION?

10:38AM 24     A.   YES.

10:38AM 25     Q.   AND WHY WERE YOU ASKING ABOUT THAT?

10:38AM  1    A.   WELL, WE, WE WERE VERY FOCUSSED ON UNDERSTANDING HOW THIS

10:38AM  2    TECHNOLOGY WAS, WAS BEING USED IN THE COMMERCIAL SETTING, IN

10:38AM  3    THE RETAIL COMMERCIAL SETTING, AND SO WE WANTED TO BE VERY

10:38AM  4    CLEAR, WE WANTED TO BE CRYSTAL CLEAR ABOUT WHAT THE TECHNOLOGY

10:38AM  5    CAPABILITIES WERE AT THAT POINT IN TIME IN A REAL WORLD RETAIL

10:39AM  6    SETTING.

10:39AM  7    Q.   AND WHY WAS IT IMPORTANT FOR YOU TO KNOW AT THE TIME IN

10:39AM  8    THE REAL WORLD RETAIL SETTING?  WHY WAS THAT IMPORTANT TO YOU?

10:39AM  9    A.   BECAUSE OUR INVESTMENT WAS BASED ON -- I MEAN, I THINK AT

10:39AM  10   A -- SO, NUMBER ONE, WE, WE -- THAT WAS A CRITICAL PART OF OUR

10:39AM  11   INVESTMENT, UNDERSTANDING HOW THIS TECHNOLOGY WAS ACTUALLY

10:39AM  12   BEING USED AT THAT POINT IN TIME IN A RETAIL ENVIRONMENT AND

10:39AM  13   WHAT, IF ANY, LIMITATIONS THERE WERE.

10:39AM  14        BUT FROM A BIGGER PICTURE PERSPECTIVE, WE WANTED TO

10:39AM  15   UNDERSTAND WHETHER THERE WAS DEVELOPMENT, TECHNOLOGICAL RISKS

10:39AM  16   OR WHETHER WE WERE INVESTING IN A COMPANY THAT ALREADY PASSED

10:39AM  17   THAT REALLY PROOF OF IMPORTANT CONCEPTS, AND THE RISKS WERE

10:39AM  18   REALLY COMMERCIAL ROLLOUT AND BUSINESS STRATEGY.

10:39AM  19   Q.   AND LET ME DRAW YOUR ATTENTION TO THE FOURTH BULLET.

10:39AM  20        DO YOU SEE WHERE IT SAYS, "WHAT ARE THE LIMITATIONS TO THE

10:40AM  21   TECHNOLOGY?  WHAT TESTS ARE NOT FEASIBLE?  ARE THERE

10:40AM  22   TRADITIONAL ANALYTIC APPROACHES THAT ARE NOT WELL SUITED TO

10:40AM  23   THERANOS'S PLATFORM?"

10:40AM  24        WHY WERE YOU ASKING ABOUT THAT?

10:40AM  25   A.   WE JUST WANTED TO ASK THE SAME QUESTIONS AS MANY WAYS AS

10:40AM 1    WE COULD SO THERE WAS NO AMBIGUITY, THERE WAS ABSOLUTELY NO,

10:40AM 2    THERE WAS NO CONFUSION ABOUT WHAT THE TECHNOLOGY WAS CAPABLE OF

10:40AM 3    DOING.

10:40AM 4         AND SO THIS IS ANOTHER WAY OF ASKING THE SAME QUESTION

10:40AM 5    AGAIN.

10:40AM 6         THE ANSWER WAS THAT THERE WERE NO LIMITATIONS.  THERE WAS

10:40AM 7    NO METHODOLOGY THAT EXISTED IN THE ANALYTIC, THERE WAS NO

10:40AM 8    ANALYTIC TECHNIQUE THAT WAS USED IN A REFERENCE LAB THAT THEY

10:40AM 9    COULD NOT AND WERE NOT DOING ON THEIR PROPRIETARY TECHNOLOGY.

10:40AM 10        AND AGAIN, THE COMMENTS, THE CONVERSATION AROUND NUCLEIC

10:40AM 11   ACID AMPLIFICATION ALSO KIND OF CAME UP AGAIN.

10:41AM 12   Q.   AND THAT'S SOMETHING THAT MS. HOLMES TOLD YOU?

10:41AM 13   A.   YES.

10:41AM 14   Q.   LET ME LOOK FURTHER DOWN, IF WE COULD, MS. HOLMES -- OR

10:41AM 15   MS. HOLLIMAN, DOWN TO NUMBER 3, WALGREENS'S RELATIONSHIP AND

10:41AM 16   COMMERCIAL STRATEGY.

10:41AM 17        DO YOU SEE THAT HEADING?

10:41AM 18   A.   YES.

10:41AM 19   Q.   AND YOUR FIRST QUESTION, "IS THE WALGREENS'S RELATIONSHIP

10:41AM 20   EXCLUSIVE?  CAN YOU SELL ANALYZERS TO PHYSICIANS?  DOES IT MAKE

10:41AM 21   ECONOMIC SENSE TO DO THIS IN THE LONG RUN?"

10:41AM 22        WHAT DID YOU MEAN BY "ANALYZERS"?

10:41AM 23   A.   WHAT I MEANT WAS THE MINILAB, THE SAMPLE PROCESSING UNIT.

10:41AM 24   Q.   AND AT ANY POINT DID YOU SEE A MINILAB OR A SAMPLE

10:41AM 25   PROCESSING UNIT?

10:41AM 1    A.   YES.

10:41AM 2    Q.   DESCRIBE IT FOR US.

10:41AM 3    A.   I SAW A FEW DIFFERENT, I SAW A FEW DIFFERENT VERSIONS.

10:41AM 4         THE VERSION THAT WAS BEING MANUFACTURED FOR THE RETAIL

10:41AM 5    SETTING WAS THE SIZE OF A PC, LIKE, FIVE YEARS AGO, A BIG PC.

10:42AM 6    THEY'RE OBVIOUSLY -- THEY KEEP GETTING SMALLER, BUT, YOU KNOW,

10:42AM 7    MAYBE, MAYBE 2 FEET TALL BY 10 INCHES WIDE, KIND OF LIKE THAT

10:42AM 8    DIMENSION.

10:42AM 9         WE SAW THEM MAKING THOSE MACHINES AT THEIR MANUFACTURING

10:42AM 10   FACILITY IN NEWARK.

10:42AM 11        WE ALSO SAW THOSE MACHINES IN THEIR CLIA LABORATORY IN

10:42AM 12   PALO ALTO.

10:42AM 13        WE ALSO SAW A DIFFERENT VERSION OF THE MINILAB IN THE

10:42AM 14   LOBBY OF THEIR CALIFORNIA AVENUE OFFICES THAT THEY TOLD US WERE

10:42AM 15   USED IN THE CLINICAL SETTING.  THEY WERE SMALLER, AND I THINK

10:42AM 16   THE POINT OF BEING SMALLER WAS TO MAKE THEM EASIER TO PUT IN

10:42AM 17   SOMEONE'S HOME.

10:42AM 18        SO WE SAW A DIFFERENT DEVICE THAT THEY TOLD US AT THE TIME

10:43AM 19   WAS WHAT THEY USED IN THE CLINICAL TRIAL BUSINESS.

10:43AM 20   Q.   AND DID MS. HOLMES HOLD OUT THIS MINILAB DEVICE THAT YOU

10:43AM 21   WERE SHOWN ON A NUMBER OF OCCASIONS AS THE DEVICE BEING USED TO

10:43AM 22   TEST PATIENT SAMPLES?

10:43AM 23   A.   YES.

10:43AM 24   Q.   AND WAS IT RELEVANT TO YOU THAT IT WAS A SMALL DEVICE THAT

10:43AM 25   THERANOS WAS MANUFACTURING?

10:43AM 1    A.   YES.

10:43AM 2    Q.   WHY?

10:43AM 3    A.   IT HAD A FUNDAMENTAL, PROFOUND IMPACT ON THE ECONOMICS OF

10:43AM 4    THE LABORATORY INDUSTRY.  THIS ISSUE CAME UP IN OUR SECOND

10:43AM 5    MEETING WITH THE COMPANY.

10:43AM 6         WHEN THEY WERE DESCRIBING THE SAMPLE PROCESSING UNIT, THEY

10:43AM 7    WERE EMPHATIC WITH US THAT THIS WAS NOT ANOTHER POINT OF CARE

10:43AM 8    TESTING TECHNOLOGY.  THIS WAS THE ENTIRE LABORATORY SHRUNK DOWN

10:43AM 9    INTO A BOX.

10:43AM 10        THE IMPLICATION OF THAT IS A RADICAL CHANGE IN THE COST

10:43AM 11   AND THE REAL ESTATE YOU NEED TO SUPPORT A LAB OPERATION IN A,

10:44AM 12   IN ANY GIVEN AREA.

10:44AM 13        AND THE EXAMPLE THEY USED WAS THE PHOENIX MARKET.  THEY

10:44AM 14   SAID, WE CAN -- WITH OUR MINILABS, WE CAN SUPPORT THE ENTIRE

10:44AM 15   COMMERCIAL ROLLOUT OF THE PHOENIX MARKET IN 200 SQUARE FEET,

10:44AM 16   20 FEET BY 10, BECAUSE OUR SYSTEMS ARE SO MUCH SMALLER.

10:44AM 17        AND THAT HAS PROFOUND IMPLICATIONS FOR THE COST STRUCTURE

10:44AM 18   OF THIS BUSINESS.

10:44AM 19        AND YOU THINK ABOUT WHAT THAT MEANS ON A GLOBAL BASIS AS

10:44AM 20   YOU TAKE A TECHNOLOGY LIKE THIS AND YOU APPLY IT NOT JUST TO

10:44AM 21   THE U.S., BUT TO OTHER MARKETS.  YOU COMPARE THAT TO A

10:44AM 22   CONVENTIONAL REFERENCE LABORATORY -- AND I'VE TOURED

10:44AM 23   CONVENTIONAL REFERENCE LABORATORIES.  QUEST HAS A BIG FACILITY

10:44AM 24   IN NEW JERSEY JUST ACROSS FROM THE GEORGE WASHINGTON BRIDGE.

10:44AM 25   IT'S HUNDREDS OF THOUSANDS OF SQUARE FEET.  SO THAT'S BIGGER

10:44AM  1    THAN MOST REFERENCE LABORATORIES, BUT YOU NEED DRAMATICALLY

10:45AM  2    MORE SPACE BECAUSE EACH TESTING METHODOLOGY HAS BIG PIECES OF

10:45AM  3    EQUIPMENT THAT NEED LAB TECHNICIANS TO RUN THOSE, YOU NEED

10:45AM  4    CHEMICALS, REAGENTS TO RUN THOSE EXPERIMENTS.

10:45AM  5         SO IT WAS A -- IT HAD IMPORTANT, PROFOUND IMPLICATIONS FOR

10:45AM  6    THE ECONOMICS OF THE TESTING BUSINESS AND REPRESENTED TO US A

10:45AM  7    TREMENDOUS DISRUPTION TO AN INDUSTRY THAT HADN'T CHANGED IN 30,

10:45AM  8    40 YEARS.

10:45AM  9         SO, YES.

10:45AM  10   Q.   THANK YOU.  LET ME DRAW YOUR ATTENTION TO PAGE 3 OF YOUR

10:45AM  11   DUE DILIGENCE QUESTIONS.  AND THESE ARE UNDER THE HEADING

10:45AM  12   "WALGREENS RELATIONSHIP AND CUSTOMER STRATEGY."

10:45AM  13        DO YOU SEE THE QUESTIONS UP AT THE TOP, "WHAT DOES THE

10:46AM  14   WALGREENS SYSTEM COST TO PRODUCE, HOW WILL THAT CHANGE OVER

10:46AM  15   TIME, AND WHAT IS THE TRANSFER PRICING YOU HAVE AGREED TO?

10:46AM  16        "DO ANALYZERS NEED TO BE VALIDATED IN THE FIELD.  WHAT IS

10:46AM  17   THE ROLLOUT SCHEDULE FOR WALGREENS.

10:46AM  18        "WHAT IS THE CAP X FROM THE WALGREENS ROLLOUT."

10:46AM  19        WHY WERE YOU ASKING THESE TYPES OF QUESTIONS,

10:46AM  20   MR. GROSSMAN?

10:46AM  21   A.   WELL, IT WAS NOT JUST TO BETTER UNDERSTAND HOW THEY WERE

10:46AM  22   GOING TO WORK WITH WALGREENS, BUT THE STRATEGY.  YOU KNOW, DID

10:46AM  23   THEY WANT TO BE A MEDICAL DEVICE COMPANY?  DID THEY WANT TO

10:46AM  24   SELL THESE DEVICES?  THAT'S TYPICALLY WHAT COMPANIES WE SEE IN

10:46AM  25   THIS SECTOR DO.

10:46AM 1      OR DID THEY WANT TO BE A VERTICALLY INTEGRATED SERVICE

10:46AM 2   PROVIDER?  DID THEY WANT TO USE THEIR OWN EQUIPMENT JUST FOR

10:46AM 3   THEMSELVES AND THEIR OWN, AND IN THEIR OWN LABORATORY.

10:46AM 4      SO WE WERE REALLY TRYING TO UNDERSTAND THE BUSINESS

10:46AM 5   STRATEGY HERE AND HOW THEY THOUGHT ABOUT THE LONG-TERM

10:46AM 6   OPPORTUNITY WITH THIS DISRUPTIVE TECHNOLOGY.

10:47AM 7   Q.   LET ME NEXT DRAW YOUR ATTENTION TO PAGE 4.  AND AT

10:47AM 8   PARAGRAPH 7, ARE THERE A NUMBER OF QUESTIONS RELATED TO

10:47AM 9   FINANCIAL MODEL/PROJECTIONS?

10:47AM 10  A.   YES.

10:47AM 11  Q.   ROUGHLY SIX BULLETS DOWN YOU WROTE, "WHAT ARE GM ON THE

10:47AM 12  ANALYZERS, THE TESTS?"

10:47AM 13     DO YOU SEE THAT?

10:47AM 14  A.   YES.

10:47AM 15  Q.   AND WHAT DOES GM STAND FOR?

10:47AM 16  A.   THAT'S A SHORTHAND FOR GROSS MARGIN.  THAT'S JUST THE

10:47AM 17  SELLING PRICE OF THE DEVICE, AND THEN YOU SUBTRACT THE COST OF

10:47AM 18  MANUFACTURING THE DEVICE, AND THAT'S YOUR GROSS PROFIT.

10:47AM 19     THAT DOESN'T INCLUDE SALES, MARKETING, ADMINISTRATIVE,

10:47AM 20  OTHER EXPENSES.

10:47AM 21  Q.   WHY DID YOU WANT TO UNDERSTAND WHAT THE COST OF

10:47AM 22  MANUFACTURING THE DEVICE WAS?

10:48AM 23  A.   WELL, WE WANTED TO UNDERSTAND WHETHER THIS WAS A

10:48AM 24  SCALEABLE, VIABLE BUSINESS.

10:48AM 25     AND THE POINT THERE IS THAT THE TECHNOLOGY COULD BE

10:48AM   1    INCREDIBLE, BUT IF YOU CAN'T MANUFACTURE IT AT A COST THAT IS

10:48AM   2    AFFORDABLE, THAT IS SIMILAR TO OTHER EQUIPMENT, THEN THEY WERE

10:48AM   3    GOING TO NEED DRAMATICALLY MORE CAPITAL TO COMMERCIALIZE THE

10:48AM   4    TECHNOLOGY OR THEY MAY NEVER BE PROFITABLE, IN WHICH CASE THIS

10:48AM   5    WOULDN'T HAVE BEEN A VERY -- THAT WOULD HAVE HAD AN IMPACT

10:48AM   6    ON -- THAT WOULD HAVE IMPACTED OUR INVESTMENT DECISION.

10:48AM   7        SO, YOU KNOW, IN THIS CASE THEY WERE -- THE GOOD NEWS WAS

10:48AM   8    THAT CONVENTIONAL EQUIPMENT FROM COMPANIES LIKE CEPHEID WAS

10:48AM   9    ALREADY KIND OF -- THEY REPRESENTED TO US THAT THE COST OF

10:48AM  10    MAKING THE MINILAB WAS ALREADY ABOUT 20 PERCENT BELOW WHAT

10:48AM  11    EQUIVALENT EQUIPMENT COSTS, AND THAT THEY HAD A PLAN TO, OVER

10:49AM  12    TIME, AS THEY MADE MORE OF THE MINILABS, THEY THOUGHT THEY

10:49AM  13    COULD GET THAT COST DOWN TO 20 PERCENT.

10:49AM  14        SO AN 80 PERCENT DECLINE VERSUS WHAT EXISTING EQUIPMENT

10:49AM  15    MOLECULAR DIAGNOSTIC EQUIPMENT COSTS.

10:49AM  16        IN ADDITION TO THAT, WE WANTED TO MAKE SURE THAT THE

10:49AM  17    CAPITAL THAT THEY RAISED WOULD -- THEY WOULD HAVE ENOUGH CASH

10:49AM  18    TO BUILD AND MANUFACTURE THESE DEVICES.

10:49AM  19        AND SO, YOU KNOW, UNDERSTANDING WHAT THEY COST WAS

10:49AM  20    FUNDAMENTAL TO UNDERSTANDING WHETHER THE SALES PROJECTIONS FOR

10:49AM  21    2014 AND '15 WERE REALISTIC BASED ON THEIR ABILITY TO

10:49AM  22    MANUFACTURE MINILABS.

10:49AM  23    Q.   AND IN YOUR MEETING WITH MS. HOLMES IN DECEMBER OF 2013

10:50AM  24    AND THE MEETING WITH MS. HOLMES THAT YOU LATER HAD WITH HER

10:50AM  25    AFTER SENDING THESE QUESTIONS, DID YOU HAVE DISCUSSIONS WITH

10:50AM  1    HER AROUND THE COSTS OF THE ANALYZER?

10:50AM  2    A.   WE, WE -- THESE QUESTIONS WERE ADDRESSED OVER THE COURSE

10:50AM  3    OF OUR DUE DILIGENCE MEETINGS, YES.

10:50AM  4    Q.   OKAY.  DID MS. HOLMES OR MR. BALWANI EVER TELL YOU THAT

10:50AM  5    THE THERANOS ANALYZER WAS CURRENTLY BEING USED FOR ONLY A

10:50AM  6    HANDFUL OF TESTS IN THE CLIA LAB?

10:50AM  7            MR. WADE:  OBJECT TO THE FORM OF THE QUESTION.

10:50AM  8            THE COURT:  CAN YOU JUST PARSE THAT OUT AS TO WHICH

10:50AM  9    INDIVIDUAL?

10:50AM  10           MR. LEACH:  YES.

10:50AM  11   Q.   DID MS. HOLMES EVER TELL YOU THAT THE THERANOS ANALYZER

10:50AM  12   WAS CURRENTLY BEING USED FOR ONLY A HANDFUL OF TESTS IN THE

10:50AM  13   CLIA LAB?

10:50AM  14   A.   NO.

10:50AM  15   Q.   DID MR. BALWANI EVER TELL YOU THAT?

10:50AM  16   A.   NO.

10:50AM  17   Q.   DID MS. HOLMES EVER TELL YOU THAT THERANOS WAS USING

10:50AM  18   MODIFIED COMMERCIALLY AVAILABLE MACHINES TO PERFORM SOME OF ITS

10:50AM  19   TESTING IN THE CLIA LAB?

10:50AM  20   A.   NO.

10:50AM  21   Q.   DID MR. BALWANI EVER TELL THAT TO YOU?

10:50AM  22   A.   NO.

10:50AM  23   Q.   DID THEY EVER -- IN THE DISCUSSIONS THAT YOU HAD WITH

10:51AM  24   MS. HOLMES, DID SHE EVER DESCRIBE FOR YOU THE COSTS OF

10:51AM  25   ACQUIRING SIEMENS MACHINES TO DO TESTING?

10:51AM 1    A.   ABSOLUTELY NOT.

10:51AM 2    Q.   WOULD THAT HAVE BEEN RESPONSIVE TO QUESTIONS THAT YOU PUT

10:51AM 3    TO MS. HOLMES?

10:51AM 4    A.   YES.

10:51AM 5    Q.   AND WOULD THAT HAVE BEEN RELEVANT TO YOU?

10:51AM 6    A.   YES.

10:51AM 7    Q.   OKAY.  DID MR. BALWANI EVER TALK TO YOU ABOUT THE COST OF

10:51AM 8    ACQUIRING SIEMENS MACHINES AND HOW THAT MIGHT AFFECT GROSS

10:51AM 9    MARGIN?

10:51AM 10   A.   NO.

10:51AM 11   Q.   AND WOULD THAT HAVE BEEN RELEVANT AS YOU'RE ASSESSING THE

10:51AM 12   POTENTIAL COSTS AND PROFITABILITY OF THIS OPERATION?

10:51AM 13   A.   YES.

10:51AM 14   Q.   DID MS. HOLMES EVER TELL YOU THAT THE GM ON ANALYZERS

10:51AM 15   INCLUDED THE COST OF THIRD PARTY MACHINES?

10:51AM 16   A.   NO.

10:51AM 17   Q.   WOULD THAT HAVE BEEN RELEVANT TO YOU?

10:51AM 18   A.   YES.

10:51AM 19   Q.   AND DID MR. BALWANI EVER TELL YOU THAT THE GROSS MARGINS

10:51AM 20   ON ANALYZERS INCLUDED THE COSTS OF THIRD PARTY MACHINES?

10:52AM 21   A.   DID HE EVER TELL ME THAT?

10:52AM 22   Q.   YES.

10:52AM 23   A.   I'M SORRY.  COULD YOU REPEAT THE QUESTION?

10:52AM 24   Q.   DID MR. BALWANI EVER TELL YOU THAT THE GROSS MARGIN ON THE

10:52AM 25   ANALYZERS INCLUDED COSTS OF THIRD PARTY MACHINES?

10:52AM   1     A.   NO.

10:52AM   2     Q.   LET'S GO BACK TO PAGE 1 OF EXHIBIT 1404.

10:52AM   3          AND IF WE CAN ZOOM IN ON THE TOP, MS. HOLLIMAN.

10:52AM   4          IN THE TOP EMAIL MR. BALWANI IS WRITING TO YOU,

10:52AM   5     MR. GROSSMAN, "WE ARE CONFIRMED FOR FRIDAY AT 9:00 A.M.  SEE

10:52AM   6     YOU THEN."

10:52AM   7          DO YOU SEE THAT LANGUAGE?

10:52AM   8     A.   YES.

10:52AM   9     Q.   AND DO YOU BELIEVE THAT TO BE A REFERENCE TO A MEETING

10:52AM  10     THAT YOU HAD WITH MS. HOLMES AND MR. BALWANI LATER THAT WEEK IN

10:52AM  11     JANUARY OF 2014?

10:52AM  12     A.   YES.

10:52AM  13     Q.   WHERE WAS THAT MEETING HELD?

10:53AM  14     A.   THAT MEETING WAS ALSO HELD AT THEIR CORPORATE HEADQUARTERS

10:53AM  15     ON CALIFORNIA AVENUE IN PALO ALTO.

10:53AM  16     Q.   AND DID YOU GO THROUGH THE SAME LEVEL OF SECURITY FOR THAT

10:53AM  17     MEETING?

10:53AM  18     A.   YES, WE HAD, WE HAD -- WE BROUGHT OUR FULL INVESTMENT TEAM

10:53AM  19     WITH US, AND SO THE NEW MEMBERS WHO HAD NOT BEEN AT THE FIRST

10:53AM  20     MEETING WERE REQUIRED TO SIGN SIMILAR DOCUMENTATION BEFORE WE

10:53AM  21     WERE ADMITTED TO THE LOBBY OF THE BUILDING.

10:53AM  22     Q.   OKAY.  WHO WAS THERE FROM THE THERANOS SIDE?

10:53AM  23     A.   IT WAS -- FROM THE THERANOS SIDE IT WAS MS. HOLMES AND

10:53AM  24     MR. BALWANI.

10:53AM  25     Q.   AND WHO WAS THERE FROM THE PFM SIDE?

10:53AM  1    A.   THE PFM SIDE HAD MYSELF, BRIAN GROSSMAN; VIVEK KHANNA;

10:53AM  2    ALEX RABODZEY; SRI BALASURYAN; AND I BELIEVE MY PARTNER,

10:54AM  3    CHRIS JAMES.

10:54AM  4    Q.   AND WERE YOU SHOWN ANY DOCUMENTS IN THIS MEETING?

10:54AM  5    A.   YES.

10:54AM  6    Q.   WHAT WERE YOU SHOWN?

10:54AM  7    A.   THE COMPANY HAD A PRESENTATION ON A LAPTOP.  THEY ALSO HAD

10:54AM  8    A FINANCIAL MODEL WHICH WAS ALSO ON A LAPTOP.

10:54AM  9    Q.   WAS MS. HOLMES THERE FOR THE ENTIRETY OF THE MEETING?

10:54AM 10    A.   I DO NOT -- I DON'T BELIEVE SHE WAS.

10:54AM 11    Q.   OKAY.  TELL US WHAT HAPPENED.

10:54AM 12    A.   THE MEETING -- COULD YOU BE A LITTLE MORE SPECIFIC?

10:54AM 13    Q.   WHY DO YOU SAY SHE WASN'T THERE FOR THE WHOLE MEETING?

10:54AM 14    A.   I REMEMBER AT SOME POINT IN THE MEETING SHE STEPPED OUT OF

10:54AM 15    THAT, OF THAT MEETING.

10:54AM 16    Q.   OKAY.  AND SITTING HERE TODAY, ARE YOU ABLE TO TELL US

10:54AM 17    WHICH PARTS SHE WAS THERE FOR OR NOT THERE FOR?

10:54AM 18    A.   I BELIEVE IT WAS ROUGHLY HALFWAY THROUGH.

10:54AM 19    Q.   OKAY.  DESCRIBE -- DID MS. HOLMES TALK TO YOU IN THIS

10:55AM 20    MEETING ABOUT THE IDEA OF MINIATURIZING THE LAB?

10:55AM 21    A.   YES.

10:55AM 22    Q.   AND WHAT DID SHE SAY ON THAT POINT?

10:55AM 23    A.   THAT, THAT THIS WAS -- WE DISCUSSED THE DIFFERENCE BETWEEN

10:55AM 24    A POINT OF CARE TESTING TECHNOLOGY, LIKE A HOME PREGNANCY TEST

10:55AM 25    OR A HOME COVID TEST, AND THE MINIATURIZATION OF THE ENTIRE

10:55AM   1    REFERENCE LAB INTO ONE SMALL DEVICE, AND THEY WERE VERY CLEAR

10:55AM   2    THAT THIS TECHNOLOGY WAS NOT A POINT OF CARE TEST, WAS NOT A

10:55AM   3    POINT OF CARE TESTING PLATFORM.  IT WAS A MINIATURIZED LAB.

10:55AM   4        AGAIN, THAT LED TO THE IMPLICATION ON THE COST OF

10:55AM   5    PROVIDING LABORATORY SERVICES IN A RETAIL OR IN A HOSPITAL

10:55AM   6    SETTING.

10:56AM   7    Q.   DID MS. HOLMES TALK TO YOU ABOUT WHY THEY WERE LAUNCHING

10:56AM   8    NOW AS OPPOSED TO EARLIER?

10:56AM   9    A.   YES.

10:56AM  10    Q.   WHAT DID SHE SAY?

10:56AM  11    A.   THAT WAS AT THE BEGINNING OF THIS MEETING, AND THEY TOLD

10:56AM  12    US THAT THE REASON THAT THEY HAD WAITED THIS LONG TO LAUNCH A

10:56AM  13    RETAIL PRODUCT WAS THAT THEY WANTED TO MAKE SURE THAT THEY HAD

10:56AM  14    COMPLETE COVERAGE, 100 PERCENT COVERAGE OF WHAT QUEST AND

10:56AM  15    LABCORP COULD OFFER.

10:56AM  16    Q.   AND DID SHE SAY THAT THEY HAD ACCOMPLISHED THAT AT THIS

10:56AM  17    POINT?

10:56AM  18    A.   YES.

10:56AM  19    Q.   AND DID MS. HOLMES TALK ABOUT THE VARIANCE BETWEEN

10:56AM  20    TRADITIONAL ANALYZERS?

10:56AM  21    A.   IN THIS MEETING WE ALSO DISCUSSED, AS WE DID IN THE FIRST

10:56AM  22    MEETING, THE ADVANTAGES OF THE MINILAB AND THEIR PROPRIETARY

10:56AM  23    TECHNOLOGY, THE FACT THAT BY ELIMINATING HUMAN ELEMENTS OF A

10:56AM  24    REFERENCE LABORATORY OPERATING ENVIRONMENT YOU COULD

10:56AM  25    DRAMATICALLY REDUCE THE VARIABILITY SYSTEM TO SYSTEM.

10:57AM  1    SO, YES, WE HIGHLIGHTED THAT AND WE DISCUSSED SOME OF THE

10:57AM  2    TESTS THAT WERE KNOWN TO BE PROBLEMATIC IN THE REFERENCE

10:57AM  3    LABORATORY ENVIRONMENT, AND I BELIEVE THAT THEY, THEY -- WE

10:57AM  4    DISCUSSED HOW THEIR PROPRIETARY TECHNOLOGY HAD A VARIANCE OF

10:57AM  5    LESS THAN 3 PERCENT.

10:57AM  6    Q.   DID MS. HOLMES MAKE STATEMENTS ABOUT THE COST OF THE

10:57AM  7    DEVICE?

10:57AM  8    A.   I BELIEVE IN THIS MEETING WE ALSO DISCUSSED THE COST OF

10:57AM  9    THE DEVICE SAMPLE PROCESSING UNIT BEING ALREADY LESS THAN WHAT

10:57AM  10   A SYSTEM FROM CEPHEID OR ILLUMINA, WHICH WERE TWO OTHER

10:57AM  11   COMPANIES THAT MAKE DIAGNOSTIC EQUIPMENT, WHAT THOSE SYSTEMS

10:57AM  12   COST, AND I BELIEVE THEY SAID THEY ALREADY WERE 15 OR

10:57AM  13   20 PERCENT LESS THAN -- THE COST WAS ALREADY 15 OR 20 PERCENT

10:57AM  14   LESS THAN WHAT THOSE SYSTEMS WERE SELLING FOR.

10:58AM  15        MR. WADE:  YOUR HONOR, MOVE TO STRIKE THE ANSWER AS

10:58AM  16   NONRESPONSIVE TO THE QUESTION.

10:58AM  17        THE COURT:  OVERRULED.  THE ANSWER CAN REMAIN.

10:58AM  18   BY MR. LEACH:

10:58AM  19   Q.   DID MS. HOLMES ALSO MAKE STATEMENTS ABOUT THE SPEED WITH

10:58AM  20   WHICH THERANOS COULD TEST BLOOD?

10:58AM  21   A.   YES.  THAT THIS IS -- THEY DESCRIBED HOW IN THE RETAIL

10:58AM  22   SETTING THEY COULD GUARANTEE A TEST RESULT WITHIN FOUR HOURS,

10:58AM  23   AND IN THE HOSPITAL SETTING HOW THEY COULD GET AN ANSWER IN

10:58AM  24   LESS THAN AN HOUR.

10:58AM  25        MR. LEACH:  YOUR HONOR, I'M ABOUT TO MOVE INTO

| | | |
|---|---|---|
| 10:58AM | 1 | ANOTHER DOCUMENT.  I'M NOT SURE WHAT TIME WE HAD PLANNED ON OUR |
| 10:58AM | 2 | BREAK, BUT WE'RE GETTING CLOSE TO 11:00. |
| 10:58AM | 3 | THE COURT:  WE WERE PLANNING ON 11:00 O'CLOCK. |
| 10:58AM | 4 | SHOULD WE DO THAT NOW? |
| 10:59AM | 5 | LET'S TAKE OUR MORNING BREAK.  30 MINUTES, LADIES AND |
| 10:59AM | 6 | GENTLEMEN. |
| 10:59AM | 7 | THIRTY MINUTES, SIR, AND THEN YOU'LL RETURN TO THE STAND. |
| 10:59AM | 8 | THE WITNESS:  OKAY. |
| 10:59AM | 9 | THE COURT:  AND WE'LL HAVE OUR BREAK. |
| 10:59AM | 10 | MR. LEACH:  THANK YOU. |
| 10:59AM | 11 | (JURY OUT AT 10:59 A.M.) |
| 11:35AM | 12 | (RECESS FROM 10:59 A.M. UNTIL 11:35 A.M.) |
| 11:35AM | 13 | THE COURT:  PLEASE BE SEATED.  WE'RE BACK ON THE |
| 11:35AM | 14 | RECORD.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN. |
| 11:35AM | 15 | MR. LEACH, DO YOU WANT TO CONTINUE WITH YOUR EXAMINATION? |
| 11:36AM | 16 | MR. LEACH:  YES, YOUR HONOR.  THANK YOU. |
| 11:36AM | 17 | Q.  MR. GROSSMAN, WHEN WE BROKE WE WERE TALKING ABOUT A |
| 11:36AM | 18 | MEETING THAT YOU HAD WITH MS. HOLMES AND MR. BALWANI IN EARLY |
| 11:36AM | 19 | JANUARY 2014. |
| 11:36AM | 20 | DO YOU RECALL THAT TOPIC? |
| 11:36AM | 21 | A.  YES. |
| 11:36AM | 22 | Q.  IN YOUR MEETING WITH MS. HOLMES AND MR. BALWANI, DID |
| 11:36AM | 23 | MS. HOLMES MAKE STATEMENTS TO YOU ABOUT THE SIZE OF THE |
| 11:36AM | 24 | THERANOS EQUIPMENT COMPARED TO OTHER LABORATORIES? |
| 11:36AM | 25 | A.  YES. |

11:36AM  1     Q.   WHAT DID SHE TELL YOU?

11:36AM  2     A.   I'M SORRY, CAN YOU RESTATE THE QUESTION AGAIN.

11:36AM  3     Q.   DID MS. HOLMES MAKE STATEMENTS TO YOU ABOUT THE

11:36AM  4     COMPARATIVE SIZE OF THE THERANOS LAB OR ANALYZER COMPARED TO

11:36AM  5     TRADITIONAL LABORATORY EQUIPMENT?

11:36AM  6     A.   YES.

11:36AM  7     Q.   WHAT DID SHE SAY TO YOU ABOUT THAT?

11:36AM  8     A.   THEY WERE -- THEIR PROPRIETARY EQUIPMENT WAS MUCH SMALLER

11:36AM  9     THAN CONVENTIONAL LABORATORY ANALYTIC INSTRUMENTS.

11:37AM  10    Q.   AND WAS THAT ATTRACTIVE TO YOU?

11:37AM  11    A.   YES.

11:37AM  12    Q.   HOW SO?

11:37AM  13    A.   IT, ON ONE LEVEL, SPOKE TO THE TECHNOLOGICAL

11:37AM  14    ACCOMPLISHMENTS THE COMPANY HAD ACHIEVED AT THAT POINT.

11:37AM  15         BUT FROM A BUSINESS PERSPECTIVE, IT HAD PROFOUND

11:37AM  16    IMPLICATIONS FOR THE COSTS, THE PRODUCTIVITY, THE ECONOMICS OF

11:37AM  17    PROVIDING LABORATORY SERVICES, WHETHER IT WAS A RETAIL LAB

11:37AM  18    SETTING OR A HOSPITAL LABORATORY SETTING.

11:37AM  19    Q.   LET ME MOVE FORWARD IN TIME, PLEASE, AND DRAW YOUR

11:37AM  20    ATTENTION TO WHAT HAS BEEN MARKED AS TRIAL EXHIBIT 4077.

11:37AM  21         IT SHOULD BE IN YOUR BINDER.

11:38AM  22         LET ME DRAW YOUR ATTENTION TO THE FIRST TWO PAGES OF

11:38AM  23    EXHIBIT 4077.

11:38AM  24         DO YOU RECOGNIZE THIS?

11:38AM  25    A.   I'M JUST REVIEWING THIS.

| 11:38AM | 1 | (PAUSE IN PROCEEDINGS.) |
| 11:38AM | 2 | THE WITNESS: YEAH. YES. |
| 11:38AM | 3 | BY MR. LEACH: |
| 11:38AM | 4 | Q. IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND SUNNY BALWANI |
| 11:38AM | 5 | FOLLOWING THE EARLY JANUARY 2014 MEETING WITH MS. HOLMES AND |
| 11:38AM | 6 | MR. BALWANI AT THERANOS? |
| 11:38AM | 7 | A. I BELIEVE IT IS. |
| 11:38AM | 8 | Q. OKAY. |
| 11:38AM | 9 | A. YES. |
| 11:38AM | 10 | Q. AND THERE'S ATTACHMENTS TO THIS EMAIL. ARE YOU FAMILIAR |
| 11:38AM | 11 | WITH THE -- AND IT'S QUITE LENGTHY, BUT IF YOU COULD JUST |
| 11:39AM | 12 | PERUSE IT AND LET ME KNOW IF YOU'RE GENERALLY FAMILIAR WITH IT. |
| 11:39AM | 13 | A. YES. |
| 11:39AM | 14 | Q. WHAT IS THE ATTACHMENT? |
| 11:39AM | 15 | A. THIS WAS THE PRESENTATION, CORPORATE PRESENTATION THAT |
| 11:39AM | 16 | THEY SENT US. |
| 11:39AM | 17 | IT ALSO INCLUDED ANALYTIC MEASUREMENT, DATA TABLES FROM |
| 11:39AM | 18 | DIFFERENT TESTS THAT WE HAD ASKED THEM FOR ON THEIR PROPRIETARY |
| 11:39AM | 19 | TECHNOLOGY. |
| 11:39AM | 20 | Q. AND IS THIS POWERPOINT CONSISTENT WITH SLIDES THAT YOU SAW |
| 11:39AM | 21 | AT THERANOS IN DECEMBER AND JANUARY? |
| 11:39AM | 22 | A. I BELIEVE IT IS, YES. |
| 11:39AM | 23 | Q. OKAY. AND IS THIS PART OF THE INFORMATION THAT YOU RELIED |
| 11:39AM | 24 | ON IN DECIDING WHETHER OR NOT TO INVEST IN THERANOS? |
| 11:39AM | 25 | A. YES. |

| | | |
|---|---|---|
| 11:39AM | 1 | MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 4077 INTO |
| 11:39AM | 2 | EVIDENCE. |
| 11:39AM | 3 | MR. WADE:  NO OBJECTION, YOUR HONOR. |
| 11:40AM | 4 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 11:40AM | 5 | (GOVERNMENT'S EXHIBIT 4077 WAS RECEIVED IN EVIDENCE.) |
| 11:40AM | 6 | MR. LEACH:  LET ME START WITH PAGE 2, IF WE COULD, |
| 11:40AM | 7 | MS. HOLLIMAN. |
| 11:40AM | 8 | Q.   AND I'LL DRAW YOUR ATTENTION TO THE BOTTOM HALF, |
| 11:40AM | 9 | MR. GROSSMAN. |
| 11:40AM | 10 | DO YOU SEE THE DATE OF JANUARY 10TH, 2014? |
| 11:40AM | 11 | A.   YES. |
| 11:40AM | 12 | Q.   AND THIS IS AN EMAIL FROM YOU TO SUNNY BALWANI? |
| 11:40AM | 13 | A.   YES. |
| 11:40AM | 14 | Q.   YOU WROTE, "THANKS AGAIN FOR THE TIME YOU SPENT WITH OUR |
| 11:40AM | 15 | TEAM WALKING US THROUGH THE THERANOS STORY." |
| 11:40AM | 16 | IS THAT A REFERENCE TO YOUR SECOND MEETING AT THERANOS |
| 11:40AM | 17 | WITH MEMBERS OF YOUR TEAM? |
| 11:40AM | 18 | A.   YES. |
| 11:40AM | 19 | Q.   OKAY.  YOU SAID, "WE WILL LIKELY NEED A FEW DAYS TO |
| 11:40AM | 20 | PROCESS EVERYTHING WE LEARNED TODAY.  ONE THING THAT WOULD BE |
| 11:40AM | 21 | ESPECIALLY HELPFUL TO OUR DUE DILIGENCE PROCESS IS HAVING |
| 11:41AM | 22 | ACCESS TO THE FINANCIAL MODEL WE VIEWED WITH YOU TODAY." |
| 11:41AM | 23 | DO YOU SEE THAT LANGUAGE? |
| 11:41AM | 24 | A.   YES. |
| 11:41AM | 25 | Q.   AND WHAT WERE YOU REFERRING TO? |

11:41AM 1    A.   IN OUR MEETING THEY SHARED A FINANCIAL FORECAST, A

11:41AM 2    FINANCIAL MODEL WITH US, A DETAILED FINANCIAL MODEL WITH US,

11:41AM 3    AND I'M ASKING FOR AN ELECTRONIC COPY OF THE MODEL THAT THEY

11:41AM 4    REVIEWED AT THAT MEETING ON JANUARY 10TH.

11:41AM 5    Q.   OKAY.  AT SOME POINT DID YOU GET A COPY OF THAT FINANCIAL

11:41AM 6    MODEL?

11:41AM 7    A.   YES.

11:41AM 8    Q.   AND DID YOU USE THAT AS PART OF THE BASIS TO PREPARE YOUR

11:41AM 9    OWN FINANCIAL MODEL WITH PROJECTIONS ABOUT WHAT THERANOS WOULD

11:41AM 10   ACHIEVE IN THE YEARS TO COME?

11:41AM 11   A.   YES.

11:41AM 12   Q.   WAS THAT AN IMPORTANT BUILDING BLOCK FOR YOUR MODEL?

11:41AM 13   A.   YES.

11:41AM 14   Q.   OKAY.  LET'S GO TO PAGE 1, PLEASE.

11:41AM 15        AND I DRAW YOUR ATTENTION TO THE TOP PORTION OF THE EMAIL

11:41AM 16   ALL OF THE WAY DOWN TO P.S.

11:42AM 17        DO YOU SEE MR. BALWANI'S NAME AT THE TOP, MR. GROSSMAN, IN

11:42AM 18   THE FROM LINE?

11:42AM 19   A.   YES.

11:42AM 20   Q.   AND DO YOU SEE WHERE HE WROTE, "BRIAN.

11:42AM 21        "ATTACHED PLEASE FIND A PDF WHICH IS A VERY CONFIDENTIAL

11:42AM 22   SLIDE DECK OF DISCUSSIONS WE HAD.  IT ALSO INCLUDES A VERY

11:42AM 23   DETAILED SECTION ON DATA WHICH ALEX HAD REQUESTED, INCLUDING

11:42AM 24   THE NUCLEIC ACID APPLICATION ASSAYS.  THIS SLIDE DECK DOES NOT

11:42AM 25   INCLUDE ANY REFERENCE TO SAFEWAY."

11:42AM  1        DO YOU SEE THAT?

11:42AM  2     A.  YES.

11:42AM  3     Q.  AND ALEX, HE WAS A MEMBER OF YOUR TEAM?

11:42AM  4     A.  YES.  THAT'S ALEX RABODZEY.

11:42AM  5     Q.  OKAY.  AND HAD YOU REQUESTED THAT MR. BALWANI PROVIDE IN

11:42AM  6  WRITTEN FORMAT SOME OF THE INFORMATION THAT YOU HAD GONE OVER

11:42AM  7  WITH HE AND MS. HOLMES IN THE PRIOR MEETINGS?

11:42AM  8     A.  YES.

11:42AM  9     Q.  LET'S LOOK AT THE SLIDE DECK, PLEASE.

11:42AM  10        JUST TO ORIENT US, PLEASE GO TO PAGE 3, PLEASE,

11:43AM  11  MS. HOLLIMAN.

11:43AM  12        IS THIS THE COVER PAGE OF THE SLIDE DECK THAT YOU

11:43AM  13  RECEIVED, MR. GROSSMAN?

11:43AM  14     A.  YES.

11:43AM  15     Q.  LET'S NOW GO TO PAGE 67 IF WE COULD.

11:43AM  16        DO YOU SEE THE SLIDE ENTITLED "OVERVIEW:  THERANOS

11:43AM  17  SYSTEMS," MR. GROSSMAN?

11:43AM  18     A.  YES.

11:43AM  19     Q.  AND IS THIS A FAIR DEPICTION OF WHAT YOU UNDERSTOOD THE

11:43AM  20  THERANOS SYSTEMS TO BE?

11:43AM  21     A.  YES.

11:43AM  22     Q.  TO THE LEFT SIDE OF THE SCREEN THERE'S THE WORDS "THERANOS

11:43AM  23  ANALYZERS," AND THERE ARE IMAGES OF TWO DEVICES.

11:43AM  24        DO YOU SEE THOSE?

11:43AM  25     A.  YES.

11:43AM  1    Q.   HOW DO THOSE COMPARE TO THE DEVICES YOU SAW IN YOUR TRIPS

11:43AM  2    TO THERANOS?

11:44AM  3    A.   THEY LOOK -- THOSE DEVICES LOOK VERY SIMILAR TO THE

11:44AM  4    DEVICES WE SAW WHEN WE VISITED THEIR CORPORATE HEADQUARTERS.

11:44AM  5    Q.   OKAY.  AT ANY POINT IN TIME DID MS. HOLMES TELL YOU THAT

11:44AM  6    THEY WERE USING THIRD PARTY MACHINES TO DO ITS TESTING?

11:44AM  7    A.   NO.

11:44AM  8    Q.   DID THEY EVER SHOW YOU AN IMAGE OF A SIEMENS DEVICE?

11:44AM  9    A.   NO.

11:44AM  10   Q.   TO THE RIGHT THERE'S THE WORDS "CARTRIDGES."

11:44AM  11        WHAT DID YOU UNDERSTAND CARTRIDGES TO BE?

11:44AM  12   A.   CARTRIDGES WERE THE CONSUMABLE, WERE THE ACTUAL TESTS.

11:44AM  13   THEY COULD PUT, I BELIEVE, UP TO 70 TESTS ON ONE CARTRIDGE, AND

11:44AM  14   THOSE CARTRIDGES WERE THEN LOADED INTO THE ANALYZER, THE SAMPLE

11:44AM  15   PROCESSING UNIT, AND THE SAMPLE PROCESSING UNIT WOULD THEN RUN

11:44AM  16   THE EXPERIMENTS ON THOSE SAMPLES.

11:44AM  17   Q.   WHERE DID YOU GET THE INFORMATION THAT THERANOS COULD PUT

11:45AM  18   70 TESTS ON A CARTRIDGE?

11:45AM  19   A.   THAT WAS PART OF OUR DUE DILIGENCE PROCESS.  I BELIEVE THE

11:45AM  20   SECOND MEETING WITH THE COMPANY, WE DISCUSSED THAT TOWARDS THE

11:45AM  21   BEGINNING OF THE MEETING.

11:45AM  22        AND THEN THAT ISSUE OF WHAT WE REFER TO AS MULTIPLEXING,

11:45AM  23   THE ABILITY TO TEST FOR MULTIPLE THINGS AT THE SAME TIME CAME

11:45AM  24   UP OVER THE COURSE OF OUR DUE DILIGENCE AS IT WAS A DRAMATIC

11:45AM  25   IMPROVEMENT ON WHAT COMPANIES THAT WERE OFFERING EQUIPMENT IN

11:45AM 1  THIS SPACE WERE CAPABLE OF DOING.

11:45AM 2  Q.    AND THE 70 TESTS ON ONE CARTRIDGE, YOU BELIEVED THAT WAS

11:45AM 3  SOMETHING THAT THERANOS WAS CURRENTLY DOING?

11:45AM 4  A.    YES.

11:45AM 5  Q.    WITH ITS SAMPLE PROCESSING UNIT?

11:45AM 6  A.    YES.

11:45AM 7  Q.    LET'S LOOK AT PAGE 66.

11:46AM 8      DO YOU SEE THE HEADING "PRODUCTS," MR. GROSSMAN?

11:46AM 9  A.    YES.

11:46AM 10 Q.    AND DOES THIS SUMMARIZE WHAT YOU UNDERSTOOD THERANOS'S

11:46AM 11 PRODUCTS TO BE?

11:46AM 12 A.    YES.

11:46AM 13 Q.    THE FIRST LINE SAYS, "DEVICE.  MINILAB AND 4S FOR

11:46AM 14 AUTOMATED PROCESSING."

11:46AM 15     DO YOU SEE THAT?

11:46AM 16 A.    YES.

11:46AM 17 Q.    AND WHAT DID YOU UNDERSTAND THE 4S TO BE?

11:46AM 18 A.    I DON'T REMEMBER.

11:46AM 19 Q.    AND WHAT DID YOU UNDERSTAND MINILAB TO BE?

11:46AM 20 A.    MINILAB REFERRED TO THE SAMPLE PROCESSING UNIT, THE

11:46AM 21 LABORATORY DOWN INTO A SINGLE DEVICE.

11:47AM 22 Q.    IN ANY OF THE WRITTEN MATERIALS THAT YOU'VE REVIEWED, DID

11:47AM 23 YOU SEE ANYTHING SUGGESTING THE DEVICE INCLUDED THIRD PARTY

11:47AM 24 MACHINES FROM SIEMENS OR SOME OTHER MANUFACTURER?

11:47AM 25 A.    NO.

11:47AM 1     Q.   WOULD THAT HAVE BEEN A RED FLAG FOR YOU?

11:47AM 2     A.   YES.

11:47AM 3     Q.   WHY IS THAT?

11:47AM 4     A.   IT WOULD HAVE RAISED A WHOLE SERIES OF QUESTIONS ABOUT

11:47AM 5     WHAT THE TECHNOLOGY WAS CAPABLE OF DOING.  IT WOULD HAVE LED TO

11:47AM 6     A SERIES OF QUESTIONS ON THE BUSINESS, HOW -- WHAT MACHINES ARE

11:47AM 7     YOU USING, WHAT SETTINGS, WHAT TYPES OF ANALYTIC EXPERIMENTS DO

11:47AM 8     YOU NEED THIRD PARTY MACHINES TO PERFORM AND WHY?

11:47AM 9          THAT WOULD HAVE LED TO A WHOLE SERIES OF QUESTIONS AROUND

11:47AM 10    THE TECHNICAL LIMITATIONS AROUND THE PLATFORM.

11:47AM 11         IT ALSO WOULD HAVE HAD IMPLICATIONS FOR THE COST STRUCTURE

11:47AM 12    OF THE BUSINESS, THE SIZE OF THE LABORATORIES THAT THEY WOULD

11:47AM 13    NEED AS THEY ROLLED THIS OUT GEOGRAPHICALLY TO DIFFERENT URBAN

11:47AM 14    AREAS.

11:47AM 15         IT WOULD HAVE IMPACTED THEIR ABILITY TO REPLACE HOSPITALS,

11:48AM 16    THE LABORATORIES WITHIN HOSPITALS, AND IT WOULD HAVE -- IT

11:48AM 17    WOULD HAVE OBVIOUSLY HAD AN IMPACT ON THE CASH BURN OF THE

11:48AM 18    BUSINESS, WHERE CASH FLOW, THE CASH THAT WAS SITTING ON THE

11:48AM 19    BALANCE SHEET WOULD GO, WHERE IT WOULD BE SPENT.

11:48AM 20         OUR, OUR UNDERSTANDING FROM THE FINANCIAL MODEL THEY SENT

11:48AM 21    US, ALL OF THE CAPITAL SPENDING WAS FOCUSSED ON MANUFACTURING

11:48AM 22    MINILABS AND MAKING ADDITIONAL INVESTMENTS IN PRODUCTION LINES

11:48AM 23    FOR EXPANDED MINILAB PRODUCTION.

11:48AM 24    Q.   BENEATH THAT FIRST LINE DEVICE IT SAYS, "CARTRIDGE.

11:48AM 25         "AUTOMATED CONSUMABLES FOR 75 PLUS ASSAYS SIMULTANEOUSLY

11:48AM  1    ACROSS ALL SAMPLE TYPES (BLOOD, URINE, TISSUE, ET CETERA)."

11:49AM  2        DO YOU SEE THAT?

11:49AM  3    A.   YES.

11:49AM  4    Q.   IS THAT CONSISTENT WITH STATEMENTS MS. HOLMES MADE TO YOU

11:49AM  5    IN YOUR MEETINGS WITH HER IN DECEMBER OR JANUARY?

11:49AM  6    A.   YES.

11:49AM  7    Q.   AND BENEATH THAT IT SAYS, "BLOOD COLLECTION DEVICES.

11:49AM  8        "AUTOMATED SAMPLE COLLECTION FOR MICRO-SAMPLE VOLUMES

11:49AM  9    CUSTOMIZED FOR PEDIATRICS, PHLEBOTOMY, AND FULL RANGE OF

11:49AM  10   COLLECTION PROCEDURES."

11:49AM  11       DO YOU SEE THAT?

11:49AM  12   A.   YES.

11:49AM  13   Q.   AND ARE YOU FAMILIAR WITH THE TERM "NANOTAINER"?

11:49AM  14   A.   YES.

11:49AM  15   Q.   AND WHAT IS THE NANOTAINER?

11:49AM  16   A.   THE NANOTAINER WAS THE COLLECTION DEVICE THEY USED TO

11:49AM  17   CAPTURE DROPLETS OF BLOOD AFTER YOUR FINGER HAD BEEN PRICKED,

11:49AM  18   AND THEN THOSE NANOTAINERS COULD THEN TRANSPORT THE SAMPLE TO A

11:49AM  19   LOCATION WHERE IT COULD BE ANALYZED.

11:49AM  20   Q.   BENEATH THAT IT SAYS, "ASSAYS.

11:49AM  21       "CHEMISTRIES, 800 PLUS TEST MENU AND TPS LIBRARY."

11:50AM  22       DO YOU SEE THAT LANGUAGE?

11:50AM  23   A.   YES.

11:50AM  24   Q.   AND IS THAT CONSISTENT WITH THE STATEMENTS THAT MS. HOLMES

11:50AM  25   MADE TO YOU IN YOUR DECEMBER AND JANUARY MEETINGS?

| | | |
|---|---|---|
| 11:50AM | 1 | A. YES. |
| 11:50AM | 2 | Q. LET'S GO BACK IN THIS DOCUMENT TO PAGE 8. |
| 11:50AM | 3 | IF WE CAN ZOOM IN ON THE SUBSTANCE, MS. HOLLIMAN. |
| 11:50AM | 4 | MR. GROSSMAN, DO YOU SEE THE HEADING "PRESS" ON THIS? |
| 11:50AM | 5 | A. YES. |
| 11:50AM | 6 | Q. AND DO YOU SEE A REFERENCE IN "THE WALL STREET JOURNAL," |
| 11:50AM | 7 | "ELIZABETH HOLMES: THE BREAKTHROUGH OF INSTANT DIAGNOSIS"? |
| 11:50AM | 8 | A. YES. |
| 11:50AM | 9 | Q. IS THIS MATERIAL THAT YOU REVIEWED PRIOR TO PFM'S |
| 11:50AM | 10 | INVESTMENT? |
| 11:50AM | 11 | A. YES. |
| 11:50AM | 12 | Q. AND WAS THIS RELEVANT INFORMATION TO YOUR INVESTMENT |
| 11:50AM | 13 | DECISION? |
| 11:50AM | 14 | A. YES. |
| 11:50AM | 15 | Q. OKAY. LET'S, PLEASE, LOOK AT PAGE 9, MS. HOLLIMAN. |
| 11:51AM | 16 | DO YOU SEE WHAT APPEARS TO BE A PRESS RELEASE TITLED |
| 11:51AM | 17 | "THERANOS SELECTS WALGREENS AS A LONG-TERM PARTNER THROUGH |
| 11:51AM | 18 | WHICH TO OFFER ITS NEW CLINICAL LABORATORY SERVICE. |
| 11:51AM | 19 | "WITH FIRST LOCATION LAUNCHING THIS MONTH IN |
| 11:51AM | 20 | SILICON VALLEY, CONSUMERS CAN NOW COMPLETE ANY |
| 11:51AM | 21 | CLINICIAN-DIRECTED LAB TEST WITH AS LITTLE AS A FEW DROPS OF |
| 11:51AM | 22 | BLOOD AND RESULTS AVAILABLE IN A MATTER OF HOURS." |
| 11:51AM | 23 | WITH YOU FAMILIAR WITH THIS LANGUAGE? |
| 11:51AM | 24 | A. YES. |
| 11:51AM | 25 | Q. AND WERE YOU FAMILIAR WITH THIS AT THE TIME OF PFM'S |

11:51AM 1      INVESTMENT?

11:51AM 2      A.   YES.

11:51AM 3      Q.   AND WAS THIS IMPORTANT INFORMATION TO YOU?

11:51AM 4      A.   YES.

11:51AM 5      Q.   AND WHY WAS THAT?

11:51AM 6      A.   THIS WAS CRITICAL.  IT REPRESENTED A TRANSITION FOR THIS

11:51AM 7      BUSINESS FROM BEING A RISKY EARLY STAGE COMPANY TO BEING A

11:52AM 8      COMMERCIAL BUSINESS, AND IT CHANGED THE NATURE OF THE

11:52AM 9      INVESTMENT AND THE RISKS OF THE INVESTMENT.

11:52AM 10          IT ALSO REPRESENTED A POWERFUL EXTERNAL VALIDATION TO THE

11:52AM 11     TECHNOLOGY, A COMPANY LIKE WALGREENS, ONE OF THE LARGEST

11:52AM 12     NATIONAL PHARMACY CHAINS, PARTNERING WITH THEM.

11:52AM 13          IT ALSO HIGHLIGHTED THAT THIS TECHNOLOGY WAS, WAS

11:52AM 14     AVAILABLE OR SOON TO BE AVAILABLE.  I DIDN'T READ THE WHOLE

11:52AM 15     ARTICLE, BUT, YOU KNOW, IT REPRESENTED, YOU KNOW, THE BEGINNING

11:52AM 16     OF THE COMMERCIAL ERA FOR THIS COMPANY.

11:52AM 17     Q.   OKAY.  YOU SAY YOU DIDN'T REVIEW THE WHOLE ARTICLE, AND I

11:52AM 18     SAW YOU LOOKING AT THE SCREEN, AND I UNDERSTAND YOU TO BE

11:52AM 19     SAYING THAT YOU DIDN'T READ THE WHOLE THING RIGHT NOW.

11:52AM 20     A.   THAT'S RIGHT.

11:53AM 21     Q.   BUT BACK AT THE TIME, YOU'RE CONFIDENT THAT YOU REVIEWED

11:53AM 22     IT IN FULL?

11:53AM 23     A.   YES.

11:53AM 24     Q.   OKAY.  LET'S GO TO PAGE 17, PLEASE.

11:53AM 25          DO YOU SEE A SLIDE TITLED, "SAME TESTS, A WHOLE NEW

11:53AM  1    APPROACH"?

11:53AM  2    A.   YES.

11:53AM  3    Q.   AND DO YOU SEE AN IMAGE OF THE NANOTAINER ON KIND OF THE

11:53AM  4    RIGHT SIDE IN THE MIDDLE THERE?

11:53AM  5    A.   YES, I DO.

11:53AM  6    Q.   OKAY.  AND THIS READS, "THERANOS RUNS ANY TEST AVAILABLE

11:53AM  7    IN CENTRAL LABORATORIES, AND PROCESSES ALL SAMPLE TYPES."

11:53AM  8         IS THAT CONSISTENT WITH INFORMATION THAT MS. HOLMES

11:53AM  9    PROVIDED YOU IN YOUR JANUARY AND DECEMBER MEETINGS?

11:53AM 10    A.   YES.

11:53AM 11    Q.   AND WAS THAT IMPORTANT TO YOU?

11:53AM 12    A.   YES.

11:53AM 13    Q.   IN THE THIRD LINE IT SAYS, "THERANOS PROVIDES THE HIGHEST

11:53AM 14    LEVEL OF OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN OUR PRE-

11:53AM 15    AND POST-ANALYTIC PROCESSES, ENSURING THE HIGHEST LEVELS OF

11:53AM 16    ACCURACY AND PRECISION."

11:54AM 17         WAS THAT RELEVANT INFORMATION TO YOU?

11:54AM 18    A.   YES, IT WAS.

11:54AM 19    Q.   AND WAS IT CONSISTENT WITH ORAL STATEMENTS THAT MS. HOLMES

11:54AM 20    MADE TO YOU?

11:54AM 21    A.   YES, IT WAS.

11:54AM 22    Q.   LET ME DRAW YOUR ATTENTION TO PAGE 19.

11:54AM 23         DO YOU SEE THE HEADING, "FASTER RESULTS.  FASTER ANSWERS"?

11:54AM 24    A.   YES.

11:54AM 25    Q.   AND WAS THE SPEED WITH WHICH THERANOS COULD PRODUCE

11:54AM  1    RESULTS IMPORTANT TO YOU?

11:54AM  2    A.   YES.

11:54AM  3    Q.   AND WHY WAS THAT?

11:54AM  4    A.   IT WAS PART OF WHY THIS COMPANY WAS CAPABLE OF

11:54AM  5    SIGNIFICANTLY IMPACTING THE LABORATORY RETAIL INDUSTRY.  THE

11:54AM  6    ABILITY TO GET YOUR TEST BACK THAT QUICKLY ON THE SAME DAY WAS

11:54AM  7    A SIGNIFICANT IMPROVEMENT FOR THE TYPICAL CONSUMER.

11:54AM  8         IT ALSO HAD IMPLICATIONS FOR HOW PHYSICIAN OFFICES WERE

11:55AM  9    ORIENTED.  THE ABILITY TO SEE THE PATIENT AND HAVE THE LAB WORK

11:55AM  10   DONE IN THE SAME DAY AVOIDED A SECOND OFFICE VISIT.

11:55AM  11        SO FOR ALL OF THOSE REASONS THIS WAS, YOU KNOW, THIS WAS

11:55AM  12   AN IMPORTANT ASPECT OF THE COMMERCIAL OFFERING.

11:55AM  13   Q.   LET'S GO FORWARD TO PAGE 21, PLEASE.

11:55AM  14        DO YOU SEE THE HEADING "A NEW STANDARD IN QUALITY.

11:55AM  15        "THE HIGHEST LEVELS OF ACCURACY"?

11:55AM  16   A.   YES.

11:55AM  17   Q.   AND DO YOU SEE IN THE MIDDLE THERE'S A LESS THAN

11:55AM  18   10 PERCENT COEFFICIENT OF VARIATION FOR VITAMIN D?

11:55AM  19   A.   YES.

11:55AM  20   Q.   AND DID YOU ASK QUESTIONS OF MS. HOLMES ABOUT THE ACCURACY

11:55AM  21   OF THERANOS'S TESTS?

11:55AM  22   A.   YES.

11:55AM  23   Q.   AND WHAT WAS THE SUBSTANCE OF WHAT SHE SAID TO YOU?

11:55AM  24   A.   IN THE FIRST MEETING WE HAD WITH THE COMPANY, THEY

11:56AM  25   DESCRIBED THAT THEIR TECHNOLOGY, BECAUSE IT DID NOT HAVE THE

11:56AM  1    HUMAN ELEMENTS, THE POTENTIAL FOR HUMANS TO INTRODUCE

11:56AM  2    VARIABILITY IN ERRORS INTO THE ANALYTIC PROCESSES IN

11:56AM  3    LABORATORIES, BY LIMITING IT, IT HAD DRAMATICALLY LESS

11:56AM  4    VARIABILITY.

11:56AM  5         WE TALKED ABOUT SOME OF THE TYPICAL TESTS THAT ARE

11:56AM  6    DIFFICULT FOR TRADITIONAL LABORATORIES TO RUN.

11:56AM  7         ONE OF THEM WAS VITAMIN D.  ANOTHER ONE WE DISCUSSED WAS

11:56AM  8    HDL.

11:56AM  9         AND IN BOTH CASES I THINK WE, WE -- IN BOTH CASES THE

11:56AM  10   PERCENTAGE OF THE COEFFICIENT OF VARIATION WAS SIGNIFICANTLY

11:56AM  11   HIGHER.  I WANT TO -- I BELIEVE SOMETHING ON THE ORDER OF 25 TO

11:56AM  12   30 PERCENT, OR HIGHER, FOR THOSE TESTS USING CONVENTIONAL

11:56AM  13   EQUIPMENT.

11:56AM  14   Q.   LET'S PLEASE NOW LOOK AT PAGE 33.

11:57AM  15        DO YOU SEE THE HEADING "COMMERCIAL"?

11:57AM  16   A.   YES.

11:57AM  17   Q.   AND THERE'S A NUMBER OF KEY DEPLOYMENTS LISTED HERE.

11:57AM  18        DO YOU SEE THAT?

11:57AM  19   A.   YES.

11:57AM  20   Q.   AND THERE'S REFERENCES DOWN AT THE BOTTOM TO DOD AND

11:57AM  21   PHARMA?

11:57AM  22   A.   YES.

11:57AM  23   Q.   AND I THINK YOU TESTIFIED EARLIER MS. HOLMES MADE

11:57AM  24   REPRESENTATIONS TO YOU ABOUT THE DOD RELATIONSHIP IN THAT FIRST

11:57AM  25   MEETING IN DECEMBER OF 2013.

11:57AM  1    A.   YES.

11:57AM  2    Q.   AND SHE ALSO MADE REPRESENTATIONS TO YOU ABOUT THE DOLLAR

11:57AM  3    AMOUNT OF THE PHARMA BUSINESS?

11:57AM  4    A.   YES.

11:57AM  5    Q.   OKAY.  LET ME NEXT DRAW YOUR ATTENTION TO PAGE 51.

11:58AM  6         DO YOU SEE THE HEADING, "NEW POSSIBILITY IS IN LAB"?

11:58AM  7    A.   YES.

11:58AM  8    Q.   AND TO THE LEFT THERE'S A BOX WITH THE TITLE, "ROUTINE,

11:58AM  9    SPECIALTY, AND ESOTERIC TESTING."

11:58AM  10        DO YOU SEE THAT?

11:58AM  11   A.   YES.

11:58AM  12   Q.   AND DO YOU SEE THE REFERENCE, "ALL 1,000 PLUS CURRENTLY

11:58AM  13   RUN TESTS/CPT CODES ARE AVAILABLE THROUGH THERANOS."

11:58AM  14        DO YOU SEE THAT?

11:58AM  15   A.   YES, I DO.

11:58AM  16   Q.   AND IS THAT CONSISTENT WITH INFORMATION THAT YOU RECEIVED

11:58AM  17   FROM MS. HOLMES IN THE MEETING IN DECEMBER OF 2013?

11:58AM  18   A.   YES.

11:58AM  19   Q.   DOWN AT THE BOTTOM IT SAYS, "WITH CLIA CERTIFICATION,

11:58AM  20   THERANOS IS A NATIONALLY ACCREDITED PROVIDER."

11:58AM  21        DO YOU SEE THAT LANGUAGE?

11:58AM  22   A.   I DO.

11:58AM  23   Q.   OKAY.  IF YOU COULD NOW TURN TO PAGE 62 AND 63.

11:58AM  24        MAYBE WE CAN SPLIT THE SCREEN, MS. HOLLIMAN.

11:59AM  25        MR. GROSSMAN, ON THE -- ON PAGE 62, WHICH IS DISPLAYED ON

11:59AM  1    THE LEFT SIDE OF THE SCREEN, IT SAYS, "THERANOS'S CLIA QUALITY

11:59AM  2    STANDARDS."

11:59AM  3         DO YOU SEE THAT?

11:59AM  4    A.   I DO.

11:59AM  5    Q.   AND THERE'S A LIST OF PERSONNEL QUALIFICATIONS AND

11:59AM  6    RESPONSIBILITIES, QUALITY CONTROL, SPECIMEN INTEGRITY AND

11:59AM  7    RECORDKEEPING, PROFICIENCY TESTING, QUALITY ASSESSMENT.

11:59AM  8         DO YOU SEE THAT LANGUAGE?

11:59AM  9    A.   I DO.

11:59AM  10   Q.   AND WHAT DID MS. HOLMES TELL YOU ABOUT THERANOS'S

11:59AM  11   PROFICIENCY TESTING?

11:59AM  12   A.   THEY TOLD US THAT, THEY TOLD US THAT THEIR, THEIR -- THE

11:59AM  13   REGULATORY AUTHORITY, OR THE REGULATORY RULES FOR THEIR

12:00PM  14   LABORATORY FELL UNDER THE CLIA LAWS, AND UNDER CLIA THEY HAD A

12:00PM  15   PROCESS THEY HAD TO, THEY HAD TO RUN IN ORDER FOR THEIR

12:00PM  16   PROPRIETARY TECHNOLOGY TO BE COMMERCIALLY AVAILABLE.

12:00PM  17        THEY WERE SENT SAMPLES THAT THEY HAD TO MEASURE, AND THEY

12:00PM  18   HAD TO REPORT THOSE MEASUREMENTS BACK TO AN INDEPENDENT

12:00PM  19   ORGANIZATION.

12:00PM  20        AND THEY TOLD US THAT THEY HAD BEEN -- THEY TOLD US THAT

12:00PM  21   THEY COULD REPEATEDLY AND RELIABLY MEET THOSE STANDARDS FOR ALL

12:00PM  22   OF THEIR COMMERCIALLY AVAILABLE TESTS ON THEIR PROPRIETARY

12:00PM  23   TECHNOLOGY.

12:00PM  24   Q.   DID MS. HOLMES TELL YOU ANYTHING ABOUT SOMETHING CALLED

12:00PM  25   ALTERNATIVE ASSESSMENT OF PROFICIENCY?

12:00PM  1    A.   WE DID, I BELIEVE, DISCUSS ALTERNATIVE -- CAN YOU PLEASE

12:01PM  2    RESTATE THE QUESTION?

12:01PM  3    Q.   ALTERNATIVE ASSESSMENT OF PROFICIENCY, OR AAP?

12:01PM  4    A.   YES, I BELIEVE WE DID DISCUSS AAP AND HOW THAT APPLIED TO

12:01PM  5    PROFICIENCY TESTING.

12:01PM  6    Q.   AND WHAT DID MS. HOLMES TELL YOU ABOUT THAT?

12:01PM  7    A.   I DON'T HAVE -- I BELIEVE THEY, I BELIEVE THEY -- I

12:01PM  8    BELIEVE WE DISCUSSED HOW THAT WAS APPLIED AS THEY DEVELOPED NEW

12:01PM  9    ASSAYS FOR THEIR PLATFORM.

12:01PM  10         FOR EXAMPLE, A NEW FLU TEST IF THERE WAS A FLU STRAIN THAT

12:01PM  11   WAS CIRCULATING THAT WAS NEW TO THE WORLD, THEY WOULD DEVELOP

12:01PM  12   THE TEST, VALIDATE THE TEST, AND THEN BRING IT UP IN THE CLIA

12:01PM  13   LAB.

12:01PM  14         AND AS PART OF THAT DISCUSSION, I BELIEVE WE TALKED ABOUT

12:01PM  15   THOSE ALTERNATIVE PROTOCOLS.

12:01PM  16   Q.   THE DISCUSSION YOU HAD ABOUT BLINDED SAMPLES AND THERANOS

12:01PM  17   GOING THROUGH TRADITIONAL PROFICIENCY TESTING, DID YOU BELIEVE

12:02PM  18   THAT APPLIED TO THERANOS'S MINILAB?

12:02PM  19   A.   YES.

12:02PM  20   Q.   LET ME DRAW YOUR ATTENTION TO PAGE 64.

12:02PM  21        FORGIVE ME, MR. GROSSMAN.  BEFORE WE GO TO 64, I HAVE ONE

12:02PM  22   MORE QUESTION ON 63.

12:02PM  23        THERE'S A STATEMENT IN 63 THAT SAYS, "THERANOS MAINTAINS

12:02PM  24   CLIA ACCREDITATION AS A HIGH COMPLEXITY LAB AND HAS PASSED ALL

12:02PM  25   AUDITS WITHOUT A SINGLE DEFICIENCY TO MAINTAIN THIS STATUS."

12:02PM  1          DO YOU SEE THAT LANGUAGE?

12:02PM  2     A.   YES.

12:02PM  3     Q.   AND WAS THAT IMPORTANT TO YOU?

12:02PM  4     A.   YES, VERY IMPORTANT.

12:02PM  5     Q.   AND WHY WAS THAT?

12:02PM  6     A.   IT JUST SPOKE TO THE FACT THAT THEY WERE ABLE TO MEET THIS

12:03PM  7     STANDARD OF ACCREDITATION UNDER THE CLIA LAWS FOR ALL OF THEIR

12:03PM  8     TESTS, AND IT ALSO MEANT THAT THEY WERE ABLE TO BILL MEDICARE

12:03PM  9     AND MEDICAID FOR LAB SERVICES FOR SAMPLES THAT THEY WERE

12:03PM  10    PROCESSING.

12:03PM  11    Q.   AND DID YOU BELIEVE THIS ACCREDITATION TO SPEAK TO USE OF

12:03PM  12    THE MINILAB IN THE CLIA LAB?

12:03PM  13    A.   YES.

12:03PM  14    Q.   NOW LET'S PLEASE GO TO PAGE 64.

12:03PM  15         DO YOU SEE THE HEADING "VALIDATION OF THERANOS"?

12:03PM  16    A.   YES.

12:03PM  17    Q.   AND DO YOU SEE THE FIRST LINE, "THERANOS HAS BEEN

12:03PM  18    COMPREHENSIVELY VALIDATED OVER THE COURSE OF THE LAST SEVEN

12:03PM  19    YEARS BY TEN OF THE FIFTEEN LARGEST PHARMACEUTICAL COMPANIES,

12:03PM  20    WITH HUNDREDS OF THOUSANDS OF ASSAYS PROCESSED."

12:03PM  21         WAS THAT RELEVANT TO YOU?

12:03PM  22    A.   YES, IT WAS.

12:03PM  23    Q.   HOW SO?

12:04PM  24    A.   IT WAS A VALIDATION OF THE TECHNOLOGY.  THOSE

12:04PM  25    ORGANIZATIONS, MANY OF WHOM WE KNEW WELL AS INVESTORS IN THIS

1    SPACE, ARE HIGHLY DEMANDING ORGANIZATIONS AND USING A

2    TECHNOLOGY LIKE THIS ON SOMETHING AS IMPORTANT AS A CLINICAL

3    TRIAL PROGRAM WOULD ONLY -- YOU COULD ONLY DO THAT IF YOU HAD

4    ENORMOUS CONFIDENCE IN THE ANALYTIC ACCURACY OF THE TECHNOLOGY

5    THAT WAS BEING USED.

6         FOR THOSE COMPANIES, CLINICAL TRIALS ON NEW EXPERIMENTAL

7    MEDICINES ARE THE LIFEBLOOD OF THOSE BUSINESSES.  WITHOUT

8    APPROVAL, WITHOUT SUCCESSFUL CLINICAL RESULTS, PHASE THREE

9    TRIAL RESULTS, THOSE ORGANIZATIONS CAN'T GROW.

10         SO THIS IS THE MOST IMPORTANT PART OF THEIR BUSINESS.

11         SO USING A TECHNOLOGY LIKE THIS IN THEIR SETTING IS A HUGE

12    VALIDATION ON THE CAPABILITIES AND ANALYTIC ACCURACY OF THIS

13    TECHNOLOGY.

14    Q.   DID MS. HOLMES EVER TELL YOU THAT THERANOS HAD ZERO

15    REVENUE FROM PHARMACEUTICAL COMPANIES IN 2013?

16    A.   NO.

17    Q.   WOULD THAT HAVE BEEN RELEVANT TO YOU?

18    A.   YES.

19    Q.   WHY?

20    A.   IT WOULD HAVE LED TO A SERIES OF QUESTIONS AROUND WHY

21    THERE WAS NO REVENUE.  SO, YES, IT WOULD HAVE BEEN, IT WOULD

22    HAVE BEEN RELEVANT TO US.

23    Q.   OKAY.  LET ME NEXT DRAW YOUR ATTENTION TO PAGE 69.

24         DO YOU SEE THE HEADING "EXCERPTS FROM THERANOS'S TEST

25    MENU"?

12:05PM   1     A.   YES.

12:05PM   2     Q.   AND THERE'S AN ASTERISK, "105 TESTS SHOWN, ANOTHER 20 PLUS

12:05PM   3     PAGES SHOW ALL AVAILABLE TESTS WITH THERANOS."

12:06PM   4          DO YOU SEE THAT LANGUAGE?

12:06PM   5     A.   YES.

12:06PM   6     Q.   AND DID YOU BELIEVE THIS TO BE A LISTING OF THE TESTS THAT

12:06PM   7     THERANOS WAS CURRENTLY ABLE TO PERFORM WITH ITS MINILAB?

12:06PM   8     A.   YES.

12:06PM   9     Q.   AND WAS THAT SIGNIFICANT TO YOU?

12:06PM  10     A.   YES, IT WAS.

12:06PM  11     Q.   LAST, LET ME DRAW YOUR ATTENTION TO PAGE 95.

12:06PM  12          DO YOU SEE THE HEADING "THERANOS:   COST SAVINGS"?

12:06PM  13     A.   YES.

12:06PM  14     Q.   AND DO YOU SEE THE FIRST BULLET, "THERANOS'S INITIAL PRICE

12:06PM  15     POINTS ARE 50 PERCENT BELOW MEDICARE REIMBURSEMENT AMOUNTS FOR

12:06PM  16     ALL CURRENTLY RUN TESTS/CPT CODES."

12:06PM  17          WAS THAT RELEVANT INFORMATION TO YOU?

12:06PM  18     A.   YES.

12:06PM  19     Q.   EXPLAIN WHY, PLEASE.

12:06PM  20     A.   IT SPOKE TO THE UNIT ECONOMICS, THE COST ADVANTAGE THAT

12:06PM  21     THEY HAD AGAINST TRADITIONAL LABORATORY EQUIPMENT AND

12:06PM  22     TRADITIONAL LABORATORY OPERATIONS, THE FACT THAT THEY COULD,

12:06PM  23     THEY COULD BILL AT 50 PERCENT OF THE MEDICARE REIMBURSEMENT AND

12:07PM  24     THEY WERE PROFITABLE DOING THAT WAS AN IMPORTANT PART, NOT THE

12:07PM  25     ONLY, BUT AN IMPORTANT PART OF THE COMPETITIVE ADVANTAGE THAT

12:07PM  1    THIS COMPANY HAD AS A RESULT OF THEIR PROPRIETARY TECHNOLOGY.

12:07PM  2    Q.   AND IS THIS BULLET HERE CONSISTENT WITH STATEMENTS

12:07PM  3    MS. HOLMES MADE TO YOU IN THE DECEMBER 2013 AND JANUARY 2014

12:07PM  4    MEETING?

12:07PM  5    A.   YES.

12:07PM  6    Q.   OKAY.  AND AT ANY POINT IN TIME DID YOU THINK THERANOS WAS

12:07PM  7    USING LOW COST TESTS AS SOME FORM OF LOSS LEADER?

12:07PM  8    A.   I DON'T RECALL IF THEY WERE USING THIS AS A LOSS LEADER.

12:07PM  9    Q.   FURTHER DOWN THERE'S A BULLET, "THE UNPRECEDENTED LACK OF

12:07PM  10   VARIATION FROM SYSTEM TO SYSTEM YIELDS HIGHER INTEGRITY DATA."

12:07PM  11       DO YOU SEE THAT LANGUAGE?

12:07PM  12   A.   YES.

12:07PM  13   Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

12:07PM  14   A.   THIS WAS CONSISTENT WITH THE COMMENTS THAT THEY MADE, THAT

12:08PM  15   MS. HOLMES MADE TO US IN THE FIRST MEETING ABOUT THE LACK OF

12:08PM  16   HUMAN INVOLVEMENT IN THE ANALYTIC OPERATIONS OF THE LABORATORY.

12:08PM  17       ELIMINATING THAT REDUCED MANY OF THE ERRORS THAT HAPPENED

12:08PM  18   IN TRADITIONAL LABORATORIES, AND STANDARDIZING -- AND ALLOWED

12:08PM  19   YOU TO STANDARDIZE THE ANALYTIC PROCESSES WITHIN THE MINILAB SO

12:08PM  20   THAT MUCH OF THE VARIATION THAT EXISTED IN THE TRADITIONAL

12:08PM  21   LABORATORY ENVIRONMENT WAS ELIMINATED, AND THAT'S WHY THEIR

12:08PM  22   TECHNOLOGY HAD SUCH LOW LEVELS OF VARIABILITY COMPARED TO

12:08PM  23   CONVENTIONAL EQUIPMENT.

12:08PM  24   Q.   IS THAT LACK OF VARIABILITY LOST SOMEHOW IF YOU'RE USING

12:08PM  25   CONVENTIONAL EQUIPMENT?

12:08PM  1    A.   IF YOU USED CONVENTIONAL EQUIPMENT, YOU WOULD HAVE ALL OF

12:08PM  2    THE SAME ISSUES THAT TRADITIONAL THIRD PARTY REFERENCE LABS

12:09PM  3    HAVE, BIG MACHINES, LAB TECHS FOR EACH MACHINE, AND THROUGHOUT

12:09PM  4    THAT PROCESS MISTAKES AND VARIATION CAN BE CREATED AT MULTIPLE

12:09PM  5    POINTS IN TIME.

12:09PM  6    Q.   AFTER RECEIVING THIS POWERPOINT FROM MR. BALWANI AROUND

12:09PM  7    JANUARY 17TH, DID YOU CONTINUE TO HAVE EMAIL AND PHONE

12:09PM  8    CONVERSATIONS WITH MR. BALWANI ABOUT A POTENTIAL INVESTMENT?

12:09PM  9    A.   YES.

12:09PM  10   Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED

12:09PM  11   AS EXHIBIT 1443.

12:09PM  12        DO YOU RECOGNIZE THIS DOCUMENT?

12:09PM  13   A.   I DON'T HAVE A DOCUMENT ON MY SCREEN.

12:09PM  14   Q.   LET'S USE THE BINDER.

12:09PM  15   A.   OKAY.

12:09PM  16   Q.   WE CAN'T DISPLAY IT UNTIL IT'S IN EVIDENCE.

12:09PM  17   A.   OH, SORRY.

12:09PM  18   Q.   SO IF WE CAN LOOK AT THE HARD COPY AT 1443.

12:10PM  19   A.   CAN YOU JUST GIVE ME A MOMENT TO REVIEW THIS?

12:10PM  20   Q.   PLEASE, TAKE YOUR TIME.

12:10PM  21        (PAUSE IN PROCEEDINGS.)

12:10PM  22            THE WITNESS:  YES, I AM FAMILIAR WITH THIS.

12:10PM  23   BY MR. LEACH:

12:10PM  24   Q.   OKAY.  AND IS THIS AN EMAIL WITH ADDITIONAL QUESTIONS AND

12:10PM  25   REQUESTS FOR INFORMATION THAT YOU SENT TO MR. BALWANI IN OR

| | | |
|---|---|---|
| 12:10PM | 1 | AROUND THE JANUARY 20TH, 2014 TIME PERIOD? |
| 12:10PM | 2 | A.   YES. |
| 12:10PM | 3 | MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 1443 INTO |
| 12:10PM | 4 | EVIDENCE. |
| 12:10PM | 5 | MR. WADE:  NO OBJECTION, YOUR HONOR. |
| 12:10PM | 6 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 12:11PM | 7 | (GOVERNMENT'S EXHIBIT 1443 WAS RECEIVED IN EVIDENCE.) |
| 12:11PM | 8 | BY MR. LEACH: |
| 12:11PM | 9 | Q.   LET ME DRAW YOUR ATTENTION, MR. GROSSMAN, TO THE EMAIL ON |
| 12:11PM | 10 | THE BOTTOM PART OF PAGE 1. |
| 12:11PM | 11 | DO YOU SEE WHERE YOU WROTE, "HERE ARE A FEW OF THE TOPICS |
| 12:11PM | 12 | FOR TOMORROW"? |
| 12:11PM | 13 | A.   YES. |
| 12:11PM | 14 | Q.   AND IS THAT A REFERENCE TO A PHONE CONVERSATION THAT YOU |
| 12:11PM | 15 | WERE SCHEDULED TO HAVE WITH MR. BALWANI? |
| 12:11PM | 16 | A.   YES, I BELIEVE IT WAS. |
| 12:11PM | 17 | Q.   OKAY.  THE FIRST PARAGRAPH RELATES TO COMPETITION. |
| 12:11PM | 18 | I WANT TO FOCUS ON THE SECOND PARAGRAPH WHERE YOU WROTE, |
| 12:11PM | 19 | "WE WANT TO REVISIT THE FDA APPROVAL PROCESS FOR ASSAYS AND |
| 12:11PM | 20 | ANALYZER." |
| 12:11PM | 21 | WHAT DID YOU MEAN BY "ANALYZER"? |
| 12:11PM | 22 | A.   ANALYZER WAS REFERRING TO THE MINILAB, THE SAMPLE |
| 12:11PM | 23 | PROCESSING UNIT. |
| 12:11PM | 24 | Q.   "MORE DETAIL ON HOW YOU INTEND TO PROCEED.  WHAT THE FDA |
| 12:12PM | 25 | HAS SAID.  THE NATURE OF THE FDA COMMUNICATIONS.  WILL THE |

12:12PM  1   ANALYZER BE AN FDA APPROVED DEVICE?"

12:12PM  2       WHY WERE YOU ASKING THAT?

12:12PM  3   A.  WE WANTED TO UNDERSTAND THEIR BUSINESS STRATEGY, WHETHER

12:12PM  4   THEY INTEND TO -- WHETHER THEY INTENDED TO SELL ANALYZERS TO

12:12PM  5   THIRD PARTIES OR WHETHER THEY WERE GOING TO USE ANALYZERS IN A

12:12PM  6   CLIA ENVIRONMENT AND OPERATE AS A LAB AND A MEDICAL DEVICE

12:12PM  7   COMPANY, SO WE REALLY WANTED TO UNDERSTAND THE BUSINESS

12:12PM  8   STRATEGY.

12:12PM  9       BUT BEYOND THAT, THEY HAD TOLD US THAT AN IMPORTANT PART

12:12PM 10   OF THEIR EXTERNAL VALIDATION WAS SEEKING FDA APPROVAL FOR ALL

12:12PM 11   OF THEIR TESTS, THE MINILAB AND THE NANOTAINERS, AND THAT WOULD

12:12PM 12   BE THE ULTIMATE PROOF TO THE MARKET, CONSUMERS, EXPERTS IN THE

12:12PM 13   LAB INDUSTRY, OTHER HEALTH CARE WORKERS THAT THIS TECHNOLOGY

12:12PM 14   WAS AS GOOD -- ACTUALLY BETTER THAN WHAT TRADITIONAL

12:13PM 15   LABORATORIES USE.

12:13PM 16       THE REASON IT WAS BETTER IS THAT TRADITIONAL LABORATORIES

12:13PM 17   DON'T OFTEN RECEIVE FDA APPROVAL FOR TESTS THAT THEY RUN.  THEY

12:13PM 18   OPERATE IN A BIT OF A GREY AREA, AND A REGULATORY GREY AREA.

12:13PM 19       BUT IN A CLIA ENVIRONMENT THEY'RE ALLOWED TO DO THAT.

12:13PM 20       SO THIS WAS -- THE COMPANY HAD EXPLAINED TO US THAT IN

12:13PM 21   ADDITION TO HAVING A HIGH PERFORMANCE, HIGHLY PERFORMING CLIA

12:13PM 22   LAB ENVIRONMENT WHERE THEY WERE RUNNING THEIR OWN PROPRIETARY

12:13PM 23   TECHNOLOGY, THEY, IN ADDITION TO THAT, WERE GOING TO SEEK FDA

12:13PM 24   APPROVAL FOR ALL OF THEIR TESTS.

12:13PM 25       SO WE WANTED TO UNDERSTAND WHERE THAT PROCESS WAS BECAUSE

12:13PM 1    AS AN INVESTOR, FDA APPROVAL WOULD BE A REALLY SIGNIFICANT

12:13PM 2    VALUE DRIVER FOR THE INVESTMENT OVER TIME.

12:13PM 3    Q.   FURTHER DOWN IN THIS EMAIL YOU WROTE TO MR. BALWANI, "WE

12:14PM 4    WANT TO BETTER UNDERSTAND THE MANUFACTURING RAMP OF ANALYZERS.

12:14PM 5    CAN THEY MAKE THEM AT HIGHER VOLUME WITHOUT SACRIFICING PRODUCT

12:14PM 6    QUALITY?  WHERE DO THEY MAKE THEM?  WE'D LIKE TO SEE THAT PART

12:14PM 7    OF THE OPERATION IF POSSIBLE.  WHY DID THEY DECIDE TO MAKE THE

12:14PM 8    ANALYZERS VERSUS OUTSOURCE THEM?"

12:14PM 9         WHAT WERE YOU GETTING AT THERE?

12:14PM 10   A.   THERE WERE A FEW DIFFERENT THINGS THAT WE WERE FOCUSSED ON

12:14PM 11   HERE.

12:14PM 12        FIRST OF ALL, MOST PEOPLE IN THE MEDICAL DEVICE INDUSTRY,

12:14PM 13   CLINICAL DIAGNOSTICS INDUSTRY, THEY OUTSOURCE MANUFACTURING.

12:14PM 14   THEY'RE JUST LIKE YOUR IPHONE.  IF YOU HAVE AN APPLE IPHONE,

12:14PM 15   IT'S NOT MADE BY APPLE, IT'S MADE BY THIRD PARTIES.

12:14PM 16        THE SAME IS TRUE IN THE MEDICAL DEVICE INDUSTRY.

12:14PM 17        SO OUR FIRST MEETING WITH THE COMPANY, ELIZABETH TOLD US

12:14PM 18   THAT THEY WERE VERTICALLY INTEGRATING FROM A MANUFACTURER

12:14PM 19   STANDPOINT, MEANING THAT THEY MADE THEIR OWN ANALYZERS AS

12:14PM 20   OPPOSED TO USING THIRD PARTIES.

12:15PM 21        SO WE WANTED TO UNDERSTAND WHY THEY WERE DOING THAT AND

12:15PM 22   MAKE SURE THAT THEY WEREN'T, AS A RESULT OF NOT USING THIRD

12:15PM 23   PARTIES, THEY WOULD BE UNABLE TO MEET DEMAND FOR THEIR SERVICE

12:15PM 24   IN THE MARKETPLACE, AND NOT HAVE ENOUGH MINILABS TO PROCESS THE

12:15PM 25   TESTS.

12:15PM  1      SO WE WANTED TO MAKE SURE THAT, NUMBER ONE, THEY HAD THEIR

12:15PM  2   ARMS AROUND THE MANUFACTURING OF THESE DEVICES SINCE THEY WERE

12:15PM  3   DOING IT THEMSELVES, WHICH WAS UNUSUAL FOR COMPANIES IN THE

12:15PM  4   DIAGNOSTIC SPACE.

12:15PM  5      NUMBER TWO, AS PART OF OUR DUE DILIGENCE PROCESS, WE

12:15PM  6   WANTED TO SEE THE FACILITY.  WE, WE, WE -- THAT IS -- IT WAS AN

12:15PM  7   IMPORTANT -- MEETING THE DEMAND ON THE HOSPITAL SIDE, ON THE

12:15PM  8   RETAIL SIDE, WE HAD TO FEEL COMFORTABLE THAT THEY HAD THE

12:15PM  9   ABILITY TO ACTUALLY MAKE THESE DEVICES.

12:15PM 10      AND THEN OBVIOUSLY YOU CAN'T, IN THE PROCESS OF SCALING

12:15PM 11   THE MANUFACTURING PROCESS, YOU CAN'T COMPROMISE QUALITY.  SO

12:16PM 12   THE DEVICE -- THEY, THEY -- IT'S ONE THING TO MAKE A DEVICE,

12:16PM 13   YOU KNOW, 10 DEVICES, BUT CAN YOU MAKE 200 DEVICES?  AND ARE

12:16PM 14   THOSE 200 DEVICES GOING TO WORK THE WAY THAT 1 OR 2 DEVICE

12:16PM 15   PROTOTYPE WOULD HAVE PERFORMED?

12:16PM 16      SO WE REALLY WANTED TO MAKE SURE THAT THIS COMPANY COULD

12:16PM 17   ACTUALLY MAKE THESE THINGS, THESE MINILABS.

12:16PM 18      AND IT WAS ALSO PART OF THE FINANCIAL FORECAST IN THE

12:16PM 19   FINANCIAL MODEL, THE CASH THAT WAS GOING TOWARDS PRODUCING

12:16PM 20   MINILABS.  WE WANTED TO MAKE SURE THAT THEY REALLY COULD MAKE

12:16PM 21   THE REQUIRED NUMBER OF MINILABS THAT WAS IN THE FORECAST.

12:16PM 22      SO FOR ALL OF THOSE REASONS WE WANTED TO, WE REALLY WANTED

12:16PM 23   TO, WE WANTED TO CIRCLE BACK TO THIS ISSUE, AND WE DIDN'T WANT

12:16PM 24   ANY MISUNDERSTANDING OR AMBIGUITY AROUND THEIR ABILITY TO

12:16PM 25   PRODUCE THEIR OWN SAMPLE PROCESSING UNITS.

12:16PM 1    Q.   SO IN YOUR INITIAL MEETING IN DECEMBER, MS. HOLMES TOLD

12:17PM 2    YOU THEY WERE VERTICALLY INTEGRATED?

12:17PM 3    A.   YES.

12:17PM 4    Q.   MEANING WE MAKE ALL OF OUR DEVICES?

12:17PM 5    A.   YES.

12:17PM 6    Q.   AND THIS IS YOU FOLLOWING UP ON STATEMENTS LIKE THAT AND

12:17PM 7    OTHER STATEMENTS THAT YOU HAD RECEIVED?

12:17PM 8    A.   YES.

12:17PM 9    Q.   OKAY.  AFTER THIS EMAIL TO MR. BALWANI, DID HE DESCRIBE

12:17PM 10   FOR YOU ANYTHING ABOUT THE MANUFACTURING RAMP UP OR ANALYZERS

12:17PM 11   VERSUS OUTSOURCING THEM?  DID HE RESPOND TO THESE QUESTIONS

12:17PM 12   HERE?

12:17PM 13   A.   YES, HE DID.

12:17PM 14   Q.   WHAT DID HE TELL YOU?

12:17PM 15   A.   HE WAS, HE WAS VERY CONFIDENT THAT THEY WOULD HAVE NO

12:17PM 16   ISSUES MANUFACTURING MINILABS TO MEET THE SALES FORECAST FOR

12:17PM 17   BOTH 2014 AND 2015.

12:17PM 18        IN FACT, HE SAID THAT THEY WOULDN'T EVEN NEED TO REACH

12:17PM 19   PEAK CAPACITY, PRODUCTION CAPACITY TO MEET THEIR FORECAST.  SO

12:17PM 20   THEY HAD SLACK.  THEY HAD EXCESS CAPACITY IN THEIR

12:17PM 21   MANUFACTURING PROCESS IN ORDER TO DELIVER ON THE FINANCIAL

12:17PM 22   FORECAST THAT THEY SENT US.

12:18PM 23        AND IT WASN'T JUST THE RETAIL SETTING.  THEY ALSO HAD TO

12:18PM 24   MAKE THESE DEVICES FOR THE HOSPITAL VISITS.  SO IT WAS BOTH OF

12:18PM 25   THOSE BUSINESSES AND UNDERSTANDING THE PRODUCTIVITY AND

12:18PM  1    THROUGHPUT OF THE SYSTEMS WAS PARTS OF THAT ANALYSIS.

12:18PM  2    Q.   DID HE SAY ANYTHING TO THE EFFECT OF, WE'RE USING MACHINES

12:18PM  3    MANUFACTURED BY OTHERS TO DO MOST OF THE TESTING IN OUR LAB?

12:18PM  4    A.   NO, NO, HE DID NOT.

12:18PM  5    Q.   DID MR. BALWANI MAKE STATEMENTS TO YOU ABOUT THERANOS'S --

12:18PM  6    WHAT IT TOOK TO MAINTAIN A PARTICULAR MINILAB?

12:18PM  7    A.   YES, HE DID.

12:18PM  8    Q.   WHAT DID HE TELL YOU?

12:18PM  9    A.   WE TALKED ABOUT HOW THEY HAD ENGINEERED THESE DEVICES SO

12:18PM  10   THAT THEY HAD INTELLIGENCE EXISTING CONVENTIONAL ANALYTICS

12:18PM  11   INSTRUMENTS THINGS DON'T HAVE, THINGS LIKE WIRELESS SENSORS

12:18PM  12   THAT WOULD PROVIDE REALTIME FEEDBACK TO THERANOS IF A MACHINE

12:19PM  13   WAS NOT PROPERLY CALIBRATED, IF IT WAS PERFORMING POORLY, IF IT

12:19PM  14   WAS CLOGGED, AND THOSE -- AND SO THAT CAPABILITY WOULD ENABLE

12:19PM  15   THEM TO SERVICE THESE MACHINES FOR EFFICIENTLY AT LOWER COST

12:19PM  16   THAN EXISTING LAB INFRASTRUCTURE, AGAIN, SPEAKING TO THE

12:19PM  17   COMPETITIVE ADVANTAGE THIS COMPANY HAD AS RESULT OF THEIR CORE

12:19PM  18   TECHNOLOGY.

12:19PM  19        HE ALSO EXPLAINED THAT BASED ON USING THESE DEVICES IN

12:19PM  20   AFGHANISTAN, THEY KNEW THAT THE SYSTEM DIDN'T FUNCTION AT

12:19PM  21   TEMPERATURES OVER 120 DEGREES FAHRENHEIT, AND THAT WAS AN

12:19PM  22   EXAMPLE OF HOW, IF A SYSTEM IS EXPOSED TO AN EXTREME

12:19PM  23   TEMPERATURE LIKE THAT, THEY WOULD HAVE -- THEY WOULD BE ALERTED

12:19PM  24   TO THAT EXPOSURE AND THEY WOULD BE ABLE TO TAKE THAT MACHINE

12:19PM  25   OFFLINE OR PUT IT IN A DIFFERENT ENVIRONMENT.

12:19PM  1    Q.   AT SOME POINT DURING YOUR ANALYSIS OF THE THERANOS

12:20PM  2    INVESTMENT, DID YOU ASK MR. BALWANI IF YOU COULD SPEAK TO

12:20PM  3    REPRESENTATIVES OF WALGREENS?

12:20PM  4    A.   YES.

12:20PM  5    Q.   WHAT DID HE TELL YOU?

12:20PM  6    A.   HE SAID HE WAS VERY UNCOMFORTABLE WITH THAT AND HE SAID

12:20PM  7    THEY WEREN'T WILLING TO DO THAT.

12:20PM  8         HE, HE, HE REFERENCED SOMETHING TO THE EFFECT THAT IT

12:20PM  9    WOULD BE A STRANGE CONVERSATION.  THEY HAVE A GREAT

12:20PM  10   RELATIONSHIP.  THEY DIDN'T -- THAT COULD SEEM -- IT WOULDN'T

12:20PM  11   LOOK GOOD.  HE HAD A SERIES OF RESPONSES ALONG THOSE LINES.

12:20PM  12   Q.   DID YOU ALSO ASK MR. BALWANI IF YOU COULD SPEAK WITH

12:20PM  13   UNITED HEALTH CARE?

12:20PM  14   A.   YES, WE DID.

12:20PM  15   Q.   AND WHY WERE YOU INTERESTED IN SPEAKING WITH UNITED HEALTH

12:20PM  16   CARE?

12:20PM  17   A.   SO IN -- TOWARDS THE BEGINNING OF OUR SECOND MEETING WITH

12:20PM  18   THE COMPANY, THEY DETAILED THE COMMERCIAL CONTRACTS THEY HAD

12:21PM  19   WITH IMPORTANT INSURANCE COMPANIES.

12:21PM  20        THE FIRST WAS THE BLUE CROSS AND BLUE SHIELD ORGANIZATION,

12:21PM  21   WHICH EVERY STATE HAS A NOT FOR PROFIT HEALTH INSURANCE

12:21PM  22   COMPANY, AND IN CALIFORNIA WE HAVE TWO, BUT THAT'S THE ONLY

12:21PM  23   STATE THAT HAS TWO.

12:21PM  24        THEY'RE TYPICALLY THE LARGEST INSURER IN EACH STATE.  THEY

12:21PM  25   ARE THE LARGEST INSURER IN EACH STATE, AND THEY HAVE A NATIONAL

12:21PM  1    ORGANIZATION THAT CAN EVALUATE TECHNOLOGY.

12:21PM  2         SO THEY TOLD US THEY HAD A CONTRACT WITH THE PARENT BLUE

12:21PM  3    CROSS AND BLUE CROSS -- I'M SORRY.  AND THEY HAD ACCESS TO THE

12:21PM  4    MEMBER STATE BLUE'S PLANS.

12:21PM  5         THEY ALSO TOLD US IN THAT MEETING THAT THEY HAD A NATIONAL

12:21PM  6    CONTRACT WITH UNITED HEALTH CARE.  THAT WAS VERY SIGNIFICANT TO

12:21PM  7    US BECAUSE UNITED HEALTH CARE IS, IN OUR VIEW, THE SMARTEST,

12:22PM  8    MOST SOPHISTICATED NATIONAL HEALTH INSURANCE COMPANY.

12:22PM  9         UNLIKE THE BLUES PLANS, THEY'RE A FOR PROFIT HEALTH

12:22PM  10   COMPANY.  SO WE KNOW THESE COMPANIES VERY WELL IN THE HEALTH

12:22PM  11   CARE SPACE AND WE HIGHLY VALUE THEIR ABILITY TO VET TECHNOLOGY

12:22PM  12   AND NEW COMPANIES.

12:22PM  13        THE FACT THAT -- SO IN THAT MEETING THE COMPANY TOLD US

12:22PM  14   THAT THEY HAD A CONTRACT WITH UNITED HEALTH CARE.  THAT WAS

12:22PM  15   SIGNIFICANT NOT JUST BECAUSE UNITED WAS A VERY SMART, WELL

12:22PM  16   RESPECTED ORGANIZATION, UNITED HAD A CONTRACT WITH I BELIEVE

12:22PM  17   LABCORP AT THE TIME.

12:22PM  18        SO THEY EXPLAINED THAT -- SO IT WAS VERY UNUSUAL THAT THEY

12:22PM  19   HAD A CONTRACT IF THEY ALREADY HAD ANOTHER CONTRACT WITH

12:22PM  20   ANOTHER THIRD PARTY.

12:22PM  21        THEY EXPLAINED TO US, BECAUSE THE TECHNOLOGY WAS SO

12:22PM  22   DIFFERENT AND SO TRANSFORMATIVE AND SUCH A HUGE ADVANCEMENT FOR

12:22PM  23   PATIENTS, THAT THEY WERE ABLE TO CONTRACT DIRECTLY WITH UNITED

12:22PM  24   HEALTH CARE AND THEY HAD ACCESS TO UNITED'S, I THINK AT THE

12:23PM  25   TIME THEY HAD ROUGHLY 30 MILLION COVERED LIVES.

12:23PM  1       SO AS A RESULT OF THAT, WE WANTED TO SPEAK TO SOMEONE AT

12:23PM  2   UNITED THAT DID THE TECHNICAL DUE DILIGENCE.  WE WANTED TO

12:23PM  3   UNDERSTAND THEIR VIEW OF THE COMPANY AND THE TECHNOLOGY AND,

12:23PM  4   JUST AS IMPORTANT, HOW THEY SAW THIS, THIS TESTING METHODOLOGY

12:23PM  5   BEING USED BY THEIR BENEFICIARIES IN THE DIFFERENT MARKETS THAT

12:23PM  6   THEY OPERATED.

12:23PM  7   Q.   OKAY.  AND WHEN YOU MADE THIS REQUEST OF MR. BALWANI, WHAT

12:23PM  8   DID HE TELL YOU?

12:23PM  9   A.   HE SAID -- SIMILAR TO WALGREENS.  HE SAID NO, WE WILL NOT

12:23PM  10  ALLOW YOU TO SPEAK TO UNITED HEALTH CARE.  WE'RE UNCOMFORTABLE

12:23PM  11  WITH THAT.  IT WOULD, AGAIN, LOOK BADLY ON US, THERANOS, IF

12:23PM  12  INVESTORS ARE ASKING TO SPEAK TO SOMEONE AT THE COMPANY.

12:23PM  13      SO SIMILAR, A VERY SIMILAR ANSWER TO WHAT -- HOW HE

12:23PM  14  RESPONDED TO THE WALGREENS, THE WALGREENS REQUEST.

12:24PM  15  Q.   AT SOME POINT IN JANUARY OF 2014 DID YOU SPEAK WITH

12:24PM  16  SOMEBODY NAMED CHANNING ROBERTSON?

12:24PM  17  A.   YES.

12:24PM  18  Q.   WHO IS CHANNING ROBERTSON?

12:24PM  19  A.   HE'S A STANFORD PROFESSOR WHO, WHO HELPED MS. HOLMES START

12:24PM  20  THE COMPANY TEN YEARS BEFORE OUR DUE DILIGENCE PROCESS.

12:24PM  21  Q.   WHY DID YOU WANT TO SPEAK WITH MR. ROBERTSON?

12:24PM  22  A.   HE WAS AN IMPORTANT FOUNDING MEMBER OF THE COMPANY.  HE

12:24PM  23  WAS ON THE BOARD, THE ORIGINAL BOARD.  I BELIEVE HE WAS ON THE

12:24PM  24  ORIGINAL BOARD WITH MS. HOLMES, AND HE WAS A WELL RESPECTED

12:24PM  25  SCIENTIST IN THE LOCAL COMMUNITY THAT HAD BEEN INVOLVED WITH

12:24PM 1    OTHER SUCCESSFUL HEALTH CARE STARTUPS THAT, AS INVESTORS IN THE

12:25PM 2    HEALTH CARE INDUSTRY, WE KNEW.  WE KNEW THOSE STARTUPS.

12:25PM 3         SO WE -- HE WAS SOMEONE THAT WE WANTED TO SPEAK TO.

12:25PM 4    Q.   AND DID YOU RELY IN PART ON THE INFORMATION THAT

12:25PM 5    MR. ROBERTSON PROVIDED YOU?

12:25PM 6    A.   YES.

12:25PM 7    Q.   OKAY.  DID MR. ROBERTSON MAKE STATEMENTS TO YOU ABOUT THE

12:25PM 8    RISKS THAT HE SAW RELATING TO THERANOS?

12:25PM 9    A.   YES.

12:25PM 10   Q.   AND WHAT DID HE TELL YOU?

12:25PM 11   A.   HE TOLD ME THAT THE RISK THAT -- THE TWO PRINCIPAL RISKS

12:25PM 12   THAT HE SAW FOR THE BUSINESS, OR THE PRINCIPAL RISK HE SAW FOR

12:25PM 13   THE BUSINESS WAS THE CONSUMER EXPERIENCE, AND THAT THIS

12:25PM 14   COMPANY, THIS TECHNOLOGY HAD LONG PASSED THE POINT OF TECHNICAL

12:25PM 15   RISK OR REGULATORY RISK.

12:25PM 16        HE DID NOT SEE ANY TECHNICAL RISK AT ALL IN, IN THEIR CORE

12:25PM 17   TECHNOLOGY AND WHAT THEY COULD DO USING THEIR PROPRIETARY

12:25PM 18   FINGERSTICK TECHNOLOGY AND THEIR SAMPLE PROCESSING UNITS.  THAT

12:25PM 19   WAS HIS PERSPECTIVE ON THE RISKS OF THE BUSINESS.

12:26PM 20   Q.   AND DID HE MAKE STATEMENTS TO YOU ABOUT THERANOS'S USE OF

12:26PM 21   ITS DEVICE COMPARED TO OTHER COMPANIES OR OTHER COMPETITORS?

12:26PM 22   A.   HE DID.  WE HAD, I BELIEVE, TWO CONVERSATIONS.  IN THE

12:26PM 23   FIRST CONVERSATION HE DESCRIBED THE PHILOSOPHICAL DIFFERENCE

12:26PM 24   THAT THERANOS HAD ABOUT TESTING COMPARED TO THE CONVENTIONAL

12:26PM 25   LABORATORY INDUSTRY.

12:26PM  1        THE CONVENTIONAL LAB INDUSTRY HAD A DECENTRALIZED NETWORK

12:26PM  2   OF SUPPLIERS.  THEY BOUGHT THIRD PARTY EQUIPMENT, THEY HAD TO

12:26PM  3   HIRE TECHNICIANS TO RUN THAT EQUIPMENT, THEY WERE INEFFICIENT,

12:26PM  4   THEY REALLY DIDN'T FOCUS ON THE PATIENT, THEY DIDN'T KEEP TRACK

12:26PM  5   OF THEIR DATA.  IT WAS AN OUTDATED, INEFFICIENT, ANTIQUATED

12:26PM  6   BUSINESS MODEL.

12:26PM  7        HE COMPARED THAT TO THERANOS WHERE EVERYTHING WAS

12:26PM  8   CENTRALIZED, AND IT WAS A PATIENT SPECIFIC, PATIENT FOCUSSED

12:27PM  9   BUSINESS WHERE YOU AS A CONSUMER NOT ONLY HAD A RADICALLY

12:27PM 10   DIFFERENT EXPERIENCE, IT WAS CHEAPER, EASY TO ACCESS, OPEN UP

12:27PM 11   TESTING TO POPULATIONS THAT STRUGGLED WITH FEAR OF NEEDLES,

12:27PM 12   VENOUS ACCESS, A WHOLE SERIES OF ISSUES.

12:27PM 13        BUT IT ALSO ENABLED THE CONSUMER TO KEEP THEIR DATA OVER

12:27PM 14   TIME, AND SO HE WAS -- AND THEN BEYOND THAT, HE JUST TALKED

12:27PM 15   ABOUT THE TECHNICAL CAPABILITIES, THE TECHNOLOGY WITHIN THE

12:27PM 16   MINILAB.

12:27PM 17        HE DESCRIBED THE PROCESS OF LOOKING IT OVER AND THE

12:27PM 18   TECHNOLOGY THAT WAS IN IT, THE OPTICS, THE CHEMISTRIES, THE

12:27PM 19   TINY PLASTIC CHANNELS WHERE FLUIDS ARE EXCHANGED, WHICH IS

12:27PM 20   CALLED MICROFLUIDICS.

12:27PM 21        HIS VIEW WAS THAT EVEN IF A COMPETITOR OPENED THE BOX, IT

12:28PM 22   WOULD TAKE THEM YEARS, IF THEY COULD AT ALL, TO CREATE A

12:28PM 23   SIMILAR TYPE OF TECHNOLOGY, REINFORCING THE COMPETITIVE

12:28PM 24   ADVANTAGE THAT THE COMPANY HAD DESCRIBED TO US OVER THE COURSE

12:28PM 25   OF OUR DUE DILIGENCE.

12:28PM   1    Q.   AND DID THE NUMBER OF ASSAYS OR PARTICULAR ASSAYS COME UP

12:28PM   2    IN YOUR CONVERSATIONS WITH MR. ROBERTSON?

12:28PM   3    A.   YEAH.  WE TALKED ABOUT THE UNDERLYING TECHNOLOGY, AND HE

12:28PM   4    DESCRIBED HOW THERE WERE ROUGHLY 300 DIFFERENT TYPES OF THINGS

12:28PM   5    THAT ONE HAD TO MEASURE IN ORDER TO MATCH THE FULL MENU THAT A

12:28PM   6    REFERENCE LABORATORY LIKE A QUEST OR A LABCORP, WHAT THEY

12:28PM   7    OFFER.

12:28PM   8        AND HE DESCRIBED THE PROCESS OVER THE PRECEDING TEN YEARS

12:28PM   9    OF GOING TEST BY TEST AND TRYING TO FIGURE OUT HOW TO MEASURE

12:28PM  10    THAT THING AT DRAMATICALLY LESS VOLUMES, MICROLITERS AS OPPOSED

12:29PM  11    TO MILLILITERS, AND THERE WAS NOTHING THAT THEY COULDN'T DO.

12:29PM  12    THERE WAS NOTHING THE TECHNOLOGY COULDN'T DO.

12:29PM  13        THERE WERE THINGS THAT WERE EASIER, BUT THEY HADN'T FOUND

12:29PM  14    A SINGLE ANALYTIC TECHNIQUE THAT THEY WERE NOT ABLE TO MEASURE.

12:29PM  15    Q.   CURRENTLY MEASURE?

12:29PM  16    A.   CURRENTLY MEASURE, CORRECT.

12:29PM  17    Q.   I THINK YOU TESTIFIED EARLIER THAT AT SOME POINT YOU

12:29PM  18    VISITED THE THERANOS MANUFACTURING FACILITY.

12:29PM  19    A.   YES.

12:29PM  20    Q.   AND WHO WAS THERE FOR THAT?

12:29PM  21    A.   FROM THE PFM SIDE IT WAS MYSELF AND MR. KHANNA, I BELIEVE

12:29PM  22    MR. KHANNA.

12:29PM  23        FROM -- MR. KHANNA -- WE MAY HAVE HAD ONE OTHER PERSON

12:29PM  24    FROM THE PFM SIDE.

12:29PM  25        FROM THE THERANOS SIDE, MR. BALWANI MET US AT THE

12:29PM 1    FACILITY, THE MANUFACTURING FACILITY IN NEWARK, CALIFORNIA,

12:30PM 2    WHICH IS IN THE EAST BAY.

12:30PM 3    Q.   OKAY.  AND WHAT DID YOU OBSERVE ON THIS TOUR OF THE

12:30PM 4    MANUFACTURING FACILITY?

12:30PM 5    A.   WE SAW, WE SAW THEM MAKING MINILABS FROM THE MICRO

12:30PM 6    MACHINING OF SPECIFIC PARTS, BOTH PLASTIC AND METAL, AND THEY

12:30PM 7    DESCRIBED FOR US HOW THAT PROCESS WAS EVOLVING FROM THOUSANDS

12:30PM 8    OF DIFFERENT LITTLE PARTS.  AND THEN WITH THEIR PROPRIETARY

12:30PM 9    MANUFACTURING TECHNIQUES THEY WERE SIMPLIFYING THE PROCESS.

12:30PM 10   THEY WERE MAKING THEIR OWN PARTS SO THAT THEY COULD REDUCE THE

12:30PM 11   NUMBER OF PIECES THAT GO INTO A MINILAB.

12:30PM 12       WE -- SO WE SAW THOSE -- THE BIG EQUIPMENT THAT MACHINED

12:30PM 13   THOSE PARTS.

12:30PM 14       WE THEN TRANSFERRED -- WE THEN MOVED TO THE PART OF THE

12:30PM 15   FACTORY FLOOR WHERE THEY WERE ASSEMBLING MINILABS, AND THEN WE

12:30PM 16   FINISHED OUR TOUR IN THE DISTRIBUTION PART OF THE MANUFACTURING

12:31PM 17   FACILITY WHERE THEY WERE PACKAGING AND SHIPPING MATERIALS.

12:31PM 18   Q.   AT ANY POINT DURING THIS TOUR OF THE MANUFACTURING

12:31PM 19   FACILITY, DID YOU SEE ANY THIRD PARTY BLOOD TESTING MACHINES?

12:31PM 20   A.   NO.

12:31PM 21   Q.   DID MR. BALWANI HIGHLIGHT ANY THIRD PARTY BLOOD TESTING

12:31PM 22   MACHINES TO YOU?

12:31PM 23   A.   NO.

12:31PM 24   Q.   DID YOU ALSO CONDUCT A TOUR OF THE THERANOS CALIFORNIA

12:31PM 25   CLIA LAB?

| | | |
|---|---|---|
| 12:31PM | 1 | A.   YES. |
| 12:31PM | 2 | Q.   WHAT DID -- WHO WAS THERE FOR THAT? |
| 12:31PM | 3 | A.   I BELIEVE IT WAS MR. BALWANI, ALTHOUGH I DON'T |
| 12:31PM | 4 | SPECIFICALLY REMEMBER. |
| 12:31PM | 5 | IT WAS MYSELF, AND I BELIEVE IT WAS MR. KHANNA, ALTHOUGH |
| 12:31PM | 6 | I'M NOT -- I DON'T, I DON'T -- I BELIEVE HE WAS WITH ME AS |
| 12:31PM | 7 | WELL. |
| 12:31PM | 8 | Q.   WHAT DID YOU OBSERVE ON THIS TOUR OF THE THERANOS CLIA |
| 12:31PM | 9 | LAB? |
| 12:31PM | 10 | A.   WE OBSERVED A LABORATORY SETTING WITH METAL RACKS THAT |
| 12:32PM | 11 | CONTAINED MINILABS THAT WERE ACTIVELY PROCESSING SAMPLES. |
| 12:32PM | 12 | Q.   DID YOU SEE ANY SIEMENS MACHINES? |
| 12:32PM | 13 | A.   NO. |
| 12:32PM | 14 | Q.   DID YOU SEE ANY OTHER THIRD PARTY BLOOD TESTING MACHINES? |
| 12:32PM | 15 | A.   NO. |
| 12:32PM | 16 | Q.   LET ME PLEASE DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED |
| 12:32PM | 17 | AS EXHIBIT 5441. |
| 12:32PM | 18 | DO YOU HAVE THAT IN FRONT OF YOU, SIR? |
| 12:32PM | 19 | A.   YES. |
| 12:32PM | 20 | Q.   IS THE FIRST PAGE OF EXHIBIT 5441 AN EMAIL FROM YOU TO |
| 12:32PM | 21 | SOMEONE NAMED ADAM CLAMMER? |
| 12:32PM | 22 | A.   YES. |
| 12:33PM | 23 | Q.   AND WHO IS MR. CLAMMER? |
| 12:33PM | 24 | A.   HE IS A PERSONAL FRIEND OF MY PARTNER AT THE TIME, |
| 12:33PM | 25 | CHRIS JAMES, AND HE'S ALSO AN INVESTOR.  HE WAS AN INVESTOR BY |

12:33PM   1      PROFESSION IN THE PRIVATE EQUITY SPACE AND HAD INVESTED IN

12:33PM   2      HEALTH CARE COMPANIES DURING HIS CAREER.

12:33PM   3      Q.   THERE IS AN ATTACHMENT TO THIS EMAIL ENTITLED

12:33PM   4      THERANOS_V12.XLSX.

12:33PM   5           DO YOU KNOW WHAT THE ATTACHMENT IS?

12:33PM   6      A.   YES.

12:33PM   7      Q.   AND WHAT IS IT?

12:33PM   8      A.   IT IS A FINANCIAL MODEL.

12:33PM   9      Q.   AND DID YOU -- DID PFM PREPARE THIS IN THE ORDINARY COURSE

12:33PM   10     OF ITS BUSINESS?

12:33PM   11     A.   YES.

12:33PM   12     Q.   AND WAS THIS PART OF YOUR EFFORT TO UNDERSTAND SOME OF THE

12:33PM   13     FINANCIAL METRICS AROUND A POSSIBLE INVESTMENT?

12:33PM   14     A.   YES.

12:33PM   15              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5441.  5441.

12:34PM   16              MR. WADE:  NO OBJECTION.

12:34PM   17              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:34PM   18          (GOVERNMENT'S EXHIBIT 5441 WAS RECEIVED IN EVIDENCE.)

12:34PM   19              MR. LEACH:  IF WE CAN ZOOM IN, MS. HOLLIMAN, ON THE

12:34PM   20     TOP.

12:34PM   21     Q.   DO YOU SEE YOUR NAME IN THE FROM LINE, MR. GROSSMAN?

12:34PM   22     A.   YES.

12:34PM   23     Q.   AND DO YOU SEE IT SAYS, "CELL D113 ON PFM, REV MODEL IS

12:34PM   24     SCENARIO.  1, 2, 3 FOR THE BEAR, BASE, BULL."

12:34PM   25           WHAT DOES THAT MEAN?

12:34PM 1      A.   SO, FIRST OF ALL, THIS IS AN EXCEL MODEL AND IN EXCEL

12:34PM 2      MODELS YOU CAN CREATE SCENARIOS WHERE, IF YOU JUST CHANGE ONE

12:34PM 3      CELL, THERE ARE A WHOLE SERIES OF ASSUMPTIONS THAT WILL CHANGE.

12:34PM 4      SO IT'S A GREAT WAY OF PRESENTING DIFFERENT IMAGES OF A

12:34PM 5      BUSINESS.

12:35PM 6           IN THIS CASE WE HAD BUILT THREE SCENARIOS TO CAPTURE WHAT

12:35PM 7      WE THOUGHT THE FINANCIAL OUTLOOK FOR THERANOS WAS, BEAR BEING

12:35PM 8      THE LOWEST, BASE BEING THE -- USING BEAR REFERS TO KIND OF BEAR

12:35PM 9      MARKET OR A BAD OUTCOME; BASE BEING KIND OF OUR CENTRAL CASE,

12:35PM 10     AND THEN BULL BEING THE UP SIDE, POSITIVE CASE, BULL STANDING

12:35PM 11     FOR BULL MARKET.

12:35PM 12     Q.   AND THE MODEL THAT PFM PREPARED, WAS THAT BASED IN PART ON

12:35PM 13     FINANCIAL INFORMATION THAT YOU RECEIVED FROM THERANOS?

12:35PM 14     A.   YES.

12:35PM 15     Q.   AND IS THAT INFORMATION INCLUDED ON SOME OF THE SLIDES OF

12:35PM 16     THE EXCEL SPREADSHEET THAT IS ATTACHED TO THIS EXHIBIT?

12:36PM 17     A.   I'D HAVE TO REVIEW THE SPREADSHEET.  I DON'T KNOW.

12:36PM 18     Q.   LET ME --

12:36PM 19     A.   THE MODEL HAD DIFFERENT TABS IN IT, SO I DON'T KNOW WHAT

12:36PM 20     IS IN THIS BINDER.

12:36PM 21     Q.   WELL, LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 44.

12:36PM 22     A.   I'VE GOT YOU.

12:36PM 23     Q.   DO YOU SEE THE LOGO FOR THERANOS IN THE TOP UPPER

12:36PM 24     LEFT-HAND CORNER?

12:36PM 25     A.   YES.

12:36PM  1    Q.   AND DO YOU REMEMBER THIS TO BE A MODEL THAT YOU RECEIVED

12:36PM  2    FROM THERANOS?

12:36PM  3    A.   YES.

12:36PM  4    Q.   AND IF YOU CONTINUE LOOKING IN THE HARD COPY TO PAGE 52,

12:36PM  5    CAN YOU TELL US IF THESE ARE ALSO INPUTS IN DATA THAT YOU

12:37PM  6    RECEIVED FROM THERANOS?

12:37PM  7    A.   IT'S KIND OF SMALL.

12:37PM  8    Q.   WE CAN DO IT ONE BY ONE THEN.  I DON'T WANT TO TEST

12:37PM  9    YOUR --

12:37PM 10    A.   I MEAN, MY EYESIGHT ISN'T WHAT IT USED TO BE.

12:37PM 11         (LAUGHTER.)

12:37PM 12              THE WITNESS:  BUT I BELIEVE THIS IS THE FINANCIAL

12:37PM 13    MODEL THAT THE COMPANY PROVIDED US.

12:37PM 14    BY MR. LEACH:

12:37PM 15    Q.   WELL, THIS SHOULDN'T BE AN EYESIGHT TEST, AND WE CAN GO

12:37PM 16    THROUGH THIS ONE BY ONE, MR. GROSSMAN.

12:37PM 17         WE'RE ON PAGE 4, WHICH IS ON THE SCREEN.

12:37PM 18    A.   YEP.

12:37PM 19    Q.   ARE YOU SATISFIED THAT THIS IS INFORMATION FROM THERANOS?

12:37PM 20    A.   YES.

12:37PM 21    Q.   OKAY.  THERE'S A ROW AT THE TOP, 2014 DEVICE COST PLUS

12:37PM 22    INSTALLATION/CONFIG PLUS TRAINING.

12:37PM 23         WHAT DID YOU UNDERSTAND THAT TO BE?

12:37PM 24    A.   THAT WAS THEIR COST OF PRODUCING MINILABS IN 2014.

12:37PM 25    Q.   AND THE COST THAT THEY WERE GIVING YOU WAS WHAT?

12:38PM 1    A.   $70,000.

12:38PM 2    Q.   AND THEN BENEATH THAT IT SAYS 2015 PLUS DEVICE COST, PLUS

12:38PM 3    INSTALLATION/CONFIG.

12:38PM 4         IS THAT A REFERENCE TO THE MINILAB DEVICE COST FOR 2015?

12:38PM 5    A.   YES.

12:38PM 6    Q.   AND WAS THIS THERANOS TELLING YOU THAT THE COST WAS GOING

12:38PM 7    TO GO DOWN FROM $70,000 TO $50,000?

12:38PM 8    A.   YES.

12:38PM 9    Q.   BENEATH THAT THERE ARE SOME LINES FOR DEPRECIATIONS, PP&E,

12:38PM 10   DEVICE INSTALLATIONS.

12:38PM 11        WHAT DID YOU UNDERSTAND THOSE TO REFER TO?

12:38PM 12   A.   THIS WAS THE ASSUMPTION THE COMPANY WAS USING TO

12:38PM 13   DEPRECIATE THEIR CAPITAL SPENDING.

12:38PM 14        SO STANDARD ACCOUNTING PRACTICES FOR BUSINESSES LIKE THIS

12:38PM 15   WHEN THEY PURCHASE CAPITAL EQUIPMENT, WHETHER IT'S -- OR

12:38PM 16   MANUFACTURE CAPITAL EQUIPMENT, EITHER ONE, YOU WILL -- IT WILL

12:39PM 17   GO AS AN ASSET ON THE BALANCE SHEET, AND THEN OVER TIME THE

12:39PM 18   ACCOUNTING STANDARDS ALLOW YOU TO DEPRECIATE THAT ASSET UNDER

12:39PM 19   DIFFERENT SCHEDULES.

12:39PM 20        IN THIS CASE THEY -- THEY'RE USING WHAT IS REFERRED TO AS

12:39PM 21   STRAIGHT LINE DEPRECIATION, THAT'S THE SL, AND THAT'S JUST A

12:39PM 22   LINEAR DEPRECIATION.

12:39PM 23        THERE ARE OTHER ACCELERATED DEPRECIATION SCHEDULES WHICH

12:39PM 24   COMPANIES OFTEN USE, BUT IN THIS CASE THE ASSUMPTION WAS A

12:39PM 25   STRAIGHT LINE DEPRECIATION.

12:39PM  1    Q.   AT ANY POINT IN TIME DID THERANOS PROVIDE YOU WITH DEVICE

12:39PM  2    COSTS OR DEPRECIATION INFORMATION FOR THIRD PARTY MACHINES MADE

12:39PM  3    BY OTHERS?

12:39PM  4    A.   NO.

12:39PM  5    Q.   DID THEY, FOR EXAMPLE, SPELL OUT FOR YOU IN THEIR MODEL

12:39PM  6    WHAT THE DEPRECIATION FOR A SIEMENS MACHINE WOULD BE?

12:39PM  7    A.   NO.

12:39PM  8    Q.   WAS THAT INFORMATION THAT WOULD HAVE BEEN RELEVANT TO YOU

12:40PM  9    IN ASSESSING THE ECONOMICS FOR THIS TRANSACTION?

12:40PM 10    A.   YES.

12:40PM 11    Q.   LET ME DRAW YOUR ATTENTION TO THE NEXT PAGE, PAGE 45.

12:40PM 12         AND IF WE CAN ZOOM IN ON THE LEFT HALF OF THIS,

12:40PM 13    MS. HOLLIMAN.

12:40PM 14             THE COURT:  BEFORE YOU ASK A QUESTION, LET'S LET OUR

12:40PM 15    JURY STAND UP AND STRETCH FOR JUST A MOMENT.

12:40PM 16             MR. LEACH:  THANK YOU, YOUR HONOR.

12:40PM 17             THE COURT:  THE NUMBERS LOOK INTIMIDATING HERE.  SO

12:40PM 18    PLEASE STAND UP AND STRETCH, FOLKS.

12:41PM 19         (STRETCHING.)

12:41PM 20             MR. LEACH:  MAY I CONTINUE, YOUR HONOR?

12:41PM 21             THE COURT:  YES.  THANK YOU VERY MUCH.

12:41PM 22    BY MR. LEACH:

12:41PM 23    Q.   MR. GROSSMAN, THE NUMBERS ON THIS PAGE ARE A LITTLE HARD

12:41PM 24    TO SEE.  MY ONLY QUESTION IS, IS THIS INFORMATION THAT YOU

12:41PM 25    BELIEVE CAME FROM THERANOS?

12:41PM  1    A.   YES, I DO.

12:41PM  2    Q.   AND IF WE CAN NOW TURN TO PAGE 47, AND IF WE CAN ZOOM IN

12:41PM  3    ON THE SUBSTANCE OF THE SLIDE, MS. HOLLIMAN.

12:41PM  4         DO YOU SEE THE HEADING "THERANOS PROJECTED STATEMENT OF

12:41PM  5    INCOME" IN THE TOP LEFT CORNER, MR. GROSSMAN?

12:42PM  6    A.   YES.

12:42PM  7    Q.   AND DO YOU BELIEVE THIS TO BE INFORMATION THAT THERANOS

12:42PM  8    PROVIDED TO YOU IN CONNECTION WITH A POSSIBLE INVESTMENT?

12:42PM  9    A.   YES.

12:42PM  10   Q.   AND DID YOU USE THE INFORMATION ON THIS SLIDE AS A BASIS

12:42PM  11   FOR HOW TO BUILD YOUR OWN REVENUE MODEL?

12:42PM  12   A.   YES.

12:42PM  13   Q.   IF WE CAN NOW GO TO PAGE 48, MS. HOLLIMAN.

12:42PM  14        ZOOM IN ON THE SUBSTANCE.

12:42PM  15        IS THIS A CONTINUATION OF THE PROJECTED STATEMENT OF

12:42PM  16   INCOME THAT THERANOS PROVIDED TO YOU, MR. GROSSMAN?

12:42PM  17   A.   YES, IT IS.

12:42PM  18   Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO THE COLUMN TO THE FAR

12:42PM  19   RIGHT FOR THE PERIOD ENDING 12/30/2014.

12:43PM  20        DO YOU SEE THAT?

12:43PM  21   A.   YES.

12:43PM  22   Q.   AND WHAT WAS THE REVENUE THAT THERANOS WAS PROJECTING FROM

12:43PM  23   LAB SERVICES FROM U.S. RETAIL PARTNERS?

12:43PM  24   A.   $109 MILLION.

12:43PM  25   Q.   AND WHAT WAS THE REVENUE THERANOS WAS PROJECTING TO YOU

12:43PM  1   FOR LAB SERVICES REVENUE FROM PHYSICIAN OFFICES?

12:43PM  2   A.   $72 MILLION.

12:43PM  3   Q.   AND WHAT WAS THE REVENUE THAT WAS BEING PROJECTED FOR

12:43PM  4   PHARMACEUTICAL SERVICES?

12:43PM  5   A.   $30 MILLION.

12:43PM  6   Q.   AND DO YOU SEE THE TOTAL OF 261 MILLION IN REVENUES BY THE

12:43PM  7   END OF 2014?

12:43PM  8   A.   YES.

12:43PM  9   Q.   WAS THAT ATTRACTIVE TO YOU?

12:43PM  10  A.   YES.

12:43PM  11  Q.   HOW SO?

12:43PM  12  A.   IT WAS A, IT WAS A STRONG, IMPRESSIVE GROWTH IN REVENUES

12:43PM  13  AS THE COMPANY COMMERCIALIZED THEIR TECHNOLOGY BOTH WITH

12:44PM  14  WALGREENS BUT ALSO THE NON-WALGREENS PART OF THE BUSINESS AS

12:44PM  15  WELL.

12:44PM  16  Q.   AND THEN TO THE RIGHT, ARE THERE PROJECTED REVENUE FOR THE

12:44PM  17  PERIOD ENDING 12/30/2015?

12:44PM  18  A.   YES.

12:44PM  19  Q.   AND WAS THERANOS PROJECTING 750 MILLION IN LAB SERVICES

12:44PM  20  FROM U.S. RETAIL PHARMACIES?

12:44PM  21  A.   YES.

12:44PM  22  Q.   AND WAS THERANOS TELLING YOU THAT IT EXPECTED 120 MILLION

12:44PM  23  FROM PHARMACEUTICAL COMPANIES BY THE END OF 2015?

12:44PM  24  A.   YES.

12:44PM  25  Q.   AND WHAT WAS THE TOTAL REVENUE THAT THERANOS WAS TELLING

12:44PM 1    YOU IT EXPECTED TO ACHIEVE BY THE END OF 2015?

12:44PM 2    A.   $1,608,000,000.

12:45PM 3    Q.   AND WAS THAT ATTRACTIVE TO YOU?

12:45PM 4    A.   YES.

12:45PM 5    Q.   AND IS IT FAIR, MR. GROSSMAN, THAT FOR PAGES WITH THE

12:45PM 6    THERANOS LOGO, LIKE WE SEE IN THE TOP LEFT HAND OF THE SCREEN,

12:45PM 7    THAT THAT IS INFORMATION COMING FROM THERANOS?

12:45PM 8    A.   YES.

12:45PM 9    Q.   AT SOME POINT IN TIME DID YOU GO TO A WALGREENS TO GET

12:45PM 10   YOUR BLOOD TESTED?

12:45PM 11   A.   YES, I DID.

12:45PM 12   Q.   TELL US ABOUT THAT EXPERIENCE.

12:45PM 13   A.   I WENT TO THE PALO ALTO STORE THAT WAS OFFERING THERANOS

12:45PM 14   SERVICES -- I DID NOT TELL THE COMPANY I WAS GOING -- AND I HAD

12:45PM 15   MY BLOOD DRAWN WITH A VENOUS DRAW, NOT A FINGERSTICK, AND MY

12:45PM 16   LAB RESULTS WERE, WERE -- AND I LEFT WITHIN A FEW MINUTES AND

12:45PM 17   THAT WAS MY EXPERIENCE.

12:45PM 18   Q.   OKAY.  AND DID YOU HAVE QUESTIONS FOR MR. BALWANI ABOUT

12:45PM 19   YOUR EXPERIENCE?

12:45PM 20   A.   YES.

12:45PM 21   Q.   AND TELL US ABOUT THAT, PLEASE.

12:45PM 22   A.   WELL, I ASKED HIM WHY I DIDN'T RECEIVE A FINGERSTICK AND

12:46PM 23   WHY IT WAS A VENOUS DRAW, AND I ALSO ASKED HIM WHY IT TOOK

12:46PM 24   LONGER THAN FOUR HOURS TO GET MY TEST RESULTS BACK.

12:46PM 25   Q.   AND WHAT DID HE TELL YOU?

12:46PM 1    A.  HE TOLD ME THAT THE TEST -- ONE OF THE TESTS THAT MY

12:46PM 2    PHYSICIAN HAD ORDERED WAS A HIGHLY UNUSUAL TEST, THAT THEY WERE

12:46PM 3    NOT AT THAT POINT IN TIME OFFERING ON FINGERSTICK.

12:46PM 4        BUT -- AND THEN IN ADDITION TO THAT, HE SAID THAT THERE

12:46PM 5    WAS SOME TYPE OF LAB FAILURE THAT SHOULD HAVE BEEN RELEASED TO

12:46PM 6    MY PHYSICIAN, THAT THEY INVESTIGATED.

12:46PM 7        IN OTHER WORDS, THERE WAS ONE TEST THAT WAS -- THAT HELD

12:46PM 8    THE PROCESS UP.  THEY SHOULD HAVE REPORTED OUT THE RESULTS

12:47PM 9    WITHIN FOUR HOURS.

12:47PM 10       I BELIEVE HE THANKED ME FOR HIGHLIGHTING THIS PROCESS

12:47PM 11   ISSUE, AND THEY HAVE ADDRESSED IT, AND FIXED IT GOING FORWARD.

12:47PM 12       SOMETHING TO THAT EFFECT.

12:47PM 13   Q.  LET ME DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS

12:47PM 14   EXHIBIT 1482.

12:47PM 15   A.  OKAY.

12:47PM 16   Q.  IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND MR. BALWANI

12:47PM 17   RELATING IN PART TO THE TESTS THAT YOU WERE ORDERING THROUGH

12:47PM 18   WALGREENS?

12:47PM 19   A.  IF YOU COULD JUST GIVE ME A MINUTE TO REVIEW THIS?

12:47PM 20   Q.  PLEASE.

12:47PM 21       (PAUSE IN PROCEEDINGS.)

12:47PM 22           THE WITNESS:  YES, OKAY.

12:48PM 23   BY MR. LEACH:

12:48PM 24   Q.  YES, IT IS AN EXCHANGE BETWEEN YOU AND MR. BALWANI

12:48PM 25   RELATING TO YOUR TESTS AT WALGREENS?

12:48PM  1    A.   YES.

12:48PM  2              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 1482.

12:48PM  3              MR. WADE:  NO OBJECTION, YOUR HONOR.

12:48PM  4              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:48PM  5          (GOVERNMENT'S EXHIBIT 1482 WAS RECEIVED IN EVIDENCE.)

12:48PM  6    BY MR. LEACH:

12:48PM  7    Q.   LET ME DRAW YOUR ATTENTION, MR. GROSSMAN, TO PAGE 2.

12:48PM  8    LET'S WORK OUR WAY UP FROM THE SECOND EMAIL FROM THE BOTTOM.

12:48PM  9          DO YOU SEE WHERE YOU QUOTE, "SUNNY, JUST TO CONFIRM WE

12:48PM  10   WOULD STILL LIKE TO SEE THE NEWARK AND THE THERANOS CLIA LAB."

12:49PM  11          DO YOU SEE THAT?

12:49PM  12   A.   YES, I DO.

12:49PM  13   Q.   IS THAT A REFERENCE TO THE TOUR THAT YOU ENDED UP TAKING?

12:49PM  14   A.   YES.

12:49PM  15   Q.   MR. BALWANI RESPONDS IN THE NEXT EMAIL, "I AM WORKING ON

12:49PM  16   BOTH.  NEWARK HAS A LOT OF OPEN DEVICES AND EQUIPMENT SO WE ARE

12:49PM  17   MOVING THEM ASIDE BUT WE CAN VISIT NEWARK FRIDAY MORNING."

12:49PM  18          DO YOU SEE THAT LANGUAGE?

12:49PM  19   A.   YES.

12:49PM  20   Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

12:49PM  21   A.   I DON'T, I DON'T KNOW WHAT -- I MEAN, I THINK WHAT I

12:49PM  22   UNDERSTOOD IS THAT WE HAD AN APPOINTMENT FOR 11:00 O'CLOCK ON

12:49PM  23   FRIDAY MORNING TO TOUR THE NEWARK LAB.  I'M NOT SURE ABOUT THE

12:49PM  24   BEGINNING OF THAT.

12:49PM  25   Q.   OKAY.  YOU WROTE BACK IN THE NEXT EMAIL, "OK THANKS.  IS

12:49PM  1      THERE A WAY WE CAN SEE A PART OF THE LAB WITHOUT COMPROMISING

12:49PM  2      THE PATENT PENDING OR UNFILLED PARTS OF IT?  THIS IS MORE OF A

12:49PM  3      PERFUNCTORY EXERCISE TO MAKE SURE THERE IS ACTUALLY A LAB

12:49PM  4      THERE."

12:49PM  5           WHAT WERE YOU GETTING AT THERE?

12:50PM  6      A.   WELL, HE WAS RESISTING OUR VISIT TO THE LAB ON THE GROUNDS

12:50PM  7      THAT THEY HAD IMPORTANT UNPATENTED INFORMATION, ROBOTICS THAT

12:50PM  8      THEY WERE USING, AND BY SHOWING US THE LAB, THEY WOULD

12:50PM  9      COMPROMISE THEIR INTELLECTUAL PROPERTY, THEIR ABILITY TO GET

12:50PM  10     PATENTS ISSUED ON THOSE, ON THOSE PROPRIETARY AUTOMATION

12:50PM  11     TECHNIQUES USING THEIR OWN PROPRIETARY TECHNOLOGY.

12:50PM  12          SO HE WAS RESISTING OUR LAB TOUR ON THOSE GROUNDS, OR HE

12:50PM  13     WAS RESISTING OUR VIEW OF THE CLIA LAB ON THOSE GROUNDS, AND I

12:50PM  14     BELIEVE HE WAS REFERRING SPECIFICALLY TO THE WHOLE BOTTOM FLOOR

12:50PM  15     OF THEIR CORPORATE HEADQUARTERS WHERE THIS AUTOMATION WAS

12:50PM  16     DEPLOYED, AND SO HE WAS NOT WILLING TO LET US SEE THAT PART OF

12:51PM  17     THE CLIA LAB.

12:51PM  18          SO THEN I'M ASKING, IS THERE A WAY THAT WE CAN SEE A PART

12:51PM  19     OF THE LAB THAT DOESN'T HAVE THIS PROPRIETARY PATENT PENDING

12:51PM  20     AUTOMATION SO THAT WE CAN MAKE SURE THAT YOU ACTUALLY ARE USING

12:51PM  21     YOUR OWN PROPRIETARY TECHNOLOGY IN A CLIA LAB ENVIRONMENT?

12:51PM  22     Q.   AT THIS POINT IN TIME, HAD YOU SIGNED A CONFIDENTIALITY

12:51PM  23     AGREEMENT?

12:51PM  24     A.   YES.

12:51PM  25     Q.   AND WERE YOU PREPARED TO GIVE THERANOS WHATEVER ASSURANCES

12:51PM  1    OF CONFIDENTIALITY THEY NEEDED IN THE COURSE OF MAKING YOUR

12:51PM  2    INVESTMENT DECISION?

12:51PM  3    A.   YES.

12:51PM  4    Q.   LET'S GO TO PAGE 1.  IF I COULD DRAW YOUR ATTENTION TO THE

12:51PM  5    BOTTOM PORTION.

12:51PM  6         MR. BALWANI IS WRITING, "ON YOUR TESTS.  THERE WAS A

12:52PM  7    CONTROL THAT FAILED ON ONE OF THE ASSAYS AND THE LAB RERAN THE

12:52PM  8    SAMPLE AND THEY WERE HOLDING BACK RESULTS FOR ALL OF THE OTHER

12:52PM  9    TESTS UNTIL THE ENTIRE ORDER WAS COMPLETE."

12:52PM  10        DO YOU SEE THAT LANGUAGE?

12:52PM  11   A.   YES, I DO.

12:52PM  12   Q.   AND DO YOU BELIEVE THIS TO BE A REFERENCE TO THE TESTS

12:52PM  13   THAT YOU ORDERED THROUGH A WALGREENS?

12:52PM  14   A.   YES.

12:52PM  15   Q.   AT ANY POINT DID MR. BALWANI TELL YOU THAT SOME OF YOUR

12:52PM  16   TESTS WERE RUN ON A THIRD PARTY MACHINE?

12:52PM  17   A.   NO, HE DID NOT.

12:52PM  18   Q.   WOULD THAT HAVE BEEN RELEVANT TO YOU?

12:52PM  19   A.   YES.

12:52PM  20   Q.   I'D LIKE TO SHOW YOU WHAT IS IN EVIDENCE AS EXHIBIT 1491.

12:52PM  21        PERMISSION TO DISPLAY, YOUR HONOR?

12:52PM  22             THE COURT:  YES.

12:52PM  23   BY MR. LEACH:

12:52PM  24   Q.   LET ME DRAW YOUR ATTENTION TO -- DO YOU HAVE 1491 IN FRONT

12:52PM  25   OF YOU, MR. GROSSMAN?

12:52PM 1    A.   I DO.

12:52PM 2    Q.   AND THIS IS AN EMAIL THAT YOU'RE NOT ON; IS THAT CORRECT?

12:52PM 3    A.   CAN YOU ASK THE QUESTION AGAIN?

12:53PM 4    Q.   THIS IS AN EMAIL THAT YOU WERE NOT ON A NOT A PARTY TO?

12:53PM 5    A.   YES, CORRECT.

12:53PM 6    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 2.

12:53PM 7         DO YOU SEE AT THE BOTTOM WHERE SOMEONE NAMED MAX FOSQUE IS

12:53PM 8    WRITING, "PLEASE FOLLOW UP ON WHY BRIAN GROSSMAN HAS NOT BEEN

12:53PM 9    RELEASED YET, HE WAS PENDING AN LDAQ AS OF LAST NIGHT.  THIS IS

12:53PM 10   CRITICAL TO GET OUT ASAP."

12:53PM 11        DO YOU SEE THAT LANGUAGE?

12:53PM 12   A.   YES.

12:53PM 13   Q.   OKAY.  AND THEN IF WE LOOK -- AND THIS IS AROUND THE TIME

12:54PM 14   WHERE YOU WERE CONSIDERING AN INVESTMENT IN THERANOS,

12:54PM 15   JANUARY 28TH?

12:54PM 16   A.   YES.

12:54PM 17   Q.   OKAY.  UP AT THE TOP, MR. FOSQUE WRITES AGAIN, "HI

12:54PM 18   ADAM/MARK,

12:54PM 19        THIS PATIENT (BRIAN GROSSMAN) IS A VIP, WOULD YOU MIND

12:54PM 20   LOOKING INTO THE SLOW DOWN HERE?"

12:54PM 21        DO YOU SEE THAT LANGUAGE?

12:54PM 22   A.   YES, I DO.

12:54PM 23   Q.   AND IF WE GO DOWN TO PAGE 1 UP AT THE TOP, THIS IS ON THE

12:54PM 24   IMMULITE; CORRECT?

12:54PM 25        DO YOU SEE WHERE MR. FOSQUE IS WRITING, "GREAT, THANKS FOR

12:54PM  1     THE UPDATE.  PLEASE LET US KNOW THE OUTCOME.

12:54PM  2          "THIS IS ON THE IMMULITE; CORRECT?"

12:54PM  3          DO YOU SEE THAT LANGUAGE?

12:54PM  4     A.   YES.

12:54PM  5     Q.   AND SOMEONE NAMED MARK PANDORI RESPONDS YES?

12:54PM  6     A.   YES.

12:54PM  7     Q.   AND DO YOU KNOW WHETHER THE IMMULITE IS A THIRD PARTY

12:55PM  8     MACHINE MADE BY SOMEONE OTHER THAN THERANOS?

12:55PM  9     A.   I DON'T KNOW WHAT THAT'S REFERRING TO.

12:55PM  10    Q.   OKAY.  BUT AT NO POINT DID MR. BALWANI TELL YOU THAT A

12:55PM  11    PORTION OF YOUR TEST WAS RUN ON A THIRD PARTY MACHINE?

12:55PM  12    A.   NO, HE DID NOT.

12:55PM  13    Q.   WOULD THAT HAVE BEEN A RED FLAG TO YOU?

12:55PM  14    A.   YES.

12:55PM  15    Q.   LET ME DRAW YOUR ATTENTION TO EXHIBIT 1505.

12:55PM  16         ARE YOU FAMILIAR WITH THIS DOCUMENT?

12:55PM  17    A.   YES.

12:55PM  18    Q.   WHAT IS IT?

12:55PM  19    A.   CAN I MAYBE JUST TAKE A MINUTE TO LOOK THROUGH IT?

12:55PM  20    Q.   SURE.

12:55PM  21         (PAUSE IN PROCEEDINGS.)

12:55PM  22             THE WITNESS:  OKAY.  THIS IS -- UM, I AM FAMILIAR

12:56PM  23    WITH THIS.

12:56PM  24    BY MR. LEACH:

12:56PM  25    Q.   OKAY.  WHAT IS IT?

12:56PM  1    A.   THIS IS THE SERIES C-2 STOCK PURCHASE AGREEMENT.

12:56PM  2    Q.   AND IS THIS THE AGREEMENT BY WHICH PFM MADE AN INVESTMENT

12:56PM  3    INTO THERANOS?

12:56PM  4    A.   YES.

12:56PM  5         MR. LEACH:   YOUR HONOR, I OFFER EXHIBIT 1505.

12:56PM  6         MR. WADE:   NO OBJECTION.

12:56PM  7         THE COURT:   IT'S ADMITTED.   IT MAY BE PUBLISHED.

12:57PM  8    (GOVERNMENT'S EXHIBIT 1505 WAS RECEIVED IN EVIDENCE.)

12:57PM  9    BY MR. LEACH:

12:57PM  10   Q.   MR. GROSSMAN, DO YOU SEE THE TITLE, THERANOS, INC. SERIES

12:57PM  11   C-2 PREFERRED STOCK PURCHASE AGREEMENT AT THE TOP?

12:57PM  12   A.   YES.

12:57PM  13   Q.   AND IS THIS A DOCUMENT THAT YOU AND YOUR TEAM REVIEWED IN

12:57PM  14   CONNECTION WITH THE THERANOS INVESTMENT?

12:57PM  15   A.   YES.

12:57PM  16   Q.   AND IF I COULD PLEASE DRAW YOUR ATTENTION TO PAGE 6.

12:57PM  17        DO YOU SEE IN SECTION 4 THERE ARE A NUMBER OF

12:57PM  18   REPRESENTATIONS AND WARRANTIES OF THE INVESTORS?

12:57PM  19   A.   YES.

12:57PM  20   Q.   AND THE INVESTORS IS A REFERENCE TO YOUR FUNDS?

12:57PM  21   A.   YES.

12:57PM  22   Q.   AND IS IF WE LOOK AT PAGE 7, THERE'S A NUMBER OF

12:57PM  23   REPRESENTATIONS RELATING TO THE INVESTORS EXPERIENCE, THE

12:57PM  24   NATURE OF THE INVESTMENT, ACCESS TO DATA, AND THE ACCREDITED

12:58PM  25   NATURE OF THE INVESTOR.

12:58PM    1          DO YOU SEE THOSE PARAGRAPHS?

12:58PM    2    A.   I'M NOT A LEGAL EXPERT BUT, YES, I DO SEE THOSE.

12:58PM    3    Q.   WELL, YOU ENDED UP SIGNING THE STOCK PURCHASE AGREEMENT;

12:58PM    4    IS THAT FAIR?

12:58PM    5    A.   YES.

12:58PM    6    Q.   AND WERE YOU SATISFIED THAT THE REPRESENTATIONS MADE BY

12:58PM    7    PFM AT THE TIME OF THE STOCK PURCHASE AGREEMENT WERE TRUE AND

12:58PM    8    CORRECT?

12:58PM    9    A.   I MEAN, TO THE BEST OF MY MEMORY, YES.

12:58PM   10    Q.   OKAY.  PLEASE LOOK AT EXHIBIT 1506.

12:58PM   11          ARE YOU FAMILIAR WITH THIS DOCUMENT?

12:58PM   12    A.   YES.

12:58PM   13    Q.   WHAT IS THIS?

12:58PM   14    A.   THIS IS THE MASTER SIGNATURE PAGE.

12:58PM   15    Q.   OKAY.  FOR THE INVESTMENT THAT YOU AND YOUR FUNDS

12:58PM   16    ULTIMATELY MAKE?

12:58PM   17    A.   YES.

12:59PM   18              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 1506.

12:59PM   19              MR. WADE:  NO OBJECTION.

12:59PM   20              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:59PM   21          (GOVERNMENT'S EXHIBIT 1506 WAS RECEIVED IN EVIDENCE.)

12:59PM   22              MR. LEACH:  IF WE CAN ZOOM IN, MS. HOLLIMAN, ON THE

12:59PM   23    PORTION WHERE THERE IS FIRST SOME HANDWRITING, IT SAYS, "I

12:59PM   24    ACKNOWLEDGE AND AGREE," AND ZOOM IN ON THE NEXT THREE -- THERE

12:59PM   25    YOU GO.

1  Q.   MR. GROSSMAN, THERE ARE THREE DIFFERENT ENTITIES ON THIS,

2  PARTNER INVESTMENT, LP; PFM HEALTHCARE MASTER FUND, LP; AND

3  PFM HEALTHCARE PRINCIPALS FUND, LP.

4       CAN YOU JUST EXPLAIN WHAT THOSE ARE?

5  A.   YES.  I'M GOING TO START WITH PFM HEALTHCARE MASTER FUND

6  LP.  THAT IS THE ENTITY THAT REPRESENTS OUR HEDGE FUND THAT IS

7  AVAILABLE TO INSTITUTIONAL CLIENTS, PENSION PLANS, FOUNDATIONS,

8  ENDOWMENTS, HIGH NET WORTH INDIVIDUALS.

9       PFM HEALTHCARE PRINCIPAL FUNDS IS WHAT WE CALLED OUR

10 FRIENDS AND FAMILY FUND.  IT'S A DIFFERENT LEGAL STRUCTURE, AND

11 AS A RESULT PEOPLE, INDIVIDUALS WITH LOWER INCOME AND WEALTH

12 LEVELS WERE ABLE TO INVEST IN THE PRINCIPALS FUND WHO WERE

13 NOT -- WHO WOULDN'T BE ABLE TO INVEST IN OUR PFM HEALTHCARE

14 MASTER FUND.

15      SO THAT'S WHAT WE REFERRED TO AS OUR FRIENDS AND FAMILY

16 FUND.

17      PARTNER INVESTMENTS IS AN ENTITY THAT WE FORMED, THAT WE

18 USED TO COINVEST IN DEALS, IN PRIVATE DEALS.  AND WHAT I MEAN

19 BY COINVEST IS WE AGGREGATE INVESTMENT INTEREST FROM OUR

20 EXISTING INVESTORS AND POTENTIALLY NON -- OTHER INDIVIDUALS OR

21 ENTITIES THAT AREN'T INVESTED WITH PFM, WE AGGREGATE THAT TO

22 PARTNER INVESTMENTS AND WE MAKE ONE INVESTMENT INTO A COMPANY

23 ALONGSIDE OUR HEDGE FUND, OUR TWO HEDGE FUNDS.

24      SO IT IS AS OPPOSED TO HAVING 10 OR 15 INDIVIDUALS INVEST

25 SEPARATELY.

01:01PM  1    Q.   AND SO DOES THIS REFLECT THAT PARTNER INVESTMENTS, LP, THE

01:01PM  2    COINVESTMENT VEHICLE, INVESTED APPROXIMATELY $55.5 MILLION IN

01:01PM  3    THERANOS?

01:01PM  4    A.   YES, IT DOES.

01:01PM  5    Q.   AND DOES THIS REFLECT THAT THE -- YOUR INVESTMENT FUND,

01:01PM  6    THE HEDGE FUND, INVESTED APPROXIMATELY 38.3 MILLION IN

01:01PM  7    THERANOS?

01:01PM  8    A.   OUR INSTITUTIONAL HEDGE FUND, YES.

01:01PM  9    Q.   AND DOES THIS REFLECT THAT THE FRIENDS AND FAMILY VEHICLE,

01:02PM  10   PFM HEALTHCARE PRINCIPALS FUND, LP, INVESTED ABOUT $2.3 MILLION

01:02PM  11   IN THERANOS?

01:02PM  12   A.   YES.

01:02PM  13   Q.   LET ME NEXT PLEASE DRAW YOUR ATTENTION TO WHAT IS IN

01:02PM  14   EVIDENCE AS EXHIBIT 4345.

01:02PM  15        PERMISSION TO DISPLAY, YOUR HONOR?

01:02PM  16            THE COURT:  YES.

01:02PM  17            MR. LEACH:  GO TO PAGE 1.  IT'S 4845.  EXCUSE ME.

01:02PM  18   Q.   DOES THIS APPEAR TO BE A, A WIRE INFORMATION RELATING TO

01:02PM  19   PFM, MR. GROSSMAN?

01:02PM  20   A.   YES.

01:02PM  21   Q.   AND UNDER BASIC INFORMATION, THERE'S AN AMOUNT

01:03PM  22   $38,336,632, THAT'S THE INVESTMENT OF THE INSTITUTIONAL HEDGE

01:03PM  23   FUND THAT YOU MANAGE?

01:03PM  24   A.   YES.

01:03PM  25            MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR?

01:03PM 1          THE COURT:  YES.

01:03PM 2          (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

01:03PM 3          MR. LEACH:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

01:03PM 4     THANK YOU.  THANK YOU, MR. GROSSMAN.

01:03PM 5          THE COURT:  CROSS-EXAMINATION?

01:03PM 6          MR. WADE:  I DO, YOUR HONOR.  MAYBE A STRETCH BREAK?

01:03PM 7          THE COURT:  SURE.  FOLKS, IF YOU FEEL LIKE STANDING

01:03PM 8     AND STRETCHING, YOU CAN DO THAT DURING THIS EXCHANGE.

01:03PM 9          (STRETCHING.)

01:05PM 10         THE COURT:  MR. WADE.

01:05PM 11         MR. WADE:  THANK YOU, YOUR HONOR.

01:06PM 12                    **CROSS-EXAMINATION**

01:06PM 13    BY MR. WADE:

01:06PM 14    Q.  GOOD AFTERNOON, MR. GROSSMAN.

01:06PM 15    A.  GOOD AFTERNOON.

01:06PM 16    Q.  MY NAME IS LANCE WADE.  I REPRESENT ELIZABETH HOLMES.

01:06PM 17         I'M GOING TO ASK YOU A FEW QUESTIONS HERE THIS AFTERNOON.

01:06PM 18    A.  OKAY.

01:06PM 19    Q.  OKAY.  I'D LIKE TO START JUST BY PROVIDING A LITTLE

01:06PM 20    FRAMEWORK DURING THE PERIOD IN WHICH PFM WAS CONSIDERING THE

01:06PM 21    INVESTMENT IN THERANOS.

01:06PM 22         ACTUALLY, YOUR HONOR, MAY I APPROACH?

01:06PM 23         THE COURT:  YES.

01:06PM 24    BY MR. WADE:

01:06PM 25    Q.  (HANDING.)

01:06PM  1          BUT BEFORE I DO THAT, I'M GOING TO HAND YOU A COUPLE OF

01:06PM  2    BINDERS, AND THEY WILL HAVE NUMERICAL TABS.  AS I CALL YOUR

01:06PM  3    ATTENTION TO PARTICULAR DOCUMENTS, YOU CAN REFERENCE THEM IN

01:06PM  4    THESE BINDERS.  OKAY?

01:07PM  5          NOW, SIR, DO YOU RECALL THAT YOU FIRST LEARNED ABOUT

01:07PM  6    THERANOS AND THE FACT THAT IT MIGHT BE A POSSIBLE INVESTMENT ON

01:07PM  7    NOVEMBER 1ST OF 2013?

01:07PM  8    A.   I DO.

01:07PM  9    Q.   OKAY.  AND I'M GOING TO PUT UP, WITH THE COURT'S

01:07PM 10    PERMISSION, A CALENDAR DEMONSTRATIVE JUST SO THAT WE CAN MARK

01:07PM 11    THESE DATES.  OKAY?

01:07PM 12          AND I BELIEVE YOU JUST TESTIFIED ON DIRECT TESTIMONY THAT

01:08PM 13    THE INVESTMENT DECISION THAT YOU MADE WAS MADE IN, WAS IT

01:08PM 14    FEBRUARY 5TH, 4TH OR 5TH OF 2014?

01:08PM 15    A.   I BELIEVE THAT'S RIGHT.

01:08PM 16    Q.   OKAY.  LET ME MARK THAT HERE ON THE DEMONSTRATIVE.

01:08PM 17          AND ON DECEMBER 12TH OF 2013, YOU HAD YOUR INITIAL MEETING

01:08PM 18    WITH MS. HOLMES AND MR. BALWANI; CORRECT?

01:08PM 19    A.   YES.

01:08PM 20    Q.   AND THAT LASTED ABOUT AN HOUR?

01:08PM 21    A.   I BELIEVE THAT'S RIGHT.

01:08PM 22    Q.   OKAY.  AND THEN I BELIEVE YOU TESTIFIED THAT THERE WAS A

01:09PM 23    SECOND MEETING ON JANUARY 10TH OF 2013; CORRECT?

01:09PM 24    A.   I BELIEVE THAT'S RIGHT.

01:09PM 25    Q.   AND I THINK YOU, YOU TESTIFIED MS. HOLMES WAS THERE FOR

01:09PM  1    ABOUT HALF OF THE MEETING; IS THAT RIGHT?

01:09PM  2    A.   YES.

01:09PM  3    Q.   AND WAS THAT ABOUT AN HOUR?

01:09PM  4    A.   I BELIEVE IT WAS LONGER THAN THAT.

01:09PM  5    Q.   MAYBE AN HOUR AND A HALF?

01:09PM  6    A.   YES.

01:09PM  7    Q.   OKAY.  NOW, YOU ALSO TESTIFIED ABOUT A SLIDE DECK THAT THE

01:09PM  8    COMPANY SENT YOU AT SOME POINT; RIGHT?

01:09PM  9    A.   YES.

01:09PM  10   Q.   AND THAT WAS SENT AT YOUR REQUEST; RIGHT?

01:09PM  11   A.   YES.

01:09PM  12   Q.   THERE HAD BEEN SOME SLIDES THAT WERE SHOWN IN A MEETING

01:09PM  13   AND YOU ASKED TO RECEIVE THOSE MATERIALS; CORRECT?

01:09PM  14   A.   YES.

01:09PM  15   Q.   OKAY.  AND IT WAS NOT JUST THE SLIDE -- AND THERE WERE

01:10PM  16   SOME OTHER PHONE CALLS WITH MR. BALWANI; CORRECT?

01:10PM  17   A.   YES.

01:10PM  18   Q.   OKAY.  BUT YOU -- YOU AS AN INSTITUTION, PFM -- DID MORE

01:10PM  19   THAN JUST HAVE THOSE MEETINGS AND LOOK AT THOSE MATERIALS;

01:10PM  20   RIGHT?

01:10PM  21   A.   YES.

01:10PM  22   Q.   YOU WENT THROUGH A PRETTY EXTENSIVE PROCESS BY WHICH YOU

01:10PM  23   CONSIDERED THE INVESTMENT; CORRECT?

01:10PM  24   A.   YES.

01:10PM  25   Q.   WOULD YOU SAY THAT YOU SPENT HUNDREDS OF HOURS

01:10PM  1      COLLECTIVELY AS A GROUP?

01:10PM  2      A.   I DON'T KNOW.

01:10PM  3      Q.   OKAY.  DO YOU HAVE ANY ESTIMATE ON THE NUMBER OF HOURS?

01:10PM  4      A.   I DON'T.

01:10PM  5      Q.   OKAY.  BUT THERE WERE, THERE WERE FOUR MEMBERS OF THE

01:10PM  6      TEAM, SOMETIMES FIVE WHO WERE INVOLVED IN THIS?

01:10PM  7      A.   YES.

01:10PM  8      Q.   THAT WAS YOU AND MR. JAMES, RIGHT, WERE IN THE INITIAL

01:10PM  9      MEETING?

01:10PM 10      A.   YES.

01:10PM 11      Q.   AND THEN THERE WERE THREE ANALYSTS; RIGHT?

01:10PM 12      A.   YES.

01:10PM 13      Q.   AND THEN IN ADDITION TO THAT, YOU ALSO CALLED IN, OR

01:10PM 14      CALLED UPON A VARIETY OF OUTSIDE EXPERTS FOR THEIR VIEWS ON THE

01:11PM 15      COMPANY; CORRECT?

01:11PM 16      A.   YES.

01:11PM 17      Q.   REGULATORY ADVISORS; RIGHT?

01:11PM 18      A.   I BELIEVE SO, YES.

01:11PM 19      Q.   SOMEONE WITH SOME LAB BACKGROUND IN THE FINANCE SECTOR,

01:11PM 20      MR. CLAMMER; RIGHT?

01:11PM 21      A.   YES.

01:11PM 22      Q.   AND A REGULATORY LAWYER, I BELIEVE, AT SOME POINT; RIGHT?

01:11PM 23      A.   I DON'T REMEMBER SPECIFICALLY.

01:11PM 24      Q.   OKAY.  BUT YOU'RE A PRETTY SOPHISTICATED OPERATION.  IS

01:11PM 25      THAT A FAIR CHARACTERIZATION?

01:11PM  1    A.   I DON'T -- I'M NOT SURE HOW TO ANSWER YOUR QUESTION.

01:11PM  2         IF YOU'RE ASSUMING -- IF THE QUESTION IS, ARE WE AN

01:11PM  3    ACCREDITED S.E.C. REGISTERED ADVISOR WITH INSTITUTIONAL FUNDS,

01:11PM  4    YES, WE ARE.

01:11PM  5    Q.   AND I DIDN'T MEAN FOR IT TO BE A TRICK QUESTION.

01:12PM  6         YOU'VE MADE A LOT OF INVESTMENTS IN YOUR CAREER; CORRECT?

01:12PM  7    A.   YES.

01:12PM  8    Q.   AND YOU GO THROUGH A PROCESS BY WHICH YOU CONSIDER WHETHER

01:12PM  9    TO MAKE AN INVESTMENT OR WHETHER TO PASS ON IT; RIGHT?

01:12PM 10    A.   YES.

01:12PM 11    Q.   AND THIS IS AN INVESTMENT THAT YOU CONSIDERED AND YOU

01:12PM 12    EITHER COULD HAVE MOVED FORWARD OR YOU COULD HAVE PASSED AT ANY

01:12PM 13    POINT; RIGHT?

01:12PM 14    A.   YES.

01:12PM 15    Q.   OKAY.  AFTER THAT MEETING HERE IN JANUARY OF 2010, YOUR

01:12PM 16    WORK WAS NOT COMPLETE; RIGHT?

01:12PM 17    A.   YES, THAT'S CORRECT.

01:12PM 18    Q.   OKAY.  BUT AFTER THAT POINT, IT WAS MORE THAN A YEAR UNTIL

01:12PM 19    YOU EVER SPOKE WITH MS. HOLMES AGAIN; CORRECT?

01:12PM 20    A.   I DON'T RECALL.

01:12PM 21    Q.   OKAY.  DO YOU RECALL SPEAKING WITH HER AGAIN PRIOR TO

01:13PM 22    FEBRUARY 4TH OR 5TH?

01:13PM 23    A.   I DON'T RECALL.

01:13PM 24    Q.   OKAY.  BUT AS YOU SIT HERE TODAY, YOU DON'T HAVE ANY

01:13PM 25    INDICATIONS THAT THERE WERE ANY INTERACTIONS WITH MS. HOLMES

01:13PM   1    AFTER YOU LEFT THAT MEETING ON JANUARY 10TH, 2014; CORRECT?

01:13PM   2    A.   IF THE QUESTION -- I'M -- I DON'T RECALL WHETHER I

01:13PM   3    INTERACTED WITH HER AFTER THE JANUARY 10TH MEETING.

01:13PM   4    Q.   OKAY.  DO YOU RECALL PREVIOUSLY MAKING STATEMENTS THAT YOU

01:13PM   5    DIDN'T INTERACT WITH HER AGAIN UNTIL LATE 2015?

01:13PM   6    A.   I DON'T.

01:13PM   7    Q.   OKAY.  AND AT THE TIME THAT YOU LEFT THAT MEETING IN

01:13PM   8    JANUARY, THERE WAS A LOT OF WORK THAT YOU WANTED TO DO AS AN

01:13PM   9    INSTITUTION BEFORE YOU WERE GOING TO MAKE AN INVESTMENT

01:13PM   10   DECISION; IS THAT FAIR?

01:13PM   11   A.   THERE WAS WORK THAT WE NEEDED TO DO, YES.

01:13PM   12   Q.   YOU WANTED TO DO ADDITIONAL RESEARCH AND DUE DILIGENCE SO

01:14PM   13   THAT YOU COULD BE FULLY INFORMED BEFORE YOU COULD MAKE YOUR

01:14PM   14   ASSESSMENT ON WHETHER TO INVEST IN THERANOS; RIGHT?

01:14PM   15   A.   YES.

01:14PM   16   Q.   OKAY.  AND THIS WAS IN SOME WAYS JUST THE START OF THE

01:14PM   17   PROCESS; CORRECT?

01:14PM   18   A.   I DON'T QUITE UNDERSTAND THE QUESTION.

01:14PM   19   Q.   WELL, YOUR INITIAL MEETINGS WITH THE BUSINESS IN WHICH YOU

01:14PM   20   MIGHT INVEST ARE SORT OF THE BEGINNING OF THE PROCESS, AND THEN

01:14PM   21   YOUR FUND GOES THROUGH ITS OWN SORT OF BOTTOM UP PROCESS BEFORE

01:14PM   22   IT MAKES AN INVESTMENT DECISION; RIGHT?

01:14PM   23   A.   NOT ALWAYS.

01:14PM   24   Q.   WELL, DO YOU RECALL TESTIFYING IN THIS CASE THAT THIS --

01:14PM   25   DO YOU RECALL TESTIFYING PREVIOUSLY WITH RESPECT TO THESE FACTS

01:14PM  1    THAT THAT JANUARY 10TH MEETING WAS JUST REALLY THE START OF THE

01:14PM  2    INVESTMENT ANALYSIS PROCESS FOR PFM?

01:14PM  3    A.   I DON'T RECALL SPECIFICALLY, BUT WE -- BUT IF THE

01:14PM  4    QUESTION -- IF THE QUESTION IS, DID WE DO SUBSEQUENT ANALYSIS,

01:15PM  5    THE ANSWER IS YES.

01:15PM  6    Q.   OKAY.  AND THAT WASN'T THE QUESTION, BUT I'LL TAKE THE

01:15PM  7    ANSWER.  OKAY?

01:15PM  8    A.   ALL RIGHT.

01:15PM  9    Q.   AND WE'LL GO INTO SOME DETAIL ON WHAT YOU CONSIDERED AS

01:15PM 10    YOU WENT THROUGH THAT INVESTMENT DECISION.

01:15PM 11        AT THE TIME THAT YOU FIRST LEARNED OF THERANOS IN

01:15PM 12    NOVEMBER 1ST OF 2013, DO YOU RECALL HOW MANY WALGREENS

01:15PM 13    LOCATIONS THERANOS WAS OPERATING OUT OF?

01:15PM 14    A.   I BELIEVE IT WAS AT THAT POINT ZERO.

01:15PM 15    Q.   OKAY.  AND, AND WITHIN ABOUT A WEEK OR SO, THEY HAD

01:15PM 16    ACTUALLY OPENED UP TO ONE LOCATION IN PALO ALTO; CORRECT?

01:15PM 17    A.   I BELIEVE THAT'S RIGHT.

01:15PM 18    Q.   OKAY.  AND THEN BY THE TIME YOU COMPLETED YOUR INVESTMENT

01:16PM 19    DECISION, DO YOU KNOW HOW MANY LOCATIONS THERANOS WAS OPERATING

01:16PM 20    OUT OF?

01:16PM 21    A.   I DON'T REMEMBER SPECIFICALLY.

01:16PM 22    Q.   DO YOU RECALL IT BEING THREE?

01:16PM 23    A.   I THINK IT WAS -- I DON'T, I DON'T REMEMBER.

01:16PM 24    Q.   FEWER THAN FIVE?

01:16PM 25    A.   I -- AS OF FEBRUARY 5TH, WHAT WAS THE NUMBER?

01:16PM  1    Q.   YEAH.

01:16PM  2    A.   YEAH, I DON'T REMEMBER.

01:16PM  3    Q.   OKAY.  WE'LL SEE IF WE CAN REFRESH YOU AS WE GO THROUGH

01:16PM  4    YOUR TESTIMONY TODAY.

01:16PM  5         YOU RECALLED LEARNING DURING THE PROCESS THAT -- WELL, IN

01:16PM  6    ANY EVENT, YOU RECALL IT WAS VERY EARLY IN THE ROLLOUT OF THE

01:16PM  7    WALGREENS RELATIONSHIP; IS THAT FAIR?

01:16PM  8    A.   YES.

01:16PM  9    Q.   OKAY.  AND THERE HAD BEEN SOME TALK OF THE 8200 LOCATIONS

01:16PM  10   NATIONWIDE; RIGHT?

01:16PM  11   A.   I BELIEVE IT WAS 8100, BUT, YES.

01:16PM  12   Q.   OKAY.  8100?

01:16PM  13   A.   YES.

01:16PM  14   Q.   BUT THEY WERE IN, A HANDFUL IN THE PERIOD THAT YOU WERE

01:17PM  15   CONSIDERING THE INVESTMENT; CORRECT?

01:17PM  16   A.   YES.

01:17PM  17   Q.   OKAY.  AND YOU RECALL THAT LEARNING DURING THIS PROCESS

01:17PM  18   THERE WAS A TWO PHASE ROLLOUT THAT WAS GOING TO HAPPEN AT

01:17PM  19   THERANOS?

01:17PM  20   A.   YES.

01:17PM  21   Q.   AND PHASE I WAS GOING TO BE THE PERIOD WHERE THEY WERE

01:17PM  22   GOING TO OPERATE WITHIN A -- I THINK YOU REFERRED TO IT IN YOUR

01:17PM  23   DOCUMENTS AS A HUB AND SPOKE MODEL; IS THAT RIGHT?

01:17PM  24   A.   YES.

01:17PM  25   Q.   WHERE THEY WOULD BASICALLY RUN A CENTRAL LABORATORY;

01:17PM  1      RIGHT?

01:17PM  2      A.   YES.

01:17PM  3      Q.   AND PHASE II WAS GOING TO BE THE POINT WHERE THE DEVICES

01:17PM  4      WERE DEPLOYED OUT INTO THE PHYSICAL LOCATIONS AT WALGREENS

01:17PM  5      LOCATIONS; CORRECT?

01:17PM  6      A.   YES.

01:17PM  7      Q.   AND AS YOU WERE LEARNING ABOUT THIS PROCESS FROM THE

01:17PM  8      COMPANY, YOU DISCUSSED AT DIFFERENT TIMES PHASE I AND PHASE II

01:18PM  9      OF THEIR BUSINESS PLAN; RIGHT?

01:18PM 10      A.   YES.

01:18PM 11      Q.   NOW, I WANT TO -- YOU MENTIONED THAT YOU'RE AN S.E.C.

01:18PM 12      REGISTERED INVESTMENT ADVISOR, AND I THINK YOU ALSO USED THE

01:18PM 13      WORD HEDGE FUND.

01:18PM 14           IS IT -- MR. LEACH SHOWED YOU THE THREE ENTITIES THAT

01:18PM 15      INVESTED IN THERANOS.  DO YOU RECALL THAT JUST A MINUTE AGO?

01:18PM 16      A.   YES, I DO.

01:18PM 17      Q.   OKAY.  WHY DON'T WE --

01:18PM 18           WITH THE COURT'S PERMISSION, I'LL PULL UP 1506, WHICH I

01:18PM 19      THINK IS IN EVIDENCE.

01:18PM 20                THE COURT:  YES.

01:18PM 21      BY MR. WADE:

01:18PM 22      Q.   AND JUST SO WE UNDERSTAND, WHICH ONE OF THESE, OR ARE

01:18PM 23      MULTIPLE OF THESE ENTITIES CONSIDERED HEDGE FUNDS?

01:19PM 24      A.   THE MIDDLE ENTITY AND THE BOTTOM ENTITY ARE CONSIDERED

01:19PM 25      HEDGE FUNDS.

01:19PM 1    Q.   OKAY.  AND WHY -- WHAT MAKES THEM A HEDGE FUND VERSUS

01:19PM 2    THE -- BY COMPARISON TO THE TOP ENTITIES, FOR EXAMPLE?

01:19PM 3    A.   WHAT MAKES THEM A HEDGE FUND?

01:19PM 4    Q.   WHY IS IT CONSIDERED A HEDGE FUND IN THE INVESTMENT WORLD?

01:19PM 5    A.   THEY'RE GOVERNED BY DIFFERENT REGULATORY REGIMES.  I'M NOT

01:19PM 6    A HEDGE FUND LEGAL EXPERT, BUT AS A HEDGE FUND YOU ARE LIMITED

01:19PM 7    IN WHAT YOU CAN SELL THE WAY YOU MARKET THE FUND, AND AS A

01:19PM 8    RESULT YOU DON'T -- YOU'RE NOT ALLOWED TO MARKET THE, THE

01:19PM 9    INVESTMENT PRODUCT TO THE GENERAL PUBLIC.

01:19PM 10        THERE ARE OTHER DIFFERENCES BETWEEN MUTUAL FUNDS AND HEDGE

01:19PM 11   FUNDS, ONE OBVIOUS ONE BEING IS THAT HEDGE FUNDS CAN HEDGE.

01:20PM 12   Q.   OKAY.  THE, THE -- AND THE -- IS IT FAIR TO SAY THE

01:20PM 13   PRINCIPAL HEALTH CARE FUND WITHIN PFM IS SOMETHING THAT YOU

01:20PM 14   WERE IN CHARGE OF DURING THIS PERIOD?

01:20PM 15   A.   CAN YOU BE A LITTLE MORE SPECIFIC WHAT YOU'RE REFERRING

01:20PM 16   TO?

01:20PM 17   Q.   WHAT WAS THE LARGEST HEALTH CARE FUND AT PFM IN THIS TIME

01:20PM 18   PERIOD?

01:20PM 19   A.   THE LARGEST HEALTH CARE FUND WAS THE HEALTH CARE MASTER

01:20PM 20   FUND.

01:20PM 21   Q.   OKAY.  AND WERE YOU THE PORTFOLIO MANAGER OF THE HEALTH

01:20PM 22   CARE MASTER FUND?

01:20PM 23   A.   YES.

01:20PM 24   Q.   OKAY.  AND THAT'S THE, THAT'S THE MIDDLE ENTITY HERE ON

01:20PM 25   THIS EXHIBIT 1506; CORRECT?

01:20PM  1    A.   YES.

01:20PM  2    Q.   OKAY.  AND THAT'S, THAT'S -- AND ARE YOU THE PERSON,

01:20PM  3    THEREFORE, THAT HAS THE ULTIMATE AUTHORITY TO MAKE THE

01:20PM  4    INVESTMENT DECISIONS WITH RESPECT TO THAT FUND?

01:20PM  5    A.   YES.

01:20PM  6    Q.   OKAY.  AND JUST SO WE ALL UNDERSTAND SORT OF HOW THIS

01:21PM  7    WORKS, YOU MENTIONED THAT THERE WERE VARIOUS, I THINK YOU SAID,

01:21PM  8    FAMILY OFFICES AND INSTITUTIONAL INVESTORS AND HIGH NET WORTH

01:21PM  9    INDIVIDUALS WHO CHOOSE TO PLACE MONEY INTO THAT FUND; IS THAT

01:21PM 10    RIGHT?

01:21PM 11    A.   THAT IS RIGHT.

01:21PM 12    Q.   AND AT THAT POINT, ALL OF THE INVESTMENT DECISIONS ARE

01:21PM 13    MADE BY YOU; IS THAT CORRECT?

01:21PM 14    A.   I HAVE -- YEAH, YES.

01:21PM 15    Q.   IN OTHER WORDS --

01:21PM 16    A.   WELL, LET ME JUST -- I JUST WANT TO MAKE SURE THAT I AGREE

01:21PM 17    WITH THE ASSUMPTION IN YOUR QUESTION.

01:21PM 18         I DON'T MAKE EVERY INVESTMENT DECISION, BUT I HAVE THE

01:21PM 19    FINAL INVESTMENT DECISION FOR THE PORTFOLIO.

01:21PM 20    Q.   FAIR ENOUGH.

01:21PM 21         AND I GUESS THE POINT I'M TRYING TO MAKE IS THAT WHEN

01:21PM 22    SOMEONE GIVES MONEY TO YOU AS A HEDGE FUND, THEY NO LONGER HAVE

01:21PM 23    CONTROL OVER HOW YOU INVEST THE MONEY.  THE DECISION IS YOURS,

01:22PM 24    NOT THE FAMILY OFFICE THAT GAVE YOU THE MONEY; CORRECT?

01:22PM 25    A.   UNTIL THEY REQUEST IT BACK, YES.

01:22PM   1    Q.   FAIR ENOUGH.

01:22PM   2         AND WITH RESPECT TO THE FUND ON THE BOTTOM, THE PRINCIPAL

01:22PM   3    HEALTH CARE, OR THE PFM HEALTHCARE PRINCIPALS FUND, LP, WHO

01:22PM   4    MAKES DECISIONS FOR THAT FUND?

01:22PM   5    A.   THE GOVERNANCE FOR THAT FUND IS THE SAME AS THE GOVERNANCE

01:22PM   6    FOR THE PFM HEALTHCARE MASTER FUND.

01:22PM   7    Q.   OKAY.  SO YOU HAVE THE ULTIMATE DECISION MAKING AUTHORITY

01:22PM   8    FOR THAT FUND AS WELL?

01:22PM   9    A.   YES.

01:22PM  10    Q.   SO WHEN PEOPLE PUT MONEY INTO THAT FUND, THEY'RE

01:22PM  11    ENTRUSTING YOU TO MAKE THE INVESTMENT DECISION; IS THAT FAIR?

01:22PM  12    A.   YES.

01:22PM  13    Q.   OKAY.  AND THEN THE FIRST FUND IS PARTNER INVESTMENT

01:23PM  14    FUNDS -- I'M SORRY, PARTNER INVESTMENTS, LP.

01:23PM  15         DO YOU SEE THAT?

01:23PM  16    A.   YES.

01:23PM  17    Q.   AND IN THAT FUND, DO THE INDIVIDUALS RETAIN CONTROL TO

01:23PM  18    MAKE INVESTMENT DECISIONS?

01:23PM  19    A.   COULD YOU BE A LITTLE MORE SPECIFIC?

01:23PM  20    Q.   WELL, LET'S USE THERANOS, FOR EXAMPLE.

01:23PM  21         SO THE PEOPLE WHO INVESTED -- I ASSUME THE 55.5 MILLION IS

01:23PM  22    MADE UP OF A NUMBER OF DIFFERENT INVESTORS; IS THAT FAIR?

01:23PM  23    A.   YES.

01:23PM  24    Q.   AND DID THOSE INDIVIDUAL INVESTORS HAVE THE ABILITY TO

01:23PM  25    MAKE THE DECISION TO INVEST IN THERANOS?

01:23PM   1    A.   YES.

01:23PM   2    Q.   OKAY.  AND DID THEY DO THAT BASED UPON ANALYSIS AND

01:23PM   3    INFORMATION THAT WAS PROVIDED BY YOU AND YOUR TEAM?

01:23PM   4    A.   I, I CAN'T REALLY ANSWER THAT QUESTION.  I'M NOT SURE WHAT

01:23PM   5    THE BASIS FOR THOSE INDIVIDUALS MAKING DECISIONS WERE.  I

01:23PM   6    DON'T, I DON'T KNOW.

01:23PM   7    Q.   FAIR ENOUGH.

01:23PM   8         WE'LL GO THROUGH SOME OF THE MATERIALS THAT THEY WERE

01:23PM   9    GIVEN.

01:23PM  10         DO YOU RECALL THAT YOU PREPARED AN ANALYSIS THAT WAS GIVEN

01:23PM  11    TO SOME OF THE PEOPLE WHO INVESTED IN THAT FUND?

01:24PM  12    A.   YES.

01:24PM  13    Q.   OKAY.  AND DO YOU HAVE REASON TO BELIEVE THAT SOME OF THE

01:24PM  14    PEOPLE WHO INVESTED IN THAT FUND MADE THE DECISIONS BASED UPON

01:24PM  15    THAT ANALYSIS?

01:24PM  16    A.   IT'S POSSIBLE.

01:24PM  17    Q.   OKAY.  NOW, AS SOMEONE WHO MAKES THESE INVESTMENT

01:24PM  18    DECISIONS, I'M SURE YOU UNDERSTAND, YOU KNOW, RISKS ARE COMMON

01:24PM  19    IN INVESTMENTS; IS THAT FAIR?

01:24PM  20    A.   YES.

01:24PM  21    Q.   OKAY.  AND ONE OF THE THINGS THAT YOU DO IS ASSESS THE

01:24PM  22    RISKS AND THE REWARDS AND DECIDE WHETHER OR NOT IT'S WORTH

01:24PM  23    PROCEEDING WITH AN INVESTMENT; IS THAT FAIR?

01:24PM  24    A.   YES.

01:24PM  25    Q.   OKAY.  AND I -- AND WOULD YOU SAY YOU'VE MADE TENS OF

01:24PM 1    THOUSANDS OF INVESTMENTS DECISIONS IN YOUR CAREER?

01:24PM 2    A.   I DON'T KNOW.

01:24PM 3    Q.   A LOT?

01:24PM 4    A.   YEAH, I DON'T -- WHAT'S "A LOT"?

01:25PM 5    Q.   HAVE YOU MADE MORE THAN A HUNDRED INVESTMENT DECISIONS IN

01:25PM 6    YOUR CAREER?

01:25PM 7    A.   YES.

01:25PM 8    Q.   OKAY.  AND SOMETIMES YOU WIN AND SOMETIMES YOU LOSE;

01:25PM 9    RIGHT?

01:25PM 10   A.   YES.

01:25PM 11   Q.   OKAY.  AND IS IT FAIR TO SAY THAT GENERALLY THE MORE RISK

01:25PM 12   THAT YOU TAKE, THE GREATER THE REWARD?  IS THAT SORT OF A

01:25PM 13   COMMON THOUGHT WITH AN INVESTMENT PHILOSOPHY?

01:25PM 14   A.   YES.

01:25PM 15   Q.   AND WHEN, WHEN -- JUST SO WE'RE CLEAR, WHEN YOU'RE MAKING

01:25PM 16   THESE INVESTMENT DECISIONS, YOU'RE NOT DOING THIS BASED UPON

01:25PM 17   JUST GUT FEEL; RIGHT?

01:25PM 18   A.   UM, NO.

01:25PM 19   Q.   YOU GO THROUGH A PRETTY EXTENSIVE PROCESS OF ANALYSIS

01:25PM 20   BEFORE YOU MAKE A DECISION TO INVEST OTHER PEOPLE'S MONEY;

01:26PM 21   RIGHT?

01:26PM 22   A.   YES.

01:26PM 23   Q.   AND YOU WANT TO DO YOUR RESEARCH AND BE CAUTIOUS TO MAKE

01:26PM 24   SURE YOU'RE MAKING A SOUND AND PRUDENT INVESTMENT DECISION;

01:26PM 25   CORRECT?

01:26PM   1    A.   YES.

01:26PM   2    Q.   OKAY.  AND IN THE HEALTH CARE SPACE IN PARTICULAR, YOU

01:26PM   3    HAVE A FAIR AMOUNT OF EXPERTISE; RIGHT?

01:26PM   4    A.   I MEAN, IF, IF YOU'RE ASKING DO I HAVE EXPERIENCE AS A

01:26PM   5    HEALTH CARE INVESTOR, YES.

01:26PM   6    Q.   HOW MUCH EXPERIENCE DO YOU HAVE AS A HEALTH CARE INVESTOR?

01:26PM   7    A.   I'VE BEEN INVESTING IN THE SPACE SINCE THE LATE '90S.

01:26PM   8    Q.   OKAY.  SO MORE THAN 20 YEARS OF EXPERIENCE IN INVESTING IN

01:26PM   9    HEALTH CARE COMPANIES; IS THAT FAIR?

01:26PM  10    A.   YES.

01:26PM  11    Q.   AND DOES THAT INCLUDE A WIDE VARIETY OF HEALTH CARE

01:26PM  12    COMPANIES?

01:26PM  13    A.   YES.

01:26PM  14    Q.   GIVE US JUST A SENSE OF THE RANGE OF DIFFERENT COMPANIES

01:26PM  15    THAT YOU HAVE EXPERIENCE INVESTING IN IN THE HEALTH CARE SPACE.

01:27PM  16    A.   FROM THE LARGEST COMPANIES LIKE UNITED HEALTH CARE, LIKE

01:27PM  17    PFIZER, TO, YOU KNOW, SMALL SERIES A SEED INVESTMENTS, THE

01:27PM  18    WHOLE CONTINUUM.

01:27PM  19    Q.   OKAY.  AND PFM IN PARTICULAR IN THE HEALTH CARE SPACE

01:27PM  20    INVESTS PREDOMINANTLY IN PUBLIC MARKET SECURITIES; IS THAT

01:27PM  21    RIGHT?

01:27PM  22    A.   MAYBE YOU COULD BE A LITTLE MORE SPECIFIC.  WHAT DO YOU

01:27PM  23    MEAN BY "PREDOMINANTLY"?

01:27PM  24    Q.   WHAT PERCENTAGE OF PFM -- IN THIS TIME PERIOD ROUGHLY,

01:27PM  25    WHAT PERCENTAGE OF PFM'S INVESTMENTS WERE IN PUBLICLY TRADED

01:27PM 1    SECURITIES?

01:27PM 2    A.   I DON'T, I DON'T KNOW OFF THE TOP OF MY HEAD.

01:27PM 3    Q.   DO YOU HAVE AN ESTIMATE?

01:27PM 4    A.   I DON'T.

01:27PM 5    Q.   OKAY.  YOU WERE THE PORTFOLIO MANAGER AT THE TIME; RIGHT?

01:27PM 6    A.   YES.

01:27PM 7    Q.   OKAY.

01:27PM 8    A.   I WAS ONE OF -- THERE WAS ANOTHER PORTFOLIO MANAGER AT PFM

01:28PM 9    AS WELL.

01:28PM 10   Q.   IS THAT MR. JAMES?

01:28PM 11   A.   YES.

01:28PM 12   Q.   BUT YOU WERE THE PORTFOLIO MANAGER OF THE HEALTH CARE

01:28PM 13   INVESTMENT FUND; CORRECT?

01:28PM 14   A.   YEP.

01:28PM 15   Q.   AND HE GENERALLY DEFERRED TO YOU ON THE HEALTH CARE

01:28PM 16   INVESTMENTS; IS THAT FAIR?

01:28PM 17   A.   YES.

01:28PM 18   Q.   OKAY.  AND JUST SO WE UNDERSTAND HOW YOUR MODEL WORKS, IF

01:28PM 19   SOMEONE ENTRUSTS YOU WITH THEIR MONEY, YOU'RE COMPENSATED BASED

01:28PM 20   UPON A PERCENTAGE OF THE ASSETS UNDER MANAGEMENT; RIGHT?

01:28PM 21   A.   NO.

01:28PM 22   Q.   OKAY.  WHY DON'T YOU TELL US HOW YOU'RE COMPENSATED.

01:28PM 23   A.   IT IS A FUNCTION OF -- IT'S THE NET PROFITABILITY OF THE

01:28PM 24   BUSINESS AFTER EXPENSES.

01:28PM 25   Q.   OKAY.  AND SO YOU HAVE TO MAKE PROFIT TO -- IN ORDER TO BE

01:28PM  1    PAID?

01:28PM  2    A.   THE BUSINESS HAS TO HAVE PROFITS IN ORDER FOR PARTNERS TO

01:28PM  3    BE COMPENSATED, YES.

01:28PM  4    Q.   RIGHT.  BUT MY QUESTION IS HOW THE BUSINESS MAKES MONEY,

01:29PM  5    NOT NECESSARILY HOW YOU PERSONALLY MAKE MONEY.

01:29PM  6    A.   OH, SORRY.

01:29PM  7    Q.   I WASN'T CLEAR.

01:29PM  8    A.   SORRY.

01:29PM  9    Q.   I APOLOGIZE.

01:29PM  10        THE BUSINESS MAKES MONEY BASED UPON A PERCENTAGE OF THE

01:29PM  11   MONEY THAT THEY'RE MANAGING FOR A PARTICULAR INVESTOR; CORRECT?

01:29PM  12   A.   NO.

01:29PM  13   Q.   OKAY.  WHY DON'T YOU EXPLAIN IT TO US?

01:29PM  14   A.   THE BUSINESS MAKES MONEY WHEN THE REVENUES -- THE

01:29PM  15   CUMULATIVE REVENUES IN ANY GIVEN YEAR ARE IN EXCESS OF OUR

01:29PM  16   CUMULATIVE EXPENSES.

01:29PM  17   Q.   OKAY.

01:29PM  18   A.   LIKE ANY BUSINESS.

01:29PM  19   Q.   ARE YOU -- LET ME TRY A THIRD TIME.  MAYBE WE'LL GET IT

01:29PM  20   THIS TIME.

01:29PM  21        YOU'RE COMPENSATED BY YOUR INVESTORS; CORRECT?

01:29PM  22   A.   IF THE QUESTION IS, DO OUR INVESTORS PAY FEES, YES, THEY

01:29PM  23   DO PAY FEES.

01:29PM  24   Q.   OKAY.  WHY DON'T YOU EXPLAIN THE FEES THAT THEY PAID TO

01:29PM  25   PFM?

01:29PM  1    A.   INVESTORS PAY A MANAGEMENT FEE, WHICH IS A PERCENTAGE OF

01:29PM  2    THEIR ASSETS.  IT CAN BE ANYWHERE FROM 0 TO 2 PERCENT.

01:30PM  3         AND THEN IN ADDITION TO THAT, THEY PAY PERFORMANCE FEES,

01:30PM  4    WHICH ARE A FUNCTION OF HOW THE FUND PERFORMS IN ANY GIVEN

01:30PM  5    YEAR.

01:30PM  6    Q.   OKAY.  SO THERE'S A, THERE'S A SMALL AMOUNT THAT YOU MAKE

01:30PM  7    REGARDLESS OF WHETHER THE INVESTMENT GOES UP OR DOWN; IS THAT

01:30PM  8    FAIR?

01:30PM  9    A.   CAN YOU BE A LITTLE MORE CLEAR ABOUT WHAT "MAKE" MEANS?

01:30PM  10   Q.   IN FEES?

01:30PM  11   A.   YEAH, WE HAVE REVENUES, YES.

01:30PM  12   Q.   OKAY.  AND THEN THERE'S SOME WHERE YOU ONLY GENERATE

01:30PM  13   ADDITIONAL FEES IF YOU PERFORM WELL ON THE INVESTMENT; IS THAT

01:30PM  14   FAIR?

01:30PM  15   A.   NO.

01:30PM  16   Q.   OKAY.  WHY DON'T YOU EXPLAIN WHAT I GOT WRONG THEN.

01:30PM  17   A.   IT'S NOT AT THE INVESTMENT, IT'S AT THE FUND LEVEL.

01:30PM  18   Q.   OKAY.  AT THE FUND LEVEL?

01:30PM  19   A.   CORRECT.

01:30PM  20   Q.   OKAY.  SO IF THEY HAVE AN INVESTMENT IN A FUND, IT'S BASED

01:30PM  21   UPON THE PERFORMANCE IN THAT FUND; IS THAT RIGHT?

01:30PM  22   A.   CORRECT.

01:30PM  23   Q.   AND IF YOU DO WELL WITH THEIR INVESTMENT WITHIN THAT FUND,

01:30PM  24   THEN YOU RECEIVE MORE MONEY; RIGHT?

01:30PM  25   A.   THE FIRM EARNS MORE REVENUES.

01:30PM  1      Q.   OKAY.  THE -- WHEN YOU'RE OUT MARKETING YOUR SERVICES, THE

01:31PM  2      PERFORMANCE IN TERMS OF RETURN ON INVESTMENTS IS A SIGNIFICANT

01:31PM  3      THING THAT YOU MARKET TO PEOPLE WHO ARE CONSIDERING INVESTMENT

01:31PM  4      IN A PFM FUND; IS THAT FAIR?

01:31PM  5      A.   UM, IT'S HARD FOR ME TO ANSWER WHAT OTHER PEOPLE THINK ARE

01:31PM  6      SIGNIFICANT, SO I -- I'M NOT SURE HOW TO ANSWER THAT QUESTION.

01:31PM  7      Q.   OKAY.  IS YOUR HISTORICAL INVESTMENT PERFORMANCE SOMETHING

01:31PM  8      THAT YOU FREQUENTLY INCLUDE WITHIN YOUR PROMOTIONAL MATERIALS

01:31PM  9      THAT YOU GIVE TO PEOPLE --

01:31PM  10     A.   YES.

01:31PM  11     Q.   -- WHO ARE CONSIDERING INVESTMENTS IN YOUR FUNDS?

01:31PM  12     A.   YES.

01:31PM  13          MR. WADE:  OKAY.  YOUR HONOR, MAYBE NOW WOULD BE A

01:31PM  14     GOOD TIME FOR OUR 1:30 BREAK AND SEE IF WE CAN RESET WHEN WE

01:31PM  15     COME BACK.

01:31PM  16          THE COURT:  I THINK THAT'S A GOOD IDEA.

01:31PM  17     LET'S TAKE OUR BREAK, LADIES AND GENTLEMEN, 30 MINUTES,

01:31PM  18     PLEASE, 30 MINUTES.

01:32PM  19          (RECESS FROM 1:32 P.M. UNTIL 2:04 P.M.)

02:04PM  20          THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE BACK ON

02:04PM  21     THE RECORD.  PLEASE BE SEATED.

02:04PM  22     ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.  OUR JURY

02:04PM  23     IS PRESENT.

02:04PM  24     MR. WADE.

02:04PM  25          MR. WADE:  THANK YOU, YOUR HONOR.

02:04PM 1    Q.   MR. GROSSMAN, I'D LIKE TO ASK JUST A COUPLE OF QUESTIONS

02:04PM 2    ABOUT THE DUE DILIGENCE TEAM THAT, OR ANALYST TEAM THAT WORKED

02:04PM 3    ON THE INVESTMENT.  OKAY?

02:04PM 4    A.   OKAY.

02:04PM 5    Q.   AND YOU MENTIONED MR. KHANNA.  HAD HE -- AT THE TIME HE

02:04PM 6    WAS WORKING ON THIS INVESTMENT, HAD HE BEEN AT PFM FOR A

02:04PM 7    SIGNIFICANT PERIOD OF TIME?

02:04PM 8    A.   I BELIEVE HE JOINED IN 2013.

02:05PM 9    Q.   OKAY.  SO HAD HE BEEN THERE FOR A REASONABLY SHORT PERIOD

02:05PM 10   OF TIME?

02:05PM 11   A.   YES.

02:05PM 12   Q.   BUT HE HAD SIGNIFICANT EXPERIENCE IN THE HEALTH CARE FIELD

02:05PM 13   PRIOR TO JOINING PFM?

02:05PM 14   A.   YES.

02:05PM 15   Q.   ABOUT 20 YEARS OF EXPERIENCE WITH RESPECT TO HEALTH CARE

02:05PM 16   COMPANIES; IS THAT RIGHT?

02:05PM 17   A.   OR MORE, YEAH.

02:05PM 18   Q.   OKAY.  AND I THINK YOU MENTIONED ALEX RABODZEY.  AM I

02:05PM 19   PRONOUNCING THAT CORRECTLY?

02:05PM 20   A.   YEP.

02:05PM 21   Q.   AND DR. RABODZEY HAD SOME TECHNICAL TRAINING; IS THAT

02:05PM 22   RIGHT?

02:05PM 23   A.   HE DID.

02:05PM 24   Q.   AND HE, HE, HE GOT A BACHELOR'S DEGREE FROM THE MOSCOW

02:05PM 25   INSTITUTE OF PHYSICS AND TECHNOLOGY; IS THAT RIGHT?

02:05PM 1      A.   YES.

02:05PM 2      Q.   AND THEN HE WENT ON TO GET A PH.D. IN BIOENGINEERING FROM

02:05PM 3      MASSACHUSETTS INSTITUTE OF TECHNOLOGY?

02:06PM 4      A.   YES.

02:06PM 5      Q.   AND IS IT FAIR TO SAY THAT HE SERVED ON SOME OF THE

02:06PM 6      TECHNICAL ISSUES AS SORT OF A SUBJECT MATTER EXPERT FOR YOU ON

02:06PM 7      THIS INVESTMENT?

02:06PM 8      A.   YES.

02:06PM 9      Q.   A SMART FELLOW.  IS THAT FAIR?

02:06PM 10     A.   MORE OF A SCIENCE BACKGROUND THAN MR. KHANNA.

02:06PM 11     Q.   UH-HUH.  AND THEN YOU MENTIONED IS IT SRI BALASURYAN?

02:06PM 12     A.   YES.

02:06PM 13     Q.   AND HE WAS, AND HE WAS THE GUY, HE WAS THE JUNIOR ANALYST

02:06PM 14     YOU REFERRED TO?

02:06PM 15     A.   YES.

02:06PM 16     Q.   AND WAS HE THE PERSON WHO DID SORT OF THE TECHNICAL

02:06PM 17     SPREADSHEET WORK AROUND BUILDING THE MODEL AND THE LIKE?

02:06PM 18     A.   HE CERTAINLY DID SOME OF IT, AND ALSO -- YOU KNOW, OLD

02:06PM 19     GUYS LIKE ME CAN'T DO POWERPOINT, AND SO HE DID ALL OF THE

02:06PM 20     CHARTS AND PRESENTATIONS.  SO HE DID THAT TYPE OF WORK FOR US.

02:07PM 21     Q.   GREAT.  AND THE -- I NOW WANT TO SHIFT AND FOCUS JUST

02:07PM 22     BRIEFLY, IF I CAN, ON THIS PERIOD IN HERE BETWEEN NOVEMBER 1ST

02:07PM 23     AND THAT FIRST MEETING THAT YOU HAD AT THERANOS, AND I HAVE

02:07PM 24     SOME QUESTIONS ON THAT PERIOD.  OKAY?

02:07PM 25     A.   OKAY.

02:07PM 1    Q.   DO YOU RECALL THAT IN THE FIRST INSTANCE, ACTUALLY

02:07PM 2    THERANOS DID NOT SOLICIT PFM FOR AN INVESTMENT, DID IT?

02:07PM 3    A.   NO.

02:07PM 4    Q.   PFM WAS ACTUALLY INTRODUCED BY ANOTHER HEDGE FUND; IS THAT

02:07PM 5    RIGHT?

02:07PM 6    A.   I, I DON'T, I DON'T RECALL EXACTLY HOW THE INTRODUCTION

02:07PM 7    WAS MADE.

02:07PM 8    Q.   OKAY.  DO YOU KNOW MR. LAFFONT?

02:07PM 9    A.   I KNOW WHO HE IS.

02:07PM 10   Q.   AND WHO IS HE?

02:07PM 11   A.   HE'S A -- HE RUNS -- HE'S ANOTHER -- HE'S AN INVESTOR WHO

02:07PM 12   WORKS AT A -- WHO RUNS -- HE WORKS AT ANOTHER HEDGE FUND.

02:08PM 13   Q.   AND IS THAT COATUE?

02:08PM 14   A.   IT'S COATUE.

02:08PM 15   Q.   COATUE.

02:08PM 16        AND DO YOU RECALL THAT HE WAS A PERSON WHO INTRODUCED YOUR

02:08PM 17   PARTNER, MR. JAMES, TO THE THERANOS INVESTMENT?

02:08PM 18   A.   THAT IS MY MEMORY, YES.

02:08PM 19   Q.   OKAY.  AND THEN ONCE MR. JAMES LEARNED ABOUT THIS

02:08PM 20   POTENTIAL OPPORTUNITY, DO YOU RECALL THAT HE KIND OF PASSED IT

02:08PM 21   ON TO YOUR GROUP TO SEE IF YOU KNEW ANYTHING ABOUT THE COMPANY?

02:08PM 22   A.   YES.

02:08PM 23   Q.   LET'S TAKE A LOOK IN YOUR BOOK AT EXHIBIT 7353.

02:08PM 24        THE COURT:  WHICH VOLUME WILL THAT BE?

02:08PM 25        MR. WADE:  THAT WILL BE IN VOLUME 1.

02:09PM 1     Q.   DO YOU HAVE THAT IN FRONT OF YOU, MR. GROSSMAN?

02:09PM 2     A.   I DO.

02:09PM 3     Q.   AND DO YOU RECOGNIZE THIS TO BE AN EMAIL ON NOVEMBER 1ST

02:09PM 4     THAT INVOLVES YOU AND SOME OTHER EMPLOYEES OF PFM RELATING TO

02:09PM 5     THERANOS?

02:09PM 6     A.   YES, I DO.

02:09PM 7              MR. WADE:  MOVE THE ADMISSION OF 7353.

02:09PM 8              MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:09PM 9              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:09PM 10         (DEFENDANT'S EXHIBIT 7353 WAS RECEIVED IN EVIDENCE.)

02:09PM 11             MR. WADE:  AND IF WE CAN BLOW UP THE BOTTOM.

02:09PM 12    Q.   THIS IS AN EMAIL FROM MR. LAFFONT TO MR. JAMES ON

02:09PM 13    NOVEMBER 1ST.

02:09PM 14         DO YOU SEE THAT?

02:09PM 15    A.   YEP.

02:09PM 16    Q.   AND WE TALKED ABOUT HOW NOVEMBER 1ST WAS THE DATE WHEN YOU

02:09PM 17    FIRST LEARNED ABOUT THERANOS BEFORE THE BREAK.

02:09PM 18         DO YOU RECALL THAT?

02:09PM 19    A.   YES.

02:09PM 20    Q.   AND WAS THIS THE EMAIL BY WHICH YOU FIRST LEARNED ABOUT

02:09PM 21    IT?

02:09PM 22    A.   I BELIEVE SO, YES.

02:09PM 23    Q.   OKAY.  YOU DON'T RECALL KNOWING ANYTHING ABOUT THE COMPANY

02:10PM 24    PRIOR TO THAT?

02:10PM 25    A.   I DON'T REMEMBER ACTUALLY BEFORE THAT, NO.

02:10PM 1     Q.   HAD YOU MET MS. HOLMES PRIOR TO THAT?

02:10PM 2     A.   NO.

02:10PM 3     Q.   OKAY.  IT ASKS -- MR. LAFFONT, YOU SEE, ASKS MR. JAMES TO

02:10PM 4     LET HIM KNOW IF HE'S INTERESTED IN THE INVESTMENT AND POINTS

02:10PM 5     OUT THE WEBSITE.

02:10PM 6          DO YOU SEE THAT?

02:10PM 7     A.   WELL, I'M NOT SURE IF HE SAYS ANYTHING ABOUT THE

02:10PM 8     INVESTMENT, BUT IT SAYS "LET ME KNOW ASAP IF THIS PRIVATE

02:10PM 9     COMPANY IS OF INTEREST TO YOU."

02:10PM 10    Q.   FAIR ENOUGH.

02:10PM 11    A.   SO, YEAH.

02:10PM 12    Q.   AND WHEN IT WAS FORWARDED TO YOU, DID YOU INFER THAT THIS

02:10PM 13    WAS A POSSIBLE INVESTMENT OPPORTUNITY?

02:10PM 14    A.   I MEAN, SORT OF.  I MEAN, PRIVATE COMPANIES ARE ALWAYS

02:10PM 15    RAISING MONEY, BUT I WOULD SAY THERE WAS MORE -- I'M SORRY, I

02:10PM 16    DIDN'T ANSWER YOUR QUESTION.

02:11PM 17         THE QUESTION IS -- COULD YOU REPEAT THE QUESTION?

02:11PM 18    Q.   DID YOU -- WHEN THIS WAS SENT TO YOU, DID YOU UNDERSTAND

02:11PM 19    THAT THIS WAS BEING SENT TO YOU AS A POSSIBLE INVESTMENT

02:11PM 20    OPPORTUNITY?

02:11PM 21    A.   ACTUALLY, AT THE TIME, NO.  NO.

02:11PM 22    Q.   OKAY.  AND -- BUT DO YOU RECALL THAT YOU FORWARDED IT TO

02:11PM 23    SOME MEMBERS OF YOUR TEAM TO ASK IF THEY KNEW ANYTHING ABOUT

02:11PM 24    THE COMPANY?

02:11PM 25    A.   YES.

02:11PM  1    Q.   AND THESE ARE SOME OF THE FOLKS WHOSE NAMES WE'VE BEEN

02:11PM  2    TALKING ABOUT HERE, MR. KHANNA AND MR. RABODZEY.

02:11PM  3         DO YOU SEE THAT?

02:11PM  4    A.   YEP.  I DO, YES.

02:11PM  5    Q.   AND YOU WERE JUST SEEING IF ANYONE HAD ANY INTEL ON THIS

02:11PM  6    COMPANY; IS THAT FAIR?

02:11PM  7    A.   YES.

02:11PM  8    Q.   DO YOU RECALL WHETHER AT THIS TIME YOU TOOK A LOOK AT THE

02:11PM  9    WEBSITE AND DID A LITTLE INTERNET RESEARCH OR ANYTHING ABOUT

02:11PM  10   THE COMPANY?

02:11PM  11   A.   I BELIEVE I DID, YES.

02:11PM  12   Q.   OKAY.  AND, IN FACT, IF WE LOOK AT -- IF YOU LOOK AT THE

02:11PM  13   NEXT DOCUMENT IN YOUR BOOK AT 7354, DO YOU SEE YOU RESPOND TO

02:12PM  14   MR. JAMES?

02:12PM  15   A.   OKAY.  YES.

02:12PM  16   Q.   YOU RECOGNIZE THIS EMAIL TO BE A RESPONSE TO MR. JAMES'S

02:12PM  17   INITIAL EMAIL, JUST A DIFFERENT EMAIL CHAIN?

02:12PM  18   A.   YES, I DO.

02:12PM  19            MR. WADE:  MOVE THE ADMISSION OF 7354.

02:12PM  20            MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:12PM  21            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:12PM  22       (DEFENDANT'S EXHIBIT 7354 WAS RECEIVED IN EVIDENCE.)

02:12PM  23   BY MR. WADE:

02:12PM  24   Q.   AND DO YOU SEE THERE, I THINK WE SAW THE RESPONSE FROM

02:12PM  25   MR. JAMES BEFORE, WOWSY.

02:12PM   1          DO YOU SEE THAT?

02:12PM   2     A.   YES, I DO.

02:12PM   3     Q.   AND IF WE LOOK UP BELOW, YOU NOTE ACTUALLY THAT IT WAS

02:12PM   4     PRETTY COOL, BUT YOU HAD NEVER HEARD OF IT BEFORE; RIGHT?

02:12PM   5     A.   YES.

02:12PM   6     Q.   AND WHEN YOU SAID IT WAS PRETTY COOL, WAS THAT BECAUSE YOU

02:12PM   7     HAD DONE A LITTLE POKING AROUND?

02:12PM   8     A.   I DON'T REMEMBER, BUT YES, LIKELY.

02:13PM   9     Q.   AND DO YOU RECALL HAVING ANY CONVERSATIONS WITH MR. JAMES

02:13PM   10    ABOUT THE COMPANY AND WHETHER THIS WAS AN OPPORTUNITY THAT

02:13PM   11    SHOULD BE CONSIDERED?

02:13PM   12    A.   I DON'T RECALL HAVING -- I DON'T RECALL DISCUSSING WITH

02:13PM   13    HIM ABOUT AN INVESTMENT IN THE COMPANY AT THIS POINT.  IT WAS

02:13PM   14    MORE, DO YOU KNOW ANYTHING ABOUT THIS COMPANY?

02:13PM   15    Q.   OKAY.

02:13PM   16    A.   SO --

02:13PM   17    Q.   AND WHEN YOU SAY "PRETTY COOL," DO YOU REMEMBER WHAT

02:13PM   18    MATERIALS YOU REVIEWED OR INFORMATION YOU REVIEWED DURING THIS

02:13PM   19    TIME PERIOD THAT CAUSED YOU TO FORM THE INITIAL IMPRESSION?

02:13PM   20    A.   I DON'T REMEMBER SPECIFICALLY, BUT MOST LIKELY IT WAS

02:13PM   21    WHATEVER WAS ON THE WEB PAGE, YOU KNOW, AT THAT TIME, THE

02:13PM   22    FINGERSTICK, THE MAIN WEB TEMPLATE THEY HAD AND, YOU KNOW, THE

02:13PM   23    FINGERSTICK, ALL OF THE -- MUCH OF THE SAME STUFF THAT WAS IN

02:13PM   24    SOME OF THE MATERIALS THAT THEY SENT US.

02:13PM   25    Q.   OKAY.  SOME SIMILAR GRAPHICS AND THINGS?

02:13PM  1    A.   YEAH.

02:13PM  2    Q.   AND DID YOU -- DO YOU RECALL TAKING A LOOK AT THEIR

02:14PM  3    LOCATIONS OR ANYWHERE YOU MIGHT GO TO GET A TEST --

02:14PM  4    A.   I DON'T, NO.

02:14PM  5    Q.   DO YOU RECALL THAT YOU TOOK A LOOK AT THE TESTING MENU

02:14PM  6    DURING THIS TIME PERIOD?

02:14PM  7    A.   I DON'T.

02:14PM  8    Q.   OKAY.  HAD YOU INVESTED IN LAB COMPANIES BEFORE THERANOS?

02:14PM  9    A.   YES.

02:14PM  10   Q.   OKAY.  SO YOU HAD SOME FAMILIARITY WITH TESTING MENUS AND

02:14PM  11   THE LIKE?

02:14PM  12   A.   UM, YES.

02:14PM  13   Q.   WHICH COMPANIES HAD YOU INVESTED IN?

02:14PM  14   A.   QUEST, LABCORP.  THERE WERE A FEW OTHER COMPANIES IN THE

02:14PM  15   LABORATORY INDUSTRY THAT HAVE BEEN ACQUIRED OVER THE YEARS.

02:14PM  16        THEN ALSO COMPANIES THAT MAKE DIAGNOSTIC ANALYTIC

02:14PM  17   INSTRUMENTS, MOLECULAR TESTING PLATFORMS.

02:14PM  18        SO ALL OF THOSE TYPES OF BUSINESSES WE'VE SEEN AS PART OF

02:15PM  19   OUR NORMAL INVESTMENT ACTIVITIES.

02:15PM  20   Q.   OKAY.  AND YOU RECALL AT SOME POINT THAT THERE WAS A

02:15PM  21   DECISION MADE TO PURSUE THIS FURTHER?

02:15PM  22   A.   YES.

02:15PM  23   Q.   AND DO YOU RECALL THAT THAT WAS DONE BY MR. JAMES

02:15PM  24   EXPRESSING AN INTEREST IN BEING CONNECTED WITH AN INVESTMENT

02:15PM  25   OPPORTUNITY?  WERE YOU AWARE OF THAT?

02:15PM 1     A.   I ACTUALLY DON'T REMEMBER THAT, BUT -- SO I DON'T REMEMBER

02:15PM 2     THE SPECIFICS OF HOW WE ENDED UP CONNECTED TO THEM.

02:15PM 3     Q.   OKAY.  DO YOU KNOW A GENTLEMAN BY THE NAME OF BOB COHEN?

02:15PM 4     A.   NEVER HEARD OF HIM.

02:15PM 5     Q.   OKAY.  BUT IN ANY EVENT, AT SOME POINT YOU OBVIOUSLY WENT

02:15PM 6     TO THE MEETING THAT YOU'VE TESTIFIED ABOUT PREVIOUSLY.

02:15PM 7     A.   YEP.

02:15PM 8     Q.   AND DO YOU RECALL IN THE MEANTIME SOME MEMBERS OF YOUR

02:15PM 9     TEAM MADE A FEW INQUIRIES ABOUT THERANOS?

02:16PM 10    A.   YES.

02:16PM 11    Q.   IN THAT TIME PERIOD THAT I POINTED TO BEFORE THAT MEETING?

02:16PM 12    DO YOU RECALL THAT?

02:16PM 13    A.   YES.

02:16PM 14    Q.   AND LET'S TAKE A LOOK AT 7358.

02:16PM 15         DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?

02:16PM 16    A.   YEAH, I DO.  COULD I JUST TAKE A MINUTE TO READ THROUGH

02:16PM 17    IT?

02:16PM 18    Q.   SURE.  LET ME KNOW WHEN YOU'RE READY.

02:16PM 19         (PAUSE IN PROCEEDINGS.)

02:16PM 20              THE WITNESS:  OKAY.  YEP.

02:16PM 21    BY MR. WADE:

02:16PM 22    Q.   AND DO YOU RECOGNIZE THIS TO BE AN EMAIL CHAIN WITH YOUR

02:17PM 23    ANALYST TEAM ABOUT SOME RESEARCH THAT THEY HAD GATHERED ON

02:17PM 24    THERANOS?

02:17PM 25    A.   I DO.

02:17PM  1        MR. WADE:  MOVE THE ADMISSION OF 7358.

02:17PM  2        MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:17PM  3        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:17PM  4        (DEFENDANT'S EXHIBIT 7358 WAS RECEIVED IN EVIDENCE.)

02:17PM  5   BY MR. WADE:

02:17PM  6   Q.   AND IF WE LOOK AT THE BOTTOM ON NOVEMBER 18TH, DO YOU SEE

02:17PM  7   IN THE SUBJECT MATTER THERE YOU POSED THE QUESTION TO YOUR

02:17PM  8   ANALYST, "IS THIS SOMETHING WE SHOULD WORK UP ON THE PRIVATE

02:17PM  9   SIDE?"

02:17PM  10       DO YOU SEE THAT?

02:17PM  11  A.   I DO, YES.

02:17PM  12  Q.   AND WHAT DID YOU MEAN BY THAT?

02:17PM  13  A.   I MEAN IS IT SOMETHING THAT WE SHOULD DEDICATE RESOURCES

02:17PM  14  TO AND LEARN MORE ABOUT THE BUSINESS.

02:17PM  15  Q.   OKAY.  SO WORK UP, YOU MEAN SORT OF START THAT RESEARCH

02:17PM  16  PROCESS WHERE YOU INFORM YOURSELVES AS TO WHETHER OR NOT TO

02:17PM  17  MAKE THE INVESTMENT DECISION?

02:17PM  18  A.   I THINK THAT'S WHAT -- I MEAN, THAT'S GENERALLY WHAT I

02:17PM  19  MEAN BY THAT.

02:17PM  20  Q.   OKAY.  AND DO YOU RECALL WHAT HAPPENED BETWEEN

02:18PM  21  NOVEMBER 1ST AND NOVEMBER 18TH THAT PROMPTED YOU TO START THAT

02:18PM  22  PROCESS OR EXPLORE THAT PROCESS?

02:18PM  23  A.   I DON'T, NO.

02:18PM  24  Q.   OKAY.  LET'S TAKE A LOOK UP THE CHAIN.

02:18PM  25       DO YOU SEE THAT MR. KHANNA NOTES THAT HE GOT VERY GOOD

02:18PM  1    FEEDBACK FROM WAG?

02:18PM  2         DO YOU SEE THAT?

02:18PM  3    A.   I DO, YES.

02:18PM  4    Q.   AND YOU UNDERSTAND WAG THERE TO BE WALGREENS?

02:18PM  5    A.   YES.

02:18PM  6    Q.   AND WAS IT YOUR UNDERSTANDING THAT MR. KHANNA HAD REACHED

02:18PM  7    OUT TO SOMEONE AT WALGREENS TO SEE WHAT THEY COULD TELL HIM

02:18PM  8    ABOUT THERANOS?

02:18PM  9    A.   I, I DON'T KNOW WHAT HE WAS REFERRING TO HERE.

02:18PM  10   Q.   OKAY.  BUT IN ANY EVENT, YOU RECEIVED THE EMAIL; RIGHT?

02:18PM  11   A.   YES.

02:18PM  12   Q.   AND YOU UNDERSTOOD THAT HE HAD HEARD SOME POSITIVE NEWS

02:18PM  13   ABOUT THE COMPANY IN CONNECTION WITH THE WORK THAT THEY WERE

02:18PM  14   DOING WITH THERANOS; IS THAT FAIR?

02:18PM  15   A.   WELL, YES, AND THERE HAD BEEN PUBLIC PRESS RELEASES FROM

02:18PM  16   BOTH WALGREENS AND THERANOS, SO ONE DIDN'T HAVE TO LOOK VERY

02:19PM  17   FAR TO FIND POSITIVE INFORMATION.

02:19PM  18        SO I DON'T -- SO THERE WAS, THERE WAS A LOT OF -- YOU

02:19PM  19   KNOW, THERE WERE THINGS THAT ONE COULD EASILY FIND AT THAT

02:19PM  20   POINT ON BOTH COMPANIES.

02:19PM  21   Q.   AND JUST SO WE'RE CLEAR, WALGREENS WAS A COMPANY THAT YOU

02:19PM  22   WERE VERY FAMILIAR WITH AT THIS TIME; IS THAT RIGHT?

02:19PM  23   A.   YES.

02:19PM  24   Q.   YOU HAD INVESTED IN WALGREENS AT DIFFERENT POINTS IN TIME;

02:19PM  25   IS THAT RIGHT?

02:19PM   1      A.   YES.

02:19PM   2      Q.   AND WHEN A FUND LIKE YOURS INVESTS IN WALGREENS, IT

02:19PM   3      GENERALLY GETS ANALYST REPORTS AND PERFORMS RESEARCH; IS THAT

02:19PM   4      FAIR?

02:19PM   5      A.   YES.

02:19PM   6      Q.   AND SO YOU HAD SORT OF A BASE LEVEL UNDERSTANDING ABOUT

02:19PM   7      WALGREENS AND HOW IT OPERATED?

02:19PM   8      A.   YES.

02:19PM   9      Q.   AND WERE YOU GENERALLY IMPRESSED BY THE COMPANY?

02:19PM  10      A.   OUR VIEWS OF COMPANIES CHANGE ALL THE TIME, SO IT'S HARD

02:19PM  11      FOR ME TO KNOW EXACTLY WHAT WE WERE THINKING AT THAT POINT IN

02:19PM  12      TIME.

02:19PM  13           BUT THE RETAIL PHARMACY BUSINESS IS A TOUGH BUSINESS AND

02:20PM  14      HAS BEEN FOR YEARS, AND SO I THINK WE, WE'VE GENERALLY BEEN

02:20PM  15      SKEPTICAL OVER THE YEARS ABOUT THEIR ABILITY TO SURVIVE IN A

02:20PM  16      WORLD WITH AMAZON AND OTHER COMPETITIVE PRESSURES.

02:20PM  17           BUT WALGREENS IS A GREAT FRANCHISE, A GREAT BUSINESS, AND

02:20PM  18      SO, YOU KNOW, FROM TIME TO TIME WE COULD BE POSITIVE, WE COULD

02:20PM  19      BE NEGATIVE.  IT JUST SORT OF DEPENDED.

02:20PM  20           I DON'T BELIEVE WE HAD ANY PARTICULAR POINT OF VIEW ON

02:20PM  21      WALGREENS AT THIS POINT, BUT THAT'S JUST SORT OF A GENERAL

02:20PM  22      MEMORY OF THAT POINT IN TIME.

02:20PM  23      Q.   AND YOU RECOGNIZED THEM AT THE TIME TO BE A WELL

02:20PM  24      EXPERIENCED RETAILER; CORRECT?

02:20PM  25      A.   YES.

02:20PM  1    Q.   AND A VERY WELL ESTABLISHED BRAND?

02:20PM  2    A.   YES.

02:20PM  3    Q.   AND THEY HAD A SIGNIFICANT NATIONAL FOOTPRINT; RIGHT?

02:20PM  4    A.   YES.

02:20PM  5    Q.   AND SIGNIFICANT EXPERIENCE IN RETAIL OPERATIONS?

02:20PM  6    A.   YES.

02:20PM  7    Q.   AND SO WHEN YOU STARTED EXPLORING THIS CONNECTION BETWEEN

02:21PM  8    THERANOS AND WALGREENS, YOU SORT OF -- DID YOU SEE THAT AS A

02:21PM  9    POSITIVE?

02:21PM  10   A.   A POTENTIAL POSITIVE, YES.

02:21PM  11   Q.   TELL US WHY YOU THOUGHT IT WAS POSITIVE.

02:21PM  12   A.   WELL, IT WAS, IT WAS A NEW REVENUE SOURCE FOR A BUSINESS

02:21PM  13   THAT, AS I SAID BEFORE, WAS -- YOU KNOW, HAD SOME STRUCTURAL

02:21PM  14   PRESSURES, AND SO GETTING INTO THE REFERENCE LABORATORY SPACE

02:21PM  15   WAS, WAS INTERESTING.

02:21PM  16        AND I MEAN, I DON'T WANT TO -- THIS IS A LONG TIME AGO,

02:21PM  17   BUT WE WEREN'T -- I DON'T THINK WE REALLY WERE INVOLVED MUCH.

02:21PM  18   WE DIDN'T THINK ANYTHING AT THAT TIME.  I DON'T BELIEVE WE HAD

02:21PM  19   A POSITION IN WALGREENS.  SO, YOU KNOW, IT WAS SOMETHING THAT

02:21PM  20   JUST WASN'T THAT INTERESTING TO US.

02:22PM  21        AND THIS WAS SOMETHING THAT WAS INTERESTING.  ALL OF A

02:22PM  22   SUDDEN WALGREENS WAS -- MAYBE THERE WAS SOMETHING INTERESTING

02:22PM  23   ABOUT THE BUSINESS.

02:22PM  24        SO I THINK THAT WAS KIND OF THE GENESIS OF THIS EMAIL,

02:22PM  25   SHOULD WE TRY TO UNDERSTAND THIS?

02:22PM 1         AND IT ALSO HAD IMPLICATIONS FOR OTHER COMPANIES IN THE

02:22PM 2   SPACE, SO WE WANTED TO KIND OF UNDERSTAND WHAT THIS COULD MEAN

02:22PM 3   FOR THE REFERENCE LAB INDUSTRY, DIAGNOSTIC EQUIPMENT.

02:22PM 4         SO I THINK WE WERE CURIOUS ABOUT THIS PARTNERSHIP.

02:22PM 5   Q.   AND YOU WERE CURIOUS BECAUSE IT PRESENTED SOME

02:22PM 6   INTERESTING -- AN INTERESTING DEVELOPMENT FOR WALGREENS; RIGHT?

02:22PM 7   A.   POTENTIALLY.

02:22PM 8   Q.   BUT IT WAS ALSO A SIGNIFICANT FACTOR RELATING TO A

02:22PM 9   POTENTIAL INVESTMENT IN THERANOS, WAS IT NOT?

02:22PM 10  A.   YES, I GUESS.  I SUPPOSE.

02:22PM 11  Q.   I MEAN, ULTIMATELY THE ABILITY TO STAND UP A RETAIL

02:22PM 12  OPERATION, IT'S GOOD TO HAVE A VERY WELL ESTABLISHED RETAIL

02:22PM 13  PARTNER WORKING WITH YOU; CORRECT?

02:22PM 14  A.   CAN YOU REPHRASE THE QUESTION OR ASK THE QUESTION AGAIN?

02:23PM 15  I'M SORRY.

02:23PM 16  Q.   WELL, YOU CAME TO LEARN THAT THERANOS WAS GOING TO OPERATE

02:23PM 17  COMMERCIALLY THROUGH A RETAIL ESTABLISHMENT; RIGHT?

02:23PM 18  A.   YES.

02:23PM 19  Q.   AND, AND FOR A YOUNG COMPANY LIKE THERANOS TO DO THAT, DID

02:23PM 20  YOU VIEWS IT AS A POSITIVE FACTOR THAT THEY WERE PARTNERED WITH

02:23PM 21  A COMPANY LIKE WALGREENS?

02:23PM 22  A.   UH, I DID.

02:23PM 23  Q.   IN FACT, DO YOU RECALL COMING TO THE VIEW OF IF IT WERE

02:23PM 24  NOT FOR WALGREENS, YOU PROBABLY WOULDN'T HAVE EVEN CONSIDERED

02:23PM 25  THIS INVESTMENT OPPORTUNITY; IS THAT FAIR?

02:23PM  1    A.    UH, I DON'T REMEMBER SPECIFICALLY THINKING THAT OR

02:23PM  2    DISCUSSING THAT.  SO IT'S HARD FOR ME TO ANSWER THAT.

02:23PM  3          BUT WALGREENS WAS CERTAINLY IMPORTANT.

02:23PM  4    Q.    THE -- IF WE CAN WORK OUR WAY UP THE CHAIN TO THE NEXT

02:23PM  5    EMAIL.

02:23PM  6          DO YOU SEE -- YOU ASK WHAT, YOU ASK WHAT THE GOOD FEEDBACK

02:24PM  7    MEANT; RIGHT?

02:24PM  8          AND THEN YOU ALSO NOTE, "WHAT DOES IT MEAN FOR LH/DGX

02:24PM  9    LONGER TERM?"

02:24PM  10          DO YOU SEE THAT?

02:24PM  11   A.    YES, I DO.

02:24PM  12   Q.    AND WHAT DOES THAT REFER TO?

02:24PM  13   A.    WELL, I THINK I'M RESPONDING TO MY COLLEAGUE, VIVEK'S

02:24PM  14   EMAIL, HE SAYS, "GOOD FEEDBACK FROM WAG," SO I'M ASKING HIM TO

02:24PM  15   SORT OF ELABORATE ON THAT.  HE'S NOT ALWAYS THE MOST -- HE

02:24PM  16   DOESN'T ALWAYS OFFER UP A LOT OF INFORMATION.  HE TENDS TO BE

02:24PM  17   VERY KIND OF DIRECT IN EMAIL.

02:24PM  18          SO I'M ASKING FOR MORE INFORMATION.  AND THE ANSWER TO

02:24PM  19   YOUR SECOND QUESTION IS LH AND DGX ARE THE STOCK SYMBOLS FOR

02:24PM  20   QUEST -- WELL, LABCORP OF AMERICA, WHICH IS LH, AND THEN

02:24PM  21   QUEST DIAGNOSTICS.  BOTH OF THOSE ARE THE PUBLICLY TRADED

02:25PM  22   REFERENCE LABORATORY COMPANIES.

02:25PM  23   Q.    WHICH YOU HAD INVESTED IN PREVIOUSLY?

02:25PM  24   A.    WE HAD AT DIFFERENT POINTS, YES.

02:25PM  25   Q.    OKAY.  AND SO YOU'RE JUST KIND OF GETTING INTO HOW THIS

02:25PM   1    FITS WITHIN THE LAB SPACE; IS THAT FAIR?

02:25PM   2    A.   YES.

02:25PM   3    Q.   AND YOU'RE TRYING TO PULL INFORMATION OUT OF MAYBE A

02:25PM   4    RELUCTANT MR. KHANNA, AND HE ACTUALLY COMPLIES.  LET'S TAKE A

02:25PM   5    LOOK AT HIS RESPONSE.

02:25PM   6         AND THIS IS -- DO YOU KNOW WHAT HE'S INCLUDING WITHIN THIS

02:25PM   7    EMAIL?  DO YOU RECOGNIZE THIS FORM OF INFORMATION?

02:25PM   8    A.   I DO.

02:25PM   9    Q.   AND WHAT IS THE FORM OF INFORMATION?

02:25PM  10    A.   WELL, YOU MEAN -- THIS IS AN EMAIL THAT HE'S --

02:25PM  11    Q.   RIGHT.  I MEANT -- I'M SORRY, MR. GROSSMAN.  I WAS

02:25PM  12    REFERRING TO THE PORTION THAT IS EXCERPTED THERE.

02:25PM  13         DO YOU UNDERSTAND THAT TO BE HIS TEXT, OR IS HE CUTTING

02:25PM  14    AND PASTING SOMETHING FROM SOMEWHERE ELSE, IF YOU KNOW?

02:25PM  15    A.   I DO KNOW.  HE'S CUTTING AND PASTING IT FROM SOMEWHERE

02:26PM  16    ELSE.

02:26PM  17    Q.   AND WHAT IS HE CUTTING AND PASTING FROM THERE?

02:26PM  18    A.   THIS IS ANOTHER EMAIL THAT WE RECEIVED, I DON'T KNOW IF IT

02:26PM  19    WAS THAT DAY, BUT LIKELY THAT DAY OR CONTEMPORANEOUS WITH THIS

02:26PM  20    EMAIL CHAIN FROM SOMEONE ELSE.

02:26PM  21    Q.   AND WHO IS THAT OTHER PERSON?

02:26PM  22    A.   FROM WHAT I REMEMBER, THIS IS AN INDIVIDUAL NAMED

02:26PM  23    JAY SCHNEIDER.

02:26PM  24    Q.   OKAY.  AND WHO IS HE?

02:26PM  25    A.   JAY SCHNEIDER IS WHAT YOU WOULD CALL AN INSTITUTIONAL

02:26PM  1      EQUITY SALESPERSON.

02:26PM  2      Q.   OKAY.

02:26PM  3      A.   HE WORKS FOR A COMPANY CALLED COWEN, C-O-W-E-N.

02:26PM  4      Q.   OKAY.

02:26PM  5      A.   THEY'RE A BROKER DEALER.  THEY'RE WHAT MOST PEOPLE WOULD

02:26PM  6      CALL A BOUTIQUE INVESTMENT BANK.  THEY HAVE -- THEY SERVICE AND

02:26PM  7      FOCUS ON THE HEALTH CARE AND TECHNOLOGY SECTORS.  THEY HAVE

02:26PM  8      INVESTMENT BANKING OPERATIONS IN THOSE AREAS.  THEY HAVE SALES

02:26PM  9      AND TRADING OPERATIONS.

02:26PM  10          THEY DON'T HAVE A RETAIL -- THEY DON'T OFFER RETAIL

02:27PM  11     BROKERAGE ACCOUNTS, SO THEIR BUSINESS IS FOCUSSED ON

02:27PM  12     INSTITUTIONAL CLIENTS LIKE OUR FIRM AND COMPANIES IN THIS

02:27PM  13     SECTOR THAT ARE LOOKING TO -- OR THAT NEED BANKING ADVICE OR

02:27PM  14     BANKING SERVICES.

02:27PM  15     Q.   OKAY.  AND DID YOU CONSIDER THIS TO BE VALUABLE

02:27PM  16     INFORMATION AT THE TIME?

02:27PM  17     A.   YES.

02:27PM  18     Q.   OKAY.  AND BECAUSE HE WAS A RESPECTED SOURCE?

02:27PM  19     A.   THAT'S DEBATABLE.  BUT MR. RHYEE WAS AN ANALYST AT COWEN.

02:27PM  20     HE'S A VERY NICE GUY.  WE DIDN'T ALWAYS AGREE WITH HIS VIEWS.

02:27PM  21          BUT IN THIS CASE HE HAD JUST BEEN MARKETING WITH THE

02:27PM  22     COMPANY, SO HE HAD JUST SPENT -- WHAT THE FIRST LINE IS

02:27PM  23     REFERRING TO IS HE REMAINS BULLISH POST MARKETING WITH THE IR

02:27PM  24     TEAM.

02:27PM  25          I'M SORRY, THIS IS ALL THE VERNACULAR OF OUR BUSINESS.

02:27PM   1            SO IR REFERS TO INVESTOR RELATIONS.  SO CHARLES, THE

02:28PM   2     ANALYST, WAS TAKING THE INVESTOR RELATIONS TEAM FROM WALGREENS

02:28PM   3     AROUND TO MEET WITH INVESTORS.

02:28PM   4            SO INVESTOR RELATIONS IS ACTUALLY A PRETTY IMPORTANT ROLE.

02:28PM   5     IT TENDS TO BE KIND OF A VICE PRESIDENT TYPE ROLE WITHIN

02:28PM   6     COMPANIES LIKE WALGREENS.  THEY'RE THE INTERFACE BETWEEN

02:28PM   7     INVESTORS LIKE US, MUTUAL FUNDS LIKE FIDELITY OR OTHER LARGE

02:28PM   8     INSTITUTIONAL ASSET MANAGERS AND THE COMPANY.

02:28PM   9            SO THEY OFTEN ARE THE -- IT'S HARD, ESPECIALLY FOR LARGER

02:28PM  10     COMPANIES, TO GET ACCESS TO THE CEO, THE CFO.  AND SO THE

02:28PM  11     INVESTOR RELATIONS TEAM, THEY'RE KIND OF A LIAISON AND THEY ARE

02:28PM  12     ABLE TO ANSWER QUESTIONS AND THEY KNOW WHAT THEY CAN DISCLOSE

02:28PM  13     AND CAN'T DISCLOSE PUBLICLY AND WHAT IS IN THE PUBLIC DOMAIN

02:28PM  14     AND WHAT ISN'T IN THE PUBLIC DOMAIN.

02:28PM  15            AND IN THIS CASE CHARLES RHYEE, HE HAD BEEN TRAVELLING

02:28PM  16     WITH THE IR TEAM, AND SO THEY HAD MADE STATEMENTS TO INVESTORS

02:29PM  17     OVER THE COURSE OF, I DON'T KNOW IF IT WAS A DAY OR A COUPLE OF

02:29PM  18     DAYS, ABOUT THERANOS.

02:29PM  19            AND SO JAY SCHNEIDER, WHO IS THE INSTITUTIONAL PERSON AT

02:29PM  20     COWEN, IS PARAPHRASING FROM CHARLES RHYEE THE COMMENTS THAT

02:29PM  21     WALGREENS WAS MAKING TO OTHER INVESTORS ABOUT THIS PARTNERSHIP

02:29PM  22     AND THIS TECHNOLOGY, AND SO THAT'S WHAT THIS IS REFERRING TO.

02:29PM  23     Q.   AND THAT -- BECAUSE OF THAT, BECAUSE IT WAS ACTUALLY

02:29PM  24     COMING FROM WALGREENS, THAT WAS SIGNIFICANT INTEL FOR YOU?

02:29PM  25     A.   WELL, IT'S -- I MEAN, IT'S ALSO -- THEY WERE POSITIVE, AND

02:29PM  1    CHARLES HIMSELF IS POSITIVE, TOO.  SO THEY BOTH SEEM TO BE

02:29PM  2    EXCITED ABOUT THIS PARTNERSHIP.

02:29PM  3         AND THEN THERE ARE SPECIFIC COMMENTS HERE ABOUT, YOU KNOW,

02:29PM  4    SOME OF THE TECHNOLOGICAL CAPABILITIES THAT, YOU KNOW, OF

02:29PM  5    THERANOS.

02:29PM  6    Q.   AND IF WE JUST LOOK QUICKLY AT YOUR RESPONSE, YOU NOTED

02:30PM  7    THAT IT WAS QUITE AN ENDORSEMENT AT THE TIME; CORRECT?

02:30PM  8    A.   YES.

02:30PM  9    Q.   AND THE -- IN ADDITION TO THAT, DO YOU RECALL THAT THERE

02:30PM  10   WAS SOME OUTREACH DONE TO LABCORP ITSELF?

02:30PM  11   A.   I DON'T RECALL SPECIFICALLY.

02:30PM  12   Q.   LET'S TAKE A LOOK AT, TAKE A LOOK AT 7359 AND JUST READ IT

02:30PM  13   TO YOURSELF FOR A SECOND.  LET ME KNOW ONCE YOU'VE HAD A CHANCE

02:30PM  14   TO DO THAT.

02:30PM  15   A.   OKAY.  YEP.

02:30PM  16   Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT MR. KHANNA WAS

02:30PM  17   REACHING OUT TO LABCORP TO GET SOME INTEL AS WELL?

02:31PM  18   A.   YES.

02:31PM  19   Q.   OKAY.  AND IF I CAN BRING YOU NEXT TO EXHIBIT 4052.

02:31PM  20   A.   BINDER 1?

02:31PM  21   Q.   IT SHOULD BE, YES.

02:31PM  22   A.   51?

02:31PM  23   Q.   4052.

02:31PM  24   A.   OKAY.

02:31PM  25   Q.   AND DO YOU RECOGNIZE THIS TO BE AN EMAIL WHERE MR. KHANNA

02:31PM  1    IS RELAYING SOME INTELLIGENCE THAT HE HAD GATHERED RELATING TO

02:31PM  2    THERANOS?

02:32PM  3    A.   I'M SORRY, COULD YOU ASK THE QUESTION AGAIN?

02:32PM  4    Q.   SURE.

02:32PM  5         DO YOU RECOGNIZE THIS TO BE AN EMAIL WHERE MR. KHANNA WAS

02:32PM  6    RELAYING TO YOU SOME MARKET INTELLIGENCE THAT HE HAD GATHERED

02:32PM  7    AS A RESULT OF HIS RESEARCH?

02:32PM  8    A.   YES.

02:32PM  9    Q.   OKAY.

02:32PM  10        MOVE THE ADMISSION OF 4052.

02:32PM  11             MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:32PM  12             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:32PM  13        (GOVERNMENT'S EXHIBIT 4052 WAS RECEIVED IN EVIDENCE.)

02:32PM  14   BY MR. WADE:

02:32PM  15   Q.   AND ON THE BOTTOM OF THIS EMAIL, IF WE CAN START THERE, DO

02:32PM  16   YOU SEE THAT IT'S DECEMBER 9TH, 2013?  AND YOU NOTE THAT YOU

02:32PM  17   WERE ACTUALLY GOING TO GO HAVE THAT MEETING THAT YOU TESTIFIED

02:32PM  18   ABOUT.

02:32PM  19        DO YOU SEE THAT?

02:32PM  20   A.   I DO, YES.

02:32PM  21   Q.   AND YOU WERE ASKING MR. KHANNA IF HE PICKED UP ANY

02:32PM  22   INFORMATION THAT WOULD BE HELPFUL TO YOU IN ADVANCE OF THAT

02:32PM  23   MEETING; RIGHT?

02:32PM  24   A.   YES.

02:32PM  25   Q.   AND LET'S LOOK AT HIS RESPONSE.

02:33PM 1          HE GIVES YOU LABCORP'S VIEW; RIGHT?

02:33PM 2     A.   YES.

02:33PM 3     Q.   AND THAT WAS NEGATIVE?  IS THAT A FAIR CHARACTERIZATION?

02:33PM 4     A.   YES.

02:33PM 5     Q.   THEY TOLD YOU -- THEY TOLD HIM THE TECHNOLOGY DIDN'T WORK;

02:33PM 6     RIGHT?

02:33PM 7     A.   YES.

02:33PM 8     Q.   AND THEY TOLD HIM THAT THERE WAS A LIMITED MENU BY

02:33PM 9     COMPARISON TO THEIR ROBUST OFFERING; CORRECT?

02:33PM 10    A.   YES.

02:33PM 11    Q.   AND ESSENTIALLY ASPECTS OF THEIR MODEL WOULDN'T WORK.

02:33PM 12         DO YOU SEE THAT?

02:33PM 13    A.   YES.

02:33PM 14    Q.   WALGREENS HAD A LITTLE BIT DIFFERENT REACTION; IS THAT

02:33PM 15    FAIR?

02:33PM 16    A.   ACCORDING TO THIS EMAIL, THEY THINK IT IS VERY EXCITING

02:33PM 17    AND WILL LIKELY BUNDLE WITH THEIR EXISTING PAYOR CONTRACTS.

02:33PM 18    Q.   YEAH.  AND WHAT DO YOU UNDERSTAND THAT TO MEAN?

02:33PM 19    A.   I'M NOT SURE WHO "THEY" IS REFERRING TO.  WAG IS

02:34PM 20    DEFINITELY REFERRING TO WALGREENS.

02:34PM 21         "THEY THINK IT IS VERY EXCITING."  I'M ASSUMING HE'S

02:34PM 22    REFERRING TO THERANOS AND THEIR TECHNOLOGY.

02:34PM 23         "BUNDLE WITH EXISTING PAYOR CONTRACTS," WHAT HE'S

02:34PM 24    REFERRING TO THERE IS THE ABILITY TO OFFER THIS LAB SERVICE AS

02:34PM 25    PART OF EXISTING CONTRACTS THEY HAVE WITH COMPANIES LIKE UNITED

02:34PM 1    HEALTH CARE, ANTHEM, CIGNA, BLUE SHIELD OF CALIFORNIA WHERE

02:34PM 2    THEY ALREADY HAVE A PHARMACY CONTRACT FOR DISPENSING BRAND

02:34PM 3    PHARMACEUTICALS, GENERIC PHARMACEUTICALS, AND SO THEY CAN FOLD

02:34PM 4    THIS -- HE'S SUGGESTING THAT THEY MAY BE ABLE TO FOLD LAB

02:34PM 5    SERVICES INTO THOSE EXISTING CONTRACTS.

02:34PM 6    Q.   AND THAT WOULD BE A SIGNIFICANT BENEFIT FOR BOTH WALGREENS

02:34PM 7    AND THERANOS; CORRECT?

02:34PM 8    A.   IT COULD BE.

02:34PM 9    Q.   OKAY.  AND SO THIS WAS INFORMATION THAT YOU HAD IN ADVANCE

02:34PM 10   OF THAT MEETING THAT YOU ATTENDED WITH MS. HOLMES AND

02:35PM 11   MR. BALWANI?

02:35PM 12   A.   YES.

02:35PM 13   Q.   CORRECT?

02:35PM 14       AND I THINK YOU ALSO TESTIFIED YOU HAD READ SOME OF THE

02:35PM 15   PRESS RELEASES THAT WALGREENS HAD PUT OUT; RIGHT?

02:35PM 16   A.   YES.

02:35PM 17   Q.   AND THOSE WERE SIGNIFICANT TO YOU IN TERMS OF GATHERING

02:35PM 18   INTELLIGENCE AND YOUR INVESTMENT DECISION; IS THAT FAIR?

02:35PM 19   A.   YES.

02:35PM 20   Q.   AND YOU KNOW THAT A COMPANY LIKE WALGREENS -- OR YOU

02:35PM 21   ASSUME A COMPANY LIKE WALGREENS IS NOT GOING TO ENTER INTO A

02:35PM 22   BUSINESS RELATIONSHIP WITHOUT DOING DUE DILIGENCE AND THE LIKE;

02:35PM 23   CORRECT?

02:35PM 24   A.   YES.

02:35PM 25   Q.   AND, AND THAT THEY'RE NOT GOING TO DO IT WITHOUT DOING

02:35PM  1    THEIR OWN VETTING OF THE TECHNOLOGY AND THE PEOPLE AT THERANOS;

02:35PM  2    IS THAT RIGHT?

02:35PM  3    A.   YES.

02:35PM  4    Q.   AND WAS THAT SIGNIFICANT FOR YOU IN TERMS OF YOUR

02:35PM  5    INVESTMENT DECISION IN THERANOS?

02:35PM  6    A.   YES.

02:35PM  7    Q.   THE -- IF WE GO TO -- I WANT TO SHIFT TO THE -- ASK YOU

02:35PM  8    SOME QUESTIONS ABOUT THE NOVEMBER 13TH MEETING -- I'M SORRY,

02:36PM  9    THE DECEMBER 13TH, 2013, MEETING.

02:36PM  10        BUT BEFORE I DO THAT, I WANT TO ASK YOU A COUPLE QUESTIONS

02:36PM  11   ABOUT SORT OF CONFIDENTIALITY AT THERANOS IF I COULD.

02:36PM  12   A.   YEAH, OKAY.

02:36PM  13   Q.   DO YOU RECALL ON YOUR DIRECT TESTIMONY YOU TALKED ABOUT

02:36PM  14   THAT THERANOS TOOK CONFIDENTIALITY VERY SERIOUSLY; IS THAT

02:36PM  15   RIGHT?

02:36PM  16   A.   WELL, AND ALSO SECURITY.

02:36PM  17   Q.   AND PHYSICAL SECURITY?

02:36PM  18   A.   PHYSICAL SECURITY.

02:36PM  19   Q.   AND I BELIEVE -- DO YOU RECALL THAT THERANOS WAS NOT

02:36PM  20   COMFORTABLE SHARING INFORMATION OR HAVING THEIR INFORMATION

02:36PM  21   SHARED WITH OTHERS WITHOUT A CONFIDENTIAL DISCLOSURE AGREEMENT

02:36PM  22   BEING SIGNED PRIOR TO THE DISCLOSURE?

02:36PM  23   A.   YES.

02:36PM  24   Q.   AND DO YOU RECALL THAT BEING IMPORTANT TO THERANOS AT THE

02:36PM  25   TIME THAT THEY WERE -- YOU WERE INTERACTING WITH THEM IN YOUR

02:37PM  1    INVESTMENT DECISION?

02:37PM  2    A.   YES.

02:37PM  3    Q.   AND SO, FOR EXAMPLE, WHEN YOU BROUGHT CERTAIN CONSULTANTS

02:37PM  4    IN TO PROVIDE SERVICES, THEY INSISTED THAT YOU HAVE THEM SIGN A

02:37PM  5    CONFIDENTIAL DISCLOSURE AGREEMENT BEFORE THEY COULD REVIEW

02:37PM  6    THERANOS INFORMATION; CORRECT?

02:37PM  7    A.   YES.

02:37PM  8    Q.   AND THAT EVEN INCLUDED MEMBERS OF YOUR TEAM?

02:37PM  9    CONFIDENTIAL, HIGHLY CONFIDENTIAL INFORMATION WOULDN'T BE

02:37PM  10   SHARED WITH YOUR TEAM UNTIL A CONFIDENTIAL DISCLOSURE AGREEMENT

02:37PM  11   WAS SIGNED; RIGHT?

02:37PM  12   A.   I MEAN, I'M NOT A LEGAL EXPERT SO I DON'T KNOW EXACTLY

02:37PM  13   WHAT WAS IN THOSE DOCUMENTS THAT WE SIGNED, BUT IN GENERAL THEY

02:37PM  14   WERE VERY PROTECTIVE OF THEIR, THEIR INFORMATION.

02:37PM  15   Q.   AND THAT'S WHY THEY -- YOU UNDERSTOOD THAT'S WHY THEY

02:37PM  16   WANTED THOSE AGREEMENTS SIGNED; IS THAT RIGHT?

02:37PM  17   A.   I'M, I'M NOT SURE WHY THEY WERE SO SPECIFIC ON EVERYONE

02:37PM  18   SIGNING THOSE, BUT -- SO I DON'T KNOW.  IT'S HARD FOR ME TO

02:38PM  19   KNOW EXACTLY WHY THEY WANTED -- WHY THAT WAS SO IMPORTANT TO

02:38PM  20   THEM.

02:38PM  21   Q.   FAIR ENOUGH.

02:38PM  22        YOU DON'T KNOW WHY THEY WERE SPECIFIC, BUT YOU DO KNOW

02:38PM  23   THAT BEFORE THEY WERE SHARING CONFIDENTIAL INFORMATION, THEY

02:38PM  24   ASKED THAT THE DOCUMENT BE SIGNED FIRST; CORRECT?

02:38PM  25   A.   YES.

02:38PM 1   Q.   OKAY.  AND IN CONNECTION WITH THAT MEETING ON

02:38PM 2   DECEMBER 13TH, 2013, I BELIEVE YOU SAID THAT WAS IN PALO ALTO

02:38PM 3   AT THE THERANOS HEADQUARTERS; IS THAT RIGHT?

02:38PM 4   A.   YES.

02:38PM 5   Q.   AND THIS WAS THE INTRODUCTORY MEETING BETWEEN PFM AND

02:38PM 6   THERANOS; CORRECT?

02:38PM 7   A.   YEP.

02:38PM 8   Q.   YOU DIDN'T DO -- YOU DID A LITTLE INITIAL RESEARCH THAT

02:38PM 9   WE'VE SEEN HERE BEFORE THE MEETING; CORRECT?

02:38PM 10  A.   YES.

02:38PM 11  Q.   BUT YOU DIDN'T DO ANY SORT OF, YOU KNOW, ROBUST VETTING OR

02:39PM 12  RESEARCH IN ADVANCE OF THAT?

02:39PM 13  A.   THAT'S CORRECT.

02:39PM 14  Q.   IT WAS SORT OF A LITTLE BIT OF A GETTING TO KNOW YOU

02:39PM 15  MEETING; IS THAT FAIR?

02:39PM 16  A.   YEAH.

02:39PM 17  Q.   AND DO YOU RECALL THAT IN ADDITION TO THERANOS TALKING A

02:39PM 18  LITTLE BIT ABOUT ITSELF, THEY ASKED QUESTIONS ABOUT PFM AND

02:39PM 19  YOUR INVESTMENT PHILOSOPHY.

02:39PM 20      DO YOU RECALL THAT?

02:39PM 21  A.   I DON'T SPECIFICALLY REMEMBER THAT, BUT, YES, THAT'S

02:39PM 22  NORM -- THAT WOULD BE TYPICAL IN A FIRST MEETING LIKE THAT.

02:39PM 23  Q.   AND WITHOUT INTENDING ANY OFFENSE, YOU UNDERSTAND THAT

02:39PM 24  THERE ARE SOME COMPANIES WHO HAVE SOME HESITANCE ABOUT HEDGE

02:39PM 25  FUND INVESTORS FOR REASONS WITHOUT GETTING TO KNOW THEM; IS

02:39PM  1    THAT FAIR?

02:39PM  2    A.   I DON'T KNOW.  I DON'T KNOW WHY THERE'S A BIG DIFFERENCE

02:39PM  3    BETWEEN A HEDGE FUND AND A MUTUAL FUND IF YOU'RE A PRIVATE

02:39PM  4    COMPANY.

02:39PM  5    Q.   OKAY.  BUT YOU UNDERSTOOD IN THIS CASE THAT THERANOS WAS

02:39PM  6    LOOKING FOR LONGER TERM INVESTORS; RIGHT?

02:40PM  7    A.   I GUESS, YEAH.  THEY WANTED FIRMS THAT COULD PARTNER WITH

02:40PM  8    THEM FOR -- YEAH, FOR THE JOURNEY FROM BEING, YOU KNOW, AS THEY

02:40PM  9    GROW OR GREW AND COMMERCIALIZED.

02:40PM  10   Q.   AND SO DO YOU RECALL THEM ASKING QUESTIONS THAT WENT TO,

02:40PM  11   YOU KNOW, WHETHER PFM AS A HEDGE FUND WAS INTERESTED IN MORE OF

02:40PM  12   A LONGER TERM RELATIONSHIP WITH THE COMPANY?

02:40PM  13   A.   I DO REMEMBER THAT.

02:40PM  14   Q.   AND, IN FACT, PFM SPECIFICALLY HAS STRUCTURES WITHIN ITS

02:40PM  15   ORGANIZATION TO PERMIT LONGER TERM INVESTMENT IN COMPANIES BY

02:40PM  16   INVESTING IN SIDE POCKETS; RIGHT?

02:40PM  17   A.   THAT'S CORRECT.

02:40PM  18   Q.   AND THAT IS WHERE PFM PUTS MORE ILLIQUID INVESTMENTS SO

02:40PM  19   THAT -- AND IT KEEPS THE MORE LIQUID INVESTMENTS IN THE MAIN

02:40PM  20   FUNDS.

02:40PM  21       IS THAT FAIR?

02:40PM  22   A.   YEAH, WE SEPARATE THE PRIVATE INVESTMENTS FROM THE PUBLIC

02:41PM  23   INVESTMENTS.  SO WE HAVE A LIQUID SECURITIES PORTFOLIO, AND WE

02:41PM  24   HAVE AN ILLIQUID SECURITIES PORTFOLIO.

02:41PM  25       SO, YES, WE DO SEPARATE THOSE.

02:41PM 1    Q.   OKAY.  AND DO YOU RECALL PFM COMMUNICATING TO THERANOS IN

02:41PM 2    THIS MEETING THAT IT WAS INTERESTED IN A, OR MAYBE AFTER THE

02:41PM 3    MEETING, THAT IT WAS INTERESTED IN EXPLORING THE POTENTIAL

02:41PM 4    LONGER TERM INVESTMENT RELATIONSHIP WITH THE COMPANY?

02:41PM 5    A.   I'M NOT EXACTLY SURE HOW WE PHRASED IT, BUT, YEAH, WE

02:41PM 6    WERE -- BASED ON THE REPRESENTATIONS FROM THAT FIRST MEETING,

02:41PM 7    WHAT THEY TOLD US THEY WERE CAPABLE OF DOING, WE WERE VERY

02:41PM 8    INTERESTED IN LEARNING MORE ABOUT THE COMPANY.

02:41PM 9    Q.   AND THIS MEETING, WHICH I THINK YOU SAID WAS ABOUT AN HOUR

02:41PM 10   LONG; IS THAT RIGHT?

02:41PM 11   A.   I DON'T I DON'T REMEMBER EXACTLY, BUT --

02:41PM 12   Q.   IT DIDN'T DELVE INTO A LOT OF SPECIFICS; CORRECT?

02:41PM 13   A.   IF THE QUESTION IS RELATIVE TO SUBSEQUENT MEETINGS THAT WE

02:42PM 14   HAD WITH THE COMPANY, IT WAS MORE HIGH LEVEL THAN THE

02:42PM 15   SUBSEQUENT MEETINGS.

02:42PM 16        BUT WE WENT THROUGH THE WHOLE BUSINESS.

02:42PM 17   Q.   AT A HIGH LEVEL.  BUT YOU RECALL THAT YOU HADN'T YET

02:42PM 18   SIGNED THE CONFIDENTIAL DISCLOSURE AGREEMENT AT THAT MEETING,

02:42PM 19   AND SO THEY WERE A LITTLE HESITANT TO SHARE WITH YOU THE MORE

02:42PM 20   SENSITIVE INFORMATION.

02:42PM 21        DO YOU RECALL THAT?

02:42PM 22   A.   I DON'T RECALL THAT ACTUALLY.  SORRY.

02:42PM 23   Q.   LET ME SEE, LET ME SEE IF I CAN REFRESH YOUR RECOLLECTION.

02:42PM 24        IF YOU TAKE A LOOK IN YOUR BOOK AT EXHIBIT 1422.

02:42PM 25             THE COURT:  IS THIS IN VOLUME 2?

02:42PM  1            MR. WADE:  1422 SHOULD BE IN VOLUME 1, YOUR HONOR.

02:42PM  2            THE WITNESS:  1422?

02:42PM  3            MR. WADE:  CORRECT.

02:43PM  4       DO YOU HAVE A COPY OF THAT?

02:43PM  5            THE WITNESS:  I DON'T THINK I HAVE THAT.

02:43PM  6            THE COURT:  IT'S NOT IN MY 1.

02:43PM  7            THE WITNESS:  I MEAN, IT'S GETTING LATE IN THE DAY,

02:43PM  8   BUT I THINK MY EYES ARE STILL WORKING.

02:43PM  9   BY MR. WADE:

02:43PM 10   Q.  WELL, GIVE ME A SECOND HERE AND I'LL SEE IF I CAN HELP THE

02:43PM 11   COURT AND THE WITNESS.

02:43PM 12       WHILE WE'RE DOING THAT, WHY DON'T WE START BY LOOKING AT

02:43PM 13   EXHIBIT 14 -- WHILE I'M LOOKING FOR THE RIGHT EXHIBIT THAT I

02:43PM 14   WAS POINTING TO YOU FIRST -- MY APOLOGIES -- WHY DON'T YOU TAKE

02:43PM 15   A MINUTE TO LOOK AT EXHIBIT 1434.

02:43PM 16       DO YOU HAVE THAT ONE?

02:43PM 17   A.  YES.

02:43PM 18   Q.  OKAY.  TAKE A MINUTE TO FAMILIARIZE YOURSELF WITH THAT,

02:43PM 19   AND I'M PARTICULARLY FOCUSSED ON THE ATTACHMENTS TO THAT JUST

02:43PM 20   SO --

02:43PM 21            MR. DOWNEY:  YOUR HONOR, WILL YOU JUST EXCUSE ME FOR

02:43PM 22   ONE SECOND?

02:43PM 23            THE COURT:  SURE.

02:43PM 24       (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

02:44PM 25            MR. WADE:  THE COURT'S INDULGENCE FOR JUST ONE

02:44PM  1    MOMENT?

02:44PM  2            THE COURT:  SURE.

02:44PM  3        (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

02:44PM  4    BY MR. WADE:

02:44PM  5    Q.   DO YOU HAVE 1434 IN FRONT OF YOU?

02:44PM  6    A.   YES.

02:44PM  7    Q.   AND DO YOU RECALL THE COVER EMAIL WAS AN EMAIL THAT, OR A

02:44PM  8    COPY OF AN EMAIL THAT MR. LEACH HAD ASKED YOU SOME QUESTIONS

02:44PM  9    ABOUT?

02:44PM  10        DO YOU RECALL THAT?

02:44PM  11   A.   I DON'T, BUT -- NO, I'M SORRY.

02:44PM  12   Q.   OKAY.  YOU SEE THAT ATTACHED TO THIS -- YOU SEE THIS IS AN

02:44PM  13   EMAIL FROM MR. BALWANI TO YOU?

02:44PM  14   A.   YES.

02:44PM  15   Q.   AND YOU SEE ATTACHED TO THIS EMAIL ARE CONFIDENTIAL

02:44PM  16   DISCLOSURE AGREEMENTS THAT ARE SIGNED BY VARIOUS PFM EMPLOYEES?

02:45PM  17   A.   YES.

02:45PM  18            MR. WADE:  MOVE THE ADMISSION OF 1434.

02:45PM  19            MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:45PM  20            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:45PM  21        (GOVERNMENT'S EXHIBIT 1434 WAS RECEIVED IN EVIDENCE.)

02:45PM  22   BY MR. WADE:

02:45PM  23   Q.   AND LET'S JUST FOCUS ON THE DATE.  WE'LL COME BACK TO THE

02:45PM  24   SUBSTANCE OF THE EMAIL LATER.  BUT YOU SEE THIS IS AN EMAIL

02:45PM  25   FROM MR. BALWANI TO YOU ON JANUARY 7TH, 2014?

02:45PM  1          DO YOU SEE THAT?

02:45PM  2     A.   IT'S NOT JANUARY 7TH.

02:45PM  3     Q.   JANUARY 17TH, 2014?

02:45PM  4     A.   YES.

02:45PM  5     Q.   IS THAT CORRECT?

02:45PM  6     A.   YES.

02:45PM  7     Q.   AND THIS WAS FOLLOWING UP ON THE MEETING, THE SECOND

02:45PM  8     MEETING THAT YOU HAD AT THERANOS; CORRECT?

02:45PM  9     A.   I BELIEVE THAT IS CORRECT, YES.

02:45PM 10     Q.   OKAY.  AND IF YOU JUST TURN YOUR ATTENTION TO THE

02:46PM 11     ATTACHMENT WHICH IS AT PAGE 5 OF THE EXHIBIT.

02:46PM 12     A.   OKAY.

02:46PM 13     Q.   DO YOU RECOGNIZE THAT TO BE A CONFIDENTIAL DISCLOSURE

02:46PM 14     AGREEMENT THAT YOU SIGNED ON 1-10-2014?

02:46PM 15     A.   YES.

02:46PM 16     Q.   AND THAT'S YOUR SIGNATURE DOWN THERE ON THE BOTTOM?

02:46PM 17     A.   YES.

02:46PM 18     Q.   OKAY.  AND LET ME, LET ME NOW TRY TO BRING YOU TO 1422,

02:46PM 19     WHICH I THINK MIGHT BE, JUST TO REALLY MAKE LIFE DIFFICULT FOR

02:46PM 20     YOU, IS GOING TO BE IN THE GOVERNMENT'S BINDER.

02:46PM 21     A.   OKAY.

02:46PM 22     Q.   IF YOU COULD?

02:46PM 23     A.   SAME NUMBER?

02:46PM 24     Q.   YES, 1422.

02:46PM 25     A.   OKAY.

| | | |
|---|---|---|
| 02:46PM | 1 | Q.   AND DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU? |
| 02:46PM | 2 | A.   I DO. |
| 02:46PM | 3 | Q.   AND DO YOU RECOGNIZE THAT TO BE AN EMAIL BETWEEN YOU AND |
| 02:46PM | 4 | MR. BALWANI ALSO ON JANUARY 13TH, 2014? |
| 02:47PM | 5 | A.   WOULD YOU JUST GIVE ME A MINUTE TO REVIEW IT? |
| 02:47PM | 6 | (PAUSE IN PROCEEDINGS.) |
| 02:47PM | 7 | THE WITNESS:  OKAY.  YES. |
| 02:47PM | 8 | MR. WADE:  MOVE THE ADMISSION OF 1422. |
| 02:47PM | 9 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 02:47PM | 10 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 02:47PM | 11 | (GOVERNMENT'S EXHIBIT 1422 WAS RECEIVED IN EVIDENCE.) |
| 02:47PM | 12 | BY MR. WADE: |
| 02:47PM | 13 | Q.   AND LET ME FOCUS ON THE BOTTOM EMAIL, THE FIRST COUPLE OF |
| 02:47PM | 14 | PARAGRAPHS THERE. |
| 02:47PM | 15 | DO YOU SEE THAT'S AN EMAIL FROM YOU TO MR. BALWANI? |
| 02:47PM | 16 | DO YOU SEE THAT? |
| 02:47PM | 17 | A.   YES, I DO. |
| 02:47PM | 18 | Q.   AND IF I JUST LOOK AT THAT VERY FIRST PARAGRAPH, I'M |
| 02:47PM | 19 | SORRY, THE PARAGRAPH THAT STARTS WITH THE WORD "FIRST." |
| 02:47PM | 20 | DO YOU SEE THERE IT SAYS, "FIRST, WE TAKE COMPLIANCE |
| 02:48PM | 21 | EXTREMELY SERIOUSLY.  AS SUCH WE'D LIKE TO UNDERSTAND WHAT WE |
| 02:48PM | 22 | ACTUALLY SIGNED WHEN WE REGISTERED FOR OUR ON SITE MEETING.  IS |
| 02:48PM | 23 | IT POSSIBLE FOR OUR GENERAL COUNCIL, KIMBERLY SUMME, TO REVIEW |
| 02:48PM | 24 | THAT DOCUMENT?" |
| 02:48PM | 25 | DO YOU SEE THAT? |

02:48PM  1     A.   YES.

02:48PM  2     Q.   AND DOES THAT REFRESH YOUR RECOLLECTION THAT IT WAS IN

02:48PM  3     THAT SECOND MEETING THAT YOU SIGNED THE CONFIDENTIAL DISCLOSURE

02:48PM  4     AGREEMENT WITH THERANOS?

02:48PM  5     A.   YES.

02:48PM  6     Q.   OKAY.  YOU CAN SET THAT BOOK ASIDE.

02:48PM  7          DO YOU -- LET ME ASK YOU A COUPLE OF THINGS ABOUT THE

02:48PM  8     GENERAL TOPICS THAT CAME UP IN THAT FIRST MEETING ON

02:49PM  9     DECEMBER 13TH, 2013.

02:49PM  10         SO I'M BACK TO THE DECEMBER 13TH, 2013 MEETING.

02:49PM  11    A.   OKAY.

02:49PM  12    Q.   OKAY.  DO YOU RECALL THAT THERE WAS DISCUSSION ABOUT --

02:49PM  13    WELL, LET ME STRIKE THAT.

02:49PM  14         THE WALGREENS LAUNCH WAS PUBLIC AT THAT POINT; CORRECT?

02:49PM  15    A.   YES.

02:49PM  16    Q.   AND YOU RECALL THAT THERE WAS SOME DISCUSSION ABOUT THE

02:49PM  17    WALGREENS RELATIONSHIP AND THAT LAUNCH?

02:49PM  18    A.   YES.

02:49PM  19    Q.   AND THE TWO PHASES TO THAT LAUNCH, DO YOU RECALL THAT

02:49PM  20    COMING UP IN THAT MEETING?

02:49PM  21    A.   YES.

02:49PM  22    Q.   AND DO YOU RECALL THE COMPANY TELLING YOU THAT GIVEN THE

02:49PM  23    PRESSURE OF THAT INITIAL COMMERCIAL LAUNCH, THAT THEY WERE

02:49PM  24    GOING TO BE PAUSING THEIR WORK ON MILITARY AND PHARMA PROJECTS

02:49PM  25    AND PUT THOSE ON HOLD?

02:50PM 1          DO YOU RECALL THAT?

02:50PM 2     A.   YES.

02:50PM 3     Q.   OKAY.  BECAUSE THE COMMERCIAL ROLLOUT WAS A BIG

02:50PM 4     UNDERTAKING; CORRECT?

02:50PM 5     A.   YES.

02:50PM 6     Q.   AND THEY WANTED TO FOCUS THEIR BEST ASSETS ON THAT

02:50PM 7     PROJECT.

02:50PM 8          IS THAT YOUR UNDERSTANDING?

02:50PM 9     A.   THAT AND THE HOSPITAL BUSINESS.

02:50PM 10    Q.   OKAY.

02:50PM 11    A.   AND THE PHYSICIAN BUSINESS.

02:50PM 12    Q.   AND, IN FACT, NOT LONG LATER THEY ANNOUNCED A DEAL WITH

02:50PM 13    INTERMOUNTAIN; IS THAT RIGHT?

02:50PM 14    A.   I DON'T REMEMBER SPECIFICALLY WHEN THEY ANNOUNCED THAT

02:50PM 15    DEAL, BUT --

02:50PM 16    Q.   OKAY.  AND I THINK YOU TESTIFIED ON DIRECT THAT THERE MAY

02:50PM 17    HAVE BEEN A FEW SLIDES THAT WERE SHOWN IN THAT MEETING; IS THAT

02:50PM 18    RIGHT?

02:50PM 19    A.   I BELIEVE SO.  YEAH.

02:50PM 20    Q.   BUT AS YOU SIT HERE TODAY, CAN YOU REMEMBER WHICH SLIDES

02:50PM 21    WERE SHOWN IN THAT MEETING?

02:50PM 22    A.   I DON'T, I DON'T REMEMBER SPECIFICALLY WHICH SLIDES WERE

02:50PM 23    SHOWN.

02:50PM 24    Q.   OKAY.  AND IS IT FAIR TO SAY THAT THIS WAS GENERALLY --

02:51PM 25    THIS WAS A RAPPORT BUILDING EXERCISE IN PART AS WELL?

02:51PM  1    A.   THAT WAS A PART OF THE MEETING, YES.

02:51PM  2    Q.   AND IT WAS A -- DO YOU RECALL IT BEING A POSITIVE MEETING?

02:51PM  3    A.   YES.

02:51PM  4    Q.   OKAY.  AND THE -- AND DO YOU RECALL COMING OUT OF THE

02:51PM  5    MEETING AND BEING INTERESTED IN EXPLORING THE INVESTMENT MORE?

02:51PM  6    A.   YES.

02:51PM  7    Q.   OKAY.  LET'S FOCUS ON SOME OF THE EVENTS AFTER THAT

02:51PM  8    MEETING, SO BETWEEN DECEMBER 12TH AND THE SECOND MEETING, AND

02:51PM  9    SOME OF THE WORK THAT YOU ALL AT PFM WERE DOING.  OKAY?

02:51PM 10    A.   OKAY.

02:51PM 11    Q.   LET'S GO TO 7376.

02:52PM 12         DO YOU HAVE, DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?

02:52PM 13    A.   I DO.

02:52PM 14    Q.   AND DO YOU RECOGNIZE THAT TO BE ANOTHER REPORT FROM

02:52PM 15    MR. KHANNA ON MATTERS RELATING TO THERANOS AND WALGREENS?

02:52PM 16    A.   I DO.

02:52PM 17              MR. WADE:  MOVE THE ADMISSION OF 7376.

02:52PM 18              MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:52PM 19              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:52PM 20         (DEFENDANT'S EXHIBIT 7376 WAS RECEIVED IN EVIDENCE.)

02:52PM 21    BY MR. WADE:

02:52PM 22    Q.   AND DO YOU SEE THERE IT SAYS "THERANOS - COMMENTS ON THE

02:52PM 23    WAG CALL"?

02:52PM 24    A.   I DO.

02:52PM 25    Q.   DO YOU KNOW WHAT WAG CALL REFERS TO THERE?

02:52PM  1    A.   I BELIEVE IT REFERS TO THE WALGREENS EARNINGS CALL.

02:53PM  2    Q.   AND THE WALGREENS EARNINGS CALL IS A CALL WHERE THE SENIOR

02:53PM  3    MANAGEMENT OF THE COMPANY GOES ON A TELEPHONE CALL; IS THAT

02:53PM  4    RIGHT?

02:53PM  5    A.   YEAH, FOUR TIMES A YEAR IN THE U.S.

02:53PM  6    Q.   WHY DON'T YOU DESCRIBE FOR US WHAT HAPPENS IN THAT CALL.

02:53PM  7    A.   YEAH.  FOUR TIMES A YEAR, QUARTERLY, THE S.E.C. REQUIRES

02:53PM  8    COMPANIES IN THE U.S. THAT ARE PUBLICLY LISTED, SO ON A STOCK

02:53PM  9    EXCHANGE, THEY'VE GONE THROUGH THE IPO PROCESS, TO HAVE -- TO

02:53PM  10   REPORT QUARTERLY RESULTS, FILE THAT WITH THE S.E.C.

02:53PM  11        AND ABOVE AND BEYOND THAT, MANY, MOST LARGE COMPANIES HOST

02:53PM  12   AN EARNINGS CALL.  THEY'LL ISSUE A PRESS RELEASE.  THEY DON'T

02:53PM  13   HAVE TO DO THAT, BUT THEY HAVE TO FILE WHAT IS CALLED FORM 10Q

02:53PM  14   WITH THE S.E.C., WHICH IS AN UPDATE OF THEIR BUSINESS.

02:53PM  15        BUT IN ADDITION TO THAT, ALMOST EVERY COMPANY, LARGE

02:53PM  16   COMPANY, MAJOR COMPANY, THEY HOLD A QUARTERLY CONFERENCE CALL.

02:54PM  17   THEY'LL ISSUE A PRESS RELEASE THAT INFORMS INVESTORS ON HOW THE

02:54PM  18   BUSINESS PERFORMED OVER THAT THREE MONTH PERIOD.

02:54PM  19        AND THEN FOR THE CONFERENCE CALLS, THEY'LL OFTEN GIVE

02:54PM  20   INVESTORS AN OPPORTUNITY TO ASK QUESTIONS.  ALMOST ALWAYS IT'S

02:54PM  21   SELL-SIDE ANALYSTS, NOT PEOPLE LIKE US.  SO THAT'S THE TYPICAL

02:54PM  22   PROCESS.

02:54PM  23        SO THIS IS THE WALGREENS HOLDS AND EARNINGS CALL.

02:54PM  24        THEIR QUARTERLY CALENDAR IS DIFFERENT FROM THE VAST

02:54PM  25   MAJORITY OF COMPANIES.  I BELIEVE THEY'RE ON AN AUGUST FISCAL

02:54PM  1    YEAR, OR THEY WERE AT THIS POINT.  SO THIS WAS THEIR -- WHAT --

02:54PM  2    IT WOULD HAVE BEEN THEIR FISCAL Q1, I THINK, THEIR FISCAL FIRST

02:54PM  3    QUARTER CALL IN LATE DECEMBER.

02:54PM  4    Q.   AND DO YOU RECALL THAT THIS WOULD BE, THIS WOULD PROBABLY

02:54PM  5    BE THE FIRST CALL AFTER THE LAUNCH WITH THERANOS?

02:55PM  6    A.   YES.

02:55PM  7    Q.   OKAY.  AND MR. KHANNA -- AND IN MORE LAYMAN'S TERMS, IT'S

02:55PM  8    A CALL IN WHICH INFORMATION IS PROVIDED, QUESTIONS ARE ASKED,

02:55PM  9    AND YOU GET, YOU GET TO LEARN WHAT IS GOING ON AT THE COMPANY.

02:55PM 10         IS THAT FAIR?

02:55PM 11    A.   YES.

02:55PM 12    Q.   AND SOMETIMES IT'S GENERAL, BUT OFTENTIMES IT GETS VERY

02:55PM 13    SPECIFIC ON FINANCIAL PERFORMANCE AND BUSINESS METRICS AND THE

02:55PM 14    LIKE.

02:55PM 15         IS THAT FAIR?

02:55PM 16    A.   YES.

02:55PM 17    Q.   OKAY.  AND MR. KHANNA WATCHED OUT OR LISTENED IN ON THE

02:55PM 18    WALGREENS CALL, IT WOULD APPEAR?

02:55PM 19    A.   YES.

02:55PM 20    Q.   AND IS THAT SOMETHING -- DID HE USUALLY LISTEN IN ON

02:55PM 21    WALGREENS CALLS GIVEN THE SIGNIFICANCE OF THE COMPANY IN THE

02:55PM 22    HEALTH CARE SPACE?

02:55PM 23    A.   YEAH, HE LISTENS TO A LOT -- YES, ALL OF THE MAJOR

02:55PM 24    COMPANIES HE'S RESPONSIBLE FOR COVERING, HE LISTENS TO THOSE

02:55PM 25    CONFERENCE CALLS.

02:55PM  1    Q.   AND WALGREENS WAS ONE OF THEM?

02:56PM  2    A.   YES.

02:56PM  3    Q.   AND BECAUSE YOU ALL WERE EXPLORING A POSSIBLE INVESTMENT

02:56PM  4    WITH THERANOS, HE PROVIDED THIS REPORT?

02:56PM  5    A.   YES.

02:56PM  6    Q.   AND THAT REPORT IS GENERALLY THAT WALGREENS WAS VERY

02:56PM  7    POSITIVE ON THERANOS; CORRECT?

02:56PM  8    A.   I MEAN, I'M JUST READING FROM WHAT HE WROTE.  SO "WE ARE

02:56PM  9    VERY POSITIVE ON THERANOS."

02:56PM 10         YEAH, I THINK HE'S ATTEMPTING TO PARAPHRASE FROM THE

02:56PM 11    WALGREENS CONFERENCE CALL.

02:56PM 12    Q.   FAIR ENOUGH.  BUT IS IT, IS IT FAIR TO SAY THAT THIS IS

02:56PM 13    A -- THIS IS A POSITIVE REPORT THAT IS COMING OUT OF THE

02:56PM 14    THERANOS -- OR THE WALGREENS ANALYST CALL WITH RESPECT TO

02:56PM 15    THERANOS?

02:56PM 16    A.   YES.

02:56PM 17    Q.   AND WAS THAT MEANINGFUL INFORMATION TO YOU WHEN YOU WERE

02:56PM 18    MAKING THE INVESTMENT DECISION?

02:56PM 19    A.   YES, YES.

02:56PM 20    Q.   AND IF WE CAN LOOK, AND I APOLOGIZE TO THE COURT AND

02:56PM 21    COUNSEL, I'M GOING TO PUT UP AN EXHIBIT THAT IS ALREADY IN

02:56PM 22    EVIDENCE.

02:56PM 23         I FAILED TO BRING A COPY OF THIS.  IF WE CAN LOOK QUICKLY

02:57PM 24    AT 12510.

02:57PM 25    A.   BINDER 2?

02:57PM 1    Q.   WE'LL BRING IT UP ON THE SCREEN.  IT'S IN EVIDENCE.

02:57PM 2         AND I TAKE IT YOU'VE SEEN A FEW TRANSCRIPTS OF ANALYST

02:57PM 3    CALLS IN YOUR DAY.

02:57PM 4    A.   YES.

02:57PM 5    Q.   AND DO YOU RECOGNIZE THIS TO BE A TRANSCRIPT OF THAT CALL

02:57PM 6    IN DECEMBER OF 2013?

02:57PM 7    A.   YES.

02:57PM 8    Q.   AND I JUST WANT TO NOTE A COUPLE OF QUICK THINGS HERE.

02:57PM 9         DO YOU SEE ON THE SECOND PAGE IN THE MIDDLE WALGREENS AND

02:57PM 10   THERANOS?

02:57PM 11        DO YOU SEE THAT?

02:57PM 12        THIS WAS SOMETHING THAT WAS RAISED BY THE CEO IN HIS

02:58PM 13   OPENING COMMENTS ON THE COMPANY; IS THAT RIGHT?

02:58PM 14   A.   IT APPEARS TO BE, YES.

02:58PM 15   Q.   AND GENERALLY -- IS IT FAIR TO SAY THAT GENERALLY THE CEO,

02:58PM 16   YOU KNOW, INCLUDES SOMETHING IN KIND OF THE OPENING COMMENT

02:58PM 17   THAT THE COMPANY CONSIDERS IT TO BE, YOU KNOW, AN IMPORTANT

02:58PM 18   INITIATIVE FOR THE COMPANY?

02:58PM 19   A.   YES.

02:58PM 20   Q.   AND DO YOU KNOW -- LET'S TAKE A LOOK AT EXHIBIT 12, OR

02:58PM 21   PAGE 12.  IF WE CAN BLOW UP THE Q AND A STARTING WITH THE NEXT

02:58PM 22   ONE DOWN, RIGHT THERE (INDICATING).

02:58PM 23        DO YOU KNOW WHO RICKY GOLDWASSER IS?

02:58PM 24   A.   I DO.

02:58PM 25   Q.   AND IS RICKY A RESPECTED ANALYST WHO COVERS STOCKS?

02:59PM  1     A.   YES.

02:59PM  2     Q.   OKAY.  AND DO YOU KNOW WHO WADE MIQUELON IS?

02:59PM  3     A.   YES.

02:59PM  4     Q.   HE'S THE CFO OF WALGREENS AT THIS POINT IN TIME?

02:59PM  5     A.   YES.

02:59PM  6     Q.   AND DO YOU SEE HERE THAT HE GIVES A REPORT ON THE THERANOS

02:59PM  7     RELATIONSHIP?

02:59PM  8          DO YOU SEE THAT?

02:59PM  9     A.   DO YOU MIND IF I JUST READ THIS?

02:59PM 10     Q.   SURE.  YEAH.  TAKE A MOMENT.

02:59PM 11          (PAUSE IN PROCEEDINGS.)

02:59PM 12              THE WITNESS:  OKAY.

03:00PM 13     BY MR. WADE:

03:00PM 14     Q.   OKAY.  AND IS IT FAIR TO SAY THAT MR. MIQUELON IS GIVING A

03:00PM 15     PRETTY POSITIVE REVIEW OF THERANOS ON THIS CALL?

03:00PM 16     A.   YES.

03:00PM 17     Q.   AND DO YOU RECALL LEARNING THAT AT THE TIME THAT YOU WERE

03:00PM 18     CONSIDERING THE THERANOS INVESTMENT, THAT SENIOR LEADERSHIP OF

03:00PM 19     WALGREENS WAS POSITIVE ON THE THERANOS RELATIONSHIP?

03:00PM 20     A.   YES.

03:00PM 21     Q.   AND DO YOU SEE IN THE BOTTOM OF THE FIRST PARAGRAPH UNDER

03:00PM 22     MR. MIQUELON'S COMMENTS, HE SAYS, "WE'LL KEEP LEARNING AND

03:00PM 23     PERFECTING THE PATIENT EXPERIENCE WHICH IS REALLY THE" CASE --

03:00PM 24     "THE KEY THING."

03:00PM 25          DO YOU SEE THAT?

03:00PM   1       A.   I DO.

03:00PM   2       Q.   AND DID YOU RECOGNIZE, GIVEN YOUR EXPERIENCE WITH

03:00PM   3    RETAILERS, THAT BEFORE YOU'RE GOING TO ROLL OUT A CONCEPT LIKE

03:00PM   4    THE THERANOS CONCEPT, THAT YOU WANTED TO MAKE SURE THAT YOU

03:00PM   5    NAILED THE PATIENT EXPERIENCE BEFORE YOU TOOK IT NATIONWIDE?

03:01PM   6       A.   I MEAN, I'M NOT -- CAN YOU REPHRASE -- CAN YOU ASK THE

03:01PM   7    QUESTION AGAIN?  I'M SORRY.

03:01PM   8       Q.   SURE.  YOU RECOGNIZED THAT, WHEN YOU WERE CONSIDERING THE

03:01PM   9    THERANOS RETAIL SERVICES, THAT PATIENT EXPERIENCE WAS

03:01PM  10    IMPORTANT; CORRECT?

03:01PM  11       A.   YES, I AGREE WITH THAT.

03:01PM  12       Q.   AND DID YOU RECOGNIZE ALSO THAT IT WAS IMPORTANT TO

03:01PM  13    PERFECT THAT PATIENT EXPERIENCE BEFORE YOU EXPAND WIDELY?

03:01PM  14       A.   THAT SEEMS LIKE A REASONABLE BUSINESS PRINCIPLE.

03:01PM  15       Q.   OKAY.  LET'S LOOK NEXT AT 125 -- OH, I'M SORRY.  LET'S

03:01PM  16    LOOK NEXT AT 1360.

03:02PM  17            AND THAT MAY BE IN THE GOVERNMENT BINDER IF IT'S NOT IN

03:02PM  18    YOUR BINDER.

03:02PM  19       A.   OKAY.  I'VE GOT THE EXHIBIT.

03:02PM  20       Q.   AND DO YOU RECOGNIZE THIS TO BE AN EMAIL FOLLOWING UP ON

03:02PM  21    THAT FIRST MEETING THAT YOU HAD AT THERANOS?

03:02PM  22       A.   LET ME JUST READ IT.

03:02PM  23       Q.   SURE.  I APOLOGIZE.  IT'S SMALL FONT.

03:02PM  24       A.   IT'S TINY.  JEEZ.

03:02PM  25       Q.   DO YOU NEED SOME GLASSES?

03:02PM   1    A.   NO, NOT YET.

03:03PM   2         (PAUSE IN PROCEEDINGS.)

03:03PM   3         THE WITNESS:  OKAY.

03:03PM   4    BY MR. WADE:

03:03PM   5    Q.   DO YOU RECOGNIZE THIS TO BE AN EMAIL FOLLOWING UP ON THAT

03:03PM   6    INITIAL MEETING THAT YOU HAD AT THERANOS?

03:03PM   7    A.   YES.

03:03PM   8         MR. WADE:  I WOULD MOVE THE ADMISSION OF 1360.

03:03PM   9         MR. LEACH:  NO OBJECTION.

03:03PM  10         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:03PM  11         (GOVERNMENT'S EXHIBIT 1360 WAS RECEIVED IN EVIDENCE.)

03:03PM  12    BY MR. WADE:

03:03PM  13    Q.   FORTUNATELY, WE CAN NOW ZOOM THIS DOCUMENT.  IF WE CAN

03:03PM  14    BLOW IT UP?

03:03PM  15    A.   I'M GOING TO BE BLIND BY THE END OF THIS.

03:04PM  16    Q.   DO YOU SEE AT THE BOTTOM MR. JAMES FOLLOWS UP ON THAT

03:04PM  17    MEETING AND HE SAYS HE IS JUST CHECKING TO SEE IF WE CAN MOVE

03:04PM  18    THE PROCESS FORWARD.

03:04PM  19         DO YOU SEE THAT?

03:04PM  20    A.   YES, YES.

03:04PM  21    Q.   AND COMING OUT OF THAT MEETING, THERANOS WASN'T, YOU KNOW,

03:04PM  22    BANGING ON YOUR DOOR TRYING TO DEMAND AN INVESTMENT.  YOU JUST

03:04PM  23    HAD THE MEETING AND YOU MOVED ON; RIGHT?

03:04PM  24    A.   THEY WERE NOT BANGING DOWN OUR DOOR, I AGREE WITH THAT.

03:04PM  25    Q.   RIGHT.  AND MR. JAMES WAS THE ONE WHO ACTUALLY CIRCLED

03:04PM 1   BACK TO THE INVESTMENT; CORRECT?

03:04PM 2   A.   YES, THAT APPEARS TO BE TRUE.

03:04PM 3   Q.   AND HE NOTES THERE, DO YOU SEE AT THE END, "WE HAVE SHOWN

03:04PM 4   TO BE GREAT LONG-TERM," AND THEN HE CUTS OFF PARTNERS, I THINK.

03:04PM 5        DO YOU RECALL THAT BEING AN ISSUE OF CONCERN TO THERANOS

03:04PM 6   AT THE TIME?

03:04PM 7   A.   I DON'T.

03:04PM 8   Q.   OKAY.  DO YOU HAVE ANY RECOLLECTION AS TO WHY MR. JAMES

03:04PM 9   WAS PROVIDING THOSE ASSURANCES?

03:04PM 10  A.   I HAVE NO IDEA.

03:05PM 11  Q.   OKAY.  AND THEN DO YOU SEE THAT MS. HOLMES RESPONDS AND

03:05PM 12  SHE THANKS, SHE THANKS MR. JAMES FOR THE NOTE AND SAYS THAT

03:05PM 13  THEY WILL BE IN TOUCH TO FOLLOW UP; RIGHT?

03:05PM 14  A.   I'M SORRY.  THE QUESTION IS WHAT?

03:05PM 15  Q.   THERE WAS AN AGREEMENT -- MS. HOLMES EXPRESSED AN INTEREST

03:05PM 16  IN RESPONSE TO MR. JAMES'S EMAIL --

03:05PM 17  A.   YES.

03:05PM 18  Q.   -- AND SAID LET'S CONTINUE OUR DISCUSSIONS; CORRECT?

03:05PM 19  A.   YES.

03:05PM 20  Q.   AND INTERNALLY IN RESPONSE TO THIS, DO YOU RECALL YOU KIND

03:05PM 21  OF ACTIVATED YOUR ANALYST TEAM TO START TO DIG IN IN A LITTLE

03:05PM 22  MORE DEPTH COMING OUT OF THAT DECEMBER MEETING?

03:05PM 23  A.   I BELIEVE THAT IS, THAT IS RIGHT.

03:05PM 24  Q.   AND DO YOU RECALL DR. RABODZEY IN PARTICULAR STARTED

03:05PM 25  DIGGING IN?

03:06PM 1    A.   YES.

03:06PM 2    Q.   DO YOU RECALL ON I THINK IT WAS CHRISTMAS EVE HE DROVE UP

03:06PM 3    TO THE WALGREENS IN PALO ALTO?

03:06PM 4         DO YOU RECALL THAT?

03:06PM 5    A.   I DON'T RECALL THAT.

03:06PM 6    Q.   ALL RIGHT.  WELL, LET'S TAKE A LOOK.  LET'S TAKE A LOOK AT

03:06PM 7    14025, WHICH I THINK IS IN YOUR SECOND BINDER.

03:06PM 8         AS YOU'RE GATHERING IT, THIS ISN'T AN EMAIL -- PLEASE DO

03:06PM 9    GATHER IT, BUT THIS ISN'T AN EMAIL ON THE CHRISTMAS VISIT TO

03:07PM 10   WALGREENS.  THIS EMAIL ACTUALLY REFERS -- THIS IS A DISCUSSION

03:07PM 11   WHERE YOU AND MR. JAMES TALK ABOUT CONTINUING TO EXPLORE THE

03:07PM 12   WALGREENS INVESTMENT; IS THAT RIGHT?

03:07PM 13   A.   YES.

03:07PM 14   Q.   AND DO YOU SEE --

03:07PM 15        MOVE THE ADMISSION OF 14025.

03:07PM 16            MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:07PM 17            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:07PM 18        (DEFENDANT'S EXHIBIT 14025 WAS RECEIVED IN EVIDENCE.)

03:07PM 19   BY MR. WADE:

03:07PM 20   Q.   DO YOU SEE IN THE MIDDLE -- THIS IS A RESPONSE TO THE

03:07PM 21   EMAIL THAT CAME FROM MS. HOLMES WHERE YOU AND MR. JAMES TALK

03:07PM 22   ABOUT PULLING TOGETHER A DUE DILIGENCE TEAM AND PULLING

03:07PM 23   TOGETHER A LIST OF QUESTIONS AND STARTING TO THINK ABOUT THE

03:07PM 24   SIZE OF THE INVESTMENT; CORRECT?

03:07PM 25   A.   YES.

03:07PM 1      Q.   AND THERE'S SOME DISCUSSION ABOUT THE POTENTIAL SIZE OF

03:08PM 2      THE INVESTMENT.

03:08PM 3           DO YOU SEE THAT THERE?

03:08PM 4      A.   YES.

03:08PM 5      Q.   AND YOU SAY "20 AT LEAST."

03:08PM 6           I TAKE IT THAT'S 20 MILLION?

03:08PM 7      A.   YES.

03:08PM 8      Q.   BUT YOU HAD NOT MADE ANY INVESTMENT DECISIONS AT THIS

03:08PM 9      POINT; CORRECT?

03:08PM 10     A.   THAT'S CORRECT.

03:08PM 11     Q.   YOU WERE JUST STARTING THIS DILIGENCE PROCESS; RIGHT?

03:08PM 12     A.   YES.

03:08PM 13     Q.   AND UP AT THE TOP, IF WE LOOK AT THE TOP TWO EMAILS, YOU

03:08PM 14     TALK ABOUT WANTING TO GET SOME ADDITIONAL INFORMATION FROM THE

03:08PM 15     COMPANY SO THAT YOU CAN DIG IN MORE; RIGHT?

03:08PM 16     A.   YES.

03:08PM 17     Q.   AND ULTIMATELY -- AND YOU TALK ABOUT PREPARING A LIST OF

03:08PM 18     QUESTIONS SO THAT YOU CAN HAVE ADDITIONAL DISCUSSIONS WITH THE

03:08PM 19     COMPANY; RIGHT?

03:08PM 20     A.   I'M SORRY, WHICH -- THE QUESTION TO ME IS WHAT?

03:08PM 21     Q.   YOU TALK ABOUT ADDITIONAL -- YOU TALK ABOUT PREPARING A

03:08PM 22     LIST OF QUESTIONS TO HELP FACILITATE A DISCUSSION WITH THE

03:09PM 23     COMPANY.

03:09PM 24     A.   I THINK THAT'S ACTUALLY CHRIS EMAILING ME.

03:09PM 25     Q.   OKAY.  BUT YOU AND MR. JAMES ARE HAVING THE DIALOGUE ABOUT

03:09PM   1    TRYING TO GET INFORMATION AND PREPARE A LIST OF QUESTIONS;

03:09PM   2    RIGHT?

03:09PM   3    A.   YES.

03:09PM   4    Q.   AND TO PULL TOGETHER A DUE DILIGENCE TEAM; CORRECT?

03:09PM   5    A.   YES.

03:09PM   6    Q.   AND THAT'S A STANDARD APPROACH THAT YOU WOULD, YOU WOULD

03:09PM   7    TAKE AT PFM BEFORE MAKING A MAJOR INVESTMENT; IS THAT FAIR?

03:09PM   8    A.   YES.

03:09PM   9    Q.   OKAY.  AND THE DUE DILIGENCE TEAM IS THE TEAM OF ANALYSTS

03:09PM  10    WE'VE TALKED ABOUT BEFORE; RIGHT?

03:09PM  11    A.   YES.

03:09PM  12    Q.   AND, AND PART OF THE STANDARD DUE DILIGENCE PROCESS IS

03:09PM  13    PREPARING THOSE LISTS OF QUESTIONS ALONG THE LINES THAT

03:09PM  14    MR. LEACH WAS READING TO YOU EARLIER; CORRECT?

03:09PM  15    A.   YES.

03:09PM  16    Q.   THERE WASN'T ANYTHING SPECIAL ABOUT THE THERANOS

03:09PM  17    INVESTMENT WITH RESPECT TO THOSE QUESTIONS; CORRECT?

03:09PM  18    A.   WELL, THE QUESTIONS WERE SPECIFIC TO THE THERANOS

03:09PM  19    INVESTMENT.

03:09PM  20    Q.   FAIR ENOUGH.

03:09PM  21         BUT IS IT FAIR TO SAY THAT WHENEVER YOU CONSIDER A MAJOR

03:10PM  22    INVESTMENT, YOU PREPARE A LIST OF DUE DILIGENCE QUESTIONS;

03:10PM  23    CORRECT?

03:10PM  24    A.   YES.

03:10PM  25    Q.   AND YOU SEND IT OVER TO THE OTHER SIDE, AND YOU WAIT TO

03:10PM 1    GET A RESPONSE; RIGHT?

03:10PM 2    A.   IT DOESN'T ALWAYS WORK LIKE THAT, BUT THAT'S CERTAINLY A

03:10PM 3    REASONABLE APPROACH.

03:10PM 4    Q.   RIGHT.  AND THAT'S, THAT'S WHAT YOU WERE EXPECTING IN THIS

03:10PM 5    CASE; RIGHT?

03:10PM 6    A.   WELL, WE HAD A LOT OF QUESTIONS TO GO THROUGH, SO WE

03:10PM 7    WANTED TO MAKE SURE THAT IT WAS A PRODUCTIVE MEETING.

03:10PM 8        WITHOUT FRAMING THE ISSUES THAT WE HAD, THAT WE WANTED TO

03:10PM 9    DISCUSS, SOMETIMES A MEETING, EVEN IF IT'S AN HOUR AND A HALF

03:10PM 10   OR TWO HOURS, CAN BE UNPRODUCTIVE.

03:10PM 11   Q.   SO YOU FELT IT WAS USEFUL TO PROVIDE THAT LIST IN

03:10PM 12   ADVANCE --

03:10PM 13   A.   YES.

03:10PM 14   Q.   -- SO GOING INTO THAT MEETING YOU WOULD HAVE A SENSE FOR

03:10PM 15   WHAT EXACTLY IT WAS THAT WOULD BE FOCUSSED ON?

03:10PM 16   A.   SO THEY WOULD HAVE A SENSE OF WHAT WE WANTED TO FOCUS ON.

03:10PM 17   Q.   SO THEY COULD PREPARE TO ANSWER YOUR QUESTIONS; RIGHT?

03:10PM 18   A.   YES.

03:10PM 19   Q.   AND THERE WERE A COUPLE OF INSTANCES WHERE YOU ASKED TO

03:10PM 20   GET ACCESS TO INFORMATION, THE CONTRACTS.

03:10PM 21       DO YOU RECALL THAT?

03:11PM 22   A.   YES.

03:11PM 23   Q.   AND THEY TOLD -- OR THEY ASKED -- LET ME STRIKE THAT.

03:11PM 24       YOU ASKED TO TALK TO SOME OF THE PEOPLE WITH WHOM THEY HAD

03:11PM 25   BUSINESS RELATIONSHIPS?

03:11PM 1    A.   SORT OF, YES.

03:11PM 2    Q.   YOU ASKED TO SPEAK TO UNITED HEALTH ABOUT THERANOS;

03:11PM 3    CORRECT?

03:11PM 4    A.   WE WANTED TO SPEAK TO THE PEOPLE WHO DID THE TECHNICAL DUE

03:11PM 5    DILIGENCE ON THERANOS'S TECHNOLOGY.

03:11PM 6         WE WANTED TO SPEAK TO PEOPLE WHO WERE INVOLVED IN THE

03:11PM 7    BUSINESS DEVELOPMENT DECISION TO PARTNER, CONTRACT WITH THOSE

03:11PM 8    TYPES OF ACTIVITIES.

03:11PM 9    Q.   I UNDERSTAND.

03:11PM 10        BUT MY QUESTION WAS THAT YOU ASKED TO SPEAK SPECIFICALLY

03:11PM 11   TO UNITED HEALTH; RIGHT?

03:11PM 12   A.   YES.

03:11PM 13   Q.   AND YOU ASKED SPECIFICALLY TO SPEAK WITH WALGREENS;

03:11PM 14   CORRECT?

03:11PM 15   A.   YES.

03:11PM 16   Q.   AND THEY TOLD YOU THAT THEY WERE NOT COMFORTABLE WITH YOU

03:11PM 17   DOING THAT; RIGHT?

03:11PM 18   A.   THAT IS CORRECT.

03:11PM 19   Q.   AND YOU AT THAT POINT COULD WALK AWAY FROM THE INVESTMENT

03:11PM 20   IF THAT WAS NOT SATISFACTORY TO YOU; CORRECT?

03:11PM 21   A.   CORRECT.

03:11PM 22   Q.   AND YOU CHOSE NOT TO; CORRECT?

03:11PM 23   A.   THAT'S CORRECT.

03:11PM 24   Q.   THE -- BUT YOU DID GATHER A LOT OF INFORMATION FROM OTHER

03:12PM 25   SOURCES, INCLUDING THE COMPANY; RIGHT?

03:12PM  1    A.   YES.

03:12PM  2    Q.   AND IN THE DAYS TO FOLLOW, YOU GATHERED INFORMATION ABOUT

03:12PM  3    THE REGULATORY ENVIRONMENT; RIGHT?

03:12PM  4    A.   WELL, WE JUST -- IT FORCED US TO RELY ON THE

03:12PM  5    REPRESENTATIONS THAT THEY MADE TO US.  SO IT JUST -- BY NOT

03:12PM  6    LETTING US TO TALK TO THOSE PEOPLE, WE HAD TO RELY ON WHAT THEY

03:12PM  7    TOLD US IN THE DUE DILIGENCE MEETINGS.

03:12PM  8    Q.   RIGHT.  BUT MY QUESTION WAS WHETHER YOU GATHERED OTHER

03:12PM  9    INFORMATION IN RESPONSE; RIGHT?

03:12PM  10   A.   YES, WE DID.

03:12PM  11   Q.   AND YOU WENT ABOUT A PROCESS TO GATHER THAT INFORMATION

03:12PM  12   WITH THIS TEAM; RIGHT?

03:12PM  13   A.   YES.

03:12PM  14   Q.   AND SOME OF THAT WORK HAPPENED IN ADVANCE OF THE NEXT

03:12PM  15   MEETING; CORRECT?

03:12PM  16   A.   WHAT SPECIFICALLY ARE YOU REFERRING TO?  WHICH MEETING?

03:12PM  17   Q.   FAIR POINT.

03:12PM  18        SOME OF THE DUE DILIGENCE WORK YOU DID HAPPENED BETWEEN

03:12PM  19   THESE TWO MEETINGS THAT WE WERE TALKING ABOUT; RIGHT?

03:13PM  20   A.   THE DECEMBER 13TH AND THE JANUARY 10TH?

03:13PM  21   Q.   YEAH.

03:13PM  22   A.   I, I, I DON'T RECALL SPECIFICALLY WHAT HAPPENED IN BETWEEN

03:13PM  23   THE FIRST AND SECOND VERSUS THE SECOND AND THE THIRD.  SO

03:13PM  24   THAT'S -- BUT WE WERE WORKING THROUGH THAT PERIOD, ESPECIALLY

03:13PM  25   ONCE THE NEW YEAR STARTED.

03:13PM 1      THINGS GET SLOW AT THE END OF THE YEAR, RIGHT?  IT'S THE

03:13PM 2  HOLIDAYS.  PEOPLE NEED A BREAK.

03:13PM 3      SO I THINK WE KIND OF GAVE EVERYONE A LITTLE VACATION AT

03:13PM 4  THE END OF THE YEAR.

03:13PM 5  Q.  FAIR ENOUGH.

03:13PM 6      LET'S TAKE A LOOK AT EXHIBIT 7378, AND WE'LL SEE IF YOU

03:14PM 7  CAN GIVE DR. RABODZEY AS MUCH OF A BREAK AS SOME OF THE OTHER

03:14PM 8  FOLKS.

03:14PM 9  A.  OKAY.

03:14PM 10 Q.  AND THIS IS AN EMAIL ON CHRISTMAS EVE OF 2013 THAT -- IN

03:14PM 11 WHICH DR. RABODZEY EMAILS WITH YOU AND MR. KHANNA ABOUT GOING

03:14PM 12 UP TO THE PALO ALTO WALGREENS; CORRECT?

03:14PM 13 A.  YES.

03:14PM 14         MR. WADE:  MOVE THE ADMISSION OF 7378.

03:14PM 15         MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:14PM 16         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:14PM 17     (DEFENDANT'S EXHIBIT 7378 WAS RECEIVED IN EVIDENCE.)

03:14PM 18 BY MR. WADE:

03:14PM 19 Q.  IF YOU LOOK AT THAT EMAIL -- WELL, LET'S START IN THE

03:14PM 20 EMAIL BELOW THIS ON THE BOTTOM.

03:14PM 21     THIS GIVES YOU THE GREEN LIGHT TO MOVE FORWARD ON THE DUE

03:14PM 22 DILIGENCE; CORRECT?  THIS GIVES YOUR TEAM THE GREEN LIGHT?

03:15PM 23 A.  YES.

03:15PM 24 Q.  AND THIS IS SORT OF THE FORMAL KICK OFF OF A MORE FORMAL

03:15PM 25 DUE DILIGENCE PROCESS?

03:15PM 1    A.   IT APPEARS TO BE, YES.

03:15PM 2    Q.   AND IT LOOKS LIKE, IF YOU GO UP THE CHAIN, DR. RABODZEY

03:15PM 3    WITHIN A COUPLE OF HOURS IS ON HIS WAY TO THE WALGREENS IN

03:15PM 4    PALO ALTO; RIGHT?

03:15PM 5    A.   YES.

03:15PM 6    Q.   AND HE'S GOING UP THERE --

03:15PM 7    A.   HE LIVES IN PALO ALTO.

03:15PM 8    Q.   HE LIVES IN PALO ALTO?

03:15PM 9    A.   YEAH, IT'S NOT THAT FAR FROM --

03:15PM 10   Q.   THE RECORD WILL NOTE THAT HE WAS DOING IT ON HIS WAY HOME

03:15PM 11   ON CHRISTMAS EVE?

03:15PM 12   A.   HE WAS -- I BELIEVE HE WAS AT HOME AND JUST WENT --

03:15PM 13   PROBABLY HAD TO GO TO THE DRUG STORE.

03:15PM 14   Q.   OKAY.  BUT HE WAS ACTUALLY -- HE SAID HE'S GOING TO SEE IF

03:15PM 15   HE CAN GET A LITTLE INTEL; RIGHT?

03:15PM 16   A.   YEAH, HE'S LOOKING FOR INFORMATION ON THE SYSTEM, AND IT

03:16PM 17   LOOKS LIKE HE HAD SOME QUESTIONS, OR A LIST OF QUESTIONS.

03:16PM 18   Q.   AND ULTIMATELY -- AND HE ACTUALLY NOTES IN THIS EMAIL THAT

03:16PM 19   HE WAS GOING TO GET THE TEST, BUT HE COULDN'T GET THE TEST

03:16PM 20   BECAUSE I GUESS THEY WEREN'T DOING THEM ON CHRISTMAS EVE;

03:16PM 21   RIGHT?

03:16PM 22   A.   I GUESS NOT.

03:16PM 23   Q.   BUT HE HAD A CHANCE TO TALK TO SOMEONE THERE AND GOT SOME

03:16PM 24   FEEDBACK FROM HOW THE SYSTEM WORKED WHEN HE WENT TO THE

03:16PM 25   WALGREENS; RIGHT?

03:16PM   1    A.   YES.

03:16PM   2    Q.   AND AGAIN, THIS IS YOUR EFFORT TO TRY TO GATHER INTEL THAT

03:16PM   3    IS INDEPENDENT OF YOUR INTERACTIONS WITH THE COMPANY; RIGHT?

03:16PM   4    A.   YES.

03:16PM   5    Q.   AND MR. RABODZEY DIDN'T NOTIFY ANYBODY AT THE COMPANY THAT

03:16PM   6    HE WAS GOING, RIGHT, TO YOUR KNOWLEDGE?

03:16PM   7    A.   NO.

03:16PM   8    Q.   AND ALTHOUGH HE DIDN'T GET A TEST ON THIS OCCASION, DO YOU

03:16PM   9    RECALL THAT HE DID GET A TEST SUBSEQUENTLY?

03:16PM   10   A.   I DO RECALL THAT HE GOT A TEST SUBSEQUENTLY.

03:16PM   11   Q.   AND HE GOT A FINGERSTICK TEST; RIGHT?

03:16PM   12   A.   I BELIEVE THAT HE DID.

03:17PM   13   Q.   AND WE'LL LOOK AT SOME DOCUMENTS LATER.

03:17PM   14        BUT DO YOU RECALL THAT WERE THERE SOME DELAYS IN GETTING

03:17PM   15   THAT TEST; IS THAT RIGHT?

03:17PM   16   A.   I DON'T RECALL SPECIFICALLY.

03:17PM   17   Q.   OKAY.  AND YOU GOT A TEST AS WELL; CORRECT?

03:17PM   18   A.   YES.

03:17PM   19   Q.   AND YOUR TEST WAS A VENOUS DRAW; RIGHT?

03:17PM   20   A.   YES.

03:17PM   21   Q.   AND YOU UNDERSTOOD THAT THERANOS WAS PERFORMING VENOUS

03:17PM   22   DRAWS IN THIS TIME PERIOD; RIGHT?

03:17PM   23   A.   YES.

03:17PM   24   Q.   AND WHAT WAS YOUR UNDERSTANDING OF THE MACHINERY ON WHICH

03:17PM   25   THEY WERE PERFORMING VENOUS DRAWS?

03:17PM  1    A.   MY UNDERSTANDING IS THAT THEY WERE PERFORMING VENOUS DRAWS

03:17PM  2    ON THEIR PROPRIETARY TECHNOLOGY.

03:17PM  3    Q.   WELL, YOU UNDERSTOOD THAT THE BASIS -- THE FRAME OF THEIR

03:17PM  4    PROPRIETARY TECHNOLOGY WAS FINGERSTICK BASED TECHNOLOGY; RIGHT?

03:17PM  5    A.   THAT WAS ONE WAY TO ACQUIRE THE SAMPLE, BUT NOT THE ONLY

03:17PM  6    WAY TO ACQUIRE THE SAMPLE.

03:17PM  7    Q.   OKAY.  DID YOU EVER SPECIFICALLY ASK THE QUESTION OF

03:17PM  8    WHETHER THE VENOUS DRAWS WERE PERFORMED ON COMMERCIAL

03:17PM  9    ANALYZERS?

03:17PM 10    A.   I DON'T RECALL.

03:17PM 11    Q.   OKAY.  AND SO WE'RE CLEAR, THE FACT THAT THEY WERE

03:18PM 12    PERFORMING VENOUS DRAWS WAS NOT A SECRET IN THIS PROCESS;

03:18PM 13    RIGHT?

03:18PM 14    A.   NO.

03:18PM 15    Q.   AND, IN FACT, IT WAS IN THE WALGREENS PRESS RELEASES;

03:18PM 16    RIGHT?

03:18PM 17    A.   WE COULD REVIEW THAT IF YOU WOULD LIKE.  I DON'T HAVE

03:18PM 18    THAT.  I DON'T REMEMBER.  I DON'T HAVE THAT DOCUMENT.

03:18PM 19    Q.   WELL, WHY DON'T YOU TAKE A LOOK AT 1113.

03:18PM 20         ACTUALLY, I THINK THIS ONE IS IN EVIDENCE.  WE CAN PUT IT

03:18PM 21    RIGHT UP ON THE SCREEN.

03:18PM 22         AND DO YOU SEE ON THE BOTTOM THERE IT SAYS, "THE SAMPLES

03:18PM 23    ARE EITHER TAKEN FROM A TINY FINGERSTICK OR A MICRO-SAMPLE

03:18PM 24    TAKEN FROM TRADITIONAL METHODS, ELIMINATING THE NEED FOR LARGER

03:19PM 25    NEEDLES AND NUMEROUS VIALS OF BLOOD."

03:19PM 1         DO YOU SEE THAT?

03:19PM 2    A.   YES, I DO.

03:19PM 3    Q.   AND YOU UNDERSTOOD THE TRADITIONAL METHOD WAS VENOUS;

03:19PM 4    CORRECT?

03:19PM 5    A.   NO, I DON'T THINK THAT'S CORRECT.

03:19PM 6    Q.   YOU DIDN'T UNDERSTAND WHAT TRADITIONAL METHOD TO BE VENOUS

03:19PM 7    METHOD THERE?

03:19PM 8    A.   MY UNDERSTANDING OF THAT IS MICRO-SAMPLE TAKEN FROM

03:19PM 9    TRADITIONAL METHODS MEANS THAT YOU'RE TAKING MUCH LESS BLOOD

03:19PM 10   THAN IS TRADITIONALLY TAKEN USING VENOUS DRAW.  AND IF YOU TAKE

03:19PM 11   MUCH LESS BLOOD USING VENOUS DRAW, YOU CAN'T USE IT ON

03:19PM 12   CONVENTIONAL EQUIPMENT.

03:19PM 13   Q.   WELL, DID YOU ACTUALLY UNDERSTAND THAT THERANOS COULD TAKE

03:19PM 14   MUCH LESS BLOOD BY VENOUS DRAW AND USE IT ON COMMERCIAL

03:19PM 15   EQUIPMENT?

03:19PM 16   A.   I WOULD FIND THAT VERY TROUBLESOME BECAUSE THAT EQUIPMENT

03:19PM 17   IS FDA APPROVED TO BE USED WITH THE COLLECTION DEVICES THAT ARE

03:19PM 18   IN THE MARKET, THE LARGER VENOUS DRAWS.

03:19PM 19        SO I WOULD BE CONCERNED THAT IF SOMEONE WAS USING A

03:19PM 20   MICRO-SAMPLE TAKEN FROM TRADITIONAL METHODS AND USING THAT ON

03:19PM 21   CONVENTIONAL LAB EQUIPMENT, THAT WOULD BE CONCERNING TO ME.

03:20PM 22        THAT'S NOT HOW IT WAS APPROVED.

03:20PM 23   Q.   WELL, DID YOU HAVE -- I BELIEVE YOU TESTIFIED THAT YOU

03:20PM 24   READ THIS PRESS RELEASE; CORRECT?

03:20PM 25   A.   YES.

03:20PM 1    Q.   AND DID YOU ASK ANYONE ABOUT ANY OF THIS LANGUAGE WHEN YOU

03:20PM 2    WERE DOING YOUR DUE DILIGENCE?

03:20PM 3    A.   I DON'T RECALL SPECIFICALLY.

03:20PM 4    Q.   OKAY.  AND DO YOU RECALL HAVING DISCUSSIONS WITH THEM

03:20PM 5    ABOUT HOW THEY PERFORM THEIR VENOUS TESTING AT ALL?

03:20PM 6    A.   I, I DON'T RECALL SPECIFICALLY.  I DON'T RECALL.

03:20PM 7    Q.   BUT YOU KNEW THAT THEY WERE DOING VENOUS TESTING; RIGHT?

03:20PM 8    A.   YES.

03:20PM 9    Q.   OKAY.  AND THE -- DO YOU RECALL WHETHER YOUR VENOUS TEST

03:20PM 10   USED THE BUTTERFLY NEEDLE?

03:20PM 11   A.   I DON'T.

03:20PM 12   Q.   YOU DON'T RECALL?

03:20PM 13   A.   I DON'T.

03:20PM 14   Q.   DO YOU KNOW WHAT A BUTTERFLY NEEDLE IS?

03:21PM 15   A.   I BELIEVE IT'S A SMALLER NEEDLE.

03:21PM 16   Q.   UH-HUH.  AND YOU KNOW IT'S SOMETIMES USED IN PEDIATRIC

03:21PM 17   APPLICATIONS AND THE LIKE?

03:21PM 18   A.   YES.

03:21PM 19   Q.   AND YOU KNOW THAT OFTENTIMES THE AMOUNT OF BLOOD THAT

03:21PM 20   COMES OUT OF A BUTTERFLY NEEDLE IS SMALLER THAN THE MULTIPLE

03:21PM 21   VIALS OF BLOOD THAT COME OUT OF A TRADITIONAL NEEDLE?

03:21PM 22   A.   YES.

03:21PM 23   Q.   OKAY.  AND DO YOU UNDERSTAND THAT THE AMOUNT OF BLOOD THAT

03:21PM 24   COMES OUT OF A BUTTERFLY NEEDLE IS FREQUENTLY RUN ON COMMERCIAL

03:21PM 25   DEVICES?

03:21PM 1    A.  I DON'T KNOW THAT.

03:21PM 2    Q.  OKAY.  YOU DON'T KNOW THAT ONE WAY OR THE OTHER?

03:21PM 3    A.  I DON'T KNOW IF THOSE ARE APPROVED, IF THOSE DEVICES ARE

03:21PM 4    APPROVED TO BE RUN SPECIFICALLY ON A BUTTERFLY, A BUTTERFLY

03:21PM 5    COLLECTION DEVICE.

03:21PM 6    Q.  RIGHT.

03:21PM 7    A.  I WOULD HOPE -- IF I WERE THE LAB OPERATING THAT, I WOULD

03:21PM 8    HOPE THAT THEY WERE.

03:21PM 9    Q.  AND YOU UNDERSTAND THAT THIS IS A CLIA LAB; RIGHT?

03:21PM 10   A.  WHICH LAB ARE YOU REFERRING TO?

03:21PM 11   Q.  THE THERANOS LAB.

03:21PM 12   A.  YES.

03:21PM 13   Q.  AND THEY HAD TO MEET ALL OF THE REGULATORY REQUIREMENTS;

03:21PM 14   RIGHT?

03:21PM 15   A.  CORRECT.

03:21PM 16   Q.  OKAY.  LET'S TAKE A LOOK -- AND DO YOU UNDERSTAND THAT

03:22PM 17   SAME LANGUAGE IS IN THE NOVEMBER WALGREENS PRESS RELEASE AS

03:22PM 18   WELL?

03:22PM 19   A.  I DON'T, I DON'T RECALL THAT DOCUMENT, SO I DON'T HAVE --

03:22PM 20   I DON'T REMEMBER THAT DOCUMENT.

03:22PM 21   Q.  OKAY.  WELL, LET'S TAKE A LOOK AT 4036.

03:22PM 22   A.  OKAY.  I'VE GOT IT.

03:23PM 23   Q.  AND DO YOU RECOGNIZE THAT TO BE A PRESS RELEASE RELATING

03:23PM 24   TO THE WALGREENS EXPANSION INTO THE PHOENIX MARKET?

03:23PM 25   A.  I DO.

03:23PM  1              MR. WADE:  MOVE THE ADMISSION OF 4036.

03:23PM  2              MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:23PM  3              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:23PM  4          (GOVERNMENT'S EXHIBIT 4036 WAS RECEIVED IN EVIDENCE.)

03:23PM  5      BY MR. WADE:

03:23PM  6      Q.   AND, AGAIN, THE DATE HERE IS NOVEMBER 13TH, 2013.

03:23PM  7           DO YOU SEE THAT?

03:23PM  8           AND THIS IS THERANOS AND WALGREENS JOINT RELEASE; CORRECT?

03:23PM  9      A.   YES.

03:23PM  10     Q.   AND LET'S LOOK AT THE SECOND PARAGRAPH.

03:23PM  11          DO YOU SEE THERE IN THE SECOND LINE IT SAYS, "LAB TESTING

03:24PM  12     FROM A BLOOD SAMPLE AS SMALL AS A FEW DROPS"?

03:24PM  13     A.   YES.

03:24PM  14     Q.   IT DOESN'T SAY, ONLY A FEW DROPS, OR EVERY TEST IS ON A

03:24PM  15     FEW DROPS; RIGHT?

03:24PM  16     A.   YES.

03:24PM  17     Q.   AND IT THEN TALKS ABOUT THE MICRO-SAMPLES COLLECTED BY

03:24PM  18     CERTIFIED PHLEBOTOMISTS; CORRECT?

03:24PM  19     A.   IT SAYS THAT, YES.

03:24PM  20     Q.   AND THEN IT TALKS ABOUT IT CAN BE TAKEN FROM A FINGERSTICK

03:24PM  21     OR TRADITIONAL METHODS; RIGHT?

03:24PM  22     A.   YES.

03:24PM  23     Q.   AND THEN IT SAYS, "ELIMINATING THE NEED FOR LARGER

03:24PM  24     NEEDLES;" RIGHT?

03:24PM  25     A.   YES.

03:24PM   1    Q.   AND THAT'S BECAUSE THEY WERE USING BUTTERFLY NEEDLES;

03:24PM   2    CORRECT?

03:24PM   3              MR. LEACH:  OBJECTION.  FOUNDATION.

03:24PM   4              THE COURT:  SUSTAINED.

03:24PM   5    BY MR. WADE:

03:24PM   6    Q.   DO YOU RECALL SEEING A PICTURE IN THE SLIDE DECK THAT

03:24PM   7    MR. LEACH SHOWED YOU OF THE USE OF A BUTTERFLY NEEDLE AS A

03:24PM   8    THERANOS METHOD?

03:24PM   9    A.   I DON'T.

03:24PM  10    Q.   OKAY.  WE'LL GO THROUGH IT IN A BIT.

03:25PM  11         LET'S LOOK AT EXHIBIT 1400, WHICH I BELIEVE IS IN THE

03:25PM  12    GOVERNMENT'S BINDER.

03:25PM  13    A.   OKAY.

03:25PM  14    Q.   AND THIS WAS -- THIS IS THAT LIST OF QUESTIONS THAT

03:25PM  15    MR. LEACH -- THIS IS IN EVIDENCE, I BELIEVE.

03:25PM  16              MR. LEACH:  I THINK IT'S 1404.

03:25PM  17              MR. WADE:  LET'S PUT UP 1404.  IT INCLUDES THE CHAIN

03:26PM  18    IN 1400.

03:26PM  19    Q.   THIS IS THE LIST THAT MR. LEACH WAS ASKING YOU ABOUT;

03:26PM  20    CORRECT?

03:26PM  21    A.   I BELIEVE THAT'S CORRECT, YES.

03:26PM  22    Q.   AND IT HAS DIFFERENT CATEGORIES OF ITEMS THAT YOU WANT TO

03:26PM  23    EXPLORE?

03:26PM  24    A.   YES.

03:26PM  25    Q.   AND IS IT FAIR THAT THE CATEGORIES RELATE TO RISKS THAT

03:26PM 1    YOU WANT TO ASSESS IN CONSIDERING YOUR INVESTMENT?

03:26PM 2    A.   SOME OF THEM RELATE TO RISKS.

03:26PM 3    Q.   YOU WANTED TO ASSESS THE TECHNOLOGY RISK; IS THAT FAIR?

03:26PM 4    A.   YEAH.

03:26PM 5    Q.   AND YOU WANTED TO INVESTIGATE THE INTELLECTUAL PROPERTY

03:26PM 6    RISK; RIGHT?

03:26PM 7    A.   WELL, IT'S -- I SUPPOSE.  BUT IT'S ALSO A STRENGTH, RIGHT?

03:26PM 8    Q.   IT'S A STRENGTH IF THE INTELLECTUAL PROPERTY IS STRONG;

03:26PM 9    RIGHT?

03:26PM 10   A.   SO IT'S NOT ALL RISKS.  SOME OF THESE ARE RISKS AND SOME

03:26PM 11   OF THESE ARE JUST UNDERSTANDING THE NATURE OF THE BUSINESS SO

03:26PM 12   THAT WE CAN MAKE A MORE INFORMED INVESTMENT DECISION.

03:26PM 13   Q.   RIGHT.  AND, AND YOU SAID ABOUT EXPLORING ALL OF THOSE

03:27PM 14   THINGS, AND THAT'S WHY YOU LISTED THESE SEVEN CATEGORIES OF

03:27PM 15   QUESTIONS THAT YOU SENT TO THE TEAM; CORRECT?

03:27PM 16   A.   WELL, WE LISTED THESE JUST TO MAKE IT EASIER FOR THEM TO

03:27PM 17   PROCESS.  I THINK WE HAD OVER 60 QUESTIONS.  SO TRYING TO

03:27PM 18   ORGANIZE THEM SO THEY COULD PROCESS THEM.

03:27PM 19   Q.   RIGHT.  AND THESE QUESTIONS WERE COMING IN FROM -- YOU

03:27PM 20   ASKED ALL OF THE MEMBERS OF YOUR TEAM TO PROVIDE INPUT INTO ALL

03:27PM 21   OF THESE QUESTIONS; CORRECT?

03:27PM 22   A.   THAT'S CORRECT.

03:27PM 23   Q.   AND THIS WAS THE AMALGAMATION OF ALL OF THOSE DIFFERENT

03:27PM 24   INPUTS; RIGHT?

03:27PM 25   A.   YES.

| | | |
|---|---|---|
| 03:27PM | 1 | Q.   AND JUST SO WE'RE CLEAR, THERE'S NO -- THE PHARMACEUTICAL |
| 03:27PM | 2 | PARTNERSHIPS ARE NOT MENTIONED THERE; CORRECT? |
| 03:27PM | 3 | A.   THAT'S CORRECT. |
| 03:27PM | 4 | Q.   AND THE, THE DEPARTMENT OF DEFENSE PROJECTS ARE NOT |
| 03:27PM | 5 | MENTIONED THERE; CORRECT? |
| 03:27PM | 6 | A.   THAT'S CORRECT. |
| 03:28PM | 7 | Q.   AND THIS IS WHAT YOU WERE FOCUSSED ON HEADING INTO THAT |
| 03:28PM | 8 | MEETING; RIGHT? |
| 03:28PM | 9 | A.   YES. |
| 03:28PM | 10 | Q.   AND IT WAS, HOW MANY WOULD YOU SAY, 60 QUESTIONS OR SO? |
| 03:28PM | 11 | A.   I -- THAT'S MY GENERAL MEMORY. |
| 03:28PM | 12 | Q.   A LOT OF QUESTIONS THOUGH; RIGHT? |
| 03:28PM | 13 | AND SOME OF THESE YOU COULD DISCUSS FOR SOME TIME; RIGHT? |
| 03:28PM | 14 | A.   YES. |
| 03:28PM | 15 | Q.   AND YOU DISCUSSED THESE -- IN TERMS OF MS. HOLMES, YOU |
| 03:28PM | 16 | DISCUSSED THOSE FOR ABOUT AN HOUR AT THAT MEETING WITH HER IN |
| 03:28PM | 17 | JANUARY AT THE THERANOS FACILITY; RIGHT? |
| 03:28PM | 18 | A.   I DON'T REMEMBER THE ORDER OF QUESTIONS, BUT, YES, SOME OF |
| 03:28PM | 19 | THOSE. |
| 03:28PM | 20 | Q.   BUT SHE WAS PRESENT I THINK YOU SAID FOR ABOUT AN HOUR, |
| 03:28PM | 21 | HOUR AND A HALF AT THAT MEETING? |
| 03:28PM | 22 | A.   YES. |
| 03:28PM | 23 | Q.   OKAY.  AND AS YOU WERE PREPARING FOR THIS, YOU ALSO |
| 03:28PM | 24 | CONTINUED TO DO OTHER WORK OUTSIDE OF YOUR COMMUNICATIONS WITH |
| 03:29PM | 25 | THE COMPANY; RIGHT? |

03:29PM   1      A.   YES.

03:29PM   2      Q.   AND YOU WERE CONTINUING TO GATHER INTELLIGENCE

03:29PM   3      INDEPENDENTLY?

03:29PM   4      A.   YES.

03:29PM   5      Q.   RIGHT?

03:29PM   6           AND DO YOU RECALL THAT IN THIS PERIOD YOU ALSO STARTED TO

03:29PM   7      GATHER MARKET INTELLIGENCE SO THAT YOU COULD CONSTRUCT A MODEL?

03:29PM   8      A.   YES.

03:29PM   9      Q.   AND IF YOU LOOK AT 14021.

03:30PM  10      A.   OKAY.

03:30PM  11      Q.   DO YOU HAVE THAT IN FRONT OF YOU?

03:30PM  12      A.   I DO.

03:30PM  13      Q.   AND WHAT DO YOU RECOGNIZE THAT DOCUMENT TO BE?

03:30PM  14      A.   COULD I HAVE A MINUTE JUST TO READ THROUGH IT?

03:30PM  15      Q.   SURE.

03:30PM  16           (PAUSE IN PROCEEDINGS.)

03:30PM  17               THE WITNESS:  OKAY.

03:30PM  18      BY MR. WADE:

03:30PM  19      Q.   AS YOU'RE READING, MAYBE I CAN HELP YOU, DO YOU RECOGNIZE

03:30PM  20      THIS TO BE EARLY DISCUSSIONS ABOUT MARKET DATA THAT WOULD FEED

03:30PM  21      INTO A MODEL?

03:30PM  22      A.   YES.

03:30PM  23               MR. WADE:  MOVE THE ADMISSION OF 14021.

03:30PM  24               MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:30PM  25               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:30PM  1        (DEFENDANT'S EXHIBIT 14021 WAS RECEIVED IN EVIDENCE.)

03:31PM  2   BY MR. WADE:

03:31PM  3   Q.   AND THIS IS AN EMAIL CHAIN WITH YOU AND MR. KHANNA IN

03:31PM  4   JANUARY OF 2014; CORRECT?

03:31PM  5   A.   YES.

03:31PM  6   Q.   AND YOU ALL WERE WORKING TOWARDS BUILDING A MODEL EVEN

03:31PM  7   BEFORE THAT SECOND MEETING WITH THERANOS; CORRECT?

03:31PM  8   A.   I DON'T KNOW WHETHER WE WERE BUILDING A MODEL.  I, I

03:31PM  9   ACTUALLY DON'T THINK THAT WE WERE, BUT I THINK THIS IS MORE

03:31PM  10  TRYING TO UNDERSTAND THE SIZE OF THE MARKET.

03:31PM  11  Q.   AND MR. LEACH ASKED YOU SOME QUESTIONS ABOUT THE THERANOS

03:31PM  12  MODEL.

03:31PM  13       DO YOU RECALL THAT?

03:31PM  14  A.   I DO.

03:31PM  15  Q.   AND DO YOU RECALL YOUR MODEL ACTUALLY HAS A DIFFERENT

03:31PM  16  PHILOSOPHY IN TERMS OF HOW IT APPROACHED THE VALUATION FROM

03:31PM  17  THERANOS'S; CORRECT?

03:31PM  18  A.   UM, I JUST WANT TO MAKE SURE I ANSWER YOUR QUESTION.

03:31PM  19       WHAT -- I DON'T -- I DON'T -- I'M HAVING A HARD TIME

03:31PM  20  ANSWERING BECAUSE I'M NOT EXACTLY CLEAR WHAT I'M COMPARING IT

03:32PM  21  TO.

03:32PM  22  Q.   OKAY.  WELL, DO YOU UNDERSTAND THAT, SEPARATE AND APART

03:32PM  23  FROM THE THERANOS MODEL THAT MR. BALWANI SENT YOU, YOU ACTUALLY

03:32PM  24  DEVELOPED YOUR OWN PROPRIETARY MODEL; RIGHT?

03:32PM  25  A.   NO, NOT REALLY.

03:32PM 1        I MEAN, CAN I EXPLAIN?

03:32PM 2    Q.  WELL, LET ME ASK THIS, DO YOU RECALL GIVING TESTIMONY

03:32PM 3    BEFORE IN A DEPOSITION THAT YOU BUILT YOUR OWN PROPRIETARY

03:32PM 4    MODEL?

03:32PM 5           MR. LEACH:  OBJECTION, YOUR HONOR.  HEARSAY.

03:32PM 6           THE COURT:  SUSTAINED.

03:32PM 7           MR. WADE:  OKAY.

03:32PM 8           THE COURT:  SO YOU CAN ASK ANOTHER QUESTION.

03:32PM 9           MR. WADE:  YEAH, I'LL ASK ANOTHER QUESTION.  SURE.

03:32PM 10          THE COURT:  THAT'S HOW IT GOES.

03:32PM 11   BY MR. WADE:

03:32PM 12   Q.  DO YOU RECALL BUILDING YOUR OWN PROPRIETARY MODEL WITHIN

03:32PM 13   PFM TO PLACE A VALUATION ON THERANOS?

03:32PM 14   A.  YES.

03:32PM 15   Q.  OKAY.  AND IS THAT SOMETHING THAT YOU DO FREQUENTLY FOR

03:33PM 16   MAJOR INVESTMENTS?

03:33PM 17   A.  YES.

03:33PM 18   Q.  OKAY.  THE -- IN ADVANCE OF THIS MEETING IN JANUARY, DO

03:33PM 19   YOU RECALL ENCOURAGING DR. RABODZEY TO GO INTO THE MEETING AND

03:33PM 20   REALLY DRILL FOR INFORMATION TO MAKE SURE THAT HE UNDERSTOOD

03:33PM 21   EVERYTHING?

03:33PM 22   A.  I DON'T SPECIFICALLY REMEMBER.

03:33PM 23   Q.  BUT YOU RECALL HE WAS KIND OF YOUR TECHNICAL GUY ON THE

03:33PM 24   TEAM; RIGHT?

03:33PM 25   A.  HE WAS -- I WANTED -- HIS DOMAIN EXPERTISE, HIS SUBJECT

GROSSMAN CROSS BY MR. WADE                                        6543

```
03:33PM   1    MATTER EXPERTISE WAS IN DATA ANALYSIS, BIO STATISTICS, THE
03:33PM   2    STATISTICAL CALCULATIONS WITHIN THE FIELD OF BIO -- BIOLOGY.
03:34PM   3         AND SO HIS -- HE WAS -- HIS SKILL SET WAS WELL MATCHED TO
03:34PM   4    ANALYZING THE DATA THAT THEY HAD, THEIR PROPRIETARY, THEIR
03:34PM   5    PROPRIETARY DATA ON THEIR PROPRIETARY TECHNOLOGY.
03:34PM   6    Q.   SO YOU WANTED HIM TO FOCUS ON THE DATA?
03:34PM   7    A.   YES.
03:34PM   8    Q.   RIGHT?
03:34PM   9         AND THE TESTING MENU?
03:34PM  10    A.   YES.
03:34PM  11    Q.   DID YOU WANT HIM TO FOCUS ON THAT?
03:34PM  12    A.   I BELIEVE THOSE WERE THE AREAS THAT WE WANTED HIM TO FOCUS
03:34PM  13    ON, YES.
03:34PM  14    Q.   AND ALSO THE SCIENCE AND REGULATORY ISSUES AS WELL?
03:34PM  15    A.   YES.
03:34PM  16    Q.   AND LET'S, LET'S --
03:34PM  17    A.   HE WASN'T THE ONLY ONE FOCUSSED ON REGULATORY, BUT THAT
03:34PM  18    WAS CERTAINLY WITHIN THE REALM OF THE TYPES OF THINGS THAT HE
03:34PM  19    WAS LOOKING AT.
03:34PM  20    Q.   AND CAN YOU LOOK AT EXHIBIT 7390, PLEASE.
03:35PM  21    A.   OKAY.
03:35PM  22    Q.   AND DO YOU RECOGNIZE THIS TO BE AN EMAIL WHERE YOU WERE
03:35PM  23    GIVING SOME DIRECTION TO MR. -- DR. RABODZEY IN ADVANCE OF THAT
03:35PM  24    THERANOS MEETING?
03:35PM  25    A.   YES.
```

03:35PM 1          MR. WADE:  MOVE THE ADMISSION OF 7390.

03:35PM 2          MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:35PM 3          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:35PM 4      (DEFENDANT'S EXHIBIT 7390 WAS RECEIVED IN EVIDENCE.)

03:35PM 5          MR. WADE:  AND IF WE CAN JUST FOCUS ON THE TOP TWO

03:35PM 6  EMAILS.

03:35PM 7  Q.   THERE'S A LOGISTICAL COMPONENT WHERE YOU WERE JUST NOTING

03:35PM 8  THAT YOU WERE GOING TO MEET AT THE FACILITY; RIGHT?

03:35PM 9  A.   YES.

03:35PM 10  Q.   AND I TAKE IT THAT -- WE'VE LEARNED THAT HE LIVED IN

03:35PM 11  PALO ALTO AT THE TIME; RIGHT?

03:35PM 12  A.   YES.

03:35PM 13  Q.   AND THEN YOU ENCOURAGE HIM TO BRING YOUR A GAME.  YOU SAY,

03:35PM 14  "U ARE THE TECHNICAL EXPERT, NEED U TO BE REALLY BE SKEPTICAL

03:36PM 15  (BUT NOT AN A HOLE)"?  RIGHT?

03:36PM 16  A.   YES.

03:36PM 17  Q.   AND THAT WAS SORT OF THE MISSION THAT YOU SENT HIM DURING

03:36PM 18  THE DUE DILIGENCE PROCESS; IS THAT FAIR?

03:36PM 19  A.   YES.

03:36PM 20  Q.   AND DID HE FULFILL THE MISSION IN YOUR MIND?

03:36PM 21  A.   YES.

03:36PM 22  Q.   AND WHEN HE WENT INTO THAT MEETING AT THERANOS, DO YOU

03:36PM 23  RECOGNIZE THAT ABOUT HALF OF THE MEETING WAS ACTUALLY SPENT

03:36PM 24  WITH HIM AND MR. BALWANI GOING OVER DETAILED DATA?

03:36PM 25  A.   I DON'T RECALL THAT.

03:36PM  1    Q.   DO YOU RECALL A SIGNIFICANT PART WAS SPENT ON THAT?

03:36PM  2    A.   I DON'T RECALL IT WAS A SIGNIFICANT PART OF THE MEETING.

03:36PM  3    Q.   AND DO YOU RECALL YOU LEARNED -- WE TALKED ABOUT THE CPT

03:36PM  4    CODES.

03:36PM  5         DO YOU RECALL YOUR TESTIMONY ON THAT?

03:36PM  6    A.   YES.

03:36PM  7    Q.   AND THERE'S A DIFFERENCE BETWEEN A CPT CODE AND AN ASSAY;

03:37PM  8    RIGHT?

03:37PM  9    A.   YES.

03:37PM  10   Q.   AND SOMETIMES ONE ASSAY CAN BE A PART OF MANY DIFFERENT

03:37PM  11   CPT CODES; CORRECT?

03:37PM  12   A.   I BELIEVE THAT IS TRUE.

03:37PM  13   Q.   BECAUSE A CPT CODE RELATES TO BILLING; RIGHT?

03:37PM  14   A.   CORRECT.

03:37PM  15   Q.   AND IT'S USED IN THE HEALTH CARE INDUSTRY USUALLY RELATING

03:37PM  16   TO REIMBURSEMENT FROM HEALTH INSURANCE COMPANIES OR MEDICARE

03:37PM  17   AND MEDICAID; CORRECT?

03:37PM  18   A.   YEAH, IT RELATES TO -- THERE ARE CODES THAT ARE USED FOR

03:37PM  19   MEDICAL INVENTION, SURGICAL INTERVENTION, AND DIAGNOSTIC

03:37PM  20   INVENTIONS, AND THEY'RE GOVERNED BY THE AMERICAN MEDICAL

03:37PM  21   ASSOCIATION AND, YES, THEY'RE USED AS BILLING CODES FOR THE

03:37PM  22   GOVERNMENT.

03:37PM  23   Q.   RIGHT.  AND SO WHEN YOU MENTIONED, FOR EXAMPLE, A THOUSAND

03:37PM  24   CPT CODES, THAT'S NOT A THOUSAND ASSAYS, THAT'S A THOUSAND

03:37PM  25   DIFFERENT BILLING NUMBERS; RIGHT?

03:37PM  1    A.   WELL, I DIDN'T MENTION THAT.  MS. HOLMES MENTIONED THAT.

03:37PM  2    Q.   NO.  WHEN YOU TALKED ABOUT IT, I MEANT IN YOUR DIRECT

03:38PM  3    TESTIMONY; RIGHT?  YOU RECALL TALKING ABOUT CPT CODES WITH

03:38PM  4    MR. LEACH?

03:38PM  5    A.   I DO.  I DON'T REMEMBER SPECIFICALLY WHAT HE WAS ASKING,

03:38PM  6    BUT, YES.

03:38PM  7    Q.   OKAY.  AND IN THIS MEETING, DO YOU RECALL THAT -- BEING

03:38PM  8    INFORMED THAT THERANOS'S ANALYSIS WAS THAT 96 PERCENT OF THE

03:38PM  9    TESTING VOLUME WAS COVERED BY 70 ASSAYS?

03:38PM  10   A.   I DON'T RECALL THAT.

03:38PM  11   Q.   UM, DO YOU RECALL THAT THERANOS DISCUSSED THAT THEY HAD 70

03:38PM  12   SMALL SAMPLE ASSAYS THAT THEY WERE USING IN THEIR ROLLOUT AT

03:38PM  13   THAT POINT?

03:38PM  14   A.   I DON'T SPECIFICALLY RECALL THAT.

03:39PM  15   Q.   AND DO YOU RECALL THAT THERE WAS DISCUSSION WITHIN THIS

03:39PM  16   MEETING ABOUT HOW THEY HAD JUST OVER 200 ASSAYS THAT THEY WERE

03:39PM  17   OFFERING IN THE CLIA LAB?

03:39PM  18   A.   I, I DON'T REMEMBER SPECIFICALLY.

03:39PM  19        BUT I DO REMEMBER THAT THEY SAID THAT THEY COULD COVER

03:39PM  20   99.9 PERCENT OF THE TESTS THAT WERE DONE IN A REFERENCE LAB

03:39PM  21   SETTING.

03:39PM  22   Q.   WELL, WE'LL COME BACK TO THE PERCENTAGES.

03:39PM  23        BUT YOU RECALL THAT -- DO YOU RECALL A DISCUSSION ABOUT

03:39PM  24   THE FACT THAT TO GET FROM 96 PERCENT TO 99 PERCENT REQUIRED A

03:39PM  25   LOT OF ADDITIONAL ASSAYS AND THAT THE CORE ASSAYS, THE CORE 70

03:39PM  1    ASSAYS WOULD COVER 96 PERCENT OF THE TEST ACQUISITIONS BASED

03:39PM  2    UPON THERANOS'S DATA ANALYSIS?

03:39PM  3    A.   I DON'T RECALL THAT.

03:39PM  4    Q.   DO YOU RECALL WHEN YOU CAME OUT OF THAT MEETING, DO YOU

03:40PM  5    RECALL BEING IN A DEBRIEF MEETING WITH YOUR ANALYST TEAM ABOUT

03:40PM  6    THE THERANOS MEETING?

03:40PM  7    A.   I DON'T REMEMBER.

03:40PM  8    Q.   OKAY.  DO YOU RECALL -- BUT YOU INTERACTED WITH THE

03:40PM  9    MEMBERS OF THE ANALYST TEAM AFTER THE MEETING; RIGHT?

03:40PM 10    A.   YES.

03:40PM 11    Q.   AND DO YOU RECALL WHETHER DR. RABODZEY INFORMED YOU OF HIS

03:40PM 12    UNDERSTANDING THAT THERE WERE 70 SMALL SAMPLE ASSAYS THAT

03:40PM 13    THERANOS WAS USING AT THAT TIME?

03:40PM 14    A.   I DON'T, I DON'T RECALL.

03:40PM 15    Q.   DO YOU RECALL LEARNING AT SOME POINT THAT HE WAS OF THE

03:40PM 16    UNDERSTANDING THAT THERANOS WAS USING 70 SMALL SAMPLE ASSAYS AT

03:40PM 17    THAT TIME?

03:40PM 18    A.   I DON'T REMEMBER.

03:40PM 19    Q.   OKAY.  DO YOU RECALL WHETHER -- I THINK YOU TALKED ABOUT

03:41PM 20    YOUR WEBSITE REVIEW WHEN YOU FIRST LEARNED OF THE THERANOS

03:41PM 21    INVESTMENT.

03:41PM 22        DO YOU RECALL THAT?

03:41PM 23    A.   I MEAN, VAGUELY.

03:41PM 24    Q.   OKAY.  DO YOU KNOW WHETHER AFTER, WHEN YOU WERE MORE

03:41PM 25    SERIOUSLY CONSIDERING THE INVESTMENT, WHETHER YOU WENT BACK TO

03:41PM  1    THAT THERANOS WEBSITE AT ALL?

03:41PM  2    A.   I DON'T REMEMBER.

03:41PM  3    Q.   OKAY.  DO YOU RECALL WHETHER YOU EVER LEARNED THAT THERE

03:41PM  4    WERE 213 ASSAYS LISTED ON THE THERANOS WEBSITE AT THAT TIME?

03:41PM  5    A.   NO.

03:41PM  6    Q.   OKAY.  DO YOU RECALL EVER SEEKING A CURRENT TEST MENU

03:41PM  7    DURING THIS POINT IN TIME?

03:41PM  8    A.   YES, I DO RECALL THAT.

03:41PM  9    Q.   AND DO YOU RECALL GETTING THE TEST MENU THAT IDENTIFIED

03:41PM 10    213 ASSAYS?

03:41PM 11    A.   NO.

03:41PM 12    Q.   DO YOU REMEMBER DURING THIS MEETING THERE WAS DISCUSSION

03:42PM 13    OF THAT 8100 GOAL, THAT THEY WERE GOING TO ROLL OUT TO 8100

03:42PM 14    WALGREENS LOCATIONS; RIGHT?

03:42PM 15    A.   I DO REMEMBER.  THAT WAS ONE OF THE FIRST THINGS THAT THEY

03:42PM 16    TALKED ABOUT, THE SPEED OF THE ROLLOUT.

03:42PM 17    Q.   RIGHT.  AND THAT THAT WAS -- EXECUTION ON THAT WAS A

03:42PM 18    SIGNIFICANT ISSUE FOR THE BUSINESS AT THAT TIME; RIGHT?

03:42PM 19    A.   JUST TO BE CLEAR, THOUGH, WHAT MEETING ARE YOU REFERRING

03:42PM 20    TO AT THIS POINT?

03:42PM 21    Q.   I'M REFERRING TO THE JANUARY MEETING WITH DR. RABODZEY AND

03:42PM 22    THE -- AND YOUR OTHER ANALYSTS.

03:42PM 23    A.   SO THIS WAS THE -- YEAH, OKAY, THE JANUARY 10TH.

03:42PM 24    Q.   THE JANUARY 10TH MEETING.

03:42PM 25    A.   YEAH, YES.

03:42PM 1    Q.   AND DO YOU RECALL THAT THERE WAS DISCUSSION OF THE 8100

03:42PM 2    LOCATIONS?

03:42PM 3    A.   I DO.

03:42PM 4    Q.   AND AT THAT TIME YOU KNEW THAT THEY WERE ONLY IN A FEW;

03:42PM 5    RIGHT?

03:42PM 6    A.   YES.

03:42PM 7    Q.   DID YOU KNOW WHAT RETAIL EXPERIENCE THERANOS MANAGEMENT

03:43PM 8    HAD AT THAT TIME?

03:43PM 9    A.   I DID NOT.

03:43PM 10   Q.   DID YOU KNOW WHETHER ANY OF THE SENIOR MANAGEMENT HAD ANY

03:43PM 11   RETAIL MANAGEMENT?

03:43PM 12   A.   I DON'T RECALL.

03:43PM 13   Q.   OKAY.  YOU TALKED ABOUT -- I THINK YOU TALKED ABOUT THE --

03:43PM 14   HOW THE ANALYZERS -- THE VARIATION WITHIN ANALYZERS BEING THE

03:43PM 15   TOPIC THAT CAME UP.

03:43PM 16       DO YOU RECALL THAT?

03:43PM 17   A.   YES.

03:43PM 18   Q.   AND DO YOU RECALL THAT COMING UP SPECIFICALLY IN

03:43PM 19   CONNECTION WITH THE DISTRIBUTED ANALYZERS WILL NOT HAVE

03:43PM 20   VARIATION?

03:43PM 21   A.   I -- IT CAME UP AT MULTIPLE POINTS.  I DON'T -- I'M TRYING

03:43PM 22   TO THINK OF THE CONTEXT YOU'RE PUTTING THIS QUESTION IN.

03:43PM 23       MAYBE YOU CAN BE A LITTLE MORE SPECIFIC.

03:43PM 24   Q.   WELL, LET ME ASK IT THIS WAY, I BELIEVE YOU'VE TESTIFIED

03:44PM 25   THAT THERE WAS A PHASE I AND A PHASE II THAT WAS UNDER

03:44PM  1    DISCUSSION IN YOUR MEETINGS WITH THERANOS; CORRECT?

03:44PM  2    A.   YES.

03:44PM  3    Q.   AND YOU UNDERSTOOD THAT PHASE II WAS WHEN THERE WOULD BE

03:44PM  4    DISTRIBUTED ANALYZERS; RIGHT?

03:44PM  5    A.   WELL, THIS IS REFERRING TO THE RETAIL ROLLOUT.

03:44PM  6    Q.   RIGHT.

03:44PM  7    A.   THIS HAS NOTHING TO DO WITH THE HOSPITAL, THE PHYSICIAN

03:44PM  8    OFFICE BUSINESS, THE CLINICAL TRIAL BUSINESS.  THIS IS THE

03:44PM  9    RETAIL ROLLOUT, YEAH.

03:44PM  10   Q.   THIS IS THE PHASE II OF THE RETAIL ROLLOUT WHERE THEY WERE

03:44PM  11   GOING TO DISTRIBUTE ANALYZERS; RIGHT?

03:44PM  12   A.   YEAH.

03:44PM  13   Q.   AND YOU RECALL HAVING DISCUSSIONS WITH THERANOS IN THESE

03:44PM  14   MEETINGS; RIGHT?

03:44PM  15   A.   WE -- I DEFINITELY REMEMBER DISCUSSING THE PHASES OF THE

03:44PM  16   RETAIL ROLLOUT, YES.

03:44PM  17   Q.   RIGHT.  AND YOU UNDERSTOOD THAT IN THOSE MEETINGS THERE

03:44PM  18   WAS SOME DISCUSSION ABOUT REGULATORY ISSUES RELATING TO THAT;

03:44PM  19   RIGHT?

03:44PM  20   A.   I, I DON'T REMEMBER SPECIFICALLY WHAT REGULATORY ISSUES

03:44PM  21   YOU'RE HIGHLIGHTING, BUT REGULATORY IS OFTEN A TOPIC IN

03:45PM  22   MEETINGS LIKE THIS.

03:45PM  23   Q.   OKAY.  DO YOU RECALL IT BEING A TOPIC IN THIS MEETING AS

03:45PM  24   OPPOSED TO MEETINGS LIKE THIS?

03:45PM  25   A.   I DON'T.

03:45PM  1    Q.   OKAY.  BUT YOU DO RECALL LEARNING --

03:45PM  2    A.   WELL, ACTUALLY, I'M SORRY.

03:45PM  3         SO YOU'RE ASKING SPECIFICALLY ABOUT THE REGULATORY RISK

03:45PM  4    AROUND PHASE II?

03:45PM  5    Q.   YEAH.

03:45PM  6    A.   IS THAT THE QUESTION?

03:45PM  7    Q.   YEAH.

03:45PM  8    A.   YEAH, I DON'T REMEMBER SPECIFICALLY WHAT WE DISCUSSED

03:45PM  9    AROUND THE REGULATORY RISK OF PHASE II.

03:45PM  10   Q.   DO YOU RECALL AT THAT TIME PERIOD THAT THERANOS WAS TAKING

03:45PM  11   THE POSITION THAT THEY WERE NOT GOING TO ROLL OUT TO PHASE II

03:45PM  12   UNTIL THEY GOT FDA APPROVAL?

03:45PM  13        DO YOU RECALL THAT?

03:45PM  14   A.   THAT WAS NOT MY RECOLLECTION.

03:45PM  15   Q.   OKAY.  DO YOU RECALL LEARNING THAT SOMETIME AFTER THE

03:45PM  16   MEETING?

03:45PM  17   A.   I DON'T REMEMBER SPECIFICALLY WHEN THAT ISSUE CAME UP, BUT

03:45PM  18   I DO RECALL THAT IN 2014 THEY HAD NO PLANS TO DISTRIBUTE THE

03:45PM  19   MINILABS IN THE WALGREENS RETAIL SETTING, THAT IT WAS A HUB AND

03:46PM  20   SPOKE MODEL.  THAT WAS MY MEMORY OF THAT CONVERSATION.

03:46PM  21   Q.   ALSO KNOWN AS MORE OF A CENTRAL LAB MODEL; RIGHT?

03:46PM  22   A.   THOSE ARE YOUR WORDS.  I THINK OF IT AS A HUB AND SPOKE.

03:46PM  23   Q.   OKAY.  BUT THE IDEA IS THAT THE LAB EQUIPMENT IS IN ONE

03:46PM  24   LOCATION, AND THE SAMPLES COME TO THAT ONE LOCATION; CORRECT?

03:46PM  25   A.   CORRECT.

03:46PM 1    Q.   OKAY.  AND WHEN YOU WERE DOING YOUR ANALYSIS AND BUILDING

03:46PM 2    YOUR MODEL, YOU WERE DOING IT UNDER THE ASSUMPTION THAT IT

03:46PM 3    WOULD ONLY BE IN THAT PHASE I; CORRECT?

03:46PM 4    A.   OUR MODEL WAS BASED ON PHASE I, YES.

03:46PM 5    Q.   OKAY.  AND PHASE II, IF IT HAPPENED IN THE FUTURE, WOULD

03:46PM 6    BE UP SIDE; CORRECT?

03:46PM 7    A.   YES.

03:46PM 8    Q.   AND IN PHASE I, YOU UNDERSTOOD THAT AT THIS POINT IN

03:46PM 9    PHASE I THERANOS WAS JUST GETTING UP AND GOING IN THOSE HANDFUL

03:46PM 10   OF LOCATIONS; RIGHT?

03:46PM 11   A.   YES.

03:47PM 12   Q.   THEY WERE JUST STARTING THEIR OPERATIONS?

03:47PM 13   A.   YES.

03:47PM 14   Q.   OKAY.  AND THAT THERE WAS STILL A LEARNING PROCESS THAT

03:47PM 15   THEY WERE GOING THROUGH.

03:47PM 16        DO YOU RECALL?

03:47PM 17   A.   I DO.

03:47PM 18   Q.   OKAY.  AND THAT YOU'RE AWARE THAT AS COMPANIES GO THROUGH

03:47PM 19   A LEARNING PROCESS, SOMETIMES THEY CHANGE THEIR APPROACH TO

03:47PM 20   THINGS; RIGHT?

03:47PM 21   A.   YES.

03:47PM 22   Q.   OKAY.  AND, UM, THAT'S A NATURAL PART OF BUSINESS

03:47PM 23   SOMETIMES; ISN'T IT?

03:47PM 24   A.   YES, IT IS.

03:47PM 25   Q.   OKAY.  AND AS AN INVESTOR WHO INVESTS IN THE COMPANY, YOU

03:47PM  1    UNDERSTAND THAT SOMETIMES A COMPANY MAY CHANGE ITS APPROACH TO

03:47PM  2    SOMETHING, AND YOU MAY AGREE WITH IT OR DISAGREE WITH IT, BUT

03:47PM  3    ULTIMATELY THAT'S NOT YOUR CALL; RIGHT?

03:47PM  4    A.   YES.

03:47PM  5    Q.   AND YOU'VE SAID THAT THE FOCUS WAS ON PHASE I AND YOUR

03:47PM  6    MODEL WAS FOCUSSED ON PHASE I.

03:47PM  7         DO YOU RECALL LEARNING AT SOME POINT THAT ONE OF THE

03:48PM  8    ISSUES RELATING TO PHASE II WAS A REGULATORY ISSUE, AND THAT A

03:48PM  9    REGULATORY ISSUE NEEDED TO BE ADDRESSED BEFORE PHASE II COULD

03:48PM  10   COMMENCE?

03:48PM  11   A.   I DON'T REMEMBER SPECIFICALLY.

03:48PM  12   Q.   OKAY.  DO YOU RECALL IN THIS MEETING THERE WAS SOME

03:48PM  13   DISCUSSION ABOUT THE PRIOR ROUND OF FUNDRAISING THE COMPANY HAD

03:48PM  14   DONE?

03:48PM  15   A.   I DO.

03:48PM  16   Q.   AND DO YOU RECALL THAT THE VALUATION THAT THE COMPANY HAD

03:48PM  17   AT THAT TIME WAS $15 A SHARE?

03:48PM  18        DO YOU RECALL THAT?

03:48PM  19   A.   THAT WAS NOT MY RECOLLECTION.

03:48PM  20        THEY TOLD US THE VALUE WAS $17 A SHARE.

03:48PM  21   Q.   $17 A SHARE FOR -- IS WHAT THEY WERE OFFERING YOU IN YOUR

03:48PM  22   ROUND; RIGHT?

03:48PM  23   A.   C-2, YES.  THE C-2 ROUND.

03:48PM  24        THEY TOLD US THAT THE C-1 ROUND, WHICH HAD CLOSED I

03:49PM  25   THINK -- WELL, THEY TOLD US IT HAD CLOSED A WEEK OR SO, A

03:49PM 1      MONTH -- WITHIN A MONTH OF OUR FIRST MEETING.

03:49PM 2           THEY TOLD US THE C-1 ROUND HAD CLOSED AT 15 AND THEY WERE

03:49PM 3      RAISING THE PRICE OF THE C-2 BASED ON HOW WELL THE C-1 ROLLOUT

03:49PM 4      WAS GOING, AND THEY RAISED IT TWICE SINCE THE WALGREENS

03:49PM 5      PARTNERSHIP WAS ANNOUNCED IN SEPTEMBER.

03:49PM 6      Q.   I THINK WE'RE TALKING ABOUT THE SAME THING.  YOU

03:49PM 7      UNDERSTOOD THAT C-1 WAS BEING OFFERED, THE MOST RECENT C-1

03:49PM 8      OFFERING WAS AT $15 A SHARE?

03:49PM 9      A.   YES.

03:49PM 10     Q.   OKAY.  AND DID YOU ALSO UNDERSTAND THAT ONE OF THERANOS'S

03:49PM 11     COMMERCIAL PARTNERS CONVERTED EQUITY AT THAT POINT AT THAT

03:49PM 12     PRICE?

03:49PM 13     A.   I, I DID NOT.

03:49PM 14     Q.   OKAY.

03:49PM 15     A.   WELL, I SHOULD SAY I DON'T REMEMBER.

03:49PM 16     Q.   OKAY.  DO YOU RECALL WALGREENS MAKING AN EQUITY CONVERSION

03:49PM 17     AT THAT PRICE IN THAT TIMEFRAME?

03:49PM 18          MR. LEACH:  OBJECTION, YOUR HONOR.  ASKED AND

03:49PM 19     ANSWERED.

03:49PM 20          THE COURT:  WELL, IT WAS, BUT I'LL ALLOW HIM TO

03:49PM 21     ANSWER.

03:49PM 22     YOU CAN ASK YOUR QUESTION AGAIN.

03:50PM 23     BY MR. WADE:

03:50PM 24     Q.   DO YOU RECALL -- I BELIEVE YOU SAID YOU DIDN'T RECALL

03:50PM 25     LEARNING THAT, AND I WAS WONDERING IF THE FACT THAT IT WAS

03:50PM 1      WALGREENS, WHETHER THAT WOULD REFRESH YOUR RECOLLECTION.

03:50PM 2      A.   NO.

03:50PM 3      Q.   OKAY.  AND WHEN YOU CAME OUT OF THIS, THIS MEETING, YOU

03:50PM 4      HAD NOT YET MADE AN INVESTMENT DECISION; RIGHT?

03:50PM 5      A.   THAT'S CORRECT.

03:50PM 6      Q.   AND YOU CONTINUED IN YOUR DUE DILIGENCE PROCESS

03:50PM 7      THEREAFTER; CORRECT?

03:50PM 8      A.   YES.

03:50PM 9      Q.   AND ONE OF THE THINGS THAT YOU WANTED TO DO COMING OUT OF

03:50PM 10     THAT WAS GET ADDITIONAL INFORMATION FROM THE COMPANY THAT WOULD

03:50PM 11     HELP AID YOUR DUE DILIGENCE PROCESS; IS THAT RIGHT?

03:50PM 12     A.   YES.

03:50PM 13     Q.   AND SPECIFICALLY THERE WAS THE FINANCIAL MODEL THAT

03:50PM 14     MR. LEACH REFERRED TO.  HAD THAT BEEN DISPLAYED IN THE MEETING?

03:51PM 15     A.   YES.

03:51PM 16     Q.   AND THAT WAS AN EXCEL SPREADSHEET; RIGHT?

03:51PM 17     A.   I ACTUALLY DON'T KNOW WHAT IT WAS.  IT WAS ON THE LAPTOP.

03:51PM 18     Q.   OKAY.

03:51PM 19     A.   IT WAS A PRESENTATION ON A LAPTOP.

03:51PM 20     Q.   BUT IN ANY EVENT, YOU ASKED -- YOU CAME OUT OF THE MEETING

03:51PM 21     AND YOU ASKED THEM FOR A COPY OF THAT SPREADSHEET; RIGHT?

03:51PM 22     A.   YES.

03:51PM 23     Q.   AND THEY GAVE IT TO YOU; RIGHT?

03:51PM 24     A.   THEY DID GIVE IT TO US, YES.

03:51PM 25     Q.   AND YOU UNDERSTAND THAT A MODEL IS A PROJECTION OF FUTURE

03:51PM   1     POTENTIAL GROWTH OF A COMPANY; RIGHT?

03:51PM   2     A.   YES.

03:51PM   3     Q.   AND THAT SOMETIMES MODELS ARE ACCURATE AND SOMETIMES

03:51PM   4     THEY'RE INACCURATE; RIGHT?

03:51PM   5     A.   YES.

03:51PM   6     Q.   BUT YOU ALSO UNDERSTOOD THAT TO DO A MODEL, THERE ARE A

03:51PM   7     LOT OF FACTUAL ASSUMPTIONS THAT YOU NEED TO BUILD INTO THE

03:51PM   8     MODEL THAT GET TO THE ULTIMATE VALUATION OR ULTIMATE

03:51PM   9     PROJECTIONS; RIGHT?

03:51PM   10    A.   IF IT'S A COMPLICATED COMPANY, THERE ARE OFTEN MANY

03:52PM   11    ASSUMPTIONS.

03:52PM   12         IF IT'S A SIMPLE SINGLE PRODUCT COMPANY, THERE ARE OFTEN

03:52PM   13    VERY FEW ASSUMPTIONS.

03:52PM   14         SO IT JUST DEPENDS ON THE NATURE OF THE BUSINESS THAT

03:52PM   15    WE'RE LOOKING AT.

03:52PM   16    Q.   AND YOU ASKED TO SEE FROM THERANOS THEIR PROJECTIONS WITH

03:52PM   17    THE DATA THAT INCLUDED ALL OF THE UNDERLYING ASSUMPTIONS;

03:52PM   18    RIGHT?

03:52PM   19    A.   WE WANTED TO UNDERSTAND THE MODEL THAT THEY SHOWED US, THE

03:52PM   20    FINANCIAL FORECAST THAT THEY SHARED WITH US AND, MORE

03:52PM   21    IMPORTANTLY, HOW THEY GOT THERE.

03:52PM   22         WHAT WERE THE ASSUMPTIONS UNDERPINNING THOSE FINANCIAL

03:52PM   23    FORECASTS THAT THEY SHARED WITH US?

03:52PM   24    Q.   RIGHT.  AND DO YOU RECALL THAT ALL OF THOSE ASSUMPTIONS

03:52PM   25    WERE INCLUDED IN THE MATERIALS THAT THEY SHARED WITH YOU AFTER

03:52PM  1    THE MEETING?

03:52PM  2    A.   YES, I THINK THEY PROVIDED THAT MATERIAL TO US AFTER THAT

03:52PM  3    MEETING.

03:52PM  4    Q.   FAIR ENOUGH.

03:52PM  5         AND THEN ONE OF THE THINGS THAT DR. RABODZEY WANTED AS

03:52PM  6    WELL IS HE WANTED TO LOOK AT THE TESTING DATA; RIGHT?

03:52PM  7    A.   YES.

03:53PM  8    Q.   AND HE -- THERE HAD BEEN SOME TESTING DATA, MAYBE WE CAN

03:53PM  9    AGREE, THAT WAS SHOWN IN THE MEETING; RIGHT?

03:53PM  10   A.   YES.

03:53PM  11   Q.   AND THERE WERE SOME SLIDES THAT DEPICTED THE PERFORMANCE

03:53PM  12   OF CERTAIN ASSAYS ON CHARTS; RIGHT?

03:53PM  13   A.   YES.

03:53PM  14   Q.   AND DID YOU HAVE ENOUGH FAMILIARITY WITH THE CHARTS TO

03:53PM  15   UNDERSTAND THAT DATA?

03:53PM  16   A.   I DON'T -- MY MEMORY OF THAT MEETING IS THAT WE SPENT VERY

03:53PM  17   LITTLE TIME ON THAT DATA, AND THAT'S WHY WE ASKED FOR IT IN

03:53PM  18   FOLLOWUP SO THAT WE COULD REVIEW THAT MORE CAREFULLY WITH MORE

03:53PM  19   TIME.

03:53PM  20        SO THE ANSWER TO YOUR QUESTION IS -- I THINK THE ANSWER TO

03:53PM  21   YOUR QUESTION IS -- ACTUALLY, I DON'T KNOW WHAT THE ANSWER TO

03:53PM  22   YOUR QUESTION IS.  IS IT YES OR NO?  I DON'T KNOW.

03:53PM  23   Q.   I THINK THE ANSWER TO THE QUESTION IS THAT YOU DON'T

03:53PM  24   REMEMBER HOW MUCH TIME YOU SPENT GOING OVER THE DATA IN THE

03:53PM  25   MEETING.  IS THAT RIGHT?

03:53PM  1    A.   YES.

03:53PM  2    Q.   OKAY.  BUT YOU DO RECALL THAT A LOT OF DATA WAS PROVIDED

03:53PM  3    AFTER THE MEETING; RIGHT?

03:53PM  4    A.   YES.

03:53PM  5    Q.   AND IN THAT SLIDE DECK THAT MR. LEACH SHOWED YOU AND YOU

03:54PM  6    WENT THROUGH SOME OF THE SLIDES, DO YOU RECALL THAT THERE WAS

03:54PM  7    MAYBE ABOUT 150 PAGES OF DATA WITHIN, WITHIN THE MATERIALS THAT

03:54PM  8    WERE PROVIDED TO YOU?

03:54PM  9    A.   THAT, THAT SOUNDS REASONABLE.  I DON'T KNOW EXACTLY.

03:54PM  10   Q.   AND, AND WE'LL GO OVER IT.  I'M NOT GOING TO START IT AT

03:54PM  11   3:54 WHEN THIS JURY LEAVES.  WE CAN PICK UP ON THAT TOMORROW.

03:54PM  12        BUT ONE OF THE REASONS THAT DR. RABODZEY WANTED IT IS THAT

03:54PM  13   HE WANTED TO ASSESS, HE WANTED TO ASSESS THE ACCURACY AND

03:54PM  14   PERFORMANCE OF THERANOS'S ASSAYS; CORRECT?

03:54PM  15   A.   WELL, WE WANTED HIM TO ASSESS, TO ANALYZE THAT, YES.

03:54PM  16   Q.   MAYBE HE DIDN'T WANT TO DO IT, BUT YOU MADE MR. RABODZEY

03:54PM  17   DO IT; IS THAT FAIR?

03:54PM  18   A.   WELL, AT FIRST HE DIDN'T, YEAH.

03:54PM  19   Q.   OKAY.  AND YOU WANTED HIM TO TAKE ALL OF THAT TECHNICAL

03:54PM  20   DATA AND LOOK AT IT AND GET A READ ON THE PERFORMANCE OF THE

03:54PM  21   THERANOS TESTS; RIGHT?

03:54PM  22   A.   YES.

03:54PM  23   Q.   AND ONE OF THE THINGS THAT YOU, YOU TASKED HIM WITH OR

03:55PM  24   THAT HE VOLUNTEERED FOR WAS TO DO THAT AND TO LOOK AT OTHER

03:55PM  25   ASSAYS AND SEE HOW THERANOS PERFORMED VIS-A-VIS OTHER ASSAYS?

03:55PM  1    A.   I DON'T RECALL GIVING SPECIFIC INSTRUCTIONS ON OTHER

03:55PM  2    NON-THERANOS ASSAYS.

03:55PM  3    Q.   OKAY.  BUT YOU DO RECALL ASKING HIM TO REVIEW AND DRILL

03:55PM  4    DOWN THE DATA?

03:55PM  5    A.   YES.

03:55PM  6    Q.   AND DO YOU RECALL SENDING YOUR ANALYSTS OFF TO LOOK AT THE

03:55PM  7    REGULATORY ISSUES IN GREATER DETAIL?

03:55PM  8    A.   YES.

03:55PM  9    Q.   AND DO YOU RECALL THAT, IN CONNECTION WITH THAT, THEY

03:55PM 10    RETAINED EXPERTS FROM A CONSULTING FIRM TO CONSULT WITH ON

03:55PM 11    THAT?

03:56PM 12    A.   YES.

03:56PM 13    Q.   OKAY.  AND YOU ULTIMATELY GOT THE FEEDBACK ON THOSE

03:56PM 14    ISSUES, AND WE CAN TALK ABOUT THAT TOMORROW AS WELL.

03:56PM 15         DO YOU RECALL THAT WHEN YOU CAME OUT OF THAT SECOND

03:56PM 16    MEETING AND YOU STARTED TO DRILL IN ON THESE ISSUES -- IF I

03:56PM 17    COULD HAVE THE ELMO.  THANK YOU.

03:56PM 18         IN THIS PERIOD BETWEEN JANUARY 10TH AND YOUR INVESTMENT

03:56PM 19    DECISION, DO YOU RECALL THAT THERE WERE, THERE WERE ACTUALLY A

03:56PM 20    LOT OF ISSUES THAT AROSE THAT GAVE YOU CONCERN WITH RESPECT TO

03:56PM 21    WHETHER OR NOT YOU SHOULD INVEST IN THERANOS?

03:56PM 22    A.   I DON'T REMEMBER SPECIFICALLY, BUT -- SO I SUPPOSE -- I

03:57PM 23    GUESS THE ANSWER TO YOUR QUESTION IS THAT THERE WERE, THERE

03:57PM 24    WERE OPEN ITEMS ON THE DUE DILIGENCE LIST THAT WE NEEDED TO

03:57PM 25    COMPLETE.

03:57PM 1      SO, YES, WE HAD NOT FINISHED OUR WORK.

03:57PM 2   Q.   OKAY.  AND YOU CONTINUED TO DRILL IN ON THE MATERIALS AS

03:57PM 3   YOU WENT THROUGH IN THAT PERIOD FOLLOWING THAT; RIGHT?

03:57PM 4   A.   YES.

03:57PM 5           MR. WADE:  YOUR HONOR, THAT IS SORT OF EMBARKING

03:57PM 6   UPON A NEW SECTION THAT PROBABLY DOESN'T MAKE SENSE WITH THREE

03:57PM 7   MINUTES LEFT.

03:57PM 8           THE COURT:  LET'S TAKE OUR EVENING RECESS NOW,

03:57PM 9   LADIES AND GENTLEMEN.

03:57PM 10      LET ME REMIND YOU OF THE ADMONITION AGAIN, PLEASE.  DO NOT

03:57PM 11  DO ANY RESEARCH, DO NOT FORM ANY OPINION, DO NOT READ, LISTEN,

03:57PM 12  OR DISCUSS ANYTHING TO DO WITH THIS CASE.

03:57PM 13      I'LL ASK YOU IF THAT HAPPENED TOMORROW MORNING AGAIN.

03:57PM 14      LET ME REMIND YOU OF OUR SCHEDULE.  TOMORROW WE'LL START

03:57PM 15  AT 9:00 O'CLOCK.

03:57PM 16      SO I'LL ASK YOU TO RETURN, SIR, SUCH THAT YOU CAN CONTINUE

03:58PM 17  YOUR EXAMINATION AT 9:00 A.M.

03:58PM 18      LADIES AND GENTLEMEN, WE WILL BE TAKING A BREAK TOMORROW.

03:58PM 19  PLEASE RECALL -- I THINK IT'S FOR AN HOUR AND IT WILL PROBABLY

03:58PM 20  BE SOME TIME BETWEEN 10:30 AND 11:50, SOMETHING LIKE THAT, BUT

03:58PM 21  WE WILL NEED TO TAKE THAT BREAK.

03:58PM 22      AND THEN TOMORROW WE END AT 3:30.  3:30 IS THE END OF OUR

03:58PM 23  DAY TOMORROW.

03:58PM 24      AND I'LL KEEP YOU APPRISED OF ANY OTHER CHANGES IN

03:58PM 25  SCHEDULES.

03:58PM 1    I THINK THE OTHER ONE I HAVE A NOTE OF IS ON THE 29TH OF

03:58PM 2    NOVEMBER WE START AT 10:00 A.M., I BELIEVE.  I THINK I HAVE A

03:58PM 3    NOTE TO THAT EFFECT, BUT WE CAN UPDATE THAT AS WE MOVE ALONG.

03:58PM 4        SO THANK YOU VERY MUCH.  HAVE A GOOD EVENING.

03:58PM 5        THANK YOU, SIR.  YOU CAN STAND DOWN.  AND WE'LL SEE YOU

03:58PM 6    TOMORROW MORNING.

03:59PM 7        (JURY OUT AT 3:59 P.M.)

03:59PM 8        MR. WADE:  YOU CAN LEAVE ALL OF THE MATERIALS RIGHT

03:59PM 9    THERE, SIR.

03:59PM 10        THE COURT:  PLEASE BE SEATED.  THANK YOU.

03:59PM 11        SIR, YOU CAN LEAVE.  THANK YOU.

03:59PM 12        ALL RIGHT.  THANK YOU.  THE RECORD SHOULD REFLECT THAT OUR

03:59PM 13    JURY HAS LEFT FOR THE DAY.  OUR WITNESS HAS LEFT FOR THE DAY.

03:59PM 14        ALL COUNSEL REMAIN AND MS. HOLMES REMAINS.

03:59PM 15        MR. DOWNEY, DID YOU WANT TO TALK ABOUT SOMETHING?

03:59PM 16        MR. DOWNEY:  I DID IN PART WANT TO TOUCH ON A SEALED

03:59PM 17    PROCEEDING WE HAD EARLIER IN THE CASE.  I DON'T KNOW IF YOU

03:59PM 18    WANT TO DO THAT NOW OR IN SOME OTHER FORUM.

04:00PM 19        THE COURT:  OKAY.  WELL, LET'S DO THAT IN -- IS THIS

04:00PM 20    REGARDING A SEALED MATTER THAT WE --

04:00PM 21        MR. DOWNEY:  A SEALED MATTER THAT WE DEALT WITH IN

04:00PM 22    CAMERA EARLIER IN THE TRIAL.

04:00PM 23        THE COURT:  MAYBE WE CAN DO THAT.  WE'LL GO IN

04:00PM 24    CAMERA AGAIN IF IT TOUCHES ON THAT.

04:00PM 25        WOULD THIS INVOLVE MR. SCHENK THEN?

04:00PM 1      MR. DOWNEY:  I THINK IT WILL INVOLVE MR. SCHENK.  I

04:00PM 2  ALSO THINK IT WILL BE QUITE BRIEF.

04:00PM 3      THE COURT:  ALL RIGHT.  DO YOU HAVE TIME,

04:00PM 4  MR. SCHENK?

04:00PM 5      MR. SCHENK:  YES, YOUR HONOR.

04:00PM 6      MR. DOWNEY:  AND I'VE ALERTED MR. SCHENK OF THE

04:00PM 7  ISSUE.

04:00PM 8      THE COURT:  ANYTHING ELSE?

04:00PM 9      MR. DOWNEY:  NOTHING FROM THE DEFENSE, YOUR HONOR.

04:00PM 10     THE COURT:  OKAY.  ANYTHING FROM THE GOVERNMENT

04:00PM 11 BEFORE WE BREAK?

04:00PM 12     MR. LEACH:  ONLY, YOUR HONOR, IF WE CAN PLEASE GET

04:00PM 13 AN ESTIMATE OF THE REMAINDER OF THE CROSS FOR MR. GROSSMAN.

04:00PM 14   I THINK THE GOVERNMENT'S DIRECT WAS APPROXIMATELY 2 HOURS

04:00PM 15 AND 15 MINUTES, AND I THINK WE HAVE ALREADY EXCEEDED THAT IN

04:00PM 16 THE CROSS-EXAMINATION, AND IN THE INTEREST OF BEING ABLE TO

04:00PM 17 MANAGE THE REMAINING WITNESSES, I WAS JUST HOPING IF WE COULD

04:00PM 18 GET A TIME ESTIMATE.

04:00PM 19     THE COURT:  ALL RIGHT.

04:00PM 20     MR. WADE:  I'LL GO THROUGH MY MATERIALS.  I'LL GIVE

04:01PM 21 MR. LEACH AN EMAIL UPDATE ON THAT.

04:01PM 22     THE COURT:  WHAT CAN YOU TELL ME RIGHT NOW?

04:01PM 23     MR. WADE:  VERY LITTLE, YOUR HONOR.

04:01PM 24   I, OF COURSE, WANT TO BE ACCURATE.

04:01PM 25     THE COURT:  AND I WANT TO KNOW A LOT.  THAT'S A

04:01PM 1    PITY.

04:01PM 2        (LAUGHTER.)

04:01PM 3        THE COURT:  I DO WANT TO -- I NOTE THAT THERE HAVE

04:01PM 4    BEEN MANY QUESTIONS -- AND I'M NOT INTERFERING WITH YOUR

04:01PM 5    DEFENSE -- BUT THERE ARE MANY QUESTIONS THAT HAVE BEEN ASKED

04:01PM 6    AND ANSWERED ON DIRECT, AND I RECOGNIZE MUCH OF THAT IS

04:01PM 7    FOUNDATIONAL FROM YOUR PERSPECTIVE, AND I RESPECT THAT.

04:01PM 8        BUT SOME OF THE MATERIAL HERE, I JUST DON'T -- I'M NOT

04:01PM 9    ASKING YOU TO REVEAL WHAT YOUR DEFENSE IS, BUT YOU NEED TO DO

04:01PM 10   WHAT YOU HAVE TO DO.  THERE ARE TWO BINDERS HERE THAT ARE ABOUT

04:01PM 11   THREE INCHES THICK WITH MATERIALS.

04:01PM 12       SO WILL YOU FINISH WITH THIS WITNESS THIS WEEK?  LET'S

04:01PM 13   START THERE.

04:01PM 14       MR. WADE:  I BELIEVE I WILL FINISH WITH THIS WITNESS

04:02PM 15   TOMORROW, AND IT MAY WELL BE ANOTHER WITNESS IS NECESSARY.

04:02PM 16       I'LL ADVISE MR. LEACH MORE PRECISELY TO THAT.

04:02PM 17       THE COURT:  OKAY.

04:02PM 18       MR. WADE:  BUT OFTENTIMES THE INQUIRY OF COUNSEL IS

04:02PM 19   WHETHER THEY SHOULD HAVE A WITNESS READY.  MY GUESS, AS WE SIT

04:02PM 20   HERE TODAY, IS THAT THEY SHOULD HAVE ANOTHER WITNESS READY.

04:02PM 21   THEY MAY GET TO ANOTHER WITNESS TOMORROW.

04:02PM 22       THE COURT:  OKAY.  WHAT WE'VE EXPERIENCED IN THE

04:02PM 23   TRIAL IS CROSS-EXAMINATION FINISHING ABOUT A QUARTER TILL OR

04:02PM 24   ABOUT THE TIME WE'RE GOING TO CLOSE WITH 30 MINUTES LEFT TO

04:02PM 25   CLOSE FOR THE DAY.

04:02PM 1       I DON'T KNOW, CAN YOU TELL ME, IS THAT THE SITUATION WE'LL

04:02PM 2  BE IN TOMORROW?

04:02PM 3           MR. WADE:  IT'S CERTAINLY NOT BY DESIGN THAT WE

04:02PM 4  WOULD DO THAT, YOUR HONOR.

04:02PM 5       I DON'T KNOW IF MR. LEACH ANTICIPATES A REDIRECT THAT IS

04:02PM 6  LENGTHY OR NOT, BUT IT'S HARD FOR ME TO BE MORE PRECISE THAN I

04:02PM 7  HAVE BEEN APART FROM, YOU KNOW, WE'LL TRY TO FINISH WITH THE

04:02PM 8  WITNESS TOMORROW.

04:02PM 9           THE COURT:  WELL, WE KNOW WE FINISH TOMORROW AT

04:02PM 10  3:30, AND WE'VE GOT THIS HOUR BREAK.

04:02PM 11           MR. WADE:  I WAS TRYING TO THINK THROUGH -- AS THE

04:03PM 12  COURT WAS RAISING THE BREAK AND THE EARLY START, I WAS TRYING

04:03PM 13  TO THINK THROUGH EXACTLY HOW LONG IT WILL BE.

04:03PM 14       SO I TAKE IT WE HAVE ABOUT AN HOUR AND A HALF IN THE

04:03PM 15  MORNING, AND THEN WE'LL HAVE THREE AND A HALF HOURS IN THE

04:03PM 16  AFTERNOON.

04:03PM 17       WE SHOULD, WE SHOULD EASILY BE ABLE TO FINISH THE WITNESS

04:03PM 18  BY THEN.

04:03PM 19           THE COURT:  AND WHEN YOU SAY THAT, WHEN YOU SAY

04:03PM 20  "WE," IS THAT THE ROYAL WE OR IS THAT YOU?

04:03PM 21           MR. WADE:  THE ROYAL WE IN THIS CASE, AND I'LL REFER

04:03PM 22  TO MYSELF AND MR. LEACH.

04:03PM 23       SO I THINK THERE SHOULD BE MORE THAN ENOUGH TIME.

04:03PM 24           THE COURT:  OKAY.

04:03PM 25           MR. LEACH:  WE'LL HAVE ADDITIONAL WITNESSES READY

04:03PM 1      FOR TOMORROW, YOUR HONOR.

04:03PM 2                  THE COURT:  OKAY.  GREAT.

04:03PM 3          ALL RIGHT.  WHY DON'T I SEE, MR. DOWNEY, YOU AND

04:03PM 4      MR. SCHENK, AND WE'LL HAVE OUR REPORTER MEET YOU IN CHAMBERS.

04:03PM 5          MS. DIBBLE WILL ESCORT YOU BACK IN JUST A MOMENT.  THANK

04:03PM 6      YOU.

04:03PM 7              (SEALED PROCEEDINGS HELD IN CAMERA.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2

 3                    CERTIFICATE OF REPORTERS

 4

 5

 6

 7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

 8   UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

 9   CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16                    _____
                      IRENE RODRIGUEZ, CSR, CRR
17                    CERTIFICATE NUMBER 8076

18

19                    _____
                      LEE-ANNE SHORTRIDGE, CSR, CRR
20                    CERTIFICATE NUMBER 9595

21                    DATED:  NOVEMBER 16, 2021

22

23

24

25
```