# EXHIBIT 53

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

    UNITED STATES OF AMERICA,          )  CR-18-00258-EJD
6                                       )
                        PLAINTIFF,      )  SAN JOSE, CALIFORNIA
7                                       )
            VS.                         )  VOLUME 40
8                                       )
    ELIZABETH A. HOLMES,                )  NOVEMBER 30, 2021
9                                       )
                        DEFENDANT.      )  PAGES 7922 - 8213
10  _____        )

11
                  TRANSCRIPT OF TRIAL PROCEEDINGS
12           BEFORE THE HONORABLE EDWARD J. DAVILA
                  UNITED STATES DISTRICT JUDGE
13
    A P P E A R A N C E S:
14
    FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
15                         BY:  JOHN C. BOSTIC
                                JEFFREY B. SCHENK
16                         150 ALMADEN BOULEVARD, SUITE 900
                           SAN JOSE, CALIFORNIA 95113
17
                           BY:  ROBERT S. LEACH
18                              KELLY VOLKAR
                           1301 CLAY STREET, SUITE 340S
19                         OAKLAND, CALIFORNIA 94612

20       (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21

    OFFICIAL COURT REPORTERS:
22                              IRENE L. RODRIGUEZ, CSR, RMR, CRR
                                CERTIFICATE NUMBER 8074
23                              LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
24
         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25            TRANSCRIPT PRODUCED WITH COMPUTER

```
 1        A P P E A R A N C E S: (CONT'D)

 2

 3    FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                              BY:  KEVIN M. DOWNEY
 4                                 LANCE A. WADE
                                   KATHERINE TREFZ
 5                                 AMY SAHARIA
                                   SEEMA ROPER
 6                                 J.R. FLEURMONT
                                   RICHARD CLEARY
 7                                 ANDREW LEMENS
                                   PATRICK LOOBY
 8                            725 TWELFTH STREET, N.W.
                              WASHINGTON, D.C. 20005
 9
                              LAW OFFICE OF JOHN D. CLINE
10                            BY:  JOHN D. CLINE
                              ONE EMBARCADERO CENTER, SUITE 500
11                            SAN FRANCISCO, CALIFORNIA 94111

12    FOR DEFENDANT BALWANI:  ORRICK, HERRINGTON & SUTCLIFFE LLP
                              BY:  JEFFREY COOPERSMITH
13                                 AMANDA MCDOWELL
                              701 FIFTH AVENUE, SUITE 5600
14                            SEATTLE, WASHINGTON 98104

15
      ALSO PRESENT:          FEDERAL BUREAU OF INVESTIGATION
16                            BY:  ADELAIDA HERNANDEZ

17                            OFFICE OF THE U.S. ATTORNEY
                              BY:  LAKISHA HOLLIMAN, PARALEGAL
18                                 MADDI WACHS, PARALEGAL

19                            WILLIAMS & CONNOLLY
                              BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL
20
                              TBC
21                            BY:  BRIAN BENNETT, TECHNICIAN

22

23

24

25
```

1

2                        INDEX OF PROCEEDINGS

3       DEFENDANT'S:

4

5       **ELIZABETH HOLMES**
        CROSS-EXAM BY MR. LEACH                P. 7963
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXHIBITS

 2
                                    IDENT.      EVIDENCE
 3      GOVERNMENT'S:

 4      1675                                      7987
        5645                                      7989
 5      5704                                      8000
        5254                                      8024
 6      5663                                      8090
        5541                                      8099
 7      5652                                      8108
        5512                                      8112
 8      3970                                      8116
        5537                                      8166
 9      5538                                      8168
        5646                                      8177
10      5387G                                     8181

11


12


13      DEFENDANT'S:

14      14259                                     8212

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    SAN JOSE, CALIFORNIA                    NOVEMBER 30, 2021

 2              P R O C E E D I N G S

 3         (COURT CONVENED AT 8:31 A.M.)

 4         (JURY OUT AT 8:31 A.M.)

 5              THE COURT:  WE'RE ON THE RECORD IN THE HOLMES

 6    MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.

 7    WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.

 8         MR. LEACH IS NOT PRESENT.

 9         OKAY.  WE'RE ON THE RECORD OUTSIDE OF THE PRESENCE OF THE

10    JURY.  WE WERE GOING TO HAVE A HEARING THIS MORNING ABOUT THE

11    DEFENSE CONTINUED MOTION 1163, DOCUMENT 1163.

12         BUT I JUST WANTED TO ASK -- MR. FLEURMONT, I SEE YOU HERE.

13    THANK YOU FOR COMING IN THIS MORNING, SIR.  I HAD CONVERSATION

14    WITH YOUR COLLEAGUES YESTERDAY, AND THEY SUGGESTED THAT WE WAIT

15    UNTIL YOU COME IN.

16         I JUST WANTED TO ASK MS. VOLKAR, IS THIS A GOOD TIME TO DO

17    THIS NOW, OR SHOULD WE WAIT?

18              MS. VOLKAR:  THANK YOU, YOUR HONOR.

19         I'M HAPPY TO -- SO THE GOVERNMENT HAS NOT HAD THE TIME TO

20    COMPLETE THE RULE 106 REVIEW.  WE HAVE STARTED IT.  IT IS ABOUT

21    1300 PAGES OF TRANSCRIPT.  SO I HAVE NOT, CANDIDLY, COMPLETED

22    IT.

23         THAT BEING SAID, I AM MORE THAN HAPPY TO PICK UP THE

24    CONVERSATION WE ENDED WITH YESTERDAY, WHICH IS WHETHER SOME

25    PARTS ARE EITHER MOOT OR CUMULATIVE, AND I THINK THAT THAT
```

08:32AM 1    WOULD ACTUALLY HELP NARROW, EVEN IF YOUR HONOR WOULD BE WILLING

08:33AM 2    TO GIVE A TENTATIVE, OR WHICH SECTIONS YOU MIGHT PERMIT OR

08:33AM 3    GRANT OR DENY, IT WOULD, OF COURSE, NARROW THE WORK FOR THE

08:33AM 4    RULE 106 PURPOSES.  SO THAT DISCUSSION COULD BE HELPFUL THIS

08:33AM 5    MORNING.

08:33AM 6        BUT I MOSTLY WANTED TO LET THE COURT KNOW THAT I DID NOT

08:33AM 7    OVERNIGHT GET ALL OF THE RULE 106 COMPLETENESS WORK DONE.

08:33AM 8            THE COURT:  ALL RIGHT.  THANK YOU FOR THAT.

08:33AM 9        THE QUESTIONS THAT WE DISCUSSED IN YOUR ABSENCE,

08:33AM 10   MR. FLEURMONT, WERE QUESTIONS THAT I HAD ABOUT THE EXHIBITS AND

08:33AM 11   THE STATEMENTS IN THE EXHIBITS.

08:33AM 12       PLEASE RECALL THAT MY CONCERNS WERE TWO.  ONE, I THINK WE

08:33AM 13   TALKED ABOUT WHETHER OR NOT UNAVAILABILITY HAS BEEN SHOWN.  WE

08:33AM 14   TALKED ABOUT YOUR COLLEAGUE'S DECLARATION.  I THINK I TOLD YOU

08:33AM 15   I WANT SOMETHING MORE THAN THAT.

08:33AM 16       SO THAT WILL GIVE YOU -- YOU CAN TAKE YOUR MASKS OFF IF

08:33AM 17   YOU'RE COMFORTABLE WITH THAT.

08:33AM 18            MS. VOLKAR:  THANK YOU, YOUR HONOR.

08:33AM 19            MR. FLEURMONT:  THANK YOU, YOUR HONOR.

08:34AM 20            THE COURT:  SO THAT WAS THE ONE QUESTION ON THE

08:34AM 21   UNAVAILABILITY.

08:34AM 22       THE OTHER QUESTION THAT IS PERHAPS MOST PRESSING IS AS TO

08:34AM 23   THE EXHIBITS AND THE STATEMENTS, PLEASE RECALL THAT I WAS

08:34AM 24   SAYING, WELL, SHOULDN'T I KNOW THE QUESTION SO I CAN KNOW WHAT

08:34AM 25   THE CONTEXT IS.

08:34AM 1    I GUESS WHAT I NEED TO KNOW IS WHAT IS, AS TO EACH OF

08:34AM 2    THESE EXHIBITS AND THE COLLOQUIES THAT ARE CONTAINED IN THEM,

08:34AM 3    WHERE IS THE -- I JUST -- I DON'T SEE, AND I NEED SOME HELP AS

08:34AM 4    TO WHAT IS THE STATEMENT AGAINST INTEREST?  I DON'T SEE IT.

08:34AM 5        I THINK WHAT I'M SEEING HERE, AND I'M GIVING YOU THE

08:34AM 6    BENEFIT SO YOU CAN HELP, WHAT I SEE IS A FACT WITNESS.  I DON'T

08:34AM 7    SEE ANY PARTICULAR PENAL OR PECUNIARY INTEREST OR A STATEMENT

08:34AM 8    AGAINST AN INTEREST.  IT JUST -- I DON'T SEE IT.  SO THAT'S

08:34AM 9    WHAT I NEED SOME HELP ON.

08:34AM 10           MR. FLEURMONT:  ABSOLUTELY, YOUR HONOR.

08:34AM 11       OKAY.  SO I THINK IT'S PROBABLY BEST IF WE JUST WALK

08:35AM 12   THROUGH EACH OF THE EXHIBITS.

08:35AM 13           THE COURT:  SURE.

08:35AM 14           MR. FLEURMONT:  AND I CAN POINT TO THE COURT

08:35AM 15   STATEMENTS AGAINST INTEREST.

08:35AM 16           THE COURT:  SURE.  THANK YOU.

08:35AM 17           MR. FLEURMONT:  SO LET'S START WITH EXHIBIT A.

08:35AM 18       OKAY.  STARTING, YOUR HONOR, WITH EXHIBIT A, THE FIRST

08:35AM 19   QUESTION AND ANSWER, THIS IS STARTING AT PAGE 3 TO PAGE 4,

08:35AM 20   RELATES TO THE WALGREENS AND SAFEWAY RELATIONSHIP.

08:35AM 21           THE COURT:  RIGHT.

08:35AM 22           MR. FLEURMONT:  IF YOU LOOK AT PAGE 4, LINES 3

08:35AM 23   AND 4.

08:35AM 24           THE COURT:  THIS IS ECF PAGE 4?

08:35AM 25           MR. FLEURMONT:  YES, YOUR HONOR.

08:35AM 1          THE COURT:  RIGHT.

08:35AM 2          MR. FLEURMONT:  "I TOOK THE LEADERSHIP ROLE THERE IN

08:35AM 3   NEGOTIATIONS AND CONTRACTS."

08:35AM 4          AND THAT'S A STATEMENT SAYING HE TOOK A LEADERSHIP ROLE IN

08:36AM 5   REGARDS TO THE SAFEWAY AND WALGREENS CONTRACTS.

08:36AM 6          AND WALGREENS, AS YOU KNOW, IS ALLEGED IN PARAGRAPH 12(D)

08:36AM 7   OF THE INDICTMENT.

08:36AM 8          OKAY.  HE CONTINUES AND HE GETS ASKED A QUESTION "WHAT

08:36AM 9   ABOUT SAFEWAY?"  THAT'S AT LINE 12.

08:36AM 10         AT LINE 13, "YES, YEAH, SAME THING ON SAFEWAY."

08:36AM 11         THE COURT:  OKAY.  HOW DOES THAT -- TELL ME ABOUT

08:36AM 12  THAT.  SO HE'S SAYING IN LINES 2 -- LET'S GO BACK.

08:36AM 13         THE START OF THIS WAS ON LINE -- PAGE 3, "YOU MENTIONED

08:36AM 14  OVER TIME YOUR RESPONSIBILITIES GREW.  CAN YOU BRIEFLY EXPLAIN

08:36AM 15  WHAT GOT ADDED TO YOUR PORTFOLIO?"  THAT'S ON PAGE ECF 3.

08:36AM 16         AND THAT GOES DOWN.  HE STARTS TALKING ABOUT HARDWARE, AND

08:37AM 17  HE LEARNED ABOUT THE BUSINESS, HE WAS ON THE ROAD MEETING WITH

08:37AM 18  THE RETAIL BUSINESS.  "AND AS THAT EVOLVED, I TOOK THE

08:37AM 19  LEADERSHIP ROLE THERE IN NEGOTIATIONS AND CONTRACTS."

08:37AM 20         AND THAT STATEMENT, I GUESS, IS WHAT YOU'RE SAYING EXPOSES

08:37AM 21  HIM TO SOME LIABILITY AGAINST HIS INTEREST BECAUSE.

08:37AM 22         MR. FLEURMONT:  BECAUSE, YOUR HONOR, AS WE MENTIONED

08:37AM 23  YESTERDAY, WHEN RECEIVING THE SUBPOENAS FROM THE S.E.C. AND THE

08:37AM 24  SUBPOENAS FROM THE GRAND JURY, THERE WERE REQUESTS IN THERE

08:37AM 25  ABOUT THE ROLE IN THE RETAIL PARTNERSHIPS.

08:37AM 1      AND THE GOVERNMENT HAS ALLEGED, AS YOU KNOW, THAT, YOU

08:37AM 2  KNOW, WALGREENS, SAFEWAY ARE BOTH INVESTORS IN THIS CASE

08:37AM 3  THROUGH MISREPRESENTATIONS MADE TO WALGREENS AND SAFEWAY.

08:37AM 4      AND HE IS SAYING THAT HE TOOK A LEADERSHIP ROLE IN

08:37AM 5  NEGOTIATIONS IN THE CONTRACTS, AND IN NEGOTIATIONS OBVIOUSLY

08:38AM 6  STATEMENTS WERE MADE.

08:38AM 7        THE COURT:  AND BECAUSE OF THAT HIS LIABILITY IS --

08:38AM 8  A JURY COULD FIND THAT HE MADE MISREPRESENTATIONS TO WALGREENS

08:38AM 9  IN THE CONTEXT OF THOSE NEGOTIATIONS AND CONTRACTS?

08:38AM 10       MR. FLEURMONT:  YES, YOUR HONOR.  HE COULD FACE

08:38AM 11  CIVIL LIABILITY UNDER THE S.E.C.

08:38AM 12       THE COURT:  I SEE.  OKAY.

08:38AM 13      AND THEN THE QUESTION IS, I GUESS PHARMACIES, DO YOU MEAN

08:38AM 14  WALGREENS PRIMARILY?

08:38AM 15      YES.

08:38AM 16      AND THEN HE TALKS ABOUT SAFEWAY.

08:38AM 17       MR. FLEURMONT:  YES, YOUR HONOR.

08:38AM 18      THAT'S WHY WE INCLUDED THE FULL CONTEXT AGENCY BECAUSE YOU

08:38AM 19  CAN SEE EXACTLY WHAT RETAIL PARTNERSHIPS HE'S DISCUSSING AND

08:38AM 20  JUST TO GIVE THE COURT FULL CONTEXT FOR THE STATEMENTS.

08:38AM 21       THE COURT:  RIGHT.  AND THEN HE SAYS HE

08:38AM 22  TOOK RESPONSES -- THIS IS ON PAGE 5.  "YOU TOOK OVER

08:38AM 23  RESPONSIBILITY FOR THE SAFEWAY RELATIONSHIP MORE SO AFTER

08:38AM 24  MR. BURD LEFT SAFEWAY?"

08:38AM 25       MR. FLEURMONT:  YES, YOUR HONOR.

08:38AM  1          THE COURT:  AND HE SAYS, "PRETTY MUCH RIGHT AFTER

08:39AM  2   THAT."

08:39AM  3      SO THAT WOULD BE AFTER THAT CONTRACT RELATIONSHIP WAS

08:39AM  4   COMPLETED; RIGHT?

08:39AM  5          MR. FLEURMONT:  I DON'T THINK SO, YOUR HONOR.  THERE

08:39AM  6   WERE DEALINGS WITH SAFEWAY AFTER MR. BURD LEFT.

08:39AM  7          THE COURT:  BUT THE CONTRACT WAS COMPLETED.  WASN'T

08:39AM  8   THERE EVIDENCE -- ISN'T THERE EVIDENCE THAT YOUR CLIENT

08:39AM  9   NEGOTIATED THE CONTRACT WITH MR. BURD?

08:39AM 10          MR. FLEURMONT:  I'D HAVE TO LOOK BACK AT THE RECORD

08:39AM 11   JUST TO CONFIRM THAT, YOUR HONOR, BUT THERE WAS EVIDENCE IN THE

08:39AM 12   TRIAL ABOUT MS. HOLMES AND MR. BURD AND THEIR DISCUSSIONS

08:39AM 13   DURING THE CONTRACT.

08:39AM 14          THE COURT:  RIGHT.  IT SOUNDS LIKE THIS COLLOQUY IS

08:39AM 15   HE'S SAYING I TOOK OVER RESPONSIBILITIES OR INCREASED MY

08:39AM 16   RESPONSIBILITIES WITH SAFEWAY AT SOME POINT IN TIME.

08:39AM 17      BUT WHAT I'M CURIOUS ABOUT, IT SEEMS AT THAT POINT IN TIME

08:39AM 18   IS SUBSEQUENT TO THE ACTUAL FORMATION OF THE CONTRACT, THE

08:39AM 19   CONSUMMATION OF THE DEAL.

08:39AM 20      AND IF THAT'S THE CASE, THEN IF THE LIABILITY IS THE

08:39AM 21   NEGOTIATION OF THE CONTRACT LIKE WE WERE TALKING ABOUT WITH

08:40AM 22   WALGREENS, THEN THIS IS POST THAT, AND IT'S NOT PARTICULARLY

08:40AM 23   RELEVANT TO HIS -- AGAINST HIS INTEREST.

08:40AM 24          MR. FLEURMONT:  WELL, THEY'RE STATEMENTS MADE AFTER

08:40AM 25   THE CONTRACT, AND THERE WAS STILL A RELATIONSHIP AFTER THE

08:40AM 1 CONTRACT.  SO I DON'T -- I PUSH BACK A LITTLE BIT THAT AFTER

08:40AM 2 THE CONTRACT WAS SIGNED THAT ALL LIABILITY CEASES.

08:40AM 3   THE COURT:  ALL RIGHT.  YOU'RE SAYING THAT HIS

08:40AM 4 CONTINUED COMMUNICATIONS WITH SAFEWAY WERE -- IT'S A LITTLE ODD

08:40AM 5 BECAUSE IT'S ALMOST LIKE SAYING, WELL, IT'S AGAINST HIS

08:40AM 6 INTEREST BECAUSE, JUDGE, THAT'S EVIDENCE THAT -- YOU'RE NOT

08:40AM 7 SAYING THIS, THERE'S NO ADMISSION HERE.  LET ME BE STRAIGHT

08:40AM 8 ABOUT THIS.

08:40AM 9  BUT THAT COULD BE VIEWED BY THE JURY AS COCONSPIRATOR

08:40AM 10 CONDUCT IN THAT HE KEPT TALKING TO THEM, SAFEWAY, TO KEEP THEM

08:40AM 11 FOOLED -- I'LL JUST USE THAT WORD AS PART OF THE CRIMINAL

08:41AM 12 INTENT OF THAT -- AND HE WAS PART OF IT.

08:41AM 13  IS THAT WHAT YOU'RE SAYING?

08:41AM 14   MR. FLEURMONT:  NOT AT ALL, YOUR HONOR.

08:41AM 15  FIRST, THE PERSPECTIVE THAT WE'RE LOOKING AT HERE IS THE

08:41AM 16 PERSPECTIVE OF THE DECLARANT.  AND SO THE QUESTION IS WHETHER A

08:41AM 17 REASONABLE PERSON IN DECLARANT'S POSITION BELIEVED THAT

08:41AM 18 STATEMENTS WERE MADE THAT WERE SUBJECT TO EITHER CIVIL OR

08:41AM 19 CRIMINAL LIABILITY.  AND THEY CAN BE BOTH CIVIL OR CRIMINAL

08:41AM 20 LIABILITY.  SO WE'RE NOT JUST TALKING ABOUT WHAT A JURY WOULD

08:41AM 21 THINK IN A CRIMINAL CASE.

08:41AM 22   THE COURT:  SO HIS WORRY WOULD NOT BE IF THIS COMES

08:41AM 23 OUT, THEN I COULD BE FOUND AS A COCONSPIRATOR BECAUSE I WAS

08:41AM 24 CONTINUING THE RUSE, IF YOU WILL?

08:41AM 25   MR. FLEURMONT:  EXACTLY.  I DON'T THINK THAT THE

08:41AM 1    CONCERN.  IT'S KIND OF AN OBJECTIVE INQUIRY ABOUT WHETHER A

08:41AM 2    PERSON IN HIS POSITION IN AN S.E.C. DEPOSITION WHERE HE'S

08:41AM 3    GOTTEN SUBPOENAS ABOUT THIS TOPIC WOULD SAY SOMETHING THAT

08:41AM 4    WOULD -- HE SAID IT TRUTHFULLY.

08:41AM 5              THE COURT:  OKAY.

08:41AM 6              MS. VOLKAR:  YOUR HONOR, MAY I BE HEARD ABOUT THIS

08:42AM 7    PORTION BEFORE WE MOVE ON TO THE NEXT PORTION?

08:42AM 8              THE COURT:  YES.  LET ME LET MR. FLEURMONT FINISH

08:42AM 9    HIS COMMENT, AND THEN WE'LL DO THIS BACK AND FORTH.

08:42AM 10      MR. FLEURMONT, DO YOU WANT TO FINISH YOUR THOUGHT?

08:42AM 11             MR. FLEURMONT:  THAT IS IT.  THAT IS WHAT I HAVE TO

08:42AM 12   SAY ON THAT TOPIC.

08:42AM 13             THE COURT:  OKAY.

08:42AM 14             MS. VOLKAR:  THANK YOU, YOUR HONOR.

08:42AM 15      SO JUST FOCUSSING ON PAGES 3 TO 5 BECAUSE I THOUGHT IT

08:42AM 16   WOULD BE EASIEST TO DO IT IN CHUNKS, WHICH IS WHAT I BELIEVE

08:42AM 17   ALSO IS WHAT MR. FLEURMONT INTENDS TO DO.

08:42AM 18             THE COURT:  RIGHT.

08:42AM 19             MS. VOLKAR:  SO WHAT WAS SKIPPED OVER WAS ON PAGE 3

08:42AM 20   THERE'S A LOT OF DISCUSSION ABOUT THE SUPPLY CHAIN AND HOW

08:42AM 21   MR. BALWANI CAME TO LEARN MORE ABOUT THE SUPPLY CHAIN DURING

08:42AM 22   HIS EARLIER YEARS WITH THE COMPANY.

08:42AM 23      FIRST OF ALL, I'M NOT ENTIRELY SURE IF THAT IS DIRECTLY

08:42AM 24   INCULPATORY.  HE'S NOT SAYING I CREATED THE DEVICE.  IT COULD

08:42AM 25   CERTAINLY BE A PIECE IN THE PUZZLE ON THE WAY THERE.  SO I TAKE

08:42AM 1    COUNSEL'S POINT THAT MAYBE THIS IS A PIECE IN THE PUZZLE, BUT I

08:42AM 2    REPRESENT THAT THE GOVERNMENT HAS NOT COMPLETED ITS RULE 106

08:42AM 3    REVIEW YET.  I HAVE GOTTEN THROUGH SOME PORTIONS RELATED TO

08:42AM 4    THIS SECTION.  AND LATER ON IN THE SAME TESTIMONY MR. BALWANI

08:43AM 5    TALKS ABOUT HOW MS. HOLMES HAD CREATED THE INTERNAL WORKINGS OF

08:43AM 6    THE TSPU BEFORE HE EVEN JOINED THE COMPANY AND WAS USING IT FOR

08:43AM 7    PHARMA COMPANIES.

08:43AM 8        ALSO RIGHT AFTER TALKING -- LITERALLY THE NEXT ANSWER ON

08:43AM 9    PAGE 5 TALKING ABOUT WALGREENS AND SAFEWAY, THE QUESTIONER ASKS

08:43AM 10   WHAT ABOUT OTHER PHARMACIES?

08:43AM 11       AND HE SAID, I HAD NO ROLE IN THAT, MS. HOLMES HANDLED

08:43AM 12   THOSE.

08:43AM 13       SO IN TERMS OF WHEN WE GET TO RULE 106, ONE OF THE THINGS

08:43AM 14   THAT I REALIZED VERY QUICKLY IS THAT WE CAN GET INTO

08:43AM 15   CONFRONTATION CLAUSE ISSUES WHERE HE IS SAYING I HAD THESE

08:43AM 16   RESPONSIBILITIES AND SHE HAD THOSE RESPONSIBILITIES, AND, OF

08:43AM 17   COURSE, THAT'S CONSISTENT WITH THE GOVERNMENT'S THEORY WHICH IS

08:43AM 18   THAT THEY WERE COCONSPIRATORS AND THEY BOTH HAD ROLES REVOLVING

08:43AM 19   AROUND DIFFERENT PIECES.

08:43AM 20       TO GET TO THE SPECIFIC INCULPATORY STATEMENT THAT I HEARD

08:43AM 21   MR. FLEURMONT SAY ON PAGE 4, THE "I TOOK LEADERSHIP ROLE IN THE

08:43AM 22   NEGOTIATIONS AND CONTRACTS FOR WALGREENS," THIS IS PART OF WHY

08:44AM 23   I WANTED TO POINT OUT THE SORT OF CUMULATIVE NATURE TO THE

08:44AM 24   LIMITED BENEFIT THAT THIS TESTIMONY MIGHT BRING.

08:44AM 25       THEY'RE BOTH WALGREENS WITNESSES.  MR. MIQUELON AND

08:44AM 1     MR. JHAVERI, I THINK, TESTIFIED THAT MOST OF THEIR

08:44AM 2 CONVERSATIONS WERE WITH MR. BALWANI.  THEY ALSO TESTIFIED THAT

08:44AM 3 THEY HAD SOME CONVERSATIONS WITH MS. HOLMES.

08:44AM 4     WE'LL GET TO PFM AND BRIAN GROSSMAN LATER, BUT WE'LL HAVE

08:44AM 5 THE SAME SITUATION THERE WHERE SOMETIMES SOME OF THE INVESTORS

08:44AM 6 SPOKE MORE WITH ONE OF THE COCONSPIRATORS, AND OTHER INVESTORS

08:44AM 7 LIKE SAFEWAY SPOKE WITH THE OTHER COCONSPIRATOR.  THAT'S ALL

08:44AM 8 CONSISTENT WITH THE TESTIMONY TO DATE.

08:44AM 9     AGAIN, I GET BACK TO THE POINT THAT YOUR HONOR WAS TALKING

08:44AM 10 ABOUT WITH RESPECT TO SAFEWAY.  HE'S SAYING THAT THEY BOTH HAD

08:44AM 11 THE RELATIONSHIP AND THE KEY PART OF THE RELATIONSHIP, WHEN THE

08:44AM 12 STATEMENTS WERE MADE THAT INDUCED THE POTENTIAL INVESTOR TO

08:44AM 13 RELY AND PART WITH MONEY WHEN SAFEWAY PAID THE MONEY IN THE

08:44AM 14 CONTRACT, THAT RELATIONSHIP WAS OWNED BY MS. HOLMES.

08:45AM 15     SO I DO THINK THAT YOUR HONOR IS PICKING UP ON A KEY

08:45AM 16 DISTINCTION.

08:45AM 17     MR. BALWANI IS SAYING THAT HE TOOK OVER THE RELATIONSHIP

08:45AM 18 AT A LATER PERIOD OF TIME.  THAT'S NOT NECESSARILY THE CORE

08:45AM 19 PERIOD OF TIME WHEN STATEMENTS WERE MADE THAT WOULD INDUCE AN

08:45AM 20 INVESTOR OR A POTENTIAL INVESTOR TO PART WITH MONEY.

08:45AM 21     THE COURT:  OKAY.  THANK YOU.

08:45AM 22     MR. FLEURMONT:  JUST A BRIEF RESPONSE.

08:45AM 23     THE COURT:  SURE.

08:45AM 24     MR. FLEURMONT:  I THINK THAT'S A BIT OF TWO SHIPS IN

08:45AM 25 THE NIGHT PASSING RIGHT HERE.

08:45AM 1          WE'VE INCLUDED THE FULL QUESTION AND ANSWER SO THE COURT

08:45AM 2     COULD HAVE CONTEXT.  SO THE STATEMENTS ABOUT MANUFACTURING AND

08:45AM 3     PRODUCTION IN THE BEGINNING, THAT'S JUST PART OF HIS ANSWER TO

08:45AM 4     THE QUESTION, AND WE THINK IT WOULD BE INAPPROPRIATE FOR

08:45AM 5     RULE 106 DESIGNATIONS AS TO PORTIONS OF THE QUESTION AND ANSWER

08:45AM 6     THEY'RE NOT EVEN SAYING ARE INCULPATORY.  SO I JUST WANT TO

08:45AM 7     CLARIFY THAT.

08:45AM 8          THE COURT:  SURE.

08:45AM 9          MR. FLEURMONT:  AND I THINK PART OF THIS EXERCISE IS

08:45AM 10    BECAUSE THE COURT WANTS TO KNOW EXACTLY WHAT THEY THINK IS A

08:45AM 11    STATEMENT AGAINST INTEREST, AND WE'D HAVE TO REVIEW THE 106

08:45AM 12    DESIGNATIONS BASED ON -- I DON'T WANT TO PROLONG TIME BUT THE

08:46AM 13    POINT --

08:46AM 14         THE COURT:  NO, NO, NO.  I'M SMILING BECAUSE I SEE A

08:46AM 15    TENNIS MATCH HERE.  WE'RE GOING TO GO BACK AND FORTH WITH THIS,

08:46AM 16    WHICH WE'LL HAVE TO DO.  LET ME JUST -- LET ME BE SERIOUS.

08:46AM 17    IT'S AN IMPORTANT POINT TO YOUR CASE AND THE GOVERNMENT'S AS

08:46AM 18    WELL.  I DO THINK THERE ARE SOME 106 ISSUES THAT PROBABLY NEED

08:46AM 19    TO BE FLESHED OUT, AND THE TWO OF YOU ARE GOING TO HAVE TO MEET

08:46AM 20    AND CONFER AND LOOK AT THOSE, AND THEN WE'RE GOING TO HAVE

08:46AM 21    ANOTHER CONVERSATION ABOUT THAT AT SOME POINT.

08:46AM 22         MR. FLEURMONT:  ABSOLUTELY, YOUR HONOR.

08:46AM 23     I JUST WANT TO CLARIFY THAT JUST BECAUSE THERE'S A PORTION

08:46AM 24    IN A QUESTION AND AN ANSWER THAT SPEAKS TO AN ISSUE THAT WE'RE

08:46AM 25    NOT SAYING IS INCULPATORY DOES NOT MEAN THAT, ONE, THE

08:46AM 1    GOVERNMENT SHOULD BE ABLE TO DESIGNATE UNDER RULE 106 OTHER,

08:46AM 2    BECAUSE THAT IS KIND OF NOT REALLY AN ISSUE, BUT ALSO PART OF

08:46AM 3    THIS EXERCISE, I BELIEVE, IS TO KIND OF FIGURE OUT WHAT WE'RE

08:46AM 4    POINTING AT.

08:46AM 5        AND IF IT BECOMES A CASE THAT THE COURT THINKS THAT WE

08:46AM 6    SHOULD JUST INCLUDE EXACTLY WHAT WE'RE SAYING IS EXCULPATORY

08:46AM 7    AND SOME LANGUAGE AROUND FOR CONTEXT, THEN THAT MIGHT BE THE

08:47AM 8    DIRECTION THAT WE GO.

08:47AM 9        THE COURT:  RIGHT.

08:47AM 10       MR. FLEURMONT:  BUT I JUST WANT TO MAKE VERY CLEAR

08:47AM 11   THAT JUST BECAUSE THERE ARE OTHER STATEMENTS ABOUT OTHER TOPICS

08:47AM 12   THAT ARE RELATED IN THE QUESTION AND ANSWER THAT WERE -- IT'S

08:47AM 13   FINE FOR THE GOVERNMENT TO DESIGNATE 106 ON THAT ISSUE, AND

08:47AM 14   ALSO THAT WE, THAT WE -- IT'S NECESSARY FOR US TO GET THAT

08:47AM 15   PORTION OF THE STATEMENT.

08:47AM 16       THE COURT:  OKAY.  IT SOUNDS LIKE WE'RE GOING TO DO

08:47AM 17   SOME MORE WORK ON THAT WITH YOUR HELP, WITH YOUR HELP.  IT

08:47AM 18   SOUNDS THAT WAY.

08:47AM 19       AND 106, THE COMPANY'S FINANCIALS AND YOUR ROLE?

08:47AM 20       MR. FLEURMONT:  YES, YOUR HONOR.  I HAVE THAT PAGE

08:47AM 21   IN MY BAG ACTUALLY.

08:48AM 22       MS. VOLKAR:  YOUR HONOR, MAY I BE HEARD BRIEFLY FOR

08:48AM 23   THE RECORD BEFORE WE MOVE ON?

08:48AM 24       THE COURT:  SURE.

08:48AM 25       MS. VOLKAR:  I RESPECTFULLY DISAGREE WITH MY

08:48AM 1    COLLEAGUE'S STATEMENT ABOUT RULE 106.

08:48AM 2         MY UNDERSTANDING OF RULE 106 IS TO MAKE A COMPLETE ANSWER

08:48AM 3    OR PICTURE SO THAT TESTIMONY WON'T BE CONFUSING TO THE JURY.

08:48AM 4         I DON'T BELIEVE THAT THEY CAN CHERRY PICK CERTAIN ANSWERS

08:48AM 5    IF THEY'RE GOING TO READ THE FULL PORTION.  EVEN IF THEY

08:48AM 6    CONCLUDED -- OR EVEN IF THEY INCLUDED THE WHOLE ANSWER SO AS TO

08:48AM 7    GIVE A FULSOME ANSWER, THAT MEANS RULE 106 APPLIES TO ANY PARTS

08:48AM 8    OF THAT ANSWER OR WHAT THEY WOULD READ OUT LOUD TO THE JURY.

08:48AM 9         SO I JUST WANTED TO MAKE SURE THE RECORD IS CLEAR FROM

08:48AM 10   THE GOVERNMENT'S POSITION ON THAT.

08:48AM 11             THE COURT:  THANK YOU.

08:48AM 12             MR. FLEURMONT:  I THINK YOU UNDERSTAND OUR POSITION

08:48AM 13   SO I WON'T BELABOR THAT.

08:48AM 14        SO ON TO PAGE 6 OF EXHIBIT A.  THE PORTION THAT WE'RE

08:49AM 15   POINTING TO AND THAT SHOWS ONE RESPONSIBILITY OVER A RELEVANT

08:49AM 16   ALLEGATION IS THE FINANCIAL MODEL, AND I'M LOOKING AT PAGE 6,

08:49AM 17   LINES 17 THROUGH 20.

08:49AM 18        AND AS YOU CAN SEE THERE, THEY'RE TALKING ABOUT THE

08:49AM 19   FINANCIAL MODEL, HOW HE BUILT IT.

08:49AM 20        AND THEN HE SAYS, HE SAYS HE OWNED THE FINANCIAL MODEL.

08:49AM 21   AND THEN THERE'S A QUESTION ABOUT "BY SAYING YOU OWNED, YOU

08:49AM 22   MEAN YOU WERE THE PERSON RESPONSIBLE FOR THE COMPANY'S

08:49AM 23   FINANCIAL PROJECTIONS AS YOU'VE JUST DESCRIBED?"

08:49AM 24        HE SAYS, "FINANCIAL MODEL.

08:49AM 25        "QUESTION:  FINANCIAL MODEL?

08:49AM  1        "ANSWER:  YES."

08:49AM  2        AND THEN ON PAGE 7, LINES 18 THROUGH 21.

08:49AM  3        "SO I WAS USING THIS AS A PLANNING TOOL AND SOME OF THE

08:50AM  4   TABS IN THE MODEL WOULD SPIT OUT AS THE END RESULTS OR, YOU

08:50AM  5   KNOW, CHANGING ANY ASSUMPTIONS IN THE MODEL," SHOWING THAT HE

08:50AM  6   WAS THE ONE USING THE MODEL AS A FINANCIAL TOOL.

08:50AM  7        WE'VE HEARD TESTIMONY ABOUT THE FINANCIAL MODEL REFERRED

08:50AM  8   TO BY MR. GROSSMAN.  THE PROJECTIONS IN THE MODEL ARE

08:50AM  9   ESSENTIALLY ONE AND THE SAME BECAUSE MANY OF THE PROJECTIONS

08:50AM  10  AND THE NUMBERS IN THE PROJECTIONS ARE ACTUALLY IN THE

08:50AM  11  FINANCIAL MODEL, AND THIS PORTION HERE SHOWS THAT HE'S A PERSON

08:50AM  12  WHO OWNS THE MODEL, HE'S A PERSON THAT WORKS WITH THE

08:50AM  13  ASSUMPTIONS, AND TAKES RESPONSIBILITY FOR THAT MODEL.

08:50AM  14       AND GOING BACK TO THE POINT I MADE EARLIER ABOUT THE

08:50AM  15  SUBPOENAS HE RECEIVED FROM THE S.E.C., THOSE ASKED ABOUT

08:50AM  16  QUESTIONS ABOUT THE COMPANY'S FINANCIALS.

08:50AM  17            THE COURT:  AND BECAUSE HE CREATED THE MODEL, THAT

08:50AM  18  EXPOSES HIM -- THAT'S AGAINST HIS INTEREST BECAUSE?

08:51AM  19            MR. FLEURMONT:  SURE.  I GUESS FOR TWO REASONS,

08:51AM  20  YOUR HONOR.

08:51AM  21       ONE, A REASONABLE PERSON WHO CREATED A FINANCIAL MODEL AND

08:51AM  22  GAVE THAT MODEL TO INVESTORS KNOWING THAT THE INVESTORS WERE

08:51AM  23  USING THE MODEL AND SOME OF THEIR DECISIONS AND WOULD NOT SAY

08:51AM  24  AND KNOWING THAT THEY'RE IN AN S.E.C. DEPOSITION FACED WITH

08:51AM  25  LIABILITY ABOUT THE FINANCES OF THE COMPANY, WOULD NOT OUTRIGHT

08:51AM 1     SAY, "I OWN THIS, THIS WAS MINE, I'M THE PERSON WHO DID THE

08:51AM 2     ASSUMPTIONS," WITHOUT KNOWING THAT THEY COULD PUT THEM AT CIVIL

08:51AM 3     LIABILITY.

08:51AM 4              THE COURT:  DO WE NEED TO LOOK AT THE RECORD TO SEE

08:51AM 5     WHETHER OR NOT THERE'S A DISTINCTION BETWEEN THE MODEL BEING

08:51AM 6     SENT TO INVESTORS AS OPPOSED TO PROJECTIONS?

08:51AM 7              MR. FLEURMONT:  I DON'T THINK SO, YOUR HONOR.

08:51AM 8         I THINK THAT BECAUSE THE MODEL HAS THE SAME -- SOME OF THE

08:51AM 9     SAME NUMBERS AS THE PROJECTIONS, THAT ESSENTIALLY, PARTICULARLY

08:51AM 10    FOR THIS PART, THEY'RE ONE AND THE SAME.

08:51AM 11        BUT HE TAKES OWNERSHIP OVER THE MODEL, AND THAT'S THE

08:52AM 12    QUESTION THAT WE'RE CONCERNED WITH HERE.

08:52AM 13             THE COURT:  SO THE MODEL IS A PREDECESSOR IN TIME TO

08:52AM 14    THE PROJECTIONS AND THEN THE PROJECTIONS ARE WHAT WAS SENT TO

08:52AM 15    THE INVESTORS BY YOUR CLIENT?  IS THAT HOW THAT WORKED?

08:52AM 16             MR. FLEURMONT:  I DON'T THINK SO, YOUR HONOR.

08:52AM 17        I THINK THAT HE'S SAYING THAT HE MADE THE MODEL VERY EARLY

08:52AM 18    ON, AND PART OF THE MODEL IS LOOKING AT THE PROJECTIONS.

08:52AM 19             THE COURT:  OKAY.

08:52AM 20             MR. FLEURMONT:  SO I DON'T THINK THAT THAT'S

08:52AM 21    ENTIRELY RIGHT.

08:52AM 22        I THINK THAT THE FOCUS IS ON THE FACT THAT THE MODEL WAS

08:52AM 23    SENT TO INVESTORS, PARTICULARLY MR. GROSSMAN, AND THE FACT THAT

08:52AM 24    MR. BALWANI IS CLAIMING OWNERSHIP OVER THAT MODEL.

08:52AM 25             THE COURT:  OKAY.

08:52AM 1      MS. VOLKAR: THANK YOU, YOUR HONOR.

08:52AM 2      I THINK THERE ARE TWO KEY ISSUES WITH RESPECT TO

08:52AM 3 804(B)(3). WHEN IT COMES TO THE MODEL INSTRUCTION, AND THERE'S

08:52AM 4 ONE PAGE IN A LATER EXHIBIT THAT ALSO TOUCHES ON THIS TOPIC.

08:52AM 5 SO IN MY MIND I'M GOING TO GROUP THEM TOGETHER FOR A MOMENT.

08:53AM 6      FIRST, THE MODEL VERSUS PROJECTIONS IS KEY BECAUSE THE

08:53AM 7 WORD "PROJECTIONS" MEANT SOMETHING TO THE INVESTORS. IT WAS

08:53AM 8 PROJECTED REVENUE. THAT WAS THE TITLE OF THE SLIDE THAT MOST

08:53AM 9 REVENUES, THAT MOST INVESTORS, RDV, MR. MOSLEY, I BELIEVE --

08:53AM 10 I'M FORGETTING THE THIRD INVESTOR THAT SPECIFICALLY TALKED

08:53AM 11 ABOUT THE SLIDE, BUT MULTIPLE INVESTORS TALKED ABOUT -- AND

08:53AM 12 I'LL PUT PFM AND MR. GROSSMAN IN A SEPARATE CATEGORY BECAUSE

08:53AM 13 THEY BUILT THEIR OWN MODEL AND THAT WAS SLIGHTLY DIFFERENT SO I

08:53AM 14 WILL COME BACK TO THAT.

08:53AM 15      BUT MOST INVESTORS SAW FINANCIAL PROJECTIONS, AND THAT

08:53AM 16 MEANT SOMETHING. THAT WAS NOT "THIS IS A THEORETICAL WORLD

08:53AM 17 THAT COULD EXIST IF A BUNCH OF ASSUMPTIONS ARE MET." THAT WAS,

08:53AM 18 "THIS IS WHAT WE PROJECT THE REVENUE OF THE COMPANY TO BE."

08:53AM 19      NOW, THAT DISTINCTION IS KEY, BECAUSE WHAT MR. BALWANI IS

08:53AM 20 SAYING HERE IS ACTUALLY THAT HE HAD NOTHING TO DO WITH

08:53AM 21 PROJECTIONS, AND HE'S NOT EVEN SURE WHO CHANGED THE WORD OR THE

08:54AM 22 TITLE OF THE SLIDE TO BE PROJECTIONS, RATHER HE BUILT A MODEL

08:54AM 23 THAT HAD A BUNCH OF ASSUMPTIONS, AND HE'S NOT EVEN SAYING IN

08:54AM 24 THE LINES THAT MR. FLEURMONT READ, HE'S NOT EVEN SAYING HE

08:54AM 25 HIMSELF ENTIRELY BUILT THE MODEL. HE'S SHARING BLAME WITH

08:54AM  1    MULTIPLE INVESTORS, WALGREENS, SAFEWAY, EVEN DANISE YAM.

08:54AM  2         AND LATER HE TALKS ABOUT HOW BDT FOLKS MADE EDITS, AND

08:54AM  3    HE'S NOT SURE WHO CHANGED THE NAME AT SOME POINT TO

08:54AM  4    PROJECTIONS, BUT AGAIN, THAT IS A BIG DISTINCTION TO PEOPLE

08:54AM  5    WITH FINANCIAL BACKGROUND.

08:54AM  6         SO FIRST AND FOREMOST ON THE PENAL INTEREST, THERE'S NOT

08:54AM  7    NECESSARILY ANY DIRECT INCULPATORY STATEMENTS HERE, RATHER

08:54AM  8    THERE'S DEFLECTING AND SHARING BLAME THAT WE KNOW FROM GADSON

08:54AM  9    IS INAPPROPRIATE.

08:54AM 10         NOW, I WANT TO TALK ABOUT PFM BRIEFLY BEFORE WE MOVE --

08:54AM 11    BEFORE I MOVE TO THE SECOND POINT.

08:54AM 12         SO WITH PFM THAT ONE SPECIFIC INVESTOR, I KNOW

08:55AM 13    MR. FLEURMONT KEEPS REFERENCING THEM, BUT IT WAS ONE INVESTOR.

08:55AM 14    THEY WORKED WITH MR. BALWANI TO TAKE SOME OF THOSE BASE

08:55AM 15    ASSUMPTIONS AND BUILD THEIR OWN MODEL, WHICH AGAIN, WAS WHAT IS

08:55AM 16    THE RESPONSIBILITIES FOR THIS COMPANY.

08:55AM 17         AND THAT IS NOT WHAT IS THE COMPANY PROJECTING ITS REVENUE

08:55AM 18    TO BE.  THAT'S GIVEN THE FIELD AND THE SPACE THAT THEY'RE

08:55AM 19    ENTERING, IF WE BUILT -- AND I THINK MR. GROSSMAN TESTIFIED

08:55AM 20    ABOUT THREE DIFFERENT SCENARIOS THAT THEY BUILT OUT IN TERMS OF

08:55AM 21    WHAT POSSIBLE GROWTH THERE WAS FOR THIS COMPANY.

08:55AM 22         AND MAYBE BECAUSE I MYSELF AM NOT A FINANCIER, I'M NOT

08:55AM 23    NECESSARILY SEPARATING THE TWO VERY WELL.  BUT ONE IS HERE IS

08:55AM 24    EXPECTED PROJECTED REVENUE, MAYBE WE'LL FALL SHORT, BUT WE'RE

08:55AM 25    NOT GOING TO FALL A BILLION DOLLARS SHORT, AND HERE'S A MODEL

08:55AM 1    WHICH IS JUST ABOUT WHAT IS THE SPHERE, WHAT IS THE SPACE IN

08:55AM 2    THE MARKET THAT THIS COMPANY IS IN, AND, THEREFORE, WHAT IS THE

08:55AM 3    FULLEST POTENTIAL?  NOT WHAT DO WE EXPECT, BUT WHAT IS

08:56AM 4    POSSIBLE?  AND THAT'S KIND OF ONE OF THE KEY DIFFERENCES

08:56AM 5    BETWEEN THE TWO OF THEM.

08:56AM 6         AND PFM DID WORK WITH MR. BALWANI ON THAT.  WE HEARD

08:56AM 7    MR. GROSSMAN'S TESTIMONY ABOUT THAT.  AGAIN, I DON'T KNOW IF

08:56AM 8    THAT IS PER SE IN DISPUTE AND THERE IS ALREADY TESTIMONY ON

08:56AM 9    THAT TOPIC.

08:56AM 10        THE SECOND POINT THAT I WANTED TO MAKE THAT CAUSES MORE

08:56AM 11   CONCERN ABOUT THIS PARTICULAR TOPIC IS THAT THIS PART, AND THE

08:56AM 12   KEY PART THAT I THINK THEY WANT, I BELIEVE IT IS EXHIBIT B.  I

08:56AM 13   KNOW WE HAVE NOT GOTTEN THERE YET, BUT I BELIEVE IT'S PORTIONS

08:56AM 14   OF EXHIBIT B.  426 IS THE PART WHERE IT SAYS THAT MS. HOLMES

08:56AM 15   DIDN'T HAVE ANY KNOWLEDGE OF THE PROJECTIONS OR THE MODEL, OR

08:56AM 16   DIDN'T ADD ANY EDITS TO IT.

08:56AM 17        AND THE PART OF 804(B)(3) THAT REQUIRES TRUSTWORTHINESS OR

08:56AM 18   CORROBORATION, THAT PART IS PARTICULARLY CONCERNING TO THE

08:56AM 19   GOVERNMENT BECAUSE WE HAVE TEXT MESSAGES WHERE MR. BALWANI IS

08:56AM 20   ASKING MS. HOLMES ABOUT THE SAME PROJECTION, THE SAME MODEL,

08:57AM 21   AND THEY'RE TALKING TO EACH OTHER, AND SHE SAYS, I CAN GET

08:57AM 22   COMFORTABLE WITH IT AND I CAN ESSENTIALLY UNDERSTAND IT AND

08:57AM 23   REPEAT IT TO INVESTORS.

08:57AM 24        AND THERE'S NO TESTIMONY FROM MR. GROSSMAN.  THERE'S NO

08:57AM 25   TESTIMONY FROM ANY OTHER INVESTOR THAT MS. HOLMES DIDN'T

08:57AM 1    UNDERSTAND OR KNOW HOW TO TALK ABOUT THIS MODEL.

08:57AM 2        SO THERE'S SIMPLY NOTHING TO CORROBORATE OR INDICATE

08:57AM 3    TRUSTWORTHINESS OF WHAT I WOULD IMAGINE IS THE KEY PART ABOUT

08:57AM 4    THE FINANCIAL STUFF THAT THEY WANT.

08:57AM 5        SO, AGAIN, I KNOW IT'S TWO SLIGHTLY DIFFERENT THINGS.  BUT

08:57AM 6    THERE'S THE PART WHERE IT'S FINANCIAL PROJECTIONS VERSUS MODELS

08:57AM 7    AND MR. BALWANI IS DEFLECTING BLAME THERE, NOT ACTUALLY OWNING

08:57AM 8    THAT HE IS THE ONE WHO CREATED PROJECTIONS PER SE.

08:57AM 9        HE'S TALKING ABOUT HIS PART IN CREATING A MODEL, THAT'S

08:57AM 10   NOT WHAT WAS SAID TO INVESTORS, THAT'S NOT ABOUT THE STATEMENTS

08:57AM 11   THAT WERE MADE, AND THEN THERE'S THE LATER PART WHERE IT SAYS

08:57AM 12   MS. HOLMES HAD NO KNOWLEDGE IN IT, AND THAT PART SIMPLY DOESN'T

08:57AM 13   HAVE ANY CORROBORATION.

08:57AM 14          THE COURT:  OKAY.  THANK YOU.

08:57AM 15          MR. FLEURMONT:  JUST A COUPLE OF POINTS.

08:57AM 16   ON THE FINANCIAL MODEL, THE FINANCIAL MODEL AS

08:58AM 17   MR. GROSSMAN CAME -- AS CAME OUT DURING MR. GROSSMAN'S

08:58AM 18   TESTIMONY, THAT DROVE THE VALUATION, RIGHT?  AND SO THAT WAS

08:58AM 19   SOMETHING THAT WAS IMPORTANT.

08:58AM 20       IN MR. GROSSMAN'S MODEL, THERE IS A TAB THAT HAS

08:58AM 21   MR. BALWANI'S FINANCIAL MODEL IN IT, SO IT'S PART OF HIS MODEL

08:58AM 22   AS WELL.

08:58AM 23       ON CORROBORATION, THE RULE REQUIRES CORROBORATING

08:58AM 24   CIRCUMSTANCES THAT INDICATE TRUSTWORTHINESS.

08:58AM 25       ON MS. VOLKAR'S LAST POINT, WE HAVE TESTIMONY FROM

08:58AM 1    GENERAL MATTIS THAT WHEN THE MODEL WAS DISCUSSED IN THE

08:58AM 2    MEETINGS, IT WAS DISCUSSED BY MR. BALWANI, NOT MS. HOLMES.

08:58AM 3        AND WE HAVE THAT SAME EXACT TESTIMONY IN MR. BALWANI'S

08:58AM 4    S.E.C. DEPOSITION THAT SAYS THAT WHEN HE WENT TO THE BOARD, I

08:58AM 5    BELIEVE ON THE VERY NEXT PAGE -- YES, THE VERY NEXT PAGE -- I'M

08:58AM 6    LOOKING AT PAGE 8, LINES 1 THROUGH 6 WHERE HE DISCUSSES WHEN

08:58AM 7    HE'S AT THE BOARD SHARING THE FINANCIAL MODEL WITH THE BOARD

08:59AM 8    ANY ASSUMPTIONS, NOT MS. HOLMES.

08:59AM 9        AND I THINK WE SHOULD ALSO -- I NEGLECTED TO SAY, OR I'M

08:59AM 10   NEGLECTING TO SAY THAT WHEN LOOKING FOR CORROBORATING

08:59AM 11   CIRCUMSTANCES THAT INDICATE TRUSTWORTHINESS, TYPICALLY IN CASES

08:59AM 12   WHERE YOU HAVE THE STATEMENT AGAINST INTEREST EXCEPTION, WE'RE

08:59AM 13   TALKING ABOUT STATEMENTS MADE TO OTHER WITNESSES, STATEMENTS

08:59AM 14   MADE TO LAWYERS SOMETIMES, AND STATEMENTS MADE SOMETIMES TO

08:59AM 15   POLICE OFFICERS.

08:59AM 16       THESE ARE STATEMENTS MADE IN THE SWORN TESTIMONY.

08:59AM 17       AND THERE'S ACTUALLY ANOTHER EXCEPTION ABOUT STATEMENTS

08:59AM 18   MADE AND IT DOESN'T REQUIRE CORROBORATION BECAUSE I THINK

08:59AM 19   THAT'S JUST A REFLECTION OF THE FACT THAT WHEN YOU'RE MAKING A

08:59AM 20   STATEMENT IN SWORN TESTIMONY, IT'S KIND OF PRESUMED TO BE

08:59AM 21   TRUSTWORTHY BECAUSE YOU HAVE ALL OF THE OTHER PENALTIES.

08:59AM 22       SO THAT'S ON THE CORROBORATION POINT AND THE FINANCIAL

08:59AM 23   AUDIT POINT.

08:59AM 24           THE COURT:  OKAY.  ANYTHING FURTHER ON THIS,

08:59AM 25   MS. VOLKAR?

08:59AM  1          MS. VOLKAR:  ONLY THAT 804(B)(3) AND THE

08:59AM  2   NINTH CIRCUIT IS CLEAR WHAT THE THREE REQUIREMENTS ARE, AND ONE

09:00AM  3   OF THEM IS CORROBORATION AND TRUSTWORTHINESS.  AND I DON'T

09:00AM  4   THINK IT'S AN ACCIDENT THAT A LOT OF THE CASE LAW IN THE

09:00AM  5   NINTH CIRCUIT TALKS ABOUT WHEN THERE ARE TWO COCONSPIRATORS AND

09:00AM  6   ONE WANTS TO USE, OR SOMETIMES THE GOVERNMENT WANTS TO USE, ONE

09:00AM  7   COCONSPIRATOR STATEMENT AGAINST THE OTHER, THERE'S A LARGE BODY

09:00AM  8   OF LAW ABOUT THIS, AND THERE DOES NEED TO BE TRUSTWORTHINESS

09:00AM  9   BECAUSE THERE CAN BE ULTERIOR MOTIVES WHEN IT IS TWO

09:00AM 10   COCONSPIRATORS, AND I DO THINK THAT WE HAVE TO CONSIDER THAT

09:00AM 11   HERE.

09:00AM 12          THE COURT:  OKAY.  I THINK MOST OF THE CASES ARE THE

09:00AM 13   LATTER AS YOU SAY, THE GOVERNMENT TRYING TO GET COCONSPIRATOR

09:00AM 14   STATEMENTS IN.  IT WAS KIND OF A MIRROR IMAGE OF THAT HERE.

09:00AM 15      OKAY.

09:00AM 16          MR. FLEURMONT:  SHOULD WE CONTINUE OR?

09:00AM 17          THE COURT:  WELL, IT'S ABOUT 9:00 O'CLOCK NOW.

09:00AM 18   LET'S FINISH THIS.  LET'S FINISH EXHIBIT A.  LET'S DO THAT.

09:00AM 19          MR. FLEURMONT:  WE HAVE ONE MORE PORTION,

09:00AM 20   YOUR HONOR.

09:00AM 21          THE COURT:  SURE.

09:00AM 22          MR. FLEURMONT:  SO NOW I'M LOOKING AT PAGE 9.  AND

09:00AM 23   THIS RELATES TO RESPONSIBILITY ABOUT THE CLIA LAB.

09:00AM 24      THE QUESTION AT LINES 4 THROUGH 5, DID YOU SUPERVISE

09:01AM 25   THERANOS'S CLIA LAB?

09:01AM  1          AND AS I SAID BEFORE, WE INCLUDED THE ENTIRE ANSWER.  WHAT

09:01AM  2     WE'RE MOST INTERESTED IN IS LINE 10, "HOWEVER, ALL LABS REPORT

09:01AM  3     ULTIMATELY TO BUSINESS," AND THEN LINES 19 THROUGH 21, "SO ALL

09:01AM  4     OF THAT CAME TO ME, REPORTED TO ME BUT THERE WERE OTHER PEOPLE

09:01AM  5     MANAGING IT," TALKING ABOUT THE LAB DIRECTORS, "BUT THEY

09:01AM  6     REPORTED UNDER ME."

09:01AM  7          AND I THINK THAT'S ONE OF THE MORE CLEAR STATEMENTS,

09:01AM  8     YOUR HONOR, HIM TAKING RESPONSIBILITY FOR THE CLIA LAB, WHICH

09:01AM  9     WE KNOW IS AT ISSUE IN THIS CASE.

09:01AM 10          TO BE SURE, THERE ARE OTHER STATEMENTS IN HERE ABOUT THE

09:01AM 11     LAB DIRECTOR, BUT THE STATEMENT THAT WE'RE INTERESTED IN IS HIM

09:01AM 12     SAYING "ALL OF THAT CAME TO ME, THEY REPORTED TO ME."

09:01AM 13          WE THINK THAT ONE IS ONE OF THE MORE CLEAR ISSUES.

09:01AM 14               THE COURT:  19 THROUGH 21?

09:01AM 15               MR. FLEURMONT:  SO, YOUR HONOR, WE THINK THE WHOLE

09:02AM 16     THING SHOULD COME IN.  I THINK YOU UNDERSTAND MY POINT AND I'M

09:02AM 17     JUST BEING FRANK WITH, YOUR HONOR.

09:02AM 18               THE COURT:  RIGHT.

09:02AM 19               MR. FLEURMONT:  JUST TO HEAR THAT, IT DOESN'T REALLY

09:02AM 20     MAKE SENSE WITHOUT HEARING THE FULL STATEMENT.

09:02AM 21          BUT THE QUESTION FROM THE COURT WAS, WHICH PART OF THE

09:02AM 22     STATEMENT IS?

09:02AM 23               THE COURT:  I APPRECIATE YOUR CANDOR.  THANK YOU.

09:02AM 24               MR. FLEURMONT:  AND THAT'S WHAT WE'RE LOOKING FOR.

09:02AM 25               THE COURT:  RIGHT.

09:02AM 1        MS. VOLKAR:  YOUR HONOR, I'LL PREVIEW ANOTHER

09:02AM 2    RULE 106 SUGGESTION, AND POSSIBLY IT MAY BECOME A DEBATE.

09:02AM 3        EARLIER IN THE TESTIMONY HE SAYS HE'S THE PRESIDENT AND

09:02AM 4    COO AND HE REPORTED DIRECTLY TO MS. HOLMES AND THEY WERE THE

09:02AM 5    TWO BUSINESS ASPECTS OF THE COMPANY.

09:02AM 6        AND I THINK THAT THIS TESTIMONY IS ENTIRELY CONSISTENT

09:02AM 7    WITH THAT, AS WELL AS, TO BE FRANK, CONSISTENT WITH TESTIMONY

09:02AM 8    THAT WE HAVE HEARD THROUGHOUT THIS TRIAL, WHICH IS BOTH OF

09:02AM 9    THEM, BOTH DEFENDANTS, BELIEVE THE CLIA LAB DIRECTOR WAS THE

09:02AM 10   PERSON RESPONSIBLE FOR THE DECISIONS IN THE LAB.

09:02AM 11       AND THAT'S THE MAJORITY OF THIS ANSWER AND THE MAJORITY OF

09:03AM 12   THE SIMILAR ANSWER IN EXHIBIT C.

09:03AM 13       BUT THE KEY PART THAT THEY WANT IS THAT THE LAB REPORTED

09:03AM 14   TO HIM, AND HE REPORTED TO MS. HOLMES.  AND THAT'S THE RULE 106

09:03AM 15   PART THAT THEY HAVE NOT INCLUDED IN THESE EXCERPTS, BUT IS IN

09:03AM 16   THE TESTIMONY.

09:03AM 17       IT'S ALSO, TO BE FRANK, WHAT HAS COME OUT DURING THE

09:03AM 18   TESTIMONY OF THIS CASE, AND INCLUDING IN EXHIBIT -- I CITED IT

09:03AM 19   IN MY BRIEF AND I'M WORRIED I'LL MESS UP THE NUMBER -- BUT

09:03AM 20   4528, THE POWERPOINT PRESENTATION THAT THEY PRESENTED TO CMS,

09:03AM 21   DEFENSE BROUGHT THAT OUT ON CROSS OF ONE OF THE LAB DIRECTORS

09:03AM 22   THAT THE LAB REPORTED TO MR. BALWANI AND MR. BALWANI REPORTED

09:03AM 23   TO MS. HOLMES.

09:03AM 24       SO I JUST -- ONE, I DON'T THINK THAT'S IN DISPUTE IN THE

09:03AM 25   CASE; AND, TWO, IF THIS PART IS GOING TO COME IN, THEN IN

09:03AM 1    FAIRNESS, AS WE'LL GET TO THE RULE 106, IT SHOULD BE THAT HE

09:03AM 2    ALSO REPORTED TO MS. HOLMES AND TOLD HER WHAT WAS GOING ON IN

09:03AM 3    THE LAB.

09:03AM 4            THE COURT:  OKAY.

09:03AM 5            MR. FLEURMONT:  ONE LAST BRIEF POINT.

09:03AM 6        MS. VOLKAR HAS SAID A FEW TIMES THAT CERTAIN PARTS ARE

09:04AM 7    CUMULATIVE, AND THAT JUST MEANS IT'S CORROBORATED.  YOU KNOW,

09:04AM 8    JUST POINTING THAT OUT.

09:04AM 9            THE COURT:  OKAY.

09:04AM 10           MS. VOLKAR:  YOUR HONOR, MAY I RESPOND TO THAT?

09:04AM 11           THE COURT:  YEAH, SURE.

09:04AM 12           MS. VOLKAR:  I'M NOT SURE THAT I SAID THIS

09:04AM 13   YESTERDAY, AND I HOPE THAT I DID.  ONE THING THAT I TRIED TO DO

09:04AM 14   IN THE BRIEF, BUT PERHAPS FAILED TO DO, THERE ARE PORTIONS THAT

09:04AM 15   ARE CUMULATIVE, AND THOSE ARE REALLY THE PORTIONS OF WHAT

09:04AM 16   YOUR HONOR IS DEEMING FACT TESTIMONY, AND IT'S NOT THE

09:04AM 17   INCULPATORY OR AGAINST PENAL INTEREST PORTIONS OF IT, OR MAYBE

09:04AM 18   THERE'S SOME SLIGHT OVERLAP THERE.

09:04AM 19       BUT I THINK THE KEY PORTIONS THAT THEY WANT, THE PART THAT

09:04AM 20   SAYS, "AND NOT MS. HOLMES," THOSE PARTS ARE NOT CORROBORATED

09:04AM 21   AND WE'RE NOT SAYING THEY'RE CUMULATIVE.

09:04AM 22       THERE'S NO EVIDENCE TO SUPPORT THEM.  IF ANYTHING, IT'S

09:04AM 23   EVIDENCE TO THE CONTRARY.  SO THERE ARE TWO BUCKETS HERE WHEN

09:04AM 24   IT COMES TO THAT.

09:04AM 25       AND TO THE EXTENT THAT MY COMMENTS ARE CONFUSING OR HAVE

09:04AM 1    CONFLATED THEM, I JUST WANT TO BE VERY CLEAR.  THERE ARE

09:04AM 2    SEVERAL OF THE STATEMENTS THAT ARE CUMULATIVE, AND

09:05AM 3    MR. FLEURMONT WOULD CALL THAT CORROBORATED, BUT I WOULD CALL

09:05AM 4    THAT, GIVEN ALL OF THE OTHER ISSUES AND THE FACT THAT THEY'RE

09:05AM 5    NOT AGAINST PENAL INTEREST IN MOST CASES, WE THINK THAT IT'S

09:05AM 6    JUST ANOTHER REASON TO EXCLUDE THEM.

09:05AM 7        SO THAT'S THE GOVERNMENT'S POINT IN ITS BRIEF WAS EVEN IF

09:05AM 8    WE GET PAST THE HEARSAY ISSUES, THERE'S STILL A 403 ISSUE.

09:05AM 9    THOSE ARE SEPARATE REASONS TO EXCLUDE THIS.

09:05AM 10       SO I JUST WANT TO MAKE SURE THAT WE'RE NOT -- THAT I'M

09:05AM 11   BEING AS CLEAR AS I CAN BE THAT THOSE ARE TWO DIFFERENT REASONS

09:05AM 12   TO EXCLUDE SOMETIMES WHAT WE'RE TALKING ABOUT AS THE SAME

09:05AM 13   TESTIMONY.

09:05AM 14             THE COURT:  OKAY.  THANK YOU.

09:05AM 15             MR. FLEURMONT:  QUICKLY.

09:05AM 16       WE ARE INTERESTED IN STATEMENTS THAT TAKE RESPONSIBILITY

09:05AM 17   AND STATEMENTS THAT ARE INCULPATORY.

09:05AM 18       IF THOSE STATEMENTS ALSO SAY "AND NOT MS. HOLMES," THE

09:05AM 19   CASE LAW IS CLEAR THAT'S FINE.

09:05AM 20       BUT THIS IS NOT AN EXERCISE TO PUT IN STATEMENTS THAT SAY

09:05AM 21   "AND NOT MS. HOLMES."

09:05AM 22       ALL OF THE STATEMENTS WE HAVE PUT IN HAVE BEEN MR. BALWANI

09:05AM 23   TAKING RESPONSIBILITY OVER A CRITICAL ALLEGATION IN THIS CASE,

09:06AM 24   AND I'LL JUST LEAVE IT AT THAT.

09:06AM 25             THE COURT:  ALL RIGHT.  WHAT ABOUT THE NULL

09:06AM 1     PROTOCOL?  DARE I GO THERE?  I ASKED YESTERDAY, IS THIS MOOT

09:06AM 2     NOW?

09:06AM 3           MR. FLEURMONT:  WITHOUT CONCEDING ANY ARGUMENTS,

09:06AM 4     WE'LL WITHDRAW THAT PORTION.

09:06AM 5           THE COURT:  ANY OBJECTION?

09:06AM 6           MS. VOLKAR:  NO OBJECTION FROM THE GOVERNMENT.

09:06AM 7     THANK YOU.

09:06AM 8           THE COURT:  WELL, LET'S CONTINUE OUR DISCUSSION ON B

09:06AM 9     AND C AT SOME OTHER TIME IF THAT'S ALL RIGHT WITH YOU, COUNSEL?

09:06AM 10          MR. FLEURMONT:  YES, YOUR HONOR.

09:06AM 11          THE COURT:  GREAT.  LET'S DO THAT THEN.

09:06AM 12     I'LL STEP DOWN AND WE'LL -- ANYTHING FURTHER ON THIS?

09:06AM 13     WE'LL FIND A TIME WHEN WE CAN CONTINUE THIS MAYBE DURING OUR

09:06AM 14     BREAK OR SOMETHING.

09:06AM 15          MR. FLEURMONT:  THAT SOUNDS GOOD, YOUR HONOR.

09:06AM 16          THE COURT:  GREAT.

09:06AM 17          MS. VOLKAR:  THANK YOU, YOUR HONOR.

09:06AM 18          THE COURT:  LET ME ASK BEFORE WE BRING THE JURY OUT,

09:06AM 19     ANYTHING WE NEED TO TALK ABOUT BEFORE THE JURY COMES OUT,

09:06AM 20     MR. LEACH?

09:06AM 21     YOU'RE PREPARED FOR CROSS-EXAMINATION?

09:06AM 22          MR. LEACH:  I AM, YOUR HONOR.  IF WE CAN HAVE MAYBE

09:06AM 23     FIVE EXTRA MINUTES TO GET THE BINDERS AND THINGS?

09:06AM 24          THE COURT:  SURE.

09:06AM 25     MR. DOWNEY?

09:06AM 1          MR. DOWNEY:  I DIDN'T KNOW YESTERDAY WHAT

09:06AM 2     MR. LEACH'S EXHIBITS WILL BE.  HE DID DISCLOSE SOME EXHIBITS

09:07AM 3     WHICH IMPLICATE THE COURT'S PRIOR RULING ON WEALTH, THE MOTION

09:07AM 4     IN LIMINE ON 798.

09:07AM 5          I DON'T KNOW HIS INTENDED USE OF THEM.  I CAN IMAGINE USES

09:07AM 6     THAT GO BOTH WAYS, BUT I JUST WANTED TO SENSITIZE THE COURT TO

09:07AM 7     THAT BECAUSE I KNOW THAT THE COURT'S RULING WILL NOT

09:07AM 8     NECESSARILY BE TOP OF MIND IN THE HEAT OF THE MOMENT, AND WE

09:07AM 9     HAD A SUBSTANTIAL DISCUSSION OF IT AT THE TIME.

09:07AM 10          AMONG THE EXHIBITS HE'S DISCLOSED, FOR EXAMPLE, TRAVEL

09:07AM 11     ITINERARIES FOR BOARD MEMBERS WHERE MS. HOLMES TRAVELLED TO

09:07AM 12     WASHINGTON, D.C. WITH BOARD MEMBERS.

09:07AM 13          WHEN WE HAD THE MOTION IN LIMINE HEARING, THE MODE OF

09:07AM 14     TRAVEL, THE SPECIFIC ITINERARY WAS A SPECIFIC DISCUSSION

09:07AM 15     BETWEEN YOUR HONOR AND MR. BOSTIC AND SOMETHING THAT I OBJECTED

09:07AM 16     TO IN THAT ARGUMENT.

09:07AM 17          I THINK THAT'S EXCLUDED UNDER THE COURT'S RULINGS, SO I

09:07AM 18     JUST WANT TO SENSITIZE THE COURT TO THAT.

09:07AM 19          AND MR. LEACH CAN PERHAPS EDUCATE US AS TO HIS INTENTIONS.

09:08AM 20          THE COURT:  MR. LEACH?

09:08AM 21          MR. LEACH:  YOUR HONOR, I THINK THE FACT THAT THE

09:08AM 22     DEFENDANT HAS ACTUALLY ASSERTED HER 12.2 DEFENSE AND PUT AT

09:08AM 23     ISSUE HER LIVING CONDITIONS WITH MR. BALWANI, PUT AT ISSUE HER

09:08AM 24     AGENCY OVER WHAT SHE ATE, HER AGENCY OVER WHAT SHE WORE, YOU

09:08AM 25     KNOW, HER RELATIVE POWER WITHIN THE RELATIONSHIP, HER

09:08AM 1     RELATIONSHIP WITH OTHER VERY POWERFUL PEOPLE WHO WERE THERE IN

09:08AM 2     A POSITION TO SUPPORT HER, ALL ESSENTIALLY MOOT MANY OF THE

09:08AM 3     ARGUMENTS THAT WERE MADE AT THE MOTION IN LIMINE STAGE.

09:08AM 4          THEY HAVE NOT JUST OPENED THE DOOR, THEY HAVE OPENED THE

09:08AM 5     FLOODGATES TO THAT RESPECTFULLY, AND IT IS MY INTENTION TO PUT

09:08AM 6     IN ITINERARIES WITH TRAVEL WITH BOARD MEMBERS THAT WERE PAID BY

09:08AM 7     THE COMPANY, TRIPS TO MEXICO ON JETS PAID FOR BY THE COMPANY

09:08AM 8     FOR BUSINESS PURPOSES.

09:08AM 9          MR. BALWANI AND MS. HOLMES OWNED A HOME TOGETHER THROUGH

09:08AM 10    AN LLC.  I THINK THAT'S RELEVANT TO HER RELATIVE AUTHORITY

09:09AM 11    WITHIN THE RELATIONSHIP.

09:09AM 12         I UNDERSTAND WHY SOME OF THESE MIGHT PRESENT 403 ISSUES IF

09:09AM 13    SHE'S NOT RAISING THIS, BUT SHE'S PUT THE ENTIRETY OF THEIR

09:09AM 14    RELATIONSHIP AT ISSUE.  SHE'S PUT HER RELATIVE POWER WITHIN THE

09:09AM 15    RELATIONSHIP AT ISSUE, AND THE GOVERNMENT MUST BE PERMITTED TO

09:09AM 16    COMBAT THOSE ASSERTIONS.

09:09AM 17              MR. DOWNEY:  12.2 IN THIS CONTEXT, YOUR HONOR,

09:09AM 18    RELATES TO DISCLOSURE OF POTENTIAL EXPERT TESTIMONY.  THAT IS

09:09AM 19    NOT SOMETHING THAT IS AT ISSUE YET IN THE COURSE OF THE CASE.

09:09AM 20              THE COURT:  PARDON ME FOR INTERRUPTING YOU.  I

09:09AM 21    WANTED TO ASK THAT THRESHOLD QUESTION, AND I DON'T KNOW IF

09:09AM 22    YOU'RE PREPARED TO ANSWER THAT.  AND IF YOU'RE NOT, THAT'S

09:09AM 23    FINE.

09:09AM 24         BUT IS 12.2 AN ISSUE IN THIS CASE YET?

09:09AM 25              MR. DOWNEY:  I'M NOT PREPARED TO ANSWER IT.  WE'LL

09:09AM 1     SEE WHERE WE ARE AT THE END OF MS. HOLMES'S TESTIMONY.

09:09AM 2              THE COURT:  OKAY.  SO I ASKED THAT QUESTION,

09:09AM 3     MR. LEACH, BECAUSE, OF COURSE, A PARTY, A DEFENDANT IS REQUIRED

09:09AM 4     UNDER THE RULES TO GIVE NOTICE, AND WE HAD THAT DISCUSSION OVER

09:10AM 5     THE LAST YEAR.  THAT NOTICE WAS GIVEN APPROPRIATELY ACCORDING

09:10AM 6     TO THE RULES.

09:10AM 7        BUT WHETHER OR NOT A PARTY DECIDES TO ENGAGE THAT DEFENSE

09:10AM 8     IS STILL AN ISSUE.

09:10AM 9        AND LET ME JUST ASK THE QUESTION, IS THAT, IS THAT A 12.2

09:10AM 10    DEFENSE ENGAGED BY VIRTUE OF CALLING AN EXPERT TO SPEAK TO IT?

09:10AM 11             MR. LEACH:  WELL, YOUR HONOR, I DON'T THINK IT'S

09:10AM 12    MERELY CALLING THE EXPERT.  I MEAN, THE WITNESS TESTIFIED

09:10AM 13    YESTERDAY, "BALWANI CONTROLLED WHAT I ATE."  SHE TESTIFIED

09:10AM 14    YESTERDAY, "I DON'T KNOW WHAT IMPACT THE RELATIONSHIP HAD ON

09:10AM 15    ME."  SHE TESTIFIED TO FEAR GOING HOME AND WHAT WAS GOING TO

09:10AM 16    HAPPEN.

09:10AM 17       THE GOVERNMENT MUST BE ABLE TO TEST THAT, AND WHETHER

09:10AM 18    SHE'S DOING IT IN THE GUISE OF A NOTICE EXPERT, WE'RE SIMPLY

09:11AM 19    RAISING THESE FACTS AND CLAIMING THROUGH A NUMBER OF STATEMENTS

09:11AM 20    THAT "I DIDN'T HAVE AGENCY," THAT "I WAS FEARFUL OF HIM," THAT

09:11AM 21    "I DIDN'T HAVE POWER IN THE RELATIONSHIP."

09:11AM 22       WHETHER OR NOT SHE CALLS AN EXPERT TO BOLSTER THAT -- AND

09:11AM 23    WE'VE HAD THAT CONVERSATION A NUMBER OF TIMES -- I DON'T THINK

09:11AM 24    IT MATTERS AT ALL.

09:11AM 25       SHE SAID SHE DIDN'T CONTROL WHAT SHE ATE.  THERE'S AMPLE

09:11AM 1    EVIDENCE TO SUGGEST THAT SHE DID.  THE GOVERNMENT SHOULD BE

09:11AM 2    ABLE TO CONFRONT HER WITH THAT.

09:11AM 3        THE COURT'S MOTION IN LIMINE ON THE TRAVEL I THOUGHT WAS

09:11AM 4    ANYTHING THAT THE COMPANY PAID FOR IN TERMS OF JETS, HOTELS ON

09:11AM 5    THE COMPANY DIME WAS FAIR GAME.

09:11AM 6        DANISE YAM TESTIFIED TO EXPENSES THAT WERE INCURRED THERE.

09:11AM 7        I DON'T THINK IT MATTERS WHETHER THEY CALL AN EXPERT OR

09:11AM 8    NOT.  THIS WITNESS TESTIFIED TO THOSE MATTERS ON HER DIRECT

09:11AM 9    EXAMINATION.

09:11AM 10        THE COURT:  SO TWO POINTS HERE THAT I'M CURIOUS

09:11AM 11   ABOUT.  LET ME JUST STATE THE FIRST ONE.

09:11AM 12        IF NO EXPERT IS CALLED THEN, AND IF YOU STOOD UP AND SAID,

09:11AM 13   YOUR HONOR, I WOULD LIKE TO STRIKE ALL OF THE TESTIMONY ABOUT

09:12AM 14   MR. BALWANI AND MS. HOLMES'S TESTIMONY ABOUT THAT BECAUSE IT'S

09:12AM 15   NOT RELEVANT IF THERE'S NO 12.2 -- I'M BEING HYPOTHETICAL

09:12AM 16   HERE -- I'M THINKING AHEAD, BUT THAT'S POTENTIALLY SOMETHING

09:12AM 17   THAT COULD HAPPEN.

09:12AM 18        WHAT IS THE RELEVANCE?  I'M NOT ASKING YOU TO RESPOND.

09:12AM 19   BUT WHAT IS THE RELEVANCE OF THAT TESTIMONY WITHOUT SUPPORTING

09:12AM 20   12.2 EXPERT, ET CETERA, ET CETERA?  I DON'T KNOW THE ANSWER TO

09:12AM 21   THAT, AND MAYBE WE'LL BE DISCUSSING THAT.  I DON'T KNOW.

09:12AM 22        TO YOUR POINT, AND MR. DOWNEY, TO THE GOVERNMENT'S POINT,

09:12AM 23   YOUR CLIENT HAS TESTIFIED AS TO CERTAIN THINGS ABOUT THE

09:12AM 24   RELATIONSHIP.

09:12AM 25        AND ON CROSS-EXAMINATION THE GOVERNMENT SHOULD BE ABLE TO

09:12AM  1    TEST AND PROBE THOSE, SOME OF THOSE THINGS.

09:12AM  2         AND HE SHOULD BE PERMITTED TO DO THAT.  AND I DON'T THINK

09:12AM  3    YOU'RE SAYING THAT.  THIS IS ABOUT EXPENSES SPECIFICALLY.

09:12AM  4         MR. DOWNEY:  THAT'S RIGHT, YOUR HONOR.  THERE'S NO

09:12AM  5    QUESTION, THERE'S NO QUESTION THAT HE CAN CROSS-EXAMINE AROUND

09:13AM  6    THAT.

09:13AM  7         THE COURT:  THE ORDER IN 798 AS TO THE EXTRAVAGANCE

09:13AM  8    WAS RELATED TO WHETHER OR NOT THE GOVERNMENT, IN THEIR

09:13AM  9    CASE-IN-CHIEF, COULD PUT ON EVIDENCE THAT SHE SHOPPED AT, IF

09:13AM  10   SHE DID, AT DESIGNER STORES, IF SHE ATE AT FIVE STAR

09:13AM  11   RESTAURANTS, WHATEVER THAT IS, SOMETHING THAT MIGHT CAUSE THE

09:13AM  12   JURY TO THINK THAT SHE WAS LIVING AN EXTRAVAGANT LIFESTYLE, ET

09:13AM  13   CETERA.

09:13AM  14        THE ORDER SAID, DIDN'T IT, THAT THE GOVERNMENT COULD AND

09:13AM  15   EVIDENCE COULD BE INTRODUCED THAT I THINK I SAID IN THE ORDER

09:13AM  16   THAT IT'S COMMON KNOWLEDGE THAT CEO'S OF LARGE COMPANIES LIVE A

09:13AM  17   LIFESTYLE VERY DIFFERENT THAN THE GENERAL PUBLIC AND ALL OF

09:13AM  18   OURS.

09:13AM  19        MR. DOWNEY:  SURE.

09:13AM  20        THE COURT:  I THINK THAT'S COMMON KNOWLEDGE.

09:13AM  21        INCLUDED IN THAT KNOWLEDGE IS THE FACT THAT CEO'S TRAVEL

09:13AM  22   ON PRIVATE JETS SOMETIMES.  THAT'S WHAT THEY DO.  THEY DON'T

09:14AM  23   FLY COACH.

09:14AM  24        AND IN THE ORDER I THINK THAT'S PERMITTED TO TALK ABOUT

09:14AM  25   WHAT DO NORMAL, WHAT DO NORMAL PEOPLE DO, WHATEVER THAT IS?

09:14AM 1     WHATEVER THE NORMAL LIFE OF A CEO OF A MAJOR COMPANY IS, I

09:14AM 2     DON'T KNOW WHAT THAT IS.

09:14AM 3         BUT WHAT I WAS -- AND I THINK IN RECOGNITION OF THE

09:14AM 4     DEFENSE OBJECTION THERE, IS IT RELEVANT THAT SHE SHOPPED AT,

09:14AM 5     AND THIS IS JUST -- I DON'T KNOW ANY EVIDENCE ABOUT IT, BUT IS

09:14AM 6     IT RELEVANT THAT SHE BREAKFASTED AT VAN CLEEF & ARPELS, IS IT

09:14AM 7     RELEVANT THAT SHE HAD CAVIAR FLOWN IN EVERY DAY, EVERY HOUR.

09:14AM 8         THERE'S NO EVIDENCE OF THAT, AND I'M NOT INDICATING THERE

09:14AM 9     IS, BUT I'M SUGGESTING THAT TYPE OF EXTRAVAGANCE IS SOMETHING

09:14AM 10    THAT THE JURY SHOULDN'T HEAR ABOUT BECAUSE THAT DOESN'T HAVE

09:14AM 11    RELEVANCE TO THE CASE.

09:14AM 12        BUT IF THERE ARE TRAVELS THAT ARE COMMENSURATE WITH CEO

09:15AM 13    TRAVEL, IF IT'S A BUSINESS TRAVEL, THAT'S, THAT'S KIND OF THE

09:15AM 14    WAY SILICON VALLEY OPERATES.

09:15AM 15            MR. DOWNEY:  WELL, OF COURSE, YOUR HONOR, IF IT'S

09:15AM 16    RELEVANT FOR SOME PURPOSE TO COMMENT ON A TRIP AND EVENTS ON

09:15AM 17    THE TRIP ARE RELEVANT, WE HAD SOME OF THAT WITH RESPECT TO

09:15AM 18    ANOTHER WITNESS WHO TESTIFIED DURING THE CASE, IT WASN'T -- A

09:15AM 19    MAJOR ISSUE WASN'T MADE OF IT.

09:15AM 20        THAT'S NOT WHAT THIS IS.  THIS IS THE INTRODUCTION OF

09:15AM 21    EVIDENCE ABOUT TRAVEL ON PRIVATE PLANES PURELY, PURELY FOR THE

09:15AM 22    PURPOSE PROHIBITED BY 401 AND 403.  IT DOESN'T HAVE ANY

09:15AM 23    RELEVANCE TO THE CASE.  THESE TRIPS ARE NOT RELEVANT TO

09:15AM 24    ANYTHING THAT ANYONE HAS TALKED ABOUT.  THEY'RE NOT RELEVANT TO

09:15AM 25    ANYTHING THAT MS. HOLMES HAS TALKED ABOUT.

09:15AM 1    THEY'RE ONLY BEING INTRODUCED TO SHOW THAT PRIVATE PLANE

09:15AM 2    TRAVEL WAS INCLUDED.  MR. LEACH JUST CONCEDED THEY'RE FOR

09:15AM 3    BUSINESS PURPOSES.  THEY'RE BUSINESS APPROVED TRAVEL.  WHY DOES

09:16AM 4    THE JURY NEED TO HEAR ABOUT THAT?

09:16AM 5    I THINK IN TERMS OF BRANDS, I DON'T KNOW MR. LEACH, I MUST

09:16AM 6    SAY THAT YOUR HONOR'S REFERENCE FLOWED RIGHT OVER ME.

09:16AM 7    THE COURT:  YOU DON'T SHOP THERE, MR. DOWNEY?

09:16AM 8    MR. DOWNEY:  I COULDN'T REPEAT WHAT YOU SAID.

09:16AM 9    (LAUGHTER.)

09:16AM 10    MR. DOWNEY:  BUT I, I -- YOU KNOW, I -- IT'S JUST

09:16AM 11    NOT NECESSARY.

09:16AM 12    OF COURSE HE'S ENTITLED TO CROSS-EXAMINE HER ABOUT HER

09:16AM 13    STATEMENTS AND SO FORTH AND TO EXPLORE THE TRUTH OF THEM.

09:16AM 14    BUT THIS ISN'T BEING OFFERED FOR THAT PURPOSE.  THIS IS

09:16AM 15    BEING OFFERED FOR INFLAMMATION OF THE JURY.

09:16AM 16    MR. LEACH:  NO, YOUR HONOR.  THIS IS BEING OFFERED

09:16AM 17    FOR MOTIVE.  THIS WITNESS HAS TESTIFIED I HAD A VISION, I WAS

09:16AM 18    DOING THIS, THE THRUST OF WHICH IS FOR ALTRUISTIC PURPOSES, I

09:16AM 19    DIDN'T SELL A SHARE OF STOCK.

09:16AM 20    THERE'S ANOTHER SIDE TO THAT COIN.  SHE WAS FLYING AROUND

09:16AM 21    THE WORLD MEETING WITH SOME OF THE MOST POWERFUL PEOPLE IN THE

09:16AM 22    UNITED STATES ON THE COMPANY'S DIME, AND THAT IS RELEVANT TO

09:16AM 23    HER MOTIVE.  SHE COVETED FAME.  SHE COVETED ATTENTION.  SHE

09:17AM 24    COVETED THE ABILITY TO INTERACT WITH MANY OF THESE PEOPLE.

09:17AM 25    THAT'S A VERY POWERFUL PART OF THE MOTIVE HERE, AND IT'S

09:17AM  1     SQUARELY WITHIN WHAT THE COURT HELD.

09:17AM  2          SO I -- AND THESE ARE BUSINESS TRIPS.  THESE ARE RELEVANT

09:17AM  3     TO THE ALLEGATIONS IN THE INDICTMENT.  ONE OF THEM IS A TRIP TO

09:17AM  4     MEET A POTENTIAL INVESTOR.  ONE OF THEM IS A TRIP TO ACCEPT AN

09:17AM  5     AWARD.

09:17AM  6          AT THE SAME TIME, SHE'S WRITING DOWN THAT SHE HAS -- I

09:17AM  7     DON'T WANT TO USE THE EXPLETIVE -- BUT A COMPANY NOT WORTHY OF

09:17AM  8     THAT.

09:17AM  9          ALL OF THIS GOES DIRECTLY TO HER MOTIVE AND HER STATE OF

09:17AM 10     MIND.  YES, THEY MIGHT APPEAR TO A LAYPERSON AS BEING OUTSIDE

09:17AM 11     OF THE NORMAL COURSE OF WHAT PEOPLE DO.

09:17AM 12          BUT WE SHOULDN'T SANITIZE THINGS HERE.  THIS IS PART OF

09:17AM 13     THE MOTIVE.

09:17AM 14               THE COURT:  IF, IF -- THANK YOU.

09:17AM 15          IF -- IT WOULD SEEM TO ME, MR. DOWNEY, THAT THERE MIGHT BE

09:17AM 16     SOME FINANCIAL RELEVANCE TO THE FINANCIAL STATE OF THE COMPANY

09:18AM 17     AND WHETHER OR NOT AN INDIVIDUAL WHO HAS A LEADERSHIP ROLE WITH

09:18AM 18     THE COMPANY WAS EXPENDING MONIES IN SOME MANNER.  THAT MIGHT

09:18AM 19     HAVE SOME RELEVANCE AS TO INTENT.

09:18AM 20               MR. DOWNEY:  WELL, I SUPPOSE, EXCEPT THAT THE

09:18AM 21     RELEVANCE THAT MR. LEACH JUST ARTICULATED IS EXACTLY WHAT IS

09:18AM 22     PROHIBITED UNDER NINTH CIRCUIT CASE LAW.  ONE IS NOT IN THE

09:18AM 23     POSITION OF THE GOVERNMENT ENTITLED TO SAY THAT THE ALLEGED

09:18AM 24     CONDUCT WAS UNDERTAKEN TO IMPROVE ONE'S FINANCIAL SITUATION OR

09:18AM 25     TO GAIN THE BENEFITS ASSOCIATED WITH THAT.

09:18AM 1          SO WE HAVEN'T HEARD THAT PURPOSE YET.

09:18AM 2                 THE COURT:  RIGHT.

09:18AM 3                 MR. LEACH:  YOUR HONOR, MR. BOSTIC IS REMINDING ME

09:18AM 4     THAT THE GOVERNMENT MAY INTRODUCE EVIDENCE THAT HOLMES ENJOYED

09:18AM 5     A LIFESTYLE AS THERANOS'S CEO THAT IS COMPARABLE TO OTHER TECH

09:18AM 6     COMPANY'S CEOS.  THIS INCLUDES TRAVEL, SALARY, CELEBRITY AND

09:19AM 7     PERKS AND OTHER BENEFITS COMMENSURATE WITH THE POSITION.

09:19AM 8          THOSE ARE EXACTLY WHAT THOSE ARE, AND I THINK YOUR HONOR

09:19AM 9     MADE A POINT THAT THE JURY SHOULD BE ABLE TO DRAW INFERENCES

09:19AM 10    FROM THE FACT THAT THEY ARE SPENDING TENS OF THOUSANDS OF

09:19AM 11    DOLLARS OF THIS RATHER THAN HIRING A LAB DIRECTOR OF THE

09:19AM 12    GREATER STATURE OF THE ONES THAT THEY HIRED IN THE RELEVANT

09:19AM 13    TIME PERIOD.

09:19AM 14         SO NOTHING HAS CHANGED IN THE COURT'S ORDER OTHER THAN

09:19AM 15    THEY'VE OPENED THE FLOODGATES ON DOES THIS WITNESS HAVE CONTROL

09:19AM 16    AND AGENCY OVER WHAT SHE DOES.

09:19AM 17                MR. DOWNEY:  I MUST SAY THAT THAT MIGHT BE THE MOST

09:19AM 18    AGGRESSIVE RUNNING OVER OF AN ORDER THAT I'VE SEEN IN RECENT

09:19AM 19    TIME.  I THINK THE POINT OF THE ORDER WAS -- EVIDENCE IS GOING

09:19AM 20    TO COME IN ABOUT CELEBRITY, EVIDENCE IS GOING TO BE RELEVANT IN

09:19AM 21    A CASE LIKE THIS, AND WE CAN'T USE THIS ARGUMENT AS A BARRIER

09:19AM 22    TO INTRODUCING THAT ARGUMENT.

09:19AM 23         BUT WHEN THE EVIDENCE IS BEING INTRODUCED EXACTLY FOR THE

09:19AM 24    REASON THAT MR. LEACH ARTICULATED THIS MORNING, WHICH IS THAT

09:19AM 25    IT'S ABOUT MOTIVE AND SO FORTH, THAT IS PROHIBITED.

09:19AM 1    WE'VE HAD EVIDENCE IN THE CASE ABOUT CELEBRITY, WE'VE HAD

09:20AM 2  EVIDENCE IN THE CASE ABOUT PRIVATE TRAVEL.  I HAVEN'T OBJECTED

09:20AM 3  TO ANY OF THAT.  BUT THIS IS DIFFERENT.

09:20AM 4         THE COURT:  ANYTHING FURTHER?

09:20AM 5         MR. LEACH:  NOT ON THAT POINT, YOUR HONOR.

09:20AM 6    BUT I DO WANT TO GO BACK TO THE CLOTHING PART.  SHE'S

09:20AM 7  SAYING --

09:20AM 8         MR. DOWNEY:  SPEAK AT A HIGH LEVEL FOR MY BENEFIT.

09:20AM 9         MR. LEACH:  IT'S ABOVE MY PAY GRADE, TOO.

09:20AM 10        THE COURT:  START AT MACY'S.

09:20AM 11        MR. LEACH:  THE POINT OF THE EVIDENCE IS NOT THAT

09:20AM 12 SHE WENT TO A PARTICULAR STORE OR BOUGHT A PARTICULAR BRAND.

09:20AM 13    THE POINT IS THAT SHE'S DOING THIS WITHOUT MR. BALWANI.

09:20AM 14 THE POINT IS THAT SHE AND HER ASSISTANT ARE MAKING DECISIONS

09:20AM 15 OVER WHERE TO GO AND WHAT TO GET.

09:20AM 16        THE COURT:  YEAH.  AND THAT'S A FAIR POINT, YES, I

09:20AM 17 AGREE.

09:20AM 18    AND I THINK MR. DOWNEY WOULD, I'M NOT ASKING HIM TO, BUT I

09:20AM 19 THINK HE WOULD HAVE TO CONCEDE THAT POINT, THAT'S RIGHT.

09:20AM 20    AND BASED ON THE TESTIMONY THAT WE HEARD YESTERDAY, I

09:20AM 21 THINK THAT'S WHAT YOU'RE TALKING ABOUT FROM MS. HOLMES, YOU'RE

09:20AM 22 ENTITLED TO PROBE THAT FOR THOSE ISSUES, THOSE INDEPENDENT

09:21AM 23 ISSUES, IF YOU WILL, I'LL CALL IT THAT, AND I THINK YOU'RE

09:21AM 24 RIGHT, YOU'RE RIGHT ON THAT.

09:21AM 25    AND I THINK MR. DOWNEY HAS TOLD US THAT YOU'RE ENTITLED TO

09:21AM 1    PROBE ON THOSE THINGS.

09:21AM 2        MY SENSE IS THAT THE TERRITORIAL BORDER HERE IS

09:21AM 3    EXTRAVAGANT EXPENSES, TWO DIFFERENT THINGS, BUT PERHAPS THERE'S

09:21AM 4    CROSSOVER AND A VEN DIAGRAM ON THAT.

09:21AM 5        BUT FOR THE PURPOSE, FOR THE PURPOSE, I GUESS, IS WHAT

09:21AM 6    YOU'LL HAVE TO SPEAK TO IF YOU SEEK TO INTRODUCE THIS EVIDENCE,

09:21AM 7    AND I DON'T KNOW IF THIS WILL COME IN THIS MORNING OR SOMETIME

09:21AM 8    LATER TODAY.

09:21AM 9            MR. LEACH:  I IMAGINE IT WILL BE AFTER THE BREAK,

09:21AM 10   YOUR HONOR.

09:21AM 11           THE COURT:  THAT'S MY SENSE OF IT.

09:21AM 12       OKAY.

09:21AM 13           MR. DOWNEY:  THANK YOU, YOUR HONOR.

09:21AM 14           THE COURT:  WELL, THANK YOU FOR BRINGING IT TO MY

09:21AM 15   ATTENTION.

09:21AM 16       ANYTHING ELSE THEN?

09:21AM 17       WE'LL BREAK AT ABOUT 11:00 O'CLOCK, WE'LL TAKE A BREAK,

09:21AM 18   AND THEN AGAIN ANOTHER ONE AT ABOUT 1:30 IF THAT WORKS.

09:21AM 19           MR. LEACH:  THANK YOU, YOUR HONOR.

09:21AM 20           MR. DOWNEY:  THANK YOU, YOUR HONOR.

09:21AM 21           THE COURT:  THANK YOU.

09:21AM 22           THE CLERK:  COURT IS IN RECESS.

09:22AM 23       (RECESS FROM 9:22 A.M. UNTIL 9:33 A.M.)

09:33AM 24       (JURY IN AT 9:33 A.M.)

09:33AM 25           THE COURT:  GOOD MORNING.  WE'RE BACK ON THE RECORD

09:33AM  1      IN THE HOLMES MATTER.  ALL COUNSEL ARE PRESENT.  OUR JURY IS

09:33AM  2   PRESENT.  MS. HOLMES IS ON THE STAND.

09:33AM  3          LADIES AND GENTLEMEN, GOOD MORNING.  LET ME, BEFORE WE

09:33AM  4   BEGIN, LET ME ASK YOU THE QUESTION AGAIN.  DURING THE EVENING,

09:33AM  5   DID ANY OF YOU HAVE CAUSE TO COME ACROSS INFORMATION, SPEAK TO

09:33AM  6   ANYONE, READ, OR DISCUSS ANYTHING ABOUT THIS CASE?

09:34AM  7          IF SO, COULD YOU PLEASE RAISE YOUR HAND.

09:34AM  8          I SEE NO HANDS.

09:34AM  9          THANK YOU VERY MUCH.

09:34AM  10          MS. HOLMES, IF YOU COULD JUST STATE YOUR NAME, PLEASE.

09:34AM  11              THE WITNESS:  MY NAME IS ELIZABETH HOLMES.

09:34AM  12              THE COURT:  THANK YOU.

09:34AM  13          AND, MR. LEACH, DO YOU HAVE EXAMINATION?

09:34AM  14              MR. LEACH:  I DO, YOUR HONOR.  THANK YOU.

09:34AM  15              THE COURT:  AND YOU'RE STILL UNDER OATH, MS. HOLMES.

09:34AM  16              THE WITNESS:  THANK YOU.

09:34AM  17              THE COURT:  AND YOU CAN REMOVE YOUR MASK IF YOU

09:34AM  18   WISH.

09:34AM  19              THE WITNESS:  THANK YOU.

09:34AM  20              THE COURT:  YOU'RE WELCOME.

09:34AM  21       **(DEFENDANT'S WITNESS, ELIZABETH HOLMES, WAS PREVIOUSLY**

09:34AM  22   **SWORN.)**

09:34AM  23                      **CROSS-EXAMINATION (RESUMED)**

09:34AM  24   BY MR. LEACH:

09:34AM  25   Q.   GOOD MORNING, MS. HOLMES.

09:34AM 1     A.   GOOD MORNING.

09:34AM 2     Q.   YESTERDAY YOU TESTIFIED THAT WHEN YOU LEARNED "THE

09:34AM 3     WALL STREET JOURNAL" MIGHT BE WRITING A NEGATIVE STORY ABOUT

09:34AM 4     THERANOS IN 2015, YOUR RESPONSE WAS AGGRESSIVE.

09:34AM 5          DO YOU RECALL THAT TESTIMONY?

09:34AM 6     A.   I DO.

09:34AM 7     Q.   I'D LIKE TO EXPLORE A LITTLE BIT ABOUT WHAT THAT MEANS.

09:34AM 8     YOU LEARNED THAT JOHN CARREYROU, A REPORTER WITH "THE

09:35AM 9     WALL STREET JOURNAL," WAS WORKING ON SOME FORM OF STORY IN OR

09:35AM 10    ABOUT APRIL OF 2015; IS THAT CORRECT?

09:35AM 11    A.   YES.

09:35AM 12    Q.   AND AFTER LEARNING THIS, YOU AND MR. BALWANI TOOK STEPS TO

09:35AM 13    CONTROL MR. CARREYROU'S EXPERIENCE AT A WELLNESS CENTER IN

09:35AM 14    ARIZONA; ISN'T THAT RIGHT?

09:35AM 15    A.   I DON'T THINK SO.

09:35AM 16    Q.   WELL, LET'S LOOK AT THAT.

09:35AM 17         YOU WERE WORRIED THAT MR. CARREYROU MIGHT GO TO A WELLNESS

09:35AM 18    CENTER AND GET A VEIN DRAW, WEREN'T YOU?

09:35AM 19    A.   I DON'T REMEMBER THAT.

09:35AM 20    Q.   OKAY.

09:35AM 21         MAY I APPROACH, YOUR HONOR?

09:35AM 22              THE COURT:  YES.

09:35AM 23    BY MR. LEACH:

09:35AM 24    Q.   (HANDING.)

09:35AM 25         MR. HOLMES, I'VE PLACED BEFORE YOU A BINDER OF DOCUMENTS,

09:35AM   1    AND I'D LIKE TO DRAW YOUR ATTENTION TO WHAT IS IN EVIDENCE AS

09:35AM   2    5387D.

09:36AM   3         IF YOU COULD PLEASE GO TO PAGE 50.

09:36AM   4         MS. HOLLIMAN, IF WE CAN DISPLAY THAT ON THE SCREEN?

09:36AM   5    A.   GOT IT.  OKAY.

09:36AM   6    Q.   ONE MOMENT WHILE WE PULL IT UP ON THE SCREEN.

09:36AM   7    A.   WAS THERE A PAGE?

09:36AM   8    Q.   PAGE 50.

09:36AM   9    A.   OKAY.

09:36AM  10    Q.   AND TO THE RIGHT YOU SHOULD SEE PRH 175, AND YOU ALSO

09:36AM  11    SHOULD HAVE THAT ON YOUR SCREEN.

09:36AM  12         MS. HOLLIMAN, IF WE COULD PLEASE EXPAND THE SUBSTANCE OF

09:36AM  13    THE TEXT WITH THE DATE.

09:37AM  14         DO YOU SEE WHERE YOU TEXTED, "RE YOUR EMAIL"?

09:37AM  15    A.   I DO.

09:37AM  16    Q.   AND THEN YOU WROTE "WSJ GUY MIGHT SHOW UP TOMORROW"?

09:37AM  17    A.   YES.

09:37AM  18    Q.   AND THAT'S A REFERENCE TO MR. CARREYROU, ISN'T IT?

09:37AM  19    A.   I THINK SO.

09:37AM  20    Q.   AND THEN YOU WROTE, "THAT IS THE THING."

09:37AM  21         AND MR. BALWANI RESPONDS, "WE NEED TOMORROW TO TEST AND

09:37AM  22    THEN THE TEAM CAN PUSH IT IN PRODUCTION TOMORROW NIGHT."

09:37AM  23         DO YOU SEE THAT?

09:37AM  24    A.   I DO.

09:37AM  25    Q.   AND YOU WROTE, "OK.

09:37AM 1          "COULD JUST DO FOR HIM ONLY IF HE SHOWS UP --"

09:37AM 2          AND MR. BALWANI SAYS, "HARD TO KNOW WHO HE IS AND WHAT

09:37AM 3    ORDER HE BRINGS.

09:37AM 4          "BETTER A PERFECT VENIPUNCTURE THAN BAD FINGERSTICK."

09:37AM 5          DOES THIS REFRESH YOUR RECOLLECTION THAT YOU AND

09:37AM 6    MR. BALWANI WERE TAKING STEPS TO CONTROL MR. CARREYROU'S

09:37AM 7    EXPERIENCE AT THE WELLNESS CENTER?

09:37AM 8    A.   NO.

09:37AM 9    Q.   YOU GO ON TO WRITE, "IT'S POSSIBLE HE TALKS TO DOCS FIRST

09:38AM 10   DAY AND DOES DRAW SECOND DAY."

09:38AM 11         YOU'RE TALKING ABOUT MR. CARREYROU GOING TO A DOCTOR FIRST

09:38AM 12   AND THEN GOING TO GET A DRAW ON THE SECOND DAY OF HIS VISIT IN

09:38AM 13   ARIZONA, AREN'T YOU?

09:38AM 14   A.   I THINK SO, YES.

09:38AM 15   Q.   OKAY.  "SEEMS LIKE THIS GUY IS LOOKING TO WRITE SOMETHING

09:38AM 16   NEGATIVE."

09:38AM 17         IS THAT WHAT MR. BALWANI WROTE TO YOU?

09:38AM 18   A.   YES.

09:38AM 19   Q.   AND "THAT'S WHAT HE DOES."

09:38AM 20         IS THAT ALSO A REFERENCE TO MR. CARREYROU?

09:38AM 21   A.   I THINK SO.

09:38AM 22   Q.   "EVEN THEN.  WE DON'T WHAT TESTS HE WILL DO.

09:38AM 23         "BUT WE CAN TURN IT INTO PIECE ABOUT WHAT" -- AND THEN CAN

09:38AM 24   YOU HELP US OUT WITH THAT ACRONYM THERE?

09:38AM 25   A.   I THINK IT SAYS SQL.

09:38AM  1    Q.   OKAY.  YOU THEN WROTE, "OUR OPPO GUY KNOWS HIM WELL.

09:38AM  2         "I KNOW."

09:38AM  3         THE OPPO GUY IS PETER FRITSCH, ISN'T IT?

09:38AM  4    A.   I THINK SO, YES.

09:38AM  5    Q.   AND HE WORKS WITH A COMPANY CALLED FUSIONGPS; IS THAT

09:38AM  6    CORRECT?

09:38AM  7    A.   HE DID.

09:38AM  8    Q.   AND YOU AND THERANOS ENGAGED FUSIONGPS TO DO OPPOSITION

09:39AM  9    RESEARCH ON JOHN CARREYROU WHEN YOU LEARNED HE WAS WRITING A

09:39AM  10   NEGATIVE STORY?

09:39AM  11   A.   NO.

09:39AM  12   Q.   WELL, LET'S LOOK AT THE TEXT.  I'LL DRAW YOUR ATTENTION TO

09:39AM  13   PAGE 53.

09:39AM  14        DO YOU HAVE THAT IN FRONT OF YOU, MS. HOLMES?

09:39AM  15   A.   I'M JUST LOOKING AT THE SCREEN.

09:39AM  16   Q.   OKAY.  DO YOU SEE THE TEXT AT 4-25-2015, "HAVE A

09:39AM  17   10:00 A.M. WITH FUSIONGPS"?

09:39AM  18   A.   I DO.

09:39AM  19   Q.   AND THAT IS A REFERENCE TO MR. FRITSCH?

09:39AM  20   A.   I THINK SO, YES.

09:39AM  21   Q.   AND YOU HIRED THEM AFTER LEARNING THAT MR. CARREYROU WAS

09:39AM  22   WRITING THIS STORY?

09:39AM  23   A.   I DON'T KNOW.

09:39AM  24   Q.   WELL, LET'S LOOK FURTHER.

09:39AM  25        YOU WRITE DOWN AT THE BOTTOM, "WE'LL GET KILLER PACKAGE

09:39AM   1      FOR WHEN MEET WITH CARREYROU TO TURN THIS INTO OUR STORY.

09:39AM   2          "GOOD."

09:40AM   3          DO YOU SEE THAT?

09:40AM   4      A.  I DO.

09:40AM   5      Q.  AND THAT'S A REFERENCE TO YOUR WORK WITH FUSIONGPS?

09:40AM   6      A.  I CAN'T TELL FROM THESE TEXT MESSAGES.

09:40AM   7      Q.  AFTER RETAINING FUSIONGPS YOU AND MR. BALWANI JOKED ABOUT

09:40AM   8      MR. CARREYROU'S HERITAGE; IS THAT CORRECT?

09:40AM   9      A.  COULD YOU TELL ME WHAT YOU MEAN?

09:40AM  10      Q.  DO YOU REMEMBER JOKING AT ALL ABOUT HIS HERITAGE?

09:40AM  11      A.  I DON'T.

09:40AM  12      Q.  LET'S LOOK AT PAGE 63 OF 5387D.

09:40AM  13          DO YOU SEE THE TEXT AT 4-29-2015?

09:40AM  14      A.  I DO.

09:40AM  15      Q.  AND YOU WROTE "CARREYROU IS FRENCH"?

09:40AM  16      A.  YES.

09:40AM  17      Q.  AND SUNNY BALWANI RESPONDED, "VERY FUNNY.  EXPLAIN

09:40AM  18      EVERYTHING"?

09:40AM  19      A.  YES.

09:40AM  20      Q.  "HE IS PROUD OF BEING FRENCH?"  IS THAT WHAT MR. BALWANI

09:41AM  21      WROTE?

09:41AM  22      A.  YES.

09:41AM  23      Q.  AND YOU WROTE "I KNOW.

09:41AM  24          "AND PROUD OF IT.

09:41AM  25          PROUD CYNIC."

09:41AM  1          THOSE WERE YOUR WORDS; RIGHT?

09:41AM  2     A.   YES.

09:41AM  3     Q.   AND YOU AND MR. BALWANI ATTEMPTED TO FIGURE OUT WHO

09:41AM  4     MR. CARREYROU'S SOURCES FOR HIS ARTICLE WERE, DIDN'T YOU?

09:41AM  5     A.   WE DID.

09:41AM  6     Q.   YOU EXPRESSED A NEED TO GET AHEAD OF IT; ISN'T THAT RIGHT?

09:41AM  7     A.   I'M NOT QUITE SURE WHAT YOU MEAN BY THAT, BUT WE WERE

09:41AM  8     CERTAINLY ACTIVELY ENGAGED WITH MR. CARREYROU ON HIS REPORTING.

09:41AM  9     Q.   OKAY.  YOU WANTED TO GET AHEAD OF THE STORY, DIDN'T YOU?

09:41AM 10     A.   WE WANTED TO MAKE SURE OUR TRADE SECRETS WEREN'T

09:41AM 11     DISCLOSED.

09:41AM 12     Q.   I UNDERSTAND YOUR ANSWER ABOUT TRADE SECRETS.  I'D LIKE AN

09:41AM 13     ANSWER TO MY QUESTION, PLEASE.

09:41AM 14          YOU WANTED TO GET AHEAD OF IT, DIDN'T YOU?

09:41AM 15     A.   I'M SORRY.  I DON'T QUITE KNOW WHAT YOU MEAN BY "AHEAD OF

09:41AM 16     IT."

09:41AM 17     Q.   WELL, LET'S LOOK AT YOUR TEXTS.  IF I COULD DRAW YOUR

09:41AM 18     ATTENTION TO PLEASE TO PAGE 76 --

09:42AM 19     A.   OKAY.

09:42AM 20     Q.   -- OF 5387D.

09:42AM 21          AND I DRAW YOUR ATTENTION TO THE BOTTOM EMAIL FROM

09:42AM 22     MR. BALWANI ON MAY 13TH, 2015.

09:42AM 23          DO YOU SEE WHERE HE WRITES, "I AM NARROWING THIS DOWN IN

09:42AM 24     CLIA.  DOWN TO 5 PEOPLE.  WILL NAIL THIS," AND THEN THERE'S AN

09:42AM 25     EXPLETIVE.

09:42AM  1          DO YOU SEE THAT?

09:42AM  2     A.   I DO.

09:42AM  3     Q.   AND THEN IF WE CAN LOOK AT THE NEXT PAGE, PAGE 77.

09:42AM  4          AM I RIGHT YOU RESPOND, "WHO DO U THINK.

09:42AM  5          "NOW WE HAVE LEGAL GROUNDS."

09:42AM  6          AND MR. BALWANI RESPONDS, "YES."

09:42AM  7          DO YOU SEE THAT?

09:42AM  8     A.   I DO.

09:42AM  9     Q.   AND THAT'S A REFERENCE TO YOUR EFFORT TO FIGURE OUT WHO

09:42AM  10    MR. CARREYROU'S SOURCES ARE, ISN'T IT?

09:43AM  11    A.   NO.  I THINK THAT WAS REFERRING TO SUNNY'S COMMENTS ABOUT

09:43AM  12    A GLASS DOOR POST.

09:43AM  13    Q.   YOU SAW WHERE HE WROTE, "I'M NARROWING THIS DOWN IN CLIA,

09:43AM  14    DOWN TO 5 PEOPLE.  WILL NAIL THIS," AND THEN THE EXPLETIVE?

09:43AM  15    A.   I DO.

09:43AM  16    Q.   AND YOUR REFERENCE, THAT'S TO A GLASS DOOR POST?

09:43AM  17    A.   I THINK SO.  IF YOU COULD SWITCH BACK TO THE OTHER TEXT

09:43AM  18    RIGHT ABOVE IT, IT WAS TALKING ABOUT GLASS DOOR.

09:43AM  19    Q.   AND YOU'RE PAYING ATTENTION, WHATEVER THE CONTEXT OF THIS

09:43AM  20    TEXT, YOU'RE PAYING ATTENTION TO THE GLASS DOOR REVIEWS BECAUSE

09:43AM  21    YOU KNEW THAT WAS SOMETHING THAT MR. CARREYROU MIGHT BE LOOKING

09:43AM  22    AT?

09:43AM  23    A.   NO.

09:43AM  24    Q.   LET'S LOOK FURTHER ON PAGE 77.

09:43AM  25          DO YOU SEE WHERE IT SAYS, "IF TYLER THINKING ABT GEORGE

09:43AM 1     FYI AT RIGHT TIME."

09:43AM 2         YOU WROTE THAT?

09:43AM 3     A.   I DID.

09:43AM 4     Q.   TYLER IS A REFERENCE TO TYLER SHULTZ?

09:43AM 5     A.   YES.

09:43AM 6     Q.   AND YOU TESTIFIED ABOUT MR. SHULTZ ON DIRECT EXAMINATION?

09:43AM 7     A.   I DID.

09:43AM 8     Q.   AND THE GEORGE IS A REFERENCE TO GEORGE SHULTZ?

09:43AM 9     A.   IT IS.

09:44AM 10    Q.   AND THIS IS YOU EXPRESSING YOU MIGHT GO TO GEORGE SHULTZ

09:44AM 11    AT SOME POINT IF THE SOURCE IS TYLER?

09:44AM 12    A.   IT COULD BE.

09:44AM 13    Q.   YOU THEN WROTE, "BUT ALSO LOTS OF LEGAL ELEMENTS HERE.

09:44AM 14        "NEED TO GET AHEAD OF ALL OF IT."

09:44AM 15        DOES THAT REFRESH YOUR MEMORY THAT YOU WERE TRYING TO GET

09:44AM 16    AHEAD OF ALL OF IT?

09:44AM 17    A.   IT DOESN'T.

09:44AM 18    Q.   READING THESE WORDS ON THE PAGE DOESN'T REFRESH YOUR

09:44AM 19    MEMORY AT ALL?

09:44AM 20    A.   I HAVE MEMORY OF THIS, BUT I DON'T KNOW EXACTLY WHAT I

09:44AM 21    MEANT BY GETTING AHEAD OF IT.

09:44AM 22    Q.   OKAY.  YOU WEREN'T WORRIED ABOUT MR. CARREYROU'S STORY?

09:44AM 23    A.   WE WERE VERY WORRIED ABOUT MR. CARREYROU'S STORY.

09:44AM 24    Q.   YOU THEN WROTE, "OUT OF ALL CHALLENGES ARE GREATEST

09:44AM 25    OPPORTUNITIES."

09:44AM  1        AND MR. BALWANI RESPONDS, "ABSOLUTELY.  THIS ONE IS FAIRLY

09:44AM  2   EASY TO GET AHEAD OF.  THIS ENTIRE EMAIL IS BASED ON TYLER,"

09:44AM  3   AND THEN WE'VE REDACTED, "AND MAYBE ADAM."

09:45AM  4        THE ADAM IS DR. ROSENDORFF; CORRECT?

09:45AM  5   A.  IT IS.

09:45AM  6   Q.  AND MR. BALWANI THEN WROTE FURTHER DOWN, "EXTREMELY

09:45AM  7   SERIOUS LEGAL IMPLICATIONS.  HE BASICALLY VIOLATED AND SHARED

09:45AM  8   OUR TRADE SECRETS DOWN TO MACHINE NAMES.

09:45AM  9        "AND ASSAYS IN WHAT DEVICE.

09:45AM  10        "IT IS TYLER, ERIKA, AND ADAM."

09:45AM  11        DO YOU SEE THAT LANGUAGE?

09:45AM  12   A.  I DO.

09:45AM  13   Q.  AND YOU AND MR. BALWANI SURMISED THAT ERIKA CHEUNG WAS ONE

09:45AM  14   OF JOHN CARREYROU'S SOURCES?

09:45AM  15   A.  YES.

09:45AM  16   Q.  AND THE ERIKA THERE IS ERIKA CHEUNG; AM I RIGHT ABOUT

09:45AM  17   THAT?

09:45AM  18   A.  IT IS, YES.

09:45AM  19   Q.  AND SO AT THIS POINT YOU KNEW WHO ERIKA CHEUNG WAS?

09:45AM  20   A.  I DID.

09:45AM  21   Q.  YOU DON'T RESPOND BY WRITING SOMETHING LIKE, WHO IS ERIKA

09:45AM  22   AND WHY WOULD MR. CARREYROU WANT TO BE TALKING TO HER?

09:45AM  23   A.  NO, I DID NOT.

09:45AM  24   Q.  AND YOU RECALL THAT MS. CHEUNG TESTIFIED IN THIS TRIAL;

09:45AM  25   CORRECT?

09:45AM 1    A.   I DO.

09:45AM 2    Q.   SHE WORKED AT THERANOS FROM 2013 TO 2014?

09:45AM 3    A.   THAT SOUNDS ABOUT RIGHT.

09:46AM 4    Q.   DO YOU RECALL HER TESTIFYING ABOUT EXAMPLES OF THERANOS

09:46AM 5    RUNNING PATIENT SAMPLES AFTER FAILING QUALITY CONTROL?

09:46AM 6    A.   I DO.

09:46AM 7    Q.   AND YOU RECALL HER TESTIFYING ABOUT HOW THERANOS'S TSPU,

09:46AM 8    THE EDISON DEVICE, WAS FAILING QUALITY CONTROL REPEATEDLY.

09:46AM 9         YOU RECALL THAT TESTIMONY?

09:46AM 10   A.   I DO.

09:46AM 11   Q.   AND YOU KNOW THAT IN 2015 AND 2016, THOSE TWO ISSUES WERE

09:46AM 12   ALSO RAISED BY CMS IN THEIR REPORT TO YOU; IS THAT CORRECT?

09:46AM 13   A.   YES.

09:46AM 14   Q.   ERIKA CHEUNG WAS RIGHT WHEN SHE WAS RAISING ISSUES ABOUT

09:46AM 15   THE 3.5, WASN'T SHE?

09:46AM 16   A.   I DON'T THINK SHE WAS RIGHT ABOUT THE SPECIFIC ISSUES THAT

09:46AM 17   SHE WAS RAISING BASED ON MY UNDERSTANDING, BUT I SURE AS HELL

09:46AM 18   WISH WE HAD TREATED HER DIFFERENTLY AND LISTENED TO HER.

09:46AM 19   Q.   YOU DON'T THINK THE CMS REPORT VINDICATES HER IN ANY WAY?

09:46AM 20   A.   I THINK IN A WAY IT DOES.

09:46AM 21   Q.   BUT THERANOS CHOSE NOT TO LISTEN TO HER AT THE TIME?

09:46AM 22   A.   MY UNDERSTANDING IS THAT WE DID LISTEN TO HER, BUT THE

09:47AM 23   TEAM BELIEVED THE SPECIFIC ISSUES SHE HAD IDENTIFIED WERE NOT

09:47AM 24   ACTUALLY CORRECTLY IDENTIFIED.

09:47AM 25   Q.   THERANOS CHOSE NOT TO LISTEN TO HER; ISN'T THAT CORRECT,

1    MS. HOLMES?

2    A.    NO.

3    Q.    THERANOS DIDN'T MAKE A DECISION NOT TO LISTEN TO HER?

4    THAT'S YOUR TESTIMONY?

5    A.    THAT'S NOT MY MEMORY OF IT.

6    Q.    OKAY.  YOU CHOSE NOT TO LISTEN TO ERIKA CHEUNG AND WHAT

7    SHE WAS RAISING?

8    A.    I DON'T THINK I THOUGHT THAT THERE WERE ISSUES AT THAT

9    TIME.  I THOUGHT THAT THE TEAM'S ANALYSIS WAS THAT THOSE WERE

10   ACTUALLY NOT ISSUES THAT SHE WAS RAISING.

11   Q.    YOU DIDN'T ASK MR. BALWANI AT THE TIME, WHAT IS SHE

12   TALKING ABOUT?

13   A.    I ASKED DR. YOUNG TO MAKE -- TO LOOK INTO IT, AND MY

14   UNDERSTANDING WAS THAT THE ISSUES THAT SHE WAS RAISING WERE NOT

15   ISSUES THAT DR. YOUNG AGREED WITH.

16   Q.    OKAY.  BUT YOU KNOW TODAY THAT MS. CHEUNG WAS RIGHT; ISN'T

17   THAT FAIR?

18   A.    YES.

19   Q.    AND INSTEAD OF LISTENING TO MS. CHEUNG, THERANOS CHOSE TO

20   RETALIATE AGAINST HER; ISN'T THAT CORRECT?

21   A.    NO.

22   Q.    THERANOS DIDN'T HIRE DAVID BOIES'S LAW FIRM TO TRACK HER

23   DOWN AND SERVE HER WITH LEGAL PROCESS?

24   A.    WE DID HIRE DAVID BOIES'S LAW FIRM TO SERVE HER WITH THE

25   SUBPOENA.

```
09:48AM   1      Q.   OKAY.  YOU CHOSE TO THREATEN HER?

09:48AM   2      A.   NO.

09:48AM   3      Q.   THERANOS CHOSE TO THREATEN HER?

09:48AM   4      A.   I DON'T THINK SO.

09:48AM   5      Q.   THERANOS CHOSE TO THREATEN HER WITH A LAWSUIT; IS THAT

09:48AM   6      FAIR?

09:48AM   7      A.   I'M NOT SURE.

09:48AM   8      Q.   WELL, LET'S LOOK.

09:48AM   9           CAN I DRAW YOUR ATTENTION TO PAGE 85 OF THE TEXTS?

09:48AM  10      A.   OKAY.

09:48AM  11      Q.   DO YOU SEE THE DATE OF JUNE 26TH, 2015?

09:48AM  12      A.   I DO.

09:48AM  13      Q.   DO YOU SEE WHERE IT SAYS, "I AM OK SENDING LETTER TO ERIKA

09:48AM  14      AS IN HEATHERS EMAIL."

09:48AM  15      A.   I DO.

09:48AM  16      Q.   AND THAT'S FROM MR. BALWANI?

09:49AM  17      A.   YES.

09:49AM  18      Q.   AND HEATHER IS A REFERENCE TO HEATHER KING, THE GENERAL

09:49AM  19      COUNSEL?

09:49AM  20      A.   IT IS.

09:49AM  21      Q.   OKAY.  I'D LIKE TO SHOW YOU WHAT IS IN EVIDENCE AS

09:49AM  22      EXHIBIT 2567.

09:49AM  23      A.   OKAY.  GOT IT.

09:49AM  24      Q.   DO YOU SEE THE DATE OF JUNE 26TH, 2015?

09:49AM  25      A.   I DO.
```

09:49AM 1    Q.   THAT'S THE SAME DATE OF THE TEXT THAT WE WERE JUST LOOKING

09:49AM 2    AT?

09:49AM 3    A.   I DIDN'T REMEMBER THAT, BUT I'M SURE YOU'RE RIGHT.

09:49AM 4    Q.   OKAY.  AND DO YOU SEE THE HEADING BOIES, SCHILLER &

09:49AM 5    FLEXNER AT THE TOP?

09:49AM 6    A.   I DO.

09:49AM 7    Q.   AND THAT'S DAVID BOIES'S LAW FIRM?

09:49AM 8    A.   IT IS.

09:49AM 9    Q.   ONE OF THE MOST POWERFUL LAW FIRMS IN THE WORLD?

09:49AM 10   A.   I THOUGHT THAT.

09:49AM 11   Q.   YOU THOUGHT THAT AT THE TIME?

09:50AM 12   A.   I DID.

09:50AM 13   Q.   AND THAT'S WHY YOU WERE SENDING THEM AFTER ERIKA CHEUNG?

09:50AM 14   A.   NO.

09:50AM 15   Q.   WELL, DOESN'T THIS SAY THAT "YOU'RE DIRECTED TO

09:50AM 16   IMMEDIATELY CEASE AND DESIST FROM THESE ACTIVITIES.  UNLESS

09:50AM 17   THIS IS RESOLVED, WE'LL CONSIDER ALL APPROPRIATE REMEDIES IN

09:50AM 18   FILING SUIT AGAINST YOU"?

09:50AM 19        DIDN'T THERANOS THREATEN HER WITH A LAWSUIT IN OR AROUND

09:50AM 20   JUNE OF 2015?

09:50AM 21   A.   I SEE THAT HERE.

09:50AM 22   Q.   AND YOU KNEW IT WAS HAPPENING AT THE TIME?

09:50AM 23   A.   I KNEW OUR LAWYERS WERE FOLLOWING UP WITH HER TO MAKE SURE

09:50AM 24   THAT SHE STOPPED DISCLOSING TRADE SECRET INFORMATION.

09:50AM 25   Q.   YOU KNEW IT WAS HAPPENING AT THE TIME.  THAT WAS MY

09:50AM 1     QUESTION.  IS THAT FAIR?

09:50AM 2     A.   AGAIN, I KNEW OUR LAWYERS WERE FOLLOWING UP WITH HER TO

09:50AM 3     MAKE SURE SHE STOPPED DISCLOSING TRADE SECRET INFORMATION.

09:50AM 4     Q.   YOU KEEP INJECTING THAT COMMENT OF TRADE SECRETS INTO YOUR

09:50AM 5     ANSWER, AND WE'LL GET TO THAT.

09:50AM 6         MY QUESTION IS THAT YOU WERE AWARE THAT THIS WAS HAPPENING

09:50AM 7     AT THE TIME?

09:50AM 8     A.   THAT BOIES SCHILLER WAS SENDING HER A LETTER?  YES.

09:50AM 9     Q.   WERE YOU ALSO AWARE THAT THERANOS PAID TWO PRIVATE

09:51AM 10    INVESTIGATION FIRMS NEARLY $150,000 TO AID IN THIS EFFORT TO

09:51AM 11    RETALIATE AGAINST MS. CHEUNG?

09:51AM 12    A.   I'M NOT SURE.

09:51AM 13    Q.   WELL, LET ME SEE IF I CAN REFRESH YOUR RECOLLECTION.

09:51AM 14        LET ME DRAW YOUR ATTENTION TO PAGE -- OR EXHIBIT 5482.

09:51AM 15    A.   I'M NOT SURE IF I HAVE 5482.

09:51AM 16            MR. LEACH:  MAY I APPROACH THE WITNESS, YOUR HONOR?

09:51AM 17            THE COURT:  YES.

09:51AM 18            THE WITNESS:  OH, I'M SORRY.  I DO.  SORRY.

09:51AM 19    BY MR. LEACH:

09:51AM 20    Q.   I'M NOT SURE I HAVE 5482, SO IF I CAN LOOK AT YOURS?

09:51AM 21    A.   OH, YES.  IT'S RIGHT HERE (HANDING).

09:52AM 22    Q.   MS. HOLMES, I'D LIKE TO DRAW YOUR ATTENTION TO THE FIRST

09:52AM 23    PAGE OF EXHIBIT 5482, AND I'LL RETURN THIS TO YOU IN A SECOND.

09:52AM 24    A.   OKAY.

09:52AM 25    Q.   AND THERE'S A LINE IN ROUGHLY THE MIDDLE OF THE PAGE WITH

09:52AM 1    A REFERENCE TO SOME NAMES AND SOME DOLLAR FIGURES.

09:52AM 2         AND MY QUESTION TO YOU IS, DOES THIS REFRESH YOUR

09:52AM 3    RECOLLECTION?

09:52AM 4    A.   OKAY.

09:52AM 5    Q.   (HANDING.)

09:52AM 6    A.   THANK YOU.

09:52AM 7    Q.   YOU'RE WELCOME.

09:52AM 8         HAVE YOU HAD AN OPPORTUNITY TO REVIEW THE LINE THAT I

09:53AM 9    REFERRED TO?

09:53AM 10   A.   YOU SAID THE FIRST PAGE?

09:53AM 11   Q.   FIRST PAGE?

09:53AM 12   A.   YES.

09:53AM 13   Q.   ROUGHLY HALFWAY DOWN?

09:53AM 14   A.   YES, I SEE IT.  I SEE IT.

09:53AM 15   Q.   OKAY.  DOES THIS REFRESH YOUR RECOLLECTION THAT THERANOS

09:53AM 16   PAID TWO PRIVATE INVESTIGATION FIRMS NEARLY $150,000 TO AID IN

09:53AM 17   ITS EFFORT AGAINST MS. CHEUNG?

09:53AM 18   A.   IT DOES NOT.

09:53AM 19   Q.   AFTER THE CARREYROU ARTICLE CAME OUT IN OCTOBER OF 2015,

09:53AM 20   YOU TRIED TO DISMISS ERIKA CHEUNG AS A LOW LEVEL DISGRUNTLED

09:53AM 21   EMPLOYEE; IS THAT CORRECT?

09:53AM 22   A.   WE DID.

09:53AM 23   Q.   IS THAT ANOTHER THING YOU WISH YOU HAD DONE DIFFERENTLY?

09:53AM 24   A.   100 PERCENT.  I THINK I MISHANDLED THE ENTIRE PROCESS OF

09:53AM 25   "THE WALL STREET JOURNAL" REPORTING.

09:53AM  1    Q.   YOU ALSO SURMISED THAT ONE OF MR. CARREYROU'S SOURCES WAS

09:53AM  2    TYLER SHULTZ; ISN'T THAT RIGHT?

09:53AM  3    A.   YES.

09:53AM  4    Q.   AND TYLER SHULTZ WAS THE GRANDSON OF GEORGE SHULTZ?

09:54AM  5    A.   HE WAS.

09:54AM  6    Q.   GEORGE SHULTZ WAS ONE OF YOUR MENTORS; IS THAT CORRECT?

09:54AM  7    A.   HE WAS.

09:54AM  8    Q.   HE WAS ON YOUR BOARD?

09:54AM  9    A.   YES.

09:54AM  10   Q.   YOU WERE VERY CLOSE TO HIM?

09:54AM  11   A.   I WAS.

09:54AM  12   Q.   YOU WERE ALSO VERY CLOSE WITH HIS WIFE, CHARLOTTE; ISN'T

09:54AM  13   THAT RIGHT?

09:54AM  14   A.   I, I WOULD LIKE TO THINK SO.  I KNEW HER LESS WELL.

09:54AM  15   Q.   YOU HAD WEEKLY MEETINGS AT GEORGE AND CHARLOTTE SHULTZ'S

09:54AM  16   HOUSE?

09:54AM  17   A.   I DID.

09:54AM  18   Q.   YOU WOULD MEET WITH HIM ONE ON ONE ALMOST EVERY WEEK?

09:54AM  19   A.   YES.

09:54AM  20   Q.   AND HE WOULD GIVE YOU ADVICE ON HOW TO RUN THE BUSINESS?

09:54AM  21   A.   HE DID.

09:54AM  22   Q.   YOU ATTENDED HOLIDAY PARTIES AT THE SHULTZ'S RESIDENCE;

09:54AM  23   ISN'T THAT RIGHT?

09:54AM  24   A.   I DID.

09:54AM  25   Q.   AND TYLER CAME TO WORK AT THERANOS IN 2013.

| 09:54AM | 1 | DOES THAT SOUND ABOUT RIGHT? |
| 09:54AM | 2 | A.  YES. |
| 09:54AM | 3 | Q.  AND HE WENT DIRECTLY TO YOU WITH PROBLEMS THAT HE WAS |
| 09:54AM | 4 | OBSERVING WITH THE THERANOS DEVICE, THE EDISON 3.5; ISN'T THAT |
| 09:54AM | 5 | RIGHT? |
| 09:54AM | 6 | A.  HE DID. |
| 09:54AM | 7 | Q.  LET ME DRAW YOUR ATTENTION TO WHAT IS IN EVIDENCE AS |
| 09:55AM | 8 | EXHIBIT 7421.  THIS IS A DOCUMENT THAT MR. DOWNEY SHOWED YOU |
| 09:55AM | 9 | THE OTHER DAY.  IT'S NOT IN YOUR BINDER, BUT PERHAPS WE CAN |
| 09:55AM | 10 | SHOW IT ON THE SCREEN. |
| 09:55AM | 11 | A.  YEAH. |
| 09:55AM | 12 | Q.  MAYBE THE ELMO IS THE BEST WAY TO GO FOR THIS. |
| 09:55AM | 13 | MAY I HAVE A MOMENT, YOUR HONOR? |
| 09:55AM | 14 | THE COURT:  YES. |
| 09:56AM | 15 | (PAUSE IN PROCEEDINGS.) |
| 09:56AM | 16 | MR. LEACH:  THANK YOU, YOUR HONOR. |
| 09:56AM | 17 | Q.  MS. HOLMES, ARE YOU ABLE TO SEE 7421 ON THE SCREEN? |
| 09:56AM | 18 | A.  I AM. |
| 09:56AM | 19 | Q.  AND THIS STARTS WITH AN EMAIL FROM DANIEL YOUNG TO YOU AND |
| 09:57AM | 20 | MR. BALWANI REGARDING SYPHILIS VALIDATIONS; IS THAT CORRECT? |
| 09:57AM | 21 | A.  YES. |
| 09:57AM | 22 | Q.  AND GOING ON PAGE 1 LATER THAT DAY, OR LATER IN FEBRUARY, |
| 09:57AM | 23 | DR. YOUNG REPORTS ON A CONVERSATION THAT HE HAD HAD WITH TYLER |
| 09:57AM | 24 | REGARDING SYPHILIS; IS THAT FAIR? |
| 09:57AM | 25 | A.  YES. |

09:57AM 1    Q.   AND MR. DOWNEY ASKED YOU SOME QUESTIONS ABOUT SOME OF THE

09:57AM 2    BULLETS ON THIS.  I'D LIKE TO DRAW YOUR ATTENTION TO THE FIFTH

09:57AM 3    BULLET WHERE IT SAYS, "REGARDING PERFORMANCE CLAIMS, HE SEEMED

09:57AM 4    VERY SURPRISED AND I ASKED HIM WHERE HE THOUGHT WE CLAIMED

09:57AM 5    SUPERIOR PERFORMANCE OVER OTHER TESTS."

09:57AM 6         DO YOU SEE THAT LANGUAGE?

09:57AM 7    A.   I DO.

09:57AM 8    Q.   AND THEN DR. YOUNG REPORTED, "THE BEST HE" -- THAT'S A

09:57AM 9    REFERENCE TO TYLER -- "THE BEST HE COULD COME UP WITH WAS

09:58AM 10   SAYING HE THOUGHT SUPERIOR ACCURACY WAS MENTIONED IN SOME OF

09:58AM 11   THE ARTICLES THAT HAVE BEEN WRITTEN ABOUT THERANOS.  I ASKED

09:58AM 12   HIM TO FOLLOW UP AND HIGHLIGHT THESE SPECIFICALLY FOR ME."

09:58AM 13        DO YOU SEE THAT LANGUAGE?

09:58AM 14   A.   I DO.

09:58AM 15   Q.   AND YOU UNDERSTOOD THAT MR. SHULTZ, IN ADDITION TO RAISING

09:58AM 16   ISSUES ABOUT SYPHILIS AND PT, HE WAS ALSO RAISING ISSUES ABOUT

09:58AM 17   SOME OF THE PUBLIC CLAIMS THAT WERE OUT THERE ABOUT THERANOS?

09:58AM 18   A.   I DID.

09:58AM 19   Q.   FURTHER UP IN THE CHAIN, MR. BALWANI ASKED, "HOW LONG DID

09:58AM 20   YOU SPEND WITH HIM?  THIS SEEMS TO BE AN OVERKILL."

09:58AM 21        DO YOU SEE THAT LANGUAGE?

09:58AM 22   A.   I DO.

09:58AM 23   Q.   AND WHAT DID YOU UNDERSTAND "OVERKILL" TO MEAN?

09:58AM 24   A.   THAT SUNNY THOUGHT THAT DANIEL WAS SPENDING TOO MUCH TIME

09:58AM 25   WITH HIM.

09:58AM 1    Q.   TOO MUCH TIME RESPONDING TO TYLER SHULTZ'S COMPLAINTS?

09:58AM 2    A.   YES.

09:58AM 3    Q.   YOU THEN WROTE, "DID HE UNDERSTAND WITH THE PT POINT?

09:58AM 4    AGREE WITH THE BELOW."

09:58AM 5         DID I READ THAT CORRECTLY?

09:59AM 6    A.   YOU DID.

09:59AM 7    Q.   AND THAT'S A REFERENCE TO THE ISSUE WHERE THERANOS SPLIT

09:59AM 8    SOME OF THE PT SAMPLES -- THAT'S A REFERENCE TO AN EVENT IN

09:59AM 9    2014 WHEN THERANOS SPLIT SOME OF THE PT SAMPLES AND RAN THEM ON

09:59AM 10   THE EDISON DEVICE; IS THAT RIGHT?

09:59AM 11   A.   YES.  I THINK IT WAS AN EXPERIMENT, NOT ACTUAL PT SAMPLES.

09:59AM 12   Q.   I'D NEXT LIKE TO DRAW YOUR ATTENTION IN THIS CONVERSATION

09:59AM 13   ABOUT MR. SHULTZ, MS. HOLMES, TO EXHIBIT 1660.

09:59AM 14   A.   OKAY.

09:59AM 15   Q.   AND I BELIEVE 1660 IS IN EVIDENCE.

09:59AM 16          THE COURT:  YES, IT IS.

09:59AM 17          MR. LEACH:  IF WE COULD PLEASE DISPLAY THAT,

10:00AM 18   MS. HOLLIMAN.  ARE YOU ABLE TO DISPLAY THAT?  GREAT.

10:00AM 19   Q.   DO YOU SEE THIS IS AN EMAIL FROM TYLER SHULTZ TO YOU ON

10:00AM 20   APRIL 11TH, 2014, MS. HOLMES?

10:00AM 21   A.   I DO.

10:00AM 22   Q.   AND SO THIS IS AFTER THE EXCHANGE THAT WE JUST SAW IN THE

10:00AM 23   PRIOR EXHIBIT?

10:00AM 24   A.   I THINK SO.

10:00AM 25   Q.   AND MR. SHULTZ STILL HAS CONCERNS ABOUT WHAT IS GOING ON

10:00AM 1    OVER AT THERANOS; IS THAT FAIR?

10:00AM 2    A.   YES.

10:00AM 3    Q.   AND LET ME START AT THE BEGINNING OF THE EMAIL CHAIN.  IF

10:00AM 4    WE COULD PLEASE GO TO PAGE 6.

10:00AM 5         DO YOU SEE WHERE HE WROTE, "WHEN YOU HAVE TIME COULD I

10:00AM 6    POSSIBLY HAVE HALF AN HOUR TO FOLLOW UP ON OUR PREVIOUS MEETING

10:00AM 7    ABOUT RPR TEST?  I KNOW YOU ARE EXTREMELY BUSY, SO I WOULDN'T

10:00AM 8    MIND WAITING UNTIL AN EVENING AFTER THE CRAZINESS OF THE WORK

10:00AM 9    DAY DIES DOWN."

10:00AM 10        DO YOU SEE THAT LANGUAGE?

10:00AM 11   A.   I DO.

10:00AM 12   Q.   AND NOW IF WE COULD GO TO PAGE 5 -- OR EXCUSE ME, PAGE 1.

10:01AM 13        AND I DRAW YOUR ATTENTION TO THE SECOND PARAGRAPH.

10:01AM 14        DO YOU SEE WHERE HE WROTE, "WHILE I UNDERSTAND THAT

10:01AM 15   CALCULATING CV BASED ON THE MEDIANS IS RELEVANT FOR COMPARING

10:01AM 16   OUR SYSTEM TO SYSTEMS OF OUR COMPETITORS, THE FACT THAT THE CV

10:01AM 17   OF OUR CUT OFF LEVEL FOR SYPHILIS RPR DROPS FROM 43 PERCENT TO

10:01AM 18   LESS THAN 20 PERCENT BY MOVING FROM CV OF THE ENTIRE DATA SET

10:01AM 19   TO CV OF THE MEDIANS TELLS ME THAT THE SIGNIFICANT PORTION OF

10:01AM 20   OUR DATA IS JUST NOISE."

10:01AM 21        DO YOU SEE THAT LANGUAGE?

10:01AM 22   A.   I DO.

10:01AM 23   Q.   AND THAT WAS THE THRUST OF THE CONCERN THAT MR. SHULTZ WAS

10:01AM 24   RAISING ABOUT SYPHILIS?

10:01AM 25   A.   I DON'T REMEMBER THAT.  I REMEMBER IT BEING A CONCERN OF

10:01AM  1    HOW WE WERE SETTING OUR EQUIVOCAL ZONE, BUT I SEE THAT HE'S

10:01AM  2    ALSO RAISING THIS CONCERN.

10:01AM  3    Q.   OKAY.  AND IF WE GO TO THE NEXT PARAGRAPH.

10:02AM  4        DO YOU SEE WHERE HE WROTE, "IN OUR VALIDATION REPORTS,"

10:02AM  5    ROUGHLY IN THE MIDDLE, "THERE IS NEVER ANY MENTION OF HOW MANY

10:02AM  6    ATTEMPTS OF PRECISION OR COMPARABILITY TESTING IT TOOK TO GET

10:02AM  7    THE DATA THAT'S PRESENTED."

10:02AM  8        DO YOU SEE THAT LANGUAGE?

10:02AM  9    A.   I DO.

10:02AM  10   Q.   I NEXT WANT TO DRAW YOUR ATTENTION TO THE FOURTH

10:02AM  11   PARAGRAPH.  MR. SHULTZ IS WRITING, "I THEN ASKED DANIEL IF HE

10:02AM  12   THOUGHT OUR SYPHILIS TEST WAS TRULY THE MOST ACCURATE AND MOST

10:02AM  13   PRECISE SYPHILIS TEST ON THE MARKET.  HE SAID THAT THERANOS

10:02AM  14   DOES NOT CLAIM TO HAVE THE MOST ACCURATE OR PRECISE TESTS, AND

10:02AM  15   THAT IF I COULD FIND ANY MARKETING MATERIALS THAT MAKE SUCH

10:02AM  16   CLAIMS, THAT I SHOULD FORWARD THEM TO HIM."

10:02AM  17       DID I READ THAT CORRECTLY?

10:02AM  18   A.   YES.

10:02AM  19   Q.   "A QUICK GOOGLE SEARCH YIELDS A HANDFUL OF ARTICLES THAT

10:02AM  20   EXPLICITLY MAKE THESE CLAIMS.  DANIEL AGREED THAT THE AUTHORS

10:02AM  21   MAKE SWEEPING STATEMENTS ABOUT OUR ASSAYS PERFORMANCES, BUT

10:03AM  22   NOTED THAT THERANOS NEVER DIRECTLY MADE ANY OF THESE CLAIMS."

10:03AM  23       DO YOU SEE THAT LANGUAGE?

10:03AM  24   A.   I DO.

10:03AM  25   Q.   "IF WELL-ESTABLISHED INSTITUTIONS SUCH AS 'THE

10:03AM  1    WALL STREET JOURNAL' HAVE PUBLISHED MISINFORMATION ABOUT

10:03AM  2    THERANOS, IT SEEMS IT WOULD BE IN OUR BEST LONG-TERM INTEREST

10:03AM  3    TO CORRECT THIS INFORMATION IN ORDER TO UPHOLD OUR IMAGE OF

10:03AM  4    BRINGING TRANSPARENCY TO BLOOD TESTING."

10:03AM  5         DID I READ THAT CORRECTLY?

10:03AM  6    A.   YOU DID.

10:03AM  7    Q.   AND THE TIMING OF THIS IS APRIL OF 2014; CORRECT?

10:03AM  8    A.   IT IS.

10:03AM  9    Q.   SO THIS IS AFTER MR. RAGO WROTE HIS PIECE ABOUT THERANOS

10:03AM 10    IN "THE WALL STREET JOURNAL" IN SEPTEMBER OF 2013?

10:03AM 11    A.   YES.

10:03AM 12    Q.   THIS WAS AFTER YOU SAT DOWN WITH ERIC TOPOL AND TALKED TO

10:03AM 13    HIM ABOUT THERANOS'S TECHNOLOGY AND WHAT YOU THOUGHT IT COULD

10:03AM 14    DO?

10:03AM 15    A.   IT IS.

10:03AM 16    Q.   AND THIS IS AFTER THE PRESS RELEASES ABOUT THE WALGREENS

10:03AM 17    RELATIONSHIP; CORRECT?

10:03AM 18    A.   IT IS.

10:03AM 19    Q.   OKAY.  THIS IS BEFORE YOU TALKED TO ROGER PARLOFF.  AM I

10:03AM 20    RIGHT ABOUT THAT PART?

10:03AM 21    A.   I THINK -- YES.

10:04AM 22    Q.   OKAY.

10:04AM 23    A.   RIGHT AROUND THE SAME TIME.

10:04AM 24    Q.   RIGHT AROUND THE SAME TIME?

10:04AM 25    A.   YEP.

10:04AM  1    Q.   TYLER SHULTZ IS SAYING THERE'S STUFF IN THE PUBLIC DOMAIN

10:04AM  2    ABOUT ACCURACY, THERANOS IS NOT SAYING THIS, BUT MAYBE WE

10:04AM  3    SHOULD BE WORRIED ABOUT THAT.

10:04AM  4         IS THAT A FAIR SUMMARY OF HIS CONCERNS?

10:04AM  5    A.   YES.

10:04AM  6    Q.   HE THEN WROTE, "I THEN THOUGHT BACK TO OUR PREVIOUS

10:04AM  7    DISCUSSION WHEN I ASKED ABOUT OUR CLAIM OF HAVING LESS THAN

10:04AM  8    10 PERCENT CV FOR ASSAYS."

10:04AM  9         MAYBE IF WE COULD PULL THAT UP, MS. HOLLIMAN.

10:04AM  10        DO YOU SEE THAT LANGUAGE?

10:04AM  11   A.   I DO.

10:04AM  12   Q.   AND HAVING A LOW CV IS GENERALLY DESIRABLE FOR A BLOOD

10:04AM  13   TESTING COMPANY?

10:04AM  14   A.   IT IS.

10:04AM  15   Q.   "WE CHECKED THE THERANOS WEBSITE TOGETHER AND FOUND THAT

10:04AM  16   WE ONLY MAKE THIS CLAIM FOR VITAMIN D.  I CHECKED THE 2-TIP

10:04AM  17   VALIDATION DATA (WE WERE RUNNING 2-TIP PROTOCOL AT THE TIME)

10:04AM  18   AND FOUND THAT THE CV'S FOR OUR 3 LEVELS WERE 18 PERCENT,

10:05AM  19   16 PERCENT, AND 19 PERCENT WHEN CALCULATED BASED ON THE MEDIAN

10:05AM  20   OF EACH PRECISION RUN AND 23 PERCENT, 23 PERCENT, AND

10:05AM  21   25 PERCENT WHEN CALCULATED BASED ON THE ENTIRE DATA SET."

10:05AM  22        DID I READ THAT CORRECTLY?

10:05AM  23   A.   YOU DID.

10:05AM  24   Q.   "HERE ARE SCATTER PLOTS FOR THE RESULTS OF VITAMIN D

10:05AM  25   PRECISION TESTING, THEY DON'T SEEM TO MEET THE STANDARD WE

10:05AM 1     CLAIM ON OUR WEBSITE FOR VITAMIN D."

10:05AM 2         DO YOU SEE THAT?

10:05AM 3     A.   I DO.

10:05AM 4     Q.   AND THERANOS ALSO MADE CLAIMS ABOUT ITS CV FOR VITAMIN D

10:05AM 5     IN INVESTOR POWERPOINTS?

10:05AM 6     A.   WE DID.

10:05AM 7     Q.   YOU'VE SEEN SOME OF THOSE SLIDES IN THIS TRIAL, HAVEN'T

10:05AM 8     YOU, MS. HOLMES?

10:05AM 9     A.   YES.

10:05AM 10    Q.   AFTER RECEIVING THIS EMAIL FROM MR. SHULTZ, I UNDERSTAND

10:05AM 11    YOU FORWARDED THIS TO SUNNY BALWANI AND DANIEL YOUNG.  AM I

10:05AM 12    RIGHT?

10:05AM 13    A.   I DID.

10:05AM 14    Q.   AND YOU ASKED DR. YOUNG TO LOOK INTO THIS?

10:06AM 15    A.   I DID.

10:06AM 16    Q.   AND I DRAW YOUR ATTENTION TO EXHIBIT 67 -- 1675.

10:06AM 17    A.   OKAY.

10:06AM 18    Q.   IS THIS AN EMAIL EXCHANGE BETWEEN TYLER SHULTZ, YOU,

10:06AM 19    MR. BALWANI, AND DANIEL YOUNG ON OR ABOUT APRIL 15TH, 2014?

10:06AM 20    A.   IT IS.

10:06AM 21         MR. LEACH:  YOUR HONOR, I MOVE THE ADMISSION OF

10:06AM 22    EXHIBIT 1675.

10:06AM 23         MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:06AM 24         THE COURT:  IT'S ADMITTED.

10:06AM 25         (GOVERNMENT'S EXHIBIT 1675 WAS RECEIVED IN EVIDENCE.)

10:06AM   1    BY MR. LEACH:

10:06AM   2    Q.   LET ME DRAW YOUR ATTENTION TO THE SECOND EMAIL FROM THE

10:06AM   3    TOP, MS. HOLMES, THE ONE FROM SUNNY BALWANI AT 4:48 P.M.

10:06AM   4        DO YOU SEE THAT?

10:06AM   5    A.   I DO.

10:06AM   6    Q.   AND MR. BALWANI WROTE TO MR. SHULTZ WITH A COPY TO YOU,

10:07AM   7    "TYLER.

10:07AM   8        "WE SAW YOUR EMAIL TO ELIZABETH.

10:07AM   9        "BEFORE I GET INTO SPECIFICS, LET ME SHARE WITH YOU THAT

10:07AM  10    HAD THIS EMAIL COME FROM ANYONE ELSE IN THE COMPANY, I WOULD

10:07AM  11    HAVE ALREADY HELD THEM ACCOUNTABLE FOR THE ARROGANT AND

10:07AM  12    PATRONIZING TONE AND RECKLESS COMMENTS."

10:07AM  13        DO YOU SEE THAT LANGUAGE?

10:07AM  14    A.   I DO.

10:07AM  15    Q.   YOU REVIEWED THIS AND COMMENTED ON IT BEFORE IT WENT TO

10:07AM  16    MR. SHULTZ; ISN'T THAT CORRECT?

10:07AM  17    A.   I'M NOT SURE IF IT WAS THIS EMAIL SPECIFICALLY, BUT ON THE

10:07AM  18    SUBSTANCE OF THE TECHNICAL QUESTIONS THAT WERE IN MR. SHULTZ

10:07AM  19    EMAIL.

10:07AM  20    Q.   WELL, LET'S SEE IF I CAN REFRESH YOUR MEMORY.

10:07AM  21        MAY I APPROACH, YOUR HONOR?

10:07AM  22            THE COURT:   YES.

10:07AM  23    BY MR. LEACH:

10:07AM  24    Q.   (HANDING.)

10:07AM  25    A.   THANK YOU.

10:08AM   1    Q.   YOU'RE WELCOME.

10:08AM   2         MS. HOLMES, I'VE PLACED BEFORE YOU WHAT WE HAVE MARKED AS

10:08AM   3    EXHIBIT 5645.

10:08AM   4         DOES THIS APPEAR TO BE AN EARLIER ITERATION OF THE EMAIL

10:08AM   5    THAT WE'RE LOOKING AT IN 1675 WITH SOME COMMENTS TO THE RIGHT?

10:08AM   6    A.   YES.

10:08AM   7              MR. LEACH:  YOUR HONOR, I MOVE THE ADMISSION OF

10:08AM   8    5645.

10:08AM   9              MR. DOWNEY:  NO OBJECTION.

10:08AM  10              THE COURT:  IT'S ADMITTED.

10:08AM  11         (GOVERNMENT'S EXHIBIT 5645 WAS RECEIVED IN EVIDENCE.)

10:08AM  12    BY MR. LEACH:

10:08AM  13    Q.   AND DO YOU SEE UP AT THE TOP, MS. HOLMES --

10:09AM  14         AND IF WE COULD, MS. HOLLIMAN, ALSO GRAB THE COMMENTS TO

10:09AM  15    THE RIGHT.

10:09AM  16         DO YOU SEE THIS PARAGRAPH BEGINS, "BEFORE I GET INTO

10:09AM  17    SPECIFICS, LET ME SHARE WITH YOU HAD THIS EMAIL COME FROM

10:09AM  18    ANYONE ELSE IN THE COMPANY, I WOULD HAVE ALREADY" -- AND

10:09AM  19    THERE'S REFERENCE TO THE ARROGANT AND INSULTING ATTITUDE.

10:09AM  20         DO YOU SEE THAT LANGUAGE?

10:09AM  21    A.   I DO.

10:09AM  22    Q.   AND IS YOUR COMMENT IN THE RIGHT IN THE EH1 BOX?

10:09AM  23    A.   IT LOOKS LIKE IT, YES.

10:09AM  24    Q.   OKAY.  YOUR COMMENT WAS, "STRONGER - EMPHASIZE WHAT HE DID

10:09AM  25    FIRST ESPECIALLY IN LIGHT OF MY COMMENT ON ACCURACY BELOW."

10:09AM 1          DO YOU SEE THAT?

10:09AM 2     A.   I SEE THAT.

10:09AM 3     Q.   SO YOU'RE ENCOURAGING MR. BALWANI TO BE FORCEFUL WITH

10:09AM 4     MR. SHULTZ IN THIS EMAIL.

10:09AM 5          IS THAT FAIR?

10:09AM 6     A.   I THINK I'M TRYING TO SAY WE NEED TO EXPLAIN WHAT THE

10:10AM 7     ISSUE IS, WHAT HE DID IN THE CONTEXT OF THE EMAIL BELOW.

10:10AM 8     Q.   WELL, LET'S GO BACK TO 1565.

10:10AM 9          AND IF WE CAN ZOOM BACK IN ON THE SECOND EMAIL FROM THE

10:10AM 10    TOP.

10:10AM 11         DO YOU SEE AFTER MR. BALWANI WRITES, "I WOULD HAVE ALREADY

10:10AM 12    HELD THEM ACCOUNTABLE FOR THE ARROGANT AND PATRONIZING TONE AND

10:10AM 13    RECKLESS COMMENTS," HE WROTE, "IN YOUR CASE, I AM GIVING YOU

10:10AM 14    THE BENEFIT OF THE DOUBT THAT YOUR INTENTIONS ARE IN THE RIGHT

10:10AM 15    PLACE, AND AM TAKING THE TIME TO RESPOND, EVEN THOUGH YOUR TONE

10:10AM 16    IN THIS EMAIL ALL OF THE WAY THROUGH THE LAST PARAGRAPH IS NOT

10:10AM 17    THAT OF SOMEONE SEEKING TO UNDERSTAND, BUT RATHER SOMEONE

10:10AM 18    STANDING AT HIGHER PERCH OF MORALITY AND BUSINESS WISDOM."

10:11AM 19         DO YOU SEE THAT LANGUAGE?

10:11AM 20    A.   I DO.

10:11AM 21    Q.   AND YOU APPROVED THIS GOING OUT TO MR. SHULTZ BEFORE

10:11AM 22    MR. BALWANI SENT THIS?

10:11AM 23    A.   I KNEW IT WAS GOING OUT, YES.

10:11AM 24    Q.   FURTHER DOWN BELOW DOES MR. BALWANI INTERLINEATE RESPONSES

10:11AM 25    TO TYLER SHULTZ, CERTAIN POINTS THAT TYLER SHULTZ IS MAKING IN

10:11AM 1      HIS EMAIL?

10:11AM 2      A.   HE DOES.

10:11AM 3      Q.   AND LET'S LOOK BRIEFLY DOWN AT THAT AT THE BOTTOM.

10:11AM 4           SO DO YOU SEE THE FIRST PARAGRAPH, "HI ELIZABETH.

10:11AM 5           "IN MY MEETINGS WITH DANIEL."

10:11AM 6      A.   I DO.

10:11AM 7      Q.   AND THAT'S IN MR. SHULTZ'S EMAIL TO YOU?

10:11AM 8      A.   YES.

10:11AM 9      Q.   AND YOUR NEXT PARAGRAPH BEGINS, "YOUR BASIC UNDERSTANDING

10:11AM 10     OF STATISTICS IS STILL LOW."

10:11AM 11          THAT'S SOMETHING THAT MR. BALWANI INTERLINEATED IN HIS

10:12AM 12     RESPONSE TO MR. SHULTZ; IS THAT CORRECT?

10:12AM 13     A.   HE DID.

10:12AM 14     Q.   LET'S GO BACK UP TO THE TOP.

10:12AM 15          AND IN RESPONSE TO THE EMAIL FROM MR. BALWANI, YOU, AND

10:12AM 16     DR. YOUNG, MR. SHULTZ REPLIED, "I DO NOT EXPECT TO BE TREATED

10:12AM 17     ANY DIFFERENTLY BECAUSE OF WHO I AM RELATED TO.  THERANOS IS

10:12AM 18     CLEARLY NOT THE PLACE FOR ME.  CONSIDER THIS MY TWO WEEK

10:12AM 19     NOTICE.  IF YOU PREFER I LEAVE TODAY THAT'S FINE WITH ME TOO."

10:12AM 20          DO YOU SEE THAT LANGUAGE?

10:12AM 21     A.   I DO.

10:12AM 22     Q.   AND MR. SHULTZ LEFT SHORTLY AFTER THIS EMAIL; CORRECT?

10:12AM 23     A.   HE DID.

10:12AM 24     Q.   NOW, SITTING HERE TODAY, YOU KNOW THAT IN 2016 FOLLOWING

10:12AM 25     THE CMS INSPECTION, THERANOS VOIDED ALL OF THE VITAMIN D TESTS

10:12AM 1    THAT WERE RUN ON THE TSPU OR THE EDISON 3.5?

10:12AM 2    A.   I DO, YES.

10:12AM 3    Q.   YOU KNOW THAT SITTING HERE TODAY?

10:12AM 4    A.   I DO.

10:12AM 5    Q.   OKAY.  TYLER SHULTZ WAS RIGHT ABOUT PROBLEMS WITH THE

10:12AM 6    EDISON 3.5, WASN'T HE?

10:13AM 7    A.   I DON'T THINK THE CONCERNS HE RAISED WERE CORRECT.

10:13AM 8    Q.   HE WAS RAISING CONCERNS ABOUT VITAMIN D; ISN'T THAT RIGHT?

10:13AM 9    A.   HE DID.

10:13AM 10   Q.   AND THERANOS ULTIMATELY VOIDED ALL OF THE VITAMIN D TESTS;

10:13AM 11   ISN'T THAT CORRECT?

10:13AM 12   A.   WE DID.

10:13AM 13   Q.   AND THERANOS CHOSE NOT TO LISTEN TO HIM AT THE TIME;

10:13AM 14   CORRECT?

10:13AM 15   A.   NO.

10:13AM 16   Q.   YOU CHOSE NOT TO LISTEN TO HIM AT THE TIME?

10:13AM 17   A.   NO.

10:13AM 18   Q.   INSTEAD YOU ELECTED TO RETALIATE AGAINST MR. SHULTZ; IS

10:13AM 19   THAT RIGHT?

10:13AM 20   A.   NO.

10:13AM 21   Q.   YOU DIDN'T HIRE DAVID BOIES'S FIRM TO THREATEN A LAWSUIT

10:13AM 22   AGAINST MR. SHULTZ?

10:13AM 23   A.   WE DID HIRE DAVID BOIES'S FIRM, AND WE DID ASK

10:13AM 24   DAVID BOIES'S FIRM TO FOLLOW UP ON THE DISCLOSURE OF TRADE

10:13AM 25   SECRETS.

10:13AM  1          I SAW THE LANGUAGE IN THE LETTER THAT YOU JUST POINTED TO,

10:13AM  2   AND IT WOULDN'T SURPRISE ME IF THERE WAS A SIMILAR LETTER THAT

10:13AM  3   WENT TO MR. SHULTZ.

10:13AM  4   Q.   AND IT WOULDN'T SURPRISE YOU, SITTING HERE TODAY, THAT

10:13AM  5   DAVID BOIES'S LAW FIRM LURED TYLER SHULTZ TO HIS GRANDFATHER'S

10:13AM  6   HOUSE TO TRY TO GET HIM TO SIGN DOCUMENTS IDENTIFYING CARREYROU

10:14AM  7   SOURCES?

10:14AM  8   A.   I DON'T THINK THAT'S HOW IT HAPPENED.

10:14AM  9   Q.   DIDN'T YOU GET A CALL FROM GEORGE SHULTZ THE NIGHT THAT

10:14AM 10   THAT HAPPENED?

10:14AM 11   A.   I'M SURE I DID.

10:14AM 12   Q.   OKAY.  DIDN'T GEORGE SHULTZ CALL YOU FROM HIS HOUSE AND

10:14AM 13   TELL YOU THAT THERE WERE LAWYERS FROM BOIES SCHILLER TRYING TO

10:14AM 14   GET TYLER TO SIGN DOCUMENTS IN AN INTIMIDATING WAY?

10:14AM 15   A.   THAT'S NOT MY MEMORY OF IT.

10:14AM 16   Q.   WELL, LET'S SEE IF WE CAN REFRESH YOUR MEMORY.

10:14AM 17          MAY I APPROACH, YOUR HONOR?

10:14AM 18              THE COURT:  YES.

10:15AM 19   BY MR. LEACH:

10:15AM 20   Q.   MS. HOLMES, I'VE PLACED BEFORE YOU A DOCUMENT THAT WE'VE

10:15AM 21   MARKED AS EXHIBIT 5520.

10:15AM 22          DO YOU HAVE A GENERAL UNDERSTANDING OF WHAT IS ON THE

10:15AM 23   COVER PAGE OF 5520?

10:15AM 24   A.   I DO.

10:15AM 25   Q.   OKAY.  SO YOU UNDERSTAND THE CONTEXT FOR WHAT THIS IS?

10:15AM   1    A.   I DO.

10:15AM   2    Q.   AND IF I COULD DRAW YOUR ATTENTION TO THE THIRD PAGE, DO

10:15AM   3    YOU SEE THE BATES NUMBER IN THE BOTTOM 14159?

10:15AM   4    A.   YES.

10:15AM   5    Q.   AND DO YOU SEE THE WORD "APPEARANCES" UP AT THE TOP?

10:15AM   6    A.   I DO.

10:15AM   7    Q.   AND IF WE GO TO THE NEXT PAGE, 14160, DO YOU SEE A

10:16AM   8    REFERENCE TO YOUR NAME?

10:16AM   9    A.   I DO.

10:16AM  10    Q.   AND AN INDIVIDUAL ASSOCIATED WITH YOU?

10:16AM  11    A.   YES.

10:16AM  12    Q.   LET ME DRAW YOUR ATTENTION TO PAGE 55 OF WHAT WE'RE

10:16AM  13    LOOKING AT, AND THE BATES NUMBER IN THE BOTTOM RIGHT CORNER IS

10:16AM  14    14210.

10:16AM  15    A.   OKAY.

10:16AM  16    Q.   AND I'D LIKE FOR YOU TO READ TO YOURSELF LINE 7,

10:16AM  17    CONTINUING TO PAGE 56, LINE 15?

10:17AM  18    A.   OKAY.  I'M SORRY.  YOU WERE ASKING ABOUT 14210?

10:17AM  19    Q.   I'M SORRY.  14211?

10:17AM  20    A.   14211.  OKAY.

10:17AM  21    Q.   IF YOU COULD READ FROM LINE 7?

10:17AM  22    A.   OKAY.

10:17AM  23    Q.   TO THE NEXT PAGE AT LINE 15?

10:17AM  24    A.   OKAY.

10:18AM  25         (PAUSE IN PROCEEDINGS.)

10:18AM  1            THE WITNESS:  OKAY.

10:18AM  2       BY MR. LEACH:

10:18AM  3       Q.   DOES THIS REFRESH YOUR RECOLLECTION THAT BOIES SCHILLER

10:18AM  4       LAWYERS WENT TO GEORGE SHULTZ'S HOUSE IN AN EFFORT TO HAVE

10:18AM  5       TYLER SHULTZ SIGN AN AFFIDAVIT DISCLOSING JOHN CARREYROU

10:18AM  6       SOURCES?

10:18AM  7       A.   I KNOW THAT THAT HAPPENED, YES.

10:18AM  8       Q.   OKAY.  AND YOU KNOW THAT GEORGE SHULTZ CALLED YOU THAT

10:18AM  9       NIGHT AND SAID THAT THIS IS UNACCEPTABLE?

10:18AM  10      A.   NO.

10:18AM  11      Q.   YOU KNOW THAT GEORGE SHULTZ CALLED YOU AND SAID THAT THE

10:18AM  12      BOIES SCHILLER LAWYERS WERE ACTING IN A TOTALLY UNACCEPTABLE

10:18AM  13      WAY?

10:18AM  14      A.   I KNOW THAT I LATER FELT THAT.

10:18AM  15      Q.   HE LATER STORMED OUT OF A BOARD MEETING BECAUSE OF THAT;

10:18AM  16      ISN'T THAT RIGHT?

10:18AM  17      A.   NO.

10:18AM  18      Q.   HE LATER COMPLAINED TO YOU ABOUT THAT; ISN'T THAT RIGHT?

10:18AM  19      A.   YES.

10:18AM  20      Q.   AND DIDN'T GEORGE SHULTZ TELL YOU IT WAS ONE OF THE WORST

10:18AM  21      LITTLE THINGS HE HAD SEEN ANYBODY TRY TO DO?

10:18AM  22      A.   NO.

10:18AM  23      Q.   YOU DENY THAT HE SAID THAT?

10:18AM  24      A.   I DON'T REMEMBER THAT.

10:18AM  25      Q.   YOU CAN'T SAY ONE WAY OR THE OTHER IF HE SAID THAT?

10:19AM  1    A.   AGAIN, IT'S NOT MY MEMORY OF THE INTERACTIONS WITH HIM.

10:19AM  2    Q.   BUT YOU KNEW HE WAS ANGRY ABOUT IT?

10:19AM  3    A.   I DO.

10:19AM  4    Q.   AND YOU WROTE TO MR. BALWANI ABOUT SOME OF THESE

10:19AM  5    INTERACTIONS IN THE TEXT MESSAGES; ISN'T THAT RIGHT?

10:19AM  6    A.   I'M NOT SURE.

10:19AM  7    Q.   WELL, LET'S LOOK.

10:19AM  8         IF WE CAN GO BACK TO 5387D, AND I DRAW YOUR ATTENTION TO

10:19AM  9    PAGE 82.

10:19AM  10   A.   OKAY.

10:19AM  11   Q.   DO YOU SEE THE TEXT ON MAY 31ST, 2015 FROM MR. BALWANI,

10:19AM  12   "YOU NOT CALLING GEORGE BACK ALSO SENDS A MESSAGE THAT WE ARE

10:19AM  13   ABOUT TO SUIT."

10:20AM  14        DO YOU SEE THAT?

10:20AM  15   A.   I DO.

10:20AM  16   Q.   GEORGE IS A REFERENCE TO GEORGE SHULTZ; CORRECT?

10:20AM  17   A.   I'M NOT SURE, BUT IT COULD BE.

10:20AM  18   Q.   OKAY.  THIS IS THE GENERAL TIME PERIOD OF WHEN THE

10:20AM  19   BOIES SCHILLER LAWYERS AMBUSHED TYLER AT GEORGE SHULTZ'S HOUSE,

10:20AM  20   ISN'T IT?

10:20AM  21   A.   I DON'T THINK THEY AMBUSHED HIM, BUT, YES, THIS IS

10:20AM  22   GENERALLY THE TIME PERIOD THAT THEY MET WITH TYLER.

10:20AM  23   Q.   YOU AGREE WITH ME THAT THEY TRIED TO FORCE HIM TO SIGN

10:20AM  24   DOCUMENTS IDENTIFYING CARREYROU SOURCES; CORRECT?

10:20AM  25   A.   I KNOW THAT THEY ASKED HIM TO SIGN DOCUMENTS.  MY MEMORY

10:20AM 1   WAS THAT IT WAS AN AGREEMENT TO STOP DISCLOSING TRADE SECRETS

10:20AM 2   TO "THE JOURNAL."

10:20AM 3   Q.   OKAY.  AND YOU KNOW THAT HE ULTIMATELY AGREED NOT TO DO

10:20AM 4   THAT?

10:20AM 5   A.   I THINK THAT'S RIGHT, YEAH.

10:20AM 6   Q.   AND YOU WROTE IN RESPONSE TO MR. BALWANI'S TEXT, "EXACTLY

10:20AM 7   WAS THINKING SAME."

10:20AM 8   A.   OKAY.

10:20AM 9   Q.   DID I READ THAT CORRECTLY?

10:20AM 10  A.   YOU DID.

10:20AM 11  Q.   LET'S PLEASE LOOK AT PAGE 84.

10:21AM 12      DO YOU SEE A TEXT A FEW DAYS LATER ON JUNE 5TH, 2015,

10:21AM 13  "DON'T TALK IN THIS MEETING.  U SHD TALK TO DAVID FIRST."

10:21AM 14  A.   I DO.

10:21AM 15  Q.   AND YOU RESPOND, "GEORGE WANTS TO KNOW WHAT TYLER HAS

10:21AM 16  DONE.  WOULD YOU ASK DAVID IF I SHOULD SAY OR TELL HIM WE'LL

10:21AM 17  LET HIM KNOW," I THINK YOU MEANT LATER, "AND TEXT ME BACK."

10:21AM 18      DO YOU SEE THAT LANGUAGE?

10:21AM 19  A.   I DO.

10:21AM 20  Q.   THE REFERENCE TO GEORGE THERE IS A REFERENCE TO

10:21AM 21  GEORGE SHULTZ; CORRECT?

10:21AM 22  A.   YES.

10:21AM 23  Q.   AND THE REFERENCE TO DAVID THERE IS A REFERENCE TO

10:21AM 24  DAVID BOIES; IS THAT CORRECT?

10:21AM 25  A.   YES.

10:21AM  1    Q.   AFTER THE CARREYROU ARTICLE CAME OUT IN 2015, YOU

10:22AM  2    CONTINUED TO DISMISS TYLER SHULTZ AS A LOW LEVEL DISGRUNTLED

10:22AM  3    EMPLOYEE; IS THAT CORRECT?

10:22AM  4    A.   YES.

10:22AM  5    Q.   AND SITTING HERE TODAY, YOU KNOW THAT YOUR INTERACTIONS

10:22AM  6    WITH TYLER SHULTZ CAUSED SIGNIFICANT ANGST IN THE RELATIONSHIP

10:22AM  7    BETWEEN TYLER AND HIS GRANDFATHER?

10:22AM  8    A.   I DO.

10:22AM  9    Q.   YOU KNOW THAT TODAY?

10:22AM  10   A.   I DO.

10:22AM  11   Q.   IS THAT ANOTHER THING THAT YOU WISH YOU WOULD HAVE DONE

10:22AM  12   DIFFERENTLY?

10:22AM  13   A.   AGAIN, I COULDN'T SAY MORE STRONGLY THE WAY WE HANDLED

10:22AM  14   "THE WALL STREET JOURNAL" PROCESS WAS A DISASTER.  WE TOTALLY

10:22AM  15   MESSED IT UP.

10:22AM  16   Q.   YOU ALSO TRIED TO INTIMIDATE MR. CARREYROU; CORRECT?

10:22AM  17   A.   I DON'T THINK SO.

10:22AM  18   Q.   YOU TRIED TO QUASH THE STORY; ISN'T THAT CORRECT?

10:22AM  19   A.   WE DID.

10:22AM  20   Q.   YOU HAD DAVID BOIES GO TO "THE WALL STREET JOURNAL"'S

10:22AM  21   OFFICES AND THREATEN LITIGATION, DIDN'T YOU?

10:22AM  22   A.   I'M NOT SURE HE THREATENED LITIGATION, BUT I KNOW HE MET

10:23AM  23   WITH PEOPLE AT "THE JOURNAL."

10:23AM  24   Q.   YOU HAD DAVID BOIES WRITE LETTERS TO "THE JOURNAL"

10:23AM  25   THREATENING LITIGATION, DIDN'T YOU?

10:23AM  1    A.   AGAIN, I DON'T KNOW IF HE WAS THREATENING LITIGATION, BUT

10:23AM  2    I KNOW THAT HE WAS ACTIVELY MEETING WITH PEOPLE AT "THE

10:23AM  3    JOURNAL."

10:23AM  4    Q.   AND WRITING TO THEM?

10:23AM  5    A.   YES.

10:23AM  6    Q.   AND WHEN NONE OF THAT WORKED, YOU PERSONALLY WENT TO THE

10:23AM  7    OWNER OF "THE WALL STREET JOURNAL" TO TRY TO GET HIM TO QUASH

10:23AM  8    THE STORY; ISN'T THAT CORRECT?

10:23AM  9    A.   I DID.

10:23AM 10    Q.   LET'S LOOK AT THAT.  I DRAW YOUR ATTENTION TO PAGE 110 OF

10:23AM 11    THE TEXT MESSAGES AT 5387D.

10:23AM 12         I'M SORRY.  MAY I APPROACH, YOUR HONOR?

10:23AM 13              THE COURT:   YES.

10:24AM 14    BY MR. LEACH:

10:24AM 15    Q.   (HANDING.)

10:24AM 16    A.   THANK YOU.

10:24AM 17    Q.   I'VE PLACED BEFORE YOU, MS. HOLMES, WHAT WE HAVE MARKED AS

10:24AM 18    EXHIBIT 5074.

10:24AM 19         DO YOU SEE YOUR NAME AT THE TOP OF THIS EMAIL?

10:24AM 20    A.   I DO.

10:24AM 21    Q.   AND DO YOU SEE RUPERT MURDOCH'S NAME IN THE TO LINE?

10:24AM 22    A.   I DO.

10:24AM 23    Q.   HE WAS THE OWNER OF "THE WALL STREET JOURNAL" IN SEPTEMBER

10:24AM 24    OF 2015?

10:24AM 25    A.   YES.

10:24AM  1     Q.   AND WAS THIS PART OF YOUR EFFORT TO GET MR. MURDOCH TO

10:24AM  2     QUASH THE STORY THAT JOHN CARREYROU WAS WRITING?

10:24AM  3     A.   IT WAS PART OF MY EFFORT TO GET MR. MURDOCH TO MAKE SURE

10:24AM  4     THAT OUR TRADE SECRETS WERE NOT PUBLISHED.

10:25AM  5     Q.   YOU KEEP INJECTING TRADE SECRETS, AND I PROMISE WE WILL

10:25AM  6     GET TO TRADE SECRETS.

10:25AM  7          MY QUESTION WAS, YOU TESTIFIED THAT YOU ATTEMPTED TO QUASH

10:25AM  8     THE STORY.  I'M JUST TRYING TO UNDERSTAND, IS THIS PART OF THAT

10:25AM  9     EFFORT?

10:25AM 10     A.   NO.  I THINK AT THIS POINT WE WERE NOT TRYING TO QUASH IT.

10:25AM 11     Q.   YOU WERE TRYING TO QUASH IT SOMETIME LATER?

10:25AM 12     A.   ONCE WE UNDERSTOOD THAT OUR TRADE SECRETS WERE GOING TO BE

10:25AM 13     DISCLOSED.

10:25AM 14     Q.   WELL, LET'S LOOK AT WHAT YOU WROTE.

10:25AM 15          YOUR HONOR, I NEED TO DISPLAY IT ON THE ELMO.  I'M PUTTING

10:25AM 16     A POST IT OVER SOMETHING THAT I DON'T THINK IS PUBLIC.

10:25AM 17               THE COURT:  ARE YOU MOVING THIS IN?

10:25AM 18               MR. LEACH:  IF I HAVE NOT MOVED IT IN, I MOVE IT IN.

10:25AM 19               MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:25AM 20               THE COURT:  AND JUST TO BE CLEAR, THIS IS

10:25AM 21     EXHIBIT 5704?

10:26AM 22               MR. LEACH:  YES, YOUR HONOR.

10:26AM 23               THE COURT:  ALL RIGHT.  THANK YOU.  IT'S ADMITTED.

10:26AM 24          (GOVERNMENT'S EXHIBIT 5704 WAS RECEIVED IN EVIDENCE.)

10:26AM 25     BY MR. LEACH:

10:26AM   1     Q.   DO YOU SEE YOUR NAME AT THE TOP, MS. HOLMES?

10:26AM   2     A.   I DO.

10:26AM   3     Q.   AND DO YOU SEE MR. MURDOCH'S NAME IN THE TO LINE?

10:26AM   4     A.   YES.

10:26AM   5     Q.   AND THE DATE IS SEPTEMBER 8TH, 2015.  THAT'S ROUGHLY A

10:26AM   6     MONTH BEFORE "THE WALL STREET JOURNAL" ARTICLE COMES OUT?

10:26AM   7     A.   IT IS.

10:26AM   8     Q.   AND AT THIS POINT IN TIME, YOU KNOW THAT CMS INSPECTORS

10:26AM   9     ARE COMING TO LOOK AT THE CALIFORNIA CLIA LAB; CORRECT?

10:26AM   10    A.   I KNOW IT WAS SOMETIME IN SEPTEMBER.

10:26AM   11    Q.   OKAY.  YOU ALSO KNOW THAT THIS IS AFTER AN FDA INSPECTION

10:26AM   12    OF YOUR CLIA LAB; CORRECT?

10:26AM   13    A.   I THINK IT'S ONGOING AT THIS POINT, YEAH.

10:26AM   14    Q.   ONGOING OR AROUND THE SAME TIME?

10:26AM   15    A.   YEAH.

10:26AM   16    Q.   OKAY.  AND THIS IS AFTER TYLER SHULTZ IS -- HAD A

10:27AM   17    CONFRONTATION AT GEORGE SHULTZ'S HOUSE ABOUT SIGNING DOCUMENTS;

10:27AM   18    IS THAT CORRECT?

10:27AM   19    A.   YES.

10:27AM   20    Q.   AND YOU WROTE -- AND YOU KNEW MR. MURDOCH WAS ALSO A

10:27AM   21    SHAREHOLDER OF THERANOS AT THE TIME?

10:27AM   22    A.   HE WAS.

10:27AM   23    Q.   A SIGNIFICANT SHAREHOLDER?

10:27AM   24    A.   HE WAS.

10:27AM   25    Q.   MORE THAN $100 MILLION?

10:27AM  1    A.   YES.

10:27AM  2    Q.   YOU WROTE, "I HOPE ALL IS WONDERFUL WITH YOU AND THAT YOU

10:27AM  3    HAD A WONDERFUL LABOR DAY.  I HAVE VERY MUCH BEEN LOOKING

10:27AM  4    FORWARD TO SEEING YOU WHEN YOU ARE OUT THIS WAY AGAIN.

10:27AM  5         "FOR PURPOSE OF KEEPING YOU IN THE LOOP, I WANTED TO SHARE

10:27AM  6    THE ATTACHED DOCUMENTS WITH YOU, INCLUDING A BRIEFING DOCUMENT

10:27AM  7    THAT WAS SENT FROM DAVID TO GERARD AT WSJ TODAY IN THE HOPES

10:27AM  8    THAT GERARD MIGHT MEET WITH OUR TEAM."

10:27AM  9    A.   YES.

10:27AM 10    Q.   AND DO YOU SEE THAT?

10:27AM 11    A.   I DO.

10:27AM 12    Q.   AND DAVID IS A REFERENCE TO DAVID BOIES?

10:27AM 13    A.   YES.

10:27AM 14    Q.   AND GERARD IS A REFERENCE TO A SENIOR OFFICER WITHIN "THE

10:27AM 15    WALL STREET JOURNAL"?

10:27AM 16    A.   IT IS.

10:27AM 17    Q.   AND THEN YOU SAID, "I'VE ALSO ATTACHED THE MATERIAL THAT

10:28AM 18    THERANOS HAS SHARED WITH WSJ (RESPONSIVE TO QUESTIONS FROM

10:28AM 19    JOHN CARREYROU) SINCE THE MATERIALS I GAVE YOU IN JULY.  AS

10:28AM 20    I'VE REFLECTED ON THIS, I THOUGHT THAT WERE I IN YOUR SHOES I

10:28AM 21    WOULD WANT TO KNOW/BE IN THE LOOP ON THIS ONE, AND SINCE YOU

10:28AM 22    HAD THE PRIOR MATERIALS FROM JULY, WANTED TO GIVE YOU THE

10:28AM 23    COMPLETE SET."

10:28AM 24         DO YOU SEE THAT LANGUAGE?

10:28AM 25    A.   I DO.

10:28AM 1    Q.   OKAY.  AFTER "THE WALL STREET JOURNAL" ARTICLE BY

10:28AM 2    MR. CARREYROU CAME OUT IN OCTOBER OF 2015, YOU ALSO WROTE

10:28AM 3    MR. MURDOCH EXPRESSING YOUR DISPLEASURE; IS THAT FAIR?

10:28AM 4    A.   I'M NOT SURE, BUT I COULD HAVE.

10:28AM 5    Q.   NO REASON TO DOUBT THAT YOU DID THAT?

10:28AM 6    A.   NO REASON TO DOUBT IT.

10:28AM 7    Q.   NOW, MR. DOWNEY ASKED YOU ON DIRECT EXAMINATION HOW MANY

10:28AM 8    ASSAYS WERE OFFERED WHERE THE ANALYSIS WAS PERFORMED ON A

10:29AM 9    MINIATURIZED THERANOS DEVICE IN THE CLIA LAB.

10:29AM 10        DO YOU REMEMBER THAT QUESTION?

10:29AM 11   A.   I DO.

10:29AM 12   Q.   AND YOUR ANSWER WAS 12?

10:29AM 13   A.   YES.

10:29AM 14   Q.   IS THAT CORRECT?

10:29AM 15   A.   YES.

10:29AM 16   Q.   IS IT ALSO CORRECT THAT THAT WAS ONE OF THE CENTRAL

10:29AM 17   QUESTIONS RAISED BY "THE WALL STREET JOURNAL"?

10:29AM 18   A.   THAT WAS ONE OF THE QUESTIONS.

10:29AM 19   Q.   OKAY.  AND YOU WERE ASKED POINT-BLANK BY JIM CRAMER ON

10:29AM 20   "MAD MONEY" WHETHER IT WAS TRUE THAT IT WAS ONLY 12 OR 15 TESTS

10:29AM 21   ON YOUR DEVICE; ISN'T THAT RIGHT?

10:29AM 22   A.   I DON'T REMEMBER THE QUESTION, BUT I REMEMBER HE WAS

10:29AM 23   ASKING ME ABOUT THE CONTENT OF "THE WALL STREET JOURNAL"

10:29AM 24   ARTICLE.

10:29AM 25   Q.   WELL, LET'S PLAY THE CLIP WHICH IS IN EVIDENCE AS

| | | |
|---|---|---|
| 10:29AM | 1 | EXHIBIT 2851-3. |
| 10:29AM | 2 | THE COURT:  IS THIS THE VIDEO CLIP? |
| 10:29AM | 3 | MR. LEACH:  YES. |
| 10:29AM | 4 | THE COURT:  AND THIS IS THE VIDEO CLIP THAT WAS |
| 10:29AM | 5 | PREVIOUSLY PLAYED? |
| 10:29AM | 6 | MR. LEACH:  YES. |
| 10:29AM | 7 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 10:29AM | 8 | THERE WILL BE NO TRANSCRIPTION OF THIS AGAIN. |
| 10:30AM | 9 | MR. LEACH:  YES, YOUR HONOR. |
| 10:30AM | 10 | THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, WE'LL |
| 10:30AM | 11 | PLAY THIS CLIP. |
| 10:30AM | 12 | (VIDEO PLAYING OFF THE RECORD.) |
| 10:32AM | 13 | BY MR. LEACH: |
| 10:32AM | 14 | Q.  MS. HOLMES, THAT WAS YOU ON THAT VIDEO; CORRECT? |
| 10:32AM | 15 | A.  IT IS. |
| 10:32AM | 16 | Q.  AND YOU HEARD MR. CRAMER ASK YOU THE QUESTION HOW MANY |
| 10:32AM | 17 | TESTS COULD BE PERFORMED ON THE EDISON? |
| 10:32AM | 18 | A.  I DID. |
| 10:32AM | 19 | Q.  AND I DIDN'T HEAR THE NUMBER 12 IN THAT CLIP.  DID YOU |
| 10:32AM | 20 | HEAR IT? |
| 10:32AM | 21 | A.  I DID NOT. |
| 10:32AM | 22 | Q.  OKAY.  YOU WERE THE FOUNDER OF THERANOS; CORRECT? |
| 10:32AM | 23 | A.  I -- YES. |
| 10:32AM | 24 | Q.  YOU WERE ITS CHIEF EXECUTIVE OFFICER? |
| 10:32AM | 25 | A.  YES. |

10:32AM 1    Q.   THROUGH 2016, YOU WERE THE ONLY CHIEF EXECUTIVE OFFICER

10:32AM 2    THAT THERANOS EVER HAD; IS THAT CORRECT?

10:32AM 3    A.   I WAS.

10:32AM 4    Q.   OKAY.  AND BEFORE 2016 YOU OWNED A MAJORITY OF THE VOTING

10:33AM 5    SHARES?

10:33AM 6    A.   AT VARIOUS POINTS IN TIMES, YES.

10:33AM 7    Q.   NO ONE WAS MORE INVESTED IN THE COMPANY THAN YOU WERE; IS

10:33AM 8    THAT FAIR?

10:33AM 9    A.   I TRIED TO BE.  WE HAD A LOT OF PEOPLE WORKING REALLY

10:33AM 10   HARD.

10:33AM 11   Q.   NO ONE OWNED MORE STOCK THAN YOU; CORRECT?

10:33AM 12   A.   CORRECT.

10:33AM 13   Q.   AND YOU TAKE RESPONSIBILITY FOR THE COMPANY; IS THAT YOUR

10:33AM 14   TESTIMONY?

10:33AM 15   A.   I DO.

10:33AM 16   Q.   AND YOU AGREE WITH ME THAT ANYTHING THAT HAPPENS IN YOUR

10:33AM 17   COMPANY IS YOUR RESPONSIBILITY AT THE END OF THE DAY; ISN'T

10:33AM 18   THAT RIGHT?

10:33AM 19   A.   THAT'S HOW I FELT.

10:33AM 20   Q.   YOU COULD FIRE THE BOARD OF DIRECTORS, COULDN'T YOU?

10:33AM 21   A.   I MEAN, TECHNICALLY, YES.  THEY COULD ALSO FIRE ME.

10:33AM 22   Q.   WELL, YOU OWNED 51 PERCENT OF THE COMPANY, RIGHT,

10:33AM 23   MS. HOLMES?

10:33AM 24   A.   I DID.

10:33AM 25   Q.   AND AS THE 51 PERCENT SHAREHOLDER OF THE COMPANY, YOU

10:33AM  1    COULD OUTVOTE ANYBODY ON WHO WAS ON THE BOARD; ISN'T THAT

10:33AM  2    RIGHT?

10:33AM  3    A.   I COULD.

10:33AM  4    Q.   OKAY.  AND IF YOU DIDN'T WANT GEORGE SHULTZ THERE, YOU

10:34AM  5    COULD, THROUGH THE WORKING OF THE LEGAL DOCUMENTS, GET HIM OFF

10:34AM  6    THE BOARD; ISN'T THAT RIGHT?

10:34AM  7    A.   YES.

10:34AM  8    Q.   AND YOU COULD DO THAT FOR ANY OF THE BOARD MEMBERS AT

10:34AM  9    THERANOS?

10:34AM  10   A.   WE COULD.

10:34AM  11   Q.   YOU COULD; CORRECT?

10:34AM  12   A.   I COULD.

10:34AM  13   Q.   OKAY.  NOW, SUNNY BALWANI REPORTED TO YOU; CORRECT?

10:34AM  14   A.   HE DID.

10:34AM  15   Q.   AND HE WAS AN AT WILL EMPLOYEE; IS THAT RIGHT?

10:34AM  16   A.   YES.

10:34AM  17   Q.   YOU COULD FIRE HIM AT ANY TIME?

10:34AM  18   A.   YES.

10:34AM  19   Q.   AND YOU AGREE WITH ME THAT YOU AND MR. BALWANI WERE

10:34AM  20   MANAGING THE COMPANY TOGETHER AND MAKING DECISIONS FOR THE

10:34AM  21   COMPANY TOGETHER; ISN'T THAT RIGHT?

10:34AM  22   A.   WE DID.

10:34AM  23   Q.   IT'S YOUR TESTIMONY, IS IT NOT, THAT YOU LET HIM RUN THE

10:34AM  24   COMPANY AND RUN OPERATIONS?

10:34AM  25   A.   YES.

10:34AM  1     Q.   YOU ALSO COULD HIRE OR FIRE THE LAB DIRECTOR; ISN'T THAT

10:35AM  2     CORRECT?

10:35AM  3     A.   YES.

10:35AM  4     Q.   IF YOU WERE UNHAPPY WITH ARNOLD GELB'S PERFORMANCE, YOU

10:35AM  5     COULD FIRE HIM?

10:35AM  6     A.   CORRECT.

10:35AM  7     Q.   AND IF YOU WERE UNHAPPY WITH ADAM ROSENDORFF'S

10:35AM  8     PERFORMANCE, YOU COULD FIRE HIM?

10:35AM  9     A.   YES.

10:35AM  10    Q.   AND IF YOU WERE UNHAPPY WITH LYNETTE SAWYER'S PERFORMANCE,

10:35AM  11    YOU COULD FIRE HER?

10:35AM  12    A.   YES.

10:35AM  13    Q.   AND IF YOU WERE UNHAPPY WITH SUNIL DHAWAN'S PERFORMANCE,

10:35AM  14    YOU COULD FIRE HIM, TOO; CORRECT?

10:35AM  15    A.   CORRECT.

10:35AM  16    Q.   AND YOU WERE RESPONSIBLE AT THE END OF THE DAY FOR

10:35AM  17    ALLOCATING RESOURCES TO ALL OF THE DEPARTMENTS WITHIN THERANOS

10:35AM  18    SO THAT THEY COULD DO THEIR JOBS EFFECTIVELY; IS THAT CORRECT?

10:35AM  19    A.   ULTIMATELY, YES.  THEY CAN'T ALL REPORT TO ME, BUT YES.

10:35AM  20    Q.   OKAY.  BUT NOT EVERYBODY IN A COMPANY REPORTS DIRECTLY TO

10:35AM  21    THE CEO; RIGHT?

10:35AM  22    A.   CORRECT.

10:35AM  23    Q.   BUT ULTIMATELY ALL ROADS, AS THE CEO, LEAD TO YOU?

10:35AM  24    A.   YES.

10:35AM  25    Q.   AND IS IT FAIR THAT THE BUCK STOPS WITH YOU?

10:35AM  1    A.   I FELT THAT.

10:35AM  2    Q.   YOU COULD HIRE OR FIRE DANISE YAM IF YOU WANTED TO?

10:35AM  3    A.   YES.

10:35AM  4    Q.   AND YOU COULD HIRE OR FIRE A CFO IF YOU WANTED TO?

10:36AM  5    A.   YES.

10:36AM  6    Q.   AND FROM 2010 TO APPROXIMATELY 2016, THERANOS HAD NO CFO?

10:36AM  7    A.   CORRECT.

10:36AM  8    Q.   YOU MADE A DECISION TO HIRE CHIAT/DAY; ISN'T THAT RIGHT?

10:36AM  9    A.   YES.

10:36AM  10   Q.   AND IF YOU WERE UNHAPPY WITH ANYTHING CHIAT/DAY WAS DOING,

10:36AM  11   YOU COULD FIRE THEM, TOO; CORRECT?

10:36AM  12   A.   YES.

10:36AM  13   Q.   YOU ALSO COULD HIRE OR FIRE THE HEAD OF MARKETING; ISN'T

10:36AM  14   THAT RIGHT?

10:36AM  15   A.   YES.

10:36AM  16   Q.   IF YOU WERE UNHAPPY WITH THE DECISIONS YOUR MARKETING

10:36AM  17   DIRECTOR WAS MAKING, YOU COULD GET RID OF THE MARKETING

10:36AM  18   DIRECTOR; IS THAT FAIR?

10:36AM  19   A.   YES, YES.

10:36AM  20   Q.   YOU HAD THAT POWER?

10:36AM  21   A.   I DID.

10:36AM  22   Q.   YOU ALSO MADE THE DECISION TO HIRE BOIES SCHILLER; IS THAT

10:36AM  23   CORRECT?

10:36AM  24   A.   I DID.

10:36AM  25   Q.   AND YOU MADE THE DECISION TO HIRE THERANOS'S LEGAL TEAM?

```
10:36AM   1        A.   YES.

10:36AM   2        Q.   YOU BROUGHT IN HEATHER KING AS THE GENERAL COUNSEL IN

10:36AM   3   2015?

10:36AM   4        A.   I DID.

10:36AM   5        Q.   YOU MADE THAT DECISION?

10:36AM   6        A.   YES.

10:36AM   7        Q.   AND YOU'RE THE ONE WHO SIGNED SUNIL DHAWAN'S OFFER LETTER;

10:37AM   8   ISN'T THAT CORRECT?

10:37AM   9        A.   I THINK SO.

10:37AM  10        Q.   DO YOU AGREE WITH ME THAT YOU WERE GENERALLY KEPT APPRISED

10:37AM  11   OF DEVELOPMENTS IN THE PRODUCTS AREA AND IN THE CLINICAL LAB?

10:37AM  12        A.   DEFINITELY IN THE PRODUCTS AREA, AND AT A HIGH LEVEL IN

10:37AM  13   THE CLINICAL LAB.

10:37AM  14        Q.   WELL, YOU WERE ASKED THAT QUESTION BEFORE, WEREN'T YOU,

10:37AM  15   MS. HOLMES?

10:37AM  16        A.   I COULD HAVE BEEN.

10:37AM  17             MR. LEACH:  MAY I APPROACH, YOUR HONOR?

10:37AM  18             THE COURT:  YES.

10:37AM  19   BY MR. LEACH:

10:37AM  20        Q.   (HANDING.)

10:37AM  21        A.   THANK YOU.

10:37AM  22        Q.   YOU'RE WELCOME.

10:37AM  23        MS. HOLMES, THIS IS NOT THE FIRST TIME THAT YOU'VE

10:37AM  24   TESTIFIED IN MATTERS RELATING TO THERANOS; ISN'T THAT RIGHT?

10:37AM  25        A.   IT'S NOT.
```

10:37AM 1    Q.   YOU TESTIFIED BEFORE THE SECURITIES AND EXCHANGE

10:38AM 2    COMMISSION IN JULY OF 2017 AND AUGUST OF 2017; IS THAT CORRECT?

10:38AM 3    A.   I DID.

10:38AM 4    Q.   AND YOU PROVIDED TESTIMONY OVER THE COURSE OF THREE DAYS

10:38AM 5    IN JULY AND AUGUST OF 2017; IS THAT CORRECT?

10:38AM 6    A.   I DID.

10:38AM 7    Q.   AND OVER THE COURSE OF THOSE THREE DAYS, YOU TOOK AN OATH?

10:38AM 8    A.   YES.

10:38AM 9    Q.   AND YOU SWORE TO TELL THE TRUTH?

10:38AM 10   A.   I DID.

10:38AM 11   Q.   AND YOU TOOK THAT OATH SERIOUSLY?

10:38AM 12   A.   I DO.

10:38AM 13   Q.   THE SAME OATH THAT YOU'RE TAKING TODAY?

10:38AM 14   A.   EXACTLY.

10:38AM 15   Q.   EXACTLY THE SAME OATH.

10:38AM 16        AND YOU WERE REPRESENTED BY COUNSEL AT THAT TIME; CORRECT?

10:38AM 17   A.   I WAS.

10:38AM 18   Q.   YOU HAD SIX LAWYERS STANDING BY YOUR SIDE; IS THAT

10:38AM 19   CORRECT?

10:38AM 20   A.   SOUNDS RIGHT.

10:38AM 21   Q.   OKAY.  A GENTLEMAN NAMED STEVE NEAL FROM COOLEY GODWARD?

10:38AM 22   A.   YES.

10:38AM 23   Q.   A VERY RESPECTED TRIAL LAWYER?

10:38AM 24   A.   I THOUGHT SO.

10:38AM 25   Q.   AND A LAWYER NAMED BILL MCLUCAS, FORMER HEAD OF

10:38AM  1    ENFORCEMENT AT THE S.E.C., IN D.C.?

10:38AM  2    A.   YES.

10:38AM  3    Q.   AND A VERY RESPECTED LAWYER?

10:38AM  4    A.   YES.

10:38AM  5    Q.   AND ALL SIX OF THOSE LAWYERS WERE THERE IN THE S.E.C.

10:39AM  6    TESTIMONY GIVING YOU ADVICE?

10:39AM  7    A.   THEY WERE THERE IN THE S.E.C. TESTIMONY.

10:39AM  8    Q.   OKAY.  AND IF I COULD DRAW YOUR ATTENTION, PLEASE, TO --

10:39AM  9    I'VE PLACED BEFORE YOU A RED BINDER.  DOES THIS APPEAR TO BE A

10:39AM 10    TRANSCRIPT OF YOUR TESTIMONY BEFORE THE S.E.C.?

10:39AM 11    A.   IT IS.

10:39AM 12    Q.   OKAY.  I WANT TO DRAW YOUR ATTENTION TO THE BATES NUMBER

10:39AM 13    ENDING 5268.  IT SHOULD BE ON THE FIRST DAY.

10:39AM 14    A.   OKAY.

10:39AM 15    Q.   AND I WANT TO DRAW YOUR ATTENTION TO PAGE 58 OF THIS

10:40AM 16    TRANSCRIPT.

10:40AM 17            MR. DOWNEY:  WHAT'S THE BATES NUMBER?

10:40AM 18            MR. LEACH:  5268.

10:40AM 19            THE COURT:  AND THE PAGE NUMBER?

10:40AM 20            MR. LEACH:  48.

10:40AM 21            THE COURT:  48.  THANK YOU.

10:40AM 22            MR. LEACH:  YOUR HONOR, I SEEK PERMISSION TO READ

10:40AM 23    LINES 10 THROUGH 12 ON PAGE 48.

10:40AM 24            THE COURT:  THIS IS IN REGARDS TO THE WITNESS'S LAST

10:40AM 25    ANSWER TO YOUR QUESTION?

10:40AM  1           MR. LEACH:  YES, YOUR HONOR.

10:40AM  2           THE COURT:  YOU MAY READ THAT.

10:40AM  3   BY MR. LEACH:

10:40AM  4   Q.  MS. HOLMES, YOU WERE ASKED THE QUESTION, "WERE YOU KEPT

10:40AM  5   APPRISED OF DEVELOPMENTS IN THE PRODUCTS AREA AND IN THE

10:40AM  6   CLINICAL LAB?"

10:40AM  7           AND YOUR ANSWER WAS "GENERALLY YES."

10:40AM  8           WAS THAT CORRECT?

10:40AM  9   A.  YES.

10:40AM  10  Q.  I'D LIKE TO TALK WITH YOU A LITTLE BIT ABOUT HOW YOU WERE

10:41AM  11  COMPENSATED AT THERANOS.

10:41AM  12          AM I RIGHT THAT YOUR WAGES IN 2010 WERE ABOUT $200,000?

10:41AM  13  A.  YES.

10:41AM  14  Q.  AND YOUR WAGES IN 2011 WERE APPROXIMATELY $200,000?

10:41AM  15  A.  YES.

10:41AM  16  Q.  AND YOUR WAGES IN 2012 WERE APPROXIMATELY $200,000?

10:41AM  17  A.  YES.

10:41AM  18  Q.  YOUR WAGES IN 2013 WERE ABOUT $200,000?

10:41AM  19  A.  YES.

10:41AM  20  Q.  YOUR WAGES IN 2014 WERE ABOUT $360,000?

10:41AM  21  A.  THAT SOUNDS RIGHT.

10:41AM  22  Q.  WELL, I'D LIKE TO BE SURE.  WHY DON'T YOU LOOK IN YOUR

10:41AM  23  BINDER AT EXHIBIT 3249, PARTICULARLY PAGE 7.

10:42AM  24  A.  3249?

10:42AM  25  Q.  3249, PAGE 7.

10:42AM 1    A.   GOT IT.  OKAY.

10:42AM 2    Q.   DO YOU SEE A TABLE DOWN AT THE BOTTOM OF PAGE 7?

10:42AM 3    A.   I DO.

10:42AM 4    Q.   DO YOU RECOGNIZE THIS AS A SWORN STATEMENT THAT YOU

10:42AM 5    PROVIDED IN PRIOR LITIGATION?

10:42AM 6    A.   I DON'T, BUT I DON'T HAVE ANY REASON TO DOUBT IT.

10:42AM 7    Q.   OKAY.  WELL, LET'S LOOK AT THE LAST PAGE.  IS THAT YOUR

10:42AM 8    SIGNATURE ON PAGE 29 OF 3249?

10:43AM 9    A.   IT IS.

10:43AM 10   Q.   OKAY.  ARE YOU SATISFIED THAT THIS IS A SWORN STATEMENT

10:43AM 11   THAT YOU PROVIDED IN PRIOR LITIGATION?

10:43AM 12   A.   YEAH, I DON'T HAVE ANY REASON TO DOUBT IT.

10:43AM 13   Q.   OKAY.  DOES THIS REFRESH YOUR RECOLLECTION THAT YOUR WAGES

10:43AM 14   IN 2014 WERE $360,229.36?

10:43AM 15   A.   AGAIN, IT SOUNDS RIGHT, YES.

10:43AM 16   Q.   AND YOUR WAGES IN 2015 WERE APPROXIMATELY $390,182.80?

10:43AM 17   A.   YES.

10:43AM 18   Q.   AND AT THE END OF 2016 YOU HELD MORE THAN 250 MILLION

10:43AM 19   SHARES OF CLASS B COMMON STOCK AT THERANOS?

10:43AM 20   A.   I DID.

10:43AM 21   Q.   THAT WAS MORE THAN 51 PERCENT OF THE SHARES?

10:43AM 22   A.   I THINK SO.

10:43AM 23   Q.   YESTERDAY YOU SAID CLOSE TO 50 PERCENT.  LET'S BE CLEAR.

10:43AM 24   IT WAS ABOVE 50 PERCENT; RIGHT?

10:44AM 25   A.   IT PROBABLY WAS.

10:44AM 1    Q.   WELL, LOOK AT 3249, PAGE 7.

10:44AM 2    A.   OKAY.

10:44AM 3    Q.   WERE YOU ASKED THE QUESTION, DESCRIBE YOUR OWNERSHIP STAKE

10:44AM 4    IN THERANOS INCLUDING WITHOUT LIMITATION ANY STOCK OPTIONS?

10:44AM 5    A.   YES.

10:44AM 6    Q.   AND WAS YOUR ANSWER, "SHE HOLDS 250,658,055 SHARES OF

10:44AM 7    CLASS B COMMON STOCK, APPROXIMATELY 51 PERCENT OF THERANOS'S

10:44AM 8    OUTSTANDING SHARES"?

10:44AM 9    A.   YES.

10:44AM 10   Q.   THAT WAS YOUR ANSWER THEN?

10:44AM 11   A.   YES.

10:44AM 12   Q.   AND NO REASON TO DOUBT THAT NOW?

10:44AM 13   A.   NO REASON.

10:44AM 14   Q.   AND NO ONE AT THE COMPANY OWNED MORE THAN YOU DID?

10:44AM 15   A.   CORRECT.

10:44AM 16   Q.   AND I BELIEVE YOU TESTIFIED THAT YOU UNDERSTOOD AT LEAST

10:44AM 17   BY THE END OF 2014, OR THE LAST ROUND OF C-2 INVESTMENT, THAT

10:45AM 18   YOUR SHARES WERE VALUED AT MORE THAN $4 BILLION?

10:45AM 19   A.   I DID.

10:45AM 20   Q.   I'D LIKE TO TALK TO YOU A LITTLE BIT ABOUT WHAT I HOPE ARE

10:45AM 21   AGREEMENTS THAT WE MAY HAVE ABOUT SOME OF THE DEVICES AND SOME

10:45AM 22   TESTING AND SOME OF THE MATTERS THAT YOU TESTIFIED TO IN YOUR

10:45AM 23   DIRECT EXAMINATION.

10:45AM 24       YOU RECALL TALKING AT LENGTH WITH MR. DOWNEY ABOUT A

10:45AM 25   MINILAB; CORRECT?

10:45AM  1    A.   I DO.

10:45AM  2    Q.   AND THAT'S PART OF THE 4 SERIES?

10:45AM  3    A.   IT IS.

10:45AM  4    Q.   THE MINILAB AND THE 4 SERIES WERE NEVER USED FOR PATIENT

10:45AM  5    TESTING; IS THAT CORRECT?

10:45AM  6    A.   THAT'S RIGHT.

10:45AM  7    Q.   THE MINILAB AND THE 4S WERE NEVER PUT IN THE CLIA LAB IN

10:45AM  8    CALIFORNIA?

10:45AM  9    A.   CORRECT.

10:45AM 10    Q.   THEY WERE NEVER PUT IN THE CLIA LAB IN ARIZONA?

10:45AM 11    A.   CORRECT.

10:45AM 12    Q.   JOHN CARREYROU'S ARTICLE CAME OUT ON OCTOBER 15TH, 2015.

10:46AM 13         AT THAT POINT IN TIME, THE FDA HAD APPROVED USE OF THE

10:46AM 14    MINILAB FOR A SINGLE ASSAY; IS THAT CORRECT?

10:46AM 15    A.   YES.

10:46AM 16    Q.   AND THAT ASSAY WAS THE HERPES ASSAY?

10:46AM 17    A.   THAT'S RIGHT.

10:46AM 18    Q.   OTHER THAN THAT ONE ASSAY, THE MINILAB AND THE 4S WERE NOT

10:46AM 19    APPROVED BY THE FDA?

10:46AM 20    A.   CORRECT.

10:46AM 21    Q.   AND THE ONLY THERANOS MANUFACTURED ANALYZER THAT WAS EVER

10:46AM 22    USED IN THE CLIA LAB IN CALIFORNIA WAS THE EDISON 3.5?

10:46AM 23    A.   THAT'S RIGHT.

10:46AM 24    Q.   AND THE EDISON 3.5 WAS LIMITED TO IMMUNOASSAYS?

10:46AM 25    A.   YES.  WELL, THAT'S HOW WE USED IT.

10:46AM  1    Q.   YOU DIDN'T USE IT FOR ANY PURPOSE OTHER THAN IMMUNOASSAYS?

10:46AM  2    A.   IN THE CLINICAL LAB.

10:46AM  3    Q.   IN THE CLINICAL LAB YOU DIDN'T USE IT FOR GENERAL

10:46AM  4    CHEMISTRY?

10:46AM  5    A.   THAT'S RIGHT.

10:46AM  6    Q.   YOU DIDN'T USE IT FOR CYTOMETRY?

10:46AM  7    A.   CORRECT.

10:46AM  8    Q.   AND YOU DID NOT USE IT FOR NUCLEIC ACID AMPLIFICATION?

10:46AM  9    A.   THAT'S RIGHT.

10:46AM  10   Q.   JUST IMMUNOASSAYS?

10:46AM  11   A.   YES.

10:46AM  12   Q.   AND THE EDISON 3.5 WAS ONLY USED FOR 12 ASSAYS IN THE

10:47AM  13   CALIFORNIA CLIA LAB BETWEEN SEPTEMBER 2013 AND JUNE OF 2015; IS

10:47AM  14   THAT CORRECT?

10:47AM  15   A.   I BELIEVE SO, THAT'S CORRECT.

10:47AM  16   Q.   AND THAT'S THE 12 NUMBER THAT YOU STARTED WITH IN YOUR

10:47AM  17   TESTIMONY?

10:47AM  18   A.   EXACTLY.

10:47AM  19   Q.   THE ONE THAT YOU DIDN'T GIVE TO JIM CRAMER WHEN HE ASKED

10:47AM  20   YOU ABOUT IT?

10:47AM  21   A.   YES.

10:47AM  22   Q.   AND BY THE TIME OF THE CMS INSPECTION IN SEPTEMBER OF

10:47AM  23   2015, THERANOS HAD STOPPED USING THE EDISON 3.5 IN THE CLIA LAB

10:47AM  24   ALTOGETHER?

10:47AM  25   A.   THAT'S RIGHT.

10:47AM  1    Q.   IT WASN'T USING IT AT ALL?

10:47AM  2    A.   YES.

10:47AM  3    Q.   SO THERANOS WASN'T USING ANY OF ITS MANUFACTURED ANALYZERS

10:47AM  4    IN THE CLIA LAB AT THE TIME THAT THE CMS INSPECTORS COME IN?

10:47AM  5    A.   CORRECT.

10:47AM  6    Q.   AFTER THE CARREYROU ARTICLE YOU WERE ASKED SOME QUESTIONS

10:47AM  7    PUBLICLY ABOUT EDISON AND EDISON 3.5.

10:47AM  8         DO YOU RECALL GETTING QUESTIONS ABOUT THOSE?

10:47AM  9    A.   GENERALLY, YES.

10:47AM 10    Q.   OKAY.  AND YOU TOLD PEOPLE IN LATE 2015 AFTER THE

10:48AM 11    CARREYROU ARTICLE CAME OUT THAT EDISON WAS A CODE NAME FOR ONE

10:48AM 12    OF THERANOS'S EARLIEST VERSIONS OF YOUR DEVICES AND YOU HAD NOT

10:48AM 13    BEEN USING EDISON FOR ANYTHING FOR A FEW YEARS.

10:48AM 14         DO YOU RECALL SAYING THAT PUBLICLY?

10:48AM 15    A.   I DO.

10:48AM 16    Q.   THAT WAS LESS THAN FORTHRIGHT, WASN'T IT?

10:48AM 17    A.   IT WAS TOO DEEP IN THE WEEDS.  IT WAS HOW I WAS THINKING

10:48AM 18    ABOUT WHAT THE EDISON WAS, BUT, OF COURSE WE WERE USING THE 3.5

10:48AM 19    IN THE CLINICAL LAB.

10:48AM 20    Q.   OKAY.  IS THAT ANOTHER THING YOU WISHED YOU HAD DONE

10:48AM 21    DIFFERENTLY?

10:48AM 22    A.   YEAH.

10:48AM 23    Q.   YOU -- SO YOU HAD BEEN USING THE EDISON 3.5 IN THE

10:48AM 24    CALIFORNIA CLIA LAB IN 2015?

10:48AM 25    A.   WE DID.

10:48AM 1      Q.   THE SAME YEAR THAT YOU GOT ASKED THAT QUESTION?

10:48AM 2      A.   YES.

10:48AM 3      Q.   AND YOU STOPPED USING THE EDISON.  YOU ONLY EVER USED IT

10:48AM 4      FOR 12 TESTS, BUT YOU WEREN'T USING IT IN SEPTEMBER OF 2015?

10:48AM 5      A.   THAT'S RIGHT.

10:49AM 6      Q.   AND THE NEWER VERSION, THE 4 SERIES, YOU NEVER USED THAT

10:49AM 7      IN THE CLIA LAB?

10:49AM 8      A.   THAT'S RIGHT.

10:49AM 9      Q.   NOW, ON TOP OF THE 12 EDISON 3.5 TESTS IN THE CALIFORNIA

10:49AM 10     CLIA LAB, THERANOS AT ITS PEAK PERFORMED AN ADDITIONAL 58

10:49AM 11     ASSAYS ON MODIFIED THIRD PARTY MACHINES LIKE THE SIEMENS ADVIA;

10:49AM 12     IS THAT CORRECT?

10:49AM 13     A.   THAT SOUNDS RIGHT.

10:49AM 14     Q.   AND FOR THOSE TESTS YOU WERE DEPENDENT ON THIRD PARTY

10:49AM 15     EQUIPMENT?

10:49AM 16     A.   YES.

10:49AM 17     Q.   YOU WERE DEPENDENT ON DEVICES FROM THE LIKES OF SIEMENS?

10:49AM 18     A.   YES.

10:49AM 19     Q.   AND YOU WERE DEPENDENT ON THE DEVICES FROM THE LIKES OF

10:49AM 20     BECKMAN COULTER?

10:49AM 21     A.   I DON'T THINK WE USED BECKMAN COULTER MACHINES, BUT WE

10:49AM 22     WERE MODIFYING THIRD PARTY MACHINES.

10:49AM 23     Q.   OKAY.  GIVE ME ANOTHER EXAMPLE OF A THIRD PARTY MACHINE

10:49AM 24     YOU MODIFIED.

10:49AM 25     A.   BECTON DICKINSON.

10:49AM 1    Q.   OKAY.  AND YOU WERE RELYING ON THOSE PRODUCTS TO DO THE

10:49AM 2    TESTING?

10:49AM 3    A.   YES.

10:49AM 4    Q.   AM I RIGHT THAT THERANOS'S OVERALL TEST MENU IN OR ABOUT

10:50AM 5    OCTOBER OF 2015 WAS SOMEWHERE IN THE NEIGHBORHOOD OF 200 TESTS?

10:50AM 6    A.   IT SOUNDS RIGHT.

10:50AM 7    Q.   SO THE MAJORITY OF THOSE 200 TESTS WERE DONE ON ORDINARY

10:50AM 8    COMMERCIAL EQUIPMENT.  CAN WE AGREE ON THAT?

10:50AM 9    A.   YES.

10:50AM 10   Q.   NOW, YOU ALSO HAD AN ARIZONA LAB?

10:50AM 11   A.   WE DID.

10:50AM 12   Q.   WHEN DID THE ARIZONA LAB OPEN?

10:50AM 13   A.   I THINK IN 2014.  MAYBE 2015.

10:50AM 14   Q.   AND THAT WAS WHAT IS CALLED A MODERATE COMPLEXITY LAB?

10:50AM 15   A.   IT WAS.

10:50AM 16   Q.   AND IT ONLY USED COMMERCIALLY AVAILABLE EQUIPMENT;

10:50AM 17   CORRECT?

10:50AM 18   A.   YES.

10:50AM 19   Q.   IT ONLY USED FDA APPROVED MACHINES USING FDA CHEMISTRIES

10:50AM 20   IN WAYS IN ACCORDANCE WITH THE FDA APPROVAL?

10:50AM 21   A.   EXACTLY.

10:50AM 22   Q.   NO MAGICAL THERANOS TECHNOLOGY IN THE ARIZONA LAB?

10:50AM 23   A.   NO.

10:50AM 24   Q.   AND YOU NEVER PUT A MINILAB IN THE ARIZONA LAB?

10:50AM 25   A.   WE DID NOT.

10:50AM  1     Q.   YOU NEVER PUT AN EDISON 3.5 IN THE ARIZONA LAB?

10:51AM  2     A.   THAT'S RIGHT.

10:51AM  3     Q.   YOU NEVER USED MODIFIED SIEMENS ADVIAS IN THE CLIA LAB --

10:51AM  4     THE ARIZONA CLIA LAB?

10:51AM  5     A.   CORRECT.

10:51AM  6     Q.   YOU NEVER DID SMALL SAMPLE TESTING ON MODIFIED THIRD PARTY

10:51AM  7     MACHINES IN THE ARIZONA LAB?

10:51AM  8     A.   WE DID NOT.

10:51AM  9     Q.   YOU DIDN'T DO ANYTHING IN THE ARIZONA LAB THAT ANY OTHER

10:51AM  10    LAB PROVIDER COULD DO; ISN'T THAT FAIR?

10:51AM  11    A.   WE INVESTED A LOT IN AUTOMATION IN THE LABORATORY THAT WE

10:51AM  12    THOUGHT AT THE TIME WAS CUTTING EDGE, BUT IT WAS ALL

10:51AM  13    COMMERCIALLY AVAILABLE MACHINES THAT WE WERE RUNNING.

10:51AM  14    Q.   OKAY.  AND YOU TESTIFIED YESTERDAY TO AN 8 MILLION NUMBER

10:51AM  15    IN TERMS OF TESTS THAT THERANOS HAD PERFORMED; IS THAT RIGHT?

10:51AM  16    A.   I DID.

10:51AM  17    Q.   OKAY.  YOU KNOW AT THE TIME OF JOHN CARREYROU'S ARTICLE IN

10:51AM  18    OCTOBER OF 2015 THAT THAT NUMBER WAS 3.5 MILLION?

10:52AM  19    A.   I DID NOT KNOW THAT, BUT I DON'T DOUBT YOU.

10:52AM  20    Q.   WELL, LET'S SEE IF WE CAN REFRESH YOUR MEMORY.

10:52AM  21         MAY I APPROACH, YOUR HONOR?

10:52AM  22              THE COURT:  YES.

10:52AM  23    BY MR. LEACH:

10:52AM  24    Q.   (HANDING.)

10:52AM  25         I'VE PLACED BEFORE YOU A DOCUMENT THAT WE HAVE MARKED FOR

10:52AM  1    IDENTIFICATION PURPOSES AS EXHIBIT 5702.

10:52AM  2         DO YOU HAVE THAT IN FRONT OF YOU?

10:52AM  3    A.   I DO.

10:52AM  4    Q.   AND DO YOU SEE A HEADING AT THE TOP OF THIS MEMO?

10:52AM  5    A.   I DO.

10:52AM  6    Q.   AND DO YOU SEE A DATE OF OCTOBER 22ND, 2015?

10:52AM  7    A.   YES.

10:52AM  8    Q.   OKAY.  AND I DRAW YOUR ATTENTION TO THE THIRD PARAGRAPH

10:53AM  9    KIND OF INDENTED BELOW THE LINE, "AS WE PROVIDE THESE ANSWERS,"

10:53AM  10   AND TAKE A MOMENT TO READ THAT THIRD PARAGRAPH TO YOURSELF,

10:53AM  11   THAT FIRST LINE.

10:53AM  12   A.   OKAY.

10:53AM  13   Q.   DOES THIS REFRESH YOUR MEMORY THAT AT THE TIME OF THE

10:53AM  14   CARREYROU ARTICLE THERANOS HAD PERFORMED 3.5 MILLION TESTS?

10:53AM  15   A.   I THINK SO, YES.

10:53AM  16   Q.   SO 4.5 MILLION OF THE 8 MILLION NUMBER THAT YOU TALKED

10:53AM  17   ABOUT YESTERDAY, THAT'S DONE AFTER THE CARREYROU ARTICLE COMES

10:53AM  18   OUT?

10:53AM  19   A.   YES.

10:53AM  20   Q.   AND YOU KNOW THAT BY OCTOBER OF 2015 THERANOS WAS NOT

10:53AM  21   DOING ANY SMALL SAMPLE TESTING IN THE CALIFORNIA CLIA LAB?

10:53AM  22   A.   THAT'S RIGHT.

10:53AM  23   Q.   AND YOU KNOW THAT THE 4.5 MILLION THAT COME AFTER OCTOBER

10:54AM  24   OF 2015, THAT IS ALL RUN ON COMMERCIALLY AVAILABLE EQUIPMENT;

10:54AM  25   IS THAT RIGHT?

10:54AM  1    A.   YES.

10:54AM  2    Q.   YOU ALSO KNOW THAT 90 PERCENT OF THE TESTING WAS DONE IN

10:54AM  3    THE ARIZONA LAB?

10:54AM  4    A.   I DON'T KNOW THAT.

10:54AM  5    Q.   MAYBE AFTER A BREAK WE'LL REFRESH YOUR MEMORY ABOUT THAT

10:54AM  6    POINT.

10:54AM  7         BUT CAN WE AGREE THAT THE VAST MAJORITY OF THE TESTING WAS

10:54AM  8    DONE IN THE ARIZONA CLIA LAB?

10:54AM  9    A.   I MEAN, I DON'T HAVE ANY REASON TO DOUBT IT.  I JUST

10:54AM 10    DIDN'T KNOW THAT STAT.

10:54AM 11    Q.   YOU KNEW THAT THE ANNUAL VOLUME OF TESTS IN THE CALIFORNIA

10:54AM 12    CLIA LAB WHERE YOU WERE USING THE EDISON 3.5 AND THE MODIFIED

10:54AM 13    THIRD PARTY MACHINES WAS ONLY DOING ABOUT 800,000 ANNUAL

10:54AM 14    VOLUME?  YOU KNOW THAT?

10:54AM 15    A.   I'M NOT SURE.

10:54AM 16    Q.   WELL, YOU WERE HERE WHEN DR. DAS TESTIFIED TO THAT,

10:55AM 17    WEREN'T YOU?

10:55AM 18    A.   I WAS.  I HEARD THAT.

10:55AM 19    Q.   AND SITTING HERE TODAY, YOU DON'T HAVE ANY REASON TO DOUBT

10:55AM 20    THAT?

10:55AM 21    A.   I DON'T.

10:55AM 22    Q.   AND YOU KNOW THAT THE VAST MAJORITY OF THE 8 MILLION

10:55AM 23    NUMBER THAT YOU TESTIFIED TO YESTERDAY HAS ABSOLUTELY NOTHING

10:55AM 24    TO DO WITH THE MINILAB?

10:55AM 25    A.   YES.

10:55AM  1    Q.   AND IT HAS ABSOLUTELY NOTHING TO DO WITH THE EDISON 3.5?

10:55AM  2    A.   I DO.

10:55AM  3    Q.   AND IT HAS NOTHING TO DO WITH THE TSPU?

10:55AM  4    A.   YES.

10:55AM  5              MR. LEACH:  YOUR HONOR, I'M ABOUT TO MOVE INTO A NEW

10:55AM  6    TOPIC AREA.  THIS MIGHT BE A GOOD TIME FOR A BREAK.

10:55AM  7              THE COURT:  LET'S TAKE OUR BREAK.  WE'LL TAKE A 30

10:55AM  8    MINUTE MORNING BREAK.  WE'LL TAKE A MORNING BREAK OF

10:55AM  9    30 MINUTES, PLEASE.

11:33AM 10         (RECESS FROM 10:56 A.M. UNTIL 11:33 A.M.)

11:35AM 11              THE COURT:  PLEASE BE SEATED.  WE'RE BACK ON THE

11:35AM 12    RECORD.  ALL COUNSEL ARE PRESENT.  OUR JURY IS PRESENT.

11:36AM 13         MR. LEACH, YOU'D LIKE TO CONTINUE?

11:36AM 14              MR. LEACH:  I WOULD, YOUR HONOR.  THANK YOU.

11:36AM 15    Q.   GOOD MORNING AGAIN, MS. HOLMES.

11:36AM 16    A.   GOOD MORNING.

11:36AM 17    Q.   BEFORE THE BREAK, WE WERE TALKING A LITTLE BIT ABOUT

11:36AM 18    90 PERCENT OF THE TESTING AND WHETHER YOU REMEMBERED THAT

11:36AM 19    NUMBER OR NOT.

11:36AM 20         I'D LIKE TO SHOW YOU A DOCUMENT AND SEE IF THIS REFRESHES

11:36AM 21    YOUR RECOLLECTION.

11:36AM 22         MAY I APPROACH, YOUR HONOR?

11:36AM 23              THE COURT:  YES.

11:36AM 24    BY MR. LEACH:

11:36AM 25    Q.   (HANDING.)

| 11:36AM | 1 | DO YOU SEE THAT THIS APPEARS TO BE A MESSAGE FROM |
|---|---|---|
| 11:37AM | 2 | BROOKE BUCHANAN TO YOU ON OR ABOUT JANUARY 28TH, 2016, |
| 11:37AM | 3 | MS. HOLMES? |
| 11:37AM | 4 | A.   YES. |
| 11:37AM | 5 | Q.   AND MS. BUCHANAN IS WRITING BACK TO AN EMAIL THAT YOU SENT |
| 11:37AM | 6 | ON AT 7:41 ON THAT DATE? |
| 11:37AM | 7 | A.   YES. |
| 11:37AM | 8 | MR. LEACH:  I MOVE THE ADMISSION OF 5254, |
| 11:37AM | 9 | YOUR HONOR. |
| 11:37AM | 10 | MR. DOWNEY:  NO OBJECTION. |
| 11:37AM | 11 | THE COURT:  IT'S ADMITTED. |
| 11:37AM | 12 | (GOVERNMENT'S EXHIBIT 5254 WAS RECEIVED IN EVIDENCE.) |
| 11:37AM | 13 | BY MR. LEACH: |
| 11:37AM | 14 | Q.   MS. HOLMES, IF I COULD PLEASE DRAW YOUR ATTENTION -- |
| 11:37AM | 15 | MAY I USE THE ELMO, MS. KRATZMANN? |
| 11:37AM | 16 | THE CLERK:  SURE. |
| 11:37AM | 17 | BY MR. LEACH: |
| 11:37AM | 18 | Q.   DO YOU SEE THE EMAIL AT 7:41 A.M. TO YOU FROM |
| 11:37AM | 19 | BROOKE BUCHANAN? |
| 11:37AM | 20 | A.   I DO. |
| 11:37AM | 21 | Q.   YOU HIRED MS. BUCHANAN IN LATE 2015 TO HELP WITH MEDIA |
| 11:38AM | 22 | RESPONSE? |
| 11:38AM | 23 | A.   I DID. |
| 11:38AM | 24 | Q.   AND YOU WROTE HERE -- LET ME ASK A BETTER QUESTION AND USE |
| 11:38AM | 25 | THE MICROPHONE. |

11:38AM  1          YOU WROTE HERE, "THIS WORK HERE IS INDEPENDENT OF

11:38AM  2   THERANOS'S ARIZONA LAB WHICH IS CLIA CERTIFIED AND GOOD

11:38AM  3   STANDING WHERE OVER 90 PERCENT OF ALL THERANOS SAMPLES ARE

11:38AM  4   PROCESSED."

11:38AM  5          DO YOU SEE THAT LANGUAGE?

11:38AM  6   A.   I DO.

11:38AM  7   Q.   AND DOES THIS REFRESH YOUR MEMORY THAT 90 PERCENT OF THE

11:38AM  8   TESTING WAS DONE IN THE ARIZONA LAB?

11:38AM  9   A.   IT DOES AS OF THAT TIME.

11:38AM  10  Q.   NOW, I NEED TO ASK YOU SOME QUESTIONS ABOUT YOUR

11:38AM  11  RELATIONSHIP WITH MR. BALWANI.

11:38AM  12         DO YOU RECALL TESTIFYING ABOUT THAT YESTERDAY, MS. HOLMES?

11:38AM  13  A.   I DO.

11:38AM  14  Q.   IS IT FAIR TO SAY THAT YOUR RELATIONSHIP WITH SUNNY WAS AT

11:38AM  15  TIMES LOVING AND AT TIMES NOT SO LOVING?

11:39AM  16  A.   YES.

11:39AM  17  Q.   THERE WERE TIMES WHEN HE WAS COMPLIMENTARY AND LOVING OF

11:39AM  18  YOU?

11:39AM  19  A.   THERE WERE.

11:39AM  20  Q.   AND THERE WERE TIMES WHEN HE WAS LESS SO?

11:39AM  21  A.   YES.

11:39AM  22  Q.   AND YOU WERE OFTEN COMPLIMENTARY AND LOVING TO HIM; IS

11:39AM  23  THAT RIGHT?

11:39AM  24  A.   I WAS.

11:39AM  25  Q.   AND AT TIMES IT WAS LESS SO?

11:39AM  1    A.   I WOULD GET UPSET SOMETIMES.

11:39AM  2    Q.   I'D LIKE TO LOOK AT SOME EXAMPLES OF THOSE.

11:39AM  3         MAY I APPROACH, YOUR HONOR?

11:39AM  4              THE COURT:   YES.

11:39AM  5    BY MR. LEACH:

11:39AM  6    Q.   (HANDING.)

11:39AM  7         MS. HOLMES, I'VE PLACED BEFORE YOU WHAT WAS MARKED FOR

11:39AM  8    IDENTIFICATION PURPOSES EARLIER AS EXHIBIT 5387.

11:39AM  9         YOU WERE HERE WHEN MR. OFFEN TESTIFIED ABOUT 5387?

11:40AM 10    A.   I WAS HERE WHEN MR. OFTEN TESTIFIED.  I DON'T REMEMBER

11:40AM 11    5387, BUT --

11:40AM 12    Q.   DO YOU REMEMBER HIM TESTIFYING TO THE PROCESS BY WHICH HE

11:40AM 13    IDENTIFIED TEXT MESSAGES BETWEEN YOU AND MR. BALWANI?

11:40AM 14    A.   I DO.  I DO.

11:40AM 15    Q.   OKAY.  AND DO YOU UNDERSTAND THE DOCUMENT THAT I'VE PLACED

11:40AM 16    BEFORE YOU TO BE TEXTS, IOS AND SKYPE MESSAGES, OR IOS MESSAGES

11:40AM 17    INVOLVING YOU AND MR. BALWANI?

11:40AM 18    A.   YES.

11:40AM 19    Q.   AND YOU UNDERSTAND THAT THESE MESSAGES WERE OBTAINED FROM

11:40AM 20    DEVICES THAT YOU USED WHILE YOU WERE AT THERANOS?

11:40AM 21    A.   I DO.

11:40AM 22    Q.   AND THESE DEVICES INCLUDED AN IPHONE 6S THAT YOU USED?

11:40AM 23    A.   IT INCLUDED AN IPHONE.  I DON'T KNOW WHAT IPHONE IT WAS.

11:40AM 24    Q.   OKAY.  THIS EXHIBIT IS 449 PAGES LONG.  IS THAT CORRECT?

11:40AM 25    A.   OKAY, YES.

11:40AM   1    Q.   AND DO YOU RECALL MR. OFFEN TESTIFYING THAT THERE WERE

11:40AM   2    OVER 12,000 INDIVIDUAL MESSAGES IN THIS DOCUMENT?

11:40AM   3    A.   I RECALL HIM TESTIFYING.  I DIDN'T REMEMBER THAT EXACT

11:41AM   4    NUMBER.

11:41AM   5    Q.   AND DO YOU AGREE WITH ME THAT YOU DON'T HAVE ANY REASON TO

11:41AM   6    DOUBT THAT THE NUMBER OF TEXT MESSAGES IN 5387?

11:41AM   7    A.   I DON'T.

11:41AM   8    Q.   AND YOU AGREE THAT WHATEVER THE NUMBER, 12,000, THEY SPAN

11:41AM   9    A TIME PERIOD 2011 ALL OF THE WAY THROUGH 2016?

11:41AM  10    A.   YES.

11:41AM  11    Q.   SO APPROXIMATELY FIVE YEARS OF YOUR RELATIONSHIP?

11:41AM  12    A.   YES.

11:41AM  13    Q.   AND CAN WE AGREE THAT THERE ARE MANY MESSAGES IN HERE

11:41AM  14    WHERE MR. BALWANI IS EXPRESSING LOVE AND AFFECTION TO YOU?

11:41AM  15    A.   YES.

11:41AM  16    Q.   BEFORE WE LOOK AT 5387, THERE ARE SOME ADDITIONAL MESSAGES

11:41AM  17    THAT I WANT TO GO THROUGH THAT HAVEN'T BEEN ADMITTED, BUT I'D

11:41AM  18    LIKE TO DRAW YOUR ATTENTION TO, IN YOUR BINDER, 5387D AT

11:41AM  19    PAGE 19, AND THIS IS ALREADY IN EVIDENCE, YOUR HONOR.

11:42AM  20         AND IF WE CAN DISPLAY THAT, MS. HOLLIMAN.

11:42AM  21         (PAUSE IN PROCEEDINGS.)

11:42AM  22             MR. LEACH:  MS. HOLLIMAN, CAN WE GO BACK A COUPLE OF

11:42AM  23    PAGES.  ONE MORE.  ONE MORE.  OR ONE MORE.

11:43AM  24    Q.   WELL, MS. HOLMES, LET ME -- I'LL USE 5387.

11:43AM  25         IF I COULD DRAW YOUR ATTENTION TO PAGE 19 OF 5387.

11:43AM 1    A.   THERE'S NOTHING ON MY MONITOR.  I DON'T KNOW IF IT SHOULD

11:43AM 2    BE.

11:43AM 3    Q.   IT'S NOT IN EVIDENCE YET.

11:43AM 4    A.   OH, OKAY.

11:43AM 5    Q.   SO WE'RE GOING TO USE THIS UNTIL WE GET TO --

11:43AM 6    A.   GOT IT.  OKAY.

11:43AM 7    Q.   -- UNTIL ANYTHING HAS BEEN ADMITTED OR WE HAVE PERMISSION

11:43AM 8    TO DISPLAY.

11:43AM 9    A.   PAGE 19?

11:43AM 10   Q.   YES, PLEASE.

11:43AM 11        YOUR HONOR, I'M -- YOUR HONOR, MY INTENTION IS TO MOVE TO

11:43AM 12   ADMIT A NUMBER OF ADDITIONAL PAGES FROM 5387 THAT ARE NOT

11:43AM 13   ALREADY IN EVIDENCE.  RATHER THAN DO IT ONE BY ONE, I'D SEEK

11:43AM 14   PERMISSION TO DISPLAY WHAT I INTEND TO ADMIT, AND THEN AT THE

11:43AM 15   END ADMIT IT IN ONE DOCUMENT SO WE DON'T HAVE MORE PIECES OF

11:43AM 16   PAPER THAN NECESSARY FOR THE JURY.

11:44AM 17             THE COURT:  SURE.  THAT'S FINE.

11:44AM 18             MR. DOWNEY:  YOUR HONOR, THE ONLY ISSUE IS THAT I

11:44AM 19   HAVE NOT HAD A CHANCE -- I DON'T KNOW THESE PAGES OR THESE

11:44AM 20   SEGMENTS, SO I DON'T KNOW WHAT IS COMING.

11:44AM 21             THE COURT:  I WAS GOING TO ASK IF YOU HAD SHARED

11:44AM 22   THIS WITH DEFENSE COUNSEL.

11:44AM 23             MR. LEACH:  I HAVE, YOUR HONOR.

11:44AM 24             THE COURT:  YOU HAVE?

11:44AM 25             MR. LEACH:  I HAVE, YOUR HONOR.  IT IS

| | | |
|---|---|---|
| 11:44AM | 1 | CROSS-EXAMINATION, SO I DIDN'T -- |
| 11:44AM | 2 | THE COURT:  OKAY.  THAT'S FINE. |
| 11:44AM | 3 | MR. LEACH:  AND I'M HAPPY TO WORK WITH MR. DOWNEY ON |
| 11:44AM | 4 | RULE 106 COMPLETIONS. |
| 11:44AM | 5 | THE COURT:  THAT'S FINE. |
| 11:44AM | 6 | MR. LEACH:  MAY I DISPLAY PAGE 19. |
| 11:44AM | 7 | Q.  MS. HOLMES, DO YOU SEE ON THE LEFT SIDE OF THE DOCUMENT, |
| 11:44AM | 8 | THERE'S NUMBERS FOR THE PARTICULAR TEXT MESSAGES? |
| 11:44AM | 9 | A.  YES. |
| 11:44AM | 10 | Q.  OKAY. |
| 11:44AM | 11 | A.  WAIT, SORRY.  THE RECORD? |
| 11:44AM | 12 | Q.  YEAH, THERE'S A HOLMES, MACBOOKAIR_SKYPE AND THEN? |
| 11:44AM | 13 | A.  OKAY, I DO. |
| 11:45AM | 14 | Q.  I WANT TO DRAW YOUR ATTENTION TO THE TEXT STARTING ON 129. |
| 11:45AM | 15 | A.  129. |
| 11:45AM | 16 | Q.  PERFECT.  THANK YOU. |
| 11:45AM | 17 | DO YOU SEE THE MESSAGE ON MAY 9TH, 2020, 12 -- |
| 11:45AM | 18 | THE COURT:  I'M SORRY.  WHAT IS THE DATE AGAIN? |
| 11:45AM | 19 | MR. LEACH:  MAY 9TH, 2020 -- 2012.  I'M SORRY. |
| 11:45AM | 20 | EXCUSE ME. |
| 11:46AM | 21 | Q.  DO YOU SEE THE MESSAGE I'M TALKING ABOUT, MS. HOLMES? |
| 11:46AM | 22 | A.  YES. |
| 11:46AM | 23 | Q.  WOULD YOU MIND READING ME FOR THE MESSAGES DOWN FROM 129 |
| 11:46AM | 24 | TO MESSAGE 121? |
| 11:46AM | 25 | A.  129 TO 121? |

11:46AM  1    Q.   YES?

11:46AM  2    A.   YES.  I GUESS I CAN DO IT HERE.

11:46AM  3         "MISSING YOU.  THIS BUSINESS CANNOT BE BUILD BY EITHER YOU

11:46AM  4    OR I ALONE.  THAT'S WHY THE UNIVERSE BROUGHT US TOGETHER (AMONG

11:46AM  5    OTHER BILLION REASONS).  NO ONE BUT YOU AND I CAN BUILD THIS

11:46AM  6    BUSINESS.

11:46AM  7         "TOGETHER.

11:46AM  8         "I KNOW.

11:46AM  9         "WE HAVE TO WORK TOGETHER ON THE REV PIECE.

11:46AM  10        "WITHOUT, SEEMS LIKE HALF MY ENERGY IS GONE AND THE

11:46AM  11   BUILDING IS AN EMPTY SHELL.

11:46AM  12        "WITHOUT U."

11:46AM  13        AND THEN I'M NOT SURE WHAT THAT IS.

11:46AM  14        "I KNOW THE FEELING.

11:46AM  15        "YOU ARE THE COMPANY.  WE NEED REVENUE PLUS FEW SENIOR

11:46AM  16   LEVEL MANAGERS - EXPERIENCED EVEN IF THEY ONLY WORK 11 HOURS

11:46AM  17   TIMES 5."

11:46AM  18   Q.   THANK YOU.  YOU WROTE "WE HAVE TO WORK TOGETHER ON THE REV

11:47AM  19   PIECE."  IS THAT A REFERENCE TO REVENUE?

11:47AM  20   A.   I'M NOT SURE.

11:47AM  21   Q.   FURTHER DOWN BELOW, MR. BALWANI WROTE, "YOU ARE THE

11:47AM  22   COMPANY.  WE NEED REVENUE PLUS FEW SENIOR LEVEL MANAGERS."

11:47AM  23        DOES THAT HELP YOU UNDERSTAND THAT THE REV PIECE ABOVE

11:47AM  24   REFERS TO REVENUE?

11:47AM  25   A.   IT COULD.

11:47AM  1      Q.   YOU HAVE NO REASON TO DOUBT THAT SITTING HERE TODAY?

11:47AM  2      A.   WHEN I READ IT THE FIRST TIME I WAS THINKING REV LIKE

11:47AM  3      REVISIONS OF TECHNOLOGY, BUT IT TOTALLY COULD BE REVENUE.

11:47AM  4      Q.   OKAY.  LET ME NEXT DRAW YOUR ATTENTION, PLEASE, TO

11:47AM  5      PAGE 341 OF 5387.

11:47AM  6           YOUR HONOR, PERMISSION TO DISPLAY 341?

11:48AM  7                THE COURT:  YES.

11:48AM  8      BY MR. LEACH:

11:48AM  9      Q.   I WANT TO DRAW YOUR ATTENTION TO MESSAGE 4698 BEGINNING,

11:48AM  10     "ALL MY LOVE."

11:48AM  11     A.   I'M SORRY, WHAT?  I DON'T -- WHICH ONE IS IT.

11:48AM  12     Q.   PAGE 341?

11:48AM  13     A.   IT'S NOT WHAT IS ON THE SCREEN?

11:48AM  14     Q.   IT'S NOT WHAT IS ON THE SCREEN.  I THINK WE HAVE 248 ON

11:48AM  15     THE SCREEN.

11:48AM  16     A.   OKAY.

11:48AM  17     Q.   WE'RE LOOKING FOR PAGE 341.

11:48AM  18     A.   GOT IT.  YEP.

11:48AM  19     Q.   AND JUST ONE MOMENT WHILE --

11:48AM  20          MS. HOLLIMAN, IF WE CAN GO TO 341.

11:49AM  21          (PAUSE IN PROCEEDINGS.)

11:49AM  22          MS. KRATZMANN, MAY I TRY THE ELMO?

11:50AM  23          (PAUSE IN PROCEEDINGS.)

11:50AM  24                MR. LEACH:  I'M NOT SEEING ANYTHING ON MY SCREEN.

11:50AM  25                THE CLERK:  LET ME DO A QUICK RESET.

| | | |
|---|---|---|
| 11:50AM | 1 | BY MR. LEACH: |
| 11:50AM | 2 | Q.   ARE YOU ABLE TO SEE THAT ON THE SCREEN, MS. HOLMES? |
| 11:50AM | 3 | A.   I AM. |
| 11:50AM | 4 | Q.   OKAY.  AND DO YOU SEE THE MESSAGE AT 10-21-2015 STARTING |
| 11:50AM | 5 | "ALL MY LOVE" FROM MR. BALWANI? |
| 11:50AM | 6 | A.   I DO, YES. |
| 11:50AM | 7 | Q.   AND WOULD YOU PLEASE READ FOR US DOWN TO THE BOTTOM IN THE |
| 11:50AM | 8 | LAST TEXT MESSAGE ON THE PAGE. |
| 11:50AM | 9 | A.   "I LOVE YOU. |
| 11:50AM | 10 | "LOVE YOU.  I PRAYED FROM THE BOTTOM OF MY HEART FOR YOU. |
| 11:50AM | 11 | I HAVE NEVER PRAYED WITH THIS INTENSITY IN MY LIFE FOR ANYTHING |
| 11:51AM | 12 | AND ANYONE.  YOU WILL SHINE. |
| 11:51AM | 13 | "WAS JUST THINKING ABOUT YOU AND MEDITATING ON MY TIGRESS. |
| 11:51AM | 14 | "GOOD. |
| 11:51AM | 15 | "I LOVE THIS. |
| 11:51AM | 16 | "IT IS US TOGETHER. |
| 11:51AM | 17 | "PERFECTION. |
| 11:51AM | 18 | "AND DIVINITY. |
| 11:51AM | 19 | "ON WAY TO HOTEL TO DO NYT. |
| 11:51AM | 20 | "GOOD CALL WITH AZ REPUBLIC AND DEUCY. |
| 11:51AM | 21 | "SMILEY FACE. |
| 11:51AM | 22 | "MY NIRVANA." |
| 11:51AM | 23 | Q.   AND THAT'S YOU WRITING "MY NIRVANA" AT THE END; RIGHT? |
| 11:51AM | 24 | A.   IT IS. |
| 11:51AM | 25 | Q.   NOW, IF WE COULD PLEASE CONTINUE ON TO THE NEXT PAGE, 342. |

11:51AM 1          DO YOU SEE THERE ARE SOME ADDITIONAL TEXT MESSAGES ON

11:52AM 2     10-21?

11:52AM 3     A.   I DO.

11:52AM 4     Q.   DO YOU SEE AT THE TOP MR. BALWANI IS WRITING "U R GOD'S

11:52AM 5     TIGRESS AND WARRIOR.  YOU ARE EXTRAORDINARY"?

11:52AM 6     A.   I DO.

11:52AM 7     Q.   OKAY.  WOULD YOU CONTINUE READING WITH YOUR RESPONSE ALL

11:52AM 8     OF THE WAY DOWN TO THE MESSAGE "WORRIED ABOUT YOUR ALL

11:52AM 9     FINGERSTICKS ON TECHNOLOGY" COMMENT?

11:52AM 10    A.   "YOU ARE GOD'S TIGRESS AND WARRIOR.  YOU ARE

11:52AM 11    EXTRAORDINARY.

11:52AM 12         "COMING FROM MY TIGER MEANS THE WHOLE UNIVERSE TO ME.

11:52AM 13         "I LOVE YOU.

11:52AM 14         "I WORSHIP YOU.  BE YOURSELF.

11:52AM 15         "ME AMORE.

11:52AM 16         "ALL MY AND THE INFINITE STRENGTH OF THE UNIVERSE WITH U.

11:53AM 17         "I LOVE YOU.

11:53AM 18         "I LOVE YOU.

11:53AM 19         "VERY CHOPPY.

11:53AM 20         "YOU SEEMED AWESOME.

11:53AM 21         "DID YOU SEE IT?

11:53AM 22         "HOW DID PEOPLE REACT?

11:53AM 23         "HMFR.

11:53AM 24         "HMFR TIGER.

11:53AM 25         "WORRIED ABOUT YOUR ALL FINGERSTICKS ON OUR TECHNOLOGY

11:53AM 1    COMMENT.  SENT AN EMAIL.  THE WEB DOCUMENT IS FINE."

11:53AM 2    Q.   YOU CAN STOP THERE, MS. HOLMES.  THAT'S WHERE I WAS

11:53AM 3    LOOKING FOR.

11:53AM 4        THERE ARE A COUPLE OF COMMENTS I WANT TO MAKE SURE WE

11:53AM 5    UNDERSTAND.

11:53AM 6        THERE'S AN ACRONYM, HMFR.  WHAT DOES THAT MEAN?

11:53AM 7    A.   IT'S ARABIC.  IT'S A PRAYER IN ARABIC.  IN ARABIC IT'S

11:53AM 8    HADHA MIN FADLI RABBI, WHICH MEANS THIS TOO IS MY GOD'S GLORY.

11:53AM 9    Q.   AND IS THIS -- FAIR TO SAY THIS IS AN EXAMPLE OF

11:54AM 10   MR. BALWANI EXPRESSING LOVE AND AFFECTION TOWARDS YOU?

11:54AM 11   A.   IT IS.

11:54AM 12   Q.   THERE'S A COMMENT, "WORRIED ABOUT YOUR ALL FINGERSTICKS ON

11:54AM 13   OUR TECHNOLOGY" COMMENT."

11:54AM 14       DO YOU SEE THAT?

11:54AM 15   A.   YEAH.

11:54AM 16   Q.   AND YOU KNOW ON THIS DAY YOU WERE GIVING A SPEECH AT A

11:54AM 17   CONFERENCE BY "THE WALL STREET JOURNAL" WHERE YOU WERE

11:54AM 18   RESPONDING TO SOME OF THE CRITICISMS IN MR. CARREYROU'S

11:54AM 19   ARTICLE; IS THAT RIGHT?

11:54AM 20   A.   I DIDN'T KNOW IT WAS THAT DAY, BUT IT'S AROUND THAT TIME,

11:54AM 21   YES.

11:54AM 22   Q.   OKAY.  AND MR. BALWANI IS EXPRESSING CONCERN ABOUT ONE OF

11:54AM 23   THE STATEMENTS THAT YOU MADE; IS THAT FAIR?

11:54AM 24   A.   IT LOOKS LIKE IT, YES.

11:54AM 25   Q.   OKAY.  AND HE'S NOT CONCEALING ANYTHING FROM YOU THERE, IS

11:54AM  1    HE?

11:54AM  2    A.   WHAT DO YOU MEAN BY THAT?

11:54AM  3    Q.   HE'S NOT HIDING FROM YOU THE FACT THAT HE'S WORRIED ABOUT

11:54AM  4    A COMMENT THAT YOU MADE THERE?

11:54AM  5    A.   NO.

11:54AM  6    Q.   LET ME DRAW YOUR ATTENTION TO WHAT IS IN EVIDENCE AT

11:54AM  7    5387D.

11:55AM  8         BEFORE I GO THERE, LET ME DRAW YOUR ATTENTION TO PAGE 72.

11:55AM  9    A.   OF THIS DOCUMENT?

11:55AM 10    Q.   YES, PLEASE.

11:55AM 11         MS. HOLMES, ARE THESE ADDITIONAL TEXT MESSAGES BETWEEN YOU

11:55AM 12    AND MR. BALWANI IN THE NOVEMBER 27TH, 2014 TIME PERIOD?

11:56AM 13    A.   THEY ARE.

11:56AM 14    Q.   AND MR. BALWANI TALKS ABOUT, FIRST OF ALL, MESSAGE 20398,

11:56AM 15    IT SAYS, "RUPERT SAID SAME THING AS YOU AND I TALKED ABOUT ON

11:56AM 16    SEPARATE R&D BUCKET."

11:56AM 17         DO YOU SEE THAT LANGUAGE?

11:56AM 18    A.   I DO.

11:56AM 19    Q.   OKAY.  AND IN OR AROUND THIS TIME WERE YOU SEEKING A

11:56AM 20    POTENTIAL INVESTMENT FROM MR. MURDOCH?

11:56AM 21    A.   YES.

11:56AM 22    Q.   AND MR. BALWANI WRITES "AWESOME."

11:56AM 23         YOU REPLY, "I KNOW.

11:56AM 24         FURTHER DOWN YOU ASK, "QUESTION:  PROMISE HONEST ANSWER?"

11:56AM 25         DO YOU SEE THAT?

11:56AM   1   A.   I DO.

11:56AM   2   Q.   AND MR. BALWANI WRITES, "OF COURSE.  WHEN HAVE I NOT?"

11:56AM   3        DO YOU SEE THAT LANGUAGE?

11:56AM   4   A.   YES.

11:56AM   5   Q.   AND THEN YOU HAVE A SMILEY FACE?

11:56AM   6   A.   YES.

11:56AM   7   Q.   AND THEN YOU WROTE, "WHY I LOVE YOU, AMONGST ALL OTHER

11:56AM   8   REASONS.  COULDN'T STOP THINKING ABOUT YOU WHOLE TIME I WAS

11:57AM   9   THERE TODAY.

11:57AM  10        "I LOVE YOU TOO DARLING.

11:57AM  11        "WHAT'S UR QUESTION?"

11:57AM  12        YOUR QUESTION WAS, "WOULD YOU BE OK IF I SAW JESSE AND

11:57AM  13   LAURA SEPARATELY IN THE A.M. TOMORROW, HOME BY LATEST 11:15

11:57AM  14   A.M."

11:57AM  15        DO YOU SEE THAT?

11:57AM  16   A.   I DO.

11:57AM  17   Q.   AND WHO WAS LAURA?

11:57AM  18   A.   LAURA WAS A FRIEND OF MINE.

11:57AM  19   Q.   AND "WHEN YOU FINISH THE GEORGE THING," WHAT WAS THAT A

11:57AM  20   REFERENCE TO?

11:57AM  21   A.   I DON'T KNOW.  I ASSUME SOMETHING WITH GEORGE.

11:57AM  22   Q.   GEORGE SHULTZ?

11:57AM  23   A.   YES.

11:57AM  24   Q.   AND IS THIS TEXT MESSAGE EXCHANGE ANOTHER EXAMPLE OF

11:57AM  25   MR. BALWANI BEING LOVING TO YOU?

11:57AM  1    A.   I THINK IT'S ME ASKING HIM FOR PERMISSION TO SEE MY

11:57AM  2    FRIENDS.

11:57AM  3    Q.   OKAY.  IS IT REPRESENTATIVE OF MANY OTHER TEXTS IN

11:57AM  4    EXHIBIT 5387?

11:57AM  5    A.   I DON'T KNOW BECAUSE I HAVEN'T GONE THROUGH THE WHOLE

11:57AM  6    THING, BUT I WOULD OFTEN TRY TO ASK HIM IF IT WOULD BE OKAY IF

11:57AM  7    I COULD SEE A FRIEND BEFORE GOING BACK TO THE OFFICE OR GOING

11:57AM  8    TO A WORK MEETING.

11:57AM  9    Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 129.

11:58AM 10    A.   OKAY.

11:58AM 11           MR. LEACH:  PERMISSION TO DISPLAY, YOUR HONOR?

11:58AM 12           THE COURT:  YES.

11:58AM 13    BY MR. LEACH:

11:58AM 14    Q.   DO YOU SEE THE MESSAGE AT THE TOP, "LOVE U TOO" FROM

11:58AM 15    MR. BALWANI?

11:58AM 16    A.   I DO.

11:58AM 17    Q.   AND WOULD YOU PLEASE READ FOR ME DOWN TO THE BOTTOM OF THE

11:58AM 18    PAGE STARTING WITH YOUR RESPONSE?

11:58AM 19    A.   "I LOVE YOU.

11:58AM 20      "XX.

11:58AM 21      "LET'S GO TO JAPAN TOGETHER THIS YEAR.

11:58AM 22      "OK.

11:58AM 23      "HEADING TO AIRPORT.

11:58AM 24      "LOVING YOU.

11:58AM 25      "ME TOO.

11:58AM 1          "WAS JUST THINKING ABOUT U.

11:58AM 2          "I MISS YOU.

11:59AM 3          "ME MORE.

11:59AM 4          "CAN YOU RESPOND TO MY SLIM AND WISENBAKER EMAILS?

11:59AM 5          "CAN YOU TALK.

11:59AM 6          "WASN'T SURE WHAT YOU WERE ASKING FOR."

11:59AM 7     Q.   YOU JUST SAID CAN YOU RESPOND TO MY SLIM AND WISENBAKER

11:59AM 8     EMAIL.

11:59AM 9          "CAN YOU TALK?

11:59AM 10         "WASN'T SURE WHAT YOU WERE ASKING FOR.

11:59AM 11         "HOME.

11:59AM 12         "WILL DROP BY FOR A BIT.

11:59AM 13         "LOVING YOU.

11:59AM 14         "ON MY WAY HEADING HOME TO RECEIVE MY MOM.

11:59AM 15         "YOU EATING THERE I ASSUME?

11:59AM 16         "YES.  RAJU AND HIS FAMILY HERE ALSO JUST FYI.

12:00PM 17         "I HAVE ORDERED JANTA FOR THEM BUT SAPNA BROUGHT FOOD

12:00PM 18    ALSO.

12:00PM 19         "K.

12:00PM 20         "HERE LOVING YOU.

12:00PM 21         "ALL MY LOVE AND HUGS FOR MY QUEEN.

12:00PM 22         "GETTING ON CVS CALL.

12:00PM 23         "ABOUT TO LEAVE.  CONGRESS UNANIMOUS VOTE IN FAVOR.

12:00PM 24         "UNANIMOUS VOTE IN FAVOR OF YOU BABY.

12:00PM 25         "TAKING OFF TO COME HOME.

12:00PM  1        "OK."

12:00PM  2        IS THIS ANOTHER EXAMPLE OF MR. BALWANI BEING LOVING AND

12:00PM  3   SUPPORTING OF YOU?

12:00PM  4   A.   YES.

12:00PM  5   Q.   AND WOULD YOU AGREE WITH ME THAT THERE ARE MANY TIMES IN

12:00PM  6   THESE TEXT MESSAGES WHERE YOU ARE LOVING AND SUPPORTIVE TO HIM?

12:00PM  7   A.   I WAS.

12:00PM  8   Q.   LET ME PLEASE DRAW YOUR ATTENTION TO PAGE 208.

12:01PM  9   A.   OKAY.

12:01PM 10            MR. LEACH:   PERMISSION TO DISPLAY, YOUR HONOR?

12:01PM 11            THE COURT:   YES.

12:01PM 12   BY MR. LEACH:

12:01PM 13   Q.   IS THIS A STRING OF MESSAGES, MS. HOLMES, FROM THE

12:01PM 14   MAY 2015 TIME PERIOD?

12:01PM 15   A.   IT IS.

12:01PM 16   Q.   OKAY.  AND I THINK YOU MAY HAVE TALKED A LITTLE BIT WITH

12:01PM 17   MR. DOWNEY ABOUT SOME OF THIS, BUT DO YOU SEE WHERE IT SAYS UP

12:01PM 18   AT THE TOP, "BEING YOUR MADIBA MATTERS MORE THAN ANYTHING TO

12:01PM 19   ME"?

12:01PM 20   A.   YES.

12:01PM 21   Q.   AND FURTHER DOWN YOU WROTE -- DO YOU SEE THE MESSAGE

12:02PM 22   RELATING TO "WHAT AN AMAZING GIFT TO MEET A MAN I FALL MADLY IN

12:02PM 23   LOVE WITH"?

12:02PM 24   A.   I DO.

12:02PM 25   Q.   AND THAT'S YOU EXPRESSING LOVE AND AFFECTION TO

12:02PM  1    MR. BALWANI?

12:02PM  2    A.   YES.

12:02PM  3    Q.   FURTHER DOWN THERE'S A MESSAGE, "DID YOU GET MY TEXT A

12:02PM  4    WHILE AGO ABOUT FALLING IN LOVE W YOU?"

12:02PM  5         DO YOU SEE THAT?

12:02PM  6    A.   YES.

12:02PM  7    Q.   AND HE WRITES BACK TO YOU ABOUT HIS KIND WORDS OF

12:02PM  8    AFFECTION FOR YOU.  IS THAT FAIR?

12:02PM  9    A.   YES.

12:02PM  10   Q.   WOULD YOU AGREE WITH ME THAT THERE ARE MANY OTHER EXAMPLES

12:02PM  11   WITHIN 5387 OF YOU EXPRESSING LOVE AND AFFECTION TO

12:02PM  12   MR. BALWANI?

12:02PM  13   A.   I'M SURE THERE ARE.

12:02PM  14   Q.   OKAY.  DO YOU KNOW HOW MANY TIMES THE WORD "LOVE" APPEARS

12:02PM  15   IN 5387?

12:02PM  16   A.   NO.

12:02PM  17   Q.   WOULD IT SURPRISE YOU TO LEARN THAT THE WORD "LOVE"

12:03PM  18   APPEARS MORE THAN 594 TIMES?

12:03PM  19   A.   NO.

12:03PM  20   Q.   HAVE YOU EVER TRIED TO COUNT THEM UP?

12:03PM  21   A.   NO.

12:03PM  22   Q.   ANY REASON TO DOUBT THAT IT'S IN THE 500'S?

12:03PM  23   A.   NO.

12:03PM  24   Q.   OKAY.  WOULD IT SURPRISE YOU TO LEARN THAT THE WORD

12:03PM  25   "LOVING" IS IN THERE 105 TIMES?

12:03PM  1    A.  NO.

12:03PM  2    Q.  IS IT FAIR TO SAY THAT YOU AND MR. BALWANI HAD A SPIRITUAL

12:03PM  3    CONNECTION?

12:03PM  4    A.  I THOUGHT WE DID.

12:03PM  5    Q.  YOU BELIEVED THAT AT THE TIME?

12:03PM  6    A.  I DID.

12:03PM  7    Q.  OKAY.  CAN I ASK YOU, PLEASE, TO LOOK AT PAGE 11 TO 12 OF

12:03PM  8    5387.

12:04PM  9        DO YOU HAVE THAT IN FRONT OF YOU, MS. HOLMES?

12:04PM  10   A.  I DO, YES.

12:04PM  11   Q.  DOWN AT THE BOTTOM DO YOU SAY -- AND IS THIS A SKYPE

12:04PM  12   EXCHANGE FROM THE 2011 TIME PERIOD?

12:04PM  13   A.  YES.

12:04PM  14   Q.  AND DO YOU SEE WHERE IT SAYS, "THRU SKYPE WE R TOGETHER.

12:04PM  15   CAN'T BE APART FROM U FOR EVEN FEW HOURS"?

12:04PM  16   A.  I DO.

12:04PM  17   Q.  AND THAT'S SOMETHING THAT MR. BALWANI WROTE?

12:04PM  18   A.  YES.

12:04PM  19   Q.  YOU REPLY WITH AMAZEMENT AND THEN MR. BALWANI SAYS,

12:05PM  20   "ULTIMATE BLESSINGS."

12:05PM  21       DO YOU SEE THOSE WORDS?

12:05PM  22   A.  I DO.

12:05PM  23   Q.  AND IS THIS A SPIRITUAL CONNECTION THAT YOU FELT WITH

12:05PM  24   MR. BALWANI AT THE TIME?

12:05PM  25   A.  I THINK THE SPIRITUAL CONNECTION WAS MORE BELIEVING THAT

12:05PM   1    GOD HAD PUT HIM IN MY LIFE AT A TIME THAT IT REALLY MATTERED.

12:05PM   2    Q.   YOU AND MR. BALWANI WERE ROMANTICALLY INVOLVED FOR MORE

12:05PM   3    THAN TEN YEARS?

12:05PM   4    A.   YES.

12:05PM   5    Q.   AND YOUR RELATIONSHIP WAS ON AND OFF TO THE TIME PERIOD

12:05PM   6    PRIOR TO HIM JOINING THE COMPANY AND THEN AFTER HE JOINED THE

12:05PM   7    COMPANY?

12:05PM   8    A.   IT WAS.

12:05PM   9    Q.   ON AND OFF DURING BOTH OF THOSE PERIODS OF TIME?

12:05PM  10    A.   YES.

12:05PM  11    Q.   AND YOU LIVED TOGETHER FROM 2005 TO 2016?

12:05PM  12    A.   YES.

12:05PM  13    Q.   AND THE ROMANTIC RELATIONSHIP DIED BEFORE HE LEFT THE

12:05PM  14    COMPANY?

12:06PM  15    A.   YES.

12:06PM  16    Q.   AND YOU ENDED THE RELATIONSHIP WITH MR. BALWANI?

12:06PM  17    A.   I DID.

12:06PM  18    Q.   YOU MADE THAT CHOICE?

12:06PM  19    A.   I DID.

12:06PM  20    Q.   HOW DID IT END?

12:06PM  21    A.   WHAT PART?

12:06PM  22    Q.   THE ROMANTIC RELATIONSHIP?

12:06PM  23    A.   COULD YOU TELL ME WHAT YOU WOULD LIKE ME TO TALK ABOUT?

12:06PM  24    Q.   I'M ASKING A QUESTION.  HOW DID THE ROMANTIC RELATIONSHIP

12:06PM  25    END?

12:06PM  1    A.   UM, I THINK WHEN I STARTED TO REALIZE THAT THIS PERSON

12:06PM  2    THAT I HAD BELIEVED IN MORE THAN ANYTHING WASN'T WHO HE WAS TO

12:06PM  3    ME, THEN NOTHING WAS REAL ANYMORE.

12:06PM  4         MY WHOLE FOUNDATION FOR LIFE, WHAT I BELIEVED IN, THE

12:06PM  5    DEVOTION TO THE COMPANY WAS BASED ON BELIEVING THAT HE WAS THIS

12:07PM  6    PERSON THAT HE HAD CONVEYED HIMSELF TO BE TO ME, AND WHEN I

12:07PM  7    STARTED TO REALIZE THAT, THEN I REALIZED THAT NOT ONLY WAS HE

12:07PM  8    NOT THE PERSON WHO HE SAID HE WAS TO ME PERSONALLY, BUT ALSO

12:07PM  9    THAT THERE WAS NO WAY I COULD SAVE OUR COMPANY IF HE WAS THERE.

12:07PM  10        AND SO THAT WAS IT.

12:07PM  11   Q.   I APPRECIATE THAT ANSWER, MS. HOLMES.

12:07PM  12        YOU, YOU KNOW YOU'VE BEEN ASKED THAT QUESTION BEFORE, HOW

12:07PM  13   DID THE RELATIONSHIP END; IS THAT CORRECT?

12:07PM  14   A.   I'M SURE I HAVE.

12:07PM  15   Q.   WOULD YOU PLEASE LOOK AT YOUR RED BINDER?

12:07PM  16   A.   YEAH.

12:07PM  17   Q.   IF I COULD DRAW YOUR ATTENTION TO THE BATES NUMBER ENDING

12:07PM  18   5567.

12:08PM  19   A.   OKAY.

12:08PM  20   Q.   EXCUSE ME.  55 -- PAGE 5568, PAGE 853?

12:08PM  21   A.   OKAY.

12:08PM  22        MR. LEACH:  YOUR HONOR, I SEEK PERMISSION TO READ

12:08PM  23   FROM LINE 13 THROUGH LINE 1 ON 854.

12:08PM  24        THE COURT:  YES.

12:08PM  25   BY MR. LEACH:

12:08PM 1    Q.   MS. HOLMES, WERE YOU ASKED THE FOLLOWING QUESTION AND DID

12:08PM 2    YOU GIVE THE FOLLOWING ANSWER:

12:08PM 3         "QUESTION:  HOW DID IT END?

12:08PM 4         "ANSWER:  THE PERSONAL RELATIONSHIP?

12:08PM 5         "QUESTION:  YES.

12:08PM 6         "ANSWER:  YOU KNOW, I THINK WHEN HE JOINED THE COMPANY IT

12:09PM 7    WAS -- WE HAD SPENT I THINK IT WAS FOUR OR FIVE YEARS TOGETHER

12:09PM 8    BY THAT POINT AND REALLY UNDERSTOOD THAT OUR CONNECTION WAS

12:09PM 9    ABOUT TRYING TO CREATE AND WORK TOGETHER.  IT WASN'T REALLY

12:09PM 10   ABOUT THE ROMANTIC PART.

12:09PM 11        "AND ONCE WE STARTED WORKING TOGETHER, IT WAS A VERY

12:09PM 12   INTENSE WORKING RELATIONSHIP.  AND THERE -- THE ROMANTIC PIECE

12:09PM 13   THAT WAS THERE AT THE VERY BEGINNING DIED.

12:09PM 14        "I DIDN'T THINK IT HAPPENED IN ONE MOMENT, BUT IT WAS VERY

12:09PM 15   CLEAR THAT WE WERE COLLEAGUES."

12:09PM 16        WAS THAT YOUR TESTIMONY BEFORE THE S.E.C.?

12:09PM 17   A.   IT IS.

12:09PM 18   Q.   AND WHEN YOU TESTIFIED ABOUT YOUR ROMANTIC RELATIONSHIP

12:09PM 19   WITH MR. BALWANI, AM I RIGHT YOU DIDN'T MENTION THE CMS

12:09PM 20   INSPECTION?

12:09PM 21   A.   I THINK THIS IS TALKING ABOUT WHEN HE JOINED THE COMPANY,

12:09PM 22   WHAT WAS THE TERMINATION OF THE ROMANTIC RELATIONSHIP AT THAT

12:09PM 23   POINT.

12:09PM 24   Q.   YOU WERE ASKED A NUMBER OF QUESTIONS ABOUT THE PERSONAL

12:09PM 25   RELATIONSHIP, AND YOU DID NOT MENTION CMS; IS THAT FAIR?

| 12:09PM | 1 | A.   I DON'T THINK SO.  I HAVEN'T RE-READ MY TESTIMONY, BUT I |
|---------|---|--------------------------------------------------------------|
| 12:10PM | 2 | DON'T THINK SO. |
| 12:10PM | 3 | Q.   YOU'RE SAYING THAT YOU HAVEN'T RE-READ YOUR TESTIMONY IN |
| 12:10PM | 4 | PREPARING FOR TODAY? |
| 12:10PM | 5 | A.   I'VE LOOKED AT PORTIONS OF IT, BUT I HAVE NOT READ ALL OF |
| 12:10PM | 6 | MY TESTIMONY. |
| 12:10PM | 7 | Q.   OKAY.  BUT SITTING HERE TODAY, YOU DON'T HAVE A MEMORY OF |
| 12:10PM | 8 | TELLING THE S.E.C. THAT CMS HAD SOMETHING TO DO WITH THE END OF |
| 12:10PM | 9 | THE RELATIONSHIP? |
| 12:10PM | 10 | A.   I DON'T. |
| 12:10PM | 11 | Q.   WHEN YOU BROKE OFF THE RELATIONSHIP IN 2016, YOU WERE NOT |
| 12:10PM | 12 | SEEING ANY MENTAL HEALTH PROFESSIONALS; IS THAT RIGHT? |
| 12:10PM | 13 | A.   I WAS NOT. |
| 12:10PM | 14 | Q.   OKAY.  YOU WEREN'T SEEING A PSYCHOLOGIST? |
| 12:10PM | 15 | A.   NO. |
| 12:10PM | 16 | Q.   YOU WEREN'T SEEING A PSYCHIATRIST? |
| 12:10PM | 17 | A.   NO. |
| 12:10PM | 18 | Q.   WHATEVER WAS KEEPING YOU AND MR. BALWANI TOGETHER, YOU |
| 12:10PM | 19 | WERE ABLE TO MAKE A BREAK IN 2016? |
| 12:10PM | 20 | A.   I DID. |
| 12:10PM | 21 | Q.   AND IS IT TRUE THAT MR. BALWANI DID NOT CONCEAL FROM YOU |
| 12:10PM | 22 | THE REALITY OF WHAT WAS HAPPENING AT THERANOS? |
| 12:10PM | 23 | A.   WHAT DO YOU MEAN BY THAT? |
| 12:10PM | 24 | Q.   PROBLEMS IN THE LAB, ISSUES WITH WALGREENS, FRUSTRATIONS |
| 12:11PM | 25 | WITH THERANOS NOT HAVING A PRODUCT, HE DIDN'T CONCEAL THESE |

12:11PM 1    THINGS FROM YOU, DID HE?

12:11PM 2    A.   I DIDN'T THINK HE DID.

12:11PM 3    Q.   WELL, LET'S LOOK AT A DOCUMENT THAT YOUR ATTORNEY SHOWED

12:11PM 4    YOU YESTERDAY.

12:11PM 5         IF WE COULD GO TO EXHIBIT 7534.

12:11PM 6         DO YOU HAVE THAT, MS. HOLMES?  IT WAS IN YOUR, IN YOUR

12:11PM 7    COUNSEL'S BINDER YESTERDAY.

12:11PM 8    A.   I DON'T HAVE THOSE ANYMORE.

12:11PM 9              THE COURT:  THAT WAS COLLECTED, I THINK.

12:11PM 10             THE WITNESS:  OH.

12:11PM 11             THE COURT:  AND THIS IS IN EVIDENCE.

12:12PM 12             MR. LEACH:  YEAH, PERHAPS WE CAN DISPLAY IT.  AND IF

12:12PM 13   WE CAN GO TO PAGE 3, PLEASE, MS. HOLLIMAN.

12:12PM 14   Q.   THIS IS A NOTE THAT YOU MADE TO YOURSELF IN THE APRIL 2015

12:12PM 15   TIME PERIOD, MS. HOLMES?

12:12PM 16   A.   IT IS.

12:12PM 17   Q.   OKAY.  AND YOU'RE TRYING TO RECOUNT A CONVERSATION THAT

12:12PM 18   YOU HAD HAD WITH MR. BALWANI?

12:12PM 19   A.   I'M TAKING NOTES AS HE'S TALKING TO ME.

12:12PM 20   Q.   OKAY.  INCLUDING STATEMENTS THAT HE'S MAKING TO YOU?

12:12PM 21   A.   EXACTLY.

12:12PM 22   Q.   OKAY.  AND YOU WROTE, "CONVINCED NEVER HAPPEN EVER.  NOT

12:12PM 23   THANKSGIVING NOT EVER.  PUT HIS DOLLARS ON IT."

12:12PM 24        DO YOU SEE THAT LANGUAGE?

12:12PM 25   A.   YES.

12:12PM 1    Q.   THOSE WERE WORDS THAT MR. BALWANI WAS EXPRESSING TO YOU IN

12:12PM 2    THE APRIL 2015 TIME PERIOD?

12:12PM 3    A.   YES.

12:12PM 4    Q.   AND THEN THERE'S A PARAGRAPH, "FOCUS.  CLARITY.

12:13PM 5    DIRECTION.  COMMUNICATION.  BRINGING EVERYONE TOGETHER AND

12:13PM 6    EXECUTION.  PLANS COME TO FRUITION.  GC AND ELISA AND CBC."

12:13PM 7         YOU RECOGNIZE GC AND ELISA AND CBC TO BE REFERENCE TO

12:13PM 8    ASSAYS WITHIN THE LAB?

12:13PM 9    A.   I THINK HE'S TALKING ABOUT R&D HERE.

12:13PM 10        BUT, YES, I RECOGNIZE THOSE THREE METHODS.

12:13PM 11   Q.   OKAY.  THEN YOU SEE A REFERENCE TO A PRODUCT PERSON.

12:13PM 12        DO YOU SEE THAT?

12:13PM 13   A.   I DO.

12:13PM 14   Q.   "KNOW HOW TO SHIP.  BASIC THINGS.  FLAWLESS.  ENOUGH

12:13PM 15   FOCUS."

12:13PM 16        DO YOU SEE THAT LANGUAGE?

12:13PM 17   A.   I DO.

12:13PM 18   Q.   THEN IN THE NEXT PARAGRAPH, DO YOU SEE WHERE YOU WROTE,

12:13PM 19   "NOT FOCUS ANY TIME ON NONCRITICAL PATH PLAN.  NOT TAKING

12:13PM 20   TANGENT.  NOT TRY SOLVE EVERY PROBLEM UP FRONT BEFORE PROCEED.

12:13PM 21   SOLVE ONCE DONE.  PREPARING 3 YEARS NOT WORRIES ABT."

12:14PM 22        DO YOU SEE THAT LANGUAGE?

12:14PM 23   A.   I DO.

12:14PM 24   Q.   OKAY.  THOSE ARE WORDS THAT MR. BALWANI SAID TO YOU?

12:14PM 25   A.   YES.

12:14PM   1      Q.   AND THEN THERE'S A REFERENCE, "EAH GETTING PRODUCT DONE.

12:14PM   2      SUNNY SW."

12:14PM   3           IS THAT A REFERENCE TO SOFTWARE?

12:14PM   4      A.   YES.

12:14PM   5      Q.   "RULE WORLD."

12:14PM   6           DO YOU SEE THAT?

12:14PM   7      A.   I DO.

12:14PM   8      Q.   AND THEN THE WORD "COMMAND"?

12:14PM   9      A.   YES.

12:14PM  10      Q.   AND THEN DOWN TOWARDS THE BOTTOM, DO YOU SEE WHERE HE

12:14PM  11      WROTE -- OR YOU WROTE, "SO ANGRY AT MYSELF FOR COMING.  SO

12:14PM  12      ANGRY SPENT 5 YEARS OF MY LIFE.  BIGGEST FAILURE OF MY LIFE.

12:14PM  13      REGRET COMING.  STAYED BECAUSE I LOVE YOU."

12:14PM  14           THOSE ARE WORDS THAT MR. BALWANI SAID TO YOU?

12:14PM  15      A.   YES.

12:14PM  16      Q.   "NO ONE TOLD RESPONSIBLE."  AND THEN THERE'S AN EXPLETIVE,

12:14PM  17      "MEDIOCRE QUALITY OF THIS," AND THERE'S A REFERENCE TO THE

12:15PM  18      COMPANY; CORRECT?

12:15PM  19      A.   YES.

12:15PM  20      Q.   AND THE COMPANY THERE IS THERANOS; RIGHT?

12:15PM  21      A.   YES.

12:15PM  22      Q.   AND HE'S NOT HIDING FROM YOU HIS VIEWS OF THE COMPANY

12:15PM  23      DURING THIS TIME PERIOD, IS HE?

12:15PM  24      A.   HE'S NOT.

12:15PM  25      Q.   HE'S BEING OPEN WITH YOU ABOUT PROBLEMS THAT HE'S SEEING?

12:15PM   1    A.   HE'S VERY ANGRY WITH ME BECAUSE HE FEELS LIKE I HAVE

12:15PM   2    CREATED MEDIOCRITY.

12:15PM   3    Q.   AND HE'S TELLING YOU THAT?

12:15PM   4    A.   YES.

12:15PM   5    Q.   HE'S TELLING YOU ABOUT PROBLEMS AT THERANOS?

12:15PM   6    A.   HE'S TELLING ME ABOUT PROBLEMS WITH ME.

12:15PM   7    Q.   DO YOU SEE THE REFERENCE TO "COMPANY" THERE?

12:15PM   8    A.   YES.

12:15PM   9    Q.   OKAY.  THAT'S NOT A REFERENCE TO YOU, THAT'S A REFERENCE

12:15PM  10    TO THE COMPANY, ISN'T IT?

12:15PM  11    A.   THAT IS A REFERENCE TO THE COMPANY.

12:15PM  12    Q.   OKAY.

12:15PM  13         IF WE CAN PLEASE DISPLAY WHAT IS IN EVIDENCE AT

12:15PM  14    EXHIBIT 5387D, PAGE 58 AND 59.

12:16PM  15         MS. HOLMES, DO YOU SEE THE DATE OF THESE TEXT MESSAGES

12:16PM  16    FROM APRIL 28TH, 2015?

12:16PM  17    A.   I DO.

12:16PM  18    Q.   OKAY.  SO THIS IS AFTER THE EXHIBIT THAT WE JUST LOOKED AT

12:16PM  19    WHERE MR. BALWANI IS DESCRIBING HIS VIEW OF THE COMPANY IN THE

12:16PM  20    APRIL 2015 TIME PERIOD?

12:16PM  21    A.   I THINK SO.

12:16PM  22    Q.   AND HE WROTE TO YOU, "IT IS MOST MADDENING THERE IS NO

12:16PM  23    FOCUS IN ANY CHEM TEAMS AND NO PRODUCT COMING OUT."

12:16PM  24         DO YOU SEE THAT LANGUAGE?

12:16PM  25    A.   I DO.

12:16PM   1        Q.   AND YOU WROTE BACK, "I KNOW;" CORRECT?

12:16PM   2        A.   YES.

12:16PM   3        Q.   AND YOU REPLIED, "LEADERSHIP;" CORRECT?

12:16PM   4        A.   YES.

12:16PM   5        Q.   AND THE REFERENCE TO "NO PRODUCT COMING OUT," THAT'S A

12:16PM   6   REFERENCE TO THE MINILAB OR THE TSPU?

12:16PM   7        A.   I THINK SO.

12:17PM   8        Q.   OKAY.  HE'S NOT HIDING HIS VIEW OF THAT FROM YOU HERE, IS

12:17PM   9   HE?

12:17PM  10        A.   I THINK -- I'M NOT SURE IF IT'S A REFERENCE TO THE

12:17PM  11   MINILAB.

12:17PM  12             NO, HE'S NOT HIDING HIS VIEW.

12:17PM  13        Q.   COULD WE PLEASE LOOK AT PAGE 77 TO 78.

12:17PM  14             AND WE LOOKED A LITTLE BIT AT THIS EARLIER.  DO YOU SEE

12:17PM  15   WHERE YOU WROTE "WHO DO U THINK.

12:17PM  16             "NOW WE HAVE LEGAL GROUNDS."

12:17PM  17             THIS IS IN THE MAY 2015 TIME PERIOD?

12:17PM  18        A.   YES.

12:17PM  19        Q.   THIS IS A REFERENCE TO YOUR EFFORT TO FIND OUT WHO'S ONE

12:17PM  20   OF MR. CARREYROU'S RESOURCES?

12:17PM  21        A.   I'M NOT SURE ABOUT THAT.

12:17PM  22        Q.   IS THIS ROUGHLY IN THAT TIME PERIOD?

12:17PM  23        A.   IT IS.

12:18PM  24        Q.   IF WE COULD GO DOWN, PLEASE, MS. HOLLIMAN.

12:18PM  25             AND DO YOU SEE MORE REFERENCES TO TYLER AND ERIKA AND

12:18PM    1      ADAM?

12:18PM    2      A.   I DO.

12:18PM    3      Q.   OKAY.  HE'S GIVING YOU HIS VIEWS ABOUT WHO MIGHT BE BEHIND

12:18PM    4      THE CARREYROU ARTICLE?

12:18PM    5      A.   HE IS.

12:18PM    6      Q.   OKAY.  AND IF WE CAN GO DOWN FURTHER, PLEASE.

12:18PM    7           DO YOU SEE WHERE HE WROTE, "YEAH.  AND WE WILL ALSO TAKE

12:18PM    8      LEGAL ACTION ONCE THIS IS BEHIND US.  VIOLATING TRADE SECRETS

12:18PM    9      IS NOT OK."

12:18PM   10           DO YOU SEE THAT LANGUAGE?

12:18PM   11      A.   I DO.

12:18PM   12      Q.   OKAY.  LET'S CONTINUE TO PAGE 78.  ZOOM IN ON THE TOP.

12:18PM   13           DO YOU SEE WHERE MR. BALWANI WROTE, "SECONDLY.  WE NEED A

12:19PM   14      BETTER STRATEGY FOR NORMANDY.  FOR A LONG TIME TO COME WE WILL

12:19PM   15      HAVE HYBRID SOLUTIONS."

12:19PM   16           DO YOU SEE THAT LANGUAGE?

12:19PM   17      A.   I DO.

12:19PM   18      Q.   OKAY.  AND YOU KNEW NORMANDY WAS THE PORTION OF THE

12:19PM   19      CALIFORNIA CLIA LAB WHERE THERANOS PERFORMED ITS LDT'S?

12:19PM   20      A.   I DID.

12:19PM   21      Q.   THE TESTS ON THE MODIFIED DEVICE, THE TEST ON THE SIEMENS

12:19PM   22      DEVICE?

12:19PM   23      A.   YES.

12:19PM   24      Q.   AND MR. BALWANI IS TELLING YOU HERE THAT YOU'RE GOING TO

12:19PM   25      HAVE HYBRID SOLUTIONS FOR A LONG TIME TO COME?

12:19PM  1    A.   YES.

12:19PM  2    Q.   MEANING YOU'RE NOT GOING TO BE ABLE TO RUN TESTS JUST ON

12:19PM  3    THE MINILAB, YOU'RE GOING TO HAVE A NUMBER OF DIFFERENT

12:19PM  4    SOLUTIONS FOR A LONG PERIOD OF TIME?

12:19PM  5    A.   I THINK HE'S SAYING THAT WE SHOULD HAVE THOSE SOLUTIONS

12:19PM  6    FOR A LONG PERIOD OF TIME.

12:19PM  7    Q.   HE'S SAYING YOU WILL HAVE THESE HYBRID SOLUTIONS, NOT --

12:19PM  8    A.   EXACTLY.

12:19PM  9    Q.   -- NOT ONE DEVICE THAT YOU WERE TRYING TO DO IN PHASE II?

12:19PM  10   A.   RIGHT.

12:19PM  11   Q.   OKAY.  AND HE'S SAYING THAT IS GOING TO TAKE A LONG TIME?

12:20PM  12   A.   NO.  HE'S SAYING THAT FOR A LONG TIME WE'RE GOING TO BE

12:20PM  13   DOING THIS TESTING ON THESE MODIFIED TYPE INVENTIONS IN THE

12:20PM  14   CLIA LAB.

12:20PM  15   Q.   I THINK WE'RE SAYING THE SAME THING.

12:20PM  16   A.   OKAY.

12:20PM  17   Q.   BUT YOU AGREE WITH ME HE'S BEING OPEN ABOUT THAT HERE?

12:20PM  18   A.   YES.

12:20PM  19   Q.   HE'S TELLING THAT TO YOU?

12:20PM  20   A.   YES.

12:20PM  21   Q.   HE'S NOT DECEIVING YOU ABOUT THAT?

12:20PM  22   A.   NO.

12:20PM  23   Q.   FURTHER DOWN YOU WROTE, "MOST LIKELY 2 PLUS WE NEED TO SUE

12:20PM  24   FOR DEFAMATION."

12:20PM  25        YOU WROTE, "I MEANT NORMANDY."

12:20PM 1          AND THEN "I AGREE."

12:20PM 2          AM I RIGHT YOU BOTH HERE ARE TALKING ABOUT THE HYBRID

12:20PM 3    SOLUTIONS THAT ARE GOING TO BE THERE FOR A LONG TIME TO COME

12:20PM 4    AND THE EFFORT TO FIND OUT WHO IS BEHIND THE CARREYROU ARTICLE?

12:20PM 5    A.   I'M NOT SURE I UNDERSTOOD THOSE PORTIONS OF THE PRIOR

12:20PM 6    TEXT.  I DON'T KNOW IF I FOLLOW THIS EXACTLY.

12:20PM 7    Q.   WELL, YOU UNDERSTAND "I MEANT NORMANDY" TO BE A REFERENCE

12:21PM 8    TO THE CALIFORNIA CLIA LAB?

12:21PM 9    A.   YES.

12:21PM 10   Q.   OKAY.  LET'S LOOK AT PAGE 54.

12:21PM 11         DO YOU SEE THE TEXT, "PETER (ONE OF THESE 2 GUYS) MET WITH

12:21PM 12   RON CONWAY."

12:21PM 13         DO YOU SEE THAT LANGUAGE?

12:21PM 14   A.   I DO.

12:21PM 15   Q.   AND IT GOES ON TO SAY "RON COMMENTED THAT THERE IS TOO

12:21PM 16   MUCH HYPE AROUND THERANOS AND YOU."

12:21PM 17         DO YOU SEE THAT LANGUAGE?

12:21PM 18   A.   I DO.

12:21PM 19   Q.   MR. BALWANI IS COMMUNICATING THIS TO YOU?

12:21PM 20   A.   YES.

12:21PM 21   Q.   HE'S NOT HIDING IT FROM YOU?

12:21PM 22   A.   NO.

12:21PM 23   Q.   "I AM WORRIED ABOUT OVER EXPOSURE WITHOUT SOLID SUBSTANCE

12:21PM 24   WHICH IS LACKING RIGHT NOW.  WE CAN TALK TOMORROW ABOUT OVER

12:21PM 25   EXPOSURE."

12:21PM  1        DO YOU SEE THAT LANGUAGE?

12:21PM  2    A.   YES.

12:21PM  3    Q.   HE'S NOT HIDING FROM YOU HIS VIEW THAT HE THOUGHT THERANOS

12:22PM  4    WAS OVER EXPOSURE WITHOUT SOLID SUBSTANCE?

12:22PM  5    A.   CORRECT.

12:22PM  6    Q.   IF WE COULD SCROLL DOWN A LITTLE BIT MORE, MS. HOLLIMAN.

12:22PM  7        YOU WROTE BACK AT 7:54, "THAT MEDIA IS WHY WE'RE GETTING

12:22PM  8    AMERICARE."

12:22PM  9        DO YOU SEE THAT?

12:22PM 10    A.   YES.

12:22PM 11    Q.   AND YOU'RE SAYING THE MEDIA EXPOSURE IS A REASON WHY

12:22PM 12    THERANOS MIGHT HAVE POTENTIAL BUSINESS?

12:22PM 13    A.   I'M NOT SURE.

12:22PM 14    Q.   OKAY.  YOU AREN'T TALKING ABOUT POTENTIAL UPSIDE OF THE

12:22PM 15    MEDIA STRATEGY THAT YOU AND MR. BALWANI DISAGREED ON?

12:22PM 16    A.   I COULD BE.  I'M JUST NOT SURE WHAT THIS IS REFERRING TO.

12:23PM 17    Q.   SITTING HERE TODAY, YOU DON'T HAVE AN EXPLANATION OTHER

12:23PM 18    THAN THAT?

12:23PM 19    A.   I DON'T.

12:23PM 20    Q.   FURTHER DOWN MR. BALWANI WROTE, "WE NEED FDA CLEARANCE AND

12:23PM 21    CTN CLEARANCE B."

12:23PM 22        DO YOU SEE THAT?

12:23PM 23    A.   YES.

12:23PM 24    Q.   CTN IS A REFERENCE TO THE NANOTAINER?

12:23PM 25    A.   IT IS.

12:23PM 1    Q.   THE COLLECTION -- OR WHERE THE BLOOD WAS STORED FOR USE IN

12:23PM 2    EDISONS OR MINILABS?

12:23PM 3    A.   YES.

12:23PM 4    Q.   OKAY.  AND HE'S NOT HIDING FROM YOU HIS VIEW, "WE NEED FDA

12:23PM 5    CLEARANCE AND CTN CLEARANCE" HERE, IS HE?

12:23PM 6    A.   HE'S NOT.

12:23PM 7    Q.   LET'S LOOK AT PAGE 56 TO 57.

12:23PM 8         DO YOU SEE WHERE IT SAYS, "PHENOMENAL CRAMER STORY"?

12:24PM 9    A.   YES.

12:24PM 10   Q.   OKAY.  YOU WERE ON "MAD MONEY" AND THE JIM CRAMER SHOW

12:24PM 11   SOME TIME BEFORE OCTOBER OF 2015 AND YOU WERE REFERENCING A

12:24PM 12   CONVERSATION YOU HAD WITH MR. CRAMER?

12:24PM 13   A.   I'M NOT SURE IT WAS WITH MR. CRAMER, BUT IT WAS A STORY

12:24PM 14   THAT I HEARD WHEN I WAS AT THAT INTERVIEW.

12:24PM 15   Q.   OKAY.  AND IF WE COULD SCROLL DOWN, PLEASE, MS. HOLLIMAN.

12:24PM 16        DO YOU SEE WHERE MR. BALWANI WROTE, "YOU WERE FLAWLESS IN

12:24PM 17   MAD MONEY.  JUST PERFECT.

12:24PM 18        "IF I WAS COMPETING WITH YOU I WOULD BE SCARED."

12:24PM 19        DO YOU SEE THAT LANGUAGE?

12:24PM 20   A.   I DO.

12:24PM 21   Q.   AND THEN RIGHT AFTER HE WRITES, "GOT TO GET MORE ASSAYS ON

12:24PM 22   FINGERSTICK."

12:24PM 23        DO YOU SEE THAT?

12:24PM 24   A.   YES.

12:24PM 25   Q.   AND HE'S EXPRESSING A VIEW THAT THERANOS NEEDS TO BUMP UP

12:25PM  1    THE NUMBER OF SMALL SAMPLE TESTING THAT IT'S DOING IN ITS CLIA

12:25PM  2    LAB?

12:25PM  3    A.   YES.

12:25PM  4    Q.   HE'S NOT HIDING FROM YOU THE NEED TO DO THAT, IS HE?

12:25PM  5    A.   NO.

12:25PM  6    Q.   HE THEN SAYS, "YOU CAME ACROSS AS A PURE STATESMAN."

12:25PM  7         DO YOU SEE THAT?

12:25PM  8    A.   I DO.

12:25PM  9    Q.   AND YOU REPLIED, "LOVED SEEING THIS SO MUCH.

12:25PM  10        "EXACTLY.

12:25PM  11        "THAT IS OUR KEY POINT NOW."

12:25PM  12        IS THAT WHAT YOU WROTE?

12:25PM  13   A.   YES.

12:25PM  14   Q.   LET'S LOOK AT PAGE 42 TO 44.

12:25PM  15        DO YOU SEE WHERE MR. BALWANI WROTE, "WHEN WE LAUNCH IN NY

12:25PM  16   WE CAN LAUNCH WITH CVS AND GIVE THEM ONCE WE HAVE 50 E DONE, WE

12:25PM  17   WILL BE INVINCIBLE."

12:26PM  18        DO YOU SEE THAT?

12:26PM  19   A.   I DO.

12:26PM  20   Q.   AND WHAT IS 50 E?

12:26PM  21   A.   I DON'T KNOW.

12:26PM  22   Q.   OKAY.  AND IN THIS TIME PERIOD, ARE YOU HAVING DISCUSSIONS

12:26PM  23   WITH CVS ABOUT A POTENTIAL BUSINESS RELATIONSHIP?

12:26PM  24   A.   I'M NOT SURE.  I -- I'M NOT SURE.

12:26PM  25   Q.   OKAY.  YOU RECALL AT SOME POINT HAVING A CONVERSATION WITH

12:26PM  1    CVS ABOUT A POTENTIAL RELATIONSHIP?

12:26PM  2    A.   WE DID.

12:26PM  3    Q.   OKAY.  AFTER YOU HAD A DEAL WITH WALGREENS?

12:26PM  4    A.   AND BEFORE.

12:26PM  5    Q.   AND AS THE WALGREENS RELATIONSHIP WAS -- I'LL USE MY

12:26PM  6    WORD -- SLOWING IN 2014, YOU STARTED TO TURN TO CVS IN ORDER TO

12:26PM  7    STRIKE UP A BUSINESS RELATIONSHIP WITH THEM; ISN'T THAT RIGHT?

12:26PM  8    A.   NO.

12:26PM  9    Q.   YOU DIDN'T HAVE CONVERSATIONS WITH CVS IN THE 2015 TIME

12:26PM  10   PERIOD?

12:26PM  11   A.   WE PROBABLY DID.  WE HAD CONVERSATIONS WITH THEM FROM THE

12:26PM  12   DAY WE MET THEM ALL OF THE WAY THROUGH TO THE DAY WE SHUT DOWN

12:26PM  13   OUR LAB.

12:26PM  14   Q.   EVEN AS YOU'RE WORKING ON HYBRID SOLUTIONS WITHIN THE CLIA

12:27PM  15   LAB, YOU WERE TRYING TO INDUCE CMS -- CVS INTO SOME TYPE OF

12:27PM  16   BUSINESS ARRANGEMENT?

12:27PM  17   A.   YES.

12:27PM  18   Q.   IF WE COULD SCROLL DOWN, PLEASE, TO THE BOTTOM PORTION,

12:27PM  19   MS. HOLLIMAN.

12:27PM  20       DO YOU SEE AT THE BOTTOM WHERE IT SAYS, "THE POINT ABOUT

12:27PM  21   NARROWING DOWN MENU TO HIT HIGH FS PERCENTAGE CAME LIKE A GIFT

12:27PM  22   FROM GOD"?

12:27PM  23   A.   I DO.

12:27PM  24   Q.   AND THAT'S MR. BALWANI EXPRESSING TO YOU HIS IDEA TO

12:27PM  25   INCREASE THE FINGERSTICK PERCENTAGE AT WALGREENS STORES?

12:27PM  1      A.   YES.

12:27PM  2      Q.   AND HE'S NOT HIDING FROM YOU HIS IDEAS ABOUT HOW TO DO

12:27PM  3   THAT, IS HE?

12:28PM  4      A.   NO.

12:28PM  5      Q.   HE'S BEING OPEN WITH YOU ABOUT IDEAS ON HOW TO INCREASE

12:28PM  6   THE FINGERSTICK PERCENTAGE AT WALGREENS?

12:28PM  7      A.   HE IS.

12:28PM  8      Q.   HE'S TALKING OPENLY ABOUT THIS ISSUE IN THE 2015 TIME

12:28PM  9   PERIOD WITH YOU?

12:28PM 10      A.   YES.

12:28PM 11      Q.   LET'S GO ON TO THE NEXT PAGE, PLEASE.

12:28PM 12           DO YOU SEE WHERE HE WROTE, "I WAS MEDITATING ON THIS

12:28PM 13   MEETING ALL NIGHT AND ALL DAY"?

12:28PM 14      A.   I DO.

12:28PM 15      Q.   AND YOU REPLIED TO HIM, "YOU NAILED IT"?

12:28PM 16      A.   YES.

12:28PM 17      Q.   AND MR. BALWANI SAYS, "WE MUST HIT OUR VOLUME GOALS NOW.

12:28PM 18           "WE NEED TO MAKE IT A MATTER OF LIFE AND DEATH.

12:28PM 19           "SURVIVAL.  WE MUST NOT LOSE."

12:28PM 20           THAT'S WHAT MR. BALWANI WROTE?

12:28PM 21      A.   YES.

12:28PM 22      Q.   LET'S LOOK AT PAGE 44, PLEASE.  AND IF WE CAN ZOOM IN ON

12:29PM 23   THE SUBSTANCE, MS. HOLLIMAN.

12:29PM 24           DO YOU SEE THE FIRST TEXT ON APRIL 11TH, 2015, "I HAVE

12:29PM 25   EXTREME CLARITY ON HOW WE WILL WIN AGAINST QUEST AND LABCORP"?

12:29PM  1    A.   I DO.

12:29PM  2    Q.   AND THEN HE WROTE, "EXTREME HARD WORK BUT NO SHORTCUTS ON

12:29PM  3    THIS ONE ANYWAY"?

12:29PM  4    A.   YES.

12:29PM  5    Q.   "FOR NEXT 3 YEARS 2015-16-17 DO ONLY CALIFORNIA NY AZ AND

12:29PM  6    CENTRAL PEN."

12:29PM  7         DO YOU SEE THAT LANGUAGE?

12:29PM  8    A.   I DO.

12:29PM  9    Q.   AND THAT'S LIMITING THE NATIONAL ROLLOUT OR THE NATIONAL

12:29PM  10   AMBITIONS THAT YOU HAD, AT LEAST WITH WALGREENS, IN THE 2015

12:29PM  11   TIME PERIOD?

12:29PM  12   A.   THAT WOULD HAVE.

12:29PM  13   Q.   AND YOU WROTE, "I SO AGREE."

12:29PM  14        IS THAT CORRECT?

12:29PM  15   A.   YES.

12:29PM  16   Q.   "CAN'T WAIT TO DISCUSS."

12:30PM  17        IS THAT WHAT YOU WROTE?

12:30PM  18   A.   YES.

12:30PM  19   Q.   "HAVE A LOT OF IDEAS ON THAT BTW FROM THESE LAST COUPLE

12:30PM  20   DAYS."

12:30PM  21        AND THEN YOU WROTE "EXACTLY."

12:30PM  22        AND THEN MR. BALWANI WROTE, "BUILD INCREDIBLE SOFTWARE."

12:30PM  23        DO YOU SEE THAT?

12:30PM  24   A.   I DO.

12:30PM  25   Q.   AND WHAT IS THE NEXT ACRONYM?

12:30PM 1    A.   D2C.

12:30PM 2    Q.   WHAT IS D2C?

12:30PM 3    A.   DIRECT TO CONSUMER.

12:30PM 4    Q.   "SOCRATES."  WHAT IS THAT A REFERENCE TO?

12:30PM 5    A.   IT'S A PIECE OF SOFTWARE THAT WE BUILT THAT DID DECISION

12:30PM 6    SUPPORT FOR PEOPLE TO BE ABLE TO UNDERSTAND THEIR LAB DATA.

12:30PM 7    Q.   AND THEN HE WROTE, "100 TO 200 FINGERSTICKS ON 4.1."

12:30PM 8         IS THAT A REFERENCE TO THE MINILAB AND THE 4 SERIES?

12:30PM 9    A.   YES.

12:30PM 10   Q.   "AND CAPTURE 100 PERCENT CA AND MY."

12:30PM 11        DO YOU THINK THAT'S NY?

12:30PM 12   A.   I DO.

12:30PM 13   Q.   HE'S BEING OPEN ABOUT HIS PLANS AND HIS IDEAS HERE, IS HE

12:31PM 14   NOT?

12:31PM 15   A.   YES.  I WOULDN'T CALL THIS A PLAN, BUT THIS IDEA, YES.

12:31PM 16   Q.   OKAY.  HE'S COMMUNICATING WITH YOU OPENLY ABOUT IDEAS AND

12:31PM 17   POSSIBILITIES AND WAYS TO MOVE THE BUSINESS?

12:31PM 18   A.   HE IS.

12:31PM 19   Q.   OKAY.  LET'S LOOK AT PAGES 46 AND 48.

12:31PM 20        IS THIS ANOTHER EXCHANGE BETWEEN YOU AND MR. BALWANI IN

12:31PM 21   LATE APRIL 2015?

12:31PM 22   A.   IT IS.

12:31PM 23   Q.   YOU WROTE, "WE NEED TO DECIDE AND THEN OPERATIONALIZE THE

12:31PM 24   STRATEGY WE WERE TALKING ABOUT REWORKING WITH MANY."

12:31PM 25        WHO IS THE MANY?

12:31PM  1      A.  I'M NOT SURE.

12:31PM  2      Q.  MR. BALWANI WROTE, "FS IS OUR COMPETITIVE ADVANTAGE AND

12:31PM  3   PRICE TRANSPARENCY."

12:31PM  4          FS, THAT'S A REFERENCE TO FINGERSTICK?

12:32PM  5      A.  YES.

12:32PM  6      Q.  AND THEN FURTHER DOWN YOU WROTE, "AND GET FS LIVE NMW."

12:32PM  7   WHAT IS NMW?

12:32PM  8      A.  I DON'T KNOW.

12:32PM  9      Q.  ARE YOU EXPRESSING A NEED TO GET FINGERSTICK LIVE WITHIN

12:32PM 10   THE CLIA LAB?

12:32PM 11      A.  YES.  I'M NOT SURE IF THIS IS TALKING ABOUT THE CLIA LAB,

12:32PM 12   BUT DEFINITELY GETTING FINGERSTICK LIVE.

12:32PM 13      Q.  OKAY.  LET'S GO TO PAGE 48.

12:32PM 14          DO YOU SEE WHERE YOU WROTE, "CAN WE TAKE FS LIE TOMORROW"?

12:32PM 15          DID YOU MEAN LIVE?

12:32PM 16      A.  I THINK SO.

12:32PM 17      Q.  AND THEN MR. BALWANI RESPONDS QUESTION MARK.

12:32PM 18          "U MEAN GC?"

12:33PM 19          DO YOU SEE THAT?

12:33PM 20      A.  I DO.

12:33PM 21      Q.  AND THEN MR. BALWANI RESPONDS "VERY RISKY.  WE NEED MORE

12:33PM 22   SOFTWARE TESTING."

12:33PM 23          DO YOU SEE THAT?

12:33PM 24      A.  I DO.

12:33PM 25      Q.  AND YOU REPLY "YES"?

```
12:33PM   1        A.   YES.

12:33PM   2        Q.   AND THEN MR. BALWANI WRITES, "CHECKING BUT VERY RISKY."

12:33PM   3             DO YOU SEE THAT?

12:33PM   4        A.   I DO.

12:33PM   5        Q.   AND MR. BALWANI IS TALKING OPENLY WITH YOU ABOUT RISKS HE

12:33PM   6   SEES HERE WITH SOMETHING THAT YOU HAD PROPOSED?

12:33PM   7        A.   HE IS.

12:33PM   8        Q.   LET'S LOOK AT PAGES 87 TO 89 OF 5387D.

12:33PM   9             DO YOU SEE WHERE MR. BALWANI ASKS THE QUESTION "BOARD

12:33PM  10   MEETING OK?"

12:33PM  11        A.   I DO.

12:33PM  12        Q.   AND YOUR RESPONSE IS "WE'LL CATCH UP"?

12:33PM  13        A.   YES.

12:33PM  14        Q.   AND DO YOU RECALL THAT THERE WAS A CONTENTIOUS BOARD

12:33PM  15   MEETING IN JULY OF 2015?

12:33PM  16        A.   I DO.

12:33PM  17        Q.   LET'S LOOK AT THE NEXT PAGE, PLEASE.

12:34PM  18             DO YOU SEE WHERE MR. BALWANI WROTE, "LOVE YOU.  BE STRONG

12:34PM  19   TODAY.  MY ADVISE.  DON'T TALK TO HEATHER ABOUT YESTERDAY

12:34PM  20   MEETING.  MAKE THIS SOMETHING ABOVE HER ROLE."

12:34PM  21             DO YOU SEE THAT?

12:34PM  22        A.   YES.

12:34PM  23        Q.   AND HEATHER THERE IS A REFERENCE TO HEATHER KING?

12:34PM  24        A.   I THINK SO.

12:34PM  25        Q.   AND THEN MR. BALWANI WROTE, "I WORKED FOR 6 YEARS DAY AND
```

| | |
|---|---|
| 12:34PM 1 | NIGHT TO HELP YOU.  I AM SAD AT WHERE YOU AND I ARE.  I THOUGHT |
| 12:34PM 2 | IT WOULD BE BETTER.  I KNOW U R ANGRY IN UR WAY.  AND UPSET |
| 12:34PM 3 | WITH ME FOR NOT DOING EVERYTHING YOU WANTED ME TO DO." |
| 12:34PM 4 | DO YOU SEE THAT LANGUAGE? |
| 12:34PM 5 | A.  I DO. |
| 12:34PM 6 | Q.  AND YOU RESPOND WITH SOME QUESTION MARKS? |
| 12:34PM 7 | A.  YES. |
| 12:34PM 8 | Q.  LATER ON YOU WROTE, "IT'S JUST HARD TO TRANSITION." |
| 12:35PM 9 | DO YOU SEE THAT LANGUAGE? |
| 12:35PM 10 | A.  YES. |
| 12:35PM 11 | Q.  AND MR. BALWANI REPLIES, "I AM RESPONSIBLE FOR EVERYTHING |
| 12:35PM 12 | AT THERANOS.  ALL HAVE BEEN MY DECISIONS TOO." |
| 12:35PM 13 | DO YOU SEE THAT LANGUAGE? |
| 12:35PM 14 | A.  I DO. |
| 12:35PM 15 | Q.  OKAY.  HE'S SAYING YOUR DECISIONS ARE HIS DECISIONS, TOO. |
| 12:35PM 16 | A.  HE'S SAYING THAT ALL OF THE THERANOS DECISIONS WERE HIS |
| 12:35PM 17 | DECISIONS TOO. |
| 12:35PM 18 | Q.  OKAY.  AND THEY WERE YOUR DECISIONS TOO? |
| 12:35PM 19 | A.  YES. |
| 12:35PM 20 | Q.  BECAUSE YOU'RE THE CEO? |
| 12:35PM 21 | A.  EXACTLY. |
| 12:35PM 22 | Q.  "BUT GETTING THROUGH YESTERDAY WILL MAKE IT EASIER TO DO |
| 12:35PM 23 | SO NOW. |
| 12:35PM 24 | "I WON'T TRANSITION UNTIL U R IN A PERFECT PLACE.  U KNOW |
| 12:35PM 25 | THAT." |

12:35PM 1          DO YOU SEE WHERE MR. BALWANI WROTE THAT?

12:35PM 2     A.   I DO.

12:35PM 3     Q.   OKAY.  AND IF WE CAN BLOW UP THE SECOND HALF OF THE PAGE,

12:35PM 4     MS. HOLLIMAN.

12:35PM 5          AND IF WE CAN GET -- CAN YOU JUST READ THIS TEXT EXCHANGE

12:35PM 6     FOR US, MS. HOLMES?

12:35PM 7     A.   "NO SUCH THING... THAT WAS THE POINT WE TALKED ABOUT.

12:36PM 8          "IT'S OK - JUST EMOTIONAL BUT AM READY.

12:36PM 9          "AND I COMPLETELY GET IT.

12:36PM 10         "ON THE CHALLENGES.

12:36PM 11         "UNFORTUNATELY U DON'T AND BRAKES MY HEART TO SEE U LIKE

12:36PM 12    THIS.

12:36PM 13         "QUESTION MARK.

12:36PM 14         "I AM NOT LEAVING UNTIL WE BREAK EVEN.  WE WILL DO THIS

12:36PM 15    TOGETHER AND I WILL BE BY YOURSELF UNTIL THEN.  CAN'T LEAVE

12:36PM 16    LIKE THIS.

12:36PM 17         "U R WRONG THAT YESTERDAYS MEETING MAKES IT EASIER.  IT

12:36PM 18    DIDN'T.

12:36PM 19         "FOR ME TO EMOTIONALLY HANDLE IT.

12:36PM 20         "THE TRANSITION.

12:36PM 21         "NO.  U R UNDERESTIMATING.

12:36PM 22         "I CAN LEAVE IT IF THAT GIVES U EMOTIONAL PEACE BUT YOU

12:36PM 23    KNOW WE HAVE TO SACRIFICE."

12:36PM 24    Q.   MR. BALWANI IS TELLING YOU HERE YOU ARE UNDERESTIMATING;

12:36PM 25    IS THAT RIGHT?

12:36PM  1    A.   HE IS.

12:36PM  2    Q.   LET'S ZOOM OUT.

12:36PM  3         AND IF WE CAN GO TO THE NEXT PAGE.

12:37PM  4         DO YOU SEE WHERE HE WROTE, "AND YES.  I DO DISLIKE THE

12:37PM  5    DIRECTION U HAVE TAKEN WITH ALL THIS PR AND ALL LEGAL WORK AND

12:37PM  6    A LOT OF OTHER THINGS BUT HOPEFULLY WE CAN TALK AND FIND

12:37PM  7    PERFECT FOCUS AND PERFECT PLAN AND EXECUTE HEADS DOWN AND BUILD

12:37PM  8    PRODUCT AND BREAK EVEN.

12:37PM  9         "I CAN LEAVE THEN."

12:37PM  10        DO YOU SEE THAT LANGUAGE?

12:37PM  11   A.   I DO.

12:37PM  12   Q.   HE'S REFERRING TO HIS DISLIKE FOR THE DIRECTION THAT YOU

12:37PM  13   TOOK ON PR AND LEGAL MATTERS; IS HE NOT?

12:37PM  14   A.   AND A LOT OF OTHER THINGS.

12:37PM  15   Q.   SO THE ANSWER TO MY QUESTION WAS YES?

12:37PM  16   A.   YES.

12:37PM  17   Q.   OKAY.  THANK YOU.

12:37PM  18        HE THEN WRITES, "THINGS ARE DIFFERENT NOW.  WE NEED TO GET

12:37PM  19   THE BUSINESS TO BREAK EVEN AND THEN I WILL LEAVE.  WE R

12:37PM  20   DIFFERENT WHEN IT COMES TO BUSINESS.  WE WILL BE HAPPIER THAT

12:37PM  21   WAY.  BUT FOR NOW, U AND I BOTH ARE ON THE SAME PAGE BECAUSE OF

12:38PM  22   YESTERDAY THAT WE NEED TO BREAK EVEN."

12:38PM  23        DO YOU SEE THAT LANGUAGE?

12:38PM  24   A.   I DO.

12:38PM  25   Q.   AND THEN WHAT WAS YOUR REPLY?

12:38PM  1    A.   "I THOUGHT THE THING WAS IF WE DID THAT THEN YOU WOULDN'T

12:38PM  2    WANT TO LEAVE."

12:38PM  3    Q.   AND THEN HE REPLIES, "STAY INTERNALLY FOCUSSED AND ONLY

12:38PM  4    MEET WITH PEOPLE WHO HAVE DEALS IN HAND.  THE PR STRATEGY IS

12:38PM  5    WRONG AND I HAVE BEEN SAYING THAT.  WE NEED TO GO ON OFFENSE

12:38PM  6    AND NOT BE DEFENSIVE."

12:38PM  7         IS THIS AGAIN MR. BALWANI DISAGREEING WITH YOU ABOUT THE

12:38PM  8    PR STRATEGY THAT YOU WERE IMPLEMENTING?

12:38PM  9    A.   YES.

12:38PM  10   Q.   LET'S GO TO THE NEXT PAGE, PLEASE.

12:38PM  11        DO YOU SEE A SERIES OF TEXTS FROM JULY 28TH, 2015,

12:39PM  12   MS. HOLMES?

12:39PM  13   A.   I DO.

12:39PM  14   Q.   AND THIS IS ROUGHLY TWO WEEKS AFTER THE EXCHANGE THAT WE

12:39PM  15   JUST LOOKED AT FOLLOWING THE CONTENTIOUS BOARD MEETING?

12:39PM  16   A.   YES.

12:39PM  17   Q.   AND MR. BALWANI WROTE TO YOU, "WE NEED TO COMMIT TO EACH

12:39PM  18   OTHER AND GET OUT OF THIS HELL SO WE CAN LIVE IN PARADISE WE

12:39PM  19   BOTH HAVE."

12:39PM  20        DO YOU SEE THAT LANGUAGE?

12:39PM  21   A.   I DO.

12:39PM  22   Q.   AND YOU WROTE BACK TO HIM, "I HAVE LITERALLY BEEN

12:39PM  23   MEDITATING ON EXACT SAME.  WHOLE TIME I WAS RUNNING WAS

12:39PM  24   THINKING OF THAT."

12:39PM  25        IS THAT WHAT YOU WROTE?

12:39PM  1    A.   YES.

12:39PM  2    Q.   AND MR. BALWANI WROTE, "WE NEED TO COMMIT TO FOCUSSING AND

12:39PM  3    GETTING IN PARADISE."

12:39PM  4         DO YOU SEE THAT LANGUAGE?

12:39PM  5    A.   I DO.

12:39PM  6    Q.   "PRODUCT COMPANY.  WINNING."

12:39PM  7         THOSE WERE YOUR WORDS; RIGHT?

12:39PM  8    A.   YES.

12:39PM  9    Q.   LET'S GO TO PAGE 8, PLEASE.

12:39PM  10        IS IT ALSO THE CASE, MS. HOLMES, THAT MR. BALWANI SPEAKS

12:40PM  11   OPENLY TO YOU ABOUT PROBLEMS HE'S SEEING IN THE CLIA LAB?

12:40PM  12   A.   YES.

12:40PM  13   Q.   LET'S LOOK AT EXAMPLES OF THOSE.

12:40PM  14        DO YOU SEE THIS TEXT EXCHANGE FROM MAY OF 2012?

12:40PM  15   A.   I DO.

12:40PM  16   Q.   DO YOU SEE WHERE -- AND THIS 2012 TIME PERIOD, THIS IS

12:40PM  17   BEFORE THERANOS IS DOING ANY LDT'S IN THE CLIA LAB; IS THAT

12:40PM  18   FAIR?

12:40PM  19   A.   IT IS.

12:40PM  20   Q.   HE WROTE, "ARNE" -- THAT'S A REFERENCE TO DR. GELB?

12:40PM  21   A.   YES.

12:40PM  22   Q.   -- "CALLED JUST NOW.  FREAKING OUT BECAUSE DIANA" -- WHO

12:40PM  23   IS DIANA?

12:40PM  24   A.   I'M NOT SURE.  I'M JUST READING IT.

12:40PM  25   Q.   IS IT DIANA DUPUY?

12:40PM  1    A.  I THINK SO.

12:40PM  2    Q.  -- "CAUGHT AN ERROR BY HOAI (AND ARNE) AND SHE BROUGHT A

12:40PM  3    HUNTER LAB CONFIDENTIAL SOP TO HIM TO TELL HIM WHY SHE WAS

12:40PM  4    RIGHT.  HE TOLD HER NEVER TO BRING ANY CONFIDENTIAL MATERIAL TO

12:41PM  5    THE BUILDING AND WAS TELLING ME HE MADE A MISTAKE IN KEEPING

12:41PM  6    HER."

12:41PM  7         DO YOU SEE THAT MESSAGE?

12:41PM  8    A.  I DO.

12:41PM  9    Q.  "HOWEVER, THE ISSUE SHE BROUGHT UP WAS A SERIOUS ONE."

12:41PM  10        DO YOU SEE THAT LANGUAGE?

12:41PM  11   A.  YES.

12:41PM  12   Q.  IS THIS AN EXAMPLE OF MR. BALWANI RAISING ISSUES THAT ARE

12:41PM  13   GOING ON IN THE CLIA LAB WITH YOU?

12:41PM  14   A.  YES.

12:41PM  15   Q.  SPEAKING OPENLY WITH YOU ABOUT THAT?

12:41PM  16   A.  YES.

12:41PM  17   Q.  HE'S NOT HIDING ANYTHING FROM YOU HERE?

12:41PM  18   A.  HE'S NOT.

12:41PM  19   Q.  AND YOU UNDERSTOOD MR. BALWANI LARGELY CAME FROM A

12:41PM  20   SOFTWARE BACKGROUND; CORRECT?

12:41PM  21   A.  I DID.

12:41PM  22   Q.  YOU KNEW HE WASN'T A PATHOLOGIST?

12:41PM  23   A.  I DID.

12:41PM  24   Q.  YOU KNEW HE WASN'T A MEDICAL DOCTOR?

12:41PM  25   A.  I DID.

12:41PM    1    Q.   OKAY.  YOU KNEW HE HAD NO EXPERIENCE RUNNING A CLINICAL

12:41PM    2    LAB; CORRECT?

12:41PM    3    A.   I DID.

12:41PM    4    Q.   YOU ADMIRED HIS BUSINESS ACUMEN FROM HIS SOFTWARE DAYS?

12:41PM    5    A.   I DID.

12:41PM    6    Q.   LET'S LOOK AT PAGES 14 TO 15, AND I DRAW YOUR ATTENTION TO

12:42PM    7    THE FIRST TEXT.

12:42PM    8         DO YOU SEE THE DATE NOVEMBER 20TH, 2013?

12:42PM    9    A.   I DO.

12:42PM   10    Q.   THIS IS A FEW MONTHS AFTER THERANOS HAS ANNOUNCED ITS

12:42PM   11    PARTNERSHIP WITH WALGREENS PUBLICLY?

12:42PM   12    A.   YES.

12:42PM   13    Q.   OKAY.  AND MR. BALWANI IS WRITING UP AT THE TOP, "BTW.

12:42PM   14    WHEN WE DO THE PATCH, CHEM8 OR CHEM14 IS THE MOST IMPORTANT AND

12:42PM   15    FIRST THING TO MONITOR."

12:42PM   16         DO YOU SEE THAT LANGUAGE?

12:42PM   17    A.   I DO.

12:42PM   18    Q.   AND THEN DOWN AT THE BOTTOM HE WROTE, "PISSING ME OFF WE

12:42PM   19    DON'T HAVE ANYONE MANAGING PSC, CTN PRODUCTION, CART

12:42PM   20    PRODUCTION, ELISA ASSAYS, TSH."

12:42PM   21         DO YOU SEE THAT LANGUAGE?

12:42PM   22    A.   I DO.

12:42PM   23    Q.   WHAT IS PSC?

12:42PM   24    A.   I THINK IT'S THE PATIENT SERVICE CENTER, OR WELLNESS

12:42PM   25    CENTERS.

12:42PM  1    Q.   AND CTN PRODUCTION, THAT'S A REFERENCE TO THE NANOTAINER

12:43PM  2    PRODUCTION?

12:43PM  3    A.   YES.

12:43PM  4    Q.   AND CART PRODUCTION, WHAT IS THAT?

12:43PM  5    A.   I'M ASSUMING IT'S CART PRODUCTION.

12:43PM  6    Q.   AND ELISA ASSAYS, THAT'S A REFERENCE TO THE IMMUNOASSAYS?

12:43PM  7    A.   YES.

12:43PM  8    Q.   AND THE TSH, THAT'S A REFERENCE TO ONE OF THE ASSAYS?

12:43PM  9    A.   EXACTLY, YES.

12:43PM  10   Q.   AND MR. BALWANI IS EXPRESSING FRUSTRATION ABOUT THE LACK

12:43PM  11   OF ANYONE MANAGING THESE ISSUES?

12:43PM  12   A.   YES, THAT'S WHAT HE'S SAYING.

12:43PM  13   Q.   HE'S SPEAKING OPENLY TO YOU ABOUT THAT?

12:43PM  14   A.   HE IS.

12:43PM  15   Q.   HE'S NOT HIDING ANYTHING FROM YOU HERE?

12:43PM  16   A.   NO.

12:43PM  17   Q.   LET'S LOOK AT THE NEXT PAGE, PAGE 15.

12:43PM  18        DO YOU SEE YOUR REPLY "I KNOW.

12:43PM  19        "RECRUITING.

12:43PM  20        "AND BETTER MANAGEMENT.

12:44PM  21        "FULL TIME JOB."

12:44PM  22   A.   YES.

12:44PM  23   Q.   YOU'RE CONCURRING WITH WHAT MR. BALWANI IS BRINGING TO

12:44PM  24   YOUR ATTENTION HERE?

12:44PM  25   A.   YES.

12:44PM   1   Q.   LET ME DRAW YOUR ATTENTION TO PAGES 23 THROUGH 25.

12:44PM   2        DO YOU SEE THE DATE NOVEMBER 19TH, 2014, MS. HOLMES?

12:44PM   3   A.   I DO, YES.

12:44PM   4   Q.   AND THIS IS RIGHT AROUND THE TIME THAT DR. ROSENDORFF IS

12:44PM   5   LEAVING THE COMPANY?

12:44PM   6   A.   YES.

12:44PM   7   Q.   AND MR. BALWANI IS WRITING TO YOU, "NEED TO FOCUS ON OPS.

12:44PM   8   GETTING HURT IN MARKET."

12:44PM   9        DO YOU SEE THAT LANGUAGE?

12:44PM  10   A.   I DO.

12:44PM  11   Q.   "CUSTOMER SERVICE SEEMS TO BE TERRIBLE.  EVERYONE

12:44PM  12   COMPLAINING."

12:44PM  13        AND YOU WRITE BACK, "YES.

12:45PM  14        "WE HAVE TO OWN THIS."

12:45PM  15        DID I READ THAT CORRECTLY?

12:45PM  16   A.   YOU DID.

12:45PM  17   Q.   "LAB, CUSTOMER SERVICE, TAT, ALL NEED DIRECTOR LEVEL

12:45PM  18   PEOPLE."

12:45PM  19        THAT'S WHAT MR. BALWANI CONVEYED TO YOU IN THIS

12:45PM  20   NOVEMBER 2014 TIME PERIOD; CORRECT?

12:45PM  21   A.   YES.

12:45PM  22   Q.   HE'S NOT HIDING THAT FROM YOU?

12:45PM  23   A.   HE'S NOT.

12:45PM  24   Q.   HE'S NOT CONCEALING THAT FROM YOU?

12:45PM  25   A.   NO.

12:45PM   1    Q.   HE'S NOT MISLEADING YOU?

12:45PM   2    A.   HE'S DEFINITELY NOT HIDING ANYTHING FROM ME IN THIS TEXT.

12:45PM   3    Q.   OKAY.  AND IF WE CAN SCROLL DOWN EVEN FURTHER, PLEASE.

12:45PM   4         DO YOU SEE WHERE HE WROTE, "WE NEED.  THE LAB AND CALL

12:45PM   5    CENTER FIXED..."

12:45PM   6         DO YOU SEE THAT LANGUAGE?

12:45PM   7    A.   I DO.

12:45PM   8    Q.   "NEED PROFESSIONALS ACROSS THE BOARD.  NEED PMS AND

12:45PM   9    ALLISON OUT ASAP.

12:46PM  10         "WASTE OF TIME IMP."

12:46PM  11         AND THEN I THINK HE CORRECTS HIMSELF "IMO."

12:46PM  12         IN MY OPINION?

12:46PM  13    A.   I THINK SO, YES.

12:46PM  14    Q.   AND YOUR RESPONSE WAS "EXACTLY"?

12:46PM  15    A.   YES.

12:46PM  16    Q.   HE WAS SPEAKING OPENLY WITH YOU ABOUT PROBLEMS?

12:46PM  17    A.   YES.

12:46PM  18    Q.   AND YOU'RE AGREEING WITH HIM?

12:46PM  19    A.   YES.

12:46PM  20    Q.   IF WE CAN GO DOWN FURTHER, PLEASE, TO PAGE 24.

12:46PM  21         DO YOU SEE WHERE MR. BALWANI -- AND THESE MESSAGES ARE

12:46PM  22    FROM NOVEMBER 19TH, 2014?

12:46PM  23    A.   YES.

12:46PM  24    Q.   AND THIS IS ROUGHLY THE SAME TIME PERIOD IN THE CONTEXT OF

12:46PM  25    THE MESSAGES THAT WE WERE JUST LOOKING AT?

12:46PM  1    A.   I THINK SO.

12:46PM  2    Q.   AND HE WROTE TO YOU, "WE NEED CALL CENTER MANAGER, NEW

12:46PM  3    CALL CENTER TEAM, GET RECURRENT CREW OUT OF DOCS FACING

12:47PM  4    COMMUNICATIONS."

12:47PM  5         DO YOU SEE THAT LANGUAGE?

12:47PM  6    A.   I DO.

12:47PM  7    Q.   HE WROTE, "FUNDAMENTALLY WE NEED TO STOP FIGHTING FIRES BY

12:47PM  8    NOT CREATING THEM."

12:47PM  9         DO YOU SEE THAT?

12:47PM  10   A.   I DO.

12:47PM  11   Q.   AND YOUR RESPONSE WAS, "YES"?

12:47PM  12   A.   YES.

12:47PM  13   Q.   "CALL CENTER, TECH SUPPORT, EVERYTHING.

12:47PM  14        "REBUILD.

12:47PM  15        "NEW LAB DIRECTORS, LAB MANAGER LIKE TRACY."

12:47PM  16        DO YOU SEE THAT LANGUAGE?

12:47PM  17   A.   I DO.

12:47PM  18   Q.   AND THE NEXT TEXT, "18C."  WHAT IS 18C A REFERENCE TO?

12:47PM  19   A.   I DON'T KNOW.

12:47PM  20   Q.   BUT YOU KNOW THAT CTN IS THE NANOTAINER?

12:47PM  21   A.   I DO.

12:47PM  22   Q.   AND TIP COATING, IS THAT A REFERENCE TO THE TIP IN THE

12:47PM  23   EITHER TECAN OR THE EDISON DEVICE?

12:47PM  24   A.   IT'S THE TIP IN THE EDISON OR THE MINILAB DEVICE, YES.

12:47PM  25   Q.   AND YOU WROTE, "FUNDAMENTALLY, WE NEED TO STOP FIGHTING

12:48PM  1    FIRES BY NOT CREATING THEM."

12:48PM  2        DID I READ THAT CORRECTLY?

12:48PM  3    A.   YES.

12:48PM  4    Q.   YOU WROTE, "NEED TO FIX ROOT CAUSE HERE"?

12:48PM  5    A.   YES.

12:48PM  6    Q.   YOU'RE AGREEING WITH MR. BALWANI?

12:48PM  7    A.   I'M REPEATING BACK TO HIM WHAT HE SAID TO ME.

12:48PM  8    Q.   OKAY.  WELL, YOUR WORDS ARE "YES" AND "EXACTLY."

12:48PM  9        AM I RIGHT?

12:48PM  10   A.   YES.

12:48PM  11   Q.   YOUR WORDS IN THE MOMENT?

12:48PM  12   A.   YES.

12:48PM  13   Q.   LET'S LOOK AT PAGE 25, PLEASE.

12:48PM  14       DO YOU SEE WHERE MR. BALWANI WROTE, "NEED CTN FIXED.  OUR

12:48PM  15   ROOT CAUSE OF ISSUES"?

12:48PM  16   A.   I DO.

12:48PM  17   Q.   AND CTN AGAIN IS A REFERENCE TO THE NANOTAINER?

12:48PM  18   A.   IT IS.

12:48PM  19   Q.   OKAY.  LET'S GO TO THE NEXT PAGE, PLEASE.

12:49PM  20       SO, MS. HOLMES, THE DATE OF THESE EMAILS OR TEXTS ARE

12:49PM  21   NOVEMBER 27TH, 2014, ROUGHLY TWO WEEKS FROM THE EXCHANGES THAT

12:49PM  22   WE JUST LOOKED AT.

12:49PM  23       AM I RIGHT ABOUT THAT?

12:49PM  24   A.   OKAY.  YES.

12:49PM  25   Q.   AND IN THIS TIME PERIOD WHERE MR. BALWANI IS RAISING

12:49PM 1    ISSUES ABOUT WHAT HE'S SEEING IN THE LAB IN THIS TIME PERIOD

12:49PM 2    WHEN DR. ROSENDORFF IS LEAVING, YOU'RE ALSO RAISING MONEY; IS

12:49PM 3    THAT CORRECT?

12:49PM 4    A.   YES.

12:49PM 5    Q.   AND WE KNOW THAT BECAUSE YOU WRITE HERE, IN RESPONSE TO

12:49PM 6    MR. BALWANI'S TEXT, "WE NEED TO LOCK ON A BILLION OR MORE NOW

12:50PM 7    SO WE HAVE LEVERAGE OVER BOTH.  AND TIME TO OPERATIONALIZE

12:50PM 8    NORMANDY AND THEN DAY."

12:50PM 9        DO YOU SEE THAT?

12:50PM 10   A.   I DO.

12:50PM 11   Q.   AND THEN HE CORRECTS HIMSELF LATER AND SAID "DDAY."

12:50PM 12       DO YOU SEE THAT?

12:50PM 13   A.   I DO.

12:50PM 14   Q.   AND YOU HAD REFERENCED D DAY INTERNALLY AS WHEN THERANOS

12:50PM 15   WOULD DO PHASE II?

12:50PM 16   A.   YES.

12:50PM 17   Q.   AND MR. BALWANI IS SAYING THE BILLION DOLLARS OR MORE

12:50PM 18   WOULD GIVE THEM TIME TO OPERATIONALIZE NORMANDY; CORRECT?

12:50PM 19   A.   UM, I THINK HE'S SAYING THAT WE ALSO NEED TIME TO

12:50PM 20   OPERATIONALIZE NORMANDY.

12:50PM 21   Q.   OKAY.  NORMANDY IS THE CLIA LAB WHERE YOU'RE DOING THE

12:50PM 22   TESTING ON THE EDISON AND THE MODIFIED SIEMENS MACHINES?

12:50PM 23   A.   EXACTLY.

12:50PM 24   Q.   AND YOU REPLY, "DRIVING HOME.

12:50PM 25       "AMAZING MEETING.

12:50PM    1              "HE IS IN."

12:50PM    2         IS THAT A REFERENCE TO RUPERT MURDOCH?

12:51PM    3    A.   I'M NOT SURE.

12:51PM    4    Q.   WELL, LET'S LOOK AT THE NEXT PAGE.

12:51PM    5         DO YOU SEE WHERE MR. BALWANI WROTE, "AWESOME.  I KNEW

12:51PM    6    ALREADY"?

12:51PM    7    A.   I DO.

12:51PM    8    Q.   DO YOU SEE WHERE HE WROTE, "WE NEED LEVERAGE ALWAYS"?

12:51PM    9    A.   I DO.

12:51PM   10    Q.   AND DO YOU SEE WHERE YOU WROTE, "RUPERT SAID SAME THING AS

12:51PM   11    YOU AND I TALKED ABOUT ON SEPARATE R&D BUCKET"?

12:51PM   12    A.   I DO.

12:51PM   13    Q.   DOES THIS REFRESH YOUR MEMORY THAT THE "HE IS IN" IS A

12:51PM   14    REFERENCE TO RUPERT MURDOCH?

12:51PM   15    A.   IT DOESN'T.

12:51PM   16    Q.   YOU AGREE WITH ME THAT THIS IS ALL IN THE CONTEXT OF A

12:51PM   17    TEXT EXCHANGE?

12:51PM   18    A.   I THINK SO, YES.

12:51PM   19    Q.   LET'S LOOK AT PAGE 38, PLEASE.

12:52PM   20         DO YOU SEE THAT THIS IS ANOTHER TEXT EXCHANGE BETWEEN YOU

12:52PM   21    AND MR. BALWANI IN THE MARCH 2015 TIME PERIOD?

12:52PM   22    A.   YES.

12:52PM   23    Q.   AND HE'S WRITING TO YOU, "I AM BLOCKING EVERYONE INVOLVED

12:52PM   24    WITH DEVICE IN SOFTWARE ALL NEXT WEEK AND I WILL ONLY DO THIS

12:52PM   25    ALSO.  NOTHING ELSE.  THIS IS THE ONLY WAY TO GET THIS DONE."

12:52PM   1              DO YOU SEE THAT LANGUAGE?

12:52PM   2       A.   I DO.

12:52PM   3       Q.   AND MR. BALWANI IS NOT HIDING ANYTHING FROM YOU HERE, IS

12:52PM   4       HE?

12:52PM   5       A.   I DON'T KNOW WHAT HE'S TALKING ABOUT.

12:52PM   6       Q.   OKAY.  HE'S NOT CONCEALING WITH YOU THE NEED TO GET DEVICE

12:52PM   7       AND SOFTWARE NEXT WEEK AND TO MAKE PROGRESS ON THE PRODUCT, IS

12:52PM   8       HE?

12:52PM   9       A.   NO.

12:52PM  10       Q.   OKAY.  AND IF WE CAN GO BACK, PLEASE, MS. HOLLIMAN, TO

12:53PM  11       PAGE 23.  ONE MORE PAGE.  ONE MORE PAGE, PLEASE.  ONE MORE.

12:53PM  12       ONE MORE.  OKAY.  ONE MORE, PLEASE.

12:53PM  13              LET ME DRAW YOUR ATTENTION, PLEASE, TO THIS TEXT EXCHANGE

12:53PM  14       FROM THE NOVEMBER 2013 TIME PERIOD, MS. HOLMES.

12:54PM  15              DO YOU SEE WHERE YOU WROTE, "LET'S BUILD THE TRUE AMERICAN

12:54PM  16       EMPIRE."

12:54PM  17              OR EXCUSE ME, MR. BALWANI WROTE, "THEN LET'S BUILD THE

12:54PM  18       TRUE AMERICAN EMPIRE.  A MONOPOLY.  OUR OBLIGATION TO U.S.A.

12:54PM  19              "THAT'S WHAT WE'RE DOING."

12:54PM  20       A.   YES.

12:54PM  21       Q.   AND THIS IS AN EXPRESSION FOR WHAT YOU WANTED TO DO WITH

12:54PM  22       THERANOS?

12:54PM  23       A.   YES.

12:54PM  24       Q.   ISN'T IT TRUE, MS. HOLMES, THAT YOU AND MR. BALWANI SPOKE

12:54PM  25       OPENLY AT INSPECTIONS WITH GOVERNMENT REGULATORS ABOUT WHAT

12:54PM  1    THEY WERE FINDING.

12:54PM  2    A.   YES.

12:54PM  3    Q.   LET ME DRAW YOUR ATTENTION TO PAGE 97 OF 387D.

12:55PM  4         DO YOU SEE THE DATE OF THESE TEXT EXCHANGES IS

12:55PM  5    AUGUST 28TH, 2015?

12:55PM  6    A.   I DO.

12:55PM  7    Q.   OKAY.  AND YOU RECALL THAT THE FDA CONDUCTED AN INSPECTION

12:55PM  8    OF THERANOS IN OR AROUND THAT TIME PERIOD?

12:55PM  9    A.   YES.

12:55PM  10   Q.   THAT INSPECTION WAS UNEXPECTED?

12:55PM  11   A.   YES.

12:55PM  12   Q.   THEY SHOWED UP UNANNOUNCED?

12:55PM  13   A.   THAT'S RIGHT.

12:55PM  14   Q.   THEY DIDN'T CALL BEFORE THEY CAME?

12:55PM  15   A.   THAT'S RIGHT.

12:55PM  16   Q.   THEY WERE THERE IN ARIZONA AND CALIFORNIA?

12:55PM  17   A.   YES.

12:55PM  18   Q.   AND THEY WERE ASKING QUESTIONS ABOUT PRODUCTION OF THE

12:55PM  19   NANOTAINER AND THE USE OF THE NANOTAINER IN CONNECTION WITH

12:55PM  20   YOUR LDT'S?

12:55PM  21   A.   THEY WERE ASKING QUESTIONS ABOUT OUR QUALITY SYSTEM FOR

12:55PM  22   THE NANOTAINER.

12:55PM  23   Q.   OKAY.  AND WHILE THIS WAS GOING ON, YOU WERE TEXTING BACK

12:55PM  24   AND FORTH TO MR. BALWANI ABOUT WHAT HE WAS LEARNING AND WHAT

12:55PM  25   YOU WERE LEARNING?

12:55PM  1     A.   YES.

12:55PM  2     Q.   YOU SPOKE OPENLY ABOUT THOSE THINGS?

12:55PM  3     A.   YES.

12:55PM  4     Q.   HE DIDN'T HIDE FROM YOU WHAT THE FDA WAS SAYING TO HIM;

12:56PM  5     CORRECT?

12:56PM  6     A.   I DON'T THINK SO.

12:56PM  7     Q.   AND YOU DIDN'T HIDE FROM HIM WHAT THE FDA WAS SAYING TO

12:56PM  8     YOU?

12:56PM  9     A.   I DID NOT.

12:56PM 10     Q.   OKAY.  UP AT THE TOP HE WROTE, "THEY ARE ASKING IF IN OUR

12:56PM 11     IDEAL WORLD FOR CTN 510K IF WE USED OUR LDT."

12:56PM 12          WHAT IS A 510K?

12:56PM 13     A.   AN FDA APPROVAL.

12:56PM 14     Q.   "LDT AS METHOD VERSUS PREDICATE WE WOULD LIKE THAT AND NOT

12:56PM 15     HAVE TO DO WHAT THEY HAVE ASKED US TO DO (POOL 8 CTN'S AND RUN

12:56PM 16     ON ADVIA INSTEAD OF JUST 1-2 CTN AND RUN ON CLIA AS LDT)."

12:56PM 17          DO YOU SEE THAT LANGUAGE?

12:56PM 18     A.   I DO.

12:56PM 19     Q.   AND YOU AND HE ARE SPEAKING OPENLY ABOUT WHAT THE FDA IS

12:56PM 20     ASKING FOR AND WHAT THERANOS MIGHT BE ABLE TO PROVIDE?

12:56PM 21     A.   YES.

12:56PM 22     Q.   GO TO THE TOP, MS. HOLLIMAN.

12:57PM 23          IS THIS ANOTHER TEXT IN THE CONTEXT OF THE FDA

12:57PM 24     CONVERSATION, MS. HOLMES?

12:57PM 25     A.   YES.

12:57PM 1    Q.   LET'S LOOK AT THE NEXT PAGE, PLEASE.

12:57PM 2        DO YOU SEE WHERE YOU WROTE, "WE ARE PREPARING FOR DAN TO

12:57PM 3    CALL SOMEONE HE KNOWS AT THE TOP OF FDA BECAUSE HE KNOWS HIM.

12:57PM 4    MAY RUFFLE FEATHERS BUT WE THINK HE WILL GET THAT 483 WILL BE

12:57PM 5    BAD FOR FDA ARE ALSO DRAFTING EMAIL TO ALBERTO TO LET HIM KNOW

12:57PM 6    WE'RE FOLLOWING UP WITH COUNSEL ON THIS (LEAVE DOOR OPEN FOR

12:57PM 7    DAN)."

12:58PM 8        THOSE ARE YOUR WORDS; CORRECT?

12:58PM 9    A.   YES.

12:58PM 10   Q.   DAN IS A REFERENCE TO YOUR LAWYER?

12:58PM 11   A.   I THINK SO.

12:58PM 12   Q.   A LAWYER IN WASHINGTON, D.C. THAT YOU HIRED TO INTERACT

12:58PM 13   WITH THE FDA?

12:58PM 14   A.   YES.

12:58PM 15   Q.   OKAY.  AND ALBERTO IS A REFERENCE TO ALBERTO GUTIERREZ?

12:58PM 16   A.   YES.

12:58PM 17   Q.   HE'S A SENIOR OFFICIAL WITHIN THE FDA WHO HAD A HAND IN

12:58PM 18   WHETHER THERANOS TECHNOLOGY WOULD BE FDA APPROVED?

12:58PM 19   A.   HE DID.

12:58PM 20   Q.   AND YOU'RE EXPRESSING A VIEW HERE THAT DAN CALLING AT THE

12:58PM 21   TOP OF THE FDA MIGHT RUFFLE FEATHERS?

12:58PM 22   A.   YES.

12:58PM 23   Q.   AND MR. BALWANI SAYS, "I THINK THIS IS NOW OUTRAGEOUS WHAT

12:58PM 24   THEY ARE DOING."

12:58PM 25       YOU WROTE BACK "AGREE."

12:58PM   1          THOSE ARE YOUR WORDS?

12:58PM   2      A.   YES.

12:58PM   3      Q.   AND THAT'S A REFERENCE TO THE FDA INSPECTION THAT IS GOING

12:58PM   4      ON?

12:58PM   5      A.   I THINK IT'S A REFERENCE TO THE REGULATION OF LDT'S IN A

12:58PM   6      WAY THAT WAS DIFFERENT THAN THE POLICY.

12:58PM   7      Q.   DIFFERENT FROM THE POLICY AS YOU UNDERSTOOD IT?

12:58PM   8      A.   YEAH.

12:59PM   9      Q.   DOWN AT THE BOTTOM MR. BALWANI SAYS, "WE NEED TO CHANGE

12:59PM  10      .COM PROVIDER SECTION.  IT TALKS ABOUT MICRO SAMPLES AND

12:59PM  11      REFLECT TESTING ON MICRO SAMPLES."

12:59PM  12          AND YOU WROTE BACK WITH A QUESTION, "IS THAT FROM AUDIT?"

12:59PM  13          DO YOU SEE THAT?

12:59PM  14      A.   I DO.

12:59PM  15      Q.   THAT'S A REFERENCE TO THE ONGOING FDA INSPECTION?

12:59PM  16      A.   YES.

12:59PM  17      Q.   OKAY.  AND MR. BALWANI IS EXPRESSING CONCERN HERE THAT YOU

12:59PM  18      MIGHT NEED TO CHANGE SOME OF THE LANGUAGE ON THE WEBSITE IN

12:59PM  19      LIGHT OF WHAT IS GOING ON WITH THE FDA OR POSSIBLE CONCERNS

12:59PM  20      ABOUT ITS ACCURACY?

12:59PM  21      A.   UM, HE SAYS HE'S JUST SAYING IT'S A DISASTER, IT'S NOT

12:59PM  22      FROM THE FDA AUDIT.

12:59PM  23      Q.   OKAY.  BUT HE'S NOT HIDING THAT FROM YOU HERE?

12:59PM  24      A.   NO.

12:59PM  25      Q.   HE'S SPEAKING WITH YOU OPENLY ABOUT THAT?

| 12:59PM | 1 | A.   HE IS. |
| 12:59PM | 2 | Q.   LET'S GO TO THE NEXT PAGE, PLEASE. |
| 01:00PM | 3 | DO YOU SEE WHERE YOU WROTE, "DANIEL INCLUDED ADVIA NUMBERS |
| 01:00PM | 4 | OF TESTS RUN SINCE 2013, BUT TECHNICALLY THOSE WERE THE |
| 01:00PM | 5 | DIFFERENT LDT'S THAN THE ADVIA ONES RUN NOW.  LET ME KNOW YOUR |
| 01:00PM | 6 | THOUGHTS ON WHETHER YOU'D USE THE BIGGER NUMBER." |
| 01:00PM | 7 | DO YOU SEE THAT LANGUAGE? |
| 01:00PM | 8 | A.   YES. |
| 01:00PM | 9 | Q.   THE DANIEL THERE WAS A REFERENCE TO DANIEL YOUNG? |
| 01:00PM | 10 | A.   YES. |
| 01:00PM | 11 | Q.   HE WAS AIDING YOU IN GATHERING DOCUMENTS FOR THE FDA? |
| 01:00PM | 12 | A.   YES. |
| 01:00PM | 13 | Q.   AND YOU'RE SPEAKING HERE OPENLY WITH MR. BALWANI ABOUT HOW |
| 01:00PM | 14 | TO RESPOND TO THE FDA? |
| 01:00PM | 15 | A.   YES. |
| 01:00PM | 16 | Q.   LET'S GO TO THE NEXT PAGE, PLEASE. |
| 01:00PM | 17 | DO YOU SEE WHERE MR. BALWANI WROTE, "WE SHOULD DISCUSS |
| 01:01PM | 18 | TONIGHT TURNING CTN OFF"? |
| 01:01PM | 19 | A.   I DO. |
| 01:01PM | 20 | Q.   THAT'S A REFERENCE TO THE NANOTAINER? |
| 01:01PM | 21 | A.   YES. |
| 01:01PM | 22 | Q.   AND YOU HAD BEEN THINKING ABOUT DOING THAT, TOO? |
| 01:01PM | 23 | A.   I SEE THAT. |
| 01:01PM | 24 | Q.   DO YOU HAVE A MEMORY OF THAT? |
| 01:01PM | 25 | A.   NO. |

01:01PM 1   Q.   OKAY.  AND THE REASON YOU WANTED TO DO THAT WAS BECAUSE

01:01PM 2   THE FDA WAS SUGGESTING TO YOU THAT THE CTN NEEDED TO BE FDA

01:01PM 3   APPROVED; IS THAT CORRECT?

01:01PM 4   A.   NO.

01:01PM 5   Q.   WHAT WAS YOUR UNDERSTANDING?

01:01PM 6   A.   I UNDERSTOOD THAT WE WERE USING THE CTN AS PART OF OUR LDT

01:01PM 7   CONSISTENT WITH THE FDA'S GUIDANCE ON LDT'S, AND THAT AS SUCH

01:01PM 8   WE WOULD NOT NEED TO BE COMPLIANT WITH CERTAIN FDA QUALITY

01:01PM 9   STANDARDS UNTIL WE GOT APPROVAL, AND WE GOT DIFFERENT GUIDANCE

01:01PM 10  IN THIS INSPECTION.

01:01PM 11  Q.   AND I THINK WE'RE TALKING PAST EACH OTHER, BUT YOU'RE

01:01PM 12  EXPRESSING NOW IN THE SEPTEMBER 2015 TIME PERIOD THE NEED TO

01:01PM 13  STOP USING THE NANOTAINER BECAUSE OF FDA CONCERNS?

01:02PM 14  A.   YES.

01:02PM 15  Q.   AND YOU ULTIMATELY DID THAT?

01:02PM 16  A.   YES.

01:02PM 17  Q.   YOU ALSO SPOKE TO MR. BALWANI ABOUT WHAT WAS GOING ON

01:02PM 18  DURING THE CMS INSPECTION; ISN'T THAT CORRECT?

01:02PM 19  A.   I DID.

01:02PM 20  Q.   OKAY.  LET ME DRAW YOUR ATTENTION, PLEASE, TO 106.

01:02PM 21       DO YOU SEE THE DATE OF SEPTEMBER 22ND, 2015?

01:02PM 22  A.   I DO.

01:02PM 23  Q.   DO YOU SEE WHERE MR. BALWANI WROTE, "VERY HOSTILE SO FAR.

01:02PM 24  THEY HAVE COMPLAINTS"?

01:03PM 25  A.   I DO.

01:03PM 1    Q.   AND THAT'S A REFERENCE TO THE CMS INSPECTORS?

01:03PM 2    A.   I THINK SO.

01:03PM 3    Q.   "THEY SHOULD KNOW THE ENTIRE LAB INDUSTRY IS AND WILL BE

01:03PM 4    SEEDING EVERYONE THEY CAN TO GET AT TO FILE COMPLAINTS."

01:03PM 5         IS THAT HOW YOU RESPONDED?

01:03PM 6    A.   YES.

01:03PM 7    Q.   AND THEN YOU WROTE, "I'M SURE TYLER IS ONE THEY PROB GOT

01:03PM 8    FROM NY.  ADAM IS THE OTHER."

01:03PM 9         IS THAT A REFERENCE TO DR. ROSENDORFF?

01:03PM 10   A.   I THINK SO.

01:03PM 11   Q.   OKAY.  YOU KNEW ENOUGH IN THIS SEPTEMBER 2015 TIME PERIOD

01:03PM 12   TO THINK THAT DR. ROSENDORFF WAS ONE OF MR. CARREYROU'S SOURCES

01:03PM 13   AND A POSSIBLE REASON FOR THE CMS INSPECTION?

01:03PM 14   A.   I DID.

01:03PM 15   Q.   OKAY.  "JC HIMSELF PLAYING LITERALLY OFF LAB COMMENTS IS

01:03PM 16   LIKELY THE OTHER."

01:03PM 17        JC IS A REFERENCE TO JOHN CARREYROU; CORRECT?

01:03PM 18   A.   I THINK SO, YES.

01:03PM 19   Q.   AND THEN YOU WROTE HMFR; CORRECT?

01:03PM 20   A.   I DID.

01:04PM 21   Q.   AND THAT'S AN ACRONYM FOR A RELIGIOUS TERM THAT YOU WOULD

01:04PM 22   YOU USE WITH MR. BALWANI?

01:04PM 23   A.   IT'S AN ACRONYM FOR A PRAYER, YES.

01:04PM 24   Q.   OKAY.  EXPRESSING GRATITUDE TO GOD?

01:04PM 25   A.   YES.

01:04PM 1    Q.  AND YOU WROTE, "PRAYING LITERALLY NONSTOP"?

01:04PM 2    A.  YES.

01:04PM 3    Q.  AND THAT'S A REFERENCE TO THE CMS INSPECTION?

01:04PM 4    A.  YES.  I DON'T KNOW THAT IT'S A REFERENCE TO THE CMS

01:04PM 5    INSPECTION.  IT'S SAYING THAT I'M PRAYING.

01:04PM 6    Q.  "DO YOU WANT ME TO STEP OUT OF FDA CALL?

01:04PM 7        "NO."

01:04PM 8        DO YOU SEE THAT LANGUAGE?

01:04PM 9    A.  I DO.

01:04PM 10   Q.  IN THIS TIME PERIOD, YOU WERE ALSO DEALING WITH THE FDA?

01:04PM 11   A.  I WAS.

01:04PM 12   Q.  OKAY.  LET'S LOOK AT THE NEXT PAGE.

01:05PM 13       DO YOU SEE WHERE MR. BALWANI WROTE, "OUR VALIDATION

01:05PM 14   REPORTS ARE TERRIBLE.  REALLY PAINFUL GOING THRU THIS PROCESS.

01:05PM 15   SAME ISSUES FDA POINTED OUT."

01:05PM 16       DO YOU SEE THAT LANGUAGE?

01:05PM 17   A.  I DO.

01:05PM 18   Q.  HE'S BEING OPEN WITH YOU ABOUT WHAT CMS IS FINDING IN THIS

01:05PM 19   TIME PERIOD?

01:05PM 20   A.  YES.

01:05PM 21   Q.  HE'S NOT HIDING ANYTHING FROM YOU HERE?

01:05PM 22   A.  NO.  I'M NOT SURE IF THIS IS WHAT CMS IS FINDING OR WHAT

01:05PM 23   HE'S SAYING TO ME.

01:05PM 24   Q.  OKAY.  HE'S REPORTING TO YOU WHAT HE'S SEEING FROM CMS?

01:05PM 25   A.  I THINK HE'S REPORTING TO ME HIS OPINION.

01:05PM 1    Q.   OKAY.  AND YOU TOLD US YESTERDAY THAT AT SOME POINT IN

01:05PM 2    JANUARY OF 2016, YOU REALIZED THE GRAVITY OF THE CMS INSPECTION

01:05PM 3    AND FORCED MR. BALWANI OUT?

01:05PM 4    A.   I REALIZED THE GRAVITY OF THE CMS INSPECTION IN JANUARY,

01:05PM 5    OR AROUND JANUARY OF 2016, STARTING IN NOVEMBER OF 2015, AND

01:05PM 6    MR. BALWANI LEFT THE COMPANY IN MAY.

01:05PM 7    Q.   OKAY.  YOU PUSHED HIM OUT; ISN'T THAT FAIR?

01:06PM 8    A.   I ASKED HIM TO LEAVE, YES.

01:06PM 9    Q.   OKAY.  YOU MADE THAT CHOICE TO GET HIM OUT OF THE COMPANY?

01:06PM 10   A.   I DID.

01:06PM 11   Q.   IN 2016 AFTER GETTING THE CMS REPORT?

01:06PM 12   A.   YES.

01:06PM 13   Q.   OKAY.  AND MR. BALWANI IN THIS SEPTEMBER TIME PERIOD IS

01:06PM 14   REPORTING TO YOU HIS OPINIONS ABOUT WHAT CMS IS FINDING HERE?

01:06PM 15   A.   HE IS.

01:06PM 16   Q.   OKAY.

01:06PM 17   A.   AGAIN, I DON'T KNOW THAT THIS IS WHAT CMS IS FINDING, BUT

01:06PM 18   HE'S REPORTING TO ME HIS OPINIONS.

01:06PM 19   Q.   OKAY.  LET'S GO DOWN, PLEASE.

01:06PM 20        DO YOU SEE WHERE YOU WROTE, "WILL MAKE SURE ALL TEAMS ARE

01:06PM 21   REVIEWING REPORTS.  LET ME KNOW ANYTHING ELSE CAN DO TO

01:06PM 22   SUPPORT."

01:06PM 23        IS THAT A REFERENCE TO YOUR EXPRESSION OF WILLINGNESS TO

01:06PM 24   BRING RESOURCES TO THE CMS INSPECTION?

01:06PM 25   A.   IT IS.

01:07PM 1     Q.   AND BALWANI, MR. BALWANI WRITES BACK, "GOING BAD SO FAR.

01:07PM 2     PRAY.

01:07PM 3          "DANIEL HAS NOTHING READY.

01:07PM 4          "TOLD ME EVERYTHING IS IN THE BINDERS.

01:07PM 5          "NOT THERE."

01:07PM 6          AND WHAT WAS YOUR RESPONSE, MS. HOLMES?

01:07PM 7     A.   "PRAYING."

01:07PM 8     Q.   YOU THEN WROTE, "AT MY DESK.

01:07PM 9          "TELL ME HOW I CAN HELP."

01:07PM 10    A.   YES.

01:07PM 11    Q.   THE REFERENCE HERE IS TO THE CMS INSPECTION; CORRECT?

01:07PM 12    A.   YES.

01:07PM 13    Q.   AND DOES THIS REFRESH YOUR RECOLLECTION THAT THE EARLY ONE

01:07PM 14    IS IN RELATION TO THE CMS INSPECTION?

01:07PM 15    A.   IT DOESN'T.

01:07PM 16    Q.   OKAY.  MR. BALWANI WAS ALSO OPEN WITH YOU ABOUT WHAT WAS

01:07PM 17    HAPPENING WITH WALGREENS; ISN'T THAT RIGHT?

01:07PM 18    A.   I THINK SO.

01:07PM 19    Q.   OKAY.  LET'S LOOK AT SOME OF THAT.

01:07PM 20         IF WE CAN GO TO PAGE 39.

01:08PM 21         DO YOU SEE THE DATE OF APRIL 7TH, 2015, MS. HOLMES?

01:08PM 22    A.   I DO.

01:08PM 23    Q.   AND YOU'RE WRITING TO MR. BALWANI, "DEEP CONCERN ABOUT

01:08PM 24    SENSE WE'RE GETTING THAT TRYING TO MANIPULATE TO FAIL.  CAN

01:08PM 25    ASSURE NOT THE CASE.  FIX STORES SUCCEED.  THERANOS OFFERED

01:08PM    1    PAY."

01:08PM    2        YOU'RE TALKING ABOUT A CONVERSATION RELATING TO WALGREENS

01:08PM    3    HERE, AREN'T YOU?

01:08PM    4    A.    I'M NOT SURE.

01:08PM    5    Q.    DID YOU HAVE STORES IN ANY OTHER PLACE IN APRIL OF 2015?

01:08PM    6    A.    WE DID NOT.

01:08PM    7    Q.    OKAY.  "ANYTIME ASK DON'T RESPOND.  SIGNAGE.  LOGOS.

01:08PM    8    CAN'T FIND.  CONFUSE HCC."

01:08PM    9        YOU DIDN'T HAVE SIGNAGE AND LOGOS ANYWHERE ELSE OTHER THAN

01:09PM   10    WALGREENS STORES, DID YOU?

01:09PM   11    A.    THAT'S RIGHT.

01:09PM   12    Q.    "TEAM NOT MAKING ANY PROGRESS.  DELIBERATE FAIL.  NOT --

01:09PM   13    DON'T NEED EXCLUSIVITY AZ.

01:09PM   14        "CAN'T SPEND DOLLARS ON MARKETING DON'T BUILD OUTRIGHT.

01:09PM   15    PATIENTS COMPLAIN."

01:09PM   16        DO YOU SEE THAT?

01:09PM   17    A.    YES.

01:09PM   18    Q.    DOES THIS REFRESH YOUR RECOLLECTION THAT YOU'RE TALKING

01:09PM   19    ABOUT WALGREENS HERE WITH MR. BALWANI?

01:09PM   20    A.    NO.

01:09PM   21    Q.    LET'S LOOK AT THE NEXT PAGE, PLEASE.

01:09PM   22        DO YOU SEE THE DATE OF APRIL 9TH, 2015?

01:09PM   23    A.    I DO.

01:09PM   24    Q.    AND MR. BALWANI WRITES, "GOING THRU CVS CONTRACT.  WE

01:09PM   25    CAN'T WORK WITH WAG OR CVS.  BOTH ARE SAME."

01:09PM   1          DO YOU SEE THAT LANGUAGE?

01:09PM   2     A.   I DO.

01:09PM   3     Q.   HE'S BEING OPEN WITH YOU ABOUT HIS VIEWS OF WHAT IS

01:10PM   4     POSSIBLE WITH WALGREENS, ISN'T HE?

01:10PM   5     A.   I THINK HE'S EXPRESSING HIS FRUSTRATIONS WITH WALGREENS

01:10PM   6     AND CVS.

01:10PM   7     Q.   OKAY.  BUT HE'S NOT HIDING THAT FROM YOU HERE, IS HE?

01:10PM   8     A.   NO.

01:10PM   9     Q.   HE'S NOT CONCEALING FROM YOU WHAT IS GOING ON WITH

01:10PM  10     WALGREENS?

01:10PM  11     A.   I DON'T THINK SO.

01:10PM  12     Q.   OKAY.  LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 5653.

01:11PM  13     A.   I DON'T THINK I HAVE THAT ONE.

01:11PM  14          MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR?

01:11PM  15          THE COURT:  YES.

01:11PM  16       (PAUSE IN PROCEEDINGS.)

01:11PM  17          THE COURT:  IS THIS IN VOLUME 2 OF YOUR BINDERS?

01:11PM  18          MR. LEACH:  IT IS, YOUR HONOR, BUT I'M NOT PREPARED

01:11PM  19     TO USE THE REMAINDER OF THE DOCUMENTS.

01:12PM  20       (PAUSE IN PROCEEDINGS.)

01:12PM  21          MR. LEACH:  MAY I APPROACH, YOUR HONOR?

01:12PM  22          THE COURT:  YES.

01:12PM  23     BY MR. LEACH:

01:12PM  24     Q.   (HANDING.)

01:12PM  25          THERE YOU GO.

| | | |
|---|---|---|
| 01:12PM | 1 | A. THANK YOU. |
| 01:12PM | 2 | Q. YOU'RE WELCOME. |
| 01:12PM | 3 | DO YOU SEE YOUR NAME AT THE TOP OF THIS EMAIL, MS. HOLMES? |
| 01:12PM | 4 | A. I DO. |
| 01:12PM | 5 | Q. AND DO YOU SEE MR. BALWANI'S NAME IN THE FROM LINE? |
| 01:12PM | 6 | A. I DO. |
| 01:12PM | 7 | Q. AND THIS IS DATED AUGUST 15TH, 2014? |
| 01:12PM | 8 | A. YES. |
| 01:12PM | 9 | Q. AND DOES THIS EMAIL RELATE TO THOUGHTS AND GOALS RELATING |
| 01:12PM | 10 | TO WALGREENS? |
| 01:12PM | 11 | A. IS IT OKAY IF I READ IT REALLY FAST? |
| 01:12PM | 12 | Q. YES, PLEASE. |
| 01:12PM | 13 | A. OKAY. |
| 01:12PM | 14 | (PAUSE IN PROCEEDINGS.) |
| 01:12PM | 15 | THE WITNESS: YES. |
| 01:12PM | 16 | MR. LEACH: YOUR HONOR, I MOVE THE ADMISSION OF |
| 01:12PM | 17 | 5663. |
| 01:13PM | 18 | THE COURT: 5663? |
| 01:13PM | 19 | MR. LEACH: YES. |
| 01:13PM | 20 | MR. DOWNEY: NO OBJECTION. |
| 01:13PM | 21 | THE COURT: THAT'S ADMITTED, 5663. |
| 01:13PM | 22 | (GOVERNMENT'S EXHIBIT 5663 WAS RECEIVED IN EVIDENCE.) |
| 01:13PM | 23 | MR. LEACH: I THINK THAT'S THE WRONG DOCUMENT, |
| 01:13PM | 24 | MS. HOLLIMAN. |
| 01:13PM | 25 | THERE WE GO. |

01:13PM 1    Q.   LET ME DRAW YOUR --

01:13PM 2                 THE CLERK:  EXCUSE ME.

01:13PM 3                 THE COURT:  5663, NOT 5653; IS THAT CORRECT?

01:13PM 4                 MR. LEACH:  I THINK WE MAY HAVE A NUMBERING ISSUE

01:13PM 5    WITH OUR ELECTRONIC COPY.

01:13PM 6           YOUR HONOR, I'LL DISPLAY IT ON THE ELMO.

01:13PM 7                 THE COURT:  OKAY.

01:13PM 8                 MR. LEACH:  OR MAY I USE?

01:13PM 9                 THE COURT:  YES.

01:13PM 10                MR. LEACH:  AND JUST TO BE CLEAR, THE DOCUMENT I

01:13PM 11   MOVED INTO EVIDENCE IS 5663, AND MS. HOLLIMAN HAS THE COPY WITH

01:13PM 12   A DIFFERENT NUMBER THAN WE'RE DISPLAYING.

01:14PM 13                THE COURT:  OKAY.

01:14PM 14                MR. LEACH:  MS. HOLLIMAN, YOU CAN DISPLAY WHAT WE'RE

01:14PM 15   LOOKING AT.

01:14PM 16   Q.   DO YOU SEE AN EMAIL FROM NIMESH JHAVERI DATED AUGUST 15TH,

01:14PM 17   MS. HOLMES?

01:14PM 18   A.   I DO.

01:14PM 19   Q.   AND IF WE SCROLL DOWN TO THE SUBSTANCE OF MR. JHAVERI'S

01:14PM 20   EMAIL, DO YOU SEE WHERE HE'S WRITING, "IT WILL BE IMPORTANT

01:14PM 21   THAT WE DRIVE A SINGLE FOCUS TOGETHER.  THE 2 AREAS WHICH MUST

01:14PM 22   BE FOCUSSED ON ARE:"

01:14PM 23          AND THEN HE WROTE, "PATIENTS PER DAY WITH A 4 PERCENT

01:14PM 24   EXPERIENCE.

01:14PM 25          "VENOUS PERCENT IN THE 10 PERCENT RANGE."

01:14PM  1        DO YOU SEE THAT?

01:14PM  2    A.  I DO.

01:14PM  3    Q.  AND THEN MR. JHAVERI WROTE, "WE NEED TO HAVE A DOCUMENTED

01:14PM  4    DETAILED PLAN ON BOTH OR IT WILL BE DIFFICULT FOR ME TO

01:14PM  5    CONVINCE EXPANSION BEYOND AZ."

01:14PM  6        DO YOU SEE THAT LANGUAGE?

01:14PM  7    A.  I DO.

01:14PM  8    Q.  AND MR. BALWANI FORWARDS THIS TO YOU; DOESN'T HE?

01:15PM  9    A.  HE DID.

01:15PM 10    Q.  AND HE WROTE, "WE CAN DISCUSS THIS TODAY.  GIVES US HUGE

01:15PM 11    OPENING FOR WHAT WE WANT TO DO."

01:15PM 12        IF WE CAN ZOOM OUT, MS. HOLLIMAN.

01:15PM 13        DO YOU SEE THAT LANGUAGE AT THE TOP, MS. HOLMES?

01:15PM 14    A.  I DO.

01:15PM 15    Q.  AND SO MR. BALWANI IS NOT HIDING FROM YOU INFORMATION THAT

01:15PM 16    HE'S GETTING FROM WALGREENS?

01:15PM 17    A.  NO.

01:15PM 18    Q.  AND HE'S OFFERING TO DISCUSS WHAT HE'S LEARNING FROM

01:15PM 19    WALGREENS WITH YOU THAT DAY?

01:15PM 20    A.  YES.

01:15PM 21    Q.  AND HE'S EXPLAINING THAT THIS MIGHT ALSO GIVE YOU AN

01:15PM 22    OPPORTUNITY TO EXPLORE RELATIONSHIPS WITH OTHER RETAILERS;

01:15PM 23    ISN'T THAT RIGHT?  ISN'T THAT THE OPPORTUNITY THAT HE'S TALKING

01:15PM 24    ABOUT?

01:15PM 25    A.  I THINK HE'S TALKING ABOUT EXPANDING WITH WALGREENS.

01:15PM  1   Q.   OKAY.  EVEN THOUGH HE'S FORWARDING MR. JHAVERI'S

01:15PM  2   COMPLAINTS ABOUT THE PERCENTAGE OF VENOUS DRAWS WITHIN THE

01:16PM  3   STORE?

01:16PM  4   A.   I READ THIS TO SAY THAT IF WE HAD A DETAILED PLAN WITHIN

01:16PM  5   THE NEXT 30 DAYS, THEY COULD MEET WITH MANAGEMENT ABOUT

01:16PM  6   EXPANSION BEYOND ARIZONA.

01:16PM  7   Q.   OKAY.  AND YOU NEVER DID EXPAND BEYOND ARIZONA?

01:16PM  8   A.   WE DID NOT.

01:16PM  9   Q.   OKAY.  WERE THERE TIMES IN YOUR WORKING RELATIONSHIP WITH

01:16PM 10   MR. BALWANI WHERE YOU GAVE HIM DIRECTION ON WHAT TO DO?

01:16PM 11   A.   I'M SURE THERE WAS.

01:16PM 12   Q.   THERE WERE TIMES WHERE YOU TOLD HIM WHAT TO DO?

01:16PM 13   A.   I'M SURE THERE COULD HAVE BEEN.

01:16PM 14   Q.   OKAY.  WELL, LET'S LOOK AT SOME EXAMPLES.

01:16PM 15        AND HE REPORTED DIRECTLY TO YOU; CORRECT?

01:16PM 16   A.   HE DID.

01:16PM 17   Q.   HE WAS THE CHIEF OPERATING OFFICER?

01:16PM 18   A.   YES.

01:16PM 19   Q.   AND THE PRESIDENT?

01:16PM 20   A.   YES.

01:16PM 21   Q.   AND YOU WERE THE CEO?

01:16PM 22   A.   THAT'S RIGHT.

01:16PM 23   Q.   OKAY.  AND HE WAS AN AT WILL EMPLOYEE?

01:16PM 24   A.   HE WAS.

01:16PM 25   Q.   OKAY.  YOU COULD FIRE HIM AT ANY TIME?

01:16PM  1    A.   I COULD.

01:16PM  2    Q.   LET'S LOOK AT EXHIBIT 5629.

01:17PM  3    A.   I DON'T KNOW IF I HAVE THAT ONE HERE.

01:17PM  4         MR. LEACH:  I'M MOVING INTO A SLIGHTLY DIFFERENT

01:17PM  5    TOPIC, YOUR HONOR, IF NOW MIGHT BE A CONVENIENT TIME FOR A

01:17PM  6    BREAK?

01:17PM  7         THE COURT:  DOES THIS WORK FOR A BREAK, FOLKS?

01:17PM  8    MR. DOWNEY, ANY OPPOSITION TO A BREAK NOW?

01:17PM  9         MR. DOWNEY:  NO.

01:17PM 10         THE COURT:  ALL RIGHT.  LET'S TAKE A 30 MINUTE BREAK

01:17PM 11    NOW.

01:17PM 12         (RECESS FROM 1:17 P.M. UNTIL 1:56 P.M.)

01:56PM 13         THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE BACK ON

01:56PM 14    THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT AGAIN.

01:56PM 15    OUR JURY IS PRESENT.

01:56PM 16    MR. LEACH, WOULD YOU LIKE TO CONTINUE?

01:56PM 17         MR. LEACH:  YES.  THANK YOU.

01:56PM 18    Q.   GOOD AFTERNOON, MS. HOLMES.

01:56PM 19    A.   GOOD AFTERNOON.

01:56PM 20    Q.   WOULD YOU AGREE WITH ME THAT THERE WERE ASPECTS OF YOUR

01:56PM 21    BUSINESS RELATIONSHIP WHERE MR. BALWANI DEFERRED TO YOU?

01:56PM 22    A.   I'M SURE THERE WERE.

01:56PM 23    Q.   YOU'RE SURE THAT THERE ARE AREAS WHERE HE DEFERRED TO YOU

01:56PM 24    ON ASPECTS OF THERANOS'S BUSINESS?

01:56PM 25    A.   YES.

01:56PM   1     Q.   AND WOULD ONE OF THOSE AREAS BE SAFEWAY?

01:57PM   2     A.   THAT'S POSSIBLE.

01:57PM   3     Q.   WELL, YOU HAD A VERY CLOSE RELATIONSHIP WITH STEVE BURD,

01:57PM   4     THE CEO OF SAFEWAY?

01:57PM   5     A.   I DID.

01:57PM   6     Q.   AND ON THE THERANOS SIDE, YOU WERE RESPONSIBLE FOR THE

01:57PM   7     SAFEWAY RELATIONSHIP AT LEAST UNTIL MR. BURD LEFT THE COMPANY

01:57PM   8     IN MAY OF 2013?

01:57PM   9     A.   YES.

01:57PM   10    Q.   AND IF THE TWO OF YOU -- IF YOU AND MR. BALWANI DISAGREED

01:57PM   11    ON A MATTER PERTAINING TO SAFEWAY PRIOR TO MAY OF 2013, IT WAS

01:57PM   12    PROBABLY YOU WHO WOULD MAKE THE ULTIMATE DECISION?

01:57PM   13    A.   POTENTIALLY.

01:57PM   14    Q.   WELL, YOU RECALL BEING ASKED THAT QUESTION BEFORE, RIGHT,

01:57PM   15    MS. HOLMES?

01:57PM   16    A.   I DON'T, BUT I'M SURE I HAVE BEEN.

01:57PM   17    Q.   OKAY.  WELL, LET ME DRAW YOUR ATTENTION TO THE RED BINDER.

01:57PM   18    A.   OKAY.

01:57PM   19    Q.   AND IF YOU COULD PLEASE LOOK AT PAGE 5270, AND I WOULD

01:58PM   20    DRAW YOUR ATTENTION TO PAGE 55 OF THE TRANSCRIPT.

01:58PM   21    A.   OKAY.

01:58PM   22         MR. LEACH:  AND, YOUR HONOR, I SEEK PERMISSION TO

01:58PM   23    READ FROM PAGE 55, LINE 20 TO PAGE 56, LINE 4.

01:58PM   24         THE COURT:  YES.

01:58PM   25    BY MR. LEACH:

01:58PM  1    Q.   MS. HOLMES, YOU WERE ASKED THE QUESTION, "SO I THINK WE

01:58PM  2    MENTIONED A NUMBER OF DIFFERENT AREAS OF THE COMPANY, BUT, FOR

01:58PM  3    INSTANCE, ON BUSINESS PARTNERSHIPS, YOU KNOW, WHO WOULD BE THE

01:58PM  4    ONE WHO WOULD MAKE THE ULTIMATE DECISION IF THE TWO OF YOU

01:58PM  5    DISAGREED?

01:59PM  6         "ANSWER:  IF IT PERTAINED TO WALGREENS, IT WAS SUNNY.

01:59PM  7         "IF IT PERTAINED TO SAFEWAY, PROBABLY ME.

01:59PM  8         "BUT IT DEPENDS ON WHAT THE ISSUE WAS.  IF IT HAD TO DO

01:59PM  9    WITH SOMETHING THAT WAS IN A FUNCTIONAL AREA THAT HE WAS

01:59PM 10    MANAGING, I WOULD DEFER TO HIM."

01:59PM 11         THAT WAS YOUR TESTIMONY BEFORE THE S.E.C.; CORRECT?

01:59PM 12    A.   YES.

01:59PM 13    Q.   AND YOU TOOK AN OATH EACH OF THE THREE DAYS YOU WERE THERE

01:59PM 14    WITH THE S.E.C.?

01:59PM 15    A.   I DID.

01:59PM 16    Q.   THE SAME ONE THAT YOU'RE TAKING TODAY?

01:59PM 17    A.   YES.

01:59PM 18    Q.   AND ISN'T IT TRUE THAT MR. BALWANI DEFERRED TO YOU ON

01:59PM 19    DEALINGS WITH THE MILITARY?

01:59PM 20    A.   I THINK PROBABLY IN MANY OF THEM, YES.

01:59PM 21    Q.   OKAY.  YOU WERE HERE WHEN MR. EDLIN TESTIFIED?

01:59PM 22    A.   YES, I WAS.

01:59PM 23    Q.   OKAY.  AND DO YOU RECALL HIM SAYING SHE WAS HIGHLY -- THAT

01:59PM 24    YOU WERE HIGHLY INVOLVED IN MATTERS WITH THE MILITARY?

01:59PM 25    A.   I DO.

01:59PM  1    Q.   AND IF HE HAD ANY FORM OF SUBSTANTIVE COMMUNICATION WITH

01:59PM  2    THE MILITARY, HE CAME TO YOU?

01:59PM  3    A.   YES.

01:59PM  4    Q.   NOT MR. BALWANI?

01:59PM  5    A.   YES.

01:59PM  6    Q.   ISN'T IT TRUE THAT MR. BALWANI DEFERRED TO YOU ON ASPECTS

02:00PM  7    OF INVENTIONS AT THERANOS?

02:00PM  8    A.   HE DID.

02:00PM  9    Q.   IF YOU THOUGHT THE MINILAB SHOULD WORK IN A PARTICULAR

02:00PM  10   WAY, YOU WEREN'T GOING TO TAKE ADVICE FROM MR. BALWANI ON THAT;

02:00PM  11   IS THAT FAIR?

02:00PM  12   A.   I WOULD TAKE HIS ADVICE, BUT HE WOULD DEFER TO ME.

02:00PM  13   Q.   FAIR ENOUGH.  HE WOULD DEFER TO YOU ON THAT ASPECT OF

02:00PM  14   THERANOS'S BUSINESS?

02:00PM  15   A.   YES.

02:00PM  16   Q.   OKAY.  HOW ABOUT WITH REGULATORY MATTERS?  ISN'T IT THE

02:00PM  17   CASE THAT YOU AND MR. BALWANI WERE JOINTLY INVOLVED IN THE

02:00PM  18   REGULATORY STRATEGY?

02:00PM  19   A.   WE WERE.

02:00PM  20   Q.   AND GENERALLY, YOU AND MR. BALWANI WOULD BE INVOLVED IN

02:00PM  21   FIRING PERSONNEL?

02:00PM  22   A.   WE COULD BE.

02:00PM  23   Q.   DO YOU HAVE THE RED BINDER THERE?

02:00PM  24   A.   I DO.

02:00PM  25   Q.   OKAY.  LET ME DRAW YOUR ATTENTION, PLEASE, TO 5269.

02:01PM  1        YOUR HONOR, I SEEK PERMISSION TO READ FROM PAGE 53,

02:01PM  2   LINE 19 TO LINE 21.

02:01PM  3             THE COURT:  YES.

02:01PM  4   BY MR. LEACH:

02:01PM  5   Q.   YOU WERE ASKED THE QUESTION, "SO GENERALLY YOU AND

02:01PM  6   MR. BALWANI WOULD BE INVOLVED IN FIRING PERSONNEL?

02:01PM  7        "ANSWER:  I THINK SO, YEAH."

02:01PM  8        THAT WAS YOUR TESTIMONY BEFORE THE S.E.C.; CORRECT?

02:01PM  9   A.   IT IS.

02:01PM  10  Q.   AND ISN'T IT TRUE THAT YOU -- OR THAT MR. BALWANI DEFERRED

02:01PM  11  TO YOU ON MARKETING MATTERS?

02:01PM  12  A.   IN CERTAIN CIRCUMSTANCES, YES.

02:01PM  13  Q.   ISN'T IT TRUE THAT ON SOME OCCASIONS MR. BALWANI

02:01PM  14  COMPLETELY DISENGAGED FROM MARKETING SO THAT YOU COULD MANAGE

02:02PM  15  IT?

02:02PM  16  A.   PROBABLY.

02:02PM  17  Q.   WELL, LET'S LOOK AT AN EXAMPLE.  IF YOU CAN LOOK IN YOUR

02:02PM  18  BINDER AT EXHIBIT 5541.  THIS MIGHT BE ONE THAT YOU DON'T HAVE.

02:02PM  19  A.   YEAH, I DON'T THINK I HAVE THAT ONE.

02:02PM  20        MR. LEACH:  MAY I APPROACH, YOUR HONOR?

02:02PM  21             THE COURT:  YES.

02:02PM  22  BY MR. LEACH:

02:02PM  23  Q.   (HANDING.)

02:02PM  24  A.   THANK YOU.

02:02PM  25  Q.   YOU'RE WELCOME.

02:02PM   1            DO YOU SEE YOUR NAME AT THE TOP OF THIS EMAIL, MS. HOLMES?

02:03PM   2    A.   I DO.

02:03PM   3    Q.   AND DO YOU SEE THAT MR. BALWANI'S NAME IS IN THE FROM

02:03PM   4    LINE?

02:03PM   5    A.   I DO.

02:03PM   6    Q.   AND THE DATE OF THIS IS MAY 21ST, 2013?

02:03PM   7    A.   YES.

02:03PM   8    Q.   AND THE SUBJECT IS CHIAT/DAY?

02:03PM   9    A.   YES.

02:03PM  10    Q.   AND CHIAT/DAY WAS YOUR MARKETING FIRM?

02:03PM  11    A.   THEY WERE.

02:03PM  12            MR. LEACH:  OKAY.  I MOVE THE ADMISSION OF

02:03PM  13    EXHIBIT 5541, YOUR HONOR.

02:03PM  14            MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

02:03PM  15            THE COURT:  IT'S ADMITTED.

02:03PM  16        (GOVERNMENT'S EXHIBIT 5541 WAS RECEIVED IN EVIDENCE.)

02:03PM  17    BY MR. LEACH:

02:03PM  18    Q.   IF I COULD DRAW YOUR ATTENTION TO THE BOTTOM EMAIL,

02:03PM  19    MS. HOLMES, DO YOU SEE THERE'S A MESSAGE FROM SUNNY BALWANI ON

02:03PM  20    MAY 21ST, 2013?

02:03PM  21    A.   I DO.

02:03PM  22    Q.   OKAY.  AND DO YOU SEE THE SECOND PARAGRAPH WHERE HE WROTE,

02:03PM  23    "I WOULD LIKE TO COMPLETELY DISENGAGE MYSELF FROM ALL THINGS

02:04PM  24    CHIAT DAY SO YOU AND THE GUYS CAN MANAGE ALL THAT IS ASKED FROM

02:04PM  25    THEM, ALL THAT IS NEEDED TO BE DELIVERED, ET CETERA, AND ALL

02:04PM  1      COMMUNICATIONS AND I CAN FOCUS ON OPERATIONS MANUFACTURING,

02:04PM  2      SUPPLY CHAIN, MATERIALS MANAGEMENT, WALGREENS, CAPSYS."

02:04PM  3           DO YOU SEE THAT LANGUAGE?

02:04PM  4      A.   I DO.

02:04PM  5      Q.   AND DID I READ THAT CORRECTLY?

02:04PM  6      A.   YOU DID.

02:04PM  7      Q.   AM I RIGHT THAT YOU HAD MANY BUSINESS MENTORS BESIDES

02:04PM  8      MR. BALWANI?

02:04PM  9      A.   I DID.

02:04PM  10     Q.   OKAY.  ONE OF THOSE BUSINESS MENTORS WAS DON LUCAS?

02:04PM  11     A.   YES.

02:04PM  12     Q.   YOU TALKED A LOT ABOUT -- IT'S DON LUCAS, SENIOR; RIGHT?

02:04PM  13     A.   YES.

02:04PM  14     Q.   THERE'S A DON LUCAS, JUNIOR?

02:04PM  15     A.   YES.

02:04PM  16     Q.   HE WAS AN INVESTOR IN THERANOS TOO, RIGHT?

02:04PM  17     A.   HE WAS.

02:04PM  18     Q.   BUT DON LUCAS WAS A BUSINESS MENTOR OF YOURS; CORRECT?

02:04PM  19     A.   HE WAS.

02:04PM  20     Q.   HE CHAIRED YOUR BOARD FOR A NUMBER OF YEARS?

02:05PM  21     A.   YES.

02:05PM  22     Q.   YOU WOULD GO TO HIM FOR BUSINESS ADVICE FREQUENTLY?

02:05PM  23     A.   I DID.

02:05PM  24     Q.   AND YOU VIEWED HIM AS VERY KNOWLEDGEABLE IN FINANCE AREAS?

02:05PM  25     A.   I DID.

02:05PM 1    Q.   AND HE WAS A VERY SUCCESSFUL ORACLE EXECUTIVE; CORRECT?

02:05PM 2    A.   HE WAS ON THE ORACLE BOARD, YES.

02:05PM 3    Q.   OKAY.  BUT HE KNEW HOW TO BUILD A BUSINESS?

02:05PM 4    A.   I THINK SO.

02:05PM 5    Q.   OKAY.  AND HE PASSED AWAY AT SOME POINT IN 2019?

02:05PM 6    A.   HE DID.

02:05PM 7    Q.   OKAY.  AND HE STEPPED DOWN FROM THERANOS ACTIVITIES AROUND

02:05PM 8    2012, 2013?

02:05PM 9    A.   2013, YEP.

02:05PM 10   Q.   YOU WERE ALSO VERY CLOSE TO CHANNING ROBERTSON; RIGHT?

02:05PM 11   A.   I WAS.

02:05PM 12   Q.   HE WAS A MENTOR TO YOURS?

02:05PM 13   A.   YES.

02:05PM 14   Q.   EXCUSE ME.  HE WAS A MENTOR TO YOU?

02:05PM 15   A.   YES.

02:05PM 16   Q.   YOU FELT LIKE YOU COULD GO TO HIM ON ANY ASPECT OF

02:05PM 17   THERANOS'S BUSINESS?

02:05PM 18   A.   I DID.

02:05PM 19   Q.   AND YOU FELT HE WAS VERY, VERY KNOWLEDGEABLE ON HOW TO

02:05PM 20   BUILD DEVICES AND HOW TO BUILD A COMPANY?

02:05PM 21   A.   I DID.

02:05PM 22   Q.   AND IF THERE WERE ISSUES ON HOW TO BUILD THE BUSINESS AND

02:06PM 23   AN ASPECT OF WHERE TO GO, YOU FELT FREE ON GOING TO HIM FOR

02:06PM 24   ADVICE AND WISDOM?

02:06PM 25   A.   I DID.

02:06PM 1      Q.   I THINK WE TALKED ABOUT GEORGE SHULTZ EARLIER.  YOU WERE

02:06PM 2      VERY CLOSE TO HIM?

02:06PM 3      A.   YES.

02:06PM 4      Q.   AND GEORGE SHULTZ WAS THE FORMER SECRETARY OF THE

02:06PM 5      TREASURY?

02:06PM 6      A.   YES.

02:06PM 7      Q.   AND HE WAS THE FORMER SECRETARY OF STATE?

02:06PM 8      A.   YES.

02:06PM 9      Q.   HE STARED DOWN THE SOVIET UNION IN THE COLD WAR?

02:06PM 10     A.   I'VE BEEN TOLD THIS.

02:06PM 11     Q.   YOU'VE BEEN TOLD THAT?

02:06PM 12     A.   YES.

02:06PM 13     Q.   AND YOU HAD GREAT RESPECT FOR HIS BUSINESS EXPERIENCE AND

02:06PM 14     HIS POLITICAL WISDOM?

02:06PM 15     A.   I DID.

02:06PM 16     Q.   AND YOU WOULD MEET WITH HIM ALMOST WEEKLY?  AM I RIGHT

02:06PM 17     ABOUT THAT?

02:06PM 18     A.   I DID.

02:06PM 19     Q.   AND YOU FELT LIKE YOU COULD GO TO HIM WITH ANY ISSUE

02:06PM 20     RELATING TO THERANOS?

02:06PM 21     A.   I DID.

02:06PM 22     Q.   OKAY.  YOU FELT IF THERE WAS SOME ASPECT OF THE BUSINESS,

02:06PM 23     BE IT FINANCE, MILITARY, YOU COULD GO TO HIM WITH QUESTIONS?

02:06PM 24     A.   I DID.

02:06PM 25     Q.   YOU WERE ALSO CLOSE TO HENRY KISSINGER; IS THAT CORRECT?

02:06PM  1     A.   I WAS.

02:06PM  2     Q.   AND HENRY KISSINGER WAS A FORMER NATIONAL SECURITY

02:07PM  3     ADVISOR?

02:07PM  4     A.   YES.

02:07PM  5     Q.   HE WAS A FORMER SECRETARY OF STATE?

02:07PM  6     A.   YES.

02:07PM  7     Q.   HE WON THE NOBEL PEACE PRIZE?

02:07PM  8     A.   HE DID.

02:07PM  9     Q.   VERY DISTINGUISHED STATESMAN; IS THAT FAIR?

02:07PM  10    A.   HE WAS.

02:07PM  11    Q.   AND HE SERVED ON OTHER BOARDS; CORRECT?

02:07PM  12    A.   YES.

02:07PM  13    Q.   AND YOU HAD TREMENDOUS RESPECT FOR HIS WISDOM AND

02:07PM  14    ABILITIES AND ABILITY TO GUIDE YOU IN RUNNING THE THERANOS

02:07PM  15    BUSINESS?

02:07PM  16    A.   I DID.

02:07PM  17    Q.   AND IF THERE WERE ANY ASPECT OF OPERATIONS AT THERANOS OR

02:07PM  18    MANAGEMENT ISSUES OR ANYTHING RELATING TO THE BUSINESS, YOU

02:07PM  19    FELT COMFORTABLE GOING TO HIM?

02:07PM  20    A.   I DID.

02:07PM  21    Q.   YOU WERE ALSO CLOSE TO WILLIAM PERRY; IS THAT CORRECT?

02:07PM  22    A.   I WAS.

02:07PM  23    Q.   WILLIAM PERRY WAS A FORMER SECRETARY OF DEFENSE?

02:07PM  24    A.   YES.

02:07PM  25    Q.   AND HE JOINED THE BOARD AT SOME POINT IN 2013?

02:07PM 1    A.   HE DID.

02:07PM 2    Q.   OKAY.  AND YOU HAD TREMENDOUS RESPECT FOR HIS ABILITY TO

02:07PM 3    GIVE YOU ADVICE AND WISDOM ABOUT HOW TO OPERATE AND MANAGE

02:08PM 4    THERANOS?

02:08PM 5    A.   I DID.

02:08PM 6    Q.   IF THERE WERE ANY ISSUE, YOU FELT YOU COULD GO TO HIM?

02:08PM 7    A.   I DID.

02:08PM 8    Q.   YOU ALSO TALKED ABOUT WILLIAM FOEGE.

02:08PM 9         DO YOU RECALL MENTIONING WILLIAM FOEGE?

02:08PM 10   A.   YES.

02:08PM 11   Q.   HE WAS A FORMER LEADER AT THE CDC?

02:08PM 12   A.   YES.

02:08PM 13   Q.   AND HE JOINED YOUR BOARD AT SOME POINT AFTER 2013?

02:08PM 14   A.   YES.

02:08PM 15   Q.   AND YOU HAD TREMENDOUS RESPECT FOR HIS ABILITIES TO GUIDE

02:08PM 16   THE THERANOS BUSINESS?

02:08PM 17   A.   I DID, YES.

02:08PM 18   Q.   AND IF THERE WERE ANY ASPECTS OF THERANOS'S OPERATIONS,

02:08PM 19   YOU FELT COMFORTABLE GOING TO HIM?

02:08PM 20   A.   YES.

02:08PM 21   Q.   YOU ALSO HAD A RELATIONSHIP WITH SAM NUNN; IS THAT

02:08PM 22   CORRECT?

02:08PM 23   A.   I DID.

02:08PM 24   Q.   AND SAM NUNN IS A FORMER SENATOR FROM GEORGIA?

02:08PM 25   A.   YES.

02:08PM  1    Q.   AND SERVED ON THE BOARD OF COCA-COLA?

02:08PM  2    A.   HE DID.

02:08PM  3    Q.   YOU HAD TREMENDOUS RESPECT FOR HIS BUSINESS ACUMEN?

02:08PM  4    A.   I DID.

02:08PM  5    Q.   YOU FELT YOU COULD GO TO FORMER SENATOR NUNN WITH ANY

02:09PM  6    QUESTION YOU HAD ABOUT HOW TO OPERATE THERANOS, RUN THE

02:09PM  7    BUSINESS, MANAGE THE FINANCES, NO RESTRICTION; IS THAT FAIR?

02:09PM  8    A.   I DID.

02:09PM  9    Q.   YOU'VE ALSO TALKED ABOUT RICHARD KOVACEVICH.

02:09PM 10         DO YOU RECALL TALKING ABOUT HIM?

02:09PM 11    A.   I DO.

02:09PM 12    Q.   AND HE WAS THE FORMER CEO OF WELLS FARGO?

02:09PM 13    A.   YES.

02:09PM 14    Q.   AND A VERY RESPECTED BUSINESSMAN?

02:09PM 15    A.   YES.

02:09PM 16    Q.   AND HE JOINED YOUR BOARD -- HE RETIRED FROM WELLS FARGO IN

02:09PM 17    OR AROUND 2009?

02:09PM 18    A.   I THINK SO.

02:09PM 19    Q.   AND HE JOINED YOUR BOARD AT SOME POINT, WAS IT AFTER 2013?

02:09PM 20    A.   2013 OR 2014.  ONE OF THOSE TWO.

02:09PM 21    Q.   OKAY.  AND YOU HAD TREMENDOUS RESPECT FOR HIS BUSINESS

02:09PM 22    ACUMEN?

02:09PM 23    A.   I DID.

02:09PM 24    Q.   YOU FELT YOU COULD GO TO HIM WITH ANY QUESTION YOU HAD

02:09PM 25    ABOUT THERANOS'S FINANCES, THERANOS'S OPERATIONS, ANY ASPECT OF

02:09PM   1    ITS BUSINESS?

02:09PM   2    A.   YES.

02:09PM   3    Q.   OKAY.  YOU ALSO FORMED A RELATIONSHIP WITH JIM MATTIS; IS

02:10PM   4    THAT FAIR?

02:10PM   5    A.   YES.

02:10PM   6    Q.   GENERAL MATTIS?

02:10PM   7    A.   YES.

02:10PM   8    Q.   WENT ON TO BECOME THE SECRETARY OF DEFENSE?

02:10PM   9    A.   HE DID.

02:10PM   10   Q.   OKAY.  HE WAS THE LEADER AT CENTCOM?

02:10PM   11   A.   YES.

02:10PM   12   Q.   AND HE JOINED YOUR BOARD IN 2013?

02:10PM   13   A.   HE DID.

02:10PM   14   Q.   AND RESIGNED AT SOME POINT IN 2016?

02:10PM   15   A.   YES.

02:10PM   16   Q.   AND YOU WOULD MEET WITH GENERAL MATTIS REGULARLY; IS THAT

02:10PM   17   RIGHT?

02:10PM   18   A.   I DID.

02:10PM   19   Q.   YOU WOULD GO TO HIS OFFICE AT STANFORD, OR HIS RESIDENCE

02:10PM   20   AT STANFORD, AND HAVE WEEKLY MEETINGS WITH HIM?

02:10PM   21   A.   I NEVER WENT TO HIS OFFICE AT STANFORD, BUT I MET WITH HIM

02:10PM   22   REGULARLY.  HE WOULD COME TO THERANOS.

02:10PM   23   Q.   OH, SO GENERAL MATTIS CAME TO YOU?

02:10PM   24   A.   HE DID.

02:10PM   25   Q.   OKAY.  AND HE GAVE YOU ADVICE ABOUT MANY MATTERS RELATING

02:10PM  1    TO THERANOS'S BUSINESS?

02:10PM  2    A.   HE DID.

02:10PM  3    Q.   HE GAVE YOU ADVICE RELATING TO HR ISSUES RELATING TO

02:10PM  4    THERANOS?

02:10PM  5    A.   ABOUT MANAGEMENT, YES.

02:10PM  6    Q.   OKAY.  AND YOU FELT FREE TO GO WITH HIM -- AND YOU HAD

02:11PM  7    RESPECT FOR HIS ACUMEN AS A LEADER?

02:11PM  8    A.   I DID.

02:11PM  9    Q.   AND YOU FELT IF THERE WAS ANY ISSUE RELATING TO THERANOS'S

02:11PM  10   OPERATIONS, ITS FINANCES, ITS BUSINESS, YOU COULD GO TO HIM FOR

02:11PM  11   ADVICE?

02:11PM  12   A.   I DID.

02:11PM  13   Q.   IS IT TRUE THAT IN JULY OF 2013 YOU AND MR. BALWANI AGREED

02:11PM  14   TO FORM A LIMITED LIABILITY COMPANY TOGETHER?

02:11PM  15   A.   I THINK SO, YES.

02:11PM  16   Q.   OKAY.

02:11PM  17        MAY I APPROACH, YOUR HONOR?

02:11PM  18            THE COURT:  YES.

02:12PM  19   BY MR. LEACH:

02:12PM  20   Q.   I'VE PLACED BEFORE YOU, MS. HOLMES, WHAT HAS BEEN MARKED

02:12PM  21   AS 5652.

02:12PM  22        DO YOU RECOGNIZE THIS AS AN OPERATING AGREEMENT FOR A

02:12PM  23   LIMITED LIABILITY COMPANY THAT YOU AND MR. BALWANI FORMED?

02:12PM  24   A.   I DO.

02:12PM  25   Q.   AND ONE OF THE PURPOSES OF THIS LIMITED LIABILITY COMPANY

02:12PM   1    WAS TO OWN THE HOME WHERE YOU AND MR. BALWANI LIVED?

02:12PM   2    A.   YES.

02:12PM   3              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5652.

02:12PM   4              MR. DOWNEY:  NO OBJECTION, YOUR HONOR, TO THIS

02:12PM   5    EXHIBIT.  NO OBJECTION TO THIS ONE.

02:12PM   6              THE COURT:  IT'S ADMITTED.

02:12PM   7         (GOVERNMENT'S EXHIBIT 5652 WAS RECEIVED IN EVIDENCE.)

02:12PM   8              MR. LEACH:  AND MAY WE PUBLISH, YOUR HONOR?

02:12PM   9              THE COURT:  YES.

02:12PM  10    BY MR. LEACH:

02:12PM  11    Q.   DO YOU SEE THE HEADING AT THE TOP, MS. HOLMES, OPERATING

02:12PM  12    AGREEMENT OF HMFR LLC?

02:13PM  13    A.   I DO.

02:13PM  14    Q.   THAT'S THE ACRONYM THAT WE'VE SEEN IN SOME OF THE TEXT

02:13PM  15    MESSAGES THAT IS SOME FORM OF PRAYER, OR GIVING THANKS TO GOD?

02:13PM  16    A.   IT IS.

02:13PM  17    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 3.

02:13PM  18         IS THAT YOUR SIGNATURE?

02:13PM  19    A.   IT IS.

02:13PM  20    Q.   IS THAT MR. BALWANI'S SIGNATURE?

02:13PM  21    A.   YES.

02:13PM  22    Q.   OKAY.  YOU SIGNED THIS VOLUNTARILY?

02:13PM  23    A.   I DID.

02:13PM  24    Q.   IT WAS NOT AGAINST YOUR WILL?

02:13PM  25    A.   NO.

02:13PM   1   Q.   AND IF WE COULD GO TO -- BACK TO THE FIRST PAGE, THE TWO

02:13PM   2   MEMBERS OF THIS LIMITED LIABILITY COMPANY ARE YOU AND

02:13PM   3   MR. BALWANI.

02:13PM   4        AM I RIGHT ABOUT THAT?

02:13PM   5   A.   YES.

02:13PM   6   Q.   AND ON PAGE 4, DOES IT SPELL OUT THE RESPECTIVE MEMBERSHIP

02:13PM   7   INTERESTS, PERCENTAGE INTEREST OF THE LLC?

02:13PM   8   A.   IT DOES.

02:13PM   9   Q.   OKAY.  THERE'S A MAILING ADDRESS 227 PARK LANE, ATHERTON,

02:14PM  10   CALIFORNIA 94027.

02:14PM  11        DO YOU SEE THAT?

02:14PM  12   A.   I DO.

02:14PM  13   Q.   AND THAT'S THE HOME WHERE YOU AND MR. BALWANI LIVED?

02:14PM  14   A.   YES.

02:14PM  15   Q.   AND TO THE RIGHT IT ASSIGNS TO MR. BALWANI A 50 PERCENT

02:14PM  16   INTEREST FOR THIS LIMITED LIABILITY COMPANY?

02:14PM  17   A.   IT DOES.

02:14PM  18   Q.   IN THE MAILING ADDRESS 855 EL CAMINO REAL, SUITE 13A,

02:14PM  19   THAT'S A P.O. BOX, ISN'T IT?

02:14PM  20   A.   IT IS.

02:14PM  21   Q.   AND AM I RIGHT THAT ONE OF THE ASSETS HMFR OWNED WAS

02:14PM  22   227 PARK LANE IN ATHERTON?

02:14PM  23   A.   YES.

02:14PM  24   Q.   I'D LIKE TO DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS

02:14PM  25   EXHIBIT 5512.

02:15PM 1    A.   I DON'T KNOW THAT I HAVE THAT ONE.

02:15PM 2                MR. LEACH:  MAY I APPROACH, YOUR HONOR?

02:15PM 3                THE COURT:  YES.

02:15PM 4    BY MR. LEACH:

02:15PM 5    Q.   (HANDING.)

02:15PM 6         DO YOU RECOGNIZE THE IMAGE ON EXHIBIT 5512?

02:15PM 7    A.   I DO.

02:15PM 8    Q.   AND DO YOU RECOGNIZE THE IMAGE ON THE SECOND PAGE OF

02:15PM 9    EXHIBIT 5512?

02:15PM 10   A.   I DO.

02:15PM 11   Q.   IS THIS 227 PARK LANE, ATHERTON?

02:15PM 12   A.   IT IS.

02:15PM 13   Q.   AND THIS IS THE HOME THAT YOU AND MR. BALWANI SHARED?

02:15PM 14   A.   YES.

02:15PM 15               MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5512.

02:15PM 16               MR. DOWNEY:  YOUR HONOR, 403, AND CONTRARY TO ORDER

02:15PM 17   AT DOCKET 798.

02:16PM 18        (PAUSE IN PROCEEDINGS.)

02:16PM 19               THE COURT:  THANK YOU.  I DON'T SEE THIS AS -- MAYBE

02:16PM 20   YOU COULD LAY A LITTLE MORE FOUNDATION, IF YOU WILL, AS TO THE

02:16PM 21   ISSUE THAT WAS RAISED IN 798 AND THE COURT'S RULING ON 798.

02:16PM 22               MR. LEACH:  OKAY.

02:16PM 23   Q.   YOU WERE AN EQUAL MEMBER OF THIS LLC, MS. HOLMES; IS THAT

02:16PM 24   CORRECT?

02:16PM 25   A.   I THOUGHT I WAS.

02:16PM 1    Q.   OKAY.  YOU HAD A 50 PERCENT INTEREST IN THIS?

02:16PM 2    A.   I THOUGHT SO.

02:16PM 3    Q.   AND SO 50 PERCENT OF THE ASSETS OF THIS LLC WERE YOUR

02:16PM 4    ASSETS THAT YOU FELT YOU COULD USE HOW YOU SAW FIT?

02:16PM 5    A.   I THOUGHT SO.

02:16PM 6    Q.   AND THIS WAS THE HOME WHERE YOU AND MR. BALWANI LIVED FROM

02:17PM 7    2013 THROUGH 2016?

02:17PM 8    A.   YES.

02:17PM 9    Q.   YOU TALKED ABOUT MOVING OUT.

02:17PM 10        IS THIS THE PLACE THAT YOU MOVED OUT FROM?

02:17PM 11   A.   IT IS.

02:17PM 12   Q.   OKAY.  AND I KNOW YOU TALKED ABOUT SOME EXPERIENCES WITH

02:17PM 13   MR. BALWANI IN YOUR DIRECT TESTIMONY, BUT DID SOME OF THOSE

02:17PM 14   EVENTS OCCUR AT 227 PARK LANE IN ATHERTON?

02:17PM 15   A.   THEY DID.

02:17PM 16   Q.   OKAY.  AND YOU WOULD HAVE FOLKS FROM THERANOS COME AND

02:17PM 17   VISIT YOU FROM TIME TO TIME AT THIS ADDRESS.  IS THAT FAIR?

02:17PM 18   A.   YES.

02:17PM 19   Q.   OKAY.  FOR EXAMPLE, MR. EDLIN WAS THERE?

02:17PM 20   A.   HE WAS.

02:17PM 21   Q.   AND DO YOU RECALL TESTIMONY FROM MR. EDLIN WHEN HE WOULD

02:17PM 22   COME TO DINNER PARTIES AT YOUR HOUSE WHERE HE WOULD HAVE AN

02:17PM 23   OPPORTUNITY TO OBSERVE YOUR INTERACTIONS WITH MR. BALWANI IN A

02:17PM 24   SOCIAL SETTING?

02:17PM 25   A.   I DO.

02:17PM  1          MR. LEACH:  YOUR HONOR, I RENEW OUR MOTION TO ADMIT

02:18PM  2   5512.

02:18PM  3          THE COURT:  ALL RIGHT.

02:18PM  4          MR. DOWNEY:  SAME OBJECTION, YOUR HONOR.

02:18PM  5          THE COURT:  ALL RIGHT.  THANK YOU.

02:18PM  6      FIRST OF ALL, I DO THINK THAT THERE'S RELEVANCE TO THIS.

02:18PM  7   UNDER 403, AND REFERENCING DOCKET 798, SPECIFICALLY LINE 19 ON

02:18PM  8   PAGE 9 OF THE COURT'S PREVIOUS ORDER, I DO THINK THAT THE

02:18PM  9   PROBATIVE VALUE OF THIS, BASED ON THE FOUNDATION LAID,

02:18PM  10  OUTWEIGHS ANY PREJUDICIAL EFFECT.

02:18PM  11     AND THE REFERENCE THE PARTIES TO THOSE LINES IN THE

02:18PM  12  COURT'S ORDER.

02:18PM  13     SO IT WILL BE ADMITTED, AND IT MAY BE PUBLISHED.

02:18PM  14     (GOVERNMENT'S EXHIBIT 5512 WAS RECEIVED IN EVIDENCE.)

02:18PM  15         MR. LEACH:  OKAY.  THANK YOU, YOUR HONOR.

02:18PM  16  Q.  MS. HOLMES, DO YOU SEE AN IMAGE ON THE SCREEN NOW?

02:18PM  17  A.  I DO.

02:18PM  18  Q.  OKAY.  AND THAT'S THE RESIDENCE THAT WE'VE BEEN TALKING

02:18PM  19  ABOUT, 227 PARK LANE IN ATHERTON?

02:18PM  20  A.  IT IS.

02:18PM  21  Q.  OKAY.  AND IF WE COULD LOOK BRIEFLY AT THE SECOND PAGE.

02:19PM  22     WERE THERE OCCASIONS WHEN AN INVESTOR NAMED KENDRA FADIL

02:19PM  23  WOULD COME TO YOUR HOUSE AND PERFORM SERVICES FOR YOU AT THIS

02:19PM  24  ADDRESS?

02:19PM  25  A.  YES.

02:19PM 1    Q.   SHE WAS A CONTRACTOR OF YOURS?

02:19PM 2    A.   YES.

02:19PM 3    Q.   AND SHE ALSO BECAME AN INVESTOR AT SOME POINT IN TIME?

02:19PM 4    A.   SHE DID.

02:19PM 5    Q.   AND SHE WOULD COME TO YOUR HOUSE AND PERFORM SERVICES, AND

02:19PM 6    IN CONNECTION WITH GETTING TO KNOW YOU, SHE EXPRESSED AN

02:19PM 7    INTEREST IN INVESTING IN THERANOS?

02:19PM 8    A.   I THINK DON LUCAS HAD GIFTED HER SOME OF HIS SHARES, AND

02:19PM 9    SHE WANTED TO BE ABLE TO BUY ADDITIONAL SHARES.

02:19PM 10   Q.   AND THAT WAS AT SOME POINT IN 2013, 2014?

02:19PM 11   A.   YES.

02:19PM 12   Q.   OKAY.  AND AT SOME POINT IN 2016, DID SHE COME TO YOU

02:19PM 13   ATTEMPTING TO SELL HER SHARES BACK TO THE COMPANY?

02:19PM 14   A.   SHE DID.

02:19PM 15   Q.   AND YOU TOLD HER NO?

02:19PM 16   A.   WE COULDN'T, YES.

02:19PM 17   Q.   YOU TOLD HER NO?

02:19PM 18   A.   YES.

02:19PM 19   Q.   IS IT TRUE -- WE CAN TAKE THIS DOWN, MS. HOLLIMAN.

02:20PM 20       IS IT TRUE, MS. HOLMES, THAT YOU WERE AWAY FROM

02:20PM 21   MR. BALWANI FOR LARGE PERIODS OF TIME IN THE 2010 TO 2015 TIME

02:20PM 22   PERIOD?

02:20PM 23   A.   YES.

02:20PM 24   Q.   YOU TRAVELLED ON BUSINESS REGULARLY; IS THAT FAIR?

02:20PM 25   A.   I DID.

02:20PM 1    Q.   AND YOU TRAVELLED WITHOUT MR. BALWANI ON MANY, IF NOT

02:20PM 2    MOST, OF THOSE OCCASIONS?

02:20PM 3    A.   CERTAINLY ON MANY.

02:20PM 4    Q.   OKAY.  IF WE LOOK AT EXHIBIT 5387, THERE WOULD BE MANY

02:20PM 5    INSTANCES OF YOU TEXTING MR. BALWANI FROM THE PLANE SAYING "I'M

02:20PM 6    ON MY WAY HOME," LOTS OF EVIDENCE IN THE TEXTS THAT YOU TWO

02:20PM 7    WERE PHYSICALLY SEPARATED FOR WEEKS OR DAYS ON END; IS THAT

02:20PM 8    FAIR?

02:20PM 9    A.   I'M SURE THERE IS, YES.

02:20PM 10   Q.   AM I RIGHT THAT YOU WERE ALSO INVOLVED IN ANOTHER ROMANTIC

02:20PM 11   RELATIONSHIP DURING THE TIME PERIOD 2010 TO 2015?

02:21PM 12   A.   NO.

02:21PM 13   Q.   DID YOU EVER TELL ANYBODY YOU WERE IN ANOTHER ROMANTIC

02:21PM 14   RELATIONSHIP DURING THAT TIME PERIOD?

02:21PM 15   A.   I'M SORRY, 2010 TO 2015?  I THINK FOR PART OF THAT.

02:21PM 16   Q.   WHICH PART OF THAT?

02:21PM 17   A.   THE BEGINNING PART.

02:21PM 18   Q.   SO THE BEGINNING PART OF 2010?

02:21PM 19   A.   YES.  YES.

02:21PM 20   Q.   OKAY.  HOW LONG DID THAT RELATIONSHIP LAST?

02:21PM 21   A.   IT DIDN'T.

02:21PM 22   Q.   OKAY.  I UNDERSTAND IT DIDN'T LAST, BUT MY QUESTION IS,

02:21PM 23   HOW LONG DID IT LAST?

02:21PM 24   A.   IT WAS NOT ACTUALLY A FORMAL RELATIONSHIP.

02:21PM 25   Q.   OKAY.  BUT YOU WERE ROMANTIC WITH SOMEBODY OTHER THAN

02:21PM  1    MR. BALWANI DURING THE TIME PERIOD 2010 TO 2015?

02:21PM  2    A.   YES.

02:21PM  3    Q.   AND IN 2016 YOU, YOU PUSHED MR. BALWANI OUT OF THE

02:22PM  4    COMPANY; IS THAT FAIR?

02:22PM  5    A.   I ASKED HIM TO LEAVE.

02:22PM  6    Q.   YOU ASKED HIM TO LEAVE?

02:22PM  7    A.   YES.

02:22PM  8    Q.   AND THE BOARD SUPPORTED THAT DECISION?

02:22PM  9    A.   YES.

02:22PM  10   Q.   I'D LIKE TO SHOW -- TALK TO YOU ABOUT SOME ADVICE THAT YOU

02:22PM  11   RECEIVED PRIOR TO THE WALGREENS LAUNCH IN SEPTEMBER OF 2013.

02:22PM  12        DO YOU HAVE THAT TIME PERIOD IN MIND?

02:22PM  13   A.   I DO.

02:22PM  14   Q.   LET ME DRAW YOUR ATTENTION TO WHAT IS IN THE BINDER AS

02:22PM  15   EXHIBIT 3970.

02:23PM  16        DO YOU SEE YOUR NAME IN THE FROM LINE OF THIS EMAIL?

02:23PM  17   A.   I'M JUST FINDING IT.

02:23PM  18        OKAY, YES.

02:23PM  19   Q.   AND DO YOU SEE YOUR NAME IN THE FROM LINE?

02:23PM  20   A.   I DO.

02:23PM  21   Q.   AND THIS APPEARS TO BE AN EMAIL TO MR. BALWANI?

02:23PM  22   A.   YES.

02:23PM  23   Q.   AND DO YOU SEE THE DATE SEPTEMBER 5TH, 2013?

02:23PM  24   A.   I DO.

02:23PM  25           MR. LEACH:  YOUR HONOR, I DON'T BELIEVE THIS IS IN

02:23PM  1    EVIDENCE, SO I MOVE THE ADMISSION OF EXHIBIT 3970.

02:23PM  2            MR. DOWNEY:  I DON'T HAVE IT AS BEING IN EVIDENCE,

02:23PM  3    BUT I HAVE NO OBJECTION.

02:23PM  4            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:23PM  5        (GOVERNMENT'S EXHIBIT 3970 WAS RECEIVED IN EVIDENCE.)

02:23PM  6    BY MR. LEACH:

02:23PM  7    Q.  LET ME DRAW YOUR ATTENTION TO THE BOTTOM EMAIL,

02:23PM  8    MS. HOLMES.

02:23PM  9        DO YOU SEE THERE'S AN EMAIL FROM YOU TO SOMEONE NAMED

02:23PM  10   KATE BEARDSLEY?

02:24PM  11   A.  I DO.

02:24PM  12   Q.  AND KATE BEARDSLEY WAS A LAWYER YOU HIRED TO REVIEW

02:24PM  13   THERANOS'S MARKETING MATERIAL?

02:24PM  14   A.  YES.

02:24PM  15   Q.  AND THE SUBJECT OF THIS IS "FORWARD DOT COM PDF."

02:24PM  16       WERE YOU FORWARDING A COPY OF WHAT WOULD HAVE BEEN

02:24PM  17   THERANOS'S WEBSITE AROUND THE TIME OF THE WALGREENS LAUNCH?

02:24PM  18   A.  YES.

02:24PM  19   Q.  I'D LIKE TO MOVE UP IN THE CHAIN AND FOCUS ON

02:24PM  20   MS. BEARDSLEY'S RESPONSE ON THURSDAY, SEPTEMBER 5TH, AT

02:24PM  21   8:58 A.M.

02:24PM  22       DO YOU SEE THAT HEADING THERE?

02:24PM  23   A.  YES.

02:24PM  24   Q.  AND SHE WROTE TO YOU, "I HAVEN'T QUITE WORKED MY WAY

02:24PM  25   THROUGH THE WHOLE WEBSITE, BUT I'M WORRIED."

02:24PM  1      DO YOU SEE THAT LANGUAGE?

02:24PM  2  A.  I DO.

02:24PM  3  Q.  AND SHE WENT ON TO WRITE, "UNLESS SOMEONE ELSE HAS WORKED

02:24PM  4  THROUGH THIS WITH YOU, THE WHOLE THING NEEDS TO BE CAREFULLY

02:24PM  5  REVIEWED."

02:24PM  6      DID I READ THAT CORRECTLY?

02:24PM  7  A.  YES.

02:24PM  8  Q.  AND THERE'S A -- "HERE ARE A FEW OF THE GENERAL ISSUES

02:25PM  9  THAT NEED TO BE DISCUSSED."

02:25PM 10      AND I WANT TO DRAW YOUR ATTENTION TO SOME OF THE BULLETS

02:25PM 11  HERE IN MS. BEARDSLEY'S EMAIL.

02:25PM 12      DO YOU SEE NUMBER 4, "THERE ARE MANY COMPARATIVE CLAIMS"?

02:25PM 13  A.  I DO.

02:25PM 14  Q.  "FOR EXAMPLE, EVERY TIME YOU SAY BETTER WITHOUT SPECIFYING

02:25PM 15  WHAT IT IS BETTER THAN, YOU ARE MAKING A COMPARATIVE CLAIM AT

02:25PM 16  LEAST TO ALL MARKET LEADERS.  YOU MUST BE ABLE TO SUBSTANTIATE

02:25PM 17  THESE CLAIMS.  I DON'T KNOW IF WE HAVE SUBSTANTIATION FOR ALL

02:25PM 18  OF THESE, BUT I AM VERY WORRIED THAT WE ARE OPENING THE DOOR TO

02:25PM 19  BIG TROUBLE FROM COMPETITORS.  ALSO, THE WORDS THAT END IN

02:25PM 20  "EST" (EG HIGHEST QUALITY) CREATE PARITY CLAIMS AT LEAST AS TO

02:25PM 21  ALL OTHER MARKET LEADERS.  WE NEED TO BE ABLE TO BE SURE THAT

02:25PM 22  WE CAN SUBSTANTIATE THOSE AS WELL."

02:25PM 23      DID I READ THAT CORRECTLY?

02:25PM 24  A.  YOU DID.

02:25PM 25  Q.  AND THIS IS ADVICE THAT YOU'RE GETTING FROM MS. BEARDSLEY

02:26PM 1    AROUND THE WALGREENS LAUNCH AROUND SEPTEMBER 10TH, SOMETIME IN

02:26PM 2    EARLY SEPTEMBER?

02:26PM 3    A.   IT IS.

02:26PM 4    Q.   AND MS. BEARDSLEY WRITES DIRECTLY TO YOU, AM I RIGHT, IN

02:26PM 5    THIS EMAIL?

02:26PM 6    A.   SHE DID.

02:26PM 7    Q.   YOU'RE PASSING THAT ON TO MR. BALWANI?

02:26PM 8    A.   YES.

02:26PM 9    Q.   LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 3981.

02:26PM 10        AND I BELIEVE THIS IS IN EVIDENCE, YOUR HONOR, BUT IF NOT,

02:26PM 11   I MOVE IT IN.

02:26PM 12             MR. DOWNEY:  IT IS, I THINK.

02:26PM 13             THE CLERK:  IT IS.

02:26PM 14             MR. LEACH:  OKAY.  PERMISSION TO DISPLAY?

02:26PM 15             THE COURT:  YES.

02:26PM 16   BY MR. LEACH:

02:26PM 17   Q.   DO YOU HAVE 3981 IN FRONT OF YOU, MS. HOLMES?

02:26PM 18   A.   I DO.

02:26PM 19   Q.   OKAY.  AND DO YOU RECALL TESTIMONY FROM DAN EDLIN ABOUT

02:27PM 20   THIS EMAIL RELATING TO THERANOS WEBSITE COMMENTS?

02:27PM 21   A.   I DO.

02:27PM 22   Q.   LET ME START FROM THE -- ON PAGE 5, IF WE COULD.

02:27PM 23        DO YOU SEE THERE'S THE INITIAL EMAIL THAT YOU SENT TO

02:27PM 24   MS. BEARDSLEY ON SEPTEMBER 4TH?

02:27PM 25   A.   YES.

02:27PM  1    Q.   AND MS. BEARDSLEY FORWARDS YOUR EMAIL TO ROBERT DORMER AND

02:27PM  2    JAIME WOLSZON.

02:27PM  3         DO YOU SEE THAT?

02:27PM  4    A.   I DO.

02:27PM  5    Q.   AND YOU UNDERSTOOD MR. DORMER AND MS. WOLSZON TO BE

02:27PM  6    ATTORNEYS WITH HYMAN PHELPS & MCNAMARA IN WASHINGTON, D.C.?

02:27PM  7    A.   YES.

02:27PM  8    Q.   AND THEY WERE ALSO BROUGHT ON TO REVIEW YOUR WEBSITE AND

02:27PM  9    PROVIDE FEEDBACK ABOUT WHAT WAS APPROPRIATE; IS THAT FAIR?

02:27PM 10    A.   YES.

02:28PM 11    Q.   MS. BEARDSLEY WRITES, "THIS IS THE THERANOS WEBSITE THAT

02:28PM 12    NEEDS TO BE REVIEWED.  IT IS SCHEDULED TO GO LIVE TOMORROW

02:28PM 13    NIGHT, SO THERE IS SOME URGENCY.  I THINK WE WILL NEED TO GET

02:28PM 14    ON THE PHONE WITH THE CLIENT ONCE WE KNOW WHAT WE WANT TO SAY.

02:28PM 15    YOU CAN REACH ME," AND THEN THERE'S A BUSINESS NUMBER.

02:28PM 16         DO YOU SEE THAT?

02:28PM 17    A.   I DO.

02:28PM 18    Q.   OKAY.  LET ME NEXT DRAW YOUR ATTENTION TO MR. WOLSZON'S

02:28PM 19    RESPONSE, W-O-L-S-Z-O-N?

02:28PM 20         AND IF WE CAN ZOOM OUT, MS. HOLLIMAN, TO ALSO CAPTURE THE

02:28PM 21    NEXT MESSAGE IN THE CHAIN, PLEASE.

02:28PM 22         DO YOU SEE THAT JAIME WOLSZON REPLIES ON SEPTEMBER 5TH,

02:28PM 23    2013, MS. HOLMES?

02:28PM 24    A.   I DO.

02:28PM 25    Q.   AND THIS IS ULTIMATELY FORWARDED TO YOU; CORRECT?

02:29PM 1    A.   IT IS.

02:29PM 2    Q.   AND JAIME WOLSZON WRITES, "PLEASE FIND BELOW MY COMMENTS

02:29PM 3    TO THE THERANOS WEBSITE," AND DO THOSE COMMENTS CONTINUE ON TO

02:29PM 4    THE NEXT PAGE?

02:29PM 5    A.   YES.

02:29PM 6    Q.   LET'S LOOK AT THE NEXT PAGE, PLEASE.

02:29PM 7         AND I WANT TO DRAW YOUR ATTENTION TO THE TOP BULLET.

02:29PM 8         DO YOU SEE WHERE IT SAYS, "PLEASE REMOVE REFERENCES TO

02:29PM 9    'ALL' TESTS AND REPLACE WITH STATEMENTS SUCH AS 'MULTIPLE' OR

02:29PM 10   'SEVERAL.'  IT IS HIGHLY UNLIKELY THAT THE LABORATORY CAN

02:29PM 11   PERFORM EVERY CONCEIVABLE TEST, BOTH FROM A LOGISTICAL

02:29PM 12   STANDPOINT AND BECAUSE THE CLIA CERTIFICATION DESIGNATES

02:29PM 13   SPECIFIC SPECIALTIES OF TESTS THE LAB PERFORMS."

02:29PM 14        DID I READ THAT CORRECTLY?

02:29PM 15   A.   YOU DID.

02:29PM 16   Q.   AND FURTHER DOWN THERE'S A BULLET THAT SAYS, "REPLACE

02:29PM 17   'HIGHEST QUALITY' WITH 'HIGH QUALITY.'"

02:29PM 18        DO YOU SEE THAT RECOMMENDATION?

02:29PM 19   A.   I DO.

02:29PM 20   Q.   AND BENEATH THAT IT SAYS, "ENSURE SUBSTANTIATION FOR

02:30PM 21   '4 HOURS OR LESS.'"

02:30PM 22        DID I READ THAT CORRECTLY?

02:30PM 23   A.   YES.

02:30PM 24   Q.   AND IF WE CAN ZOOM OUT, MS. HOLLIMAN, AND GO DOWN TO THE

02:30PM 25   NEXT SERIES OF BULLETS.

02:30PM  1          DO YOU SEE WHERE THE ATTORNEYS AT HYMAN PHELPS ARE SAYING,

02:30PM  2   "REPLACE 'HIGHEST LEVELS OF ACCURACY' WITH 'HIGH LEVELS OF

02:30PM  3   ACCURACY,'" THE THIRD BULLET FROM THE BOTTOM?

02:30PM  4   A.   I DO.

02:30PM  5   Q.   AND IF WE CAN GO TO THE NEXT PAGE, PLEASE.

02:30PM  6          DO YOU SEE THE THIRD BULLET WHERE ONE OF THE RECOMMENDED

02:31PM  7   CHANGES WAS, "CHANGE 'MORE PRECISE' TO 'PRECISE'"?

02:31PM  8   A.   I DO.

02:31PM  9   Q.   DO YOU SEE THE BULLET FOR "ENSURE SUBSTANTIATION FOR 'IT'S

02:31PM  10  A LESS INVASIVE, AND LESS PAINFUL EXPERIENCE'"?

02:31PM  11  A.   YES.

02:31PM  12  Q.   IF WE COULD ZOOM OUT, PLEASE, MS. HOLLIMAN, AND THEN LOOK

02:31PM  13  AT THE REMAINING BULLET.

02:31PM  14         DO YOU SEE THE FOURTH FROM THE BOTTOM IT SAYS, "ENSURE

02:31PM  15  SUBSTANTIATION FOR DRAMATICALLY LOWER"?

02:31PM  16  A.   I DO.

02:31PM  17  Q.   AND THESE WERE ALL COMMENTS THAT YOU WERE RECEIVING ON THE

02:31PM  18  EVE OF LAUNCHING YOUR PUBLIC WEBSITE ABOUT THERANOS'S WALGREENS

02:31PM  19  RELATIONSHIP?

02:31PM  20  A.   THEY ARE.

02:31PM  21  Q.   AND THESE ARE GOING IN THE FIRST INSTANCE TO YOU; CORRECT?

02:31PM  22  A.   THAT'S RIGHT.

02:31PM  23  Q.   AND YOU SHARE THEM WITH CHRISTIAN HOLMES AND MR. BALWANI

02:31PM  24  AND OTHER MEMBERS OF YOUR TEAM?

02:31PM  25  A.   I THINK SO, YES.  YES, I SHARED THEM WITH CHRISTIAN AND

02:32PM  1    SUNNY, YES.

02:32PM  2    Q.   OKAY.  I'D NOW LIKE TO SHOW YOU SOME OF THE INVESTOR

02:32PM  3    POWERPOINTS THAT HAVE BEEN ADMITTED INTO EVIDENCE, AND I'D LIKE

02:32PM  4    TO START WITH EXHIBIT 4077.

02:32PM  5    A.   OKAY.

02:32PM  6    Q.   DO YOU RECALL MR. GROSSMAN TESTIFYING ABOUT EXHIBIT 4077?

02:32PM  7    A.   I DO.

02:32PM  8    Q.   OKAY.  LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 17.

02:32PM  9         AND IF I COULD DRAW YOUR ATTENTION TO THAT LAST LANGUAGE

02:32PM  10   ON THE SLIDE, DO YOU SEE WHERE IT SAYS, "THERANOS PROVIDES THE

02:32PM  11   HIGHEST LEVEL OF OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN

02:33PM  12   OUR PRE- AND POST-ANALYTIC PROCESSES, ENSURING THE HIGHEST

02:33PM  13   LEVELS OF ACCURACY AND PRECISION."

02:33PM  14        DO YOU SEE THAT LANGUAGE?

02:33PM  15   A.   I DO.

02:33PM  16   Q.   AND DID I READ THAT CORRECTLY?

02:33PM  17   A.   YOU DID.

02:33PM  18   Q.   AND THIS IS GOING TO MR. GROSSMAN IN JANUARY OF 2014?

02:33PM  19   A.   IT IS.

02:33PM  20   Q.   SO ROUGHLY THREE OR FOUR MONTHS AFTER THE WALGREENS

02:33PM  21   LAUNCH?

02:33PM  22   A.   YES.

02:33PM  23   Q.   AND THREE OR FOUR MONTHS AFTER YOU RECEIVED ADVICE FROM

02:33PM  24   THE ATTORNEYS AT HYMAN PHELPS?

02:33PM  25   A.   YES.

02:33PM  1    Q.   LET'S LOOK AT PAGE 21 OF THIS.

02:33PM  2         DO YOU SEE THE HEADING, "A NEW STANDARD IN QUALITY"?

02:33PM  3    A.   I DO.

02:33PM  4    Q.   AND DO YOU SEE BENEATH THAT THERE'S A BULLET, OR THE LINE,

02:33PM  5    "THE HIGHEST LEVELS OF ACCURACY"?

02:33PM  6    A.   I DO.

02:33PM  7    Q.   AND IN THE REMAINDER OF THE TEXT IT SAYS, "BY

02:33PM  8    SYSTEMATICALLY CONTROLLING AND STANDARDIZING OUR PROCESSES,

02:34PM  9    THERANOS OFFERS TESTS WITH THE HIGHEST LEVELS OF ACCURACY."

02:34PM 10         DO YOU SEE THAT LANGUAGE?

02:34PM 11    A.   I DO.

02:34PM 12    Q.   I READ THAT CORRECTLY?

02:34PM 13    A.   YOU DID.

02:34PM 14    Q.   AND THIS IS, AGAIN, IN JANUARY OF 2014?

02:34PM 15    A.   YES.

02:34PM 16    Q.   AFTER YOU GOT THE ADVICE FROM HYMAN & PHELPS?

02:34PM 17    A.   YES.

02:34PM 18    Q.   AND THERE'S ALSO THAT LESS THAN 10 PERCENT COEFFICIENT OF

02:34PM 19    VARIATION OF VITAMIN D.

02:34PM 20         DO YOU SEE THAT?

02:34PM 21    A.   I DO.

02:34PM 22    Q.   AND VITAMIN D WAS THE SAME ASSAY THAT MR. SHULTZ STARTS

02:34PM 23    RAISING CONCERNS ABOUT IN THE APRIL 2014 TIME PERIOD?

02:34PM 24    A.   YES.

02:34PM 25    Q.   AND LET'S LOOK NOW AT 4858.

02:35PM   1      A.   OKAY.

02:35PM   2      Q.   AND THIS IS IN EVIDENCE, SO WE CAN DISPLAY IT.

02:35PM   3           DO YOU SEE THE BATES LABEL IN THE BOTTOM RDV, MS. HOLMES?

02:35PM   4      A.   OH, SORRY.  I'M ON THE WRONG ONE.

02:35PM   5      Q.   IT'S ALSO ON THE SCREEN IF THAT'S EASIER FOR YOU.

02:35PM   6      A.   OKAY.  I DON'T HAVE A 4858.

02:35PM   7      Q.   ARE YOU COMFORTABLE?

02:35PM   8      A.   YEAH, YEAH, TOTALLY COMFORTABLE.

02:35PM   9      Q.   OKAY.  DO YOU SEE IN THE BOTTOM RIGHT-HAND CORNER THERE'S

02:35PM  10      A NUMBER RDV WITH SOME NUMBERS BY IT?

02:35PM  11      A.   I DO.

02:35PM  12      Q.   OKAY.  AND YOU WERE HERE WHEN LISA PETERSON TESTIFIED

02:35PM  13      ABOUT RDV'S INVESTMENT IN THERANOS?

02:35PM  14      A.   I WAS.

02:35PM  15      Q.   AND YOU WERE HERE WHEN SHE TESTIFIED ABOUT THIS

02:35PM  16      POWERPOINT?

02:35PM  17      A.   YES.

02:35PM  18      Q.   LET'S GO TO PAGE 5, PLEASE.

02:35PM  19           DO YOU SEE THE SLIDE, "THERANOS IS CERTIFIED AS A HIGH

02:35PM  20      COMPLEXITY CLIA LABORATORY"?

02:36PM  21      A.   I DO.

02:36PM  22      Q.   OKAY.  AND WE TALKED EARLIER ABOUT HOW THE CALIFORNIA

02:36PM  23      LABORATORY IS HIGH COMPLEXITY.

02:36PM  24           AT SOME POINT YOU ALSO HAVE AN ARIZONA LAB THAT IS

02:36PM  25      MODERATE COMPLEXITY?

02:36PM 1    A.   YES.

02:36PM 2    Q.   AND HERE YOU'RE TALKING ABOUT THE HIGH COMPLEXITY?

02:36PM 3    A.   YES.

02:36PM 4    Q.   AND YOU'RE HOLDING THIS OUT AS PART OF THE INFORMATION FOR

02:36PM 5    INVESTORS TO GET COMFORT THAT YOUR TECHNOLOGY WORKS; IS THAT

02:36PM 6    FAIR?

02:36PM 7    A.   I THINK WE WERE TRYING TO DESCRIBE WHAT A HIGH COMPLEXITY

02:36PM 8    LAB WAS HERE IN TERMS OF WHAT REQUIREMENTS WERE IN PLACE FOR

02:36PM 9    ONE.

02:36PM 10   Q.   OKAY.  AND THIS WAS PART OF THE WAY THAT YOU PERSUADED

02:36PM 11   INVESTORS THAT THERANOS'S TECHNOLOGY WAS ACCURATE; ISN'T THAT

02:36PM 12   RIGHT?

02:36PM 13   A.   IT WAS PART OF WHY I BELIEVED IN OUR TECHNOLOGY, YES.

02:36PM 14   Q.   LET'S LOOK AT PAGE 7, PLEASE.

02:36PM 15        DO YOU SEE THE SLIDE TITLED "THERANOS PROFICIENCY TESTING

02:36PM 16   AND AUDITS"?

02:37PM 17   A.   I DO.

02:37PM 18   Q.   AND I THINK YOU TALKED TO MR. DOWNEY ABOUT THE CONCEPT OF

02:37PM 19   PROFICIENCY TESTING IN YOUR DIRECT EXAMINATION.

02:37PM 20        DO YOU RECALL THAT?

02:37PM 21   A.   I DID, YES.

02:37PM 22   Q.   AND PROFICIENCY TESTING WAS WHERE YOU, IF YOU HAVE AN FDA

02:37PM 23   APPROVED MACHINE IN A LAB, YOU RUN YOUR SAMPLES, REPORT THE

02:37PM 24   RESULTS TO SOME AGENCY, AND THOSE ARE COMPARED AGAINST OTHERS

02:37PM 25   RUNNING THAT SAME DEVICE?

02:37PM  1    A.   YES.

02:37PM  2    Q.   AND YOU TOOK THE POSITION AT THERANOS THAT BECAUSE THERE

02:37PM  3    WAS NO COMPARATOR FOR THE EDISON 3.5, OR THE MODIFIED SIEMENS

02:37PM  4    TEST, THAT YOU WERE GOING TO DO SOMETHING CALLED ALTERNATIVE

02:37PM  5    ASSESSMENT OF PROFICIENCY?

02:37PM  6    A.   YES.

02:37PM  7    Q.   AND THOSE WERE CONCEPTS THAT YOU WERE FAMILIAR WITH IN

02:37PM  8    2013 AND 2014?

02:37PM  9    A.   YES.

02:37PM  10   Q.   NOW, THIS SLIDE TALKS ABOUT PROFICIENCY TESTING THAT IS

02:37PM  11   OCCURRING IN 2011, 2012, AND 2013 BEFORE THE WALGREENS LAUNCH.

02:37PM  12        DO YOU SEE THAT?

02:38PM  13   A.   I DO.

02:38PM  14   Q.   AM I RIGHT THAT ANY PROFICIENCY TESTING THAT WAS DONE AT

02:38PM  15   THERANOS IN 2011 RELATED ONLY TO THE FDA APPROVED MACHINES?

02:38PM  16   A.   YES.

02:38PM  17   Q.   OKAY.  SO THIS BULLET API HEMATOLOGY, THAT DOESN'T SAY

02:38PM  18   ANYTHING ABOUT HOW THE EDISON 3.5 OR HOW THE MODIFIED SIEMENS

02:38PM  19   TESTS ARE PERFORMING?

02:38PM  20   A.   THAT'S RIGHT.

02:38PM  21   Q.   AND THAT WOULD ALSO BE RIGHT FOR THE PROFICIENCY TESTING

02:38PM  22   IN 2012?

02:38PM  23   A.   YES.

02:38PM  24   Q.   THOSE WOULD RELATE ONLY TO FDA APPROVED MACHINES RUNNING

02:38PM  25   FDA APPROVED TESTS?

02:38PM 1    A.   YES.

02:38PM 2    Q.   THEY DON'T SAY ANYTHING AT ALL ABOUT PROFICIENCY TESTING

02:38PM 3    ON THE EDISON, OR PROFICIENCY TESTING ON THE MODIFIED SIEMENS

02:38PM 4    MACHINES?

02:38PM 5    A.   YES.

02:38PM 6    Q.   OKAY.  AND THAT WOULD BE THE SAME FOR THE 2013 PROFICIENCY

02:38PM 7    TESTING THAT IS REPORTED HERE.  THESE WOULD RELATE ONLY TO FDA

02:38PM 8    APPROVED MACHINES?

02:39PM 9    A.   I THINK SO.

02:39PM 10   Q.   IN OTHER WORDS, THEY DON'T SAY ANYTHING ABOUT PROFICIENCY

02:39PM 11   TESTING ON YOUR MINILAB, ON YOUR EDISON 3.5, OR THE MODIFIED

02:39PM 12   SIEMENS MACHINES?

02:39PM 13   A.   I THINK SO.

02:39PM 14   Q.   OKAY.  HOW ABOUT 2014, CHLAMYDIA, YOU DIDN'T TEST FOR

02:39PM 15   CHLAMYDIA ON THE EDISON?

02:39PM 16   A.   NO.

02:39PM 17   Q.   THAT'S NOT AN IMMUNOASSAY?

02:39PM 18   A.   IT IS NOT.

02:39PM 19   Q.   HOW ABOUT HEPATITIS VIRAL LOAD-B?  THAT WAS NOT SOMETHING

02:39PM 20   YOU RAN ON THE EDISON, IS IT?

02:39PM 21   A.   IT IS NOT.

02:39PM 22   Q.   OKAY.  SO EVEN THE 2014 NUMBERS HERE DON'T SAY ANYTHING

02:39PM 23   ABOUT PROFICIENCY TESTING ON THE EDISON DEVICE OR YOUR MINILAB?

02:39PM 24   A.   CORRECT.

02:39PM 25   Q.   AND YOU WERE HOLDING THIS OUT TO INVESTORS SO THAT THEY

02:39PM 1      COULD BE COMFORTABLE WITH THERANOS BECAUSE THEY HAD PASSED

02:39PM 2      PROFICIENCY TESTING IN 2011, 2012, AND 2013?

02:39PM 3      A.   YES, I WAS SHARING OUR PROFICIENCY TESTING SCORES FOR

02:40PM 4      THOSE YEARS.

02:40PM 5      Q.   AND YOU NEVER TOLD THE INVESTORS THAT THE NUMBERS ON THIS

02:40PM 6      SLIDE HAD ZERO TO DO WITH EDISON, DID YOU?

02:40PM 7      A.   WE DID NOT.  I DON'T REMEMBER EVER DISCUSSING THE NUMBERS

02:40PM 8      ON THIS SLIDE.

02:40PM 9      Q.   AND YOU NEVER TOLD AN INVESTOR THAT THE NUMBERS ON THIS

02:40PM 10     SCREENS HAVE ZERO TO DO WITH THE MODIFIED SIEMENS MACHINES?

02:40PM 11     A.   NO, I DON'T THINK WE DISCUSSED THE SLIDE.

02:40PM 12     Q.   YOU DIDN'T TALK ABOUT MODIFIED SIEMENS MACHINES WITH ANY

02:40PM 13     INVESTORS.

02:40PM 14          AM I RIGHT ABOUT THAT?

02:40PM 15     A.   I DID NOT.

02:40PM 16     Q.   LET ME NEXT ASK YOU TO LOOK AT EXHIBIT 39, OR ACTUALLY IF

02:40PM 17     WE COULD LOOK AT PAGE 28 OF THIS EXHIBIT.

02:40PM 18          IS THIS ANOTHER SLIDE THAT IS SIMILAR TO THE ONE THAT WE

02:40PM 19     SAW IN THE PFM PRESENTATION IN THE PRIOR EXHIBIT?

02:40PM 20     A.   YES.

02:40PM 21     Q.   OKAY.  AND THIS SLIDE ALSO HAS IN THAT THIRD LINE,

02:41PM 22     "THERANOS PROVIDES THE HIGHEST LEVEL OF OVERSIGHT, AUTOMATION,

02:41PM 23     AND STANDARDIZATION IN OUR PRE- AND POST-ANALYTIC PROCESSES,

02:41PM 24     ENSURING THE HIGHEST LEVELS OF ACCURACY AND PRECISION."

02:41PM 25          DID I READ THAT CORRECTLY?

02:41PM  1     A.   YOU DID.

02:41PM  2     Q.   AND THIS IS GOING TO RDV AT SOME POINT IN SEPTEMBER OR

02:41PM  3     OCTOBER OF 2014?

02:41PM  4     A.   I THINK SO.  I DON'T HAVE THE EMAIL, BUT THAT SOUNDS

02:41PM  5     RIGHT.

02:41PM  6     Q.   WELL, YOU REMEMBER THE BDT CONFERENCE IN SEPTEMBER OR

02:41PM  7     OCTOBER OF 2014?

02:41PM  8     A.   I DO.

02:41PM  9     Q.   AND YOU ASSOCIATE THAT WITH THE RDV INVESTMENT?

02:41PM 10     A.   I DO.

02:41PM 11     Q.   SO ARE YOU COMFORTABLE THAT THIS PRESENTATION IS SOMETIME

02:41PM 12     IN THE FALL OF 2014?

02:41PM 13     A.   YES.

02:41PM 14     Q.   AND MORE THAN A YEAR AFTER THE LAUNCH?

02:41PM 15     A.   YES.

02:41PM 16     Q.   AND MORE THAN A YEAR AFTER YOU GOT THE ADVICE FROM

02:41PM 17     HYMAN PHELPS ABOUT THE HIGHEST LEVELS OF ACCURACY?

02:41PM 18     A.   YES.

02:41PM 19     Q.   LET'S LOOK AT PAGE 30.

02:42PM 20          IS THIS SLIDE SIMILAR TO THE SLIDE THAT WE SAW IN THE PFM

02:42PM 21     PRESENTATION?

02:42PM 22     A.   IT IS.

02:42PM 23     Q.   AND IT ALSO INCLUDES TWICE HIGHEST LEVELS OF ACCURACY?

02:42PM 24     A.   IT DOES.

02:42PM 25     Q.   OKAY.  DAN YOUNG DIDN'T GO TO INVESTOR PRESENTATIONS; IS

02:42PM 1    THAT CORRECT?

02:42PM 2    A.   NOT GENERALLY.  HE MAY HAVE BEEN AT SOME.

02:42PM 3    Q.   YOU DON'T HAVE A SPECIFIC MEMORY OF DAN YOUNG EVER GOING

02:42PM 4    TO AN INVESTOR PRESENTATION?

02:42PM 5    A.   I DO.

02:42PM 6    Q.   WHICH ONE?

02:42PM 7    A.   WHEN WE STARTED DOING SHAREHOLDER MEETINGS, DR. YOUNG

02:42PM 8    WOULD JOIN US IN THOSE SHAREHOLDER MEETINGS.

02:42PM 9    Q.   OKAY.  THAT'S 2016?

02:42PM 10   A.   YES.

02:42PM 11   Q.   RIGHT.

02:42PM 12       LET'S FOCUS ON THE TIME PERIOD PRIOR TO OCTOBER 2015.  YOU

02:42PM 13   HAVE NO MEMORY OF DAN YOUNG EVER GOING TO AN INVESTOR

02:43PM 14   PRESENTATION?

02:43PM 15   A.   I DON'T THINK SO.

02:43PM 16   Q.   HE WASN'T THERE WHEN YOU PRESENTED TO PFM?

02:43PM 17   A.   I DON'T THINK SO.

02:43PM 18   Q.   HE WASN'T THERE WHEN YOU PRESENTED TO RDV?

02:43PM 19   A.   NO.

02:43PM 20   Q.   AND HE WASN'T THERE FOR MEETINGS THAT YOU HAD WITH BDT?

02:43PM 21   A.   I'M SORRY.  WITH?

02:43PM 22   Q.   BDT.

02:43PM 23   A.   I DON'T THINK SO.

02:43PM 24   Q.   HE WASN'T THERE FOR MEETINGS YOU HAD WITH RUPERT MURDOCH?

02:43PM 25   A.   HE WAS NOT.

02:43PM  1    Q.  HE WASN'T THERE FOR MEETINGS THAT YOU HAD WITH THE

02:43PM  2    DEVOS FAMILY?

02:43PM  3    A.  HE WAS NOT.

02:43PM  4    Q.  HIS JOB WAS TO RUN R&D.  AM I RIGHT?

02:43PM  5    A.  IT WAS, YES.

02:43PM  6    Q.  AND NOT INVESTOR RELATIONS?

02:43PM  7    A.  CORRECT.

02:43PM  8    Q.  THANK YOU, MS. HOLLIMAN.  WE CAN TAKE THAT DOWN.

02:43PM  9        AM I RIGHT IT'S YOUR TESTIMONY THAT YOU TOLD THE BOARD OF

02:44PM  10   DIRECTORS THERANOS WAS USING MODIFIED COMMERCIAL ANALYZERS TO

02:44PM  11   DO THE PHASE I TESTING?

02:44PM  12   A.  I TOLD THE BOARD OF DIRECTORS THAT WE HAD AN INVENTION

02:44PM  13   AROUND MODIFIED COMMERCIAL ANALYZERS.

02:44PM  14   Q.  OKAY.  AND YOU -- YOUR TESTIMONY IS THAT YOU TOLD THE

02:44PM  15   BOARD OF DIRECTORS THAT IN OCTOBER OF 2013?

02:44PM  16   A.  YES.

02:44PM  17   Q.  OKAY.  AND WE SAW DURING YOUR DIRECT EXAMINATION THE

02:44PM  18   MINUTES OF THAT MEETING; CORRECT?

02:44PM  19   A.  YES.

02:44PM  20   Q.  OKAY.  AND YOU POINTED TO SOME LANGUAGE ABOUT TRADE

02:44PM  21   SECRETS, BUT THERE'S NO REFERENCE IN THE MINUTES TO MODIFIED

02:44PM  22   COMMERCIAL MACHINES.

02:44PM  23        CAN WE AGREE ON THAT?

02:44PM  24   A.  I THINK THAT'S RIGHT.  I HAVEN'T REREAD THEM, BUT THAT

02:44PM  25   WOULD MAKE SENSE.

02:44PM  1    Q.   OKAY.  WE HAVE YOUR MEMORY FOR THAT POINT.  IT'S NOT

02:44PM  2    SOMETHING IN THE MINUTES?

02:44PM  3    A.   I THINK THAT'S RIGHT.

02:44PM  4    Q.   OKAY.  AND YOU WERE HERE WHEN GENERAL MATTIS TESTIFIED

02:45PM  5    THAT HE WAS UNAWARE THAT THE COMPANY WAS USING THIRD PARTY

02:45PM  6    COMMERCIAL MACHINES TO DO THIS TESTING?

02:45PM  7    A.   I WAS.

02:45PM  8    Q.   OKAY.  AND CAN WE AGREE THAT YOU HAD NO REASON TO KEEP

02:45PM  9    FROM THE -- THE BOARD OF DIRECTORS IS A -- CAN BE TRUSTED TO

02:45PM  10   KEEP SECRETS, CAN WE AGREE ON THAT?

02:45PM  11   A.   YES.

02:45PM  12   Q.   AND SO I KNOW YOU'VE MENTIONED TRADE SECRETS IN THE PAST,

02:45PM  13   BUT YOU CAN SHARE YOUR TRADE SECRETS FREELY WITH YOUR BOARD OF

02:45PM  14   DIRECTORS; CORRECT?

02:45PM  15   A.   I THINK SO.

02:45PM  16   Q.   SO THERE WAS NOTHING IN YOUR VIEW OF TRADE SECRETS THAT

02:45PM  17   GOT IN THE WAY OF YOU TELLING MEMBERS OF THE BOARD, WE'RE

02:45PM  18   MODIFYING SIEMENS MACHINES, THAT THIS IS HOPEFULLY JUST PART OF

02:45PM  19   PHASE I.

02:45PM  20        THERE WAS NOTHING IN THE WAY OF YOU TELLING THEM THAT?

02:45PM  21   A.   I UNDERSTOOD DESCRIBING THAT WE HAD THIS INVENTION THAT WE

02:45PM  22   HAD A TRADE SECRET WAS TOTALLY APPROPRIATE.

02:46PM  23   Q.   AND YOU WERE ALSO SHOWN SOME PATENT PORTFOLIOS THAT WERE

02:46PM  24   PROVIDED TO THE BOARD?

02:46PM  25   A.   YES.

02:46PM  1    Q.   OKAY.  YOU DON'T HAVE A MEMORY OF GOING THROUGH THE PATENT

02:46PM  2    PORTFOLIO WITH MEMBERS OF YOUR BOARD OF DIRECTORS, DO YOU?

02:46PM  3    A.   I DO.

02:46PM  4    Q.   YOU WENT THROUGH LINE BY LINE AND TOLD THEM THIS RELATES

02:46PM  5    TO THAT, THIS RELATES TO THIS?

02:46PM  6    A.   I WOULD GO THROUGH SECTIONS OF IT, SO WE WOULD DESCRIBE

02:46PM  7    GENERAL SECTIONS RELATED TO DIFFERENT TOPICS, LIKE IN THAT CASE

02:46PM  8    COLLECTION DEVICES ASSOCIATED WITH THE LAUNCH OR OTHER

02:46PM  9    TECHNOLOGIES THAT WERE ASSOCIATED WITH THE LAUNCH THAT WE WERE

02:46PM  10   TRYING TO PROTECT IN ANTICIPATION OF THE PUBLIC ANNOUNCEMENT.

02:46PM  11   Q.   BUT YOU AGREE WITH ME THAT THERE'S NO RECORD OF THE

02:46PM  12   SPECIFIC PORTION OF THE DOCUMENT THAT YOU WALKED THROUGH WITH

02:46PM  13   THE BOARD OF DIRECTORS IN OCTOBER OF 2013?

02:46PM  14   A.   I THINK YOU'RE RIGHT.  AGAIN, I HAVEN'T READ THOSE MINUTES

02:46PM  15   IN THEIR ENTIRETY.

02:46PM  16   Q.   OKAY.  WE HAVE YOUR MEMORY FOR THAT?

02:46PM  17   A.   YES.

02:46PM  18   Q.   AND WE HAVE GENERAL MATTIS'S MEMORY OF THAT?

02:46PM  19   A.   WE DO.

02:46PM  20   Q.   OKAY.  I'D LIKE TO DRAW YOUR ATTENTION TO -- WELL, ISN'T

02:47PM  21   IT RIGHT AFTER "THE WALL STREET JOURNAL" ARTICLE COMES OUT IN

02:47PM  22   2015, MS. HOLMES, MEMBERS OF THE BOARD ASK YOU QUESTIONS ABOUT

02:47PM  23   WHAT ARE WE TESTING AND WHAT ARE WE TESTING ON?

02:47PM  24   A.   THEY DID.

02:47PM  25   Q.   LET ME DRAW YOUR ATTENTION TO EXHIBIT 4553.

02:47PM 1    A.   OKAY.

02:47PM 2    Q.   IS THAT YOUR EMAIL ADDRESS?

02:47PM 3    A.   IT IS.

02:47PM 4    Q.   AND DO YOU SEE THE DATE SATURDAY, OCTOBER 17TH, 2015?

02:47PM 5    A.   I DO.

02:48PM 6    Q.   AND DO YOU SEE EMAIL ADDRESSES FOR A NUMBER OF YOUR BOARD

02:48PM 7    MEMBERS?

02:48PM 8    A.   I DO.

02:48PM 9         MR. LEACH:  YOUR HONOR, I MOVE THE ADMISSION OF

02:48PM 10   EXHIBIT 4553.

02:48PM 11        THE CLERK:  THAT WAS PREVIOUSLY ADMITTED.  IT'S

02:48PM 12   PREVIOUSLY ADMITTED, YOUR HONOR.

02:48PM 13        MR. LEACH:  EVEN BETTER.

02:48PM 14   THANK YOU, MS. KRATZMANN.

02:48PM 15        THE COURT:  IT LOOKS LIKE IT HAS BEEN PREVIOUSLY

02:48PM 16   ADMITTED, SO IT CAN BE PUBLISHED.

02:48PM 17   BY MR. LEACH:

02:48PM 18   Q.   LET ME DRAW YOUR ATTENTION, MS. HOLMES, TO THE BOTTOM

02:48PM 19   EMAIL.  THERE'S AN EMAIL FROM -- IS THAT MR. KOVACEVICH'S EMAIL

02:48PM 20   IN THE FROM LINE AT WELLS FARGO?

02:48PM 21   A.   IT IS.

02:48PM 22   Q.   OKAY.  AND YOU SEE THE DATE OCTOBER 16TH, 2015?

02:48PM 23   A.   I DO.

02:48PM 24   Q.   AND THIS IS AFTER MR. CARREYROU HAS COME OUT WITH HIS

02:48PM 25   ARTICLE?

02:48PM 1    A.   I THINK SO.

02:48PM 2    Q.   AND MR. KOVACEVICH IS WRITING, "THIS WAS WELL DONE.  I AM

02:49PM 3    STILL CONFUSED, HOWEVER, REGARDING MY PREVIOUS EMAIL.  AT THIS

02:49PM 4    MOMENT, HOW MANY OF OUR CUSTOMER SUBMISSIONS ARE BEING TESTED

02:49PM 5    ON LAB EQUIPMENT VERSUS EDISON?  I UNDERSTAND WHAT IS BEING

02:49PM 6    SAID THERE IS VERY LITTLE."

02:49PM 7         DO YOU SEE THAT LANGUAGE?

02:49PM 8    A.   YES.

02:49PM 9    Q.   AND IS THIS CONSISTENT WITH OTHER QUESTIONS THAT YOU

02:49PM 10   RECEIVED FROM YOUR BOARD IN THIS TIME PERIOD ABOUT WHAT EXACTLY

02:49PM 11   THERANOS WAS TESTING AND ON WHAT?

02:49PM 12   A.   IT IS.

02:49PM 13   Q.   LET'S LOOK AT YOUR RESPONSE.

02:49PM 14        CAN WE AGREE, MS. HOLMES, THAT YOU DON'T USE THE WORD

02:49PM 15   "SIEMENS" IN YOUR RESPONSE TO YOUR BOARD OF DIRECTORS HERE?

02:49PM 16   A.   I HAVEN'T READ IT YET, BUT I PROBABLY DIDN'T.

02:49PM 17   Q.   OKAY.  AND CAN WE AGREE THAT YOU DID NOT USE THE WORD

02:50PM 18   "BECTON DICKINSON" IN YOUR RESPONSE TO THE BOARD OF DIRECTORS?

02:50PM 19   A.   I'M SURE I DIDN'T.

02:50PM 20   Q.   AND YOU DO WRITE IN THAT THIRD PARAGRAPH -- I DON'T KNOW

02:50PM 21   THE PARAGRAPHS, BUT IT'S THE LINE BEGINNING DURING, "DURING THE

02:50PM 22   TIME WE ARE TRANSITIONING THE NANOTAINERS OPERATIONS, WE ARE

02:50PM 23   STILL ABLE TO USE ALL OF OUR PROPRIETARY TECHNOLOGY, INCLUDING

02:50PM 24   OUR DEVICES, WHICH WERE APPROVED FOR USE THIS SUMMER BASED ON

02:50PM 25   THE STUDIES WITH APPROXIMATELY 900 PATIENT SAMPLES."

02:50PM   1              DID I READ THAT CORRECTLY?

02:50PM   2   A.    YOU DID.

02:50PM   3   Q.    AND THEN YOU WROTE, "NOTE THE NAME EDISON WAS THE NAME OF

02:50PM   4   THE COMPANY'S VERY FIRST DEVICE (NOT OUR CURRENT SYSTEMS) -

02:50PM   5   THIS IS ONE OF MANY INCORRECT STATEMENTS BY THE FORMER EMPLOYEE

02:50PM   6   WHO COMMUNICATED THIS INFORMATION TO THE WSJ REPORTER."

02:50PM   7              DO YOU SEE THAT LANGUAGE?

02:50PM   8   A.    I DO.

02:50PM   9   Q.    AND IS THIS SIMILAR TO COMMENTS THAT YOU MADE PUBLIC ABOUT

02:50PM  10   EDISON BEING SOMETHING THAT YOU HAD USED WAY IN THE PAST?

02:51PM  11   A.    IT IS.

02:51PM  12   Q.    AND THAT WASN'T COMPLETELY FORTHRIGHT; IS THAT RIGHT?

02:51PM  13   A.    I DEFINITELY WOULDN'T SAY IT THAT WAY NOW.  WHAT I WAS

02:51PM  14   ATTEMPTING TO EXPRESS IS THAT I THOUGHT OF EDISON AS AN EARLIER

02:51PM  15   VERSION OF THE 3 SERIES.

02:51PM  16   Q.    SO THIS IS ANOTHER THING THAT YOU WISH YOU DID

02:51PM  17   DIFFERENTLY?

02:51PM  18   A.    YES.  THERE ARE MANY THINGS THAT I WISH I DID DIFFERENTLY.

02:51PM  19   Q.    INCLUDING THIS ONE?

02:51PM  20   A.    YES.

02:51PM  21   Q.    OKAY.  THANK YOU.

02:51PM  22              THANK YOU, MS. HOLLIMAN.  WE CAN TAKE THAT DOWN.

02:51PM  23              I'D LIKE TO DRAW YOUR ATTENTION, MS. HOLMES, TO SOME OF

02:51PM  24   YOUR DIRECT TESTIMONY ABOUT PHARMACEUTICAL COMPANIES.

02:51PM  25              DO YOU RECALL TESTIFYING ABOUT PHARMACEUTICAL COMPANIES?

02:52PM 1    A.   I DO.

02:52PM 2    Q.   AND I UNDERSTAND YOU'VE SEEN, THROUGH A NUMBER OF

02:52PM 3    WITNESSES, A REPORT THAT YOU SENT TO INVESTORS AND TO WALGREENS

02:52PM 4    BEARING THE PFIZER LOGO.

02:52PM 5         DO YOU RECALL TESTIMONY AROUND THAT?

02:52PM 6    A.   I DO.

02:52PM 7    Q.   AND YOUR TESTIMONY ON DIRECT EXAMINATION WAS YOU APPLIED

02:52PM 8    THAT LOGO TO THE DOCUMENT?

02:52PM 9    A.   IT WAS.

02:52PM 10   Q.   OKAY.  AND IF WE COULD PLEASE DISPLAY WHAT IS IN EVIDENCE

02:52PM 11   AS TRIAL EXHIBIT 291 AT PAGE 8.

02:52PM 12        DO YOU RECOGNIZE THIS AS THE ATTACHMENT THAT YOU SENT TO

02:52PM 13   WALGREENS IN ADVANCE OF OR IN CONNECTION WITH DISCUSSIONS ABOUT

02:52PM 14   A POTENTIAL PARTNERSHIP?

02:52PM 15   A.   I DO.

02:52PM 16   Q.   OKAY.  AND DO YOU AGREE WITH ME THAT THIS DOCUMENT IS NOT

02:53PM 17   FROM PFIZER?

02:53PM 18   A.   NO.  IT'S FROM THERANOS.

02:53PM 19   Q.   IT'S FROM THERANOS, NOT PFIZER?

02:53PM 20   A.   YES.

02:53PM 21   Q.   WE CAN AGREE ON THAT?

02:53PM 22   A.   YES.

02:53PM 23   Q.   OKAY.  AND YOU PUT THE PFIZER LOGO ON THIS?

02:53PM 24   A.   I DID.

02:53PM 25   Q.   YOU DID NOT SEEK PFIZER'S PERMISSION TO DO THAT?

02:53PM  1    A.   I DON'T KNOW.

02:53PM  2    Q.   NO ONE FROM PFIZER AUTHORIZED YOU TO DO THAT?

02:53PM  3    A.   AGAIN, I DON'T KNOW.  I CAN'T REMEMBER.  I CAN'T REMEMBER

02:53PM  4    DOING THIS.

02:53PM  5    Q.   NO ONE FROM PFIZER ORALLY TOLD YOU THAT YOU HAD PFIZER'S

02:53PM  6    PERMISSION TO PUT THE PFIZER LOGO ON A THERANOS REPORT; IS THAT

02:53PM  7    RIGHT?

02:53PM  8    A.   I DON'T KNOW.

02:53PM  9    Q.   AND NO ONE TOLD YOU IN WRITING THAT YOU HAD PERMISSION TO

02:53PM  10   PUT THE PFIZER LOGO ON THE THERANOS REPORT?

02:53PM  11   A.   I DON'T THINK SO.

02:53PM  12   Q.   BEFORE GIVING THE DOCUMENT TO WALGREENS, YOU DID NOT TELL

02:54PM  13   PFIZER YOU WERE ADDING ITS LOGO TO A DOCUMENT THAT THERANOS

02:54PM  14   PREPARED; AM I RIGHT?

02:54PM  15   A.   I DON'T KNOW.  I DON'T REMEMBER THIS PROCESS.

02:54PM  16   Q.   AND YOU NEVER TOLD WALGREENS THAT YOU PUT THE PFIZER LOGO

02:54PM  17   ON THIS?

02:54PM  18   A.   I'M SURE WE DIDN'T.

02:54PM  19   Q.   DO YOU AGREE WITH ME THAT THIS IS NOT AN INDEPENDENT DUE

02:54PM  20   DILIGENCE REPORT?

02:54PM  21   A.   I THOUGHT IT WAS.

02:54PM  22   Q.   SITTING HERE TODAY, DO YOU AGREE WITH ME THAT THIS IS NOT

02:54PM  23   AN INDEPENDENT DUE DILIGENCE REPORT?

02:54PM  24   A.   I STILL THINK IT WAS.

02:54PM  25   Q.   IT'S NOT AN INDEPENDENT DUE DILIGENCE REPORT FROM PFIZER;

02:54PM   1      IS THAT FAIR?  WILL YOU AGREE WITH ME ON THAT?

02:54PM   2      A.   IT IS WRITTEN BY THERANOS.  IT WAS FROM THE PROGRAM THAT

02:54PM   3      WE DID WITH PFIZER.

02:54PM   4      Q.   OKAY.  BUT IT'S NOT FROM PFIZER?  THAT WAS YOUR TESTIMONY

02:55PM   5      A FEW MINUTES AGO?

02:55PM   6      A.   CORRECT.  IT WAS -- I SENT IT TO WALGREENS.  THERANOS SENT

02:55PM   7      IT TO WALGREENS, NOT PFIZER.  PFIZER DID NOT SEND IT TO

02:55PM   8      WALGREENS.

02:55PM   9      Q.   NOW, THERANOS DID MORE THAN SIMPLY AFFIX THE PFIZER LOGO

02:55PM  10      TO THIS; ISN'T THAT CORRECT?

02:55PM  11      A.   I'M NOT SURE.

02:55PM  12      Q.   WELL, LET'S LOOK.  IF WE CAN COMPARE EXHIBIT 291, PAGE 8

02:55PM  13      WITH EXHIBIT 143, PAGE 3.  THESE ARE IN EVIDENCE.

02:55PM  14           (PAUSE IN PROCEEDINGS.)

02:55PM  15      BY MR. LEACH:

02:56PM  16      Q.   MS. HOLMES, DO YOU SEE ON THE SCREEN ON THE LEFT SIDE

02:56PM  17      EXHIBIT 291, PAGE 8?

02:56PM  18      A.   I DO.

02:56PM  19      Q.   AND THIS WAS WHAT WAS SENT TO WALGREENS?

02:56PM  20      A.   YES.

02:56PM  21      Q.   AND DO YOU SEE ON THE RIGHT EXHIBIT 143, PAGE 3, THIS IS

02:56PM  22      THE DOCUMENT THAT YOU HAD INITIALLY SENT TO PFIZER?

02:56PM  23      A.   YES.

02:56PM  24      Q.   AND DO YOU SEE HOW THE WORDS "PREPARED FOR

02:56PM  25      DR. AIDAN POWER" ARE ABSENT FROM EXHIBIT 291 ON PAGE 8?

02:56PM 1    A.   I DO.

02:56PM 2    Q.   AND DID YOU DELETE THOSE WORDS?

02:57PM 3    A.   I THINK SO.

02:57PM 4    Q.   YOU DIDN'T MENTION THAT IN YOUR DIRECT EXAMINATION, DID

02:57PM 5    YOU?

02:57PM 6    A.   NO, I DON'T THINK WE TALKED ABOUT THAT EXPLICITLY.

02:57PM 7    Q.   OKAY.  DO YOU AGREE WITH ME THAT EXPLICITLY STATING THAT

02:57PM 8    THIS WAS PREPARED FOR DR. AIDAN POWER MIGHT MAKE IT EASIER FOR

02:57PM 9    A READER TO DETERMINE THAT THIS WAS PREPARED BY THERANOS?

02:57PM 10   A.   IT COULD.

02:57PM 11   Q.   IS DELETING THOSE WORDS ANOTHER THING YOU WISH YOU HAD

02:57PM 12   DONE DIFFERENTLY?

02:57PM 13   A.   I DO.  I WISH I HAD HANDLED THIS DIFFERENTLY, YES.

02:57PM 14   Q.   OKAY.  LET'S LOOK AT EXHIBIT 174, WHICH IS IN EVIDENCE.  I

02:57PM 15   THINK IT'S ALSO IN YOUR BINDER, MS. HOLMES.

02:57PM 16        DO YOU RECALL TESTIMONY FROM SHANE WEBER RELATING TO THIS

02:57PM 17   EXHIBIT, MS. HOLMES?

02:57PM 18   A.   I DO.

02:57PM 19   Q.   OKAY.  DO YOU RECALL SHANE WEBER TELLING YOU PFIZER DID

02:58PM 20   NOT HAVE AT THAT TIME A FORESEEABLE USE FOR THE THERANOS

02:58PM 21   DEVICE?

02:58PM 22   A.   I DON'T.

02:58PM 23   Q.   IN THIS DOCUMENT IT SAYS, "TODAY I SPOKE WITH

02:58PM 24   ELIZABETH HOLMES, CEO, THERANOS AND EXPLAINED TO HER THAT

02:58PM 25   PFIZER DID NOT HAVE AT THIS TIME A FORESEEABLE USE FOR THE

02:58PM 1    THERANOS IMMUNOASSAY DEVICE FOR AT PATIENT SELF USE AT HOME BUT

02:58PM 2    SHE AND I AGREED TO STAY IN TOUCH EVERY SIX MONTHS."

02:58PM 3         DO YOU RECALL DR. WEBER TELLING YOU THAT YOU AGREED TO

02:58PM 4    STAY IN TOUCH EVERY SIX MONTHS?

02:58PM 5    A.   I REMEMBER GENERALLY THAT I HAD A CALL WITH PFIZER AND

02:58PM 6    THAT WE WERE GOING TO CONTINUE TALKING.

02:58PM 7    Q.   YOU ALSO TESTIFIED ABOUT INTERACTIONS THAT YOU HAD WITH

02:58PM 8    PFIZER AFTER JANUARY OF 2009.

02:58PM 9         DO YOU RECALL THAT TESTIMONY?

02:58PM 10   A.   I DO.

02:58PM 11   Q.   AND LET'S BE 100 PERCENT CLEAR.  NONE OF THOSE

02:59PM 12   INTERACTIONS WITH PFIZER RESULTED IN ANY REVENUE GENERATING

02:59PM 13   CONTRACT WITH THERANOS; CORRECT?

02:59PM 14   A.   THAT'S RIGHT.

02:59PM 15   Q.   NOTHING EVER CAME OF THAT TALK?

02:59PM 16   A.   CORRECT.

02:59PM 17   Q.   IT WAS JUST TALK?

02:59PM 18   A.   IT WAS TALK AND WORK, BUT WE DIDN'T GET REVENUE FROM IT.

02:59PM 19   Q.   YOU NEVER HAD ANOTHER AGREEMENT WITH PFIZER AFTER THE 2009

02:59PM 20   REPORT; ISN'T THAT RIGHT?

02:59PM 21   A.   THAT'S RIGHT.

02:59PM 22   Q.   PFIZER DIDN'T PAY THERANOS ANOTHER DIME AFTER JANUARY OF

02:59PM 23   2009; CORRECT?

02:59PM 24   A.   THAT'S RIGHT.

02:59PM 25   Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO EXHIBIT 1504, 15041,

02:59PM   1    WHICH I THINK WAS ADMITTED DURING YOUR DIRECT EXAMINATION.

02:59PM   2         AND IF WE COULD -- MS. HOLLIMAN, IS THERE A WAY TO BE ABLE

02:59PM   3    TO PULL THAT UP?

03:00PM   4         AND IF WE CAN ALSO DISPLAY THIS NEXT TO EXHIBIT 291,

03:00PM   5    PAGE 33.

03:00PM   6         MS. HOLMES, DO YOU SEE ON THE SCREEN ON THE LEFT

03:00PM   7    EXHIBIT 15041?

03:00PM   8    A.   I DO.

03:00PM   9    Q.   AND YOU RECALL TESTIFYING ABOUT THIS ON YOUR DIRECT

03:00PM   10   EXAMINATION?

03:00PM   11   A.   I DO.

03:00PM   12   Q.   AND I JUXTAPOSED THIS AGAINST PAGE 33 OF EXHIBIT 291.

03:00PM   13   THAT'S THE DOCUMENT THAT YOU SENT TO WALGREENS WITH THE PFIZER

03:00PM   14   LOGO ON IT?

03:00PM   15   A.   YES.

03:00PM   16   Q.   AND THIS PAGE OF EXHIBIT 291 LISTS A NUMBER OF

03:00PM   17   CONCLUSIONS.

03:00PM   18        DO YOU SEE THAT TO THE RIGHT?

03:01PM   19   A.   I DO.

03:01PM   20   Q.   FOCUSSING ON EXHIBIT 15041, THERE WERE A COUPLE NAMES,

03:01PM   21   DAVID LESTER.  DAVID LESTER WAS SOMEBODY WHO HAD WORKED AT

03:01PM   22   PFIZER?

03:01PM   23   A.   YES.

03:01PM   24   Q.   AND THEN HE CAME TO THERANOS?

03:01PM   25   A.   HE DID.

03:01PM  1    Q.   AND HE LEFT PRETTY SHORTLY AFTER COMING TO THERANOS; ISN'T

03:01PM  2    THAT RIGHT?

03:01PM  3    A.   YEAH.  I DON'T REMEMBER WHEN HE LEFT, BUT HE WASN'T THERE

03:01PM  4    VERY LONG.

03:01PM  5    Q.   A MATTER OF MONTHS MAYBE?

03:01PM  6    A.   I REMEMBER IT AS LONGER, BUT I DON'T KNOW.

03:01PM  7    Q.   NOT MORE THAN THREE OR FOUR YEARS?

03:01PM  8    A.   NO.

03:01PM  9    Q.   AND HE CERTAINLY WASN'T THERE IN 2011, 2012, 2013?

03:01PM  10   A.   HE WASN'T.

03:01PM  11   Q.   AND THINGS JUST DIDN'T WORK OUT WITH MR. LESTER?

03:01PM  12   A.   THEY DID NOT.

03:01PM  13   Q.   AND THE EMAIL -- AND WE CAN ZOOM OUT, MS. HOLLIMAN.

03:01PM  14       THE EMAIL DOWN AT THE BOTTOM FROM CRAIG LIPSET, THAT WAS

03:01PM  15   ANOTHER CONTACT THAT YOU HAD WITH PFIZER; IS THAT CORRECT?

03:02PM  16   A.   YES, HE OVERSAW OUR PROGRAM THAT WE DID WITH THEM.

03:02PM  17   Q.   OKAY.  AND YOU RECALL MR. WEBER TESTIFYING ABOUT HIS

03:02PM  18   INTERACTIONS WITH CRAIG LIPSET WHEN HE CAME TO PFIZER?

03:02PM  19   A.   I DO.

03:02PM  20   Q.   OKAY.  AND THIS EMAIL RELATES TO MODELING CAPABILITIES;

03:02PM  21   CORRECT?

03:02PM  22   A.   IT DOES.

03:02PM  23   Q.   THERANOS IN THIS TIME PERIOD WAS TRYING TO DEVELOP MODELS

03:02PM  24   TO HELP PHARMACEUTICAL COMPANIES ASSESS DRUG CONCENTRATIONS AND

03:02PM  25   IDENTIFY BIOMARKERS.

03:02PM  1              AM I SUMMARIZING IT AT A HIGH LEVEL CORRECTLY?

03:02PM  2      A.   YES.  OTHER THINGS, TOO, BUT YES.

03:02PM  3      Q.   BUT IT RELATES TO MODELING?

03:02PM  4      A.   YES.

03:02PM  5      Q.   IT'S NOT RELATED TO THE DEVICE.

03:02PM  6              IS THAT FAIR?

03:02PM  7      A.   I THINK HE'S SAYING UNLESS SAMPLES BECOME AVAILABLE.  IF

03:02PM  8      SAMPLES BECOME AVAILABLE, THEN IT WOULD.

03:02PM  9      Q.   YOU AGREE WITH ME THAT NOWHERE IN EXHIBIT 15041 DOES

03:02PM  10     MR. LIPSET SAY THAT HE AGREES WITH THE CONCLUSIONS IN

03:03PM  11     EXHIBIT 291?

03:03PM  12     A.   THAT'S RIGHT.

03:03PM  13     Q.   AND NOWHERE HERE DOES MR. LIPSET SAY THAT PFIZER HAS

03:03PM  14     VALIDATED THERANOS'S TECHNOLOGY?

03:03PM  15     A.   HE DOES NOT.

03:03PM  16     Q.   AND NOWHERE IN 15041 DOES MR. LIPSET SAY THAT PFIZER HAS

03:03PM  17     COMPREHENSIVELY VALIDATED THERANOS'S TECHNOLOGY?

03:03PM  18     A.   HE DOES NOT.

03:03PM  19     Q.   AND NOWHERE IN HERE DOES MR. LIPSET AUTHORIZE YOU TO AFFIX

03:03PM  20     THE PFIZER LOGO TO DOCUMENTS?

03:03PM  21     A.   CORRECT.

03:03PM  22     Q.   AND NOTHING EVER CAME OF THIS EMAIL EXCHANGE ABOUT

03:03PM  23     MODELING CAPABILITIES; CORRECT?

03:03PM  24     A.   ULTIMATELY, NO.

03:03PM  25     Q.   OKAY.  THERE WAS NO CONTRACT RELATING TO MODELING

03:03PM  1    CAPABILITIES?

03:03PM  2    A.   THAT'S RIGHT.

03:03PM  3    Q.   OKAY.  THERE WAS SOME TALK?

03:03PM  4    A.   YES.  WE DID SOME WORK ON THIS, AND ULTIMATELY THE DRUG

03:03PM  5    WAS DISCONTINUED.

03:03PM  6    Q.   OKAY.  AND PFIZER DIDN'T PAY MONEY TO THERANOS AS A RESULT

03:03PM  7    OF THIS EMAIL EXCHANGE, DID THEY?

03:03PM  8    A.   THEY DID NOT.

03:03PM  9    Q.   OKAY.  LET'S LOOK AT EXHIBIT 15047, WHICH I THINK YOU

03:04PM 10    COVERED WITH MR. DOWNEY.

03:04PM 11        AND IF WE CAN ALSO DISPLAY THAT SIDE-BY-SIDE WITH 291,

03:04PM 12    PAGE 33.

03:04PM 13        THIS IS AN EMAIL DATED OCTOBER 29TH, 2013.

03:04PM 14        DO YOU SEE THAT ON THE SCREEN, MS. HOLMES?

03:04PM 15    A.   I DO.

03:04PM 16    Q.   AND YOU RECALL TESTIFYING ABOUT THIS?

03:04PM 17    A.   I DO.

03:04PM 18    Q.   OKAY.  AND THIS IS AN EMAIL EXCHANGE BETWEEN YOU AND

03:04PM 19    SOMEONE NAMED HAKAN SAKUL?

03:04PM 20    A.   YES.

03:04PM 21    Q.   AND EARLIER IN THE EXCHANGE THERE'S ALSO REFERENCE TO

03:04PM 22    MORTEN SOGAARD?

03:04PM 23    A.   YES.  I DON'T KNOW IF I HAVE A COPY OF IT.

03:04PM 24        OH, I CAN SEE IT, YES.

03:04PM 25    Q.   IF YOU LOOK AT THE VERY BOTTOM.

03:04PM  1     A.   YEP, YEP.

03:04PM  2     Q.   AND THIS IS FROM OCTOBER OF 2013; CORRECT?

03:05PM  3     A.   IT IS.

03:05PM  4     Q.   AND MR. SAKUL WROTE TO YOU, "IT WAS VERY NICE TO MEET WITH

03:05PM  5     YOU AND SEEING YOU AGAIN ELIZABETH, AND LEARN ABOUT THE GREAT

03:05PM  6     PROGRESS THERANOS HAS MADE OVER THE YEARS."

03:05PM  7          DO YOU RECALL TESTIFYING ABOUT THIS EXCHANGE?

03:05PM  8     A.   I DO.

03:05PM  9     Q.   LET'S BE CLEAR ABOUT THE TIMING OF THIS EMAIL.  THIS WAS

03:05PM 10     AFTER THE SEPTEMBER 23RD, OR 2013 JOE RAGO PIECE IN "THE

03:05PM 11     WALL STREET JOURNAL"; CORRECT?

03:05PM 12     A.   IT IS.

03:05PM 13     Q.   SO THIS IS AFTER THERANOS HAS VERY PUBLICLY TOLD THE WORLD

03:05PM 14     ABOUT ITS TECHNOLOGY AND WHAT IT WAS HOPING TO DO?

03:05PM 15     A.   IT IS.

03:05PM 16     Q.   OKAY.  AND THIS IS AFTER WALGREENS HAS ISSUED A PRESS

03:05PM 17     RELEASE SAYING THAT WE HAVE A RELATIONSHIP WITH THERANOS?

03:05PM 18     A.   YES.

03:05PM 19     Q.   AND AFTER THERANOS HAD ISSUED A PRESS RELEASE SAYING WE

03:05PM 20     ARE DOING TESTING WITH WALGREENS?

03:05PM 21     A.   I THINK IT WAS THE SAME PRESS RELEASE, BUT YES.

03:06PM 22     Q.   I THINK WE'VE SEEN TWO.

03:06PM 23     A.   I'D DEFER TO YOU.

03:06PM 24     Q.   NOT MATERIAL FOR OUR DISCUSSION?

03:06PM 25     A.   YES.

03:06PM   1       Q.   THIS EMAIL COMES AFTER THAT; CORRECT?

03:06PM   2       A.   IT DOES.

03:06PM   3       Q.   SO THERE'S NEW INFORMATION OUT IN THE WORLD AND PFIZER IS

03:06PM   4       EMAILING YOU AND MEETING WITH YOU IN THIS TIME PERIOD?

03:06PM   5       A.   YES.

03:06PM   6       Q.   OKAY.  AND THIS WAS AFTER MR. RAGO HAD WRITTEN IN HIS

03:06PM   7       ARTICLE "THERANOS TECHNOLOGY ELIMINATES MULTIPLE LAB TRIPS

03:06PM   8       BECAUSE IT CAN RUN ANY COMBINATION OF TESTS AT ONCE VERY

03:06PM   9       QUICKLY ALL FROM A SINGLE MICRO SAMPLE"?

03:06PM   10           THIS IS AFTER THAT?

03:06PM   11      A.   YES.

03:06PM   12      Q.   AND THIS IS AFTER MR. RAGO HAD SAID "THERANOS'S PROCESSES

03:06PM   13      ARE FASTER, CHEAPER AND MORE ACCURATE THAN CONVENTIONAL

03:06PM   14      METHODS"?

03:06PM   15      A.   YES.  I DON'T HAVE THE ARTICLE IN FRONT OF ME, BUT I'M

03:06PM   16      ASSUMING THAT'S FROM THE ARTICLE.

03:06PM   17      Q.   THAT SOUNDS RIGHT TO YOU?

03:06PM   18      A.   IT DOES.

03:06PM   19      Q.   OKAY.  AND THAT WAS AN ARTICLE THAT YOU HAD AN OPPORTUNITY

03:06PM   20      TO REVIEW AND COMMENT ON?

03:06PM   21      A.   I DID.

03:06PM   22      Q.   YOU DON'T DISPUTE THAT?

03:06PM   23      A.   I DON'T.

03:06PM   24      Q.   NOW, NOWHERE IN EXHIBIT 15047 DO MR. SAKUL OR MR. SOGAARD

03:07PM   25      SAY PFIZER AGREES WITH THE CONCLUSIONS IN EXHIBIT 291; IS THAT

03:07PM  1    CORRECT?

03:07PM  2    A.    THAT'S RIGHT.

03:07PM  3    Q.    AND IF WE CAN ZOOM OUT, MS. HOLLIMAN.

03:07PM  4          NOWHERE IN EXHIBIT 15047 DO DR. SAKUL OR DR. SOGAARD SAY

03:07PM  5    PFIZER HAS VALIDATED THERANOS'S TECHNOLOGY?

03:07PM  6    A.    CORRECT.

03:07PM  7    Q.    AND NOWHERE IN EXHIBIT 15047 DO DR. SAKUL OR DR. SOGAARD

03:07PM  8    SAY PFIZER HAS COMPREHENSIVELY VALIDATED THERANOS'S TECHNOLOGY?

03:07PM  9    A.    I DON'T THINK SO.

03:07PM  10   Q.    AND NOWHERE IN HERE DO THOSE TWO INDIVIDUALS AUTHORIZE YOU

03:07PM  11   TO AFFIX THE PFIZER LOGO TO DOCUMENTS.

03:07PM  12         AM I RIGHT ABOUT THAT?

03:08PM  13   A.    YES.

03:08PM  14   Q.    AND NOTHING EVER CAME OF THIS EXCHANGE EITHER, DID IT?

03:08PM  15   A.    AGAIN, I THINK THERE'S ONGOING MEETINGS AND DISCUSSIONS

03:08PM  16   ABOUT CLINICAL TRIALS AT RETAIL.

03:08PM  17   Q.    MEETINGS AND DISCUSSIONS AND TALK; RIGHT?

03:08PM  18   A.    YES.

03:08PM  19   Q.    BUT PFIZER DIDN'T PAY ANY MONEY TO THERANOS AS A RESULT OF

03:08PM  20   THIS EMAIL EXCHANGE?

03:08PM  21   A.    THEY DID NOT.

03:08PM  22   Q.    OKAY.  LET'S LOOK AT EXHIBIT 15039.  AND IF WE CAN

03:08PM  23   JUXTAPOSE THEN AGAINST 291, PAGE 33.

03:08PM  24         MS. HOLMES, DO YOU SEE ON THE SCREEN AN EMAIL EXCHANGE

03:08PM  25   THAT STARTS FROM CRAIG LIPSET IN OR AROUND FEBRUARY 20TH, 2015?

03:09PM  1    A.   I DO.

03:09PM  2    Q.   OKAY.  AND I DRAW YOUR ATTENTION TO THE SUBJECT LINE

03:09PM  3    "TOUCHING BASE; OPPORTUNITIES."

03:09PM  4         DO YOU SEE THAT?

03:09PM  5    A.   I DO.

03:09PM  6    Q.   AND MR. LIPSET WRITES, "HI, ELIZABETH.  IT HAS BEEN

03:09PM  7    YEARS," ALL CAPS, "SINCE WE LAST TOUCHED BASE, BUT YOU HAVE

03:09PM  8    CLEARLY BEEN BUSY."

03:09PM  9         DO YOU SEE THAT LANGUAGE?

03:09PM  10   A.   I DO.

03:09PM  11   Q.   WAS IT TRUE THAT IT HAD BEEN YEARS SINCE YOU AND

03:09PM  12   MR. LIPSET HAD LAST TOUCHED BASE?

03:09PM  13   A.   I THINK SO.

03:09PM  14   Q.   AND LET'S BE CLEAR ON THE TIMING OF THIS EMAIL, FEBRUARY

03:09PM  15   OF 2015.

03:09PM  16        THIS WAS MORE THAN A YEAR AND A COUPLE MONTHS AFTER

03:09PM  17   THERANOS AND WALGREENS ANNOUNCED THEIR PARTNERSHIP; CORRECT?

03:09PM  18   A.   IT IS.

03:09PM  19   Q.   AND THIS WAS AFTER ROGER PARLOFF'S ARTICLE IN JUNE OF

03:09PM  20   2014?

03:09PM  21   A.   YES.

03:09PM  22   Q.   THIS IS AFTER MR. PARLOFF HAD REPORTED THAT THERANOS DID

03:10PM  23   NOT BUY COMMERCIALLY AVAILABLE ANALYZERS; CORRECT?

03:10PM  24   A.   I SAW THAT IN HIS ARTICLE, YES.

03:10PM  25   Q.   AND THIS IS AFTER THAT?

03:10PM  1    A.   IT IS.

03:10PM  2    Q.   AND THIS IS AFTER, FAIR TO SAY, A LOT OF PUBLICITY ABOUT

03:10PM  3    THERANOS?

03:10PM  4    A.   YES.

03:10PM  5    Q.   AND SO BY FEBRUARY OF 2015, THERE'S SIGNIFICANT NEW

03:10PM  6    INFORMATION OUT THERE ABOUT THERANOS?

03:10PM  7    A.   THERE IS.

03:10PM  8    Q.   AND MR. LIPSET IS REACHING OUT TO YOU IN THAT CONTEXT

03:10PM  9    SAYING IT'S BEEN YEARS SINCE YOU'VE BEEN IN TOUCH?

03:10PM  10   A.   YES.

03:10PM  11   Q.   AND IF WE CAN ZOOM OUT, MS. HOLLIMAN.

03:10PM  12        AM I RIGHT THAT NOWHERE IN EXHIBIT 15039 DOES MR. LIPSET

03:10PM  13   SAY PFIZER AGREES WITH THE CONCLUSIONS IN EXHIBIT 291?

03:10PM  14   A.   CORRECT.

03:10PM  15   Q.   AND NOWHERE IN EXHIBIT 15039 DOES MR. LIPSET SAY PFIZER

03:10PM  16   HAS VALIDATED THERANOS'S TECHNOLOGY?

03:10PM  17   A.   CORRECT.

03:10PM  18   Q.   AND NOWHERE IN HERE DOES MR. LIPSET SAY PFIZER HAS

03:11PM  19   COMPREHENSIVELY VALIDATED THERANOS'S TECHNOLOGY?

03:11PM  20   A.   YES.

03:11PM  21   Q.   AND NOWHERE IN HERE DOES MR. LIPSET AUTHORIZE YOU TO AFFIX

03:11PM  22   THE PFIZER LOGO TO DOCUMENTS?

03:11PM  23   A.   CORRECT.

03:11PM  24   Q.   OKAY.  AND NOTHING EVER CAME OF THIS EXHIBIT; ISN'T THAT

03:11PM  25   RIGHT?

03:11PM  1     A.   CORRECT.

03:11PM  2     Q.   IT WAS TALK?

03:11PM  3     A.   IT WAS WORK TOWARD SEEING IF WE COULD DO CLINICAL TRIALS

03:11PM  4     IN THE STORES, BUT WE NEVER DID THAT.

03:11PM  5     Q.   OKAY.  AND PFIZER DIDN'T PAY MONEY TO THERANOS AS A RESULT

03:11PM  6     OF THIS EXCHANGE?

03:11PM  7     A.   THEY DID NOT.

03:11PM  8     Q.   YOU ALSO TESTIFIED ABOUT SCHERING-PLOUGH.

03:11PM  9          DO YOU RECALL SOME TESTIMONY ABOUT SCHERING-PLOUGH?

03:11PM  10    A.   I DO.

03:11PM  11    Q.   OKAY.  AND IF WE COULD DISPLAY EXHIBIT 291, WHICH WE'VE

03:11PM  12    BEEN ON, PAGE 34.

03:12PM  13         AND WE CAN TAKE DOWN 15039, MS. HOLLIMAN.

03:12PM  14         DO YOU RECALL TESTIFYING, MS. HOLMES, THAT YOU WERE THE

03:12PM  15    INDIVIDUAL WHO APPLIED THE SCHERING-PLOUGH LOGO TO THIS

03:12PM  16    DOCUMENT?

03:12PM  17    A.   I DO.

03:12PM  18    Q.   OKAY.  DID YOU DO THAT AT OR AROUND THE TIME THAT YOU

03:12PM  19    APPLIED THE LOGO FOR THE PFIZER DOCUMENT?

03:12PM  20    A.   I BELIEVE SO.

03:12PM  21    Q.   OKAY.  DO YOU AGREE WITH ME THAT THIS DOCUMENT IS NOT FROM

03:12PM  22    SCHERING-PLOUGH?

03:12PM  23    A.   NO.  IT IS WRITTEN BY THERANOS.

03:12PM  24    Q.   IT'S FROM THERANOS?

03:12PM  25    A.   YES.

03:12PM 1    Q.   AND YOU DON'T HAVE A MEMORY OF SEEKING SCHERING-PLOUGH'S

03:12PM 2    PERMISSION TO DO THAT?

03:12PM 3    A.   I DON'T.

03:12PM 4    Q.   YOU DON'T HAVE A MEMORY OF SOMEONE FROM SCHERING-PLOUGH

03:12PM 5    AUTHORIZING YOU TO DO THAT?

03:12PM 6    A.   I DON'T.

03:13PM 7    Q.   YOU DON'T HAVE A MEMORY OF SOMEONE FROM SCHERING-PLOUGH

03:13PM 8    ORALLY TELLING YOU THAT YOU HAD SCHERING-PLOUGH'S PERMISSION TO

03:13PM 9    PUT THE SCHERING-PLOUGH LOGO ON THIS THERANOS REPORT?

03:13PM 10   A.   I DON'T.

03:13PM 11   Q.   AND YOU DON'T HAVE A MEMORY OF SOMEONE FROM

03:13PM 12   SCHERING-PLOUGH TELLING YOU IN WRITING THAT YOU HAD

03:13PM 13   SCHERING-PLOUGH'S PERMISSION TO APPLY THE SCHERING-PLOUGH LOGO

03:13PM 14   TO THE THERANOS REPORT; CORRECT?

03:13PM 15   A.   CORRECT.

03:13PM 16   Q.   BEFORE GIVING THE DOCUMENT TO WALGREENS, YOU DON'T HAVE A

03:13PM 17   MEMORY OF TELLING SCHERING-PLOUGH YOU WERE ADDING ITS LOGO TO A

03:13PM 18   DOCUMENT THAT YOU PREPARED?

03:13PM 19   A.   I DON'T HAVE A MEMORY.

03:13PM 20   Q.   AND YOU NEVER TOLD WALGREENS YOU PUT THE SCHERING-PLOUGH

03:13PM 21   LOGO ON THIS?

03:13PM 22   A.   I DON'T THINK SO.

03:13PM 23   Q.   AND JUST TO BE 100 PERCENT CLEAR, THERE ARE SOME WORDS IN

03:13PM 24   THIS DOCUMENT BENEATH THE LOGO, IT SAYS SCHERING-PLOUGH

03:13PM 25   CORPORATION, SCHERING-PLOUGH RESEARCH, AND THEN THERE'S SOME

03:13PM  1    ADDITIONAL LANGUAGE.

03:14PM  2        DID YOU WRITE THAT?

03:14PM  3    A.   I THINK SO.

03:14PM  4    Q.   OKAY.  AND THERANOS DID MORE THAN SIMPLY AFFIX THE

03:14PM  5    SCHERING-PLOUGH LOGO TO THIS AND ADD THOSE WORDS; ISN'T THAT

03:14PM  6    RIGHT, MS. HOLMES?

03:14PM  7    A.   YES.

03:14PM  8    Q.   LET'S LOOK AT PAGE, IF WE CAN SCROLL DOWN, MS. HOLLIMAN,

03:14PM  9    TO THE CONCLUSIONS PORTION OF THIS AND COMPARE IT WITH 259.

03:14PM  10       SO, MS. HOLLIMAN, IF WE COULD PLEASE COMPARE EXHIBIT 291

03:14PM  11   AT PAGE 51 TO 259, PAGE 19.

03:16PM  12       OKAY.  MS. HOLMES, DO YOU SEE ON THE LEFT-HAND SIDE OF THE

03:16PM  13   PAGE WE HAVE EXHIBIT 291, PAGE 51?

03:16PM  14   A.   I DO.

03:16PM  15   Q.   AND DO YOU SEE THE SCHERING-PLOUGH LOGO AT THE TOP?

03:16PM  16   A.   I DO.

03:16PM  17   Q.   THAT'S THE LOGO THAT YOU AFFIXED?

03:16PM  18   A.   YES.

03:16PM  19   Q.   OKAY.  AND TO THE RIGHT, DO YOU SEE EXHIBIT 259, PAGE 19?

03:16PM  20   A.   I DO.

03:16PM  21   Q.   AND DO YOU SEE JUST THE THERANOS LOGO IN THE UPPER LEFT?

03:16PM  22   A.   I DO.

03:16PM  23   Q.   AND THIS IS THE VERSION OF THE REPORT THAT YOU SENT TO

03:16PM  24   SCHERING-PLOUGH?

03:16PM  25   A.   YES.

03:16PM  1     Q.   259?

03:16PM  2     A.   I THINK SO.  I DON'T HAVE THEM IN FRONT OF ME, BUT I

03:16PM  3     ASSUME SO.

03:16PM  4     Q.   OKAY.  AND, MS. HOLLIMAN, IF WE COULD PLEASE ZOOM OUT.

03:16PM  5          THERE ARE SOME DIFFERENCES IN THE CONCLUSIONS PARAGRAPH OF

03:16PM  6     THIS -- OF THESE TWO DOCUMENTS.

03:16PM  7          DO YOU SEE HOW ON 291 IT SAYS, "THE THERANOS IL-6, TNF-A,

03:17PM  8     CRP ASSAY MULTIPLEX HAS BEEN SHOWN TO GIVE MORE ACCURATE AND

03:17PM  9     PRECISE RESULTS FOR THREE INDEPENDENTLY CALIBRATED CARTRIDGE

03:17PM 10     LOTS AND ALL OF THE MANY INSTRUMENTS USED THAN CURRENT 'GOLD

03:17PM 11     STANDARD' REFERENCE METHODS."

03:17PM 12          DO YOU SEE THAT LANGUAGE?

03:17PM 13     A.   I DO.

03:17PM 14     Q.   AND I PROBABLY DIDN'T READ THAT AS WELL AS I SHOULD HAVE.

03:17PM 15          BUT DO YOU SEE THAT LANGUAGE?

03:17PM 16     A.   I DO.

03:17PM 17     Q.   AND DO YOU SEE HOW THOSE WORDS, "GOLD STANDARD REFERENCE

03:17PM 18     METHODS," ARE NOT ON THE CONCLUSIONS IN THE REPORT THAT GOES TO

03:17PM 19     SCHERING-PLOUGH?

03:17PM 20     A.   YES.

03:17PM 21     Q.   DID YOU ADD THOSE WORDS?

03:17PM 22     A.   I THINK SO.

03:17PM 23     Q.   OKAY.  AND YOU DIDN'T TESTIFY TO THAT IN YOUR DIRECT

03:17PM 24     EXAMINATION; IS THAT CORRECT?

03:17PM 25     A.   I DON'T THINK SO.



03:17PM   1    Q.   IS MAKING THE CHANGE TO THE CONCLUSIONS PARAGRAPH ALSO

03:18PM   2    SOMETHING THAT YOU WISH YOU HAD DONE DIFFERENTLY?

03:18PM   3    A.   I THINK THIS WAS ACCURATELY REFLECTING THE DATA IN THE

03:18PM   4    DOCUMENT.

03:18PM   5         BUT, YES, I THINK THAT THE WAY THAT THESE REPORTS WERE

03:18PM   6    COMMUNICATED, I ABSOLUTELY WISH IT HAD BEEN BOLDED THAT THEY

03:18PM   7    WERE WRITTEN BY US.

03:18PM   8    Q.   LET'S TALK ABOUT GSK.

03:18PM   9         DO YOU RECALL TESTIFYING ABOUT GSK?

03:18PM  10    A.   I DO.

03:18PM  11    Q.   OKAY.  AND IF WE COULD LOOK AT EXHIBIT 291, PAGE 2.

03:18PM  12         IS THIS ANOTHER ONE OF THE ATTACHMENTS THAT WENT TO

03:18PM  13    WALGREENS?

03:18PM  14    A.   YES.

03:18PM  15    Q.   AND DO YOU SEE THE GLAXOSMITHKLINE LOGO IN THE TOP LEFT

03:19PM  16    PORTION OF THIS DOCUMENT?

03:19PM  17    A.   I DO.

03:19PM  18    Q.   AND DO YOU SEE THE HEADING "EXCERPTS FROM GSK METABOLIC

03:19PM  19    STUDY REPORT"?

03:19PM  20    A.   I DO.

03:19PM  21    Q.   NOW, GSK, UNLIKE SCHERING-PLOUGH AND PFIZER, GSK HAD

03:19PM  22    PROVIDED TO THERANOS AN EMAIL TITLED "THERANOS EVALUATION."

03:19PM  23         YOU RECALL SEEING THAT?

03:19PM  24    A.   I DO.

03:19PM  25    Q.   AND THAT WAS FROM SOMEONE NAMED NELSON RHODES?

03:19PM  1    A.   YES.

03:19PM  2    Q.   AND HE EMAILED YOU A WORD DOCUMENT WITH INFORMATION FROM

03:19PM  3    THAT EVALUATION?

03:19PM  4    A.   I THINK SO.

03:19PM  5    Q.   AND THE WORD DOCUMENT INCLUDED A SUMMARY OF THERANOS

03:19PM  6    SYSTEMS BY SOMETHING CALLED THE GSK METABOLIC BIOMARKER.

03:19PM  7         DOES THAT SOUND RIGHT?

03:19PM  8    A.   IT DOES.

03:19PM  9    Q.   AND YOU REVIEWED THAT DOCUMENT WHEN YOU RECEIVED IT?

03:19PM  10   A.   I'M SURE I DID.

03:19PM  11   Q.   YOU WERE PLEASED WITH THE FEEDBACK?

03:19PM  12   A.   YES.

03:19PM  13   Q.   AND SO UNLIKE PFIZER, GSK HAD PROVIDED A WRITTEN DOCUMENT

03:20PM  14   SETTING FORTH AT LEAST SOME OF ITS VIEWS?

03:20PM  15   A.   YES.

03:20PM  16   Q.   AND UNLIKE SCHERING-PLOUGH, GSK HAD PROVIDED A DOCUMENT

03:20PM  17   SETTING FORTH SOME OF ITS VIEWS?

03:20PM  18   A.   YES.

03:20PM  19   Q.   LET'S LOOK AT EXHIBIT 142, WHICH IS IN EVIDENCE.

03:20PM  20        LET ME CONFIRM, MS. KRATZMANN, IS 142 IN EVIDENCE?

03:20PM  21             THE CLERK:  142?  NO.

03:20PM  22             MR. LEACH:  IS 112 IN EVIDENCE?

03:20PM  23             THE CLERK:  THERE'S 112 AND --

03:20PM  24             MR. LEACH:  OKAY.  LET'S TRY 112.

03:21PM  25   Q.   MS. HOLMES, DO YOU SEE EXHIBIT 112 ON THE SCREEN?

03:21PM  1    A.   I DO, YES.

03:21PM  2    Q.   AND THIS IS THE EMAIL THAT WE HAVE BEEN TALKING ABOUT FROM

03:21PM  3    NELSON RHODES AT GSK?

03:21PM  4    A.   YES.

03:21PM  5    Q.   AND IF WE COULD PLEASE GO TO PAGE 2.

03:21PM  6         AND IF WE CAN SPLIT THE SCREEN, MS. HOLLIMAN, WITH

03:21PM  7    EXHIBIT 291, PAGE 2.

03:21PM  8         DO YOU SEE ON THE LEFT SCREEN THE SECOND PAGE OF

03:21PM  9    EXHIBIT 112, MS. HOLMES?

03:21PM  10   A.   I'M SORRY, WHICH ONE?

03:22PM  11   Q.   ON THE LEFT SIDE OF THE SCREEN --

03:22PM  12   A.   YES.

03:22PM  13   Q.   -- DO YOU SEE THE SECOND PAGE OF EXHIBIT 112?

03:22PM  14   A.   I DO.

03:22PM  15   Q.   OKAY.  AND TO THE RIGHT IS THE SECOND PAGE OF EXHIBIT 291

03:22PM  16   AT PAGE 2?

03:22PM  17   A.   YES.

03:22PM  18   Q.   AND 291 IS THE DOCUMENT THAT GOES TO WALGREENS?

03:22PM  19   A.   YES.

03:22PM  20   Q.   OKAY.  THERE'S A LOGO FOR GSK AT THE TOP LEFT OF 291.

03:22PM  21        DID YOU ADD THAT LOGO?

03:22PM  22   A.   I ASSUME SO.

03:22PM  23   Q.   AND DID YOU PROVIDE THE -- AND YOU PROVIDED THE DOCUMENT

03:22PM  24   IN 291 TO WALGREENS?

03:22PM  25   A.   I DID.

03:22PM  1    Q.  DID YOU RECEIVE ANY PERMISSION FROM GSK TO ADD THE LOGO?

03:22PM  2    A.  I DON'T KNOW.

03:22PM  3    Q.  AND YOU HAVE NO MEMORY OF RECEIVING ANY ORAL PERMISSION

03:22PM  4    FROM GSK TO ADD THE LOGO?

03:22PM  5    A.  I DON'T.

03:22PM  6    Q.  AND YOU HAVE NO MEMORY OF ANY WRITTEN COMMUNICATION FROM

03:23PM  7    GSK AUTHORIZING YOU TO ADD THE LOGO?

03:23PM  8    A.  I DON'T.

03:23PM  9    Q.  AND YOU DON'T HAVE A MEMORY OF TELLING ANYBODY FROM GSK

03:23PM  10   THAT YOU HAD ALTERED THE DOCUMENT IN EXHIBIT 112?

03:23PM  11   A.  I'M NOT SURE.  THERE WAS A GSK EXECUTIVE THAT CAME IN TO

03:23PM  12   WORK WITH US WHO WAS IN ACTUAL COMMUNICATION WITH THEM.

03:23PM  13   Q.  BUT YOU DON'T HAVE A MEMORY OF HIM TELLING YOU TO AFFIX

03:23PM  14   THE LOGO TO THIS AND DO WHAT YOU WILL TO IT?

03:23PM  15   A.  NO.

03:23PM  16   Q.  DID YOU TELL ANYBODY FROM GSK THAT YOU MIGHT BE PROVIDING

03:23PM  17   EXCERPTS OF A METABOLIC STUDY REPORT TO INVESTORS?

03:23PM  18   A.  WE MIGHT HAVE.

03:23PM  19   Q.  BUT YOU DON'T HAVE A MEMORY OF IT?

03:23PM  20   A.  I'M NOT SURE.

03:23PM  21   Q.  IF YOU COMPARE EXHIBIT 112 AT PAGE 2 ON THE LEFT TO 291-2

03:24PM  22   ON THE RIGHT, YOU'LL SEE THAT THE DATES ON MAY 27TH TO 28TH,

03:24PM  23   2008 ARE NOT PRESENT ON THE DOCUMENT WITH THE GSK LOGO.

03:24PM  24       DO YOU SEE THAT?

03:24PM  25   A.  I DO.

03:24PM  1    Q.   DID YOU DELETE THOSE WORDS?

03:24PM  2    A.   I DON'T KNOW.

03:24PM  3    Q.   IS THE REASON THAT THOSE WORDS ARE DELETED IS BECAUSE IT

03:24PM  4    MIGHT SUGGEST THE LIMITS OF GSK'S EVALUATION?

03:24PM  5    A.   I DON'T THINK SO.

03:24PM  6    Q.   YOU DON'T RECALL TESTIFYING ABOUT ADDING THE GSK LOGO

03:24PM  7    DURING YOUR DIRECT EXAMINATION, DO YOU?

03:24PM  8    A.   I DON'T THINK SO.

03:24PM  9    Q.   AND THERANOS DID MORE THAN SIMPLY DELETE DATES HERE.

03:24PM  10        WHY DON'T -- CAN I DRAW YOUR ATTENTION, PLEASE, TO THE

03:25PM  11   BULLETS?

03:25PM  12   A.   YES.

03:25PM  13   Q.   IF WE COULD ZOOM OUT, MS. HOLLIMAN, AND GO TO PAGE 3 OF

03:25PM  14   112.

03:25PM  15        DO YOU SEE IN 112 THERE'S A BULLET UNDER "GSK METABOLIC

03:25PM  16   BIOMARKER LAB COMMENTS" THAT SAYS, "FINGER PRICK/BLOOD DRAW

03:25PM  17   PROCEDURE WAS DIFFICULT (NEEDED LARGER LANCET AND BETTER

03:25PM  18   SYRINGE SYSTEM)."

03:25PM  19        DO YOU SEE THAT LANGUAGE?

03:25PM  20   A.   I DO.

03:25PM  21   Q.   AND THAT COMMENT IS DELETED FROM THE DOCUMENT THAT GOES TO

03:25PM  22   WALGREENS; ISN'T THAT RIGHT?

03:25PM  23   A.   I DON'T KNOW.  I HAVEN'T LOOKED AT IT, BUT -- BUT I TAKE

03:25PM  24   YOUR WORD FOR IT.

03:25PM  25   Q.   DID YOU MAKE THAT DELETION?

03:26PM  1    A.   I DON'T KNOW.

03:26PM  2    Q.   OKAY.  IF WE COULD ZOOM OUT, MS. HOLLIMAN, SO WE MIGHT --

03:26PM  3         DO YOU SEE HOW ON THE 291 UNDER "GSK METABOLIC BIOMARKER

03:26PM  4    LAB COMMENTS," THERE ARE THREE -- SIX BULLETS OR --

03:26PM  5    A.   I DO.

03:26PM  6    Q.   AND THE LAST ONE ENDS WITH "ASSAYS TOOK APPROXIMATELY ONE

03:26PM  7    HOUR."

03:26PM  8    A.   YES.

03:26PM  9    Q.   AND THE COMMENT ABOUT THE FINGER PRICK BEING DIFFICULT IS

03:26PM 10    NOT THERE; AM I RIGHT ABOUT THAT?

03:26PM 11    A.   YOU ARE.

03:26PM 12    Q.   AND YOU DON'T KNOW WHO AT THERANOS MADE THE CHANGE TO

03:26PM 13    THESE DOCUMENTS?

03:26PM 14    A.   I DON'T.

03:26PM 15    Q.   AND DID YOU EVER TELL ANYONE AT THERANOS THAT WE CAN'T

03:26PM 16    HAVE THE SLIGHTEST NEGATIVE COMMENT IN WHAT IS GOING OUT TO OUR

03:26PM 17    PARTNERS?

03:26PM 18    A.   I DON'T THINK SO.

03:26PM 19    Q.   AM I RIGHT THAT THE MEMO THAT DR. RHODES SENT YOU WAS

03:26PM 20    NEVER INTENDED FOR USE OUTSIDE OF GSK?

03:27PM 21    A.   I DON'T KNOW.

03:27PM 22    Q.   DIDN'T YOU UNDERSTAND THAT IT WAS A MEANS BY WHICH OTHER

03:27PM 23    UNITS WITHIN GSK MIGHT HAVE SOME INFORMATION ABOUT THERANOS?

03:27PM 24    A.   I THINK THAT'S WHAT THE EVALUATION WAS FOR.

03:27PM 25    Q.   OKAY.  LET'S LOOK AT THE EMAIL.

03:27PM  1          IF WE CAN GO OUT TO 112.

03:27PM  2          DO YOU SEE THE EMAIL FROM, IS IT SUSAN DIGIAIMO?

03:27PM  3   A.    YES.

03:27PM  4   Q.    AND SHE WAS A SALESPERSON FOR THERANOS DURING THIS TIME

03:27PM  5   PERIOD?

03:27PM  6   A.    YES.

03:27PM  7   Q.    BY THE WAY, WE SAW DURING YOUR DIRECT SOME EMAILS TO HER

03:27PM  8   PERSONAL EMAIL ADDRESS.  DO YOU KNOW WHY SHE DID THAT?

03:27PM  9   A.    I THINK SHE LIKED TO MAINTAIN LOGS OF ALL OF HER CUSTOMER

03:27PM  10  RELATIONSHIPS SO THAT SHE COULD USE THEM ON AN ONGOING BASIS.

03:27PM  11  Q.    DID YOU GIVE HER AUTHORITY TO DO THAT?

03:27PM  12  A.    TO DO WHAT?

03:28PM  13  Q.    FORWARD THERANOS PROPRIETARY INFORMATION TO HER PERSONAL

03:28PM  14  EMAIL ADDRESS?

03:28PM  15  A.    I DID NOT.

03:28PM  16  Q.    SO THAT'S AN INSTANCE WHERE YOU WERE LESS CONCERNED ABOUT

03:28PM  17  TRADE SECRETS?

03:28PM  18  A.    I DON'T REMEMBER ANY TRADE SECRETS IN THAT EMAIL.

03:28PM  19  Q.    YOU WOULD FEEL COMFORTABLE JUST PUTTING ON THE WEBSITE

03:28PM  20  YOUR WORK WITH PFIZER AND YOUR WORK WITH GSK AND YOUR WORK WITH

03:28PM  21  SCHERING-PLOUGH?

03:28PM  22  A.    IT DEPENDS ON WHAT IT IS.

03:28PM  23  Q.    OKAY.  GOING BACK TO THE EMAIL, DO YOU SEE WHERE IT SAYS,

03:28PM  24  "SEE ATTACHED SUMMARY OF GSK'S EVALUATION OF OUR SYSTEMS.  I AM

03:28PM  25  FOLLOWING UP WITH REBECCA HODGE AS WELL AS DEREK AND

03:28PM 1   BOB DOBBINS IN REGARDS TO THE UP COMING AXOR STUDY AS WELL AS

03:28PM 2   ADDITIONAL OPPORTUNITIES."

03:28PM 3       YOU KNEW REBECCA HODGE AND DEREK AND BOB DOBBINS WERE GSK

03:28PM 4   EMPLOYEES?

03:28PM 5   A.   I DID.

03:28PM 6   Q.   AND YOU UNDERSTOOD THAT WHAT DR. RHODES WAS DOING WAS SO

03:28PM 7   OTHER UNITS WITHIN GSK MIGHT HAVE INFORMATION ABOUT THERANOS?

03:28PM 8   A.   YES.

03:28PM 9   Q.   AND AM I RIGHT THAT YOUR CONTRACTS WITH PFIZER AND

03:29PM 10  SCHERING-PLOUGH AND GSK PROHIBITED THERANOS FROM USING THE

03:29PM 11  PFIZER -- THE RESPECTIVE LOGOS WITHOUT THEIR WRITTEN

03:29PM 12  PERMISSION?

03:29PM 13  A.   I DON'T KNOW.

03:29PM 14  Q.   WELL, LET'S LOOK.

03:29PM 15      IF WE CAN GO TO WHAT IS IN EVIDENCE AS EXHIBIT 7753.  AND

03:29PM 16  IF WE CAN GO TO THE BATES ENDING 837, WHICH I BELIEVE IS

03:29PM 17  PAGE 117 OF THE DOCUMENT.

03:29PM 18      MS. HOLMES, DO YOU RECALL DURING MS. SPIVEY'S TESTIMONY A

03:29PM 19  NUMBER OF CONTRACTS WITH PHARMACEUTICAL COMPANIES WERE

03:29PM 20  INTRODUCED INTO EVIDENCE?

03:29PM 21  A.   I DO.

03:29PM 22  Q.   AND DURING YOUR DIRECT EXAMINATION, YOU WERE SHOWN SOME OF

03:30PM 23  THE CONTRACTS WITH YOUR PHARMACEUTICAL PARTNERS.

03:30PM 24      DO YOU RECALL TESTIFYING TO THAT?

03:30PM 25  A.   I DO.

03:30PM 1    Q.   OKAY.  I'M SHOWING YOU A PORTION OF THE PFIZER CONTRACT,

03:30PM 2    AND I DRAW YOUR ATTENTION TO THE PARAGRAPH 7.2 UNDER PUBLICITY.

03:30PM 3         DO YOU SEE WHERE IT SAYS, "NEITHER PARTY WILL USE, OR

03:30PM 4    AUTHORIZE OTHERS TO USE, THE NAME, SYMBOLS, OR MARKS OF THE

03:30PM 5    OTHER PARTY IN ANY ADVERTISING OR PUBLICITY MATERIAL OR MAKE

03:30PM 6    ANY FORM OF REPRESENTATION OR STATEMENT WITH REGARD TO THE

03:30PM 7    SERVICES WHICH WOULD KNOWINGLY CONSTITUTE AN EXPRESS OR IMPLIED

03:30PM 8    ENDORSEMENT BY THE OTHER PARTY OF ANY COMMERCIAL PRODUCT OR

03:30PM 9    SERVICE WITHOUT THAT OTHER PARTY'S PRIOR WRITTEN APPROVAL."

03:30PM 10        DO YOU SEE THAT LANGUAGE?

03:30PM 11   A.   I DO.

03:30PM 12   Q.   AND IF I UNDERSTAND YOUR TESTIMONY, BEFORE APPLYING THE

03:30PM 13   LOGO, YOU DIDN'T LOOK AT THE CONTRACT TO MAKE SURE THAT IT WAS

03:30PM 14   OKAY TO DO THAT?

03:30PM 15   A.   I DID NOT.

03:30PM 16   Q.   AND THIS WOULD BE THE TYPE OF THING THAT WOULD UPSET

03:30PM 17   THERANOS IF ONE OF THERANOS'S COUNTER PARTIES DID THIS.

03:30PM 18        IS THAT FAIR?

03:31PM 19   A.   I'M NOT SURE.  IT DEPENDS ON THE CONTEXT.

03:31PM 20   Q.   YOU WERE VERY AGGRESSIVE WITH YOUR INTELLECTUAL PROPERTY;

03:31PM 21   ISN'T THAT CORRECT?

03:31PM 22   A.   WE WERE.

03:31PM 23   Q.   YOU WERE NOT AFRAID TO SUE PEOPLE YOU THOUGHT WERE

03:31PM 24   INFRINGING PATENTS; IS THAT CORRECT?

03:31PM 25   A.   CORRECT.

03:31PM  1     Q.   YOU WERE VERY, VERY AGGRESSIVE IN ENFORCING YOUR

03:31PM  2     INTELLECTUAL PROPERTY?

03:31PM  3     A.   YES.

03:31PM  4     Q.   AND IF SOMEBODY WAS USING YOUR LOGO WITHOUT YOUR CONSENT,

03:31PM  5     YOU WOULD HAVE BEEN ANGRY ABOUT THAT?

03:31PM  6     A.   AGAIN, IT DEPENDS ON THE CONTEXT.

03:31PM  7          WE HAD PHARMA PARTNERS WHO WERE REPRESENTING OUR WORK AT

03:31PM  8     CONFERENCES WITH OUR LOGO I THINK.

03:31PM  9     Q.   LET'S LOOK AT THE SCHERING-PLOUGH AGREEMENT.

03:31PM 10          IF WE CAN GO TO PAGE 135.

03:31PM 11          AND I DRAW YOUR ATTENTION TO PARAGRAPH 7.

03:31PM 12          DO YOU SEE THE REFERENCE TO SPRI?

03:31PM 13     A.   I DO.

03:31PM 14     Q.   AND IS THAT A REFERENCE TO A SCHERING-PLOUGH ENTITY?

03:32PM 15     A.   I THINK SO.

03:32PM 16     Q.   OKAY.  AND THIS SAYS, "PROVIDER AGREES" -- PROVIDER IN

03:32PM 17     THIS IS THERANOS; RIGHT?

03:32PM 18     A.   I THINK SO.

03:32PM 19     Q.   "PROVIDER AGREES THAT IT WILL NOT, WITHOUT THE PRIOR

03:32PM 20     WRITTEN PERMISSION OF SPRI, USE INFORMATION AND DATA RECEIVED

03:32PM 21     BY IT OR GENERATED PURSUANT TO THE PROJECT FOR ANY PURPOSE

03:32PM 22     OTHER THAN IN CARRYING OUT THIS AGREEMENT.

03:32PM 23          "NEITHER PARTY MAY USE THE NAME OF THE OTHER PARTY IN ANY

03:32PM 24     PUBLICITY OR ADVERTISING NOR ISSUE A PRESS RELEASE OR OTHERWISE

03:32PM 25     PUBLICIZE OR DISCLOSE ANY INFORMATION RELATED TO THE EXISTENCE

03:32PM  1    OF THIS AGREEMENT OR THE TERMS AND CONDITIONS HEREOF, WITHOUT

03:32PM  2    THE PRIOR WRITTEN CONSENT OF THE OTHER PARTY."

03:32PM  3         DO YOU SEE THAT LANGUAGE?

03:32PM  4    A.   I DO.

03:32PM  5    Q.   AND YOU DIDN'T CONSULT WITH SCHERING-PLOUGH OR REVIEW THE

03:32PM  6    CONTRACT BEFORE APPLYING THE SCHERING-PLOUGH LOGO?

03:32PM  7    A.   I DID NOT REVIEW THE CONTRACT.

03:32PM  8    Q.   AND AM I RIGHT THAT YOU DID NOT REVIEW THE GSK CONTRACT

03:32PM  9    BEFORE DOING THAT?

03:32PM 10    A.   I DID NOT.

03:32PM 11    Q.   OKAY.  AND WOULD IT SURPRISE YOU THAT THE GSK CONTRACT

03:33PM 12    ALSO HAS LANGUAGE GOVERNING ITS USE OF TRADEMARKS?

03:33PM 13    A.   IT WOULD NOT.

03:33PM 14    Q.   LET ME DRAW YOUR ATTENTION TO --

03:33PM 15         MS. HOLLIMAN, IS 5537 IN EVIDENCE?

03:33PM 16         OR, I'M SORRY, MS. KRATZMANN?

03:33PM 17              THE CLERK:  5537?  NO.

03:33PM 18              MR. LEACH:  OKAY.  THANK YOU.

03:33PM 19         MAY I APPROACH, YOUR HONOR?

03:33PM 20              THE COURT:  YES.

03:34PM 21    BY MR. LEACH:

03:34PM 22    Q.   I'M PLACING BEFORE YOU WHAT HAS BEEN MARKED AS

03:34PM 23    EXHIBIT 5537.

03:34PM 24         DO YOU HAVE THAT IN FRONT OF YOU, MS. HOLMES?

03:34PM 25    A.   I DO, YES.

03:34PM 1    Q.   AND THIS IS AN EMAIL EXCHANGE BETWEEN -- INVOLVING YOU AND

03:34PM 2    DAN EDLIN?

03:34PM 3    A.   YES.

03:34PM 4    Q.   AND IT RELATES TO INFORMATION THAT MR. EDLIN AT YOUR

03:34PM 5    DIRECTION IS TO PROVIDE TO ROGER PARLOFF IN CONNECTION WITH HIS

03:34PM 6    REPORTING?

03:34PM 7    A.   YES.

03:34PM 8         MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5537.

03:35PM 9         (PAUSE IN PROCEEDINGS.)

03:35PM 10        MR. DOWNEY:  NO OBJECTION.

03:35PM 11        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:35PM 12        (GOVERNMENT'S EXHIBIT 5537 WAS RECEIVED IN EVIDENCE.)

03:35PM 13        MR. LEACH:  IF WE CAN ZOOM IN ON THE TOP HALF,

03:35PM 14   MS. HOLLIMAN.

03:35PM 15   Q.   DO YOU SEE THERE'S AN EMAIL FROM YOU, MS. HOLMES, TO

03:35PM 16   DAN EDLIN ON SUNDAY, JUNE 1ST, 2014?

03:35PM 17   A.   YES.

03:35PM 18   Q.   AND THE SUBJECT IS "ROGER PARLOFF - AGGREGATED ACTION

03:35PM 19   ITEMS"?

03:35PM 20   A.   YES.

03:35PM 21   Q.   AND YOU GAVE GUIDANCE TO MR. EDLIN ABOUT HOW TO -- WHAT

03:35PM 22   INFORMATION TO COMMUNICATE TO ROGER PARLOFF IN CONNECTION WITH

03:35PM 23   HIS REPORTING; IS THAT CORRECT?

03:35PM 24   A.   I DID.

03:35PM 25   Q.   AND HERE DOES IT APPEAR THAT YOU ARE FORWARDING THE -- A

03:35PM  1    VERSION OF THE DOCUMENT RELATING TO SCHERING-PLOUGH TO

03:36PM  2    DAN EDLIN FOR HIM TO PROVIDE TO ROGER PARLOFF?

03:36PM  3    A.   I DID.

03:36PM  4    Q.   OKAY.  IF WE CAN LOOK AT THE NEXT PAGE, MS. HOLLIMAN.  AND

03:36PM  5    THE NEXT ONE.  LET'S GO TO THE ATTACHMENT IF WE COULD.

03:36PM  6         AND THE VERSION THAT YOU ARE SENDING IS THE ONE WITH THE

03:36PM  7    SCHERING-PLOUGH LOGO UP AT THE TOP; CORRECT?

03:36PM  8    A.   YES.

03:36PM  9    Q.   AND THAT'S THE ONE THAT YOU APPLIED?

03:36PM  10   A.   YES.

03:36PM  11   Q.   OKAY.  AND YOU NEVER TOLD DAN EDLIN ABOUT THE APPLICATION

03:36PM  12   OF THE SCHERING-PLOUGH LOGO TO THIS; IS THAT CORRECT?

03:36PM  13   A.   I DON'T KNOW.

03:36PM  14   Q.   YOU DON'T HAVE A MEMORY OF THAT?

03:36PM  15   A.   I DON'T.

03:36PM  16   Q.   OKAY.  AND YOU DON'T HAVE A MEMORY OF INSTRUCTING

03:36PM  17   DAN EDLIN TO LET ROGER PARLOFF KNOW THAT?

03:36PM  18   A.   I DON'T.

03:36PM  19   Q.   OKAY.  LET'S LOOK AT EXHIBIT 553 --

03:37PM  20        CAN YOU ZOOM OUT, PLEASE, MS. HOLLIMAN.

03:37PM  21        IF WE COULD PLEASE LOOK AT 5538.

03:37PM  22   A.   I DON'T THINK I HAVE THAT ONE.

03:37PM  23   Q.   THAT'S BECAUSE I DIDN'T PUT IT IN YOUR BINDER.

03:37PM  24   A.   OKAY.

03:37PM  25   Q.   I'LL BRING IT UP.

03:37PM 1        MAY I APPROACH, YOUR HONOR?

03:37PM 2              THE COURT:  YES.

03:37PM 3    BY MR. LEACH:

03:37PM 4    Q.   (HANDING.)

03:37PM 5        IS THIS ANOTHER EMAIL EXCHANGE INVOLVING YOU AND MR. EDLIN

03:37PM 6    RELATING TO INFORMATION TO PROVIDE TO ROGER PARLOFF?

03:37PM 7    A.   IT IS.

03:37PM 8              MR. LEACH:  YOUR HONOR, I MOVE 5538 INTO EVIDENCE.

03:38PM 9              MR. DOWNEY:  ARE THESE ALL THE SAME ATTACHMENTS,

03:38PM 10   BOB?

03:38PM 11       YEAH, NO OBJECTION.

03:38PM 12             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:38PM 13       (GOVERNMENT'S EXHIBIT 5538 WAS RECEIVED IN EVIDENCE.)

03:38PM 14   BY MR. LEACH:

03:38PM 15   Q.   AND IF WE CAN ZOOM IN AT THE TOP.

03:38PM 16       DO YOU SEE, MS. HOLMES, YOU'RE EMAILING MR. EDLIN ON THE

03:38PM 17   SAME DAY AS THE PRIOR EXHIBIT, THIS TIME ATTACHING THE -- A

03:38PM 18   REPORT RELATING TO PFIZER?

03:38PM 19   A.   I DO.

03:38PM 20   Q.   OKAY.  AND IS THIS SIMILAR TO THE EXHIBIT THAT WE SAW

03:38PM 21   PREVIOUSLY WHERE YOU'RE PROVIDING SCHERING-PLOUGH RELATED

03:38PM 22   DOCUMENTS TO MR. EDLIN TO PROVIDE TO MR. PARLOFF?

03:38PM 23   A.   IT IS.

03:38PM 24   Q.   OKAY.  FURTHER BELOW YOU WROTE, "WHAT CAN BE DISCLOSED IS

03:38PM 25   DEVICES.

03:38PM    1          "DECENTRALIZABLE.

03:39PM    2          "WILL DECENTRALIZE.

03:39PM    3          "WILL MAINTAIN CENTRALIZED OVERSIGHT."

03:39PM    4          DO YOU SEE THAT LANGUAGE?

03:39PM    5     A.   I DO.

03:39PM    6     Q.   AND YOU RECALL SOME OF THE AUDIO CONVERSATIONS WITH

03:39PM    7     MR. PARLOFF WHERE YOU TALKED TO MR. PARLOFF ABOUT THIS IDEA

03:39PM    8     THAT YOU CAN REFER TO OUR SYSTEM AS DEVICES, BUT DON'T USE THE

03:39PM    9     WORD "DEVICE."

03:39PM   10          DO YOU RECALL THAT AUDIO?

03:39PM   11     A.   YES.

03:39PM   12     Q.   AND YOU WERE BEING VERY CAREFUL IN YOUR WORD CHOICE IN

03:39PM   13     THAT CONVERSATION.

03:39PM   14          IS THAT FAIR, MS. HOLMES?

03:39PM   15     A.   I THINK SO.

03:39PM   16     Q.   OKAY.  YOU WERE PAYING ATTENTION TO THE DIFFERENCE BETWEEN

03:39PM   17     "DEVICES" AND "DEVICE"?

03:39PM   18     A.   I THINK SO, YES.

03:39PM   19     Q.   OKAY.  AND THAT'S WHAT YOU'RE EXPRESSING HERE IN THIS

03:39PM   20     EMAIL?

03:39PM   21     A.   I'M NOT SURE WHAT I'M EXPRESSING HERE.

03:39PM   22     Q.   OKAY.  WELL, YOU'RE ALSO TALKING ABOUT WAYS TO USE THE

03:39PM   23     FUTURE TENSE TO TALK ABOUT DECENTRALIZATION OF THE LAB, AREN'T

03:39PM   24     YOU?

03:39PM   25     A.   YOU'RE REFERRING TO "WILL DECENTRALIZE"?

03:40PM   1    Q.   WELL, AREN'T ALL THREE OF THOSE WORDS A WAY TO EXPRESS THE

03:40PM   2    ABILITY TO DECENTRALIZE SOMETHING?

03:40PM   3    A.   I THINK SO.

03:40PM   4    Q.   OKAY.  AND THIS WAS GUIDANCE THAT YOU WERE GIVING TO

03:40PM   5    MR. EDLIN IN ANY CONVERSATIONS HE MIGHT HAVE WITH MR. PARLOFF?

03:40PM   6    A.   IT'S CERTAINLY RELATED TO MR. PARLOFF.  IT'S NOTES OF

03:40PM   7    SOMETHING.  I'M NOT QUITE SURE WHAT THIS IS.

03:40PM   8    Q.   OKAY.  ISN'T THIS AN EXAMPLE OF YOU BEING EXTRAORDINARILY

03:40PM   9    CAREFUL WITH THE WAY YOU PUT PHRASES IN TERMS OF FUTURE USE,

03:40PM   10   ASPIRATION, HISTORICAL USE?

03:40PM   11   A.   I DON'T KNOW.  THIS IS -- IT LOOKS LIKE NOTES OF SOMETHING

03:40PM   12   TO ME.

03:40PM   13   Q.   OKAY.  ON YOUR DIRECT -- WE CAN TAKE THIS DOWN,

03:40PM   14   MS. HOLLIMAN.

03:40PM   15       ON YOUR DIRECT EXAMINATION YOU WERE ASKED A QUESTION, "AND

03:40PM   16   AS OF DECEMBER 13TH, DECEMBER 2013, DID THERANOS NEED CAPITAL

03:41PM   17   BY THE END OF 2013?"

03:41PM   18       DO YOU RECALL THAT QUESTION BEING ASKED OF YOU?

03:41PM   19   A.   I DO.

03:41PM   20   Q.   AND YOU ANSWERED, "WE HAD RECEIVED $75 MILLION IN CAPITAL

03:41PM   21   FROM WALGREENS, SO WE DID NOT NEED CAPITAL AFTER THAT."

03:41PM   22       THAT WAS YOUR TESTIMONY?

03:41PM   23   A.   IT WAS.

03:41PM   24   Q.   OKAY.  ISN'T IT TRUE THOUGH, MS. HOLMES, THAT YOU NEEDED

03:41PM   25   CAPITAL IN SEPTEMBER OF 2013 AND AGAIN IN DECEMBER OF 2013?

03:41PM  1      A.   YES.

03:41PM  2      Q.   LET'S LOOK AT SOME OF THE EXAMPLES OF THAT.

03:41PM  3           IF WE CAN CALL UP WHAT IS IN EVIDENCE AS EXHIBIT 5172.

03:41PM  4           AND I THINK WE NEED THE NATIVE FILE FOR THIS,

03:41PM  5      MS. HOLLIMAN.

03:42PM  6           MS. HOLMES, DO YOU RECALL TESTIMONY FROM MS. SPIVEY ABOUT

03:42PM  7      CASH BALANCE SPREADSHEETS THAT SHE WOULD SHARE WITH YOU FROM

03:42PM  8      TIME TO TIME?

03:42PM  9      A.   I DO.

03:42PM  10     Q.   AND I BELIEVE YOU TESTIFIED THAT YOU PAID ATTENTION TO THE

03:42PM  11     COMPANY'S CASH POSITION OVER TIME?

03:42PM  12     A.   YES.

03:42PM  13     Q.   I WOULD LIKE -- MR. DOWNEY ASKED YOU QUESTIONS ABOUT THE

03:42PM  14     END OF DECEMBER 2013.  I'D LIKE TO FOCUS ON THE SEPTEMBER 2013

03:42PM  15     TIME PERIOD.

03:42PM  16          AND IF WE CAN MOVE TO COLUMN EN, MS. HOLLIMAN.

03:43PM  17          DO YOU SEE, MS. HOLMES, THAT THERE ARE ROWS FOR THE WEEK

03:43PM  18     BEGINNING SEPTEMBER 23RD, 2013, AND ENDING SEPTEMBER 29TH,

03:43PM  19     2013?

03:43PM  20     A.   I DO.

03:43PM  21     Q.   AND THEN DO YOU SEE A LISTING OF PARTICULAR ACCOUNTS IN

03:43PM  22     ROWS 9 THROUGH 14, FIDELITY, MORGAN STANLEY-INVESTMENT,

03:43PM  23     MORGAN STANLEY-LOC.

03:43PM  24          DO YOU SEE THOSE?

03:43PM  25     A.   I DO.

03:43PM  1    Q.   AND IN THE MORGAN STANLEY-LOC LINE, THAT LOC STANDS FOR

03:43PM  2    LINE OF CREDIT; CORRECT?

03:43PM  3    A.   YES.

03:43PM  4    Q.   AND THAT LINE OF CREDIT WAS SECURING THERANOS'S RENT

03:44PM  5    OBLIGATIONS?

03:44PM  6    A.   I'M NOT SURE.

03:44PM  7    Q.   OKAY.  IT WAS SECURING SOMETHING; IS THAT FAIR?

03:44PM  8    A.   I DON'T KNOW.

03:44PM  9    Q.   DO YOU GENERALLY HAVE A MEMORY THAT YOU WEREN'T SIMPLY

03:44PM  10   FREE TO DRAW DOWN ON THE LETTER OF CREDIT?

03:44PM  11   A.   I THINK THAT'S RIGHT.

03:44PM  12   Q.   OKAY.  SO DIPPING INTO THAT $7.5 MILLION WOULD NOT BE A

03:44PM  13   HAPPY DAY FOR THERANOS?

03:44PM  14   A.   I THINK YOU'RE RIGHT.

03:44PM  15   Q.   OKAY.  AND THIS SAYS THERE'S $5 MILLION IN A FIDELITY

03:44PM  16   ACCOUNT.

03:44PM  17       DO YOU SEE THAT?

03:44PM  18   A.   I DO.

03:44PM  19   Q.   AND 85,700,000 IN ANOTHER -- IN A MORGAN

03:44PM  20   STANLEY-INVESTMENT ACCOUNT?

03:44PM  21   A.   YES.

03:44PM  22   Q.   AND AT THIS POINT IN TIME, THERANOS'S TOTAL CASH BALANCE

03:44PM  23   IS DOWN TO APPROXIMATELY $14.46 MILLION; IS THAT CORRECT?

03:45PM  24   A.   YES.

03:45PM  25   Q.   AND IF YOU SCROLL TO THE LEFT, DO YOU SEE AT THE END OF --

03:45PM   1    IN ROW EI THERE'S A DEBIT FOR $18.5 MILLION IN LINE 22?

03:45PM   2         FURTHER DOWN, MS. HOLLIMAN.

03:45PM   3         DO YOU SEE THAT?

03:45PM   4    A.   I DO.

03:45PM   5    Q.   AND THAT 18.5 MILLION DEBIT WAS TAKEN OUT OF YOUR FIDELITY

03:45PM   6    ACCOUNT, DROPPING IT DOWN FROM $32 MILLION TO $12 MILLION IN

03:45PM   7    THAT WEEK.

03:45PM   8         DO YOU SEE THAT IN LINE 9?

03:45PM   9    A.   I DO.

03:45PM  10    Q.   AND THAT 18.5 MILLION, THAT WAS FROM BLUE CROSS BLUE

03:45PM  11    SHIELD, WASN'T IT?

03:45PM  12    A.   I THINK SO.

03:45PM  13    Q.   YOU HAD GOTTEN MONEY FROM BLUE CROSS BLUE SHIELD IN 2011

03:45PM  14    WITH THE HOPE THAT YOU WERE GOING TO FULFILL SOME CONTRACT

03:45PM  15    OBLIGATIONS TO THEM?

03:45PM  16    A.   YES.

03:45PM  17    Q.   AND AT SOME POINT IN THE SUMMER OF 2013, BLUE CROSS BLUE

03:46PM  18    SHIELD TOLD YOU THERANOS HADN'T MET ITS OBLIGATIONS, WE WANT

03:46PM  19    OUR 18.5 MILLION BACK?

03:46PM  20    A.   I THINK IT WAS WE HADN'T DEPLOYED IN THAT STATE.

03:46PM  21    Q.   OKAY.  BUT IN ANY EVENT, THEY WANTED THEIR MONEY BACK?

03:46PM  22    A.   WE REFUNDED IT TO THEM.

03:46PM  23    Q.   AND THAT'S THE 18.5 MILLION THAT WE SEE HERE?

03:46PM  24    A.   IT IS.

03:46PM  25    Q.   AND THAT PUT PRESSURE ON THE COMPANY; ISN'T THAT RIGHT?

03:46PM 1    A.   YES.

03:46PM 2    Q.   THIS WAS A MATTER OF WEEKS BEFORE THE LAUNCH WITH

03:46PM 3    WALGREENS?

03:46PM 4    A.   IT WAS.

03:46PM 5    Q.   THIS WAS WHEN YOU WERE PUSHING YOUR TEAMS VERY, VERY HARD

03:46PM 6    TO VALIDATE ASSAYS ON THE MODIFY SIEMENS MACHINES?

03:46PM 7    A.   YES.

03:46PM 8    Q.   THIS WAS IN THE TIME PERIOD WHEN YOU WERE PUSHING YOUR

03:46PM 9    TEAM TO VALIDATE ASSAYS ON THE 3.5 DEVICE?

03:46PM 10   A.   YES, WE WERE WORKING REALLY HARD ON THAT.

03:46PM 11   Q.   OKAY.  AND YOU KNEW THAT THERANOS HAD A BURN RATE IN THE

03:47PM 12   MILLIONS OF DOLLARS?

03:47PM 13   A.   I DID.

03:47PM 14   Q.   THERANOS WAS ALMOST OUT OF MONEY IN SEPTEMBER OF 2013;

03:47PM 15   ISN'T THAT CORRECT?

03:47PM 16   A.   I HAD NEVER THOUGHT OF IT LIKE THAT, NO.

03:47PM 17   Q.   OKAY.  WELL, YOU RAISED MONEY FROM INVESTORS IN SEPTEMBER

03:47PM 18   OF 2013, DIDN'T YOU?

03:47PM 19   A.   WE DID.

03:47PM 20   Q.   YOU RAISED OVER $21 MILLION FROM INVESTORS IN SEPTEMBER OF

03:47PM 21   2013; IS THAT FAIR?

03:47PM 22   A.   THAT SOUNDS RIGHT.

03:47PM 23   Q.   OKAY.  WELL, LET'S LOOK AT THE SPREADSHEETS.

03:47PM 24        DO YOU SEE IF WE MOVE -- IF WE LOOK DOWN AT THE CUSTOMER

03:47PM 25   RECEIPTS FOR THE FOLLOWING WEEK, SEPTEMBER 30TH, 2013, DO YOU

03:47PM  1    SEE THE $21 MILLION NUMBER THERE, ROW 27, COLUMN EO?

03:47PM  2    A.   I DO.

03:47PM  3    Q.   AND LET'S JUST GIVE MS. HOLLIMAN A MOMENT TO GET THERE.

03:47PM  4         DO YOU SEE $21,995,100 IN OPTION/STOCK PROCEEDS?

03:48PM  5    A.   I DO.

03:48PM  6    Q.   AND IF WE CAN GO TO, THERE'S A TAB IN THE EXCEL

03:48PM  7    SPREADSHEET TO COMERICA.  IF WE CAN CLICK ON THAT.

03:48PM  8         AND IF WE CAN GO TO THE EO COLUMN.

03:48PM  9         I THINK, MS. HOLLIMAN, IF YOU CLICK ON THIS, ON THE PLUS

03:48PM  10   SIGN UP THERE, IT WILL EXPAND IT EVEN MORE.  THERE YOU GO.

03:48PM  11        AND DO YOU SEE THAT SAME NUMBER $21,995,100 IN ROW 23 EO?

03:48PM  12   A.   I DO.

03:48PM  13   Q.   AND IF I COULD ASK MS. HOLLIMAN TO HIGHLIGHT ON THAT.

03:48PM  14        DO YOU SEE HOW IT CALLS UP A COMMENT FROM MS. YAM, OR JUST

03:49PM  15   CLICK ON THE CELL, 15 MILLION PEER?

03:49PM  16        DO YOU SEE THAT?

03:49PM  17   A.   I DO.

03:49PM  18   Q.   AND THAT'S A REFERENCE TO PEER VENTURES?

03:49PM  19   A.   IT IS.

03:49PM  20   Q.   AND PEER VENTURES WAS AN INVESTMENT FUND THAT INVESTED IN

03:49PM  21   THERANOS?

03:49PM  22   A.   YES.

03:49PM  23   Q.   AND THEY INVESTED IN 2010?

03:49PM  24   A.   YES.

03:49PM  25   Q.   AND THEY INVESTED AGAIN IN 2013?

| | | |
|---|---|---|
| 03:49PM | 1 | A.   YES. |
| 03:49PM | 2 | Q.   BASED IN PART ON THE PROMISE OF THE WALGREENS LAUNCH? |
| 03:49PM | 3 | A.   YES. |
| 03:49PM | 4 | Q.   AND THERE'S ALSO A REFERENCE TO LVG XI AND LVG IV. |
| 03:49PM | 5 | DO YOU SEE THAT? |
| 03:49PM | 6 | A.   I DO. |
| 03:49PM | 7 | Q.   AND YOU UNDERSTAND THAT TO BE REFERENCE TO DON LUCAS, |
| 03:49PM | 8 | JUNIOR'S INVESTMENT FUNDS? |
| 03:49PM | 9 | A.   YES. |
| 03:49PM | 10 | Q.   AND THOSE TWO FIRMS PUT IN ABOUT 21,995,000 AT OR AROUND |
| 03:49PM | 11 | THE TIME YOUR CASH BALANCE HAD DROPPED TO $14 MILLION? |
| 03:49PM | 12 | A.   THEY DID. |
| 03:50PM | 13 | Q.   AND YOU KNEW THAT PEER VENTURES WAS AN INVESTMENT FUND RUN |
| 03:50PM | 14 | BY JARED HUTCHINGS AND MARK CAMPBELL? |
| 03:50PM | 15 | A.   I DID. |
| 03:50PM | 16 | Q.   THEY WERE 20 SOMETHINGS, 30 SOMETHINGS IN THE INVESTMENT |
| 03:50PM | 17 | BUSINESS? |
| 03:50PM | 18 | A.   YOU MEAN YEARS OLD? |
| 03:50PM | 19 | Q.   YES. |
| 03:50PM | 20 | A.   YES, YES. |
| 03:50PM | 21 | Q.   ENTREPRENEURS LIKE YOURSELF? |
| 03:50PM | 22 | A.   YES. |
| 03:50PM | 23 | Q.   AND YOU AND MR. BALWANI WERE EXTREMELY RELIEVED WHEN THIS |
| 03:50PM | 24 | MONEY CAME IN; ISN'T THAT RIGHT? |
| 03:50PM | 25 | A.   I'M SURE WE WERE HAPPY WHEN IT CAME IN. |

03:50PM  1    Q.   WELL, LET'S LOOK AT EXHIBIT 5646.

03:51PM  2    A.   OKAY.

03:51PM  3              MR. LEACH:  MAY I APPROACH, YOUR HONOR?

03:51PM  4              THE COURT:  YES.

03:51PM  5    BY MR. LEACH:

03:51PM  6    Q.   (HANDING.)

03:51PM  7         DO YOU RECOGNIZE THIS DOCUMENTS, MS. HOLMES?

03:51PM  8    A.   I DON'T REMEMBER IT, BUT I SEE IT'S AN EMAIL EXCHANGE.

03:52PM  9    Q.   OKAY.  YOU HAVE NO REASON TO DOUBT THAT THIS IS A TRUE

03:52PM 10    EMAIL EXCHANGE BETWEEN YOU AND MR. BALWANI IN SEPTEMBER OF

03:52PM 11    2014?

03:52PM 12    A.   I DON'T.

03:52PM 13    Q.   AND THIS RELATES TO INVESTMENTS BY PEER AND DON LUCAS'S

03:52PM 14    FUND?

03:52PM 15    A.   IT DOES.

03:52PM 16              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5646.

03:52PM 17              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

03:52PM 18              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:52PM 19         (GOVERNMENT'S EXHIBIT 5646 WAS RECEIVED IN EVIDENCE.)

03:52PM 20    BY MR. LEACH:

03:52PM 21    Q.   LET ME DRAW YOUR ATTENTION TO THE BOTTOM PORTION OF THIS

03:52PM 22    EMAIL, MS. HOLMES.

03:52PM 23         DO YOU SEE AN EMAIL FROM JARED HUTCHINGS?

03:52PM 24    A.   I DO.

03:52PM 25    Q.   IT SAYS, "BY THE WAY, WE ARE PLANNING TO LET A VERY

03:52PM   1    CONTRITE MASSY INTO THIS CLOSING.  I HAVE A CALL WITH HER

03:52PM   2    TOMORROW TO CONFIRM.  LET ME KNOW IF THAT GIVES YOU PAUSE."

03:52PM   3         IS THAT A REFERENCE TO AN INVESTOR IN THE PEER VENTURES

03:52PM   4    FUND?

03:52PM   5    A.   I THINK SO, YES.

03:52PM   6    Q.   YOU WROTE BACK, "THAT IS FINE.  LET ME KNOW HOW MUCH SHE

03:52PM   7    WANTS TO BE ABLE TO COME IN FOR/WHAT TOTAL YOU'RE PLANNING FOR

03:53PM   8    THIS CLOSE AND WE'LL PLAN ACCORDINGLY."

03:53PM   9         DO YOU SEE THAT?

03:53PM  10    A.   I DO.

03:53PM  11    Q.   AND PEER VENTURES -- YOU UNDERSTOOD PEER VENTURES WOULD

03:53PM  12    RAISE MONEY FROM ITS OWN INVESTORS OR EVEN HOSPITALS FOR THE

03:53PM  13    WHOLE PURPOSE OF INVESTING IN THERANOS?

03:53PM  14    A.   I DID.

03:53PM  15    Q.   AND IF WE COULD MOVE UP THE CHAIN, PLEASE.

03:53PM  16         DO YOU SEE WHERE MR. HUTCHINGS WRITES, "OK.  I HAVE A CALL

03:53PM  17    WITH INTERMOUNTAIN THIS MORNING TO FINALIZE EVERYTHING.  IT

03:53PM  18    LOOKS LIKES WE CLOSE THE PEER WIRES TOMORROW.  I WILL SEND YOU

03:53PM  19    A FINAL CONFIRMATION ON OUR TOTAL THIS AFTERNOON.  WE SHOULD BE

03:53PM  20    READY TO CLOSE WITH YOU ON MONDAY.  LET ME KNOW IF THAT WORKS."

03:53PM  21         DID I READ THAT CORRECTLY?

03:53PM  22    A.   YOU DID.

03:53PM  23    Q.   AND YOU UNDERSTOOD THAT INTERMOUNTAIN WAS GOING TO INVEST

03:53PM  24    IN PEER TO INVEST IN THERANOS?

03:53PM  25    A.   I DID.

03:53PM 1    Q.   AND YOU FORWARDED THIS TO MR. BALWANI ON SEPTEMBER 26TH?

03:54PM 2    A.   I DID.

03:54PM 3    Q.   AND HIS RESPONSE WAS HMFR, AND THAT'S THE ACRONYM THAT

03:54PM 4    WE'VE SEEN BEFORE IN THE TEXT?

03:54PM 5    A.   IT IS.

03:54PM 6    Q.   THANKING GOD FOR THE MONEY THAT IS COMING IN NOW?

03:54PM 7    A.   I THINK IT'S THE PRAYER THAT HE WOULD RECITE ON A REGULAR

03:54PM 8    BASIS.

03:54PM 9    Q.   OKAY.  AND THAT'S A PRAYER THAT YOU WOULD RECITE ON A

03:54PM 10   REGULAR BASIS?

03:54PM 11   A.   IT IS.

03:54PM 12   Q.   BUT THERANOS'S CASH CRUNCH DIDN'T END WITH PEER AND

03:54PM 13   LUCAS'S FUND INVESTING AT THE END OF SEPTEMBER; ISN'T THAT

03:54PM 14   RIGHT?

03:54PM 15   A.   AGAIN, I DIDN'T THINK ABOUT IT THAT WAY.

03:54PM 16   Q.   OKAY.  WELL, LET'S LOOK AT THE CASH BALANCE SPREADSHEET.

03:54PM 17        THIS IS EXHIBIT 5172, MS. HOLLIMAN.

03:55PM 18        AND IF WE CAN GO BACK NEAR COLUMN EN.

03:55PM 19        DO YOU SEE THE $14 MILLION NUMBER IN THE TOTAL CASH

03:55PM 20   BALANCE FOR THE END OF SEPTEMBER, MS. HOLMES?

03:55PM 21   A.   I DO.

03:55PM 22   Q.   AND IF WE CAN SCROLL TO THE LEFT -- THE RIGHT, PLEASE.

03:55PM 23   AND STOP RIGHT THERE, MS. HOLLIMAN.

03:55PM 24        I DRAW YOUR ATTENTION TO THE TIME PERIOD -- WELL, LET ME

03:55PM 25   FIRST ASK YOU, DO YOU SEE THAT THE TOTAL CASH BALANCES GET DOWN

03:55PM 1    TO APPROXIMATELY 23 MILLION, 21 MILLION, 19 MILLION IN THE TIME

03:56PM 2    PERIOD NOVEMBER 2013 TO DECEMBER 15TH OF 2013?

03:56PM 3    A.   I DO.

03:56PM 4    Q.   AND IF WE WERE TO DEDUCT THE AMOUNT OF THE LOC PAYMENT

03:56PM 5    FROM THOSE AMOUNTS, THAT MEANS THAT THERANOS HAS IN THE

03:56PM 6    NEIGHBORHOOD OF 14 -- $12- TO $16 MILLION OF FREE CASH?

03:56PM 7    A.   SOMETHING LIKE THAT, YEAH.

03:56PM 8    Q.   OKAY.  LET'S LOOK AT SOME OF THE TEXT MESSAGES BETWEEN YOU

03:56PM 9    AND MR. BALWANI IN THIS TIME PERIOD, AND IF WE CAN GO TO

03:56PM 10   EXHIBIT 5387D, AND SPECIFICALLY PAGE 20.

03:57PM 11       AND IF WE CAN ZOOM IN ON THE SUBSTANCE?

03:57PM 12       DO YOU SEE THE DATE OF NOVEMBER 28TH, 2013, MS. HOLMES?

03:57PM 13   A.   I DO.

03:57PM 14   Q.   AND DO YOU SEE WHERE MR. BALWANI WROTE, "WE ARE AT 15M AS

03:57PM 15   OF TODAY"?

03:57PM 16   A.   I DO.

03:57PM 17   Q.   "FREE CASH," HE WROTE.

03:57PM 18       AND YOU SAY "I SAW THAT.

03:57PM 19       "DROP BY TO DISCUSS WHEN U CAN."

03:57PM 20       DO YOU SEE THAT LANGUAGE?

03:57PM 21   A.   I DO.

03:57PM 22       MR. LEACH:  YOUR HONOR, I'M ABOUT TO MOVE ON TO A

03:57PM 23   DIFFERENT TOPIC, AND I HAVE ONE HOUSEKEEPING MATTER, WHICH IS

03:57PM 24   TO MOVE INTO EVIDENCE PAGES 11, 12, 19, 72, 129, 208, 341, AND

03:57PM 25   342 OF EXHIBIT 5387.

03:57PM 1          AND WE CAN PUT THAT IN ONE DOCUMENT CALLED 5387G.

03:58PM 2              THE COURT:  G?

03:58PM 3          ANY OBJECTION?

03:58PM 4              MR. DOWNEY:  YOUR HONOR, MR. LEACH AND I HAVE

03:58PM 5   CONFERRED, AND IF THERE ARE ANY ADDITIONS AS A RESULT OF

03:58PM 6   COMPLETENESS CONCERNS, I THINK WE'LL WORK THAT OUT AND

03:58PM 7   SUPPLEMENT THE EXHIBIT.

03:58PM 8          BUT SUBJECT TO THAT, NO OBJECTION.

03:58PM 9              THE COURT:  ALL RIGHT.  THANK YOU.

03:58PM 10         THESE WILL BE ADMITTED THEN, SUBJECT TO ANY REVIEW, AND

03:58PM 11  YOU CAN BRING THAT UP WITH THE COURT AS NEEDED.

03:58PM 12         (GOVERNMENT'S EXHIBIT 5387G WAS RECEIVED IN EVIDENCE.)

03:58PM 13             THE COURT:  LET'S TAKE OUR BREAK NOW.  YOU HAVE

03:58PM 14  ADDITIONAL QUESTIONS?  LET'S TAKE OUR BREAK NOW?

03:58PM 15             MR. LEACH:  I DO, YOUR HONOR.

03:58PM 16             THE COURT:  LET'S DO THAT THEN, LADIES AND

03:58PM 17  GENTLEMEN.

03:58PM 18         WE'LL RECESS FOR THE DAY.  PLEASE RECALL THAT WE'RE NOT

03:58PM 19  GOING TO SEE EACH OTHER FOR SOME TIME, I BELIEVE.

03:58PM 20         I THINK OUR NEXT DATE TOGETHER IS THE 7TH, MS. KRATZMANN?

03:58PM 21             THE CLERK:  YES, YOUR HONOR.

03:58PM 22             THE COURT:  SO ONCE AGAIN, LADIES AND GENTLEMEN, WE

03:58PM 23  HAVE A LARGE BREAK HERE.  YOU WILL GO BACK TO YOUR REGULAR

03:58PM 24  LIVES OUTSIDE OF THE TRIAL, AND AS YOU DO THAT WITH YOUR

03:59PM 25  FAMILY, YOUR JOBS, AND YOUR SOCIAL ENGAGEMENTS, I'M GOING TO

03:59PM 1    ASK YOU AGAIN TO PLEASE, PLEASE DO NOT IN ANY WAY DO ANY

03:59PM 2    INVESTIGATION, DO NOT LISTEN TO, READ, OR IN ANY WAY TRY TO

03:59PM 3    GAIN ANY INFORMATION ABOUT ANYTHING IN THIS CASE OR ANYTHING

03:59PM 4    ABOUT IT OR ANY OF THE PARTIES INVOLVED.

03:59PM 5        PLEASE PAY FIDELITY, CONTINUED FIDELITY TO THAT

03:59PM 6    ADMONISHMENT, PLEASE.

03:59PM 7        THE SECOND THING I'LL ASK YOU TO DO IS, THE WORLD IS AWARE

03:59PM 8    OF NEW HEALTH CONCERNS, SO I'M GOING TO ASK YOU TO PLEASE,

03:59PM 9    PLEASE BE CAREFUL, CONTINUE TO BE CAREFUL WITH YOU AND YOUR

03:59PM 10   LOVED ONES.  WE WANT ALL OF US TO STAY HEALTHY, AND THAT'S MY

03:59PM 11   WISH FOR YOU AND ALL OF US HERE, AND PLEASE BE CAREFUL IN

03:59PM 12   REGARDS TO YOUR SAFETY, YOUR PERSONAL SAFETY IN THAT REGARD.

03:59PM 13       WITH THAT ADMONISHMENT, WE WILL SEE YOU -- I THINK WE'RE

03:59PM 14   GOING TO BE BACK AT 9:00 A.M., MS. KRATZMANN, AND THAT'S GOING

03:59PM 15   TO BE FOR A FULL DAY I'M HOPEFUL.

03:59PM 16       PLEASE RECALL THAT WEEK IS THE WEEK OF DECEMBER 6TH.

04:00PM 17   DECEMBER 7TH AGAIN IS OUR FIRST DAY.  THAT WILL BE A BUSY WEEK.

04:00PM 18   WE'LL BE IN SESSION THE 7TH, THE 8TH, THE 10TH.

04:00PM 19       I DON'T BELIEVE WE'RE IN SESSION ON THE 9TH, AT LEAST AS

04:00PM 20   FAR AS -- WE ARE.  I HAVE A MISDATED CALENDAR IN FRONT OF ME.

04:00PM 21       THAT'S A BUSY WEEK.  WE'RE IN SESSION ALL WEEK, AND THAT'S

04:00PM 22   TO ACCOMPLISH AS MUCH AS WE CAN DURING THIS SEASON.

04:00PM 23       SO THANK YOU VERY MUCH.  HAVE A GOOD TIME OFF.

04:00PM 24       WITH THAT ADMONISHMENT, WE'LL SEE YOU THEN.  THANK YOU.

04:00PM 25       MS. HOLMES, YOU CAN STAND DOWN.  THANK YOU.

```
04:00PM   1              (JURY OUT AT 4:00 P.M.)

04:00PM   2                   THE COURT:  PLEASE BE SEATED.  THANK YOU.

04:00PM   3         THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT FOR OUR

04:01PM   4    BREAK.

04:01PM   5         COUNSEL, I JUST WANT TO TALK ABOUT WHAT WE SHOULD DO

04:01PM   6    ABOUT -- I GUESS THIS IS -- I WANT TO TALK ABOUT OUR CONTINUED

04:01PM   7    MOTION THAT WE HAD THIS MORNING WITH MR. FLEURMONT, BUT I DON'T

04:01PM   8    KNOW IF WE SHOULD GO FORWARD WITH THAT TODAY.

04:01PM   9         LET ME JUST ASK THE LAWYERS HERE IN THE WELL, ANYTHING

04:01PM  10    FURTHER BEFORE WE BREAK?

04:01PM  11         (DISCUSSION OFF THE RECORD.)

04:01PM  12                   MR. FLEURMONT:  GOOD AFTERNOON, YOUR HONOR.

04:01PM  13                   MR. LEACH:  YOUR HONOR, I EXPECT MS. HOLMES'S

04:01PM  14    TESTIMONY TO BE COMPLETE --

04:01PM  15                   THE COURT:  I'M SORRY.  LET ME ASK YOU TO COME

04:01PM  16    FORWARD.

04:01PM  17                   MR. LEACH:  MAY I TAKE MY MASK OFF?

04:01PM  18                   THE COURT:  YEAH, SURE.

04:02PM  19                   MR. LEACH:  I EXPECT MS. HOLMES'S TESTIMONY TO

04:02PM  20    COMPLETE EARLY NEXT WEEK, POSSIBLY ON MONDAY.  I DON'T KNOW HOW

04:02PM  21    MUCH REDIRECT THE DEFENSE WILL HAVE.

04:02PM  22                   THE CLERK:  TUESDAY.

04:02PM  23                   MR. LEACH:  TUESDAY, EXCUSE ME.

04:02PM  24         AND I DON'T KNOW WHAT ADDITIONAL WITNESSES THE DEFENSE

04:02PM  25    INTENDS TO CALL, BUT I DO THINK IT MIGHT BE THE APPROPRIATE
```

04:02PM 1    TIME TO START THINKING OF WHEN TO SCHEDULE THE CHARGING

04:02PM 2    CONFERENCE AND MAP AROUND THOSE DATES.

04:02PM 3              THE COURT:  SURE.  OKAY.

04:02PM 4              MR. DOWNEY:  YEAH, I CERTAINLY THINK THE DEFENSE

04:02PM 5    CASE WILL NOT LAST THE BALANCE OF NEXT WEEK AFTER MS. HOLMES'S

04:02PM 6    TESTIMONY, SO I THINK IT DOES IMPLICATE AT LEAST TWO ISSUES I

04:02PM 7    CAN THINK OF.

04:02PM 8         ONE IS THAT I AGREE WITH MR. LEACH THAT IF WE CAN FIND A

04:02PM 9    TIME TO THINK ABOUT CHARGING AND, YOU KNOW, WE PROBABLY OWE THE

04:02PM 10   COURT SOME FILINGS ON THAT, WHICH WE CAN, WE CAN GET ON FILE

04:02PM 11   EXPEDITIOUSLY IF THAT SUITS THE COURT, AND THAT WAY WE CAN KEEP

04:02PM 12   MOVING.

04:02PM 13             THE COURT:  WELL, IT DOES.  I'D LIKE TO KEEP AN EYE

04:03PM 14   ON THAT.

04:03PM 15        I KNOW YOUR ORIGINAL SUBMISSIONS WERE MONTHS AGO.

04:03PM 16             MR. DOWNEY:  RIGHT.

04:03PM 17             THE COURT:  THINGS HAVE CHANGED A BIT PERHAPS.

04:03PM 18        AND I HAVE THOSE.  I'VE USED THEM AS A WORKING COPY, BUT

04:03PM 19   CANDIDLY, I STEPPED BACK BECAUSE I ANTICIPATE THERE WILL BE

04:03PM 20   CHANGES, AND WE SHOULD DEVOTE OUR RESOURCES TOWARDS A FRESH

04:03PM 21   SET.

04:03PM 22        SO WHAT'S YOUR THOUGHTS ABOUT THAT?

04:03PM 23        AND, MR. DOWNEY, I DON'T WANT -- WHEN WE ASK THESE

04:03PM 24   QUESTIONS, OF COURSE THERE MAY BE SOME OTHER EVIDENCE THAT

04:03PM 25   YOU'RE GOING TO PUT IN THAT MIGHT CALL FOR OTHER INSTRUCTIONS.

04:03PM 1          MR. DOWNEY:  SURE.  AND I THINK PART OF THE REASON

04:03PM 2     WE'RE HAVING THIS CONVERSATION IS THAT IT'S EVIDENT TO ALL OF

04:03PM 3     US IS THAT WE HAVE THREE DAYS THIS WEEK WITHOUT A JURY AND THEN

04:03PM 4     NEXT WEEK WE'RE, WE'RE BACKED UP WITH THE JURY EVERY DAY.

04:03PM 5          SO THIS IS MORE OF A SCHEDULING MATTER OBVIOUSLY.

04:03PM 6          THE COURT:  RIGHT.

04:03PM 7          MR. DOWNEY:  EVENTS CAN ALWAYS CHANGE SUBJECT TO

04:03PM 8     EVIDENCE.

04:03PM 9          THE COURT:  RIGHT.  SO WHAT ARE YOUR THOUGHTS

04:03PM 10    ABOUT -- WHAT WOULD YOU LIKE TO DO TO SOLVE THE PROBLEM?  DO

04:04PM 11    YOU WANT TO GET ME OR AUGMENT YOUR SET?  SHOULD I GET A NEW SET

04:04PM 12    FROM YOU?

04:04PM 13         MR. DOWNEY:  I THINK THAT WOULD BE WELL.  LET ME --

04:04PM 14    CAN I JUST TALK TO MS. SAHARIA?

04:04PM 15         THE COURT:  SURE.

04:04PM 16    (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

04:04PM 17         THE COURT:  AND LET ME SAY, WHILE YOU'RE DISCUSSING

04:04PM 18    THIS, I'M NOT -- I DON'T MEAN TO TASK YOU, OVER TASK YOU WITH

04:04PM 19    CREATING A WHOLE NEW SET.  BUT THERE MIGHT BE SOME AUGMENTATION

04:04PM 20    IF THAT WOULD BE EASIER FOR YOU.  THAT'S FINE, TOO.

04:04PM 21    (DISCUSSION OFF THE RECORD.)

04:04PM 22         MR. LEACH:  YOUR HONOR, THE GOVERNMENT -- I'LL WAIT

04:04PM 23    FOR MY COLLEAGUES.

04:04PM 24    (PAUSE IN PROCEEDINGS.)

04:05PM 25         MR. DOWNEY:  I THINK FROM OUR PERSPECTIVE,

04:05PM 1    YOUR HONOR, WE HAD -- WE HAD, AT THE OUTSET, AS YOU MENTIONED,

04:05PM 2    SUBMITTED SOME PROPOSED INSTRUCTIONS.  I THINK WE'VE AUGMENTED

04:05PM 3    THOSE OVER TIME IN LIGHT OF SUBSEQUENT DEVELOPMENTS.

04:05PM 4         AND I THINK WE ALSO HAVE NOTED THE OBJECTIONS WE HAVE TO

04:05PM 5    WHAT THE GOVERNMENT SUBMITTED ORIGINALLY.

04:05PM 6         IF IT WOULD BE HELPFUL -- I DON'T THINK WE'RE QUITE IN A

04:05PM 7    POSITION TO FILE THOSE, BUT WE COULD DO IT PROBABLY LATE

04:05PM 8    TOMORROW NIGHT SO YOUR HONOR COULD HAVE THEM THURSDAY MORNING

04:05PM 9    TO WORK ON IF THAT'S HELPFUL.

04:05PM 10         THE COURT:  WELL, I JUST -- I WANT TO GIVE YOU TIME

04:05PM 11   TO DO WHAT YOU NEED TO DO.

04:05PM 12        SO, MR. LEACH, WHAT IS YOUR TEAM'S POSITION?

04:05PM 13         MR. LEACH:  THURSDAY IS CERTAINLY SUFFICIENT FOR US

04:05PM 14   TO AUGMENT OUR FILINGS.  WE MAY HAVE A FEW, BUT I DON'T THINK

04:06PM 15   THE VOLUME FROM THE GOVERNMENT WILL BE SIGNIFICANT, AND I ALSO

04:06PM 16   THINK THAT WE COULD BE AVAILABLE ON FRIDAY FOR A CONFERENCE.

04:06PM 17        I REALIZE THERE MIGHT BE SOME ISSUES THAT ARE RESOLVED,

04:06PM 18   BUT THAT FRIDAY COULD BE USED PRODUCTIVELY IF THE COURT IS

04:06PM 19   AVAILABLE.

04:06PM 20         THE COURT:  SURE.

04:06PM 21         MR. DOWNEY:  WELL, I ALSO RECOGNIZE IT'S A SHORT

04:06PM 22   WINDOW FOR THE COURT, BUT FRIDAY OR MONDAY IS FINE FOR US.

04:06PM 23        I THINK THE COURT MAY BE SCHEDULED OTHERWISE ON MONDAY,

04:06PM 24   BUT I'M NOT SURE.

04:06PM 25         THE COURT:  WELL, LET'S DO THIS, WHAT I'LL DO IS

04:06PM 1    I'LL RESERVE -- I DON'T THINK WE HAVE ANYTHING ON FRIDAY, DO

04:06PM 2    WE?

04:06PM 3                    THE CLERK:  THIS FRIDAY?

04:06PM 4                    THE COURT:  CORRECT.

04:06PM 5                    THE CLERK:  NO, YOUR HONOR.

04:06PM 6                    THE COURT:  OTHER THAN RESPITE.

04:06PM 7          (LAUGHTER.)

04:06PM 8                    THE COURT:  WELL, WHAT WE CAN DO IS I'LL MAKE MYSELF

04:06PM 9    AVAILABLE, AND MAYBE WE CAN HAVE JUST A HIGH LEVEL PASS AND WE

04:06PM 10   CAN SEE WHERE WE ARE ON THESE THINGS WITHOUT -- AND I'M NOT

04:06PM 11   SUGGESTING OR GUARANTEEING THAT WE'LL HAVE ANY FORMAL, FORMAL

04:07PM 12   FINALITY AS TO WHAT THEY ARE.

04:07PM 13         BUT I THINK IT WOULD BE A GOOD IDEA JUST TO GIVE A HIGH

04:07PM 14   LEVEL PASS ON WHAT WE HAVE NOW.

04:07PM 15         AND AGAIN, THINGS COULD CHANGE DEPENDING ON WHERE THE

04:07PM 16   EVIDENCE GOES AND --

04:07PM 17                    MR. DOWNEY:  AND I THINK THERE ARE PROBABLY SOME

04:07PM 18   THINGS THAT WE CAN'T DO UNTIL THE EVIDENCE CLOSES, BUT, YEAH.

04:07PM 19                    THE COURT:  RIGHT.  BUT I APPRECIATE THE OFFER TO

04:07PM 20   GET STARTED ON THIS.

04:07PM 21         WELL, LET'S DO THAT.  I'LL KEEP FRIDAY OPEN, AND WE CAN

04:07PM 22   HAVE A DISCUSSION ABOUT IT.  AND YOU'LL SUBMIT SOMETHING, WHAT,

04:07PM 23   CLOSE OF BUSINESS THURSDAY?  DID YOU SAY THAT?

04:07PM 24                    MR. LEACH:  IF THAT'S OKAY WITH THE COURT.

04:07PM 25                    MR. DOWNEY:  THAT'S FINE, YOUR HONOR.

04:07PM 1          THE COURT:  THAT GIVES US ALL NIGHT TO LOOK AT THEM.

04:07PM 2          MR. DOWNEY:  WE CAN MAKE AN EFFORT TO SUBMIT THEM

04:07PM 3   WEDNESDAY NIGHT IF THAT MAKES IT EASIER FOR YOU.

04:07PM 4          THE COURT:  IF YOU CAN.  I SEE MS. SAHARIA SAYING,

04:07PM 5   YES, THAT'S FINE.

04:07PM 6          MS. SAHARIA:  THAT'S FINE, YOUR HONOR.

04:07PM 7          THE COURT:  GREAT.  I APPRECIATE IT.  THAT'S GOOD.

04:07PM 8          MR. LEACH:  COULD WE HAVE THURSDAY MORNING?

04:07PM 9          MR. DOWNEY:  YEAH, WHEN I SAY WEDNESDAY NIGHT, I'M

04:08PM 10  NOT SURE THERE'S A BIG DIFFERENCE BETWEEN WHAT I'M TALKING

04:08PM 11  ABOUT.

04:08PM 12         THE COURT:  LET'S FIGURE OUT OUR TIME ZONE FIRST.

04:08PM 13  LET'S START THERE.

04:08PM 14      THAT'S FINE.  10:00 O'CLOCK.  WHY DON'T WE SAY 10:00

04:08PM 15  O'CLOCK ON THURSDAY.

04:08PM 16         THE CLERK:  FOR THE HEARING ON FRIDAY?

04:08PM 17         THE COURT:  NO.  THIS IS FOR YOUR SUBMISSIONS.

04:08PM 18         MR. LEACH:  YES.

04:08PM 19         THE CLERK:  WHAT TIME WOULD YOU LIKE TO START ON

04:08PM 20  FRIDAY?

04:08PM 21         THE COURT:  WE'LL START AT 9:00 O'CLOCK?  IS THAT

04:08PM 22  ALL RIGHT?  DOES THAT WORK FOR YOUR TEAMS?

04:08PM 23         MR. DOWNEY:  YES, THAT'S FINE.

04:08PM 24         THE COURT:  LET'S DO THAT.  GREAT.  THANK YOU.

04:08PM 25  THANK YOU FOR THAT.

04:08PM 1          YOU PUT YOUR MASK ON TOO QUICKLY, MR. DOWNEY.

04:08PM 2              MR. DOWNEY:  YES.  THIS IS PROBABLY ONLY MY THIRD

04:08PM 3      TRIP UP.  WE'LL SEE HOW MANY ARE LEFT.

04:08PM 4          I UNDERSTAND THAT IN CONNECTION WITH THE MATTER

04:08PM 5      MR. FLEURMONT IS GOING TO DISCUSS WITH YOU, MR. WADE SPOKE WITH

04:08PM 6      MR. COOPERSMITH AND ASKED HIM TO BE AVAILABLE IN CONNECTION

04:09PM 7      WITH STATING WHATEVER POSITION HE WOULD STATE IN RESPONSE TO

04:09PM 8      YOUR HONOR'S QUESTIONS.

04:09PM 9          SO I BELIEVE HE IS -- HE IS HERE, YES, I BELIEVE HE'S

04:09PM 10     HERE.

04:09PM 11             THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

04:09PM 12         WELL, I WANTED TO -- I SEE MS. VOLKAR HERE, TOO.

04:09PM 13         ONE OF THE THOUGHTS I HAD, I KNOW MS. VOLKAR HAD INDICATED

04:09PM 14     SHE WANTED TO REVIEW THE TRANSCRIPTS, AND I DID NOT WANT TO

04:09PM 15     ENGAGE THIS UNTIL EVERYBODY IS READY, INCLUDING AN ABILITY TO

04:09PM 16     TALK ABOUT THIS 106 ISSUE AS IT EXISTED.

04:09PM 17         BUT, MS. VOLKAR, WHAT IS YOUR THOUGHT ON TIMING?

04:09PM 18         MR. FLEURMONT, ARE YOU HERE?  YES, THANK YOU.

04:09PM 19             MS. VOLKAR:  MAY I REMOVE MY MASK, YOUR HONOR?

04:09PM 20             THE COURT:  YES, THANK YOU.

04:09PM 21         AS WELL AS MR. FLEURMONT.

04:09PM 22             MR. FLEURMONT:  THANK YOU, YOUR HONOR.

04:09PM 23             MS. VOLKAR:  TO BE CLEAR, YOUR HONOR, THE GOVERNMENT

04:09PM 24     WOULD LIKE ADDITIONAL TIME TO GO THROUGH THE TRANSCRIPT FOR THE

04:09PM 25     RULE 106 ADDITIONS.

04:09PM  1    IT WOULD BE BENEFICIAL TO THE GOVERNMENT IF THE COURT WERE

04:10PM  2    ABLE TO GIVE A TENTATIVE OR SORT OF WHAT IT WAS THINKING.

04:10PM  3    AS OBVIOUSLY JUST AN EXAMPLE, I WOULD HAVE BEEN REVIEWING

04:10PM  4    WITH THE NULL PROTOCOL SECTION IN MIND, BUT I UNDERSTAND THE

04:10PM  5    DEFENSE HAS WITHDRAWN THAT SECTION.

04:10PM  6    EACH SECTION THAT IS GOING TO BE REMOVED IS LESS THAT I

04:10PM  7    WOULD LOOK FOR RULE 106 COMPLETENESS ADDITIONS TO.

04:10PM  8    SO WITH THAT, I COULD PROVIDE THE COURT AND THE DEFENSE

04:10PM  9    WITH THE RULE 106 BY THURSDAY NIGHT, I BELIEVE.

04:10PM  10    BUT IT WOULD BE HELPFUL TO KNOW WHAT THE VOLUME IS.  IF

04:10PM  11    THE VOLUME SHRINKS, I COULD GET IT TO THEM SOONER.

04:10PM  12    MR. FLEURMONT:  THURSDAY NIGHT WOULD BE FINE WITH

04:10PM  13    US, YOUR HONOR.  WE DON'T NEED A TENTATIVE RULING.

04:10PM  14    I THINK THE COURT SHOULD BE INFORMED OF ALL OF THE ISSUES

04:10PM  15    AND WE SHOULD HAVE A FULL DISCUSSION BEFORE WE HAVE A RULING,

04:10PM  16    AND IF THEY NEED UNTIL THURSDAY TO HAVE THEIR RULE 106

04:10PM  17    DESIGNATIONS, I THINK THAT'S OKAY WITH US.

04:10PM  18    THE COURT:  SO YOU WOULD LIKE US TO CONTINUE OUR

04:10PM  19    DISCUSSION THURSDAY?  IS THAT WHAT I HEAR YOU SAYING?

04:10PM  20    MS. VOLKAR:  WELL, YOUR HONOR --

04:10PM  21    THE COURT:  ARE YOU SAYING YOU WOULD LIKE THE RULING

04:11PM  22    NOW SO YOU COULD THEN LOOK?  IS THAT WHAT I HEARD YOU SAY?

04:11PM  23    MS. VOLKAR:  I GUESS THE CLEAREST POINT OF THE

04:11PM  24    GOVERNMENT'S POSITION IS THAT WE DON'T BELIEVE THE EVIDENCE IS

04:11PM  25    ADMISSIBLE, AND SO THEREFORE I WOULD RATHER NOT SPEND THE TIME

04:11PM 1    ON RULE 106 --

04:11PM 2              THE COURT:  I UNDERSTAND.  I UNDERSTAND.

04:11PM 3              MS. VOLKAR:  -- TO POSSIBLY BE TOO BLUNT.

04:11PM 4         BUT THE GOVERNMENT'S POSITION IS THAT UNDER RULE 804, THIS

04:11PM 5    EVIDENCE IS NOT ADMISSIBLE.

04:11PM 6         AND ALSO, AS I HOPE I CLARIFIED THIS MORNING,

04:11PM 7    ALTERNATIVELY, MUCH OF THE TESTIMONY IS NOT ADMISSIBLE UNDER

04:11PM 8    RULE 403, EXCUSE ME, AS CUMULATIVE EVIDENCE AS WELL.

04:11PM 9         I DON'T WANT TO REHASH THAT.

04:11PM 10             THE COURT:  RIGHT.

04:11PM 11             MS. VOLKAR:  I BELIEVE THAT MATTER HAS BEEN

04:11PM 12   SUFFICIENTLY ARGUED FOR THE COURT TO RULE ON IT.

04:11PM 13        IF THE COURT WERE GOING TO GRANT AND ADMIT ANY OF THE

04:11PM 14   PORTIONS, THEN THE GOVERNMENT WAS REQUESTING TIME FOR RULE 106.

04:11PM 15             THE COURT:  OKAY.

04:11PM 16             MS. VOLKAR:  AND I DON'T KNOW THAT THE RULE 106

04:11PM 17   ADDITIONS HAVE TO HOLD UP YOUR HONOR'S RULING.

04:11PM 18        CANDIDLY, I DON'T QUITE UNDERSTAND MY COLLEAGUE'S COMMENT

04:12PM 19   THAT THE TWO RELATE TO ONE ANOTHER.

04:12PM 20        BUT I DID ALSO FLAG THIS MORNING FOR YOUR HONOR THAT IN

04:12PM 21   DOING THE RULE 106 ANALYSIS I'VE DONE THUS FAR, I HAVE REALIZED

04:12PM 22   THAT IT COULD TRIGGER ADDITIONAL ISSUES, SUCH AS CONFRONTATION

04:12PM 23   CLAUSE ISSUES.

04:12PM 24        I'M JUST PERHAPS FORECASTING WHAT I IMAGINE MY COLLEAGUES

04:12PM 25   MAY SAY, ON THE OTHER SIDE OF THE TABLE MAY SAY.

04:12PM  1    SO THAT, YOUR HONOR, IS WHAT I'VE PERHAPS MUDDIED THE

04:12PM  2    WATERS WITH THIS MORNING, BUT THE GOVERNMENT'S POSITION IS THAT

04:12PM  3    NONE OF IT IS ADMISSIBLE AND I THINK WE CAN DO AWAY WITH THAT,

04:12PM  4    AND IF THE COURT FEELS DIFFERENTLY, OF COURSE --

04:12PM  5         THE COURT:  I HEAR BOTH YOUR POSITIONS ARE THE SAME,

04:12PM  6    AND IF YOU JUST RULE FOR US, JUDGE, WE'RE DONE WITH THOSE

04:12PM  7    ISSUES.  I THINK I GET THAT.  THAT'S CLEAR.

04:12PM  8         (LAUGHTER.)

04:12PM  9         THE COURT:  LET ME SAY THIS, MAYBE WE CAN HAVE A

04:12PM 10    LITTLE DISCUSSION NOW.

04:12PM 11    SOMETHING CAME UP DURING THE EXAMINATION OF MS. HOLMES

04:12PM 12    THAT I THINK I HAVE A QUESTION ABOUT THAT MAY BE SIMILAR TO THE

04:12PM 13    ISSUE IN THE NULL VOID, AND THIS REGARDS TESTIMONY FROM

04:13PM 14    MS. HOLMES ABOUT A CERTAIN ISSUE, I THINK IT WAS ABOUT

04:13PM 15    WALGREENS.

04:13PM 16    I WANT TO GET MY NOTES.  I HAVE YOUR MOTION IN MY OFFICE.

04:13PM 17    SO LET'S TAKE ABOUT A 10 MINUTE BREAK.  I'LL GO GET THAT AND

04:13PM 18    COME BACK.

04:13PM 19    AS I SAID EARLIER, IT'S THE DEFENSE BURDEN TO SHOW

04:13PM 20    UNAVAILABILITY.  SO WHATEVER YOU WANT TO DO ON THAT -- YOU

04:13PM 21    KNOW, IF YOU WANT TO DO SOMETHING ABOUT THAT THIS AFTERNOON, WE

04:13PM 22    CAN DO THAT.

04:13PM 23         MR. FLEURMONT:  YES, YOUR HONOR.

04:13PM 24    I UNDERSTAND THAT MR. COOPERSMITH IS HERE AND HE'S

04:13PM 25    AVAILABLE TO MAKE A PROFFER TO THE COURT CONSISTENT WITH --

04:13PM 1      THE COURT:  OKAY.  WE'LL TAKE OUR BREAK.  WE'LL COME

04:13PM 2  BACK AND YOU'LL TELL ME WHAT YOU WOULD LIKE TO DO IN REGARD TO

04:13PM 3  MR. COOPERSMITH.

04:13PM 4      SHOULD I ORDER HIM TO STAY IN THE COURTROOM, OR IS HE

04:13PM 5  SUBJECT TO FLIGHT DO YOU THINK?

04:13PM 6      MR. FLEURMONT:  I DON'T THINK YOU NEED TO DO THAT.

04:13PM 7      THE COURT:  HE'S A TRUSTWORTHY LAD, IS HE?

04:13PM 8  (LAUGHTER.)

04:13PM 9      MR. FLEURMONT:  YEAH.

04:13PM 10      THE CLERK:  COURT IS IN RECESS.

04:35PM 11  (RECESS FROM 4:14 P.M. UNTIL 4:41 P.M.)

04:41PM 12      THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD

04:41PM 13  WITH ALL PARTIES BEING PRESENT ONCE AGAIN.

04:41PM 14      WE'RE OUTSIDE OF THE PRESENCE OF THE JURY, AND WE WANTED

04:41PM 15  TO HAVE SOME MORE DISCUSSION ON THE MOTIONS BEFORE THE COURT

04:41PM 16  REGARDING PRIOR TESTIMONY.

04:41PM 17      LET ME JUST, LET ME JUST SAY, THANK YOU FOR YOUR

04:41PM 18  ARGUMENTS.  I'VE LISTENED TO THE ARGUMENTS.

04:41PM 19      COUNSEL, YOU CAN COME FORWARD IF YOU WOULD LIKE.  THANKS.

04:41PM 20  YOU CAN TAKE YOUR MASKS OFF IF YOU WISH.

04:41PM 21      MS. VOLKAR:  THANK YOU, YOUR HONOR.

04:41PM 22      THE COURT:  LET ME -- I JUST WANT TO START WITH

04:41PM 23  EXHIBIT C.  AND THIS IS ONE WHERE I DON'T THINK I NEED ANY MORE

04:41PM 24  HELP FROM YOU ON THIS.

04:41PM 25      I THINK THERE'S BEEN EVIDENCE REGARDING THE CLIA LAB AND

04:41PM 1      MR. BALWANI'S CONNECTION TO THE CLIA LAB.

04:41PM 2         I THINK DIFFERENT WITNESSES HAVE TOLD THE JURY ABOUT THEIR

04:42PM 3      OBSERVATIONS, THEIR OPINIONS, THEIR OPINIONS SUCH THAT THEY

04:42PM 4      WERE PERMITTED TO TESTIFY ON THIS.

04:42PM 5         I DO THINK THAT, UNDER 403, THIS IS CUMULATIVE.  I THINK

04:42PM 6      THERE IS SUFFICIENT, SUFFICIENT EVIDENCE IN THE RECORD NOW THAT

04:42PM 7      SUPPORTS THE FINDINGS, MR. FLEURMONT, THAT YOU SEEK TO CAPTURE

04:42PM 8      WITH 1163-4, EXHIBIT C, AND SO I'M NOT GOING TO ALLOW THIS TO

04:42PM 9      COME IN.

04:42PM 10         I THINK THERE'S PLENTY OF INFORMATION IN THE RECORD

04:42PM 11      ALREADY THAT ESTABLISHES WHAT YOU NEED TO DO.

04:42PM 12         ANYTHING FURTHER, AS I SAID, WOULD BE FOUND CUMULATIVE.

04:42PM 13         SO UNDER 403, I THINK THAT TO ALLOW THIS WOULD TAKE MORE

04:42PM 14      TIME AND WOULD POSSIBLY CONFUSE THE JURY ON THIS ISSUE.  IT

04:42PM 15      COULD OPEN UP TO OTHER ADDITIONAL EVIDENCE THAT MIGHT HAVE TO

04:42PM 16      COME IN TO SUPPORT OR DETRACT FROM IT THAT WOULD BE AN

04:42PM 17      UNNECESSARY WASTE OF TIME.

04:43PM 18         SO I'M GOING TO RESPECTFULLY DECLINE YOUR INVITATION TO

04:43PM 19      ADMIT EXHIBIT C.

04:43PM 20         SO THAT'S THE RULING ON THAT.

04:43PM 21         LET'S GO BACK TO WHERE WE WERE INITIALLY.

04:43PM 22         SO LET ME TURN BACK TO YOU, MR. FLEURMONT.  YOU HAVE THE

04:43PM 23      FLOOR.

04:43PM 24         LET'S DO THE THRESHOLD ISSUE FIRST.  WHY DON'T WE DO THAT?

04:43PM 25            MR. FLEURMONT:  YES, YOUR HONOR.

04:43PM 1          WE WOULD LIKE TO INVITE MR. COOPERSMITH UP SO HE COULD

04:43PM 2    PROVIDE A PROFFER TO THE COURT.

04:43PM 3          THE COURT:  ALL RIGHT.  THANK YOU.

04:43PM 4      AND, MR. COOPERSMITH, I SEE YOU HERE.  THANK YOU FOR BEING

04:43PM 5    HERE.

04:43PM 6      MR. FLEURMONT, THIS IS, AGAIN, YOUR BURDEN.  SO WHAT IS IT

04:43PM 7    YOU WOULD LIKE TO KNOW FROM MR. COOPERSMITH.

04:43PM 8      I'M NOT GOING TO -- I'M A NEUTRAL PARTY HERE, SO I JUST

04:43PM 9    NEED TO KNOW WHAT IT IS.

04:43PM 10     THERE'S A QUESTION OF UNAVAILABILITY THAT YOU HAVE

04:43PM 11   INDICATED MR. WADE HAS.  HE HAS PROVIDED A DECLARATION TO THE

04:43PM 12   COURT.  I'VE INDICATED THAT I NEED MORE WITH RESPECT TO

04:44PM 13   MR. WADE AND THAT DECLARATION.

04:44PM 14     SO WHAT IS IT YOU WOULD LIKE THE COURT TO CONSIDER IN

04:44PM 15   REGARDS TO THE ISSUE OF UNAVAILABILITY OF MR. BALWANI.

04:44PM 16          MR. FLEURMONT:  UNDERSTOOD, YOUR HONOR.

04:44PM 17     OUR FIRST QUESTION IS IF WE WERE TO CALL -- WELL, WE SEEK

04:44PM 18   TO CALL MR. BALWANI IN OUR CASE.  IS HE AVAILABLE TO TESTIFY?

04:44PM 19     SO THAT'S THE FIRST QUESTION.

04:44PM 20          THE COURT:  SO LET ME ASK THEN, YOU'VE CAUSED THE

04:44PM 21   YOUNG MAN TO COME FORWARD HERE.

04:44PM 22     MAY I KNOW YOUR NAME, SIR?

04:44PM 23          MR. COOPERSMITH:  JEFF COOPERSMITH.  I REPRESENT

04:44PM 24   MR. BALWANI.

04:44PM 25          THE COURT:  THANK YOU.  YOU CURRENTLY REPRESENT HIM?

04:44PM 1          MR. COOPERSMITH:  YES, YOUR HONOR.

04:44PM 2          THE COURT:  IN THIS LITIGATION?

04:44PM 3          MR. COOPERSMITH:  YES, YOUR HONOR.

04:44PM 4          THE COURT:  AND YOU'RE HERE AS HIS ATTORNEY AND YOU

04:44PM 5     CAN ANSWER ANY QUESTIONS THAT MR. FLEURMONT HAS ABOUT YOU AND

04:44PM 6     YOUR CLIENT AND HIS DESIRE TO ASK YOUR CLIENT QUESTIONS?

04:44PM 7          MR. COOPERSMITH:  YES, YOUR HONOR.

04:44PM 8          THE COURT:  OKAY.

04:45PM 9          MR. FLEURMONT:  OKAY.  MR. COOPERSMITH, IF WE WERE

04:45PM 10    TO CALL MR. BALWANI IN THIS CASE, WOULD HE BE AVAILABLE TO

04:45PM 11    TESTIFY?

04:45PM 12         MR. COOPERSMITH:  UNDER THE CIRCUMSTANCES, IF

04:45PM 13    MR. BALWANI WERE CALLED AS A WITNESS, I UNDERSTAND THAT UNDER

04:45PM 14    THE ADVICE OF COUNSEL HE WOULD ASSERT HIS FIFTH AMENDMENT

04:45PM 15    RIGHTS WITH RESPECT TO ANY SUBSTANTIVE QUESTION, INCLUDING ON

04:45PM 16    THE TOPICS THAT I UNDERSTAND THE DEFENSE IS INTERESTED IN

04:45PM 17    CALLING HIM FOR BASED ON THEIR MOTION.

04:45PM 18         THE COURT:  ALL RIGHT.  AND YOU'VE BEEN APPRISED OF

04:45PM 19    THE CONTEXT OF THE QUESTIONS THAT WOULD BE POSED TO YOUR CLIENT

04:45PM 20    WERE HE TO BE SUBPOENAED?

04:45PM 21         MR. COOPERSMITH:  YES, YOUR HONOR.  I'VE REVIEWED

04:45PM 22    THE PLEADINGS ON THIS ISSUE.  SO YES.

04:45PM 23         THE COURT:  OKAY.

04:45PM 24         MR. FLEURMONT:  MR. COOPERSMITH, IF WE WERE TO ASK

04:45PM 25    HIM QUESTIONS RELATED TO HIS ROLE IN THE CLIA LAB, WOULD HE

04:45PM 1    ANSWER THOSE QUESTIONS?

04:45PM 2           MR. COOPERSMITH:  ON ADVICE OF COUNSEL I UNDERSTAND

04:45PM 3    MR. BALWANI WOULD ASSERT HIS FIFTH AMENDMENT RIGHTS.

04:45PM 4           MR. FLEURMONT:  MR. COOPERSMITH, IF WE WERE TO ASK

04:46PM 5    HIM QUESTIONS RELATED TO HIS ROLE IN FINANCIAL MODELING, WOULD

04:46PM 6    HE ANSWER.

04:46PM 7           MR. COOPERSMITH:  AGAIN, ON ADVICE OF COUNSEL, HE

04:46PM 8    WOULD ASSERT HIS FIFTH AMENDMENT RIGHTS.

04:46PM 9           MR. FLEURMONT:  AND, MR. COOPERSMITH, IF WE WERE TO

04:46PM 10   ASK HIM QUESTIONS RELATED TO HIS ROLE IN THE WALGREENS AND

04:46PM 11   SAFEWAY RELATIONSHIPS, WOULD HE ANSWER?

04:46PM 12          MR. COOPERSMITH:  ON ADVICE OF COUNSEL, I UNDERSTAND

04:46PM 13   THAT HE WOULD ASSERT HIS FIFTH AMENDMENT RIGHTS.

04:46PM 14          THE COURT:  OKAY.  ANYTHING FURTHER, MR. FLEURMONT?

04:46PM 15          MR. FLEURMONT:  NO, YOUR HONOR.

04:46PM 16          THE COURT:  OKAY.

04:46PM 17      DO YOU WISH TO CROSS-EXAMINE MR. COOPERSMITH?

04:46PM 18      (LAUGHTER.)

04:46PM 19          MS. VOLKAR:  I RESPECTFULLY DECLINE, YOUR HONOR.

04:46PM 20          THE COURT:  ALL RIGHT.  THANK YOU, MR. COOPERSMITH.

04:46PM 21   I APPRECIATE YOUR ATTENTION TO THIS.  IT'S BEEN VERY HELPFUL TO

04:46PM 22   THE COURT.  THANK YOU.

04:46PM 23          MR. COOPERSMITH:  YOU'RE WELCOME, YOUR HONOR.  THANK

04:46PM 24   YOU.

04:46PM 25          THE COURT:  ALL RIGHT.  THANK YOU.

04:46PM 1      LET ME JUST STATE, AFTER HEARING FROM MR. BALWANI'S

04:46PM 2  ATTORNEY, THE COURT DOES FIND THEN AND MAKES A FINDING THAT

04:46PM 3  WERE MR. BALWANI TO BE CALLED TO TESTIFY IN THIS CASE -- AND

04:46PM 4  ONCE AGAIN, WE ARE OUTSIDE OF THE PRESENCE OF THE JURY NOW --

04:47PM 5  PURSUANT TO THE REPRESENTATIONS OF COUNSEL, MR. BALWANI WOULD

04:47PM 6  ASSERT HIS FIFTH AMENDMENT PRIVILEGE TO NOT ANSWER THOSE

04:47PM 7  QUESTIONS.

04:47PM 8      SO THE COURT DOES FIND HIM THEN UNAVAILABLE FOR PURPOSES

04:47PM 9  OF TESTIMONY HERE.

04:47PM 10     ALL RIGHT.  THANK YOU.

04:47PM 11     AND THANK YOU FOR DOING THAT, MR. FLEURMONT.  I APPRECIATE

04:47PM 12 IT.

04:47PM 13     SO ONE OF THE -- I MENTIONED TO YOU THAT THERE WAS SOME

04:47PM 14 TESTIMONY, AND I WAS -- LET ME JUST DRAW YOUR ATTENTION TO IT.

04:47PM 15 I THINK IT WAS IN EXHIBIT 5387D, I THINK IT WAS, BUT IT WAS

04:47PM 16 CONVERSATION REGARDING -- I THINK MS. HOLMES TESTIFIED, I'M

04:47PM 17 PARAPHRASING HERE, BUT "WE WOULD WORK TOGETHER ON A REVENUE

04:47PM 18 PIECE," I THINK IT WAS.

04:47PM 19     AND THAT TO ME SUGGESTED THAT -- I GUESS IT GOES TO THE

04:47PM 20 INCULPATION ISSUE, THAT IF THEY WORKED TOGETHER, THEN THAT

04:47PM 21 MIGHT SOMEHOW MITIGATE THE QUESTION OF WHETHER OR NOT THAT IS

04:48PM 22 INCULPATORY AS TO MR. BALWANI.

04:48PM 23     AND I DON'T HAVE THAT PIECE IN FRONT OF ME, AND I'LL

04:48PM 24 INVITE YOUR TEAMS TO FIND IT FOR ME IF YOU WOULD LIKE.

04:48PM 25     BUT THAT WAS MY GENERAL RECOLLECTION OF THAT TESTIMONY.

04:48PM 1             AND I'M NOT CERTAIN I HAVE THE CITE CORRECT, BUT I DO

04:48PM 2   REMEMBER --

04:48PM 3           MR. FLEURMONT:  I REMEMBER THAT TESTIMONY,

04:48PM 4   YOUR HONOR.

04:48PM 5           THE COURT:  GREAT.

04:48PM 6           MR. FLEURMONT:  SO FROM WHAT I REMEMBER, THERE WAS A

04:48PM 7   TEXT MESSAGE AND "WE WORKED TOGETHER ON THE REV PIECE."

04:48PM 8           THE COURT:  RIGHT.

04:48PM 9           MR. FLEURMONT:  AND I WASN'T SURE -- I BELIEVE SHE

04:48PM 10   SAID "I WASN'T SURE IF THAT MEANT REVISIONS OR REVENUE."

04:48PM 11           THE COURT:  RIGHT.

04:48PM 12           MR. FLEURMONT:  WE DON'T HAVE CONTEXT FOR THAT TEXT

04:48PM 13   MESSAGE.

04:48PM 14      I'M NOT EVEN QUITE SURE WHAT IT WOULD RELATE TO IN TERMS

04:48PM 15   OF WHAT WE'RE DISCUSSING HERE.  IT COULD RELATE TO PROJECTIONS.

04:48PM 16   IT COULD RELATE TO THE WALGREENS RELATIONSHIP.

04:48PM 17      I'M NOT -- I DON'T EVEN HAVE ENOUGH CONTEXT I THINK TO

04:49PM 18   UNDERSTAND WHAT IT RELATES TO EVEN IN THIS MOTION.

04:49PM 19      SO I THINK THIS IS JUST AN EXAMPLE OF HOW THAT TEXT

04:49PM 20   MESSAGE IN ISOLATION DOESN'T CHANGE THE NEED FOR ANY OF THE

04:49PM 21   TESTIMONY HERE.

04:49PM 22           THE COURT:  OKAY.  WELL, I RECALL, I THINK MR. LEACH

04:49PM 23   DREW HER ATTENTION -- I SAY "HER," PARDON ME, I MEAN NO

04:49PM 24   DISRESPECT -- MS. HOLMES'S ATTENTION TO THAT COLLOQUY AND

04:49PM 25   TRACED IT BACK TO REVENUE, IF I RECALL CORRECTLY.

04:49PM 1          AND MR. LEACH HAS THE DOCUMENT HERE.

04:49PM 2               MS. VOLKAR:  YES, YOUR HONOR, WITH THE HELP OF MY --

04:49PM 3     WITH THE HELP OF MR. LEACH, I DO HAVE --

04:49PM 4               THE COURT:  WHAT PAGE WAS THAT ON?  MAYBE YOU CAN --

04:49PM 5               MS. VOLKAR:  PAGE 19 OF 5387, SO IT WAS JUST

04:50PM 6     ADMITTED, IT WAS JUST ADMITTED MOMENTS AGO WHEN MR. LEACH MOVED

04:50PM 7     IT INTO EVIDENCE.

04:50PM 8               THE COURT:  THANK YOU.

04:50PM 9               MS. VOLKAR:  AND TO BE -- SPECIFICALLY, MR. LEACH

04:50PM 10    ASKED MS. HOLMES ABOUT HER SKYPE MESSAGE, "WE HAVE TO WORK

04:50PM 11    TOGETHER ON THE REV PIECE," I BELIEVE MR. FLEURMONT'S -- MY

04:50PM 12    MEMORY MATCHED MR. FLEURMONT'S WITH RESPECT TO HER ANSWER,

04:50PM 13    WHICH WAS THAT SHE WASN'T SURE WHETHER IT WAS REVENUE OR

04:50PM 14    REVISIONS OR IT COULD HAVE BEEN.

04:50PM 15         AND THEN MR. LEACH POINTED OUT THAT JUST A FEW LINES DOWN,

04:50PM 16    MR. BALWANI RESPONDED, "YOU ARE THE COMPANY," REFERRING TO

04:50PM 17    MS. HOLMES, "WE NEED REVENUE PLUS A FEW SENIOR LEVEL MANAGERS

04:50PM 18    EXPERIENCED EVEN IF THEY ONLY WORK 11 HOURS."

04:50PM 19         AND MY RECOLLECTION IS THAT MR. LEACH ASKED IF SHE HAD ANY

04:50PM 20    REASON TO DOUBT THAT THEY WERE TALKING ABOUT REVENUE, AND I

04:50PM 21    THOUGHT SHE SAID THAT SHE DIDN'T HAVE A REASON TO DOUBT, OR

04:50PM 22    THERE WAS AT LEAST SOME UNCERTAINTY THERE, BUT IT WASN'T A

04:50PM 23    SOLID, NO, WE WEREN'T TALKING ABOUT REVENUE.

04:50PM 24         THAT'S MY BEST RECOLLECTION.

04:51PM 25               THE COURT:  ALL RIGHT.  THANK YOU.

04:51PM 1          THIS IS WHAT I WAS REMEMBERING, AND IT CAUSED ME TO LOOK

04:51PM 2     BACK AT THE STATEMENT THAT YOU SEEK TO INTRODUCE, AND IT CAUSED

04:51PM 3     ME TO THINK THAT, WELL, IF SHE WAS IN THE REVENUE PIECE, IF

04:51PM 4     MS. HOLMES WAS IN THE REVENUE PIECE, THEN I DON'T SEE WHERE THE

04:51PM 5     INCULPATION IS.

04:51PM 6          MR. FLEURMONT:  YES.  SO I THINK THE COURT IS

04:51PM 7     ASKING, BASED ON THIS TEXT MESSAGE AND THE CONTEXT, IS THERE

04:51PM 8     LESS CORROBORATION FOR THE STATEMENT THAT WE SEEK TO ADMIT?

04:51PM 9          THE STATEMENTS WE SEEK TO ADMIT RELATE TO THE PROJECTIONS

04:51PM 10    AND THE FINANCIAL MODEL.

04:51PM 11         I DON'T THINK THERE'S ANYTHING IN THESE TEXT MESSAGES THAT

04:51PM 12    CONTRADICT HIS TESTIMONY THAT HE OWNED THE MODEL OR CONTRADICT

04:51PM 13    HIS TESTIMONY RELATED TO WALGREENS AND HIS RELATIONSHIP WITH

04:51PM 14    WALGREENS.

04:51PM 15         THE FACT THAT THEY'RE DISCUSSING REVENUE AND ARE BOTH

04:51PM 16    TALKING ABOUT REVENUE, I DON'T THINK UNDERMINES HIS STATEMENT

04:51PM 17    THAT "I OWNED THE FINANCIAL MODEL."

04:52PM 18         SHE -- MS. HOLMES MAY KNOW ABOUT REVENUE, AND I THINK A

04:52PM 19    CEO OF A COMPANY WILL KNOW ABOUT SOME REVENUE.

04:52PM 20         BUT IT DOESN'T NECESSARILY MEAN THAT THE STATEMENTS THAT

04:52PM 21    HE'S MAKING IN HIS DEPOSITION ARE UNDERMINED.

04:52PM 22         MS. VOLKAR:  THANK YOU, YOUR HONOR.

04:52PM 23         THE GOVERNMENT WOULD LIKE TO DIRECT THAT THERE ARE TWO

04:52PM 24    REQUIREMENTS AT ISSUE HERE FOR 804(B)(3).

04:52PM 25         THERE IS WHETHER OR NOT THE SUBJECT, OR THE STATEMENT

04:52PM 1    TENDED TO SUBJECT THE DECLARANT TO PENAL LIABILITY OR CRIMINAL

04:52PM 2    LIABILITY.  THAT'S THE INCULPATORY STATEMENTS THAT WE HAVE

04:52PM 3    SPENT A LOT OF TIME TALKING ABOUT.

04:52PM 4        AND THEN THERE'S ALSO THE SECOND REQUIREMENT FOR

04:52PM 5    804(B)(3), THAT THERE EXIST CORROBORATING CIRCUMSTANCES THAT

04:52PM 6    CLEARLY INDICATE THE STATEMENT'S TRUSTWORTHINESS.

04:52PM 7        AND I THINK THAT YOUR HONOR FORESAW WHERE THE GOVERNMENT

04:52PM 8    WAS GOING.  I THINK THAT WHAT OUR POSITION IS HERE IS THAT

04:52PM 9    THERE ISN'T SUFFICIENT EVIDENCE TO CORROBORATE OR SHOW THE

04:53PM 10   TRUSTWORTHINESS OF THESE STATEMENTS WHEN THE TESTIMONY TO DATE

04:53PM 11   HAS BEEN PERHAPS MR. BALWANI WOULD BE THE ONE TO PRESENT THE

04:53PM 12   PROJECTIONS, THERE HAS BEEN SOME TESTIMONY THERE.

04:53PM 13       THERE HASN'T NECESSARILY BEEN ANY TESTIMONY ABOUT WHO

04:53PM 14   CREATED OR WHO OWNED THE MODELS.  THIS WOULD BE SORT OF THE

04:53PM 15   FIRST INSTANCE OF THAT.

04:53PM 16       AND WHAT WE DO HAVE ARE TEXT MESSAGES SHOWING THAT

04:53PM 17   MR. BALWANI AND MS. HOLMES TALKED ABOUT THESE MODELS, AND IT IS

04:53PM 18   AT BEST UNCLEAR WHO WAS REALLY TAKING OWNERSHIP OF IT.

04:53PM 19       SO I WANT TO FOCUS ON THE PIECE THAT DEFENSE COUNSEL IS

04:53PM 20   TALKING ABOUT, THE OWNERSHIP PIECE.  THERE ISN'T ANY

04:53PM 21   CORROBORATION OR ANYTHING TO INDICATE TRUSTWORTHINESS OF THAT

04:53PM 22   PORTION.

04:53PM 23       IN FACT, THE TEXT MESSAGES, I WOULD SAY, POINT IN BOTH

04:53PM 24   DIRECTIONS AND THE TESTIMONY WE HAVE HEARD TODAY POINTS IN BOTH

04:53PM 25   DIRECTIONS.

04:53PM 1      AND THEN IN TERMS OF THE REMAINDER OF THE STATEMENT AROUND

04:53PM 2   IT, THAT MR. BALWANI WORKED WITH MULTIPLE PEOPLE TO BUILD THIS

04:53PM 3   MODEL, THAT'S WHERE I GO BACK TO THE GADSON AND THE PRONG ABOUT

04:54PM 4   INCULPATORY STATEMENTS BECAUSE GADSON SAYS IF SOMEONE IS

04:54PM 5   DEFLECTING OR SHARING BLAME, THAT'S NOT INCULPATORY.

04:54PM 6      SO I WOULD SAY THAT BETWEEN THOSE TWO PRONGS, ALL OF THE

04:54PM 7   PORTIONS ABOUT THE FINANCIAL MODEL AND PROJECTIONS ARE

04:54PM 8   INADMISSIBLE HEARSAY.

04:54PM 9             MR. FLEURMONT:  IF I COULD BRIEFLY RESPOND,

04:54PM 10  YOUR HONOR?

04:54PM 11            THE COURT:  YES, PLEASE.

04:54PM 12            MR. FLEURMONT:  BRIAN GROSSMAN TESTIFIED THAT HE

04:54PM 13  RECEIVED THE FINANCIAL MODEL FROM SUNNY, FROM MR. BALWANI,

04:54PM 14  EXCUSE ME.

04:54PM 15     AND THERE IS OTHER -- AND THAT'S AT TRANSCRIPT 6411,

04:54PM 16  NOVEMBER 16TH.

04:54PM 17     THERE'S TESTIMONY FROM GENERAL MATTIS THAT THE BOARD

04:54PM 18  RECEIVED PRESENTATIONS ABOUT THE FINANCIALS FROM MR. BALWANI.

04:54PM 19     THE RULE DOES NOT REQUIRE, AND I HAVE NOT SEEN A CASE THAT

04:54PM 20  SAYS THIS, THAT THE RULE REQUIRES A WITNESS TO SAY WHAT THE,

04:55PM 21  WHAT THE PROPONENT WANTS TO ADMIT IS -- THERE'S NO REQUIREMENT

04:55PM 22  THAT THERE'S A ONE-TO-ONE MATCH WITH THE STATEMENT THAT THE

04:55PM 23  DECLARANT WANTS TO ADMIT AND THE CORROBORATION.

04:55PM 24     WHAT THE RULE REQUIRES IS THAT CORROBORATING CIRCUMSTANCES

04:55PM 25  THAT INDICATE TRUSTWORTHINESS.

04:55PM 1    AND SO THE TESTIMONY OF GENERAL MATTIS, THE TESTIMONY OF

04:55PM 2    BRIAN GROSSMAN, AND OTHER STATEMENTS BY MR. BALWANI'S SWORN

04:55PM 3    DECLARATION, EXCUSE ME, SWORN DEPOSITION SUPPORT THE STATEMENTS

04:55PM 4    THAT WE SEEK TO ADMIT.

04:55PM 5         THE COURT:  OKAY.  IT SEEMS LIKE THERE'S A -- WHAT

04:55PM 6    DO WE DO WHEN THERE'S, THERE'S AN EQUAL WEIGHT OR EQUAL

04:55PM 7    INTERPRETATION AS TO EACH?  IT COULD BE LOOKED AT THIS WAY?  IT

04:55PM 8    COULD BE LOOKED AT ANOTHER WAY?

04:55PM 9         I GUESS THAT'S FOR THE COURT TO BALANCE AND SEE, BUT

04:55PM 10   THAT'S ONE OF THE THINGS THAT THE COURT HAS TO LOOK AT, AND

04:56PM 11   THAT'S WHY WE'RE HAVING THIS CONVERSATION CANDIDLY.

04:56PM 12        YOU SHOULD UNDERSTAND THAT I'M HAVING DIFFICULTY FINDING

04:56PM 13   THAT HERE.  THAT'S WHY WE'RE DISCUSSING THIS NOW.

04:56PM 14        AND THEN I LOOK AT -- AND I DON'T MEAN TO MUDDLE THE

04:56PM 15   WATERS -- BUT ON 1163-3, ECF PAGE 6, LINE 19, THE QUESTION WAS,

04:56PM 16   "DID SHE EVER EDIT THE MODEL?"

04:56PM 17        AND MR. BALWANI TELLS US THAT, HE SAYS, "TO THE BEST OF MY

04:56PM 18   KNOWLEDGE, NO.  I HAD QUESTIONS FOR HER AND THEN I PUT A MODEL

04:56PM 19   WITH HER NAME ON IT SO SHE COULD EDIT."

04:56PM 20        THIS IS ONE OF THOSE AREAS THAT, WELL, WAIT A MINUTE, NOW

04:56PM 21   SHE'S EDITING.  I DON'T KNOW IF IT'S THE SAME MODEL.  IS IT A

04:56PM 22   DIFFERENT MODEL?

04:56PM 23        AND THEN HE SAYS, "I DON'T THINK SHE DID BECAUSE I

04:56PM 24   CONTINUED WITH MY ASSUMPTIONS.  I NEVER EVEN LOOKED AT THAT

04:56PM 25   MODEL.  SO I THINK MY ANSWER IS NO."

04:56PM 1    SO THAT -- IT JUST CREATES ANOTHER ISSUE OF, IS THAT

04:56PM 2    SUFFICIENT CORROBORATION?

04:57PM 3        YOU'RE GOING TO TELL ME YES.

04:57PM 4        MR. FLEURMONT:  I THINK SO.

04:57PM 5        THERE ARE TWO ISSUES AT PLAY HERE.  ONE, IS THERE

04:57PM 6    SUFFICIENT CORROBORATION FOR THE STATEMENT?

04:57PM 7        WE'VE INCLUDED THE STATEMENT BECAUSE IT CORROBORATES THE

04:57PM 8    FACT THAT TO HIS KNOWLEDGE HE NEVER -- TO HIS KNOWLEDGE, SHE

04:57PM 9    DID NOT EDIT THE MODEL, MS. HOLMES DID NOT EDIT THE MODEL.

04:57PM 10       AND HE SAYS AT THE END, "I THINK MY ANSWER IS NO."

04:57PM 11       THE MAIN STATEMENT THAT WE'RE SEEKING TO INTRODUCE IS

04:57PM 12   EARLIER AND -- BUT ONE IN EXHIBIT A WHERE HE SAYS HE OWNS THE

04:57PM 13   MODEL, AND THEN ALSO IN EXHIBIT B WHERE HE SAYS -- THIS IS AT

04:57PM 14   PAGE 4, LINES 8 THROUGH 9 -- "I WOULD, YOU KNOW, UPDATE THE

04:57PM 15   MODEL AND KEEP IT UPDATED."

04:57PM 16       THE COURT:  RIGHT.

04:57PM 17       MR. FLEURMONT:  HE IS A PERSON WHO IS UPDATING THIS

04:57PM 18   MODEL.

04:57PM 19       SO THE FACT THAT HE SAYS "TO THE BEST OF MY KNOWLEDGE, NO"

04:57PM 20   IN RESPONSE TO A QUESTION ABOUT MS. HOLMES EDITING THE MODEL

04:58PM 21   CORROBORATES THAT STATEMENT.

04:58PM 22       THE COURT MAY LOOK AT THIS STATEMENT AND SAY -- JUST TO BE

04:58PM 23   CLEAR, I DON'T THINK THIS IS A WHOLESALE EXERCISE.  IF THE

04:58PM 24   COURT SEES ONE QUESTION AND ANSWER THAT THEN IT DOESN'T BELIEVE

04:58PM 25   IS EITHER INCULPATORY, OR IF THE COURT SEES ONE QUESTION AND

04:58PM 1    ANSWER AND IT DOESN'T BELIEVE IT'S CORROBORATED, THEN IT SHOULD

04:58PM 2    THROW OUT THE REST OF THE TRANSCRIPT.

04:58PM 3        IF THE COURT THINKS THAT THE SCALES ARE EQUAL ON THIS ONE,

04:58PM 4    I THINK THE COURT IS WELL WITHIN ITS RIGHTS TO LOOK AT THE

04:58PM 5    OTHER STATEMENTS AND SAY, WELL, THIS ONE MEETS THE RULE.

04:58PM 6        THE COURT:  OKAY.  OKAY.

04:58PM 7        MS. VOLKAR:  YOUR HONOR, I THINK THE COURT'S

04:58PM 8    QUESTIONS SHOW AND DEMONSTRATE WHY THIS -- THESE PORTIONS ARE

04:58PM 9    INADMISSIBLE, AND THE REASON IS BECAUSE WHEN THERE IS EVIDENCE

04:58PM 10   POINTING IN BOTH DIRECTIONS, THE TYPICAL ANSWER IN OUR COURT

04:58PM 11   AND LEGAL SYSTEM IS THROUGH CROSS-EXAMINATION, IS TO TEST IT

04:58PM 12   THROUGH THE ADVERSARIAL PROCESS.

04:58PM 13       AND THAT BRINGS US BACK TO THE FUNDAMENTAL PROBLEM HERE.

04:58PM 14       THE DEFENSE SEEKS TO ADMIT THESE STATEMENTS WHEN THE

04:59PM 15   GOVERNMENT, THE PROSECUTION TEAM HAS NOT HAD THE OPPORTUNITY TO

04:59PM 16   CROSS-EXAMINE MR. BALWANI.

04:59PM 17       AND I KNOW THAT WHEN WE'RE LOOKING AT THIS, WE'RE TALKING

04:59PM 18   ABOUT THOSE TWO PRONGS THAT I MENTIONED.

04:59PM 19       BUT FOR A HEARSAY EXCEPTION, THE INDICATION OF

04:59PM 20   TRUSTWORTHINESS, THAT PRONG IS INCORPORATING THE IDEA THAT IF

04:59PM 21   WE'RE GOING TO BRING IN AN OUT-OF-COURT STATEMENT THAT CAN'T

04:59PM 22   NECESSARILY -- WHERE THE DECLARANT CANNOT BE TESTED THROUGH THE

04:59PM 23   TYPICAL PROCESS OF CROSS-EXAMINATION, DO WE HAVE SUFFICIENT --

04:59PM 24   DO WE HAVE SUFFICIENT INDICATION OF TRUSTWORTHINESS THAT WE CAN

04:59PM 25   RELY ON THOSE STATEMENTS WITHOUT TESTING THEM THROUGH THE

04:59PM 1      NORMAL TRIAL PROCESS?

04:59PM 2              THE COURT:  OKAY.

04:59PM 3              MS. VOLKAR:  AND THAT'S WHERE I WOULD ARGUE,

04:59PM 4      ALTHOUGH WE'RE TALKING ABOUT CORROBORATION, WHEN WE ARE IN A

04:59PM 5      SITUATION THAT THE COURT FACES HERE WHERE THERE IS SOME

04:59PM 6      EVIDENCE THAT POINTS BOTH WAYS, THERE'S NOTHING ELSE EXPLICITLY

04:59PM 7      EVIDENT.

04:59PM 8          AND WITH RESPECT TO MY COLLEAGUE, I LISTENED TO WHAT HE

04:59PM 9      SAID ABOUT MR. GROSSMAN AND THE OTHER INVESTORS RECEIVING THE

04:59PM 10     MODEL, BUT I DIDN'T HEAR ANYTHING ABOUT WHO HAS TESTIFIED, AND

05:00PM 11     I HAVE NOT HEARD ANY TESTIMONY IN THIS CASE FROM A WITNESS TO

05:00PM 12     DATE ABOUT WHO BUILT THE MODEL OTHER THAN THIS.

05:00PM 13             THE COURT:  OKAY.  MR. FLEURMONT, ANYTHING ELSE YOU

05:00PM 14     WANT ME TO KNOW?

05:00PM 15             MR. FLEURMONT:  YES, YOUR HONOR.

05:00PM 16         BRIEFLY ON THE MODEL VERSUS PROJECTIONS DISCUSSIONS WE HAD

05:00PM 17     EARLIER, I JUST WANTED TO CLARIFY SOME THINGS.

05:00PM 18             THE COURT:  SURE.

05:00PM 19             MR. FLEURMONT:  SO THE WAY THE PROJECTIONS WERE MADE

05:00PM 20     WERE BY PLUGGING THE ASSUMPTIONS INTO THE MODEL, AND THERE ARE

05:00PM 21     DIFFERENT ASSUMPTIONS.  FOR EXAMPLE, HOW MANY STORES DO WE

05:00PM 22     THINK WILL OPEN THIS YEAR?  HOW MUCH REVENUE DO WE THINK WE'LL

05:00PM 23     GET BASED ON DIFFERENT METRICS?

05:00PM 24         ONCE THOSE METRICS WERE PUT INTO THE MODEL, THEN THAT'S

05:00PM 25     WHAT GENERATES A PROJECTION THAT IS ACTUALLY SENT TO THE

05:00PM 1 INVESTOR.

05:00PM 2        SO I JUST WANT IT TO BE CLEAR THAT THE MODEL AND THE

05:00PM 3 PROJECTION ARE ESSENTIALLY THE SAME THING FOR THAT REASON.  THE

05:00PM 4 MODEL IS WHAT IS GENERATING THE PROJECTION THAT IS SENT TO THE

05:00PM 5 INVESTORS.  SO I WANTED TO CLARIFY THAT.

05:00PM 6             THE COURT:  RIGHT.  I THINK I FOLLOW THAT.

05:00PM 7             MR. FLEURMONT:  OKAY.

05:00PM 8             THE COURT:  THE MODEL IS THE, IS THE INITIAL

05:01PM 9 DOCUMENT WHERE ALL OF THE INFORMATION IS PUT IN, AND THAT IS --

05:01PM 10 THE FINAL PRODUCT IS THE PROJECTION THAT IS SENT OUT.

05:01PM 11             MR. FLEURMONT:  OKAY.  COOL.  I JUST WANTED TO MAKE

05:01PM 12 SURE.

05:01PM 13        (LAUGHTER.)

05:01PM 14             THE COURT:  NO, IT IS COOL.

05:01PM 15             MR. FLEURMONT:  I JUST WANTED TO MAKE SURE I WAS

05:01PM 16 CLEAR ON THAT.

05:01PM 17        JUST TAKE A STEP BACK FROM THE PRIOR DISCUSSION, WHAT THE

05:01PM 18 RULE REQUIRES IS A STATEMENT AGAINST INTEREST.  THERE'S NO

05:01PM 19 REQUIREMENT IN THAT RULE FOR SIMILAR MODE OF OPPORTUNITY TO

05:01PM 20 CROSS-EXAMINE LIKE THERE IS IN 804(B)(1), AND THAT'S FOR A

05:01PM 21 REASON TYPICALLY.

05:01PM 22        AS I MENTIONED EARLIER TODAY, THESE STATEMENTS AGAINST

05:01PM 23 INTEREST ARE SAID TO ANOTHER WITNESS OR SAID TO A POLICE

05:01PM 24 OFFICER, AND THE OTHER PARTY ISN'T EVEN THERE.

05:01PM 25        THE REASON THAT THEY'RE ALLOWED TO COME IN IS BECAUSE

05:01PM 1  THEY'RE TYPICALLY RELIABLE BECAUSE THEY'RE STATEMENTS AGAINST

05:01PM 2  THE PERSON'S INTEREST.  THEY WOULDN'T MAKE THE STATEMENT IF

05:01PM 3  THEY -- THEY WOULDN'T MAKE THE STATEMENT BECAUSE IT SUBJECTS

05:01PM 4  THEM TO SOME SORT OF LIABILITY, WHETHER IT'S CIVIL OR CRIMINAL

05:02PM 5  LIABILITY.

05:02PM 6       AND WE SUBMIT, YOUR HONOR, THAT THAT'S WHAT HAPPENED HERE.

05:02PM 7       I DO THINK THAT IT'S IMPORTANT TO NOTE THAT THESE ARE

05:02PM 8  STATEMENTS MADE IN A DEPOSITION OF THE S.E.C. UNDER THE PENALTY

05:02PM 9  OF PERJURY.  THESE ARE NOT STATEMENTS MADE TO ANOTHER WITNESS,

05:02PM 10 NOT STATEMENTS MADE TO A POLICE OFFICER.

05:02PM 11      AND I'M NOT SAYING THAT THE CORROBORATION ELEMENT DOES NOT

05:02PM 12 NEED TO BE MET BECAUSE OF THAT, BUT I THINK THAT'S SOMETHING

05:02PM 13 THAT THE COURT SHOULD CONSIDER WHEN CONSIDERING IF THESE

05:02PM 14 STATEMENTS ARE TRUSTWORTHY.

05:02PM 15      THERE'S A WHOLE OTHER EXCEPTION THAT TALKS ABOUT

05:02PM 16 STATEMENTS MADE IN DEPOSITIONS FOR A REASON.  I THINK THAT'S --

05:02PM 17 YOU KNOW, YOU SWORN UNDER PERJURY, LIKE, YOU WANT TO BE HONEST.

05:02PM 18      SO THERE IS THAT POINT.

05:02PM 19      IN TERMS OF THE RULE 106 AND WHAT WE WANT TO ADMIT, GOING

05:03PM 20 BACK TO JUST WHAT I SAID EARLIER, I THINK I'VE POINTED THE

05:03PM 21 COURT TO THE PORTIONS THAT WE'RE SEEKING TO ADMIT.

05:03PM 22      IF THE COURT WAS TO FASHION A LIMITED RULING THAT JUST HAD

05:03PM 23 THOSE PORTIONS, THAT WOULD KIND OF GUIDE OUR 106 DESIGNATIONS.

05:03PM 24           THE COURT:  SURE.  OKAY.  UNDERSTOOD.  OKAY.

05:03PM 25      ALL RIGHT.  WELL, IT USED TO BE AT PERIL OF ONE'S SOUL,

05:03PM  1   REMEMBER THOSE DAYS, BUT NOW WE'VE MOVED IT TO PERILS OF

05:03PM  2   PERJURY, SO --

05:03PM  3           MS. VOLKAR:  YOUR HONOR, THE LAST THING I WANT TO

05:03PM  4   SAY ON THE CORROBORATION AND THE TRUSTWORTHINESS POINT, BECAUSE

05:03PM  5   I THINK THAT'S REALLY WHERE WE ARE FOCUSSING FOR THESE PIECES,

05:03PM  6   THIS IS APPROXIMATELY A YEAR AFTER THE PARTIES SPLIT UP, AND WE

05:03PM  7   DID HEAR TODAY AND YESTERDAY THAT THERE WAS A COMPLICATED

05:03PM  8   RELATIONSHIP BETWEEN MS. HOLMES AND MR. BALWANI.  THERE WERE

05:03PM  9   LOVING ASPECTS AND NOT LOVING ASPECTS.

05:03PM 10        BUT WE HAVEN'T YET HEARD FROM MR. BALWANI, TO BE FRANK,

05:03PM 11   AND HIS SIDE OF THE STORY, AND WE -- AS FAR AS WE CAN TELL FROM

05:03PM 12   THE TEXT MESSAGES, HE EXPRESSED A LOT OF LOVE AND DEVOTION.

05:04PM 13        AND AGAIN, WITHOUT CROSS-EXAMINATION, WE DON'T KNOW WHAT

05:04PM 14   INFLUENCE THAT WOULD HAVE HAD ON HIM IN THESE SITUATIONS.

05:04PM 15        AND WE HAVE THE NINTH CIRCUIT SAYING A MOTIVE OF LOVE IS

05:04PM 16   ANOTHER REASON TO TAKE A LITTLE BIT CLOSER LOOK AT CERTAIN

05:04PM 17   STATEMENTS.

05:04PM 18           THE COURT:  I DID.  I DID LOOK AT THAT, AND I LOOKED

05:04PM 19   AT THAT IN RELATION TO THE TIMING AND IS THIS A SITUATION WHERE

05:04PM 20   MR. BALWANI WOULD HAVE, BECAUSE OF THAT MOTIVATION, HIS

05:04PM 21   FEELINGS FOR MS. HOLMES, HE MIGHT HAVE BEEN TRYING TO PROTECT

05:04PM 22   HER IN SOME WAY, OR IN SOME WAY SHIELD HER?  THAT'S A

05:04PM 23   CONSIDERATION.

05:04PM 24        I THINK IT'S MITIGATED BECAUSE OF THE TIMING HERE, BUT I

05:04PM 25   THINK YOU'RE RIGHT TO POINT OUT THAT THERE'S SOME -- IT WAS A

| | | |
|---|---|---|
| 05:04PM | 1 | COMPLEX RELATIONSHIP I THINK IS WHAT YOU SAID, AND I THINK THE |
| 05:04PM | 2 | RECORD REFLECTS THAT. |
| 05:04PM | 3 | SO THANK YOU FOR THAT. |
| 05:04PM | 4 | OKAY.  ALL RIGHT.  THANK YOU. |
| 05:04PM | 5 | LET ME TURN TO 1165, WHICH WAS THE RENEWED MOTION TO ADMIT |
| 05:04PM | 6 | 14259.  THIS IS REALLY ABOUT DR. ASIN IF I'M NOT MISTAKEN. |
| 05:05PM | 7 | MS. VOLKAR:  IT IS, YOUR HONOR. |
| 05:05PM | 8 | I WAS CURIOUS IF YOUR HONOR HAD A TENTATIVE RULING ON THE |
| 05:05PM | 9 | FINANCIAL MODELS OR IF IT WAS STILL UNDER SUBMISSION. |
| 05:05PM | 10 | THE COURT:  I DO, BUT WHAT I'M GOING TO DO IS GIVE |
| 05:05PM | 11 | IT TO YOU PROBABLY TOMORROW BECAUSE I WANT TO LOOK, AND I'M |
| 05:05PM | 12 | GOING TO COMPARE THIS AND GO THROUGH THE TRANSCRIPTS, AND I'LL |
| 05:05PM | 13 | HAVE SOMETHING. |
| 05:05PM | 14 | BUT MY SENSE IS THAT I DON'T THINK ALL OF IT COMES IN, |
| 05:05PM | 15 | MR. FLEURMONT.  I'M GOING TO LOOK AT THIS AND SEE WHAT |
| 05:05PM | 16 | PORTIONS. |
| 05:05PM | 17 | SO YOU CAN STOP READING THE TRANSCRIPTS, MS. VOLKAR. |
| 05:05PM | 18 | BUT I THINK I'M PROBABLY GOING TO GRANT THE MOTION AS TO |
| 05:05PM | 19 | SOME PORTIONS, BUT IT'S NOT GOING TO BE A WHOLESALE GRANT.  I |
| 05:05PM | 20 | THINK THERE WILL BE SOME LIMITATIONS TO IT, IF I COULD TELL YOU |
| 05:05PM | 21 | THAT. |
| 05:05PM | 22 | MR. FLEURMONT:  UNDERSTOOD, YOUR HONOR. |
| 05:05PM | 23 | MS. VOLKAR:  THANK YOU, YOUR HONOR.  VERY HELPFUL. |
| 05:05PM | 24 | THE COURT:  YOU BET. |
| 05:05PM | 25 | AS TO 1165, LET ME JUST SAY THAT I'VE LOOKED AT THIS. |

05:05PM 1        MR. BOSTIC, I THINK YOU'RE RESPONSIBLE FOR THIS.  THANK

05:05PM 2    YOU FOR YOUR COMMENTS ON THIS.

05:05PM 3        AS TO THE MOTION TO ADMIT THIS, I'VE LOOKED THIS OVER,

05:06PM 4    CONSIDERED THE ARGUMENTS OF COUNSEL.  I'M GOING TO ALLOW IT TO

05:06PM 5    COME IN.  I DO THINK THAT THERE WAS, THERE WAS TESTIMONY ABOUT

05:06PM 6    DR. ASIN AND THE WITNESS TESTIFIED AS SHE DID ABOUT HER TEST

05:06PM 7    RESULTS.

05:06PM 8        I DID ALLOW THE GOVERNMENT TO GET IN CERTAIN EVIDENCE AND

05:06PM 9    DOCUMENTS AS I THINK THE DEFENSE POINTS OUT HERE.  I DO THINK

05:06PM 10   IT'S APPROPRIATE TO ALLOW THIS TO COME IN.  THERE IS A 401

05:06PM 11   THRESHOLD OF RELEVANCE THAT HAS BEEN MET.

05:06PM 12       UNDER 403, I DO THINK THAT PROBATIVE VALUE OUTWEIGHS ANY

05:06PM 13   PREJUDICIAL VALUE.  THE PARTIES HAVE TALKED ABOUT THAT.

05:06PM 14       SO I AM GOING TO GRANT THE MOTION AS TO THAT.  THAT WILL

05:06PM 15   BE ALLOWED TO COME IN.  SO THANK YOU.

05:06PM 16       (DEFENDANT'S EXHIBIT 14259 WAS RECEIVED IN EVIDENCE.)

05:06PM 17           THE COURT:  YES, MR. BOSTIC?

05:06PM 18           MR. BOSTIC:  IS THE COURT CONSIDERING WHETHER TO

05:06PM 19   REDACT THAT ONE LINE WHERE IT SAYS THAT DR. ASIN -- I FORGET

05:07PM 20   WHAT THE PHRASE IS, I DON'T HAVE IT IN FRONT OF ME.  BUT

05:07PM 21   DR. ASIN HAD NO PROBLEM WITH THE PROCESS.

05:07PM 22           THE COURT:  RIGHT.

05:07PM 23           MR. BOSTIC:  MY CONCERN IS THAT MIGHT BE PORTRAYED

05:07PM 24   AS THE DOCTOR HAVING NO CONCERNS ABOUT THE ACCURACY OF THE TEST

05:07PM 25   OR THAT MIGHT CAUSE CONFUSION IN THE JURY.

05:07PM 1        THE COURT:  YEAH, FAIR QUESTION.

05:07PM 2        SO WHEN I -- LET ME GET THE LANGUAGE.  I THINK IT'S

05:07PM 3    PROTOCOL.  I THINK IT'S PROTOCOL.  I THOUGHT ABOUT THAT, AND IN

05:07PM 4    GRANTING THE MOTION, I THOUGHT THAT THESE LAWYERS ARE

05:07PM 5    INTELLIGENT ENOUGH TO KNOW THAT WHEN THEY MAKE THEIR ARGUMENTS,

05:07PM 6    IF THEY WISH, TO INFORM THE JURY THE DIFFERENCE BETWEEN TEST

05:07PM 7    RESULTS AND A PROTOCOL.

05:07PM 8        AND I THINK THAT -- I GUESS THAT'S MY ANSWER.

05:07PM 9        MR. BOSTIC:  THANK YOU.  I JUST WANT TO MAKE SURE

05:07PM 10   THE COURT HAD CONSIDERED IT, YOUR HONOR.  SUBMITTED.

05:07PM 11       THE COURT:  GREAT.  ALL RIGHT.  THANK YOU.

05:07PM 12       ANYTHING FURTHER?  THANK YOU VERY MUCH.  THANK YOU.

05:07PM 13       ANYTHING FURTHER BEFORE WE BREAK FOR THE DAY FROM EITHER

05:07PM 14   TEAM?

05:07PM 15       MR. BOSTIC:  NOT FROM THE GOVERNMENT, YOUR HONOR.

05:08PM 16       THE COURT:  OKAY.  SO WE'LL SEE EACH OTHER NEXT, IS

05:08PM 17   IT FRIDAY?

05:08PM 18       MR. DOWNEY:  FRIDAY AT 9:00.

05:08PM 19       THE COURT:  OKAY.  THANK YOU.

05:08PM 20       THE CLERK:  COURT IS ADJOURNED.

05:08PM 21       (COURT ADJOURNED AT 5:08 P.M.)

22

23

24

25

```
 1

 2

 3                    CERTIFICATE OF REPORTERS

 4

 5

 6

 7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

 8   UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

 9   CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16        IRENE RODRIGUEZ, CSR, CRR
          CERTIFICATE NUMBER 8076
17

18

19        LEE-ANNE SHORTRIDGE, CSR, CRR
          CERTIFICATE NUMBER 9595
20

21        DATED:  NOVEMBER 30, 2021

22

23

24

25
```