# EXHIBIT 56

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR-18-00258-EJD |
| | ) | |
| PLAINTIFF, | ) | SAN JOSE, CALIFORNIA |
| | ) | |
| VS. | ) | VOLUME 24 |
| | ) | |
| ELIZABETH A. HOLMES, | ) | OCTOBER 26, 2021 |
| | ) | |
| DEFENDANT. | ) | PAGES 4577 – 4869 |
| _____ | ) | **PAGES 4674 TO 4677 SEALED** |


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                       BY:  JOHN C. BOSTIC
                            JEFFREY B. SCHENK
                       150 ALMADEN BOULEVARD, SUITE 900
                       SAN JOSE, CALIFORNIA 95113

                       BY:  ROBERT S. LEACH
                            KELLY VOLKAR
                       1301 CLAY STREET, SUITE 340S
                       OAKLAND, CALIFORNIA 94612

       (APPEARANCES CONTINUED ON THE NEXT PAGE.)


OFFICIAL COURT REPORTERS:
                       IRENE L. RODRIGUEZ, CSR, RMR, CRR
                       CERTIFICATE NUMBER 8074
                       LEE-ANNE SHORTRIDGE, CSR, CRR
                       CERTIFICATE NUMBER 9595

       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
         TRANSCRIPT PRODUCED WITH COMPUTER

<pre>
 1        A P P E A R A N C E S: (CONT'D)

 2

 3        FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                                  BY:  KEVIN M. DOWNEY
 4                                     LANCE A. WADE
                                       KATHERINE TREFZ
 5                                     SEEMA ROPER
                                       PATRICK LOOBY
 6                                     RICHARD CLEARY
                                       J.R. FLEURMONT
 7                                725 TWELFTH STREET, N.W.
                                  WASHINGTON, D.C. 20005
 8
                                  LAW OFFICE OF JOHN D. CLINE
 9                                BY:  JOHN D. CLINE
                                  ONE EMBARCADERO CENTER, SUITE 500
10                                SAN FRANCISCO, CALIFORNIA 94111

11
          ALSO PRESENT:          FEDERAL BUREAU OF INVESTIGATION
12                                BY:  ADELAIDA HERNANDEZ

13                                OFFICE OF THE U.S. ATTORNEY
                                  BY:  LAKISHA HOLLIMAN, PARALEGAL
14                                     MADDI WACHS, PARALEGAL

15                                WILLIAMS & CONNOLLY
                                  BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL
16
                                  TBC
17                                BY:  BRIAN BENNETT, TECHNICIAN

18

19

20

21

22

23

24

25
</pre>

INDEX OF PROCEEDINGS

GOVERNMENT'S:

**LISA PETERSON**
DIRECT EXAM BY MR. LEACH                    P. 4634
CROSS-EXAM BY MR. WADE                      P. 4710

```
INDEX OF EXHIBITS


                                    IDENT.      EVIDENCE

GOVERNMENT'S:


1944                                            4640
5432                                            4643
2015                                            4646
2073                                            4651
4858                                            4663
2107                                            4690
2166                                            4692
3152                                            4703
2170                                            4719
4197                                            4735
2097                                            4812
2098                                            4814
2139                                            4819


DEFENDANT'S:


12751                                           4728
14089                                           4801
14106, PARAGRAPH 2, REDACTED                    4809
12856                                           4816
14080                                           4820
13987                                           4820
14081                                           4822
```

|  | |
|---|---|
| | 1 | SAN JOSE, CALIFORNIA                    OCTOBER 26, 2021 |
| | 2 |                    P R O C E E D I N G S |
| 08:31AM | 3 |        (COURT CONVENED AT 8:31 A.M.) |
| 08:31AM | 4 |        (JURY OUT AT 8:31 A.M.) |
| 08:31AM | 5 |            THE COURT:  LET'S GO ON THE RECORD IN THE HOLMES |
| 08:31AM | 6 | MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT. |
| 08:31AM | 7 |        WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.  I UNDERSTAND |
| 08:32AM | 8 | THERE'S A FEW THINGS THAT WE SHOULD TAKE UP BEFORE WE BEGIN |
| 08:32AM | 9 | EVIDENCE. |
| 08:32AM | 10 |        MR. WADE? |
| 08:32AM | 11 |            MR. WADE:  GOOD MORNING, YOUR HONOR.  THANK YOU. |
| 08:32AM | 12 |        LANCE WADE FOR MS. HOLMES. |
| 08:32AM | 13 |        WE HAVE TWO WITNESSES THAT WE WOULD LIKE TO RAISE SOME |
| 08:32AM | 14 | MATTERS WITH THE COURT IN ADVANCE OF TESTIMONY.  THE FIRST IS |
| 08:32AM | 15 | LISA PETERSON, WHO I UNDERSTAND FROM THE GOVERNMENT WILL BE THE |
| 08:32AM | 16 | FIRST WITNESS TODAY. |
| 08:32AM | 17 |        AND THEN MR. DOWNEY WILL ADDRESS A COUPLE OF ISSUES |
| 08:32AM | 18 | RELATING TO ALAN EISENMAN, WHO IS AN INVESTOR WHO WE UNDERSTAND |
| 08:32AM | 19 | MAY TESTIFY LATE IN THE DAY OR TOMORROW DEPENDING ON HOW THE |
| 08:32AM | 20 | TRIAL PROCEEDS. |
| 08:32AM | 21 |        WITH RESPECT TO MS. PETERSON, THERE ARE, I THINK, THREE |
| 08:33AM | 22 | ISSUES.  ONE RELATES TO THE ADMISSION OF CERTAIN VIDEO |
| 08:33AM | 23 | EVIDENCE.  WE WANTED TO RAISE THESE ISSUES WITH THE COURT TO |
| 08:33AM | 24 | TRY AND AVOID ISSUES LIKE THE KIND WE HAD LAST WEEK. |
| 08:33AM | 25 |            THE COURT:  SURE. |

08:33AM 1          MR. WADE:  AND WE'VE BEEN MEETING AND CONFERRING

08:33AM 2    WITH THE GOVERNMENT TO TRY TO GET SOME CLARITY ON THAT.

08:33AM 3          THE SECOND RELATES TO NO NOTES.  I THINK I RAISED --

08:33AM 4    FLAGGED FOR THE COURT THAT WE MAY HAVE CONCERNS ABOUT THE

08:33AM 5    NOTES.

08:33AM 6          I THINK BASED UPON THE EXHIBITS THAT WERE DISCLOSED BY THE

08:33AM 7    GOVERNMENT, I THINK WE PROBABLY ARE OKAY WITH THE NOTES.  WE

08:33AM 8    WOULDN'T STIPULATE TO THEM, BUT WE'LL SEE IF THEY LAY A

08:33AM 9    FOUNDATION.  THERE MAY BE THE -- THE ONE PAGE THEY INTEND TO

08:33AM 10   OFFER MAY BE APPROPRIATE.

08:33AM 11         AND THEN FINALLY, THERE ARE STATEMENTS CONCERNING

08:33AM 12   MATERIALITY.

08:33AM 13         WITH RESPECT TO THE VIDEOS, THERE ARE THREE VIDEOS THAT I

08:33AM 14   THINK MAY BE AT ISSUE, ALTHOUGH I'M NOT SURE WHAT THE

08:33AM 15   GOVERNMENT'S POSITION IS WITH RESPECT TO THE THIRD.

08:34AM 16         IT'S MY UNDERSTANDING THAT THE GOVERNMENT INTENDS TO OFFER

08:34AM 17   A VIDEO FROM JIM CRAMER'S "MAD MONEY" ON CNBC ON WHICH THE

08:34AM 18   CLIENT APPEARED.  IT'S A SEGMENT.  I'M NOT SURE HOW LONG, MAYBE

08:34AM 19   EIGHT MINUTES IN TOTAL.

08:34AM 20         IT'S MY UNDERSTANDING THAT THE GOVERNMENT WANTS TO OFFER

08:34AM 21   EXCERPTS OF THAT VIDEO.

08:34AM 22         WE THINK THE VIDEO IN ITS ENTIRETY SHOULD BE OFFERED.

08:34AM 23   INITIALLY WE UNDERSTOOD THAT'S WHAT WAS GOING TO BE OFFERED,

08:34AM 24   AND THEN THEY WOULD JUST PLAY CERTAIN EXCERPTS.

08:34AM 25         I BELIEVE THE GOVERNMENT DOES NOT NOW INTEND TO OFFER THE

08:34AM  1    COMPLETE VIDEO, BUT JUST WANTS TO OFFER THE EXCERPTS.

08:34AM  2         THIS IS A SEGMENT ON A NEWS PROGRAM.  I'M SURE THE COURT

08:34AM  3    HAS SEEN A MILLION OF THEM, IF NOT THIS ONE.

08:34AM  4         AND WE JUST THINK THAT THE CONTEXT AND THE TOTALITY IS

08:34AM  5    IMPORTANT.  IT'S NOT VERY LONG.  WE THINK IT SHOULD BE PLAYED.

08:34AM  6         IF THE GOVERNMENT CHOOSES NOT TO PLAY IT, WE WOULD

08:35AM  7    PROBABLY JUST PLAY THE WHOLE THING ON CROSS.

08:35AM  8         SIMILARLY, THERE'S A "TODAY SHOW" --

08:35AM  9              THE COURT:  I'M SORRY.  IS THIS AN INTERVIEW OF YOUR

08:35AM 10    CLIENT?  OR --

08:35AM 11              MR. WADE:  IT'S A SEGMENT THAT INCLUDES AN INTERVIEW

08:35AM 12    OF THE CLIENT.

08:35AM 13              THE COURT:  I SEE.  OKAY.

08:35AM 14              MR. WADE:  SO I ACTUALLY DON'T KNOW THE PURPOSE FOR

08:35AM 15    WHICH THE GOVERNMENT IS OFFERING IT.

08:35AM 16         I'M ASSUMING THERE'S SOME FOUNDATION OF RELEVANCE.  I KNOW

08:35AM 17    THE WITNESS HAS SAID -- MS. PETERSON HAS SAID SHE SAW THE TWO

08:35AM 18    VIDEOS.

08:35AM 19         I ACTUALLY DON'T KNOW EXACTLY --

08:35AM 20              THE COURT:  OKAY.

08:35AM 21              MR. WADE:  -- WHAT THE BASIS FOR IT BEING OFFERED

08:35AM 22    IS.

08:35AM 23         MR. LEACH MAY BE ABLE TO GIVE US SOME WINDOW INTO THAT.

08:35AM 24         BUT TO THE EXTENT THAT THEY SEEK TO OFFER ANY OF IT, WE

08:35AM 25    THINK THEY SHOULD OFFER ALL OF IT.

| | | |
|---|---|---|
| 08:35AM | 1 | THE COURT: OKAY. |
| 08:35AM | 2 | MR. WADE: OUR ARGUMENT AND POSITION IS ESSENTIALLY |
| 08:35AM | 3 | THE SAME WITH RESPECT TO A "TODAY SHOW" SEGMENT THAT INCLUDES |
| 08:35AM | 4 | STATEMENTS FROM OUR CLIENT. SAME ISSUES. |
| 08:35AM | 5 | THE COURT: OKAY. |
| 08:35AM | 6 | MR. WADE: SO WE DON'T KNOW EXACTLY WHAT ABOUT THE |
| 08:35AM | 7 | VIDEO THE GOVERNMENT -- WHY THE GOVERNMENT THINKS IT'S |
| 08:36AM | 8 | RELEVANT, WHAT ITS POSITION IS, BUT IF THEY WANT TO OFFER IT, |
| 08:36AM | 9 | WE THINK THEY SHOULD JUST SHOW THE WHOLE THING. WE THINK IT'S |
| 08:36AM | 10 | TAKEN OUT OF CONTEXT AND SOME OF THESE STATEMENTS COULD BE |
| 08:36AM | 11 | CONFUSING. |
| 08:36AM | 12 | THE COURT: IS THERE -- AND THE "TODAY SHOW" IS AN |
| 08:36AM | 13 | INTERVIEW OF YOUR CLIENT AS WELL? |
| 08:36AM | 14 | MR. WADE: IT INVOLVES AN INTERVIEW OF THE CLIENT, |
| 08:36AM | 15 | YES. |
| 08:36AM | 16 | THE COURT: AND HOW LONG IS THAT, DO YOU KNOW? |
| 08:36AM | 17 | MR. LEACH: IT'S ABOUT FOUR MINUTES, YOUR HONOR. |
| 08:36AM | 18 | THE COURT: OH, OKAY. IN TOTAL. OKAY. |
| 08:36AM | 19 | MR. WADE: AND AGAIN, I THINK THE GOVERNMENT IS |
| 08:36AM | 20 | INTENDING TO OFFER SEGMENTS. I DON'T KNOW THE THEORY OF |
| 08:36AM | 21 | RELEVANCE OR WHY THEY WANT TO OFFER IT. I CAN IMAGINE A FEW. |
| 08:36AM | 22 | THE COURT: OKAY. AND THEN WHAT IS YOUR THIRD |
| 08:36AM | 23 | ISSUE? I'M SORRY. |
| 08:36AM | 24 | MR. WADE: THE THIRD ISSUE IS A LONGER VIDEO AND IT |
| 08:36AM | 25 | RELATES TO A PRESENTATION AT THE AACC, WHICH IS THE AMERICAN |

08:36AM 1    ASSOCIATION OF CLINICAL CHEMISTRY, WHICH IS ESSENTIALLY A LAB

08:36AM 2    TRADE ASSOCIATION WHERE ALL OF THE CLINICAL CHEMISTS GATHER AND

08:36AM 3    HAVE AN ANNUAL CONVENTION.

08:37AM 4        OUR CLIENT GAVE A PRESENTATION OF TECHNOLOGY AT THAT

08:37AM 5    MEETING, AND -- A RELATIVELY LENGTHY PRESENTATION OF TECHNOLOGY

08:37AM 6    AT THAT MEETING, WHICH WAS OBSERVED BY A NUMBER OF WITNESSES IN

08:37AM 7    THE CASE, INCLUDING MS. PETERSON, WHO ACTUALLY ATTENDED THE

08:37AM 8    PRESENTATION AND PROVIDED CONTEMPORANEOUS THOUGHTS AND ANALYSIS

08:37AM 9    OF THE PRESENTATION THAT COMPARE THE PRESENTATION BACK TO HER

08:37AM 10   VIEWS OF THE TECHNOLOGY AT THE TIME SHE VISITED THE COMPANY.

08:37AM 11       SO WE THINK, WE THINK EXCERPTS OF THAT ARE RELEVANT.  WE

08:37AM 12   WOULD BE HAPPY TO PLAY THE WHOLE THING, BUT FOR --

08:37AM 13               THE COURT:  HOW LONG IS THAT?

08:37AM 14               MR. WADE:  THAT'S AN HOUR AND A HALF.  BUT IN THE

08:37AM 15   INTEREST OF --

08:37AM 16               THE COURT:  AND IT'S, AND IT'S TECHNOLOGY AND IT

08:38AM 17   SOUNDS LIKE IT'S RATHER DENSE.

08:38AM 18               MR. WADE:  IT'S RATHER EXCITING, YOUR HONOR, I WOULD

08:38AM 19   SUGGEST.

08:38AM 20               THE COURT:  WHAT DID YOU DO THIS WEEKEND, MR. WADE?

08:38AM 21               MR. WADE:  I VIEWED THIS VIDEO A COUPLE OF TIMES.

08:38AM 22       WELL, THE GIANTS AREN'T IN THE SERIES, SO WHAT ELSE DO WE

08:38AM 23   HAVE TO DO?

08:38AM 24       (LAUGHTER.)

08:38AM 25               MR. WADE:  WE WOULD INTEND TO OFFER EXCERPTS, I

08:38AM 1    THINK TOTALLING MAYBE 20 MINUTES INTERSPERSED WITH SOME

08:38AM 2    Q AND A.  WE DO THAT -- SO THERE ARE TWO PARTS OF THE

08:38AM 3    PRESENTATION.  ONE IS A PRESENTATION BY THE CLIENT, IT INVOLVED

08:38AM 4    VIDEO AND IT INVOLVES A POWERPOINT.  THAT'S ABOUT AN HOUR.  WE

08:38AM 5    WOULD PLAY EXCERPTS OF THAT.

08:38AM 6        WE ACTUALLY, IN ALL SERIOUSNESS, DO THINK IT WOULD BE

08:38AM 7    USEFUL TO THE JURY BECAUSE IT DOES SHOW SOME OF THE TECHNOLOGY

08:38AM 8    THAT HAS BEEN TALKED ABOUT A LOT, WHICH HASN'T REALLY BEEN SEEN

08:39AM 9    ALL THAT MUCH, AND I THINK THE JURY MAY TAKE INTEREST IN SORT

08:39AM 10   OF HOW SOME OF THIS STUFF FUNCTIONS AND IT MAY GIVE THEM

08:39AM 11   IMPORTANT CONTEXTS.

08:39AM 12       THE SECOND PIECE IS A Q AND A WHICH INVOLVES THREE EXPERTS

08:39AM 13   WHO ARE QUESTIONING MS. HOLMES AND THREE SCIENTISTS WHO WORK AT

08:39AM 14   THERANOS.  THAT IS 30 MINUTES.  WE HAD INTENDED TO PLAY

08:39AM 15   EXCERPTS OF THAT IN THE INTEREST OF TIME.

08:39AM 16       I CERTAINLY DON'T WANT TO BE ACCUSED OF CHERRY PICKING AND

08:39AM 17   HAVE A SITUATION WHERE WE PLAY EXCERPTS IN THE INTEREST OF TIME

08:39AM 18   AND THEN THERE'S A SUGGESTION CREATED THAT WE'RE HIDING OTHER

08:39AM 19   EXCERPTS.  WE'RE HAPPY TO PLAY THE ENTIRE 30 MINUTES OF THE

08:39AM 20   Q AND A.

08:39AM 21       BUT WE THINK, WE THINK EITHER WOULD BE APPROPRIATE FOR THE

08:39AM 22   JURY GIVEN ITS RELEVANCE TO SOME OF THE WITNESSES IN THE CASE

08:39AM 23   AND THE FACT THAT THE GOVERNMENT APPEARS TO BE INTERESTED IN

08:40AM 24   GOING BEYOND THE SORT OF INVESTMENT PERIOD INTO "THE

08:40AM 25   WALL STREET JOURNAL" PERIOD AND THE POST "WALL STREET JOURNAL"

08:40AM  1       PERIOD.

08:40AM  2            SO WE WOULD INTEND TO OFFER THOSE EXCERPTS.

08:40AM  3            I ACTUALLY DON'T KNOW WHAT THE GOVERNMENT'S POSITION IS ON

08:40AM  4       THAT.  WE HAVEN'T RECEIVED THE GOVERNMENT'S POSITION ON THE

08:40AM  5       ADMISSION OF THAT.

08:40AM  6            SO THAT'S IT FOR THE VIDEOS.

08:40AM  7            AND THEN WE HAVE SOME MATERIALITY CONCERNS, BUT MAYBE I'LL

08:40AM  8       PAUSE THERE.

08:40AM  9            THE COURT:  LET'S TALK ABOUT THE VIDEOS.  THANK YOU.

08:40AM 10       MR. LEACH?

08:40AM 11            MR. LEACH:  THANK YOU, YOUR HONOR.

08:40AM 12       LET ME TAKE THEM IN ORDER AND GIVE THE COURT A LITTLE MORE

08:40AM 13       CONTEXT.

08:40AM 14            THE FIRST VIDEO IS THE "MAD MONEY" INTERVIEW.  IT'S ON THE

08:40AM 15       DAY ON OCTOBER 15TH OR 16TH, 2015, THE DAY "THE

08:40AM 16       WALL STREET JOURNAL" ARTICLE BY JOHN CARREYROU COMES OUT, AND

08:40AM 17       MS. HOLMES IS ASKED ABOUT THE VERACITY OF CERTAIN STATEMENTS IN

08:40AM 18       "THE WALL STREET JOURNAL" ARTICLE.

08:40AM 19            IT'S THE EQUIVALENT OF A POLICE INTERROGATION WHERE SHE'S

08:40AM 20       ASKED, IS THIS TRUE?  IS THIS TRUE?  AND WE THINK SOME OF HER

08:40AM 21       RESPONSES ARE, AT BEST, MISLEADING AND ARGUABLY FALSE.

08:41AM 22            SO THE RELEVANCE IS THAT SHE'S MAKING FALSE EXCULPATORY

08:41AM 23       STATEMENTS AT THE TIME THAT SHE'S CONFRONTED WITH NEGATIVE

08:41AM 24       INFORMATION.

08:41AM 25            IT'S CLEARLY RELEVANT, AND WHAT THE DEFENSE IS LOOKING

08:41AM  1    OVER IS THE HEARSAY ISSUE THAT IS BAKED INTO ALL OF THIS.  HER

08:41AM  2    STATEMENTS, WHEN OFFERED BY THE DEFENSE -- EXCUSE ME -- ARE

08:41AM  3    HEARSAY.  WHEN THEY'RE OFFERED BY THE GOVERNMENT, THEY'RE

08:41AM  4    ADMISSIBLE.

08:41AM  5        AND SHE'S ASKED VERY DIRECT QUESTIONS.  I DON'T -- I

08:41AM  6    HAVEN'T HEARD AN ARGUMENT ABOUT THE RULE OF COMPLETENESS, BUT

08:41AM  7    THE ANSWER TO WHY ONLY SOME OF THE CLIPS IS HER STATEMENTS ARE

08:41AM  8    HEARSAY WHEN OFFERED BY THE DEFENSE.  THEY'RE NOT HEARSAY WHEN

08:41AM  9    OFFERED BY THE GOVERNMENT.

08:41AM  10       WE WANT TO PLAY THE RESPONSE TO TWO QUESTIONS, TWO VERY

08:41AM  11   DIRECT QUESTIONS, AND THE REMAINDER SHOULD NOT COME IN OVER A

08:41AM  12   HEARSAY OBJECTION.

08:41AM  13           THE COURT:  ARE THESE STATEMENTS THAT THE WITNESS --

08:41AM  14   I'M JUST TRYING TO GET FOUNDATIONALLY, IS THIS -- MS. PETERSON

08:42AM  15   IS GOING TO SAY SOMETHING ABOUT THIS?

08:42AM  16           MR. LEACH:  MS. PETERSON IS GOING TO SAY, I WATCHED

08:42AM  17   THE VIDEO.

08:42AM  18           THE COURT:  I SEE.

08:42AM  19           MR. LEACH:  I DON'T WANT TO SPEAK FOR HER, BUT IN A

08:42AM  20   SENSE --

08:42AM  21           THE COURT:  RIGHT.

08:42AM  22           MR. LEACH:  -- IT WAS A POSITIVE FACT TO SEE HER GO

08:42AM  23   ON T.V. AND DENY SOME VERY SERIOUS ALLEGATIONS, AND THIS

08:42AM  24   STARTED A PROCESS WHERE SHE WANTED TO GET MORE INFORMATION FROM

08:42AM  25   THE DEFENDANT.

08:42AM 1    SO THIS IS -- WE WANT TO GET MS. PETERSON'S RESPONSE TO

08:42AM 2  SOME OF THE THINGS SHE HEARD.

08:42AM 3    BUT PUTTING THAT ASIDE, THESE ARE STATEMENTS BY THE

08:42AM 4  DEFENDANT AT THE TIME THAT NEGATIVE INFORMATION IS PRESENTED.

08:42AM 5  IT COULD NOT BE MORE RELEVANT, AND IT'S SIMPLY THE RULE OF

08:42AM 6  HEARSAY THAT THE DEFENSE DOES NOT GET TO PUT IN SELF-SERVING

08:42AM 7  STATEMENTS THAT THEY WANT TO PUT IN BECAUSE SHE'S NOT UNDER

08:42AM 8  OATH.

08:42AM 9    THE COURT:  OKAY.

08:42AM 10    MR. LEACH:  THE "TODAY SHOW" VIDEO IS SLIGHTLY

08:42AM 11  DIFFERENT IN THE SENSE THAT IT'S A COMBINATION OF BOTH

08:42AM 12  STATEMENTS BY A REPORTER, YOU KNOW, SUMMARIZING INFORMATION,

08:42AM 13  AND SEGMENTS OF AN INTERVIEW OF MS. HOLMES.

08:43AM 14    WE PROPOSE PLAYING SOME OF THE STATEMENTS ONLY BY

08:43AM 15  MS. HOLMES IN THAT INTERVIEW.

08:43AM 16    THE REMAINDER, I'M NOT SURE I APPRECIATE THE RELEVANCE OF

08:43AM 17  IT.  AND PERHAPS IF THE DEFENSE LAYS MORE FOUNDATION, I, I CAN

08:43AM 18  SEE THE ENTIRETY COMING IN.  I'M NOT SURE I HAVE A PROBLEM WITH

08:43AM 19  THAT.

08:43AM 20    BUT THERE'S A HEARSAY ISSUE THERE.  AND IT'S NOT JUST AN

08:43AM 21  INTERVIEW.  IT'S STATEMENTS BY A REPORTER WHICH, IF OFFERED FOR

08:43AM 22  THE TRUTH, THERE MAY BE HEARSAY ISSUES BEHIND IT.

08:43AM 23    AND I HAVE TRANSCRIPTS OF THE -- OF BOTH THE "MAD MONEY"

08:43AM 24  AND THE "TODAY SHOW" INTERVIEW.

08:43AM 25    WITH RESPECT TO THE THIRD VIDEO --

08:43AM 1      THE COURT:  PARDON ME.  IS MS. PETERSON ALSO GOING

08:43AM 2   TO SPEAK TO THE "TODAY SHOW" INTERVIEW?

08:43AM 3      MR. LEACH:  YES, YES.

08:43AM 4      THE COURT:  SAME?

08:43AM 5      MR. LEACH:  SHE WILL SAY, I VIEWED IT AND I WAS

08:43AM 6   PLEASED TO SEE THE DEFENDANT OUT THERE.

08:43AM 7      THE COURT:  OKAY.

08:43AM 8      MR. LEACH:  AND MS. PETERSON HAS A MEETING WITH

08:44AM 9   MS. HOLMES IN PALO ALTO SHORTLY AFTER THAT INTERVIEW, AND I

08:44AM 10  WANT TO ASK HER ABOUT THINGS MS. HOLMES SAID PUBLICLY AND

08:44AM 11  THINGS MS. HOLMES SAID TO MS. PETERSON PRIVATELY.

08:44AM 12      THE COURT:  OKAY.

08:44AM 13      MR. LEACH:  AND JUST FOR CONTEXT, YOUR HONOR, THAT

08:44AM 14  "TODAY SHOW" INTERVIEW IS APRIL OF 2016.

08:44AM 15      WITH RESPECT TO THE THIRD VIDEO, THIS IS NOT ONE THAT THE

08:44AM 16  GOVERNMENT INTENDS TO OFFER, IT'S ONE THE DEFENSE INTENDS TO

08:44AM 17  OFFER DURING CROSS-EXAMINATION.  I HAVEN'T SEEN WHICH EXCERPTS

08:44AM 18  THEY'RE THINKING OF, BUT THIS IS A PRESENTATION FROM AUGUST OF

08:44AM 19  2016, SO NEARLY A YEAR AFTER "THE WALL STREET JOURNAL" ARTICLE

08:44AM 20  COMES OUT.

08:44AM 21      IT'S LARGELY STATEMENTS BY MS. HOLMES, WHICH COULD NOT

08:44AM 22  PRESENT A GREATER HEARSAY PROBLEM.  I REALLY DON'T UNDERSTAND

08:44AM 23  THE -- YOU KNOW, I DON'T UNDERSTAND THE BASIS FOR ADMITTING

08:44AM 24  MINUTES UPON POSSIBLY HOURS OF THE DEFENDANT'S UNSWORN

08:45AM 25  STATEMENTS ABOUT WHAT HER TECHNOLOGY SUPPOSEDLY CAN OR CAN'T

08:45AM 1   DO.

08:45AM 2        WHAT I HEARD FROM MR. WADE RIGHT NOW IS THAT IT POSSIBLY

08:45AM 3   RELATES TO MS. PETERSON'S STATE OF MIND, MS. PETERSON'S STATE

08:45AM 4   OF MIND IN AUGUST OF 2016.

08:45AM 5        BUT I DON'T THINK MS. PETERSON'S STATE OF MIND IN AUGUST

08:45AM 6   OF 2016 IS REMOTELY RELEVANT.  THE INVESTMENT SHE MADE WAS BACK

08:45AM 7   IN 2014 BY -- THIS IS MORE THAN A YEAR AFTER "THE

08:45AM 8   WALL STREET JOURNAL."

08:45AM 9        SO WE DON'T UNDERSTAND THE RELEVANCE OF THE AACC

08:45AM 10  PRESENTATION, AND WE CERTAINLY OBJECT TO WHOLESALE STATEMENTS

08:45AM 11  BY THE DEFENDANT, UNSWORN, ABOUT WHAT HER TECHNOLOGY CAN DO.

08:45AM 12       IF SHE WANTS TO STAND BY THOSE STATEMENTS, SHE SHOULD TAKE

08:45AM 13  THE STAND AND SAY IT UNDER OATH SUBJECT TO CROSS-EXAMINATION.

08:45AM 14       BUT IT'S MASSIVE HEARSAY.

08:45AM 15            THE COURT:  SO YOU DON'T, YOU DON'T INTEND TO DO

08:45AM 16  ANYTHING WITH THE THIRD VIDEO?  THAT'S NOT YOURS, THAT'S

08:45AM 17  MR. WADE'S?

08:46AM 18            MR. LEACH:  CORRECT.

08:46AM 19            THE COURT:  I SEE.  OKAY.

08:46AM 20            MR. WADE:  YOUR HONOR, IF I MIGHT ADDRESS THESE

08:46AM 21  ISSUES AND GIVE SOME CONTEXT.

08:46AM 22       OF COURSE YOUR HONOR HEARD DAN EDLIN'S TESTIMONY LAST WEEK

08:46AM 23  IN WHICH THE GOVERNMENT NOT ONCE, BUT TWICE, WENT AND SOLICITED

08:46AM 24  ANSWERS ABOUT THE REASONS HE LEFT THE COMPANY IN DECEMBER OF

08:46AM 25  2016 RELATING TO THE TECHNOLOGY AND EFFORTS MADE TO

08:46AM 1    REHABILITATE THE TECHNOLOGY THAT HE THOUGHT WERE NOT

08:46AM 2    SUCCESSFUL.

08:46AM 3        THE GOVERNMENT HAS OPENED THE DOOR ON THIS EVIDENCE IN

08:46AM 4    TERMS OF THE TECHNOLOGICAL CAPACITY IN THAT TIME PERIOD THROUGH

08:46AM 5    SOLICITING THAT EVIDENCE WHICH WAS, FRANKLY, VERY PREJUDICIAL,

08:46AM 6    NOT ONCE, BUT TWICE, SO WE SHOULD HAVE THE ABILITY TO REBUT

08:46AM 7    THAT.

08:46AM 8        NUMBER TWO, WE'RE NOT OFFERING ANY OF THESE FOR THE TRUTH

08:46AM 9    OF THE MATTER ASSERTED.  WE'RE OFFERING THEM FOR NONHEARSAY

08:46AM 10   PURPOSES.  THEY REFLECT OUR CLIENT'S STATE OF MIND AT THE TIME

08:46AM 11   SHE'S MAKING THE STATEMENTS, AND THEY ARE RELEVANT FOR THE

08:46AM 12   EFFECT ON THE LISTENER IN ALL OF THEM.

08:47AM 13       IN FACT, MR. LEACH JUST SAID HE SOUGHT TO ELICIT THIS

08:47AM 14   EVIDENCE -- THE REACTION OF THE LISTENER TO VIEWING THIS

08:47AM 15   EVIDENCE.

08:47AM 16       MS. PETERSON, AS WE UNDERSTAND IT, NOT ONLY VIEWED THE

08:47AM 17   "MAD MONEY" CLIP, AND HE'S GOING TO ASK QUESTIONS ABOUT THAT,

08:47AM 18   MY UNDERSTANDING IS THAT SHE THEN VIEWED THE "TODAY SHOW" CLIP,

08:47AM 19   AND HE'S GOING TO ASK QUESTIONS ABOUT THAT.

08:47AM 20       SO WE'RE ENTITLED TO GET THE WHOLE PICTURE IN FRONT OF THE

08:47AM 21   JURY AND ASK QUESTIONS ABOUT THE EFFECT OF THE WHOLE SEGMENTS

08:47AM 22   ON MS. PETERSON.

08:47AM 23       HE ALSO SAID THAT THEY'RE GOING TO TALK ABOUT A MEETING

08:47AM 24   THAT HAPPENED IN APRIL OF 2016, WHICH IS ALSO WELL AFTER THE

08:47AM 25   PERIOD BECAUSE HE WANTS -- BECAUSE HE THINKS WHATEVER

08:47AM 1    MS. PETERSON HAS TO SAY ABOUT THAT IS RELEVANT TO THEIR CASE.

08:47AM 2    WELL, I DON'T KNOW WHAT THE DIFFERENCE BETWEEN THAT AND

08:48AM 3    THE STATEMENTS IN AUGUST OF 2016 ARE.

08:48AM 4    IN FACT, THE STATEMENTS IN APRIL OF 2016, IN THE WITNESS'S

08:48AM 5    NOTES THERE ARE STATEMENTS ABOUT THE FACT THAT THEY'RE GOING TO

08:48AM 6    GO TO THE AACC PRESENTATION AND DISPLAY THIS TECHNOLOGY, AND

08:48AM 7    THEY SHOULD ATTEND THE PRESENTATION AND OBSERVE THAT.  THAT'S

08:48AM 8    REFERENCED IN THE VERY MEETING THAT MR. LEACH WANTS TO OPEN THE

08:48AM 9    DOOR ON.

08:48AM 10   SO ALL OF THIS STUFF IS RELEVANT BASED UPON WHAT THE

08:48AM 11   GOVERNMENT WANTS TO PUT IN.  THEY CAN'T PUT IN THE CRAMER VIDEO

08:48AM 12   AND THE "TODAY SHOW" VIDEO AND THEN SAY THERE IS SOME MAGIC

08:48AM 13   LINE OR MAGIC CURTAIN THAT COMES DOWN IN APRIL AND EVERYTHING

08:48AM 14   PAST THAT IN TERMS OF THE EFFECT ON MS. PETERSON IS IRRELEVANT.

08:48AM 15   THE COURT:  WHAT ABOUT, WHAT ABOUT THE FACT THAT, AS

08:48AM 16   YOU KNOW, A DEFENDANT CAN'T GET IN STATEMENTS THAT GO TO HER

08:49AM 17   DEFENSE IN THIS CASE UNLESS SHE TESTIFIES, THESE HEARSAY

08:49AM 18   STATEMENTS, MR. LEACH'S POINT?

08:49AM 19   ISN'T THAT WHAT THIS DOES?  ISN'T THIS A NEGATING HER

08:49AM 20   STATE OF MIND, OR YOUR CLIENT'S STATE OF MIND IN THIS EFFECT?

08:49AM 21   MR. WADE:  THESE WERE, THESE WERE STATEMENTS THAT

08:49AM 22   WERE OBSERVED BY THE WITNESSES THAT THE GOVERNMENT HAS CHOSEN

08:49AM 23   TO CALL IN THIS CASE.

08:49AM 24   THE COURT:  RIGHT.

08:49AM 25   MR. WADE:  AND SO --

08:49AM 1          THE COURT:  BUT LET'S SAY IF HE DIDN'T, LET'S SAY

08:49AM 2     MR. LEACH DIDN'T WANT TO PUT THESE IN, YOU COULDN'T DO THEM;

08:49AM 3     RIGHT?

08:49AM 4          MR. WADE:  IF MR. LEACH DIDN'T WANT TO OPEN THE DOOR

08:49AM 5     FOR STATEMENTS DURING THIS PERIOD OF TIME, IN OTHER WORDS,

08:49AM 6     REACTIONS TO "THE WALL STREET JOURNAL" COVERAGE, IT'S NOT CLEAR

08:49AM 7     TO ME THAT WE COULD PUT THESE IN, AT LEAST NOT THROUGH

08:49AM 8     MS. PETERSON.

08:49AM 9          YOU KNOW, I RESERVE OUR RIGHTS AS TO WHAT ISSUES MAY COME

08:49AM 10    UP WITH RESPECT TO OTHER WITNESSES.

08:49AM 11         BUT HE DOES WANT TO OPEN THE DOOR, AND SO HE DOES WANT

08:50AM 12    TO -- HE JUST WANTS TO PUT IT A CRACK OPEN AND SAYS THAT, YOU

08:50AM 13    KNOW, IT CAN'T GO -- IT CAN'T SWING A LITTLE BIT FURTHER.

08:50AM 14         THE COURT:  RIGHT.  BUT TO MR. LEACH'S POINT, HE

08:50AM 15    SAYS, LOOK, WE CAN PUT THIS ON, WE'RE PROSECUTING, AND THESE

08:50AM 16    ARE STATEMENTS OF A DEFENDANT THAT ARE ADMISSIBLE, AND WHAT HE

08:50AM 17    SAYS IS, BUT THE DEFENSE CAN'T SAY, OKAY, WELL, LET US PUT OUR

08:50AM 18    STATEMENTS OF OUR CLIENT ON WITHOUT PUTTING THE CLIENT ON.

08:50AM 19         MR. WADE:  AGAIN, WE'RE NOT SEEKING -- THE REASON

08:50AM 20    WE'RE SEEKING TO OFFER THIS EVIDENCE IS BECAUSE THROUGH THIS

08:50AM 21    WITNESS THEY'RE INTENDING TO OPEN THE DOOR ON THIS ISSUE AND ON

08:50AM 22    THE POST "WALL STREET JOURNAL" IMPACT ON THE REACTION FROM

08:50AM 23    MS. HOLMES AND THE COMPANY ON THIS EVIDENCE.

08:50AM 24         THEY CAN'T OPEN THAT DOOR AND SAY THEY CAN ONLY OFFER THE

08:50AM 25    EVIDENCE THAT THEY WANT WHEN THE WITNESS OBSERVED MANY OTHER

THINGS.

08:50AM 1

08:50AM 2    THE COURT:  WELL, I'M TALKING ABOUT -- I'M STARTING

08:51AM 3 CHRONOLOGICALLY WITH THE "MAD MONEY."

08:51AM 4    MR. WADE:  RIGHT.

08:51AM 5    THE COURT:  THEY WANT TO PUT ON A FEW CLIPS OF YOUR

08:51AM 6 CLIENT'S STATEMENTS DURING "MAD MONEY" AND YOU WANT TO PLAY THE

08:51AM 7 WHOLE THING.

08:51AM 8    MR. WADE:  WE WANT TO PLAY THE WHOLE THING.  WE

08:51AM 9 THINK IT'S A RULE OF COMPLETENESS ISSUE.  WE THINK TAKING THE

08:51AM 10 STATEMENTS OUT OF CONTEXT IN A NEWS SEGMENT IS MISLEADING,

08:51AM 11 PARTICULARLY IN, PARTICULARLY IN THE "MAD MONEY" SEGMENT.

08:51AM 12    WE THINK YOU NEED THE CONTEXT IN WHICH THE QUESTIONS ARE

08:51AM 13 ASKED.  IT'S A VERY SHORT SEGMENT.

08:51AM 14    IN THE CONTEXT OF --

08:51AM 15    THE COURT:  BUT, MR. LEACH, WHAT IS YOUR POINT ON

08:51AM 16 THIS?

08:51AM 17    MR. LEACH:  YOUR HONOR, THIS IS THE EQUIVALENT OF A

08:51AM 18 POLICE INTERVIEW.  THE DEFENDANT CAN'T SAY, IF IT WERE A ONE

08:51AM 19 HOUR INTERVIEW AND THE GOVERNMENT WANTS TO ELICIT FIVE MINUTES

08:51AM 20 IN RESPONSE TO ONE QUESTION, WE THEREFORE GET TO SUBMIT THE

08:51AM 21 WHOLE THING.

08:51AM 22    I HAVEN'T HEARD A PARTICULAR QUESTION OR ANSWER THAT IS

08:51AM 23 MISLEADING UNDER THE RULE OF COMPLETENESS HERE.  IT'S JUST, YOU

08:51AM 24 NEED THE COMPLETE CONTEXT.

08:51AM 25    RULE 106 IS LIMITED.  I CAN GIVE THE COURT THE TRANSCRIPT

| | | |
|---|---|---|
| 08:52AM | 1 | OF THE PARTICULAR QUESTIONS AND ANSWERS.  I DON'T KNOW WHY YOU |
| 08:52AM | 2 | NEED THE REMAINDER IN ORDER TO UNDERSTAND HER RESPONSE TO THAT |
| 08:52AM | 3 | PARTICULAR QUESTION. |
| 08:52AM | 4 | AND I JUST NEED TO GO BACK, YOUR HONOR. |
| 08:52AM | 5 | THESE CLIPS ARE RELEVANT BECAUSE THEY SHOW THE DEFENDANT'S |
| 08:52AM | 6 | STATE OF MIND, MS. HOLMES'S STATE OF MIND, WHICH THE GOVERNMENT |
| 08:52AM | 7 | CAN DO.  SHE'S, IN THE CRAMER INTERVIEW, YOU KNOW, NOT |
| 08:52AM | 8 | RESPONDING TO THE QUESTION OF HOW MANY TESTS YOUR EDISON DEVICE |
| 08:52AM | 9 | CAN DO. |
| 08:52AM | 10 | IN THE "TODAY SHOW" INTERVIEW, SHE'S SAYING, I'M THE CEO |
| 08:52AM | 11 | OF THE COMPANY, I'M RESPONSIBLE FOR EVERYTHING. |
| 08:52AM | 12 | SHE'S -- YOU KNOW, INSTEAD OF BLAMING THE LAB DIRECTOR |
| 08:52AM | 13 | LIKE SHE DOES IN THIS COURTROOM, SHE'S SAYING, NO, I'M |
| 08:52AM | 14 | RESPONSIBLE FOR THIS. |
| 08:52AM | 15 | THAT'S AN ADMISSION.  THAT SHOWS HER STATE OF MIND.  YOU |
| 08:52AM | 16 | KNOW, THE FACT THAT IT HAPPENED TO BE SOMETHING THAT |
| 08:52AM | 17 | MS. PETERSON SAW IS NEITHER HERE NOR THERE. |
| 08:52AM | 18 | AND THE FACT THAT WE WANT TO OFFER THESE STATEMENTS BY A |
| 08:52AM | 19 | DEFENDANT DOESN'T OPEN THE DOOR TO EVERYTHING A DEFENDANT EVER |
| 08:53AM | 20 | SAID TO A WITNESS OR EVER SAID TO A POLICE OFFICER. |
| 08:53AM | 21 | THE RULE THAT MR. WADE IS PROPOSING WOULD SWALLOW UP THE |
| 08:53AM | 22 | HEARSAY RULE, AND I JUST DON'T SEE WHY MS. PETERSON'S STATE OF |
| 08:53AM | 23 | MIND IN 2016 HAS ANY RELEVANCE ON WHY THEY MADE THE INVESTMENT. |
| 08:53AM | 24 | SO THAT'S THE GOVERNMENT'S POINT THERE, YOUR HONOR. |
| 08:53AM | 25 | MR. WADE:  MR. LEACH JUST SAID WHY WE WANT TO OFFER |

08:53AM  1    THE CASE, OR OFFER ALL OF THE EVIDENCE.  HE JUST SAID IT'S

08:53AM  2    RELEVANT TO THE CLIENT'S STATE OF MIND, AND THAT'S WHY THEY

08:53AM  3    WANT TO OFFER IT.

08:53AM  4        THAT'S WHY WE WANT TO OFFER IT, TOO.

08:53AM  5        WE'RE HAPPY TO HAVE AN INSTRUCTION THAT IT DOESN'T GO --

08:53AM  6    IT'S NOT BEING OFFERED FOR THE TRUTH OF THE MATTER ASSERTED,

08:53AM  7    BUT THE PROFFERED BASIS WHICH THE GOVERNMENT JUST GAVE IS

08:53AM  8    PERMISSIBLE AS A NONHEARSAY ADMISSION OF ALL OF THIS EVIDENCE

08:53AM  9    GIVEN THAT THE GOVERNMENT WANTS TO GO INTO THIS PERIOD OF TIME.

08:53AM  10        THE COURT:  GO AHEAD.

08:53AM  11        MR. LEACH:  THAT'S JUST SO WRONG, YOUR HONOR, AND IT

08:53AM  12    WOULD SWALLOW UP THE HEARSAY RULE.  WE MIGHT AS WELL PUT IN

08:54AM  13    EVERY EMAIL THAT MS. HOLMES EVER WROTE TO SHOW HER STATE OF

08:54AM  14    MIND.

08:54AM  15        THE COURT:  I'M NOT CERTAIN, MR. WADE, THAT THE

08:54AM  16    COMPLETENESS APPLIES TO WHAT YOU'RE TALKING ABOUT HERE, AND I'M

08:54AM  17    LOOKING AT THE "MAD MONEY" AND THE "TODAY SHOW" FIRST AND

08:54AM  18    SEPARATING THOSE TWO OUT.

08:54AM  19        SO THE GOVERNMENT WANTS TO PLAY CERTAIN EXCERPTS.  THEY

08:54AM  20    CAN DO THAT.  AND THEY'RE STATEMENTS OF YOUR CLIENT.  THEY ARE

08:54AM  21    ADMISSIBLE FOR THAT PURPOSE.

08:54AM  22        BUT THEN THE QUESTION IS, CAN YOU THEN GET IN STATEMENTS

08:54AM  23    OF YOUR OWN CLIENT IN THE SAME VIDEO AS TESTIMONIAL?  IS THAT

08:54AM  24    WHAT YOU'RE TRYING TO DO?

08:54AM  25        MR. WADE:  NO, I DON'T WANT IT.  I SPECIFICALLY DO

08:54AM 1    NOT WANT IT AS TESTIMONIAL.  I WANT IT TO SHOW HER STATE OF

08:54AM 2    MIND AND I WANT IT TO SHOW THE EFFECTS ON THE LISTENER.

08:54AM 3         THEY INTEND TO ASK QUESTIONS ABOUT -- MR. LEACH JUST SAID

08:54AM 4    THAT THEY INTEND TO ASK QUESTIONS ABOUT THE EFFECT OF THAT

08:54AM 5    STATEMENT ON THE LISTENER.

08:54AM 6         I'M ENTITLED TO PUT THE WHOLE STATEMENT IN AND ASK MY OWN

08:55AM 7    QUESTIONS ABOUT THE EFFECT ON THE LISTENER AS PART OF

08:55AM 8    CROSS-EXAMINATION.

08:55AM 9         AND SO I'M NOT OFFERING IT AS A TESTIMONIAL STATEMENT.

08:55AM 10   I'M HAPPY TO HAVE AN INSTRUCTION THAT IT'S NOT OFFERED FOR THE

08:55AM 11   TRUTH OF THE MATTER ASSERTED.  THAT'S NOT WHAT WE'RE SEEKING.

08:55AM 12        AND SO FOR BOTH OF THOSE, ONE, IT'S A NONHEARSAY PURPOSE;

08:55AM 13   AND, TWO, WE THINK IN CONTEXT WHEN YOU LOOK AT THE VIDEO, IT'S

08:55AM 14   MISLEADING WITHOUT GETTING THE FULL STATEMENT.

08:55AM 15             THE COURT:  BECAUSE IT EXPOSES YOUR CLIENT'S STATE

08:55AM 16   OF MIND, YOUR CLIENT'S STATE OF MIND IN A DIFFERENT WAY?

08:55AM 17             MR. WADE:  YEAH.

08:55AM 18             THE COURT:  SHE DIDN'T MEAN THAT?

08:55AM 19             MR. WADE:  WE THINK -- YES.

08:55AM 20             THE COURT:  BECAUSE YOU CAN'T PUT YOUR CLIENT'S

08:55AM 21   STATE OF MIND IN THROUGH THIS TYPE OF EVIDENCE.

08:55AM 22             MR. WADE:  WE CAN ADMIT STATEMENT -- WE CAN ADMIT

08:55AM 23   THINGS FOR A NONHEARSAY PURPOSE.  THERE ARE MULTIPLE NONHEARSAY

08:55AM 24   PURPOSES AS OFFERED THROUGH THIS WITNESS.

08:55AM 25             THE COURT:  YEAH, BUT IF YOU'RE TRYING TO -- IF YOU

08:55AM 1    WANT THIS TO COME IN AND THEN TO ARGUE, SEE, MY CLIENT'S STATE

08:56AM 2    OF MIND AS TO AN ELEMENT HERE, SHE DIDN'T INTEND TO DEFRAUD,

08:56AM 3    THAT'S -- THERE'S SOME CASE LAW ON THAT THAT SAYS YOU CAN'T DO

08:56AM 4    THAT.

08:56AM 5               MR. WADE:  NO.  BUT THE GOVERNMENT WANTS TO OFFER

08:56AM 6    PART OF THIS STATEMENT AND TALK ABOUT THE EFFECT IT HAS ON

08:56AM 7    WITNESSES IN THE CASE.  THAT'S EXACTLY WHAT MR. LEACH SAID THAT

08:56AM 8    THEY'RE INTENDING TO DO.  THAT IS NOT A HEARSAY -- THAT'S A

08:56AM 9    NONHEARSAY PURPOSE FOR THE ADMISSION OF THE STATEMENT.

08:56AM 10   HE JUST WANTS THEM TO HAVE THE -- TO REACT ONLY TO THE

08:56AM 11   PIECES OF THE STATEMENT THAT HE WANTS THEM TO REACT TO WHEN

08:56AM 12   IT'S NOT FAIR TO SAY, WHAT WAS YOUR REACTION TO THOSE TWO

08:56AM 13   QUESTIONS, WHEN CLEARLY IF THE WITNESS SAW THE STATEMENT, THE

08:56AM 14   SEGMENT, THEY SAW THE WHOLE SEGMENT.

08:56AM 15   SO IF HE WANTS TO ASK THE WITNESS WHAT THE REACTION TO THE

08:56AM 16   SEGMENT IS, IT'S TOTALLY UNFAIR TO SAY, WE'RE ONLY GOING TO

08:56AM 17   GIVE YOU THIS PIECE AND THIS PIECE WITH RESPECT TO THE --

08:56AM 18   THAT'S ON THE CRAMER PIECE.

08:56AM 19   ON THE "MAD MONEY" PIECE -- OR I'M SORRY, ON THE "TODAY

08:57AM 20   SHOW" PIECE, IT ARGUABLY SHOULDN'T BE ADMITTED BECAUSE OF RULE

08:57AM 21   OF COMPLETENESS CONCERNS ANYWAY BECAUSE THE SEGMENTS WITHIN,

08:57AM 22   WITHIN -- WE DON'T HAVE THE ROUGH TRANSCRIPT.  THEY COULD HAVE

08:57AM 23   SUBPOENAED THE "TODAY SHOW" AND GOTTEN ALL OF THE Q AND A.

08:57AM 24   INSTEAD, WE'RE TALKING ABOUT DISCRETE SEGMENTS, YOU KNOW,

08:57AM 25   TAKEN OUT OF CONTEXT WITHIN THAT -- WITHIN A LONGER INTERVIEW.

4600

08:57AM  1         SO, YOUR HONOR MAY KNOW WHEN ONE OF THESE THINGS IS

08:57AM  2   CONDUCTED, AND IN THIS CASE IT IS MARIA SHRIVER, SHE COMES OUT

08:57AM  3   TO THE COMPANY AND SHE DOES A LENGTHY INTERVIEW.

08:57AM  4         THE GOVERNMENT WANTS TO OFFER VERY NARROW SEGMENTS.  WE

08:57AM  5   DON'T KNOW THE CONTEXT OF THAT, SO THERE'S ARGUABLY A RULE OF

08:57AM  6   COMPLETENESS CONCERN JUST WITH RESPECT TO OFFERING THOSE

08:57AM  7   SEGMENTS BECAUSE WE DON'T KNOW.

08:57AM  8         BUT THERE'S PARTICULAR PREJUDICE WHEN YOU TAKE IT OUT OF

08:57AM  9   THE CONTEXT OF THE BROADER, OF THE BROADER NARRATIVE OF THE

08:57AM 10   STORY.  IT'S JUST MISLEADING.  IT'S A FOUR MINUTE SEGMENT.

08:58AM 11         AND IF THEY WANT TO ASK ABOUT THE REACTION OF THIS

08:58AM 12   WITNESS, THEN THEY -- WE SHOULD BE ABLE TO GET THE REACTION TO

08:58AM 13   THE WHOLE THING, NOT JUST TO THE PIECES THAT THE GOVERNMENT

08:58AM 14   WANTS TO OFFER.

08:58AM 15         WITH RESPECT TO THE AACC VIDEO, THIS WITNESS TOOK NOTES

08:58AM 16   THE DAY OF THE VIDEO THAT SAID, "MUCH OF THE MEDIA COVERAGE

08:58AM 17   I'VE READ SO FAR IN THE PRESENTATION CALLS THE PRESENTATION A

08:58AM 18   BAIT AND SWITCH.  SHE'S PRESENTING THE PUBLIC WITH A NEW

08:58AM 19   MACHINE WHILE IGNORING THE ISSUES OF THE OLD MACHINE.  I DIDN'T

08:58AM 20   SEE IT THAT WAY.  HAVING BEEN PRIVY TO SEEING THE MACHINE IN

08:58AM 21   2014, AND SEEING IT TODAY, I DO SEE THE MACHINES AS

08:58AM 22   FUNDAMENTALLY SIMILAR.  THE COMPANY JUST CAME OUT TOO SOON,

08:58AM 23   OVERPROMISED, AND WOEFULLY FAILED IN EXECUTION THE FIRST TIME

08:58AM 24   AROUND, MADE MUCH WORSE BY A TOTAL LACK OF COMMUNICATION AND A

08:58AM 25   PERCEPTION OF ARROGANCE."

08:58AM 1      IT'S NOT -- THAT'S HER STATE OF MIND, HER REACTION TO THIS

08:59AM 2      PRESENTATION.

08:59AM 3              THE COURT:  AFTER HER INVESTMENT?

08:59AM 4              MR. WADE:  AFTER HER INVESTMENT.

08:59AM 5          BUT, AGAIN, THE GOVERNMENT --

08:59AM 6              THE COURT:  SO WHAT IS THE RELEVANCE OF THAT?

08:59AM 7              MR. WADE:  WELL, THE GOVERNMENT WANTS TO GET IN ALL

08:59AM 8      OF THESE STATEMENTS, YOUR HONOR.

08:59AM 9              THE COURT:  NO, I UNDERSTAND.  BUT WHAT IS THE

08:59AM 10     RELEVANCE OF HER -- THIS IS BEYOND THE CHARGING PERIOD;

08:59AM 11     CORRECT?

08:59AM 12             MR. WADE:  WELL --

08:59AM 13             THE COURT:  IS THAT RIGHT?

08:59AM 14             MR. WADE:  THE STATEMENT -- ALL OF THESE STATEMENTS,

08:59AM 15     I THINK, ARE BEYOND THE CHARGING PERIOD, WITH THE POSSIBLE

08:59AM 16     EXCEPTION OF THE CRAMER STATEMENT, ALTHOUGH IT'S LONG AFTER --

08:59AM 17     IT'S A YEAR AFTER THE INVESTMENT WAS MADE IN THIS CASE.

08:59AM 18         BUT, YOUR HONOR, THE RELEVANCE IS WHAT I JUST SAID, WHICH

08:59AM 19     IS THE COMPANY -- HAVING BEEN PRIVY TO SEEING THE MACHINE IN

08:59AM 20     2014 AND SEEING IT TODAY, I DO SEE THE MACHINES AS

08:59AM 21     FUNDAMENTALLY SIMILAR.

08:59AM 22         SO SHE'S, SHE'S LOOKING AT THE TECHNOLOGY, WHICH THE

09:00AM 23     GOVERNMENT IN THIS PERIOD OF TIME HAS PUT AT ISSUE AS A RESULT

09:00AM 24     OF MR. EDLIN'S TESTIMONY, SHE'S LOOKING AT THE TECHNOLOGY AND

09:00AM 25     SHE'S SAYING, YEAH, THIS SEEMS SIMILAR TO WHAT I OBSERVED WHEN

09:00AM 1     I WENT TO VISIT THE COMPANY.

09:00AM 2          THE COURT:  OKAY.

09:00AM 3          MR. LEACH:  MS. PETERSON'S STATE OF MIND IN 2016 IS

09:00AM 4     IRRELEVANT, YOUR HONOR.  THE PURPOSE OF THE "MAD MONEY" AND THE

09:00AM 5     "TODAY SHOW" CLIPS IS TO SHOW THE DEFENDANT'S RESPONSE TO

09:00AM 6     QUESTIONING ABOUT THE ALLEGATION -- THE ALLEGATIONS IN THIS

09:00AM 7     CASE.  HOW MANY TESTS CAN YOUR EDISON DO?  SHE DEFLECTS.  ARE

09:00AM 8     YOU IN CHARGE OF THIS COMPANY OR ARE YOU NOT?  SHE ANSWERS

09:00AM 9     THAT, I AM.

09:00AM 10         MS. PETERSON IS AN AUTHENTICATING WITNESS FOR THESE

09:00AM 11    VIDEOS, HER REACTION IS, FRANKLY, NEITHER HERE NOR THERE, AND

09:00AM 12    HER STATE OF MIND IN 2016 TWO YEARS AFTER THE INVESTMENT AT ONE

09:00AM 13    ISOLATED POINT IN TIME BASED ON AN UNSWORN HOUR LONG SCIENTIFIC

09:01AM 14    PRESENTATION BY MS. HOLMES WHICH WE CANNOT CROSS-EXAMINE ON

09:01AM 15    UNLESS SHE TESTIFIES HAS NO BEARING ON THE ALLEGATIONS IN THIS

09:01AM 16    CASE.  IT'S HEARSAY.  IT'S 403.

09:01AM 17         I DON'T KNOW WHY WHAT MS. PETERSON THOUGHT IN AUGUST OF

09:01AM 18    2016, TWO YEARS AFTER HER INVESTMENT, REALLY MATTERS IN THIS

09:01AM 19    CASE.

09:01AM 20         THE COURT:  WELL, MR. WADE SAYS THAT SHE'S PERHAPS

09:01AM 21    HAD AN EPIPHANY AFTER LOOKING AT THIS AND DECIDED, OH, MAYBE

09:01AM 22    THE MACHINES ARE THE SAME.

09:01AM 23         MR. LEACH:  I'M QUITE CONFIDENT, WHEN ASKED ABOUT

09:01AM 24    THAT, YOUR HONOR, SHE WILL DENY HAVING AN EPIPHANY, THAT SHE'LL

09:01AM 25    SAY THE BAIT AND SWITCH IS MORE A REFERENCE TO WHAT TYPE OF

09:01AM 1    PROMISES HAD BEEN MADE IN THE PRESENTATION, AND SHE HAS A

09:01AM 2    RESPONSE TO THAT AND IT'S NOT, I WAS HAPPY WITH THE INVESTMENT

09:01AM 3    AND REALLY CONFIDENT THAT THINGS WERE GOING TO WORK OUT.

09:01AM 4        AND IT OPENS UP, YOUR HONOR -- I MEAN, THERE'S A CONTEXT

09:01AM 5    AFTER THIS WHERE RDV IS TAKING STEPS, YOU KNOW, TO TRY TO

09:02AM 6    MAXIMIZE ITS INVESTMENT.  SHE'S HEARING LOTS OF THINGS FROM

09:02AM 7    LOTS OF PEOPLE ABOUT LOTS OF DIFFERENT ISSUES, ALL OF WHICH IS

09:02AM 8    HEARSAY.

09:02AM 9        AND IF WE'RE GOING INTO AUGUST OF 2016, THERE'S A WHOLE

09:02AM 10   ADDITIONAL CONTEXT THAT THE GOVERNMENT IS GOING TO WANT TO

09:02AM 11   ELICIT AND IT BECOMES A MINI TRIAL OVER WHAT HAPPENED TO THE

09:02AM 12   INVESTMENT.

09:02AM 13       AND I JUST DON'T SEE THE RELEVANCE.  IT RAISES A NUMBER OF

09:02AM 14   403 ISSUES, AND I -- IT SHOULDN'T COME IN.

09:02AM 15           MR. WADE:  YOUR HONOR, WITH RESPECT, IF THE

09:02AM 16   GOVERNMENT TAKES THAT POSITION, THEY SHOULDN'T HAVE ELICITED

09:02AM 17   THAT TESTIMONY FROM DAN EDLIN TWICE.  THEY OPENED THE DOOR TO

09:02AM 18   THIS.  THERE'S ALSO -- WE DON'T HAVE VIDEO OF IT, BUT --

09:02AM 19           THE COURT:  DID YOU OBJECT TO THAT TESTIMONY?

09:02AM 20           MR. WADE:  NO.

09:02AM 21           THE COURT:  I DON'T THINK I HEARD AN OBJECTION TO

09:02AM 22   THAT.

09:02AM 23           MR. WADE:  NO.  YOUR HONOR, BELIEVE ME, IT'S ONE OF

09:02AM 24   THOSE CIRCUMSTANCES WHERE A TRIAL LAWYER HAS TO MAKE A JUDGMENT

09:02AM 25   AS TO WHETHER YOU OBJECT IN FRONT OF THE JURY OR NOT, AND THE

09:02AM 1    JUDGMENT WAS MADE NOT TO DO IT.  BUT THAT DOESN'T MEAN THAT THE

09:02AM 2    DOOR HAS NOT BEEN OPENED.  IT'S OPEN.

09:02AM 3        SO THE GOVERNMENT MADE THAT DECISION.  IT WASN'T AN

09:03AM 4    ACCIDENT.  IT DID IT TWICE.  IT DID IT ON REDIRECT AS WELL.

09:03AM 5        AND TO NOW SAY, ONCE THEY HAVE MR. EDLIN COME IN AND SAY,

09:03AM 6    I THOUGHT AS A RESULT OF ALL OF THESE INTERACTIONS THAT THE

09:03AM 7    TECHNOLOGY DIDN'T WORK OR WOULDN'T WORK OR COULDN'T WORK, WHEN

09:03AM 8    AT THE AACC PRESENTATION THERE'S A DEMONSTRATION OF THE

09:03AM 9    TECHNOLOGY, THERE'S Q AND A IN WHICH THREE OTHER EXPERTS

09:03AM 10   COMMENT ON THE TECHNOLOGY --

09:03AM 11       THE COURT:  RIGHT.  AND THAT'S WHERE I'M -- SORRY TO

09:03AM 12   INTERRUPT YOU, MR. WADE.  BUT I THINK I SEE WHERE YOU'RE GOING

09:03AM 13   WITH THAT.

09:03AM 14       SO MR. EDLIN SAYS HE LOST FAITH, HE LOST FAITH IN THE

09:03AM 15   COMPANY FOR WHATEVER REASON, THERE COULD HAVE BEEN OTHER

09:03AM 16   REASONS, AND YOU COULD HAVE PROBED THAT, BUT HE SAID, I LOST

09:03AM 17   FAITH, COULDN'T DO IT, AND SO I DECIDED TO LEAVE.

09:03AM 18       NOW, MS. PETERSON, YOU WANT HER TO TESTIFY BASICALLY TO

09:03AM 19   SAY, WELL, ACTUALLY, IN MY OPINION, BASED ON WHAT I HAVE SEEN

09:03AM 20   AT THIS OTHER -- AT THIS CONFERENCE, ACTUALLY, I THINK THE

09:03AM 21   TECHNOLOGY WAS -- IT SOUNDS LIKE THEY COULD HAVE DONE WHAT THEY

09:04AM 22   SAID THEY WERE GOING TO DO.

09:04AM 23       AND THIS IS TO SOFTEN MR. EDLIN'S STATEMENT.

09:04AM 24       SO AREN'T WE TALKING ABOUT -- ISN'T THIS REALLY TO TRY TO

09:04AM 25   SOMEHOW BUFFER EDLIN'S STATEMENT ABOUT HIS BELIEF IN THIS, IN

THE TECHNOLOGY, AND NOW YOU'RE TRYING TO SAY MS. PETERSON, HER

BELIEF IN THE TESTIMONY, WHICH, WHAT IS THE RELEVANCE OF THAT?

I JUST DON'T CAPTURE IT.

          MR. WADE:  WELL, THE RELEVANCE IN THE CASE IS, IS

PUT AT ISSUE BY THE GOVERNMENT OPENING THE DOOR ON THE ISSUE

GENERALLY WITH EDLIN, AND IT WAS THEIR JUDGMENT TO DO THAT.

     ONCE THOSE ISSUES ARE IN THE CASE, WE HAVE THE ABILITY TO

REBUT IT.

     WHETHER IT'S WITHIN THE SCOPE OF CROSS --

          THE COURT:  REBUT THE FACT THAT EDLIN LOST FAITH?

          MR. WADE:  NO, IT'S NOT THAT HE LOST FAITH,

YOUR HONOR.  IF YOU LOOK AT THE STATEMENTS, HE MADE THEM TWICE.

HE COMMENTED SPECIFICALLY ON HIS BELIEF IN THE TECHNOLOGY AS A

RESULT OF POST "WALL STREET JOURNAL" ACTIONS.  I THINK HE MAYBE

EVEN SAID THE AACC.  AND IT CAME UP IN HIS TESTIMONY THAT THERE

WERE EVENTS IN DECEMBER OF 2016, WHICH WE WANT TO GET INTO AS

WELL.

     THIS WITNESS WAS INVOLVED IN -- THIS WITNESS -- THE

GOVERNMENT WANTS TO PUT IN A MEETING IN APRIL OF 2016 --

          THE COURT:  BUT WHAT IS IT THAT YOU'RE TRYING TO

SHOW, THAT EDLIN WAS WRONG?  HE WAS WRONG IN HIS ASSESSMENT

BECAUSE MS. PETERSON WAS RIGHT?  AND THEN WE GET INTO THIS MINI

TRIAL ABOUT WHO IS CORRECT AND WHO IS NOT?

     SO WHAT WE KNOW IS EDLIN SAID WHAT HE SAID.  HE LEFT

BECAUSE OF HIS OWN PERSONAL BELIEFS.  RIGHT, WRONG, OR

09:05AM 1    WHATEVER, HE LEFT.

09:05AM 2         NOW, WHAT DOES MS. PETERSON'S ASSESSMENT OF THE TECHNOLOGY

09:05AM 3    HAVE TO DO WITH EDLIN?

09:05AM 4              MR. WADE:  THE EVIDENCE THAT WILL COME IN THROUGH

09:05AM 5    MS. PETERSON, BECAUSE THE GOVERNMENT WANTS TO OPEN THE DOOR TO

09:05AM 6    POST "WALL STREET JOURNAL" INTERACTIONS AND REACTIONS FROM THE

09:06AM 7    COMPANY, IF IT CHOOSES NOT TO DO THAT, WE WON'T OFFER THE AACC

09:06AM 8    PRESENTATION.  IF IT DOESN'T WANT TO OFFER THE CRAMER

09:06AM 9    STATEMENTS, IF IT DOESN'T WANT TO OFFER THE APRIL SEGMENT, THE

09:06AM 10   APRIL MEETING --

09:06AM 11             THE COURT:  I THINK THAT'S OFF THE TABLE.  WE'VE

09:06AM 12   BEEN TALKING ABOUT THIS ALREADY.

09:06AM 13        I'M JUST -- I JUST DON'T SEE HOW MS. PETERSON, THE AACC

09:06AM 14   TESTIMONY IS RELEVANT.

09:06AM 15             MR. WADE:  WELL, IT ALL IS EVIDENCE OF THE COMPANY'S

09:06AM 16   GOOD FAITH BELIEF THAT THE TECHNOLOGY WORKS, WHICH -- AND

09:06AM 17   IT'S --

09:06AM 18             THE COURT:  WHEN YOU SAY "THE COMPANY," WHO ARE YOU

09:06AM 19   REFERRING TO?

09:06AM 20             MR. WADE:  I'M SAYING THERANOS AS AN ENTITY,

09:06AM 21   INCLUDING MS. HOLMES.  THERE WERE FIVE PEOPLE -- FOUR PEOPLE ON

09:06AM 22   THE STAGE IN THE AACC --

09:06AM 23             THE COURT:  BUT WHAT YOU'VE JUST TOLD ME IS THAT

09:06AM 24   IT'S EVIDENCE THAT THE COMPANY BELIEVED IT WORKED, AND THE

09:06AM 25   COMPANY IS NOT ON TRIAL HERE, YOUR CLIENT IS.  AND THAT GOES TO

09:06AM  1    STATE OF MIND.

09:06AM  2         SO DOESN'T THAT THEN COME IN TO TRY TO NEGATE AN ELEMENT

09:07AM  3    OF THE OFFENSE USING HEARSAY THAT YOU'RE NOT ENTITLED TO DO?

09:07AM  4         MR. WADE:  WE CAN OFFER EVIDENCE THAT GOES TO THAT

09:07AM  5    FOR A NONHEARSAY PURPOSE.  EVIDENCE THAT REFLECTS A DEFENDANT'S

09:07AM  6    STATE OF MIND, YOU KNOW, CAN BE OFFERED.

09:07AM  7         IN THIS CASE, THE FACT THAT THEY WALKED INTO A

09:07AM  8    PRESENTATION WITH 2500 -- THE GOVERNMENT HAS AN ALLEGATION IN

09:07AM  9    ITS 404(B) NOTICE THAT THEY HID THIS DEVICE FROM THE PUBLIC AND

09:07AM  10   THAT THAT CONCEALMENT IS EVIDENCE OF CRIMINAL INTENT.

09:07AM  11        THIS IS THE OPPOSITE OF THAT.  THEY WENT IN FRONT OF 2500

09:07AM  12   PEOPLE AT A CLINICAL CHEMISTRY CONVENTION, THE WORLD'S EXPERTS,

09:07AM  13   SKEPTICS, PEOPLE WHOSE JOBS MIGHT BE ELIMINATED IF THIS

09:07AM  14   TECHNOLOGY WORKS, AND SAID, HERE'S OUR TECHNOLOGY.

09:07AM  15        THAT'S, THAT'S THE -- THE VERY ACT IS EVIDENCE AND IT

09:07AM  16   NEGATES CRIMINAL INTENT.

09:07AM  17        THE COURT:  OKAY.  ARE THERE OTHER ISSUES WE WANT TO

09:08AM  18   TALK ABOUT?  WE'RE PAST 9:00 HERE.  I SHOULD HAVE STARTED THIS

09:08AM  19   CONVERSATION AT 8:00.  I APOLOGIZE FOR THAT.  I WANT TO CAPTURE

09:08AM  20   SOME TIME HERE.

09:08AM  21        IS THERE ANYTHING ELSE WE NEED TO TALK ABOUT?

09:08AM  22        MR. WADE:  THERE IS ONE ISSUE FOR MS. PETERSON AND

09:08AM  23   THEN MAYBE WE CAN TAKE MR. EISENMAN EITHER NOW OR AT A BREAK

09:08AM  24   DEPENDING ON WHAT THE COURT'S PREFERENCE IS.

09:08AM  25        THE COURT:  OKAY.

09:08AM 1      MR. WADE:  IT'S MY UNDERSTANDING THAT THE GOVERNMENT

09:08AM 2 MAY SEEK TO OFFER EVIDENCE OF STATEMENTS FROM MS. PETERSON WITH

09:08AM 3 RESPECT TO MATERIALITY, YOU KNOW, HERE'S THIS STATEMENT, DID

09:08AM 4 YOUR EMPLOYER CONSIDER THAT THE -- DID THE ENTITY THAT EMPLOYS

09:08AM 5 YOU CONSIDER THAT TO BE MATERIAL TO THE INVESTMENT DECISION?

09:08AM 6      AS CONTEXT, YOUR HONOR, THE ENTITY THAT THE INVESTOR WHO

09:08AM 7 MS. PETERSON WORKED FOR IS RDV CORPORATION, WHICH IS THE FAMILY

09:08AM 8 OFFICE OF THE DEVOS FAMILY.

09:08AM 9      MS. PETERSON PLAYED NO ROLE IN MAKING THE INVESTMENT

09:09AM 10 DECISION.  SHE WAS NOT A DECISION-MAKER.  MR. TUBERGEN,

09:09AM 11 JERRY TUBERGEN, AND FOUR MEMBERS OF THE DEVOS FAMILY WERE THE

09:09AM 12 DECISION MAKERS.  THEY WERE INVOLVED IN A WHOLE OTHER SERIES OF

09:09AM 13 INTERACTIONS THAT MS. PETERSON WAS NOT INVOLVED IN.  THEY MADE

09:09AM 14 THE INVESTMENT DECISION INDEPENDENT OF MS. PETERSON.  SHE'S

09:09AM 15 BEEN ASKED UNDER OATH, WHAT ROLE DID YOU PLAY IN THOSE

09:09AM 16 DISCUSSIONS, AND SHE SAID NONE.

09:09AM 17      AND SO WE JUST WANT TO MAKE CLEAR THAT THE GOVERNMENT

09:09AM 18 SHOULD NOT THEREFORE BE IN A POSITION TO SAY, HERE'S THIS

09:09AM 19 STATEMENT, WAS THAT IMPORTANT TO RDV IN MAKING ITS INVESTMENT

09:09AM 20 DECISION?  BECAUSE SHE DOESN'T HAVE, YOU KNOW, A FOUNDATION TO

09:09AM 21 MAKE SUCH STATEMENTS.

09:09AM 22      THE COURT:  I SEE.  OKAY.

09:09AM 23      MR. LEACH:  YOUR HONOR, I THINK THAT DOES NOT PAINT

09:09AM 24 A COMPLETE PICTURE OF MS. PETERSON'S ROLE.  SHE'S THE

09:09AM 25 INVESTMENT PROFESSIONAL WITHIN RDV WHO WAS TASKED TO ANALYZE

09:10AM  1    THIS INVESTMENT.  SHE ATTENDS ALL OF THE CRITICAL INVESTOR

09:10AM  2    PRESENTATIONS BY MS. HOLMES; SHE PARTICIPATES IN A ONE HOUR

09:10AM  3    PHONE CALL WITH MS. HOLMES; SHE PREPARES THE DOCUMENT FOR RDV

09:10AM  4    BY WHICH THE INVESTMENT COMMITTEE APPROVES THE INVESTMENT.

09:10AM  5         SHE HEARS ALL OF THE STATEMENTS.  SHE'S PERFECTLY

09:10AM  6    CAPABLE -- AND SHE MAKES INVESTMENTS FOR RDV, OR RECOMMENDS

09:10AM  7    INVESTMENTS FOR RDV ALL OF THE TIME, SO SHE'S PERFECTLY CAPABLE

09:10AM  8    TO TESTIFY TO HER REACTIONS TO PARTICULAR STATEMENTS.

09:10AM  9         WHY SHE INCLUDED INFORMATION IN THE APPROVAL MEMO FOR THE

09:10AM  10   INVESTMENT, WAS THIS RELEVANT TO HER ANALYSIS, I THINK ALL

09:10AM  11   OF -- YOU KNOW, MATERIALITY IS AN OBJECTIVE STANDARD.

09:10AM  12        WE DON'T NEED TO PROVE RELIANCE.  WE NEED TO PROVE

09:10AM  13   OBJECTIVE TO A REASONABLE PERSON.  MS. PETERSON IS A REASONABLE

09:10AM  14   PERSON WHO WAS IN THE ROOM FOR ALL OF THIS.

09:10AM  15             THE COURT:  SO SHE IS GOING TO TESTIFY --

09:11AM  16   FOUNDATIONALLY SHE'LL TESTIFY ABOUT WHO SHE IS EMPLOYED BY, WHO

09:11AM  17   IS AN INVESTOR, I PRESUME, AND SHE'LL TALK ABOUT HER DUTIES,

09:11AM  18   THE JOB TITLES, HER RESPONSIBILITIES, WHAT SHE'S TASKED TO DO,

09:11AM  19   MUCH LIKE THE WITNESS LAST WEEK?

09:11AM  20             MR. LEACH:  YES.

09:11AM  21             THE COURT:  AND THEN SHE'LL TELL US WHAT SHE DID

09:11AM  22   BASED ON HER RESEARCH, HER ANALYSIS?

09:11AM  23             MR. LEACH:  YES.

09:11AM  24             THE COURT:  WHAT HER JOB SCOPE WAS AND WHAT SHE DID

09:11AM  25   WITH THAT INFORMATION?

09:11AM 1          MR. LEACH:  YES.

09:11AM 2          THE COURT:  AND SHE DIDN'T PERSONALLY WRITE A CHECK,

09:11AM 3    BUT THIS IS PART OF HER JOB FOR THE CORPORATION, I ASSUME?

09:11AM 4          MR. WADE:  YOUR HONOR, WITH APPROPRIATE RESPECT AND

09:11AM 5    DEFERENCE, ALMOST EVERYTHING THAT MR. LEACH JUST SAID IS NOT

09:11AM 6    TRUE.

09:11AM 7          THE COURT:  OH.

09:11AM 8          MR. WADE:  IT WAS A HALF HOUR PHONE CALL THAT SHE

09:11AM 9    PARTICIPATED IN.  THAT WAS A VERY HIGH LEVEL MEETING.

09:11AM 10       SHE WAS NOT INVOLVED IN A CRITICAL MEETING THAT HAPPENED

09:11AM 11   BEFORE THAT, SO SHE WAS NOT INVOLVED IN ALL OF THE DECISIONS.

09:11AM 12         THE COURT:  I WAS JUST ASKING A GENERAL JOB

09:11AM 13   DESCRIPTION THAT SHE HAS.  SHE'LL TESTIFY THAT SHE'S EMPLOYED

09:11AM 14   BY THIS COMPANY, WHAT SHE DOES, WHAT SHE'S TASKED TO DO,

09:12AM 15   WHATEVER THE LENGTH OF RESEARCH SHE DID, SHE'LL SAY WHAT SHE

09:12AM 16   DID, AND SHE'LL THEN SAY, I THEN WROTE A REPORT THAT EITHER WAS

09:12AM 17   THUMBS UP, THUMBS DOWN, WHATEVER IT WAS, AND I GAVE IT TO THE

09:12AM 18   COMPANY AND THEY DID WHAT THEY DID.

09:12AM 19         MR. WADE:  BUT MY POINT IS THAT ALMOST ALL OF THAT

09:12AM 20   IS ACTUALLY NOT TRUE.

09:12AM 21         THE COURT:  OH.

09:12AM 22         MR. WADE:  SO THAT'S WHY WE'RE RAISING THE ISSUE,

09:12AM 23   AND WE WOULD BE HAPPY TO VOIR DIRE THE WITNESS.

09:12AM 24         THE COURT:  SHE DIDN'T DO ANY OF THAT?

09:12AM 25         MR. WADE:  LET ME EXPLAIN WHAT SHE DID DO.  LET ME

09:12AM 1   EXPLAIN THE RELATIONSHIP.

09:12AM 2            THE COURT:  SURE.

09:12AM 3            MR. WADE:  THERE WAS AN INITIAL MEETING THAT

09:12AM 4   HAPPENED BETWEEN MS. PETERSON'S BOSS'S BOSS, JERRY TUBERGEN,

09:12AM 5   WHO IS THE CEO AND CHIEF INVESTMENT OFFICER OF RDV.

09:12AM 6       HE HAD A BUNCH OF INTERACTIONS AROUND THAT MEETING AND

09:12AM 7   RECEIVED INFORMATION IN THAT MEETING WHICH WAS NOT CONVEYED TO

09:12AM 8   MS. PETERSON IN TOTAL.

09:12AM 9       MR. TUBERGEN THEN HAD EXTENSIVE INTERACTIONS WITH MANY

09:12AM 10  MEMBERS OF THE DEVOS FAMILY WHO HAVE LEGAL AUTHORITY TO MAKE

09:13AM 11  THE INVESTMENT DECISION.

09:13AM 12      HE THEN COMES BACK FROM THIS CONFERENCE.  HE IS IN HIS

09:13AM 13  OFFICE.  HE RECEIVES MATERIALS.  HE HAS A 30 MINUTE PHONE

09:13AM 14  CONVERSATION WITH MS. HOLMES WITH MS. PETERSON PRESENT.  IT WAS

09:13AM 15  A HIGH-LEVEL CONVERSATION, ACCORDING TO THE TESTIMONY OF

09:13AM 16  MS. PETERSON, ABOUT VISION, WHAT SHOULD HAPPEN AT ANOTHER

09:13AM 17  MEETING THAT WAS TO COME.

09:13AM 18      THEY SEND 12 INCHES OF MATERIALS TO MR. TUBERGEN.

09:13AM 19  MS. PETERSON'S GIVEN THE MATERIALS.  SHE WRITES A MEMO.  SHE

09:13AM 20  DOES NOT KNOW IF MR. TUBERGEN REVIEWED THE MEMO OR IF ANY

09:13AM 21  MEMBER OF THE DEVOS FAMILY REVIEWED THE MEMO ACCORDING TO HER

09:13AM 22  TESTIMONY.

09:13AM 23      SHE ATTENDS A TRIP.  THERE ARE EXTENSIVE ADDITIONAL

09:13AM 24  INTERACTIONS HAPPENING BETWEEN MR. TUBERGEN AND MEMBERS OF THE

09:13AM 25  DEVOS INVESTMENT COUNSEL, WHO ARE THE DECISION MAKERS TOGETHER,

09:14AM 1 THOSE TWO PEOPLE.

09:14AM 2  MEMBERS OF THE DEVOS FAMILY AND MR. TUBERGEN AND

09:14AM 3 LISA PETERSON FLY TO CALIFORNIA, THEY VISIT WITH THE COMPANY,

09:14AM 4 AND THEY MAKE AN INVESTMENT COMMITMENT ON THE SPOT.

09:14AM 5  THAT'S MS. PETERSON'S TESTIMONY.  THEY MAKE THE

09:14AM 6 INVESTMENT, AND THERE ARE CONTEMPORANEOUS DOCUMENTS THAT SHOW

09:14AM 7 THAT.

09:14AM 8  THE MEMO IS PREPARED LATER.  IT IS SIGNED.  WE DON'T KNOW

09:14AM 9 EXACTLY WHEN.  MONTHS LATER.

09:14AM 10  WE HAVE EVIDENCE THAT IT WAS SIGNED WELL AFTER THE

09:14AM 11 DOCUMENTS ON THE INVESTMENT WERE SIGNED.  AND IT WAS WELL AFTER

09:14AM 12 THE PERIOD WHERE THE INVESTMENT WAS FUNDED.

09:14AM 13  SO THE DOCUMENTS GO, THE WIRE GOES, SOME PERIOD OF TIME

09:14AM 14 LATER THAT MEMO WAS SIGNED.  WE DON'T KNOW -- MS. PETERSON

09:15AM 15 DOESN'T KNOW WHO REVIEWED IT.  I MEAN, SHE KNOWS WHO SIGNED IT,

09:15AM 16 BUT SHE DOESN'T KNOW WHO REVIEWED IT OR WHEN.

09:15AM 17  SO THE FACT THAT -- THEY CAN'T USE THAT DEVICE TO PAPER

09:15AM 18 THE FILE -- ALL OF THE EVIDENCE MAKES CLEAR THAT THE INVESTMENT

09:15AM 19 DECISION WAS MADE BY MEMBERS OF THE DEVOS FAMILY AND

09:15AM 20 MR. TUBERGEN IN THE ROOM IN PALO ALTO WHEN THEY VISITED.

09:15AM 21  SO THIS ISN'T THE CASE WHERE -- YOUR HONOR HAS PROBABLY

09:15AM 22 SEEN MANY DIFFERENT, YOU KNOW, SCENARIOS WHERE SOME ANALYST

09:15AM 23 WRITES UP A REPORT AND THEY GIVE THE REPORT AND IT'S APPROVED.

09:15AM 24  THAT'S NOT WHAT THIS IS.  IT'S A TOTALLY DIFFERENT

09:15AM 25 RELATIONSHIP THAT IS A UNIQUE INVESTMENT SITUATION ACCORDING TO

09:15AM 1    ALL INVOLVED, AND IT'S HIGHLY PREJUDICIAL FOR HER TO BE ABLE TO

09:15AM 2    SAY, THIS WAS IMPORTANT, THIS MATTERED, WHEN THERE WERE A LOT

09:15AM 3    OF FACTS THAT SHE DOESN'T KNOW ABOUT THAT MAY WELL HAVE

09:15AM 4    MATTERED AND WE CAN'T CROSS-EXAMINE THEM.

09:15AM 5           THE COURT:  SURE.  CAN SHE SAY WHAT MATTERED AT

09:15AM 6    LEAST TO HER KNOWLEDGE?

09:15AM 7           MR. WADE:  I DON'T THINK SO.  I THINK IT CREATES A

09:16AM 8    MISLEADING PICTURE FOR THE JURY BECAUSE SHE DOESN'T HAVE -- SHE

09:16AM 9    DIDN'T PLAY ANY ACTUAL ROLE IN THE INVESTMENT DECISION.

09:16AM 10          THE COURT:  BUT CAN SHE TESTIFY, JUST AS YOU

09:16AM 11   DESCRIBED IT, CAN'T SHE TESTIFY ABOUT THE FAMILY STRUCTURE,

09:16AM 12   WHAT HER JOB IS, THEY FLEW OUT.

09:16AM 13        WAS THERE AN INVESTMENT?  YES.

09:16AM 14        DID YOU SEE THE "TODAY SHOW"?  DID YOU SEE "MAD MONEY"?  I

09:16AM 15   DID.

09:16AM 16        DID YOU GIVE THAT INFORMATION TO THEM, YES OR NO?

09:16AM 17        CAN'T SHE TESTIFY ABOUT THAT?

09:16AM 18          MR. WADE:  SOME OF -- THE "MAD MONEY" AND THE OTHER

09:16AM 19   THINGS, THOSE HAPPENED AFTER THE INVESTMENT, WHICH IS PART OF

09:16AM 20   THE REASON WHY WE DON'T THINK THEY SHOULD COME IN.

09:16AM 21          THE COURT:  SURE.

09:16AM 22          MR. WADE:  BUT SHE CAN SAY, I'VE GOT TWO BINDERS OR

09:16AM 23   TWO THINGS, OR A FOOT, A STACK OF TWO BINDERS.

09:16AM 24          THE COURT:  AND IT SOUNDS LIKE YOU HAVE PLENTY OF

09:16AM 25   FODDER FOR CROSS-EXAMINATION.

09:16AM 1       MR. WADE:  BUT IT'S NOT APPROPRIATE TESTIMONY IN THE

09:16AM 2  FIRST INSTANCE, YOUR HONOR.

09:16AM 3       IF SHE JUST WANTS TO TESTIFY AS TO THE FACTS, THIS IS WHAT

09:16AM 4  WAS HERE, THIS IS WHAT WAS SAID, THIS IS WHAT I PUT IN THE

09:16AM 5  MEMO, THIS IS WHAT I CONVEYED TO THE INVESTMENT PEOPLE, THIS IS

09:17AM 6  WHAT HAPPENED DURING THE MEETING, THAT'S FINE.

09:17AM 7       THE COURT:  AND AN INVESTMENT WAS MADE.

09:17AM 8       MR. WADE:  AND AN INVESTMENT WAS MADE.

09:17AM 9       BUT CAN SHE SAY, WAS THIS IMPORTANT TO RDV'S INVESTMENT

09:17AM 10  DECISION?  SHE CANNOT DO THAT.  SHE DOESN'T HAVE A FOUNDATION

09:17AM 11  TO OFFER THOSE KINDS OF FACTS.

09:17AM 12       THE COURT:  MR. LEACH?

09:17AM 13       MR. LEACH:  FIRST OF ALL, YOUR HONOR, THAT SOUNDS

09:17AM 14  LIKE EFFECTIVE CROSS-EXAMINATION.  NOTHING TO UNDERMINE THE

09:17AM 15  RELEVANCE OR THE PERCIPIENT KNOWLEDGE OF THIS PARTICULAR

09:17AM 16  WITNESS.

09:17AM 17       SHE ATTENDS THE MEETING WHERE, ACCORDING TO MR. WADE, THE

09:17AM 18  INVESTMENT DECISION WAS MADE.  THEY DID NOT WRITE A CHECK AT

09:17AM 19  THAT MEETING.  THEY WERE IMPRESSED, THEY WERE EXCITED, THEY

09:17AM 20  WERE TRENDING TOWARD AN INVESTMENT.  BUT I THINK IT'S AN

09:17AM 21  OVERSTATEMENT TO SAY THE INVESTMENT WAS MADE.  SHE WAS THERE IN

09:17AM 22  THE ROOM.  SHE HEARD THE STATEMENTS.  SHE'S PERFECTLY COMPETENT

09:17AM 23  TO SAY, WAS THAT IMPRESSIVE?  WAS THAT RELEVANT TO YOU?  WAS

09:17AM 24  THAT SOMETHING THAT YOU THOUGHT WAS IMPRESSIVE?

09:17AM 25       SHE PREPARES THE APPROVAL DOCUMENT THAT RDV ALWAYS USES

09:18AM 1    FOR ITS INVESTMENTS.  THE FACT THAT SHE IS PREPARING THAT SHOWS

09:18AM 2    HER INVOLVEMENT.

09:18AM 3        NOW, IF THEY WANT TO ARGUE SOMETHING ABOUT THE TIMING OR

09:18AM 4    NOBODY REVIEWED IT, THAT'S CERTAINLY FODDER FOR

09:18AM 5    CROSS-EXAMINATION.

09:18AM 6        BUT SHE'S THE INVESTMENT PROFESSIONAL WITHIN RDV WHO IS

09:18AM 7    ASSIGNED TO THIS TASK.  AND THEY WANT TO SUGGEST THAT THAT'S AN

09:18AM 8    EMPTY GESTURE, FINE.  BUT IT DOESN'T UNDERCUT THE RELEVANCE OF

09:18AM 9    WHAT SHE'S GOING TO SAY.

09:18AM 10            THE COURT:  THIS GETS BACK TO -- LET ME GO BACK TO

09:18AM 11   THESE TWO VIDEOS, THOUGH, MR. LEACH.

09:18AM 12       WHAT IS THE -- IF THE VIDEOS WERE AFTER THE INVESTMENT,

09:18AM 13   THEN WHAT IS THE RELEVANCE OF THOSE?

09:18AM 14            MR. LEACH:  YOUR HONOR, DEFENDANTS SOMETIMES MAKE

09:18AM 15   STATEMENTS AFTER THE OFFENSE THAT ARE STILL RELEVANT.  YOU

09:18AM 16   KNOW, MS. HOLMES TESTIFIED BEFORE THE S.E.C. IN 2017 ABOUT THE

09:18AM 17   EVENTS.

09:18AM 18            THE COURT:  RIGHT.

09:18AM 19            MR. LEACH:  NO ONE WOULD QUESTION THE RELEVANCE OF

09:18AM 20   THAT.

09:18AM 21            THE COURT:  NO.  I'M JUST TRYING TO DETERMINE THE

09:18AM 22   ORDER OF INTRODUCING THESE STATEMENTS THROUGH THIS WITNESS.

09:19AM 23            MR. LEACH:  THOSE WILL COME AT THE END OF THE

09:19AM 24   EXAMINATION, BUT -- AND THEY'RE A YEAR AFTER THE INVESTMENT.

09:19AM 25            THE COURT:  RIGHT.

09:19AM 1          MR. LEACH:  AND SO THE TIMING IS AFTER THE FACT.

09:19AM 2      THE STATEMENTS ARE RELEVANT NOT BECAUSE THEY WERE MADE TO

09:19AM 3  MS. PETERSON.  IT'S SIMPLY THE DEFENDANT'S FALSE STATEMENT WHEN

09:19AM 4  CONFRONTED WITH EVIDENCE ABOUT HOW MANY TESTS THE EDISON CAN

09:19AM 5  DO, AND IT'S HER ADMISSION OF RESPONSIBILITY FOR HER OWN

09:19AM 6  COMPANY.

09:19AM 7          THE COURT:  SO THEN MS. PETERSON'S OBSERVATION OF

09:19AM 8  THOSE TWO VIDEOS HAS NOTHING TO DO WITH THE INVESTMENT?

09:19AM 9          MR. LEACH:  CORRECT.

09:19AM 10          THE COURT:  WHAT THEY'RE -- SHE'LL TESTIFY AS

09:19AM 11  ANYONE, I GUESS YOU COULD CALL ANYONE AS FOUNDATIONAL FOR

09:19AM 12  THOSE.  DID YOU SEE THIS?  DID YOU HEAR HER MAKE THAT

09:19AM 13  STATEMENT?  YES, I DID.

09:19AM 14          MR. LEACH:  WE COULD CALL ANYBODY, YOUR HONOR.

09:19AM 15          THE COURT:  THAT'S WHAT I'M --

09:19AM 16          MR. LEACH:  WE'RE PUTTING IT IN THROUGH HER BECAUSE

09:19AM 17  SHE HAPPENS TO HAVE SEEN THEM, BUT WE COULD DO IT THROUGH

09:20AM 18  ANYBODY.

09:20AM 19          MR. WADE:  AND THERE ARE A COUPLE OF ISSUES, RIGHT?

09:20AM 20      YOUR HONOR IS RIGHT TO FOCUS ON THE FACT THAT IT IS AFTER

09:20AM 21  THE INVESTMENT DECISION.

09:20AM 22      THE CONCERN THAT I WAS TRYING TO EXPRESS WITH THE COURT IS

09:20AM 23  THAT ONCE THEY OPEN THE DOOR TO THAT PERIOD, THEY CAN'T CRACK

09:20AM 24  IT AND NOT OPEN IT, AND SO IF THEY WANT TO JUST INTRODUCE THE

09:20AM 25  VIDEO AND PLAY IT TO THE JURY LIKE THEY'VE BEEN PLAYING SOME OF

09:20AM 1    THESE TEXT MESSAGES OR WHATEVER THROUGH DIFFERENT WITNESSES

09:20AM 2    BECAUSE MAYBE THEY'RE ADMISSIBLE, THAT'S A DIFFERENT ISSUE.

09:20AM 3         I THINK MR. LEACH STARTED THE DISCUSSION BY SAYING HE

09:20AM 4    WANTED HER COMMENTARY AND REACTION FROM IT, AND THAT'S WHERE WE

09:20AM 5    GET INTO ALL OF THE POST-INVESTMENT INTERACTIONS AND THOSE

09:20AM 6    BECOME FAIR GAME.

09:20AM 7         WITH RESPECT TO THIS ISSUE -- AND I JUST WANT TO BE VERY

09:20AM 8    CLEAR BECAUSE IT'S A UNIQUE SET OF CIRCUMSTANCES HERE,

09:20AM 9    YOUR HONOR -- THIS WITNESS WAS ASKED UNDER OATH, WHEN WAS THE

09:20AM 10   INVESTMENT COMMITMENT MADE?  THE INVESTMENT COMMITMENT WAS MADE

09:20AM 11   AT THE END OF THE MEETING IN PALO ALTO.

09:20AM 12        WHAT INPUT DID YOU HAVE REGARDING THAT COMMITMENT?  NONE.

09:21AM 13        THAT'S HER TESTIMONY.  SO FOR HER -- AGAIN, SHE CAN

09:21AM 14   TESTIFY AS TO WHAT HAPPENED THERE, BUT FOR HER TO SAY, WAS THIS

09:21AM 15   SIGNIFICANT?  WAS THIS IMPORTANT?  WAS THIS -- YOU KNOW, WE'VE

09:21AM 16   HEARD --

09:21AM 17             THE COURT:  YOU MEAN THE VIDEOS YOU'RE TALKING

09:21AM 18   ABOUT?

09:21AM 19             MR. WADE:  NO, NO.  I'M TALKING ABOUT -- SHE

09:21AM 20   SHOULDN'T BE ABLE TO ASK -- ANSWER THOSE QUESTIONS ABOUT ANY

09:21AM 21   FACTS IN THE CASE BECAUSE SHE DIDN'T MAKE THE INVESTMENT

09:21AM 22   DECISION.

09:21AM 23        THE U.S. SUPREME COURT CASE ON THIS, WHICH IS IRONICALLY

09:21AM 24   NAMED PETERSON --

09:21AM 25             THE COURT:  SHE SHOULD BE ABLE TO TESTIFY ABOUT HER

09:21AM 1    JOB AND WHAT SHE DID AND ALL OF THAT, AND THAT'S WHAT I THINK

09:21AM 2    HE'S GOING TO ELICIT, WHAT IS YOUR JOB AND WHAT DID YOU DO?

09:21AM 3         ALL RIGHT.  EVEN IF THE DECISION WAS MADE IN PALO ALTO ON

09:21AM 4    THE SPOT, OKAY.

09:21AM 5              MR. WADE:  ALL FAIR GAME, YOUR HONOR.

09:21AM 6              THE COURT:  RIGHT.

09:21AM 7              MR. WADE:  THE ISSUE IS, CAN HE SAY, WHICH HE DID,

09:21AM 8    CAN MR. LEACH ASK, AS THEY DID IN DIFFERENT INTERVIEWS AND AT

09:21AM 9    TIMES IN GRAND JURY APPEARANCES, WAS THIS IMPORTANT TO THE RDV

09:22AM 10   INVESTMENT DECISION?

09:22AM 11        THAT SHE HAS NO BASIS TO --

09:22AM 12             THE COURT:  WHAT IS THIS?  WHAT IS THIS?

09:22AM 13             MR. WADE:  WAS THIS REFERENCED IN A SLIDE DECK

09:22AM 14   IMPORTANT TO RDV'S INVESTMENT DECISION?  WAS THIS --

09:22AM 15             THE COURT:  SO HE COULD ASK HER, TO YOUR KNOWLEDGE,

09:22AM 16   WHAT WAS IMPORTANT IN THE RDV INVESTMENT DECISION?

09:22AM 17             MR. WADE:  RIGHT.

09:22AM 18             THE COURT:  HE COULD ASK THAT QUESTION?

09:22AM 19             MR. WADE:  I GUESS HE COULD IF HE LAYS A FOUNDATION

09:22AM 20   THAT SHE HAS KNOWLEDGE AS TO WHAT IS IMPORTANT TO THE

09:22AM 21   INVESTMENT DECISION.

09:22AM 22             THE COURT:  WELL, SHE PROBABLY HAS WORKED THERE FOR

09:22AM 23   SOME PERIOD OF TIME AND HAS THE TRUST OF THE COMPANY TO

09:22AM 24   CONTINUE IN HER EMPLOYMENT.

09:22AM 25             MR. WADE:  THE FACTUAL RECORD IS PRETTY CLEAR ON

09:22AM 1   THIS, YOUR HONOR.  SHE HAS NO INTERACTION WITH -- VERY LITTLE

09:22AM 2   INTERACTION IN ADVANCE OF THE INVESTMENT DECISION WITH

09:22AM 3   THE DECISION MAKERS.

09:22AM 4           THE COURT:  ALL RIGHT.  WELL, THIS SOUNDS MORE LIKE

09:22AM 5   THE JURY IS GOING TO HAVE TO DECIDE WHAT TO DO WITH IT.  IT'S

09:22AM 6   MORE OF A WEIGHT ISSUE THAN AN ADMISSIBILITY ISSUE, IT SEEMS

09:22AM 7   LIKE.

09:22AM 8           MR. WADE:  I THINK IT'S A FOUNDATION ISSUE, YOUR

09:22AM 9   HONOR.  I THINK IT EFFECTIVELY SHIFTS THE BURDEN OF MATERIALITY

09:23AM 10  TO US BECAUSE WE CAN'T CROSS-EXAMINE THE ACTUAL DECISION

09:23AM 11  MAKERS.

09:23AM 12      THEY WANT TO MISLEAD THE JURY INTO THINKING SHE'S THE

09:23AM 13  DECISION-MAKER AND, THEREFORE, SHE THOUGHT THIS WAS IMPORTANT,

09:23AM 14  THAT IT WAS IMPORTANT, WHEN SHE ACTUALLY HAD NO ROLE IN THAT.

09:23AM 15          THE COURT:  WELL, IT SOUNDS LIKE YOU'LL BE VERY

09:23AM 16  EFFECTIVE IN CROSS-EXAMINING AND LETTING THE JURY KNOW THAT

09:23AM 17  NONE OF THAT IS ACCURATE.

09:23AM 18          MR. WADE:  IT SHOULDN'T COME IN IN THE FIRST

09:23AM 19  INSTANCE, YOUR HONOR.

09:23AM 20      BUT I WOULD ASK THAT -- I'LL OBJECT, BUT I WOULD JUST ASK

09:23AM 21  FOR A STANDING OBJECTION WITH RESPECT TO ANY QUESTIONS OF THIS

09:23AM 22  NATURE BECAUSE WE THINK ANY QUESTIONS THAT THEY'RE GOING TO ASK

09:23AM 23  THIS WITNESS ABOUT WAS THIS IMPORTANT --

09:23AM 24          THE COURT:  DON'T BE CONCERNED ABOUT OBJECTING.  WE

09:23AM 25  HAD A -- I TOLD THE JURY IN VOIR DIRE, AS YOU REMEMBER, THAT

09:23AM 1    THIS WILL BE A LONG CASE AND THERE WILL BE OBJECTIONS AND THEY

09:23AM 2    SHOULD EXPECT OBJECTIONS, AND I THINK I -- I CRAFTED A

09:23AM 3    PRELIMINARY INSTRUCTION TELLING THEM THAT THEY SHOULD NOT, AND

09:23AM 4    WILL NOT, CONSIDER THE NUMBER AND WHO MAKES IT AND THAT HAS

09:23AM 5    NOTHING TO DO WITH THEIR DECISION PROCESS.

09:24AM 6        SO BOTH SIDES DON'T BE AFRAID TO OBJECT AND STAND ON YOUR

09:24AM 7    POSITIONS.

09:24AM 8        I KNOW THERE ARE STRATEGIC REASONS WHY THAT'S NOT

09:24AM 9    HAPPENING, TOO.

09:24AM 10        MR. WADE:  AND I JUST WANT TO ASK THE COURT, IF THE

09:24AM 11   COURT IS GOING TO LET IN QUESTIONS OF THIS NATURE, IF I COULD

09:24AM 12   HAVE A STANDING OBJECTION SO I DON'T HAVE TO OBJECT TO EVERY

09:24AM 13   QUESTION.

09:24AM 14        THE COURT:  RIGHT.  AND I CAN SAY THAT IN FRONT OF

09:24AM 15   THE JURY AS WELL IF YOU WOULD LIKE SO THEY KNOW AT LEAST YOUR

09:24AM 16   POSITION.

09:24AM 17        OKAY.  WHAT ELSE DO WE NEED TO TALK ABOUT?

09:24AM 18        MR. DOWNEY:  YOUR HONOR, WE HAVE A WITNESS --

09:24AM 19        MR. LEACH:  NOTHING FROM THE GOVERNMENT.

09:24AM 20        MR. DOWNEY:  -- MR. EISENMAN, WHO I THINK WILL COME

09:24AM 21   NOT UNTIL AFTER CERTAINLY THE FIRST AND MAYBE THE SECOND BREAK.

09:24AM 22   I WAS WONDERING IF WE COULD --

09:24AM 23        THE COURT:  LET'S DO THAT SO WE CAN GET STARTED THIS

09:24AM 24   MORNING.

09:24AM 25        THANK YOU, MR. DOWNEY:  I APPRECIATE THAT.

09:24AM  1       ANYTHING ELSE THAT THE PARTIES WANTED TO TALK ABOUT THIS

09:24AM  2   MORNING?

09:24AM  3       MR. LEACH:  NO, YOUR HONOR.

09:24AM  4   IF THE COURT WOULD LIKE TRANSCRIPTS OF THE "TODAY SHOW" OR

09:24AM  5   "MAD MONEY," I HAVE THEM.

09:24AM  6       THE COURT:  THAT WOULD BE HELPFUL.  THANK YOU.

09:25AM  7   DO YOU HAVE THESE TOO, MR. WADE?

09:25AM  8       MR. WADE:  I DON'T.

09:25AM  9       MR. LEACH:  I HAVE ONE FOR THE DEFENSE.

09:25AM 10       THE COURT:  OKAY.  LET ME JUST TALK ABOUT SOME OTHER

09:25AM 11   SCHEDULING MATTERS.

09:25AM 12       PLEASE RECALL I ASKED IF WE COULD RESCHEDULE TO CAPTURE

09:25AM 13   MORE TIME.  AS I UNDERSTAND IT, WE WILL NOT BE ABLE TO MEET

09:25AM 14   ON -- LET'S START WITH MONDAYS.  I'VE ADVANCED MONDAY MORNINGS

09:25AM 15   AS POSSIBILITIES.  WE WILL NOT BE ABLE TO DO THAT ON THE 1ST

09:25AM 16   NOR THE 8TH, BUT IT SOUNDS LIKE THE 15TH, THE 22ND, AND THE

09:25AM 17   29TH WOULD BE AVAILABLE FOR EVERYONE.

09:25AM 18       I SUGGESTED SWAPPING THE DAY BEFORE THANKSGIVING TO THE

09:25AM 19   18TH, AND THAT SEEMS TO BE ACCEPTABLE.  SO WE'LL TRY TO DO

09:25AM 20   THAT.

09:25AM 21       AND THEN WE'LL LOOK AND SEE -- DECEMBER 3RD, REMEMBER, WE

09:26AM 22   CAN'T BE IN SESSION.  A JUROR IS TRAVELLING ON THAT DAY.  WE'LL

09:26AM 23   JUST SEE WHERE WE CAN FIT OTHER THINGS IN.

09:26AM 24       MR. WADE:  DID THE COURT WANT TO EXPLORE SWAPPING

09:26AM 25   THE THURSDAY FOR THE FRIDAY IN DECEMBER?  I KNOW YOU HAVE A

09:26AM  1    CALENDAR, SO IT MAY NOT WORK.  I JUST -- PLEASE LET THE PARTIES

09:26AM  2    KNOW.

09:26AM  3           THE COURT:  YEAH, WE'LL LOOK AT THAT AND SEE.  I MAY

09:26AM  4    HAVE TO FIND SOME OTHER TIME.  I DON'T KNOW WHERE WE ARE AS FAR

09:26AM  5    AS TIMING GOES IN THE CASE.

09:26AM  6       I DON'T KNOW, MR. LEACH, IF YOU CAN GIVE US ANY GUIDANCE,

09:26AM  7    YOU DON'T HAVE TO CERTAINLY, ABOUT WHERE YOU'RE AT IN YOUR

09:26AM  8    PRESENTATION OR HOW MANY MORE DAYS YOU THINK YOU NEED.

09:26AM  9       OF COURSE, THAT'S DEPENDENT, I UNDERSTAND, ON

09:26AM  10   CROSS-EXAMINATION.

09:26AM  11          MR. LEACH:  CERTAINLY THE SECOND HALF, YOUR HONOR.

09:26AM  12   I'M NOT SURE I COULD GIVE GREATER CLARITY THAN THAT, BUT I'M

09:26AM  13   NOT SURE IT'S NECESSARY TO RESOLVE DATES IN DECEMBER NOW.

09:27AM  14          THE COURT:  THAT'S FINE.

09:27AM  15       LET ME SHARE WITH YOU, WE RECEIVED AN EMAIL FROM A JUROR,

09:27AM  16   AND AGAIN, THIS IS FOR -- ACTUALLY, THIS IS INFORMATIONAL FOR

09:27AM  17   THE PARTIES, BUT ALSO DIRECTIONAL TO OUR GUESTS WHO ARE VIEWING

09:27AM  18   THIS, THAT IS, THE PUBLIC.

09:27AM  19       MS. KRATZMANN RECEIVED AN EMAIL FROM A JUROR WHO -- I'LL

09:27AM  20   JUST PARAPHRASE IT HERE.  HE THANKED THE COURT FOR COMMENTING

09:27AM  21   REGARDING THE NOTE TAKING AND THE PROCEEDINGS AND THEY HAVE HAD

09:27AM  22   SOME HELP.

09:27AM  23       THIS JUROR REPORTS, SPEAKING FOR THE JURY, IT CONTINUES TO

09:27AM  24   BE A DISTRACTION.  SEVERAL JURORS -- ONE PARTICULAR INDIVIDUAL

09:27AM  25   WHOSE TYPING WAS DISTRACTING.  THE JUROR INDICATES HE WAS

09:27AM 1    TEMPTED TO RAISE HIS HAND AND REQUEST THAT THE COURT DO

09:27AM 2    SOMETHING ABOUT THIS.

09:28AM 3        I JUST WANT TO INDICATE AGAIN THAT THOSE WHO ARE HERE

09:28AM 4    TAKING NOTES, YOU'RE SUPPOSED TO HAVE SILENT KEYBOARDS AND BE

09:28AM 5    ABLE TO KNOW HOW TO USE THE SILENT KEYBOARD.

09:28AM 6        I WILL BRING ANOTHER MARSHAL IN TO MONITOR THIS.  I DON'T

09:28AM 7    LIKE TO DO THAT, BUT WE DO HAVE THE OVERFLOW ROOM THAT IS

09:28AM 8    AVAILABLE, AND I INVITE THOSE OF YOU WITH KEYBOARDS TO USE THAT

09:28AM 9    ROOM.

09:28AM 10       I'LL HAVE TO ASK YOU TO GO THERE IF IT BECOMES A PROBLEM.

09:28AM 11   I JUST WANT TO SAY THAT.

09:28AM 12       AND THIS IS PARTICULARLY FOR, I THINK I'M SPEAKING FOR THE

09:28AM 13   JURORS WHO ARE SEATED IN THE -- OUTSIDE OF THE WELL AREA,

09:28AM 14   THEY'RE IN THE PUBLIC AREA.

09:28AM 15       SO THOSE OF YOU WHO FEEL THE NEED TO TYPE, PLEASE DO IT

09:28AM 16   SILENTLY.

09:28AM 17       IF I GET ANOTHER COMPLAINT ABOUT IT SUCH THAT THIS JURY IS

09:28AM 18   BEING DISTRACTED IN A WAY THAT IMPAIRS MS. HOLMES'S RIGHT TO

09:28AM 19   HER FAIR TRIAL OR THE GOVERNMENT'S ABILITY TO PUT ON A FULSOME

09:29AM 20   PROSECUTION, I'M GOING TO HAVE ANYONE WHO WANTS TO TYPE TO GO

09:29AM 21   TO THE OVERFLOW ROOM AND DO YOUR TYPING THERE AND NOT BE IN

09:29AM 22   THIS ROOM.  IT'S DISTRACTING, IT'S NOT FAIR TO MS. HOLMES, IT'S

09:29AM 23   NOT FAIR TO THE GOVERNMENT, AND IT CERTAINLY, CERTAINLY IS

09:29AM 24   INAPPROPRIATE FOR THE JURY TO HAVE TO FEND WITH THAT WHILE THEY

09:29AM 25   LISTEN TO THE TESTIMONY HERE.

| | | |
|---|---|---|
| 09:29AM | 1 | SO I WOULD APPRECIATE IT VERY MUCH IF FOLKS COULD POLICE |
| 09:29AM | 2 | THEMSELVES WITH THEIR KEYBOARDS, AND IF NOT, THEN I'LL HAVE TO |
| 09:29AM | 3 | ENGAGE A PROCESS FOR THAT.  I DON'T WANT TO DO THAT.  I REALLY |
| 09:29AM | 4 | DON'T. |
| 09:29AM | 5 | SO HOPEFULLY YOU CAN -- THOSE OF YOU WHO ARE TYPING CAN |
| 09:29AM | 6 | MANAGE IT ON YOUR OWN. |
| 09:29AM | 7 | ALL RIGHT. |
| 09:29AM | 8 | MR. WADE:  YOUR HONOR, IF WE MIGHT, MAYBE WHEN YOU |
| 09:29AM | 9 | GIVE YOUR STANDARD MORNING GREETING WITH THE JURY, MAYBE IT |
| 09:29AM | 10 | WOULD BE A GOOD IDEA TO ACTUALLY ENCOURAGE THEM TO RAISE THEIR |
| 09:29AM | 11 | HAND IF THERE'S A CIRCUMSTANCE WHERE THEY'RE UNABLE TO PAY |
| 09:30AM | 12 | ATTENTION SO WE CAN PAUSE THE PROCEEDINGS AT THAT POINT. |
| 09:30AM | 13 | OBVIOUSLY WE WANT TO MAKE SURE THAT THAT DOESN'T PERSIST IN |
| 09:30AM | 14 | THAT MOMENT.  SO MAYBE JUST EMBOLDENING THE JURY TO DO THAT |
| 09:30AM | 15 | WOULD BE A GOOD IDEA. |
| 09:30AM | 16 | THE COURT:  I THINK I'M GOING TO DO THAT AND ASK |
| 09:30AM | 17 | THEM TO COMMENT ON THAT.  AGAIN, THAT'S A DISTRACTION WITH THE |
| 09:30AM | 18 | EVIDENCE. |
| 09:30AM | 19 | THERE'S SOMEONE RAISING THEIR HAND IN THE AUDIENCE, AND |
| 09:30AM | 20 | I'LL HAVE THAT PERSON TALK TO MS. KRATZMANN AT THE BREAK IF |
| 09:30AM | 21 | THEY WANT TO BE HEARD. |
| 09:30AM | 22 | THAT'S THE INTENT OF THE COURT.  THIS IS A PUBLIC |
| 09:30AM | 23 | COURTROOM.  THE PUBLIC OWNS THIS COURT BUILDING.  THE PUBLIC |
| 09:30AM | 24 | OWNS THESE FACILITIES AND THEY HAVE A RIGHT TO ACCESS TO THEM. |
| 09:30AM | 25 | WHEN WE'RE IN TRIAL AND WE'RE IN THIS COURTROOM, THE |

09:30AM 1    RESPONSIBILITY FOR CONDUCTING A FAIR TRIAL SUCH THAT ALL

09:30AM 2    PARTIES HAVE ACCESS TO THIS COURTROOM FALLS UPON THE JUDGE, AND

09:30AM 3    THAT'S WHAT I'M TRYING TO DO IS TO BALANCE INDIVIDUAL'S ACCESS

09:30AM 4    TO THEIR COURTHOUSES WITH THE PARTIES' RIGHTS TO A FAIR TRIAL,

09:30AM 5    AND SOMETIMES THERE ARE SOME TENSION BETWEEN THOSE TWO.  WE

09:31AM 6    HAVE THE OVERFLOW ROOM WHICH IS AVAILABLE TO MEDIATE THAT

09:31AM 7    SITUATION, AND I HOPE IT'S SUCCESSFULLY USED BY THE PARTIES.

09:31AM 8        OKAY.  WE'LL TAKE A BREAK AND THEN WE'LL BRING THE JURY IN

09:31AM 9    IN JUST A MOMENT.

09:31AM 10           MR. LEACH:  THANK YOU, YOUR HONOR.

09:31AM 11       (RECESS FROM 9:31 A.M. UNTIL 9:41 A.M.)

09:41AM 12       (PROCEEDINGS HELD IN CHAMBERS.)

09:58AM 13           THE COURT:  LET'S GO ON THE RECORD.  WE ARE ON THE

09:58AM 14   RECORD IN CHAMBERS WITH COUNSEL.

09:58AM 15       YOU CAN TAKE YOUR MASKS OFF, COUNSEL, IF YOU WOULD LIKE,

09:58AM 16   MR. DOWNEY, MR. SCHENK.  WE'RE OUTSIDE OF THE PRESENCE OF OTHER

09:58AM 17   COUNSEL AND THE DEFENDANT.

09:58AM 18   ███████████████████████████████████████████

09:58AM 19   ███████████████████████████████████████████████

09:58AM 20   ███████████████████████████████████████████████

09:58AM 21   ████████████████████████████████████████████████

09:58AM 22   ███████████████████████████████████████

09:58AM 23       I BELIEVE HER FATHER, THE CHILD'S GRANDFATHER, IS TENDING

09:58AM 24   TO THAT NOW.

09:58AM 25       SHE HAS A PHONE, AND SHE'S GOING TO BE TEXTED SHOULD SHE

09:58AM 1   NEED TO LEAVE OR SHOULD ANYTHING COME UP.

09:58AM 2        SHE'LL HAVE THE PHONE WITH HER AT HER HAND, AND PER

09:58AM 3   MS. KRATZMANN.  SHE SAID SHE'S NOT GOING TO -- SHE'LL LOOK AT

09:58AM 4   IT WHEN IT LIGHTS UP AND WE CAN LET HER KNOW THAT SHE COULD

09:58AM 5   RAISE HER HAND AND WE'LL TAKE A BREAK.  THAT'S THE PROTOCOL

09:58AM 6   THAT I WOULD LIKE TO ENGAGE.

09:58AM 7        I WANTED TO LET COUNSEL KNOW, AND ANYTHING YOU WOULD LIKE

09:58AM 8   TO SAY OR ANY SUGGESTIONS OR OBJECTIONS TO PROCEEDING IN THIS

09:58AM 9   MANNER.

09:58AM 10        MR. SCHENK:  CERTAINLY NO OBJECTIONS.  I CAN'T THINK

09:58AM 11   OF A SUGGESTION OTHER THAN WHAT THE COURT HAS OUTLINED.  THAT'S

09:58AM 12   FINE.

09:58AM 13        MR. DOWNEY:  I THINK IT'S FINE WITH US, YOUR HONOR.

09:58AM 14   IT MAKES SENSE, AND WE'LL SEE WHAT HAPPENS.

09:58AM 15        THE COURT:  RIGHT.  IT -- MS. KRATZMANN, WHAT ELSE?

09:58AM 16   ANYTHING ELSE ABOUT THAT?

09:58AM 17        THE CLERK:  SHE JUST INDICATED SHE WOULD BE CHECKING

09:58AM 18   HER PHONE AND IF SHE HAD PERMISSION TO DO THAT, AND I SAID IF

09:58AM 19   THERE'S ANYTHING THAT YOU NEED THE COURT'S ATTENTION, PLEASE

09:58AM 20   RAISE YOUR HAND, OR IF YOU NEED TO GO, JUST RAISE YOUR HAND AND

09:58AM 21   GET HIS HONOR'S ATTENTION AND WE'LL ATTEND TO WHAT YOU NEED.

09:58AM 22        THE COURT:  OKAY.  ALL RIGHT.

09:58AM 23        I JUST WANTED TO ALERT COUNSEL.  YOU CAN NOTIFY YOUR

09:58AM 24   TEAMS.

09:58AM 25        AND MAYBE BE -- MAYBE SOME OF YOUR TEAMS CAN KEEP AN EYE

09:58AM  1    ON THIS JUROR ALSO.

09:58AM  2            MR. SCHENK:  DID THE COURT -- DID THE JURORS CHANGE

09:58AM  3    SEATS THIS MORNING?

09:58AM  4            THE COURT:  I THINK WE ARRANGED THEM.

09:58AM  5            THE CLERK:  SO THEY ARE SITTING AS THEY ARE

09:58AM  6    NUMBERED.  MR. HANG IS IN NUMBER 1, AND THEY'RE ALL SEATED

09:58AM  7    THROUGH 12, AND WE HAVE THE TWO ALTERNATES IN THE PEW.

09:58AM  8            THE COURT:  OKAY.  THANK YOU.

09:58AM  9        (PAUSE IN PROCEEDINGS.)

09:58AM  10           THE COURT:  LET'S GO BACK ON THE RECORD.  WE'RE BACK

09:58AM  11   ON THE RECORD.

09:58AM  12       WE HAD A DISCUSSION ABOUT A JUROR'S CHILD AND HEALTH

09:58AM  13   CONDITION, AND I'M GOING TO ORDER THAT PORTION OF THE

09:58AM  14   TRANSCRIPT SEALED OTHER THAN TO SAY THERE WAS A HEALTH

09:58AM  15   CONDITION.  BUT THE SPECIFICS SHOULD BE SEALED, AS WELL AS THE

09:58AM  16   JUROR'S NAME.  THERE WAS A JUROR'S NAME THAT WAS MENTIONED AND

09:58AM  17   THAT SHOULD BE REDACTED.  SO REDACT THE JUROR NAME AND THE

09:58AM  18   HEALTH CONDITION.

10:04AM  19           (JURY IN AT 10:04 A.M.)

10:04AM  20           THE COURT:  ALL RIGHT.  THANK YOU.  GOOD MORNING

10:04AM  21   EVERYONE.

10:04AM  22       WE'RE BACK ON THE RECORD IN THE HOLMES MATTER.  ALL

10:04AM  23   COUNSEL ARE PRESENT AND MS. HOLMES IS PRESENT.

10:04AM  24       AND OUR JURY IS PRESENT.  THANK YOU FOR YOUR PATIENCE,

10:04AM  25   LADIES AND GENTLEMEN.

10:04AM 1       LET ME -- BEFORE WE BEGIN, LET ME ASK YOU MY STANDARD

10:04AM 2  QUESTION.

10:04AM 3       FIRST OF ALL, I HOPE YOU HAD A PLEASANT WEEKEND, THAT YOU

10:04AM 4  ENJOYED THE RAIN THAT WE HAD AND SOAKED THAT UP.

10:04AM 5       BUT LET ME ASK YOU, DURING THE WEEKEND, DID ANY OF YOU

10:04AM 6  HAVE ANY OCCASION TO COME ACROSS ANY INFORMATION, TALK OR SEE

10:04AM 7  ANYONE THAT HAD ANYTHING TO DO WITH THIS CASE?  IF SO, COULD

10:04AM 8  YOU PLEASE RAISE YOUR HAND.

10:04AM 9       I SEE NO HANDS.

10:04AM 10       I WANT TO THANK YOU ON BEHALF OF ALL OF THE PARTICIPANTS

10:04AM 11  IN THIS TRIAL FOR YOUR CONTINUED VIGILANCE IN THIS REGARD.  I'M

10:04AM 12  REALLY GRATEFUL FOR YOUR EFFORTS IN THIS REGARD AND I THANK YOU

10:04AM 13  FOR THAT.

10:04AM 14       BEFORE WE BEGIN, I WANT TO -- LET ME JUST ASK, TIMING

10:05AM 15  TODAY, 4:00 O'CLOCK?  IS THAT POSSIBLE, 4:00 O'CLOCK?

10:05AM 16       OKAY.  I SEE NO HANDS OBJECTING TO THAT.

10:05AM 17       WE'LL GO UNTIL 4:00.

10:05AM 18       AND I SUGGESTED A CHANGE IN SCHEDULE OF ADDING SOME DAYS.

10:05AM 19       I DON'T KNOW IF YOU, LADIES AND GENTLEMEN, HAVE HAD

10:05AM 20  OCCASION TO LOOK AT YOUR SCHEDULES TO SEE IF THAT'S SOMETHING

10:05AM 21  THAT WOULD WORK.  AGAIN, THIS WOULD MEAN MONDAYS THE 15TH,

10:05AM 22  22ND, AND 29TH IN THE MORNINGS, IF WE COULD MEET FOR SOME TIME

10:05AM 23  THEN.  IF THAT WORKS FOR EVERYONE, WE'LL ADOPT THAT SCHEDULE.

10:05AM 24       ALL RIGHT.  I SEE NO HANDS.

10:05AM 25       OH, YES, I SEE -- YES, SIR.

10:05AM 1            JUROR:  YEAH, IT'S JUST GETTING HARD ON MY WORK

10:05AM 2    SCHEDULE TO LOSE THOSE HOURS.

10:05AM 3            THE COURT:  LET ME -- HANG ON JUST A SECOND.  I'M

10:05AM 4    GOING TO SEE IF WE CAN GET A MICROPHONE.

10:06AM 5         THIS IS ALTERNATE 5.  YES, SIR?

10:06AM 6            JUROR:  YES, IT'S GETTING TOUGH TO BALANCE THE

10:06AM 7    WORKLOAD, LOSING THOSE HOURS ON MY SIDE.

10:06AM 8            THE COURT:  GOTCHA.  OKAY.

10:06AM 9            JUROR:  IF NO ONE ELSE HAS ANY OBJECTIONS, I CAN

10:06AM 10   MOVE THE STUFF AROUND, BUT IT'S JUST GETTING VERY TOUGH FOR ME.

10:06AM 11           THE COURT:  WELL, THANK YOU.  I APPRECIATE THAT.

10:06AM 12        LET'S SEE -- LET ME PUT THOSE DAYS IN PLACE NOW.  MAYBE WE

10:06AM 13   CAN TAKE ONE OFF AS WE GO FORWARD.

10:06AM 14           JUROR:  UH-HUH.

10:06AM 15           THE COURT:  BUT I JUST WANT TO RESERVE THOSE FOR OUR

10:06AM 16   COURT PURPOSES FOR NOW.

10:06AM 17        THANK YOU SO MUCH.  THANK YOU.

10:06AM 18        AND I THINK PEOPLE WERE IN AGREEMENT THAT WE WOULD NOT

10:06AM 19   MEET ON THE 24TH OF NOVEMBER, THE DAY BEFORE THANKSGIVING, BUT

10:06AM 20   INSTEAD WE WOULD MEET ON THE 18TH.  I THINK THAT MEETS WITH

10:07AM 21   EVERYONE'S APPROVAL.

10:07AM 22        SO I WANT TO REMIND EVERYONE THAT WE'RE NOT IN SESSION

10:07AM 23   DECEMBER 3RD.  DECEMBER 3RD, WE WILL NOT BE IN SESSION ON THAT

10:07AM 24   DATE.

10:07AM 25        OKAY.  I THINK THAT'S THE UPDATE FOR SCHEDULING PURPOSES.

10:07AM  1    LET ME TURN TO ANOTHER TOPIC THAT REGRETTABLY HAS BEEN A

10:07AM  2  CONTINUOUS ISSUE HERE IN THIS COURTROOM FOR THIS TRIAL, AND

10:07AM  3  THAT IS THE NOISE.  THIS IS REALLY -- AND I'M SPEAKING TO OUR

10:07AM  4  PUBLIC AUDIENCE HERE.  I'M GRATEFUL THAT YOU ARE HERE.  I'M

10:07AM  5  GRATEFUL THAT YOU ARE PARTICIPATING AND WITNESSING YOUR JUSTICE

10:07AM  6  SYSTEM IN ACTION IN REALTIME.

10:07AM  7    I HAVE PERMITTED INDIVIDUALS TO REPORT HERE WITH LAPTOPS

10:07AM  8  AND OTHER DEVICES ON THE CONDITION THAT THEY HAVE SILENT

10:07AM  9  KEYBOARDS, AND I JUST WANT EVERYONE TO KNOW THAT I HAVE

10:07AM 10  RECEIVED REPORTS THROUGH MS. KRATZMANN THAT, INCLUDING FROM

10:08AM 11  JURY MEMBERS AND OTHER PARTICIPANTS IN THE TRIAL, THAT THE

10:08AM 12  NOISE LEVEL FROM THESE KEYBOARDS IS BECOMING DISTRACTING, HAS

10:08AM 13  BEEN DISTRACTING AT TIMES THROUGHOUT THE TRIAL.

10:08AM 14    AND I'M GOING TO ASK INDIVIDUALS AGAIN, IF YOU DON'T HAVE

10:08AM 15  A SILENT KEYBOARD, YOU SHOULDN'T BE IN THIS COURTROOM.  YOU

10:08AM 16  SHOULD BE IN THE OVERFLOW ROOM DOWNSTAIRS WHERE YOU CAN USE

10:08AM 17  YOUR DEVICE.

10:08AM 18    I UNDERSTAND THAT NOT ALL OF YOU HAVE THESE SILENT

10:08AM 19  KEYBOARDS AND THAT SOMETIMES TYPING SPEED IS OF ESSENCE IN THE

10:08AM 20  COMPLETION OF YOUR DUTIES, AND I RESPECT THAT.

10:08AM 21    BUT I HOPE YOU ALSO ARE RECIPROCAL FOR THE JUDICIAL

10:08AM 22  PROCESS AND THE TRIAL PROCESS AND THE NEED TO PROTECT

10:08AM 23  MS. HOLMES'S RIGHT TO A FAIR TRIAL AND THE GOVERNMENT'S RIGHT

10:08AM 24  TO PUT A PROSECUTION ON IN A FAIR AND FULSOME MANNER.

10:08AM 25    THERE IS SOME TENSION BETWEEN THESE TWO, I MENTIONED

10:08AM 1 EARLIER, AND THE SOLUTION THAT WE HAVE FOR THIS TENSION IS TO

10:09AM 2 ALLOW THOSE OF YOU TO PARTICIPATE IN REALTIME IN OUR OVERFLOW

10:09AM 3 ROOM WHERE YOUR TYPEWRITERS CAN BE USED WITHOUT ANY ISSUE ABOUT

10:09AM 4 DISTURBING THE TRIAL PROCESS DOWN THERE.

10:09AM 5 IT MAY BE, AND I HOPE IT DOESN'T COME TO THIS, BUT IF THIS

10:09AM 6 CONTINUES, IT MAY BE THAT I'LL HAVE ANYONE WHO IS GOING TO

10:09AM 7 TYPE, INCLUDING THOSE OF YOU WHO HAVE SILENT KEYBOARDS AND

10:09AM 8 THOSE WHO HAVE BEEN ABLE TO MONITOR YOUR TYPING AND KEEP YOUR

10:09AM 9 TYPING SILENT, I'LL HAVE TO ASK ALL OF YOU TO GO DOWN TO THAT

10:09AM 10 ROOM AND USE THE OVERFLOW ROOM.

10:09AM 11 AND I HATE TO SEND ALL OF YOU DOWN THERE, INCLUDING THOSE

10:09AM 12 OF YOU WHO ARE PRESCRIBING BY THE RULES OF BEING SILENT IN YOUR

10:09AM 13 DEVICES, BUT IT MAY CAUSE -- BECAUSE OF THE ACTIONS OF A FEW,

10:09AM 14 IT MAY CAUSE ALL OF YOU TO HAVE TO GO DOWN THERE AND SIT IN

10:10AM 15 THAT ROOM.

10:10AM 16 SO I JUST WANT TO PUT YOU ON NOTICE ABOUT THAT.

10:10AM 17 I MAY BRING UP ANOTHER MARSHAL TO MONITOR THINGS HERE SUCH

10:10AM 18 THAT WE CAN KEEP THAT PORTION OF THE COURTROOM SILENT SO THAT

10:10AM 19 EVERYONE, AND PARTICULARLY THE JURORS, CAN HEAR THESE

10:10AM 20 PROCEEDINGS IN A FAIR AND FULL MANNER.

10:10AM 21 SO I JUST WANT TO STATE THAT NOW.  AND I APPRECIATE

10:10AM 22 YOUR -- THOSE OF YOU WHO ARE TYPING HERE, I APPRECIATE YOUR

10:10AM 23 CONSIDERATION ABOUT THIS.  BUT I JUST HAVE TO GIVE YOU FAIR

10:10AM 24 WARNING, IT MAY BE THAT I'LL HAVE TO HAVE YOU ALL MOVE DOWN TO

10:10AM 25 THAT ROOM IF YOU'RE NOT ABLE TO KEEP YOUR DEVICES SILENT.

10:10AM  1    AND LET ME SAY THAT ALSO INCLUDES TELEPHONE DEVICES.  THIS

10:10AM  2  MORNING I THINK WE HEARD TWO OR THREE RINGS, CHIMES OF PHONES

10:10AM  3  GOING OFF, AND IF I BRING A MARSHAL IN HERE AND IF SHE HEARS A

10:10AM  4  DEVICE, SHE'S GOING TO ASK YOU TO LEAVE, NOT JUST TURN OFF THE

10:10AM  5  DEVICE.

10:10AM  6    BUT YOU CAN'T BE HERE IN IF YOU'RE NOT ABLE TO POLICE IT.

10:11AM  7  THIS TRIAL HAS BEEN GOING ON FOR SEVERAL WEEKS.  MANY OF YOU

10:11AM  8  HAVE BEEN HERE EVERY DAY OF THE TRIAL, AND I THINK YOU KNOW

10:11AM  9  WHAT IS EXPECTED OF YOU.

10:11AM  10    SO THAT'S ALL I'M GOING TO SAY ON THE MATTER.  THANK YOU

10:11AM  11  VERY MUCH.

10:11AM  12    I THINK OUR JURORS WOULD BE GRATEFUL ALSO FOR THE ABILITY

10:11AM  13  TO KEEP THAT FROM BEING A DISTRACTION FROM THEIR DUTIES.

10:11AM  14    ALL RIGHT.  ANYTHING FURTHER FROM EITHER SIDE?

10:11AM  15    MR. DOWNEY:  YOUR HONOR, I JUST WANT TO REMIND THE

10:11AM  16  COURT THAT I THINK YOU WERE GOING TO ENGAGE A PROTOCOL IF THERE

10:11AM  17  WERE A DISTRACTION.

10:11AM  18    THE COURT:  THANK YOU.  THANK YOU, MR. DOWNEY.

10:11AM  19    LET ME JUST INDICATE THAT I RECOGNIZE THAT THERE MAY BE

10:11AM  20  SOMEONE WHO NEEDS TO TAKE A BREAK FOR WHATEVER REASON IN THE

10:11AM  21  JURY, AND IF YOU WOULD JUST RAISE YOUR HAND, PLEASE, RAISE YOUR

10:11AM  22  HAND IF YOU NEED TO TAKE A BREAK AND WE WILL STOP THE

10:11AM  23  PROCEEDING IMMEDIATELY AND WE CAN TAKE WHATEVER ACTION WE NEED

10:11AM  24  TO DO TO ALLOW THAT JUROR ACCESS TO WHATEVER NEED THEY NEED TO

10:12AM  25  ACCOMPLISH.  I JUST WANT THAT TO BE KNOWN.

10:12AM  1    SO PLEASE -- I KNOW THAT JUROR AND ALL OF YOU ARE GOING TO

10:12AM  2    CONTINUE TO PAY ATTENTION TO THE TESTIMONY HERE, BUT SHOULD THE

10:12AM  3    NEED ARISE THAT WE NEED TO TAKE A BREAK, PLEASE DO NOT BE SHY

10:12AM  4    ABOUT PUTTING YOUR HAND UP, PUT YOUR HAND UP, AND WE'LL STOP

10:12AM  5    THE PROCEEDINGS AND ALLOW THINGS TO GO FORWARD.

10:12AM  6        ALL RIGHT.  THANK YOU.  THANK YOU, MR. DOWNEY.  I

10:12AM  7    APPRECIATE IT.

10:12AM  8        YOU HAVE A WITNESS?

10:12AM  9            MR. LEACH:  WE DO, YOUR HONOR.

10:12AM  10   THE UNITED STATES CALLS LISA PETERSON.

10:12AM  11           THE COURT:  AND WE'RE GOING TO BREAK AT 11:00; IS

10:12AM  12   THAT RIGHT?

10:12AM  13           MS. TREFZ:  YES, IT IS.

10:12AM  14           THE COURT:  11:00?

10:12AM  15           MS. TREFZ:  YES.

10:12AM  16           THE COURT:  GOOD MORNING.  IF YOU WOULD COME

10:12AM  17   FORWARD, PLEASE.

10:12AM  18       IF YOU COULD STAND HERE FACING OUR COURTROOM DEPUTY WHILE

10:12AM  19   YOU RAISE YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU.

10:13AM  20       **(GOVERNMENT'S WITNESS, LISA PETERSON, WAS SWORN.)**

10:13AM  21           THE WITNESS:  YES.

10:13AM  22           THE COURT:  LET ME INVITE YOU TO HAVE A SEAT HERE.

10:13AM  23   FEEL FREE TO ADJUST THAT CHAIR AND MICROPHONE AS YOU MAKE

10:13AM  24   YOURSELF COMFORTABLE.

10:13AM  25       THERE'S SOME FRESH WATER IN THE CONTAINER, AND FEEL FREE

10:13AM 1     TO USE THAT AS YOU NEED.

10:13AM 2          WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

10:13AM 3     AND THEN SPELL IT, PLEASE.  AND I'LL ENCOURAGE YOU TO SPEAK

10:13AM 4     DIRECTLY INTO THE MICROPHONE.

10:13AM 5               THE WITNESS:  LISA PETERSON.  L-I-S-A,

10:13AM 6     P-E-T-E-R-S-O-N.

10:13AM 7               THE COURT:  THANK YOU.

10:13AM 8          COUNSEL.

10:13AM 9               MR. LEACH:  THANK YOU, YOUR HONOR.

10:13AM 10                    **DIRECT EXAMINATION**

10:13AM 11    BY MR. LEACH:

10:13AM 12    Q.   GOOD MORNING, MS. PETERSON.

10:13AM 13    A.   GOOD MORNING.

10:13AM 14    Q.   IF YOU'RE FULLY VACCINATED AND COMFORTABLE, YOU HAVE THE

10:13AM 15    COURT'S PERMISSION TO TESTIFY WITHOUT A MASK.

10:14AM 16         WHERE DO YOU WORK?

10:14AM 17    A.   I WORK FOR RDV CORPORATION IN GRAND RAPIDS, MICHIGAN.

10:14AM 18    Q.   AND WHAT IS RDV CORPORATION?

10:14AM 19    A.   RDV CORPORATION IS THE FAMILY OFFICE FOR THE DEVOS FAMILY,

10:14AM 20    AND WE'RE ALSO A REGISTERED INVESTMENT ADVISOR FOR OTHER

10:14AM 21    FAMILIES AS WELL.

10:14AM 22    Q.   WHAT DO YOU DO FOR RDV?

10:14AM 23    A.   I WORK IN THEIR INVESTMENT GROUP, AND I'M ONE OF TWO

10:14AM 24    PRIVATE EQUITY MANAGERS THAT MANAGES A PRIVATE EQUITY PORTFOLIO

10:14AM 25    FOR RDV CORPORATION.

10:14AM 1    Q.   AND HOW LONG HAVE YOU SERVED IN THE INVESTMENT GROUP FOR

10:14AM 2    RDV CORPORATION?

10:14AM 3    A.   ABOUT 17 YEARS.

10:14AM 4    Q.   IN APPROXIMATELY OCTOBER OF 2014, DID RDV CORPORATION MAKE

10:14AM 5    AN INVESTMENT IN THERANOS?

10:14AM 6    A.   YES.

10:14AM 7    Q.   WE'LL COME BACK TO THAT, BUT FOR NOW, COULD YOU BRIEFLY

10:14AM 8    DESCRIBE YOUR EDUCATIONAL BACKGROUND FOR US?

10:14AM 9    A.   I GRADUATED FROM MICHIGAN STATE UNIVERSITY IN 1992 WITH A

10:14AM 10   FINANCE DEGREE.

10:14AM 11   Q.   AND COULD YOU BRIEFLY DESCRIBE YOUR PROFESSIONAL

10:15AM 12   BACKGROUND LEADING UP TO JOINING RDV CORPORATION?

10:15AM 13   A.   I WAS A COMMERCIAL LENDER AT NDB BANK, WHICH WAS BOUGHT BY

10:15AM 14   FIRST CHICAGO AND IS NOW PART OF JPMORGAN CHASE, I THINK, FOR

10:15AM 15   ABOUT THREE YEARS; AND THEN AFTER THAT I WAS AN INVESTMENT

10:15AM 16   BANKER WITH MACDONALD INVESTMENTS, WHICH GOT BOUGHT BY KEY

10:15AM 17   BANK, AND WAS THERE UNTIL I STARTED WITH RDV CORPORATION IN

10:15AM 18   2005.

10:15AM 19   Q.   AND SO YOU'VE BEEN WITH RDV FOR APPROXIMATELY 16 YEARS?

10:15AM 20   A.   YEAH.

10:15AM 21   Q.   OKAY.  MOST OF MY QUESTIONS RELATE TO THE 2014 TIME

10:15AM 22   PERIOD, MS. PETERSON.

10:15AM 23       IN THAT TIME PERIOD, WHAT WAS YOUR JOB AGAIN?

10:15AM 24   A.   SAME AS IT IS NOW.  I MANAGE A PORTFOLIO OF PRIVATE EQUITY

10:15AM 25   INVESTMENTS, WHICH MEANS I FIND AND MANAGE PRIVATE EQUITY

10:15AM 1    FUNDS, INVESTMENTS IN THOSE PRIVATE EQUITY FUNDS, AND

10:15AM 2    OCCASIONALLY THOSE FUNDS WILL ASK US TO COINVEST ALONGSIDE OF

10:16AM 3    THEM.

10:16AM 4        AND SO I HAVE A PORTFOLIO OF PRIVATE EQUITY FUND MANAGERS

10:16AM 5    THAT I MANAGE AND A PORTFOLIO OF COINVESTMENTS ALONGSIDE OF

10:16AM 6    THOSE PRIVATE EQUITY MANAGERS THAT I MANAGE.

10:16AM 7    Q.   WHAT DO YOU MEAN BY A COINVESTMENT?

10:16AM 8    A.   A COINVESTMENT IS WHEN WE INVEST INSIDE THESE PRIVATE

10:16AM 9    EQUITY FUNDS, AND THERE'S SOMETIMES AN OPPORTUNITY THAT COMES

10:16AM 10   ALONG WHERE THE TRANSACTION THAT THEY'RE LOOKING AT IS A LITTLE

10:16AM 11   BIT BIGGER THAN WHAT THE FUND CAN DO ON ITS OWN.  THEY WILL ASK

10:16AM 12   US IF WE WANT TO COINVEST ALONGSIDE THE FUND.

10:16AM 13       SO WE'LL HAVE AN INVESTMENT IN THAT COMPANY THROUGH THE

10:16AM 14   PRIVATE EQUITY FUND, AND WE'LL ALSO HAVE A SIDE COINVESTMENT IN

10:16AM 15   THAT COMPANY AS A COINVESTMENT.

10:16AM 16   Q.   AS PRIVATE EQUITY MANAGER WITHIN RDV, IS IT IMPORTANT FOR

10:16AM 17   YOU TO UNDERSTAND THE INVESTING PRIORITIES FOR RDV CORPORATION?

10:16AM 18   A.   YES.

10:16AM 19   Q.   CAN YOU EXPLAIN THAT A LITTLE BIT?

10:17AM 20   A.   WELL, WE HAVE A STRATEGY THAT WE FOLLOW AND WE TRY TO STAY

10:17AM 21   DISCIPLINED TO THAT STRATEGY.  SO IT'S IMPORTANT FOR ME TO KNOW

10:17AM 22   WHAT THE FAMILY AND MY BOSS IS LOOKING FOR IN TERMS OF WHAT

10:17AM 23   TYPE OF PRIVATE EQUITY FUNDS ARE WE GOING TO LOOK FOR AND

10:17AM 24   INVEST WITH, AND THEN WHAT TYPE OF COINVESTMENTS WOULD WE DO

10:17AM 25   WITH THOSE GROUPS.

10:17AM 1        SO, YES, IT'S IMPORTANT THAT I KNOW WHAT THE STRATEGY IS

10:17AM 2    THAT WE'RE DOING.

10:17AM 3    Q.   I WANT TO STAY WITH YOU IN THE TIME PERIOD 2014.

10:17AM 4    A.   UH-HUH.

10:17AM 5    Q.   IN OR AROUND THAT TIME, DID YOU BECOME AWARE OF A COMPANY

10:17AM 6    CALLED THERANOS?

10:17AM 7    A.   YES.

10:17AM 8    Q.   AND HOW DID YOU BECOME AWARE OF THERANOS?

10:17AM 9    A.   I WAS ON A PLANE RIDE BACK FROM CHICAGO WITH MY BOSS,

10:17AM 10   RANDY DAMSTRA, AT THE TIME, AND ALSO THE PERSON THAT RAN OUR

10:17AM 11   GROUP, OUR CEO AND CIO, JERRY TUBERGEN, AND JERRY HAD JUST HAD

10:17AM 12   A MEETING WITH ELIZABETH HOLMES AND HER BROTHER CHRISTIAN AT A

10:17AM 13   CONFERENCE THAT HE HAD ATTENDED.

10:17AM 14   Q.   AND WERE YOU GIVEN ANY RESPONSIBILITIES WITH RESPECT TO A

10:18AM 15   POSSIBLE INVESTMENT IN THERANOS?

10:18AM 16   A.   YEAH.  WE TALKED ABOUT IT ON THE PLANE RIDE BACK TO

10:18AM 17   GRAND RAPIDS AND I HAD ASKED IF I COULD WORK ON THE TRANSACTION

10:18AM 18   BECAUSE I HAD A NUMBER OF HEALTH CARE INVESTMENTS, FUNDS THAT I

10:18AM 19   WORKED WITH, AND I LIKE HEALTH CARE AND IT WAS VERY INTERESTING

10:18AM 20   TO ME.

10:18AM 21       MY HUSBAND IS TYPE 1 DIABETIC AND DOES A LOT OF BLOOD

10:18AM 22   TESTING, AND SO IT WAS VERY INTERESTING TO ME AND SO I WANTED

10:18AM 23   TO WORK ON THAT ONE.

10:18AM 24   Q.   WHEN YOU SAY YOU WANTED TO WORK ON THAT, WHAT WERE YOU

10:18AM 25   SIGNING UP FOR?

10:18AM 1    A.   SO I WAS SIGNING UP TO HELP FACILITATE AND INFORM AND DO

10:18AM 2    ALL OF THE WORK ASSOCIATED WITH MAKING AN INVESTMENT IN THAT

10:18AM 3    AND INFORMING THE FAMILY.

10:18AM 4         SO THIS ONE WAS DIFFERENT THAN A TYPICAL COINVESTMENT

10:18AM 5    BECAUSE THERE WASN'T ANY PRIVATE EQUITY FUND IN THE MIDDLE OF

10:18AM 6    THE TRANSACTION.

10:18AM 7         NORMALLY THERE'S A PRIVATE EQUITY FUND THAT MAKES AN

10:18AM 8    INVESTMENT AND THEN WE COINVEST ALONGSIDE THEM.

10:19AM 9         THIS ONE WAS A LITTLE BIT DIFFERENT IN THAT THERE WAS NO

10:19AM 10   PRIVATE EQUITY FUND AND WE WANTED -- THE FAMILY IS VERY -- HAS

10:19AM 11   A LOT OF AFFINITY TOWARDS HEALTH CARE AND EDUCATION AND JERRY

10:19AM 12   WANTED THE FAMILY TO TAKE A LOOK AT THIS INVESTMENT.

10:19AM 13        IT WAS VERY MUCH CHARACTERIZED TO JERRY THAT THIS WAS AN

10:19AM 14   OPPORTUNITY THAT WE WERE BEING INVITED TO LOOK AT, AND HE

10:19AM 15   WANTED TO TAKE THE OPPORTUNITY TO THE FAMILY AND SEE IF THEY

10:19AM 16   WANTED TO MAKE AN INVESTMENT.

10:19AM 17        SO MY ROLE WAS TO WORK WITH JERRY AND INFORM THE FAMILY ON

10:19AM 18   EVERYTHING AND ATTEND CALLS AND MEETINGS AND PREPARE EVERYTHING

10:19AM 19   THAT WOULD GO TO THE INVESTMENT COMMITTEE, WHICH IS MADE UP OF

10:19AM 20   FAMILY MEMBERS.

10:19AM 21        MR. WADE:  OBJECTION, YOUR HONOR.  THERE WAS HEARSAY

10:19AM 22   WITHIN THE ANSWER TO THAT QUESTION.

10:19AM 23        THE COURT:  MR. LEACH, WILL YOU ASK -- WAS THIS

10:19AM 24   FOUNDATIONAL AS TO HER EMPLOYMENT THEN?

10:20AM 25        MR. LEACH:  YES.

10:20AM   1              THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, THE

10:20AM   2      TESTIMONY THAT YOU HEARD, THIS IS REGARDING THE -- WHAT'S HIS

10:20AM   3      NAME?  JERRY?

10:20AM   4              THE WITNESS:  TUBERGEN.

10:20AM   5              THE COURT:  TUBERGEN, THANK YOU.

10:20AM   6         YES, THE STATEMENTS ATTRIBUTED TO MR. TUBERGEN WERE NOT

10:20AM   7      OFFERED FOR THE TRUTH OF THE MATTER ASSERTED BY HIM, BUT RATHER

10:20AM   8      AS FOUNDATIONAL FOR THIS WITNESS'S EMPLOYMENT AND HER DUTIES

10:20AM   9      AND HER ENGAGEMENT IN THAT REGARD AS FOUNDATION.

10:20AM  10         SO GO AHEAD, MR. LEACH.

10:20AM  11              MR. LEACH:  THANK YOU, YOUR HONOR.

10:20AM  12      Q.  AND DID I HEAR YOU SAY THAT YOU IN SOME SENSE VOLUNTEERED

10:20AM  13      FOR THIS PROJECT?

10:20AM  14      A.  YES.

10:20AM  15      Q.  AND WHY WAS THAT?

10:20AM  16      A.  BECAUSE IT DIDN'T COME IN THROUGH ONE OF MY PRIVATE EQUITY

10:20AM  17      FUNDS, SOMEONE HAD TO WORK ON IT ON THE INVESTMENT TEAM.  AND

10:20AM  18      SO I WANTED TO, SO HE SAID, SURE, I WOULD LOVE FOR YOU TO WORK

10:20AM  19      ON IT.

10:20AM  20      Q.  AND WHY DID YOU WANT TO?

10:20AM  21      A.  BECAUSE I HAD A LITTLE BIT OF KNOWLEDGE IN THE HEALTH CARE

10:20AM  22      SPACE AND IT INTRIGUED ME.

10:20AM  23              MR. LEACH:  MAY I APPROACH, YOUR HONOR?

10:20AM  24              THE COURT:  YES.

10:21AM  25              MR. LEACH:  (HANDING.)

10:21AM  1   Q.   MS. PETERSON, I'VE PLACED BEFORE YOU A BINDER OF

10:21AM  2   DOCUMENTS, AND I'D LIKE TO DRAW YOUR ATTENTION, PLEASE, TO WHAT

10:21AM  3   HAS BEEN MARKED AS EXHIBIT 1944.

10:21AM  4        DOES THIS APPEAR TO BE AN EMAIL DATED SEPTEMBER 18TH,

10:21AM  5   2014?

10:21AM  6   A.   YES.

10:21AM  7   Q.   AND IS THIS CONSISTENT WITH THE TIME PERIOD WHEN YOU WERE

10:21AM  8   APPROACHED BY MR. TUBERGEN ABOUT A POSSIBLE INVESTMENT

10:21AM  9   OPPORTUNITY IN THERANOS?

10:21AM 10   A.   YES.

10:21AM 11   Q.   OKAY.  THERE'S AN ATTACHMENT TO EXHIBIT 1944.

10:22AM 12        DO YOU SEE THAT?

10:22AM 13   A.   YES.

10:22AM 14   Q.   AND AT SOME POINT DID MR. TUBERGEN PROVIDE YOU WITH THIS

10:22AM 15   ATTACHMENT?

10:22AM 16   A.   YES.

10:22AM 17   Q.   OKAY.  DO YOU KNOW WHERE HE GOT IT?

10:22AM 18   A.   NO, I DON'T KNOW WHERE HE GOT IT.

10:22AM 19   Q.   OKAY.  WAS IT PART OF THE INFORMATION THAT YOU CONSIDERED

10:22AM 20   IN CONNECTION WITH A POSSIBLE INVESTMENT IN THERANOS?

10:22AM 21   A.   YES.

10:22AM 22            MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 1944.

10:22AM 23            MR. WADE:  NO OBJECTION, YOUR HONOR.

10:22AM 24            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:22AM 25        (GOVERNMENT'S EXHIBIT 1944 WAS RECEIVED IN EVIDENCE.)

10:22AM  1          MR. LEACH:  AND IF WE CAN START, MS. HOLLIMAN, ON

10:22AM  2   PAGE 2.  AND IF WE CAN ZOOM IN ON THE TOP PORTION.

10:22AM  3   Q.   DO YOU SEE THE EMAIL, MS. PETERSON, FROM JERRY TUBERGEN TO

10:23AM  4   DICK DEVOS, DOUG DEVOS, DAN DEVOS, AND CHERI DEVOS?

10:23AM  5   A.   YES.

10:23AM  6   Q.   AND WHO ARE THEY?

10:23AM  7   A.   THEY ARE THE CHILDREN OF RICH DEVOS AND THE MEMBERS THAT

10:23AM  8   WE WORKED FOR AT THE TIME.

10:23AM  9   Q.   MEMBERS OF THE INVESTMENT COMMITTEE YOU MENTIONED?

10:23AM 10   A.   SOME OF THEM ARE ON THE INVESTMENT COMMITTEE, YES.  DOUG

10:23AM 11   IS THE CHAIRMAN.

10:23AM 12   Q.   OKAY.  AND THE FIRST SENTENCE OF THIS READS, "ALL.

10:23AM 13        "THIS MORNING, I HAD ONE OF THE MOST INTERESTING MEETINGS

10:23AM 14   I CAN RECALL WITH THE WOMAN PROFILED IN THE ATTACHED 'FORTUNE'

10:23AM 15   MAGAZINE ARTICLE."

10:23AM 16        DO YOU SEE THAT?

10:23AM 17   A.   YES.

10:23AM 18   Q.   AND IS THE ATTACHMENTS THE "FORTUNE" MAGAZINE ARTICLE, A

10:23AM 19   COPY OF WHICH YOU AT SOME POINT GOT?

10:23AM 20   A.   YES.

10:23AM 21   Q.   OKAY.  LET'S LOOK AT PAGE 2.

10:23AM 22        AND IF WE COULD ZOOM IN ON UP AT THE TOP.

10:23AM 23        MS. PETERSON, THERE APPEARS TO BE SOME LANGUAGE -- WELL,

10:24AM 24   BEFORE I ASK THAT QUESTION, DO YOU SEE THAT THIS IS AN ARTICLE

10:24AM 25   BY ROGER PARLOFF?

10:24AM   1    A.   YES.

10:24AM   2    Q.   AND UP AT THE TOP IT SAYS "1/1000TH THERANOS TESTS CAN BE

10:24AM   3    PERFORMED ON JUST A FEW DROPS OF BLOOD, OR ABOUT 1/100TH TO

10:24AM   4    1/1000TH OF ORDINARY AMOUNT."

10:24AM   5         DO YOU SEE THAT LANGUAGE?

10:24AM   6    A.   YES.

10:24AM   7    Q.   AND WAS THAT OF INTEREST TO YOU?

10:24AM   8    A.   VERY.

10:24AM   9    Q.   WHY?

10:24AM  10    A.   BECAUSE NO ONE HAD BEEN ABLE TO DO THAT BEFORE.

10:24AM  11    Q.   LET ME DRAW YOUR ATTENTION TO THE NEXT PAGE, PAGE 4.

10:24AM  12         DO YOU SEE AN IMAGE THERE?

10:24AM  13    A.   YES.

10:24AM  14    Q.   AND DO YOU RECOGNIZE THE PERSON IN THAT IMAGINE?

10:24AM  15    A.   YES.

10:24AM  16    Q.   AND WHO IS IT?

10:24AM  17    A.   THAT'S ELIZABETH HOLMES.

10:24AM  18    Q.   AND DO YOU SEE MS. HOLMES HERE IN THE COURTROOM TODAY?

10:24AM  19    A.   YES.

10:24AM  20    Q.   AND WHERE IS SHE SEATED?

10:24AM  21    A.   RIGHT THERE (INDICATING).

10:24AM  22    Q.   AT THE DEFENSE TABLE?

10:24AM  23    A.   YES.

10:24AM  24    Q.   AND CAN YOU JUST DESCRIBE FOR THE RECORD WHAT SHE'S

10:24AM  25    WEARING?

10:24AM  1    A.    SHE HAS A GREEN MASK ON.

10:25AM  2    Q.    OKAY.  THANK YOU.

10:25AM  3          WHAT DID YOU DO WITH THIS ARTICLE?

10:25AM  4    A.    READ IT.

10:25AM  5    Q.    AND WAS THIS SORT OF THE FIRST INFORMATION THAT YOU GOT IN

10:25AM  6    CONNECTION WITH THERANOS?

10:25AM  7    A.    YES, AND THEN STARTED DOING SOME GOOGLE SEARCHES ALSO.

10:25AM  8    Q.    OKAY.  LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 5432.

10:25AM  9          DO YOU HAVE THAT IN FRONT OF YOU?

10:25AM 10    A.    YES.

10:25AM 11    Q.    OKAY.  DO YOU SEE AT THE TOP AN EMAIL FROM JERRY TUBERGEN

10:25AM 12    TO ELIZABETH HOLMES WITH A COPY TO DANIEL EDLIN AND AMI NEIL?

10:25AM 13    A.    AMI, YES.

10:25AM 14    Q.    AND WHO IS MS. NEIL?

10:25AM 15    A.    AMI NEIL IS JERRY'S SECRETARY OR ASSISTANT AT THE TIME.

10:25AM 16    Q.    AND DOES IT APPEAR TO BE FORWARDING A MESSAGE FROM

10:26AM 17    MS. HOLMES ON OR ABOUT SEPTEMBER 24TH, 2014?

10:26AM 18    A.    YES.

10:26AM 19          MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5432 INTO

10:26AM 20    EVIDENCE.

10:26AM 21          MR. WADE:  NO OBJECTION.

10:26AM 22          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:26AM 23          (GOVERNMENT'S EXHIBIT 5432 WAS RECEIVED IN EVIDENCE.)

10:26AM 24    BY MR. LEACH:

10:26AM 25    Q.    LET'S START DOWN ON THE BOTTOM, MS. PETERSON.  THERE'S AN

10:26AM 1    EMAIL FROM JERRY TUBERGEN WITH A CC TO D. MOSLEY, AND THE

10:26AM 2    SUBJECT IS CONFIDENTIAL DISCLOSURE AGREEMENT.

10:26AM 3        DO YOU SEE THAT?

10:26AM 4    A.   YES.

10:26AM 5    Q.   WHO WAS D. MOSLEY?

10:26AM 6    A.   DAN MOSLEY WAS AN ESTATE ATTORNEY FOR THE FAMILY, AND HE'S

10:26AM 7    THE ONE WHO INTRODUCED US TO ELIZABETH HOLMES.

10:26AM 8    Q.   DO YOU KNOW WHETHER MR. MOSLEY ULTIMATELY INVESTED IN

10:26AM 9    THERANOS?

10:26AM 10   A.   I BELIEVE SO, YES.

10:26AM 11   Q.   AND AT OR AROUND THIS TIME, DID RDV EXECUTE A CONFIDENTIAL

10:26AM 12   DISCLOSURE AGREEMENT SO IT COULD CONSIDER INFORMATION ABOUT

10:27AM 13   THERANOS?

10:27AM 14   A.   YES.

10:27AM 15   Q.   LET'S MOVE FORWARD IN THE EMAIL CHAIN TO THE MESSAGE FROM

10:27AM 16   MS. HOLMES.

10:27AM 17       DO YOU SEE WHERE IT SAYS, "GOT IT.  WE'RE VERY MUCH

10:27AM 18   LOOKING FORWARD TO OUR MEETING"?

10:27AM 19   A.   YES.

10:27AM 20   Q.   AND DO YOU SEE MS. HOLMES WROTE, "I'VE HAD OUR TEAM

10:27AM 21   PREPARE MATERIALS FOR YOU - LET US KNOW THE BEST ADDRESS TO

10:27AM 22   WHICH TO SEND THEM AND WE'LL GET THEM OUT TO YOU."

10:27AM 23       DO YOU SEE THAT?

10:27AM 24   A.   YES.

10:27AM 25   Q.   AND ULTIMATELY DID YOU RECEIVE SOME MATERIALS RELATING TO

10:27AM   1    THERANOS?

10:27AM   2    A.   YES.

10:27AM   3    Q.   DESCRIBE FOR US WHAT YOU GOT.

10:27AM   4    A.   TWO VERY LARGE BINDERS AND A COVER LETTER.

10:27AM   5    Q.   OKAY.  AND DID YOU REVIEW THOSE MATERIALS?

10:27AM   6    A.   ALL OF IT, YES.

10:27AM   7    Q.   WHY DID YOU REVIEW ALL OF IT?

10:27AM   8    A.   TRYING TO LEARN WHAT THIS COMPANY WAS ALL ABOUT, AS WELL

10:28AM   9    AS MY PRIMARY JOB WAS TO INFORM THE FAMILY AND THE INVESTMENT

10:28AM  10    COMMITTEE ON THIS OPPORTUNITY.

10:28AM  11    Q.   AND DID YOU -- DID YOU VIEW YOUR ROLE AS INFORMING THE

10:28AM  12    FAMILY ABOUT WHAT WAS IMPORTANT AND RELEVANT TO AN INVESTMENT?

10:28AM  13    A.   YES.

10:28AM  14    Q.   DID YOU ULTIMATELY SPEAK TO MS. HOLMES BY TELEPHONE?

10:28AM  15    A.   JERRY AND I DID, YES.

10:28AM  16    Q.   OKAY.  ROUGHLY WHEN WAS THAT?

10:28AM  17    A.   FIRST COUPLE OF DAYS OF OCTOBER 2014.

10:28AM  18    Q.   OKAY.  BY THAT POINT IN TIME, HAD YOU REVIEWED THE

10:28AM  19    MATERIALS THAT THERANOS HAD SENT?

10:28AM  20    A.   I HAD I THINK JUST GOTTEN THEM THAT MORNING FROM JERRY.

10:28AM  21    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO WHAT WE HAVE MARKED

10:28AM  22    AS EXHIBIT 2015.

10:28AM  23         DO YOU RECOGNIZE THIS DOCUMENT?

10:28AM  24    A.   YES.

10:28AM  25    Q.   WHAT IS THIS?

10:28AM 1    A.   THIS WAS THE NOTES FROM THE CALL THAT WE HAD WITH

10:29AM 2    ELIZABETH ON THAT DAY, WHICH WAS THE START OF A LOT OF

10:29AM 3    INFORMATION THAT WE PULLED TOGETHER, THAT I PULLED TOGETHER FOR

10:29AM 4    THIS IN PREPARATION FOR A LONGER MEETING AT THE COMPANY A WEEK

10:29AM 5    OR TWO LATER.

10:29AM 6    Q.   DID YOU PREPARE THESE NOTES IN THE ORDINARY COURSE OF

10:29AM 7    BUSINESS?

10:29AM 8    A.   YES.

10:29AM 9    Q.   AND DID YOU MAKE AN EFFORT TO BE ACCURATE IN YOUR NOTES?

10:29AM 10   A.   VERY.

10:29AM 11   Q.   AND WAS IT YOUR REGULAR PRACTICE TO TAKE NOTES OF CALLS OF

10:29AM 12   POTENTIAL INVESTMENT OPPORTUNITIES?

10:29AM 13   A.   YES.

10:29AM 14   Q.   OKAY.

10:29AM 15        YOUR HONOR, I OFFER EXHIBIT 215.

10:29AM 16            MR. WADE:  NO OBJECTION.

10:29AM 17            MR. LEACH:  2015.  EXCUSE ME.

10:29AM 18            THE COURT:  2015 IS ADMITTED, AND IT MAY BE

10:29AM 19   PUBLISHED.

10:29AM 20        (GOVERNMENT'S EXHIBIT 2015 WAS RECEIVED IN EVIDENCE.)

10:29AM 21   BY MR. LEACH:

10:29AM 22   Q.   LET'S LOOK AT THE TOP PORTION OF YOUR NOTES, MS. PETERSON.

10:29AM 23        UP AT THE TOP IT SAYS, "THERANOS CONF CALL NOTES."

10:30AM 24        DO YOU SEE THAT?

10:30AM 25   A.   YES.

10:30AM  1     Q.   AND OCTOBER 3RD, 2014, THAT'S THE DATE OF THE MEETING?

10:30AM  2     A.   YES.

10:30AM  3     Q.   OR THE PHONE CALL?

10:30AM  4          YOU WROTE "ELIZABETH HOLMES.

10:30AM  5          "JLT, LP"

10:30AM  6          WHAT DOES THAT REFER TO?

10:30AM  7     A.   THE PEOPLE ON THE CALL.  SO ELIZABETH WAS ON THE CALL FROM

10:30AM  8     HER SIDE, AND JLT IS JERRY TUBERGEN, AND LP IS ME.

10:30AM  9     Q.   AND YOU WROTE, "WHAT IS THE LONG-TERM VISION OF THERANOS?"

10:30AM  10         WHAT WAS THAT GETTING AT?

10:30AM  11    A.   THE BOLD THINGS IN THIS MEMO ARE THE QUESTIONS THAT JERRY

10:30AM  12    AND I HAD THOUGHT OF BEFORE THE CALL.  SO THESE ARE THE

10:30AM  13    QUESTIONS THAT WE WANTED TO ASK, WITH THE REST OF IT BEING THE

10:30AM  14    ANSWERS THAT WE GOT.

10:30AM  15    Q.   OKAY.  THERE'S AN ENTRY "WALGREENS (MARKET:  11 MM."

10:30AM  16         IS THAT MILLION?

10:30AM  17    A.   YES.

10:30AM  18    Q.   " -- (TESTS/MONTH).

10:30AM  19         "BOOTS IN EUROPE."

10:30AM  20         WHAT IS THAT REFERRING TO?

10:30AM  21    A.   THE SIZE OF THE MARKET, THE PHARMACEUTICAL TESTING MARKET

10:31AM  22    WITH WALGREENS.

10:31AM  23    Q.   AND WAS THAT SOMETHING THAT YOU DISCUSSED WITH MS. HOLMES

10:31AM  24    ON THIS OCTOBER 2014 PHONE CALL?

10:31AM  25    A.   YES.

10:31AM  1    Q.   AND THERE'S A REFERENCE TO "INSURANCE, HOSPITALS/DOC

10:31AM  2    GROUPS."

10:31AM  3         WHAT DOES THAT REFER TO?

10:31AM  4    A.   THE SAME, THAT THESE WERE -- WE WERE TRYING TO GET A SENSE

10:31AM  5    OF THE MARKET.  SHE HAD REFERENCED CONTRACTS WITH MANY OF THESE

10:31AM  6    GROUPS, SO WE WERE TRYING TO GET A SENSE OF IF THEY COULD

10:31AM  7    PENETRATE THE MARKET, HOW BIG WOULD THAT BE, HOW BIG IS THE

10:31AM  8    MARKET?

10:31AM  9    Q.   IF WE CAN ZOOM OUT, MS. HOLLIMAN, AND THERE'S A BOLD ENTRY

10:31AM 10    FOR WALGREENS.  THE BOTTOM HALF OF THE PAGE WOULD BE GREAT.

10:31AM 11    THANK YOU.

10:31AM 12         DO YOU SEE THE REFERENCE TO, "WALGREENS, NATIONAL ROLLOUT,

10:31AM 13    PROJECTIONS BASED ON 900 STORES?

10:31AM 14    A.   YES.

10:31AM 15    Q.   AND WHAT DOES THAT REFER TO?

10:31AM 16    A.   WE TALKED ABOUT WALGREENS CONTRACTS WHICH WERE VERY MUCH

10:32AM 17    IN THE PRESS AT THE TIME, AND SHE WAS GOING THROUGH THAT THEY

10:32AM 18    HAD THIS CONTRACT AND THAT THEY WERE IN STORES IN ARIZONA AND

10:32AM 19    THAT THEY WERE PREPPING FOR A NATIONAL ROLLOUT AND THAT THE

10:32AM 20    PROJECTIONS THAT WERE IN -- THERE WERE TWO PAGES OF PROJECTIONS

10:32AM 21    IN THE BINDER THAT WE RECEIVED, AND THAT THE PROJECTIONS THAT

10:32AM 22    WERE THERE WERE BASED ON A ROLLOUT OF 900 STORES FOR WALGREENS

10:32AM 23    IN 2015.

10:32AM 24    Q.   SO MS. HOLMES TOLD YOU THAT THE PROJECTIONS YOU HAD WERE

10:32AM 25    BASED ON 900 STORES --

10:32AM  1    A.   YES.

10:32AM  2    Q.   -- FOR WALGREENS.

10:32AM  3         BENEATH THAT, THERE'S A BOLD HEADING, "RISKS."

10:32AM  4         "WE NOW HAVE LONG-TERM CONTRACTS, SO RISK IS EXECUTION."

10:32AM  5         WHAT DID MS. HOLMES TELL YOU ABOUT THE RISKS OF AN

10:32AM  6    INVESTMENT IN THIS PARTICULAR CALL?

10:32AM  7    A.   THAT'S EXACTLY -- WE ASKED HER WHAT THE RISKS WERE, AND

10:32AM  8    THAT WAS HER ANSWER.

10:32AM  9    Q.   WHAT DID THAT MEAN, "NOW HAVE LONG-TERM CONTRACTS, SO RISK

10:32AM 10    IS EXECUTION"?

10:33AM 11    A.   TO US IT MEANT THAT SHE HAD THESE LONG-TERM CONTRACTS AND

10:33AM 12    THEY WERE ALREADY USING THEM IN WALGREENS STORES, AND THE

10:33AM 13    EXECUTION WAS THE PEOPLE THAT SHE HAD AROUND HER AND THE

10:33AM 14    ABILITY FOR WALGREENS TO ROLL OUT AND LAUNCH IT IN DIFFERENT

10:33AM 15    MARKETS THAN JUST ARIZONA.

10:33AM 16    Q.   WAS THERE ANY DISCUSSION OF THERE BEING RISK AROUND THE

10:33AM 17    UTILITY OF THE TECHNOLOGY?

10:33AM 18    A.   NONE.

10:33AM 19    Q.   LET'S LOOK AT THE NEXT PAGE, PLEASE.  IF WE CAN ZOOM IN ON

10:33AM 20    THE HEADING.  THERE YOU GO.  THANK YOU, MS. HOLLIMAN.

10:33AM 21         DO YOU SEE HEADING, "GOALS FOR OCTOBER 14" AT THE TOP?

10:33AM 22    A.   YES.

10:33AM 23    Q.   WHAT DOES THAT REFER TO?

10:33AM 24    A.   THAT WAS THE DATE THAT WE HAD AN IN PERSON MEETING WITH

10:33AM 25    HER WITH A FEW PEOPLE FROM THE INVESTMENT COMMITTEE.

10:33AM 1    Q.   OKAY.  AND THEN THERE'S SOME WRITING UNDERNEATH THAT, "GET

10:34AM 2    TO KNOW THE PEOPLE WHO ARE MAKING THE INVESTMENT AND WILL BE

10:34AM 3    KEY IN THE RELATIONSHIP GOING FORWARD."

10:34AM 4         DO YOU SEE THAT?

10:34AM 5    A.   YES.

10:34AM 6    Q.   AND DURING THIS TIME PERIOD, DID YOU FEEL AS IF THERANOS

10:34AM 7    WAS SELECTING YOU AS AN INVESTOR?

10:34AM 8    A.   VERY MUCH SO.

10:34AM 9    Q.   EXPLAIN THAT FOR US.

10:34AM 10   A.   WE WERE VERY MUCH -- THE SITUATION WAS CHARACTERIZED THAT

10:34AM 11   SHE WAS KIND OF HAND PICKING FIVE OR SIX PRIVATE FAMILIES TO

10:34AM 12   INVEST IN HER COMPANY.  SHE DIDN'T WANT LARGE PRIVATE EQUITY

10:34AM 13   FIRMS OR INSTITUTIONAL INVESTORS BECAUSE THEIR TIMEFRAMES WERE

10:34AM 14   TOO SHORT.  THEY WANTED TO MONETIZE THAT INVESTMENT QUICKER

10:34AM 15   THAN SHE WANTED TO.

10:34AM 16        AND OFTENTIMES THEY WANT TO GO PUBLIC, AND SHE WANTED TO

10:34AM 17   STAY A PRIVATE COMPANY.

10:34AM 18        SO IT WAS VERY MUCH CHARACTERIZED AND WRITTEN IN HER

10:34AM 19   LETTER TO US WITH THE BINDERS THAT SHE WAS INVITING US TO

10:35AM 20   PARTICIPATE IN THIS OPPORTUNITY.

10:35AM 21        SO THE GET TO KNOW THE PEOPLE WHO ARE MAKING THE

10:35AM 22   INVESTMENT WAS WHAT SHE WAS SAYING, THAT THEY REALLY WANTED TO

10:35AM 23   GET TO KNOW US AS MUCH AS WE WANTED TO DO DUE DILIGENCE ON

10:35AM 24   THEM.  THEY WANTED TO UNDERSTAND WHO THE INVESTORS WERE THAT

10:35AM 25   WERE INVESTING WITH THEM.

10:35AM  1    Q.   LET ME MOVE FORWARD IN TIME AND DRAW YOUR ATTENTION TO

10:35AM  2    WHAT HAS BEEN MARKED AS EXHIBIT 2073.

10:35AM  3         DO YOU HAVE THAT, MS. PETERSON?

10:35AM  4    A.   YES.

10:35AM  5    Q.   AND DO YOU RECOGNIZE THIS?

10:35AM  6    A.   YES.

10:35AM  7    Q.   AND WHAT IS THIS?

10:35AM  8    A.   SO AFTER THAT PHONE CALL, I PUT TOGETHER A VERY THOROUGH

10:35AM  9    MEMO OF ALL OF THE THINGS THAT I HAD READ IN THE BINDER AND

10:35AM  10   EVERYTHING THAT WAS SAID ON THE PHONE CALL AND PUT IT TOGETHER

10:35AM  11   INTO A MEMO THAT THE FAMILY COULD UTILIZE IN REVIEWING THIS

10:35AM  12   OPPORTUNITY, AND WE WERE GOING TO REVIEW THIS MEMO ON THE PLANE

10:36AM  13   RIDE ON THE WAY TO THE OCTOBER 14TH MEETING.

10:36AM  14   Q.   OKAY.  WHY DID YOU PREPARE THIS MEMO?

10:36AM  15   A.   TO CONSOLIDATE ALL OF THE INFORMATION THAT WE HAD RECEIVED

10:36AM  16   SO FAR FROM MS. HOLMES --

10:36AM  17   Q.   SO --

10:36AM  18   A.   -- IN THE BINDERS.

10:36AM  19   Q.   SO THAT RDV COULD MAKE AN INVESTMENT DECISION?

10:36AM  20   A.   CORRECT.

10:36AM  21        MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 2073 INTO

10:36AM  22   EVIDENCE.

10:36AM  23        MR. WADE:  NO OBJECTION.

10:36AM  24        THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:36AM  25        (GOVERNMENT'S EXHIBIT 2073 WAS RECEIVED IN EVIDENCE.)

10:36AM 1            MR. LEACH:  AND, MS. HOLLIMAN, IF WE CAN ZOOM IN ON

10:36AM 2    THE SUBSTANCE.

10:36AM 3    Q.   MS. PETERSON, LET ME JUST GET SOME BACKGROUND FROM YOU.

10:37AM 4         DO YOU SEE THE DATE OCTOBER 12TH, 2014?

10:37AM 5    A.   YES.

10:37AM 6    Q.   AND THAT'S A FEW DAYS IN ADVANCE OF THE MEETING OUT IN

10:37AM 7    PALO ALTO?

10:37AM 8    A.   CORRECT.

10:37AM 9    Q.   AND THERE WERE SOME FOLKS.  WE TALKED ABOUT MR. TUBERGEN,

10:37AM 10   HE WAS YOUR BOSS AT THE TIME?

10:37AM 11   A.   YES.

10:37AM 12   Q.   AND IN THE CC LINE THERE'S AN INDIVIDUAL MICHAEL LUNT.

10:37AM 13   WHO IS HE?

10:37AM 14   A.   OUR IN-HOUSE COUNSEL.

10:37AM 15   Q.   AND RANDY DAMSTRA, I THINK YOU MENTIONED HIM EARLIER, BUT

10:37AM 16   WHO IS HE?

10:37AM 17   A.   HE RAN THE INVESTMENT GROUP.

10:37AM 18   Q.   YOU WRITE TO THIS GROUP IN THE THIRD LINE, "I THINK IT

10:37AM 19   GIVES YOU AND THE FAMILY MEMBERS GOING ON THIS TRIP A SHORT BUT

10:37AM 20   SOLID BASIS OF THE COMPANY, ITS OBJECTIVES, ITS HISTORY, ITS

10:37AM 21   ADVANTAGES, ITS SKEPTIC'S VIEWS, ET CETERA, AND ENOUGH OF A

10:37AM 22   VIEW TO HAVE AN ENGAGED AND PRODUCTIVE MEETING ON TUESDAY

10:37AM 23   WITHOUT HAVING TO READ THROUGH THE FOOT OF MATERIALS SHE SENT."

10:37AM 24        IS THAT A FAIR SUMMARY OF WHAT YOU WERE TRYING TO DO?

10:37AM 25   A.   YES.

10:37AM  1   Q.  AND THE FOOT OF MATERIALS, THOSE WERE THE BINDERS THAT YOU

10:38AM  2   PERSONALLY REVIEWED?

10:38AM  3   A.  YES.

10:38AM  4   Q.  AND LET'S LOOK AT YOUR MEMO.  IF WE CAN GO TO PAGE 4, AND

10:38AM  5   IF WE CAN ZOOM IN ON THE TOP HALF.

10:38AM  6        PERFECT, MS. HOLLIMAN.  THANK YOU.

10:38AM  7        DO YOU SEE WHERE IT SAYS, "RECAP OF CONVERSATIONS WITH

10:38AM  8   ELIZABETH HOLMES, FOUNDER AND CEO OF THERANOS, AND EXCERPTS

10:38AM  9   FROM WRITTEN MATERIALS PROVIDED TO RDV ON THE COMPANY"?

10:38AM  10  A.  YES.

10:38AM  11  Q.  AND AT THIS POINT, DID YOU HAVE ANY OTHER SOURCE OF

10:38AM  12  INFORMATION FROM THERANOS BESIDES MS. HOLMES?

10:38AM  13  A.  THE PHONE CALL FROM MS. HOLMES AND THE BINDERS WERE THE

10:38AM  14  TWO THINGS, AS WELL AS WHAT I COULD FIND ON THE INTERNET.

10:38AM  15  Q.  OKAY.  YOU WRITE UNDER THE HEADING, "WHAT IS THERANOS

10:38AM  16  TODAY?

10:38AM  17       "INSTEAD OF VIALS OF BLOOD (ONE FOR EVERY TEST NEEDED),

10:38AM  18  THERANOS REQUIRES ONLY A PINPRICK AND A DROP OF BLOOD TO

10:38AM  19  PERFORM HUNDREDS OF TESTS, FROM STANDARD CHOLESTEROL CHECKS TO

10:39AM  20  SOPHISTICATED GENETIC ANALYSES."

10:39AM  21       DO YOU SEE THAT?

10:39AM  22  A.  YES.

10:39AM  23  Q.  WHERE DID YOU GET THAT INFORMATION?

10:39AM  24  A.  FROM MS. HOLMES AND THE MATERIALS.

10:39AM  25  Q.  AND WAS THAT RELEVANT TO YOU?

10:39AM  1    A.   YES.

10:39AM  2    Q.   WHY?

10:39AM  3    A.   BECAUSE IT SAID THAT THEY COULD DO HUNDREDS OF TESTS WITH

10:39AM  4    A PINPRICK WITH A FINGERSTICK OF BLOOD.

10:39AM  5    Q.   IT THEN SAYS, "THE RESULTS ARE FASTER (COUPLE HOURS), MORE

10:39AM  6    ACCURATE (100 PERCENT AUTOMATED, NO MANUAL HANDLING OF THE

10:39AM  7    SAMPLE), AND FAR CHEAPER THAN CONVENTIONAL METHODS."

10:39AM  8         DO YOU SEE THAT LANGUAGE?

10:39AM  9    A.   YES.

10:39AM 10    Q.   AND WHERE DID YOU GET THAT INFORMATION?

10:39AM 11    A.   THAT WAS IN THE MATERIALS, AND WE TALKED ABOUT IT ON THE

10:39AM 12    PHONE CALL AS WELL.

10:39AM 13    Q.   WAS THAT RELEVANT TO YOUR ANALYSIS OF THERANOS?

10:39AM 14    A.   YES.

10:39AM 15    Q.   HOW SO?

10:39AM 16    A.   IT SHOWED THAT THIS WAS GOING TO BE A GAME CHANGER FOR

10:39AM 17    HEALTH CARE.

10:40AM 18    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 5 OF THE

10:40AM 19    EXHIBIT.

10:40AM 20         DO YOU SEE THE HEADING, "WHAT ARE THE MAIN RISKS THAT

10:40AM 21    THERANOS FACES?"

10:40AM 22    A.   YES.

10:40AM 23    Q.   AND IN THAT FIRST SENTENCE, YOU WROTE, "HOLMES BELIEVES

10:40AM 24    THE COMPANY'S PRIMARY RISK IS THE EXECUTION OF ITS BUSINESS

10:40AM 25    PLAN RATHER THAN TECHNOLOGY, VALIDATION, AND CUSTOMER

10:40AM 1    ACCEPTANCE."

10:40AM 2        DO YOU SEE THAT LANGUAGE?

10:40AM 3    A.   YES.

10:40AM 4    Q.   AND WHERE DID YOU GET THAT INFORMATION?

10:40AM 5    A.   WE TALKED ABOUT THAT ON THE PHONE, AS WELL AS IT'S IN HER

10:40AM 6    PACKET OF INFORMATION.

10:40AM 7    Q.   AND WAS IT RELEVANT TO YOU THAT THE COMPANY'S PRIMARY RISK

10:40AM 8    WAS EXECUTION RATHER THAN TECHNOLOGY VALIDATION?

10:40AM 9    A.   YES.

10:40AM 10   Q.   HOW SO?

10:40AM 11   A.   IT GOES ON FURTHER TO SAY THAT IT HAD BEEN DOING WORK FOR

10:40AM 12   PHARMACEUTICAL COMPANIES FOR THE LAST 9 YEARS, 10 OF THE TOP

10:41AM 13   15, AND THAT LENDED A LOT OF CREDIBILITY THAT WHAT SHE WAS

10:41AM 14   SAYING WAS TRUE, THAT THESE TESTS, THE FINGERSTICK TESTS

10:41AM 15   WORKED.

10:41AM 16   Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO THE BOTTOM OF

10:41AM 17   PAGE 5.

10:41AM 18       DO YOU SEE THE HEADING, "WHAT ARE THERANOS'S KEY

10:41AM 19   OBJECTIVES FOR THE MEETING ON OCTOBER 14TH?"

10:41AM 20   A.   YES.

10:41AM 21   Q.   AND THE LAST SENTENCE SAYS, "THUS, HOLMES AND THE THERANOS

10:41AM 22   TEAM WANT TO GET TO KNOW THE PEOPLE MAKING THE INVESTMENT,

10:41AM 23   UNDERSTANDING THEIR INVESTMENT PHILOSOPHY, AND TARGET

10:41AM 24   INVESTMENT PROFILE, AS WELL AS MEET IN PERSON THOSE WHO WILL BE

10:41AM 25   INTERACTING WITH THE COMPANY ON A GO-FORWARD BASIS."

10:41AM  1        IS THAT WHAT WE TALKED ABOUT EARLIER IN TERMS OF THERE WAS

10:41AM  2    AN ELEMENT OF THERANOS SELECTING YOU FOR THIS?

10:41AM  3    A.   YES, AND WE TALKED ABOUT THAT SPECIFICALLY ON THE PHONE

10:41AM  4    CALL.

10:41AM  5    Q.   AND "YOU" MEANING RDV, NOT "YOU" LISA PETERSON?

10:41AM  6    A.   CORRECT.

10:41AM  7    Q.   LET'S LOOK BRIEFLY AT PAGE 6.

10:42AM  8        AND IF WE CAN ZOOM IN ON THE TOP HALF OF THE PAGE,

10:42AM  9    MS. HOLLIMAN.  THAT'S GOOD.

10:42AM  10       UP AT THE TOP, IT READS, "APPENDIX - STATISTICS AND

10:42AM  11   NOTEWORTHY ITEMS."

10:42AM  12       DO YOU SEE THAT, MS. PETERSON?

10:42AM  13   A.   YES.

10:42AM  14   Q.   AND WHAT DID YOU MEAN BY THAT?

10:42AM  15   A.   A LOT OF THIS WAS TAKEN FROM THE BINDERS THAT WE RECEIVED,

10:42AM  16   OTHER THAN THIS SKEPTIC COMMENT AT THE BOTTOM OF THE PAGE,

10:42AM  17   WHICH WERE MORE FOUND ONLINE.

10:42AM  18   Q.   AND WHY DID YOU INCLUDE THIS IN YOUR MEMO?

10:42AM  19   A.   BECAUSE I WANTED THE FAMILY MEMBERS GOING ON THE TRIP AND

10:42AM  20   THE INVESTMENT COMMITTEE TO UNDERSTAND ALL OF THE THINGS THAT

10:42AM  21   IT COULD DO.

10:42AM  22   Q.   OKAY.  AND ALL OF THE INFORMATION THAT YOU THOUGHT WAS

10:42AM  23   IMPORTANT?

10:42AM  24   A.   YES.

10:42AM  25   Q.   LET ME DRAW YOUR ATTENTION TO THE THIRD BULLET.

10:42AM 1    DO YOU SEE WHERE IT SAYS IN THE SECOND SENTENCE, "THERANOS

10:42AM 2 AUTOMATES THE PRE- AND POST-ANALYTIC PROCESSES (NO MANUAL

10:43AM 3 HANDLING OF THE SAMPLE), DRASTICALLY MINIMIZING THE HUMAN

10:43AM 4 ELEMENTS OF PROCESSING IS WHICH IS PROVEN TO CAUSE THE MAJORITY

10:43AM 5 OF LAB TEST ERRORS."

10:43AM 6    DO YOU SEE THAT?

10:43AM 7 A. YES.

10:43AM 8 Q. AND WHERE DID YOU GET THAT INFORMATION?

10:43AM 9 A. I BELIEVE IT WAS BOTH IN THE BINDERS, AND WE ALSO TALKED

10:43AM 10 ABOUT THAT AS WELL, THAT SHE HAD MENTIONED THAT MOST OF THE

10:43AM 11 ISSUES -- THINGS THAT WENT WRONG WAS FROM THE PEOPLE PERSONALLY

10:43AM 12 HANDLING THE BLOOD AND THE ASSAYS.

10:43AM 13 Q. AND WAS THIS ATTRACTIVE TO YOU?

10:43AM 14 A. YES.

10:43AM 15 Q. LET'S MOVE DOWN TO THE BOTTOM HALF OF THE PAGE.  AND I

10:43AM 16 WANT TO DRAW YOUR ATTENTION, MS. PETERSON, TO THE THIRD BULLET

10:43AM 17 ON THE SCREEN WHERE IT SAYS, "THERANOS USES THEIR OWN ANALYZER

10:43AM 18 EQUIPMENT."

10:44AM 19    DO YOU SEE THAT LANGUAGE?

10:44AM 20 A. YES.

10:44AM 21 Q. AND WHY WERE YOU INCLUDING THIS IN YOUR MEMO?

10:44AM 22 A. BECAUSE THIS WAS THE REASON GIVEN THAT THEY DIDN'T HAVE TO

10:44AM 23 HAVE FDA APPROVAL.

10:44AM 24 Q. AND WHERE DID YOU GET THIS INFORMATION, THAT "THERANOS

10:44AM 25 USES THEIR OWN ANALYZER EQUIPMENT"?

10:44AM 1    A.   BOTH FROM CONVERSATIONS AND THE BINDERS.

10:44AM 2    Q.   CONVERSATIONS WITH MS. HOLMES?

10:44AM 3    A.   YES.

10:44AM 4    Q.   AND WAS THAT IMPORTANT TO YOU?

10:44AM 5    A.   YES.

10:44AM 6    Q.   WHY?

10:44AM 7    A.   BECAUSE, AGAIN, IT ALL LENDS CREDIBILITY TO THE FACT THAT

10:44AM 8    THE ANALYZER WORKS.

10:44AM 9    Q.   OKAY.  IN THE NEXT BULLET, IT SAYS, "A THERANOS ANALYZER

10:44AM 10   STATION IS A SMALL FRACTION OF THE SIZE OF A CURRENT LAB,

10:44AM 11   MAKING IT POSSIBLE TO PLACE A THERANOS LAB IN THE OPERATING

10:44AM 12   ROOM OR IN A MILITARY EVACUATION HELICOPTER, ON SHIPS, IN

10:44AM 13   REFUGEE CAMPS, VIRTUALLY ANYWHERE."

10:44AM 14        DO YOU SEE THAT LANGUAGE?

10:44AM 15   A.   YES.

10:44AM 16   Q.   AND WAS THAT RELEVANT TO YOU?

10:44AM 17   A.   VERY MUCH SO.

10:45AM 18   Q.   OKAY.

10:45AM 19   A.   IT MADE IT PORTABLE.

10:45AM 20   Q.   AND WHERE DID YOU GET THIS INFORMATION?

10:45AM 21   A.   FROM THE CONVERSATIONS AND THE BINDERS.  MOSTLY THAT ONE

10:45AM 22   IN THE CONVERSATIONS.  WE TALKED ABOUT CERTAIN INSTANCES IN

10:45AM 23   WHICH THEY WERE USING THE ANALYZER IN REAL LIFE.

10:45AM 24   Q.   MS. HOLMES TOLD YOU THAT?

10:45AM 25   A.   YES.

10:45AM  1    Q.   AND WHAT DID SHE SAY?

10:45AM  2    A.   THAT THEY WERE USING THEM ON MILITARY HELICOPTERS, AND

10:45AM  3    AGAIN, THEY WERE USING THEM IN CLINICAL TRIALS WITH

10:45AM  4    PHARMACEUTICAL COMPANIES.

10:45AM  5    Q.   IN THE NEXT BULLET IT SAYS, "INCUMBENT PLAYERS CRITICIZE

10:45AM  6    THERANOS'S LACK OF PUBLICATION OF ANY VALIDATION STUDIES IN

10:45AM  7    PEER-REVIEW JOURNALS."

10:45AM  8         DO YOU SEE THAT LANGUAGE?

10:45AM  9    A.   YES.

10:45AM  10   Q.   AND THEN FURTHER ON IT SAYS, "UNLIKE MOST LABS, THERANOS

10:45AM  11   DOES NOT BUY ANALYZER EQUIPMENT FROM A THIRD PARTY, AND THEY DO

10:45AM  12   NOT SELL THEIR ANALYZERS TO OTHER LABS."

10:45AM  13        DO YOU SEE THAT?

10:45AM  14   A.   YES.

10:45AM  15   Q.   AND WHERE DID YOU GET THAT INFORMATION?

10:45AM  16   A.   FROM OUR CONVERSATION AND THE BINDERS.  MOSTLY OUR

10:46AM  17   CONVERSATION AROUND THAT ONE.

10:46AM  18   Q.   WAS THAT RELEVANT TO YOU?

10:46AM  19   A.   VERY.

10:46AM  20   Q.   AND WHY WAS IT RELEVANT THAT THERANOS DID NOT BUY ANALYZER

10:46AM  21   EQUIPMENT FROM THIRD PARTIES?

10:46AM  22   A.   BECAUSE IT WAS DIFFERENT THAN THE COMPETITORS AND IT MEANT

10:46AM  23   THAT THEY DIDN'T HAVE TO HAVE FDA APPROVAL.

10:46AM  24   Q.   DID MS. HOLMES EVER TALK TO YOU ABOUT THE CONCEPT OF A LAB

10:46AM  25   IN A BOX?

10:46AM 1     A.   YES.

10:46AM 2     Q.   AND TELL US ABOUT THAT, PLEASE.

10:46AM 3     A.   THAT WAS ESSENTIALLY WHAT -- HOW SHE DESCRIBED HER

10:46AM 4     ANALYZER, THAT IT WAS A LAB IN A BOX AND IT WAS PORTABLE AND

10:46AM 5     THAT THEY COULD DO HUNDREDS OF TESTS ON THAT BOX, AND THE GOAL

10:46AM 6     WAS TO GET WITHIN, LIKE, FIVE MILES OF EVERY CONSUMER.

10:46AM 7     Q.   LET ME MOVE FORWARD IN TIME TO THE MEETING THAT YOU

10:46AM 8     DESCRIBED IN PALO ALTO.

10:46AM 9          DID THAT HAPPEN ON OR ABOUT OCTOBER 14TH?

10:46AM 10    A.   YES.

10:46AM 11    Q.   AND YOU FLEW OUT PERSONALLY FOR THAT MEETING?

10:46AM 12    A.   YES.

10:46AM 13    Q.   AND WHO ELSE WAS THERE?

10:46AM 14    A.   DOUG DEVOS WAS THERE, WHO CHAIRED THE INVESTMENT

10:46AM 15    COMMITTEE; RICK DEVOS, WHO WAS ON THE INVESTMENT COMMITTEE;

10:47AM 16    CHERI DEVOS, WHO WAS A SIBLING OF DOUG DEVOS; AND

10:47AM 17    JERRY TUBERGEN AND MYSELF.

10:47AM 18    Q.   AND WHY DID YOU ATTEND?

10:47AM 19    A.   AGAIN, I WAS FACILITATING ALL OF THE INFORMATION AND

10:47AM 20    HELPING THEM WITH INFORMING THEM ON THE INVESTMENT AND

10:47AM 21    LISTENING AND TAKING A LOT OF NOTES.

10:47AM 22    Q.   AND WHO WAS THERE FROM THE THERANOS SIDE?

10:47AM 23    A.   ELIZABETH HOLMES AND SUNNY BALWANI.

10:47AM 24    Q.   DID YOU -- WAS THERE SOME TYPE OF POWERPOINT PRESENTATION

10:47AM 25    DURING THE MEETING?

10:47AM   1    A.   NO.

10:47AM   2    Q.   OKAY.  DID YOU SEE ANY DEVICES DURING YOUR TIME?

10:47AM   3    A.   YES.

10:47AM   4    Q.   AND WHAT DID YOU SEE?

10:47AM   5    A.   THEY SHOWED US THE ANALYZER AND RAN IT, AND THEN

10:47AM   6    EVENTUALLY TOWARDS THE END OF THE TOUR CHERI HAD HER BLOOD

10:47AM   7    TESTED.

10:47AM   8    Q.   AND DESCRIBE THE ANALYZER THAT YOU SAW FOR US.

10:47AM   9    A.   IT LOOKED LIKE A COMPUTER TOWER.  IT WAS SMALL AND

10:48AM  10    PORTABLE.

10:48AM  11    Q.   OKAY.  AND DID THEY SHOW YOU ANY THIRD PARTY DEVICES?

10:48AM  12    A.   NO.

10:48AM  13    Q.   DID YOU SEE ANY OF THE PRODUCTION FACILITIES?

10:48AM  14    A.   NO.

10:48AM  15    Q.   DID YOU STEP INTO THE CLINICAL LABORATORY?

10:48AM  16    A.   NO, NO.

10:48AM  17    Q.   OKAY.  YOU SAID CHERI DEVOS'S BLOOD WAS DRAWN?

10:48AM  18    A.   YES.

10:48AM  19    Q.   AND DESCRIBE THAT FOR US, PLEASE.

10:48AM  20    A.   THEY HAD -- A PART OF THE BUILDING THAT THEY WERE IN HAD

10:48AM  21    A -- WHAT LOOKED LIKE SOME SMALL LITTLE WALK-IN CLINICAL

10:48AM  22    CLINIC, AND SHE WENT IN AND THEY DID A FINGERSTICK TEST ON HER

10:48AM  23    AND, TO MY KNOWLEDGE, SHE RECEIVED THE RESULTS.

10:48AM  24    Q.   BUT YOU NEVER SAW THE RESULTS?

10:48AM  25    A.   NO, HUH-UH.

10:48AM 1    Q.   AND WAS THIS IN THE ROOM WITH THE ANALYZER THAT YOU

10:48AM 2    DESCRIBED?

10:48AM 3    A.   NOT THE ONE THAT WE -- THERE WERE TWO DIFFERENT ROOMS.  WE

10:48AM 4    WENT IN ONE ROOM WHERE THEY SHOWED US HOW IT WORKED, AND THEN

10:48AM 5    CHERI WENT INTO A LITTLE CLINIC AREA WITH ANOTHER ANALYZER, TWO

10:49AM 6    DIFFERENT AREAS OF THE BUILDING.

10:49AM 7    Q.   AND HOW LONG DID THIS MEETING LAST?

10:49AM 8    A.   ABOUT FOUR OR FIVE HOURS.

10:49AM 9    Q.   HOW DID IT END?

10:49AM 10   A.   HOW DID IT END?  WE, WE TALKED FOR A LONG, LONG TIME AND

10:49AM 11   EVERYTHING WAS VERY FAVORABLE TOWARDS THE END.  AND WE DEPARTED

10:49AM 12   AND CAUCUSED IN THE -- I WAS GOING IN A DIFFERENT LOCATION AND

10:49AM 13   EVERYONE ELSE WAS GOING BACK ON THE PLANE, AND WE CAUCUSED OUT

10:49AM 14   WHERE WE PARKED FOR, I DON'T KNOW, A GOOD 15 OR 20 MINUTES.

10:49AM 15   Q.   DID YOU WRITE A CHECK THEN AND THERE?

10:49AM 16   A.   NO.  NO.  BUT THERE WAS CONVERSATION AROUND MOVING OUR

10:49AM 17   AMOUNT.  WHEN WE WENT TO THAT MEETING, THE THOUGHT WAS TO DO

10:49AM 18   50 MILLION POTENTIALLY, THAT'S WHAT WE WERE LOOKING AT; AND

10:49AM 19   WHEN WE LEFT THE MEETING -- THEY HAD TALKED IN THE MEETING

10:50AM 20   ABOUT OTHER INVESTORS COMING IN FOR 100 MILLION, AND SO THE

10:50AM 21   FAMILY, DOUG AND JERRY, THOUGHT THAT 100 MIGHT BE A BETTER

10:50AM 22   NUMBER FOR US TO DO.

10:50AM 23   Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO WHAT HAS BEEN

10:50AM 24   MARKED AS EXHIBIT 4858 IN YOUR BINDER.

10:50AM 25        DO YOU RECOGNIZE THIS DOCUMENTED?

| | | |
|---|---|---|
| 10:50AM | 1 | A.  YES. |
| 10:50AM | 2 | Q.  AND WHAT IS IT? |
| 10:50AM | 3 | A.  THIS IS PART OF THE BINDERS THAT CAME AS PART OF THE |
| 10:50AM | 4 | DILIGENCE PACKETS. |
| 10:50AM | 5 | Q.  AND DID YOU REVIEW THIS -- |
| 10:50AM | 6 | A.  YES. |
| 10:50AM | 7 | Q.  LET ME PLEASE FINISH MY QUESTION. |
| 10:50AM | 8 | DID YOU REVIEW THIS AS PART OF PROVIDING INFORMATION TO |
| 10:50AM | 9 | RDV SO THAT IT COULD MAKE AN INVESTMENT DECISION? |
| 10:50AM | 10 | A.  YES, THOROUGHLY. |
| 10:50AM | 11 | MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 4858. |
| 10:51AM | 12 | MR. WADE:  LET ME JUST BE CLEAR.  WAS THIS THE |
| 10:51AM | 13 | ENTIRE BINDER THAT WAS OFFERED, OR IS THIS AN EXCERPT? |
| 10:51AM | 14 | MR. LEACH:  I'LL ASK THE WITNESS. |
| 10:51AM | 15 | Q.  DO YOU KNOW, IS THIS THE ENTIRETY OF THE BINDER OR A |
| 10:51AM | 16 | PORTION OF THE BINDER? |
| 10:51AM | 17 | A.  NO.  NO. |
| 10:51AM | 18 | MR. WADE:  NO OBJECTION. |
| 10:51AM | 19 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:51AM | 20 | (GOVERNMENT'S EXHIBIT 4858 WAS RECEIVED IN EVIDENCE.) |
| 10:51AM | 21 | BY MR. LEACH: |
| 10:51AM | 22 | Q.  DO YOU SEE THE HEADING THERANOS CONFIDENTIAL OVERVIEW, |
| 10:51AM | 23 | MS. PETERSON? |
| 10:51AM | 24 | A.  YES. |
| 10:51AM | 25 | Q.  AND LET ME PLEASE DRAW YOUR ATTENTION TO PAGE 3.  THERE'S |

10:51AM  1    SOME HIGHLIGHTING AND SOME HANDWRITING ON PAGE 3.

10:51AM  2         DO YOU SEE THAT?

10:51AM  3    A.   YES.

10:51AM  4    Q.   IS THAT YOUR HIGHLIGHTING AND HANDWRITING?

10:52AM  5    A.   YES.

10:52AM  6    Q.   OKAY.  IT SAYS IN BLACK IN THE -- WHERE THE HIGHLIGHTING

10:52AM  7    IS, "THERANOS'S PROPRIETARY PATENTED TECHNOLOGY RUNS

10:52AM  8    COMPREHENSIVE BLOOD TESTS FROM A FINGERSTICK AND TESTS FOR

10:52AM  9    MICRO-SAMPLES OF OTHER MATRICES AND GENERATES SIGNIFICANTLY

10:52AM 10    HIGHER INTEGRITY DATA THAN CURRENTLY POSSIBLE."

10:52AM 11         DO YOU SEE THAT LANGUAGE?

10:52AM 12    A.   YES.

10:52AM 13    Q.   AND IS THAT CONSISTENT WITH STATEMENTS THAT MS. HOLMES

10:52AM 14    MADE TO YOU ON YOUR PHONE CALL WITH HER AND IN PALO ALTO?

10:52AM 15    A.   YES.

10:52AM 16    Q.   AND WAS THIS IMPORTANT TO YOU?

10:52AM 17    A.   VERY, YES.

10:52AM 18    Q.   IN THE NEXT ENTRY IT SAYS, "THERANOS IS THE WORLD'S FIRST

10:52AM 19    AND ONLY CLIA-CERTIFIED LABORATORY RUNNING ITS TESTS ON

10:52AM 20    MICRO-SAMPLES."

10:52AM 21         AND THEN YOU WROTE "CLINICAL LAB IMPROVEMENT AMENDMENTS."

10:52AM 22         IS THAT THE ACRONYM FOR CLIA?

10:52AM 23    A.   YES.

10:52AM 24    Q.   BEFORE THIS INVESTMENT, DID YOU HAVE ANY EXPERIENCE WITH

10:53AM 25    CLIA?

10:53AM 1    A.   NO.

10:53AM 2    Q.   LET'S LOOK AT PAGE 5, PLEASE.

10:53AM 3        DO YOU SEE THE HEADING, "THERANOS IS CERTIFIED AS A HIGH

10:53AM 4    COMPLEXITY CLIA LABORATORY"?

10:53AM 5    A.   YES.

10:53AM 6    Q.   AND THEN THERE'S A GREEN BAR, "HIGH COMPLEXITY REQUIRES

10:53AM 7    THE HIGHEST LEVEL OF TRAINING, TECHNIQUE, RESULT

10:53AM 8    INTERPRETATION, MOST STRINGENT STANDARDS, LABS ARE SURVEYED

10:53AM 9    ROUTINELY AND RANDOMLY."

10:53AM 10       WAS THIS IMPRESSIVE TO YOU?

10:53AM 11    A.   YES.

10:53AM 12    Q.   HOW SO?

10:53AM 13    A.   IT SHOWED THAT IT WAS A HIGH COMPLEXITY LAB, THAT THEY

10:53AM 14    WERE RUNNING SOMETHING THAT WAS VERY COMPLEX AND DOING IT

10:53AM 15    ACCURATELY.

10:53AM 16    Q.   AND WAS THAT SOMETHING THAT MS. HOLMES HELD OUT TO YOU IN

10:53AM 17    YOUR MEETING OUT IN CALIFORNIA?

10:53AM 18    A.   YES.

10:53AM 19    Q.   OKAY.  LET'S LOOK AT PAGE 7, PLEASE.

10:54AM 20       DO YOU SEE THE HEADING, "THERANOS PROFICIENCY TESTING AND

10:54AM 21    AUDITS"?

10:54AM 22    A.   YES.

10:54AM 23    Q.   AND DO YOU SEE THE LANGUAGE, "SINCE 2011 THERANOS'S CLIA

10:54AM 24    LAB HAS BEEN SUBJECTED TO REGULAR PROFICIENCY TESTING BY

10:54AM 25    MULTIPLE NATIONALLY RECOGNIZED AGENCIES"?

10:54AM 1          DO YOU SEE THAT LANGUAGE?

10:54AM 2     A.   YES.

10:54AM 3     Q.   AND WAS THIS IMPRESSIVE TO YOU?

10:54AM 4     A.   YES.

10:54AM 5     Q.   AND DID YOU UNDERSTAND THAT THERANOS'S MINILAB DEVICE WAS

10:54AM 6     BEING USED IN THE CLIA LAB SINCE 2011?

10:54AM 7     A.   YES.

10:54AM 8     Q.   AND DID YOU UNDERSTAND THAT THIS PROFICIENCY TESTING WAS

10:54AM 9     DONE WITH RESPECT TO THERANOS'S MINILAB DEVICES BETWEEN 2011

10:54AM 10    AND 2014?

10:54AM 11    A.   YES.

10:54AM 12    Q.   AND IF THIS PROFICIENCY TESTING HAD RELATED TO ORDINARY

10:54AM 13    FDA APPROVED MACHINES, WOULD THAT HAVE BEEN AS IMPRESSIVE TO

10:54AM 14    YOU?

10:54AM 15    A.   IT WOULDN'T HAVE BEEN AS IMPRESSIVE.  IT WOULD HAVE BEEN

10:54AM 16    IMPRESSIVE, BUT NOT AS IMPRESSIVE AS THIS BECAUSE THIS HADN'T

10:54AM 17    BEEN DONE BEFORE, THE FINGERSTICK.

10:55AM 18    Q.   PLEASE GO FORWARD TO PAGE 8.

10:55AM 19         DO YOU SEE THE HEADING "VALIDATION OF THERANOS TESTS"?

10:55AM 20    A.   YES.

10:55AM 21    Q.   AND BENEATH THAT IT SAYS, "THERANOS HAS BEEN

10:55AM 22    COMPREHENSIVELY VALIDATED OVER THE COURSE OF THE LAST SEVEN

10:55AM 23    YEARS BY 10 OF THE 15 LARGEST PHARMACEUTICAL COMPANIES, WITH

10:55AM 24    HUNDREDS OF THOUSANDS OF ASSAYS PROCESSED."

10:55AM 25         I THINK YOU MENTIONED THIS EARLIER IN RESPECT OF YOUR

10:55AM 1      MEMO.  WAS THIS IMPRESSIVE TO YOU?

10:55AM 2      A.   YES.

10:55AM 3      Q.   HOW SO?

10:55AM 4      A.   IT, IT SAYS THAT THE -- WE TALKED ABOUT IT ALSO AT THE

10:55AM 5      OCTOBER 14TH MEETING.  I MEAN, IT WAS VERY IMPRESSIVE TO US

10:55AM 6      THAT THEY HAD BEEN WORKING WITH PHARMACEUTICAL COMPANIES FOR

10:55AM 7      THE LAST SO MANY YEARS AND DOING CLINICAL TRIALS.

10:55AM 8          THEY WENT ON TO SAY THAT THEIR FINGERSTICK TECHNOLOGY WAS

10:55AM 9      GREAT BECAUSE THEY COULD TEST SUBJECTS MULTIPLE TIMES A DAY,

10:56AM 10     WHERE YOU COULDN'T DO THAT WITH A VENOUS TEST.

10:56AM 11         AND, YES, IT WAS -- IT DEFINITELY LENT CREDIBILITY THAT

10:56AM 12     THE TECHNOLOGY WORKS.

10:56AM 13     Q.   PLEASE MOVE FORWARD TO PAGE 12.

10:56AM 14         DO YOU SEE THE HEADING "OVERVIEW OF CURRENT LABORATORY"?

10:56AM 15     A.   YES.

10:56AM 16     Q.   AND THERE IS SOME HIGHLIGHTING AND HANDWRITING.  IS THAT

10:56AM 17     YOUR HIGHLIGHTING AND HANDWRITING?

10:56AM 18     A.   YES.

10:56AM 19     Q.   OKAY.  IN THE FIRST BULLET IT SAYS, "DECADES OLD BUSINESS

10:56AM 20     PROCESSES - AND TECHNOLOGY INVESTMENTS AROUND THOSE BUSINESS

10:56AM 21     PROCESSES - WITH VERY LITTLE MOTIVATION TO INNOVATE, HAS

10:56AM 22     CREATED A DUOPOLY OF BUSINESSES BURDENED WITH INFRASTRUCTURE

10:56AM 23     COSTS AND LITTLE/NO R&D."

10:56AM 24         DO YOU SEE THAT?

10:56AM 25     A.   YES.



10:56AM 1    Q.   AND YOU WROTE QUEST LAB CORP. TO THE RIGHT.

10:57AM 2         WHY DID YOU WRITE THAT?

10:57AM 3    A.   THAT WAS REFERRING TO THE DUOPOLY.

10:57AM 4    Q.   AND WHAT DID MS. HOLMES SAY TO YOU IN TERMS OF THERANOS'S

10:57AM 5    INFRASTRUCTURE COSTS AND R&D INVESTMENTS?

10:57AM 6    A.   THAT THEY WERE OFFERING THE MARKET TEST RESULTS AT 50 TO

10:57AM 7    90 PERCENT LESS COSTS, WHICH WAS GOING TO BE VERY BIG FOR THE

10:57AM 8    HEALTH CARE INDUSTRY.

10:57AM 9    Q.   PLEASE LOOK AT PAGE 14.  DO YOU SEE THE HEADING "COST

10:57AM 10   SAVINGS"?

10:57AM 11   A.   YES.

10:57AM 12   Q.   AND IS THIS ANOTHER SLIDE THAT YOU REVIEWED AS PART OF

10:57AM 13   YOUR REVIEW OF THE THERANOS OPPORTUNITY?

10:57AM 14   A.   YES.

10:57AM 15   Q.   AND GENERALLY SPEAKING, WAS THE INFORMATION IN THIS

10:57AM 16   POWERPOINT RELEVANT TO YOU?

10:57AM 17   A.   YES, VERY.

10:57AM 18   Q.   OKAY.  THIS SAYS, "THE FULL RANGE OF TESTS.  A FRACTION OF

10:58AM 19   THE COSTS."

10:58AM 20        AND THEN YOU HIGHLIGHTED 50 PERCENT.

10:58AM 21        WHAT DID YOU UNDERSTAND THIS TO MEAN?

10:58AM 22   A.   WE WERE TOLD MULTIPLE TIMES THAT THEY COULD OFFER HUNDREDS

10:58AM 23   OF TESTS.  OUR THOUGHT WAS 200 TO 300 TESTS VIA FINGERSTICK ON

10:58AM 24   THE ANALYZER, AND THEY WERE DONE AT 50 TO 90 PERCENT OF THE

10:58AM 25   COSTS, AND ALL OF THE COSTS SHE SAID WERE PUBLISHED ON THEIR

10:58AM 1    WEBSITE.

10:58AM 2    Q.   AND THIS COST SAVINGS SLIDE CONTINUES ON TO PAGE 15.  IF

10:58AM 3    WE COULD PLEASE LOOK AT THAT.

10:58AM 4         AND THERE'S SOME MORE HIGHLIGHTING AND HANDWRITING DOWN AT

10:58AM 5    THE BOTTOM.  THERE'S A BULLET, "THE UNPRECEDENTED LACK OF

10:58AM 6    VARIATION FROM SYSTEM TO SYSTEM YIELDS HIGHER INTEGRITY DATA."

10:58AM 7         DO YOU SEE THAT?

10:58AM 8    A.   YES.

10:58AM 9    Q.   AND YOU WROTE "THERANOS IS STANDARDIZED"?

10:58AM 10   A.   YES.

10:58AM 11   Q.   WHAT DID THAT REFER TO?

10:58AM 12   A.   THAT THERE WASN'T ANY KIND OF MANUAL HUMAN INTERACTION

10:59AM 13   WITH THE MACHINE, SO IT WAS MY WAY OF SAYING IT WAS

10:59AM 14   STANDARDIZED.

10:59AM 15   Q.   OKAY.  AND THAT'S INFORMATION THAT YOU GOT FROM

10:59AM 16   MS. HOLMES?

10:59AM 17   A.   YES.

10:59AM 18   Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 28.

10:59AM 19        DO YOU SEE THE HEADING, "SAME TESTS, A WHOLE NEW

10:59AM 20   APPROACH"?

10:59AM 21   A.   YES.

10:59AM 22   Q.   AND BENEATH THAT, "THE ACTIONABLE INFORMATION YOU NEED

10:59AM 23   1/1000TH THE SIZE OF A TYPICAL BLOOD DRAW."

10:59AM 24        AND THERE ARE SOME IMAGES OF FINGERS AND TO THE RIGHT A

10:59AM 25   SMALL VIAL.

10:59AM   1          DO YOU SEE THAT?

10:59AM   2      A.   YES.

10:59AM   3      Q.   AND WHAT DID YOU UNDERSTAND THAT TO BE?

10:59AM   4      A.   THAT THAT WAS THE AMOUNT OF BLOOD THAT THEY NEEDED TO RUN

10:59AM   5      THEIR HUNDREDS OF TESTS.

10:59AM   6      Q.   AND YOU HIGHLIGHTED, "THERANOS RUNS ANY TEST AVAILABLE IN

10:59AM   7      CENTRAL LABORATORIES, AND PROCESSES ALL SAMPLE TYPES."

10:59AM   8          WHY DID YOU HIGHLIGHT THAT?

10:59AM   9      A.   AGAIN, IT WAS JUST IN WRITING WHAT SHE HAD BEEN SAYING,

11:00AM  10      THAT THEY WERE RUNNING HUNDREDS OF TESTS ON THIS ANALYZER.

11:00AM  11      Q.   AT THE BOTTOM IT SAYS, "THERANOS PROVIDES THE HIGHEST

11:00AM  12      LEVEL OF OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN OUR PRE-

11:00AM  13      AND POST-ANALYTIC PROCESSES, ENSURING THE HIGHEST LEVELS OF

11:00AM  14      ACCURACY AND PRECISION."

11:00AM  15          WAS IT IMPRESSIVE TO YOU THAT THERANOS PROVIDED THE

11:00AM  16      HIGHEST LEVELS OF ACCURACY AND PRECISION?

11:00AM  17      A.   YES, OF COURSE.

11:00AM  18              MR. LEACH:  YOUR HONOR, I STILL HAVE MORE ON THIS

11:00AM  19      DOCUMENT, BUT I KNOW IT'S 11:00 O'CLOCK.

11:00AM  20              THE COURT:  LET'S TAKE OUR BREAK.  I SAID WE WOULD

11:00AM  21      TAKE OUR BREAK AT 11:00, SO LET'S TAKE A 30 MINUTE BREAK AND

11:00AM  22      WE'LL COME BACK.  SO WE'LL BE IN RECESS.

11:01AM  23          (JURY OUT AT 11:01 A.M.)

11:01AM  24              THE COURT:  MS. PETERSON, YOU CAN STAND DOWN.

11:01AM  25          PLEASE BE SEATED.  THANK YOU.  ALL RIGHT.  THE RECORD

11:01AM  1    SHOULD REFLECT THAT THE JURY HAS LEFT FOR A RECESS, AND THE

11:01AM  2    WITNESS HAS LEFT THE COURTROOM.

11:01AM  3         MR. DOWNEY?

11:01AM  4              MR. DOWNEY:  YOUR HONOR, I JUST WANTED TO REQUEST

11:01AM  5    THAT AT SOME POINT DURING THE BREAK THAT MR. SCHENK AND I HAVE

11:01AM  6    A CHANCE TO HAVE A BRIEF CONVERSATION WITH YOU.

11:01AM  7              THE COURT:  SURE.  WE CAN DO THAT RIGHT NOW IF YOU

11:01AM  8    WOULD LIKE.  SURE.  I'LL ASK THE REPORTER TO JOIN US.

11:02AM  9              THE CLERK:  COURT IS IN RECESS.

11:02AM  10        (PROCEEDINGS HELD IN CHAMBERS.)

11:15AM  11             THE COURT:  COME ON IN.  I'M SORRY.

11:15AM  12        ALL RIGHT.  WE'RE ON THE RECORD IN CHAMBERS WITH

11:15AM  13   MR. DOWNEY AND MR. SCHENK AT MR. DOWNEY'S REQUEST.

11:15AM  14             MR. DOWNEY:  YOUR HONOR, I WAS OBSERVING DURING OUR

11:15AM  15   FIRST SESSION JUROR NUMBER 5.  I THINK SHE'S CLEARLY DOING THE

11:15AM  16   BEST THAT SHE CAN TO TRY TO FOLLOW THE PROCEEDINGS.

11:15AM  17        THERE WERE INTERIM PERIODS WHERE I THINK SHE WAS

11:15AM  18   COMPLETELY DISTRACTED FROM MY VANTAGE POINT.

11:15AM  19        SO I AM -- I'M NOT SURE THAT WHAT WE'RE ASKING HER TO DO

11:15AM  20   IN THE CURRENT CIRCUMSTANCE IS REALLY A FAIR REQUEST.

11:15AM  21        I WONDER IF WE MIGHT ADJOURN WITH THE BALANCE OF TODAY AND

11:15AM  22   ALLOW HER TO GET HER ARMS AROUND THE SITUATION, AND THEN WE CAN

11:15AM  23   DECIDE WHAT THAT MEANS FOR THE REST OF THE PROCEEDING.

11:15AM  24        BUT I'M CONCERNED ABOUT ONE JUROR BEING DISTRACTED DURING

11:15AM  25   DIFFERENT PERIODS OF THE TRIAL.  OBVIOUSLY IT'S NOT IN THE

11:15AM  1      GOVERNMENT'S DIRECT, BUT I'M CONCERNED ABOUT IT.

11:15AM  2              THE COURT:  SURE.

11:15AM  3         MR. SCHENK?

11:15AM  4              MR. SCHENK:  FROM MY SEAT I DID NOT HAVE THE

11:15AM  5      OPPORTUNITY TO OBSERVE THE JUROR.  I'D BE HAPPY TO GO BACK AND

11:15AM  6      ASK OTHER PEOPLE ON MY TEAM IF THEY HAD THE OPPORTUNITY TO

11:15AM  7      OBSERVE HER, OR THE COURT COULD ASK HER, IF THE COURT IS

11:15AM  8      INCLINED TO ADJOURN FOR THE DAY AND ASK HER IF THAT WOULD BE

11:15AM  9      HELPFUL FOR THIS JUROR.

11:15AM 10         I DON'T KNOW THAT I'M IN A POSITION TO COMMENT.  I JUST

11:15AM 11      DIDN'T SEE IT FROM WHERE I SIT.

11:15AM 12              THE COURT:  THANK YOU.  I WAS KEEPING AN EYE ON HER

11:15AM 13      THROUGH THE -- THIS MORNING FOR, I GUESS WE'VE BEEN IN

11:15AM 14      TESTIMONY FOR MAYBE AN HOUR OR 45 MINUTES, AN HOUR.

11:15AM 15         AT ONE POINT I NOTICED HER HEAD WAS DOWN, SHE WAS LOOKING

11:15AM 16      TOWARDS HER LAP, AND I THOUGHT SHE WAS -- IT LOOKED LIKE SHE

11:15AM 17      WAS MANIPULATING A PHONE, MAYBE TEXTING, AND THEN SHE CAME UP

11:15AM 18      AND SHE UNWRAPPED A PIECE OF FOIL AND PUT SOME GUM IN HER

11:15AM 19      MOUTH.

11:15AM 20         AND I THOUGHT, WELL, OKAY.  I DIDN'T SEE HER -- I THINK I

11:15AM 21      NOTICED HER LOOKING DOWN AT HER LAP AGAIN A COUPLE OF TIMES,

11:15AM 22      BUT I DIDN'T SEE HER DO THE MANIPULATION.

11:15AM 23         I THINK IT'S A GOOD IDEA, THOUGH, I THINK THAT SUGGESTION

11:15AM 24      TO BRING HER IN AND ASK HER HER THOUGHTS MAYBE NOW WOULD BE

11:15AM 25      BETTER THAN JUST TO GET HER REAL-TIME THOUGHTS ON WHERE THIS

| | | |
|---|---|---|
| 11:15AM | 1 | IS. |
| 11:15AM | 2 | SO, MS. KRATZMANN. |
| 11:15AM | 3 | THE CLERK:  SO, WHEN THE JURORS WERE EXITING, SHE |
| 11:15AM | 4 | STARTED TO PUT HER AIR BUDS IN AND WAS GOING TO MAKE A CALL, SO |
| 11:15AM | 5 | I ASSUME SHE'S COMMUNICATING. |
| 11:15AM | 6 | THE COURT:  COULD YOU ASK HER TO COME IN? |
| 11:15AM | 7 | THE CLERK:  OKAY. |
| 11:15AM | 8 | MR. DOWNEY:  COULD WE RELOCATE OURSELVES, JUDGE? |
| 11:15AM | 9 | THE COURT:  YEAH.  LET'S HAVE YOU SIT BACK WHERE YOU |
| 11:15AM | 10 | WERE IF YOU DON'T MIND.  THANKS. |
| 11:15AM | 11 | WOULD YOU GUYS LIKE SOME COFFEE OR TEA OR ANYTHING? |
| 11:15AM | 12 | MR. SCHENK:  NO.  THANK YOU. |
| 11:15AM | 13 | (PAUSE IN PROCEEDINGS.) |
| 11:15AM | 14 | THE CLERK:  YOUR HONOR, I BELIEVE SHE HAS STEPPED |
| 11:15AM | 15 | OUTSIDE.  DO YOU WANT ME TO WAIT UNTIL SHE RETURNS? |
| 11:15AM | 16 | THE COURT:  CAN YOU POKE YOUR HEAD OUT IN THE |
| 11:15AM | 17 | HALLWAY THERE? |
| 11:15AM | 18 | THE CLERK:  YES.  AND IF SHE'S NOT OUT THERE, I |
| 11:15AM | 19 | PRESUME SHE'S NOT IN THE BUILDING. |
| 11:15AM | 20 | THE COURT:  YES.  OKAY. |
| 11:15AM | 21 | (PAUSE IN PROCEEDINGS.) |
| 11:15AM | 22 | (THE FOLLOWING PROCEEDINGS WERE HELD IN CHAMBERS IN SEALED |
| 11:15AM | 23 | PROCEEDINGS WITH JUROR NUMBER 5 PRESENT, PAGES 4674- 4677.) |
| | 24 | |
| | 25 | |

**AFTERNOON SESSION**

11:15AM 1

11:42AM 2          (IN OPEN COURT.)

11:42AM 3          (JURY IN AT 11:42 A.M.)

11:42AM 4          THE COURT:  THANK YOU.  PLEASE BE SEATED.  WE'RE

11:42AM 5  BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT

11:42AM 6  ONCE AGAIN.

11:42AM 7          MS. PETERSON IS BACK ON THE STAND.  THANK YOU.

11:42AM 8          MR. LEACH.

11:42AM 9          MR. LEACH:  THANK YOU, YOUR HONOR.

11:43AM 10  Q.   GOOD MORNING, MS. PETERSON.

11:43AM 11          WHEN WE BROKE WE WERE GOING THROUGH PORTIONS OF THE

11:43AM 12  POWERPOINT THAT YOU REVIEWED, AND I WANT TO DRAW YOUR

11:43AM 13  ATTENTION, PLEASE, TO PAGE 30 OF EXHIBIT 4858.

11:43AM 14          DO YOU SEE THE HEADING, "A NEW STANDARD IN QUALITY.

11:43AM 15          "THE HIGHEST LEVELS OF ACCURACY."

11:43AM 16  A.   YES.  IS THAT ON OKAY?  YES.

11:43AM 17  Q.   DO YOU SEE THE HEADING, "A NEW STANDARD IN QUALITY.

11:43AM 18          "THE HIGHEST LEVELS OF ACCURACY"?

11:43AM 19  A.   YES.

11:43AM 20  Q.   AND IS THAT A CONCEPT THAT MS. HOLMES SPOKE ABOUT IN YOUR

11:43AM 21  MEETING IN CALIFORNIA IN PALO ALTO?

11:43AM 22  A.   YES.

11:43AM 23  Q.   AND DO YOU SEE WHERE IT SAYS, "BY SYSTEMATICALLY

11:43AM 24  CONTROLLING AND STANDARDIZING OUR PROCESSES, THERANOS OFFERS

11:43AM 25  TESTS WITH THE HIGHEST LEVELS OF ACCURACY."

11:43AM  1      WAS THAT IMPORTANT TO YOU?

11:43AM  2   A.   YES, IT LENDED CREDIBILITY, AGAIN, TO THE ACCURACY OF THE

11:44AM  3   ANALYZER.

11:44AM  4   Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 32.

11:44AM  5      DO YOU SEE THE HEADING "NEW POSSIBILITIES IN LAB"?

11:44AM  6   A.   YES.

11:44AM  7   Q.   AND BENEATH THE COLUMN "ROUTINE, SPECIALTY, AND ESOTERIC

11:44AM  8   TESTING," DO YOU SEE WHERE IT SAYS, "COMPREHENSIVE LABORATORY

11:44AM  9   TEST MENU AVAILABLE THROUGH THERANOS.

11:44AM  10      "THERANOS RUNS ANY TEST AVAILABLE IN CENTRAL LABORATORIES.

11:44AM  11      "THERANOS CAN PROCESS ANY SAMPLE TYPE."

11:44AM  12      IS THAT CONSISTENT WITH REPRESENTATIONS THAT MS. HOLMES

11:44AM  13   MADE TO YOU?

11:44AM  14   A.   YES, VERY.

11:44AM  15   Q.   AND LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 38.

11:44AM  16      DO YOU SEE THE HEADING "THERANOS LABORATORY MARKET"?

11:44AM  17   A.   YES.

11:44AM  18   Q.   AND IN THE FOURTH BULLET IT READS, "REPLACES OLD

11:45AM  19   INFRASTRUCTURE WITH NEW."

11:45AM  20      WHAT DID YOU UNDERSTAND THAT TO MEAN?

11:45AM  21   A.   I WOULD TAKE THAT TO MEAN AT THE TIME THAT IT WAS

11:45AM  22   REPLACING THE OLD DUOPOLY INFRASTRUCTURE FROM QUEST AND

11:45AM  23   LAB CORP. AND MAKING IT MORE AUTOMATED AND PORTABLE.

11:45AM  24   Q.   AND WHAT DO YOU MEAN BY "INFRASTRUCTURE"?

11:45AM  25   A.   THE BOX ITSELF, THE ANALYZER.

11:45AM 1    Q.   LET ME MOVE FORWARD TO PAGE 40.

11:45AM 2       DO YOU SEE THE HEADING "THERANOS'S FOOTPRINT UPON NATIONAL

11:45AM 3    DEPLOYMENT:

11:45AM 4       "THERANOS WELLNESS CENTERS IN WALGREENS"?

11:45AM 5    A.   YES.

11:45AM 6    Q.   AND DID YOU DISCUSS THE WALGREENS ROLLOUT WITH MS. HOLMES

11:45AM 7    IN YOUR MEETING IN CALIFORNIA ON OR ABOUT OCTOBER 14TH?

11:45AM 8    A.   YES.

11:45AM 9    Q.   AND THIS IS IN 2014?

11:45AM 10   A.   YES.

11:45AM 11   Q.   OKAY.  DID MS. HOLMES OR MR. BALWANI SAY ANYTHING TO THE

11:46AM 12   EFFECT THAT THE WALGREENS ROLLOUT WAS STALLING OR SLOWING?

11:46AM 13   A.   NOT AT ALL.

11:46AM 14   Q.   DID THEY SAY ANYTHING TO THE EFFECT THAT WALGREENS WAS

11:46AM 15   FRUSTRATED BY THE NUMBER OF VENOUS DRAWS?

11:46AM 16   A.   NOT AT ALL.

11:46AM 17   Q.   DID YOU HAVE ANY CONCEPT THAT THERANOS WAS DOING VENOUS

11:46AM 18   DRAWS?

11:46AM 19   A.   NONE WHATSOEVER.

11:46AM 20   Q.   PLEASE LOOK AT PAGE 49.

11:46AM 21      DO YOU SEE THE HEADING "RECENT PRESS"?

11:46AM 22   A.   YES.

11:46AM 23   Q.   AND TO THE RIGHT THERE'S AN IMAGE OF A "FORTUNE" MAGAZINE

11:46AM 24   ARTICLE, "THIS CEO IS OUT FOR BLOOD."

11:46AM 25      ARE THESE PRESS ARTICLES THAT MS. HOLMES REFERRED -- OR

11:46AM 1    THAT THIS POWERPOINT REFERRED YOU TO?

11:46AM 2    A.   YES.

11:46AM 3    Q.   AND DID YOU MAKE AN EFFORT TO REVIEW WHATEVER PUBLIC

11:46AM 4    INFORMATION YOU COULD FIND ABOUT THERANOS?

11:46AM 5    A.   YES.

11:46AM 6    Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 103 OF THIS

11:47AM 7    DOCUMENT.

11:47AM 8        IS THIS A PORTION OF THE MATERIALS IN THE BINDER THAT YOU

11:47AM 9    REVIEWED, MS. PETERSON?

11:47AM 10   A.   YES.

11:47AM 11   Q.   OKAY.  AND DO YOU SEE WHERE IT SAYS, "EXEMPLARY REPORTS

11:47AM 12   FROM PHARMACEUTICAL PARTNERS"?

11:47AM 13   A.   YES.

11:47AM 14   Q.   PLEASE LOOK AT THE NEXT PAGE, PAGE 140, OR 104.

11:47AM 15       AND IF WE CAN ZOOM IN, MS. HOLLIMAN, ON EVERYTHING DOWN TO

11:47AM 16   THE WORD "CONCLUSIONS" AND THE THREE BULLETS.  THERE YOU GO.

11:47AM 17       THANK YOU.

11:47AM 18       DOES THIS APPEAR TO BE SOMETHING CALLED "THERANOS

11:47AM 19   ANGIOGENESIS STUDY REPORT"?

11:47AM 20   A.   YES.

11:47AM 21   Q.   AND DO YOU SEE THE PFIZER LOGO UP IN THE LEFT-HAND CORNER?

11:47AM 22   A.   YES.

11:47AM 23   Q.   AND DO YOU SEE THE THERANOS LOGO IN THE RIGHT-HAND CORNER?

11:48AM 24   A.   YES.

11:48AM 25   Q.   OKAY.  DID YOU BELIEVE THIS REPORT WAS PREPARED BY PFIZER?

11:48AM 1    A.   YES.

11:48AM 2    Q.   WHY DID YOU BELIEVE THAT?

11:48AM 3    A.   BECAUSE THE LOGO WAS ON IT.

11:48AM 4    Q.   DID YOU EVER SEE A VERSION OF THIS REPORT WITH ONLY THE

11:48AM 5    THERANOS LOGO ON IT?

11:48AM 6    A.   NO.

11:48AM 7    Q.   DID YOU EVER SEE A VERSION OF THIS REPORT WHERE UNDERNEATH

11:48AM 8    THE HEADING "THERANOS ANGIOGENESIS STUDY REPORT" IT SAYS

11:48AM 9    "PREPARED FOR DR. AIDAN POWER"?

11:48AM 10   A.   I DON'T RECALL THAT.

11:48AM 11   Q.   OKAY.  HAVE YOU EVER HEARD OF SOMEBODY CALLED

11:48AM 12   DR. AIDAN POWER?

11:48AM 13   A.   NO.

11:48AM 14   Q.   DID MS. HOLMES EVER TELL YOU THAT THIS REPORT WAS

11:48AM 15   THERANOS'S WORK AND WAS NOT APPROVED BY PFIZER?

11:48AM 16   A.   NO.

11:48AM 17   Q.   OKAY.  WAS IT RELEVANT TO YOU THAT THIS CAME FROM PFIZER?

11:48AM 18   A.   VERY RELEVANT.

11:48AM 19   Q.   WHY?

11:48AM 20   A.   AGAIN, IT CAME FROM A LARGE COMPANY.  IT VALIDATED

11:48AM 21   EVERYTHING THAT SHE WAS TELLING US FROM A LARGE EXTERNAL

11:49AM 22   INDEPENDENT THIRD PARTY.

11:49AM 23   Q.   LET'S LOOK, PLEASE, AT PAGE 129.

11:49AM 24        DO YOU SEE THE PFIZER LOGO AGAIN, MS. PETERSON?

11:49AM 25   A.   YES.

4683

| | | |
|---|---|---|
| 11:49AM | 1 | Q.   AND THE THERANOS LOGO TO THE RIGHT? |
| 11:49AM | 2 | A.   YES. |
| 11:49AM | 3 | Q.   OKAY.  AND THERE'S A NUMBER OF CONCLUSIONS LISTED ON THIS. |
| 11:49AM | 4 | WE SEE ON THE SCREEN 1 THROUGH 9. |
| 11:49AM | 5 | A.   YES. |
| 11:49AM | 6 | Q.   AND ON THE DOCUMENT ARE THERE SOME ADDITIONAL ONES, 10 |
| 11:49AM | 7 | THROUGH 13? |
| 11:49AM | 8 | A.   I DIDN'T -- I DON'T HAVE IT IN THE BINDER HERE, BUT -- |
| 11:49AM | 9 | Q.   OKAY.  THERE YOU GO. |
| 11:49AM | 10 | A.   YES. |
| 11:49AM | 11 | Q.   DID YOU BELIEVE THESE TO BE CONCLUSIONS THAT PFIZER HAD |
| 11:49AM | 12 | REACHED AFTER ITS WORK? |
| 11:49AM | 13 | A.   YES. |
| 11:49AM | 14 | Q.   OKAY.  ASSUMING THESE WERE JUST THE VIEWS OF THERANOS, |
| 11:49AM | 15 | WOULD THAT HAVE HAD RELEVANCE TO YOU? |
| 11:49AM | 16 | A.   NOT NEAR AS MUCH, NO. |
| 11:49AM | 17 | Q.   WHY IS THAT? |
| 11:49AM | 18 | A.   BECAUSE PFIZER IS A LARGE REPUTABLE PHARMACEUTICAL COMPANY |
| 11:50AM | 19 | THAT WE THOUGHT USED THE ANALYZER AND WAS SAYING THAT THE |
| 11:50AM | 20 | RESULTS WERE ACCURATE. |
| 11:50AM | 21 | Q.   OKAY.  LET ME DRAW YOUR ATTENTION, PLEASE, TO ANOTHER |
| 11:50AM | 22 | DOCUMENT.  IT'S EXHIBIT 1853.  I BELIEVE THIS IS IN EVIDENCE. |
| 11:50AM | 23 | A.   I'M SORRY, WHAT IS THE NUMBER AGAIN? |
| 11:50AM | 24 | Q.   1853. |
| 11:50AM | 25 | A.   18 -- OKAY. |

4684

| Time | Line | |
|---|---|---|
| 11:50AM | 1 | Q.   DO YOU RECOGNIZE THIS DOCUMENT? |
| 11:50AM | 2 | A.   YES. |
| 11:50AM | 3 | Q.   WHAT IS THIS? |
| 11:50AM | 4 | A.   THESE ARE THE FINANCIAL STATEMENTS, FINANCIALS THAT WE |
| 11:50AM | 5 | RECEIVED AS PART OF THE DILIGENCE BINDER, AND THE WRITING IS |
| 11:50AM | 6 | MINE. |
| 11:50AM | 7 | Q.   YOU RECEIVED THIS FROM THERANOS? |
| 11:50AM | 8 | A.   YES. |
| 11:50AM | 9 | Q.   AND DID YOU DISCUSS THIS PROJECTED STATEMENT OF INCOME |
| 11:50AM | 10 | WITH MS. HOLMES IN YOUR MEETING IN CALIFORNIA IN OCTOBER OF |
| 11:51AM | 11 | 2014? |
| 11:51AM | 12 | A.   YES, WITH BOTH MS. HOLMES AND MR. BALWANI. |
| 11:51AM | 13 | Q.   OKAY.  AND YOU SEE THE LINE "PROJECTED STATEMENT OF |
| 11:51AM | 14 | INCOME" TO THE LEFT? |
| 11:51AM | 15 | A.   YES. |
| 11:51AM | 16 | Q.   AND THEN THERE IS A COLUMN FOR DECEMBER 31ST, 2014. |
| 11:51AM | 17 | DO YOU SEE THAT? |
| 11:51AM | 18 | A.   YES. |
| 11:51AM | 19 | Q.   AND DID YOU BELIEVE THIS TO BE THERANOS'S REVENUE |
| 11:51AM | 20 | PROJECTIONS FOR THE YEAR ENDING 2014? |
| 11:51AM | 21 | A.   YES. |
| 11:51AM | 22 | Q.   OKAY.  WHAT MONTH DID RDV RECEIVE THESE PROJECTED |
| 11:51AM | 23 | FINANCIAL STATEMENTS? |
| 11:51AM | 24 | A.   OCTOBER. |
| 11:51AM | 25 | Q.   OCTOBER OF 2014? |

| | | |
|---|---|---|
| 11:51AM | 1 | A.   YES. |
| 11:51AM | 2 | Q.   AND DID THAT GIVE YOU ANY COMFORT THAT THERANOS WOULD BE |
| 11:51AM | 3 | BETTER ABLE TO HIT THOSE PROJECTIONS? |
| 11:51AM | 4 | A.   YES. |
| 11:51AM | 5 | Q.   EXPLAIN THAT FOR US. |
| 11:51AM | 6 | A.   ONE WOULD ASSUME IN OCTOBER THAT THERE WERE -- IF THEY |
| 11:51AM | 7 | WERE PUTTING FORTH A PROJECTION FOR DECEMBER OF THAT YEAR, THAT |
| 11:51AM | 8 | THEY WERE AT OR CLOSE TO THAT PROJECTION. |
| 11:51AM | 9 | Q.   THE FIRST LINE UNDER REVENUE U.S. COMMERCIAL ONLY SAYS, |
| 11:52AM | 10 | "LAB SERVICES FROM U.S. RETAIL PHARMACIES." |
| 11:52AM | 11 | AND THEN FOR 2014 THE AMOUNT IS 42 MILLION. |
| 11:52AM | 12 | DO YOU SEE THAT? |
| 11:52AM | 13 | A.   YES. |
| 11:52AM | 14 | Q.   AND DID YOU UNDERSTAND THAT TO BE REVENUE FROM THE |
| 11:52AM | 15 | WALGREENS RELATIONSHIP? |
| 11:52AM | 16 | A.   YES. |
| 11:52AM | 17 | Q.   AND THEN THERE'S TWO ENTRIES FOR PHYSICIAN OFFICES AND LAB |
| 11:52AM | 18 | SERVICES REVENUE FROM HOSPITALS IN THE AMOUNT OF 11 MILLION AND |
| 11:52AM | 19 | 47 MILLION. |
| 11:52AM | 20 | DO YOU SEE THAT? |
| 11:52AM | 21 | A.   YES. |
| 11:52AM | 22 | Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN? |
| 11:52AM | 23 | A.   THERE WERE A NUMBER OF HOSPITALS THAT SHE MENTIONED THEY |
| 11:52AM | 24 | HAD CONTRACTED WITH, LIKE INTERMOUNTAIN AND UCSF AND DIGNITY |
| 11:52AM | 25 | HEALTH WERE SOME THAT SHE NAMED.  WE WERE ASSUMING THAT THOSE |

11:52AM 1    WERE REVENUES COMING FROM THOSE CONTRACTS.

11:52AM 2    Q.   THERE IS ALSO AN ENTRY FOR PHARMACEUTICAL SERVICES IN THE

11:52AM 3    AMOUNT OF $40 MILLION.

11:52AM 4        DO YOU SEE THAT?

11:52AM 5    A.   YES.

11:52AM 6    Q.   AND WHAT DID YOU UNDERSTAND THAT TO REFER TO?

11:52AM 7    A.   REVENUE COMING FROM THE CLINICAL STUDIES FROM PEOPLE LIKE

11:53AM 8    PFIZER AND OTHER -- THE TOP 10 OF THE 15 PHARMACEUTICAL

11:53AM 9    COMPANIES, THAT THERE WAS REVENUE COMING IN FROM THOSE.

11:53AM 10   Q.   THERE'S SOME QUESTION MARKS NEXT TO PHARMACEUTICAL

11:53AM 11   SERVICES AND DOD.

11:53AM 12       DO YOU SEE THAT?

11:53AM 13   A.   YES.

11:53AM 14   Q.   AND CAN YOU EXPLAIN WHAT YOU MEANT BY THAT, OR WHAT THAT

11:53AM 15   REFERS TO?

11:53AM 16   A.   THE QUESTION MARKS -- THERE'S TWO DIFFERENT INKS ON HERE.

11:53AM 17   THE QUESTION MARKS AND QUESTION OF ORDER OF MAGNITUDE WITH THE

11:53AM 18   QUESTION MARKS.  THE QUESTION MARKS WERE PUT ON THERE BEFORE

11:53AM 19   THE MEETING AND DISCUSSED AND ANSWERED NOT SO MUCH ON THIS

11:53AM 20   PAGE, BUT IN MY MEMO FOLLOWING THE MEETING.

11:53AM 21   Q.   OKAY.  SO DO I UNDERSTAND YOU TO BE SAYING THAT THE

11:53AM 22   LIGHTER INK IS QUESTIONS THAT YOU HAD GOING INTO THE MEETING,

11:53AM 23   AND THEN THE DARKER INK IS WHAT YOU LEARNED IN THE MEETING?

11:53AM 24   A.   CORRECT.

11:53AM 25   Q.   OKAY.  IN THE OCTOBER 2014 MEETING, DID MS. HOLMES OR

11:53AM 1    MR. BALWANI TELL YOU THAT THERANOS HAD ZERO REVENUE FROM

11:54AM 2    PHARMACEUTICAL COMPANIES IN 2013?

11:54AM 3    A.   NO, NO.

11:54AM 4    Q.   HOW ABOUT ZERO REVENUE FROM PHARMACEUTICAL COMPANIES IN

11:54AM 5    2012?

11:54AM 6    A.   NO.

11:54AM 7    Q.   WOULD THAT HAVE BEEN RELEVANT TO YOU?

11:54AM 8    A.   YES, VERY.

11:54AM 9    Q.   WHY?

11:54AM 10   A.   BECAUSE IT WAS CONTRARY TO WHAT THEY WERE SAYING, THAT

11:54AM 11   THEY HAD SIX OR SEVEN YEARS OF DOING WORK FOR MAJOR

11:54AM 12   PHARMACEUTICAL COMPANIES.

11:54AM 13   Q.   OKAY.  THE TOTAL AMOUNT OF REVENUE UNDER DECEMBER 31ST,

11:54AM 14   2014 IS $140 MILLION.

11:54AM 15        DO YOU SEE THAT?

11:54AM 16   A.   YES.

11:54AM 17   Q.   AND WAS THAT IMPRESSIVE TO YOU?

11:54AM 18   A.   YES.

11:54AM 19   Q.   OKAY.  TO THE RIGHT THERE'S SOME NUMBERS FOR 2015.

11:54AM 20        DO YOU SEE THOSE?

11:54AM 21   A.   YES.

11:54AM 22   Q.   AND YOU'VE CROSSED OUT THE NUMBERS FOR PHYSICIAN'S OFFICES

11:54AM 23   ON SITE SERVICES REVENUE FROM HOSPITALS AND PHARMACEUTICAL

11:54AM 24   SERVICES AND HAVE WRITTEN SOME NUMBERS TO THE RIGHT.

11:54AM 25        CAN YOU EXPLAIN WHAT THAT MEANS?

11:54AM 1    A.   DURING THE MEETING THEY HAD MADE SOME CHANGES TO THOSE

11:55AM 2    NUMBERS, BUT THEY WERE MINOR.  THE 160 IS 160 MILLION.  IT'S

11:55AM 3    NOT 160,000.  IT'S JUST MY SHORTHAND.

11:55AM 4    Q.   OKAY.  SO THE 60,000 OR ASSOCIATED --

11:55AM 5    A.   $60 MILLION.  YES, YES.

11:55AM 6         THE COURT:  WHY DON'T YOU ASK YOUR QUESTION AGAIN?

11:55AM 7         MR. LEACH:  I WILL.

11:55AM 8    THANK YOU, MS. RODRIGUEZ.

11:55AM 9    Q.   SO THE 60,000 TO THE RIGHT OF THE CROSSED OUT 62 MILLION,

11:55AM 10   YOU'RE CONVEYING 60 MILLION THERE?

11:55AM 11   A.   YES.

11:55AM 12   Q.   AND THAT'S THE LEVEL OF -- AND DOES THAT REFLECT THE

11:55AM 13   CONVERSATION THAT YOU HAD WHERE MS. HOLMES AND MR. BALWANI WERE

11:55AM 14   SAYING IN 2015 IT'S ACTUALLY GOING TO BE $2 MILLION LESS?

11:55AM 15   A.   YES.

11:55AM 16   Q.   AND THE TOTAL REVENUE THAT MS. HOLMES AND MR. BALWANI WERE

11:55AM 17   PROJECTING FOR DECEMBER 31ST, 2005 WAS $990 MILLION?

11:55AM 18   A.   YES.

11:55AM 19   Q.   AND WAS THAT IMPRESSIVE TO YOU?

11:55AM 20   A.   YES.

11:55AM 21   Q.   ABOVE THE COLUMN, YOU WROTE THE WORDS, "900 LOCATIONS."

11:56AM 22   WHAT DOES THAT REFER TO?

11:56AM 23   A.   THAT REFERRED TO WALGREENS, THE ROLLOUT THAT THEY WERE

11:56AM 24   PLANNING.  THE NUMBERS IN HERE WERE BASED ON A ROLLOUT AT

11:56AM 25   WALGREENS OF 900 LOCATIONS FOR 2015.

11:56AM 1      THERE'S ALSO 300 SAFEWAY LOCATIONS IN THAT NUMBER.  AGAIN,

11:56AM 2  THERE'S, THERE'S -- NOT ALL OF MY NOTES ON ARE THIS PAGE.  THEY

11:56AM 3  ALL CULMINATED INTO ANOTHER MEMO THAT WAS WRITTEN.

11:56AM 4  Q.   AND IF WE CAN ZOOM OUT, MS. HOLLIMAN, AND FOCUS ON THE NET

11:56AM 5  INCOME DOWN AT THE BOTTOM.

11:56AM 6      THANK YOU.

11:56AM 7      DOES THIS REFLECT THAT MS. HOLMES AND MR. BALWANI WERE

11:56AM 8  PROJECTING NET INCOME OF A $3 MILLION LOSS IN DECEMBER OF 2014?

11:56AM 9  A.   YES.

11:56AM 10 Q.   FOR THE YEAR?

11:56AM 11 A.   YES.

11:56AM 12 Q.   AND DOES THIS REFLECT THAT THEY WERE PROJECTING A PROFIT

11:57AM 13 OF 230 MILLION BY THE END OF 2015?

11:57AM 14 A.   YES.

11:57AM 15 Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO WHAT HAS BEEN

11:57AM 16 MARKED AS EXHIBIT 2107.

11:57AM 17     DOES THIS APPEAR TO BE AN EMAIL FROM SUNNY BALWANI TO

11:57AM 18 JERRY TUBERGEN, WITH A COPY TO MS. HOLMES, ATTACHING VARIOUS

11:57AM 19 INVESTMENT DOCUMENTS?

11:57AM 20 A.   YES.

11:57AM 21 Q.   AND DID YOU ULTIMATELY REVIEW THE ITERATIONS OF THE

11:57AM 22 INVESTMENT DOCUMENTS THAT ARE ATTACHED TO THIS EMAIL?

11:57AM 23 A.   YES, ALONG WITH OUR INHOUSE COUNSEL.

11:58AM 24     MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 2107 INTO

11:58AM 25 EVIDENCE.

11:58AM  1        MR. WADE:  THE COURT'S INDULGENCE FOR ONE MOMENT.

11:58AM  2        (PAUSE IN PROCEEDINGS.)

11:58AM  3        MR. WADE:  NO OBJECTION.

11:58AM  4        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:58AM  5        (GOVERNMENT'S EXHIBIT 2107 WAS RECEIVED IN EVIDENCE.)

11:58AM  6        MR. LEACH:  MS. HOLLIMAN, IF WE CAN PLEASE ZOOM IN

11:58AM  7   ON THE TOP HALF OF THIS EMAIL ON PAGE 1.

11:58AM  8   Q.   MS. PETERSON, DO YOU SEE THERE ARE SOME ATTACHMENTS TO

11:59AM  9   THIS INVESTOR MASTER SIGNATURE PAGE, SERIES C-2.

11:59AM 10        WHAT IS C-2?

11:59AM 11   A.   THAT WAS THE SERIES OF SECURITIES THAT WE WERE BUYING

11:59AM 12   INTO.

11:59AM 13   Q.   AND THERE'S NEW INVESTOR.ZIP AND THERANOS BANK WIRE

11:59AM 14   INSTRUCTION.PDF.

11:59AM 15        I WANT TO DRAW YOUR ATTENTION, PLEASE, TO PAGE 56.

11:59AM 16        DO YOU SEE THE HEADING "THERANOS, INC.

11:59AM 17        "SERIES C-2 PREFERRED STOCK PURCHASE AGREEMENT"?

11:59AM 18   A.   YES.

11:59AM 19   Q.   AND IS THIS A LENGTHY LEGAL DOCUMENT RELATING TO THE TERMS

11:59AM 20   OF THE POTENTIAL STOCK PURCHASE BY RDV?

11:59AM 21   A.   YES.

11:59AM 22   Q.   PLEASE LOOK AT PAGE 61.

11:59AM 23        DO YOU SEE SECTION 4 DOWN AT THE BOTTOM, "REPRESENTATIONS

11:59AM 24   AND WARRANTIES OF THE INVESTORS"?

11:59AM 25   A.   YES.

| | | |
|---|---|---|
| 11:59AM | 1 | Q. AND IN THIS CIRCUMSTANCE, RDV OR ITS AFFILIATE IS THE |
| 12:00PM | 2 | INVESTOR? |
| 12:00PM | 3 | A. CORRECT. |
| 12:00PM | 4 | Q. OKAY. AND IF WE CAN CONTINUE, PLEASE, TO PAGE 62. |
| 12:00PM | 5 | DO YOU SEE THAT THERE ARE CERTAIN REPRESENTATIONS RELATING |
| 12:00PM | 6 | IN 4.3, 4.4, 4.5, AND 4.6 RELATING TO THE INVESTOR'S INVESTMENT |
| 12:00PM | 7 | EXPERIENCE, THE NATURE OF THE INVESTMENT, ACCESS TO DATA, AND |
| 12:00PM | 8 | THE INVESTOR'S ACCREDITED STATUS? |
| 12:00PM | 9 | A. YES. |
| 12:00PM | 10 | Q. AND WERE THESE REPRESENTATIONS TRUE OF RDV AT THE TIME? |
| 12:00PM | 11 | A. AT THE TIME, YES. |
| 12:00PM | 12 | Q. OKAY. THANK YOU, MS. HOLLIMAN. WE CAN TAKE THAT DOWN. |
| 12:00PM | 13 | LET ME NEXT DRAW YOUR ATTENTION, PLEASE, TO EXHIBIT 2166. |
| 12:01PM | 14 | DO YOU RECOGNIZE THIS DOCUMENT? |
| 12:01PM | 15 | A. YES. |
| 12:01PM | 16 | Q. AND WHAT IS THIS? |
| 12:01PM | 17 | A. THIS IS THE DOCUMENT WE PUT TOGETHER FOR ALL INVESTMENTS |
| 12:01PM | 18 | THAT GO TO OUR INVESTMENT COMMITTEE. |
| 12:01PM | 19 | Q. WHEN YOU SAY "WE," DOES THAT INCLUDE YOU? |
| 12:01PM | 20 | A. YES, I PUT THIS TOGETHER. |
| 12:01PM | 21 | Q. OKAY. WHY DID YOU PUT THIS TOGETHER? |
| 12:01PM | 22 | A. BECAUSE WE NEEDED TO PUT TOGETHER EVERYTHING THAT WE HAD |
| 12:01PM | 23 | LEARNED ON THE INVESTMENT AND PRESENT IT TO THE INVESTMENT |
| 12:01PM | 24 | COMMITTEE. |
| 12:01PM | 25 | Q. OKAY. AND DID YOU PREPARE THIS IN THE ORDINARY COURSE OF |

12:01PM 1      BUSINESS?

12:01PM 2      A.   YES.

12:01PM 3      Q.   OKAY.  DID YOU PREPARE THIS AT OR FROM -- AT OR AROUND THE

12:01PM 4      TIME OF THE THERANOS INVESTMENT?

12:01PM 5      A.   YES, IN BETWEEN -- RIGHT AFTER THE MEETING THAT WE HAD ON

12:01PM 6      THE 14TH OF OCTOBER.

12:01PM 7      Q.   OKAY.  AND WAS IT RDV'S PRACTICE TO PREPARE APPROVAL

12:01PM 8      DOCUMENTS SUCH AS THESE?

12:01PM 9      A.   YES.

12:01PM 10             MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 2166.

12:01PM 11             MR. WADE:  NO OBJECTION.

12:01PM 12             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:02PM 13         (GOVERNMENT'S EXHIBIT 2166 WAS RECEIVED IN EVIDENCE.)

12:02PM 14             MR. LEACH:  IF WE CAN PLEASE ZOOM IN, MS. HOLLIMAN,

12:02PM 15     TO THE TOP HALF OF THE PAGE ALL OF THE WAY DOWN TO THE SECOND

12:02PM 16     PARAGRAPH IN COMPANY OVERVIEW.  A LITTLE BIT MORE.

12:02PM 17         PERFECT.

12:02PM 18     Q.   WHO ELSE HAD A HAND IN PREPARING THIS, IF ANYONE,

12:02PM 19     MS. PETERSON?

12:02PM 20     A.   THIS WAS, THIS WAS ALL ME THAT PREPARED THIS.

12:02PM 21     Q.   OKAY.  UP AT THE TOP IT SAYS, "RDV APPROVAL DOCUMENT - NEW

12:02PM 22     EQUITY INVESTMENT.

12:02PM 23         "DIRECT INVESTMENT:  THERANOS, INC."

12:02PM 24         DO YOU SEE THAT?

12:02PM 25     A.   YES.

12:02PM 1    Q.   AND TO THE RIGHT DO YOU SEE "CLOSED:  OCTOBER 31ST, 2014"?

12:02PM 2    A.   YES.

12:02PM 3    Q.   IS THAT APPROXIMATELY THE DATE OF RDV'S INVESTMENT?

12:02PM 4    A.   YES.

12:02PM 5    Q.   IN THE RDV OPPORTUNITY SECTION YOU WROTE IN THE THIRD

12:02PM 6    LINE, "TO DATE, THE COMPANY HAS RAISED OVER $400 FROM VARIOUS

12:03PM 7    INDIVIDUAL INVESTORS AND VENTURE CAPITAL FIRMS.  THE LAST

12:03PM 8    EQUITY RAISE WAS COMPLETED IN JAN-2014 AT A $9,000 VALUATION."

12:03PM 9         WHAT DO YOU MEAN BY THAT $9,000 VALUATION?

12:03PM 10   A.   IT'S 9 BILLION AND THE ZEROS ARE OMITTED.

12:03PM 11   Q.   SO THAT'S ANOTHER INSTANCE WHERE, FOR EASE OF REFERENCE,

12:03PM 12   YOU'RE OMITTING THE ZEROS?

12:03PM 13   A.   YES.

12:03PM 14   Q.   HALFWAY DOWN IN THE COMPANY OVERVIEW IT READS, "THERANOS

12:03PM 15   MANUFACTURES ITS ANALYZER EQUIPMENT."

12:03PM 16        DO YOU SEE THAT?

12:03PM 17   A.   YES.

12:03PM 18   Q.   AND WHY DID YOU INCLUDE THIS IN THE RDV APPROVAL DOCUMENT?

12:03PM 19   A.   BECAUSE IT'S VERY RELEVANT TO OUR UNDERWRITING OF THE

12:03PM 20   INVESTMENT.

12:03PM 21   Q.   IF WE COULD ZOOM OUT NOW, PLEASE, MS. HOLLIMAN.  AND IF WE

12:03PM 22   COULD FOCUS ON THAT THIRD PARAGRAPH IN THE COMPANY OVERVIEW.

12:04PM 23        IN THAT LAST SENTENCE OF THE THIRD PARAGRAPH IT READS,

12:04PM 24   "THROUGH THIS WORK THERANOS HAS BEEN COMPREHENSIVELY VALIDATED

12:04PM 25   SINCE 2015 BY 10 MAJOR PHARMACEUTICAL COMPANIES, WITH HUNDREDS

12:04PM  1    OF THOUSANDS ASSAYS PROCESSED."

12:04PM  2    A.   BY 2005.

12:04PM  3    Q.   2005, EXCUSE ME.

12:04PM  4        WHY DID YOU INCLUDE THIS IN THE RDV APPROVAL DOCUMENT?

12:04PM  5    A.   BECAUSE IT'S VERY RELEVANT TO OUR UNDERWRITING OF THIS

12:04PM  6    INVESTMENT THAT THEY WERE VALIDATED BY TEN MAJOR PHARMACEUTICAL

12:04PM  7    COMPANIES, INCLUDING PFIZER.

12:04PM  8            MR. WADE:  YOUR HONOR, I MOVE TO STRIKE THIS ANSWER

12:04PM  9    AND THE LAST ANSWER UNDER 602 FOR THE REASONS THAT WE

12:04PM  10   PREVIOUSLY RAISED.

12:05PM  11           THE COURT:  OVERRULED.  THE ANSWER WILL REMAIN.

12:05PM  12   BY MR. LEACH:

12:05PM  13   Q.   LET'S LOOK AT PAGE 3, MS. PETERSON.

12:05PM  14       DO YOU SEE THE ROW "GROWTH PLANS" TO THE LEFT?  THERE'S A

12:05PM  15   HEADING FOR THAT ROW CALLED -- OR THE FIRST PART CALLED "GROWTH

12:05PM  16   PLANS"?

12:05PM  17   A.   YES.

12:05PM  18   Q.   AND IN THE BODY TO THE RIGHT IT READS, "WITH THE

12:05PM  19   SUCCESSFUL BUILD-OUT OF THE PHOENIX MARKET, THERANOS WILL BE

12:05PM  20   READY IN 2015 TO BEGIN A BROADER NATIONAL ROLLOUT.  WALGREENS

12:05PM  21   AND THERANOS PLAN TO HAVE 900 WELLNESS CENTER LOCATIONS IN 5

12:05PM  22   MAJOR METROPOLITAN MARKETS NEXT YEAR."

12:05PM  23       WHERE DID THAT INFORMATION COME FROM?

12:05PM  24   A.   FROM THE CONVERSATION THAT WE HAD IN PALO ALTO.

12:05PM  25   Q.   OKAY.  AND DID MS. HOLMES OR MR. BALWANI SAY ANYTHING TO

12:05PM 1    THE EFFECT THAT WALGREENS WAS SCALING BACK THE NUMBER OF

12:05PM 2    LOCATIONS?

12:05PM 3    A.   NO.

12:05PM 4    Q.   IF WE CAN GO FURTHER DOWN TO THE FINANCIAL SUMMARY

12:05PM 5    PORTION.  ARE THESE FINANCIAL METRICS DRAWN FROM THE

12:06PM 6    SPREADSHEET THAT WE LOOKED AT EARLIER WITH YOUR HANDWRITING,

12:06PM 7    MS. PETERSON?

12:06PM 8    A.   YES.

12:06PM 9    Q.   AND THIS WAS INFORMATION THAT YOU GOT FROM MS. HOLMES AND

12:06PM 10   MR. BALWANI?

12:06PM 11   A.   YES.

12:06PM 12   Q.   WHY WERE YOU INCLUDING THIS IN THE RDV APPROVAL DOCUMENT?

12:06PM 13   A.   BECAUSE THE FINANCIALS ARE ONE OF THE FUNDAMENTALS OF

12:06PM 14   UNDERWRITING THE INVESTMENT THAT WE LOOK AT.

12:06PM 15   Q.   LET'S GO TO PAGE 6, PLEASE.

12:06PM 16       DOES THIS SECTION RELATES TO INVESTMENT STRENGTHS?

12:06PM 17   A.   YES.

12:06PM 18   Q.   AND IF WE CAN GO DOWN A LITTLE BIT MORE, MS. HOLLIMAN.

12:06PM 19       DO YOU SEE THE BULLET THAT READS, "A THERANOS ANALYZER

12:06PM 20   STATION IS A SMALL FRACTION OF THE SIZE OF A CURRENT LAB,

12:07PM 21   MAKING IT POSSIBLE TO PLACE A THERANOS LAB IN THE OPERATING

12:07PM 22   ROOM OR IN A MILITARY EVACUATION HELICOPTER, ON SHIPS, IN

12:07PM 23   REFUGEE CAMPS - VIRTUALLY ANYWHERE."

12:07PM 24       IS THAT INFORMATION THAT YOU GOT FROM MS. HOLMES AND

12:07PM 25   MR. BALWANI?

12:07PM 1    A.   YES.

12:07PM 2    Q.   AND WHY WERE YOU INCLUDING THAT IN THIS MEMO?

12:07PM 3    A.   BECAUSE, AGAIN, IT WAS CRITICAL TO OUR UNDERSTANDING OF

12:07PM 4    THE INVESTMENT, THAT IT COULD DO THIS AND THAT IT WAS PORTABLE

12:07PM 5    AND IT WAS VERY GAME CHANGING FROM -- FOR THIS INDUSTRY.

12:07PM 6    Q.   OKAY.  AND IF WE CAN GO TO THE LAST PAGE, PLEASE, PAGE 7.

12:07PM 7    AND IF WE CAN ZOOM IN ON THE ENTIRETY OF THE SUBSTANCE.

12:07PM 8         DO YOU SEE MR. TUBERGEN'S SIGNATURE IN THE SIGNATURE

12:07PM 9    BLOCK?

12:07PM 10   A.   YES.

12:07PM 11   Q.   AND IS THAT MR. DAMSTRA'S SIGNATURE TO THE RIGHT?

12:07PM 12   A.   YES.

12:07PM 13   Q.   OKAY.  IN THE RISK SECTION IT READS, "FURTHERMORE, UNLIKE

12:08PM 14   MOST LABS, THERANOS DOES NOT BUY ANALYZER EQUIPMENT FROM A

12:08PM 15   THIRD PARTY AND THEY DO NOT SELL THEIR ANALYZERS TO OTHER

12:08PM 16   LABS."

12:08PM 17        IS THAT INFORMATION THAT YOU GOT FROM MS. HOLMES AND

12:08PM 18   MR. BALWANI?

12:08PM 19   A.   YES.

12:08PM 20   Q.   AT ANY POINT IN TIME PRIOR TO INVESTING, DID MS. HOLMES

12:08PM 21   TELL YOU THERANOS WAS USING THIRD PARTY MACHINES TO DO SOME OF

12:08PM 22   ITS TESTING?

12:08PM 23   A.   NEVER.

12:08PM 24   Q.   DID THEY TELL YOU THEY WERE USING THIRD PARTY MACHINES TO

12:08PM 25   DO THE MAJORITY OF THEIR TESTING?

12:08PM 1     A.   NO.

12:08PM 2     Q.   PRIOR TO THE INVESTMENT, WERE YOU EVER TOLD THAT THERANOS

12:08PM 3     WAS USING IT'S TSPU FOR NO MORE THAN 12 ASSAYS?

12:08PM 4     A.   NO.

12:08PM 5     Q.   WOULD THAT HAVE MATTERED TO YOU?

12:08PM 6     A.   YES.

12:08PM 7     Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO WHAT IS IN EVIDENCE

12:08PM 8     AS EXHIBIT 4845.

12:08PM 9          AND WITH LEAVE, YOUR HONOR, I WOULD LIKE TO DISPLAY THAT.

12:09PM 10              THE COURT:  YES.

12:09PM 11              MR. LEACH:  IF WE COULD GO TO PAGE 22.

12:09PM 12              THE WITNESS:  I SHOW 4858.

12:09PM 13    BY MR. LEACH:

12:09PM 14    Q.   WE'LL DISPLAY 4845 ON THE SCREEN, MS. PETERSON.  I DON'T

12:09PM 15    THINK IT'S IN YOUR BINDER.

12:09PM 16    A.   OH, OKAY.

12:09PM 17    Q.   AND IF WE CAN PLEASE ZOOM IN, MS. HOLLIMAN, ON THE

12:09PM 18    SUBSTANCE.

12:09PM 19         DOWN TOWARDS THE BOTTOM, MS. PETERSON, UNDER THE BOLD

12:09PM 20    HEADING "ORIGINATOR INFORMATION," THE LAST LINE SAYS "LINE 1,

12:09PM 21    DYNASTY FINANCIAL II LLC."

12:09PM 22         ARE YOU FAMILIAR WITH THAT ENTITY?

12:09PM 23    A.   YES.

12:09PM 24    Q.   AND WHAT IS IT?

12:09PM 25    A.   IT'S AN ENTITY CREATED BY RDV CORP. THAT HOUSES A NUMBER

12:09PM 1    OF INVESTMENTS, INCLUDING THIS ONE.

12:09PM 2    Q.   AND SO DYNASTY FINANCIAL II LLC IS THE LEGAL ENTITY THAT

12:10PM 3    MADE THE INVESTMENT IN THERANOS ON RDV'S BEHALF?

12:10PM 4    A.   YES.

12:10PM 5    Q.   AND IF WE GO UP UNDER THE HEADING "BASIC INFORMATION" IN

12:10PM 6    LINE 4, THERE'S AN AMOUNT OF $99,999,984.

12:10PM 7         DO YOU SEE THAT?

12:10PM 8    A.   YES.

12:10PM 9    Q.   AND IS THAT THE AMOUNT OF RDV'S INVESTMENT?

12:10PM 10   A.   YES.

12:10PM 11   Q.   AND DO YOU SEE ABOVE THAT IN THE LINE OMAD, THERE'S A DATE

12:10PM 12   2014-10-31, OR THE NUMBERS.

12:10PM 13        DO YOU SEE THAT?

12:10PM 14   A.   YES.

12:10PM 15   Q.   AND IS OCTOBER 31ST, 2014 THE APPROXIMATE DATE OF THE

12:10PM 16   INVESTMENT?

12:10PM 17   A.   YES.

12:10PM 18   Q.   THERE'S A REFERENCE TO SOMETHING CALLED LAKESHORE CAPITAL

12:10PM 19   MANAGEMENT.   WHAT IS THAT?

12:11PM 20   A.   IT'S ONE OF OUR CASH ACCOUNTS.

12:11PM 21   Q.   THANK YOU, MS. HOLLIMAN.   WE CAN TAKE THAT DOWN.

12:11PM 22        I'D LIKE TO MOVE FORWARD IN TIME, MS. PETERSON, TO THE

12:11PM 23   TIME PERIOD OF OCTOBER OF 2015.

12:11PM 24        DO YOU HAVE THAT TIME PERIOD IN MIND?

12:11PM 25   A.   YES.

12:11PM 1    Q.  AT OR AROUND THAT TIME, DID YOU LEARN THAT "THE

12:11PM 2    WALL STREET JOURNAL" HAD WRITTEN AN ARTICLE RAISING ISSUES

12:11PM 3    ABOUT THERANOS?

12:11PM 4    A.  YES.

12:11PM 5    Q.  AND DID YOU KNOW THE AUTHOR OF THAT ARTICLE TO BE SOMEONE

12:11PM 6    NAMED JOHN CARREYROU?

12:11PM 7    A.  YES.

12:11PM 8    Q.  AND AT OR ABOUT THAT TIME, DID YOU VIEW AN INTERVIEW OF

12:11PM 9    MS. HOLMES ON THE T.V. SHOW "MAD MONEY"?

12:11PM 10    A.  YES.

12:11PM 11    Q.  PRIOR TO TESTIFYING, DID YOU HAVE A CHANCE TO REVIEW CLIPS

12:11PM 12    OF THAT "MAD MONEY" INTERVIEW?

12:11PM 13    A.  YES.

12:11PM 14          MR. LEACH:  YOUR HONOR, AT THIS TIME I WOULD LIKE TO

12:11PM 15    PLAY CLIPS OF THAT "MAD MONEY" INTERVIEW, 2851, CLIPS 1, 2 AND

12:12PM 16    3.

12:12PM 17          THE COURT:  2851?  AND I'M SORRY, IT'S CLIPS?

12:12PM 18          MR. LEACH:  2851-1, 2851-2, AND 2851-3.

12:12PM 19          THE COURT:  ALL RIGHT.  AND CAN YOU TELL US WHAT IS

12:12PM 20    THE APPROXIMATE LENGTH OF EACH OF THOSE CLIPS?

12:12PM 21          MR. LEACH:  THE FIRST CLIP IS ABOUT 5 SECONDS, THE

12:12PM 22    SECOND CLIP IS LESS THAN A MINUTE, AND THE THIRD CLIP IS ONE TO

12:12PM 23    TWO MINUTES.

12:12PM 24          THE COURT:  OKAY.  THANK YOU.

12:12PM 25          MR. WADE:  WE HAVE OBJECTIONS INITIALLY ON

12:12PM 1    FOUNDATION.  I BELIEVE THE WITNESS TESTIFIED THAT SHE READ IT

12:12PM 2    BEFORE SHE TESTIFIED.  I DON'T KNOW HOW IT CONNECTS TO THE

12:12PM 3    EVENTS IN THE CASE AND WHAT THE RELEVANCE IS, SO I DON'T THINK

12:12PM 4    WE HAVE A FOUNDATION PRELIMINARILY.

12:12PM 5        WE ALSO HAVE 106 OBJECTIONS.

12:12PM 6            THE COURT:  ALL RIGHT.  THANK YOU.  SO, MR. LEACH,

12:13PM 7    THIS WITNESS HAS TESTIFIED ABOUT THE INVESTMENT AND HER

12:13PM 8    PARTICIPATION IN THAT.

12:13PM 9        IS THIS A SEPARATE AREA, THEN, THAT IS CONNECTED TO THE

12:13PM 10   INVESTMENT, OR IS THIS OFFERED SEPARATE FROM THE INVESTMENT

12:13PM 11   ITSELF?

12:13PM 12           MR. LEACH:  IT'S SEPARATE FROM THE INVESTMENT,

12:13PM 13   YOUR HONOR.

12:13PM 14       BUT I BELIEVE ON THE VIDEO THE DEFENDANT MAKES STATEMENTS

12:13PM 15   RELATING TO THE SAME REPRESENTATIONS THAT INDUCED THE

12:13PM 16   INVESTMENT, BUT IT'S A YEAR REMOVED FROM THE INVESTMENT ITSELF.

12:13PM 17           THE COURT:  ALL RIGHT.

12:13PM 18           MR. LEACH:  BUT THE, THE --

12:13PM 19           THE COURT:  GO AHEAD.

12:13PM 20           MR. LEACH:  THE DEFENDANT IS PRESENTED WITH

12:13PM 21   ASSERTIONS FROM THE ARTICLE AND GIVEN THE OPPORTUNITY TO GIVE

12:13PM 22   HER RESPONSE, AND THIS RELATES TO STATEMENTS THAT WERE MADE TO

12:13PM 23   MS. PETERSON DURING THE COURSE OF THE INVESTMENT.

12:13PM 24           THE COURT:  ALL RIGHT.  THANK YOU.

12:13PM 25       I'LL NOTE THE OBJECTIONS THAT WERE MADE AND YOUR

12:13PM 1     OBJECTIONS, MR. WADE, CURRENTLY.

12:13PM 2         I'LL OVERRULE THE OBJECTIONS AND ALLOW THESE TO BE PLAYED.

12:14PM 3     SO YOU'LL PLAY THEM SEQUENTIALLY?

12:14PM 4             MR. LEACH:  YES, YOUR HONOR.

12:14PM 5             THE COURT:  ALL RIGHT.  SO DO YOU HAVE NUMBER 1

12:14PM 6     QUEUED UP NOW THEN?  LET'S SEE IF WE CAN GET THIS ON THE

12:14PM 7     SCREEN.

12:14PM 8         (VIDEO PLAYING OFF THE RECORD.)

12:14PM 9             THE COURT:  THAT WAS THE FIRST CLIP?

12:14PM 10            MR. LEACH:  THAT WAS THE FIRST CLIP, YOUR HONOR.

12:14PM 11            THE COURT:  AND LET ME JUST ASK FOR CLARITY'S SAKE,

12:14PM 12    ARE YOU ASKING THAT THE COURT REPORTER NOT REPORT THIS, WHAT IS

12:14PM 13    ON THE VIDEOS, OR DO YOU WANT THEM REPORTED?

12:14PM 14            MR. LEACH:  WE HAVE A TRANSCRIPT WHICH WE'VE

12:14PM 15    PROVIDED THE DEFENSE.  I'M HAPPY TO APPEND THAT.  I DON'T THINK

12:14PM 16    IT'S NECESSARY FOR THE COURT REPORTER TO TAKE IT DOWN.

12:14PM 17            THE COURT:  OKAY.

12:14PM 18        ANY OBJECTION TO THE COURT REPORTER NOT REPORTING THIS?

12:14PM 19            MR. WADE:  NO OBJECTION, YOUR HONOR.  IT WILL BE IN

12:14PM 20    EVIDENCE ONE WAY OR THE OTHER.

12:14PM 21            THE COURT:  ALL RIGHT.  THANK YOU.  SO THE COURT

12:14PM 22    REPORTER WILL NOT HAVE TO TRANSCRIBE THE VIDEOS.  THANK YOU.

12:14PM 23        (VIDEO PLAYING OFF THE RECORD.)

12:16PM 24            MR. LEACH:  THAT COMPLETES 2851-2, YOUR HONOR, AND

12:17PM 25    WE WILL PLAY NOW 2851-3.

12:17PM 1          THE COURT:  ALL RIGHT.

12:17PM 2          (VIDEO PLAYING OFF THE RECORD.)

12:19PM 3          MR. LEACH:  THAT COMPLETES CLIP 2851-3, YOUR HONOR.

12:19PM 4     Q.  MS. PETERSON, I WANT TO MOVE FORWARD IN TIME TO APRIL OF

12:19PM 5     2016.

12:19PM 6          DO YOU HAVE THAT TIME PERIOD IN MIND?

12:19PM 7     A.  YES.

12:19PM 8     Q.  AT OR AROUND THAT TIME, DID YOU REVIEW A SEGMENT ON THE

12:19PM 9     "TODAY SHOW" FEATURING MS. HOLMES?

12:19PM 10    A.  YES.

12:19PM 11    Q.  AND DID YOU OBSERVE MS. HOLMES MAKING STATEMENTS ABOUT HER

12:19PM 12    LEVEL OF INVOLVEMENT IN HER COMPANY?

12:19PM 13    A.  YES.

12:19PM 14    Q.  AND THIS WAS IN APPROXIMATELY APRIL OF 2016?

12:19PM 15    A.  CORRECT.

12:19PM 16    Q.  IT WAS THE "TODAY SHOW"?

12:19PM 17    A.  I DON'T REMEMBER WHICH ONE.  ONE OF THOSE MORNING SHOWS.

12:19PM 18    Q.  PRIOR TO TESTIFYING TODAY, DID YOU HAVE AN OPPORTUNITY TO

12:19PM 19    REVIEW SEGMENTS OF A NEWS STORY IN APRIL OF 2016?

12:19PM 20    A.  YES.

12:19PM 21    Q.  OKAY.

12:19PM 22         YOUR HONOR, I WOULD LIKE TO OFFER THE INTERVIEW SEGMENT

12:20PM 23    FROM THE "TODAY SHOW."  IT'S EXHIBIT 3152, AND I'LL OFFER THE

12:20PM 24    EXHIBIT IN ITS ENTIRETY.

12:20PM 25         THE COURT:  ALL RIGHT.  THANK YOU.  DID YOU --

12:20PM 1    BEFORE WE DO THAT, I'M NOT SURE THAT THIS WITNESS TESTIFIED

12:20PM 2    THAT WHAT WE JUST SAW, THE THREE CLIPS, WERE THE ONES THAT SHE

12:20PM 3    SAW.

12:20PM 4            MR. LEACH:  I CAN ASK THAT, YOUR HONOR.  I'M

12:20PM 5    CONSCIOUSLY NOT GETTING INTO REACTION OR STATE OF MIND ON THAT,

12:20PM 6    BUT --

12:20PM 7            THE COURT:  CORRECT.  FOUNDATIONALLY -- I THINK YOU

12:20PM 8    ASKED HER IF SHE SAW THEM, BUT I'M NOT CERTAIN THAT SHE

12:20PM 9    TESTIFIED THAT WHAT WE SAW WAS WHAT SHE WAS REFERENCING.

12:20PM 10           MR. LEACH:  I'LL ASK THE FOLLOWUP.

12:20PM 11   Q.  WE LOOKED AT THREE SEGMENTS FROM "MAD MONEY,"

12:20PM 12   MS. PETERSON, CLIPS 2851-1, -2, AND -3.  ARE THOSE PORTIONS OF

12:20PM 13   THE "MAD MONEY" CLIPS THAT YOU VIEWED?

12:20PM 14   A.  YES.

12:20PM 15           THE COURT:  ALL RIGHT.  THANK YOU.

12:21PM 16       MR. WADE?

12:21PM 17           MR. WADE:  JUST THE SAME.

12:21PM 18           THE COURT:  SAME OBJECTIONS?

12:21PM 19       ALL RIGHT.  THANK YOU.  WE'LL NOTE THAT, AND THE

12:21PM 20   OBJECTIONS ARE OVERRULED, AND YOU CAN PLAY THE CLIP.

12:21PM 21           MR. LEACH:  ALL RIGHT.  THANK YOU.  AND I'M GOING TO

12:21PM 22   PLAY THE ENTIRETY OF THE CLIP.

12:21PM 23           MR. WADE:  YES.

12:21PM 24           MR. LEACH:  THANK YOU.

12:21PM 25       (GOVERNMENT'S EXHIBIT 3152 WAS RECEIVED IN EVIDENCE.)

12:22PM 1           THE COURT:  EXCUSE ME.  COULD WE STOP THIS FOR JUST

12:22PM 2   A SECOND?  MS. HOLLIMAN, CAN WE STOP THERE FOR JUST A SECOND?

12:22PM 3           I'M SORRY.  AND I NEED TO TALK TO COUNSEL FOR A MOMENT.

12:22PM 4   WHY DON'T WE DO THAT?  LET'S GO IN CHAMBERS RATHER THAN CLEAR

12:23PM 5   EVERYONE.

12:23PM 6           THE CLERK:  LET ME TAKE THIS DOWN, YOUR HONOR.

12:23PM 7           THE COURT:  YES, GO AHEAD AND TAKE THAT DOWN.  I

12:23PM 8   JUST NEED CLARIFICATION ON SOMETHING.  I'M SORRY.

12:23PM 9           SO LET'S SEE -- I THINK THIS WILL JUST TAKE A SECOND.  SO

12:23PM 10  WE CAN DO THAT IN THE LITTLE ROOM BACK HERE, MR. WADE.

12:23PM 11          MR. WADE:  SURE.

12:23PM 12          THE COURT:  FOLKS, THIS WILL TAKE JUST A COUPLE OF

12:23PM 13  MINUTES, BUT YOU CAN STAND AND STRETCH.  DON'T LEAVE THE ROOM,

12:23PM 14  PLEASE.

12:23PM 15      (CONFERENCE ON THE RECORD IN THE JURY ROOM WITH COUNSEL.)

12:29PM 16          THE COURT:  WE'RE ON THE RECORD.  WE'RE IN --

12:29PM 17  OUTSIDE OF THE PRESENCE OF THE JURY.

12:29PM 18          MR. LEACH IS HERE AND MR. WADE IS HERE.

12:29PM 19          I STOPPED THIS, AND WE CAN REWIND IT ACCORDINGLY.  BUT

12:29PM 20  THIS WAS GOING TO BE A VIDEO OF HER MAKING HER -- MS. HOLMES,

12:29PM 21  PARDON ME, MAKING STATEMENTS.

12:29PM 22          MY CONCERN IS THAT THERE'S COMMENTARY FROM THE REPORTERS

12:29PM 23  TALKING ABOUT REPORTING AND GETTING THAT INFORMATION IN, WHICH

12:29PM 24  I THINK IS ADDITIONAL TO THOSE STATEMENTS.

12:29PM 25          THAT'S MY CONCERN, AND I HAVE SOME CONCERN ABOUT THE

12:29PM 1  INTRODUCTION, MS. SHRIVER, THE REPORTER TALKING AND OFFERING

12:29PM 2  THAT COMMENTARY.

12:29PM 3       I DON'T THINK YOU MENTIONED THIS, MR. WADE, IN YOUR

12:29PM 4  COMMENTS EARLIER, BUT I GUESS I'M CONCERNED ABOUT WHAT I SHOULD

12:29PM 5  TELL THE JURY ABOUT THAT OR WHETHER OR NOT -- I THOUGHT

12:29PM 6  HONESTLY THIS WAS GOING TO BE A -- THE SAME THING AS THE "MAD

12:29PM 7  MONEY," QUESTION, ANSWER, QUESTION, ANSWER.

12:29PM 8            MR. LEACH:  FIRST, YOUR HONOR, LET ME APOLOGIZE.

12:29PM 9            THE COURT:  I SHOULD HAVE READ THE TRANSCRIPT A

12:29PM 10  LITTLE CLOSER.

12:29PM 11            MR. LEACH:  THE GOVERNMENT ONLY PROPOSED THE

12:29PM 12  PORTIONS WHERE MS. HOLMES IS SPEAKING, AND AS I UNDERSTAND THE

12:29PM 13  DEFENSE'S OBJECTION, IF THAT WAS GOING TO COME IN, THEY WANTED

12:29PM 14  THE ENTIRETY OF THE INTERVIEW.

12:29PM 15            MR. WADE:  (NODS HEAD UP AND DOWN.)

12:29PM 16            MR. LEACH:  SO AFTER OUR COLLOQUY, LISTENING TO THE

12:29PM 17  DEFENSE OBJECTION THAT THEY WANTED THE ENTIRE VIDEO IN, TO

12:29PM 18  AVOID THE OBJECTION, I OFFERED THE ENTIRE VIDEO.

12:29PM 19            THE COURT:  I SEE.

12:29PM 20            MR. LEACH:  I DON'T KNOW WHAT THEIR POSITION ON THE

12:29PM 21  COMMENTARY IS, BUT WE WANTED MS. HOLMES'S STATEMENTS IN.  WE

12:29PM 22  STILL WANT MS. HOLMES'S STATEMENTS IN.

12:29PM 23            THE COURT:  RIGHT.

12:29PM 24            MR. LEACH:  AND IF THE OBJECTION IS A RULE 106

12:29PM 25  OBJECTION FOR COMPLETENESS AND PLAY THE WHOLE THING, WE'RE FINE

```
12:29PM    1    WITH THAT, TOO.  IT'S INITIALLY NOT WHAT WE WANTED TO OFFER,

12:29PM    2    BUT IN RESPONSE TO THE DEFENSE'S OBJECTION, I UNDERSTOOD THE

12:29PM    3    WHOLE THING COULD COME IN.

12:29PM    4            MR. WADE:  BUT I DON'T THINK WE'RE PLAYING ALL OF

12:29PM    5    THE STATEMENTS, RIGHT?  WE'RE ONLY PLAYING SELECTIVE

12:29PM    6    STATEMENTS?

12:29PM    7            THE COURT:  OF THIS, OF THIS "TODAY" INTERVIEW?

12:29PM    8            MR. WADE:  YEAH, YEAH.

12:29PM    9            THE COURT:  IT SOUNDS LIKE IT'S THE WHOLE TAPE.

12:29PM   10            MR. WADE:  YOUR INITIAL PROPOSAL.

12:29PM   11            MR. LEACH:  OUR INITIAL PROPOSAL WAS SOME OF

12:29PM   12    MS. HOLMES'S STATEMENTS IN THE INTERVIEW.  THE DEFENSE OBJECTED

12:29PM   13    THAT THEY WANTED THE ENTIRETY OF THE CLIP IN.

12:29PM   14            THE COURT:  OKAY.

12:29PM   15            MR. LEACH:  IN RESPONSE TO THAT OBJECTION, I'M FINE

12:29PM   16    WITH THE ENTIRE CLIP COMING IN --

12:29PM   17            THE COURT:  OKAY.

12:29PM   18            MR. LEACH:  -- INCLUDING STATEMENTS BY MS. HOLMES

12:29PM   19    THAT THE GOVERNMENT HAD NOT INITIALLY OFFERED.

12:29PM   20            THE COURT:  OKAY.  ALL RIGHT.  YOU'RE GOOD WITH

12:29PM   21    THAT?

12:29PM   22            MR. WADE:  I'M FINE WITH THAT.

12:29PM   23            THE COURT:  OKAY.  THANK YOU.  I WAS -- I LOOKED AT

12:29PM   24    IT, AND JUST FOR THE RECORD, THE REASON I STOPPED THE

12:29PM   25    PROCEEDING -- AND WE'LL PLAY THIS AGAIN AND START IT BECAUSE I
```

12:29PM 1    SAW THAT THERE WAS COMMENTARY AND I DIDN'T -- I KNOW THAT YOU

12:29PM 2    DIDN'T OBJECT.  I JUST WANTED TO BE CLEAR AND MAKE SURE THAT I

12:29PM 3    HAVE THAT NOW, THAT'S ON THE RECORD NOW, THAT THE ENTIRETY OF

12:29PM 4    THIS CAN BE PLAYED.

12:29PM 5        YOU'VE HEARD MY REASON I STOPPED THIS WAS --

12:29PM 6            MR. WADE:  NO, I APPRECIATE THE CAUTION, YOUR HONOR.

12:29PM 7    BECAUSE IT WAS A LITTLE -- I THINK IT WAS A LAST MINUTE

12:29PM 8    ADJUSTMENT BY MR. LEACH, WHICH WE UNDERSTAND AND --

12:29PM 9            THE COURT:  AND I'M NOT POINTING --

12:29PM 10           MR. WADE:  SO I'M GLAD WE'RE CLEAR ON THAT.

12:29PM 11           THE COURT:  THANK YOU FOR THAT.  I'M SORRY FOR THE

12:29PM 12   DISRUPTION.  I'M NOT POINTING FINGERS.  I JUST WANTED CLARITY.

12:29PM 13           MR. WADE:  NO.  THAT'S ALWAYS BETTER SAFE THAN

12:29PM 14   SORRY.  THANK YOU, YOUR HONOR.

12:29PM 15           THE COURT:  SO LET'S -- WE'RE STILL ON THE RECORD

12:29PM 16   HERE.

12:29PM 17       SHOULD WE START THE TAPE AGAIN?  I CAN'T RECALL WHERE I

12:29PM 18   STOPPED IT.  I THINK IT WAS JUST AFTER MS. SHRIVER, THE

12:29PM 19   REPORTER, WAS INTRODUCED.  SHOULD WE START IT THERE?

12:29PM 20           MR. LEACH:  I'M FINE STARTING IT WHERE WE STOPPED.

12:29PM 21           MR. WADE:  THAT'S FINE.  WE CAN START WHERE IT IS.

12:29PM 22           THE COURT:  WELL, I WAS TALKING AND IT WAS RUNNING.

12:29PM 23           MR. WADE:  MAYBE BACK IT UP 15 SECONDS OR SO.

12:29PM 24           THE COURT:  WHY DON'T WE START WHEN THE REPORTER,

12:29PM 25   MS. SHRIVER, IS INTRODUCED, AND THEN IT BREAKS AWAY INTO THE

12:29PM 1    INTERVIEW.  IS THAT ALL RIGHT WITH YOU?

12:29PM 2              MR. LEACH:  THAT'S FINE.

12:29PM 3              MR. WADE:  THAT'S FINE.  SURE.

12:29PM 4              THE COURT:  THANK YOU.  SORRY FOR THE DISRUPTION.

12:29PM 5              MR. WADE:  NO.  NO PROBLEM AT ALL, YOUR HONOR.

12:29PM 6         (END OF CONFERENCE ON THE RECORD IN THE JURY ROOM WITH

12:29PM 7    COUNSEL.)

12:29PM 8              THE COURT:  ALL RIGHT.  THANK YOU, COUNSEL.  THANK

12:29PM 9    YOU.  AND I APOLOGIZE FOR THE INTERRUPTION.

12:29PM 10        WE'RE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT

12:29PM 11   ARE PRESENT ONCE AGAIN.  OUR WITNESS IS STILL ON THE STAND.

12:29PM 12        MR. LEACH, IF YOU COULD QUEUE UP THE RECORDING AGAIN.

12:29PM 13   PERHAPS WE CAN START IT JUST AS THE REPORTER, MS. SHRIVER, WAS

12:29PM 14   BEING INTRODUCED.  WOULD THAT BE ALL RIGHT TO START THERE?

12:29PM 15             MR. LEACH:  YES, YOUR HONOR.

12:29PM 16             THE COURT:  WOULD THAT BE ALL RIGHT TO START THERE?

12:29PM 17             MR. WADE:  YES, YOUR HONOR.

12:29PM 18             THE COURT:  OKAY.

12:29PM 19        (VIDEO PLAYING OFF THE RECORD.)

12:34PM 20             MR. LEACH:  THAT COMPLETES THE VIDEO CLIP,

12:34PM 21   YOUR HONOR, EXHIBIT 3152.

12:34PM 22   Q.   MS. PETERSON, DID YOU VIEW THAT SEGMENT IN OR AROUND APRIL

12:34PM 23   OF 2016?

12:34PM 24   A.   YES.

12:34PM 25   Q.   AND SHORTLY AFTER THAT VIDEO SEGMENT, DID YOU MEET WITH

| | | |
|--|--|--|
| 12:35PM | 1 | MS. HOLMES PERSONALLY IN PALO ALTO? |
| 12:35PM | 2 | A.   YES, JERRY AND I DID. |
| 12:35PM | 3 | Q.   AND WHO ELSE WAS AT THIS MEETING IN PALO ALTO? |
| 12:35PM | 4 | A.   DAN MOSLEY -- IT WAS DAN MOSLEY, JERRY TUBERGEN AND |
| 12:35PM | 5 | MYSELF, AS WELL AS PEOPLE FROM THE OTHER SIDE, TOO. |
| 12:35PM | 6 | Q.   AND DID MS. HOLMES DISCUSS THE CMS INSPECTION? |
| 12:35PM | 7 | A.   THERE WAS A NUMBER OF THINGS DISCUSSED.  WE ASKED ABOUT |
| 12:35PM | 8 | EVERYTHING -- THIS WAS THE FIRST TIME THAT WE HAD A CHANCE TO |
| 12:35PM | 9 | ACTUALLY TALK TO HER IN PERSON SINCE WE MADE THE INVESTMENT, |
| 12:35PM | 10 | AND A LOT HAD HAPPENED SINCE, SO WE WERE ASKING REALLY WHAT WAS |
| 12:35PM | 11 | GOING ON. |
| 12:35PM | 12 | AND THERE WAS A LOT OF CONVERSATION BY HER AROUND THE LAB |
| 12:35PM | 13 | AND THINGS THAT WERE GOING ON, AND IT WAS MORE ALONG THE LINES |
| 12:35PM | 14 | OF THE PROCESS WASN'T -- CMS WAS QUESTIONING THE PROCESS, NOT |
| 12:36PM | 15 | THE ACCURACY OF THE TESTS. |
| 12:36PM | 16 | Q.   AND DID MS. HOLMES SAY, IN SUBSTANCE, THERANOS CAN'T |
| 12:36PM | 17 | TRIVIALIZE THE ISSUES IN THE PRESS? |
| 12:36PM | 18 | A.   YES. |
| 12:36PM | 19 | Q.   AND DID SHE SAY, IN SUBSTANCE, THAT IN REALITY THERANOS |
| 12:36PM | 20 | DOESN'T FEEL THE ISSUES ARE MAJOR? |
| 12:36PM | 21 | A.   CORRECT.  VERY MUCH DOWNPLAYED WHAT HAD BEEN HAPPENING IN |
| 12:36PM | 22 | THE PRESS, AND MUCH OF THE CORRESPONDENCE THAT WE HAD RECEIVED |
| 12:36PM | 23 | FROM THE COMPANY SINCE THE INVESTMENT WAS DOWNPLAYING WHAT HAD |
| 12:36PM | 24 | BEEN SAID IN THE NEWS. |
| 12:36PM | 25 | MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR? |

12:36PM 1          THE COURT:  YES.

12:36PM 2          (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

12:36PM 3          MR. LEACH:  NO FURTHER QUESTIONS, YOUR HONOR.

12:36PM 4      THANK YOU.  THANK YOU, MS. PETERSON.

12:36PM 5          THE COURT:  ANY CROSS-EXAMINATION?

12:36PM 6          MR. WADE:  I DO, YOUR HONOR.  MAYBE A STANDING BREAK

12:36PM 7  AS I TRANSITION?

12:37PM 8          THE COURT:  SURE.

12:37PM 9      FOLKS, FEEL FREE TO STAND AND STRETCH AS YOU WOULD LIKE

12:37PM 10 DURING THE TRANSITION HERE.

12:37PM 11     I THINK WE'RE GOING TO TAKE A BREAK AT 1:30, LADIES AND

12:37PM 12 GENTLEMEN, RIGHT AROUND 1:30.

12:37PM 13     YOU CAN STAND AS WELL, MS. PETERSON, IF YOU WOULD LIKE TO

12:37PM 14 STRETCH.

12:38PM 15     (STRETCHING.)

12:38PM 16         MR. WADE:  MAY I APPROACH, YOUR HONOR?

12:38PM 17         THE COURT:  YES.

12:38PM 18         MR. WADE:  (HANDING.)

12:39PM 19                    **CROSS-EXAMINATION**

12:39PM 20 BY MR. WADE:

12:39PM 21 Q.  GOOD AFTERNOON, MS. PETERSON.

12:39PM 22 A.  HI.

12:39PM 23 Q.  MY NAME IS LANCE WADE.  I REPRESENT MS. HOLMES.  I'LL ASK

12:39PM 24 YOU A FEW QUESTIONS HERE THIS AFTERNOON.

12:39PM 25     DO YOU RECALL BEING ASKED SOME QUESTIONS ABOUT A PFIZER

12:39PM   1    REPORT THAT YOU REVIEWED IN CONNECTION --

12:39PM   2    A.   DO I RECALL?

12:39PM   3    Q.   YEAH.

12:39PM   4    A.   YES.

12:39PM   5    Q.   TELL US WHAT YOU REMEMBER ABOUT THAT REPORT.

12:39PM   6    A.   THERE WERE A LOT OF PAGES IN THE DUE DILIGENCE BINDER

12:39PM   7    AROUND THAT, AND I JUST RECALL READING IT, AND THE TAKE AWAY

12:39PM   8    FOR ME WAS THE ACCURACY OF THE TESTING THAT THEY HAD DONE.

12:39PM   9    Q.   WHAT WAS THE KIND OF STUDY THAT WAS DONE BY PFIZER?

12:39PM  10    A.   I DON'T RECALL.

12:39PM  11    Q.   WHERE WAS IT DONE?

12:39PM  12    A.   I DON'T RECALL THAT.

12:39PM  13    Q.   WHAT WAS THE DRUG INVOLVED?

12:39PM  14    A.   I DON'T RECALL THE SPECIFICS.

12:39PM  15    Q.   DO YOU RECALL ANYTHING ABOUT THAT STUDY?

12:40PM  16    A.   NOT TODAY, NO.

12:40PM  17    Q.   JUST THE LOGO?  JUST THE LOGO, THAT'S ALL YOU RECALL?

12:40PM  18    A.   NO.  I RECALL READING THEM AT THE TIME AND

12:40PM  19    UNDERSTANDING -- THE TAKE AWAY FOR ME IN LOOKING AT IT WAS THAT

12:40PM  20    IT WAS LENDING CREDIBILITY TO THE ACCURACY OF THE ANALYZERS AND

12:40PM  21    THAT IT HAD DONE WORK AND, AS ELIZABETH HAD SAID, THEY HAD DONE

12:40PM  22    WORK FOR THE PHARMACEUTICAL COMPANIES FOR THE LAST FIVE TO

12:40PM  23    SEVEN YEARS.

12:40PM  24         SO, YES, I WAS LOOKING AT -- THAT THAT WAS TRUE, AND

12:40PM  25    EVERYTHING I WAS READING, THE TAKE AWAY WAS ACCURACY OF THE

12:40PM  1    TESTS THAT WAS DONE.

12:40PM  2    Q.   BUT YOU DON'T RECALL THE ACTUAL WORK THAT WAS DONE WITH

12:40PM  3    PFIZER BY THE COMPANY?

12:40PM  4    A.   NO, NOT THE SPECIFIC TESTS THAT WERE RUN, NO.

12:40PM  5    Q.   OKAY.  WE'LL COME BACK TO THE PFIZER REPORT IN A MINUTE.

12:40PM  6         LET ME START WITH YOUR EMPLOYER.  YOU WORK FOR RDV; IS

12:40PM  7    THAT RIGHT?  RDV CORPORATION?

12:40PM  8    A.   CORRECT.

12:40PM  9    Q.   AND WHAT DOES RDV STAND FOR?

12:41PM 10    A.   RICHARD DEVOS.

12:41PM 11    Q.   AND HE'S THE FOUNDER OF AMWAY; IS THAT RIGHT?

12:41PM 12    A.   HE'S A COFOUNDER, THE PATRIARCH OF THE FAMILY THAT I WORK

12:41PM 13    FOR, YES.

12:41PM 14    Q.   AND JUST FOR THE BENEFIT OF THE JURY, BECAUSE SOME OF US

12:41PM 15    MAY NOT UNDERSTAND WHAT AN ENTITY LIKE THAT IS, THAT'S

12:41PM 16    SOMETIMES REFERRED TO AS A FAMILY OFFICE; IS THAT RIGHT?

12:41PM 17    A.   CORRECT.

12:41PM 18    Q.   AND COULD YOU EXPLAIN TO US WHAT A FAMILY OFFICE IS, OR

12:41PM 19    WHAT THIS FAMILY OFFICE IS?  HOW'S THAT?

12:41PM 20    A.   THIS FAMILY OFFICE IS VERY MUCH A FAMILY -- THERE'S A

12:41PM 21    FAMILY SERVICES PART OF THE OFFICE THAT DOES A LOT OF SERVICES

12:41PM 22    DIRECTLY FOR THE FAMILY, LIKE MANAGING THEIR I.T. AND THEIR

12:41PM 23    PHONES AND CUTTING THEIR CHECKS AND DOING ALL OF THE STUFF THAT

12:41PM 24    YOU DO FOR A FAMILY, FOR A LARGE FAMILY LIKE THIS, HIRING THEIR

12:41PM 25    STAFF.

12:41PM  1          AND THEN THERE'S THE INVESTMENT SIDE, WHICH IS WHERE I

12:41PM  2     WAS.

12:41PM  3     Q.   OKAY.  AND ABOUT HOW MANY PEOPLE ARE THERE ON THE

12:41PM  4     INVESTMENT SIDE?

12:41PM  5     A.   ON THE INVESTMENT SIDE AT THE TIME?

12:41PM  6     Q.   (NODS HEAD UP AND DOWN.)

12:41PM  7     A.   ABOUT 12 TO 15.

12:41PM  8     Q.   ABOUT 12 TO 15.

12:41PM  9          AND TO WHOM DID YOU REPORT AT THE TIME THE INVESTMENT?

12:42PM  10    A.   DIRECTLY TO RANDY DAMSTRA.

12:42PM  11    Q.   TO RANDY DAMSTRA.  AND WHAT WAS HIS TITLE?

12:42PM  12    A.   SENIOR MANAGING DIRECTOR OF PRIVATE EQUITY.

12:42PM  13    Q.   AND TO WHOM DID MR. DAMSTRA REPORT?

12:42PM  14    A.   DIRECTLY TO JERRY TUBERGEN.

12:42PM  15    Q.   AND TO WHOM DID MR. TUBERGEN REPORT?

12:42PM  16    A.   TO THE FAMILY.

12:42PM  17    Q.   WHAT DOES THAT MEAN IN PRACTICE?

12:42PM  18    A.   THE FAMILY MEMBERS, AND IT ROTATED, MADE UP THE INVESTMENT

12:42PM  19    COMMITTEE.

12:42PM  20          SO JERRY REPORTED TO THE FAMILY DIRECTLY AND TO THE

12:42PM  21    INVESTMENT COMMITTEE, AND THEY HAVE A BOARD, RDV HAS A BOARD OF

12:42PM  22    DIRECTORS WHICH IS MADE UP OF FAMILY MEMBERS, AND JERRY

12:42PM  23    REPORTED TO THEM.

12:42PM  24    Q.   OKAY.  SO -- AND AS PART OF THE INVESTMENT PORTFOLIO, IT'S

12:42PM  25    THE JOB OF RDV PEOPLE TO MANAGE THE ASSETS OF THE DEVOS FAMILY?

12:42PM   1      IS THAT A FAIR HIGH LEVEL SUMMARY?

12:42PM   2      A.   CORRECT.

12:43PM   3      Q.   AND OBVIOUSLY TO TRY AND GET GAINS TO THE EXTENT POSSIBLE;

12:43PM   4      RIGHT?

12:43PM   5      A.   CORRECT.

12:43PM   6      Q.   AND HOW MANY -- YOU HAD TESTIFIED THAT I THINK YOU HAD

12:43PM   7      BEEN THERE HOW MANY YEARS AGAIN?  I'M SORRY.

12:43PM   8      A.   TODAY?  GOING ON 17.  I STARTED IN 2005.

12:43PM   9      Q.   OKAY.  SO FROM 2005 TO 2014, HOW MANY OTHER DIRECT

12:43PM  10      INVESTMENTS IN PRIVATE COMPANIES DID YOU DO THAT WERE NOT

12:43PM  11      AFFILIATED WITH PRIVATE EQUITY INVESTMENTS?

12:43PM  12      A.   NONE.

12:43PM  13      Q.   NONE?  THIS WAS THE FIRST ONE?

12:43PM  14      A.   CORRECT.

12:43PM  15      Q.   AND THIS WAS SOMEWHAT UNIQUE?

12:43PM  16      A.   YES.

12:43PM  17      Q.   AND THIS WAS AN INVESTMENT THAT HAD TO BE APPROVED BEFORE

12:43PM  18      IT COULD BE FUNDED; RIGHT?

12:43PM  19      A.   CORRECT.

12:43PM  20      Q.   AND WHO, WHO HAD AUTHORITY -- DID YOU HAVE AUTHORITY TO

12:43PM  21      APPROVE THE INVESTMENT?

12:43PM  22      A.   NO.

12:43PM  23      Q.   WHO HAD AUTHORITY TO MAKE THE INVESTMENT DECISION?

12:43PM  24      A.   THE MEMBERS OF THE INVESTMENT COMMITTEE.

12:44PM  25      Q.   OKAY.  SO THAT'S A -- MEMBERS OF THE DEVOS FAMILY?

12:44PM 1     A.   CORRECT.

12:44PM 2     Q.   AND HOW FREQUENTLY DID YOU COMMUNICATE DIRECTLY WITH THE

12:44PM 3     MEMBERS OF THE DEVOS FAMILY ABOUT THE THERANOS INVESTMENT?

12:44PM 4     A.   WE HAD A LOT OF CONVERSATION, I DID DIRECTLY WITH THE

12:44PM 5     INVESTMENT -- THE TWO INVESTMENT COMMITTEE MEMBERS THAT WERE ON

12:44PM 6     THE AIRPLANE ON THE RIDE TO THE DILIGENCE MEETING THAT WE HAD.

12:44PM 7          AND THEN EVERYTHING FROM THERE WENT THROUGH

12:44PM 8     JERRY TUBERGEN.

12:44PM 9     Q.   OKAY.  SO YOU TALKED TO -- I'M SORRY, WERE YOU DONE?  I

12:44PM 10    DIDN'T MEAN TO INTERRUPT.

12:44PM 11    A.   YES.

12:44PM 12    Q.   OKAY.  YOU TALKED ON THE PLANE RIDE OUT TO THE COMPANY?

12:44PM 13    A.   YES.

12:44PM 14    Q.   AND IS THAT IT?

12:44PM 15    A.   DIRECTLY WITH THE FAMILY MEMBERS?

12:44PM 16    Q.   YEAH.

12:44PM 17    A.   THERE MIGHT HAVE BEEN ONE OR TWO EMAIL EXCHANGES WITH

12:44PM 18    RICK DEVOS AND THAT WAS ABOUT IT.

12:44PM 19    Q.   AND IS RICK DEVOS WHAT THEY CALL A GENERATION THREE FAMILY

12:44PM 20    MEMBER?  IS THAT RIGHT?

12:45PM 21    A.   YES.

12:45PM 22    Q.   SO THAT MEANS THAT HE'S --

12:45PM 23    A.   THE OLDEST OF THE GRANDCHILDREN OF THE PATRIARCH.

12:45PM 24    Q.   SO THAT'S KIND OF TWO LEVELS DOWN FROM THE PATRIARCH; IS

12:45PM 25    THAT RIGHT?

12:45PM  1    A.   YES.

12:45PM  2    Q.   AND HE WAS ON THE INVESTMENT COMMITTEE?

12:45PM  3    A.   AT THE TIME, YES.

12:45PM  4    Q.   AND HE TOOK THE TRIP OUT TO THERANOS?

12:45PM  5    A.   YES.

12:45PM  6    Q.   OKAY.  AND JUST SO WE HAVE A SENSE OF WHERE THE OTHER

12:45PM  7    FOLKS FALL, WHERE IN THE GENERATIONS DO THE OTHER INVESTMENT

12:45PM  8    COMMITTEE MEMBERS FALL?

12:45PM  9    A.   DOUG DEVOS WAS THE CHAIRMAN OF THE INVESTMENT COMMITTEE AT

12:45PM 10    THE TIME AND HE'S ONE OF THE SONS OF THE PATRIARCH; AND THEN

12:45PM 11    THERE'S CHERI DEVOS WHO WENT ON THE TRIP, AND SHE WAS NOT ON

12:45PM 12    THE INVESTMENT COMMITTEE, BUT SHE'S A FAMILY MEMBER AND THEY

12:45PM 13    OFTEN -- FAMILY MEMBERS KIND OF CAME IN AND OUT OF THE

12:45PM 14    INVESTMENT COMMITTEE.  SO IT WASN'T UNUSUAL FOR HER TO GO.

12:45PM 15        AND THEN THE OTHER TWO MEMBERS OF THE INVESTMENT COMMITTEE

12:45PM 16    FROM THE GENERATION TWO WAS DOUG DEVOS -- OR I'M SORRY --

12:45PM 17    DAN DEVOS AND I BELIEVE DICK DEVOS.

12:46PM 18    Q.   OKAY.  SO IS IT DAN DEVOS, DOUG DEVOS, AND DICK DEVOS

12:46PM 19    REPRESENTED GENERATION TWO?

12:46PM 20    A.   YES.

12:46PM 21    Q.   AND RICK DEVOS REPRESENTED GENERATION ONE ON THE

12:46PM 22    INVESTMENT COMMITTEE?

12:46PM 23    A.   GENERATION THREE.

12:46PM 24    Q.   GENERATION THREE, I APOLOGIZE.

12:46PM 25    A.   AND THEN THERE WERE TWO OTHER GENERATION THREE MEMBERS ON

12:46PM 1    THE INVESTMENT COMMITTEE AT THE TIME.

12:46PM 2    Q.   AND MR. TUBERGEN REPORTS DIRECTLY TO THE INVESTMENT

12:46PM 3    COMMITTEE AND TO THE DEVOS FAMILY; IS THAT RIGHT?

12:46PM 4    A.   YES.

12:46PM 5    Q.   OKAY.  AND THE ENTITY THAT ACTUALLY INVESTED IN THIS

12:46PM 6    COMPANY WAS CALLED DYNASTY FINANCIAL II LLC; CORRECT?

12:46PM 7    A.   YES.

12:46PM 8    Q.   AND DO YOU KNOW WHO OWNS THAT?

12:46PM 9    A.   I DON'T KNOW THE BENEFICIAL OWNERS OF THE ENTITY, NO.

12:46PM 10   Q.   DO YOU KNOW -- WHAT DO YOU KNOW ABOUT THE ENTITY?  DOES

12:46PM 11   THE ENTITY HAVE A BOARD?

12:47PM 12   A.   NO.

12:47PM 13   Q.   IT DOESN'T?

12:47PM 14   A.   NO.  WE USUALLY CREATE A NEW ENTITY FOR ALL OF OUR

12:47PM 15   INVESTMENTS.  THIS PARTICULAR ONE I KNOW HAD MULTIPLE ASSETS IN

12:47PM 16   IT, BUT I'M NOT PRIVY TO ALL OF THE OWNERS OF THAT ENTITY.

12:47PM 17   Q.   OKAY.  THE INVESTMENT IN TOTAL WAS $100 MILLION; IS THAT

12:47PM 18   RIGHT?

12:47PM 19   A.   99 SOMETHING RATHER, YES.

12:47PM 20   Q.   OKAY.  AND THERE ARE DOCUMENTS WITHIN THE RDV THAT SUGGEST

12:47PM 21   80 MILLION OF THAT IS ATTRIBUTED TO RDV.  ARE YOU FAMILIAR WITH

12:47PM 22   THAT?

12:47PM 23   A.   NO.

12:47PM 24   Q.   DO YOU KNOW -- DO YOU KNOW WHETHER THERE WAS ANOTHER

12:47PM 25   ENTITY THAT HELD 20 MILLION?

12:47PM  1    A.   THE ONLY OTHER INDIVIDUALS OUTSIDE OF THE FAMILY THAT

12:47PM  2    WOULD HAVE BEEN INVESTING AT THAT POINT IN TIME WAS THE

12:47PM  3    EXECUTIVE STAFF.

12:47PM  4    Q.   OKAY.

12:47PM  5    A.   JERRY.

12:47PM  6    Q.   SO SENIOR LEADERSHIP COULD CHOOSE TO PARTICIPATE IN THAT,

12:47PM  7    TOO?

12:47PM  8    A.   CORRECT.

12:47PM  9    Q.   AND YOU DON'T KNOW WHETHER THEY DID OR NOT?

12:47PM  10   A.   I DON'T.

12:47PM  11   Q.   OKAY.  THERE ARE DOCUMENTS THAT REFER TO WINDQUEST.

12:48PM  12   A.   YES.

12:48PM  13   Q.   AND WHAT IS WINDQUEST?

12:48PM  14   A.   WINDQUEST IS DICK AND BETSY'S FAMILY OFFICE.  IT'S THE

12:48PM  15   NAME OF THEIR FAMILY OFFICE.  SO THERE ARE THE C-2 GENERATION,

12:48PM  16   THE FOUR SIBLINGS EACH HAVE THEIR OWN OUTSIDE INTERESTS OUTSIDE

12:48PM  17   OF RDV CORPORATION, IN WHICH THEY HAVE -- SOME OF THEM HAVE

12:48PM  18   FAMILY OFFICES, NAMES OF THEIR FAMILY OFFICES, AND THAT WOULD

12:48PM  19   BE ONE OF THEM.

12:48PM  20   Q.   DID YOU SAY THERE WERE FOUR GENERATION TWO DEVOS MEMBERS?

12:48PM  21   A.   YES.

12:48PM  22   Q.   AND THEY HAVE INDIVIDUAL FAMILY OFFICES IN ADDITION TO THE

12:48PM  23   RDV FAMILY OFFICE?

12:48PM  24   A.   YES.

12:48PM  25   Q.   AND DO YOU KNOW WHETHER WINDQUEST INVESTED IN THE THERANOS

| 12:48PM | 1 | TRANSACTION? |
| 12:48PM | 2 | A.   I DON'T KNOW. |
| 12:48PM | 3 | Q.   OKAY.  DOUG DEVOS WHO, YOU MENTIONED, HE'S ALSO THE CEO OF |
| 12:48PM | 4 | AMWAY; IS THAT RIGHT? |
| 12:48PM | 5 | A.   HE WAS.  HE'S NO LONGER. |
| 12:49PM | 6 | Q.   OKAY.  CAN I DRAW YOUR ATTENTION TO 2170 IN YOUR BINDER. |
| 12:49PM | 7 | THE CLERK:  2107? |
| 12:49PM | 8 | MR. WADE:  NO.  IT'S A NEW EXHIBIT. |
| 12:49PM | 9 | THE WITNESS:  OKAY. |
| 12:49PM | 10 | BY MR. WADE: |
| 12:49PM | 11 | Q.   LET ME KNOW WHEN YOU HAVE THAT IN FRONT OF YOU. |
| 12:49PM | 12 | A.   I DO. |
| 12:49PM | 13 | Q.   DO YOU RECOGNIZE THAT TO BE AN EMAIL RELATING TO THE |
| 12:50PM | 14 | CLOSING OF THE THERANOS INVESTMENT THAT YOU'RE ON? |
| 12:50PM | 15 | A.   I'M SORRY, SAY THE QUESTION AGAIN. |
| 12:50PM | 16 | Q.   DO YOU RECOGNIZE THAT THIS IS AN EMAIL THAT RELATES TO THE |
| 12:50PM | 17 | CLOSING OF THE THERANOS INVESTMENT? |
| 12:50PM | 18 | A.   YES. |
| 12:50PM | 19 | Q.   AND DO YOU SEE YOUR NAME IS ON THE EMAIL? |
| 12:50PM | 20 | A.   YES. |
| 12:50PM | 21 | Q.   OKAY. |
| 12:50PM | 22 | MOVE THE ADMISSION OF 2170. |
| 12:50PM | 23 | MR. LEACH:  NO OBJECTION. |
| 12:50PM | 24 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 12:50PM | 25 | (DEFENDANT'S EXHIBIT 2170 WAS RECEIVED IN EVIDENCE.) |

BY MR. WADE:

Q.   AND WE CAN JUST LOOK AT THE TOP.

     DO YOU SEE THAT THIS INDICATES THAT THE INVESTMENT, THE

SIGNED INVESTMENT DOCUMENTATION WAS SENT BY MR. TUBERGEN TO

MR. BALWANI ON 10-31-2014?

     DO YOU SEE THAT?

A.   YES.

Q.   AND IF WE GO TO THE SECOND PAGE, THIS IS THE, THIS IS THE

EXECUTED MASTER SIGNATURE PAGE?

A.   CORRECT.

Q.   AND ON YOUR DIRECT TESTIMONY, MR. LEACH SHOWED YOU SOME

ELECTRONIC FILES WITH ALL OF THE PAPERWORK FOR THE INVESTMENT.

     DO YOU RECALL THAT?

A.   YES.

Q.   AND THIS IS THE EXECUTED VERSION OF IT; CORRECT?

A.   IT'S THE SIGNATURE PAGE FOR THOSE DOCUMENTS, YES.

Q.   OKAY.  AND WHO IS THE PERSON WHO IS SIGNING HERE?  WHO IS

THAT PERSON?

A.   ROBERT SCHIERBEEK.

Q.   AND WHO IS HE?

A.   HE RUNS THE FAMILY SIDE OF THE OFFICE, AND HE WAS THE COO

OF RDV CORPORATION WHICH OWNED DYNASTY FINANCIAL, AND HE'S THE

SIGNOR FOR THE ENTITY.

Q.   OKAY.  SO IS THAT THE NUMBER 2 -- IS HE THE NUMBER 2

PERSON WITHIN THE FAMILY OFFICE?

12:51PM  1    A.   MR. SCHIERBEEK AND -- MR. DAMSTRA WOULD BE ON THE

12:51PM  2    INVESTMENT SIDE, AND MR. SCHIERBEEK WAS RUNNING THE FAMILY

12:52PM  3    SERVICES SIDE.

12:52PM  4    Q.   OKAY.

12:52PM  5    A.   THE FAMILY SIDE CONTROLS THE BANK, THE MONEY, AND THAT'S

12:52PM  6    WHY HE'S THE SIGNER.

12:52PM  7    Q.   OKAY.  SO ONCE THERE'S, THERE'S APPROVAL OF THE

12:52PM  8    INVESTMENT, THEN MR. -- IS IT SCHIERBEEK?

12:52PM  9    A.   SCHIERBEEK.

12:52PM  10   Q.   -- SCHIERBEEK HAS THE AUTHORITY TO DISBURSE THE FUNDS TO

12:52PM  11   FUND THE INVESTMENT?

12:52PM  12   A.   CORRECT.

12:52PM  13   Q.   OKAY.  LET ME BACK UP TO THE START OF THE RELATIONSHIP

12:53PM  14   WITH THERANOS.

12:53PM  15        IS IT YOUR UNDERSTANDING THAT MR. DAN MOSLEY INTRODUCED

12:53PM  16   RDV TO THE THERANOS INVESTMENT?

12:53PM  17   A.   THAT'S MY UNDERSTANDING, YES.

12:53PM  18   Q.   AND MR. MOSLEY WAS A PARTNER AT THE LAW FIRM OF

12:53PM  19   CRAVATH, SWAINE & MOORE IN NEW YORK CITY?

12:53PM  20   A.   YES.

12:53PM  21   Q.   AND HE HAD PREVIOUSLY DONE SOME WORK FOR THE DEVOS FAMILY?

12:53PM  22   A.   YES.

12:53PM  23   Q.   AND CRAVATH IS ONE OF THE MOST REPUTABLE CORPORATE LAW

12:53PM  24   FIRMS IN THE WORLD; CORRECT?

12:53PM  25   A.   I DON'T KNOW.

12:53PM 1    Q.    OKAY.  DO YOU KNOW IT TO BE A HIGHLY REPUTABLE CORPORATE

12:53PM 2    LAW FIRM?

12:53PM 3    A.    I DON'T KNOW.

12:53PM 4    Q.    OKAY.  DO YOU KNOW THAT MR. MOSLEY ALSO HAD CLOSE TIES

12:53PM 5    WITH BDT CAPITAL?

12:53PM 6    A.    NOT AT THE TIME, NO.

12:53PM 7    Q.    BUT YOU KNOW THAT NOW?

12:53PM 8    A.    YES.

12:53PM 9    Q.    OKAY.  HE NOW WORKS AT BDT CAPITAL; RIGHT?

12:54PM 10   A.    YES, I KNOW THAT.

12:54PM 11   Q.    AND THE MEETING THAT WAS SCHEDULED -- THAT YOU TESTIFIED

12:54PM 12   TO ON DIRECT WHERE MR. TUBERGEN AND MS. HOLMES MET INITIALLY,

12:54PM 13   THAT WAS AT THE BDT CAPITAL CONFERENCE; CORRECT?

12:54PM 14   A.    YES.

12:54PM 15   Q.    OKAY.  AND THAT'S A MEETING IN CHICAGO; RIGHT?

12:54PM 16   A.    YES.

12:54PM 17   Q.    AND THAT'S HOSTED BY THAT INVESTMENT FIRM; CORRECT?

12:54PM 18   A.    CORRECT.

12:54PM 19   Q.    AND BDT CAPITAL IS A FIRM THAT WAS FOUNDED BY

12:54PM 20   MR. BYRON TROTT?

12:54PM 21   A.    YES.

12:54PM 22   Q.    AND MR. TROTT IS A FORMER SENIOR BANKER AT GOLDMAN SACHS;

12:54PM 23   CORRECT?

12:54PM 24   A.    YES.

12:54PM 25   Q.    AND HE STARTED THIS FIRM FOCUSSING ON A NICHE RELATED TO

12:54PM 1      PRIVATE FAMILY INVESTMENT; IS THAT RIGHT?

12:54PM 2      A.   YES.

12:54PM 3      Q.   AND IS IT FAIR TO SAY, IF YOU KNOW, THAT MR. TROTT IS

12:55PM 4      REPUTED TO BE ONE OF THE WISEST INVESTMENT BANKERS AROUND IN

12:55PM 5      THIS SPACE?

12:55PM 6      A.   YES.

12:55PM 7      Q.   AND, IN FACT, THE DEVOS FAMILY INVESTS MONEY NOW WITH

12:55PM 8      MR. TROTT; CORRECT?

12:55PM 9      A.   WE DID IN THEIR FUND 2, AND WE DID NOT IN THEIR FUND 3.

12:55PM 10     Q.   OKAY.  AND MR. TUBERGEN WAS IN CHICAGO TO ATTEND THE

12:55PM 11     CONFERENCE THAT BDT HOSTS EVERY YEAR; RIGHT?

12:55PM 12     A.   YES.

12:55PM 13     Q.   AND HE WAS ACTUALLY THERE TO SPEAK AT THE CONFERENCE;

12:55PM 14     RIGHT?

12:55PM 15     A.   MR. TUBERGEN?

12:55PM 16     Q.   YES.

12:55PM 17     A.   NOT MY RECOLLECTION.

12:55PM 18     Q.   DO YOU RECALL THAT MR. TUBERGEN SPOKE AT THE CONFERENCE

12:56PM 19     AND GAVE A PRESENTATION ON HOW TO HAVE INVESTMENT SUCCESS?

12:56PM 20     A.   I WAS NOT TOLD THAT.  I DON'T KNOW.

12:56PM 21     Q.   LET'S TAKE A LOOK AT 1938 TO SEE IF THAT REFRESHES YOUR

12:56PM 22     RECOLLECTION.

12:56PM 23             THE CLERK:  WHAT EXHIBIT NUMBER, COUNSEL?

12:56PM 24             MR. WADE:  1938.

12:56PM 25             THE CLERK:  THANK YOU.

12:56PM 1        THE WITNESS:  OKAY.

12:56PM 2    BY MR. WADE:

12:56PM 3    Q.  DO YOU RECOGNIZE THAT TO BE AN AGENDA FOR THAT BDT CAPITAL

12:56PM 4    CONFERENCE?

12:56PM 5    A.  NO.  I WAS NOT THERE.  I WAS AT A DIFFERENT MEETING.  WE

12:56PM 6    ONLY FLEW HOME TOGETHER.

12:56PM 7    Q.  RIGHT.  DO YOU RECOGNIZE THAT IT IS CAPTIONED AS A --

12:56PM 8    A.  I'VE NEVER SEEN THIS BEFORE.

12:56PM 9    Q.  OKAY.  TAKE A LOOK AT THE FOURTH PAGE -- OR, I'M SORRY,

12:56PM 10   THE LAST PAGE, THE EIGHTH PAGE IN THE DOCUMENT.

12:57PM 11   A.  THE EIGHTH PAGE?

12:57PM 12   Q.  THE LAST PAGE IN THE DOCUMENT.

12:57PM 13   A.  OKAY.

12:57PM 14   Q.  DO YOU SEE THAT?

12:57PM 15   A.  YES.

12:57PM 16   Q.  DOES THAT REFRESH YOUR RECOLLECTION THAT MR. TUBERGEN

12:57PM 17   SPOKE ON A PANEL WHERE HE PROVIDED EXPERT ADVICE ON INVESTMENT

12:57PM 18   SUCCESS?

12:57PM 19   A.  I DID NOT KNOW THAT.

12:57PM 20   Q.  DID YOU CONSIDER HIM TO BE AN EXPERT ON INVESTMENTS,

12:57PM 21   MR. TUBERGEN?

12:57PM 22   A.  YES.

12:57PM 23   Q.  WERE YOU AWARE THAT -- WERE YOU GIVEN A BRIEFING OF

12:57PM 24   EVERYTHING THAT HAPPENED AT THE BDT CONFERENCE BY MR. TUBERGEN?

12:57PM 25   A.  AT THE CONFERENCE, NO.

12:57PM   1     Q.   WERE YOU GIVEN A DEBRIEFING ON ALL OF HIS INTERACTIONS

12:57PM   2     WITH DAN MOSLEY?

12:57PM   3     A.   NO.

12:57PM   4     Q.   WERE YOU GIVEN A BRIEFING ON ALL OF HIS INTERACTIONS WITH

12:58PM   5     BYRON TROTT?

12:58PM   6     A.   NO.

12:58PM   7     Q.   AND WERE YOU GIVEN A DEBRIEFING ON ALL OF HIS INTERACTIONS

12:58PM   8     WITH THE WALTON FAMILY?

12:58PM   9     A.   NO.

12:58PM  10     Q.   AND DO YOU KNOW WHO THE WALTON FAMILY IS?

12:58PM  11     A.   YES.

12:58PM  12     Q.   AND THAT'S THE WAL-MART HEIRS?

12:58PM  13     A.   YES.

12:58PM  14     Q.   AND YOU UNDERSTOOD THAT THEY LATER INVESTED IN THERANOS?

12:58PM  15     A.   YES, I KNOW THAT.

12:58PM  16     Q.   AND WERE YOU AWARE THAT THEY ATTENDED THE BDT CONFERENCE?

12:58PM  17     A.   NO.

12:58PM  18     Q.   WERE YOU AWARE THAT THEY WERE CLIENTS OF DAN MOSLEY?

12:58PM  19     A.   NO.  AND AT THE TIME WE WEREN'T AWARE THAT THEY WERE AN

12:58PM  20     INVESTOR.

12:58PM  21     Q.   OKAY.  WE'LL GET TO THAT.

12:58PM  22          BUT COMING OUT OF THIS CONFERENCE, YOU DIDN'T GET A

12:58PM  23     DEBRIEFING FROM MR. TUBERGEN ABOUT THE INTERACTIONS THAT HE HAD

12:58PM  24     WITH RESPECT TO THOSE INDIVIDUALS?

12:58PM  25     A.   NO.

12:58PM 1    Q.   AND DID YOU GET A DEBRIEFING WITH RESPECT TO ALL OF THE

12:58PM 2    INTERACTIONS AND DISCUSSIONS THAT HE MAY HAVE HAD WITH -- ABOUT

12:58PM 3    THERANOS?

12:58PM 4    A.   WE TALKED ABOUT THERANOS.  WE TALKED A LOT ABOUT THE, THE

12:59PM 5    MEETING THAT JERRY HAD DIRECTLY WITH CHRISTIAN AND

12:59PM 6    ELIZABETH HOLMES.

12:59PM 7    Q.   ALL RIGHT.  SO YOU TALKED ABOUT THE MEETING, AND I'LL ASK

12:59PM 8    YOU SOME QUESTIONS ABOUT THAT IN A SECOND.

12:59PM 9    A.   UH-HUH.

12:59PM 10   Q.   DID YOU TALK -- DID YOU TALK AT ALL WITH MR. TUBERGEN

12:59PM 11   ABOUT ANY OTHER INTERACTIONS THAT HE HAD AT THE BDT CAPITAL

12:59PM 12   CONFERENCE WITH RESPECT TO THERANOS?

12:59PM 13   A.   NO, NO.

12:59PM 14   Q.   OKAY.  ARE YOU AWARE THAT, ARE YOU AWARE THAT MS. HOLMES

12:59PM 15   SPOKE ON A PANEL AT THE BDT CONFERENCE?

12:59PM 16   A.   NO.

12:59PM 17   Q.   OKAY.  ARE YOU AWARE THAT MS. HOLMES HOSTED A DINNER WITH

12:59PM 18   TOBY COSGROVE FROM THE CLEVELAND CLINIC AT THE BDT CONFERENCE?

12:59PM 19   A.   NO.

12:59PM 20   Q.   AND YOU DIDN'T HAVE ANY DISCUSSIONS WITH MR. TUBERGEN

12:59PM 21   ABOUT ANY OF THOSE KINDS OF TOPICS?

12:59PM 22   A.   NO.

01:00PM 23        (PAUSE IN PROCEEDINGS.)

01:00PM 24   BY MR. WADE:

01:00PM 25   Q.   NOW, YOU TALKED ABOUT THE MEETING THAT MR. TUBERGEN HAD

01:00PM 1      WITH ELIZABETH HOLMES, CHRISTIAN HOLMES, AND DAN MOSLEY.

01:00PM 2          DO YOU RECALL THAT?

01:00PM 3      A.   YES.

01:00PM 4      Q.   AND THAT HAPPENED AT THAT CONFERENCE; CORRECT?

01:00PM 5      A.   YES.

01:00PM 6      Q.   AND THAT WAS A MEETING THAT WAS BROKERED BY MR. MOSLEY;

01:00PM 7      CORRECT?

01:00PM 8      A.   THAT'S MY UNDERSTANDING.

01:00PM 9      Q.   AND, AGAIN, YOU DON'T KNOW WHAT INFORMATION MR. MOSLEY

01:00PM 10     IMPARTED TO MR. TUBERGEN IN ADVANCE OF THAT MEETING; CORRECT?

01:00PM 11     A.   NO.   ONLY THAT HE WAS EXCITED ABOUT THE OPPORTUNITY.

01:00PM 12     Q.   OKAY.   AND ARE YOU AWARE IF MR. MOSLEY PROVIDED

01:01PM 13     MR. TUBERGEN WITH ANY MATERIALS IN ADVANCE OF THAT MEETING?

01:01PM 14     A.   NO.

01:01PM 15     Q.   TAKE A LOOK AT 12571.

01:01PM 16     A.   125 --

01:01PM 17     Q.   12571.

01:01PM 18          THE COURT:  12751?

01:01PM 19          MR. WADE:  YES, YOUR HONOR, 12751.  MY APOLOGIES.

01:02PM 20          THE WITNESS:  OKAY.

01:02PM 21     BY MR. WADE:

01:02PM 22     Q.   AND DO YOU SEE THIS IS AN EMAIL ON SEPTEMBER 17TH, 2014

01:02PM 23     FROM DAN MOSLEY TO JERRY TUBERGEN?

01:02PM 24     A.   YES, I SEE THAT.

01:02PM 25     Q.   ATTACHING THE "FORTUNE" ARTICLE THAT YOU LOOKED AT

01:02PM   1    EARLIER; CORRECT?

01:02PM   2    A.   YES.

01:02PM   3    Q.   OKAY.  AND DO YOU RECALL THAT WHEN YOU WERE RIDING BACK TO

01:02PM   4    MICHIGAN FROM CHICAGO THAT MR. MOSLEY PULLED UP ON HIS COMPUTER

01:02PM   5    THE ARTICLE AND SHOWED IT TO YOU?

01:02PM   6    A.   NO.  NO, I DON'T RECALL THAT.

01:02PM   7    Q.   DO YOU RECALL MAKING PRIOR STATEMENTS IN CONNECTION WITH

01:02PM   8    PROCEEDINGS AND RELATING TO THERANOS THAT THAT'S WHAT HAPPENED?

01:02PM   9    A.   I THINK HE HAD IT IN -- ON PAPER.

01:02PM  10    Q.   OKAY.  DID -- IS THIS THE VERSION THAT HE SHOWED YOU?

01:02PM  11    A.   YES.

01:02PM  12    Q.   OKAY.

01:02PM  13         MOVE THE ADMISSION OF 12751.

01:03PM  14              MR. LEACH:  NO OBJECTION, YOUR HONOR.

01:03PM  15              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:03PM  16         (DEFENDANT'S EXHIBIT 12751 WAS RECEIVED IN EVIDENCE.)

01:03PM  17    BY MR. WADE:

01:03PM  18    Q.   OKAY.  YOU SEE 12751 AND YOU SEE THE ATTACHMENT THAT'S

01:03PM  19    SEPTEMBER 17TH, 2014?

01:03PM  20         DO YOU SEE THAT?

01:03PM  21    A.   YES.

01:03PM  22    Q.   AND THAT'S THE DATE OF THE MEETING THAT HAPPENED WITH

01:03PM  23    MS. HOLMES; CORRECT?

01:03PM  24    A.   YES.

01:03PM  25    Q.   AND YOU WROTE BACK THE NEXT DAY AFTER THAT MEETING ON THE

01:03PM  1    18TH; CORRECT?

01:03PM  2    A.   YES.

01:03PM  3    Q.   OKAY.  AND I THINK -- DO YOU SEE THERE THAT THE ATTACHMENT

01:03PM  4    SAYS THERANOS.PDF?

01:04PM  5         DO YOU SEE THAT?

01:04PM  6    A.   YES.

01:04PM  7    Q.   AND DO YOU RECOGNIZE THAT AS THE SAME FILE NAME AS THE

01:04PM  8    ATTACHMENT OF THE DOCUMENT THAT MR. LEACH SHOWED YOU PREVIOUSLY

01:04PM  9    WHERE MR. TUBERGEN SENT THE DOCUMENT TO THE DEVOS FAMILY?

01:04PM 10    A.   I'M SORRY, WHAT IS THE QUESTION?  IS THIS THE SAME ONE

01:04PM 11    THAT MR. LEACH SHOWED ME?  YES.

01:04PM 12    Q.   ALL RIGHT.  WE'LL TAKE THEM ONE AT A TIME TO MAKE SURE THE

01:04PM 13    RECORD IS CLEAR.

01:04PM 14    A.   YES.

01:04PM 15    Q.   YOU SEE IT'S THERANOS.PDF SENT 9-17-2014?

01:04PM 16    A.   YES.

01:04PM 17    Q.   AND THAT'S FROM DAN MOSLEY TO JERRY TUBERGEN; CORRECT?

01:04PM 18    A.   YES.

01:04PM 19    Q.   YOUR BOSS'S BOSS?

01:04PM 20    A.   YES.

01:04PM 21    Q.   LET'S PULL UP 1944.

01:04PM 22         THE CLERK:  IS THAT IN EVIDENCE, COUNSEL?

01:04PM 23         MR. WADE:  WHICH IS IN EVIDENCE.

01:04PM 24    Q.   AND DO YOU SEE THE ATTACHMENT THERE IS THERANOS.PDF?

01:05PM 25         DO YOU SEE THAT?

01:05PM  1      A.   YES.

01:05PM  2      Q.   AND THAT'S THE SAME, THAT'S THE SAME "FORTUNE" ARTICLE

01:05PM  3   THAT MR. TUBERGEN HAD SENT ON TO MEMBERS OF THE DEVOS FAMILY?

01:05PM  4           DO YOU SEE THAT?

01:05PM  5      A.   YES.

01:05PM  6      Q.   AND THOSE COMMUNICATIONS HAPPENED THE DAY AFTER THE

01:05PM  7   MEETING THAT MS. HOLMES HAD WITH MR. TUBERGEN; CORRECT?

01:05PM  8      A.   YES.

01:05PM  9      Q.   OKAY.  AND DO YOU SEE IN THIS DOCUMENT, IF YOU LOOK ON THE

01:05PM 10   THIRD LINE, IT SAYS, "I'D LIKE TO SEE IF WE CAN FIND 15 MINUTES

01:05PM 11   TOMORROW TO SHARE WITH YOU AND DISCUSS A VERY UNIQUE INVESTMENT

01:05PM 12   OPPORTUNITY WE MAY HAVE WITH HER COMPANY."

01:05PM 13           DO YOU SEE THAT?

01:05PM 14      A.   YES.

01:05PM 15      Q.   AND DO YOU KNOW WHETHER THAT MEETING HAPPENED?

01:06PM 16      A.   I DON'T KNOW.

01:06PM 17      Q.   DO YOU KNOW WHETHER A CALL HAPPENED?  WHETHER A CALL

01:06PM 18   HAPPENED?

01:06PM 19      A.   NO, I DON'T KNOW SPECIFICALLY.  I WAS NOT ON IT.

01:06PM 20      Q.   OKAY.  DO YOU KNOW WHETHER -- DO YOU KNOW WHETHER, AROUND

01:06PM 21   THIS TIME, MR. TUBERGEN WAS HAVING ANY COMMUNICATIONS WITH THE

01:06PM 22   MEMBERS OF THE DEVOS FAMILY?

01:06PM 23      A.   YES, HE WAS.

01:06PM 24      Q.   HE WAS.

01:06PM 25      A.   YES.

01:06PM  1    Q.   BUT YOU DON'T KNOW WHAT THE SUBSTANCE WAS?

01:06PM  2    A.   CORRECT.

01:06PM  3    Q.   YOU WEREN'T INVOLVED IN THOSE COMMUNICATIONS?

01:06PM  4    A.   I WASN'T INVOLVED IN THE COMMUNICATIONS, BUT I WAS ASKED

01:06PM  5    TO WORK ON IT, SO I KNOW THERE WAS COMMUNICATION GOING ON.

01:06PM  6    Q.   AND YOU SAY -- AND YOU WANTED TO WORK ON IT; CORRECT?

01:06PM  7    A.   YES.

01:06PM  8    Q.   AND YOU HAD A CONVERSATION ON THE PLANE ON THE 18TH WITH

01:06PM  9    MR. TUBERGEN AND MR. DAMSTRA; CORRECT?

01:06PM 10    A.   YES.

01:06PM 11    Q.   AND THEN ABOUT 12 DAYS WENT BY AND YOU HADN'T HEARD

01:06PM 12    ANYTHING, SO YOU ACTUALLY FOLLOWED UP WITH MR. DAMSTRA AND

01:06PM 13    SAID, IF THERE'S AN OPPORTUNITY, I'D LIKE TO, I'D LIKE TO WORK

01:06PM 14    ON THIS.

01:06PM 15         DO YOU RECALL THAT?

01:06PM 16    A.   I WAS ENTHUSED FROM THE VERY BEGINNING, AND I'M NOT ON THE

01:07PM 17    BDT RELATIONSHIP, SO I THOUGHT THAT THIS MIGHT GO TO THE PERSON

01:07PM 18    THAT WAS IN CHARGE OF BDT.

01:07PM 19    Q.   OKAY.  SO UNDER MR. DAMSTRA THERE'S A PERSON KIND OF AT

01:07PM 20    YOUR LEVEL, IF YOU WILL?

01:07PM 21    A.   YES.

01:07PM 22    Q.   I MEAN NO OFFENSE WHEN I SAY THAT, BUT A SIMILAR POSITION

01:07PM 23    WITHIN THE FAMILY OFFICE?

01:07PM 24    A.   YES.

01:07PM 25    Q.   AND THEY WERE RESPONSIBLE FOR BDT?

01:07PM  1    A.   CORRECT.

01:07PM  2    Q.   AND COMING OUT OF THIS, COMING OUT OF THIS MEETING,

01:07PM  3    BETWEEN THE TIME THAT YOU HAD THOSE INTERACTIONS WITH

01:07PM  4    MR. TUBERGEN AND THE TIME THAT YOU GOT ON THE PLANE TO GO TO

01:07PM  5    CALIFORNIA, YOU DIDN'T HAVE ANY INTERACTIONS WITH THE DEVOS

01:08PM  6    FAMILY MEMBERS ABOUT THIS?

01:08PM  7    A.   OTHER THAN SHARING MY MEMOS, NO.

01:08PM  8    Q.   WELL, YOU DON'T ACTUALLY KNOW WHETHER THEY GOT YOUR MEMOS,

01:08PM  9    DO YOU?

01:08PM  10   A.   YES, BECAUSE WE TALKED ABOUT IT ON THE PLANE.

01:08PM  11   Q.   DO YOU RECALL --

01:08PM  12   A.   WE WENT THROUGH THE MEMO ON THE PLANE.

01:08PM  13   Q.   OKAY.  DO YOU RECALL GIVING TESTIMONY IN THIS CASE IN

01:08PM  14   CONNECTION WITH THERANOS MATTERS PREVIOUSLY?

01:08PM  15   A.   YES.

01:08PM  16   Q.   OKAY.  DO YOU RECALL YOU WERE DEPOSED?  DO YOU REMEMBER

01:08PM  17   THAT?

01:08PM  18   A.   YES.

01:08PM  19   Q.   IN MICHIGAN?

01:08PM  20   A.   YES.

01:08PM  21   Q.   DO YOU RECALL THAT?

01:08PM  22        AND THERE WAS A COURT REPORTER LIKE OUR COURT REPORTER

01:08PM  23   HERE TAKING DOWN EVERYTHING THAT YOU SAID?

01:08PM  24        DO YOU RECALL THAT?

01:08PM  25   A.   YES.

01:08PM 1    Q.   OKAY.  AND YOU WERE UNDER OATH; RIGHT?

01:08PM 2    A.   YES.

01:08PM 3    Q.   AND YOU TOLD THE TRUTH IN THAT TESTIMONY, DID YOU NOT?

01:08PM 4    A.   IF YOU CAN SHOW ME WHAT YOU'RE REFERRING TO, MAYBE IT WILL

01:08PM 5    REFRESH MY MEMORY.

01:08PM 6    Q.   MY QUESTION IS JUST WHETHER YOU TOLD THE TRUTH.

01:08PM 7    A.   YES.

01:08PM 8    Q.   AND DID YOU TESTIFY IN THAT DEPOSITION THAT YOU DON'T KNOW

01:08PM 9    WHETHER THE DEVOS FAMILY MEMBERS REVIEWED ANY OF YOUR MEMOS?

01:09PM 10   A.   I KNOW THAT WE TALKED ABOUT ALL OF THE WORK THAT I HAD

01:09PM 11   DONE ON THE AIRPLANE ON THE WAY HERE, SO YES.

01:09PM 12   Q.   OKAY.

01:09PM 13   A.   I DON'T KNOW IF THEY HAD ACTUALLY PHYSICALLY PUT THEIR

01:09PM 14   EYES ON THE MEMO, BUT WE DEFINITELY TALKED ABOUT THE SUBSTANCE

01:09PM 15   OF MY MEMO ON THE PLANE.

01:09PM 16   Q.   OKAY.  OKAY.  I JUST WANT TO MAKE SURE OUR RECORD IS

01:09PM 17   CLEAR.

01:09PM 18        YOU DON'T KNOW WHETHER THEY READ YOUR MEMO; CORRECT?

01:09PM 19   A.   CORRECT.

01:09PM 20   Q.   BUT YOU DID HAVE DISCUSSIONS WITH THEM ON THE PLANE RIDE

01:09PM 21   ON THE WAY?

01:09PM 22   A.   YES, LOTS OF THEM.

01:09PM 23   Q.   OKAY.  DO YOU HAVE NOTES OF THOSE CONVERSATIONS?

01:09PM 24   A.   NO.

01:09PM 25   Q.   OKAY.  THE NEXT INTERACTION THAT YOU HAD WITH THERANOS --

01:09PM  1    WELL, LET ME STEP BACK.  LET ME ASK YOU ANOTHER QUESTION ABOUT

01:09PM  2    MR. MOSLEY.

01:09PM  3        ARE YOU AWARE THAT -- I WANT TO SHOW YOU A DOCUMENT.  IF

01:10PM  4    YOU LOOK AT 4197.

01:10PM  5    A.   OKAY.

01:10PM  6    Q.   AND THIS IS A DOCUMENT THAT YOU'VE SEEN BEFORE; CORRECT?

01:10PM  7    A.   I DON'T RECALL.  DEFINITELY NOT PRIOR TO OUR MAKING THE

01:11PM  8    INVESTMENT.

01:11PM  9    Q.   OKAY.  DO YOU RECALL -- LET'S TAKE IT ONE PIECE AT A TIME.

01:11PM  10       DO YOU RECALL WHETHER YOU'VE SEEN THIS DOCUMENT BEFORE?

01:11PM  11   A.   I DON'T RECALL.

01:11PM  12   Q.   OKAY.  LET'S LOOK AT 10587.  ACTUALLY, BEFORE I DO THAT,

01:11PM  13   LET ME JUST ASK A QUESTION ABOUT DO YOU KNOW WHETHER -- LET'S

01:11PM  14   GO TO 10587.

01:11PM  15           THE COURT:  10587?

01:12PM  16           MR. WADE:  YES.

01:12PM  17   Q.   DO YOU SEE THAT THIS IS AN EMAIL THAT WAS SENT TO YOU BY

01:12PM  18   HUGH FREUND IN 2017?  I'M LOOKING AT THE COVER EMAIL RIGHT NOW.

01:12PM  19   A.   YES.

01:12PM  20   Q.   OKAY.  AND DO YOU SEE THAT HE ATTACHES THE DOCUMENT THAT I

01:12PM  21   WAS REFERRING TO AS EXHIBIT 4197?

01:12PM  22   A.   OKAY, YES.

01:12PM  23   Q.   OKAY.

01:12PM  24       MOVE THE ADMISSION OF --

01:12PM  25       AND THIS IS AN INVESTMENT ANALYSIS THAT MR. MOSLEY DID IN

01:12PM 1    CONNECTION WITH THERANOS; CORRECT?

01:12PM 2    A.   CORRECT.

01:12PM 3    Q.   OKAY.

01:12PM 4         MOVE THE ADMISSION OF 10587.

01:13PM 5             MR. LEACH:  HEARSAY ON 10587, YOUR HONOR.  I HAVE NO

01:13PM 6    OBJECTION TO THE PRIOR EXHIBIT THAT WE WERE LOOKING AT.

01:13PM 7             THE COURT:  WILL THAT WORK FOR YOU, MR. WADE?

01:13PM 8             MR. WADE:  WHY DON'T WE TRY IT?

01:13PM 9             THE COURT:  4197?

01:13PM 10            MR. WADE:  IF THE GOVERNMENT IS OKAY WITH ME ASKING

01:13PM 11   QUESTIONS OF 4197, MAYBE I'LL JUST ASK THE QUESTION.

01:13PM 12            THE COURT:  SURE.

01:13PM 13            MR. WADE:  I MOVE THE ADMISSION OF 4197.

01:13PM 14            MR. LEACH:  NO OBJECTION.

01:13PM 15            THE COURT:  THAT'S ADMITTED, AND IT MAY BE

01:13PM 16   PUBLISHED.

01:13PM 17        (GOVERNMENT'S EXHIBIT 4197 WAS RECEIVED IN EVIDENCE.)

01:13PM 18   BY MR. WADE:

01:13PM 19   Q.   OKAY.  DO YOU SEE HERE THIS IS A DAY -- THIS IS A DAY --

01:13PM 20   OR A DOCUMENT FROM MR. MOSLEY.

01:13PM 21        DO YOU SEE THAT?

01:13PM 22   A.   YES.

01:13PM 23   Q.   AND THIS ONE IS ADDRESSED TO DR. KISSINGER?

01:13PM 24   A.   YES.

01:13PM 25   Q.   DO YOU RECOGNIZE THAT TO BE HENRY KISSINGER?

01:13PM 1    A.   YES.

01:13PM 2    Q.   OKAY.  AND ATTACHED TO THIS, IF YOU GO TO THE SECOND PAGE,

01:14PM 3    AND IT'S SEPTEMBER 2ND -- I'M SORRY.  IT'S SEPTEMBER 2ND, 2014;

01:14PM 4    RIGHT?

01:14PM 5    A.   BUT I DIDN'T SEE THIS UNTIL THREE YEARS LATER.

01:14PM 6    Q.   THAT'S NOT MY QUESTION, BUT WE'LL GET TO THAT.

01:14PM 7    A.   OKAY.  OKAY.

01:14PM 8    Q.   YOU SEE THAT IT'S DATED SEPTEMBER 2ND, 2014?

01:14PM 9    A.   YES.

01:14PM 10   Q.   OKAY.  AND THAT IS A COUPLE OF WEEKS BEFORE THE MEETING

01:14PM 11   THAT MR. MOSLEY AND MR. TUBERGEN AND MS. HOLMES HAD IN CHICAGO

01:14PM 12   AT THE BDT CONFERENCE; CORRECT?

01:14PM 13   A.   YES.

01:14PM 14   Q.   OKAY.  LET'S GO TO THE SECOND PAGE.

01:14PM 15        AND IF YOU LOOK, AND I WON'T GO THROUGH THE DETAILS OF IT

01:14PM 16   NOW, BUT IF WE JUST SCROLL THROUGH THE PAGES, THERE'S A PRETTY

01:14PM 17   DETAILED ANALYSIS THAT MR. MOSLEY HAD DONE WITH RESPECT TO

01:14PM 18   THERANOS; CORRECT?

01:14PM 19   A.   IT APPEARS THAT WAY, YES.

01:15PM 20   Q.   OKAY.  OKAY.

01:15PM 21        AND DO YOU KNOW WHETHER THIS DOCUMENT WAS COMMUNICATED TO

01:15PM 22   MR. TUBERGEN BEFORE HIS MEETING WITH MS. HOLMES?

01:15PM 23   A.   NOT TO MY KNOWLEDGE.

01:15PM 24   Q.   OKAY.  BUT YOU DON'T KNOW; CORRECT?

01:15PM 25   A.   I DON'T KNOW.

01:15PM 1    Q.   OKAY.  AND DO YOU KNOW WHETHER THE SUBSTANCE OF THIS

01:15PM 2    ANALYSIS WAS COMMUNICATED ORALLY BY MR. MOSLEY TO MR. TUBERGEN

01:15PM 3    IN PART OR IN WHOLE?

01:15PM 4    A.   I DON'T KNOW.

01:15PM 5    Q.   OKAY.  THIS DOCUMENT, DO YOU RECALL THAT THIS DOCUMENT WAS

01:15PM 6    LATER COMMUNICATED TO YOU IN YOUR GMAIL ACCOUNT?

01:15PM 7    A.   YES.

01:15PM 8    Q.   AND DO YOU ORDINARILY USE YOUR GMAIL ACCOUNT FOR BUSINESS

01:16PM 9    MATTERS?

01:16PM 10   A.   NOT REGULARLY, NO.

01:16PM 11   Q.   OKAY.  AND DO YOU RECALL THEN THAT YOU FORWARDED THIS

01:16PM 12   DOCUMENT FROM YOUR GMAIL ACCOUNT TO A GMAIL ACCOUNT AND A HOME

01:16PM 13   ACCOUNT RELATING TO MR. TUBERGEN?

01:16PM 14   A.   YES.

01:16PM 15   Q.   OKAY.  DO YOU NORMALLY COMMUNICATE WITH MR. TUBERGEN ABOUT

01:16PM 16   MATTERS WITH WORK EMAIL?

01:16PM 17   A.   NO.

01:16PM 18   Q.   NO?

01:16PM 19   A.   I NORMALLY COMMUNICATE WITH MR. TUBERGEN WITH MY WORK

01:16PM 20   EMAIL, YES.

01:16PM 21   Q.   YOU DO?

01:16PM 22   A.   YES.

01:16PM 23   Q.   SO NORMALLY YOU SEND IT FROM YOUR WORK EMAIL TO HIS WORK

01:16PM 24   EMAIL; RIGHT?

01:16PM 25   A.   YES.

01:16PM 1    Q.   OKAY.  AND WERE -- IS THE FACT THAT IT WAS BEING

01:16PM 2    COMMUNICATED BY GMAIL SOME INDICATION THAT YOU WERE TRYING TO

01:17PM 3    HIDE THE DOCUMENT?

01:17PM 4    A.   EVERYTHING AROUND THIS, WE WERE TRYING TO UNDERSTAND

01:17PM 5    MR. MOSLEY'S ROLE IN THE THERANOS INVESTMENT, AND WE COULDN'T

01:17PM 6    FIGURE IT OUT, AND WE HAD NOT SEEN THIS.

01:17PM 7         AND ONE OF THE OTHER -- ONCE WE UNDERSTOOD WHO THE OTHER

01:17PM 8    INVESTORS WERE, ONE OF THE OTHER INVESTORS GAVE US THIS.

01:17PM 9    Q.   OKAY.

01:17PM 10   A.   AND UNTIL WE UNDERSTOOD WHAT HIS ROLE WAS IN ALL OF THIS.

01:17PM 11   Q.   NO, I UNDERSTAND THAT.  FAIR ENOUGH.

01:17PM 12   A.   UH-HUH.

01:17PM 13   Q.   YOU WERE DOING SOME WORK TO FIGURE OUT -- THIS IS YEARS

01:17PM 14   LATER; RIGHT?

01:17PM 15   A.   YES.

01:17PM 16   Q.   AND YOU WERE DOING SOME WORK TO FIGURE OUT WHAT

01:17PM 17   MR. MOSLEY'S ROLE IN THE INVESTMENTS WAS; RIGHT?

01:17PM 18   A.   CORRECT, AND WHETHER HE WAS COMPENSATED.

01:17PM 19   Q.   AND HE HAD ACTUALLY -- PRIOR TO THE INVESTMENT, HE HAD

01:17PM 20   DONE LEGAL WORK FOR THE DEVOS FAMILY; CORRECT?

01:17PM 21   A.   CORRECT.

01:17PM 22   Q.   OKAY.  MY QUESTION IS, AS YOU'RE TRYING TO FIGURE THIS

01:18PM 23   OUT, IS THERE A REASON THAT THESE DOCUMENTS ARE BEING

01:18PM 24   COMMUNICATED IN GMAIL AS OPPOSED TO WORK EMAIL?

01:18PM 25   A.   BECAUSE AT THIS TIME THERE WAS ALL KINDS OF ISSUES GOING

01:18PM  1    ON AROUND THE COMPANY, AND WE DIDN'T KNOW WHETHER MR. MOSLEY --

01:18PM  2    WHAT HIS ROLE WAS IN ALL OF THIS AND, FRANKLY, WE DID NOT WANT

01:18PM  3    TO GET HIM IN TROUBLE.

01:18PM  4    Q.   OKAY.  SO YOU WANTED TO KEEP IT UNDER YOUR HAT?

01:18PM  5    A.   CORRECT.

01:18PM  6    Q.   SO YOU KIND OF HID THE DOCUMENT?

01:18PM  7         IS THAT FAIR?

01:18PM  8    A.   SOMEWHAT, YES.

01:18PM  9    Q.   DO YOU KNOW -- YOU TESTIFIED THAT MR. MOSLEY WORKED AT THE

01:18PM 10    LAW FIRM OF CRAVATH, SWAINE & MOORE.

01:18PM 11         DO YOU RECALL THAT?

01:18PM 12    A.   YES.

01:18PM 13    Q.   AND DO YOU RECALL THAT LEARNING, DURING YOUR WORK RELATING

01:18PM 14    TO THERANOS, THAT HE USED -- THAT THERANOS HAD A LAWYER BY THE

01:18PM 15    NAME OF MR. DAVID BOIES?

01:18PM 16    A.   YES, I KNEW THAT.

01:18PM 17    Q.   AND WERE YOU AWARE THAT MR. DAVID BOIES USED TO BE LAW

01:19PM 18    PARTNERS WITH MR. MOSLEY AT CRAVATH, SWAINE & MOORE?

01:19PM 19    A.   NO.

01:19PM 20    Q.   WERE YOU AWARE AT ANY TIME THAT MR. MOSLEY WAS DOING DUE

01:19PM 21    DILIGENCE AND OBTAINING INFORMATION FROM DAVID BOIES IN

01:19PM 22    CONNECTION WITH THERANOS?

01:19PM 23    A.   NO.

01:19PM 24              MR. LEACH:  FOUNDATION.  RELEVANCE.

01:19PM 25              THE COURT:  I'LL ALLOW IT.  YOU CAN --

01:19PM  1    BY MR. WADE:

01:19PM  2    Q.   ARE YOU -- DO YOU KNOW WHETHER MR. TUBERGEN LEARNED OF ANY

01:19PM  3    OF THOSE FACTS IN CONNECTION WITH THE INVESTMENT?

01:19PM  4    A.   NOT TO MY KNOWLEDGE.

01:19PM  5    Q.   OKAY.  MR. TUBERGEN CAME OUT OF THE MEETING WITH

01:20PM  6    MS. HOLMES VERY EXCITED ABOUT THE POTENTIAL INVESTMENT;

01:20PM  7    CORRECT?

01:20PM  8    A.   YES.

01:20PM  9    Q.   HE -- THIS WAS BEFORE -- THIS WAS BASED ON THE INITIAL

01:20PM  10   INTERACTION; RIGHT?

01:20PM  11   A.   CORRECT.

01:20PM  12   Q.   AND WHATEVER OTHER INTERACTIONS HE HAD IN ADVANCE OF THAT;

01:20PM  13   CORRECT?

01:20PM  14   A.   I DON'T KNOW WHAT OTHER INTERACTIONS HE HAD, BUT HE WAS

01:20PM  15   VERY EXCITED ABOUT THE MEETING THAT HE HAD WITH CHRISTIAN AND

01:20PM  16   ELIZABETH.

01:20PM  17   Q.   RIGHT.  AND HE CAME, HE CAME BACK HIGHLY INTERESTED IN

01:20PM  18   DOING THE INVESTMENT; CORRECT?

01:20PM  19   A.   HE CAME BACK HIGHLY INTERESTED AND LOOKING AT THE

01:20PM  20   OPPORTUNITY AND TAKING IT TO THE FAMILY.

01:20PM  21   Q.   AND DO YOU RECALL THAT HE REALLY WANTED TO MAKE IT HAPPEN?

01:21PM  22        DO YOU RECALL THAT?

01:21PM  23   A.   I DON'T SEE HIS BEHAVIOR ANY DIFFERENT THAN NORMAL.  HE

01:21PM  24   WAS, HE WAS EXCITED ABOUT AN OPPORTUNITY THAT WE HAD A CHANCE

01:21PM  25   TO LOOK AT, AND WE LOOKED AT IT, AND IT WENT THROUGH THE PROPER

01:21PM  1    PROCESS OF GOING THROUGH THE INVESTMENT COMMITTEE.

01:21PM  2    Q.   DO YOU RECALL, DO YOU RECALL WHAT DROVE THE INVESTMENT WAS

01:21PM  3    MR. TUBERGEN'S BELIEF THAT THERANOS WAS A UNICORN?

01:21PM  4    A.   I DON'T RECALL THAT.

01:21PM  5    Q.   OKAY.  DO YOU KNOW WHAT A UNICORN IS?

01:21PM  6    A.   CAN YOU EXPLAIN IT?

01:21PM  7    Q.   I'M ASKING YOU.  YOU'RE THE INVESTMENT PROFESSIONAL.  I'M

01:21PM  8    WONDERING IF YOU KNOW WHAT A UNICORN IS.

01:21PM  9    A.   (LAUGHTER.)

01:21PM 10        IT'S NOT SOMETHING THAT WE NORMALLY INVEST WITH.  HIGH

01:21PM 11    GROWTH INVESTMENTS LIKE THAT, WE DON'T AT ALL INVEST WITH

01:21PM 12    THOSE.

01:21PM 13    Q.   AND WHEN YOU SAY "HIGH GROWTH INVESTMENTS," UNICORNS ARE

01:22PM 14    USUALLY INVESTMENTS THAT CAN REALLY POP; CORRECT?

01:22PM 15    A.   THAT'S YOUR DEFINITION, YES.  THAT'S YOUR DEFINITION,

01:22PM 16    OKAY?

01:22PM 17    Q.   WHAT IS YOUR DEFINITION?

01:22PM 18    A.   I DON'T DEAL IN INVESTING IN UNICORNS, SO --

01:22PM 19    Q.   OKAY.  AND YOU DON'T RECALL THAT WHAT DROVE THE INVESTMENT

01:22PM 20    IN THE CASE OF THERANOS WAS MR. TUBERGEN'S BELIEF THAT THERANOS

01:22PM 21    WAS A UNICORN?

01:22PM 22    A.   I DON'T BELIEVE THAT WAS THE CASE.  WE WERE RELYING ON

01:22PM 23    FOUR KEY ELEMENTS OF THIS, WHICH WERE THE FINANCIALS THAT WERE

01:22PM 24    SOLID, THE CONTRACTS THAT WERE IN PLACE, THE FACT THAT THEY HAD

01:22PM 25    DONE WORK FOR THE LAST FIVE TO SEVEN YEARS WITH PHARMACEUTICAL

01:22PM 1    COMPANIES THAT, THAT SUBSTANTIATED THE ACCURACY OF IT.

01:23PM 2        THOSE ARE WHAT WE BASED OUR INVESTMENT DECISION ON.

01:23PM 3    Q.   WELL, YOU DIDN'T MAKE THE INVESTMENT DECISION; RIGHT?

01:23PM 4    A.   I INFORMED THE INVESTMENT COMMITTEE THAT MADE THE

01:23PM 5    INVESTMENT DECISION, YES, AS WELL AS THEM GOING IN THE MEETING.

01:23PM 6    Q.   JUST TO BE CLEAR, YOU DID NOT ATTEND THE INVESTMENT

01:23PM 7    COMMITTEE MEETING; CORRECT?

01:23PM 8    A.   CORRECT.

01:23PM 9    Q.   AND YOU DON'T KNOW WHETHER ANY OF YOUR MEMOS WERE EVER

01:23PM 10   READ BY THE INVESTMENT COMMITTEE; RIGHT?

01:23PM 11   A.   CORRECT.

01:23PM 12   Q.   OKAY.  AND, IN FACT, THE INVESTMENT IN THERANOS WAS

01:23PM 13   COMMITTED TO BEFORE YOU EVEN PREPARED THAT MEMO, THE SECOND

01:23PM 14   MEMO; CORRECT?

01:23PM 15   A.   THAT'S NOT CORRECT.

01:23PM 16   Q.   OKAY.  WE'LL GET TO THAT.

01:23PM 17       BUT STICKING WITH THE UNICORN, DO YOU RECALL THAT YOU GAVE

01:23PM 18   AN INTERVIEW WITH THE S.E.C. AND THE DEPARTMENT OF JUSTICE IN

01:23PM 19   APRIL OF 2017?

01:23PM 20   A.   YES.

01:23PM 21   Q.   AND DO YOU RECALL THAT WAS, THAT WAS A MEETING WHERE,

01:24PM 22   WHERE MANY OF THE -- A COUPLE OF THE PROSECUTORS MAYBE HERE

01:24PM 23   ATTENDED.

01:24PM 24       DO YOU RECALL THAT?

01:24PM 25   A.   I DON'T RECALL WHO WAS IN THE ROOM EXACTLY, BUT I REMEMBER

01:24PM  1    THE INTERVIEW.

01:24PM  2    Q.   AND THERE WERE SOME S.E.C. ATTORNEYS.

01:24PM  3         DO YOU RECALL THAT?

01:24PM  4    A.   YES.

01:24PM  5    Q.   AND IT WAS IN SAN FRANCISCO, I THINK.

01:24PM  6    A.   YES.

01:24PM  7    Q.   OKAY.  AND YOU WERE REPRESENTED BY COUNSEL; RIGHT?

01:24PM  8    A.   YES.

01:24PM  9    Q.   OKAY.  AND DO YOU RECALL, IN CONNECTION WITH THAT, THAT

01:24PM  10   YOUR ATTORNEYS HAD MEETINGS IN ADVANCE WITH THE S.E.C.?

01:24PM  11   A.   I DON'T RECALL ANY OF THAT, NO.

01:24PM  12   Q.   OKAY.  DO YOU RECALL IN ADVANCE THAT YOUR ATTORNEYS TOLD

01:24PM  13   THE S.E.C. AND DOJ THAT WHAT DROVE THE INVESTMENT WAS A

01:24PM  14   UNICORN?

01:24PM  15             MR. LEACH:  OBJECTION.

01:24PM  16             THE COURT:  SUSTAINED.

01:24PM  17             THE WITNESS:  I DON'T RECALL THAT.

01:24PM  18             THE COURT:  SUSTAINED.  SUSTAINED.  THE ANSWER IS

01:24PM  19   STRICKEN.

01:24PM  20        YOU CAN ASK ANOTHER QUESTION.

01:24PM  21   BY MR. WADE:

01:24PM  22   Q.   I'M TRYING TO REFRESH YOUR RECOLLECTION.  IF YOU CAN LOOK

01:24PM  23   AT EXHIBIT 11453.

01:25PM  24   A.   CAN YOU DIRECT ME TO WHAT YOU'RE REFERRING TO?

01:25PM  25   Q.   YEAH, I WILL.  AND JUST SO WE'RE CLEAR, READ IT TO

01:25PM 1    YOURSELF.  PLEASE DON'T SPEAK UNTIL AFTER I ASK YOU A QUESTION

01:25PM 2    JUST SO NEITHER ONE OF US GET IN TROUBLE, OKAY?

01:25PM 3         THE -- IF YOU CAN LOOK ABOUT TWO-THIRDS OF THE WAY DOWN

01:25PM 4    THE PAGE, MAYBE THREE QUARTERS OF THE WAY, DO YOU SEE WHAT

01:25PM 5    DROVE INVESTMENT?  DO YOU SEE THAT LANGUAGE?

01:25PM 6         IF I COULD APPROACH, I CAN POINT IT OUT, YOUR HONOR.

01:25PM 7              THE COURT:  SURE.  GO RIGHT AHEAD.  GO RIGHT AHEAD.

01:25PM 8    YES.

01:25PM 9              THE WITNESS:  I DON'T RECALL EVER SAYING THAT WORD.

01:25PM 10        I SEE THAT.  I DO NOT EVER RECALL SAYING THAT WORD.  IT'S

01:26PM 11   NOT SOMETHING I WOULD EVER USE.

01:26PM 12        I DO RECALL IT SAYS RELIED ON LONG-TERM CONTRACTS WITH

01:26PM 13   WALGREENS AND SAFEWAY.

01:26PM 14   BY MR. WADE:

01:26PM 15   Q.   SO DO YOU THINK YOUR ATTORNEYS GOT THOSE FACTS RIGHT WHEN

01:26PM 16   THEY GAVE THE PROFFER?

01:26PM 17              MR. LEACH:  OBJECTION.

01:26PM 18              THE COURT:  SUSTAINED.  WHY DON'T WE MOVE ON?

01:26PM 19              THE WITNESS:  I WOULD NEVER USE THE WORD "UNICORN."

01:26PM 20   BY MR. WADE:

01:26PM 21   Q.   JUST TO BE CLEAR, JUST SO THE RECORD IS CLEAR, I WAS NEVER

01:26PM 22   SUGGESTING THAT YOU WERE.

01:26PM 23        DO YOU RECALL THAT YOUR LAWYERS ON YOUR BEHALF PROFFERED

01:26PM 24   THOSE FACTS?

01:26PM 25              MR. LEACH:  OBJECTION.  FOUNDATION.

01:26PM  1                    THE COURT:  DO YOU HAVE ANOTHER QUESTION?

01:26PM  2                    MR. WADE:  I DO.

01:26PM  3                    THE COURT:  GREAT.

01:27PM  4        BY MR. WADE:

01:27PM  5        Q.   AFTER YOUR MEETING WITH MR. TUBERGEN ON THE AIRPLANE, WHEN

01:27PM  6        DID YOU NEXT MEET WITH HIM IN CONNECTION WITH THE THERANOS

01:27PM  7        INVESTMENT?

01:27PM  8        A.   I BELIEVE HE -- WE TALKED THE DAY OF THE CALL WITH

01:27PM  9        ELIZABETH HOLMES.

01:27PM 10        Q.   DID -- WHEN YOU DID THE CALL, WERE YOU IN THE SAME

01:27PM 11        PHYSICAL SPACE?

01:27PM 12        A.   YES.

01:27PM 13        Q.   OKAY.  IN HIS OFFICE?

01:27PM 14        A.   YES.

01:27PM 15        Q.   OKAY.  AND SO YOU MET THAT DAY AND MADE THE CALL TO

01:28PM 16        MS. HOLMES?

01:28PM 17        A.   YES.

01:28PM 18        Q.   AND THAT WAS THE CALL THAT YOU REFERRED TO, THE

01:28PM 19        OCTOBER 3RD CALL?

01:28PM 20        A.   CORRECT.

01:28PM 21        Q.   OKAY.

01:28PM 22        A.   WE TALKED AHEAD OF THE CALL AND AFTER THE CALL.

01:28PM 23        Q.   OKAY.  AND THAT WAS THE POINT AT WHICH MR. TUBERGEN GAVE

01:28PM 24        YOU THE BINDERS; IS THAT RIGHT?

01:28PM 25        A.   YES.

01:28PM  1    Q.   AND THERE WERE TWO -- I BELIEVE YOU'VE SAID PREVIOUSLY

01:28PM  2    THAT THERE WERE TWO BINDERS; IS THAT RIGHT?

01:28PM  3    A.   THERE WERE TWO BINDERS.  I WENT UP AND GOT THE BINDERS

01:28PM  4    EARLY THAT MORNING AND STARTED GOING THROUGH THEM AND

01:28PM  5    DEVELOPING QUESTIONS FOR THE CALL LATER THAT DAY.

01:28PM  6    Q.   I THOUGHT YOU SAID IT WAS IN THE MEETING THAT HE GAVE YOU

01:28PM  7    THE BINDERS.

01:28PM  8    A.   NO.  HE EMAILED ME AND SAID THAT THERE WAS GOING TO BE A

01:28PM  9    CALL THAT DAY AND COULD I ATTEND, AND I SAID YES.

01:28PM 10        AND THEN HE SAID THAT THE BINDERS HAD ARRIVED AND THEY

01:28PM 11    WERE ON HIS DESK, AND SO I WENT AND GOT THEM AND MADE A COPY.

01:28PM 12    Q.   OKAY.

01:28PM 13    A.   AND I BEGAN LOOKING AT THEM AHEAD OF THE CALL THAT WAS

01:28PM 14    LATER THAT AFTERNOON.

01:28PM 15    Q.   OKAY.  AND WITH RESPECT TO THAT CALL, DO YOU RECALL THAT

01:29PM 16    THAT WAS ABOUT LESS THAN HALF AN HOUR?

01:29PM 17    A.   IT WAS PROBABLY HALF AN HOUR.

01:29PM 18    Q.   OKAY.  THE MINUTES -- YOU TOOK NOTES OF THE CALL; CORRECT?

01:29PM 19    A.   YES.

01:29PM 20    Q.   AND YOU WERE LOOKING AT THOSE NOTES EARLIER; CORRECT?

01:29PM 21    A.   CORRECT.

01:29PM 22    Q.   AND I THINK THAT'S 2015, WHICH IS PROBABLY IN BOTH

01:29PM 23    BINDERS.

01:30PM 24        DO YOU HAVE THAT IN FRONT OF YOU?

01:30PM 25    A.   YES.

01:30PM 1    Q.   OKAY.  AND DO YOU SEE AT THE TOP THE FIRST HEADING IS

01:30PM 2    "WHAT IS THE LONG-TERM VISION OF THERANOS?"

01:30PM 3    A.   YES.

01:30PM 4    Q.   AND THAT WAS SOMETHING THAT MR. TUBERGEN WAS VERY FOCUSSED

01:30PM 5    ON; CORRECT?

01:30PM 6    A.   NO.  IT'S JUST A QUESTION THAT WE HAD.

01:30PM 7    Q.   OKAY.  DO YOU RECALL HIM, WHEN HE CAME BACK WITH THE

01:30PM 8    FAMILY AND WITH YOU, HE WAS SPEAKING ABOUT THE LONG-TERM VISION

01:30PM 9    THAT THE COMPANY HAD?

01:30PM 10   A.   WELL, I THINK IT'S ONE OF MANY ASPECTS IN UNDERWRITING

01:30PM 11   THAT WE UNDERTAKE WHAT IS THE LONG-TERM VISION AND GROWTH OF

01:30PM 12   THE COMPANY.

01:30PM 13   Q.   RIGHT.  I WAS ASKING SPECIFICALLY WITH RESPECT TO

01:31PM 14   MR. TUBERGEN.  DO YOU RECALL HIM SPEAKING ABOUT THE VISION OF

01:31PM 15   THE COMPANY, HIS INTEREST IN THE LONG-TERM VISION OF THE

01:31PM 16   COMPANY?

01:31PM 17   A.   YEAH, BUT IT WASN'T THE ONLY THING THAT HE WAS FOCUSSED

01:31PM 18   ON.

01:31PM 19   Q.   OKAY.  IT WAS THE FIRST QUESTION THAT HE ASKED MS. HOLMES;

01:31PM 20   CORRECT?

01:31PM 21   A.   IT WAS THE FIRST QUESTION ON MY LIST OF QUESTIONS.

01:31PM 22        THE CLERK:  ZOOM JUST WENT DOWN.

01:31PM 23        THE COURT:  OKAY.  EXCUSE ME JUST A SECOND.

01:31PM 24   WHY DON'T WE TAKE OUR BREAK NOW?  I UNDERSTAND THAT

01:31PM 25   THEY'RE HAVING PROBLEMS WITH THE ZOOM FEED.

01:31PM   1            MR. WADE:  DOWNSTAIRS?  OKAY.

01:31PM   2            THE COURT:  SO LET'S TAKE A BREAK NOW.  30 MINUTES,

01:31PM   3    30 MINUTE BREAK, PLEASE.

01:31PM   4        (PAUSE IN PROCEEDINGS.)

01:32PM   5        (RECESS FROM 1:32 P.M. UNTIL 2:02 P.M.)

02:02PM   6            THE COURT:  THANK YOU.  PLEASE BE SEATED.  THANK

02:02PM   7    YOU.

02:02PM   8        WE'RE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT

02:02PM   9    ARE PRESENT ONCE AGAIN.

02:02PM   10        MS. HOLMES IS PRESENT.

02:02PM   11        MR. WADE, YOU HAVE ADDITIONAL QUESTIONS?

02:03PM   12            MR. WADE:  I DO, YOUR HONOR.  THANK YOU.

02:03PM   13    Q.  MS. PETERSON, I THINK WE WERE ABOUT TO TALK A LITTLE BIT

02:03PM   14    ABOUT THE CALL THAT YOU HAD WITH MS. HOLMES.

02:03PM   15        DO YOU RECALL THAT THE PURPOSE OF THE CALL WAS TO GET A

02:03PM   16    BETTER SENSE OF HER VISION?

02:03PM   17    A.  THE PURPOSE OF THE CALL WAS TO BE ASKING SOME QUESTIONS.

02:03PM   18    Q.  OKAY.  DO YOU RECALL IN ONE OF YOUR EARLIER MEETINGS WITH

02:03PM   19    THE GOVERNMENT IN THIS CASE THAT YOU TOLD THEM THE PURPOSE OF

02:03PM   20    THE CALL WAS TO GET A BETTER SENSE OF THE VISION?

02:03PM   21    A.  I DON'T RECALL THAT, BUT I -- WE HAD LISTED OUT THESE

02:03PM   22    QUESTIONS.  THESE ARE THE KIND OF THINGS THAT WE WERE -- THE

02:03PM   23    DARKER, THE DARKER WORDS IN HERE ARE THE QUESTIONS THAT WE HAD

02:03PM   24    GOING INTO THE CALL.

02:03PM   25    Q.  MY QUESTION WAS DID, DID -- DO YOU RECALL TELLING THE

02:04PM  1    GOVERNMENT THAT THE PURPOSE OF THE CALL WAS TO GET A BETTER

02:04PM  2    SENSE OF HER VISION?

02:04PM  3    A.   I MAY HAVE.  I DON'T RECALL EXACTLY.

02:04PM  4    Q.   OKAY.  LET'S TAKE A LOOK.  IF YOU WOULD LOOK IN YOUR

02:04PM  5    BINDER AT EXHIBIT 11249.  TELL ME WHEN YOU HAVE THAT IN FRONT

02:04PM  6    OF YOU.

02:04PM  7         AGAIN, PLEASE READ THIS TO YOURSELF AND WAIT FOR MY

02:04PM  8    QUESTION AFTER I DIRECT YOU TO THE SPOT.

02:04PM  9         DO YOU HAVE THAT IN FRONT OF YOU?

02:04PM  10   A.   YES.

02:04PM  11   Q.   OKAY.  AND DO YOU RECALL THAT YOU MET WITH PEOPLE IN THE

02:04PM  12   U.S. ATTORNEY'S OFFICE IN APRIL OF 2017?

02:04PM  13   A.   YES.

02:04PM  14   Q.   OKAY.  I WANT YOU TO LOOK IN THE ONE, TWO -- IN THE FOURTH

02:05PM  15   PARAGRAPH, I THINK ABOUT FOUR SENTENCES IN THE SENTENCE THAT

02:05PM  16   STARTS WITH "PETERSON HAD."

02:05PM  17   A.   I'M SORRY, WHICH PARAGRAPH?

02:05PM  18   Q.   THE FOURTH PARAGRAPH ON THE FIRST PAGE.

02:05PM  19   A.   UH-HUH.

02:05PM  20   Q.   DO YOU SEE THE SENTENCE "PETERSON HAD" MIDWAY THROUGH THAT

02:05PM  21   PARAGRAPH?

02:05PM  22   A.   YES.

02:05PM  23   Q.   READ THAT TO YOURSELF.

02:05PM  24        HAVE YOU READ THAT TO YOURSELF?

02:05PM  25   A.   YES.

02:05PM 1      Q.   AND DOES THAT REFRESH YOUR RECOLLECTION THAT YOU TOLD THE

02:05PM 2      GOVERNMENT THAT THE PURPOSE OF THE CALL WAS TO GET A BETTER

02:05PM 3      SENSE OF HER VISION?

02:05PM 4      A.   THAT'S NOT MY RECOLLECTION EXACTLY.

02:05PM 5      Q.   OKAY.

02:05PM 6      A.   THE CALL WAS TO BEGIN DOING DILIGENCE.

02:05PM 7      Q.   DID YOU DO A FULL DUE DILIGENCE ON THIS INVESTMENT?

02:05PM 8      A.   THIS WAS THE START OF QUESTIONS.  THAT'S DILIGENCE FOR US.

02:06PM 9      Q.   OKAY.  YOU DID A FULL, FULL -- EXHAUSTIVE DUE DILIGENCE ON

02:06PM 10     THE INVESTMENT?

02:06PM 11     A.   THAT'S NOT WHAT I SAID.

02:06PM 12     Q.   WELL, THAT'S MY QUESTION.

02:06PM 13     A.   WE DID ALL, WE DID -- YES, ALL OF THE DILIGENCE THAT WE

02:06PM 14     WERE GOING TO DO ON THIS INVESTMENT AT THE TIME.

02:06PM 15     Q.   WHEN YOU SAY "ALL OF THE DILIGENCE THAT YOU WERE GOING TO

02:06PM 16     DO ON THE INVESTMENT," WHAT DOES THAT MEAN?

02:06PM 17     A.   WE DID -- WE DID THE CALL AND WE WENT ON SITE AND WE

02:06PM 18     DID -- THAT WAS OUR DILIGENCE.

02:06PM 19     Q.   OKAY.  DO YOU BELIEVE THAT YOU DID APPROPRIATE DUE

02:06PM 20     DILIGENCE IN CONNECTION WITH THIS INVESTMENT?

02:06PM 21     A.   YES.

02:06PM 22     Q.   AND DO YOU BELIEVE THAT YOU DID THOROUGH DUE DILIGENCE IN

02:06PM 23     CONNECTION WITH THIS INVESTMENT?

02:06PM 24     A.   I THINK WE DID APPROPRIATE DUE DILIGENCE FOR WHAT WE WERE

02:06PM 25     DOING, YES.

02:06PM  1    Q.   OKAY.  THE, THE -- IF YOU CAN BRING BACK IN FRONT OF YOU

02:07PM  2    THE DOCUMENT THAT WE LEFT OFF WITH IN 2015.

02:07PM  3         DO YOU HAVE THAT IN FRONT OF YOU?

02:07PM  4    A.   YES.

02:07PM  5    Q.   OKAY.  CAN WE BRING THAT UP?  IT'S IN EVIDENCE.

02:07PM  6         OKAY.  YOU WERE ASKED SOME QUESTIONS ABOUT THIS ON DIRECT;

02:07PM  7    DO YOU RECALL?

02:07PM  8    A.   YES.

02:07PM  9    Q.   AND THE FIRST QUESTION IS ABOUT THE LONG-TERM VISION OF

02:07PM  10   THERANOS.

02:07PM  11        DO YOU SEE THAT?

02:07PM  12   A.   YES.

02:07PM  13   Q.   AND THEN -- AND IT GIVES SOME DETAILS.

02:07PM  14        WAS THIS INFORMATION IN RESPONSE TO QUESTIONS THAT YOU HAD

02:07PM  15   ASKED?

02:07PM  16   A.   YES.

02:07PM  17   Q.   OKAY.  LET'S GO TO WALGREENS.

02:07PM  18        DO YOU SEE THAT?

02:07PM  19   A.   YES.

02:07PM  20   Q.   NOW, THIS WAS, THIS WAS -- YOU'RE AWARE THAT THEY HAD A

02:07PM  21   WALGREENS ROLLOUT; CORRECT?

02:08PM  22   A.   YES.

02:08PM  23   Q.   AND DID YOU GO AND VISIT A WALGREENS LOCATION?

02:08PM  24   A.   NO.

02:08PM  25   Q.   DID YOU PULL THE PUBLIC ANNOUNCEMENTS OF --

02:08PM 1    A.   WE ACTUALLY DID PULL THE 10K FROM THE -- FROM 2013.

02:08PM 2    Q.   AND THE PRESS RELEASE ANNOUNCING THE --

02:08PM 3    A.   IT SAID THAT THEY WERE GOING TO GO AND BEGIN LAUNCHING

02:08PM 4    THEIR -- WITH THERANOS.  IT WAS TWO OR THREE SENTENCES IN THE

02:08PM 5    10K.

02:08PM 6    Q.   OKAY.  DID YOU LOOK AT THE PRESS RELEASE THAT ANNOUNCED

02:08PM 7    THE PARTNERSHIP?

02:08PM 8    A.   I DON'T RECALL.

02:08PM 9    Q.   OKAY.  LET'S LOOK AT 1113.  IT'S IN EVIDENCE.

02:09PM 10        IT'S UP ON YOUR SCREEN IF YOU'D LIKE AND IF IT'S EASIER.

02:09PM 11   A.   OKAY.

02:09PM 12   Q.   DO YOU SEE IT?

02:09PM 13   A.   YES.

02:09PM 14   Q.   OKAY.  AND IN LOOKING AT 1113, DO YOU RECOGNIZE THAT AS

02:09PM 15   THE JOINT PRESS RELEASE BETWEEN WALGREENS AND THERANOS?

02:09PM 16        DO YOU SEE THAT?

02:09PM 17   A.   YES.

02:09PM 18   Q.   AND THAT WAS OUT ON THE INTERNET.  DO YOU KNOW IF YOU

02:09PM 19   FOUND THIS AS PART OF YOUR INTERNET RESEARCH?

02:09PM 20   A.   I DON'T RECALL.

02:09PM 21   Q.   OKAY.  IF YOU, IF YOU -- DO YOU RECALL YOUR TESTIMONY ON

02:09PM 22   DIRECT THAT YOU WEREN'T AWARE OF ANY VENOUS DRAWS BEING DONE AT

02:09PM 23   THERANOS?

02:09PM 24   A.   CORRECT.

02:09PM 25   Q.   OKAY.  AND YOU DIDN'T GO TO A WALGREENS LOCATION AT THE

02:09PM  1    TIME AND SEE WHAT KIND OF DRAWS THEY USED; CORRECT?

02:09PM  2    A.   CORRECT.

02:09PM  3    Q.   AND IF YOU LOOK AT THE LAST SENTENCE IN THIS PRESS

02:09PM  4    RELEASE, IF WE CAN JUST HIGHLIGHT THAT, DO YOU SEE IT SAYS,

02:09PM  5    "THE SAMPLES ARE EITHER TAKEN FROM A TINY FINGERSTICK OR A

02:09PM  6    MICRO-SAMPLE TAKEN FROM TRADITIONAL METHODS."

02:10PM  7         DO YOU SEE THAT?

02:10PM  8    A.   I SEE THAT.

02:10PM  9    Q.   AND DO YOU KNOW WHAT "TRADITIONAL METHODS" MEANS?

02:10PM  10   A.   I DON'T RECALL LOOKING AT THIS.

02:10PM  11   Q.   OKAY.  WOULD YOU UNDERSTAND TRADITIONAL METHODS TO MEAN

02:10PM  12   VENOUS DRAW?

02:10PM  13   A.   YES.

02:10PM  14   Q.   AND DO YOU KNOW WHETHER YOU WENT AND LOOKED AT -- YOU SAID

02:10PM  15   YOU DID INTERNET RESEARCH; CORRECT?

02:10PM  16   A.   SOME, YES.

02:10PM  17   Q.   WELL, I THOUGHT YOU SAID YOU DID THOROUGH DUE DILIGENCE,

02:10PM  18   DID YOU NOT?

02:10PM  19   A.   WE DID ADEQUATE DILIGENCE FOR THIS DEAL, YES.

02:10PM  20   Q.   OKAY.  AND IN CONNECTION WITH THAT, DID YOU GO INTO THE

02:10PM  21   COMPANY THERANOS'S WEBSITE?

02:10PM  22   A.   YES.

02:10PM  23   Q.   OKAY.  DID YOU GO TO THE WALGREENS WEBSITE?

02:10PM  24   A.   I DON'T RECALL.  I REMEMBER GOING ON THERANOS'S WEBSITE

02:10PM  25   AND LOOKING AT THE PRICE LISTINGS AND EVERYTHING ELSE THAT SHE

02:10PM  1    HAD TALKED ABOUT.

02:10PM  2    Q.   OKAY.

02:10PM  3    A.   TRYING TO VERIFY THAT THAT WAS TRUE.

02:10PM  4    Q.   OKAY.  SO YOU WENT THERE TO LOOK AT THE TEST MENU?

02:10PM  5    A.   YES.

02:10PM  6    Q.   AND HOW MANY?  DO YOU RECALL?

02:10PM  7    A.   IT WAS A LOT.  I DIDN'T COUNT THEM.

02:10PM  8    Q.   IT WAS A LOT.  OKAY.

02:10PM  9         AND WHEN YOU WERE THERE, YOU DON'T RECALL WHETHER YOU

02:10PM  10   LOOKED AT THIS PRESS RELEASE ON EITHER OF THE COMPANIES'

02:11PM  11   WEBSITES?

02:11PM  12   A.   NO.

02:11PM  13   Q.   OKAY.  DID YOU LOOK -- DO YOU RECALL ASKING ANY FOLLOW-UP

02:11PM  14   QUESTIONS ABOUT WALGREENS AND HOW THE RELATIONSHIP WORKED OF

02:11PM  15   THERANOS?

02:11PM  16   A.   WE ASKED A LOT OF QUESTIONS ABOUT WALGREENS AND

02:11PM  17   SPECIFICALLY WHAT THE ROLLOUT PLAN WAS AND WHERE WERE THEY AT

02:11PM  18   THE MOMENT, IN 42 OR -- 40 OR 42 LOCATIONS IN ARIZONA, AND WE

02:11PM  19   ASKED SPECIFICALLY ABOUT WHAT THE ROLLOUT PLAN WAS.

02:11PM  20        THEY WERE ALREADY OPERATING IN WALGREENS STORES, SO THE

02:11PM  21   PRESS RELEASE WASN'T THAT RELEVANT TO US.

02:11PM  22   Q.   OKAY.  AND --

02:11PM  23   A.   WE WANTED TO KNOW WHAT LOCATIONS WERE THEY GOING TO OPEN

02:11PM  24   IN AND WHEN, AND WE WENT THROUGH THAT.

02:11PM  25   Q.   OKAY.  DID YOU LEARN HOW THE WALGREENS -- HOW IT WORKED AT

02:11PM 1     WALGREENS WITH THERANOS, I MEAN, WHAT THE EXPERIENCE WAS LIKE?

02:11PM 2     A.   WELL, CHERI WAS TESTED, SO IT WAS SIMILAR TO WHAT WE WERE

02:12PM 3     TOLD.  CHERI WAS TESTED AT THEIR LOCATION AND, LIKE I SAID,

02:12PM 4     THEY HAD PUT SOME TINY CLINIC INSIDE OF THEIR BUILDING AND THEY

02:12PM 5     SAID THIS WAS VERY MUCH THE LOOK AND FEEL OF THE CLINIC INSIDE

02:12PM 6     OF A WALGREENS.

02:12PM 7     Q.   OKAY.  THAT WASN'T MY QUESTION.

02:12PM 8          MY QUESTION WAS, DID YOU LEARN ABOUT WHAT IT WAS LIKE, HOW

02:12PM 9     THEY WERE OPERATING WITHIN THE WALGREENS AND WITH DIFFERENT

02:12PM 10    WALGREENS LOCATIONS?

02:12PM 11    A.   LEARN HOW THEY WERE OPERATING?

02:12PM 12    Q.   YES, HOW IT WORKED.

02:12PM 13    A.   EVERYTHING THAT SHE HAD TOLD US WAS THAT THEY WERE DOING

02:12PM 14    FINGERSTICK AT WALGREENS.

02:12PM 15    Q.   OH, I UNDERSTAND THAT.  YOU'VE SAID THAT.

02:12PM 16         BUT EXPLAIN TO ME WHAT HAPPENED WHEN A PATIENT GOES INTO A

02:12PM 17    WALGREENS AT THERANOS IN THIS PERIOD BEFORE YOU ARE MAKING THE

02:12PM 18    INVESTMENT.

02:12PM 19    A.   IT WAS OUR UNDERSTANDING THAT THEY WOULD GO IN, EXACTLY

02:12PM 20    LIKE CHERI DID, INTO A CLINIC AND HAVE A FINGERSTICK DRAW.

02:12PM 21    Q.   AND THEN WHAT HAPPENS?

02:12PM 22    A.   AND THEN IT WAS TESTED RIGHT THERE.

02:12PM 23    Q.   IT WAS TESTED RIGHT THERE?  THAT'S YOUR TESTIMONY?

02:12PM 24    A.   IN THE MACHINES, YEAH.

02:13PM 25    Q.   AND IT WAS YOUR TESTIMONY THAT THEY TESTED IT IN THE

02:13PM 1   MACHINES IN THE WALGREENS STORE?

02:13PM 2   A.   YES.

02:13PM 3   Q.   AND THAT THEY WEREN'T RUNNING OUT OF A CENTRAL LAB?

02:13PM 4   A.   THEY, THEY SAID THEY HAD A LAB THAT WAS RUNNING SOME OF

02:13PM 5   THE TESTS, BUT EVERYTHING WAS FINGERSTICK.

02:13PM 6        BUT EVERYTHING THAT WAS GOING ON IN THE 42 WALGREENS

02:13PM 7   STORES, IT WAS OUR IMPRESSIONS THAT THIS WAS DONE AT WALGREENS.

02:13PM 8   Q.   WAS IT YOUR IMPRESSION OR DID THEY TELL YOU THAT?

02:13PM 9   A.   THEY TOLD US THAT.

02:13PM 10  Q.   OKAY.  YOU'RE SURE ABOUT THAT?

02:13PM 11  A.   YES.

02:13PM 12  Q.   OKAY.  AND --

02:13PM 13  A.   THERE WERE OTHER TESTS THAT THEY WERE DOING AND THEY SAID

02:13PM 14  THAT THEY WERE DOING WORK FOR THESE PHARMACEUTICAL COMPANIES

02:13PM 15  AND EVERYTHING ELSE, WHICH IS WHAT WE THOUGHT THEY WERE DOING

02:13PM 16  AT THEIR LAB.

02:13PM 17  Q.   AND WHY DID THEY HAVE -- SO THEY HAD A CLIA LAB JUST FOR

02:13PM 18  THE PHARMACIES?

02:13PM 19  A.   FOR OTHER THINGS BESIDES WALGREENS.

02:13PM 20  Q.   DID YOU EVER TAKE THE TIME IN ANY OF THESE MEETINGS TO

02:13PM 21  CLARIFY ANY OF THESE ISSUES AND ASK QUESTIONS?

02:13PM 22  A.   WE ASKED QUESTIONS AND WE GOT ANSWERS THAT WE WERE

02:13PM 23  SATISFIED WITH THAT ARE DIFFERENT THAN WHAT CAME OUT LATER.

02:14PM 24  Q.   UNDERSTOOD.  YOU WENT UNDER THE -- BUT YOU NEVER ACTUALLY

02:14PM 25  WENT TO ONE OF THOSE WALGREENS LOCATIONS AND FIGURED OUT WHAT

02:14PM   1    HAPPENED ONCE THE BLOOD WAS GIVEN?

02:14PM   2    A.   NO.

02:14PM   3    Q.   OKAY.

02:14PM   4    A.   BECAUSE THEY SAID IT WAS VERY MUCH LIKE THE EXPERIENCE

02:14PM   5    THAT CHERI HAD AT THE OFFICE, THE CLINIC.

02:14PM   6    Q.   OKAY.  I THINK YOU TESTIFIED IN YOUR INTERNET RESEARCH

02:14PM   7    THAT YOU WENT ONTO THE WEBSITES OF BOTH COMPANIES.

02:14PM   8    A.   BOTH COMPANIES?

02:14PM   9    Q.   WALGREENS AND THERANOS?

02:14PM  10    A.   I WENT AND PULLED THE 10K, YES --

02:14PM  11    Q.   DID YOU GO --

02:14PM  12    A.   -- FROM WALGREENS.

02:14PM  13    Q.   BUT --

02:14PM  14    A.   BUT I DID NOT GO ON THE WEBSITE OF WALGREENS.

02:14PM  15    Q.   DID YOU GO ON THE WEBSITE OF THERANOS?

02:14PM  16    A.   YES.

02:14PM  17    Q.   AND DID YOU READ THE LANGUAGE WHERE THEY TALKED ABOUT

02:14PM  18    USING VENOUS DRAWS ON THE WEBSITE OF THERANOS?

02:14PM  19    A.   I DON'T RECALL EVER SEEING THAT, NO.

02:14PM  20    Q.   DID YOU JUST LOOK AT THE TEST MENUS, OR DID YOU LOOK

02:14PM  21    AROUND AT OTHER SITES?

02:14PM  22    A.   I DON'T RECALL WHAT I LOOKED AT THERE EXACTLY.

02:14PM  23    Q.   BUT YOU DIDN'T SEE THE WEB PAGE THAT TALKS ABOUT THE FACT

02:15PM  24    THAT THEY USE VENOUS TESTS?

02:15PM  25    A.   NO.  THAT WAS NOT MADE AWARE TO US UNTIL AFTER "THE

02:15PM 1    WALL STREET JOURNAL" ARTICLE.

02:15PM 2    Q.   WELL, THEY DIDN'T PREVENT YOU FROM REVIEWING THE WEBSITE?

02:15PM 3    A.   NO, BUT WE DID NOT DO THAT.

02:15PM 4    Q.   THEY DIDN'T TELL YOU YOU COULD NOT REVIEW THE WEBSITE;

02:15PM 5    RIGHT?

02:15PM 6    A.   NO.

02:15PM 7    Q.   OKAY.  DID YOU EVER ASK FOR ANY OF THE DETAILED

02:15PM 8    INFORMATION ABOUT HOW IT -- HOW THE EXPERIENCE WORKED AT

02:15PM 9    WALGREENS?  DID YOU ASK FOR DOCUMENTS OR ANYTHING LIKE THAT?

02:15PM 10   A.   YES.  WE ASKED HOW IT WORKED AND WE WERE SHOWN HOW IT

02:15PM 11   WORKED WITH CHERI.

02:15PM 12   Q.   OKAY.  ISN'T IT THE CASE THAT YOU ACTUALLY WANTED TO CALL

02:15PM 13   YOUR CONTACT AT WALGREENS?

02:15PM 14   A.   I HAD SUGGESTED IT BECAUSE I DID KNOW THE CIO OF WALGREENS

02:15PM 15   AT THE TIME, YES.

02:15PM 16   Q.   SO THE ANSWER IS YES?

02:15PM 17   A.   YES.

02:15PM 18   Q.   OKAY.  AND MR. TUBERGEN TOLD YOU NOT TO DO THAT; CORRECT?

02:15PM 19   A.   HE SAID -- YES, HE ADVISED NOT TO DO THAT.

02:16PM 20        THE KEY THING THERE WAS, YOU KNOW, THIS WAS LARGELY AN

02:16PM 21   INVITATION ONLY, AND WE FELT THAT IF WE HAD CIRCUMVENTED SOME

02:16PM 22   OF THE PROCESS THAT WE FELT THAT WE WERE IN, THAT WE WOULD BE

02:16PM 23   UNINVITED TO PARTICIPATE IN THIS OPPORTUNITY.

02:16PM 24        SO WE WERE VERY CAREFUL NOT TO CIRCUMVENT THINGS AND UPSET

02:16PM 25   ELIZABETH.

| | | |
|---|---|---|
| 02:16PM | 1 | Q.   SO THE ANSWER TO THE QUESTION ABOUT -- MR. TUBERGEN TOLD |
| 02:16PM | 2 | YOU NOT TO CONTACT WALGREENS; CORRECT? |
| 02:16PM | 3 | A.   CORRECT. |
| 02:16PM | 4 | Q.   OKAY.  DID HE TELL YOU NOT TO LOOK AT THE WALGREENS |
| 02:16PM | 5 | WEBSITE? |
| 02:16PM | 6 | A.   NO. |
| 02:16PM | 7 | Q.   OKAY.  THERE WAS NOTHING THAT PREVENTED YOU FROM DOING |
| 02:16PM | 8 | THAT? |
| 02:16PM | 9 | A.   CORRECT. |
| 02:16PM | 10 | Q.   OKAY.  DID HE TELL YOU NOT TO GO TO WALGREENS? |
| 02:16PM | 11 | A.   THE WALGREENS WAS IN ARIZONA.  NO, I DID NOT GO TO |
| 02:16PM | 12 | ARIZONA. |
| 02:16PM | 13 | Q.   WELL, THE FAMILY HAS PLANES THAT THEY CAN USE; CORRECT? |
| 02:16PM | 14 | A.   THAT IS NOT PART OF WHAT WE WOULD HAVE DONE. |
| 02:16PM | 15 | Q.   OKAY. |
| 02:17PM | 16 | A.   WE WERE RELYING ON WHAT WE WERE TOLD. |
| 02:17PM | 17 | Q.   I APOLOGIZE. |
| 02:17PM | 18 | YOU'VE DONE A LOT OF INVESTMENTS IN YOUR CAREER; CORRECT? |
| 02:17PM | 19 | A.   YES. |
| 02:17PM | 20 | Q.   AND YOU'RE FAMILIAR WITH THE CONCEPT CALLED DUE DILIGENCE; |
| 02:17PM | 21 | CORRECT? |
| 02:17PM | 22 | A.   YES. |
| 02:17PM | 23 | Q.   AND DUE DILIGENCE IS A PROCESS WHERE PEOPLE, BEFORE THEY |
| 02:17PM | 24 | MAKE AN INVESTMENT, DO RESEARCH SO THAT THEY FULLY UNDERSTAND |
| 02:17PM | 25 | THE INVESTMENT; RIGHT? |

02:17PM 1   A.   YES.

02:17PM 2   Q.   OKAY.  AND YOU SAW WITHIN THE AGREEMENT MR. LEACH SHOWED

02:17PM 3   YOU THAT YOU HAD THE ABILITY TO DO DUE DILIGENCE; CORRECT?

02:17PM 4   A.   CORRECT.

02:17PM 5   Q.   THERE WAS CONTRACTUALLY NOTHING THAT PROHIBITED YOUR

02:17PM 6   ABILITY TO DO DUE DILIGENCE; RIGHT?

02:17PM 7   A.   WE DID DO DUE DILIGENCE.

02:17PM 8   Q.   AND THERE WAS --

02:17PM 9   A.   WE WERE ON SITE FOR FIVE HOURS.  THAT WAS A LOT OF DUE

02:17PM 10  DILIGENCE FOR US.

02:17PM 11  Q.   THAT WASN'T MY QUESTION.

02:17PM 12       MY QUESTION WAS, THERE WAS NOTHING IN THE CONTRACT THAT

02:17PM 13  PREVENTED YOU FROM DOING DUE DILIGENCE; CORRECT?

02:17PM 14  A.   CORRECT.

02:17PM 15  Q.   OKAY.  SO YOU WERE FREE TO DO WHATEVER INVESTIGATION YOU

02:17PM 16  WANTED TO MAKE SURE THAT YOU HAD A FULL AND ACCURATE

02:17PM 17  UNDERSTANDING OF HOW THE COMPANY WAS OPERATING AT THE TIME;

02:17PM 18  CORRECT?

02:17PM 19  A.   IT WAS CHARACTERIZED TO US.  WE THOUGHT THAT IF WE DID

02:18PM 20  MORE THAN WHAT -- IF WE DID TOO MUCH, WE WOULDN'T BE INVITED

02:18PM 21  BACK TO INVEST.  THAT WAS THE ISSUE.

02:18PM 22  Q.   I UNDERSTAND HOW YOU -- HOW SOME PEOPLE AT RDV MAY HAVE

02:18PM 23  FELT, BUT THAT WASN'T MY QUESTION.

02:18PM 24       MY QUESTION WAS, THERE WASN'T NOTHING THAT PREVENTED

02:18PM 25  YOU FROM --

02:18PM 1   A.   CORRECT.

02:18PM 2   Q.   -- DOING ALL OF THAT RESEARCH; RIGHT?

02:18PM 3   A.   OTHER THAN THE FEAR OF BEING UNINVITED TO INVEST.

02:18PM 4   Q.   RIGHT.  BUT GOING ON A WEBSITE ISN'T GOING TO PROMPT THAT,

02:18PM 5   IS IT?

02:18PM 6   A.   NO.

02:18PM 7   Q.   AND GOING ON A VISIT TO A LOCATION ISN'T GOING TO PROMPT

02:18PM 8   THAT, IS IT?

02:18PM 9   A.   NO.

02:18PM 10  Q.   AND YOU COULD PROBABLY CALL OTHER PEOPLE AND THERANOS

02:18PM 11  WOULD NEVER KNOW ABOUT IT; RIGHT?

02:18PM 12       YOU DO THAT ALL OF THE TIME IN INVESTMENTS, DON'T YOU?

02:18PM 13  A.   YES, BUT THAT'S NOT WHAT WE DID HERE.

02:18PM 14  Q.   OKAY.  BUT YOU COULD?  YOU'VE DONE IT IN OTHER CASES

02:18PM 15  THOUGH; CORRECT?

02:18PM 16  A.   CORRECT, BUT THAT'S NOT WHAT WE DID HERE.

02:19PM 17  Q.   BACK TO 2015.

02:19PM 18       MR. LEACH FOCUSSED YOU ON THE DISCUSSION OF THE WALGREENS

02:19PM 19  AND THE ROLLOUT.

02:19PM 20       DO YOU SEE THAT?

02:19PM 21       AND THAT SAYS THE PROJECTIONS WERE BASED ON 900 STORES.

02:19PM 22       DO YOU SEE THAT?

02:19PM 23  A.   YES.

02:19PM 24  Q.   AND THAT'S THE PROJECTIONS THAT WERE IN THE BINDER; RIGHT?

02:19PM 25  A.   YES, FOR 2015.

02:19PM 1    Q.   WE'LL ASK SOME QUESTIONS ABOUT THAT IN A SECOND.

02:19PM 2        YOU UNDERSTOOD THOSE WERE PROJECTIONS; RIGHT?

02:19PM 3    A.   YES, AND FOR CONTRACTS, WE WERE TOLD THAT THERE WERE

02:19PM 4    CONTRACTS THAT SUBSTANTIATED WHAT THE PROJECTION SAID.

02:19PM 5    Q.   I UNDERSTAND.  MY QUESTION IS, YOU UNDERSTOOD THOSE WERE

02:19PM 6    PROJECTIONS; CORRECT?

02:19PM 7    A.   CORRECT.

02:19PM 8    Q.   OKAY.  AND YOU KNEW HOW MANY STORES THEY HAD AT THE TIME;

02:20PM 9    RIGHT?

02:20PM 10   A.   YES.

02:20PM 11   Q.   HOW MANY?

02:20PM 12   A.   FORTY OR FORTY-TWO.

02:20PM 13   Q.   OKAY.  AND UNDER THE RISKS, DO YOU SEE THE RISK THAT IS

02:20PM 14   FOCUSSED ON THERE IS THE RISK OF AN EXECUTION; RIGHT?

02:20PM 15   A.   CORRECT.

02:20PM 16   Q.   AND FOR A YOUNG COMPANY, THAT'S ALWAYS A RISK; RIGHT?

02:20PM 17   A.   YES.

02:20PM 18   Q.   AND TO GO FROM, WHATEVER, 42 STORES YOU SAID, TO 900

02:20PM 19   STORES IN A YEAR IS A LOT; CORRECT?

02:20PM 20   A.   CORRECT.

02:20PM 21   Q.   OKAY.  AND SO THE PRIMARY RISK THAT MS. HOLMES ALERTED YOU

02:20PM 22   TO WAS THE RISK OF BEING ABLE TO EXECUTE ON THAT AND GROW AT

02:20PM 23   THAT RATE; CORRECT?

02:20PM 24   A.   YES.

02:20PM 25   Q.   OKAY.  LET'S GO TO THE SECOND PAGE.

02:21PM  1          THIS SETS FORTH THE GOALS FOR OCTOBER 14TH.

02:21PM  2          DO YOU SEE THAT?

02:21PM  3     A.   YES.

02:21PM  4     Q.   AND THAT WAS THE VISIT THAT THE FAMILY WAS GOING TO TAKE

02:21PM  5     OUT TO THE COMPANY; RIGHT?

02:21PM  6     A.   CORRECT.

02:21PM  7     Q.   AND SO THE GOAL WAS REALLY SORT OF A RELATIONSHIP

02:21PM  8     GET-TO-KNOW-YOU GOAL?

02:21PM  9     A.   PART OF IT.

02:21PM 10     Q.   WELL --

02:21PM 11     A.   THIS WAS OUR GOALS FOR THE OCTOBER 14TH.

02:21PM 12          AND IN HERS, SHE MADE IT VERY SPECIFIC THAT SHE WANTED TO

02:21PM 13     GET TO KNOW THE PEOPLE WHO ARE MAKING THE INVESTMENT.

02:21PM 14     Q.   WELL, IN FACT, MR. TUBERGEN SAID THAT THAT WAS ONE OF THE

02:21PM 15     PRINCIPLES OF --

02:21PM 16     A.   CORRECT.

02:21PM 17     Q.   RIGHT?

02:21PM 18          BECAUSE THE DEVOS FAMILY WANTED A LONG-TERM INVESTMENT;

02:21PM 19     RIGHT?

02:21PM 20     A.   CORRECT.

02:21PM 21     Q.   AND THEY WANTED TO BE A COMMITTED PARTNER IN THE

02:21PM 22     INVESTMENT; RIGHT?

02:21PM 23     A.   CORRECT.

02:21PM 24     Q.   AND BEFORE THEY DID THAT, THEY WANTED TO GET TO KNOW

02:21PM 25     ELIZABETH AND OTHER PEOPLE AT THERANOS; RIGHT?

02:21PM 1       A.   CORRECT.

02:21PM 2       Q.   AND SO ONE OF THE CORE PRINCIPLES IN GOING OUT THERE WAS

02:21PM 3       SO THAT THERE COULD BE INTERACTION THAT WOULD ALLOW PEOPLE TO

02:22PM 4       GET COMFORTABLE WITH ONE ANOTHER; RIGHT?

02:22PM 5       A.   ON BOTH SIDES, CORRECT.

02:22PM 6       Q.   RIGHT.  ON BOTH SIDES?

02:22PM 7       A.   YES.

02:22PM 8       Q.   AND THAT WAS DISCUSSED IN ADVANCE; RIGHT?

02:22PM 9       A.   YES.

02:22PM 10      Q.   AND, IN FACT, ULTIMATELY LATER WHEN, WHEN YOU WENT OUT

02:22PM 11      THERE, THERE WAS A LOT OF DISCUSSION GOING BOTH WAYS ABOUT THE

02:22PM 12      PHILOSOPHIES OF BOTH SIDES; RIGHT?

02:22PM 13      A.   CORRECT.

02:22PM 14      Q.   AND THERE WAS DISCUSSION FROM MR. DEVOS, ONE OF THE

02:22PM 15      MR. DEVOS'S ABOUT --

02:22PM 16      A.   DOUG.

02:22PM 17      Q.   DOUG, ABOUT THE BUSINESS RELATIONSHIPS THAT THE COMPANY

02:22PM 18      HAD HAD AND ITS PHILOSOPHY AND APPROACH TO MAKING INVESTMENTS;

02:22PM 19      RIGHT?

02:22PM 20      A.   YES.

02:22PM 21      Q.   AND HOW HE GREW THE AMWAY BUSINESS AND HIS BUSINESS

02:22PM 22      PHILOSOPHY FROM A MANAGEMENT PERSPECTIVE; RIGHT?

02:22PM 23      A.   YES, THAT WAS DISCUSSED.

02:22PM 24      Q.   RIGHT.  AND THERE WERE SIMILAR DISCUSSIONS ABOUT

02:22PM 25      MS. HOLMES'S VISION, AND SHE HAD A LONG-TERM VIEW OF THE

02:22PM 1    BUSINESS; CORRECT?

02:22PM 2    A.   CORRECT.

02:22PM 3    Q.   AND HOW SHE WANTED TO SEE THIS OVER THE LONG TERM IN ORDER

02:22PM 4    TO HAVE THE TYPE OF IMPACT IN HEALTH CARE THAT SHE WANTED TO

02:23PM 5    HAVE; RIGHT?

02:23PM 6    A.   CORRECT.

02:23PM 7    Q.   AND MR. TUBERGEN ACTUALLY SPECIFICALLY SAID IN THIS

02:23PM 8    PRE-CALL THAT IT NEEDED TO BE -- IT NEEDED TO BE UNDERSTOOD

02:23PM 9    THAT THESE WEREN'T HIGHLY SCIENTIFIC PEOPLE, RIGHT, THE DEVOS

02:23PM 10   FAMILY, AND THIS NEEDED TO BE KEPT AT A LEVEL THAT WAS NOT A

02:23PM 11   TECHNICAL MEETING, BUT MORE OF A RELATIONSHIP MEETING; RIGHT?

02:23PM 12   A.   I DON'T RECALL HIM SAYING THAT, BUT, YES, I CAN -- NONE OF

02:23PM 13   US WERE SCIENTISTS, SO KEEPING IT AT A LEVEL THAT WE ALL COULD

02:23PM 14   UNDERSTAND WAS IMPORTANT.

02:23PM 15   Q.   RIGHT.  AND YOU WEREN'T SEEKING OR YOU DIDN'T ASK FOR ANY

02:23PM 16   TESTING DATA; CORRECT?

02:23PM 17   A.   WE DID NOT ASK FOR THAT, NO.

02:23PM 18   Q.   OKAY.  AND YOU DIDN'T BRING IN A CONSULTANT WHO HAS

02:23PM 19   GREATER EXPERTISE IN THIS AREA TO LOOK AT THE TECHNOLOGY OR THE

02:23PM 20   DATA, DID YOU?

02:23PM 21   A.   NO.

02:23PM 22   Q.   AND YOU DIDN'T BRING IN A REGULATORY EXPERT TO LOOK AT THE

02:23PM 23   REGULATORY ISSUES THAT WERE PRESENT IN CONNECTION WITH THIS

02:23PM 24   INVESTMENT; RIGHT?

02:24PM 25   A.   NO.

02:24PM  1    Q.   OKAY.  YOU DIDN'T BRING IN A LAWYER WHO IS WITH EXPERTISE

02:24PM  2    WHO COULD MAKE THOSE KINDS OF JUDGMENTS; RIGHT?

02:24PM  3    A.   NO.  WE WERE RELYING ON WHAT WE WERE TOLD BY THEM ON THE

02:24PM  4    ACCURACY OF THE ANALYZER.

02:24PM  5    Q.   YOU'RE NOT AN EXPERT IN THE -- IN FDA OR CMS RELATED

02:24PM  6    ISSUES, ARE YOU?

02:24PM  7    A.   NO.

02:24PM  8    Q.   AND NO ONE IN THE FAMILY IS EITHER; RIGHT?

02:24PM  9    A.   NO.

02:24PM  10   Q.   AND NO ONE IN THE COMPANY SAID YOU COULDN'T HIRE ANY OF

02:24PM  11   THOSE PEOPLE; RIGHT?

02:24PM  12   A.   NO.  BUT THEY ALSO SAID THAT THEY DIDN'T NEED FDA

02:24PM  13   REGULATORY APPROVAL FROM THE FDA TO DO IT.

02:24PM  14   Q.   I UNDERSTAND.  THAT WASN'T MY QUESTION.

02:24PM  15        MY QUESTION WAS, NO ONE SAID THAT YOU, YOU COULDN'T HIRE

02:24PM  16   ANY OF THOSE EXPERTS TO COME IN AND HELP YOU UNDERSTAND THE

02:24PM  17   TECHNICAL ISSUES; RIGHT?

02:24PM  18   A.   NO ONE DID, BUT WE DIDN'T KNOW WHY WE WOULD NEED THAT.

02:24PM  19   Q.   OKAY.  WELL, YOU'RE NOT A TECHNICAL EXPERT IN THIS CASE;

02:24PM  20   CORRECT?

02:24PM  21   A.   NO, BUT THEY WERE TELLING US THAT IT WORKED.

02:24PM  22   Q.   THAT WASN'T MY QUESTION.

02:24PM  23        MY QUESTION WAS WHETHER YOU UNDERSTOOD THE FDA AND CMS

02:25PM  24   TECHNICAL ISSUES.  DID YOU?

02:25PM  25   A.   WE UNDERSTOOD WHAT THEY TOLD US.

02:25PM 1    Q.   OKAY.  AND DID YOU -- AND NO ONE PREVENTED YOU --

02:25PM 2    A.   CORRECT.

02:25PM 3    Q.   -- FROM BRINGING IN SOMEONE WHO HAS EXPERTISE TO GIVE

02:25PM 4    ADDITIONAL PERSPECTIVE ON THAT; CORRECT?

02:25PM 5    A.   WE DIDN'T THINK THAT WE NEEDED IT.

02:25PM 6    Q.   OKAY.  YOU THEN TALKED ABOUT THE RDV INVESTMENT PHILOSOPHY

02:25PM 7    THERE AND HOW IT WAS A GOAL IN THE MEETING.  THIS IS KIND OF

02:25PM 8    ONE OF THE ISSUES THAT YOU WERE TALKING ABOUT; RIGHT?

02:25PM 9    A.   YES.

02:25PM 10   Q.   AND THAT WAS ONE OF THE THINGS THAT THERANOS WANTED TO

02:25PM 11   LEARN FROM THE FAMILY?

02:25PM 12   A.   YES.

02:25PM 13   Q.   AND, IN FACT, IT WASN'T USUAL FOR THE DEVOS FAMILY TO GO

02:25PM 14   OUT ON AN INVESTMENT; RIGHT?

02:25PM 15   A.   THEY'VE NEVER GONE ON AN INVESTMENT WITH ME.

02:25PM 16   Q.   OKAY.  SO THIS WAS SORT OF A UNIQUE SITUATION; RIGHT?

02:25PM 17   A.   YES.

02:25PM 18   Q.   AND IT WAS MORE OF A RELATIONSHIP SITUATION; RIGHT?

02:26PM 19   A.   NO.  NO.  THIS WAS AN INVESTMENT AND ONE THAT CAME WITH

02:26PM 20   IT, WE WANTED TO MAKE SURE -- WITH ANYONE WE INVEST WITH, WE

02:26PM 21   WANT TO HAVE A GOOD PARTNERSHIP, LONG-TERM PARTNERSHIP WITH

02:26PM 22   ANYONE WE INVEST WITH.

02:26PM 23        THIS WASN'T ANY DIFFERENT THAN ANYTHING ELSE.

02:26PM 24   Q.   UNDERSTOOD.  YOU SEE THE REFERENCE THERE TO THE IMPORTANCE

02:26PM 25   OF THE RELATIONSHIP GOING FORWARD.  DO YOU SEE THAT?

02:26PM   1    A.   IT IS.

02:26PM   2    Q.   THAT WAS IMPORTANT TO BOTH SIDES; RIGHT?

02:26PM   3    A.   IT IS.  BUT THAT WASN'T UNIQUE TO THIS DEAL.

02:26PM   4    Q.   OKAY.  I WAS JUST ASKING WHETHER THAT WAS PART OF THE

02:26PM   5    DISCUSSION GOING INTO THE MEETING.

02:26PM   6    A.   CORRECT.  IT JUST WASN'T UNIQUE TO THIS DEAL.

02:26PM   7    Q.   OKAY.  LET'S GO TO THE NEXT PAGE, OR THE NEXT PIECE.

02:26PM   8    YEAH, LET'S GET THE REST OF IT.

02:26PM   9         OKAY.  AND THIS IS THE BALANCE OF THE DISCUSSION THERE;

02:26PM  10    RIGHT?

02:26PM  11    A.   YES.

02:26PM  12    Q.   YOU DISCUSSED WHAT THE EXPECTATION WAS ON SOME OF THE

02:26PM  13    NUMBERS; RIGHT?

02:26PM  14    A.   WE TALKED ABOUT WHAT THEY MIGHT RAISE IN THIS FUND

02:27PM  15    RAISING, YES.

02:27PM  16    Q.   RIGHT.  THAT THEY MIGHT RAISE 500 MILLION.

02:27PM  17         DO YOU SEE THAT?

02:27PM  18    A.   YES.

02:27PM  19    Q.   AND 50 MILLION WAS A GOOD NUMBER TO START; RIGHT?

02:27PM  20    A.   WE ALWAYS KIND OF ASKED SIZING, WHAT MAKES THE MOST SENSE,

02:27PM  21    AND SO JERRY HAD BROUGHT UP 50 MILLION.

02:27PM  22         IS THAT A GOOD NUMBER FOR US TO CONSIDER?  WE ALWAYS WANT

02:27PM  23    TO KNOW WHAT WE'RE TO CONSIDER IN AN INVESTMENT.

02:27PM  24    Q.   UNDERSTOOD.  AND A LOT OF THE ISSUES THAT YOU TALKED ABOUT

02:27PM  25    IN YOUR MEMO, WHICH WE'RE GOING TO TALK ABOUT IN A LITTLE BIT

02:27PM  1    ABOUT THE PARTICULARS, AREN'T REFERENCED IN YOUR NOTES

02:27PM  2    ANYWHERE; RIGHT?

02:27PM  3    A.   THIS WAS JUST MY SHORTHAND FROM THE CALL.  EVERYTHING ELSE

02:27PM  4    THAT WE TALKED ABOUT IS REFERENCED IN THE MEMO THAT WENT TO THE

02:27PM  5    FAMILY.

02:27PM  6    Q.   OKAY.  SO, SO THERE WAS A LOT OF STUFF THAT HAPPENED ON

02:27PM  7    THIS CALL THAT YOU DIDN'T WRITE DOWN IN YOUR NOTES; IS THAT

02:27PM  8    YOUR --

02:27PM  9    A.   YES, THIS WAS SHORTHAND OF ALL OF THE POINTS, THE

02:28PM  10   QUESTIONS THAT WE HAD AND THE ANSWERS, AND THEN THERE'S --

02:28PM  11   THERE WAS MORE.

02:28PM  12       AND ALSO I INCORPORATED IN SOME OF THE STUFF THAT I READ

02:28PM  13   FROM THE DUE DILIGENCE BINDERS.

02:28PM  14   Q.   NO.  I UNDERSTAND THAT.  WE'LL TALK ABOUT THE

02:28PM  15   INCORPORATION OF THE DUE DILIGENCE BINDERS.

02:28PM  16       BUT WE'RE TALKING ABOUT A 30 MINUTE CALL HERE; RIGHT?

02:28PM  17   A.   UH-HUH.

02:28PM  18   Q.   AND YOU WENT THROUGH THESE TWO -- YOU COVERED EVERYTHING

02:28PM  19   IN THESE PAGES; RIGHT?

02:28PM  20   A.   YEAH, BUT THIS IS FAIRLY SHORTHAND FOR -- THIS ISN'T

02:28PM  21   EXACTLY WHAT WAS SAID.

02:28PM  22   Q.   OKAY.  AND ALL OF THE TECHNICAL STUFF THAT RELATES TO YOUR

02:28PM  23   MEMO, YOU DIDN'T PUT THAT IN THE NOTES; IS THAT RIGHT?

02:28PM  24   A.   CORRECT.

02:28PM  25   Q.   OKAY.  LET'S TAKE A LOOK AT YOUR MEMO.  I BELIEVE IT'S IN

02:28PM 1    YOUR -- THE GOVERNMENT BINDER AT 2073.

02:28PM 2    A.   YOUR BINDER OR THIS BINDER?

02:28PM 3    Q.   YOU CAN STAY IN THAT BINDER.  I THINK IT'S IN THE NEXT

02:29PM 4    BINDER, THE WHITE BINDER.

02:29PM 5    A.   I'M IN THE BLACK BINDER.

02:29PM 6    Q.   I THINK IT'S IN BOTH, BUT I HAPPEN TO BE LOOKING AT THE

02:29PM 7    GOVERNMENT VERSION 2073, WHICH I THINK IS IN EVIDENCE.

02:29PM 8        DO YOU HAVE THAT?  DO YOU SEE THAT IN FRONT OF YOU?

02:29PM 9           THE COURT:  THAT'S ALSO IN YOUR BINDER AS WELL,

02:29PM 10   2073.

02:29PM 11          MR. WADE:  SURE, LET'S STAY IN OUR BINDER.  WE'LL

02:29PM 12   LOOK AT 2073.

02:29PM 13          THE WITNESS:  OKAY.  YES.

02:29PM 14   BY MR. WADE:

02:29PM 15   Q.   AND I JUST WANT TO MAKE SURE.  THERE'S A REFERENCE HERE

02:29PM 16   TO -- THIS IS AN OVERVIEW FOR THE MEMO -- FOR THE MEETING IN

02:29PM 17   ADVANCE; CORRECT?

02:29PM 18   A.   CORRECT.

02:29PM 19   Q.   OKAY.  AND THIS WAS PREPARED AFTER THAT CALL?

02:29PM 20   A.   YES.

02:29PM 21   Q.   AND THEN THE MATERIALS THAT YOU REFERENCED IN THERE, IT'S

02:30PM 22   YOUR TESTIMONY THAT ALL OF THOSE MATERIALS WERE PRINCIPALLY

02:30PM 23   FROM THE 30 MINUTE CONVERSATION WITH MS. HOLMES AND THE BINDERS

02:30PM 24   THAT YOU WERE SENT?

02:30PM 25   A.   AND THE BINDERS, YES.

02:30PM 1    Q.   OKAY.

02:30PM 2    A.   OTHER THAN THE SKEPTIC PARTS THAT I PUT IN THE BACK OF

02:30PM 3    THIS --

02:30PM 4    Q.   OKAY.

02:30PM 5    A.   -- WHICH I READ ONLINE.

02:30PM 6    Q.   OKAY.  ISN'T IT, ISN'T IT ACTUALLY THE CASE THAT A LOT OF

02:30PM 7    THE MATERIAL IN THERE CAME DIRECTLY OUT OF THE "FORTUNE"

02:30PM 8    ARTICLE?

02:30PM 9    A.   NO.  A LOT OF THIS CAME OUT OF THE BINDERS, AND SOME OF IT

02:30PM 10   COULD HAVE COME OUT OF WHAT I READ, YES.

02:30PM 11   Q.   OKAY.  YOU RECEIVED THAT "FORTUNE" ARTICLE THAT WAS SENT

02:30PM 12   FROM MR. MOSLEY TO MR. TUBERGEN; CORRECT?

02:30PM 13   A.   CORRECT.

02:30PM 14   Q.   OKAY.  AND YOU HAD THAT ARTICLE; CORRECT?

02:31PM 15   A.   YES.

02:31PM 16   Q.   OKAY.  AND I KNOW YOU'VE TESTIFIED THAT YOU -- I KNOW THAT

02:31PM 17   YOU'VE TESTIFIED THAT YOU RELIED ON THE BINDER MATERIALS, BUT

02:31PM 18   ISN'T IT TRUE THAT A LOT OF THE ITEMS IN YOUR MEMO ACTUALLY

02:31PM 19   CAME ALMOST DIRECTLY FROM THE "FORTUNE" ARTICLE?

02:31PM 20   A.   THAT'S NOT MY RECOLLECTION.

02:31PM 21   Q.   OKAY.  LET'S TAKE A LOOK.  WHY DON'T -- I'LL -- LET'S

02:31PM 22   START WITH PAGE 6 OF YOUR MEMO.

02:31PM 23        DO YOU SEE THAT?  THAT'S THE APPENDIX?

02:31PM 24   A.   YES.

02:31PM 25   Q.   AND DO YOU SEE THAT THERE ARE A LOT OF BULLET POINTS

02:32PM 1    THERE?

02:32PM 2    A.   A LOT OF THE APPENDIX -- THAT'S WHY IT SAYS STATISTICS AND

02:32PM 3    NOTEWORTHY ITEMS.  A LOT OF THAT WAS WHATEVER I COULD FIND.

02:32PM 4    Q.   YEAH.  DO YOU RECALL IN YOUR TESTIMONY WHERE YOU WERE

02:32PM 5    GOING THROUGH AND MR. LEACH WAS ASKING YOU, WAS THAT BASED UPON

02:32PM 6    THE BINDER AND THE MATERIALS THAT MS. HOLMES GAVE YOU?  AND YOU

02:32PM 7    SAID YES, YES, YES, YES, EXCEPT FOR THE LAST ONE.

02:32PM 8        DO YOU RECALL THAT?

02:32PM 9    A.   MUCH OF THIS WAS IN THE BINDER, YES.

02:32PM 10   Q.   YES.  BUT MUCH OF IT WAS IN OTHER ITEMS; RIGHT?

02:32PM 11   A.   IT WAS IN MULTIPLE PLACES, YES.

02:32PM 12   Q.   OKAY.  WELL, DID YOU TAKE THINGS RIGHT OUT OF THE

02:32PM 13   "FORTUNE" ARTICLE AND PUT THEM INTO THE MEMO?  DO YOU REMEMBER?

02:32PM 14   A.   I MIGHT HAVE, YES.

02:32PM 15   Q.   OKAY.  LET'S TAKE A LOOK AT THE 11TH PARAGRAPH, OKAY?  OR

02:32PM 16   THE 11TH NUMBER WHICH STARTS, "THERANOS USES THEIR OWN ANALYZER

02:32PM 17   EQUIPMENT."

02:32PM 18       DO YOU SEE THAT?

02:32PM 19   A.   YES.

02:32PM 20   Q.   OKAY.  AND IF -- CAN WE DO A SPLIT SCREEN?  LET'S DO A

02:32PM 21   SPLIT SCREEN AND PULL UP THE "FORTUNE" ARTICLE.

02:33PM 22       I'LL DO IT ON THE SCREEN, BUT YOU'RE WELCOME TO REFERENCE

02:33PM 23   THIS AT ANY TIME.  THE "FORTUNE" ARTICLE IS 1944, OKAY?

02:33PM 24       OKAY.  LET'S LOOK AT PAGE -- LET'S LOOK AT PAGE 4, AND

02:33PM 25   LET'S BLOW UP THE PARAGRAPH WITH THE P.

02:33PM  1          I'M GOING TO GIVE YOU A MINUTE TO LOOK AT THAT.

02:33PM  2          THAT BULLET IS LIFTED RIGHT FROM THE "FORTUNE" ARTICLE,

02:33PM  3   CORRECT, THAT YOU GOT FROM MR. MOSLEY?

02:33PM  4   A.   YES, UH-HUH.

02:33PM  5   Q.   ALL RIGHT.

02:33PM  6   A.   BUT WE ALSO DISCUSSED THIS WITH ELIZABETH.

02:34PM  7   Q.   LET'S GO TO, LET'S GO TO PAGE 5 OF THE ARTICLE.

02:34PM  8          LET'S LOOK AT THE PARAGRAPH -- THE TWO PARAGRAPHS ON THE

02:34PM  9   RIGHT COLUMN, "IMPORTANTLY" AND "IT TAKES."

02:34PM  10         LET'S BLOW THOSE UP.

02:34PM  11         AND LET'S GO TO THE MEMO AND BLOW UP THE NEXT BULLET

02:34PM  12  THERE, 12.  OKAY.

02:34PM  13         TAKE A MINUTE TO REVIEW THOSE.

02:34PM  14         (PAUSE IN PROCEEDINGS.)

02:34PM  15             THE WITNESS:  UH-HUH.

02:34PM  16  BY MR. WADE:

02:34PM  17  Q.   DO YOU SEE THAT YOU'RE LIFTING THAT ALMOST DIRECTLY FROM

02:34PM  18  THE "FORTUNE" ARTICLE?

02:34PM  19  A.   NOT EXACTLY.  AND WE TALKED ABOUT -- WE TALKED ABOUT HER

02:35PM  20  USING THE MACHINE IN THE MILITARY AND USING IT -- THEY WERE

02:35PM  21  WORKING ON EBOLA AT THE TIME.  THERE WAS A LOT OF DISCUSSION

02:35PM  22  AROUND WHAT THEY WERE DOING WITH THE GOVERNMENT.

02:35PM  23  Q.   AND, AND IN THE 30 MINUTE CALL?

02:35PM  24  A.   YES.  THERE WAS, THERE WAS -- WE WERE TALKING ABOUT WHERE

02:35PM  25  THEY WERE USING IT AND IS IT ACCURATE.

02:35PM 1     Q.   IN THE 30 MINUTE CALL?  I'M JUST TRYING TO UNDERSTAND

02:35PM 2     WHERE YOU'RE GETTING THIS KNOWLEDGE.

02:35PM 3     A.   I DON'T RECALL WHICH ONE EXACTLY, BUT WE -- I KNOW WE

02:35PM 4     TALKED ABOUT IT AT LENGTH IN THE MEETING ON THE 14TH.

02:35PM 5     Q.   OKAY.  SO TO THE EXTENT THAT THERE ARE LANGUAGE

02:35PM 6     SIMILARITIES BETWEEN THESE TWO PARAGRAPHS, THAT'S JUST A

02:35PM 7     COINCIDENCE?  OR DID YOU LIFT IT FROM THE "FORTUNE" ARTICLE?

02:35PM 8     A.   I DON'T RECALL.

02:35PM 9     Q.   OKAY.  LET'S FOCUS ON THAT MILITARY SENTENCE THAT MAKES

02:35PM 10    IT -- LET'S HIGHLIGHT THE SENTENCE ON THE RIGHT THAT SAYS "THAT

02:35PM 11    MAKES IT POSSIBLE TO IMAGINE ONE DAY."

02:36PM 12         LET'S HIGHLIGHT THE REST OF THAT.

02:36PM 13         DO YOU SEE THAT?

02:36PM 14    A.   YES.

02:36PM 15    Q.   THAT, THAT DOESN'T SAY THAT THEY'RE DOING IT RIGHT NOW;

02:36PM 16    CORRECT?

02:36PM 17    A.   CORRECT.

02:36PM 18    Q.   OKAY.  IT SAYS IT MAKES IT POSSIBLE TO DO IT; CORRECT?

02:36PM 19    A.   CORRECT.

02:36PM 20    Q.   AND THEY WERE DOING A LOT OF RESEARCH AND HAVING A LOT OF

02:36PM 21    MEETINGS AND TRYING TO DO THAT, WEREN'T THEY?

02:36PM 22    A.   CORRECT.  BUT THAT'S WHY WE ASKED ABOUT IT WHEN WE WENT

02:36PM 23    THERE ON THE 14TH OF WHAT IS GOING ON?  WHERE ARE YOU USING IT?

02:36PM 24         AND WE TALKED ABOUT IT BEING USED WITH THE GOVERNMENT.

02:36PM 25    Q.   RIGHT.  I -- IT WASN'T -- I THOUGHT YOU SAID IT WAS IN THE

02:36PM 1    OCTOBER 3RD CALL?

02:36PM 2    A.   BOTH.

02:36PM 3    Q.   IT WAS IN BOTH?

02:36PM 4    A.   WE DEFINITELY TALKED ABOUT -- WE DEFINITELY ASKED THE

02:36PM 5    QUESTION WHEN WE WERE THERE AROUND THIS WHOLE CONVERSATION

02:36PM 6    WHETHER IT WAS BEING USED.

02:36PM 7         WE WERE ASKING ABOUT WHETHER THAT WAS TRUE OR NOT.

02:36PM 8    Q.   RIGHT.

02:36PM 9    A.   ON THE 14TH.

02:36PM 10   Q.   AND THEY SAID IT WAS POSSIBLE IN THE ARTICLE; CORRECT?

02:36PM 11   A.   CORRECT.  AND THAT'S WHAT IT SAYS.  IT SAYS MAKING IT

02:37PM 12   POSSIBLE TO PLACE A THERANOS LAB.  I DIDN'T SAY THAT THEY WERE.

02:37PM 13   Q.   RIGHT.  AND, IN FACT --

02:37PM 14   A.   BUT THIS WAS SOMETHING THAT WE ASKED ABOUT.

02:37PM 15   Q.   MY APOLOGIES FOR INTERRUPTING.

02:37PM 16        I BELIEVE IN YOUR DIRECT TESTIMONY YOU DID SAY THAT THEY

02:37PM 17   WERE, BUT THAT'S NOT WHAT THE ARTICLE SAYS; RIGHT?

02:37PM 18   A.   I'M MAYBE MIXING THE CALL WITH THE MEETING.

02:37PM 19   Q.   OKAY.  THE ARTICLE DOES NOT SAY THAT; CORRECT?  IT SAYS

02:37PM 20   IT'S POSSIBLE; RIGHT?

02:37PM 21   A.   CORRECT, AND SO DO MY NOTES.

02:37PM 22   Q.   AND YOUR STATEMENT SAYS THAT IT'S POSSIBLE; CORRECT?

02:37PM 23   A.   CORRECT.

02:37PM 24   Q.   OKAY.  AND, IN FACT, THEY TOLD YOU IN THE MEETING THAT

02:37PM 25   THEY WERE PAUSING THEIR WORK WITH THE MILITARY AND PHARMA AND

02:37PM   1    FOCUSSING ALL OF THEIR EFFORTS ON RETAIL; CORRECT?

02:37PM   2    A.   I DON'T RECALL THEM SAYING THAT THEY PAUSED IT.

02:37PM   3    Q.   YOU DON'T REMEMBER WRITING THAT IN YOUR MEMO?

02:37PM   4    A.   I DON'T RECALL THEM SAYING THAT THEY PAUSED DOING THAT.

02:37PM   5         THEY WERE FOCUSSING THEIR EFFORTS ON WALGREENS AND MOVING

02:37PM   6    FORWARD.  THAT WAS THE DIRECTION THAT THEY WERE GOING TO TAKE.

02:37PM   7         BUT IT WAS IMPORTANT TO US WHAT THEY WERE DOING

02:38PM   8    HISTORICALLY, WHICH WAS WORKING WITH THE MILITARY AND WORKING

02:38PM   9    WITH PHARMACEUTICAL COMPANIES.

02:38PM   10        THAT WAS IMPORTANT TO VALIDATE THE ACCURACY OF THE MACHINE

02:38PM   11   AND THEIR TESTING.

02:38PM   12        ALL OF THAT WAS IMPORTANT.

02:38PM   13   Q.   UNDERSTOOD.  LET ME GO TO THE NEXT BULLET POINT.

02:38PM   14        THIS PARAGRAPH IS FROM THE "FORTUNE" ARTICLE AS WELL;

02:38PM   15   CORRECT?

02:38PM   16   A.   UH-HUH.

02:38PM   17   Q.   RIGHT?

02:38PM   18   A.   YES.

02:38PM   19   Q.   OKAY.  ON YOUR DIRECT TESTIMONY YOU SAID IT WAS FROM

02:38PM   20   MS. HOLMES AND IN THE MEETING, RIGHT?  BUT IT WAS ACTUALLY

02:38PM   21   ALMOST VERBATIM FROM THE "FORTUNE" ARTICLE; RIGHT?

02:38PM   22   A.   NO.  I SAID THAT SOME OF THE SKEPTICISM I PULLED FROM OUT

02:38PM   23   OF THE INTERNET, AND THAT'S WHAT THIS IS, INCUMBENT PLAYERS

02:38PM   24   CRITICIZED THERANOS.

02:38PM   25        THIS DIDN'T COME FROM THERANOS SAYING THIS.

02:38PM  1          I WAS TRYING TO GIVE THE FAMILY MEMBERS AN IDEA OF WHAT

02:39PM  2     THE MARKET WAS SAYING ABOUT THEM, WHICH PART OF IT DID COME

02:39PM  3     FROM ARTICLES THAT I HAD READ.

02:39PM  4     Q.   RIGHT.

02:39PM  5     A.   MORE THAN JUST THIS ONE.

02:39PM  6     Q.   AND, IN FACT, IT'S IN THIS, IN THIS PARAGRAPH RIGHT HERE

02:39PM  7     IN THE ARTICLE; CORRECT?

02:39PM  8     A.   CORRECT.

02:39PM  9     Q.   AND THE NEXT PARAGRAPH IS FROM THE "FORTUNE" ARTICLE THAT

02:39PM  10    YOU GOT FROM MR. MOSLEY AS WELL; CORRECT?

02:39PM  11    A.   CORRECT.

02:39PM  12    Q.   OKAY.  YOU RECALL THAT ONE?

02:39PM  13    A.   I DO RECALL THE BOTTOM PART OF THAT AND I -- WE DID NOT

02:39PM  14    HEAR FROM HER WHAT HER SKEPTICS WERE.  YOU KNOW, THAT WAS STUFF

02:39PM  15    THAT I WAS PULLING OUT OF THE INTERNET IN CERTAIN THINGS LIKE

02:39PM  16    THIS AND OTHER THINGS THAT I HAD READ, YES.

02:39PM  17    Q.   OKAY.  AND YOU MENTIONED THE -- YOU MENTIONED THAT THE

02:39PM  18    WALGREENS RELATIONSHIP WAS IMPORTANT TO --

02:39PM  19    A.   VERY.

02:39PM  20    Q.   -- YOU, OR RELEVANT TO YOU; CORRECT?

02:39PM  21    A.   YES.

02:39PM  22    Q.   LET'S GO TO PAGE 5 OF YOUR MEMO AND HIGHLIGHT THE FIRST

02:40PM  23    HALF OF THAT DOWN TO "ALLIANCE BOOTS."

02:40PM  24          YOU SEE THAT'S FROM YOUR MEMO; RIGHT?

02:40PM  25    A.   YES.

02:40PM  1    Q.   EXHIBIT 5; RIGHT?

02:40PM  2    A.   YES.

02:40PM  3    Q.   PAGE 2 OF THE MEMO?

02:40PM  4    A.   YES.

02:40PM  5    Q.   AND YOU MENTION BEFORE 44 LOCATIONS, BUT HERE YOU HAVE 22

02:40PM  6    LOCATIONS; RIGHT?

02:40PM  7    A.   YES.

02:40PM  8    Q.   AND THAT'S BECAUSE YOU GOT THE WALGREENS INFORMATION FROM

02:40PM  9    THE "FORTUNE" ARTICLE; RIGHT?

02:40PM  10   A.   IT COULD BE, YES.  THE 40 CAME FROM THE MEETING TOGETHER.

02:40PM  11   Q.   AND IF WE JUST GO DOWN TO THE KEY OBJECTIVES, IF WE JUST

02:41PM  12   GO BACK TO YOUR MEMO, THE BOTTOM, WE CAN BRING THE "FORTUNE"

02:41PM  13   ARTICLE DOWN.

02:41PM  14        THESE WERE WHAT YOU IDENTIFIED AS THE KEY OBJECTIVES FOR

02:41PM  15   THE MEETING IN YOUR MEMO?

02:41PM  16   A.   YES.

02:41PM  17   Q.   YEAH.  AND WAS THAT ACCURATE AT THE TIME TO THE BEST OF

02:41PM  18   YOUR KNOWLEDGE?

02:41PM  19   A.   YES.

02:42PM  20   Q.   OKAY.  AND YOU ASKED MR. TUBERGEN --

02:42PM  21   A.   CAN I SAY ONE OTHER THING?  THIS IS THERANOS --

02:42PM  22   Q.   THERE'S NO QUESTION PENDING.  SO THE WAY THIS GENERALLY

02:42PM  23   WORKS IS THAT THE GOVERNMENT CAN DO FOLLOWUP WITH YOU, BUT --

02:42PM  24            THE COURT:  HE'LL ASK YOU ANOTHER QUESTION.

02:42PM  25            MR. WADE:  YEAH, I'LL ASK YOU ANOTHER QUESTION.

02:42PM  1                    THE WITNESS:  OKAY.

02:42PM  2     BY MR. WADE:

02:42PM  3     Q.   THE -- MR. TUBERGEN -- YOU ASKED MR. TUBERGEN IN ADVANCE

02:42PM  4     WHETHER THERE WAS ANY SORT OF MODELING OR ANYTHING THAT SHOULD

02:42PM  5     BE DONE IN CONNECTION WITH THE THERANOS INVESTMENT; CORRECT?

02:42PM  6     A.   CORRECT.

02:42PM  7     Q.   AND HE TOLD YOU NO; RIGHT?

02:42PM  8     A.   HE JUST SAID THAT IT WASN'T NECESSARY FOR THIS.

02:42PM  9     Q.   OKAY.  BUT FINANCIAL MODELING IS SOMETHING THAT IS

02:42PM  10    FREQUENTLY DONE IN DUE DILIGENCE; RIGHT?

02:42PM  11    A.   IT'S -- YES.

02:42PM  12    Q.   OKAY.  BUT MR. TUBERGEN TOLD YOU NOT TO DO IT IN THIS

02:42PM  13    CASE; RIGHT?

02:42PM  14    A.   HE SAID WE WERE RELYING ON WHAT WE WERE GIVEN BY THE

02:43PM  15    COMPANY.

02:43PM  16    Q.   RIGHT.  AND YOU ACTUALLY RAISED A COUPLE OF POTENTIAL

02:43PM  17    TECHNICAL PEOPLE THAT YOU COULD TALK TO AS WELL.

02:43PM  18         DO YOU RECALL THAT?

02:43PM  19    A.   I DON'T RECALL WHAT YOU MEAN.

02:43PM  20    Q.   WERE YOU AWARE THAT MEMBERS OF THE DEVOS FAMILY RAISED

02:43PM  21    WITH MR. TUBERGEN THAT THERE MIGHT BE SOME TECHNICAL PEOPLE WHO

02:43PM  22    COULD BE USED TO CONSULT ON THIS RELATIONSHIP?

02:43PM  23    A.   I DON'T --

02:43PM  24    Q.   YOU DON'T?

02:43PM  25    A.   -- KNOW WHAT YOU'RE REFERRING TO.

02:43PM   1      Q.   I'M JUST WONDERING IF YOU RECALL THAT COMING UP IN ADVANCE

02:43PM   2      OF THE MEETING.

02:43PM   3      A.   NO.

02:43PM   4      Q.   OKAY.  YOU MENTIONED THAT YOU DID LOOK AT THE TWO BINDERS

02:43PM   5      OF MATERIALS; RIGHT?

02:43PM   6      A.   YES.

02:43PM   7      Q.   AND MR. LEACH SHOWED YOU, I DON'T KNOW, TWO INCHES OF THEM

02:43PM   8      MAYBE?  IS THAT FAIR?

02:43PM   9      A.   OKAY.

02:43PM  10      Q.   IS IT --

02:43PM  11      A.   YES.

02:43PM  12      Q.   OKAY.  I BELIEVE IN YOUR PRIOR TESTIMONY YOU SAID THERE

02:43PM  13      WERE ABOUT A FOOT OF MATERIALS.

02:43PM  14      A.   YES.

02:43PM  15      Q.   AND WHAT WERE THE OTHER MATERIALS IN THE BINDER?

02:43PM  16      A.   I CAN'T RECALL ALL OF THE SPECIFICS OF THAT, BUT IT WAS

02:44PM  17      VERY MUCH -- ONE BINDER WAS VERY MUCH THERANOS AND THE COMPANY

02:44PM  18      AND WHAT IT DOES AND WHAT IT HAD TO OFFER, AND THE SECOND

02:44PM  19      BINDER WAS VERY CLINICAL.

02:44PM  20      Q.   VERY CLINICAL.  WAS IT DATA?

02:44PM  21      A.   YES, YES.

02:44PM  22      Q.   OKAY.  SO THEY SENT YOU -- DID THEY SEND YOU LIKE A REAM

02:44PM  23      OF DATA BASICALLY?

02:44PM  24      A.   YES.

02:44PM  25      Q.   OKAY.  DID YOU ASK ANYONE TO LOOK AT THAT?

02:44PM  1    A.   NO.

02:44PM  2    Q.   OKAY.  SO THERE'S DATA.  WHAT ELSE DO YOU RECALL ABOUT

02:44PM  3    WHAT THEY SENT?

02:44PM  4    A.   THAT'S WHAT I RECALL.

02:44PM  5    Q.   OKAY.  DID YOU REVIEW THE DATA YOURSELF, OR TRY TO REVIEW

02:44PM  6    THE DATA?

02:44PM  7    A.   I FLIPPED THROUGH ALL OF THE PAGES OF BOTH BINDERS AND THE

02:44PM  8    KEY THINGS THAT WERE IMPORTANT TO US WAS THE WORK WITH THE

02:44PM  9    PHARMACEUTICAL COMPANIES AND THE FINANCIALS AND THE CONTRACTS

02:44PM 10    AND THE MANY TIMES THAT IT STATED THAT -- THE ACCURACY OF THE

02:44PM 11    TEST.

02:44PM 12    Q.   YEAH, I UNDERSTAND YOUR TESTIMONY.

02:44PM 13         BUT YOU ACTUALLY DIDN'T MAKE THE INVESTMENT DECISION;

02:45PM 14    RIGHT?

02:45PM 15    A.   CORRECT.

02:45PM 16    Q.   OKAY.  THE -- LET'S LOOK AT THE MATERIALS YOU WERE SENT.

02:45PM 17    IT'S 4858.

02:45PM 18         AND YOU'RE THE ONLY PERSON AT RDV WHO LOOKED AT THESE

02:45PM 19    MATERIALS; RIGHT?

02:45PM 20    A.   I DON'T KNOW.

02:45PM 21    Q.   OKAY.  YOU'RE NOT AWARE OF ANYONE ELSE LOOKING AT THOSE?

02:45PM 22    A.   I'M NOT AWARE, NO.

02:45PM 23    Q.   AND WHEN MR. TUBERGEN GOT THEM, HE ASKED YOU TO LOOK AT

02:45PM 24    THEM; RIGHT?

02:45PM 25    A.   CORRECT.

02:45PM 1   Q.   OKAY.  AND DO YOU RECALL PREVIOUSLY MAKING STATEMENTS TO

02:46PM 2   THE EFFECT OF YOU'RE THE ONLY ONE WHO DID A DETAILED REVIEW OF

02:46PM 3   THE BINDERS?

02:46PM 4   A.   YES.

02:46PM 5   Q.   OKAY.  THAT'S BECAUSE YOU DON'T KNOW OF ANYONE ELSE DOING

02:46PM 6   IT; RIGHT?

02:46PM 7   A.   CORRECT.

02:46PM 8   Q.   OKAY.  AND WITHIN THESE MATERIALS -- SO THEY SENT THE TWO

02:46PM 9   BINDERS.  DID YOU ASK IN FOLLOWUP FOR ANY ADDITIONAL

02:46PM 10  INFORMATION IN WRITING?

02:46PM 11  A.   NO.

02:46PM 12  Q.   OKAY.  AND --

02:46PM 13  A.   WE WERE GOING TO GO AND VISIT THEM, SO WE DIDN'T THINK IT

02:46PM 14  WAS NECESSARY TO ASK FOR MORE.

02:46PM 15  Q.   I UNDERSTAND.  BUT MY QUESTION WAS WHETHER -- YOU

02:46PM 16  UNDERSTAND THAT IN A TYPICAL DUE DILIGENCE PROCESS, FREQUENTLY

02:46PM 17  THERE ARE LISTS OF REQUESTS; RIGHT?

02:46PM 18  A.   UH-HUH.

02:46PM 19  Q.   OKAY.  AND THEN YOU SEND THAT TO THE OTHER SIDE, RIGHT, IN

02:46PM 20  A TYPICAL DUE DILIGENCE PROCESS; RIGHT?

02:46PM 21  A.   YES.

02:46PM 22  Q.   AND THEN THEY SEND YOU BACK MATERIALS; RIGHT?

02:46PM 23  A.   YES.

02:46PM 24  Q.   AND YOU DIDN'T DO THAT IN THIS CASE?

02:46PM 25  A.   WE WERE GOING TO SEE THEM PERSONALLY AND SPEND A DAY

02:46PM 1    THERE, SO WE WERE GOING TO HANDLE IT THEN.

02:46PM 2    Q.   I UNDERSTAND.  BUT WITH RESPECT TO WRITTEN MATERIALS OR

02:46PM 3    MORE DETAILED INFORMATION --

02:46PM 4    A.   NO, WE DID NOT ASK FOR MORE.

02:47PM 5    Q.   OKAY.  AND IS IT YOUR TESTIMONY THAT YOU DID REVIEW IN

02:47PM 6    DETAIL ALL OF THE MATERIAL WITHIN THE SUBGROUP?

02:47PM 7    A.   SUBGROUP?

02:47PM 8    Q.   WITHIN TWO -- 4858, DID YOU LOOK CAREFULLY AND REVIEW ALL

02:47PM 9    OF THIS MATERIAL?

02:47PM 10   A.   I HAVE A 4859 AND 4734.

02:47PM 11   Q.   I'M SORRY.  IT'S IN THE WHITE BINDER BECAUSE MR. LEACH

02:47PM 12   REFERRED TO IT EARLIER.

02:47PM 13   A.   WHAT NUMBER?

02:47PM 14   Q.   4858.

02:48PM 15   A.   YES.  AND ALL OF THE HIGHLIGHTING WAS DONE EARLY.

02:48PM 16   Q.   OKAY.  SO YOU'VE REVIEWED EVERYTHING IN THIS EXHIBIT IN

02:48PM 17   DETAIL?

02:48PM 18   A.   YES.

02:48PM 19   Q.   OKAY.  DO YOU SEE IN THE BACK THERE'S A VERY DETAILED LIST

02:48PM 20   OF INTELLECTUAL PROPERTY MATERIALS?

02:48PM 21   A.   YOU'LL HAVE TO GIVE ME A PAGE NUMBER.

02:48PM 22   Q.   SURE.  I BELIEVE IT'S 12805 IN THE BOTTOM RIGHT CORNER, OR

02:48PM 23   ON THE EXHIBIT IN THE MIDDLE IT'S 133.

02:48PM 24   A.   YES.

02:48PM 25   Q.   OKAY.  AND IN CONNECTION WITH THIS, THE GOVERNMENT -- OR,

02:48PM   1      I'M SORRY -- THE COMPANY SENT YOU A LIST OF ALL OF THEIR

02:48PM   2      INTELLECTUAL PROPERTY MATERIALS; CORRECT?

02:48PM   3      A.   YES.

02:48PM   4      Q.   AND DID YOU DO -- DID YOU REVIEW THIS AND LOOK AT THE

02:49PM   5      PATENTS THAT THE COMPANY HAD FILED?

02:49PM   6      A.   WE, WE KNEW THAT THEY HAD PATENTS.  I CAN'T SAY THAT I

02:49PM   7      REVIEWED THEM OR KNEW WHAT THE PATENTS WERE.

02:49PM   8      Q.   OKAY.  SO THIS WASN'T REVIEWED IN DETAIL?

02:49PM   9      A.   THIS LENDS CREDIBILITY TO THE FACT THAT IT WORKS.  YES, I

02:49PM  10      FLIPPED THROUGH EVERYTHING.

02:49PM  11      Q.   OKAY.

02:49PM  12      A.   BUT I'M NOT A SCIENTIST, SO I DON'T KNOW EXACTLY WHAT SOME

02:49PM  13      OF THESE ARE SAYING.

02:49PM  14           BUT I DO -- I CAN FIGURE OUT WHETHER THINGS ARE LENDING

02:49PM  15      CREDIBILITY TO WHAT THEY WERE TELLING US.

02:49PM  16      Q.   NO, I UNDERSTAND.  I JUST -- YOU UNDERSTAND THAT OFTEN IN

02:49PM  17      DUE DILIGENCE ON TECHNOLOGY COMPANIES THAT PEOPLE DO PRETTY

02:49PM  18      DETAILED REVIEWS OF INTELLECTUAL PROPERTY PORTFOLIOS; RIGHT?

02:49PM  19      A.   OKAY.

02:49PM  20      Q.   THEY'LL HIRE EXPERTS.  ARE YOU AWARE OF THAT?

02:49PM  21      A.   YES.

02:49PM  22      Q.   AND DID YOU DO THAT?

02:49PM  23      A.   NO.

02:49PM  24      Q.   AND YOU DIDN'T HIRE AN EXPERT; CORRECT?

02:49PM  25      A.   NO.

02:49PM  1    Q.   AND YOU DIDN'T, BY YOURSELF, LOOK UP ANY OF THESE

02:49PM  2    MATERIALS IN A PUBLIC RECORD OR ASK FOR ANY INFORMATION

02:50PM  3    RELATING TO THESE MATERIALS?

02:50PM  4    A.   NO.  WE TRUSTED WHAT WE READ.

02:50PM  5    Q.   WELL, BUT DID YOU WANT ANY MORE INFORMATION?  FOR EXAMPLE,

02:50PM  6    A LOT OF THESE --

02:50PM  7    A.   NO, NO.

02:50PM  8    Q.   -- SOME OF THESE PATENTS AND APPLICATIONS RELATE TO THE

02:50PM  9    USE OF SMALL SAMPLES ON COMMERCIAL DEVICES.

02:50PM  10   A.   NO.

02:50PM  11   Q.   DID YOU LOOK INTO THAT AT ALL?

02:50PM  12   A.   NO.  WHAT WAS RELEVANT TO US WAS THAT THEY SAID THAT'S

02:50PM  13   WHAT THEY WERE DOING.

02:50PM  14       AGAIN, IT GOES BACK TO THE KEY THINGS OF WHAT WE WERE

02:50PM  15   UNDERWRITING, WHICH WERE THE FINANCIALS, THE CONTRACTS, AND THE

02:50PM  16   VALIDITY OF THE ANALYZER WORKING BY ALL THE PHARMACEUTICAL

02:50PM  17   COMPANIES AND THE GOVERNMENT.

02:50PM  18   Q.   I'M GLAD YOU BROUGHT UP THE CONTRACTS.

02:50PM  19       WHAT WAS YOUR UNDERSTANDING OF THE WALGREENS CONTRACT?

02:51PM  20   A.   THAT IT WAS BEGINNING TO LAUNCH AND ROLL OUT IN ADDITIONAL

02:51PM  21   LOCATIONS.  THERE WAS NO SUGGESTION THAT THERE WAS ANYTHING

02:51PM  22   WRONG WITH THE WALGREENS CONTRACTS.

02:51PM  23   Q.   DID YOU LOOK --

02:51PM  24   A.   AND THAT SAFEWAY WAS GOING TO ROLL OUT AS WELL.

02:51PM  25   Q.   DID YOU LOOK AT THE CONTRACTS?

PETERSON CROSS BY MR. WADE                                    4786

02:51PM 1    A.   NO.

02:51PM 2    Q.   OKAY.  YOU UNDERSTAND THAT'S A PRETTY TYPICAL THING TO

02:51PM 3    REQUEST IN DUE DILIGENCE?

02:51PM 4    A.   YES.

02:51PM 5    Q.   MATERIAL CONTRACTS?

02:51PM 6         YOU DIDN'T ASK FOR THEM?

02:51PM 7    A.   NO.

02:51PM 8    Q.   DID YOU ASK FOR A SUMMARY OF THE RELATIONSHIP?

02:51PM 9    A.   WE TALKED ABOUT THE WALGREENS RELATIONSHIP AND IT WAS ALL

02:51PM 10   VERY POSITIVE.

02:51PM 11   Q.   AND THEY TOLD YOU ABOUT THE PHASE I AND PHASE II OF THE

02:51PM 12   WALGREENS RELATIONSHIP?

02:51PM 13   A.   I DON'T RECALL THAT SPECIFICALLY.

02:51PM 14   Q.   DO YOU RECALL IT GENERALLY?

02:51PM 15   A.   IN GENERAL.  I MEAN, WE TALKED ABOUT, WE ASKED ABOUT

02:51PM 16   WHAT -- AGAIN, AT THE MEETING, WE WANTED TO KNOW WHERE THEY

02:51PM 17   WERE GOING TO GO NEXT, WHAT -- WERE THEY GOING TO BIG CITIES

02:51PM 18   AND HOW MANY CITIES AND HOW MANY LOCATIONS WERE THEY GOING TO

02:51PM 19   OPEN IN THE NEXT YEAR OR TWO?  AND THAT'S WHAT THE DISCUSSION

02:51PM 20   WAS AROUND.

02:51PM 21   Q.   WHAT WAS YOUR UNDERSTANDING OF THE PHASE I AND PHASE II OF

02:52PM 22   THE WALGREENS RELATIONSHIP?

02:52PM 23   A.   I DON'T KNOW WHAT YOU MEAN BY PHASE I AND PHASE II OF THE

02:52PM 24   WALGREENS RELATIONSHIP.  THEY WERE IN 40 STORES AT THE TIME,

02:52PM 25   AND THEY WERE GOING TO ROLL OUT TO 900 THE FOLLOWING YEAR.

02:52PM  1    Q.   OKAY.

02:52PM  2    A.   AND THEY WERE GOING TO ROLL INTO I WANT TO SAY FOUR

02:52PM  3    METROPOLITAN AREAS FIRST, AND THEY WERE VERY SPECIFIC ABOUT HOW

02:52PM  4    MANY LOCATIONS -- HOW MANY METROPOLITAN AREAS THEY WERE GOING

02:52PM  5    TO GO IN EACH YEAR.

02:52PM  6    Q.   RIGHT.  THEY HAD A PLAN --

02:52PM  7    A.   CORRECT.

02:52PM  8    Q.   -- THAT THEY WERE GOING TO IMPLEMENT; RIGHT?

02:52PM  9    A.   CORRECT.

02:52PM  10   Q.   THEY HAD THE EXECUTION LIST, BUT THEY HAD --

02:52PM  11   A.   THEY HAD A ROLLOUT PLAN.

02:52PM  12   Q.   THEY HAD A ROLLOUT PLAN?

02:52PM  13   A.   YES.

02:52PM  14   Q.   BUT MY QUESTION WAS MORE, DO YOU RECALL ANY DISCUSSION OR

02:52PM  15   ASKING ANY QUESTIONS ABOUT TWO DIFFERENT PHASES OF THE

02:52PM  16   WALGREENS RELATIONSHIP THAT WAS SET FORTH IN WALGREENS

02:52PM  17   CONTRACTS?

02:52PM  18   A.   THAT'S NOT HOW IT WAS CHARACTERIZED TO US.

02:52PM  19   Q.   OKAY.  THE DOCUMENT JUST PRIOR TO THIS IS THE PFIZER

02:53PM  20   THERANOS DOCUMENT THAT IF YOU LOOK ON PAGE --

02:53PM  21   A.   YES.

02:53PM  22   Q.   -- 104.  ACTUALLY, IF YOU CAN BRING UP 109, 109 OF THE

02:53PM  23   EXHIBIT, WHICH IS PAGE 6 OF THIS DOCUMENT.

02:53PM  24        (PAUSE IN PROCEEDINGS.)

02:53PM  25   BY MR. WADE:

02:53PM   1    Q.   DO YOU SEE THIS DOCUMENT?

02:53PM   2    A.   YES.

02:53PM   3    Q.   OKAY.  AND THIS SETS FORTH THE DETAILS OF THE

02:54PM   4    RELATIONSHIP, DO YOU SEE THAT, OF THE PROJECT THAT THEY WERE

02:54PM   5    DOING?

02:54PM   6    A.   WHERE ARE YOU LOOKING?

02:54PM   7    Q.   I'M JUST LOOKING AT PAGE 109.

02:54PM   8    A.   YES, ON THE PAGE.

02:54PM   9    Q.   AND DO YOU SEE -- IF YOU LOOK UP ON THE SCREEN, DO YOU SEE

02:54PM   10   THIS?

02:54PM   11   A.   YES.

02:54PM   12   Q.   IT SAYS "FOR THIS STUDY, AN INSTRUMENT WAS DEPLOYED IN THE

02:54PM   13   HOME OF EACH PATIENT."

02:54PM   14   A.   YES.

02:54PM   15   Q.   "FOUR OTHERS WERE INSTALLED AT THE CANCER CENTER."

02:54PM   16        DO YOU SEE THAT?

02:54PM   17   A.   YES.

02:54PM   18   Q.   OKAY.  AND DO YOU UNDERSTAND THAT THIS WAS A THERANOS

02:54PM   19   DEVICE?

02:54PM   20   A.   YES.

02:54PM   21   Q.   AND IT THEN TALKS ABOUT HOW THREE ASSAYS WERE PERFORMED

02:54PM   22   SIMULTANEOUSLY IN MULTIPLEX.

02:54PM   23        DO YOU SEE THAT?

02:54PM   24   A.   YES.

02:54PM   25   Q.   AND DO YOU KNOW WHAT THAT MEANS?

02:54PM  1    A.   NO.

02:54PM  2    Q.   IT MEANS THAT AT THE TIME THEY ARE RUNNING THE TESTS, THAT

02:55PM  3    THEY'RE RUNNING THREE DIFFERENT TESTS AT THE SAME TIME.

02:55PM  4         DID YOU UNDERSTAND THAT AT THE TIME?

02:55PM  5    A.   NO.

02:55PM  6    Q.   AND WAS THERE ANY DISCUSSION OF EXACTLY WHAT HAPPENED IN

02:55PM  7    CONNECTION WITH THIS?

02:55PM  8    A.   NO.  THE PAGES THAT WE WERE FOCUSSED IN ON ARE THE ONES

02:55PM  9    THAT SAY THAT THE THERANOS SYSTEM PERFORMED WITH SUPERIOR

02:55PM 10    PERFORMANCE TO REFERENCE ASSAYS WHILE RUNNING IN A COMPLEX

02:55PM 11    AMBULATORY ENVIRONMENT AND THINGS LIKE THAT.

02:55PM 12         WE WERE MUCH MORE AT THE SUMMARY LEVEL THAN GOING THROUGH

02:55PM 13    AND MAKING SURE THAT THE PROCESS THAT THEY USED OR WHAT THEY

02:55PM 14    WERE DOING WAS -- WE DIDN'T NEED TO UNDERSTAND THE PROCESS THAT

02:55PM 15    THEY WERE USING, JUST THE OUTCOME.

02:55PM 16    Q.   OKAY.  MY QUESTION THEN IS THIS:  WHAT DID THEY DO IN

02:55PM 17    THIS?  WHAT WAS THIS REPORT?

02:55PM 18    A.   THIS, THIS WAS -- THIS DEFINITELY TOLD US THAT, THAT

02:55PM 19    PFIZER WAS USING THEIR MACHINES AND IT WAS PERFORMING

02:55PM 20    EXCEPTIONALLY WELL IN THEIR TESTS.

02:55PM 21    Q.   DID YOU UNDERSTAND THAT PFIZER -- THAT THE MACHINES WERE

02:55PM 22    DEPLOYED IN THE HOME OF A NUMBER OF PATIENTS?

02:56PM 23    A.   I DON'T RECALL THAT.  IT WAS A LONG TIME AGO.

02:56PM 24    Q.   OKAY.

02:56PM 25    A.   THE SPECIFICS OF THE REPORT.

02:56PM  1    Q.  RIGHT.  YOU JUST RECALL THE SPECIFIC PARTS THAT THE

02:56PM  2    GOVERNMENT POINTED YOU TO?  IS THAT THE LIMIT OF YOUR

02:56PM  3    RECOLLECTION?

02:56PM  4    A.  NO, NO.  I COMPLETELY REMEMBER WHEN WE WERE DOING THIS

02:56PM  5    THAT THAT -- THE TAKE AWAY FROM THIS IS THAT LARGE

02:56PM  6    PHARMACEUTICAL BUSINESSES, COMPANIES, WERE USING THEIR ANALYZER

02:56PM  7    AND THEY WEREN'T HAVING ANY ISSUES WITH IT.

02:56PM  8    Q.  RIGHT.  NO.  I UNDERSTAND THAT POINT.

02:56PM  9    A.  THAT WAS THE TAKE AWAY.

02:56PM  10   Q.  I UNDERSTAND.

02:56PM  11       BUT YOU TALKED ABOUT HOW IT VALIDATED THE TECHNOLOGY, AND

02:56PM  12   TO VALIDATE THE TECHNOLOGY, YOU KIND OF NEED TO KNOW WHAT

02:56PM  13   HAPPENED AND HOW IT WORKED; RIGHT?

02:56PM  14   A.  NO.  I JUST NEED TO KNOW THAT THEY SAID IT WORKED.

02:56PM  15   Q.  OKAY.  AND YOU UNDERSTOOD THAT THEY WERE TESTING THIS IN

02:56PM  16   CONNECTION WITH THE USE OF -- THAT THIS WAS A THERANOS DEVICE;

02:56PM  17   RIGHT?

02:56PM  18   A.  YES.

02:56PM  19   Q.  AND THAT THIS WAS TESTED IN CONNECTION WITH A PFIZER DRUG;

02:56PM  20   RIGHT?

02:56PM  21   A.  YES.

02:56PM  22   Q.  OKAY.  THAT BOTH COMPANIES WERE INVOLVED IN THIS; RIGHT?

02:56PM  23   YOU KNEW THAT?

02:56PM  24   A.  THAT -- I DON'T RECALL THAT.  I DON'T RECALL EXACTLY.

02:57PM  25       I JUST KNOW THAT THEY WERE USING THEIR ANALYZERS IN

02:57PM 1      CLINICAL TRIALS.

02:57PM 2      Q.   OKAY.  AND IF YOU GO TO PAGE 8 -- I'M SORRY, ONE MORE

02:57PM 3      PAGE.

02:57PM 4          DO YOU HAVE ANY FAMILIARITY WITH CHARTS OF THIS KIND?

02:57PM 5      A.   NO.

02:57PM 6      Q.   OKAY.  THIS IS A MEASURE OF ACCURACY.  DO YOU HAVE ANY --

02:57PM 7      WAS THERE ANY DISCUSSION OF THE R SQUARED OF THIS PARTICULAR

02:57PM 8      ASSAY?

02:57PM 9      A.   NO.

02:57PM 10     Q.   OKAY.  LET'S GO BACK TO THE START OF THE DOCUMENT.  IF WE

02:57PM 11     GO TO -- LET'S GO TO PAGE 3.  OKAY.  HERE -- DO YOU SEE THE

02:58PM 12     REFERENCE TO THERANOS'S PROPRIETARY PATENTED TECHNOLOGY?

02:58PM 13     A.   YES.

02:58PM 14     Q.   OKAY.  AND THEY ATTENDED -- APPENDED ALL OF THE PATENTS TO

02:58PM 15     THIS PRESENTATION; RIGHT?

02:58PM 16     A.   THEY -- I'M SORRY?

02:58PM 17     Q.   THEY APPENDED A LIST OF ALL OF THEIR PATENTS?

02:58PM 18          DO YOU RECALL THAT?

02:58PM 19     A.   YES.

02:58PM 20     Q.   OKAY.  WHAT DO YOU UNDERSTAND TO BE THE BREADTH OF

02:58PM 21     THERANOS'S PROPRIETARY PATENTED TECHNOLOGY AS REFERENCED IN

02:58PM 22     THIS STATEMENT?

02:58PM 23     A.   THAT IT WAS CAPABLE OF DOING FINGERSTICK BLOOD TESTING --

02:58PM 24     Q.   AND WHAT IS "IT"?

02:58PM 25     A.   -- ON THEIR ANALYZER.

02:58PM  1    Q.   I'M SORRY, I THOUGHT YOU WERE DONE.

02:58PM  2         WHAT IS "IT"?

02:58PM  3    A.   "IT"?

02:58PM  4    Q.   YEAH, YOU SAID "IT IS CAPABLE."  WHAT IS "IT"?

02:58PM  5    A.   THAT THE ANALYZER IS CAPABLE OF DOING FINGERSTICK

02:58PM  6    TECHNOLOGY BECAUSE OF ITS IP --

02:58PM  7    Q.   NO.  MY QUESTION IS --

02:58PM  8    A.   -- AND IS DOING IT ACCURATELY.

02:58PM  9    Q.   MY QUESTION WAS, WHAT DOES THERANOS PROPRIETARY PATENTED

02:59PM 10    TECHNOLOGY REFER TO?  WHAT IS THE BREADTH OF THE TECHNOLOGY?

02:59PM 11    A.   THE WAY THAT THE ANALYZER WORKS AND RUNS FINGERSTICK BLOOD

02:59PM 12    TESTING ON IT.

02:59PM 13    Q.   SO IS IT YOUR TESTIMONY THAT THERANOS PROPRIETARY PATENTED

02:59PM 14    TECHNOLOGY REFERS TO JUST THE DEVICE?

02:59PM 15    A.   AND HOW IT DOES -- HOW IT DOES THE BLOOD TESTING WITHIN

02:59PM 16    THE DEVICE, YES.

02:59PM 17    Q.   OKAY.

02:59PM 18    A.   WITH THE ASSAYS.

02:59PM 19    Q.   OKAY.  IT DOESN'T SAY "DEVICE" THERE?  YOU'LL AGREE WITH

02:59PM 20    ME; RIGHT?

02:59PM 21    A.   I THINK IT'S IMPLIED.

02:59PM 22    Q.   OKAY.  AND THAT WAS YOUR UNDERSTANDING AT THE TIME;

02:59PM 23    CORRECT?

02:59PM 24    A.   YES.

02:59PM 25    Q.   OKAY.  YOU UNDERSTOOD THAT A LOT OF THESE SLIDES WERE

03:00PM   1    FORWARD LOOKING; RIGHT?

03:00PM   2    A.   NO.

03:00PM   3    Q.   YOU DIDN'T UNDERSTAND THAT?

03:00PM   4    A.   NO.

03:00PM   5    Q.   YOU THOUGHT THEY WERE ALL PRESENT?

03:00PM   6    A.   YES.

03:00PM   7    Q.   OKAY.  SO LET'S LOOK AT -- I KNOW MR. LEACH SHOWED YOU

03:00PM   8    SOME.

03:00PM   9         LET'S LOOK AT -- LET'S GO TO 19, WHICH IS -- YEAH, 19.

03:00PM   10   IT'S 19 ON BOTH DOCUMENTS.

03:00PM   11        DO YOU SEE THAT?

03:00PM   12   A.   YES.

03:00PM   13   Q.   NOW, THIS IS FORWARD LOOKING; RIGHT?

03:00PM   14   A.   CORRECT.

03:00PM   15   Q.   AND THIS IS TALKING ABOUT THE FUTURE; RIGHT?

03:00PM   16   A.   WITH HOW IT'S GOING TO SAVE THE GOVERNMENT MONEY.

03:00PM   17   Q.   RIGHT.  AND THIS IS A GOAL; RIGHT?

03:00PM   18   A.   CORRECT.

03:00PM   19   Q.   THIS IS IN PART THE VISION THAT MS. HOLMES HAD WAS TO TRY

03:01PM   20   TO CHANGE HEALTH CARE IN A WAY WHERE THERE WERE SAVINGS TO THE

03:01PM   21   WHOLE SYSTEM; RIGHT?

03:01PM   22   A.   CORRECT.

03:01PM   23   Q.   OKAY.  AND IF YOU LOOK AT THE NEXT SLIDE, IT'S SIMILAR;

03:01PM   24   RIGHT?

03:01PM   25   A.   YES.

03:01PM   1    Q.   AND IF YOU LOOK AT THE NEXT SLIDE, IT'S SIMILAR?

03:01PM   2    A.   YES.

03:01PM   3    Q.   AND IF WE CAN CLICK THROUGH A COUPLE MORE.

03:01PM   4         THESE ARE FORWARD LOOKING ITEMS; RIGHT?

03:01PM   5    A.   YES.

03:01PM   6    Q.   OKAY.  IF YOU WOULD LOOK AT 40, WHICH MR. LEACH TALKED TO

03:01PM   7    YOU ABOUT THIS.  THIS IS FORWARD LOOKING; RIGHT?

03:01PM   8    A.   YES.

03:01PM   9    Q.   AND THEY WEREN'T NATIONALLY DEPLOYED AT THIS TIME?

03:01PM   10   A.   NO.

03:01PM   11   Q.   THEY WERE TALKING ABOUT THE VISION THAT THEY HAD FOR THE

03:01PM   12   COMPANY; RIGHT?

03:02PM   13   A.   NO.  BUT IT WAS VERY CLEAR THAT THEY WERE GOING TO DO 900

03:02PM   14   THE NEXT YEAR.

03:02PM   15   Q.   AND THIS TALKS ABOUT 8,000; RIGHT?

03:02PM   16   A.   YES.

03:02PM   17   Q.   OKAY.  AND THAT HAD NOT HAPPENED YET; RIGHT?

03:02PM   18   A.   CORRECT.

03:02PM   19   Q.   AND MOST OF THE DOTS ON THIS WERE NOT THERE?

03:02PM   20   A.   CORRECT.

03:02PM   21   Q.   OKAY.  AND IF YOU LOOK AT THE NEXT SLIDE, THAT, TOO, THAT

03:02PM   22   TALKS ABOUT THE PROXIMITY OF THERANOS TO PATIENTS; RIGHT?

03:02PM   23   A.   YES.

03:02PM   24   Q.   AND HOW IT COMPARES TO OTHER LABS; RIGHT?

03:02PM   25   A.   YES.

03:02PM  1    Q.  BUT THAT WASN'T -- THAT DIDN'T HAPPEN YET; RIGHT?

03:02PM  2    A.  NO.  THAT WAS --

03:02PM  3    Q.  FORWARD LOOKING; RIGHT?

03:02PM  4    A.  THAT WAS HER VISION, YES.

03:02PM  5    Q.  ALL RIGHT.  AND IF YOU GO TO, IF YOU GO TO SLIDE 28, DO

03:03PM  6    YOU SEE THAT?  YOU WERE ASKED ABOUT THAT?

03:03PM  7    A.  YES.

03:03PM  8    Q.  YOU HIGHLIGHTED THAT?

03:03PM  9    A.  YES.

03:03PM  10   Q.  AND DO YOU SEE WHERE IT SAYS, "PROCESSES ALL SAMPLE

03:03PM  11   TYPES"?

03:03PM  12   A.  YES.

03:03PM  13   Q.  AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

03:03PM  14   A.  I'M FOCUSSED IN ON "THERANOS RUNS ANY TEST AVAILABLE IN

03:03PM  15   CENTER LABORATORIES," AND WE WERE TOLD THAT THEY COULD DO

03:03PM  16   HUNDREDS OF THEM, 2- TO 300 OF THEM.

03:03PM  17   Q.  MY QUESTION WAS ABOUT THE LANGUAGE "AND PROCESSES ALL

03:03PM  18   SAMPLE TYPES."

03:03PM  19       DO YOU SEE THAT?

03:03PM  20   A.  YES.

03:03PM  21   Q.  WHAT DOES THAT REFER TO?

03:03PM  22   A.  I DON'T KNOW WHAT THEY MEANT BY THAT.

03:03PM  23   Q.  DOES IT REFER TO VENOUS DRAWS?

03:03PM  24   A.  I DON'T KNOW.

03:03PM  25   Q.  OKAY.

03:03PM 1     A.   IT'S NOT IN THE PICTURE.

03:03PM 2     Q.   AND AGAIN, I BELIEVE IT WAS YOUR TESTIMONY THERE WERE NO

03:03PM 3     SLIDES AT THE MEETING THAT YOU WENT TO --

03:03PM 4     A.   CORRECT.

03:03PM 5     Q.   -- IN CALIFORNIA; CORRECT?

03:03PM 6          THESE WERE SENT TO YOU IN ADVANCE; RIGHT?

03:03PM 7     A.   CORRECT.

03:03PM 8     Q.   AND YOU DIDN'T BRING THESE SLIDES AND GO THROUGH A LIST OF

03:04PM 9     QUESTIONS ITEM BY ITEM; RIGHT?

03:04PM 10    A.   NO.

03:04PM 11    Q.   AND IN FACT, YOU DIDN'T TAKE ANY NOTES, OTHER THAN ON THE

03:04PM 12    FINANCIAL DOCUMENT, AT THE MEETING; RIGHT?

03:04PM 13    A.   NO, I TOOK NOTES.

03:04PM 14    Q.   DO YOU RECALL PREVIOUSLY TESTIFYING THAT YOU TOOK NO NOTES

03:04PM 15    BECAUSE IT WAS A HIGH LEVEL MEETING?

03:04PM 16    A.   I TOOK ENOUGH NOTES TO WRITE THE MEMO AFTERWARDS, YES.

03:04PM 17    Q.   AND SO IF YOU TESTIFIED PREVIOUSLY, THAT WAS MISTAKEN?

03:04PM 18    A.   I --

03:04PM 19         MR. LEACH:  OBJECTION.  ARGUMENTATIVE.

03:04PM 20         THE COURT:  OVERRULED.

03:04PM 21    YOU CAN ANSWER THE QUESTION.

03:04PM 22         THE WITNESS:  YES, MY MAIN JOB WAS TO SIT AND

03:04PM 23    LISTEN.  BUT I WAS TAKING NOTES, YES.

03:04PM 24    BY MR. WADE:

03:04PM 25    Q.   OKAY.  BUT AGAIN, NOT WITH RESPECT TO THIS POWERPOINT

03:04PM   1   BECAUSE IT WASN'T DISCUSSED; CORRECT?

03:04PM   2   A.   CORRECT.   THE PAGES THAT WERE PRESENTED WERE THE

03:04PM   3   FINANCIALS IN THE MEETING.

03:04PM   4   Q.   LET'S -- SINCE YOU BROUGHT IT UP, WHY DON'T WE TALK ABOUT

03:04PM   5   THE FINANCIALS.

03:04PM   6        I BELIEVE THAT'S ITEM 1853.

03:05PM   7        DO YOU SEE THAT?

03:05PM   8   A.   WHICH BINDER?

03:05PM   9   Q.   I'M SORRY.   THE WHITE BINDER, 1853.

03:05PM  10   A.   YES.

03:05PM  11   Q.   YOU WERE ASKED QUESTIONS ABOUT THIS DOCUMENT.

03:05PM  12        DO YOU RECALL THAT?

03:05PM  13   A.   YES.

03:05PM  14   Q.   AND YOU UNDERSTOOD -- JUST HIGHLIGHT THE LANGUAGE IN THE

03:05PM  15   UPPER LEFT-HAND CORNER.

03:05PM  16        AGAIN, YOU UNDERSTOOD THAT THESE WERE PROJECTIONS; RIGHT?

03:05PM  17   A.   YES.

03:05PM  18   Q.   AND IF YOU GO -- MR. LEACH DIDN'T FOCUS YOU I DON'T THINK

03:05PM  19   ON THE SECOND PAGE.   LET'S TAKE A LOOK AT THAT.

03:05PM  20        OKAY.   AND YOU SEE THIS WAS INCLUDED WITHIN THE MATERIALS

03:05PM  21   AS WELL.

03:05PM  22        DO YOU RECALL THAT?

03:05PM  23   A.   YES.

03:05PM  24   Q.   OKAY.   AND IT IDENTIFIES THAT THERE'S ALMOST $163 MILLION

03:05PM  25   IN CASH AT THE TIME.

03:05PM 1          DO YOU SEE THAT?

03:05PM 2     A.   YES.

03:05PM 3     Q.   AND YOU CIRCLED THAT; RIGHT?

03:05PM 4     A.   YES.

03:05PM 5     Q.   AND THEN DOWN BELOW THERE'S $168 MILLION IN -- ALMOST

03:05PM 6     $169 MILLION IN DEFERRED REVENUE AND CUSTOMER'S DEPOSITS;

03:06PM 7     RIGHT?

03:06PM 8     A.   YES.

03:06PM 9     Q.   AND YOU CIRCLED THAT; RIGHT?

03:06PM 10    A.   YES.

03:06PM 11    Q.   OKAY.  AND YOU SEE IN THE UPPER LEFT-HAND CORNER THAT

03:06PM 12    THESE FINANCIALS THAT YOU WERE PROVIDED WERE PREPARED FOR THE

03:06PM 13    PERIOD ENDING JULY 14TH, 2014?

03:06PM 14    A.   UH-HUH, YES.

03:06PM 15    Q.   AND DID YOU ASK FOR UPDATED FINANCIALS OR PROJECTIONS THAT

03:06PM 16    WERE BEYOND THAT DATE?

03:06PM 17    A.   WHAT, WHAT WE HAD IN THE BINDERS, THESE TWO PAGES IS WHAT

03:06PM 18    WE WERE GIVEN.

03:06PM 19    Q.   RIGHT.  SO AS OF JULY 14TH, 2014?

03:06PM 20    A.   YES.

03:06PM 21    Q.   MY QUESTION IS, DID YOU ASK FOR AN UPDATE IN OCTOBER?

03:06PM 22    A.   I DON'T RECALL IF WE ASKED FOR A SPECIFIC UPDATE.

03:06PM 23    Q.   OKAY.  I'M DONE WITH THE FINANCIAL DOCUMENT.

03:07PM 24         DID YOU ASK, DURING YOUR MEETING, WHETHER THE COMPANY USED

03:07PM 25    CASH OR ACCRUAL ACCOUNTING?

03:07PM 1       A.   I DON'T RECALL.

03:07PM 2       Q.   OKAY.  IS THAT SOMETHING THAT YOU THINK YOU WOULD HAVE

03:07PM 3    NOTED IN YOUR MEMO IF YOU HAD?

03:07PM 4       A.   I DON'T RECALL ASKING OR TALKING ABOUT THAT.

03:07PM 5       Q.   YOU TALKED A FAIR AMOUNT ABOUT THE "FORTUNE" ARTICLE;

03:08PM 6    RIGHT?

03:08PM 7       A.   UH-HUH.

03:08PM 8       Q.   AND THAT WAS -- THOSE WERE THE MATERIALS THAT MR. TUBERGEN

03:08PM 9    CAME BACK WITH; RIGHT?

03:08PM 10      A.   YES.

03:08PM 11      Q.   AND HE WAS VERY EXCITED; RIGHT?

03:08PM 12      A.   YES.

03:08PM 13      Q.   OKAY.  DID YOU READ THE WHOLE ARTICLE?

03:08PM 14      A.   I BELIEVE SO.

03:08PM 15      Q.   OKAY.  WE'LL COME BACK TO THAT IN A SECOND.

03:08PM 16           IN ADVANCE OF THE MEETING OUT THERE, OR IN THE MEETING OUT

03:08PM 17   THERE, DO YOU RECALL MAKING THE STATEMENT THAT THIS WAS NOT A

03:08PM 18   DUE DILIGENCE MEETING?

03:08PM 19      A.   I DON'T RECALL THAT.

03:08PM 20      Q.   OKAY.  DID YOU -- IN YOUR MIND THIS WAS NOT A DUE

03:08PM 21   DILIGENCE MEETING; CORRECT?

03:08PM 22      A.   THIS WAS AN OPPORTUNITY TO ASK QUESTIONS, YES.  WE WERE --

03:08PM 23   IT WAS AN ON SITE VISIT.

03:08PM 24      Q.   OKAY.  DO YOU RECALL TELLING THE GOVERNMENT THAT IN YOUR

03:08PM 25   VIEW THIS WAS NOT A DUE DILIGENCE MEETING?

03:08PM 1      A.   I DON'T RECALL SAYING THAT.

03:08PM 2      Q.   WHY DON'T YOU TAKE A LOOK AT EXHIBIT 11249 AT PAGE 6.

03:09PM 3      A.   OKAY.

03:09PM 4      Q.   DO YOU HAVE THAT IN FRONT OF YOU?

03:09PM 5      A.   YES.

03:09PM 6      Q.   IF YOU LOOK AT THE BOTTOM OF 6, DO YOU SEE THE LAST

03:09PM 7      SENTENCE ON THE PAGE?

03:09PM 8      A.   WHERE ARE THE PAGE NUMBERS?

03:09PM 9      Q.   GOOD QUESTION.  IN THE UPPER RIGHT-HAND CORNER.

03:09PM 10          AGAIN, THIS IS ONE OF THOSE DOCUMENTS WHERE YOU SHOULD

03:09PM 11     READ IT TO YOURSELF AND THEN I'LL ASK A QUESTION.  IF YOU COULD

03:09PM 12     READ THE LAST SENTENCE THERE.

03:09PM 13          (PAUSE IN PROCEEDINGS.)

03:10PM 14     BY MR. WADE:

03:10PM 15     Q.   DO YOU SEE THAT LAST SENTENCE?

03:10PM 16     A.   I'M STILL READING HERE.

03:10PM 17          (PAUSE IN PROCEEDINGS.)

03:10PM 18          THE WITNESS:  I DON'T RECALL -- I DIDN'T SAY THAT.

03:10PM 19     BY MR. WADE:

03:10PM 20     Q.   HERE'S MY QUESTION.  DOES THAT REFRESH YOUR RECOLLECTION

03:10PM 21     THAT YOU TOLD THE GOVERNMENT THAT YOU DID NOT VIEW THE MEETING

03:10PM 22     IN PALO ALTO AS A DUE DILIGENCE MEETING?

03:11PM 23     A.   I DON'T RECALL SAYING THAT.

03:11PM 24     Q.   OKAY.  DO YOU RECALL DURING THE MEETING THAT THERE WAS A

03:11PM 25     SIGNIFICANT AMOUNT OF DISCUSSION ABOUT MS. HOLMES'S VISION IN

03:11PM   1     THE MEETING?

03:11PM   2     A.   THERE WAS A LOT OF DISCUSSION ABOUT A LOT OF THINGS.

03:11PM   3     THERE WAS A LOT --

03:11PM   4     Q.   THAT WASN'T MY QUESTION.  MY QUESTION WAS, DO YOU RECALL

03:11PM   5     THAT THERE WAS A SIGNIFICANT AMOUNT OF DISCUSSION ABOUT

03:11PM   6     MS. HOLMES'S VISION IN THE MEETING?

03:11PM   7     A.   YES.

03:11PM   8     Q.   OKAY.  I BELIEVE YOU TESTIFIED ON CROSS BEFORE WE TOOK OUR

03:11PM   9     BREAK THAT YOU DIDN'T KNOW WHETHER THE WALTONS INVESTED?

03:11PM  10     A.   CORRECT.

03:11PM  11     Q.   OKAY.

03:12PM  12     A.   AT THE TIME OF THE INVESTMENT.

03:12PM  13     Q.   CAN I DRAW YOUR ATTENTION TO 14089?

03:12PM  14     A.   OKAY.

03:12PM  15     Q.   DO YOU HAVE THAT IN FRONT OF YOU?

03:12PM  16     A.   I DO.

03:12PM  17     Q.   AND THAT WAS AN EMAIL BETWEEN YOU AND MR. TUBERGEN AND THE

03:12PM  18     DEVOSES?

03:12PM  19     A.   YES.

03:12PM  20     Q.   ABOUT THE THERANOS INVESTMENT?

03:12PM  21     A.   YES.

03:12PM  22              MR. WADE:  I MOVE THE ADMISSION OF 14089.

03:12PM  23              MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:12PM  24              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:12PM  25              (DEFENDANT'S EXHIBIT 14089 WAS RECEIVED IN EVIDENCE.)

03:13PM  1    BY MR. WADE:

03:13PM  2    Q.   AND IF WE CAN JUST BLOW UP -- DO YOU SEE AT THE TOP THIS

03:13PM  3    IS AN EMAIL ON 10-24-2014?

03:13PM  4    A.   YES.

03:13PM  5    Q.   OKAY.  AND IF YOU GO TO THAT FIRST SENTENCE, DO YOU SEE

03:13PM  6    THAT?

03:13PM  7    A.   YES.

03:13PM  8    Q.   DO YOU SEE MR. TUBERGEN REPORTING THAT THE WALTON FAMILY

03:13PM  9    FOR SURE IS INVESTING?

03:13PM 10    A.   YES.

03:13PM 11         I DON'T REMEMBER THIS.

03:13PM 12    Q.   WERE YOU A PART OF THE DISCUSSIONS THAT HE WAS HAVING WITH

03:13PM 13    REPRESENTATIVES OF THE WALTON FAMILY?

03:13PM 14    A.   NO.

03:13PM 15    Q.   WERE YOU A PART OF ANY DISCUSSIONS AFTER THE MEETING AT

03:13PM 16    THERANOS WITH MR. MOSLEY?

03:13PM 17    A.   SAY AGAIN.  I'M SORRY.

03:13PM 18    Q.   WITH MR. MOSLEY?  WERE YOU PART OF ANY DISCUSSIONS WITH

03:13PM 19    MR. MOSLEY?

03:13PM 20    A.   NO.

03:13PM 21    Q.   IN THAT FOLLOWING MONTH?

03:13PM 22    A.   NO.

03:13PM 23    Q.   AND WERE YOU INVOLVED IN ANY DISCUSSIONS AFTER THE VISIT

03:13PM 24    TO THERANOS WITH MR. TROTT?

03:13PM 25    A.   NO.

03:13PM  1    Q.  OKAY.

03:13PM  2    A.  MY BOSS WAS.

03:13PM  3    Q.  MR. DAMSTRA?

03:14PM  4    A.  YES.

03:14PM  5    Q.  AND ARE YOU AWARE THAT MR. TUBERGEN WAS TALKING WITH

03:14PM  6    MR. TROTT AS WELL?

03:14PM  7    A.  I ONLY HAD DISCUSSIONS WITH MR. DAMSTRA AROUND BDT.  I

03:14PM  8    KNEW THAT THEY WERE POTENTIALLY GOING TO LOOK AT THE INVESTMENT

03:14PM  9    AND MAYBE INVEST.

03:14PM 10    Q.  OKAY.  I THINK ON YOUR DIRECTION TESTIMONY YOU MADE A LOT

03:14PM 11    OF STATEMENTS RELATING TO INFORMATION THAT YOU LEARNED IN THAT

03:14PM 12    MEETING.

03:14PM 13        DO YOU RECALL THAT?

03:14PM 14    A.  WHICH MEETING?

03:14PM 15    Q.  IN THE MEETING IN PALO ALTO.

03:14PM 16    A.  YES.

03:14PM 17    Q.  HADN'T YOU PREVIOUSLY TESTIFIED THAT YOU DIDN'T RECALL THE

03:14PM 18    SPECIFICS OF THAT MEETING?

03:14PM 19    A.  I -- WE'VE HAD A LOT OF TIME TO THINK ABOUT IT.  WE'VE

03:15PM 20    TALKED ABOUT A LOT OF THINGS AND I HAD THE OPPORTUNITY TO READ

03:15PM 21    THROUGH ALL OF THE MEMOS THAT I DID, AND THERE'S -- AND WE DID

03:15PM 22    TALK ABOUT A LOT OF THINGS.

03:15PM 23    Q.  OKAY.  AND, AND YOU GAVE THAT DEPOSITION THAT WE TALKED

03:15PM 24    ABOUT BEFORE IN MARCH OF 2019; RIGHT?

03:15PM 25    A.  MARCH OF 2019?  OKAY, YES.

03:15PM 1    Q.   THAT'S WHEN YOU GAVE THE DEPOSITION.  THAT WAS A COUPLE

03:15PM 2    YEARS AGO, TWO AND A HALF YEARS AGO; RIGHT?

03:15PM 3    A.   YES.

03:15PM 4    Q.   THAT WAS CLOSER IN TIME TO THE MEETING; RIGHT?

03:15PM 5    A.   YES.

03:15PM 6    Q.   AND IN THE DEPOSITION YOU WERE SHOWN A LOT OF THE SAME

03:15PM 7    DOCUMENTS THAT YOU'VE LOOKED AT TODAY; RIGHT?

03:15PM 8    A.   YES, BUT I'VE HAD A LOT OF TIME TO REFLECT AND READ

03:15PM 9    THROUGH A LOT OF THINGS THAT WAS GOING ON AT THAT POINT IN

03:15PM 10   TIME.

03:15PM 11   Q.   OKAY.  AND SO YOU'RE NOT DISPUTING THAT YOU SAID THAT YOU

03:15PM 12   DON'T RECALL THE SPECIFICS IN THAT DEPOSITION?

03:15PM 13   A.   NOT AT THAT TIME, NO.

03:15PM 14   Q.   OKAY.  SO YOUR MEMORY HAS IMPROVED OVER TIME; IS THAT YOUR

03:15PM 15   TESTIMONY?

03:15PM 16   A.   I'VE, I'VE RECOLLECTED A LOT OF THINGS FROM WHAT I'VE

03:16PM 17   READ, YES.  I HAVE A TENDENCY TO WRITE A LOT DOWN.

03:16PM 18   Q.   OKAY.  THE RECOLLECTION THAT YOU GOT FROM REVIEWING A LOT

03:16PM 19   OF THINGS, IS THAT REVIEWING IT IN CONNECTION WITH YOUR

03:16PM 20   TESTIMONY HERE TODAY?

03:16PM 21   A.   YEAH.  I'VE REVIEWED ALL OF MY NOTES, YES.

03:16PM 22   Q.   AND YOU WERE ACTUALLY SHOWN ALL OF YOUR NOTES IN THAT

03:16PM 23   DEPOSITION; RIGHT?

03:16PM 24   A.   THERE WASN'T ANYTHING THAT HASN'T BEEN IN THESE BINDERS.

03:16PM 25   Q.   RIGHT.  AND MY POINT IS THAT IN THAT DEPOSITION YOU WERE

03:16PM  1    ACTUALLY SHOWN YOUR NOTES; RIGHT?

03:16PM  2    A.   I WAS TOLD NOT TO PREPARE AT ALL FOR ANY OF THOSE

03:16PM  3    DEPOSITIONS, TO WHICH I DIDN'T.  I DIDN'T GO BACK AND READ ANY

03:16PM  4    OF MY NOTES FROM BEFORE.

03:16PM  5    Q.   NOW, YOU ALSO TOLD THE GOVERNMENT IN 2017 THAT YOU DIDN'T

03:17PM  6    TAKE ANY NOTES DURING THAT MEETING.  WAS THAT -- ARE YOU -- DO

03:17PM  7    YOU BELIEVE THAT YOU DID NOT SAY THAT?

03:17PM  8         MR. LEACH:  OBJECTION, YOUR HONOR.  CALLS FOR

03:17PM  9    HEARSAY.

03:17PM  10         THE WITNESS:  YEAH, I --

03:17PM  11         THE COURT:  EXCUSE ME.  EXCUSE ME, MA'AM.

03:17PM  12         THE WITNESS:  I DON'T RECALL SAYING THAT.

03:17PM  13         THE COURT:  HANG ON A SECOND.

03:17PM  14      ARE YOU ABOUT DONE WITH THIS AREA, OR?

03:17PM  15         MR. WADE:  I'VE GOT A LITTLE MORE.

03:17PM  16         THE COURT:  OKAY.  SUSTAINED.

03:17PM  17    BY MR. WADE:

03:17PM  18    Q.   WELL, WHY DON'T YOU LOOK AT 11249, PAGE 7.

03:17PM  19         (PAUSE IN PROCEEDINGS.)

03:17PM  20    BY MR. WADE:

03:18PM  21    Q.   AND DOES THAT REFRESH YOUR RECOLLECTION WHETHER YOU TOOK

03:18PM  22    ANY NOTES?

03:18PM  23    A.   I'M SORRY.  IT'S A LONG MEMO.  WHAT AM I LOOKING AT?

03:18PM  24    Q.   PAGE 7.  PAGE 7.

03:18PM  25    A.   PAGE 7.

03:18PM 1                    (PAUSE IN PROCEEDINGS.)

03:19PM 2        BY MR. WADE:

03:19PM 3        Q.   IF YOU LOOK AT THE FIRST FULL PARAGRAPH.

03:19PM 4        A.   I DON'T RECALL SAYING THAT.

03:19PM 5        Q.   AND DO YOU RECALL THAT -- TELLING THE GOVERNMENT THAT IT

03:19PM 6        ONLY CONTAINED HIGH LEVEL INFORMATION?

03:19PM 7        A.   I DO RECALL THAT, AND I DO RECALL -- IT SAYS PETERSON DID

03:19PM 8        NOT HEAR ANYTHING AT THE MEETING THAT CHANGED HER UNDERSTANDING

03:19PM 9        OF THERANOS.

03:19PM 10       Q.   OKAY.  SO YOU RECALL THAT THE DISCUSSION FOCUSSED ON HIGH

03:19PM 11       LEVEL INFORMATION?

03:19PM 12       A.   THE DISCUSSION FOCUSSED AROUND EVERYTHING THAT WE HAD READ

03:19PM 13       IN THE BINDERS AND QUESTIONS AROUND THE CONTRACTS AND THE

03:20PM 14       FINANCIALS AND WHERE THEY HAD DONE WORK PREVIOUSLY WITH THE

03:20PM 15       ANALYZER AND WHERE THEY WERE GOING TO ROLL OUT AND THE VISION

03:20PM 16       OF THE COMPANY, YES.

03:20PM 17       Q.   OKAY.  THAT WASN'T MY QUESTION.  MY QUESTION WAS, DO YOU

03:20PM 18       RECALL THAT THE MEETING FOCUSSED ON HIGH LEVEL INFORMATION?

03:20PM 19       YES OR NO?

03:20PM 20       A.   IT DEPENDS ON THE DEFINITION OF "HIGH LEVEL."  THOSE WERE

03:20PM 21       THE TOPICS THAT WE DISCUSSED THAT I JUST LISTED.

03:20PM 22       Q.   DO YOU RECALL ON DIRECT YOU GAVE TESTIMONY ABOUT THE FACT

03:20PM 23       THAT THE SIZE OF THE INVESTMENT INCREASED ON SITE?

03:20PM 24       A.   YES.

03:20PM 25       Q.   ISN'T IT THE CASE THAT ACTUALLY BEFORE THE DEVOSES AND

03:20PM 1    MR. TUBERGEN AND YOU WENT OUT THERE THAT THERE WAS DISCUSSION

03:21PM 2    AND A BELIEF THAT THEY SHOULD INCREASE THE INVESTMENT TO

03:21PM 3    $100 MILLION?

03:21PM 4    A.   NOT THAT I RECALL.

03:21PM 5    Q.   TAKE A LOOK AT 14106.

03:21PM 6         (PAUSE IN PROCEEDINGS.)

03:21PM 7              THE WITNESS:  OKAY.

03:21PM 8    BY MR. WADE:

03:21PM 9    Q.   DO YOU HAVE 14106 IN FRONT OF YOU?

03:21PM 10   A.   YES.

03:21PM 11   Q.   AND AGAIN, MR. SCHIERBEEK IS THE CONUMBER 2 PERSON WITHIN

03:22PM 12   THE RDV OFFICE; IS THAT RIGHT?

03:22PM 13   A.   YES.

03:22PM 14   Q.   OKAY.

03:22PM 15        MOVE THE ADMISSION OF 14106.

03:22PM 16             MR. LEACH:  OBJECTION.  HEARSAY, FOUNDATION.  SHE'S

03:22PM 17   NOT ON THIS.

03:22PM 18             MR. WADE:  WE'VE LET IN MANY DOCUMENTS THAT SHE'S

03:22PM 19   NOT ON.

03:22PM 20             THE COURT:  OKAY.  GIVE ME JUST A MOMENT, PLEASE.

03:22PM 21        (PAUSE IN PROCEEDINGS.)

03:22PM 22             MR. WADE:  AND FOR THE BENEFIT OF THE COURT, I'M

03:22PM 23   FOCUSSED ON NUMBER 2 WITHIN THAT COMMUNICATION.

03:22PM 24             THE WITNESS:  YES.  OH.

03:22PM 25             MR. WADE:  FOR THE JUDGE'S BENEFIT.  WE'LL WAIT FOR

03:22PM  1    HIM.

03:22PM  2            (PAUSE IN PROCEEDINGS.)

03:22PM  3                THE COURT:  DO YOU WANT TO JUST PROBE THIS THEN?  IS

03:23PM  4    THAT WHAT YOU WANT TO DO IS PROBE THIS?  OR DID YOU --

03:23PM  5    BY MR. WADE:

03:23PM  6    Q.   ARE YOU AWARE THAT THERE WAS ACTUALLY DISCUSSION AND A

03:23PM  7    BELIEF GOING INTO THE TRIP TO CALIFORNIA THAT MR. TUBERGEN WAS

03:23PM  8    VERY BULLISH ON THE POTENTIAL INVESTMENT AND THAT THEY PROBABLY

03:23PM  9    WOULD MAKE $100 MILLION INVESTMENT?

03:23PM  10   A.   HE WAS VERY BULLISH ON THE OPPORTUNITY.  I DON'T RECALL

03:23PM  11   CONVERSATION AROUND 100 MILLION UNTIL AFTER THE MEETING, AND

03:23PM  12   BOB DIDN'T -- MR. SCHIERBEEK DIDN'T HAVE ANYTHING REALLY TO DO

03:23PM  13   WITH THIS DEAL.

03:23PM  14   Q.   BUT HE'S A SENIOR OFFICER IN THE COMPANY; RIGHT?

03:23PM  15   A.   YES, BUT HE'S ON THE FAMILY SERVICES SIDE.  HE'S NOT PART

03:23PM  16   OF THE INVESTMENT GROUP.

03:23PM  17   Q.   I UNDERSTAND YOUR VIEW.  BUT YOU WERE NOT A PART OF EVERY

03:23PM  18   CONVERSATION THAT MR. TUBERGEN HAD WITH MR. SCHIERBEEK; RIGHT?

03:23PM  19   A.   CORRECT.  BUT I DON'T KNOW -- I DON'T KNOW WHERE HE WOULD

03:24PM  20   HAVE GOTTEN THAT PROBABLY 100 MILLION INVESTMENT.  THAT WASN'T

03:24PM  21   THE DISCUSSION THAT WE HAD HAD ON THE PLANE.

03:24PM  22   Q.   BUT YOU UNDERSTAND HE WAS OF THE VIEW THAT IT WAS PROBABLY

03:24PM  23   A $100 MILLION INVESTMENT?

03:24PM  24   A.   HE WAS, RIGHT, BUT HE WASN'T WORKING ON THIS DEAL.

03:24PM  25   Q.   YOU UNDERSTOOD THAT HE COMMUNICATED WITH MR. TUBERGEN

03:24PM  1    ABOUT THE THERANOS TRANSACTION; RIGHT?

03:24PM  2    A.   SURE.   THEY COMMUNICATED.   I DON'T KNOW IF THEY TALKED

03:24PM  3    ABOUT THERANOS.

03:24PM  4    Q.   HE'S ULTIMATELY THE GUY WHO SIGNED THE AGREEMENT; RIGHT?

03:24PM  5    A.   CORRECT.

03:24PM  6    Q.   HE'S THE GUY WHO AUTHORIZED THE WIRE; RIGHT?

03:24PM  7    A.   YES.   BUT HE WASN'T PART OF THE INVESTMENT COMMITTEE AND

03:24PM  8    HE'S NOT IN THE INVESTMENT GROUP.   HE CONTROLS THE CASH.

03:24PM  9            MR. WADE:   I MOVE THE ADMISSION OF THE DOCUMENT.

03:24PM 10            THE COURT:   WELL, THERE'S SOME OTHER INFORMATION ON

03:24PM 11    HERE -- THAT'S WHY I ALLOWED YOU TO PROBE.

03:24PM 12            MR. WADE:   I COULD REDACT -- I'D BE WILLING TO

03:24PM 13    REDACT EVERYTHING BUT THAT PARAGRAPH.

03:24PM 14            THE COURT:   OKAY.   I'LL ALLOW IT IN, JUST THAT

03:24PM 15    NUMBER 2 PARAGRAPH, AND I'M SURE YOUR TEAM CAN REDACT THAT.

03:24PM 16        (DEFENDANT'S EXHIBIT 14106, PARAGRAPH 2, REDACTED, WAS

03:25PM 17    RECEIVED IN EVIDENCE.)

03:25PM 18            MR. WADE:   YEAH.   CAN YOU GIVE ME ONE SECOND SO I

03:25PM 19    CAN LET MY COLLEAGUE WORK?

03:25PM 20            THE COURT:   OKAY.

03:25PM 21            MR. WADE:   OKAY.   LET ME KNOW WHEN YOU'RE READY,

03:25PM 22    MR. BENNETT.

03:25PM 23            THE COURT:   OKAY.   AND WHY DON'T YOU TAKE A LOOK AT

03:25PM 24    IT TO MAKE SURE THAT IT CONFORMS.   THAT WOULD PROBABLY BE A

03:25PM 25    GOOD IDEA.

| | | |
|---|---|---|
| 03:25PM | 1 | MR. WADE:  THANK YOU, YOUR HONOR. |
| 03:25PM | 2 | THE COURT:  FOLKS, WHY DON'T YOU STAND UP AND |
| 03:25PM | 3 | STRETCH IF YOU WOULD LIKE. |
| 03:25PM | 4 | (STRETCHING.) |
| 03:25PM | 5 | MR. WADE:  JUST TO MAKE SURE WE'RE ON THE SAME PAGE, |
| 03:25PM | 6 | WE'RE GOING TO INCLUDE THE HEADER AND THAT PARAGRAPH. |
| 03:25PM | 7 | THE COURT:  RIGHT, UP TO SUBJECT AND NUMBER 2. |
| 03:25PM | 8 | MR. WADE:  RIGHT.  EVERYTHING ELSE WILL BE REDACTED. |
| 03:25PM | 9 | THE COURT:  GREAT. |
| 03:26PM | 10 | WHILE THAT HAPPENING, CAN I JUST ASK A TIME ESTIMATE FOR |
| 03:26PM | 11 | THIS WITNESS?  WILL WE CONCLUDE THIS WITNESS TODAY? |
| 03:26PM | 12 | MR. WADE:  PROBABLY NOT. |
| 03:26PM | 13 | THE COURT:  OKAY. |
| 03:26PM | 14 | MR. WADE:  WE HAVE ANOTHER 30 MINUTES? |
| 03:26PM | 15 | THE COURT:  THAT'S WHAT WE HAVE.  THAT'S WHAT I TOLD |
| 03:26PM | 16 | THE JURY. |
| 03:26PM | 17 | MR. WADE:  I DON'T THINK SO. |
| 03:26PM | 18 | THE COURT:  OKAY. |
| 03:26PM | 19 | BY MR. WADE: |
| 03:26PM | 20 | Q.   OKAY.  DO YOU SEE THAT IN FRONT OF YOU ON THE SCREEN NOW? |
| 03:26PM | 21 | A.   YES. |
| 03:26PM | 22 | Q.   AND THIS IS -- 10-14, AGAIN, IS A COUPLE OF DAYS BEFORE |
| 03:26PM | 23 | YOU, OR MAYBE THE DAY THAT YOU WERE HEADED OUT TO PALO ALTO; |
| 03:26PM | 24 | CORRECT? |
| 03:26PM | 25 | A.   YES. |

03:26PM  1    Q.  OKAY.  AND IN THIS EMAIL THEY TALK ABOUT JERRY, AND THAT'S

03:26PM  2    JERRY TUBERGEN; RIGHT?

03:27PM  3    A.  YES.

03:27PM  4    Q.  AND HE'S TRAVELLING OUT TO MEET WITH THE FOUNDER,

03:27PM  5    ELIZABETH HOLMES.

03:27PM  6        DO YOU SEE THAT?

03:27PM  7    A.  YES.

03:27PM  8    Q.  AND HE'S BEEN VERY BULLISH ON THIS POTENTIAL

03:27PM  9    RELATIONSHIP/INVESTMENT.

03:27PM  10       DO YOU SEE THAT?

03:27PM  11   A.  YES.

03:27PM  12   Q.  AND THE FAMILY WAS TRAVELLING WITH HIM AND THAT IT WAS

03:27PM  13   PROBABLY A $100 MILLION INVESTMENT; CORRECT?  THAT'S WHAT HE

03:27PM  14   SAYS THERE?

03:27PM  15   A.  YES.

03:27PM  16   Q.  OKAY.  AND THE INVESTMENT -- THE DECISION TO -- OR THE

03:27PM  17   COMMITMENT TO INVEST WAS MADE ACTUALLY IN THE ROOM AT THERANOS;

03:27PM  18   CORRECT?

03:27PM  19   A.  WE TALKED ABOUT SIZING, AND ALONG WITH WHAT SOME OF THE

03:27PM  20   OTHER INVESTORS WERE GOING TO INVEST AT, AND, YES, WE DISCUSSED

03:27PM  21   LOOKING AT IT, OR CONSIDERING THE 100 MILLION INSTEAD OF THE

03:28PM  22   50 MILLION.

03:28PM  23   Q.  WELL, ACTUALLY, THERE WAS AN ACTUAL COMMITMENT MADE BY

03:28PM  24   MR. TUBERGEN AND MR. DEVOS TO A $100 MILLION COMMITMENT IN THE

03:28PM  25   MEETING WITH THERANOS; CORRECT?

03:28PM 1     A.   THERE WASN'T A COMMITMENT, NO.  THAT'S NOT HOW IT WORKS.

03:28PM 2     IT HAS TO GO THROUGH OUR INVESTMENT COMMITTEE PROCESS.

03:28PM 3          THEY MAY HAVE SAID THAT THEY WOULD LOOK AT 100 MILLION OR

03:28PM 4     WERE WILLING TO DO 100 MILLION, BUT IT STILL HAD TO BE -- IT

03:28PM 5     STILL HAD TO GO THROUGH THE PROCESS.  THERE WERE A NUMBER OF

03:28PM 6     PEOPLE NOT THERE THAT WERE ON THE INVESTMENT COMMITTEE, AND

03:28PM 7     JERRY IS NOT ON OUR INVESTMENT COMMITTEE.

03:28PM 8     Q.   DO YOU RECALL PREVIOUSLY TESTIFYING THAT THE COMMITMENT

03:28PM 9     WAS MADE IN THE ROOM?

03:28PM 10    A.   I DON'T RECALL.

03:28PM 11    Q.   OKAY.  WE'LL GO THROUGH THAT IN A SECOND, BUT BEFORE I DO,

03:29PM 12    LET'S LOOK AT THE -- LET'S LOOK AT 204 -- I'M SORRY, 2097.

03:29PM 13         DO YOU SEE THAT IN FRONT OF YOU?

03:29PM 14    A.   YES.

03:29PM 15    Q.   OKAY.  AND THAT'S AN EMAIL BETWEEN YOU AND ONE OF YOUR

03:29PM 16    COLLEAGUES THAT DISCUSSES THE THERANOS INVESTMENT.

03:29PM 17         DO YOU SEE THAT?

03:29PM 18    A.   YEAH, SHE'S A COWORKER, FRIEND.

03:29PM 19    Q.   OKAY.

03:29PM 20         MOVE THE ADMISSION OF 2097.

03:29PM 21              MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:30PM 22              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:30PM 23         (GOVERNMENT'S EXHIBIT 2097 WAS RECEIVED IN EVIDENCE.)

03:30PM 24    BY MR. WADE:

03:30PM 25    Q.   LET ME BLOW UP THE MIDDLE EMAIL.

03:30PM  1              THIS IS AN EMAIL THAT YOU WROTE ON OCTOBER 20TH, 2014;

03:30PM  2     RIGHT?

03:30PM  3     A.   YES.

03:30PM  4     Q.   THAT'S LESS THAN A WEEK AFTER THE DATE OF THE MEETING;

03:30PM  5     CORRECT?

03:30PM  6     A.   YES.

03:30PM  7     Q.   AND DO YOU SEE DOWN BELOW WHERE IT SAYS, "JERRY COMMITTED

03:30PM  8     ON THE SPOT $100 MILLION WITH DOUG AND CHERI IN COMPLETE

03:30PM  9     AGREEMENT"?

03:30PM  10             DO YOU SEE THAT?

03:30PM  11    A.   YES.

03:30PM  12    Q.   AND WAS THAT TRUE AT THE TIME?

03:30PM  13    A.   IT DOESN'T WORK THAT WAY.  I THINK THAT HE HAD SIGNALLED

03:30PM  14    AND DOUG AND CHERI WERE IN AGREEMENT TO DO THE 100 AND WE

03:30PM  15    TALKED ABOUT THE 100 AFTERWARD.  BUT IT STILL HAS TO GO THROUGH

03:30PM  16    THE PROCESS OF GOING THROUGH INVESTMENT COMMITTEE.

03:30PM  17             THAT'S JUST MY CHARACTERIZATION TO A FRIEND AND A

03:30PM  18    COWORKER.

03:30PM  19    Q.   OKAY.  SO YOU DON'T RECALL THEM COMMITTING IN THE ROOM TO

03:31PM  20    THE $100 MILLION INVESTMENT?

03:31PM  21    A.   WE TALKED ABOUT IT.  I DON'T -- THERE'S, THERE'S NOT A

03:31PM  22    COMMITMENT BECAUSE IT HAS TO GO THROUGH INVESTMENT COMMITTEE.

03:31PM  23    Q.   LET ME JUST ASK IF THE LANGUAGE -- IF THAT IS AN ACCURATE

03:31PM  24    STATEMENT AT THE TIME THAT YOU MADE IT.

03:31PM  25    A.   IT WAS MY CHARACTERIZATION OF WHAT I SAW GOING ON, YES.

03:31PM  1    Q.   AND LET ME GO TO 2098.

03:31PM  2    A.   YES.

03:31PM  3    Q.   OKAY.  THIS IS AN EMAIL RELATING TO THE THERANOS

03:31PM  4    INVESTMENT THAT YOU ARE ON; CORRECT?

03:31PM  5    A.   IT'S -- WHICH PART ARE YOU ON?  IT'S A FEW PAGES LONG.

03:31PM  6    Q.   THE BOTTOM PART OF THE EMAIL IS AN EMAIL BETWEEN

03:31PM  7    MR. TUBERGEN, MS. HOLMES, MR. BALWANI, AND MR. DEVOS, CORRECT,

03:32PM  8    THE LATER PART OF THE EMAIL?  AND THEN IT'S FORWARDED TO YOU;

03:32PM  9    CORRECT?

03:32PM  10   A.   YES.

03:32PM  11            MR. WADE:  I MOVE THE ADMISSION OF 2098.

03:32PM  12            MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:32PM  13            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:32PM  14        (GOVERNMENT'S EXHIBIT 2098 WAS RECEIVED IN EVIDENCE.)

03:32PM  15            MR. WADE:  IF WE CAN GO TO THE SECOND PAGE AND BLOW

03:32PM  16   UP THE BOTTOM EMAIL.  I'M SORRY.  ACTUALLY, LET'S GO TO THE

03:32PM  17   THIRD PAGE AND GET MR. TUBERGEN'S EMAIL.

03:32PM  18   Q.   DO YOU SEE THIS IS AN EMAIL FROM MR. TUBERGEN?

03:33PM  19   A.   YES.

03:33PM  20   Q.   TO MS. HOLMES AND MR. BALWANI COPYING DOUG DEVOS?

03:33PM  21        DO YOU SEE THAT?

03:33PM  22   A.   YES.

03:33PM  23   Q.   OKAY.  AND DO YOU SEE IN THE MIDDLE PARAGRAPH WHERE IT

03:33PM  24   SAYS, "WE WOULD LOVE TO MOVE FORWARD AND BE A PART OF THE NEW

03:33PM  25   SHAREHOLDER BASE YOU ARE ASSEMBLING.  AS WE DISCUSSED, AN

03:33PM 1    INVESTMENT OF $100 MILLION SEEMS TO FIT, IF THAT WORKS FOR YOU

03:33PM 2    AND THE COMPANY."  RIGHT?

03:33PM 3    A.   YES, THAT'S PRETTY MUCH HOW IT WAS DISCUSSED IN THE

03:33PM 4    MEETING.

03:33PM 5    Q.   RIGHT.  AND THAT'S FOUR DAYS AFTER THE MEETING THEY'RE

03:33PM 6    SAYING THEY MADE THE COMMITMENT; CORRECT?

03:33PM 7    A.   IT DOESN'T NECESSARILY SAY THEY MADE THE COMMITMENT, BUT

03:33PM 8    YES.

03:33PM 9    Q.   ALL RIGHT.  LET'S GO FORWARD AND LOOK AT MS. HOLMES'S

03:33PM 10   EMAIL.

03:33PM 11       DO YOU SEE THAT?  AND SHE SAYS, "WE HAVE RESERVED THE

03:33PM 12   $100 MILLION ALLOCATION FOR YOU AND THE FAMILY."

03:34PM 13       DO YOU SEE THAT?

03:34PM 14   A.   YES.

03:34PM 15   Q.   AND THEN THIS IS LATER FORWARDED TO YOU SO THAT SUNNY CAN

03:34PM 16   BE IN TOUCH ON THE DOCUMENTATION; RIGHT?

03:34PM 17   A.   YES.

03:34PM 18   Q.   OKAY.  LET'S GO TO 12856.

03:34PM 19       DO YOU SEE THAT?

03:34PM 20   A.   WHERE?  I'M SORRY?

03:34PM 21   Q.   DO YOU HAVE 12856 IN FRONT OF YOU, THAT EMAIL?

03:34PM 22   A.   THERE'S NOTHING ON MY SCREEN.  IS THERE SUPPOSED TO BE?

03:35PM 23   Q.   NO, NOT YET.

03:35PM 24   A.   OKAY.

03:35PM 25   Q.   I'M SORRY.  THE WAY IT WORKS IS THAT ONCE WE INTRODUCE IT,

03:35PM  1    WE CAN PUT IT UP ON THE SCREEN.  BUT UNTIL IT IS IN EVIDENCE,

03:35PM  2    WE CAN'T PUT IT UP ON THE SCREEN.

03:35PM  3        MY APOLOGIES.

03:35PM  4    A.   I DON'T -- I'M NOT SEEING 12856.  I'M SORRY.

03:35PM  5    Q.   YOU DON'T HAVE THAT IN THE BLACK BINDER?

03:35PM  6    A.   WHERE AM I LOOKING?

03:35PM  7    Q.   DO YOU SEE A TAB WITH 12856?

03:35PM  8    A.   I THOUGHT WE WERE STILL ON THAT SERIES OF EMAILS.  I'M

03:35PM  9    SORRY.

03:35PM  10   Q.   NO.

03:35PM  11   A.   12 --

03:35PM  12   Q.   I'M SORRY IF I --

03:35PM  13        MR. LEACH:  YOUR HONOR, I HAVE NO OBJECTION TO THIS

03:35PM  14   EXHIBIT IF YOU WANT TO JUST DISPLAY IT.

03:35PM  15        MR. WADE:  OKAY.

03:35PM  16        THE COURT:  DO YOU WANT TO INTRODUCE IT?

03:35PM  17        MR. WADE:  YES, PLEASE.

03:35PM  18        THE COURT:  ALL RIGHT.  IT'S ADMITTED, AND IT MAY BE

03:35PM  19   PUBLISHED.

03:35PM  20        (DEFENDANT'S EXHIBIT 12856 WAS RECEIVED IN EVIDENCE.)

03:35PM  21        MR. WADE:  IF WE CAN BLOW UP THE THIRD EMAIL DOWN.

03:35PM  22   YEAH, THE --

03:36PM  23   Q.   DO YOU SEE THAT THIS IS THAT EMAIL THAT WE WERE JUST

03:36PM  24   TALKING ABOUT WHERE MS. HOLMES RESPONDED IN THE SEPARATE CHAIN

03:36PM  25   THAT WAS FORWARDED TO YOU?

03:36PM 1      A.   YES, YES.

03:36PM 2      Q.   OKAY.  NOW, LET'S JUST GO UP THE CHAIN AND LOOK AT THE

03:36PM 3      NEXT EMAIL.

03:36PM 4           MR. TUBERGEN SAYS, "THANKS VERY MUCH."

03:36PM 5           AND THEN WE'LL KEEP WORKING UP.

03:36PM 6           THIS IS FOR -- HE THEN FORWARDS IT TO DOUG DEVOS?

03:36PM 7      A.   YES.

03:36PM 8      Q.   AND THERE'S A SEPARATE COMMUNICATION BETWEEN MR. DEVOS AND

03:36PM 9      MR. TUBERGEN.

03:36PM 10          DO YOU SEE THAT?

03:36PM 11     A.   YES.

03:36PM 12     Q.   AND HE SAYS, "WELL DONE, IT LOOKS LIKE WE'RE THERE."

03:36PM 13          DO YOU SEE THAT?

03:36PM 14     A.   YES.

03:36PM 15     Q.   "EXCITING TO BE A PART OF THIS TREMENDOUS EFFORT TO CHANGE

03:36PM 16     THE WORLD FOR THE BETTER."

03:36PM 17          DO YOU SEE THAT?

03:36PM 18     A.   YES.

03:36PM 19     Q.   THE LAST LANGUAGE WE REFLECTED WAS THE FORWARD LONG-TERM

03:36PM 20     FOCUS THAT THE DEVOS FAMILY HAD; CORRECT?

03:36PM 21     A.   YES.

03:36PM 22     Q.   OKAY.  LET'S LOOK UP THE CHAIN.

03:37PM 23          MR. TUBERGEN CONFIRMS, "THANKS, DOUG.  YUP, WE'RE THERE."

03:37PM 24          RIGHT?  DO YOU SEE THAT?

03:37PM 25     A.   YES.

03:37PM 1    Q.   THE -- YOU'VE TALKED A LITTLE BIT ABOUT THE MEMO THAT YOU

03:37PM 2    PREPARED.

03:37PM 3         DO YOU RECALL THAT?

03:37PM 4    A.   YES.  THE MEMO SUMMARIZED WHAT WAS DISCUSSED AT THE

03:37PM 5    MEETING --

03:37PM 6    Q.   RIGHT.

03:37PM 7    A.   -- ALONG WITH EVERYTHING ELSE.

03:37PM 8    Q.   I UNDERSTAND.  BUT THE INVESTMENT DECISION WAS PREPARED

03:37PM 9    BEFORE THE MEMO --

03:37PM 10             THE COURT:  LET HIM FINISH.

03:37PM 11   BY MR. WADE:

03:37PM 12   Q.   I APOLOGIZE.  NORMALLY WE HAVE CONVERSATIONS, BUT WE HAVE

03:37PM 13   TO LET ME FINISH, AND THEN I'LL TRY NOT TO INTERRUPT YOU, TOO.

03:37PM 14   I THINK I'VE DONE THAT A FEW TIMES.  I'M SORRY.

03:37PM 15   A.   OKAY.

03:37PM 16   Q.   THE INVESTMENT DECISION WAS MADE BEFORE THE MEMO WAS

03:38PM 17   PREPARED; CORRECT?

03:38PM 18   A.   IT STILL HAS TO GO TO INVESTMENT COMMITTEE, SO IN MY -- IN

03:38PM 19   MY FINISHING OF THIS, THE ONLY WAY THAT WE CAN FINALIZE

03:38PM 20   EVERYTHING IS IT HAS TO -- THE MEMO HAS TO GO OUT AND BE SIGNED

03:38PM 21   AND APPROVED THROUGH THE INVESTMENT COMMITTEE, BUT JERRY AND

03:38PM 22   DOUG WERE EMAILING THAT THEY WERE THERE.  SO YES.

03:38PM 23   Q.   SO THE -- AGAIN, I UNDERSTAND THAT YOU HAD SOME -- ON YOUR

03:38PM 24   END, YOU HAD SOME PROCESSING THAT YOU NEEDING TO PERFORM --

03:38PM 25   A.   CORRECT.

03:38PM 1   Q.   -- AND SOME LOGISTICAL ISSUES, BUT THE INVESTMENT WAS DONE

03:38PM 2   BEFORE THE MEMO WAS PREPARED; CORRECT?

03:38PM 3   A.   HMM -- THEY STILL -- WE STILL DIDN'T WIRE THE MONEY UNTIL

03:38PM 4   AFTER OUR PROCESS WAS COMPLETED.

03:38PM 5   Q.   BUT YOU SEE HERE THE COMMITMENT IS MADE; RIGHT?

03:38PM 6   A.   IT'S NOT REALLY A COMMITMENT UNTIL YOU SEND THE DOCUMENTS.

03:38PM 7   Q.   OKAY.  LET'S KEEP GOING.  2139.

03:39PM 8        DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?

03:39PM 9   A.   YES.

03:39PM 10  Q.   AND THIS IS A COMMUNICATION --

03:39PM 11       MOVE THE ADMISSION OF 2139.

03:39PM 12           MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:39PM 13           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:39PM 14       (GOVERNMENT'S EXHIBIT 2139 WAS RECEIVED IN EVIDENCE.)

03:39PM 15  BY MR. WADE:

03:39PM 16  Q.   THIS IS A COMMUNICATION BETWEEN YOU AND MR. BALWANI WHERE

03:39PM 17  YOU'RE WORKING TO PAPER THE DEAL AND GET SIGNATURES AND THE

03:39PM 18  LIKE; RIGHT?

03:39PM 19  A.   CORRECT.

03:39PM 20  Q.   OKAY.  AND THEN DO YOU RECALL THERE BEING WORD THAT THEY

03:39PM 21  WANTED TO FUND IT PRETTY QUICKLY AND IT WAS FUNDED WITHIN A

03:39PM 22  COUPLE OF DAYS AFTER THAT?

03:39PM 23  A.   AFTER THIS MEMO, OR AFTER WHAT?

03:39PM 24  Q.   AFTER THIS EMAIL.

03:39PM 25  A.   YES.

03:39PM   1    Q.   OKAY.  AND IF WE GO TO 14080.

03:40PM   2    A.   14080.  OKAY.  OKAY.

03:40PM   3    Q.   THIS IS A DOCUMENT CONFIRMING RECEIPT OF THE SIGNATURE

03:40PM   4    PAGE ON OCTOBER 31ST; CORRECT?

03:41PM   5    A.   CORRECT.

03:41PM   6         MR. WADE:  MOVE THE ADMISSION OF 14080.

03:41PM   7         MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:41PM   8         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:41PM   9         (DEFENDANT'S EXHIBIT 14080 WAS RECEIVED IN EVIDENCE.)

03:41PM   10   BY MR. WADE:

03:41PM   11   Q.   I JUST WANT TO FOCUS ON THE DATE.  THAT'S 10-31; CORRECT?

03:41PM   12   A.   CORRECT.

03:41PM   13   Q.   EXECUTED DOCUMENTS?

03:41PM   14   A.   YES.

03:41PM   15   Q.   OKAY.  NOW LET'S GO TO 13987.

03:41PM   16   A.   YES.

03:41PM   17   Q.   OKAY.  AND DO YOU SEE THIS IS AN EMAIL ABOUT THE THERANOS

03:42PM   18   INVESTMENT THAT YOU'RE ON?

03:42PM   19   A.   YES.

03:42PM   20         MR. WADE:  I MOVE THE ADMISSION OF 13987.

03:42PM   21         MR. LEACH:  NO OBJECTION.

03:42PM   22         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:42PM   23         (DEFENDANT'S EXHIBIT 13987 WAS RECEIVED IN EVIDENCE.)

03:42PM   24   BY MR. WADE:

03:42PM   25   Q.   AND IF YOU LOOK AT THE BOTTOM, YOU SEE THERE'S AN EMAIL

03:42PM   1    FROM YOU TO A GROUP OF PEOPLE WITHIN RDV?

03:42PM   2    A.   YES.

03:42PM   3    Q.   DO YOU SEE THAT?

03:42PM   4         ARE THOSE SORT OF ACCOUNTING AND FINANCIAL PEOPLE?

03:42PM   5    A.   YES, INTERNAL.

03:42PM   6    Q.   OKAY.  AND THERE IT SAYS, "JERRY WANTS TO BRING THERANOS

03:42PM   7    TO IC.  NOT SURE WHEN THAT WILL BE, NOR IS IT RELEVANT GIVEN

03:42PM   8    WE'VE FUNDED, BUT FYI I WON'T HAVE A SIGNATURE ON APPROVAL DOC

03:42PM   9    FOR A BIT."

03:42PM  10         DO YOU SEE THAT?

03:42PM  11    A.   YES.

03:42PM  12    Q.   OKAY.  AND THIS IS FIVE OR SIX DAYS AFTER THE MONEY WAS

03:42PM  13    WIRED AND THE DOCUMENTS WERE SIGNED; RIGHT?

03:42PM  14    A.   CORRECT.

03:42PM  15    Q.   OKAY.

03:43PM  16    A.   BUT THE MEMO HAD GONE OUT ON THE 23RD OF OCTOBER.

03:43PM  17    Q.   RIGHT.

03:43PM  18         DO YOU KNOW WHEN IT WAS SIGNED?  IT WASN'T SIGNED AS OF

03:43PM  19    NOVEMBER 5TH; RIGHT?

03:43PM  20    A.   CORRECT.

03:43PM  21    Q.   AND DO YOU KNOW WHEN THE INVESTMENT COMMITTEE GOT IT?

03:43PM  22    A.   ON THE 20 -- IT WAS DONE ON THE 23RD AND SENT TO JERRY.

03:43PM  23    Q.   RIGHT.  DO YOU KNOW WHEN THE INVESTMENT COMMITTEE GOT IT?

03:43PM  24    A.   I BELIEVE THEY GOT IT THEN.  I DON'T KNOW EXACTLY.

03:43PM  25    Q.   OKAY.  DO YOU KNOW WHEN THE NEXT INVESTMENT COMMITTEE

03:43PM 1    MEETING WAS?

03:43PM 2    A.   IN DECEMBER.

03:43PM 3    Q.   OKAY.  LET'S LOOK AT 14081.  IT WAS DECEMBER 17TH;

03:43PM 4    CORRECT?

03:43PM 5    A.   YES.

03:43PM 6    Q.   AND THESE ARE THE DEVOS FAMILY COUNCIL MINUTES; CORRECT?

03:43PM 7    A.   YES.

03:43PM 8         MR. WADE:  AND I'D MOVE THE ADMISSION.  I THINK

03:43PM 9    THEY'RE APPROPRIATELY REDACTED ALREADY, YOUR HONOR.

03:44PM 10        MAYBE WE CAN REDACT THE -- AFTER PETER EVANS NAMES.

03:44PM 11             THE COURT:  ON THE FRONT PAGE?

03:44PM 12             MR. WADE:  YES, IF THAT --

03:44PM 13             THE COURT:  MR. LEACH?

03:44PM 14             MR. LEACH:  I DON'T OBJECT TO THE EXHIBIT,

03:44PM 15   YOUR HONOR.  THE REDACTIONS SOUND APPROPRIATE.

03:44PM 16             THE COURT:  WITH THOSE REDACTIONS, THEN IT WILL BE

03:44PM 17   ADMITTED.

03:44PM 18        MR. LEACH, YOU HAVE NO OBJECTION?

03:44PM 19             MR. LEACH:  NO OBJECTION.

03:44PM 20             THE COURT:  ALL RIGHT.

03:44PM 21        (DEFENDANT'S EXHIBIT 14081 WAS RECEIVED IN EVIDENCE.)

03:44PM 22             MS. TREFZ:  MR. WADE, CAN YOU JUST COME AND SEE?

03:45PM 23   SORRY.

03:45PM 24   BY MR. WADE:

03:45PM 25   Q.   OKAY.  THIS IS THE DEVOS -- THESE ARE MINUTES OF THE DEVOS

03:45PM   1    FAMILY COUNCIL MEETING; CORRECT?

03:45PM   2    A.   YES.

03:45PM   3    Q.   AND THAT'S WHERE THEY ACT ON A VARIETY OF CORPORATE

03:45PM   4    MATTERS; CORRECT?

03:45PM   5    A.   YES.  THIS ISN'T THE INVESTMENT COMMITTEE.

03:45PM   6    Q.   RIGHT, I UNDERSTAND.

03:45PM   7         BUT FOR THE FAMILY OFFICE, THEY -- THEY'LL ACT OFTEN AT

03:45PM   8    THESE MEETINGS; CORRECT?

03:45PM   9    A.   THEY WHAT?

03:45PM  10    Q.   THEY'LL ACT OFTEN AT THESE MEETINGS; IS THAT RIGHT?

03:45PM  11    A.   ACT OFTEN?  I'M NOT SURE I'M FOLLOWING.

03:45PM  12    Q.   OKAY.  LET ME TRY AGAIN.  LIKE A CORPORATION SOMETIMES

03:45PM  13    ACTS THROUGH ITS BOARD OF DIRECTORS, THE DEVOS FAMILY WILL TAKE

03:45PM  14    CORPORATE ACTIONS AT MEETINGS OF THIS KIND; IS THAT RIGHT?

03:45PM  15    A.   FAMILY COUNCIL IS DIFFERENT THAN INVESTMENT COMMITTEE.

03:46PM  16         OFTENTIMES THERE WILL BE AN UPDATE ON THINGS, BUT IT'S NOT

03:46PM  17    A FORMAL INVESTMENT COMMITTEE MEETING.

03:46PM  18    Q.   OKAY.  SO DO YOU -- I'M SORRY.  I DIDN'T MEAN TO

03:46PM  19    INTERRUPT.

03:46PM  20    A.   THOSE, THOSE CAN OFTEN BE DONE VIA TELEPHONE, AND WE DO

03:46PM  21    HAVE TWO OR THREE A YEAR, FORMAL ONES.

03:46PM  22    Q.   OKAY.  AS YOU SIT HERE TODAY, DO YOU KNOW THE DATE ON

03:46PM  23    WHICH THE INVESTMENT COMMITTEE ACTED, OR IF THEY ACTED?

03:46PM  24    A.   IT WAS MY UNDERSTANDING THAT THERE WAS A PHONE CALL OR

03:46PM  25    DISCUSSION RIGHT AFTER -- BETWEEN THE 23RD AND THE 30TH, 31ST

```
03:46PM   1    WHEN WE WIRED THE MONEY, THAT ALL WAS GREEN LIGHTED TO GO.

03:46PM   2    Q.   AND HAVE YOU SEEN ANY DOCUMENTS TO THAT EFFECT?

03:46PM   3    A.   IT'S JUST JERRY TELLING ME.

03:46PM   4    Q.   OKAY.  JERRY TOLD YOU THAT?

03:46PM   5    A.   YES.

03:46PM   6    Q.   OKAY.  WERE YOU PRESENT FOR THE MEETING?

03:46PM   7    A.   NO.

03:47PM   8    Q.   OKAY.  IF I CAN PULL UP 13987, AND BRING UP THAT BOTTOM

03:47PM   9    EMAIL AGAIN.

03:47PM  10         IF YOUR RECOLLECTION IS RIGHT, WHY IS IT THAT THE DOCUMENT

03:47PM  11    WASN'T SIGNED ON NOVEMBER 5TH, 2014?

03:47PM  12    A.   I DON'T KNOW IF HE JUST HADN'T SIGNED IT YET.

03:47PM  13         BUT THERE HAD TO HAVE BEEN A DISCUSSION AROUND IT WITH THE

03:47PM  14    OTHER MEMBERS OF THE INVESTMENT COMMITTEE.  IT COULD HAVE

03:47PM  15    HAPPENED ON THE PLANE AS WELL.  I DON'T KNOW HOW MANY PEOPLE

03:47PM  16    HAD TO -- ON THE WAY HOME.  I DON'T KNOW HOW MANY HAD TO OKAY

03:47PM  17    THE INVESTMENT --

03:47PM  18    Q.   OKAY.

03:47PM  19    A.   -- AS PART OF THE INVESTMENT COMMITTEE.

03:48PM  20         (PAUSE IN PROCEEDINGS.)

03:48PM  21    BY MR. WADE:

03:48PM  22    Q.   AFTER YOUR INTERACTIONS IN THE MEETING WITH MS. HOLMES,

03:49PM  23    WERE YOUR NEXT INTERACTIONS WITH PEOPLE FROM THERANOS THE

03:49PM  24    INTERACTIONS WITH MR. BALWANI?

03:49PM  25    A.   THROUGH THE EMAILS AND A CONVERSATION ON THE TELEPHONE?
```

03:49PM  1      Q.   YES.

03:49PM  2      A.   YES.

03:49PM  3      Q.   AND WERE THOSE THE LAST COMMUNICATIONS THAT YOU HAD IN

03:49PM  4      2014 AND '15?

03:49PM  5      A.   YES.

03:49PM  6      Q.   OKAY.  AND COMMUNICATIONS THAT HAPPENED THEREAFTER WERE

03:49PM  7      COMMUNICATIONS THAT HAPPENED AFTER "THE WALL STREET JOURNAL"?

03:49PM  8      A.   CORRECT.

03:49PM  9      Q.   OKAY.  AND YOU TESTIFIED ON DIRECT THAT -- OR YOU WERE

03:50PM  10     SHOWN THE JIM CRAMER CLIP.

03:50PM  11          DO YOU RECALL THAT?

03:50PM  12     A.   YES.

03:50PM  13     Q.   AND WERE YOU SHOWN -- DID YOU WATCH THAT AT THE TIME?

03:50PM  14     A.   YES.

03:50PM  15     Q.   OKAY.  DO YOU RECALL OTHER -- YOU HAD OTHER INTERACTIONS

03:50PM  16     WITH MS. HOLMES IN THE PERIOD FOLLOWING THAT CLIP?  YOU TALKED

03:50PM  17     ABOUT SOME OF THEM.

03:50PM  18          DO YOU RECALL THAT?

03:50PM  19     A.   I DON'T RECALL THE EXACT DATE OF THAT CLIP.  THE NEXT TIME

03:50PM  20     THAT WE SAW ELIZABETH WAS APRIL -- LATE APRIL OF 2016.

03:50PM  21     Q.   AND THAT WAS THE MEETING THAT -- THAT WAS THE MEETING THAT

03:51PM  22     MR. LEACH ASKED YOU ABOUT?

03:51PM  23     A.   YES.

03:51PM  24     Q.   OKAY.  AND THAT WAS ATTENDED BY, I THINK YOU SAID,

03:51PM  25     MR. MOSLEY, MR. TUBERGEN, AND SOME OTHERS AT THERANOS?

03:51PM  1          DO YOU RECALL THAT?

03:51PM  2     A.   MYSELF AND LEGAL COUNSEL, HEATHER KING, AND DAN EDLIN, AND

03:51PM  3     ELIZABETH.

03:51PM  4     Q.   OKAY.  AND DO YOU RECALL THAT THEY GAVE YOU AN UPDATE ON

03:51PM  5     THE REGULATORY ISSUES AT THAT MEETING?

03:51PM  6     A.   YES.

03:51PM  7     Q.   AND THEY GAVE YOU AN UPDATE ON SOME CHANGES THAT WERE

03:51PM  8     BEING MADE WITHIN MANAGEMENT?

03:51PM  9          DO YOU RECALL THAT?

03:51PM  10    A.   YES.

03:51PM  11    Q.   AND THEY GAVE YOU AN UPDATE ABOUT CHANGES THAT WERE MADE

03:51PM  12    IN THE BOARD?

03:51PM  13    A.   YES.

03:51PM  14    Q.   AND SET FORTH WHAT THEY THOUGHT WAS THEIR STRATEGY GOING

03:51PM  15    FORWARD TO TRY TO REGAIN CREDIBILITY IN THE MARKETPLACE?

03:52PM  16         DO YOU RECALL THAT?

03:52PM  17    A.   YES.

03:52PM  18    Q.   AND ONE OF THOSE WAS TO TRY TO FOCUS ON, TRY TO WORK TO

03:52PM  19    GET SOME PEER REVIEW PUBLICATIONS.

03:52PM  20         DO YOU RECALL THAT?

03:52PM  21    A.   RIGHT.

03:52PM  22    Q.   AND THERE WAS ALSO A PLAN TO FORM SOME COMMITTEES TO GIVE

03:52PM  23    SCIENTIFIC AND TECHNICAL ADVICE TO THE COMPANY?

03:52PM  24         DO YOU RECALL THAT?

03:52PM  25    A.   YES.

03:52PM 1    Q.   AND THEY ALSO GAVE YOU A REPORT ON THE FINANCIAL STATE OF

03:52PM 2    THE COMPANY AT THAT TIME?

03:52PM 3    A.   NO.

03:52PM 4    Q.   YOU DON'T BELIEVE THEY DID?

03:52PM 5    A.   THEY DIDN'T GIVE US ANY PAPER AT THAT MEETING.

03:52PM 6    Q.   DID YOU --

03:52PM 7    A.   WE DIDN'T LEAVE WITH ANYTHING.  THERE MIGHT HAVE BEEN SOME

03:52PM 8    VERBAL AROUND WHERE THE CASH WAS OF THE COMPANY, BUT I DON'T

03:52PM 9    RECALL SPECIFICALLY.

03:52PM 10   Q.   OKAY.  DO YOU RECALL THAT THERE WAS DISCUSSION ABOUT HOW

03:52PM 11   THEY HAD ABOUT $375 MILLION IN CASH AT THAT TIME?

03:53PM 12   A.   I DON'T RECALL THE EXACT NUMBERS.

03:53PM 13   Q.   OKAY.

03:53PM 14   A.   YES, WE WERE TALKING ABOUT THE CASH POSITION OF THE

03:53PM 15   COMPANY.

03:53PM 16   Q.   AND --

03:53PM 17   A.   BUT THERE WERE NO FINANCIALS SHOWN.

03:53PM 18   Q.   UNDERSTOOD.  AND DID THEY TELL YOU THAT THEY WERE ACTUALLY

03:53PM 19   IN THE PROCESS OF TRYING TO IMPROVE THE FINANCIALS OF THE

03:53PM 20   COMPANY IN THAT TIME?

03:53PM 21   A.   I DON'T RECALL THAT PART OF THE CONVERSATION.

03:53PM 22   Q.   DO YOU RECALL THAT THEY WERE BRINGING IN NEW PEOPLE INTO

03:53PM 23   THE FINANCIAL OPERATIONS TO TRY TO IMPROVE THE ACCOUNTING

03:53PM 24   FUNCTION?

03:53PM 25   A.   I RECALL WE SENT AHEAD A LIST OF QUESTIONS THAT WE HAD,

03:53PM  1    AND A LOT OF IT WAS AROUND THE FINANCIALS AND EVERYTHING, AND

03:53PM  2    WE DIDN'T RECEIVE ANY HARD CORE -- ANYTHING TO TAKE BACK WITH

03:53PM  3    US.  THAT IS WHAT I REMEMBER.

03:53PM  4    Q.   OKAY.  DO YOU REMEMBER THAT, AS PART OF THAT, THE COMPANY

03:53PM  5    TOLD YOU THAT THEY -- PART OF THEIR STRATEGY FOR MOVING FORWARD

03:53PM  6    WAS TO INCREASE ENGAGEMENT WITH THE SCIENTIFIC COMMUNITY?

03:54PM  7         DO YOU RECALL THAT?

03:54PM  8    A.   YES.

03:54PM  9    Q.   AND TO BE MORE TRANSPARENT?

03:54PM 10    A.   YES.

03:54PM 11    Q.   OKAY.  AND THAT THEY WERE WORKING, THAT THEY HAD PLANNED

03:54PM 12    TO GIVE A PRESENTATION ABOUT THE TECHNOLOGY, THEIR TECHNOLOGY

03:54PM 13    AT THE AACC --

03:54PM 14    A.   YES.

03:54PM 15    Q.   -- MEETING?

03:54PM 16         DO YOU RECALL BEING TOLD THAT IN THAT APRIL MEETING?

03:54PM 17    A.   YES.  BUT WE WERE ALSO TOLD IN THAT MEETING -- MUCH OF

03:54PM 18    WHAT YOU HEARD IN THE TWO CLIPS THAT WERE SHOWN IS THE SAME

03:54PM 19    THING THAT SHE WAS SAYING IN THAT MEETING, THAT A LOT OF IT WAS

03:54PM 20    ERRONEOUS AND UNFOUNDED AND DONE BY A VERY OVERZEALOUS REPORTER

03:54PM 21    WHO WANTED TO WIN A PULITZER.

03:54PM 22         THERE WAS A LOT OF CONVERSATION AROUND WE WERE TRYING TO

03:54PM 23    UNDERSTAND WHAT WAS GOING ON IN THE NEWSPAPER AND TRYING TO GET

03:54PM 24    HER TO EXPLAIN A LOT OF IS IT TRUE OR IS IT NOT TRUE?

03:55PM 25         AND SHE DOWNPLAYED A LOT OF IT.

03:55PM 1          AND THAT WAS MUCH OF THE CONVERSATION, MUCH MORE SO AROUND

03:55PM 2    THAT NOT BEING BASED ON FACT OF WHAT WAS BEING WRITTEN IN THE

03:55PM 3    NEWSPAPER THAN THE CHANGING OF THE PEOPLE.

03:55PM 4              MR. WADE:  YOUR HONOR, I WOULD MOVE TO STRIKE

03:55PM 5    EVERYTHING AFTER THE IMMEDIATE ANSWER TO MY QUESTION.

03:55PM 6          (PAUSE IN PROCEEDINGS.)

03:55PM 7              THE COURT:  ALL RIGHT.  I'LL STRIKE -- EVERYTHING

03:55PM 8    AFTER "YES" IS STRICKEN AS NONRESPONSIVE.

03:55PM 9    BY MR. WADE:

03:55PM 10   Q.  AND ONE OF THE THINGS THAT YOU CAME AWAY FROM THAT MEETING

03:55PM 11   WAS A REQUEST TO GET -- YOU WANTED TO GET AN INVITE TO THE AACC

03:55PM 12   PRESENTATION?

03:55PM 13   A.  YES.

03:55PM 14   Q.  AND DID YOU GET SUCH AN INVITE?

03:56PM 15   A.  YES.

03:56PM 16   Q.  AND DID YOU GO TO THE PRESENTATION?

03:56PM 17   A.  YES.

03:56PM 18   Q.  AND THE AACC IS A PROFESSIONAL ORGANIZATION OF PEOPLE WHO

03:56PM 19   WORK IN CLINICAL CHEMISTRY?

03:56PM 20   A.  YES.

03:56PM 21   Q.  AND THERE WERE APPROXIMATELY 2500 PEOPLE AT THAT

03:56PM 22   CONFERENCE?

03:56PM 23   A.  YES.

03:56PM 24   Q.  DO YOU RECALL THAT?

03:56PM 25   A.  YES.

03:56PM   1   Q.   AND IT WAS A PRETTY HOSTILE ENVIRONMENT; RIGHT?

03:56PM   2   A.   YES.

03:56PM   3   Q.   AND THEY WERE VERY SKEPTICAL OF THERANOS GOING IN; RIGHT?

03:56PM   4   A.   YES.  THAT WAS MY VIEW OF THINGS, YES.

03:56PM   5   Q.   BUT THERANOS WENT IN AND GAVE -- A NUMBER OF PEOPLE GAVE A

03:56PM   6   PRESENTATION AND PARTICIPATED IN THE Q AND A WITH RESPECT TO

03:56PM   7   THEIR TECHNOLOGY; CORRECT?

03:56PM   8   A.   A NUMBER OF -- I'M SORRY, SAY AGAIN.

03:56PM   9   Q.   LET ME TAKE IT IN TWO STEPS.

03:56PM  10        DO YOU RECALL THAT THERE WERE SEVERAL PEOPLE FROM THERANOS

03:57PM  11   AT THAT MEETING, AT THAT CONFERENCE?

03:57PM  12   A.   I ONLY RECALL ELIZABETH TALKING.

03:57PM  13   Q.   OKAY.  YOU RECALL MS. HOLMES WAS THERE?

03:57PM  14   A.   YES.

03:57PM  15   Q.   AND SHE GAVE PART OF A PRESENTATION; RIGHT?

03:57PM  16   A.   YES.

03:57PM  17   Q.   OKAY.  AND DO YOU RECALL THAT AFTER HER PRESENTATION THERE

03:57PM  18   WAS A Q AND A WITH A PANEL OF PEOPLE?

03:57PM  19   A.   YES -- I DON'T RECALL EXACTLY, NO.

03:57PM  20   Q.   AND DO YOU RECALL THAT THERE WERE THREE PEOPLE FROM AACC

03:57PM  21   REPRESENTATIVES AND ABOUT FOUR PEOPLE FROM THERANOS?

03:57PM  22   A.   I DON'T REMEMBER THAT, NO.

03:57PM  23   Q.   OKAY.  DO YOU RECALL -- LET ME GIVE YOU NAMES AND SEE IF

03:57PM  24   YOU REMEMBER THAT.

03:57PM  25        DO YOU RECALL THAT DR. YOUNG WAS THERE?

03:57PM  1    A.   NO.

03:57PM  2    Q.   DO YOU RECALL THAT DR. PANGARKAR WAS THERE?

03:57PM  3    A.   NO.

03:57PM  4    Q.   DO YOU RECALL THAT DR. ANEKAL WAS THERE?

03:57PM  5    A.   NO.

03:57PM  6    Q.   OKAY.  AND YOU OBSERVED THE WHOLE PRESENTATION IN THE

03:57PM  7    Q AND A?

03:57PM  8    A.   I DON'T RECALL OBSERVING THAT PART OF IT.

03:58PM  9         I REMEMBER HER PRESENTING, YES.

03:58PM 10    Q.   OKAY.  AND YOU PREPARED A SUMMARY OF THAT PRESENTATION;

03:58PM 11    CORRECT?

03:58PM 12    A.   I JUST PREPARED A SUMMARY OF WHAT I OBSERVED.

03:58PM 13    Q.   AND YOU --

03:58PM 14    A.   I DIDN'T, I DIDN'T TRY TO SUMMARIZE WHAT SHE WAS TRYING TO

03:58PM 15    SAY.

03:58PM 16    Q.   UM --

03:58PM 17    A.   THE WHOLE PURPOSE OF GOING WAS TO TRY TO FIGURE OUT

03:58PM 18    WHETHER THE TECHNOLOGY WORKED OR NOT.  WE WERE STILL TRYING TO

03:58PM 19    FIGURE OUT WHAT WAS GOING ON.

03:58PM 20    Q.   I UNDERSTAND.  MY QUESTION WAS, YOU PREPARED A SUMMARY --

03:58PM 21    A.   YES.

03:58PM 22    Q.   -- OF WHAT YOU OBSERVED IN THAT MEETING; CORRECT?

03:58PM 23    A.   YES.

03:58PM 24    Q.   CAN YOU LOOK AT 5273.

03:59PM 25    A.   YES.

03:59PM  1    Q.   AND IS THIS THE SUMMARY THAT YOU PREPARED OF THAT MEETING?

03:59PM  2    A.   YES.

03:59PM  3              MR. WADE:  MOVE THE ADMISSION OF 5273.

03:59PM  4              MR. LEACH:  YOUR HONOR, RELEVANCE AND HEARSAY, 403.

04:00PM  5         (PAUSE IN PROCEEDINGS.)

04:01PM  6              THE COURT:  I'M JUST CURIOUS HERE ABOUT THE TIME

04:01PM  7    DIFFERENCE AND THE RELEVANCE.

04:01PM  8              MR. WADE:  WELL, I WONDER IF, GIVEN THE HOUR, MAYBE

04:01PM  9    WE CAN BREAK HERE AND THEN DISCUSS THIS WITHOUT BURDENING THE

04:01PM 10    JURY AND START BACK WITH THIS TOMORROW?

04:02PM 11              THE COURT:  LET'S DO THAT THEN.

04:02PM 12         LADIES AND GENTLEMEN, LET'S TAKE OUR RECESS FOR THE DAY.

04:02PM 13    WE'LL RESUME TOMORROW AT 9:00 O'CLOCK.

04:02PM 14         AGAIN, LET ME ADMONISH YOU TO CONTINUE YOUR VIGILANCE NOT

04:02PM 15    TO READ, LISTEN, OR DISCUSS THIS CASE IN ANY WAY WITH ANYONE OR

04:02PM 16    TO FORM ANY OPINIONS ABOUT THIS CASE UNTIL THE CASE HAS BEEN

04:02PM 17    DELIVERED TO YOU FOR YOUR DELIBERATIONS.  PLEASE CONTINUE TO DO

04:02PM 18    THAT.

04:02PM 19         I'LL ASK YOU TOMORROW IF ANY OF YOU HAVE INADVERTENTLY

04:02PM 20    COME ACROSS ANY SUBJECT MATTER.

04:02PM 21         LET ME ALSO TELL YOU ANOTHER SCHEDULING ISSUE.

04:02PM 22    NOVEMBER 4TH WE'RE IN SESSION, THAT'S NEXT THURSDAY, BUT WE

04:02PM 23    WON'T START UNTIL 9:30.  9:30 THAT MORNING I EXPECT IS WHEN OUR

04:02PM 24    START TIME WILL BE.  I JUST WANT TO LET YOU KNOW THAT FOR

04:02PM 25    PLANNING PURPOSES.

04:02PM  1       TOMORROW WE'LL GO UNTIL 4:00 O'CLOCK I HOPE.  IS THAT A

04:02PM  2  PROBLEM FOR ANYONE?

04:02PM  3       OKAY.  LET'S SHOOT FOR 4:00 O'CLOCK.

04:03PM  4       OTHER THAN THAT, WE'LL BE IN RECESS FOR THE DAY.  THANK

04:03PM  5  YOU VERY MUCH.

04:03PM  6       MS. PETERSON, YOU CAN STAND DOWN AS WELL.  THANK YOU.

04:03PM  7  WE'LL SEE YOU TOMORROW AT 9:00 O'CLOCK, PLEASE.

04:03PM  8       (JURY OUT AT 4:03 P.M.)

04:03PM  9            THE COURT:  PLEASE BE SEATED.  THANK YOU.

04:03PM 10       ALL RIGHT.  THANK YOU.  THE RECORD SHOULD REFLECT THAT THE

04:04PM 11  JURY HAS LEFT FOR THE DAY AND MS. PETERSON HAS LEFT THE

04:04PM 12  COURTROOM.  ALL COUNSEL AND MS. HOLMES ARE PRESENT.

04:04PM 13       ALL RIGHT.  THANK YOU.

04:04PM 14       THIS IS 5273.  THIS IS WHAT WE DISCUSSED THIS MORNING I

04:04PM 15  THINK AND --

04:04PM 16            MR. LEACH:  YES, YOUR HONOR.

04:04PM 17            THE COURT:  -- MY QUESTIONS ARE THE INVESTMENT WAS

04:04PM 18  IN 2014, I BELIEVE.  IS THAT RIGHT?

04:04PM 19            MR. LEACH:  YES, YOUR HONOR.

04:04PM 20            THE COURT:  AND SO WHAT IS THE RELEVANCE TIME-WISE

04:04PM 21  ABOUT HER OPINIONS?

04:04PM 22       AND I THINK WHAT WE'RE TALKING ABOUT IS EXPRESSED IN THE

04:04PM 23  LAST PARAGRAPH ON THIS PAGE.

04:04PM 24            MR. WADE:  THAT'S THE GIST OF IT, YOUR HONOR.

04:04PM 25       AND IT RELATES TO -- YOU KNOW, THE GOVERNMENT OPENED THE

4834

1     DOOR ON THIS BY GOING INTO A NUMBER OF THESE INTERACTIONS AFTER

04:04PM  2     THE INVESTMENT PERIOD.  THEY WENT INTO BOTH THE REACTION TO THE

04:04PM  3     CRAMER PIECE, AND THEY WENT INTO THE REACTION TO -- IN APRIL,

04:04PM  4     THEY DECIDED THEY WANTED TO GO INTO THAT MEETING.

04:04PM  5          I EXPLAINED -- I THINK AT THE OUTSET I OBJECTED TO THE

04:05PM  6     ADMISSION OF EVIDENCE RELATING TO THAT.

04:05PM  7          THIS FLOWS DIRECTLY OUT OF THAT APRIL MEETING.  THEY HAD A

04:05PM  8     MEETING TO TRY TO FIGURE OUT WHAT IS GOING ON, TO TRY TO

04:05PM  9     UNDERSTAND THE TECHNOLOGY.

04:05PM  10         SHE'S -- SHE CHARACTERIZED THAT MEETING IN HER TESTIMONY,

04:05PM  11    AND THIS ACTUALLY REFLECTS HER ACTUAL CONTEMPORANEOUS

04:05PM  12    UNDERSTANDING OF IT.

04:05PM  13              THE COURT:  WELL, THIS IS IN AUGUST, NOT APRIL.

04:05PM  14              MR. WADE:  WELL, IT RELATES DIRECTLY TO THAT BECAUSE

04:05PM  15    ONE OF THE THINGS THEY WANTED TO ASSESS, SHE SAID, WAS THE

04:05PM  16    TECHNOLOGY AND THEY'RE TRYING TO FIGURE IT OUT AND THEY DID

04:05PM  17    THAT AT THIS MEETING AND IT'S REFLECTED IN THIS, IN THIS MEMO.

04:05PM  18         THERE'S A SIMILAR --

04:05PM  19              THE COURT:  SO WHAT -- I GUESS WHAT I'M -- AND HELP

04:05PM  20    ME OUT HERE, MR. WADE.

04:05PM  21         WHAT IS THE RELEVANCE OF THIS WITNESS'S OPINION ABOUT WHAT

04:05PM  22    WAS GOING ON AT THERANOS AFTER THE, AFTER THE DEAL?  WHAT IS

04:05PM  23    THE RELEVANCE OF THAT?

04:06PM  24              MR. WADE:  THAT'S WHY I OBJECTED TO THE EVIDENCE

04:06PM  25    COMING IN, YOUR HONOR.  THE GOVERNMENT OPENED THE DOOR.

04:06PM 1    THE COURT:  THAT CAME IN FOR A DIFFERENT PURPOSE.

04:06PM 2    THOSE WERE STATEMENTS, I THINK, OF YOUR CLIENT THAT THE

04:06PM 3    GOVERNMENT COULD GET IN.  THAT'S WHAT YOU'RE TALKING ABOUT.

04:06PM 4    MR. WADE:  NO, BUT THEY ALSO ASKED ABOUT THE MEETING

04:06PM 5    THAT THEY HAD AND THEY TRIED TO CONTRAST THE INTERACTIONS IN

04:06PM 6    THAT MEETING WITH THE STATEMENTS.

04:06PM 7    THE COURT:  THE APRIL MEETING?

04:06PM 8    MR. WADE:  YEAH.  AND PART OF THE INTERACTION, AND

04:06PM 9    MY CLIENT'S GOOD FAITH INTERACTION WITH THAT SHAREHOLDER AT

04:06PM 10   THAT TIME WAS TELLING THEM WHAT THEY WERE GOING TO DO TO TRY TO

04:06PM 11   ADDRESS THE SITUATION, TO SAY THAT THEY BELIEVED IN THE

04:06PM 12   TECHNOLOGY, THAT A LOT OF WHAT WAS BEING WRITTEN WAS NOT TRUE.

04:06PM 13   THE COURT:  OKAY.

04:06PM 14   MR. WADE:  AND THIS SPECIFIC EVENT WAS REFERENCED

04:06PM 15   AND THEY SAID SPECIFICALLY IN THAT MEETING THAT THEY WANTED TO

04:06PM 16   COME AND SEE IT, AND THEY DID.

04:06PM 17   THE COURT:  WELL, THAT WAS RAISED BY YOU, I THINK,

04:06PM 18   ON CROSS; RIGHT?  I DON'T THINK MR. LEACH TOUCHED ON THAT.

04:06PM 19   MAYBE HE DID.

04:06PM 20   MR. WADE:  WELL, MR. LEACH WENT INTO THE MEETING.

04:06PM 21   BUT ONCE -- HE GOES IN TO TRY TO CREATE A NEGATIVE

04:07PM 22   IMPLICATION WITH RESPECT TO MS. HOLMES, OVER MY OBJECTION.

04:07PM 23   SO ONCE HE GOES INTO THE MEETING AND THESE POST-INVESTMENT

04:07PM 24   ACTIVITIES, THE DOOR HAS BEEN OPENED AND IT'S ONLY FAIR IF YOU

04:07PM 25   GET THE FULL PICTURE OF HOW THIS INVESTOR FELT AFTER THE

MEETING.

RIGHT NOW THEY HAVE A PARTIAL PICTURE BASED UPON THE
INTERACTIONS THAT MR. LEACH ELICITED IN CONNECTION WITH VIDEO
CLIPS.

I WOULD HAVE PREFERRED THAT NONE OF IT COME IN THROUGH
THIS WITNESS, BUT IT HAS OVER OUR OBJECTION AND --

THE COURT:  WELL, LET ME HEAR FROM MR. LEACH AND
THEN I'LL HAVE AN OBSERVATION.

MR. LEACH:  YOUR HONOR, THE CRAMER PIECE WAS
RELEVANT BECAUSE THE DEFENDANT IS ASKED POINT-BLANK, HOW MANY
TESTS CAN YOUR EDISON RUN?

AND HER STATEMENTS, WHETHER IT'S MS. PETERSON LISTENING TO
IT OR SOMEBODY ELSE, ARE EVIDENCE OF THE DEFENDANT'S --
ADMISSIONS BY A DEFENDANT.

I ASKED NO QUESTION OF THIS WITNESS WHAT SHE THOUGHT ABOUT
THAT.

THE "TODAY SHOW" INTERVIEW WAS RELEVANT BECAUSE THIS
DEFENDANT, UNLIKE THE DEFENSE WE HEAR HERE THAT IT'S ALL THE
LAB DIRECTOR'S FAULT, WAS SAYING, I'M THE CEO OF THE COMPANY,
I'M RESPONSIBLE FOR THIS.

I ASKED A SINGLE QUESTION ABOUT THE -- LIMITED QUESTIONS
ABOUT THE APRIL MEETING 11 DAYS LATER ABOUT WHETHER OR NOT
MS. HOLMES TRIVIALIZED THE CMS INSPECTION, YOU KNOW, DAYS AFTER
SHE WAS SAYING, I FEEL DEVASTATED ABOUT THIS.

THAT DOES NOT OPEN -- AND ALL OF THIS IS TIED TO WHAT THE

04:08PM 1   DEFENDANT SAID. YOU KNOW, IF THE DEFENDANT WANTS TO SAY WHAT

04:08PM 2   SHE SAID AT THE AACC CONFERENCE, SHE CAN TAKE THE STAND AND SAY

04:08PM 3   ALL OF THOSE THINGS.

04:08PM 4         ALL OF THIS IS ASKING FOR A REACTION TO SOMETHING THAT THE

04:08PM 5   DEFENDANT SAID IN AUGUST OF 2016.

04:08PM 6         AND IT'S ALL PREMISED ON HEARSAY, IT'S NOT RELEVANT.

04:08PM 7         AND IT DOESN'T STOP THERE, YOUR HONOR, BECAUSE THERE ARE

04:08PM 8   ADDITIONAL INTERACTIONS AFTERWARDS AND WE CAN ASK HER TODAY,

04:08PM 9   HOW DO YOU FEEL ABOUT THE TECHNOLOGY, AND SHE'LL GIVE ANSWERS,

04:08PM 10  YOU KNOW, I DON'T THINK MR. WADE WOULD LIKE.

04:08PM 11        SO THERE HAS TO BE A CUTOFF. THE APRIL MEETING WAS

04:09PM 12  RELEVANT BECAUSE IT'S 11 DAYS TIED TO A PUBLIC STATEMENT THAT

04:09PM 13  I'M RESPONSIBLE FOR EVERYTHING IN THE LAB AND CMS -- WE TAKE

04:09PM 14  CMS REALLY, REALLY SERIOUSLY, AND 11 DAYS LATER SHE'S

04:09PM 15  TRIVIALIZING IT.

04:09PM 16        THAT DOESN'T OPEN THE DOOR TO EVERY STATEMENT THAT

04:09PM 17  MS. HOLMES MAKES AFTER THE FACT AND SOMEBODY'S REACTION TO IT.

04:09PM 18              THE COURT: SO -- THANK YOU. SO THAT'S ONE OF THE

04:09PM 19  CONCERNS THAT I HAVE AND IT IS -- I'M NOT CERTAIN OF THE

04:09PM 20  RELEVANCE OF IT.

04:09PM 21        I UNDERSTAND, MR. WADE, YOU'D LIKE TO GET A FULL PICTURE

04:09PM 22  OF THIS AND HAVE THIS WITNESS OFFER THIS PARAGRAPH, OR HER

04:09PM 23  MEMO, OBSERVATIONS IN 2016.

04:09PM 24        I STILL DON'T KNOW WHAT THE RELEVANCE OF THAT IS, HER

04:09PM 25  OPINION. THE INVESTMENT'S DONE. AS YOU POINT OUT, SHE WAS

04:09PM 1    NOT -- SHE DIDN'T WRITE THE CHECK, SHE DIDN'T SIGN IT.  YOU

04:09PM 2    CROSS-EXAMINED HER ON WHAT HER DUTIES AND LIMITATIONS WERE.

04:09PM 3        LET ME JUST MAKE AN OBSERVATION HERE.  IF THIS COMES IN,

04:10PM 4    IF SHE TESTIFIES ABOUT THIS, I'M GOING TO PERMIT THE

04:10PM 5    GOVERNMENT, IF THEY WANT TO, TO REHABILITATE, IN ESSENCE TO

04:10PM 6    BASICALLY GO THROUGH, THAT WAS YOUR OPINION THEN?  AND WHAT IS

04:10PM 7    YOUR OPINION TODAY?

04:10PM 8        AND AS MR. LEACH POINTS OUT, SHE MIGHT SAY SOMETHING THAT,

04:10PM 9    THAT MIGHT NOT BE HELPFUL, AND BECAUSE I THINK WHAT -- I'M JUST

04:10PM 10   SAYING WE CAN EXPECT THAT SHE'S GOING TO DEFEND HERSELF IN

04:10PM 11   THIS -- AS TO THIS STATEMENT.

04:10PM 12       YOU HAVE TO DECIDE THE VALUE OF WHETHER THIS COMES IN OR

04:10PM 13   NOT, AND THE COST/BENEFIT ANALYSIS FOR THIS, AND I'M NOT TRYING

04:10PM 14   TO STAND WHERE YOU'RE STANDING AND TRY TO RUN THE CASE.  IT'S

04:10PM 15   YOUR CASE.

04:10PM 16           MR. WADE:  I WISH YOU COULD SEE MY SMILE,

04:10PM 17   YOUR HONOR.

04:10PM 18       I DON'T THINK THIS -- I DON'T THINK THIS WITNESS HAS BEEN

04:10PM 19   RESTRAINED IN OFFERING HER CURRENT VIEWS OF THINGS.

04:10PM 20           THE COURT:  WELL, THAT'S WHAT I'M SAYING.

04:10PM 21           MR. WADE:  SO --

04:10PM 22           THE COURT:  YOU'RE GOING TO GET THAT, AREN'T YOU?

04:10PM 23           MR. WADE:  MY VIEW IS IT'S TUMBLED IN, WHETHER I'VE

04:11PM 24   ASKED THE QUESTION OR NOT, REPEATEDLY, WHETHER IT'S RESPONSIVE

04:11PM 25   OR NOT.

04:11PM 1       IT DOESN'T ALIGN WITH WHAT SHE ACTUALLY SAID AT THE TIME

04:11PM 2   IN NUMEROUS DOCUMENTS.

04:11PM 3       THERE'S ANOTHER DOCUMENT THAT THE COURT WILL NOTE AT 14104

04:11PM 4   WHERE IT IS TOTALLY INCONSISTENT WITH, WITH THE CONCLUSIONS AND

04:11PM 5   HER TAKE AWAYS HERE.

04:11PM 6           THE COURT:  IS 14104 IN EVIDENCE?

04:11PM 7           MR. WADE:  IT'S NOT, BUT WE MIGHT AS WELL PREVIEW

04:11PM 8   TOMORROW'S 8:30 GIVEN THIS DISCUSSION.

04:11PM 9       AND I WASN'T NECESSARILY INTENDING TO OFFER THE DOCUMENT

04:11PM 10  BECAUSE THEY'RE NOTES, BUT I WAS -- UNLIKE --

04:11PM 11          THE COURT:  THESE ARE HER NOTES ALSO?

04:11PM 12          MR. WADE:  MY UNDERSTANDING IS THAT THESE ARE HER

04:11PM 13  NOTES.

04:11PM 14      THE OTHER, YOU'LL NOTE, IS A REPORT TO HER TWO

04:11PM 15  SUPERVISORS, HER TWO SUPERIORS, RIGHT?  SO THEY'RE NOT NOTES.

04:11PM 16  IT'S A COMMUNICATION, A PRETTY LENGTHY ONE, TO HER TWO

04:12PM 17  SUPERIORS.

04:12PM 18      THIS IS A DIFFERENT ONE.

04:12PM 19      BUT HER REACTION IN REALTIME PRIOR TO --

04:12PM 20          THE COURT:  IF YOU WANT TO TAKE YOUR MASK OFF, GO

04:12PM 21  AHEAD.

04:12PM 22          MR. WADE:  PRIOR TO EXTRAORDINARY AMOUNTS OF

04:12PM 23  NEGATIVE PUBLICITY, WHICH IS WHAT WE SAW TODAY, WAS

04:12PM 24  FUNDAMENTALLY DIFFERENT IN REALTIME.

04:12PM 25      AND SO I KNOW THAT I'M GOING TO GET -- I APPRECIATE THE

04:12PM 1    COURT'S CAUTION, BUT --

04:12PM 2         THE COURT:  I LOOK AT THIS AND I STILL HAVE SOME

04:12PM 3    PROBLEMS WITH THE RELEVANCE OF HER OPINION IS AFTER THE

04:12PM 4    INVESTMENT AND AFTER GOING AND HEARING A BUNCH OF HEARSAY.

04:12PM 5    IT'S -- WHAT SHE'S GOING TO TESTIFY ABOUT IS HER, AND WHAT SHE

04:12PM 6    TOLD US, I THINK, IS I DON'T REMEMBER THE PANEL, I DON'T

04:12PM 7    REMEMBER Q AND A.

04:12PM 8         I REMEMBER MS. HOLMES AND I REMEMBER WHAT SHE SAID.

04:13PM 9         THAT'S REFLECTED IN THE LAST PARAGRAPH, APPARENTLY, IN

04:13PM 10   THIS EMAIL.

04:13PM 11        AND I'M, I'M STRUGGLING TO FIND THE RELEVANCE OF THAT.

04:13PM 12        CONCURRENT WITH THAT, THOUGH, IF THIS COMES IN, I THINK

04:13PM 13   IT'S -- I DON'T WANT TO GET INTO MINI TRIALS, BUT YOU'LL HAVE

04:13PM 14   TO SIT ON YOUR HANDS WHILE I GIVE MR. LEACH LATITUDE TO

04:13PM 15   REHABILITATE WITH THIS.

04:13PM 16        MR. WADE:  NO, I UNDERSTAND, AND WE'LL TAKE THE

04:13PM 17   COURT'S COMMENTS OVERNIGHT.

04:13PM 18        I WILL NOTE, AGAIN, THE POST-INVESTMENT EVIDENCE CAME IN

04:13PM 19   OVER MY OBJECTION, SO IT'S NOT -- I DIDN'T OPEN THE DOOR.  I'M

04:13PM 20   JUST HAVING TO DEAL WITH IT GIVEN THAT THIS WITNESS HAS OFFERED

04:13PM 21   TESTIMONY ABOUT IT, AND, YOU KNOW, HAVING TO MEET THE

04:13PM 22   OBLIGATIONS.

04:13PM 23        THERE'S NO MAGIC TO APRIL.  HOW IS IT THAT THE GOVERNMENT

04:13PM 24   CAN PICK THE ONE INTERACTION AFTER THIS THAT THEY WANT TO

04:13PM 25   OFFER, BUT WE CAN'T PROBE --

| | | |
|---|---|---|
| 04:13PM | 1 | THE COURT:  I'M SORRY, APRIL?  YOU MEAN THE MEETING |
| 04:13PM | 2 | IN PALO ALTO? |
| 04:13PM | 3 | MR. WADE:  NO, NO.  THE GOVERNMENT HAS CHOSEN A |
| 04:14PM | 4 | POST-INVESTMENT INTERACTION TO QUESTION THE WITNESS ABOUT, |
| 04:14PM | 5 | APRIL 2016. |
| 04:14PM | 6 | THEY SHOWED VIDEO, I THINK THEY LIKED THE PROXIMITY OF |
| 04:14PM | 7 | THAT INTERACTION TO THE VIDEO, THEY WANTED TO SHOW IT, THEY |
| 04:14PM | 8 | WANTED TO PORTRAY MY CLIENT IN A CERTAIN LIGHT.  IN OUR VIEW IT |
| 04:14PM | 9 | SHOULDN'T HAVE COME IN, IT WASN'T RELEVANT. |
| 04:14PM | 10 | IT'S COME IN. |
| 04:14PM | 11 | THERE'S NO MATERIAL DIFFERENCE BETWEEN AN APRIL |
| 04:14PM | 12 | POST-INVESTMENT INTERACTION AND AN AUGUST ONE OR A |
| 04:14PM | 13 | DECEMBER ONE.  AND SO -- |
| 04:14PM | 14 | THE COURT:  BUT I THINK MR. LEACH WOULD TELL US HE |
| 04:14PM | 15 | INTRODUCED THOSE AND QUERIED WHETHER OR NOT THIS WAS THE |
| 04:14PM | 16 | WITNESS -- HE COULD HAVE GOT THIS IN THROUGH ANY WITNESS, |
| 04:14PM | 17 | CANDIDLY.  ANY WITNESS COULD HAVE COME IN AND SAID, YEAH, I SAW |
| 04:14PM | 18 | IT, YEAH, THAT'S WHAT SHE SAID.  IT'S A STATEMENT, RIGHT?  IT'S |
| 04:14PM | 19 | HER STATEMENT. |
| 04:14PM | 20 | MR. WADE:  THE VIDEO, BUT NOT THE MEETING RELATED TO |
| 04:14PM | 21 | IT.  HE DIDN'T JUST ASK ABOUT THE VIDEO.  IT WOULD BE A |
| 04:14PM | 22 | DIFFERENT KETTLE OF FISH IF WE ASKED JUST ABOUT THE VIDEO. |
| 04:14PM | 23 | THE COURT:  BUT HERE YOU'RE ASKING THIS WITNESS TO |
| 04:15PM | 24 | COMMENT ON HER OPINIONS OF YOUR CLIENT'S STATEMENTS SOME MONTHS |
| 04:15PM | 25 | AFTER THE INVESTMENT, AND I JUST -- WHAT IS THE RELEVANCE OF |

04:15PM 1      HER -- OF THAT NOW?

04:15PM 2              MR. WADE:  WELL, IT, IT -- IT'S RELEVANT FOR THE

04:15PM 3      REASONS THAT WE'VE BEEN DISCUSSING.  I DON'T HAVE A LOT TO ADD

04:15PM 4      ABOUT IT.

04:15PM 5          AGAIN, IT'S -- WHAT MR. LEACH ASKED ABOUT WAS NOT

04:15PM 6      RELEVANT, BUT IT'S AS RELEVANT AS HIS IRRELEVANT STUFF, AND SO

04:15PM 7      AS A MATTER OF FAIRNESS AND TO NOT MISLEAD THE JURY, WE THINK

04:15PM 8      WE SHOULD BE ABLE TO PROBE IT.

04:15PM 9          I WOULD SAY THE OTHER POINT, YOUR HONOR, AS I NOTED I

04:15PM 10     THINK THIS MORNING, MAYBE I DIDN'T, THE STATEMENT AT THE BOTTOM

04:15PM 11     TIES THE OBSERVATIONS OF THE TECHNOLOGY AND ITS FUNCTIONALITY

04:15PM 12     BACK TO THE OBSERVATIONS THAT WERE MADE AT THE TIME OF THE

04:15PM 13     INVESTMENT.

04:15PM 14             THE COURT:  YOU KNOW, LET ME JUST BE CANDID SINCE

04:16PM 15     WE'RE DEAR FRIENDS HERE, ALL OF US, SINCE WE HAVE SPENT SOME

04:16PM 16     TIME TOGETHER.  SHE'S GOT -- TOMORROW SHE MAY VERY WELL, AND

04:16PM 17     NOBODY IS TALKING TO HER OF COURSE IN THE INTERIM, BUT SHE

04:16PM 18     COULD COME IN AND SHE COULD SAY SOMETHING, YEAH, I WAS FOOLED

04:16PM 19     AGAIN, AND ARE YOU GOING TO LIVE WITH THAT ANSWER?

04:16PM 20         YOU KNOW, PARDON ME, I DON'T MEAN TO BE FLIP HERE, BUT I'M

04:16PM 21     JUST -- YOU KNOW, YOU'RE EXPERIENCED TRIAL LAWYERS AND THERE'S

04:16PM 22     A RISK THERE.

04:16PM 23             MR. WADE:  AGAIN, I WOULD ANTICIPATE THAT,

04:16PM 24     NOTWITHSTANDING THE CONTEMPORANEOUS DOCUMENTS, I HAVE A SENSE

04:16PM 25     OF WHAT THE WITNESS IS GOING TO SAY.  I'VE HAD TO USE THE

04:16PM 1    CONTEMPORANEOUS DOCUMENTS TO DEAL WITH THAT, AND SO THAT'S THE

04:16PM 2    NATURE OF THE JOB.

04:16PM 3              THE COURT:  OKAY.

04:16PM 4              MR. LEACH:  I JUST WANT TO SAY ONE MORE THING ABOUT

04:16PM 5    OPENING THE DOOR, YOUR HONOR.

04:16PM 6         MY QUESTIONS TO THIS WITNESS WERE, WHAT DID THE DEFENDANT

04:16PM 7    SAY TO YOU ON THESE DATES?

04:16PM 8         THAT DOESN'T OPEN THE DOOR TO EVERY OTHER THING THAT THE

04:16PM 9    DEFENDANT SAID IN EVERY OTHER UNIVERSE.

04:16PM 10        I DID NOT ASK THE WITNESS, WHAT DID YOU THINK ABOUT THAT?

04:17PM 11   I DID NOT ASK THE WITNESS, WHAT WAS YOUR STATE OF MIND?

04:17PM 12        THEY WANT TO USE LISA PETERSON'S STATE OF MIND YEARS AFTER

04:17PM 13   THE INVESTMENT AS A SPRINGBOARD TO GET ALL OF THE DEFENDANT'S

04:17PM 14   HEARSAY STATEMENTS INTO EVIDENCE, AND IT MAY FEEL LIKE A

04:17PM 15   ONE-WAY STREET TO THE DEFENSE, BUT THAT'S BECAUSE OF THE

04:17PM 16   HEARSAY RULE.

04:17PM 17        AND SIMPLY BY ASKING, WHAT DID MS. HOLMES SAY ON

04:17PM 18   APRIL 28TH, 2016, DOESN'T MEAN THAT YOU GET TO ASK, WHAT DID

04:17PM 19   MS. HOLMES SAY AT THE AACC CONFERENCE AND WHAT DID YOU THINK

04:17PM 20   ABOUT THAT AFTER THE FACT, WITNESS?

04:17PM 21        AND IT IS NOT JUST A MINI TRIAL ON MS. PETERSON'S STATE OF

04:17PM 22   MIND, YOUR HONOR.  THERE'S TWO YEARS AFTER THIS OF RDV TRYING

04:17PM 23   TO GET INFORMATION FROM THE DEFENDANT, TRYING TO FIGURE OUT

04:17PM 24   WHAT IS GOING ON, LEARNING ABOUT LAWSUITS, S.E.C.

04:17PM 25   INVESTIGATIONS, DOJ INVESTIGATIONS, AND IF HER STATE OF MIND

04:17PM 1  REALLY MATTERS IN THIS TRIAL, WE'RE GOING TO HAVE TO EXPLORE

04:17PM 2  THAT.

04:17PM 3      AND I JUST DON'T THINK THAT YOU CAN USE THE DEFENDANT'S

04:17PM 4  HEARSAY OUT OF COURT STATEMENTS AS A SPRINGBOARD TO ASK ABOUT A

04:18PM 5  WITNESS'S STATE OF MIND YEARS AFTER THE INVESTMENT.

04:18PM 6          MR. WADE:  ONE FINAL POINT, YOUR HONOR.

04:18PM 7      THE GOVERNMENT WANTS TO HAVE THEIR CAKE AND EAT IT, TOO.

04:18PM 8  THEY WANT TO GET IN ALL OF THE POST "WALL STREET JOURNAL"

04:18PM 9  NEGATIVE EVIDENCE THAT THEY LIKE, ALL OF THE WAY THROUGH TO

04:18PM 10 MR. EDLIN OFFERING HIS VIEW OF THE TECHNOLOGY AT THE END OF

04:18PM 11 2016, BUT THEY DON'T WANT US TO HAVE ANY OF THE EVIDENCE THAT

04:18PM 12 IS ACTUALLY FAVORABLE AND CONSISTENT WITH THE CLIENT'S GOOD

04:18PM 13 FAITH AND INTENT.

04:18PM 14     SO IT'S NOT --

04:18PM 15         THE COURT:  YOU WILL HAVE A TIME TO PUT THAT ON IF

04:18PM 16 YOU WANT.

04:18PM 17         MR. WADE:  SURE.  BUT I THINK THIS WITNESS IS HERE

04:18PM 18 AND IT RELATES TO THE MEETING THAT SHE TALKED ABOUT.  THERE'S A

04:18PM 19 DIRECT LINE --

04:18PM 20         THE COURT:  LET ME ASK YOU THIS.  WHAT ABOUT -- IN

04:18PM 21 HER MEMO SHE'S QUOTING YOUR CLIENT.  ARE YOU ASKING THAT YOUR

04:18PM 22 CLIENT'S STATEMENTS BE ADMITTED AS WELL, OR JUST THIS WITNESS'S

04:18PM 23 OBSERVATION AND EVALUATION?

04:18PM 24     I THINK THOSE ARE TWO DIFFERENT THINGS.

04:18PM 25         MR. WADE:  I CAN LOOK AT THAT, YOUR HONOR.

04:19PM 1      THE COURT:  RIGHT.  SO I THINK WE WILL CONTINUE OUR

04:19PM 2  CONVERSATION ON THIS TOMORROW MORNING, BUT THOSE ARE THE -- AND

04:19PM 3  WE HAD A DISCUSSION ABOUT WHETHER OR NOT A DEFENDANT CAN

04:19PM 4  INTRODUCE STATEMENTS, UNLIKE THE PROSECUTION CAN, AND I THINK

04:19PM 5  THERE'S AN ISSUE HERE WITH THAT AS WELL, IF THAT'S WHAT YOU'RE

04:19PM 6  TRYING TO GET IN.

04:19PM 7      IF YOU WANT TO GET IN THE QUOTES HERE -- I TOOK SOME TIME

04:19PM 8  READING THIS WHEN IT WAS OFFERED IN, AND MAYBE WE'LL READ IT

04:19PM 9  AGAIN TONIGHT A LITTLE CLOSER.  BUT THERE CERTAINLY SEEM TO BE

04:19PM 10  SOME QUOTES HERE THAT I DON'T THINK WOULD COME IN.  YOU MIGHT

04:19PM 11  HAVE TO ASK YOUR I.T. SPECIALIST TO DO SOME REDACTION IF THIS

04:19PM 12  COMES IN AGAIN.

04:19PM 13      MR. WADE:  HE CAN WORK WONDERS.

04:19PM 14      SO WE'LL CONSIDER THE COURT'S COMMENTS AND MAYBE WE'LL

04:19PM 15  COME BACK AT 8:30 TOMORROW TO ADDRESS THIS, OR WHENEVER THE

04:19PM 16  COURT WOULD LIKE.

04:19PM 17      THE COURT:  I THINK SO.  I'LL DEFER THE 5:00 A.M.

04:19PM 18  START MY COURT REPORTER LIKES.  WE'LL STICK TO 8:00, 8:15,

04:20PM 19  SOMETHING LIKE THAT.

04:20PM 20      MR. WADE:  GOOD.

04:20PM 21      THE COURT:  ANYTHING YOU WANT TO SAY, MR. LEACH,

04:20PM 22  BEFORE WE END FOR THE DAY?

04:20PM 23      MR. LEACH:  NO, THANK YOU.

04:20PM 24      THE COURT:  AND FOR THE DEFENSE?

04:20PM 25      MR. WADE:  NO.  AND I DON'T THINK WE'LL BE MUCH

04:20PM 1    LONGER WITH THIS WITNESS.  I DON'T KNOW IF -- THERE WERE SOME

04:20PM 2    ISSUES AT THE BEGINNING OF THE DAY WITH RESPECT TO

04:20PM 3    MR. EISENMAN.  I DON'T KNOW IF --

04:20PM 4         MR. DOWNEY:  YOUR HONOR, I THINK IF I CAN IDENTIFY

04:20PM 5    THE ISSUES?

04:20PM 6         THE COURT:  SURE.  LET'S TALK ABOUT THOSE.

04:20PM 7       ANYTHING FURTHER, MR. WADE, ON THIS?

04:20PM 8       WE'LL CONTINUE OUR CONVERSATION ABOUT THIS TOMORROW,

04:20PM 9    MR. LEACH?

04:20PM 10        MR. WADE:  NO.  THANK YOU.

04:20PM 11        MR. DOWNEY:  LET ME JUST SAY THEM BY CATEGORY, AND

04:20PM 12   MR. BOSTIC AND I HAVE DISCUSSED THESE, AND IF I MISSTATE

04:20PM 13   ANYTHING HE'S SAID, I'M SURE HE'LL LET US KNOW.

04:20PM 14      I THINK THERE ARE REALLY BASICALLY A COUPLE OF ISSUES, AND

04:20PM 15   THEY MAY AFFECT BOTH THE TESTIMONY AND A FEW OF THE EXHIBITS

04:20PM 16   THAT THE GOVERNMENT INTENDS TO PROFFER WITH ALAN EISENMAN, WHO

04:20PM 17   IS AN INVESTOR WHOSE INVESTMENT DATE IS IN LATE 2013.

04:20PM 18      MR. EISENMAN HAS REALLY, THROUGHOUT THE 302'S, THROUGHOUT

04:21PM 19   THOSE INTERVIEWS WITH THE GOVERNMENT HAS MADE STATEMENTS ABOUT

04:21PM 20   THE EFFECT OF THE LOSS OF THE INVESTMENT ON HIS RETIREMENT, ON

04:21PM 21   HIS GRANDCHILDREN, ET CETERA.

04:21PM 22      HE DID SO IN REALTIME WHEN HE WAS UNABLE TO LIQUIDATE THE

04:21PM 23   INVESTMENT IN 2014 AND 2015 IN CONTEMPORANEOUS DOCUMENTS.

04:21PM 24      EVIDENCE ABOUT THE EFFECT OF THE INVESTMENT LOSS ON HIM IS

04:21PM 25   NOT RELEVANT TO WHAT WE'RE TRYING, AND IT MAY INDEED INTRODUCE

04:21PM 1     A SUBSTANTIAL AMOUNT OF PREJUDICE TO THE DEFENDANT.

04:21PM 2          THERE'S ALSO THE PROSPECT THAT IT WOULD INTRODUCE

04:21PM 3     UNPLEASANT AND IRRELEVANT MINI TRIALS.  THE GRANDCHILD THAT

04:21PM 4     HE'S WORRYING ABOUT IS THE GRANDDAUGHTER OF A BILLIONAIRE AND I

04:21PM 5     THINK SOME OF THE CONCERNS MAY HAVE LESS MERIT THAN HE

04:21PM 6     ARTICULATES.

04:21PM 7          I DON'T WANT TO GET INTO THAT.  I JUST WANT TO KEEP THAT

04:22PM 8     OUT OF THE CASE.

04:22PM 9          IT OCCURS -- COMMENTARY TO THAT EFFECT OCCURS IN THREE

04:22PM 10    DOCUMENTS IN A LIMITED WAY.  I THINK THE GOVERNMENT INTENDS TO

04:22PM 11    OFFER THOSE DOCUMENTS.

04:22PM 12         BUT I PROPOSE THAT THOSE BE REDACTED, AND I HAVE THE

04:22PM 13    PLACES WHERE IT WOULD GET REDACTED, AND I CAN GIVE YOUR HONOR A

04:22PM 14    COPY OF THAT AND MR. BOSTIC A COPY OF THAT TO LOOK AT

04:22PM 15    OVERNIGHT.  SO THAT'S ISSUE NUMBER ONE.

04:22PM 16         ISSUE NUMBER TWO IS THAT MR. EISENMAN HAS DISCUSSED, IN

04:22PM 17    HIS MOST RECENT 302 WITH THE GOVERNMENT, A NARRATIVE ABOUT

04:22PM 18    HAVING SEVERAL CONVERSATIONS WITH MS. HOLMES IN THE TIME PERIOD

04:22PM 19    BETWEEN 2006 AND 2010, THE POTENTIAL FOR AN INITIAL PUBLIC

04:22PM 20    OFFERING OF THERANOS STOCK.

04:22PM 21         TO BE CLEAR, I MENTIONED HIS 2013 INVESTMENT.  HE ALSO HAD

04:22PM 22    MADE AN INVESTMENT NEAR THE BIRTH OF THE COMPANY IN 2006.  SO

04:22PM 23    HE WAS AN INVESTOR IN THAT PERIOD, BUT OUTSIDE THE CONSPIRACY

04:23PM 24    PERIOD AND NOT THE SUBJECT OF THE COUNT IN THE INDICTMENT.

04:23PM 25         THE GIST OF HIS TESTIMONY IS, I KEPT BEING PUT OFF ABOUT

04:23PM  1   WHEN THERE WOULD BE AN IPO.

04:23PM  2        THAT UNTO ITSELF IS A LENGTHY SUBJECT FOR EXPLORATION.

04:23PM  3        THE TRUTH IS, AFTER HAVING ALL OF THOSE CONVERSATIONS AND

04:23PM  4   BEING FRUSTRATED THAT THERE WASN'T AN IPO, HE CHOSE TO INVEST

04:23PM  5   AGAIN IN 2013.  SO IT'S OF LIMITED RELEVANCE IN THE CASE.

04:23PM  6        IT, TOO, IS THE SUBJECT OF DISCUSSION IN SOME OF THE

04:23PM  7   DOCUMENTS, AGAIN, IN A VERY LIMITED WAY AND I THINK IT COULD BE

04:23PM  8   REDACTED -- YOU KNOW, THE DOCUMENTS COULD BE REDACTED TO CURE

04:23PM  9   THAT PROBLEM.

04:23PM 10        THE THIRD ISSUE IS ONE THAT MR. BOSTIC AND I HAVE TALKED

04:23PM 11   ABOUT.  I DON'T ANTICIPATE ISSUES WITH THIS, BUT JUST TO FLAG

04:23PM 12   IT FOR THE GOVERNMENT.  THERE'S A LONG COMPOSITE EXHIBIT OF

04:24PM 13   EMAILS AND NOTES AND SO FORTH THAT IS EXHIBIT 14.

04:24PM 14        I DON'T THINK MR. BOSTIC INTENDS TO OFFER THAT TO BE

04:24PM 15   ADMITTED IN THE CASE, AND I WOULD JUST ASK THAT IF THAT IS

04:24PM 16   ADMITTED, THAT HE CARVE THAT UP INTO SUBEXHIBITS BECAUSE IT'S

04:24PM 17   AN AGGREGATION OF MATERIAL THAT DOESN'T GO TOGETHER.  I'M

04:24PM 18   ACTUALLY NOT SURE WHY IT'S AGGREGATED IN THE WAY THAT IT IS.

04:24PM 19        BUT FOR PURPOSES OF THE RECORD, THE DOCUMENTS THAT RELATE

04:24PM 20   TO THE PERSONAL FINANCIAL SITUATION OF MR. EISENMAN ARE

04:24PM 21   EXHIBIT 2216, 2468, AND IN A LIMITED WAY 1371.

04:24PM 22        AND MY REQUEST, I SHOULD SAY, IN CONNECTION WITH THAT,

04:24PM 23   YOUR HONOR, IS NOT ONLY THAT THAT BE ADJUDGED NOT TESTIMONY OR

04:24PM 24   AN EXHIBIT THAT SHOULD COME IN, BUT ALSO THAT THE WITNESS BE

04:24PM 25   SPECIFICALLY ADMONISHED BECAUSE I THINK THERE'S A REAL DANGER

04:25PM 1    OF IT BASED ON WHAT IT APPEARS TO BE HIS BEHAVIOR IN THE CASE

04:25PM 2    TO DATE.

04:25PM 3              THE COURT:  THAT'S JUST RELATED TO NUMBER THREE,

04:25PM 4    YOUR --

04:25PM 5              MR. DOWNEY:  WELL, THAT RELATES TO NUMBERS ONE AND

04:25PM 6    TWO.

04:25PM 7              THE COURT:  I SEE, OKAY.

04:25PM 8              MR. DOWNEY:  THOSE ARE JUST TOPICS THAT HE HAS

04:25PM 9    BROUGHT UP WITH SOME FREQUENCY, AND I'LL LEAVE IT THAT.

04:25PM 10             THE COURT:  OKAY.  THANK YOU.

04:25PM 11             MR. DOWNEY:  SO I CAN HAND UP HOW THE EXHIBITS,

04:25PM 12   WHICH I THINK WOULD OTHERWISE BE ADMITTED, WOULD BE AFFECTED.

04:25PM 13             THE COURT:  MR. BOSTIC?

04:25PM 14             MR. DOWNEY:  AND I'LL GIVE MR. BOSTIC A COPY OF THE

04:25PM 15   SAME.

04:25PM 16        THAT'S FOR YOU (HANDING).

04:25PM 17        AND THIS IS WHAT THE DOCUMENT WOULD LOOK LIKE REDACTED.

04:25PM 18        DO YOU HAVE THE UNREDACTED VERSION?

04:25PM 19        THAT'S 2216, AND THIS IS 2468, AND THEN THERE IS 1371.

04:26PM 20             THE COURT:  THE HIGHLIGHTED PORTION, WHAT IS THAT?

04:26PM 21             MR. DOWNEY:  YEAH, THAT'S THE PROPOSED REDACTION.

04:26PM 22             THE COURT:  I SEE.

04:26PM 23             MR. DOWNEY:  I SHOULD SAY, I THINK ON 1371, THE

04:26PM 24   REDACTION MAY NOT BE NECESSARY BECAUSE MR. BOSTIC HAD INFORMED

04:26PM 25   ME THAT HE ONLY INTENDS TO OFFER REALLY THE FIRST FIVE PAGES,

04:26PM 1    SO IT MAY BE THAT OVERNIGHT HE CAN DIVIDE THAT EXHIBIT AND

04:26PM 2    WE'LL BE ABLE TO DO IT THAT WAY.

04:26PM 3              THE COURT:  OKAY.  THANK YOU.

04:26PM 4         MR. BOSTIC?

04:26PM 5              MR. BOSTIC:  YOUR HONOR, I'LL TRY TO TAKE THE ISSUES

04:26PM 6    FROM SIMPLEST TO MOST COMPLICATED.

04:26PM 7         FIRST, WHEN IT COMES TO EXHIBIT 14, WHICH IS MENTIONED

04:26PM 8    THIRD BY MR. DOWNEY, HE'S CORRECT THAT THE GOVERNMENT CURRENTLY

04:26PM 9    DOESN'T PLAN TO OFFER THAT INTO EVIDENCE.

04:26PM 10        IF IT DOES BECOME APPROPRIATE TO OFFER IT AT SOME POINT,

04:26PM 11   EITHER TO REPLACE THE WITNESS'S RECOLLECTION UNDER 803 OR FOR

04:26PM 12   SOME OTHER APPROPRIATE PURPOSE, THE GOVERNMENT WILL ATTEMPT TO

04:27PM 13   DO THAT IN A WAY THAT DOESN'T CREATE CONFUSION OR BURDEN THE

04:27PM 14   EVIDENCE RECORD.  BUT I THINK THAT IS A MOOT POINT.

04:27PM 15             THE COURT:  OKAY.  THANK YOU.

04:27PM 16             MR. BOSTIC:  ON POINT NUMBER ONE, I THINK THERE'S NO

04:27PM 17   DISAGREEMENT OVER THE PRINCIPLE THAT THE COURT HAS RULED ON THE

04:27PM 18   ADMISSIBILITY OF DOWNSTREAM EFFECTS, FINANCIAL EMOTIONAL HARM

04:27PM 19   SUFFERED BY VICTIMS IN THIS CASE.

04:27PM 20        THE GOVERNMENT HAS REVIEWED THAT ORDER, UNDERSTANDS IT.  I

04:27PM 21   WILL REVIEW IT AGAIN BEFORE MR. EISENMAN'S TESTIMONY TO MAKE

04:27PM 22   SURE WE COMPLY WITH IT IN ELICITING TESTIMONY FROM HIM, AND

04:27PM 23   IT'S ALSO OUR PRACTICE TO HAVE CONVERSATIONS WITH WITNESSES

04:27PM 24   ABOUT AREAS THAT NEED TO BE AVOIDED IN ORDER TO COMPLY WITH THE

04:27PM 25   COURT'S ORDERS.

04:27PM 1         BUT I WANT TO MAKE SURE THAT WE'RE ON THE SAME PAGE,

04:27PM 2  BECAUSE THE DEFENSE AND THE PROSECUTION DON'T ALWAYS AGREE ON

04:27PM 3  WHERE THE LINE IS WHEN IT COMES TO THAT DOWNSTREAM EFFECT

04:27PM 4  TESTIMONY.

04:27PM 5         I JUST RECEIVED DEFENSE COUNSEL'S PROPOSED REDACTIONS.  I

04:27PM 6  WOULD LIKE THE EVENING TO LOOK AT THOSE IF I COULD AND THEN

04:28PM 7  PERHAPS WE CAN FINISH THIS CONVERSATION TOMORROW MORNING IF THE

04:28PM 8  COURT IS AMENABLE.

04:28PM 9         FOR NOW I'LL JUST SAY THAT PART OF MR. EISENMAN'S

04:28PM 10  TESTIMONY IS GOING TO INVOLVE EFFORTS THAT HE MADE TO GET

04:28PM 11  INFORMATION FROM MS. HOLMES BEFORE AND AFTER HIS 2013

04:28PM 12  INVESTMENT.

04:28PM 13         THE WILLINGNESS OF AN ALLEGED FRAUDSTER TO PROVIDE

04:28PM 14  INFORMATION TO A VICTIM IS RELEVANT IN A CASE LIKE THIS.  TO

04:28PM 15  THE EXTENT THAT SOMEONE WHO HAS DECEIVED SOMEONE PREVIOUSLY IS

04:28PM 16  WILLING TO PROVIDE ADDITIONAL INFORMATION OR STONEWALLS THAT

04:28PM 17  PERSON, REFUSING TO PROVIDE THEM DETAIL IS RELEVANT TO THAT

04:28PM 18  INDIVIDUAL'S INTENT AND KNOWLEDGE.

04:28PM 19         IN THIS CASE, ONE OF THE TOPICS THAT MR. EISENMAN WAS

04:28PM 20  SEEKING INFORMATION ON WAS THE POTENTIAL FOR A LIQUIDITY EVENT

04:28PM 21  RELATING TO THERANOS, WHETHER THAT WAS AN IPO OR SOMETHING

04:29PM 22  ELSE.

04:29PM 23         SO WE SEE IN THE CONVERSATION BETWEEN MR. EISENMAN AND

04:29PM 24  MS. HOLMES THAT HE'S ASKING HER QUESTIONS ABOUT A POTENTIAL

04:29PM 25  LIQUIDITY EVENT, THE POSSIBILITY OF SELLING HIS SHARES EITHER

04:29PM 1    TO THERANOS OR TO A THIRD PARTY, AND IN CONNECTION WITH THAT,

04:29PM 2    HE EXPLAINS SOME LIFE CIRCUMSTANCES THAT CREATE, IN HIS MIND,

04:29PM 3    HIS NEED TO HAVE THAT INFORMATION IN ORDER TO WEIGH THINGS FOR

04:29PM 4    HIS RETIREMENT OR FAMILY OBLIGATIONS.

04:29PM 5        THOSE ARE THERE, IN MY VIEW, FOR CONTEXT RELATING TO HIS

04:29PM 6    REQUEST FOR MORE INFORMATION.  THEY'RE NOT CENTRAL TO HIS

04:29PM 7    TESTIMONY.  WE DON'T PLAN TO HIGHLIGHT THEM.

04:29PM 8        AND I DON'T BELIEVE THAT THE INFORMATION THAT HE DISCLOSES

04:29PM 9    IN THESE EXHIBITS RUNS AFOUL OF THE COURT'S ORDER, BUT I'M

04:29PM 10   SENSITIVE TO MR. DOWNEY'S CONCERNS, SO I WILL TAKE A CLOSER

04:29PM 11   LOOK.

04:29PM 12       THE COURT:  WELL, IF HE'S GOING TO TESTIFY IN THE

04:29PM 13   BROAD SCHEME, THIS WAS IMPORTANT TO MY FINANCIAL PLANNING, MY

04:30PM 14   RETIREMENT, MY WHATEVER IT IS, THAT GENERAL TYPE OF DESCRIPTION

04:30PM 15   I THINK IS APPROPRIATE.  IT'S PART OF HIS PLANNING, AND HE CAN

04:30PM 16   TALK ABOUT THAT.

04:30PM 17       IF HE -- AND I THINK WE START TO GET INTO GRAVEL WHEN HE

04:30PM 18   SAYS, WELL, THIS WAS CRITICAL FOR WHATEVER REASON AND GETS

04:30PM 19   TESTIMONY IN ABOUT, YOU KNOW, PERSONAL FEELINGS AND THOSE TYPES

04:30PM 20   OF THINGS, THAT'S WHERE WE'LL GET INTO THE WEEDS A LITTLE BIT I

04:30PM 21   THINK.

04:30PM 22       BUT GENERAL TOPICS ABOUT, WELL, IT'S IMPORTANT FOR MY

04:30PM 23   FINANCIAL PLANNING AND MY HEIRS, THOSE TYPES OF THING, AND

04:30PM 24   GENERALLY, I DON'T KNOW IF THAT'S WHAT HE'S GOING TO TALK

04:30PM 25   ABOUT, I DON'T HAVE A PROBLEM WITH THAT, AND I DON'T THINK

04:30PM 1  MR. DOWNEY WOULD EITHER, IF IT'S GENERAL ESTATE PLANNING AND

04:30PM 2  THE REASON AND THE IMPORTANCE OF IT, TO CARE FOR YOUR FAMILY OR

04:30PM 3  WHATEVER.

04:31PM 4      AND WHAT EXHIBIT GOES TO NUMBER ONE?  WHICH ONE OF THESE?

04:31PM 5          MR. DOWNEY:  IT'S THREE EXHIBITS.  IT'S 2468, 2216,

04:31PM 6  AND 1371.

04:31PM 7          THE COURT:  OH, ALL OF THESE WOULD GO TO --

04:31PM 8          MR. DOWNEY:  YEAH, THEY WILL ALL BE -- AND YOU'LL

04:31PM 9  SEE THE PROPOSED TEXT.

04:31PM 10          THE COURT:  OKAY.

04:31PM 11          MR. DOWNEY:  YOUR HONOR, I'M TEMPTED TO SAY I'M GLAD

04:31PM 12  THAT WE HAD THIS CONVERSATION, BECAUSE SOMETHING THAT

04:31PM 13  MR. BOSTIC SAID MADE ME WANT TO COMMENT.

04:31PM 14      THE PURPOSE FOR WHICH HE INTENDS TO PROFFER THAT EVIDENCE

04:31PM 15  IS TOTALLY INAPPROPRIATE.  THIS IS A SHAREHOLDER PROCEEDING

04:31PM 16  PURSUANT TO A SHAREHOLDER AGREEMENT WHICH DEFINES THE RIGHTS OF

04:31PM 17  HIM AND EVERY OTHER SHAREHOLDER.

04:31PM 18      HIS REQUEST FOR INFORMATION OR REQUEST FOR UNIQUE

04:31PM 19  INFORMATION THAT NO OTHER SHAREHOLDER HAD, TO PUT IN FRONT OF

04:31PM 20  THE JURY THAT THAT IS SOME OBFUSCATION BY THE DEFENDANT TO

04:31PM 21  INSIST THAT THE SHARING OF INFORMATION BE UNIFORM ACROSS ALL

04:31PM 22  SHAREHOLDERS AND TO IMPLY THAT THAT IS SOME FORM OF OBFUSCATION

04:32PM 23  IS TOTALLY INAPPROPRIATE.

04:32PM 24          MR. BOSTIC:  YOUR HONOR, HERE'S ANOTHER SITUATION

04:32PM 25  WHERE THE TWO PARTIES VIEW THE FACTS DIFFERENTLY.  THAT'S

04:32PM 1    CERTAINLY NOT HOW I WOULD DESCRIBE WHAT HAPPENED HERE.

04:32PM 2         MR. EISENMAN HAD A HISTORY OF QUARTERLY CALLS WITH

04:32PM 3    MS. HOLMES FOR A WHILE.  AT A CERTAIN POINT THOSE CALLS

04:32PM 4    STOPPED.

04:32PM 5         MR. EISENMAN WAS -- I THINK IN HIS COMMUNICATIONS AND IN

04:32PM 6    HIS TESTIMONY, IT WILL BE CLEAR THAT HE WAS NOT NECESSARILY

04:32PM 7    ASKING FOR INFORMATION BEYOND WHAT OTHER INVESTORS WERE

04:32PM 8    RECEIVING.  HE WANTED INFORMATION.  FULL STOP.

04:32PM 9         AND IF THAT MEANT THAT MS. HOLMES WOULD ENGAGE MORE WITH

04:32PM 10   ALL INVESTORS, THEN THAT WOULD HAVE SATISFIED HIM.

04:32PM 11        HE WASN'T ASKING FOR SPECIAL TREATMENT PER SE.  HE WANTED

04:32PM 12   TO KNOW WHAT WAS HAPPENING WITH THE COMPANY.  HE FELT THAT HIS

04:32PM 13   MILLION DOLLAR-PLUS INVESTMENT ENTITLED HIM -- ALTHOUGH HE

04:32PM 14   UNDERSTANDS THE LIMITATIONS TO HIS RIGHTS TO INFORMATION, HE

04:32PM 15   FELT THAT IT WAS APPROPRIATE FOR MS. HOLMES TO TELL HIM MORE

04:33PM 16   ABOUT WHAT WAS GOING ON WITH THE COMPANY SO THAT HE COULD

04:33PM 17   DECIDE WHAT TO DO WITH HIS INVESTMENT.

04:33PM 18        MR. DOWNEY:  IT'S TRUE THAT HE HAD A QUARTERLY

04:33PM 19   MEETING WITH MS. HOLMES FOR A PERIOD.  HE WAS UNIQUE IN THAT

04:33PM 20   REGARD AMONGST THE SCORES OF SHAREHOLDERS THAT ARE AT ISSUE

04:33PM 21   HERE.

04:33PM 22        IT'S CLEAR FROM WHAT MR. BOSTIC SAID THAT THEY WANT TO

04:33PM 23   CREATE AN IMPRESSION THAT EITHER WHAT MS. HOLMES SAID TURNED

04:33PM 24   OUT NOT TO EVENTUATE OR THAT BY FAILING TO PROVIDE COMPARABLE

04:33PM 25   INFORMATION LATER, THAT EVIDENCE IS SOME INTENT OF A CRIME.

04:33PM 1    UNDER THE DOCUMENTS THAT HE SIGNED, PLAIN AND SIMPLE ON

04:33PM 2    THE FACE OF THE AGREEMENT, HE AGREES THAT HE HAS NO ACCESS TO

04:33PM 3    DATA WHATSOEVER; AND, SECOND, ANY PLANNING THAT THE COMPANY

04:33PM 4    PROVIDES TO HIM IS CONDITIONAL SUBJECT TO CHANGE AND NOT

04:33PM 5    SOMETHING ON WHICH HE IS GOING TO RELY.

04:33PM 6    THE NOTION THAT DECLINING TO GIVE HIM THAT INFORMATION

04:33PM 7    DEMONSTRATES, YOU KNOW, GUILTY INTENT IN CONNECTION WITH

04:34PM 8    CHARGES LIKE THESE IS, I THINK, A TERRIBLE, UNFAIR, AND

04:34PM 9    PREJUDICIAL IMPLICATION TO CREATE IN FRONT OF THE JURY.

04:34PM 10    THE COURT:  IS IT, IS IT APPROPRIATE FOR THE JURY TO

04:34PM 11    LEARN THAT THERE WAS A HISTORY OF QUARTERLY MEETINGS THAT WAS

04:34PM 12    AFFORDED THIS INVESTOR AND THAT THEY STOPPED SOMEHOW?  I DON'T

04:34PM 13    KNOW WHO STOPPED IT, BUT THEY STOPPED.  SHOULDN'T THEY KNOW

04:34PM 14    THAT?

04:34PM 15    MR. DOWNEY:  I THINK WITHOUT GOING INTO THE CONTENT

04:34PM 16    OF THOSE MEETINGS TO IMPLY THAT EITHER NOT GETTING COMPARABLE

04:34PM 17    INFORMATION IS SOMEHOW SUSPICIOUS OR THAT, YOU KNOW, THEY

04:34PM 18    PROJECTED THERE WOULD BE AN IPO AT SOME POINT AND THEY DECIDED

04:34PM 19    TO REMAIN A PRIVATE COMPANY THEREAFTER, YOU KNOW, THE FACT THAT

04:34PM 20    THERE WERE QUARTERLY MEETINGS ALONE MIGHT BE CAPABLE OF BEING

04:34PM 21    ADMITTED, AS WOULD BE THE FACT THAT HE WAS UNIQUE WITH RESPECT

04:34PM 22    TO GETTING THESE QUARTERLY MEETINGS.

04:34PM 23    THE COURT:  WELL, IF HE HAD ACCESS TO A QUARTERLY

04:34PM 24    MEETING THAT NO ONE ELSE HAD, THAT MUST HAVE BEEN A MUTUAL

04:35PM 25    DECISION.  I DON'T KNOW.

| | | |
|---|---|---|
| 04:35PM | 1 | MR. DOWNEY: IT WAS PURSUANT TO HIS REQUEST AND IT |
| 04:35PM | 2 | WAS STOPPED BECAUSE OF THE FEROCITY WITH WHICH HE WAS -- ON |
| 04:35PM | 3 | SOME OCCASIONS, THE DOCUMENTS REFLECT DAILY CALLING THE COMPANY |
| 04:35PM | 4 | AND ASKING FOR INFORMATION NOT IN THE PERIOD THAT IS THE |
| 04:35PM | 5 | CONSPIRACY PERIOD THAT WE'RE DEALING WITH, AS BROAD AS THAT |
| 04:35PM | 6 | PERIOD IS, NOT IN THE PERIOD AROUND HIS 2013 INVESTMENT, BUT |
| 04:35PM | 7 | FOR THE ENTIRETY OF HIS INVOLVEMENT WITH THIS COMPANY AND |
| 04:35PM | 8 | THEREAFTER. |
| 04:35PM | 9 | SO I JUST -- I THINK IT'S AN IMPRESSION THAT -- THE |
| 04:35PM | 10 | GOVERNMENT KNOWS THE RECORD. THE GOVERNMENT, YOU KNOW, TO -- |
| 04:35PM | 11 | THERE'S PLENTY THAT THEY COULD DO WITH THIS WITNESS THAT |
| 04:35PM | 12 | DOESN'T RELATE TO TRYING TO CREATE THAT IMPRESSION, WHICH IS |
| 04:35PM | 13 | FALSE. |
| 04:35PM | 14 | THE COURT: MR. BOSTIC? |
| 04:35PM | 15 | MR. BOSTIC: YOUR HONOR, I THINK THE DEFENSE CAN |
| 04:35PM | 16 | EXPLORE THIS IN CROSS-EXAMINATION TO THE EXTENT THAT THEY NEED |
| 04:35PM | 17 | TO. |
| 04:35PM | 18 | THE RECORD AND THE EVIDENCE REFLECT THE TRUTH HERE. I |
| 04:35PM | 19 | THINK THE PARTIES JUST SEE IT DIFFERENTLY. |
| 04:35PM | 20 | WHEN IT COMES TO THE HISTORY OF COMMUNICATION HERE, I |
| 04:35PM | 21 | THINK THE DEFENSE HAS ITS ARGUMENTS ABOUT WHAT THE CONTRACTS |
| 04:36PM | 22 | REQUIRE. |
| 04:36PM | 23 | BUT THIS WITNESS SHOULD BE ALLOWED TO EXPLAIN WHY HE TOOK |
| 04:36PM | 24 | THE ACTIONS HE DID, WHY HE SOUGHT MORE INFORMATION FROM |
| 04:36PM | 25 | MS. HOLMES AND FROM THERANOS, AND HIS EXPERIENCE, HIS FUTILE |

04:36PM 1    EXPERIENCE IN MAKING THOSE ATTEMPTS TO TRY TO GET THAT

04:36PM 2    INFORMATION AND GET ANSWERS TO HIS QUESTIONS, SOME OF WHICH

04:36PM 3    BEAR -- OR MANY OF WHICH BEAR DIRECTLY ON THE SUBJECTS THAT

04:36PM 4    MS. HOLMES WAS DECEPTIVE ABOUT IN CONNECTION WITH NEWS ARTICLES

04:36PM 5    AND IN THE OTHER INVESTOR CONVERSATIONS THAT WE HAVE HEARD

04:36PM 6    ABOUT SO FAR IN TRIAL.

04:36PM 7            THE COURT:  AND ALL OF THIS WAS WITHIN THE CHARGED

04:36PM 8    PERIOD OF TIME?

04:36PM 9            MR. BOSTIC:  IT INCLUDES CONVERSATIONS DURING THE

04:36PM 10   CHARGED PERIOD OF TIME, YOUR HONOR.

04:36PM 11       THE HISTORY OF COMMUNICATION THAT WE'RE TALKING ABOUT

04:36PM 12   EXTENDS TO THE PAST ALSO.

04:36PM 13       AS WAS THE CASE WITH MR. TOLBERT'S TESTIMONY, WHICH I

04:36PM 14   BELIEVE ALSO COVERED SOME INTERACTION IN A PRE-2010 TIME

04:36PM 15   PERIOD, THE FACT THAT THE GOVERNMENT CHARGES A FRAUD SPANNING

04:36PM 16   FROM 2010 ON DOESN'T ERASE HISTORY BEFORE THAT.

04:36PM 17       I THINK THERE'S NOTHING WRONG WITH GIVING THE JURY THE

04:37PM 18   THREAD OF A CONVERSATION THAT CONTINUES INTO THE PAST, BUT THEN

04:37PM 19   HAS RELEVANT PORTIONS DURING THE TIME PERIOD ALLEGED IN THE

04:37PM 20   INDICTMENT.

04:37PM 21       AND I HAVEN'T ADDRESSED THE ISSUE OF THE IPO YET, BUT

04:37PM 22   THAT'S RELEVANT FOR SIMILAR REASONS.  IT'S PART OF

04:37PM 23   MR. EISENMAN'S CONVERSATIONS WITH THE DEFENDANT ABOUT WHETHER

04:37PM 24   THERE WAS GOING TO BE A LIQUIDITY EVENT OR NOT.

04:37PM 25       IN PARTICULAR, THAT CONVERSATION CONTINUED INTO THE

1     POST-2010 TIME PERIOD.

2          AND I SHOULD POINT OUT, THIS ISN'T JUST, YOU KNOW, AN

3     UNRELATED TOPIC HERE.

4          AS MR. EISENMAN UNDERSTOOD IT, I EXPECT THAT HE'LL TESTIFY

5     THAT THERANOS'S WILLINGNESS OR INTENTION TO MOVE FORWARD WITH

6     AN IPO TOLD HIM SOMETHING ABOUT THE STATE OF THE COMPANY'S

7     FINANCIAL HEALTH, AND THE STATE OF THE TECHNOLOGY AS WELL.

8          SO REPRESENTATIONS MADE BY HOLMES TO HIM ABOUT THE

9     LIKELIHOOD OR THE TIMING OF AN IPO WERE NOT JUST ABOUT A

10    LIQUIDITY EVENT FOR HIM AND A CHANCE TO REALIZE GAIN ON HIS

11    INVESTMENT, BUT WERE ALSO IMPLICIT, CLEAR REPRESENTATIONS ABOUT

12    WHERE THE COMPANY STOOD IN TERMS OF ITS FINANCIAL GROWTH,

13    COMMERCIAL SUCCESS, AND THE DEVELOPMENT OF ITS TECHNOLOGY, AND

14    THAT'S WHY IT'S RELEVANT.

15          MR. DOWNEY:  WELL, TO BE CLEAR, YOUR HONOR, THIS IS

16    AN EFFORT TO INJECT ESSENTIALLY A DIFFERENT CONSPIRACY INTO

17    THIS CASE, AN UNCHARGED, UNNOTICED CONSPIRACY THAT THERE WERE

18    LIES ABOUT WHETHER OR NOT THE COMPANY COMMITTED TO CONDUCTING

19    AN IPO KNOWING IT WAS NOT GOING TO CONDUCT AN IPO, WHICH IN AND

20    OF ITSELF, IF THAT WERE CHARGED AND THAT'S WHAT WE WERE

21    DEBATING ABOUT, I WOULD BE QUITE COMFORTABLE WITH THAT CASE.

22          THE ISSUE IS THAT I SHOULD NOT HAVE TO TRY THAT CASE, AND

23    I PARTICULARLY SHOULD NOT HAVE TO TRY IT WHEN, AS THE

24    GOVERNMENT KNOWS, THIS DEFENDANT REPRESENTED THAT HE UNDERSTOOD

25    THERE WAS NOT A PUBLIC MARKET, HE UNDERSTOOD THAT THERE MAY

04:39PM 1    NEVER BE A PUBLIC MARKET, HE UNDERSTOOD THAT ANY PROJECTION OR

04:39PM 2    ESTIMATE OF THE COMPANY AS TO WHAT MIGHT HAPPEN IN THE FUTURE

04:39PM 3    WAS NOT RELIABLE.

04:39PM 4        I MEAN, THAT'S THE FRAMEWORK UNDER WHICH ALL OF THESE

04:39PM 5    INTERACTIONS THAT HE'S CHARACTERIZING HAPPENED.  THERE'S A

04:39PM 6    SIGNIFICANCE DISPUTE BETWEEN THE PARTIES IN REALTIME AS TO WHO

04:39PM 7    SAID WHAT, AND I THINK TO THROW THAT INTO THIS TRIAL WHEN ALL

04:39PM 8    OF THAT WITH MS. HOLMES IS YEARS BEFORE THE INVESTMENT DECISION

04:39PM 9    IN 2013.

04:39PM 10       THE PROBLEM THE GOVERNMENT HAS HERE IS THE OFFER TO

04:39PM 11   MR. EISENMAN TO INVEST IN 2013 IS IN A LIMITED WINDOW BETWEEN

04:39PM 12   DECEMBER 15TH AND DECEMBER 31ST.  MR. EISENMAN DOESN'T SPEAK TO

04:39PM 13   MS. HOLMES DURING THAT PERIOD.  HE HAS NOT SPOKEN TO HER FOR A

04:39PM 14   SUBSTANTIAL PERIOD PRIOR TO THAT TIME.  HE'S TAKEN NO

04:39PM 15   REPRESENTATIONS FROM HER ABOUT THIS PARTICULAR INVESTMENT

04:40PM 16   OPPORTUNITY OTHER THAN WHAT IS GENERALLY AVAILABLE TO

04:40PM 17   SHAREHOLDERS.

04:40PM 18       THEY, THEREFORE, WANT TO IMPORT ALL OF THESE PAST

04:40PM 19   INTERACTIONS FOR PURPOSES OF BOLSTERING, YOU KNOW, THE CLAIM

04:40PM 20   THAT SOMEHOW THE INVESTMENT LOSS OF MR. EISENMAN RELATES TO THE

04:40PM 21   DEFENDANT.

04:40PM 22       HE DOES HAVE INTERACTIONS WITH MR. BALWANI AND THEY CAN --

04:40PM 23   YOU KNOW, I UNDERSTAND MR. BALWANI IS ALLEGED TO BE A

04:40PM 24   COCONSPIRATOR AND THAT CAN COME IN.  BUT I'M NOT CONCERNED

04:40PM 25   ABOUT THAT.  THAT'S FAIR GAME.

04:40PM 1          MR. BOSTIC:  YOUR HONOR, JUST A COUPLE OF POINTS ON

04:40PM 2     THAT.

04:40PM 3          THE FACT IS THE STORY OF MR. EISENMAN'S INTERACTIONS WITH

04:40PM 4     THERANOS AND MS. HOLMES DID NOT START IN 2010.  IT WOULD BE

04:40PM 5     DECEPTIVE AND PRESENTING AN INCOMPLETE PICTURE TO THE JURY TO

04:40PM 6     BEGIN HIS TESTIMONY THERE WITHOUT, AGAIN, ALLOWING THE JURY TO

04:40PM 7     UNDERSTAND THE CONTEXT OF THOSE LATER INTERACTIONS, TO

04:40PM 8     UNDERSTAND WHAT MR. EISENMAN HAD PREVIOUSLY BEEN TOLD, AND WHAT

04:40PM 9     INFORMATION WAS AVAILABLE TO HIM IN FULL AT THE TIME THAT HE

04:40PM 10    MADE HIS DECISION TO INVEST IN 2013.

04:41PM 11         THE COURT:  WELL, IT SEEMS LIKE -- AND I DON'T

04:41PM 12    THINK, MR. DOWNEY, YOU ARE OBJECTING TO THE JURY KNOWING ABOUT

04:41PM 13    THE DURATION OF THE RELATIONSHIP.

04:41PM 14         MR. DOWNEY:  NO, I DON'T OBJECT TO THAT, AND I DON'T

04:41PM 15    OBJECT TO THE FACT THAT THEY KNOW THAT HE WAS AN INVESTOR.

04:41PM 16         BUT I DON'T SEE WHAT ELSE ABOUT THAT PERIOD -- IF THERE'S

04:41PM 17    ANYTHING, YOU KNOW, THAT IS DIRECTLY RELEVANT TO THE CONSPIRACY

04:41PM 18    ALLEGATIONS THAT HE WANTS TO TESTIFY TO THAT HE THINKS HE KNEW

04:41PM 19    ABOUT THE COMPANY, FOR EXAMPLE, HE MAKES SOME STATEMENTS ABOUT

04:41PM 20    WHAT HE THINKS HE KNEW ABOUT THE RELATIONSHIP BETWEEN THERANOS

04:41PM 21    AND PHARMACEUTICAL COMPANIES, I THINK THAT'S, YOU KNOW, FAIR

04:41PM 22    GAME.

04:41PM 23         THIS IS A DIFFERENT ISSUE.  THIS IS INJECTING A WHOLE NEW

04:41PM 24    THEORY OF LIABILITY INTO THE CASE.

04:41PM 25         WE'VE GOT PLENTY HERE TO DEAL WITH.

04:41PM 1    MR. BOSTIC:  YOUR HONOR, JUST ONE FINAL POINT.

04:41PM 2    MR. DOWNEY HAS REFERENCED SEVERAL TIMES LANGUAGE IN THE

04:41PM 3    STOCK PURCHASE AGREEMENT, A LEGAL DOCUMENT ENTERED INTO BETWEEN

04:41PM 4    MR. EISENMAN AND THERANOS.

04:42PM 5    LANGUAGE IN THAT CONTRACT WHERE THE INVESTOR SAID THAT

04:42PM 6    THEY HAVE ACCESS TO ALL OF THE INFORMATION THAT THEY NEED,

04:42PM 7    WHERE THEY SAY THAT THEY UNDERSTAND THE COMPANY'S HIGH RISK,

04:42PM 8    PROVISIONS LIKE THAT MIGHT HAVE A GREATER EFFECT WERE THIS A

04:42PM 9    CIVIL CASE BROUGHT BY THE INVESTOR AGAINST THE COMPANY WHERE

04:42PM 10   THE DECISION MIGHT TURN ON WHETHER THE INVESTOR HAD WAIVED

04:42PM 11   CERTAIN RIGHTS BY MAKING THOSE STATEMENTS.

04:42PM 12   THEY DO NOT, HOWEVER, RENDER INADMISSIBLE A VICTIM'S

04:42PM 13   STATEMENTS OR TESTIMONY ABOUT MISREPRESENTATIONS THAT A

04:42PM 14   FRAUDSTER MADE TO HIM BEFORE THE SIGNING OF THAT CONTRACT.

04:42PM 15   THEY CANNOT BE USED AS A SHIELD TO KEEP OUT TESTIMONY

04:42PM 16   ABOUT PREVIOUS MISREPRESENTATIONS.

04:42PM 17   THE COURT:  OKAY.

04:42PM 18   MR. DOWNEY:  YOUR HONOR, ONE OTHER THING.  I JUST

04:42PM 19   WANTED TO COMMENT ON YOUR HONOR'S COMMENT ABOUT TO CONSIDER,

04:42PM 20   NOT TO BELABOR THE COURT FOR THE COURT, BUT JUST WITH RESPECT

04:43PM 21   TO THE SCOPE ON THE EFFECT OF THE INVESTMENT ON HIS RETIREMENT

04:43PM 22   PLANNING AND SO FORTH, WITH RESPECT, I DISAGREE THAT COMMENTS

04:43PM 23   ABOUT HERE'S WHAT I WAS THINKING IN TERMS OF WHAT I WOULD DO

04:43PM 24   WITH THE MONEY, THAT HAS TO DO WITH HIS STATE OF MIND IF HE

04:43PM 25   REALIZES A RETURN.

04:43PM 1       IT DOESN'T HAVE TO DEAL -- IT HAS NOTHING TO DO WITH WHAT

04:43PM 2   IS MATERIAL IN HIS MAKING THE INVESTMENT DECISION OR THE STATE

04:43PM 3   OF MIND OF THE DEFENDANT.  THOSE ARE THE RELEVANT ISSUES.

04:43PM 4       SO HOW MONEY IS GOING TO BE USED, WHETHER IT'S LOST OR

04:43PM 5   REPRESENTS A SUBSTANTIAL GAIN, THAT'S NOT RELEVANT IN THE CASE.

04:43PM 6       SO I THINK THE SCOPE OF THE ADMONITION, YOU KNOW, SHOULD

04:43PM 7   INCLUDE THOSE ISSUES, AND I THINK THAT'S THE -- I THINK IT'S A

04:43PM 8   HELPFUL CONVERSATION.  THAT'S THE NUM OF OUR DISAGREEMENT.

04:43PM 9           THE COURT:  WELL, I THINK IT'S -- WHEN I SAID I

04:43PM 10  THINK HE CAN SAY, THIS IS PART OF MY PLANNING --

04:43PM 11          MR. DOWNEY:  YEAH.

04:43PM 12          THE COURT:  -- I DON'T SEE ANY HARM IN THAT.  THAT'S

04:44PM 13  COMMON KNOWLEDGE.  PEOPLE DO THAT.  AND THIS IS WHAT HE WAS

04:44PM 14  DOING AS PART OF HIS FINANCIAL PLANNING.

04:44PM 15      AND IT'S AN INVESTMENT.  WHATEVER IT IS, THAT'S FINE.

04:44PM 16          MR. DOWNEY:  I THINK THAT FAR IS FINE.  IT'S GOING

04:44PM 17  BEYOND THAT.

04:44PM 18          THE COURT:  WELL, I THINK THAT'S WHAT WE'RE TALKING

04:44PM 19  ABOUT, TOO.  IF HE TALKS ABOUT SOMETHING THAT IS REAL OR NOT

04:44PM 20  THAT SEEKS TO INJECT SYMPATHY OR SOMETHING LIKE THAT, IT MIGHT

04:44PM 21  NOT BE APPROPRIATE FOR THAT.  THAT'S WHAT I'M THINKING ABOUT.

04:44PM 22  THAT'S WHAT I HEARD.

04:44PM 23      BUT GENERAL TERMS ABOUT FINANCIAL PLANNING, I THINK

04:44PM 24  THAT'S -- WHY ELSE WOULD HE INVEST?  WHY DO PEOPLE DO THAT?

04:44PM 25          MR. DOWNEY:  HE HARDLY NEEDS TO SAY IT.

04:44PM 1      MR. BOSTIC:  YOUR HONOR, JUST ON THAT POINT, THE

04:44PM 2  LANGUAGE THAT WE'RE TALKING ABOUT -- AND I EXPECT THE LANGUAGE

04:44PM 3  THAT IS REDACTED IN THESE EMAILS -- IT ALL OCCURS BEFORE THE

04:44PM 4  ACTUAL LOSS IN THIS CASE, SO NONE OF IT IS OF THE SORT THAT I

04:44PM 5  THINK THE COURT WAS TARGETING IN ITS MOTION IN LIMINE ORDER --

04:44PM 6      THE COURT:  RIGHT.

04:44PM 7      MR. BOSTIC:  -- RELATING TO THE HARM AND THE

04:45PM 8  DOWNSTREAM EFFECTS THAT MIGHT HAVE FLOWED FROM THE LOSS.

04:45PM 9      THE COURT:  WELL, WE'LL ALL LOOK AT THIS.

04:45PM 10   SO WHAT IS THE SCHEDULE THEN?  WE'LL FINISH MS. PETERSON,

04:45PM 11  I THINK MR. WADE HAS ABOUT SEVEN MINUTES LEFT, AND THEN SOME

04:45PM 12  REDIRECT?

04:45PM 13      MR. DOWNEY:  I THINK DR. CULLEN, IT SOUNDS LIKE

04:45PM 14  SHE'LL BE AN HOUR IN TOTAL PERHAPS.

04:45PM 15      THE COURT:  AND THEN WE'RE GOING TO CALL THE DOCTOR

04:45PM 16  I GUESS; IS THAT RIGHT?

04:45PM 17      MR. SCHENK:  YOUR HONOR, I NEED TO SPEAK WITH THE

04:45PM 18  AGENTS.  THE DEFENSE ASKED US A COUPLE OF DAYS AGO FOR NAMES OF

04:45PM 19  WITNESSES AND WITNESS ORDER TODAY.  THEY ASKED FOR THREE NAMES

04:45PM 20  THAT DAY, INCLUDING MS. PETERSON.

04:45PM 21   SO WE WERE UNDER THE IMPRESSION THAT WE COULD ACCOMPLISH

04:45PM 22  MS. PETERSON'S TESTIMONY AND TWO OTHER WITNESSES TODAY.

04:45PM 23      THE COURT:  TODAY.

04:45PM 24      MR. SCHENK:  AGAIN, THAT WAS BASED ON ASKING FOR

04:45PM 25  ADDITIONAL NAMES, REQUESTS FROM THE DEFENSE FOR ADDITIONAL

04:45PM 1    NAMES.

04:45PM 2         WE HAD TO TAKE A WITNESS OUT OF ORDER.  WE CALLED

04:46PM 3    MS. PETERSON FIRST BECAUSE DR. CULLEN HAD TRAVEL ISSUES

04:46PM 4    PREVENTING HER FROM FLYING IN YESTERDAY.  SHE ARRIVED THIS

04:46PM 5    MORNING, AND SO WE PUT MS. PETERSON ON THE STAND FIRST.

04:46PM 6         I DO NOT KNOW -- MS. -- DR. CULLEN HAD A FLIGHT OUT

04:46PM 7    TONIGHT.  I TOLD HER SHE WOULD GET ON THE STAND TODAY AND SHE

04:46PM 8    WOULD GET OFF THE STAND TODAY BECAUSE THAT'S THE IMPRESSION I

04:46PM 9    WAS UNDER.

04:46PM 10        I DON'T KNOW WHETHER SHE'S GOING TO GET ON THAT FLIGHT AND

04:46PM 11   FLY HOME TONIGHT AND WE WILL BRING HER BACK NEXT WEEK OR AT

04:46PM 12   SOME OTHER POINT BECAUSE WE THOUGHT SHE WOULD FINISH TODAY.

04:46PM 13        SO I DON'T KNOW WHO THE NEXT WITNESS IS.  I'D LIKE TO

04:46PM 14   SPEND SOME TIME THIS EVENING INQUIRING ABOUT THAT.

04:46PM 15             THE COURT:  SURE.

04:46PM 16             MR. SCHENK:  IT WOULD BE VERY HELPFUL IF WE COULD

04:46PM 17   GET A REALISTIC ESTIMATE FROM THE DEFENSE ON THE LENGTH OF

04:46PM 18   CROSS REMAINING FOR PETERSON, AS WELL AS EISENMAN, BECAUSE

04:46PM 19   SOMETIMES WE'VE BROUGHT TOO MANY WITNESSES BECAUSE WE THOUGHT

04:46PM 20   THAT THE CROSSES WOULD END IN TIME, AND IT WOULD BE HELPFUL TO

04:46PM 21   PROVIDE ESTIMATES THAT WERE MORE REALISTIC.

04:47PM 22             THE COURT:  WELL, I'M SURE -- THANK YOU.

04:47PM 23        I'M SURE MR. WADE HAS MORE THAN SEVEN MINUTES TOMORROW.

04:47PM 24             MR. WADE:  I DON'T ANTICIPATE A LOT.  I ANTICIPATE A

04:47PM 25   VERY SHORT AMOUNT OF --

04:47PM 1    THE COURT:  WHAT I'VE LEARNED IS THAT THOSE TERMS

04:47PM 2    ARE QUITE RELATIVE IN THIS TRIAL.

04:47PM 3    MR. WADE:  YEAH.

04:47PM 4    THE COURT:  SO WHAT DO YOU THINK?  CAN WE FINISH TWO

04:47PM 5    WITNESSES?  CAN WE FINISH MS. PETERSON AND A WITNESS TOMORROW?

04:47PM 6    MR. WADE:  I THINK IT PROBABLY DEPENDS ON WHO THE

04:47PM 7    SECOND WITNESS IS.

04:47PM 8    MR. DOWNEY:  I THINK CERTAINLY DR. CULLEN.  MY

04:47PM 9    IMPRESSION IS THAT THAT'S A BRIEF WITNESS.

04:47PM 10    MR. SCHENK:  I DON'T THINK THERE'S ANY QUESTION THAT

04:47PM 11    DR. CULLEN WOULD FINISH IF SHE'S STILL IN TOWN.

04:47PM 12    I'M WONDERING IF EISENMAN, WHO IS IN TOWN, IF EISENMAN

04:47PM 13    FOLLOWS PETERSON, CAN -- WILL THE GOVERNMENT NEED A WITNESS

04:47PM 14    AFTER EISENMAN OR WILL EISENMAN NOT FINISH TOMORROW?

04:47PM 15    MR. DOWNEY:  THAT I DON'T KNOW, YOUR HONOR.  SOME OF

04:47PM 16    IT RELATES TO THE RULINGS ON THESE ISSUES BECAUSE THEY TAKE US

04:47PM 17    INTO COMPLEX AREAS.

04:47PM 18    BUT I WOULD -- I WOULD THINK WE WOULD GET VERY CLOSE WITH

04:48PM 19    EISENMAN IF NOT FINISH TOMORROW.

04:48PM 20    THE COURT:  DIRECT IS GOING TO BE AN HOUR OR SO WITH

04:48PM 21    HIM MAYBE?

04:48PM 22    MR. BOSTIC:  I'D ESTIMATE BETWEEN 60 AND 90 MINUTES,

04:48PM 23    YOUR HONOR.

04:48PM 24    MR. DOWNEY:  YEAH.  SO IT SOUNDS LIKE -- WELL, IT

04:48PM 25    SOUNDS LIKE WE WOULD ONLY HAVE ABOUT 90 MINUTES THEN.  I'M NOT

4866

```
04:48PM  1    SURE WE WOULD FINISH THAT.
04:48PM  2              THE COURT:  YEAH.  MR. WADE HAS SOME TIME TO GO IN
04:48PM  3    HIS REDIRECT AND THERE'S RECROSS, AND THAT'S TWO HOURS RIGHT
04:48PM  4    THERE I'M SURE.
04:48PM  5              MR. DOWNEY:  I'M SURE THAT'S TWO HOURS.
04:48PM  6              MR. SCHENK:  FOR PETERSON?
04:48PM  7              MR. WADE:  I WOULDN'T ANTICIPATE IT'S GOING TO BE
04:48PM  8    TWO HOURS, YOUR HONOR.  MY HOPE IS IT WOULD BE AN HOUR MAX.
04:48PM  9              THE COURT:  IN TOTAL?
04:48PM 10              MR. WADE:  I DON'T KNOW HOW MUCH MR. LEACH HAS,
04:48PM 11    BUT --
04:48PM 12              THE COURT:  YOU'RE GOING TO BE LESS THAN AN HOUR YOU
04:48PM 13    THINK?
04:48PM 14              MR. WADE:  I BELIEVE I WILL BE, YEAH.
04:48PM 15              THE COURT:  OKAY.  WELL, I DON'T KNOW IF THAT'S
04:48PM 16    HELPFUL TO YOU.
04:48PM 17              MR. SCHENK:  IF I COULD JUST CLARIFY?  IT SOUNDED
04:49PM 18    LIKE MR. DOWNEY WAS SAYING, EVEN WITH SIX HOURS REMAINING IN
04:49PM 19    THE DAY, IF PETERSON, LET'S SAY, TAKES TWO HOURS OR SO, MAYBE
04:49PM 20    AN HOUR, IF WE GO UNTIL 4:00, WE STILL MIGHT NOT FINISH AND THE
04:49PM 21    GOVERNMENT'S --
04:49PM 22              MR. DOWNEY:  I THOUGHT YOU WERE SAYING WITH CULLEN
04:49PM 23    IN BETWEEN.
04:49PM 24              MR. SCHENK:  CULLEN MAY GET ON A PLANE AND LEAVE
04:49PM 25    TONIGHT.  WE MAY HAVE TO GO DIRECTLY TO EISENMAN TOMORROW.  I
```

04:49PM 1    NEED TO WORK ON THAT WHEN WE LEAVE.

04:49PM 2            THE COURT:  RIGHT.

04:49PM 3            MR. SCHENK:  WHAT I'M WONDERING IS, CAN I TELL

04:49PM 4    CULLEN, YOU'RE GUARANTEED TO FINISH TOMORROW?  OR NOT?  AND I

04:49PM 5    HAVE SOME CONCERN.

04:49PM 6            MR. CLINE:  CULLEN OR EISENMAN?

04:49PM 7            THE COURT:  THIS IS CULLEN TOMORROW.

04:49PM 8            MR. DOWNEY:  GOING AFTER PETERSON?

04:49PM 9            MR. SCHENK:  GOING AFTER PETERSON OR GOING AFTER

04:49PM 10   EISENMAN DEPENDING ON THE LENGTH.

04:49PM 11           MR. CLINE:  I'M DOING CULLEN, DR. CULLEN.  I'M NOT

04:49PM 12   SURE HOW LONG THE DIRECT WILL BE, BUT MY CROSS WON'T BE MORE

04:49PM 13   THAN 20 MINUTES.  AND LET'S JUST SAY 30 TO BE ABSOLUTELY SAFE.

04:50PM 14   DEFINITELY NOT MORE THAN 30 MINUTES.

04:50PM 15           THE COURT:  CULLEN'S DIRECT I CAN'T IMAGINE WILL BE

04:50PM 16   MORE THAN AN HOUR.

04:50PM 17           MR. SCHENK:  CULLEN, IT SOUNDS LIKE, WILL CERTAINLY

04:50PM 18   FINISH AFTER PETERSON IF SHE STAYS IN TOWN.  JUST ONE MOMENT.

04:50PM 19           THE COURT:  SURE.

04:50PM 20      (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

04:50PM 21           MR. SCHENK:  SO FAR WHAT I WAS SUGGESTING IS

04:50PM 22   EISENMAN ALSO HAS TO FINISH.  HE HAS COMMITMENTS, AND WE'RE

04:50PM 23   DARK THURSDAY, FRIDAY.  HE CAN'T BE HERE NEXT WEEK.

04:50PM 24           THE COURT:  RIGHT.

04:50PM 25           MR. SCHENK:  SO I WAS TRYING TO FIGURE OUT IF CULLEN

4868

04:50PM 1   STAYS, DOES SHE TESTIFY BEFORE OR AFTER EISENMAN?  BECAUSE WE

04:50PM 2   NEED TO FINISH BOTH OF THEM.  AND IF CULLEN JUST LEAVES TONIGHT

04:50PM 3   AND WE PUT EISENMAN ON TOMORROW AND HE'S DONE AND WE DON'T HAVE

04:50PM 4   A CARRY-OVER PROBLEM WITH CULLEN, OR IS THERE A CHANCE THEY

04:50PM 5   BOTH FINISH SO WE DON'T HAVE TO CONCERN OURSELVES WITH THE

04:50PM 6   ORDER?

04:50PM 7           THE COURT:  IT SOUNDS TO ME LIKE IT'S GOING TO BE

04:50PM 8   VERY DIFFICULT, IF NOT IMPOSSIBLE, TO FINISH TWO WITNESSES, TWO

04:51PM 9   ADDITIONAL WITNESSES FROM MS. PETERSON'S FINISHING.

04:51PM 10      SO IS THIS THEN A CHOICE -- IS IT EISENMAN?  IS THAT HIS

04:51PM 11  NAME?

04:51PM 12          MR. SCHENK:  EISENMAN.

04:51PM 13          THE COURT:  HE'S NOT AVAILABLE NEXT WEEK?

04:51PM 14          MR. SCHENK:  CORRECT.

04:51PM 15          THE COURT:  SO MAYBE THAT'S -- WE NEED TO FOCUS ON

04:51PM 16  HIM FOR TOMORROW AND HOPE THAT HE FINISHES TOMORROW.

04:51PM 17          MR. SCHENK:  THAT'S WHAT IT IS SOUNDING LIKE TO ME.

04:51PM 18          THE COURT:  YEAH.

04:51PM 19      SORRY, MR. CLINE.  WE'LL HAVE TO DEFER.

04:51PM 20          MR. CLINE:  I WAS SO READY FOR DR. CULLEN TO COME.

04:51PM 21          THE COURT:  SHARPENING YOUR KNIVES ALL WEEKEND.

04:51PM 22          MR. DOWNEY:  AND IT MAY EVENTUALLY.  WE'LL SEE WHAT

04:51PM 23  HAPPENS.

04:51PM 24      YOU'RE SENDING DR. CULLEN HOME THEN?

04:51PM 25          MR. SCHENK:  I WOULD LIKE TO SPEND SOME TIME THIS

04:51PM 1    EVENING FIGURING THAT OUT.

04:51PM 2            MR. DOWNEY:  I WOULD SAY THERE'S A DIFFERENCE

04:51PM 3    BETWEEN A BOSTIC HOUR AND A BOSTIC HOUR AND A HALF, TOO.  SO I

04:51PM 4    APPRECIATE YOUR COMMENTS ON THE CROSSES, BUT I -- AND WE'RE

04:52PM 5    DOING THE BEST WE CAN.

04:52PM 6            THE COURT:  BOTH SIDES, EVERYONE IS.  THAT INCLUDES

04:52PM 7    ME, TOO.

04:52PM 8            MR. DOWNEY:  I KNOW THAT.

04:52PM 9        AND MR. SCHENK IS RIGHT, WE ARE TRYING TO WORK WITH HIM SO

04:52PM 10   THAT HE CAN BE PREDICTIVE AS TO WHAT HAPPENS.

04:52PM 11           THE COURT:  ALL RIGHT.  WELL, IT SOUNDS LIKE -- IT

04:52PM 12   SOUNDS LIKE EISENMAN, MR. EISENMAN, WE NEED TO GET HIM DONE.

04:52PM 13   OTHERWISE HE'S GOING TO BE DRAGGED BACK IN WEEKS AFTER.

04:52PM 14           MR. SCHENK:  RIGHT.

04:52PM 15           THE COURT:  WELL, ALL RIGHT.  WE'LL LET YOU DISCUSS,

04:52PM 16   AND WE'LL LOOK AT THIS, AND WE'LL SEE YOU TOMORROW ABOUT 8:15.

04:52PM 17           MR. DOWNEY:  GREAT.  THANKS, JUDGE.

04:52PM 18           THE COURT:  THANK YOU.

04:52PM 19           MR. SCHENK:  THANK YOU.

04:52PM 20           THE COURT:  ALL RIGHT.

04:52PM 21           THE CLERK:  COURT IS ADJOURNED.

04:52PM 22       (COURT ADJOURNED AT 4:52 P.M.)

23

24

25

```
 1

 2

 3                    CERTIFICATE OF REPORTERS

 4

 5

 6

 7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

 8   UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

 9   CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16        _____
          IRENE RODRIGUEZ, CSR, CRR
17        CERTIFICATE NUMBER 8076

18

19        _____
          LEE-ANNE SHORTRIDGE, CSR, CRR
20        CERTIFICATE NUMBER 9595

21        DATED:  OCTOBER 26, 2021

22

23

24

25
```