No. 22-10312

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

      v.

ELIZABETH HOLMES,

    Defendant-Appellant.

_____

**UNITED STATES' OPPOSITION TO APPELLANT'S MOTION FOR RELEASE PENDING APPEAL**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 18-CR-00258-EJD-1
_____

**STEPHANIE M. HINDS**
Attorney for the United States
Acting Under Authority Conferred By
28 U.S.C. § 515

**MATTHEW M. YELOVICH**
Chief, Appellate Section, Criminal Division

**KELLY I. VOLKAR**
Assistant United States Attorney
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
(415) 436-7185
**Attorneys for Plaintiff-Appellee**
**UNITED STATES OF AMERICA**

May 5, 2023

# TABLE OF CONTENTS

PROCEDURAL BACKGROUND ........................................................ 2

LEGAL STANDARD ........................................................................ 4

ARGUMENT ................................................................................... 5

I.    THE QUESTIONS HOLMES PRESENTS ARE NOT LIKELY
TO RESULT IN REVERSAL OR A NEW TRIAL ........................... 5

II.    HOLMES DOES NOT RAISE A SUBSTANTIAL QUESTION ...... 11

    A.    Das, the CMS Report, and Voiding All Edison Patient Tests .. 11

        1.    Background .................................................................. 11

        2.    Das Testified as a Percipient, Not Expert, Witness ....... 14

        3.    The District Court Properly Admitted the CMS Report
Relating to Holmes's State of Mind in 2016 ................ 16

        4.    Theranos's Voiding of All Edison-Run Tests Was
Not Remedial .............................................................. 17

    B.    Limiting Cross-Examination of Rosendorff After Four
Days .......................................................................................... 18

    C.    Exclusion of Balwani's SEC Testimony ................................. 22

CONCLUSION ............................................................................... 24

i

# TABLE OF AUTHORITIES

## <u>FEDERAL CASES</u>

*United States v. Balwani*, No. 22-10338 (9th Cir. filed Dec. 21, 2022) .................. 4

*United States v. Figueroa-Lopez*, 125 F.3d 1241 (9th Cir. 1997) .........................15

*United States v. Gadson*, 763 F.3d 1189 (9th Cir. 2014) .......................................22

*United States v. Handy*, 761 F.2d 1279 (9th Cir. 1985) ....................................5, 14

*United States v. Larson*, 495 F.3d 1094 (9th Cir. 2007) .......................................20

*United States v. Miller*, 753 F.2d 19 (3d Cir. 1985)..........................................5, 14

*United States v. Paguio*, 114 F.3d 928 (9th Cir. 1997) .........................................22

## <u>FEDERAL STATUTES AND RULES</u>

18 U.S.C. § 3143.................................................................................................4, 5

Fed. R. Evid. 401 ................................................................................................. 3

Fed. R. Evid. 403 ..........................................................................3, 13, 17, 20, 21

Fed. R. Evid. 407 ...................................................................................3, 13, 17

Fed. R. Evid. 701 ................................................................................................. 3

Fed. R. Evid. 702 ..........................................................................3, 12, 14, 15

Fed. R. Evid. 608 ...........................................................................................20, 21

Fed. R. Evid. 804 ..........................................................................................3, 22, 23

No. 22-10312

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

        v.

ELIZABETH HOLMES,

    Defendant-Appellant.

_____

## UNITED STATES' OPPOSITION TO APPELLANT'S MOTION FOR RELEASE PENDING APPEAL

Defendant-Appellant Elizabeth Holmes and her co-defendant, Ramesh "Sunny" Balwani, stand convicted following separate jury trials for their multi-year scheme to defraud investors into believing that their company, Theranos, had a revolutionary market-ready product that had been endorsed and adopted at high levels—when in fact that was not true. The district court sentenced Holmes to 135 months' imprisonment, the low-end of the Guidelines. Holmes now seeks to further delay serving that sentence by challenging discretionary evidentiary rulings of the district court that are no more substantial than those that this Court recently deemed insufficient to merit relief for her co-defendant Balwani. The district court that oversaw these months-long trials and examined Holmes's claims in detail did

not err in holding that Holmes failed to overcome the statutory presumption that she should begin serving her sentence as scheduled. This Court should similarly deny Holmes's motion for bail pending appeal.

## PROCEDURAL BACKGROUND

On July 28, 2020, a grand jury returned the Third Superseding Indictment ("TSI"), charging Holmes and Balwani with conspiracy to commit wire fraud against investors from 2010 to 2015 (Count 1); six specific wire fraud counts against investor-victims, namely, the "C-1 investors" in 2013 (Counts 3–5) and "C-2 investors" in 2014 (Counts 6–8); conspiracy to commit wire fraud against patients from 2013 to 2016 (Count 2); and four specific wire fraud counts related to patient-victims (Counts 9–12). Ex. 3.[1] The district court granted Balwani's severance motion. CR-977.

Beginning August 31, 2021, Holmes's trial spanned 46 trial days and included over 900 admitted exhibits and 32 witnesses. Dkt. 27. The jury found Holmes guilty of four investor-related counts, including the investor-related conspiracy (Count 1) and wire fraud against three C-2 investors (Counts 6–8). The jury could not reach a verdict for three C-1 investors (Counts 3–5) and acquitted on

---

[1] "Ex." refers to numerical exhibits submitted with Appellant's Motion ("Mot.") (*see* Dkts. 36, 37) and alphabetical attached to this opposition, CR to the district court clerk's record for No. 5:18-CR-00258-EJD, "Dkt." to this Court's docket, and ER to Appellant's Excerpts of Record (Dkt. 22).

the patient-related counts (Counts 2, 10–12).  Ex. 2.  Balwani was later found

guilty on all twelve counts in a separate trial.  CR-1507.

On November 18, 2022, the court sentenced Holmes to 135 months'

imprisonment, the low-end of the Sentencing Guidelines range, on each count to

run concurrently.  *See* CR-1721.

Holmes moved for bail pending appeal below, asserting several purported

substantial questions, only three of which she maintains on appeal.  Mot. 5–20.

First, she asserts that the district court abused its discretion regarding evidentiary

rulings during the testimony of Dr. Kingshuk Das,[2] who testified to events at

Theranos that occurred between December 2015 and April 2016.  Second, Holmes

complains that the court limited her cross-examination of Dr. Adam Rosendorff

whom she spent four days cross-examining.  Finally, Holmes urges that the court

abused its discretion in excluding Balwani's prior uncorroborated out-of-court

statements under Federal Rule of Evidence 804(b)(3).

The district court denied her motion.  Ex. 1.  The court did not find Holmes a

danger or flight risk—although it noted her purchasing of a one-way ticket to

Mexico departing shortly after the verdict was "ill-advised"—but held that Holmes

did not present a substantial question likely to result in reversal of all counts.  *Id.*

Specifically, the court found that alleged evidentiary errors that Holmes identified

---

[2]  Based on Federal Rules of Evidence 401, 403, 407, 701, and 702.

were harmless or non-prejudicial because "Holmes's misrepresentations to Theranos investors involved more than just whether Theranos technology 'work[ed] as promised'" and her claimed errors, even if credited, "would not disturb evidence of [ ] Holmes's clear involvement in other misrepresentations made to investors." *Id.*

A panel of this Court recently reviewed and rejected similar claims from Balwani. Ex. A. Balwani claimed that (1) erroneous admission of certain patient testimony and the same regulatory report that Holmes challenges here constructively amended the indictment, (2) former Theranos scientists' testimony should have been deemed expert testimony, and (3) the court erred in excluding Holmes's prior recorded statements to investors. *See United States v. Balwani*, No. 22-10338, Dkt. 8-1 (filed Mar. 15, 2023). This Court held that Balwani had not shown that his "appeal raises a 'substantial question' of law or fact that is 'fairly debatable,'" nor that favorable resolution would result in "reversal, an order for a new trial on all counts resulting in imprisonment," or a meaningful change to his sentence. Ex. A. Because the issues Holmes presents are no more substantial than those raised by her co-defendant, this Court should reach the same conclusion.

## LEGAL STANDARD

Detention is the mandatory, routine norm for any defendant following conviction and the imposition of a custodial sentence. 18 U.S.C. § 3143(b)(1).

The defendant bears the burden of proving her appeal (1) raises a substantial question of law or fact that is (2) likely to result in reversal or an order for a new trial. *Id.* Harmless errors, errors that have no prejudicial effect on the counts of conviction, or insufficiently preserved errors would not justify a court's granting bail. *See United States v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985). The standard is meant to "make[ ] it considerably more difficult for a defendant to be released on bail pending appeal." *United States v. Handy*, 761 F.2d 1279, 1280–83 (9th Cir. 1985) (adopting *Miller*).

## ARGUMENT

## I.      THE QUESTIONS HOLMES PRESENTS ARE NOT LIKELY TO RESULT IN REVERSAL OR A NEW TRIAL

On appeal, Holmes raises tangential evidentiary challenges, reviewed for abuse of discretion, that relate to small slivers of the evidence introduced during a lengthy trial. While the government proved seven categories of false misrepresentations listed in the TSI that Holmes made to investors (Ex. 3 ¶12), Holmes acknowledges that her first two issues relate solely to one (¶12(A)): that Theranos's proprietary devices were capable of consistently producing accurate and reliable test results. Mot. 3. The district court repeatedly held that evidence of this type was not material to the investor counts—and therefore correctly concluded that these issues were unlikely to result in reversal or a new trial, even if meritorious. Ex. 1; *see* CR-1636.

As an initial matter, Holmes challenges *portions* of two witnesses' testimony (out of 32 witnesses) and there are large swaths of evidence presented on this topic that are wholly unaffected by Holmes's claims:

Holmes secured dozens of investors from 2010 to 2015 by falsely claiming that Theranos had revolutionized blood testing by inventing a single, proprietary blood analyzer (a.k.a. the Edison, minilab, TSPU, etc. (herein called "Theranos's device")) that could accurately run every conventional blood test from a few drops of blood drawn via fingerstick rather than a vein draw.  *See* Exs. 17, 46, 56; *see also* Ex. 54 at 18–22, 39–46, 52, 67 ("800+ test menu" on "minilab").  However, Theranos employees testified that Theranos's device was only ever used for 12 types of blood tests, often with less accuracy than traditional machines manufactured by third-party companies.  Ex. B.[3]

For example, Surekha Gangakhedkar, a long-time Theranos employee, testified about observing consistent problems with multiple iterations of Theranos's device until she felt compelled to resign on the eve of Theranos's commercial launch with Walgreens in September 2013 because unreliable devices

---

[3]  Multiple witnesses testified that the "minilab" (or "4.0") device was never used to test patient samples and never worked.  *See* Ex. 43 at 15, 19 (summarizing testimony); *see also* Ex. 18 (Tr. 7223–34) (defense witness, Dr. Fabrizio Bonanni testified that in 2016 he "would not have made [ ] statement" that "Theranos was presently capable of testing about 200 assays on a Theranos device"—namely the minilab—"[b]ecause it would not have been accurate even in 2016").

were going to be used to test real patients.  18-ER-4879–83, 4910–16.  Similarly,

Erika Cheung, a Theranos lab associate from October 2013 until April 2014,

testified about her daily role testing patient samples on Theranos's device and how

it failed quality control (QC) measures at alarmingly high rates.  17-ER-4479–81,

4531–4536, 4648–62; *see also* Ex. 43 at 15–24 (summarizing testimony).

Holmes tried to hide these deficiencies by using third-party machines to

fulfill the remainder of Theranos's available blood test menu to patients at

Walgreens stores—without telling Walgreens or potential investors.  Ex. 43 at 14–

21.  Cheung testified that Theranos did the vast majority of its patient testing on

unmodified third-party machines.  17-ER-4490–504; *see also* Ex. 7 (Tr. 1712–19).

None of the above is undermined even if the Court rules favorably on every issue

Holmes raises.

Similarly, Holmes's last issue relates to Theranos's financial status, a second

misrepresentation to investors (Ex. 3 ¶12(B)).  There, too, overwhelming

evidence—unaffected by her claim on appeal—was presented at trial:

Holmes provided wildly unachievable projections to Safeway CEO Steve

Burd in 2010 (Ex. 11 (Tr. 2953–64)), despite knowing Theranos had struggled to

make payroll the year prior (Ex. 9 (Tr. 621–26, 632–34)).  The pattern continued

throughout 2014.  Theranos had zero revenue in 2012 and 2013 and, in November

2013, shortly before the C-1 investors invested, Holmes and Balwani were texting

each other about the fact that Theranos was down to approximately $15 million in cash with a burn rate of $1 to $2 million per week. Ex. D (Tr. 692–96, 705, 717–20). In 2014, Theranos's revenue was just $150,000. *Id.*; *see also* Ex. 43 at 8–10 (summarizing text messages discussing finances). Holmes received weekly updates on Theranos's finances from the company's highest ranking financial officer, who reported directly to Holmes. Ex. D (Tr. 718). Nevertheless, Holmes and Balwani provided projections to investor-victim RDV in October 2014—three-quarters of the way through the year—predicting $140 million in revenue for 2014 and even higher revenue in 2015. Ex. 56 (Tr. 4645–50, 4683–88); *see* Ex. 44; *see also* Ex. 43 at 25–26.

Finally, none of Holmes's claims addresses the remaining five categories of misrepresentations proven at trial, which are wholly unaffected even if her claims were resolved favorably to her (*see* Ex. 3 ¶12(C)–(H)):

- Investors repeatedly testified at trial that they would have been shocked to learn Theranos was using third-party machines—not Theranos's device as pitched—to run patient blood samples. *See*, *e.g.*, Ex. 14 (Tr. 3604); Ex. 17 (Tr. 5097–104); Ex. 46 (Tr. 6395–402, 6412–16, 6442–43); Ex. 56 (Tr. 4693–97); Ex. 3 ¶12(G).

- In April 2010, Holmes emailed Walgreens executives reports with favorable conclusions about Theranos's technology that were emblazoned with

8

logos of large pharmaceutical companies Pfizer, GlaxoSmithKline, and Schering

Plough (now Merck). Ex. 43 at 13 & n.3. Holmes pitched these to Walgreens as

"three independent due diligence reports on Theranos systems" that were "from"

those companies. *Id.* However, at trial, representatives from Pfizer and Schering

Plough testified that their companies did not endorse the reports nor authorize

Theranos to affix their logos to them. *Id.* Critically, Holmes herself testified that

she added the logos to reports Theranos wrote and enhanced the conclusions

shortly before she sent them to Walgreens. *Id.* Yet she continued to send these

falsified reports to investors, including investor-victims Daniel Mosley (Count 8)

and RDV (Count 7), who considered them material. *Id.*; Ex. 3 ¶12(H).

- In 2013 and 2014, Holmes repeatedly told investors that the
Department of Defense (DOD) was using Theranos's device on medevac
helicopters, in the battlefield, or to treat soldiers in Afghanistan and Iraq. Ex. 43 at
14. In truth, DOD never used Theranos's device to clinically treat patients, nor did
it ever move out of initial testing phases with the technology. *Id.*; Ex. 3 ¶12(E).

- Holmes told investor-victim PFM (Count 6) in December 2013 that
Theranos had historically earned over $200 million from its work with DOD and
pharmaceutical companies, when, in reality, Theranos had never earned more than
$10 million from both sources combined. Ex. 43 at 25; Ex. 3 ¶12(E).

- In August 2013, Holmes gave a misleading technology demonstration to Walgreens executives where they believed their blood was being tested on Theranos's device as shown to them, when in reality it was tested on a third-party machine. Ex. 43 at 15–16; Ex. 3 ¶12(C).

- In August 2014, Balwani forwarded Holmes an email from Walgreens executives stating that Walgreens would not expand further beyond the few dozen stores within which Theranos already provided its testing services unless venous draws were dramatically reduced. Ex. 43 at 24. Nevertheless, two months later, Holmes told RDV (Count 7) that Theranos projected it would provide testing services within 900 Walgreens locations by 2015. *Id.*; Ex. 3 ¶12(D).

In short, regardless of whether this Court finds Holmes has raised a substantial question based on the below evidentiary rulings—themselves subject to abuse of discretion review—any such error would be harmless or non-prejudicial given the overwhelming evidence introduced at trial demonstrating Holmes's multi-faceted misrepresentations made to investors underlying her four counts of conviction. *See* Ex. 3 ¶12(A)–(H). Therefore, the district court did not err in holding that, even if meritorious, Holmes's claims on appeal did not materially affect the jury's verdict "in light of the breadth of misrepresentations" Holmes made to investors. Ex. 1. Holmes's citation to cases describing the harmlessness standard are thus inapposite. *Cf.* Mot. 10–11.

10

## II. HOLMES DOES NOT RAISE A SUBSTANTIAL QUESTION

### A. Das, the CMS Report, and Voiding All Edison Patient Tests

#### 1. Background

In fall 2015, the agency that oversees blood testing laboratories, Centers for Medicare and Medicaid Services ("CMS"), inspected Theranos's clinical laboratory. Ex. C at 2. CMS observed from Theranos records that Theranos's device repeatedly failed QC checks in 2014 and 2015 and produced values outside of ranges Theranos itself deemed acceptable—yet Theranos continued to report patient results. Ex. 28. CMS found deficiencies that presented "immediate jeopardy" to patient health, informed Holmes and Balwani of this intended finding in November 2015, and memorialized the finding in a 121-page report and 4-page cover letter ("CMS Report"), excerpts of which were admitted at trial for Holmes's state of mind. *See id.*; Ex. C at 5; CR-898-3.[4]

Holmes hired Das around December 2015 as Theranos's lab director, and by March 2016 "nearly the sole responsibility" Das had was "reviewing [the CMS Report], developing an understanding of it, and responding to it[.]" Ex. 10 (Tr. 5784, 5795). Das observed concerns with certain lab practices—in particular with Theranos's device—and communicated those concerns to Holmes. Ex. 10 (Tr.

---

[4] At trial, Holmes conceded that the CMS Report vindicated QC issues Erika Cheung and Tyler Shultz, another Theranos employee, had raised to Holmes in early 2014. Ex. 53 (Tr. 7972–92).

5795–835, 5844–59). For example, Das testified about how he used a prostate cancer screening test to explain to Holmes that Theranos's device was "generating erroneous results" because it produced results for females when "[i]t should only be detected in males." Ex. 10 (Tr. 5823–24). In response, Holmes provided an "implausible" alternative explanation. *Id.* The parties debated the permissible scope of Das's testimony and Holmes's counsel objected throughout Das's testimony regarding the CMS Report under Rule 702, some of which the district court sustained or directed the government to rephrase. *See* Ex. 10 (Tr. 5818–19, 5854).

Das testified that he was required by regulation and professional ethics to ameliorate deficiencies identified in the CMS Report and, to respond, Theranos voided all 50,000 to 60,000 test results from 2014 and 2015 produced by Theranos's device. Ex. 10 (Tr. 5825–35, 5860). Holmes pushed back and claimed that Theranos's device was not the issue. Ex. E (Tr. 6028–29).

Das prepared a Theranos business record—that Holmes approved—called a "Patient Impact Assessment" to provide the company's response to CMS. *Id.* To do so, Das testified that he reviewed a broader set of information than had been provided to CMS in the inspection, including validation reports, QC data, and patient test results. Ex. 10 (Tr. 5796, 5833–34). Das told Holmes in 2016 that he had concluded that the problems with Theranos's device identified in the CMS

Report were a "representative sample" of the greater number of actual issues. Ex. 10 (Tr. 5824–35, 5854–57); Ex. E (Tr. 6023–25). Indeed, Das found in his internal review that there were multiple instances where Theranos reported patient results in 2014 and 2015 *after* Theranos's device had failed QC. *Id.* As a result, Das decided Theranos's device was "unsuitable for clinical use," and Theranos never used any Theranos-manufactured device for patient testing thereafter. Ex. 10 (Tr. 5835, 5860–61). After hearing Das's testimony, the district court admitted two pages of the Patient Impact Assessment and evidence that Theranos voided all Edison tests over Holmes's Rule 407 and 403 objections. Ex. 10 (Tr. 5825–35); Ex. 26. Holmes's counsel did not object during Das's testimony regarding the Patient Impact Assessment. *Id.*

Despite Das's contemporaneous internal warnings, Holmes continued to minimize publicly the seriousness of the CMS Report. For example, in April 2016, Holmes appeared on the *Today Show* where she dismissed the immediate jeopardy finding. CR-1395-4 (providing transcript). In a meeting with investor-victim RDV shortly afterwards, she "downplayed what had been happening in the press" and said that "CMS was questioning the process, not the accuracy of the tests." Ex. 56 (Tr. 4702–09). Holmes's minimization was probative of her consciousness of guilt.

On appeal, Holmes challenges the above-described evidentiary rulings, which the district court referred to as the "accuracy and reliability evidence" (Ex. 1), and what she deems the "2016 evidence" (Mot. 6). *See* Mot. 5–11. These evidentiary rulings were not an abuse of discretion, and Holmes does not raise a substantial question here.

### 2. *Das Testified as a Percipient, Not Expert, Witness*

As a threshold matter, what Holmes now challenges—Das's testimony about the Patient Impact Assessment, including that Theranos's device was not suitable for clinical use—was not objected to below, constituting forfeiture of the Rule 702 claim. *See* Ex. 10 (Tr. 5825–35). Thus, it is not sufficiently preserved to merit bail pending appeal. *Miller*, 753 F.2d at 23; *accord Handy*, 761 F.2d at 1280–83.

Regardless, Das testified as a percipient—not expert—witness. Just as a company's top accountant might prepare a spreadsheet to explain the company's dire financial status to executives, or take the lead in preparing the company's response to regulators, Das was hired by Holmes to assess the findings in the CMS Report, review Theranos's available information, and report back to her with what he found and recommended—all of which he did contemporaneously to the charged patient counts and testified about in summary fashion. Ex. 10 (Tr. 5795–835, 5844–59); Ex. E (Tr. 6023–29). The government's direct examination was grounded in what Das observed and what he communicated to Holmes in real-time

14

(*i.e.*, early 2016). Ex. 10 (Tr. 5825–35). The Patient Impact Assessment, while his primary focus, was ultimately *Theranos's* response to CMS (thereby approved by Holmes). *Id.*; Ex. 26.

Regardless, Holmes has never challenged Das's qualifications as an expert. Indeed, she admitted at trial Das's resume from when Theranos hired him. Ex. E (Tr. 5892–93); *see also* Ex. 10 (Tr. 5781–84). And Holmes relied on his qualifications in closing arguments to the jury, stating he "sound[ed] like a defense witness" because her empowering of Das and others were "part of a reform effort . . . with [ ] Holmes's support[.]" Ex. 5 (Tr. 9209–11).[5] Therefore, under this Court's cases, even if some of Das's testimony strayed into Rule 702 territory, it was harmless because he could have been qualified as an expert. *See United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246–47 (9th Cir. 1997); *cf.* Mot. 7.

To avoid this inevitable conclusion, Holmes challenges on appeal, instead, the "missing" data underlying Das's "opinions." Mot. 7. But Das disagreed with her on cross-examination that all data he relied upon came from a no-longer-accessible database (Ex. E (Tr. 5931–33)), confirmed he relied on multiple sources of information (including validation reports that were admitted at trial) (Ex. 10 (Tr. 5796, 5833–34); *see* 51-ER-14625–900), and said pre-trial that he left all data he had relied upon in Theranos's control (CR-727-2).

---

[5] Holmes's untimely disclosure argument fails for the same reason. *Cf.* Mot. 6.

### 3. The District Court Properly Admitted the CMS Report Relating to Holmes's State of Mind in 2016

The district court did not abuse its discretion in admitting a handful of pages from the 121-page CMS Report for the limited purpose of demonstrating Holmes's state of mind regarding Theranos's lab in 2015 and 2016. Ex. 28; *see* CR-1196; Ex. 10 (Tr. 5810). This issue was extensively briefed before and during trial. *See, e.g.*, CR-574, 588, 659, 675, 717, 726, 798, 810, 846, 850, 887, 897, 906, 989, 1086, 1133, 1134, 1191, 1192, 1196.

First, Holmes does not dispute that all of the "2016 evidence" she challenges occurred during the charged patient-fraud conspiracy period (2013–2016) and relates to the accuracy of tests that patients received. *Cf.* Mot. 7–8. This was always the government's foremost argument for admissibility below. *See* CR-1133. Her failure to challenge here the primary theory of admissibility precludes her from establishing a substantial question on this ground.

Second, Holmes herself repeatedly introduced her state of mind regarding Theranos's technology in 2016 and 2017, including during her opening statement (Ex. 8 (Tr. 560, 609–13)), cross-examination of witnesses and introduction of documents regarding convening a "scientific board" in 2016 (Ex. 55 (Tr. 1646–55)) and presenting at a scientific conference in August 2016 (Ex. 56 (Tr. 4828–31)), and throughout her closing argument (Ex. 6 (Tr. 9054); Ex. 5 (Tr. 9209–11)). Holmes even called a witness who joined Theranos in May 2016, whose sole

16

purpose was to establish Holmes's state of mind in 2016. Ex. 18 (Tr. 7180–235). The court did not abuse its discretion in permitting the government to introduce the "2016 evidence" to demonstrate Holmes's ongoing notice of issues with Theranos's device—even as she continued to minimize those issues when talking with investors to lull them into believing the problems were surmountable. *See* Ex. 56 (Tr. 4702–09).[6]

### 4. *Theranos's Voiding of All Edison-Run Tests Was Not Remedial*

Finally, voiding every test run on the Theranos's Edison device was not a remedial measure under Rule 407 (*cf.* Mot. 8) because it was required by regulation, as Das repeatedly testified. Ex. 10 (Tr. 5825–35); Ex. E (Tr. 6028–29). Furthermore, as argued below, even if the ultimate voiding of test results were considered remedial, Theranos's internal analysis leading up to that step—*i.e.*, the Patient Impact Assessment—would not be protected under Rule 407. *See* CR-1133 at 10–11. Thus, the district court did not abuse its discretion.[7]

---

[6] For the same reasons, Holmes's Rule 403 arguments fail. *Cf.* Mot. 8–9. Holmes further asserts that the jury might have improperly convicted her based on regulatory violations—but ignores that she successfully advocated for a jury instruction to prevent against that very possibility. *See* CR-1206 at 33.

[7] The district court considered and rejected her Rule 403 arguments pre-trial. CR-798 at 36–38; *see also* Ex. 32 at 11–14; CR-1134; *cf.* Mot. 9 n.3.

## B. Limiting Cross-Examination of Rosendorff After Four Days

Holmes does not present a substantial question regarding the extent of her cross-examination of Rosendorff. *Cf.* Mot. 11–15. Rosendorff worked as the laboratory director at Theranos from April 2013 until he resigned in November 2014. Ex. 7 (Tr. 1702–03). Over two days of direct examination, Rosendorff described how he witnessed firsthand the severe limitations of Theranos's device, how he consistently raised his concerns to Holmes and Balwani, and how he came to feel that the company cared "more about PR and fundraising than about patient care[.]" *Id.*; *see* Exs. 7, 9. Rosendorff warned Holmes leading up to the Walgreens launch that he "didn't feel [proprietary tests] were ready for launch." Ex. 7 (Tr. 1711–29, 1755–59). Rosendorff described consistently observing third-party machines perform superior to Theranos's device. *Id.* As but one example, Theranos's hCG assay—used to monitor pregnancy status—was performing so poorly in patient testing that Rosendorff ordered it moved from Theranos's device to a standard third-party commercial analyzer. Ex. 7 (Tr. 1785–92).

Rosendorff decided to resign because he was feeling "really uncomfortable with what [was] happening" at Theranos and because he felt "pressured to vouch for results" in which he was not confident. Ex. 9 (Tr. 1948–51); Ex. 36 (Tr. 2733). Before his departure, Rosendorff began forwarding internal company emails to his personal email address because he was concerned Theranos would not maintain the

records; he was also considering filing a lawsuit as a whistleblower.  Ex. 7
(Tr. 1834–35).

At trial, Holmes, through counsel, cross-examined Rosendorff across four
trial days (a longer cross-examination than any other witness at trial and
accounting for more than 8% of the total trial days).  *See* 21-ER-5668–948; 22-ER-
5951–6000, 6126–247; 23-ER-6250–468; *see also* CR-1618 at 9–10 (summarizing
aspects of cross-examination).  At the end, Holmes sought to demonstrate
Rosendorff's bias by questioning him about three of his post-Theranos jobs.
Ex. 36 (Tr. 2548–78, 2705–16).

After leaving Theranos, Rosendorff worked at several large companies,
some of which faced government scrutiny.  Holmes sought to use this subsequent
work history to impugn Rosendorff's character.  *See* CR-1405.  Rosendorff worked
at Invitae, which announced in September 2017 that it would retest 50,000 samples
for a rare genetic mutation, estimating that a testing error might have generated
false negative results for 2 to 15 patients.  Ex. 36 (Tr. 2564–70).  Rosendorff
worked at uBiome as lab director for a few months, and subsequently a criminal
indictment was filed against the founders of the company with charges related to
fraudulent healthcare billing and reimbursement practices—unrelated to
Rosendorff's role in the company.  *Id.*  Finally, during Holmes's trial, Rosendorff
was working for Perkin-Elmer, which was under a then-ongoing investigation by

CMS where one possible outcome was a sanction that could have involved Rosendorff's professional license. *Id.*; Ex. 36 (Tr. 2717–20). Subsequently, that investigation resolved without any sanctions. *See* CR-1405.

The district court disallowed questioning Rosendorff about his employment at uBiome and Invitae but permitted limited inquiry into Rosendorff's then-current role at Perkin-Elmer. Ex. 36 (Tr. 2571–76, 2705–16). In reaching this conclusion, the court held that Holmes sought to introduce "inappropriate character evidence"—attempting to discredit Rosendorff as an incompetent lab director— that was cumulative and more prejudicial than probative for purposes of Rule 403. *Id.* The court also referenced Rule 608 and its purpose of "avoid[ing] mini trials," and found that the proposed cross-examination would be cumulative. *Id.* As the court reiterated in finding that this issue did not present a substantial question on appeal, "Holmes [ ] fully availed herself of the right to confront Dr. Rosendorff, who was cross examined over four days of trial." Ex. 1.

A district court has "wide latitude" in exercising its discretion to "impose reasonable limits on [ ] cross-examination" that constitutes "harassment" or "confusion of the issues" or "interrogation that is repetitive or only marginally relevant." *United States v. Larson*, 495 F.3d 1094, 1101–02 (9th Cir. 2007) (*en banc*) (quotation omitted).

Here, the district court acted well within its discretion under Rules 403 and 608 to prevent mini-trials and avoid cumulative evidence with marginal relevance. Moreover, the topics Holmes sought to further explore do not constitute evidence of Rosendorff's bias in favor of the government. Tellingly, each of the government investigations Holmes references began in 2021—*after* Rosendorff had already given prior consistent statements regarding his observations while working at Theranos. *See* CR-1405 (providing record and case citations). This timeline cuts against Holmes's claim that questioning regarding these three companies would show Rosendorff's motive to slant his testimony favorably for the prosecution. *See id.*

Finally, any error was harmless considering Rosendorff was one of several overlapping witnesses that testified to consistent problems with accuracy and reliability of Theranos's devices, which was only one of several misrepresentations Holmes made to investors. *See* Ex. 43 15–24 (summarizing trial testimony); CR-1636 at 7–8. Therefore, any error in a modest limitation of one line of inquiry on this witness's bias—after a four-day cross-examination where ample other grounds for impeachment by bias were covered—was harmless. *Cf.* Mot. 14–15. Accordingly, Holmes falls well short of showing a substantial issue on this ground.

21

### C.   Exclusion of Balwani's SEC Testimony

Finally, Holmes argues that the district court abused its discretion by excluding as hearsay Balwani's prior testimony before the Securities and Exchange Commission (SEC) in August 2017, insisting it met the elements of Rule 804(b)(3) (statements against interest).  Exs. 48 & 49.  Holmes claims this evidence was "critical" because Balwani stated he "owned" the financial model and stated that he did not think Holmes ever made edits to it.  Mot. 15–16.

Under Rule 804(b)(3), the defendant must show that (1) the declarant is unavailable, (2) the statement tended to subject the declarant to criminal liability such that a reasonable person would not have made the statement unless he believed it to be true, and (3) corroborating evidence supports the statement's trustworthiness.  *United States v. Paguio*, 114 F.3d 928, 932 (9th Cir. 1997).

The district court did not abuse its discretion in excluding Balwani's uncorroborated prior testimony because it largely deflected or shared blame by pointing to others—such as Safeway, Walgreens, and other individuals from potential investors—who also provided input and edited the financial "model" (not projection).  Ex. 19; *see United States v. Gadson*, 763 F.3d 1189, 1200 (9th Cir. 2014) ("Statements that curry favor or deflect (or share) blame do not fall within the scope of Rule 804(b)(3)(A).").  As the court found, it "is not a crime to create a financial model" or even "to take ownership over the creation of a financial model"

as Balwani testified—it is a crime to commit fraud or mislead investors with projections, but that is not what Balwani said he did. Ex. 19; *see also* Exs. 48 & 49. Holmes argues that Balwani's statements would exculpate her—but that is not the standard for admissibility under Rule 804(b)(3).

Moreover, as described in more detail above, the evidence admitted at trial did not corroborate the trustworthiness of the statements. Holmes received weekly updates about Theranos's dire financial situation while contemporaneously providing investors projections of nearly $1 billion in revenue. *See* CR-1486 at 5, 9; *cf.* Mot. 15–20. Regardless of who created and edited the financial model leading to the projections, a jury could determine Holmes knowingly misrepresented Theranos's financial stability to investors. Ex. 3 ¶12(B).

Holmes attempts to escape the bleak reality of Theranos's financial situation, as she did before the jury, by pointing to deferred revenue—meaning cash already received but not earned that could be recalled by the payor at any time. *See* Ex. D (Tr. 783). But the sources of deferred revenue did not match the detailed breakdown of sources of projected revenue that Holmes and Balwani provided to investors in the 2014 and 2015 financial projections. Ex. 44; *see* CR-1486 at 9 (summarizing related trial evidence). Moreover, it is unclear why that argument is anything more than a jury plea—it does not speak to why the district court abused its discretion in excluding Balwani's uncorroborated hearsay.

In sum, Holmes does not present a substantial question on this issue and, regardless, the district court correctly determined that "admission of Balwani's prior [SEC] testimony would [not] have affected the jury's verdict, because it would not disturb evidence of [ ] Holmes's clear involvement in other misrepresentations made to investors."  Ex. 1.

## CONCLUSION

For the reasons set forth above, this Court should deny Holmes's motion for bail pending appeal.


Dated: May 5, 2023                    Respectfully submitted,

                                      STEPHANIE M. HINDS
                                      Attorney for the United States
                                      Acting Under Authority Conferred By
                                      28 U.S.C. § 515

                                      MATTHEW M. YELOVICH
                                      Chief, Appellate Section, Criminal Division

                                       */s/ Kelly I. Volkar*
                                      KELLY I. VOLKAR
                                      Assistant United States Attorney

                                      Attorneys for Plaintiff-Appellee
                                      UNITED STATES OF AMERICA

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing complies with the type size and typeface requirements of Fed. R. App. P. 32(a)(5) and (6) and with the 20-page length limit of Ninth Circuit Rule 27-1(1)(d) under the page/word count conversion formula of Circuit Rule 32-3.  The foregoing is 5,296 words.


Dated:  May 5, 2023                            */s/ Kelly I. Volkar*
                                               KELLY I. VOLKAR
                                               Assistant United States Attorneys

25