# EXHIBIT D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR-18-00258-EJD |
| | ) | |
| PLAINTIFF, | ) | SAN JOSE, CALIFORNIA |
| | ) | |
| VS. | ) | VOLUME 6 |
| | ) | |
| ELIZABETH A. HOLMES, | ) | SEPTEMBER 14, 2021 |
| | ) | |
| DEFENDANT. | ) | PAGES 660 - 854 |
| _____ | ) | |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                       BY:  JOHN C. BOSTIC
                            JEFFREY B. SCHENK
                       150 ALMADEN BOULEVARD, SUITE 900
                       SAN JOSE, CALIFORNIA 95113

                       BY:  ROBERT S. LEACH
                            KELLY VOLKAR
                       1301 CLAY STREET, SUITE 340S
                       OAKLAND, CALIFORNIA 94612

     (APPEARANCES CONTINUED ON THE NEXT PAGE.)


OFFICIAL COURT REPORTERS:
                            IRENE L. RODRIGUEZ, CSR, RMR, CRR
                            CERTIFICATE NUMBER 8074
                            LEE-ANNE SHORTRIDGE, CSR, CRR
                            CERTIFICATE NUMBER 9595

     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
          TRANSCRIPT PRODUCED WITH COMPUTER

```
 1        A P P E A R A N C E S: (CONT'D)

 2


 3     FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                                BY:  KEVIN M. DOWNEY
 4                                   LANCE A. WADE
                                     KATHERINE TREFZ
 5                                   JEAN RALPH FLEURMONT
                                725 TWELFTH STREET, N.W.
 6                              WASHINGTON, D.C. 20005

 7                              LAW OFFICE OF JOHN D. CLINE
                                BY:  JOHN D. CLINE
 8                              ONE EMBARCADERO CENTER, SUITE 500
                                SAN FRANCISCO, CALIFORNIA 94111
 9

10     ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
                                BY:  ADELAIDA HERNANDEZ
11
                                OFFICE OF THE U.S. ATTORNEY
12                              BY:  LAKISHA HOLLIMAN, PARALEGAL
                                     MADDI WACHS, PARALEGAL
13
                                WILLIAMS & CONNOLLY
14                              BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL

15                              TBC
                                BY:  BRIAN BENNETT, TECHNICIAN
16

17

18

19

20

21

22

23

24

25
```

1

INDEX OF PROCEEDINGS

2

GOVERNMENT'S:

3

4       **SO HAN SPIVEY (A.K.A. DANISE YAM)**
        DIRECT EXAM BY MR. LEACH (RES.)          P. 685

5       CROSS-EXAM BY MR. WADE                   P. 740
        REDIRECT EXAM BY MR. LEACH               P. 783

6

7       **ERIKA CHEUNG**
        DIRECT EXAM BY MR. BOSTIC                P. 789

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | INDEX OF EXHIBITS | |
|---|---|---|---|

|  | | IDENT. | EVIDENCE |
|---|---|---|---|
| **GOVERNMENT'S:** | | | |
| 615 | | | 685 |
| 792 | | | 689 |
| 1901 | | | 685 |
| 5206 | | | 696 |
| 431 | | | 707 |
| 5219 | | | 711 |
| 5172 | | | 717 |
| 5085 | | | 724 |
| 5141 | | | 726 |
| 3533 | | | 729 |
| 3527 | | | 730 |
| 5190 | | | 731 |
| 2623 | | | 732 |
| 4859, PROVISIONALLY | | | 735 |
| 3233 | | | 737 |
| 1853 | | | 762 |
| 256 | | | 784 |
| 5388 | | | 801 |
| 5389 | | | 807 |
| 3741, BATES 15286-15292 | | | 811 |
| 1287 | | | 845 |
| | | | |
| **DEFENDANT'S:** | | | |
| 7753 | | | 749 |
| 13711 | | | 760 |
| 7761 | | | 763 |
| 13719 | | | 771 |
| 7091 | | | 776 |
| 4176 | | | 780 |

```
 1                SAN JOSE, CALIFORNIA                    SEPTEMBER 14, 2021

 2                           P R O C E E D I N G S

 3                 (COURT CONVENED AT 8:42 A.M.)

 4                 (JURY OUT AT 8:42 A.M.)

 5                     THE COURT:  GOOD MORNING.  PLEASE BE SEATED.  THANK

 6            YOU AGAIN FOR YOUR COURTESY.

 7                 LET'S GO ON THE RECORD IN OUR MATTER UNITED STATES VERSUS

 8            HOLMES.

 9                 LET ME GET APPEARANCES OF THE PARTIES FOR TODAY, PLEASE.

10                     MR. LEACH:  GOOD MORNING, YOUR HONOR.

11                 ROBERT LEACH, JEFF SCHENK, AND JOHN BOSTIC FOR THE

12            UNITED STATES.

13                     THE COURT:  THANK YOU.  GOOD MORNING EVERYONE.

14                 MR. WADE.

15                     MR. DOWNEY:  GOOD MORNING, YOUR HONOR.

16                     THE COURT:  OR MR. DOWNEY.

17                     MR. DOWNEY:  I'M CLOSEST.

18                     THE COURT:  OKAY.

19                     MR. DOWNEY:  KEVIN DOWNEY FOR MS. HOLMES.

20                 WITH ME ARE LANCE WADE, KATIE TREFZ, AND J.R. FLEURMONT,

21            AND OUR COCOUNSEL, JOHN CLINE, IS HERE, AND MS. HOLMES IS

22            PRESENT.

23                     THE COURT:  THANK YOU.  GOOD MORNING, EVERYONE.

24                 WE ARE OUTSIDE OF THE PRESENCE OF OUR JURY, AND I WANTED

25            TO TAKE UP A COUPLE OF MATTERS.
```

08:43AM 1          INITIALLY LET ME TALK ABOUT WE WERE NOT IN SESSION LAST

08:43AM 2    FRIDAY, AND THAT WAS OWING TO SOME CONVERSATION WE HAD WITH ONE

08:43AM 3    OF OUR JURORS, JUROR NUMBER 9, WHO INFORMED US OF POTENTIAL

08:43AM 4    CONTACT WITH AN INDIVIDUAL WHO HAD CONTRACTED OR WAS POSITIVE

08:44AM 5    FOR COVID.

08:44AM 6          OVER THE WEEKEND, AND I THINK YESTERDAY, MS. KRATZMANN

08:44AM 7    RECEIVED EMAIL INFORMATION, AND I THINK I SHARED THAT, THAT WAS

08:44AM 8    SHARED WITH COUNSEL THAT OUR JUROR RECEIVED TWO NEGATIVE TESTS,

08:44AM 9    ONE ON SEPTEMBER 9TH AND ANOTHER TEST ON SEPTEMBER 11TH, AND

08:44AM 10   BOTH OF THOSE TESTS WERE NEGATIVE.  WE RECEIVED THAT, AND WE'RE

08:44AM 11   HAPPY FOR THAT JUROR, AND THAT'S WHY WE'RE IN SESSION TODAY.

08:44AM 12         I THINK COUNSEL RECEIVED THAT INFORMATION, DID YOU?

08:44AM 13             MR. DOWNEY:  YES, YOUR HONOR.

08:44AM 14             MR. SCHENK:  YES, YOUR HONOR.

08:44AM 15             THE COURT:  GREAT.

08:44AM 16         AND THEN WE DID RECEIVE SOME OTHER INFORMATION REGARDING

08:44AM 17   JUROR NUMBER 7 WHO YOU RECALL HAD SOME ISSUES WITH HER

08:44AM 18   EMPLOYMENT.  I HAD ASKED HER TO TALK WITH HER EMPLOYER TO SEE

08:44AM 19   IF IT WERE POSSIBLE TO RESCHEDULE HER EMPLOYMENT SUCH THAT SHE

08:44AM 20   COULD REMAIN ON THE JURY.

08:45AM 21         WE RECEIVED, MS. KRATZMANN DID, AN EMAIL FROM JUROR

08:45AM 22   NUMBER 7 INDICATING THAT THAT WAS NOT POSSIBLE.  SO I THINK WE

08:45AM 23   SHARED THAT INFORMATION WITH COUNSEL AS WELL.

08:45AM 24         IN LIGHT OF THAT, I'M INCLINED TO EXCUSE HER FOR FINANCIAL

08:45AM 25   HARDSHIP REASONS.

08:45AM 1          BUT LET ME ASK COUNSEL IF THEY WISH TO COMMENT.

08:45AM 2               MR. SCHENK:  YES WE AGREE.  NO OBJECTION.

08:45AM 3               MR. DOWNEY:  NO OBJECTION TO EXCUSAL FOR HARDSHIP.

08:45AM 4               THE COURT:  THANK YOU VERY MUCH.

08:45AM 5          THEN JUROR NUMBER 7, MS. HERNANDEZ-PEREZ, IS EXCUSED.  AND

08:45AM 6     WE'LL ADVANCE ALTERNATE NUMBER 1 TO SEAT 7, AND THAT ALTERNATE

08:45AM 7     JUROR WILL REPLACE MS. HERNANDEZ-PEREZ AS A SEATING JUROR.

08:45AM 8     THANK YOU FOR THAT.  WE'LL DO THAT WHEN THE JURY COMES OUT.

08:45AM 9          THERE WILL BE GREAT FORMALITY WHEN HE MOVES FROM HIS SEAT

08:46AM 10    TO SEAT NUMBER 7.

08:46AM 11         I NEXT WANT TO TALK ABOUT THE GOVERNMENT HAD FILED

08:46AM 12    DOCUMENT 1014, WHICH WAS AN EX PARTE APPLICATION FOR IMMUNITY

08:46AM 13    FOR A WITNESS.

08:46AM 14         MR. SCHENK, MR. LEACH, CAN YOU JUST SPEAK TO ME A LITTLE

08:46AM 15    BIT ABOUT THIS, PLEASE.

08:46AM 16         THE DEFENSE HAS RECEIVED THIS ALSO I ASSUME.

08:46AM 17              MR. WADE:  WE HAVE, YOUR HONOR.

08:46AM 18              THE COURT:  ALL RIGHT.  THANK YOU.

08:46AM 19              MR. LEACH:  YES, YOUR HONOR.

08:46AM 20         THE GOVERNMENT ANTICIPATES CALLING AFTER ERIKA CHEUNG

08:46AM 21    MS. SUREKHA GANGADKHEDKAR WHO IS A FORMER EMPLOYEE OF THERANOS.

08:46AM 22    HER COUNSEL INDICATED TO ME THAT IF CALLED TO TESTIFY SHE WOULD

08:46AM 23    INVOKE HER FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION.

08:46AM 24         MY OFFICE HAS OBTAINED APPROVAL FROM DOJ TO IMMUNIZE HER

08:46AM 25    BECAUSE OF HER INVOCATION, AND THAT'S THE BASIS OF THE EX PARTE

08:46AM 1   APPLICATION.

08:46AM 2          THE COURT:  I SEE.  CAN YOU -- THANK YOU.  I HAVE

08:47AM 3   THAT BEFORE ME, AND I JUST HAVE A COUPLE OF QUESTIONS ABOUT

08:47AM 4   THIS.

08:47AM 5       SHOULD THE COURT BE CONCERNED THAT THIS POTENTIAL WITNESS

08:47AM 6   WHO IS IN ESSENCE GRANTED IMMUNITY, SHOULD I BE CONCERNED ABOUT

08:47AM 7   ANY COMPLICITY IN THE UNDERLYING CHARGES SUCH THAT I NEED TO

08:47AM 8   BALANCE THOSE INTERESTS WITH THE ORDER?

08:47AM 9          MR. LEACH:  I DON'T THINK THE COURT NEEDS TO DO

08:47AM 10  THAT.  I THINK THAT THE STATUTORY BASIS FOR IMMUNITY ARE LAID

08:47AM 11  OUT IN 18 U.S.C. SECTION 6002.  IT'S A DECISION FOR THE

08:47AM 12  EXECUTIVE BRANCH TO DECIDE IF IT'S IN THE PUBLIC INTEREST TO

08:47AM 13  CONFER IMMUNITY.

08:47AM 14      SO I THINK THE COURT'S ROLE IS TO ASSESS WHETHER THOSE

08:47AM 15  STATUTORY FACTORS ARE MET, AND I DON'T THINK THAT THE COURT

08:47AM 16  NEEDS TO DO ANY ANALYSIS BEYOND THAT.

08:47AM 17         THE COURT:  ALL RIGHT.  THANK YOU.

08:47AM 18      MR. DOWNEY, DO YOU WISH TO BE HEARD ON THIS?  MR. WADE?

08:48AM 19         MR. WADE:  I'M WALKING A LONG WAY, YOUR HONOR, TO

08:48AM 20  SAY THAT THE DEFENSE TAKES NO POSITION ON THIS MOTION.

08:48AM 21         THE COURT:  THANK YOU VERY MUCH.

08:48AM 22      I JUST WANTED TO MAKE THAT INITIAL INQUIRY, MR. LEACH.

08:48AM 23  I'M AWARE OF THE STATUTORY GROUNDS FOR THIS.  I HAVE THE

08:48AM 24  DOCUMENT IN FRONT OF ME, AND I WILL APPROVE THIS, AND I WILL

08:48AM 25  SIGN THIS, AND THIS WILL BE ON FILE TODAY.

08:48AM 1      MR. LEACH:  THANK YOU, YOUR HONOR.

08:48AM 2      THE COURT:  THANK YOU.

08:48AM 3      I WANT TO TURN NEXT TO AN ISSUE THAT WAS JUST RAISED THIS

08:48AM 4  MORNING TO ME.  I WAS SHARED AN EMAIL FROM THE COURT'S MEDIA

08:48AM 5  COORDINATOR AND THE COURT'S MEDIA COORDINATOR APPARENTLY

08:48AM 6  MONITORED ON SOMETHING CALLED "LAW 360," A TWITTER FEED FROM AN

08:49AM 7  INDIVIDUAL.

08:49AM 8      I'LL JUST READ THE QUOTE:  "THE WOMAN BEHIND ME WHO GREW

08:49AM 9  UP IN NJ IS A SPECTATOR," QUOTE, "'DON'T FORGET THE ME TOO

08:49AM 10  MOVEMENT,'" END QUOTE, "SHE SHOUTS AS JURORS WAIT TO GO THROUGH

08:49AM 11  SECURITY.

08:49AM 12      "A MAN IN A SUIT BEHIND HER TELLS HER TO BE QUIET BECAUSE

08:49AM 13  SHE COULD CAUSE A MISTRIAL.

08:49AM 14      "'THIS MAY BE HER ONLY DAY ATTENDING COURT,' SHE REPLIES."

08:49AM 15      THIS WAS FORWARDED FROM OUR MEDIA COORDINATOR, AND I

08:49AM 16  PRESUME YOU READ IT OFF OF THE TWITTER FEED.

08:49AM 17      LET ME JUST STATE THAT ANYONE WHO INTERFERES WITH A JUROR,

08:49AM 18  A SITTING JUROR IN A CASE RISKS INVESTIGATION FOR TAMPERING

08:49AM 19  WITH THE JURY AND THE COURT PROCESS, AND THAT COULD RESULT IN

08:49AM 20  AN INVESTIGATION BY THE COURT, AND THE COURT COULD ORDER AN

08:50AM 21  INVESTIGATION.

08:50AM 22      SO, COUNSEL, I JUST WANT TO TELL YOU, AND I THINK YOU'RE

08:50AM 23  AWARE OF THIS, IF ANYONE DOES INTERFERE OR ATTEMPT TO INTERFERE

08:50AM 24  WITH A JUROR, ANY OF THE JURORS, I'D LIKE IT TO BE BROUGHT TO

08:50AM 25  MY ATTENTION, PLEASE, AND I'LL TAKE WHATEVER ACTION I FEEL IS

08:50AM 1    APPROPRIATE.

08:50AM 2         SO THANK YOU FOR THAT.

08:50AM 3         ANYTHING FURTHER ON THAT?

08:50AM 4              MR. SCHENK:  NO.  THANK YOU, YOUR HONOR.

08:50AM 5              THE COURT:  MR. DOWNEY, ANYTHING?  MR. WADE?  SORRY.

08:50AM 6              MR. WADE:  NO, YOUR HONOR.

08:50AM 7              THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

08:50AM 8         NEXT I'D LIKE TO TAKE UP A QUESTION ABOUT JUROR NUMBER 12.

08:50AM 9    AND I BELIEVE MS. KRATZMANN SHARED SOME EMAILS THAT JUROR

08:50AM 10   NUMBER 12 SENT TO HER.  THERE'S A QUESTION ABOUT -- NOT A

08:50AM 11   QUESTION, BUT SHE HAD INDICATED THAT SHE HAD PREVIOUSLY WORKED

08:50AM 12   AT KPMG FROM MAY UNTIL OCTOBER IN 2012 AS AN ADMINISTRATIVE

08:51AM 13   ASSISTANT FOR A NUMBER OF PARTNERS.  SHE INDICATES SHE WAS

08:51AM 14   NEVER EXPOSED TO ANY INFORMATION OR MATERIAL REGARDING THE

08:51AM 15   CASE.  SHE FOLLOWED UP -- THIS WAS SEPTEMBER 8TH, I BELIEVE.

08:51AM 16        ON SEPTEMBER 12TH SHE FOLLOWED UP WITH AN EMAIL

08:51AM 17   INDICATING THAT SHE HAD A VERY GOOD FRIEND WHO WORKED AT KPMG

08:51AM 18   FOR 20-PLUS YEARS, HOWEVER, SHE WAS NOT IN A ROLE THAT WOULD

08:51AM 19   REVEAL ANY INFORMATION OR GAIN KNOWLEDGE OF ANY CASE OR

08:51AM 20   CLIENTS.  SHE APPARENTLY IS A SENIOR REPRESENTATIVE OFFICE

08:51AM 21   SERVICES.  THAT WAS RECEIVED.

08:51AM 22        THE OTHER EMAIL THAT WAS RECEIVED FROM THIS WITNESS, OR

08:51AM 23   EXCUSE ME, JUROR ON SEPTEMBER 7TH THE JUROR E-MAILED

08:51AM 24   MS. KRATZMANN ABOUT A QUESTION AND SHE HAD A QUESTION ABOUT

08:51AM 25   WHETHER OR NOT THE JURY WOULD BE RESPONSIBLE FOR POTENTIAL

08:52AM 1    SENTENCING PHASE IN THE CASE.

08:52AM 2        I THINK WE SHARED THAT WITH COUNSEL, THOSE EMAILS WITH

08:52AM 3    COUNSEL.

08:52AM 4        DO YOU HAVE THOSE?

08:52AM 5            MR. SCHENK:  YES.  YES, YOUR HONOR.

08:52AM 6            MR. DOWNEY:  YES, YOUR HONOR.

08:52AM 7            THE COURT:  THANK YOU.

08:52AM 8        MY THOUGHT WAS TO -- EXCUSE ME, IS TO BRING THIS JUROR OUT

08:52AM 9    THIS MORNING, OUTSIDE OF THE PRESENCE OF THE OTHER JURORS, AND

08:52AM 10   MAKE SOME INQUIRIES ABOUT THESE EMAILS.  I'LL ALLOW COUNSEL TO

08:52AM 11   ASK QUESTIONS IF YOU FEEL IT'S APPROPRIATE AS WELL.

08:52AM 12       ANY OBJECTION TO THAT PROCESS?

08:52AM 13           MR. SCHENK:  NO, YOUR HONOR.

08:52AM 14           MR. DOWNEY:  NO, YOUR HONOR.

08:52AM 15           THE COURT:  ALL RIGHT.  THANK YOU.

08:52AM 16       LET'S BRING JUROR NUMBER 12 OUT THEN.

08:52AM 17       COUNSEL, WHILE THAT IS HAPPENING, MY THOUGHT WAS I WOULD

08:52AM 18   READ, AFTER OUR DISCUSSION, I THINK I WILL READ TO THE JURY

08:52AM 19   ONCE THEY COME IN NINTH CIRCUIT MODEL INSTRUCTION 7.4, WHICH IS

08:52AM 20   THE JURY CONSIDERATION OF PUNISHMENT.

08:52AM 21       AS YOU RECALL IN MY VOIR DIRE, AND I BELIEVE ALSO IN MY

08:52AM 22   PRELIMINARY INSTRUCTIONS, I INSTRUCTED THE JURY THAT THEY ARE

08:52AM 23   NOT TO CONSIDER PUNISHMENT AT ALL, BUT I THOUGHT OUT OF AN

08:53AM 24   ABUNDANCE OF CAUTION I'LL READ THAT TO THEM.

08:53AM 25       AND LET ME INDICATE THAT I HAVE EDITED 7.4.  I HAVE LOOKED

| | | |
|---|---|---|
| 08:53AM | 1 | AT THE SUBMISSION OF BOTH PARTIES IN YOUR JURY INSTRUCTIONS, |

08:53AM  1   AT THE SUBMISSION OF BOTH PARTIES IN YOUR JURY INSTRUCTIONS,

08:53AM  2   AND I'VE EDITED ACCORDING TO MS. HOLMES'S EDITS.  I'LL PASS YOU

08:53AM  3   DOWN THIS, AND YOU CAN LOOK AT IT.

08:53AM  4       KYLE, DO YOU WANT TO HAND THESE (HANDING).

08:53AM  5       THANK YOU.

08:53AM  6       GIVE ONE TO IRENE.

08:54AM  7       ANY COMMENT ON 7.4 AS I'VE EDITED IT?

08:54AM  8           MR. DOWNEY:  THAT INSTRUCTION IS FINE WITH THE

08:54AM  9   DEFENSE.

08:54AM  10          MR. LEACH:  YOUR HONOR, I DON'T HAVE THE BENEFIT OF

08:54AM  11  THE MODEL IN FRONT OF ME, BUT THIS INSTRUCTION IS FINE.

08:54AM  12      THE GOVERNMENT -- BEFORE THE FINAL INSTRUCTIONS IS GIVEN

08:54AM  13  WE WOULD LIKE TO LOOK AT IT ONE MORE TIME, BUT FOR PURPOSES OF

08:54AM  14  TODAY WE HAVE NO OBJECTION.

08:54AM  15          THE COURT:  ALL RIGHT.  THANK YOU.

08:54AM  16      (JUROR NUMBER 12 PRESENT.)

08:55AM  17          THE COURT:  GOOD MORNING.

08:55AM  18          JUROR:  GOOD MORNING.

08:55AM  19          THE COURT:  PLEASE BE SEATED, LADIES AND GENTLEMEN.

08:55AM  20      WE HAVE JUROR NUMBER 12 OUTSIDE OF THE PRESENCE OF THE

08:55AM  21  OTHER JURORS.

08:55AM  22      FIRST, BEFORE WE DO ANYTHING ELSE, I DO WANT TO ASK YOU

08:55AM  23  SOME QUESTIONS ABOUT SOME EMAILS THAT YOU SENT TO

08:55AM  24  MS. KRATZMANN.

08:55AM  25          BUT BEFORE I DO THAT, I DO WANT TO ASK YOU A QUESTION THAT

08:55AM 1    I'M GOING TO ASK YOUR COLLEAGUES IN JUST A MOMENT WHEN THEY

08:55AM 2    JOIN US, AND THAT IS THAT I'D LIKE TO KNOW WHETHER OR NOT,

08:55AM 3    SINCE OUR LAST IN-COURT APPEARANCE, SINCE YOUR LAST IN-COURT

08:55AM 4    APPEARANCE, WHETHER OR NOT YOU'VE SEEN, HEARD, READ, OR BEEN

08:55AM 5    SUBJECT TO ANY TYPE OF MEDIA OR CONVERSATION ABOUT THIS CASE OR

08:55AM 6    ANYTHING TO DO WITH IT?

08:55AM 7         HAVE ANY OF THOSE THINGS HAPPENED?

08:55AM 8              JUROR:  NO, NOT REALLY.

08:55AM 9              THE COURT:  SO I NEED TO INQUIRE.  WHEN YOU SAY "NOT

08:55AM 10   REALLY," TELL ME WHAT?

08:55AM 11             JUROR:  SO BEFORE I WAS SELECTED I HAD MENTIONED TO

08:55AM 12   A FRIEND THAT I WAS UP FOR JURY DUTY.  I NEVER MENTIONED WHAT

08:55AM 13   CASE IT WAS, BUT I GUESS THEY KIND OF FIGURED IT OUT, AND WHEN

08:56AM 14   THEY ASKED ME I DIDN'T CONFIRM OR DENY.

08:56AM 15        THURSDAY I GOT A TEXT FROM MY FRIEND'S WIFE ASKING ME IF I

08:56AM 16   WAS OKAY, AND I THOUGHT THAT WAS KIND OF WEIRD.  SO LATER HE

08:56AM 17   CALLED ME AND HE ASKED ME IF I WAS OKAY.  AND HE SAID THAT ON

08:56AM 18   THE NEWS THAT THERE WAS SOMETHING ABOUT -- I HAD MENTIONED, NO,

08:56AM 19   I DIDN'T HAVE COURT TODAY.

08:56AM 20        AND HE SAID, YEAH, I KNOW.

08:56AM 21        AND I SAID, WELL, HOW DO YOU KNOW?

08:56AM 22        AND HE SAID IT WAS ON THE NEWS.

08:56AM 23        I SAID DON'T TELL ME ANYTHING ABOUT IT, AND THEY DIDN'T

08:56AM 24   MENTION IT TO US SO THERE MUST BE SOME REASON WE DON'T KNOW.

08:56AM 25   SO THAT WAS IT.

08:56AM 1          THE COURT:  OH, I SEE.

08:56AM 2          JUROR:  BUT I DIDN'T SEE -- I DON'T WATCH THE LOCAL

08:56AM 3    NEWS BECAUSE OF THIS.

08:56AM 4          THE COURT:  OKAY.

08:56AM 5          JUROR:  AND THEY DON'T MENTION IT ON CABLE NEWS.

08:56AM 6          THE COURT:  OH, OKAY.  ALL RIGHT.

08:56AM 7       SO IN REGARDS TO WHETHER OR NOT YOU'VE SEEN, HEARD, OR

08:56AM 8    READ ANYTHING, COMMUNICATED YOURSELF OR ANYONE TO YOU ABOUT

08:56AM 9    THIS CASE, IS THAT ANSWER NO?

08:56AM 10          JUROR:  THE ANSWER IS NO.  YES.

08:56AM 11          THE COURT:  ALL RIGHT.  THANK YOU.

08:56AM 12       LET ME ASK COUNSEL IF THEY HAVE QUESTIONS FOR YOU ABOUT

08:57AM 13    THIS TOPIC?

08:57AM 14          MR. SCHENK:  NO, YOUR HONOR.  THANK YOU.

08:57AM 15          MR. DOWNEY:  NOTHING FROM US.

08:57AM 16          THE COURT:  ALL RIGHT.  THANK YOU.

08:57AM 17       I'D LIKE TO MOVE TO A COUPLE OF OTHER TOPICS AND THEY

08:57AM 18    INVOLVE KPMG.

08:57AM 19          JUROR:  UH-HUH.

08:57AM 20          THE COURT:  AND I THINK YOU SENT AN EMAIL TO

08:57AM 21    MS. KRATZMANN ABOUT YOUR CONNECTION WITH KPMG.

08:57AM 22          JUROR:  RIGHT.

08:57AM 23          THE COURT:  AND I HAVE THOSE IN FRONT OF ME HERE,

08:57AM 24    AND I KNOW YOU DON'T.  AND I'M AT A BIT OF AN ADVANTAGE.

08:57AM 25       I THINK YOU TOLD MS. KRATZMANN THAT IN MAY TO OCTOBER OF

08:57AM 1    2012 YOU WORKED AS AN ADMINISTRATIVE ASSISTANT THERE?

08:57AM 2              JUROR:  CORRECT.

08:57AM 3              THE COURT:  AND I THINK YOU TOLD MS. KRATZMANN THAT

08:57AM 4    YOU WERE NEVER EXPOSED TO ANY INFORMATION OR MATERIAL IN THIS

08:57AM 5    CASE?

08:57AM 6              JUROR:  CORRECT.

08:57AM 7              THE COURT:  AND WHAT WERE THE SCOPE OF YOUR DUTIES

08:57AM 8    THERE DURING YOUR EMPLOYMENT?

08:57AM 9              JUROR:  IT WAS, YOU KNOW, MAINLY DOING EXPENSES AND

08:57AM 10   CALENDAR MANAGING, AND JUST ADMINISTRATIVE SUPPORT, BASIC

08:57AM 11   SUPPORT.

08:57AM 12             THE COURT:  OKAY.  WERE YOU INVOLVED AT ALL IN ANY

08:57AM 13   OF THE WORK THAT ANY OF THE PARTNERS DID OR ANY OF THE

08:58AM 14   EMPLOYEES DID, THAT IS, ANY OF THE FINANCIAL WORK THAT THEY

08:58AM 15   DID?

08:58AM 16             JUROR:  OTHER THAN EXPENSES.

08:58AM 17             THE COURT:  OKAY.  AND TELL ME A LITTLE BIT ABOUT

08:58AM 18   THAT.  WERE YOU RECONCILING THE EXPENSES OR COORDINATING THOSE

08:58AM 19   IN SOME FASHION?

08:58AM 20             JUROR:  FOR THEIR REIMBURSEMENT, YES.

08:58AM 21             THE COURT:  I SEE.

08:58AM 22             JUROR:  OR PAYMENT OF THE CARD.

08:58AM 23             THE COURT:  I SEE.  SO IT WAS A COMPANY CREDIT CARD

08:58AM 24   THAT WAS USED?

08:58AM 25             JUROR:  CORRECT, IN MOST CASES.

08:58AM 1          THE COURT:  OKAY.  AND THEN WHAT WOULD YOU DO?  WHAT

08:58AM 2     WAS YOUR JOB IN THAT REGARD?  WHAT DID YOU DO?

08:58AM 3          JUROR:  SO BASICALLY IT WAS MANAGING THE CALENDARS.

08:58AM 4     AND, GOSH, IT'S BEEN A WHILE.  I DON'T REMEMBER MORE SPECIFICS,

08:58AM 5     BUT BASIC ADMINISTRATIVE SUPPORT, ANYTHING THAT THEY MAY HAVE

08:58AM 6     NEEDED AS FAR AS, YOU KNOW, COPIES OR EMAILS OR PHONE CALLS

08:58AM 7     OR --

08:58AM 8          THE COURT:  I SEE.  OKAY.

08:58AM 9          JUROR:  A LOT OF EXPENSING.

08:58AM 10          THE COURT:  OKAY.  AND YOU WERE -- WERE YOU JUST

08:58AM 11     MATCHING FIGURES?  I SAY JUST, PARDON ME.

08:59AM 12          JUROR:  YES.

08:59AM 13          THE COURT:  YOU WERE MATCHING THE REQUESTS WITH THE

08:59AM 14     RECEIPTS, THAT TYPE OF THING?

08:59AM 15          JUROR:  CORRECT.

08:59AM 16          THE COURT:  AND WERE YOU INVOLVED AT ALL IN ANY OF

08:59AM 17     THE AUDITING WORK OR ANYTHING THAT --

08:59AM 18          JUROR:  NO.  NO.  JUST PROCESSING ENGAGEMENT LETTERS

08:59AM 19     AND WHATEVER.  BUT NOTHING THAT I RECALL SPECIFICS AT ALL,

08:59AM 20     ESPECIALLY AT THIS POINT.

08:59AM 21          THE COURT:  SURE.

08:59AM 22      AND THEN YOU FOLLOWED UP INDICATING THAT YOU HAVE A GOOD

08:59AM 23     FRIEND WHO HAS WORKED THERE AT KPMG FOR 20 YEARS AND SHE'S NOT

08:59AM 24     IN A ROLE THAT WOULD REVEAL TO HER ANY INFORMATION?

08:59AM 25          JUROR:  CORRECT.

08:59AM 1          THE COURT:  TELL US ABOUT THAT.

08:59AM 2          JUROR:  SO SHE WORKED IN REPROGRAPHICS FOR MANY

08:59AM 3   BEING MANY, MANY YEARS AND JUST RECENTLY NOW SHE'S IN SOME SORT

08:59AM 4   OF SERVICE ROLE.

08:59AM 5          THE COURT:  I THINK YOU SAID SENIOR REPRESENTATIVE

08:59AM 6   OFFICER.

08:59AM 7          JUROR:  YES.

08:59AM 8          THE COURT:  RIGHT.  AND DO YOU TALK TO HER ABOUT HER

08:59AM 9   WORK OR ANYTHING?

08:59AM 10         JUROR:  NOT LIKE -- MORE OF A GOSSIPY KIND OF THING

09:00AM 11  RATHER THAN SPECIFICS ABOUT ANYTHING WORK RELATED.

09:00AM 12         THE COURT:  DID ANY OF THE GOSSIP, AND PARDON ME,

09:00AM 13  BUT DID ANY OF THAT TOUCH ON THIS CASE?

09:00AM 14         JUROR:  NO.  SHE DOESN'T EVEN KNOW I'M ON THIS JURY.

09:00AM 15         THE COURT:  I SEE.

09:00AM 16         JUROR:  SO I'VE TALKED TO NO ONE ELSE EXCEPT THIS

09:00AM 17  ONE PARTICULAR COUPLE BEFORE I GOT, YOU KNOW, PLACED ON JURY

09:00AM 18  DUTY.

09:00AM 19         THE COURT:  RIGHT.

09:00AM 20         JUROR:  AND JUST HAPPENED TO MENTION JURY DUTY

09:00AM 21  PERIOD AND NOT ANYTHING OTHER THAN THAT SPECIFICALLY.

09:00AM 22         THE COURT:  OKAY.

09:00AM 23         JUROR:  SO NO ONE ELSE REALLY KNOWS.

09:00AM 24         THE COURT:  OKAY.  IS THERE ANYTHING ABOUT YOUR --

09:00AM 25  AND YOU RAISE THIS.  I THINK WE HEARD SOME TESTIMONY AND THAT

09:00AM 1    COMPANY'S NAME CAME UP LAST WEEK KPMG I THINK.

09:00AM 2              JUROR:  OH, YES, THAT'S WHY I BROUGHT IT TO HER

09:00AM 3    ATTENTION.

09:00AM 4              THE COURT:  RIGHT.  AND THANK YOU FOR DOING THAT.  I

09:00AM 5    APPRECIATE YOUR ATTENTION TO YOUR RESPONSIBILITIES.

09:00AM 6         IS THERE ANYTHING ABOUT YOUR FORMER EMPLOYMENT AND THE

09:00AM 7    FACT THAT YOU KNOW YOUR FRIEND WHO WORKS AT THIS KPMG, ANYTHING

09:01AM 8    ABOUT THAT WILL AFFECT YOUR ABILITY TO CONTINUE TO BE FAIR AND

09:01AM 9    IMPARTIAL AS YOU SIT AS A JUROR?

09:01AM 10             JUROR:  NO.  LIKE I SAY, SHE HAS NO IDEA THAT I'M

09:01AM 11   EVEN ON THE JURY.

09:01AM 12             THE COURT:  OKAY.

09:01AM 13             JUROR:  AND EVEN IF SHE DID, I THINK SHE HAS NO

09:01AM 14   INFORMATION WHATSOEVER.

09:01AM 15             THE COURT:  OKAY.

09:01AM 16             JUROR:  PLUS I DON'T TELL ANYBODY SO IT DOESN'T COME

09:01AM 17   UP SO I DON'T, YOU KNOW, FOR LACK OF A BETTER WAY OF DESCRIBING

09:01AM 18   IT, BECOME COMFORTABLE TALKING ABOUT IT.  SO I JUST DON'T EVEN

09:01AM 19   BRING IT UP TO ANYBODY.

09:01AM 20             THE COURT:  WELL, THANK YOU.  AND THANK YOU FOR

09:01AM 21   FOLLOWING MY ORDER IN THAT REGARD.  I APPRECIATE IT.  THANK

09:01AM 22   YOU.

09:01AM 23        I'M GOING TO TURN TO THESE LAWYERS AND SEE IF THEY HAVE

09:01AM 24   ANY QUESTIONS FOR YOU.

09:01AM 25             MR. SCHENK:  NOTHING FURTHER.

09:01AM 1              MR. DOWNEY:  NO, YOUR HONOR.  I APPRECIATE IT BEING

09:01AM 2 BROUGHT TO OUR ATTENTION, BUT I DON'T HAVE ANY QUESTIONS.

09:01AM 3              THE COURT:  ALL RIGHT.  THANK YOU.

09:01AM 4       I DO WANT TO ASK YOU ABOUT YOUR EMAIL, ONE OTHER ISSUE,

09:01AM 5 AND YOU INDICATED TO MS. KRATZMANN THAT YOU HAD A QUESTION THAT

09:01AM 6 YOU THOUGHT OF OVER THE WEEKEND.  EXCUSE ME.

09:01AM 7       AND YOUR QUESTION WAS, "I DON'T KNOW IF WE WILL HAVE

09:01AM 8 FURTHER OPPORTUNITIES TO TALK WITH YOU ONCE THE TRIAL BEGINS.

09:02AM 9       "MY QUESTION IS, WILL WE ALSO BE RESPONSIBLE FOR THE

09:02AM 10 (POTENTIAL) SENTENCING PHASE OF THIS TRIAL OR IS IT ALREADY

09:02AM 11 PREDETERMINED BASED ON THE CHARGES."

09:02AM 12       AND THEN YOU ENDED SAYING "YOU CAN BCC EVERYONE WITH YOUR

09:02AM 13 ANSWER IF APPROPRIATE."

09:02AM 14       SO LET ME ASK YOU ABOUT THAT QUESTION.

09:02AM 15              JUROR:  WELL, TRIALS THAT I'VE SEEN ON T.V.

09:02AM 16 SOMETIMES HAVE A SENTENCING PHASE THAT THE JURY IS RESPONSIBLE

09:02AM 17 FOR, SO I JUST WANTED TO KNOW BECAUSE YOU GAVE A TIMEFRAME AND

09:02AM 18 THEN THAT WAS FOR, YOU KNOW, THE ANTICIPATION OF THE JURY

09:02AM 19 TIMELINE, AND THEN, OF COURSE, WE WOULD HAVE THE DELIBERATION

09:02AM 20 PHASE, AND THEN ONCE THAT'S OVER, THEN THERE WOULD BE, I WOULD

09:02AM 21 GUESS, I WASN'T SURE IF THERE WOULD BE A SENTENCING PHASE SO I

09:02AM 22 WAS KIND OF TRYING TO TIME OUT IF THAT WAS THE CASE HOW MUCH

09:02AM 23 TIME THAT WOULD INVOLVE.

09:03AM 24              THE COURT:  I SEE.

09:03AM 25              JUROR:  IF THERE WAS GOING TO BE AN EXTENDED TIME

09:03AM 1    BEYOND THE 13, 14 WEEKS THAT IS ANTICIPATED FOR THE TRIAL.

09:03AM 2              THE COURT:  OKAY.  I SEE.  ALL RIGHT.

09:03AM 3       DO YOU RECALL ME TELLING YOU AND YOUR COLLEAGUE JURORS

09:03AM 4    THAT THE JURY IS NOT TO CONSIDER SENTENCING, THAT'S NOT

09:03AM 5    SOMETHING THAT THEY SHOULD CONSIDER?

09:03AM 6              JUROR:  I DON'T RECALL.

09:03AM 7              THE COURT:  OKAY.  ALL RIGHT.

09:03AM 8       AND LET ME ASK A FOLLOW-UP.  YOU SAID "YOU CAN BCC

09:03AM 9    EVERYONE."  I ASSUME THAT MEANS THAT THE EMAIL WAS SENT BY

09:03AM 10   MS. KRATZMANN TO THE ENTIRE JURY?

09:03AM 11             JUROR:  YEAH.  SHE WANTED TO -- IN CASE SOMEBODY

09:03AM 12   ELSE HAD THAT QUESTION IN THEIR MIND, IF SHE WANTED TO SHARE

09:03AM 13   THAT ANSWER WITH THE REST OF THE JURY, THEN I DIDN'T HAVE ANY

09:03AM 14   OBJECTION TO THAT.

09:03AM 15             THE COURT:  I SEE.

09:03AM 16             JUROR:  OF COURSE NOT IT BEING ADDRESSED FROM ME BUT

09:03AM 17   FROM HER.

09:03AM 18             THE COURT:  RIGHT.  RIGHT.

09:03AM 19      LET ME ASK YOU, HAVE YOU TALKED WITH ANY OF YOUR FELLOW

09:03AM 20   JURORS ABOUT THAT QUESTION?

09:03AM 21             JUROR:  NO.

09:03AM 22             THE COURT:  THAT DIDN'T COME UP?

09:03AM 23             JUROR:  NO.  I FIGURED SHE DIDN'T ADDRESS IT SO I

09:04AM 24   WASN'T GOING TO BRING IT UP MYSELF.

09:04AM 25             THE COURT:  OKAY.  ALL RIGHT.

09:04AM 1          SO IF I TOLD YOU THIS MORNING THAT IN ANSWER TO YOUR

09:04AM 2    QUESTION THAT THE JURY IS NOT TO BE INVOLVED AT ALL, WON'T BE

09:04AM 3    INVOLVED AT ALL IN SENTENCING, ASSUMING THERE IS A SENTENCING,

09:04AM 4    THAT IS SOLELY IN THE PROVINCE OF THE COURT, YOU WOULD RESPECT

09:04AM 5    THAT?

09:04AM 6          JUROR:  OH, OF COURSE.

09:04AM 7          THE COURT:  AND YOU WOULD NOT CONSIDER PUNISHMENT AT

09:04AM 8    ALL DURING YOUR DELIBERATIONS?

09:04AM 9          JUROR:  NO.

09:04AM 10         THE COURT:  OKAY.  AND I JUST WANT TO EMPHASIZE

09:04AM 11   SOMETHING.  I TALKED ABOUT -- DO YOU REMEMBER ME TALKING ABOUT

09:04AM 12   THE PRESUMPTION OF INNOCENCE?

09:04AM 13         JUROR:  OH, OF COURSE.

09:04AM 14         THE COURT:  AND YOU UNDERSTAND THAT CARRIES

09:04AM 15   THROUGHOUT THE TRIAL THROUGH YOUR DELIBERATIONS?

09:04AM 16         JUROR:  YES.

09:04AM 17         THE COURT:  AND THE PURPOSE OF THE DELIBERATIONS IS

09:04AM 18   TO DETERMINE WHETHER OR NOT THE GOVERNMENT HAS MET THEIR

09:04AM 19   BURDEN.

09:04AM 20        I DON'T WANT TO GO INTO IT WITH YOU WHAT WE TALKED ABOUT

09:04AM 21   LAST WEEK, BUT IT'S IMPORTANT.  YOU UNDERSTAND ALL OF THAT?

09:04AM 22         JUROR:  I DO.  THANK YOU FOR CLARIFYING.

09:04AM 23         THE COURT:  OF COURSE.

09:04AM 24        WHAT I'M GOING TO DO IS TO READ THE INSTRUCTION AGAIN TO

09:05AM 25   YOU AND YOUR COLLEAGUES AGAIN JUST TO MAKE SURE THAT THERE'S

09:05AM 1    CLARITY ON THAT.

09:05AM 2              JUROR:  OKAY.

09:05AM 3              THE COURT:  LET ME TURN IT OVER TO COUNSEL AND SEE

09:05AM 4    IF THEY HAVE SOME QUESTIONS FOR YOU.

09:05AM 5              MR. SCHENK:  NOTHING FURTHER.  THANK YOU.

09:05AM 6              MR. DOWNEY:  NOTHING FROM US, YOUR HONOR.

09:05AM 7              THE COURT:  ALL RIGHT.  THANK YOU.

09:05AM 8         THANK YOU VERY MUCH FOR SPENDING TIME WITH ME THIS

09:05AM 9    MORNING.  I APPRECIATE IT.

09:05AM 10             JUROR:  OF COURSE.

09:05AM 11             THE COURT:  SO WE'RE GOING TO -- WELL, LET'S SEE.

09:05AM 12   WHY DON'T WE HAVE YOU GO BACK.  COULD WE BRING EVERYONE OUT

09:05AM 13   NOW?  IS EVERYONE READY TO PROCEED?

09:05AM 14             MR. SCHENK:  YES, YOUR HONOR.

09:05AM 15             THE CLERK:  I'M MISSING JUROR NUMBER 2.  I DON'T

09:05AM 16   KNOW IF HE'S HERE.

09:05AM 17             THE COURT:  LET'S HAVE YOU GO BACK FOR A MOMENT, AND

09:05AM 18   MS. KRATZMANN WILL ESCORT YOU BACK TO THE JURY ROOM.

09:05AM 19             JUROR:  OF COURSE.

09:05AM 20             THE COURT:  THANK YOU FOR YOUR CANDOR THIS MORNING.

09:05AM 21   WE APPRECIATE.  THANK YOU.

09:05AM 22             JUROR:  OF COURSE.  YOU'RE WELCOME.

09:05AM 23        (PROCEEDINGS HELD OUT OF THE PRESENCE OF JUROR NUMBER 12.)

09:05AM 24             THE COURT:  ALL RIGHT.  PLEASE BE SEATED.

09:05AM 25        I'M INFORMED THAT JUROR NUMBER 2 HAD NOT ARRIVED YET SO

09:05AM  1    WE'LL GIVE THIS A MOMENT.

09:07AM  2         (PAUSE IN PROCEEDINGS.)

09:07AM  3         THE COURT:  I'M GOING TO STEP DOWN AND SEE WHAT IS

09:07AM  4    GOING ON HERE.  HOPEFULLY WE CAN START IN JUST A MOMENT.

09:07AM  5         THAT DID IT.

09:10AM  6         (JURY IN AT 9:10 A.M.)

09:10AM  7         THE COURT:  PLEASE BE SEATED.  THANK YOU.

09:10AM  8    THE RECORD SHOULD REFLECT THAT OUR JURY AND ALTERNATES ARE

09:10AM  9    NOW IN THE COURTROOM.

09:10AM  10        GOOD MORNING EVERYONE.  BEFORE WE GO FURTHER, I SEE

09:10AM  11   ALTERNATE JUROR NUMBER 1, MR. BEDNAR, SIR.  I'M GOING TO ASK

09:10AM  12   YOU TO STAND UP, AND WE'RE GOING TO ASK YOU TO SIT IN JUROR

09:10AM  13   NUMBER 7'S SEAT.

09:10AM  14        WE EXCUSED A JUROR, AND SO ALTERNATE NUMBER 1, MR. BEDNAR,

09:10AM  15   WILL NOW REPLACE JUROR NUMBER 7 AS A DELIBERATING JUROR.

09:11AM  16        THANK YOU, SIR.

09:11AM  17        AND OUR ALTERNATES CAN SCOOT OVER AND MAKE YOURSELF

09:11AM  18   COMFORTABLE, AND WE'LL CONTINUE WITH OUR TRIAL.

09:11AM  19        ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

09:11AM  20   OUR JURY IS PRESENT.

09:11AM  21        BEFORE I ASK THE GOVERNMENT IF THEY HAVE ADDITIONAL

09:11AM  22   EXAMINATION OF A WITNESS, I DO WANT TO INQUIRE OF OUR JURY AND

09:11AM  23   OUR ALTERNATES A QUESTION THAT I TOLD YOU I WOULD ASK EACH TIME

09:11AM  24   WE WOULD START EACH DAY, AND THAT IS THAT IT'S IMPORTANT THAT

09:11AM  25   YOU DECIDE THE CASE SOLELY, THIS CASE, SOLELY ON THE EVIDENCE

09:11AM 1    AND THE LAW PRESENTED IN THE COURTROOM.  SO YOU MUST NOT LEARN

09:11AM 2    ANY INFORMATION ABOUT THIS CASE FROM SOURCES OUTSIDE OF THE

09:11AM 3    COURTROOM TO ENSURE FAIRNESS TO ALL PARTIES IN THE TRIAL.

09:11AM 4        I'LL NOW ASK YOU WHETHER OR NOT ANY OF YOU HAVE LEARNED

09:11AM 5    ABOUT OR SHARED INFORMATION ABOUT THIS CASE OUTSIDE OF THE

09:11AM 6    COURTROOM EVEN IF IT WAS ACCIDENTAL?

09:12AM 7        IF ANY OF YOU THINK YOU MAY HAVE DONE SO, WOULD YOU PLEASE

09:12AM 8    RAISE YOUR HAND AND LET US KNOW THAT.

09:12AM 9        I SEE NO HANDS.

09:12AM 10       THANK YOU VERY MUCH, LADIES AND GENTLEMEN.  I APPRECIATE

09:12AM 11   YOUR ATTENTION, CONTINUED ATTENTION TO THIS.

09:12AM 12       LET ME ALSO JUST FOR A MATTER OF COMFORT FOR A COUPLE OF

09:12AM 13   OUR JURORS, JUROR NUMBER 11 AND JUROR NUMBER 9, THOSE OF YOU

09:12AM 14   WHO ARE IN THE OUTSIDE SEATS, I THINK THOSE SEATS WILL RAISE IF

09:12AM 15   THAT'S HELPFUL TO YOU.  I DON'T KNOW IF YOU'VE FIGURED THAT

09:12AM 16   OUT, BUT IF YOU WOULD LIKE TO RAISE THE SEATING, I THINK

09:12AM 17   THERE'S A BUTTON ON IT THAT WOULD ALLOW YOU TO DO THAT IF YOU

09:12AM 18   WISH.

09:12AM 19       ALSO, IF ANY JUROR HAS ANY DIFFICULTY EITHER SEEING OR

09:12AM 20   HEARING ANY OF THE TESTIMONY, PLEASE RAISE YOUR HAND, LET ME

09:12AM 21   KNOW, AND WE'LL TRY TO CORRECT THAT.  SO THANK YOU VERY MUCH.

09:12AM 22       MR. LEACH, DO YOU HAVE A CONTINUING EXAMINATION?

09:12AM 23           MR. LEACH:  WE DO, YOUR HONOR.  THANK YOU.

09:12AM 24           THE COURT:  ALL RIGHT.  THANK YOU.

09:12AM 25       LET'S ASK THE WITNESS TO PLEASE COME IN.

09:13AM 1    ONE THING I DO WANT TO DO WHILE THAT'S HAPPENING, WE'LL

09:13AM 2  HAVE MS. SPIVEY TAKE THE SEAT AGAIN.  GOOD MORNING.

09:13AM 3    THE WITNESS:  GOOD MORNING.

09:13AM 4    THE COURT:  PLEASE HAVE A SEAT.  IN JUST A MOMENT

09:13AM 5  I'M GOING TO ASK YOU TO STATE YOUR NAME.

09:13AM 6    LADIES AND GENTLEMEN OF THE JURY, I DO WANT TO -- I AM

09:13AM 7  GOING TO READ YOU AN INSTRUCTION AGAIN.  I WANT TO READ THIS

09:13AM 8  INSTRUCTION NOW.  I'VE HAD SOME CONVERSATION WITH COUNSEL, AND

09:13AM 9  I THINK IT APPROPRIATE FOR ME TO READ TO YOU AN INSTRUCTION.

09:13AM 10  YOU WILL RECEIVE FINAL INSTRUCTIONS AT THE END OF THE CASE, BUT

09:13AM 11  FOR NOW I'D LIKE TO READ THIS INSTRUCTION TO YOU.

09:13AM 12    THE PUNISHMENT PROVIDED BY LAW FOR THIS CRIME IS FOR THE

09:13AM 13  COURT TO DECIDE.  YOU MAY NOT CONSIDER PUNISHMENT IN DECIDING

09:13AM 14  WHETHER THE GOVERNMENT HAS PROVED ITS CASE AGAINST MS. HOLMES

09:14AM 15  BEYOND A REASONABLE DOUBT.

09:14AM 16    SO THANK YOU VERY MUCH, LADIES AND GENTLEMEN.

09:14AM 17    COUNSEL, DO YOU HAVE QUESTIONS?

09:14AM 18    COULD YOU STATE YOUR NAME AGAIN, PLEASE, FOR THE RECORD.

09:14AM 19    THE WITNESS:  SO HAN SPIVEY.

09:14AM 20    THE COURT:  THANK YOU.

09:14AM 21    **(GOVERNMENT'S WITNESS, SO HAN SPIVEY, WAS PREVIOUSLY**

09:14AM 22  **SWORN.)**

09:14AM 23    THE COURT:  I JUST WANT TO REMIND THE WITNESS,

09:14AM 24  YOU'RE STILL UNDER OATH, MS. SPIVEY.

09:14AM 25    DO YOU UNDERSTAND THAT?

09:14AM  1            THE WITNESS:  YES.

09:14AM  2            MR. LEACH:  THANK YOU SO MUCH, YOUR HONOR.

09:14AM  3            **DIRECT EXAMINATION (RESUMED)**

09:14AM  4    BY MR. LEACH:

09:14AM  5    Q.  MS. SPIVEY, WHEN WE WERE LAST HERE WE WERE DISCUSSING WHAT

09:14AM  6    HAD BEEN MARKED AS EXHIBIT 578 AND THERANOS'S BALANCE SHEET AND

09:14AM  7    INCOME STATEMENT FROM 2010 AND 2009.

09:14AM  8        DO YOU RECALL THAT TESTIMONY?

09:14AM  9    A.  YES.

09:14AM 10    Q.  I'D LIKE TO NOW DRAW YOUR ATTENTION TO WHAT HAS BEEN

09:14AM 11    MARKED AS EXHIBIT 615.

09:15AM 12        YOUR HONOR, I UNDERSTAND THE PARTIES STIPULATE TO THE

09:15AM 13    ADMISSION OF 615?

09:15AM 14            MR. WADE:  WE DO, YOUR HONOR.

09:15AM 15            THE COURT:  ALL RIGHT.  THANK YOU.

09:15AM 16        THIS IS EXHIBIT 615?

09:15AM 17            MR. LEACH:  YES, YOUR HONOR.

09:15AM 18            THE COURT:  ALL RIGHT.  THANK YOU.  SO THAT WILL BE

09:15AM 19    ADMITTED BY STIPULATION.  IT MAY BE PUBLISHED.

09:15AM 20        (GOVERNMENT'S EXHIBIT 615 WAS ADMITTED.)

09:15AM 21            MR. LEACH:  THANK YOU, YOUR HONOR.

09:15AM 22    Q.  IF I COULD PLEASE --

09:15AM 23        MS. HOLLIMAN, IF YOU WOULD ZOOM INTO THE TOP HALF OF THE

09:15AM 24    EMAIL.  WONDERFUL.

09:15AM 25        DO YOU SEE THIS EMAIL?

SPIVEY DIRECT EXAM BY MR. LEACH (RES.)                                    686

```
09:15AM   1    A.   YES.

09:15AM   2    Q.   AND TO REFRESH US, DANISE YAM WAS THE NAME YOU WERE USING

09:15AM   3    AT THE TIME THAT YOU WERE AT THERANOS AS THE CORPORATE

09:15AM   4    CONTROLLER?

09:15AM   5    A.   YES.

09:15AM   6    Q.   AND DO YOU SEE ELIZABETH HOLMES NAME IN THE TO LINE?

09:16AM   7    A.   YES.

09:16AM   8    Q.   THERE'S AN ATTACHMENT TO THIS EMAIL.  IT SAYS, FINANCIAL

09:16AM   9    STATEMENT ANALYSIS TEMPLATE-THERANOS.PDF; AND THEN FS 12/31/11.

09:16AM  10         DO YOU SEE THAT?

09:16AM  11    A.   YES.

09:16AM  12    Q.   AND WHAT DOES THAT 12/31/11 REFER TO?

09:16AM  13    A.   DECEMBER 31, 2011.

09:16AM  14    Q.   AND WHAT DOES FS REFER TO?

09:16AM  15    A.   FINANCIAL STATEMENTS.

09:16AM  16    Q.   AND ARE YOU PROVIDING FINANCIAL STATEMENTS FOR THE TIME

09:16AM  17    PERIOD 2011 TO MS. HOLMES DURING THIS EMAIL?

09:16AM  18    A.   YES.

09:16AM  19    Q.   IF WE COULD GO TO PAGE 4, MS. HOLLIMAN.  AND IF WE COULD

09:16AM  20    PLEASE ZOOM IN ON THE TOP PORTION OF THE DOCUMENT.

09:16AM  21         UP AT THE TOP, MS. SPIVEY, IT SAYS THERANOS INC. AND

09:16AM  22    SUBSIDIARY CONSOLIDATED STATEMENTS OF OPERATIONS.

09:17AM  23         DO YOU SEE THAT?

09:17AM  24    A.   YES.

09:17AM  25    Q.   AND WHAT IS THE CONSOLIDATED STATEMENTS OF OPERATIONS?
```

| | | |
|---|---|---|
| 09:17AM | 1 | A. THAT'S THE CONSOLIDATED STATEMENTS. |
| 09:17AM | 2 | Q. AND TO THE RIGHT THERE ARE TWO COLUMNS FOR 2011 AND 2012. |
| 09:17AM | 3 | WHAT DO THOSE CONVEY. |
| 09:17AM | 4 | I'M SORRY, 2011 AND 2010. WHAT DO THOSE COLUMNS CONVEY? |
| 09:17AM | 5 | A. THAT'S THE INCOME FOR THE YEAR OF 2010 AND 2011. |
| 09:17AM | 6 | Q. OKAY. AND DID YOU BELIEVE THAT YOU WERE PROVIDING |
| 09:17AM | 7 | ACCURATE INFORMATION TO THE DEFENDANT ABOUT THERANOS'S 2011 AND |
| 09:17AM | 8 | 2010 FINANCIAL STATEMENTS? |
| 09:17AM | 9 | A. YES. |
| 09:17AM | 10 | Q. THERE'S A LINE FOR REVENUE. |
| 09:17AM | 11 | DO YOU SEE THAT? |
| 09:17AM | 12 | A. YES. |
| 09:17AM | 13 | Q. WHAT IS REVENUE? |
| 09:17AM | 14 | A. THAT'S THE INCOME THAT THE COMPANY GETS FOR PROVIDING |
| 09:17AM | 15 | SERVICES. |
| 09:18AM | 16 | Q. AND WHAT WAS THERANOS'S REVENUE FOR 2010? |
| 09:18AM | 17 | A. $1,401,305. |
| 09:18AM | 18 | Q. AND THE REVENUE FOR 2011, WHAT WAS THAT? |
| 09:18AM | 19 | A. $518,248. |
| 09:18AM | 20 | Q. FURTHER DOWN IN THE INCOME STATEMENT THERE'S A LINE FOR |
| 09:18AM | 21 | NET LOSS. |
| 09:18AM | 22 | DO YOU SEE THAT? |
| 09:18AM | 23 | A. YES. |
| 09:18AM | 24 | Q. AND WHAT IS THE NET LOSS? |
| 09:18AM | 25 | A. THAT IS THE COMPANY THAT -- THAT'S THE MONEY THAT THE |

09:18AM  1    COMPANY LOST FOR THAT YEAR.

09:18AM  2    Q.   SO THE NET LOSS FOR 2011 IS APPROXIMATELY $27.66 MILLION?

09:18AM  3    A.   YES.

09:18AM  4    Q.   AND THE LOSS FOR 2010 WAS APPROXIMATELY $16.2 MILLION?

09:18AM  5    A.   YES.

09:19AM  6    Q.   IF WE COULD GO TO PAGE 3, PLEASE.

09:19AM  7         AND IF WE CAN ZOOM IN, PLEASE, MS. HOLLIMAN ON THE TEXT ON

09:19AM  8    PAGE 3 ALL OF THE WAY DOWN TO THE MIDDLE.  WONDERFUL.  THANK

09:19AM  9    YOU.

09:19AM  10        MS. SPIVEY, DO YOU SEE AT THE TOP WHERE IT SAYS

09:19AM  11   CONSOLIDATED BALANCE SHEETS DECEMBER 2011 AND 2010?

09:19AM  12   A.   YES.

09:19AM  13   Q.   AND I DRAW YOUR ATTENTION TO A LINE ROUGHLY FOUR FROM THE

09:19AM  14   BOTTOM CALLED THE ACCUMULATED DEFICIT.  DOWN A LITTLE.  RIGHT

09:19AM  15   THERE (INDICATING).

09:19AM  16        THANK YOU, MS. HOLLIMAN.

09:19AM  17        DO YOU SEE THAT LINE, MS. SPIVEY?

09:19AM  18   A.   YES.

09:19AM  19   Q.   AND WHAT IS MEANT BY ACCUMULATED DEFICIT?

09:19AM  20   A.   THAT'S THE ACCUMULATED LOSSES FOR THE COMPANY SINCE

09:19AM  21   INCEPTION.

09:19AM  22   Q.   SO WHAT WAS THE ACCUMULATED DEFICIT FOR THERANOS IN 2010?

09:20AM  23   A.   76.5 MILLION.

09:20AM  24   Q.   AND WHAT DOES THAT MEAN?

09:20AM  25   A.   THAT MEANS SINCE INCEPTION THE COMPANY LOST 76.5 MILLION.

09:20AM  1    Q.   WHEN YOU SAY "INCEPTION" THAT'S 2003, 2004?

09:20AM  2    A.   YES.

09:20AM  3    Q.   AND WHAT IS THE ACCUMULATED DEFICIT FOR THERANOS AS THE

09:20AM  4    YEAR ENDED 2011?

09:20AM  5    A.   ABOUT 104 MILLION.

09:20AM  6    Q.   IF I CAN NOW DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED

09:20AM  7    AS EXHIBIT 792.

09:20AM  8         I BELIEVE THE PARTIES STIPULATED TO THE ADMISSION OF THIS

09:20AM  9    EXHIBIT.

09:20AM  10                MR. WADE:  WE DO, YOUR HONOR.

09:20AM  11                THE COURT:  ALL RIGHT.  THANK YOU.

09:20AM  12         IT'S ADMITTED, AND IT MAY BE PUBLISHED.

09:20AM  13         (GOVERNMENT'S EXHIBIT 792 WAS RECEIVED IN EVIDENCE.)

09:21AM  14    BY MR. LEACH:

09:21AM  15    Q.   AND IF I COULD, LET'S START, MS. HOLLIMAN, WITH THE TOP

09:21AM  16    PORTION OF THE EMAIL IF WE COULD.  THANK YOU.

09:21AM  17         DO YOU SEE YOUR NAME IN THE FROM LINE, MS. SPIVEY?

09:21AM  18    A.   YES.

09:21AM  19    Q.   AND DO YOU SEE MS. HOLMES NAME IN THE TO LINE?

09:21AM  20    A.   YES.

09:21AM  21    Q.   AND DO YOU SEE THE DATE FEBRUARY 12TH, 2013?

09:21AM  22    A.   YES.

09:21AM  23    Q.   THERE ARE TWO ATTACHMENTS TO THIS EMAIL.  ONE IS TITLED

09:21AM  24    FS 2012.XLSX.

09:21AM  25         DO YOU SEE THAT?

09:21AM   1      A.    YES.

09:21AM   2      Q.    AND WHAT DOES FS STAND FOR?

09:21AM   3      A.    FINANCIAL STATEMENTS.

09:21AM   4      Q.    AND THE 2012, WHAT DOES THAT REFER TO?

09:21AM   5      A.    YEAR 2012.

09:21AM   6      Q.    IS THAT A DOCUMENT THAT YOU PREPARED?

09:21AM   7      A.    YES.

09:21AM   8      Q.    OKAY.  AND THE SUBJECT OF THIS EMAIL CHAIN IS STANFORD.

09:21AM   9            DO YOU SEE THAT?  OR IT INCLUDES THE NAME STANFORD.

09:21AM  10            DO YOU SEE THAT?

09:21AM  11      A.    YES.

09:21AM  12      Q.    AND WHAT RELATIONSHIP DID THERANOS HAVE WITH STANFORD?

09:22AM  13      A.    STANFORD IS A LANDLORD TO THERANOS.

09:22AM  14      Q.    AND IF I COULD NOW DRAW YOUR ATTENTION TO THE BOTTOM

09:22AM  15      PORTION OF PAGE 1, THE EMAIL THAT EXPANDS -- THAT GOES OVER

09:22AM  16      PAGE 1 TO PAGE 2.

09:22AM  17            MS. HOLLIMAN, I DON'T KNOW IF YOU CAN SHOW ALL OF THAT.

09:22AM  18            DO YOU SEE WHERE IT SAYS, "SOME TIME AGO WE MET WITH

09:22AM  19      STANFORD AND SHARED SOME FINANCIAL INFORMATION IN A TEMPLATE

09:22AM  20      THEY REQUESTED"?

09:22AM  21      A.    YES.

09:22AM  22      Q.    AND IN THIS EMAIL WERE YOU ATTEMPTING TO PROVIDE TRUE AND

09:22AM  23      ACCURATE INFORMATION ABOUT THERANOS'S FINANCIAL CONDITION TO

09:22AM  24      MS. HOLMES?

09:22AM  25      A.    YES.

09:22AM  1    Q.   LET ME PLEASE DRAW YOUR ATTENTION TO PAGE 6 OF THE

09:22AM  2    DOCUMENT OF THE EXHIBIT.  P.

09:22AM  3         AND I'D LIKE TO DISPLAY THE NATIVE FILE, IF WE COULD,

09:22AM  4    MS. HOLLIMAN.

09:23AM  5         MS. SPIVEY, DO YOU SEE THE TABS DOWN AT THE BOTTOM BS, IS,

09:23AM  6    CF, AND TB?

09:23AM  7    A.   YES.

09:23AM  8    Q.   AND WHAT DO THOSE REFER TO?

09:23AM  9    A.   BS IS BALANCE SHEETS, IS IS INCOME STATEMENT, AND CF IS

09:23AM  10   CASH FLOW STATEMENT, AND TB IS TRIAL BALANCE.

09:23AM  11   Q.   AND PLEASE, LET'S START WITH THE BALANCE SHEET.  WERE YOU

09:23AM  12   TRYING TO PROVIDE ACCURATE INFORMATION TO MS. HOLMES ABOUT THE

09:23AM  13   COMPANY'S ASSETS, LIABILITIES, AND STOCKHOLDERS EQUITY IN THIS

09:23AM  14   DOCUMENT?

09:23AM  15   A.   YES.

09:23AM  16   Q.   UP IN ROW 5 AND 6 THERE WILL DATES, AND THERE IS A LINE

09:24AM  17   WITH THREE ZEROS.  CAN YOU EXPLAIN WHAT THOSE THREE ZEROS MEANS

09:24AM  18   FOR US?

09:24AM  19   A.   THAT MEANS THAT THOSE NUMBERS PRESENTED IS IN THOUSANDS.

09:24AM  20   Q.   OKAY.  SO IF WE LOOK AT THE CASH FOR YEAR END

09:24AM  21   DECEMBER 31ST, 2012, THAT'S APPROXIMATELY $51 MILLION, NOT

09:24AM  22   $51,000?

09:24AM  23   A.   CORRECT.

09:24AM  24   Q.   AND IF WE COULD GO TO THE LINE FOR THE ACCUMULATED DEFICIT

09:24AM  25   DOWN BELOW LINE 32.

09:24AM  1        WHAT WAS THE ACCUMULATED DEFICIT FOR THERANOS AS OF

09:24AM  2   DECEMBER 2012?

09:24AM  3   A.    APPROXIMATELY 161 MILLION.

09:24AM  4   Q.    NOW IF WE COULD PLEASE GO TO THE TAB IS.

09:25AM  5        WERE YOU TRYING TO PROVIDE ACCURATE INFORMATION TO

09:25AM  6   MS. HOLMES IN THIS TAB?

09:25AM  7   A.    YES.

09:25AM  8   Q.    AND DOES THIS INCOME STATEMENT COVER THE TIME PERIOD 2002

09:25AM  9   AND THE FIRST MONTH OF 2013?

09:25AM  10  A.    YES.

09:25AM  11  Q.    THERE APPEAR TO BE FOUR ROWS TO THE LEFT:  OPERATING LOSS,

09:25AM  12  INTEREST AND OTHER INCOME, NET, INTEREST EXPENSE, AND NET LOSS.

09:25AM  13        DO YOU SEE THOSE?

09:25AM  14  A.    YES.

09:25AM  15  Q.    AND THERE'S NO LINE FOR REVENUE IN THIS SPREADSHEET.  WHY

09:25AM  16  IS THAT?

09:25AM  17  A.    BECAUSE THERE WAS NO REVENUE FOR THE COMPANY.

09:25AM  18  Q.    SO THERE WAS NO REVENUE FOR THE COMPANY AT ALL IN 2012?

09:25AM  19  A.    CORRECT.

09:25AM  20  Q.    AND FOR THE YEAR 2012 THERE'S THE NUMBER IN RED,

09:25AM  21  PARENTHESIS, 57,111.  WHAT DOES THAT SIGNIFY?

09:26AM  22  A.    THAT'S THE COMPANY, ALL OF THE EXPENSES FOR THE COMPANY

09:26AM  23  FOR THE YEAR.

09:26AM  24  Q.    AND IS THAT IN MILLIONS OR IN THOUSANDS OR SOME OTHER

09:26AM  25  NUMBER?

09:26AM  1    A.    THAT'S 57 MILLION.

09:26AM  2    Q.    THAT WAS THE NET LOSS FOR 2012?

09:26AM  3    A.    RIGHT.

09:26AM  4    Q.    OKAY.  THANK YOU.  WE CAN TAKE THAT DOWN, MS. HOLLIMAN.

09:26AM  5          MS. SPIVEY, YOU SHOULD HAVE A BINDER IN FRONT OF YOU, AND

09:26AM  6    I'D LIKE TO DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS

09:26AM  7    EXHIBIT 1901.

09:26AM  8          DO YOU HAVE THAT IN FRONT OF YOU?

09:26AM  9    A.    YES.

09:26AM  10   Q.    DOES THIS APPEAR TO BE AN EMAIL THAT YOU AUTHORED?

09:26AM  11   A.    YES.

09:26AM  12   Q.    AND THERE ARE TWO NAMES AT THE TOP, MARK KUCHARSKI AND

09:26AM  13   DENNIS ONDYAK.

09:26AM  14         WHO ARE THEY?

09:26AM  15   A.    THEY ARE THE ACCOUNTANTS FOR THE TAX FIRM THAT THERANOS

09:27AM  16   USED.

09:27AM  17   Q.    AND DID YOU WORK WITH THOSE ACCOUNTANTS AT THE TAX FIRM IN

09:27AM  18   ORDER TO PREPARE ACCURATE TAX RETURNS ON BEHALF OF THERANOS?

09:27AM  19   A.    YES.

09:27AM  20   Q.    THERE'S A NUMBER OF ATTACHMENTS TO THIS EMAIL.  GENERALLY

09:27AM  21   SPEAKING, WHAT ARE THESE?

09:27AM  22   A.    THESE ARE THE SCHEDULE AND FINANCIAL INFORMATION THAT

09:27AM  23   THERANOS PROVIDED TO ACCOUNTANTS SO THAT THEY CAN PREPARE THE

09:27AM  24   TAX RETURN.

09:27AM  25   Q.    WERE THESE EXCEL FILES MADE AT OR NEAR THE TIME IN ORDER

09:27AM   1    TO PREPARE ACCURATE TAX RETURNS?

09:27AM   2    A.   YES.

09:27AM   3    Q.   AND DID YOU KEEP THESE DOCUMENTS IN THE ORDINARY COURSE OF

09:27AM   4    BUSINESS?

09:27AM   5    A.   YES.

09:27AM   6    Q.   OKAY.  AND WAS IT YOUR REGULAR PRACTICE TO PREPARE THESE

09:27AM   7    DOCUMENTS SO THAT THERANOS COULD ACCURATELY REPORT ITS INCOME

09:27AM   8    AND EXPENSES TO THE I.R.S.?

09:28AM   9    A.   YES.

09:28AM  10    Q.   ONE OF THE EXCEL SPREADSHEETS IS -- OR ONE OF THE

09:28AM  11    ATTACHMENTS IS TITLED TB 12/31/13.  IT'S THE SECOND ONE FROM

09:28AM  12    THE BOTTOM.

09:28AM  13         DO YOU SEE THAT?

09:28AM  14    A.   YES.

09:28AM  15    Q.   AND WHAT DOES TB STAND FOR?

09:28AM  16    A.   TRIAL BALANCE.

09:28AM  17    Q.   AND WHAT IS THAT TRIAL BALANCE FOR?

09:28AM  18    A.   2013.

09:28AM  19    Q.   AND DID YOU PREPARE THAT TRIAL BALANCE AND MAINTAIN THAT

09:28AM  20    IN THE ORDINARY COURSE OF BUSINESS?

09:28AM  21    A.   YES.

09:28AM  22    Q.   AND DID YOU PREPARE IT BASED ON DATA FROM THE QAD SYSTEM?

09:28AM  23    A.   YES.

09:28AM  24         MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 1901 AND THE

09:28AM  25    ATTACHMENTS TB 12-31-13.

09:28AM   1            THE COURT:  ANY OBJECTION?

09:28AM   2            MR. WADE:  WE HAVE NO OBJECTION TO THE TRIAL

09:28AM   3    BALANCE.

09:28AM   4        WE OBJECT TO THE DOCUMENT ITSELF UNDER 401 AND 805.

09:29AM   5            THE COURT:  DO YOU WISH TO RESPOND?

09:29AM   6            MR. LEACH:  IT'S THE STATEMENT OF AN AGENT.

09:29AM   7            THE COURT:  I THINK IT QUALIFIES UNDER 803, SO I'LL

09:29AM   8    ADMIT IT.

09:29AM   9        (GOVERNMENT'S EXHIBIT 1901 WAS RECEIVED IN EVIDENCE.)

09:29AM  10            MR. LEACH:  IF YOU COULD PLEASE DISPLAY IT.

09:29AM  11        MS. KRATZMANN, IF I COULD USE THE ELMO?

09:29AM  12            THE CLERK:  YES.

09:29AM  13    BY MR. LEACH:

09:30AM  14    Q.   MS. SPIVEY, WHILE MY LAPTOP IS REBOOTING LET ME ORIENT

09:30AM  15    HERE EVERYONE ON 1901.

09:30AM  16        DO YOU SEE YOUR NAME IN THE FROM LINE?

09:30AM  17    A.   YES.

09:30AM  18    Q.   DENNIS ONDYAK AND MARK KUCHARSKI, THEY'RE WITH THE TAX

09:30AM  19    PREPARATION FIRM?

09:30AM  20    A.   YES.

09:30AM  21    Q.   AND I WAS DRAWING YOUR ATTENTION TO TB 12/31/13.

09:30AM  22        DO YOU SEE THAT?

09:30AM  23    A.   YES.

09:30AM  24    Q.   LET ME PLEASE DRAW YOUR ATTENTION TO PAGE 59.

09:31AM  25        DO YOU SEE THE TITLE THERANOS INC. AND SUBSIDIARY AT THE

09:31AM  1      TOP?

09:31AM  2      A.   YES.

09:31AM  3      Q.   AND IS THIS THE INCOME STATEMENTS FOR YEAR ENDED

09:31AM  4      DECEMBER 31ST, 2013, 2012, 2011, AND 2010?

09:31AM  5      A.   YES.

09:31AM  6      Q.   WHAT WAS THE REVENUE FOR THERANOS FOR 2013?

09:31AM  7      A.   ZERO.

09:31AM  8      Q.   AND DOWN AT THE BOTTOM THERE'S A NET LOSS OF $92,367,725.

09:31AM  9           DO YOU SEE THAT?

09:31AM  10     A.   YES.

09:31AM  11     Q.   AND WHAT DOES THAT SIGNIFY?

09:31AM  12     A.   THAT'S ALL OF THE EXPENSES FOR THE YEAR.

09:31AM  13     Q.   FOR THE YEAR 2013?

09:31AM  14     A.   RIGHT.

09:32AM  15     Q.   THANK YOU, MS. SPIVEY.  WE CAN PUT THAT DOCUMENT TO THE

09:32AM  16     SIDE.

09:32AM  17          LET ME DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS

09:32AM  18     5206.  I BELIEVE WE STIPULATED TO THE ADMISSION OF 5206.

09:32AM  19               MR. WADE:  WE DO, YOUR HONOR.

09:32AM  20               THE COURT:  ALL RIGHT.  THANK YOU.  IT'S ADMITTED.

09:32AM  21     IT MAY BE PUBLISHED.

09:32AM  22          (GOVERNMENT'S EXHIBIT 5206 WAS RECEIVED IN EVIDENCE.)

09:32AM  23               MR. LEACH:  MAY I APPROACH THE WITNESS, YOUR HONOR?

09:32AM  24               THE COURT:  YES.

09:32AM  25     BY MR. LEACH:

| | | |
|---|---|---|
| 09:32AM | 1 | Q.   (HANDING.) |
| 09:33AM | 2 | MS. SPIVEY, I'M PLACING ON THE SCREEN THE FIRST PAGE OF |
| 09:33AM | 3 | EXHIBIT 5206. |
| 09:33AM | 4 | DO YOU SEE YOUR NAME IN THE FROM LINE? |
| 09:33AM | 5 | A.   YES. |
| 09:33AM | 6 | Q.   AND IS THIS TO MS. HOLMES AND MR. BALWANI? |
| 09:33AM | 7 | A.   YES. |
| 09:33AM | 8 | Q.   THE SUBJECT OF THIS EMAIL IS 409A -- OR 409A VALUATION |
| 09:33AM | 9 | ANALYSIS. |
| 09:33AM | 10 | WHAT IS A 409A VALUATION ANALYSIS? |
| 09:34AM | 11 | A.   THAT'S THE I.R.S. TAX CODE FOR THE VALUATION FOR OPTIONS. |
| 09:34AM | 12 | Q.   WHAT DO YOU MEAN BY OPTIONS? |
| 09:34AM | 13 | A.   THAT'S THE OPTION THAT WE GIVE TO EMPLOYEES, DIRECTOR, |
| 09:34AM | 14 | CONSULTANTS, AND THEY CAN BUY COMPANY STOCK AT A PREDETERMINED |
| 09:34AM | 15 | PRICE. |
| 09:34AM | 16 | Q.   AND WHY WAS IT NECESSARY FOR THERANOS TO VALUE THESE STOCK |
| 09:34AM | 17 | OPTIONS? |
| 09:34AM | 18 | A.   SO THE COMPANY KNOWS WHAT THE PREDETERMINED PRICE SHOULD |
| 09:34AM | 19 | BE. |
| 09:34AM | 20 | Q.   OKAY.  AND IN THIS EMAIL YOU ARE WRITING TO MS. HOLMES, |
| 09:34AM | 21 | "ATTACHED PLEASE FIND THE LATEST 409A REPORT.  THE VALUE GOES |
| 09:34AM | 22 | UP FROM $1.56 (FROM $1.44 IN DECEMBER) DUE TO THE LATEST |
| 09:34AM | 23 | FUNDING IN FEB AND MARCH 2015." |
| 09:35AM | 24 | DO YOU SEE THAT LANGUAGE? |
| 09:35AM | 25 | A.   YES. |

09:35AM  1     Q.  AND WHAT DID YOU MEAN BY "THE LATEST FUNDING IN FEB AND

09:35AM  2     MARCH OF 2015"?

09:35AM  3     A.  LOOKING AT THIS EMAIL I BELIEVE THERE WAS A ROUND OF

09:35AM  4     FINANCING TO RAISE MONEY IN FEBRUARY AND MARCH OF 2015.

09:35AM  5     Q.  RAISE MONEY FROM WHOM?

09:35AM  6     A.  INVESTORS.

09:35AM  7     Q.  AND DOES THE COMPANY RECORD ANY TYPE OF EXPENSE RELATED TO

09:35AM  8     ITS STOCK OPTIONS IN ITS FINANCIAL STATEMENTS?

09:35AM  9     A.  YES.

09:35AM  10    Q.  AND DOES THAT HAVE ANY CONNECTION TO THE 409A VALUATION

09:35AM  11    ANALYSIS THAT YOU'RE TALKING ABOUT HERE?

09:35AM  12    A.  YES.

09:35AM  13    Q.  CAN YOU EXPLAIN THAT FOR US, PLEASE?

09:35AM  14    A.  SO EACH OPTION -- SO THE COMPANY WILL -- WHEN THE COMPANY

09:35AM  15    GRANT AN OPTION, THIS PART IS CONSIDERED AN EXPENSE ON THE

09:35AM  16    FINANCIAL STATEMENTS.  SO IT'S BASED ON THE -- HOW MUCH EXPENSE

09:36AM  17    THE COMPANY RECOGNIZED IS BASED ON THE VALUE.

09:36AM  18    Q.  AND ARE YOU PROCURING THIS REPORT IN ORDER TO MAKE SURE

09:36AM  19    THAT YOU GET THAT VALUE RIGHT IN THE FINANCIAL STATEMENTS?

09:36AM  20    A.  YES.

09:36AM  21    Q.  LET ME PLEASE DRAW YOUR ATTENTION TO PAGE 14.

09:36AM  22         I UNDERSTAND FROM MS. HOLLIMAN THAT WE CAN HAVE IT

09:36AM  23    DISPLAYED WITHOUT THE ELMO.

09:36AM  24         WERE YOU ABLE TO SEE PAGE 14 ON THE SCREEN, MS. SPIVEY?

09:36AM  25    A.  YES.

09:36AM  1    Q.   THERE'S A NAME AT THE BOTTOM, ARANCA.  WHAT IS ARANCA?

09:36AM  2    A.   ARANCA IS THE INDEPENDENT FIRM THAT PROVIDE THE VALUATION

09:36AM  3    SERVICE TO THERANOS.

09:36AM  4    Q.   AND WHAT WAS ARANCA ENGAGED TO DO?

09:36AM  5    A.   LIKE THE ENGAGEMENT WOULD LET THERANOS KNOW WHAT THE FAIR

09:37AM  6    VALUE OF THE COMMON STOCK SHOULD BE.

09:37AM  7    Q.   OKAY.  DID YOU DO YOUR BEST TO PROVIDE ACCURATE

09:37AM  8    INFORMATION TO ARANCA?

09:37AM  9    A.   YES.

09:37AM  10   Q.   AND DID YOU CONSULT WITH MS. HOLMES ABOUT THE INFORMATION

09:37AM  11   YOU WERE PROVIDING TO ARANCA?

09:37AM  12   A.   YES.

09:37AM  13   Q.   AND WHY DID YOU DO THAT?

09:37AM  14   A.   BECAUSE SHE HAS THE BEST INFORMATION ON WHAT THE COMPANY

09:37AM  15   PROJECTION AND FORECAST IS.

09:37AM  16   Q.   AND WHAT TYPES OF INFORMATION DID YOU PROVIDE TO ARANCA?

09:37AM  17   A.   TYPICALLY IT WOULD BE THE HISTORICAL FINANCIAL

09:37AM  18   INFORMATION, AND THE PROJECTION FOR THE NEXT FIVE YEARS, AND

09:37AM  19   THE CAPITALIZATION RECORD FOR THE COMPANY.

09:37AM  20   Q.   WHEN YOU SAY "PROJECTION FOR THE NEXT FIVE YEARS," WHAT DO

09:37AM  21   YOU MEAN?

09:37AM  22   A.   THAT MEANS WHAT THE COMPANY FORECAST FOR THE FINANCIAL

09:37AM  23   INFORMATION FOR THE NEXT FIVE YEARS THAT -- LIKE THE REVENUE,

09:38AM  24   AND EXPENSES, AND CAPITAL EXPENDITURE, ET CETERA.

09:38AM  25   Q.   AND DID YOU HAVE DISCUSSIONS WITH MS. HOLMES ABOUT WHAT

09:38AM 1    FINANCIAL PROJECTIONS TO PROVIDE TO ARANCA?

09:38AM 2    A.   YES.

09:38AM 3    Q.   AND DID YOU HAVE MORE THAN ONE, MORE THAN ONE DISCUSSION?

09:38AM 4    A.   YES.

09:38AM 5    Q.   IF WE COULD ZOOM OUT, PLEASE, MS. HOLLIMAN.

09:38AM 6         I WANT TO DRAW YOUR ATTENTION TO THE MIDDLE OF THE PAGE

09:38AM 7    WHERE IT SAYS, "THERANOS INC., FMV OF COMMON STOCK AS OF

09:38AM 8    MARCH 25, 2015."

09:38AM 9         DO YOU SEE THAT?

09:38AM 10   A.   YES.

09:38AM 11   Q.   AND WHAT IS FMV?

09:38AM 12   A.   FAIR MARKET VALUE.

09:38AM 13   Q.   AND IF WE CAN PLEASE GO TO PAGE 17.  AND IF WE COULD

09:38AM 14   PLEASE ZOOM IN ON SECTION 1.1, THE BACKGROUND.

09:39AM 15        MS. SPIVEY, DO YOU SEE WHERE IT SAYS, "ARANCA, INC.,

09:39AM 16   ('ARANCA') HAS BEEN ENGAGED BY THERANOS'S INC., ('THERANOS' OR

09:39AM 17   "THE COMPANY') TO CONDUCT VALUATION ANALYSIS OF THE COMPANY AND

09:39AM 18   PREPARE A WRITTEN REPORT TO EXPRESS OUR OPINION ON THE FAIR

09:39AM 19   MARKET VALUE (FMV) OF ITS COMMON STOCK."

09:39AM 20        DO YOU SEE THAT LANGUAGE?

09:39AM 21   A.   YES.

09:39AM 22   Q.   AND IS THAT A FAIR SUMMARY OF WHAT ARANCA WAS ENGAGED TO

09:39AM 23   DO?

09:39AM 24   A.   YES.

09:39AM 25   Q.   NOW, IF WE COULD GO OUT, PLEASE, MS. HOLLIMAN, AND LOOK AT

09:39AM 1    SECTION 1.2, THE FIRST BULLET OR THE FIRST FOUR WOULD BE GREAT.

09:39AM 2    THANK YOU SO MUCH.

09:39AM 3         DO YOU SEE IN THE FIRST BULLET WHERE IT SAYS, "WE

09:39AM 4    UNDERSTAND THIS REPORT AND ITS CONCLUSIONS WOULD BE USED BY THE

09:39AM 5    COMPANY'S BOARD OF DIRECTORS SOLELY IN CONNECTION WITH

09:39AM 6    DETERMINING THE EXERCISE PRICE FOR GRANTING OPTIONS TO ITS

09:40AM 7    EMPLOYEES TO COMPLY WITH IRC SECTION 409A."

09:40AM 8         DO YOU SEE THAT LANGUAGE?

09:40AM 9    A.   YES.

09:40AM 10   Q.   AND WAS THAT YOUR UNDERSTANDING AT THE TIME WHEN ARANCA

09:40AM 11   WAS PREPARING THIS REPORT?

09:40AM 12   A.   YES.

09:40AM 13   Q.   IN THE FOURTH BULLET IT SAYS, "IN PREPARING OUR ANALYSIS,

09:40AM 14   DANISE YAM, CORPORATE CONTROLLER, PROVIDED INFORMATION

09:40AM 15   REGARDING THERANOS'S BUSINESS, PRODUCTS AND SERVICES,

09:40AM 16   OPERATIONS, PAST PERFORMANCE AND FINANCIAL RESULTS, FINANCIAL

09:40AM 17   CONDITION, DEVELOPMENT, AND BUDGET."

09:40AM 18        DO YOU SEE THAT LANGUAGE?

09:40AM 19   A.   YES.

09:40AM 20   Q.   IS THAT ACCURATE?

09:40AM 21   A.   YES.

09:40AM 22   Q.   AND IN THE COURSE OF DOING THAT, DID YOU CONSULT WITH

09:40AM 23   MS. HOLMES?

09:40AM 24   A.   YES.

09:40AM 25   Q.   THANK YOU.

09:40AM  1          MS. HOLLIMAN, IF WE COULD PLEASE GO TO PAGE 19.  AND IF WE

09:40AM  2    COULD ZOOM IN ON THE TOP PART.  GREAT.

09:41AM  3          MS. SPIVEY, DO YOU SEE WHERE IT SAYS, "DURING THE COURSE

09:41AM  4    OF OUR ANALYSIS WE HAVE CONDUCTED LIMITED REVIEWS, INQUIRIES,

09:41AM  5    AND INTERVIEWS."

09:41AM  6          DO YOU SEE THAT LANGUAGE?

09:41AM  7    A.   YES.

09:41AM  8    Q.   AND IN BULLET NUMBER 2 IT SAYS, "REVIEW OF FINANCIAL

09:41AM  9    STATEMENTS."

09:41AM 10          DO YOU SEE THAT LANGUAGE?

09:41AM 11    A.   YES.

09:41AM 12    Q.   IS THAT ACCURATE?

09:41AM 13    A.   YES.

09:41AM 14    Q.   AND HOW ABOUT NUMBER 3, "REVIEW OF FORECASTED FINANCIAL

09:41AM 15    STATEMENTS."

09:41AM 16          IS THAT ACCURATE?

09:41AM 17    A.   YES.

09:41AM 18    Q.   IF WE CAN ZOOM OUT, PLEASE, MS. HOLLIMAN, AND NOW GO TO

09:41AM 19    PAGE 2, THE NEXT PAGE.

09:41AM 20          AND IF WE CAN ZOOM IN ON THE SUMMARY OF FINDINGS DOWN AT

09:41AM 21    THE BOTTOM.  THANK YOU.

09:42AM 22          DO YOU SEE A SIGNATURE ON THIS, MS. SPIVEY?

09:42AM 23    A.   YES.

09:42AM 24    Q.   AND THE NAME IS HEMENDRA ARAN.  IS THAT THE PERSON FROM

09:42AM 25    ARANCA WHO YOU WORKED WITH IN PART TO PREPARE THIS VALUATION

09:42AM   1      ANALYSIS?

09:42AM   2      A.   YES.

09:42AM   3      Q.   HOW LONG DID THERANOS USE ARANCA FOR?

09:42AM   4      A.   THEY USED IT BEFORE I JOINED THE COMPANY.

09:42AM   5      Q.   AND YOU JOINED WHEN?  CAN YOU PLEASE REMIND US.

09:42AM   6      A.   2006.

09:42AM   7      Q.   OKAY.  IF WE COULD PLEASE GO TO PAGE 20.  I'M SORRY, PAGE

09:42AM   8      23, MS. HOLLIMAN.  WONDERFUL.

09:42AM   9           IF WE COULD PLEASE ZOOM IN ON THE TABLE AT THE TOP.

09:43AM  10           DO YOU HAVE THAT IN FRONT OF YOU, MS. SPIVEY?

09:43AM  11      A.   YES.

09:43AM  12      Q.   IN THIS TABLE THERE'S A LIST OF CLASS OF STOCK.

09:43AM  13           DO YOU SEE THAT?

09:43AM  14      A.   YES.

09:43AM  15      Q.   AND THERE'S SERIES A, B, C, C-1, C-1 WITH AN ASTERISK, AND

09:43AM  16      C-2.

09:43AM  17           WHAT DO THOSE REPRESENT?

09:43AM  18      A.   THOSE ARE THE DIFFERENT SERIES OF PREFERRED STOCK.

09:43AM  19      Q.   HOW DOES SERIES A DIFFER FROM SERIES B?

09:43AM  20      A.   THAT WAS DEPENDING ON THE TIME OF THE INVESTMENT.

09:43AM  21      Q.   OKAY.  IS IT FAIR TO ASSUME FROM THIS THAT THE C-2 SERIES

09:43AM  22      COMES LATER THAN THE SERIES A INVESTORS?

09:43AM  23      A.   YES.

09:43AM  24      Q.   OKAY.  I WANT TO FOCUS ON THE SERIES C-2.  THERE'S AN

09:43AM  25      ISSUE PRICE OF $17 IF YOU GO TO THE RIGHT.  WHAT DOES THAT $17

09:43AM  1    REPRESENT?

09:43AM  2    A.    THAT EACH SHARE OF THE PREFERRED STOCK C-2 COSTS $17.

09:44AM  3    Q.    IS THAT THE PRICE PER SHARE THAT INVESTORS WERE PAYING FOR

09:44AM  4    C-2 INVESTMENTS?

09:44AM  5    A.    YES.

09:44AM  6    Q.    AND TO THE RIGHT THERE'S A COLUMN FOR INVESTED CAPITAL,

09:44AM  7    $730,109,863.

09:44AM  8         WHAT DOES THAT REPRESENT?

09:44AM  9    A.    THAT REPRESENTS THE AMOUNT OF MONEY THAT THERANOS RECEIVED

09:44AM  10   FROM THE C-2 INVESTORS.

09:44AM  11   Q.    OKAY.  AND ROUGHLY WHAT TIME PERIOD WAS THE C-2 FINANCING

09:44AM  12   ROUND?

09:44AM  13   A.    PROBABLY 2014, 2015.

09:44AM  14   Q.    SO LATER ON IN THE COMPANY'S TENURE?

09:44AM  15   A.    RIGHT.

09:44AM  16   Q.    OKAY.  LET'S PLEASE GO NOUN TO PAGE 54.  ACTUALLY, I THINK

09:45AM  17   IT'S FURTHER DOWN, WHICH I'M LOOKING FOR SECTION 7.2,

09:45AM  18   MS. HOLLIMAN, WHICH I'LL GET YOU.

09:45AM  19        PAGE 67.  MY APOLOGIES.

09:45AM  20        IF WE COULD ZOOM IN, PLEASE, ON THE TOP HALF OF THIS WHERE

09:45AM  21   THERE'S HISTORICAL FINANCIALS INCOME STATEMENT.  THANK YOU.

09:45AM  22        DO YOU SEE WHERE IT SAYS 7.2.1 INCOME STATEMENT,

09:45AM  23   MS. SPIVEY?

09:45AM  24   A.    YES.

09:45AM  25   Q.    AND THERE'S A ROW SUMMARY INCOME STATEMENT IN 3 ZEROS,

09:46AM  1      DECEMBER 11TH, DECEMBER 12TH, AND THEN IT MOVES FORWARD.

09:46AM  2          ARE THOSE THE YEAR ENDS FOR THOSE INCOME STATEMENTS?

09:46AM  3      A.   YES.

09:46AM  4      Q.   AND BENEATH THAT IT SAYS F Y-A.  WHAT DOES FY-A MEAN?

09:46AM  5      A.   FINANCIAL YEAR ACTUAL.

09:46AM  6      Q.   SO THOSE ARE THE REAL RESULTS AS COMPARED TO PROJECTED

09:46AM  7      RESULTS?

09:46AM  8      A.   YES.

09:46AM  9      Q.   AND DID YOU DO YOUR BEST TO PROVIDE ACCURATE INFORMATION

09:46AM  10     TO ARANCA ON THESE POINTS?

09:46AM  11     A.   YES.

09:46AM  12     Q.   AND IN DECEMBER OF '14 THERE'S A NUMBER 150.

09:46AM  13          DO YOU SEE THAT?

09:46AM  14     A.   YES.

09:46AM  15     Q.   AND WHAT DOES THAT MEAN?

09:46AM  16     A.   THAT'S THE INCOME THAT THE COMPANY RECORDED FOR SERVICES

09:46AM  17     PROVIDED.

09:46AM  18     Q.   SO $150,000?

09:46AM  19     A.   YES.

09:46AM  20     Q.   AND TO THE RIGHT FOR THE PERIOD ENDING MARCH 15TH THERE'S

09:46AM  21     THE NUMBER 14.

09:46AM  22          DO YOU SEE THAT?

09:46AM  23     A.   YES.

09:46AM  24     Q.   AND WHAT DOES THAT MEAN?

09:47AM  25     A.   THAT'S THE REVENUE THAT THE COMPANY RECORDED FOR SERVICES

09:47AM  1    PROVIDED.

09:47AM  2    Q.   $14,000?

09:47AM  3    A.   $14,000, YES.

09:47AM  4    Q.   OKAY.  AND DO YOU RECALL THINGS GETTING MATERIALLY BETTER

09:47AM  5    FOR THE YEAR 2015?

09:47AM  6    A.   NO.

09:47AM  7    Q.   I'M SORRY?

09:47AM  8    A.   NO.

09:47AM  9    Q.   LET'S LOOK AT THE NEXT PAGE, PLEASE.  PAGE 68.  THERE'S A

09:47AM  10   BALANCE SHEET AT THE TOP.

09:47AM  11        ACTUALLY, IF WE COULD ZOOM IN ON THE ENTIRETY OF THE TEXT,

09:47AM  12   MS. HOLLIMAN.  PERFECT.  THANK YOU.

09:47AM  13        ALL RIGHT.  DID YOU PROVIDE THIS BALANCE SHEET, THE

09:47AM  14   INFORMATION IN THIS BALANCE SHEET TO ARANCA, MS. SPIVEY?

09:47AM  15   A.   YES.

09:47AM  16   Q.   AND DOWN TOWARDS THE BOTTOM THERE'S A LINE FOR SOMETHING

09:47AM  17   CALLED RETAINED EARNINGS.

09:48AM  18        DO YOU SEE THAT ROW, MS. SPIVEY?

09:48AM  19   A.   YES.

09:48AM  20   Q.   AND WHAT IS RETAINED EARNINGS?

09:48AM  21   A.   THAT'S THE ACCUMULATED INCOME AND LOSS FOR THE YEAR.

09:48AM  22   Q.   AND IS THAT SYNONYMOUS WITH ACCUMULATED DEFICIT?

09:48AM  23   A.   YES.

09:48AM  24   Q.   AND THE TERM THAT WE SAW IN PRIOR SPREADSHEETS?

09:48AM  25   A.   YES.

09:48AM  1    Q.   WHAT WAS THE ACCUMULATED DEFICIT OR RETAINED EARNINGS AS

09:48AM  2    OF DECEMBER 2014 --

09:48AM  3    A.   I --

09:48AM  4    Q.   IF WE COULD ZOOM OUT FOR THE WITNESS.

09:48AM  5    A.   APPROXIMATELY 376 MILLION.

09:48AM  6    Q.   AND THAT'S THE ACCUMULATED DEFICIT AS OF 2013?  OR 2014,

09:49AM  7    EXCUSE ME?

09:49AM  8    A.   YES.

09:49AM  9    Q.   OKAY.  THANK YOU.

09:49AM 10         WE CAN TAKE THIS DOWN, PLEASE, MS. HOLLIMAN.

09:49AM 11         I'D LIKE TO SHIFT FOCUS A LITTLE BIT FROM THERANOS'S

09:49AM 12    OVERALL FINANCIAL CONDITION AND TALK ABOUT SOME PARTICULAR

09:49AM 13    RELATIONSHIPS THAT THERANOS HAD, MS. SPIVEY.

09:49AM 14         I'D LIKE TO DRAW YOUR ATTENTION, PLEASE, TO EXHIBIT 431.

09:49AM 15    I BELIEVE WE HAVE STIPULATED TO THE ADMISSION OF 431.

09:49AM 16              MR. WADE:  WE HAVE, YOUR HONOR.

09:49AM 17              THE COURT:  THANK YOU.  IT'S ADMITTED, AND IT MAY BE

09:49AM 18    PUBLISHED.

09:49AM 19         (GOVERNMENT'S EXHIBIT 431 WAS RECEIVED IN EVIDENCE.)

09:49AM 20    BY MR. LEACH:

09:49AM 21    Q.   LET'S FOCUS ON THE TOP PORTION OF THIS EMAIL, MS. SPIVEY.

09:50AM 22         DO YOU SEE YOUR FORMER NAME IN THE TOP PART OF THE EMAIL?

09:50AM 23    A.   YES.

09:50AM 24    Q.   AND THIS IS TO AN INDIVIDUAL AT KPMG.  REMIND US, WE'VE

09:50AM 25    TALKED A LITTLE BIT ABOUT KPMG LAST WEEK, WHAT WAS KPMG DOING

09:50AM 1       FOR THERANOS?

09:50AM 2       A.    KPMG WAS THE AUDITOR TO THERANOS.

09:50AM 3       Q.    OKAY.  AND THE SUBJECT IS FOR PFIZER REV REC.

09:50AM 4             DO YOU SEE THAT?

09:50AM 5       A.    YES.

09:50AM 6       Q.    AND WHAT IS REV REC?

09:50AM 7       A.    IT'S REVENUE RECOGNITION.

09:50AM 8       Q.    AND WHAT DOES THAT MEAN?

09:50AM 9       A.    THAT MEANS HOW MUCH MONEY THAT THE -- REVENUE THAT THE

09:50AM 10      COMPANY CAN RECORD FOR THE YEAR.

09:50AM 11      Q.    AND WHY WERE YOU FORWARDING THIS EMAIL TO KPMG IN OR

09:50AM 12      AROUND 2011?

09:50AM 13      A.    THIS IS TO BACK UP THE REVENUE THAT THE COMPANY RECORDED

09:50AM 14      IN THE FINANCIAL BOOK.

09:50AM 15      Q.    REVENUE RELATING TO WHICH CUSTOMER?

09:50AM 16      A.    PFIZER.

09:50AM 17      Q.    OKAY.  I'D LIKE TO DRAW YOUR ATTENTION TO THE FIRST EMAIL

09:50AM 18      IN THIS CHAIN.  IF I CAN ZOOM OUT A LITTLE BIT, MS. HOLLIMAN.

09:51AM 19      MAYBE THE TOP HALF OF THE DOCUMENT WOULD BE GOOD.

09:51AM 20            DO YOU SEE THE EMAIL FROM ELIZABETH HOLMES TO AIDAN POWER

09:51AM 21      AND CRAIG LIPSET ON OCTOBER 10TH, 2008?

09:51AM 22      A.    YES.

09:51AM 23      Q.    AND WHO DO YOU UNDERSTAND THOSE FOLKS TO BE?

09:51AM 24      A.    YES.

09:51AM 25      Q.    AND WHO DO YOU UNDERSTAND THOSE FOLKS TO BE?

09:51AM  1    A.   I'M NOT SURE.

09:51AM  2    Q.   AND DO YOU BELIEVE THEM TO BE WITH PFIZER?

09:51AM  3    A.   I'M NOT SURE.

09:51AM  4    Q.   OKAY.  THERE'S A NAME IN THE CC LINE MARC THIBONNIER.  WHO

09:51AM  5    IS HE?

09:51AM  6    A.   HE'S THE CHIEF MEDICAL OFFICER AT THAT TIME.

09:51AM  7    Q.   BACK IN 2008?

09:51AM  8    A.   YES.

09:51AM  9    Q.   AND MS. HOLMES WROTE IN THE SECOND PARAGRAPH, "IN THE

09:51AM  10   INTEREST OF FINISHING AS QUICKLY AS POSSIBLE, WE VARIED THE

09:52AM  11   ENROLLMENT SCHEDULES OF SOME OF OUR EXISTING AND NEW PATIENTS,

09:52AM  12   AS YOU WILL SEE IN THE ATTACHED.

09:52AM  13        "THROUGHOUT THIS PROCESS, WE HAVE BEEN COMPILING THE DATA

09:52AM  14   FOR OUR FINAL REPORT.  I'M VERY PLEASED TO PRESENT YOU WITH THE

09:52AM  15   FINAL DATA -- SEE THE ATTACHED STUDY REPORT."

09:52AM  16        DO YOU SEE THAT LANGUAGE?

09:52AM  17   A.   YES.

09:52AM  18   Q.   AND MS. HOLMES FORWARDS THIS TO YOU SHORTLY AFTER SENDING

09:52AM  19   IT TO AIDAN POWER AND CRAIG LIPSET AND WRITES, "THE REPORT HAS

09:52AM  20   BEEN SUBMITTED.  WE CAN NOW INVOICE FOR THE REMAINING 400K."

09:52AM  21        DO YOU SEE THAT LANGUAGE?

09:52AM  22   A.   YES.

09:52AM  23   Q.   AND WHAT DID THAT MEAN?

09:52AM  24   A.   SO MY RECOLLECTION OF THIS CONSIDER IS THAT THERANOS WOULD

09:52AM  25   PROVIDE A STUDY REPORT TO PFIZER FOR A TOTAL OF $900,000 AND

09:52AM  1    PFIZER WOULD -- ALREADY PAID $500,000 BEFORE 2008, AND THE

09:52AM  2    REMAINING 400,000 WOULD BE PAID WHEN THERANOS PROVIDED THE

09:53AM  3    REPORTS.

09:53AM  4    Q.   IS THIS MS. HOLMES GIVING YOU DIRECTION TO RECOGNIZE

09:53AM  5    ADDITIONAL REVENUE ON THE PFIZER CONTRACT?

09:53AM  6    A.   TO INVOICE FOR THE REMAINING AMOUNT.

09:53AM  7    Q.   WHAT DO YOU MEAN BY "INVOICE"?

09:53AM  8    A.   TO SEND PFIZER THE INVOICE SO THEY WOULD PAY THE AMOUNT.

09:53AM  9    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 3 OF THIS

09:53AM  10   DOCUMENT.

09:53AM  11        IF WE COULD ZOOM IN ON THE TOP PORTION OF PAGE 3.  LET'S

09:53AM  12   INCLUDE ALL OF THE TEXT AT THE TOP, PLEASE.  THERE WE GO.

09:53AM  13   THANK YOU, MS. HOLLIMAN.

09:53AM  14        MS. SPIVEY, DO YOU -- THERE'S A LOGO AT THE TOP THAT SAYS,

09:54AM  15   "THERANOS REDEFINING HEALTHCARE."

09:54AM  16        DO YOU SEE THAT?

09:54AM  17   A.   YES.

09:54AM  18   Q.   AND IS THAT THERANOS'S OLD LOGO?

09:54AM  19   A.   YES.

09:54AM  20   Q.   AND DID THAT CHANGE AT SOME POINT IN TIME?

09:54AM  21   A.   YES.

09:54AM  22   Q.   OKAY.  AND THEN IT SAYS, THERANOS'S ANGIOGENESIS STUDY

09:54AM  23   REPORT PREPARED FOR DR. AIDAN POWER, PFIZER, INC."

09:54AM  24        DO YOU SEE THAT LANGUAGE?

09:54AM  25   A.   YES.

09:54AM  1    Q.   AND DO YOU BELIEVE THAT TO BE THE REPORT THAT MS. HOLMES

09:54AM  2    WAS REFERRING TO IN HER EMAIL THAT SHE WAS FORWARDING TO YOU?

09:54AM  3    A.   YES.

09:54AM  4    Q.   AND DO YOU BELIEVE THAT THIS WAS PROVIDED TO PFIZER AS

09:54AM  5    SUPPORT FOR THE INVOICE?

09:54AM  6    A.   YES.

09:54AM  7    Q.   LET ME PLEASE DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED

09:54AM  8    AS 5219.

09:54AM  9         AND I BELIEVE THE PARTIES HAVE AGREED TO THE ADMISSION OF

09:54AM  10   5219?

09:54AM  11              MR. WADE:  WE DO, YOUR HONOR.

09:54AM  12              THE COURT:  ALL RIGHT.  THANK YOU.  IT'S ADMITTED

09:54AM  13   AND MAY BE PUBLISHED.

09:54AM  14        (GOVERNMENT'S EXHIBIT 5219 WAS RECEIVED IN EVIDENCE.)

09:55AM  15              MR. LEACH:  MS. HOLLIMAN, IF WE CAN PLEASE ZOOM IN

09:55AM  16   ON THE TOP HALF OF THIS.

09:55AM  17   Q.   DO YOU SEE YOUR NAME IN THE FROM LINE, MS. SPIVEY?

09:55AM  18   A.   YES.

09:55AM  19   Q.   AND IS THIS AN EMAIL THAT YOU SENT TO FOLKS AT KPMG IN

09:55AM  20   CONNECTION WITH THEIR AUDIT WORK?

09:55AM  21   A.   YES.

09:55AM  22   Q.   AND DID KPMG EVER RENDER AN OPINION ON THERANOS'S

09:55AM  23   FINANCIAL STATEMENTS?

09:55AM  24   A.   NO.

09:55AM  25   Q.   THERE ARE TWO EXCEL -- OR FOUR EXCEL SPREADSHEETS ON THIS,

09:55AM  1    TWO TITLED CONTRACT SUMMARY.

09:55AM  2         DO YOU SEE THOSE?

09:55AM  3    A.   YES.

09:55AM  4    Q.   ARE THOSE DOCUMENTS THAT YOU PREPARED?

09:55AM  5    A.   YES.

09:55AM  6    Q.   OKAY.  IF WE COULD PLEASE DISPLAY PAGE 14, THE NATIVE

09:55AM  7    FILE.  IF WE COULD MOVE TO THE LEFT, PLEASE, MS. HOLLIMAN.

09:56AM  8         I THINK WE NEED TO MOVE THIS OVER TO THE LEFT.  THERE WE

09:56AM  9    GO.  AND IF WE COULD GO ALL OF THE WAY TO THE TOP, PLEASE.

09:56AM  10   WONDERFUL.  THANK YOU.

09:56AM  11        UP IN THE RIGHT-HAND CORNER IT SAYS, "THERANOS INC. SALES

09:56AM  12   CONTRACT SUMMARY YE 12/31/2009."

09:56AM  13        WHAT DOES YE STAND FOR?

09:56AM  14   A.   YEAR ENDED.

09:56AM  15   Q.   AND IN THE FIRST COLUMN THERE'S A CUSTOMER AND IT SAYS

09:56AM  16   ASTRAZENECA.

09:56AM  17        WHAT IS MEANT BY THAT?

09:56AM  18   A.   THE CUSTOMER IS ASTRAZENECA.

09:56AM  19   Q.   AND WAS ASTRAZENECA A PHARMACEUTICAL COMPANY THAT THERANOS

09:57AM  20   DID SOME BUSINESS WITH?

09:57AM  21   A.   YES.

09:57AM  22   Q.   AND TO THE RIGHT IN THE COLUMN UNDER D IT SAYS 1/31/2008.

09:57AM  23        DO YOU SEE THAT?

09:57AM  24   A.   YES.

09:57AM  25   Q.   AND WHAT DOES THAT REFER TO?

09:57AM  1    A.   THE CONTRACT WAS EFFECTIVE ON THAT DATE.

09:57AM  2    Q.   AND THEN THERE'S A LINE CONTRACT TOTAL, 25,000.

09:57AM  3         DO YOU SEE THAT?

09:57AM  4    A.   YES.

09:57AM  5    Q.   AND WHAT DOES THAT MEAN?

09:57AM  6    A.   THERANOS WOULD PROVIDE SERVICES OR PRODUCT FOR THAT

09:57AM  7    CONTRACT AMOUNT.

09:57AM  8    Q.   OKAY.  AND THERE ARE TWO CONTRACTS HERE FOR ASTRAZENECA

09:57AM  9    AND ONE TOTALLED 25,000 AND ONE TOTALLED 225,000.

09:57AM 10         IF WE CAN GO DOWN TO THE NEXT ROW.  OTHER THAN THOSE TWO

09:57AM 11    CONTRACTS, DID THERANOS HAVE ANY REVENUE GENERATING CONTRACTS

09:57AM 12    WITH ASTRAZENECA?

09:58AM 13    A.   NO.

09:58AM 14    Q.   AND IN ROW 2 THERE'S CELGENE CORPORATION.

09:58AM 15         DO YOU SEE THAT?

09:58AM 16    A.   YES.

09:58AM 17    Q.   AND THE AMOUNT OF THAT CONTRACT IS $106,000.

09:58AM 18         DO YOU SEE THAT?

09:58AM 19    A.   YES.

09:58AM 20    Q.   AND I'LL COME BACK TO CELGENE IN A MOMENT.  BUT LET ME

09:58AM 21    FIRST ASK ABOUT ROW 11, NOVARTIS.

09:58AM 22         DO YOU SEE THAT?

09:58AM 23    A.   YES.

09:58AM 24    Q.   AND WHAT IS THE DATE OF THE NOVARTIS CONTRACT?

09:58AM 25    A.   JUNE 24TH, 2008.

09:58AM  1    Q.   AND WHAT IS THE AMOUNT?

09:58AM  2    A.   65,000.

09:58AM  3    Q.   AND IF WE CAN SCROLL DOWN A LITTLE MORE.

09:58AM  4         OUTSIDE OF THAT 65,000 NOVARTIS CONTRACT, DID THERANOS

09:58AM  5    HAVE ANY REVENUE GENERATING CONTRACTS WITH NOVARTIS?

09:58AM  6    A.   NO.

09:58AM  7    Q.   IN ROW, IN ROW 12 THERE'S CENTOCOR, AND I'LL COME BACK TO

09:58AM  8    THAT IN A MOMENT, MS. SPIVEY.

09:58AM  9         I WANTED TO ASK ABOUT ROW 13, MERCK, FOR $12,000.  OUTSIDE

09:58AM 10    OF THAT AGREEMENT, DID THERANOS HAVE ANY REVENUE GENERATING

09:58AM 11    CONTRACTS WITH MERCK?

09:59AM 12    A.   NO.

09:59AM 13    Q.   AND FURTHER DOWN THE ROW THERE'S PFIZER.

09:59AM 14         DO YOU SEE THAT?

09:59AM 15    A.   YES.

09:59AM 16    Q.   AND DO YOU BELIEVE THAT TO BE A REFERENCE TO THE EXHIBIT

09:59AM 17    THAT WE JUST LOOKED AT?

09:59AM 18    A.   YES.

09:59AM 19    Q.   AND THAT WAS A $900,000 CONTRACT?

09:59AM 20    A.   YES.

09:59AM 21    Q.   OUTSIDE OF THIS $900,000 CONTRACT WITH PFIZER DATED

09:59AM 22    DECEMBER 15TH, 2006, DID THERANOS HAVE ANY REVENUE GENERATING

09:59AM 23    CONTRACTS WITH PFIZER?

09:59AM 24    A.   NO.

09:59AM 25    Q.   HOW ABOUT THE MAYO CLINIC IN ROW 15.  OUTSIDE OF THE

09:59AM  1    $60,000 CONTRACT REFERENCED THERE, DID THERANOS HAVE ANY

09:59AM  2    REVENUE GENERATION CONTRACTS WITH THE MAYO CLINIC?

09:59AM  3    A.   NO.

09:59AM  4    Q.   IN ROW 18 THERE'S SCHERING-PLOUGH.

09:59AM  5         DO YOU SEE THAT?

09:59AM  6    A.   YES.

09:59AM  7    Q.   AND WHAT WAS THE VALUE OF THE SCHERING-PLOUGH AGREEMENT?

09:59AM  8    A.   279,000.

09:59AM  9    Q.   AND WHAT WAS THE DATE?

09:59AM 10    A.   APRIL 30TH, 2009.

10:00AM 11    Q.   OUTSIDE OF THIS AGREEMENT, DID THERANOS HAVE ANY REVENUE

10:00AM 12    GENERATING CONTRACTS WITH SCHERING-PLOUGH?

10:00AM 13    A.   NO.

10:00AM 14    Q.   AND LET ME PLEASE NOW DRAW YOUR -- I WANT TO GO BACK TO

10:00AM 15    CENTOCOR AND CELGENE IN THE CONTEXT OF PAGE 16 OF THIS EXHIBIT,

10:00AM 16    ANOTHER EXCEL FILE.  WONDERFUL.

10:00AM 17         WE'RE NOW LOOKING AT PAGE 6 OF THIS EXHIBIT, MS. SPIVEY.

10:00AM 18    UP AT THE TOP IT SAYS YE 12/31/2009.

10:01AM 19         DO YOU ACTUALLY BELIEVE THIS TO BE THE CONTRACTS REVENUE

10:01AM 20    ANALYSIS FOR 2010?

10:01AM 21    A.   I BELIEVE SO.

10:01AM 22    Q.   AND OUTSIDE OF THE CONTRACTS ON THIS SPREADSHEET FOR

10:01AM 23    CENTOCOR AND CELGENE, DID THERANOS HAVE ANY REVENUE GENERATING

10:01AM 24    CONTRACTS WITH THOSE TWO PHARMACEUTICAL COMPANIES?

10:01AM 25    A.   NO.

10:01AM 1    Q.   DOWN AT THE -- IN ROW 11 THERE'S A REFERENCE TO SOMETHING

10:01AM 2    CALLED THE AMERICAN BURN ASSOCIATION.

10:01AM 3         WHAT IS THAT?

10:01AM 4    A.   WHAT DO YOU MEAN?

10:01AM 5    Q.   WHAT WAS THAT CONTRACT?  WHAT WAS THAT ARRANGEMENT?

10:01AM 6    A.   OH.  SO THERANOS WOULD PROVIDE SOME -- THE CARTRIDGES AND

10:01AM 7    THE DEVICE TO AMERICAN BURN ASSOCIATION FOR THE AMOUNT OF THE

10:01AM 8    CONTRACT TOTAL OF 288,000.

10:02AM 9    Q.   OUTSIDE OF THE CONTRACT LISTED HERE, DID THERANOS HAVE ANY

10:02AM 10   REVENUE GENERATING CONTRACTS WITH THE AMERICAN BURN

10:02AM 11   ASSOCIATION?

10:02AM 12   A.   NO.

10:02AM 13   Q.   DID THERANOS HAVE ANY REVENUE GENERATING CONTRACTS WITH

10:02AM 14   THE DEPARTMENT OF DEFENSE?

10:02AM 15   A.   NO.

10:02AM 16   Q.   HOW ABOUT THE UNITED STATES MILITARY?

10:02AM 17   A.   NO.

10:02AM 18   Q.   HOW ABOUT ANY HOSPITAL CHAINS?

10:02AM 19   A.   NO.

10:02AM 20   Q.   THANK YOU, MS. HOLLIMAN.  YOU CAN TAKE THAT DOWN.

10:02AM 21        I'D LIKE TO NOW DRAW YOUR ATTENTION, MS. HOLMES, TO

10:02AM 22   EXHIBIT 5172.  I BELIEVE THAT THE PARTIES STIPULATE TO THE

10:02AM 23   ADMISSION OF 5172.

10:02AM 24             MR. WADE:  WE DO, YOUR HONOR.

10:02AM 25             THE COURT:  THANK YOU.  IT'S ADMITTED, AND IT MAY BE

10:02AM  1      PUBLISHED.

10:02AM  2          (GOVERNMENT'S EXHIBIT 5172 WAS RECEIVED IN EVIDENCE.)

10:02AM  3      BY MR. LEACH:

10:02AM  4      Q.   BEFORE WE GET TO THE EXHIBIT, MS. SPIVEY, I'D LIKE TO DRAW

10:03AM  5      YOUR ATTENTION THAT LAST WEEK WE TALKED ABOUT THE TIME PERIOD

10:03AM  6      OF 2009.  WAS THERANOS SHORT ON CASH AT THE BEGINNING OF 2009?

10:03AM  7      A.   YES.

10:03AM  8      Q.   AND HOW WOULD YOU DESCRIBE THE COMPANY'S CASH POSITION AT

10:03AM  9      THAT TIME PERIOD?

10:03AM  10     A.   THE CASH POSITION WAS VERY TIGHT IN 2009.

10:03AM  11     Q.   AND I'D LIKE TO NOW MOVE FORWARD IN TIME TO 2013.

10:03AM  12          DO YOU HAVE THAT TIMEFRAME IN MIND?

10:03AM  13     A.   YES.

10:03AM  14     Q.   OKAY.  IN 2013 WAS THERANOS ALSO EXPERIENCING SOME CASH

10:03AM  15     DIFFICULTIES?

10:03AM  16     A.   IT STARTED TO GET A BIT TIGHT, NOT TO THE EXTENT OF 2009,

10:03AM  17     BUT WE WERE WATCHING THE CASH POSITION VERY CLOSELY.

10:03AM  18     Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO 5172 IF WE COULD.

10:04AM  19          UP IN THE TOP LEFT-HAND CORNER OF THIS THERANOS

10:04AM  20     SPREADSHEET IT SAYS THERANOS CASH BALANCE.

10:04AM  21          DO YOU SEE THAT?

10:04AM  22     A.   YES.

10:04AM  23     Q.   AND IS THIS A DOCUMENT THAT YOU PREPARED?

10:04AM  24     A.   YES.

10:04AM  25     Q.   AND WHY DID YOU PREPARE THIS?

10:04AM  1     A.   TO SHOW ELIZABETH HOLMES AND SUNNY BALWANI OF THE CASH

10:04AM  2     POSITION IN EACH WEEK.

10:04AM  3     Q.   DID YOU DO THAT ON A REGULAR BASIS?

10:04AM  4     A.   YES.  WEEKLY.

10:04AM  5     Q.   USING DOCUMENTS SUCH AS EXHIBIT 5172?

10:04AM  6     A.   YES.

10:04AM  7     Q.   OKAY.  MS. HOLLIMAN, IF WE COULD MOVE TO THE LEFT TO

10:04AM  8     COLUMNS E1 AND E9.  A LITTLE MORE TO THE LEFT.  THERE WE GO.

10:04AM  9     LET'S USE E9 IF WE COULD.

10:05AM  10         I'M SORRY, EN.  EXCUSE ME.

10:05AM  11         IN COLUMN EN, MS. SPIVEY, THERE'S TWO ROWS BEGINNING AND

10:05AM  12    ENDING.  WHAT DO THOSE ROWS SIGNIFY?

10:05AM  13    A.   THAT'S THE WEEK STARTING SEPTEMBER 23RD.

10:05AM  14    Q.   THERE WE GO.  LET'S LEAVE IT RIGHT THERE, MS. HOLLIMAN.

10:05AM  15    THANK YOU.

10:05AM  16         SO 9-23 TO 9-29, THAT'S THE LAST WEEK OF SEPTEMBER 2013?

10:05AM  17    A.   YES.

10:05AM  18    Q.   OKAY.  AND WHAT WAS THE TOTAL CASH BALANCE FOR THAT WEEK?

10:06AM  19    A.   AS OF 9-29 THE CASH BALANCE WAS ABOUT 14.5 MILLION.

10:06AM  20    Q.   OKAY.  AND IF WE COULD GO JUST A LITTLE BIT TO THE LEFT,

10:06AM  21    MS. HOLLIMAN, PLEASE.

10:06AM  22         AND THE WEEK BEFORE THAT WAS THE TOTAL CASH BALANCE

10:06AM  23    16.6 MILLION?

10:06AM  24    A.   YES.

10:06AM  25    Q.   AND THE WEEK BEFORE THAT IT WAS 18.82 MILLION?

10:06AM  1    A.    YES.

10:06AM  2    Q.    AND IS THIS WHAT YOU WERE REFERRING TO WHEN YOU WERE

10:06AM  3    SAYING THAT THINGS WERE GETTING TIGHT?

10:06AM  4    A.    YES.

10:06AM  5    Q.    IN ROW 14 THERE'S SOME AMOUNTS FOR TOTAL PAYMENTS.

10:06AM  6          DO YOU SEE THAT?   IN ROW 24.

10:06AM  7    A.    YES.

10:06AM  8    Q.    WHAT DOES TOTAL PAYMENTS REPRESENT?

10:06AM  9    A.    THAT'S THE AMOUNTS THAT THERANOS OR THE CASH THAT THERANOS

10:07AM  10   BURNED FOR THAT WEEK.

10:07AM  11   Q.    AND DID YOU SAY BURNED?

10:07AM  12   A.    SPENT.

10:07AM  13   Q.    OKAY.  ARE YOU FAMILIAR WITH THE TERM BURN RATE?

10:07AM  14   A.    YES.

10:07AM  15   Q.    AND WHAT DOES BURN RATE MEAN?

10:07AM  16   A.    THAT'S ALL OF THE EXPENSES AND OUTGOING PAYMENTS.

10:07AM  17   Q.    OKAY.  AND SO DOES THIS INDICATE THAT IN THE WEEK OF

10:07AM  18   SEPTEMBER 23RD, 2013, THERANOS WAS SPENDING $2.16 MILLION IN

10:07AM  19   CASH?

10:07AM  20   A.    YES.

10:07AM  21   Q.    AND THE WEEK BEFORE THAT IT WAS 2.217?

10:07AM  22   A.    YES.

10:07AM  23   Q.    AND THE WEEK BEFORE THAT IT WAS 1.194 MILLION?

10:07AM  24   A.    YES.

10:07AM  25   Q.    AND DOES THAT ROUGHLY APPROXIMATE THE WEEKLY BURN RATE OF

10:07AM   1    THERANOS DURING THIS TIME PERIOD?

10:07AM   2    A.   YES.

10:07AM   3    Q.   IF WE COULD DOWN FURTHER IN ROW 27 THERE'S A LINE FOR

10:08AM   4    OPTION STOCK PROCEEDS.

10:08AM   5         DO YOU SEE THAT?

10:08AM   6    A.   YES.

10:08AM   7    Q.   WHAT DOES THAT REFER TO?

10:08AM   8    A.   THAT'S THE MONEY THAT THERANOS RECEIVED EITHER FROM

10:08AM   9    EXERCISED OPTION OR FROM SELLING STOCK.

10:08AM  10    Q.   SO DOES THIS REFLECT THAT IN THE WEEK OF SEPTEMBER 30TH,

10:08AM  11    2013, THERANOS RECEIVED $21 MILLION THROUGH THE EXERCISE OF

10:08AM  12    OPTIONS OR THE SALE OF STOCK TO AN INVESTOR?

10:08AM  13    A.   YES.

10:08AM  14    Q.   AND IF WE COULD PLEASE MOVE TO THE RIGHT, MS. HOLLIMAN --

10:08AM  15    PERFECT.  FEBRUARY 3RD, 2014, THERE'S A LINE FOR $114,559,985.

10:09AM  16         MAYBE WE CAN MOVE UP A LITTLE BIT SO WE CAN SEE IT,

10:09AM  17    MS. HOLLIMAN.  THERE WE GO.  DOWN A LITTLE MORE, PLEASE.  RIGHT

10:09AM  18    HERE, THIS NUMBER (INDICATING).

10:09AM  19         DOES THAT -- DOES $114 MILLION REPRESENT MONEY RECEIVED

10:09AM  20    FROM THE EXERCISE OF STOCK OPTIONS OR INVESTMENTS FROM

10:09AM  21    INVESTORS?

10:09AM  22    A.   YES.

10:09AM  23    Q.   OKAY.  AS THE CORPORATE CONTROLLER --

10:09AM  24         WILL YOU TAKE THAT DOWN, MS. HOLLIMAN.  THANK YOU.

10:09AM  25         AS THE CORPORATE CONTROLLER OF THERANOS, WERE YOU

10:09AM 1      RESPONSIBLE FOR MONITORING THE COMPANY'S SPENDING ON PARTICULAR

10:09AM 2      EXPENSES?

10:09AM 3      A.   YES.

10:10AM 4      Q.   AND WERE YOU -- DO YOU KNOW WHETHER THE DEFENDANT EARNED A

10:10AM 5      SALARY DURING HER TIME AT THERANOS?

10:10AM 6      A.   YES.

10:10AM 7      Q.   AND FOR THE TIME PERIOD OF 2015, APPROXIMATELY WHAT AMOUNT

10:10AM 8      WAS THE DEFENDANT'S SALARY?

10:10AM 9      A.   400,000.

10:10AM 10     Q.   $400,000?

10:10AM 11     A.   YES.

10:10AM 12     Q.   BUT FOR THE TIME PERIOD 2010 THROUGH 2014, DO YOU KNOW

10:10AM 13     APPROXIMATELY WHAT THE DEFENDANT'S SALARY WAS?

10:10AM 14     A.   200,000.

10:10AM 15     Q.   $200,000?

10:10AM 16     A.   RIGHT.

10:10AM 17     Q.   ARE YOU FAMILIAR WITH A COMPANY CALLED FLIGHT

10:10AM 18     LOGISTICS INC.?

10:10AM 19     A.   YES.

10:10AM 20     Q.   AND WHAT IS FLIGHT LOGISTICS INC.?

10:10AM 21     A.   IT'S THE COMPANY THAT PROVIDE PRIVATE JET SERVICES TO

10:10AM 22     THERANOS.

10:10AM 23     Q.   AND WHEN YOU SAY IT'S THE COMPANY THAT PROVIDED PRIVATE

10:10AM 24     JET SERVICES TO THERANOS, WHAT DO YOU MEAN?

10:10AM 25     A.   THAT MEANS WHEN ELIZABETH HOLMES AND -- USED TO TRAVEL

10:11AM  1    THROUGH A PRIVATE JET, THAT WE WOULD PAY THROUGH THAT COMPANY

10:11AM  2    AND THEY WOULD ARRANGE THE FLIGHT FOR THERANOS.

10:11AM  3    Q.   AND DID YOU HAVE A ROLE IN ARRANGING FLIGHTS FOR

10:11AM  4    MS. HOLMES ON THIS PRIVATE JET?

10:11AM  5    A.   NO.

10:11AM  6    Q.   OKAY.  WHO HANDLED THAT?

10:11AM  7    A.   I'M NOT SURE.

10:11AM  8    Q.   WERE YOU REQUIRED TO APPROVE THE INVOICES FOR A PRIVATE

10:11AM  9    JET BY THE DEFENDANT?

10:11AM  10   A.   YES.

10:11AM  11   Q.   AND WHO ELSE USED THIS PRIVATE JET THAT THERANOS WAS

10:11AM  12   PAYING FOR?

10:11AM  13   A.   I CAN'T REMEMBER.

10:11AM  14   Q.   OKAY.  AND WHAT TYPES OF PURPOSES WAS THIS PRIVATE JET

10:11AM  15   USED FOR?  WHERE WAS THE DEFENDANT GOING?

10:11AM  16   A.   I'M NOT SURE.

10:11AM  17   Q.   OKAY.  DO YOU HAVE A BALLPARK OF HOW MUCH MONEY THERANOS

10:11AM  18   SPENT ON PRIVATE JETS FOR MS. HOLMES'S USE?

10:12AM  19   A.   I CAN'T RECALL.

10:12AM  20   Q.   MORE THAN 500,000?

10:12AM  21   A.   I CAN'T RECALL.

10:12AM  22   Q.   MORE THAN A MILLION?

10:12AM  23   A.   I DON'T KNOW.

10:12AM  24   Q.   OKAY.  ARE YOU FAMILIAR WITH A COMPANY CALLED SIEMENS?

10:12AM  25   A.   YES.

10:12AM 1    Q.   AND WHAT IS SIEMENS?

10:12AM 2    A.   WE -- THERANOS PURCHASED EQUIPMENT AND SOME LAB SUPPLIES

10:12AM 3    FROM THAT COMPANY.

10:12AM 4    Q.   OKAY.  AND WERE YOU RESPONSIBLE FOR APPROVING INVOICES

10:12AM 5    FROM SIEMENS?

10:12AM 6    A.   NO.

10:12AM 7    Q.   WHO WAS RESPONSIBLE FOR DOING THAT?

10:12AM 8    A.   SO THERANOS USED QAD AND A PURCHASING SYSTEM, WHICH I

10:12AM 9    CAN'T REMEMBER WHAT IT'S CALLED, BUT THERE'S AN APPROVAL SYSTEM

10:12AM 10   THAT THERANOS USED.

10:12AM 11        SO THE STAFF WILL SUBMIT A PURCHASE REQUISITION, AND IT

10:13AM 12   WOULD GO THROUGH THE APPROVAL PROCESS BASED ON THE AMOUNT, AND

10:13AM 13   SO AFTER IT'S APPROVED, THEN THE PURCHASING TEAM WILL PLACE THE

10:13AM 14   PURCHASE ORDER.

10:13AM 15        AND WHEN THE COMPANY RECEIVED WHAT WE PURCHASED, ACCORDING

10:13AM 16   TO THE PURCHASE ORDER, THEN THE STAFF WILL RECEIVE THAT INTO

10:13AM 17   QAD.

10:13AM 18        SO FROM AN ACCOUNTING PERSPECTIVE, I ONLY -- WE ONLY LOOK

10:13AM 19   AT WHAT HAS BEEN RECEIVED AND THEN AFTER WE MATCH UP WITH THE

10:13AM 20   INVOICE AND THEN WE CAN PROCESS PAYMENT.

10:13AM 21   Q.   OKAY.  SO YOU KNOW THE COMPANY SPENT MONEY ON SIEMENS FOR

10:13AM 22   SOME TYPE OF EQUIPMENT; IS THAT FAIR?

10:13AM 23   A.   YES.

10:13AM 24   Q.   BUT YOU WEREN'T RESPONSIBLE FOR APPROVING THAT?

10:13AM 25   A.   I WASN'T INVOLVED IN THAT APPROVAL PROCESS.

10:13AM   1    Q.   OKAY.  AND DID YOU HAVE ANY INSIGHT INTO WHAT THE SIEMENS

10:13AM   2    EQUIPMENT WAS BEING USED FOR?

10:13AM   3    A.   NO.

10:13AM   4    Q.   OKAY.  LET ME SHIFT TOPICS, MS. SPIVEY.  THE LAST TOPIC I

10:14AM   5    WANT TO GO BACK TO IS ARANCA.  YOU SHOULD HAVE IN BINDER

10:14AM   6    NUMBER 2 EXHIBIT 5085.

10:14AM   7         DOES THIS APPEAR TO BE AN EMAIL FROM YOU TO

10:14AM   8    ELIZABETH HOLMES DATED MAY 25TH, 2013?

10:14AM   9    A.   YES.

10:14AM  10    Q.   AND DOES THE SUBJECT APPEAR TO BE 409A?

10:14AM  11    A.   YES.

10:14AM  12    Q.   AND, AGAIN, WHAT IS 409A?

10:15AM  13    A.   IT'S THE I.R.S. TEST CODE FOR STOCK OPTION.

10:15AM  14    Q.   AND FROM TIME TO TIME DID YOU HAVE DISCUSSIONS WITH

10:15AM  15    MS. HOLMES ABOUT 409A ANALYSES?

10:15AM  16    A.   YES.

10:15AM  17              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5085.

10:15AM  18              MR. WADE:  NO OBJECTION, YOUR HONOR.

10:15AM  19              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:15AM  20         (GOVERNMENT'S EXHIBIT 5085 WAS RECEIVED IN EVIDENCE.)

10:15AM  21    BY MR. LEACH:

10:15AM  22    Q.   AND, MS. HOLLIMAN, IF WE COULD PLEASE ZOOM IN ON THE TOP

10:15AM  23    PORTION WITH THE TEXT.

10:15AM  24         DO YOU SEE THE EMAIL AT THE BOTTOM WHERE MS. HOLMES

10:15AM  25    APPEARS TO WRITE, "CAN YOU FORWARD ME THE LATEST YOU HAVE ON

10:15AM  1    GETTING THIS DONE AGAIN -- I AM GOING TO GET WHATEVER WE NEED

10:15AM  2    DONE DONE THIS WEEKEND."

10:16AM  3        DO YOU SEE THAT LANGUAGE?

10:16AM  4    A.   YES.

10:16AM  5    Q.   AND YOU WRITE BACK, "HERE ARE THE THREE LATEST MODEL WE

10:16AM  6    HAVE."

10:16AM  7        THERE'S A LINE FOR 5/31/10, 7/01/10, 7/01/11.

10:16AM  8        WHAT DO THOSE DATES REFER TO?

10:16AM  9    A.   MAY 31ST, 2010, JULY 1ST, 2010, AND JULY 1ST, 2011.

10:16AM 10    Q.   AND ARE THOSE DATES OF MODELS THAT ARANCA WAS PREPARING?

10:16AM 11    A.   YES.

10:16AM 12    Q.   AND FOR THE MAY 31ST, 2010, YOU WROTE, "BASED ON THIS

10:16AM 13    MODEL, ARANCA CAME BACK WITH A VALUE OF $0.44."

10:16AM 14        IS THAT THE PRICE PER SHARE FOR COMMON STOCK?

10:16AM 15    A.   YES.

10:16AM 16    Q.   AND "THE IMPACT WAS THAT YOUR OPTION PLUS ALL OF THE OTHER

10:16AM 17    OPTIONS THAT WERE GRANTED IN JUNE WOULD BE GRANTED BELOW

10:16AM 18    VALUE."

10:16AM 19        WHAT DOES THAT MEAN?

10:16AM 20    A.   SO THE COMPANY GRANTED OPTIONS TO ELIZABETH HOLMES IN MAY

10:17AM 21    AND ALSO TO A LIST OF EMPLOYEES IN JUNE 2010 AT A LOWER VALUE.

10:17AM 22    Q.   AND WHAT DOES THAT MEAN?  WHAT CONSEQUENCE DOES THAT HAVE?

10:17AM 23    A.   IF THE COMPANY GRANTED OPTION BELOW FAIR MARKET VALUE,

10:17AM 24    THEN IT WOULD TRIGGER TAX CONSEQUENCE TO THE OPTIONEE.

10:17AM 25    Q.   AND THE OPTIONEE HERE WOULD BE THE DEFENDANT, MS. HOLMES?

10:17AM  1    A.   TO MS. HOLMES AND TO THE OTHER OPTIONEES THAT WE GRANTED

10:17AM  2    THE OPTION IN JUNE.

10:17AM  3    Q.   YOU TESTIFIED LAST WEEK THAT KPMG WAS ALSO RAISING

10:18AM  4    QUESTIONS WITH RESPECT TO THE VALUE OF THE OPTION GRANT IN

10:18AM  5    2010.

10:18AM  6        DO YOU UNDERSTAND THAT TESTIMONY?

10:18AM  7    A.   YES.

10:18AM  8    Q.   AND DID THAT ISSUE EVER GET RESOLVED WITH KPMG?

10:18AM  9    A.   NO.

10:18AM 10    Q.   AND IN THE DISCUSSION WITH KPMG, WERE THEY ADVOCATING FOR

10:18AM 11    A HIGHER PRICE FOR THE OPTIONS OR A LOWER PRICE FOR THE

10:18AM 12    OPTIONS?

10:18AM 13    A.   HIGHER.

10:18AM 14    Q.   THANK YOU.  WE CAN PUT THIS ASIDE, MS. HOLLIMAN.

10:18AM 15        LET ME DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS

10:18AM 16    EXHIBIT 5141.

10:18AM 17        I UNDERSTAND THAT WE ARE STIPULATING TO THE ADMISSION OF

10:18AM 18    5141?

10:18AM 19            MR. WADE:  THAT'S CORRECT, YOUR HONOR.

10:18AM 20            THE COURT:  THANK YOU.  IT'S ADMITTED.  IT MAY BE

10:18AM 21    PUBLISHED.

10:18AM 22        (GOVERNMENT'S EXHIBIT 5141 WAS RECEIVED IN EVIDENCE.)

10:18AM 23    BY MR. LEACH:

10:19AM 24    Q.   PERFECT, MS. HOLLIMAN.  THANK YOU.

10:19AM 25        DO YOU SEE YOUR NAME AT THE TOP OF THIS EMAIL, MS. SPIVEY?

10:19AM 1      A.   YES.

10:19AM 2      Q.   AND THE DATE IS DECEMBER 8TH, 2013?

10:19AM 3      A.   YES.

10:19AM 4      Q.   AND IT'S TO SOMEONE NAMED VALESKA HINTZ.

10:19AM 5           WHO IS THAT?

10:19AM 6      A.   SHE'S THE SENIOR ATTORNEY AT THERANOS.

10:19AM 7      Q.   AND YOU HAVE COPIED MS. HOLMES ON THIS EMAIL; IS THAT

10:19AM 8      RIGHT?

10:19AM 9      A.   YES.

10:19AM 10     Q.   THE SUBJECT IS 409A VALUATION REPORTS.

10:19AM 11          DO YOU SEE THAT?

10:19AM 12     A.   YES.

10:19AM 13     Q.   AND IS THAT A REFERENCE TO THESE 409A VALUATION REPORTS

10:19AM 14     THAT ARANCA WAS PREPARING?

10:19AM 15     A.   YES.

10:19AM 16     Q.   AND LET'S LOOK AT PAGE 2, PLEASE.

10:19AM 17          WE'RE LOOKING AT PAGE 2 OF THE EXHIBIT, THE ATTACHMENT TO

10:19AM 18     THE EMAIL.  IS THIS ARANCA REPORT VALUING THERANOS'S COMMON

10:19AM 19     STOCK AS OF SEPTEMBER 30TH, 2013?

10:19AM 20     A.   YES.

10:20AM 21     Q.   AND IF I COULD DRAW YOUR ATTENTION TO PAGE 38.

10:20AM 22          THANK YOU, MS. HOLLIMAN.  THERE WE GO.  AND IF WE COULD

10:20AM 23     ZOOM IN ON THE TOP PORTION, THE TABLE AT THE TOP.

10:20AM 24          MS. YAM, I DRAW YOUR ATTENTION TO THE EXISTING

10:20AM 25     SHAREHOLDERS AS OF SEPTEMBER 30TH, 2013, AND I DON'T SEE A

10:20AM  1    REFERENCE TO THE C-2 INVESTORS.

10:20AM  2         IS IT FAIR TO CONCLUDE FROM THIS THAT THE C-2 INVESTORS

10:20AM  3    COME THEREAFTER?

10:20AM  4    A.   YES.

10:20AM  5    Q.   AND IF WE COULD PLEASE GO TO PAGE 51.

10:21AM  6         MS. SPIVEY, THERE'S A SUMMARY INCOME STATEMENT AT THE TOP

10:21AM  7    WITH DIFFERENT YEARS GOING OUT TO 2017.

10:21AM  8         DO YOU SEE THAT?

10:21AM  9    A.   YES.

10:21AM  10   Q.   AND THERE'S A ROW WITH 3 MTH-F, FY-F.  DO YOU SEE THAT?

10:21AM  11   A.   YES.

10:21AM  12   Q.   AND HELP US TO UNDERSTAND WHAT THAT MEANS?

10:21AM  13   A.   SO THE FIRST COLUMN IS 3 MONTH FORECAST AND 2013, AND THE

10:21AM  14   NEXT ROW IS FOR THE YEAR 2013 FORECAST SO ON AND SO FORTH.

10:21AM  15   Q.   SO THE F IS FOR THE FORECAST?

10:21AM  16   A.   YES.

10:21AM  17   Q.   AND THESE FORECASTED REVENUE NUMBERS, WHERE DOES ARANCA

10:22AM  18   GET THOSE?

10:22AM  19   A.   THEY GOT THAT FROM ME.

10:22AM  20   Q.   AND WHERE DID YOU GET THEM FROM?

10:22AM  21   A.   FROM ELIZABETH HOLMES.

10:22AM  22   Q.   WHAT WAS THE REVENUE FORECAST THAT THERANOS PROVIDED FOR

10:22AM  23   YEAR ENDED 2013?

10:22AM  24   A.   50 MILLION.

10:22AM  25   Q.   HOW ABOUT 2015 OR 2014?

10:22AM  1    A.   ABOUT 90 MILLION.

10:22AM  2    Q.   AND 2015?

10:22AM  3    A.   112 MILLION.

10:22AM  4    Q.   AND YOU'VE HAD DISCUSSION WITH MS. HOLMES ABOUT THESE

10:22AM  5    NUMBERS?

10:22AM  6    A.   YES.

10:22AM  7    Q.   DID YOU EVER PROVIDE FINANCIAL PROJECTIONS TO INVESTORS?

10:22AM  8    A.   NO.

10:22AM  9    Q.   DID MS. HOLMES OR MR. BALWANI ASK YOU TO PREPARE REVENUE

10:22AM  10   PROJECTIONS FOR ANYBODY INTERESTED IN INVESTING IN THE COMPANY?

10:22AM  11   A.   NO.

10:22AM  12   Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO EXHIBIT 3533.

10:23AM  13        I BELIEVE WE HAVE STIPULATED TO THE ADMISSION OF 3533?

10:23AM  14            MR. WADE:   WE HAVE, YOUR HONOR.

10:23AM  15            THE COURT:   THANK YOU.   IT'S ADMITTED, AND IT MAY BE

10:23AM  16   PUBLISHED.

10:23AM  17        (GOVERNMENT'S EXHIBIT 3533 WAS RECEIVED IN EVIDENCE.)

10:23AM  18            MR. LEACH:   IF WE CAN PLEASE ZOOM IN, MS. HOLLIMAN,

10:23AM  19   ON JUST THE TEXT TO ABOUT RIGHT HERE (INDICATING).

10:23AM  20   Q.   DO YOU SEE YOUR NAME IN THE FROM LINE ON THIS EMAIL,

10:23AM  21   MS. SPIVEY?

10:23AM  22   A.   YES.

10:23AM  23   Q.   AND DO YOU SEE MS. HOLMES'S NAME IN THE TO LINE?

10:23AM  24   A.   YES.

10:23AM  25   Q.   AND THE SUBJECT IS 409A PREP.   IS THIS ANOTHER REFERENCE

10:23AM  1    TO DISCUSSIONS ABOUT 409A VALUATIONS?

10:24AM  2    A.   YES.

10:24AM  3    Q.   AND IS THIS AN EXAMPLE OF YOU CONSULTING WITH THE

10:24AM  4    DEFENDANT ABOUT WHAT REVENUE PROJECTIONS TO PROVIDE TO ARANCA?

10:24AM  5    A.   YES.

10:24AM  6    Q.   THANK YOU.  IF WE COULD NOW LOOK AT 3527.

10:24AM  7         I BELIEVE WE HAVE STIPULATED TO 3527.

10:24AM  8              MR. WADE:  WE HAVE, YOUR HONOR.

10:24AM  9              THE COURT:  THANK YOU.  IT'S ADMITTED, AND MAY BE

10:24AM  10   PUBLISHED.

10:24AM  11             (GOVERNMENT'S EXHIBIT 3527 WAS RECEIVED IN EVIDENCE.)

10:24AM  12             MR. LEACH:  THAT'S GOOD, MS. HOLLIMAN.  RIGHT THERE.

10:24AM  13   THANK YOU.

10:24AM  14        IS THERE SOME WAY TO DELETE MY WRITING?  THANK YOU.

10:24AM  15   Q.   MS. SPIVEY, IS THIS ANOTHER EXAMPLE OF YOU DISCUSSING 409A

10:25AM  16   VALUATIONS WITH THE DEFENDANT?

10:25AM  17   A.   YES.

10:25AM  18   Q.   OKAY.  IN THE MIDDLE ON DECEMBER 22ND, 2014, YOU WROTE "I

10:25AM  19   SENT OVER THE PROJECTION TO ARANCA LAST NIGHT.  THEY KNOW WE

10:25AM  20   HAVE A DEADLINE BEFORE THE END OF THE YEAR AND WILL WORK WITH

10:25AM  21   THAT.

10:25AM  22        "I USED THE SAME ASSUMPTIONS FOR REVENUE AS IN OCTOBER,

10:25AM  23   ROUGHLY $100M, $300M, $300M, AND $500M IN 2015 THRU 2018."

10:25AM  24        WHAT DID YOU MEAN BY THAT?

10:25AM  25   A.   THAT'S THE REVENUE PROJECTION THAT WE USE FOR THE

10:25AM   1    FORECAST.

10:25AM   2    Q.   THAT YOU WOULD USE FOR THE LAST FORECAST?

10:25AM   3    A.   RIGHT.

10:25AM   4    Q.   AND ARE YOU ASKING FOR PERMISSION TO USE THOSE SAME

10:25AM   5    FORECASTS FOR THE NEXT VALUATION?

10:25AM   6    A.   CORRECT.

10:25AM   7    Q.   AND MS. HOLMES WRITES BACK, "100M FOR 15 RIGHT."

10:26AM   8         YOU REPLY, "YES."

10:26AM   9         AND THEN SHE WRITES, "THX."

10:26AM  10         DO YOU SEE THAT?

10:26AM  11    A.   YES.

10:26AM  12    Q.   AND WHAT DID THAT MEAN?  WHAT ARE YOU TALKING ABOUT THERE?

10:26AM  13    A.   FROM HERE SHE WANTS TO CONFIRM THAT WE USE 100 MILLION FOR

10:26AM  14    2015, AND I RESPOND YES.

10:26AM  15    Q.   AND THAT'S 115 MILLION IN REVENUE FOR THE YEAR END 2015?

10:26AM  16    A.   100 MILLION, YES.

10:26AM  17    Q.   AND THE DATE OF THIS EMAIL EXCHANGE IS THE END OF 2014?

10:26AM  18    A.   YES.

10:26AM  19    Q.   LET ME DRAW YOUR ATTENTION TO EXHIBIT 5190.

10:26AM  20         I BELIEVE WE HAVE STIPULATED TO THE ADMISSION OF 5190?

10:27AM  21              MR. WADE:  WE HAVE, YOUR HONOR.

10:27AM  22              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:27AM  23         (GOVERNMENT'S EXHIBIT 5190 WAS RECEIVED IN EVIDENCE.)

10:27AM  24    BY MR. LEACH:

10:27AM  25    Q.   MS. SPIVEY, IS THIS AN EMAIL WITH YOU SENDING THE FINAL

10:27AM  1      DECEMBER 2014 ARANCA VALUATION REPORTS TO MS. HOLMES?

10:27AM  2      A.   YES.

10:27AM  3      Q.   OKAY.  AND IS THE REPORT ATTACHED IN THERANOS 409A REPORT,

10:27AM  4      DECEMBER 15TH, 2014?

10:27AM  5      A.   YES.

10:27AM  6      Q.   AND IS THIS ANOTHER EXAMPLE OF YOU DISCUSSING 409A

10:27AM  7      ANALYSES WITH MS. HOLMES?

10:27AM  8      A.   YES.

10:27AM  9      Q.   OKAY.  ONE MORE FOR ARANCA.  IF WE CAN PLEASE LOOK AT

10:27AM  10     EXHIBIT 2623.

10:27AM  11          I BELIEVE WE HAVE STIPULATED TO THE ADMISSION OF 2623?

10:28AM  12              MR. WADE:  THAT'S CORRECT, YOUR HONOR.

10:28AM  13              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:28AM  14          (GOVERNMENT'S EXHIBIT 2623 WAS RECEIVED IN EVIDENCE.)

10:28AM  15     BY MR. LEACH:

10:28AM  16     Q.   IF WE CAN PLEASE LOOK AT PAGE 2 OF THIS EMAIL THREAD.  AND

10:28AM  17     IF WE CAN HIGHLIGHT THE TOP PART OF THE PAGE DOWN TO THE TABLE.

10:28AM  18          THE SUBJECT OF THIS IS SUNIL DHAWAN.

10:28AM  19          DO YOU KNOW WHO SUNIL DHAWAN IS?

10:28AM  20     A.   HE WAS THE CONTRACT LAB DIRECTOR AT THERANOS.

10:28AM  21     Q.   THANK YOU.  AND DOES THIS EMAIL THREAD RELATE TO POSSIBLE

10:29AM  22     OPTION GRANTS FOR DR. DHAWAN?

10:29AM  23     A.   YES.

10:29AM  24     Q.   AND YOU WROTE TO ELIZABETH HOLMES AND SUNNY BALWANI ON

10:29AM  25     JUNE 27TH, 2015, "PLEASE SEE ATTACHED FOR THE FULL PROJECTION

MODEL.  THE QUICKEST TURNAROUND TIME IS TWO WEEKS, DEPENDING ON

HOW MUCH CHANGES TO THE ASSUMPTIONS WE ARE MAKING.  THE

ASSUMPTIONS WE HAD BEEN USING SINCE SEPTEMBER 2014 WERE AS

FOLLOWS."

     AND THEN THERE'S A COLUMN WITH REVENUE NUMBERS FOR 2015 TO

2018.

     DO YOU SEE THOSE?

A.  YES.

Q.  AND WHAT DID YOU MEAN "THE ASSUMPTIONS WE HAD BEEN USING

SINCE SEPTEMBER 2014 WERE AS FOLLOWS"?

A.   THESE ARE THE ASSUMPTIONS THAT THE COMPANY USED TO CREATE

AND PROJECT ALL OF THE FORECAST FINANCIAL STATEMENTS.

Q.  AND AM I RIGHT TO READ THIS AS YOU TELLING SINCE SEPTEMBER

OF 2014 THERANOS HAD BEEN TELLING ARANCA THAT ITS PROJECTED

REVENUE FOR 2015 WAS $113 MILLION?

A.  YES.

Q.  LET ME PLEASE DRAW YOUR ATTENTION TO EXHIBIT 4859.

     DO YOU HAVE 4859 IN FRONT OF YOU, MS. SPIVEY?

A.  YES.

Q.  OKAY.  PRIOR TO 2015, HAD YOU EVER SEEN THIS DOCUMENT

BEFORE?

A.  NO.

Q.  DID YOU HAVE ANY ROLE IN PREPARING FINANCIAL PROJECTIONS

FOR INVESTORS?

A.  NO.

10:31AM  1    Q.   AND DID YOU HAVE ANY IDEA WHERE THIS DOCUMENT CAME FROM?

10:31AM  2    A.   NO.

10:31AM  3    Q.   DO YOU HAVE ANY IDEA WHAT SUPPORT THERE WAS FOR THE

10:31AM  4    PARTICULAR NUMBERS ON THE RIGHT SIDE OF THIS DOCUMENT?

10:31AM  5    A.   NO.

10:31AM  6    Q.   DID YOU PROVIDE ANY INFORMATION TO MS. HOLMES OR

10:31AM  7    MR. BALWANI ABOUT THE INFORMATION IN THE RIGHT TWO COLUMNS OF

10:31AM  8    THIS DOCUMENT?

10:31AM  9    A.   NO.

10:31AM  10          MR. LEACH:  YOUR HONOR, I'D LIKE TO OFFER 4859 RIGHT

10:31AM  11   NOW.  I THINK THIS WILL COME IN THROUGH ANOTHER WITNESS, AND I

10:31AM  12   THINK IT MAY AID TO GO THROUGH IT NOW.

10:31AM  13          MR. WADE:  WE WOULD OBJECT UNDER 602 AND 802.

10:32AM  14          THE COURT:  DO YOU HAVE A FOUNDATIONAL WITNESS THAT

10:32AM  15   IS AVAILABLE?

10:32AM  16          MR. LEACH:  YES, LATER IN THE TRIAL, YES.

10:32AM  17          THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, I'M

10:32AM  18   GOING TO ADMIT THIS NOW PROVISIONALLY, THAT IS TO SAY THAT I AM

10:32AM  19   GOING TO ALLOW EXAMINATION BY BOTH SIDES ON THIS NOW SUBJECT TO

10:32AM  20   THE FOUNDATION BEING LAID FOR ITS ADMITTANCE LATER.

10:32AM  21       IF THAT DOESN'T HAPPEN, YOU'LL HEAR ME TELL YOU TO STRIKE

10:32AM  22   ANY TESTIMONY AND THIS EXHIBIT.

10:32AM  23       IF THE FOUNDATION IS LAID, I WILL TELL YOU THAT AND INFORM

10:32AM  24   YOU OF THAT AS WELL THAT IT MAY BE CONSIDERED.

10:32AM  25          SO FOR NOW IT'S ADMITTED PROVISIONALLY, SUBJECT TO THE

10:32AM   1      FOUNDATION BEING LAID IN THE FUTURE.

10:32AM   2          (GOVERNMENT'S EXHIBIT 4859 WAS PROVISIONALLY RECEIVED IN

10:32AM   3      EVIDENCE.)

10:32AM   4              MR. LEACH:  THANK YOU, YOUR HONOR.  UNDERSTOOD.

10:32AM   5              THE COURT:  SO IT MAY BE PUBLISHED AT THIS TIME.

10:33AM   6      BY MR. LEACH:

10:33AM   7      Q.  MS. SPIVEY, COULD YOU SEE IN THE UPPER LEFT-HAND CORNER

10:33AM   8      WHERE IT SAYS PROJECTED STATEMENT OF INCOME?

10:33AM   9      A.  YES.

10:33AM  10      Q.  AND THERE'S SOME HANDWRITING ON THIS PAGE.  YOU DON'T KNOW

10:33AM  11      WHOSE HANDWRITING THAT IS?

10:33AM  12      A.  I DON'T KNOW.

10:33AM  13      Q.  AND THERE ARE TWO COLUMNS FOR 1231, 2014, AND 12/31/2015.

10:33AM  14          DO YOU SEE THOSE?

10:33AM  15      A.  YES.

10:33AM  16      Q.  AND THERE'S A REVENUE PROJECTION FOR DECEMBER 31ST, 2014,

10:33AM  17      OF $140 MILLION.

10:33AM  18          DO YOU SEE THAT?

10:33AM  19      A.  YES.

10:33AM  20      Q.  AND DID YOU PROVIDE THAT NUMBER TO ANYBODY?

10:33AM  21      A.  NO.

10:33AM  22      Q.  AND DO YOU HAVE ANY IDEA WHERE THAT NUMBER CAME FROM?

10:33AM  23      A.  NO.

10:33AM  24      Q.  TO THE RIGHT THERE'S A TOTAL REVENUE OF 990 MILLION FOR

10:33AM  25      DECEMBER 31ST, 2015.

10:33AM  1          DO YOU SEE THAT?

10:33AM  2     A.   YES.

10:33AM  3     Q.   AND DID YOU PROVIDE THAT NUMBER TO SOMEBODY?

10:33AM  4     A.   NO.

10:33AM  5     Q.   DO YOU HAVE ANY IDEA WHERE THAT NUMBER CAME FROM?

10:34AM  6     A.   NO.

10:34AM  7     Q.   DO YOU HAVE ANY EXPLANATION FOR WHY THAT NUMBER IS

10:34AM  8     DIFFERENT THAN THE NUMBERS THAT WERE PROVIDED TO ARANCA?

10:34AM  9     A.   NO.

10:34AM 10     Q.   AND CAN YOU THINK OF ANY REASON WHY THERANOS WOULD PROVIDE

10:34AM 11     ONE SET OF NUMBERS TO ARANCA AND A DIFFERENT SET OF NUMBERS TO

10:34AM 12     A DIFFERENT AUDIENCE?

10:34AM 13     A.   NO, I DON'T KNOW.

10:34AM 14     Q.   THANK YOU, MS. HOLLIMAN.  YOU CAN PLEASE TAKE THAT DOWN.

10:34AM 15          LET ME DRAW YOUR ATTENTION TO EXHIBIT 3233.

10:34AM 16               THE COURT:  I'M SORRY, WHAT EXHIBIT IS IT?

10:35AM 17               MR. LEACH:  3233, YOUR HONOR.

10:35AM 18               THE COURT:  THANK YOU.

10:35AM 19     BY MR. LEACH:

10:35AM 20     Q.   DOES THIS APPEAR TO BE A COPY OF THERANOS'S TAX RETURN FOR

10:35AM 21     THE YEAR ENDED DECEMBER 31ST, 2015, MS. SPIVEY?

10:35AM 22     A.   YES.

10:35AM 23     Q.   AND DID YOU HAVE A HAND IN PREPARING THIS OR GIVING

10:35AM 24     INFORMATION TO CONSULTANTS TO PREPARE THIS?

10:35AM 25     A.   YES.

10:35AM 1    Q.   AND DID THERANOS PREPARE TAX RETURNS IN THE ORDINARY

10:35AM 2    COURSE OF BUSINESS?

10:35AM 3    A.   YES.

10:35AM 4    Q.   WAS IT MADE AT OR NEAR THE TIME OF THE INFORMATION IN THE

10:35AM 5    QAD SYSTEM AND OTHER FINANCIAL RECORDS?

10:35AM 6    A.   YES.

10:35AM 7    Q.   AND WAS IT THERANOS'S PRACTICE TO KEEP ITS TAX RETURNS SO

10:35AM 8    THAT IT COULD DEMONSTRATE ITS INCOME AND EXPENSES TO THE

10:35AM 9    I.R.S.?

10:35AM 10   A.   YES.

10:35AM 11            MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 3233.

10:35AM 12            MR. WADE:  WE OBJECT UNDER 401, YOUR HONOR.

10:35AM 13            THE COURT:  THANK YOU.  THE OBJECTION IS OVERRULED.

10:36AM 14   IT MAY BE ADMITTED UNDER 803.  THE FOUNDATION HAS BEEN LAID.

10:36AM 15       IT MAY BE PUBLISHED.

10:36AM 16       (GOVERNMENT'S EXHIBIT 3233 WAS RECEIVED IN EVIDENCE.)

10:36AM 17            MR. LEACH:  LET'S ZOOM IN BRIEFLY, PLEASE,

10:36AM 18   MS. HOLLIMAN AT THE TOP OF THE TEXT.

10:36AM 19   Q.   DO YOU SEE THE DATE DECEMBER 31ST, 2015, MS. SPIVEY?

10:36AM 20   A.   YES.

10:36AM 21   Q.   AND THERE'S A REFERENCE TO MOSS ADAMS LLP.  IS THAT THE

10:36AM 22   TAX PREPARATION FIRM?

10:36AM 23   A.   YES.

10:36AM 24   Q.   AND LET ME PLEASE DRAW YOUR ATTENTION TO PAGE 4 THERE'S AN

10:36AM 25   ENTRY OF $429,210 FOR GROSS RECEIPTS OR SALES.

10:37AM  1      DO YOU SEE THAT?

10:37AM  2      A.   YES.

10:37AM  3      Q.   AND DO YOU BELIEVE THAT TO BE THE REVENUE FOR THERANOS IN

10:37AM  4      2015?

10:37AM  5      A.   YES.

10:37AM  6      Q.   AND IF I COULD PLEASE DRAW YOUR ATTENTION TO PAGE 8

10:37AM  7      THERE'S A NUMBER NEGATIVE $585,079,242.

10:37AM  8      DO YOU SEE THAT IN RETAINED EARNINGS?

10:37AM  9      A.   YES.

10:37AM  10     Q.   IS THAT A REFERENCE TO THERANOS'S ACCUMULATED DEFICIT FROM

10:37AM  11     2003 UP THROUGH 2015?

10:37AM  12     A.   YES.

10:37AM  13     Q.   THANK YOU, MS. SPIVEY.

10:38AM  14     THANK YOU, YOUR HONOR.  I HAVE NOTHING FURTHER.

10:38AM  15          THE COURT:  THANK YOU.

10:38AM  16     CROSS-EXAMINATION?

10:38AM  17          MR. WADE:  YES, YOUR HONOR.

10:38AM  18     YOUR HONOR, MAYBE THE JURY WOULD LIKE TO STAND UP AS I'M

10:38AM  19     JUST TRANSITIONING MY MATERIALS?

10:38AM  20          THE COURT:  WELL, THANK YOU FOR THAT.

10:38AM  21     FOLKS, YOU MAY STAND IF YOU WOULD LIKE.

10:38AM  22     (STRETCHING.)

10:39AM  23          THE COURT:  LET ME ASK COUNSEL, WILL WE BE RECESSING

10:39AM  24     AT 11:00?

10:39AM  25          MR. DOWNEY:  I THINK SOME TIME BETWEEN 11:00 AND

10:39AM   1      11:15.  WHATEVER SEEMS SENSIBLE.

10:39AM   2              THE COURT:  THANK YOU.  THANK YOU FOR THAT.

10:39AM   3          (PAUSE IN PROCEEDINGS.)

10:39AM   4              THE COURT:  LADIES AND GENTLEMEN OF THE JURY, ONE

10:39AM   5      THING I'M GOING TO ASK YOU TO DO IS TO LOOK AT YOUR SCHEDULES

10:39AM   6      OVER THE NEXT DAY AND MAYBE TODAY.  IT MAY BE THAT I'M GOING TO

10:39AM   7      ASK YOU IF WE COULD -- I TOLD YOU THAT WE END AT 2:00 P.M.  I

10:39AM   8      MAY ASK IF WE CAN EXTEND THAT AN HOUR TO MAYBE GO UNTIL

10:39AM   9      3:00 O'CLOCK ON SOME DAYS JUST TO CAPTURE EXTRA TIME.

10:39AM  10          WE LOST FRIDAY'S TESTIMONY, AS YOU KNOW.  I'D LIKE TO GET

10:39AM  11      US ON SCHEDULE AND KEEP US ON SCHEDULE FOR YOUR CONVENIENCE.

10:39AM  12      BUT I JUST WANT TO LET YOU KNOW IN ADVANCE OF THAT FOR YOUR

10:40AM  13      PLANNING IF YOU MIGHT INVESTIGATE MAYBE ENDING AT 3:00 O'CLOCK.

10:40AM  14          CANDIDLY, THERE MAY BE SOME DAYS THAT I'M GOING TO ASK YOU

10:40AM  15      MAYBE WE'LL GO UNTIL 4:00 O'CLOCK.  I'M NOT GOING TO KEEP YOU

10:40AM  16      UNTIL 5:00, I PROMISE YOU THAT, ON ANY DAY.

10:40AM  17          I DO WANT TO POINT OUT ONE OTHER THING.  I THINK WE DO

10:40AM  18      HAVE THE HEPA FILTERS NOW IN THE COURTROOM, AND THEY SHOULD BE

10:40AM  19      BY COUNSEL TABLE.  I THINK THAT'S RIGHT.  I HAVEN'T HEARD THEM

10:40AM  20      KICK THEM OVER YET SO I ASSUME THAT THEY'RE WELL PLACED.

10:40AM  21          BUT I JUST WANT TO LET YOU KNOW THAT, LADIES AND

10:40AM  22      GENTLEMEN, WE DO HAVE SOME ADDITIONAL FILTRATION HERE IN THE

10:40AM  23      COURTROOM.

10:40AM  24      ///

10:40AM  25      ///

| | | |
|---|---|---|
| 10:40AM | 1 | **CROSS-EXAMINATION** |
| 10:40AM | 2 | BY MR. WADE: |
| 10:40AM | 3 | Q.   GOOD MORNING, MS. SPIVEY. |
| 10:40AM | 4 | A.   GOOD MORNING. |
| 10:40AM | 5 | Q.   MY NAME IS LANCE WADE.  I REPRESENT MS. HOLMES.  I'D LIKE |
| 10:40AM | 6 | TO ASK YOU A FEW QUESTIONS HERE THIS MORNING. |
| 10:40AM | 7 | A.   OKAY. |
| 10:40AM | 8 | Q.   WE'VE NEVER MET BEFORE; CORRECT? |
| 10:41AM | 9 | A.   NO. |
| 10:41AM | 10 | Q.   IT'S NICE TO MEET YOU. |
| 10:41AM | 11 | MS. YAM, I'D LIKE TO START WITH GOVERNMENT EXHIBIT 5702. |
| 10:41AM | 12 | IF WE COULD CALL THAT UP. |
| 10:41AM | 13 | THE CLERK:  COUNSEL, THAT HAS NOT BEEN ADMITTED. |
| 10:41AM | 14 | MR. WADE:  I'M SORRY.  I CALLED THE WRONG NUMBER. |
| 10:41AM | 15 | 5172. |
| 10:42AM | 16 | Q.   DO YOU RECALL THIS DOCUMENT, MS. SPIVEY? |
| 10:42AM | 17 | A.   YES. |
| 10:42AM | 18 | Q.   AND THIS IS A DOCUMENT THAT RELATES TO THE CASH FLOW OF |
| 10:42AM | 19 | THE COMPANY FROM THE PERIOD 2011 UNTIL THE END OF 2015? |
| 10:42AM | 20 | A.   YES. |
| 10:42AM | 21 | Q.   AND THIS WAS THE TYPE OF DOCUMENTS THAT YOU WOULD |
| 10:42AM | 22 | REGULARLY PROVIDE MS. HOLMES? |
| 10:42AM | 23 | A.   YES. |
| 10:42AM | 24 | Q.   AND IT WAS FOCUSSED ON THE CASH? |
| 10:42AM | 25 | A.   YES. |

10:42AM  1   Q.   AND THAT WAS AN AREA OF THE FINANCES THAT MS. HOLMES WAS

10:42AM  2   MOST KEENLY FOCUSSED ON?

10:42AM  3   A.   I'M NOT SURE.  I PROVIDE THIS ON A WEEKLY BASIS.

10:42AM  4   Q.   THIS WAS THE REPORT THAT YOU PROVIDED TO HER MOST

10:42AM  5   FREQUENTLY?

10:42AM  6   A.   YES.

10:42AM  7   Q.   AND WE'VE TALKED ABOUT SOME DIFFERENT ACCOUNTING

10:42AM  8   PRINCIPLES HERE THIS MORNING.  I'D LIKE TO EXPLORE THE

10:43AM  9   DIFFERENCES BETWEEN CASH AND REVENUE.  OKAY?

10:43AM 10   A.   UH-HUH, YES.

10:43AM 11   Q.   THEY'RE NOT THE SAME; CORRECT?

10:43AM 12   A.   CORRECT.

10:43AM 13   Q.   AND WHEN CASH COMES IN THE DOOR FROM A CUSTOMER AND GOES

10:43AM 14   INTO THE THERANOS BANK ACCOUNT, THAT DOESN'T MEAN THAT IT'S

10:43AM 15   REVENUE; CORRECT?

10:43AM 16   A.   CORRECT.

10:43AM 17   Q.   SOMETIMES IT'S CONSIDERED DEFERRED REVENUE?

10:43AM 18   A.   YES.

10:43AM 19   Q.   AND IT WILL SIT ON THE BOOKS OF THE COMPANY AS DEFERRED

10:43AM 20   REVENUE UNTIL CERTAIN CONDITIONS ARE MET AND IT CAN BE

10:43AM 21   RECOGNIZED IN THE REVENUE; CORRECT?

10:43AM 22   A.   CORRECT.

10:43AM 23   Q.   BUT THE CASH IS IN THE BANK ACCOUNT; CORRECT?

10:43AM 24   A.   YES.

10:43AM 25   Q.   AND THE CASH CAN BE SPENT BY THE COMPANY; CORRECT?

10:43AM  1    A.   YES.

10:43AM  2    Q.   AND IN THIS CASE THE CASH WAS INVESTED BY THE COMPANY INTO

10:43AM  3    VARIOUS THINGS LIKE RESEARCH AND DEVELOPMENT?

10:43AM  4    A.   YES.

10:43AM  5    Q.   AND SO WHEN MR. LEACH WAS ASKING ABOUT REVENUE, HE WAS

10:44AM  6    FOCUSSED ON AN ACCOUNTING JUDGMENT THAT IS MADE; CORRECT?

10:44AM  7    A.   CAN YOU REPEAT THAT.

10:44AM  8    Q.   SURE.  LET ME TRY IT A DIFFERENT WAY.

10:44AM  9         THERE ARE MANY RULES THAT RELATE TO WHEN YOU CAN RECOGNIZE

10:44AM  10   CASH AS REVENUE; CORRECT?

10:44AM  11   A.   YES.

10:44AM  12   Q.   AND THERE ARE A LOT OF ACCOUNTING CONCEPTS RELATED TO

10:44AM  13   THAT?

10:44AM  14   A.   YES.

10:44AM  15   Q.   AND, IN FACT, IN THIS TIME PERIOD THERE WERE NUMEROUS

10:44AM  16   ACCOUNTING PRINCIPLES AND OPINIONS THAT RELATED TO REVENUE

10:44AM  17   RECOGNITION; CORRECT?

10:44AM  18   A.   YES.

10:44AM  19   Q.   AND THAT'S A PRETTY TECHNICAL ACCOUNTING JUDGMENT;

10:44AM  20   CORRECT?

10:44AM  21   A.   YES.

10:44AM  22   Q.   AND THAT WAS A JUDGMENT THAT YOU WERE INTERACTING WITH

10:44AM  23   FREQUENTLY WITH KPMG AND OTHERS; CORRECT?

10:44AM  24   A.   YES.

10:44AM  25   Q.   AND OFTENTIMES IT WOULD HINGE ON VERY PARTICULAR ELEMENTS

| | | |
|---|---|---|
| 10:44AM | 1 | OF FACTS AND CIRCUMSTANCES THAT RELATED TO A PARTICULAR |
| 10:44AM | 2 | CONTRACT; CORRECT? |
| 10:44AM | 3 | A.   YES. |
| 10:44AM | 4 | Q.   AND SO YOU'D HAVE TO LOOK AT THE TERMS OF A CONTRACT, FOR |
| 10:45AM | 5 | EXAMPLE, AND ASSESS WHETHER IT WOULD MEET THE TECHNICAL |
| 10:45AM | 6 | PROVISION OF THE ACCOUNTING? |
| 10:45AM | 7 | A.   YES. |
| 10:45AM | 8 | Q.   AND THAT'S A VERY DETAILED ANALYSIS? |
| 10:45AM | 9 | A.   YES. |
| 10:45AM | 10 | Q.   THAT WAS DONE BY YOU AND OTHER ACCOUNTANTS WITHIN THE |
| 10:45AM | 11 | COMPANY? |
| 10:45AM | 12 | A.   YES. |
| 10:45AM | 13 | Q.   AND IN CONJUNCTION WITH DISCUSSIONS ABOUT THOSE MATTERS |
| 10:45AM | 14 | WITH YOUR OUTSIDE ACCOUNTANTS FROM TIME TO TIME; CORRECT? |
| 10:45AM | 15 | A.   YES. |
| 10:45AM | 16 | Q.   AND, IN FACT, WE SAW ONE EMAIL BY MR. LEACH WHERE SOME |
| 10:45AM | 17 | INFORMATION WAS FORWARDED A FEW MONTHS AFTER IT WAS RECEIVED SO |
| 10:45AM | 18 | THAT THE ACCOUNTANTS COULD GIVE THEIR VIEW FOR WHETHER A PFIZER |
| 10:45AM | 19 | CONTRACT COULD BE RECOGNIZED AS REVENUE; CORRECT? |
| 10:45AM | 20 | A.   YES. |
| 10:45AM | 21 | Q.   BUT THAT MONEY HAD BEEN IN THE DOOR FOR A LONG TIME? |
| 10:45AM | 22 | A.   YES. |
| 10:45AM | 23 | Q.   AND THE COMPANY HAD BEEN USING THAT MONEY FOR A LONG TIME? |
| 10:45AM | 24 | A.   YES. |
| 10:45AM | 25 | Q.   I'LL COME BACK TO SOME DETAILS RELATING TO THAT IN A |

10:46AM   1    MINUTE, BUT LET ME SHIFT TO SOME OF YOUR TESTIMONY WITH RESPECT

10:46AM   2    TO CHALLENGES THAT THE COMPANY FACED IN 2009.

10:46AM   3         DO YOU RECALL THAT TESTIMONY?

10:46AM   4    A.   YES.

10:46AM   5    Q.   AND DO YOU RECALL IN LATE 2008 AND EARLY 2009 THE COUNTRY

10:46AM   6    WAS EXPERIENCING A FINANCIAL CRISIS?

10:46AM   7    A.   YES.

10:46AM   8    Q.   AND DO YOU RECALL THAT BEAR STEARNS COLLAPSED IN OCTOBER

10:46AM   9    OF 2008 AND IT PRECIPITATED A FINANCIAL CRISIS THAT BESET THE

10:46AM  10    COUNTRY FOR A NUMBER OF YEARS?

10:46AM  11    A.   YES.

10:46AM  12    Q.   AND AS A RESULT OF THAT A LOT OF COMPANIES WERE GOING

10:46AM  13    THROUGH HARD TIMES; CORRECT?

10:46AM  14    A.   I'M NOT SURE.

10:46AM  15    Q.   WELL, WERE YOU AWARE OF AT LEAST ONE COMPANY THAT WAS

10:46AM  16    GOING THROUGH HARD TIMES?

10:46AM  17    A.   THERANOS.

10:46AM  18         (LAUGHTER.)

10:46AM  19    BY MR. WADE:

10:46AM  20    Q.   OKAY.  AND THERE WERE A LOT OF WORKERS AT THAT TIME WHO

10:47AM  21    WERE GOING THROUGH HARD TIMES AS A RESULT OF A FINANCIAL

10:47AM  22    CRISIS; CORRECT?

10:47AM  23    A.   I'M NOT SURE.

10:47AM  24    Q.   YOU'RE NOT AWARE OF ANY OF THAT?

10:47AM  25    A.   NOPE.

10:47AM  1   Q.   OKAY.  AND IN THIS TIME PERIOD MS. HOLMES WAS VERY

10:47AM  2   FOCUSSED ON THE CASH MANAGEMENT OF THE COMPANY; CORRECT?

10:47AM  3   A.   YES.

10:47AM  4   Q.   AND IT WAS SIMILAR TO THE TYPE OF ANALYSIS THAT WE WERE

10:47AM  5   DISCUSSING IN CONNECTION WITH THE EXHIBIT?

10:47AM  6   A.   YES.

10:47AM  7   Q.   SHE WOULD LOOK AT MONEY COMING IN AND MONEY GOING OUT?

10:47AM  8   A.   YES.

10:47AM  9   Q.   AND THERE WOULD BE A NEED AS A STRUGGLING BUSINESS TO

10:47AM  10  PRIORITIZE THOSE DEMANDS; CORRECT?

10:47AM  11  A.   YES.

10:47AM  12  Q.   AND YOU WORKED WITH HER HARD ON THAT TO TRY AND DO THAT

10:47AM  13  CORRECTLY?

10:47AM  14  A.   YES.

10:47AM  15  Q.   AND ENSURING THAT THERANOS EMPLOYEES WOULD GET PAID WAS A

10:47AM  16  PARTICULAR FOCUS FOR MS. HOLMES; CORRECT?

10:47AM  17  A.   I'M NOT -- I MEAN, I'M NOT SURE WHAT SHE PRIORITIZE OR HOW

10:48AM  18  SHE PRIORITIZE.

10:48AM  19  Q.   WELL, YOU RECALL YOUR TESTIMONY YESTERDAY ABOUT THE

10:48AM  20  PAYROLL -- I'M SORRY, NOT YESTERDAY.  IT FEELS LIKE YESTERDAY

10:48AM  21  MAYBE.

10:48AM  22      YOU RECALL YOUR TESTIMONY LAST WEEK WITH RESPECT TO THE

10:48AM  23  PAYROLL AND EFFORTS TO ENSURE THAT PAYROLL WAS MADE?

10:48AM  24  A.   YES.

10:48AM  25  Q.   AND THERE WERE SOME EXTRAORDINARY EFFORTS TO MAKE SURE

10:48AM   1    THAT A CHECK CLEARED THE BANK SO THAT THE PAYROLL WOULD CLEAR.

10:48AM   2         DO YOU RECALL THAT?

10:48AM   3    A.   YES.

10:48AM   4    Q.   AND THAT WAS SOMETHING THAT MS. HOLMES CARED A LOT ABOUT

10:48AM   5    IN THAT INSTANCE; CORRECT?

10:48AM   6    A.   IN THAT INSTANCE, YES.

10:48AM   7    Q.   AND, IN FACT, THE COMPANY ALWAYS MADE ITS PAYROLL, DID IT

10:48AM   8    NOT?

10:48AM   9    A.   YES.

10:48AM  10    Q.   THAT'S TRUE IN THE ENTIRE TIME PERIOD THAT YOU WORKED AT

10:48AM  11    THE COMPANY?

10:48AM  12    A.   YES.

10:48AM  13    Q.   NOW, WHEN YOU STARTED AT THE COMPANY IN 2006, THERANOS

10:48AM  14    ALREADY HAD SOME INVESTORS?

10:48AM  15    A.   YES.

10:48AM  16    Q.   AND THE COMPANY WAS INVESTING A LOT OF ITS CAPITAL IN

10:49AM  17    RESEARCH AND DEVELOPMENT?

10:49AM  18    A.   YES.

10:49AM  19    Q.   AND FROM THE TIME THAT YOU ARRIVED AT THERANOS THAT

10:49AM  20    CONTINUED INVESTMENT CONTINUED UNTIL 2015; CORRECT?

10:49AM  21    A.   YES.

10:49AM  22    Q.   AND THAT WAS TYPICALLY THE LARGEST EXPENDITURE THAT THE

10:49AM  23    COMPANY MADE?

10:49AM  24    A.   I'M NOT SURE.

10:49AM  25    Q.   WE CAN LOOK AT SOME DETAILED EXPENSE RECORDS IN A MOMENT

10:49AM 1    THAT MIGHT HELP REFRESH YOUR RECOLLECTION ON THAT.

10:49AM 2        YOU TALKED A BIT ABOUT THE PHARMACEUTICAL COMPANIES THAT

10:49AM 3    THERANOS DID BUSINESS WITH.

10:49AM 4        DO YOU RECALL THAT TESTIMONY?

10:49AM 5    A.   YES.

10:49AM 6    Q.   AND THERANOS RECEIVED MILLIONS OF DOLLARS FROM CONTRACTS

10:50AM 7    THAT IT HAD AND WORK THAT IT DID WITH THOSE COMPANIES; CORRECT?

10:50AM 8    A.   YES.

10:50AM 9    Q.   AND INITIALLY THAT WAS CASH THAT CAME IN THE DOOR?

10:50AM 10   A.   YES.

10:50AM 11   Q.   AND CUSTOMER RECEIPTS?

10:50AM 12   A.   YES.

10:50AM 13   Q.   AND THEN AT DIFFERENT POINTS IN TIME IT WOULD BE

10:50AM 14   RECOGNIZED AS REVENUE?

10:50AM 15   A.   YES.

10:50AM 16   Q.   AFTER YOUR ACCOUNTING JUDGMENTS WERE MADE?

10:50AM 17   A.   YES.

10:50AM 18   Q.   AND THERE WERE SOMETIMES WHERE THE COMPANY WAS SUPPORTED

10:50AM 19   BY BANK LOANS?

10:50AM 20   A.   YES.

10:50AM 21   Q.   AND THERE WERE MANY TIMES WHEN THERANOS HAD LARGE AMOUNTS

10:50AM 22   OF CASH IN THE BANK BUT IT ACCEPTED ADDITIONAL INVESTMENTS

10:50AM 23   ANYWAY; CORRECT?

10:50AM 24   A.   YES.

10:50AM 25   Q.   IN FACT, LET'S LOOK AT 5172 AGAIN.  LET ME BRING YOU TO

10:50AM  1    COLUMN GR.  AND THIS IS FOR THE WEEK OF OCTOBER 2014; CORRECT?

10:51AM  2    A.   YES.

10:51AM  3    Q.   AND AT THIS TIME THE COMPANY HAD A HUNDRED MILLION DOLLARS

10:51AM  4    IN THE BANK?

10:51AM  5    A.   YES.

10:51AM  6    Q.   AND IF YOU LOOK IN COLUMN GS, NOTWITHSTANDING THE FACT

10:51AM  7    THAT IT HAD $113 MILLION IN THE BANK, IT TOOK AN ADDITIONAL

10:51AM  8    INVESTMENT OF $130 MILLION; CORRECT?

10:51AM  9    A.   YES.

10:51AM  10   Q.   AND THAT'S REFLECTED IN ROW 27?

10:51AM  11   A.   YES.

10:51AM  12   Q.   AND IN EARLY NOVEMBER 2014, IF WE CAN GO TO GT, YOU SEE

10:52AM  13   THE COMPANY HAD SIGNIFICANT CASH ON HAND.

10:52AM  14        DO YOU SEE THAT?

10:52AM  15   A.   YES.

10:52AM  16   Q.   I'M SORRY.  LET ME FOCUS YOU FIRST ON GS.  GS THEY HAVE

10:52AM  17   $233 MILLION ON HAND; CORRECT?

10:52AM  18   A.   YES.

10:52AM  19   Q.   AND THEN NOTWITHSTANDING THAT THEY TOOK IN THE NEXT WEEK

10:52AM  20   ANOTHER HUNDRED MILLION DOLLAR INVESTMENT?

10:52AM  21   A.   YES.

10:52AM  22   Q.   AND THIS PATTERN OCCURRED THROUGHOUT 2014 AND '15?

10:52AM  23   A.   YES.

10:52AM  24   Q.   THERANOS WASN'T JUST RECEIVING INVESTMENT BECAUSE IT

10:52AM  25   NEEDED IMMEDIATE CASH?

10:53AM 1    A.  CORRECT.

10:53AM 2    Q.  YOU TESTIFIED ON DIRECT ABOUT THAT TIME PERIOD IN 2009,

10:53AM 3    AND I'D LIKE TO FOCUS ON SOME PAYMENTS THAT WERE RECEIVED IN

10:53AM 4    2009.

10:53AM 5        AND I'LL DO THAT BY BRINGING UP EXHIBITS 7753, WHICH I

10:53AM 6    BELIEVE THAT THE GOVERNMENT HAS STIPULATED TO ADMITTING?

10:53AM 7            MR. LEACH:  THAT'S CORRECT, YOUR HONOR.

10:53AM 8            THE COURT:  ALL RIGHT.  THAT IS ADMITTED, AND IT MAY

10:53AM 9    BE PUBLISHED.

10:53AM 10       (DEFENDANT'S EXHIBIT 7753 WAS RECEIVED IN EVIDENCE.)

10:53AM 11   BY MR. WADE:

10:53AM 12   Q.  AND DO YOU SEE THIS IS AN EMAIL THAT YOU -- IF WE CAN BLOW

10:54AM 13   UP THE TOP.  I'M JUST FOCUSSED ON THE DATE, MS. SPIVEY.  THIS

10:54AM 14   IS A DOCUMENT THAT YOU PREPARED IN NOVEMBER 2016 AT THE REQUEST

10:54AM 15   OF SOME COMPANY EMPLOYEES AND AGENTS AND IT INCLUDED A LIST OF

10:54AM 16   RECEIPTS FROM PHARMA.

10:54AM 17       DO YOU SEE THAT?

10:54AM 18   A.  YES.

10:54AM 19   Q.  AND A CONTRACT SUMMARY?

10:54AM 20   A.  YES.

10:54AM 21   Q.  AND SOME OF THE RELATED CONTRACTS FOR THAT.

10:54AM 22       DO YOU RECALL COMPILING THIS?

10:54AM 23   A.  LOOKING AT THIS EMAIL, I DON'T RECALL IT OUTSIDE OF THIS

10:54AM 24   EMAIL.

10:54AM 25   Q.  OKAY.  BUT YOU RECALL THAT YOU KEPT SOME OF THESE RECORDS

10:54AM  1    DURING YOUR TIME AT THE COMPANY?

10:54AM  2    A.   YES.

10:54AM  3    Q.   AND I'D LIKE TO LOOK AT THE ATTACHMENT AND BRING UP BATES

10:54AM  4    ENDING 5721.

10:56AM  5         (PAUSE IN PROCEEDINGS.)

10:56AM  6         MR. WADE:  I WOULD ASK THE COURT'S INDULGENCE WHILE

10:56AM  7    WE IRON OUT A TECHNICAL DETAIL.

10:56AM  8         THE COURT:  YES, OF COURSE.

10:56AM  9         (PAUSE IN PROCEEDINGS.)

10:56AM 10    BY MR. WADE:

10:56AM 11    Q.   I'VE CALLED UP AN ATTACHMENT TO EXHIBIT 7753.  AND DO YOU

10:56AM 12    SEE THAT THIS IS A DOCUMENT THAT SHOWS WHEN DIFFERENT PAYMENTS

10:56AM 13    WERE RECEIVED FROM THE PHARMACEUTICAL COMPANIES THAT THERANOS

10:56AM 14    DID WORK FOR?

10:57AM 15    A.   YES.

10:57AM 16    Q.   AND CAN YOU SEE FROM THIS THAT THERANOS, FROM JANUARY TO

10:57AM 17    MARCH OF 2009, IF I CAN PULL THAT UP.

10:57AM 18         DO YOU SEE THAT?  DO YOU SEE IN THAT TIME PERIOD THERANOS

10:57AM 19    RECEIVED ABOUT $3.7 MILLION IN PAYMENTS FROM CELGENE, CENTOCOR,

10:57AM 20    AND THE MAYO CLINIC?

10:57AM 21    A.   YES.

10:57AM 22    Q.   AND IN THE APRIL THROUGH JUNE PERIOD OF 2009 THE COMPANY

10:57AM 23    RECEIVED $1.8 MILLION IN PAYMENTS FROM CENTOCOR AND

10:57AM 24    SCHERING-PLOUGH?

10:57AM 25    A.   YES.

10:57AM 1    Q.   AND THEN IN THE PERIODS THAT FOLLOW, IF WE SCROLL TO THE

10:58AM 2    RIGHT YOU SEE IN THE 2009 AND 2010 PERIOD THEY'RE APPROACHING

10:58AM 3    ANOTHER $2 MILLION IN PAYMENTS?

10:58AM 4    A.   HUH, WHERE AM I LOOKING AT?

10:58AM 5    Q.   WELL, YOU SEE CELGENE THERE'S 1.4 MILLION COMBINED IN

10:58AM 6    2010?

10:58AM 7         DO YOU SEE THAT?

10:58AM 8    A.   1.1 MILLION, RIGHT.

10:59AM 9              THE CLERK:   DO YOU WANT ME TO CLEAR IT?

10:59AM 10             MR. WADE:   PLEASE.

10:59AM 11   Q.   THE PAYMENT IS RIGHT NEAR THE PENCIL AND GOING TO THE

10:59AM 12   RIGHT.

10:59AM 13        DO YOU SEE THAT?

10:59AM 14   A.   YES.

10:59AM 15   Q.   AND FROM THE AMERICAN BURN ASSOCIATION THERE WAS A

10:59AM 16   $250,000 PAYMENT?

10:59AM 17   A.   YES.

10:59AM 18   Q.   ACTUALLY TWO PAYMENTS, ONE FOR 250,000 AND ONE FOR 38,000?

10:59AM 19   A.   YES.

10:59AM 20   Q.   AND THAT AMERICAN BURN ASSOCIATION, THAT WAS WORK THAT WAS

10:59AM 21   DONE IN CONNECTION WITH THE DEPARTMENT OF DEFENSE?

10:59AM 22   A.   YES.

11:00AM 23        (PAUSE IN PROCEEDINGS.)

11:00AM 24   BY MR. WADE:

11:00AM 25   Q.   I'D LIKE TO TALK QUICKLY ABOUT THE STOCK OPTIONS ISSUE

11:00AM  1    THAT YOU'VE BEEN ASKED QUESTIONS ABOUT IN CONNECTIONS WITH THE

11:00AM  2    DEALING WITH KPMG.

11:00AM  3         DO YOU RECALL THAT TESTIMONY?

11:00AM  4    A.   YES.

11:00AM  5    Q.   AND THE ISSUE RELATED TO OPTIONS THAT WERE GRANTED ON MAY

11:00AM  6    31ST, 2010?

11:00AM  7    A.   YES.

11:00AM  8    Q.   AND THOSE WERE OPTIONS THAT WERE GRANTED AND APPROVED AT

11:00AM  9    THE MEETING OF THE THERANOS BOARD OF DIRECTORS?

11:00AM  10   A.   YES.

11:00AM  11   Q.   AND THE OPTION PRICE THAT IS REFLECTED HAS TO REFLECT THE

11:00AM  12   FAIR MARKET VALUE ON THE DATE THAT THEY'RE GRANTED; CORRECT?

11:01AM  13   A.   YES.

11:01AM  14   Q.   AND PART OF THAT IS THAT IF THE OPTION IS BELOW FAIR

11:01AM  15   MARKET VALUE, THERE'S AN EXPENSE THAT THE COMPANY TAKES?

11:01AM  16   A.   RIGHT.

11:01AM  17   Q.   BECAUSE THAT WOULD BE A NON-CASH COMPENSATION EXPENSE?

11:01AM  18   A.   RIGHT.

11:01AM  19   Q.   BUT THERE'S NO COMPENSATION EXPENSE IF THEY'RE DONE ON

11:01AM  20   FAIR MARKET VALUE ON DATE OF AGREEMENT?

11:01AM  21   A.   YES.

11:01AM  22   Q.   AND YOU ALSO AVOID CREATING VARIOUS TAX IMPLICATIONS IF

11:01AM  23   YOU DO THEM ON FAIR MARKET VALUE, AT FAIR MARKET VALUE ON THE

11:01AM  24   DAY OF THE GRANT?

11:01AM  25   A.   YES.

11:01AM  1    Q.   AND SO THERE'S AN EFFORT THAT IS MADE IN GOOD FAITH BY THE

11:01AM  2    COMPANY TO TRY AND ASSESS THE FAIR MARKET VALUE SO THAT IT

11:01AM  3    COMPLIES WITH ALL OF THOSE REQUIREMENTS; CORRECT?

11:01AM  4    A.   YES.

11:01AM  5    Q.   AND THAT'S THE PROCESS THAT YOU WERE ENGAGED IN WITH

11:01AM  6    VARIOUS PROFESSIONAL FIRMS IN CONNECTION WITH THESE OPTIONS?

11:01AM  7    A.   YES.

11:01AM  8    Q.   DO YOU RECALL THAT IN THIS TIME PERIOD IT WAS ACTUALLY YOU

11:01AM  9    WHO REACHED OUT TO KPMG TO SEEK SPECIFIC ASSISTANCE FROM THEM

11:02AM  10   IN ANALYZING THESE OPTIONS?

11:02AM  11   A.   WHAT DOES THAT MEAN?

11:02AM  12   Q.   WELL, LET ME SEE IF I CAN REFRESH YOUR RECOLLECTION.

11:02AM  13        MAY I APPROACH, YOUR HONOR?

11:02AM  14             THE COURT:  YES.

11:02AM  15   BY MR. WADE:

11:02AM  16   Q.   (HANDING.)

11:02AM  17        MS. SPIVEY, I'M SHOWING YOU WHAT HAS BEEN MARKED FOR

11:03AM  18   IDENTIFICATION PURPOSES AT THIS POINT IS DX 13744.

11:03AM  19        DO YOU RECOGNIZE THIS EMAIL?

11:03AM  20   A.   YES.

11:03AM  21   Q.   AND DOES THIS REFRESH YOUR RECOLLECTION THAT YOU REACHED

11:03AM  22   OUT TO KPMG BECAUSE YOU WANTED TO GET ITS TAKE ON THESE STOCK

11:03AM  23   OPTIONS MATTERS?

11:03AM  24   A.   YES.

11:03AM  25   Q.   IT WASN'T KPMG RAISING AN ISSUE.  YOU, ON BEHALF OF THE

11:03AM 1    COMPANY, ACTUALLY REACHED OUT AND SOLICITED THEIR ADVICE?

11:03AM 2    A.   I BELIEVE MY RECOLLECTION OF THIS IS THAT THEY PERFORMED

11:03AM 3    THE AUDIT OF THE FINANCIAL STATEMENT FOR THE COMPANY, AND THIS

11:04AM 4    WAS PART OF THE ISSUE THAT THEY RAISED AND THE COMPANY AND KPMG

11:04AM 5    WAS TRYING TO WORK TOGETHER TO RESOLVE THAT.

11:04AM 6    Q.   DIDN'T YOU TELL KPMG IN APRIL OF 2011 THAT WITH RESPECT TO

11:04AM 7    THE 409A ISSUE WE WOULD LIKE TO GET THEIR TAKE ON THIS MATTER?

11:04AM 8    A.   YES.

11:04AM 9    Q.   AND DIDN'T YOU ADVISE KPMG THAT YOU HAD DISCUSSED THESE

11:04AM 10   ISSUES WITH LEGAL AND VALUATION FIRMS?

11:04AM 11   A.   YES.

11:04AM 12   Q.   AND THAT THOSE PROFESSIONALS SUGGESTED THAT YOU REACH OUT

11:04AM 13   TO KPMG?

11:04AM 14        MR. LEACH:  YOUR HONOR, CAN HE BE CLEAR IF THIS IS

11:04AM 15   REFRESHING THE RECOLLECTION OR READING FROM THE DOCUMENT.

11:05AM 16        THE COURT:  WELL, THE DOCUMENT IS NOT IN EVIDENCE.

11:05AM 17        MR. LEACH:  RIGHT.

11:05AM 18        THE COURT:  I DON'T KNOW IF YOU'RE READING FROM THE

11:05AM 19   DOCUMENT.

11:05AM 20      IF YOU'RE SEEKING TO REFRESH THE RECOLLECTION OF THIS

11:05AM 21   WITNESS, PLEASE DO SO BY THE QUESTION.

11:05AM 22        MR. WADE:  I'M SEEKING TO REFRESH HER RECOLLECTION

11:05AM 23   IF SHE RECALLS TELLING KPMG WHETHER THEY WERE REFERRED TO THE

11:05AM 24   ACCOUNTANTS BY THEIR LEGAL AND VALUATION ADVISORS.

11:05AM 25        THE COURT:  DO YOU UNDERSTAND THE QUESTION?

11:05AM   1            MS. SPIVEY, DO YOU UNDERSTAND HIS QUESTION?

11:05AM   2                 THE WITNESS:  CAN YOU REPEAT.

11:05AM   3       BY MR. WADE:

11:05AM   4       Q.   DOES LOOKING AT THIS DOCUMENT REFRESH YOUR RECOLLECTION

11:05AM   5       THAT YOU WERE CONSULTING WITH LEGAL AND VALUATION ADVISORS ON

11:05AM   6       THESE OPTION ISSUES?

11:05AM   7       A.   YES.

11:05AM   8       Q.   AND DOES IT REFRESH YOUR RECOLLECTION THAT AS A RESULT OF

11:05AM   9       THOSE CONSULTATIONS YOU WANTED TO REACH OUT TO KPMG?

11:05AM  10       A.   I CAN'T RECALL WHETHER THEY RAISED THE ISSUE AND WE

11:06AM  11       RESPOND OR WE REACHED OUT TO THEM.  I CAN'T RECALL THAT.

11:06AM  12       Q.   AND 13744 DOES NOT REFRESH YOUR RECOLLECTION ON THAT

11:06AM  13       POINT?

11:06AM  14       A.   NO.

11:06AM  15       Q.   OKAY.  DO YOU RECALL WHETHER THERE WAS A REQUEST

11:06AM  16       IMMEDIATELY FOLLOWING THIS OR IN THE WEEK THAT FOLLOWED THIS TO

11:06AM  17       HAVE KPMG PERFORM SOME SPECIAL PROCEDURES RELATING TO LOOKING

11:06AM  18       AT THESE OPTIONS?

11:06AM  19       A.   I DON'T REMEMBER.

11:06AM  20       Q.   LET ME SEE IF I CAN REFRESH YOUR RECOLLECTION.

11:07AM  21            MAY I APPROACH?

11:07AM  22                 THE COURT:  YES.

11:07AM  23       BY MR. WADE:

11:07AM  24       Q.   (HANDING.)

11:07AM  25                 THE COURT:  SO, MR. WADE, YOUR QUESTION IS, DO YOU

11:07AM 1    RECALL THAT THERE WAS A REQUEST IMMEDIATELY FOLLOWING THIS OR

11:07AM 2    IN THE WEEK FOLLOWING THIS TO HAVE KPMG PERFORM SOME SPECIAL

11:07AM 3    PROCEDURES RELATING TO THE OPTIONS?

11:07AM 4           MR. WADE:  CORRECT.

11:07AM 5           THE COURT:  ALL RIGHT.  SO THAT'S THE QUESTION,

11:07AM 6    MS. SPIVEY.

11:07AM 7       LOOK AT THIS DOCUMENT AND SEE IF THIS DOCUMENT REFRESHES

11:07AM 8    YOUR RECOLLECTION AS TO THAT QUESTION.

11:07AM 9       (PAUSE IN PROCEEDINGS.)

11:07AM 10          THE COURT:  HAVE YOU FINISHED LOOKING AT THAT

11:07AM 11   DOCUMENT?

11:07AM 12          THE WITNESS:  YES.

11:08AM 13   BY MR. WADE:

11:08AM 14   Q.   DOES THAT REFRESH YOUR RECOLLECTION ON THAT?

11:08AM 15   A.   I DON'T REMEMBER THIS DOCUMENT.

11:08AM 16   Q.   OKAY.  AND YOU DON'T RECALL KPMG LOOKING AT THAT ISSUE IN

11:08AM 17   THAT TIME PERIOD?

11:08AM 18   A.   I REMEMBER THEY -- THERANOS AND KPMG DISCUSSED THIS ISSUE,

11:08AM 19   BUT I DID NOT REMEMBER THIS PARTICULAR DOCUMENT THAT THEY

11:08AM 20   PERFORMED.

11:08AM 21   Q.   DO YOU RECALL THAT KPMG CONCLUDED BASED ON THEIR TEST WORK

11:08AM 22   THAT THE SHARE BASED PAYMENT EXPENSE APPEARS TO BE COMPLETE AND

11:08AM 23   ACCURATE, EXIST, AND BE PROPERLY VALUED AND PRESENTED?

11:08AM 24       DO YOU RECALL THAT?

11:08AM 25   A.   NO.

| | | |
|---|---|---|
| 11:08AM | 1 | MR. LEACH:  OBJECTION.  HEARSAY. |
| 11:08AM | 2 | THE COURT:  I'LL LET THE ANSWER REMAIN. |
| 11:08AM | 3 | YOU CAN ASK ANOTHER QUESTION. |
| 11:08AM | 4 | THE WITNESS:  ARE YOU STILL LOOKING AT THIS DOCUMENT |
| 11:08AM | 5 | THAT -- |
| 11:08AM | 6 | BY MR. WADE: |
| 11:08AM | 7 | Q.  I'M JUST ASKING IF YOU RECALL THAT KPMG CAME TO THE |
| 11:08AM | 8 | CONCLUSION THAT THERANOS'S VIEWS WITH RESPECT TO THE PRICING OF |
| 11:09AM | 9 | THOSE OPTIONS WAS ACCURATE? |
| 11:09AM | 10 | A.  NO. |
| 11:09AM | 11 | Q.  AND THIS DOCUMENT DOESN'T REFRESH YOUR RECOLLECTION AS TO |
| 11:09AM | 12 | THAT? |
| 11:09AM | 13 | A.  NO. |
| 11:09AM | 14 | MR. WADE:  YOUR HONOR, MAYBE NOW WOULD BE A GOOD |
| 11:09AM | 15 | TIME FOR A BREAK. |
| 11:09AM | 16 | THE COURT:  FOLKS, LET'S TAKE OUR RECESS NOW.  LET'S |
| 11:09AM | 17 | TAKE ABOUT 30 MINUTES, IT PROBABLY WILL BE 35 MINUTES BY THE |
| 11:09AM | 18 | TIME WE GET YOU BACK IN HERE. |
| 11:09AM | 19 | SO PLEASE RECALL MY ADMONITION.  YOU'RE NOT TO DISCUSS THE |
| 11:09AM | 20 | CASE WITH ANYONE, INCLUDING YOURSELVES.  DON'T REACH ANY |
| 11:09AM | 21 | CONCLUSIONS ABOUT ANYTHING UNTIL THE CASE HAS BEEN PRESENTED TO |
| 11:09AM | 22 | YOU FOR YOUR DELIBERATIONS. |
| 11:09AM | 23 | HAVE A GOOD BREAK.  THANK YOU. |
| 11:09AM | 24 | MS. SPIVEY, YOU CAN STAND DOWN AS WELL.  THANK YOU. |
| 11:09AM | 25 | THE WITNESS:  THANK YOU. |

```
11:14AM   1              (RECESS FROM 11:14 A.M. UNTIL 11:49 A.M.)

11:49AM   2              THE COURT:  PLEASE BE SEATED.  THANK YOU.  WE'RE

11:49AM   3    BACK ON THE RECORD.  OUR JURY IS PRESENT, AND ALTERNATES ARE

11:49AM   4    PRESENT, AND COUNSEL AND THE DEFENDANT ARE PRESENT.

11:49AM   5         IF WE CAN GET OUR WITNESS BACK.

11:50AM   6         GOOD AFTERNOON, MS. SPIVEY.

11:50AM   7         MR. WADE, WOULD YOU LIKE TO CONTINUE?

11:50AM   8              MR. WADE:  I WOULD, YOUR HONOR.  THANK YOU.

11:50AM   9    Q.   GOOD AFTERNOON, MS. SPIVEY.

11:50AM  10         I'D LIKE TO TALK BRIEFLY ABOUT MR. BALWANI.

11:50AM  11    A.   YES.

11:50AM  12    Q.   HE JOINED THE COMPANY IN 2009; IS THAT CORRECT?

11:50AM  13    A.   YES.  YES.

11:50AM  14    Q.   AND WHEN HE JOINED THE COMPANY, HE REPORTED DIRECTLY TO --

11:50AM  15    YOU REPORTED DIRECTLY TO HIM AS WELL; CORRECT?

11:50AM  16    A.   REPORTED?  I REPORTED DIRECTLY TO ELIZABETH HOLMES.

11:50AM  17    Q.   YOU DIDN'T ALSO DIRECTLY REPORT TO MR. BALWANI?

11:51AM  18    A.   I WOULD KEEP HIM INVOLVED.

11:51AM  19    Q.   YOU KEPT HIM INVOLVED IN THE FINANCIAL AFFAIRS OF THE

11:51AM  20    COMPANY?

11:51AM  21    A.   CORRECT.

11:51AM  22    Q.   AND YOU PROVIDED HIM INFORMATION I THINK WE TALKED ABOUT

11:51AM  23    EARLIER TODAY?

11:51AM  24    A.   YES.

11:51AM  25    Q.   AND WITH RESPECT TO THESE 409A ISSUES AND THE ARANCA
```

11:51AM  1      ISSUES, HE WAS SOMETIMES INVOLVED IN REVIEWING THE MATERIALS

11:51AM  2      THAT WENT TO THE VALUATION FIRM AS WELL; CORRECT?

11:51AM  3      A.   YES.

11:51AM  4      Q.   AND DO YOU RECALL THAT MR. BALWANI WAS PARTICULARLY

11:51AM  5      INVOLVED IN DEVELOPING SOME MODELS WITHIN THE COMPANY?

11:52AM  6      A.   I'M NOT SURE.

11:52AM  7      Q.   YOU DON'T RECALL HIM BEING INVOLVED IN ANY FINANCIAL

11:52AM  8      MODELS?

11:52AM  9      A.   NO.

11:52AM  10     Q.   DO YOU RECALL HIM BEING INVOLVED IN FINANCIAL PROJECTIONS?

11:52AM  11     A.   AS FAR AS I CAN REMEMBER FROM MY POINT IT'S ONLY FOR THE

11:52AM  12     409A.

11:52AM  13     Q.   409A PURPOSE?

11:52AM  14     A.   RIGHT.

11:52AM  15     Q.   LET ME PUT UP DTX 13710, WHICH I BELIEVE THE GOVERNMENT

11:52AM  16     HAS STIPULATED TO.

11:52AM  17          THE CLERK:  CAN YOU SAY THAT NUMBER AGAIN, PLEASE,

11:52AM  18     COUNSEL.

11:52AM  19          MR. WADE:  13710.

11:53AM  20          MR. LEACH:  I DON'T BELIEVE I HAVE THAT.

11:53AM  21          MR. WADE:  SORRY, BOB.  I'LL SKIP TO THE NEXT ONE.

11:53AM  22     Q.   LET ME SHOW YOU EXHIBIT 13711.

11:53AM  23          MR. LEACH:  NO OBJECTION, YOUR HONOR.

11:53AM  24          THE COURT:  THAT'S RECEIVED.

11:53AM  25          YOU'RE ASKING THAT THAT BE ADMITTED?

11:53AM  1              MR. WADE:  YES, YOUR HONOR.

11:53AM  2              THE COURT:  IT'S RECEIVED WITHOUT OBJECTION, AND IT

11:53AM  3     MAY BE PUBLISHED.

11:53AM  4         (DEFENDANT'S EXHIBIT 13711 WAS RECEIVED IN EVIDENCE.)

11:53AM  5     BY MR. WADE:

11:53AM  6     Q.   MS. YAM, WE WERE TALKING ABOUT YOUR 409A PROJECTIONS WITH

11:53AM  7     MR. BALWANI; CORRECT?

11:53AM  8     A.   YES.

11:53AM  9     Q.   AND ON THIS MS. HOLMES IS ASKING WHAT DROVE THE

11:54AM 10     $50 MILLION IN REVENUE PROJECTION.

11:54AM 11         DO YOU SEE THAT?

11:54AM 12     A.   YES.

11:54AM 13     Q.   AND WHAT WAS YOUR RESPONSE?

11:54AM 14     A.   SUNNY'S ESTIMATE.

11:54AM 15     Q.   SO THAT WAS INFORMATION THAT YOU RECEIVED FROM

11:54AM 16     MR. BALWANI?

11:54AM 17     A.   YES.

11:54AM 18     Q.   AND MR. BALWANI WORKED WITH YOU ON THE PREPARATION OF

11:54AM 19     FINANCIAL INFORMATION IN ADVANCE OF BOARD MEETINGS; CORRECT?

11:54AM 20     A.   USUALLY I GOT THE DATA FROM THE QAD SYSTEM.

11:54AM 21     Q.   AND YOU PREPARED BALANCE SHEETS FOR THOSE QUARTERLY BOARD

11:54AM 22     MEETINGS?

11:54AM 23     A.   RIGHT.

11:54AM 24     Q.   AND YOU PROVIDED THOSE TO MR. BALWANI?

11:54AM 25     A.   YES.

11:54AM  1    Q.   I'D LIKE TO PUBLISH DOCUMENT EXHIBIT 4859, PLEASE.

11:55AM  2         THIS IS ALREADY IN EVIDENCE, YOUR HONOR.

11:55AM  3              THE COURT:  ALL RIGHT.

11:55AM  4    BY MR. WADE:

11:55AM  5    Q.   DO YOU RECALL THE GOVERNMENT SHOWING YOU THIS DOCUMENT?

11:55AM  6    A.   YES.

11:55AM  7    Q.   AND YOU DIDN'T HAVE ANY FAMILIARITY WITH THIS DOCUMENT?

11:55AM  8    A.   CORRECT.

11:55AM  9    Q.   DO YOU KNOW THE PURPOSE FOR WHICH IT WAS PREPARED?

11:55AM  10   A.   NO.

11:55AM  11   Q.   DO YOU KNOW WHETHER IT WAS PROVIDED TO INVESTORS?

11:55AM  12   A.   NO.

11:55AM  13   Q.   DO YOU KNOW WHAT DISCUSSIONS OCCURRED IN CONNECTION WITH

11:55AM  14   THE HANDWRITING THAT IS ASSOCIATED?

11:55AM  15   A.   NO.

11:55AM  16   Q.   DO YOU SEE UP IN THE UPPER LEFT-HAND CORNER WHERE IT SAYS

11:56AM  17   "PROJECTED STATEMENT OF INCOME"?

11:56AM  18   A.   YES.

11:56AM  19   Q.   AND DO YOU KNOW WHAT "INCOME" MEANS IN THE CONTEXT OF THIS

11:56AM  20   DOCUMENT?

11:56AM  21   A.   THE REVENUE THAT THE COMPANY PROJECTED.

11:56AM  22   Q.   WELL, IT SAYS TOTAL REVENUE DOWN BELOW; CORRECT?

11:56AM  23   A.   RIGHT.

11:56AM  24   Q.   AND DO YOU KNOW WHAT ACCOUNTING PRINCIPLES WERE USED IN

11:56AM  25   CONNECTION WITH THE PREPARATION OF THIS?

SPIVEY CROSS BY MR. WADE                                                762

| | | |
|---|---|---|
| 11:56AM | 1 | A.   NO. |
| 11:56AM | 2 | Q.   NO.  DO YOU KNOW WHO PREPARED THIS DOCUMENT? |
| 11:56AM | 3 | A.   NO. |
| 11:56AM | 4 | Q.   DO YOU KNOW WHEN THIS DOCUMENT WAS PREPARED? |
| 11:56AM | 5 | A.   NO. |
| 11:56AM | 6 | Q.   I'D LIKE TO SHOW YOU DOCUMENT NUMBER 1853, WHICH I BELIEVE |
| 11:57AM | 7 | THE GOVERNMENT HAS STIPULATED TO. |
| 11:57AM | 8 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 11:57AM | 9 | THE COURT:  IT MAY BE ADMITTED. |
| 11:57AM | 10 | (GOVERNMENT'S EXHIBIT 1853 WAS RECEIVED IN EVIDENCE.) |
| 11:57AM | 11 | BY MR. WADE: |
| 11:57AM | 12 | Q.   DO YOU SEE I HAVE ON THE SCREEN 1853, MS. YAM? |
| 11:57AM | 13 | A.   YES. |
| 11:57AM | 14 | Q.   AND DOES THAT DOCUMENT LOOK FAMILIAR TO EXHIBIT 4859 WHICH |
| 11:57AM | 15 | WE WERE JUST LOOKING AT? |
| 11:57AM | 16 | A.   YES. |
| 11:57AM | 17 | Q.   OKAY.  AND THIS VERSION HAS TWO PAGES.  I'D LIKE TO TURN |
| 11:57AM | 18 | YOUR ATTENTION TO THE SECOND PAGE OF THIS DOCUMENT. |
| 11:57AM | 19 | DO YOU SEE THIS DOCUMENT? |
| 11:57AM | 20 | A.   YES. |
| 11:57AM | 21 | Q.   AND IS THIS A DOCUMENT THAT YOU'RE FAMILIAR WITH? |
| 11:58AM | 22 | A.   YES. |
| 11:58AM | 23 | Q.   AND IS THIS A DOCUMENT THAT YOU BELIEVE YOU PREPARED? |
| 11:58AM | 24 | A.   YES. |
| 11:58AM | 25 | Q.   AND THIS DOCUMENT IS DATED AS OF JULY 14TH, 2014; CORRECT? |

| | | |
|---|---|---|
| 11:58AM | 1 | A.   YES. |
| 11:58AM | 2 | Q.   AND DO YOU SEE ABOUT MAYBE TWO-THIRDS OF THE WAY DOWN THE |
| 11:58AM | 3 | PAGE THERE'S AN INDICATION OF DEFERRED REVENUE AND CUSTOMER |
| 11:58AM | 4 | DEPOSITS? |
| 11:58AM | 5 | DO YOU SEE THAT? |
| 11:58AM | 6 | A.   YES. |
| 11:58AM | 7 | Q.   AND THE AMOUNT THERE IS HOW MUCH? |
| 11:58AM | 8 | A.   ABOUT 169 MILLION. |
| 11:58AM | 9 | Q.   ABOUT $169 MILLION? |
| 11:58AM | 10 | A.   YES. |
| 11:58AM | 11 | Q.   AND THAT WAS INFORMATION THAT MR. BALWANI -- YOU PROVIDED |
| 11:58AM | 12 | TO -- STRIKE THAT. |
| 11:58AM | 13 | THAT WAS INFORMATION THAT YOU PROVIDED IN CONNECTION WITH |
| 11:58AM | 14 | THIS EXHIBIT? |
| 11:58AM | 15 | A.   YES. |
| 11:58AM | 16 | Q.   AND IF I COULD PUT UP DOCUMENT 7761, AND WITH THE |
| 11:59AM | 17 | GOVERNMENT'S STIPULATION MOVE THAT INTO EVIDENCE, YOUR HONOR. |
| 11:59AM | 18 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 11:59AM | 19 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 11:59AM | 20 | (DEFENDANT'S EXHIBIT 7761 WAS RECEIVED IN EVIDENCE.) |
| 11:59AM | 21 | BY MR. WADE: |
| 11:59AM | 22 | Q.   AND IF WE CAN BLOW UP THE TOP, PLEASE. |
| 11:59AM | 23 | MS. YAM, DO YOU SEE THIS IS AN EMAIL BETWEEN YOU AND |
| 11:59AM | 24 | MR. BALWANI ON JULY 15TH, 2014? |
| 11:59AM | 25 | A.   YES. |

11:59AM  1    Q.    AND THE SUBJECT MATTER IS BS AT 063014?

11:59AM  2    A.    YES.

11:59AM  3    Q.    AND DO YOU KNOW WHAT THAT REFERS TO?

11:59AM  4    A.    BALANCE SHEET AS OF JUNE 30TH, 2014.

11:59AM  5    Q.    AND IF WE CAN LOOK AT THE ATTACHMENT TO THIS EMAIL.

12:00PM  6          DOES THIS APPEAR TO BE -- I'LL DRAW YOUR ATTENTION TO THE

12:00PM  7    DEFERRED REVENUE AND CUSTOMER DEPOSITS ON LINE 25 OF THIS

12:00PM  8    BALANCE SHEET.

12:00PM  9          DO YOU SEE THAT?

12:00PM  10   A.    YES.

12:00PM  11   Q.    AND THAT'S ALMOST 169 MILLION THERE?

12:00PM  12   A.    YES.

12:00PM  13   Q.    AND SO YOU BELIEVE THAT THIS IS THE INFORMATION THAT MADE

12:00PM  14   IT INTO EXHIBIT 1853?

12:00PM  15   A.    YES.

12:00PM  16   Q.    IT APPEARS TO MATCH?

12:00PM  17   A.    YES.

12:00PM  18   Q.    SO THE FINANCIAL INFORMATION THAT YOU PROVIDED TO

12:00PM  19   MR. BALWANI MADE IT INTO THIS DOCUMENT, THE EXHIBIT 1853;

12:01PM  20   CORRECT?

12:01PM  21   A.    YES.

12:01PM  22   Q.    IF I COULD BRING UP 1853 AGAIN.

12:01PM  23          FOCUSSING ON PAGE 1 OF THIS EXHIBIT, DO YOU RECALL WHETHER

12:01PM  24   YOU EVER SAW A LIVE SPREADSHEET, A NATIVE FILE THAT DEPICTED

12:01PM  25   THIS INFORMATION?

12:01PM  1    A.   NO.

12:01PM  2    Q.   NO, YOU DON'T BELIEVE THAT YOU DID SEE THAT?

12:01PM  3    A.   I DON'T THINK SO.

12:01PM  4    Q.   SO YOU DON'T KNOW IF THIS IS A SPREADSHEET, YOU DON'T KNOW

12:01PM  5    WHETHER THERE'S OTHER INFORMATION THAT FED INTO IT; CORRECT?

12:01PM  6    A.   CORRECT.

12:01PM  7    Q.   I'D LIKE TO ASK YOU A COUPLE OF QUESTIONS ABOUT INVESTORS,

12:02PM  8    AND I CAN TAKE THIS DOCUMENT DOWN.

12:02PM  9         YOU DIDN'T ATTEND MEETINGS WITH POTENTIAL INVESTORS, DID

12:02PM  10   YOU?

12:02PM  11   A.   NO.

12:02PM  12   Q.   YOU WERE THE CONTROLLER AT THE COMPANY?

12:02PM  13   A.   CORRECT.

12:02PM  14   Q.   AND YOUR PRINCIPAL JOB WAS THE ACCOUNTING OF THE COMPANY?

12:02PM  15   A.   YES.

12:02PM  16   Q.   AND DEALING WITH INVESTORS WAS NOT ONE OF YOUR JOB

12:02PM  17   RESPONSIBILITIES?

12:02PM  18   A.   RIGHT.

12:02PM  19   Q.   AND ARE YOU AWARE THAT THE COMPANY SOMETIMES WOULD HAVE

12:02PM  20   MEETINGS WITH POTENTIAL INVESTORS WHERE THEY WOULD PROVIDE

12:02PM  21   INFORMATION ABOUT THE COMPANY?

12:02PM  22   A.   I HAVE NO PERSONAL KNOWLEDGE OF THAT.

12:02PM  23   Q.   DID YOU KNOW WHETHER THAT WAS HAPPENING OR NOT?

12:02PM  24   A.   I DON'T KNOW.

12:02PM  25   Q.   BUT YOU KNOW THE COMPANY RECEIVED MONEY FROM INVESTORS?

12:03PM   1      A.   YES.

12:03PM   2      Q.   SO IT MUST HAVE COME FROM SOMEWHERE?

12:03PM   3      A.   YES.

12:03PM   4      Q.   WHEN YOU WERE ASKED OR IF YOU WERE ASKED TO PROVIDE

12:03PM   5   INFORMATION TO INVESTORS, DID YOU ALWAYS PROVIDE ACCURATE

12:03PM   6   INFORMATION?

12:03PM   7      A.   YES.

12:03PM   8      Q.   AND, IN FACT, WHENEVER YOU WERE REQUESTED TO PROVIDE

12:03PM   9   INFORMATION TO ANYONE, DID YOU ALWAYS TRY TO PROVIDE ACCURATE

12:03PM  10   INFORMATION?

12:03PM  11      A.   YES.

12:03PM  12      Q.   YOU'RE A CPA; CORRECT?

12:03PM  13      A.   YES.

12:03PM  14      Q.   AND YOU'RE A LICENSED PROFESSIONAL?

12:03PM  15      A.   YES.

12:03PM  16      Q.   AND YOU ALWAYS TRIED TO PROVIDE THE MOST ACCURATE

12:03PM  17   FINANCIAL INFORMATION THAT YOU COULD?

12:03PM  18      A.   YES.

12:03PM  19      Q.   SOMETIMES ACCOUNTING RECORDS ARE NOT STATIC; CORRECT?

12:03PM  20      A.   I'M NOT SURE WHAT THAT MEANS.

12:03PM  21      Q.   LET ME SEE IF I CAN UNPACK THAT.

12:03PM  22          YOU SOMETIMES MAKE ENTRIES INTO THE BOOKS AND RECORDS OF

12:03PM  23   THE COMPANY AND HAVE TO CHANGE THOSE IN THE FUTURE AFTER

12:03PM  24   ADDITIONAL ACCOUNTING JUDGMENTS ARE MADE WITH RESPECT TO A

12:04PM  25   PARTICULAR ENTRY; IS THAT RIGHT?

12:04PM 1    A.   YES.

12:04PM 2    Q.   ONE EXAMPLE OF THAT WOULD BE DEFERRED REVENUE THAT WE

12:04PM 3    TALKED ABOUT EARLIER; CORRECT?

12:04PM 4    A.   YES.

12:04PM 5    Q.   AND YOU MIGHT BOOK THE REVENUE, BUT THEN DECIDE THAT SOME

12:04PM 6    OF IT WOULD NEED TO BE DEFERRED?

12:04PM 7    A.   YES.

12:04PM 8    Q.   OR YOU MIGHT DEFER REVENUE AND THEN DECIDE THAT SOME OF IT

12:04PM 9    MIGHT NEED TO BE RECOGNIZED?

12:04PM 10   A.   RIGHT.

12:04PM 11   Q.   AND IN CONNECTION WITH THE FINANCIAL ACTIVITY OF THE

12:04PM 12   COMPANY, THERE ARE A VARIETY OF DIFFERENT REPORTS THAT YOU

12:04PM 13   PREPARE?

12:04PM 14   A.   YES.

12:04PM 15   Q.   WE'VE SEEN MANY OF THEM TODAY AND THEY PROVIDE DIFFERENT

12:04PM 16   VANTAGE POINTS INTO THE FINANCIAL PERFORMANCE OF THE COMPANY?

12:04PM 17   A.   YES.

12:04PM 18   Q.   AND WE SAW INCOME STATEMENTS THAT PROVIDE ONE VIEWPOINT;

12:04PM 19   CORRECT?

12:04PM 20   A.   YES.

12:05PM 21   Q.   AND THOSE USUALLY INVOLVE GAAP ACCOUNTING; CORRECT?

12:05PM 22   A.   YES.

12:05PM 23   Q.   AND WE SAW A BALANCE SHEET?

12:05PM 24   A.   YES.

12:05PM 25   Q.   AND THAT USUALLY DISPLAYS THE COMPANY'S ASSETS,

12:05PM 1    LIABILITIES, AND SHAREHOLDER'S EQUITY?

12:05PM 2    A.   YES.

12:05PM 3    Q.   AND THEN WE SAW THE CASH FLOW STATEMENT WHICH JUST TRACKS

12:05PM 4    THE CASH IN AND OUT?

12:05PM 5    A.   RIGHT.

12:05PM 6    Q.   AND WITH RESPECT TO ARANCA, WE SAW SOME VALUATION REPORTS;

12:05PM 7    CORRECT?

12:05PM 8    A.   YES.

12:05PM 9    Q.   AND WE FOCUSSED ON A COUPLE OF PARAGRAPHS WITHIN THOSE

12:05PM 10   REPORTS.

12:05PM 11       DO YOU RECALL THAT?

12:05PM 12   A.   YES.

12:05PM 13   Q.   BUT THOSE DOCUMENTS ARE EXTREMELY LENGTHY; CORRECT?

12:05PM 14   A.   YES.

12:05PM 15   Q.   MAYBE 150 PAGES?

12:05PM 16   A.   SOMETHING LIKE THAT.

12:05PM 17   Q.   AND THEY PROVIDE VERY DETAILED ANALYSES?

12:05PM 18   A.   YES.

12:05PM 19   Q.   AND THEY PROVIDE MANY DIFFERENT VALUATION APPROACHES?

12:06PM 20   A.   YES.

12:06PM 21   Q.   AND OFTENTIMES THAT COME UP WITH DIFFERENT ANSWERS?

12:06PM 22   A.   YES.

12:06PM 23   Q.   SOMETIMES THOSE ANSWERS AS TO VALUATION CAN RANGE

12:06PM 24   SIGNIFICANTLY?

12:06PM 25   A.   I'M NOT SURE.

| | | |
|---|---|---|
| 12:06PM | 1 | Q.   THEY CAN -- THERE CAN BE SIGNIFICANT DIFFERENCES BETWEEN |
| 12:06PM | 2 | THE VALUATIONS BASED UPON DIFFERENT VALUATION METHODS? |
| 12:06PM | 3 | A.   THERE ARE USUALLY DIFFERENCES. |
| 12:06PM | 4 | Q.   WELL, LET ME PULL UP ONE OF THEM AND WE CAN ASK RELATED TO |
| 12:06PM | 5 | THAT EXHIBIT 5206, WHICH IS ALREADY IN EVIDENCE. |
| 12:06PM | 6 | I'D LIKE TO TURN TO PAGE 52 AT THE BOTTOM. |
| 12:07PM | 7 | SORRY, 52. |
| 12:07PM | 8 | MR. BENNETT:  BATES NUMBER? |
| 12:07PM | 9 | MR. WADE:  1078552. |
| 12:08PM | 10 | Q.   AND THIS IS THE EMAIL CHAIN IN EXHIBIT 5206, IN WHICH THE |
| 12:08PM | 11 | ARANCA REPORT WAS ULTIMATELY TRANSMITTED TO THE COMPANY. |
| 12:08PM | 12 | DO YOU RECALL THAT EMAIL CHAIN? |
| 12:08PM | 13 | A.   YES. |
| 12:08PM | 14 | Q.   AND WITHIN THIS CHAIN DO YOU SEE THAT YOU ARE BEING |
| 12:08PM | 15 | PROVIDED SOME INFORMATION BY ARUN MONTENA AT ARANCA? |
| 12:08PM | 16 | A.   YES. |
| 12:08PM | 17 | Q.   AND HE'S TALKING ABOUT SOME DIFFERENT VALUATION APPROACHES |
| 12:08PM | 18 | WITHIN THIS EMAIL? |
| 12:08PM | 19 | A.   YES. |
| 12:08PM | 20 | Q.   AND HOW ONE OF THOSE VALUATION APPROACHES VALUED THE |
| 12:08PM | 21 | COMPANY AT $1.96 BILLION? |
| 12:08PM | 22 | A.   YES. |
| 12:08PM | 23 | Q.   AND HOW ONE OF THE VALUATION APPROACHES VALUED THE COMPANY |
| 12:08PM | 24 | AT $9.5 BILLION? |
| 12:08PM | 25 | A.   YES. |

12:09PM  1    Q.   THAT WAS THE POST MONEY VALUATION?

12:09PM  2    A.   YES.

12:09PM  3    Q.   AND SO IS IT FAIR TO SAY BASED ON DIFFERENT METHODOLOGIES,

12:09PM  4    THERE CAN BE A PRETTY FAIR RANGE IN THE VALUATIONS OF A

12:09PM  5    COMPANY?

12:09PM  6    A.   YES.

12:09PM  7         (PAUSE IN PROCEEDINGS.)

12:10PM  8    BY MR. WADE:

12:10PM  9    Q.   WE TALKED ABOUT, BEFORE THE BREAK, HOW SOMETIMES CASH HAD

12:10PM 10    TO BE REFERRED TO AS DEFERRED REVENUE.

12:10PM 11         DO YOU RECALL THAT?

12:10PM 12    A.   YES.

12:10PM 13    Q.   AND THAT WAS THE RESULT OF THE APPLICATION OF ACCOUNTING

12:10PM 14    PRINCIPLES?

12:10PM 15    A.   YES.

12:10PM 16    Q.   AND SOMETIMES WHEN YOU COULD RECOGNIZE THE REVENUE WOULD

12:10PM 17    BE SUBJECT TO DEBATE?

12:10PM 18    A.   YES.

12:10PM 19    Q.   I'D LIKE TO SHOW YOU AND MOVE INTO EVIDENCE DTX 13719,

12:10PM 20    WHICH I BELIEVE THE GOVERNMENT HAS STIPULATED TO.

12:10PM 21              MR. LEACH:  THAT'S CORRECT, YOUR HONOR.  NO

12:10PM 22    OBJECTION.

12:10PM 23              THE COURT:  ALL RIGHT.  IT'S ADMITTED, AND IT MAY BE

12:10PM 24    PUBLISHED.

12:10PM 25         (DEFENDANT'S EXHIBIT 13719 WAS RECEIVED IN EVIDENCE.)

12:11PM   1    BY MR. WADE:

12:11PM   2    Q.   I'D LIKE TO START AT THE BOTTOM OF THIS EMAIL CHAIN IN

12:11PM   3    WHICH YOU SENT DECEMBER 12TH, 2014.

12:11PM   4         DO YOU SEE THAT?

12:11PM   5    A.   YES.

12:11PM   6    Q.   AND THIS SAYS IN HERE, YOU WRITE, "AFTER ADDING BACK 50

12:11PM   7    MILLION, THE DEFERRED REVENUE IS 168 MILLION."

12:11PM   8         DO YOU SEE THAT?

12:11PM   9    A.   YES.

12:11PM  10    Q.   AND IT TALKS WHAT THAT INCLUDES; RIGHT?

12:11PM  11    A.   YES.

12:11PM  12    Q.   AND THAT INCLUDES MONEY THAT YOU RECEIVED FROM CUSTOMERS

12:11PM  13    OVER A PERIOD OF TIME?

12:11PM  14    A.   YES.

12:11PM  15    Q.   AND IF I CAN MOVE TO THE NEXT EMAIL IN THE CHAIN.  THAT'S

12:11PM  16    AN EMAIL IN RESPONSE FROM MR. BALWANI TO YOU AND MS. HOLMES.

12:12PM  17         DO YOU SEE THAT?

12:12PM  18    A.   YES.

12:12PM  19    Q.   AND THAT'S DECEMBER 12TH, 2014?

12:12PM  20    A.   YES.

12:12PM  21    Q.   AND HE'S SUGGESTING THAT CELGENE SHOULD BE RECOGNIZED IN

12:12PM  22    2013.

12:12PM  23         DO YOU SEE THAT?

12:12PM  24    A.   YES.

12:12PM  25    Q.   AND HE THEN SAYS KEEP 165 AS DEFERRED AND -- FOR 2013.

12:12PM   1           DO YOU SEE THAT?

12:12PM   2      A.   YES.

12:12PM   3      Q.   AND HE'S SUGGESTING THAT THE 165 MILLION COULD BE

12:12PM   4      RECOGNIZED -- COULD BE CATEGORIZED AS DEFERRED REVENUE?

12:12PM   5      A.   YES.

12:12PM   6      Q.   THAT'S FOR THE 2013 PERIOD?

12:12PM   7      A.   YES.

12:12PM   8      Q.   HE THEN SAYS, "BUT IN 2014, WE WILL RECOGNIZE AT LEAST 100

12:12PM   9      MILLION OF IT."

12:12PM  10           DO YOU SEE THAT?

12:12PM  11      A.   YES.

12:12PM  12      Q.   AND THIS EMAIL IS SENT ON DECEMBER 12TH, 2014; CORRECT?

12:12PM  13      A.   YES.

12:12PM  14      Q.   AND JUST SO WE'RE CLEAR, IT'S NOT AS THOUGH 100 MILLION IS

12:13PM  15      JUST GOING TO FALL OUT OF THE SKY IN DECEMBER OF 2014; CORRECT?

12:13PM  16      A.   RIGHT.

12:13PM  17      Q.   THAT 100 MILLION HAD BEEN BOOKED INTO THE COMPANY AS CASH;

12:13PM  18      CORRECT?

12:13PM  19      A.   YES.

12:13PM  20      Q.   AND MR. BALWANI IS EXPRESSING THE VIEW THAT 100 MILLION OF

12:13PM  21      THAT COULD BE RECOGNIZED IN 2014?

12:13PM  22      A.   YES.

12:13PM  23      Q.   NOW, DO YOU RECALL AT THE END OF 2013 OR THE BEGINNING OF

12:13PM  24      2014 THE COMPANY RECEIVED A $75 MILLION PAYMENT FROM WALGREENS?

12:14PM  25      A.   YES.

SPIVEY CROSS BY MR. WADE

12:14PM 1    Q.   AND THAT WAS BOOKED AS REVENUE IN -- ON DECEMBER 31ST,

12:14PM 2    2013?

12:14PM 3    A.   NO.

12:14PM 4    Q.   IT WAS BOOKED ON -- IT WAS ADDED TO THE BOOKS AS CASH ON

12:14PM 5    DECEMBER 31ST OF 2013?

12:14PM 6    A.   YES.

12:14PM 7    Q.   AND IT WAS DEFERRED REVENUE AT THAT POINT?

12:14PM 8    A.   YES.

12:14PM 9    Q.   AND THAT WAS AMONG THIS MONEY THAT THERE WAS DISCUSSION AS

12:14PM 10   TO WHEN IT COULD BE RECOGNIZED; CORRECT?

12:14PM 11   A.   YES.

12:14PM 12   Q.   IF WE CAN GO TO DTX 5172, WHICH IS ALREADY IN EVIDENCE,

12:15PM 13   AND I'D LIKE TO GO TO ROW 26 WHERE IT SAYS "CUSTOMER RECEIPTS."

12:15PM 14        DO YOU SEE THAT?

12:15PM 15   A.   YES.

12:15PM 16   Q.   AND WE'VE BEEN TALKING A LITTLE BIT ABOUT WHEN MONEY WAS

12:15PM 17   RECEIVED FROM CUSTOMERS.

12:15PM 18        DO YOU RECALL THAT TESTIMONY?

12:15PM 19   A.   YES.

12:15PM 20   Q.   AND THIS IS WHERE IT WOULD SHOW UP; CORRECT?

12:15PM 21   A.   YES.

12:15PM 22   Q.   AND SO, FOR EXAMPLE, COLUMN DC IN THE FIRST WEEK OF 2013

12:15PM 23   SHOWS $25 MILLION IN CUSTOMER RECEIPTS; CORRECT?

12:15PM 24   A.   YES.

12:15PM 25   Q.   AND DO YOU KNOW WHERE THAT PAYMENT WAS FROM?

12:15PM  1    A.   I DON'T REMEMBER.

12:15PM  2    Q.   OKAY.  WELL, LET ME START BACK.  LET ME GO TO COLUMN D AND

12:16PM  3    WE'LL RUN THROUGH AND JUST GET A SENSE OF THE CUSTOMER

12:16PM  4    RECEIPTS.

12:16PM  5         IN COLUMN D, WE START SMALL, ROW 26.  I'LL STAY IN ROW 26

12:16PM  6    THROUGHOUT.

12:16PM  7         DO YOU SEE THERE'S $462 THERE?

12:16PM  8    A.   YES.

12:16PM  9    Q.   AND AS YOU WORK YOUR WAY ACROSS COLUMN H, THERE'S 60,000?

12:16PM  10   A.   YES.

12:16PM  11   Q.   AND COLUMN J, THERE'S 201,000?

12:16PM  12   A.   YES.

12:16PM  13   Q.   AND IN COLUMN N4, 358?

12:16PM  14   A.   YES.

12:16PM  15   Q.   AND LET ME JUMP TO COLUMN AC.

12:16PM  16        DO YOU SEE THERE THAT'S $5 MILLION?

12:16PM  17   A.   YES.

12:16PM  18   Q.   AND COLUMN AH IS $30 MILLION?

12:16PM  19   A.   YES.

12:16PM  20   Q.   COLUMN AO, ANOTHER 5 MILLION COMES IN?

12:17PM  21   A.   YES.

12:17PM  22   Q.   COLUMN AU, THERE'S $15 MILLION?

12:17PM  23   A.   YES.

12:17PM  24   Q.   COLUMN AZ, DO YOU SEE 18 MILLION -- 18.5 MILLION?

12:17PM  25   A.   YES.

12:17PM  1    Q.   COLUMN BY, DO YOU SEE 40 MILLION?

12:17PM  2    A.   YES.

12:17PM  3    Q.   DC, DO YOU SEE 25 MILLION?

12:17PM  4    A.   YES.

12:17PM  5    Q.   DD IS 4 MILLION?

12:17PM  6    A.   YES.

12:17PM  7    Q.   AND IF I GO TO FC, THAT WAS -- THOSE WERE CUSTOMER

12:17PM  8    RECEIPTS FOR $75 MILLION FROM WALGREENS THAT WE MENTIONED A

12:17PM  9    MINUTE AGO.

12:18PM 10         DO YOU SEE THAT?

12:18PM 11    A.   YES.

12:18PM 12    Q.   AND IN ALL, THE COMPANY RECEIVED FROM CUSTOMERS HUNDREDS

12:18PM 13    OF MILLIONS OF DOLLARS; CORRECT?

12:18PM 14    A.   YES.

12:18PM 15    Q.   AND IT RECEIVED THESE PAYMENTS FROM CAPITAL BLUE CROSS?

12:18PM 16    A.   YES.

12:18PM 17    Q.   AND SAFEWAY?

12:18PM 18    A.   YES.

12:18PM 19    Q.   AND WALGREENS?

12:18PM 20    A.   YES.

12:18PM 21    Q.   AND BLUE CROSS BLUE SHIELD OF WYOMING?

12:18PM 22    A.   YES.

12:18PM 23    Q.   AND BLUE CROSS BLUE SHIELD OF MASSACHUSETTS?

12:18PM 24    A.   YES.

12:18PM 25    Q.   AND BLUE CROSS BLUE SHIELD OF NORTH CAROLINA?

12:18PM   1      A.   YES.

12:18PM   2      Q.   AND A LOT OF THIS MONEY WAS CASH THAT WAS RECEIVED AND

12:18PM   3      USED, BUT IT WAS BOOKED AS DEFERRED REVENUE; CORRECT?

12:18PM   4      A.   YES.

12:18PM   5      Q.   I'D LIKE TO RETURN BRIEFLY TO THE BURN STUDY WE HEARD

12:19PM   6      ABOUT AND SHOW YOU DOCUMENT 7091, WHICH I BELIEVE THE

12:19PM   7      GOVERNMENT STIPULATED TO ADMIT.

12:19PM   8           WE MOVE THE ADMISSION, YOUR HONOR.

12:19PM   9              MR. LEACH:  THAT'S CORRECT, YOUR HONOR, NO

12:19PM  10      OBJECTION.

12:19PM  11              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:19PM  12           (DEFENDANT'S EXHIBIT 7091 WAS RECEIVED IN EVIDENCE.)

12:19PM  13      BY MR. WADE:

12:19PM  14      Q.   LET ME BLOW UP THE TOP SO WE CAN ORIENT YOU.

12:19PM  15           THIS IS AN EMAIL THAT YOU RECEIVED IN DECEMBER OF 2009.

12:19PM  16           DO YOU SEE THAT?

12:19PM  17      A.   YES.

12:19PM  18      Q.   AND THIS MAKES YOU AWARE OF INFORMATION RELATING TO

12:20PM  19      PAYMENTS THAT WERE TO BE PROVIDED BY THE BURN CENTER?

12:20PM  20      A.   YES.

12:20PM  21      Q.   FOR THE BURN STUDY?  I'M SORRY.

12:20PM  22      A.   YES.

12:20PM  23      Q.   AND IF WE CAN TURN TO -- AS ONE OF YOUR ROLES IN

12:20PM  24      DETERMINING REVENUE RECOGNITION AND BOOKING ITEMS ON THE BOOKS

12:20PM  25      OF THE COMPANY, WOULD YOU OFTENTIMES GET CONTRACT DOCUMENTATION

12:20PM  1    AND INFORMATION TO KEEP IN YOUR FILES?

12:20PM  2    A.   YES.

12:20PM  3    Q.   OKAY.  I'D LIKE TO LOOK AT THE DOCUMENT THAT FOLLOWS THE

12:20PM  4    ATTACHMENT.

12:20PM  5    A.   YES.

12:20PM  6    Q.   AND THIS PARTICULAR DOCUMENT WAS A GRANT THAT WAS

12:20PM  7    PROVIDED; CORRECT?

12:20PM  8    A.   YES.

12:20PM  9    Q.   AND SO IN THIS PARTICULAR CASE WITH THE BURN STUDY, THIS

12:21PM  10   IS -- THIS WAS EFFECTIVELY THE CONTRACT; IS THAT RIGHT?

12:21PM  11   A.   I DON'T RECALL THIS DOCUMENT.

12:21PM  12   Q.   OKAY.  BUT YOU RECALL -- YOU SAW THAT YOU RECEIVED THIS

12:21PM  13   DOCUMENT AS PART OF THAT EMAIL?

12:21PM  14   A.   YES.

12:21PM  15   Q.   AND THIS WOULD HAVE BEEN A DOCUMENT THAT MIGHT HAVE GIVEN

12:21PM  16   YOU INFORMATION THAT YOU WOULD USE TO DETERMINE REVENUE

12:21PM  17   RECOGNITION; IS THAT FAIR?  MAYBE IF WE LOOK AT THE FULL

12:21PM  18   DOCUMENT YOU CAN TAKE A LOOK.

12:21PM  19        (PAUSE IN PROCEEDINGS.)

12:21PM  20           THE WITNESS:  I AM NOT SURE.  I DON'T RECALL THIS

12:21PM  21   DOCUMENT.

12:21PM  22   BY MR. WADE:

12:21PM  23   Q.   YOU DON'T RECALL THE DOCUMENT?

12:21PM  24   A.   NO.

12:21PM  25   Q.   OKAY.  THANK YOU.

12:22PM 1        AS THE CONTROLLER OF THE COMPANY, DID YOU HAVE A SENSE FOR

12:22PM 2   HOW THE COMPANY WAS SPENDING ITS MONEY?

12:22PM 3   A.   YES.

12:22PM 4   Q.   AND ONE OF THE THINGS THAT YOU WOULD DO WAS BOOK,

12:22PM 5   CATEGORIZE DIFFERENT EXPENSES ACCORDING TO DIFFERENT PARTS OF

12:22PM 6   THE BUSINESS; CORRECT?

12:22PM 7   A.   YES.

12:22PM 8   Q.   AND THAT INCLUDES, FOR EXAMPLE, FOR RESEARCH AND

12:22PM 9   DEVELOPMENT?

12:22PM 10  A.   YES.

12:22PM 11  Q.   OR ADMINISTRATIVE EXPENSES?

12:22PM 12  A.   YES.

12:22PM 13  Q.   AND SO AS EXPENSES WOULD COME IN, YOU WOULD CATEGORIZE HOW

12:22PM 14  IT WAS DEPICTED IN THE FINANCIAL STATEMENTS?

12:22PM 15  A.   YES.

12:22PM 16  Q.   I'D LIKE TO SHOW YOU DX 578, WHICH I BELIEVE IS -- WHICH

12:23PM 17  IS ALREADY IN EVIDENCE.

12:23PM 18       DO YOU RECALL THIS DOCUMENT?  THESE WERE SOME FINANCIAL

12:23PM 19  STATEMENTS THAT WERE EMAILED TO KPMG?

12:23PM 20  A.   YES.

12:23PM 21  Q.   AND I'D LIKE TO LOOK AT THE ATTACHMENT THAT INCLUDES THE

12:23PM 22  TRIAL BALANCE.

12:24PM 23       WHILE WE'RE PULLING THAT UP, WHAT IS THE TRIAL BALANCE?

12:24PM 24  A.   IT'S THE FINANCIAL ACCOUNTS, ALL OF THE FINANCIAL ACCOUNTS

12:24PM 25  OF THE COMPANY THAT HAS ALL OF THE ASSETS, LIABILITY,

12:24PM   1    SHAREHOLDER'S EQUITY, EXPENSES, INCOME.

12:24PM   2    Q.   OKAY.   AND IF I CAN GO TO THE BS TAB.   THIS IS THE

12:24PM   3    CONSOLIDATED BALANCE SHEET THAT WE LOOKED AT EARLIER.

12:24PM   4         DO YOU RECALL THAT?

12:24PM   5    A.   YES.

12:24PM   6    Q.   AND IF WE CAN SCROLL DOWN.

12:25PM   7         DO YOU SEE IN COLUMN B THERE THE DEFERRED REVENUE?

12:25PM   8    A.   YES.

12:25PM   9    Q.   AND THAT'S $77 MILLION IN DEFERRED REVENUE?

12:25PM  10    A.   YES.

12:25PM  11    Q.   IF WE CAN GO TO THE PL BY GROUP.   THIS SHOWS THE

12:25PM  12    CATEGORIZATION OF SOME OF THE EXPENSES; IS THAT CORRECT?

12:25PM  13    A.   YES.

12:25PM  14    Q.   AND IF WE CAN -- YOU SEE IN COLUMN I IT SAYS R&D?

12:25PM  15    A.   YES.

12:25PM  16    Q.   AND THAT IN COLUMN K IT SAYS GRAND TOTAL?

12:25PM  17    A.   YES.

12:25PM  18    Q.   AND IF WE CAN GO TO THE BOTTOM.

12:26PM  19         DO YOU SEE IN COLUMN I IT SHOWS $21.9 MILLION IN R&D

12:26PM  20    EXPENSES?

12:26PM  21    A.   YES.

12:26PM  22    Q.   AND THAT'S OUT OF 26.2 MILLION IN TOTAL?

12:26PM  23    A.   YES.

12:26PM  24    Q.   AND DO YOU RECALL THE YEAR THIS IS FOR?

12:26PM  25    A.   WAS IT 2010?

12:26PM 1     Q.   WE CAN GO TO THE TOP.   LET'S GO TO THE BALANCE SHEET.

12:26PM 2     THAT WILL SHOW THE DATE CLEARLY.

12:26PM 3          THAT WAS FOR 2011?

12:26PM 4     A.   IT COULD BE.   I DON'T KNOW.   I HAVEN'T LOOKED AT THE DATA.

12:27PM 5     Q.   LET ME PULL UP DTX 4176, WHICH I BELIEVE IS IN EVIDENCE.

12:27PM 6          THE CLERK:   CAN YOU SAY THAT NUMBER AGAIN, PLEASE,

12:27PM 7     COUNSEL.

12:27PM 8          COUNSEL, WHAT IS THE NUMBER?

12:27PM 9          MR. WADE:   4176, WHICH I WILL MOVE INTO EVIDENCE

12:27PM 10    ACTUALLY, YOUR HONOR.   I APOLOGIZE.   WITH STIPULATION.

12:27PM 11         MR. LEACH:   NO OBJECTION.   THANK YOU, YOUR HONOR.

12:27PM 12         THE COURT:   IT'S ADMITTED.   IT CAN BE PUBLISHED.

12:27PM 13    (DEFENDANT'S EXHIBIT 4176 WAS RECEIVED IN EVIDENCE.)

12:27PM 14    BY MR. WADE:

12:27PM 15    Q.   AND DO YOU SEE HERE -- DO YOU RECOGNIZE THIS DOCUMENT?

12:28PM 16    A.   YES.

12:28PM 17    Q.   AND WHAT IS THIS DOCUMENT?

12:28PM 18    A.   THAT'S THE CONSOLIDATED INCOME STATEMENTS FOR THE COMPANY.

12:28PM 19    Q.   AND DOES IT SHOW THE OPERATING EXPENSES?

12:28PM 20    A.   YES.

12:28PM 21    Q.   AND FOR 2013, WHAT WERE THE TOTAL OPERATING EXPENSES?

12:28PM 22    A.   92 MILLION.

12:28PM 23    Q.   AND THE AMOUNT THAT WAS SPENT ON RESEARCH AND DEVELOPMENT?

12:28PM 24    A.   ABOUT 68 MILLION.

12:28PM 25    Q.   AND FOR 2012, WHAT WERE THE TOTAL OPERATING EXPENSES?

12:28PM  1    A.   ABOUT 67 MILLION.

12:28PM  2    Q.   AND THE TOTAL AMOUNT SPENT ON RESEARCH AND DEVELOPMENT?

12:28PM  3    A.   ABOUT 53 MILLION.

12:28PM  4    Q.   AND FOR 2011, YOU SEE THAT THERE WAS 28.2 MILLION IN TOTAL

12:28PM  5    OPERATING EXPENSES?

12:28PM  6    A.   YES.

12:28PM  7    Q.   AND 22 MILLION IN RESEARCH AND DEVELOPMENT?

12:29PM  8    A.   YES.

12:29PM  9    Q.   AND SO YOU SEE THERE THAT THERE ARE OPERATING LOSSES?

12:29PM  10   A.   YES.

12:29PM  11   Q.   AND THE GOVERNMENT PREVIOUSLY REFERRED TO ACCUMULATED

12:29PM  12   DEFICIT.

12:29PM  13        DO YOU RECALL THAT?

12:29PM  14   A.   YES.

12:29PM  15   Q.   AND A BIG REASON FOR THESE OPERATING LOSSES WAS BECAUSE OF

12:29PM  16   THE SIGNIFICANT INVESTMENT AND THE RESEARCH AND DEVELOPMENT; IS

12:29PM  17   THAT RIGHT?

12:29PM  18   A.   YES.

12:29PM  19   Q.   DID YOU MAINTAIN THE CAPITALIZATION TABLE FOR THE COMPANY

12:29PM  20   AS WELL?

12:29PM  21   A.   YES.

12:29PM  22   Q.   AND THAT IS A LISTING THAT IDENTIFIES THE VARIOUS

12:29PM  23   SHAREHOLDERS?

12:29PM  24   A.   YES.

12:29PM  25   Q.   AND YOU WOULD TRACK THAT AS NEW SHAREHOLDERS WOULD BE

12:30PM  1        ADDED?

12:30PM  2        A.   YES.

12:30PM  3        Q.   AND WHO WAS THE LARGEST SHAREHOLDER?

12:30PM  4        A.   I'M NOT SURE.

12:30PM  5        Q.   WAS MS. HOLMES THE LARGEST SHAREHOLDER?

12:30PM  6        A.   I WOULD THINK SO, BUT I, I DON'T, I DON'T REMEMBER.

12:30PM  7        Q.   WELL, MS. HOLMES OWNED ABOUT HALF OF THE COMPANY; CORRECT?

12:30PM  8        A.   I DON'T REMEMBER AT THIS TIME.

12:30PM  9        Q.   THAT WASN'T SOMETHING YOU FOCUSSED ON?

12:30PM 10        A.   I WOULD HAVE TO LOOK AT THE DATA.

12:30PM 11        Q.   DO YOU RECALL PROCESSING ANY STOCK SALES FOR MS. HOLMES?

12:30PM 12        A.   I'M SORRY?

12:30PM 13        Q.   DID YOU EVER PROCESS ANY STOCK SALES FOR MS. HOLMES?

12:30PM 14        A.   NO.

12:30PM 15        Q.   SHE NEVER SOLD ANY STOCK, DID SHE?

12:30PM 16        A.   NO.

12:31PM 17                   MR. WADE:  THE COURT'S INDULGENCE.

12:31PM 18             (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

12:31PM 19                   MR. WADE:  WE HAVE NO FURTHER QUESTIONS, YOUR HONOR.

12:31PM 20                   THE COURT:  RECROSS?  EXCUSE ME.  REDIRECT?

12:31PM 21                   MR. LEACH:  VERY BRIEFLY, YOUR HONOR.  THANK YOU.

12:31PM 22        ///

12:31PM 23        ///

12:31PM 24        ///

12:31PM 25        ///

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
| 12:31PM | 1  | **REDIRECT EXAMINATION** |
| 12:31PM | 2  | BY MR. LEACH: |
| 12:31PM | 3  | Q.   GOOD MORNING AGAIN, MS. SPIVEY. |
| 12:31PM | 4  | MR. WADE ASKED YOU A LOT OF QUESTIONS ABOUT DEFERRED |
| 12:31PM | 5  | REVENUE. |
| 12:31PM | 6  | DO YOU RECALL THAT TESTIMONY? |
| 12:31PM | 7  | A.   YES. |
| 12:31PM | 8  | Q.   WHAT IS DEFERRED REVENUE? |
| 12:31PM | 9  | A.   IT'S MONEY THAT THE COMPANY RECEIVED BUT WE HAVE NOT |
| 12:32PM | 10 | PROVIDES SERVICES OR PRODUCT. |
| 12:32PM | 11 | Q.   HAVE YOU EARNED THE REVENUE AT THAT POINT? |
| 12:32PM | 12 | A.   NO. |
| 12:32PM | 13 | Q.   AND IF YOU DON'T PERFORM UNDER THE CONTRACT, IF YOU DON'T |
| 12:32PM | 14 | EARN THE REVENUE, DO YOU GET TO KEEP THE MONEY? |
| 12:32PM | 15 | A.   DEPENDING ON THE CONTRACTS.  THERE COULD BE A CLAUSE FOR A |
| 12:32PM | 16 | REFUND. |
| 12:32PM | 17 | Q.   SO THE REASON THAT YOU DON'T MOVE DEFERRED REVENUE INTO |
| 12:32PM | 18 | REVENUE IS BECAUSE THE COMPANY HASN'T DONE WHAT IT NEEDS TO IN |
| 12:32PM | 19 | ORDER TO EARN THAT MONEY; IS THAT FAIR? |
| 12:32PM | 20 | A.   YES. |
| 12:32PM | 21 | Q.   AND IS THERE SOME POSSIBILITY THAT YOU HAVE TO GIVE THAT |
| 12:32PM | 22 | MONEY BACK? |
| 12:32PM | 23 | A.   YES. |
| 12:32PM | 24 | Q.   MR. WADE ALSO ASKED YOU ABOUT THE COMPANY'S FINANCIAL |
| 12:32PM | 25 | CONDITION IN 2009.  I'D LIKE TO BRING YOUR ATTENTION TO |

12:32PM   1      EXHIBIT 256, WHICH I THINK WE STIPULATE TO THE ADMISSION OF.

12:33PM   2                MR. WADE:  YES, YOUR HONOR.

12:33PM   3                THE COURT:  THANK YOU.  IT IS ADMITTED, AND IT MAY

12:33PM   4      BE PUBLISHED.

12:33PM   5           (GOVERNMENT'S EXHIBIT 256 WAS RECEIVED IN EVIDENCE.)

12:33PM   6      BY MR. LEACH:

12:33PM   7      Q.   AND IF WE CAN PLEASE LOOK AT THE -- DO YOU SEE YOUR EMAIL

12:33PM   8      IN THE TOP, MS. SPIVEY?  DO YOU SEE YOUR NAME AT THE TOP OF THE

12:33PM   9      EMAIL?

12:33PM   10     A.   YES.

12:33PM   11     Q.   AND DO YOU SEE THAT THIS IS AN EMAIL TO ELIZABETH HOLMES?

12:33PM   12     A.   YES.

12:33PM   13     Q.   AND DO YOU ATTACH FINANCIAL STATEMENTS FOR THE PERIOD

12:33PM   14     ENDING DECEMBER 2009?

12:33PM   15     A.   YES.

12:33PM   16     Q.   LET ME DRAW YOUR ATTENTION TO THE NATIVE FILE, WHICH I

12:33PM   17     BELIEVE IS PAGE 5.

12:34PM   18          IF I COULD DRAW YOUR ATTENTION, PLEASE, TO THE TAB MONTHLY

12:34PM   19     PL.  IF WE CAN MOVE A LITTLE BIT TO THE LEFT, PLEASE,

12:34PM   20     MS. HOLLIMAN.  PERFECT.  THANK YOU.

12:34PM   21          THERE'S A LINE THERE FOR TOTAL OPERATING EXPENSES.

12:34PM   22          DO YOU SEE THAT, MS. SPIVEY?

12:34PM   23     A.   YES.

12:34PM   24     Q.   AND IN JANUARY IT'S 936,000?

12:34PM   25     A.   YES.

12:34PM  1      Q.   AND FEBRUARY $1 MILLION?

12:34PM  2      A.   YES.

12:34PM  3      Q.   THOSE ARE THE MONTHLY EXPENSES THAT THE COMPANY IS

12:34PM  4      INCURRING DURING THAT TIME PERIOD?

12:34PM  5      A.   YES.

12:34PM  6      Q.   AND WOULD THOSE AMOUNTS HAVE TO BE OFFSET BY ANY CASH FROM

12:34PM  7      THE PHARMACEUTICAL CONTRACTS THAT MIGHT BE COMING IN AT ANY

12:35PM  8      PARTICULAR TIME?

12:35PM  9      A.   CAN YOU REPEAT?

12:35PM  10     Q.   LET ME ASK YOU A BETTER QUESTION.

12:35PM  11          MR. WADE SHOWED YOU SOME RECEIPTS FROM PHARMACEUTICAL

12:35PM  12     CONTRACTS DURING YOUR CROSS-EXAMINATION.

12:35PM  13          DO YOU RECALL THAT TESTIMONY?

12:35PM  14     A.   YES.

12:35PM  15     Q.   AND WOULD THOSE CASH RECEIPTS BE OFFSET BY EXPENSES THAT

12:35PM  16     THE COMPANY IS INCURRING DURING THAT SAME TIME PERIOD?

12:35PM  17     A.   YES.

12:35PM  18     Q.   THANK YOU.  WE CAN TAKE THAT DOWN, MS. HOLLIMAN.

12:35PM  19          AND IF WE CAN PLEASE GO BACK TO MR. WADE ASKED YOU A

12:35PM  20     COUPLE OF QUESTIONS ABOUT DIFFERENT VALUATION METHODS FOR THE

12:35PM  21     409 ANALYSIS, AND HE DREW YOUR ATTENTION TO EXHIBIT 5206,

12:35PM  22     PAGE 4.

12:36PM  23          DO YOU RECALL THIS EMAIL WHERE YOU WERE BEING ASKED

12:36PM  24     QUESTIONS ABOUT THE DIFFERENT VALUATION METHODS THAT WENT INTO

12:36PM  25     ARANCA'S ANALYSIS?

12:36PM  1    A.   YES.

12:36PM  2    Q.   AND DO YOU RECALL ATTENTION BEING DRAWN -- WHOOPS.

12:36PM  3         IF WE CAN ZOOM OUT, PLEASE, MS. HOLLIMAN.  THANK YOU.

12:36PM  4         I THINK YOU WERE ASKED ABOUT THIS THING CALLED A POST

12:36PM  5    MONEY VALUATION OF 9.5 BILLION?

12:36PM  6    A.   YES.

12:36PM  7    Q.   DO YOU RECALL BEING ASKED ABOUT THAT?

12:36PM  8    A.   YES.

12:36PM  9    Q.   AND THAT'S BASED ON THE RECENT SERIES C-2 FUNDING.

12:36PM  10        DO YOU SEE THAT LANGUAGE?

12:36PM  11   A.   YES.

12:36PM  12   Q.   AND IS THAT ESSENTIALLY THE VALUE ASSIGNED TO THE SHARE

12:36PM  13   PRICE FOR THE C-2 FINANCING?

12:36PM  14   A.   THE SHARE PRICE.

12:36PM  15   Q.   WELL, I THINK WE TALKED EARLIER ABOUT THE C-2 SHARE PRICE

12:36PM  16   BEING $17 A SHARE.  IF YOU MULTIPLY THAT BY THE NUMBER OF

12:37PM  17   SHARES, YOU GET SOMETHING IN THE NEIGHBORHOOD OF $9.5 BILLION?

12:37PM  18             MR. WADE:  OBJECTION, YOUR HONOR.  602 AND 701, 702.

12:37PM  19             THE COURT:  OVERRULED.  I DON'T THINK THIS CALLS FOR

12:37PM  20   EXPERT TESTIMONY.  IT'S MULTIPLICATION OF THE FIGURES, SO --

12:37PM  21        DO YOU WANT TO REPEAT THE QUESTION?

12:37PM  22   BY MR. LEACH:

12:37PM  23   Q.   SURE.  DO YOU UNDERSTAND THE POST MONEY VALUATION REFERRED

12:37PM  24   HERE TO BE BASED ON THE C-2 SHARE PRICE?

12:37PM  25   A.   YES.

12:37PM  1    Q.   OKAY.  AND THEN AT THE BOTTOM OF THIS PARAGRAPH IT SAYS,

12:37PM  2    "WE HAVE NOT ASSIGNED ANY WEIGHT TO THIS APPROACH."

12:37PM  3         DO YOU SEE THAT LANGUAGE?

12:37PM  4    A.   YES.

12:37PM  5    Q.   AND DO YOU UNDERSTAND THAT TO BE ARANCA TELLING YOU THAT

12:37PM  6    EVEN THOUGH THE C-2 FINANCING IS AT THIS PRICE, WE'RE NOT

12:37PM  7    ASSIGNING THAT ANY WEIGHT IN HOW WE VALUE THESE STOCK OPTIONS?

12:37PM  8    A.   YES.

12:37PM  9    Q.   OKAY.  THANK YOU, MS. SPIVEY.

12:38PM 10         THANK YOU, YOUR HONOR.  I HAVE NOTHING FURTHER.

12:38PM 11              MR. WADE:  NOTHING FURTHER, YOUR HONOR.

12:38PM 12              THE COURT:  MAY THIS WITNESS BE EXCUSED?

12:38PM 13              MR. LEACH:  YES, YOUR HONOR.

12:38PM 14              MR. WADE:  YES, YOUR HONOR.

12:38PM 15              THE COURT:  THANK YOU.  YOU'RE EXCUSED.  THANK YOU.

12:38PM 16              THE WITNESS:  THANK YOU.

12:38PM 17              THE COURT:  DOES THE GOVERNMENT HAVE ANOTHER

12:38PM 18    WITNESS?

12:38PM 19              MR. BOSTIC:  YES, YOUR HONOR.

12:38PM 20         THE UNITED STATES CALLS ERIKA CHEUNG.

12:39PM 21         MAY I APPROACH THE STAND, YOUR HONOR?

12:39PM 22              THE COURT:  YES.

12:39PM 23         IF YOU COULD COME FORWARD, PLEASE, AND I'LL HAVE YOU STAND

12:39PM 24    BY THE WITNESS STAND THERE.  OUR COURTROOM DEPUTY WILL PLACE

12:39PM 25    YOU OATH.  AND IF YOU'LL RAISE YOUR RIGHT HAND, SHE HAS A

12:39PM 1    QUESTION FOR YOU.

12:39PM 2            **(GOVERNMENT'S WITNESS, ERIKA CHEUNG, WAS SWORN.)**

12:39PM 3            THE WITNESS:  YES.

12:39PM 4            THE CLERK:  THANK YOU.

12:39PM 5            THE COURT:  THANK YOU.  PLEASE HAVE A SEAT HERE.

12:39PM 6    MAKE YOURSELF COMFORTABLE.  FEEL FREE TO ADJUST THE CHAIR AND

12:39PM 7    MICROPHONE AS YOU NEED.

12:39PM 8        I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

12:40PM 9            WHEN YOU ARE COMFORTABLE, COULD YOU PLEASE STATE YOUR NAME

12:40PM 10   AND THEN SPELL IT, PLEASE.

12:40PM 11           THE WITNESS:  MY NAME IS ERIKA CHEUNG.  AND THAT'S

12:40PM 12   SPELLED E-R-I-K-A, AND LAST NAME CHEUNG, C-H-E-U-N-G.

12:40PM 13           THE COURT:  THANK YOU.  COUNSEL.

12:40PM 14           MR. BOSTIC:  THANK YOU, YOUR HONOR.  AND,

12:40PM 15   YOUR HONOR, PLEASE CORRECT ME IF I'M WRONG, MY UNDERSTANDING IS

12:40PM 16   THAT IF WITNESSES ARE VACCINATED, THE COURT IS AMENABLE TO THEM

12:40PM 17   TESTIFYING WITHOUT A MASK?

12:40PM 18           THE COURT:  YES.

12:40PM 19           MR. BOSTIC:  MS. CHEUNG, MAY I ASK IF YOU'RE

12:40PM 20   COMFORTABLE DISCLOSING AND IF YOU'RE VACCINATED, IF THAT IS

12:40PM 21   TRUE WOULD YOU LIKE TO REMOVE YOUR MASK?

12:40PM 22           THE WITNESS:  I'M VACCINATED AND I AM COMFORTABLE

12:40PM 23   TAKING OFF MY MASK.

12:40PM 24           THE COURT:  ALL RIGHT.  THANK YOU.  YOU MAY DO SO.

12:40PM 25           MR. BOSTIC:  AND, YOUR HONOR, DOES THE SAME GO FOR

12:40PM  1    QUESTIONING COUNSEL?

12:40PM  2          THE COURT:  IT DOES.  AND I THINK WE ESTABLISHED

12:40PM  3    THAT ALL PARTIES ON ALL TEAMS ARE ALL VACCINATED.

12:40PM  4          MR. BOSTIC:  YES, YOUR HONOR.

12:40PM  5          THE COURT:  AND, MS. CHEUNG, JUST TO LET YOU KNOW,

12:40PM  6    WE HAVE AN AIR FILTER SYSTEM JUST BELOW YOU AND I THINK IT'S

12:40PM  7    OPERATIONAL NOW.

12:40PM  8          THE WITNESS:  YEAH, IT IS.

12:40PM  9          THE COURT:  GREAT.  THANK YOU.

12:40PM  10    COUNSEL.

12:40PM  11                    **DIRECT EXAMINATION**

12:40PM  12    BY MR. BOSTIC:

12:40PM  13    Q.   GOOD AFTERNOON, MS. CHEUNG.

12:41PM  14    A.   GOOD AFTERNOON.

12:41PM  15    Q.   WAS THERE A TIME WHEN YOU WERE EMPLOYED BY A COMPANY

12:41PM  16    CALLED THERANOS?

12:41PM  17    A.   YES.

12:41PM  18    Q.   AND WHEN YOU WERE AT THERANOS, WHAT WAS YOUR JOB TITLE AND

12:41PM  19    DESCRIPTION?

12:41PM  20    A.   SO MY JOB TITLE AND DESCRIPTION WAS LAB ASSOCIATE, AND I

12:41PM  21    CAME INTO THE COMPANY WORKING IN THE RESEARCH AND DEVELOPMENT

12:41PM  22    LAB WHEN I FIRST STARTED WORKING FOR THE COMPANY.

12:41PM  23    Q.   OKAY.  DID YOU REMAIN IN THE RESEARCH AND DEVELOPMENT LAB

12:41PM  24    FOR YOUR ENTIRE TIME AT THE COMPANY?

12:41PM  25    A.   NO.  I WAS FIRST IN THE RESEARCH AND DEVELOPMENT LAB AS A

12:41PM  1     LAB ASSOCIATE, AND THEN WAS INTEGRATED INTO THE CLINICAL LAB AS

12:41PM  2     A LAB ASSOCIATE WHERE THE CLINICAL LAB IS EFFECTIVELY WHERE THE

12:41PM  3     PATIENT PROCESSING OCCURRED OR OCCURS AT THERANOS.

12:41PM  4     Q.   WHAT WERE YOUR DATES OF EMPLOYMENT AT THERANOS?

12:41PM  5     A.   I WORKED AT THERANOS OCTOBER 2013 TO ABOUT APRIL OF 2014.

12:41PM  6     Q.   OKAY.  APPROXIMATELY SIX MONTHS GIVE OR TAKE?

12:41PM  7     A.   YES.

12:41PM  8     Q.   HOW DID YOUR EMPLOYMENT AT THERANOS END?  WERE YOU

12:41PM  9     TERMINATED?  LAID OFF?  DID YOU RESIGN?

12:42PM  10    A.   I RESIGNED.

12:42PM  11    Q.   AND IN GENERAL TERMS, WHAT WAS THE REASON FOR RESIGNING

12:42PM  12    FROM YOUR JOB AT THERANOS?

12:42PM  13    A.   I LEFT THERANOS BECAUSE I WAS UNCOMFORTABLE PROCESSING

12:42PM  14    PATIENT SAMPLES AND I DID NOT FEEL THAT THE TECHNOLOGY THAT WE

12:42PM  15    WERE USING IN ORDER TO PROCESS PATIENT SAMPLES WAS ADEQUATE

12:42PM  16    ENOUGH TO BE ENGAGING IN THAT BEHAVIOR OF PROCESSING PATIENT

12:42PM  17    SAMPLES.

12:42PM  18         AFTER LOTS OF CONVERSATIONS WITH VARIOUS EXECUTIVES AND

12:42PM  19    PEOPLE WITHIN THE ORGANIZATION, I HAD MADE THE DECISION TO

12:42PM  20    LEAVE THE ORGANIZATION.

12:42PM  21    Q.   OKAY.  LET'S GO BACK IN TIME A LITTLE BIT.

12:42PM  22         CAN YOU SUMMARIZE YOUR EDUCATION FOR ME BEGINNING POST

12:42PM  23    HIGH SCHOOL?

12:42PM  24    A.   POST HIGH SCHOOL EDUCATION, I GRADUATED FROM

12:42PM  25    U.C. BERKELEY, UNIVERSITY OF CALIFORNIA BERKELEY, AND I

12:42PM  1    RECEIVED A DEGREE IN MOLECULAR AND CELLULAR BIOLOGY AND A

12:43PM  2    BACHELOR'S IN LINGUISTICS, SO A DUAL DEGREE.

12:43PM  3    Q.   WAS THERANOS YOUR FIRST EMPLOYMENT OUT OF COLLEGE?

12:43PM  4    A.   YES.

12:43PM  5    Q.   AND HOW DID YOU FIRST HEAR ABOUT THE COMPANY THERANOS?

12:43PM  6    A.   I FIRST HEARD ABOUT THERANOS AT A STUDENT CAREER FAIR AT

12:43PM  7    THE U.C. BERKELEY CAMPUS, AND ESSENTIALLY THEY'RE BOOTHS SET UP

12:43PM  8    WITH DIFFERENT COMPANIES, AND THERANOS HAD PROBABLY THE MOST

12:43PM  9    POPULAR BOOTH.  IT HAD KIND OF A LINE OUT THE DOOR OF PEOPLE

12:43PM  10   WAITING TO TALK TO THE RECRUITER THERE, AND SO I WAITED IN LINE

12:43PM  11   TO TALK TO ONE OF THE RECRUITERS TO BE A PART OF THE COMPANY.

12:43PM  12   Q.   AND AT THAT TIME DID YOU KNOW MUCH ABOUT THE BUSINESS OF

12:43PM  13   THE COMPANY, WHAT IT WAS DOING?

12:43PM  14   A.   NO.

12:43PM  15   Q.   DID YOU THEN GO THROUGH THE JOB INTERVIEW PROCESS FOR A

12:43PM  16   POSITION AT THERANOS?

12:43PM  17   A.   YES.  SO ESSENTIALLY AFTER WAITING IN LINE, I HANDED OVER

12:43PM  18   MY RESUME TO THE RECRUITER, AND SHE SAID WE'RE HIRING A WHOLE

12:44PM  19   BUNCH OF PEOPLE FOR MANY DIFFERENT POSITIONS, LET ME SUBMIT

12:44PM  20   YOUR RESUME AND GIVE YOU A CALL TO SEE WHAT OPENING POSITIONS

12:44PM  21   YOU'LL HAVE.

12:44PM  22        SO AFTER I SUBMITTED MY RESUME I HAD GOTTEN A CALL BACK

12:44PM  23   AND THEY HAD TOLD ME THAT I HAD A PHONE INTERVIEW WITH THE

12:44PM  24   COMPANY FOR A POTENTIAL POSITION, AN ENTRY LEVEL POSITION.

12:44PM  25        AND THEN I PROCEEDED TO GO THROUGH THEIR INTERVIEW PROCESS

12:44PM  1    FROM THAT POINT FORWARD.

12:44PM  2    Q.   AND DID THE INTERVIEW PROCESS INCLUDE INTERVIEWS WITH

12:44PM  3    EITHER ELIZABETH HOLMES OR RAMESH "SUNNY" BALWANI?

12:44PM  4    A.   YES, WITH BOTH RAMESH BALWANI AND ELIZABETH HOLMES.

12:44PM  5    Q.   OKAY.  AND WAS THAT THE ORDER THAT THEY OCCURRED IN FIRST

12:44PM  6    MR. BALWANI AND THEN MS. HOLMES IF YOU RECALL?

12:44PM  7    A.   YES.

12:44PM  8    Q.   DURING THOSE INTERVIEWS -- WELL, LET'S START WITH THE

12:44PM  9    INTERVIEW WITH MR. BALWANI FIRST.

12:44PM  10        DO YOU RECALL LEARNING ANYTHING ABOUT THE COMPANY DURING

12:44PM  11   YOUR CONVERSATION WITH HIM?

12:44PM  12   A.   I DIDN'T LEARN TOO MUCH.  I UNDERSTOOD THAT IT WAS A

12:44PM  13   MEDICAL DIAGNOSTIC COMPANY, THAT THERE WERE SORT OF GRAND

12:45PM  14   ENVISIONS OF WHAT THEY WERE GOING TO ACCOMPLISH, BUT IN TERMS

12:45PM  15   OF THE QUESTIONS THAT I ASKED DURING THE INTERVIEW IT WAS TOLD

12:45PM  16   TO ME THAT THEY, YOU KNOW, HAD CONFIDENTIALITY AROUND THE

12:45PM  17   TECHNOLOGY THAT THEY WERE BUILDING AND I WOULD FIND OUT ONCE I

12:45PM  18   STARTED WORKING FOR THE COMPANY AND MORE SPECIFICS ABOUT WHAT

12:45PM  19   IT WAS THAT WE WERE WORKING ON AND THE TECHNOLOGY THAT WE WERE

12:45PM  20   DEALING WITH.

12:45PM  21   Q.   HOW ABOUT YOUR INTERVIEW WITH MS. HOLMES, HOW DID THAT

12:45PM  22   COMPARE IN THAT REGARD?

12:45PM  23   A.   I ALSO -- IN MY INTERVIEW WITH MS. HOLMES I THINK I WAS

12:45PM  24   MORE KIND OF STAR STRUCK BECAUSE OF WHAT I HAD READ ON THE

12:45PM  25   INTERNET WITH HER.  I ASKED A COUPLE OF QUESTIONS, AND SHE SAID

12:45PM  1    YOU'LL FIND OUT ONCE YOU START WORKING FOR THE COMPANY AS WELL

12:45PM  2    ABOUT THE TECHNOLOGY WE'RE WORKING WITH AND SEE WHAT IT IS THAT

12:45PM  3    WE'RE ALL ABOUT AND WHAT THE PROSPECTS BASICALLY OF THE COMPANY

12:45PM  4    ARE GOING TO BE RIGHT NOW AND IN THE FUTURE.

12:45PM  5    Q.    AND YOU WERE IN THE MIDST OF THE JOB APPLICATION PROCESS,

12:45PM  6    SO I TAKE IT YOU WERE INTERESTED IN THE POSITION; IS THAT

12:46PM  7    CORRECT?

12:46PM  8    A.    YES.

12:46PM  9    Q.    SEPARATE FROM THAT, WERE YOU EXCITED ABOUT THE PROSPECT OF

12:46PM  10   WORKING AT THERANOS?

12:46PM  11   A.    I WAS VERY EXCITED ABOUT THE PROSPECT OF WORKING FOR

12:46PM  12   THERANOS BASED ON THE VERY LITTLE INFORMATION THAT WAS ABOUT

12:46PM  13   THE COMPANY, IT HAD WHAT WOULD APPEAR TO BE A REALLY EXCITING

12:46PM  14   TECHNOLOGY WHERE THEY WERE ESSENTIALLY GOING TO PREVENT PEOPLE

12:46PM  15   FROM GETTING LAB DIAGNOSTICS THAT WERE PAINFUL BY DOING VENOUS

12:46PM  16   DRAWS BY A FINGERSTICK, THAT IT WOULD BE AFFORDABLE, THAT THERE

12:46PM  17   WAS COMPLETE PRICE TRANSPARENCY, WHICH IS SOMETHING THAT I WAS

12:46PM  18   EXCITED ABOUT, SOMETHING THAT WAS GOING TO BE MORE ACCESSIBLE.

12:46PM  19   SO ESSENTIALLY INSTEAD OF JUST GETTING YOUR BLOOD TESTS DONE

12:46PM  20   ONCE OR TWICE, YOU COULD GET IT MULTIPLE TIMES.

12:46PM  21        SO BETWEEN THE TECHNOLOGY, BETWEEN WHAT I HAD HEARD ABOUT

12:46PM  22   MS. HOLMES, AND THE FACT THAT WE WERE IN THE SILICON VALLEY AND

12:46PM  23   IT HAD SORT OF THIS HYPE ABOUT BEING THIS KIND OF A STARTUP, I

12:46PM  24   WAS REALLY EXCITED TO WORK WITH THERANOS AND HAD ACTUALLY

12:46PM  25   TURNED DOWN OTHER JOB OPPORTUNITIES TO WORK WITH THEM.



12:47PM  1    Q.   WHAT WAS ABOUT IT MS. HOLMES IN PARTICULAR THAT INCREASED

12:47PM  2    THE APPEAL OF THE COMPANY TO YOU?

12:47PM  3    A.   I THINK IN THE INTERVIEW THAT I HAD SEEN WITH THE STANFORD

12:47PM  4    TECHNOLOGY VENTURE PROGRAM SHE HAD TALKED ABOUT ESSENTIALLY

12:47PM  5    WHAT THE TECHNOLOGY COULD DO, WHAT POINT OF CARE DIAGNOSTICS

12:47PM  6    COULD DO.

12:47PM  7         SO INSTEAD OF JUST HAVING A ONE TIME STAMP OF YOUR BLOOD

12:47PM  8    DIAGNOSTICS YOU COULD HAVE MULTIPLE BECAUSE IT WAS EASIER, LESS

12:47PM  9    PAINFUL, CHEAPER, AND IT WOULD HAVE A SORT OF DYNAMIC STORY

12:47PM  10   LINE OF WHAT YOUR HEALTH WAS, WHICH COULD REALLY CHANGE THE WAY

12:47PM  11   IN WHICH WE TREAT PATIENTS.

12:47PM  12        AND SHE HAD A CHARISMA TO HER, RIGHT?  SHE WAS VERY

12:47PM  13   ARTICULATE.  SHE HAD A STRONG SENSE OF CONVICTION ABOUT HER

12:47PM  14   MISSION.

12:47PM  15        AND ALSO AT THAT TIME SHE WAS ONE OF THE FEW, YOU KNOW,

12:47PM  16   FEMALE ENTREPRENEURS WHO MANAGED TO GET THIS SORT OF UNICORN

12:47PM  17   STATUS OF A COMPANY, WHICH MEANS THAT IT HAD A VALUATION OF

12:47PM  18   OVER A BILLION DOLLARS, AND TO HELP SUPPORT SOMEONE WHO HAD

12:48PM  19   WHAT APPEARED TO BE STRONG LEADERSHIP, A STRONG MISSION, AND

12:48PM  20   WHO COULD POTENTIALLY SET AN EXAMPLE FOR OTHER WOMEN TO GET

12:48PM  21   EXCITED ABOUT SCIENCE AND ENGINEERING.

12:48PM  22        IT SEEMED LIKE A COMPANY THAT I WANTED TO BE APART OF AND

12:48PM  23   TO HELP BUILD AND GROW.

12:48PM  24   Q.   AT THE CONCLUSION OF THE APPLICATION PROCESS, WERE YOU

12:48PM  25   OFFERED A POSITION AT THERANOS?

12:48PM   1    A.   YES.

12:48PM   2    Q.   AND DID YOU ACCEPT?

12:48PM   3    A.   YES.

12:48PM   4    Q.   AND FOR THE REASONS THAT WE JUST DISCUSSED?

12:48PM   5    A.   YES.

12:48PM   6    Q.   WHEN YOU STARTED AT THE COMPANY, DID YOU SIGN A

12:48PM   7    NONDISCLOSURE AGREEMENT?

12:48PM   8    A.   YES.

12:48PM   9    Q.   DURING THE EARLY DAYS OF YOUR EMPLOYMENT WITH THE COMPANY,

12:48PM   10   DID YOU GET A SENSE OF WHETHER INFORMATION WAS RESTRICTED AT

12:48PM   11   THE COMPANY?  IN OTHER WORDS, WHETHER THERE WAS INFORMATION

12:48PM   12   THAT YOU WERE LEARNING THAT COULD NOT BE SHARED OUTSIDE OF THE

12:48PM   13   COMPANY?

12:48PM   14   A.   YES.

12:48PM   15   Q.   AND HOW DID YOU GET THAT SENSE?

12:48PM   16   A.   WHEN WE DID OUR ENTRY INTERVIEW INTO THE COMPANY, WE SAT

12:48PM   17   DOWN WITH CHRISTIAN HOLMES, WHO WAS ONE OF THE PROJECT MANAGERS

12:49PM   18   OF THE COMPANY, AND HE ESSENTIALLY TOLD US THAT SECRECY WAS

12:49PM   19   VERY IMPORTANT BECAUSE WE NEEDED TO GUARD INFORMATION TO ENSURE

12:49PM   20   THAT COMPETITORS WOULD NOT FIGURE OUT WHAT WE WERE DOING WITHIN

12:49PM   21   THE COMPANY AND THAT WE COULDN'T PUT -- SAY THAT WE WORKED AT

12:49PM   22   THERANOS ON OUR LINKEDIN PROFILES OR HAVE VERY DESCRIPTIVE

12:49PM   23   INDICATIONS ABOUT WHAT OUR ROLES AND RESPONSIBILITIES WERE, AND

12:49PM   24   IT WAS VERY IMPORTANT FOR US TO KEEP INFORMATION ABOUT WHAT WE

12:49PM   25   WERE DOING IN THE COMPANY INTERNAL.



12:49PM  1        SO IT WAS VERY CLEAR FROM THE VERY BEGINNING WORKING THERE

12:49PM  2   THE FIRST DAY ON THE JOB THAT WE NEEDED TO KEEP INFORMATION

12:49PM  3   CONFIDENTIAL AND SECRET AND THAT IT WAS MEANT FOR SORT OF

12:49PM  4   INTERNAL VIEWING.

12:49PM  5   Q.   REMIND ME OR REPEAT, WHAT WAS CHRISTIAN HOLMES'S TITLE AT

12:49PM  6   THE COMPANY AGAIN?

12:49PM  7   A.   CHRISTIAN HOLMES'S TITLE, HE WAS ONE OF THE LEAD PROJECT

12:49PM  8   MANAGERS.

12:49PM  9   Q.   IN ADDITION TO THAT WAS HE ALSO ELIZABETH HOLMES'S

12:50PM  10  BROTHER?

12:50PM  11  A.   YES.

12:50PM  12  Q.   NOW THAT YOU WERE EMPLOYED AT THE COMPANY, DID YOU DEVELOP

12:50PM  13  A SENSE OF WHAT BUSINESS THE COMPANY WAS IN?  WHAT THE COMPANY

12:50PM  14  DID?

12:50PM  15  A.   YES.

12:50PM  16  Q.   AND HOW WOULD YOU DESCRIBE THAT AT A HIGH LEVEL?

12:50PM  17  A.   SO AT A HIGH LEVEL THERANOS WAS CREATING A NEW TYPE OF

12:50PM  18  MEDICAL DEVICE WHERE ESSENTIALLY INSTEAD OF RUNNING VENOUS DRAW

12:50PM  19  BLOOD SAMPLES THEY WERE RUNNING A FINGERSTICK.

12:50PM  20       YOU WOULD TAKE THIS FINGERSTICK SAMPLE AND PUT IT INTO A

12:50PM  21  TESTING KIT, AND STICK IT INTO A MACHINE, AND THEN IT WOULD

12:50PM  22  GIVE YOU ALL OF THE RESULTS THAT YOU WOULD NEED FOR YOUR LAB

12:50PM  23  DIAGNOSTICS THAT AT THAT POINT A DOCTOR WOULD TYPICALLY ORDER.

12:50PM  24       SO IT WAS A PATIENT PROCESSING COMPANY IN ADDITION TO AN

12:50PM  25  INNOVATIVE MEDICAL DEVICE COMPANY.

12:50PM  1    Q.   BASED ON YOUR UNDERSTANDING AT THE TIME, DID THERANOS HAVE

12:50PM  2    ANY COMPETITORS IN THE BLOOD TESTING FIELD?

12:50PM  3    A.   THEY DID, YES.

12:51PM  4    Q.   WHO WERE THE CHIEF COMPETITORS IF YOU HAVE A SENSE?

12:51PM  5    A.   THE CHIEF COMPETITORS WERE LAB CORP. AND

12:51PM  6    QUEST DIAGNOSTICS.

12:51PM  7    Q.   AND WAS THERE ANYTHING ABOUT THERANOS THAT SET THAT

12:51PM  8    COMPANY APART FROM THOSE TWO COMPETITORS THAT YOU MENTIONED?

12:51PM  9    A.   YES.

12:51PM 10    Q.   AND WHAT WAS THAT?

12:51PM 11    A.   SO THE BIGGEST THING THAT SET THERANOS APART WAS

12:51PM 12    EVENTUALLY THE GOAL OF THERANOS WAS THE FACT THAT THESE DEVICES

12:51PM 13    WOULD BE SET UP IN PHARMACIES ACROSS THE U.S., SO IN WALGREENS.

12:51PM 14    SO INSTEAD OF HAVING YOUR BLOOD TUBES SORT OF SENT TO A

12:51PM 15    CENTRALIZED LABORATORY FACILITY LIKE LAB CORP.,

12:51PM 16    QUEST DIAGNOSTICS, IT COULD BE RUN ONSITE.  SO IT COULD BE RUN

12:51PM 17    AT THE WALGREENS LOCATION AND HAVING A MORE SORT OF

12:51PM 18    DECENTRALIZED WAY OF TESTING PEOPLE WAS SOMETHING THAT YOU

12:51PM 19    HADN'T QUITE SEEN YET.

12:51PM 20    Q.   YOU MENTIONED A MINUTE AGO THE METHOD OF DRAWING BLOOD

12:51PM 21    FROM A FINGERSTICK AS WELL?

12:51PM 22    A.   YES.

12:51PM 23    Q.   AND WAS THAT SOMETHING THAT WAS RELATIVELY UNIQUE TO

12:52PM 24    THERANOS AS COMPARED TO THE COMPETITOR COMPANIES THAT YOU

12:52PM 25    MENTIONED?

12:52PM   1    A.   YES.

12:52PM   2    Q.   YOU SAID THAT YOUR INITIAL PLACEMENT AT THE COMPANY WAS IN

12:52PM   3    THE RESEARCH AND DEVELOPMENT LAB; IS THAT CORRECT?

12:52PM   4    A.   THAT IS CORRECT.

12:52PM   5    Q.   AND JUST ONE MORE TIME, WHAT WAS YOUR JOB TITLE THERE?

12:52PM   6    A.   I WAS A LAB ASSOCIATE.

12:52PM   7    Q.   WHEN YOU JOINED THE COMPANY, WAS THERANOS ALREADY OFFERING

12:52PM   8    BLOOD TESTING SERVICES TO THE PUBLIC?

12:52PM   9    A.   YES.

12:52PM  10    Q.   AND THIS WOULD HAVE BEEN IN OCTOBER 2013 YOU SAID?

12:52PM  11    A.   YES.

12:52PM  12    Q.   AND WHAT DEPARTMENT OR GROUP IN THERANOS HANDLED PATIENT

12:52PM  13    BLOOD TESTING?

12:52PM  14    A.   IN OCTOBER OF 2013 IT WAS THE RESEARCH AND DEVELOPMENT

12:52PM  15    DEPARTMENT FOR FINGERSTICK SAMPLES.

12:52PM  16    Q.   WAS THERE ALSO A CLINICAL LAB OPERATING AT THAT TIME?

12:52PM  17    A.   YES.

12:52PM  18    Q.   AND DID THE CLINICAL LAB ALSO HAVE A ROLE IN CONDUCTING

12:52PM  19    PATIENT TESTING?

12:52PM  20    A.   YES.

12:52PM  21    Q.   CAN YOU EXPLAIN AGAIN IN GENERAL TERMS THE DIFFERENCE

12:52PM  22    BETWEEN THE RESEARCH AND DEVELOPMENT DEPARTMENT VERSUS THE

12:53PM  23    CLINICAL LABORATORY DEPARTMENT AT THERANOS?

12:53PM  24    A.   JUST TO MAKE SURE I UNDERSTAND THE QUESTION.  EXPLAIN THE

12:53PM  25    DIFFERENCES BETWEEN THE RESEARCH AND DEVELOPMENT LAB AND THE

12:53PM   1    CLINICAL LAB?

12:53PM   2    Q.   EXACTLY.

12:53PM   3    A.   SO IN THE RESEARCH AND DEVELOPMENT LAB, THAT WAS THE

12:53PM   4    CREATION OF ALL OF THE DIFFERENT BLOOD TESTS.

12:53PM   5         SO THE RESEARCH AND DEVELOPMENT LAB WAS THE LABORATORY

12:53PM   6    WHERE WE WERE DEVELOPING ALL OF THE TESTS THAT WE WERE GOING TO

12:53PM   7    RUN ON FINGERSTICK SAMPLES.  AND SO THE DEVELOPMENT HAPPENED

12:53PM   8    THERE IN ADDITION TO THE VALIDATION TO MAKE SURE ARE THESE

12:53PM   9    ACCURATE TESTS?  DO THEY OPERATE RELIABLY?  AND, YOU KNOW, THIS

12:53PM  10    WAS THE PLACE WHERE ALL OF THE NEW TESTS THAT WE HADN'T

12:53PM  11    DEVELOPED YET WERE ONGOING AND WORKING.

12:53PM  12         AND THEN IN THE CLINICAL LAB, THE CLINICAL LAB IS WHERE

12:53PM  13    YOU ACTIVELY PROCESS PATIENT SAMPLES.  SO WHEN A DOCTOR HAS A

12:54PM  14    REQUEST, IT GETS SENT TO THE CLINICAL LAB, AND WE FIGURE OUT IN

12:54PM  15    THE CLINICAL LAB HOW TO RUN THAT PATIENT SAMPLE.

12:54PM  16         SO THAT'S THE DIFFERENCE.

12:54PM  17    Q.   SO A GIVEN TEST WOULD BEGIN IN THE RESEARCH AND

12:54PM  18    DEVELOPMENT SECTION OR LAB, AND THEN ONCE IT WAS READY IT WOULD

12:54PM  19    BE MOVED INTO THE CLINICAL LAB FOR PATIENT TESTING?

12:54PM  20    A.   YES.

12:54PM  21    Q.   AND YOU WORKED IN BOTH OF THESE LABS AT THERANOS; CORRECT?

12:54PM  22    A.   YES.

12:54PM  23    Q.   AND DURING YOUR TIME AT THE COMPANY, DID YOU BECOME

12:54PM  24    GENERALLY FAMILIAR WITH WHAT KINDS OF TESTS THERANOS WAS

12:54PM  25    CONDUCTING?

12:54PM  1   A.   YES.

12:54PM  2   Q.   HOW ABOUT THE DEVICES USED BY THE COMPANY.  AS PART OF

12:54PM  3   YOUR ROLE DID YOU BECOME FAMILIAR WITH THE KINDS OF ANALYZERS

12:54PM  4   THAT THERANOS WAS USING TO TEST PATIENT BLOOD SAMPLES?

12:54PM  5   A.   YES.

12:54PM  6   Q.   AND DID THERANOS MANUFACTURE SOME BLOOD ANALYZERS?

12:54PM  7   A.   YES, THEY DID.

12:54PM  8   Q.   WHAT WERE THOSE?

12:55PM  9   A.   THE DEVICES THAT THERANOS MANUFACTURED WERE THE EDISON,

12:55PM  10  THE EDISON DEVICES.

12:55PM  11  Q.   AND WERE THERE DIFFERENT VERSIONS OF THE EDISON DEVICES?

12:55PM  12  A.   YES.  SO THERE WAS THE EDISON 3.0'S AND THE EDISON 3.5'S.

12:55PM  13  Q.   AND WERE THOSE TWO DIFFERENT VERSIONS OF THE SAME BASIC

12:55PM  14  DEVICE?

12:55PM  15  A.   YES.

12:55PM  16  Q.   AND THERE'S A BINDER ON THE DESK IN FRONT OF YOU.  IF I

12:55PM  17  COULD ASK YOU TO OPEN THAT AND TURN TO A TAB LABELLED

12:55PM  18  EXHIBIT 5388.

12:55PM  19       LET ME KNOW WHEN YOU'RE THERE.

12:55PM  20  A.   IS IT IN THE FRONT OF 5388 OR THE BACK?

12:55PM  21  Q.   IT SHOULD BE IN THE BACK.  I THINK IT'S THE SECOND TO THE

12:55PM  22  LAST TAB IN THE BINDER.

12:55PM  23  A.   YES.

12:55PM  24  Q.   AND YOU SHOULD BE LOOKING AT AN IMAGE.

12:55PM  25  A.   YES.

12:55PM  1    Q.   AND DO YOU RECOGNIZE WHAT IS DEPICTED IN THAT IMAGE?

12:55PM  2    A.   YES.

12:56PM  3    Q.   AND WHAT IS IT?

12:56PM  4    A.   THAT'S THE EDISON DEVICE.

12:56PM  5    Q.   AND IS THIS A TRUE AND CORRECT IMAGE OF THE EDISON DEVICE?

12:56PM  6    A.   YES.

12:56PM  7         MR. BOSTIC:  YOUR HONOR, I WOULD MOVE EXHIBIT 5388

12:56PM  8    INTO EVIDENCE AT THIS TIME.

12:56PM  9         MR. WADE:  NO OBJECTION.

12:56PM  10        THE COURT:  IT'S RECEIVED AND MAY BE PUBLISHED.

12:56PM  11        (GOVERNMENT'S EXHIBIT 5388 WAS RECEIVED IN EVIDENCE.)

12:56PM  12        MR. BOSTIC:  LET'S GET THAT UP ON THE SCREEN,

12:56PM  13   MS. HOLLIMAN.

12:56PM  14        OKAY.

12:56PM  15   Q.   MS. CHEUNG, DO YOU NOW SEE ON THE SCREEN IN FRONT OF YOU

12:56PM  16   THE IMAGE THAT WE WERE TALKING ABOUT?

12:56PM  17   A.   YES.

12:56PM  18   Q.   AND YOU SAID THIS WAS THE EDISON.  WHAT DOES THIS LOOK

12:56PM  19   LIKE IN PERSON?  CAN YOU EXPLAIN, FOR EXAMPLE, HOW BIG IT WAS?

12:56PM  20   A.   IT WAS ABOUT THE SIZE OF A, LIKE, DESKTOP COMPUTER, MAYBE

12:56PM  21   SLIGHTLY BIGGER.

12:56PM  22   Q.   AND THE SCREEN IN FRONT, IS THAT A TOUCH SCREEN?

12:56PM  23   A.   YES.

12:56PM  24   Q.   DURING YOUR TIME AT THE COMPANY, DID YOU BECOME FAMILIAR

12:56PM  25   WITH THE USE OF THE EDISON ANALYZER?

12:56PM 1     A.   YES.

12:56PM 2     Q.   AND CAN YOU DESCRIBE WHAT THE STEPS WERE INVOLVED IN

12:57PM 3     RUNNING A SAMPLE ON THE EDISON?

12:57PM 4     A.   YES.  SO WHEN A PATIENT WOULD GET THEIR BLOOD COLLECTED,

12:57PM 5     IT WOULD BE IN A CONTAINER CALLED A NANOTAINER.

12:57PM 6          THAT NANOTAINER WOULD BE TAKEN TO THE LABORATORY WHERE WE

12:57PM 7     WOULD BASICALLY SORT WHO GOT ACCESS TO THE BLOOD SAMPLE FIRST.

12:57PM 8          AND THEN ONCE WE WOULD GET THE BLOOD SAMPLE, WE WOULD RUN

12:57PM 9     IT THROUGH SOMETHING CALLED A TECAN, AND THEN PUT THIS BLOOD

12:57PM 10    SAMPLE INTO A CARTRIDGE.

12:57PM 11         AND THAT CARTRIDGE WOULD THEN BE PUT INTO THIS DEVICE.

12:57PM 12    AND WE WOULD SCAN A BAR CODE, AND WE WOULD HIT START IF IT WAS

12:57PM 13    THE ACCURATE TEST, MAKING SURE YOU CHECK.

12:57PM 14         AND THEN ONCE WE CONFIRMED IT WAS THE ACCURATE TEST, WE

12:57PM 15    WOULD START IT, AND IT WOULD RUN.

12:57PM 16         AND EVENTUALLY THE RESULTS WOULD COME THROUGH A BACK-END

12:57PM 17    SYSTEM CALLED ALCHEMIST, IT'S A-L-C-H-E-M-I-S-T.

12:58PM 18         AND FROM THERE WE WOULD GET THE PATIENT RESULTS.

12:58PM 19         AND THAT'S HOW WE USE THE EDISON DEVICES.

12:58PM 20    Q.   I JUST WANT TO FOLLOW UP ON ONE STEP YOU MENTIONED.  YOU

12:58PM 21    MENTIONED I THINK A DEVICE CALLED THE TECAN; IS THAT CORRECT?

12:58PM 22    A.   YES.

12:58PM 23    Q.   AND IS THAT T-E-C-A-N?

12:58PM 24    A.   YES.

12:58PM 25    Q.   AND WHAT DID THE TECAN DO IN THIS PROCESS?

12:58PM   1      A.   SO THE TECAN WAS A LIQUID HANDLING DEVICE.  ESSENTIALLY

12:58PM   2   WHAT IT DOES IS THAT IT'S ABLE TO DISPENSE AND DISPENSE VERY

12:58PM   3   SMALL QUANTITIES OF LIQUID INTO VERY SPECIFIC LOCATIONS.  SO

12:58PM   4   IT'S A ROBOTIC SYSTEM.

12:58PM   5      YEAH, IT'S ROBOTICS LIQUID HANDLING DEVICE.

12:58PM   6      Q.   AND DID THE TECAN ADD TO OR TAKE ANYTHING AWAY FROM THE

12:58PM   7   BLOOD SAMPLE?

12:58PM   8      A.   IT WOULD DILUTE THE BLOOD SAMPLE.

12:58PM   9      Q.   SO, IN OTHER WORDS, IT WOULD ADD A LIQUID TO THE BLOOD

12:59PM  10   SAMPLE?

12:59PM  11      A.   YES.

12:59PM  12      Q.   AND WHAT LIQUID WAS USED TO DILUTE THE BLOOD SAMPLES?

12:59PM  13      A.   TYPICALLY IT WOULD BE SOME SORT OF REAGENT.  IT WOULD BE

12:59PM  14   SOMETHING LIKE PBS OR PSA, DEPENDING ON WHAT TYPE OF TEST IT

12:59PM  15   WAS.  THERE WERE DIFFERENT DILUTION BUFFERS THAT WOULD BE USED.

12:59PM  16      Q.   AND WAS THE TECAN DEVICE, THE TECAN MACHINE MANUFACTURED

12:59PM  17   BY THERANOS?

12:59PM  18      A.   NO.

12:59PM  19      Q.   WAS IT SOMETHING THAT HAD BEEN INVENTED BY OR DEVELOPED BY

12:59PM  20   THERANOS?

12:59PM  21      A.   NO.

12:59PM  22      Q.   AND WHAT DID IT LOOK LIKE, THE TECAN DEVICE?

12:59PM  23      A.   IT'S A VERY LARGE DEVICE.  IT'S PROBABLY, IF YOU FLIPPED A

12:59PM  24   REFRIGERATOR ON ITS SIDE IT WOULD BE ABOUT THAT SIZE, AND IT

12:59PM  25   HAS KIND OF LIKE A TABLETOP WHERE YOU CAN SORT OF SET UP

12:59PM   1      DIFFERENT SETUPS IN ORDER TO TELL THE ROBOTIC SYSTEM WHERE TO

12:59PM   2      PLACE THE LIQUID OR WHERE TO TAKE LIQUID FROM, OR WHAT TO PUT

12:59PM   3      IT INTO.

12:59PM   4           SO IT'S A PRETTY LARGE TABLETOP ROBOTICS DEVICE, YEAH.

01:00PM   5      Q.   THE EDISON ANALYZER, COULD IT RUN DIFFERENT TYPES OF

01:00PM   6      TESTS -- WELL, LET ME ASK A DIFFERENT QUESTION.

01:00PM   7           IN YOUR EXPERIENCE USING THE EDISON ANALYZER, WAS IT USED

01:00PM   8      TO RUN MULTIPLE TYPES OF TESTS ON THE SAME SAMPLE AT ONE TIME?

01:00PM   9      A.   THE EDISON DEVICE COULD ONLY RUN ONE TYPE OF TEST FOR ONE

01:00PM  10      PATIENT AT A GIVEN TIME.

01:00PM  11      Q.   IN OTHER WORDS, ONE DEVICE COULD ONLY RUN ONE TYPE OF

01:00PM  12      SAMPLE ON ONE DEVICE AT ONE TIME?

01:00PM  13      A.   YES.

01:00PM  14      Q.   WERE THERE OTHER BLOOD ANALYZERS THAT THERANOS

01:00PM  15      MANUFACTURED IN HOUSE?

01:00PM  16      A.   THERE WAS ONE OTHER THAT THERANOS DEVELOPED, YEAH.

01:00PM  17      Q.   SO LET ME ASK A BETTER QUESTION, WHICH IS DURING YOUR TIME

01:01PM  18      AT THE COMPANY, WERE THERE ANY OTHER THERANOS MANUFACTURED

01:01PM  19      DEVICES THAT WERE USED FOR PATIENT SAMPLE TESTING?

01:01PM  20      A.   NO.

01:01PM  21      Q.   WERE THERE OTHER THERANOS ANALYZERS THAT WERE BEING USED

01:01PM  22      BUT NOT FOR PATIENT TESTING?

01:01PM  23      A.   YES.

01:01PM  24      Q.   AND CAN YOU DESCRIBE WHICH OF THOSE YOU BECAME FAMILIAR

01:01PM  25      WITH?

01:01PM  1   A.   SO THERE WAS ANOTHER DEVICE CALLED THE 4.0'S WHICH WAS

01:01PM  2   ESSENTIALLY A DEVICE THAT WAS MEANT TO BE ABLE TO PROCESS ALL

01:01PM  3   OF THE DIFFERENT TYPES OF TESTS THAT WE RUN WITH DIFFERENT

01:01PM  4   TYPES OF METHODOLOGY.

01:01PM  5        YOU KNOW, ONE WOULD BE A CHEMISTRY METHODOLOGY, AND AN

01:01PM  6   IMMUNOCHEMISTRY METHODOLOGY, MICROBIOLOGY.  SO IT WAS SUPPOSED

01:01PM  7   TO BE THIS AGGREGATIVE DEVICE, AND THAT WAS THE 4.0.

01:01PM  8   Q.   AND YOU SAID "SUPPOSED TO BE."  WHY ARE YOU USING THAT

01:01PM  9   TERM INSTEAD OF JUST SAYING WHAT THE DEVICE COULD DO?

01:01PM 10   A.   IT WAS STILL IN DEVELOPMENT WHILE I WAS THERE.  IT DIDN'T

01:01PM 11   HAVE THAT CAPACITY WHILE I WAS WORKING FOR THE COMPANY.

01:01PM 12   Q.   YOU SAID THAT THAT DEVICE -- AND DID YOU CALL IT THE 4.0?

01:02PM 13   A.   YES.

01:02PM 14   Q.   AND YOU SAID THAT THAT DEVICE WAS SUPPOSED TO BE ABLE TO

01:02PM 15   DO ALL OF THE KINDS OF TESTS THAT THERANOS OFFERED; IS THAT

01:02PM 16   CORRECT?

01:02PM 17   A.   YES.

01:02PM 18   Q.   WOULD THAT MAKE IT DIFFERENT FROM THE EDISON DEVICE?

01:02PM 19   A.   YES.

01:02PM 20   Q.   AND HOW SO?

01:02PM 21   A.   THE EDISON DEVICES COULD ONLY RUN ABOUT 12 DIFFERENT TYPES

01:02PM 22   OF TESTS, AND THEY WERE IMMUNO ASSAYS, SO THEY WERE

01:02PM 23   IMMUNOCHEMISTRY TESTS.  ANOTHER TERM FOR THEM IS AN ELISA, SO

01:02PM 24   IT'S E-L-I-S-A.

01:02PM 25   Q.   AND THAT WAS JUST A SUBSET OF THE TOTAL SET OF TESTS THAT

01:02PM  1    THERANOS WAS OFFERING AT THE TIME?

01:02PM  2    A.   YES.

01:02PM  3    Q.   I THINK YOU JUST ANSWERED THIS QUESTION AS WELL, BUT JUST

01:02PM  4    TO BE CLEAR, DURING YOUR TIME AT THERANOS, DID THERANOS RUN

01:02PM  5    PATIENT BLOOD TESTS ONLY ON THE EDISON, THE THERANOS BUILT

01:03PM  6    ANALYZER?

01:03PM  7    A.   NO.

01:03PM  8    Q.   DID IT USE OTHER TYPES OF DEVICES FOR PATIENT BLOOD SAMPLE

01:03PM  9    TESTING?

01:03PM  10   A.   YES.

01:03PM  11   Q.   WHAT WERE THE OTHER TYPES OF DEVICES THAT THERANOS USED

01:03PM  12   FOR PATIENT SAMPLE TESTING?

01:03PM  13   A.   SO THERANOS HAD UTILIZED OTHER FDA APPROVED MACHINES THAT

01:03PM  14   THEY HAD MODIFIED IN ORDER TO BE ABLE TO HANDLE THE SMALL BLOOD

01:03PM  15   SAMPLES THAT WE HAD.

01:03PM  16        SO ONE OF THEM FOR CHEMISTRY SAMPLES WAS CALLED THE

01:03PM  17   SIEMENS ADVIA, AND THAT'S A NORMAL FDA APPROVED MACHINE THAT

01:03PM  18   YOU WOULD FIND IN HOSPITALS AND YOU CAN BUY OFF THE SHELF.

01:03PM  19        ANOTHER ONE FOR ALL OF THE HEMATOLOGY SAMPLES WE WOULD USE

01:03PM  20   A MACHINE CALLED THE BSD FORTESSA, IT'S A FLOW CYTOMETER, AND

01:03PM  21   THAT WAS ANOTHER DEVICE THAT WE USED IN ORDER TO RUN ALL OF THE

01:04PM  22   CYTOLOGY OR HEMATOLOGY SAMPLES.

01:04PM  23   Q.   THE DEVICES THAT YOU'RE TALKING ABOUT RIGHT NOW, WERE

01:04PM  24   THOSE DEVICES MANUFACTURED OR DEVELOPED BY THERANOS?

01:04PM  25   A.   NO.

01:04PM  1     Q.   WERE THEY INSTEAD DEVELOPED AND SOLD BY THIRD PARTY

01:04PM  2     COMPANIES?

01:04PM  3     A.   YES.

01:04PM  4     Q.   IN THE BINDER IN FRONT OF YOU, CAN I ASK YOU TO TURN TO

01:04PM  5     EXHIBIT 5389.  THAT SHOULD BE JUST THE NEXT ONE IN ORDER.

01:04PM  6         YOU SHOULD SEE AN IMAGE THERE.

01:04PM  7     A.   YES.

01:04PM  8     Q.   AND DO YOU RECOGNIZE WHAT IS DEPICTED IN THAT IMAGE?

01:04PM  9     A.   YES.  THIS IS THE SIEMENS ADVIA.

01:04PM 10     Q.   IS THE IMAGE MARKED AS EXHIBIT 5389 A TRUE AND CORRECT

01:04PM 11     DEPICTION OF THAT DEVICE BASED ON YOUR EXPERIENCE?

01:04PM 12     A.   YES.

01:04PM 13              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT WOULD MOVE

01:04PM 14     TO ADMIT EXHIBIT 5389 AT THIS TIME.

01:04PM 15              MR. WADE:  NO OBJECTION, YOUR HONOR.

01:04PM 16              THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

01:04PM 17         (GOVERNMENT'S EXHIBIT 5389 WAS RECEIVED IN EVIDENCE.)

01:04PM 18     BY MR. BOSTIC:

01:04PM 19     Q.   MS. CHEUNG, ARE WE NOW LOOKING AT THE SIEMENS ADVIA

01:05PM 20     ANALYZER?

01:05PM 21     A.   YES.

01:05PM 22     Q.   AND WHAT DID THIS LOOK LIKE IN PERSON?

01:05PM 23     A.   THIS DEVICE, IT'S LARGER.  IT'S ABOUT THE SIZE OF -- IT

01:05PM 24     WOULD BE LIKE THE SIZE OF A WASHER AND DRYER IF YOU PUT IT

01:05PM 25     TOGETHER, SO IT WAS QUITE LARGE.  YOU COULD FIT PROBABLY TWO TO

01:05PM  1    THREE PEOPLE IN FRONT OF IT.

01:05PM  2         AND YOU OPEN THIS CASING AND ESSENTIALLY IT WILL HAVE A

01:05PM  3    PLACE WHERE YOU CAN PUT ALL OF THE VENOUS TUBES, THE BLOOD

01:05PM  4    TUBES FOR VENOUS DRAWS IN THERE WITH DIFFERENT BAR CODES SO YOU

01:05PM  5    CAN SCAN IT AND ACTUALLY PROCESS THE PATIENT SAMPLES.

01:05PM  6    Q.   THIS DEVICE WAS MANY TIMES LARGER THAN THE EDISON

01:05PM  7    ANALYZER; CORRECT?

01:05PM  8    A.   YES.

01:05PM  9    Q.   YOU SAID THAT THE EDISON ANALYZER COULD ONLY RUN ONE TYPE

01:05PM 10    OF ASSAY OR ONE TYPE OF TEST ON ONE PATIENT SAMPLE AT A TIME;

01:05PM 11    IS THAT RIGHT?

01:05PM 12    A.   CAN YOU REPEAT THAT.

01:05PM 13    Q.   I THINK YOU SAID THAT THE EDISON ANALYZER COULD ONLY RUN

01:06PM 14    ONE TYPE OF TEST ON ONE PATIENT SAMPLE AT A TIME; IS THAT

01:06PM 15    CORRECT?

01:06PM 16    A.   YES.

01:06PM 17    Q.   AND WAS THAT TRUE FOR THE SIEMENS ADVIA AS WELL?

01:06PM 18    A.   NO.

01:06PM 19    Q.   AND HOW WAS IT DIFFERENT?

01:06PM 20    A.   SO THE SIEMENS ADVIA WAS DIFFERENT BECAUSE YOU COULD

01:06PM 21    ESSENTIALLY PLACE THE VENOUS TUBE IN THERE AND SCAN THE BAR

01:06PM 22    CODE, AND IT WOULD BE ABLE TO DETERMINE, YOU KNOW, MAYBE A

01:06PM 23    BLOOD SAMPLE HAS NUMEROUS TYPES OF CHEMISTRY TESTS THAT IT

01:06PM 24    NEEDS TO RUN, AND IT WOULD RUN THEM IN CONJUNCTION WITH ONE

01:06PM 25    ANOTHER.  AND IT WOULD RUN BASICALLY MULTIPLE TESTS, MULTIPLE

01:06PM  1      DIFFERENT TYPES OF TESTS ON MULTIPLE DIFFERENT SAMPLES.

01:06PM  2           THERE WOULD BE SOME SORT OF CAP, LIKE MAY BE 30 PATIENTS,

01:06PM  3      LET'S SAY 30 TO 40 PATIENTS.

01:06PM  4           YEAH, YOU COULD RUN MULTIPLE PATIENTS, MULTIPLE DIFFERENT

01:06PM  5      TYPES OF TESTS WITHIN A GIVEN, WHAT WE WOULD CALL A RUN.

01:06PM  6           SO ONCE YOU FILL UP ALL OF THE SLOTS FOR ALL OF THE VENOUS

01:06PM  7      TUBES AND ALL OF THE SLOTS FOR ALL OF THE TESTING, THEN YOU

01:07PM  8      COULD START IT AND HAVE IT GO TO COMPLETION TO RUN ALL OF THE

01:07PM  9      PATIENTS IN DIFFERENT TYPES OF TESTS.

01:07PM  10     Q.   THE SIEMENS ADVIA ANALYZER, THE WAY IT COMES FROM THE

01:07PM  11     FACTORY, IS IT CAPABLE OF PROCESSING A SMALL FINGERSTICK BLOOD

01:07PM  12     SAMPLES AS FAR AS YOU KNOW?

01:07PM  13     A.   NO.

01:07PM  14     Q.   DID THERANOS MAKE CHANGES TO ITS SIEMENS ADVIA TO ALLOW

01:07PM  15     THEM TO RUN SMALL FINGERSTICK SAMPLES?

01:07PM  16     A.   YES.

01:07PM  17     Q.   AND WHAT WERE THOSE CHANGES GENERALLY SPEAKING?

01:07PM  18     A.   SO INSTEAD OF -- WHERE THE PATIENT PROCESSING HAPPENS ARE

01:07PM  19     IN THESE LITTLE CUPS, AND THEY'RE CALLED J-CUPS, AND THAT'S

01:07PM  20     WHAT SIEMENS ENDS UP SELLING TO YOU IN ORDER TO DO THE

01:07PM  21     PROCESSING.

01:07PM  22          BUT THERANOS HAD 3D PRINTED THESE THINGS CALLED T-CUPS, SO

01:07PM  23     THEY WERE SHORTER, AND WOULD PLACE THE T-CUPS BASICALLY INSIDE

01:07PM  24     OF THE SIEMENS ADVIA IN ORDER TO RUN THE FINGERSTICK SAMPLES

01:08PM  25     THAT HAD THESE SMALLER VOLUMES OF BLOOD.



01:08PM  1    Q.   AND WHY WAS THE DIFFERENT CUP NECESSARY?

01:08PM  2    A.   BECAUSE IT WAS -- THE MACHINE WASN'T BUILT TO BE ABLE TO

01:08PM  3    DO THE PROCESSING ON THAT SMALL OF A VOLUME THAT WE HAD

01:08PM  4    COLLECTED UTILIZING THE SORT OF NANOTAINERS AND FINGERSTICK

01:08PM  5    COLLECTION.

01:08PM  6    Q.   FOR A SAMPLE TO BE RUN -- LET ME START AGAIN.

01:08PM  7         FOR A FINGERSTICK SAMPLE TO BE RUN ON THE SIEMENS ADVIA,

01:08PM  8    DOES IT NEED TO FIRST BE DILUTED ON THE TECAN DEVICE AS WELL?

01:08PM  9    A.   YES.

01:08PM  10   Q.   FOR A FINGERSTICK SAMPLE TO BE RUN ON A SIEMENS ADVIA, DID

01:08PM  11   IT FIRST HAVE TO BE DILUTED USING THE TECAN DEVICE, T-E-C-A-N?

01:08PM  12   A.   YES.

01:08PM  13   Q.   AND SIMILAR TO RUNNING A SAMPLE ON THE EDISON ANALYZER?

01:09PM  14   A.   YES.

01:09PM  15   Q.   AND CAN I ASK YOU TO TURN IN YOUR BINDER TO EXHIBIT 3741.

01:09PM  16   I'LL ASK YOU TO LOOK AT THE FIRST SEVEN PAGES OF THIS EXHIBIT,

01:09PM  17   PLEASE.

01:09PM  18        HAVE YOU PREVIOUSLY HAD A CHANCE TO REVIEW THIS DOCUMENT

01:09PM  19   IN DETAIL?

01:09PM  20   A.   YES.

01:09PM  21   Q.   AND DO YOU RECOGNIZE THIS DOCUMENT?

01:09PM  22   A.   YES.

01:09PM  23   Q.   WHAT IS IT?

01:09PM  24   A.   THIS IS THERANOS'S TESTING MENU.

01:09PM  25   Q.   AND IS THIS REPRESENTATIVE OF THE TESTING MENU

01:09PM 1    APPROXIMATELY DURING THE TIME THAT YOU WORKED AT THE COMPANY?

01:09PM 2    A.   YES.

01:09PM 3            MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO

01:09PM 4    ADMIT EXHIBIT 3741 AT THIS TIME -- OR SORRY.  THE GOVERNMENT

01:09PM 5    MOVES TO ADMIT PAGES 1 THROUGH 7 OF EXHIBIT 3741, AND WE'LL

01:09PM 6    MARK THAT AS EXHIBIT 3741A IF WE CAN.

01:10PM 7            MR. WADE:  YOUR HONOR, MAY I INQUIRE OF THE BATES

01:10PM 8    RANGE SO I'M CLEAR ON WHAT IS COMING IN.

01:10PM 9            MR. BOSTIC:  SO THIS WILL BE BATES 15286 THROUGH

01:10PM 10   15292.

01:10PM 11           MR. WADE:  NO OBJECTION, YOUR HONOR.

01:10PM 12           THE COURT:  THESE PAGES ARE ADMITTED, AND THEY MAY

01:10PM 13   BE PUBLISHED.

01:10PM 14       (GOVERNMENT'S EXHIBIT 3741, BATES PAGES 15286 THROUGH

01:10PM 15   15292, WAS RECEIVED IN EVIDENCE.)

01:10PM 16           MR. BOSTIC:  MS. HOLLIMAN, IF WE COULD PUT UP PAGE 6

01:10PM 17   OF EXHIBIT 3741.

01:10PM 18   Q.   MS. CHEUNG, ARE YOU SEEING IN FRONT OF YOU ONE OF THE

01:10PM 19   PAGES FROM WHAT YOU SAID WAS THE TEST MENU?

01:10PM 20   A.   YES.

01:10PM 21   Q.   AND I WON'T ASK YOU TO PROVIDE AN EXHAUSTIVE LIST, BUT

01:10PM 22   LOOKING AT THESE TESTS, CAN YOU GIVE US SOME EXAMPLES OF SOME

01:10PM 23   TESTS THAT THE EDISON ANALYZER COULD DO?

01:10PM 24   A.   SOME EXAMPLES OF THE TESTS THAT THE EDISON COULD DO.

01:10PM 25   Q.   YES, PLEASE.  EITHER REFERENCING THIS OR FROM YOUR MEMORY?

01:10PM  1    A.   SO THE EDISON COULD DO -- WHILE I WAS WORKING THERE?

01:11PM  2    Q.   YES, PLEASE.

01:11PM  3    A.   THE EDISON COULD DO ABOUT MAYBE THREE TESTS ON THE

01:11PM  4    THYROID, THYROID SECTION.

01:11PM  5         WE COULD DO ABOUT TWO ON THE REPRODUCTIVE HEALTH SECTION.

01:11PM  6         AND MAYBE ONE ON THE -- YES, ONE ON THE ALPHABETICAL TEST

01:11PM  7    SECTION.

01:11PM  8    Q.   AND YOU SAID IN TOTAL THE NUMBER OF TESTS THAT THE EDISON

01:11PM  9    COULD RUN IN YOUR EXPERIENCE WAS APPROXIMATELY HOW MANY?

01:11PM 10    A.   IT WAS LIKE, DEPENDING ON THE TIME, IT WAS BETWEEN 4 TO

01:11PM 11    MAX 12.

01:11PM 12    Q.   WE HAVE ALSO BEEN TALKING ABOUT THERANOS'S USE OF MODIFIED

01:12PM 13    THIRD PARTY DEVICES.

01:12PM 14         DO YOU SEE ANY TESTS ON THIS PANEL THAT THERANOS RELIED ON

01:12PM 15    MODIFIED THIRD PARTY DEVICES TO RUN?

01:12PM 16    A.   YES.

01:12PM 17    Q.   AND WHICH ONES OF THOSE THAT STAND OUT TO YOU?

01:12PM 18    A.   THE COMMON PANELS, SO THINGS LIKE CBC, CBC WITH

01:12PM 19    DIFFERENTIAL, THE LIPID PANEL, THERE'S THE ELECTROLYTES PANEL,

01:12PM 20    THE COMPREHENSIVE METABOLIC PANEL, AND WE COULD ALSO DO -- ON

01:12PM 21    THE MODIFIED, AGAIN, JUST FOR CLARIFICATION?

01:12PM 22    Q.   JUST ON THE MODIFIED FOR NOW, UH-HUH.

01:12PM 23    A.   WE COULD DO SOME OF THE ALPHABETICAL TESTS AS WELL, THINGS

01:12PM 24    LIKE THE -- LIKE MAGNESIUM, I BELIEVE, IRON.

01:13PM 25    Q.   FAIR TO SAY THAT THE THIRD PARTY MODIFIED DEVICES COULD DO

01:13PM  1    SIGNIFICANTLY MORE TYPES OF ASSAYS THAN THE THERANOS-BUILT

01:13PM  2    EDISON?

01:13PM  3    A.   YES.

01:13PM  4    Q.   AND WERE THERE SOME -- LET ME FIRST ASK, THE TEST THAT

01:13PM  5    COULD NOT BE RUN ON THE EDISON, FOR EXAMPLE, YOU LISTED SEVERAL

01:13PM  6    OF THE COMMON PANELS IN THAT LIST; IS THAT RIGHT?

01:13PM  7    A.   YES.

01:13PM  8    Q.   AND ARE THEY CALLED COMMON PANELS BECAUSE THEY'RE COMMON

01:13PM  9    AND FREQUENTLY ORDERED?

01:13PM  10   A.   YES.

01:13PM  11   Q.   LOOKING AT THE TEST MENU, WERE THERE SOME THAT COULD NOT

01:13PM  12   BE RUN ON THE EDISON OR THE THIRD PARTY MODIFIED?

01:13PM  13   A.   YES.

01:13PM  14   Q.   AND WHAT DID THERANOS DO TO RUN THOSE TESTS?

01:14PM  15   A.   SO THERANOS ARE SOME OF THESE FDA APPROVED MACHINES, SORT

01:14PM  16   OF PREDICATED MACHINES IN AN UPSTAIRS LABORATORY WHERE THEY

01:14PM  17   COULD RUN SOME VENOUS SAMPLES, SO THEY WOULD COLLECT A VENOUS

01:14PM  18   TUBE AND RUN THEM IN THE UPSTAIRS LABORATORY.

01:14PM  19        AND IF IT WAS SOMETHING THAT WE DIDN'T POSSESS IN HOUSE IN

01:14PM  20   ORDER TO PROCESS, IT WOULD BE SENT TO AN ORGANIZATION CALLED

01:14PM  21   ARUP, IT'S A-R-U-P, LABORATORIES, ALL CAPS FOR A-R-U-P, IN

01:14PM  22   ORDER TO DO THE ONES THAT WE DIDN'T HAVE IN-HOUSE CAPABILITIES

01:14PM  23   TO RUN.

01:14PM  24   Q.   SO NOW WE'RE TALKING ABOUT DEVICES THAT WERE NOT INVENTED

01:14PM  25   OR MANUFACTURED BY THERANOS; IS THAT CORRECT?

01:14PM 1    A.   YES.

01:14PM 2    Q.   AND DEVICES THAT HAVE NOT BEEN CHANGED OR ALTERED BY

01:14PM 3    THERANOS IN ANY WAY?

01:14PM 4    A.   YES.

01:14PM 5    Q.   ARE THESE DEVICES THAT ANY BLOOD LAB TO YOUR KNOWLEDGE

01:14PM 6    COULD PURCHASE AND OPERATE THE SAME WAY THAT THERANOS DID?

01:15PM 7    A.   YES.

01:15PM 8    Q.   AM I UNDERSTANDING CORRECTLY THAT EVEN THOSE CATEGORIES

01:15PM 9    THAT WE'VE TALKED ABOUT, THE THERANOS'S BUILT EDISON, THE

01:15PM 10    MODIFIED THIRD PARTY DEVICES, AND THE UNMODIFIED STORE BOUGHT

01:15PM 11    THIRD PARTY DEVICES, THOSE THREE CATEGORIES WERE STILL NOT

01:15PM 12    SUFFICIENT FOR THERANOS TO BE ABLE TO CONDUCT ALL OF THE

01:15PM 13    TESTING THAT IT OFFERED?

01:15PM 14    A.   YES.

01:15PM 15    Q.   AND HOW DID IT HANDLE THE KINDS OF TESTS THAT IT COULD NOT

01:15PM 16    PERFORM IN HOUSE?

01:15PM 17    A.   IT WOULD SEND THEM OFF TO A THIRD PARTY ESSENTIALLY TO RUN

01:15PM 18    THOSE SAMPLES.

01:15PM 19    Q.   AND THAT WAS AN INDEPENDENT THIRD PARTY NOT AFFILIATED

01:15PM 20    WITH THERANOS?

01:15PM 21    A.   YES.

01:15PM 22    Q.   I'D LIKE TO TALK A LITTLE BIT ABOUT YOUR WORK IN THE

01:15PM 23    RESEARCH AND DEVELOPMENT LAB?

01:15PM 24    A.   OKAY.

01:15PM 25    Q.   WHEN YOU WERE WORKING IN R&D, DID YOU COME TO UNDERSTAND

01:15PM 1    WHAT VALIDATION MEANT, THE PROCESS OF VALIDATION AT THERANOS?

01:15PM 2    A.   YES.

01:15PM 3    Q.   AND WHAT WAS VALIDATION?

01:15PM 4    A.   SO VALIDATIONS, VALIDATION IS ESSENTIALLY A SERIES OF

01:16PM 5    EXPERIMENTS THAT YOU RUN WHEN YOU DEVELOP A TYPE OF LABORATORY

01:16PM 6    TEST OR DIAGNOSTIC TEST.

01:16PM 7         SO IT WILL CHECK THINGS LIKE IS THE TEST ACCURATE?  IS IT

01:16PM 8    PRECISE?

01:16PM 9         BECAUSE WE WERE DOING FINGERSTICKS VERSUS VENOUS DRAWS, IS

01:16PM 10   THERE A DIFFERENCE BETWEEN THOSE AND HOW DO WE ACCOMMODATE FOR

01:16PM 11   THOSE DIFFERENCES?

01:16PM 12        IT WOULD CHECK THINGS LIKE THE STABILITY OF, YOU KNOW, DO

01:16PM 13   YOU RUN IT IN A DIFFERENT TYPE OF COLLECTION UNIT?  YOU KNOW,

01:16PM 14   DO YOU HAVE TO HAVE A CERTAIN TYPE OF CODING?

01:16PM 15        SO ESSENTIALLY IT'S A VERY COMPREHENSIVE SET OF

01:16PM 16   EXPERIMENTS THAT YOU RUN IN ORDER TO MAKE SURE THAT THE NEW

01:16PM 17   TEST THAT YOU'RE DEVELOPING IS, IS UP TO A QUALITY THAT IS

01:16PM 18   APPROPRIATE TO TEST ON PATIENTS.

01:16PM 19   Q.   AND IN YOUR EXPERIENCE IS THAT PROCESS SUPPOSED TO HAPPEN

01:16PM 20   BEFORE, DURING, OR AFTER THE ACTUAL USE OF THAT ASSAY FOR A

01:16PM 21   PATIENT TESTING?

01:16PM 22   A.   IT'S SUPPOSED TO HAPPEN BEFORE.

01:17PM 23   Q.   AND DOES A GIVEN TEST OR ASSAY NEED TO PASS VALIDATION

01:17PM 24   BEFORE IT CAN BE USED FOR CLINICAL PATIENT TESTING?

01:17PM 25   A.   YES.

01:17PM 1    Q.   YOU MENTIONED BEFORE THAT WHEN YOU JOINED THE COMPANY IN

01:17PM 2    OCTOBER OF 2013, THE COMPANY WAS ALREADY CONDUCTING PATIENT

01:17PM 3    TESTING; IS THAT RIGHT?

01:17PM 4    A.   YES.

01:17PM 5    Q.   AND DOES THAT MEAN THAT ALL OF THE VALIDATION WORK WAS

01:17PM 6    DONE AND THERE WAS NOTHING TO DO IN THE R&D LAB?

01:17PM 7    A.   NO.

01:17PM 8    Q.   AND WHAT WAS STILL HAPPENING IN THE R&D LAB?

01:17PM 9    A.   THE RESEARCH AND DEVELOPMENT LAB WAS STILL VALIDATING SOME

01:17PM 10   OF THE DIFFERENT ASSAYS AND TESTS FOR THE EDISON DEVICES WHEN I

01:17PM 11   CAME TO THE COMPANY.

01:17PM 12   Q.   WAS THAT PART OF AN EFFORT TO TRY TO GET MORE TESTS RUN ON

01:17PM 13   THE THERANOS DEVICE?

01:17PM 14   A.   YES.

01:17PM 15   Q.   DID YOU WORK ON VALIDATION WHEN YOU WERE AT THERANOS?

01:17PM 16   A.   YES.

01:17PM 17   Q.   WHEN YOU LEFT THE COMPANY IN APRIL OF 2014, WAS VALIDATION

01:17PM 18   WORK COMPLETE AT THAT POINT OR WAS IT STILL ONGOING IN R&D?

01:18PM 19   A.   IT WAS STILL ONGOING IN R&D.

01:18PM 20   Q.   DID THE VALIDATION WORK INVOLVE TESTING THE ANALYZER BY

01:18PM 21   HAVING IT RUN BLOOD SAMPLES?

01:18PM 22   A.   YES.

01:18PM 23   Q.   AND WHERE DID THE BLOOD SAMPLES COME FROM IN THE THERANOS

01:18PM 24   R&D LAB?

01:18PM 25   A.   THE BLOOD SAMPLES CAME FROM -- SOMETIMES THEY WERE

01:18PM  1    PURCHASED AND OTHER TIMES THEY WERE COLLECTED FROM EMPLOYEES.

01:18PM  2    SO EMPLOYEES WOULD ESSENTIALLY DONATE THEIR BLOOD TO THERANOS

01:18PM  3    IN EXCHANGE FOR, LIKE, CASH FOR BOTH FINGERSTICK AND VENOUS

01:18PM  4    DRAWS IN ORDER TO CONDUCT THE RESEARCH STUDIES.

01:18PM  5    Q.   DID YOU PERSONALLY EVER DONATE BLOOD TO THE RESEARCH

01:18PM  6    PROCESS?

01:18PM  7    A.   YES.

01:18PM  8    Q.   ON MULTIPLE OCCASIONS?

01:18PM  9    A.   YES.

01:18PM  10   Q.   AND WHEN YOU DID THAT, DID YOU GET RESULTS BACK FROM THE

01:18PM  11   TESTS THAT WERE RUN ON YOUR BLOOD?

01:18PM  12   A.   YES.

01:18PM  13   Q.   AND DID ANYTHING STAND OUT TO YOU ABOUT THE SPECIFIC TEST

01:18PM  14   RESULTS THAT YOU GOT BACK ON YOUR SAMPLES?

01:18PM  15   A.   WHAT WE WERE -- WHAT I NOTICED WHEN I HAD -- ESSENTIALLY

01:19PM  16   WHAT WE WOULD DO IS WE WOULD MEMORIZE THE KIND OF NUMBER THAT

01:19PM  17   WAS CREATED ONCE THEY TOOK OUR BLOOD SAMPLES.  AND SO WE WOULD

01:19PM  18   RUN IT.

01:19PM  19       IN MY CASE I WAS IN CHARGE OF RUNNING VITAMIN D SAMPLES,

01:19PM  20   AND SO WHEN I WOULD RUN MY VITAMIN D, IT WOULD ALWAYS COME OUT

01:19PM  21   THAT I HAD A VITAMIN D DEFICIENCY, WHICH REALLY WOULDN'T MATCH

01:19PM  22   UP WITH WHAT WE WOULD RUN ON THE PREDICATE DEVICES.

01:19PM  23       SO I STARTED TO NOTICE THAT THERE WAS A SLIGHT DISCREPANCY

01:19PM  24   BETWEEN WHAT WAS DONE ON THE EDISON DEVICES VERSUS WHAT WAS

01:19PM  25   DONE ON THE UPSTAIRS CLINICAL LAB FOR THE VENOUS DRAWS.

01:19PM 1   Q.  AND JUST TO BE CLEAR, AROUND THE TIME THAT YOU WERE HAVING

01:19PM 2   YOUR BLOOD SAMPLE TESTED AS PART OF THE R&D PROCESS ON THE

01:19PM 3   THERANOS ANALYZER --

01:19PM 4   A.  RIGHT.

01:19PM 5   Q.  -- WERE YOU ALSO ABLE TO SEE RESULTS FROM YOUR BLOOD

01:20PM 6   ANALYSIS RUN ON A THIRD PARTY DEVICE?

01:20PM 7   A.  YES, BECAUSE WE WERE FREQUENTLY RUNNING SORT OF THE

01:20PM 8   COMPARATIVE STUDIES.

01:20PM 9   Q.  I SEE.  AND THAT'S THE BASIS FOR YOU SAYING THAT YOU SAW

01:20PM 10  SOME DISAGREEMENT BETWEEN THE TWO?

01:20PM 11  A.  YES.

01:20PM 12  Q.  DID THERANOS EVER RUN DEMONSTRATIONS OF ITS TECHNOLOGY FOR

01:20PM 13  VIP GUESTS OR POTENTIAL INVESTORS WHO CAME TO THE COMPANY?

01:20PM 14  A.  YES.

01:20PM 15  Q.  AND DID YOU HAVE AN UNDERSTANDING AT THE TIME OF WHO THOSE

01:20PM 16  GUESTS WERE GENERALLY SPEAKING?

01:20PM 17  A.  WE UNDERSTOOD THEM TO BE VERY IMPORTANT PEOPLE.  SO THEY

01:20PM 18  WOULD BE CALLED DEMO PATIENTS OR VIP PATIENTS ESSENTIALLY THAT

01:20PM 19  WOULD COME IN.

01:20PM 20  Q.  WERE YOU EVER INVOLVED IN HELPING WITH THOSE DEMOS OR

01:20PM 21  RUNNING THOSE DEMOS?

01:20PM 22  A.  YES.

01:20PM 23  Q.  AND WHAT WAS YOUR ROLE?

01:20PM 24  A.  I WAS IN CHARGE OF ANY DEMOS THAT CAME IN THAT REQUIRED

01:21PM 25  EDISON TESTING.

01:21PM 1        SO ANY OF THE EDISON TESTS THAT CAME IN, I WOULD BE IN

01:21PM 2    CHARGE OF RUNNING THOSE DEMO SAMPLES.

01:21PM 3    Q.   WHEN THESE DEMOS WERE HAPPENING -- WE'VE TALKED ABOUT THE

01:21PM 4    RESEARCH AND DEVELOPMENT LAB, THAT WAS OPERATIONAL; CORRECT?

01:21PM 5    A.   YES.

01:21PM 6    Q.   AND THERE WAS ALSO A CLINICAL LAB WHERE PATIENT TESTING

01:21PM 7    WAS HAPPENING; IS THAT RIGHT?

01:21PM 8    A.   YES.

01:21PM 9    Q.   AND BETWEEN THOSE TWO WHERE WERE THE DEMO SAMPLES RUN OR

01:21PM 10   WERE THEY SOMETIMES IN BOTH?

01:21PM 11   A.   SO IN THE BEGINNING OF STARTING TO WORK THERE THEY WERE

01:21PM 12   RAN IN THE RESEARCH AND DEVELOPMENT LAB, BUT THEN EVENTUALLY --

01:21PM 13   AND THIS IS FOR THE EDISONS, THEY WERE RUN IN THE CLINICAL LAB.

01:21PM 14   Q.   I'LL ASK YOU TO TURN IN YOUR BINDER TO EXHIBIT 1227,

01:21PM 15   PLEASE.

01:22PM 16       DO YOU RECOGNIZE EXHIBIT 1227?

01:22PM 17   A.   YES.

01:22PM 18   Q.   AND IS THIS AN EMAIL THAT YOU RECEIVED DURING YOUR TIME AS

01:22PM 19   AN EMPLOYEE AT THERANOS?

01:22PM 20   A.   YES.

01:22PM 21   Q.   IS THIS A TRUE AND ACCURATE COPY OF THAT EMAIL?

01:22PM 22   A.   YES.

01:22PM 23        MR. BOSTIC:  YOUR HONOR, I'LL MOVE EXHIBIT 1227 INTO

01:22PM 24   EVIDENCE AT THIS TIME.

01:22PM 25        MR. WADE:  YOUR HONOR, MAY WE APPROACH ON THESE

01:22PM  1    DOCUMENTS?  I THINK THERE ARE A NUMBER OF SIMILAR DOCUMENTS

01:22PM  2    COMING UP.

01:22PM  3              THE COURT:  DO YOU HAVE OTHER DOCUMENTS SIMILAR TO

01:22PM  4    THIS CLASS THAT YOU'LL BE EXAMINING THIS WITNESS ON?

01:22PM  5              MR. BOSTIC:  THERE ARE OTHER EMAILS IF THAT'S WHAT

01:22PM  6    DEFENSE COUNSEL IS REFERRING TO, YES, YOUR HONOR.

01:22PM  7              THE COURT:  OKAY.  ALL RIGHT.  LET'S HAVE A

01:22PM  8    SIDE-BAR.  FOLKS, I'M GOING TO MEET WITH COUNSEL IN THE BACK IN

01:22PM  9    THE JURY ROOM NOW.  WE'LL HAVE OUR COURT REPORTER GO BACK AS

01:23PM  10   WELL.

01:23PM  11        LADIES AND GENTLEMEN, WE'RE GOING TO LEAVE THE COURTROOM.

01:23PM  12   YOU'RE NOT TO DISCUSS THE CASE AT ALL AMONGST YOURSELVES.

01:23PM  13        COUNSEL, DO YOU HAVE AN IDEA OF HOW LONG THIS WILL BE?

01:23PM  14              MR. WADE:  HOPEFULLY NOT LONG.  FIVE OR TEN MINUTES.

01:23PM  15              THE COURT:  WHY DON'T WE DO THIS.  RATHER THAN DO

01:23PM  16   THAT, WHY DON'T WE EXCUSE OUR JURY FOR JUST A SECOND.  LET'S DO

01:23PM  17   THAT.

01:23PM  18        LADIES AND GENTLEMEN, WHY DON'T YOU GO BACK TO THE JURY

01:23PM  19   ROOM, PLEASE.  I'LL REMAIN HERE.

01:23PM  20        MS. CHEUNG, YOU CAN STEP DOWN.  IF YOU WOULD GO OUTSIDE OF

01:23PM  21   THE COURTROOM, PLEASE.

01:24PM  22        (JURY OUT AT 1:24 P.M.)

01:24PM  23              THE COURT:  PLEASE BE SEATED.  THE RECORD SHOULD

01:24PM  24   REFLECT THAT OUR JURY AND ALTERNATES HAVE LEFT THE ROOM.

01:24PM  25        MS. CHEUNG IS OUTSIDE.  YES.  SHE'S OUTSIDE.

01:24PM   1              ALL COUNSEL AND THE DEFENDANT REMAIN.

01:24PM   2              MR. WADE:  THANK YOU, YOUR HONOR.

01:24PM   3          THERE ARE A NUMBER OF EXHIBITS THAT ARE ABOUT TO BE

01:24PM   4    INTRODUCED, I BELIEVE, BASED ON COUNSEL'S COURTESY DISCLOSURE

01:24PM   5    OF THESE DOCUMENTS IN ADVANCE OF THE TESTIMONY THAT ARE

01:24PM   6    BUSINESS RECORDS, AND CONTAIN -- THAT ARE NOT BUSINESS RECORDS

01:24PM   7    AND THAT CONTAIN HEARSAY WITHIN THEM.

01:24PM   8          IN ADDITION, WE WOULD SUGGEST TO THE COURT VIRTUALLY ALL

01:24PM   9    OF THE DOCUMENTS THAT ARE ABOUT TO BE OFFERED, AND I BELIEVE A

01:24PM  10    LOT OF THE TESTIMONY BASED ON THE 302, DOESN'T INVOLVE OUR

01:24PM  11    CLIENT IN ANY WAY SO IT WOULD NOT BE RELEVANT UNDER 401.

01:25PM  12          IT CERTAINLY IS NOT RELEVANT TO HER STATE OF MIND IF SHE'S

01:25PM  13    NOT AWARE OF IT.  AND SOME OF THESE ISSUES THAT ARE ABOUT TO

01:25PM  14    COME UP MAY HAVE -- I ASSUME THE GOVERNMENT IS GOING TO CONTEND

01:25PM  15    THAT THEY REFLECT LAB DEFICIENCIES OF SOME KIND, BUT, YOU KNOW,

01:25PM  16    THIS PERSON IS NOT AN EXPERT, AND NOT -- IS NOT IN A POSITION

01:25PM  17    TO OPINE ON THOSE.

01:25PM  18          MS. HOLMES WASN'T AWARE OF MANY OF THESE THINGS.

01:25PM  19          SO I WANTED TO FLAG THIS ISSUE.  AND IN PARTICULAR THE

01:25PM  20    DOCUMENTS THAT THEY SEEK TO BE ADMITTED, I THINK THE

01:25PM  21    NINTH CIRCUIT LAW IS CLEAR ON THESE EMAILS THAT DON'T GO TO OUR

01:25PM  22    CLIENT, YOU KNOW, BEING HEARSAY AND IN SOME CASES LAYERED

01:25PM  23    HEARSAY AND SHOULD NOT BE ADMISSIBLE.

01:25PM  24              THE COURT:  MR. BOSTIC?

01:25PM  25              MR. BOSTIC:  YOUR HONOR, I DISAGREE.  I THINK THE

01:25PM  1    RECORDS THAT THE GOVERNMENT IS GOING TO OFFER ARE BUSINESS

01:25PM  2    RECORDS.  I'D ASK FOR AN OPPORTUNITY TO LAY A FOUNDATION FOR

01:25PM  3    THAT WITH THIS WITNESS.  I THINK WE CAN DO THAT.

01:26PM  4         SEPARATELY, I THINK SEVERAL OF THESE DOCUMENTS ARE COMING

01:26PM  5    IN FOR A NONHEARSAY PURPOSE.  NOT ON ALL OF THEM BUT ON SOME

01:26PM  6    THE COURT WILL SEE THAT ISSUES WERE ULTIMATELY RAISED TO

01:26PM  7    MR. BALWANI, WHO IS THE CHARGED COCONSPIRATOR IN THIS CASE, HIS

01:26PM  8    KNOWLEDGE OF ISSUES AT THERANOS IS RELEVANT AND ADMISSIBLE

01:26PM  9    HERE.

01:26PM  10        SEPARATELY, I THINK THAT TO THE EXTENT THAT THESE

01:26PM  11   DOCUMENTS AND MS. CHEUNG'S TESTIMONY WILL SHOW THAT ISSUES WERE

01:26PM  12   FREQUENT IN THE THERANOS LAB, THAT THEY WERE SERIOUS, THAT THEY

01:26PM  13   WERE FREQUENTLY ELEVATED, THAT THEY WERE GENERALLY KNOWN.

01:26PM  14        THE JURY COULD INFER FROM THAT AND FROM OTHER EVIDENCE

01:26PM  15   THAT THE DEFENDANT AND THE COCONSPIRATOR WERE AWARE OF THESE

01:26PM  16   ISSUES.

01:26PM  17        FINALLY, AT THE CONCLUSION OF THE WITNESS'S TESTIMONY I

01:26PM  18   EXPECT THAT SHE WILL TESTIFY ABOUT ISSUES THAT SHE DID RAISE

01:26PM  19   DIRECTLY TO MR. BALWANI BEFORE SHE LEFT AND THE REASONS WHY SHE

01:27PM  20   DID NOT RAISE ISSUES TO MS. HOLMES, SPECIFICALLY THAT SHE WAS

01:27PM  21   SHOWN AN EMAIL BY ANOTHER EMPLOYEE SENT DIRECTLY TO MS. HOLMES

01:27PM  22   RAISING SOME OF THESE ISSUES.

01:27PM  23        SO ULTIMATELY THESE ISSUES DO PERCOLATE UP TO THE

01:27PM  24   DEFENDANTS IN THE CASE.  THE WITNESS SHOULD BE ABLE TO DESCRIBE

01:27PM  25   WHAT SHE ACTUALLY WITNESSED AT THE GROUND LEVEL IN THE LAB TO

01:27PM  1    EXPLAIN HOW THOSE CONCERNS DEVELOPED AND WHY THEY EVENTUALLY

01:27PM  2    PROMPTED HER TO TAKE THAT ACTION.

01:27PM  3            THE COURT:  SO I THINK SHE CAN, AS YOU SUGGEST, SHE

01:27PM  4    CAN TESTIFY ABOUT HER PERCIPIENT OBSERVATIONS, THOSE THINGS

01:27PM  5    THAT SHE EXPERIENCED, AND IF THERE ARE SPECIFIC COMMENTS FROM

01:27PM  6    EITHER THIS DEFENDANT TO HER, SHE CAN CERTAINLY TALK ABOUT

01:27PM  7    THAT.

01:27PM  8        BUT WHAT ABOUT, MR. WADE SUGGESTS, THESE AREN'T BUSINESS

01:27PM  9    RECORDS AND THERE MAY NOT BE AN OPPORTUNITY TO PROVE THOSE UP?

01:28PM 10            MR. BOSTIC:  I THINK, YOUR HONOR, THEY SHOULD BE

01:28PM 11    CONSIDERED BUSINESS RECORDS.  THE WITNESS'S ROLE AT THE COMPANY

01:28PM 12    WORKING IN THE LAB, I EXPECT THAT SHE WILL EXPLAIN, IF GIVEN A

01:28PM 13    CHANCE, THAT THAT EMAIL WAS THE PRINCIPAL MEANS OF

01:28PM 14    COMMUNICATION AND THE MEANS BY WHICH EMPLOYEES IN THE LAB

01:28PM 15    TRANSMITTED IMPORTANT INFORMATION TO EACH OTHER ABOUT THE

01:28PM 16    OPERATIONS OF THE COMPANY AND THE BUSINESS AFFAIRS OF THE

01:28PM 17    COMPANY AT THAT TIME.

01:28PM 18        I THINK THAT DOES MAKE THEM ADMISSIBLE UNDER 803(6).  THAT

01:28PM 19    RULE AND THE COMMENTARY TALKS ABOUT THE IMPORTANCE OF

01:28PM 20    SITUATIONS WHERE THERE'S A DUTY TO BE ACCURATE IN REPORTING AND

01:28PM 21    WHERE THAT IS IMPORTANT, AND THAT WAS CERTAINLY THE CASE HERE.

01:28PM 22        I THINK THAT IF GIVEN THE CHANCE, THE WITNESS WILL

01:28PM 23    EXPLAIN THAT BOTH ON THE R&D SIDE, AND, OF COURSE, ON THE

01:28PM 24    CLINICAL SIDE WHEN DEALING WITH PATIENT TESTING IT WAS VERY

01:28PM 25    IMPORTANT THAT INFORMATION BE TRANSMITTED CONTEMPORANEOUSLY,

01:28PM  1     ACCURATELY REFLECTING THE TRUE EVENTS, AND THAT THE PURPOSE OF

01:29PM  2     THESE EMAILS WAS TO TRANSMIT THAT INFORMATION, TO PRESERVE AND

01:29PM  3     MAINTAIN THAT INFORMATION, AND TO FACILITATE THE OPERATION OF

01:29PM  4     THE BUSINESS.

01:29PM  5          I THINK THAT PUTS THEM SQUARELY WITHIN THE COVERAGE OF THE

01:29PM  6     RULE.

01:29PM  7               THE COURT:  YOU THINK HER TESTIMONY WILL ALLOW THESE

01:29PM  8     TO COME IN UNDER 803(6)?

01:29PM  9               MR. BOSTIC:  I DO, YOUR HONOR.

01:29PM 10               MR. WADE:  YOUR HONOR, WE WELCOME THE OPPORTUNITY TO

01:29PM 11     BRIEF THIS.  IT'S 1:30.  WE'RE APPROACHING 2:00 O'CLOCK.  MAYBE

01:29PM 12     WE CAN GO -- WE HAVE A BENCH MEMORANDUM I CAN HAND UP.

01:29PM 13     UNFORTUNATELY, I ONLY HAVE ONE COPY.

01:29PM 14               THE COURT:  WELL, WHO GETS IT, HE DOES OR ME?

01:29PM 15               MR. WADE:  YOU KNOW THE ANSWER TO THAT, YOUR HONOR.

01:29PM 16          (LAUGHTER.)

01:29PM 17               MR. WADE:  AND WE WILL FILE THIS ON ECF SO EVERYONE

01:29PM 18     HAS NOTICE OF IT, BUT THE LAW IN THE NINTH CIRCUIT IS CLEAR ON

01:29PM 19     THIS.  THEY ARE CONSIDERED BUSINESS RECORDS THAT ARE EMAILS AND

01:29PM 20     WHETHER THEY'RE ADMISSIBLE, AND THEY'RE NOT.  AND IN MANY CASES

01:29PM 21     THESE DOCUMENTS ARE LAYERED HEARSAY.

01:29PM 22          SO --

01:29PM 23               THE COURT:  WELL, EMAILS CAN BE BUSINESS RECORDS.

01:29PM 24     IT'S NOT A WHOLESALE PRECLUSION.

01:30PM 25               MR. WADE:  YOUR HONOR IS ABSOLUTELY RIGHT, ALTHOUGH

01:30PM 1    THE LIMITATIONS UNDER THE LAW ARE PRETTY LIMITED.

01:30PM 2        FOR EXAMPLE, THE PHILLIPS CASE COUNSEL SUGGESTED THAT THE

01:30PM 3    STATE OF MIND OF THE COCONSPIRATOR WOULD BE A NONHEARSAY

01:30PM 4    PURPOSE.  UNDER THE PHILLIPS CASE IN THE NINTH CIRCUIT THAT'S

01:30PM 5    NOT THE CASE.  ONLY ACTS IN FURTHERANCE OF THE CONSPIRACY.

01:30PM 6        THE MENTAL STATE OF THE COCONSPIRATOR IS NOT A BASIS TO

01:30PM 7    OFFER A DOCUMENT FOR A NONHEARSAY PURPOSE.

01:30PM 8            THE COURT:  SO I THINK I KNOW WHERE YOU'RE -- I

01:30PM 9    THINK I TRACK WHERE YOU'RE GOING WITH THIS, BUT I WAS CURIOUS

01:30PM 10   WHETHER OR NOT YOU WERE GOING TO TRY, THE GOVERNMENT IS GOING

01:30PM 11   TO OFFER ANY OF THIS EVIDENCE OR THIS -- THESE DIALOGUES UNDER

01:30PM 12   AN E EXCEPTION, THAT IS, A CONSPIRACY.

01:30PM 13       IS THAT SOMETHING THAT YOU'RE GOING TO TRY TO DO, A

01:30PM 14   STATEMENT IN FURTHERANCE OF?  I HAVEN'T HEARD IT YET, LET ME

01:30PM 15   JUST SAY THAT.

01:31PM 16       AND YOUR QUESTIONING DON'T SEEM TO BE DESIGNED TO CREATE

01:31PM 17   THAT YET.  I'M JUST ASKING IF THAT IS SOMETHING THAT WE'RE

01:31PM 18   GOING TO SEE AS WELL.

01:31PM 19           MR. BOSTIC:  I THINK, YOUR HONOR, FOR SOME OF THE

01:31PM 20   EXHIBITS THAT I'M CONTEMPLATING INTRODUCING, YES, THAT

01:31PM 21   PROVISION WILL APPLY.

01:31PM 22       I THINK THAT FOR OTHERS 801(D)(2)(D) STATEMENT OF AN AGENT

01:31PM 23   WILL APPLY.

01:31PM 24       I THINK THIS NEEDS TO BE ANALYZED ON A CASE-BY-CASE BASIS

01:31PM 25   FOR THESE EMAILS, BUT I DO THINK THAT GENERALLY THEY'RE

01:31PM  1    ADMISSIBLE AS A BUSINESS RECORD IN THIS CASE.

01:31PM  2              THE COURT:  OKAY.  SO UNDER THE (2)(D)(2) ANALYSIS,

01:31PM  3    I WAS LOOKING AT THAT, TOO, AND WONDERING CAN THIS WITNESS LAY

01:31PM  4    A FOUNDATION FOR THAT?

01:31PM  5              MR. BOSTIC:  I BELIEVE SO, YOUR HONOR.

01:31PM  6         I BELIEVE THIS WITNESS COULD TESTIFY ABOUT THE REPORTING

01:31PM  7    RELATIONSHIP THAT SHE HAD TO OTHERS IN THE COMPANY AND HOW THAT

01:31PM  8    ULTIMATELY LED TO MS. HOLMES.

01:31PM  9         I THINK SHE WILL BE ABLE TO IDENTIFY THE PARTICIPANTS ON

01:31PM  10   THE EMAILS IN PARTICULAR, IDENTIFYING THEM ALSO AS EMPLOYEES OF

01:32PM  11   THE COMPANY AND AGENTS OF MS. HOLMES, AND EXPLAIN HOW THEY FIT

01:32PM  12   INTO THAT GENERAL ORG CHART AND REPORTING STRUCTURE.

01:32PM  13             THE COURT:  SO HOW DOES THAT RELATE TO THIS WITNESS

01:32PM  14   IF SHE WAS NOT A DIRECT REPORT?  I DON'T KNOW IF SHE WAS OR

01:32PM  15   NOT.

01:32PM  16        IF SHE'S A DIRECT REPORT, IT MAKES IT EASY -- OR EASIER.

01:32PM  17   BUT IF SHE'S NOT A DIRECT REPORT, WE'LL PROBABLY HAVE -- I'M

01:32PM  18   JUST ANTICIPATING THAT MR. WADE WILL OBJECT TO THAT LINEUP.

01:32PM  19             MR. BOSTIC:  SO I'M NOT AWARE OF THE CASE LAW,

01:32PM  20   YOUR HONOR, THAT SAYS THAT AN AGENT CANNOT BE REPORTING TO THE

01:32PM  21   PRINCIPAL THROUGH A LAYER, INCLUDING SOMEONE ELSE.  I HAVEN'T

01:32PM  22   SEEN THAT.  I'M HAPPY TO REVIEW IT, OF COURSE, IF DEFENSE

01:32PM  23   COUNSEL IS AWARE.

01:32PM  24             THE COURT:  WELL, WE'LL LET'S SEE IF HE RAISES IT.

01:32PM  25             MR. WADE:  YOUR HONOR, KNOWS FROM THE MOTION IN

01:32PM   1    LIMINE BRIEFING THAT THERE HAS TO BE SOME TIE HERE TO OUR

01:32PM   2    CLIENT.  THE CEO IS NOT RESPONSIBLE FOR EVERY COMMUNICATION

01:33PM   3    THAT OCCURS WITHIN THE COMPANY.  THEY HAVE TO PROFFER SOME

01:33PM   4    BASIS AND SHOW SOME EVIDENCE THAT GOES FORWARD APART FROM JUST

01:33PM   5    A REPORTING RELATIONSHIP.

01:33PM   6         TO THE BEST OF OUR KNOWLEDGE BASED ON THE STATEMENTS OF

01:33PM   7    THE WITNESS WHO WE HAVE NEVER SPOKEN WITH BEFORE, THE INTERVIEW

01:33PM   8    THAT YOU JUST HEARD IS THE LONGEST CONVERSATION THAT SHE EVER

01:33PM   9    HAD WITH OUR CLIENT, AND SO SHE WAS NOT INTERACTING WITH HER ON

01:33PM  10    A DAILY BASIS.

01:33PM  11         THE EVIDENCE IS PRETTY CLEAR THAT MR. BALWANI WAS THE

01:33PM  12    MANAGER FROM A NON-LAB STANDPOINT, WAS THE MANAGER OVERSEEING

01:33PM  13    THE LAB.

01:33PM  14         SO I DON'T THINK THAT THE GOVERNMENT CAN ADMIT IT ON THAT

01:33PM  15    BASIS, AND I DON'T THINK THAT THEY -- MANY OF THESE STATEMENTS

01:33PM  16    ARE NOT, ARE NOT DOCUMENTS THAT ARE STATEMENTS IN FURTHERANCE

01:33PM  17    OF THE CONSPIRACY EVEN IF, YOU KNOW, EVEN IF WE GET TO THAT

01:33PM  18    LEVEL AS THE COURT WAS REFERRING TO THAT EXCEPTION.

01:33PM  19         SO, YOU KNOW, WHAT I'M -- I KNOW THE COURT DENIED OUR 1000

01:34PM  20    MOTION ON THIS, AND IN PART THERE WAS A TIMING ISSUE ON THIS.

01:34PM  21    THIS IS WHERE WE ARE NOW BECAUSE I THINK EVERY DOCUMENT, YOU

01:34PM  22    KNOW, IS GOING TO PRESENT THE NEED TO, THE NEED TO COME TO

01:34PM  23    SIDE-BAR AND TO RAISE THESE ISSUES BECAUSE THEY'RE CLEARLY

01:34PM  24    HEARSAY.

01:34PM  25         YOU HEARD THE GOVERNMENT SUGGESTING THAT THEY CAN OFFER A

01:34PM  1    HEARSAY STATEMENT OF ANOTHER WITNESS TO OUR CLIENT THAT THIS

01:34PM  2    WITNESS OBTAINED KNOWLEDGE OF, YOU KNOW, INTO THE CASE, WHICH

01:34PM  3    THAT IS A NEW ONE FOR ME, YOUR HONOR.

01:34PM  4         SO I JUST WANT TO FIND AN ORDERLY WAY TO TRY TO DEAL WITH

01:34PM  5    THIS WITHOUT DERAILING THE TRIAL.

01:34PM  6              THE COURT:  ALL RIGHT.

01:34PM  7              MR. BOSTIC:  YOUR HONOR, ON THAT, I WOULD JUST

01:34PM  8    BRIEFLY COMMENT THAT I THINK WE NEED TO RESIST THE RULE THAT A

01:34PM  9    DOCUMENT IS NOT RELEVANT UNLESS MS. HOLMES'S NAME IS ON IT, AN

01:34PM  10   EVENT DOESN'T EXIST UNLESS SHE WAS PRESENT FOR IT.  THAT'S NOT

01:34PM  11   HOW IT WORKS.

01:34PM  12        THERE WILL BE SUBSTANTIAL EVIDENCE THROUGHOUT THE TRIAL

01:34PM  13   SHOWING AND ESTABLISHING MS. HOLMES'S INVOLVEMENT IN THE

01:35PM  14   AFFAIRS OF THE COMPANY GENERALLY.  THE TYPES OF INFLUENCE,

01:35PM  15   INTERACTION, AND DIRECTION THAT SHE APPLIED WHEN SHE WAS AT THE

01:35PM  16   COMPANY, IN PARTICULAR THE LEVEL OF COMMUNICATION AND THE

01:35PM  17   PERVASIVE NATURE OF THE COMMUNICATION BETWEEN MR. BALWANI AND

01:35PM  18   MS. HOLMES, THAT IS ALL SUITABLE EVIDENCE FOR THE JURY TO INFER

01:35PM  19   THAT MS. HOLMES WAS AWARE OF THE HAPPENINGS AT THERANOS.

01:35PM  20        THE GOVERNMENT SHOULD BE ALLOWED TO SHOW WHAT WAS

01:35PM  21   HAPPENING AT THE COMPANY, MS. HOLMES'S KNOWLEDGE OF WHAT WAS

01:35PM  22   HAPPENING AT THE COMPANY.  THOSE TWO THINGS DON'T NECESSARILY

01:35PM  23   NEED TO HAPPEN SIMULTANEOUSLY.  OF COURSE, ONLY ONE PERSON CAN

01:35PM  24   FIT ON THE WITNESS STAND AT A TIME SO WE WOULD ASK FOR SOME

01:35PM  25   LATITUDE TO DEVELOP IT.

01:35PM    1          THE COURT:  WELL, I APPRECIATE THAT.  YOU'RE

01:35PM    2    CREATING THE LADDER, IF YOU WILL, THAT MOVES UPWARDS.

01:35PM    3          BUT I THINK TO MR. WADE'S POINT, THERE MIGHT BE SOME

01:35PM    4    FOUNDATIONAL ISSUES THAT WE SHOULD CLEAR UP FIRST.

01:35PM    5          LET ME ASK YOU THIS, AND HE HAS SOME LAW THAT HE WOULD

01:36PM    6    LIKE TO GIVE TO THE COURT AND HE'S, OF COURSE, GOING TO GIVE IT

01:36PM    7    TO YOU.  I THINK COUNSEL SHOULD HAVE AN OPPORTUNITY TO LOOK AT

01:36PM    8    THIS AND RESPOND.

01:36PM    9          IS THERE ANY -- ARE THERE ANY OTHER QUESTIONS THAT YOU CAN

01:36PM   10    POSE TO THIS WITNESS BEYOND THESE ISSUES?

01:36PM   11          AND WHAT I'D LIKE TO DO IN THE INTERIM ALSO IS I'M CURIOUS

01:36PM   12    TO KNOW WHICH EXHIBITS THAT YOU THINK MIGHT FALL UNTO

01:36PM   13    MR. WADE'S OBJECTION SO I COULD REVIEW THAT AS WELL, IF THEY'RE

01:36PM   14    ALL THE SAME CATEGORY OF DOCUMENTS, IT'S THE EMAILS IT SOUNDS

01:36PM   15    LIKE.

01:36PM   16          MR. BOSTIC:  YOUR HONOR, I WANT TO BE HELPFUL TO THE

01:36PM   17    COURT'S ANALYSIS HERE.  I'M NOT SURE I'M IN THE BEST POSITION

01:36PM   18    TO PREDICT WHAT THE OBJECTION IS GOING TO BE.  THE GOVERNMENT

01:36PM   19    PROVIDED THE DEFENSE NOTICE LAST WEEK OF THE SPECIFIC EXHIBITS

01:36PM   20    THAT IT INTENDED TO INTRODUCE THROUGH MS. CHEUNG.

01:36PM   21          IF THE DEFENSE'S POSITION IS THAT THESE OBJECTIONS APPLY

01:36PM   22    IT TO EACH AND EVERY SINGLE EMAIL THAT THE GOVERNMENT INTENDS

01:37PM   23    TO INTRODUCE, THEN I THINK WE HAVE OUR ANSWERS, BUT I'M NOT

01:37PM   24    SURE.

01:37PM   25          MR. WADE:  I THINK THEY DO, YOUR HONOR.

01:37PM 1          THE COURT:  OKAY.

01:37PM 2          MR. WADE:  WITH POSSIBLY ONE EXCEPTION, WHICH MAY

01:37PM 3   NOT BE ADMISSIBLE FOR A DIFFERENT PURPOSE.

01:37PM 4          BUT THAT'S WHY WE DIDN'T STIPULATE.

01:37PM 5          AS THE COURT SAW WITH MS. SPIVEY, WE STIPULATED ON ALMOST

01:37PM 6   EVERY DOCUMENT.

01:37PM 7          WE DID NOT STIPULATE TO THESE BECAUSE OF THE HEARSAY

01:37PM 8   ISSUES.  SO I WOULD SUGGEST IF THE COURT HAS A BINDER, IT'S

01:37PM 9   VIRTUALLY EVERY DOCUMENT IN THE BINDER.

01:37PM 10         AND THE COURT WILL NOTE, I THINK THERE'S ONE EXCEPTION,

01:37PM 11  MAYBE THERE'S TWO WITHIN THE BINDER THAT ACTUALLY GO TO OUR

01:37PM 12  CLIENT.  MANY OF THEM ARE LOWER LEVEL ISSUES THAT HAPPEN WITHIN

01:37PM 13  THE LAB.

01:37PM 14         MS. CHEUNG, AS SHE TESTIFIED, WAS AN ENTRY LEVEL EMPLOYEE.

01:37PM 15  THERE WERE SEVERAL LEVELS, YOU KNOW, BETWEEN HER AND EVEN THE

01:37PM 16  LAB DIRECTOR, BUT SHE'S INTERACTING, YOU KNOW, WITH PEOPLE

01:37PM 17  WITHIN THE LAB.  THERE'S NOT AN INDICATION FROM THESE DOCUMENTS

01:38PM 18  THAT THEY GO TO OUR CLIENT.

01:38PM 19         IF THE ISSUE DOES GO TO OUR CLIENT, THEY CAN CALL THE

01:38PM 20  WITNESS WHO BROUGHT IT TO OUR CLIENT OR OFFER THE EVIDENCE

01:38PM 21  THROUGH A COCONSPIRATOR EXCEPTION THAT BRINGS IT TO OUR CLIENT.

01:38PM 22         BUT THEY CAN'T JUST DUMP EVERY ISSUE IN THE LAB AND

01:38PM 23  SUGGEST THAT'S IMPUTABLE TO OUR CLIENT.  THE COURT NOTED THE

01:38PM 24  RISK IN THE MOTION IN LIMINE ORDER WHERE THERE'S A RISK THAT

01:38PM 25  OUR CLIENT COULD BE FOUND GUILTY BECAUSE OF NEGLIGENT PRACTICES

01:38PM 1    WITHIN THE LAB.

01:38PM 2            THE COURT:  THAT WAS GOING TO -- WHAT I WAS TALKING

01:38PM 3    ABOUT IS THAT WAS GOING TO A VIOLATION OF A REGULATORY THAT

01:38PM 4    CAN'T BE CONSIDERED.

01:38PM 5            MR. WADE:  SURE.

01:38PM 6            THE COURT:  AND I UNDERSTAND THAT.

01:38PM 7        MR. BOSTIC, ARE THERE -- I WANT TO GIVE YOU -- I'M GOING

01:38PM 8    TO LOOK AT THIS.  HE'S OFFERED ME SOME LAW THAT I NEED TO LOOK

01:38PM 9    AT, AND I WANT YOU TO LOOK AT IT ALSO.

01:38PM 10       IS THERE ANOTHER LINE OF QUESTIONING THAT YOU CAN CONDUCT

01:38PM 11   FOR 20 MINUTES WITH THIS WITNESS?  WILL THAT BREAK IT UP?  IF

01:38PM 12   NOT, WE CAN TAKE A RECESS NOW AND YOU'LL HAVE 20 EXTRA MINUTES

01:39PM 13   TO GO OVER THIS DOCUMENT.

01:39PM 14           MR. BOSTIC:  YOUR HONOR, I WONDER IF THE ONE

01:39PM 15   EXCEPTION -- WELL, I DON'T WANT TO GUESS.  IF COUNSEL WILL TELL

01:39PM 16   ME WHAT THE ONE EXCEPTION IS TO THE OBJECTION, WE MIGHT BE ABLE

01:39PM 17   TO EXPLORE THAT WITH THE WITNESS.

01:39PM 18           MR. WADE:  WELL, I DIDN'T STIPULATE TO ANY OF THEM.

01:39PM 19           THE COURT:  I THOUGHT YOU SAID THERE MIGHT BE ONE.

01:39PM 20           MR. WADE:  THERE MIGHT BE ONE DEPENDING ON HOW THEY

01:39PM 21   OFFER THE DOCUMENT.

01:39PM 22       I BELIEVE 1287 OUR CLIENT RECEIVES, BUT THE ISSUES ON

01:39PM 23   WHICH MS. CHEUNG IS COMMUNICATING ARE NOT, ARE NOT -- SHE'S NOT

01:39PM 24   ON THE EMAIL CHAIN WITH OUR CLIENT.

01:39PM 25           DOES THE COURT HAVE THAT DOCUMENT?  I APOLOGIZE.

01:39PM   1              THE COURT:  I HAVE 1287, YES.

01:39PM   2              MR. BOSTIC:  YOUR HONOR, I WOULD ALSO DRAW THE

01:39PM   3     COURT'S ATTENTION TO 1289, WHICH IS THAT SAME EMAIL CHAIN.

01:39PM   4         I'D SUBMIT THAT WE SHOULD BE ABLE TO AT LEAST EXPLORE

01:40PM   5     THESE WITH THIS WITNESS PENDING RESOLUTION OF THE DEFENSE'S

01:40PM   6     OBJECTIONS.

01:40PM   7              THE COURT:  DO YOU SEE 1289, MR. WADE?

01:40PM   8              MR. WADE:  I'M SORRY, YOUR HONOR?

01:40PM   9              THE COURT:  1289?  MR. BOSTIC IS SUGGESTING THAT AT

01:40PM  10     A MINIMUM WE GO FORWARD WITH 1289.  MS. CHEUNG'S NAME IS ON

01:40PM  11     THESE EMAILS.

01:40PM  12              MR. BOSTIC:  AND THE CHAIN IS FORWARDED TO

01:40PM  13     MS. HOLMES AT THE TOP OF 1287.

01:40PM  14              THE COURT:  SO IT SEEMS FOUNDATIONALLY WE CAN GO

01:40PM  15     THROUGH THIS ONE.

01:40PM  16              MR. WADE:  I THINK WE CAN GO THROUGH 1287,

01:41PM  17     YOUR HONOR.  I HAVEN'T -- MY ONLY HESITATION IS THAT I

01:41PM  18     HAVEN'T -- I NOW WANT TO JUST LOOK TO MAKE SURE THERE'S NO

01:41PM  19     LAYERED HEARSAY WITHIN HERE, BUT IT DID GO TO OUR CLIENT.  SO

01:41PM  20     AS LONG AS IT'S NOT OFFERED FOR THE TRUTH.

01:41PM  21              THE COURT:  AND THIS IS -- 1287, IT LOOKS LIKE

01:41PM  22     FOUNDATIONALLY 1289 CONNECTS WITH THIS.

01:41PM  23              MR. BOSTIC:  CORRECT, YOUR HONOR.

01:41PM  24              THE COURT:  LET'S -- WHY DON'T WE DO THIS, WE HAVE

01:41PM  25     15 MINUTES LEFT IN THE DAY.  WHY DON'T I LET YOU START WITH

01:41PM   1    THESE THEN, MR. BOSTIC.  I'M SORRY TO INTERRUPT YOUR

01:41PM   2    PRESENTATION HERE, BUT DO YOU HAVE A COPY OF THE -- WHAT YOU

01:41PM   3    WANT TO GIVE ME, YOUR BRIEF?

01:41PM   4         MR. WADE:  I WILL HAND THIS UP.  AND MY APOLOGIES

01:41PM   5    FOR NOT BRINGING TWO COPIES.  WE'LL SEND ONE TO THE GOVERNMENT,

01:41PM   6    AND WE CAN FILE IT ON PACER.

01:41PM   7         THE COURT:  KYLE, CAN YOU MAKE A COPY?

01:41PM   8         MR. DOWNEY:  I HAVE ONE, YOUR HONOR, AND I'LL GIVE

01:41PM   9    IT.

01:41PM  10         THE COURT:  THANK YOU.

01:41PM  11         MR. BOSTIC:  VERY BRIEFLY, YOUR HONOR, A PROCESS

01:41PM  12    POINT, IF I COULD.

01:41PM  13    WE HAVE HAD A COUPLE OF DISCUSSIONS, THE PARTIES AND THE

01:42PM  14    COURT, ABOUT THE MOST EFFICIENT WAY OF RAISING DEFENSE

01:42PM  15    OBJECTIONS TO GOVERNMENT EVIDENCE.  THERE WAS SOME DISCUSSION

01:42PM  16    ABOUT FILING WEEKLY MOTIONS ON MONDAY MORNINGS.  I UNDERSTAND

01:42PM  17    THAT THE COURT EXPRESSED A PREFERENCE THAT THOSE ISSUES BE

01:42PM  18    RAISED SOONER.  I THINK THE COURT PROPOSED SATURDAY AS A

01:42PM  19    DEADLINE FOR THAT.  THE GOVERNMENT WAS IN AGREEMENT WITH THE

01:42PM  20    COURT THERE.

01:42PM  21    THIS SEEMS TO BE A STEP IN THE OPPOSITE DIRECTION RAISING

01:42PM  22    AN ISSUE THAT IS ALREADY BRIEFED BUT NOT TO THE GOVERNMENT'S

01:42PM  23    KNOWLEDGE WHILE A WITNESS IS ON THE STAND.

01:42PM  24    I'M HOPEFUL THAT WE CAN FIND A MORE EFFICIENT WAY TO DEAL

01:42PM  25    WITH THESE DISPUTES IN THE FUTURE.

01:42PM  1      MR. WADE:  WE RAISED -- WE FILED MOTION 1000 AND THE

01:42PM  2  GOVERNMENT DIDN'T LIKE THAT, SO WE UNDERSTOOD IT WAS OUR

01:42PM  3  PREFERENCE TO DEFER ON MS. CHEUNG PER THE COURT'S ORDER.

01:42PM  4      SO WE'RE HERE TO DO THAT.

01:42PM  5      WE'LL RAISE ISSUES AS PROMPTLY AS WE CAN.

01:42PM  6      THE COURT:  I THOUGHT YOU SAID YOU HAD THIS LAST

01:42PM  7  WEEK?  I THOUGHT YOU SAID YOU HAD THIS LAST WEEK OR LOOKED AT

01:43PM  8  THIS LAST WEEK?

01:43PM  9      MR. WADE:  WE FILED THE MOTION LAST WEEK.  THE

01:43PM  10  1000 MOTION, AS THE COURT KNOWS, WAS RULED ON LAST WEEK.

01:43PM  11      THE COURT:  RIGHT.  RIGHT.

01:43PM  12      MR. WADE:  THE GOVERNMENT EXHIBITS WITH RESPECT TO

01:43PM  13  MS. CHEUNG, YOU KNOW, WE HAVE HAD TO PULL THEM AND SORT OF GO

01:43PM  14  THROUGH A PROCESS, BUT IF THE COURT PREFERS US TO RAISE THEM IN

01:43PM  15  THE MORNING, I WOULD HAVE BEEN HAPPY TO RAISE THIS.

01:43PM  16      THE REASON I WAITED UNTIL NOW IS BECAUSE I THOUGHT IT WAS

01:43PM  17  THE COURT'S PREFERENCE TO COME FORWARD AFTER WE SAW HOW THE

01:43PM  18  EVIDENCE WAS GOING TO COME IN.

01:43PM  19      THE COURT:  WELL, THAT'S HOW -- THAT'S WHAT THE

01:43PM  20  ORDER SUGGESTS IT WAS PREMATURE TO MAKE OBJECTIONS AT THAT

01:43PM  21  POINT.

01:43PM  22      BUT IF YOU KNOW IN ADVANCE WHAT THE OBJECTIONS ARE GOING

01:43PM  23  TO BE BASED ON THE DOCUMENTATION THAT YOU RECEIVE, THAT'S

01:43PM  24  HELPFUL TO -- SO WE DON'T HAVE TO WASTE THE JURY'S TIME

01:43PM  25  OBVIOUSLY, AND I WOULD PREFER TO DO IT WHEN WE -- TO DO THESE

01:43PM 1    DISCUSSIONS OUTSIDE, OF COURSE, THE PRESENCE OF THE JURY, BUT

01:43PM 2    ALSO BEFORE THE JURY COMES INTO THE COURTROOM, THAT'S HELPFUL

01:43PM 3    TO THEM.

01:44PM 4        YOU'VE HEARD ME TELL THEM TODAY I MIGHT ASK THEM TO STAY A

01:44PM 5    LITTLE LATER ON SOME DAYS SO WE CAN CAPTURE TIME AND STAY ON

01:44PM 6    SEQUENCE.  THIS IS COUNTER TO THAT.

01:44PM 7        BUT LET'S DEVELOP A PROTOCOL WHERE WE CAN MEET IN THE

01:44PM 8    MORNING, AND I'LL GET HERE AS EARLY AS YOU WOULD LIKE SO WE CAN

01:44PM 9    DISCUSS THESE ISSUES.

01:44PM 10   BUT FOR NOW WHY DON'T WE -- LET'S CALL THE JURY BACK,

01:44PM 11   WE'LL PROCEED WITH -- MR. BOSTIC, YOU CAN LAY SOME FOUNDATION

01:44PM 12   AND START ON THESE EXHIBITS 1287 AND 1289 AND SEE WHAT KIND OF

01:44PM 13   FOUNDATION YOU CAN LAY.

01:44PM 14   I'LL LOOK AT THESE DOCUMENTS TOMORROW.  WE'RE IN SESSION

01:44PM 15   TOMORROW.  I MIGHT TELL THE JURY THAT WE WON'T HAVE THEM OUT

01:44PM 16   UNTIL 9:30 JUST TO GIVE US A FULL OPPORTUNITY TO DISCUSS THESE

01:44PM 17   TOMORROW.  MAYBE WE WILL MEET AT 8:00.  WE'LL TALK ABOUT THAT

01:44PM 18   AFTER THE JURY LEAVES TODAY.  ALL RIGHT.

01:44PM 19           MR. WADE:  THANK YOU, YOUR HONOR.

01:45PM 20           MR. BOSTIC:  THANK YOU, YOUR HONOR.

01:45PM 21       (PAUSE IN PROCEEDINGS.)

01:45PM 22       (JURY IN AT 1:45 P.M.)

01:46PM 23           THE COURT:  THANK YOU.  PLEASE BE SEATED.  WE'RE

01:46PM 24   BACK ON THE RECORD.  OUR JURY AND ALTERNATES ARE PRESENT.

01:47PM 25       THE WITNESS IS ON THE STAND, AND ALL PARTIES PREVIOUSLY

01:47PM  1    PRESENT ARE PRESENT ONCE AGAIN.

01:47PM  2         I'M SORRY FOR THE INTERRUPTION, LADIES AND GENTLEMEN.

01:47PM  3         MR. BOSTIC.

01:47PM  4              MR. BOSTIC:  THANK YOU, YOUR HONOR.

01:47PM  5    Q.   WELCOME BACK, MS. CHEUNG.

01:47PM  6         CAN I DIRECT YOUR ATTENTION, PLEASE, TO EXHIBIT 1289 IN

01:47PM  7    THE BINDER IN FRONT OF YOU?

01:47PM  8    A.   YES.

01:47PM  9    Q.   LET ME KNOW ONCE YOU'RE THERE?

01:47PM  10   A.   I'M AT 1289.

01:47PM  11   Q.   OKAY.  IF YOU WOULD LOOK AT PAGE 2 OF 1289, DO YOU SEE AN

01:47PM  12   EMAIL THAT BEGINS THIS CHAIN?

01:47PM  13        IT SHOULD JUST BE ON THE BACK OF THAT FIRST PAGE.

01:47PM  14   A.   OH, YES.

01:47PM  15   Q.   ARE YOU LOOKING AT AN EMAIL FROM YOU TO OTHER EMPLOYEES AT

01:47PM  16   THERANOS?

01:47PM  17   A.   YES.

01:47PM  18   Q.   AND LOOKING AT THIS EMAIL CHAIN, DO YOU HAVE A

01:47PM  19   RECOLLECTION OF THE EVENTS THAT IT COVERS?

01:48PM  20   A.   YES.

01:48PM  21   Q.   AND CAN YOU EXPLAIN -- WE'LL GO THROUGH THIS IN SOME MORE

01:48PM  22   DETAIL, BUT CAN YOU EXPLAIN GENERALLY WHAT WAS HAPPENING?

01:48PM  23   A.   A PATIENT SAMPLE CAME INTO THE WALGREENS LOCATION IN

01:48PM  24   PALO ALTO TO HAVE THEIR VITAMIN D TESTED, AND ESSENTIALLY I WAS

01:48PM  25   PREPPING TO RUN THIS VITAMIN D SAMPLE.  AND BEFORE YOU RUN A

01:48PM  1    VITAMIN D SAMPLE YOU HAVE TO RUN SOMETHING CALLED QUALITY

01:48PM  2    CONTROLS, AND THEY HAVE TO PASS IN ORDER TO RUN THE PATIENT

01:48PM  3    SAMPLE.

01:48PM  4         SO IN THIS EMAIL I'M NOTIFYING DIFFERENT PEOPLE WITHIN THE

01:48PM  5    CLINICAL LAB AND THE RESEARCH AND DEVELOPMENT LAB AND THE HELP

01:48PM  6    LINE CALLED NORMANDY 911 THAT THE QC'S AREN'T PASSING AND

01:48PM  7    TRYING TO FIGURE OUT WHAT I'M SUPPOSED TO DO.

01:48PM  8    Q.   AND DO YOU REMEMBER THESE EVENTS?

01:48PM  9    A.   YES.

01:48PM  10   Q.   LET ME ASK YOU A FEW QUESTIONS ABOUT HOW YOU USED EMAIL AT

01:49PM  11   THERANOS IF THAT'S OKAY.

01:49PM  12   A.   OKAY.

01:49PM  13   Q.   FIRST, DID YOU REGULARLY SEND EMAILS AS PART OF YOUR WORK

01:49PM  14   AT THERANOS?

01:49PM  15   A.   YES.

01:49PM  16   Q.   AND WAS IT YOUR PRACTICE TO SEND EMAILS LIKE THESE AT OR

01:49PM  17   NEAR THE TIME OF THE EVENTS THAT YOU WERE DESCRIBING IN THE

01:49PM  18   EMAILS?

01:49PM  19   A.   YES.

01:49PM  20   Q.   IN RESEARCH AND DEVELOPMENT AND IN THE CLINICAL LAB, DID

01:49PM  21   YOU AND OTHER EMPLOYEES AT THERANOS USE INFORMATION TO CONVEY

01:49PM  22   INFORMATION IN THE COURSE OF REGULARLY CONDUCTED ACTIVITIES OF

01:49PM  23   THE COMPANY?

01:49PM  24   A.   YES.

01:49PM  25   Q.   IN THE WORK THAT YOU DID AND THE WORK THAT OTHERS DID AT

01:49PM 1   THERANOS IN R&D AND IN THE CLINICAL LAB, WAS IT IMPORTANT TO

01:49PM 2   CONVEY INFORMATION IN EMAILS ACCURATELY?

01:49PM 3   A.   YES.

01:49PM 4   Q.   AND WERE THESE KINDS OF EMAILS RELIED UPON BY INDIVIDUALS

01:49PM 5   AT THERANOS SUCH THAT IT WAS ESSENTIAL TO REPORT INFORMATION

01:49PM 6   ACCURATELY IN THE EMAILS?

01:50PM 7   A.   YES.

01:50PM 8   Q.   DID YOU ALSO, WHEN YOU WERE AT THERANOS, USE EMAILS TO

01:50PM 9   MEMORIALIZE OR PRESERVE INFORMATION SO IT COULD BE REFERRED

01:50PM 10  BACK TO LATER?

01:50PM 11  A.   YES.

01:50PM 12  Q.   DID THERANOS SET UP ANY SPECIFIC EMAIL GROUPS OR EMAIL

01:50PM 13  ALIASES OR ADDRESSES TO BE USED TO FACILITATE THE FUNCTIONS

01:50PM 14  THAT WE'VE BEEN TALKING ABOUT?

01:50PM 15  A.   YES.

01:50PM 16  Q.   AND WHAT WERE SOME OF THEM IF YOU REMEMBER?

01:50PM 17  A.   SO WE CREATED DIFFERENT GROUPS FOR DIFFERENT DEPARTMENTS,

01:50PM 18  SO DIFFERENT RESEARCH AND DEVELOPMENT LABS WOULD HAVE THEIR OWN

01:50PM 19  SORT OF GROUP, EMAIL GROUP.

01:50PM 20      AND WE ALSO HAD THEM IN THIS CASE FOR A HELP LINE.  SO IF

01:50PM 21  WE HAD ANY ISSUES IN THE LABORATORY, WE HAD NORMANDY 911, WHICH

01:50PM 22  WAS TO ESSENTIALLY CONTACT A GROUP OF PEOPLE WHO COULD HELP

01:50PM 23  TROUBLESHOOT ANY PROBLEMS THAT MAY HAVE AROSE WHILE WE WERE

01:51PM 24  WORKING.

01:51PM 25  Q.   AND HOW DID YOU CONTACT THE NORMANDY 911 GROUP?  WHAT WAS

01:51PM 1     THE MECHANISM AT THERANOS?

01:51PM 2     A.   YOU JUST CC'D THAT GROUP TAG.

01:51PM 3     Q.   AND SO YOU WOULD SEND AN EMAIL TO AN EMAIL ADDRESS

01:51PM 4     NORMANDY 911?

01:51PM 5     A.   YES.

01:51PM 6     Q.   AT THERANOS.COM OR SOMETHING LIKE THAT?

01:51PM 7     A.   YES.

01:51PM 8     Q.   AND THAT EMAIL ADDRESS WAS CREATED BY THE COMPANY ITSELF?

01:51PM 9     A.   YES.

01:51PM 10    Q.   GOING BACK TO EXHIBIT 1289.  WE TALKED ABOUT THE BASIC

01:51PM 11    SITUATION INVOLVING HERE I THINK YOU SAID A QC FAILURE; IS THAT

01:51PM 12    CORRECT?

01:51PM 13    A.   YES.

01:51PM 14    Q.   AND I'LL POINT YOUR ATTENTION TO PAGE 1 OF THAT EXHIBIT.

01:51PM 15    YOU WILL SEE AT THE TOP THE EMAIL CHAIN ENDS WITH AN EMAIL FROM

01:51PM 16    MR. BALWANI; IS THAT CORRECT?

01:51PM 17    A.   YES.

01:51PM 18    Q.   AND CAN YOU FLIP BACK ONE EXHIBIT TO EXHIBIT 1287, PLEASE.

01:52PM 19         DO YOU SEE EXHIBIT 1287?

01:52PM 20    A.   YES.

01:52PM 21    Q.   IS THAT ANOTHER VERSION OR A DIFFERENT PORTION OF THIS

01:52PM 22    SAME EMAIL CHAIN?

01:52PM 23    A.   YES.

01:52PM 24    Q.   AT THE TOP OF EXHIBIT 1287 DO YOU SEE A COUPLE OF

01:52PM 25    EXCHANGES WHERE MS. HOLMES IS EITHER THE SENDER OR RECIPIENT OF

01:52PM  1    EMAILS?

01:52PM  2    A.   YES.

01:52PM  3           MR. BOSTIC:  YOUR HONOR, AT THIS TIME THE GOVERNMENT

01:52PM  4    WOULD MOVE TO ADMIT EXHIBIT 1289.

01:52PM  5           MR. WADE:  YOUR HONOR, I HAVE NO OBJECTION TO EVERY

01:52PM  6    EMAIL IN 1289 WITH THE EXCEPTION OF THE TOP EMAIL, WHICH IS NOT

01:52PM  7    INCLUDED IN 1287.

01:52PM  8           THE COURT:  THE EMAIL AT THE TOP OF THE PAGE ON THE

01:52PM  9    FIRST PAGE OF 3069?

01:53PM 10           MR. WADE:  I'M SORRY, 1289 I BELIEVE IS WHAT THE

01:53PM 11    GOVERNMENT IS MOVING; IS THAT CORRECT?

01:53PM 12           MR. BOSTIC:  BATES ENDING IN 3069.

01:53PM 13           MR. WADE:  BATES, CORRECT.  YES, YOUR HONOR, THE TOP

01:53PM 14    EMAIL OF THAT CHAIN.

01:53PM 15           THE COURT:  MR. BOSTIC?

01:53PM 16           MR. BOSTIC:  I BELIEVE THAT EMAIL SHOULD BE

01:53PM 17    ADMITTED, YOUR HONOR.  IT PROVIDES THE REACTION OF THE

01:53PM 18    COCONSPIRATOR IN THIS CASE, AND I THINK THAT'S RELEVANT.

01:53PM 19           MR. WADE:  SHOULD WE APPROACH, YOUR HONOR?

01:53PM 20           THE COURT:  I SEE THE COCONSPIRATOR'S NAME HERE.

01:53PM 21        WHAT IS THE -- IS HE A RECIPIENT?

01:53PM 22           MR. BOSTIC:  HE'S A SENDER IN THE EMAIL MESSAGE THAT

01:53PM 23    WE'RE REFERENCING, YOUR HONOR.

01:53PM 24           THE COURT:  I SEE.  IT'S A THREE HOLE PUNCH, AND

01:53PM 25    IT'S PUNCHED OUT IN THE TITLE OF THE COPY THAT I HAVE.

01:53PM  1          MR. BOSTIC:  YOUR HONOR, FOR EXPEDIENCY, WE CAN

01:54PM  2   DEFER ON 1289 FOR NOW.  I CAN ASK THE WITNESS ABOUT THE EVENTS

01:54PM  3   INDEPENDENT OF THE EMAIL.

01:54PM  4          THE COURT:  SURE.  ALL RIGHT.  LET'S DO THAT.  WE'LL

01:54PM  5   TALK ABOUT THIS TOMORROW.

01:54PM  6   BY MR. BOSTIC:

01:54PM  7   Q.   MS. CHEUNG, YOU MENTIONED A CONCEPT CALLED QC OR QUALITY

01:54PM  8   CONTROL?

01:54PM  9   A.   YES.

01:54PM  10  Q.   AND WHAT IS QC AND HOW DID IT WORK AT THERANOS?

01:54PM  11  A.   SO QC STANDS FOR QUALITY CONTROLS, AND ESSENTIALLY QUALITY

01:54PM  12  CONTROL IS A SYSTEM THAT YOU SET UP BEFORE YOU RUN PATIENT

01:54PM  13  SAMPLES.

01:54PM  14       SO A QUALITY CONTROL ITSELF IS A SAMPLE WHERE YOU HAVE A

01:54PM  15  KNOWN CONCENTRATION OF WHATEVER YOU'RE TRYING TO TEST.  SO, FOR

01:54PM  16  EXAMPLE, IF YOU'RE TRYING TO TEST VITAMIN D, YOU KNOW THAT THE

01:54PM  17  QUALITY CONTROL SAMPLE IS 12 MICROGRAMS PER MIL.

01:54PM  18       SO WHAT YOU'LL DO IS RUN THESE QUALITY CONTROL SAMPLES

01:55PM  19  PRIOR TO RUNNING A PATIENT SAMPLE TO MAKE SURE EVERYTHING IN

01:55PM  20  YOUR SYSTEM IS WORKING ACCURATELY.

01:55PM  21       BECAUSE THERE ARE SO MANY DIFFERENT MOVING PARTS, YOU WANT

01:55PM  22  TO MAKE SURE THAT THE DEVICE, THE CHEMICALS THAT YOU USE, THE

01:55PM  23  CHEMISTRY, EVERYTHING, THE TECHNICIAN IS TRAINED PROPERLY, IS

01:55PM  24  WORKING EFFECTIVELY SO YOU RUN THIS QUALITY CONTROL SAMPLE TO

01:55PM  25  SEE IF IT PASSES OR FAILS IN ORDER TO ALLOW YOU THEN TO PROCESS

01:55PM   1      A PATIENT SAMPLE.

01:55PM   2           SO IT'S KIND OF LIKE AN ASSURANCE SYSTEM BEFORE RUNNING A

01:55PM   3      PATIENT SAMPLE.

01:55PM   4      Q.   SO A BLOOD TEST, THE GOAL IS TO TEST THE CONCENTRATION OF

01:55PM   5      A CERTAIN SUBSTANCE IN THE BLOOD GENERALLY SPEAKING?

01:55PM   6      A.   YES.

01:55PM   7      Q.   AND SO FOR THIS QUALITY CONTROL STEP, IF I'M UNDERSTANDING

01:55PM   8      CORRECTLY, YOU TAKE A SAMPLE THAT HAS A KNOWN CONCENTRATION?

01:55PM   9      A.   RIGHT.

01:55PM  10      Q.   AND THE GOAL IS TO SEE IF THE DEVICE CAN RETURN THE RESULT

01:55PM  11      THAT MATCHES WITH THAT KNOWN CONCENTRATION?

01:56PM  12      A.   YEAH.  SO IT WILL EITHER BE A TYPE OF CONCENTRATION, SO

01:56PM  13      YOU WANT THE SAME CONCENTRATION, OR SOMETIMES IT WILL BE A

01:56PM  14      POSITIVE OR A NEGATIVE VALUE OR YOU WILL KNOW YOU HAVE A

01:56PM  15      POSITIVE VALUE OR A NEGATIVE VALUE.  SO IT COULD BE EITHER OF

01:56PM  16      THOSE TYPES OF SETUPS.

01:56PM  17      Q.   AND HOW OFTEN WAS -- HOW OFTEN DID QUALITY CONTROL HAVE TO

01:56PM  18      BE PERFORMED AT THERANOS WHEN YOU WERE WORKING THERE?

01:56PM  19      A.   AT THERANOS WE PERFORMED QUALITY CONTROLS TYPICALLY AT THE

01:56PM  20      BEGINNING OF THE DAY BEFORE WE WERE GOING TO RUN ALL OF OUR

01:56PM  21      PATIENT SAMPLES.

01:56PM  22      Q.   DID QUALITY CONTROL HAVE TO BE PERFORMED JUST ON ONE

01:56PM  23      REPRESENTATIVE DEVICE OR DID IT HAVE TO BE PERFORMED ON EACH

01:56PM  24      DEVICE THAT WAS GOING TO BE USED FOR PATIENT TESTING?

01:56PM  25      A.   IT HAS TO BE RUN ON EACH DEVICE THAT IS GOING TO BE USED



01:56PM  1    FOR PATIENT TESTING.

01:56PM  2    Q.   AND DOES IT HAVE TO BE RUN FOR EACH KIND OF TEST FOR EACH

01:56PM  3    ASSAY THAT IS GOING TO BE USED THAT DAY OR JUST FOR CERTAIN

01:56PM  4    EXAMPLE ASSAYS?

01:56PM  5    A.   IT HAS TO BE RUN FOR EACH ASSAY.  SO EACH TEST THAT YOU

01:57PM  6    RUN YOU HAVE TO RUN QC'S FOR.

01:57PM  7    Q.   AND WHAT HAPPENS IF A DEVICE FAILS QC ON A CERTAIN DAY FOR

01:57PM  8    A CERTAIN ASSAY?

01:57PM  9    A.   SO TYPICALLY IF A QC FAILS, YOU HAVE TO INVESTIGATE WHY

01:57PM 10    DID IT FAIL, AND YOU HAVE TO COME UP WITH SOME SORT OF

01:57PM 11    CORRECTIVE ACTION IN ORDER TO MAKE SURE THAT THEY PASS AND THAT

01:57PM 12    THE SYSTEM IS WORKING.

01:57PM 13         SO, FOR EXAMPLE, IF IT FAILS, YOU WILL LOOK AND SEE, OKAY,

01:57PM 14    LET'S LOOK AT THE SOLUTIONS I'M USING, YOU KNOW, IS ANYTHING

01:57PM 15    EXPIRED?

01:57PM 16         OR MAYBE I MADE SOME SORT OF A MISTAKE, AND YOU'LL TRY AND

01:57PM 17    BASICALLY RE-CORRECT FOR ANY POTENTIAL ERROR THAT YOU MIGHT

01:57PM 18    HAVE.

01:57PM 19         IT KIND OF WORKS LIKE A FLAG SYSTEM TO LET YOU KNOW THAT

01:57PM 20    SOMETHING IS OFF OR SOMETHING IS WRONG AND SO YOU HAVE TO

01:57PM 21    INVESTIGATE WHAT THAT IS.

01:57PM 22    Q.   AND IN THAT CASE IF A DEVICE FAILS QC FOR A CERTAIN ASSAY

01:57PM 23    ON A CERTAIN DAY, CAN IT CONTINUE TO BE USED FOR PATIENT

01:57PM 24    TESTING WHILE THE PROBLEM IS INVESTIGATED?

01:57PM 25    A.   NO.

01:57PM  1    Q.   CAN THE MACHINE BE USED AGAIN BEFORE IT PASSES -- SORRY.

01:58PM  2         WHEN A MACHINE FAILS QC, CAN IT BE USED AGAIN FOR PATIENT

01:58PM  3    TESTING BEFORE IT PASSES QC?

01:58PM  4    A.   CAN YOU REPEAT THAT QUESTION.

01:58PM  5    Q.   SURE.  IF A DEVICE FAILS QC, ARE YOU ALLOWED TO USE IT FOR

01:58PM  6    PATIENT TESTING AGAIN BEFORE IT PASSES QC?

01:58PM  7    A.   NO, YOU CAN'T USE IT FOR PATIENT TESTING.

01:58PM  8    Q.   SO GOING BACK TO THE EMAIL THAT YOU SEE IN FRONT OF YOU.

01:58PM  9         WHAT WAS THE DATE WHEN THIS SITUATION OCCURRED WITH THE QC

01:58PM  10   RESULT YOU REFERENCED EARLIER?

01:58PM  11   A.   THE DATE WAS NOVEMBER 30TH, 2013.

01:58PM  12   Q.   OKAY.  AND ON THAT DATE DO YOU REMEMBER SENDING AN EMAIL

01:58PM  13   TO THE NORMANDY 911 EMAIL ADDRESS?

01:58PM  14   A.   YES.

01:58PM  15   Q.   AND WHAT WAS THE REASON FOR SENDING THAT EMAIL?

01:58PM  16   A.   THE REASON FOR SENDING THAT IS BECAUSE THE QC'S DIDN'T

01:58PM  17   PASS, AND I WAS TRYING TO TROUBLESHOOT DIFFERENT SOLUTIONS AND

01:58PM  18   NOTHING WAS WORKING BECAUSE THEY KEPT REPEATEDLY FAILING.

01:59PM  19   Q.   AND BECAUSE THE QC'S FAILED, YOU WEREN'T ALLOWED TO RUN

01:59PM  20   THE PATIENT SAMPLE THAT YOU NEEDED TO RUN; IS THAT CORRECT?

01:59PM  21   A.   THAT IS CORRECT.

01:59PM  22   Q.   AND WHAT WAS THE ASSAY INVOLVED HERE?

01:59PM  23   A.   THE ASSAY WAS VITAMIN D.

01:59PM  24   Q.   DO YOU HAVE AN UNDERSTANDING FROM YOUR TIME AT THERANOS OF

01:59PM  25   WHAT THE VITAMIN D TEST IS AND WHY IT'S IMPORTANT?

01:59PM  1    A.   THE VITAMIN D TEST IS TO CHECK FOR THE MINERAL VITAMIN D,

01:59PM  2    AND SO IT WILL INDICATE TO A PATIENT WHETHER THEY HAVE A

01:59PM  3    DEFICIENCY, WHETHER THEY'RE OVERDOSING, IF THEY'RE TAKING

01:59PM  4    SUPPLEMENTS OR WHETHER THEY'RE IN THE NORMAL RANGE.

01:59PM  5    Q.   I'LL ASK YOU TO TURN BACK TO EXHIBIT 1287.

01:59PM  6         MR. WADE:  YOUR HONOR, ARE WE REFRESHING

01:59PM  7    RECOLLECTION NOW?

01:59PM  8         THE COURT:  HE HASN'T ASKED A QUESTION YET.

01:59PM  9         MR. WADE:  OKAY.  I JUST -- WE'RE GOING -- I'M JUST

01:59PM  10   SEEKING CLARIFICATION.

02:00PM  11        MR. BOSTIC:  MY NEXT STEP IS TO SEEK TO MOVE

02:00PM  12   EXHIBIT 1287 INTO EVIDENCE.

02:00PM  13        MR. WADE:  WITHOUT OBJECTION.

02:00PM  14        THE COURT:  IT MAY BE PUBLISHED.  THANK YOU.

02:00PM  15     (GOVERNMENT'S EXHIBIT 1287 WAS RECEIVED IN EVIDENCE.)

02:00PM  16   BY MR. BOSTIC:

02:00PM  17   Q.   DO YOU SEE A VERSION OF THIS EMAIL CHAIN ON THE SCREEN IN

02:00PM  18   FRONT OF YOU, MS. CHEUNG?

02:00PM  19   A.   YES.

02:00PM  20   Q.   I'LL DIRECT YOUR ATTENTION TO THE BOTTOM OF PAGE 1.  IF WE

02:00PM  21   CAN ZOOM DOWN TO -- YES, TO THE BOTTOM THERE, MS. HOLLIMAN.

02:00PM  22   THANK YOU.

02:00PM  23        THERE'S A MESSAGE FROM MR. BALWANI IN THE MIDDLE OF THE

02:00PM  24   TEXT THERE ON NOVEMBER 30TH, 2013, AT 7:10 A.M.

02:01PM  25        DO YOU SEE THAT?

02:01PM  1   A.   YES.

02:01PM  2   Q.   AND MR. BALWANI REMARKS, "THIS IS BEYOND UNACCEPTABLE

02:01PM  3   PERFORMANCE."

02:01PM  4        DO YOU SEE THAT?

02:01PM  5   A.   YES.

02:01PM  6   Q.   AND FROM YOUR STANDPOINT AS AN EMPLOYEE OF THE COMPANY,

02:01PM  7   DID YOU AGREE THAT THIS WAS BEYOND UNACCEPTABLE PERFORMANCE FOR

02:01PM  8   THE THERANOS ASSAY AT THIS TIME?

02:01PM  9   A.   YES, THAT THE QC FAILED.

02:01PM  10  Q.   MS. HOLMES THEN RESPONDS TO THAT MESSAGE AND ASKS "DO WE

02:01PM  11  HAVE ENOUGH SAMPLE TO RUN THIS ONE ON TRADITIONAL METHODS?"

02:01PM  12       DO YOU SEE THAT?

02:01PM  13  A.   YES.

02:01PM  14  Q.   AND WHAT WAS YOUR UNDERSTANDING WHAT SHE MEANT WHEN SHE

02:01PM  15  SAID "TRADITIONAL METHODS"?  WHAT DOES THAT MEAN?

02:01PM  16  A.   TRADITIONAL METHODS MEANS IS THE PREDICATE METHOD, SO IT'S

02:01PM  17  THE MACHINES THAT WE HAD IN THAT UPSTAIRS LABORATORY, THE SORT

02:01PM  18  OF OFF-THE-SHELF MACHINES.  SO THIS WOULD HAVE LIKELY BEEN THE

02:02PM  19  DIASORIN, WHICH IS UTILIZED FOR VITAMIN D SAMPLES.

02:02PM  20  Q.   AND YOU SAID DIASORIN.  IS THAT ANOTHER MANUFACTURER

02:02PM  21  BESIDES THERANOS?

02:02PM  22  A.   YEAH, IT'S LIKE THE DIASORIN LIAISON.  IT'S THE MACHINE

02:02PM  23  USED TO PROCESS VITAMIN D SAMPLES.

02:02PM  24  Q.   SO, IN OTHER WORDS, MS. HOLMES IS ASKING HERE WHETHER THE

02:02PM  25  SAMPLE IS LARGE ENOUGH TO FORGET ABOUT USING THE THERANOS

02:02PM  1    TECHNOLOGY ALTOGETHER AND SIMPLY RELY ON GENERAL STORE BOUGHT

02:02PM  2    ANALYZERS; IS THAT CORRECT?

02:02PM  3    A.   YES.

02:02PM  4    Q.   THANK YOU, MS. HOLLIMAN.  LET'S ZOOM OUT AND ZOOM IN ON

02:02PM  5    THE NEXT -- KIND OF THE NEXT MIDDLE THIRD OF THE DOCUMENT,

02:02PM  6    PLEASE.

02:02PM  7         LET'S SAY FROM THE LINE ABOUT ONE-THIRD DOWN, FROM ABOUT

02:02PM  8    THERE (INDICATING).

02:02PM  9         SORRY.  LET'S GO BACK.  AND FROM WHERE I MARKED NEAR THE

02:03PM  10   TOP, STARTING FROM THERE GOING DOWN.  CORRECT.  PERFECT.  THANK

02:03PM  11   YOU.

02:03PM  12        NISHIT DOSHI RESPONDS TO MS. HOLMES'S QUESTION; CORRECT?

02:03PM  13   A.   YES.

02:03PM  14   Q.   AND WHAT IS THE ANSWER TO HER QUESTION AND WHETHER IT IS

02:03PM  15   POSSIBLE TO JUST USE THIRD PARTY DEVICES AND NOT THERANOS

02:03PM  16   DEVICES FOR THIS?

02:03PM  17   A.   HE'S EFFECTIVELY SAYING THAT WE NEED A LARGER SAMPLE, SO

02:03PM  18   WE NEED 150 MICROLITERS OF SERUM, WHICH SERUM IS A DIFFERENT

02:03PM  19   TYPE OF TUBE AND NOT EDTA PLASMA.

02:03PM  20        SO SOMETIMES YOU HAVE DIFFERENT COATINGS ON DIFFERENT

02:03PM  21   TYPES OF TUBES.  SO WE DON'T HAVE ENOUGH SAMPLE AND THE RIGHT

02:03PM  22   TYPE OF SAMPLE IN ORDER TO RUN IT ON THE LIAISON, WHICH IS THIS

02:03PM  23   PREDICATE METHOD MACHINE, THE VENOUS OFF-THE-SHELF FDA-APPROVED

02:03PM  24   MACHINE THAT YOU WOULD RUN VITAMIN D SAMPLES ALTERNATIVELY ON.

02:03PM  25   Q.   MS. HOLMES THEN RESPONDS AND ASKING HOW FAST WE CAN

02:04PM  1    RESOLVE THIS ISSUE.

02:04PM  2         DO YOU SEE THAT?

02:04PM  3    A.   YES.

02:04PM  4    Q.   AND DANIEL YOUNG RESPONDS.  WHO WAS DANIEL YOUNG AT THE

02:04PM  5    COMPANY?

02:04PM  6    A.   DANIEL YOUNG WAS THE VICE PRESIDENT OF THE COMPANY.

02:04PM  7    Q.   WHAT WAS HIS FUNCTION AT THE COMPANY, IF YOU HAVE AN

02:04PM  8    UNDERSTANDING OF WHAT HIS JOB ENTAILED?

02:04PM  9    A.   SO DANIEL YOUNG WAS THE VICE PRESIDENT, AND HE TENDED TO

02:04PM  10   HAVE OVERSIGHT OVER ALL OF THE RESEARCH AND DEVELOPMENT

02:04PM  11   ACTIVITIES.

02:04PM  12        AND THEN SPECIFICALLY WHEN IT CAME TO SORT OF THIS

02:04PM  13   INTEGRATION, HELPING TO BASICALLY MAKE IT POSSIBLE SO THAT

02:04PM  14   THERANOS COULD PROCESS EVEN MORE SAMPLES THAN WE CURRENTLY HAD

02:04PM  15   CAPACITY OF.  SO THAT WAS MY UNDERSTANDING OF WHAT HIS ROLE

02:04PM  16   WAS.

02:04PM  17        HE KIND OF OVERSAW A LOT OF THE R&D AND A LOT OF THE

02:04PM  18   SCIENTISTS AND ALSO THIS INTEGRATION OF GETTING THESE NEW TYPES

02:04PM  19   OF TESTS THAT WE WERE DEALING WITH INTO THE CLINICAL SETTING.

02:04PM  20        HE WAS KIND OF A LEAD PERSON THAT WE WOULD CONTACT TO

02:04PM  21   DISCUSS WHAT WE WERE WORKING ON OR ANY ISSUES THAT WE HAD IN

02:04PM  22   THAT REGARD.

02:05PM  23   Q.   HIS ANSWER TO MS. HOLMES IS "THIS HAS BEEN RESOLVED.

02:05PM  24   SAMPLE IS BEING RUN ON THE EDISON."

02:05PM  25        IS THAT CORRECT?



02:05PM 1    A.   YES.

02:05PM 2    Q.   AND MS. HOLMES ASKS "WHAT IS THE RESOLUTION?"

02:05PM 3         LET'S ZOOM OUT AND GO TO THE TOP EMAIL ON THE CHAIN,

02:05PM 4    PLEASE, THE TOP PORTION.  THANK YOU.  THERE'S AN EMAIL FROM

02:05PM 5    SURAJ SAKSENA.  WHO WAS SURAJ SAKSENA AT THERANOS?

02:05PM 6    A.   SURAJ SAKSENA WAS A TEAM LEAD.  HE WAS A SCIENTIST ON THE

02:05PM 7    BINDERS TEAM AND HE ALSO WORKED ON THE ELISA AND ALSO ON

02:05PM 8    PRODUCTION.

02:05PM 9    Q.   AND HIS RESPONSE SAYS, "HI ELIZABETH.  2 OUTLIERS HAD TO

02:05PM 10   BE MANUALLY REMOVED TO PASS QC.  FOR FUTURE, WE WILL

02:06PM 11   INCORPORATE AUTOMATIC OUTLIER DETECTION AND REMOVAL FROM

02:06PM 12   ANALYSIS."

02:06PM 13        CAN YOU EXPLAIN WHAT THAT MEANS, "2 OUTLIERS HAD TO BE

02:06PM 14   MANUALLY REMOVED TO PASS QC"?

02:06PM 15   A.   SO ESSENTIALLY THE PATIENT RESULTS AND THE QC RESULTS WERE

02:06PM 16   ALL DERIVED FROM AN AGGREGATION OF SIX DATA POINTS.  AND SURAJ

02:06PM 17   IS TALKING ABOUT THIS, LIKE, PROCESS AT THERANOS WHERE THEY

02:06PM 18   WOULD DELETE TWO DATA POINTS IF A QC FAILED OR IF A THERE WAS

02:06PM 19   SOME INSTANCE WHERE WE WEREN'T GETTING LIKE THE QC TO PASS OR

02:06PM 20   INVALIDATION STUDIES, THIS WAS ALSO CONDUCTED LIKE THIS SORT OF

02:06PM 21   OUTLIER REMOVAL.

02:06PM 22        SO LET'S TAKE TWO DATA POINTS OUT OF THE SIX DATA POINTS

02:06PM 23   THAT WE HAVE TO SEE IF THAT CHANGES THE RESULTS THAT WE'RE

02:06PM 24   GETTING.

02:06PM 25   Q.   AND IS THIS A PROCESS THAT YOU BECAME FAMILIAR WITH DURING

02:06PM  1    YOUR TIME AT THERANOS?

02:06PM  2    A.   YES.

02:06PM  3    Q.   AND IS THIS A PROCESS THAT YOU AGREED WITH OR DISAGREED

02:06PM  4    WITH?

02:06PM  5    A.   I DISAGREED WITH.

02:06PM  6    Q.   BY SAYING OUTLIERS WERE REMOVED, DOES THAT MEAN THAT THOSE

02:07PM  7    RESULTS NEVER EXISTED IN THE FIRST PLACE OR JUST THAT THEY WERE

02:07PM  8    IGNORED OR DISREGARDED FOR PURPOSES OF QUALITY CONTROL?

02:07PM  9    A.   THEY WERE IGNORED AND DISREGARDED FOR THE PURPOSES OF

02:07PM  10   QUALITY CONTROL.

02:07PM  11           MR. BOSTIC:  YOUR HONOR, THERE'S MORE TO TALK ABOUT

02:07PM  12   ON THIS TOPIC, BUT THIS MIGHT BE A GOOD TIME TO BREAK FOR THE

02:07PM  13   DAY.

02:07PM  14           THE COURT:  LET'S DO THAT.

02:07PM  15       LADIES AND GENTLEMEN, WE'LL TAKE OUR RECESS AT THIS TIME.

02:07PM  16   I WANT TO TELL YOU TOMORROW I'M HOPEFUL THAT WE CAN BEGIN AT

02:07PM  17   9:00 O'CLOCK TOMORROW.  IT MAY BE -- I'M PROBABLY GOING TO WANT

02:07PM  18   TO TALK TO THE LAWYERS IN ADVANCE, BUT I'M QUITE CONFIDENT THAT

02:07PM  19   WE WILL BE ABLE TO BEGIN AT THE LATEST AT 9:30, BUT I'M

02:07PM  20   SHOOTING FOR 9:00 O'CLOCK.  I JUST WANT TO GIVE YOU A HEADS UP

02:07PM  21   ON THAT.

02:07PM  22       WE'LL TAKE OUR RECESS TODAY.  I DO, ONCE AGAIN, WANT TO

02:07PM  23   ADMONISH YOU ABOUT THE NEED TO DECIDE THIS CASE SOLELY ON THE

02:07PM  24   EVIDENCE PRESENTED IN THE COURTROOM.  AGAIN, THIS MEANS THAT

02:07PM  25   YOU'RE NOT TO DO ANY RESEARCH ABOUT THE CASE, ANYTHING TO DO

02:08PM  1   WITH THE CASE, INCLUDING ANY INDEPENDENT RESEARCH.  YOU SHOULD

02:08PM  2   LIMIT YOUR EXPOSURE TO TRADITIONAL FORMS OF MEDIA INFORMATION,

02:08PM  3   AND YOU MUST NOT COMMUNICATE WITH ANYONE IN ANY WAY ABOUT THIS

02:08PM  4   CASE, AND YOU MUST IGNORE ANY INFORMATION ABOUT THE CASE THAT

02:08PM  5   YOU MIGHT SEE WHILE BROWSING THE INTERNET OR ON YOUR SOCIAL

02:08PM  6   MEDIA FEEDS.

02:08PM  7       AGAIN, TOMORROW MORNING I'M GOING TO ASK YOU THE OTHER

02:08PM  8   QUESTION, WHETHER OR NOT ANY OF YOU HAVE BEEN EXPOSED TO

02:08PM  9   INFORMATION.  I HOPE YOU APPRECIATE THE SOMEWHAT REDUNDANCY OF

02:08PM  10  THIS, BUT I HOPE YOU ALSO APPRECIATE HOW IMPORTANT IT IS FOR

02:08PM  11  THIS CASE AND FOR YOUR DELIBERATIONS TO BE DECIDED ONLY ON THE

02:08PM  12  EVIDENCE HERE.

02:08PM  13      WITH THAT, WE'LL SEE YOU TOMORROW MORNING.

02:08PM  14      MS. KRATZMANN WILL TELL YOU WHERE TO COLLECT YOURSELVES

02:08PM  15  AND HOW THAT IS GOING TO BE ENGAGED.

02:08PM  16      I UNDERSTAND THERE'S ANOTHER JURY TRIAL GOING ON IN OUR

02:08PM  17  COURTHOUSE, AND IT MIGHT CREATE SOME CHALLENGES AS FAR AS

02:08PM  18  ELEVATORS AND THINGS.  ALTHOUGH I BELIEVE WE HAVE WORKED THE

02:08PM  19  TIMING OUT ON THAT.

02:08PM  20      BUT IN ANY EVENT, HAVE A GOOD EVENING.  PLEASE REMEMBER

02:09PM  21  THE ADMONITION.  I HOPE WE CAN START AT 9:00 O'CLOCK.

02:09PM  22  REALISTICALLY IT'S PROBABLY GOING TO BE A LITTLE BIT AFTER

02:09PM  23  THAT, JUST TO BE CANDID, BUT WE'LL DO THE BEST THAT WE CAN.

02:09PM  24      TOMORROW WE MIGHT GO LATER.  I ASKED YOU TO CHECK ON THAT,

02:09PM  25  BUT WE'LL FOLLOW UP ON THAT TOMORROW.  THANK YOU.

02:09PM 1    MS. CHEUNG, YOU CAN STEP DOWN AS WELL.  IF YOU COULD BE

02:09PM 2    AVAILABLE TOMORROW AT 9:00 O'CLOCK, PLEASE.

02:10PM 3         (JURY OUT AT 2:10 P.M.)

02:10PM 4         THE COURT:  ALL RIGHT.  PLEASE BE SEATED.  THANK

02:10PM 5    YOU.

02:10PM 6    THE RECORD SHOULD REFLECT OUR JURY HAS LEFT FOR THE DAY.

02:10PM 7    MS. CHEUNG, OUR WITNESS, HAS LEFT THE COURTROOM.

02:10PM 8    COUNSEL, I THINK THE PROSECUTION -- YOU HAVE A COPY OF

02:10PM 9    THIS, OF THE BRIEF?

02:10PM 10        MR. BOSTIC:  WE DO, YOUR HONOR.

02:10PM 11        THE COURT:  YOU CAN LOOK THAT OVER TONIGHT.  IF YOU

02:10PM 12   HAVE ANYTHING YOU WANT TO PREPARE IN WRITING AND YOU FINISH IT

02:10PM 13   THIS EVENING, I APPRECIATE YOU SENDING IT OVER SO I CAN LOOK AT

02:10PM 14   IT BEFORE TOMORROW MORNING, AND THEN WE'LL HAVE A FULLER

02:10PM 15   DISCUSSION ABOUT THIS TOMORROW.

02:10PM 16   MR. WADE?

02:10PM 17        MR. WADE:  YOUR HONOR, IN LIGHT OF SOME OF THE

02:10PM 18   ISSUES THAT CAME UP, IF THERE'S ANYTHING THAT -- ANY CASE LAW

02:10PM 19   THAT WE THINK WOULD SHED ANY FURTHER LIGHT ON THIS, WE'LL FILE

02:11PM 20   IT AS WELL.  THIS WAS NOT A SUBMISSION THAT WAS SPECIFIC TO

02:11PM 21   THESE EMAILS.  IT WAS JUST A BENCH MEMO THAT WE HAD ON BUSINESS

02:11PM 22   RECORDS.

02:11PM 23   IF IN LIGHT OF SOME OF THE ISSUES THAT THE GOVERNMENT HAS

02:11PM 24   RAISED THERE ARE PARTICULAR ITEMS THAT COME UP, WE'LL FILE THEM

02:11PM 25   WITH THE COURT AND GIVE THEM TO THE GOVERNMENT AS QUICKLY AS WE

02:11PM 1   CAN.

02:11PM 2            THE COURT:  YOU'RE SAYING IN RESPONSE TO WHAT THEY

02:11PM 3   FILE?

02:11PM 4            MR. WADE:  THEY RAISED, FOR EXAMPLE, THE AGENCY

02:11PM 5   ISSUE WHICH IS SUGGESTING THAT A WHOLE SLEW OF DOCUMENTS CAN

02:11PM 6   COME IN.  IF WE THINK THERE'S SOME CASE LAW ON POINT, WE MAY

02:11PM 7   SUBMIT A ONE PAGER OR A VERY SHORT SUBMISSION JUST IN THE

02:11PM 8   SPIRIT OF GIVING EVERYONE NOTICE AS QUICKLY AS POSSIBLE.

02:11PM 9            THE COURT:  WELL, LET'S -- I DON'T KNOW WHAT THE --

02:11PM 10  WE'VE TALKED ABOUT A BUSINESS RECORD EXCEPTION, WE'VE TALKED

02:11PM 11  ABOUT VICARIOUS ADMISSIONS, WE'VE TALKED ABOUT, I THINK, AN

02:11PM 12  AGENCY TYPE OF THEORY FOR ADMISSION UNDER 801(D)(2) AND PERHAPS

02:11PM 13  (E) AND PERHAPS (D), PERHAPS (C), IF YOU WANT TO LOOK AT THOSE.

02:12PM 14  I THINK THIS IS WHAT WE TALKED ABOUT IN OUR DISCUSSION.  THERE

02:12PM 15  MIGHT BE ALTERNATIVE WAYS THAT THIS COULD BE AT LEAST ARGUABLY

02:12PM 16  ADMITTED.  SO IF THERE'S GOING TO BE DISCUSSION ABOUT THAT, I'M

02:12PM 17  HAPPY TO RECEIVE YOUR COMMENTS.

02:12PM 18           MR. WADE:  AND I'M NOT SUGGESTING -- WE WOULDN'T

02:12PM 19  FILE A MOTION THAT WOULD REQUIRE A RULING OR ANYTHING TO THAT

02:12PM 20  EFFECT.  IT'S JUST THAT IF WE NOTE SOME AUTHORITY, WE'LL BRING

02:12PM 21  IT TO EVERYONE'S ATTENTION SO THEY HAVE AS MUCH NOTICE AS

02:12PM 22  POSSIBLE.

02:12PM 23           THE COURT:  OKAY.  ANYTHING FURTHER?

02:12PM 24           MR. BOSTIC:  NOT ON THIS ISSUE.

02:12PM 25           THE COURT:  ANYTHING FROM YOUR SIDE?

02:12PM  1          MR. WADE:  NO, YOUR HONOR.

02:12PM  2          THE COURT:  ALL RIGHT.  HAVE A GOOD EVENING.

02:12PM  3     THANKS.

02:12PM  4          (COURT ADJOURNED AT 2:12 P.M.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                          CERTIFICATE OF REPORTERS

4

5

6

7           WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11          THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16          _____
            IRENE RODRIGUEZ, CSR, CRR
17          CERTIFICATE NUMBER 8076

18

19          _____
            LEE-ANNE SHORTRIDGE, CSR, CRR
20          CERTIFICATE NUMBER 9595

21          DATED:  SEPTEMBER 14, 2021

22

23

24

25