# EXHIBIT E

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR-18-00258-EJD |
| | ) | |
| PLAINTIFF, | ) | SAN JOSE, CALIFORNIA |
| | ) | |
| VS. | ) | VOLUME 31 |
| | ) | |
| ELIZABETH A. HOLMES, | ) | NOVEMBER 10, 2021 |
| | ) | |
| DEFENDANT. | ) | PAGES 5873 - 6145 |
| _____ | ) | |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                       BY:  JOHN C. BOSTIC
                            JEFFREY B. SCHENK
                       150 ALMADEN BOULEVARD, SUITE 900
                       SAN JOSE, CALIFORNIA 95113

                       BY:  ROBERT S. LEACH
                            KELLY VOLKAR
                       1301 CLAY STREET, SUITE 340S
                       OAKLAND, CALIFORNIA 94612

     (APPEARANCES CONTINUED ON THE NEXT PAGE.)


OFFICIAL COURT REPORTERS:
                       IRENE L. RODRIGUEZ, CSR, RMR, CRR
                       CERTIFICATE NUMBER 8074
                       LEE-ANNE SHORTRIDGE, CSR, CRR
                       CERTIFICATE NUMBER 9595

     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
        TRANSCRIPT PRODUCED WITH COMPUTER

A P P E A R A N C E S: (CONT'D)


FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                         BY:  KEVIN M. DOWNEY
                              LANCE A. WADE
                              KATHERINE TREFZ
                              PATRICK LOOBY
                              SEEMA ROPER
                              RICHARD CLEARY
                              J.R. FLEURMONT
                         725 TWELFTH STREET, N.W.
                         WASHINGTON, D.C. 20005

                         LAW OFFICE OF JOHN D. CLINE
                         BY:  JOHN D. CLINE
                         ONE EMBARCADERO CENTER, SUITE 500
                         SAN FRANCISCO, CALIFORNIA 94111


ALSO PRESENT:            FEDERAL BUREAU OF INVESTIGATION
                         BY:  ADELAIDA HERNANDEZ

                         OFFICE OF THE U.S. ATTORNEY
                         BY:  LAKISHA HOLLIMAN, PARALEGAL
                              MADDI WACHS, PARALEGAL

                         WILLIAMS & CONNOLLY
                         BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL

                         TBC
                         BY:  BRIAN BENNETT, TECHNICIAN

1

INDEX OF PROCEEDINGS

2

GOVERNMENT'S:

3

4    **KINGSHUK DAS**
CROSS-EXAM BY MR. WADE (RES.)        P. 5891
5    REDIRECT EXAM BY MR. LEACH            P. 6017
     RECROSS-EXAM BY MR. WADE              P. 6030
6
7    **ALAN EISENMAN**
DIRECT EXAM BY MR. BOSTIC             P. 6037
     CROSS-EXAM BY MR. DOWNEY              P. 6101
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                           INDEX OF EXHIBITS

2
                                        IDENT.      EVIDENCE
3        GOVERNMENT'S:

4        663                                        6058
         713                                        6073
5        1334                                       6081
         1371, PAGES 1 - 8                          6083
6        2223                                       6089
         2216                                       6095
7        2468                                       6096

8

9        DEFENDANT'S:

10       10290                                      5893
         10563                                      5899
11       10634                                      5902
         14159                                      5904
12       10665                                      5906
         10666                                      5912
13       10678                                      5938
         14162                                      5946
14       10674                                      5973
         10651                                      5976
15       10641                                      5979
         7746 AND 7747                              5982
16       10628                                      5991
         13333, REDACTED                            5995
17       10668, REDACTED                            5998, 6002
         10639                                      6004
18       10675                                      6006
         10638                                      6011
19       10626                                      6109

20

21

22

23

24

25
```

```
 1    SAN JOSE, CALIFORNIA                    NOVEMBER 10, 2021

 2                       P R O C E E D I N G S

 3          (COURT CONVENED AT 8:32 A.M.)

 4          (JURY OUT AT 8:32 A.M.)

 5              THE COURT:  WE'RE ON THE RECORD IN THE HOLMES

 6    MATTER.  ALL COUNSEL ARE PRESENT AND MS. HOLMES IS PRESENT.

 7          I UNDERSTAND THAT COUNSEL WANTED TO SPEAK ABOUT SOMETHING?

 8              MR. SCHENK:  YES.  GOOD MORNING.  THANK YOU,

 9    YOUR HONOR.

10          THERE ARE TWO ISSUES THAT WE WANTED TO BRING TO THE

11    COURT'S ATTENTION.  THE FIRST ONE I THINK WE WOULD BENEFIT FROM

12    SOME GUIDANCE FROM THE COURT ON.  THE ISSUE IS RELATED TO LIS.

13          THIS ISSUE HAS BEEN RAISED TO THE COURT PREVIOUSLY.  IT

14    WAS AROUND THE TIME OF THE CROSS-EXAMINATION OF DR. ROSENDORFF.

15    THE DEFENSE ASKED QUESTIONS ABOUT WHETHER THERANOS HAD AN LIS

16    AND THE CAPABILITIES OF LIS.

17          AT THAT TIME WE RAISED TO THE COURT THE QUESTION OF

18    WHETHER THE DOOR HAD BEEN OPENED TO THE GOVERNMENT PRESENTING

19    THE TRUE STORY ABOUT WHY LIS IS NOT AVAILABLE, AND WE RAISED

20    THAT AT THE TIME FOR THE COURT TO CONSIDER AND SUGGESTED THAT

21    WE MIGHT BE RAISING IT LATER IN THE TRIAL DEPENDING ON HOW

22    QUESTIONS PROCEED.

23          YESTERDAY DURING THE CROSS-EXAMINATION OF DR. SAWYER, THE

24    DEFENSE WENT THROUGH ABOUT SEVEN OR EIGHT PAGES OF THE LIS SOP

25    AND ASKED QUESTIONS, AGAIN, ABOUT THE CAPABILITIES OF LIS, ITS
```

08:33AM 1    FUNCTIONALITY, OF A WITNESS WHO HASN'T USED IT.

08:33AM 2        WE NOW WONDER, FROM THE COURT, WHETHER THE DOOR HAS BEEN

08:33AM 3    OPENED TO THE GOVERNMENT CALLING WITNESSES TO ADDRESS THE

08:33AM 4    REASON WHY LIS IS NOT AVAILABLE.

08:33AM 5        I CAN EVEN REFINE THE ISSUE A LITTLE BIT MORE FOR THE

08:33AM 6    COURT.  WHAT WE'RE INTERESTED IN IS KNOWING WHETHER THE DEFENSE

08:33AM 7    IS GOING TO BE PERMITTED IN ARGUMENT TO SUGGEST THAT THERE IS

08:33AM 8    MISSING EVIDENCE, THAT THE EVIDENCE IS LACKING AND, THEREFORE,

08:33AM 9    INSUFFICIENT TO SUPPORT CONVICTIONS ON COUNTS FOR WHICH LIS IS

08:34AM 10   RELEVANT.

08:34AM 11       I DISTINGUISH THAT FROM ARGUMENTS THAT THERANOS RAN A GOOD

08:34AM 12   LAB BECAUSE IT HAD LIS, BECAUSE LABS ARE SUPPOSED TO HAVE LIS.

08:34AM 13   THAT'S WHAT THE TESTIMONY FROM DR. SAWYER WAS.  THERANOS HAD

08:34AM 14   LIS AND THEREFORE, THERANOS WAS A GOOD LAB.

08:34AM 15       THAT'S LEGITIMATE, AND I DON'T THINK I NEED TO CALL

08:34AM 16   WITNESSES TO ADDRESS THIS SORT OF MISSING EVIDENCE POINT IF

08:34AM 17   THAT'S THE DIRECTION THAT THEY'RE GOING.

08:34AM 18       BUT IF THE DEFENSE IS GOING TO ARGUE THAT THE EVIDENCE IS

08:34AM 19   INSUFFICIENT TO CONVICT ON THE PATIENT COUNTS OR ON THE

08:34AM 20   CONSPIRACY COUNT THAT IS RELATED TO THAT, OUR VIEW IS THAT THE

08:34AM 21   DOOR HAS BEEN OPENED IF THAT'S THE WAY THAT THE EVIDENCE IS

08:34AM 22   GOING TO BE ARGUED, AND WE SHOULD BE ALLOWED TO EXPLAIN WHY

08:34AM 23   THERE ISN'T MISSING EVIDENCE, AND I THINK WE WOULD BENEFIT FROM

08:34AM 24   SOME CLARITY ON THAT ISSUE AS WE PLAN OUT THE REMAINING

08:34AM 25   WITNESSES IN THE CASE.

|         |    |                                                            |
|---------|----|------------------------------------------------------------|
| 08:34AM | 1  | THE COURT:  THANK YOU.                                      |
| 08:34AM | 2  | MR. SCHENK:  THERE'S ONE OTHER ISSUE, BUT I'LL             |
| 08:34AM | 3  | PAUSE.                                                      |
| 08:34AM | 4  | THE COURT:  OKAY.  THANK YOU, MR. SCHENK.                  |
| 08:34AM | 5  | MR. WADE.                                                   |
| 08:34AM | 6  | MR. WADE:  GOOD MORNING.                                    |
| 08:35AM | 7  | MR. SCHENK RAISES A FAIR ISSUE.  WE OBVIOUSLY HEARD THE    |
| 08:35AM | 8  | COMMENTS THAT WERE MADE BY COUNSEL FOR THE GOVERNMENT AT THE|
| 08:35AM | 9  | TIME OF DR. ROSENDORFF'S EXAMINATION.  WE UNDERSTAND THE POINT|
| 08:35AM | 10 | HE'S MAKING NOW.  WE WOULD LIKE TO THINK ABOUT IT, LOOK AT THE|
| 08:35AM | 11 | TRANSCRIPTS, AND GIVE A MORE INFORMED VIEW.                |
| 08:35AM | 12 | I DON'T THINK THE ISSUE IS WHETHER OR NOT THE LIS IS       |
| 08:35AM | 13 | MISSING.  THE LIS IS MISSING.                              |
| 08:35AM | 14 | I THINK THE LITIGATION RELATING TO THAT IS, WHO IS         |
| 08:35AM | 15 | RESPONSIBLE FOR THAT?                                       |
| 08:35AM | 16 | AND IF WE WERE TO COME IN AND BLAME THE GOVERNMENT FOR NOT |
| 08:35AM | 17 | OBTAINING THAT EVIDENCE OR FAULTING THEM FOR FAILING TO PRESENT|
| 08:35AM | 18 | ALL OF THAT EVIDENCE OR OBTAINING THAT, WHATEVER THE CASE MAY|
| 08:35AM | 19 | BE, WE'LL HAVE TO LOOK BACK AT THE COURT'S ORDER, THAT MAY OPEN|
| 08:35AM | 20 | THE DOOR TO, WELL, WHO IS ACTUALLY RESPONSIBLE FOR THE LIS NOT|
| 08:35AM | 21 | BEING HERE?                                                 |
| 08:35AM | 22 | THE LIS IS -- NUMEROUS WITNESSES HAVE SAID, AND I EXPECT   |
| 08:35AM | 23 | TO A DEGREE DR. DAS MAY SAY THIS TODAY, IT'S PART OF THE CORE|
| 08:36AM | 24 | FUNCTION OF THE LAB, IT'S HOW IT TRACKS ITS DATA, IT'S HOW IT|
| 08:36AM | 25 | TRACKS ITS PATIENTS, AND THEY LOOK AT THIS INFORMATION, AND I|

08:36AM 1    THINK ALL OF THAT QUESTIONING IS FAIR AND APPROPRIATE IN THE

08:36AM 2    CASE AND IT'S KIND OF AT THE HEART OF THE LAB ISSUES.

08:36AM 3        I DON'T THINK IT OPENS THE DOOR TO SOME MINI TRIAL ABOUT

08:36AM 4    WHO AT THERANOS WAS RESPONSIBLE FOR, YOU KNOW, NOT PRESERVING

08:36AM 5    LIS AT THE TIME THE COMPANY WAS WRAPPING UP OPERATIONS BECAUSE,

08:36AM 6    AS THE COURT KNOWS, THE GOVERNMENT HAS PRESENTED NO EVIDENCE

08:36AM 7    THAT MS. HOLMES WAS, YOU KNOW, INVOLVED IN THOSE DECISIONS OR

08:36AM 8    RESPONSIBLE FOR THOSE DECISIONS.

08:36AM 9        THE COURT:  I THINK THAT'S WHAT MR. SCHENK IS

08:36AM 10   ACTUALLY SAYING.  HE'S SAYING WE HAVE IT AND WE DON'T THINK

08:36AM 11   IT'S APPROPRIATE.

08:36AM 12       BUT WHAT I HEAR MR. SCHENK SAYING IS, I'M ASKING DIRECTION

08:36AM 13   FROM THE COURT.  IS IT APPROPRIATE NOW BECAUSE HAS THE DOOR

08:36AM 14   BEEN OPENED?  IS THE KNOB TURNED AND IS THE DOOR OPENED?

08:36AM 15       AND I DON'T THINK MR. SCHENK PARTS COMPANY WITH YOU

08:37AM 16   TALKING ABOUT OBVIOUSLY LABS HAVE TO HAVE THE LIS.  THAT'S PART

08:37AM 17   OF AN INTEGRAL COMPONENT TO THE LEGITIMACY OF THE LAB.

08:37AM 18       SHIFTING THE ISSUE IS -- AND WE HAD LITIGATION ON THIS

08:37AM 19   PRETRIAL, AND I THINK YOU'RE RIGHT TO FOCUS ON IT -- IF THERE'S

08:37AM 20   GOING TO BE -- IF PART OF THIS TRIAL BECOMES RESPONSIBILITY FOR

08:37AM 21   THE LOSS OF THE LIS, AND IF PART OF THE TRIAL BECOMES THAT'S

08:37AM 22   EVIDENCE THAT IS IMPORTANT TO ONE SIDE OR THE OTHER, AND THEN

08:37AM 23   CONNECTED TO THAT IS, IF THERE'S GOING TO BE AN ARGUMENT ABOUT

08:37AM 24   IT DOESN'T EXIST, AND IT DOESN'T EXIST BECAUSE THE GOVERNMENT

08:37AM 25   LOST IT, THEN WE'LL HAVE SOME LITIGATION ON THAT PROBABLY IN

08:37AM 1     FRONT OF THE JURY.

08:37AM 2           MR. WADE:  YEAH, IT WOULD SEEM THAT'S THE CASE,

08:37AM 3     YOUR HONOR.

08:37AM 4        AS THE COURT KNOWS, WE, WE -- WE'RE NOT AFRAID OF THAT

08:37AM 5     LITIGATION IN THE SENSE THAT, YOU KNOW, WE DON'T THINK IT

08:37AM 6     INVOLVES MS. HOLMES.

08:37AM 7           THE COURT:  RIGHT.

08:37AM 8           MR. WADE:  AND IT'S JUST A QUESTION OF WHETHER IT

08:38AM 9     WAS THE GOVERNMENT'S RESPONSIBILITY AND THEIR FAILURES, OR

08:38AM 10    WHETHER -- AND SOME OF THE MEMBERS OF THE TEAM PRESENT MAY BE

08:38AM 11    WITNESSES WITH RESPECT TO THAT.

08:38AM 12       BUT I DO THINK IT'S A SIGNIFICANT ISSUE WITH RESPECT TO

08:38AM 13    SORT OF THE PROCEEDING WITHIN THE TRIAL IN THE SENSE THAT THAT

08:38AM 14    COULD ELONGATE THE TRIAL BY, YOU KNOW, A WEEK OR TWO TO

08:38AM 15    LITIGATE THOSE ISSUES.

08:38AM 16       SO I THINK IT'S SOMETHING THAT WE SHOULD, WE SHOULD GIVE

08:38AM 17    SOME THOUGHT TO IN LIGHT OF THE FACT THAT MR. SCHENK IS RAISING

08:38AM 18    IT AS TO HOW WE MIGHT WANT TO ARGUE THE ISSUE, AND THEN GIVE

08:38AM 19    THE GOVERNMENT NOTICE AS TO WHAT WE MIGHT DO.

08:38AM 20       AND IF THEY -- IF THERE'S A -- ANY AMBIGUITY AS TO WHETHER

08:38AM 21    WE'RE OPENING THE DOOR, WE CAN PRESENT IT TO THE COURT.

08:38AM 22       AND IF THE GOVERNMENT -- IF --

08:38AM 23           THE COURT:  I THINK THAT'S WHAT MR. SCHENK IS DOING

08:38AM 24    NOW.

08:38AM 25           MR. WADE:  YEAH.  YEAH.  ALL I'M SAYING IS THAT I'M

08:38AM  1    NOT PREPARED TO TELL THE COURT WHAT WE'RE PREPARED TO ARGUE IN

08:38AM  2    CLOSING ON THIS ISSUE GIVEN THIS ISSUE WAS RAISED THIS MORNING.

08:38AM  3         THE COURT:  WELL -- I'M SORRY, I KEEP CUTTING YOU

08:38AM  4    OFF.  I APOLOGIZE, MR. WADE.

08:38AM  5         BUT BEFORE WE LOSE THIS WITNESS, IT MAY BECOME NECESSARY

08:39AM  6    TO EXAMINE THIS WITNESS AS TO SOME OF THESE TOPICS.  I DON'T

08:39AM  7    KNOW.  AND I THINK THAT'S -- THAT'S WHY I'M TAKING THAT IT'S

08:39AM  8    BEING RAISED NOW.

08:39AM  9         IF IT'S APPROPRIATE TO GET INFORMATION ABOUT THE LIS FROM

08:39AM  10   THIS WITNESS, WE DO IT WHILE HE'S HERE, AS OPPOSED TO BRINGING

08:39AM  11   HIM BACK I SUPPOSE, THAT COULD BE IT.

08:39AM  12        BUT, YOU KNOW, I APPRECIATE YOUR OBSERVATION OF NOT

08:39AM  13   WANTING TO ELONGATE THE TRIAL.  I THINK THAT'S WHAT I HEARD YOU

08:39AM  14   SAY.

08:39AM  15        MR. WADE:  YEAH.

08:39AM  16        THE COURT:  THE TRIAL HAS BEEN GOING PRETTY LONG.  I

08:39AM  17   DON'T KNOW IF THE GOVERNMENT IS CLOSE TO THE END OF THEIR CASE.

08:39AM  18   IT SOUNDS LIKE -- I'M PARAPHRASING MR. BOSTIC, THEY'RE PROBABLY

08:39AM  19   CLOSER TO THE END THAN THE BEGINNING I WOULD THINK, AND WE CAN

08:39AM  20   WRAP UP VERY SOON I THINK.

08:39AM  21        BUT -- AND I HAVE TO SAY, MY EARS OPENED UP A LITTLE MORE

08:39AM  22   YESTERDAY WHEN I HEARD LIS BEING MENTIONED FOR THIS VERY

08:40AM  23   REASON, BECAUSE IT IS A CONTROVERSIAL TOPIC.  WE HAD LITIGATION

08:40AM  24   ON IT PRETRIAL, AND THE ISSUE ABOUT RESPONSIBILITY FOR THAT AND

08:40AM  25   WHETHER OR NOT THAT RESPONSIBILITY GOES BACK TO YOUR CLIENT OR

08:40AM 1     NOT IS STILL PERHAPS AN OPEN ISSUE.  I DON'T KNOW.

08:40AM 2         BUT I APPRECIATE YOUR CONCERN ABOUT WANTING TO INFECT THAT

08:40AM 3     ISSUE IN THE TRIAL.

08:40AM 4         MR. SCHENK IS TELLING ME THAT IT'S COMING CLOSE, JUDGE,

08:40AM 5     AND WE JUST WANT TO KNOW.  I UNDERSTAND YOU NEEDED TO CONSULT

08:40AM 6     WITH YOUR TEAM ABOUT THAT.

08:40AM 7         BUT I DON'T KNOW WHAT TRIAL STRATEGY IS ON BOTH SIDES, BUT

08:40AM 8     I DON'T WANT THE TRIAL TO GO INTO JANUARY.  I DON'T THINK WE

08:40AM 9     NEED TO, BUT THAT DEPENDS ON WHAT YOU'RE GOING TO DO WHEN THE

08:40AM 10    GOVERNMENT RESTS, OF COURSE.

08:40AM 11            MR. WADE:  UNDERSTOOD, YOUR HONOR.

08:40AM 12        WE, TOO, HAVE HEARD WE'RE CLOSER TO THE END THAN THE

08:40AM 13    BEGINNING.  I THINK FOR SOME OF US THAT PROBABLY DESCRIBES OUR

08:40AM 14    STATE OF LIFE GENERALLY.

08:40AM 15        BUT, YOU KNOW, WE DON'T KNOW EXACTLY WHEN IT IS THAT THE

08:41AM 16    GOVERNMENT INTENDS TO REST.

08:41AM 17        BUT WITH RESPECT TO THIS ISSUE AND THIS WITNESS, TO MY

08:41AM 18    KNOWLEDGE THIS WITNESS DOESN'T HAVE ANY INFORMATION ABOUT THE,

08:41AM 19    YOU KNOW, THE MOTH BALLING OF THE LIS SERVERS OR ANYTHING TO

08:41AM 20    THAT EFFECT.

08:41AM 21        SO I'M NOT SURE THAT WHO IS RESPONSIBLE FOR THE

08:41AM 22    DESTRUCTION OF LIS IS SOMETHING THAT IS RIPE FOR THIS WITNESS.

08:41AM 23        I WILL JUST BE CANDID WITH THE COURT AND COUNSEL.  I

08:41AM 24    BELIEVE THAT ON DIRECT EXAMINATION DR. DAS TALKED ABOUT KIND OF

08:41AM 25    THREE PILLARS THAT HE LOOKED AT IN MAKING SOME OF THE JUDGMENTS

08:41AM 1    THAT HE MADE IN CONNECTION WITH HIS WORK, AND I BELIEVE SOME OF

08:41AM 2    THAT RELATED TO DATA THAT HE OBTAINED FROM THE LIS SYSTEM, AND

08:41AM 3    I INTEND TO ASK HIM ABOUT THE PROCESS THAT HE WENT THROUGH.

08:41AM 4        BUT I DON'T INTEND TO ASK HIM QUESTIONS RELATING TO, AND

08:41AM 5    THE GOVERNMENT FAILED TO PRESENT YOU WITH ANY OF THIS EVIDENCE,

08:42AM 6    OR ANYTHING THAT I THINK IS IN THE SPIRIT OF THE ORDER THAT THE

08:42AM 7    COURT ISSUED ON THAT.

08:42AM 8        I JUST -- AND I'M NOT SURE THAT WE'LL BE IN A PLACE WHERE

08:42AM 9    WE WOULD OPEN THE DOOR ON ARGUMENT, BUT I DON'T WANT TO MAKE

08:42AM 10   THAT DECISION ON THE FLY.  I WANT TO CONSULT WITH MY TEAM, AND

08:42AM 11   WE CAN COME BACK TO THAT BEFORE WE RESUME TRIAL IF THE

08:42AM 12   GOVERNMENT WOULD LIKE.

08:42AM 13           THE COURT:  MR. SCHENK, ANYTHING FURTHER?

08:42AM 14           MR. SCHENK:  COULD, BY 7:00 P.M. TOMORROW, THE

08:42AM 15   DEFENSE LET US KNOW WHETHER THEY INTEND TO ARGUE THAT THE

08:42AM 16   FAILURE OF LIS EVIDENCE TO BE PRESENTED IN THE CASE BY THE

08:42AM 17   GOVERNMENT IS A BASIS TO FIND MS. HOLMES NOT GUILTY?  THAT

08:42AM 18   MS. HOLMES SHOULD NOT BE FOUND GUILTY BECAUSE THE EVIDENCE IS

08:42AM 19   INSUFFICIENT?  THAT'S WHAT THE HEART OF MY CONCERN IS.

08:42AM 20       TO ARGUE THAT THERANOS HAD LIS, JUST LIKE THEY HAD A

08:42AM 21   GENERAL SUPERVISOR IN THE LAB AND A TECHNICAL SUPERVISOR,

08:43AM 22   THAT'S FINE.  I THINK THAT'S APPROPRIATE ARGUMENT.  IT'S

08:43AM 23   APPROPRIATE FOR THEM TO SAY, THERANOS WAS A LEGITIMATE LAB AND

08:43AM 24   LET ME GIVE YOU THE REASONS WHY, ONE OF THOSE IS THAT YOU HEARD

08:43AM 25   THAT THEY HAD AN LIS.

08:43AM 1      THE COURT HAS HEARD AND COUNSEL HAS HEARD ME SAY, I DON'T

08:43AM 2  OBJECT TO THAT.

08:43AM 3      WHAT DOES PROVIDE SOME CONCERN TO ME IS THE KINDS OF

08:43AM 4  QUESTIONS THAT THEY HAVE ASKED ON CROSS MIGHT BE USED IN

08:43AM 5  ARGUMENT TO SUGGEST THAT YOU HEARD THAT THERANOS HAD AN LIS,

08:43AM 6  YOU HEARD WHAT ITS CAPABILITIES WERE AND THE KIND OF DATA THAT

08:43AM 7  IT STORED, AND THAT EVIDENCE WASN'T PRESENTED TO YOU AND THE

08:43AM 8  GOVERNMENT IS ASKING YOU TO CONVICT MS. HOLMES OF OFFENSES

08:43AM 9  RELATED TO THE PATIENT COUNTS.  YOU CAN'T DO THAT WITHOUT

08:43AM 10  KNOWING WHAT WAS IN LIS.  THAT'S WHERE THE REAL EVIDENCE IS.

08:43AM 11      THAT WOULD NOT BE APPROPRIATE TO ARGUE WITHOUT A FINDING

08:43AM 12  BY THE COURT THAT THE DOOR HAS BEEN OPENED SO THE GOVERNMENT'S

08:43AM 13  CASE-IN-CHIEF CAN ARGUE ABOUT WHERE LIS IS AND WHY IT IS NOT IN

08:43AM 14  FRONT OF THE COURT.

08:43AM 15      THAT'S THE HEART OF MY CONCERN.

08:43AM 16      AND AS THE COURT NOTED, AS WE PLAN OUT OUR REMAINING

08:44AM 17  WITNESSES IN THE CASE, IT WOULD BE VERY HELPFUL TO KNOW IF THE

08:44AM 18  DOOR HAS BEEN OPENED AND WE CAN PRESENT THE LIS DESTRUCTION

08:44AM 19  EVIDENCE, OR WHETHER THE DEFENSE JUST INTENDS TO ARGUE LIS WAS

08:44AM 20  ONE OF MANY THINGS THAT SHOWED THERANOS HAD A GOOD LAB OR WAS

08:44AM 21  TRYING TO HAVE A GOOD LAB.

08:44AM 22      THAT'S SORT OF THE FORK IN THE ROAD AS I SEE IT, AND IT

08:44AM 23  WOULD BE HELPFUL TO KNOW TOMORROW EVENING AS WE PRESENT OUR

08:44AM 24  NEXT ROUND OF NAMES TO THE DEFENSE ON A THURSDAY 7:00 P.M.

08:44AM 25  DEADLINE OF WHO WOULD TESTIFY.

08:44AM 1          MR. WADE:  THE COURT'S INDULGENCE FOR ONE SECOND?

08:44AM 2          THE COURT:  NO, NO.  SURE.  OF COURSE.

08:44AM 3       (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

08:45AM 4          MR. WADE:  TWO ISSUES, YOUR HONOR.

08:45AM 5       FIRST OF ALL, WITH RESPECT TO MR. SCHENK'S REQUEST, WE CAN

08:45AM 6   DO SLIGHTLY BETTER, WHICH IS WE CAN INFORM THE GOVERNMENT BY

08:45AM 7   4:00 P.M. TOMORROW WHETHER WE CAN RULE OUT THE POSSIBILITY THAT

08:45AM 8   WE CAN OFFER THAT DEFENSE.

08:45AM 9       I WON'T BE IN A POSITION TO TELL THE GOVERNMENT WE ARE OR

08:45AM 10  ARE NOT GOING TO OFFER IT UNTIL MUCH LATER, AS THE COURT KNOWS.

08:45AM 11      BUT WE CAN ADVISE THE GOVERNMENT AS TO WHETHER WE'LL RULE

08:45AM 12  THAT OUT.  WE SUGGEST 4:00 P.M. BECAUSE THE GOVERNMENT GIVES US

08:45AM 13  NOTICES OF WITNESSES AT 7:00 P.M., AND SO WE'LL GIVE THEM A FEW

08:45AM 14  HOURS TO CONSIDER OUR POSITION ON THAT.

08:45AM 15      I DO WANT TO MAKE ONE POINT CLEAR, THOUGH, WHICH IS WE'RE

08:46AM 16  MOVING THE GOALPOST A LITTLE BIT HERE, WHICH IS WE HAVE NOT YET

08:46AM 17  OPENED THE DOOR ON THIS ISSUE AND THE GOVERNMENT IS NOW ASKING

08:46AM 18  FOR A DIFFERENT INQUIRY.

08:46AM 19      SO I DON'T THINK WE'VE OPENED THE DOOR TO MAKING THIS

08:46AM 20  ARGUMENT AND PRESENTING THIS EVIDENCE.

08:46AM 21      IF WE GO INTO THESE ISSUES IN OUR CASE AND THE GOVERNMENT

08:46AM 22  WANTS TO PRESENT THESE ISSUES IN REBUTTAL, YOU KNOW, THAT'S A

08:46AM 23  DIFFERENT STORY.

08:46AM 24      BUT I THINK THROUGH THE QUESTIONING WE HAVEN'T ELICITED

08:46AM 25  THE TYPES OF QUESTIONS THAT, UNDER THE COURT'S ORDER ON THIS

08:46AM 1    ISSUE, WOULD OPEN THE DOOR.

08:46AM 2         SO I THINK THAT'S WHAT WAS CONTEMPLATED.  I DON'T THINK IT

08:46AM 3    WAS CONTEMPLATED THAT IN THE MIDDLE OF THE GOVERNMENT'S CASE

08:46AM 4    THAT WE WERE TO BE TOLD, WE WERE TO BE ASKED TO CONFINE AND

08:46AM 5    DEFINE ALL OF THE -- OUR DEFENSES AND WHAT WE INTEND TO PRESENT

08:46AM 6    IN OUR CASE AND WHAT WE INTEND TO ARGUE TO THE JURY, BECAUSE I

08:46AM 7    DON'T THINK, YOU KNOW, THAT'S OBVIOUSLY CONSTITUTIONALLY

08:46AM 8    APPROPRIATE TO EVER REQUIRE DEFENSE COUNSEL TO DO THAT.

08:47AM 9         THAT BEING SAID, WE'LL BE IN A POSITION TO PROVIDE THAT,

08:47AM 10   THE NOTICE REQUESTED BY THE GOVERNMENT.

08:47AM 11             THE COURT:  THANK YOU.

08:47AM 12        AND THERE IS SOME TENSION HERE, TENSION IN THAT THE

08:47AM 13   DEFENSE SHOULD NOT HAVE BURDEN SHIFTING, OR THE DEFENSE SHOULD

08:47AM 14   NOT HAVE TO REVEAL ANY OF THEIR DEFENSES IN THE PROSECUTION

08:47AM 15   CASE, OF COURSE.

08:47AM 16        THE TENSION, HOWEVER, JUXTAPOSED WITH THAT IS, OF COURSE,

08:47AM 17   THE PRETRIAL ISSUE AND THIS ISSUE DOES LINGER IN THIS CASE

08:47AM 18   ABOUT THE LIS AND WHETHER OR NOT RESPONSIBILITY ABOUT -- AS TO

08:47AM 19   ITS DESTRUCTION IS GOING TO BE AN ISSUE IN THE CASE.

08:47AM 20        AND WE'VE TALKED LONG AND HARD ABOUT DOORS AND OPENING

08:47AM 21   THEM, AND I THINK THAT'S RIPE FOR DISCUSSION HERE AND I THINK

08:47AM 22   IT'S APPROPRIATE FOR MR. SCHENK TO RAISE IT JUST AS A CONCERN

08:47AM 23   OF HIS TEAM, AND ALSO IT PERHAPS HAS PROPHYLACTIC ASSISTANCE TO

08:47AM 24   YOU AND YOUR TEAM AS TO GETTING CLOSE AND THERE'S SOME NOTICE

08:47AM 25   HERE AND THIS COULD BE ANOTHER ISSUE.

5888

08:47AM 1    SO I THINK IT'S APPROPRIATE FOR THE DISCUSSION.

08:47AM 2    I DO THINK THAT THE TENSION HERE IS -- AND I DON'T SEE THE

08:47AM 3    GOVERNMENT ASKING YOU TO REVEAL YOUR DEFENSE.  THAT'S NOT -- I

08:48AM 4    DON'T TAKE IT THAT WAY, AND IF YOU FEEL THAT WAY, WE SHOULD

08:48AM 5    TALK ABOUT THAT.

08:48AM 6    BUT WHAT I HEAR THE DEFENSE SAYING IS THAT THIS IS AN

08:48AM 7    ISSUE, AND IF IT'S GOING TO BE SOMETHING THAT THE DEFENSE IS

08:48AM 8    PLANNING ON ARGUING BECAUSE THEY HAVE THESE WITNESSES, THEY'RE

08:48AM 9    ASKING THE QUESTION, THEY'RE IN CONTROL OF THAT NOW, AND THEN

08:48AM 10   WE WOULD LIKE -- "WE" THE GOVERNMENT -- WOULD LIKE TO KNOW THAT

08:48AM 11   BECAUSE WE'LL CALL WITNESSES IN OUR CASE-IN-CHIEF

08:48AM 12   APPROPRIATELY.

08:48AM 13   IF YOU FEEL, IF YOU FEEL THAT IT'S GOING INTO YOUR

08:48AM 14   CLIENT'S CONSTITUTIONAL RIGHT TO PUT ON A DEFENSE AND KEEP THAT

08:48AM 15   QUIET UNTIL ITS YOUR TURN, YOU SHOULD TELL ME THAT, TOO, AND

08:48AM 16   WE'LL TALK ABOUT THAT.

08:48AM 17   BUT I THINK THIS IS A LITTLE MORE STRATEGIC THAN THAT, AND

08:48AM 18   NOT IN A PEJORATIVE WAY.

08:48AM 19   MR. WADE:  NO, NO.  FAIR POINT, YOUR HONOR.

08:48AM 20   AGAIN, WE WELCOME THE DIALOGUE.  IT WAS RAISED THIS

08:48AM 21   MORNING.  WE'LL GIVE IT SOME THOUGHT AND WE'LL CONSIDER IT.

08:48AM 22   OF COURSE IT'S PART OF THE REASON WHY OUR SYSTEM ALLOWS

08:49AM 23   THE GOVERNMENT A REBUTTAL CASE, WHICH IS SOMETHING THAT THE

08:49AM 24   DEFENSE DOES NOT HAVE.

08:49AM 25   SO, YOU KNOW, TO THE EXTENT THAT THAT BECOMES AN ISSUE,

```
08:49AM   1    THEY DO HAVE THAT OPPORTUNITY IN REBUTTAL.

08:49AM   2        BUT WE UNDERSTAND THE COMMENTS OF THE COURT.  WE RESPECT

08:49AM   3    MR. SCHENK'S INQUIRY AND THE NOTICE, AND WE'LL BE IN A POSITION

08:49AM   4    TO ADVISE THEM THAT BY 4:00 O'CLOCK TOMORROW.

08:49AM   5             THE COURT:  OKAY.  GOOD.

08:49AM   6        MR. SCHENK?

08:49AM   7             MR. SCHENK:  NOTHING FURTHER ON THAT ISSUE.

08:49AM   8        THE OTHER VERY BRIEF ISSUE IS THAT THE FIRST WITNESS IN

08:49AM   9    TRIAL WAS DANISE YAM.  THE GOVERNMENT HAS ONE EMAIL THAT IT

08:49AM  10    WANTS TO ADMIT.  WE ASKED THE DEFENSE IF THEY WOULD STIPULATE

08:49AM  11    TO THE ADMISSION.  OBVIOUSLY IT'S THEIR PREROGATIVE TO GIVE US

08:49AM  12    A YES OR NO, THEY ARE NOT INTERESTED IN STIPULATING.

08:49AM  13        AND SO WE WILL BE RECALLING MS. YAM TO ADMIT THIS EMAIL,

08:49AM  14    AND I JUST WANTED TO GIVE THE COURT NOTICE OF IT.

08:49AM  15             THE COURT:  OKAY.

08:49AM  16        MS. TREFZ, GOOD MORNING.

08:49AM  17             MS. TREFZ:  THE DEFENSE IS FINE WITH MS. YAM BEING

08:50AM  18    RECALLED FOR THIS LIMITED PURPOSE.

08:50AM  19        IT'S TRUE THAT WE WOULD NOT STIPULATE TO THE ADMISSION OF

08:50AM  20    THIS EMAIL.

08:50AM  21             THE COURT:  OKAY.  THAT'S FINE.

08:50AM  22        DO YOU HAVE ANY IDEA WHEN THAT IS GOING TO BE?

08:50AM  23             MR. SCHENK:  NEXT WEEK.

08:50AM  24             THE COURT:  OKAY.  I SEE.  SO THAT SHOULD BE A

08:50AM  25    BRIEF -- THE BINDER WILL BE THIN ON THIS --
```

08:50AM 1          MS. TREFZ:  THERE'S NO GUARANTEE.

08:50AM 2          THE COURT:  FAIR ENOUGH.  THANK YOU.

08:50AM 3          MR. SCHENK:  THANK YOU.

08:50AM 4          THE COURT:  AND I'M JUST HAPPY TO TELL YOU THAT OUR

08:50AM 5    I.T. PEOPLE WORKED HERE, I THINK I GOT AN EMAIL PAST 7:30 THAT

08:50AM 6    THEY HAD WORKED OUT THE BUGS IN THE SYSTEM.

08:50AM 7          SO KNOCKING ON WOOD, I HOPE FOR A PRODUCTIVE DAY TODAY.

08:50AM 8          OKAY.  THANK YOU.

08:50AM 9          MR. WADE:  WE'RE VERY APPRECIATIVE.  THANK YOU,

08:50AM 10   YOUR HONOR.

08:50AM 11         THE COURT:  GREAT.

08:50AM 12         THE CLERK:  COURT IS IN RECESS.

08:50AM 13         (RECESS FROM 8:50 A.M. UNTIL 9:03 A.M.)

09:03AM 14         (JURY IN AT 9:03 A.M.)

09:03AM 15         THE COURT:  PLEASE BE SEATED.  THANK YOU.  GOOD

09:03AM 16   MORNING.

09:03AM 17         WE ARE BACK ON THE RECORD IN THE HOLMES MATTER.  ALL

09:03AM 18   COUNSEL ARE PRESENT, MS. HOLMES IS PRESENT.

09:03AM 19         OUR JURY IS PRESENT.

09:03AM 20         LET'S -- IS OUR WITNESS HERE, DR. DAS?  YES.

09:03AM 21         MR. WADE, YOU HAVE ADDITIONAL QUESTIONS I THINK?

09:03AM 22         MR. WADE:  I DO, YOUR HONOR.  BUT DO YOU WANT TO

09:03AM 23   MAKE YOUR MORNING INQUIRY?

09:03AM 24         THE COURT:  I DO, YES, I DO.

09:03AM 25         GOOD MORNING, DR. DAS.

09:03AM  1                  THE WITNESS:  GOOD MORNING.

09:04AM  2                  THE COURT:  GOOD MORNING, SIR.

09:04AM  3          I'LL ASK YOU TO STATE YOUR NAME AGAIN.  YOU CAN TAKE YOUR

09:04AM  4   MASK OFF IF YOU WOULD LIKE.

09:04AM  5                  THE WITNESS:  THANK YOU, YOUR HONOR.

09:04AM  6          KINGSHUK DAS.

09:04AM  7                  THE COURT:  THANK YOU.  I'LL REMIND YOU YOU'RE STILL

09:04AM  8   UNDER OATH, SIR.

09:04AM  9          **(GOVERNMENT'S WITNESS, KINGSHUK DAS, WAS PREVIOUSLY**

09:04AM 10   **SWORN.)**

09:04AM 11                  THE COURT:  AND MR. WADE, BEFORE YOU BEGIN, LADIES

09:04AM 12   AND GENTLEMEN, GOOD MORNING.  I JUST WANT TO ASK YOU THAT

09:04AM 13   QUESTION.  OVERNIGHT, SINCE YOU LEFT HERE, DID ANY OF YOU HAVE

09:04AM 14   OCCASION TO COME ACROSS, DISCUSS, READ, WATCH OR SEE ANYTHING

09:04AM 15   TO DO ABOUT THIS CASE IN ANY OTHER MANNER?

09:04AM 16          IF SO, PLEASE RAISE YOUR HAND.

09:04AM 17          I SEE NO HANDS.

09:04AM 18          THANK YOU VERY MUCH.

09:04AM 19          MR. WADE.

09:04AM 20                  MR. WADE:  THANK YOU, YOUR HONOR.

09:04AM 21                  **CROSS-EXAMINATION (RESUMED)**

09:04AM 22   BY MR. WADE:

09:04AM 23   Q.   GOOD MORNING, DR. DAS.

09:04AM 24   A.   GOOD MORNING.

09:04AM 25   Q.   I HAVE SOME QUESTIONS FOR YOU THIS MORNING.

09:04AM  1        I WOULD LIKE TO START WHERE YOU STARTED, WHICH WAS WHEN

09:04AM  2   YOU WERE JOINING THE COMPANY IN DECEMBER OF 2015.  I'D LIKE TO

09:05AM  3   ASK YOU SOME QUESTIONS ABOUT YOUR QUALIFICATIONS FOLLOWING UP

09:05AM  4   ON SOME OF THE QUESTIONS THAT THE GOVERNMENT ASKED.  OKAY?

09:05AM  5   A.   YES.

09:05AM  6   Q.   COULD I TURN YOUR ATTENTION --

09:05AM  7        ACTUALLY, YOUR HONOR, MAY I APPROACH?

09:05AM  8            THE COURT:  YES.

09:05AM  9   BY MR. WADE:

09:05AM 10   Q.   (HANDING.)

09:05AM 11   A.   THANK YOU.

09:05AM 12   Q.   DR. DAS, I'VE HANDED YOU A BINDER OF DOCUMENTS THAT I MAY

09:05AM 13   REFER TO DURING THE EXAMINATION.  YOU'LL NOTICE THAT THE

09:05AM 14   EXHIBITS ARE NUMBERED ON THE SIDE, AND SO I'LL CALL ATTENTION

09:05AM 15   TO THEM AS WE'RE ASKING QUESTIONS.  OKAY?

09:05AM 16   A.   YES.

09:05AM 17   Q.   THE FIRST EXHIBIT I'D LIKE TO DRAW YOUR ATTENTION TO IS

09:05AM 18   EXHIBIT 10290.

09:05AM 19   A.   YES.

09:05AM 20   Q.   AND DO YOU RECOGNIZE THIS TO BE YOUR RESUME AS OF 2015 AT

09:06AM 21   THE TIME THAT YOU WERE APPLYING FOR THE POSITION AT THERANOS?

09:06AM 22   A.   YES.

09:06AM 23   Q.   AND DO YOU UNDERSTAND ONE OF THE RESPONSIBILITIES UNDER

09:06AM 24   CLIA IS FOR A LABORATORY TO LOG INFORMATION RELATING TO THE

09:06AM 25   QUALIFICATIONS OF THEIR PERSONNEL?  YOU'RE AWARE OF THAT?

09:06AM  1    A.   YES.

09:06AM  2    Q.   AND TO DOCUMENT THAT?

09:06AM  3    A.   YES.

09:06AM  4    Q.   AND THAT'S FREQUENTLY DONE BY PUTTING A COPY OF THE RESUME

09:06AM  5    AND OTHER CERTIFICATIONS AND THE LIKE IN THE FILES; IS THAT

09:06AM  6    RIGHT?

09:06AM  7    A.   YES.

09:06AM  8         MR. WADE:  I MOVE THE ADMISSION OF 10290.

09:06AM  9         MR. LEACH:  NO OBJECTION, YOUR HONOR.

09:06AM  10        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:06AM  11        (DEFENDANT'S EXHIBIT 10290 WAS RECEIVED IN EVIDENCE.)

09:06AM  12   BY MR. WADE:

09:06AM  13   Q.   THE GOVERNMENT YESTERDAY ASKED YOU SOME QUESTIONS ABOUT

09:06AM  14   YOUR TRAINING AND BACKGROUND, AND I'D JUST LIKE TO ASK A FEW

09:06AM  15   MORE BASED ON THE RESUME.

09:06AM  16        LET ME START WITH THE QUESTION THE GOVERNMENT ASKED.  YOU

09:07AM  17   MENTIONED YOU WERE BOARD CERTIFIED.

09:07AM  18        DO YOU RECALL THAT?

09:07AM  19   A.   YES.

09:07AM  20   Q.   AND I THINK YOU SAID YOU WERE BOARD CERTIFIED IN CLINICAL

09:07AM  21   PATHOLOGY.

09:07AM  22   A.   YES.

09:07AM  23   Q.   AND WHAT DOES BOARD CERTIFICATION MEAN?

09:07AM  24   A.   IT MEANS YOU'VE MET THE REQUIREMENTS TO TAKE A CERTAIN

09:07AM  25   EXAMINATION, IN THIS CASE CLINICAL PATHOLOGY, SUPPLIED BY THE

09:07AM 1    AMERICAN BOARD OF PATHOLOGY.  SO YOU HAVE TO MEET THEIR

09:07AM 2    TRAINING REQUIREMENTS FOR THE EXAMINATION, AND THEN YOU HAVE TO

09:07AM 3    PASS THE EXAMINATION, AND THEREAFTER YOU HAVE CERTAIN

09:07AM 4    REQUIREMENTS EVERY TWO YEARS THAT YOU NEED TO MAKE IN ORDER TO

09:07AM 5    MAINTAIN YOUR CERTIFICATION.

09:07AM 6    Q.   ONGOING TRAINING REQUIREMENTS AND THE LIKE?

09:07AM 7    A.   YES.

09:07AM 8    Q.   AND SO IF YOU MEET THE REQUIREMENTS TO BE ABLE TO SIT FOR

09:07AM 9    THE EXAMINATION, AND THEN YOU PASS THE EXAMINATION, IS THAT --

09:07AM 10   IS IT FAIR TO SAY THAT THE CERTIFICATION IS MEANT TO SUGGEST A

09:07AM 11   PARTICULAR EXPERTISE IN AN AREA?

09:07AM 12   A.   YES.

09:07AM 13   Q.   OKAY.  AND YOUR PARTICULAR EXPERTISE WAS IN CLINICAL

09:07AM 14   PATHOLOGY?

09:07AM 15   A.   YES.

09:07AM 16   Q.   WHICH RELATES FUNDAMENTALLY TO THE OPERATION OF A CLINICAL

09:07AM 17   LABORATORY; CORRECT?

09:08AM 18   A.   YES.

09:08AM 19   Q.   OKAY.  AND YOU TESTIFIED -- IF I CAN DRAW YOUR ATTENTION

09:08AM 20   TO THE TOP UNDER EDUCATION, YOU TESTIFIED YESTERDAY AS TO

09:08AM 21   NUMEROUS RESIDENCIES AND FELLOWSHIPS THAT YOU DID IN YOUR

09:08AM 22   TRAINING; IS THAT CORRECT?

09:08AM 23   A.   YES.

09:08AM 24   Q.   AND YOU -- I BELIEVE MR. LEACH MENTIONED YOU SPENT TIME

09:08AM 25   BOTH AS A TROJAN AND A BRUIN.

09:08AM  1          DO YOU RECALL THAT?

09:08AM  2     A.   I DO.

09:08AM  3     Q.   AND IN ADDITION TO THAT, YOU HAD -- YOU DID SOME

09:08AM  4     FELLOWSHIPS WITH THE CLEVELAND CLINIC AS WELL?

09:08AM  5     A.   THAT WAS PRIOR TO RESIDENCY, YES.

09:08AM  6     Q.   THAT WAS PRIOR TO YOUR RESIDENCY.

09:08AM  7          AND THOSE FELLOWSHIPS FOCUSSED -- IN PARTICULAR, ONE OF

09:08AM  8     THEM FOCUSSED ON MOLECULAR PATHOLOGY; IS THAT RIGHT?

09:08AM  9     A.   YES.

09:08AM 10     Q.   AND YOU HAD A PARTICULAR AREA OF FOCUS WITH RESPECT TO

09:09AM 11     MOLECULAR PATHOLOGY; IS THAT CORRECT?

09:09AM 12     A.   YES.

09:09AM 13     Q.   AND A PARTICULAR AREA OF EXPERTISE -- THAT WAS A

09:09AM 14     PARTICULAR AREA OF EXPERTISE FOR YOU.

09:09AM 15          IS THAT FAIR?

09:09AM 16     A.   YES.

09:09AM 17     Q.   OKAY.  AND LET'S GO TO UNDER THE CURRENT PROFESSIONAL

09:09AM 18     EXPERIENCE.

09:09AM 19          YOU TALKED A LITTLE BIT, I THINK SOMEWHAT HUMBLY, ABOUT

09:09AM 20     THE FACT THAT YOU WERE A PROFESSOR AT UCLA AS WELL.

09:09AM 21          DO YOU RECALL THAT?

09:09AM 22     A.   YES.

09:09AM 23     Q.   IN FACT, YOU WERE A SUCCESSFUL PROFESSOR.  YOU HAD WON A

09:09AM 24     NUMBER OF AWARDS AND THE LIKE WHILE YOU WERE THERE; CORRECT?

09:09AM 25     A.   YES.

09:09AM 1    Q.   AND IN ADDITION TO THE WORK THAT YOU WERE DOING THERE AS

09:09AM 2    TEACHING, YOU WERE ALSO WORKING IN THE CLINICAL LABORATORIES AT

09:09AM 3    UCLA; RIGHT?

09:09AM 4    A.   YES.

09:09AM 5    Q.   AND IS IT FAIR TO SAY THAT UCLA IS A PREMIER INSTITUTION

09:09AM 6    ON THE WEST COAST?

09:09AM 7    A.   YES.

09:09AM 8    Q.   I -- IN ADDITION TO THAT WORK THAT YOU DID AT UCLA, YOU

09:10AM 9    ALSO SERVED AS A CLINICAL CONSULTANT FOR A NUMBER OF TECHNOLOGY

09:10AM 10   COMPANIES; IS THAT RIGHT?

09:10AM 11   A.   YES.

09:10AM 12   Q.   AND YOU ACTUALLY HAD A PARTICULAR FOCUS IN LABORATORY

09:10AM 13   MEDICINE AND HOW IT RELATED TO TECHNOLOGY; RIGHT?

09:10AM 14   A.   YES.

09:10AM 15   Q.   AND IF WE CAN GO AND JUST LOOK AT THE BOTTOM OF YOUR

09:10AM 16   RESUME, WHICH WE'RE DISPLAYING ON THE SCREEN, THIS IDENTIFIES A

09:10AM 17   NUMBER OF DIFFERENT ENTITIES FOR WHOM YOU WERE SERVING IN AN

09:10AM 18   ADVISORY CAPACITY WITH RESPECT TO CERTAIN NOVEL TECHNOLOGIES;

09:10AM 19   IS THAT RIGHT?

09:10AM 20   A.   TO SOME EXTENT, YES.

09:10AM 21   Q.   AND IF WE JUST CONTINUE UP, IT CAN BE INCLUSIVE OF THE

09:10AM 22   OTHER EXPERIENCES THAT YOU HAD THERE, AND JUST PUT THEM UP

09:11AM 23   TOGETHER, THERE ARE ACTUALLY A NUMBER OF DIFFERENT TECHNOLOGY

09:11AM 24   COMPANIES THAT YOU WERE PROVIDING CONSULTING WORK FOR WITH

09:11AM 25   RESPECT TO LABORATORY MEDICINE AND TECHNOLOGY ISSUES; CORRECT?

09:11AM  1      A.   YES.

09:11AM  2      Q.   OKAY.  AND IS IT FAIR TO SAY THIS BECAME AN AREA OF GREAT

09:11AM  3      INTEREST FOR YOU?

09:11AM  4      A.   I BELIEVE SO, YES.

09:11AM  5      Q.   AND WAS, WAS THE INTERSECTION OF LABORATORY MEDICINE AND

09:11AM  6      TECHNOLOGY ULTIMATELY ONE OF THE REASONS THAT YOU BECAME

09:11AM  7      ATTRACTED TO WORKING AT THERANOS?

09:11AM  8      A.   YES.

09:11AM  9      Q.   OKAY.  THE -- AND I WON'T GO THROUGH THEM LINE BY LINE,

09:11AM  10     BUT IN ADDITION TO ALL OF THIS OTHER WORK THAT YOU DO, YOU SEEM

09:11AM  11     TO FIND TIME TO WRITE A NUMBER OF RESEARCH PAPERS THAT WERE

09:11AM  12     PEER REVIEWED; IS THAT RIGHT?

09:11AM  13     A.   YES.

09:11AM  14     Q.   AND WRITING PEER REVIEWED RESEARCH PAPERS IN ACADEMIC

09:11AM  15     WORLDS IS SOMETHING THAT CONNOTES A LEVEL OF PRESTIGE.

09:11AM  16          IS THAT FAIR TO SAY?

09:11AM  17     A.   YES.

09:12AM  18     Q.   AND I BELIEVE AS OF THIS DATE YOU HAD PUBLISHED, WAS IT

09:12AM  19     MAYBE APPROXIMATELY 15 RESEARCH PAPERS THAT WERE PEER REVIEWED?

09:12AM  20     A.   YES.

09:12AM  21     Q.   AND WOULD YOU, AT THE TIME YOU WERE APPLYING TO THERANOS,

09:12AM  22     CONSIDERED YOURSELF TO BE A PRETTY THOROUGH SCIENTIST?

09:12AM  23     A.   IF YOU COULD PLEASE CLARIFY.

09:12AM  24     Q.   SURE.  WHEN YOU RESEARCHED ISSUES AND CAME TO CONCLUSIONS,

09:12AM  25     DID YOU LIKE TO DO THOROUGH AND COMPREHENSIVE RESEARCH BEFORE

09:12AM  1    YOU CAME TO A CONCLUSION?

09:12AM  2    A.   YES.

09:12AM  3    Q.   AND WERE YOU INCLINED TO DIG IN DEEPLY ON WHATEVER ISSUE

09:12AM  4    YOU WERE CONSIDERING AND UNDERSTAND THE RELEVANT FACTS BEFORE

09:12AM  5    YOU REACHED CONCLUSIONS?

09:12AM  6    A.   YES.

09:12AM  7    Q.   AND WAS THAT THE GENERAL APPROACH WITH RESPECT TO SCIENCE

09:12AM  8    THAT YOU BROUGHT TO THERANOS?

09:12AM  9    A.   YES.

09:12AM  10   Q.   OKAY.  AND IF WE CAN GO -- DO YOU RECALL YESTERDAY WE

09:13AM  11   TALKED ABOUT HOW DR. HELFEND HAD COME ON BEFORE YOU JOINED THE

09:13AM  12   COMPANY TO SERVE ON AN INTERIM BASIS AS THE LAB DIRECTOR.

09:13AM  13        DO YOU RECALL THAT?

09:13AM  14   A.   YES.

09:13AM  15   Q.   AND COULD WE TAKE A LOOK AT 10563 --

09:13AM  16   A.   SURE.

09:13AM  17   Q.   -- WHICH I DON'T BELIEVE IS IN YOUR BINDER?

09:13AM  18   A.   I DON'T SEE IT HERE.

09:13AM  19   Q.   BUT I WILL PASS THAT ONE UP, DOCTOR.

09:13AM  20        MAY I APPROACH, YOUR HONOR?

09:13AM  21            THE COURT:  YES.

09:13AM  22   BY MR. WADE:

09:13AM  23   Q.   (HANDING.)

09:13AM  24   A.   THANK YOU.

09:13AM  25   Q.   AND DO YOU RECOGNIZE 10563 AS A CALIFORNIA DEPARTMENT OF

09:14AM  1    PUBLIC HEALTH FORM THAT PROVIDES NOTIFICATION OF A LAB CHANGE?

09:14AM  2    A.   YES.

09:14AM  3    Q.   AND YOU KNOW, BASED UPON YOUR WORK IN LABORATORIES, THAT

09:14AM  4    THIS IS THE TYPE OF PAPERWORK THAT IS FILED WITH LABORATORY

09:14AM  5    AUTHORITIES AT THE TIME THAT, FOR EXAMPLE, A LAB DIRECTOR IS

09:14AM  6    ADDED TO WORK AT A COMPANY; IS THAT RIGHT?

09:14AM  7    A.   YES.

09:14AM  8    Q.   AND THIS PARTICULAR, THIS PARTICULAR NOTIFICATION OF

09:14AM  9    LABORATORY CHANGE RELATES TO THE ADDITION OF DR. HELFEND AS A

09:14AM  10   LAB DIRECTOR; CORRECT?

09:14AM  11   A.   YES.

09:14AM  12          MR. WADE:  MOVE THE ADMISSION OF 10563.

09:14AM  13          MR. LEACH:  NO OBJECTION.

09:14AM  14          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:14AM  15       (DEFENDANT'S EXHIBIT 10563 WAS RECEIVED IN EVIDENCE.)

09:14AM  16   BY MR. WADE:

09:14AM  17   Q.   AND I'LL JUST DRAW YOUR ATTENTION TO THE BOTTOM HALF OF

09:15AM  18   THE PAGE.  THIS NOTES THAT DR. HELFEND -- WHO I GUESS IS AN

09:15AM  19   M.D. AND A PH.D.; RIGHT?

09:15AM  20   A.   YES.

09:15AM  21   Q.   AND SHE WAS BEING ADDED AS THE CO-DIRECTOR OF THE LAB.

09:15AM  22        DO YOU SEE THAT?

09:15AM  23   A.   YES.

09:15AM  24   Q.   BUT NOT AS THE CLIA DIRECTOR AT THIS TIME.  SHE WAS JUST

09:15AM  25   ADDED AS A SECONDARY LAB DIRECTOR TO WORK ALONGSIDE THE CLIA

09:15AM   1    LAB DIRECTOR.

09:15AM   2        DO YOU RECALL THAT?

09:15AM   3    A.   YES.

09:15AM   4    Q.   AND AROUND THIS TIME IN MID-DECEMBER, YOU STARTED ON A

09:15AM   5    PART-TIME BASIS AND YOU WERE ADDED AS THE CLIA LAB DIRECTOR FOR

09:15AM   6    THERANOS; CORRECT?

09:15AM   7    A.   YES.

09:15AM   8    Q.   AND ALTHOUGH YOU CAN ONLY SERVED ON A PART-TIME BASIS

09:15AM   9    INITIALLY, AS YOU WRAPPED UP YOUR WORK AT UCLA, YOU KNEW THAT

09:15AM  10    DR. HELFEND AND A TEAM OF OTHER PEOPLE WERE INVOLVED IN DIGGING

09:16AM  11    INTO ISSUES AT THERANOS; CORRECT?

09:16AM  12    A.   YES.

09:16AM  13    Q.   AND THAT GAVE YOU COMFORT THAT EVERYTHING WAS BEING

09:16AM  14    ADDRESSED ADEQUATELY; CORRECT?

09:16AM  15    A.   YES.

09:16AM  16    Q.   AND I THINK YOU TESTIFIED A LITTLE BIT YESTERDAY ABOUT THE

09:16AM  17    FACT THAT YOU WERE INTERVIEWED FOR YOUR POSITION AT THERANOS BY

09:16AM  18    MS. HOLMES.

09:16AM  19        DO YOU RECALL THAT?

09:16AM  20    A.   YES.

09:16AM  21    Q.   AND THAT WAS 2015, EARLY DECEMBER?

09:16AM  22    A.   YES.

09:16AM  23    Q.   AND LET'S TAKE A LOOK AT 10634, WHICH SHOULD BE IN YOUR

09:16AM  24    BINDER.

09:16AM  25    A.   OKAY.

09:16AM  1    Q.  AND DO YOU RECOGNIZE THIS TO BE CORRESPONDENCE WITH

09:16AM  2    MS. HOLMES FOLLOWING UP ON THE INTERVIEW THAT YOU HAD WITH HER

09:17AM  3    IN EARLY DECEMBER?

09:17AM  4    A.  YES.

09:17AM  5              MR. WADE:  MOVE THE ADMISSION OF 10634.

09:17AM  6              MR. LEACH:  YOUR HONOR, NO OBJECTION TO THE BOTTOM

09:17AM  7    PORTION OF 10634.  THE RESPONSE IS HEARSAY.

09:17AM  8         (PAUSE IN PROCEEDINGS.)

09:17AM  9              THE COURT:  MR. WADE?

09:17AM  10             MR. WADE:  I THINK THE RESPONSE IS RELEVANT TO THIS

09:17AM  11   WITNESS'S UNDERSTANDING OF THE ENGAGEMENT AND CONDITIONS UNDER

09:17AM  12   WHICH HE WAS JOINING THE COMPANY.  HE REPORTED DIRECTLY TO

09:17AM  13   MS. HOLMES, AND THIS WAS AN INTERACTION THAT RELATED TO THAT.

09:18AM  14        I'M NOT OFFERING THAT TOP PART FOR THE TRUTH OF THE MATTER

09:18AM  15   ASSERTED WITHIN THE DOCUMENT.

09:18AM  16             THE COURT:  WHAT IS THE RELEVANCE?

09:18AM  17             MR. WADE:  I'M SORRY?

09:18AM  18             THE COURT:  WHAT IS THE RELEVANCE?

09:18AM  19             MR. WADE:  THE RELEVANCE IS THE CIRCUMSTANCES UNDER

09:18AM  20   WHICH HE WAS BEING ASKED TO JOIN THE COMPANY WITH THE SUPPORT

09:18AM  21   OF --

09:18AM  22             THE COURT:  ALL RIGHT.  I'LL ADMIT THIS, 10634.

09:18AM  23        THE TOP HALF, LADIES AND GENTLEMEN, YOU'LL SEE DISPLAYED

09:18AM  24   IN JUST A MOMENT.  IT'S THE RESPONSE SENT SUNDAY, JANUARY 3RD,

09:18AM  25   2016 AT 5:18 P.M., THAT IS NOT OFFERED FOR THE TRUTH OF THE

DAS CROSS BY MR. WADE (RES.)                                    5902

|       |    |                                                      |
|-------|----|------------------------------------------------------|
| 09:18AM | 1 | MATTER ASSERTED.  IT'S NOT OFFERED FOR THE TRUTH OF THE |
| 09:18AM | 2 | STATEMENTS ASSERTED THERE, BUT ONLY TO SHOW CONTEXT TO THE |
| 09:18AM | 3 | ORIGINAL EMAIL. |
| 09:18AM | 4 | ALL RIGHT.  IT'S ADMITTED WITH THOSE RESTRICTIONS.  IT CAN |
| 09:19AM | 5 | BE DISPLAYED. |
| 09:19AM | 6 | MR. WADE:  THANK YOU, YOUR HONOR. |
| 09:19AM | 7 | (DEFENDANT'S EXHIBIT 10634 WAS RECEIVED IN EVIDENCE.) |
| 09:19AM | 8 | MR. WADE:  IF WE CAN FOCUS ON THE FIRST PARAGRAPH IN |
| 09:19AM | 9 | THE BOTTOM EMAIL. |
| 09:19AM | 10 | Q.   AND DO YOU SEE THIS WAS SENT DECEMBER 7TH, 2015? |
| 09:19AM | 11 | AND YOU THANKED HER FOR THE OPPORTUNITY TO MEET WITH HER |
| 09:19AM | 12 | OVER THE WEEKEND. |
| 09:19AM | 13 | DO YOU SEE THAT? |
| 09:19AM | 14 | A.   YES. |
| 09:19AM | 15 | Q.   AND THAT WAS, IN PART, FOR LOGISTICAL REASONS THAT YOU ALL |
| 09:19AM | 16 | HAD TO HAVE YOUR INTERVIEW OVER THE WEEKEND; CORRECT? |
| 09:19AM | 17 | A.   YES. |
| 09:19AM | 18 | Q.   AND DID YOU GO UP TO PALO ALTO FOR THAT MEETING? |
| 09:19AM | 19 | A.   I DID. |
| 09:19AM | 20 | Q.   OKAY.  AND YOU NOTE IN THAT LINE THAT "I WAS SO IMPRESSED |
| 09:19AM | 21 | BY THE VISION OF WHAT YOU'VE ACCOMPLISHED ALREADY, AND YOUR |
| 09:19AM | 22 | PLANS FOR THE FUTURE." |
| 09:19AM | 23 | DO YOU SEE THAT? |
| 09:19AM | 24 | A.   YES. |
| 09:19AM | 25 | Q.   AND CAN YOU TELL US A LITTLE BIT WHAT YOU MEANT BY THAT? |

09:19AM  1    A.   THAT WAS BASED ON A DISCUSSION THAT WE HAD DURING THE

09:19AM  2    INTERVIEW.

09:19AM  3    Q.   AND WHAT ASPECTS -- IN THAT INTERVIEW, SHE WAS

09:19AM  4    COMMUNICATING TO YOU WHAT SHE WANTED TO DO WITH THE COMPANY; IS

09:20AM  5    THAT RIGHT?

09:20AM  6    A.   YES.  I DON'T RECALL THE SPECIFICS, BUT YES.

09:20AM  7    Q.   YOU DON'T RECALL THE SPECIFICS?

09:20AM  8    A.   NO.

09:20AM  9    Q.   AND DO YOU RECALL ANYTHING ABOUT THAT DISCUSSION?

09:20AM  10   A.   YES.

09:20AM  11   Q.   AND WHAT DO YOU RECALL?

09:20AM  12   A.   I REMEMBER IT BEING A VERY POSITIVE MEETING.  I REMEMBER

09:20AM  13   IT BEING VERY CHARISMATIC.  IT WAS A VERY POSITIVE MEETING.

09:20AM  14   Q.   AND AS A RESULT OF THIS, YOU WERE, YOU WERE EXCITED ABOUT

09:20AM  15   THE POSSIBILITY OF GOING AND JOINING THIS ENDEAVOR; IS THAT

09:20AM  16   RIGHT?

09:20AM  17   A.   YES.

09:20AM  18   Q.   AND IF YOU LOOK DOWN A COUPLE OF PARAGRAPHS TO THE FIRST

09:20AM  19   SENTENCE IN THE LAST PARAGRAPH, YOU ACTUALLY PRETTY QUICKLY

09:20AM  20   ACCEPTED THE POSITION AT THERANOS; CORRECT?

09:20AM  21   A.   YES.

09:20AM  22   Q.   AND YOU AGREED DURING THIS PERIOD TO START ON THE

09:20AM  23   PART-TIME BASIS ALMOST RIGHT AWAY WHILE YOU WERE WRAPPING UP

09:21AM  24   YOUR WORK AT UCLA; CORRECT?

09:21AM  25   A.   YES.

09:21AM  1    Q.   YOU WANTED TO BE RESPONSIBLE TO YOUR FORMER LAB AT UCLA

09:21AM  2    AND MAKE SURE EVERYTHING WAS COMPLETED THERE; CORRECT?

09:21AM  3    A.   YES.

09:21AM  4    Q.   OKAY.  AND IF WE CAN GO NEXT -- AND YOU TALKED A LITTLE

09:21AM  5    BIT ABOUT THAT CONTRACTING WORK DURING THAT TRANSITION PERIOD

09:21AM  6    AND HOW YOU SPENT -- YOU TRIED TO SPEND AT LEAST ONE DAY A WEEK

09:21AM  7    UP, UP AT THE FACILITY.

09:21AM  8         IS THAT RIGHT?

09:21AM  9    A.   YES.

09:21AM  10   Q.   AND YOU WERE OTHERWISE CONSULTING WITH THE COMPANY ON KIND

09:21AM  11   OF AN AS-NEEDED BASIS?

09:21AM  12   A.   YES.

09:21AM  13   Q.   OKAY.  LET'S JUST TAKE A QUICK LOOK AT 14159.

09:21AM  14   A.   OKAY.

09:21AM  15   Q.   AND DO YOU RECOGNIZE THIS TO BE AN INVOICE THAT SETS FORTH

09:22AM  16   THE CONSULTING SERVICES THAT YOU PROVIDED IN THAT PERIOD BEFORE

09:22AM  17   YOU BECAME THE FULL-TIME LAB DIRECTOR AT THERANOS?

09:22AM  18   A.   YES.

09:22AM  19             MR. WADE:  I MOVE THE ADMISSION OF 14159.

09:22AM  20             MR. LEACH:  NO OBJECTION, YOUR HONOR.

09:22AM  21             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:22AM  22        (DEFENDANT'S EXHIBIT 14159 WAS RECEIVED IN EVIDENCE.)

09:22AM  23   BY MR. WADE:

09:22AM  24   Q.   AND I WON'T SPEND MUCH TIME ON THIS, BUT THIS JUST SETS

09:22AM  25   FORTH IN THAT TIME PERIOD EACH AND EVERY WEEK YOU TRIED TO GET

09:22AM  1    UP TO THE COMPANY TO DO ON-SITE CONSULTATION WORK FOR A FULL

09:22AM  2    DAY?

09:22AM  3    A.   YES.

09:22AM  4    Q.   AND YOU WOULD FLY UP FROM L.A. AND SPEND THE DAY AND THEN

09:22AM  5    GO BACK?

09:22AM  6    A.   YES.

09:22AM  7    Q.   AND THEN THERE'S ALSO ON THE BOTTOM, YOU SEE THERE ARE A

09:22AM  8    NUMBER OF REFERENCES TO PART-TIME REMOTE CONSULTATION.

09:22AM  9         DO YOU SEE THAT?

09:22AM  10   A.   YES.

09:22AM  11   Q.   AND THAT WAS -- THAT WORK WAS IN ADDITION TO THE WORK THAT

09:23AM  12   YOU WERE DOING WHERE YOU WOULD GO UP ONE DAY A WEEK; RIGHT?

09:23AM  13   A.   YES.

09:23AM  14   Q.   SO THERE WOULD BE TIMES WHERE YOU WOULD BE PULLED IN TO

09:23AM  15   ASK QUESTIONS OR CONSULT OR PROVIDE GUIDANCE WHILE YOU WERE

09:23AM  16   WORKING REMOTELY; IS THAT RIGHT?

09:23AM  17   A.   YES.

09:23AM  18   Q.   OKAY.  AND DO YOU RECALL THAT IN THIS TIME PERIOD, THE

09:23AM  19   GOVERNMENT -- OR THE COMPANY WAS ALSO IN THE PROCESS OF

09:23AM  20   CREATING A SCIENTIFIC ADVISORY BOARD?

09:23AM  21   A.   I DON'T RECALL THAT.

09:23AM  22   Q.   OKAY.  LET ME SEE IF I CAN REFRESH YOUR RECOLLECTION.

09:23AM  23        LET'S LOOK AT 10665.

09:24AM  24   A.   APOLOGIES, MR. WADE.  JUST A MOMENT.

09:24AM  25   Q.   NO APOLOGIES, DOCTOR.  TAKE WHATEVER TIME YOU NEED.

DAS CROSS BY MR. WADE (RES.)

09:24AM  1    A.   COULD YOU REPEAT THAT NUMBER, PLEASE.

09:24AM  2    Q.   SURE.  IT'S 10665.

09:24AM  3    A.   10665.

09:24AM  4         OKAY.  THERE WE GO.

09:24AM  5    Q.   FEEL FREE TO TAKE THE TIME YOU NEED.  AND I'M JUST GOING

09:24AM  6    TO ASK A FEW QUESTIONS ABOUT THE DOCUMENT, BUT IF YOU JUST WANT

09:24AM  7    TO TAKE A FEW SECONDS AND FAMILIARIZE YOURSELF YOUR WITH THE

09:24AM  8    CONTENT GENERALLY.

09:25AM  9         (PAUSE IN PROCEEDINGS.)

09:25AM  10        THE WITNESS:  YES.  OKAY.

09:25AM  11   BY MR. WADE:

09:25AM  12   Q.   OKAY.  DOES THIS REFRESH YOUR RECOLLECTION THAT IN THIS

09:25AM  13   TIME PERIOD, THE COMPANY WAS CREATING A SCIENTIFIC REVIEW

09:25AM  14   COMMITTEE TO HELP ADVISE THE COMPANY?

09:25AM  15   A.   YES.

09:25AM  16   Q.   AND DO YOU RECALL THAT YOUR INPUT ON MEMBERSHIP RELATING

09:25AM  17   TO THAT COMMITTEE WAS SOLICITED?

09:25AM  18   A.   YES.

09:25AM  19        MR. WADE:  I WOULD MOVE THE ADMISSION OF 10665.

09:25AM  20        MR. LEACH:  NO OBJECTION, YOUR HONOR.

09:25AM  21        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:25AM  22   (DEFENDANT'S EXHIBIT 10665 WAS RECEIVED IN EVIDENCE.)

09:26AM  23        MR. WADE:  IF WE CAN GO TO THE SECOND PAGE AND BLOW

09:26AM  24   UP THAT TOP -- YEAH, THE MIDDLE DOWN THROUGH NUMBER 1.

09:26AM  25        THANK YOU, MR. BENNETT.

DAS CROSS BY MR. WADE (RES.)

09:26AM 1     Q.   AND THIS WAS AN EMAIL FROM DANIEL EDLIN.

09:26AM 2          DO YOU SEE THAT?

09:26AM 3     A.   YES.

09:26AM 4     Q.   AND THAT WAS SOMEONE WHO WORKED WITH MS. HOLMES?

09:26AM 5     A.   YES.

09:26AM 6     Q.   AND YOU SEE HERE THAT THERE WERE SOME NAMES BEING PROPOSED

09:26AM 7     FOR -- TO JOIN THIS SCIENCE REVIEW COMMITTEE.

09:26AM 8          DO YOU SEE THAT?

09:26AM 9     A.   YES.

09:26AM 10    Q.   AND IT SAYS HERE THAT BILL FOEGE HAD SUGGESTED THE

09:26AM 11    FOLLOWING THREE PEOPLE TO BE ADDED?

09:26AM 12    A.   YES.

09:26AM 13    Q.   AND DO YOU KNOW WHO BILL FOEGE IS?

09:26AM 14    A.   YES.

09:26AM 15    Q.   AND WHO IS HE?

09:26AM 16    A.   I DON'T REMEMBER HIS TITLE, BUT WE HAD MET AT ONE OF THE

09:26AM 17    ADVISORY BOARDS.

09:26AM 18    Q.   OKAY.  AND YOU RECALL THAT HE WAS THE FORMER HEAD OF THE

09:26AM 19    CDC PREVIOUSLY?

09:27AM 20    A.   I DO BELIEVE THAT.

09:27AM 21    Q.   AND HE WAS VIEWED AS A HIGHLY REPUTABLE PROFESSIONAL IN

09:27AM 22    THAT SPACE; IS THAT FAIR?

09:27AM 23    A.   YES.

09:27AM 24    Q.   INFECTIOUS DISEASE AND OTHER AREAS?

09:27AM 25    A.   YES.

09:27AM 1    Q.   AND HE WAS WORKING WITH THE COMPANY DURING THIS PERIOD?

09:27AM 2    A.   THAT'S WHAT I RECALL.

09:27AM 3    Q.   AND HE WAS RECOMMENDING SOME NAMES.  BUT YOUR FEEDBACK --

09:27AM 4    THE FEEDBACK FROM YOU WAS SOLICITED TO MAKE SURE THAT YOU WERE

09:27AM 5    COMFORTABLE WITH THE NAMES; CORRECT?

09:27AM 6    A.   YES.

09:27AM 7    Q.   OKAY.  AND DID YOU RECOGNIZE THE PEOPLE WHO ARE IDENTIFIED

09:27AM 8    IN THIS LIST?  LET'S START WITH MR. -- I GUESS IT'S

09:27AM 9    DR. TRISTRAM PARSLOW?

09:27AM 10   A.   NO.

09:27AM 11   Q.   YOU DIDN'T RECOGNIZE DR. PARSLOW?

09:27AM 12   A.   NO.

09:27AM 13   Q.   OKAY.  LET'S GO TO THE NEXT PAGE.

09:28AM 14        THIS IS DR. AHMED?  DID YOU RECOGNIZE DR. AHMED?

09:28AM 15   A.   NO.

09:28AM 16   Q.   AND LET'S GO TO THE NEXT PAGE.

09:28AM 17        DR. KESSLER?  DO YOU RECALL THAT?  DO YOU RECALL

09:28AM 18   DR. KESSLER?

09:28AM 19   A.   NO.

09:28AM 20   Q.   OKAY.  SO YOU WEREN'T PERSONALLY FAMILIAR WITH THE NAMES

09:28AM 21   WHO WERE RECOMMENDED BY DR. FOEGE?

09:28AM 22   A.   THAT'S CORRECT.

09:28AM 23   Q.   BUT DO YOU RECOGNIZE THEM, BASED UPON THEIR

09:28AM 24   QUALIFICATIONS, TO BE HIGHLY QUALIFIED PEOPLE IN THEIR FIELDS?

09:28AM 25   A.   YES.

09:28AM 1    Q.   OKAY.  YOU DID HOWEVER RECOMMEND SOME NAMES OF YOUR OWN;

09:28AM 2    CORRECT?

09:28AM 3    A.   YES.

09:28AM 4    Q.   OKAY.  LET'S GO UP THE EMAIL CHAIN.  I'M SORRY.  IF WE CAN

09:28AM 5    GET THE EMAIL DOWN BELOW.  IN FACT, I DON'T NEED TO DISPLAY THE

09:28AM 6    EMAIL.

09:28AM 7         BUT DO YOU RECALL TELLING MS. HOLMES THAT YOU WERE A

09:28AM 8    LITTLE DELAYED IN GETTING TO THE EMAIL, BUT IF YOUR THOUGHTS

09:28AM 9    WERE STILL NEEDED, YOU WOULD HAVE SOME ADDITIONS THAT COULD BE

09:29AM 10   PROVIDED?

09:29AM 11   A.   YES.

09:29AM 12   Q.   AND MS. HOLMES SAYS PLEASE DO, ADD ANY THOUGHTS THAT YOU

09:29AM 13   HAVE.

09:29AM 14        DO YOU SEE THAT?

09:29AM 15   A.   YES.

09:29AM 16   Q.   AND THEN YOU, YOU PROPOSED A NUMBER OF PEOPLE WHO COULD BE

09:29AM 17   ADDED TO THIS SCIENTIFIC ADVISORY BOARD; RIGHT?

09:29AM 18   A.   YES.

09:29AM 19   Q.   AND THESE WERE PEOPLE WHO YOU KNEW AND WERE FAMILIAR WITH

09:29AM 20   BASED UPON YOUR WORK; RIGHT?

09:29AM 21   A.   YES, BASED UPON MY TRAINING.

09:29AM 22   Q.   AND SOME OF THESE PEOPLE YOU HAD ACTUALLY TRAINED UNDER;

09:29AM 23   CORRECT?

09:29AM 24   A.   YES.

09:29AM 25   Q.   AND YOU THOUGHT THEM TO BE HIGHLY QUALIFIED AND THOUGHTFUL

09:29AM   1      PEOPLE; IS THAT FAIR?

09:29AM   2      A.   YES.

09:29AM   3      Q.   OKAY.  AND IN PARTICULAR, DR., IS IT, GRONOWSKI?

09:29AM   4      A.   GRONOWSKI.

09:29AM   5      Q.   OKAY.  GRONOWSKI.  IS SHE SOMEONE YOU TRAINED UNDER?

09:29AM   6      A.   YES.

09:29AM   7      Q.   AND YOU RECOMMEND THAT SHE -- SHE WAS A FORMER AACC

09:29AM   8      PRESIDENT.

09:29AM   9           DO YOU SEE THAT?

09:29AM   10     A.   YES.

09:29AM   11     Q.   AND THE AACC, THAT'S A -- SORT OF A TRADE GROUP OF

09:29AM   12     CLINICAL CHEMISTS; IS THAT RIGHT?

09:29AM   13     A.   YES.

09:29AM   14     Q.   AND YOU RECOMMENDED THAT SHE BE CONSIDERED; IS THAT RIGHT?

09:30AM   15     A.   YES.

09:30AM   16     Q.   AND SHE ACTUALLY JOINED THE SCIENTIFIC REVIEW COMMITTEE,

09:30AM   17     DID SHE NOT?

09:30AM   18     A.   YES.

09:30AM   19     Q.   AND YOU UNDERSTOOD AT THE TIME THAT THIS WAS PART OF THOSE

09:30AM   20     REFORM EFFORTS THAT THE COMPANY WAS INVOLVED IN TO TRY TO GET

09:30AM   21     MORE DIALOGUE AND INPUT FROM THE SCIENTIFIC COMMUNITY?

09:30AM   22     A.   YES.

09:30AM   23     Q.   I NEXT WANT TO ASK YOU BRIEFLY ABOUT YOUR TRANSITION UP

09:30AM   24     AND THE WORK THAT YOU HAD BEEN DOING IN BETWEEN.

09:30AM   25           THIS MUST HAVE BEEN SOMEWHAT DIFFICULT.  YOUR FAMILY WAS

| | | |
|---|---|---|
| 09:30AM | 1 | STILL IN LOS ANGELES; RIGHT? |
| 09:30AM | 2 | A.  YES. |
| 09:30AM | 3 | Q.  AND YOU WERE WEARING MULTIPLE HATS AND TRYING TO MEET ALL |
| 09:30AM | 4 | OF YOUR RESPONSIBILITIES; RIGHT? |
| 09:30AM | 5 | A.  YES. |
| 09:30AM | 6 | Q.  AND SO IT WAS PROBABLY A PRETTY TAXING TIME FOR YOU; IS |
| 09:31AM | 7 | THAT FAIR? |
| 09:31AM | 8 | A.  YES. |
| 09:31AM | 9 | Q.  OKAY.  BUT THERE WAS A TEAM OF PEOPLE THAT WERE WORKING ON |
| 09:31AM | 10 | SOME OF THE ISSUES THAT CAME UP; RIGHT? |
| 09:31AM | 11 | A.  YES. |
| 09:31AM | 12 | Q.  AND DR. TSCHIRHART WAS ALSO GOING TO BE COMING UP AT |
| 09:31AM | 13 | EXACTLY THE SAME TIME. |
| 09:31AM | 14 | DO YOU RECALL? |
| 09:31AM | 15 | A.  YES. |
| 09:31AM | 16 | Q.  AND DO YOU RECALL THAT AS PART OF -- IN ADVANCE OF YOUR |
| 09:31AM | 17 | COMING UP, YOU WERE COMMUNICATING WITH DR. TSCHIRHART TO KIND |
| 09:31AM | 18 | OF FORMULATE A PLAN AS TO HOW YOU WOULD WORK TO IMPROVE THE LAB |
| 09:31AM | 19 | AT THERANOS. |
| 09:31AM | 20 | DO YOU RECALL THAT? |
| 09:31AM | 21 | A.  YES. |
| 09:31AM | 22 | Q.  LET ME HAVE YOU TAKE A LOOK AT 10666. |
| 09:31AM | 23 | A.  OKAY. |
| 09:31AM | 24 | Q.  DO YOU RECOGNIZE THIS TO BE AN EMAIL CHAIN BETWEEN YOU AND |
| 09:31AM | 25 | DR. TSCHIRHART WITH RESPECT TO THE PLANS THAT YOU WERE PUTTING |

| | | |
|---|---|---|
| 09:31AM | 1 | IN PLACE FOR HOW YOU WOULD IMPROVE THE LAB AT THERANOS? |
| 09:32AM | 2 | (PAUSE IN PROCEEDINGS.) |
| 09:32AM | 3 | THE WITNESS:  YES. |
| 09:32AM | 4 | MR. WADE:  MOVE THE ADMISSION OF 10666. |
| 09:32AM | 5 | MR. LEACH:  NO OBJECTION. |
| 09:32AM | 6 | THE COURT:  IT IS ADMITTED.  IT MAY BE PUBLISHED. |
| 09:32AM | 7 | (DEFENDANT'S EXHIBIT 10666 WAS RECEIVED IN EVIDENCE.) |
| 09:32AM | 8 | MR. WADE:  AND IF WE CAN START AT THE LAST EMAIL AND |
| 09:32AM | 9 | FOCUS.  GOOD.  THANK YOU. |
| 09:32AM | 10 | Q.   AND IN THIS EMAIL, DR. TSCHIRHART IS REACHING OUT AND |
| 09:32AM | 11 | NOTES THAT HE WAS -- YOU AND HE WERE GOING TO JOIN ABOUT THE |
| 09:32AM | 12 | SAME TIME ON MARCH 14TH. |
| 09:32AM | 13 | DO YOU RECALL THAT? |
| 09:32AM | 14 | A.   YES. |
| 09:32AM | 15 | Q.   AND BY "FULL," THAT MEANS YOU WERE GOING TO BE PHYSICALLY |
| 09:32AM | 16 | ON SITE FROM THAT POINT GOING FORWARD; IS THAT RIGHT? |
| 09:33AM | 17 | A.   YES. |
| 09:33AM | 18 | Q.   OKAY.  AND HE SAYS HE NOTES HOW THERE WOULD BE SOME |
| 09:33AM | 19 | BENEFITS IN TALKING ABOUT SOME OF THE PRELIMINARY ISSUES. |
| 09:33AM | 20 | DO YOU SEE THAT? |
| 09:33AM | 21 | A.   YES. |
| 09:33AM | 22 | Q.   OKAY.  AND THEN IT SAYS, "OF COURSE WE WILL NEED TO REVIEW |
| 09:33AM | 23 | THE INSPECTION DEFICIENCY RESPONSE, AS IT WILL BE OUR BURDEN TO |
| 09:33AM | 24 | MAKE SURE THAT THE SPECIFIED CORRECTIVE ACTION ACTUALLY TAKES |
| 09:33AM | 25 | PLACE." |

09:33AM 1          DO YOU SEE THAT?

09:33AM 2     A.   YES.

09:33AM 3     Q.   AND HE NOTES HE WOULD LIKE TO DO THAT TOGETHER IF YOU'RE

09:33AM 4     COMFORTABLE WITH THAT SO YOU COULD WORK AS A TEAM?

09:33AM 5     A.   YES.

09:33AM 6     Q.   AND I TAKE IT YOU WERE COMFORTABLE WORKING AS A TEAM WITH

09:33AM 7     DR. TSCHIRHART?

09:33AM 8     A.   YES.

09:33AM 9     Q.   YOU CONSIDERED HIM TO BE A HIGHLY COMPETENT AND QUALIFIED

09:33AM 10    PATHOLOGIST?

09:33AM 11    A.   YES.

09:33AM 12    Q.   OKAY.  HE THEN NOTES IN THE FINAL PARAGRAPH, "THE LAST

09:33AM 13    STICKY PART IS THAT BOTH OF US ANSWER DIRECTLY TO ELIZABETH;

09:33AM 14    BUT AS THESE ARE ALL OPERATIONAL ISSUES, IT SEEMS TO ME THAT

09:34AM 15    SUNNY SHOULD SIGN OFF ON THE CHANGES BEFORE WE GO THERE.  DO

09:34AM 16    YOU HAVE A FEEL FOR THIS YET?"

09:34AM 17         DO YOU SEE THAT?

09:34AM 18    A.   YES.

09:34AM 19    Q.   AND DO YOU RECALL IN THIS TIME PERIOD LEARNING THAT

09:34AM 20    HISTORICALLY IT HAD BEEN MR. BALWANI WHO HAD HAD THE

09:34AM 21    RESPONSIBILITY OVER THE LABORATORY FROM A MANAGEMENT

09:34AM 22    STANDPOINT?

09:34AM 23    A.   YES.

09:34AM 24    Q.   AND THAT THE LABORATORY DIRECTORS PREVIOUSLY HAD REPORTED

09:34AM 25    UP TO MR. BALWANI?

09:34AM  1      A.   YES.

09:34AM  2      Q.   BUT AS A RESULT OF THE DESIRE TO MAKE IMPROVEMENTS AND

09:34AM  3      ADDRESS SOME OF THESE REFORM EFFORTS, THAT FOR THE FIRST TIME

09:34AM  4      MS. HOLMES WAS GOING TO COME IN AND HAVE THE LABORATORY

09:34AM  5      DIRECTORS REPORT DIRECTLY TO HER; CORRECT?

09:34AM  6               MR. LEACH:  OBJECTION.  FOUNDATION.  ARGUMENT.

09:34AM  7               THE COURT:  IF YOU CAN LAY A FOUNDATION FOR THAT

09:34AM  8      QUESTION.

09:34AM  9               MR. WADE:  SURE.

09:34AM  10     Q.   WE TALKED ABOUT THE REFORM EFFORTS THAT THE LAB WAS MAKING

09:34AM  11     YESTERDAY A BIT.

09:34AM  12          DO YOU RECALL THAT?

09:35AM  13     A.   YES.

09:35AM  14     Q.   AND YOU RECALL THAT THAT INCLUDED HIRING NEW PEOPLE;

09:35AM  15     CORRECT?

09:35AM  16     A.   YES.

09:35AM  17     Q.   AND DO YOU RECALL THAT AS PART OF THAT THERE WAS A DESIRE

09:35AM  18     WITHIN THE COMPANY TO HAVE THE LABORATORY DIRECTORS REPORT

09:35AM  19     DIRECTLY TO THE CEO?

09:35AM  20               MR. LEACH:  OBJECTION.  VAGUE, FOUNDATION.

09:35AM  21               THE COURT:  I THINK YOU CAN ASK THAT QUESTION IN A

09:35AM  22     DIFFERENT WAY.  YOU'RE STATING IT AS IF IT IS A FACT AND IF HE

09:35AM  23     KNOWS THAT AS A FACT.

09:35AM  24               MR. WADE:  FAIR ENOUGH, YOUR HONOR.

09:35AM  25     Q.   DO YOU RECALL WHETHER PART OF THOSE EFFORTS WAS A DESIRE

09:35AM   1    TO HAVE THE LABORATORY DIRECTORS REPORT DIRECTLY TO THE CEO AS

09:35AM   2    A GOVERNANCE MATTER?

09:35AM   3    A.   NO, I WAS NOT PRIVY TO THE REASONING OF THE SWITCH IN THE

09:35AM   4    CHAIN OF COMMAND.

09:35AM   5    Q.   OKAY.  FAIR ENOUGH.

09:35AM   6         BUT YOU DO RECALL THAT WHEN YOU WERE COMING IN AS

09:35AM   7    LABORATORY DIRECTOR, YOU WERE NOT GOING TO BE REPORTING TO

09:35AM   8    MR. BALWANI; CORRECT?

09:35AM   9    A.   YES.

09:35AM   10   Q.   AND YOU RECALL THAT YOU WERE GOING TO BE REPORTING

09:36AM   11   DIRECTLY TO MS. HOLMES?

09:36AM   12   A.   YES.

09:36AM   13   Q.   AND WAS IT YOUR UNDERSTANDING AT THE TIME THAT THIS WAS

09:36AM   14   THE FIRST TIME THAT A LABORATORY DIRECTOR HAD EVER REPORTED

09:36AM   15   DIRECTLY TO MS. HOLMES?

09:36AM   16   A.   YES.

09:36AM   17   Q.   I'D LIKE TO GO UP THE EMAIL AND JUST LOOK AT YOUR

09:36AM   18   RESPONSE, THE EMAIL UP THE CHAIN.

09:36AM   19        YOU RESPOND TO HIM WITHIN A COUPLE OF DAYS HERE, AND I

09:36AM   20   JUST WANT TO FOCUS ON THAT FIRST SUBSTANTIVE PARAGRAPH.

09:36AM   21        IT SAYS, THE SECOND SENTENCE, "I CAN TELL YOU THAT THE CMS

09:36AM   22   DEFICIENCY RESPONSE IS QUITE COMPREHENSIVE, AND ADDRESSES ALL

09:36AM   23   OF THE BASIC INFRASTRUCTURE THAT WAS MISSING (A LARGE

09:36AM   24   UNDERTAKING) QUITE NICELY -- THE CLINICAL CONSULTANTS AND LEGAL

09:36AM   25   TEAM DID AN OUTSTANDING JOB PUTTING IT TOGETHER - I'M MOST

09:37AM   1    FAMILIAR WITH THE PATIENT IMPACT ASSESSMENTS, SINCE THAT WAS MY

09:37AM   2    FOCUS."

09:37AM   3         DO YOU SEE THAT?

09:37AM   4    A.   YES.

09:37AM   5    Q.   AND DOES THIS REFRESH YOUR RECOLLECTION THAT -- AS TO THE

09:37AM   6    TEAM EFFORT THAT WAS UNDERWAY IN THIS PERIOD TO TRY TO RESPOND

09:37AM   7    TO THE CMS ISSUES?

09:37AM   8    A.   YES.

09:37AM   9    Q.   AND SO IT WASN'T JUST YOU, IT WAS ALSO SOME MEMBERS OF THE

09:37AM  10    LEGAL TEAM THAT WERE INVOLVED IN GOING THROUGH THE LEGAL

09:37AM  11    ASPECTS OF THAT RESPONSE?

09:37AM  12    A.   COULD YOU CLARIFY "THE LEGAL ASPECTS OF THE RESPONSE"?

09:37AM  13    Q.   WELL, THERE ARE A LOT OF REGULATIONS; CORRECT?

09:37AM  14    A.   YES.

09:37AM  15    Q.   AND THERE IS SORT OF AN ADMINISTRATIVE PROCESS THAT A

09:37AM  16    COMPANY CAN GO THROUGH IN THESE MATTERS?

09:37AM  17    A.   YES.

09:37AM  18    Q.   AND THE LAWYERS WERE INVOLVED IN THAT; RIGHT?

09:37AM  19    A.   YES.

09:37AM  20    Q.   OKAY.  BUT ALSO WE TALKED ABOUT YESTERDAY THEY HAD THIS

09:37AM  21    BIG TEAM OF PEOPLE THAT WAS BROUGHT IN TO DIG IN ON SOME OF THE

09:38AM  22    FACTS; RIGHT?

09:38AM  23    A.   YES.

09:38AM  24    Q.   AND THOSE ARE THE CLINICAL CONSULTANTS THAT YOU REFER TO

09:38AM  25    IN THAT EMAIL?

09:38AM  1     A.   YES.

09:38AM  2     Q.   AND IT WAS YOUR BELIEF THAT ALL OF THESE PEOPLE WERE

09:38AM  3     WORKING HARD AND IN GOOD FAITH AS THEY WERE UNDERTAKING THESE

09:38AM  4     EFFORTS; IS THAT FAIR?

09:38AM  5     A.   YES.

09:38AM  6     Q.   OKAY.  AND YOU NOTE THERE THAT IT WAS A LARGE UNDERTAKING.

09:38AM  7          DO YOU SEE THAT?

09:38AM  8     A.   YES.

09:38AM  9     Q.   AND WE'LL TALK ABOUT THIS A BIT MORE LATER.

09:38AM 10          BUT AS YOU CAME INTO THE COMPANY, YOU RECOGNIZED THERE

09:38AM 11     WERE A LOT OF IMPROVEMENTS THAT WERE NEEDED AS A RESULT OF

09:38AM 12     PRIORS ISSUES THAT HADN'T BEEN ADEQUATELY ADDRESSED BY PRIOR

09:38AM 13     LAB DIRECTORS; IS THAT RIGHT?

09:38AM 14     A.   YES.

09:38AM 15     Q.   YOU THEN NOTE ALL OF THE SOP'S, COMPETENCIES, TRAINING

09:39AM 16     HAVE BEEN ADDRESSED, HOWEVER, AS YOU KNOW, THEY WILL NEED TO BE

09:39AM 17     REDUCED TO PRACTICE AND MONITORED, WHICH WILL BE JUST AS

09:39AM 18     DIFFICULT EVIDENCED BY THE PROCEEDINGS IN THE RECENT MONTHLY

09:39AM 19     QA/QC MEETINGS.

09:39AM 20          DO YOU SEE THAT?

09:39AM 21     A.   YES.

09:39AM 22     Q.   AND SO THE PROCEDURES HAD BEEN IN PLACE, BUT YOU

09:39AM 23     UNDERSTOOD AS YOU WENT IN, THERE WAS GOING TO BE A LOT OF WORK

09:39AM 24     REQUIRED TO TRY TO MAKE SURE THAT THE TEAM WAS REALLY LIVING

09:39AM 25     THE POLICIES?

| | |
|---|---|
| 09:39AM | 1 |

A.   YES.

Q.   AND THAT'S IMPORTANT; CORRECT?

A.   YES.

Q.   AND BECAUSE ULTIMATELY A POLICY IS ONLY AS GOOD AS WHETHER
OR NOT IT'S FOLLOWED; IS THAT RIGHT?

A.   YES.

Q.   AND AS LABORATORY DIRECTOR, YOU UNDERSTOOD THAT YOU ARE
THE PERSON RESPONSIBLE TO ENSURE THAT THOSE WERE FOLLOWED;
RIGHT?

A.   YES.

Q.   AND IT WAS YOUR INTENTION AT THIS POINT TO GO AND DO JUST
THAT; IS THAT RIGHT?

A.   YES.

Q.   OKAY.  AND YOU THEN NOTE IF THERE'S, IN THAT SECOND
SENTENCE, YOU HAVE SOME TWEAKS ON QC/QA,
VERIFICATION/VALIDATION THAT YOU WANT TO PUT IN PLACE, BUT THE
BONES HAVE BEEN PUT IN PLACE NICELY ALREADY.

     DO YOU SEE THAT?

A.   YES.

Q.   SO THERE WAS PROGRESS MADE, BUT YOU STILL HAD WORK THAT
YOU WANTED TO DO; IS THAT FAIR?

A.   YES.

Q.   AND THEN IF WE CAN -- YOU OFFERED TO PROVIDE
DR. TSCHIRHART ANY OF THE MATERIALS OR GET HIM ANY OF THE
SPECIFIC MATERIALS ON THIS IF IT WOULD BE HELPFUL TO HIM?

09:40AM  1    A.   YES.

09:40AM  2    Q.   AND YOU ALSO THEN ADDRESSED THE ISSUE WITH RESPECT TO

09:41AM  3    MS. HOLMES AND MR. BALWANI A COUPLE OF PARAGRAPHS DOWN; RIGHT?

09:41AM  4         LET'S PUT THAT UP.

09:41AM  5         DO YOU SEE THERE ON THE PARAGRAPH IN THE SCREEN,

09:41AM  6    "REGARDING SIGN-OFF BY SUNNY, THAT MAKES SENSE - I'M NOT SURE

09:41AM  7    EXACTLY HOW THAT IS PLANNED.  I KNOW FOR SURE THAT I REPORT

09:41AM  8    DIRECTLY TO ELIZABETH, AND SOUNDS LIKE YOU DO AS WELL - BUT I'M

09:41AM  9    SURE SUNNY IS INVOLVED.  THAT'S PROBABLY A QUESTION BEST LEFT

09:41AM  10   FOR ELIZABETH."

09:41AM  11        DO YOU SEE THAT?

09:41AM  12   A.   YES.

09:41AM  13   Q.   AND, IN FACT, A SHORT TIME LATER YOU UNDERSTOOD THAT

09:41AM  14   MR. BALWANI LEFT THE COMPANY; IS THAT RIGHT?

09:41AM  15   A.   YES.

09:41AM  16   Q.   AND YOU REPORTED DIRECTLY TO ELIZABETH; RIGHT?

09:41AM  17   A.   YES.

09:41AM  18   Q.   AND YOUR INTERACTIONS, AS YOU TALKED ABOUT WITH MR. LEACH,

09:41AM  19   ON IMPROVEMENTS TO THE LAB WERE WITH MS. HOLMES AT THAT POINT?

09:41AM  20   A.   YES.

09:41AM  21   Q.   AND JUST SO WE'RE CLEAR ABOUT THAT, YOU WERE IN CHARGE OF

09:41AM  22   THE LABORATORY; CORRECT?

09:41AM  23   A.   YES.

09:41AM  24   Q.   ARE YOU FAMILIAR WITH MS. HOLMES'S BACKGROUND AND TRAINING

09:42AM  25   A BIT?

09:42AM  1    A.   YES.

09:42AM  2    Q.   AND AS YOU UNDERSTAND IT, SHE WOULDN'T BE QUALIFIED TO

09:42AM  3    SERVE AS A LABORATORY DIRECTOR IN A HIGH COMPLEXITY LAB, WOULD

09:42AM  4    SHE?

09:42AM  5    A.   CORRECT.

09:42AM  6    Q.   AND THAT WAS GOING TO BE -- YOU WERE THE PERSON WHO HAD

09:42AM  7    THE NECESSARY TRAINING AND EXPERTISE TO FILL THAT JOB?

09:42AM  8    A.   YES.

09:42AM  9    Q.   AND YOU WOULD BRIEF MS. HOLMES ON WHAT WAS HAPPENING AND

09:42AM  10   EDUCATE HER ON DIFFERENT REQUIREMENTS AND PROCEDURES AND THE

09:42AM  11   LIKE?

09:42AM  12   A.   YES.

09:42AM  13   Q.   BUT ULTIMATELY THE JUDGMENTS WERE YOURS; RIGHT?

09:42AM  14   A.   YES.

09:42AM  15   Q.   AND MS. HOLMES SUPPORTED YOU IN THAT; RIGHT?

09:42AM  16   A.   YES.

09:42AM  17   Q.   IF WE THEN GO UP THE CHAIN AND LOOK AT DR. TSCHIRHART'S

09:42AM  18   RESPONSE BRIEFLY, FOCUSSING ON THE SECOND PARAGRAPH.  HE TALKS

09:42AM  19   ABOUT HOW HE WANTS TO GET INVOLVED AND FOCUS ON THE STRUCTURE

09:43AM  20   WITHIN THE LAB AND THE REORGANIZATION AND FIGURE OUT WHAT

09:43AM  21   PERSONNEL WERE RIGHT TO PUT IN PLACE; RIGHT?

09:43AM  22   A.   YES.

09:43AM  23   Q.   AND THAT'S IMPORTANT; RIGHT?

09:43AM  24   A.   YES.

09:43AM  25   Q.   YOU WERE GOING TO ULTIMATELY BE RESPONSIBLE TO A DEGREE

09:43AM  1    FOR THE REACTIONS OF THE PEOPLE WHO WERE WORKING UNDER YOU;

09:43AM  2    RIGHT?

09:43AM  3    A.   YES.

09:43AM  4    Q.   AND YOU WANTED, YOU WANTED COMFORT THAT THEY WERE GOOD

09:43AM  5    PEOPLE WHO WERE DOING A GOOD JOB; RIGHT?

09:43AM  6    A.   YES.

09:43AM  7    Q.   OKAY.  AND MS. HOLMES SUPPORTED YOU IN THAT; IS THAT

09:43AM  8    RIGHT?

09:43AM  9    A.   YES.

09:43AM  10   Q.   OKAY.  LET'S GO JUST TO THE CONTINUATION OF THAT, WHICH IS

09:43AM  11   BACK ON THE SECOND PAGE.

09:43AM  12       HE ACTUALLY -- DR. TSCHIRHART DESCRIBED THIS AS LOOKING

09:43AM  13   FOR A BULLDOG.

09:43AM  14       DO YOU SEE THAT?

09:43AM  15   A.   YES.

09:43AM  16   Q.   AND SOMEONE WHO WOULD REALLY DIG IN; RIGHT?

09:43AM  17   A.   YES.

09:43AM  18   Q.   AND LET'S LOOK AT YOUR RESPONSE.

09:44AM  19       YOU AGREED, YOU WANTED A BULLDOG; RIGHT?

09:44AM  20   A.   YES.

09:44AM  21   Q.   AND YOU WANTED SOMEONE WHO WOULD DIG IN AND START TURNING

09:44AM  22   OVER ROCKS; RIGHT?

09:44AM  23   A.   YES.

09:44AM  24   Q.   AND WHO YOU COULD TRUST TO BE THOROUGH IN EVERYTHING THEY

09:44AM  25   WERE DOING; IS THAT FAIR?

09:44AM 1    A.   YES.

09:44AM 2    Q.   AND YOU IDENTIFIED THAT THERE WAS ACTUALLY A PERSON THERE

09:44AM 3    ALREADY, SONIA, WHO MAY BE IN A POSITION TO SERVE THAT

09:44AM 4    FUNCTION; RIGHT?

09:44AM 5    A.   YES.

09:44AM 6    Q.   AND DO YOU RECALL SONIA'S LAST NAME?

09:44AM 7    A.   CENDEJAS, I BELIEVE.

09:44AM 8    Q.   SONIA CENDEJAS.  BUT YOU NOTED IT WOULD TAKE SOME TIME

09:44AM 9    WHEN YOU WERE ON THE GROUND TO SORT OF ASSESS THE STRENGTHS AND

09:44AM 10   WEAKNESSES AND FIGURE OUT THE BEST PLAN; IS THAT FAIR?

09:44AM 11   A.   YES.

09:44AM 12   Q.   AND THEN IF YOU FOCUS ON THAT BOTTOM PARAGRAPH, DO YOU SEE

09:44AM 13   IT SAYS, "ELIZABETH AND SUNNY HAVE BEEN FULLY SUPPORTIVE, SO

09:44AM 14   THERE'S ABSOLUTELY NO ISSUES THERE."

09:45AM 15        DO YOU SEE THAT?

09:45AM 16   A.   YES.

09:45AM 17   Q.   AND YOU BELIEVED THAT AT THE TIME; RIGHT?

09:45AM 18   A.   YES.

09:45AM 19   Q.   AND WITH RESPECT TO MS. HOLMES, WHO STAYED THERE, YOU

09:45AM 20   BELIEVED THAT THROUGHOUT YOUR TENURE THERE; IS THAT RIGHT?

09:45AM 21   A.   YES.

09:45AM 22   Q.   AND YOU NOTICED THAT IN THIS PERIOD THEY SHARED OVERSIGHT

09:45AM 23   AND THERE WERE NO ISSUES; RIGHT?

09:45AM 24   A.   YES.

09:45AM 25   Q.   BUT THEN AGAIN, OF COURSE, MR. BALWANI LEFT JUST A SHORT

09:45AM  1    TIME AFTER THIS?

09:45AM  2    A.   YES.

09:45AM  3    Q.   OKAY.  I'D LIKE TO SWITCH TO ASK YOU SOME QUESTIONS ABOUT

09:45AM  4    THE CMS REPORT.  AND YOU RECALL THAT MR. LEACH ASKED YOU SOME

09:45AM  5    QUESTIONS ABOUT THAT YESTERDAY.

09:46AM  6         AND A LOT OF THE CMS REPORT RELATED TO -- WELL, ALL OF THE

09:46AM  7    CMS REPORT RELATED TO HISTORICAL ISSUES AT THE COMPANY UNDER

09:46AM  8    PRIOR LABORATORY DIRECTORS; IS THAT RIGHT?

09:46AM  9    A.   YES.

09:46AM  10   Q.   AND A LOT OF THE QUESTIONS THAT YOU WERE ASKED ABOUT

09:46AM  11   RELATED TO THE LAB DEVELOPED TESTS THAT WERE RUN ON THE EDISON

09:46AM  12   3.5 DEVICE.

09:46AM  13        DO YOU RECALL THAT?

09:46AM  14   A.   YES.

09:46AM  15   Q.   OKAY.  AND THAT WAS -- I THINK YOU SAID THERE WERE MAYBE

09:46AM  16   12 TESTS THAT WERE RUN ON THE EDISON DEVICE.

09:46AM  17        DO YOU RECALL THAT?

09:46AM  18   A.   YES.

09:46AM  19   Q.   AND DO YOU RECALL LEARNING THROUGH YOUR WORK THAT THOSE

09:46AM  20   WERE BROUGHT ONLINE OR VALIDATED AND PUT INTO THE LABORATORY

09:46AM  21   DURING THE TENURE OF DR. ADAM ROSENDORFF?

09:47AM  22   A.   I DON'T RECALL WHOSE TENURE.

09:47AM  23   Q.   WELL, DO YOU RECALL THE TENURE OF DR. ADAM ROSENDORFF?

09:47AM  24   A.   I WAS AWARE OF HIS NAME.

09:47AM  25   Q.   OKAY.  AND THAT HE STARTED SERVING THE LAB WHEN IT WENT

09:47AM   1    LIVE FROM A COMMERCIAL STANDPOINT.

09:47AM   2         DO YOU RECALL THAT?

09:47AM   3    A.   I WASN'T SURE OF THE TIMELINE.

09:47AM   4    Q.   OKAY.  AND LET ME JUST -- DO YOU RECALL -- LET ME STRIKE

09:47AM   5    THAT.

09:47AM   6         YOU RECALL COMING TO THE VIEW IN THIS TIME PERIOD THAT THE

09:47AM   7    LABORATORY WAS NOT WELL RUN; IS THAT FAIR, HISTORICALLY?

09:47AM   8    A.   YES.

09:47AM   9    Q.   AND, IN FACT, THAT WAS THE REASON WHY YOU WERE WORKING TO

09:47AM  10    IMPROVE IT; CORRECT?

09:47AM  11    A.   YES.

09:47AM  12    Q.   I WANT TO FOCUS A LITTLE BIT -- DO YOU RECALL THAT

09:48AM  13    MR. LEACH SHOWED YOU THAT LETTER THAT TALKED ABOUT IMMEDIATE

09:48AM  14    JEOPARDY?

09:48AM  15         DO YOU RECALL THAT?

09:48AM  16    A.   YES.

09:48AM  17    Q.   AND THAT WAS ONE OF THE REASONS THAT PROMPTED SUCH A QUICK

09:48AM  18    AND URGENT RESPONSE FROM THE COMPANY.

09:48AM  19         DO YOU RECALL THAT?

09:48AM  20    A.   YES.

09:48AM  21    Q.   AND YOU TOOK THAT SERIOUSLY I TAKE IT?

09:48AM  22    A.   YES.

09:48AM  23    Q.   AND -- BUT AS YOU SIT HERE TODAY, THERE'S NO CLEAR

09:48AM  24    UNDERSTANDING -- WHEN A COMPANY RECEIVES INFORMATION LIKE THAT,

09:48AM  25    THERE WAS NO CLEAR UNDERSTANDING AS TO EXACTLY WHAT THAT MEANT

```
09:48AM   1   OR EXACTLY WHAT WAS NEEDED TO RESPOND TO THAT?

09:48AM   2           MR. LEACH:  OBJECTION.  AMBIGUOUS.  VAGUE.

09:48AM   3           THE COURT:  DID YOU UNDERSTAND THE QUESTION?

09:48AM   4           THE WITNESS:  I COULD USE SOME CLARIFICATION,

09:48AM   5   PLEASE.

09:48AM   6           MR. WADE:  FAIR ENOUGH.

09:48AM   7   Q.   THE WORDS "IMMEDIATE JEOPARDY" AS APPLIED TO THE FACTS OF

09:49AM   8   A LAB ARE NOT SPELLED OUT SPECIFICALLY WITHIN THAT LETTER;

09:49AM   9   RIGHT?

09:49AM  10   A.   I BELIEVE THEY WERE.

09:49AM  11   Q.   THE APPLICATION OF THAT DETERMINATION WAS.

09:49AM  12        DO YOU RECALL THAT?

09:49AM  13   A.   I DO NOT.

09:49AM  14   Q.   LET ME DO THIS, LET ME SHOW YOU A COPY OF THE REPORT.

09:49AM  15   A.   YES.

09:49AM  16   Q.   WHAT I'D LIKE TO DO IS SHOW YOU -- DO YOU RECALL YESTERDAY

09:49AM  17   COUNSEL WAS DOING SOME REDACTIONS AND WAS PRESENTING YOU

09:49AM  18   EXCERPTS OF THE REPORT.

09:49AM  19        DO YOU RECALL THAT?

09:49AM  20   A.   YES.

09:49AM  21   Q.   OKAY.  I HAVE COPIES OF THOSE, JUST THE EXCERPTS SO WE CAN

09:49AM  22   ALL AVOID CONFUSION.

09:49AM  23        AND I'M GOING TO HAND UP TO YOU, WITH THE COURT'S

09:49AM  24   PERMISSION, A COPY OF THE LETTER THAT WAS ADMITTED AND A COPY

09:50AM  25   OF THE EXCERPTS.
```

09:50AM  1          AND I'LL PROVIDE A COPY TO COUNSEL AS WELL AND THE COURT.

09:50AM  2          MAY I APPROACH, YOUR HONOR?

09:50AM  3               THE COURT:  YES.

09:50AM  4               MR. WADE:  (HANDING.)

09:50AM  5          AND JUST FOR THE RECORD, I BELIEVE THESE EXCERPTS ARE

09:50AM  6     ALREADY IN EVIDENCE AND HAVE BEEN MADE AVAILABLE PUBLICLY.

09:50AM  7          I THINK THE LETTER WE HAVE BEEN REFERRING TO IS PART A,

09:50AM  8     4621A, AND I'LL REFER TO THE EXCERPTS FROM THE REPORT AS 4621B,

09:51AM  9     WITH THE COURT'S PERMISSION.

09:51AM 10               THE COURT:  YES.  THANK YOU.

09:51AM 11     BY MR. WADE:

09:51AM 12     Q.  NOW, BEFORE I ASK YOU QUESTIONS ABOUT THIS, DO YOU RECALL

09:51AM 13     THE GUIDELINES AND REGULATIONS THAT SET FORTH HOW A CLIA LAB

09:51AM 14     OPERATES ARE SET FORTH IN THOSE -- IN THAT EXHIBIT THAT

09:51AM 15     MR. LEACH WAS SHOWING YOU YESTERDAY, EXHIBIT 7603; RIGHT?

09:51AM 16     A.  YES.

09:51AM 17     Q.  AND MR. LEACH SHOWED YOU SOME SPECIFIC PORTIONS OF THAT.

09:51AM 18          DO YOU RECALL?

09:51AM 19     A.  YES.

09:51AM 20     Q.  AND SOME OF THOSE RELATED TO OWNERS OF A LAB.

09:52AM 21          DO YOU RECALL THAT?

09:52AM 22     A.  YES.

09:52AM 23     Q.  AND ULTIMATELY AN OWNER WHO IS NOT QUALIFIED TO SERVE AS A

09:52AM 24     LABORATORY DIRECTOR CANNOT COME IN AND PERFORM THE FUNCTIONS OF

09:52AM 25     A LABORATORY DIRECTOR; CORRECT?

09:52AM 1    A.   YES.

09:52AM 2    Q.   OKAY.  SO THERE'S A DEGREE TO WHICH THE OWNER IS DEPENDENT

09:52AM 3    UPON THE LABORATORY DIRECTOR TO TRY TO MAKE SURE THAT

09:52AM 4    EVERYTHING IS DONE CONSISTENT WITH THE REGULATORY STRUCTURE; IS

09:52AM 5    THAT RIGHT?

09:52AM 6    A.   YES.

09:52AM 7    Q.   AND THAT POSITION IS AN IMPORTANT JOB; RIGHT?

09:52AM 8    A.   YES.

09:52AM 9    Q.   BECAUSE THE LABORATORY DIRECTOR IN A HIGH COMPLEXITY

09:52AM 10   LABORATORY IS A PERSON WHO IS HIGHLY TRAINED AND QUALIFIED;

09:52AM 11   RIGHT?

09:52AM 12   A.   YES.

09:52AM 13   Q.   AND THOSE REGULATIONS PUT A LOT OF RESPONSIBILITY ON THAT

09:52AM 14   PERSON TO TRY TO ENSURE THAT EVERYTHING IS DONE RIGHT; CORRECT?

09:52AM 15   A.   YES.

09:52AM 16   Q.   AND THAT'S, THAT'S MORE RESPONSIBILITY THAN ANY ONE PERSON

09:53AM 17   COULD THEMSELVES ACTUALLY PERFORM; RIGHT?

09:53AM 18            MR. LEACH:  OBJECTION.  ARGUMENT.

09:53AM 19            THE COURT:  SUSTAINED.

09:53AM 20   BY MR. WADE:

09:53AM 21   Q.   IN ORDER TO MEET ALL OF THOSE RESPONSIBILITIES, THE

09:53AM 22   LABORATORY DIRECTOR NEEDS TO RELY ON OTHER PEOPLE TO PERFORM

09:53AM 23   CERTAIN FUNCTIONS; RIGHT?

09:53AM 24   A.   USUALLY, YES.

09:53AM 25   Q.   AND THAT'S WHY OFTENTIMES THERE ARE PEOPLE WHO ARE

09:53AM 1    INVOLVED IN QUALITY ASSURANCE AND QUALITY CONTROL; RIGHT?

09:53AM 2    A.   YES.

09:53AM 3    Q.   AND THERE ARE SOMETIMES SEPARATE TECHNICAL SUPERVISORS;

09:53AM 4    RIGHT?

09:53AM 5    A.   YES.

09:53AM 6    Q.   AND THERE ARE GENERAL SUPERVISORS?

09:53AM 7    A.   YES.

09:53AM 8    Q.   AND ALL OF THOSE PEOPLE HAVE TO MEET REQUIREMENTS THAT ARE

09:53AM 9    SET FORTH IN THOSE REGULATIONS; RIGHT?

09:53AM 10   A.   YES.

09:53AM 11   Q.   AND WHEN WE TALKED ABOUT HIRING QUALIFIED PERSONNEL, ONE

09:53AM 12   OF THE REASONS WHY YOU NEED TO DO THAT IS BECAUSE AS THE

09:53AM 13   LABORATORY DIRECTOR, YOU'RE DEPENDENT UPON THOSE PEOPLE IN

09:53AM 14   ORDER TO DISPATCH YOUR OBLIGATIONS; RIGHT?

09:53AM 15   A.   YES.

09:53AM 16   Q.   AND IF THEY DON'T PERFORM THEIR JOB, THERE'S A DEGREE TO

09:54AM 17   WHICH YOU COULD BE HELD RESPONSIBLE FOR IT; RIGHT?

09:54AM 18   A.   YES.

09:54AM 19   Q.   OKAY.  AND IN CONNECTION WITH -- AND WERE YOU AWARE WHEN

09:54AM 20   YOU CAME IN THAT THE COMPANY -- YOU WERE AWARE THAT THE COMPANY

09:54AM 21   HAD PRIOR LABORATORY DIRECTORS; RIGHT?

09:54AM 22   A.   YES.

09:54AM 23   Q.   AND YOU WERE AWARE THAT THEY ALSO RETAINED CONSULTING

09:54AM 24   SERVICES TO ADVISE THEM ON POLICIES AND PROCEDURES AND THE

09:54AM 25   LIKE?

09:54AM   1    A.   NOT UNTIL I JOINED.

09:54AM   2    Q.   OKAY.  WHEN YOU JOINED YOU LEARNED THAT THEY HAD GOTTEN

09:54AM   3    SOME ADVICE ON THAT PREVIOUSLY?

09:54AM   4    A.   YES.

09:54AM   5    Q.   AND THAT ADVICE HAD COME FROM A GENTLEMAN NAMED

09:54AM   6    JERRY HURST.

09:54AM   7         DO YOU RECALL THAT?

09:54AM   8    A.   I DON'T RECALL THAT NAME.

09:54AM   9    Q.   DO YOU RECALL LEARNING THAT IN ADVANCE OF THE INSPECTION

09:54AM  10    THAT CMS HAD DONE, THAT THEY HAD DONE SOME MOCK AUDITS?

09:54AM  11    A.   YES, I WAS AWARE OF THAT.

09:54AM  12    Q.   YES.  AND THAT THEY ACTUALLY FELT THAT THE MOCK AUDITS

09:54AM  13    WENT PRETTY WELL?

09:55AM  14             MR. LEACH:  OBJECTION.  FOUNDATION.

09:55AM  15             THE COURT:  YOU'RE ASKING HIS UNDERSTANDING OF THAT?

09:55AM  16    BY MR. WADE:

09:55AM  17    Q.   DID YOU --

09:55AM  18             THE COURT:  WERE YOU AWARE OF THAT, SIR?

09:55AM  19             THE WITNESS:  HUH?

09:55AM  20             THE COURT:  WERE YOU AWARE OF THAT?

09:55AM  21             THE WITNESS:  YES, YOUR HONOR.

09:55AM  22    BY MR. WADE:

09:55AM  23    Q.   OKAY.  YOU WERE AWARE THAT THE MOCK AUDITS WERE THOUGHT TO

09:55AM  24    HAVE GONE WELL?

09:55AM  25    A.   YES, I WAS MADE AWARE OF THOSE.

09:55AM  1    Q.  BUT NEVERTHELESS, THERE WERE THESE DEFICIENCIES IDENTIFIED

09:55AM  2    DURING THE INSPECTION?

09:55AM  3    A.  YES.

09:55AM  4    Q.  OKAY.  AND WITHIN THE DOCUMENT THAT I'VE HANDED YOU MARKED

09:55AM  5    4621B THERE ARE, THERE ARE ISSUES THAT ARE IDENTIFIED THAT

09:55AM  6    MR. LEACH WENT THROUGH.

09:56AM  7        DO YOU RECALL THAT?

09:56AM  8    A.  YES.

09:56AM  9    Q.  AND I THINK THE VAST MAJORITY OF THEM RELATED TO QUALITY

09:56AM  10   CONTROL.

09:56AM  11       DO YOU RECALL THAT?

09:56AM  12   A.  I DON'T REMEMBER THE PROPORTION, BUT THERE WERE A NUMBER.

09:56AM  13   Q.  FAIR ENOUGH.  YOU RECALL A SIGNIFICANT NUMBER OF THEM

09:56AM  14   RELATED TO QUALITY CONTROL?

09:56AM  15   A.  YES.

09:56AM  16   Q.  AND A QUALITY CONTROL PROCEDURE IS SOMETHING THAT A LAB

09:56AM  17   DIRECTOR IS RESPONSIBLE FOR IMPLEMENTING; RIGHT?

09:56AM  18   A.  YES.

09:56AM  19   Q.  AND EITHER THE LAB DIRECTOR OR SOMEONE TO WHOM THE LAB

09:56AM  20   DIRECTOR HAS DELEGATED RESPONSIBILITY IS RESPONSIBLE FOR

09:56AM  21   ENSURING THAT THAT IS ENFORCED?

09:56AM  22   A.  YES.

09:56AM  23   Q.  AND TO -- AND THE PEOPLE -- AND THOSE ARE PEOPLE WHO HAVE

09:56AM  24   SOME EXPERTISE; RIGHT?

09:56AM  25   A.  YES.

```
09:56AM   1      Q.   AND THEY'RE RESPONSIBLE FOR LOOKING AT THE DATA AND MAKING

09:56AM   2      SURE THAT THE POLICY IS ADHERED TO; IS THAT RIGHT?

09:56AM   3      A.   YES.

09:56AM   4      Q.   OKAY.  AND WHEN YOU LOOKED AT THAT DATA, YOU, YOU

09:57AM   5      ULTIMATELY HAD, YOU ULTIMATELY CAME TO THE VIEW THAT SOME

09:57AM   6      REMEDIATION WAS NECESSARY; IS THAT RIGHT?

09:57AM   7      A.   YES.

09:57AM   8      Q.   AND I WANT TO TALK A LITTLE BIT ABOUT -- I THINK WITH

09:57AM   9      MR. LEACH YOU WERE ASKED SOME QUESTIONS ABOUT SOME OF THE

09:57AM  10      INFORMATION THAT YOU LOOKED AT.

09:57AM  11           DO YOU RECALL THAT?

09:57AM  12      A.   YES.

09:57AM  13      Q.   AND YOU, YOU -- WE WERE TALKING ABOUT BUCKETS, I THINK.

09:57AM  14           DO YOU RECALL THAT?

09:57AM  15      A.   YES.

09:57AM  16      Q.   AND THERE WERE, THERE WERE THREE BUCKETS IN PARTICULAR.

09:57AM  17           DO YOU RECALL?

09:57AM  18      A.   YES.

09:57AM  19      Q.   AND ONE RELATED TO THE VALIDATION OF THOSE EDISON ASSAYS;

09:57AM  20      RIGHT?

09:57AM  21      A.   YES.

09:58AM  22      Q.   AND THE SECOND BUCKET RELATED TO QUALITY CONTROL RESULTS;

09:58AM  23      CORRECT?

09:58AM  24      A.   YES.

09:58AM  25      Q.   AND THEN THE THIRD BUCKET RELATED TO WHAT I THINK YOU
```

| | | |
|---|---|---|
| 09:58AM | 1 | DESCRIBED AS SORT OF A PATIENT TEST RESULT DISTRIBUTION |
| 09:58AM | 2 | ANALYSIS; RIGHT? |
| 09:58AM | 3 | A.  YES. |
| 09:58AM | 4 | Q.  AND I JUST WANT TO MAKE SURE THAT WE ALL UNDERSTAND KIND |
| 09:58AM | 5 | OF A LITTLE BIT MORE ABOUT WHAT YOU DID AND WHAT YOU CONSIDERED |
| 09:58AM | 6 | THERE.  OKAY? |
| 09:58AM | 7 | A.  YES. |
| 09:58AM | 8 | Q.  WITHIN 4621, THERE WAS SOME SPECIFIC DATA AND ITEMS THAT |
| 09:58AM | 9 | WERE IDENTIFIED RELATING TO QUALITY CONTROL; RIGHT? |
| 09:58AM | 10 | A.  YES. |
| 09:58AM | 11 | Q.  BUT YOU -- IN PERFORMING YOUR FUNCTION, YOU DIDN'T LIMIT |
| 09:58AM | 12 | YOURSELF TO JUST LOOKING AT THAT QUALITY CONTROL INFORMATION; |
| 09:58AM | 13 | RIGHT? |
| 09:58AM | 14 | A.  YES. |
| 09:58AM | 15 | Q.  YOU ACTUALLY ASKED FOR ALL OF THE QUALITY CONTROL |
| 09:58AM | 16 | INFORMATION WITH RESPECT TO EDISON ASSAYS TO BE EXTRACTED AND |
| 09:59AM | 17 | REVIEWED; RIGHT? |
| 09:59AM | 18 | A.  YES. |
| 09:59AM | 19 | Q.  AND YOU STARTED TO TURN OVER ROCKS, IF YOU WILL? |
| 09:59AM | 20 | A.  YES. |
| 09:59AM | 21 | Q.  AND YOU DID A RETROSPECTIVE ANALYSIS OF THE QUALITY |
| 09:59AM | 22 | CONTROL DATA APPLYING CERTAIN WESTGARD RULES AND PRINCIPLES TO |
| 09:59AM | 23 | ASSESS THE HISTORICAL QUALITY CONTROL PERFORMANCE OF THOSE |
| 09:59AM | 24 | EDISON ASSAYS; RIGHT? |
| 09:59AM | 25 | A.  YES. |

09:59AM  1    Q.   AND IN DOING THAT, YOU ASKED SOMEONE TO EXTRACT ALL OF

09:59AM  2    THAT INFORMATION OUT OF THE LIS, OR LABORATORY INFORMATION

09:59AM  3    SYSTEMS DATABASE; RIGHT?

09:59AM  4    A.   I'M NOT SURE WHERE THEY WOULD HAVE EXTRACTED THEM FROM BUT

09:59AM  5    YES, THOSE WERE BROUGHT TO OUR --

09:59AM  6    Q.   ALL OF THOSE ASSAYS?

09:59AM  7    A.   YES.

09:59AM  8    Q.   AND JUST SO WE'RE CLEAR, THERE WERE A COUPLE OF SPECIFIC

09:59AM  9    EDISON DEVICES OR 3.5 DEVICES OF THERANOS THAT WERE IDENTIFIED

10:00AM  10   WITHIN THIS EXCERPT OF 4621B; CORRECT?

10:00AM  11   A.   YES.

10:00AM  12   Q.   BUT THERE WERE A COUPLE HUNDRED EDISON DEVICES THAT THE

10:00AM  13   COMPANY HAD AT THE TIME?

10:00AM  14   A.   YES.

10:00AM  15   Q.   AND YOU LOOKED AT ALL OF THE DATA FOR ALL OF THEM;

10:00AM  16   CORRECT?

10:00AM  17   A.   YES.

10:00AM  18   Q.   AND MS. HOLMES ENCOURAGED YOU TO TURN OVER THOSE ROCKS;

10:00AM  19   RIGHT?

10:00AM  20   A.   YES.

10:00AM  21   Q.   OKAY.  AND WHEN YOU APPLIED THOSE WESTGARD PRINCIPLES AND

10:00AM  22   LOOKED AT THE COMPANY'S HISTORIC POLICY, YOU FELT LIKE THERE

10:00AM  23   WERE DEFICIENCIES?

10:00AM  24   A.   YES.

10:00AM  25   Q.   AND YOU FELT LIKE THE QUALIFIED PROFESSIONALS WHO ARE

10:00AM 1    TASKED WITH MONITORING THAT BEFORE SHOULD HAVE IDENTIFIED THOSE

10:00AM 2    ISSUES; IS THAT FAIR?

10:00AM 3    A.   YES.

10:00AM 4    Q.   AND PERHAPS, AS A RESULT OF THAT, SHOULD HAVE STOPPED

10:00AM 5    OFFERING THOSE EDISON TESTS WHEN THEY SAW THAT DATA; IS THAT

10:01AM 6    FAIR?

10:01AM 7    A.   YES.

10:01AM 8    Q.   OKAY.  AND IN ADDITION TO THAT, YOU LOOKED AT, YOU LOOKED

10:01AM 9    AT VALIDATION DATA FOR -- OR VALIDATION INFORMATION WITH

10:01AM 10   RESPECT TO THE EDISON ASSAYS; RIGHT?

10:01AM 11   A.   YES.

10:01AM 12   Q.   AND IN CONNECTION WITH THAT VALIDATION DATA, YOU CAME TO

10:01AM 13   THE VIEW THAT THE PROFESSIONALS WHO IMPLEMENTED THOSE REPORTS

10:01AM 14   DIDN'T USE THE APPROPRIATE STANDARDS IN SETTING BENCHMARKS FOR

10:01AM 15   THE PERFORMANCE OF THE ASSAYS; RIGHT?

10:01AM 16   A.   I DON'T REMEMBER SPECIFYING THE PROFESSIONALS, BUT IN

10:01AM 17   GENERAL, YES.

10:01AM 18   Q.   OKAY.  FAIR ENOUGH.

10:01AM 19       YOU RECALL COMING TO THE VIEW THAT THE STANDARDS THAT WERE

10:01AM 20   SET FORTH FOR VALIDATION WEREN'T APPROPRIATE IN YOUR VIEW?

10:02AM 21   A.   CAN YOU CLARIFY THAT?

10:02AM 22   Q.   SURE.  YOU'RE AWARE THAT WHEN AN LDT IS OFFERED WITHIN A

10:02AM 23   LAB, THAT TYPICALLY A VALIDATION REPORT IS PREPARED BEFORE THE

10:02AM 24   LDT IS OFFERED IN THE LAB; RIGHT?

10:02AM 25   A.   YES.

10:02AM 1    Q.   AND IN CONNECTION WITH THAT VALIDATION REPORT, THERE ARE

10:02AM 2    DIFFERENT STANDARDS THAT ARE SET UNDER WHICH THE ASSAY NEEDS TO

10:02AM 3    PERFORM BEFORE IT CAN BE OFFERED IN THE LAB; RIGHT?

10:02AM 4    A.   CORRECT.

10:02AM 5    Q.   AND THOSE -- THERE'S NO MAGIC LIST SOMEWHERE THAT SAYS

10:02AM 6    THESE ARE THE STANDARDS FOR LDT'S THAT NEED TO BE MET; RIGHT?

10:02AM 7    A.   THERE ARE A SET OF EXPERIMENTS THAT NEED TO BE MET.

10:02AM 8    Q.   THERE ARE EXPERIMENTS THAT NEED TO BE MET, BUT IN TERMS

10:02AM 9    OF, FOR EXAMPLE, TOTAL ALLOWABLE ERROR, THERE ISN'T A SET LIST

10:02AM 10   IN CLIA REGULATIONS THAT SAYS FOR AN LDT, THIS IS THE BENCHMARK

10:03AM 11   THAT YOU NEED FOR VALIDATION?

10:03AM 12   A.   CORRECT.

10:03AM 13   Q.   THERE'S A DEGREE TO WHICH SETTING THOSE, THE TOTAL

10:03AM 14   ALLOWABLE ERROR, IS SOMETHING THAT IS WITHIN THE PROFESSIONAL

10:03AM 15   JUDGMENT OF THE LABORATORY DIRECTOR?

10:03AM 16   A.   YES.

10:03AM 17   Q.   OKAY.  AND, AND THAT IS USUALLY INCLUDED WITHIN THE

10:03AM 18   VALIDATION REPORT, THE TOTAL ALLOWABLE ERROR?

10:03AM 19   A.   YES.

10:03AM 20   Q.   AND THAT SORT OF SETS THE FRAMEWORK FOR THE PRECISION OF

10:03AM 21   THE ASSAY; IS THAT RIGHT?

10:03AM 22   A.   IT SETS A FRAMEWORK FOR ASSESSING THE ASSAY.

10:03AM 23   Q.   RIGHT.  AND IF -- AND IN COMING TO AND LOOKING AT THIS

10:03AM 24   DATA BACK THEN, YOU LOOKED AT THE TOTAL ALLOWABLE ERROR METRICS

10:03AM 25   THAT HAD BEEN SET BY THE COMPANY.

10:03AM   1        DO YOU RECALL THAT?

10:03AM   2   A.   YES.

10:03AM   3   Q.   AND I'M GOING TO GO INTO THOSE IN A SECOND.  BEFORE I DO,

10:03AM   4   I JUST WANT TO GO INTO THE THIRD BUCKET, WHICH WAS THE PATIENT

10:04AM   5   TEST DISTRIBUTION RESULTS.  OKAY?

10:04AM   6   A.   YES.

10:04AM   7   Q.   AND THERE WHAT YOU DID IS FOR EACH OF THE ASSAYS YOU

10:04AM   8   ESSENTIALLY PULLED OUT OF THE LIS ALL OF THE PATIENT RESULTS

10:04AM   9   FOR EACH ASSAY; RIGHT?

10:04AM   10  A.   I'M NOT SURE WHERE THE DATA WAS PULLED FROM.  IT WAS

10:04AM   11  PULLED FOR OUR TEAM.

10:04AM   12  Q.   OKAY.  WHEREVER THE DATA WAS -- FOR PATIENT RESULTS WAS

10:04AM   13  MAINTAINED, ALL OF THAT DATA WAS EXTRACTED; CORRECT?

10:04AM   14  A.   YES, THAT WAS TRUE TO THE BEST OF MY UNDERSTANDING.

10:04AM   15  Q.   OKAY.  AND YOU LOOKED AT ALL OF THE RESULTS AND LOOKED AT

10:04AM   16  SORT OF WHETHER THEY -- HOW THEY PERFORMED WITHIN THE REFERENCE

10:04AM   17  RANGE.

10:04AM   18       IS THAT --

10:04AM   19  A.   TO SOME EXTENT.

10:04AM   20  Q.   CAN YOU GIVE US A SENSE OF WHAT THE PATIENT DISTRIBUTION

10:04AM   21  ANALYSIS CONSISTS OF?

10:04AM   22  A.   I'LL TRY TO AVOID JARGON AS MUCH AS POSSIBLE.

10:04AM   23       IN GENERAL, WE WERE TRYING TO ASSESS HOW THE AVERAGE

10:05AM   24  VALUES WERE CHANGING OR NOT CHANGING OVER TIME, WHICH IS A

10:05AM   25  REFLECTION OF INACCURACY WITH THE TEST.

10:05AM  1    ALSO, YOU CAN LOOK AT WHAT YOU WERE DESCRIBING, THE

10:05AM  2    DISTRIBUTIONS OF ABNORMALS VERSUS NORMALS, AND GET A SENSE OF

10:05AM  3    ANY SORT OF IMPRECISION IN THE ASSAY.

10:05AM  4         THERE'S VARIOUS WAYS TO LOOK AT THESE METRICS.  BUT, YES

10:05AM  5    IN GENERAL.

10:05AM  6    Q.   SO YOU ESSENTIALLY PLOT ALL OF THE RESULTS FOR THE

10:05AM  7    PATIENTS AND SORT OF LOOK AT AND ANALYZE THE DATA AND CONSIDER

10:05AM  8    WHETHER YOU CAN INFER ANYTHING FROM ALL OF THE RESULTS FOR THAT

10:05AM  9    PARTICULAR ASSAY?

10:05AM  10   A.   TO SOME EXTENT, YES.  WE MAKE CALCULATIONS BASED ON THE

10:05AM  11   ENTIRE DATA SET AND LOOK AT IT IN CHUNKS.  BUT, BUT OVERALL,

10:05AM  12   YES.

10:05AM  13   Q.   OKAY.  AND THESE, THESE THREE BUCKETS THAT YOU'RE TALKING

10:05AM  14   ABOUT, THIS IS A PRETTY SOPHISTICATED ANALYSIS; IS THAT FAIR?

10:05AM  15   A.   YES.

10:05AM  16   Q.   AND IT REQUIRED THE EXTRACTION OF A LOT OF DATA; RIGHT?

10:06AM  17   A.   YES.

10:06AM  18   Q.   AND IT REQUIRED THE CONSIDERATION AND ANALYSIS OF A LOT OF

10:06AM  19   THAT DATA IN ORDER TO INFORM YOUR VIEWS; RIGHT?

10:06AM  20   A.   YES.

10:06AM  21   Q.   THIS IS NOT SOMETHING THAT IN YOUR VIEW SOMEONE WITHOUT

10:06AM  22   KNOWLEDGE AND TRAINING WOULD BE IN A POSITION TO DO; IS THAT

10:06AM  23   FAIR?

10:06AM  24   A.   CORRECT.

10:06AM  25   Q.   OKAY.  AND AS A RESULT OF THAT COMBINATION OF INFORMATION,

| | | |
|---|---|---|
| 10:06AM | 1 | THAT INFORMED YOUR ANALYSIS AS TO HOW TO RESPOND AND WHAT |
| 10:06AM | 2 | ACTIONS TO TAKE WITH RESPECT TO THE EDISON 3.5; IS THAT RIGHT? |
| 10:06AM | 3 | A.   YES. |
| 10:06AM | 4 | Q.   OKAY.  AND I'D LIKE TO FOCUS YOU ON EXHIBIT 10678, WHICH I |
| 10:06AM | 5 | THINK IS THE RED WELD. |
| 10:07AM | 6 | MAY I APPROACH, YOUR HONOR? |
| 10:07AM | 7 | THE COURT:  YES. |
| 10:07AM | 8 | BY MR. WADE: |
| 10:07AM | 9 | Q.   (HANDING.) |
| 10:07AM | 10 | DR. DAS, DO YOU HAVE EXHIBIT 10678 IN FRONT OF YOU? |
| 10:07AM | 11 | A.   I DO. |
| 10:07AM | 12 | Q.   AND DO YOU RECOGNIZE THIS TO BE INFORMATION THAT YOU WERE |
| 10:07AM | 13 | PROVIDED IN CONNECTION WITH YOUR ANALYSIS OF THAT FIRST BUCKET, |
| 10:07AM | 14 | THE VALIDATION BUCKET? |
| 10:08AM | 15 | A.   YES, IT LOOKS FAMILIAR. |
| 10:08AM | 16 | MR. WADE:  I MOVE THE ADMISSION OF 10678. |
| 10:08AM | 17 | MR. LEACH:  NO OBJECTION. |
| 10:08AM | 18 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:08AM | 19 | (DEFENDANT'S EXHIBIT 10678 WAS RECEIVED IN EVIDENCE.) |
| 10:08AM | 20 | MR. WADE:  IF WE CAN, LET'S JUST BLOW UP QUICKLY THE |
| 10:08AM | 21 | BOTTOM EMAIL. |
| 10:08AM | 22 | Q.   DO YOU RECALL YESTERDAY THAT WE WERE TALKING ABOUT AS YOU |
| 10:08AM | 23 | WERE BECOMING MORE FAMILIAR, OR AS YOU WERE FAMILIARIZING |
| 10:08AM | 24 | YOURSELF WITH THE COMPANY, YOU WERE TALKING WITH A VARIETY OF |
| 10:08AM | 25 | PEOPLE AT THE COMPANY AND ASKING THEM TO PROVIDE YOU WITH A |

10:08AM 1    VARIETY OF INFORMATION.

10:08AM 2         DO YOU RECALL THAT?

10:08AM 3    A.   YES.

10:08AM 4    Q.   AND THAT PROCESS BECAME A LITTLE MORE EXPEDITED AS YOU

10:08AM 5    WERE DEALING WITH THE CMS RESPONSE; RIGHT?

10:08AM 6    A.   YES.

10:08AM 7    Q.   AND SOME OF THE PEOPLE -- AND THIS EMAIL, MARCH 23RD, THIS

10:09AM 8    IS A LITTLE OVER A WEEK AFTER YOU JOINED THE COMPANY?

10:09AM 9    A.   YES.

10:09AM 10   Q.   AND IS IT FAIR TO SAY THAT THE PEOPLE WHO ARE IDENTIFIED

10:09AM 11   IN THE EMAIL ARE AMONG THE INTERNAL FOLKS AT THERANOS WHO ARE

10:09AM 12   PROVIDING YOU WITH INFORMATION TO HELP GET YOU UP TO SPEED?

10:09AM 13   A.   YES.

10:09AM 14   Q.   OKAY.  AND YOU WERE SENT THIS SPREADSHEET THAT INCLUDED

10:09AM 15   SOME INFORMATION WITH RESPECT TO THE EDISON ASSAYS; CORRECT?

10:09AM 16   A.   YES.

10:09AM 17   Q.   AND JUST FOR CONTEXT, YOU'RE GETTING THIS INFORMATION

10:09AM 18   AROUND THE TIME OF WHETHER -- OF WHEN DECISIONS ARE BEING MADE

10:09AM 19   ABOUT WHETHER TO VOID THE RESULTS ON THE -- RELATING TO THE

10:09AM 20   EDISON; CORRECT?

10:09AM 21   A.   YES.

10:09AM 22   Q.   OKAY.  AND LET'S LOOK AT THE SPREADSHEET.  AND LET'S JUST

10:10AM 23   HIGHLIGHT, OR IF WE CAN ZOOM IN SO WE CAN JUST FOCUS ON THOSE

10:10AM 24   FIRST FOUR COLUMNS.

10:10AM 25        DO YOU SEE THAT?

DAS CROSS BY MR. WADE (RES.)                                    5940

```
10:10AM   1     A.   YES.

10:10AM   2     Q.   OKAY.  AND IT IDENTIFIES THE DIFFERENT ASSAYS.

10:10AM   3          DO YOU SEE THAT IN COLUMN B?

10:10AM   4     A.   YES.

10:10AM   5     Q.   AND THESE ARE ALL -- THIS IS EXCLUSIVELY THE 12 EDISON

10:10AM   6     ASSAYS; RIGHT?

10:10AM   7     A.   YES.

10:10AM   8     Q.   AND THEN WE WERE JUST TALKING A LITTLE BIT ABOUT TOTAL

10:10AM   9     ALLOWABLE ERROR.  AND THE TOTAL ALLOWABLE ERROR, IS THAT

10:10AM  10     SOMETIMES REFERRED TO AS TAE?

10:10AM  11     A.   YES.

10:10AM  12     Q.   AND DO YOU SEE THE TAE IDENTIFIED IN COLUMN E THERE?

10:10AM  13     A.   YES.

10:10AM  14     Q.   AND DID YOU UNDERSTAND AT THE TIME THAT TAE HERE REFERRED

10:10AM  15     TO THE STANDARDS THAT WERE SET FOR THE VALIDATION OF THESE

10:11AM  16     ASSAYS ON THE EDISON 3.5 DEVICE?

10:11AM  17     A.   I'M NOT SURE I WAS AWARE OF THAT AT THE TIME.

10:11AM  18     Q.   OKAY.  BUT YOU RECALL LEARNING ABOUT THE TOTAL ALLOWABLE

10:11AM  19     ERROR STANDARDS THAT THE COMPANY WAS USING?

10:11AM  20     A.   YES.

10:11AM  21     Q.   AND DO YOU RECALL COMING TO THE VIEW THAT THE COMPANY, IN

10:11AM  22     YOUR JUDGMENT, HAD USED THE WRONG STANDARDS FOR TOTAL ALLOWABLE

10:11AM  23     ERROR IN CONNECTION WITH THE VALIDATION OF THE EDISON ASSAYS?

10:11AM  24     A.   THAT WAS NOT MY DISAGREEMENT WITH THOSE NUMBERS.

10:11AM  25     Q.   WHAT WAS YOUR DISAGREEMENT?
```

| 10:11AM | 1 | A.   IT WAS THE WAY THAT THOSE, THOSE STANDARDS WERE USED. |

10:11AM   1    A.   IT WAS THE WAY THAT THOSE, THOSE STANDARDS WERE USED.

10:11AM   2    Q.   OKAY.  EXPLAIN.

10:11AM   3    A.   SO THE TOTAL ALLOWABLE ERROR WAS PRESUMABLY SET BY THE

10:11AM   4    LABORATORY DIRECTOR OR THEIR STAFF.  I DIDN'T SCRUTINIZE THOSE

10:11AM   5    AS MUCH AS HOW THEY WERE USED IN THE CALCULATIONS.

10:11AM   6    Q.   AND HOW DID YOU SCRUTINIZE THOSE AND HOW THEY WERE USED IN

10:12AM   7    THE CALCULATIONS?

10:12AM   8    A.   SO I CALCULATED WHAT ARE CALLED SIGMA METRICS.  SO I'LL

10:12AM   9    SPARE THE JARGON, BUT BASICALLY I SET A BASELINE TO WHICH THEY

10:12AM   10   SHOULD SET THEMSELVES, OR A BENCHMARK SO TO SPEAK, WHICH WAS

10:12AM   11   NOT DONE PROPERLY IN THE VALIDATION REPORTS.

10:12AM   12        SO I WAS NOT SCRUTINIZING THE TAE COLUMN SO TO SPEAK, BUT

10:12AM   13   MORE THE USE OF IT.

10:12AM   14   Q.   RIGHT.  AND I WANT TO STAY OUT OF THE COMPLEXITY.

10:12AM   15        BUT ESSENTIALLY, DO YOU RECALL COMING TO THE VIEW THAT THE

10:12AM   16   STANDARDS THAT WERE USED WITHIN THE VALIDATION OF THE ASSAYS

10:12AM   17   WERE ESSENTIALLY TOO WIDE AND SHOULD HAVE BEEN TIGHTER?

10:12AM   18   A.   NO, THAT WAS, THAT WAS NOT MY DESCRIPTION.

10:12AM   19   Q.   AND IS THERE A SIMPLIFIED DESCRIPTION OF THE CONCLUSION

10:12AM   20   THAT YOU CAME TO?

10:12AM   21   A.   LET ME TRY.

10:13AM   22   Q.   YEAH.

10:13AM   23   A.   IT WAS AN ANALYSIS OF THE ERROR RATES THAT ENDED UP BEING

10:13AM   24   TOO HIGH --

10:13AM   25   Q.   OKAY.

10:13AM  1    A.   -- TO BE MOST CORRECT.

10:13AM  2    Q.   AND THAT WAS IN CONNECTION WITH THE VALIDATION OF THE

10:13AM  3    ASSAYS?

10:13AM  4    A.   YES.

10:13AM  5    Q.   AND SO YOUR, YOUR VIEW ESSENTIALLY BECAME THAT THESE,

10:13AM  6    THESE ASSAYS NEVER SHOULD HAVE BEEN OFFERED WITHIN THE CLIA

10:13AM  7    LAB?

10:13AM  8    A.   YES.

10:13AM  9    Q.   BASED UPON THE STANDARDS THAT WERE USED IN THE VALIDATION?

10:13AM  10   A.   YES.

10:13AM  11   Q.   AND THAT THE VALIDATION REPORTS SHOULD NEVER HAVE BEEN

10:13AM  12   SIGNED BY THE LAB DIRECTOR?

10:13AM  13   A.   YES.

10:13AM  14   Q.   OKAY.  AND THAT WAS -- WITH RESPECT TO THAT BUCKET, THAT

10:13AM  15   SORT OF INFORMED YOUR VIEW AS TO WHY -- THE USE OF THE WRONG

10:13AM  16   STANDARDS INVALIDATING THE ASSAYS INFORMED YOUR VIEW AS TO WHY

10:14AM  17   THE RESULTS NEEDED TO BE VOIDED; RIGHT?

10:14AM  18   A.   IF I MAY CORRECT YOU, IT'S THE INAPPROPRIATE USE OF THOSE

10:14AM  19   STANDARDS.

10:14AM  20   Q.   SURE.

10:14AM  21   A.   BUT YES.

10:14AM  22   Q.   AND AGAIN, WITHOUT GOING INTO THE SPECIFICS, THERE WERE

10:14AM  23   SORT OF CALCULATIONS THAT WERE PERFORMED WHICH CAUSED YOU TO BE

10:14AM  24   OF THE VIEW THAT THE ASSAYS SHOULD NEVER HAVE BEEN VALIDATED;

10:14AM  25   CORRECT?

10:14AM 1    A.    YES.

10:14AM 2    Q.    AND IT NEVER SHOULD HAVE BEEN USED WITHIN THE LAB?

10:14AM 3    A.    CORRECT.

10:14AM 4    Q.    OKAY.  AND SO THE VALIDATION OF AN ASSAY IS GENERALLY DONE

10:14AM 5    WITHIN THE SET OF STANDARDS AND FRAMEWORK THAT ARE SET BY THE

10:14AM 6    LAB DIRECTOR TO ASSESS WHETHER IT'S APPROPRIATE TO OFFER IT

10:14AM 7    WITHIN THE CLIA LAB; RIGHT?

10:14AM 8    A.    YES.  WE CALL THOSE ACCEPTANCE CRITERIA.

10:15AM 9    Q.    ACCEPTANCE CRITERIA AS SET FORTH IN THE CLIA REGULATIONS I

10:15AM 10   BELIEVE; RIGHT?

10:15AM 11   A.    YES, THERE ARE DIFFERENT CRITERIA, YES.

10:15AM 12   Q.    AND THEN AS A COMPANY WORKS ON THE PERFORMANCE OF THE

10:15AM 13   ASSAY, THEY WORK ON IT TO TRY TO MEET THAT CRITERIA; CORRECT?

10:15AM 14   A.    YES.

10:15AM 15   Q.    AND ONCE THEY MEET THE CRITERIA THAT IS SET BY THE

10:15AM 16   LABORATORY DIRECTOR, THE ASSAY WILL BE VALIDATED AND THEN

10:15AM 17   PERMITTED INTO THE LAB; RIGHT?

10:15AM 18   A.    YES.

10:15AM 19   Q.    AND YOUR VIEW IS ESSENTIALLY THE GATES THAT WERE SET WERE

10:15AM 20   WRONG?

10:15AM 21   A.    YES.

10:15AM 22   Q.    OKAY.  AND I THINK YOU TALKED ABOUT HOW YOU WENT INTO A

10:15AM 23   MEETING AND THIS WAS DISCUSSED.

10:15AM 24       DO YOU RECALL THAT?

10:15AM 25   A.    YES.

```
10:15AM   1     Q.   AND I WANT TO ASK YOU A LITTLE BIT ABOUT THAT MEETING.

10:16AM   2          DO YOU RECALL THAT IN -- BEFORE I DO, LET ME JUST ASK YOU

10:16AM   3     A LITTLE BIT ABOUT SOME EVENTS AROUND THAT TIME PERIOD.

10:16AM   4          YOU WERE WORKING -- YOU WERE TURNING OVER ROCKS AND

10:16AM   5     DIGGING INTO DATA; RIGHT?

10:16AM   6     A.   YES.

10:16AM   7     Q.   AND YOU WERE LEARNING ABOUT HOW THE COMPANY HAD VALIDATED

10:16AM   8     THE ASSAYS?

10:16AM   9     A.   YES.

10:16AM  10     Q.   AND YOU WERE ALSO INTERACTING WITH FOLKS AT CMS A BIT

10:16AM  11     DIRECTLY.

10:16AM  12          DO YOU RECALL THAT?

10:16AM  13     A.   YES, FROM TIME TO TIME.

10:16AM  14     Q.   AND LET ME -- AND THAT WAS GARY YAMAMOTO; RIGHT?

10:16AM  15     A.   YES.

10:16AM  16     Q.   AND HE WAS ONE OF THE SENIOR PEOPLE IN THE CALIFORNIA

10:16AM  17     REGION?

10:16AM  18     A.   I'M NOT AWARE OF THE HIERARCHY, BUT --

10:16AM  19     Q.   OKAY.  AND HE WAS ONE OF THE PERSONS -- HE WAS ONE OF THE

10:17AM  20     CMS EMPLOYEES WHO WAS INVOLVED IN THE INSPECTION OF THERANOS?

10:17AM  21     A.   YES.

10:17AM  22     Q.   AND THE OTHER PERSON WAS SARAH BENNETT?

10:17AM  23     A.   YES.

10:17AM  24     Q.   AND YOU INTERACTED WITH MS. BENNETT AND MR. YAMAMOTO --

10:17AM  25     A.   YES.
```

10:17AM 1    Q.   -- WHEN YOU CAME IN?

10:17AM 2         LET'S -- AND PART OF YOUR INTERACTIONS WITH THEM, WAS THAT

10:17AM 3    HELPING KIND OF INFORM HOW BEST TO RESPOND TO CMS?

10:17AM 4    A.   YES.

10:17AM 5    Q.   AND DO YOU RECALL COMING TO THE VIEW THAT THE COMPANY

10:17AM 6    SHOULD TAKE A CONSERVATIVE RESPONSE -- A CONSERVATIVE POSITION

10:17AM 7    IN TERMS OF HOW IT DEALS WITH PATIENTS IN A SAFE -- LET ME

10:17AM 8    STRIKE THAT.

10:17AM 9         YOU WANTED TO BE CONSERVATIVE, DO YOU RECALL, IN TERMS OF

10:17AM 10   THE APPROACH THAT YOU WERE TAKING ON THIS?

10:17AM 11   A.   WOULD YOU MIND PROVIDING THE SPECIFICS THERE, PLEASE.

10:17AM 12   Q.   SURE.  LET ME SHOW YOU A DOCUMENT.

10:17AM 13   A.   SURE.

10:17AM 14        MR. WADE:  THE COURT'S INDULGENCE FOR ONE SECOND?

10:18AM 15        MAY I APPROACH, YOUR HONOR?

10:18AM 16        THE COURT:  YES.

10:18AM 17   BY MR. WADE:

10:18AM 18   Q.   (HANDING.)

10:18AM 19        AND I PUT IN FRONT OF YOU EXHIBIT 14162.  AND DO YOU

10:18AM 20   RECOGNIZE THIS TO BE EMAIL COMMUNICATIONS BETWEEN YOU AND

10:18AM 21   MEMBERS OF THE TEAM THAT WAS WORKING ON THE CMS RESPONSE?

10:18AM 22   A.   YES.

10:18AM 23   Q.   OKAY.

10:18AM 24        MOVE THE ADMISSION OF 14162.

10:18AM 25        MR. LEACH:  NO OBJECTION.

10:18AM   1              THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:19AM   2          (DEFENDANT'S EXHIBIT 14162 WAS RECEIVED IN EVIDENCE.)

10:19AM   3     BY MR. WADE:

10:19AM   4     Q.   AND I DRAW YOUR ATTENTION TO THE SECOND PAGE.  AND DO YOU

10:19AM   5     SEE THERE'S AN EMAIL FROM YOU TO OTHERS MARCH 11TH?

10:19AM   6     A.   YES.

10:19AM   7     Q.   AND DO YOU SEE THAT YOU'RE GIVING A LITTLE BIT, I GUESS,

10:19AM   8     OF AN UPDATE ON SOME THINGS?

10:19AM   9          DO YOU SEE THAT?

10:19AM  10          OR YOUR PERSPECTIVE ON THINGS?

10:19AM  11     A.   YES.

10:19AM  12     Q.   AND YOU SEE IT SAYS, "I HAD A CHANCE TO TOUCH BASE WITH

10:19AM  13     TINA AND DANIEL THE OTHER DAY TO GET DETAILS ON THE UPDATED

10:19AM  14     PATIENT IMPACT ASSESSMENTS, AND I'VE DECIDED TO TAKE A MORE

10:19AM  15     CONSERVATIVE APPROACH."

10:19AM  16          DO YOU SEE THAT?

10:19AM  17     A.   YES.

10:19AM  18     Q.   AND IS IT FAIR -- AND WHAT DID YOU MEAN BY "CONSERVATIVE"

10:20AM  19     IN THAT CONTEXT?

10:20AM  20     A.   YOU KNOW, TO THE BEST OF MY RECOLLECTION, I BELIEVE I

10:20AM  21     DISAGREED WITH THE APPROACH THAT THEY WERE USING AT THE TIME.

10:20AM  22     Q.   OKAY.  YOU WANTED TO BE MORE CAUTIOUS; IS THAT FAIR?

10:20AM  23     A.   NO, I WOULD DISAGREE WITH THAT DESCRIPTION.

10:20AM  24          I BELIEVE THEY WERE APPROACHING THE PATIENT, HOW TO USE

10:20AM  25     THE SPECIAL ANALYTES TOGETHER AS OPPOSED TO SEPARATELY AS WE --

10:20AM 1    I THINK YOU CAN READ IT LATER IN THE PARAGRAPH.  THAT WAS MY

10:20AM 2    DISAGREEMENT.

10:20AM 3    Q.   OKAY.  AND YOU WERE WEIGHING IN HERE SUGGESTING THAT A

10:20AM 4    DIFFERENT APPROACH SHOULD BE TAKEN; RIGHT?

10:20AM 5    A.   THAT'S CORRECT.

10:20AM 6    Q.   AND SO THERE'S A -- TO THE EXTENT THAT THERE WAS A LITTLE

10:20AM 7    BIT OF A DISAGREEMENT BETWEEN YOU AND SOME OF THE HISTORICAL

10:20AM 8    PEOPLE WHO HAD WORKED IN THE LAB?

10:20AM 9    A.   YES.

10:20AM 10   Q.   AND YOUR APPROACH WAS FOLLOWED; CORRECT?

10:20AM 11   A.   YES.

10:20AM 12   Q.   OKAY.  AND THEN YOU -- WE TALKED ABOUT YOUR THREE BUCKETS.

10:21AM 13   THIS EMAIL MARCH 11TH I THINK IS JUST BEFORE YOU JOINED FULL

10:21AM 14   TIME, MAYBE THE FRIDAY BEFORE?

10:21AM 15   A.   YES.

10:21AM 16   Q.   AND A SHORT TIME LATER, YOU HAD A MEETING WITH MS. HOLMES.

10:21AM 17        DO YOU RECALL THAT?

10:21AM 18   A.   I DON'T RECALL THAT MEETING.

10:21AM 19   Q.   WELL, YOU RECALL A MEETING WHERE THE MAIN TOPIC OF THE

10:21AM 20   DISCUSSION WAS WHETHER OR NOT THE EDISON 3.5 ASSAY SHOULD BE

10:21AM 21   VOIDED?

10:21AM 22   A.   YES, I RECALL THAT MEETING.

10:21AM 23   Q.   OKAY.  WHO DO YOU RECALL BEING PRESENT FOR THAT MEETING?

10:21AM 24   A.   THERE WERE QUITE A FEW PEOPLE IN THE ROOM.  I DO REMEMBER

10:21AM 25   ELIZABETH, DANIEL YOUNG, I BELIEVE THE BOIES SCHILLER LAWYERS

| | |
|---|---|
| 10:21AM | 1 |

WERE THERE AS WELL, WHICH WOULD BE DAVID ZIFKIN AND TWO OTHER

LAWYERS, DR. TSCHIRHART, AND DR. HELFEND I BELIEVE.  AND MAYBE

OTHERS.

Q.   THERE MAY HAVE BEEN OTHERS?

A.   THERE MAY HAVE BEEN OTHERS.  THOSE ARE THE PRINCIPAL FOLKS

THAT I REMEMBER.

Q.   OKAY.  IS IT FAIR TO SAY THAT THE MAIN TOPIC OF THAT

MEETING WAS WHETHER THE -- ALL OF THE EDISON 3.5 RESULTS SHOULD

BE VOIDED?

A.   THAT WAS THE TOPIC.

Q.   OKAY.  AND YOU CAME INTO THAT MEETING WITH THE VIEW THAT

THEY SHOULD BE VOIDED; RIGHT?

A.   YES.

Q.   AND THERE WERE OTHER PEOPLE WHO CAME INTO THAT MEETING

WITH THE VIEW THAT THEY SHOULD NOT ALL BE VOIDED; CORRECT?

A.   I DON'T KNOW THE VIEWS OF THE OTHER PEOPLE IN THE ROOM.

Q.   WELL, DO YOU RECALL THAT THERE WAS DISCUSSION AND SOME

DISAGREEMENT AS TO APPROACH WITHIN THE MEETING?

A.   THERE WAS NO DISAGREEMENT ABOUT VOIDING.

Q.   OKAY.  DO YOU RECALL THAT MS. HOLMES FULLY SUPPORTED YOUR

DECISION TO VOID ALL OF THE EDISON 3.5 RESULTS?

A.   YES.

Q.   AND THIS WAS A BIG DECISION AT THE TIME; RIGHT?

A.   YES.

Q.   AT THE TIME THAT THIS WAS HAPPENING, THERE HAD BEEN A FAIR

| | | |
|---|---|---|
| 10:23AM | 1 | AMOUNT OF MEDIA SCRUTINY ON THE COMPANY; RIGHT? |
| 10:23AM | 2 | A.   YES. |
| 10:23AM | 3 | Q.   AND A FAIR AMOUNT OF CRITICISM; CORRECT? |
| 10:23AM | 4 | A.   YES. |
| 10:23AM | 5 | Q.   AND THIS WAS GOING TO HAVE SOME POTENTIALLY SERIOUS |
| 10:23AM | 6 | RAMIFICATIONS FOR THE COMPANY GOING FORWARD; RIGHT? |
| 10:23AM | 7 | A.   COULD YOU CLARIFY THAT LAST POINT, PLEASE. |
| 10:23AM | 8 | Q.   WELL, IT WAS A BIG DECISION TO MAKE TO VOID ALL OF THE |
| 10:23AM | 9 | ASSAYS FOR THEIR ANALYZER; RIGHT? |
| 10:23AM | 10 | A.   YES. |
| 10:23AM | 11 | Q.   AND THAT WASN'T NECESSARILY SOMETHING THAT ANYONE WANTED |
| 10:23AM | 12 | TO DO; CORRECT? |
| 10:23AM | 13 | A.   I'M NOT AWARE OF THEIR INTENTIONS OR WISHES. |
| 10:23AM | 14 | Q.   WELL, THE PREFERENCE WOULD BE NOT TO HAVE TO DO THAT; IS |
| 10:23AM | 15 | THAT FAIR? |
| 10:23AM | 16 | A.   I APOLOGIZE, I CAN'T SPEAK TO WHAT THEY WOULD HAVE WANTED. |
| 10:23AM | 17 | Q.   FAIR ENOUGH, DOCTOR. |
| 10:23AM | 18 | BUT WITHIN THAT MEETING YOU WENT IN, YOU EXPRESSED YOUR |
| 10:24AM | 19 | VIEWS ABOUT THE EDISON 3.5, AND YOU RECOMMENDED THAT THE |
| 10:24AM | 20 | RESULTS SHOULD BE VOIDED; CORRECT? |
| 10:24AM | 21 | A.   YES. |
| 10:24AM | 22 | Q.   AND YOU RECOMMENDED THAT THE -- AND MS. HOLMES AGREED WITH |
| 10:24AM | 23 | THAT DECISION; RIGHT? |
| 10:24AM | 24 | A.   YES. |
| 10:24AM | 25 | Q.   AND THAT DECISION WAS THEN ACTED UPON VERY SHORTLY |

10:24AM   1    THEREAFTER; RIGHT?

10:24AM   2    A.   YES.

10:24AM   3    Q.   AND THE VOIDING WAS COMMUNICATED TO CMS; RIGHT?

10:24AM   4    A.   YES.

10:24AM   5    Q.   AND THE VOIDED RESULTS WENT OUT TO ALL OF THE PATIENTS;

10:24AM   6    RIGHT?

10:24AM   7    A.   YES.

10:24AM   8    Q.   OKAY.  AND YOU UNDERSTOOD THAT THAT EDISON 3.5 DEVICE AT

10:24AM   9    THAT POINT HAD NOT BEEN USED FOR SOME TIME; RIGHT?

10:24AM  10    A.   YES.

10:24AM  11    Q.   THAT WAS THE, THAT WAS THE VERSION OF THE ANALYZER THAT

10:24AM  12    THE COMPANY HAD STOPPED USING BEFORE YOU JOINED, YOU EVEN

10:24AM  13    JOINED THE COMPANY; RIGHT?

10:24AM  14    A.   YES.

10:24AM  15    Q.   AND THERE WAS NEVER -- MR. LEACH ASKED YOU ABOUT WHETHER

10:25AM  16    IT EVER CAME BACK ONLINE.

10:25AM  17         DO YOU RECALL THAT?

10:25AM  18    A.   I DO RECALL THAT.

10:25AM  19    Q.   AND THERE WAS ACTUALLY NEVER INTENTION TO EVER BRING THAT

10:25AM  20    DEVICE BACK ONLINE AT THE TIME THAT YOU JOINED THE COMPANY;

10:25AM  21    RIGHT?

10:25AM  22    A.   NOT TO MY KNOWLEDGE.

10:25AM  23    Q.   AND THE COMPANY WAS ACTUALLY WORKING ON THE NEXT

10:25AM  24    GENERATION DEVICE AT THE TIME THAT YOU JOINED THE COMPANY;

10:25AM  25    RIGHT?

10:25AM 1    A.   I DON'T REMEMBER THE TIMELINE ON THAT, BUT I BELIEVE

10:25AM 2    YOU'RE CORRECT.

10:25AM 3    Q.   WELL, YOU RECALL IN THE TIME PERIOD THAT YOU WERE AT THE

10:25AM 4    COMPANY THAT THERE WAS WORK BEING DONE ON THE NEXT GENERATION

10:25AM 5    DEVICE?

10:25AM 6    A.   YES.

10:25AM 7    Q.   OKAY.  AND YOU, YOU PLAYED SOME ROLE IN THAT DURING YOUR

10:25AM 8    TENURE; RIGHT?

10:25AM 9    A.   YES.

10:25AM 10   Q.   OKAY.  I BELIEVE ON DIRECT YOU TALKED A LITTLE BIT ABOUT

10:25AM 11   THE PSA ASSAY AND A DISCUSSION THAT YOU HAD ABOUT THE PSA

10:25AM 12   ASSAY.

10:25AM 13       DO YOU RECALL THAT?

10:25AM 14   A.   YES.

10:25AM 15   Q.   OKAY.  WAS THAT IN THIS MEETING OR IN A SEPARATE MEETING?

10:26AM 16   A.   IT WAS IN AN INFORMAL MEETING.

10:26AM 17   Q.   IT WAS IN AN INFORMAL MEETING?

10:26AM 18   A.   YES.

10:26AM 19   Q.   AND LET ME STAY WITH THIS MEETING FOR A BIT.  YOU TALKED

10:26AM 20   ABOUT -- SOMETHING ABOUT MS. HOLMES REFERRING TO ONE OF HER

10:26AM 21   DEPUTIES, OR SOMETHING, IN THIS MEETING AND A DIFFERENT VIEW

10:26AM 22   THAT THEY EXPRESSED?

10:26AM 23   A.   YES.

10:26AM 24   Q.   WHAT DO YOU RECALL ABOUT THAT?

10:26AM 25   A.   I BELIEVE THERE WAS DISAGREEMENT ON WHY THE VOIDING WAS

10:26AM  1    BEING DONE.

10:26AM  2    Q.   OKAY.  AND WHAT WAS MOSTLY -- AND IT WAS YOUR VIEW THAT

10:26AM  3    OTHER PEOPLE WERE EXPRESSING OTHER VIEWS ON THE VOIDING AND WHY

10:26AM  4    IT SHOULD BE DONE?

10:26AM  5    A.   I WAS ONLY AWARE OF THAT ONE ALTERNATE VIEW.

10:26AM  6    Q.   OKAY.  AND WAS THAT DR. YOUNG?

10:26AM  7    A.   I BELIEVE SO, YES.

10:26AM  8    Q.   OKAY.  AND HE WAS EXPRESSING A DIFFERENT REASON FOR WHY

10:27AM  9    THESE RESULTS SHOULD BE VOIDED; RIGHT?

10:27AM 10    A.   I DON'T RECALL DR. YOUNG ACTUALLY VERBALIZING HIS VIEW.

10:27AM 11    Q.   OKAY.  AND I'M TRYING TO UNDERSTAND YOUR TESTIMONY.  YOU

10:27AM 12    UNDERSTOOD THAT MS. HOLMES WAS RECEIVING DIFFERENT VIEWS FROM

10:27AM 13    OTHER ADVISORS?

10:27AM 14    A.   YES.

10:27AM 15    Q.   OKAY.  AND THE MOST IMPORTANT THING FOR YOU COMING OUT OF

10:27AM 16    THAT MEETING WAS THE VOIDING OF THE RESULTS; CORRECT?

10:27AM 17    A.   YES.

10:27AM 18    Q.   AND THAT WAS WHAT HAPPENED AND WHAT WAS AGREED TO IN THAT

10:27AM 19    MEETING; RIGHT?

10:27AM 20    A.   YES.

10:27AM 21    Q.   AND THE PSA MEETING, OR PSA CONVERSATION THAT YOU HAD, I

10:27AM 22    THINK YOU TALKED ABOUT HOW YOU WERE USING THAT SORT OF AS A

10:27AM 23    DEVICE TO TRY TO EXPLAIN ISSUES RELATING TO THE EDISON TO

10:27AM 24    MS. HOLMES.

10:27AM 25         DO YOU RECALL THAT?

10:27AM   1     A.   YES, I WAS USING THAT AS AN EXAMPLE.

10:27AM   2     Q.   AND MANY OF THE ANALYSES THAT YOU WERE DOING WERE PRETTY

10:28AM   3     TECHNICAL IN NATURE; RIGHT?

10:28AM   4     A.   YES.

10:28AM   5     Q.   AND MS. HOLMES'S DIDN'T HAVE THAT SORT OF TECHNICAL

10:28AM   6     BACKGROUND; RIGHT?

10:28AM   7     A.   YES.

10:28AM   8     Q.   AND SO YOU WERE TRYING -- AND SHE HAD NOT SUPERVISED THE

10:28AM   9     LAB PREVIOUSLY TO YOUR KNOWLEDGE; RIGHT?

10:28AM  10     A.   CORRECT.

10:28AM  11     Q.   AND SO YOU WERE TRYING TO KIND OF BRIEF HER IN ON SOME OF

10:28AM  12     THESE CONCEPTS AND EXPLAIN TO HER WHY YOU CAME TO THE VIEWS

10:28AM  13     THAT YOU CAME TO; IS THAT FAIR?

10:28AM  14     A.   YES.

10:28AM  15     Q.   AND SO WHILE DOING THAT, IS IT FAIR TO SAY THAT IN SOME

10:28AM  16     WAY YOU WERE DESCRIBING, OR TRYING TO DESCRIBE, THESE THREE

10:28AM  17     BUCKETS AND HOW YOUR VIEWS WERE INFORMED?

10:28AM  18     A.   YES.

10:28AM  19     Q.   AND YOU USED, AS AN EXAMPLE OF THAT, THE PSA ASSAY TO NOTE

10:28AM  20     THAT PSA WAS DETECTED IN SOME FEMALE PATIENTS, WHICH WAS

10:28AM  21     UNUSUAL; RIGHT?

10:28AM  22     A.   YES.

10:28AM  23     Q.   AND DID YOU COME TO UNDERSTAND THAT MS. HOLMES HAD

10:29AM  24     PROVIDED SOME KIND OF A STUDY BY ANOTHER ADVISOR THAT SUGGESTED

10:29AM  25     THAT PSA COULD SOMETIMES BE DETECTED IN FEMALES?

10:29AM  1    A.   SHE BROUGHT THAT INFORMATION AT A LATER TIME POINT.

10:29AM  2    Q.   OKAY.  SOME SORT OF ACADEMIC RESEARCH OR THE LIKE.

10:29AM  3         DO YOU RECALL?

10:29AM  4    A.   I BELIEVE IT WAS EITHER AN ARTICLE OR AN ABSTRACT THAT SHE

10:29AM  5    HAD FOUND.

10:29AM  6    Q.   OKAY.  AND ARE YOU AWARE THAT THERE ARE ENDOCRINOLOGISTS

10:29AM  7    WHO HAVE DETECTED PSA IN FEMALES ON OCCASION?

10:29AM  8    A.   YES, ON OCCASION.

10:29AM  9    Q.   AND YOU CAME TO THE VIEW THAT THAT WASN'T A PLAUSIBLE

10:29AM  10   EXPLANATION FOR THE DATA ANALYSIS THAT YOU WERE DOING; CORRECT?

10:29AM  11   A.   CORRECT.

10:29AM  12   Q.   AND THAT DISCUSSION THAT YOU HAD ABOUT THAT INFORMATION,

10:29AM  13   THAT DIDN'T ALTER THE COURSE OF ACTION THAT THE COMPANY WAS

10:29AM  14   TAKING WITH RESPECT TO THE ASSAYS IN ANY WAY; RIGHT?

10:29AM  15   A.   CORRECT.

10:30AM  16   Q.   AND YOU STILL VOIDED ALL OF THE PSA ASSAYS; RIGHT?

10:30AM  17   A.   CORRECT.

10:30AM  18   Q.   AND THIS WAS PART OF THE DISCUSSION WHERE YOU, AS THE

10:30AM  19   EXPERT IN THE FIELD, WERE TRYING TO --

10:30AM  20        MR. LEACH:  YOUR HONOR, I'M SORRY TO INTERRUPT, BUT

10:30AM  21   THE JUROR IS RAISING HER HAND.

10:30AM  22        JUROR:  COULD WE TAKE A BREAK?  I NEED TO USE THE

10:30AM  23   RESTROOM.

10:30AM  24        THE COURT:  SURE.  SURE.  LET'S TAKE A BREAK NOW.

10:30AM  25   COULD WE TAKE A BREAK NOW?  WOULD THIS BE A GOOD TIME FOR

| | | |
|---|---|---|
| 10:30AM | 1 | OUR 30 MINUTE RECESS? |
| 10:30AM | 2 | MS. TREFZ:  YES. |
| 10:30AM | 3 | THE COURT:  LET'S TAKE A BREAK, AND WE'LL RESUME IN |
| 10:30AM | 4 | 30 MINUTES.  THANK YOU. |
| 10:30AM | 5 | THE WITNESS:  THANK YOU. |
| 10:30AM | 6 | (JURY OUT AT 10:30 A.M.) |
| 10:30AM | 7 | THE COURT:  THANK YOU.  PLEASE BE SEATED. |
| 10:31AM | 8 | YOU CAN STAND DOWN, DOCTOR.  THANK YOU. |
| 10:31AM | 9 | ANYTHING FURTHER BEFORE WE BREAK? |
| 10:31AM | 10 | MR. LEACH:  NO, YOUR HONOR. |
| 10:31AM | 11 | THE COURT:  ALL RIGHT. |
| 10:31AM | 12 | MR. WADE:  NO, YOUR HONOR. |
| 10:31AM | 13 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 10:31AM | 14 | (RECESS FROM 10:31 A.M. UNTIL 11:03 A.M.) |
| 11:03AM | 15 | THE COURT:  LET'S GO BACK ON THE RECORD.  ALL |
| 11:03AM | 16 | COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT. |
| 11:03AM | 17 | WE'RE OUTSIDE OF THE PRESENCE OF THE JURY. |
| 11:03AM | 18 | MR. BOSTIC, YOU WANTED TO TALK ABOUT THE NEXT WITNESS? |
| 11:03AM | 19 | MR. BOSTIC:  YES.  THANK YOU, YOUR HONOR. |
| 11:03AM | 20 | THE GOVERNMENT'S NEXT WITNESS IS ALAN EISENMAN. |
| 11:03AM | 21 | I BELIEVE THE DEFENSE MIGHT HAVE SOME QUESTIONS FROM THE |
| 11:03AM | 22 | COURT OR MIGHT BE SEEKING SOME GUIDANCE ON SOME ISSUES WE |
| 11:03AM | 23 | PREVIOUSLY TALKED ABOUT, BUT I'LL LET MR. DOWNEY ADDRESS THAT. |
| 11:03AM | 24 | THE GOVERNMENT WANTED TO RAISE WITH THE COURT THE ISSUE OF |
| 11:03AM | 25 | AN OUT OF COURT COMMENT BY THIS WITNESS.  I UNDERSTAND THE |

11:03AM   1    COURT IS AWARE.

11:03AM   2         I HAVE DISCUSSED THE MATTER WITH DEFENSE COUNSEL.  MY

11:03AM   3    UNDERSTANDING IS THAT THE DEFENSE COUNSEL MAY DECIDE TO RAISE

11:03AM   4    THAT TOPIC IN THE CROSS OF THIS WITNESS.

11:04AM   5         MY CONCERN, IF SO, WOULD BE MAKING SURE THAT THE COURT'S

11:04AM   6    ORDER REGARDING MENTIONING PUNISHMENT IN FRONT OF THE JURY IS

11:04AM   7    COMPLIED WITH.  SO I WANTED TO MAKE SURE THAT WE HAD AN

11:04AM   8    OPPORTUNITY TO UNDERSTAND THE BOUNDARIES OF THAT EXAMINATION,

11:04AM   9    IF NECESSARY.

11:04AM  10              THE COURT:  SURE.  OKAY.  THANK YOU.

11:04AM  11              MR. DOWNEY:  WELL, YOUR HONOR, I THINK I WAS REALLY

11:04AM  12    INTENDING, IN TERMS OF THE CONTENT OF THE WITNESS'S COMMENT

11:04AM  13    OUTSIDE OF COURT, JUST TO ASK HIM WHETHER HE MADE THE COMMENT

11:04AM  14    OR NOT, AND NOT BEYOND THAT.

11:04AM  15         I DON'T THINK -- I THINK IT'S AN IMPORTANT ELEMENT OF

11:04AM  16    CONFRONTING THIS WITNESS POTENTIALLY DEPENDING ON HIS TESTIMONY

11:04AM  17    ON DIRECT.  THERE'S NOT A REFERENCE TO A PARTICULAR TERM OR A

11:04AM  18    PARTICULAR PUNISHMENT.  I THINK IN GENERAL TERMS IT WON'T

11:04AM  19    INTRUDE ON THAT -- ON THE COURT'S INSTRUCTION ON PUNISHMENT,

11:04AM  20    WHICH I ANTICIPATE IT WILL GIVE, AS IT ALWAYS DOES.

11:04AM  21         SO I DON'T THINK THERE'S ANY ISSUE PRESENTED.  I DON'T

11:04AM  22    MEAN TO GO BEYOND WHAT THE WITNESS SAID.

11:05AM  23              THE COURT:  SO IS IT YOUR INTENT -- OR AS YOU LOOK

11:05AM  24    AT IT TODAY, YOUR INTENT WOULD BE TO ASK HIM, DID YOU SAY X?

11:05AM  25              MR. DOWNEY:  EXACTLY.

11:05AM  1          THE COURT:  AND HE'LL RESPOND.  AND WHAT WILL YOU DO

11:05AM  2    WITH THAT?

11:05AM  3          MR. DOWNEY:  WELL, I -- WHATEVER I DO WITH IT, IT'S

11:05AM  4    NOT GOING TO BE TALKING ABOUT THE SENTENCING GUIDELINES WITH

11:05AM  5    HIM GETTING INTO PARTICULAR PUNISHMENT.

11:05AM  6       SO I DON'T THINK MR. BOSTIC'S CONCERN IS REALLY GOING TO

11:05AM  7    BE MADE RIPE I THINK AT THIS POINT.

11:05AM  8          THE COURT:  THANK YOU FOR THAT.  I SUPPOSE THAT

11:05AM  9    COULD BLEED INTO -- IT MIGHT BE A BIAS ISSUE OR SOMETHING LIKE

11:05AM  10   THAT.

11:05AM  11         MR. DOWNEY:  SURE.

11:05AM  12         THE COURT:  BUT IT COULD BLEED INTO SOMETHING ELSE

11:05AM  13   THAT I'LL JUST SAY I'LL HAVE TO SCRUTINIZE AT THE TIME.

11:05AM  14         MR. DOWNEY:  WELL, YOUR HONOR, I DON'T WANT THE

11:05AM  15   WITNESS'S, YOU KNOW, OUT OF COURT BEHAVIOR, WHICH IS

11:05AM  16   INAPPROPRIATE IN MY VIEW, I DON'T WANT TO ALLOW THAT TO BECOME

11:06AM  17   AN INVITATION TO HIM TO SORT OF NARRATE HIS GRIEVANCES ON

11:06AM  18   REDIRECT, FOR EXAMPLE.

11:06AM  19         THE COURT:  SURE.

11:06AM  20         MR. DOWNEY:  SO, YOU KNOW, MY CONCERN IS ONLY TO

11:06AM  21   DEMONSTRATE THAT HE'S ARTICULATED THAT PARTICULAR AGENDA BEFORE

11:06AM  22   TESTIFYING AND NOT REALLY BEYOND THAT.

11:06AM  23       BUT I DON'T WANT HIM TO BE PERMITTED ON REDIRECT TO SAY

11:06AM  24   THINGS HE OTHERWISE WOULD NOT BE PERMITTED TO SAY IN TERMS OF

11:06AM  25   MAKING CLAIMS ABOUT MS. HOLMES.

DAS CROSS BY MR. WADE (RES.)                                          5958

```
11:06AM   1        SO I, I -- IF THE COURT WERE TO INDICATE IT'S GOING TO

11:06AM   2   ALLOW THAT, I PROBABLY WOULD REFRAIN FROM THAT QUESTIONING, BUT

11:06AM   3   I THINK THAT WOULD BE HIGHLY INAPPROPRIATE.

11:06AM   4        THE COURT:  WELL, I DON'T.  HIS -- A WITNESS'S BIAS,

11:06AM   5   IF ANY, IS ALWAYS RELEVANT AS WE KNOW.

11:06AM   6        AND WE KNOW THERE WAS THIS STATEMENT THAT WAS OBSERVED BY

11:06AM   7   INDIVIDUALS.

11:06AM   8        HAVE YOU SATISFIED REVIEWING THAT WITH MR. SCHENK?

11:06AM   9        MR. DOWNEY:  WELL, I HAVE NOT YET HAD THE

11:06AM  10   OPPORTUNITY TO REVIEW WHAT MR. SCHENK AND I WERE INTENDING TO

11:06AM  11   REVIEW.

11:06AM  12        THE COURT:  OKAY.

11:06AM  13        MR. DOWNEY:  AS OF THIS MORNING, I THINK MR. SCHENK

11:06AM  14   HAS STILL NOT BEEN APPRISED OF WHEN THAT MIGHT BE POSSIBLE.

11:07AM  15        THE COURT:  OKAY.  WELL, WE --

11:07AM  16        MR. BOSTIC?

11:07AM  17        MR. BOSTIC:  I'M SORRY.  TWO POINTS IN RESPONSE TO

11:07AM  18   THE ARGUMENTS BY MR. DOWNEY.

11:07AM  19        FIRST, AS TO THE CONTENT OF THE STATEMENT, I DON'T THINK

11:07AM  20   THAT -- EVEN PUTTING THE CONTENT OF THE STATEMENT IN FRONT OF

11:07AM  21   THE JURY I THINK IS IN CONFLICT WITH OR IN SEVERE TENSION WITH

11:07AM  22   THE COURT'S ORDER ABOUT MENTIONING PUNISHMENT IN FRONT OF THE

11:07AM  23   JURY.

11:07AM  24        THAT RULE AND THE COURT'S ORDER DOESN'T SAY ANYTHING

11:07AM  25   ABOUT, WELL, YOU CAN MENTION PUNISHMENT OR THE NATURE OF THE
```

11:07AM  1    PUNISHMENT, JUST NOT THE LENGTH OF THE TERM OR ANYTHING

11:07AM  2    SPECIFIC.  IT'S MORE GENERAL THAN THAT, AND FOR GOOD REASON.

11:07AM  3        I THINK THE PARTIES HAVE BEEN CAREFUL THUS FAR NOT TO MAKE

11:07AM  4    COMMENTS, ANY OF WHICH WOULD BE SPECULATIVE, BY THE WAY, ABOUT

11:07AM  5    WHAT ANY SENTENCE MIGHT BE OR THE FORM IT MIGHT TAKE.

11:07AM  6        SO I THINK TO PUT THAT CONCEPT IN FRONT OF THE JURY FOR

11:07AM  7    THE FIRST TIME I THINK WOULD BE CROSSING A LINE THAT WE HAVE

11:07AM  8    NOT YET CROSSED AND SHOULDN'T BE CROSSED.

11:07AM  9        I THINK THERE'S A WAY TO EXPLORE THAT SAME ISSUE BY SIMPLY

11:08AM  10   REMOVING THAT CONCEPT FROM THE COMMENT AND DESCRIBING IT IN

11:08AM  11   TERMS OF A DESIRE ABOUT THE OUTCOME OF THE CASE OR ABOUT THE

11:08AM  12   JURY'S VERDICT.  I THINK THERE'S A WAY TO DO THAT WITHOUT

11:08AM  13   MENTIONING THE NATURE OF ANY POTENTIAL PUNISHMENT THAT IS IN

11:08AM  14   GREATER COMPLIANCE WITH THE COURT'S ORDER.

11:08AM  15           THE COURT:  WELL, THANK YOU.  AGAIN, IT'S ONE OF THE

11:08AM  16   MANY THORNY ISSUES THAT HAVE COME UP IN THIS CASE.  IT'S -- AND

11:08AM  17   WE HAVE NO CONTROL OVER WHAT THIS WITNESS'S RESPONSE IS.  I'M

11:08AM  18   NOT GOING TO ASK THE GOVERNMENT TO TELL ITS WITNESS WHAT TO SAY

11:08AM  19   AND WHAT NOT TO SAY, NOR AM I GOING TO TELL YOU, MR. DOWNEY,

11:08AM  20   THAT.

11:08AM  21       WE HAVE TO BE VERY CAREFUL ABOUT -- YOU KNOW WHAT THE RULE

11:08AM  22   IS.  YOU KNOW I'VE SAID WE'RE NOT GOING TO MENTION PUNISHMENT

11:08AM  23   AND WE'RE NOT GOING TO GET THAT OUT OF ANY WITNESS.

11:08AM  24       THIS STATEMENT WAS NOT A STATEMENT THAT WAS ELICITED BY A

11:08AM  25   COUNSEL AT ALL.  IT WAS A STATEMENT THAT APPARENTLY THIS

11:09AM 1   WITNESS MADE UPON ENTERING THE COURT.  IT PERHAPS TOUCHES ON

11:09AM 2   HIS BIAS, HIS PERSONAL FEELINGS.

11:09AM 3       I DON'T KNOW, MR. DOWNEY, IF YOU CAN ASK A QUESTION THAT

11:09AM 4   AVOIDS THAT.  I DON'T KNOW WHAT THE VALUE IS OF GETTING THE

11:09AM 5   ACTUAL PUNISHMENT TYPE IN AS OPPOSED TO GETTING IN, YOU KNOW,

11:09AM 6   YOU HAVE CERTAIN FEELINGS ABOUT WHAT SHOULD HAPPEN IN THIS

11:09AM 7   CASE.

11:09AM 8           MR. DOWNEY:  WELL, I DON'T KNOW THAT I CAN DO THAT,

11:09AM 9   YOUR HONOR.  I MEAN, I THINK THE STATEMENT REVEALS THE SEVERITY

11:09AM 10  OF THE AGENDA THAT HE'S BRINGING IN TO TESTIFY.

11:09AM 11      I'M NOT SURE THAT REALLY A RESTRICTION ON SORT OF A

11:09AM 12  GENERAL CONCEPT OF SENDING A WITNESS -- SENDING A DEFENDANT TO

11:09AM 13  PRISON OR JAIL WOULD ACTUALLY BE CONSISTENT WITH THE

11:09AM 14  CONFRONTATION CLAUSE.

11:09AM 15      I THINK AS YOU GET INTO MORE DETAIL ABOUT THAT, YOU KNOW,

11:09AM 16  THE CASES TEND TO RESTRICT IT.

11:09AM 17      BUT I DON'T WANT TO -- AT THIS POINT, I DON'T WANT TO BE

11:10AM 18  UNDER ANY RESTRICTION, YOU KNOW, AND WE'LL SEE HOW IT GOES.  I

11:10AM 19  MEAN, I HAVE TO ASSESS THE WITNESS OBVIOUSLY.

11:10AM 20          THE COURT:  NO.  SURE.  AND YOU HAVEN'T SEEN --

11:10AM 21          MR. DOWNEY:  I HAVEN'T SEEN HIM AND SEEN THE TAPE.

11:10AM 22          THE COURT:  AND I DON'T KNOW IF THERE'S VIDEO OR

11:10AM 23  AUDIO ON THAT TAPE OR WHATEVER.

11:10AM 24      ALL RIGHT.  WELL, THANK YOU FOR RAISING IT.  I DO HAVE

11:10AM 25  SOME CONCERNS ABOUT THAT.

11:10AM    1          ON THE OTHER HAND, THE WITNESS SAID WHAT HE ALLEGEDLY

11:10AM    2    SAID, AND I DO THINK IT'S APPROPRIATE TO INQUIRE ON THAT.

11:10AM    3          BUT YOU CAN'T GO INTO ANY DETAIL ON THAT.  YOU REALLY

11:10AM    4    CAN'T.

11:10AM    5          AND IT WILL MOST LIKELY BE, IF SOMETHING COMES UP ABOUT

11:10AM    6    THAT, I WILL, ONCE AGAIN, TELL THIS JURY THAT THEY'RE NOT TO

11:10AM    7    CONSIDER PUNISHMENT IN ANY WAY, IN ANY FASHION AT ALL.  AND I

11:10AM    8    MIGHT DO THAT WHILE THIS WITNESS IS ON THE STAND.

11:10AM    9          BUT, YOU KNOW, TO PROBE IT ANY FURTHER THAN THAT, OF

11:10AM   10    COURSE --

11:10AM   11          MR. DOWNEY:  WELL, AS I'VE SAID, I DON'T INTEND TO

11:10AM   12    PROBE IT ANY FURTHER THAN THAT, BUT I THINK THAT'S SORT OF

11:10AM   13    PRECISELY WHERE THE LINE HAS BEEN WHERE I'M BALANCING THE

11:11AM   14    PRINCIPLE YOUR HONOR IS ARTICULATING WITH THE RIGHT TO

11:11AM   15    DEMONSTRATE A WITNESS'S BIAS.

11:11AM   16          MR. BOSTIC:  YOUR HONOR, JUST ON THAT, I WOULD ASK,

11:11AM   17    IF THE DEFENSE IS ALLOWED TO GO INTO THE CONTENT OF THAT

11:11AM   18    QUESTION, THE GOVERNMENT BE ALLOWED A REASONABLE AMOUNT OF

11:11AM   19    LATITUDE TO FOLLOW UP, AGAIN, NOT GOING DEEPER INTO THE

11:11AM   20    PROBLEMATIC AREAS, BUT TO ASK THIS WITNESS, YOU KNOW, FOR

11:11AM   21    EXAMPLE, WHETHER THAT FEELING AFFECTED HIS TESTIMONY OR THE --

11:11AM   22    YOU KNOW, INTERFERED WITH HIS ABILITY TO ANSWER QUESTIONS

11:11AM   23    DURING DIRECT.

11:11AM   24          THE COURT:  I THINK THIS WITNESS HAS BEEN IDENTIFIED

11:11AM   25    BY THE GOVERNMENT AS A VICTIM.

11:11AM  1          MR. DOWNEY:  HE HAS.

11:11AM  2          THE COURT:  AND AS A VICTIM, HE MAY HAVE SOME

11:11AM  3  STATEMENTS ABOUT WHAT HAPPENED TO HIM AND HOW HE FEELS, AND

11:11AM  4  THAT'S, THAT'S -- WITHIN CERTAIN REASON, THAT'S PERMISSIBLE.

11:11AM  5      BUT THIS WHOLE OTHER ISSUE IS SOMETHING THAT YOU BOTH HAVE

11:12AM  6  TO TREAD VERY LIGHTLY ON.

11:12AM  7          MR. DOWNEY:  WELL, YOUR HONOR, I DON'T WANT TO LET

11:12AM  8  YOUR COMMENT GO, BECAUSE TO MY MIND, I DON'T THINK THE WITNESS

11:12AM  9  SHOULD GET A GOLD STAR FOR THIS BEHAVIOR AND BE ALLOWED TO SAY,

11:12AM 10  BOY, BECAUSE I'VE BEEN DEFRAUDED, I WANT HER TO GO TO PRISON.

11:12AM 11  THAT SEEMS TO ME LIKE IT WOULD BE WILDLY INAPPROPRIATE.

11:12AM 12          THE COURT:  WELL, IF HE SAYS THAT, IF HE SAYS, I

11:12AM 13  SAID WHAT I SAID BECAUSE SHE, YOU KNOW -- PARDON ME -- STOLE

11:12AM 14  MONEY FROM ME AND I BELIEVE PEOPLE WHO STEAL SHOULD GO TO

11:12AM 15  PRISON, I DON'T KNOW, HE MIGHT SAY SOMETHING LIKE THAT.

11:12AM 16          MR. BOSTIC:  YOUR HONOR, THAT'S THE KIND OF

11:12AM 17  TESTIMONY, OF COURSE, THE GOVERNMENT WOULD NEVER SEEK TO ELICIT

11:12AM 18  ON DIRECT OR ON REDIRECT.

11:12AM 19      BUT THAT'S PART OF MY CONCERN HERE IS THAT IF WE GO INTO

11:12AM 20  THAT TOPIC, WE'RE NOT SURE WHAT THE WITNESS WILL SAY ON CROSS.

11:12AM 21      AND ON DIRECT I FEEL LIKE IT WILL OPEN THE DOOR TO SOME

11:12AM 22  APPROPRIATE LEVEL OF QUESTIONING ABOUT THE MOTIVE FOR THAT

11:13AM 23  STATEMENT, WITHIN REASON.

11:13AM 24          THE COURT:  WELL, AND THAT'S THE THING, TOO, IS THAT

11:13AM 25  A WITNESS, A VICTIM MIGHT SAY, WELL, YEAH, I'M UPSET BECAUSE I

11:13AM  1    LOST MONEY, OR WHATEVER THE WITNESS MIGHT SAY.

11:13AM  2        I THINK THAT'S SOMETHING THAT WE COULD EXPECT IN THE HUMAN

11:13AM  3    EXPERIENCE.  SOMEONE -- PARTICULARLY BASED ON WHAT WE KNOW

11:13AM  4    ABOUT WHAT WAS SAID HERE, WE MIGHT ANTICIPATE THAT.

11:13AM  5        SO WE'RE ALL GOING TO BE -- HAVE TO BE ON GUARD TO SHUT

11:13AM  6    THAT DOWN AS BEST WE CAN FOR BOTH SIDES' REASONS.

11:13AM  7        SOME OF THIS IS -- THE BIAS, THAT'S ALWAYS RELEVANT FOR A

11:13AM  8    WITNESS.  THE WITNESS, HIS STATEMENT, THE REASONS WHY HE SAYS

11:13AM  9    WHAT HE DOES, BECAUSE HE FEELS HE'S A VICTIM, THAT HAPPENS IN

11:13AM  10   CRIMINAL TRIALS FREQUENTLY.

11:13AM  11       BUT THERE'S LIMITS TO THAT, OF COURSE.

11:13AM  12       OKAY.

11:13AM  13           MR. DOWNEY:  YOUR HONOR, JUST A MORE MEAT AND

11:13AM  14   POTATOES ISSUE.

11:14AM  15           THE COURT:  SURE.

11:14AM  16           MR. DOWNEY:  WE HAD DISCUSSED MANY MOONS AGO WHEN

11:14AM  17   THIS WITNESS WAS ANTICIPATED THAT I HAD ASKED FOR SOME

11:14AM  18   RESTRICTIONS ON PORTIONS OF DOCUMENTS, AND I THINK YOUR HONOR

11:14AM  19   HAD DISAGREED WITH ME ON ONE FRONT AND AGREED ON ANOTHER FRONT.

11:14AM  20       AND THERE ARE FOUR EXHIBITS THAT ARE AFFECTED BY THAT, AND

11:14AM  21   I THOUGHT, SINCE I'LL BE MENTIONING THAT WHEN THE WITNESS IS ON

11:14AM  22   DIRECT, I MIGHT JUST GIVE THE COURT THOSE EXHIBITS.

11:14AM  23           THE COURT:  SURE.

11:14AM  24           MR. DOWNEY:  BUT I WILL HIGHLIGHT TO MR. BOSTIC AS

11:14AM  25   WELL.

11:14AM   1          THEY ARE 2216.  THE COURT HAD REJECTED ONE OF MY

11:14AM   2     SUGGESTIONS, BUT ACCEPTED ANOTHER ONE, AND THAT IS ON THE FIRST

11:14AM   3     PAGE AND IT'S HIGHLIGHTED HERE.

11:14AM   4          THE COURT:  DO YOU WANT ME TO LOOK AT THIS?

11:14AM   5          MR. DOWNEY:  JUST -- I THINK THAT, I THINK THAT IS

11:14AM   6     CONSISTENT WITH THE DIRECTION, BUT YOU MIGHT WANT TO CONFIRM IT

11:14AM   7     AND HAVE IT SO IF THE ISSUE COMES UP.

11:15AM   8          AND THEN --

11:15AM   9          MR. BOSTIC:  COUNSEL, I'M SORRY.  IF WE COULD JUST

11:15AM  10     TAKE THESE ONE BY ONE VERY BRIEFLY?

11:15AM  11          MR. DOWNEY:  SURE.

11:15AM  12          MR. BOSTIC:  AS TO 2216, YOUR HONOR, MY

11:15AM  13     UNDERSTANDING FROM OUR PREVIOUS DISCUSSION IS THAT THERE'S A

11:15AM  14     LINE IN MR. EISENMAN'S EMAIL THAT SAYS -- SORRY.  THERE'S A

11:15AM  15     LINE ON PAGE 1 OF 2216, AN EMAIL FROM MR. EISENMAN SAYS, "I

11:15AM  16     HAVE MOST OF MY NET WORTH IN YOUR COMPANY."

11:15AM  17          I REMEMBER THE COURT HAD CONCERNS ABOUT THAT LINE.  THE

11:15AM  18     GOVERNMENT'S INTENTION IS TO REDACT THAT FROM THE --

11:15AM  19          MR. DOWNEY:  OKAY.  THAT'S FINE.  THAT'S GOOD WITH

11:15AM  20     ME.

11:15AM  21          AND THEN ON 2648, I THINK THE COURT --

11:15AM  22          MR. BOSTIC:  2468?

11:15AM  23          MR. DOWNEY:  2468, WE HAD A SIMILAR CONCERN, AND I

11:15AM  24     THINK YOU HAD PERMITTED THE GOVERNMENT TO INCLUDE THE DIFFERENT

11:16AM  25     STAGE OF LIFE LANGUAGE ON THE FIRST PAGE, SO I WAS UNSUCCESSFUL

11:16AM   1       THERE.

11:16AM   2           BUT THEN THERE'S A REFERENCE ON THE SECOND PAGE TO THE

11:16AM   3       GRANDDAUGHTER BEING BORN AND HIS RETIREMENT AND SO FORTH.

11:16AM   4               THE COURT:  RIGHT.

11:16AM   5               MR. DOWNEY:  I DON'T KNOW WHAT THE COURT'S INTENTION

11:16AM   6       IS WITH RESPECT TO THAT, BUT I HAVE HIGHLIGHTED WHAT BOTHERS ME

11:16AM   7       THERE.

11:16AM   8               MR. BOSTIC:  I INTEND TO INTRODUCE THAT EXHIBIT AS

11:16AM   9       IS, YOUR HONOR.  I DON'T THINK THAT HAS ANYTHING TO DO WITH THE

11:16AM  10       KINDS OF ISSUES THAT THE COURT WOULD SEEK TO LIMIT IN TERMS OF

11:16AM  11       DOWNSTREAM HARM.

11:16AM  12           THIS IS SIMPLY AN EXPLANATION FROM THIS WITNESS ABOUT WHY

11:16AM  13       HE WAS SEEKING ADDITIONAL INFORMATION FROM THE COMPANY.

11:16AM  14               THE COURT:  DO YOU HAVE A COPY?  I DIDN'T BRING IT

11:16AM  15       UP WITH ME HERE.  I'M SORRY.

11:16AM  16               MR. DOWNEY:  YES, I DO, YOUR HONOR.

11:16AM  17               THE COURT:  THANK YOU.

11:17AM  18               MR. DOWNEY:  LET ME JUST ELIMINATE ONE OF THESE.

11:17AM  19               MR. BOSTIC:  YOUR HONOR, MY UNDERSTANDING FOLLOWING

11:17AM  20       OUR LAST CONVERSATION WAS THAT THE LINE THAT I MENTIONED

11:17AM  21       REDACTING WAS THE ONLY LINE THAT THE COURT WAS INCLINED TO

11:17AM  22       REDACT.  BUT WE'RE, OF COURSE, INTERESTED IN ANY FURTHER

11:17AM  23       GUIDANCE THE COURT HAS.

11:17AM  24               THE COURT:  THAT WAS IN 2216?

11:17AM  25               MR. BOSTIC:  YES, YOUR HONOR.

| | | |
|---|---|---|
| 11:17AM | 1 | THE COURT:  YES. |
| 11:17AM | 2 | MR. DOWNEY:  AND 2468, IT'S REALLY THE TOP OF THE |
| 11:17AM | 3 | SECOND PAGE WHICH IS HIGHLIGHTED WHICH IS THE REFERENCE TO A |
| 11:17AM | 4 | BABY AND SO FORTH. |
| 11:17AM | 5 | (HANDING.) |
| 11:17AM | 6 | (PAUSE IN PROCEEDINGS.) |
| 11:17AM | 7 | THE COURT:  THE FIRST LINE ON PAGE 2? |
| 11:17AM | 8 | MR. DOWNEY:  THAT'S RIGHT. |
| 11:17AM | 9 | THE COURT:  YES. |
| 11:18AM | 10 | (PAUSE IN PROCEEDINGS.) |
| 11:18AM | 11 | THE COURT:  SO IF THAT LINE IS REDACTED, THEN WHAT |
| 11:18AM | 12 | REMAINS IS, "WE ARE BOTH CONSIDERING." |
| 11:18AM | 13 | THIS CONVERSATION SEEMS TO INCLUDE THE DAUGHTER. |
| 11:18AM | 14 | MR. DOWNEY:  RIGHT. |
| 11:18AM | 15 | MR. BOSTIC:  YOUR HONOR, I JUST DON'T THINK THAT'S |
| 11:18AM | 16 | ANYWHERE NEAR THE STANDARD OF WHAT NEEDS TO BE EXCLUDED UNDER |
| 11:18AM | 17 | 403. |
| 11:18AM | 18 | MR. DOWNEY:  WELL, I THINK WE'RE AGREED, MAYBE WE'RE |
| 11:19AM | 19 | NOT, BUT I THINK WE'RE AGREED THAT WHAT A PURPORTED VICTIM DOES |
| 11:19AM | 20 | WITH THE PROPERTY THAT IS THE SUBJECT OF THE WIRE FRAUD CHARGE |
| 11:19AM | 21 | IS POTENTIAL 403 MATERIAL AND NOT RELEVANT. |
| 11:19AM | 22 | I WOULD SAY THIS IS HIGHLY INFLAMMATORY IN THE SENSE THAT |
| 11:19AM | 23 | WHATEVER THE TRUTH OF THE ASSERTION IS, YOU KNOW, THE SENSE OF |
| 11:19AM | 24 | IT IS THAT THE IMPACT IS BEING VISITED ON HIS GRANDDAUGHTER. |
| 11:19AM | 25 | THE COURT:  HIS DAUGHTER. |

11:19AM 1      AND IF IT READ, IN ADDITION TO THE FACT I'M RETIRING, AND

11:19AM 2   THEN ALL OF THAT BALANCE IS REDACTED, PERHAPS THAT SOLVES IT.

11:19AM 3      BUT I STILL HAVE A PROBLEM WITH THE CONTEXT, BECAUSE THEN

11:19AM 4   IT REFERS TO "WE."

11:19AM 5           MR. BOSTIC:  YOUR HONOR, I'LL JUST POINT OUT THIS IS

11:19AM 6   ALL BEFORE ANY MONEY WAS ACTUALLY LOST.  SO IT WOULD BE ONE

11:19AM 7   THING IF THE WITNESS HAD LOST THE MONEY, WAS AT THIS TIME A

11:19AM 8   VICTIM OF A COMPLETED FRAUD, AND WAS SAYING, HERE'S HOW THIS

11:20AM 9   HURT ME, HERE'S HOW THIS HURT MY FAMILY.

11:20AM 10     THAT'S NOT AT ALL WHAT IS HAPPENING HERE.  INSTEAD, THIS

11:20AM 11  WITNESS IS SAYING, AS THE COURT NOTED BEFORE, MY LIFE

11:20AM 12  CIRCUMSTANCES HAVE CHANGED AND HERE'S WHY I'M EVALUATING WHAT

11:20AM 13  TO DO WITH THIS INVESTMENT, THIS IS WHY I WOULD LIKE MORE

11:20AM 14  INFORMATION ABOUT THE COMPANY.

11:20AM 15          MR. DOWNEY:  ON THAT POINT, YOUR HONOR, HE'S

11:20AM 16  OBVIOUSLY TYING THESE ISSUES TO THE INVESTMENT, WHICH THE

11:20AM 17  BALANCE OF HIS TESTIMONY IS GOING TO SUGGEST, YOU KNOW, HE LOST

11:20AM 18  SO MUCH.  I DON'T THINK THE DISTINCTION IS AS SIGNIFICANT AS

11:20AM 19  MR. BOSTIC SUGGESTS, BUT --

11:20AM 20          THE COURT:  THANK YOU.  I THINK AT LEAST I'M TRYING

11:20AM 21  TO PUT MYSELF IN YOUR SHOES, MR. DOWNEY, AND I THINK THE MOST

11:20AM 22  TROUBLING PART OF THIS IS "RECENTLY HAD A BABY."

11:20AM 23          MR. DOWNEY:  FOR SURE.

11:20AM 24          THE COURT:  "AND NEEDS LIQUIDITY."

11:20AM 25     AND I THINK IF IT READ, IN ADDITION TO THE FACT THAT I'M

11:20AM  1   RETIRING, MY DAUGHTER KELLY EITHER NEEDS -- AND STRIKE THE

11:21AM  2   "RECENTLY HAD A BABY" PART -- NEEDS LIQUIDITY TO BUY A HOUSE

11:21AM  3   AND WE'RE BOTH CONSIDERING --

11:21AM  4           MR. DOWNEY:  THAT'S FINE, YOUR HONOR.  THAT SOUNDS

11:21AM  5   LIKE A SENSIBLE LINE.

11:21AM  6           THE COURT:  SO WE'LL STRIKE THE "RECENTLY HAD A

11:21AM  7   BABY" --

11:21AM  8           MR. DOWNEY:  THAT'S FINE.

11:21AM  9           THE COURT:  -- UNDER 403.

11:21AM 10       AND THEN THE CONTEXT, OR AT LEAST THE GRAMMAR, THE

11:21AM 11   REMAINING WOULD BE CONSISTENT.

11:21AM 12           MR. BOSTIC:  UNDERSTOOD, YOUR HONOR.

11:21AM 13           THE COURT:  AND YOU'LL DO THE BEST THAT YOU CAN TO

11:21AM 14   NOT HAVE HIM TALK ABOUT HIS GRANDDAUGHTER.

11:21AM 15           MR. BOSTIC:  I WON'T INTENTIONALLY ELICIT THAT,

11:21AM 16   YOUR HONOR.

11:21AM 17           THE COURT:  LET ME RETURN THESE TO YOU BOTH

11:21AM 18   (HANDING).

11:21AM 19           MR. DOWNEY:  THANK YOU, YOUR HONOR.

11:21AM 20       AND THE LAST ISSUE RELATES TO ANOTHER ISSUE ON WHICH THE

11:21AM 21   COURT HAS ALREADY RULED, BUT I JUST WANTED TO IDENTIFY TWO OF

11:21AM 22   THE DOCUMENTS, AND THERE'S ALSO A BIT OF A DISCUSSION ABOUT THE

11:21AM 23   GRANDDAUGHTER IN THESE AS WELL, 1371 AND 1663.  I'LL HAND THOSE

11:22AM 24   UP.

11:22AM 25       I HAD REQUESTED THAT MR. BOSTIC BE PRECLUDED FROM

DAS CROSS BY MR. WADE (RES.) 5969

11:22AM 1    ELICITING FROM THE WITNESS DETAILS ABOUT DISCUSSIONS OF AN IPO

11:22AM 2    IN THE 2006 TO 2010 TIMEFRAME.

11:22AM 3        I THINK THE COURT SUGGESTED IT WAS MORE INCLINED TO GIVE

11:22AM 4    AN INSTRUCTION IN CONNECTION WITH THAT.  I THINK -- OUR

11:22AM 5    POSITION IS I THINK THAT IT IS WELL BEYOND THE SCOPE OF A

11:22AM 6    WIDELY CHARGED CASE, BOTH IN TIME AND SUBSTANCE, AND SO WE

11:22AM 7    WOULD LIKE TO HAVE IT EXCLUDED.

11:22AM 8        BUT IN ANY EVENT, IF THE COURT WERE TO AGREE WITH US, THAT

11:22AM 9    REFLECTS WHERE THE REDACTIONS WOULD BE.

11:22AM 10            THE COURT:  ALL RIGHT.  THIS IS ON -- SHOULD WE LOOK

11:22AM 11    AT 1371 FIRST?

11:22AM 12            MR. DOWNEY:  OKAY.

11:23AM 13            THE COURT:  AND IS THE FIRST REDACTION ON PAGE 12?

11:23AM 14    NO.  IT LOOKS LIKE --

11:23AM 15            MR. DOWNEY:  YEAH, THERE ARE SOME TELEPHONIC

11:23AM 16    REDACTIONS BEFORE THEN, BUT --

11:23AM 17            THE COURT:  IT LOOKS LIKE IT'S PAGE 9.

11:23AM 18            MR. DOWNEY:  YEAH, I THINK ON PAGE 9 THE COURT HAS

11:23AM 19    EFFECTIVELY NOT ACCEPTED THAT REDACTION BY ITS RULING ON THE

11:23AM 20    OTHER DOCUMENTS.

11:23AM 21        I THINK ON PAGE 10 THERE ARE TWO REDACTIONS, ONE OF WHICH

11:23AM 22    TOUCHES ON THE BABY.

11:23AM 23            THE COURT:  WE JUST COVERED THAT, DIDN'T WE?

11:23AM 24            MR. DOWNEY:  YEAH, I THINK THAT'S THE SAME EMAIL.

11:23AM 25            THE COURT:  RIGHT.

11:23AM 1              MR. DOWNEY:  BUT IT WOULD BE REDACTED HERE.

11:23AM 2              MR. BOSTIC:  SORRY TO INTERRUPT, COUNSEL.  I ONLY

11:23AM 3     INTEND TO INTRODUCE PAGES 1 THROUGH 8.

11:23AM 4              MR. DOWNEY:  ALL RIGHT.  WELL, THAT SOLVES THE

11:23AM 5     PROBLEM.

11:23AM 6              MR. BOSTIC:  JUST TO SAVE US SOME TIME.

11:23AM 7              THE COURT:  THANK YOU, MR. BOSTIC.

11:23AM 8          LET'S MOVE TO 663.

11:23AM 9              MR. DOWNEY:  AND THIS IS A DISCUSSION I THINK,

11:23AM 10    YOUR HONOR, EXCLUSIVELY UNDER THE COURT'S RULING THAT TOUCHES

11:24AM 11    ON THAT IPO ISSUE AND REFERS TO IT LARGELY I THINK REFERRING

11:24AM 12    BACK TO EVENTS BETWEEN 2006 AND 2010, ALTHOUGH THIS IS A, YOU

11:24AM 13    KNOW, AN EXCHANGE THAT BEGINS IN 2010 AND THEN GOES FORWARD.

11:25AM 14         (PAUSE IN PROCEEDINGS.)

11:25AM 15             THE COURT:  MR. BOSTIC?

11:25AM 16             MR. BOSTIC:  I UNDERSTAND THE DEFENSE TO BE

11:25AM 17    REQUESTING THAT ANY MENTION OF AN IPO BE REDACTED FROM THIS

11:25AM 18    EMAIL CONVERSATION BETWEEN MR. EISENMAN AND MS. HOLMES.

11:25AM 19         I DON'T THINK THAT'S NECESSARY.  I REALLY DON'T INTEND TO

11:25AM 20    FEATURE THE IPO OR REPRESENTATIONS ABOUT THE IPO IN THIS

11:25AM 21    WITNESS'S EXAMINATION.

11:25AM 22         AS I REPRESENTED TO THE COURT BEFORE, THE GOVERNMENT IS

11:25AM 23    NOT GOING TO ARGUE THAT THE DEFENDANT DEFRAUDED VICTIMS BY

11:25AM 24    MAKING MISREPRESENTATIONS ABOUT AN IPO.

11:25AM 25             INSTEAD, IT'S PART OF A CONVERSATION THREAD BETWEEN

11:25AM 1    MS. HOLMES AND AN INVESTOR IN THERANOS WHERE THE INVESTOR IS

11:25AM 2    ASKING FOR INFORMATION ABOUT WHERE THINGS STAND WITH THE

11:25AM 3    COMPANY.

11:25AM 4        QUESTIONS ABOUT PLANS FOR AN IPO OR TIMING OF THE IPO ARE

11:25AM 5    JUST RELEVANT GENERALLY TO THAT CONVERSATION.  HE'S SIMPLY

11:25AM 6    ASKING FOR SOME UPDATED INFORMATION RELATING TO STATEMENTS THAT

11:26AM 7    MS. HOLMES PREVIOUSLY MADE.

11:26AM 8            MR. DOWNEY:  WELL, I'LL ACCEPT THAT LINE.  THAT'S

11:26AM 9    MORE PROGRESS THAN WHERE WE WERE, SO I'LL ACCEPT THAT, AND WE

11:26AM 10   SHOULD GO FROM THERE.

11:26AM 11       I APOLOGIZE FOR TAKING THIS TIME.

11:26AM 12           THE COURT:  NO, NOT AT ALL.  THEY'RE IMPORTANT

11:26AM 13   ISSUES.

11:26AM 14       THANK YOU, MR. BOSTIC.

11:26AM 15       SO I'M NOT GOING TO ORDER ANY REDACTIONS.  THAT'S NOT

11:26AM 16   GOING TO BE ARGUED IN YOUR CASE THEN AT ALL?

11:26AM 17           MR. BOSTIC:  NO, YOUR HONOR.

11:26AM 18           MR. DOWNEY:  THANK YOU, YOUR HONOR.

11:26AM 19           MR. BOSTIC:  THANK YOU, YOUR HONOR.

11:26AM 20           MR. SCHENK:  YOUR HONOR, MAY WE COME TO SIDE-BAR

11:26AM 21   VERY BRIEFLY ABOUT A SCHEDULING ISSUE?

11:26AM 22           THE COURT:  YES.  THANK YOU.

11:26AM 23       (SIDE-BAR CONFERENCE OFF THE RECORD.)

11:30AM 24       (PAUSE IN PROCEEDINGS.)

11:30AM 25       (JURY IN AT 11:30 A.M.)

| 11:30AM | 1 | THE COURT:  THANK YOU.  PLEASE BE SEATED. |
| 11:30AM | 2 | WE'RE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT |
| 11:30AM | 3 | ARE PRESENT ONCE AGAIN. |
| 11:30AM | 4 | OUR JURY IS PRESENT. |
| 11:30AM | 5 | DR. DAS IS ON THE STAND. |
| 11:30AM | 6 | YOU'D LIKE TO RESUME YOUR EXAMINATION, MR. WADE? |
| 11:30AM | 7 | MR. WADE:  I WOULD, YOUR HONOR.  THANK YOU. |
| 11:30AM | 8 | Q.  GOOD MORNING AGAIN. |
| 11:30AM | 9 | A.  GOOD MORNING. |
| 11:30AM | 10 | Q.  BEFORE WE BROKE, I WAS ASKING YOU SOME QUESTIONS RELATING |
| 11:31AM | 11 | TO THE COMPANY'S RESPONSE RELATING TO ITS ANALYZER. |
| 11:31AM | 12 | DO YOU RECALL THAT? |
| 11:31AM | 13 | A.  YES. |
| 11:31AM | 14 | Q.  AND I'D LIKE TO ASK YOU ABOUT A FEW OTHER MATTERS THAT |
| 11:31AM | 15 | RELATE TO THE WORK THAT YOU WERE DOING WHEN YOU CAME INTO THE |
| 11:31AM | 16 | COMPANY FULL TIME.  OKAY? |
| 11:31AM | 17 | A.  OKAY. |
| 11:31AM | 18 | Q.  COULD I DRAW YOUR ATTENTION TO EXHIBIT 10674, WHICH SHOULD |
| 11:31AM | 19 | BE IN YOUR BINDER. |
| 11:31AM | 20 | A.  YES. |
| 11:31AM | 21 | Q.  AND DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU? |
| 11:31AM | 22 | A.  YES. |
| 11:31AM | 23 | Q.  AND IS THIS AN EMAIL IN WHICH YOU WERE GIVING AN UPDATE TO |
| 11:31AM | 24 | MS. HOLMES ON THE WORK YOU WERE DOING AFTER YOU STARTED AT THE |
| 11:31AM | 25 | COMPANY FULL TIME? |

11:31AM  1    A.   YES.

11:31AM  2              MR. WADE:  MOVE THE ADMISSION OF 10674.

11:31AM  3              MR. LEACH:  NO OBJECTION, YOUR HONOR.

11:31AM  4              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:32AM  5         (DEFENDANT'S EXHIBIT 10674 WAS RECEIVED IN EVIDENCE.)

11:32AM  6    BY MR. WADE:

11:32AM  7    Q.   HERE YOU NOTE -- LET'S LOOK AT THE SUBJECT MATTER.  IT

11:32AM  8    SAYS "SOME GOOD NEWS, FOR ONCE."

11:32AM  9         DO YOU SEE THAT?

11:32AM  10   A.   YES.

11:32AM  11   Q.   AND WE TALKED ABOUT THE MEETING THAT OCCURRED AND SOME

11:32AM  12   OTHER COMMUNICATIONS WHERE YOU WERE AT TIMES DELIVERING WHAT

11:32AM  13   COULD BE CONSIDERED BAD NEWS.

11:32AM  14        DO YOU RECALL THAT?

11:32AM  15   A.   YES.

11:32AM  16   Q.   AND YOU WERE, ON THIS PARTICULAR OCCASION, ON THIS WORK,

11:32AM  17   YOU ACTUALLY HAD SOME GOOD NEWS TO REPORT; RIGHT?

11:32AM  18   A.   YES.

11:32AM  19   Q.   OKAY.  LET'S TAKE A LOOK.

11:32AM  20        IT NOTES HERE THAT YOU HAD DONE CALCULATIONS FOR TWO OF

11:32AM  21   THE FIVE CAPILLARY 1800 ANALYTES, GLUCOSE AND SODIUM, FOR THOSE

11:33AM  22   VALIDATIONS.

11:33AM  23        DO YOU SEE THAT?

11:33AM  24   A.   YES.

11:33AM  25   Q.   AND THEY LOOK EXCELLENT.

11:33AM  1        DO YOU SEE THAT?

11:33AM  2    A.   YES.

11:33AM  3    Q.   AND YOU THEN NOTE DOWN BELOW THAT YOU WERE NOT A BIG FAN

11:33AM  4    OF CERTAIN ASPECTS OF THE STUDIES AS THEY WERE DOCUMENTED; IS

11:33AM  5    THAT FAIR?

11:33AM  6    A.   YES.  I DON'T HAVE A SPECIFIC RECOLLECTION.

11:33AM  7    Q.   OKAY.  BUT YOU THOUGHT THE DATA WAS GOOD ON THESE?

11:33AM  8    A.   IT APPEARS SO.

11:33AM  9    Q.   AND THE 1800 ANALYTES, THOSE WERE ADVIA 1800?

11:33AM 10    A.   YES.

11:33AM 11    Q.   AND THOSE WERE THE CIRCUMSTANCES IN WHICH THE COMPANY WAS

11:33AM 12    RUNNING A SMALL SAMPLE ASSAY ON A MODIFIED ADVIA 1800.

11:33AM 13        DO YOU RECALL THAT?

11:33AM 14    A.   YES.

11:33AM 15    Q.   AND DO YOU RECALL LEARNING WHEN YOU WERE THERE THAT THE

11:33AM 16    ADVIA 1800, THE COMPANY HAD ADAPTED SOME TECHNOLOGY TO MODIFY

11:34AM 17    THE ADVIA 1800 SO IT COULD RUN SMALL SAMPLES OF THE ASSAYS IN A

11:34AM 18    HIGH THROUGHPUT MANNER?

11:34AM 19    A.   YES.

11:34AM 20    Q.   AND THAT'S WHAT YOU'RE REFERRING TO IN THIS EMAIL?

11:34AM 21    A.   YES.

11:34AM 22    Q.   OKAY.  AND IN YOUR PRIOR EXPERIENCE AS A LAB DIRECTOR,

11:34AM 23    HAVE YOU EVER SEEN SOMEONE DO THESE ASSAYS ON A SMALL SAMPLE IN

11:34AM 24    A HIGH THROUGHPUT MANNER?

11:34AM 25    A.   YES.

11:34AM  1    Q.   YOU HAVE?  ON A FINGERSTICK?

11:34AM  2    A.   I DON'T RECALL IF IT WAS A FINGERSTICK.

11:34AM  3    Q.   OKAY.

11:34AM  4    A.   I BELIEVE HEELSTICK.

11:34AM  5    Q.   HEELSTICK.  OKAY.

11:34AM  6         AND THE -- IN LOOKING AT THESE VALIDATIONS, THIS WAS PART

11:34AM  7    OF ONE OF THOSE ASPECTS WHERE YOU WERE JUST TURNING OVER THE

11:34AM  8    DIFFERENT ROCKS AND LOOKING AT THE DIFFERENT ITEMS WITHIN THE

11:34AM  9    LAB TO GET YOURSELF COMFORTABLE WITH IT; IS THAT RIGHT?

11:34AM 10    A.   YES.

11:34AM 11    Q.   AND, IN FACT, IN THE NEXT EMAIL BELOW, YOU NOTE THAT

11:34AM 12    YOU'RE GOING TO LOOK AT THE THREE OTHER ANALYTES; CORRECT?

11:34AM 13    A.   YES.

11:35AM 14    Q.   AND DO YOU RECALL WHETHER YOU DID THAT?

11:35AM 15    A.   I DO NOT.

11:35AM 16    Q.   OKAY.  I'D LIKE TO NEXT TURN YOUR ATTENTION TO

11:35AM 17    EXHIBIT 10651, WHICH SHOULD BE A COUPLE DOCUMENTS BACK?

11:35AM 18    A.   YES.

11:35AM 19    Q.   AND IS THIS AN EMAIL COMMUNICATION BETWEEN YOU AND

11:35AM 20    MS. HOLMES IN WHICH YOU'RE INFORMING HER OF PLANS THAT YOU HAD

11:35AM 21    UNDERWAY TO DIG IN ON THE CMS RESPONSE?

11:35AM 22    A.   YES.

11:35AM 23              MR. WADE:  MOVE THE ADMISSION OF 10651.

11:35AM 24              MR. LEACH:  NO OBJECTION, YOUR HONOR.

11:35AM 25              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

```
11:36AM   1              (DEFENDANT'S EXHIBIT 10651 WAS RECEIVED IN EVIDENCE.)

11:36AM   2    BY MR. WADE:

11:36AM   3    Q.   OKAY.  IN THIS EMAIL IN EARLY APRIL YOU SAY, "AFTER WE GOT

11:36AM   4    BACK FROM NWK."

11:36AM   5         IS NWK THE NEWARK LAB?

11:36AM   6    A.   YES.

11:36AM   7    Q.   YOU GOT IN TOUCH WITH MICHELE, FRAN, AND LISA.

11:36AM   8         DO YOU KNOW WHO MICHELE, FRAN, AND LISA ARE THERE?

11:36AM   9    A.   YES.

11:36AM  10    Q.   AND WHO ARE THEY?

11:36AM  11    A.   MICHELE REFERS TO MICHELE CARBONE, FRAN REFERS TO

11:36AM  12    FRANCIS YOUNG, AND LISA REFERS TO LISA HELFEND, DR. HELFEND.

11:36AM  13    Q.   OKAY.  AND THOSE WERE SOME OF THE OUTSIDE CONSULTANTS THAT

11:36AM  14    THE COMPANY BROUGHT IN TO WORK ON CMS ISSUES AND IMPROVING THE

11:36AM  15    LAB?

11:36AM  16    A.   YES.

11:36AM  17    Q.   AND IT NOTES HERE IN THIS EMAIL, "WE'RE FULL STEAM AHEAD

11:36AM  18    ON 2120 AND REVIEW OF THE CMS RESPONSE, AS YOU OUTLINED EARLIER

11:37AM  19    TODAY."

11:37AM  20         DO YOU SEE THAT?

11:37AM  21    A.   YES.

11:37AM  22    Q.   AND DOES THIS INDICATE THAT YOU PUT THIS TEAM TO WORK ON

11:37AM  23    DIGGING IN AND ADDRESSING ISSUES THAT WERE COMING UP IN CMS?

11:37AM  24    A.   YES.

11:37AM  25    Q.   OKAY.  AND YOU NOTE A CHANGE THERE IN THE SECOND
```

| | | |
|---|---|---|
| 11:37AM | 1 | PARAGRAPH, AND IT SAYS -- CAN YOU TELL ME WHAT YOU'RE REFERRING |
| 11:37AM | 2 | TO IN THIS PARAGRAPH? |
| 11:37AM | 3 | A.   YES.  TO THE BEST OF MY RECOLLECTION, I WAS RECOMMENDING |
| 11:37AM | 4 | THAT A STAFF MEMBER NAMED JUN RUN THE 2120 ASSAY INSTEAD OF |
| 11:37AM | 5 | ANOTHER STAFF MEMBER NAMED HODA. |
| 11:37AM | 6 | Q.   OKAY.  AND THAT WAS BECAUSE YOU THOUGHT THAT WOULD BE A |
| 11:37AM | 7 | BETTER FIT? |
| 11:37AM | 8 | A.   YES.  HE HAD MORE EXPERIENCE. |
| 11:37AM | 9 | Q.   OKAY.  AND YOU WANTED SOMEONE WITH THE MOST EXPERIENCE ON |
| 11:37AM | 10 | THAT? |
| 11:37AM | 11 | A.   YES. |
| 11:37AM | 12 | Q.   THEN IN THE NEXT LINE YOU SAY YOU'LL BE CONTACTING A. BACA |
| 11:38AM | 13 | IN A FEW MINUTES TO SECURE HIS SERVICES, IF POSSIBLE. |
| 11:38AM | 14 | DO YOU SEE THAT? |
| 11:38AM | 15 | A.   YES. |
| 11:38AM | 16 | Q.   AND IS THAT DR. BACA, THE LABORATORY CONSULTANT THAT WE |
| 11:38AM | 17 | REFERRED TO PREVIOUSLY? |
| 11:38AM | 18 | A.   YES, DR. AUTHOR BACA. |
| 11:38AM | 19 | Q.   AND YOU WERE BRINGING IN EVEN MORE RESEARCHERS TO WORK ON |
| 11:38AM | 20 | THIS; RIGHT? |
| 11:38AM | 21 | A.   YES. |
| 11:38AM | 22 | Q.   AND THAT WAS BECAUSE YOU WANTED TO GO QUICKLY AND ADDRESS |
| 11:38AM | 23 | IT THOROUGHLY. |
| 11:38AM | 24 | IS THAT FAIR? |
| 11:38AM | 25 | A.   I DON'T RECALL MY EXACT INTENTIONS WITH DR. BACA. |

11:38AM  1   Q.   OKAY.  BUT GENERALLY WITH RESPECT TO WHAT YOU WERE DOING

11:38AM  2   HERE, IS IT FAIR TO SAY THAT YOU WANTED TO BE THOROUGH?

11:38AM  3   A.   YES.

11:38AM  4   Q.   AND TRY TO DEAL WITH IT AS QUICKLY AS YOU COULD

11:38AM  5   CONSIDERING YOUR PROFESSIONAL OBLIGATIONS?

11:38AM  6   A.   YES.

11:38AM  7   Q.   AND YOU NOTE WE'RE GOING TO GET ALL OF THIS DONE, AND THIS

11:38AM  8   IS JUST AN UPDATE; RIGHT?

11:38AM  9   A.   YES.

11:38AM  10  Q.   AND MS. HOLMES IS NOT DIRECTLY INVOLVED IN THE WORK THAT

11:38AM  11  YOU WERE DOING; RIGHT?

11:38AM  12  A.   NOT TO MY RECOLLECTION.

11:38AM  13  Q.   BUT YOU WERE REPORTING TO HER AT THIS TIME?

11:39AM  14  A.   YES.

11:39AM  15  Q.   AND YOU WERE GIVING HER AN UPDATE ON YOUR PLAN; RIGHT?

11:39AM  16  A.   YES.

11:39AM  17  Q.   OKAY.  LET'S LOOK AT HER RESPONSE.

11:39AM  18      SHE THANKS YOU FOR THE UPDATE AND FOR DRIVING THIS FORWARD

11:39AM  19  AND NOTES THIS IS HOW WE MAKE SURE WE GET ACCEPTED BY CMS.

11:39AM  20      DO YOU SEE THAT?

11:39AM  21  A.   YES.

11:39AM  22  Q.   AND DID YOU FEEL LIKE IN THIS TIME PERIOD MS. HOLMES WAS

11:39AM  23  DEDICATED TO GIVING YOU WHATEVER RESOURCES YOU ASKED FOR TO TRY

11:39AM  24  TO ADDRESS THESE LAB ISSUES?

11:39AM  25  A.   YES.

11:39AM 1     Q.   AND DID YOU FEEL LIKE SHE WAS GIVING YOU UNFETTERED ACCESS

11:39AM 2     TO THE INFORMATION THAT YOU NEEDED WITHIN THE COMPANY TO DO A

11:39AM 3     THOROUGH ANALYSIS?

11:39AM 4     A.   COULD YOU SPECIFY, PLEASE?

11:39AM 5     Q.   WELL, WHEN YOU WERE TURNING OVER THOSE ROCKS, DO YOU

11:39AM 6     RECALL TALKING ABOUT THAT?

11:39AM 7     A.   YES.

11:39AM 8     Q.   DID YOU FEEL LIKE YOU COULD LOOK AT ANY INFORMATION OR

11:39AM 9     DATA THAT YOU NEEDED?

11:39AM 10    A.   AS OF THE DATE OF THIS EMAIL, I DON'T RECALL.  AS TIME

11:40AM 11    WENT ON, YES.

11:40AM 12    Q.   AND SO AS TIME WENT ON, YOU WOULD GET MORE AND MORE

11:40AM 13    INFORMATION; RIGHT?

11:40AM 14    A.   YES.

11:40AM 15    Q.   OKAY.  LET'S LOOK NEXT AT 10641.

11:40AM 16    A.   OKAY.

11:40AM 17    Q.   AND THIS -- DO YOU RECOGNIZE THIS TO BE AN EMAIL

11:40AM 18    COMMUNICATION BETWEEN YOU AND MS. HOLMES IN EARLY MARCH OF 2016

11:40AM 19    RELATING TO SOME OF THERANOS'S TECHNOLOGY?

11:40AM 20    A.   YES.

11:40AM 21            MR. WADE:  MOVE THE ADMISSION OF 10641.

11:40AM 22            MR. LEACH:  NO OBJECTION, YOUR HONOR.

11:40AM 23            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:40AM 24        (DEFENDANT'S EXHIBIT 10641 WAS RECEIVED IN EVIDENCE.)

11:41AM 25    BY MR. WADE:

11:41AM  1    Q.   AND I JUST WANT TO FOCUS ON A COUPLE OF THINGS.

11:41AM  2         YOU RECALL THAT A LOT OF THE QUESTIONING RELATED TO THE

11:41AM  3    OLDER 3.0 DEVICE.

11:41AM  4         DO YOU RECALL THAT QUESTIONING?

11:41AM  5    A.   YES.

11:41AM  6    Q.   BUT WE TALKED ABOUT THE NEWER DEVICE THAT THE COMPANY WAS

11:41AM  7    BRINGER FORWARD?

11:41AM  8    A.   YES.

11:41AM  9    Q.   AND DO YOU RECALL HAVING A MEETING IN MARCH WHERE YOU WERE

11:41AM  10   SHOWN THAT DEVICE AND GIVEN A SENSE FOR HOW IT WAS DEVELOPED,

11:41AM  11   BEING DEVELOPED?

11:41AM  12   A.   I DON'T RECALL THAT SPECIFIC MEETING.

11:41AM  13   Q.   DOES THIS EMAIL REFRESH YOUR RECOLLECTION OF A MEETING

11:41AM  14   THAT YOU HAD, A SCIENTIFIC MEETING?

11:41AM  15   A.   IT DOES NOT, BUT I DON'T DOUBT IT.

11:41AM  16   Q.   OKAY.  YOU SEE THERE IN THE SECOND PARAGRAPH IT SAYS, "NOW

11:41AM  17   THAT I'VE SEEN 'UNDER THE HOOD' OF YOUR INSTRUMENT, SOMETHING

11:42AM  18   ALONG THESE LINES WOULD BE PERFECT AS FAR AS SPACE, PLUS ONLY

11:42AM  19   NEEDS A LAPTOP PROCESSOR."

11:42AM  20        DO YOU SEE THAT?

11:42AM  21   A.   YES.

11:42AM  22   Q.   AND DO YOU RECALL THAT THERE WAS -- MAYBE YOU DON'T

11:42AM  23   REMEMBER THIS MEETING, BUT DO YOU RECALL SOME POINT IN TIME

11:42AM  24   WHERE YOU GOT A LOOK UNDER THE HOOD OF THE THERANOS INSTRUMENT?

11:42AM  25   A.   YES.

11:42AM  1    Q.   AND THAT WAS THE NEXT GENERATION INSTRUMENT AFTER THE 3.5?

11:42AM  2    A.   YES.  I DON'T REMEMBER WHICH GENERATION EXACTLY, BUT YES.

11:42AM  3    Q.   OKAY.  AND YOU HAD A PARTICULAR -- YOU HAD SOME PARTICULAR

11:42AM  4    BACKGROUNDS ON SOME RNA, RRNA SEQUENCING BASED UPON SOME WORK

11:42AM  5    THAT YOU HAD DONE AT UCLA; IS THAT RIGHT?

11:42AM  6    A.   YES.

11:42AM  7    Q.   AND YOU WERE SUGGESTING SOME WAYS IN WHICH THE DEVICE

11:42AM  8    MIGHT BE ABLE TO ADAPT TO INCLUDE SOME OF THAT TECHNOLOGY?

11:42AM  9    A.   YES.

11:42AM 10    Q.   AND YOU UNDERSTOOD THAT THE PRODUCT THAT WAS BEING

11:43AM 11    DEVELOPED WAS BEING DEVELOPED SO IT COULD RUN MULTIPLE

11:43AM 12    DIFFERENT TYPES OF ASSAYS ON A SINGLE DEVICE?

11:43AM 13    A.   YES.

11:43AM 14    Q.   AND WERE YOU AWARE OF THAT EVER BEING DONE BEFORE?

11:43AM 15    A.   NOT TO MY RECOLLECTION.

11:43AM 16    Q.   OKAY.  AND SO YOU WERE MAKING SOME RECOMMENDATIONS BASED

11:43AM 17    UPON YOUR EXPERIENCE FOR WAYS IN WHICH THAT MIGHT BE MODIFIED

11:43AM 18    TO ACCOUNT FOR SOME ADDITIONAL AREAS OF TESTING?

11:43AM 19    A.   YES.

11:43AM 20    Q.   OKAY.  AND LET ME ASK YOU -- YOU DON'T RECALL THE SPECIFIC

11:43AM 21    DEVICE, BUT LET ME ASK YOU AND SHOW YOU A PICTURE AND SEE IF

11:43AM 22    THIS IS THE DEVICE.  I'LL HAND UP TWO PICTURES.

11:44AM 23         MAY I APPROACH, YOUR HONOR?

11:44AM 24              THE COURT:  YES.

11:44AM 25    BY MR. WADE:

11:44AM 1    Q.  (HANDING.)

11:44AM 2         DR. DAS, I'VE HANDED YOU TWO DOCUMENTS, ONE MARKED

11:44AM 3    EXHIBIT 7747 AND ANOTHER MARKED 7746.

11:44AM 4         DO YOU RECOGNIZE THIS TO BE THE DEVICE THAT YOU WERE

11:44AM 5    SHOWN -- A DEVICE OF THIS TYPE BEING THE ONE THAT YOU WERE

11:44AM 6    SHOWN WHEN YOU JOINED THE COMPANY?

11:44AM 7    A.  I RECOGNIZE THIS DEVICE.  I DON'T KNOW IF THIS IS THE

11:44AM 8    DEVICE WE'RE REFERRING TO IN THE EMAIL.

11:44AM 9    Q.  OKAY.  YOU DON'T KNOW IF IT'S THE DEVICE THAT YOU ARE

11:44AM 10   REFERRING TO IN EXHIBIT 10641?

11:45AM 11   A.  THAT'S CORRECT.

11:45AM 12   Q.  OKAY.  BUT YOU WERE SHOWN THIS DEVICE AT SOME POINT?

11:45AM 13   A.  YES.

11:45AM 14   Q.  AND THIS IS WHAT -- THIS DEVICE IS SOMETIMES WHAT IS

11:45AM 15   REFERRED TO AS THE MINILAB?

11:45AM 16   A.  YES.

11:45AM 17             MR. WADE:  OKAY.  MOVE TO ADMIT EXHIBIT 7747 AND

11:45AM 18   7746.

11:45AM 19             MR. LEACH:  NO OBJECTION, YOUR HONOR.

11:45AM 20             THE COURT:  THEY'RE ADMITTED AND MAY BE PUBLISHED.

11:45AM 21        (DEFENDANT'S EXHIBITS 7746 AND 7747 WERE RECEIVED IN

11:45AM 22   EVIDENCE.)

11:45AM 23   BY MR. WADE:

11:45AM 24   Q.  AND THIS IS A COPY OF THAT DEVICE WHICH IS SHOWING UP IN

11:45AM 25   BLACK AND WHITE ON THE SCREEN.

| 11:45AM | 1 | AND YOU SAW THIS DEVICE WHEN YOU WERE WORKING WITH THE |
|---|---|---|

11:45AM  1    AND YOU SAW THIS DEVICE WHEN YOU WERE WORKING WITH THE

11:45AM  2    COMPANY?

11:45AM  3    A.   YES.

11:45AM  4    Q.   AND YOU UNDERSTOOD THAT IN THE SLOT THERE ON THE FRONT

11:45AM  5    BELOW THE LABEL THERANOS IS WHERE A CARTRIDGE WOULD GO IN?

11:46AM  6    A.   YES.

11:46AM  7    Q.   OKAY.  AND COULD WE PUBLISH 7746, PLEASE.

11:46AM  8    AND IS THIS SORT OF UNDER THE HOOD, IF YOU WILL, OF THAT

11:46AM  9    DEVICE?

11:46AM  10   A.   YES.

11:46AM  11   Q.   AND THE IDEA WAS THAT DIFFERENT FORMS OF SENSORS AND THE

11:46AM  12   LIKE COULD BE ADAPTED ONTO THIS PLATFORM SO THAT DIFFERENT

11:46AM  13   TYPES OF ASSAYS COULD BE RUN; IS THAT RIGHT?

11:46AM  14   A.   YES.

11:46AM  15   Q.   OKAY.  AND IN THIS EMAIL IN MARCH, YOU'RE PROVIDE SOME

11:46AM  16   THOUGHTS AND INPUT TO MS. HOLMES IN THAT REGARD; IS THAT RIGHT?

11:46AM  17   A.   YES.

11:46AM  18   Q.   I BELIEVE YOU TESTIFIED ON DIRECT ABOUT PARTICIPATING IN A

11:47AM  19   MEETING WITH DR. GOODRICH FROM CMS.

11:47AM  20   DO YOU RECALL THAT?

11:47AM  21   A.   YES.

11:47AM  22   Q.   AND THAT WAS A MEETING -- AND DO YOU RECALL WHO

11:47AM  23   DR. GOODRICH IS?

11:47AM  24   A.   YES.

11:47AM  25   Q.   AND WHO WAS DR. GOODRICH?

11:47AM   1    A.   I BELIEVE HER TITLE WAS MEDICAL DIRECTOR AT CMS FOR

11:47AM   2    LABORATORIES.

11:47AM   3    Q.   UM --

11:47AM   4    A.   BUT I DON'T KNOW THE EXACT WORDING.

11:47AM   5    Q.   SHE WAS A SENIOR POSITION OR SENIOR PERSON WITHIN CMS; IS

11:47AM   6    THAT RIGHT?

11:47AM   7    A.   YES.

11:47AM   8    Q.   AND THERE WAS -- DO YOU RECALL THAT THERANOS PROVIDED A

11:47AM   9    WRITTEN BRIEFING ON THE STEPS THAT THEY WERE TAKING UNDER YOUR

11:47AM  10    LEADERSHIP TO IMPROVE THE QUALITY OF THE LAB?

11:48AM  11    A.   YES.

11:48AM  12    Q.   AND THERE WAS A MEETING OUT IN BALTIMORE, MARYLAND TO

11:48AM  13    DISCUSS THAT.

11:48AM  14         DO YOU RECALL THAT?

11:48AM  15    A.   YES.

11:48AM  16    Q.   AND YOU PARTICIPATED IN THAT, ALONG WITH OTHER PEOPLE AT

11:48AM  17    THERANOS WHO PROVIDED INFORMATION TO DR. GOODRICH; IS THAT

11:48AM  18    RIGHT?

11:48AM  19    A.   YES.

11:48AM  20    Q.   AND I TAKE IT YOU FELT AT THE TIME THAT THE COMPANY HAD

11:48AM  21    MADE A LOT OF PROGRESS IN IMPROVING THE LAB AND WAS COMMITTED

11:48AM  22    TO EVEN MAKING MORE.

11:48AM  23         IS THAT FAIR?

11:48AM  24    A.   YES.

11:48AM  25    Q.   OKAY.  A SIGNIFICANT FOCUS OF THAT WAS ACTUALLY BRINGING

11:48AM  1    YOU IN AS LABORATORY DIRECTOR; RIGHT?

11:48AM  2    A.   YES.

11:48AM  3    Q.   YOU WERE CONSIDERED BY THE COMPANY TO BE HIGHLY QUALIFIED

11:48AM  4    AND CREDENTIALED AND CAPABLE OF DOING THIS VERY IMPORTANT JOB;

11:48AM  5    RIGHT?

11:48AM  6    A.   I CAN'T SPEAK TO THEIR THOUGHTS EXACTLY.

11:48AM  7    Q.   WELL, DO YOU RECALL THEM ARTICULATING THAT TO CMS?

11:48AM  8    A.   YES.

11:48AM  9    Q.   AND THERE WAS ALSO A SUBSTANTIAL REWORKING OF THE

11:49AM  10   PERSONNEL WITHIN THE LAB AT THERANOS; RIGHT?

11:49AM  11   A.   YES.

11:49AM  12   Q.   AND THAT WAS FEATURED AS PART OF THAT RESPONSE AS WELL;

11:49AM  13   RIGHT?

11:49AM  14   A.   YES, I BELIEVE SO.

11:49AM  15   Q.   AND THERE WAS ALSO ENHANCED POLICIES AND PROCEDURES THAT

11:49AM  16   WERE PUT IN PLACE?

11:49AM  17   A.   YES.

11:49AM  18   Q.   AND THERE WAS NEW COMPREHENSIVE TRAINING THAT WAS

11:49AM  19   IMPLEMENTED TO ENSURE THAT PEOPLE UNDERSTOOD WHAT THEY WERE

11:49AM  20   DOING?

11:49AM  21   A.   YES.

11:49AM  22   Q.   AND UNDERSTOOD THEIR JOBS AND HOW THE LAB TECHNOLOGY

11:49AM  23   WORKED; RIGHT?

11:49AM  24   A.   YES.

11:49AM  25   Q.   THERE WAS -- WE TALKED ABOUT THERE WAS A NEW OPERATIONAL

11:49AM 1    STRUCTURE WHERE YOU REPORTED DIRECTLY TO THE CEO; CORRECT?

11:49AM 2    A.   YES.

11:49AM 3    Q.   AND THE COMPANY ALSO IMPLEMENTED SOME ENHANCED AUDIT

11:49AM 4    PROCEDURES.

11:49AM 5        DO YOU RECALL THAT?

11:50AM 6    A.   YES.

11:50AM 7    Q.   AND THEY ALSO IMPLEMENTED A NEW QUALITY MONITORING AND

11:50AM 8    PROCESSING PROGRAM.

11:50AM 9        DO YOU RECALL THAT?

11:50AM 10   A.   YES.

11:50AM 11   Q.   AND ALL OF THESE THINGS ARE UNDER YOUR LEADERSHIP; IS THAT

11:50AM 12   RIGHT?

11:50AM 13   A.   YES.

11:50AM 14   Q.   AND THEY WERE WITH THE SUPPORT OF MS. HOLMES; CORRECT?

11:50AM 15   A.   YES.

11:50AM 16   Q.   DO YOU RECALL THERE WAS ALSO SOME EFFORTS MADE TO DO WHAT

11:50AM 17   ARE CALLED TRACER AUDITS?

11:50AM 18   A.   YES.

11:50AM 19   Q.   AND WHAT IS A TRACER AUDIT?

11:50AM 20   A.   BASICALLY IT IS A PERIODIC AUDITING BACK OF A SAMPLE ALL

11:50AM 21   OF THE WAY THROUGH THE LABORATORY PROCESS TO MAKE SURE ALL OF

11:50AM 22   THE PROCEDURES WERE FOLLOWED.

11:50AM 23   Q.   OKAY.  SO YOU FOLLOW IT THROUGH FROM CRADLE TO GRAVE, IF

11:50AM 24   YOU WILL?

11:50AM 25   A.   YES, AND VICE VERSA.

11:50AM  1    Q.   AND MAKE SURE THAT ALL OF THE DIFFERENT STEPS IN THE

11:50AM  2    PROCESS ARE WORKING?

11:50AM  3    A.   CORRECT.

11:50AM  4    Q.   OKAY.  AND WAS THAT SOMETHING THAT YOU IMPLEMENTED AT

11:50AM  5    THERANOS?

11:50AM  6    A.   YES.

11:50AM  7    Q.   OKAY.  AND, OF COURSE, YOU ALSO WORKED TO TRY TO GET THOSE

11:51AM  8    CORRECTED LABORATORY REPORTS OUT AS WELL.

11:51AM  9         DO YOU RECALL THAT?

11:51AM  10   A.   YES.

11:51AM  11   Q.   AND THAT WAS PART OF WHAT YOU WORKED ON AT THERANOS;

11:51AM  12   RIGHT?

11:51AM  13   A.   YES.

11:51AM  14   Q.   OKAY.  AND DO YOU -- ONE OF THE THINGS, WE TALKED A LITTLE

11:51AM  15   BIT ABOUT HOW YOU WERE LOOKING AT SOME OF THE ADVIA 1800

11:51AM  16   ASSAYS.

11:51AM  17        DO YOU RECALL THAT?

11:51AM  18   A.   YES.

11:51AM  19   Q.   AND DO YOU RECALL COMING TO THE CONCLUSION WITH RESPECT TO

11:51AM  20   GETTING YOURSELF COMFORTABLE WITH RESPECT TO SOME OF THOSE

11:51AM  21   ASSAYS AND THEIR VALIDATION AND COMMUNICATING THAT TO CMS?

11:51AM  22   A.   YES.

11:51AM  23   Q.   AND SPECIFICALLY RELATING TO AN ASSAY ALT?

11:52AM  24   A.   YES.

11:52AM  25   Q.   AND WHAT IS THAT?

| | | |
|---|---|---|
| 11:52AM | 1 | A.   THAT STANDS FOR ALANINE AMINOTRANSFERASE. |
| 11:52AM | 2 | Q.   I'M GLAD YOU SAID THAT AND NOT ME. |
| 11:52AM | 3 | AND HOW ABOUT BUN? |
| 11:52AM | 4 | A.   YES. |
| 11:52AM | 5 | Q.   AND WHAT IS THAT? |
| 11:52AM | 6 | A.   THAT STANDS FOR BLOOD UREA NITROGEN. |
| 11:52AM | 7 | Q.   OKAY.  AND IN ADDITION TO THAT, ALSO CALCIUM, GLUCOSE, AND |
| 11:52AM | 8 | SODIUM; IS THAT RIGHT? |
| 11:52AM | 9 | A.   YES. |
| 11:52AM | 10 | Q.   AND YOUR ANALYSIS GAVE YOU COMFORT IN CONNECTION WITH |
| 11:52AM | 11 | THOSE ASSAYS; CORRECT? |
| 11:52AM | 12 | A.   YES, AT THAT POINT IN TIME. |
| 11:52AM | 13 | Q.   LET ME DRAW YOUR ATTENTION TO 10629. |
| 11:53AM | 14 | AND DO YOU RECALL -- I THINK YOU TALKED ABOUT THE COMPANY |
| 11:53AM | 15 | WAS RECEIVING IN THIS TIME PERIOD A FAIR AMOUNT OF MEDIA |
| 11:53AM | 16 | SCRUTINY. |
| 11:53AM | 17 | DO YOU RECALL THAT? |
| 11:53AM | 18 | A.   YES. |
| 11:53AM | 19 | Q.   AND FROM TIME TO TIME, THE COMPANY WOULD BE ASKED TO MAKE |
| 11:53AM | 20 | STATEMENTS TO MEDIA OUTLETS. |
| 11:53AM | 21 | DO YOU RECALL THAT? |
| 11:53AM | 22 | A.   YES. |
| 11:53AM | 23 | Q.   AND IN CONNECTION WITH THAT, YOU WOULD SOMETIMES BE ASKED |
| 11:53AM | 24 | TO REVIEW A COMMENT. |
| 11:54AM | 25 | DO YOU RECALL THAT? |

11:54AM  1    A.   YES.

11:54AM  2    Q.   AND IS 10629 ONE OF THOSE OCCASIONS WHERE YOU WERE ASKED

11:54AM  3    TO REVIEW A COMMENT?

11:54AM  4    A.   YES.

11:54AM  5         MR. WADE:  OKAY.  MOVE TO ADMIT 10629.

11:54AM  6         MR. LEACH:  HEARSAY, YOUR HONOR.

11:54AM  7         THE COURT:  ARE YOU OFFERING IT FOR THE TRUTH OF

11:54AM  8    WHAT WAS SAID IN THE STATEMENT?

11:54AM  9         MR. WADE:  NO, I AM NOT.

11:54AM  10        THE COURT:  WHAT IS THE RELEVANCE?

11:54AM  11        MR. WADE:  THE RELEVANCE IS THAT THERE WAS A

11:54AM  12   STATEMENT THAT THE COMPANY WAS INTENDING TO MAKE AND THE

11:54AM  13   WITNESS WAS ASKED TO REVIEW IT, AND SO IT INFORMED MS. HOLMES'S

11:54AM  14   STATE OF MIND AS TO THE ACCURACY OF THE STATEMENT.

11:54AM  15        THE COURT:  CAN YOU LAY A FOUNDATION FOR THAT?

11:54AM  16        MR. WADE:  SURE.  WHY DON'T I GO A DIFFERENT

11:54AM  17   DIRECTION HERE?

11:54AM  18        THE COURT:  SURE.

11:54AM  19        MR. WADE:  I TAKE IT THE OBJECTION IS IN CONNECTION

11:54AM  20   WITH THE TOP EMAIL?

11:54AM  21        THE COURT:  WELL, I THINK IT'S THE ENTIRETY OF THE

11:54AM  22   DOCUMENT, IS IT, MR. LEACH?

11:55AM  23        MR. LEACH:  YES, YOUR HONOR.

11:55AM  24        MR. WADE:  OKAY.  LET'S TAKE A LOOK AT 10628.

11:55AM  25   Q.   WE TALKED ABOUT HOW THE COMPANY IN THIS PERIOD WAS BEING

| | |
|---|---|
| 11:55AM | 1 |

1    ASKED TO PROVIDE MEDIA COMMENTS ON, MEDIA STATEMENTS IN

2    CONNECTION WITH ISSUES THAT WERE ARISING.

3        DO YOU RECALL THAT?

4    A.   YES.

5    Q.   AND THERE WAS A TEAM OF PEOPLE WHO WORKED ON INTERACTING

6    WITH THE MEDIA IN THAT PERIOD; CORRECT?

7    A.   YES.

8    Q.   AND BEFORE THE COMPANY WOULD ISSUE STATEMENTS RELATING TO

9    YOUR AREA, THEY WOULD OFTENTIMES GO THROUGH A PROCESS WHERE

10   THEY WOULD RUN IT BY YOU TO MAKE SURE THAT YOU WERE COMFORTABLE

11   WITH THE LANGUAGE THAT WAS BEING OFFERED; RIGHT?

12   A.   YES.  THAT WAS NOT ALWAYS DONE, BUT FROM TIME TO TIME.

13   Q.   RIGHT.  AND THAT WAS, IN PART, TO ENSURE THAT, BASED UPON

14   YOUR AREA OF EXPERTISE, THAT YOU WERE COMFORTABLE THAT THE

15   STATEMENT WAS AN ACCURATE REPRESENTATION; CORRECT?

16   A.   I DON'T KNOW IF I COULD SPEAK TO THEIR INTENTIONS.

17   Q.   OKAY.  BUT YOU -- DID YOU UNDERSTAND THAT THEY WERE ASKING

18   FOR YOU TO CHECK THE ACCURACY OF THE STATEMENT WHEN IT WAS SENT

19   TO YOU?

20   A.   YES.

21   Q.   AND THE WAY IN WHICH THEY WOULD COMMUNICATE THAT TO YOU

22   WAS VIA EMAIL SOMETIMES?

23   A.   YES.

24   Q.   AND THAT WAS OFTENTIMES THE WAY IN WHICH THE COMPANY WOULD

25   GO ABOUT DOING BUSINESS ON VARIOUS MATTERS; IS THAT RIGHT?

```
11:56AM   1        A.   YES.

11:56AM   2        Q.   AND INCLUDING ON THESE TYPES OF ISSUES; RIGHT?

11:56AM   3        A.   YES.

11:56AM   4        Q.   AND YOU UNDERSTOOD THAT IT WAS IMPORTANT WHEN YOU WERE

11:56AM   5   DOING THIS TO TRY AND PROVIDE ACCURATE INFORMATION IN RESPONSE

11:56AM   6   TO ANY INQUIRIES THAT WERE MADE OF YOU; RIGHT?

11:56AM   7        A.   YES.

11:56AM   8        Q.   AND YOU UNDERSTOOD THAT THE COMPANY HAD A PROCESS WHEREBY

11:56AM   9   THEY WERE PRESERVING ITS ELECTRONIC INFORMATION; RIGHT?

11:57AM  10        A.   I DON'T KNOW IF I KNEW THAT AT THE TIME.

11:57AM  11        Q.   OKAY.  BUT YOU UNDERSTOOD THAT THE EMAILS WERE PART OF THE

11:57AM  12   BOOKS AND RECORDS OF THE COMPANY?

11:57AM  13        A.   YES.

11:57AM  14        Q.   AND THAT THEY WERE PART OF THE WAY IN WHICH THE COMPANY

11:57AM  15   OPERATED FROM A BUSINESS ON A VARIETY OF DIFFERENT ISSUES?

11:57AM  16        A.   YES.

11:57AM  17             MR. WADE:  OFFER 10628.

11:57AM  18             MR. LEACH:  NO OBJECTION TO 10628, YOUR HONOR.

11:57AM  19             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:57AM  20        (DEFENDANT'S EXHIBIT 10628 WAS RECEIVED IN EVIDENCE.)

11:57AM  21   BY MR. WADE:

11:57AM  22        Q.   OKAY.  AND IF YOU LOOK ON THE BOTTOM, DO YOU SEE

11:57AM  23   MR. BALWANI WAS SENDING YOU A STATEMENT THAT WAS MADE AND

11:57AM  24   ASKING YOU TO REVIEW IT AND MAKE SURE THAT IT WAS REASONABLE.

11:57AM  25        DO YOU SEE THAT?
```

11:57AM  1    A.   YES.

11:57AM  2    Q.   AND ON OTHER OCCASIONS MS. HOLMES ASKED YOU TO PERFORM

11:58AM  3    EXACTLY THE SAME KIND OF REVIEW; IS THAT RIGHT?

11:58AM  4    A.   YES.

11:58AM  5    Q.   AND YOU UNDERSTOOD THAT WHEN SHE DID THAT, IT WAS TO GET

11:58AM  6    YOUR VIEW AS TO WHETHER OR NOT THE STATEMENT WAS ACCURATE;

11:58AM  7    RIGHT?

11:58AM  8    A.   YES.

11:58AM  9    Q.   OKAY.  AND LET'S JUST LOOK AT THE STATEMENT THAT IS

11:58AM  10   PROVIDED HERE.

11:58AM  11       THIS SAYS, "CMS SURVEYS EVALUATE LAB PRACTICES.  THE

11:58AM  12   DEFICIENCIES CITED REFER TO HOW CERTAIN THERANOS TECHNOLOGIES

11:58AM  13   WERE USED AND NOT TO THE FUNDAMENTAL INTEGRITY OF THE

11:58AM  14   TECHNOLOGIES THEMSELVES.  THE COMPANY'S PROPRIETARY

11:58AM  15   TECHNOLOGIES HAVE ALWAYS BEEN CLEARED FOR TESTING HSV-1 BY THE

11:58AM  16   FDA.  SEPARATELY, THE MAJORITY OF THE CMS DEFICIENCIES WERE NOT

11:58AM  17   RELATED TO THERANOS PROPRIETARY TECHNOLOGIES."

11:58AM  18       DO YOU SEE THAT?

11:58AM  19   A.   I DO.

11:59AM  20   Q.   IF WE JUST LOOK AT YOUR RESPONSE.  YOU BELIEVED AT THE

11:59AM  21   TIME THAT IT WAS A TRUE AND ACCURATE STATEMENT; IS THAT

11:59AM  22   CORRECT?

11:59AM  23   A.   THAT'S CORRECT.

11:59AM  24   Q.   AND AGAIN, ON OTHER OCCASIONS MS. HOLMES ASKED YOU TO

11:59AM  25   PERFORM EXACTLY THAT KIND OF REVIEW; RIGHT?

11:59AM  1    A.   I DON'T RECALL THE SPECIFIC OCCASIONS.

11:59AM  2    Q.   OKAY.  WELL, LET'S LOOK AT 10629.

11:59AM  3    A.   OKAY.

11:59AM  4    Q.   DOES THIS REFRESH YOUR RECOLLECTION OF MS. HOLMES ASKING

11:59AM  5    YOU TO PERFORM A REVIEW OF A STATEMENT THAT WAS GOING TO BE

11:59AM  6    PROVIDED TO MAKE SURE THAT IT WAS ACCURATE?

11:59AM  7    A.   YES.

11:59AM  8    Q.   AND THIS IS IN THE -- YOU RECALL HER DOING THAT IN LATE

11:59AM  9    MARCH OF 2016?

11:59AM  10   A.   YES, IT APPEARS SO.

12:00PM  11   Q.   OKAY.  I'D LIKE TO TALK A LITTLE MORE ABOUT SOME OTHER

12:00PM  12   REFORMS THAT YOU WERE WORKING ON WITHIN THE LAB DURING YOUR

12:00PM  13   TENURE AT THERANOS.

12:00PM  14        IF WE CAN GO TO 13333.  THAT'S ONE 1, FOUR 3'S.

12:00PM  15   A.   YES.

12:00PM  16   Q.   DO YOU RECALL THAT THERE WERE SOME ISSUES THAT AROSE IN

12:01PM  17   CONNECTION WITH -- OR ISSUES THAT YOU DISCOVERED IN CONNECTION

12:01PM  18   WITH REVIEWING THE WORK OF THE BUGS LAB?

12:01PM  19   A.   YES.

12:01PM  20   Q.   AND FOR THE BENEFIT OF THE JURY, WHAT IS THE BUGS LAB?

12:01PM  21   A.   IT WAS OUR CODE NAME FOR THE MICROBIOLOGY LAB IN NEWARK.

12:01PM  22   Q.   OKAY.  AND JUST GIVE US A SENSE OF WHAT THE MICROBIOLOGY

12:01PM  23   LAB WAS AND HOW IT DIFFERED FROM OTHER LABS.

12:01PM  24   A.   IT DIFFERED BY THE TYPE OF TESTING.  SO THIS TYPE OF

12:01PM  25   LABORATORY IS INVOLVED IN IDENTIFYING INFECTIOUS ORGANISMS.

12:01PM   1    Q.   OKAY.  AND DOES THIS EMAIL RELATE TO, DOES THIS EMAIL

12:01PM   2    RELATE TO CONCERNS THAT YOU DISCOVERED OR ISSUES YOU DISCOVERED

12:01PM   3    IN CONNECTION WITH YOUR WORK AS LAB DIRECTOR?

12:02PM   4    A.   YES.

12:02PM   5         MR. WADE:  MOVE THE ADMISSION OF 13333.

12:02PM   6         MR. LEACH:  YOUR HONOR, I DON'T OBJECT TO THE BOTTOM

12:02PM   7    PORTION OF THE EMAIL.

12:02PM   8       THE TOP PORTION IS HEARSAY.

12:02PM   9       (PAUSE IN PROCEEDINGS.)

12:02PM  10         MR. WADE:  I OFFER IT FOR THE STATE OF MIND OF

12:02PM  11    MS. HOLMES, NOT FOR THE TRUTH.

12:02PM  12         THE COURT:  AS TO WHAT ISSUE?  AS TO WHAT ISSUE?

12:02PM  13         MR. WADE:  AS TO THE REMEDIAL EFFORTS THAT WERE

12:02PM  14    BEING MADE WITHIN THE LAB.

12:02PM  15         MR. LEACH:  IT'S AN OUT-OF-COURT STATEMENT BY A

12:02PM  16    NONTESTIFYING WITNESS, YOUR HONOR.  IT WAS THE SUBJECT OF A

12:02PM  17    MOTION IN LIMINE.

12:02PM  18         THE COURT:  DO YOU HAVE ANY OBJECTION TO IT COMING

12:02PM  19    IN SOLELY FOR THE STATE OF MIND FOR REMEDIAL ISSUES AT THIS

12:03PM  20    TIME?

12:03PM  21         MR. LEACH:  YES.

12:03PM  22         THE COURT:  ALL RIGHT.  I'M GOING TO SUSTAIN THE

12:03PM  23    OBJECTION.

12:03PM  24         MR. WADE:  OKAY.  I'M GOING TO OFFER -- I CAN REDACT

12:03PM  25    THAT EMAIL.

| 12:03PM | 1 | THE COURT: SURE. |

12:03PM 1    THE COURT:  SURE.

12:03PM 2    MR. WADE:  COULD I OFFER THE BOTTOM PORTION OF THE

12:03PM 3    DOCUMENT?

12:03PM 4    THE COURT:  I THINK YOU CAN DO THAT, YES.

12:03PM 5    (DISCUSSION OFF THE RECORD WITH THE COURT AND CLERK.)

12:03PM 6    THE COURT:  COUNSEL?

12:03PM 7    MR. WADE:  MAY I PUBLISH?

12:03PM 8    THE COURT:  YES.

12:03PM 9    (DEFENDANT'S EXHIBIT 13333, REDACTED, WAS RECEIVED IN

12:03PM 10   EVIDENCE.)

12:03PM 11   BY MR. WADE:

12:03PM 12   Q.   THIS EMAIL RELATES TO THE ISSUE WE WERE JUST DISCUSSING;

12:03PM 13   IS THAT CORRECT?

12:03PM 14   A.   YES.

12:03PM 15   Q.   AND IN THIS YOU NOTE SOME GOOD NEWS LAST NIGHT REGARDING

12:04PM 16   THE CAPILLARY DATA.

12:04PM 17   DO YOU SEE THAT?

12:04PM 18   A.   YES.

12:04PM 19   Q.   AND LET'S FOCUS ON THE BOTTOM EMAIL.  DO YOU SEE THAT THIS

12:04PM 20   IS WHAT REFERS TO THE BUGS LAB?

12:04PM 21   A.   YES.

12:04PM 22   Q.   IT SAYS -- YOU IDENTIFIED SOME CONCERNS WITHIN THAT LAB

12:04PM 23   THAT MAY JEOPARDIZE PATIENT CARE, "SO I'M BRINGING THAT ASSAY

12:04PM 24   DOWN."  AND IS THAT ASSAY REFERRING TO HIV?

12:04PM 25   A.   THAT IS.

12:04PM  1    Q.   OKAY.  AND THEN YOU NOTED, "AS WELL AS ALL OTHERS IN THE

12:04PM  2    BUGS LAB."

12:04PM  3         CORRECT?

12:04PM  4    A.   YES.

12:04PM  5    Q.   "AS THERE'S NO REASON TO GO ASSAY BY ASSAY IN OUR LOOK

12:04PM  6    BACK AFTER UNCOVERING SUCH ISSUES."

12:04PM  7         RIGHT?

12:04PM  8    A.   YES.

12:04PM  9    Q.   AND IS THAT FAIR TO SAY, THAT YOU WERE EFFECTIVELY

12:04PM  10   SHUTTING DOWN THE BUGS LAB?

12:04PM  11   A.   YES.

12:04PM  12   Q.   AND THAT'S BECAUSE, AS YOU WERE TURNING OVER THOSE ROCKS,

12:04PM  13   YOU CAME TO THE VIEW THAT THAT'S WHAT NEEDED TO BE DONE HERE;

12:05PM  14   RIGHT?

12:05PM  15   A.   YES.

12:05PM  16   Q.   AND WAS MS. HOLMES FULLY SUPPORTIVE OF YOUR DECISION TO DO

12:05PM  17   THAT?

12:05PM  18   A.   YES.

12:05PM  19   Q.   WAS TURNING OVER THOSE ROCKS AND FINDING THOSE ISSUES

12:05PM  20   EXACTLY WHAT SHE WANTED YOU TO DO WHEN SHE HIRED YOU?

12:05PM  21            MR. LEACH:  OBJECTION.  FOUNDATION.

12:05PM  22   BY MR. WADE:

12:05PM  23   Q.   DID YOU UNDERSTAND --

12:05PM  24            THE COURT:  THIS IS A NEW QUESTION?

12:05PM  25            MR. WADE:  YEAH.  I'LL WITHDRAW THE QUESTION.

12:05PM  1    Q.   DID YOU UNDERSTAND THAT THIS WAS EXACTLY THE KIND OF WORK

12:05PM  2    AND DISCOVERY THAT MS. HOLMES WAS ASKING YOU TO DO?

12:05PM  3    A.   YES.

12:05PM  4    Q.   OKAY.  LET'S GO TO 10668.

12:06PM  5    A.   OKAY.

12:06PM  6    Q.   AND DO YOU RECALL EARLIER WE TALKED ABOUT EFFORTS THAT YOU

12:06PM  7    WERE MAKING TO ENSURE THAT LABORATORY PERSONNEL WERE QUALIFIED

12:06PM  8    AND UP TO THE JOB?

12:06PM  9    A.   YES.

12:06PM  10   Q.   AND THAT WAS SOMETHING THAT WAS IMPORTANT TO YOU?

12:06PM  11   A.   YES.

12:06PM  12   Q.   AND IS THIS EMAIL CHAIN AN EMAIL IN WHICH YOU WERE

12:06PM  13   COMMUNICATING WITH A TEAM AT THERANOS ABOUT MAKING THOSE

12:06PM  14   ASSESSMENTS AND TAKING NECESSARY ACTIONS?

12:06PM  15   A.   YES.

12:06PM  16          MR. WADE:  OFFER 10668.

12:07PM  17          MR. LEACH:  HEARSAY, YOUR HONOR, TO THE BOTTOM

12:07PM  18   PORTION OF PAGE 1.

12:07PM  19          THE COURT:  SHOULD THAT BE REDACTED?

12:07PM  20          MR. WADE:  SURE.

12:07PM  21          THE COURT:  THE OBJECTION IS SUSTAINED.  THAT CAN BE

12:07PM  22   REDACTED.

12:07PM  23       WHILE THAT BEING DONE, JUST GIVE ME JUST A SECOND.  THE

12:07PM  24   CSO HAS TO SPEAK SOMEONE IN THE AUDIENCE, THE GENTLEMAN WITH

12:07PM  25   THE PLAID SHIRT.  THE CSO IS GOING TO SPEAK WITH THIS GENTLEMAN

| | | |
|---|---|---|
| 12:07PM | 1 | FOR JUST A MOMENT. |
| 12:07PM | 2 | MR. WADE:  I'LL GET SOME WATER, YOUR HONOR. |
| 12:07PM | 3 | (PAUSE IN PROCEEDINGS.) |
| 12:08PM | 4 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 12:08PM | 5 | MR. WADE:  YOUR HONOR, JUST FOR THE RECORD, I |
| 12:08PM | 6 | BELIEVE THE PRIOR EXHIBIT, I JUST WANT TO MAKE SURE THE RECORD |
| 12:08PM | 7 | IS CLEAR, I WAS MOVING ITS ADMISSION CONTINGENT UPON THE |
| 12:08PM | 8 | REDACTION. |
| 12:08PM | 9 | THE COURT:  CORRECT. |
| 12:08PM | 10 | MR. WADE:  I UNDERSTOOD IT WAS ADMITTED. |
| 12:08PM | 11 | THE COURT:  AND WE PAUSED FOR A MINUTE TO ALLOW FOR |
| 12:08PM | 12 | THE REDACTIONS, AND IF IT'S ACCOMPLISHED IT CAN NOW BE |
| 12:08PM | 13 | PUBLISHED. |
| 12:08PM | 14 | MR. WADE:  AND SIMILARLY FOR THE PRIOR DOCUMENT. |
| 12:08PM | 15 | THE COURT:  CORRECT. |
| 12:08PM | 16 | MR. WADE:  AND SIMILARLY FOR 10668, I WILL OFFER IT |
| 12:08PM | 17 | WITH THE BOTTOM PORTION TO WHICH MR. LEACH OBJECTED REDACTED. |
| 12:08PM | 18 | FOR THE TIME BEING I WON'T PUBLISH IT TO THE JURY. |
| 12:08PM | 19 | THE COURT:  OKAY.  THAT'S FINE.  THANK YOU. |
| 12:08PM | 20 | (DEFENDANT'S EXHIBIT 10668, REDACTED, WAS RECEIVED IN |
| 12:08PM | 21 | EVIDENCE.) |
| 12:08PM | 22 | BY MR. WADE: |
| 12:08PM | 23 | Q.  BEFORE I PUBLISH THAT DOCUMENT, I MEANT TO ASK YOU ONE |
| 12:08PM | 24 | MORE QUESTION ABOUT THE HIV TEST IN THE BUGS LAB. |
| 12:08PM | 25 | A.  YES. |

12:08PM   1    Q.   THAT WAS AN FDA APPROVED TEST THAT YOU WERE LOOKING AT;

12:09PM   2    CORRECT?

12:09PM   3    A.   CORRECT.

12:09PM   4    Q.   AND THAT WASN'T A THERANOS TECHNOLOGY ISSUE; RIGHT?

12:09PM   5    A.   CORRECT.

12:09PM   6    Q.   AND SIMILARLY, YOU'VE BEEN ASKED SOME QUESTIONS IN DIRECT

12:09PM   7    EXAMINATION ABOUT PT INR.

12:09PM   8         DO YOU RECALL THAT?

12:09PM   9    A.   YES.

12:09PM  10    Q.   AND THAT WAS AN ISSUE THAT CAME UP WITH CMS; CORRECT?

12:09PM  11    A.   YES.

12:09PM  12    Q.   AND THAT WAS AN FDA APPROVED DEVICE; CORRECT?

12:09PM  13    A.   YES.

12:09PM  14    Q.   AND THAT -- BY THAT I MEAN THE ASSAY THAT HAD ISSUES THAT

12:09PM  15    AROSE WAS BEING RUN ON AN FDA APPROVED DEVICE?

12:09PM  16    A.   YES.

12:09PM  17    Q.   OKAY.  THAT WAS NOT THERANOS TECHNOLOGY; CORRECT?

12:09PM  18    A.   CORRECT.

12:09PM  19    Q.   OKAY.  TURNING BACK TO 10668, WHICH WE WILL PUBLISH IN

12:09PM  20    REDACTED FORM, IF WE CAN GO TO THE LAST EMAIL.

12:10PM  21         AND THIS IS AN EMAIL FROM TRACY MASSON IN APRIL OF 2016.

12:10PM  22         DO YOU SEE THAT?

12:10PM  23    A.   YES.

12:10PM  24    Q.   DO YOU RECALL THAT TRACY MASSON WAS SORT OF A MANAGEMENT

12:10PM  25    PERSON WHO WAS BROUGHT IN TO HELP IMPROVE OPERATIONS WITHIN THE

DAS CROSS BY MR. WADE (RES.)                                    6000

12:10PM  1    LAB?

12:10PM  2    A.   YES.

12:10PM  3    Q.   SHE WASN'T A SPECIFIC TECHNICAL LAB PERSON; CORRECT?

12:10PM  4    A.   THAT'S CORRECT.

12:10PM  5    Q.   SHE WAS MORE OF AN OPERATIONS OR MANAGEMENT PERSON WHO WAS

12:10PM  6    HELPING OUT?

12:10PM  7    A.   YES.

12:10PM  8    Q.   AND DID YOU CONSIDER HER TO BE A GOOD EMPLOYEE AND

12:10PM  9    COMPETENT?

12:10PM  10   A.   YES.

12:10PM  11   Q.   AND AS PART OF THAT EFFORT, SHE WAS WORKING WITH YOU AND

12:10PM  12   OTHERS TO TRY TO MAKE SURE THAT THE RIGHT TEAM WAS IN PLACE; IS

12:11PM  13   THAT RIGHT?

12:11PM  14   A.   YES.

12:11PM  15   Q.   AND THIS EMAIL TALKS ABOUT, THIS EMAIL TALKS ABOUT HOW

12:11PM  16   THERE HAVE BEEN SOME ASSESSMENTS OF EMPLOYEES AND SOME

12:11PM  17   RECOMMENDATIONS AS TO WHO SHOULD BE KEPT AND WHO SHOULDN'T BE

12:11PM  18   KEPT; RIGHT?

12:11PM  19   A.   YES.

12:11PM  20   Q.   AND WHETHER THEY WERE A BENEFIT TO THE DEPARTMENT OR NOT A

12:11PM  21   BENEFIT TO THE DEPARTMENT?

12:11PM  22   A.   YES.

12:11PM  23   Q.   OKAY.  I'M NOT GOING TO PUBLISH THAT PART OF THE EXHIBIT

12:11PM  24   FOR CONFIDENTIALITY REASONS, BUT I WANT TO FOCUS ON YOUR

12:11PM  25   RESPONSE UP THE CHAIN.

12:11PM  1        YOU THANK HER FOR THIS WORK AND YOU NOTE THAT YOU TRUST

12:12PM  2   THE INPUT OF JEN.

12:12PM  3        AND JEN THERE IS JEN TRICK?

12:12PM  4   A.   YES.

12:12PM  5   Q.   AND WHO IS JEN TRICK?

12:12PM  6   A.   JEN TRICK WAS ONE OF THE LABORATORY MANAGERS.

12:12PM  7   Q.   OKAY.  AND WAS SHE SOMEONE NEW WHO WAS BROUGHT IN AS WELL?

12:12PM  8   A.   AS OF APRIL 2016?  I DON'T RECALL THE EXACT TIMELINES.

12:12PM  9   Q.   OKAY.  BUT WAS SHE SOMEONE WHO WAS BROUGHT IN AS PART OF

12:12PM  10  THE EFFORT TO BRING NEW PERSONNEL IN AND IMPROVE THE LAB?

12:12PM  11  A.   YES.

12:12PM  12  Q.   OKAY.  AND YOU THOUGHT HER TO BE A -- YOU RESPECTED HER

12:12PM  13  OPINION?

12:12PM  14  A.   YES.

12:12PM  15  Q.   OKAY.  AND I WANT TO FOCUS ON THE NEXT EMAIL UP THE CHAIN.

12:12PM  16       I WANT TO ASK, BEFORE WE PUBLISH THAT, IF THE COURT OR

12:12PM  17  COUNSEL HAS A PREFERENCE AS TO WHETHER I REDACT -- MAY I CONFER

12:12PM  18  WITH MR. LEACH?

12:12PM  19           THE COURT:  YES.  GO RIGHT AHEAD.  PLEASE.

12:12PM  20       (DISCUSSION AMONGST GOVERNMENT AND DEFENSE COUNSEL OFF THE

12:13PM  21  RECORD.)

12:13PM  22           MR. WADE:  THANK YOU, YOUR HONOR.

12:13PM  23       WE'RE JUST GOING TO TAKE A MOMENT AND REDACT, HAVING

12:13PM  24  CONFERRED WITH COUNSEL, THE NAME OF AN INDIVIDUAL FOR

12:13PM  25  CONFIDENTIALITY PURPOSES.

12:14PM  1          OKAY.  WE HAVE THE REDACTED DOCUMENT UP, WHICH I MOVE THE

12:14PM  2     ADMISSION OF THIS REDACTED VERSION.

12:14PM  3               THE CLERK:  WHAT IS THE EXHIBIT NUMBER?

12:14PM  4               THE COURT:  THE OBJECTION, MR. LEACH?  THERE'S NO

12:14PM  5     OBJECTION TO THIS.

12:14PM  6               MR. LEACH:  NO OBJECTION.

12:14PM  7               MR. WADE:  MOVE THE ADMISSION OF 10668 AS REDACTED.

12:14PM  8               THE COURT:  AS REDACTED, IT'S ADMITTED, AND IT MAY

12:14PM  9     BE PUBLISHED, YES.

12:14PM 10          (DEFENDANT'S EXHIBIT 10668, REDACTED, WAS RECEIVED IN

12:14PM 11     EVIDENCE.)

12:14PM 12     BY MR. WADE:

12:14PM 13     Q.   AND DO YOU SEE HERE YOU'RE PROVIDING AN UPDATE ON SOME OF

12:14PM 14     THESE EFFORTS THAT YOU'RE DOING WITH MS. MASSON ON -- BOTH IN

12:14PM 15     THE BUGS LAB AND WITH RESPECT TO PERSONNEL?

12:14PM 16     A.   YES.

12:14PM 17     Q.   YOU NOTE FIRST THAT, WITH RESPECT TO THE BUGS LAB, THAT

12:14PM 18     THERE'S A CULTURE OVER THERE THAT NEEDS CHANGING.

12:14PM 19          DO YOU SEE THAT?

12:14PM 20     A.   YES.

12:14PM 21     Q.   AND YOU TALK ABOUT SOME WAYS IN WHICH YOU'RE GOING TO GO

12:14PM 22     ABOUT TRYING TO DO THAT; RIGHT?

12:15PM 23     A.   YES.

12:15PM 24     Q.   AND THEN LET'S FOCUS ON THE NEXT PARAGRAPH.  AND THERE IT

12:15PM 25     SAYS WITH RESPECT TO A CERTAIN INDIVIDUAL, YOU HAD MORE

12:15PM   1      SIGNIFICANT CONCERNS, DIDN'T YOU?

12:15PM   2      A.   YES.

12:15PM   3      Q.   YOU HAD CONCERNS ABOUT INCOMPETENCE AND DISHONESTY; RIGHT?

12:15PM   4      A.   YES.

12:15PM   5      Q.   AND YOU WERE UNWILLING TO TOLERATE THAT; IS THAT RIGHT?

12:15PM   6      A.   YES.

12:15PM   7      Q.   AND SO YOU --

12:15PM   8      A.   THE DISHONESTY PART.

12:15PM   9      Q.   RIGHT.  THE DISHONESTY WAS -- INCOMPETENCE MAYBE YOU COULD

12:15PM  10      WORK AND TRAIN TO IMPROVE THE PERSON; IS THAT FAIR?

12:15PM  11      A.   YES.

12:15PM  12      Q.   BUT SOMEONE WHO WAS DISHONEST YOU HAD NO PATIENCE FOR; IS

12:15PM  13      THAT RIGHT?

12:15PM  14      A.   YES.

12:15PM  15      Q.   AND AS A RESULT OF THAT, YOU ASKED TO HAVE THAT PERSON

12:15PM  16      REMOVED; IS THAT CORRECT?

12:15PM  17      A.   YES.

12:15PM  18      Q.   AND THAT PERSON WAS REMOVED; CORRECT?

12:15PM  19      A.   YES.

12:15PM  20      Q.   AND MS. HOLMES WAS FULLY SUPPORTIVE OF THOSE EFFORTS;

12:16PM  21      RIGHT?

12:16PM  22      A.   YES.

12:16PM  23      Q.   AND SHE KNEW IT WAS IMPORTANT THAT YOU HAD THE TEAM THAT

12:16PM  24      YOU FELT LIKE YOU NEEDED?

12:16PM  25      A.   YES.

12:16PM  1    Q.   AND YOU UNDERSTOOD THAT SHE WASN'T GOING TO TOLERATE ANY

12:16PM  2    INTEGRITY ISSUES EITHER; CORRECT?

12:16PM  3    A.   YES.

12:16PM  4    Q.   AND LET'S GO TO THE TOP EMAIL ON PAGE 1.

12:16PM  5         AND YOU THANKED HER FOR THE SUPPORT ON THAT; RIGHT?

12:16PM  6    A.   YES.

12:16PM  7    Q.   BUT IN REALITY, THIS WASN'T A TOUGH CALL, WAS IT?

12:16PM  8    A.   NO.

12:16PM  9    Q.   AND YOU HAD TO TAKE ACTIONS ONCE YOU HAD THOSE KINDS OF

12:16PM  10   CONCERNS; RIGHT?

12:16PM  11   A.   YES.

12:16PM  12   Q.   LET'S GO TO 10639.

12:17PM  13        DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?

12:17PM  14   A.   I DO.

12:17PM  15   Q.   AND THIS IS, THIS IS A DOCUMENT WHERE YOU JUST ARE

12:17PM  16   PROVIDING AN UPDATE TO MS. HOLMES ON REPORTING STRUCTURES AND

12:17PM  17   SOME WORK YOU WERE DOING WITHIN THE LAB; CORRECT?

12:17PM  18   A.   YES.

12:17PM  19            MR. WADE:  MOVE THE ADMISSION OF 10639.

12:17PM  20            MR. LEACH:  NO OBJECTION.

12:17PM  21            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:17PM  22        (DEFENDANT'S EXHIBIT 10639 WAS RECEIVED IN EVIDENCE.)

12:17PM  23   BY MR. WADE:

12:17PM  24   Q.   AND I DON'T NEED TO SPEND A LOT OF TIME ON THIS, BUT YOU

12:17PM  25   WERE WORKING ON REVAMPING THE REPORTING STRUCTURE AND THE

12:17PM  1    ORGANIZATIONAL STRUCTURE IN THE LAB; RIGHT?

12:17PM  2    A.   YES.

12:17PM  3    Q.   AND YOU WERE GIVING MS. HOLMES AN UPDATE ON THAT; RIGHT?

12:17PM  4    A.   YES.

12:17PM  5    Q.   AND SHE WAS FULLY SUPPORTIVE OF THE EFFORTS THAT YOU WERE

12:17PM  6    UNDERTAKING IN THAT REGARD; IS THAT FAIR?

12:17PM  7    A.   YES.

12:17PM  8    Q.   LET'S LOOK AT 10675.

12:18PM  9    A.   YES.

12:18PM  10   Q.   DO YOU RECALL THAT, AS PART OF THE WORK THAT YOU WERE

12:18PM  11   DOING TO IMPROVE THE LAB, THAT YOU WERE WORKING TO FIND A THIRD

12:18PM  12   PARTY WHO COULD COME IN AND DO SOME TESTING ON LABORATORY

12:19PM  13   QUALITY?

12:19PM  14   A.   IF I MAY, MR. WADE?  IF I MAY MAKE A SLIGHT CLARIFICATION

12:19PM  15   OF THAT?

12:19PM  16   Q.   SURE.

12:19PM  17   A.   WE WERE LOOKING FOR A QUALITY MANAGER --

12:19PM  18   Q.   OKAY.

12:19PM  19   A.   -- TO HIRE.

12:19PM  20   Q.   TO HIRE?

12:19PM  21   A.   YES.

12:19PM  22   Q.   AND DOES THIS EMAIL RELATE TO THAT?

12:19PM  23   A.   I BELIEVE SO.

12:19PM  24         MR. WADE:  MOVE THE ADMISSION OF 10675.

12:19PM  25         MR. LEACH:  NO OBJECTION.

|          |    |                                                                |
|----------|----|----------------------------------------------------------------|
| 12:19PM  | 1  | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 12:19PM  | 2  | (DEFENDANT'S EXHIBIT 10675 WAS RECEIVED IN EVIDENCE.) |
| 12:19PM  | 3  | BY MR. WADE: |
| 12:19PM  | 4  | Q.   AND IF I COULD FOCUS -- DR. TSCHIRHART DRAFTED AN EMAIL |
| 12:19PM  | 5  | THERE. |
| 12:19PM  | 6  | DO YOU SEE THAT? |
| 12:19PM  | 7  | A.   YES. |
| 12:19PM  | 8  | Q.   AND IT NOTES -- DO YOU KNOW WHO MS. ABBOTT WAS? |
| 12:20PM  | 9  | A.   I DON'T RECALL. |
| 12:20PM  | 10 | Q.   AND IT WAS A CANDIDATE POTENTIALLY FOR THAT POSITION, OR |
| 12:20PM  | 11 | SOMEONE WHO MIGHT REFER SOMEONE? |
| 12:20PM  | 12 | A.   PERHAPS. |
| 12:20PM  | 13 | Q.   AND DO YOU RECALL BEING REFERRED BY DR. KRICKA? |
| 12:20PM  | 14 | A.   I DON'T RECALL THAT SPECIFICALLY. |
| 12:20PM  | 15 | Q.   OKAY.  BUT IN ANY EVENT, DOES THIS FAIRLY DESCRIBE THE |
| 12:20PM  | 16 | TYPE OF PERSON WHO YOU WERE LOOKING FOR TO COME IN AND DIG IN |
| 12:20PM  | 17 | ON QUALITY ISSUES? |
| 12:20PM  | 18 | A.   YES. |
| 12:20PM  | 19 | Q.   OKAY.  MR. LEACH ASKED YOU SOME QUESTIONS ABOUT THE |
| 12:20PM  | 20 | ARIZONA LAB. |
| 12:20PM  | 21 | DO YOU RECALL THAT? |
| 12:20PM  | 22 | A.   YES. |
| 12:20PM  | 23 | Q.   AND THAT WAS -- AND YOU BECAME GENERALLY FAMILIAR WITH |
| 12:20PM  | 24 | WHAT WAS -- THAT THERE WAS AN ARIZONA LAB; RIGHT? |
| 12:20PM  | 25 | A.   YES. |

12:20PM  1    Q.   BUT YOU WEREN'T THE LABORATORY DIRECTOR OF THAT LAB?

12:21PM  2    A.   CORRECT.

12:21PM  3    Q.   AND YOU UNDERSTOOD THAT THAT LAB WAS LOCATED IN CLOSE

12:21PM  4    PROXIMITY TO THE WALGREENS LOCATIONS AT WHICH THERANOS WAS

12:21PM  5    COLLECTING SAMPLES?

12:21PM  6    A.   I DON'T RECALL THE LOCATION OF THE LAB WITH RESPECT TO

12:21PM  7    WALGREENS.  IT WAS LOCATED IN SCOTTSDALE, I BELIEVE.

12:21PM  8    Q.   IT WAS LOCATED IN SCOTTSDALE.

12:21PM  9         AND DO YOU RECALL THAT THERANOS HAD SOME WALGREENS PATIENT

12:21PM  10   SERVICE CENTERS IN THE GREATER PHOENIX AREA?

12:21PM  11   A.   YES.

12:21PM  12   Q.   OKAY.  AND THERE WERE SOME QUESTIONS ABOUT THE PROPORTION

12:21PM  13   OF TESTS THAT WERE DONE THERE.

12:21PM  14        DO YOU RECALL THAT?

12:21PM  15   A.   YES.

12:21PM  16   Q.   AND YOU DIDN'T RECALL THAT, DID YOU?

12:21PM  17   A.   NO, I DON'T BELIEVE I DID.

12:21PM  18   Q.   GENERALLY DO YOU RECALL THAT YOU WERE LOOKING -- LET ME

12:21PM  19   STRIKE THAT AND START OVER.

12:21PM  20        AS PART OF YOUR WORK, YOU WERE LOOKING BACK OVER A RANGE

12:21PM  21   OF TESTS AT THERANOS; CORRECT?

12:22PM  22   A.   YES.

12:22PM  23   Q.   AND DO YOU RECALL THAT IN THE TIME PERIOD IT WAS OPERATING

12:22PM  24   AS A CLINICAL LABORATORY, THAT IT PERFORMED A LITTLE MORE THAN

12:22PM  25   8 MILLION TESTS?

12:22PM   1    A.   I DON'T RECALL THAT NUMBER SPECIFICALLY.

12:22PM   2            MR. LEACH:  I OBJECT TO THE QUESTION.  CAN WE BE

12:22PM   3    CLEAR ABOUT WHICH LAB WE'RE TALKING ABOUT?

12:22PM   4            THE COURT:  DID YOU UNDERSTAND THE QUESTION, SIR?

12:22PM   5            THE WITNESS:  I COULD USE SOME CLARIFICATION,

12:22PM   6    YOUR HONOR.

12:22PM   7            THE COURT:  OKAY.  WHY DON'T WE -- WHY DON'T YOU ASK

12:22PM   8    THE QUESTION AGAIN.

12:22PM   9            MR. WADE:  FAIR ENOUGH.

12:22PM  10    Q.   JUST TO BE CLEAR, I'M ASKING GENERALLY.  YOU DIDN'T RECALL

12:22PM  11    THE PROPORTIONS FROM ONE LAB TO THE NEXT?

12:22PM  12    A.   NO.

12:22PM  13    Q.   AND MY QUESTION WAS WHETHER YOU RECALLED THAT, IN TOTAL,

12:22PM  14    THE ENTITY PERFORMED ABOUT 8 MILLION TESTS?

12:22PM  15    A.   I DON'T RECALL THAT NUMBER SPECIFICALLY.

12:22PM  16    Q.   OKAY.  DO YOU HAVE A GENERAL RECOLLECTION?

12:22PM  17    A.   I WAS MORE FAMILIAR WITH A NUMBER IN THE RANGE OF 800-,

12:22PM  18    900,000.

12:22PM  19    Q.   THAT WAS IN THE NEWARK LAB?

12:23PM  20    A.   YES, BUT THAT'S THE NUMBER WITH WHICH I'M FAMILIAR.

12:23PM  21    Q.   UNDERSTOOD.  I JUST WANT TO MAKE SURE THAT THE RECORD IS

12:23PM  22    CLEAR.

12:23PM  23        YOU UNDERSTOOD THAT THE NEWARK LAB HAD PERFORMED ABOUT

12:23PM  24    THAT NUMBER OF TESTS ON AN ANNUAL BASIS; CORRECT?

12:23PM  25    A.   YES.

12:23PM  1    Q.   OKAY.  AND AS YOU SIT HERE TODAY, YOU DON'T KNOW THE TOTAL

12:23PM  2    NUMBER OF TESTS THAT THE COMPANY AS A WHOLE WAS PERFORMING AT

12:23PM  3    DIFFERENT LOCATIONS?

12:23PM  4    A.   CORRECT.

12:23PM  5    Q.   OKAY.  DO YOU RECALL THERE WAS A TIME PERIOD WHEN YOU

12:23PM  6    BEGAN DOING A LITTLE MORE WORK ON SOME R&D ISSUES AS WELL?

12:23PM  7    A.   I NEED A LITTLE BIT OF SPECIFICITY THERE AS WELL,

12:24PM  8    MR. WADE.

12:24PM  9    Q.   SURE.  THERE WERE TIMES WHERE YOUR INPUT WAS SOUGHT ON

12:24PM  10   DIFFERENT R&D MATTERS THAT THE COMPANY WAS WORKING ON; IS THAT

12:24PM  11   CORRECT?

12:24PM  12   A.   YES.

12:24PM  13   Q.   IN FACT, THERE CAME A TIME WHERE, IN ADDITION TO YOUR

12:24PM  14   OFFICE OVER AT THE NEWARK FACILITY, YOU WERE SPENDING SOME TIME

12:24PM  15   OVER AT THE PALO ALTO FACILITY AS WELL?

12:24PM  16   A.   YES.

12:24PM  17   Q.   AND THAT WAS WHERE THE R&D WORK WAS HAPPENING?

12:24PM  18   A.   PREDOMINANTLY, YES.

12:24PM  19   Q.   AND THAT WAS AN AREA THAT INTERESTED YOU; IS THAT RIGHT?

12:24PM  20   A.   YES.

12:24PM  21   Q.   AND YOU WERE ASKED TO PARTICIPATE IN DIFFERENT ASPECTS OF

12:24PM  22   THAT IN YOUR TENURE AT THE COMPANY; CORRECT?

12:24PM  23   A.   YES.

12:24PM  24   Q.   LET'S TAKE A LOOK AT 10638.

12:25PM  25   A.   OKAY.

12:25PM  1    Q.   AND DOES THIS EMAIL RELATE -- THIS IS AN EMAIL FROM

12:25PM  2    MAY 16TH, 2016; CORRECT?

12:25PM  3    A.   YES.

12:25PM  4    Q.   AND IT'S AN EMAIL THAT YOU SENT TO MS. HOLMES?

12:25PM  5    A.   YES.

12:25PM  6    Q.   AND IT RELATES TO SOME FEEDBACK THAT YOU WERE PROVIDING ON

12:25PM  7    SOME R&D ISSUES; IS THAT FAIR?

12:25PM  8    A.   I DON'T RECALL THE CONTEXT FOR THIS EMAIL.

12:25PM  9    Q.   DO YOU RECALL PARTICIPATING IN AN R&D CALL WHERE SOME

12:25PM  10   ISSUES WERE DISCUSSED AND YOU THOUGHT THAT YOU SHOULD PROVIDE

12:25PM  11   SOME PERSPECTIVE TO MS. HOLMES?

12:25PM  12   A.   I DON'T RECALL THAT.

12:25PM  13   Q.   OKAY.  DO YOU RECALL, IN CONNECTION WITH R&D WORK, BEING

12:26PM  14   ASKED TO PROVIDE SOME THOUGHTS IN CONNECTION WITH THE TYPES OF

12:26PM  15   STANDARDS THAT THE COMPANY SHOULD USE IN CONNECTION WITH THE

12:26PM  16   VALIDATION OF ASSAYS?

12:26PM  17   A.   YES.  VAGUELY THOUGH.

12:26PM  18   Q.   OKAY.  AND WE TALKED ABOUT THAT BEFORE IN CONNECTION WITH

12:26PM  19   SOME OF THE EDISON 3.5 ASSAYS.

12:26PM  20        DO YOU RECALL THAT?

12:26PM  21   A.   YES.

12:26PM  22   Q.   AND DO YOU RECALL THAT AS THE COMPANY WAS WORKING TO

12:26PM  23   DEVELOP ITS NEXT GENERATION DEVICE, THAT IT WANTED YOUR INPUT

12:26PM  24   ON THE RIGHT STANDARDS TO USE AS IT WAS IMPLEMENTING ITS NEXT

12:26PM  25   TECHNOLOGY?

12:26PM  1    A.   I RECALL BEING CONSULTED FROM TIME TO TIME.

12:26PM  2    Q.   OKAY.

12:26PM  3         MOVE THE ADMISSION OF 10638.

12:26PM  4              MR. LEACH:  NO OBJECTION, YOUR HONOR.

12:26PM  5              THE COURT:  IT'S ADMITTED.

12:26PM  6         (DEFENDANT'S EXHIBIT 10638 WAS RECEIVED IN EVIDENCE.)

12:27PM  7    BY MR. WADE:

12:27PM  8    Q.   AND DO YOU SEE HERE THAT THIS REFERS TO AN R&D CALL IN THE

12:27PM  9    SUBJECT LINE?

12:27PM 10    A.   YES.

12:27PM 11    Q.   AND YOU REFERENCE A DISCUSSION AND YOU TALK ABOUT

12:27PM 12    ALLOWABLE BIAS AND TOTAL ALLOWABLE ERROR FOR POTASSIUM THERE.

12:27PM 13         DO YOU SEE THAT?

12:27PM 14    A.   YES.

12:27PM 15    Q.   AND YOU SET FORTH SOME THOUGHTS AS TO WHAT APPROPRIATE

12:27PM 16    STANDARDS MIGHT BE FOR THAT; RIGHT?

12:27PM 17    A.   YES.

12:27PM 18    Q.   AND YOU NOTE THERE IN THE SECOND PARAGRAPH, SECOND

12:27PM 19    SENTENCE, THAT YOU USE CLIA AS A LAST RESORT SINCE IT'S AKIN TO

12:27PM 20    HITTING THE BROAD SIDE OF A BARN?

12:27PM 21    A.   YES.

12:27PM 22    Q.   AND SO BASED ON YOUR EXPERTISE HERE, YOU WERE OF THE VIEW

12:28PM 23    THAT YOU SHOULDN'T USE THE CLIA STANDARD AS THE BENCHMARK FOR

12:28PM 24    TOTAL ALLOWABLE ERROR; RIGHT?

12:28PM 25    A.   YES.  THAT WOULD BE INAPPROPRIATE.

12:28PM 1    Q.   OKAY.  AND WERE YOU RELAYING THIS TO MS. HOLMES SO THAT

12:28PM 2    SHE HAD THE BENEFIT OF YOUR EXPERTISE ON THIS ISSUE?

12:28PM 3    A.   YES.

12:28PM 4    Q.   AND YOU ACTUALLY REFER TO A DIFFERENT SET OF STANDARDS

12:28PM 5    THAT COULD BE USED THERE BASED ON CALLUM FRASER'S WORK?

12:28PM 6         DO YOU SEE THAT?

12:28PM 7    A.   YES.

12:28PM 8    Q.   AND THAT WAS REFERENCED IN THE RICOS HANDBOOK, WHICH I

12:28PM 9    THINK IS AVAILABLE ON THE INTERNET AS WELL; CORRECT?

12:28PM 10   A.   YES.

12:28PM 11   Q.   AND THIS WAS AN INSTANCE WHERE YOU WERE TRYING TO GET

12:28PM 12   INVOLVED IN THE R&D THAT THE COMPANY WAS WORKING ON AND GIVE

12:28PM 13   THEM AN APPROPRIATE CLIA LENS AND STANDARD TO DEVELOP THEIR

12:29PM 14   TECHNOLOGY BASED UPON; IS THAT RIGHT?

12:29PM 15   A.   YES.

12:29PM 16   Q.   AND IN CONNECTION WITH THE DEVELOPMENT OF THAT TECHNOLOGY,

12:29PM 17   YOU'RE AWARE THAT A PRESENTATION WAS GIVEN OF THE NEXT

12:29PM 18   GENERATION DEVICE AT THE AACC CONFERENCE IN AUGUST OF 2016?

12:29PM 19   A.   YES.

12:29PM 20   Q.   AND YOU DID NOT, YOU DID NOT ATTEND THAT CONFERENCE;

12:29PM 21   CORRECT?

12:29PM 22   A.   CORRECT.

12:29PM 23   Q.   BUT YOU WATCHED THAT PRESENTATION OVER A VIDEO LINK;

12:29PM 24   RIGHT?

12:29PM 25   A.   I DID NOT VIEW THE PRESENTATION.

12:30PM   1    Q.   LET ME SEE IF I CAN REFRESH YOUR RECOLLECTION.

12:30PM   2         COULD YOU LOOK AT 14160?

12:30PM   3    A.   YES.

12:30PM   4    Q.   AND IF I COULD JUST CALL YOUR ATTENTION TO THE ITEM

12:30PM   5    RELATING TO AUGUST 2ND, 2016.

12:30PM   6         DO YOU SEE THAT?  AND JUST READ THAT TO YOURSELF.

12:30PM   7    A.   YES.

12:31PM   8         (PAUSE IN PROCEEDINGS.)

12:31PM   9              THE WITNESS:  I'VE READ IT.

12:31PM  10    BY MR. WADE:

12:31PM  11    Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT YOU WATCHED AT

12:31PM  12    LEAST PORTIONS OF THE AACC CONFERENCE IN YOUR OFFICE?

12:31PM  13    A.   YES.  I DON'T RECALL DOING SO, BUT IT APPEARS THAT I DID.

12:31PM  14    Q.   AND MAYBE YOU RECALL THAT IT WAS ACTUALLY RECORDED AND

12:31PM  15    AVAILABLE ONLINE?

12:31PM  16    A.   RIGHT, YES, I'M AWARE OF THAT.

12:31PM  17    Q.   AND YOU'VE SEEN PART OF THAT?

12:31PM  18    A.   YES.

12:31PM  19    Q.   AND DO YOU RECALL BEING OF THE VIEW THAT MS. HOLMES DID A

12:31PM  20    GOOD JOB IN THAT PRESENTATION?

12:31PM  21    A.   YES.

12:31PM  22    Q.   AND THAT YOU THOUGHT THAT SOME OF THE FOCUS ON THAT

12:31PM  23    PRESENTATION WAS, WAS NARROW MINDED?

12:31PM  24    A.   IT APPEARS SO.  I DON'T RECALL THAT.

12:32PM  25    Q.   OKAY.  BUT YOU WERE COMPLIMENTARY OF THE WORK THAT SHE HAD

12:32PM  1    DONE THERE; IS THAT RIGHT?

12:32PM  2    A.   YES.

12:32PM  3    Q.   AND DO YOU RECALL DURING THAT PRESENTATION SOME SLIDES

12:32PM  4    WERE PROJECTED?

12:32PM  5    A.   YES.

12:32PM  6    Q.   OKAY.

12:32PM  7         MAY I APPROACH, YOUR HONOR?

12:32PM  8              THE COURT:  YES.

12:33PM  9    BY MR. WADE:

12:33PM  10   Q.   (HANDING.)

12:33PM  11        HAVE YOU HAD A CHANCE TO JUST GENERALLY PERUSE THE SLIDE

12:33PM  12   PRESENTATION?

12:33PM  13   A.   IT DOES LOOK FAMILIAR.

12:33PM  14   Q.   DO YOU RECOGNIZE THIS TO BE THE SLIDES THAT WERE PRESENTED

12:33PM  15   DURING THAT PRESENTATION?

12:33PM  16   A.   THEY'RE CONSISTENT WITH MY RECOLLECTION.

12:33PM  17              MR. WADE:  MOVE THE ADMISSION OF 7673A.

12:33PM  18              MR. LEACH:  OBJECTION, YOUR HONOR.  RELEVANCE,

12:34PM  19   HEARSAY.

12:34PM  20              THE COURT:  SUSTAINED.

12:34PM  21   BY MR. WADE:

12:34PM  22   Q.   YOUR UNDERSTANDING WAS PART OF THAT PRESENTATION WAS AN

12:34PM  23   EFFORT THAT THE COMPANY WAS MAKING TO ENGAGE IN SOME SCIENTIFIC

12:34PM  24   DIALOGUE WITH THE BROADER CLINICAL LABORATORY COMMUNITY?

12:34PM  25   A.   YES.

12:34PM 1    Q.   AND AN EFFORT TO TRY TO BE MORE TRANSPARENT ABOUT THE

12:34PM 2    PRODUCT THAT IT WAS DEVELOPING?

12:34PM 3    A.   YES.

12:34PM 4    Q.   ABOUT ITS TECHNOLOGY?

12:34PM 5    A.   YES.

12:34PM 6    Q.   AND WHAT IT THOUGHT ITS TECHNOLOGY COULD DO?

12:34PM 7         DO YOU RECALL THAT?

12:34PM 8              MR. LEACH:  OBJECTION.  FOUNDATION.

12:34PM 9              THE COURT:  WELL, I'LL ALLOW HIM TO ANSWER THIS LAST

12:34PM 10   QUESTION.

12:34PM 11        DO YOU RECALL THAT, SIR?

12:34PM 12             THE WITNESS:  I DO, YOUR HONOR.

12:34PM 13   BY MR. WADE:

12:34PM 14   Q.   OKAY.  AND IN ADDITION TO THAT PRESENTATION, THE COMPANY

12:34PM 15   WAS WORKING ON PUBLICATIONS AND ENGAGING WITH OTHER MEDICAL

12:35PM 16   INSTITUTIONS TO TRY TO INCREASE TRANSPARENCY; IS THAT RIGHT?

12:35PM 17   A.   YES.  JUST AS A MATTER OF CLARIFICATION, I BELIEVE IT WAS

12:35PM 18   ONE INSTITUTION THAT I WAS AWARE OF.  BUT, YES.

12:35PM 19   Q.   AND WHAT INSTITUTION WAS THAT?

12:35PM 20   A.   I BELIEVE IT WAS UCSF.

12:35PM 21   Q.   IT WAS UCSF THAT THEY WERE WORKING WITH ON A STUDY?

12:35PM 22   A.   YES.

12:35PM 23             MR. WADE:  THE COURT'S INDULGENCE FOR A MOMENT?

12:35PM 24        (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

12:35PM 25   BY MR. WADE:

12:35PM  1    Q.   JUST A COUPLE MORE QUESTIONS FOR YOU, SIR.

12:36PM  2         AT THE -- DO YOU RECALL ABOUT WHEN YOU LEFT, YOU STOPPED

12:36PM  3    WORKING AT THERANOS?

12:36PM  4    A.   THAT WOULD HAVE BEEN JUNE OF 2018, I BELIEVE.

12:36PM  5    Q.   OKAY.  AND AT THE TIME THAT YOU LEFT THE COMPANY -- YOU

12:36PM  6    STARTED AT THE COMPANY WITH MS. HOLMES COMMUNICATING TO HER

12:36PM  7    ABOUT HOW IMPRESSED YOU WERE WITH THE VISION SHE HAD AND WHAT

12:36PM  8    SHE WAS TRYING TO ACCOMPLISH; CORRECT?

12:36PM  9    A.   YES.

12:36PM 10    Q.   AND AT THE TIME THAT YOU LEFT THE COMPANY, DID YOU STILL

12:36PM 11    BELIEVE IN THE MISSION AND WHAT IT HAD HOPED TO ACCOMPLISH?

12:37PM 12    A.   YES.

12:37PM 13              MR. WADE:  NO FURTHER QUESTIONS, YOUR HONOR.

12:37PM 14              THE COURT:  REDIRECT?

12:37PM 15              MR. LEACH:  YES, YOUR HONOR.  BRIEFLY.

12:37PM 16         (PAUSE IN PROCEEDINGS.)

12:37PM 17              THE COURT:  FOLKS, GO AHEAD AND STAND UP AND STRETCH

12:37PM 18    IF YOU WOULD LIKE WHILE WE MAKE THE TRANSITION HERE.

12:37PM 19         YOU, TOO, DOCTOR.  GO AHEAD AND STAND UP AND STRETCH IF

12:37PM 20    YOU WOULD LIKE.

12:37PM 21              THE WITNESS:  THANK YOU, YOUR HONOR.

12:37PM 22              THE COURT:  YOU'RE WELCOME.

12:37PM 23         (STRETCHING.)

12:38PM 24              MR. WADE:  LET ME GET MY WATER HERE.

12:38PM 25              MR. LEACH:  THANK YOU.

12:38PM  1          MAY I INQUIRE, YOUR HONOR?

12:38PM  2               THE COURT:  YES.

12:38PM  3               MR. WADE:  THANK YOU.

12:38PM  4                    **REDIRECT EXAMINATION**

12:38PM  5     BY MR. LEACH:

12:38PM  6     Q.   GOOD AFTERNOON, DR. DAS.  I JUST HAVE A FEW QUESTIONS.

12:38PM  7          YOU WERE ASKED A NUMBER OF QUESTIONS ON CROSS-EXAMINATION

12:38PM  8     ABOUT THERANOS'S NEXT GENERATION DEVICE.

12:38PM  9          DO YOU RECALL QUESTIONS ALONG THOSE LINES?

12:38PM 10     A.   YES.

12:38PM 11     Q.   AND DO YOU RECALL REVIEWING A PHOTO OF THE INSIDE OF ONE

12:38PM 12     OF THE NEXT GENERATION DEVICES?

12:38PM 13     A.   YES.

12:38PM 14     Q.   AND YOU WERE ASKED SOME QUESTIONS ABOUT A PRESENTATION AT

12:38PM 15     AACC WHERE THERE WAS DISCUSSION ABOUT THE NEXT GENERATION

12:38PM 16     DEVICE.

12:38PM 17          DO YOU RECALL THAT?

12:38PM 18     A.   YES.

12:38PM 19     Q.   AND THAT NEXT GENERATION DEVICE WAS NEVER USED IN THE

12:38PM 20     CLINICAL LAB; CORRECT?

12:39PM 21     A.   YES.

12:39PM 22     Q.   IT WAS NEVER USED TO TEST PATIENT SAMPLES IN THE LAB THAT

12:39PM 23     YOU WERE OPERATING; RIGHT?

12:39PM 24     A.   CORRECT.

12:39PM 25     Q.   AND TO YOUR KNOWLEDGE, IT WAS NEVER USED IN THE ARIZONA

12:39PM   1    MODERATE COMPLEXITY LAB; IS THAT CORRECT?

12:39PM   2    A.   CORRECT.

12:39PM   3    Q.   YOU WERE ALSO ASKED A NUMBER OF QUESTIONS ABOUT ACTIONS

12:39PM   4    THAT YOU WERE TAKING AND STEPS THAT THE COMPANY WAS TAKING IN

12:39PM   5    2016.  AND I WANT TO MAKE SURE -- I WANT TO GO THROUGH THAT

12:39PM   6    TIMELINE WITH YOU IF WE COULD.

12:39PM   7    A.   SURE.

12:39PM   8    Q.   WAS IT YOUR UNDERSTANDING THAT THERANOS FIRST OBTAINED ITS

12:39PM   9    CLIA LICENSE IN 2011?

12:39PM  10    A.   I DON'T HAVE RECOLLECTION OF THAT DATE.

12:39PM  11    Q.   WELL, YOU STARTED IN 2015; IS THAT RIGHT?

12:39PM  12    A.   YES.

12:39PM  13    Q.   AND WHEN YOU STARTED THE LAB WASN'T NEW?  IT HAD BEEN

12:39PM  14    OPERATING FOR YEARS BASED ON YOUR UNDERSTANDING?

12:39PM  15    A.   YES, THAT WAS MY UNDERSTANDING.

12:39PM  16    Q.   AND IF I COULD PLEASE DISPLAY, WITH THE COURT'S

12:39PM  17    PERMISSION, WHAT IS IN EVIDENCE AS EXHIBIT 4528.

12:40PM  18             THE COURT:  YES.

12:40PM  19             MR. LEACH:  I THINK THIS IS A NATIVE DOCUMENT,

12:40PM  20    MS. HOLLIMAN.

12:40PM  21        IF WE CAN ZOOM IN ON THE FIRST PAGE OF THE POWERPOINT.

12:40PM  22    Q.   DR. DAS, DO YOU SEE WHERE IT SAYS THERANOS CLIA LABORATORY

12:40PM  23    OVERVIEW 9-22-15?

12:40PM  24    A.   YES.

12:40PM  25    Q.   AND I WANT TO FOCUS ON THAT DATE, SEPTEMBER 22ND, 2015.

12:40PM  1        DID YOU HAVE AN UNDERSTANDING THAT THAT WAS THE DATE WHEN

12:40PM  2   CMS'S SURVEY BEGAN?

12:40PM  3   A.   I WASN'T AWARE OF THAT EXACT DATE.

12:40PM  4   Q.   BUT YOU KNEW IT HAD STARTED AT SOME POINT BEFORE YOU

12:40PM  5   JOINED?

12:40PM  6   A.   YES.

12:40PM  7   Q.   MS. HOLLIMAN, IF WE COULD PLEASE GO TO PAGE 8.

12:40PM  8        DO YOU SEE THE CLIA LABORATORIES ORG CHART ON THIS SLIDE,

12:40PM  9   DR. DAS?

12:40PM 10   A.   YES.

12:40PM 11   Q.   AND DO YOU SEE MS. HOLMES'S NAME AT THE TOP?

12:41PM 12   A.   YES.

12:41PM 13   Q.   OKAY.  YOU TALKED ABOUT A NUMBER OF PEOPLE ON YOUR DIRECT

12:41PM 14   EXAMINATION, ARTHUR BACA, FRANCIS YOUNG, MICHELE CARBONE,

12:41PM 15   DR. HELFEND.

12:41PM 16        ARE THOSE ALL INDIVIDUALS WHO JOINED THE COMPANY AFTER

12:41PM 17   SEPTEMBER OF 2015?

12:41PM 18   A.   YES.

12:41PM 19   Q.   AND AT SOME POINT DID YOU BECOME AWARE THAT IN OCTOBER OF

12:41PM 20   2015, THERE WAS AN ARTICLE IN "THE WALL STREET JOURNAL"

12:41PM 21   GENERALLY CRITICAL OF THERANOS?

12:41PM 22   A.   YES.

12:41PM 23   Q.   AND YOU WERE COMING ON BOARD AFTER THAT ARTICLE HAD BEEN

12:41PM 24   PUBLISHED?

12:41PM 25   A.   YES.

| | | |
|---|---|---|
| 12:41PM | 1 | Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO EXHIBIT 4621, WHICH |
| 12:41PM | 2 | IS IN EVIDENCE.  LET'S GO TO PAGE 1. |
| 12:41PM | 3 | AND IF WE COULD GO DOWN TO THE START OF THE SECOND |
| 12:42PM | 4 | PARAGRAPH, MS. HOLLIMAN. |
| 12:42PM | 5 | DO YOU SEE, DR. DAS, WHERE IT SAYS, "THE ON-SITE SURVEY |
| 12:42PM | 6 | WAS COMPLETED ON NOVEMBER 20TH, 2015"? |
| 12:42PM | 7 | DO YOU SEE THAT LANGUAGE? |
| 12:42PM | 8 | A.   YES. |
| 12:42PM | 9 | Q.   AND IS THAT YOUR UNDERSTANDING OF THE DATE WHEN CMS |
| 12:42PM | 10 | LARGELY COMPLETED ITS SURVEY? |
| 12:42PM | 11 | A.   YES. |
| 12:42PM | 12 | Q.   OKAY.  DO YOU KNOW WHETHER CMS PROVIDED AN EXIT INTERVIEW |
| 12:42PM | 13 | TO MS. HOLMES ON NOVEMBER 20TH, 2015? |
| 12:42PM | 14 | A.   I'M NOT AWARE OF THAT. |
| 12:42PM | 15 | Q.   DO YOU KNOW WHETHER CMS DESCRIBED ANY OF THE POTENTIAL |
| 12:42PM | 16 | FINDINGS TO MS. HOLMES AT THE COMPLETION OF THE SURVEY IN |
| 12:42PM | 17 | NOVEMBER OF 2015? |
| 12:42PM | 18 | A.   NO. |
| 12:42PM | 19 | Q.   YOU INTERVIEWED WITH MS. HOLMES AT SOME POINT IN DECEMBER |
| 12:42PM | 20 | OF 2015? |
| 12:42PM | 21 | A.   YES. |
| 12:42PM | 22 | Q.   AND DID SHE BRING UP THE CMS INSPECTION AT THAT POINT? |
| 12:42PM | 23 | A.   NO. |
| 12:42PM | 24 | Q.   DID SHE MENTION ANYTHING ABOUT THE POSSIBILITY OF SOME |
| 12:42PM | 25 | FORM OF STATEMENT OF DEFICIENCIES? |

12:42PM  1    A.    NO.

12:42PM  2    Q.    AND YOU DON'T LEARN ABOUT THAT UNTIL YOU COME ON BOARD AT

12:43PM  3    SOME POINT IN JANUARY OR FEBRUARY; IS THAT FAIR?

12:43PM  4    A.    I CAN'T REMEMBER THE EXACT DATE.

12:43PM  5    Q.    OKAY.  THAT'S SOMETHING THAT YOU LEARNED OF AFTER YOU

12:43PM  6    JOINED THE COMPANY?

12:43PM  7    A.    YES.

12:43PM  8    Q.    THANK YOU, MS. HOLLIMAN.  WE CAN TAKE THAT DOWN.

12:43PM  9          YOU WERE ASKED A COUPLE OF QUESTIONS ON CROSS-EXAMINATION

12:43PM  10   ABOUT OWNERS AND OPERATORS OF CLIA LABS.

12:43PM  11         I WANT TO UNDERSTAND YOUR POSITION WITHIN THE THERANOS

12:43PM  12   HIERARCHY.

12:43PM  13         YOU REPORTED TO MS. HOLMES?

12:43PM  14   A.    YES.

12:43PM  15   Q.    AND SO SHE'S THE ONE WHO HIRED YOU?

12:43PM  16   A.    YES.

12:43PM  17   Q.    AND SHE IN THEORY COULD FIRE YOU AT ANY POINT?  WAS THAT

12:43PM  18   YOUR UNDERSTANDING?

12:43PM  19   A.    YES.

12:43PM  20   Q.    IF SHE DIDN'T LIKE THE JOB YOU WERE DOING, SHE COULD FIRE

12:43PM  21   YOU, JUST LIKE ANY EMPLOYEE AT ANY OTHER COMPANY?

12:43PM  22   A.    YES.

12:43PM  23   Q.    AND IF YOU NEEDED RESOURCES FOR YOUR CLIA LAB, WHO WOULD

12:43PM  24   YOU GO TO?

12:43PM  25   A.    I WOULD GO TO MS. HOLMES.

| 12:44PM | 1 | Q. WHY WOULD YOU GO TO HER? |
| 12:44PM | 2 | A. SHE WOULD HAVE CONTROL OVER THE RESOURCES. |
| 12:44PM | 3 | Q. RESOURCES YOU WOULD NEED TO GET YOUR JOB DONE? |
| 12:44PM | 4 | A. YES. |
| 12:44PM | 5 | Q. YOU WERE ALSO ASKED SOME QUESTIONS ABOUT A MOCK AUDIT AT |
| 12:44PM | 6 | SOME POINT IN ADVANCE OF SEPTEMBER 2015. |
| 12:44PM | 7 | DO YOU RECALL THOSE QUESTIONS? |
| 12:44PM | 8 | A. YES, I DO. |
| 12:44PM | 9 | Q. AND DO YOU RECALL THE NAME JERRY HURST BEING MENTIONED? |
| 12:44PM | 10 | A. YES. |
| 12:44PM | 11 | Q. HAVE YOU EVER MET MR. HURST? |
| 12:44PM | 12 | A. NO. |
| 12:44PM | 13 | Q. DO YOU HAVE ANY IDEA WHAT WAS DONE IN THAT AUDIT? |
| 12:44PM | 14 | A. NO. |
| 12:44PM | 15 | Q. DO YOU KNOW WHETHER MR. HURST LOOKED AT AN EDISON DEVICE? |
| 12:44PM | 16 | A. NO. |
| 12:44PM | 17 | Q. DO YOU KNOW WHETHER HE WAS SHOWN ANY DATA FROM AN EDISON |
| 12:44PM | 18 | DEVICE? |
| 12:44PM | 19 | A. NO. |
| 12:44PM | 20 | Q. DO YOU KNOW WHETHER HE WAS SHOWN ANY DATA FROM TESTING ON |
| 12:44PM | 21 | MODIFIED THIRD PARTY DEVICES? |
| 12:44PM | 22 | A. NO. |
| 12:44PM | 23 | Q. DO YOU KNOW WHETHER HE SAW A MODIFIED SIEMENS MACHINE? |
| 12:44PM | 24 | A. NO. |
| 12:44PM | 25 | MR. WADE: YOUR HONOR, FOUNDATION. I THINK WE'VE -- |

12:44PM  1    HE SAID HE DOESN'T KNOW WHAT HAPPENED AND --

12:45PM  2            THE COURT:  WELL, I'LL ALLOW IT.  I THINK YOU'RE

12:45PM  3    ABOUT DONE WITH THIS.

12:45PM  4            MR. LEACH:  I'M ABOUT DONE, YOUR HONOR.  THANK YOU.

12:45PM  5    Q.   YOU WERE ALSO ASKED SOME QUESTIONS ABOUT SOME OF THE

12:45PM  6    QUALITY CONTROL DATA THAT WAS REPORTED IN THE CMS REPORT.

12:45PM  7         DO YOU RECALL SOME QUESTIONS ABOUT THAT?

12:45PM  8    A.   YES.

12:45PM  9    Q.   AND IN RESPONSE TO THE 2567, YOU REVIEWED NOT JUST THE

12:45PM 10    QUALITY CONTROL DATA THAT WAS LISTED IN THE CMS REPORT, BUT A

12:45PM 11    BROADER UNIVERSE OF DATA.

12:45PM 12         IS THAT FAIR?

12:45PM 13    A.   YES.

12:45PM 14    Q.   AND WHAT WAS THE REASON FOR DOING THAT?

12:45PM 15    A.   THAT WAS TO IDENTIFY THE EXTENT OF THE DEFICIENCY.

12:45PM 16    Q.   OKAY.  AND AFTER THAT BROADER REVIEW, DID YOU VIEW THE

12:45PM 17    INSTANCES THAT WERE LISTED BY CMS AS REPRESENTATIVE SAMPLES?

12:45PM 18    A.   YES.

12:45PM 19    Q.   THOSE DIDN'T SEEM OUT OF -- UNUSUAL IN THE SENSE OF BEING

12:45PM 20    ONE OFFS OR OUT OF THE ORDINARY?

12:45PM 21    A.   OUTLIERS?  IS THAT CORRECT?

12:46PM 22    Q.   WE'VE USED THAT TERM IN SOME OTHER CONTEXTS.  I JUST WANT

12:46PM 23    TO MAKE SURE IF WHAT WAS REPORTED IN CMS WAS REPRESENTATIVE OF

12:46PM 24    WHAT YOU SAW IN YOUR BROADER REVIEW.

12:46PM 25    A.   YES.

12:46PM  1    Q.   YOU WERE ASKED A NUMBER OF QUESTIONS ABOUT THE VALIDATION

12:46PM  2    REPORTS FOR ASSAYS RUN ON THE EDISON 3.5.

12:46PM  3         DO YOU RECALL THAT TESTIMONY?

12:46PM  4    A.   YES.

12:46PM  5    Q.   AND A VALIDATION REPORT IS THE DOCUMENT AT THE OUTSET OF

12:46PM  6    TESTING WHEN YOU START USING A PARTICULAR ASSAY IN A PARTICULAR

12:46PM  7    DEVICE IN THE LAB; IS THAT RIGHT?

12:46PM  8    A.   CORRECT.

12:46PM  9    Q.   IS THAT THE END OF THE MATTER WHEN IT COMES TO THE LAB

12:46PM  10   DIRECTOR ASSESSING WHETHER THE ASSAY IS WORKING OR NOT WORKING?

12:46PM  11   A.   NO.

12:46PM  12   Q.   HOW IS THAT NOT THE END OF THE MATTER?

12:46PM  13   A.   MAY I GET A LITTLE BIT OF SPECIFICITY THERE?

12:46PM  14   Q.   WELL, ARE THERE OTHER PROCEDURES IN A LAB TO MAKE SURE

12:46PM  15   THAT, AFTER VALIDATION, THE ASSAY IS WORKING OR NOT WORKING AS

12:46PM  16   IT'S SUPPOSED TO?

12:47PM  17   A.   YES.

12:47PM  18   Q.   AND IS QUALITY CONTROL ONE OF THOSE?

12:47PM  19   A.   THAT IS THE CHIEF COMPONENT, YES.

12:47PM  20   Q.   AND IS QUALITY CONTROL, LIKE, THE ALARM BELL TO ASSESS

12:47PM  21   WHETHER A PARTICULAR ASSAY IS WORKING OR NOT WORKING AS IT'S

12:47PM  22   SUPPOSED TO?

12:47PM  23   A.   YES.

12:47PM  24   Q.   OKAY.  AND BASED ON YOUR REVIEW OF THE BROADER UNIVERSE OF

12:47PM  25   QC DATA, WERE ALARM BELLS GOING OFF?

12:47PM  1   A.   YES.

12:47PM  2   Q.   AT ANY TIME IN YOUR INITIAL INTERVIEW WITH MR. HOLMES, OR

12:47PM  3   EVEN IN THE PERIOD UP THROUGH MARCH, DID ANYBODY EVER RAISE

12:47PM  4   INSTANCES TO YOU WHERE FOLKS WITHIN THE CLIA LAB WERE RAISING

12:47PM  5   ISSUES WITH RESPECT TO QUALITY CONTROL?

12:47PM  6   A.   COULD YOU ELABORATE A LITTLE BIT, PLEASE.

12:47PM  7   Q.   FOR EXAMPLE, IN YOUR INTERVIEW WITH MS. HOLMES OR IN YOUR

12:47PM  8   FIRST FEW WEEKS AS YOU'RE COMING UP TO THE LAB, DID ANYBODY

12:47PM  9   REPORT TO YOU ISSUES THAT HAD BEEN RAISED PREVIOUSLY WITHIN THE

12:47PM  10  CLIA LAB BY INSIDERS WITHIN THE COMPANY?

12:47PM  11  A.   NO.

12:47PM  12  Q.   DID ANYONE MENTION THE NAME ERIKA CHEUNG TO YOU?

12:48PM  13  A.   NO.

12:48PM  14  Q.   DID ANYBODY MENTION THE NAME TYLER SHULTZ TO YOU?

12:48PM  15  A.   NO.

12:48PM  16  Q.   AND DID ANYBODY DESCRIBE FOR YOU THE CIRCUMSTANCES UNDER

12:48PM  17  WHICH DR. ROSENDORFF LEFT?

12:48PM  18  A.   NO.

12:48PM  19  Q.   YOU WERE ALSO ASKED SOME QUESTIONS ABOUT EXHIBIT 14162.

12:48PM  20       AND IF WE COULD PLEASE DISPLAY THAT, MS. HOLLIMAN.

12:48PM  21       DO YOU RECALL BEING EXAMINED ABOUT YOUR APPROACH WITH

12:48PM  22  RESPECT TO SOME PARTICULAR ASSAYS IN EXHIBIT 14162, DR. DAS?

12:48PM  23  A.   YES.

12:48PM  24  Q.   I WANT TO WALK THROUGH SOME OF THE DETAILS OF THIS EMAIL

12:48PM  25  AND MAKE SURE I UNDERSTAND THE CONTEXT OF YOUR COMMENT.

12:48PM  1          IF WE CAN GO, PLEASE, TO I BELIEVE IT'S PAGE 5 OF THE

12:49PM  2   DOCUMENT, MS. HOLLIMAN.  AND IF WE CAN ZOOM IN ON THE PORTION

12:49PM  3   BEGINNING, "THANKS FOR YOUR TIME YESTERDAY."

12:49PM  4          DR. DAS, WHAT PARTICULAR ASSAYS AND DEVICES ARE BEING

12:49PM  5   REFERENCED IN THIS EMAIL?

12:49PM  6   A.   I BELIEVE THESE WOULD BE THE MODIFIED ADVIA 18 ASSAYS.

12:49PM  7   Q.   AND THERE'S A REFERENCE TO SODIUM AND CALCIUM.

12:49PM  8          DO YOU SEE THAT?

12:49PM  9   A.   YES.

12:49PM  10  Q.   AND IF WE COULD NOW PLEASE GO TO YOUR COMMENT ON PAGE 2

12:49PM  11  AND ZOOM IN ON THE TOP EMAIL FROM DR. DAS ALL OF THE WAY DOWN

12:49PM  12  TO THE --

12:50PM  13         ONE MORE PARAGRAPH IF WE COULD, MS. HOLLIMAN.  IF WE COULD

12:50PM  14  ZOOM DOWN A LITTLE BIT MORE TO THE SECOND PARAGRAPH,

12:50PM  15  MS. HOLLIMAN.

12:50PM  16         DO YOU HAVE THAT IN FRONT OF YOU, DR. DAS?

12:50PM  17  A.   YES, I DO.

12:50PM  18  Q.   OKAY.  YOU WROTE, "I HAD A CHANCE TO TOUCH BASE WITH TINA

12:50PM  19  AND DANIEL THE OTHER DAY TO GET DETAILS ON THE UPDATED PATIENT

12:50PM  20  IMPACT ASSESSMENTS, AND I'VE DECIDED TO TAKE A MORE

12:50PM  21  CONSERVATIVE APPROACH."

12:50PM  22         IS THAT IN THE CONTEXT OF THESE ASSAYS RUN ON THE

12:50PM  23  SIEMENS ADVIA?

12:50PM  24  A.   YES.

12:50PM  25  Q.   AND JUST EXPLAIN FOR US WHAT YOU MEANT BY THAT.

12:50PM  1    A.   REGARDING THE PRIOR EMAIL, THERE WAS AN APPROACH OUTLINED

12:50PM  2    THAT I DISAGREED WITH.

12:50PM  3    Q.   AND WHAT WAS THE APPROACH THAT YOU DISAGREED WITH?

12:50PM  4    A.   IF I REMEMBER CORRECTLY, THEY WERE PROPOSING A MORE

12:50PM  5    LIBERAL APPROACH THAT WOULD REQUIRE MULTIPLE ANALYTES TO BE,

12:51PM  6    QUOTE-UNQUOTE, ABNORMAL IN ORDER TO TRIGGER VOIDING OR

12:51PM  7    CORRECTIONS, AND I DISAGREED WITH THAT ASSERTION.

12:51PM  8    Q.   AND YOU WANTED TO LOOK AT IT ANALYTE BY ANALYTE; IS THAT

12:51PM  9    FAIR?

12:51PM  10   A.   YES, THAT WOULD BE THE CORRECT WAY TO DO IT.

12:51PM  11   Q.   AND WHEN YOU VOIDED TESTS ON THE EDISON 3.5 DEVICE, WERE

12:51PM  12   YOU BEING CONSERVATIVE?

12:51PM  13   A.   CAN YOU CLARIFY, PLEASE.

12:51PM  14   Q.   DID YOU FEEL LIKE YOU WERE BEING CONSERVATIVE?

12:51PM  15   A.   I WAS JUST FOLLOWING THE DATA.

12:51PM  16   Q.   YOU WERE ALSO ASKED A NUMBER OF QUESTIONS ABOUT

12:51PM  17   MS. HOLMES'S BACKGROUND AND EXPERIENCE.

12:51PM  18        DO YOU RECALL THAT TESTIMONY?

12:51PM  19   A.   YES.

12:51PM  20   Q.   OKAY.  YOU WERE HIRED IN 2015?

12:51PM  21   A.   YES.

12:51PM  22   Q.   OKAY.  AT THAT POINT THERANOS HAD BEEN IN EXISTENCE FOR

12:51PM  23   OVER 12 YEARS.

12:51PM  24        WAS THAT YOUR UNDERSTANDING?

12:51PM  25   A.   YES.

|          |    |
|----------|----|

12:51PM  1    Q.   OKAY.  AND SHE WAS THE CEO OF THE COMPANY; CORRECT?

12:52PM  2    A.   YES.

12:52PM  3    Q.   AND WERE YOU AWARE THAT SHE HELD HERSELF OUT AS THE AUTHOR

12:52PM  4    OF A NUMBER OF PATENTS?

12:52PM  5    A.   NO.

12:52PM  6    Q.   WERE YOU AWARE THAT SHE HAD HELD HERSELF OUT TO MEDIA

12:52PM  7    OUTLETS AS BEING THE LEADER OF THE COMPANY?

12:52PM  8    A.   YES.

12:52PM  9    Q.   I'D ALSO LIKE TO ASK SOME QUESTIONS ABOUT EXHIBIT 10674.

12:52PM  10   YOU WERE ASKED SOME QUESTIONS ABOUT GLUCOSE AND SODIUM

12:52PM  11   VALIDATION DATA THAT YOU LOOKED AT IN APRIL OF 2016?

12:52PM  12   A.   YES.

12:52PM  13   Q.   AND I THINK YOU WERE THEN SHOWN SOME QUESTIONS OR ASKED

12:52PM  14   SOME QUESTIONS ABOUT SOME ADDITIONAL ASSAYS THAT HAD BEEN RUN

12:52PM  15   ON THE MODIFIED SIEMENS MACHINE, AND YOU WERE ASKED WERE YOU

12:52PM  16   COMFORTABLE WITH THE DATA, AND YOUR ANSWER WAS AT THAT POINT IN

12:52PM  17   TIME.

12:52PM  18        DO YOU RECALL THAT TESTIMONY?

12:52PM  19   A.   YES.

12:52PM  20   Q.   AND WHAT DID YOU MEAN BY "AT THAT POINT IN TIME"?

12:52PM  21   A.   WE SUBSEQUENTLY TURNED OVER MORE ROCKS AND STONES.

12:53PM  22   Q.   YOU WERE ASKED A NUMBER OF QUESTIONS ABOUT A MEETING THAT

12:53PM  23   YOU HAD WITH MS. HOLMES AND OTHERS ABOUT THE VOIDING OF THE

12:53PM  24   TESTS.

12:53PM  25        DO YOU RECALL THAT TESTIMONY?

| 12:53PM | 1 | A.   YES. |
| 12:53PM | 2 | Q.   AND I THINK YOU TESTIFIED THAT THERE WAS AGREEMENT TO VOID |
| 12:53PM | 3 | THE TESTS? |
| 12:53PM | 4 | A.   YES. |
| 12:53PM | 5 | Q.   OKAY.  DID YOU GET PUSHBACK FROM MS. HOLMES ABOUT HOW TO |
| 12:53PM | 6 | CHARACTERIZE THE VOIDING OF THE TESTS? |
| 12:53PM | 7 | A.   YES. |
| 12:53PM | 8 | Q.   DESCRIBE THAT PUSHBACK FOR US, PLEASE? |
| 12:53PM | 9 | A.   THERE WAS A CHARACTERIZATION FOR WHY THE VOIDING WAS DONE, |
| 12:53PM | 10 | TO WHICH I DISAGREED. |
| 12:53PM | 11 | Q.   AND THAT CHARACTERIZATION WAS WHAT? |
| 12:53PM | 12 | A.   THAT CHARACTERIZATION WAS THAT THE PROBLEMS WERE DUE TO |
| 12:53PM | 13 | ISSUES WITH QUALITY CONTROL AND QUALITY ASSURANCE RATHER THAN |
| 12:53PM | 14 | THE INSTRUMENT ITSELF. |
| 12:53PM | 15 | Q.   AND THAT WAS COMMUNICATED -- THE IDEA THAT THIS WAS JUST A |
| 12:54PM | 16 | QUALITY SYSTEMS ISSUE WAS COMMUNICATED TO CMS; IS THAT CORRECT? |
| 12:54PM | 17 | A.   YES. |
| 12:54PM | 18 | Q.   AND YOU DISAGREED WITH THAT? |
| 12:54PM | 19 | A.   YES. |
| 12:54PM | 20 | MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR? |
| 12:54PM | 21 | (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.) |
| 12:54PM | 22 | MR. LEACH:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR. |
| 12:54PM | 23 | THANK YOU. |
| 12:54PM | 24 | THANK YOU, DR. DAS. |
| 12:54PM | 25 | THE WITNESS:  THANK YOU. |

| 12:54PM | 1 | THE COURT:  MR. WADE? |
| 12:54PM | 2 | **RECROSS-EXAMINATION** |
| 12:54PM | 3 | BY MR. WADE: |
| 12:54PM | 4 | Q.  JUST A COUPLE MORE QUESTIONS, DR. DAS. |
| 12:54PM | 5 | A.  SURE. |
| 12:54PM | 6 | Q.  YOU WERE JUST ASKED ABOUT THAT MEETING AND WHAT WAS |
| 12:54PM | 7 | COMMUNICATED TO CMS ABOUT THE REASONS FOR VOIDING. |
| 12:54PM | 8 | DO YOU RECALL THAT? |
| 12:54PM | 9 | A.  YES. |
| 12:54PM | 10 | Q.  AND THERE WERE A LOT OF -- I THINK WHEN YOU DESCRIBED THAT |
| 12:55PM | 11 | MEETING, YOU DESCRIBED THAT THERE WERE A LOT OF COOKS IN THE |
| 12:55PM | 12 | KITCHEN, IF YOU WILL? |
| 12:55PM | 13 | A.  I DON'T RECALL THAT STATEMENT BUT -- |
| 12:55PM | 14 | Q.  OKAY.  YOU RECALL THAT THERE WERE SOME LAWYERS PRESENT AND |
| 12:55PM | 15 | SOME OTHER ADVISORS AND MS. HOLMES AND YOURSELF? |
| 12:55PM | 16 | A.  YES. |
| 12:55PM | 17 | Q.  AND THEN THE OUTGROWTH OF THAT MEETING WAS THE PREPARATION |
| 12:55PM | 18 | OF SOME COMMUNICATIONS TO CMS PROVIDING INFORMATION ABOUT THE |
| 12:55PM | 19 | VOIDING. |
| 12:55PM | 20 | DO YOU RECALL THAT? |
| 12:55PM | 21 | A.  YES. |
| 12:55PM | 22 | Q.  AND WE LOOKED AT THAT PATIENT IMPACT ASSESSMENT YESTERDAY. |
| 12:55PM | 23 | DO YOU RECALL THAT? |
| 12:55PM | 24 | A.  YES. |
| 12:55PM | 25 | Q.  AND THAT RELATED TO THE EDISON 3.5 DEVICE; RIGHT? |

12:55PM   1   A.   YES.

12:55PM   2   Q.   AND THAT SET FORTH THE QUALITY CONTROL AND QUALITY

12:55PM   3   ASSURANCE CONCERNS AS A BASIS TO VOID THE TESTS; CORRECT?

12:55PM   4   A.   IN PART, YES.

12:55PM   5   Q.   AND YOU BELIEVED THAT WAS A BASIS TO VOID THE TESTS;

12:55PM   6   CORRECT?

12:55PM   7   A.   THE QUALITY CONTROL RESULTS?  YES.

12:55PM   8   Q.   YEAH.  AND THE -- WHAT THAT BUCKET ON QUALITY CONTROL AND

12:56PM   9   QUALITY ASSURANCE THAT YOU HAD IDENTIFIED AS YOU WERE TURNING

12:56PM  10   OVER THOSE ROCKS, YOU FELT AS A RESULT OF THAT YOU SHOULD VOID

12:56PM  11   THE EDISON RESULTS; CORRECT?

12:56PM  12   A.   YES, IN PART.

12:56PM  13   Q.   AND THAT STATEMENT WAS PUT INTO A LETTER THAT WAS DRAFTED

12:56PM  14   AND SENT TO CMS; RIGHT?

12:56PM  15   A.   YES, I BELIEVE SOME OF VERBIAGE WAS THERE.

12:56PM  16   Q.   AND YOU SIGNED THE LETTER, RIGHT, SIR?

12:56PM  17   A.   I DID.

12:56PM  18   Q.   AND YOU WERE COMFORTABLE WITH IT AT THAT TIME?

12:56PM  19   A.   I BELIEVE I DISAGREED WITH THAT PARTICULAR

12:56PM  20   CHARACTERIZATION, BUT THE LETTER AS A WHOLE WAS ACCEPTABLE.

12:56PM  21   Q.   AND YOU -- IN FACT, YOU RECALL THAT THERE WERE TWO

12:56PM  22   LETTERS.  THERE WAS ONE SENT MARCH 28TH.

12:56PM  23        DO YOU RECALL THAT?

12:56PM  24   A.   I COULD USE A REFRESHER, PLEASE.

12:56PM  25   Q.   SURE.  LET'S SEE IF WE CAN FIND THIS.

12:57PM   1        THE COURT'S INDULGENCE FOR A MOMENT?

12:57PM   2             THE COURT:  SURE.

12:57PM   3   BY MR. WADE:

12:57PM   4   Q.   IT WILL BE IN THE WHITE BINDER.  AND LOOK AT 5260.

12:57PM   5   A.   YES.

12:57PM   6   Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT THERE WAS A

12:57PM   7   LETTER SENT TO CMS ON MARCH 28TH, 2016?

12:57PM   8   A.   YES.

12:57PM   9   Q.   AND YOU SIGNED THIS LETTER; CORRECT?

12:57PM  10   A.   I BELIEVE SO, YES.

12:57PM  11   Q.   AND WAS IT YOUR RECOLLECTION, WAS THIS LETTER PREPARED BY

12:58PM  12   THE LAWYERS WHO WERE ADVISING THE COMPANY?

12:58PM  13   A.   YES.

12:58PM  14   Q.   OKAY.  AND THEN AFTER THEY PREPARED IT, YOU REVIEWED AND

12:58PM  15   SENT IT TO THE COMPANY, OR SENT IT TO CMS; CORRECT?

12:58PM  16   A.   YES.

12:58PM  17   Q.   AND THEN THERE WAS ANOTHER SIMILAR LETTER THAT WAS SENT

12:58PM  18   APRIL 1ST; IS THAT CORRECT?

12:58PM  19   A.   I DON'T RECALL THE EXACT DATE, BUT --

12:58PM  20   Q.   I'LL CALL YOUR ATTENTION TO 5471.

12:58PM  21   A.   YES, APRIL 1ST.

12:58PM  22   Q.   AND AGAIN, THIS WAS A LETTER THAT WAS PREPARED BY COUNSEL;

12:58PM  23   CORRECT?

12:58PM  24   A.   YES.

12:58PM  25   Q.   AND YOU SIGNED THAT LETTER; CORRECT?

12:58PM 1    A.   YES.

12:58PM 2    Q.   AND DO YOU KNOW, WAS THE COUNSEL WHO PREPARED IT THE

12:58PM 3    LAWYER WHO WAS IN THE ROOM MEETING WITH YOU AND MS. HOLMES?

12:58PM 4    A.   YES.

12:58PM 5    Q.   THE, THE -- MR. LEACH TALKED TO YOU ABOUT HOW MS. HOLMES

12:59PM 6    HAD SOME EXPERIENCE.

12:59PM 7         DO YOU RECALL THAT?

12:59PM 8    A.   YES.

12:59PM 9    Q.   AND TO BE SURE, THE COMPANY HAD BEEN AROUND FOR A WHILE AT

12:59PM 10   THAT TIME; IS THAT CORRECT?

12:59PM 11   A.   YES.

12:59PM 12   Q.   BUT BASED UPON YOUR INTERACTIONS WITH HER, DID YOU FEEL

12:59PM 13   THAT SHE WAS -- SHE HAD EXPERIENCE IN CLIA LABORATORY

12:59PM 14   OPERATIONS?

12:59PM 15   A.   NO.

12:59PM 16   Q.   OR CLIA LABORATORY REGULATIONS?

12:59PM 17   A.   NO.

12:59PM 18   Q.   OR EXPERTISE IN VALIDATION?

12:59PM 19   A.   NO.

12:59PM 20   Q.   OR EXPERTISE IN PATHOLOGY?

12:59PM 21   A.   NO.

12:59PM 22   Q.   OR THE APPROPRIATE BENCHMARKS FOR VALIDATION?

12:59PM 23   A.   NO.

12:59PM 24   Q.   OR THE WAY IN WHICH TO RUN A QUALITY CONTROL PROGRAM?

12:59PM 25   A.   NO.

12:59PM  1    Q.  AND UNTIL SHE WAS REPORTING TO YOU, SHE HAD NEVER HAD A

12:59PM  2    LABORATORY DIRECTOR REPORT DIRECTLY TO HER TO YOUR KNOWLEDGE;

12:59PM  3    CORRECT?

12:59PM  4    A.  I'M NOT AWARE OF THAT.  I DON'T KNOW.

01:00PM  5    Q.  MR. LEACH ASKED YOU SOME QUESTIONS ABOUT THAT BROADER

01:00PM  6    REVIEW THAT WAS DONE AND SOME OF THE CONCLUSIONS THAT YOU CAME

01:00PM  7    TO BASED UPON THAT REVIEW?

01:00PM  8    A.  YES.

01:00PM  9    Q.  DO YOU RECALL THAT?

01:00PM  10       AND THAT WAS SOMETHING THAT THIS WHOLE TEAM OF PEOPLE THAT

01:00PM  11   HAD BEEN BROUGHT TOGETHER ENGAGED IN; CORRECT?

01:00PM  12   A.  YES.

01:00PM  13   Q.  AND THOSE PEOPLE WERE OUTSIDE PEOPLE WHO DID COME IN AFTER

01:00PM  14   THAT SEPTEMBER 2015 INSPECTION; RIGHT?

01:00PM  15   A.  YES.

01:00PM  16   Q.  THERE WAS A DESIRE TO HAVE THE OUTSIDE, OUTSIDER'S

01:00PM  17   PERSPECTIVE ON THESE ISSUES; CORRECT?

01:00PM  18   A.  I'M NOT AWARE OF THE DESIRE OR THE INTENT.

01:00PM  19   Q.  BUT IN ANY EVENT, THE PEOPLE CAME IN ANEW TO LOOK AT THESE

01:00PM  20   ISSUES; RIGHT?

01:00PM  21   A.  YES.

01:00PM  22   Q.  AND TO TURN OVER THOSE ROCKS?

01:01PM  23   A.  YES.

01:01PM  24   Q.  AND THAT WAS A HARD AND DIFFICULT PROCESS FOR THE TEAM

01:01PM  25   THAT WAS INVOLVED; RIGHT?

01:01PM  1    A.   YES.

01:01PM  2    Q.   AND DO YOU RECALL DESCRIBING, AS YOU TALKED ABOUT, AS YOU

01:01PM  3    WERE WORKING THROUGH THAT PROCESS, LIKENING IT TO A FAVORITE

01:01PM  4    MOVIE QUOTE THAT YOU HAVE?

01:01PM  5    A.   I RECALL WRITING A MOVIE QUOTE AT SOME POINT.  I DON'T

01:01PM  6    RECALL THE EXACT QUOTE.

01:01PM  7    Q.   AND WHAT IS THAT MOVIE QUOTE?

01:01PM  8    A.   I DON'T REMEMBER THAT OFF THE TOP OF MY HEAD.

01:01PM  9    Q.   OKAY.  DO YOU RECALL IT BEING ABOUT "EVERYTHING WILL BE

01:01PM  10   RIGHT IN THE END, AND IF IT'S" --

01:01PM  11   A.   CORRECT, YES.  I'M SORRY TO SPEAK OVER YOU, BUT I BELIEVE

01:01PM  12   THAT WAS A QUOTE FROM "THE BEST EXOTIC MARIGOLD HOTEL."

01:01PM  13   Q.   AND WHAT DO YOU RECALL THE QUOTE?

01:01PM  14   A.   DO WE HAVE IT HERE?  I DON'T THINK I'LL DO IT JUSTICE.

01:01PM  15   Q.   IS IT SOMETHING TO THE EFFECT OF "EVERYTHING WILL BE ALL

01:01PM  16   RIGHT IN THE END AND IF IT'S NOT ALL RIGHT, IT'S NOT YET THE

01:02PM  17   END"?

01:02PM  18   A.   YES.

01:02PM  19   Q.   NO FURTHER QUESTIONS.

01:02PM  20        MR. LEACH:  NOTHING FURTHER, YOUR HONOR.

01:02PM  21        THE COURT:  MAY THIS WITNESS BE EXCUSED?

01:02PM  22        MR. WADE:  YES, YOUR HONOR.

01:02PM  23        MR. LEACH:  YES.

01:02PM  24        THE COURT:  THANK YOU, SIR.  YOU'RE EXCUSED.

01:02PM  25        YOU CAN LEAVE THOSE BINDERS THERE.

01:02PM  1          THE WITNESS:  OKAY.  THANK YOU.

01:02PM  2          THE COURT:  DOES THE GOVERNMENT HAVE ANOTHER

01:02PM  3   WITNESS?

01:02PM  4          MR. BOSTIC:  YES, YOUR HONOR.

01:02PM  5       THE UNITED STATES CALLS ALAN EISENMAN.

01:02PM  6          THE COURT:  FOLKS, WE'LL BE BREAKING AT 1:30.  IF

01:03PM  7   YOU WANT TO TAKE STRETCH, FEEL FREE.

01:03PM  8       (STRETCHING.)

01:03PM  9          THE COURT:  SIR, IF YOU'LL COME FORWARD, PLEASE.

01:03PM  10  I'LL INVITE YOU TO FACE OUR COURTROOM DEPUTY HERE.  RAISE YOUR

01:03PM  11  RIGHT HAND WHILE YOU DO SO, SHE HAS A QUESTION FOR YOU.

01:03PM  12         THE WITNESS:  OKAY.

01:03PM  13         THE CLERK:  GOOD AFTERNOON.

01:03PM  14         THE WITNESS:  GOOD AFTERNOON.

01:03PM  15     **(GOVERNMENT'S WITNESS, ALAN EISENMAN, WAS SWORN.)**

01:03PM  16         THE WITNESS:  YES.

01:03PM  17         THE COURT:  PLEASE HAVE A SEAT HERE, SIR.  LET ME

01:03PM  18  INVITE YOU TO MAKE YOURSELF COMFORTABLE.

01:03PM  19      FEEL FREE TO ADJUST THE CHAIR AND THE MICROPHONE AS YOU

01:04PM  20  NEED.

01:04PM  21      I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

01:04PM  22      WHEN YOU ARE COMFORTABLE --

01:04PM  23         THE WITNESS:  IS IT OKAY TO TAKE THIS OFF?

01:04PM  24         THE COURT:  HAVE YOU BEEN VACCINATED, SIR?

01:04PM  25         THE WITNESS:  YES, I HAVE.

01:04PM   1              THE COURT:  YES, THAT'S FINE.

01:04PM   2              THE WITNESS:  THANK YOU.

01:04PM   3              THE COURT:  WHEN YOU ARE COMFORTABLE, WOULD YOU

01:04PM   4     PLEASE STATE YOUR NAME AND THEN SPELL IT, PLEASE.

01:04PM   5              THE WITNESS:  MY NAME IS ALAN EISENMAN.  A-L-A-N,

01:04PM   6     E-I-S-E-N-M-A-N.

01:04PM   7              THE COURT:  THANK YOU.  I'LL ENCOURAGE YOU TO SPEAK

01:04PM   8     DIRECTLY INTO THE MICROPHONE AS YOU CAN.

01:04PM   9         MR. BOSTIC?

01:04PM  10              MR. BOSTIC:  THANK YOU, YOUR HONOR.

01:04PM  11                          **DIRECT EXAMINATION**

01:04PM  12     BY MR. BOSTIC:

01:04PM  13     Q.   GOOD AFTERNOON, MR. EISENMAN.

01:04PM  14     A.   GOOD AFTERNOON.

01:04PM  15     Q.   LET ME START BY ASKING WAS THERE A TIME WHEN YOU WERE AN

01:04PM  16     INVESTOR IN A COMPANY CALLED THERANOS?

01:04PM  17     A.   YES, THERE WAS.

01:04PM  18     Q.   I'D LIKE TO TALK TO YOU ABOUT THAT, BUT FIRST LET ME ASK

01:04PM  19     YOU SOME QUESTIONS ABOUT YOUR BACKGROUND.

01:04PM  20         FIRST, WHERE DO YOU LIVE?

01:04PM  21     A.   HOUSTON, TEXAS.

01:04PM  22     Q.   ARE YOU CURRENTLY EMPLOYED?

01:04PM  23     A.   I AM RETIRED.

01:04PM  24     Q.   BEFORE YOU RETIRED, WHAT WAS YOUR PROFESSION?

01:04PM  25     A.   I WOULD SAY FINANCIAL PLANNER AND A MONEY MANAGER.

01:05PM  1    Q.   AND FOR HOW LONG WERE YOU A FINANCIAL PLANNER AND MONEY

01:05PM  2    MANAGER?

01:05PM  3    A.   THIRTY-FIVE YEARS.

01:05PM  4    Q.   AND WHEN DID YOU RETIRE?

01:05PM  5    A.   FOUR YEARS AGO.

01:05PM  6    Q.   CAN YOU GIVE US AN OVERVIEW OF YOUR EDUCATIONAL

01:05PM  7    BACKGROUND, PLEASE?

01:05PM  8    A.   I WENT TO UNDERGRAD AT UNIVERSITY OF TEXAS AT AUSTIN; WENT

01:05PM  9    TO LAW SCHOOL AT UNIVERSITY OF HOUSTON; AND A YEAR AFTER LAW

01:05PM  10   SCHOOL I PICKED UP MY CPA CERTIFICATE.

01:05PM  11   Q.   AND CAN YOU GIVE US, JUST AT A HIGH LEVEL, AN OVERVIEW OF

01:05PM  12   YOUR CAREER FOLLOWING YOUR EDUCATION?

01:05PM  13   A.   FOLLOWING MY EDUCATION, I DID SOME ESTATE PLANNING AND TAX

01:05PM  14   WORK FOR A COUPLE OF YEARS, AND THEN I WENT TO WORK FOR A

01:05PM  15   COUPLE OF REAL ESTATE DEVELOPERS IN HOUSTON WHO WERE GENERATING

01:05PM  16   SIGNIFICANT CASH FLOW, AND I WAS RESPONSIBLE FOR PUTTING THEIR

01:05PM  17   CASH FLOW TO WORK AND LOOKING AT A VARIETY OF INVESTMENTS, ALSO

01:05PM  18   DOING A LITTLE BIT OF TAX WORK FOR THEM.

01:05PM  19        AFTER THAT I GOT MY SERIES 7 AND STARTED ACQUIRING CLIENTS

01:06PM  20   AND DOING INVESTING IN PUBLIC MARKETS.

01:06PM  21   Q.   YOU MENTIONED YOUR WORK AS A MONEY MANAGER.  IN YOUR

01:06PM  22   PERSONAL CAPACITY, DID YOU ALSO DO SOME INVESTING IN COMPANIES?

01:06PM  23   A.   FREQUENTLY.

01:06PM  24   Q.   AS OF AROUND 2005, CAN YOU TELL ME ABOUT THAT ACTIVITY AT

01:06PM  25   A HIGH LEVEL?  WHAT WERE YOUR PRACTICES THERE?

01:06PM  1    A.   IN 2005 I HAD CLIENTS THAT I WAS INVESTING IN PUBLIC

01:06PM  2    MARKETS, BUT I ALSO HAD A NETWORK OF FRIENDS AND FAMILY THAT WE

01:06PM  3    WERE LOOKING AT PRIVATE EQUITY.

01:06PM  4    Q.   AND DID THAT INCLUDE INVESTING YOUR PERSONAL ASSETS IN

01:06PM  5    COMPANIES?

01:06PM  6    A.   YES, IT DID.

01:06PM  7    Q.   APPROXIMATELY WHEN DID YOU FIRST INVEST IN THERANOS?

01:06PM  8    A.   I BELIEVE IT WAS 2006.

01:06PM  9    Q.   AND UP TILL THAT POINT HAD YOU HAD ANY PREVIOUS EXPERIENCE

01:07PM  10   INVESTING IN A BIOTECH COMPANY?

01:07PM  11   A.   NO.

01:07PM  12   Q.   LET'S TALK ABOUT HOW YOU CAME TO BE ACQUAINTED WITH

01:07PM  13   THERANOS, THE COMPANY.

01:07PM  14        DO YOU REMEMBER HOW YOU FIRST HEARD ABOUT IT?

01:07PM  15   A.   YES, I DO.

01:07PM  16   Q.   HOW WAS THAT?

01:07PM  17   A.   ONE OF MY CLOSE PERSONAL FRIENDS IN HOUSTON, DAVID HARRIS,

01:07PM  18   WAS THE FINANCIAL ADVISOR TO THE HOLMES FAMILY, AND HE TOLD ME

01:07PM  19   AND ANOTHER GROUP OF FRIENDS ABOUT THIS OPPORTUNITY.

01:07PM  20   Q.   AND WHAT DID HE TELL YOU ABOUT THE COMPANY AT THAT TIME?

01:07PM  21   A.   HE TOLD ME THAT ELIZABETH WAS BRILLIANT; THAT SHE WAS

01:07PM  22   DROPPING OUT OF SCHOOL TO START A COMPANY; AND SHE WAS

01:07PM  23   PARTIALLY ON HER WAY.

01:07PM  24        HE HAD INVESTED IN THE FIRST SEED ROUND, AND THEY WERE

01:07PM  25   RAISING MONEY IN A SECOND SEED ROUND, AND GOT ME INVOLVED TO DO

01:07PM 1    A LITTLE DUE DILIGENCE AND MAKE A DECISION WHETHER I WANTED TO

01:07PM 2    CO-INVEST WITH HIS OTHER GROUP OF HOUSTON INVESTORS IN THE

01:08PM 3    SECOND SEED ROUND.

01:08PM 4    Q.   AND YOU'RE USING THAT TERM "SEED ROUND."  WHAT DOES THAT

01:08PM 5    MEAN IN THE CONTEXT OF AN INVESTMENT IN A COMPANY LIKE THIS?

01:08PM 6    A.   JUST LIKE IN A TREE, IT'S A VERY EARLY STAGE.

01:08PM 7    Q.   AND YOUR UNDERSTANDING WHEN YOU FIRST FOUND OUT ABOUT THE

01:08PM 8    COMPANY WAS THAT THERE HAD BEEN ONE ROUND OF INVESTMENT THAT

01:08PM 9    HAD ALREADY OCCURRED?

01:08PM 10   A.   CORRECT.

01:08PM 11   Q.   AND THE SECOND ROUND OF SEED FUNDING WAS PENDING?

01:08PM 12   A.   THAT IS CORRECT.

01:08PM 13   Q.   WAS MR. HARRIS ABLE TO PUT YOU IN CONTACT WITH MS. HOLMES

01:08PM 14   AT THERANOS?

01:08PM 15   A.   YES, HE WAS.

01:08PM 16   Q.   AND WERE YOU IN TOUCH WITH MS. HOLMES PRIOR TO YOUR FIRST

01:08PM 17   INVESTMENT IN THE COMPANY?

01:08PM 18   A.   YES, I WAS.

01:08PM 19   Q.   WHAT FORM DID THAT CONTACT TAKE?  DID YOU HAVE AN

01:08PM 20   IN-PERSON MEETING?  DID YOU SPEAK ON THE PHONE?

01:08PM 21   A.   WE HAD SEVERAL CONVERSATIONS ON THE PHONE.

01:08PM 22   Q.   WHAT DO YOU RECALL ABOUT THOSE CONVERSATIONS AND

01:08PM 23   INFORMATION THAT YOU GAINED?

01:08PM 24   A.   I RECALL THAT LARRY ELLISON WAS INVOLVED IN THE COMPANY,

01:09PM 25   WAS ON HER BOARD.  IT WAS THE ONLY BOARD THAT HE SERVED ON

01:09PM  1    OTHER THAN ORACLE.

01:09PM  2        THE SEED ROUND WAS APPROXIMATELY $30 MILLION.  HE WAS

01:09PM  3    TAKING $20 MILLION OF THE SEED ROUND.  I WAS TOLD THAT HE WAS A

01:09PM  4    PERSONAL ADVISOR AND SPOKE TO ELIZABETH ON A WEEKLY BASIS.

01:09PM  5    Q.   DID YOU HAVE -- BEFORE YOU INVESTED IN THE COMPANY IN

01:09PM  6    2006, DID YOU HAVE A SINGLE CONVERSATION WITH MS. HOLMES OR

01:09PM  7    MULTIPLE CONVERSATIONS?

01:09PM  8    A.   MULTIPLE CONVERSATIONS.

01:09PM  9    Q.   AROUND THE TIME THAT YOU INVESTED, WHAT WAS YOUR

01:09PM 10    UNDERSTANDING FROM THOSE CONVERSATIONS AS TO WHAT THE COMPANY

01:09PM 11    WAS DOING?

01:09PM 12    A.   MY UNDERSTANDING IS THEY HAD A TECHNOLOGY THAT WOULD TAKE

01:09PM 13    A RELATIVELY SMALL AMOUNT OF BLOOD AND WOULD PERFORM A LOT OF

01:09PM 14    TESTS THAT WERE CURRENTLY REQUIRED BY A MUCH LARGER BLOOD DRAW,

01:10PM 15    AND IT WOULD PROVIDE THOSE TESTS IN A MUCH MORE RAPID FASHION.

01:10PM 16    Q.   AROUND THIS TIME PERIOD, THE TIMING OF YOUR FIRST

01:10PM 17    INVESTMENT, HOW ACCESSIBLE WAS MS. HOLMES TO YOU?

01:10PM 18    A.   EXTREMELY ACCESSIBLE.

01:10PM 19        WE WOULD HAVE UPDATED QUARTERLY MEETINGS BY TELEPHONE, AND

01:10PM 20    THAT OCCURRED FOR THE FIRST COUPLE YEARS OF OUR INVESTMENT.

01:10PM 21    Q.   DID YOU HAVE, FOR EXAMPLE, MS. HOLMES'S DIRECT CONTACT

01:10PM 22    INFORMATION, INCLUDING HER CELL NUMBER?

01:10PM 23    A.   I DID.

01:10PM 24    Q.   AND DID YOUR CONVERSATIONS WITH MS. HOLMES CONTINUE AFTER

01:10PM 25    YOU MADE YOUR INITIAL INVESTMENT IN THE COMPANY?

01:10PM 1    A.   THEY DID.

01:10PM 2    Q.   BASED ON YOUR CONVERSATIONS WITH MS. HOLMES AROUND THE

01:10PM 3    TIME OF THAT FIRST INVESTMENT, SO AROUND 2006, HOW FAR ALONG

01:10PM 4    DID YOU UNDERSTAND THE THERANOS TECHNOLOGY TO BE?

01:11PM 5    A.   I UNDERSTOOD THE TECHNOLOGY TO BE SIGNIFICANTLY FAR ALONG

01:11PM 6    FOR AN EARLY STAGE COMPANY.

01:11PM 7         ONE OF THE THINGS THAT IMPRESSED ME, IN ADDITION TO HAVING

01:11PM 8    LARRY ELLISON INVOLVED WITH CAPITAL AND WITH TIME, IS BEFORE I

01:11PM 9    MADE MY FIRST INVESTMENT I WAS ALSO TOLD THAT THEY CURRENTLY

01:11PM 10   HAD CONTRACTS WITH FIVE OR SIX MAJOR INTERNATIONAL

01:11PM 11   PHARMACEUTICAL COMPANIES.

01:11PM 12        AND I TOOK NOTES AND CONTEMPORANEOUS NOTES.  AND IT WAS AN

01:11PM 13   IMPRESSIVE LIST OF COMPANIES.  IT WAS COMPANIES LIKE PFIZER,

01:11PM 14   BRISTOL MYERS, NOVARTIS, SMITHKLINE BEECHAM.  SO TO ME, THAT

01:11PM 15   PUT AN ADDITIONAL STAMP OF APPROVAL ON THIS INVESTMENT.

01:11PM 16   Q.   AND YOU SAID THAT YOU UNDERSTOOD FROM THOSE CONVERSATIONS

01:11PM 17   THAT THE TECHNOLOGY WAS, I'LL PARAPHRASE IT, FAIRLY FAR ALONG

01:11PM 18   FOR AN EARLY STAGE COMPANY; IS THAT CORRECT?

01:11PM 19   A.   MY UNDERSTANDING IS THAT THESE INTERNATIONAL

01:12PM 20   PHARMACEUTICAL COMPANIES HAD ADOPTED THIS TECHNOLOGY IN SOME OF

01:12PM 21   THEIR CLINICAL TRIALS.  SO I WAS UNDER THE IMPRESSION THAT NOT

01:12PM 22   ONE COMPANY, AND NOT ONE MINOR COMPANY, BUT SEVERAL MAJOR

01:12PM 23   COMPANIES WERE USING THIS TECHNOLOGY FOR SOME OF THEIR CLINICAL

01:12PM 24   STUDIES AND DRUGS.

01:12PM 25        SO MY UNDERSTANDING WAS THAT IT WAS SIGNIFICANTLY FAR

01:12PM  1    ALONG FOR AN EARLY STAGE COMPANY.

01:12PM  2    Q.   YOU STILL UNDERSTOOD, THOUGH, THAT THIS WAS AN EARLY STAGE

01:12PM  3    COMPANY?

01:12PM  4    A.   ABSOLUTELY, YES.

01:12PM  5    Q.   AND DID YOU HAVE AN UNDERSTANDING AS TO WHETHER R&D WORK

01:12PM  6    AT THERANOS WAS COMPLETE OR WHETHER THERE WAS STILL RESEARCH

01:12PM  7    AND DEVELOPMENT TO BE DONE?

01:12PM  8    A.   MY UNDERSTANDING IS THAT THE TECHNOLOGY WAS TO A POINT

01:12PM  9    WHERE IT WAS SOLVING PROBLEMS AND IT WAS BEING USED, BUT IT WAS

01:12PM  10   A WORK-IN-PROCESS AND THAT THERE WERE GOING TO BE FUTURE

01:12PM  11   ITERATIONS AND FUTURE IMPROVEMENTS.

01:12PM  12   Q.   AND THAT UNDERSTANDING THAT THERE WAS STILL SOME

01:12PM  13   DEVELOPMENT WORK TO BE DONE, DID THAT COME THROUGH IN

01:13PM  14   MS. HOLMES'S DESCRIPTIONS TO YOU?

01:13PM  15   A.   THAT'S A HARD QUESTION TO ANSWER BECAUSE MY UNDERSTANDING

01:13PM  16   IS THE TECHNOLOGY WAS WORKING BUT WAS WORKING AT A LEVEL THAT

01:13PM  17   COULD BE IMPROVED UPON OVER TIME.

01:13PM  18   Q.   AROUND THAT TIME WHAT WERE YOUR SOURCES OF INFORMATION

01:13PM  19   ABOUT WHAT THERANOS WAS DOING?  AGAIN, WE'RE STILL IN THE 2006

01:13PM  20   TIMEFRAME.

01:13PM  21   A.   MY SOURCE OF INFORMATION WERE PRIMARILY CALLS WITH

01:13PM  22   ELIZABETH.

01:13PM  23   Q.   WAS THERE ANYONE ELSE THAT YOU WERE GETTING INFORMATION

01:13PM  24   ABOUT THE COMPANY FROM?

01:13PM  25   A.   THERE WAS A TIME, AND I THINK IT WAS A LITTLE BIT LATER IN

01:13PM  1    THE TIMEFRAME, THAT I REACHED OUT TO DON LUCAS, WHO WAS THEIR

01:13PM  2    CHAIRMAN OF THE BOARD AND ALSO THE CHAIRMAN OF THE BOARD OF

01:13PM  3    ORACLE, AND THERE WERE SOME CONVERSATIONS AMONG THE HOUSTON

01:13PM  4    INVESTORS, BUT THE INFORMATION REALLY WASN'T FRESH INFORMATION,

01:13PM  5    IT WAS JUST PASSING ALONG.

01:14PM  6         SOMETIMES DAVID HARRIS WOULD HAVE CALLS, AND HE WOULD PASS

01:14PM  7    ALONG INFORMATION TO ME.  AND OCCASIONALLY I WOULD HAVE AN

01:14PM  8    INDEPENDENT CALL, AND I WOULD PASS ALONG INFORMATION TO DAVID

01:14PM  9    AND A COUPLE OF THE OTHER HOUSTON INVESTORS.

01:14PM  10   Q.   WHAT WAS YOUR PRIMARY SOURCE OF INFORMATION ABOUT THE

01:14PM  11   COMPANY DURING AT THAT TIME?

01:14PM  12   A.   ELIZABETH.

01:14PM  13   Q.   AND AGAIN, WE'RE TALKING ABOUT ONE-ON-ONE CALLS BETWEEN

01:14PM  14   YOU AND MS. HOLMES?

01:14PM  15   A.   MOSTLY ONE-ON-ONE CALLS.  THERE WERE A COUPLE OF QUARTERLY

01:14PM  16   CALLS WHERE SOME OF THE OTHER HOUSTON INVESTORS WERE INVOLVED,

01:14PM  17   BUT MOSTLY ONE-ON-ONE CALLS.

01:14PM  18   Q.   YOU MENTIONED THAT YOU TOOK CONTEMPORANEOUS NOTES OF THESE

01:14PM  19   CALLS; IS THAT CORRECT?

01:14PM  20   A.   YES, I DID FROM EVERY CALL.

01:14PM  21   Q.   TELL ME ABOUT THAT.  TELL ME ABOUT YOUR NOTE TAKING

01:14PM  22   PRACTICE FOR THESE CALLS?

01:14PM  23   A.   I'VE BEEN INVOLVED IN INVESTMENTS FOR DECADES, AND IT'S

01:14PM  24   JUST MY PRACTICE ANY TIME I TALK TO SOMEONE I TAKE

01:14PM  25   CONTEMPORANEOUS NOTES BECAUSE PEOPLE HAVE A TENDENCY TO

01:14PM  1    EXAGGERATE, AND I LIKE TO TAKE A SNAPSHOT OF THAT POINT IN TIME

01:14PM  2    AND WHAT THEIR THINKING IS, AND USE THAT AS A BASELINE TO

01:15PM  3    COMPARE AND SEE WHY WE'RE ON SCHEDULE AND WHY WE'RE NOT ON

01:15PM  4    SCHEDULE.

01:15PM  5    Q.   AND DO YOU TAKE THOSE NOTES DURING THE CONVERSATIONS?

01:15PM  6    IMMEDIATELY AFTERWARDS?  WHAT IS YOUR PRACTICE THERE?

01:15PM  7    A.   CONTEMPORANEOUS, DURING THE CONVERSATIONS.

01:15PM  8    Q.   AND JUST TO BE CLEAR, WAS THAT YOUR PRACTICE, GENERALLY

01:15PM  9    SPEAKING, AS TO THE CALLS WITH MS. HOLMES?

01:15PM  10   A.   YES.

01:15PM  11   Q.   AROUND THE 2006 TIME PERIOD, DO YOU RECALL MS. HOLMES

01:15PM  12   TELLING YOU ANYTHING ABOUT THE FINANCIAL HEALTH OR THE

01:15PM  13   FINANCIAL STATUS OF THE COMPANY?

01:15PM  14   A.   YES, I DO.

01:15PM  15   Q.   WHAT DO YOU REMEMBER ABOUT THAT?

01:15PM  16   A.   THEY'RE IN MY NOTES, BUT SHE TOLD ME CERTAIN REVENUE

01:15PM  17   LEVELS THAT THEY WERE ACHIEVING, CERTAIN REVENUE LEVELS THAT

01:15PM  18   THEY WERE GOING TO ACHIEVE IN THE NEXT YEAR OR TWO, SAID THAT

01:15PM  19   AT THE TIME OF MY INVESTMENT THEY WERE ALREADY TALKING TO

01:15PM  20   INVESTMENT BANKERS, SPECIFICALLY MORGAN STANLEY, ABOUT AN IPO

01:16PM  21   IN THE 12 TO 18 MONTH TIME PERIOD, WHICH WAS ANOTHER REASON

01:16PM  22   THAT COMPELLED ME TO MAKE MY INVESTMENT KNOWING THAT ALREADY

01:16PM  23   INVESTMENT BANKERS ARE LOOKING AT THIS OR THEY'RE HAVING

01:16PM  24   CONVERSATIONS AND THERE'S A POSSIBILITY FOR LIQUIDITY EVENT IN

01:16PM  25   THE NEXT YEAR OR SO.

01:16PM  1    Q.   AND I WANT TO FOLLOW UP MORE ON THE REVENUE NUMBERS THAT

01:16PM  2    YOU HEARD FROM MS. HOLMES.

01:16PM  3         SITTING HERE TODAY, DO YOU HAVE A MEMORY OF WHAT REVENUE

01:16PM  4    NUMBERS MS. HOLMES WAS REPRESENTING TO YOU AROUND THE 2006 TIME

01:16PM  5    PERIOD?

01:16PM  6    A.   YES, I DO.  THEY WERE SUPPOSED TO GENERATE ABOUT $50 OR

01:16PM  7    $60 MILLION IN REVENUES IN THE COMING YEAR AND POTENTIALLY

01:16PM  8    $200 MILLION IN REVENUES IN 2008.

01:16PM  9    Q.   AND AS AN INVESTOR IN THE COMPANY, WAS THAT IMPORTANT

01:16PM  10   INFORMATION FOR YOU?

01:16PM  11   A.   EXTREMELY IMPORTANT.

01:16PM  12   Q.   WHY SO?

01:16PM  13   A.   A START-UP COMPANY WHO IS GENERATING HUNDREDS OR HUNDREDS

01:16PM  14   OF THOUSANDS OR A FEW MILLION DOLLARS OF REVENUE, A COMPANY

01:16PM  15   THAT HAS THE POTENTIAL A YEAR OR SO DOWN THE ROAD TO GENERATE

01:17PM  16   $200 MILLION IN REVENUE IS PRETTY FAR ALONG AND POTENTIALLY

01:17PM  17   VERY SUCCESSFUL AND VERY VALUABLE.

01:17PM  18   Q.   AND THAT $200 MILLION NUMBER, IS THAT REFLECTED IN THE

01:17PM  19   NOTES THAT YOU TOOK DURING YOUR CALLS WITH MS. HOLMES?

01:17PM  20        MR. DOWNEY:  YOUR HONOR, OBJECTION TO THE

01:17PM  21   DESCRIPTION TO THESE DOCUMENTS.  EITHER THE DOCUMENTS COME IN

01:17PM  22   OR THEY DON'T.  I DON'T THINK WE SHOULD BE TALKING ABOUT

01:17PM  23   UNADMITTED DOCUMENTS.

01:17PM  24        THE COURT:  ARE YOU ASKING WHETHER HE MEMORIALIZED

01:17PM  25   THESE THINGS?

01:17PM 1        MR. BOSTIC:  YES, YOUR HONOR.  I CAN REFRAME THE

01:17PM 2   QUESTION.

01:17PM 3        THE COURT:  SURE, WHY DON'T YOU.

01:17PM 4   BY MR. BOSTIC:

01:17PM 5   Q.   MR. EISENMAN, HAVE YOU REVIEWED THE NOTES OF YOUR

01:17PM 6   CONVERSATIONS WITH MS. HOLMES SINCE THOSE CONVERSATIONS?

01:17PM 7   A.   YES, I HAVE.

01:17PM 8   Q.   AND WHEN WAS THE LAST TIME THAT YOU REVIEWED THOSE NOTES?

01:17PM 9   A.   LAST NIGHT.

01:17PM 10  Q.   AND DID THEY GENERALLY REFRESH YOUR RECOLLECTION ABOUT THE

01:17PM 11  CONTENT OF YOUR CONVERSATIONS WITH MS. HOLMES?

01:17PM 12  A.   YES, THEY DO.  I HAVE A CLEAR RECOLLECTION OF THAT.

01:17PM 13  Q.   APOLOGIES FOR TALKING OVER YOU.

01:18PM 14       SITTING HERE TODAY, DO YOU HAVE A RECOLLECTION OF

01:18PM 15  MS. HOLMES CONVEYING TO YOU THAT REVENUE PROJECTION OF

01:18PM 16  $200 MILLION?

01:18PM 17  A.   YES, I DO.  AND I KNOW YOU'RE SUPPOSED TO ASK THE

01:18PM 18  QUESTIONS, BUT HOW THAT RELATES IS THE ROUND THAT WE WERE IN

01:18PM 19  WAS A $20 MILLION ROUND.

01:18PM 20       MR. DOWNEY:  OBJECTION.

01:18PM 21       THE COURT:  EXCUSE ME.  EXCUSE ME.  LET'S WAIT FOR

01:18PM 22  THE NEXT QUESTION.

01:18PM 23       THE WITNESS:  OKAY.

01:18PM 24  BY MR. BOSTIC:

01:18PM 25  Q.   THANK YOU, MR. EISENMAN.

01:18PM  1    A.   SORRY.

01:18PM  2    Q.   SO BASED ON THE INFORMATION THAT YOU WERE RECEIVING FROM

01:18PM  3    MS. HOLMES IN THAT 2006 TIME PERIOD, YOU MADE THE DECISION TO

01:18PM  4    INVEST IN THE COMPANY; CORRECT?

01:18PM  5    A.   THAT IS CORRECT.

01:18PM  6    Q.   AND HOW MUCH DID YOU INVEST IN THAT FIRST ROUND IN THE

01:18PM  7    COMPANY?

01:18PM  8    A.   PERSONALLY OR FAMILY WIDE?

01:18PM  9    Q.   GIVE US A BREAKDOWN IF YOU CAN?

01:18PM 10    A.   OKAY.  MY WIFE AND I SHARED A $900,000 INVESTMENT, AND

01:18PM 11    EACH OF MY THREE KIDS HAD A $90,000 INVESTMENT.

01:19PM 12    Q.   DOES THAT MEAN APPROXIMATELY $1.1 MILLION?

01:19PM 13    A.   APPROXIMATELY.  A LITTLE CLOSER TO 1.2 BUT --

01:19PM 14    Q.   FOLLOWING THAT INVESTMENT, HOW FREQUENTLY WERE YOU IN

01:19PM 15    CONTACT WITH MS. HOLMES?

01:19PM 16    A.   AT LEAST QUARTERLY.

01:19PM 17    Q.   AND GENERALLY SPEAKING, WERE THOSE PHONE CALLS?

01:19PM 18    A.   THOSE WERE PHONE CALLS.  ONE PERSONAL VISIT.

01:19PM 19    Q.   OKAY.  I'LL CIRCLE BACK TO THAT.

01:19PM 20         FOR THOSE PHONE CALLS, WERE THEY PRESCHEDULED AT A CERTAIN

01:19PM 21    TIME?  HOW DID THEY COME TO TAKE PLACE?

01:19PM 22    A.   WE HAD AN UNDERSTANDING THAT THERE WOULD BE A QUARTERLY

01:19PM 23    UPDATE, AND EVERY QUARTER TYPICALLY I WOULD REACH OUT AND SAY,

01:19PM 24    YOU KNOW, WE'RE COMING UP TO THE QUARTER, CAN WE SCHEDULE

01:19PM 25    SOMETHING?  AND WE WOULD PUT SOMETHING ON THE CALENDAR.

01:19PM  1    Q.   AND FROM YOUR PERSPECTIVE, WHAT WAS THE PURPOSE OF THOSE

01:19PM  2    CALLS WITH MS. HOLMES?

01:19PM  3    A.   TO DETERMINE THE PROGRESS OF THE COMPANY.

01:19PM  4    Q.   AND WHY WAS THAT INFORMATION THAT YOU NEEDED TO HAVE?

01:20PM  5    A.   BECAUSE I'M ALWAYS INTERESTED IN FOLLOWING THE COMPANIES

01:20PM  6    THAT I'M INVESTED IN.  THERE'S ALWAYS AN OPPORTUNITY TO INVEST

01:20PM  7    MORE IN LATER ROUNDS.  THERE'S POTENTIALLY AN OPPORTUNITY FOR

01:20PM  8    AN EXIT, WHICH IN THE EARLY YEARS THERE WAS COMMUNICATED THAT

01:20PM  9    THERE WOULD BE AN EXIT ONE YEAR AWAY, TWO YEARS AWAY, AND THAT

01:20PM 10    KEPT GETTING PUSHED FURTHER AWAY.  AND I WANT TO BE SENSITIVE

01:20PM 11    TO THE VALUE PROPOSITION IF I'M GOING TO CONSIDER A POTENTIAL

01:20PM 12    EXIT.

01:20PM 13    Q.   DO YOU RECALL WHETHER YOUR DISCUSSIONS DURING THOSE CALLS

01:20PM 14    INCLUDED MS. HOLMES PROVIDING INFORMATION ABOUT PRODUCT

01:20PM 15    DEVELOPMENT AND THE STATE OF THE TECHNOLOGY?

01:20PM 16    A.   YES, I DO RECALL, AND THAT WAS THE SUBSTANCE OF THE CALLS.

01:20PM 17    Q.   DURING THAT TIME PERIOD, SO NOW WE'RE TALKING ABOUT

01:20PM 18    FOLLOWING YOUR INVESTMENT, 2006, 2007, DID YOU HAVE AN

01:20PM 19    UNDERSTANDING OF WHAT TECHNOLOGY OR WHAT KIND OF DEVICE

01:21PM 20    THERANOS WAS DEVELOPING?

01:21PM 21    A.   YES.

01:21PM 22    Q.   AND WHAT WAS YOUR UNDERSTANDING?

01:21PM 23    A.   MY UNDERSTANDING WAS IT WAS A DEVICE TO ANALYZE BLOOD THAT

01:21PM 24    WAS MORE ACCURATE, AND PROVIDED MORE RAPID RESULTS, AND

01:21PM 25    INVOLVED A SMALLER BLOOD DRAW THAN CONVENTIONAL BLOOD TESTING

01:21PM  1    EQUIPMENT AND BLOOD TESTING THERAPIES.

01:21PM  2    Q.   DID MS. HOLMES TELL YOU ANYTHING ABOUT THE SCALEABILITY OF

01:21PM  3    THE THERANOS TECHNOLOGY?

01:21PM  4    A.   IT DEPENDS ON WHICH YEAR, BUT, YES, THERE WERE

01:21PM  5    CONVERSATIONS ALONG THE WAY ABOUT THE SCALEABILITY, ABOUT THE

01:21PM  6    APPLICATION.

01:21PM  7         AND THERE WERE ALSO CONVERSATIONS A COUPLE OF YEARS AFTER

01:21PM  8    WE INVESTED ABOUT THE DATA THAT THEY WERE GATHERING FROM THESE

01:21PM  9    PHARMACEUTICAL COMPANIES THAT WOULD BE A SECOND SOURCE OF

01:21PM 10    REVENUE POSSIBLY EQUALLING THE FIRST SOURCE OF REVENUE.

01:21PM 11    Q.   AND WHEN WE'RE TALKING ABOUT SCALEABILITY, WHAT DOES THAT

01:22PM 12    MEAN IN THE CONTEXT OF A COMPANY LIKE THIS?

01:22PM 13    A.   SCALEABILITY MEANS ACCEPTANCE INTO THE MARKETPLACE, MORE

01:22PM 14    APPLICATIONS, MORE PHARMACEUTICAL COMPANIES USING IT IN

01:22PM 15    CLINICAL TRIALS, DRUG DEVELOPMENT.

01:22PM 16         AND THIS IS A FEW YEARS FURTHER DOWN THE ROAD, BUT THERE

01:22PM 17    WAS ALSO TALK ABOUT APPLICATIONS IN THE MILITARY, APPLICATIONS

01:22PM 18    IN FOREIGN COUNTRIES FOR DIFFERENT TYPES OF DISEASES THAT WERE

01:22PM 19    MORE RAMPANT IN CERTAIN AREAS OF THE WORLD.

01:22PM 20    Q.   AND THIS WAS -- WHAT YOU'RE DESCRIBING NOW IS CONTENT OF

01:22PM 21    YOUR CONVERSATIONS WITH MS. HOLMES?

01:22PM 22    A.   YES.

01:22PM 23    Q.   YOU MENTIONED ONE IN-PERSON MEETING AS WELL DURING THESE

01:22PM 24    EARLY YEARS; IS THAT CORRECT?

01:22PM 25    A.   THAT'S CORRECT.

01:22PM 1    Q.   AND WHEN DID THAT HAPPEN?

01:22PM 2    A.   IT HAPPENED APPROXIMATELY 2008 OR '09.  IT WAS MY HIGH

01:22PM 3    SCHOOL SON'S SPRING BREAK TRIP TO CALIFORNIA, AND OUR FIRST

01:23PM 4    STOP WAS VISITING ELIZABETH AND GETTING A TOUR OF THE LAB.

01:23PM 5    Q.   WAS THAT AT THE THERANOS HEADQUARTERS?

01:23PM 6    A.   THAT WAS AT THE EARLY THERANOS HEADQUARTERS.

01:23PM 7    Q.   AND WHAT DO YOU REMEMBER ABOUT THAT VISIT?

01:23PM 8    A.   I REMEMBER BEING TAKEN INTO THE LAB AND SHOWN AN EARLY

01:23PM 9    VERSION OF THE READERS.  I RECALL THAT IT HAD MULTIPLE TESTS ON

01:23PM 10   EACH READER.  I THINK IT WAS MAYBE FIVE TESTS.

01:23PM 11        SO THEY HAD A PROTOTYPE THAT THEY APPARENTLY WERE USING,

01:23PM 12   AND YOU HAD THE CARTRIDGES, AND THEN YOU HAD THE READER.  YOU

01:23PM 13   PUT -- IT WAS EXPLAINED THAT YOU PUT THE BLOOD IN THE

01:23PM 14   CARTRIDGES, YOU PUT THE CARTRIDGE IN THE READER, AND THE READER

01:23PM 15   GAVE YOU THE TEST RESULTS.

01:23PM 16   Q.   YOU DESCRIBED WHAT YOU SAW AS AN "EARLY VERSION" OF THE

01:23PM 17   READER; IS THAT CORRECT?

01:23PM 18   A.   YES.

01:23PM 19   Q.   AND WHAT MAKES YOU CALL WHAT YOU SAW AS AN EARLY VERSION?

01:23PM 20   A.   BECAUSE WE LEARNED EITHER FROM RESOURCES IN THE COMPANY OR

01:23PM 21   THE WEBSITE OR PUBLICITY THAT IT WAS DIFFERENT VERSIONS THAT

01:24PM 22   CAME OUT.  I THINK THEY CALLED ONE OF THE EARLY VERSIONS THE

01:24PM 23   EDISON, AND THEN THERE WAS THE EDISON 2.  I DON'T REMEMBER THE

01:24PM 24   EXACT LABELLING, BUT THERE WERE BETTER AND BETTER VERSIONS OF

01:24PM 25   THE EARLIER TECHNOLOGY THAT APPARENTLY THE FINANCIAL PRESS

01:24PM  1    BROUGHT TO LIGHT.

01:24PM  2    Q.   CAN YOU DESCRIBE WHAT YOU SAW PHYSICALLY?  WHAT DID THE

01:24PM  3    DEVICE OR DEVICES LOOK LIKE?

01:24PM  4    A.   I DON'T HAVE A STRONG RECOLLECTION, BUT I DO REMEMBER THAT

01:24PM  5    THE THING THAT YOU PUT THE SAMPLES IN WAS FAIRLY SMALL, AND

01:24PM  6    THERE WAS SOME KIND OF A BOX THAT LOOKED LIKE A COMPUTER THAT

01:24PM  7    THOSE SAMPLES WENT INTO FOR READING PURPOSES.

01:24PM  8         BUT AGAIN, I DON'T HAVE A STRONG RECOLLECTION.  JUST A

01:24PM  9    LITTLE BIT FUZZY.

01:24PM 10    Q.   AND DO YOU REMEMBER ANYTHING ABOUT THE OVERALL SIZE OF THE

01:24PM 11    DEVICE, JUST ROUGHLY SPEAKING?

01:24PM 12    A.   I REMEMBER THE READER BEING FAIRLY SMALL, AND I THINK IT

01:24PM 13    WAS SORT OF RECTANGULAR.

01:25PM 14    Q.   WHEN YOU SAY "SMALL," CAN YOU ATTEMPT TO QUANTIFY IT TO

01:25PM 15    SOMETHING?

01:25PM 16    A.   MAYBE A HALF AN INCH BY FOUR INCHES.

01:25PM 17    Q.   SOMETHING THAT YOU CAN HOLD IN YOUR HANDS?

01:25PM 18    A.   YES.

01:25PM 19    Q.   AND DID YOU LATER COME TO UNDERSTAND THAT THERANOS WAS

01:25PM 20    WORKING ON A LARGER ANALYZER THAT WOULD SIT ON A DESKTOP?

01:25PM 21    A.   THERE WERE TWO OR THREE ADVANCED ITERATIONS, AND I

01:25PM 22    REMEMBER THERE WAS SOME CONVERSATIONS A FEW YEARS AFTER WE

01:25PM 23    INVESTED THAT THERE WERE -- THERE WAS SOME KIND OF A DESKTOP

01:25PM 24    THAT WAS FIRST PUT IN PHARMACEUTICAL COMPANIES FOR CLINICAL

01:25PM 25    TESTS, BUT THEN THERE WAS SOME CONVERSATION ABOUT THESE THINGS

01:25PM 1    WERE PORTABLE, AND THESE COULD BE IN EVERY DOCTOR'S OFFICES AND

01:25PM 2    POTENTIALLY IN PEOPLE'S HOMES.

01:25PM 3    Q.   THE LARGER ANALYZER THAT WE'RE REFERENCING, DID YOU EVER

01:26PM 4    SEE A PHYSICAL EXAMPLE OF THAT?

01:26PM 5    A.   YOU KNOW, I THINK I DID, BUT I'M NOT POSITIVE.

01:26PM 6    Q.   OKAY.  DID YOU HAVE AN UNDERSTANDING FROM YOUR

01:26PM 7    CONVERSATIONS WITH MS. HOLMES ABOUT CARTRIDGES THAT WOULD BE

01:26PM 8    USED IN CONNECTION WITH THE THERANOS ANALYZERS?

01:26PM 9    A.   YES.

01:26PM 10   Q.   AND WHAT DID YOU UNDERSTAND CARTRIDGES TO BE REFERRING TO?

01:26PM 11   A.   ARE WE TALKING ABOUT IN THE EARLY STAGE OR THE MIDDLE

01:26PM 12   STAGE BECAUSE THERE WAS A LITTLE BIT OF A DIFFERENCE?

01:26PM 13   Q.   I THINK WE'RE INTO THE MIDDLE STAGE NOW.

01:26PM 14       SO FIRST CAN YOU DEFINE WHAT YEARS WE'RE TALKING ABOUT IN

01:26PM 15   THE MIDDLE STAGE?

01:26PM 16   A.   OKAY.  THIS WAS, YOU KNOW, THREE OR FOUR YEARS INTO OUR

01:26PM 17   INVESTMENT.  THERE WERE CONVERSATIONS, AND THERE WAS AN EMAIL

01:26PM 18   EXCHANGE THAT THERE WAS, THERE WAS WIDE ACCEPTANCE IN THE

01:26PM 19   MARKETPLACE WITH THESE CARTRIDGES THAT COULD DO BETWEEN ONE AND

01:26PM 20   EITHER FIVE OR SIX TESTS, AND THEY WERE GOING TO CHARGE $30 PER

01:26PM 21   TEST FOR THESE CARTRIDGES.

01:27PM 22       AND THERE WAS CURRENT DEMAND FOR A MILLION OF THESE

01:27PM 23   CARTRIDGES A MONTH.  THAT THEY WERE SCALING UP.  THAT THEY WERE

01:27PM 24   DOING 200,000 IN FEBRUARY; THEY WERE GOING TO DO 300,000 IN

01:27PM 25   MARCH, BUT WITHIN A PERIOD OF 6 MONTHS THEY WERE GOING TO SCALE

01:27PM  1    UP TO MEET THE MARKET DEMAND OF 1 MILLION CARTRIDGES PER MONTH,

01:27PM  2    AND THEY THOUGHT THAT DEMAND IN THE NEXT YEAR WOULD GO TO 2

01:27PM  3    MILLION CARTRIDGES PER MONTH.

01:27PM  4         SO JUST DOING SIMPLE MATH, IF THE AVERAGE CARTRIDGE DOES

01:27PM  5    UP TO 5 TESTS AT $30 A TEST AND IT'S $100 FOR 3 TESTS, AND

01:27PM  6    YOU'RE DOING A MILLION OF THESE A MONTH, GOING TO 2 MILLION A

01:27PM  7    MONTH, AND THERE'S CURRENT DEMAND FOR A MILLION A MONTH, THESE

01:27PM  8    ARE NUMBERS THAT ARE PRETTY ASTOUNDING AND WOULD CREATE A VERY

01:27PM  9    SIGNIFICANT VALUE FOR THIS COMPANY.

01:27PM  10   Q.   YOU UNDERSTOOD THAT THIS WOULD BE REVENUE GENERATING

01:27PM  11   ACTIVITY BY THE COMPANY?

01:27PM  12   A.   YES.

01:27PM  13   Q.   THESE REPRESENTATIONS ABOUT THE DEMAND AND MANUFACTURING

01:28PM  14   OF THESE CARTRIDGES, WHEN DID THOSE CONVERSATIONS TAKE PLACE,

01:28PM  15   IF YOU RECALL?

01:28PM  16   A.   I WOULD HAVE TO LOOK AT MY NOTES, BUT MY RECOLLECTION IS

01:28PM  17   IT WAS ABOUT THREE OR FOUR YEARS AFTER MY INVESTMENT.  SO 2008,

01:28PM  18   2009.

01:28PM  19   Q.   LET ME DIRECT YOU TO YOUR NOTES.  IF YOU COULD TURN IN THE

01:28PM  20   BINDER IN FRONT OF YOU TO TAB 14.

01:28PM  21   A.   OKAY.

01:28PM  22   Q.   FIRST OF ALL, DOES THE DOCUMENT AT TAB 14 INCLUDE YOUR

01:28PM  23   HANDWRITTEN NOTES?

01:28PM  24   A.   YES, IT DOES.

01:28PM  25   Q.   I'LL DIRECT YOUR ATTENTION TO PAGE 14 OF TAB 14.

01:28PM   1      A.   OKAY.

01:28PM   2      Q.   AND I WANT YOU TO, JUST WHEN YOU GET THERE, ON PAGE 14 --

01:28PM   3      A.   GOT IT.

01:28PM   4      Q.   PAGE 14, TAKE A MOMENT AND REVIEW THAT PAGE TO YOURSELF

01:28PM   5      AND DON'T READ IT OUT LOUD, AND THEN LET ME KNOW WHEN YOU'RE

01:28PM   6      DONE.

01:28PM   7           (PAUSE IN PROCEEDINGS.)

01:28PM   8               THE WITNESS:  OKAY.

01:29PM   9      BY MR. BOSTIC:

01:29PM  10      Q.   DOES THAT REFRESH YOUR RECOLLECTION AS TO WHEN THESE

01:29PM  11      CONVERSATIONS ABOUT THE NUMBER OF CARTRIDGES TOOK PLACE?

01:29PM  12      A.   YES.  EARLIER THAN I RECALLED.  THIS WAS DATED 10-1-09.

01:29PM  13      Q.   DURING THESE CONVERSATIONS WITH MS. HOLMES IN THIS TIME

01:29PM  14      PERIOD DID SHE TELL YOU ANYTHING ABOUT WHETHER THE COMPANY WAS

01:29PM  15      CASH FLOW POSITIVE OR WHEN THAT WOULD HAPPEN?

01:29PM  16      A.   YES.  THERE WAS ONE ANNUAL MEETING IN THE WHOLE HISTORY OF

01:29PM  17      THE COMPANY, AND THEY WERE TALKING ABOUT THE REVENUES THAT WERE

01:29PM  18      CURRENTLY GENERATED AND THE CONTRACTS THAT THEY WERE CAPTURING.

01:29PM  19           THEY SAID AT THAT TIME THEY HAD ENOUGH CASH IN THE

01:29PM  20      TREASURY FOR A ONE AND A HALF YEAR RUNWAY, BUT WITHIN THAT ONE

01:30PM  21      AND A HALF YEAR RUNWAY, THE OTHER CONTRACTS WOULD START

01:30PM  22      CATCHING UP AND THEY WOULD NOT HAVE TO GO TO THE MARKETS TO

01:30PM  23      RAISE ADDITIONAL CAPITAL.

01:30PM  24      Q.   AND WHAT DID YOU HEAR ABOUT THE TIMING OF WHEN THE COMPANY

01:30PM  25      WOULD BE CASH FLOW POSITIVE, IF YOU RECALL?

01:30PM  1    A.   THE TIMING WAS -- I'D HAVE TO REFER TO MY NOTES, BUT THE

01:30PM  2    TIMING WAS WITHIN A YEAR OR SO OF THIS POINT IN TIME.

01:30PM  3         SO AROUND 2010.

01:30PM  4    Q.   LET ME INVITE YOU TO LOOK AT PAGE 10 OF TAB 14.

01:30PM  5         WHEN YOU GET THERE, SAME THING AS BEFORE, JUST TAKE A

01:30PM  6    MOMENT TO REVIEW THOSE NOTES ON YOUR OWN.  LET ME KNOW WHEN

01:30PM  7    YOU'RE DONE.

01:30PM  8         (PAUSE IN PROCEEDINGS.)

01:30PM  9              THE WITNESS:  OKAY.

01:31PM  10   BY MR. BOSTIC:

01:31PM  11   Q.   AND, MR. EISENMAN, DOES THAT REFRESH YOUR RECOLLECTION AS

01:31PM  12   TO INFORMATION THAT MS. HOLMES GAVE YOU ABOUT THE COMPANY

01:31PM  13   BECOMING CASH FLOW POSITIVE?

01:31PM  14   A.   YES.

01:31PM  15   Q.   DID MS. HOLMES -- WELL, FIRST LET ME ASK, WHAT DOES "CASH

01:31PM  16   FLOW POSITIVE" MEAN IN THE CONTEXT OF A COMPANY LIKE THIS?

01:31PM  17   A.   CASH FLOW POSITIVE MEANS THAT YOU'RE GENERATING MORE CASH

01:31PM  18   THAN YOU'RE EXPENDING, AND ONE OF THE REASONS THAT THAT'S

01:31PM  19   IMPORTANT IS THAT YOU DON'T HAVE TO GO OUT TO THE MARKETS AND

01:31PM  20   RAISE MORE CASH, MORE CAPITAL.

01:31PM  21   Q.   IS THAT AN IMPORTANT MILESTONE FROM AN INVESTOR'S

01:31PM  22   PERSPECTIVE?

01:31PM  23   A.   IT'S A HUGE MILESTONE BECAUSE YOUR COMPANY IS NO LONGER A

01:31PM  24   SEED COMPANY, IT'S A GROWING COMPANY.  IT'S A MUCH LATER STAGE

01:32PM  25   AND MUCH LESS RISKY AND MUCH MORE VALUABLE.

01:32PM 1    Q.   AND WHAT DID MS. HOLMES TELL YOU ABOUT THE TIMING OF

01:32PM 2    THERANOS BECOMING CASH FLOW POSITIVE?

01:32PM 3    A.   CASH FLOW POSITIVE BY THE END OF '08.

01:32PM 4    Q.   AND WAS THAT GOOD NEWS TO YOU AS AN INVESTOR?

01:32PM 5    A.   THAT WAS TREMENDOUS NEWS, VERY GOOD NEWS.

01:32PM 6             MR. BOSTIC:  YOUR HONOR, DID THE COURT SAY IT

01:32PM 7    INTENDED TO TAKE A BREAK AT 1:30?

01:32PM 8             THE COURT:  YES.

01:32PM 9             MR. BOSTIC:  THIS MAY BE A GOOD STOPPING POINT.

01:32PM 10            THE COURT:  LET'S DO THAT.  LET'S TAKE A BREAK FOR

01:32PM 11   30 MINUTES, LADIES AND GENTLEMEN, 30 MINUTES.

01:32PM 12        YOU CAN STEP DOWN, SIR.  WE WILL RESUME IN 30 MINUTES.

01:32PM 13            THE WITNESS:  OKAY.  THANK YOU.

01:32PM 14            THE COURT:  YOU'RE WELCOME.

01:51PM 15        (LUNCH RECESS TAKEN AT 1:32 P.M.)

16

17

18

19

20

21

22

23

24

25

01:51PM  1                        **AFTERNOON SESSION**

02:07PM  2              (JURY IN AT 2:07 P.M.)

02:07PM  3              THE COURT:  THANK YOU.  LADIES AND GENTLEMEN, PLEASE

02:07PM  4   BE SEATED.  WE'RE BACK ON THE RECORD.  THE JURY IS PRESENT.

02:07PM  5        ALL COUNSEL IS PRESENT.  MS. HOLMES IS PRESENT.  THE

02:07PM  6   WITNESS IS ON THE STAND.

02:07PM  7        MR. BOSTIC, YOU'D LIKE TO CONTINUE?

02:07PM  8              MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

02:07PM  9   Q.   WELCOME BACK, MR. EISENMAN.

02:07PM 10   A.   THANK YOU.

02:07PM 11   Q.   IN THE BINDER IN FRONT OF YOU CAN I ASK YOU TO TURN TO THE

02:07PM 12   TAB MARKED 663, PLEASE.

02:08PM 13   A.   OKAY.

02:08PM 14   Q.   AND AT TAB 663 ARE YOU LOOKING AT AN EMAIL CHAIN INCLUDING

02:08PM 15   MESSAGES BETWEEN YOU, SOMEONE NAMED NANCY MINNIG, AND

02:08PM 16   ELIZABETH HOLMES?

02:08PM 17   A.   YES.

02:08PM 18   Q.   AND IS THIS EMAIL CORRESPONDENCE RELATING TO INFORMATION

02:08PM 19   THAT YOU WERE SEEKING TO OBTAIN FROM MS. HOLMES ABOUT THERANOS?

02:08PM 20   A.   YES.

02:08PM 21              MR. BOSTIC:  YOUR HONOR, I OFFER EXHIBIT 663.

02:08PM 22              MR. DOWNEY:  NO OBJECTION.

02:08PM 23              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:08PM 24        (GOVERNMENT'S EXHIBIT 663 WAS RECEIVED IN EVIDENCE.)

02:08PM 25              MR. BOSTIC:  MS. HOLLIMAN, IF WE CAN START WITH PAGE

02:08PM  1    4 OF EXHIBIT 663.

02:08PM  2            THE WITNESS:  OKAY.

02:08PM  3    BY MR. BOSTIC:

02:08PM  4    Q.  MR. EISENMAN, THIS WILL BE ON THE SCREEN IN FRONT OF YOU,

02:08PM  5    AND YOU CAN ALSO REFERENCE THE COPY IN THE BINDER.

02:09PM  6         LET'S ZOOM IN ON THE BOTTOM OF PAGE 4 AND LOOK AT THE

02:09PM  7    HEADER THERE.

02:09PM  8         AND, MR. EISENMAN, DO YOU SEE WE'RE ABOUT TO LOOK AT AN

02:09PM  9    EMAIL FROM YOU TO ELIZABETH HOLMES?

02:09PM  10   A.  YES.

02:09PM  11   Q.  LET'S GO TO THE NEXT PAGE, PAGE 5.  LET'S ZOOM IN ON THE

02:09PM  12   TEXT OF THE EMAIL.

02:09PM  13        FIRST OF ALL, DO YOU SEE THE DATE OF THE EMAIL IS MAY 3RD,

02:09PM  14   2010?

02:09PM  15   A.  YES, I DO.

02:09PM  16   Q.  IN THE EMAIL YOU WRITE, "ELIZABETH,

02:09PM  17        "CAN WE SCHEDULE OUR QUARTERLY UPDATE THE WEEK OF JUNE

02:09PM  18   FIRST TO JUNE 4TH."

02:09PM  19        DO YOU SEE THAT?

02:09PM  20   A.  YES, I DO.

02:09PM  21   Q.  DURING THAT PERIOD OF MID 2010 HAD YOU STILL BEEN HAVING

02:09PM  22   THOSE QUARTERLY UPDATE CALLS WITH MS. HOLMES?

02:09PM  23   A.  YES.

02:09PM  24   Q.  YOU ALSO HAVE SOME QUESTIONS FOR HER IN THIS EMAIL; IS

02:09PM  25   THAT RIGHT?

02:09PM 1    A.   YES.

02:09PM 2    Q.   YOU'RE ASKING FOR A RESPONSE TO A COUPLE OF QUESTIONS.

02:10PM 3         ITEM NUMBER 1 YOU WRITE, "YOU SAID IN MARCH YOU WERE

02:10PM 4    MANUFACTURING ABOUT 500,000 CARTRIDGES AND SELLING ABOUT

02:10PM 5    400,000 AT ABOUT $80 PER CARTRIDGE.  CAN YOU SHARE THE SAME

02:10PM 6    STATISTICS FOR APRIL, AND AN ESTIMATE FOR MAY?"

02:10PM 7         DO YOU SEE THAT?

02:10PM 8    A.   YES, I DO.

02:10PM 9    Q.   DO YOU RECALL MS. HOLMES TELLING YOU ABOUT MANUFACTURING

02:10PM 10   HUNDREDS OF THOUSANDS OF CARTRIDGES ON A MONTHLY BASIS?

02:10PM 11   A.   YES, I DO.

02:10PM 12   Q.   AND AGAIN, WHAT WAS YOUR UNDERSTANDING OF WHAT THESE

02:10PM 13   CARTRIDGES WERE AND HOW THEY WERE BEING USED?

02:10PM 14   A.   THE CARTRIDGES HAD BETWEEN ONE AND EITHER FIVE OR SIX

02:10PM 15   TESTS, AND THEY WERE SELLING THEM FOR $30 PER TEST, AND THEY

02:10PM 16   WERE GEARING UP TO MEET THE DEMAND, WHICH THEY SAID WAS OR SHE

02:10PM 17   SAID WAS CURRENTLY A MILLION A MONTH, POSSIBLY GOING TO

02:10PM 18   2 MILLION A MONTH IN THE NEXT YEAR.

02:10PM 19   Q.   AND IN YOUR EMAIL YOU ASK FOR CARTRIDGE MANUFACTURE

02:11PM 20   NUMBERS FOR APRIL AND AN ESTIMATE FOR MAY; IS THAT RIGHT?

02:11PM 21   A.   CORRECT.

02:11PM 22   Q.   AND WHY WERE YOU ASKING FOR THAT INFORMATION?

02:11PM 23   A.   TO SEE THE TREND IF INDEED THEY WERE MANUFACTURING AND

02:11PM 24   DELIVERING INCREASING NUMBERS APPROACHING THE MILLION -- A

02:11PM 25   MILLION CARTRIDGES PER MONTH.

02:11PM  1     Q.   AND WHY WERE YOU INTERESTED IN THAT AS AN INVESTOR?

02:11PM  2     A.   ONE OF THE MAIN INDICATIONS OF VALUE IS REVENUE AND EARLY

02:11PM  3     STAGE COMPANIES SELL AT A MULTITUDE OF REVENUE, SO IF THEY WERE

02:11PM  4     POTENTIALLY GENERATING $200- OR $300,000 MILLION IN REVENUE,

02:11PM  5     THE COMPANY WAS POTENTIALLY WORTH $1, $2, OR $3 BILLION AT THAT

02:11PM  6     TIME.  AND AT THE POINT OF OUR INVESTMENT, THE ENTIRE COMPANY

02:11PM  7     WAS ONLY WORTH $150 MILLION.

02:11PM  8     Q.   SO THIS WAS AN EFFORT BY YOU TO TRY TO BETTER UNDERSTAND

02:11PM  9     WHAT YOUR INVESTMENT WAS WORTH?

02:11PM 10     A.   EXACTLY.

02:11PM 11     Q.   AND IN THAT SAME EMAIL YOU ASK ABOUT WHETHER MS. HOLMES

02:12PM 12     HAS ANY THOUGHTS OF A SHAREHOLDER MEETING IN ITEM NUMBER 2.

02:12PM 13          DO YOU SEE THAT?

02:12PM 14     A.   YES.

02:12PM 15     Q.   AND WAS THAT ALSO FOR THE PURPOSE OF POTENTIALLY GETTING

02:12PM 16     MORE INFORMATION ABOUT THE COMPANY?

02:12PM 17     A.   YES.

02:12PM 18     Q.   AND IN ITEM NUMBER 4 YOU SAY, "ARE THERE ANY OTHER

02:12PM 19     SIGNIFICANT ITEMS THAT YOU CAN SHARE BEFORE WE HAVE OUR

02:12PM 20     QUARTERLY UPDATE CALL?"

02:12PM 21          WERE YOU ASKING THAT QUESTION FOR THE SAME REASON?

02:12PM 22     A.   YES.

02:12PM 23     Q.   LET'S LOOK AT PAGE 4 OF THIS EXHIBIT.  ZOOM IN ON THE

02:12PM 24     MIDDLE OF THE PAGE.  THERE'S AN EMAIL FROM YOU ON MAY 10TH,

02:12PM 25     2010.

02:12PM  1      SO ONE WEEK AFTER THE EMAIL THAT WE JUST LOOKED AT;

02:12PM  2   CORRECT?

02:12PM  3   A.   YES.

02:12PM  4   Q.   IN THAT MESSAGE YOU WRITE AGAIN TO MS. HOLMES, "WOULD IT

02:12PM  5   BE POSSIBLE TO GET A RESPONSE TODAY?  I HAVE BEEN TRYING SINCE

02:12PM  6   LAST MONDAY."

02:12PM  7      WAS THIS A CONTINUING EFFORT TO TRY TO OBTAIN INFORMATION

02:12PM  8   ABOUT THE COMPANY?

02:12PM  9   A.   YES, IT WAS.

02:12PM 10   Q.   LET'S GO TO PAGE 3 OF THIS EXHIBIT NOW, SO WE'RE MOVING

02:13PM 11   FORWARD IN TIME.

02:13PM 12      LET'S ZOOM IN ON THE BOTTOM TWO-THIRDS OF THE PAGE.

02:13PM 13   STARTING WHERE IT SAYS, "ALAN."

02:13PM 14   A.   OKAY.

02:13PM 15   Q.   WE SEE HERE A RESPONSE FROM MS. HOLMES; IS THAT RIGHT?

02:13PM 16   A.   YES.

02:13PM 17   Q.   SHE SAYS THAT SHE RECEIVED YOUR EMAILS.  SHE SAYS, "JUNE

02:13PM 18   IS A TOUGH MONTH FOR US, AND I DON'T KNOW WHEN WE CAN DO OUR

02:13PM 19   NEXT CALL.  AS YOU KNOW, WE DON'T DO QUARTERLY CALLS WITH OUR

02:13PM 20   OTHER INVESTORS, MANY OF WHOM INVESTED MUCH GREATER AMOUNTS

02:13PM 21   THAN YOU DID."

02:13PM 22      DO YOU SEE THAT?

02:13PM 23   A.   YES, I DO.

02:13PM 24   Q.   SHE THEN SAYS IN THE FOLLOWING PARAGRAPH, "AS DISCUSSED IN

02:13PM 25   OUR CALL IN MARCH, WE CANNOT PROVIDE THE LEVEL OF COMMUNICATION

02:13PM 1    YOU KEEP REQUESTING."

02:13PM 2        DO YOU RECALL AROUND THIS TIME PERIOD CONVERSATIONS WITH

02:13PM 3    MS. HOLMES ABOUT HER NOT BEING ABLE OR WILLING TO PROVIDE THE

02:13PM 4    LEVEL OF COMMUNICATION THAT YOU WANTED?

02:13PM 5    A.   YES, I DO.

02:13PM 6    Q.   AND DID SHE GIVE YOU AN EXPLANATION AS TO WHY THAT WAS THE

02:14PM 7    CASE?

02:14PM 8    A.   THERE WAS NO EXPLANATION.

02:14PM 9    Q.   BELOW THAT HER EMAIL GOES ON TO SAY, "WITH THE DEALS WE

02:14PM 10   ARE FORMALIZING WITH RETAILERS, WE ARE NOW OBLIGATED NOT TO

02:14PM 11   DISCLOSE OUR PRODUCTION VOLUMES AND CARTRIDGE SALE PRICES."

02:14PM 12       DO YOU SEE THAT?

02:14PM 13   A.   YES.

02:14PM 14   Q.   AND WHAT WAS YOUR UNDERSTANDING OF THAT STATEMENT?

02:14PM 15   A.   THERE WAS SOME INFORMATION THAT THEY WERE TRYING TO HAVE

02:14PM 16   THEIR DEVICES AND CHANGE THE PHARMACIES.  THERE WAS THE NAME

02:14PM 17   WAL-MART THAT WAS MENTIONED, CVS, WALGREENS.

02:14PM 18       SO WE DIDN'T HAVE ANY DIRECT KNOWLEDGE, BUT THERE WAS SOME

02:14PM 19   INFORMATION THAT THEY WERE TRYING TO MOVE ALL OF THE READERS

02:14PM 20   INTO ONE CHAIN OF PHARMACIES.

02:14PM 21   Q.   AND WHAT DID THAT HAVE TO DO WITH YOUR REQUEST FOR

02:14PM 22   INFORMATION ABOUT PRODUCTION VOLUME INFORMATION?

02:14PM 23   A.   I THINK IT WAS IRRELEVANT.

02:15PM 24       AS A SHAREHOLDER, I'VE HAD LOTS OF CONVERSATIONS WITH

02:15PM 25   SIMILAR SITUATIONS WHERE THERE IS A CERTAIN LEVEL OF

02:15PM  1    COMMUNICATION AND IF IT IS SENSITIVE INFORMATION, THERE'S A

02:15PM  2    SIMPLE SOLUTION, YOU JUST SIGN AN NDA, NONDISCLOSURE AGREEMENT,

02:15PM  3    SO ANY CONVERSATION THAT YOU HAVE --

02:15PM  4           MR. DOWNEY:  YOUR HONOR, EXCUSE ME.  I MOVE TO

02:15PM  5    STRIKE EVERYTHING AFTER "IRRELEVANT" IN THE ANSWER GIVEN.

02:15PM  6        (PAUSE IN PROCEEDINGS.)

02:15PM  7           THE COURT:  ALL RIGHT.  I'LL STRIKE EVERYTHING AFTER

02:15PM  8    THE WORD "IRRELEVANT."

02:15PM  9        THE ANSWER WAS "I THINK IT WAS IRRELEVANT."  AND THEN

02:15PM  10   EVERYTHING AFTER THAT, LADIES AND GENTLEMEN, IS STRICKEN AS

02:15PM  11   NONRESPONSIVE.

02:15PM  12       YOU CAN ASK ANOTHER QUESTION, MR. BOSTIC.

02:15PM  13   BY MR. BOSTIC:

02:15PM  14   Q.  MR. EISENMAN, DID MS. HOLMES EVER EXPLAIN TO YOU THAT SHE

02:16PM  15   WAS UNABLE TO PROVIDE THE INFORMATION THAT YOU WERE REQUESTING

02:16PM  16   BECAUSE IT WAS CONFIDENTIAL?

02:16PM  17   A.  NO.

02:16PM  18   Q.  IF SHE HAD EXPLAINED THAT TO YOU AND ASKED YOU TO SIGN AN

02:16PM  19   NDA, WOULD YOU HAVE BEEN WILLING TO SIGN ONE?

02:16PM  20   A.  YES.  I'VE DONE IT MANY TIMES.

02:16PM  21   Q.  LET'S MOVE ON IN THIS EMAIL.  AT THE BOTTOM OF PAGE 3

02:16PM  22   MS. HOLMES WRITES -- IF WE COULD ZOOM BACK IN ON THE VERY

02:16PM  23   BOTTOM PARAGRAPH.  MS. HOLMES WRITES, "GIVEN YOUR FRUSTRATION

02:16PM  24   LEVEL AND OUR FRUSTRATION LEVEL WITH THIS INTERACTION, I

02:16PM  25   STRONGLY ENCOURAGE YOU TO RE-CONSIDER THE OPPORTUNITY I

02:16PM   1    PRESENTED ON OUR LAST CALL TO REALIZE THE RETURN ON YOUR

02:16PM   2    INVESTMENT."

02:16PM   3        LET'S GO TO PAGE 4.  AT THE TOP OF THE PAGE MS. HOLMES

02:16PM   4    SAYS, "WE RECOGNIZE YOU HAVE BEEN AN INVESTOR FOR SOME TIME,

02:16PM   5    AND IF WE PROCEED WITH THE TRANSACTION WE ARE PROPOSING WE CAN

02:17PM   6    PROVIDE YOU WITH A GREATER THAN 5X RETURN ON YOUR INVESTMENT IN

02:17PM   7    THERANOS."

02:17PM   8        DO YOU SEE THAT?

02:17PM   9    A.   YES.

02:17PM  10    Q.   AROUND THIS TIME PERIOD, DO YOU RECALL CONVERSATIONS WITH

02:17PM  11    MS. HOLMES ABOUT POTENTIALLY EXITING FROM YOUR INVESTMENT IN

02:17PM  12    THE COMPANY?

02:17PM  13    A.   YES, I HAVE A CLEAR RECOLLECTION.

02:17PM  14    Q.   AND TELL US ABOUT THOSE COMMUNICATIONS?

02:17PM  15    A.   AS ELIZABETH MENTIONED, THERE WAS FRUSTRATION WITH ME

02:17PM  16    TRYING TO GET INFORMATION ON THE COMPANY.  AND THERE WAS NOT

02:17PM  17    JUST A LIMITED AMOUNT OF INFORMATION, THERE WAS NO INFORMATION

02:17PM  18    COMING FROM THE COMPANY.  AND TO ME THAT'S, THAT'S A SIGN OF

02:17PM  19    TROUBLE.

02:17PM  20        I'VE BEEN INVESTORS IN OTHER COMPANIES, AND WHEN

02:17PM  21    INFORMATION DOESN'T FLOW --

02:17PM  22             MR. DOWNEY:  YOUR HONOR, YOUR HONOR, I MOVE TO

02:17PM  23    STRIKE THIS ANSWER AS NONRESPONSIVE.  AND MAYBE THE QUESTION

02:17PM  24    CAN BE ASKED AGAIN.

02:17PM  25             THE COURT:  WELL, I THINK THE LAST TWO WORDS ARE

02:18PM  1    NONRESPONSIVE, BUT THE BALANCE OF THE ANSWER WILL REMAIN.

02:18PM  2         BUT WHY DON'T YOU ASK ANOTHER QUESTION TO FOLLOW UP.

02:18PM  3              MR. BOSTIC:  SURE.

02:18PM  4    Q.   MR. EISENMAN, TELL US WHAT YOU RECALL ABOUT THE CONTENT OF

02:18PM  5    YOUR COMMUNICATIONS WITH MS. HOLMES AROUND THIS TIME ABOUT

02:18PM  6    POSSIBLY EXITING FROM YOUR INVESTMENT?  WHAT WAS SAID BETWEEN

02:18PM  7    THE TWO OF YOU?

02:18PM  8    A.   UM, THERE WAS A SERIES OF CONVERSATIONS ABOUT A LIQUIDITY

02:18PM  9    EVENT THAT WE WERE EXPECTING.  IT WAS FIRST 12 TO 18 MONTHS

02:18PM  10   AFTER WE INVESTED, AND THEN IT WAS 2 YEARS AFTER, THEN 3 YEARS

02:18PM  11   AFTER, THEN 4 YEARS AFTER, AND THAT WAS ONE OF THE DATA POINTS

02:18PM  12   THAT I WAS TRYING TO GET BECAUSE ALL INVESTORS WOULD LIKE TO

02:18PM  13   EXIT AT SOME POINT.

02:18PM  14        AND THAT POINT -- IF A COMPANY SAYS SOMETHING AND IT

02:18PM  15   CHANGES, THAT'S OKAY, BUT IF IT KEEPS CHANGING YEAR AFTER YEAR

02:18PM  16   AFTER YEAR, IT RAISES SUSPICION.

02:19PM  17        AND I WAS, I WAS MORE PROACTIVE AS A STAKEHOLDER THAN

02:19PM  18   OTHER STAKEHOLDERS.  AND MANAGEMENT, PARTICULARLY ELIZABETH,

02:19PM  19   DID NOT LIKE THE FACT THAT I WAS TRYING TO COMMUNICATE AND

02:19PM  20   TRYING TO GET INFORMATION.

02:19PM  21        SO THIS WAS A WAY THAT WAS PROPOSED FROM ELIZABETH TO ME

02:19PM  22   TO TAKE ME OUT OF MY POSITION.

02:19PM  23   Q.   AND WHAT WAS THAT PROPOSAL FROM MS. HOLMES?

02:19PM  24   A.   THE PROPOSAL IS STATED HERE.  SHE WAS GOING TO PROVIDE A

02:19PM  25   LIQUIDITY EVENT FOR MY INVESTMENT OF GREATER THAN 5 TIMES MY

02:19PM  1    COST.

02:19PM  2    Q.  AT THAT TIME DID YOU FEEL LIKE YOU HAD THE INFORMATION

02:19PM  3    FROM THE COMPANY THAT YOU NEEDED TO DECIDE WHETHER TO TAKE PART

02:19PM  4    IN THAT TRANSACTION?

02:19PM  5            MR. DOWNEY:  YOUR HONOR, I OBJECT TO THIS AS 401 AND

02:19PM  6    403.  WE'RE WELL OUTSIDE ANY ISSUES IN THE CASE HERE IN TERMS

02:19PM  7    OF HAVING HIM NARRATE HIS MINDSET ON THESE ISSUES.

02:20PM  8            THE COURT:  MR. BOSTIC, WHAT IS THE RELEVANCE OF

02:20PM  9    THIS?

02:20PM  10           MR. BOSTIC:  SO, YOUR HONOR, PART OF THE SCOPE OF

02:20PM  11   THE TESTIMONY HERE WILL RELATE TO MR. EISENMAN'S CONTINUING

02:20PM  12   EFFORTS TO GET INFORMATION FROM THE COMPANY.  I BELIEVE HE

02:20PM  13   SHOULD BE ALLOWED TO EXPLAIN WHY HE WAS SEEKING THAT

02:20PM  14   INFORMATION.

02:20PM  15           THE COURT:  WELL, I'LL ALLOW HIM TO CONTINUE WITH

02:20PM  16   THIS BY QUESTION AND ANSWER.

02:20PM  17   BY MR. BOSTIC:

02:20PM  18   Q.  AND LET ME ASK, MR. EISENMAN, AROUND THIS TIME PERIOD WHEN

02:20PM  19   MS. HOLMES HAD MADE THIS PROPOSAL, WERE YOU SEEKING MORE

02:20PM  20   INFORMATION FROM THE COMPANY TO HELP YOU DECIDE WHETHER TO

02:20PM  21   ACCEPT THAT OFFER OR NOT?

02:20PM  22   A.  YES.

02:20PM  23   Q.  LET'S LOOK AT PAGE 2 OF EXHIBIT 663.  LET'S ZOOM IN ON THE

02:20PM  24   TOP HALF.

02:21PM  25           MR. EISENMAN, IS THIS YOUR RESPONSE TO THE EMAIL FROM

02:21PM  1    MS. HOLMES THAT WE JUST SAW?

02:21PM  2    A.  YES, IT IS.

02:21PM  3    Q.  YOU THANK HER FOR HER RESPONSE AND YOU SAY, "MY QUESTIONS

02:21PM  4    WERE MERELY A FOLLOW UP FROM OUR DECEMBER CALL WHEN YOU SAID

02:21PM  5    THAT:" AND THEN YOU INCLUDE A LIST BELOW.

02:21PM  6        DO YOU SEE THAT?

02:21PM  7    A.  YES, I DO.

02:21PM  8    Q.  IS THIS LIST RECOUNTING THINGS THAT MS. HOLMES TOLD YOU ON

02:21PM  9    A PHONE CALL IN DECEMBER?

02:21PM 10    A.  YES, IT WAS.

02:21PM 11    Q.  ITEM NUMBER 1 ON THIS LIST TALKS ABOUT A STATEMENT FROM

02:21PM 12    MS. HOLMES THAT "THE COMPANY WAS CLOSE TO ACHIEVING $200

02:21PM 13    MILLION IN SALES FOR 2009."

02:21PM 14        DO YOU SEE THAT?

02:21PM 15    A.  YES.

02:21PM 16    Q.  AND DO YOU RECALL MS. HOLMES TELLING YOU THAT THERANOS WAS

02:21PM 17    GOING TO ACHIEVE $200 MILLION IN SALES FOR THE YEAR 2009?

02:21PM 18    A.  YES, I DO.

02:21PM 19    Q.  AND YOU'RE WRITING THIS EMAIL IN MAY OF 2010?

02:21PM 20    A.  YES.

02:21PM 21    Q.  AND SO WERE YOU SEEKING TO FIND OUT IF THE COMPANY HAD HIT

02:22PM 22    THAT TARGET?

02:22PM 23    A.  YES.

02:22PM 24    Q.  YOU ASK FOR THE FINAL FIGURE?  DID MS. HOLMES EVER PROVIDE

02:22PM 25    THAT INFORMATION?  DID SHE EVER TELL YOU WHETHER THE COMPANY

02:22PM   1    HIT THAT $200 MILLION MARK?

02:22PM   2    A.   THERE WAS AN EMAIL THAT SAID THAT THAT GOAL WAS STRETCHED

02:22PM   3    ANOTHER YEAR.

02:22PM   4    Q.   UNDER ITEM 2 YOU TALK ABOUT THE QUARTERLY UPDATE SCHEDULE

02:22PM   5    THAT YOU HAD UNTIL THEN AND YOU SAY, "SINCE THIS IS MY ONLY

02:22PM   6    AVENUE FOR INFORMATION, I HOPE YOU THAT YOU CAN FIND 20 TO

02:22PM   7    30 MINUTES FOR AN UPDATE IN JUNE AND I AM HAPPY TO CONTACT

02:22PM   8    AFTER HOURS OR ON A WEEKEND."

02:22PM   9         DO YOU SEE THAT?

02:22PM  10    A.   YES.

02:22PM  11    Q.   AND ABOUT HOW LONG HAD EACH OF THESE QUARTERLY CALLS BEEN?

02:22PM  12    A.   TWENTY TO THIRTY MINUTES.

02:22PM  13    Q.   SO APPROXIMATELY ONE TO TWO HOURS PER YEAR OF PHONE

02:22PM  14    COMMUNICATIONS WITH MS. HOLMES DURING THESE QUARTERLY CALLS?

02:23PM  15    A.   YES, AND OCCASIONAL CALLS IN BETWEEN.

02:23PM  16    Q.   UNDER ITEM 3 THERE'S SOME ADDITIONAL DISCUSSION ABOUT

02:23PM  17    DEMAND PER CARTRIDGES PER MONTH AND PRODUCTION NUMBERS.

02:23PM  18         DO YOU SEE THAT?

02:23PM  19    A.   YES.

02:23PM  20    Q.   DID MS. HOLMES EVER RESPOND TO PROVIDE YOU WITH UPDATED

02:23PM  21    INFORMATION ABOUT THE VOLUME OF THERANOS'S CARTRIDGE

02:23PM  22    PRODUCTION?

02:23PM  23    A.   NO.

02:23PM  24    Q.   LOOKING AT PAGE 1 OF THE EXHIBIT, THERE ARE SOME EMAILS

02:23PM  25    BETWEEN YOU AND SOMEONE NAMED NANCY MINNIG.

02:23PM   1          DO YOU SEE THAT?

02:23PM   2     A.   YES.

02:23PM   3     Q.   AND WHO WAS NANCY MINNIG?

02:23PM   4     A.   NANCY MINNIG WAS DON LUCAS'S EXECUTIVE ASSISTANT.

02:23PM   5     Q.   AND WHY DID YOU REACH OUT TO HER AT THIS TIME?

02:23PM   6     A.   BECAUSE I WAS A FRUSTRATED STAKEHOLDER TRYING TO SEEK

02:23PM   7     INFORMATION ON MY INVESTMENT, AND I WASN'T GETTING IT FROM THE

02:23PM   8     COMPANY.

02:24PM   9     Q.   FOLLOWING THIS APPROXIMATE TIME PERIOD, WHAT HAPPENS WITH

02:24PM  10     THE FREQUENCY OF YOUR CONTACT WITH MS. HOLMES?

02:24PM  11     A.   IT DROPPED TO ZERO.

02:24PM  12     Q.   DID THE QUARTERLY CALLS CEASE?

02:24PM  13     A.   THEY CEASED.

02:24PM  14     Q.   WERE THERE ANY IN-PERSON MEETINGS FOLLOW THIS MID 2010

02:24PM  15     TIME PERIOD FOR THE NEXT YEAR OR TWO?

02:24PM  16     A.   NO.

02:24PM  17     Q.   DID YOU CONTINUE TO MAKE ATTEMPTS TO GET MORE INFORMATION

02:24PM  18     FROM MS. HOLMES ABOUT THERANOS?

02:24PM  19     A.   I MADE AN ATTEMPT TO GET INFORMATION WHEREVER I COULD,

02:24PM  20     FROM DIRECTORS, FROM WHATEVER SOURCES WERE AVAILABLE, AND THEY

02:24PM  21     WERE VERY LIMITED.

02:24PM  22     Q.   I'LL ASK YOU TO LOOK AT TAB 713 IN YOUR BINDER, PLEASE.

02:24PM  23     IS EXHIBIT 713 ANOTHER EMAIL CHAIN BETWEEN YOU, AND MS. HOLMES,

02:25PM  24     AND MS. MINNIG RELATING TO REQUESTS FOR INFORMATION ABOUT

02:25PM  25     THERANOS?

02:25PM  1    A.   YES.

02:25PM  2              MR. BOSTIC:  YOUR HONOR, I OFFER EXHIBIT 713.

02:25PM  3              MR. DOWNEY:  YOUR HONOR, I HAVE NO OBJECTION TO THE

02:25PM  4    DOCUMENT.  THERE ARE SOME LAYERS OF DOUBLE HEARSAY IN HERE AT

02:25PM  5    THE BOTTOM OF PAGE 4, THE FIRST SENTENCE OF THE NOVEMBER 13TH

02:25PM  6    EMAIL AT 9:39 A.M., AND THERE ARE TWO OTHER INSTANCES.

02:25PM  7              THE COURT:  MR. BOSTIC?

02:25PM  8              MR. BOSTIC:  YOUR HONOR, I DON'T NEED THIS ADMITTED

02:25PM  9    FOR THE TRUTH.  THIS IS SIMPLY TO SHOW THE CORRESPONDENCE

02:25PM  10   BETWEEN THIS WITNESS AND THE DEFENDANT.

02:26PM  11             THE COURT:  SO IT GOES TO THIS WITNESS'S STATE OF

02:26PM  12   MIND AS TO CORRESPONDENCE.

02:26PM  13             MR. BOSTIC:  CORRECT, THIS WITNESS'S STATE OF MIND

02:26PM  14   AS WELL AS HIS DECISION MAKING AND THE DEFENDANT'S STATE OF

02:26PM  15   MIND AND KNOWLEDGE.

02:26PM  16             MR. DOWNEY:  WELL, YOUR HONOR, IF I MIGHT?  IF YOU

02:26PM  17   LOOK AS WELL AT THE LAST SENTENCE ON PAGE 3 AND ON PAGE 2,

02:26PM  18   REALLY JUST THE SECOND HALF OF THE FIRST SENTENCE IN THE BOTTOM

02:26PM  19   EMAIL, THIS EMAIL IS COMPLETELY DIVORCED IN TIME FROM ANY

02:26PM  20   INVESTMENT DECISION MADE BY THIS WITNESS, IT DOESN'T DISCUSS

02:26PM  21   THAT OR SAY ANYTHING ABOUT IT.

02:26PM  22        SO I DON'T KNOW THAT THIS WITNESS'S STATE OF MIND AT THIS

02:26PM  23   POINT IN TIME IS REALLY RELEVANT TO THE CASE.

02:27PM  24             THE COURT:  WELL, I WOULD -- I THINK THE PAGE 4 THAT

02:27PM  25   YOU MENTIONED, I THINK WE CAN STRIKE THAT.

02:27PM   1          MR. BOSTIC, I DON'T THINK YOU NEED THAT.

02:27PM   2              MR. BOSTIC:  IS THAT THE EMAIL MESSAGE AT THE BOTTOM

02:27PM   3    OF PAGE 4?

02:27PM   4              THE COURT:  YES.

02:27PM   5              MR. BOSTIC:  IF I COULD HAVE A MOMENT TO MAKE SURE

02:27PM   6    THAT REDACTION GETS IMPLEMENTED.

02:27PM   7              THE COURT:  OTHERWISE I'LL ALLOW THIS TO COME IN.

02:27PM   8              MR. DOWNEY:  YOUR HONOR, IF I MIGHT?

02:27PM   9          WELL, THE INFORMATION AT THE BOTTOM OF PAGE 2 IS ACTUALLY

02:27PM  10    THE SAME AS THE COMMUNICATION AT THE BOTTOM OF PAGE 4 AND THE

02:27PM  11    FIRST SENTENCE OF THE NOVEMBER 20TH, 8:36 A.M. EMAIL.  IT'S

02:27PM  12    ESSENTIALLY THE SAME STATEMENT.

02:28PM  13              THE COURT:  YES, IT'S THE SAME CONTEXT.

02:28PM  14              MR. DOWNEY:  YES.

02:28PM  15              MR. BOSTIC:  YOUR HONOR, I THINK I SEE THAT ISSUE AS

02:28PM  16    TO SOME OF THE CONTENT IN THAT MESSAGE, BUT I THINK TO THE

02:28PM  17    EXTENT -- AND THIS IS BEING COMMUNICATED TO THE DEFENDANT --

02:28PM  18              THE COURT:  I'M LOOKING AT THIS AGAIN.  AND PARDON

02:28PM  19    ME FOR INTERRUPTING YOU, MR. BOSTIC.

02:28PM  20          I THINK I SEE YOUR CONCERN, BUT I DON'T THINK IT IS

02:28PM  21    PRESENT AS IT WAS IN 4.  SO I WILL ALLOW THIS TO COME IN,

02:28PM  22    NOTING YOUR OBJECTION.

02:28PM  23          SO YOU CAN REDACT THAT LAST PORTION.

02:28PM  24              MR. BOSTIC:  UNDERSTOOD.

02:28PM  25          WITH THE EXCEPTION OF THE BOTTOM MESSAGE ON PAGE 4, IS

02:28PM 1    THAT DOCUMENT ADMITTED, YOUR HONOR?

02:28PM 2              THE COURT:  YES.

02:28PM 3              MR. BOSTIC:  MAY I PUBLISH?

02:28PM 4              THE COURT:  YES, YOU MAY PUBLISH.

02:28PM 5         (GOVERNMENT'S EXHIBIT 713, REDACTED, WAS RECEIVED IN

02:28PM 6    EVIDENCE.)

02:28PM 7    BY MR. BOSTIC:

02:29PM 8    Q.   WHILE WE'RE WAITING FOR THAT TO COME UP ON THE SCREEN,

02:29PM 9    MR. EISENMAN, CAN YOU EXPLAIN IN NOVEMBER OF 2012, WHAT

02:29PM 10   ADDITIONAL EFFORTS WERE YOU MAKING TO TRY TO LEARN ABOUT THE

02:29PM 11   STATUS OF THERANOS?

02:29PM 12   A.   I WAS REACHING OUT TO DON LUCAS, WHO WAS CHAIRMAN OF THE

02:29PM 13   BOARD.

02:29PM 14   Q.   AND WHAT WAS YOUR PURPOSE IN REACHING OUT TO MR. LUCAS?

02:29PM 15   A.   TO GET UPDATED INFORMATION ON MY INVESTMENT.

02:29PM 16   Q.   LET'S LOOK AT PAGE 3 OF THIS EXHIBIT.  LET'S ZOOM IN ON

02:29PM 17   THE BOTTOM EMAIL MESSAGE.

02:29PM 18        ARE WE LOOKING AT AN EMAIL FROM SOMEONE IN DON LUCAS'S

02:29PM 19   OFFICE TO MS. HOLMES CC'ING YOU?

02:29PM 20   A.   YES.

02:29PM 21   Q.   AND SHE SAYS TO ELIZABETH HOLMES, "PLEASE SEE THE NOTE

02:29PM 22   FROM ALAN EISENMAN.  WOULD YOU PLEASE HAVE THE APPROPRIATE

02:29PM 23   PERSON GET IN TOUCH WITH HIM TO PROVIDE A STATUS REPORT?"

02:29PM 24        DO YOU SEE THAT?

02:29PM 25   A.   YES.

02:29PM   1       Q.   AND LET'S JUST ABOVE THAT MESSAGE.  AND THERE'S A MESSAGE

02:30PM   2   FROM MS. HOLMES DIRECTLY TO YOU.

02:30PM   3       DO YOU SEE THAT?

02:30PM   4       A.   YES.

02:30PM   5       Q.   AND SHE SAYS, "ALAN,

02:30PM   6       "WE HAVE COMMUNICATED ABOUT THIS MULTIPLE TIMES BEFORE YET

02:30PM   7   YOU CHOOSE TO CONTINUE GOING DOWN THIS PATH."

02:30PM   8       WHAT WAS YOUR UNDERSTANDING OF WHAT MS. HOLMES WAS

02:30PM   9   REFERENCING THERE?

02:30PM  10       A.   I FIRST TRIED TO CORRESPOND WITH ELIZABETH ABOUT A

02:30PM  11   BUSINESS UPDATE, WOULD NOT GET A RESPONSE, SO I WAS THEN TRYING

02:30PM  12   TO COMMUNICATE WITH THE CHAIRMAN OF THE BOARD, DON LUCAS, AND

02:30PM  13   THAT WAS NOT TAKEN VERY KINDLY BY ELIZABETH THAT I APPARENTLY

02:30PM  14   WAS GOING AROUND HER.

02:30PM  15       Q.   LET'S LOOK AT YOUR RESPONSE ON PAGE 2, AND LET'S ZOOM IN

02:30PM  16   ON THE BOTTOM OF PAGE 2.

02:30PM  17       MR. EISENMAN, IS THIS A MESSAGE FROM YOU TO MS. HOLMES ON

02:30PM  18   NOVEMBER 20TH, 2012?

02:30PM  19       A.   YES, IT IS.

02:30PM  20       Q.   YOU WRITE, "ELIZABETH.

02:31PM  21       "IT HAS BEEN OVER 2 YEARS SINCE YOU COMMUNICATED WITH YOUR

02:31PM  22   INVESTORS.  I EMAILED YOU ONE WEEK AGO, FOLLOWING YOUR

02:31PM  23   INSTRUCTIONS THAT INVESTORS SHOULD COMMUNICATE DIRECTLY WITH

02:31PM  24   THE COMPANY."

02:31PM  25       YOU THEN ASK WHETHER MS. HOLMES CAN'T OR WON'T COMMUNICATE

02:31PM   1    WITH YOU OR OTHER INVESTORS?

02:31PM   2        IS THIS ALL PART OF YOUR CONTINUING EFFORTS TO TRY TO

02:31PM   3    REESTABLISH COMMUNICATION SO THAT YOU COULD GET INFORMATION

02:31PM   4    ABOUT THE COMPANY?

02:31PM   5    A.   YES.

02:31PM   6    Q.   IN NOVEMBER OF 2012, WERE YOUR EFFORTS SUCCESSFUL?  WERE

02:31PM   7    YOU ABLE TO OBTAIN ANY UPDATED INFORMATION ABOUT THE STATUS OF

02:31PM   8    THERANOS?

02:31PM   9    A.   NO.

02:31PM  10    Q.   DID THERE COME A TIME WHEN YOU CONSIDERED INVESTING MORE

02:31PM  11    MONEY IN THERANOS?

02:31PM  12    A.   YES.

02:31PM  13    Q.   AND WHEN DID THAT HAPPEN?

02:31PM  14    A.   IN 2013 WHEN THEY APPARENTLY WERE SUCCESSFUL IN PERFECTING

02:32PM  15    THEIR READER AND THEY WERE TRYING TO RAISE GROWTH CAPITAL TO

02:32PM  16    MOVE THE COMPANY FORWARD IN A FASTER FASHION.

02:32PM  17    Q.   BEFORE THAT INVESTMENT, DID YOU HAVE A CALL WITH

02:32PM  18    SUNNY BALWANI IN MID 2014?

02:32PM  19    A.   YES.

02:32PM  20    Q.   AND WHAT DO YOU RECALL ABOUT THAT TELEPHONE CALL?

02:32PM  21    A.   THE CALL WAS UNUSUALLY FRIENDLY AFTER A PERIOD OF VERY

02:32PM  22    STRONG HOSTILITY.

02:32PM  23        IN RETROSPECT, THEY WERE RAISING MONEY, AND WHEN YOU ARE

02:32PM  24    RAISING MONEY SOMETIMES YOU PUT ON A DIFFERENT FACE.

02:32PM  25        I WOULD BE HESITANT TO COMMIT MORE CAPITAL TO A COMPANY

02:33PM   1    THAT WAS NOT COMMUNICATING WITH A SHAREHOLDER, BUT WITH THE

02:33PM   2    PUBLICITY SURROUNDING THEIR LAUNCH OF THIS ROUND AND WITH THE

02:33PM   3    INFORMATION THAT I GOT FROM DIRECT CONVERSATIONS WITH SUNNY AND

02:33PM   4    ELIZABETH, I WAS OF THE UNDERSTANDING THAT NOT ONLY WAS THE

02:33PM   5    TECHNOLOGY WORKING, THERE WAS A HUGE AND GROWING MARKET THAT

02:33PM   6    WAS ALSO COMMUNICATED TO ME THAT BECAUSE I WAS AN EARLIER

02:33PM   7    INVESTOR, THEY WERE DOING A SPECIAL FAVOR FOR EXISTING

02:33PM   8    INVESTORS, THEY WERE PRICING THIS ROUND AT $15 A SHARE, AND IT

02:33PM   9    WAS A SMALL ROUND, AND AFTER THEY FINISHED RAISING THE MONEY IN

02:33PM   10   THIS ROUND, THEY WERE GOING TO DO A MUCH LARGER INSTITUTIONAL

02:33PM   11   ROUND AT $17 A SHARE.

02:33PM   12   Q.   THE INFORMATION THAT YOU JUST DESCRIBED GETTING FROM

02:33PM   13   MS. HOLMES AND MR. BALWANI, DID YOU OBTAIN THAT INFORMATION IN

02:33PM   14   2013 BEFORE YOU MADE THE DECISION TO INVEST MORE MONEY?

02:34PM   15   A.   YES.

02:34PM   16   Q.   LET'S LOOK AT SOME OF THE PUBLICITY THAT YOU WERE TALKING

02:34PM   17   ABOUT.

02:34PM   18        LET'S START WITH EXHIBIT 1106, WHICH IS IN EVIDENCE.

02:34PM   19        PERMISSION TO PUBLISH, YOUR HONOR?

02:34PM   20            THE COURT:   YES.

02:34PM   21   BY MR. BOSTIC:

02:34PM   22   Q.   THIS IS IN YOUR BINDER BUT ALSO ON THE SCREEN IN FRONT OF

02:34PM   23   YOU OR WILL BE.

02:34PM   24   A.   OKAY.

02:34PM   25   Q.   DO YOU SEE IN FRONT OF YOU A "WALL STREET JOURNAL" ARTICLE

02:34PM  1    DATED SEPTEMBER 8TH, 2013?

02:34PM  2    A.   YES, I DO.

02:34PM  3    Q.   AND THE TITLE IS "ELIZABETH HOLMES:  THE BREAKTHROUGH OF

02:34PM  4    INSTANT DIAGNOSIS"?

02:34PM  5    A.   YES.

02:34PM  6    Q.   AND DO YOU RECALL READING THIS ARTICLE?

02:34PM  7    A.   YES.

02:34PM  8    Q.   AND GENERALLY SPEAKING, WHAT WAS YOUR REACTION UPON

02:34PM  9    READING THIS PIECE ABOUT THERANOS?

02:34PM  10   A.   TREMENDOUS AMOUNT OF EXCITEMENT AND ENTHUSIASM.

02:34PM  11   Q.   FIRST LOOK AT SOME OF THE CONTENT.

02:34PM  12        FIRST LET'S GO DOWN AND LOOK AT THE FIRST INDENTED

02:34PM  13   PARAGRAPH ON PAGE 1.

02:35PM  14        MR. EISENMAN, DO YOU SEE IN THIS ARTICLE LANGUAGE THAT

02:35PM  15   SAYS, "THE SECRET THAT HUNDREDS OF EMPLOYEES ARE NOW REFINING

02:35PM  16   INVOLVES DEVICES THAT AUTOMATE AND MINIATURIZE MORE THAN 1,000

02:35PM  17   LABORATORY TESTS"?

02:35PM  18   A.   YES.

02:35PM  19   Q.   AND DO YOU SEE BELOW THAT A CLAIM THAT "THERANOS'S

02:35PM  20   PROCESSES ARE FASTER, CHEAPER, AND MORE ACCURATE THAN THE

02:35PM  21   CONVENTIONAL METHODS AND REQUIRE ONLY MICROSCOPIC BLOOD

02:35PM  22   VOLUMES, NOT VIAL AFTER VIAL OF THE STUFF"?

02:35PM  23   A.   YES.

02:35PM  24   Q.   I WANT TO ASK YOU ABOUT THOSE CLAIMS.

02:35PM  25        FIRST, "AUTOMATING AND MINIATURIZING MORE THAN 1,000

02:35PM  1    LABORATORY TESTS," THE ABILITY OF THE DEVICE TO DO THAT, WAS

02:35PM  2    THAT AN IMPORTANT FACT TO YOU AS A POTENTIAL INVESTOR?

02:35PM  3    A.   YES.

02:35PM  4    Q.   WHY?

02:35PM  5    A.   BECAUSE THIS IS WHAT LABCORP AND QUEST DO WITH MUCH LARGER

02:35PM  6    BLOOD DRAWS AND THEY CAN ONLY ANALYZE A LIMITED NUMBER OF

02:36PM  7    TESTS.

02:36PM  8        SO THIS IS A BREAKTHROUGH IN TERMS OF THE VOLUME OF BLOOD,

02:36PM  9    AND THE QUANTITY OF TESTS, AND THE SPEED OF RESULTS BACK TO THE

02:36PM  10   PATIENT.

02:36PM  11   Q.   SO THE SPEED OF THE TECHNOLOGY WAS ALSO A MATERIAL FACT TO

02:36PM  12   YOU?

02:36PM  13   A.   YES.

02:36PM  14   Q.   HOW ABOUT ACCURACY, THAT PARAGRAPH SAYS THAT THERANOS'S

02:36PM  15   PROCESSES WERE MORE ACCURATE THAN THE CONVENTIONAL METHODS.

02:36PM  16       DO YOU SEE THAT LANGUAGE?

02:36PM  17   A.   YES.

02:36PM  18   Q.   WAS THE ACCURACY OF THE THERANOS DEVICE IMPORTANT TO YOU

02:36PM  19   WHEN YOU WERE DECIDING WHETHER TO INVEST MORE MONEY IN THE

02:36PM  20   COMPANY?

02:36PM  21   A.   YES, BECAUSE IT'S IMPORTANT TO PATIENTS AND IT'S IMPORTANT

02:36PM  22   TO THE MEDICAL COMMUNITY.  IT'S A VALUE PROPOSITION.

02:36PM  23   Q.   BEFORE YOU INVESTED, DID YOU EVER HAVE CONVERSATIONS WITH

02:36PM  24   MS. HOLMES ABOUT THE CAPABILITIES OF THE THERANOS TECHNOLOGY?

02:36PM  25   A.   YES.

02:36PM  1    Q.   AND DID SHE EVER MAKE ANY COMPARISONS HOLDING UP

02:36PM  2    THERANOS'S ANALYZERS TO THE CONVENTIONAL ANALYZERS THAT WERE

02:37PM  3    USED BY OTHER LABS?

02:37PM  4    A.   YES.

02:37PM  5    Q.   AND WHAT DID SHE SAY ABOUT HOW THERANOS'S STACKED UP?

02:37PM  6    A.   SHE COMPARED HER TECHNOLOGY TO THE TWO BIG PLAYERS IN THE

02:37PM  7    MARKET, LABCORP AND QUEST, AND SAID THAT HERS WERE CHEAPER,

02:37PM  8    FASTER, MORE ACCURATE, SMALLER BLOOD DRAW.

02:37PM  9    Q.   THE SAME REPRESENTATIONS THAT YOU SEE IN THE ARTICLE IN

02:37PM  10   FRONT OF YOU?

02:37PM  11   A.   YES.

02:37PM  12   Q.   LET'S LOOK AT PAGE 2 OF THIS ARTICLE.  AND LET'S ZOOM IN

02:37PM  13   ON THE BOTTOM HALF OF THE PAGE.  THERE'S A PARAGRAPH BEGINNING

02:37PM  14   "THERANOS'S TECHNOLOGY."

02:37PM  15        MS. HOLLIMAN, LET'S SEE IF WE CAN -- THAT'S PERFECT.

02:37PM  16        DO YOU SEE AT THE TOP, MR. EISENMAN, IT SAYS, "THERANOS'S

02:37PM  17   TECHNOLOGY ELIMINATES MULTIPLE LAB TRIPS BECAUSE IT CAN 'RUN

02:38PM  18   ANY COMBINATION OF TESTS, INCLUDING SETS OF FOLLOW-ON TESTS,'

02:38PM  19   AT ONCE VERY QUICKLY ALL FROM A SINGLE MICRO SAMPLE."

02:38PM  20   A.   YES.

02:38PM  21   Q.   WAS THE ABILITY OF THE TECHNOLOGY TO RUN ANY COMBINATION

02:38PM  22   OF TESTS ALL FROM A SINGLE MICRO SAMPLE AN IMPORTANT FACT FOR

02:38PM  23   YOU?

02:38PM  24   A.   YES.

02:38PM  25   Q.   AND WHY IS THAT?

A.   IT'S ONE OF MANY FACTORS THAT SHOW THAT THIS TECHNOLOGY IS

SUPERIOR TO CONVENTIONAL TECHNOLOGIES IN THE COMPANIES THAT

THERANOS WAS GOING TO COMPETE AGAINST, LABCORP AND QUEST, ARE

MULTI BILLION DOLLAR COMPANIES.

Q.   AT THE BOTTOM OF THIS PAGE IN THE SECOND TO LAST PARAGRAPH

THERE'S A PARAGRAPH THAT BEGINS, "THAT'S BECAUSE THE PRECISION

OF LAB INSTRUMENTS, AND THEIR REFERENCE RANGES, VARY FROM

MANUFACTURE TO MANUFACTURER.  LABS BUY FROM DIFFERENT VENDORS

AND OFTEN DON'T CALIBRATE THE MACHINES TO EACH OTHER."

     DO YOU SEE THAT?

A.   YES.

Q.   DID MS. HOLMES EVER TELL YOU ABOUT THERANOS PURCHASING

ANALYZERS FROM OTHER MANUFACTURERS?

A.   NEVER.

Q.   WAS THE COMPANY'S ABILITY TO RUN ALL OF ITS TESTS ON ITS

OWN TECHNOLOGY AN IMPORTANT FACT FOR YOU AS A POTENTIAL

INVESTOR?

A.   YES.

Q.   I'LL ASK YOU TO TURN NOW TO TAB 1334 IN THE BINDER.  THAT

SHOULD BE THE NEXT ONE.

     AND DO YOU RECOGNIZE 1334?

A.   YES.

Q.   IS THIS A DECEMBER EMAIL CHAIN -- I'M SORRY, DECEMBER 2013

EMAIL CHAIN BETWEEN YOU AND THERANOS RELATING TO A POTENTIAL

INVESTMENT?

02:39PM   1    A.   YES.

02:39PM   2              MR. BOSTIC:  YOUR HONOR, I OFFER EXHIBIT 1334.

02:39PM   3              MR. DOWNEY:  NO OBJECTION.

02:39PM   4              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:40PM   5         (GOVERNMENT'S EXHIBIT 1334 WAS RECEIVED IN EVIDENCE.)

02:40PM   6    BY MR. BOSTIC:

02:40PM   7    Q.   LET'S START WITH THE BOTTOM OF PAGE 1.

02:40PM   8    MR. EISENMAN, DO YOU SEE AN EMAIL SENT FROM THERANOS AT

02:40PM   9    THE EMAIL ADDRESS SHAREHOLDERINFO@THERANOS.COM TO YOU?

02:40PM  10    A.   YES.

02:40PM  11    Q.   AND THIS IS ON DECEMBER 16TH, 2013; IS THAT RIGHT?

02:40PM  12    A.   YES.

02:40PM  13    Q.   SO A FEW MONTHS AFTER THE ARTICLE THAT WE JUST LOOKED AT?

02:40PM  14    A.   YES.

02:40PM  15    Q.   THE EMAIL SAYS, "DEAR ALAN.

02:40PM  16    "WE HOPE THIS EMAIL FINDS YOU WELL."

02:40PM  17    AND THEN IT SAYS BELOW, "PLEASE FIND A MEMO TO

02:40PM  18    STOCKHOLDERS REGARDING CERTAIN DEALS AND TRANSACTIONS."

02:40PM  19    DO YOU SEE THAT?

02:40PM  20    A.   YES.

02:40PM  21    Q.   AND LET'S LOOK AT THAT MEMO ON PAGE 2 OF THAT EXHIBIT, AND

02:40PM  22    LET'S ZOOM IN ON THE TOP THIRD.

02:41PM  23    AND DO YOU SEE THAT THIS MEMO TO THERANOS INVESTORS SAYS,

02:41PM  24    "WITH OUR LAUNCH TO CONSUMER HEALTH CARE THIS YEAR, WE ARE

02:41PM  25    RAPIDLY SCALING TO ESTABLISH A NATIONAL FOOTPRINT AND CAPTURE

02:41PM  1    THE OPPORTUNITY WE HAVE TO SERVE AS THE ONLY CERTIFIED,

02:41PM  2    NATIONAL LABORATORY CAPABLE OF RUNNING ANY OF ITS LABORATORY

02:41PM  3    TESTS FROM A FEW TINY DROPLETS OF BLOOD."

02:41PM  4        DO YOU SEE THAT?

02:41PM  5    A.   YES.

02:41PM  6    Q.   AND WHEN IT REFERENCES THE LAUNCH TO CONSUMER HEALTH CARE

02:41PM  7    THAT YEAR, WHAT DID YOU UNDERSTAND THAT TO MEAN?

02:41PM  8    A.   MY UNDERSTANDING WAS THE TECHNOLOGY WAS PROVEN, AND THEY

02:41PM  9    WERE OFFERING THE SHAREHOLDERS A DISCOUNTED VALUE BEFORE THEY

02:41PM 10    RAISED THE PRICE AND RAISED A SIGNIFICANT AMOUNT OF ADDITIONAL

02:41PM 11    CAPITAL TO GROW THE COMPANY, AND THIS IS WHAT I THOUGHT WAS

02:41PM 12    GROWTH CAPITAL.

02:41PM 13        THE COMPANY HAD PROVEN ITSELF, AND NOW THEY WERE TRYING TO

02:41PM 14    SCALE UP AS FAST AS POSSIBLE AND TAKING IN CAPITAL TO SCALE UP.

02:41PM 15    Q.   AT THE BOTTOM OF THAT PARAGRAPH THERE'S LANGUAGE THAT

02:42PM 16    SAYS, "WE ARE ACTIVELY INVESTING IN INFRASTRUCTURE TO BUILD

02:42PM 17    THIS NEW INDUSTRY WE HAVE CREATED."

02:42PM 18        DID THAT CONTRIBUTE TO THAT IMPRESSION IN YOUR MIND?

02:42PM 19    A.   YES.

02:42PM 20    Q.   THE LANGUAGE IN THAT MEMO THAT SAYS, "WE ARE RAPIDLY

02:42PM 21    SCALING," DID THAT LANGUAGE HAVE ANY EFFECT ON YOUR PERCEPTION

02:42PM 22    OF THE AMOUNT OF RISK INVOLVED IN THIS INVESTMENT?

02:42PM 23    A.   YES.

02:42PM 24    Q.   HOW SO?

02:42PM 25    A.   THE INVESTMENT WAS SUBSTANTIALLY DE-RISKED.

02:42PM  1    Q.   IN WHAT WAY?

02:42PM  2    A.   THEY HAD PROVEN THEMSELVES, THEY HAD A TECHNOLOGY THAT

02:42PM  3    THEY CLAIMED WORKED, THERE WAS A HUGE MARKET, AND THIS WAS AN

02:42PM  4    OPPORTUNITY TO RAISE CAPITAL TO GROW THAT MARKET AS RAPIDLY AS

02:43PM  5    POSSIBLE.

02:43PM  6    Q.   LET'S LOOK AT TAB 1371 NEXT.

02:43PM  7         AND I WANT TO HAVE YOU TAKE A LOOK AT THE FIRST EIGHT

02:43PM  8    PAGES OF 1371.

02:43PM  9         AND IS THAT AN EMAIL CHAIN BETWEEN YOU AND MR. BALWANI

02:43PM  10   RELATING TO THIS POTENTIAL INVESTMENT IN DECEMBER OF 2013?

02:43PM  11   A.   YES.

02:43PM  12            MR. BOSTIC:  YOUR HONOR, I OFFER PAGES 1 THROUGH 8

02:43PM  13   OF EXHIBIT 1371.

02:43PM  14            MR. DOWNEY:  1 THROUGH 8 IS FINE, YOUR HONOR.  NO

02:43PM  15   OBJECTION.

02:43PM  16            THE COURT:  THOSE PAGES ARE ADMITTED.  THEY MAY BE

02:43PM  17   PUBLISHED.

02:43PM  18        (GOVERNMENT'S EXHIBIT 1371, PAGES 1 THROUGH 8, WAS

02:43PM  19   RECEIVED IN EVIDENCE.)

02:43PM  20   BY MR. BOSTIC:

02:44PM  21   Q.   AND LET'S START WITH PAGE 6 OF THAT EXHIBIT.

02:44PM  22        AND AT THE BOTTOM OF PAGE 6, MR. EISENMAN, DO YOU SEE THE

02:44PM  23   MESSAGE TO ALL STOCKHOLDERS THAT WE WERE JUST LOOKING AT?

02:44PM  24   A.   YES.

02:44PM  25   Q.   LET'S GO TO PAGE 3, AND AT THE BOTTOM OF PAGE 3 THERE'S AN

02:44PM 1    EMAIL FROM YOU BACK TO THERANOS.

02:44PM 2        DO YOU SEE THAT?

02:44PM 3    A.   YES.

02:44PM 4    Q.   AND YOU ASK FOR A PHONE CALL.  AND YOU SAY, "I WOULD LIKE

02:44PM 5    TO KNOW HOW MUCH ADDITIONAL INVESTMENT IS AVAILABLE, AND WHAT

02:44PM 6    THE TIMING IS FOR PAPERWORK IN, AND FUNDING."

02:44PM 7        DO YOU SEE THAT?

02:44PM 8    A.   YES.

02:44PM 9    Q.   AND YOU SAY, "WE MAY BE INTERESTED IN $1 MILLION."

02:44PM 10       IS THAT CORRECT?

02:44PM 11   A.   YES.

02:44PM 12   Q.   AND THIS EMAIL WAS SENT TO THERANOS AT THAT SHAREHOLDER

02:44PM 13   INFO ADDRESS; IS THAT RIGHT?

02:44PM 14   A.   CORRECT.

02:44PM 15   Q.   AND LET'S LOOK AT THE EMAIL MESSAGE ABOVE THIS ONE.

02:45PM 16       AND SEE WE THAT SUNNY BALWANI WRITES DIRECTLY BACK TO YOU;

02:45PM 17   IS THAT CORRECT?

02:45PM 18   A.   YES.

02:45PM 19   Q.   AND HE SAYS, "ALAN.

02:45PM 20       LET ME KNOW WHAT TIME WOULD BE GOOD TO TALK AND I CAN CALL

02:45PM 21   AND DISCUSS THIS."

02:45PM 22       DO YOU SEE THAT?

02:45PM 23   A.   YES.

02:45PM 24   Q.   AND LET'S LOOK AT THE NEXT EMAIL IN THE CHAIN ABOVE THAT.

02:45PM 25   JUST ZOOM IN ON THE TOP PORTION OF THE PAGE.

02:45PM  1      A.   OKAY.

02:45PM  2      Q.   DID WE LOSE ALL OF THE SCREENS OR JUST MINE?  IS YOUR

02:45PM  3      SCREEN STILL DISPLAYING THE DOCUMENT?

02:45PM  4      A.   YES.

02:45PM  5      Q.   AT THE TOP OF THE PAGE DO YOU SEE A MESSAGE FROM YOU THAT

02:45PM  6      SAYS, "I AM AVAILABLE ANY TIME TODAY UNTIL MIDNIGHT CENTRAL

02:45PM  7      TIME"?

02:45PM  8      A.   YES.

02:45PM  9      Q.   AND ABOVE THAT MR. BALWANI WRITES, "OK.  I WILL CALL YOU

02:45PM  10     IN 5-10 MINUTES"?

02:45PM  11     A.   YES.

02:45PM  12     Q.   HOW DID THIS LEVEL OF RESPONSIVENESS COMPARE TO WHAT YOU

02:45PM  13     HAD BEEN EXPERIENCING FROM THE COMPANY IN THE MONTHS AND YEARS

02:46PM  14     LEADING UP TO IT?

02:46PM  15     A.   SHOCKING AND SURPRISING.

02:46PM  16     Q.   IN WHAT WAY?

02:46PM  17     A.   HE WAS -- TO SAY IT MINIMALLY, HE WAS HOSTILE FOR AN

02:46PM  18     EXTENDED PERIOD OF TIME AND NOT ONLY NONRESPONSIVE BUT ACTUALLY

02:46PM  19     AGGRESSIVE IN HIS COMMUNICATIONS WITH ME IN THE PAST COUPLE OF

02:46PM  20     YEARS.

02:46PM  21     Q.   SO THIS WAS A CHANGE IN TUNE TO THAT?

02:46PM  22     A.   180 DEGREES.

02:46PM  23     Q.   LET'S LOOK AT PAGE 2 OF THIS EXHIBIT AND THE TOP HALF.

02:46PM  24          DO YOU SEE AN EMAIL FROM MR. BALWANI TO YOU ON CHRISTMAS,

02:46PM  25     2013?

Case 5:22-cr-00258-EJD Document 1285, Filed 01/18/23, Page 215 of 275

02:46PM  1     A.   YES.

02:46PM  2     Q.   AND HE THANKS YOU FOR YOUR EMAIL, AND HE SENDS YOU A

02:46PM  3     SIGNATURE PAGE AND WIRING INSTRUCTIONS.

02:46PM  4          WAS THAT TO FACILITATE YOUR INVESTMENT IN THERANOS?

02:46PM  5     A.   YES.

02:46PM  6     Q.   FINALLY, LET'S GO TO PAGE 1 OF THIS EXHIBIT.

02:47PM  7          LET'S ZOOM IN ON FIRST THE BOTTOM HALF.

02:47PM  8          MR. EISENMAN, DO YOU SEE THAT YOU'RE ASKING SOME QUESTIONS

02:47PM  9     HERE IN CONNECTION WITH THIS POTENTIAL INVESTMENT?

02:47PM  10    A.   YES.

02:47PM  11    Q.   GENERALLY SPEAKING, WHY DID YOU WANT TO OBTAIN THIS

02:47PM  12    INFORMATION FROM THE COMPANY?

02:47PM  13    A.   TO FIND OUT MORE ABOUT THE SIZE OF THE ROUND VERSUS THE

02:47PM  14    SIZE OF THE NEXT ROUND.  AND IF ANY DIRECTORS ARE PARTICIPATING

02:47PM  15    IN THE ROUND, THAT'S A VERY POSITIVE SIGN IF DIRECTORS OF THE

02:47PM  16    COMPANY ARE ALSO PUTTING MONEY IN AT THIS ROUND.

02:47PM  17    Q.   LET'S LOOK AT THE TOP MESSAGE ON THIS PAGE.

02:48PM  18         DO YOU SEE THAT MESSAGE WHICH IS A RESPONSE FROM

02:48PM  19    MR. BALWANI TO YOU?

02:48PM  20    A.   YES.

02:48PM  21    Q.   IN SHORT, HE DECLINES TO PROVIDE THE REQUESTED

02:48PM  22    INFORMATION; IS THAT RIGHT?

02:48PM  23    A.   THAT'S CORRECT.

02:48PM  24    Q.   AROUND THIS TIME PERIOD DID YOU ALSO LOOK AT THE THERANOS

02:48PM  25    PUBLIC WEBSITE?

02:48PM    1      A.   YES.

02:48PM    2      Q.   DID YOU LOOK AT IT IN ORDER TO GAIN MORE INFORMATION TO

02:48PM    3   HELP YOU DECIDE WHETHER TO INVEST IN THE COMPANY?

02:48PM    4      A.   YES.

02:48PM    5      Q.   AND DID THE INFORMATION ON THE WEBSITE ALSO MAKE YOU FEEL

02:48PM    6   POSITIVE OR INCLINED TO INVEST IN THE COMPANY?

02:48PM    7      A.   YES.

02:48PM    8      Q.   LET'S LOOK AT EXHIBIT 4845.

02:48PM    9           YOUR HONOR, THIS IS IN EVIDENCE.  PERMISSION TO PUBLISH?

02:48PM   10              THE COURT:  YES.

02:48PM   11   BY MR. BOSTIC:

02:48PM   12      Q.   LET'S GO TO PAGE 18 OF 4845.

02:48PM   13           MR. EISENMAN, DO YOU SEE ON THE SCREEN IN FRONT OF YOU A

02:48PM   14   WIRE TRANSFER RECORD?  IT MAY NOT BE IN YOUR BINDER.

02:49PM   15      A.   OKAY.  I DON'T SEE IT IN MY BINDER.  BUT, YES, I DO SEE A

02:49PM   16   WIRE TRANSFER.

02:49PM   17      Q.   AND IF YOU LOOK AT THE LINE NEAR THE TOP LABELLED OMAD

02:49PM   18   THERE'S A DATE INDICATED DECEMBER 30TH, 2013.

02:49PM   19           DO YOU SEE THAT?

02:49PM   20      A.   YES.

02:49PM   21      Q.   AND THIS WIRE TRANSFER IS IN THE AMOUNT OF $99,990.

02:49PM   22           DO YOU SEE THAT?

02:49PM   23      A.   YES.

02:49PM   24      Q.   WAS THIS THE WIRE TRANSFER FOR WHICH YOU INVESTED MORE

02:49PM   25   MONEY IN THERANOS IN DECEMBER?

02:49PM 1      A.   YES, IT IS.

02:49PM 2      Q.   AND WE SEE THAT YOUR NAME IS INDICATED UNDER ORIGINATOR.

02:49PM 3           DO YOU SEE THAT?

02:49PM 4      A.   YES.

02:49PM 5      Q.   AND THERANOS IS LISTED UNDER BENEFICIARY.

02:49PM 6           DO YOU SEE THAT?

02:49PM 7      A.   YES.

02:49PM 8      Q.   TOWARDS THE BOTTOM OF THE PAGE?

02:49PM 9      A.   YES.

02:49PM 10     Q.   SO AT THE POINT THAT YOU DECIDED TO INVEST, YOU JUST

02:49PM 11     TESTIFIED THAT YOU HAD HAD A CONTENTIOUS, LET'S CALL IT,

02:50PM 12     RELATIONSHIP WITH MR. BALWANI; IS THAT RIGHT?

02:50PM 13     A.   THAT'S PUTTING IT MILDLY.

02:50PM 14     Q.   YOU HAD HAD SOME DIFFICULTY GETTING INFORMATION FROM

02:50PM 15     MS. HOLMES?

02:50PM 16     A.   YES.

02:50PM 17     Q.   WHY DID YOU DECIDE TO INVEST MORE IN THERANOS FOLLOWING

02:50PM 18     THAT EXPERIENCE?

02:50PM 19     A.   THIS IS WHAT WE CALL A SEAT AT THE TABLE.  IF YOU PUT

02:50PM 20     MONEY IN AT AN EARLY STAGE AND THEY ARE SUCCESSFUL, YOU'RE THE

02:50PM 21     FIRST ONE THAT IS ALLOWED TO PUT MONEY IN AS THEY RAISE MORE

02:50PM 22     MONEY AND THE VALUATION INCREASES.

02:50PM 23          AND THIS WAS RATIFIED BY THE PRESS AND BY THIRD PARTIES,

02:50PM 24     AND BY SUNNY AND BY ELIZABETH, THAT THEY WERE SUCCESSFUL, THAT

02:50PM 25     THEY HAD CROSSED THE FINISH LINE, AND THIS WAS TO GROW THE

02:50PM   1    COMPANY.

02:50PM   2         THEY ALSO TOLD ME THAT THIS WAS A SPECIAL VALUATION FOR

02:50PM   3    EXISTING SHAREHOLDERS; THAT THEY WERE GOING TO ALLOW US IN A

02:50PM   4    SMALL ROUND TO BUY STOCK AT $15 A SHARE, AND THEY WERE GOING TO

02:51PM   5    CLOSE THIS ROUND, AND SHORTLY THEREAFTER THEY WERE GOING TO DO

02:51PM   6    A MUCH MORE INSTITUTIONAL ROUND AT $17 A SHARE.

02:51PM   7    Q.   AND IN YOUR MIND THOSE FACTS WERE ENOUGH TO OVERCOME THE

02:51PM   8    EXPERIENCE THAT YOU HAD HAD IN TRYING TO GET INFORMATION IN THE

02:51PM   9    PAST?

02:51PM  10    A.   YES.

02:51PM  11    Q.   LET'S MOVE FORWARD IN TIME TO 2014.

02:51PM  12         I'LL ASK YOU TO LOOK AT TAB 2223 IN THE BINDER.

02:51PM  13         AND IS THIS AN EMAIL CHAIN BETWEEN YOU, ELIZABETH HOLMES,

02:51PM  14    AND SUNNY BALWANI RELATING TO SOME INFORMATION ABOUT THERANOS?

02:51PM  15    A.   YES.

02:51PM  16              MR. BOSTIC:  YOUR HONOR, I OFFER EXHIBIT 2223.

02:51PM  17              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

02:51PM  18              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:51PM  19         (GOVERNMENT'S EXHIBIT 2223 WAS RECEIVED IN EVIDENCE.)

02:52PM  20    BY MR. BOSTIC:

02:52PM  21    Q.   LET'S START AT THE BOTTOM OF PAGE 1 OF 2223.

02:52PM  22         MR. EISENMAN, DO YOU SEE AN EMAIL THAT YOU SENT ON

02:52PM  23    OCTOBER 8TH, 2014, TO MS. HOLMES AND MR. BALWANI?

02:52PM  24    A.   YES.

02:52PM  25    Q.   AND THE SUBJECT IS "NEGATIVE REPORT ON THERANOS FROM UBS"?

02:52PM  1    A.   YES.

02:52PM  2    Q.   AND FIRST OF ALL, LET ME ASK, BETWEEN THE TIME OF YOUR

02:52PM  3    INVESTMENT AT THE END OF 2013, AND AT THIS POINT IN LATE 2014,

02:52PM  4    HAD YOU REESTABLISHED COMMUNICATION WITH MS. HOLMES AT

02:52PM  5    THERANOS?

02:52PM  6    A.   NO.

02:52PM  7    Q.   HAD YOU HAD ANY ADDITIONAL LUCK IN OBTAINING MORE DETAILS

02:52PM  8    ABOUT HOW THE COMPANY WAS DOING?

02:52PM  9    A.   NO.

02:52PM  10   Q.   DURING THIS TIME PERIOD WERE YOU MONITORING PUBLIC MEDIA

02:52PM  11   TO TRY TO GET INFORMATION ABOUT THE COMPANY?

02:52PM  12   A.   YES.

02:52PM  13   Q.   IN THIS EMAIL YOU WRITE TO MS. HOLMES AND MR. BALWANI

02:52PM  14   PROVIDING INFORMATION ABOUT A UBS REPORT ON THERANOS; IS THAT

02:53PM  15   CORRECT?

02:53PM  16   A.   YES.

02:53PM  17   Q.   YOUR EMAIL SAYS THAT UBS CLAIMS THAT THE BLOOD SAMPLES

02:53PM  18   HAVE TO BE SENT TO PALO ALTO, THEY ARE LESS RELIABLE THAN

02:53PM  19   TRADITIONAL TESTS, AND THE TURNAROUND TIME IS OVER 24 HOURS.

02:53PM  20        DO YOU SEE THAT?

02:53PM  21   A.   YES.

02:53PM  22   Q.   AND WAS READING THESE CLAIMS ABOUT THE COMPANY CONCERNING

02:53PM  23   TO YOU AT THIS TIME?

02:53PM  24   A.   DEEPLY CONCERNING.

02:53PM  25   Q.   WHY WAS THAT?

02:53PM  1    A.   BECAUSE I WAS UNDER THE IMPRESSION THAT THE TECHNOLOGY

02:53PM  2    WORKED, THAT THE SAMPLES WERE DONE ON SITE, OR AS ONE OF THEIR

02:53PM  3    DIRECTORS SAID, IT WAS SENT TO THE CLOUD, AND THE CLOUD WOULD

02:53PM  4    ANALYZE IT AND YOU WOULD HAVE RESULTS BACK IN 20 TO 30 MINUTES.

02:53PM  5         SO IF THE TECHNOLOGY WAS WORKING, WHY WASN'T IT BEING USED

02:53PM  6    IN THESE PHARMACIES?  WHY WAS IT -- WERE THEY PHYSICALLY

02:53PM  7    TRANSPORTED BACK TO PALO ALTO USING WHATEVER TECHNOLOGY THEY

02:53PM  8    HAD IN PALO ALTO WITH THE SAME TWO-DAY TURNAROUND THAT THE

02:53PM  9    COMPETITORS HAD?

02:53PM  10   Q.   WAS THAT NEGATIVE INFORMATION THAT YOU READ DIFFERENT FROM

02:54PM  11   THE INFORMATION THAT YOU HAD RECEIVED FROM MS. HOLMES AND

02:54PM  12   MR. BALWANI?

02:54PM  13   A.   TOTALLY CONTRADICTORY.

02:54PM  14   Q.   LET'S LOOK AT THE UBS REPORT ON PAGE 2 OF THIS EXHIBIT.

02:54PM  15   LET'S ZOOM IN ON THE TEXT ON THE TOP HALF OF THE PAGE.

02:54PM  16        DO YOU SEE TOWARDS THE BOTTOM OF THAT SELECTION THERE'S A

02:54PM  17   SUBHEADING, "THERANOS REMAINS A FOCUS FOR INVESTORS"?

02:54PM  18   A.   YES.

02:54PM  19   Q.   AND IT READS THERE, "OUR INDUSTRY CONSULTANT WAS INITIALLY

02:54PM  20   OPTIMISTIC ABOUT THE PROMISE OF THERANOS."

02:54PM  21        DO YOU SEE THAT?

02:54PM  22   A.   YES.

02:54PM  23   Q.   AND IT SAYS IN THE NEXT SENTENCE, "HOWEVER, THE MODEL AS

02:54PM  24   SEEN IN A HANDFUL OF WALGREENS'S LOCATIONS, HAS EVOLVED INTO A

02:54PM  25   TRADITIONAL REFERENCE LAB," EXCUSE ME, "A TRADITIONAL REFERENCE

02:54PM   1    LAB OFFERING WHERE BLOOD IS DRAWN MOSTLY THROUGH VENIPUNCTURE

02:55PM   2    AND SENT THROUGH A REGIONAL LAB LOCATION WITH A 24 PLUS HOUR

02:55PM   3    TURN AROUND."

02:55PM   4        DO YOU SEE THAT?

02:55PM   5    A.   YES.

02:55PM   6    Q.   AND THIS TALKS ABOUT THE ORIGINAL CONCEPT BEING THAT THE

02:55PM   7    ORIGINAL TEST MENU COULD BE PERFORMED ON ONE MACHINE IN THE

02:55PM   8    WALGREENS.

02:55PM   9        WAS THAT YOUR UNDERSTANDING UNTIL YOU READ THIS?

02:55PM  10    A.   THAT WAS MY UNDERSTANDING.

02:55PM  11    Q.   THAT REPORT GOES ON TO SAY, "HOWEVER, THE TEST MENU AT THE

02:55PM  12    RELEVANT WALGREENS'S LOCATIONS HAS EVOLVED TO OVER 215 TODAY

02:55PM  13    (INCLUDING MANY ESOTERIC TESTS), WHICH BASED ON EXISTING

02:55PM  14    TECHNOLOGY WOULD TEND TO REQUIRE 10-20 DIFFERENT TESTING

02:55PM  15    PLATFORMS.  OUR CONSULTANT BELIEVES IT IS HIGHLY UNLIKELY THAT

02:55PM  16    ALL OF THESE TESTS ARE BEING DONE ON ONE MACHINE."

02:55PM  17        DO YOU SEE THAT?

02:55PM  18    A.   I DO.

02:55PM  19    Q.   AND UP UNTIL THIS POINT, BASED ON THE INFORMATION THAT YOU

02:55PM  20    HAD OBTAINED FROM MS. HOLMES AND MR. BALWANI, DID YOU

02:55PM  21    UNDERSTAND THAT ALL OF THERANOS'S TESTS WERE BEING DONE ON ONE

02:55PM  22    MACHINE?

02:55PM  23    A.   YES.

02:55PM  24    Q.   IN ANY OF YOUR COMMUNICATIONS WITH MS. HOLMES OR

02:56PM  25    MR. BALWANI, DID THEY EXPLAIN TO YOU THE COMPANY'S USE OF THIRD

02:56PM   1    PARTY ANALYZERS?

02:56PM   2    A.   NO.

02:56PM   3    Q.   LET'S LOOK AT THE RESPONSE OF MR. BALWANI TO YOUR EMAIL.

02:56PM   4    IF WE GO BACK TO PAGE 1 AND ZOOM IN ON THE BOTTOM HALF OF THE

02:56PM   5    PAGE.

02:56PM   6         DO YOU SEE A RESPONSE FROM MR. BALWANI TO YOU IN OCTOBER

02:56PM   7    OF 2014?

02:56PM   8    A.   YES.

02:56PM   9    Q.   AND HIS REACTION TO THAT UBS REPORT IS, "DOESN'T SURPRISE

02:56PM  10    US.  SOUNDS LIKE AN UNINFORMED CONSULTANT."

02:56PM  11         DO YOU SEE THAT?

02:56PM  12    A.   YES.

02:56PM  13    Q.   AND WHAT CONCLUSION DID YOU DRAW FROM THAT ABOUT THE TRUTH

02:56PM  14    OF THE STATEMENTS IN THE UBS REPORT?

02:56PM  15    A.   IT RAISED SUSPICION, AND THE SUSPICION IN MY COMMUNICATION

02:56PM  16    WITH SUNNY ACTUALLY INCREASED MY SUSPICION.

02:57PM  17    Q.   DID YOU TAKE THIS AS A DENIAL OF THE INFORMATION IN THE

02:57PM  18    UBS REPORT?

02:57PM  19    A.   IT WAS AN OPPORTUNITY TO DENY IT, BUT IT WAS KIND OF A

02:57PM  20    KICK THE CAN DOWN THE ROAD, NOT REALLY ADDRESSING THE

02:57PM  21    SITUATION.

02:57PM  22    Q.   LET'S LOOK AT THE TOP HALF OF PAGE 1.

02:57PM  23         IN RESPONSE YOU ASK FOR SOME MORE INFORMATION; IS THAT

02:57PM  24    CORRECT?

02:57PM  25    A.   YES.

02:57PM  1    Q.   AND MR. BALWANI WRITES BACK IN THE MIDDLE OF THAT

02:57PM  2    SELECTION, "ALAN.

02:57PM  3         "I HAVE NO INTENTION OF RESPONDING TO THIS EMAIL AND

02:57PM  4    EXPLAINING THE TECH AND PROCESSES.  PLEASE STOP SENDING ME WITH

02:57PM  5    EMAILS EVERYDAY."

02:57PM  6         DO YOU SEE THAT?

02:57PM  7    A.   YES.

02:57PM  8    Q.   AND AROUND THIS TIME PERIOD IN NOVEMBER OF 2014 WERE YOU

02:57PM  9    EMAILING THERANOS EVERY DAY?

02:57PM  10   A.   PROBABLY NOT EVERY DAY BUT PROBABLY ON A REGULAR COURSE

02:57PM  11   WHEN THERE WAS INFORMATION THAT WAS CONTRADICTORY TO WHAT I HAD

02:58PM  12   BEEN LED TO BELIEVE.

02:58PM  13   Q.   IF YOU HAD KNOWN BEFORE YOU INVESTED IN 2013 THAT THE

02:58PM  14   COMPANY WAS RELYING ON THIRD PARTY DEVICES FOR MANY OF THE

02:58PM  15   TESTS THAT IT WAS OFFERING, WOULD THAT HAVE BEEN AN IMPORTANT

02:58PM  16   FACT TO YOUR DECISION MAKING?

02:58PM  17   A.   YES.

02:58PM  18   Q.   LET'S LOOK IN YOUR BINDER, PLEASE, AT EXHIBIT 2216 NEXT.

02:58PM  19        DO YOU SEE THAT THIS IS A CONTINUATION OF THAT SAME EMAIL

02:58PM  20   CHAIN?

02:58PM  21   A.   YES.

02:59PM  22             MR. BOSTIC:  YOUR HONOR, I OFFER EXHIBIT 2216.

02:59PM  23             MR. DOWNEY:  YOUR HONOR, OTHER THAN THE REDACTION

02:59PM  24   THAT WE'VE REQUESTED ON THE FIRST PAGE OF THIS, NO OBJECTION.

02:59PM  25             THE COURT:  ALL RIGHT.  WITH THAT REDACTION IT CAN

02:59PM 1    BE PUBLISHED.  IT'S ADMITTED, AND IT CAN BE PUBLISHED.  THANK

02:59PM 2    YOU.

02:59PM 3          (GOVERNMENT'S EXHIBIT 2216, REDACTED, WAS RECEIVED IN

02:59PM 4    EVIDENCE.)

02:59PM 5              MR. BOSTIC:  MS. HOLLIMAN, LET'S DISPLAY PAGE 1, THE

02:59PM 6    TOP HALF.

02:59PM 7              MR. DOWNEY:  YOUR HONOR, IF I MIGHT?

02:59PM 8          HAVE YOU REDACTED IT?

02:59PM 9              MR. BOSTIC:  YES.

02:59PM 10   Q.   MR. EISENMAN, IN THE MIDDLE OF THAT SELECTION DO YOU SEE A

02:59PM 11   RESPONSE EMAIL THAT YOU WROTE BACK TO MR. BALWANI?

02:59PM 12   A.   YES.

02:59PM 13   Q.   YOU WRITE, "I DON'T MEAN TO BROTHER YOU."

03:00PM 14        THEN THERE'S SOME CONTENT THAT WE'VE REDACTED.

03:00PM 15        YOU SAY, "I AM CLOSE TO RETIREMENT AND I AM TRYING TO

03:00PM 16   DECIDE WHETHER TO LIGHTEN UP IF THERE IS A LIQUIDITY EVENT IN

03:00PM 17   2015.  HOPEFULLY THERE WILL BE ADDITIONAL INFORMATION AVAILABLE

03:00PM 18   IN THE NOT TOO DISTANT FUTURE, OR THERANOS WILL CONSIDER AN

03:00PM 19   INFORMATION EVENT FOR EXISTING SHAREHOLDERS."

03:00PM 20        WHY WERE YOU TRYING TO OBTAIN ADDITIONAL INFORMATION ABOUT

03:00PM 21   THE COMPANY AT THIS TIME AFTER YOUR INVESTMENT?

03:00PM 22   A.   BECAUSE I HAD SUSPICIONS THAT THINGS WERE NOT AS THEY WERE

03:00PM 23   COMMUNICATED.  I HAD A SIGNIFICANT AMOUNT OF NET WORTH INVOLVED

03:00PM 24   IN THIS COMPANY, AND I HAD BEEN LOOKING FOR FURTHER

03:00PM 25   OPPORTUNITIES FOR A LIQUIDITY EVENT TO REDUCE MY POSITION.

03:00PM 1    Q.   I'LL ASK YOU TO TURN TO -- WELL, BEFORE WE GO TO THE NEXT

03:00PM 2    EXHIBIT, WERE YOUR EFFORTS TO GET MORE INFORMATION IN 2014

03:01PM 3    SUCCESSFUL?

03:01PM 4    A.   NO.

03:01PM 5    Q.   PLEASE TURN TO TAP 2468.

03:01PM 6         AT 2468, DO YOU SEE AN EMAIL CHAIN BETWEEN YOU,

03:01PM 7    MS. HOLMES, AND MR. BALWANI IN APRIL 2015?

03:01PM 8    A.   YES.

03:01PM 9              MR. BOSTIC:  YOUR HONOR, I OFFER EXHIBIT 2468 WITH

03:01PM 10   THE REDACTION THAT WE DISCUSSED.

03:01PM 11             MR. DOWNEY:  WITH THAT REDACTION, YOUR HONOR, NO

03:01PM 12   OBJECTION.

03:01PM 13             THE COURT:  THE REDACTED VERSION IS ADMITTED.  IT

03:01PM 14   MAY BE PUBLISHED.

03:01PM 15        (GOVERNMENT'S EXHIBIT 2468, REDACTED, WAS RECEIVED IN

03:02PM 16   EVIDENCE.)

03:02PM 17   BY MR. BOSTIC:

03:02PM 18   Q.   IF WE CAN START ON PAGE 2 AT THE BOTTOM.

03:02PM 19        MR. EISENMAN, DO YOU SEE AN EMAIL THAT YOU SENT

03:02PM 20   MR. BALWANI IN MARCH OF 2015?

03:02PM 21   A.   YES.

03:02PM 22   Q.   YOU SAY "SUNNY,

03:02PM 23        "WE HAVE BEEN INFORMED OF AN OPPORTUNITY TO SELL THERANOS

03:02PM 24   STOCK.  BEFORE WE DO, WE WANTED TO GET SOME NARRATIVE FROM YOU,

03:02PM 25   TO GET A SENSE OF WHETHER OUR VALUE HAS GROWN IN THE YEAR AND

03:02PM    1    3 MONTHS SINCE THE ROUND VALUING THE COMPANY AT 9 BILLION WAS

03:02PM    2    PRICED."

03:02PM    3        DO YOU SEE THAT?

03:02PM    4    A.   YES.

03:02PM    5    Q.   IN THE PARAGRAPH BELOW THAT YOU SAY, "WOULD IT BE POSSIBLE

03:02PM    6    TO SCHEDULE A SHORT CATCH UP CALL?"

03:02PM    7        DO YOU SEE THAT?

03:02PM    8    A.   YES.

03:02PM    9    Q.   LET'S LOOK AT MR. BALWANI'S RESPONSE.

03:02PM   10        IN HIS EMAIL BACK TO YOU HE TELLS YOU ABOUT THE PRICE OF

03:02PM   11    THE LAST TRANSACTION.  HE SAYS, "I DID NOT SAY WE WILL HAVE, OR

03:03PM   12    CONSIDER A LIQUIDITY EVENT IN 2015."

03:03PM   13        DO YOU SEE THAT?

03:03PM   14    A.   YES.

03:03PM   15    Q.   AND HE SAYS, "WE DON'T KNOW ANYTHING OF THIS TRANSACTION

03:03PM   16    BELOW."

03:03PM   17        DO YOU SEE THAT?

03:03PM   18    A.   YES.

03:03PM   19    Q.   AND LET'S LOOK AT YOUR EMAIL BACK.

03:03PM   20        AND YOU EXPLAIN THAT IN ADDITION TO THE FACT THAT YOU ARE

03:03PM   21    RETIRING, YOUR DAUGHTER NEEDS LIQUIDITY TO BUY A HOUSE.

03:03PM   22        DO YOU SEE THAT?

03:03PM   23    A.   YES.

03:03PM   24    Q.   AND YOU'RE TRYING HERE TO DECIDE, AGAIN, WHETHER TO UNLOAD

03:03PM   25    YOUR THERANOS STOCK; IS THAT CORRECT?

03:03PM  1    A.   THAT'S CORRECT.

03:03PM  2    Q.   YOU MENTION AT THE BOTTOM OF YOUR EMAIL THAT YOU ALSO

03:03PM  3    DIDN'T GET A RESPONSE TO YOUR REQUEST FOR A COMPANY VISIT?

03:03PM  4    A.   YES.

03:03PM  5    Q.   WERE YOU ASKING FOR A VISIT TO THE COMPANY AT THIS TIME?

03:03PM  6    A.   YES.

03:03PM  7    Q.   AND WAS THAT FOR THE SAME PURPOSE, TO TRY TO LEARN ABOUT

03:03PM  8    WHAT WAS HAPPENING WITH YOUR INVESTMENT?

03:03PM  9    A.   YES, IT WAS.

03:03PM  10   Q.   LET'S GO TO PAGE 1.  LET'S ZOOM IN ON THE BOTTOM HALF OF

03:04PM  11   THE PAGE.

03:04PM  12        WE SEE THERE AN EMAIL ON APRIL 12TH, 2015.  SO -- I'M

03:04PM  13   SORRY, APRIL 11TH, 2015, THE FOLLOWING MONTH.

03:04PM  14        AND YOU'VE CHANGED THE SUBJECT LINE TO "PLEASE RESPOND" IN

03:04PM  15   ALL CAPS; IS THAT RIGHT?

03:04PM  16   A.   THAT'S CORRECT.

03:04PM  17   Q.   AND YOU SAY, "I WOULD APPRECIATE A RESPONSE OR CALL THIS

03:04PM  18   WEEKEND."

03:04PM  19        MR. BALWANI WRITES BACK THAT HE ALREADY RESPONDED TO YOUR

03:04PM  20   QUESTION ABOUT WANTING TO SELL YOUR SHARES.

03:04PM  21        DO YOU SEE THAT?

03:04PM  22   A.   YES.

03:04PM  23   Q.   AT THIS POINT DID YOU HAVE THE INFORMATION THAT YOU NEEDED

03:04PM  24   TO WEIGH THAT OPTION?

03:04PM  25   A.   NO, I HAD NO INFORMATION.

03:04PM  1    Q.  LET'S LOOK AT THE TOP HALF OF PAGE 1.

03:05PM  2        AND, MR. EISENMAN, IN THIS EMAIL YOU INCLUDE MS. HOLMES ON

03:05PM  3    APRIL 12TH, 2015; IS THAT CORRECT?

03:05PM  4    A.  YES.

03:05PM  5    Q.  AND YOU SAY, "THE RESPONSE I AM LOOKING FOR FROM YOU OR

03:05PM  6    ELIZABETH IS A BUSINESS UPDATE LIKE YOU PROVIDED LAST YEAR WHEN

03:05PM  7    WE DISCUSSED THE COMPANY'S TIMETABLE FOR A PRIVATE OR PUBLIC

03:05PM  8    LIQUIDITY EVENT."

03:05PM  9        AT THE BOTTOM OF THAT PARAGRAPH YOU SAY, "IT IS REALLY

03:05PM  10   UNFAIR FOR YOU TO PLAY THIS CAT AND MOUSE GAME WITH ME.  I HAVE

03:05PM  11   BEEN A SHAREHOLDER FOR OVER 9 YEARS AND I, AS WELL AS MY

03:05PM  12   DAUGHTER, ALSO A SHAREHOLDER, ARE IN A DIFFERENT STAGE OF LIFE.

03:05PM  13   I CAN'T MAKE A RATIONAL DECISION TO SELL OR HOLD MY STOCK WITH

03:05PM  14   THE LACK OF INFORMATION THAT YOU HAVE PROVIDED."

03:05PM  15       DO YOU SEE THAT?

03:05PM  16   A.  YES.

03:05PM  17   Q.  WAS THIS EMAIL MESSAGE SUCCESSFUL IN BREAKING LOOSE THE

03:05PM  18   LOG JAM AND REESTABLISHING THE FLOW OF INFORMATION?

03:05PM  19   A.  NO.

03:05PM  20   Q.  AT THE TOP OF THIS PAGE THERE'S A RESPONSE FROM

03:05PM  21   MR. BALWANI.

03:05PM  22       DO YOU SEE THAT?

03:05PM  23   A.  YES.

03:05PM  24   Q.  HE SAYS TO YOU, "YOUR EMAILS ARE INSULTING, FULL OF

03:06PM  25   INACCURATE STATEMENTS AND WASTEFUL OF OUR TIME.

03:06PM   1          "OUR NEXT RESPONSE TO THIS EMAIL AND ALL YOUR FUTURE

03:06PM   2    EMAILS WILL COME FROM OUR COUNSEL."

03:06PM   3          DO YOU SEE THAT?

03:06PM   4    A.   YES.

03:06PM   5    Q.   AND FOLLOWING THIS POINT IN APRIL OF 2015 WERE YOU EVER

03:06PM   6    ABLE TO GET A SATISFACTORY LEVEL OF INFORMATION FROM THE

03:06PM   7    COMPANY ABOUT WHAT WAS HAPPENING THERE?

03:06PM   8    A.   NONE WHATSOEVER.

03:06PM   9    Q.   DID YOU END UP ULTIMATELY SELLING ANY OF YOUR SHARES?

03:06PM  10    A.   NO.

03:06PM  11    Q.   TO YOUR KNOWLEDGE DID THE COMPANY ULTIMATELY CEASE

03:06PM  12    OPERATIONS?

03:06PM  13    A.   YES.

03:06PM  14          MR. BOSTIC:  ONE MOMENT, YOUR HONOR.

03:06PM  15          THE COURT:  YES.

03:06PM  16      (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

03:06PM  17          MR. BOSTIC:  NO FURTHER QUESTIONS AT THIS TIME.

03:06PM  18    THANK YOU.

03:06PM  19          THE COURT:  CROSS-EXAMINATION?

03:06PM  20          MR. DOWNEY:  YES, YOUR HONOR.  IT MIGHT TAKE US A

03:06PM  21    MOMENT.

03:07PM  22          THE COURT:  YES.  SO, FOLKS, I'LL REMIND YOU THAT

03:07PM  23    WE'RE GOING UNTIL 4:00 O'CLOCK TODAY.

03:07PM  24          PLEASE FEEL FREE TO STAND AND STRETCH IF YOU WOULD LIKE.

03:07PM  25          YOU MAY AS WELL, SIR, IF YOU WOULD LIKE TO STRETCH FOR A

03:07PM   1    MOMENT, YOU'RE FREE TO STAND.

03:07PM   2         WHILE WE'RE DOING THIS, SCHEDULING WISE, LADIES AND

03:07PM   3    GENTLEMEN, PLEASE RECALL THAT WE WILL BE IN SESSION THE 15TH IN

03:07PM   4    THE MORNING, MONDAY IN THE MORNING.  I WANT TO REMIND YOU OF

03:07PM   5    THAT.  WE'RE SCHEDULED TO GO UNTIL NOON, I THINK.

03:07PM   6         THERE'S A POSSIBILITY THAT I COULD FREE UP THE AFTERNOON,

03:07PM   7    JUST A POSSIBILITY, AND I JUST WANT TO SHARE THAT WITH YOU.  IF

03:07PM   8    THAT'S TOO MUCH -- I KNOW NEXT WEEK IS A HEAVY LIFT FOR US.

03:07PM   9    WE'RE MEETING EVERY DAY NEXT WEEK.

03:07PM  10         BUT THAT REMAINS A POSSIBILITY.

03:07PM  11         SO I JUST WANT TO SHARE THAT WITH YOU FOR NOW.  THANK YOU.

03:07PM  12         (PAUSE IN PROCEEDINGS.)

03:08PM  13                        **CROSS-EXAMINATION**

03:08PM  14    BY MR. DOWNEY:

03:08PM  15    Q.   GOOD AFTERNOON, MR. EISENMAN.

03:08PM  16    A.   GOOD AFTERNOON.

03:08PM  17    Q.   MY NAME IS KEVIN DOWNEY, AND I REPRESENT MS. HOLMES.  I'M

03:08PM  18    GOING TO ASK YOU SOME QUESTIONS TODAY AND POSSIBLY CONTINUING

03:08PM  19    INTO MONDAY.

03:08PM  20         LET ME FIRST TRY TO PIN DOWN THE DATE OF THE FIRST

03:08PM  21    INVESTMENT THAT YOU MADE IN THERANOS.

03:08PM  22         DO YOU RECALL DISCUSSING THAT INVESTMENT WITH MR. BOSTIC?

03:08PM  23    A.   YES.

03:08PM  24    Q.   I'M GOING TO SHOW YOU A DOCUMENT THAT RELATES TO THAT TO

03:08PM  25    SEE IF THAT HELPS US IN IDENTIFYING THAT DATE.

03:08PM 1          YOUR HONOR, MAY I APPROACH THE WITNESS?

03:08PM 2               THE COURT:  YES.

03:09PM 3     BY MR. DOWNEY:

03:09PM 4     Q.   IF YOU CAN LOOK AT THE NOTEBOOK THAT I'VE HANDED YOU,

03:09PM 5     MR. EISENMAN, AT THE TAB THAT IS MARKED 12003A.

03:09PM 6     A.   OKAY.

03:09PM 7     Q.   AND IF YOU LOOK AT THE FIRST PAGE OF THAT --

03:09PM 8          YOUR HONOR, THIS DOCUMENT IS ALREADY IN EVIDENCE, AND I'M

03:09PM 9     GOING TO DISPLAY IT.

03:09PM 10         IF YOU LOOK AT THE FIRST PAGE HERE, THIS IS A SERIES C

03:09PM 11    PREFERRED STOCK PURCHASE AGREEMENT.

03:09PM 12         DO YOU SEE THAT?

03:09PM 13    A.   YES.

03:09PM 14    Q.   AND DO YOU SEE UNDERNEATH THAT IT LISTS A SERIES OF

03:09PM 15    CLOSINGS?

03:09PM 16    A.   YES.

03:09PM 17    Q.   AND THAT THE FIRST CLOSING IS BOLDED, AND IT'S DATED

03:09PM 18    OCTOBER 13TH, 2006.

03:09PM 19         DO YOU SEE THAT?

03:09PM 20    A.   YES.

03:09PM 21    Q.   AND THEN IF YOU TURN TO THE FIFTH PAGE OF THE EXHIBIT

03:10PM 22    WHERE THE TEXT ACTUALLY BEGINS AND YOU ZERO IN ON THE FIRST

03:10PM 23    PARAGRAPH.  WE'LL DO THAT ON THE SCREEN FOR YOU.  IT MIGHT MAKE

03:10PM 24    IT A LITTLE EASIER FOR YOU TO FOLLOW.

03:10PM 25         IT INDICATES THAT THE STOCK PURCHASE AGREEMENT WAS MADE AS

03:10PM  1    OF OCTOBER 13TH, 2006.

03:10PM  2        DO YOU SEE THAT?

03:10PM  3    A.   YES.

03:10PM  4    Q.   AND THEN IF WE LOOK AT THE BACK OF THE DOCUMENT, AND WE'LL

03:10PM  5    PUT THIS ON THE SCREEN SO YOU DON'T HAVE TO GO FENDING THROUGH

03:10PM  6    ALL OF THE PAGES.

03:10PM  7    A.   OKAY.

03:10PM  8    Q.   BUT IF YOU LOOK AT WHAT IS PAGE 45 OF THE EXHIBIT, IS THAT

03:10PM  9    YOUR SIGNATURE THERE ON PAGE 45?

03:10PM  10   A.   YES.

03:10PM  11   Q.   AND LET ME GO FORWARD.  AND I JUST WANT TO SEE IF WE CAN

03:10PM  12   SEE THE AMOUNT THAT YOU INVESTED AS OF THE OCTOBER 13TH

03:11PM  13   INVESTMENT.

03:11PM  14       I'M DRAWING YOUR ATTENTION TO PAGE 94, WHICH IS

03:11PM  15   EXHIBIT 8380.

03:11PM  16       DO YOU SEE THERE EXHIBIT A?

03:11PM  17   A.   YES.

03:11PM  18   Q.   AND THAT'S A SCHEDULE OF PURCHASERS; CORRECT?

03:11PM  19   A.   CORRECT.

03:11PM  20   Q.   AND THAT'S A LISTING OF ALL OF THE PEOPLE WHO HAVE BOUGHT

03:11PM  21   STOCK AS PART OF THE OFFERING THAT YOU WERE PURCHASING STOCK AS

03:11PM  22   PART OF; CORRECT?

03:11PM  23   A.   YES.

03:11PM  24   Q.   AND IT INDICATES HERE THAT YOU BOUGHT ABOUT A LITTLE OVER

03:11PM  25   402 SHARES IN THIS OFFERING; IS THAT RIGHT?

03:11PM  1      A.   YES.

03:11PM  2      Q.   AND YOU PAID A PRICE OF -- YOU AND MR. BOSTIC WERE TRYING

03:11PM  3      TO FIGURE OUT WHETHER IT WAS CLOSER TO 1.1 OR 1.2 BUT --

03:11PM  4      A.   SOMEWHERE IN THE MIDDLE.

03:11PM  5      Q.   TO BE PRECISE IT WAS $1,134,243; RIGHT?

03:11PM  6      A.   YES.

03:11PM  7      Q.   AND IT LOOKS LIKE YOU PAID SOMEWHERE UNDER $3 A SHARE FOR

03:12PM  8      THIS?

03:12PM  9      A.   $2.82.

03:12PM  10     Q.   $2.82.  FAIR ENOUGH.

03:12PM  11          ALL RIGHT.  I WANT TO TAKE YOU BACK TO THE PERIOD BEFORE

03:12PM  12     YOU DECIDED TO MAKE THIS INVESTMENT.

03:12PM  13          YOU COME FROM HOUSTON, TEXAS; RIGHT?

03:12PM  14     A.   YES.

03:12PM  15     Q.   AND AS OF 2006 YOU HAD BEEN WORKING IN HOUSTON

03:12PM  16     PROFESSIONALLY FOR A NUMBER OF DECADES; RIGHT?

03:12PM  17     A.   CORRECT.

03:12PM  18     Q.   AND YOU HAD WORKED AS AN ADVISOR TO INDIVIDUALS AS TO HOW

03:12PM  19     TO MANAGE THEIR MONEY; CORRECT?

03:12PM  20     A.   CORRECT.

03:12PM  21     Q.   AND AS A RESULT OF THAT WORK YOU MADE SOME CONTACTS WHO

03:12PM  22     HAD SOME EXPERTISE IN INVESTMENT AND ADVISED PEOPLE ON HOW BEST

03:12PM  23     TO INVEST THEIR MONEY FOR WHATEVER THEIR PURPOSE WAS?

03:12PM  24     A.   CORRECT.

03:12PM  25     Q.   AND THAT WAS -- I THINK YOU CALLED THAT A NETWORK.  YOU

03:12PM   1    HAD A NETWORK; IS THAT RIGHT?

03:12PM   2    A.   NO.   THERE WERE THINGS.   THERE WERE CLIENTS THAT I

03:13PM   3    INVESTED CONSERVATIVELY IN SECURITIES, AND I HAD A NETWORK OF

03:13PM   4    FRIENDS AND FAMILY THAT WE LOOKED AT PRIVATE SECURITIES LIKE

03:13PM   5    THIS THERANOS --

03:13PM   6    Q.   I SEE.   AND WAS DAVID HARRIS ONE OF THOSE FRIENDS?

03:13PM   7    A.   YES.

03:13PM   8    Q.   AND I ASSUME YOU INVESTED ON YOUR OWN BEHALF?

03:13PM   9    A.   CORRECT.

03:13PM  10    Q.   AND THAT INCLUDED IN PRIVATE COMPANIES; CORRECT?

03:13PM  11    A.   CORRECT.

03:13PM  12    Q.   AND SO YOU HAD YOUR EARS OPEN ON AN ONGOING BASIS TO MAKE

03:13PM  13    AN EFFORT TO TRY TO HEAR ABOUT PRIVATE INVESTING OPPORTUNITIES

03:13PM  14    THAT MIGHT BE OF INTEREST TO YOU; CORRECT?

03:13PM  15    A.   CORRECT.

03:13PM  16    Q.   AND DAVID HARRIS MENTIONED TO YOU THAT HE HAD INVESTED IN

03:13PM  17    A COMPANY A COUPLE OF YEARS BEFORE IN CALIFORNIA CALLED

03:13PM  18    THERANOS; CORRECT?

03:13PM  19    A.   CORRECT.

03:13PM  20    Q.   AND HE TOLD YOU A LITTLE BIT ABOUT THE FOUNDER OF THE

03:13PM  21    COMPANY; CORRECT?

03:13PM  22    A.   CORRECT.

03:13PM  23    Q.   MS. HOLMES; CORRECT?

03:13PM  24    A.   YES.

03:13PM  25    Q.   AND HE TOLD YOU THAT MS. HOLMES WAS SOMEONE WHO HE HAD A

03:14PM  1    LOT OF CONFIDENCE IN; CORRECT?

03:14PM  2    A.   THAT'S CORRECT.

03:14PM  3    Q.   AND HE TOLD YOU THAT SHE HAD INVENTED A TECHNOLOGY THAT

03:14PM  4    HAD TO DO WITH MEASURING BLOOD AND MEASURING THE DISTRIBUTION

03:14PM  5    OF DRUGS; CORRECT?

03:14PM  6    A.   NOT EXACTLY IN THOSE WORDS BUT SIMILAR.

03:14PM  7    Q.   OKAY.  THE GIST OF IT WAS ALONG THOSE LINES?

03:14PM  8    A.   YES.

03:14PM  9    Q.   OKAY.  HE TOLD YOU HE KNEW HER FAMILY A LITTLE BIT?

03:14PM  10   A.   HE WAS THEIR FINANCIAL ADVISOR.

03:14PM  11   Q.   OKAY.  AND HE TOLD YOU THAT, IN FACT, MS. HOLMES HAD ROOTS

03:14PM  12   IN HOUSTON; CORRECT?

03:14PM  13   A.   CORRECT.

03:14PM  14   Q.   AND SHE HAD ATTENDED HIGH SCHOOL IN HOUSTON; CORRECT?

03:14PM  15   A.   YES.

03:14PM  16   Q.   AND A FEW YEARS BEFORE THE CONVERSATION THAT YOU WERE

03:14PM  17   HAVING WITH MR. HARRIS, SHE HAD GRADUATED FROM HIGH SCHOOL AND

03:14PM  18   GONE ON TO STANFORD UNIVERSITY; CORRECT?

03:14PM  19   A.   CORRECT.

03:14PM  20   Q.   AND HE TOLD YOU THAT WHILE AT STANFORD UNIVERSITY, SHE HAD

03:14PM  21   COME UP WITH THE IDEA FOR THIS INVENTION AND APPLIED FOR A

03:14PM  22   PATENT; CORRECT?

03:14PM  23   A.   CORRECT.

03:14PM  24   Q.   AND THAT HE HAD BEEN ASKED A COUPLE YEARS BEFORE THIS

03:14PM  25   CONVERSATION, HE HAD BEEN ASKED TO INVEST IN A COMPANY THAT SHE

03:14PM  1    HAD JUST FOUNDED; CORRECT?

03:15PM  2    A.   I WAS NOT AWARE OF THE TIMING OR THE EXTENT OF HIS EARLIER

03:15PM  3    INVESTMENT.

03:15PM  4         WE ONLY TALKED ABOUT THIS SECOND ROUND.

03:15PM  5    Q.   I SEE.  OKAY.

03:15PM  6         BUT YOU KNEW THAT HE WAS ALREADY AN INVESTOR?

03:15PM  7    A.   I'M NOT SURE IF I KNEW THAT HE WAS AN INVESTOR IN THE

03:15PM  8    FIRST ROUND.

03:15PM  9    Q.   OKAY.  DID HE TELL YOU THE NAMES OF OTHER INDIVIDUALS IN

03:15PM  10   HOUSTON WHO WERE CONSIDERING BECOMING INVESTORS AT THE SAME

03:15PM  11   TIME YOU WERE CONSIDERING THE INVESTMENT?

03:15PM  12   A.   NO.

03:15PM  13   Q.   BUT HE TOLD YOU, DID HE NOT, THAT THERE WERE SOME

03:15PM  14   INDIVIDUALS IN SILICON VALLEY WHO MIGHT ALSO BE INVESTING IN

03:15PM  15   THE COMPANY; CORRECT?

03:15PM  16   A.   NO.

03:15PM  17   Q.   MR. HARRIS DID NOT TELL YOU THAT?

03:15PM  18   A.   NO.  HE MENTIONED LARRY ELLISON WAS INVOLVED WITH THE

03:15PM  19   COMPANY, BUT AS FAR AS OTHER INDIVIDUALS, NOT TO MY

03:15PM  20   RECOLLECTION.

03:15PM  21   Q.   OKAY.  HE MENTIONED MR. ELLISON'S INVOLVEMENT; CORRECT?

03:15PM  22   A.   YES.

03:15PM  23   Q.   AND DID HE MENTION MR. LUCAS'S INVOLVEMENT AT THAT TIME?

03:15PM  24   A.   I DON'T RECALL IF I GOT THAT INFORMATION FROM DAVID OR

03:16PM  25   FROM ELIZABETH.

03:16PM   1    Q.   OKAY.  NOW, YOU SAY -- AND HE, I PRESUME IT IS HE WHO PUT

03:16PM   2    YOU IN TOUCH WITH MS. HOLMES FOR PURPOSES OF HAVING A PHONE

03:16PM   3    CALL?

03:16PM   4    A.   THAT'S CORRECT.

03:16PM   5    Q.   AND YOU KNEW WHO MR. ELLISON WAS OF COURSE; CORRECT?

03:16PM   6    A.   OF COURSE.

03:16PM   7    Q.   AND YOU KNOW THAT HE WAS VERY SUCCESSFUL AND HAD BEEN VERY

03:16PM   8    SUCCESSFUL IN BUILDING ORACLE; CORRECT?

03:16PM   9    A.   CORRECT.

03:16PM  10    Q.   AND DID YOU KNOW WHO MR. LUCAS WAS?

03:16PM  11    A.   I DIDN'T AT THE TIME, BUT I FOUND OUT THAT HE WAS THE

03:16PM  12    CHAIRMAN OF THE BOARD OF ORACLE AND THAT'S A LEVEL OF

03:16PM  13    RESPECTABILITY.

03:16PM  14    Q.   NOW, PRIOR TO THIS OCTOBER 13TH INVESTMENT, YOU SAY YOU

03:16PM  15    CALLED MS. HOLMES; CORRECT?

03:16PM  16    A.   CORRECT.

03:16PM  17    Q.   AND YOU HAD A SERIES OF TELEPHONE CONVERSATIONS WITH HER;

03:16PM  18    RIGHT?

03:16PM  19    A.   THAT'S CORRECT.

03:16PM  20    Q.   AND DURING THOSE TELEPHONE CONVERSATIONS SHE WENT THROUGH

03:16PM  21    ALL SORTS OF FINANCIAL INFORMATION ABOUT THE COMPANY; CORRECT?

03:16PM  22    A.   PROJECTIONS OVER THE NEXT FEW YEARS, PHARMACEUTICAL

03:16PM  23    COMPANIES SHE WAS DOING BUSINESS WITH, INVESTMENT BANKERS THAT

03:16PM  24    SHE WAS ALREADY IN CONTACT WITH, YES.

03:17PM  25    Q.   SO HOW MANY PHONE CONVERSATIONS WAS THAT PRIOR TO THE DATE

03:17PM  1    OF YOUR OCTOBER 13TH INVESTMENT?

03:17PM  2    A.   I'M GUESSING THREE OR FOUR.

03:17PM  3    Q.   OKAY.  HOW LONG DID THOSE CONVERSATIONS TAKE?

03:17PM  4    A.   IT'S JUST A GUESS BUT, YOU KNOW, 5 TO 15 MINUTES.

03:17PM  5    Q.   ISN'T IT TRUE, MR. EISENMAN, THAT YOU ONLY HAD ONE

03:17PM  6    CONVERSATION WITH MS. HOLMES PRIOR TO THE TIME THAT YOU

03:17PM  7    INVESTED AND IT WAS A VERY BRIEF CONVERSATION?

03:17PM  8    A.   NO.

03:17PM  9    Q.   LET ME ASK YOU TO LOOK AT A DOCUMENT IN YOUR BINDER THAT

03:17PM  10   IS MARKED AS EXHIBIT 10626.

03:18PM  11   A.   OKAY.

03:18PM  12   Q.   AND IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND MR. HARRIS

03:18PM  13   DISCUSSING YOUR POTENTIAL INVESTMENT IN THERANOS AT THAT TIME?

03:18PM  14   A.   YES.

03:18PM  15        MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:18PM  16   EXHIBIT 10626.

03:18PM  17        MR. BOSTIC:  NO OBJECTION.

03:18PM  18        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:18PM  19   (DEFENDANT'S EXHIBIT 10626 WAS RECEIVED IN EVIDENCE.)

03:18PM  20   BY MR. DOWNEY:

03:18PM  21   Q.   IF WE JUST BLOW UP -- THERE'S REALLY JUST ONE EMAIL HERE.

03:18PM  22   THIS IS YOU EMAILING MR. HARRIS.  IT LOOKS LIKE IN THE EVENING

03:18PM  23   OF OCTOBER 12TH.

03:18PM  24        DO YOU SEE THAT?

03:18PM  25   A.   YES.

03:18PM   1    Q.   AND YOU SAY TO MR. HARRIS, "THANK YOU FOR ALLOWING ME TO

03:18PM   2    CO-INVEST IN THERANOS."

03:18PM   3         DO YOU SEE THAT?

03:18PM   4    A.   YES.

03:18PM   5    Q.   AND WHAT DID YOU MEAN WHEN YOU USED THE TERM "CO-INVEST"?

03:19PM   6    A.   DAVID WAS INVESTING IN THIS ROUND.

03:19PM   7    Q.   OKAY.  WERE YOU INVESTING ALONGSIDE HIM, OR WHAT DID YOU

03:19PM   8    MEAN WITH THE TERM "CO-INVEST"?

03:19PM   9    A.   NO.  I WAS JUST ANOTHER INVESTOR IN THIS ROUND.

03:19PM  10    Q.   I SEE.  AND THEN YOU GO ON TO SAY, "I CALLED ELIZABETH

03:19PM  11    YESTERDAY AND CHATTED FOR ABOUT 5 MINUTES."

03:19PM  12         AND THAT WAS TRUE, WASN'T IT?

03:19PM  13    A.   APPARENTLY SO.

03:19PM  14    Q.   AND YOU GO ON TO SAY, "SHE SEEMS LIKE A TERRIFIC PERSON."

03:19PM  15         CORRECT?

03:19PM  16    A.   CORRECT.

03:19PM  17    Q.   AND THEN YOU SAY YOU LOOK FORWARD TO MEETING HER AND YOU

03:19PM  18    TALK A LITTLE INSIDE SHOP ABOUT THE MARKET WITH MR. HARRIS;

03:19PM  19    CORRECT?

03:19PM  20    A.   CORRECT.

03:19PM  21    Q.   AND THIS WAS THE EVENING OF OCTOBER 12TH; CORRECT?

03:19PM  22    A.   CORRECT.

03:19PM  23    Q.   AND YOUR INVESTMENT TOOK PLACE ON OCTOBER 13TH; CORRECT?

03:19PM  24    A.   I'D HAVE TO LOOK AT THE INVESTMENT AGAIN.

03:19PM  25    Q.   WELL, LOOK AT -- LET'S PUT BACK UP EXHIBIT 12003A.

03:19PM 1        AND YOU CAN LOOK AT PAGE 1 AND 5 OF THAT.  LET ME DRAW

03:20PM 2    THAT BACK UP FOR YOUR -- JUST LOOK AT THE FIRST PAGE.

03:20PM 3        DO YOU SEE THAT REFERENCE TO THE OCTOBER 13TH AS THE FIRST

03:20PM 4    CLOSING BOLDED?

03:20PM 5    A.   YES.

03:20PM 6    Q.   AND DO YOU SEE THAT REFERENCE THERE?

03:20PM 7    A.   YES.

03:20PM 8    Q.   AND IF WE GO TO THE FIRST PAGE IT INDICATES THE DATE OF

03:20PM 9    THE AGREEMENT WHICH I THINK YOU SIGNED, WHICH IS OCTOBER 13TH,

03:20PM 10   2006; CORRECT?

03:20PM 11   A.   YES.  ALSO, MY RECOLLECTION IS THE FIRST INVESTMENT I

03:20PM 12   INVESTED A SMALLER AMOUNT, AND IT WAS A BACK AND FORTH BETWEEN

03:20PM 13   ME AND THE CHIEF COUNSEL AT THE TIME, I THINK HIS NAME WAS

03:20PM 14   DAVID ESQUIVEL, AND THERE WAS AN OPPORTUNITY THAT SOME

03:20PM 15   INVESTORS DID NOT GET THEIR MONEY IN, AND THERE WAS AN

03:20PM 16   OPPORTUNITY TO ADD TO MY INVESTMENT.

03:20PM 17       AND MY RECOLLECTION IS THAT MY INVESTMENTS WERE STAGED

03:21PM 18   OVER A PERIOD OF TIME.

03:21PM 19   Q.   ARE YOU SAYING THAT YOU INVESTED MORE THAN THE MILLION

03:21PM 20   DOLLARS THAT IS REFLECTED IN THE DOCUMENT THAT IS --

03:21PM 21   A.   NO, NO.

03:21PM 22       MY FIRST INVESTMENT --

03:21PM 23           THE COURT:  LET HIM FINISH HIS QUESTION.

03:21PM 24   BY MR. DOWNEY:

03:21PM 25   Q.   LET ME JUST ASK THE QUESTION AGAIN SO WE HAVE A CLEAR

03:21PM  1    RECORD.

03:21PM  2    A.   OKAY.

03:21PM  3    Q.   ARE YOU SAYING THAT YOU INVESTED MORE THAN THE MILLION

03:21PM  4    1.34 THAT IS INDICATED IN THE OCTOBER 13TH DOCUMENT?

03:21PM  5    A.   NO.  WHAT I'M SAYING IS THAT I INVESTED MUCH LESS, AND IN

03:21PM  6    CONVERSATIONS WITH THEIR GENERAL COUNSEL HE SAID THAT SOME OF

03:21PM  7    OUR INVESTORS DID NOT GET THEIR WIRES IN TIME, THERE'S MORE

03:21PM  8    ROOM IN THIS ROUND IF YOU'RE INTERESTED.  SO I MADE A SERIES OF

03:21PM  9    INVESTMENTS OVER A PERIOD OF TIME THAT TOTALLED THE AMOUNT THAT

03:21PM  10   YOU REFERENCED.

03:21PM  11   Q.   I SEE.  BUT YOUR DECISION TO MAKE THE FIRST INVESTMENT WAS

03:21PM  12   AS OF THIS OCTOBER 13TH DATE; CORRECT?

03:21PM  13   A.   APPARENTLY SO, YES.

03:21PM  14   Q.   ALL RIGHT.  NOW, I WANT TO ASK YOU ABOUT THE PERIOD THAT

03:22PM  15   FOLLOWED THE DECISION TO MAKE YOUR ORIGINAL INVESTMENT AND SOME

03:22PM  16   OF THE COMMENTS OR THE TESTIMONY THAT YOU GAVE DURING YOUR

03:22PM  17   DIRECT EXAMINATION.

03:22PM  18       I GATHERED THAT PERIOD IS A LITTLE HARD TO SEPARATE

03:22PM  19   EXACTLY THE DATE ON WHICH YOU WERE TOLD PARTICULAR INFORMATION

03:22PM  20   THAT YOU RECALL RECEIVING?

03:22PM  21   A.   SURE.  YES.  OKAY.

03:22PM  22       THERE'S ALSO A CONTRADICTION ON NUMBER OF CALLS AND TIMING

03:22PM  23   OF CALLS, BUT I CAN SEE ON MY NOTES THAT WAS MORE THAN ONE

03:22PM  24   5 MINUTE CALL.

03:22PM  25       IF IT WAS ONE CALL, WHICH I DON'T RECALL, IT WAS A MUCH

03:22PM  1    LONGER CALL TO TAKE THIS SERIES OF NOTES THAT WERE IMPORTANT TO

03:22PM  2    ME BEFORE I MADE THAT INVESTMENT.

03:22PM  3              MR. DOWNEY:  I MOVE TO STRIKE EVERYTHING AFTER

03:22PM  4    "SURE."

03:22PM  5              THE COURT:  ALL RIGHT.  EVERYTHING AFTER "SURE" IS

03:22PM  6    STRICKEN AS NONRESPONSIVE.

03:23PM  7         EXCUSE ME.  THE ANSWER "YES" WILL REMAIN.  EVERYTHING

03:23PM  8    AFTER THAT IS STRICKEN.

03:23PM  9              MR. DOWNEY:  THANK YOU.

03:23PM  10   Q.  I THINK YOU MENTIONED THAT YOU RECALL LEARNING AT SOME

03:23PM  11   POINT FROM MS. HOLMES THAT THERANOS HAD DEVELOPED RELATIONSHIPS

03:23PM  12   WITH CERTAIN PHARMACEUTICAL COMPANIES.

03:23PM  13        DO YOU REMEMBER THAT?

03:23PM  14   A.  I REMEMBER THAT BEFORE I MADE MY INVESTMENT THAT SHE WAS

03:23PM  15   CURRENTLY DOING BUSINESS WITH FIVE INTERNATIONAL PHARMACEUTICAL

03:23PM  16   COMPANIES.

03:23PM  17   Q.  AND I THINK YOU IDENTIFIED THEM; CORRECT?

03:23PM  18   A.  CORRECT.

03:23PM  19   Q.  AND YOU ARE READING THE NOTES THAT YOU BROUGHT WITH YOU

03:23PM  20   HERE?

03:23PM  21   A.  YES.

03:23PM  22   Q.  WAS ONE OF THEM GLAXOSMITHKLINE?

03:23PM  23   A.  YES, IT WAS.

03:23PM  24   Q.  AND IT IS TRUE THAT AS OF THE TIME OF THIS 2006 AGREEMENT

03:23PM  25   THAT THERANOS HAD, IN FACT, DEVELOPED A RELATIONSHIP WITH

03:23PM  1      GLAXOSMITHKLINE, WASN'T IT?

03:23PM  2                  MR. BOSTIC:  OBJECTION.  FOUNDATION.

03:23PM  3                  THE WITNESS:  FIRST OF ALL --

03:23PM  4                  THE COURT:  EXCUSE ME.  EXCUSE ME.

03:24PM  5                  THE WITNESS:  OH, OKAY.

03:24PM  6                  THE COURT:  THERE'S AN OBJECTION.  I HAVE TO RULE ON

03:24PM  7      THE OBJECTION.

03:24PM  8                  THE WITNESS:  OH, OKAY.

03:24PM  9                  THE COURT:  DO YOU WANT TO ASK A LITTLE MORE

03:24PM  10     FOUNDATIONAL QUESTION ABOUT THAT?

03:24PM  11     BY MR. DOWNEY:

03:24PM  12     Q.   WELL, YOU, AS PART OF THE PURCHASE AGREEMENT THAT YOU

03:24PM  13     SIGNED, CERTAIN DISCLOSURES WERE MADE TO YOU ABOUT IMPORTANT

03:24PM  14     AGREEMENTS THAT THE COMPANY HAD ENTERED INTO, WEREN'T THEY?

03:24PM  15     A.   I DON'T RECALL.

03:24PM  16     Q.   OKAY.  BUT DO YOU HAVE A GENERAL KNOWLEDGE THAT SOMETIMES

03:24PM  17     IN CONNECTION WITH MAKING INVESTMENTS IN A PRIVATE COMPANY,

03:24PM  18     THEY MAKE DISCLOSURES OF CERTAIN IMPORTANT FACTS ABOUT THE

03:24PM  19     COMPANY LIKE PATENTS THAT THE COMPANY HOLDS OR MATERIAL

03:24PM  20     CONTRACTS THAT THE COMPANY HAS?

03:24PM  21     A.   IT'S POSSIBLE.  I DON'T KNOW.

03:24PM  22     Q.   LET ME ASK YOU TO LOOK BACK AT EXHIBIT 12003 AGAIN,

03:24PM  23     12003A.  THIS IS THE EXHIBIT THAT WE WERE LOOKING FOR --

03:24PM  24     LOOKING AT A MOMENT AGO.

03:25PM  25     A.   DO I NEED TO LOOK OR ARE YOU GOING TO PUT IT ON THE

03:25PM 1     SCREEN?

03:25PM 2     Q.   I'LL PUT IT ON THE SCREEN.  THAT MIGHT BE EASIER FOR YOU

03:25PM 3     TO OPERATE WITH.

03:25PM 4          SO JUST TO RE-ORIENT YOU, THIS IS THE DOCUMENT THAT

03:25PM 5     REFLECTS THE STOCK PURCHASE AGREEMENT THAT WE WERE TALKING

03:25PM 6     ABOUT A MOMENT AGO.

03:25PM 7          DO YOU SEE THAT?

03:25PM 8     A.   OKAY.  AND THEN I HAVE A QUESTION.  THAT SAYS FIRST,

03:25PM 9     SECOND, THIRD, AND FOURTH CLOSING.

03:25PM 10    Q.   WELL, LET ME ASK THE QUESTIONS FOR PURPOSES OF THIS

03:25PM 11    EXERCISE.

03:25PM 12         LET ME ASK YOU TO GO TO THE PAGE THAT IS BATES LABELLED

03:25PM 13    8041, AND WE'LL FIND THAT FOR YOU AND PUT IT UP.

03:25PM 14         ACTUALLY, IF YOU GO A FEW PAGES BEFORE THAT, MAYBE TO THE

03:25PM 15    BEGINNING OF THIS APPENDIX TO PAGE 1 HERE OF THIS APPENDIX.

03:25PM 16         OKAY.  DO YOU SEE THERE'S A SCHEDULE OF EXCEPTIONS HERE?

03:26PM 17    A.   YES.

03:26PM 18    Q.   AND DO YOU SEE HERE IT INDICATES -- IF YOU READ THE FIRST

03:26PM 19    PARAGRAPH AND BLOW THAT UP, ABOUT HALFWAY THROUGH THAT

03:26PM 20    PARAGRAPH IT SAYS, "THE SECTION NUMBERS BELOW CORRESPOND TO THE

03:26PM 21    SECTION NUMBERS OF THE REPRESENTATIONS AND WARRANTIES IN THIS

03:26PM 22    AGREEMENT; PROVIDED, HOWEVER, THAT ANY INFORMATION DISCLOSED

03:26PM 23    HEREIN UNDER ANY SECTION NUMBER SHALL BE DEEMED TO BE DISCLOSED

03:26PM 24    AND INCORPORATED," ET CETERA, ET CETERA.

03:26PM 25         DO YOU SEE THAT LANGUAGE?

03:26PM  1    A.   UH-HUH.

03:26PM  2    Q.   AND IF YOU FOLLOW THROUGH TO THE NEXT PAGE, THIS CONTAINS

03:26PM  3    INFORMATION ABOUT THE DIFFERENT ASPECTS OF THE COMPANY.

03:26PM  4         SO, FOR EXAMPLE, AT 3.3(C) AT THE TOP OF PAGE 2 THERE'S AN

03:26PM  5    INDICATION THAT THERE WAS AN ERROR IN SHAREHOLDER GRANTS AND

03:26PM  6    IT'S ATTEMPTING TO CORRECT THOSE ERRORS.

03:27PM  7         DO YOU SEE THAT?

03:27PM  8    A.   YES.

03:27PM  9    Q.   AND IF YOU GO TO THE BOTTOM OF PAGE 2 THERE'S AN

03:27PM  10   INDICATION THAT THEY'VE ENTERED INTO CHANGE OF CONTROL

03:27PM  11   AGREEMENTS WITH THE FOLLOWING PEOPLE.

03:27PM  12        DO YOU SEE THAT?

03:27PM  13   A.   YES.

03:27PM  14   Q.   AND DO YOU KNOW WHAT A CHANGE OF CONTROL AGREEMENT IS?

03:27PM  15   A.   NOT EXACTLY.

03:27PM  16   Q.   AND LET'S GO TO THE PAGE THAT WE WERE LOOKING AT A MOMENT

03:27PM  17   AGO WHICH IS THE BATES LABELLED 8401.  IF YOU LOOK AT THE

03:27PM  18   SECTION LABELLED 3.8(B) AND BLOW THAT UP.

03:27PM  19        DO YOU SEE THERE -- I LOST MY MONITOR.

03:27PM  20            THE CLERK:  CAN WE DO A QUICK RESET?

03:27PM  21   BY MR. DOWNEY:

03:27PM  22   Q.   IF YOU LOOK IN THE MIDDLE OF THE PAGE SCHEDULE 3.8(B) IT

03:28PM  23   SAYS AN EVALUATION --

03:28PM  24            THE COURT:  NOW WE JUST LOST EVERYBODY.

03:28PM  25            THE CLERK:  I'M DOING A RESET.

03:28PM  1          THE WITNESS:  YES, I SAW IT.

03:28PM  2          THE COURT:  GIVE US A MOMENT HERE.  THERE WE ARE.

03:28PM  3       IS THAT UP NOW FOR YOU, MR. DOWNEY?

03:28PM  4          MR. DOWNEY:  IT IS, YOUR HONOR.

03:28PM  5   Q.   AND DO YOU SEE THERE'S A REFERENCE TO AN AGREEMENT BETWEEN

03:28PM  6   THERANOS AND SMITHKLINE BEECHAM CORPORATION?

03:28PM  7       DO YOU SEE THAT?

03:28PM  8   A.   YES.

03:28PM  9   Q.   AND SMITHKLINE DOES BUSINESS AS GLAXOSMITHKLINE; CORRECT?

03:28PM 10   A.   CORRECT.

03:28PM 11   Q.   AND SO IN THIS WRITTEN DISCLOSURE THAT WAS TOLD TO YOU, IF

03:28PM 12   NOT ELSEWHERE, THEY TOLD YOU THAT WE HAVE THIS AGREEMENT;

03:28PM 13   CORRECT?

03:28PM 14   A.   CAN YOU SHOW ME ON THIS AGREEMENT WHERE SHE'S DOING

03:28PM 15   BUSINESS WITH PFIZER, BRISTOL MYERS, AND NOVARTIS BECAUSE

03:28PM 16   THAT'S ALSO WHAT SHE TOLD ME AT THE TIME.

03:29PM 17          MR. DOWNEY:  YOUR HONOR, I MOVE TO STRIKE THAT.

03:29PM 18   Q.   I WANT TO ASK YOU --

03:29PM 19          THE COURT:  HE'S GOING TO ASK YOU QUESTIONS.

03:29PM 20   BY MR. DOWNEY:

03:29PM 21   Q.   I'M GOING TO SHOW YOU A DOCUMENT, WHICH I DON'T KNOW IF

03:29PM 22   YOU SAW THE DOCUMENT IN REAL TIME OR NOT, BUT I'M GOING TO DO

03:29PM 23   IT FOR PURPOSES OF SEEING IF I CAN -- IF YOU'RE FAMILIAR WITH

03:29PM 24   THE DOCUMENT.

03:29PM 25          SO DON'T DESCRIBE THE DOCUMENT.  DON'T COMMENT ON THE

03:29PM 1    DOCUMENT FOR PURPOSES OF THE JURY.

03:29PM 2        JUST TAKE A LOOK AT THE DOCUMENT, AND TELL ME IF IT'S A

03:29PM 3    DOCUMENT THAT YOU HAVE EVER SEEN BEFORE.  OKAY?

03:29PM 4        AND THIS WILL BE EXHIBIT 14111.

03:29PM 5    A.  ARE YOU PUTTING IT ON THE SCREEN, OR DO I NEED TO LOOK AT

03:29PM 6    IT IN MY BOOK.

03:29PM 7    Q.  NO.  YOU JUST NEED TO LOOK AT IT PRIVATELY.  BECAUSE IF

03:29PM 8    IT'S NOT A DOCUMENT THAT YOU SAW IN REAL TIME, THEN I'M --

03:29PM 9    A.  14110?

03:29PM 10   Q.  14111.  DO YOU HAVE THAT?

03:29PM 11   A.  NO, I DON'T HAVE THAT.

03:30PM 12   Q.  OKAY.  LET ME SEE IF I CAN GET YOU A COPY OF THAT.

03:30PM 13       YOUR HONOR, MAY I APPROACH THE WITNESS?

03:30PM 14           THE COURT:  YES.

03:30PM 15   BY MR. DOWNEY:

03:30PM 16   Q.  AND I'LL GIVE YOU MY QUESTION IN ADVANCE SO YOU DON'T

03:30PM 17   LABOR NEEDLESSLY OVER IT.

03:30PM 18       THE ONLY QUESTION I HAVE IS HAVE YOU SEEN THAT DOCUMENT

03:30PM 19   BEFORE?

03:30PM 20   A.  I DON'T RECALL.

03:30PM 21   Q.  OKAY.  NOW, YOU MENTIONED IN ADDITION TO GLAXO, THAT

03:30PM 22   MS. HOLMES HAD MENTIONED TO YOU THAT AROUND THE TIME OF YOUR

03:31PM 23   INVESTMENT, SO THE 2006 TIMEFRAME, THAT THERANOS WAS ALSO DOING

03:31PM 24   BUSINESS WITH PFIZER; CORRECT?

03:31PM 25   A.  CORRECT.

03:31PM   1    Q.   LET ME ASK YOU TO LOOK AT ANOTHER DOCUMENT -- BY THE WAY,

03:31PM   2    WITH THE COMMENTARY, YOU DON'T MEAN TO IMPLY TO THIS JURY THAT

03:31PM   3    MS. HOLMES DID NOT HAVE AGREEMENTS OR DISCUSSIONS WITH THESE

03:31PM   4    COMPANIES.

03:31PM   5         I THINK YOU'RE SAYING THAT YOU DON'T KNOW; CORRECT?

03:31PM   6    A.   UM, SKEPTICAL.

03:31PM   7    Q.   WELL, DO YOU HAVE ANY FOUNDATION TO KNOW THAT?

03:31PM   8    A.   I HAVE A HISTORY OF INFORMATION THAT WAS TOLD TO ME OVER

03:31PM   9    THE COURSE OF YEARS THAT WAS NOT ACCURATE.

03:31PM  10    Q.   EXCUSE ME?

03:31PM  11              THE COURT:   YOU ASKED THE QUESTION.

03:31PM  12              MR. DOWNEY:   EXCUSE ME.

03:31PM  13    Q.   YOU DON'T KNOW WHAT WAS GOING ON INTERNALLY AT THERANOS IN

03:31PM  14    TERMS OF THEIR WORKING WITH PHARMACEUTICAL COMPANIES, DO YOU?

03:31PM  15    A.   I HAD SOME PRETTY STRONG EVIDENCE FROM A LOT OF SOURCES

03:32PM  16    THAT A LOT OF THINGS THAT WERE TOLD TO ME WERE NOT ACCURATE.

03:32PM  17    Q.   OKAY.  WELL, WHAT ABOUT THE EVIDENCE THAT I JUST SHOWED

03:32PM  18    YOU, DOES THAT REFRESH YOUR RECOLLECTION, FOR EXAMPLE, THAT

03:32PM  19    THEY WERE WORKING WITH GLAXO?

03:32PM  20    A.   I DON'T RECALL SEEING THIS AT THIS TIME.  THAT WAS 2006.

03:32PM  21    Q.   OKAY.

03:32PM  22    A.   AND THERE'S A LOT OF INFORMATION AND A LOT OF DOCUMENTS.

03:32PM  23    Q.   OKAY.  LET ME SHOW YOU ANOTHER DOCUMENT, WHICH I REGRET TO

03:32PM  24    SAY IS ALSO FROM 2006, BUT LET'S SEE IF YOU SAW IT IN REAL

03:32PM  25    TIME.

03:33PM   1          THE CLERK:  WHAT EXHIBIT NUMBER IS THAT, COUNSEL?

03:33PM   2          MR. DOWNEY:  YES.  I DON'T THINK I IDENTIFIED THE

03:33PM   3   EXHIBIT NUMBER, WHICH IS EXHIBIT 14112.

03:33PM   4          THE WITNESS:  CAN YOU TELL ME IF I WAS PROVIDED

03:33PM   5   THESE DOCUMENTS AT THE TIME OF MY INVESTMENT, BECAUSE I DON'T

03:33PM   6   RECALL SEEING THESE?

03:33PM   7   BY MR. DOWNEY:

03:33PM   8   Q.   WELL, I DON'T KNOW.  THAT'S WHY YOU'RE HERE TO ANSWER OUR

03:33PM   9   QUESTIONS ABOUT THAT.  MY QUESTION --

03:33PM  10   A.   I DON'T RECALL.

03:33PM  11   Q.   YOU DON'T RECALL?

03:33PM  12   A.   SO WE HAVE TWO LEFT, BRISTOL MYERS AND NOVARTIS.

03:33PM  13   Q.   WE DON'T WANT YOU TO IMPLY WHAT THE CONTENT OF THE

03:33PM  14   DOCUMENT IS TO THE JURY IF IT'S NOT YET ADMITTED INTO EVIDENCE.

03:33PM  15   SO THAT'S FINE.

03:33PM  16          SO GLAXOSMITHKLINE.

03:33PM  17          BY THE WAY, DO YOU REMEMBER A DESCRIPTION OF THE

03:33PM  18   PARTICULARS OF THE WORK THAT WAS DONE WITH EITHER GLAXO OR

03:34PM  19   SMITHKLINE AS OF 2006?

03:34PM  20   A.   THE DETAILS WEREN'T DISCUSSED.  JUST THE NAMES WERE

03:34PM  21   DISCUSSED THAT PFIZER WAS CURRENTLY DOING BUSINESS WITH THESE

03:34PM  22   FIVE COMPANIES, OR THESE FOUR COMPANIES.

03:34PM  23   Q.   OKAY.  SO WE'VE TALKED ABOUT PFIZER AND WE'VE TALKED ABOUT

03:34PM  24   SMITHKLINE.

03:34PM  25          WHO WERE THE OTHERS?

03:34PM  1    A.   BRISTOL MYERS AND NOVARTIS.

03:34PM  2    Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 14113, WHICH I THINK

03:34PM  3    ALSO IS NOT IN YOUR NOTEBOOK.

03:34PM  4    A.   CAN I ASK YOU WHAT A SERVICE FRAME AGREEMENT IS?  I DON'T

03:34PM  5    KNOW WHAT THAT MEANS.

03:34PM  6    Q.   YOU CANNOT.

03:34PM  7         THE COURT:  HE'LL, HE'LL ASK YOU THE QUESTIONS.

03:34PM  8         THE WITNESS:  OKAY.

03:34PM  9         THE COURT:  AND THEN YOU CAN DO YOUR BEST TO ANSWER

03:34PM 10    THE QUESTIONS.

03:34PM 11         MR. DOWNEY:  MAY I APPROACH THE WITNESS, YOUR HONOR?

03:35PM 12         THE COURT:  YES.

03:35PM 13    BY MR. DOWNEY:

03:35PM 14    Q.   SO I THINK THE THIRD COMPANY THAT YOU MENTIONED WAS

03:35PM 15    NOVARTIS?

03:35PM 16    A.   CORRECT.

03:35PM 17    Q.   AND I'VE SHOWN YOU EXHIBIT 14113.

03:35PM 18         DO YOU SEE THAT?

03:35PM 19    A.   I DO.

03:35PM 20    Q.   AND DID YOU SEE THIS DOCUMENT IN OR AROUND THE TIME OF

03:35PM 21    YOUR 2006 INVESTMENT?

03:35PM 22    A.   NO.

03:35PM 23    Q.   OKAY.  AND I THINK THE LAST COMPANY THAT YOU MENTIONED WAS

03:35PM 24    BRISTOL MYERS; CORRECT?

03:35PM 25    A.   YES.

03:35PM  1    Q.   AND DO YOU KNOW THAT THERANOS MET WITH BRISTOL MYERS?

03:36PM  2    A.   I DON'T KNOW.

03:36PM  3    Q.   OKAY.  YOU DIDN'T KNOW ANY OF THE DETAILS AT THAT TIME,

03:36PM  4    YOU JUST KNEW THE NAMES OF THESE COMPANIES?

03:36PM  5    A.   YES.

03:36PM  6    Q.   NOW, IN CONNECTION WITH THE AGREEMENT, YOU SIGNED THE

03:36PM  7    EXHIBIT THAT WE SAW BEFORE THAT WAS THE STOCK PURCHASE

03:36PM  8    AGREEMENT; CORRECT?

03:36PM  9    A.   WELL, YOU PRESENTED THE THREE COMPANIES.  YOU DIDN'T

03:36PM  10   PRESENT BRISTOL MYERS.  IS THERE EVIDENCE THAT THEY'RE DOING

03:36PM  11   BUSINESS WITH BRISTOL MYERS?

03:36PM  12          THE COURT:  I'M SORRY, SIR.  LISTEN TO HIS QUESTION

03:36PM  13   AND TRY TO ANSWER HIS QUESTION AS BEST YOU CAN.

03:36PM  14   BY MR. DOWNEY:

03:36PM  15   Q.   DO YOU RECALL LOOKING AT THE STOCK PURCHASE AGREEMENT IN

03:36PM  16   CONNECTION WITH YOUR OCTOBER 2006 INVESTMENT?

03:36PM  17   A.   I DON'T RECALL.

03:36PM  18   Q.   WELL, DO YOU RECALL THAT WE JUST LOOKED AT IT A MOMENT

03:36PM  19   AGO?

03:36PM  20   A.   YES.

03:36PM  21   Q.   AND LET ME JUST DRAW THAT BACK UP.  THAT'S EXHIBIT 12003A.

03:37PM  22        AND WHEN YOU ENTERED INTO THE AGREEMENT WITH THERANOS,

03:37PM  23   THIS IS NOT THE FIRST TIME THAT YOU HAD ENTERED INTO A STOCK

03:37PM  24   PURCHASE AGREEMENT; CORRECT?

03:37PM  25   A.   CORRECT.

```
03:37PM  1    Q.   AND YOU HAD INVESTED IN A NUMBER OF PRIVATE COMPANIES;

03:37PM  2    CORRECT?

03:37PM  3    A.   CORRECT.

03:37PM  4    Q.   AND TYPICALLY THERE'S SOME AGREEMENT BETWEEN THE COMPANY

03:37PM  5    AND THE SHAREHOLDER AS TO THE TERMS ON WHICH THE SHAREHOLDER

03:37PM  6    WILL INVEST; CORRECT?

03:37PM  7    A.   CORRECT.

03:37PM  8    Q.   AND YOU HAD, PRIOR TO 2006, YOU HAD EXPERIENCE REVIEWING

03:37PM  9    AND EDITING AND SIGNING STOCK PURCHASE AGREEMENTS; CORRECT?

03:37PM 10    A.   TYPICALLY NOT EDITING.  REVIEWING AND SIGNING.

03:37PM 11    Q.   OKAY.  WELL, YOU'RE TRAINED AS A LAWYER; CORRECT?

03:37PM 12    A.   NOT EXACTLY.  I WENT TO LAW SCHOOL.  I DID TAX WORK.  IT

03:37PM 13    WAS -- I DIDN'T PRACTICE IN THESE AREAS OF LAW.

03:37PM 14    Q.   WELL, I, I THINK A TAX LAWYER COUNTS AS A LAWYER, BUT IF

03:37PM 15    YOU DON'T ACCEPT IT, THAT'S OKAY.

03:38PM 16         BUT YOU HAD LEGAL TRAINING; CORRECT?

03:38PM 17    A.   CORRECT.

03:38PM 18    Q.   AND YOU TOOK THE COURSES IN CONTRACT AND THE BASIC COURSES

03:38PM 19    IN LAW SCHOOL; CORRECT?

03:38PM 20    A.   CORRECT.

03:38PM 21    Q.   AND WHEN YOU GOT THIS AGREEMENT, DO YOU RECALL MAKING

03:38PM 22    REQUESTS FOR ANY CHANGES TO THE AGREEMENT?

03:38PM 23    A.   NO.  COMPANIES DO NOT CHANGE AGREEMENTS, ESPECIALLY A

03:38PM 24    SMALL SHAREHOLDER.  IT WOULD HAVE BEEN A WASTE OF TIME.

03:38PM 25    Q.   SO YOU DID NOT ASK FOR CHANGES IN THE AGREEMENT?
```

03:38PM  1    A.   NO.

03:38PM  2    Q.   I WANT TO TAKE A LOOK AT SOME OF THE TERMS UNDER WHICH YOU

03:38PM  3    AGREED.

03:38PM  4         AND I'M GOING TO BEGIN BY -- BY THE WAY, THIS IS IN YOUR

03:38PM  5    BINDER, AND YOU MAY WANT TO REVIEW SOME OF THE SURROUNDING

03:38PM  6    LANGUAGE, BUT SINCE IT'S IN EVIDENCE, I'M GOING TO DISPLAY IT

03:38PM  7    JUST SO THE JURY CAN SEE IT.

03:38PM  8         I'M GOING TO GO TO SECTION 4.9 OF THE AGREEMENT.  OKAY?

03:38PM  9    A.   IT'S GOING TO BE ON THE SCREEN?

03:38PM  10   Q.   IT WILL BE ON THE SCREEN, YEAH.  IT'S AT BATES LABELLED

03:39PM  11   8302.

03:39PM  12        AND I WANT TO JUST HIGHLIGHT THAT PARAGRAPH.  NOW, YOU

03:39PM  13   WERE TALKING DURING OF COURSE OF YOUR DIRECT ABOUT AN

03:39PM  14   OPPORTUNITY TO, YOU KNOW, FOR I THINK WHAT YOU CALL A LIQUIDITY

03:39PM  15   EVENT?

03:39PM  16   A.   YES.

03:39PM  17   Q.   AND ONE OF THOSE LIQUIDITY EVENTS MIGHT BE THAT THERE

03:39PM  18   MIGHT BE SOME KIND OF A PUBLIC MARKET THAT MIGHT BE CREATED FOR

03:39PM  19   SHARES IN A COMPANY; CORRECT?

03:39PM  20   A.   IN OUR EARLY CONVERSATIONS THERE WAS A CONVERSATION THAT

03:39PM  21   ELIZABETH TOLD ME THAT SHE HOPED TO IPO IN 12 TO 18 MONTHS.

03:39PM  22   Q.   FAIR ENOUGH.

03:39PM  23   A.   THEY WERE ALREADY TALKING TO AN INVESTMENT BANKER

03:39PM  24   MORGAN STANLEY.

03:39PM  25   Q.   OKAY.  AND WHEN YOU SIGNED THIS AGREEMENT, YOU

03:39PM  1    ACKNOWLEDGED THAT YOU KNEW THAT THERE WAS -- THESE STOCKS WERE

03:39PM  2    PRIVATE STOCKS; CORRECT?

03:39PM  3    A.   CORRECT.

03:39PM  4    Q.   AND THERE WAS NO PUBLIC MARKET ON WHICH TO TRADE THESE

03:39PM  5    STOCKS; CORRECT?

03:39PM  6    A.   CORRECT.

03:39PM  7    Q.   AND THE COMPANY HAD GIVEN YOU NO ASSURANCES THAT THERE

03:39PM  8    WOULD EVER BE A PUBLIC MARKET?

03:39PM  9    A.   SHE -- WELL, THERE'S NEVER ANY GUARANTEE, BUT SHE THOUGHT

03:40PM  10   THE COMPANY WOULD IPO IN 12 TO 18 MONTHS, AND AFTER THAT 12 TO

03:40PM  11   18 MONTHS IT WAS GOING TO BE WITHIN THE NEXT YEAR OR 2.  AND

03:40PM  12   AFTER THAT, WITHIN THE NEXT YEAR OR 2, THERE WAS JUST A WHOLE

03:40PM  13   SERIES OF DELAYS.

03:40PM  14   Q.   AND, WELL, I WANT TO FOCUS YOU ON THE AGREEMENT THAT YOU

03:40PM  15   SIGNED.

03:40PM  16        IN THE AGREEMENT THAT YOU SIGNED, DID YOU AGREE THAT THE

03:40PM  17   COMPANY HAD NOT MADE ANY ASSURANCES THAT A PUBLIC MARKET WOULD

03:40PM  18   EVER EXIST FOR THE COMPANY'S SECURITIES?

03:40PM  19   A.   THERE WAS NO GUARANTEE, BUT IT WAS STATED TO ME THAT THAT

03:40PM  20   WAS THEIR INTENT, AND IT WOULD HAPPEN WITHIN THE NEXT YEAR OR

03:40PM  21   TWO.

03:40PM  22   Q.   WELL, MR. EISENMAN, I'M JUST ASKING YOU A QUESTION ABOUT

03:40PM  23   THE TERMS OF THE AGREEMENT THAT YOU SIGNED.

03:40PM  24        DO YOU AGREE WITH ME THAT IN THE STOCK PURCHASE AGREEMENT,

03:40PM  25   YOU AGREED THAT THE COMPANY HAD MADE NO ASSURANCES THAT A

03:40PM  1    PUBLIC MARKET WILL EVER EXIST FOR THE COMPANY'S SECURITIES?

03:40PM  2    A.   THIS IS WHAT WE CALL BOILERPLATE, AS YOU KNOW AS AN

03:40PM  3    ATTORNEY.   THIS IS IN EVERY AGREEMENT AND EVERY PRIVATE

03:40PM  4    INVESTMENT, AND THIS IS WHAT ANY INVESTOR HAS TO SIGN IF THEY

03:40PM  5    WANT TO INVEST IN A PRIVATE COMPANY.

03:41PM  6         BUT WHAT IS MORE IMPORTANT ARE CONVERSATIONS THAT YOU HAVE

03:41PM  7    WITH THE PRINCIPALS, AND THEY WILL TELL YOU WHAT THEIR THOUGHTS

03:41PM  8    ARE, WHAT THEY THINK WILL HAPPEN.

03:41PM  9         AND THAT'S MORE IMPORTANT THAN THIS STATEMENT.

03:41PM 10         THE COURT:   MR. EISENMAN, MR. EISENMAN, I'M SORRY,

03:41PM 11    SIR.   I APPRECIATE YOUR ASSISTANCE HERE, BUT YOU JUST NEED TO

03:41PM 12    LISTEN TO HIS QUESTION AND THEN ANSWER THE QUESTION AS BEST YOU

03:41PM 13    CAN, AND THEN HE'LL ASK YOU ANOTHER QUESTION.

03:41PM 14         THE WITNESS:   OKAY.

03:41PM 15         MR. DOWNEY:   IN CONNECTION WITH THAT, YOUR HONOR, I

03:41PM 16    MOVE TO STRIKE THE ANSWER.

03:41PM 17         THE COURT:   YES.   THE COLLOQUY WOULD BE STRICKEN

03:41PM 18    THEN.   YOU CAN ASK ANOTHER QUESTION.

03:41PM 19    BY MR. DOWNEY:

03:41PM 20    Q.   DID YOU, IN THE STOCK PURCHASE AGREEMENT THAT YOU SIGNED

03:41PM 21    WITH THERANOS, ACKNOWLEDGE THAT NO ASSURANCES HAD BEEN GIVEN TO

03:41PM 22    YOU THAT A PUBLIC MARKET WOULD EVER EXIST FOR THE COMPANY'S

03:41PM 23    SECURITIES?

03:41PM 24    A.   I DON'T UNDERSTAND YOUR LANGUAGE.

03:41PM 25         WHEN YOU SAY "ACKNOWLEDGE," I SIGNED A DOCUMENT THAT EVERY

```
03:41PM   1       INVESTOR SIGNS AND HAS TO SIGN BEFORE MAKING AN INVESTMENT, BUT

03:41PM   2    THIS IS PART OF LANGUAGE THAT IS IN EVERY PRIVATE INVESTMENT

03:41PM   3    THAT THERE'S NO ASSURANCES BUT THAT'S NOT WHY WE INVEST.

03:42PM   4       AN INVESTOR DOES NOT INVEST IN SOMETHING WHEN THERE'S

03:42PM   5    NO --

03:42PM   6          THE COURT:  MR. EISENMAN, MR. EISENMAN, I HAVE TO

03:42PM   7    STOP YOU AGAIN, SIR.

03:42PM   8       SO I'M GOING TO ASK YOU TO FOCUS ON THE LAWYERS, NOT JUST

03:42PM   9    THIS LAWYER, BUT ANY LAWYER WHO ASKS YOU A QUESTION.  JUST

03:42PM  10    FOCUS ON THE QUESTION THAT THEY ASK.

03:42PM  11          THE WITNESS:  OKAY.

03:42PM  12          THE COURT:  AND THEN ANSWER THAT QUESTION.

03:42PM  13          THE WITNESS:  I'M TRYING.

03:42PM  14          THE COURT:  OKAY.  SO THE QUESTION THAT IS BEFORE

03:42PM  15    YOU NOW I BELIEVE IS WHETHER OR NOT YOU SIGNED THIS DOCUMENT.

03:42PM  16       I'M GOING TO ASK MR. WADE TO ASK THAT QUESTION -- EXCUSE

03:42PM  17    ME, MR. DOWNEY TO ASK THAT QUESTION AGAIN.

03:42PM  18          MR. DOWNEY:  THAT IS CORRECT, YOUR HONOR.

03:42PM  19          THE WITNESS:  DID I SIGN THIS?

03:42PM  20          MR. DOWNEY:  YES.

03:42PM  21          THE COURT:  SO LET ME -- HERE'S THE WAY IT WORKS.

03:42PM  22    THEY GET TO ASK THE QUESTIONS.  THEY ALSO GET TO OBJECT TO

03:42PM  23    QUESTIONS.

03:42PM  24          THE WITNESS:  OKAY.

03:42PM  25          THE COURT:  IF THEY OBJECT, THE WITNESS CAN'T ANSWER
```

03:42PM  1    UNTIL THE JUDGE, THAT'S WHO I AM, MAKES A DECISION AS TO

03:42PM  2    WHETHER A QUESTION CAN BE ANSWERED OR NOT.

03:42PM  3             THE WITNESS:  OKAY.

03:42PM  4             THE COURT:  AND THEN THE WITNESS CAN EITHER ANSWER

03:42PM  5    OR WHAT HAPPENS.

03:42PM  6        BUT THEY GET TO ASK THE QUESTIONS.

03:43PM  7             THE WITNESS:  OKAY.

03:43PM  8             THE COURT:  AND YOU GET TO ANSWER THOSE QUESTIONS AS

03:43PM  9    BEST YOU CAN.

03:43PM  10            THE WITNESS:  OKAY.

03:43PM  11            THE COURT:  OKAY.  GREAT.

03:43PM  12        MR. DOWNEY.

03:43PM  13            MR. DOWNEY:  JUST IN THE INTEREST OF PERFECT

03:43PM  14   CLARITY.

03:43PM  15   Q.  YOU SIGNED THE DOCUMENT WHICH CONTAINS THE LANGUAGE

03:43PM  16   REFLECTED IN SECTION 4.9 OF EXHIBIT 12003A; CORRECT?

03:43PM  17   A.  I SIGNED THIS DOCUMENT, CORRECT.

03:43PM  18   Q.  OKAY.  AND YOU ALSO AGREED IN SIGNING THAT DOCUMENT THAT

03:43PM  19   YOU DIDN'T HAVE ANY PRESENT INTENTION TO TRY TO SELL THE

03:43PM  20   SHARES; CORRECT?

03:43PM  21   A.  NO.

03:43PM  22   Q.  LET ME ASK YOU TO LOOK AT WITHIN EXHIBIT 12003A, SECTION

03:43PM  23   4.2.

03:43PM  24   A.  ARE YOU GOING TO PUT IT ON THE SCREEN?

03:43PM  25   Q.  I'M GOING TO PUT IT ON THE SCREEN, YEAH.

03:43PM  1          DO YOU SEE THAT THAT PARAGRAPH READS, "SUCH INVESTOR IS

03:43PM  2   ACQUIRING THE SHARES AND THE CONVERSION SHARES, FOR INVESTMENT

03:44PM  3   FOR ITS OWN ACCOUNT, NOT AS A NOMINEE OR AGENT, AND NOT WITH

03:44PM  4   THE VIEW TO, OR FOR RESALE IN CONNECTION WITH ANY DISTRIBUTION

03:44PM  5   THEREOF, AND THAT SUCH INVESTOR HAS NO PRESENT INTENTION OF

03:44PM  6   SELLING, GRANTING ANY PARTICIPATION IN OR OTHERWISE

03:44PM  7   DISTRIBUTING THE SAME."

03:44PM  8          DO YOU SEE THAT?

03:44PM  9   A.   YES.

03:44PM 10   Q.   AND THAT'S PART OF THE AGREEMENT THAT YOU SIGNED AS WELL;

03:44PM 11   CORRECT?

03:44PM 12   A.   CORRECT.

03:44PM 13   Q.   AND THEN DO YOU RECALL TALKING DURING YOUR DIRECT

03:44PM 14   EXAMINATION ABOUT CERTAIN PREDICTIONS MS. HOLMES MADE OR

03:44PM 15   PROJECTIONS SHE GAVE TO YOU AS TO WHAT THE PERFORMANCE OF THE

03:44PM 16   COMPANY WOULD BE.

03:44PM 17          DO YOU REMEMBER THAT?

03:44PM 18   A.   YES.

03:44PM 19   Q.   AND YOU WENT OVER THAT IN SOME DETAIL WITH MR. BOSTIC;

03:44PM 20   CORRECT?

03:44PM 21   A.   CORRECT.

03:44PM 22   Q.   LET ME ASK YOU TO LOOK AT SECTION 4.5, AND I WANT TO DRAW

03:44PM 23   YOUR ATTENTION ACTUALLY DOWN TO THE NEXT PARAGRAPH OF THE NEXT

03:45PM 24   BOTTOM HALF OF THIS.

03:45PM 25          ALL RIGHT.  DO YOU SEE THE PART THAT WE'VE HIGHLIGHTED

03:45PM  1    WHERE IT SAYS THAT YOU'VE RECEIVED ALL OF THE INFORMATION THAT

03:45PM  2    THE INVESTOR CONSIDERS NECESSARY OR APPROPRIATE FOR DECIDING

03:45PM  3    WHETHER TO PURCHASE THE SHARES AND CONVERSION SHARES.

03:45PM  4         AND THAT WAS TRUE; CORRECT?

03:45PM  5    A.   YES.

03:45PM  6    Q.   AND THEN YOU -- IT GOES ON TO SAY THAT YOU UNDERSTOOD THAT

03:45PM  7    SUCH DISCUSSIONS AS WELL AS ANY INFORMATION ISSUED BY THE

03:45PM  8    COMPANY WERE INTENDED TO DESCRIBE CERTAIN ASPECTS OF THE

03:45PM  9    COMPANY'S BUSINESS AND PROSPECTS BUT WERE NOT NECESSARILY A

03:45PM 10    THOROUGH OR EXHAUSTIVE DESCRIPTION.

03:45PM 11         DO YOU SEE THAT?

03:45PM 12    A.   YES.

03:45PM 13    Q.   SO, FOR EXAMPLE, THEY DIDN'T MAKE AVAILABLE TO YOU

03:45PM 14    INFORMATION ABOUT THE TECHNOLOGY OR TESTS IN ANY, IN ANY -- YOU

03:45PM 15    DIDN'T GO AND INSPECT THE TECHNOLOGY OR ANYTHING?

03:45PM 16    A.   NO.

03:45PM 17    Q.   AND YOU DIDN'T LOOK AT ANY CONTRACTS THAT THE COMPANY HAD

03:46PM 18    IN PLACE, DID YOU?

03:46PM 19    A.   NO.

03:46PM 20    Q.   OKAY.  AND THEN IF YOU GO ON TO THE NEXT SENTENCE IT SAYS,

03:46PM 21    "SUCH INVESTOR ACKNOWLEDGES THAT ANY BUSINESS PLANS PREPARED BY

03:46PM 22    THE COMPANY HAVE BEEN, AND CONTINUE TO BE, SUBJECT TO CHANGE

03:46PM 23    AND THAT ANY PROJECTIONS INCLUDED IN SUCH BUSINESS PLANS, OR

03:46PM 24    OTHERWISE, ARE NECESSARILY SPECULATIVE IN NATURE, AND IT CAN BE

03:46PM 25    EXPECTED THAT SOME OR ALL OF THE ASSUMPTIONS UNDERLYING THE

03:46PM  1    PROJECTIONS WILL NOT MATERIALIZE OR WILL VARY SIGNIFICANTLY

03:46PM  2    FROM ACTUAL RESULTS."

03:46PM  3        DO YOU SEE THAT?

03:46PM  4    A.   YES.

03:46PM  5    Q.   AND YOU SIGNED THAT ACKNOWLEDGEMENT AS PART OF THIS

03:46PM  6    AGREEMENT AS WELL; CORRECT?

03:46PM  7    A.   CORRECT.

03:46PM  8    Q.   AND AM I RIGHT THAT IN ORDER TO ENTER INTO -- BE ELIGIBLE

03:46PM  9    TO BUY STOCK FROM THERANOS, YOU HAD TO BE AN ACCREDITED

03:46PM 10    INVESTOR; CORRECT?

03:46PM 11    A.   CORRECT.

03:46PM 12    Q.   AND YOU WERE AN ACCREDITED INVESTOR IN 2006?

03:46PM 13    A.   CORRECT.

03:46PM 14    Q.   AND CAN YOU TELL US WHAT THAT MEANS?

03:46PM 15    A.   IT MEANS THAT YOU HAVE A CERTAIN LEVEL OF NET WORTH OR

03:47PM 16    INCOME.

03:47PM 17    Q.   OKAY.  AND DO YOU KNOW WHAT THAT LEVEL OF INCOME IS?

03:47PM 18    A.   THERE'S DIFFERENT LEVELS AND I DON'T RECALL.

03:47PM 19    Q.   OKAY.  BUT, IN OTHER WORDS, YOU EITHER HAVE TO MAKE A

03:47PM 20    CERTAIN AMOUNT PER YEAR OR YOU HAVE TO BE WORTH A CERTAIN

03:47PM 21    AMOUNT IN TERMS OF YOUR NET WORTH I GUESS?

03:47PM 22    A.   YES.

03:47PM 23    Q.   OKAY.  NOW, YOU TESTIFIED ON DIRECT WHEN YOU WERE

03:47PM 24    DISCUSSING MATTERS WITH MR. BOSTIC, YOU SAID THAT FOR THE

03:47PM 25    CLIENTS WHO YOU ADVISED ON WEALTH MANAGEMENT AND -- MAYBE YOU

03:47PM  1    DIDN'T USE THE TERM WEALTH MANAGEMENT.

03:47PM  2         WHAT TERM DID YOU USE TO DESCRIBE YOUR PROFESSION?

03:47PM  3    A.   I DON'T RECALL.

03:47PM  4    Q.   OKAY.  BUT WHAT WAS YOUR PROFESSION BEFORE YOU WERE

03:47PM  5    RETIRED?

03:47PM  6    A.   FINANCIAL PLANNER, INVESTMENT MANAGER, INVESTMENT

03:47PM  7    COUNSELLOR.

03:47PM  8    Q.   RIGHT.  AND YOU SAID THAT YOU ADVISED THOSE CLIENTS

03:47PM  9    TYPICALLY TO INVEST IN WHAT YOU CALLED PUBLIC EQUITIES?

03:47PM  10   A.   YES.

03:47PM  11   Q.   AND THAT MEANS STOCK IN A PUBLICLY TRADED COMPANY;

03:47PM  12   CORRECT?

03:47PM  13   A.   CORRECT.

03:48PM  14   Q.   AND SO STOCK THAT WOULD BE TRADED ON THE NASDAQ OR THE

03:48PM  15   NEW YORK STOCK EXCHANGE OR SOMETHING; CORRECT?

03:48PM  16   A.   CORRECT.

03:48PM  17   Q.   AND THOSE INFORMATION -- THOSE COMPANIES DISCLOSE

03:48PM  18   INFORMATION EVERY QUARTER ABOUT THEIR OPERATIONS; CORRECT?

03:48PM  19   A.   CORRECT.

03:48PM  20   Q.   AND THEY'RE REQUIRED BY LAW TO DO THAT; CORRECT?

03:48PM  21   A.   CORRECT.

03:48PM  22   Q.   BUT YOU SAID THAT FOR PURPOSES OF YOUR OWN INVESTMENTS

03:48PM  23   THAT YOU AT LEAST HAD AN ASPECT OF THEM THAT WAS FOCUSSED ON

03:48PM  24   INVESTING IN PRIVATE COMPANIES; CORRECT?

03:48PM  25   A.   CORRECT.

03:48PM 1    Q.   NOW, YOU DIDN'T INVEST OR YOU DIDN'T ADVISE YOUR CLIENTS

03:48PM 2    IN YOUR WORK TO INVEST IN PRIVATE COMPANIES; IS THAT RIGHT?

03:48PM 3    A.   THAT'S CORRECT.

03:48PM 4    Q.   AND WHY IS THAT?

03:48PM 5    A.   BECAUSE PRIVATE COMPANIES HAVE A HIGHER LEVEL OF RISK BUT

03:48PM 6    A HIGHER LEVEL OF RETURN.  AND TO BE SUCCESSFUL, WHAT MOST

03:48PM 7    PEOPLE DO IS THAT THEY INVEST IN A LOT OF COMPANIES, BECAUSE

03:48PM 8    SOME OF THEM ARE GOING TO GO OUT OF BUSINESS AND SOME OF THEM

03:48PM 9    ARE GOING TO DO REALLY WELL.

03:48PM 10        IT'S A HIGH RISK, HIGHER POTENTIAL REWARD SITUATION.

03:49PM 11   Q.   BUT YOUR CLIENTS GENERALLY WERE NOT PEOPLE WHO YOU WANTED

03:49PM 12   TO SEE LOSE THE ENTIRE AMOUNT OF AN INVESTMENT, FOR EXAMPLE?

03:49PM 13   A.   THEIR RISK TOLERANCE WAS AT A DIFFERENT LEVEL WHERE THEY

03:49PM 14   WERE SUITED TO INVEST IN PUBLIC SECURITIES, NOT PRIVATE

03:49PM 15   EQUITIES.

03:49PM 16   Q.   FAIR ENOUGH.

03:49PM 17        AND WHEN YOU WERE SIGNING THE DOCUMENT THAT IS 12003A, THE

03:49PM 18   STOCK PURCHASE AGREEMENT FOR THERANOS, YOU ACKNOWLEDGED THAT

03:49PM 19   THIS WAS A LITTLE BIT OF A SPECULATIVE INVESTMENT; CORRECT?

03:49PM 20   A.   YES.

03:49PM 21   Q.   AND LET'S PUT THAT LANGUAGE UP.  THAT'S SECTION 4.4 OF

03:49PM 22   EXHIBIT 12003A, AND IF WE BLOW THAT UP -- FIRST OF ALL, IT

03:49PM 23   INDICATED THAT THE COMPANY HAD A LIMITED FINANCIAL AND

03:49PM 24   OPERATING HISTORY; RIGHT?

03:49PM 25   A.   RIGHT.

03:49PM   1      Q.   AND YOU KNEW THAT WAS TRUE; CORRECT?

03:50PM   2      A.   CORRECT.

03:50PM   3      Q.   IN FACT, IT WAS ONLY, WHAT, A COUPLE YEARS OLD WHEN YOU

03:50PM   4      MADE YOUR INVESTMENT?

03:50PM   5      A.   I BELIEVE SO.

03:50PM   6      Q.   OKAY.  AND YOU REPRESENTED THAT YOU COULD BE BEAR THE

03:50PM   7      ECONOMIC RISK OF YOUR INVESTMENT; CORRECT?

03:50PM   8      A.   CORRECT.

03:50PM   9      Q.   AND THAT IT WOULDN'T IMPAIR YOUR FINANCIAL CONDITION IF

03:50PM   10     THERE WERE A LOSS; CORRECT?

03:50PM   11     A.   CORRECT.

03:50PM   12     Q.   AND THAT YOU COULD SUFFER A COMPLETE LOSS OF YOUR

03:50PM   13     INVESTMENT; CORRECT?

03:50PM   14     A.   CORRECT.

03:50PM   15     Q.   I WANT TO SHOW YOU JUST ON THE ATTACHMENT OF SCHEDULES

03:50PM   16     THAT WE LOOKED AT A MOMENT AGO, SOME ADDITIONAL INFORMATION

03:50PM   17     THAT WAS PROVIDED WITH THIS STOCK PURCHASE AGREEMENT.

03:50PM   18          SO IF WE CAN GO BACK TO THE SCHEDULE OF PURCHASERS ON

03:50PM   19     8377.

03:51PM   20          YOU MAY RECALL WE WERE LOOKING AT THIS EARLIER, AND THIS

03:51PM   21     REFLECTED THE LIST OF INDIVIDUALS WHO HAD INVESTED IN THERANOS

03:51PM   22     AS PART OF THE SAME ROUND WHERE YOU INVESTED; CORRECT?

03:51PM   23     A.   OKAY.

03:51PM   24     Q.   AND I WANT TO JUST DRAW YOUR ATTENTION TO A FEW OF THEM.

03:51PM   25          THE ENTITY HIGHLIGHTED RIGHT NOW IS ATA VENTURES.

03:51PM   1        DID YOU RECOGNIZE THAT NAME WHEN YOU WERE INVESTING IN

03:51PM   2   2006?

03:51PM   3   A.   I DON'T RECALL.

03:51PM   4   Q.   OKAY.  LET ME ASK YOU -- LET ME GO DOWN A LITTLE BIT TO

03:51PM   5   THE E SECTION.  LET ME GO FORWARD A FEW PAGES.

03:51PM   6        YEAH, HERE.  IF WE COULD GO UP SORT OF THE FIRST THREE

03:51PM   7   ENTRIES HERE.  THIS WAS THE SECTION THAT WE WERE LOOKING AT

03:51PM   8   BEFORE.

03:51PM   9        DO YOU SEE YOUR OWN INVESTMENT AGAIN?

03:51PM  10   A.   YES.

03:51PM  11   Q.   AND THEN YOU SEE UNDER THAT AN INVESTMENT BY MR. LUCAS OF

03:52PM  12   ABOUT A MILLION DOLLARS.

03:52PM  13        DO YOU SEE THAT?

03:52PM  14   A.   YES.

03:52PM  15   Q.   AND YOU SEE THAT MR. ELLISON INVESTED AS WELL AT THE SAME

03:52PM  16   TIME; CORRECT?

03:52PM  17   A.   CORRECT.

03:52PM  18   Q.   OR I SHOULD SAY EACH OF THEM I THINK PERHAPS INVESTED

03:52PM  19   THROUGH TRUSTS, BUT EFFECTIVELY INVESTED?

03:52PM  20   A.   YES.

03:52PM  21   Q.   OKAY.  NOW, LET'S MOVE FORWARD FROM THE TIME OF -- THAT

03:52PM  22   YOU MAKE THE DECISION TO INVEST AND GO AHEAD AND INVEST, AND

03:52PM  23   LET'S TALK ABOUT THE PERIOD BETWEEN LET'S SAY 2006 AND 2010.

03:52PM  24   OKAY?

03:52PM  25   A.   OKAY.

03:52PM 1     Q.   NOW, I THINK YOU SAID THAT IN SOME RANGE, AND I DON'T WANT

03:52PM 2     TO PUT WORDS IN YOUR MOUTH AS TO WHAT THE RANGE WAS, BUT THAT

03:52PM 3     YOU WERE ABLE TO HAVE QUARTERLY MEETINGS WITH THE COMPANY;

03:52PM 4     CORRECT?

03:52PM 5     A.   WITH ELIZABETH.

03:52PM 6     Q.   OKAY.  AND THEY WOULD TYPICALLY TAKE PLACE TELEPHONICALLY;

03:53PM 7     CORRECT?

03:53PM 8     A.   CORRECT.

03:53PM 9     Q.   AND WAS THAT SOMETHING THAT EVERY SHAREHOLDER OF THE

03:53PM 10    COMPANY WAS DOING?

03:53PM 11    A.   NOT TO MY KNOWLEDGE.

03:53PM 12    Q.   OKAY.  IN FACT, YOU AND YOUR GROUP FROM HOUSTON WERE THE

03:53PM 13    ONLY GROUP OF SHAREHOLDERS WHO WERE HAVING THAT QUARTERLY

03:53PM 14    MEETING WITH MS. HOLMES; ISN'T THAT RIGHT?

03:53PM 15          MR. BOSTIC:  FOUNDATION.  CALLS FOR SPECULATION.

03:53PM 16          THE COURT:  IF YOU COULD LAY A FOUNDATION.  I'LL

03:53PM 17    SUSTAIN THE OBJECTION.

03:53PM 18          MR. DOWNEY:  SURE.

03:53PM 19    Q.   WELL, DID MS. HOLMES TELL YOU OVER TIME THAT YOUR GROUP

03:53PM 20    WAS THE ONLY GROUP THAT SHE WAS MEETING WITH ON A QUARTERLY

03:53PM 21    BASIS?

03:53PM 22          MR. BOSTIC:  HEARSAY, YOUR HONOR.

03:53PM 23          THE COURT:  SUSTAINED.

03:53PM 24          MR. DOWNEY:  OKAY.  FAIR ENOUGH.

03:53PM 25    Q.   BUT YOU RECOGNIZE GENERALLY THAT NOT EVERY INVESTOR HAD A

03:53PM  1    QUARTERLY MEETING WITH THE CEO OF THE COMPANY; CORRECT?

03:53PM  2              MR. BOSTIC:  SAME OBJECTION, YOUR HONOR.

03:53PM  3              THE WITNESS:  I DON'T KNOW.

03:53PM  4              THE COURT:  THE ANSWER IS STRICKEN.  YOU CAN ASK

03:53PM  5    ANOTHER QUESTION.  THE OBJECTION IS SUSTAINED.

03:53PM  6              MR. DOWNEY:  SURE.

03:53PM  7    Q.   NOW, UNDER -- YOU WERE PROVIDED INFORMATION ABOUT THE

03:54PM  8    COMPANY, CORRECT, AND ITS OPERATIONS BY MS. HOLMES DURING THOSE

03:54PM  9    MEETINGS; CORRECT?

03:54PM 10    A.   CORRECT.

03:54PM 11    Q.   BUT YOU UNDERSTOOD ACTUALLY THAT YOU DIDN'T HAVE ANY RIGHT

03:54PM 12    TO INFORMATION UNDER THE AGREEMENTS THAT YOU HAD SIGNED;

03:54PM 13    CORRECT?

03:54PM 14    A.   CORRECT.

03:54PM 15    Q.   AND THAT'S BECAUSE UNLIKE IN A PUBLIC COMPANY WHERE

03:54PM 16    THERE'S A LOT OF INFORMATION PROVIDED SO THAT EVERYBODY CAN

03:54PM 17    HAVE IT AT THE SAME TIME, PRIVATE COMPANIES DON'T TYPICALLY

03:54PM 18    PROVIDE THAT SAME LEVEL OF DISCLOSURE; CORRECT?

03:54PM 19    A.   INCORRECT.

03:54PM 20    Q.   WELL, LET ME ASK YOU TO LOOK AT THE EXHIBIT THAT IS IN

03:54PM 21    YOUR -- LET ME GIVE YOU A DIFFERENT NOTEBOOK, OKAY?

03:54PM 22         YOUR HONOR, MAY I JUST HAVE A MOMENT TO GRAB ANOTHER

03:54PM 23    NOTEBOOK?

03:54PM 24              THE COURT:  YES, OF COURSE.

03:55PM 25              MR. DOWNEY:  ACTUALLY, I THINK THIS WILL BE IN THE

03:55PM    1        COURT'S BINDER, AND IT'S IN A DIFFERENT BINDER FOR ME.

03:55PM    2        Q.   IT SHOULD BE IN YOUR BINDER, MR. EISENMAN.

03:55PM    3             I'M GOING TO DRAW YOUR ATTENTION TO EXHIBIT 11021.

03:55PM    4        A.   WILL THAT BE ON THE SCREEN?

03:55PM    5        Q.   IT WILL NOT BE ON THE SCREEN, NO.  SO I'M GOING TO ASK

03:55PM    6        YOU, FIRST OF ALL, JUST TO LOOK AT IT.

03:55PM    7             BUT BEFORE WE GET INTO IT, AM I RIGHT THAT AT SOME POINT

03:55PM    8        DURING THE COURSE OF YOUR DEALINGS WITH THERANOS, I THINK IT'S

03:55PM    9        FAIR TO SAY FROM YOUR DIRECT TESTIMONY THAT YOU HAD A LEVEL OF

03:55PM   10        FRUSTRATION WITH THE AMOUNT OF COMMUNICATION THAT YOU WERE

03:55PM   11        RECEIVING; CORRECT?

03:55PM   12        A.   CORRECT.

03:55PM   13        Q.   AND YOU WENT BACK AND YOU TRIED TO FIGURE OUT WHETHER YOU

03:55PM   14        HAD A RIGHT UNDER YOUR AGREEMENTS TO GET INFORMATION FROM

03:56PM   15        THERANOS; CORRECT?

03:56PM   16        A.   INCORRECT.

03:56PM   17        Q.   OKAY.  AND DID YOU ALSO HAVE AN ATTORNEY LOOK AT THE

03:56PM   18        AGREEMENTS FOR PURPOSES OF DETERMINING WHETHER OR NOT YOU HAD A

03:56PM   19        RIGHT TO INFORMATION?

03:56PM   20        A.   NO.  IT WAS IRRELEVANT.

03:56PM   21        Q.   OKAY.  LET ME ASK YOU IN EXHIBIT 11021 TO LOOK AT

03:56PM   22        PAGE 129, LINE 7.  AND DON'T SAY ANYTHING OUT LOUD.

03:56PM   23        A.   I'M SORRY, WHAT PAGE?  I'VE GOT 11021.  WHAT PAGE?

03:56PM   24        Q.   11021.

03:56PM   25        A.   OKAY.

03:56PM   1      Q.   PAGE 129.

03:56PM   2      A.   I DON'T SEE WHERE THE PAGE -- OH, OKAY.   OKAY.

03:57PM   3      Q.   CAN YOU SEE IT IN THE BOTTOM --

03:57PM   4      A.   YEAH.

03:57PM   5      Q.   UNFORTUNATELY, I CAN'T BRING THIS UP ON THE SCREEN.

03:57PM   6      A.   OKAY.

03:57PM   7      Q.   ALL RIGHT.   NOW, YOU RECALL THAT IN CONNECTION WITH

03:57PM   8      ANOTHER PROCEEDING RELATED TO THERANOS YOU GAVE A DEPOSITION.

03:57PM   9           DO YOU RECALL THAT?

03:57PM  10      A.   YES.

03:57PM  11      Q.   AND YOU WENT TO AN OFFICE AND WERE QUESTIONED BY SOME

03:57PM  12      LAWYERS ABOUT YOUR EXPERIENCES INVESTING IN THERANOS; CORRECT?

03:57PM  13      A.   CORRECT.

03:57PM  14      Q.   AND YOU, AS YOU DID HERE TODAY, YOU TOOK AN OATH TO TELL

03:57PM  15      THE TRUTH; CORRECT?

03:57PM  16      A.   CORRECT.

03:57PM  17      Q.   AND DURING THE COURSE OF THAT DEPOSITION, I WANT TO ASK

03:57PM  18      YOU IF YOU WERE ASKED THE FOLLOWING QUESTION AND GAVE THE

03:57PM  19      FOLLOWING ANSWER:

03:57PM  20           "AND IS THAT A TRUE STATEMENT OF YOUR UNDERSTANDING OF

03:57PM  21      YOUR RIGHTS, THAT YOU HAD NO INFORMATION RIGHTS?"

03:58PM  22           "ANSWER:  YES."  I'M SORRY.

03:58PM  23           THE QUESTION IS, THEN YOU WROTE, QUOTE, "IT IS MY

03:58PM  24      UNDERSTANDING" -- I'M SORRY.

03:58PM  25           "QUESTION:  AND IS THAT A TRUE STATEMENT OF YOUR

03:58PM  1    UNDERSTANDING OF YOUR RIGHTS, THAT YOU HAD NO INFORMATION

03:58PM  2    RIGHTS?

03:58PM  3         "ANSWER:  YES."

03:58PM  4         AND THEN MY QUESTION TO THE WITNESS IS, WERE YOU ASKED

03:58PM  5    THAT QUESTION AND DID YOU GIVE THAT ANSWER IN THE DEPOSITION

03:58PM  6    ABOUT THERANOS?

03:58PM  7    A.   APPARENTLY SO.

03:58PM  8              MR. DOWNEY:  YOUR HONOR, I'M GOING TO MOVE TO A

03:58PM  9    DIFFERENT TOPIC AT THIS POINT.

03:58PM  10             THE COURT:  WELL, LET'S MOVE TO OUR WEEKEND THEN,

03:58PM  11   SHALL WE?

03:58PM  12        (LAUGHTER.)

03:58PM  13             THE COURT:  THANK YOU, MR. DOWNEY.  I APPRECIATE

03:58PM  14   THAT.

03:58PM  15        LADIES AND GENTLEMEN, WE'RE GOING TO TAKE OUR RECESS NOW,

03:58PM  16   AND THIS WILL BE A LONG RECESS.  AS YOU KNOW TOMORROW IS A

03:59PM  17   HOLIDAY.  WE RECOGNIZE VETERAN'S DAY TOMORROW.

03:59PM  18        THEN WE WILL NOT BE IN SESSION ON FRIDAY, WE WILL NOT BE

03:59PM  19   IN SESSION ON FRIDAY.  WE'LL NEXT BE IN SESSION MONDAY NEXT,

03:59PM  20   WHICH IS THE 15TH, NOVEMBER 15TH.  AND WE'VE SCHEDULED THAT FOR

03:59PM  21   THE MORNING, 9:00 O'CLOCK.  I'D LIKE TO START AT 9:00 O'CLOCK

03:59PM  22   IF WE CAN.

03:59PM  23        I'LL DEFER WHETHER OR NOT WE CAN GO IN THE AFTERNOON OR

03:59PM  24   NOT.  I'M JUST SAYING THAT THAT'S AVAILABLE FOR US.  IT MIGHT

03:59PM  25   BE AVAILABLE.

03:59PM 1    IF IT CAUSES PROBLEMS FOR ANY JUROR, THAT'S FINE.  AS I

03:59PM 2  SAID, OUR SCHEDULE NEXT WEEK, WE'RE SCHEDULED TO SEE EACH OTHER

03:59PM 3  EVERY DAY OF THE WEEK, 16TH, 17TH, 18TH, 19TH.

03:59PM 4    THERE'S AN ABBREVIATED BREAK ON THE 17TH, BUT OTHERWISE

03:59PM 5  NEXT WEEK WILL BE A FULL WEEK.  WE'LL TRY TO ACCOMMODATE YOU AS

03:59PM 6  BEST WE CAN WITH OTHER TREATS TO HELP MAKE YOUR STAY MORE

04:00PM 7  ENJOYABLE.

04:00PM 8    BUT UNTIL THEN, PLEASE, DURING THIS LONG BREAK, AGAIN, I

04:00PM 9  REMIND YOU OF THE ADMONITION, DO NOT, DO NOT DO ANY

04:00PM 10  INVESTIGATION, DO NOT COMMUNICATE WITH ANYONE IN ANY WAY, DO

04:00PM 11  NOT READ, DISCUSS, GO ON SOCIAL MEDIA, OR IN ANY WAY ATTEMPT TO

04:00PM 12  FIND OUT ANYTHING ABOUT THIS CASE OR LEARN ANYTHING ABOUT THIS

04:00PM 13  CASE.

04:00PM 14    IF SUCH A THING HAPPENS, PLEASE TURN AWAY, TURN OFF THE

04:00PM 15  DEVICE, CLOSE THE PAPER, WHATEVER IT IS, AND I'LL ASK YOU

04:00PM 16  WHETHER OR NOT ANY OF THESE THINGS HAPPENED WHEN WE SEE EACH

04:00PM 17  OTHER NEXT ON THE 15TH.

04:00PM 18    SO DO HAVE A GOOD LONG WEEKEND.  ENJOY.

04:00PM 19    WE'LL SEE YOU NEXT WEEK.  THANK YOU VERY MUCH.

04:00PM 20    (JURY OUT AT 4:00 P.M.)

04:01PM 21    THE COURT:  AND WE'LL SEE YOU BACK NEXT WEEK AS

04:01PM 22  WELL, SIR.  THANK YOU VERY MUCH.  YOU'RE FREE TO GO.

04:01PM 23    ALL RIGHT.  THANK YOU.  PLEASE BE SEATED.  THANK YOU.

04:01PM 24    THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR THE

04:01PM 25  LONG WEEKEND.  THE WITNESS HAS LEFT THE COURTROOM.

04:01PM 1        ALL COUNSEL AND MS. HOLMES ARE PRESENT.

04:01PM 2        ANYTHING THAT EITHER COUNSEL WOULD LIKE TO PUT ON THE

04:01PM 3  RECORD BEFORE WE BREAK?

04:01PM 4          MR. SCHENK:  YES, YOUR HONOR, JUST TWO QUICK THINGS.

04:01PM 5        FIRST, MR. EISENMAN JUST ASKED US A QUESTION ABOUT TRAVEL.

04:01PM 6  SO I WOULD SEEK PERMISSION FROM THE COURT AND NOTIFY COUNSEL

04:01PM 7  THAT ORDINARILY WE WOULD NOT TALK TO A WITNESS ONCE WE PASS THE

04:01PM 8  WITNESS.  WE WILL STILL COMMUNICATE WITH MR. EISENMAN IF THAT'S

04:01PM 9  OKAY, BUT JUST ABOUT SCHEDULING, FLIGHTS, THINGS LIKE THAT.

04:01PM 10         THE COURT:  RIGHT.  THAT'S FINE.

04:01PM 11      MR. DOWNEY?

04:01PM 12         MR. DOWNEY:  YEAH, I THINK IF IT'S CONFINED TO THAT

04:01PM 13  IT'S FINE.

04:01PM 14         THE COURT:  SURE.  OKAY.

04:01PM 15         MR. SCHENK:  THANK YOU, YOUR HONOR.

04:02PM 16      THE SECOND TOPIC IS SCHEDULING FOR NEXT WEEK.

04:02PM 17      I THINK IT IS LIKELY THAT THE GOVERNMENT WILL REST NEXT

04:02PM 18  WEEK.  I THINK IT IS LIKELY THAT WE DO NOT HAVE ENOUGH

04:02PM 19  WITNESSES TO FILL THE WEEK.

04:02PM 20      I DON'T KNOW EXACTLY WHICH DAY NEXT WEEK WE WOULD REST.

04:02PM 21  IT'S GOING TO DEPEND ON HOW QUICKLY WE MOVE THROUGH THE

04:02PM 22  REMAINING WITNESSES.

04:02PM 23      WHAT WE WOULD ASK IS A COUPLE OF THINGS.  THURSDAY AT

04:02PM 24  7:00 P.M. HAS BEEN THE ROLLING DISCLOSURE DEADLINE.  WE WILL

04:02PM 25  MAKE OUR DISCLOSURE BY 7:00 P.M. TOMORROW OF THE WITNESSES WE

04:02PM  1    ANTICIPATE CALLING NEXT WEEK.

04:02PM  2         WE WOULD ASK THAT THAT DISCLOSURE OBLIGATION KICK IN FOR

04:02PM  3    THE DEFENSE TOMORROW AT 7:00, THAT THEY GIVE US A FIRST HALF,

04:02PM  4    THAT THEY GIVE US NEXT WEEK WITNESSES, AND ALSO JENCKS.  I

04:02PM  5    DON'T BELIEVE WE'VE RECEIVED A JENCKS PRODUCTION SINCE THE

04:02PM  6    THIRD DAY OF OUR MOTION IN LIMINE HEARING.

04:02PM  7         SO I THINK IT'S APPROPRIATE FOR THOSE OBLIGATIONS TO NOW

04:03PM  8    KICK IN.

04:03PM  9              THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

04:03PM 10              MR. DOWNEY:  ALL OF THAT IS FINE WITH US,

04:03PM 11    YOUR HONOR.

04:03PM 12         ONE THING THAT WOULD HELP TO GET SOME SENSE OF IS WHAT DAY

04:03PM 13    DURING THE WEEK THEY WOULD BE IN THE BEST POSITION TO REST.

04:03PM 14              THE COURT:  WELL, WHILE YOU PONDER THAT, I KNOW

04:03PM 15    YOU'RE GOING TO GIVE SOME INFORMATION TO THE GOVERNMENT ABOUT

04:03PM 16    THIS LIS BUSINESS AND WHETHER OR NOT THAT POTENTIALLY COULD

04:03PM 17    EXTEND THIS CASE.

04:03PM 18         SO YOU'LL BE INFORMED, MR. SCHENK, BY THAT -- I THINK YOU

04:03PM 19    SAID TOMORROW AT 4:00 P.M.?

04:03PM 20              MR. DOWNEY:  WE'LL DO THAT TOMORROW BY 4:00 SO AS

04:03PM 21    NOT TO DISTURB THE NORMAL PROCEDURE.

04:03PM 22              THE COURT:  RIGHT.

04:03PM 23              MR. DOWNEY:  AND THEN WE WILL COMPLY WITH

04:03PM 24    MR. SCHENK'S REQUEST IN TERMS OF IDENTIFYING FIRST HALF

04:03PM 25    WITNESSES.

```
04:03PM   1              THE COURT:  THAT WOULD BE HELPFUL.

04:03PM   2              MR. DOWNEY:  AT 7:00 P.M. I SHOULD SAY.

04:03PM   3              THE COURT:  RIGHT.

04:03PM   4         AND THEN MAYBE WHAT WE SHOULD DO IS WHY DON'T WE PLAN

04:03PM   5   ON -- CAN WE GET TOGETHER THE MORNING OF THE 15TH JUST TO GET

04:04PM   6   ANOTHER PLOT ABOUT SCHEDULING BEFORE WE START?

04:04PM   7              MR. DOWNEY:  IS THAT MONDAY, YOUR HONOR?

04:04PM   8              THE COURT:  YES.

04:04PM   9              MR. DOWNEY:  YES, THAT WOULD BE GOOD.

04:04PM  10              MR. SCHENK:  YES.

04:04PM  11              THE COURT:  WERE YOU SUGGESTING THE WEEKEND,

04:04PM  12   MR. DOWNEY?

04:04PM  13              MR. DOWNEY:  NO.  I'M SO DISORIENTED AT THIS POINT

04:04PM  14   AS TO DATES, I DIDN'T KNOW WHAT DAY IT WAS.

04:04PM  15              THE COURT:  THEY ALL BLEND TOGETHER.  THE GOOD THING

04:04PM  16   IS THAT OUR COMPUTERS SEEM TO WORK TOGETHER.

04:04PM  17              MR. DOWNEY:  QUITE WELL, ACTUALLY.

04:04PM  18              THE COURT:  THERE WAS A LITTLE GLITCH, BUT WE'RE

04:04PM  19   GRATEFUL FOR ALL OF THE EFFORTS OUR I.T. PEOPLE GAVE TO THAT.

04:04PM  20         ALL RIGHT.  THANK YOU THEN.

04:04PM  21         THERE'S AGREEMENT ON THIS SCHEDULE THEN I THINK FROM THE

04:04PM  22   DEFENSE; IS THAT RIGHT?

04:04PM  23              MR. DOWNEY:  THERE IS AGREEMENT ON OUR FULFILLING

04:04PM  24   JENCKS OBLIGATIONS, MAKING THE DISCLOSURE, AND WE'LL RECEIVE

04:04PM  25   THE DISCLOSURE.
```

04:04PM 1          THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  HAVE A

04:04PM 2   GOOD WEEKEND.

04:05PM 3          THE CLERK:  COURT IS ADJOURNED.

04:05PM 4       (COURT ADJOURNED AT 4:05 P.M.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                      CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16    _____
      IRENE RODRIGUEZ, CSR, CRR
      CERTIFICATE NUMBER 8076

17

18    _____

19    LEE-ANNE SHORTRIDGE, CSR, CRR
      CERTIFICATE NUMBER 9595

20

21         DATED:  NOVEMBER 10, 2021

22

23

24

25