# EXHIBIT 67

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR-18-00258-EJD |
| | ) | |
| PLAINTIFF, | ) | SAN JOSE, CALIFORNIA |
| | ) | |
| VS. | ) | VOLUME 24 |
| | ) | |
| ELIZABETH A. HOLMES, | ) | OCTOBER 26, 2021 |
| | ) | |
| DEFENDANT. | ) | PAGES 4577 – 4869 |
| _____ | ) | **PAGES 4674 TO 4677 SEALED** |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                       BY:  JOHN C. BOSTIC
                            JEFFREY B. SCHENK
                       150 ALMADEN BOULEVARD, SUITE 900
                       SAN JOSE, CALIFORNIA 95113

                       BY:  ROBERT S. LEACH
                            KELLY VOLKAR
                       1301 CLAY STREET, SUITE 340S
                       OAKLAND, CALIFORNIA 94612

       (APPEARANCES CONTINUED ON THE NEXT PAGE.)


OFFICIAL COURT REPORTERS:
                       IRENE L. RODRIGUEZ, CSR, RMR, CRR
                       CERTIFICATE NUMBER 8074
                       LEE-ANNE SHORTRIDGE, CSR, CRR
                       CERTIFICATE NUMBER 9595

       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
            TRANSCRIPT PRODUCED WITH COMPUTER

```
1
        A P P E A R A N C E S: (CONT'D)
2

3    FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                              BY:  KEVIN M. DOWNEY
4                                  LANCE A. WADE
                                   KATHERINE TREFZ
5                                  SEEMA ROPER
                                   PATRICK LOOBY
6                                  RICHARD CLEARY
                                   J.R. FLEURMONT
7                             725 TWELFTH STREET, N.W.
                              WASHINGTON, D.C. 20005
8
                              LAW OFFICE OF JOHN D. CLINE
9                             BY:  JOHN D. CLINE
                              ONE EMBARCADERO CENTER, SUITE 500
10                            SAN FRANCISCO, CALIFORNIA 94111

11
     ALSO PRESENT:            FEDERAL BUREAU OF INVESTIGATION
12                            BY:  ADELAIDA HERNANDEZ

13                            OFFICE OF THE U.S. ATTORNEY
                              BY:  LAKISHA HOLLIMAN, PARALEGAL
14                                 MADDI WACHS, PARALEGAL

15                            WILLIAMS & CONNOLLY
                              BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL
16
                              TBC
17                            BY:  BRIAN BENNETT, TECHNICIAN

18

19

20

21

22

23

24

25
```

1

INDEX OF PROCEEDINGS

2

GOVERNMENT'S:

3

4   **LISA PETERSON**

DIRECT EXAM BY MR. LEACH                    P. 4634

5   CROSS-EXAM BY MR. WADE                      P. 4710

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          INDEX OF EXHIBITS

2
                                       IDENT.      EVIDENCE
3        GOVERNMENT'S:

4        1944                                        4640
         5432                                        4643
5        2015                                        4646
         2073                                        4651
6        4858                                        4663
         2107                                        4690
7        2166                                        4692
         3152                                        4703
8        2170                                        4719
         4197                                        4735
9        2097                                        4812
         2098                                        4814
10       2139                                        4819

11

         DEFENDANT'S:
12

13       12751                                       4728
         14089                                       4801
         14106, PARAGRAPH 2, REDACTED               4809
14       12856                                       4816
         14080                                       4820
15       13987                                       4820
         14081                                       4822
16

17

18

19

20

21

22

23

24

25
```

```
 1     SAN JOSE, CALIFORNIA                    OCTOBER 26, 2021

 2                        P R O C E E D I N G S

 3            (COURT CONVENED AT 8:31 A.M.)

 4            (JURY OUT AT 8:31 A.M.)

 5                 THE COURT:  LET'S GO ON THE RECORD IN THE HOLMES

 6     MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.

 7            WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.  I UNDERSTAND

 8     THERE'S A FEW THINGS THAT WE SHOULD TAKE UP BEFORE WE BEGIN

 9     EVIDENCE.

10            MR. WADE?

11                 MR. WADE:  GOOD MORNING, YOUR HONOR.  THANK YOU.

12            LANCE WADE FOR MS. HOLMES.

13            WE HAVE TWO WITNESSES THAT WE WOULD LIKE TO RAISE SOME

14     MATTERS WITH THE COURT IN ADVANCE OF TESTIMONY.  THE FIRST IS

15     LISA PETERSON, WHO I UNDERSTAND FROM THE GOVERNMENT WILL BE THE

16     FIRST WITNESS TODAY.

17            AND THEN MR. DOWNEY WILL ADDRESS A COUPLE OF ISSUES

18     RELATING TO ALAN EISENMAN, WHO IS AN INVESTOR WHO WE UNDERSTAND

19     MAY TESTIFY LATE IN THE DAY OR TOMORROW DEPENDING ON HOW THE

20     TRIAL PROCEEDS.

21            WITH RESPECT TO MS. PETERSON, THERE ARE, I THINK, THREE

22     ISSUES.  ONE RELATES TO THE ADMISSION OF CERTAIN VIDEO

23     EVIDENCE.  WE WANTED TO RAISE THESE ISSUES WITH THE COURT TO

24     TRY AND AVOID ISSUES LIKE THE KIND WE HAD LAST WEEK.

25                 THE COURT:  SURE.
```

08:33AM 1        MR. WADE:  AND WE'VE BEEN MEETING AND CONFERRING

08:33AM 2   WITH THE GOVERNMENT TO TRY TO GET SOME CLARITY ON THAT.

08:33AM 3        THE SECOND RELATES TO NO NOTES.  I THINK I RAISED --

08:33AM 4   FLAGGED FOR THE COURT THAT WE MAY HAVE CONCERNS ABOUT THE

08:33AM 5   NOTES.

08:33AM 6        I THINK BASED UPON THE EXHIBITS THAT WERE DISCLOSED BY THE

08:33AM 7   GOVERNMENT, I THINK WE PROBABLY ARE OKAY WITH THE NOTES.  WE

08:33AM 8   WOULDN'T STIPULATE TO THEM, BUT WE'LL SEE IF THEY LAY A

08:33AM 9   FOUNDATION.  THERE MAY BE THE -- THE ONE PAGE THEY INTEND TO

08:33AM 10  OFFER MAY BE APPROPRIATE.

08:33AM 11       AND THEN FINALLY, THERE ARE STATEMENTS CONCERNING

08:33AM 12  MATERIALITY.

08:33AM 13       WITH RESPECT TO THE VIDEOS, THERE ARE THREE VIDEOS THAT I

08:33AM 14  THINK MAY BE AT ISSUE, ALTHOUGH I'M NOT SURE WHAT THE

08:33AM 15  GOVERNMENT'S POSITION IS WITH RESPECT TO THE THIRD.

08:34AM 16       IT'S MY UNDERSTANDING THAT THE GOVERNMENT INTENDS TO OFFER

08:34AM 17  A VIDEO FROM JIM CRAMER'S "MAD MONEY" ON CNBC ON WHICH THE

08:34AM 18  CLIENT APPEARED.  IT'S A SEGMENT.  I'M NOT SURE HOW LONG, MAYBE

08:34AM 19  EIGHT MINUTES IN TOTAL.

08:34AM 20       IT'S MY UNDERSTANDING THAT THE GOVERNMENT WANTS TO OFFER

08:34AM 21  EXCERPTS OF THAT VIDEO.

08:34AM 22       WE THINK THE VIDEO IN ITS ENTIRETY SHOULD BE OFFERED.

08:34AM 23  INITIALLY WE UNDERSTOOD THAT'S WHAT WAS GOING TO BE OFFERED,

08:34AM 24  AND THEN THEY WOULD JUST PLAY CERTAIN EXCERPTS.

08:34AM 25       I BELIEVE THE GOVERNMENT DOES NOT NOW INTEND TO OFFER THE

08:34AM 1  COMPLETE VIDEO, BUT JUST WANTS TO OFFER THE EXCERPTS.

08:34AM 2       THIS IS A SEGMENT ON A NEWS PROGRAM.  I'M SURE THE COURT

08:34AM 3  HAS SEEN A MILLION OF THEM, IF NOT THIS ONE.

08:34AM 4       AND WE JUST THINK THAT THE CONTEXT AND THE TOTALITY IS

08:34AM 5  IMPORTANT.  IT'S NOT VERY LONG.  WE THINK IT SHOULD BE PLAYED.

08:34AM 6       IF THE GOVERNMENT CHOOSES NOT TO PLAY IT, WE WOULD

08:35AM 7  PROBABLY JUST PLAY THE WHOLE THING ON CROSS.

08:35AM 8       SIMILARLY, THERE'S A "TODAY SHOW" --

08:35AM 9            THE COURT:  I'M SORRY.  IS THIS AN INTERVIEW OF YOUR

08:35AM 10 CLIENT?  OR --

08:35AM 11           MR. WADE:  IT'S A SEGMENT THAT INCLUDES AN INTERVIEW

08:35AM 12 OF THE CLIENT.

08:35AM 13           THE COURT:  I SEE.  OKAY.

08:35AM 14           MR. WADE:  SO I ACTUALLY DON'T KNOW THE PURPOSE FOR

08:35AM 15 WHICH THE GOVERNMENT IS OFFERING IT.

08:35AM 16      I'M ASSUMING THERE'S SOME FOUNDATION OF RELEVANCE.  I KNOW

08:35AM 17 THE WITNESS HAS SAID -- MS. PETERSON HAS SAID SHE SAW THE TWO

08:35AM 18 VIDEOS.

08:35AM 19      I ACTUALLY DON'T KNOW EXACTLY --

08:35AM 20           THE COURT:  OKAY.

08:35AM 21           MR. WADE:  -- WHAT THE BASIS FOR IT BEING OFFERED

08:35AM 22 IS.

08:35AM 23      MR. LEACH MAY BE ABLE TO GIVE US SOME WINDOW INTO THAT.

08:35AM 24      BUT TO THE EXTENT THAT THEY SEEK TO OFFER ANY OF IT, WE

08:35AM 25 THINK THEY SHOULD OFFER ALL OF IT.

08:35AM 1          THE COURT:  OKAY.

08:35AM 2          MR. WADE:  OUR ARGUMENT AND POSITION IS ESSENTIALLY

08:35AM 3  THE SAME WITH RESPECT TO A "TODAY SHOW" SEGMENT THAT INCLUDES

08:35AM 4  STATEMENTS FROM OUR CLIENT.  SAME ISSUES.

08:35AM 5          THE COURT:  OKAY.

08:35AM 6          MR. WADE:  SO WE DON'T KNOW EXACTLY WHAT ABOUT THE

08:35AM 7  VIDEO THE GOVERNMENT -- WHY THE GOVERNMENT THINKS IT'S

08:36AM 8  RELEVANT, WHAT ITS POSITION IS, BUT IF THEY WANT TO OFFER IT,

08:36AM 9  WE THINK THEY SHOULD JUST SHOW THE WHOLE THING.  WE THINK IT'S

08:36AM 10 TAKEN OUT OF CONTEXT AND SOME OF THESE STATEMENTS COULD BE

08:36AM 11 CONFUSING.

08:36AM 12         THE COURT:  IS THERE -- AND THE "TODAY SHOW" IS AN

08:36AM 13 INTERVIEW OF YOUR CLIENT AS WELL?

08:36AM 14         MR. WADE:  IT INVOLVES AN INTERVIEW OF THE CLIENT,

08:36AM 15 YES.

08:36AM 16         THE COURT:  AND HOW LONG IS THAT, DO YOU KNOW?

08:36AM 17         MR. LEACH:  IT'S ABOUT FOUR MINUTES, YOUR HONOR.

08:36AM 18         THE COURT:  OH, OKAY.  IN TOTAL.  OKAY.

08:36AM 19         MR. WADE:  AND AGAIN, I THINK THE GOVERNMENT IS

08:36AM 20 INTENDING TO OFFER SEGMENTS.  I DON'T KNOW THE THEORY OF

08:36AM 21 RELEVANCE OR WHY THEY WANT TO OFFER IT.  I CAN IMAGINE A FEW.

08:36AM 22         THE COURT:  OKAY.  AND THEN WHAT IS YOUR THIRD

08:36AM 23 ISSUE?  I'M SORRY.

08:36AM 24         MR. WADE:  THE THIRD ISSUE IS A LONGER VIDEO AND IT

08:36AM 25 RELATES TO A PRESENTATION AT THE AACC, WHICH IS THE AMERICAN

08:36AM  1    ASSOCIATION OF CLINICAL CHEMISTRY, WHICH IS ESSENTIALLY A LAB

08:36AM  2    TRADE ASSOCIATION WHERE ALL OF THE CLINICAL CHEMISTS GATHER AND

08:36AM  3    HAVE AN ANNUAL CONVENTION.

08:37AM  4         OUR CLIENT GAVE A PRESENTATION OF TECHNOLOGY AT THAT

08:37AM  5    MEETING, AND -- A RELATIVELY LENGTHY PRESENTATION OF TECHNOLOGY

08:37AM  6    AT THAT MEETING, WHICH WAS OBSERVED BY A NUMBER OF WITNESSES IN

08:37AM  7    THE CASE, INCLUDING MS. PETERSON, WHO ACTUALLY ATTENDED THE

08:37AM  8    PRESENTATION AND PROVIDED CONTEMPORANEOUS THOUGHTS AND ANALYSIS

08:37AM  9    OF THE PRESENTATION THAT COMPARE THE PRESENTATION BACK TO HER

08:37AM 10    VIEWS OF THE TECHNOLOGY AT THE TIME SHE VISITED THE COMPANY.

08:37AM 11         SO WE THINK, WE THINK EXCERPTS OF THAT ARE RELEVANT.  WE

08:37AM 12    WOULD BE HAPPY TO PLAY THE WHOLE THING, BUT FOR --

08:37AM 13              THE COURT:  HOW LONG IS THAT?

08:37AM 14              MR. WADE:  THAT'S AN HOUR AND A HALF.  BUT IN THE

08:37AM 15    INTEREST OF --

08:37AM 16              THE COURT:  AND IT'S, AND IT'S TECHNOLOGY AND IT

08:38AM 17    SOUNDS LIKE IT'S RATHER DENSE.

08:38AM 18              MR. WADE:  IT'S RATHER EXCITING, YOUR HONOR, I WOULD

08:38AM 19    SUGGEST.

08:38AM 20              THE COURT:  WHAT DID YOU DO THIS WEEKEND, MR. WADE?

08:38AM 21              MR. WADE:  I VIEWED THIS VIDEO A COUPLE OF TIMES.

08:38AM 22         WELL, THE GIANTS AREN'T IN THE SERIES, SO WHAT ELSE DO WE

08:38AM 23    HAVE TO DO?

08:38AM 24         (LAUGHTER.)

08:38AM 25              MR. WADE:  WE WOULD INTEND TO OFFER EXCERPTS, I

08:38AM 1    THINK TOTALLING MAYBE 20 MINUTES INTERSPERSED WITH SOME

08:38AM 2    Q AND A.  WE DO THAT -- SO THERE ARE TWO PARTS OF THE

08:38AM 3    PRESENTATION.  ONE IS A PRESENTATION BY THE CLIENT, IT INVOLVED

08:38AM 4    VIDEO AND IT INVOLVES A POWERPOINT.  THAT'S ABOUT AN HOUR.  WE

08:38AM 5    WOULD PLAY EXCERPTS OF THAT.

08:38AM 6         WE ACTUALLY, IN ALL SERIOUSNESS, DO THINK IT WOULD BE

08:38AM 7    USEFUL TO THE JURY BECAUSE IT DOES SHOW SOME OF THE TECHNOLOGY

08:38AM 8    THAT HAS BEEN TALKED ABOUT A LOT, WHICH HASN'T REALLY BEEN SEEN

08:39AM 9    ALL THAT MUCH, AND I THINK THE JURY MAY TAKE INTEREST IN SORT

08:39AM 10   OF HOW SOME OF THIS STUFF FUNCTIONS AND IT MAY GIVE THEM

08:39AM 11   IMPORTANT CONTEXTS.

08:39AM 12        THE SECOND PIECE IS A Q AND A WHICH INVOLVES THREE EXPERTS

08:39AM 13   WHO ARE QUESTIONING MS. HOLMES AND THREE SCIENTISTS WHO WORK AT

08:39AM 14   THERANOS.  THAT IS 30 MINUTES.  WE HAD INTENDED TO PLAY

08:39AM 15   EXCERPTS OF THAT IN THE INTEREST OF TIME.

08:39AM 16        I CERTAINLY DON'T WANT TO BE ACCUSED OF CHERRY PICKING AND

08:39AM 17   HAVE A SITUATION WHERE WE PLAY EXCERPTS IN THE INTEREST OF TIME

08:39AM 18   AND THEN THERE'S A SUGGESTION CREATED THAT WE'RE HIDING OTHER

08:39AM 19   EXCERPTS.  WE'RE HAPPY TO PLAY THE ENTIRE 30 MINUTES OF THE

08:39AM 20   Q AND A.

08:39AM 21        BUT WE THINK, WE THINK EITHER WOULD BE APPROPRIATE FOR THE

08:39AM 22   JURY GIVEN ITS RELEVANCE TO SOME OF THE WITNESSES IN THE CASE

08:39AM 23   AND THE FACT THAT THE GOVERNMENT APPEARS TO BE INTERESTED IN

08:40AM 24   GOING BEYOND THE SORT OF INVESTMENT PERIOD INTO "THE

08:40AM 25   WALL STREET JOURNAL" PERIOD AND THE POST "WALL STREET JOURNAL"

08:40AM 1    PERIOD.

08:40AM 2         SO WE WOULD INTEND TO OFFER THOSE EXCERPTS.

08:40AM 3         I ACTUALLY DON'T KNOW WHAT THE GOVERNMENT'S POSITION IS ON

08:40AM 4    THAT.  WE HAVEN'T RECEIVED THE GOVERNMENT'S POSITION ON THE

08:40AM 5    ADMISSION OF THAT.

08:40AM 6         SO THAT'S IT FOR THE VIDEOS.

08:40AM 7         AND THEN WE HAVE SOME MATERIALITY CONCERNS, BUT MAYBE I'LL

08:40AM 8    PAUSE THERE.

08:40AM 9              THE COURT:  LET'S TALK ABOUT THE VIDEOS.  THANK YOU.

08:40AM 10        MR. LEACH?

08:40AM 11             MR. LEACH:  THANK YOU, YOUR HONOR.

08:40AM 12        LET ME TAKE THEM IN ORDER AND GIVE THE COURT A LITTLE MORE

08:40AM 13   CONTEXT.

08:40AM 14        THE FIRST VIDEO IS THE "MAD MONEY" INTERVIEW.  IT'S ON THE

08:40AM 15   DAY ON OCTOBER 15TH OR 16TH, 2015, THE DAY "THE

08:40AM 16   WALL STREET JOURNAL" ARTICLE BY JOHN CARREYROU COMES OUT, AND

08:40AM 17   MS. HOLMES IS ASKED ABOUT THE VERACITY OF CERTAIN STATEMENTS IN

08:40AM 18   "THE WALL STREET JOURNAL" ARTICLE.

08:40AM 19        IT'S THE EQUIVALENT OF A POLICE INTERROGATION WHERE SHE'S

08:40AM 20   ASKED, IS THIS TRUE?  IS THIS TRUE?  AND WE THINK SOME OF HER

08:40AM 21   RESPONSES ARE, AT BEST, MISLEADING AND ARGUABLY FALSE.

08:41AM 22        SO THE RELEVANCE IS THAT SHE'S MAKING FALSE EXCULPATORY

08:41AM 23   STATEMENTS AT THE TIME THAT SHE'S CONFRONTED WITH NEGATIVE

08:41AM 24   INFORMATION.

08:41AM 25        IT'S CLEARLY RELEVANT, AND WHAT THE DEFENSE IS LOOKING

08:41AM 1   OVER IS THE HEARSAY ISSUE THAT IS BAKED INTO ALL OF THIS.  HER

08:41AM 2   STATEMENTS, WHEN OFFERED BY THE DEFENSE -- EXCUSE ME -- ARE

08:41AM 3   HEARSAY.  WHEN THEY'RE OFFERED BY THE GOVERNMENT, THEY'RE

08:41AM 4   ADMISSIBLE.

08:41AM 5       AND SHE'S ASKED VERY DIRECT QUESTIONS.  I DON'T -- I

08:41AM 6   HAVEN'T HEARD AN ARGUMENT ABOUT THE RULE OF COMPLETENESS, BUT

08:41AM 7   THE ANSWER TO WHY ONLY SOME OF THE CLIPS IS HER STATEMENTS ARE

08:41AM 8   HEARSAY WHEN OFFERED BY THE DEFENSE.  THEY'RE NOT HEARSAY WHEN

08:41AM 9   OFFERED BY THE GOVERNMENT.

08:41AM 10      WE WANT TO PLAY THE RESPONSE TO TWO QUESTIONS, TWO VERY

08:41AM 11  DIRECT QUESTIONS, AND THE REMAINDER SHOULD NOT COME IN OVER A

08:41AM 12  HEARSAY OBJECTION.

08:41AM 13          THE COURT:  ARE THESE STATEMENTS THAT THE WITNESS --

08:41AM 14  I'M JUST TRYING TO GET FOUNDATIONALLY, IS THIS -- MS. PETERSON

08:42AM 15  IS GOING TO SAY SOMETHING ABOUT THIS?

08:42AM 16          MR. LEACH:  MS. PETERSON IS GOING TO SAY, I WATCHED

08:42AM 17  THE VIDEO.

08:42AM 18          THE COURT:  I SEE.

08:42AM 19          MR. LEACH:  I DON'T WANT TO SPEAK FOR HER, BUT IN A

08:42AM 20  SENSE --

08:42AM 21          THE COURT:  RIGHT.

08:42AM 22          MR. LEACH:  -- IT WAS A POSITIVE FACT TO SEE HER GO

08:42AM 23  ON T.V. AND DENY SOME VERY SERIOUS ALLEGATIONS, AND THIS

08:42AM 24  STARTED A PROCESS WHERE SHE WANTED TO GET MORE INFORMATION FROM

08:42AM 25  THE DEFENDANT.

08:42AM 1     SO THIS IS -- WE WANT TO GET MS. PETERSON'S RESPONSE TO

08:42AM 2  SOME OF THE THINGS SHE HEARD.

08:42AM 3     BUT PUTTING THAT ASIDE, THESE ARE STATEMENTS BY THE

08:42AM 4  DEFENDANT AT THE TIME THAT NEGATIVE INFORMATION IS PRESENTED.

08:42AM 5  IT COULD NOT BE MORE RELEVANT, AND IT'S SIMPLY THE RULE OF

08:42AM 6  HEARSAY THAT THE DEFENSE DOES NOT GET TO PUT IN SELF-SERVING

08:42AM 7  STATEMENTS THAT THEY WANT TO PUT IN BECAUSE SHE'S NOT UNDER

08:42AM 8  OATH.

08:42AM 9          THE COURT:  OKAY.

08:42AM 10          MR. LEACH:  THE "TODAY SHOW" VIDEO IS SLIGHTLY

08:42AM 11  DIFFERENT IN THE SENSE THAT IT'S A COMBINATION OF BOTH

08:42AM 12  STATEMENTS BY A REPORTER, YOU KNOW, SUMMARIZING INFORMATION,

08:42AM 13  AND SEGMENTS OF AN INTERVIEW OF MS. HOLMES.

08:43AM 14     WE PROPOSE PLAYING SOME OF THE STATEMENTS ONLY BY

08:43AM 15  MS. HOLMES IN THAT INTERVIEW.

08:43AM 16     THE REMAINDER, I'M NOT SURE I APPRECIATE THE RELEVANCE OF

08:43AM 17  IT.  AND PERHAPS IF THE DEFENSE LAYS MORE FOUNDATION, I, I CAN

08:43AM 18  SEE THE ENTIRETY COMING IN.  I'M NOT SURE I HAVE A PROBLEM WITH

08:43AM 19  THAT.

08:43AM 20     BUT THERE'S A HEARSAY ISSUE THERE.  AND IT'S NOT JUST AN

08:43AM 21  INTERVIEW.  IT'S STATEMENTS BY A REPORTER WHICH, IF OFFERED FOR

08:43AM 22  THE TRUTH, THERE MAY BE HEARSAY ISSUES BEHIND IT.

08:43AM 23     AND I HAVE TRANSCRIPTS OF THE -- OF BOTH THE "MAD MONEY"

08:43AM 24  AND THE "TODAY SHOW" INTERVIEW.

08:43AM 25     WITH RESPECT TO THE THIRD VIDEO --

08:43AM 1          THE COURT:  PARDON ME.  IS MS. PETERSON ALSO GOING

08:43AM 2   TO SPEAK TO THE "TODAY SHOW" INTERVIEW?

08:43AM 3          MR. LEACH:  YES, YES.

08:43AM 4          THE COURT:  SAME?

08:43AM 5          MR. LEACH:  SHE WILL SAY, I VIEWED IT AND I WAS

08:43AM 6   PLEASED TO SEE THE DEFENDANT OUT THERE.

08:43AM 7          THE COURT:  OKAY.

08:43AM 8          MR. LEACH:  AND MS. PETERSON HAS A MEETING WITH

08:44AM 9   MS. HOLMES IN PALO ALTO SHORTLY AFTER THAT INTERVIEW, AND I

08:44AM 10  WANT TO ASK HER ABOUT THINGS MS. HOLMES SAID PUBLICLY AND

08:44AM 11  THINGS MS. HOLMES SAID TO MS. PETERSON PRIVATELY.

08:44AM 12         THE COURT:  OKAY.

08:44AM 13         MR. LEACH:  AND JUST FOR CONTEXT, YOUR HONOR, THAT

08:44AM 14  "TODAY SHOW" INTERVIEW IS APRIL OF 2016.

08:44AM 15      WITH RESPECT TO THE THIRD VIDEO, THIS IS NOT ONE THAT THE

08:44AM 16  GOVERNMENT INTENDS TO OFFER, IT'S ONE THE DEFENSE INTENDS TO

08:44AM 17  OFFER DURING CROSS-EXAMINATION.  I HAVEN'T SEEN WHICH EXCERPTS

08:44AM 18  THEY'RE THINKING OF, BUT THIS IS A PRESENTATION FROM AUGUST OF

08:44AM 19  2016, SO NEARLY A YEAR AFTER "THE WALL STREET JOURNAL" ARTICLE

08:44AM 20  COMES OUT.

08:44AM 21      IT'S LARGELY STATEMENTS BY MS. HOLMES, WHICH COULD NOT

08:44AM 22  PRESENT A GREATER HEARSAY PROBLEM.  I REALLY DON'T UNDERSTAND

08:44AM 23  THE -- YOU KNOW, I DON'T UNDERSTAND THE BASIS FOR ADMITTING

08:44AM 24  MINUTES UPON POSSIBLY HOURS OF THE DEFENDANT'S UNSWORN

08:45AM 25  STATEMENTS ABOUT WHAT HER TECHNOLOGY SUPPOSEDLY CAN OR CAN'T

08:45AM 1   DO.

08:45AM 2         WHAT I HEARD FROM MR. WADE RIGHT NOW IS THAT IT POSSIBLY

08:45AM 3   RELATES TO MS. PETERSON'S STATE OF MIND, MS. PETERSON'S STATE

08:45AM 4   OF MIND IN AUGUST OF 2016.

08:45AM 5         BUT I DON'T THINK MS. PETERSON'S STATE OF MIND IN AUGUST

08:45AM 6   OF 2016 IS REMOTELY RELEVANT.  THE INVESTMENT SHE MADE WAS BACK

08:45AM 7   IN 2014 BY -- THIS IS MORE THAN A YEAR AFTER "THE

08:45AM 8   WALL STREET JOURNAL."

08:45AM 9         SO WE DON'T UNDERSTAND THE RELEVANCE OF THE AACC

08:45AM 10  PRESENTATION, AND WE CERTAINLY OBJECT TO WHOLESALE STATEMENTS

08:45AM 11  BY THE DEFENDANT, UNSWORN, ABOUT WHAT HER TECHNOLOGY CAN DO.

08:45AM 12        IF SHE WANTS TO STAND BY THOSE STATEMENTS, SHE SHOULD TAKE

08:45AM 13  THE STAND AND SAY IT UNDER OATH SUBJECT TO CROSS-EXAMINATION.

08:45AM 14        BUT IT'S MASSIVE HEARSAY.

08:45AM 15        THE COURT:  SO YOU DON'T, YOU DON'T INTEND TO DO

08:45AM 16  ANYTHING WITH THE THIRD VIDEO?  THAT'S NOT YOURS, THAT'S

08:45AM 17  MR. WADE'S?

08:46AM 18        MR. LEACH:  CORRECT.

08:46AM 19        THE COURT:  I SEE.  OKAY.

08:46AM 20        MR. WADE:  YOUR HONOR, IF I MIGHT ADDRESS THESE

08:46AM 21  ISSUES AND GIVE SOME CONTEXT.

08:46AM 22        OF COURSE YOUR HONOR HEARD DAN EDLIN'S TESTIMONY LAST WEEK

08:46AM 23  IN WHICH THE GOVERNMENT NOT ONCE, BUT TWICE, WENT AND SOLICITED

08:46AM 24  ANSWERS ABOUT THE REASONS HE LEFT THE COMPANY IN DECEMBER OF

08:46AM 25  2016 RELATING TO THE TECHNOLOGY AND EFFORTS MADE TO

08:46AM 1    REHABILITATE THE TECHNOLOGY THAT HE THOUGHT WERE NOT

08:46AM 2    SUCCESSFUL.

08:46AM 3         THE GOVERNMENT HAS OPENED THE DOOR ON THIS EVIDENCE IN

08:46AM 4    TERMS OF THE TECHNOLOGICAL CAPACITY IN THAT TIME PERIOD THROUGH

08:46AM 5    SOLICITING THAT EVIDENCE WHICH WAS, FRANKLY, VERY PREJUDICIAL,

08:46AM 6    NOT ONCE, BUT TWICE, SO WE SHOULD HAVE THE ABILITY TO REBUT

08:46AM 7    THAT.

08:46AM 8         NUMBER TWO, WE'RE NOT OFFERING ANY OF THESE FOR THE TRUTH

08:46AM 9    OF THE MATTER ASSERTED.  WE'RE OFFERING THEM FOR NONHEARSAY

08:46AM 10   PURPOSES.  THEY REFLECT OUR CLIENT'S STATE OF MIND AT THE TIME

08:46AM 11   SHE'S MAKING THE STATEMENTS, AND THEY ARE RELEVANT FOR THE

08:46AM 12   EFFECT ON THE LISTENER IN ALL OF THEM.

08:47AM 13        IN FACT, MR. LEACH JUST SAID HE SOUGHT TO ELICIT THIS

08:47AM 14   EVIDENCE -- THE REACTION OF THE LISTENER TO VIEWING THIS

08:47AM 15   EVIDENCE.

08:47AM 16        MS. PETERSON, AS WE UNDERSTAND IT, NOT ONLY VIEWED THE

08:47AM 17   "MAD MONEY" CLIP, AND HE'S GOING TO ASK QUESTIONS ABOUT THAT,

08:47AM 18   MY UNDERSTANDING IS THAT SHE THEN VIEWED THE "TODAY SHOW" CLIP,

08:47AM 19   AND HE'S GOING TO ASK QUESTIONS ABOUT THAT.

08:47AM 20        SO WE'RE ENTITLED TO GET THE WHOLE PICTURE IN FRONT OF THE

08:47AM 21   JURY AND ASK QUESTIONS ABOUT THE EFFECT OF THE WHOLE SEGMENTS

08:47AM 22   ON MS. PETERSON.

08:47AM 23        HE ALSO SAID THAT THEY'RE GOING TO TALK ABOUT A MEETING

08:47AM 24   THAT HAPPENED IN APRIL OF 2016, WHICH IS ALSO WELL AFTER THE

08:47AM 25   PERIOD BECAUSE HE WANTS -- BECAUSE HE THINKS WHATEVER

08:47AM  1      MS. PETERSON HAS TO SAY ABOUT THAT IS RELEVANT TO THEIR CASE.

08:47AM  2      WELL, I DON'T KNOW WHAT THE DIFFERENCE BETWEEN THAT AND

08:48AM  3  THE STATEMENTS IN AUGUST OF 2016 ARE.

08:48AM  4      IN FACT, THE STATEMENTS IN APRIL OF 2016, IN THE WITNESS'S

08:48AM  5  NOTES THERE ARE STATEMENTS ABOUT THE FACT THAT THEY'RE GOING TO

08:48AM  6  GO TO THE AACC PRESENTATION AND DISPLAY THIS TECHNOLOGY, AND

08:48AM  7  THEY SHOULD ATTEND THE PRESENTATION AND OBSERVE THAT.  THAT'S

08:48AM  8  REFERENCED IN THE VERY MEETING THAT MR. LEACH WANTS TO OPEN THE

08:48AM  9  DOOR ON.

08:48AM 10      SO ALL OF THIS STUFF IS RELEVANT BASED UPON WHAT THE

08:48AM 11  GOVERNMENT WANTS TO PUT IN.  THEY CAN'T PUT IN THE CRAMER VIDEO

08:48AM 12  AND THE "TODAY SHOW" VIDEO AND THEN SAY THERE IS SOME MAGIC

08:48AM 13  LINE OR MAGIC CURTAIN THAT COMES DOWN IN APRIL AND EVERYTHING

08:48AM 14  PAST THAT IN TERMS OF THE EFFECT ON MS. PETERSON IS IRRELEVANT.

08:48AM 15      THE COURT:  WHAT ABOUT, WHAT ABOUT THE FACT THAT, AS

08:48AM 16  YOU KNOW, A DEFENDANT CAN'T GET IN STATEMENTS THAT GO TO HER

08:49AM 17  DEFENSE IN THIS CASE UNLESS SHE TESTIFIES, THESE HEARSAY

08:49AM 18  STATEMENTS, MR. LEACH'S POINT?

08:49AM 19      ISN'T THAT WHAT THIS DOES?  ISN'T THIS A NEGATING HER

08:49AM 20  STATE OF MIND, OR YOUR CLIENT'S STATE OF MIND IN THIS EFFECT?

08:49AM 21      MR. WADE:  THESE WERE, THESE WERE STATEMENTS THAT

08:49AM 22  WERE OBSERVED BY THE WITNESSES THAT THE GOVERNMENT HAS CHOSEN

08:49AM 23  TO CALL IN THIS CASE.

08:49AM 24      THE COURT:  RIGHT.

08:49AM 25      MR. WADE:  AND SO --

08:49AM 1          THE COURT:  BUT LET'S SAY IF HE DIDN'T, LET'S SAY

08:49AM 2    MR. LEACH DIDN'T WANT TO PUT THESE IN, YOU COULDN'T DO THEM;

08:49AM 3    RIGHT?

08:49AM 4          MR. WADE:  IF MR. LEACH DIDN'T WANT TO OPEN THE DOOR

08:49AM 5    FOR STATEMENTS DURING THIS PERIOD OF TIME, IN OTHER WORDS,

08:49AM 6    REACTIONS TO "THE WALL STREET JOURNAL" COVERAGE, IT'S NOT CLEAR

08:49AM 7    TO ME THAT WE COULD PUT THESE IN, AT LEAST NOT THROUGH

08:49AM 8    MS. PETERSON.

08:49AM 9       YOU KNOW, I RESERVE OUR RIGHTS AS TO WHAT ISSUES MAY COME

08:49AM 10   UP WITH RESPECT TO OTHER WITNESSES.

08:49AM 11      BUT HE DOES WANT TO OPEN THE DOOR, AND SO HE DOES WANT

08:50AM 12   TO -- HE JUST WANTS TO PUT IT A CRACK OPEN AND SAYS THAT, YOU

08:50AM 13   KNOW, IT CAN'T GO -- IT CAN'T SWING A LITTLE BIT FURTHER.

08:50AM 14         THE COURT:  RIGHT.  BUT TO MR. LEACH'S POINT, HE

08:50AM 15   SAYS, LOOK, WE CAN PUT THIS ON, WE'RE PROSECUTING, AND THESE

08:50AM 16   ARE STATEMENTS OF A DEFENDANT THAT ARE ADMISSIBLE, AND WHAT HE

08:50AM 17   SAYS IS, BUT THE DEFENSE CAN'T SAY, OKAY, WELL, LET US PUT OUR

08:50AM 18   STATEMENTS OF OUR CLIENT ON WITHOUT PUTTING THE CLIENT ON.

08:50AM 19         MR. WADE:  AGAIN, WE'RE NOT SEEKING -- THE REASON

08:50AM 20   WE'RE SEEKING TO OFFER THIS EVIDENCE IS BECAUSE THROUGH THIS

08:50AM 21   WITNESS THEY'RE INTENDING TO OPEN THE DOOR ON THIS ISSUE AND ON

08:50AM 22   THE POST "WALL STREET JOURNAL" IMPACT ON THE REACTION FROM

08:50AM 23   MS. HOLMES AND THE COMPANY ON THIS EVIDENCE.

08:50AM 24      THEY CAN'T OPEN THAT DOOR AND SAY THEY CAN ONLY OFFER THE

08:50AM 25   EVIDENCE THAT THEY WANT WHEN THE WITNESS OBSERVED MANY OTHER

08:50AM 1    THINGS.

08:50AM 2          THE COURT:  WELL, I'M TALKING ABOUT -- I'M STARTING

08:51AM 3    CHRONOLOGICALLY WITH THE "MAD MONEY."

08:51AM 4          MR. WADE:  RIGHT.

08:51AM 5          THE COURT:  THEY WANT TO PUT ON A FEW CLIPS OF YOUR

08:51AM 6    CLIENT'S STATEMENTS DURING "MAD MONEY" AND YOU WANT TO PLAY THE

08:51AM 7    WHOLE THING.

08:51AM 8          MR. WADE:  WE WANT TO PLAY THE WHOLE THING.  WE

08:51AM 9    THINK IT'S A RULE OF COMPLETENESS ISSUE.  WE THINK TAKING THE

08:51AM 10    STATEMENTS OUT OF CONTEXT IN A NEWS SEGMENT IS MISLEADING,

08:51AM 11    PARTICULARLY IN, PARTICULARLY IN THE "MAD MONEY" SEGMENT.

08:51AM 12      WE THINK YOU NEED THE CONTEXT IN WHICH THE QUESTIONS ARE

08:51AM 13    ASKED.  IT'S A VERY SHORT SEGMENT.

08:51AM 14      IN THE CONTEXT OF --

08:51AM 15          THE COURT:  BUT, MR. LEACH, WHAT IS YOUR POINT ON

08:51AM 16    THIS?

08:51AM 17          MR. LEACH:  YOUR HONOR, THIS IS THE EQUIVALENT OF A

08:51AM 18    POLICE INTERVIEW.  THE DEFENDANT CAN'T SAY, IF IT WERE A ONE

08:51AM 19    HOUR INTERVIEW AND THE GOVERNMENT WANTS TO ELICIT FIVE MINUTES

08:51AM 20    IN RESPONSE TO ONE QUESTION, WE THEREFORE GET TO SUBMIT THE

08:51AM 21    WHOLE THING.

08:51AM 22      I HAVEN'T HEARD A PARTICULAR QUESTION OR ANSWER THAT IS

08:51AM 23    MISLEADING UNDER THE RULE OF COMPLETENESS HERE.  IT'S JUST, YOU

08:51AM 24    NEED THE COMPLETE CONTEXT.

08:51AM 25      RULE 106 IS LIMITED.  I CAN GIVE THE COURT THE TRANSCRIPT

08:52AM 1    OF THE PARTICULAR QUESTIONS AND ANSWERS.  I DON'T KNOW WHY YOU

08:52AM 2    NEED THE REMAINDER IN ORDER TO UNDERSTAND HER RESPONSE TO THAT

08:52AM 3    PARTICULAR QUESTION.

08:52AM 4         AND I JUST NEED TO GO BACK, YOUR HONOR.

08:52AM 5         THESE CLIPS ARE RELEVANT BECAUSE THEY SHOW THE DEFENDANT'S

08:52AM 6    STATE OF MIND, MS. HOLMES'S STATE OF MIND, WHICH THE GOVERNMENT

08:52AM 7    CAN DO.  SHE'S, IN THE CRAMER INTERVIEW, YOU KNOW, NOT

08:52AM 8    RESPONDING TO THE QUESTION OF HOW MANY TESTS YOUR EDISON DEVICE

08:52AM 9    CAN DO.

08:52AM 10        IN THE "TODAY SHOW" INTERVIEW, SHE'S SAYING, I'M THE CEO

08:52AM 11   OF THE COMPANY, I'M RESPONSIBLE FOR EVERYTHING.

08:52AM 12        SHE'S -- YOU KNOW, INSTEAD OF BLAMING THE LAB DIRECTOR

08:52AM 13   LIKE SHE DOES IN THIS COURTROOM, SHE'S SAYING, NO, I'M

08:52AM 14   RESPONSIBLE FOR THIS.

08:52AM 15        THAT'S AN ADMISSION.  THAT SHOWS HER STATE OF MIND.  YOU

08:52AM 16   KNOW, THE FACT THAT IT HAPPENED TO BE SOMETHING THAT

08:52AM 17   MS. PETERSON SAW IS NEITHER HERE NOR THERE.

08:52AM 18        AND THE FACT THAT WE WANT TO OFFER THESE STATEMENTS BY A

08:52AM 19   DEFENDANT DOESN'T OPEN THE DOOR TO EVERYTHING A DEFENDANT EVER

08:53AM 20   SAID TO A WITNESS OR EVER SAID TO A POLICE OFFICER.

08:53AM 21        THE RULE THAT MR. WADE IS PROPOSING WOULD SWALLOW UP THE

08:53AM 22   HEARSAY RULE, AND I JUST DON'T SEE WHY MS. PETERSON'S STATE OF

08:53AM 23   MIND IN 2016 HAS ANY RELEVANCE ON WHY THEY MADE THE INVESTMENT.

08:53AM 24        SO THAT'S THE GOVERNMENT'S POINT THERE, YOUR HONOR.

08:53AM 25             MR. WADE:  MR. LEACH JUST SAID WHY WE WANT TO OFFER

08:53AM 1    THE CASE, OR OFFER ALL OF THE EVIDENCE.  HE JUST SAID IT'S

08:53AM 2    RELEVANT TO THE CLIENT'S STATE OF MIND, AND THAT'S WHY THEY

08:53AM 3    WANT TO OFFER IT.

08:53AM 4         THAT'S WHY WE WANT TO OFFER IT, TOO.

08:53AM 5         WE'RE HAPPY TO HAVE AN INSTRUCTION THAT IT DOESN'T GO --

08:53AM 6    IT'S NOT BEING OFFERED FOR THE TRUTH OF THE MATTER ASSERTED,

08:53AM 7    BUT THE PROFFERED BASIS WHICH THE GOVERNMENT JUST GAVE IS

08:53AM 8    PERMISSIBLE AS A NONHEARSAY ADMISSION OF ALL OF THIS EVIDENCE

08:53AM 9    GIVEN THAT THE GOVERNMENT WANTS TO GO INTO THIS PERIOD OF TIME.

08:53AM 10        THE COURT:  GO AHEAD.

08:53AM 11        MR. LEACH:  THAT'S JUST SO WRONG, YOUR HONOR, AND IT

08:53AM 12   WOULD SWALLOW UP THE HEARSAY RULE.  WE MIGHT AS WELL PUT IN

08:54AM 13   EVERY EMAIL THAT MS. HOLMES EVER WROTE TO SHOW HER STATE OF

08:54AM 14   MIND.

08:54AM 15        THE COURT:  I'M NOT CERTAIN, MR. WADE, THAT THE

08:54AM 16   COMPLETENESS APPLIES TO WHAT YOU'RE TALKING ABOUT HERE, AND I'M

08:54AM 17   LOOKING AT THE "MAD MONEY" AND THE "TODAY SHOW" FIRST AND

08:54AM 18   SEPARATING THOSE TWO OUT.

08:54AM 19        SO THE GOVERNMENT WANTS TO PLAY CERTAIN EXCERPTS.  THEY

08:54AM 20   CAN DO THAT.  AND THEY'RE STATEMENTS OF YOUR CLIENT.  THEY ARE

08:54AM 21   ADMISSIBLE FOR THAT PURPOSE.

08:54AM 22        BUT THEN THE QUESTION IS, CAN YOU THEN GET IN STATEMENTS

08:54AM 23   OF YOUR OWN CLIENT IN THE SAME VIDEO AS TESTIMONIAL?  IS THAT

08:54AM 24   WHAT YOU'RE TRYING TO DO?

08:54AM 25        MR. WADE:  NO, I DON'T WANT IT.  I SPECIFICALLY DO

08:54AM 1    NOT WANT IT AS TESTIMONIAL.  I WANT IT TO SHOW HER STATE OF

08:54AM 2    MIND AND I WANT IT TO SHOW THE EFFECTS ON THE LISTENER.

08:54AM 3        THEY INTEND TO ASK QUESTIONS ABOUT -- MR. LEACH JUST SAID

08:54AM 4    THAT THEY INTEND TO ASK QUESTIONS ABOUT THE EFFECT OF THAT

08:54AM 5    STATEMENT ON THE LISTENER.

08:54AM 6        I'M ENTITLED TO PUT THE WHOLE STATEMENT IN AND ASK MY OWN

08:55AM 7    QUESTIONS ABOUT THE EFFECT ON THE LISTENER AS PART OF

08:55AM 8    CROSS-EXAMINATION.

08:55AM 9        AND SO I'M NOT OFFERING IT AS A TESTIMONIAL STATEMENT.

08:55AM 10   I'M HAPPY TO HAVE AN INSTRUCTION THAT IT'S NOT OFFERED FOR THE

08:55AM 11   TRUTH OF THE MATTER ASSERTED.  THAT'S NOT WHAT WE'RE SEEKING.

08:55AM 12       AND SO FOR BOTH OF THOSE, ONE, IT'S A NONHEARSAY PURPOSE;

08:55AM 13   AND, TWO, WE THINK IN CONTEXT WHEN YOU LOOK AT THE VIDEO, IT'S

08:55AM 14   MISLEADING WITHOUT GETTING THE FULL STATEMENT.

08:55AM 15           THE COURT:  BECAUSE IT EXPOSES YOUR CLIENT'S STATE

08:55AM 16   OF MIND, YOUR CLIENT'S STATE OF MIND IN A DIFFERENT WAY?

08:55AM 17           MR. WADE:  YEAH.

08:55AM 18           THE COURT:  SHE DIDN'T MEAN THAT?

08:55AM 19           MR. WADE:  WE THINK -- YES.

08:55AM 20           THE COURT:  BECAUSE YOU CAN'T PUT YOUR CLIENT'S

08:55AM 21   STATE OF MIND IN THROUGH THIS TYPE OF EVIDENCE.

08:55AM 22           MR. WADE:  WE CAN ADMIT STATEMENT -- WE CAN ADMIT

08:55AM 23   THINGS FOR A NONHEARSAY PURPOSE.  THERE ARE MULTIPLE NONHEARSAY

08:55AM 24   PURPOSES AS OFFERED THROUGH THIS WITNESS.

08:55AM 25           THE COURT:  YEAH, BUT IF YOU'RE TRYING TO -- IF YOU

08:55AM 1    WANT THIS TO COME IN AND THEN TO ARGUE, SEE, MY CLIENT'S STATE

08:56AM 2    OF MIND AS TO AN ELEMENT HERE, SHE DIDN'T INTEND TO DEFRAUD,

08:56AM 3    THAT'S -- THERE'S SOME CASE LAW ON THAT THAT SAYS YOU CAN'T DO

08:56AM 4    THAT.

08:56AM 5              MR. WADE:  NO.  BUT THE GOVERNMENT WANTS TO OFFER

08:56AM 6    PART OF THIS STATEMENT AND TALK ABOUT THE EFFECT IT HAS ON

08:56AM 7    WITNESSES IN THE CASE.  THAT'S EXACTLY WHAT MR. LEACH SAID THAT

08:56AM 8    THEY'RE INTENDING TO DO.  THAT IS NOT A HEARSAY -- THAT'S A

08:56AM 9    NONHEARSAY PURPOSE FOR THE ADMISSION OF THE STATEMENT.

08:56AM 10   HE JUST WANTS THEM TO HAVE THE -- TO REACT ONLY TO THE

08:56AM 11   PIECES OF THE STATEMENT THAT HE WANTS THEM TO REACT TO WHEN

08:56AM 12   IT'S NOT FAIR TO SAY, WHAT WAS YOUR REACTION TO THOSE TWO

08:56AM 13   QUESTIONS, WHEN CLEARLY IF THE WITNESS SAW THE STATEMENT, THE

08:56AM 14   SEGMENT, THEY SAW THE WHOLE SEGMENT.

08:56AM 15   SO IF HE WANTS TO ASK THE WITNESS WHAT THE REACTION TO THE

08:56AM 16   SEGMENT IS, IT'S TOTALLY UNFAIR TO SAY, WE'RE ONLY GOING TO

08:56AM 17   GIVE YOU THIS PIECE AND THIS PIECE WITH RESPECT TO THE --

08:56AM 18   THAT'S ON THE CRAMER PIECE.

08:56AM 19   ON THE "MAD MONEY" PIECE -- OR I'M SORRY, ON THE "TODAY

08:57AM 20   SHOW" PIECE, IT ARGUABLY SHOULDN'T BE ADMITTED BECAUSE OF RULE

08:57AM 21   OF COMPLETENESS CONCERNS ANYWAY BECAUSE THE SEGMENTS WITHIN,

08:57AM 22   WITHIN -- WE DON'T HAVE THE ROUGH TRANSCRIPT.  THEY COULD HAVE

08:57AM 23   SUBPOENAED THE "TODAY SHOW" AND GOTTEN ALL OF THE Q AND A.

08:57AM 24   INSTEAD, WE'RE TALKING ABOUT DISCRETE SEGMENTS, YOU KNOW,

08:57AM 25   TAKEN OUT OF CONTEXT WITHIN THAT -- WITHIN A LONGER INTERVIEW.

08:57AM 1          SO, YOUR HONOR MAY KNOW WHEN ONE OF THESE THINGS IS

08:57AM 2    CONDUCTED, AND IN THIS CASE IT IS MARIA SHRIVER, SHE COMES OUT

08:57AM 3    TO THE COMPANY AND SHE DOES A LENGTHY INTERVIEW.

08:57AM 4          THE GOVERNMENT WANTS TO OFFER VERY NARROW SEGMENTS.  WE

08:57AM 5    DON'T KNOW THE CONTEXT OF THAT, SO THERE'S ARGUABLY A RULE OF

08:57AM 6    COMPLETENESS CONCERN JUST WITH RESPECT TO OFFERING THOSE

08:57AM 7    SEGMENTS BECAUSE WE DON'T KNOW.

08:57AM 8          BUT THERE'S PARTICULAR PREJUDICE WHEN YOU TAKE IT OUT OF

08:57AM 9    THE CONTEXT OF THE BROADER, OF THE BROADER NARRATIVE OF THE

08:57AM 10   STORY.  IT'S JUST MISLEADING.  IT'S A FOUR MINUTE SEGMENT.

08:58AM 11         AND IF THEY WANT TO ASK ABOUT THE REACTION OF THIS

08:58AM 12   WITNESS, THEN THEY -- WE SHOULD BE ABLE TO GET THE REACTION TO

08:58AM 13   THE WHOLE THING, NOT JUST TO THE PIECES THAT THE GOVERNMENT

08:58AM 14   WANTS TO OFFER.

08:58AM 15         WITH RESPECT TO THE AACC VIDEO, THIS WITNESS TOOK NOTES

08:58AM 16   THE DAY OF THE VIDEO THAT SAID, "MUCH OF THE MEDIA COVERAGE

08:58AM 17   I'VE READ SO FAR IN THE PRESENTATION CALLS THE PRESENTATION A

08:58AM 18   BAIT AND SWITCH.  SHE'S PRESENTING THE PUBLIC WITH A NEW

08:58AM 19   MACHINE WHILE IGNORING THE ISSUES OF THE OLD MACHINE.  I DIDN'T

08:58AM 20   SEE IT THAT WAY.  HAVING BEEN PRIVY TO SEEING THE MACHINE IN

08:58AM 21   2014, AND SEEING IT TODAY, I DO SEE THE MACHINES AS

08:58AM 22   FUNDAMENTALLY SIMILAR.  THE COMPANY JUST CAME OUT TOO SOON,

08:58AM 23   OVERPROMISED, AND WOEFULLY FAILED IN EXECUTION THE FIRST TIME

08:58AM 24   AROUND, MADE MUCH WORSE BY A TOTAL LACK OF COMMUNICATION AND A

08:58AM 25   PERCEPTION OF ARROGANCE."

08:58AM 1      IT'S NOT -- THAT'S HER STATE OF MIND, HER REACTION TO THIS

08:59AM 2   PRESENTATION.

08:59AM 3           THE COURT:  AFTER HER INVESTMENT?

08:59AM 4           MR. WADE:  AFTER HER INVESTMENT.

08:59AM 5       BUT, AGAIN, THE GOVERNMENT --

08:59AM 6           THE COURT:  SO WHAT IS THE RELEVANCE OF THAT?

08:59AM 7           MR. WADE:  WELL, THE GOVERNMENT WANTS TO GET IN ALL

08:59AM 8   OF THESE STATEMENTS, YOUR HONOR.

08:59AM 9           THE COURT:  NO, I UNDERSTAND.  BUT WHAT IS THE

08:59AM 10  RELEVANCE OF HER -- THIS IS BEYOND THE CHARGING PERIOD;

08:59AM 11  CORRECT?

08:59AM 12          MR. WADE:  WELL --

08:59AM 13          THE COURT:  IS THAT RIGHT?

08:59AM 14          MR. WADE:  THE STATEMENT -- ALL OF THESE STATEMENTS,

08:59AM 15  I THINK, ARE BEYOND THE CHARGING PERIOD, WITH THE POSSIBLE

08:59AM 16  EXCEPTION OF THE CRAMER STATEMENT, ALTHOUGH IT'S LONG AFTER --

08:59AM 17  IT'S A YEAR AFTER THE INVESTMENT WAS MADE IN THIS CASE.

08:59AM 18      BUT, YOUR HONOR, THE RELEVANCE IS WHAT I JUST SAID, WHICH

08:59AM 19  IS THE COMPANY -- HAVING BEEN PRIVY TO SEEING THE MACHINE IN

08:59AM 20  2014 AND SEEING IT TODAY, I DO SEE THE MACHINES AS

08:59AM 21  FUNDAMENTALLY SIMILAR.

08:59AM 22      SO SHE'S, SHE'S LOOKING AT THE TECHNOLOGY, WHICH THE

09:00AM 23  GOVERNMENT IN THIS PERIOD OF TIME HAS PUT AT ISSUE AS A RESULT

09:00AM 24  OF MR. EDLIN'S TESTIMONY, SHE'S LOOKING AT THE TECHNOLOGY AND

09:00AM 25  SHE'S SAYING, YEAH, THIS SEEMS SIMILAR TO WHAT I OBSERVED WHEN

09:00AM  1    I WENT TO VISIT THE COMPANY.

09:00AM  2                THE COURT:  OKAY.

09:00AM  3                MR. LEACH:  MS. PETERSON'S STATE OF MIND IN 2016 IS

09:00AM  4    IRRELEVANT, YOUR HONOR.  THE PURPOSE OF THE "MAD MONEY" AND THE

09:00AM  5    "TODAY SHOW" CLIPS IS TO SHOW THE DEFENDANT'S RESPONSE TO

09:00AM  6    QUESTIONING ABOUT THE ALLEGATION -- THE ALLEGATIONS IN THIS

09:00AM  7    CASE.  HOW MANY TESTS CAN YOUR EDISON DO?  SHE DEFLECTS.  ARE

09:00AM  8    YOU IN CHARGE OF THIS COMPANY OR ARE YOU NOT?  SHE ANSWERS

09:00AM  9    THAT, I AM.

09:00AM  10        MS. PETERSON IS AN AUTHENTICATING WITNESS FOR THESE

09:00AM  11   VIDEOS, HER REACTION IS, FRANKLY, NEITHER HERE NOR THERE, AND

09:00AM  12   HER STATE OF MIND IN 2016 TWO YEARS AFTER THE INVESTMENT AT ONE

09:00AM  13   ISOLATED POINT IN TIME BASED ON AN UNSWORN HOUR LONG SCIENTIFIC

09:01AM  14   PRESENTATION BY MS. HOLMES WHICH WE CANNOT CROSS-EXAMINE ON

09:01AM  15   UNLESS SHE TESTIFIES HAS NO BEARING ON THE ALLEGATIONS IN THIS

09:01AM  16   CASE.  IT'S HEARSAY.  IT'S 403.

09:01AM  17        I DON'T KNOW WHY WHAT MS. PETERSON THOUGHT IN AUGUST OF

09:01AM  18   2016, TWO YEARS AFTER HER INVESTMENT, REALLY MATTERS IN THIS

09:01AM  19   CASE.

09:01AM  20                THE COURT:  WELL, MR. WADE SAYS THAT SHE'S PERHAPS

09:01AM  21   HAD AN EPIPHANY AFTER LOOKING AT THIS AND DECIDED, OH, MAYBE

09:01AM  22   THE MACHINES ARE THE SAME.

09:01AM  23                MR. LEACH:  I'M QUITE CONFIDENT, WHEN ASKED ABOUT

09:01AM  24   THAT, YOUR HONOR, SHE WILL DENY HAVING AN EPIPHANY, THAT SHE'LL

09:01AM  25   SAY THE BAIT AND SWITCH IS MORE A REFERENCE TO WHAT TYPE OF

09:01AM 1    PROMISES HAD BEEN MADE IN THE PRESENTATION, AND SHE HAS A

09:01AM 2    RESPONSE TO THAT AND IT'S NOT, I WAS HAPPY WITH THE INVESTMENT

09:01AM 3    AND REALLY CONFIDENT THAT THINGS WERE GOING TO WORK OUT.

09:01AM 4         AND IT OPENS UP, YOUR HONOR -- I MEAN, THERE'S A CONTEXT

09:01AM 5    AFTER THIS WHERE RDV IS TAKING STEPS, YOU KNOW, TO TRY TO

09:02AM 6    MAXIMIZE ITS INVESTMENT.  SHE'S HEARING LOTS OF THINGS FROM

09:02AM 7    LOTS OF PEOPLE ABOUT LOTS OF DIFFERENT ISSUES, ALL OF WHICH IS

09:02AM 8    HEARSAY.

09:02AM 9         AND IF WE'RE GOING INTO AUGUST OF 2016, THERE'S A WHOLE

09:02AM 10   ADDITIONAL CONTEXT THAT THE GOVERNMENT IS GOING TO WANT TO

09:02AM 11   ELICIT AND IT BECOMES A MINI TRIAL OVER WHAT HAPPENED TO THE

09:02AM 12   INVESTMENT.

09:02AM 13        AND I JUST DON'T SEE THE RELEVANCE.  IT RAISES A NUMBER OF

09:02AM 14   403 ISSUES, AND I -- IT SHOULDN'T COME IN.

09:02AM 15             MR. WADE:  YOUR HONOR, WITH RESPECT, IF THE

09:02AM 16   GOVERNMENT TAKES THAT POSITION, THEY SHOULDN'T HAVE ELICITED

09:02AM 17   THAT TESTIMONY FROM DAN EDLIN TWICE.  THEY OPENED THE DOOR TO

09:02AM 18   THIS.  THERE'S ALSO -- WE DON'T HAVE VIDEO OF IT, BUT --

09:02AM 19             THE COURT:  DID YOU OBJECT TO THAT TESTIMONY?

09:02AM 20             MR. WADE:  NO.

09:02AM 21             THE COURT:  I DON'T THINK I HEARD AN OBJECTION TO

09:02AM 22   THAT.

09:02AM 23             MR. WADE:  NO.  YOUR HONOR, BELIEVE ME, IT'S ONE OF

09:02AM 24   THOSE CIRCUMSTANCES WHERE A TRIAL LAWYER HAS TO MAKE A JUDGMENT

09:02AM 25   AS TO WHETHER YOU OBJECT IN FRONT OF THE JURY OR NOT, AND THE

4604

JUDGMENT WAS MADE NOT TO DO IT.  BUT THAT DOESN'T MEAN THAT THE

DOOR HAS NOT BEEN OPENED.  IT'S OPEN.

SO THE GOVERNMENT MADE THAT DECISION.  IT WASN'T AN

ACCIDENT.  IT DID IT TWICE.  IT DID IT ON REDIRECT AS WELL.

AND TO NOW SAY, ONCE THEY HAVE MR. EDLIN COME IN AND SAY,

I THOUGHT AS A RESULT OF ALL OF THESE INTERACTIONS THAT THE

TECHNOLOGY DIDN'T WORK OR WOULDN'T WORK OR COULDN'T WORK, WHEN

AT THE AACC PRESENTATION THERE'S A DEMONSTRATION OF THE

TECHNOLOGY, THERE'S Q AND A IN WHICH THREE OTHER EXPERTS

COMMENT ON THE TECHNOLOGY --

THE COURT:  RIGHT.  AND THAT'S WHERE I'M -- SORRY TO

INTERRUPT YOU, MR. WADE.  BUT I THINK I SEE WHERE YOU'RE GOING

WITH THAT.

SO MR. EDLIN SAYS HE LOST FAITH, HE LOST FAITH IN THE

COMPANY FOR WHATEVER REASON, THERE COULD HAVE BEEN OTHER

REASONS, AND YOU COULD HAVE PROBED THAT, BUT HE SAID, I LOST

FAITH, COULDN'T DO IT, AND SO I DECIDED TO LEAVE.

NOW, MS. PETERSON, YOU WANT HER TO TESTIFY BASICALLY TO

SAY, WELL, ACTUALLY, IN MY OPINION, BASED ON WHAT I HAVE SEEN

AT THIS OTHER -- AT THIS CONFERENCE, ACTUALLY, I THINK THE

TECHNOLOGY WAS -- IT SOUNDS LIKE THEY COULD HAVE DONE WHAT THEY

SAID THEY WERE GOING TO DO.

AND THIS IS TO SOFTEN MR. EDLIN'S STATEMENT.

SO AREN'T WE TALKING ABOUT -- ISN'T THIS REALLY TO TRY TO

SOMEHOW BUFFER EDLIN'S STATEMENT ABOUT HIS BELIEF IN THIS, IN

09:04AM 1     THE TECHNOLOGY, AND NOW YOU'RE TRYING TO SAY MS. PETERSON, HER

09:04AM 2     BELIEF IN THE TESTIMONY, WHICH, WHAT IS THE RELEVANCE OF THAT?

09:04AM 3     I JUST DON'T CAPTURE IT.

09:04AM 4          MR. WADE:  WELL, THE RELEVANCE IN THE CASE IS, IS

09:04AM 5     PUT AT ISSUE BY THE GOVERNMENT OPENING THE DOOR ON THE ISSUE

09:04AM 6     GENERALLY WITH EDLIN, AND IT WAS THEIR JUDGMENT TO DO THAT.

09:04AM 7          ONCE THOSE ISSUES ARE IN THE CASE, WE HAVE THE ABILITY TO

09:04AM 8     REBUT IT.

09:04AM 9          WHETHER IT'S WITHIN THE SCOPE OF CROSS --

09:04AM 10          THE COURT:  REBUT THE FACT THAT EDLIN LOST FAITH?

09:04AM 11          MR. WADE:  NO, IT'S NOT THAT HE LOST FAITH,

09:04AM 12     YOUR HONOR.  IF YOU LOOK AT THE STATEMENTS, HE MADE THEM TWICE.

09:04AM 13     HE COMMENTED SPECIFICALLY ON HIS BELIEF IN THE TECHNOLOGY AS A

09:04AM 14     RESULT OF POST "WALL STREET JOURNAL" ACTIONS.  I THINK HE MAYBE

09:05AM 15     EVEN SAID THE AACC.  AND IT CAME UP IN HIS TESTIMONY THAT THERE

09:05AM 16     WERE EVENTS IN DECEMBER OF 2016, WHICH WE WANT TO GET INTO AS

09:05AM 17     WELL.

09:05AM 18          THIS WITNESS WAS INVOLVED IN -- THIS WITNESS -- THE

09:05AM 19     GOVERNMENT WANTS TO PUT IN A MEETING IN APRIL OF 2016 --

09:05AM 20          THE COURT:  BUT WHAT IS IT THAT YOU'RE TRYING TO

09:05AM 21     SHOW, THAT EDLIN WAS WRONG?  HE WAS WRONG IN HIS ASSESSMENT

09:05AM 22     BECAUSE MS. PETERSON WAS RIGHT?  AND THEN WE GET INTO THIS MINI

09:05AM 23     TRIAL ABOUT WHO IS CORRECT AND WHO IS NOT?

09:05AM 24          SO WHAT WE KNOW IS EDLIN SAID WHAT HE SAID.  HE LEFT

09:05AM 25     BECAUSE OF HIS OWN PERSONAL BELIEFS.  RIGHT, WRONG, OR

09:05AM 1    WHATEVER, HE LEFT.

09:05AM 2        NOW, WHAT DOES MS. PETERSON'S ASSESSMENT OF THE TECHNOLOGY

09:05AM 3    HAVE TO DO WITH EDLIN?

09:05AM 4        MR. WADE:  THE EVIDENCE THAT WILL COME IN THROUGH

09:05AM 5    MS. PETERSON, BECAUSE THE GOVERNMENT WANTS TO OPEN THE DOOR TO

09:05AM 6    POST "WALL STREET JOURNAL" INTERACTIONS AND REACTIONS FROM THE

09:06AM 7    COMPANY, IF IT CHOOSES NOT TO DO THAT, WE WON'T OFFER THE AACC

09:06AM 8    PRESENTATION.  IF IT DOESN'T WANT TO OFFER THE CRAMER

09:06AM 9    STATEMENTS, IF IT DOESN'T WANT TO OFFER THE APRIL SEGMENT, THE

09:06AM 10    APRIL MEETING --

09:06AM 11        THE COURT:  I THINK THAT'S OFF THE TABLE.  WE'VE

09:06AM 12    BEEN TALKING ABOUT THIS ALREADY.

09:06AM 13    I'M JUST -- I JUST DON'T SEE HOW MS. PETERSON, THE AACC

09:06AM 14    TESTIMONY IS RELEVANT.

09:06AM 15        MR. WADE:  WELL, IT ALL IS EVIDENCE OF THE COMPANY'S

09:06AM 16    GOOD FAITH BELIEF THAT THE TECHNOLOGY WORKS, WHICH -- AND

09:06AM 17    IT'S --

09:06AM 18        THE COURT:  WHEN YOU SAY "THE COMPANY," WHO ARE YOU

09:06AM 19    REFERRING TO?

09:06AM 20        MR. WADE:  I'M SAYING THERANOS AS AN ENTITY,

09:06AM 21    INCLUDING MS. HOLMES.  THERE WERE FIVE PEOPLE -- FOUR PEOPLE ON

09:06AM 22    THE STAGE IN THE AACC --

09:06AM 23        THE COURT:  BUT WHAT YOU'VE JUST TOLD ME IS THAT

09:06AM 24    IT'S EVIDENCE THAT THE COMPANY BELIEVED IT WORKED, AND THE

09:06AM 25    COMPANY IS NOT ON TRIAL HERE, YOUR CLIENT IS.  AND THAT GOES TO

09:06AM 1    STATE OF MIND.

09:06AM 2         SO DOESN'T THAT THEN COME IN TO TRY TO NEGATE AN ELEMENT

09:07AM 3    OF THE OFFENSE USING HEARSAY THAT YOU'RE NOT ENTITLED TO DO?

09:07AM 4         MR. WADE:  WE CAN OFFER EVIDENCE THAT GOES TO THAT

09:07AM 5    FOR A NONHEARSAY PURPOSE.  EVIDENCE THAT REFLECTS A DEFENDANT'S

09:07AM 6    STATE OF MIND, YOU KNOW, CAN BE OFFERED.

09:07AM 7         IN THIS CASE, THE FACT THAT THEY WALKED INTO A

09:07AM 8    PRESENTATION WITH 2500 -- THE GOVERNMENT HAS AN ALLEGATION IN

09:07AM 9    ITS 404(B) NOTICE THAT THEY HID THIS DEVICE FROM THE PUBLIC AND

09:07AM 10   THAT THAT CONCEALMENT IS EVIDENCE OF CRIMINAL INTENT.

09:07AM 11        THIS IS THE OPPOSITE OF THAT.  THEY WENT IN FRONT OF 2500

09:07AM 12   PEOPLE AT A CLINICAL CHEMISTRY CONVENTION, THE WORLD'S EXPERTS,

09:07AM 13   SKEPTICS, PEOPLE WHOSE JOBS MIGHT BE ELIMINATED IF THIS

09:07AM 14   TECHNOLOGY WORKS, AND SAID, HERE'S OUR TECHNOLOGY.

09:07AM 15        THAT'S, THAT'S THE -- THE VERY ACT IS EVIDENCE AND IT

09:07AM 16   NEGATES CRIMINAL INTENT.

09:07AM 17        THE COURT:  OKAY.  ARE THERE OTHER ISSUES WE WANT TO

09:08AM 18   TALK ABOUT?  WE'RE PAST 9:00 HERE.  I SHOULD HAVE STARTED THIS

09:08AM 19   CONVERSATION AT 8:00.  I APOLOGIZE FOR THAT.  I WANT TO CAPTURE

09:08AM 20   SOME TIME HERE.

09:08AM 21        IS THERE ANYTHING ELSE WE NEED TO TALK ABOUT?

09:08AM 22        MR. WADE:  THERE IS ONE ISSUE FOR MS. PETERSON AND

09:08AM 23   THEN MAYBE WE CAN TAKE MR. EISENMAN EITHER NOW OR AT A BREAK

09:08AM 24   DEPENDING ON WHAT THE COURT'S PREFERENCE IS.

09:08AM 25        THE COURT:  OKAY.

09:08AM 1          MR. WADE:  IT'S MY UNDERSTANDING THAT THE GOVERNMENT

09:08AM 2   MAY SEEK TO OFFER EVIDENCE OF STATEMENTS FROM MS. PETERSON WITH

09:08AM 3   RESPECT TO MATERIALITY, YOU KNOW, HERE'S THIS STATEMENT, DID

09:08AM 4   YOUR EMPLOYER CONSIDER THAT THE -- DID THE ENTITY THAT EMPLOYS

09:08AM 5   YOU CONSIDER THAT TO BE MATERIAL TO THE INVESTMENT DECISION?

09:08AM 6          AS CONTEXT, YOUR HONOR, THE ENTITY THAT THE INVESTOR WHO

09:08AM 7   MS. PETERSON WORKED FOR IS RDV CORPORATION, WHICH IS THE FAMILY

09:08AM 8   OFFICE OF THE DEVOS FAMILY.

09:08AM 9          MS. PETERSON PLAYED NO ROLE IN MAKING THE INVESTMENT

09:09AM 10  DECISION.  SHE WAS NOT A DECISION-MAKER.  MR. TUBERGEN,

09:09AM 11  JERRY TUBERGEN, AND FOUR MEMBERS OF THE DEVOS FAMILY WERE THE

09:09AM 12  DECISION MAKERS.  THEY WERE INVOLVED IN A WHOLE OTHER SERIES OF

09:09AM 13  INTERACTIONS THAT MS. PETERSON WAS NOT INVOLVED IN.  THEY MADE

09:09AM 14  THE INVESTMENT DECISION INDEPENDENT OF MS. PETERSON.  SHE'S

09:09AM 15  BEEN ASKED UNDER OATH, WHAT ROLE DID YOU PLAY IN THOSE

09:09AM 16  DISCUSSIONS, AND SHE SAID NONE.

09:09AM 17         AND SO WE JUST WANT TO MAKE CLEAR THAT THE GOVERNMENT

09:09AM 18  SHOULD NOT THEREFORE BE IN A POSITION TO SAY, HERE'S THIS

09:09AM 19  STATEMENT, WAS THAT IMPORTANT TO RDV IN MAKING ITS INVESTMENT

09:09AM 20  DECISION?  BECAUSE SHE DOESN'T HAVE, YOU KNOW, A FOUNDATION TO

09:09AM 21  MAKE SUCH STATEMENTS.

09:09AM 22         THE COURT:  I SEE.  OKAY.

09:09AM 23         MR. LEACH:  YOUR HONOR, I THINK THAT DOES NOT PAINT

09:09AM 24  A COMPLETE PICTURE OF MS. PETERSON'S ROLE.  SHE'S THE

09:09AM 25  INVESTMENT PROFESSIONAL WITHIN RDV WHO WAS TASKED TO ANALYZE

09:10AM 1    THIS INVESTMENT.  SHE ATTENDS ALL OF THE CRITICAL INVESTOR

09:10AM 2    PRESENTATIONS BY MS. HOLMES; SHE PARTICIPATES IN A ONE HOUR

09:10AM 3    PHONE CALL WITH MS. HOLMES; SHE PREPARES THE DOCUMENT FOR RDV

09:10AM 4    BY WHICH THE INVESTMENT COMMITTEE APPROVES THE INVESTMENT.

09:10AM 5         SHE HEARS ALL OF THE STATEMENTS.  SHE'S PERFECTLY

09:10AM 6    CAPABLE -- AND SHE MAKES INVESTMENTS FOR RDV, OR RECOMMENDS

09:10AM 7    INVESTMENTS FOR RDV ALL OF THE TIME, SO SHE'S PERFECTLY CAPABLE

09:10AM 8    TO TESTIFY TO HER REACTIONS TO PARTICULAR STATEMENTS.

09:10AM 9         WHY SHE INCLUDED INFORMATION IN THE APPROVAL MEMO FOR THE

09:10AM 10   INVESTMENT, WAS THIS RELEVANT TO HER ANALYSIS, I THINK ALL

09:10AM 11   OF -- YOU KNOW, MATERIALITY IS AN OBJECTIVE STANDARD.

09:10AM 12        WE DON'T NEED TO PROVE RELIANCE.  WE NEED TO PROVE

09:10AM 13   OBJECTIVE TO A REASONABLE PERSON.  MS. PETERSON IS A REASONABLE

09:10AM 14   PERSON WHO WAS IN THE ROOM FOR ALL OF THIS.

09:10AM 15             THE COURT:  SO SHE IS GOING TO TESTIFY --

09:11AM 16   FOUNDATIONALLY SHE'LL TESTIFY ABOUT WHO SHE IS EMPLOYED BY, WHO

09:11AM 17   IS AN INVESTOR, I PRESUME, AND SHE'LL TALK ABOUT HER DUTIES,

09:11AM 18   THE JOB TITLES, HER RESPONSIBILITIES, WHAT SHE'S TASKED TO DO,

09:11AM 19   MUCH LIKE THE WITNESS LAST WEEK?

09:11AM 20             MR. LEACH:  YES.

09:11AM 21             THE COURT:  AND THEN SHE'LL TELL US WHAT SHE DID

09:11AM 22   BASED ON HER RESEARCH, HER ANALYSIS?

09:11AM 23             MR. LEACH:  YES.

09:11AM 24             THE COURT:  WHAT HER JOB SCOPE WAS AND WHAT SHE DID

09:11AM 25   WITH THAT INFORMATION?

09:11AM 1          MR. LEACH:  YES.

09:11AM 2          THE COURT:  AND SHE DIDN'T PERSONALLY WRITE A CHECK,

09:11AM 3  BUT THIS IS PART OF HER JOB FOR THE CORPORATION, I ASSUME?

09:11AM 4          MR. WADE:  YOUR HONOR, WITH APPROPRIATE RESPECT AND

09:11AM 5  DEFERENCE, ALMOST EVERYTHING THAT MR. LEACH JUST SAID IS NOT

09:11AM 6  TRUE.

09:11AM 7          THE COURT:  OH.

09:11AM 8          MR. WADE:  IT WAS A HALF HOUR PHONE CALL THAT SHE

09:11AM 9  PARTICIPATED IN.  THAT WAS A VERY HIGH LEVEL MEETING.

09:11AM 10     SHE WAS NOT INVOLVED IN A CRITICAL MEETING THAT HAPPENED

09:11AM 11  BEFORE THAT, SO SHE WAS NOT INVOLVED IN ALL OF THE DECISIONS.

09:11AM 12         THE COURT:  I WAS JUST ASKING A GENERAL JOB

09:11AM 13  DESCRIPTION THAT SHE HAS.  SHE'LL TESTIFY THAT SHE'S EMPLOYED

09:11AM 14  BY THIS COMPANY, WHAT SHE DOES, WHAT SHE'S TASKED TO DO,

09:12AM 15  WHATEVER THE LENGTH OF RESEARCH SHE DID, SHE'LL SAY WHAT SHE

09:12AM 16  DID, AND SHE'LL THEN SAY, I THEN WROTE A REPORT THAT EITHER WAS

09:12AM 17  THUMBS UP, THUMBS DOWN, WHATEVER IT WAS, AND I GAVE IT TO THE

09:12AM 18  COMPANY AND THEY DID WHAT THEY DID.

09:12AM 19         MR. WADE:  BUT MY POINT IS THAT ALMOST ALL OF THAT

09:12AM 20  IS ACTUALLY NOT TRUE.

09:12AM 21         THE COURT:  OH.

09:12AM 22         MR. WADE:  SO THAT'S WHY WE'RE RAISING THE ISSUE,

09:12AM 23  AND WE WOULD BE HAPPY TO VOIR DIRE THE WITNESS.

09:12AM 24         THE COURT:  SHE DIDN'T DO ANY OF THAT?

09:12AM 25         MR. WADE:  LET ME EXPLAIN WHAT SHE DID DO.  LET ME

4611

09:12AM 1    EXPLAIN THE RELATIONSHIP.

09:12AM 2            THE COURT:  SURE.

09:12AM 3            MR. WADE:  THERE WAS AN INITIAL MEETING THAT

09:12AM 4    HAPPENED BETWEEN MS. PETERSON'S BOSS'S BOSS, JERRY TUBERGEN,

09:12AM 5    WHO IS THE CEO AND CHIEF INVESTMENT OFFICER OF RDV.

09:12AM 6        HE HAD A BUNCH OF INTERACTIONS AROUND THAT MEETING AND

09:12AM 7    RECEIVED INFORMATION IN THAT MEETING WHICH WAS NOT CONVEYED TO

09:12AM 8    MS. PETERSON IN TOTAL.

09:12AM 9        MR. TUBERGEN THEN HAD EXTENSIVE INTERACTIONS WITH MANY

09:12AM 10   MEMBERS OF THE DEVOS FAMILY WHO HAVE LEGAL AUTHORITY TO MAKE

09:13AM 11   THE INVESTMENT DECISION.

09:13AM 12       HE THEN COMES BACK FROM THIS CONFERENCE.  HE IS IN HIS

09:13AM 13   OFFICE.  HE RECEIVES MATERIALS.  HE HAS A 30 MINUTE PHONE

09:13AM 14   CONVERSATION WITH MS. HOLMES WITH MS. PETERSON PRESENT.  IT WAS

09:13AM 15   A HIGH-LEVEL CONVERSATION, ACCORDING TO THE TESTIMONY OF

09:13AM 16   MS. PETERSON, ABOUT VISION, WHAT SHOULD HAPPEN AT ANOTHER

09:13AM 17   MEETING THAT WAS TO COME.

09:13AM 18       THEY SEND 12 INCHES OF MATERIALS TO MR. TUBERGEN.

09:13AM 19   MS. PETERSON'S GIVEN THE MATERIALS.  SHE WRITES A MEMO.  SHE

09:13AM 20   DOES NOT KNOW IF MR. TUBERGEN REVIEWED THE MEMO OR IF ANY

09:13AM 21   MEMBER OF THE DEVOS FAMILY REVIEWED THE MEMO ACCORDING TO HER

09:13AM 22   TESTIMONY.

09:13AM 23       SHE ATTENDS A TRIP.  THERE ARE EXTENSIVE ADDITIONAL

09:13AM 24   INTERACTIONS HAPPENING BETWEEN MR. TUBERGEN AND MEMBERS OF THE

09:13AM 25   DEVOS INVESTMENT COUNSEL, WHO ARE THE DECISION MAKERS TOGETHER,

09:14AM 1    THOSE TWO PEOPLE.

09:14AM 2         MEMBERS OF THE DEVOS FAMILY AND MR. TUBERGEN AND

09:14AM 3    LISA PETERSON FLY TO CALIFORNIA, THEY VISIT WITH THE COMPANY,

09:14AM 4    AND THEY MAKE AN INVESTMENT COMMITMENT ON THE SPOT.

09:14AM 5         THAT'S MS. PETERSON'S TESTIMONY.  THEY MAKE THE

09:14AM 6    INVESTMENT, AND THERE ARE CONTEMPORANEOUS DOCUMENTS THAT SHOW

09:14AM 7    THAT.

09:14AM 8         THE MEMO IS PREPARED LATER.  IT IS SIGNED.  WE DON'T KNOW

09:14AM 9    EXACTLY WHEN.  MONTHS LATER.

09:14AM 10        WE HAVE EVIDENCE THAT IT WAS SIGNED WELL AFTER THE

09:14AM 11   DOCUMENTS ON THE INVESTMENT WERE SIGNED.  AND IT WAS WELL AFTER

09:14AM 12   THE PERIOD WHERE THE INVESTMENT WAS FUNDED.

09:14AM 13        SO THE DOCUMENTS GO, THE WIRE GOES, SOME PERIOD OF TIME

09:14AM 14   LATER THAT MEMO WAS SIGNED.  WE DON'T KNOW -- MS. PETERSON

09:15AM 15   DOESN'T KNOW WHO REVIEWED IT.  I MEAN, SHE KNOWS WHO SIGNED IT,

09:15AM 16   BUT SHE DOESN'T KNOW WHO REVIEWED IT OR WHEN.

09:15AM 17        SO THE FACT THAT -- THEY CAN'T USE THAT DEVICE TO PAPER

09:15AM 18   THE FILE -- ALL OF THE EVIDENCE MAKES CLEAR THAT THE INVESTMENT

09:15AM 19   DECISION WAS MADE BY MEMBERS OF THE DEVOS FAMILY AND

09:15AM 20   MR. TUBERGEN IN THE ROOM IN PALO ALTO WHEN THEY VISITED.

09:15AM 21        SO THIS ISN'T THE CASE WHERE -- YOUR HONOR HAS PROBABLY

09:15AM 22   SEEN MANY DIFFERENT, YOU KNOW, SCENARIOS WHERE SOME ANALYST

09:15AM 23   WRITES UP A REPORT AND THEY GIVE THE REPORT AND IT'S APPROVED.

09:15AM 24        THAT'S NOT WHAT THIS IS.  IT'S A TOTALLY DIFFERENT

09:15AM 25   RELATIONSHIP THAT IS A UNIQUE INVESTMENT SITUATION ACCORDING TO

09:15AM  1    ALL INVOLVED, AND IT'S HIGHLY PREJUDICIAL FOR HER TO BE ABLE TO

09:15AM  2    SAY, THIS WAS IMPORTANT, THIS MATTERED, WHEN THERE WERE A LOT

09:15AM  3    OF FACTS THAT SHE DOESN'T KNOW ABOUT THAT MAY WELL HAVE

09:15AM  4    MATTERED AND WE CAN'T CROSS-EXAMINE THEM.

09:15AM  5              THE COURT:  SURE.  CAN SHE SAY WHAT MATTERED AT

09:15AM  6    LEAST TO HER KNOWLEDGE?

09:15AM  7              MR. WADE:  I DON'T THINK SO.  I THINK IT CREATES A

09:16AM  8    MISLEADING PICTURE FOR THE JURY BECAUSE SHE DOESN'T HAVE -- SHE

09:16AM  9    DIDN'T PLAY ANY ACTUAL ROLE IN THE INVESTMENT DECISION.

09:16AM 10              THE COURT:  BUT CAN SHE TESTIFY, JUST AS YOU

09:16AM 11    DESCRIBED IT, CAN'T SHE TESTIFY ABOUT THE FAMILY STRUCTURE,

09:16AM 12    WHAT HER JOB IS, THEY FLEW OUT.

09:16AM 13         WAS THERE AN INVESTMENT?  YES.

09:16AM 14         DID YOU SEE THE "TODAY SHOW"?  DID YOU SEE "MAD MONEY"?  I

09:16AM 15    DID.

09:16AM 16         DID YOU GIVE THAT INFORMATION TO THEM, YES OR NO?

09:16AM 17         CAN'T SHE TESTIFY ABOUT THAT?

09:16AM 18              MR. WADE:  SOME OF -- THE "MAD MONEY" AND THE OTHER

09:16AM 19    THINGS, THOSE HAPPENED AFTER THE INVESTMENT, WHICH IS PART OF

09:16AM 20    THE REASON WHY WE DON'T THINK THEY SHOULD COME IN.

09:16AM 21              THE COURT:  SURE.

09:16AM 22              MR. WADE:  BUT SHE CAN SAY, I'VE GOT TWO BINDERS OR

09:16AM 23    TWO THINGS, OR A FOOT, A STACK OF TWO BINDERS.

09:16AM 24              THE COURT:  AND IT SOUNDS LIKE YOU HAVE PLENTY OF

09:16AM 25    FODDER FOR CROSS-EXAMINATION.

09:16AM 1          MR. WADE:  BUT IT'S NOT APPROPRIATE TESTIMONY IN THE

09:16AM 2    FIRST INSTANCE, YOUR HONOR.

09:16AM 3          IF SHE JUST WANTS TO TESTIFY AS TO THE FACTS, THIS IS WHAT

09:16AM 4    WAS HERE, THIS IS WHAT WAS SAID, THIS IS WHAT I PUT IN THE

09:16AM 5    MEMO, THIS IS WHAT I CONVEYED TO THE INVESTMENT PEOPLE, THIS IS

09:17AM 6    WHAT HAPPENED DURING THE MEETING, THAT'S FINE.

09:17AM 7          THE COURT:  AND AN INVESTMENT WAS MADE.

09:17AM 8          MR. WADE:  AND AN INVESTMENT WAS MADE.

09:17AM 9          BUT CAN SHE SAY, WAS THIS IMPORTANT TO RDV'S INVESTMENT

09:17AM 10   DECISION?  SHE CANNOT DO THAT.  SHE DOESN'T HAVE A FOUNDATION

09:17AM 11   TO OFFER THOSE KINDS OF FACTS.

09:17AM 12         THE COURT:  MR. LEACH?

09:17AM 13         MR. LEACH:  FIRST OF ALL, YOUR HONOR, THAT SOUNDS

09:17AM 14   LIKE EFFECTIVE CROSS-EXAMINATION.  NOTHING TO UNDERMINE THE

09:17AM 15   RELEVANCE OR THE PERCIPIENT KNOWLEDGE OF THIS PARTICULAR

09:17AM 16   WITNESS.

09:17AM 17         SHE ATTENDS THE MEETING WHERE, ACCORDING TO MR. WADE, THE

09:17AM 18   INVESTMENT DECISION WAS MADE.  THEY DID NOT WRITE A CHECK AT

09:17AM 19   THAT MEETING.  THEY WERE IMPRESSED, THEY WERE EXCITED, THEY

09:17AM 20   WERE TRENDING TOWARD AN INVESTMENT.  BUT I THINK IT'S AN

09:17AM 21   OVERSTATEMENT TO SAY THE INVESTMENT WAS MADE.  SHE WAS THERE IN

09:17AM 22   THE ROOM.  SHE HEARD THE STATEMENTS.  SHE'S PERFECTLY COMPETENT

09:17AM 23   TO SAY, WAS THAT IMPRESSIVE?  WAS THAT RELEVANT TO YOU?  WAS

09:17AM 24   THAT SOMETHING THAT YOU THOUGHT WAS IMPRESSIVE?

09:17AM 25         SHE PREPARES THE APPROVAL DOCUMENT THAT RDV ALWAYS USES

09:18AM 1   FOR ITS INVESTMENTS.  THE FACT THAT SHE IS PREPARING THAT SHOWS

09:18AM 2   HER INVOLVEMENT.

09:18AM 3       NOW, IF THEY WANT TO ARGUE SOMETHING ABOUT THE TIMING OR

09:18AM 4   NOBODY REVIEWED IT, THAT'S CERTAINLY FODDER FOR

09:18AM 5   CROSS-EXAMINATION.

09:18AM 6       BUT SHE'S THE INVESTMENT PROFESSIONAL WITHIN RDV WHO IS

09:18AM 7   ASSIGNED TO THIS TASK.  AND THEY WANT TO SUGGEST THAT THAT'S AN

09:18AM 8   EMPTY GESTURE, FINE.  BUT IT DOESN'T UNDERCUT THE RELEVANCE OF

09:18AM 9   WHAT SHE'S GOING TO SAY.

09:18AM 10          THE COURT:  THIS GETS BACK TO -- LET ME GO BACK TO

09:18AM 11  THESE TWO VIDEOS, THOUGH, MR. LEACH.

09:18AM 12      WHAT IS THE -- IF THE VIDEOS WERE AFTER THE INVESTMENT,

09:18AM 13  THEN WHAT IS THE RELEVANCE OF THOSE?

09:18AM 14          MR. LEACH:  YOUR HONOR, DEFENDANTS SOMETIMES MAKE

09:18AM 15  STATEMENTS AFTER THE OFFENSE THAT ARE STILL RELEVANT.  YOU

09:18AM 16  KNOW, MS. HOLMES TESTIFIED BEFORE THE S.E.C. IN 2017 ABOUT THE

09:18AM 17  EVENTS.

09:18AM 18          THE COURT:  RIGHT.

09:18AM 19          MR. LEACH:  NO ONE WOULD QUESTION THE RELEVANCE OF

09:18AM 20  THAT.

09:18AM 21          THE COURT:  NO.  I'M JUST TRYING TO DETERMINE THE

09:18AM 22  ORDER OF INTRODUCING THESE STATEMENTS THROUGH THIS WITNESS.

09:19AM 23          MR. LEACH:  THOSE WILL COME AT THE END OF THE

09:19AM 24  EXAMINATION, BUT -- AND THEY'RE A YEAR AFTER THE INVESTMENT.

09:19AM 25          THE COURT:  RIGHT.

09:19AM 1           MR. LEACH:  AND SO THE TIMING IS AFTER THE FACT.

09:19AM 2       THE STATEMENTS ARE RELEVANT NOT BECAUSE THEY WERE MADE TO

09:19AM 3  MS. PETERSON.  IT'S SIMPLY THE DEFENDANT'S FALSE STATEMENT WHEN

09:19AM 4  CONFRONTED WITH EVIDENCE ABOUT HOW MANY TESTS THE EDISON CAN

09:19AM 5  DO, AND IT'S HER ADMISSION OF RESPONSIBILITY FOR HER OWN

09:19AM 6  COMPANY.

09:19AM 7           THE COURT:  SO THEN MS. PETERSON'S OBSERVATION OF

09:19AM 8  THOSE TWO VIDEOS HAS NOTHING TO DO WITH THE INVESTMENT?

09:19AM 9           MR. LEACH:  CORRECT.

09:19AM 10         THE COURT:  WHAT THEY'RE -- SHE'LL TESTIFY AS

09:19AM 11  ANYONE, I GUESS YOU COULD CALL ANYONE AS FOUNDATIONAL FOR

09:19AM 12  THOSE.  DID YOU SEE THIS?  DID YOU HEAR HER MAKE THAT

09:19AM 13  STATEMENT?  YES, I DID.

09:19AM 14         MR. LEACH:  WE COULD CALL ANYBODY, YOUR HONOR.

09:19AM 15         THE COURT:  THAT'S WHAT I'M --

09:19AM 16         MR. LEACH:  WE'RE PUTTING IT IN THROUGH HER BECAUSE

09:19AM 17  SHE HAPPENS TO HAVE SEEN THEM, BUT WE COULD DO IT THROUGH

09:20AM 18  ANYBODY.

09:20AM 19         MR. WADE:  AND THERE ARE A COUPLE OF ISSUES, RIGHT?

09:20AM 20      YOUR HONOR IS RIGHT TO FOCUS ON THE FACT THAT IT IS AFTER

09:20AM 21  THE INVESTMENT DECISION.

09:20AM 22      THE CONCERN THAT I WAS TRYING TO EXPRESS WITH THE COURT IS

09:20AM 23  THAT ONCE THEY OPEN THE DOOR TO THAT PERIOD, THEY CAN'T CRACK

09:20AM 24  IT AND NOT OPEN IT, AND SO IF THEY WANT TO JUST INTRODUCE THE

09:20AM 25  VIDEO AND PLAY IT TO THE JURY LIKE THEY'VE BEEN PLAYING SOME OF

09:20AM 1    THESE TEXT MESSAGES OR WHATEVER THROUGH DIFFERENT WITNESSES

09:20AM 2    BECAUSE MAYBE THEY'RE ADMISSIBLE, THAT'S A DIFFERENT ISSUE.

09:20AM 3         I THINK MR. LEACH STARTED THE DISCUSSION BY SAYING HE

09:20AM 4    WANTED HER COMMENTARY AND REACTION FROM IT, AND THAT'S WHERE WE

09:20AM 5    GET INTO ALL OF THE POST-INVESTMENT INTERACTIONS AND THOSE

09:20AM 6    BECOME FAIR GAME.

09:20AM 7         WITH RESPECT TO THIS ISSUE -- AND I JUST WANT TO BE VERY

09:20AM 8    CLEAR BECAUSE IT'S A UNIQUE SET OF CIRCUMSTANCES HERE,

09:20AM 9    YOUR HONOR -- THIS WITNESS WAS ASKED UNDER OATH, WHEN WAS THE

09:20AM 10   INVESTMENT COMMITMENT MADE?  THE INVESTMENT COMMITMENT WAS MADE

09:20AM 11   AT THE END OF THE MEETING IN PALO ALTO.

09:20AM 12        WHAT INPUT DID YOU HAVE REGARDING THAT COMMITMENT?  NONE.

09:21AM 13        THAT'S HER TESTIMONY.  SO FOR HER -- AGAIN, SHE CAN

09:21AM 14   TESTIFY AS TO WHAT HAPPENED THERE, BUT FOR HER TO SAY, WAS THIS

09:21AM 15   SIGNIFICANT?  WAS THIS IMPORTANT?  WAS THIS -- YOU KNOW, WE'VE

09:21AM 16   HEARD --

09:21AM 17             THE COURT:  YOU MEAN THE VIDEOS YOU'RE TALKING

09:21AM 18   ABOUT?

09:21AM 19             MR. WADE:  NO, NO.  I'M TALKING ABOUT -- SHE

09:21AM 20   SHOULDN'T BE ABLE TO ASK -- ANSWER THOSE QUESTIONS ABOUT ANY

09:21AM 21   FACTS IN THE CASE BECAUSE SHE DIDN'T MAKE THE INVESTMENT

09:21AM 22   DECISION.

09:21AM 23        THE U.S. SUPREME COURT CASE ON THIS, WHICH IS IRONICALLY

09:21AM 24   NAMED PETERSON --

09:21AM 25             THE COURT:  SHE SHOULD BE ABLE TO TESTIFY ABOUT HER

09:21AM 1   JOB AND WHAT SHE DID AND ALL OF THAT, AND THAT'S WHAT I THINK

09:21AM 2   HE'S GOING TO ELICIT, WHAT IS YOUR JOB AND WHAT DID YOU DO?

09:21AM 3        ALL RIGHT.  EVEN IF THE DECISION WAS MADE IN PALO ALTO ON

09:21AM 4   THE SPOT, OKAY.

09:21AM 5            MR. WADE:  ALL FAIR GAME, YOUR HONOR.

09:21AM 6            THE COURT:  RIGHT.

09:21AM 7            MR. WADE:  THE ISSUE IS, CAN HE SAY, WHICH HE DID,

09:21AM 8   CAN MR. LEACH ASK, AS THEY DID IN DIFFERENT INTERVIEWS AND AT

09:21AM 9   TIMES IN GRAND JURY APPEARANCES, WAS THIS IMPORTANT TO THE RDV

09:22AM 10  INVESTMENT DECISION?

09:22AM 11       THAT SHE HAS NO BASIS TO --

09:22AM 12           THE COURT:  WHAT IS THIS?  WHAT IS THIS?

09:22AM 13           MR. WADE:  WAS THIS REFERENCED IN A SLIDE DECK

09:22AM 14  IMPORTANT TO RDV'S INVESTMENT DECISION?  WAS THIS --

09:22AM 15           THE COURT:  SO HE COULD ASK HER, TO YOUR KNOWLEDGE,

09:22AM 16  WHAT WAS IMPORTANT IN THE RDV INVESTMENT DECISION?

09:22AM 17           MR. WADE:  RIGHT.

09:22AM 18           THE COURT:  HE COULD ASK THAT QUESTION?

09:22AM 19           MR. WADE:  I GUESS HE COULD IF HE LAYS A FOUNDATION

09:22AM 20  THAT SHE HAS KNOWLEDGE AS TO WHAT IS IMPORTANT TO THE

09:22AM 21  INVESTMENT DECISION.

09:22AM 22           THE COURT:  WELL, SHE PROBABLY HAS WORKED THERE FOR

09:22AM 23  SOME PERIOD OF TIME AND HAS THE TRUST OF THE COMPANY TO

09:22AM 24  CONTINUE IN HER EMPLOYMENT.

09:22AM 25           MR. WADE:  THE FACTUAL RECORD IS PRETTY CLEAR ON

09:22AM 1    THIS, YOUR HONOR.  SHE HAS NO INTERACTION WITH -- VERY LITTLE

09:22AM 2    INTERACTION IN ADVANCE OF THE INVESTMENT DECISION WITH

09:22AM 3    THE DECISION MAKERS.

09:22AM 4         THE COURT:  ALL RIGHT.  WELL, THIS SOUNDS MORE LIKE

09:22AM 5    THE JURY IS GOING TO HAVE TO DECIDE WHAT TO DO WITH IT.  IT'S

09:22AM 6    MORE OF A WEIGHT ISSUE THAN AN ADMISSIBILITY ISSUE, IT SEEMS

09:22AM 7    LIKE.

09:22AM 8         MR. WADE:  I THINK IT'S A FOUNDATION ISSUE, YOUR

09:22AM 9    HONOR.  I THINK IT EFFECTIVELY SHIFTS THE BURDEN OF MATERIALITY

09:23AM 10   TO US BECAUSE WE CAN'T CROSS-EXAMINE THE ACTUAL DECISION

09:23AM 11   MAKERS.

09:23AM 12       THEY WANT TO MISLEAD THE JURY INTO THINKING SHE'S THE

09:23AM 13   DECISION-MAKER AND, THEREFORE, SHE THOUGHT THIS WAS IMPORTANT,

09:23AM 14   THAT IT WAS IMPORTANT, WHEN SHE ACTUALLY HAD NO ROLE IN THAT.

09:23AM 15        THE COURT:  WELL, IT SOUNDS LIKE YOU'LL BE VERY

09:23AM 16   EFFECTIVE IN CROSS-EXAMINING AND LETTING THE JURY KNOW THAT

09:23AM 17   NONE OF THAT IS ACCURATE.

09:23AM 18        MR. WADE:  IT SHOULDN'T COME IN IN THE FIRST

09:23AM 19   INSTANCE, YOUR HONOR.

09:23AM 20       BUT I WOULD ASK THAT -- I'LL OBJECT, BUT I WOULD JUST ASK

09:23AM 21   FOR A STANDING OBJECTION WITH RESPECT TO ANY QUESTIONS OF THIS

09:23AM 22   NATURE BECAUSE WE THINK ANY QUESTIONS THAT THEY'RE GOING TO ASK

09:23AM 23   THIS WITNESS ABOUT WAS THIS IMPORTANT --

09:23AM 24        THE COURT:  DON'T BE CONCERNED ABOUT OBJECTING.  WE

09:23AM 25   HAD A -- I TOLD THE JURY IN VOIR DIRE, AS YOU REMEMBER, THAT

09:23AM 1 THIS WILL BE A LONG CASE AND THERE WILL BE OBJECTIONS AND THEY

09:23AM 2 SHOULD EXPECT OBJECTIONS, AND I THINK I -- I CRAFTED A

09:23AM 3 PRELIMINARY INSTRUCTION TELLING THEM THAT THEY SHOULD NOT, AND

09:23AM 4 WILL NOT, CONSIDER THE NUMBER AND WHO MAKES IT AND THAT HAS

09:23AM 5 NOTHING TO DO WITH THEIR DECISION PROCESS.

09:24AM 6 SO BOTH SIDES DON'T BE AFRAID TO OBJECT AND STAND ON YOUR

09:24AM 7 POSITIONS.

09:24AM 8 I KNOW THERE ARE STRATEGIC REASONS WHY THAT'S NOT

09:24AM 9 HAPPENING, TOO.

09:24AM 10 MR. WADE: AND I JUST WANT TO ASK THE COURT, IF THE

09:24AM 11 COURT IS GOING TO LET IN QUESTIONS OF THIS NATURE, IF I COULD

09:24AM 12 HAVE A STANDING OBJECTION SO I DON'T HAVE TO OBJECT TO EVERY

09:24AM 13 QUESTION.

09:24AM 14 THE COURT: RIGHT. AND I CAN SAY THAT IN FRONT OF

09:24AM 15 THE JURY AS WELL IF YOU WOULD LIKE SO THEY KNOW AT LEAST YOUR

09:24AM 16 POSITION.

09:24AM 17 OKAY. WHAT ELSE DO WE NEED TO TALK ABOUT?

09:24AM 18 MR. DOWNEY: YOUR HONOR, WE HAVE A WITNESS --

09:24AM 19 MR. LEACH: NOTHING FROM THE GOVERNMENT.

09:24AM 20 MR. DOWNEY: -- MR. EISENMAN, WHO I THINK WILL COME

09:24AM 21 NOT UNTIL AFTER CERTAINLY THE FIRST AND MAYBE THE SECOND BREAK.

09:24AM 22 I WAS WONDERING IF WE COULD --

09:24AM 23 THE COURT: LET'S DO THAT SO WE CAN GET STARTED THIS

09:24AM 24 MORNING.

09:24AM 25 THANK YOU, MR. DOWNEY: I APPRECIATE THAT.

09:24AM 1    ANYTHING ELSE THAT THE PARTIES WANTED TO TALK ABOUT THIS

09:24AM 2    MORNING?

09:24AM 3         MR. LEACH:  NO, YOUR HONOR.

09:24AM 4    IF THE COURT WOULD LIKE TRANSCRIPTS OF THE "TODAY SHOW" OR

09:24AM 5    "MAD MONEY," I HAVE THEM.

09:24AM 6         THE COURT:  THAT WOULD BE HELPFUL.  THANK YOU.

09:25AM 7    DO YOU HAVE THESE TOO, MR. WADE?

09:25AM 8         MR. WADE:  I DON'T.

09:25AM 9         MR. LEACH:  I HAVE ONE FOR THE DEFENSE.

09:25AM 10        THE COURT:  OKAY.  LET ME JUST TALK ABOUT SOME OTHER

09:25AM 11   SCHEDULING MATTERS.

09:25AM 12   PLEASE RECALL I ASKED IF WE COULD RESCHEDULE TO CAPTURE

09:25AM 13   MORE TIME.  AS I UNDERSTAND IT, WE WILL NOT BE ABLE TO MEET

09:25AM 14   ON -- LET'S START WITH MONDAYS.  I'VE ADVANCED MONDAY MORNINGS

09:25AM 15   AS POSSIBILITIES.  WE WILL NOT BE ABLE TO DO THAT ON THE 1ST

09:25AM 16   NOR THE 8TH, BUT IT SOUNDS LIKE THE 15TH, THE 22ND, AND THE

09:25AM 17   29TH WOULD BE AVAILABLE FOR EVERYONE.

09:25AM 18   I SUGGESTED SWAPPING THE DAY BEFORE THANKSGIVING TO THE

09:25AM 19   18TH, AND THAT SEEMS TO BE ACCEPTABLE.  SO WE'LL TRY TO DO

09:25AM 20   THAT.

09:25AM 21   AND THEN WE'LL LOOK AND SEE -- DECEMBER 3RD, REMEMBER, WE

09:26AM 22   CAN'T BE IN SESSION.  A JUROR IS TRAVELLING ON THAT DAY.  WE'LL

09:26AM 23   JUST SEE WHERE WE CAN FIT OTHER THINGS IN.

09:26AM 24        MR. WADE:  DID THE COURT WANT TO EXPLORE SWAPPING

09:26AM 25   THE THURSDAY FOR THE FRIDAY IN DECEMBER?  I KNOW YOU HAVE A

09:26AM 1   CALENDAR, SO IT MAY NOT WORK.  I JUST -- PLEASE LET THE PARTIES

09:26AM 2   KNOW.

09:26AM 3              THE COURT:  YEAH, WE'LL LOOK AT THAT AND SEE.  I MAY

09:26AM 4   HAVE TO FIND SOME OTHER TIME.  I DON'T KNOW WHERE WE ARE AS FAR

09:26AM 5   AS TIMING GOES IN THE CASE.

09:26AM 6       I DON'T KNOW, MR. LEACH, IF YOU CAN GIVE US ANY GUIDANCE,

09:26AM 7   YOU DON'T HAVE TO CERTAINLY, ABOUT WHERE YOU'RE AT IN YOUR

09:26AM 8   PRESENTATION OR HOW MANY MORE DAYS YOU THINK YOU NEED.

09:26AM 9       OF COURSE, THAT'S DEPENDENT, I UNDERSTAND, ON

09:26AM 10  CROSS-EXAMINATION.

09:26AM 11             MR. LEACH:  CERTAINLY THE SECOND HALF, YOUR HONOR.

09:26AM 12  I'M NOT SURE I COULD GIVE GREATER CLARITY THAN THAT, BUT I'M

09:26AM 13  NOT SURE IT'S NECESSARY TO RESOLVE DATES IN DECEMBER NOW.

09:27AM 14             THE COURT:  THAT'S FINE.

09:27AM 15      LET ME SHARE WITH YOU, WE RECEIVED AN EMAIL FROM A JUROR,

09:27AM 16  AND AGAIN, THIS IS FOR -- ACTUALLY, THIS IS INFORMATIONAL FOR

09:27AM 17  THE PARTIES, BUT ALSO DIRECTIONAL TO OUR GUESTS WHO ARE VIEWING

09:27AM 18  THIS, THAT IS, THE PUBLIC.

09:27AM 19      MS. KRATZMANN RECEIVED AN EMAIL FROM A JUROR WHO -- I'LL

09:27AM 20  JUST PARAPHRASE IT HERE.  HE THANKED THE COURT FOR COMMENTING

09:27AM 21  REGARDING THE NOTE TAKING AND THE PROCEEDINGS AND THEY HAVE HAD

09:27AM 22  SOME HELP.

09:27AM 23      THIS JUROR REPORTS, SPEAKING FOR THE JURY, IT CONTINUES TO

09:27AM 24  BE A DISTRACTION.  SEVERAL JURORS -- ONE PARTICULAR INDIVIDUAL

09:27AM 25  WHOSE TYPING WAS DISTRACTING.  THE JUROR INDICATES HE WAS

09:27AM 1    TEMPTED TO RAISE HIS HAND AND REQUEST THAT THE COURT DO

09:27AM 2    SOMETHING ABOUT THIS.

09:28AM 3        I JUST WANT TO INDICATE AGAIN THAT THOSE WHO ARE HERE

09:28AM 4    TAKING NOTES, YOU'RE SUPPOSED TO HAVE SILENT KEYBOARDS AND BE

09:28AM 5    ABLE TO KNOW HOW TO USE THE SILENT KEYBOARD.

09:28AM 6        I WILL BRING ANOTHER MARSHAL IN TO MONITOR THIS.  I DON'T

09:28AM 7    LIKE TO DO THAT, BUT WE DO HAVE THE OVERFLOW ROOM THAT IS

09:28AM 8    AVAILABLE, AND I INVITE THOSE OF YOU WITH KEYBOARDS TO USE THAT

09:28AM 9    ROOM.

09:28AM 10       I'LL HAVE TO ASK YOU TO GO THERE IF IT BECOMES A PROBLEM.

09:28AM 11   I JUST WANT TO SAY THAT.

09:28AM 12       AND THIS IS PARTICULARLY FOR, I THINK I'M SPEAKING FOR THE

09:28AM 13   JURORS WHO ARE SEATED IN THE -- OUTSIDE OF THE WELL AREA,

09:28AM 14   THEY'RE IN THE PUBLIC AREA.

09:28AM 15       SO THOSE OF YOU WHO FEEL THE NEED TO TYPE, PLEASE DO IT

09:28AM 16   SILENTLY.

09:28AM 17       IF I GET ANOTHER COMPLAINT ABOUT IT SUCH THAT THIS JURY IS

09:28AM 18   BEING DISTRACTED IN A WAY THAT IMPAIRS MS. HOLMES'S RIGHT TO

09:28AM 19   HER FAIR TRIAL OR THE GOVERNMENT'S ABILITY TO PUT ON A FULSOME

09:29AM 20   PROSECUTION, I'M GOING TO HAVE ANYONE WHO WANTS TO TYPE TO GO

09:29AM 21   TO THE OVERFLOW ROOM AND DO YOUR TYPING THERE AND NOT BE IN

09:29AM 22   THIS ROOM.  IT'S DISTRACTING, IT'S NOT FAIR TO MS. HOLMES, IT'S

09:29AM 23   NOT FAIR TO THE GOVERNMENT, AND IT CERTAINLY, CERTAINLY IS

09:29AM 24   INAPPROPRIATE FOR THE JURY TO HAVE TO FEND WITH THAT WHILE THEY

09:29AM 25   LISTEN TO THE TESTIMONY HERE.

4624

09:29AM 1    SO I WOULD APPRECIATE IT VERY MUCH IF FOLKS COULD POLICE

09:29AM 2    THEMSELVES WITH THEIR KEYBOARDS, AND IF NOT, THEN I'LL HAVE TO

09:29AM 3    ENGAGE A PROCESS FOR THAT.  I DON'T WANT TO DO THAT.  I REALLY

09:29AM 4    DON'T.

09:29AM 5        SO HOPEFULLY YOU CAN -- THOSE OF YOU WHO ARE TYPING CAN

09:29AM 6    MANAGE IT ON YOUR OWN.

09:29AM 7        ALL RIGHT.

09:29AM 8            MR. WADE:  YOUR HONOR, IF WE MIGHT, MAYBE WHEN YOU

09:29AM 9    GIVE YOUR STANDARD MORNING GREETING WITH THE JURY, MAYBE IT

09:29AM 10   WOULD BE A GOOD IDEA TO ACTUALLY ENCOURAGE THEM TO RAISE THEIR

09:29AM 11   HAND IF THERE'S A CIRCUMSTANCE WHERE THEY'RE UNABLE TO PAY

09:30AM 12   ATTENTION SO WE CAN PAUSE THE PROCEEDINGS AT THAT POINT.

09:30AM 13   OBVIOUSLY WE WANT TO MAKE SURE THAT THAT DOESN'T PERSIST IN

09:30AM 14   THAT MOMENT.  SO MAYBE JUST EMBOLDENING THE JURY TO DO THAT

09:30AM 15   WOULD BE A GOOD IDEA.

09:30AM 16           THE COURT:  I THINK I'M GOING TO DO THAT AND ASK

09:30AM 17   THEM TO COMMENT ON THAT.  AGAIN, THAT'S A DISTRACTION WITH THE

09:30AM 18   EVIDENCE.

09:30AM 19       THERE'S SOMEONE RAISING THEIR HAND IN THE AUDIENCE, AND

09:30AM 20   I'LL HAVE THAT PERSON TALK TO MS. KRATZMANN AT THE BREAK IF

09:30AM 21   THEY WANT TO BE HEARD.

09:30AM 22       THAT'S THE INTENT OF THE COURT.  THIS IS A PUBLIC

09:30AM 23   COURTROOM.  THE PUBLIC OWNS THIS COURT BUILDING.  THE PUBLIC

09:30AM 24   OWNS THESE FACILITIES AND THEY HAVE A RIGHT TO ACCESS TO THEM.

09:30AM 25       WHEN WE'RE IN TRIAL AND WE'RE IN THIS COURTROOM, THE

09:30AM  1    RESPONSIBILITY FOR CONDUCTING A FAIR TRIAL SUCH THAT ALL

09:30AM  2    PARTIES HAVE ACCESS TO THIS COURTROOM FALLS UPON THE JUDGE, AND

09:30AM  3    THAT'S WHAT I'M TRYING TO DO IS TO BALANCE INDIVIDUAL'S ACCESS

09:30AM  4    TO THEIR COURTHOUSES WITH THE PARTIES' RIGHTS TO A FAIR TRIAL,

09:30AM  5    AND SOMETIMES THERE ARE SOME TENSION BETWEEN THOSE TWO.  WE

09:31AM  6    HAVE THE OVERFLOW ROOM WHICH IS AVAILABLE TO MEDIATE THAT

09:31AM  7    SITUATION, AND I HOPE IT'S SUCCESSFULLY USED BY THE PARTIES.

09:31AM  8        OKAY.  WE'LL TAKE A BREAK AND THEN WE'LL BRING THE JURY IN

09:31AM  9    IN JUST A MOMENT.

09:31AM  10           MR. LEACH:  THANK YOU, YOUR HONOR.

09:31AM  11       (RECESS FROM 9:31 A.M. UNTIL 9:41 A.M.)

09:41AM  12       (PROCEEDINGS HELD IN CHAMBERS.)

09:58AM  13           THE COURT:  LET'S GO ON THE RECORD.  WE ARE ON THE

09:58AM  14    RECORD IN CHAMBERS WITH COUNSEL.

09:58AM  15        YOU CAN TAKE YOUR MASKS OFF, COUNSEL, IF YOU WOULD LIKE,

09:58AM  16    MR. DOWNEY, MR. SCHENK.  WE'RE OUTSIDE OF THE PRESENCE OF OTHER

09:58AM  17    COUNSEL AND THE DEFENDANT.

09:58AM  18    ██████████████████████████████████████████████████

09:58AM  19    ██████████████████████████████████████████████████████

09:58AM  20    ██████████████████████████████████████████████████████

09:58AM  21    █████████████████████████████████████████████████████████

09:58AM  22    ████████████████████████████████████████████

09:58AM  23        I BELIEVE HER FATHER, THE CHILD'S GRANDFATHER, IS TENDING

09:58AM  24    TO THAT NOW.

09:58AM  25        SHE HAS A PHONE, AND SHE'S GOING TO BE TEXTED SHOULD SHE

09:58AM 1    NEED TO LEAVE OR SHOULD ANYTHING COME UP.

09:58AM 2        SHE'LL HAVE THE PHONE WITH HER AT HER HAND, AND PER

09:58AM 3    MS. KRATZMANN.  SHE SAID SHE'S NOT GOING TO -- SHE'LL LOOK AT

09:58AM 4    IT WHEN IT LIGHTS UP AND WE CAN LET HER KNOW THAT SHE COULD

09:58AM 5    RAISE HER HAND AND WE'LL TAKE A BREAK.  THAT'S THE PROTOCOL

09:58AM 6    THAT I WOULD LIKE TO ENGAGE.

09:58AM 7        I WANTED TO LET COUNSEL KNOW, AND ANYTHING YOU WOULD LIKE

09:58AM 8    TO SAY OR ANY SUGGESTIONS OR OBJECTIONS TO PROCEEDING IN THIS

09:58AM 9    MANNER.

09:58AM 10            MR. SCHENK:  CERTAINLY NO OBJECTIONS.  I CAN'T THINK

09:58AM 11   OF A SUGGESTION OTHER THAN WHAT THE COURT HAS OUTLINED.  THAT'S

09:58AM 12   FINE.

09:58AM 13            MR. DOWNEY:  I THINK IT'S FINE WITH US, YOUR HONOR.

09:58AM 14   IT MAKES SENSE, AND WE'LL SEE WHAT HAPPENS.

09:58AM 15            THE COURT:  RIGHT.  IT -- MS. KRATZMANN, WHAT ELSE?

09:58AM 16   ANYTHING ELSE ABOUT THAT?

09:58AM 17            THE CLERK:  SHE JUST INDICATED SHE WOULD BE CHECKING

09:58AM 18   HER PHONE AND IF SHE HAD PERMISSION TO DO THAT, AND I SAID IF

09:58AM 19   THERE'S ANYTHING THAT YOU NEED THE COURT'S ATTENTION, PLEASE

09:58AM 20   RAISE YOUR HAND, OR IF YOU NEED TO GO, JUST RAISE YOUR HAND AND

09:58AM 21   GET HIS HONOR'S ATTENTION AND WE'LL ATTEND TO WHAT YOU NEED.

09:58AM 22            THE COURT:  OKAY.  ALL RIGHT.

09:58AM 23        I JUST WANTED TO ALERT COUNSEL.  YOU CAN NOTIFY YOUR

09:58AM 24   TEAMS.

09:58AM 25        AND MAYBE BE -- MAYBE SOME OF YOUR TEAMS CAN KEEP AN EYE

09:58AM 1  ON THIS JUROR ALSO.

09:58AM 2          MR. SCHENK:  DID THE COURT -- DID THE JURORS CHANGE

09:58AM 3  SEATS THIS MORNING?

09:58AM 4          THE COURT:  I THINK WE ARRANGED THEM.

09:58AM 5          THE CLERK:  SO THEY ARE SITTING AS THEY ARE

09:58AM 6  NUMBERED.  MR. HANG IS IN NUMBER 1, AND THEY'RE ALL SEATED

09:58AM 7  THROUGH 12, AND WE HAVE THE TWO ALTERNATES IN THE PEW.

09:58AM 8          THE COURT:  OKAY.  THANK YOU.

09:58AM 9      (PAUSE IN PROCEEDINGS.)

09:58AM 10         THE COURT:  LET'S GO BACK ON THE RECORD.  WE'RE BACK

09:58AM 11 ON THE RECORD.

09:58AM 12     WE HAD A DISCUSSION ABOUT A JUROR'S CHILD AND HEALTH

09:58AM 13 CONDITION, AND I'M GOING TO ORDER THAT PORTION OF THE

09:58AM 14 TRANSCRIPT SEALED OTHER THAN TO SAY THERE WAS A HEALTH

09:58AM 15 CONDITION.  BUT THE SPECIFICS SHOULD BE SEALED, AS WELL AS THE

09:58AM 16 JUROR'S NAME.  THERE WAS A JUROR'S NAME THAT WAS MENTIONED AND

09:58AM 17 THAT SHOULD BE REDACTED.  SO REDACT THE JUROR NAME AND THE

09:58AM 18 HEALTH CONDITION.

10:04AM 19         (JURY IN AT 10:04 A.M.)

10:04AM 20         THE COURT:  ALL RIGHT.  THANK YOU.  GOOD MORNING

10:04AM 21 EVERYONE.

10:04AM 22     WE'RE BACK ON THE RECORD IN THE HOLMES MATTER.  ALL

10:04AM 23 COUNSEL ARE PRESENT AND MS. HOLMES IS PRESENT.

10:04AM 24     AND OUR JURY IS PRESENT.  THANK YOU FOR YOUR PATIENCE,

10:04AM 25 LADIES AND GENTLEMEN.

10:04AM 1          LET ME -- BEFORE WE BEGIN, LET ME ASK YOU MY STANDARD

10:04AM 2     QUESTION.

10:04AM 3          FIRST OF ALL, I HOPE YOU HAD A PLEASANT WEEKEND, THAT YOU

10:04AM 4     ENJOYED THE RAIN THAT WE HAD AND SOAKED THAT UP.

10:04AM 5          BUT LET ME ASK YOU, DURING THE WEEKEND, DID ANY OF YOU

10:04AM 6     HAVE ANY OCCASION TO COME ACROSS ANY INFORMATION, TALK OR SEE

10:04AM 7     ANYONE THAT HAD ANYTHING TO DO WITH THIS CASE?  IF SO, COULD

10:04AM 8     YOU PLEASE RAISE YOUR HAND.

10:04AM 9          I SEE NO HANDS.

10:04AM 10         I WANT TO THANK YOU ON BEHALF OF ALL OF THE PARTICIPANTS

10:04AM 11    IN THIS TRIAL FOR YOUR CONTINUED VIGILANCE IN THIS REGARD.  I'M

10:04AM 12    REALLY GRATEFUL FOR YOUR EFFORTS IN THIS REGARD AND I THANK YOU

10:04AM 13    FOR THAT.

10:04AM 14         BEFORE WE BEGIN, I WANT TO -- LET ME JUST ASK, TIMING

10:05AM 15    TODAY, 4:00 O'CLOCK?  IS THAT POSSIBLE, 4:00 O'CLOCK?

10:05AM 16         OKAY.  I SEE NO HANDS OBJECTING TO THAT.

10:05AM 17         WE'LL GO UNTIL 4:00.

10:05AM 18         AND I SUGGESTED A CHANGE IN SCHEDULE OF ADDING SOME DAYS.

10:05AM 19         I DON'T KNOW IF YOU, LADIES AND GENTLEMEN, HAVE HAD

10:05AM 20    OCCASION TO LOOK AT YOUR SCHEDULES TO SEE IF THAT'S SOMETHING

10:05AM 21    THAT WOULD WORK.  AGAIN, THIS WOULD MEAN MONDAYS THE 15TH,

10:05AM 22    22ND, AND 29TH IN THE MORNINGS, IF WE COULD MEET FOR SOME TIME

10:05AM 23    THEN.  IF THAT WORKS FOR EVERYONE, WE'LL ADOPT THAT SCHEDULE.

10:05AM 24         ALL RIGHT.  I SEE NO HANDS.

10:05AM 25         OH, YES, I SEE -- YES, SIR.

10:05AM 1       JUROR:  YEAH, IT'S JUST GETTING HARD ON MY WORK

10:05AM 2  SCHEDULE TO LOSE THOSE HOURS.

10:05AM 3       THE COURT:  LET ME -- HANG ON JUST A SECOND.  I'M

10:05AM 4  GOING TO SEE IF WE CAN GET A MICROPHONE.

10:06AM 5     THIS IS ALTERNATE 5.  YES, SIR?

10:06AM 6       JUROR:  YES, IT'S GETTING TOUGH TO BALANCE THE

10:06AM 7  WORKLOAD, LOSING THOSE HOURS ON MY SIDE.

10:06AM 8       THE COURT:  GOTCHA.  OKAY.

10:06AM 9       JUROR:  IF NO ONE ELSE HAS ANY OBJECTIONS, I CAN

10:06AM 10  MOVE THE STUFF AROUND, BUT IT'S JUST GETTING VERY TOUGH FOR ME.

10:06AM 11       THE COURT:  WELL, THANK YOU.  I APPRECIATE THAT.

10:06AM 12     LET'S SEE -- LET ME PUT THOSE DAYS IN PLACE NOW.  MAYBE WE

10:06AM 13  CAN TAKE ONE OFF AS WE GO FORWARD.

10:06AM 14       JUROR:  UH-HUH.

10:06AM 15       THE COURT:  BUT I JUST WANT TO RESERVE THOSE FOR OUR

10:06AM 16  COURT PURPOSES FOR NOW.

10:06AM 17     THANK YOU SO MUCH.  THANK YOU.

10:06AM 18     AND I THINK PEOPLE WERE IN AGREEMENT THAT WE WOULD NOT

10:06AM 19  MEET ON THE 24TH OF NOVEMBER, THE DAY BEFORE THANKSGIVING, BUT

10:06AM 20  INSTEAD WE WOULD MEET ON THE 18TH.  I THINK THAT MEETS WITH

10:07AM 21  EVERYONE'S APPROVAL.

10:07AM 22     SO I WANT TO REMIND EVERYONE THAT WE'RE NOT IN SESSION

10:07AM 23  DECEMBER 3RD.  DECEMBER 3RD, WE WILL NOT BE IN SESSION ON THAT

10:07AM 24  DATE.

10:07AM 25     OKAY.  I THINK THAT'S THE UPDATE FOR SCHEDULING PURPOSES.

10:07AM 1     LET ME TURN TO ANOTHER TOPIC THAT REGRETTABLY HAS BEEN A

10:07AM 2  CONTINUOUS ISSUE HERE IN THIS COURTROOM FOR THIS TRIAL, AND

10:07AM 3  THAT IS THE NOISE.  THIS IS REALLY -- AND I'M SPEAKING TO OUR

10:07AM 4  PUBLIC AUDIENCE HERE.  I'M GRATEFUL THAT YOU ARE HERE.  I'M

10:07AM 5  GRATEFUL THAT YOU ARE PARTICIPATING AND WITNESSING YOUR JUSTICE

10:07AM 6  SYSTEM IN ACTION IN REALTIME.

10:07AM 7     I HAVE PERMITTED INDIVIDUALS TO REPORT HERE WITH LAPTOPS

10:07AM 8  AND OTHER DEVICES ON THE CONDITION THAT THEY HAVE SILENT

10:07AM 9  KEYBOARDS, AND I JUST WANT EVERYONE TO KNOW THAT I HAVE

10:07AM 10  RECEIVED REPORTS THROUGH MS. KRATZMANN THAT, INCLUDING FROM

10:08AM 11  JURY MEMBERS AND OTHER PARTICIPANTS IN THE TRIAL, THAT THE

10:08AM 12  NOISE LEVEL FROM THESE KEYBOARDS IS BECOMING DISTRACTING, HAS

10:08AM 13  BEEN DISTRACTING AT TIMES THROUGHOUT THE TRIAL.

10:08AM 14     AND I'M GOING TO ASK INDIVIDUALS AGAIN, IF YOU DON'T HAVE

10:08AM 15  A SILENT KEYBOARD, YOU SHOULDN'T BE IN THIS COURTROOM.  YOU

10:08AM 16  SHOULD BE IN THE OVERFLOW ROOM DOWNSTAIRS WHERE YOU CAN USE

10:08AM 17  YOUR DEVICE.

10:08AM 18     I UNDERSTAND THAT NOT ALL OF YOU HAVE THESE SILENT

10:08AM 19  KEYBOARDS AND THAT SOMETIMES TYPING SPEED IS OF ESSENCE IN THE

10:08AM 20  COMPLETION OF YOUR DUTIES, AND I RESPECT THAT.

10:08AM 21     BUT I HOPE YOU ALSO ARE RECIPROCAL FOR THE JUDICIAL

10:08AM 22  PROCESS AND THE TRIAL PROCESS AND THE NEED TO PROTECT

10:08AM 23  MS. HOLMES'S RIGHT TO A FAIR TRIAL AND THE GOVERNMENT'S RIGHT

10:08AM 24  TO PUT A PROSECUTION ON IN A FAIR AND FULSOME MANNER.

10:08AM 25     THERE IS SOME TENSION BETWEEN THESE TWO, I MENTIONED

10:08AM 1    EARLIER, AND THE SOLUTION THAT WE HAVE FOR THIS TENSION IS TO

10:09AM 2    ALLOW THOSE OF YOU TO PARTICIPATE IN REALTIME IN OUR OVERFLOW

10:09AM 3    ROOM WHERE YOUR TYPEWRITERS CAN BE USED WITHOUT ANY ISSUE ABOUT

10:09AM 4    DISTURBING THE TRIAL PROCESS DOWN THERE.

10:09AM 5        IT MAY BE, AND I HOPE IT DOESN'T COME TO THIS, BUT IF THIS

10:09AM 6    CONTINUES, IT MAY BE THAT I'LL HAVE ANYONE WHO IS GOING TO

10:09AM 7    TYPE, INCLUDING THOSE OF YOU WHO HAVE SILENT KEYBOARDS AND

10:09AM 8    THOSE WHO HAVE BEEN ABLE TO MONITOR YOUR TYPING AND KEEP YOUR

10:09AM 9    TYPING SILENT, I'LL HAVE TO ASK ALL OF YOU TO GO DOWN TO THAT

10:09AM 10   ROOM AND USE THE OVERFLOW ROOM.

10:09AM 11       AND I HATE TO SEND ALL OF YOU DOWN THERE, INCLUDING THOSE

10:09AM 12   OF YOU WHO ARE PRESCRIBING BY THE RULES OF BEING SILENT IN YOUR

10:09AM 13   DEVICES, BUT IT MAY CAUSE -- BECAUSE OF THE ACTIONS OF A FEW,

10:09AM 14   IT MAY CAUSE ALL OF YOU TO HAVE TO GO DOWN THERE AND SIT IN

10:10AM 15   THAT ROOM.

10:10AM 16       SO I JUST WANT TO PUT YOU ON NOTICE ABOUT THAT.

10:10AM 17       I MAY BRING UP ANOTHER MARSHAL TO MONITOR THINGS HERE SUCH

10:10AM 18   THAT WE CAN KEEP THAT PORTION OF THE COURTROOM SILENT SO THAT

10:10AM 19   EVERYONE, AND PARTICULARLY THE JURORS, CAN HEAR THESE

10:10AM 20   PROCEEDINGS IN A FAIR AND FULL MANNER.

10:10AM 21       SO I JUST WANT TO STATE THAT NOW.  AND I APPRECIATE

10:10AM 22   YOUR -- THOSE OF YOU WHO ARE TYPING HERE, I APPRECIATE YOUR

10:10AM 23   CONSIDERATION ABOUT THIS.  BUT I JUST HAVE TO GIVE YOU FAIR

10:10AM 24   WARNING, IT MAY BE THAT I'LL HAVE TO HAVE YOU ALL MOVE DOWN TO

10:10AM 25   THAT ROOM IF YOU'RE NOT ABLE TO KEEP YOUR DEVICES SILENT.

|          |    |                                                                          |
|----------|----|--------------------------------------------------------------------------|
| 10:10AM  | 1  | AND LET ME SAY THAT ALSO INCLUDES TELEPHONE DEVICES.  THIS                |
| 10:10AM  | 2  | MORNING I THINK WE HEARD TWO OR THREE RINGS, CHIMES OF PHONES             |
| 10:10AM  | 3  | GOING OFF, AND IF I BRING A MARSHAL IN HERE AND IF SHE HEARS A            |
| 10:10AM  | 4  | DEVICE, SHE'S GOING TO ASK YOU TO LEAVE, NOT JUST TURN OFF THE            |
| 10:10AM  | 5  | DEVICE.                                                                   |
| 10:10AM  | 6  | BUT YOU CAN'T BE HERE IN IF YOU'RE NOT ABLE TO POLICE IT.                 |
| 10:11AM  | 7  | THIS TRIAL HAS BEEN GOING ON FOR SEVERAL WEEKS.  MANY OF YOU              |
| 10:11AM  | 8  | HAVE BEEN HERE EVERY DAY OF THE TRIAL, AND I THINK YOU KNOW               |
| 10:11AM  | 9  | WHAT IS EXPECTED OF YOU.                                                  |
| 10:11AM  | 10 | SO THAT'S ALL I'M GOING TO SAY ON THE MATTER.  THANK YOU                  |
| 10:11AM  | 11 | VERY MUCH.                                                                |
| 10:11AM  | 12 | I THINK OUR JURORS WOULD BE GRATEFUL ALSO FOR THE ABILITY                 |
| 10:11AM  | 13 | TO KEEP THAT FROM BEING A DISTRACTION FROM THEIR DUTIES.                  |
| 10:11AM  | 14 | ALL RIGHT.  ANYTHING FURTHER FROM EITHER SIDE?                            |
| 10:11AM  | 15 | MR. DOWNEY:  YOUR HONOR, I JUST WANT TO REMIND THE                        |
| 10:11AM  | 16 | COURT THAT I THINK YOU WERE GOING TO ENGAGE A PROTOCOL IF THERE           |
| 10:11AM  | 17 | WERE A DISTRACTION.                                                       |
| 10:11AM  | 18 | THE COURT:  THANK YOU.  THANK YOU, MR. DOWNEY.                            |
| 10:11AM  | 19 | LET ME JUST INDICATE THAT I RECOGNIZE THAT THERE MAY BE                   |
| 10:11AM  | 20 | SOMEONE WHO NEEDS TO TAKE A BREAK FOR WHATEVER REASON IN THE              |
| 10:11AM  | 21 | JURY, AND IF YOU WOULD JUST RAISE YOUR HAND, PLEASE, RAISE YOUR           |
| 10:11AM  | 22 | HAND IF YOU NEED TO TAKE A BREAK AND WE WILL STOP THE                     |
| 10:11AM  | 23 | PROCEEDING IMMEDIATELY AND WE CAN TAKE WHATEVER ACTION WE NEED            |
| 10:11AM  | 24 | TO DO TO ALLOW THAT JUROR ACCESS TO WHATEVER NEED THEY NEED TO            |
| 10:12AM  | 25 | ACCOMPLISH.  I JUST WANT THAT TO BE KNOWN.                                |

10:12AM 1    SO PLEASE -- I KNOW THAT JUROR AND ALL OF YOU ARE GOING TO

10:12AM 2    CONTINUE TO PAY ATTENTION TO THE TESTIMONY HERE, BUT SHOULD THE

10:12AM 3    NEED ARISE THAT WE NEED TO TAKE A BREAK, PLEASE DO NOT BE SHY

10:12AM 4    ABOUT PUTTING YOUR HAND UP, PUT YOUR HAND UP, AND WE'LL STOP

10:12AM 5    THE PROCEEDINGS AND ALLOW THINGS TO GO FORWARD.

10:12AM 6    ALL RIGHT.  THANK YOU.  THANK YOU, MR. DOWNEY.  I

10:12AM 7    APPRECIATE IT.

10:12AM 8    YOU HAVE A WITNESS?

10:12AM 9    MR. LEACH:  WE DO, YOUR HONOR.

10:12AM 10   THE UNITED STATES CALLS LISA PETERSON.

10:12AM 11   THE COURT:  AND WE'RE GOING TO BREAK AT 11:00; IS

10:12AM 12   THAT RIGHT?

10:12AM 13   MS. TREFZ:  YES, IT IS.

10:12AM 14   THE COURT:  11:00?

10:12AM 15   MS. TREFZ:  YES.

10:12AM 16   THE COURT:  GOOD MORNING.  IF YOU WOULD COME

10:12AM 17   FORWARD, PLEASE.

10:12AM 18   IF YOU COULD STAND HERE FACING OUR COURTROOM DEPUTY WHILE

10:12AM 19   YOU RAISE YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU.

10:13AM 20   **(GOVERNMENT'S WITNESS, LISA PETERSON, WAS SWORN.)**

10:13AM 21   THE WITNESS:  YES.

10:13AM 22   THE COURT:  LET ME INVITE YOU TO HAVE A SEAT HERE.

10:13AM 23   FEEL FREE TO ADJUST THAT CHAIR AND MICROPHONE AS YOU MAKE

10:13AM 24   YOURSELF COMFORTABLE.

10:13AM 25   THERE'S SOME FRESH WATER IN THE CONTAINER, AND FEEL FREE

10:13AM  1      TO USE THAT AS YOU NEED.

10:13AM  2          WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

10:13AM  3      AND THEN SPELL IT, PLEASE.  AND I'LL ENCOURAGE YOU TO SPEAK

10:13AM  4      DIRECTLY INTO THE MICROPHONE.

10:13AM  5              THE WITNESS:  LISA PETERSON.  L-I-S-A,

10:13AM  6      P-E-T-E-R-S-O-N.

10:13AM  7              THE COURT:  THANK YOU.

10:13AM  8          COUNSEL.

10:13AM  9              MR. LEACH:  THANK YOU, YOUR HONOR.

10:13AM 10                       **DIRECT EXAMINATION**

10:13AM 11      BY MR. LEACH:

10:13AM 12      Q.   GOOD MORNING, MS. PETERSON.

10:13AM 13      A.   GOOD MORNING.

10:13AM 14      Q.   IF YOU'RE FULLY VACCINATED AND COMFORTABLE, YOU HAVE THE

10:13AM 15      COURT'S PERMISSION TO TESTIFY WITHOUT A MASK.

10:14AM 16          WHERE DO YOU WORK?

10:14AM 17      A.   I WORK FOR RDV CORPORATION IN GRAND RAPIDS, MICHIGAN.

10:14AM 18      Q.   AND WHAT IS RDV CORPORATION?

10:14AM 19      A.   RDV CORPORATION IS THE FAMILY OFFICE FOR THE DEVOS FAMILY,

10:14AM 20      AND WE'RE ALSO A REGISTERED INVESTMENT ADVISOR FOR OTHER

10:14AM 21      FAMILIES AS WELL.

10:14AM 22      Q.   WHAT DO YOU DO FOR RDV?

10:14AM 23      A.   I WORK IN THEIR INVESTMENT GROUP, AND I'M ONE OF TWO

10:14AM 24      PRIVATE EQUITY MANAGERS THAT MANAGES A PRIVATE EQUITY PORTFOLIO

10:14AM 25      FOR RDV CORPORATION.

10:14AM  1    Q.   AND HOW LONG HAVE YOU SERVED IN THE INVESTMENT GROUP FOR

10:14AM  2    RDV CORPORATION?

10:14AM  3    A.   ABOUT 17 YEARS.

10:14AM  4    Q.   IN APPROXIMATELY OCTOBER OF 2014, DID RDV CORPORATION MAKE

10:14AM  5    AN INVESTMENT IN THERANOS?

10:14AM  6    A.   YES.

10:14AM  7    Q.   WE'LL COME BACK TO THAT, BUT FOR NOW, COULD YOU BRIEFLY

10:14AM  8    DESCRIBE YOUR EDUCATIONAL BACKGROUND FOR US?

10:14AM  9    A.   I GRADUATED FROM MICHIGAN STATE UNIVERSITY IN 1992 WITH A

10:14AM  10   FINANCE DEGREE.

10:14AM  11   Q.   AND COULD YOU BRIEFLY DESCRIBE YOUR PROFESSIONAL

10:15AM  12   BACKGROUND LEADING UP TO JOINING RDV CORPORATION?

10:15AM  13   A.   I WAS A COMMERCIAL LENDER AT NDB BANK, WHICH WAS BOUGHT BY

10:15AM  14   FIRST CHICAGO AND IS NOW PART OF JPMORGAN CHASE, I THINK, FOR

10:15AM  15   ABOUT THREE YEARS; AND THEN AFTER THAT I WAS AN INVESTMENT

10:15AM  16   BANKER WITH MACDONALD INVESTMENTS, WHICH GOT BOUGHT BY KEY

10:15AM  17   BANK, AND WAS THERE UNTIL I STARTED WITH RDV CORPORATION IN

10:15AM  18   2005.

10:15AM  19   Q.   AND SO YOU'VE BEEN WITH RDV FOR APPROXIMATELY 16 YEARS?

10:15AM  20   A.   YEAH.

10:15AM  21   Q.   OKAY.  MOST OF MY QUESTIONS RELATE TO THE 2014 TIME

10:15AM  22   PERIOD, MS. PETERSON.

10:15AM  23        IN THAT TIME PERIOD, WHAT WAS YOUR JOB AGAIN?

10:15AM  24   A.   SAME AS IT IS NOW.  I MANAGE A PORTFOLIO OF PRIVATE EQUITY

10:15AM  25   INVESTMENTS, WHICH MEANS I FIND AND MANAGE PRIVATE EQUITY

10:15AM  1    FUNDS, INVESTMENTS IN THOSE PRIVATE EQUITY FUNDS, AND

10:15AM  2    OCCASIONALLY THOSE FUNDS WILL ASK US TO COINVEST ALONGSIDE OF

10:16AM  3    THEM.

10:16AM  4         AND SO I HAVE A PORTFOLIO OF PRIVATE EQUITY FUND MANAGERS

10:16AM  5    THAT I MANAGE AND A PORTFOLIO OF COINVESTMENTS ALONGSIDE OF

10:16AM  6    THOSE PRIVATE EQUITY MANAGERS THAT I MANAGE.

10:16AM  7    Q.   WHAT DO YOU MEAN BY A COINVESTMENT?

10:16AM  8    A.   A COINVESTMENT IS WHEN WE INVEST INSIDE THESE PRIVATE

10:16AM  9    EQUITY FUNDS, AND THERE'S SOMETIMES AN OPPORTUNITY THAT COMES

10:16AM  10   ALONG WHERE THE TRANSACTION THAT THEY'RE LOOKING AT IS A LITTLE

10:16AM  11   BIT BIGGER THAN WHAT THE FUND CAN DO ON ITS OWN.  THEY WILL ASK

10:16AM  12   US IF WE WANT TO COINVEST ALONGSIDE THE FUND.

10:16AM  13        SO WE'LL HAVE AN INVESTMENT IN THAT COMPANY THROUGH THE

10:16AM  14   PRIVATE EQUITY FUND, AND WE'LL ALSO HAVE A SIDE COINVESTMENT IN

10:16AM  15   THAT COMPANY AS A COINVESTMENT.

10:16AM  16   Q.   AS PRIVATE EQUITY MANAGER WITHIN RDV, IS IT IMPORTANT FOR

10:16AM  17   YOU TO UNDERSTAND THE INVESTING PRIORITIES FOR RDV CORPORATION?

10:16AM  18   A.   YES.

10:16AM  19   Q.   CAN YOU EXPLAIN THAT A LITTLE BIT?

10:17AM  20   A.   WELL, WE HAVE A STRATEGY THAT WE FOLLOW AND WE TRY TO STAY

10:17AM  21   DISCIPLINED TO THAT STRATEGY.  SO IT'S IMPORTANT FOR ME TO KNOW

10:17AM  22   WHAT THE FAMILY AND MY BOSS IS LOOKING FOR IN TERMS OF WHAT

10:17AM  23   TYPE OF PRIVATE EQUITY FUNDS ARE WE GOING TO LOOK FOR AND

10:17AM  24   INVEST WITH, AND THEN WHAT TYPE OF COINVESTMENTS WOULD WE DO

10:17AM  25   WITH THOSE GROUPS.

10:17AM   1          SO, YES, IT'S IMPORTANT THAT I KNOW WHAT THE STRATEGY IS

10:17AM   2   THAT WE'RE DOING.

10:17AM   3   Q.   I WANT TO STAY WITH YOU IN THE TIME PERIOD 2014.

10:17AM   4   A.   UH-HUH.

10:17AM   5   Q.   IN OR AROUND THAT TIME, DID YOU BECOME AWARE OF A COMPANY

10:17AM   6   CALLED THERANOS?

10:17AM   7   A.   YES.

10:17AM   8   Q.   AND HOW DID YOU BECOME AWARE OF THERANOS?

10:17AM   9   A.   I WAS ON A PLANE RIDE BACK FROM CHICAGO WITH MY BOSS,

10:17AM  10   RANDY DAMSTRA, AT THE TIME, AND ALSO THE PERSON THAT RAN OUR

10:17AM  11   GROUP, OUR CEO AND CIO, JERRY TUBERGEN, AND JERRY HAD JUST HAD

10:17AM  12   A MEETING WITH ELIZABETH HOLMES AND HER BROTHER CHRISTIAN AT A

10:17AM  13   CONFERENCE THAT HE HAD ATTENDED.

10:17AM  14   Q.   AND WERE YOU GIVEN ANY RESPONSIBILITIES WITH RESPECT TO A

10:18AM  15   POSSIBLE INVESTMENT IN THERANOS?

10:18AM  16   A.   YEAH.  WE TALKED ABOUT IT ON THE PLANE RIDE BACK TO

10:18AM  17   GRAND RAPIDS AND I HAD ASKED IF I COULD WORK ON THE TRANSACTION

10:18AM  18   BECAUSE I HAD A NUMBER OF HEALTH CARE INVESTMENTS, FUNDS THAT I

10:18AM  19   WORKED WITH, AND I LIKE HEALTH CARE AND IT WAS VERY INTERESTING

10:18AM  20   TO ME.

10:18AM  21          MY HUSBAND IS TYPE 1 DIABETIC AND DOES A LOT OF BLOOD

10:18AM  22   TESTING, AND SO IT WAS VERY INTERESTING TO ME AND SO I WANTED

10:18AM  23   TO WORK ON THAT ONE.

10:18AM  24   Q.   WHEN YOU SAY YOU WANTED TO WORK ON THAT, WHAT WERE YOU

10:18AM  25   SIGNING UP FOR?

10:18AM   1    A.   SO I WAS SIGNING UP TO HELP FACILITATE AND INFORM AND DO

10:18AM   2    ALL OF THE WORK ASSOCIATED WITH MAKING AN INVESTMENT IN THAT

10:18AM   3    AND INFORMING THE FAMILY.

10:18AM   4         SO THIS ONE WAS DIFFERENT THAN A TYPICAL COINVESTMENT

10:18AM   5    BECAUSE THERE WASN'T ANY PRIVATE EQUITY FUND IN THE MIDDLE OF

10:18AM   6    THE TRANSACTION.

10:18AM   7         NORMALLY THERE'S A PRIVATE EQUITY FUND THAT MAKES AN

10:18AM   8    INVESTMENT AND THEN WE COINVEST ALONGSIDE THEM.

10:19AM   9         THIS ONE WAS A LITTLE BIT DIFFERENT IN THAT THERE WAS NO

10:19AM  10    PRIVATE EQUITY FUND AND WE WANTED -- THE FAMILY IS VERY -- HAS

10:19AM  11    A LOT OF AFFINITY TOWARDS HEALTH CARE AND EDUCATION AND JERRY

10:19AM  12    WANTED THE FAMILY TO TAKE A LOOK AT THIS INVESTMENT.

10:19AM  13         IT WAS VERY MUCH CHARACTERIZED TO JERRY THAT THIS WAS AN

10:19AM  14    OPPORTUNITY THAT WE WERE BEING INVITED TO LOOK AT, AND HE

10:19AM  15    WANTED TO TAKE THE OPPORTUNITY TO THE FAMILY AND SEE IF THEY

10:19AM  16    WANTED TO MAKE AN INVESTMENT.

10:19AM  17         SO MY ROLE WAS TO WORK WITH JERRY AND INFORM THE FAMILY ON

10:19AM  18    EVERYTHING AND ATTEND CALLS AND MEETINGS AND PREPARE EVERYTHING

10:19AM  19    THAT WOULD GO TO THE INVESTMENT COMMITTEE, WHICH IS MADE UP OF

10:19AM  20    FAMILY MEMBERS.

10:19AM  21              MR. WADE:  OBJECTION, YOUR HONOR.  THERE WAS HEARSAY

10:19AM  22    WITHIN THE ANSWER TO THAT QUESTION.

10:19AM  23              THE COURT:  MR. LEACH, WILL YOU ASK -- WAS THIS

10:19AM  24    FOUNDATIONAL AS TO HER EMPLOYMENT THEN?

10:20AM  25              MR. LEACH:  YES.

10:20AM  1      THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, THE

10:20AM  2  TESTIMONY THAT YOU HEARD, THIS IS REGARDING THE -- WHAT'S HIS

10:20AM  3  NAME?  JERRY?

10:20AM  4      THE WITNESS:  TUBERGEN.

10:20AM  5      THE COURT:  TUBERGEN, THANK YOU.

10:20AM  6    YES, THE STATEMENTS ATTRIBUTED TO MR. TUBERGEN WERE NOT

10:20AM  7  OFFERED FOR THE TRUTH OF THE MATTER ASSERTED BY HIM, BUT RATHER

10:20AM  8  AS FOUNDATIONAL FOR THIS WITNESS'S EMPLOYMENT AND HER DUTIES

10:20AM  9  AND HER ENGAGEMENT IN THAT REGARD AS FOUNDATION.

10:20AM 10    SO GO AHEAD, MR. LEACH.

10:20AM 11      MR. LEACH:  THANK YOU, YOUR HONOR.

10:20AM 12  Q.  AND DID I HEAR YOU SAY THAT YOU IN SOME SENSE VOLUNTEERED

10:20AM 13  FOR THIS PROJECT?

10:20AM 14  A.  YES.

10:20AM 15  Q.  AND WHY WAS THAT?

10:20AM 16  A.  BECAUSE IT DIDN'T COME IN THROUGH ONE OF MY PRIVATE EQUITY

10:20AM 17  FUNDS, SOMEONE HAD TO WORK ON IT ON THE INVESTMENT TEAM.  AND

10:20AM 18  SO I WANTED TO, SO HE SAID, SURE, I WOULD LOVE FOR YOU TO WORK

10:20AM 19  ON IT.

10:20AM 20  Q.  AND WHY DID YOU WANT TO?

10:20AM 21  A.  BECAUSE I HAD A LITTLE BIT OF KNOWLEDGE IN THE HEALTH CARE

10:20AM 22  SPACE AND IT INTRIGUED ME.

10:20AM 23      MR. LEACH:  MAY I APPROACH, YOUR HONOR?

10:20AM 24      THE COURT:  YES.

10:21AM 25      MR. LEACH:  (HANDING.)

10:21AM   1    Q.   MS. PETERSON, I'VE PLACED BEFORE YOU A BINDER OF

10:21AM   2    DOCUMENTS, AND I'D LIKE TO DRAW YOUR ATTENTION, PLEASE, TO WHAT

10:21AM   3    HAS BEEN MARKED AS EXHIBIT 1944.

10:21AM   4         DOES THIS APPEAR TO BE AN EMAIL DATED SEPTEMBER 18TH,

10:21AM   5    2014?

10:21AM   6    A.   YES.

10:21AM   7    Q.   AND IS THIS CONSISTENT WITH THE TIME PERIOD WHEN YOU WERE

10:21AM   8    APPROACHED BY MR. TUBERGEN ABOUT A POSSIBLE INVESTMENT

10:21AM   9    OPPORTUNITY IN THERANOS?

10:21AM  10    A.   YES.

10:21AM  11    Q.   OKAY.  THERE'S AN ATTACHMENT TO EXHIBIT 1944.

10:22AM  12         DO YOU SEE THAT?

10:22AM  13    A.   YES.

10:22AM  14    Q.   AND AT SOME POINT DID MR. TUBERGEN PROVIDE YOU WITH THIS

10:22AM  15    ATTACHMENT?

10:22AM  16    A.   YES.

10:22AM  17    Q.   OKAY.  DO YOU KNOW WHERE HE GOT IT?

10:22AM  18    A.   NO, I DON'T KNOW WHERE HE GOT IT.

10:22AM  19    Q.   OKAY.  WAS IT PART OF THE INFORMATION THAT YOU CONSIDERED

10:22AM  20    IN CONNECTION WITH A POSSIBLE INVESTMENT IN THERANOS?

10:22AM  21    A.   YES.

10:22AM  22              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 1944.

10:22AM  23              MR. WADE:  NO OBJECTION, YOUR HONOR.

10:22AM  24              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:22AM  25         (GOVERNMENT'S EXHIBIT 1944 WAS RECEIVED IN EVIDENCE.)

| | | |
|---|---|---|
| 10:22AM | 1 | MR. LEACH: AND IF WE CAN START, MS. HOLLIMAN, ON |
| 10:22AM | 2 | PAGE 2. AND IF WE CAN ZOOM IN ON THE TOP PORTION. |
| 10:22AM | 3 | Q. DO YOU SEE THE EMAIL, MS. PETERSON, FROM JERRY TUBERGEN TO |
| 10:23AM | 4 | DICK DEVOS, DOUG DEVOS, DAN DEVOS, AND CHERI DEVOS? |
| 10:23AM | 5 | A. YES. |
| 10:23AM | 6 | Q. AND WHO ARE THEY? |
| 10:23AM | 7 | A. THEY ARE THE CHILDREN OF RICH DEVOS AND THE MEMBERS THAT |
| 10:23AM | 8 | WE WORKED FOR AT THE TIME. |
| 10:23AM | 9 | Q. MEMBERS OF THE INVESTMENT COMMITTEE YOU MENTIONED? |
| 10:23AM | 10 | A. SOME OF THEM ARE ON THE INVESTMENT COMMITTEE, YES. DOUG |
| 10:23AM | 11 | IS THE CHAIRMAN. |
| 10:23AM | 12 | Q. OKAY. AND THE FIRST SENTENCE OF THIS READS, "ALL. |
| 10:23AM | 13 | "THIS MORNING, I HAD ONE OF THE MOST INTERESTING MEETINGS |
| 10:23AM | 14 | I CAN RECALL WITH THE WOMAN PROFILED IN THE ATTACHED 'FORTUNE' |
| 10:23AM | 15 | MAGAZINE ARTICLE." |
| 10:23AM | 16 | DO YOU SEE THAT? |
| 10:23AM | 17 | A. YES. |
| 10:23AM | 18 | Q. AND IS THE ATTACHMENTS THE "FORTUNE" MAGAZINE ARTICLE, A |
| 10:23AM | 19 | COPY OF WHICH YOU AT SOME POINT GOT? |
| 10:23AM | 20 | A. YES. |
| 10:23AM | 21 | Q. OKAY. LET'S LOOK AT PAGE 2. |
| 10:23AM | 22 | AND IF WE COULD ZOOM IN ON UP AT THE TOP. |
| 10:23AM | 23 | MS. PETERSON, THERE APPEARS TO BE SOME LANGUAGE -- WELL, |
| 10:24AM | 24 | BEFORE I ASK THAT QUESTION, DO YOU SEE THAT THIS IS AN ARTICLE |
| 10:24AM | 25 | BY ROGER PARLOFF? |

10:24AM 1      A.   YES.

10:24AM 2      Q.   AND UP AT THE TOP IT SAYS "1/1000TH THERANOS TESTS CAN BE

10:24AM 3      PERFORMED ON JUST A FEW DROPS OF BLOOD, OR ABOUT 1/100TH TO

10:24AM 4      1/1000TH OF ORDINARY AMOUNT."

10:24AM 5          DO YOU SEE THAT LANGUAGE?

10:24AM 6      A.   YES.

10:24AM 7      Q.   AND WAS THAT OF INTEREST TO YOU?

10:24AM 8      A.   VERY.

10:24AM 9      Q.   WHY?

10:24AM 10     A.   BECAUSE NO ONE HAD BEEN ABLE TO DO THAT BEFORE.

10:24AM 11     Q.   LET ME DRAW YOUR ATTENTION TO THE NEXT PAGE, PAGE 4.

10:24AM 12         DO YOU SEE AN IMAGE THERE?

10:24AM 13     A.   YES.

10:24AM 14     Q.   AND DO YOU RECOGNIZE THE PERSON IN THAT IMAGINE?

10:24AM 15     A.   YES.

10:24AM 16     Q.   AND WHO IS IT?

10:24AM 17     A.   THAT'S ELIZABETH HOLMES.

10:24AM 18     Q.   AND DO YOU SEE MS. HOLMES HERE IN THE COURTROOM TODAY?

10:24AM 19     A.   YES.

10:24AM 20     Q.   AND WHERE IS SHE SEATED?

10:24AM 21     A.   RIGHT THERE (INDICATING).

10:24AM 22     Q.   AT THE DEFENSE TABLE?

10:24AM 23     A.   YES.

10:24AM 24     Q.   AND CAN YOU JUST DESCRIBE FOR THE RECORD WHAT SHE'S

10:24AM 25     WEARING?

| | | |
|---|---|---|
| 10:24AM | 1 | A.   SHE HAS A GREEN MASK ON. |
| 10:25AM | 2 | Q.   OKAY.  THANK YOU. |
| 10:25AM | 3 | WHAT DID YOU DO WITH THIS ARTICLE? |
| 10:25AM | 4 | A.   READ IT. |
| 10:25AM | 5 | Q.   AND WAS THIS SORT OF THE FIRST INFORMATION THAT YOU GOT IN |
| 10:25AM | 6 | CONNECTION WITH THERANOS? |
| 10:25AM | 7 | A.   YES, AND THEN STARTED DOING SOME GOOGLE SEARCHES ALSO. |
| 10:25AM | 8 | Q.   OKAY.  LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 5432. |
| 10:25AM | 9 | DO YOU HAVE THAT IN FRONT OF YOU? |
| 10:25AM | 10 | A.   YES. |
| 10:25AM | 11 | Q.   OKAY.  DO YOU SEE AT THE TOP AN EMAIL FROM JERRY TUBERGEN |
| 10:25AM | 12 | TO ELIZABETH HOLMES WITH A COPY TO DANIEL EDLIN AND AMI NEIL? |
| 10:25AM | 13 | A.   AMI, YES. |
| 10:25AM | 14 | Q.   AND WHO IS MS. NEIL? |
| 10:25AM | 15 | A.   AMI NEIL IS JERRY'S SECRETARY OR ASSISTANT AT THE TIME. |
| 10:25AM | 16 | Q.   AND DOES IT APPEAR TO BE FORWARDING A MESSAGE FROM |
| 10:26AM | 17 | MS. HOLMES ON OR ABOUT SEPTEMBER 24TH, 2014? |
| 10:26AM | 18 | A.   YES. |
| 10:26AM | 19 | MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5432 INTO |
| 10:26AM | 20 | EVIDENCE. |
| 10:26AM | 21 | MR. WADE:  NO OBJECTION. |
| 10:26AM | 22 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:26AM | 23 | (GOVERNMENT'S EXHIBIT 5432 WAS RECEIVED IN EVIDENCE.) |
| 10:26AM | 24 | BY MR. LEACH: |
| 10:26AM | 25 | Q.   LET'S START DOWN ON THE BOTTOM, MS. PETERSON.  THERE'S AN |

10:26AM 1    EMAIL FROM JERRY TUBERGEN WITH A CC TO D. MOSLEY, AND THE

10:26AM 2    SUBJECT IS CONFIDENTIAL DISCLOSURE AGREEMENT.

10:26AM 3         DO YOU SEE THAT?

10:26AM 4    A.   YES.

10:26AM 5    Q.   WHO WAS D. MOSLEY?

10:26AM 6    A.   DAN MOSLEY WAS AN ESTATE ATTORNEY FOR THE FAMILY, AND HE'S

10:26AM 7    THE ONE WHO INTRODUCED US TO ELIZABETH HOLMES.

10:26AM 8    Q.   DO YOU KNOW WHETHER MR. MOSLEY ULTIMATELY INVESTED IN

10:26AM 9    THERANOS?

10:26AM 10   A.   I BELIEVE SO, YES.

10:26AM 11   Q.   AND AT OR AROUND THIS TIME, DID RDV EXECUTE A CONFIDENTIAL

10:26AM 12   DISCLOSURE AGREEMENT SO IT COULD CONSIDER INFORMATION ABOUT

10:27AM 13   THERANOS?

10:27AM 14   A.   YES.

10:27AM 15   Q.   LET'S MOVE FORWARD IN THE EMAIL CHAIN TO THE MESSAGE FROM

10:27AM 16   MS. HOLMES.

10:27AM 17        DO YOU SEE WHERE IT SAYS, "GOT IT.  WE'RE VERY MUCH

10:27AM 18   LOOKING FORWARD TO OUR MEETING"?

10:27AM 19   A.   YES.

10:27AM 20   Q.   AND DO YOU SEE MS. HOLMES WROTE, "I'VE HAD OUR TEAM

10:27AM 21   PREPARE MATERIALS FOR YOU - LET US KNOW THE BEST ADDRESS TO

10:27AM 22   WHICH TO SEND THEM AND WE'LL GET THEM OUT TO YOU."

10:27AM 23        DO YOU SEE THAT?

10:27AM 24   A.   YES.

10:27AM 25   Q.   AND ULTIMATELY DID YOU RECEIVE SOME MATERIALS RELATING TO

10:27AM   1     THERANOS?

10:27AM   2     A.   YES.

10:27AM   3     Q.   DESCRIBE FOR US WHAT YOU GOT.

10:27AM   4     A.   TWO VERY LARGE BINDERS AND A COVER LETTER.

10:27AM   5     Q.   OKAY.  AND DID YOU REVIEW THOSE MATERIALS?

10:27AM   6     A.   ALL OF IT, YES.

10:27AM   7     Q.   WHY DID YOU REVIEW ALL OF IT?

10:27AM   8     A.   TRYING TO LEARN WHAT THIS COMPANY WAS ALL ABOUT, AS WELL

10:28AM   9     AS MY PRIMARY JOB WAS TO INFORM THE FAMILY AND THE INVESTMENT

10:28AM   10    COMMITTEE ON THIS OPPORTUNITY.

10:28AM   11    Q.   AND DID YOU -- DID YOU VIEW YOUR ROLE AS INFORMING THE

10:28AM   12    FAMILY ABOUT WHAT WAS IMPORTANT AND RELEVANT TO AN INVESTMENT?

10:28AM   13    A.   YES.

10:28AM   14    Q.   DID YOU ULTIMATELY SPEAK TO MS. HOLMES BY TELEPHONE?

10:28AM   15    A.   JERRY AND I DID, YES.

10:28AM   16    Q.   OKAY.  ROUGHLY WHEN WAS THAT?

10:28AM   17    A.   FIRST COUPLE OF DAYS OF OCTOBER 2014.

10:28AM   18    Q.   OKAY.  BY THAT POINT IN TIME, HAD YOU REVIEWED THE

10:28AM   19    MATERIALS THAT THERANOS HAD SENT?

10:28AM   20    A.   I HAD I THINK JUST GOTTEN THEM THAT MORNING FROM JERRY.

10:28AM   21    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO WHAT WE HAVE MARKED

10:28AM   22    AS EXHIBIT 2015.

10:28AM   23         DO YOU RECOGNIZE THIS DOCUMENT?

10:28AM   24    A.   YES.

10:28AM   25    Q.   WHAT IS THIS?

| 10:28AM | 1 | A.   THIS WAS THE NOTES FROM THE CALL THAT WE HAD WITH |
| 10:29AM | 2 | ELIZABETH ON THAT DAY, WHICH WAS THE START OF A LOT OF |
| 10:29AM | 3 | INFORMATION THAT WE PULLED TOGETHER, THAT I PULLED TOGETHER FOR |
| 10:29AM | 4 | THIS IN PREPARATION FOR A LONGER MEETING AT THE COMPANY A WEEK |
| 10:29AM | 5 | OR TWO LATER. |
| 10:29AM | 6 | Q.   DID YOU PREPARE THESE NOTES IN THE ORDINARY COURSE OF |
| 10:29AM | 7 | BUSINESS? |
| 10:29AM | 8 | A.   YES. |
| 10:29AM | 9 | Q.   AND DID YOU MAKE AN EFFORT TO BE ACCURATE IN YOUR NOTES? |
| 10:29AM | 10 | A.   VERY. |
| 10:29AM | 11 | Q.   AND WAS IT YOUR REGULAR PRACTICE TO TAKE NOTES OF CALLS OF |
| 10:29AM | 12 | POTENTIAL INVESTMENT OPPORTUNITIES? |
| 10:29AM | 13 | A.   YES. |
| 10:29AM | 14 | Q.   OKAY. |
| 10:29AM | 15 |      YOUR HONOR, I OFFER EXHIBIT 215. |
| 10:29AM | 16 |           MR. WADE:  NO OBJECTION. |
| 10:29AM | 17 |           MR. LEACH:  2015.  EXCUSE ME. |
| 10:29AM | 18 |           THE COURT:  2015 IS ADMITTED, AND IT MAY BE |
| 10:29AM | 19 | PUBLISHED. |
| 10:29AM | 20 |      (GOVERNMENT'S EXHIBIT 2015 WAS RECEIVED IN EVIDENCE.) |
| 10:29AM | 21 | BY MR. LEACH: |
| 10:29AM | 22 | Q.   LET'S LOOK AT THE TOP PORTION OF YOUR NOTES, MS. PETERSON. |
| 10:29AM | 23 |      UP AT THE TOP IT SAYS, "THERANOS CONF CALL NOTES." |
| 10:30AM | 24 |      DO YOU SEE THAT? |
| 10:30AM | 25 | A.   YES. |

10:30AM  1      Q.   AND OCTOBER 3RD, 2014, THAT'S THE DATE OF THE MEETING?

10:30AM  2      A.   YES.

10:30AM  3      Q.   OR THE PHONE CALL?

10:30AM  4           YOU WROTE "ELIZABETH HOLMES.

10:30AM  5           "JLT, LP"

10:30AM  6           WHAT DOES THAT REFER TO?

10:30AM  7      A.   THE PEOPLE ON THE CALL.  SO ELIZABETH WAS ON THE CALL FROM

10:30AM  8      HER SIDE, AND JLT IS JERRY TUBERGEN, AND LP IS ME.

10:30AM  9      Q.   AND YOU WROTE, "WHAT IS THE LONG-TERM VISION OF THERANOS?"

10:30AM  10          WHAT WAS THAT GETTING AT?

10:30AM  11     A.   THE BOLD THINGS IN THIS MEMO ARE THE QUESTIONS THAT JERRY

10:30AM  12     AND I HAD THOUGHT OF BEFORE THE CALL.  SO THESE ARE THE

10:30AM  13     QUESTIONS THAT WE WANTED TO ASK, WITH THE REST OF IT BEING THE

10:30AM  14     ANSWERS THAT WE GOT.

10:30AM  15     Q.   OKAY.  THERE'S AN ENTRY "WALGREENS (MARKET:  11 MM."

10:30AM  16          IS THAT MILLION?

10:30AM  17     A.   YES.

10:30AM  18     Q.   " -- (TESTS/MONTH).

10:30AM  19          "BOOTS IN EUROPE."

10:30AM  20          WHAT IS THAT REFERRING TO?

10:30AM  21     A.   THE SIZE OF THE MARKET, THE PHARMACEUTICAL TESTING MARKET

10:31AM  22     WITH WALGREENS.

10:31AM  23     Q.   AND WAS THAT SOMETHING THAT YOU DISCUSSED WITH MS. HOLMES

10:31AM  24     ON THIS OCTOBER 2014 PHONE CALL?

10:31AM  25     A.   YES.

10:31AM 1    Q.   AND THERE'S A REFERENCE TO "INSURANCE, HOSPITALS/DOC

10:31AM 2    GROUPS."

10:31AM 3         WHAT DOES THAT REFER TO?

10:31AM 4    A.   THE SAME, THAT THESE WERE -- WE WERE TRYING TO GET A SENSE

10:31AM 5    OF THE MARKET.  SHE HAD REFERENCED CONTRACTS WITH MANY OF THESE

10:31AM 6    GROUPS, SO WE WERE TRYING TO GET A SENSE OF IF THEY COULD

10:31AM 7    PENETRATE THE MARKET, HOW BIG WOULD THAT BE, HOW BIG IS THE

10:31AM 8    MARKET?

10:31AM 9    Q.   IF WE CAN ZOOM OUT, MS. HOLLIMAN, AND THERE'S A BOLD ENTRY

10:31AM 10   FOR WALGREENS.  THE BOTTOM HALF OF THE PAGE WOULD BE GREAT.

10:31AM 11   THANK YOU.

10:31AM 12        DO YOU SEE THE REFERENCE TO, "WALGREENS, NATIONAL ROLLOUT,

10:31AM 13   PROJECTIONS BASED ON 900 STORES?

10:31AM 14   A.   YES.

10:31AM 15   Q.   AND WHAT DOES THAT REFER TO?

10:31AM 16   A.   WE TALKED ABOUT WALGREENS CONTRACTS WHICH WERE VERY MUCH

10:32AM 17   IN THE PRESS AT THE TIME, AND SHE WAS GOING THROUGH THAT THEY

10:32AM 18   HAD THIS CONTRACT AND THAT THEY WERE IN STORES IN ARIZONA AND

10:32AM 19   THAT THEY WERE PREPPING FOR A NATIONAL ROLLOUT AND THAT THE

10:32AM 20   PROJECTIONS THAT WERE IN -- THERE WERE TWO PAGES OF PROJECTIONS

10:32AM 21   IN THE BINDER THAT WE RECEIVED, AND THAT THE PROJECTIONS THAT

10:32AM 22   WERE THERE WERE BASED ON A ROLLOUT OF 900 STORES FOR WALGREENS

10:32AM 23   IN 2015.

10:32AM 24   Q.   SO MS. HOLMES TOLD YOU THAT THE PROJECTIONS YOU HAD WERE

10:32AM 25   BASED ON 900 STORES --

10:32AM  1     A.   YES.

10:32AM  2     Q.   -- FOR WALGREENS.

10:32AM  3          BENEATH THAT, THERE'S A BOLD HEADING, "RISKS."

10:32AM  4          "WE NOW HAVE LONG-TERM CONTRACTS, SO RISK IS EXECUTION."

10:32AM  5          WHAT DID MS. HOLMES TELL YOU ABOUT THE RISKS OF AN

10:32AM  6     INVESTMENT IN THIS PARTICULAR CALL?

10:32AM  7     A.   THAT'S EXACTLY -- WE ASKED HER WHAT THE RISKS WERE, AND

10:32AM  8     THAT WAS HER ANSWER.

10:32AM  9     Q.   WHAT DID THAT MEAN, "NOW HAVE LONG-TERM CONTRACTS, SO RISK

10:32AM 10     IS EXECUTION"?

10:33AM 11     A.   TO US IT MEANT THAT SHE HAD THESE LONG-TERM CONTRACTS AND

10:33AM 12     THEY WERE ALREADY USING THEM IN WALGREENS STORES, AND THE

10:33AM 13     EXECUTION WAS THE PEOPLE THAT SHE HAD AROUND HER AND THE

10:33AM 14     ABILITY FOR WALGREENS TO ROLL OUT AND LAUNCH IT IN DIFFERENT

10:33AM 15     MARKETS THAN JUST ARIZONA.

10:33AM 16     Q.   WAS THERE ANY DISCUSSION OF THERE BEING RISK AROUND THE

10:33AM 17     UTILITY OF THE TECHNOLOGY?

10:33AM 18     A.   NONE.

10:33AM 19     Q.   LET'S LOOK AT THE NEXT PAGE, PLEASE.  IF WE CAN ZOOM IN ON

10:33AM 20     THE HEADING.  THERE YOU GO.  THANK YOU, MS. HOLLIMAN.

10:33AM 21          DO YOU SEE HEADING, "GOALS FOR OCTOBER 14" AT THE TOP?

10:33AM 22     A.   YES.

10:33AM 23     Q.   WHAT DOES THAT REFER TO?

10:33AM 24     A.   THAT WAS THE DATE THAT WE HAD AN IN PERSON MEETING WITH

10:33AM 25     HER WITH A FEW PEOPLE FROM THE INVESTMENT COMMITTEE.

10:33AM 1    Q.   OKAY.  AND THEN THERE'S SOME WRITING UNDERNEATH THAT, "GET

10:34AM 2    TO KNOW THE PEOPLE WHO ARE MAKING THE INVESTMENT AND WILL BE

10:34AM 3    KEY IN THE RELATIONSHIP GOING FORWARD."

10:34AM 4        DO YOU SEE THAT?

10:34AM 5    A.   YES.

10:34AM 6    Q.   AND DURING THIS TIME PERIOD, DID YOU FEEL AS IF THERANOS

10:34AM 7    WAS SELECTING YOU AS AN INVESTOR?

10:34AM 8    A.   VERY MUCH SO.

10:34AM 9    Q.   EXPLAIN THAT FOR US.

10:34AM 10   A.   WE WERE VERY MUCH -- THE SITUATION WAS CHARACTERIZED THAT

10:34AM 11   SHE WAS KIND OF HAND PICKING FIVE OR SIX PRIVATE FAMILIES TO

10:34AM 12   INVEST IN HER COMPANY.  SHE DIDN'T WANT LARGE PRIVATE EQUITY

10:34AM 13   FIRMS OR INSTITUTIONAL INVESTORS BECAUSE THEIR TIMEFRAMES WERE

10:34AM 14   TOO SHORT.  THEY WANTED TO MONETIZE THAT INVESTMENT QUICKER

10:34AM 15   THAN SHE WANTED TO.

10:34AM 16       AND OFTENTIMES THEY WANT TO GO PUBLIC, AND SHE WANTED TO

10:34AM 17   STAY A PRIVATE COMPANY.

10:34AM 18       SO IT WAS VERY MUCH CHARACTERIZED AND WRITTEN IN HER

10:34AM 19   LETTER TO US WITH THE BINDERS THAT SHE WAS INVITING US TO

10:35AM 20   PARTICIPATE IN THIS OPPORTUNITY.

10:35AM 21       SO THE GET TO KNOW THE PEOPLE WHO ARE MAKING THE

10:35AM 22   INVESTMENT WAS WHAT SHE WAS SAYING, THAT THEY REALLY WANTED TO

10:35AM 23   GET TO KNOW US AS MUCH AS WE WANTED TO DO DUE DILIGENCE ON

10:35AM 24   THEM.  THEY WANTED TO UNDERSTAND WHO THE INVESTORS WERE THAT

10:35AM 25   WERE INVESTING WITH THEM.

10:35AM  1    Q.   LET ME MOVE FORWARD IN TIME AND DRAW YOUR ATTENTION TO

10:35AM  2    WHAT HAS BEEN MARKED AS EXHIBIT 2073.

10:35AM  3         DO YOU HAVE THAT, MS. PETERSON?

10:35AM  4    A.   YES.

10:35AM  5    Q.   AND DO YOU RECOGNIZE THIS?

10:35AM  6    A.   YES.

10:35AM  7    Q.   AND WHAT IS THIS?

10:35AM  8    A.   SO AFTER THAT PHONE CALL, I PUT TOGETHER A VERY THOROUGH

10:35AM  9    MEMO OF ALL OF THE THINGS THAT I HAD READ IN THE BINDER AND

10:35AM  10   EVERYTHING THAT WAS SAID ON THE PHONE CALL AND PUT IT TOGETHER

10:35AM  11   INTO A MEMO THAT THE FAMILY COULD UTILIZE IN REVIEWING THIS

10:36AM  12   OPPORTUNITY, AND WE WERE GOING TO REVIEW THIS MEMO ON THE PLANE

10:36AM  13   RIDE ON THE WAY TO THE OCTOBER 14TH MEETING.

10:36AM  14   Q.   OKAY.  WHY DID YOU PREPARE THIS MEMO?

10:36AM  15   A.   TO CONSOLIDATE ALL OF THE INFORMATION THAT WE HAD RECEIVED

10:36AM  16   SO FAR FROM MS. HOLMES --

10:36AM  17   Q.   SO --

10:36AM  18   A.   -- IN THE BINDERS.

10:36AM  19   Q.   SO THAT RDV COULD MAKE AN INVESTMENT DECISION?

10:36AM  20   A.   CORRECT.

10:36AM  21        MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 2073 INTO

10:36AM  22   EVIDENCE.

10:36AM  23        MR. WADE:  NO OBJECTION.

10:36AM  24        THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:36AM  25        (GOVERNMENT'S EXHIBIT 2073 WAS RECEIVED IN EVIDENCE.)

10:36AM  1          MR. LEACH:  AND, MS. HOLLIMAN, IF WE CAN ZOOM IN ON

10:36AM  2     THE SUBSTANCE.

10:36AM  3     Q.   MS. PETERSON, LET ME JUST GET SOME BACKGROUND FROM YOU.

10:37AM  4          DO YOU SEE THE DATE OCTOBER 12TH, 2014?

10:37AM  5     A.   YES.

10:37AM  6     Q.   AND THAT'S A FEW DAYS IN ADVANCE OF THE MEETING OUT IN

10:37AM  7     PALO ALTO?

10:37AM  8     A.   CORRECT.

10:37AM  9     Q.   AND THERE WERE SOME FOLKS.  WE TALKED ABOUT MR. TUBERGEN,

10:37AM 10     HE WAS YOUR BOSS AT THE TIME?

10:37AM 11     A.   YES.

10:37AM 12     Q.   AND IN THE CC LINE THERE'S AN INDIVIDUAL MICHAEL LUNT.

10:37AM 13     WHO IS HE?

10:37AM 14     A.   OUR IN-HOUSE COUNSEL.

10:37AM 15     Q.   AND RANDY DAMSTRA, I THINK YOU MENTIONED HIM EARLIER, BUT

10:37AM 16     WHO IS HE?

10:37AM 17     A.   HE RAN THE INVESTMENT GROUP.

10:37AM 18     Q.   YOU WRITE TO THIS GROUP IN THE THIRD LINE, "I THINK IT

10:37AM 19     GIVES YOU AND THE FAMILY MEMBERS GOING ON THIS TRIP A SHORT BUT

10:37AM 20     SOLID BASIS OF THE COMPANY, ITS OBJECTIVES, ITS HISTORY, ITS

10:37AM 21     ADVANTAGES, ITS SKEPTIC'S VIEWS, ET CETERA, AND ENOUGH OF A

10:37AM 22     VIEW TO HAVE AN ENGAGED AND PRODUCTIVE MEETING ON TUESDAY

10:37AM 23     WITHOUT HAVING TO READ THROUGH THE FOOT OF MATERIALS SHE SENT."

10:37AM 24          IS THAT A FAIR SUMMARY OF WHAT YOU WERE TRYING TO DO?

10:37AM 25     A.   YES.

10:37AM  1    Q.   AND THE FOOT OF MATERIALS, THOSE WERE THE BINDERS THAT YOU

10:38AM  2    PERSONALLY REVIEWED?

10:38AM  3    A.   YES.

10:38AM  4    Q.   AND LET'S LOOK AT YOUR MEMO.  IF WE CAN GO TO PAGE 4, AND

10:38AM  5    IF WE CAN ZOOM IN ON THE TOP HALF.

10:38AM  6         PERFECT, MS. HOLLIMAN.  THANK YOU.

10:38AM  7         DO YOU SEE WHERE IT SAYS, "RECAP OF CONVERSATIONS WITH

10:38AM  8    ELIZABETH HOLMES, FOUNDER AND CEO OF THERANOS, AND EXCERPTS

10:38AM  9    FROM WRITTEN MATERIALS PROVIDED TO RDV ON THE COMPANY"?

10:38AM  10   A.   YES.

10:38AM  11   Q.   AND AT THIS POINT, DID YOU HAVE ANY OTHER SOURCE OF

10:38AM  12   INFORMATION FROM THERANOS BESIDES MS. HOLMES?

10:38AM  13   A.   THE PHONE CALL FROM MS. HOLMES AND THE BINDERS WERE THE

10:38AM  14   TWO THINGS, AS WELL AS WHAT I COULD FIND ON THE INTERNET.

10:38AM  15   Q.   OKAY.  YOU WRITE UNDER THE HEADING, "WHAT IS THERANOS

10:38AM  16   TODAY?

10:38AM  17        "INSTEAD OF VIALS OF BLOOD (ONE FOR EVERY TEST NEEDED),

10:38AM  18   THERANOS REQUIRES ONLY A PINPRICK AND A DROP OF BLOOD TO

10:38AM  19   PERFORM HUNDREDS OF TESTS, FROM STANDARD CHOLESTEROL CHECKS TO

10:39AM  20   SOPHISTICATED GENETIC ANALYSES."

10:39AM  21        DO YOU SEE THAT?

10:39AM  22   A.   YES.

10:39AM  23   Q.   WHERE DID YOU GET THAT INFORMATION?

10:39AM  24   A.   FROM MS. HOLMES AND THE MATERIALS.

10:39AM  25   Q.   AND WAS THAT RELEVANT TO YOU?

10:39AM  1    A.   YES.

10:39AM  2    Q.   WHY?

10:39AM  3    A.   BECAUSE IT SAID THAT THEY COULD DO HUNDREDS OF TESTS WITH

10:39AM  4    A PINPRICK WITH A FINGERSTICK OF BLOOD.

10:39AM  5    Q.   IT THEN SAYS, "THE RESULTS ARE FASTER (COUPLE HOURS), MORE

10:39AM  6    ACCURATE (100 PERCENT AUTOMATED, NO MANUAL HANDLING OF THE

10:39AM  7    SAMPLE), AND FAR CHEAPER THAN CONVENTIONAL METHODS."

10:39AM  8         DO YOU SEE THAT LANGUAGE?

10:39AM  9    A.   YES.

10:39AM 10    Q.   AND WHERE DID YOU GET THAT INFORMATION?

10:39AM 11    A.   THAT WAS IN THE MATERIALS, AND WE TALKED ABOUT IT ON THE

10:39AM 12    PHONE CALL AS WELL.

10:39AM 13    Q.   WAS THAT RELEVANT TO YOUR ANALYSIS OF THERANOS?

10:39AM 14    A.   YES.

10:39AM 15    Q.   HOW SO?

10:39AM 16    A.   IT SHOWED THAT THIS WAS GOING TO BE A GAME CHANGER FOR

10:39AM 17    HEALTH CARE.

10:40AM 18    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 5 OF THE

10:40AM 19    EXHIBIT.

10:40AM 20         DO YOU SEE THE HEADING, "WHAT ARE THE MAIN RISKS THAT

10:40AM 21    THERANOS FACES?"

10:40AM 22    A.   YES.

10:40AM 23    Q.   AND IN THAT FIRST SENTENCE, YOU WROTE, "HOLMES BELIEVES

10:40AM 24    THE COMPANY'S PRIMARY RISK IS THE EXECUTION OF ITS BUSINESS

10:40AM 25    PLAN RATHER THAN TECHNOLOGY, VALIDATION, AND CUSTOMER

10:40AM  1   ACCEPTANCE."

10:40AM  2       DO YOU SEE THAT LANGUAGE?

10:40AM  3   A.   YES.

10:40AM  4   Q.   AND WHERE DID YOU GET THAT INFORMATION?

10:40AM  5   A.   WE TALKED ABOUT THAT ON THE PHONE, AS WELL AS IT'S IN HER

10:40AM  6   PACKET OF INFORMATION.

10:40AM  7   Q.   AND WAS IT RELEVANT TO YOU THAT THE COMPANY'S PRIMARY RISK

10:40AM  8   WAS EXECUTION RATHER THAN TECHNOLOGY VALIDATION?

10:40AM  9   A.   YES.

10:40AM 10   Q.   HOW SO?

10:40AM 11   A.   IT GOES ON FURTHER TO SAY THAT IT HAD BEEN DOING WORK FOR

10:40AM 12   PHARMACEUTICAL COMPANIES FOR THE LAST 9 YEARS, 10 OF THE TOP

10:41AM 13   15, AND THAT LENDED A LOT OF CREDIBILITY THAT WHAT SHE WAS

10:41AM 14   SAYING WAS TRUE, THAT THESE TESTS, THE FINGERSTICK TESTS

10:41AM 15   WORKED.

10:41AM 16   Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO THE BOTTOM OF

10:41AM 17   PAGE 5.

10:41AM 18       DO YOU SEE THE HEADING, "WHAT ARE THERANOS'S KEY

10:41AM 19   OBJECTIVES FOR THE MEETING ON OCTOBER 14TH?"

10:41AM 20   A.   YES.

10:41AM 21   Q.   AND THE LAST SENTENCE SAYS, "THUS, HOLMES AND THE THERANOS

10:41AM 22   TEAM WANT TO GET TO KNOW THE PEOPLE MAKING THE INVESTMENT,

10:41AM 23   UNDERSTANDING THEIR INVESTMENT PHILOSOPHY, AND TARGET

10:41AM 24   INVESTMENT PROFILE, AS WELL AS MEET IN PERSON THOSE WHO WILL BE

10:41AM 25   INTERACTING WITH THE COMPANY ON A GO-FORWARD BASIS."

10:41AM 1        IS THAT WHAT WE TALKED ABOUT EARLIER IN TERMS OF THERE WAS

10:41AM 2   AN ELEMENT OF THERANOS SELECTING YOU FOR THIS?

10:41AM 3   A.   YES, AND WE TALKED ABOUT THAT SPECIFICALLY ON THE PHONE

10:41AM 4   CALL.

10:41AM 5   Q.   AND "YOU" MEANING RDV, NOT "YOU" LISA PETERSON?

10:41AM 6   A.   CORRECT.

10:41AM 7   Q.   LET'S LOOK BRIEFLY AT PAGE 6.

10:42AM 8        AND IF WE CAN ZOOM IN ON THE TOP HALF OF THE PAGE,

10:42AM 9   MS. HOLLIMAN.  THAT'S GOOD.

10:42AM 10       UP AT THE TOP, IT READS, "APPENDIX - STATISTICS AND

10:42AM 11  NOTEWORTHY ITEMS."

10:42AM 12       DO YOU SEE THAT, MS. PETERSON?

10:42AM 13  A.   YES.

10:42AM 14  Q.   AND WHAT DID YOU MEAN BY THAT?

10:42AM 15  A.   A LOT OF THIS WAS TAKEN FROM THE BINDERS THAT WE RECEIVED,

10:42AM 16  OTHER THAN THIS SKEPTIC COMMENT AT THE BOTTOM OF THE PAGE,

10:42AM 17  WHICH WERE MORE FOUND ONLINE.

10:42AM 18  Q.   AND WHY DID YOU INCLUDE THIS IN YOUR MEMO?

10:42AM 19  A.   BECAUSE I WANTED THE FAMILY MEMBERS GOING ON THE TRIP AND

10:42AM 20  THE INVESTMENT COMMITTEE TO UNDERSTAND ALL OF THE THINGS THAT

10:42AM 21  IT COULD DO.

10:42AM 22  Q.   OKAY.  AND ALL OF THE INFORMATION THAT YOU THOUGHT WAS

10:42AM 23  IMPORTANT?

10:42AM 24  A.   YES.

10:42AM 25  Q.   LET ME DRAW YOUR ATTENTION TO THE THIRD BULLET.

10:42AM 1          DO YOU SEE WHERE IT SAYS IN THE SECOND SENTENCE, "THERANOS

10:42AM 2    AUTOMATES THE PRE- AND POST-ANALYTIC PROCESSES (NO MANUAL

10:43AM 3    HANDLING OF THE SAMPLE), DRASTICALLY MINIMIZING THE HUMAN

10:43AM 4    ELEMENTS OF PROCESSING IS WHICH IS PROVEN TO CAUSE THE MAJORITY

10:43AM 5    OF LAB TEST ERRORS."

10:43AM 6          DO YOU SEE THAT?

10:43AM 7    A.   YES.

10:43AM 8    Q.   AND WHERE DID YOU GET THAT INFORMATION?

10:43AM 9    A.   I BELIEVE IT WAS BOTH IN THE BINDERS, AND WE ALSO TALKED

10:43AM 10   ABOUT THAT AS WELL, THAT SHE HAD MENTIONED THAT MOST OF THE

10:43AM 11   ISSUES -- THINGS THAT WENT WRONG WAS FROM THE PEOPLE PERSONALLY

10:43AM 12   HANDLING THE BLOOD AND THE ASSAYS.

10:43AM 13   Q.   AND WAS THIS ATTRACTIVE TO YOU?

10:43AM 14   A.   YES.

10:43AM 15   Q.   LET'S MOVE DOWN TO THE BOTTOM HALF OF THE PAGE.  AND I

10:43AM 16   WANT TO DRAW YOUR ATTENTION, MS. PETERSON, TO THE THIRD BULLET

10:43AM 17   ON THE SCREEN WHERE IT SAYS, "THERANOS USES THEIR OWN ANALYZER

10:43AM 18   EQUIPMENT."

10:44AM 19         DO YOU SEE THAT LANGUAGE?

10:44AM 20   A.   YES.

10:44AM 21   Q.   AND WHY WERE YOU INCLUDING THIS IN YOUR MEMO?

10:44AM 22   A.   BECAUSE THIS WAS THE REASON GIVEN THAT THEY DIDN'T HAVE TO

10:44AM 23   HAVE FDA APPROVAL.

10:44AM 24   Q.   AND WHERE DID YOU GET THIS INFORMATION, THAT "THERANOS

10:44AM 25   USES THEIR OWN ANALYZER EQUIPMENT"?

10:44AM 1    A.   BOTH FROM CONVERSATIONS AND THE BINDERS.

10:44AM 2    Q.   CONVERSATIONS WITH MS. HOLMES?

10:44AM 3    A.   YES.

10:44AM 4    Q.   AND WAS THAT IMPORTANT TO YOU?

10:44AM 5    A.   YES.

10:44AM 6    Q.   WHY?

10:44AM 7    A.   BECAUSE, AGAIN, IT ALL LENDS CREDIBILITY TO THE FACT THAT

10:44AM 8    THE ANALYZER WORKS.

10:44AM 9    Q.   OKAY.  IN THE NEXT BULLET, IT SAYS, "A THERANOS ANALYZER

10:44AM 10   STATION IS A SMALL FRACTION OF THE SIZE OF A CURRENT LAB,

10:44AM 11   MAKING IT POSSIBLE TO PLACE A THERANOS LAB IN THE OPERATING

10:44AM 12   ROOM OR IN A MILITARY EVACUATION HELICOPTER, ON SHIPS, IN

10:44AM 13   REFUGEE CAMPS, VIRTUALLY ANYWHERE."

10:44AM 14        DO YOU SEE THAT LANGUAGE?

10:44AM 15   A.   YES.

10:44AM 16   Q.   AND WAS THAT RELEVANT TO YOU?

10:44AM 17   A.   VERY MUCH SO.

10:45AM 18   Q.   OKAY.

10:45AM 19   A.   IT MADE IT PORTABLE.

10:45AM 20   Q.   AND WHERE DID YOU GET THIS INFORMATION?

10:45AM 21   A.   FROM THE CONVERSATIONS AND THE BINDERS.  MOSTLY THAT ONE

10:45AM 22   IN THE CONVERSATIONS.  WE TALKED ABOUT CERTAIN INSTANCES IN

10:45AM 23   WHICH THEY WERE USING THE ANALYZER IN REAL LIFE.

10:45AM 24   Q.   MS. HOLMES TOLD YOU THAT?

10:45AM 25   A.   YES.

10:45AM 1    Q.   AND WHAT DID SHE SAY?

10:45AM 2    A.   THAT THEY WERE USING THEM ON MILITARY HELICOPTERS, AND

10:45AM 3    AGAIN, THEY WERE USING THEM IN CLINICAL TRIALS WITH

10:45AM 4    PHARMACEUTICAL COMPANIES.

10:45AM 5    Q.   IN THE NEXT BULLET IT SAYS, "INCUMBENT PLAYERS CRITICIZE

10:45AM 6    THERANOS'S LACK OF PUBLICATION OF ANY VALIDATION STUDIES IN

10:45AM 7    PEER-REVIEW JOURNALS."

10:45AM 8         DO YOU SEE THAT LANGUAGE?

10:45AM 9    A.   YES.

10:45AM 10   Q.   AND THEN FURTHER ON IT SAYS, "UNLIKE MOST LABS, THERANOS

10:45AM 11   DOES NOT BUY ANALYZER EQUIPMENT FROM A THIRD PARTY, AND THEY DO

10:45AM 12   NOT SELL THEIR ANALYZERS TO OTHER LABS."

10:45AM 13        DO YOU SEE THAT?

10:45AM 14   A.   YES.

10:45AM 15   Q.   AND WHERE DID YOU GET THAT INFORMATION?

10:45AM 16   A.   FROM OUR CONVERSATION AND THE BINDERS.  MOSTLY OUR

10:46AM 17   CONVERSATION AROUND THAT ONE.

10:46AM 18   Q.   WAS THAT RELEVANT TO YOU?

10:46AM 19   A.   VERY.

10:46AM 20   Q.   AND WHY WAS IT RELEVANT THAT THERANOS DID NOT BUY ANALYZER

10:46AM 21   EQUIPMENT FROM THIRD PARTIES?

10:46AM 22   A.   BECAUSE IT WAS DIFFERENT THAN THE COMPETITORS AND IT MEANT

10:46AM 23   THAT THEY DIDN'T HAVE TO HAVE FDA APPROVAL.

10:46AM 24   Q.   DID MS. HOLMES EVER TALK TO YOU ABOUT THE CONCEPT OF A LAB

10:46AM 25   IN A BOX?

10:46AM   1      A.   YES.

10:46AM   2      Q.   AND TELL US ABOUT THAT, PLEASE.

10:46AM   3      A.   THAT WAS ESSENTIALLY WHAT -- HOW SHE DESCRIBED HER

10:46AM   4      ANALYZER, THAT IT WAS A LAB IN A BOX AND IT WAS PORTABLE AND

10:46AM   5      THAT THEY COULD DO HUNDREDS OF TESTS ON THAT BOX, AND THE GOAL

10:46AM   6      WAS TO GET WITHIN, LIKE, FIVE MILES OF EVERY CONSUMER.

10:46AM   7      Q.   LET ME MOVE FORWARD IN TIME TO THE MEETING THAT YOU

10:46AM   8      DESCRIBED IN PALO ALTO.

10:46AM   9           DID THAT HAPPEN ON OR ABOUT OCTOBER 14TH?

10:46AM  10      A.   YES.

10:46AM  11      Q.   AND YOU FLEW OUT PERSONALLY FOR THAT MEETING?

10:46AM  12      A.   YES.

10:46AM  13      Q.   AND WHO ELSE WAS THERE?

10:46AM  14      A.   DOUG DEVOS WAS THERE, WHO CHAIRED THE INVESTMENT

10:46AM  15      COMMITTEE; RICK DEVOS, WHO WAS ON THE INVESTMENT COMMITTEE;

10:47AM  16      CHERI DEVOS, WHO WAS A SIBLING OF DOUG DEVOS; AND

10:47AM  17      JERRY TUBERGEN AND MYSELF.

10:47AM  18      Q.   AND WHY DID YOU ATTEND?

10:47AM  19      A.   AGAIN, I WAS FACILITATING ALL OF THE INFORMATION AND

10:47AM  20      HELPING THEM WITH INFORMING THEM ON THE INVESTMENT AND

10:47AM  21      LISTENING AND TAKING A LOT OF NOTES.

10:47AM  22      Q.   AND WHO WAS THERE FROM THE THERANOS SIDE?

10:47AM  23      A.   ELIZABETH HOLMES AND SUNNY BALWANI.

10:47AM  24      Q.   DID YOU -- WAS THERE SOME TYPE OF POWERPOINT PRESENTATION

10:47AM  25      DURING THE MEETING?

10:47AM  1     A.   NO.

10:47AM  2     Q.   OKAY.  DID YOU SEE ANY DEVICES DURING YOUR TIME?

10:47AM  3     A.   YES.

10:47AM  4     Q.   AND WHAT DID YOU SEE?

10:47AM  5     A.   THEY SHOWED US THE ANALYZER AND RAN IT, AND THEN

10:47AM  6     EVENTUALLY TOWARDS THE END OF THE TOUR CHERI HAD HER BLOOD

10:47AM  7     TESTED.

10:47AM  8     Q.   AND DESCRIBE THE ANALYZER THAT YOU SAW FOR US.

10:47AM  9     A.   IT LOOKED LIKE A COMPUTER TOWER.  IT WAS SMALL AND

10:48AM 10     PORTABLE.

10:48AM 11     Q.   OKAY.  AND DID THEY SHOW YOU ANY THIRD PARTY DEVICES?

10:48AM 12     A.   NO.

10:48AM 13     Q.   DID YOU SEE ANY OF THE PRODUCTION FACILITIES?

10:48AM 14     A.   NO.

10:48AM 15     Q.   DID YOU STEP INTO THE CLINICAL LABORATORY?

10:48AM 16     A.   NO, NO.

10:48AM 17     Q.   OKAY.  YOU SAID CHERI DEVOS'S BLOOD WAS DRAWN?

10:48AM 18     A.   YES.

10:48AM 19     Q.   AND DESCRIBE THAT FOR US, PLEASE.

10:48AM 20     A.   THEY HAD -- A PART OF THE BUILDING THAT THEY WERE IN HAD

10:48AM 21     A -- WHAT LOOKED LIKE SOME SMALL LITTLE WALK-IN CLINICAL

10:48AM 22     CLINIC, AND SHE WENT IN AND THEY DID A FINGERSTICK TEST ON HER

10:48AM 23     AND, TO MY KNOWLEDGE, SHE RECEIVED THE RESULTS.

10:48AM 24     Q.   BUT YOU NEVER SAW THE RESULTS?

10:48AM 25     A.   NO, HUH-UH.

10:48AM 1   Q.   AND WAS THIS IN THE ROOM WITH THE ANALYZER THAT YOU

10:48AM 2   DESCRIBED?

10:48AM 3   A.   NOT THE ONE THAT WE -- THERE WERE TWO DIFFERENT ROOMS.  WE

10:48AM 4   WENT IN ONE ROOM WHERE THEY SHOWED US HOW IT WORKED, AND THEN

10:48AM 5   CHERI WENT INTO A LITTLE CLINIC AREA WITH ANOTHER ANALYZER, TWO

10:49AM 6   DIFFERENT AREAS OF THE BUILDING.

10:49AM 7   Q.   AND HOW LONG DID THIS MEETING LAST?

10:49AM 8   A.   ABOUT FOUR OR FIVE HOURS.

10:49AM 9   Q.   HOW DID IT END?

10:49AM 10  A.   HOW DID IT END?  WE, WE TALKED FOR A LONG, LONG TIME AND

10:49AM 11  EVERYTHING WAS VERY FAVORABLE TOWARDS THE END.  AND WE DEPARTED

10:49AM 12  AND CAUCUSED IN THE -- I WAS GOING IN A DIFFERENT LOCATION AND

10:49AM 13  EVERYONE ELSE WAS GOING BACK ON THE PLANE, AND WE CAUCUSED OUT

10:49AM 14  WHERE WE PARKED FOR, I DON'T KNOW, A GOOD 15 OR 20 MINUTES.

10:49AM 15  Q.   DID YOU WRITE A CHECK THEN AND THERE?

10:49AM 16  A.   NO.  NO.  BUT THERE WAS CONVERSATION AROUND MOVING OUR

10:49AM 17  AMOUNT.  WHEN WE WENT TO THAT MEETING, THE THOUGHT WAS TO DO

10:49AM 18  50 MILLION POTENTIALLY, THAT'S WHAT WE WERE LOOKING AT; AND

10:49AM 19  WHEN WE LEFT THE MEETING -- THEY HAD TALKED IN THE MEETING

10:50AM 20  ABOUT OTHER INVESTORS COMING IN FOR 100 MILLION, AND SO THE

10:50AM 21  FAMILY, DOUG AND JERRY, THOUGHT THAT 100 MIGHT BE A BETTER

10:50AM 22  NUMBER FOR US TO DO.

10:50AM 23  Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO WHAT HAS BEEN

10:50AM 24  MARKED AS EXHIBIT 4858 IN YOUR BINDER.

10:50AM 25       DO YOU RECOGNIZE THIS DOCUMENTED?

| | | |
|---|---|---|
| 10:50AM | 1 | A.   YES. |
| 10:50AM | 2 | Q.   AND WHAT IS IT? |
| 10:50AM | 3 | A.   THIS IS PART OF THE BINDERS THAT CAME AS PART OF THE |
| 10:50AM | 4 | DILIGENCE PACKETS. |
| 10:50AM | 5 | Q.   AND DID YOU REVIEW THIS -- |
| 10:50AM | 6 | A.   YES. |
| 10:50AM | 7 | Q.   LET ME PLEASE FINISH MY QUESTION. |
| 10:50AM | 8 | DID YOU REVIEW THIS AS PART OF PROVIDING INFORMATION TO |
| 10:50AM | 9 | RDV SO THAT IT COULD MAKE AN INVESTMENT DECISION? |
| 10:50AM | 10 | A.   YES, THOROUGHLY. |
| 10:50AM | 11 | MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 4858. |
| 10:51AM | 12 | MR. WADE:  LET ME JUST BE CLEAR.  WAS THIS THE |
| 10:51AM | 13 | ENTIRE BINDER THAT WAS OFFERED, OR IS THIS AN EXCERPT? |
| 10:51AM | 14 | MR. LEACH:  I'LL ASK THE WITNESS. |
| 10:51AM | 15 | Q.   DO YOU KNOW, IS THIS THE ENTIRETY OF THE BINDER OR A |
| 10:51AM | 16 | PORTION OF THE BINDER? |
| 10:51AM | 17 | A.   NO.  NO. |
| 10:51AM | 18 | MR. WADE:  NO OBJECTION. |
| 10:51AM | 19 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:51AM | 20 | (GOVERNMENT'S EXHIBIT 4858 WAS RECEIVED IN EVIDENCE.) |
| 10:51AM | 21 | BY MR. LEACH: |
| 10:51AM | 22 | Q.   DO YOU SEE THE HEADING THERANOS CONFIDENTIAL OVERVIEW, |
| 10:51AM | 23 | MS. PETERSON? |
| 10:51AM | 24 | A.   YES. |
| 10:51AM | 25 | Q.   AND LET ME PLEASE DRAW YOUR ATTENTION TO PAGE 3.  THERE'S |

| | | |
|---|---|---|
| 10:51AM | 1 | SOME HIGHLIGHTING AND SOME HANDWRITING ON PAGE 3. |
| 10:51AM | 2 | DO YOU SEE THAT? |
| 10:51AM | 3 | A.   YES. |
| 10:51AM | 4 | Q.   IS THAT YOUR HIGHLIGHTING AND HANDWRITING? |
| 10:52AM | 5 | A.   YES. |
| 10:52AM | 6 | Q.   OKAY.  IT SAYS IN BLACK IN THE -- WHERE THE HIGHLIGHTING |
| 10:52AM | 7 | IS, "THERANOS'S PROPRIETARY PATENTED TECHNOLOGY RUNS |
| 10:52AM | 8 | COMPREHENSIVE BLOOD TESTS FROM A FINGERSTICK AND TESTS FOR |
| 10:52AM | 9 | MICRO-SAMPLES OF OTHER MATRICES AND GENERATES SIGNIFICANTLY |
| 10:52AM | 10 | HIGHER INTEGRITY DATA THAN CURRENTLY POSSIBLE." |
| 10:52AM | 11 | DO YOU SEE THAT LANGUAGE? |
| 10:52AM | 12 | A.   YES. |
| 10:52AM | 13 | Q.   AND IS THAT CONSISTENT WITH STATEMENTS THAT MS. HOLMES |
| 10:52AM | 14 | MADE TO YOU ON YOUR PHONE CALL WITH HER AND IN PALO ALTO? |
| 10:52AM | 15 | A.   YES. |
| 10:52AM | 16 | Q.   AND WAS THIS IMPORTANT TO YOU? |
| 10:52AM | 17 | A.   VERY, YES. |
| 10:52AM | 18 | Q.   IN THE NEXT ENTRY IT SAYS, "THERANOS IS THE WORLD'S FIRST |
| 10:52AM | 19 | AND ONLY CLIA-CERTIFIED LABORATORY RUNNING ITS TESTS ON |
| 10:52AM | 20 | MICRO-SAMPLES." |
| 10:52AM | 21 | AND THEN YOU WROTE "CLINICAL LAB IMPROVEMENT AMENDMENTS." |
| 10:52AM | 22 | IS THAT THE ACRONYM FOR CLIA? |
| 10:52AM | 23 | A.   YES. |
| 10:52AM | 24 | Q.   BEFORE THIS INVESTMENT, DID YOU HAVE ANY EXPERIENCE WITH |
| 10:53AM | 25 | CLIA? |

10:53AM  1    A.   NO.

10:53AM  2    Q.   LET'S LOOK AT PAGE 5, PLEASE.

10:53AM  3         DO YOU SEE THE HEADING, "THERANOS IS CERTIFIED AS A HIGH

10:53AM  4    COMPLEXITY CLIA LABORATORY"?

10:53AM  5    A.   YES.

10:53AM  6    Q.   AND THEN THERE'S A GREEN BAR, "HIGH COMPLEXITY REQUIRES

10:53AM  7    THE HIGHEST LEVEL OF TRAINING, TECHNIQUE, RESULT

10:53AM  8    INTERPRETATION, MOST STRINGENT STANDARDS, LABS ARE SURVEYED

10:53AM  9    ROUTINELY AND RANDOMLY."

10:53AM  10        WAS THIS IMPRESSIVE TO YOU?

10:53AM  11   A.   YES.

10:53AM  12   Q.   HOW SO?

10:53AM  13   A.   IT SHOWED THAT IT WAS A HIGH COMPLEXITY LAB, THAT THEY

10:53AM  14   WERE RUNNING SOMETHING THAT WAS VERY COMPLEX AND DOING IT

10:53AM  15   ACCURATELY.

10:53AM  16   Q.   AND WAS THAT SOMETHING THAT MS. HOLMES HELD OUT TO YOU IN

10:53AM  17   YOUR MEETING OUT IN CALIFORNIA?

10:53AM  18   A.   YES.

10:53AM  19   Q.   OKAY.  LET'S LOOK AT PAGE 7, PLEASE.

10:53AM  20        DO YOU SEE THE HEADING, "THERANOS PROFICIENCY TESTING AND

10:54AM  21   AUDITS"?

10:54AM  22   A.   YES.

10:54AM  23   Q.   AND DO YOU SEE THE LANGUAGE, "SINCE 2011 THERANOS'S CLIA

10:54AM  24   LAB HAS BEEN SUBJECTED TO REGULAR PROFICIENCY TESTING BY

10:54AM  25   MULTIPLE NATIONALLY RECOGNIZED AGENCIES"?

10:54AM  1        DO YOU SEE THAT LANGUAGE?

10:54AM  2   A.   YES.

10:54AM  3   Q.   AND WAS THIS IMPRESSIVE TO YOU?

10:54AM  4   A.   YES.

10:54AM  5   Q.   AND DID YOU UNDERSTAND THAT THERANOS'S MINILAB DEVICE WAS

10:54AM  6   BEING USED IN THE CLIA LAB SINCE 2011?

10:54AM  7   A.   YES.

10:54AM  8   Q.   AND DID YOU UNDERSTAND THAT THIS PROFICIENCY TESTING WAS

10:54AM  9   DONE WITH RESPECT TO THERANOS'S MINILAB DEVICES BETWEEN 2011

10:54AM 10   AND 2014?

10:54AM 11   A.   YES.

10:54AM 12   Q.   AND IF THIS PROFICIENCY TESTING HAD RELATED TO ORDINARY

10:54AM 13   FDA APPROVED MACHINES, WOULD THAT HAVE BEEN AS IMPRESSIVE TO

10:54AM 14   YOU?

10:54AM 15   A.   IT WOULDN'T HAVE BEEN AS IMPRESSIVE.  IT WOULD HAVE BEEN

10:54AM 16   IMPRESSIVE, BUT NOT AS IMPRESSIVE AS THIS BECAUSE THIS HADN'T

10:54AM 17   BEEN DONE BEFORE, THE FINGERSTICK.

10:55AM 18   Q.   PLEASE GO FORWARD TO PAGE 8.

10:55AM 19        DO YOU SEE THE HEADING "VALIDATION OF THERANOS TESTS"?

10:55AM 20   A.   YES.

10:55AM 21   Q.   AND BENEATH THAT IT SAYS, "THERANOS HAS BEEN

10:55AM 22   COMPREHENSIVELY VALIDATED OVER THE COURSE OF THE LAST SEVEN

10:55AM 23   YEARS BY 10 OF THE 15 LARGEST PHARMACEUTICAL COMPANIES, WITH

10:55AM 24   HUNDREDS OF THOUSANDS OF ASSAYS PROCESSED."

10:55AM 25        I THINK YOU MENTIONED THIS EARLIER IN RESPECT OF YOUR

10:55AM   1    MEMO.  WAS THIS IMPRESSIVE TO YOU?

10:55AM   2    A.   YES.

10:55AM   3    Q.   HOW SO?

10:55AM   4    A.   IT, IT SAYS THAT THE -- WE TALKED ABOUT IT ALSO AT THE

10:55AM   5    OCTOBER 14TH MEETING.  I MEAN, IT WAS VERY IMPRESSIVE TO US

10:55AM   6    THAT THEY HAD BEEN WORKING WITH PHARMACEUTICAL COMPANIES FOR

10:55AM   7    THE LAST SO MANY YEARS AND DOING CLINICAL TRIALS.

10:55AM   8         THEY WENT ON TO SAY THAT THEIR FINGERSTICK TECHNOLOGY WAS

10:55AM   9    GREAT BECAUSE THEY COULD TEST SUBJECTS MULTIPLE TIMES A DAY,

10:56AM  10    WHERE YOU COULDN'T DO THAT WITH A VENOUS TEST.

10:56AM  11         AND, YES, IT WAS -- IT DEFINITELY LENT CREDIBILITY THAT

10:56AM  12    THE TECHNOLOGY WORKS.

10:56AM  13    Q.   PLEASE MOVE FORWARD TO PAGE 12.

10:56AM  14         DO YOU SEE THE HEADING "OVERVIEW OF CURRENT LABORATORY"?

10:56AM  15    A.   YES.

10:56AM  16    Q.   AND THERE IS SOME HIGHLIGHTING AND HANDWRITING.  IS THAT

10:56AM  17    YOUR HIGHLIGHTING AND HANDWRITING?

10:56AM  18    A.   YES.

10:56AM  19    Q.   OKAY.  IN THE FIRST BULLET IT SAYS, "DECADES OLD BUSINESS

10:56AM  20    PROCESSES - AND TECHNOLOGY INVESTMENTS AROUND THOSE BUSINESS

10:56AM  21    PROCESSES - WITH VERY LITTLE MOTIVATION TO INNOVATE, HAS

10:56AM  22    CREATED A DUOPOLY OF BUSINESSES BURDENED WITH INFRASTRUCTURE

10:56AM  23    COSTS AND LITTLE/NO R&D."

10:56AM  24         DO YOU SEE THAT?

10:56AM  25    A.   YES.

10:56AM  1     Q.   AND YOU WROTE QUEST LAB CORP. TO THE RIGHT.

10:57AM  2          WHY DID YOU WRITE THAT?

10:57AM  3     A.   THAT WAS REFERRING TO THE DUOPOLY.

10:57AM  4     Q.   AND WHAT DID MS. HOLMES SAY TO YOU IN TERMS OF THERANOS'S

10:57AM  5     INFRASTRUCTURE COSTS AND R&D INVESTMENTS?

10:57AM  6     A.   THAT THEY WERE OFFERING THE MARKET TEST RESULTS AT 50 TO

10:57AM  7     90 PERCENT LESS COSTS, WHICH WAS GOING TO BE VERY BIG FOR THE

10:57AM  8     HEALTH CARE INDUSTRY.

10:57AM  9     Q.   PLEASE LOOK AT PAGE 14.  DO YOU SEE THE HEADING "COST

10:57AM 10     SAVINGS"?

10:57AM 11     A.   YES.

10:57AM 12     Q.   AND IS THIS ANOTHER SLIDE THAT YOU REVIEWED AS PART OF

10:57AM 13     YOUR REVIEW OF THE THERANOS OPPORTUNITY?

10:57AM 14     A.   YES.

10:57AM 15     Q.   AND GENERALLY SPEAKING, WAS THE INFORMATION IN THIS

10:57AM 16     POWERPOINT RELEVANT TO YOU?

10:57AM 17     A.   YES, VERY.

10:57AM 18     Q.   OKAY.  THIS SAYS, "THE FULL RANGE OF TESTS.  A FRACTION OF

10:58AM 19     THE COSTS."

10:58AM 20          AND THEN YOU HIGHLIGHTED 50 PERCENT.

10:58AM 21          WHAT DID YOU UNDERSTAND THIS TO MEAN?

10:58AM 22     A.   WE WERE TOLD MULTIPLE TIMES THAT THEY COULD OFFER HUNDREDS

10:58AM 23     OF TESTS.  OUR THOUGHT WAS 200 TO 300 TESTS VIA FINGERSTICK ON

10:58AM 24     THE ANALYZER, AND THEY WERE DONE AT 50 TO 90 PERCENT OF THE

10:58AM 25     COSTS, AND ALL OF THE COSTS SHE SAID WERE PUBLISHED ON THEIR

10:58AM  1    WEBSITE.

10:58AM  2    Q.   AND THIS COST SAVINGS SLIDE CONTINUES ON TO PAGE 15.  IF

10:58AM  3    WE COULD PLEASE LOOK AT THAT.

10:58AM  4         AND THERE'S SOME MORE HIGHLIGHTING AND HANDWRITING DOWN AT

10:58AM  5    THE BOTTOM.  THERE'S A BULLET, "THE UNPRECEDENTED LACK OF

10:58AM  6    VARIATION FROM SYSTEM TO SYSTEM YIELDS HIGHER INTEGRITY DATA."

10:58AM  7         DO YOU SEE THAT?

10:58AM  8    A.   YES.

10:58AM  9    Q.   AND YOU WROTE "THERANOS IS STANDARDIZED"?

10:58AM  10   A.   YES.

10:58AM  11   Q.   WHAT DID THAT REFER TO?

10:58AM  12   A.   THAT THERE WASN'T ANY KIND OF MANUAL HUMAN INTERACTION

10:59AM  13   WITH THE MACHINE, SO IT WAS MY WAY OF SAYING IT WAS

10:59AM  14   STANDARDIZED.

10:59AM  15   Q.   OKAY.  AND THAT'S INFORMATION THAT YOU GOT FROM

10:59AM  16   MS. HOLMES?

10:59AM  17   A.   YES.

10:59AM  18   Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 28.

10:59AM  19        DO YOU SEE THE HEADING, "SAME TESTS, A WHOLE NEW

10:59AM  20   APPROACH"?

10:59AM  21   A.   YES.

10:59AM  22   Q.   AND BENEATH THAT, "THE ACTIONABLE INFORMATION YOU NEED

10:59AM  23   1/1000TH THE SIZE OF A TYPICAL BLOOD DRAW."

10:59AM  24        AND THERE ARE SOME IMAGES OF FINGERS AND TO THE RIGHT A

10:59AM  25   SMALL VIAL.

10:59AM  1        DO YOU SEE THAT?

10:59AM  2   A.   YES.

10:59AM  3   Q.   AND WHAT DID YOU UNDERSTAND THAT TO BE?

10:59AM  4   A.   THAT THAT WAS THE AMOUNT OF BLOOD THAT THEY NEEDED TO RUN

10:59AM  5   THEIR HUNDREDS OF TESTS.

10:59AM  6   Q.   AND YOU HIGHLIGHTED, "THERANOS RUNS ANY TEST AVAILABLE IN

10:59AM  7   CENTRAL LABORATORIES, AND PROCESSES ALL SAMPLE TYPES."

10:59AM  8        WHY DID YOU HIGHLIGHT THAT?

10:59AM  9   A.   AGAIN, IT WAS JUST IN WRITING WHAT SHE HAD BEEN SAYING,

11:00AM 10   THAT THEY WERE RUNNING HUNDREDS OF TESTS ON THIS ANALYZER.

11:00AM 11   Q.   AT THE BOTTOM IT SAYS, "THERANOS PROVIDES THE HIGHEST

11:00AM 12   LEVEL OF OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN OUR PRE-

11:00AM 13   AND POST-ANALYTIC PROCESSES, ENSURING THE HIGHEST LEVELS OF

11:00AM 14   ACCURACY AND PRECISION."

11:00AM 15        WAS IT IMPRESSIVE TO YOU THAT THERANOS PROVIDED THE

11:00AM 16   HIGHEST LEVELS OF ACCURACY AND PRECISION?

11:00AM 17   A.   YES, OF COURSE.

11:00AM 18            MR. LEACH:  YOUR HONOR, I STILL HAVE MORE ON THIS

11:00AM 19   DOCUMENT, BUT I KNOW IT'S 11:00 O'CLOCK.

11:00AM 20            THE COURT:  LET'S TAKE OUR BREAK.  I SAID WE WOULD

11:00AM 21   TAKE OUR BREAK AT 11:00, SO LET'S TAKE A 30 MINUTE BREAK AND

11:00AM 22   WE'LL COME BACK.  SO WE'LL BE IN RECESS.

11:01AM 23        (JURY OUT AT 11:01 A.M.)

11:01AM 24            THE COURT:  MS. PETERSON, YOU CAN STAND DOWN.

11:01AM 25        PLEASE BE SEATED.  THANK YOU.  ALL RIGHT.  THE RECORD

11:01AM  1      SHOULD REFLECT THAT THE JURY HAS LEFT FOR A RECESS, AND THE

11:01AM  2      WITNESS HAS LEFT THE COURTROOM.

11:01AM  3           MR. DOWNEY?

11:01AM  4                MR. DOWNEY:  YOUR HONOR, I JUST WANTED TO REQUEST

11:01AM  5      THAT AT SOME POINT DURING THE BREAK THAT MR. SCHENK AND I HAVE

11:01AM  6      A CHANCE TO HAVE A BRIEF CONVERSATION WITH YOU.

11:01AM  7                THE COURT:  SURE.  WE CAN DO THAT RIGHT NOW IF YOU

11:01AM  8      WOULD LIKE.  SURE.  I'LL ASK THE REPORTER TO JOIN US.

11:02AM  9                THE CLERK:  COURT IS IN RECESS.

11:02AM  10          (PROCEEDINGS HELD IN CHAMBERS.)

11:15AM  11               THE COURT:  COME ON IN.  I'M SORRY.

11:15AM  12          ALL RIGHT.  WE'RE ON THE RECORD IN CHAMBERS WITH

11:15AM  13     MR. DOWNEY AND MR. SCHENK AT MR. DOWNEY'S REQUEST.

11:15AM  14               MR. DOWNEY:  YOUR HONOR, I WAS OBSERVING DURING OUR

11:15AM  15     FIRST SESSION JUROR NUMBER 5.  I THINK SHE'S CLEARLY DOING THE

11:15AM  16     BEST THAT SHE CAN TO TRY TO FOLLOW THE PROCEEDINGS.

11:15AM  17          THERE WERE INTERIM PERIODS WHERE I THINK SHE WAS

11:15AM  18     COMPLETELY DISTRACTED FROM MY VANTAGE POINT.

11:15AM  19          SO I AM -- I'M NOT SURE THAT WHAT WE'RE ASKING HER TO DO

11:15AM  20     IN THE CURRENT CIRCUMSTANCE IS REALLY A FAIR REQUEST.

11:15AM  21          I WONDER IF WE MIGHT ADJOURN WITH THE BALANCE OF TODAY AND

11:15AM  22     ALLOW HER TO GET HER ARMS AROUND THE SITUATION, AND THEN WE CAN

11:15AM  23     DECIDE WHAT THAT MEANS FOR THE REST OF THE PROCEEDING.

11:15AM  24          BUT I'M CONCERNED ABOUT ONE JUROR BEING DISTRACTED DURING

11:15AM  25     DIFFERENT PERIODS OF THE TRIAL.  OBVIOUSLY IT'S NOT IN THE

11:15AM 1    GOVERNMENT'S DIRECT, BUT I'M CONCERNED ABOUT IT.

11:15AM 2            THE COURT:  SURE.

11:15AM 3        MR. SCHENK?

11:15AM 4            MR. SCHENK:  FROM MY SEAT I DID NOT HAVE THE

11:15AM 5    OPPORTUNITY TO OBSERVE THE JUROR.  I'D BE HAPPY TO GO BACK AND

11:15AM 6    ASK OTHER PEOPLE ON MY TEAM IF THEY HAD THE OPPORTUNITY TO

11:15AM 7    OBSERVE HER, OR THE COURT COULD ASK HER, IF THE COURT IS

11:15AM 8    INCLINED TO ADJOURN FOR THE DAY AND ASK HER IF THAT WOULD BE

11:15AM 9    HELPFUL FOR THIS JUROR.

11:15AM 10        I DON'T KNOW THAT I'M IN A POSITION TO COMMENT.  I JUST

11:15AM 11   DIDN'T SEE IT FROM WHERE I SIT.

11:15AM 12           THE COURT:  THANK YOU.  I WAS KEEPING AN EYE ON HER

11:15AM 13   THROUGH THE -- THIS MORNING FOR, I GUESS WE'VE BEEN IN

11:15AM 14   TESTIMONY FOR MAYBE AN HOUR OR 45 MINUTES, AN HOUR.

11:15AM 15        AT ONE POINT I NOTICED HER HEAD WAS DOWN, SHE WAS LOOKING

11:15AM 16   TOWARDS HER LAP, AND I THOUGHT SHE WAS -- IT LOOKED LIKE SHE

11:15AM 17   WAS MANIPULATING A PHONE, MAYBE TEXTING, AND THEN SHE CAME UP

11:15AM 18   AND SHE UNWRAPPED A PIECE OF FOIL AND PUT SOME GUM IN HER

11:15AM 19   MOUTH.

11:15AM 20        AND I THOUGHT, WELL, OKAY.  I DIDN'T SEE HER -- I THINK I

11:15AM 21   NOTICED HER LOOKING DOWN AT HER LAP AGAIN A COUPLE OF TIMES,

11:15AM 22   BUT I DIDN'T SEE HER DO THE MANIPULATION.

11:15AM 23        I THINK IT'S A GOOD IDEA, THOUGH, I THINK THAT SUGGESTION

11:15AM 24   TO BRING HER IN AND ASK HER HER THOUGHTS MAYBE NOW WOULD BE

11:15AM 25   BETTER THAN JUST TO GET HER REAL-TIME THOUGHTS ON WHERE THIS

11:15AM  1        IS.

11:15AM  2               SO, MS. KRATZMANN.

11:15AM  3               THE CLERK:  SO, WHEN THE JURORS WERE EXITING, SHE

11:15AM  4        STARTED TO PUT HER AIR BUDS IN AND WAS GOING TO MAKE A CALL, SO

11:15AM  5        I ASSUME SHE'S COMMUNICATING.

11:15AM  6               THE COURT:  COULD YOU ASK HER TO COME IN?

11:15AM  7               THE CLERK:  OKAY.

11:15AM  8               MR. DOWNEY:  COULD WE RELOCATE OURSELVES, JUDGE?

11:15AM  9               THE COURT:  YEAH.  LET'S HAVE YOU SIT BACK WHERE YOU

11:15AM 10        WERE IF YOU DON'T MIND.  THANKS.

11:15AM 11            WOULD YOU GUYS LIKE SOME COFFEE OR TEA OR ANYTHING?

11:15AM 12               MR. SCHENK:  NO.  THANK YOU.

11:15AM 13           (PAUSE IN PROCEEDINGS.)

11:15AM 14               THE CLERK:  YOUR HONOR, I BELIEVE SHE HAS STEPPED

11:15AM 15        OUTSIDE.  DO YOU WANT ME TO WAIT UNTIL SHE RETURNS?

11:15AM 16               THE COURT:  CAN YOU POKE YOUR HEAD OUT IN THE

11:15AM 17        HALLWAY THERE?

11:15AM 18               THE CLERK:  YES.  AND IF SHE'S NOT OUT THERE, I

11:15AM 19        PRESUME SHE'S NOT IN THE BUILDING.

11:15AM 20               THE COURT:  YES.  OKAY.

11:15AM 21           (PAUSE IN PROCEEDINGS.)

11:15AM 22           (THE FOLLOWING PROCEEDINGS WERE HELD IN CHAMBERS IN SEALED

11:15AM 23        PROCEEDINGS WITH JUROR NUMBER 5 PRESENT, PAGES 4674- 4677.)

        24

        25

11:15AM 1                         **AFTERNOON SESSION**

11:42AM 2        (IN OPEN COURT.)

11:42AM 3        (JURY IN AT 11:42 A.M.)

11:42AM 4          THE COURT:  THANK YOU.  PLEASE BE SEATED.  WE'RE

11:42AM 5 BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT

11:42AM 6 ONCE AGAIN.

11:42AM 7        MS. PETERSON IS BACK ON THE STAND.  THANK YOU.

11:42AM 8        MR. LEACH.

11:42AM 9         MR. LEACH:  THANK YOU, YOUR HONOR.

11:43AM 10 Q.  GOOD MORNING, MS. PETERSON.

11:43AM 11        WHEN WE BROKE WE WERE GOING THROUGH PORTIONS OF THE

11:43AM 12 POWERPOINT THAT YOU REVIEWED, AND I WANT TO DRAW YOUR

11:43AM 13 ATTENTION, PLEASE, TO PAGE 30 OF EXHIBIT 4858.

11:43AM 14        DO YOU SEE THE HEADING, "A NEW STANDARD IN QUALITY.

11:43AM 15        "THE HIGHEST LEVELS OF ACCURACY."

11:43AM 16 A.  YES.  IS THAT ON OKAY?  YES.

11:43AM 17 Q.  DO YOU SEE THE HEADING, "A NEW STANDARD IN QUALITY.

11:43AM 18        "THE HIGHEST LEVELS OF ACCURACY"?

11:43AM 19 A.  YES.

11:43AM 20 Q.  AND IS THAT A CONCEPT THAT MS. HOLMES SPOKE ABOUT IN YOUR

11:43AM 21 MEETING IN CALIFORNIA IN PALO ALTO?

11:43AM 22 A.  YES.

11:43AM 23 Q.  AND DO YOU SEE WHERE IT SAYS, "BY SYSTEMATICALLY

11:43AM 24 CONTROLLING AND STANDARDIZING OUR PROCESSES, THERANOS OFFERS

11:43AM 25 TESTS WITH THE HIGHEST LEVELS OF ACCURACY."

| | | |
|---|---|---|
| 11:43AM | 1 | WAS THAT IMPORTANT TO YOU? |
| 11:43AM | 2 | A.   YES, IT LENDED CREDIBILITY, AGAIN, TO THE ACCURACY OF THE |
| 11:44AM | 3 | ANALYZER. |
| 11:44AM | 4 | Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 32. |
| 11:44AM | 5 | DO YOU SEE THE HEADING "NEW POSSIBILITIES IN LAB"? |
| 11:44AM | 6 | A.   YES. |
| 11:44AM | 7 | Q.   AND BENEATH THE COLUMN "ROUTINE, SPECIALTY, AND ESOTERIC |
| 11:44AM | 8 | TESTING," DO YOU SEE WHERE IT SAYS, "COMPREHENSIVE LABORATORY |
| 11:44AM | 9 | TEST MENU AVAILABLE THROUGH THERANOS. |
| 11:44AM | 10 | "THERANOS RUNS ANY TEST AVAILABLE IN CENTRAL LABORATORIES. |
| 11:44AM | 11 | "THERANOS CAN PROCESS ANY SAMPLE TYPE." |
| 11:44AM | 12 | IS THAT CONSISTENT WITH REPRESENTATIONS THAT MS. HOLMES |
| 11:44AM | 13 | MADE TO YOU? |
| 11:44AM | 14 | A.   YES, VERY. |
| 11:44AM | 15 | Q.   AND LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 38. |
| 11:44AM | 16 | DO YOU SEE THE HEADING "THERANOS LABORATORY MARKET"? |
| 11:44AM | 17 | A.   YES. |
| 11:44AM | 18 | Q.   AND IN THE FOURTH BULLET IT READS, "REPLACES OLD |
| 11:45AM | 19 | INFRASTRUCTURE WITH NEW." |
| 11:45AM | 20 | WHAT DID YOU UNDERSTAND THAT TO MEAN? |
| 11:45AM | 21 | A.   I WOULD TAKE THAT TO MEAN AT THE TIME THAT IT WAS |
| 11:45AM | 22 | REPLACING THE OLD DUOPOLY INFRASTRUCTURE FROM QUEST AND |
| 11:45AM | 23 | LAB CORP. AND MAKING IT MORE AUTOMATED AND PORTABLE. |
| 11:45AM | 24 | Q.   AND WHAT DO YOU MEAN BY "INFRASTRUCTURE"? |
| 11:45AM | 25 | A.   THE BOX ITSELF, THE ANALYZER. |

11:45AM 1    Q.   LET ME MOVE FORWARD TO PAGE 40.

11:45AM 2         DO YOU SEE THE HEADING "THERANOS'S FOOTPRINT UPON NATIONAL

11:45AM 3    DEPLOYMENT:

11:45AM 4         "THERANOS WELLNESS CENTERS IN WALGREENS"?

11:45AM 5    A.   YES.

11:45AM 6    Q.   AND DID YOU DISCUSS THE WALGREENS ROLLOUT WITH MS. HOLMES

11:45AM 7    IN YOUR MEETING IN CALIFORNIA ON OR ABOUT OCTOBER 14TH?

11:45AM 8    A.   YES.

11:45AM 9    Q.   AND THIS IS IN 2014?

11:45AM 10   A.   YES.

11:45AM 11   Q.   OKAY.  DID MS. HOLMES OR MR. BALWANI SAY ANYTHING TO THE

11:46AM 12   EFFECT THAT THE WALGREENS ROLLOUT WAS STALLING OR SLOWING?

11:46AM 13   A.   NOT AT ALL.

11:46AM 14   Q.   DID THEY SAY ANYTHING TO THE EFFECT THAT WALGREENS WAS

11:46AM 15   FRUSTRATED BY THE NUMBER OF VENOUS DRAWS?

11:46AM 16   A.   NOT AT ALL.

11:46AM 17   Q.   DID YOU HAVE ANY CONCEPT THAT THERANOS WAS DOING VENOUS

11:46AM 18   DRAWS?

11:46AM 19   A.   NONE WHATSOEVER.

11:46AM 20   Q.   PLEASE LOOK AT PAGE 49.

11:46AM 21        DO YOU SEE THE HEADING "RECENT PRESS"?

11:46AM 22   A.   YES.

11:46AM 23   Q.   AND TO THE RIGHT THERE'S AN IMAGE OF A "FORTUNE" MAGAZINE

11:46AM 24   ARTICLE, "THIS CEO IS OUT FOR BLOOD."

11:46AM 25        ARE THESE PRESS ARTICLES THAT MS. HOLMES REFERRED -- OR

11:46AM 1    THAT THIS POWERPOINT REFERRED YOU TO?

11:46AM 2    A.   YES.

11:46AM 3    Q.   AND DID YOU MAKE AN EFFORT TO REVIEW WHATEVER PUBLIC

11:46AM 4    INFORMATION YOU COULD FIND ABOUT THERANOS?

11:46AM 5    A.   YES.

11:46AM 6    Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 103 OF THIS

11:47AM 7    DOCUMENT.

11:47AM 8        IS THIS A PORTION OF THE MATERIALS IN THE BINDER THAT YOU

11:47AM 9    REVIEWED, MS. PETERSON?

11:47AM 10   A.   YES.

11:47AM 11   Q.   OKAY.  AND DO YOU SEE WHERE IT SAYS, "EXEMPLARY REPORTS

11:47AM 12   FROM PHARMACEUTICAL PARTNERS"?

11:47AM 13   A.   YES.

11:47AM 14   Q.   PLEASE LOOK AT THE NEXT PAGE, PAGE 140, OR 104.

11:47AM 15       AND IF WE CAN ZOOM IN, MS. HOLLIMAN, ON EVERYTHING DOWN TO

11:47AM 16   THE WORD "CONCLUSIONS" AND THE THREE BULLETS.  THERE YOU GO.

11:47AM 17       THANK YOU.

11:47AM 18       DOES THIS APPEAR TO BE SOMETHING CALLED "THERANOS

11:47AM 19   ANGIOGENESIS STUDY REPORT"?

11:47AM 20   A.   YES.

11:47AM 21   Q.   AND DO YOU SEE THE PFIZER LOGO UP IN THE LEFT-HAND CORNER?

11:47AM 22   A.   YES.

11:47AM 23   Q.   AND DO YOU SEE THE THERANOS LOGO IN THE RIGHT-HAND CORNER?

11:48AM 24   A.   YES.

11:48AM 25   Q.   OKAY.  DID YOU BELIEVE THIS REPORT WAS PREPARED BY PFIZER?

| | | |
|---|---|---|
| 11:48AM | 1 | A. YES. |
| 11:48AM | 2 | Q. WHY DID YOU BELIEVE THAT? |
| 11:48AM | 3 | A. BECAUSE THE LOGO WAS ON IT. |
| 11:48AM | 4 | Q. DID YOU EVER SEE A VERSION OF THIS REPORT WITH ONLY THE |
| 11:48AM | 5 | THERANOS LOGO ON IT? |
| 11:48AM | 6 | A. NO. |
| 11:48AM | 7 | Q. DID YOU EVER SEE A VERSION OF THIS REPORT WHERE UNDERNEATH |
| 11:48AM | 8 | THE HEADING "THERANOS ANGIOGENESIS STUDY REPORT" IT SAYS |
| 11:48AM | 9 | "PREPARED FOR DR. AIDAN POWER"? |
| 11:48AM | 10 | A. I DON'T RECALL THAT. |
| 11:48AM | 11 | Q. OKAY. HAVE YOU EVER HEARD OF SOMEBODY CALLED |
| 11:48AM | 12 | DR. AIDAN POWER? |
| 11:48AM | 13 | A. NO. |
| 11:48AM | 14 | Q. DID MS. HOLMES EVER TELL YOU THAT THIS REPORT WAS |
| 11:48AM | 15 | THERANOS'S WORK AND WAS NOT APPROVED BY PFIZER? |
| 11:48AM | 16 | A. NO. |
| 11:48AM | 17 | Q. OKAY. WAS IT RELEVANT TO YOU THAT THIS CAME FROM PFIZER? |
| 11:48AM | 18 | A. VERY RELEVANT. |
| 11:48AM | 19 | Q. WHY? |
| 11:48AM | 20 | A. AGAIN, IT CAME FROM A LARGE COMPANY. IT VALIDATED |
| 11:48AM | 21 | EVERYTHING THAT SHE WAS TELLING US FROM A LARGE EXTERNAL |
| 11:49AM | 22 | INDEPENDENT THIRD PARTY. |
| 11:49AM | 23 | Q. LET'S LOOK, PLEASE, AT PAGE 129. |
| 11:49AM | 24 | DO YOU SEE THE PFIZER LOGO AGAIN, MS. PETERSON? |
| 11:49AM | 25 | A. YES. |

11:49AM 1    Q.   AND THE THERANOS LOGO TO THE RIGHT?

11:49AM 2    A.   YES.

11:49AM 3    Q.   OKAY.  AND THERE'S A NUMBER OF CONCLUSIONS LISTED ON THIS.

11:49AM 4    WE SEE ON THE SCREEN 1 THROUGH 9.

11:49AM 5    A.   YES.

11:49AM 6    Q.   AND ON THE DOCUMENT ARE THERE SOME ADDITIONAL ONES, 10

11:49AM 7    THROUGH 13?

11:49AM 8    A.   I DIDN'T -- I DON'T HAVE IT IN THE BINDER HERE, BUT --

11:49AM 9    Q.   OKAY.  THERE YOU GO.

11:49AM 10   A.   YES.

11:49AM 11   Q.   DID YOU BELIEVE THESE TO BE CONCLUSIONS THAT PFIZER HAD

11:49AM 12   REACHED AFTER ITS WORK?

11:49AM 13   A.   YES.

11:49AM 14   Q.   OKAY.  ASSUMING THESE WERE JUST THE VIEWS OF THERANOS,

11:49AM 15   WOULD THAT HAVE HAD RELEVANCE TO YOU?

11:49AM 16   A.   NOT NEAR AS MUCH, NO.

11:49AM 17   Q.   WHY IS THAT?

11:49AM 18   A.   BECAUSE PFIZER IS A LARGE REPUTABLE PHARMACEUTICAL COMPANY

11:50AM 19   THAT WE THOUGHT USED THE ANALYZER AND WAS SAYING THAT THE

11:50AM 20   RESULTS WERE ACCURATE.

11:50AM 21   Q.   OKAY.  LET ME DRAW YOUR ATTENTION, PLEASE, TO ANOTHER

11:50AM 22   DOCUMENT.  IT'S EXHIBIT 1853.  I BELIEVE THIS IS IN EVIDENCE.

11:50AM 23   A.   I'M SORRY, WHAT IS THE NUMBER AGAIN?

11:50AM 24   Q.   1853.

11:50AM 25   A.   18 -- OKAY.

11:50AM 1    Q.   DO YOU RECOGNIZE THIS DOCUMENT?

11:50AM 2    A.   YES.

11:50AM 3    Q.   WHAT IS THIS?

11:50AM 4    A.   THESE ARE THE FINANCIAL STATEMENTS, FINANCIALS THAT WE

11:50AM 5    RECEIVED AS PART OF THE DILIGENCE BINDER, AND THE WRITING IS

11:50AM 6    MINE.

11:50AM 7    Q.   YOU RECEIVED THIS FROM THERANOS?

11:50AM 8    A.   YES.

11:50AM 9    Q.   AND DID YOU DISCUSS THIS PROJECTED STATEMENT OF INCOME

11:50AM 10   WITH MS. HOLMES IN YOUR MEETING IN CALIFORNIA IN OCTOBER OF

11:51AM 11   2014?

11:51AM 12   A.   YES, WITH BOTH MS. HOLMES AND MR. BALWANI.

11:51AM 13   Q.   OKAY.  AND YOU SEE THE LINE "PROJECTED STATEMENT OF

11:51AM 14   INCOME" TO THE LEFT?

11:51AM 15   A.   YES.

11:51AM 16   Q.   AND THEN THERE IS A COLUMN FOR DECEMBER 31ST, 2014.

11:51AM 17        DO YOU SEE THAT?

11:51AM 18   A.   YES.

11:51AM 19   Q.   AND DID YOU BELIEVE THIS TO BE THERANOS'S REVENUE

11:51AM 20   PROJECTIONS FOR THE YEAR ENDING 2014?

11:51AM 21   A.   YES.

11:51AM 22   Q.   OKAY.  WHAT MONTH DID RDV RECEIVE THESE PROJECTED

11:51AM 23   FINANCIAL STATEMENTS?

11:51AM 24   A.   OCTOBER.

11:51AM 25   Q.   OCTOBER OF 2014?

11:51AM  1    A.   YES.

11:51AM  2    Q.   AND DID THAT GIVE YOU ANY COMFORT THAT THERANOS WOULD BE

11:51AM  3    BETTER ABLE TO HIT THOSE PROJECTIONS?

11:51AM  4    A.   YES.

11:51AM  5    Q.   EXPLAIN THAT FOR US.

11:51AM  6    A.   ONE WOULD ASSUME IN OCTOBER THAT THERE WERE -- IF THEY

11:51AM  7    WERE PUTTING FORTH A PROJECTION FOR DECEMBER OF THAT YEAR, THAT

11:51AM  8    THEY WERE AT OR CLOSE TO THAT PROJECTION.

11:51AM  9    Q.   THE FIRST LINE UNDER REVENUE U.S. COMMERCIAL ONLY SAYS,

11:52AM  10   "LAB SERVICES FROM U.S. RETAIL PHARMACIES."

11:52AM  11        AND THEN FOR 2014 THE AMOUNT IS 42 MILLION.

11:52AM  12        DO YOU SEE THAT?

11:52AM  13   A.   YES.

11:52AM  14   Q.   AND DID YOU UNDERSTAND THAT TO BE REVENUE FROM THE

11:52AM  15   WALGREENS RELATIONSHIP?

11:52AM  16   A.   YES.

11:52AM  17   Q.   AND THEN THERE'S TWO ENTRIES FOR PHYSICIAN OFFICES AND LAB

11:52AM  18   SERVICES REVENUE FROM HOSPITALS IN THE AMOUNT OF 11 MILLION AND

11:52AM  19   47 MILLION.

11:52AM  20        DO YOU SEE THAT?

11:52AM  21   A.   YES.

11:52AM  22   Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

11:52AM  23   A.   THERE WERE A NUMBER OF HOSPITALS THAT SHE MENTIONED THEY

11:52AM  24   HAD CONTRACTED WITH, LIKE INTERMOUNTAIN AND UCSF AND DIGNITY

11:52AM  25   HEALTH WERE SOME THAT SHE NAMED.  WE WERE ASSUMING THAT THOSE

11:52AM 1    WERE REVENUES COMING FROM THOSE CONTRACTS.

11:52AM 2    Q.    THERE IS ALSO AN ENTRY FOR PHARMACEUTICAL SERVICES IN THE

11:52AM 3    AMOUNT OF $40 MILLION.

11:52AM 4        DO YOU SEE THAT?

11:52AM 5    A.    YES.

11:52AM 6    Q.    AND WHAT DID YOU UNDERSTAND THAT TO REFER TO?

11:52AM 7    A.    REVENUE COMING FROM THE CLINICAL STUDIES FROM PEOPLE LIKE

11:53AM 8    PFIZER AND OTHER -- THE TOP 10 OF THE 15 PHARMACEUTICAL

11:53AM 9    COMPANIES, THAT THERE WAS REVENUE COMING IN FROM THOSE.

11:53AM 10   Q.    THERE'S SOME QUESTION MARKS NEXT TO PHARMACEUTICAL

11:53AM 11   SERVICES AND DOD.

11:53AM 12       DO YOU SEE THAT?

11:53AM 13   A.    YES.

11:53AM 14   Q.    AND CAN YOU EXPLAIN WHAT YOU MEANT BY THAT, OR WHAT THAT

11:53AM 15   REFERS TO?

11:53AM 16   A.    THE QUESTION MARKS -- THERE'S TWO DIFFERENT INKS ON HERE.

11:53AM 17   THE QUESTION MARKS AND QUESTION OF ORDER OF MAGNITUDE WITH THE

11:53AM 18   QUESTION MARKS.  THE QUESTION MARKS WERE PUT ON THERE BEFORE

11:53AM 19   THE MEETING AND DISCUSSED AND ANSWERED NOT SO MUCH ON THIS

11:53AM 20   PAGE, BUT IN MY MEMO FOLLOWING THE MEETING.

11:53AM 21   Q.    OKAY.  SO DO I UNDERSTAND YOU TO BE SAYING THAT THE

11:53AM 22   LIGHTER INK IS QUESTIONS THAT YOU HAD GOING INTO THE MEETING,

11:53AM 23   AND THEN THE DARKER INK IS WHAT YOU LEARNED IN THE MEETING?

11:53AM 24   A.    CORRECT.

11:53AM 25   Q.    OKAY.  IN THE OCTOBER 2014 MEETING, DID MS. HOLMES OR

11:53AM 1    MR. BALWANI TELL YOU THAT THERANOS HAD ZERO REVENUE FROM

11:54AM 2    PHARMACEUTICAL COMPANIES IN 2013?

11:54AM 3    A.   NO, NO.

11:54AM 4    Q.   HOW ABOUT ZERO REVENUE FROM PHARMACEUTICAL COMPANIES IN

11:54AM 5    2012?

11:54AM 6    A.   NO.

11:54AM 7    Q.   WOULD THAT HAVE BEEN RELEVANT TO YOU?

11:54AM 8    A.   YES, VERY.

11:54AM 9    Q.   WHY?

11:54AM 10   A.   BECAUSE IT WAS CONTRARY TO WHAT THEY WERE SAYING, THAT

11:54AM 11   THEY HAD SIX OR SEVEN YEARS OF DOING WORK FOR MAJOR

11:54AM 12   PHARMACEUTICAL COMPANIES.

11:54AM 13   Q.   OKAY.  THE TOTAL AMOUNT OF REVENUE UNDER DECEMBER 31ST,

11:54AM 14   2014 IS $140 MILLION.

11:54AM 15        DO YOU SEE THAT?

11:54AM 16   A.   YES.

11:54AM 17   Q.   AND WAS THAT IMPRESSIVE TO YOU?

11:54AM 18   A.   YES.

11:54AM 19   Q.   OKAY.  TO THE RIGHT THERE'S SOME NUMBERS FOR 2015.

11:54AM 20        DO YOU SEE THOSE?

11:54AM 21   A.   YES.

11:54AM 22   Q.   AND YOU'VE CROSSED OUT THE NUMBERS FOR PHYSICIAN'S OFFICES

11:54AM 23   ON SITE SERVICES REVENUE FROM HOSPITALS AND PHARMACEUTICAL

11:54AM 24   SERVICES AND HAVE WRITTEN SOME NUMBERS TO THE RIGHT.

11:54AM 25        CAN YOU EXPLAIN WHAT THAT MEANS?

11:54AM 1    A.   DURING THE MEETING THEY HAD MADE SOME CHANGES TO THOSE

11:55AM 2    NUMBERS, BUT THEY WERE MINOR.  THE 160 IS 160 MILLION.  IT'S

11:55AM 3    NOT 160,000.  IT'S JUST MY SHORTHAND.

11:55AM 4    Q.   OKAY.  SO THE 60,000 OR ASSOCIATED --

11:55AM 5    A.   $60 MILLION.  YES, YES.

11:55AM 6         THE COURT:  WHY DON'T YOU ASK YOUR QUESTION AGAIN?

11:55AM 7         MR. LEACH:  I WILL.

11:55AM 8    THANK YOU, MS. RODRIGUEZ.

11:55AM 9    Q.   SO THE 60,000 TO THE RIGHT OF THE CROSSED OUT 62 MILLION,

11:55AM 10   YOU'RE CONVEYING 60 MILLION THERE?

11:55AM 11   A.   YES.

11:55AM 12   Q.   AND THAT'S THE LEVEL OF -- AND DOES THAT REFLECT THE

11:55AM 13   CONVERSATION THAT YOU HAD WHERE MS. HOLMES AND MR. BALWANI WERE

11:55AM 14   SAYING IN 2015 IT'S ACTUALLY GOING TO BE $2 MILLION LESS?

11:55AM 15   A.   YES.

11:55AM 16   Q.   AND THE TOTAL REVENUE THAT MS. HOLMES AND MR. BALWANI WERE

11:55AM 17   PROJECTING FOR DECEMBER 31ST, 2005 WAS $990 MILLION?

11:55AM 18   A.   YES.

11:55AM 19   Q.   AND WAS THAT IMPRESSIVE TO YOU?

11:55AM 20   A.   YES.

11:55AM 21   Q.   ABOVE THE COLUMN, YOU WROTE THE WORDS, "900 LOCATIONS."

11:56AM 22   WHAT DOES THAT REFER TO?

11:56AM 23   A.   THAT REFERRED TO WALGREENS, THE ROLLOUT THAT THEY WERE

11:56AM 24   PLANNING.  THE NUMBERS IN HERE WERE BASED ON A ROLLOUT AT

11:56AM 25   WALGREENS OF 900 LOCATIONS FOR 2015.

| | | |
|---|---|---|
| 11:56AM | 1 | THERE'S ALSO 300 SAFEWAY LOCATIONS IN THAT NUMBER. AGAIN, |
| 11:56AM | 2 | THERE'S, THERE'S -- NOT ALL OF MY NOTES ON ARE THIS PAGE. THEY |
| 11:56AM | 3 | ALL CULMINATED INTO ANOTHER MEMO THAT WAS WRITTEN. |
| 11:56AM | 4 | Q. AND IF WE CAN ZOOM OUT, MS. HOLLIMAN, AND FOCUS ON THE NET |
| 11:56AM | 5 | INCOME DOWN AT THE BOTTOM. |
| 11:56AM | 6 | THANK YOU. |
| 11:56AM | 7 | DOES THIS REFLECT THAT MS. HOLMES AND MR. BALWANI WERE |
| 11:56AM | 8 | PROJECTING NET INCOME OF A $3 MILLION LOSS IN DECEMBER OF 2014? |
| 11:56AM | 9 | A. YES. |
| 11:56AM | 10 | Q. FOR THE YEAR? |
| 11:56AM | 11 | A. YES. |
| 11:56AM | 12 | Q. AND DOES THIS REFLECT THAT THEY WERE PROJECTING A PROFIT |
| 11:57AM | 13 | OF 230 MILLION BY THE END OF 2015? |
| 11:57AM | 14 | A. YES. |
| 11:57AM | 15 | Q. LET ME DRAW YOUR ATTENTION, PLEASE, TO WHAT HAS BEEN |
| 11:57AM | 16 | MARKED AS EXHIBIT 2107. |
| 11:57AM | 17 | DOES THIS APPEAR TO BE AN EMAIL FROM SUNNY BALWANI TO |
| 11:57AM | 18 | JERRY TUBERGEN, WITH A COPY TO MS. HOLMES, ATTACHING VARIOUS |
| 11:57AM | 19 | INVESTMENT DOCUMENTS? |
| 11:57AM | 20 | A. YES. |
| 11:57AM | 21 | Q. AND DID YOU ULTIMATELY REVIEW THE ITERATIONS OF THE |
| 11:57AM | 22 | INVESTMENT DOCUMENTS THAT ARE ATTACHED TO THIS EMAIL? |
| 11:57AM | 23 | A. YES, ALONG WITH OUR INHOUSE COUNSEL. |
| 11:58AM | 24 | MR. LEACH: YOUR HONOR, I OFFER EXHIBIT 2107 INTO |
| 11:58AM | 25 | EVIDENCE. |

| | | |
|---|---|---|
| 11:58AM | 1 | MR. WADE: THE COURT'S INDULGENCE FOR ONE MOMENT. |
| 11:58AM | 2 | (PAUSE IN PROCEEDINGS.) |
| 11:58AM | 3 | MR. WADE: NO OBJECTION. |
| 11:58AM | 4 | THE COURT: IT'S ADMITTED. IT MAY BE PUBLISHED. |
| 11:58AM | 5 | (GOVERNMENT'S EXHIBIT 2107 WAS RECEIVED IN EVIDENCE.) |
| 11:58AM | 6 | MR. LEACH: MS. HOLLIMAN, IF WE CAN PLEASE ZOOM IN |
| 11:58AM | 7 | ON THE TOP HALF OF THIS EMAIL ON PAGE 1. |
| 11:58AM | 8 | Q. MS. PETERSON, DO YOU SEE THERE ARE SOME ATTACHMENTS TO |
| 11:59AM | 9 | THIS INVESTOR MASTER SIGNATURE PAGE, SERIES C-2. |
| 11:59AM | 10 | WHAT IS C-2? |
| 11:59AM | 11 | A. THAT WAS THE SERIES OF SECURITIES THAT WE WERE BUYING |
| 11:59AM | 12 | INTO. |
| 11:59AM | 13 | Q. AND THERE'S NEW INVESTOR.ZIP AND THERANOS BANK WIRE |
| 11:59AM | 14 | INSTRUCTION.PDF. |
| 11:59AM | 15 | I WANT TO DRAW YOUR ATTENTION, PLEASE, TO PAGE 56. |
| 11:59AM | 16 | DO YOU SEE THE HEADING "THERANOS, INC. |
| 11:59AM | 17 | "SERIES C-2 PREFERRED STOCK PURCHASE AGREEMENT"? |
| 11:59AM | 18 | A. YES. |
| 11:59AM | 19 | Q. AND IS THIS A LENGTHY LEGAL DOCUMENT RELATING TO THE TERMS |
| 11:59AM | 20 | OF THE POTENTIAL STOCK PURCHASE BY RDV? |
| 11:59AM | 21 | A. YES. |
| 11:59AM | 22 | Q. PLEASE LOOK AT PAGE 61. |
| 11:59AM | 23 | DO YOU SEE SECTION 4 DOWN AT THE BOTTOM, "REPRESENTATIONS |
| 11:59AM | 24 | AND WARRANTIES OF THE INVESTORS"? |
| 11:59AM | 25 | A. YES. |

| | | |
|---|---|---|
| 11:59AM | 1 | Q. AND IN THIS CIRCUMSTANCE, RDV OR ITS AFFILIATE IS THE |
| 12:00PM | 2 | INVESTOR? |
| 12:00PM | 3 | A. CORRECT. |
| 12:00PM | 4 | Q. OKAY. AND IF WE CAN CONTINUE, PLEASE, TO PAGE 62. |
| 12:00PM | 5 | DO YOU SEE THAT THERE ARE CERTAIN REPRESENTATIONS RELATING |
| 12:00PM | 6 | IN 4.3, 4.4, 4.5, AND 4.6 RELATING TO THE INVESTOR'S INVESTMENT |
| 12:00PM | 7 | EXPERIENCE, THE NATURE OF THE INVESTMENT, ACCESS TO DATA, AND |
| 12:00PM | 8 | THE INVESTOR'S ACCREDITED STATUS? |
| 12:00PM | 9 | A. YES. |
| 12:00PM | 10 | Q. AND WERE THESE REPRESENTATIONS TRUE OF RDV AT THE TIME? |
| 12:00PM | 11 | A. AT THE TIME, YES. |
| 12:00PM | 12 | Q. OKAY. THANK YOU, MS. HOLLIMAN. WE CAN TAKE THAT DOWN. |
| 12:00PM | 13 | LET ME NEXT DRAW YOUR ATTENTION, PLEASE, TO EXHIBIT 2166. |
| 12:01PM | 14 | DO YOU RECOGNIZE THIS DOCUMENT? |
| 12:01PM | 15 | A. YES. |
| 12:01PM | 16 | Q. AND WHAT IS THIS? |
| 12:01PM | 17 | A. THIS IS THE DOCUMENT WE PUT TOGETHER FOR ALL INVESTMENTS |
| 12:01PM | 18 | THAT GO TO OUR INVESTMENT COMMITTEE. |
| 12:01PM | 19 | Q. WHEN YOU SAY "WE," DOES THAT INCLUDE YOU? |
| 12:01PM | 20 | A. YES, I PUT THIS TOGETHER. |
| 12:01PM | 21 | Q. OKAY. WHY DID YOU PUT THIS TOGETHER? |
| 12:01PM | 22 | A. BECAUSE WE NEEDED TO PUT TOGETHER EVERYTHING THAT WE HAD |
| 12:01PM | 23 | LEARNED ON THE INVESTMENT AND PRESENT IT TO THE INVESTMENT |
| 12:01PM | 24 | COMMITTEE. |
| 12:01PM | 25 | Q. OKAY. AND DID YOU PREPARE THIS IN THE ORDINARY COURSE OF |

12:01PM 1    BUSINESS?

12:01PM 2    A.   YES.

12:01PM 3    Q.   OKAY.  DID YOU PREPARE THIS AT OR FROM -- AT OR AROUND THE

12:01PM 4    TIME OF THE THERANOS INVESTMENT?

12:01PM 5    A.   YES, IN BETWEEN -- RIGHT AFTER THE MEETING THAT WE HAD ON

12:01PM 6    THE 14TH OF OCTOBER.

12:01PM 7    Q.   OKAY.  AND WAS IT RDV'S PRACTICE TO PREPARE APPROVAL

12:01PM 8    DOCUMENTS SUCH AS THESE?

12:01PM 9    A.   YES.

12:01PM 10         MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 2166.

12:01PM 11         MR. WADE:  NO OBJECTION.

12:01PM 12         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:02PM 13       (GOVERNMENT'S EXHIBIT 2166 WAS RECEIVED IN EVIDENCE.)

12:02PM 14         MR. LEACH:  IF WE CAN PLEASE ZOOM IN, MS. HOLLIMAN,

12:02PM 15    TO THE TOP HALF OF THE PAGE ALL OF THE WAY DOWN TO THE SECOND

12:02PM 16    PARAGRAPH IN COMPANY OVERVIEW.  A LITTLE BIT MORE.

12:02PM 17       PERFECT.

12:02PM 18    Q.   WHO ELSE HAD A HAND IN PREPARING THIS, IF ANYONE,

12:02PM 19    MS. PETERSON?

12:02PM 20    A.   THIS WAS, THIS WAS ALL ME THAT PREPARED THIS.

12:02PM 21    Q.   OKAY.  UP AT THE TOP IT SAYS, "RDV APPROVAL DOCUMENT - NEW

12:02PM 22    EQUITY INVESTMENT.

12:02PM 23       "DIRECT INVESTMENT:  THERANOS, INC."

12:02PM 24       DO YOU SEE THAT?

12:02PM 25    A.   YES.

| | | |
|---|---|---|
| 12:02PM | 1 | Q. AND TO THE RIGHT DO YOU SEE "CLOSED: OCTOBER 31ST, 2014"? |
| 12:02PM | 2 | A. YES. |
| 12:02PM | 3 | Q. IS THAT APPROXIMATELY THE DATE OF RDV'S INVESTMENT? |
| 12:02PM | 4 | A. YES. |
| 12:02PM | 5 | Q. IN THE RDV OPPORTUNITY SECTION YOU WROTE IN THE THIRD |
| 12:02PM | 6 | LINE, "TO DATE, THE COMPANY HAS RAISED OVER $400 FROM VARIOUS |
| 12:03PM | 7 | INDIVIDUAL INVESTORS AND VENTURE CAPITAL FIRMS. THE LAST |
| 12:03PM | 8 | EQUITY RAISE WAS COMPLETED IN JAN-2014 AT A $9,000 VALUATION." |
| 12:03PM | 9 | WHAT DO YOU MEAN BY THAT $9,000 VALUATION? |
| 12:03PM | 10 | A. IT'S 9 BILLION AND THE ZEROS ARE OMITTED. |
| 12:03PM | 11 | Q. SO THAT'S ANOTHER INSTANCE WHERE, FOR EASE OF REFERENCE, |
| 12:03PM | 12 | YOU'RE OMITTING THE ZEROS? |
| 12:03PM | 13 | A. YES. |
| 12:03PM | 14 | Q. HALFWAY DOWN IN THE COMPANY OVERVIEW IT READS, "THERANOS |
| 12:03PM | 15 | MANUFACTURES ITS ANALYZER EQUIPMENT." |
| 12:03PM | 16 | DO YOU SEE THAT? |
| 12:03PM | 17 | A. YES. |
| 12:03PM | 18 | Q. AND WHY DID YOU INCLUDE THIS IN THE RDV APPROVAL DOCUMENT? |
| 12:03PM | 19 | A. BECAUSE IT'S VERY RELEVANT TO OUR UNDERWRITING OF THE |
| 12:03PM | 20 | INVESTMENT. |
| 12:03PM | 21 | Q. IF WE COULD ZOOM OUT NOW, PLEASE, MS. HOLLIMAN. AND IF WE |
| 12:03PM | 22 | COULD FOCUS ON THAT THIRD PARAGRAPH IN THE COMPANY OVERVIEW. |
| 12:04PM | 23 | IN THAT LAST SENTENCE OF THE THIRD PARAGRAPH IT READS, |
| 12:04PM | 24 | "THROUGH THIS WORK THERANOS HAS BEEN COMPREHENSIVELY VALIDATED |
| 12:04PM | 25 | SINCE 2015 BY 10 MAJOR PHARMACEUTICAL COMPANIES, WITH HUNDREDS |

12:04PM 1   OF THOUSANDS ASSAYS PROCESSED."

12:04PM 2   A.   BY 2005.

12:04PM 3   Q.   2005, EXCUSE ME.

12:04PM 4        WHY DID YOU INCLUDE THIS IN THE RDV APPROVAL DOCUMENT?

12:04PM 5   A.   BECAUSE IT'S VERY RELEVANT TO OUR UNDERWRITING OF THIS

12:04PM 6   INVESTMENT THAT THEY WERE VALIDATED BY TEN MAJOR PHARMACEUTICAL

12:04PM 7   COMPANIES, INCLUDING PFIZER.

12:04PM 8        MR. WADE:  YOUR HONOR, I MOVE TO STRIKE THIS ANSWER

12:04PM 9   AND THE LAST ANSWER UNDER 602 FOR THE REASONS THAT WE

12:04PM 10  PREVIOUSLY RAISED.

12:05PM 11       THE COURT:  OVERRULED.  THE ANSWER WILL REMAIN.

12:05PM 12  BY MR. LEACH:

12:05PM 13  Q.   LET'S LOOK AT PAGE 3, MS. PETERSON.

12:05PM 14       DO YOU SEE THE ROW "GROWTH PLANS" TO THE LEFT?  THERE'S A

12:05PM 15  HEADING FOR THAT ROW CALLED -- OR THE FIRST PART CALLED "GROWTH

12:05PM 16  PLANS"?

12:05PM 17  A.   YES.

12:05PM 18  Q.   AND IN THE BODY TO THE RIGHT IT READS, "WITH THE

12:05PM 19  SUCCESSFUL BUILD-OUT OF THE PHOENIX MARKET, THERANOS WILL BE

12:05PM 20  READY IN 2015 TO BEGIN A BROADER NATIONAL ROLLOUT.  WALGREENS

12:05PM 21  AND THERANOS PLAN TO HAVE 900 WELLNESS CENTER LOCATIONS IN 5

12:05PM 22  MAJOR METROPOLITAN MARKETS NEXT YEAR."

12:05PM 23       WHERE DID THAT INFORMATION COME FROM?

12:05PM 24  A.   FROM THE CONVERSATION THAT WE HAD IN PALO ALTO.

12:05PM 25  Q.   OKAY.  AND DID MS. HOLMES OR MR. BALWANI SAY ANYTHING TO

12:05PM 1   THE EFFECT THAT WALGREENS WAS SCALING BACK THE NUMBER OF

12:05PM 2   LOCATIONS?

12:05PM 3   A.   NO.

12:05PM 4   Q.   IF WE CAN GO FURTHER DOWN TO THE FINANCIAL SUMMARY

12:05PM 5   PORTION.  ARE THESE FINANCIAL METRICS DRAWN FROM THE

12:06PM 6   SPREADSHEET THAT WE LOOKED AT EARLIER WITH YOUR HANDWRITING,

12:06PM 7   MS. PETERSON?

12:06PM 8   A.   YES.

12:06PM 9   Q.   AND THIS WAS INFORMATION THAT YOU GOT FROM MS. HOLMES AND

12:06PM 10  MR. BALWANI?

12:06PM 11  A.   YES.

12:06PM 12  Q.   WHY WERE YOU INCLUDING THIS IN THE RDV APPROVAL DOCUMENT?

12:06PM 13  A.   BECAUSE THE FINANCIALS ARE ONE OF THE FUNDAMENTALS OF

12:06PM 14  UNDERWRITING THE INVESTMENT THAT WE LOOK AT.

12:06PM 15  Q.   LET'S GO TO PAGE 6, PLEASE.

12:06PM 16       DOES THIS SECTION RELATES TO INVESTMENT STRENGTHS?

12:06PM 17  A.   YES.

12:06PM 18  Q.   AND IF WE CAN GO DOWN A LITTLE BIT MORE, MS. HOLLIMAN.

12:06PM 19       DO YOU SEE THE BULLET THAT READS, "A THERANOS ANALYZER

12:06PM 20  STATION IS A SMALL FRACTION OF THE SIZE OF A CURRENT LAB,

12:07PM 21  MAKING IT POSSIBLE TO PLACE A THERANOS LAB IN THE OPERATING

12:07PM 22  ROOM OR IN A MILITARY EVACUATION HELICOPTER, ON SHIPS, IN

12:07PM 23  REFUGEE CAMPS - VIRTUALLY ANYWHERE."

12:07PM 24       IS THAT INFORMATION THAT YOU GOT FROM MS. HOLMES AND

12:07PM 25  MR. BALWANI?

12:07PM  1      A.   YES.

12:07PM  2      Q.   AND WHY WERE YOU INCLUDING THAT IN THIS MEMO?

12:07PM  3      A.   BECAUSE, AGAIN, IT WAS CRITICAL TO OUR UNDERSTANDING OF

12:07PM  4      THE INVESTMENT, THAT IT COULD DO THIS AND THAT IT WAS PORTABLE

12:07PM  5      AND IT WAS VERY GAME CHANGING FROM -- FOR THIS INDUSTRY.

12:07PM  6      Q.   OKAY.  AND IF WE CAN GO TO THE LAST PAGE, PLEASE, PAGE 7.

12:07PM  7      AND IF WE CAN ZOOM IN ON THE ENTIRETY OF THE SUBSTANCE.

12:07PM  8           DO YOU SEE MR. TUBERGEN'S SIGNATURE IN THE SIGNATURE

12:07PM  9      BLOCK?

12:07PM  10     A.   YES.

12:07PM  11     Q.   AND IS THAT MR. DAMSTRA'S SIGNATURE TO THE RIGHT?

12:07PM  12     A.   YES.

12:07PM  13     Q.   OKAY.  IN THE RISK SECTION IT READS, "FURTHERMORE, UNLIKE

12:08PM  14     MOST LABS, THERANOS DOES NOT BUY ANALYZER EQUIPMENT FROM A

12:08PM  15     THIRD PARTY AND THEY DO NOT SELL THEIR ANALYZERS TO OTHER

12:08PM  16     LABS."

12:08PM  17          IS THAT INFORMATION THAT YOU GOT FROM MS. HOLMES AND

12:08PM  18     MR. BALWANI?

12:08PM  19     A.   YES.

12:08PM  20     Q.   AT ANY POINT IN TIME PRIOR TO INVESTING, DID MS. HOLMES

12:08PM  21     TELL YOU THERANOS WAS USING THIRD PARTY MACHINES TO DO SOME OF

12:08PM  22     ITS TESTING?

12:08PM  23     A.   NEVER.

12:08PM  24     Q.   DID THEY TELL YOU THEY WERE USING THIRD PARTY MACHINES TO

12:08PM  25     DO THE MAJORITY OF THEIR TESTING?

| | | |
|---|---|---|
| 12:08PM | 1 | A.   NO. |
| 12:08PM | 2 | Q.   PRIOR TO THE INVESTMENT, WERE YOU EVER TOLD THAT THERANOS |
| 12:08PM | 3 | WAS USING IT'S TSPU FOR NO MORE THAN 12 ASSAYS? |
| 12:08PM | 4 | A.   NO. |
| 12:08PM | 5 | Q.   WOULD THAT HAVE MATTERED TO YOU? |
| 12:08PM | 6 | A.   YES. |
| 12:08PM | 7 | Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO WHAT IS IN EVIDENCE |
| 12:08PM | 8 | AS EXHIBIT 4845. |
| 12:08PM | 9 | AND WITH LEAVE, YOUR HONOR, I WOULD LIKE TO DISPLAY THAT. |
| 12:09PM | 10 | THE COURT:  YES. |
| 12:09PM | 11 | MR. LEACH:  IF WE COULD GO TO PAGE 22. |
| 12:09PM | 12 | THE WITNESS:  I SHOW 4858. |
| 12:09PM | 13 | BY MR. LEACH: |
| 12:09PM | 14 | Q.   WE'LL DISPLAY 4845 ON THE SCREEN, MS. PETERSON.  I DON'T |
| 12:09PM | 15 | THINK IT'S IN YOUR BINDER. |
| 12:09PM | 16 | A.   OH, OKAY. |
| 12:09PM | 17 | Q.   AND IF WE CAN PLEASE ZOOM IN, MS. HOLLIMAN, ON THE |
| 12:09PM | 18 | SUBSTANCE. |
| 12:09PM | 19 | DOWN TOWARDS THE BOTTOM, MS. PETERSON, UNDER THE BOLD |
| 12:09PM | 20 | HEADING "ORIGINATOR INFORMATION," THE LAST LINE SAYS "LINE 1, |
| 12:09PM | 21 | DYNASTY FINANCIAL II LLC." |
| 12:09PM | 22 | ARE YOU FAMILIAR WITH THAT ENTITY? |
| 12:09PM | 23 | A.   YES. |
| 12:09PM | 24 | Q.   AND WHAT IS IT? |
| 12:09PM | 25 | A.   IT'S AN ENTITY CREATED BY RDV CORP. THAT HOUSES A NUMBER |

12:09PM 1    OF INVESTMENTS, INCLUDING THIS ONE.

12:09PM 2    Q.   AND SO DYNASTY FINANCIAL II LLC IS THE LEGAL ENTITY THAT

12:10PM 3    MADE THE INVESTMENT IN THERANOS ON RDV'S BEHALF?

12:10PM 4    A.   YES.

12:10PM 5    Q.   AND IF WE GO UP UNDER THE HEADING "BASIC INFORMATION" IN

12:10PM 6    LINE 4, THERE'S AN AMOUNT OF $99,999,984.

12:10PM 7         DO YOU SEE THAT?

12:10PM 8    A.   YES.

12:10PM 9    Q.   AND IS THAT THE AMOUNT OF RDV'S INVESTMENT?

12:10PM 10   A.   YES.

12:10PM 11   Q.   AND DO YOU SEE ABOVE THAT IN THE LINE OMAD, THERE'S A DATE

12:10PM 12   2014-10-31, OR THE NUMBERS.

12:10PM 13        DO YOU SEE THAT?

12:10PM 14   A.   YES.

12:10PM 15   Q.   AND IS OCTOBER 31ST, 2014 THE APPROXIMATE DATE OF THE

12:10PM 16   INVESTMENT?

12:10PM 17   A.   YES.

12:10PM 18   Q.   THERE'S A REFERENCE TO SOMETHING CALLED LAKESHORE CAPITAL

12:10PM 19   MANAGEMENT.  WHAT IS THAT?

12:11PM 20   A.   IT'S ONE OF OUR CASH ACCOUNTS.

12:11PM 21   Q.   THANK YOU, MS. HOLLIMAN.  WE CAN TAKE THAT DOWN.

12:11PM 22        I'D LIKE TO MOVE FORWARD IN TIME, MS. PETERSON, TO THE

12:11PM 23   TIME PERIOD OF OCTOBER OF 2015.

12:11PM 24        DO YOU HAVE THAT TIME PERIOD IN MIND?

12:11PM 25   A.   YES.

12:11PM 1   Q.   AT OR AROUND THAT TIME, DID YOU LEARN THAT "THE

12:11PM 2   WALL STREET JOURNAL" HAD WRITTEN AN ARTICLE RAISING ISSUES

12:11PM 3   ABOUT THERANOS?

12:11PM 4   A.   YES.

12:11PM 5   Q.   AND DID YOU KNOW THE AUTHOR OF THAT ARTICLE TO BE SOMEONE

12:11PM 6   NAMED JOHN CARREYROU?

12:11PM 7   A.   YES.

12:11PM 8   Q.   AND AT OR ABOUT THAT TIME, DID YOU VIEW AN INTERVIEW OF

12:11PM 9   MS. HOLMES ON THE T.V. SHOW "MAD MONEY"?

12:11PM 10   A.   YES.

12:11PM 11   Q.   PRIOR TO TESTIFYING, DID YOU HAVE A CHANCE TO REVIEW CLIPS

12:11PM 12   OF THAT "MAD MONEY" INTERVIEW?

12:11PM 13   A.   YES.

12:11PM 14        MR. LEACH:  YOUR HONOR, AT THIS TIME I WOULD LIKE TO

12:11PM 15   PLAY CLIPS OF THAT "MAD MONEY" INTERVIEW, 2851, CLIPS 1, 2 AND

12:12PM 16   3.

12:12PM 17        THE COURT:  2851?  AND I'M SORRY, IT'S CLIPS?

12:12PM 18        MR. LEACH:  2851-1, 2851-2, AND 2851-3.

12:12PM 19        THE COURT:  ALL RIGHT.  AND CAN YOU TELL US WHAT IS

12:12PM 20   THE APPROXIMATE LENGTH OF EACH OF THOSE CLIPS?

12:12PM 21        MR. LEACH:  THE FIRST CLIP IS ABOUT 5 SECONDS, THE

12:12PM 22   SECOND CLIP IS LESS THAN A MINUTE, AND THE THIRD CLIP IS ONE TO

12:12PM 23   TWO MINUTES.

12:12PM 24        THE COURT:  OKAY.  THANK YOU.

12:12PM 25        MR. WADE:  WE HAVE OBJECTIONS INITIALLY ON

12:12PM 1    FOUNDATION.  I BELIEVE THE WITNESS TESTIFIED THAT SHE READ IT

12:12PM 2    BEFORE SHE TESTIFIED.  I DON'T KNOW HOW IT CONNECTS TO THE

12:12PM 3    EVENTS IN THE CASE AND WHAT THE RELEVANCE IS, SO I DON'T THINK

12:12PM 4    WE HAVE A FOUNDATION PRELIMINARILY.

12:12PM 5         WE ALSO HAVE 106 OBJECTIONS.

12:12PM 6              THE COURT:  ALL RIGHT.  THANK YOU.  SO, MR. LEACH,

12:13PM 7    THIS WITNESS HAS TESTIFIED ABOUT THE INVESTMENT AND HER

12:13PM 8    PARTICIPATION IN THAT.

12:13PM 9         IS THIS A SEPARATE AREA, THEN, THAT IS CONNECTED TO THE

12:13PM 10   INVESTMENT, OR IS THIS OFFERED SEPARATE FROM THE INVESTMENT

12:13PM 11   ITSELF?

12:13PM 12             MR. LEACH:  IT'S SEPARATE FROM THE INVESTMENT,

12:13PM 13   YOUR HONOR.

12:13PM 14        BUT I BELIEVE ON THE VIDEO THE DEFENDANT MAKES STATEMENTS

12:13PM 15   RELATING TO THE SAME REPRESENTATIONS THAT INDUCED THE

12:13PM 16   INVESTMENT, BUT IT'S A YEAR REMOVED FROM THE INVESTMENT ITSELF.

12:13PM 17             THE COURT:  ALL RIGHT.

12:13PM 18             MR. LEACH:  BUT THE, THE --

12:13PM 19             THE COURT:  GO AHEAD.

12:13PM 20             MR. LEACH:  THE DEFENDANT IS PRESENTED WITH

12:13PM 21   ASSERTIONS FROM THE ARTICLE AND GIVEN THE OPPORTUNITY TO GIVE

12:13PM 22   HER RESPONSE, AND THIS RELATES TO STATEMENTS THAT WERE MADE TO

12:13PM 23   MS. PETERSON DURING THE COURSE OF THE INVESTMENT.

12:13PM 24             THE COURT:  ALL RIGHT.  THANK YOU.

12:13PM 25        I'LL NOTE THE OBJECTIONS THAT WERE MADE AND YOUR

12:13PM 1  OBJECTIONS, MR. WADE, CURRENTLY.

12:13PM 2       I'LL OVERRULE THE OBJECTIONS AND ALLOW THESE TO BE PLAYED.

12:14PM 3  SO YOU'LL PLAY THEM SEQUENTIALLY?

12:14PM 4       MR. LEACH:  YES, YOUR HONOR.

12:14PM 5       THE COURT:  ALL RIGHT.  SO DO YOU HAVE NUMBER 1

12:14PM 6  QUEUED UP NOW THEN?  LET'S SEE IF WE CAN GET THIS ON THE

12:14PM 7  SCREEN.

12:14PM 8       (VIDEO PLAYING OFF THE RECORD.)

12:14PM 9       THE COURT:  THAT WAS THE FIRST CLIP?

12:14PM 10      MR. LEACH:  THAT WAS THE FIRST CLIP, YOUR HONOR.

12:14PM 11      THE COURT:  AND LET ME JUST ASK FOR CLARITY'S SAKE,

12:14PM 12 ARE YOU ASKING THAT THE COURT REPORTER NOT REPORT THIS, WHAT IS

12:14PM 13 ON THE VIDEOS, OR DO YOU WANT THEM REPORTED?

12:14PM 14      MR. LEACH:  WE HAVE A TRANSCRIPT WHICH WE'VE

12:14PM 15 PROVIDED THE DEFENSE.  I'M HAPPY TO APPEND THAT.  I DON'T THINK

12:14PM 16 IT'S NECESSARY FOR THE COURT REPORTER TO TAKE IT DOWN.

12:14PM 17      THE COURT:  OKAY.

12:14PM 18      ANY OBJECTION TO THE COURT REPORTER NOT REPORTING THIS?

12:14PM 19      MR. WADE:  NO OBJECTION, YOUR HONOR.  IT WILL BE IN

12:14PM 20 EVIDENCE ONE WAY OR THE OTHER.

12:14PM 21      THE COURT:  ALL RIGHT.  THANK YOU.  SO THE COURT

12:14PM 22 REPORTER WILL NOT HAVE TO TRANSCRIBE THE VIDEOS.  THANK YOU.

12:14PM 23      (VIDEO PLAYING OFF THE RECORD.)

12:16PM 24      MR. LEACH:  THAT COMPLETES 2851-2, YOUR HONOR, AND

12:17PM 25 WE WILL PLAY NOW 2851-3.

12:17PM  1          THE COURT:  ALL RIGHT.

12:17PM  2          (VIDEO PLAYING OFF THE RECORD.)

12:19PM  3              MR. LEACH:  THAT COMPLETES CLIP 2851-3, YOUR HONOR.

12:19PM  4  Q.  MS. PETERSON, I WANT TO MOVE FORWARD IN TIME TO APRIL OF

12:19PM  5  2016.

12:19PM  6      DO YOU HAVE THAT TIME PERIOD IN MIND?

12:19PM  7  A.  YES.

12:19PM  8  Q.  AT OR AROUND THAT TIME, DID YOU REVIEW A SEGMENT ON THE

12:19PM  9  "TODAY SHOW" FEATURING MS. HOLMES?

12:19PM 10  A.  YES.

12:19PM 11  Q.  AND DID YOU OBSERVE MS. HOLMES MAKING STATEMENTS ABOUT HER

12:19PM 12  LEVEL OF INVOLVEMENT IN HER COMPANY?

12:19PM 13  A.  YES.

12:19PM 14  Q.  AND THIS WAS IN APPROXIMATELY APRIL OF 2016?

12:19PM 15  A.  CORRECT.

12:19PM 16  Q.  IT WAS THE "TODAY SHOW"?

12:19PM 17  A.  I DON'T REMEMBER WHICH ONE.  ONE OF THOSE MORNING SHOWS.

12:19PM 18  Q.  PRIOR TO TESTIFYING TODAY, DID YOU HAVE AN OPPORTUNITY TO

12:19PM 19  REVIEW SEGMENTS OF A NEWS STORY IN APRIL OF 2016?

12:19PM 20  A.  YES.

12:19PM 21  Q.  OKAY.

12:19PM 22      YOUR HONOR, I WOULD LIKE TO OFFER THE INTERVIEW SEGMENT

12:20PM 23  FROM THE "TODAY SHOW."  IT'S EXHIBIT 3152, AND I'LL OFFER THE

12:20PM 24  EXHIBIT IN ITS ENTIRETY.

12:20PM 25          THE COURT:  ALL RIGHT.  THANK YOU.  DID YOU --

| 12:20PM | 1 | BEFORE WE DO THAT, I'M NOT SURE THAT THIS WITNESS TESTIFIED |
| 12:20PM | 2 | THAT WHAT WE JUST SAW, THE THREE CLIPS, WERE THE ONES THAT SHE |
| 12:20PM | 3 | SAW. |
| 12:20PM | 4 | MR. LEACH: I CAN ASK THAT, YOUR HONOR. I'M |
| 12:20PM | 5 | CONSCIOUSLY NOT GETTING INTO REACTION OR STATE OF MIND ON THAT, |
| 12:20PM | 6 | BUT -- |
| 12:20PM | 7 | THE COURT: CORRECT. FOUNDATIONALLY -- I THINK YOU |
| 12:20PM | 8 | ASKED HER IF SHE SAW THEM, BUT I'M NOT CERTAIN THAT SHE |
| 12:20PM | 9 | TESTIFIED THAT WHAT WE SAW WAS WHAT SHE WAS REFERENCING. |
| 12:20PM | 10 | MR. LEACH: I'LL ASK THE FOLLOWUP. |
| 12:20PM | 11 | Q. WE LOOKED AT THREE SEGMENTS FROM "MAD MONEY," |
| 12:20PM | 12 | MS. PETERSON, CLIPS 2851-1, -2, AND -3. ARE THOSE PORTIONS OF |
| 12:20PM | 13 | THE "MAD MONEY" CLIPS THAT YOU VIEWED? |
| 12:20PM | 14 | A. YES. |
| 12:20PM | 15 | THE COURT: ALL RIGHT. THANK YOU. |
| 12:21PM | 16 | MR. WADE? |
| 12:21PM | 17 | MR. WADE: JUST THE SAME. |
| 12:21PM | 18 | THE COURT: SAME OBJECTIONS? |
| 12:21PM | 19 | ALL RIGHT. THANK YOU. WE'LL NOTE THAT, AND THE |
| 12:21PM | 20 | OBJECTIONS ARE OVERRULED, AND YOU CAN PLAY THE CLIP. |
| 12:21PM | 21 | MR. LEACH: ALL RIGHT. THANK YOU. AND I'M GOING TO |
| 12:21PM | 22 | PLAY THE ENTIRETY OF THE CLIP. |
| 12:21PM | 23 | MR. WADE: YES. |
| 12:21PM | 24 | MR. LEACH: THANK YOU. |
| 12:21PM | 25 | (GOVERNMENT'S EXHIBIT 3152 WAS RECEIVED IN EVIDENCE.) |

12:22PM 1            THE COURT: EXCUSE ME. COULD WE STOP THIS FOR JUST

12:22PM 2 A SECOND? MS. HOLLIMAN, CAN WE STOP THERE FOR JUST A SECOND?

12:22PM 3      I'M SORRY. AND I NEED TO TALK TO COUNSEL FOR A MOMENT.

12:22PM 4 WHY DON'T WE DO THAT? LET'S GO IN CHAMBERS RATHER THAN CLEAR

12:23PM 5 EVERYONE.

12:23PM 6            THE CLERK: LET ME TAKE THIS DOWN, YOUR HONOR.

12:23PM 7            THE COURT: YES, GO AHEAD AND TAKE THAT DOWN. I

12:23PM 8 JUST NEED CLARIFICATION ON SOMETHING. I'M SORRY.

12:23PM 9      SO LET'S SEE -- I THINK THIS WILL JUST TAKE A SECOND. SO

12:23PM 10 WE CAN DO THAT IN THE LITTLE ROOM BACK HERE, MR. WADE.

12:23PM 11            MR. WADE: SURE.

12:23PM 12            THE COURT: FOLKS, THIS WILL TAKE JUST A COUPLE OF

12:23PM 13 MINUTES, BUT YOU CAN STAND AND STRETCH. DON'T LEAVE THE ROOM,

12:23PM 14 PLEASE.

12:23PM 15      (CONFERENCE ON THE RECORD IN THE JURY ROOM WITH COUNSEL.)

12:29PM 16            THE COURT: WE'RE ON THE RECORD. WE'RE IN --

12:29PM 17 OUTSIDE OF THE PRESENCE OF THE JURY.

12:29PM 18      MR. LEACH IS HERE AND MR. WADE IS HERE.

12:29PM 19      I STOPPED THIS, AND WE CAN REWIND IT ACCORDINGLY. BUT

12:29PM 20 THIS WAS GOING TO BE A VIDEO OF HER MAKING HER -- MS. HOLMES,

12:29PM 21 PARDON ME, MAKING STATEMENTS.

12:29PM 22      MY CONCERN IS THAT THERE'S COMMENTARY FROM THE REPORTERS

12:29PM 23 TALKING ABOUT REPORTING AND GETTING THAT INFORMATION IN, WHICH

12:29PM 24 I THINK IS ADDITIONAL TO THOSE STATEMENTS.

12:29PM 25      THAT'S MY CONCERN, AND I HAVE SOME CONCERN ABOUT THE

12:29PM 1    INTRODUCTION, MS. SHRIVER, THE REPORTER TALKING AND OFFERING

12:29PM 2    THAT COMMENTARY.

12:29PM 3        I DON'T THINK YOU MENTIONED THIS, MR. WADE, IN YOUR

12:29PM 4    COMMENTS EARLIER, BUT I GUESS I'M CONCERNED ABOUT WHAT I SHOULD

12:29PM 5    TELL THE JURY ABOUT THAT OR WHETHER OR NOT -- I THOUGHT

12:29PM 6    HONESTLY THIS WAS GOING TO BE A -- THE SAME THING AS THE "MAD

12:29PM 7    MONEY," QUESTION, ANSWER, QUESTION, ANSWER.

12:29PM 8                MR. LEACH:  FIRST, YOUR HONOR, LET ME APOLOGIZE.

12:29PM 9                THE COURT:  I SHOULD HAVE READ THE TRANSCRIPT A

12:29PM 10   LITTLE CLOSER.

12:29PM 11               MR. LEACH:  THE GOVERNMENT ONLY PROPOSED THE

12:29PM 12   PORTIONS WHERE MS. HOLMES IS SPEAKING, AND AS I UNDERSTAND THE

12:29PM 13   DEFENSE'S OBJECTION, IF THAT WAS GOING TO COME IN, THEY WANTED

12:29PM 14   THE ENTIRETY OF THE INTERVIEW.

12:29PM 15               MR. WADE:  (NODS HEAD UP AND DOWN.)

12:29PM 16               MR. LEACH:  SO AFTER OUR COLLOQUY, LISTENING TO THE

12:29PM 17   DEFENSE OBJECTION THAT THEY WANTED THE ENTIRE VIDEO IN, TO

12:29PM 18   AVOID THE OBJECTION, I OFFERED THE ENTIRE VIDEO.

12:29PM 19               THE COURT:  I SEE.

12:29PM 20               MR. LEACH:  I DON'T KNOW WHAT THEIR POSITION ON THE

12:29PM 21   COMMENTARY IS, BUT WE WANTED MS. HOLMES'S STATEMENTS IN.  WE

12:29PM 22   STILL WANT MS. HOLMES'S STATEMENTS IN.

12:29PM 23               THE COURT:  RIGHT.

12:29PM 24               MR. LEACH:  AND IF THE OBJECTION IS A RULE 106

12:29PM 25   OBJECTION FOR COMPLETENESS AND PLAY THE WHOLE THING, WE'RE FINE

12:29PM 1    WITH THAT, TOO.  IT'S INITIALLY NOT WHAT WE WANTED TO OFFER,

12:29PM 2    BUT IN RESPONSE TO THE DEFENSE'S OBJECTION, I UNDERSTOOD THE

12:29PM 3    WHOLE THING COULD COME IN.

12:29PM 4           MR. WADE:  BUT I DON'T THINK WE'RE PLAYING ALL OF

12:29PM 5    THE STATEMENTS, RIGHT?  WE'RE ONLY PLAYING SELECTIVE

12:29PM 6    STATEMENTS?

12:29PM 7           THE COURT:  OF THIS, OF THIS "TODAY" INTERVIEW?

12:29PM 8           MR. WADE:  YEAH, YEAH.

12:29PM 9           THE COURT:  IT SOUNDS LIKE IT'S THE WHOLE TAPE.

12:29PM 10          MR. WADE:  YOUR INITIAL PROPOSAL.

12:29PM 11          MR. LEACH:  OUR INITIAL PROPOSAL WAS SOME OF

12:29PM 12   MS. HOLMES'S STATEMENTS IN THE INTERVIEW.  THE DEFENSE OBJECTED

12:29PM 13   THAT THEY WANTED THE ENTIRETY OF THE CLIP IN.

12:29PM 14          THE COURT:  OKAY.

12:29PM 15          MR. LEACH:  IN RESPONSE TO THAT OBJECTION, I'M FINE

12:29PM 16   WITH THE ENTIRE CLIP COMING IN --

12:29PM 17          THE COURT:  OKAY.

12:29PM 18          MR. LEACH:  -- INCLUDING STATEMENTS BY MS. HOLMES

12:29PM 19   THAT THE GOVERNMENT HAD NOT INITIALLY OFFERED.

12:29PM 20          THE COURT:  OKAY.  ALL RIGHT.  YOU'RE GOOD WITH

12:29PM 21   THAT?

12:29PM 22          MR. WADE:  I'M FINE WITH THAT.

12:29PM 23          THE COURT:  OKAY.  THANK YOU.  I WAS -- I LOOKED AT

12:29PM 24   IT, AND JUST FOR THE RECORD, THE REASON I STOPPED THE

12:29PM 25   PROCEEDING -- AND WE'LL PLAY THIS AGAIN AND START IT BECAUSE I

12:29PM 1     SAW THAT THERE WAS COMMENTARY AND I DIDN'T -- I KNOW THAT YOU

12:29PM 2     DIDN'T OBJECT.  I JUST WANTED TO BE CLEAR AND MAKE SURE THAT I

12:29PM 3     HAVE THAT NOW, THAT'S ON THE RECORD NOW, THAT THE ENTIRETY OF

12:29PM 4     THIS CAN BE PLAYED.

12:29PM 5          YOU'VE HEARD MY REASON I STOPPED THIS WAS --

12:29PM 6               MR. WADE:  NO, I APPRECIATE THE CAUTION, YOUR HONOR.

12:29PM 7     BECAUSE IT WAS A LITTLE -- I THINK IT WAS A LAST MINUTE

12:29PM 8     ADJUSTMENT BY MR. LEACH, WHICH WE UNDERSTAND AND --

12:29PM 9               THE COURT:  AND I'M NOT POINTING --

12:29PM 10              MR. WADE:  SO I'M GLAD WE'RE CLEAR ON THAT.

12:29PM 11              THE COURT:  THANK YOU FOR THAT.  I'M SORRY FOR THE

12:29PM 12    DISRUPTION.  I'M NOT POINTING FINGERS.  I JUST WANTED CLARITY.

12:29PM 13              MR. WADE:  NO.  THAT'S ALWAYS BETTER SAFE THAN

12:29PM 14    SORRY.  THANK YOU, YOUR HONOR.

12:29PM 15              THE COURT:  SO LET'S -- WE'RE STILL ON THE RECORD

12:29PM 16    HERE.

12:29PM 17         SHOULD WE START THE TAPE AGAIN?  I CAN'T RECALL WHERE I

12:29PM 18    STOPPED IT.  I THINK IT WAS JUST AFTER MS. SHRIVER, THE

12:29PM 19    REPORTER, WAS INTRODUCED.  SHOULD WE START IT THERE?

12:29PM 20              MR. LEACH:  I'M FINE STARTING IT WHERE WE STOPPED.

12:29PM 21              MR. WADE:  THAT'S FINE.  WE CAN START WHERE IT IS.

12:29PM 22              THE COURT:  WELL, I WAS TALKING AND IT WAS RUNNING.

12:29PM 23              MR. WADE:  MAYBE BACK IT UP 15 SECONDS OR SO.

12:29PM 24              THE COURT:  WHY DON'T WE START WHEN THE REPORTER,

12:29PM 25    MS. SHRIVER, IS INTRODUCED, AND THEN IT BREAKS AWAY INTO THE

| | | |
|---|---|---|
| 12:29PM | 1 | INTERVIEW.  IS THAT ALL RIGHT WITH YOU? |
| 12:29PM | 2 | MR. LEACH:  THAT'S FINE. |
| 12:29PM | 3 | MR. WADE:  THAT'S FINE.  SURE. |
| 12:29PM | 4 | THE COURT:  THANK YOU.  SORRY FOR THE DISRUPTION. |
| 12:29PM | 5 | MR. WADE:  NO.  NO PROBLEM AT ALL, YOUR HONOR. |
| 12:29PM | 6 | (END OF CONFERENCE ON THE RECORD IN THE JURY ROOM WITH |
| 12:29PM | 7 | COUNSEL.) |
| 12:29PM | 8 | THE COURT:  ALL RIGHT.  THANK YOU, COUNSEL.  THANK |
| 12:29PM | 9 | YOU.  AND I APOLOGIZE FOR THE INTERRUPTION. |
| 12:29PM | 10 | WE'RE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT |
| 12:29PM | 11 | ARE PRESENT ONCE AGAIN.  OUR WITNESS IS STILL ON THE STAND. |
| 12:29PM | 12 | MR. LEACH, IF YOU COULD QUEUE UP THE RECORDING AGAIN. |
| 12:29PM | 13 | PERHAPS WE CAN START IT JUST AS THE REPORTER, MS. SHRIVER, WAS |
| 12:29PM | 14 | BEING INTRODUCED.  WOULD THAT BE ALL RIGHT TO START THERE? |
| 12:29PM | 15 | MR. LEACH:  YES, YOUR HONOR. |
| 12:29PM | 16 | THE COURT:  WOULD THAT BE ALL RIGHT TO START THERE? |
| 12:29PM | 17 | MR. WADE:  YES, YOUR HONOR. |
| 12:29PM | 18 | THE COURT:  OKAY. |
| 12:29PM | 19 | (VIDEO PLAYING OFF THE RECORD.) |
| 12:34PM | 20 | MR. LEACH:  THAT COMPLETES THE VIDEO CLIP, |
| 12:34PM | 21 | YOUR HONOR, EXHIBIT 3152. |
| 12:34PM | 22 | Q.  MS. PETERSON, DID YOU VIEW THAT SEGMENT IN OR AROUND APRIL |
| 12:34PM | 23 | OF 2016? |
| 12:34PM | 24 | A.  YES. |
| 12:34PM | 25 | Q.  AND SHORTLY AFTER THAT VIDEO SEGMENT, DID YOU MEET WITH |

12:35PM 1    MS. HOLMES PERSONALLY IN PALO ALTO?

12:35PM 2    A.   YES, JERRY AND I DID.

12:35PM 3    Q.   AND WHO ELSE WAS AT THIS MEETING IN PALO ALTO?

12:35PM 4    A.   DAN MOSLEY -- IT WAS DAN MOSLEY, JERRY TUBERGEN AND

12:35PM 5    MYSELF, AS WELL AS PEOPLE FROM THE OTHER SIDE, TOO.

12:35PM 6    Q.   AND DID MS. HOLMES DISCUSS THE CMS INSPECTION?

12:35PM 7    A.   THERE WAS A NUMBER OF THINGS DISCUSSED.  WE ASKED ABOUT

12:35PM 8    EVERYTHING -- THIS WAS THE FIRST TIME THAT WE HAD A CHANCE TO

12:35PM 9    ACTUALLY TALK TO HER IN PERSON SINCE WE MADE THE INVESTMENT,

12:35PM 10   AND A LOT HAD HAPPENED SINCE, SO WE WERE ASKING REALLY WHAT WAS

12:35PM 11   GOING ON.

12:35PM 12       AND THERE WAS A LOT OF CONVERSATION BY HER AROUND THE LAB

12:35PM 13   AND THINGS THAT WERE GOING ON, AND IT WAS MORE ALONG THE LINES

12:35PM 14   OF THE PROCESS WASN'T -- CMS WAS QUESTIONING THE PROCESS, NOT

12:36PM 15   THE ACCURACY OF THE TESTS.

12:36PM 16   Q.   AND DID MS. HOLMES SAY, IN SUBSTANCE, THERANOS CAN'T

12:36PM 17   TRIVIALIZE THE ISSUES IN THE PRESS?

12:36PM 18   A.   YES.

12:36PM 19   Q.   AND DID SHE SAY, IN SUBSTANCE, THAT IN REALITY THERANOS

12:36PM 20   DOESN'T FEEL THE ISSUES ARE MAJOR?

12:36PM 21   A.   CORRECT.  VERY MUCH DOWNPLAYED WHAT HAD BEEN HAPPENING IN

12:36PM 22   THE PRESS, AND MUCH OF THE CORRESPONDENCE THAT WE HAD RECEIVED

12:36PM 23   FROM THE COMPANY SINCE THE INVESTMENT WAS DOWNPLAYING WHAT HAD

12:36PM 24   BEEN SAID IN THE NEWS.

12:36PM 25       MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR?

| 12:36PM | 1  |         THE COURT:  YES. |
|---------|----|--------------------------|

12:36PM 1          THE COURT:  YES.

12:36PM 2          (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

12:36PM 3          MR. LEACH:  NO FURTHER QUESTIONS, YOUR HONOR.

12:36PM 4     THANK YOU.  THANK YOU, MS. PETERSON.

12:36PM 5          THE COURT:  ANY CROSS-EXAMINATION?

12:36PM 6          MR. WADE:  I DO, YOUR HONOR.  MAYBE A STANDING BREAK

12:36PM 7     AS I TRANSITION?

12:37PM 8          THE COURT:  SURE.

12:37PM 9     FOLKS, FEEL FREE TO STAND AND STRETCH AS YOU WOULD LIKE

12:37PM 10    DURING THE TRANSITION HERE.

12:37PM 11    I THINK WE'RE GOING TO TAKE A BREAK AT 1:30, LADIES AND

12:37PM 12    GENTLEMEN, RIGHT AROUND 1:30.

12:37PM 13    YOU CAN STAND AS WELL, MS. PETERSON, IF YOU WOULD LIKE TO

12:37PM 14    STRETCH.

12:38PM 15    (STRETCHING.)

12:38PM 16          MR. WADE:  MAY I APPROACH, YOUR HONOR?

12:38PM 17          THE COURT:  YES.

12:38PM 18          MR. WADE:  (HANDING.)

12:39PM 19                          **CROSS-EXAMINATION**

12:39PM 20    BY MR. WADE:

12:39PM 21    Q.   GOOD AFTERNOON, MS. PETERSON.

12:39PM 22    A.   HI.

12:39PM 23    Q.   MY NAME IS LANCE WADE.  I REPRESENT MS. HOLMES.  I'LL ASK

12:39PM 24    YOU A FEW QUESTIONS HERE THIS AFTERNOON.

12:39PM 25    DO YOU RECALL BEING ASKED SOME QUESTIONS ABOUT A PFIZER

12:39PM 1    REPORT THAT YOU REVIEWED IN CONNECTION --

12:39PM 2    A.   DO I RECALL?

12:39PM 3    Q.   YEAH.

12:39PM 4    A.   YES.

12:39PM 5    Q.   TELL US WHAT YOU REMEMBER ABOUT THAT REPORT.

12:39PM 6    A.   THERE WERE A LOT OF PAGES IN THE DUE DILIGENCE BINDER

12:39PM 7    AROUND THAT, AND I JUST RECALL READING IT, AND THE TAKE AWAY

12:39PM 8    FOR ME WAS THE ACCURACY OF THE TESTING THAT THEY HAD DONE.

12:39PM 9    Q.   WHAT WAS THE KIND OF STUDY THAT WAS DONE BY PFIZER?

12:39PM 10   A.   I DON'T RECALL.

12:39PM 11   Q.   WHERE WAS IT DONE?

12:39PM 12   A.   I DON'T RECALL THAT.

12:39PM 13   Q.   WHAT WAS THE DRUG INVOLVED?

12:39PM 14   A.   I DON'T RECALL THE SPECIFICS.

12:39PM 15   Q.   DO YOU RECALL ANYTHING ABOUT THAT STUDY?

12:40PM 16   A.   NOT TODAY, NO.

12:40PM 17   Q.   JUST THE LOGO?  JUST THE LOGO, THAT'S ALL YOU RECALL?

12:40PM 18   A.   NO.  I RECALL READING THEM AT THE TIME AND

12:40PM 19   UNDERSTANDING -- THE TAKE AWAY FOR ME IN LOOKING AT IT WAS THAT

12:40PM 20   IT WAS LENDING CREDIBILITY TO THE ACCURACY OF THE ANALYZERS AND

12:40PM 21   THAT IT HAD DONE WORK AND, AS ELIZABETH HAD SAID, THEY HAD DONE

12:40PM 22   WORK FOR THE PHARMACEUTICAL COMPANIES FOR THE LAST FIVE TO

12:40PM 23   SEVEN YEARS.

12:40PM 24        SO, YES, I WAS LOOKING AT -- THAT THAT WAS TRUE, AND

12:40PM 25   EVERYTHING I WAS READING, THE TAKE AWAY WAS ACCURACY OF THE

1    TESTS THAT WAS DONE.

2    Q.   BUT YOU DON'T RECALL THE ACTUAL WORK THAT WAS DONE WITH

3    PFIZER BY THE COMPANY?

4    A.   NO, NOT THE SPECIFIC TESTS THAT WERE RUN, NO.

5    Q.   OKAY.  WE'LL COME BACK TO THE PFIZER REPORT IN A MINUTE.

6         LET ME START WITH YOUR EMPLOYER.  YOU WORK FOR RDV; IS

7    THAT RIGHT?  RDV CORPORATION?

8    A.   CORRECT.

9    Q.   AND WHAT DOES RDV STAND FOR?

10   A.   RICHARD DEVOS.

11   Q.   AND HE'S THE FOUNDER OF AMWAY; IS THAT RIGHT?

12   A.   HE'S A COFOUNDER, THE PATRIARCH OF THE FAMILY THAT I WORK

13   FOR, YES.

14   Q.   AND JUST FOR THE BENEFIT OF THE JURY, BECAUSE SOME OF US

15   MAY NOT UNDERSTAND WHAT AN ENTITY LIKE THAT IS, THAT'S

16   SOMETIMES REFERRED TO AS A FAMILY OFFICE; IS THAT RIGHT?

17   A.   CORRECT.

18   Q.   AND COULD YOU EXPLAIN TO US WHAT A FAMILY OFFICE IS, OR

19   WHAT THIS FAMILY OFFICE IS?  HOW'S THAT?

20   A.   THIS FAMILY OFFICE IS VERY MUCH A FAMILY -- THERE'S A

21   FAMILY SERVICES PART OF THE OFFICE THAT DOES A LOT OF SERVICES

22   DIRECTLY FOR THE FAMILY, LIKE MANAGING THEIR I.T. AND THEIR

23   PHONES AND CUTTING THEIR CHECKS AND DOING ALL OF THE STUFF THAT

24   YOU DO FOR A FAMILY, FOR A LARGE FAMILY LIKE THIS, HIRING THEIR

25   STAFF.

12:41PM 1         AND THEN THERE'S THE INVESTMENT SIDE, WHICH IS WHERE I

12:41PM 2    WAS.

12:41PM 3    Q.   OKAY.  AND ABOUT HOW MANY PEOPLE ARE THERE ON THE

12:41PM 4    INVESTMENT SIDE?

12:41PM 5    A.   ON THE INVESTMENT SIDE AT THE TIME?

12:41PM 6    Q.   (NODS HEAD UP AND DOWN.)

12:41PM 7    A.   ABOUT 12 TO 15.

12:41PM 8    Q.   ABOUT 12 TO 15.

12:41PM 9         AND TO WHOM DID YOU REPORT AT THE TIME THE INVESTMENT?

12:42PM 10   A.   DIRECTLY TO RANDY DAMSTRA.

12:42PM 11   Q.   TO RANDY DAMSTRA.  AND WHAT WAS HIS TITLE?

12:42PM 12   A.   SENIOR MANAGING DIRECTOR OF PRIVATE EQUITY.

12:42PM 13   Q.   AND TO WHOM DID MR. DAMSTRA REPORT?

12:42PM 14   A.   DIRECTLY TO JERRY TUBERGEN.

12:42PM 15   Q.   AND TO WHOM DID MR. TUBERGEN REPORT?

12:42PM 16   A.   TO THE FAMILY.

12:42PM 17   Q.   WHAT DOES THAT MEAN IN PRACTICE?

12:42PM 18   A.   THE FAMILY MEMBERS, AND IT ROTATED, MADE UP THE INVESTMENT

12:42PM 19   COMMITTEE.

12:42PM 20        SO JERRY REPORTED TO THE FAMILY DIRECTLY AND TO THE

12:42PM 21   INVESTMENT COMMITTEE, AND THEY HAVE A BOARD, RDV HAS A BOARD OF

12:42PM 22   DIRECTORS WHICH IS MADE UP OF FAMILY MEMBERS, AND JERRY

12:42PM 23   REPORTED TO THEM.

12:42PM 24   Q.   OKAY.  SO -- AND AS PART OF THE INVESTMENT PORTFOLIO, IT'S

12:42PM 25   THE JOB OF RDV PEOPLE TO MANAGE THE ASSETS OF THE DEVOS FAMILY?

12:42PM  1     IS THAT A FAIR HIGH LEVEL SUMMARY?

12:42PM  2     A.   CORRECT.

12:43PM  3     Q.   AND OBVIOUSLY TO TRY AND GET GAINS TO THE EXTENT POSSIBLE;

12:43PM  4     RIGHT?

12:43PM  5     A.   CORRECT.

12:43PM  6     Q.   AND HOW MANY -- YOU HAD TESTIFIED THAT I THINK YOU HAD

12:43PM  7     BEEN THERE HOW MANY YEARS AGAIN?  I'M SORRY.

12:43PM  8     A.   TODAY?  GOING ON 17.  I STARTED IN 2005.

12:43PM  9     Q.   OKAY.  SO FROM 2005 TO 2014, HOW MANY OTHER DIRECT

12:43PM 10     INVESTMENTS IN PRIVATE COMPANIES DID YOU DO THAT WERE NOT

12:43PM 11     AFFILIATED WITH PRIVATE EQUITY INVESTMENTS?

12:43PM 12     A.   NONE.

12:43PM 13     Q.   NONE?  THIS WAS THE FIRST ONE?

12:43PM 14     A.   CORRECT.

12:43PM 15     Q.   AND THIS WAS SOMEWHAT UNIQUE?

12:43PM 16     A.   YES.

12:43PM 17     Q.   AND THIS WAS AN INVESTMENT THAT HAD TO BE APPROVED BEFORE

12:43PM 18     IT COULD BE FUNDED; RIGHT?

12:43PM 19     A.   CORRECT.

12:43PM 20     Q.   AND WHO, WHO HAD AUTHORITY -- DID YOU HAVE AUTHORITY TO

12:43PM 21     APPROVE THE INVESTMENT?

12:43PM 22     A.   NO.

12:43PM 23     Q.   WHO HAD AUTHORITY TO MAKE THE INVESTMENT DECISION?

12:43PM 24     A.   THE MEMBERS OF THE INVESTMENT COMMITTEE.

12:44PM 25     Q.   OKAY.  SO THAT'S A -- MEMBERS OF THE DEVOS FAMILY?

12:44PM  1    A.   CORRECT.

12:44PM  2    Q.   AND HOW FREQUENTLY DID YOU COMMUNICATE DIRECTLY WITH THE

12:44PM  3    MEMBERS OF THE DEVOS FAMILY ABOUT THE THERANOS INVESTMENT?

12:44PM  4    A.   WE HAD A LOT OF CONVERSATION, I DID DIRECTLY WITH THE

12:44PM  5    INVESTMENT -- THE TWO INVESTMENT COMMITTEE MEMBERS THAT WERE ON

12:44PM  6    THE AIRPLANE ON THE RIDE TO THE DILIGENCE MEETING THAT WE HAD.

12:44PM  7         AND THEN EVERYTHING FROM THERE WENT THROUGH

12:44PM  8    JERRY TUBERGEN.

12:44PM  9    Q.   OKAY.  SO YOU TALKED TO -- I'M SORRY, WERE YOU DONE?  I

12:44PM  10   DIDN'T MEAN TO INTERRUPT.

12:44PM  11   A.   YES.

12:44PM  12   Q.   OKAY.  YOU TALKED ON THE PLANE RIDE OUT TO THE COMPANY?

12:44PM  13   A.   YES.

12:44PM  14   Q.   AND IS THAT IT?

12:44PM  15   A.   DIRECTLY WITH THE FAMILY MEMBERS?

12:44PM  16   Q.   YEAH.

12:44PM  17   A.   THERE MIGHT HAVE BEEN ONE OR TWO EMAIL EXCHANGES WITH

12:44PM  18   RICK DEVOS AND THAT WAS ABOUT IT.

12:44PM  19   Q.   AND IS RICK DEVOS WHAT THEY CALL A GENERATION THREE FAMILY

12:44PM  20   MEMBER?  IS THAT RIGHT?

12:45PM  21   A.   YES.

12:45PM  22   Q.   SO THAT MEANS THAT HE'S --

12:45PM  23   A.   THE OLDEST OF THE GRANDCHILDREN OF THE PATRIARCH.

12:45PM  24   Q.   SO THAT'S KIND OF TWO LEVELS DOWN FROM THE PATRIARCH; IS

12:45PM  25   THAT RIGHT?

12:45PM 1    A.   YES.

12:45PM 2    Q.   AND HE WAS ON THE INVESTMENT COMMITTEE?

12:45PM 3    A.   AT THE TIME, YES.

12:45PM 4    Q.   AND HE TOOK THE TRIP OUT TO THERANOS?

12:45PM 5    A.   YES.

12:45PM 6    Q.   OKAY.  AND JUST SO WE HAVE A SENSE OF WHERE THE OTHER

12:45PM 7    FOLKS FALL, WHERE IN THE GENERATIONS DO THE OTHER INVESTMENT

12:45PM 8    COMMITTEE MEMBERS FALL?

12:45PM 9    A.   DOUG DEVOS WAS THE CHAIRMAN OF THE INVESTMENT COMMITTEE AT

12:45PM 10   THE TIME AND HE'S ONE OF THE SONS OF THE PATRIARCH; AND THEN

12:45PM 11   THERE'S CHERI DEVOS WHO WENT ON THE TRIP, AND SHE WAS NOT ON

12:45PM 12   THE INVESTMENT COMMITTEE, BUT SHE'S A FAMILY MEMBER AND THEY

12:45PM 13   OFTEN -- FAMILY MEMBERS KIND OF CAME IN AND OUT OF THE

12:45PM 14   INVESTMENT COMMITTEE.  SO IT WASN'T UNUSUAL FOR HER TO GO.

12:45PM 15        AND THEN THE OTHER TWO MEMBERS OF THE INVESTMENT COMMITTEE

12:45PM 16   FROM THE GENERATION TWO WAS DOUG DEVOS -- OR I'M SORRY --

12:45PM 17   DAN DEVOS AND I BELIEVE DICK DEVOS.

12:46PM 18   Q.   OKAY.  SO IS IT DAN DEVOS, DOUG DEVOS, AND DICK DEVOS

12:46PM 19   REPRESENTED GENERATION TWO?

12:46PM 20   A.   YES.

12:46PM 21   Q.   AND RICK DEVOS REPRESENTED GENERATION ONE ON THE

12:46PM 22   INVESTMENT COMMITTEE?

12:46PM 23   A.   GENERATION THREE.

12:46PM 24   Q.   GENERATION THREE, I APOLOGIZE.

12:46PM 25   A.   AND THEN THERE WERE TWO OTHER GENERATION THREE MEMBERS ON

```
12:46PM   1    THE INVESTMENT COMMITTEE AT THE TIME.

12:46PM   2    Q.   AND MR. TUBERGEN REPORTS DIRECTLY TO THE INVESTMENT

12:46PM   3    COMMITTEE AND TO THE DEVOS FAMILY; IS THAT RIGHT?

12:46PM   4    A.   YES.

12:46PM   5    Q.   OKAY.  AND THE ENTITY THAT ACTUALLY INVESTED IN THIS

12:46PM   6    COMPANY WAS CALLED DYNASTY FINANCIAL II LLC; CORRECT?

12:46PM   7    A.   YES.

12:46PM   8    Q.   AND DO YOU KNOW WHO OWNS THAT?

12:46PM   9    A.   I DON'T KNOW THE BENEFICIAL OWNERS OF THE ENTITY, NO.

12:46PM  10    Q.   DO YOU KNOW -- WHAT DO YOU KNOW ABOUT THE ENTITY?  DOES

12:46PM  11    THE ENTITY HAVE A BOARD?

12:47PM  12    A.   NO.

12:47PM  13    Q.   IT DOESN'T?

12:47PM  14    A.   NO.  WE USUALLY CREATE A NEW ENTITY FOR ALL OF OUR

12:47PM  15    INVESTMENTS.  THIS PARTICULAR ONE I KNOW HAD MULTIPLE ASSETS IN

12:47PM  16    IT, BUT I'M NOT PRIVY TO ALL OF THE OWNERS OF THAT ENTITY.

12:47PM  17    Q.   OKAY.  THE INVESTMENT IN TOTAL WAS $100 MILLION; IS THAT

12:47PM  18    RIGHT?

12:47PM  19    A.   99 SOMETHING RATHER, YES.

12:47PM  20    Q.   OKAY.  AND THERE ARE DOCUMENTS WITHIN THE RDV THAT SUGGEST

12:47PM  21    80 MILLION OF THAT IS ATTRIBUTED TO RDV.  ARE YOU FAMILIAR WITH

12:47PM  22    THAT?

12:47PM  23    A.   NO.

12:47PM  24    Q.   DO YOU KNOW -- DO YOU KNOW WHETHER THERE WAS ANOTHER

12:47PM  25    ENTITY THAT HELD 20 MILLION?
```

12:47PM  1    A.   THE ONLY OTHER INDIVIDUALS OUTSIDE OF THE FAMILY THAT

12:47PM  2    WOULD HAVE BEEN INVESTING AT THAT POINT IN TIME WAS THE

12:47PM  3    EXECUTIVE STAFF.

12:47PM  4    Q.   OKAY.

12:47PM  5    A.   JERRY.

12:47PM  6    Q.   SO SENIOR LEADERSHIP COULD CHOOSE TO PARTICIPATE IN THAT,

12:47PM  7    TOO?

12:47PM  8    A.   CORRECT.

12:47PM  9    Q.   AND YOU DON'T KNOW WHETHER THEY DID OR NOT?

12:47PM  10   A.   I DON'T.

12:47PM  11   Q.   OKAY.  THERE ARE DOCUMENTS THAT REFER TO WINDQUEST.

12:48PM  12   A.   YES.

12:48PM  13   Q.   AND WHAT IS WINDQUEST?

12:48PM  14   A.   WINDQUEST IS DICK AND BETSY'S FAMILY OFFICE.  IT'S THE

12:48PM  15   NAME OF THEIR FAMILY OFFICE.  SO THERE ARE THE C-2 GENERATION,

12:48PM  16   THE FOUR SIBLINGS EACH HAVE THEIR OWN OUTSIDE INTERESTS OUTSIDE

12:48PM  17   OF RDV CORPORATION, IN WHICH THEY HAVE -- SOME OF THEM HAVE

12:48PM  18   FAMILY OFFICES, NAMES OF THEIR FAMILY OFFICES, AND THAT WOULD

12:48PM  19   BE ONE OF THEM.

12:48PM  20   Q.   DID YOU SAY THERE WERE FOUR GENERATION TWO DEVOS MEMBERS?

12:48PM  21   A.   YES.

12:48PM  22   Q.   AND THEY HAVE INDIVIDUAL FAMILY OFFICES IN ADDITION TO THE

12:48PM  23   RDV FAMILY OFFICE?

12:48PM  24   A.   YES.

12:48PM  25   Q.   AND DO YOU KNOW WHETHER WINDQUEST INVESTED IN THE THERANOS

12:48PM   1    TRANSACTION?

12:48PM   2    A.   I DON'T KNOW.

12:48PM   3    Q.   OKAY.  DOUG DEVOS WHO, YOU MENTIONED, HE'S ALSO THE CEO OF

12:48PM   4    AMWAY; IS THAT RIGHT?

12:48PM   5    A.   HE WAS.  HE'S NO LONGER.

12:49PM   6    Q.   OKAY.  CAN I DRAW YOUR ATTENTION TO 2170 IN YOUR BINDER.

12:49PM   7         THE CLERK:  2107?

12:49PM   8         MR. WADE:  NO.  IT'S A NEW EXHIBIT.

12:49PM   9         THE WITNESS:  OKAY.

12:49PM  10    BY MR. WADE:

12:49PM  11    Q.   LET ME KNOW WHEN YOU HAVE THAT IN FRONT OF YOU.

12:49PM  12    A.   I DO.

12:49PM  13    Q.   DO YOU RECOGNIZE THAT TO BE AN EMAIL RELATING TO THE

12:50PM  14    CLOSING OF THE THERANOS INVESTMENT THAT YOU'RE ON?

12:50PM  15    A.   I'M SORRY, SAY THE QUESTION AGAIN.

12:50PM  16    Q.   DO YOU RECOGNIZE THAT THIS IS AN EMAIL THAT RELATES TO THE

12:50PM  17    CLOSING OF THE THERANOS INVESTMENT?

12:50PM  18    A.   YES.

12:50PM  19    Q.   AND DO YOU SEE YOUR NAME IS ON THE EMAIL?

12:50PM  20    A.   YES.

12:50PM  21    Q.   OKAY.

12:50PM  22         MOVE THE ADMISSION OF 2170.

12:50PM  23         MR. LEACH:  NO OBJECTION.

12:50PM  24         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:50PM  25         (DEFENDANT'S EXHIBIT 2170 WAS RECEIVED IN EVIDENCE.)

BY MR. WADE:

Q.   AND WE CAN JUST LOOK AT THE TOP.

     DO YOU SEE THAT THIS INDICATES THAT THE INVESTMENT, THE

SIGNED INVESTMENT DOCUMENTATION WAS SENT BY MR. TUBERGEN TO

MR. BALWANI ON 10-31-2014?

     DO YOU SEE THAT?

A.   YES.

Q.   AND IF WE GO TO THE SECOND PAGE, THIS IS THE, THIS IS THE

EXECUTED MASTER SIGNATURE PAGE?

A.   CORRECT.

Q.   AND ON YOUR DIRECT TESTIMONY, MR. LEACH SHOWED YOU SOME

ELECTRONIC FILES WITH ALL OF THE PAPERWORK FOR THE INVESTMENT.

     DO YOU RECALL THAT?

A.   YES.

Q.   AND THIS IS THE EXECUTED VERSION OF IT; CORRECT?

A.   IT'S THE SIGNATURE PAGE FOR THOSE DOCUMENTS, YES.

Q.   OKAY.  AND WHO IS THE PERSON WHO IS SIGNING HERE?  WHO IS

THAT PERSON?

A.   ROBERT SCHIERBEEK.

Q.   AND WHO IS HE?

A.   HE RUNS THE FAMILY SIDE OF THE OFFICE, AND HE WAS THE COO

OF RDV CORPORATION WHICH OWNED DYNASTY FINANCIAL, AND HE'S THE

SIGNOR FOR THE ENTITY.

Q.   OKAY.  SO IS THAT THE NUMBER 2 -- IS HE THE NUMBER 2

PERSON WITHIN THE FAMILY OFFICE?

12:51PM 1   A.   MR. SCHIERBEEK AND -- MR. DAMSTRA WOULD BE ON THE

12:51PM 2   INVESTMENT SIDE, AND MR. SCHIERBEEK WAS RUNNING THE FAMILY

12:52PM 3   SERVICES SIDE.

12:52PM 4   Q.   OKAY.

12:52PM 5   A.   THE FAMILY SIDE CONTROLS THE BANK, THE MONEY, AND THAT'S

12:52PM 6   WHY HE'S THE SIGNER.

12:52PM 7   Q.   OKAY.  SO ONCE THERE'S, THERE'S APPROVAL OF THE

12:52PM 8   INVESTMENT, THEN MR. -- IS IT SCHIERBEEK?

12:52PM 9   A.   SCHIERBEEK.

12:52PM 10  Q.   -- SCHIERBEEK HAS THE AUTHORITY TO DISBURSE THE FUNDS TO

12:52PM 11  FUND THE INVESTMENT?

12:52PM 12  A.   CORRECT.

12:52PM 13  Q.   OKAY.  LET ME BACK UP TO THE START OF THE RELATIONSHIP

12:53PM 14  WITH THERANOS.

12:53PM 15       IS IT YOUR UNDERSTANDING THAT MR. DAN MOSLEY INTRODUCED

12:53PM 16  RDV TO THE THERANOS INVESTMENT?

12:53PM 17  A.   THAT'S MY UNDERSTANDING, YES.

12:53PM 18  Q.   AND MR. MOSLEY WAS A PARTNER AT THE LAW FIRM OF

12:53PM 19  CRAVATH, SWAINE & MOORE IN NEW YORK CITY?

12:53PM 20  A.   YES.

12:53PM 21  Q.   AND HE HAD PREVIOUSLY DONE SOME WORK FOR THE DEVOS FAMILY?

12:53PM 22  A.   YES.

12:53PM 23  Q.   AND CRAVATH IS ONE OF THE MOST REPUTABLE CORPORATE LAW

12:53PM 24  FIRMS IN THE WORLD; CORRECT?

12:53PM 25  A.   I DON'T KNOW.

12:53PM 1    Q.   OKAY.  DO YOU KNOW IT TO BE A HIGHLY REPUTABLE CORPORATE

12:53PM 2    LAW FIRM?

12:53PM 3    A.   I DON'T KNOW.

12:53PM 4    Q.   OKAY.  DO YOU KNOW THAT MR. MOSLEY ALSO HAD CLOSE TIES

12:53PM 5    WITH BDT CAPITAL?

12:53PM 6    A.   NOT AT THE TIME, NO.

12:53PM 7    Q.   BUT YOU KNOW THAT NOW?

12:53PM 8    A.   YES.

12:53PM 9    Q.   OKAY.  HE NOW WORKS AT BDT CAPITAL; RIGHT?

12:54PM 10   A.   YES, I KNOW THAT.

12:54PM 11   Q.   AND THE MEETING THAT WAS SCHEDULED -- THAT YOU TESTIFIED

12:54PM 12   TO ON DIRECT WHERE MR. TUBERGEN AND MS. HOLMES MET INITIALLY,

12:54PM 13   THAT WAS AT THE BDT CAPITAL CONFERENCE; CORRECT?

12:54PM 14   A.   YES.

12:54PM 15   Q.   OKAY.  AND THAT'S A MEETING IN CHICAGO; RIGHT?

12:54PM 16   A.   YES.

12:54PM 17   Q.   AND THAT'S HOSTED BY THAT INVESTMENT FIRM; CORRECT?

12:54PM 18   A.   CORRECT.

12:54PM 19   Q.   AND BDT CAPITAL IS A FIRM THAT WAS FOUNDED BY

12:54PM 20   MR. BYRON TROTT?

12:54PM 21   A.   YES.

12:54PM 22   Q.   AND MR. TROTT IS A FORMER SENIOR BANKER AT GOLDMAN SACHS;

12:54PM 23   CORRECT?

12:54PM 24   A.   YES.

12:54PM 25   Q.   AND HE STARTED THIS FIRM FOCUSSING ON A NICHE RELATED TO

12:54PM  1    PRIVATE FAMILY INVESTMENT; IS THAT RIGHT?

12:54PM  2    A.   YES.

12:54PM  3    Q.   AND IS IT FAIR TO SAY, IF YOU KNOW, THAT MR. TROTT IS

12:55PM  4    REPUTED TO BE ONE OF THE WISEST INVESTMENT BANKERS AROUND IN

12:55PM  5    THIS SPACE?

12:55PM  6    A.   YES.

12:55PM  7    Q.   AND, IN FACT, THE DEVOS FAMILY INVESTS MONEY NOW WITH

12:55PM  8    MR. TROTT; CORRECT?

12:55PM  9    A.   WE DID IN THEIR FUND 2, AND WE DID NOT IN THEIR FUND 3.

12:55PM  10   Q.   OKAY.  AND MR. TUBERGEN WAS IN CHICAGO TO ATTEND THE

12:55PM  11   CONFERENCE THAT BDT HOSTS EVERY YEAR; RIGHT?

12:55PM  12   A.   YES.

12:55PM  13   Q.   AND HE WAS ACTUALLY THERE TO SPEAK AT THE CONFERENCE;

12:55PM  14   RIGHT?

12:55PM  15   A.   MR. TUBERGEN?

12:55PM  16   Q.   YES.

12:55PM  17   A.   NOT MY RECOLLECTION.

12:55PM  18   Q.   DO YOU RECALL THAT MR. TUBERGEN SPOKE AT THE CONFERENCE

12:56PM  19   AND GAVE A PRESENTATION ON HOW TO HAVE INVESTMENT SUCCESS?

12:56PM  20   A.   I WAS NOT TOLD THAT.  I DON'T KNOW.

12:56PM  21   Q.   LET'S TAKE A LOOK AT 1938 TO SEE IF THAT REFRESHES YOUR

12:56PM  22   RECOLLECTION.

12:56PM  23        THE CLERK:  WHAT EXHIBIT NUMBER, COUNSEL?

12:56PM  24        MR. WADE:  1938.

12:56PM  25        THE CLERK:  THANK YOU.

12:56PM  1                    THE WITNESS:  OKAY.

12:56PM  2       BY MR. WADE:

12:56PM  3       Q.  DO YOU RECOGNIZE THAT TO BE AN AGENDA FOR THAT BDT CAPITAL

12:56PM  4       CONFERENCE?

12:56PM  5       A.  NO.  I WAS NOT THERE.  I WAS AT A DIFFERENT MEETING.  WE

12:56PM  6       ONLY FLEW HOME TOGETHER.

12:56PM  7       Q.  RIGHT.  DO YOU RECOGNIZE THAT IT IS CAPTIONED AS A --

12:56PM  8       A.  I'VE NEVER SEEN THIS BEFORE.

12:56PM  9       Q.  OKAY.  TAKE A LOOK AT THE FOURTH PAGE -- OR, I'M SORRY,

12:56PM  10      THE LAST PAGE, THE EIGHTH PAGE IN THE DOCUMENT.

12:57PM  11      A.  THE EIGHTH PAGE?

12:57PM  12      Q.  THE LAST PAGE IN THE DOCUMENT.

12:57PM  13      A.  OKAY.

12:57PM  14      Q.  DO YOU SEE THAT?

12:57PM  15      A.  YES.

12:57PM  16      Q.  DOES THAT REFRESH YOUR RECOLLECTION THAT MR. TUBERGEN

12:57PM  17      SPOKE ON A PANEL WHERE HE PROVIDED EXPERT ADVICE ON INVESTMENT

12:57PM  18      SUCCESS?

12:57PM  19      A.  I DID NOT KNOW THAT.

12:57PM  20      Q.  DID YOU CONSIDER HIM TO BE AN EXPERT ON INVESTMENTS,

12:57PM  21      MR. TUBERGEN?

12:57PM  22      A.  YES.

12:57PM  23      Q.  WERE YOU AWARE THAT -- WERE YOU GIVEN A BRIEFING OF

12:57PM  24      EVERYTHING THAT HAPPENED AT THE BDT CONFERENCE BY MR. TUBERGEN?

12:57PM  25      A.  AT THE CONFERENCE, NO.

12:57PM   1    Q.   WERE YOU GIVEN A DEBRIEFING ON ALL OF HIS INTERACTIONS

12:57PM   2    WITH DAN MOSLEY?

12:57PM   3    A.   NO.

12:57PM   4    Q.   WERE YOU GIVEN A BRIEFING ON ALL OF HIS INTERACTIONS WITH

12:58PM   5    BYRON TROTT?

12:58PM   6    A.   NO.

12:58PM   7    Q.   AND WERE YOU GIVEN A DEBRIEFING ON ALL OF HIS INTERACTIONS

12:58PM   8    WITH THE WALTON FAMILY?

12:58PM   9    A.   NO.

12:58PM  10    Q.   AND DO YOU KNOW WHO THE WALTON FAMILY IS?

12:58PM  11    A.   YES.

12:58PM  12    Q.   AND THAT'S THE WAL-MART HEIRS?

12:58PM  13    A.   YES.

12:58PM  14    Q.   AND YOU UNDERSTOOD THAT THEY LATER INVESTED IN THERANOS?

12:58PM  15    A.   YES, I KNOW THAT.

12:58PM  16    Q.   AND WERE YOU AWARE THAT THEY ATTENDED THE BDT CONFERENCE?

12:58PM  17    A.   NO.

12:58PM  18    Q.   WERE YOU AWARE THAT THEY WERE CLIENTS OF DAN MOSLEY?

12:58PM  19    A.   NO.  AND AT THE TIME WE WEREN'T AWARE THAT THEY WERE AN

12:58PM  20    INVESTOR.

12:58PM  21    Q.   OKAY.  WE'LL GET TO THAT.

12:58PM  22         BUT COMING OUT OF THIS CONFERENCE, YOU DIDN'T GET A

12:58PM  23    DEBRIEFING FROM MR. TUBERGEN ABOUT THE INTERACTIONS THAT HE HAD

12:58PM  24    WITH RESPECT TO THOSE INDIVIDUALS?

12:58PM  25    A.   NO.

Case 5:18-cr-00258-EJD Document 1745, Filed 01/18/23, Page 147 of 290

12:58PM  1   Q.   AND DID YOU GET A DEBRIEFING WITH RESPECT TO ALL OF THE

12:58PM  2   INTERACTIONS AND DISCUSSIONS THAT HE MAY HAVE HAD WITH -- ABOUT

12:58PM  3   THERANOS?

12:58PM  4   A.   WE TALKED ABOUT THERANOS.  WE TALKED A LOT ABOUT THE, THE

12:59PM  5   MEETING THAT JERRY HAD DIRECTLY WITH CHRISTIAN AND

12:59PM  6   ELIZABETH HOLMES.

12:59PM  7   Q.   ALL RIGHT.  SO YOU TALKED ABOUT THE MEETING, AND I'LL ASK

12:59PM  8   YOU SOME QUESTIONS ABOUT THAT IN A SECOND.

12:59PM  9   A.   UH-HUH.

12:59PM  10  Q.   DID YOU TALK -- DID YOU TALK AT ALL WITH MR. TUBERGEN

12:59PM  11  ABOUT ANY OTHER INTERACTIONS THAT HE HAD AT THE BDT CAPITAL

12:59PM  12  CONFERENCE WITH RESPECT TO THERANOS?

12:59PM  13  A.   NO, NO.

12:59PM  14  Q.   OKAY.  ARE YOU AWARE THAT, ARE YOU AWARE THAT MS. HOLMES

12:59PM  15  SPOKE ON A PANEL AT THE BDT CONFERENCE?

12:59PM  16  A.   NO.

12:59PM  17  Q.   OKAY.  ARE YOU AWARE THAT MS. HOLMES HOSTED A DINNER WITH

12:59PM  18  TOBY COSGROVE FROM THE CLEVELAND CLINIC AT THE BDT CONFERENCE?

12:59PM  19  A.   NO.

12:59PM  20  Q.   AND YOU DIDN'T HAVE ANY DISCUSSIONS WITH MR. TUBERGEN

12:59PM  21  ABOUT ANY OF THOSE KINDS OF TOPICS?

12:59PM  22  A.   NO.

01:00PM  23       (PAUSE IN PROCEEDINGS.)

01:00PM  24  BY MR. WADE:

01:00PM  25  Q.   NOW, YOU TALKED ABOUT THE MEETING THAT MR. TUBERGEN HAD

```
01:00PM   1    WITH ELIZABETH HOLMES, CHRISTIAN HOLMES, AND DAN MOSLEY.

01:00PM   2         DO YOU RECALL THAT?

01:00PM   3    A.   YES.

01:00PM   4    Q.   AND THAT HAPPENED AT THAT CONFERENCE; CORRECT?

01:00PM   5    A.   YES.

01:00PM   6    Q.   AND THAT WAS A MEETING THAT WAS BROKERED BY MR. MOSLEY;

01:00PM   7    CORRECT?

01:00PM   8    A.   THAT'S MY UNDERSTANDING.

01:00PM   9    Q.   AND, AGAIN, YOU DON'T KNOW WHAT INFORMATION MR. MOSLEY

01:00PM  10    IMPARTED TO MR. TUBERGEN IN ADVANCE OF THAT MEETING; CORRECT?

01:00PM  11    A.   NO.  ONLY THAT HE WAS EXCITED ABOUT THE OPPORTUNITY.

01:00PM  12    Q.   OKAY.  AND ARE YOU AWARE IF MR. MOSLEY PROVIDED

01:01PM  13    MR. TUBERGEN WITH ANY MATERIALS IN ADVANCE OF THAT MEETING?

01:01PM  14    A.   NO.

01:01PM  15    Q.   TAKE A LOOK AT 12571.

01:01PM  16    A.   125 --

01:01PM  17    Q.   12571.

01:01PM  18         THE COURT:  12751?

01:01PM  19         MR. WADE:  YES, YOUR HONOR, 12751.  MY APOLOGIES.

01:02PM  20         THE WITNESS:  OKAY.

01:02PM  21    BY MR. WADE:

01:02PM  22    Q.   AND DO YOU SEE THIS IS AN EMAIL ON SEPTEMBER 17TH, 2014

01:02PM  23    FROM DAN MOSLEY TO JERRY TUBERGEN?

01:02PM  24    A.   YES, I SEE THAT.

01:02PM  25    Q.   ATTACHING THE "FORTUNE" ARTICLE THAT YOU LOOKED AT
```

01:02PM   1    EARLIER; CORRECT?

01:02PM   2    A.   YES.

01:02PM   3    Q.   OKAY.  AND DO YOU RECALL THAT WHEN YOU WERE RIDING BACK TO

01:02PM   4    MICHIGAN FROM CHICAGO THAT MR. MOSLEY PULLED UP ON HIS COMPUTER

01:02PM   5    THE ARTICLE AND SHOWED IT TO YOU?

01:02PM   6    A.   NO.  NO, I DON'T RECALL THAT.

01:02PM   7    Q.   DO YOU RECALL MAKING PRIOR STATEMENTS IN CONNECTION WITH

01:02PM   8    PROCEEDINGS AND RELATING TO THERANOS THAT THAT'S WHAT HAPPENED?

01:02PM   9    A.   I THINK HE HAD IT IN -- ON PAPER.

01:02PM  10    Q.   OKAY.  DID -- IS THIS THE VERSION THAT HE SHOWED YOU?

01:02PM  11    A.   YES.

01:02PM  12    Q.   OKAY.

01:02PM  13         MOVE THE ADMISSION OF 12751.

01:03PM  14             MR. LEACH:  NO OBJECTION, YOUR HONOR.

01:03PM  15             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:03PM  16         (DEFENDANT'S EXHIBIT 12751 WAS RECEIVED IN EVIDENCE.)

01:03PM  17    BY MR. WADE:

01:03PM  18    Q.   OKAY.  YOU SEE 12751 AND YOU SEE THE ATTACHMENT THAT'S

01:03PM  19    SEPTEMBER 17TH, 2014?

01:03PM  20         DO YOU SEE THAT?

01:03PM  21    A.   YES.

01:03PM  22    Q.   AND THAT'S THE DATE OF THE MEETING THAT HAPPENED WITH

01:03PM  23    MS. HOLMES; CORRECT?

01:03PM  24    A.   YES.

01:03PM  25    Q.   AND YOU WROTE BACK THE NEXT DAY AFTER THAT MEETING ON THE

01:03PM   1    18TH; CORRECT?

01:03PM   2    A.   YES.

01:03PM   3    Q.   OKAY.  AND I THINK -- DO YOU SEE THERE THAT THE ATTACHMENT

01:03PM   4    SAYS THERANOS.PDF?

01:04PM   5        DO YOU SEE THAT?

01:04PM   6    A.   YES.

01:04PM   7    Q.   AND DO YOU RECOGNIZE THAT AS THE SAME FILE NAME AS THE

01:04PM   8    ATTACHMENT OF THE DOCUMENT THAT MR. LEACH SHOWED YOU PREVIOUSLY

01:04PM   9    WHERE MR. TUBERGEN SENT THE DOCUMENT TO THE DEVOS FAMILY?

01:04PM   10   A.   I'M SORRY, WHAT IS THE QUESTION?  IS THIS THE SAME ONE

01:04PM   11   THAT MR. LEACH SHOWED ME?  YES.

01:04PM   12   Q.   ALL RIGHT.  WE'LL TAKE THEM ONE AT A TIME TO MAKE SURE THE

01:04PM   13   RECORD IS CLEAR.

01:04PM   14   A.   YES.

01:04PM   15   Q.   YOU SEE IT'S THERANOS.PDF SENT 9-17-2014?

01:04PM   16   A.   YES.

01:04PM   17   Q.   AND THAT'S FROM DAN MOSLEY TO JERRY TUBERGEN; CORRECT?

01:04PM   18   A.   YES.

01:04PM   19   Q.   YOUR BOSS'S BOSS?

01:04PM   20   A.   YES.

01:04PM   21   Q.   LET'S PULL UP 1944.

01:04PM   22        THE CLERK:  IS THAT IN EVIDENCE, COUNSEL?

01:04PM   23        MR. WADE:  WHICH IS IN EVIDENCE.

01:04PM   24   Q.   AND DO YOU SEE THE ATTACHMENT THERE IS THERANOS.PDF?

01:05PM   25        DO YOU SEE THAT?

01:05PM 1    A.   YES.

01:05PM 2    Q.   AND THAT'S THE SAME, THAT'S THE SAME "FORTUNE" ARTICLE

01:05PM 3    THAT MR. TUBERGEN HAD SENT ON TO MEMBERS OF THE DEVOS FAMILY?

01:05PM 4         DO YOU SEE THAT?

01:05PM 5    A.   YES.

01:05PM 6    Q.   AND THOSE COMMUNICATIONS HAPPENED THE DAY AFTER THE

01:05PM 7    MEETING THAT MS. HOLMES HAD WITH MR. TUBERGEN; CORRECT?

01:05PM 8    A.   YES.

01:05PM 9    Q.   OKAY.  AND DO YOU SEE IN THIS DOCUMENT, IF YOU LOOK ON THE

01:05PM 10   THIRD LINE, IT SAYS, "I'D LIKE TO SEE IF WE CAN FIND 15 MINUTES

01:05PM 11   TOMORROW TO SHARE WITH YOU AND DISCUSS A VERY UNIQUE INVESTMENT

01:05PM 12   OPPORTUNITY WE MAY HAVE WITH HER COMPANY."

01:05PM 13        DO YOU SEE THAT?

01:05PM 14   A.   YES.

01:05PM 15   Q.   AND DO YOU KNOW WHETHER THAT MEETING HAPPENED?

01:06PM 16   A.   I DON'T KNOW.

01:06PM 17   Q.   DO YOU KNOW WHETHER A CALL HAPPENED?  WHETHER A CALL

01:06PM 18   HAPPENED?

01:06PM 19   A.   NO, I DON'T KNOW SPECIFICALLY.  I WAS NOT ON IT.

01:06PM 20   Q.   OKAY.  DO YOU KNOW WHETHER -- DO YOU KNOW WHETHER, AROUND

01:06PM 21   THIS TIME, MR. TUBERGEN WAS HAVING ANY COMMUNICATIONS WITH THE

01:06PM 22   MEMBERS OF THE DEVOS FAMILY?

01:06PM 23   A.   YES, HE WAS.

01:06PM 24   Q.   HE WAS.

01:06PM 25   A.   YES.

01:06PM 1    Q.   BUT YOU DON'T KNOW WHAT THE SUBSTANCE WAS?

01:06PM 2    A.   CORRECT.

01:06PM 3    Q.   YOU WEREN'T INVOLVED IN THOSE COMMUNICATIONS?

01:06PM 4    A.   I WASN'T INVOLVED IN THE COMMUNICATIONS, BUT I WAS ASKED

01:06PM 5    TO WORK ON IT, SO I KNOW THERE WAS COMMUNICATION GOING ON.

01:06PM 6    Q.   AND YOU SAY -- AND YOU WANTED TO WORK ON IT; CORRECT?

01:06PM 7    A.   YES.

01:06PM 8    Q.   AND YOU HAD A CONVERSATION ON THE PLANE ON THE 18TH WITH

01:06PM 9    MR. TUBERGEN AND MR. DAMSTRA; CORRECT?

01:06PM 10   A.   YES.

01:06PM 11   Q.   AND THEN ABOUT 12 DAYS WENT BY AND YOU HADN'T HEARD

01:06PM 12   ANYTHING, SO YOU ACTUALLY FOLLOWED UP WITH MR. DAMSTRA AND

01:06PM 13   SAID, IF THERE'S AN OPPORTUNITY, I'D LIKE TO, I'D LIKE TO WORK

01:06PM 14   ON THIS.

01:06PM 15        DO YOU RECALL THAT?

01:06PM 16   A.   I WAS ENTHUSED FROM THE VERY BEGINNING, AND I'M NOT ON THE

01:07PM 17   BDT RELATIONSHIP, SO I THOUGHT THAT THIS MIGHT GO TO THE PERSON

01:07PM 18   THAT WAS IN CHARGE OF BDT.

01:07PM 19   Q.   OKAY.  SO UNDER MR. DAMSTRA THERE'S A PERSON KIND OF AT

01:07PM 20   YOUR LEVEL, IF YOU WILL?

01:07PM 21   A.   YES.

01:07PM 22   Q.   I MEAN NO OFFENSE WHEN I SAY THAT, BUT A SIMILAR POSITION

01:07PM 23   WITHIN THE FAMILY OFFICE?

01:07PM 24   A.   YES.

01:07PM 25   Q.   AND THEY WERE RESPONSIBLE FOR BDT?

01:07PM  1    A.   CORRECT.

01:07PM  2    Q.   AND COMING OUT OF THIS, COMING OUT OF THIS MEETING,

01:07PM  3    BETWEEN THE TIME THAT YOU HAD THOSE INTERACTIONS WITH

01:07PM  4    MR. TUBERGEN AND THE TIME THAT YOU GOT ON THE PLANE TO GO TO

01:07PM  5    CALIFORNIA, YOU DIDN'T HAVE ANY INTERACTIONS WITH THE DEVOS

01:08PM  6    FAMILY MEMBERS ABOUT THIS?

01:08PM  7    A.   OTHER THAN SHARING MY MEMOS, NO.

01:08PM  8    Q.   WELL, YOU DON'T ACTUALLY KNOW WHETHER THEY GOT YOUR MEMOS,

01:08PM  9    DO YOU?

01:08PM  10   A.   YES, BECAUSE WE TALKED ABOUT IT ON THE PLANE.

01:08PM  11   Q.   DO YOU RECALL --

01:08PM  12   A.   WE WENT THROUGH THE MEMO ON THE PLANE.

01:08PM  13   Q.   OKAY.  DO YOU RECALL GIVING TESTIMONY IN THIS CASE IN

01:08PM  14   CONNECTION WITH THERANOS MATTERS PREVIOUSLY?

01:08PM  15   A.   YES.

01:08PM  16   Q.   OKAY.  DO YOU RECALL YOU WERE DEPOSED?  DO YOU REMEMBER

01:08PM  17   THAT?

01:08PM  18   A.   YES.

01:08PM  19   Q.   IN MICHIGAN?

01:08PM  20   A.   YES.

01:08PM  21   Q.   DO YOU RECALL THAT?

01:08PM  22        AND THERE WAS A COURT REPORTER LIKE OUR COURT REPORTER

01:08PM  23   HERE TAKING DOWN EVERYTHING THAT YOU SAID?

01:08PM  24        DO YOU RECALL THAT?

01:08PM  25   A.   YES.

01:08PM   1   Q.   OKAY.  AND YOU WERE UNDER OATH; RIGHT?

01:08PM   2   A.   YES.

01:08PM   3   Q.   AND YOU TOLD THE TRUTH IN THAT TESTIMONY, DID YOU NOT?

01:08PM   4   A.   IF YOU CAN SHOW ME WHAT YOU'RE REFERRING TO, MAYBE IT WILL

01:08PM   5   REFRESH MY MEMORY.

01:08PM   6   Q.   MY QUESTION IS JUST WHETHER YOU TOLD THE TRUTH.

01:08PM   7   A.   YES.

01:08PM   8   Q.   AND DID YOU TESTIFY IN THAT DEPOSITION THAT YOU DON'T KNOW

01:08PM   9   WHETHER THE DEVOS FAMILY MEMBERS REVIEWED ANY OF YOUR MEMOS?

01:09PM  10   A.   I KNOW THAT WE TALKED ABOUT ALL OF THE WORK THAT I HAD

01:09PM  11   DONE ON THE AIRPLANE ON THE WAY HERE, SO YES.

01:09PM  12   Q.   OKAY.

01:09PM  13   A.   I DON'T KNOW IF THEY HAD ACTUALLY PHYSICALLY PUT THEIR

01:09PM  14   EYES ON THE MEMO, BUT WE DEFINITELY TALKED ABOUT THE SUBSTANCE

01:09PM  15   OF MY MEMO ON THE PLANE.

01:09PM  16   Q.   OKAY.  OKAY.  I JUST WANT TO MAKE SURE OUR RECORD IS

01:09PM  17   CLEAR.

01:09PM  18        YOU DON'T KNOW WHETHER THEY READ YOUR MEMO; CORRECT?

01:09PM  19   A.   CORRECT.

01:09PM  20   Q.   BUT YOU DID HAVE DISCUSSIONS WITH THEM ON THE PLANE RIDE

01:09PM  21   ON THE WAY?

01:09PM  22   A.   YES, LOTS OF THEM.

01:09PM  23   Q.   OKAY.  DO YOU HAVE NOTES OF THOSE CONVERSATIONS?

01:09PM  24   A.   NO.

01:09PM  25   Q.   OKAY.  THE NEXT INTERACTION THAT YOU HAD WITH THERANOS --

01:09PM  1    WELL, LET ME STEP BACK.  LET ME ASK YOU ANOTHER QUESTION ABOUT

01:09PM  2    MR. MOSLEY.

01:09PM  3         ARE YOU AWARE THAT -- I WANT TO SHOW YOU A DOCUMENT.  IF

01:10PM  4    YOU LOOK AT 4197.

01:10PM  5    A.   OKAY.

01:10PM  6    Q.   AND THIS IS A DOCUMENT THAT YOU'VE SEEN BEFORE; CORRECT?

01:10PM  7    A.   I DON'T RECALL.  DEFINITELY NOT PRIOR TO OUR MAKING THE

01:11PM  8    INVESTMENT.

01:11PM  9    Q.   OKAY.  DO YOU RECALL -- LET'S TAKE IT ONE PIECE AT A TIME.

01:11PM 10         DO YOU RECALL WHETHER YOU'VE SEEN THIS DOCUMENT BEFORE?

01:11PM 11    A.   I DON'T RECALL.

01:11PM 12    Q.   OKAY.  LET'S LOOK AT 10587.  ACTUALLY, BEFORE I DO THAT,

01:11PM 13    LET ME JUST ASK A QUESTION ABOUT DO YOU KNOW WHETHER -- LET'S

01:11PM 14    GO TO 10587.

01:11PM 15              THE COURT:  10587?

01:12PM 16              MR. WADE:  YES.

01:12PM 17    Q.   DO YOU SEE THAT THIS IS AN EMAIL THAT WAS SENT TO YOU BY

01:12PM 18    HUGH FREUND IN 2017?  I'M LOOKING AT THE COVER EMAIL RIGHT NOW.

01:12PM 19    A.   YES.

01:12PM 20    Q.   OKAY.  AND DO YOU SEE THAT HE ATTACHES THE DOCUMENT THAT I

01:12PM 21    WAS REFERRING TO AS EXHIBIT 4197?

01:12PM 22    A.   OKAY, YES.

01:12PM 23    Q.   OKAY.

01:12PM 24         MOVE THE ADMISSION OF --

01:12PM 25         AND THIS IS AN INVESTMENT ANALYSIS THAT MR. MOSLEY DID IN

01:12PM  1    CONNECTION WITH THERANOS; CORRECT?

01:12PM  2    A.   CORRECT.

01:12PM  3    Q.   OKAY.

01:12PM  4         MOVE THE ADMISSION OF 10587.

01:13PM  5              MR. LEACH:  HEARSAY ON 10587, YOUR HONOR.  I HAVE NO

01:13PM  6    OBJECTION TO THE PRIOR EXHIBIT THAT WE WERE LOOKING AT.

01:13PM  7              THE COURT:  WILL THAT WORK FOR YOU, MR. WADE?

01:13PM  8              MR. WADE:  WHY DON'T WE TRY IT?

01:13PM  9              THE COURT:  4197?

01:13PM 10              MR. WADE:  IF THE GOVERNMENT IS OKAY WITH ME ASKING

01:13PM 11    QUESTIONS OF 4197, MAYBE I'LL JUST ASK THE QUESTION.

01:13PM 12              THE COURT:  SURE.

01:13PM 13              MR. WADE:  I MOVE THE ADMISSION OF 4197.

01:13PM 14              MR. LEACH:  NO OBJECTION.

01:13PM 15              THE COURT:  THAT'S ADMITTED, AND IT MAY BE

01:13PM 16    PUBLISHED.

01:13PM 17         (GOVERNMENT'S EXHIBIT 4197 WAS RECEIVED IN EVIDENCE.)

01:13PM 18    BY MR. WADE:

01:13PM 19    Q.   OKAY.  DO YOU SEE HERE THIS IS A DAY -- THIS IS A DAY --

01:13PM 20    OR A DOCUMENT FROM MR. MOSLEY.

01:13PM 21         DO YOU SEE THAT?

01:13PM 22    A.   YES.

01:13PM 23    Q.   AND THIS ONE IS ADDRESSED TO DR. KISSINGER?

01:13PM 24    A.   YES.

01:13PM 25    Q.   DO YOU RECOGNIZE THAT TO BE HENRY KISSINGER?

01:13PM   1    A.   YES.

01:13PM   2    Q.   OKAY.  AND ATTACHED TO THIS, IF YOU GO TO THE SECOND PAGE,

01:14PM   3    AND IT'S SEPTEMBER 2ND -- I'M SORRY.  IT'S SEPTEMBER 2ND, 2014;

01:14PM   4    RIGHT?

01:14PM   5    A.   BUT I DIDN'T SEE THIS UNTIL THREE YEARS LATER.

01:14PM   6    Q.   THAT'S NOT MY QUESTION, BUT WE'LL GET TO THAT.

01:14PM   7    A.   OKAY.  OKAY.

01:14PM   8    Q.   YOU SEE THAT IT'S DATED SEPTEMBER 2ND, 2014?

01:14PM   9    A.   YES.

01:14PM  10    Q.   OKAY.  AND THAT IS A COUPLE OF WEEKS BEFORE THE MEETING

01:14PM  11    THAT MR. MOSLEY AND MR. TUBERGEN AND MS. HOLMES HAD IN CHICAGO

01:14PM  12    AT THE BDT CONFERENCE; CORRECT?

01:14PM  13    A.   YES.

01:14PM  14    Q.   OKAY.  LET'S GO TO THE SECOND PAGE.

01:14PM  15         AND IF YOU LOOK, AND I WON'T GO THROUGH THE DETAILS OF IT

01:14PM  16    NOW, BUT IF WE JUST SCROLL THROUGH THE PAGES, THERE'S A PRETTY

01:14PM  17    DETAILED ANALYSIS THAT MR. MOSLEY HAD DONE WITH RESPECT TO

01:14PM  18    THERANOS; CORRECT?

01:14PM  19    A.   IT APPEARS THAT WAY, YES.

01:15PM  20    Q.   OKAY.  OKAY.

01:15PM  21         AND DO YOU KNOW WHETHER THIS DOCUMENT WAS COMMUNICATED TO

01:15PM  22    MR. TUBERGEN BEFORE HIS MEETING WITH MS. HOLMES?

01:15PM  23    A.   NOT TO MY KNOWLEDGE.

01:15PM  24    Q.   OKAY.  BUT YOU DON'T KNOW; CORRECT?

01:15PM  25    A.   I DON'T KNOW.

01:15PM   1    Q.   OKAY.  AND DO YOU KNOW WHETHER THE SUBSTANCE OF THIS

01:15PM   2    ANALYSIS WAS COMMUNICATED ORALLY BY MR. MOSLEY TO MR. TUBERGEN

01:15PM   3    IN PART OR IN WHOLE?

01:15PM   4    A.   I DON'T KNOW.

01:15PM   5    Q.   OKAY.  THIS DOCUMENT, DO YOU RECALL THAT THIS DOCUMENT WAS

01:15PM   6    LATER COMMUNICATED TO YOU IN YOUR GMAIL ACCOUNT?

01:15PM   7    A.   YES.

01:15PM   8    Q.   AND DO YOU ORDINARILY USE YOUR GMAIL ACCOUNT FOR BUSINESS

01:16PM   9    MATTERS?

01:16PM   10   A.   NOT REGULARLY, NO.

01:16PM   11   Q.   OKAY.  AND DO YOU RECALL THEN THAT YOU FORWARDED THIS

01:16PM   12   DOCUMENT FROM YOUR GMAIL ACCOUNT TO A GMAIL ACCOUNT AND A HOME

01:16PM   13   ACCOUNT RELATING TO MR. TUBERGEN?

01:16PM   14   A.   YES.

01:16PM   15   Q.   OKAY.  DO YOU NORMALLY COMMUNICATE WITH MR. TUBERGEN ABOUT

01:16PM   16   MATTERS WITH WORK EMAIL?

01:16PM   17   A.   NO.

01:16PM   18   Q.   NO?

01:16PM   19   A.   I NORMALLY COMMUNICATE WITH MR. TUBERGEN WITH MY WORK

01:16PM   20   EMAIL, YES.

01:16PM   21   Q.   YOU DO?

01:16PM   22   A.   YES.

01:16PM   23   Q.   SO NORMALLY YOU SEND IT FROM YOUR WORK EMAIL TO HIS WORK

01:16PM   24   EMAIL; RIGHT?

01:16PM   25   A.   YES.

01:16PM 1   Q.   OKAY.  AND WERE -- IS THE FACT THAT IT WAS BEING

01:16PM 2   COMMUNICATED BY GMAIL SOME INDICATION THAT YOU WERE TRYING TO

01:17PM 3   HIDE THE DOCUMENT?

01:17PM 4   A.   EVERYTHING AROUND THIS, WE WERE TRYING TO UNDERSTAND

01:17PM 5   MR. MOSLEY'S ROLE IN THE THERANOS INVESTMENT, AND WE COULDN'T

01:17PM 6   FIGURE IT OUT, AND WE HAD NOT SEEN THIS.

01:17PM 7        AND ONE OF THE OTHER -- ONCE WE UNDERSTOOD WHO THE OTHER

01:17PM 8   INVESTORS WERE, ONE OF THE OTHER INVESTORS GAVE US THIS.

01:17PM 9   Q.   OKAY.

01:17PM 10  A.   AND UNTIL WE UNDERSTOOD WHAT HIS ROLE WAS IN ALL OF THIS.

01:17PM 11  Q.   NO, I UNDERSTAND THAT.  FAIR ENOUGH.

01:17PM 12  A.   UH-HUH.

01:17PM 13  Q.   YOU WERE DOING SOME WORK TO FIGURE OUT -- THIS IS YEARS

01:17PM 14  LATER; RIGHT?

01:17PM 15  A.   YES.

01:17PM 16  Q.   AND YOU WERE DOING SOME WORK TO FIGURE OUT WHAT

01:17PM 17  MR. MOSLEY'S ROLE IN THE INVESTMENTS WAS; RIGHT?

01:17PM 18  A.   CORRECT, AND WHETHER HE WAS COMPENSATED.

01:17PM 19  Q.   AND HE HAD ACTUALLY -- PRIOR TO THE INVESTMENT, HE HAD

01:17PM 20  DONE LEGAL WORK FOR THE DEVOS FAMILY; CORRECT?

01:17PM 21  A.   CORRECT.

01:17PM 22  Q.   OKAY.  MY QUESTION IS, AS YOU'RE TRYING TO FIGURE THIS

01:18PM 23  OUT, IS THERE A REASON THAT THESE DOCUMENTS ARE BEING

01:18PM 24  COMMUNICATED IN GMAIL AS OPPOSED TO WORK EMAIL?

01:18PM 25  A.   BECAUSE AT THIS TIME THERE WAS ALL KINDS OF ISSUES GOING

01:18PM  1    ON AROUND THE COMPANY, AND WE DIDN'T KNOW WHETHER MR. MOSLEY --

01:18PM  2    WHAT HIS ROLE WAS IN ALL OF THIS AND, FRANKLY, WE DID NOT WANT

01:18PM  3    TO GET HIM IN TROUBLE.

01:18PM  4    Q.   OKAY.  SO YOU WANTED TO KEEP IT UNDER YOUR HAT?

01:18PM  5    A.   CORRECT.

01:18PM  6    Q.   SO YOU KIND OF HID THE DOCUMENT?

01:18PM  7         IS THAT FAIR?

01:18PM  8    A.   SOMEWHAT, YES.

01:18PM  9    Q.   DO YOU KNOW -- YOU TESTIFIED THAT MR. MOSLEY WORKED AT THE

01:18PM  10   LAW FIRM OF CRAVATH, SWAINE & MOORE.

01:18PM  11        DO YOU RECALL THAT?

01:18PM  12   A.   YES.

01:18PM  13   Q.   AND DO YOU RECALL THAT LEARNING, DURING YOUR WORK RELATING

01:18PM  14   TO THERANOS, THAT HE USED -- THAT THERANOS HAD A LAWYER BY THE

01:18PM  15   NAME OF MR. DAVID BOIES?

01:18PM  16   A.   YES, I KNEW THAT.

01:18PM  17   Q.   AND WERE YOU AWARE THAT MR. DAVID BOIES USED TO BE LAW

01:19PM  18   PARTNERS WITH MR. MOSLEY AT CRAVATH, SWAINE & MOORE?

01:19PM  19   A.   NO.

01:19PM  20   Q.   WERE YOU AWARE AT ANY TIME THAT MR. MOSLEY WAS DOING DUE

01:19PM  21   DILIGENCE AND OBTAINING INFORMATION FROM DAVID BOIES IN

01:19PM  22   CONNECTION WITH THERANOS?

01:19PM  23   A.   NO.

01:19PM  24              MR. LEACH:  FOUNDATION.  RELEVANCE.

01:19PM  25              THE COURT:  I'LL ALLOW IT.  YOU CAN --

BY MR. WADE:

Q.   ARE YOU -- DO YOU KNOW WHETHER MR. TUBERGEN LEARNED OF ANY

OF THOSE FACTS IN CONNECTION WITH THE INVESTMENT?

A.   NOT TO MY KNOWLEDGE.

Q.   OKAY.  MR. TUBERGEN CAME OUT OF THE MEETING WITH

MS. HOLMES VERY EXCITED ABOUT THE POTENTIAL INVESTMENT;

CORRECT?

A.   YES.

Q.   HE -- THIS WAS BEFORE -- THIS WAS BASED ON THE INITIAL

INTERACTION; RIGHT?

A.   CORRECT.

Q.   AND WHATEVER OTHER INTERACTIONS HE HAD IN ADVANCE OF THAT;

CORRECT?

A.   I DON'T KNOW WHAT OTHER INTERACTIONS HE HAD, BUT HE WAS

VERY EXCITED ABOUT THE MEETING THAT HE HAD WITH CHRISTIAN AND

ELIZABETH.

Q.   RIGHT.  AND HE CAME, HE CAME BACK HIGHLY INTERESTED IN

DOING THE INVESTMENT; CORRECT?

A.   HE CAME BACK HIGHLY INTERESTED AND LOOKING AT THE

OPPORTUNITY AND TAKING IT TO THE FAMILY.

Q.   AND DO YOU RECALL THAT HE REALLY WANTED TO MAKE IT HAPPEN?

     DO YOU RECALL THAT?

A.   I DON'T SEE HIS BEHAVIOR ANY DIFFERENT THAN NORMAL.  HE

WAS, HE WAS EXCITED ABOUT AN OPPORTUNITY THAT WE HAD A CHANCE

TO LOOK AT, AND WE LOOKED AT IT, AND IT WENT THROUGH THE PROPER

01:21PM 1    PROCESS OF GOING THROUGH THE INVESTMENT COMMITTEE.

01:21PM 2    Q.   DO YOU RECALL, DO YOU RECALL WHAT DROVE THE INVESTMENT WAS

01:21PM 3    MR. TUBERGEN'S BELIEF THAT THERANOS WAS A UNICORN?

01:21PM 4    A.   I DON'T RECALL THAT.

01:21PM 5    Q.   OKAY.  DO YOU KNOW WHAT A UNICORN IS?

01:21PM 6    A.   CAN YOU EXPLAIN IT?

01:21PM 7    Q.   I'M ASKING YOU.  YOU'RE THE INVESTMENT PROFESSIONAL.  I'M

01:21PM 8    WONDERING IF YOU KNOW WHAT A UNICORN IS.

01:21PM 9    A.   (LAUGHTER.)

01:21PM 10        IT'S NOT SOMETHING THAT WE NORMALLY INVEST WITH.  HIGH

01:21PM 11   GROWTH INVESTMENTS LIKE THAT, WE DON'T AT ALL INVEST WITH

01:21PM 12   THOSE.

01:21PM 13   Q.   AND WHEN YOU SAY "HIGH GROWTH INVESTMENTS," UNICORNS ARE

01:22PM 14   USUALLY INVESTMENTS THAT CAN REALLY POP; CORRECT?

01:22PM 15   A.   THAT'S YOUR DEFINITION, YES.  THAT'S YOUR DEFINITION,

01:22PM 16   OKAY?

01:22PM 17   Q.   WHAT IS YOUR DEFINITION?

01:22PM 18   A.   I DON'T DEAL IN INVESTING IN UNICORNS, SO --

01:22PM 19   Q.   OKAY.  AND YOU DON'T RECALL THAT WHAT DROVE THE INVESTMENT

01:22PM 20   IN THE CASE OF THERANOS WAS MR. TUBERGEN'S BELIEF THAT THERANOS

01:22PM 21   WAS A UNICORN?

01:22PM 22   A.   I DON'T BELIEVE THAT WAS THE CASE.  WE WERE RELYING ON

01:22PM 23   FOUR KEY ELEMENTS OF THIS, WHICH WERE THE FINANCIALS THAT WERE

01:22PM 24   SOLID, THE CONTRACTS THAT WERE IN PLACE, THE FACT THAT THEY HAD

01:22PM 25   DONE WORK FOR THE LAST FIVE TO SEVEN YEARS WITH PHARMACEUTICAL

01:22PM   1    COMPANIES THAT, THAT SUBSTANTIATED THE ACCURACY OF IT.

01:23PM   2         THOSE ARE WHAT WE BASED OUR INVESTMENT DECISION ON.

01:23PM   3    Q.   WELL, YOU DIDN'T MAKE THE INVESTMENT DECISION; RIGHT?

01:23PM   4    A.   I INFORMED THE INVESTMENT COMMITTEE THAT MADE THE

01:23PM   5    INVESTMENT DECISION, YES, AS WELL AS THEM GOING IN THE MEETING.

01:23PM   6    Q.   JUST TO BE CLEAR, YOU DID NOT ATTEND THE INVESTMENT

01:23PM   7    COMMITTEE MEETING; CORRECT?

01:23PM   8    A.   CORRECT.

01:23PM   9    Q.   AND YOU DON'T KNOW WHETHER ANY OF YOUR MEMOS WERE EVER

01:23PM  10    READ BY THE INVESTMENT COMMITTEE; RIGHT?

01:23PM  11    A.   CORRECT.

01:23PM  12    Q.   OKAY.  AND, IN FACT, THE INVESTMENT IN THERANOS WAS

01:23PM  13    COMMITTED TO BEFORE YOU EVEN PREPARED THAT MEMO, THE SECOND

01:23PM  14    MEMO; CORRECT?

01:23PM  15    A.   THAT'S NOT CORRECT.

01:23PM  16    Q.   OKAY.  WE'LL GET TO THAT.

01:23PM  17         BUT STICKING WITH THE UNICORN, DO YOU RECALL THAT YOU GAVE

01:23PM  18    AN INTERVIEW WITH THE S.E.C. AND THE DEPARTMENT OF JUSTICE IN

01:23PM  19    APRIL OF 2017?

01:23PM  20    A.   YES.

01:23PM  21    Q.   AND DO YOU RECALL THAT WAS, THAT WAS A MEETING WHERE,

01:24PM  22    WHERE MANY OF THE -- A COUPLE OF THE PROSECUTORS MAYBE HERE

01:24PM  23    ATTENDED.

01:24PM  24         DO YOU RECALL THAT?

01:24PM  25    A.   I DON'T RECALL WHO WAS IN THE ROOM EXACTLY, BUT I REMEMBER

01:24PM  1    THE INTERVIEW.

01:24PM  2    Q.   AND THERE WERE SOME S.E.C. ATTORNEYS.

01:24PM  3         DO YOU RECALL THAT?

01:24PM  4    A.   YES.

01:24PM  5    Q.   AND IT WAS IN SAN FRANCISCO, I THINK.

01:24PM  6    A.   YES.

01:24PM  7    Q.   OKAY.  AND YOU WERE REPRESENTED BY COUNSEL; RIGHT?

01:24PM  8    A.   YES.

01:24PM  9    Q.   OKAY.  AND DO YOU RECALL, IN CONNECTION WITH THAT, THAT

01:24PM  10   YOUR ATTORNEYS HAD MEETINGS IN ADVANCE WITH THE S.E.C.?

01:24PM  11   A.   I DON'T RECALL ANY OF THAT, NO.

01:24PM  12   Q.   OKAY.  DO YOU RECALL IN ADVANCE THAT YOUR ATTORNEYS TOLD

01:24PM  13   THE S.E.C. AND DOJ THAT WHAT DROVE THE INVESTMENT WAS A

01:24PM  14   UNICORN?

01:24PM  15              MR. LEACH:  OBJECTION.

01:24PM  16              THE COURT:  SUSTAINED.

01:24PM  17              THE WITNESS:  I DON'T RECALL THAT.

01:24PM  18              THE COURT:  SUSTAINED.  SUSTAINED.  THE ANSWER IS

01:24PM  19   STRICKEN.

01:24PM  20        YOU CAN ASK ANOTHER QUESTION.

01:24PM  21   BY MR. WADE:

01:24PM  22   Q.   I'M TRYING TO REFRESH YOUR RECOLLECTION.  IF YOU CAN LOOK

01:24PM  23   AT EXHIBIT 11453.

01:25PM  24   A.   CAN YOU DIRECT ME TO WHAT YOU'RE REFERRING TO?

01:25PM  25   Q.   YEAH, I WILL.  AND JUST SO WE'RE CLEAR, READ IT TO

01:25PM  1    YOURSELF.  PLEASE DON'T SPEAK UNTIL AFTER I ASK YOU A QUESTION

01:25PM  2    JUST SO NEITHER ONE OF US GET IN TROUBLE, OKAY?

01:25PM  3         THE -- IF YOU CAN LOOK ABOUT TWO-THIRDS OF THE WAY DOWN

01:25PM  4    THE PAGE, MAYBE THREE QUARTERS OF THE WAY, DO YOU SEE WHAT

01:25PM  5    DROVE INVESTMENT?  DO YOU SEE THAT LANGUAGE?

01:25PM  6         IF I COULD APPROACH, I CAN POINT IT OUT, YOUR HONOR.

01:25PM  7              THE COURT:  SURE.  GO RIGHT AHEAD.  GO RIGHT AHEAD.

01:25PM  8    YES.

01:25PM  9              THE WITNESS:  I DON'T RECALL EVER SAYING THAT WORD.

01:25PM  10        I SEE THAT.  I DO NOT EVER RECALL SAYING THAT WORD.  IT'S

01:26PM  11   NOT SOMETHING I WOULD EVER USE.

01:26PM  12        I DO RECALL IT SAYS RELIED ON LONG-TERM CONTRACTS WITH

01:26PM  13   WALGREENS AND SAFEWAY.

01:26PM  14   BY MR. WADE:

01:26PM  15   Q.   SO DO YOU THINK YOUR ATTORNEYS GOT THOSE FACTS RIGHT WHEN

01:26PM  16   THEY GAVE THE PROFFER?

01:26PM  17              MR. LEACH:  OBJECTION.

01:26PM  18              THE COURT:  SUSTAINED.  WHY DON'T WE MOVE ON?

01:26PM  19              THE WITNESS:  I WOULD NEVER USE THE WORD "UNICORN."

01:26PM  20   BY MR. WADE:

01:26PM  21   Q.   JUST TO BE CLEAR, JUST SO THE RECORD IS CLEAR, I WAS NEVER

01:26PM  22   SUGGESTING THAT YOU WERE.

01:26PM  23        DO YOU RECALL THAT YOUR LAWYERS ON YOUR BEHALF PROFFERED

01:26PM  24   THOSE FACTS?

01:26PM  25              MR. LEACH:  OBJECTION.  FOUNDATION.

01:26PM 1          THE COURT:  DO YOU HAVE ANOTHER QUESTION?

01:26PM 2          MR. WADE:  I DO.

01:26PM 3          THE COURT:  GREAT.

01:27PM 4    BY MR. WADE:

01:27PM 5    Q.   AFTER YOUR MEETING WITH MR. TUBERGEN ON THE AIRPLANE, WHEN

01:27PM 6    DID YOU NEXT MEET WITH HIM IN CONNECTION WITH THE THERANOS

01:27PM 7    INVESTMENT?

01:27PM 8    A.   I BELIEVE HE -- WE TALKED THE DAY OF THE CALL WITH

01:27PM 9    ELIZABETH HOLMES.

01:27PM 10   Q.   DID -- WHEN YOU DID THE CALL, WERE YOU IN THE SAME

01:27PM 11   PHYSICAL SPACE?

01:27PM 12   A.   YES.

01:27PM 13   Q.   OKAY.  IN HIS OFFICE?

01:27PM 14   A.   YES.

01:27PM 15   Q.   OKAY.  AND SO YOU MET THAT DAY AND MADE THE CALL TO

01:28PM 16   MS. HOLMES?

01:28PM 17   A.   YES.

01:28PM 18   Q.   AND THAT WAS THE CALL THAT YOU REFERRED TO, THE

01:28PM 19   OCTOBER 3RD CALL?

01:28PM 20   A.   CORRECT.

01:28PM 21   Q.   OKAY.

01:28PM 22   A.   WE TALKED AHEAD OF THE CALL AND AFTER THE CALL.

01:28PM 23   Q.   OKAY.  AND THAT WAS THE POINT AT WHICH MR. TUBERGEN GAVE

01:28PM 24   YOU THE BINDERS; IS THAT RIGHT?

01:28PM 25   A.   YES.

01:28PM 1    Q.   AND THERE WERE TWO -- I BELIEVE YOU'VE SAID PREVIOUSLY

01:28PM 2    THAT THERE WERE TWO BINDERS; IS THAT RIGHT?

01:28PM 3    A.   THERE WERE TWO BINDERS.  I WENT UP AND GOT THE BINDERS

01:28PM 4    EARLY THAT MORNING AND STARTED GOING THROUGH THEM AND

01:28PM 5    DEVELOPING QUESTIONS FOR THE CALL LATER THAT DAY.

01:28PM 6    Q.   I THOUGHT YOU SAID IT WAS IN THE MEETING THAT HE GAVE YOU

01:28PM 7    THE BINDERS.

01:28PM 8    A.   NO.  HE EMAILED ME AND SAID THAT THERE WAS GOING TO BE A

01:28PM 9    CALL THAT DAY AND COULD I ATTEND, AND I SAID YES.

01:28PM 10        AND THEN HE SAID THAT THE BINDERS HAD ARRIVED AND THEY

01:28PM 11   WERE ON HIS DESK, AND SO I WENT AND GOT THEM AND MADE A COPY.

01:28PM 12   Q.   OKAY.

01:28PM 13   A.   AND I BEGAN LOOKING AT THEM AHEAD OF THE CALL THAT WAS

01:28PM 14   LATER THAT AFTERNOON.

01:28PM 15   Q.   OKAY.  AND WITH RESPECT TO THAT CALL, DO YOU RECALL THAT

01:29PM 16   THAT WAS ABOUT LESS THAN HALF AN HOUR?

01:29PM 17   A.   IT WAS PROBABLY HALF AN HOUR.

01:29PM 18   Q.   OKAY.  THE MINUTES -- YOU TOOK NOTES OF THE CALL; CORRECT?

01:29PM 19   A.   YES.

01:29PM 20   Q.   AND YOU WERE LOOKING AT THOSE NOTES EARLIER; CORRECT?

01:29PM 21   A.   CORRECT.

01:29PM 22   Q.   AND I THINK THAT'S 2015, WHICH IS PROBABLY IN BOTH

01:29PM 23   BINDERS.

01:30PM 24        DO YOU HAVE THAT IN FRONT OF YOU?

01:30PM 25   A.   YES.

01:30PM  1    Q.   OKAY.  AND DO YOU SEE AT THE TOP THE FIRST HEADING IS

01:30PM  2    "WHAT IS THE LONG-TERM VISION OF THERANOS?"

01:30PM  3    A.   YES.

01:30PM  4    Q.   AND THAT WAS SOMETHING THAT MR. TUBERGEN WAS VERY FOCUSSED

01:30PM  5    ON; CORRECT?

01:30PM  6    A.   NO.  IT'S JUST A QUESTION THAT WE HAD.

01:30PM  7    Q.   OKAY.  DO YOU RECALL HIM, WHEN HE CAME BACK WITH THE

01:30PM  8    FAMILY AND WITH YOU, HE WAS SPEAKING ABOUT THE LONG-TERM VISION

01:30PM  9    THAT THE COMPANY HAD?

01:30PM  10   A.   WELL, I THINK IT'S ONE OF MANY ASPECTS IN UNDERWRITING

01:30PM  11   THAT WE UNDERTAKE WHAT IS THE LONG-TERM VISION AND GROWTH OF

01:30PM  12   THE COMPANY.

01:30PM  13   Q.   RIGHT.  I WAS ASKING SPECIFICALLY WITH RESPECT TO

01:31PM  14   MR. TUBERGEN.  DO YOU RECALL HIM SPEAKING ABOUT THE VISION OF

01:31PM  15   THE COMPANY, HIS INTEREST IN THE LONG-TERM VISION OF THE

01:31PM  16   COMPANY?

01:31PM  17   A.   YEAH, BUT IT WASN'T THE ONLY THING THAT HE WAS FOCUSSED

01:31PM  18   ON.

01:31PM  19   Q.   OKAY.  IT WAS THE FIRST QUESTION THAT HE ASKED MS. HOLMES;

01:31PM  20   CORRECT?

01:31PM  21   A.   IT WAS THE FIRST QUESTION ON MY LIST OF QUESTIONS.

01:31PM  22           THE CLERK:  ZOOM JUST WENT DOWN.

01:31PM  23           THE COURT:  OKAY.  EXCUSE ME JUST A SECOND.

01:31PM  24       WHY DON'T WE TAKE OUR BREAK NOW?  I UNDERSTAND THAT

01:31PM  25   THEY'RE HAVING PROBLEMS WITH THE ZOOM FEED.

01:31PM  1          MR. WADE:  DOWNSTAIRS?  OKAY.

01:31PM  2          THE COURT:  SO LET'S TAKE A BREAK NOW.  30 MINUTES,

01:31PM  3     30 MINUTE BREAK, PLEASE.

01:31PM  4          (PAUSE IN PROCEEDINGS.)

01:32PM  5          (RECESS FROM 1:32 P.M. UNTIL 2:02 P.M.)

02:02PM  6          THE COURT:  THANK YOU.  PLEASE BE SEATED.  THANK

02:02PM  7     YOU.

02:02PM  8          WE'RE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT

02:02PM  9     ARE PRESENT ONCE AGAIN.

02:02PM 10          MS. HOLMES IS PRESENT.

02:02PM 11          MR. WADE, YOU HAVE ADDITIONAL QUESTIONS?

02:03PM 12          MR. WADE:  I DO, YOUR HONOR.  THANK YOU.

02:03PM 13     Q.  MS. PETERSON, I THINK WE WERE ABOUT TO TALK A LITTLE BIT

02:03PM 14     ABOUT THE CALL THAT YOU HAD WITH MS. HOLMES.

02:03PM 15          DO YOU RECALL THAT THE PURPOSE OF THE CALL WAS TO GET A

02:03PM 16     BETTER SENSE OF HER VISION?

02:03PM 17     A.  THE PURPOSE OF THE CALL WAS TO BE ASKING SOME QUESTIONS.

02:03PM 18     Q.  OKAY.  DO YOU RECALL IN ONE OF YOUR EARLIER MEETINGS WITH

02:03PM 19     THE GOVERNMENT IN THIS CASE THAT YOU TOLD THEM THE PURPOSE OF

02:03PM 20     THE CALL WAS TO GET A BETTER SENSE OF THE VISION?

02:03PM 21     A.  I DON'T RECALL THAT, BUT I -- WE HAD LISTED OUT THESE

02:03PM 22     QUESTIONS.  THESE ARE THE KIND OF THINGS THAT WE WERE -- THE

02:03PM 23     DARKER, THE DARKER WORDS IN HERE ARE THE QUESTIONS THAT WE HAD

02:03PM 24     GOING INTO THE CALL.

02:03PM 25     Q.  MY QUESTION WAS DID, DID -- DO YOU RECALL TELLING THE

02:04PM  1    GOVERNMENT THAT THE PURPOSE OF THE CALL WAS TO GET A BETTER

02:04PM  2    SENSE OF HER VISION?

02:04PM  3    A.   I MAY HAVE.  I DON'T RECALL EXACTLY.

02:04PM  4    Q.   OKAY.  LET'S TAKE A LOOK.  IF YOU WOULD LOOK IN YOUR

02:04PM  5    BINDER AT EXHIBIT 11249.  TELL ME WHEN YOU HAVE THAT IN FRONT

02:04PM  6    OF YOU.

02:04PM  7         AGAIN, PLEASE READ THIS TO YOURSELF AND WAIT FOR MY

02:04PM  8    QUESTION AFTER I DIRECT YOU TO THE SPOT.

02:04PM  9         DO YOU HAVE THAT IN FRONT OF YOU?

02:04PM  10   A.   YES.

02:04PM  11   Q.   OKAY.  AND DO YOU RECALL THAT YOU MET WITH PEOPLE IN THE

02:04PM  12   U.S. ATTORNEY'S OFFICE IN APRIL OF 2017?

02:04PM  13   A.   YES.

02:04PM  14   Q.   OKAY.  I WANT YOU TO LOOK IN THE ONE, TWO -- IN THE FOURTH

02:05PM  15   PARAGRAPH, I THINK ABOUT FOUR SENTENCES IN THE SENTENCE THAT

02:05PM  16   STARTS WITH "PETERSON HAD."

02:05PM  17   A.   I'M SORRY, WHICH PARAGRAPH?

02:05PM  18   Q.   THE FOURTH PARAGRAPH ON THE FIRST PAGE.

02:05PM  19   A.   UH-HUH.

02:05PM  20   Q.   DO YOU SEE THE SENTENCE "PETERSON HAD" MIDWAY THROUGH THAT

02:05PM  21   PARAGRAPH?

02:05PM  22   A.   YES.

02:05PM  23   Q.   READ THAT TO YOURSELF.

02:05PM  24        HAVE YOU READ THAT TO YOURSELF?

02:05PM  25   A.   YES.

02:05PM   1    Q.   AND DOES THAT REFRESH YOUR RECOLLECTION THAT YOU TOLD THE

02:05PM   2    GOVERNMENT THAT THE PURPOSE OF THE CALL WAS TO GET A BETTER

02:05PM   3    SENSE OF HER VISION?

02:05PM   4    A.   THAT'S NOT MY RECOLLECTION EXACTLY.

02:05PM   5    Q.   OKAY.

02:05PM   6    A.   THE CALL WAS TO BEGIN DOING DILIGENCE.

02:05PM   7    Q.   DID YOU DO A FULL DUE DILIGENCE ON THIS INVESTMENT?

02:05PM   8    A.   THIS WAS THE START OF QUESTIONS.  THAT'S DILIGENCE FOR US.

02:06PM   9    Q.   OKAY.  YOU DID A FULL, FULL -- EXHAUSTIVE DUE DILIGENCE ON

02:06PM  10    THE INVESTMENT?

02:06PM  11    A.   THAT'S NOT WHAT I SAID.

02:06PM  12    Q.   WELL, THAT'S MY QUESTION.

02:06PM  13    A.   WE DID ALL, WE DID -- YES, ALL OF THE DILIGENCE THAT WE

02:06PM  14    WERE GOING TO DO ON THIS INVESTMENT AT THE TIME.

02:06PM  15    Q.   WHEN YOU SAY "ALL OF THE DILIGENCE THAT YOU WERE GOING TO

02:06PM  16    DO ON THE INVESTMENT," WHAT DOES THAT MEAN?

02:06PM  17    A.   WE DID -- WE DID THE CALL AND WE WENT ON SITE AND WE

02:06PM  18    DID -- THAT WAS OUR DILIGENCE.

02:06PM  19    Q.   OKAY.  DO YOU BELIEVE THAT YOU DID APPROPRIATE DUE

02:06PM  20    DILIGENCE IN CONNECTION WITH THIS INVESTMENT?

02:06PM  21    A.   YES.

02:06PM  22    Q.   AND DO YOU BELIEVE THAT YOU DID THOROUGH DUE DILIGENCE IN

02:06PM  23    CONNECTION WITH THIS INVESTMENT?

02:06PM  24    A.   I THINK WE DID APPROPRIATE DUE DILIGENCE FOR WHAT WE WERE

02:06PM  25    DOING, YES.

02:06PM   1    Q.   OKAY.  THE, THE -- IF YOU CAN BRING BACK IN FRONT OF YOU

02:07PM   2    THE DOCUMENT THAT WE LEFT OFF WITH IN 2015.

02:07PM   3         DO YOU HAVE THAT IN FRONT OF YOU?

02:07PM   4    A.   YES.

02:07PM   5    Q.   OKAY.  CAN WE BRING THAT UP?  IT'S IN EVIDENCE.

02:07PM   6         OKAY.  YOU WERE ASKED SOME QUESTIONS ABOUT THIS ON DIRECT;

02:07PM   7    DO YOU RECALL?

02:07PM   8    A.   YES.

02:07PM   9    Q.   AND THE FIRST QUESTION IS ABOUT THE LONG-TERM VISION OF

02:07PM  10    THERANOS.

02:07PM  11         DO YOU SEE THAT?

02:07PM  12    A.   YES.

02:07PM  13    Q.   AND THEN -- AND IT GIVES SOME DETAILS.

02:07PM  14         WAS THIS INFORMATION IN RESPONSE TO QUESTIONS THAT YOU HAD

02:07PM  15    ASKED?

02:07PM  16    A.   YES.

02:07PM  17    Q.   OKAY.  LET'S GO TO WALGREENS.

02:07PM  18         DO YOU SEE THAT?

02:07PM  19    A.   YES.

02:07PM  20    Q.   NOW, THIS WAS, THIS WAS -- YOU'RE AWARE THAT THEY HAD A

02:07PM  21    WALGREENS ROLLOUT; CORRECT?

02:08PM  22    A.   YES.

02:08PM  23    Q.   AND DID YOU GO AND VISIT A WALGREENS LOCATION?

02:08PM  24    A.   NO.

02:08PM  25    Q.   DID YOU PULL THE PUBLIC ANNOUNCEMENTS OF --

02:08PM    1    A.    WE ACTUALLY DID PULL THE 10K FROM THE -- FROM 2013.

02:08PM    2    Q.    AND THE PRESS RELEASE ANNOUNCING THE --

02:08PM    3    A.    IT SAID THAT THEY WERE GOING TO GO AND BEGIN LAUNCHING

02:08PM    4    THEIR -- WITH THERANOS.  IT WAS TWO OR THREE SENTENCES IN THE

02:08PM    5    10K.

02:08PM    6    Q.    OKAY.  DID YOU LOOK AT THE PRESS RELEASE THAT ANNOUNCED

02:08PM    7    THE PARTNERSHIP?

02:08PM    8    A.    I DON'T RECALL.

02:08PM    9    Q.    OKAY.  LET'S LOOK AT 1113.  IT'S IN EVIDENCE.

02:09PM   10          IT'S UP ON YOUR SCREEN IF YOU'D LIKE AND IF IT'S EASIER.

02:09PM   11    A.    OKAY.

02:09PM   12    Q.    DO YOU SEE IT?

02:09PM   13    A.    YES.

02:09PM   14    Q.    OKAY.  AND IN LOOKING AT 1113, DO YOU RECOGNIZE THAT AS

02:09PM   15    THE JOINT PRESS RELEASE BETWEEN WALGREENS AND THERANOS?

02:09PM   16          DO YOU SEE THAT?

02:09PM   17    A.    YES.

02:09PM   18    Q.    AND THAT WAS OUT ON THE INTERNET.  DO YOU KNOW IF YOU

02:09PM   19    FOUND THIS AS PART OF YOUR INTERNET RESEARCH?

02:09PM   20    A.    I DON'T RECALL.

02:09PM   21    Q.    OKAY.  IF YOU, IF YOU -- DO YOU RECALL YOUR TESTIMONY ON

02:09PM   22    DIRECT THAT YOU WEREN'T AWARE OF ANY VENOUS DRAWS BEING DONE AT

02:09PM   23    THERANOS?

02:09PM   24    A.    CORRECT.

02:09PM   25    Q.    OKAY.  AND YOU DIDN'T GO TO A WALGREENS LOCATION AT THE

02:09PM  1    TIME AND SEE WHAT KIND OF DRAWS THEY USED; CORRECT?

02:09PM  2    A.   CORRECT.

02:09PM  3    Q.   AND IF YOU LOOK AT THE LAST SENTENCE IN THIS PRESS

02:09PM  4    RELEASE, IF WE CAN JUST HIGHLIGHT THAT, DO YOU SEE IT SAYS,

02:09PM  5    "THE SAMPLES ARE EITHER TAKEN FROM A TINY FINGERSTICK OR A

02:09PM  6    MICRO-SAMPLE TAKEN FROM TRADITIONAL METHODS."

02:10PM  7         DO YOU SEE THAT?

02:10PM  8    A.   I SEE THAT.

02:10PM  9    Q.   AND DO YOU KNOW WHAT "TRADITIONAL METHODS" MEANS?

02:10PM  10   A.   I DON'T RECALL LOOKING AT THIS.

02:10PM  11   Q.   OKAY.  WOULD YOU UNDERSTAND TRADITIONAL METHODS TO MEAN

02:10PM  12   VENOUS DRAW?

02:10PM  13   A.   YES.

02:10PM  14   Q.   AND DO YOU KNOW WHETHER YOU WENT AND LOOKED AT -- YOU SAID

02:10PM  15   YOU DID INTERNET RESEARCH; CORRECT?

02:10PM  16   A.   SOME, YES.

02:10PM  17   Q.   WELL, I THOUGHT YOU SAID YOU DID THOROUGH DUE DILIGENCE,

02:10PM  18   DID YOU NOT?

02:10PM  19   A.   WE DID ADEQUATE DILIGENCE FOR THIS DEAL, YES.

02:10PM  20   Q.   OKAY.  AND IN CONNECTION WITH THAT, DID YOU GO INTO THE

02:10PM  21   COMPANY THERANOS'S WEBSITE?

02:10PM  22   A.   YES.

02:10PM  23   Q.   OKAY.  DID YOU GO TO THE WALGREENS WEBSITE?

02:10PM  24   A.   I DON'T RECALL.  I REMEMBER GOING ON THERANOS'S WEBSITE

02:10PM  25   AND LOOKING AT THE PRICE LISTINGS AND EVERYTHING ELSE THAT SHE

02:10PM  1    HAD TALKED ABOUT.

02:10PM  2    Q.   OKAY.

02:10PM  3    A.   TRYING TO VERIFY THAT THAT WAS TRUE.

02:10PM  4    Q.   OKAY.  SO YOU WENT THERE TO LOOK AT THE TEST MENU?

02:10PM  5    A.   YES.

02:10PM  6    Q.   AND HOW MANY?  DO YOU RECALL?

02:10PM  7    A.   IT WAS A LOT.  I DIDN'T COUNT THEM.

02:10PM  8    Q.   IT WAS A LOT.  OKAY.

02:10PM  9         AND WHEN YOU WERE THERE, YOU DON'T RECALL WHETHER YOU

02:10PM  10   LOOKED AT THIS PRESS RELEASE ON EITHER OF THE COMPANIES'

02:11PM  11   WEBSITES?

02:11PM  12   A.   NO.

02:11PM  13   Q.   OKAY.  DID YOU LOOK -- DO YOU RECALL ASKING ANY FOLLOW-UP

02:11PM  14   QUESTIONS ABOUT WALGREENS AND HOW THE RELATIONSHIP WORKED OF

02:11PM  15   THERANOS?

02:11PM  16   A.   WE ASKED A LOT OF QUESTIONS ABOUT WALGREENS AND

02:11PM  17   SPECIFICALLY WHAT THE ROLLOUT PLAN WAS AND WHERE WERE THEY AT

02:11PM  18   THE MOMENT, IN 42 OR -- 40 OR 42 LOCATIONS IN ARIZONA, AND WE

02:11PM  19   ASKED SPECIFICALLY ABOUT WHAT THE ROLLOUT PLAN WAS.

02:11PM  20        THEY WERE ALREADY OPERATING IN WALGREENS STORES, SO THE

02:11PM  21   PRESS RELEASE WASN'T THAT RELEVANT TO US.

02:11PM  22   Q.   OKAY.  AND --

02:11PM  23   A.   WE WANTED TO KNOW WHAT LOCATIONS WERE THEY GOING TO OPEN

02:11PM  24   IN AND WHEN, AND WE WENT THROUGH THAT.

02:11PM  25   Q.   OKAY.  DID YOU LEARN HOW THE WALGREENS -- HOW IT WORKED AT

```
02:11PM   1    WALGREENS WITH THERANOS, I MEAN, WHAT THE EXPERIENCE WAS LIKE?

02:11PM   2    A.   WELL, CHERI WAS TESTED, SO IT WAS SIMILAR TO WHAT WE WERE

02:12PM   3    TOLD.  CHERI WAS TESTED AT THEIR LOCATION AND, LIKE I SAID,

02:12PM   4    THEY HAD PUT SOME TINY CLINIC INSIDE OF THEIR BUILDING AND THEY

02:12PM   5    SAID THIS WAS VERY MUCH THE LOOK AND FEEL OF THE CLINIC INSIDE

02:12PM   6    OF A WALGREENS.

02:12PM   7    Q.   OKAY.  THAT WASN'T MY QUESTION.

02:12PM   8         MY QUESTION WAS, DID YOU LEARN ABOUT WHAT IT WAS LIKE, HOW

02:12PM   9    THEY WERE OPERATING WITHIN THE WALGREENS AND WITH DIFFERENT

02:12PM  10    WALGREENS LOCATIONS?

02:12PM  11    A.   LEARN HOW THEY WERE OPERATING?

02:12PM  12    Q.   YES, HOW IT WORKED.

02:12PM  13    A.   EVERYTHING THAT SHE HAD TOLD US WAS THAT THEY WERE DOING

02:12PM  14    FINGERSTICK AT WALGREENS.

02:12PM  15    Q.   OH, I UNDERSTAND THAT.  YOU'VE SAID THAT.

02:12PM  16         BUT EXPLAIN TO ME WHAT HAPPENED WHEN A PATIENT GOES INTO A

02:12PM  17    WALGREENS AT THERANOS IN THIS PERIOD BEFORE YOU ARE MAKING THE

02:12PM  18    INVESTMENT.

02:12PM  19    A.   IT WAS OUR UNDERSTANDING THAT THEY WOULD GO IN, EXACTLY

02:12PM  20    LIKE CHERI DID, INTO A CLINIC AND HAVE A FINGERSTICK DRAW.

02:12PM  21    Q.   AND THEN WHAT HAPPENS?

02:12PM  22    A.   AND THEN IT WAS TESTED RIGHT THERE.

02:12PM  23    Q.   IT WAS TESTED RIGHT THERE?  THAT'S YOUR TESTIMONY?

02:12PM  24    A.   IN THE MACHINES, YEAH.

02:13PM  25    Q.   AND IT WAS YOUR TESTIMONY THAT THEY TESTED IT IN THE
```

02:13PM  1    MACHINES IN THE WALGREENS STORE?

02:13PM  2    A.   YES.

02:13PM  3    Q.   AND THAT THEY WEREN'T RUNNING OUT OF A CENTRAL LAB?

02:13PM  4    A.   THEY, THEY SAID THEY HAD A LAB THAT WAS RUNNING SOME OF

02:13PM  5    THE TESTS, BUT EVERYTHING WAS FINGERSTICK.

02:13PM  6         BUT EVERYTHING THAT WAS GOING ON IN THE 42 WALGREENS

02:13PM  7    STORES, IT WAS OUR IMPRESSIONS THAT THIS WAS DONE AT WALGREENS.

02:13PM  8    Q.   WAS IT YOUR IMPRESSION OR DID THEY TELL YOU THAT?

02:13PM  9    A.   THEY TOLD US THAT.

02:13PM  10   Q.   OKAY.  YOU'RE SURE ABOUT THAT?

02:13PM  11   A.   YES.

02:13PM  12   Q.   OKAY.  AND --

02:13PM  13   A.   THERE WERE OTHER TESTS THAT THEY WERE DOING AND THEY SAID

02:13PM  14   THAT THEY WERE DOING WORK FOR THESE PHARMACEUTICAL COMPANIES

02:13PM  15   AND EVERYTHING ELSE, WHICH IS WHAT WE THOUGHT THEY WERE DOING

02:13PM  16   AT THEIR LAB.

02:13PM  17   Q.   AND WHY DID THEY HAVE -- SO THEY HAD A CLIA LAB JUST FOR

02:13PM  18   THE PHARMACIES?

02:13PM  19   A.   FOR OTHER THINGS BESIDES WALGREENS.

02:13PM  20   Q.   DID YOU EVER TAKE THE TIME IN ANY OF THESE MEETINGS TO

02:13PM  21   CLARIFY ANY OF THESE ISSUES AND ASK QUESTIONS?

02:13PM  22   A.   WE ASKED QUESTIONS AND WE GOT ANSWERS THAT WE WERE

02:13PM  23   SATISFIED WITH THAT ARE DIFFERENT THAN WHAT CAME OUT LATER.

02:14PM  24   Q.   UNDERSTOOD.  YOU WENT UNDER THE -- BUT YOU NEVER ACTUALLY

02:14PM  25   WENT TO ONE OF THOSE WALGREENS LOCATIONS AND FIGURED OUT WHAT

02:14PM  1    HAPPENED ONCE THE BLOOD WAS GIVEN?

02:14PM  2    A.   NO.

02:14PM  3    Q.   OKAY.

02:14PM  4    A.   BECAUSE THEY SAID IT WAS VERY MUCH LIKE THE EXPERIENCE

02:14PM  5    THAT CHERI HAD AT THE OFFICE, THE CLINIC.

02:14PM  6    Q.   OKAY.  I THINK YOU TESTIFIED IN YOUR INTERNET RESEARCH

02:14PM  7    THAT YOU WENT ONTO THE WEBSITES OF BOTH COMPANIES.

02:14PM  8    A.   BOTH COMPANIES?

02:14PM  9    Q.   WALGREENS AND THERANOS?

02:14PM 10    A.   I WENT AND PULLED THE 10K, YES --

02:14PM 11    Q.   DID YOU GO --

02:14PM 12    A.   -- FROM WALGREENS.

02:14PM 13    Q.   BUT --

02:14PM 14    A.   BUT I DID NOT GO ON THE WEBSITE OF WALGREENS.

02:14PM 15    Q.   DID YOU GO ON THE WEBSITE OF THERANOS?

02:14PM 16    A.   YES.

02:14PM 17    Q.   AND DID YOU READ THE LANGUAGE WHERE THEY TALKED ABOUT

02:14PM 18    USING VENOUS DRAWS ON THE WEBSITE OF THERANOS?

02:14PM 19    A.   I DON'T RECALL EVER SEEING THAT, NO.

02:14PM 20    Q.   DID YOU JUST LOOK AT THE TEST MENUS, OR DID YOU LOOK

02:14PM 21    AROUND AT OTHER SITES?

02:14PM 22    A.   I DON'T RECALL WHAT I LOOKED AT THERE EXACTLY.

02:14PM 23    Q.   BUT YOU DIDN'T SEE THE WEB PAGE THAT TALKS ABOUT THE FACT

02:15PM 24    THAT THEY USE VENOUS TESTS?

02:15PM 25    A.   NO.  THAT WAS NOT MADE AWARE TO US UNTIL AFTER "THE

02:15PM 1    WALL STREET JOURNAL" ARTICLE.

02:15PM 2    Q.   WELL, THEY DIDN'T PREVENT YOU FROM REVIEWING THE WEBSITE?

02:15PM 3    A.   NO, BUT WE DID NOT DO THAT.

02:15PM 4    Q.   THEY DIDN'T TELL YOU YOU COULD NOT REVIEW THE WEBSITE;

02:15PM 5    RIGHT?

02:15PM 6    A.   NO.

02:15PM 7    Q.   OKAY.  DID YOU EVER ASK FOR ANY OF THE DETAILED

02:15PM 8    INFORMATION ABOUT HOW IT -- HOW THE EXPERIENCE WORKED AT

02:15PM 9    WALGREENS?  DID YOU ASK FOR DOCUMENTS OR ANYTHING LIKE THAT?

02:15PM 10   A.   YES.  WE ASKED HOW IT WORKED AND WE WERE SHOWN HOW IT

02:15PM 11   WORKED WITH CHERI.

02:15PM 12   Q.   OKAY.  ISN'T IT THE CASE THAT YOU ACTUALLY WANTED TO CALL

02:15PM 13   YOUR CONTACT AT WALGREENS?

02:15PM 14   A.   I HAD SUGGESTED IT BECAUSE I DID KNOW THE CIO OF WALGREENS

02:15PM 15   AT THE TIME, YES.

02:15PM 16   Q.   SO THE ANSWER IS YES?

02:15PM 17   A.   YES.

02:15PM 18   Q.   OKAY.  AND MR. TUBERGEN TOLD YOU NOT TO DO THAT; CORRECT?

02:15PM 19   A.   HE SAID -- YES, HE ADVISED NOT TO DO THAT.

02:16PM 20        THE KEY THING THERE WAS, YOU KNOW, THIS WAS LARGELY AN

02:16PM 21   INVITATION ONLY, AND WE FELT THAT IF WE HAD CIRCUMVENTED SOME

02:16PM 22   OF THE PROCESS THAT WE FELT THAT WE WERE IN, THAT WE WOULD BE

02:16PM 23   UNINVITED TO PARTICIPATE IN THIS OPPORTUNITY.

02:16PM 24        SO WE WERE VERY CAREFUL NOT TO CIRCUMVENT THINGS AND UPSET

02:16PM 25   ELIZABETH.

02:16PM  1    Q.    SO THE ANSWER TO THE QUESTION ABOUT -- MR. TUBERGEN TOLD

02:16PM  2    YOU NOT TO CONTACT WALGREENS; CORRECT?

02:16PM  3    A.    CORRECT.

02:16PM  4    Q.    OKAY.  DID HE TELL YOU NOT TO LOOK AT THE WALGREENS

02:16PM  5    WEBSITE?

02:16PM  6    A.    NO.

02:16PM  7    Q.    OKAY.  THERE WAS NOTHING THAT PREVENTED YOU FROM DOING

02:16PM  8    THAT?

02:16PM  9    A.    CORRECT.

02:16PM  10   Q.    OKAY.  DID HE TELL YOU NOT TO GO TO WALGREENS?

02:16PM  11   A.    THE WALGREENS WAS IN ARIZONA.  NO, I DID NOT GO TO

02:16PM  12   ARIZONA.

02:16PM  13   Q.    WELL, THE FAMILY HAS PLANES THAT THEY CAN USE; CORRECT?

02:16PM  14   A.    THAT IS NOT PART OF WHAT WE WOULD HAVE DONE.

02:16PM  15   Q.    OKAY.

02:17PM  16   A.    WE WERE RELYING ON WHAT WE WERE TOLD.

02:17PM  17   Q.    I APOLOGIZE.

02:17PM  18         YOU'VE DONE A LOT OF INVESTMENTS IN YOUR CAREER; CORRECT?

02:17PM  19   A.    YES.

02:17PM  20   Q.    AND YOU'RE FAMILIAR WITH THE CONCEPT CALLED DUE DILIGENCE;

02:17PM  21   CORRECT?

02:17PM  22   A.    YES.

02:17PM  23   Q.    AND DUE DILIGENCE IS A PROCESS WHERE PEOPLE, BEFORE THEY

02:17PM  24   MAKE AN INVESTMENT, DO RESEARCH SO THAT THEY FULLY UNDERSTAND

02:17PM  25   THE INVESTMENT; RIGHT?

02:17PM  1    A.   YES.

02:17PM  2    Q.   OKAY.  AND YOU SAW WITHIN THE AGREEMENT MR. LEACH SHOWED

02:17PM  3    YOU THAT YOU HAD THE ABILITY TO DO DUE DILIGENCE; CORRECT?

02:17PM  4    A.   CORRECT.

02:17PM  5    Q.   THERE WAS CONTRACTUALLY NOTHING THAT PROHIBITED YOUR

02:17PM  6    ABILITY TO DO DUE DILIGENCE; RIGHT?

02:17PM  7    A.   WE DID DO DUE DILIGENCE.

02:17PM  8    Q.   AND THERE WAS --

02:17PM  9    A.   WE WERE ON SITE FOR FIVE HOURS.  THAT WAS A LOT OF DUE

02:17PM  10   DILIGENCE FOR US.

02:17PM  11   Q.   THAT WASN'T MY QUESTION.

02:17PM  12       MY QUESTION WAS, THERE WAS NOTHING IN THE CONTRACT THAT

02:17PM  13   PREVENTED YOU FROM DOING DUE DILIGENCE; CORRECT?

02:17PM  14   A.   CORRECT.

02:17PM  15   Q.   OKAY.  SO YOU WERE FREE TO DO WHATEVER INVESTIGATION YOU

02:17PM  16   WANTED TO MAKE SURE THAT YOU HAD A FULL AND ACCURATE

02:17PM  17   UNDERSTANDING OF HOW THE COMPANY WAS OPERATING AT THE TIME;

02:17PM  18   CORRECT?

02:17PM  19   A.   IT WAS CHARACTERIZED TO US.  WE THOUGHT THAT IF WE DID

02:18PM  20   MORE THAN WHAT -- IF WE DID TOO MUCH, WE WOULDN'T BE INVITED

02:18PM  21   BACK TO INVEST.  THAT WAS THE ISSUE.

02:18PM  22   Q.   I UNDERSTAND HOW YOU -- HOW SOME PEOPLE AT RDV MAY HAVE

02:18PM  23   FELT, BUT THAT WASN'T MY QUESTION.

02:18PM  24       MY QUESTION WAS, THERE WASN'T NOTHING THAT PREVENTED

02:18PM  25   YOU FROM --

02:18PM  1      A.   CORRECT.

02:18PM  2      Q.   -- DOING ALL OF THAT RESEARCH; RIGHT?

02:18PM  3      A.   OTHER THAN THE FEAR OF BEING UNINVITED TO INVEST.

02:18PM  4      Q.   RIGHT.  BUT GOING ON A WEBSITE ISN'T GOING TO PROMPT THAT,

02:18PM  5      IS IT?

02:18PM  6      A.   NO.

02:18PM  7      Q.   AND GOING ON A VISIT TO A LOCATION ISN'T GOING TO PROMPT

02:18PM  8      THAT, IS IT?

02:18PM  9      A.   NO.

02:18PM  10     Q.   AND YOU COULD PROBABLY CALL OTHER PEOPLE AND THERANOS

02:18PM  11     WOULD NEVER KNOW ABOUT IT; RIGHT?

02:18PM  12          YOU DO THAT ALL OF THE TIME IN INVESTMENTS, DON'T YOU?

02:18PM  13     A.   YES, BUT THAT'S NOT WHAT WE DID HERE.

02:18PM  14     Q.   OKAY.  BUT YOU COULD?  YOU'VE DONE IT IN OTHER CASES

02:18PM  15     THOUGH; CORRECT?

02:18PM  16     A.   CORRECT, BUT THAT'S NOT WHAT WE DID HERE.

02:19PM  17     Q.   BACK TO 2015.

02:19PM  18          MR. LEACH FOCUSSED YOU ON THE DISCUSSION OF THE WALGREENS

02:19PM  19     AND THE ROLLOUT.

02:19PM  20          DO YOU SEE THAT?

02:19PM  21          AND THAT SAYS THE PROJECTIONS WERE BASED ON 900 STORES.

02:19PM  22          DO YOU SEE THAT?

02:19PM  23     A.   YES.

02:19PM  24     Q.   AND THAT'S THE PROJECTIONS THAT WERE IN THE BINDER; RIGHT?

02:19PM  25     A.   YES, FOR 2015.

02:19PM  1    Q.   WE'LL ASK SOME QUESTIONS ABOUT THAT IN A SECOND.

02:19PM  2         YOU UNDERSTOOD THOSE WERE PROJECTIONS; RIGHT?

02:19PM  3    A.   YES, AND FOR CONTRACTS, WE WERE TOLD THAT THERE WERE

02:19PM  4    CONTRACTS THAT SUBSTANTIATED WHAT THE PROJECTION SAID.

02:19PM  5    Q.   I UNDERSTAND.  MY QUESTION IS, YOU UNDERSTOOD THOSE WERE

02:19PM  6    PROJECTIONS; CORRECT?

02:19PM  7    A.   CORRECT.

02:19PM  8    Q.   OKAY.  AND YOU KNEW HOW MANY STORES THEY HAD AT THE TIME;

02:20PM  9    RIGHT?

02:20PM  10   A.   YES.

02:20PM  11   Q.   HOW MANY?

02:20PM  12   A.   FORTY OR FORTY-TWO.

02:20PM  13   Q.   OKAY.  AND UNDER THE RISKS, DO YOU SEE THE RISK THAT IS

02:20PM  14   FOCUSSED ON THERE IS THE RISK OF AN EXECUTION; RIGHT?

02:20PM  15   A.   CORRECT.

02:20PM  16   Q.   AND FOR A YOUNG COMPANY, THAT'S ALWAYS A RISK; RIGHT?

02:20PM  17   A.   YES.

02:20PM  18   Q.   AND TO GO FROM, WHATEVER, 42 STORES YOU SAID, TO 900

02:20PM  19   STORES IN A YEAR IS A LOT; CORRECT?

02:20PM  20   A.   CORRECT.

02:20PM  21   Q.   OKAY.  AND SO THE PRIMARY RISK THAT MS. HOLMES ALERTED YOU

02:20PM  22   TO WAS THE RISK OF BEING ABLE TO EXECUTE ON THAT AND GROW AT

02:20PM  23   THAT RATE; CORRECT?

02:20PM  24   A.   YES.

02:20PM  25   Q.   OKAY.  LET'S GO TO THE SECOND PAGE.

02:21PM 1          THIS SETS FORTH THE GOALS FOR OCTOBER 14TH.

02:21PM 2          DO YOU SEE THAT?

02:21PM 3     A.   YES.

02:21PM 4     Q.   AND THAT WAS THE VISIT THAT THE FAMILY WAS GOING TO TAKE

02:21PM 5     OUT TO THE COMPANY; RIGHT?

02:21PM 6     A.   CORRECT.

02:21PM 7     Q.   AND SO THE GOAL WAS REALLY SORT OF A RELATIONSHIP

02:21PM 8     GET-TO-KNOW-YOU GOAL?

02:21PM 9     A.   PART OF IT.

02:21PM 10    Q.   WELL --

02:21PM 11    A.   THIS WAS OUR GOALS FOR THE OCTOBER 14TH.

02:21PM 12         AND IN HERS, SHE MADE IT VERY SPECIFIC THAT SHE WANTED TO

02:21PM 13    GET TO KNOW THE PEOPLE WHO ARE MAKING THE INVESTMENT.

02:21PM 14    Q.   WELL, IN FACT, MR. TUBERGEN SAID THAT THAT WAS ONE OF THE

02:21PM 15    PRINCIPLES OF --

02:21PM 16    A.   CORRECT.

02:21PM 17    Q.   RIGHT?

02:21PM 18         BECAUSE THE DEVOS FAMILY WANTED A LONG-TERM INVESTMENT;

02:21PM 19    RIGHT?

02:21PM 20    A.   CORRECT.

02:21PM 21    Q.   AND THEY WANTED TO BE A COMMITTED PARTNER IN THE

02:21PM 22    INVESTMENT; RIGHT?

02:21PM 23    A.   CORRECT.

02:21PM 24    Q.   AND BEFORE THEY DID THAT, THEY WANTED TO GET TO KNOW

02:21PM 25    ELIZABETH AND OTHER PEOPLE AT THERANOS; RIGHT?

02:21PM  1    A.   CORRECT.

02:21PM  2    Q.   AND SO ONE OF THE CORE PRINCIPLES IN GOING OUT THERE WAS

02:21PM  3    SO THAT THERE COULD BE INTERACTION THAT WOULD ALLOW PEOPLE TO

02:22PM  4    GET COMFORTABLE WITH ONE ANOTHER; RIGHT?

02:22PM  5    A.   ON BOTH SIDES, CORRECT.

02:22PM  6    Q.   RIGHT.  ON BOTH SIDES?

02:22PM  7    A.   YES.

02:22PM  8    Q.   AND THAT WAS DISCUSSED IN ADVANCE; RIGHT?

02:22PM  9    A.   YES.

02:22PM  10   Q.   AND, IN FACT, ULTIMATELY LATER WHEN, WHEN YOU WENT OUT

02:22PM  11   THERE, THERE WAS A LOT OF DISCUSSION GOING BOTH WAYS ABOUT THE

02:22PM  12   PHILOSOPHIES OF BOTH SIDES; RIGHT?

02:22PM  13   A.   CORRECT.

02:22PM  14   Q.   AND THERE WAS DISCUSSION FROM MR. DEVOS, ONE OF THE

02:22PM  15   MR. DEVOS'S ABOUT --

02:22PM  16   A.   DOUG.

02:22PM  17   Q.   DOUG, ABOUT THE BUSINESS RELATIONSHIPS THAT THE COMPANY

02:22PM  18   HAD HAD AND ITS PHILOSOPHY AND APPROACH TO MAKING INVESTMENTS;

02:22PM  19   RIGHT?

02:22PM  20   A.   YES.

02:22PM  21   Q.   AND HOW HE GREW THE AMWAY BUSINESS AND HIS BUSINESS

02:22PM  22   PHILOSOPHY FROM A MANAGEMENT PERSPECTIVE; RIGHT?

02:22PM  23   A.   YES, THAT WAS DISCUSSED.

02:22PM  24   Q.   RIGHT.  AND THERE WERE SIMILAR DISCUSSIONS ABOUT

02:22PM  25   MS. HOLMES'S VISION, AND SHE HAD A LONG-TERM VIEW OF THE

02:22PM  1   BUSINESS; CORRECT?

02:22PM  2   A.   CORRECT.

02:22PM  3   Q.   AND HOW SHE WANTED TO SEE THIS OVER THE LONG TERM IN ORDER

02:22PM  4   TO HAVE THE TYPE OF IMPACT IN HEALTH CARE THAT SHE WANTED TO

02:23PM  5   HAVE; RIGHT?

02:23PM  6   A.   CORRECT.

02:23PM  7   Q.   AND MR. TUBERGEN ACTUALLY SPECIFICALLY SAID IN THIS

02:23PM  8   PRE-CALL THAT IT NEEDED TO BE -- IT NEEDED TO BE UNDERSTOOD

02:23PM  9   THAT THESE WEREN'T HIGHLY SCIENTIFIC PEOPLE, RIGHT, THE DEVOS

02:23PM  10  FAMILY, AND THIS NEEDED TO BE KEPT AT A LEVEL THAT WAS NOT A

02:23PM  11  TECHNICAL MEETING, BUT MORE OF A RELATIONSHIP MEETING; RIGHT?

02:23PM  12  A.   I DON'T RECALL HIM SAYING THAT, BUT, YES, I CAN -- NONE OF

02:23PM  13  US WERE SCIENTISTS, SO KEEPING IT AT A LEVEL THAT WE ALL COULD

02:23PM  14  UNDERSTAND WAS IMPORTANT.

02:23PM  15  Q.   RIGHT.  AND YOU WEREN'T SEEKING OR YOU DIDN'T ASK FOR ANY

02:23PM  16  TESTING DATA; CORRECT?

02:23PM  17  A.   WE DID NOT ASK FOR THAT, NO.

02:23PM  18  Q.   OKAY.  AND YOU DIDN'T BRING IN A CONSULTANT WHO HAS

02:23PM  19  GREATER EXPERTISE IN THIS AREA TO LOOK AT THE TECHNOLOGY OR THE

02:23PM  20  DATA, DID YOU?

02:23PM  21  A.   NO.

02:23PM  22  Q.   AND YOU DIDN'T BRING IN A REGULATORY EXPERT TO LOOK AT THE

02:23PM  23  REGULATORY ISSUES THAT WERE PRESENT IN CONNECTION WITH THIS

02:23PM  24  INVESTMENT; RIGHT?

02:24PM  25  A.   NO.

02:24PM 1    Q.   OKAY.  YOU DIDN'T BRING IN A LAWYER WHO IS WITH EXPERTISE

02:24PM 2    WHO COULD MAKE THOSE KINDS OF JUDGMENTS; RIGHT?

02:24PM 3    A.   NO.  WE WERE RELYING ON WHAT WE WERE TOLD BY THEM ON THE

02:24PM 4    ACCURACY OF THE ANALYZER.

02:24PM 5    Q.   YOU'RE NOT AN EXPERT IN THE -- IN FDA OR CMS RELATED

02:24PM 6    ISSUES, ARE YOU?

02:24PM 7    A.   NO.

02:24PM 8    Q.   AND NO ONE IN THE FAMILY IS EITHER; RIGHT?

02:24PM 9    A.   NO.

02:24PM 10   Q.   AND NO ONE IN THE COMPANY SAID YOU COULDN'T HIRE ANY OF

02:24PM 11   THOSE PEOPLE; RIGHT?

02:24PM 12   A.   NO.  BUT THEY ALSO SAID THAT THEY DIDN'T NEED FDA

02:24PM 13   REGULATORY APPROVAL FROM THE FDA TO DO IT.

02:24PM 14   Q.   I UNDERSTAND.  THAT WASN'T MY QUESTION.

02:24PM 15        MY QUESTION WAS, NO ONE SAID THAT YOU, YOU COULDN'T HIRE

02:24PM 16   ANY OF THOSE EXPERTS TO COME IN AND HELP YOU UNDERSTAND THE

02:24PM 17   TECHNICAL ISSUES; RIGHT?

02:24PM 18   A.   NO ONE DID, BUT WE DIDN'T KNOW WHY WE WOULD NEED THAT.

02:24PM 19   Q.   OKAY.  WELL, YOU'RE NOT A TECHNICAL EXPERT IN THIS CASE;

02:24PM 20   CORRECT?

02:24PM 21   A.   NO, BUT THEY WERE TELLING US THAT IT WORKED.

02:24PM 22   Q.   THAT WASN'T MY QUESTION.

02:24PM 23        MY QUESTION WAS WHETHER YOU UNDERSTOOD THE FDA AND CMS

02:25PM 24   TECHNICAL ISSUES.  DID YOU?

02:25PM 25   A.   WE UNDERSTOOD WHAT THEY TOLD US.

02:25PM 1    Q.   OKAY.  AND DID YOU -- AND NO ONE PREVENTED YOU --

02:25PM 2    A.   CORRECT.

02:25PM 3    Q.   -- FROM BRINGING IN SOMEONE WHO HAS EXPERTISE TO GIVE

02:25PM 4    ADDITIONAL PERSPECTIVE ON THAT; CORRECT?

02:25PM 5    A.   WE DIDN'T THINK THAT WE NEEDED IT.

02:25PM 6    Q.   OKAY.  YOU THEN TALKED ABOUT THE RDV INVESTMENT PHILOSOPHY

02:25PM 7    THERE AND HOW IT WAS A GOAL IN THE MEETING.  THIS IS KIND OF

02:25PM 8    ONE OF THE ISSUES THAT YOU WERE TALKING ABOUT; RIGHT?

02:25PM 9    A.   YES.

02:25PM 10   Q.   AND THAT WAS ONE OF THE THINGS THAT THERANOS WANTED TO

02:25PM 11   LEARN FROM THE FAMILY?

02:25PM 12   A.   YES.

02:25PM 13   Q.   AND, IN FACT, IT WASN'T USUAL FOR THE DEVOS FAMILY TO GO

02:25PM 14   OUT ON AN INVESTMENT; RIGHT?

02:25PM 15   A.   THEY'VE NEVER GONE ON AN INVESTMENT WITH ME.

02:25PM 16   Q.   OKAY.  SO THIS WAS SORT OF A UNIQUE SITUATION; RIGHT?

02:25PM 17   A.   YES.

02:25PM 18   Q.   AND IT WAS MORE OF A RELATIONSHIP SITUATION; RIGHT?

02:26PM 19   A.   NO.  NO.  THIS WAS AN INVESTMENT AND ONE THAT CAME WITH

02:26PM 20   IT, WE WANTED TO MAKE SURE -- WITH ANYONE WE INVEST WITH, WE

02:26PM 21   WANT TO HAVE A GOOD PARTNERSHIP, LONG-TERM PARTNERSHIP WITH

02:26PM 22   ANYONE WE INVEST WITH.

02:26PM 23        THIS WASN'T ANY DIFFERENT THAN ANYTHING ELSE.

02:26PM 24   Q.   UNDERSTOOD.  YOU SEE THE REFERENCE THERE TO THE IMPORTANCE

02:26PM 25   OF THE RELATIONSHIP GOING FORWARD.  DO YOU SEE THAT?

02:26PM  1    A.   IT IS.

02:26PM  2    Q.   THAT WAS IMPORTANT TO BOTH SIDES; RIGHT?

02:26PM  3    A.   IT IS.  BUT THAT WASN'T UNIQUE TO THIS DEAL.

02:26PM  4    Q.   OKAY.  I WAS JUST ASKING WHETHER THAT WAS PART OF THE

02:26PM  5    DISCUSSION GOING INTO THE MEETING.

02:26PM  6    A.   CORRECT.  IT JUST WASN'T UNIQUE TO THIS DEAL.

02:26PM  7    Q.   OKAY.  LET'S GO TO THE NEXT PAGE, OR THE NEXT PIECE.

02:26PM  8    YEAH, LET'S GET THE REST OF IT.

02:26PM  9         OKAY.  AND THIS IS THE BALANCE OF THE DISCUSSION THERE;

02:26PM  10   RIGHT?

02:26PM  11   A.   YES.

02:26PM  12   Q.   YOU DISCUSSED WHAT THE EXPECTATION WAS ON SOME OF THE

02:26PM  13   NUMBERS; RIGHT?

02:26PM  14   A.   WE TALKED ABOUT WHAT THEY MIGHT RAISE IN THIS FUND

02:27PM  15   RAISING, YES.

02:27PM  16   Q.   RIGHT.  THAT THEY MIGHT RAISE 500 MILLION.

02:27PM  17        DO YOU SEE THAT?

02:27PM  18   A.   YES.

02:27PM  19   Q.   AND 50 MILLION WAS A GOOD NUMBER TO START; RIGHT?

02:27PM  20   A.   WE ALWAYS KIND OF ASKED SIZING, WHAT MAKES THE MOST SENSE,

02:27PM  21   AND SO JERRY HAD BROUGHT UP 50 MILLION.

02:27PM  22        IS THAT A GOOD NUMBER FOR US TO CONSIDER?  WE ALWAYS WANT

02:27PM  23   TO KNOW WHAT WE'RE TO CONSIDER IN AN INVESTMENT.

02:27PM  24   Q.   UNDERSTOOD.  AND A LOT OF THE ISSUES THAT YOU TALKED ABOUT

02:27PM  25   IN YOUR MEMO, WHICH WE'RE GOING TO TALK ABOUT IN A LITTLE BIT

02:27PM  1      ABOUT THE PARTICULARS, AREN'T REFERENCED IN YOUR NOTES

02:27PM  2      ANYWHERE; RIGHT?

02:27PM  3      A.   THIS WAS JUST MY SHORTHAND FROM THE CALL.  EVERYTHING ELSE

02:27PM  4      THAT WE TALKED ABOUT IS REFERENCED IN THE MEMO THAT WENT TO THE

02:27PM  5      FAMILY.

02:27PM  6      Q.   OKAY.  SO, SO THERE WAS A LOT OF STUFF THAT HAPPENED ON

02:27PM  7      THIS CALL THAT YOU DIDN'T WRITE DOWN IN YOUR NOTES; IS THAT

02:27PM  8      YOUR --

02:27PM  9      A.   YES, THIS WAS SHORTHAND OF ALL OF THE POINTS, THE

02:28PM  10     QUESTIONS THAT WE HAD AND THE ANSWERS, AND THEN THERE'S --

02:28PM  11     THERE WAS MORE.

02:28PM  12         AND ALSO I INCORPORATED IN SOME OF THE STUFF THAT I READ

02:28PM  13     FROM THE DUE DILIGENCE BINDERS.

02:28PM  14     Q.   NO.  I UNDERSTAND THAT.  WE'LL TALK ABOUT THE

02:28PM  15     INCORPORATION OF THE DUE DILIGENCE BINDERS.

02:28PM  16         BUT WE'RE TALKING ABOUT A 30 MINUTE CALL HERE; RIGHT?

02:28PM  17     A.   UH-HUH.

02:28PM  18     Q.   AND YOU WENT THROUGH THESE TWO -- YOU COVERED EVERYTHING

02:28PM  19     IN THESE PAGES; RIGHT?

02:28PM  20     A.   YEAH, BUT THIS IS FAIRLY SHORTHAND FOR -- THIS ISN'T

02:28PM  21     EXACTLY WHAT WAS SAID.

02:28PM  22     Q.   OKAY.  AND ALL OF THE TECHNICAL STUFF THAT RELATES TO YOUR

02:28PM  23     MEMO, YOU DIDN'T PUT THAT IN THE NOTES; IS THAT RIGHT?

02:28PM  24     A.   CORRECT.

02:28PM  25     Q.   OKAY.  LET'S TAKE A LOOK AT YOUR MEMO.  I BELIEVE IT'S IN

02:28PM   1    YOUR -- THE GOVERNMENT BINDER AT 2073.

02:28PM   2    A.   YOUR BINDER OR THIS BINDER?

02:28PM   3    Q.   YOU CAN STAY IN THAT BINDER.  I THINK IT'S IN THE NEXT

02:29PM   4    BINDER, THE WHITE BINDER.

02:29PM   5    A.   I'M IN THE BLACK BINDER.

02:29PM   6    Q.   I THINK IT'S IN BOTH, BUT I HAPPEN TO BE LOOKING AT THE

02:29PM   7    GOVERNMENT VERSION 2073, WHICH I THINK IS IN EVIDENCE.

02:29PM   8         DO YOU HAVE THAT?  DO YOU SEE THAT IN FRONT OF YOU?

02:29PM   9              THE COURT:  THAT'S ALSO IN YOUR BINDER AS WELL,

02:29PM  10    2073.

02:29PM  11              MR. WADE:  SURE, LET'S STAY IN OUR BINDER.  WE'LL

02:29PM  12    LOOK AT 2073.

02:29PM  13              THE WITNESS:  OKAY.  YES.

02:29PM  14    BY MR. WADE:

02:29PM  15    Q.   AND I JUST WANT TO MAKE SURE.  THERE'S A REFERENCE HERE

02:29PM  16    TO -- THIS IS AN OVERVIEW FOR THE MEMO -- FOR THE MEETING IN

02:29PM  17    ADVANCE; CORRECT?

02:29PM  18    A.   CORRECT.

02:29PM  19    Q.   OKAY.  AND THIS WAS PREPARED AFTER THAT CALL?

02:29PM  20    A.   YES.

02:29PM  21    Q.   AND THEN THE MATERIALS THAT YOU REFERENCED IN THERE, IT'S

02:30PM  22    YOUR TESTIMONY THAT ALL OF THOSE MATERIALS WERE PRINCIPALLY

02:30PM  23    FROM THE 30 MINUTE CONVERSATION WITH MS. HOLMES AND THE BINDERS

02:30PM  24    THAT YOU WERE SENT?

02:30PM  25    A.   AND THE BINDERS, YES.

02:30PM  1    Q.   OKAY.

02:30PM  2    A.   OTHER THAN THE SKEPTIC PARTS THAT I PUT IN THE BACK OF

02:30PM  3    THIS --

02:30PM  4    Q.   OKAY.

02:30PM  5    A.   -- WHICH I READ ONLINE.

02:30PM  6    Q.   OKAY.  ISN'T IT, ISN'T IT ACTUALLY THE CASE THAT A LOT OF

02:30PM  7    THE MATERIAL IN THERE CAME DIRECTLY OUT OF THE "FORTUNE"

02:30PM  8    ARTICLE?

02:30PM  9    A.   NO.  A LOT OF THIS CAME OUT OF THE BINDERS, AND SOME OF IT

02:30PM  10   COULD HAVE COME OUT OF WHAT I READ, YES.

02:30PM  11   Q.   OKAY.  YOU RECEIVED THAT "FORTUNE" ARTICLE THAT WAS SENT

02:30PM  12   FROM MR. MOSLEY TO MR. TUBERGEN; CORRECT?

02:30PM  13   A.   CORRECT.

02:30PM  14   Q.   OKAY.  AND YOU HAD THAT ARTICLE; CORRECT?

02:31PM  15   A.   YES.

02:31PM  16   Q.   OKAY.  AND I KNOW YOU'VE TESTIFIED THAT YOU -- I KNOW THAT

02:31PM  17   YOU'VE TESTIFIED THAT YOU RELIED ON THE BINDER MATERIALS, BUT

02:31PM  18   ISN'T IT TRUE THAT A LOT OF THE ITEMS IN YOUR MEMO ACTUALLY

02:31PM  19   CAME ALMOST DIRECTLY FROM THE "FORTUNE" ARTICLE?

02:31PM  20   A.   THAT'S NOT MY RECOLLECTION.

02:31PM  21   Q.   OKAY.  LET'S TAKE A LOOK.  WHY DON'T -- I'LL -- LET'S

02:31PM  22   START WITH PAGE 6 OF YOUR MEMO.

02:31PM  23        DO YOU SEE THAT?  THAT'S THE APPENDIX?

02:31PM  24   A.   YES.

02:31PM  25   Q.   AND DO YOU SEE THAT THERE ARE A LOT OF BULLET POINTS

02:32PM 1    THERE?

02:32PM 2    A.   A LOT OF THE APPENDIX -- THAT'S WHY IT SAYS STATISTICS AND

02:32PM 3    NOTEWORTHY ITEMS.  A LOT OF THAT WAS WHATEVER I COULD FIND.

02:32PM 4    Q.   YEAH.  DO YOU RECALL IN YOUR TESTIMONY WHERE YOU WERE

02:32PM 5    GOING THROUGH AND MR. LEACH WAS ASKING YOU, WAS THAT BASED UPON

02:32PM 6    THE BINDER AND THE MATERIALS THAT MS. HOLMES GAVE YOU?  AND YOU

02:32PM 7    SAID YES, YES, YES, YES, EXCEPT FOR THE LAST ONE.

02:32PM 8        DO YOU RECALL THAT?

02:32PM 9    A.   MUCH OF THIS WAS IN THE BINDER, YES.

02:32PM 10   Q.   YES.  BUT MUCH OF IT WAS IN OTHER ITEMS; RIGHT?

02:32PM 11   A.   IT WAS IN MULTIPLE PLACES, YES.

02:32PM 12   Q.   OKAY.  WELL, DID YOU TAKE THINGS RIGHT OUT OF THE

02:32PM 13   "FORTUNE" ARTICLE AND PUT THEM INTO THE MEMO?  DO YOU REMEMBER?

02:32PM 14   A.   I MIGHT HAVE, YES.

02:32PM 15   Q.   OKAY.  LET'S TAKE A LOOK AT THE 11TH PARAGRAPH, OKAY?  OR

02:32PM 16   THE 11TH NUMBER WHICH STARTS, "THERANOS USES THEIR OWN ANALYZER

02:32PM 17   EQUIPMENT."

02:32PM 18       DO YOU SEE THAT?

02:32PM 19   A.   YES.

02:32PM 20   Q.   OKAY.  AND IF -- CAN WE DO A SPLIT SCREEN?  LET'S DO A

02:32PM 21   SPLIT SCREEN AND PULL UP THE "FORTUNE" ARTICLE.

02:33PM 22       I'LL DO IT ON THE SCREEN, BUT YOU'RE WELCOME TO REFERENCE

02:33PM 23   THIS AT ANY TIME.  THE "FORTUNE" ARTICLE IS 1944, OKAY?

02:33PM 24       OKAY.  LET'S LOOK AT PAGE -- LET'S LOOK AT PAGE 4, AND

02:33PM 25   LET'S BLOW UP THE PARAGRAPH WITH THE P.

02:33PM   1        I'M GOING TO GIVE YOU A MINUTE TO LOOK AT THAT.

02:33PM   2        THAT BULLET IS LIFTED RIGHT FROM THE "FORTUNE" ARTICLE,

02:33PM   3   CORRECT, THAT YOU GOT FROM MR. MOSLEY?

02:33PM   4   A.   YES, UH-HUH.

02:33PM   5   Q.   ALL RIGHT.

02:33PM   6   A.   BUT WE ALSO DISCUSSED THIS WITH ELIZABETH.

02:34PM   7   Q.   LET'S GO TO, LET'S GO TO PAGE 5 OF THE ARTICLE.

02:34PM   8        LET'S LOOK AT THE PARAGRAPH -- THE TWO PARAGRAPHS ON THE

02:34PM   9   RIGHT COLUMN, "IMPORTANTLY" AND "IT TAKES."

02:34PM  10        LET'S BLOW THOSE UP.

02:34PM  11        AND LET'S GO TO THE MEMO AND BLOW UP THE NEXT BULLET

02:34PM  12   THERE, 12.  OKAY.

02:34PM  13        TAKE A MINUTE TO REVIEW THOSE.

02:34PM  14        (PAUSE IN PROCEEDINGS.)

02:34PM  15            THE WITNESS:  UH-HUH.

02:34PM  16   BY MR. WADE:

02:34PM  17   Q.   DO YOU SEE THAT YOU'RE LIFTING THAT ALMOST DIRECTLY FROM

02:34PM  18   THE "FORTUNE" ARTICLE?

02:34PM  19   A.   NOT EXACTLY.  AND WE TALKED ABOUT -- WE TALKED ABOUT HER

02:35PM  20   USING THE MACHINE IN THE MILITARY AND USING IT -- THEY WERE

02:35PM  21   WORKING ON EBOLA AT THE TIME.  THERE WAS A LOT OF DISCUSSION

02:35PM  22   AROUND WHAT THEY WERE DOING WITH THE GOVERNMENT.

02:35PM  23   Q.   AND, AND IN THE 30 MINUTE CALL?

02:35PM  24   A.   YES.  THERE WAS, THERE WAS -- WE WERE TALKING ABOUT WHERE

02:35PM  25   THEY WERE USING IT AND IS IT ACCURATE.

02:35PM 1   Q.  IN THE 30 MINUTE CALL?  I'M JUST TRYING TO UNDERSTAND

02:35PM 2   WHERE YOU'RE GETTING THIS KNOWLEDGE.

02:35PM 3   A.  I DON'T RECALL WHICH ONE EXACTLY, BUT WE -- I KNOW WE

02:35PM 4   TALKED ABOUT IT AT LENGTH IN THE MEETING ON THE 14TH.

02:35PM 5   Q.  OKAY.  SO TO THE EXTENT THAT THERE ARE LANGUAGE

02:35PM 6   SIMILARITIES BETWEEN THESE TWO PARAGRAPHS, THAT'S JUST A

02:35PM 7   COINCIDENCE?  OR DID YOU LIFT IT FROM THE "FORTUNE" ARTICLE?

02:35PM 8   A.  I DON'T RECALL.

02:35PM 9   Q.  OKAY.  LET'S FOCUS ON THAT MILITARY SENTENCE THAT MAKES

02:35PM 10  IT -- LET'S HIGHLIGHT THE SENTENCE ON THE RIGHT THAT SAYS "THAT

02:35PM 11  MAKES IT POSSIBLE TO IMAGINE ONE DAY."

02:36PM 12      LET'S HIGHLIGHT THE REST OF THAT.

02:36PM 13      DO YOU SEE THAT?

02:36PM 14  A.  YES.

02:36PM 15  Q.  THAT, THAT DOESN'T SAY THAT THEY'RE DOING IT RIGHT NOW;

02:36PM 16  CORRECT?

02:36PM 17  A.  CORRECT.

02:36PM 18  Q.  OKAY.  IT SAYS IT MAKES IT POSSIBLE TO DO IT; CORRECT?

02:36PM 19  A.  CORRECT.

02:36PM 20  Q.  AND THEY WERE DOING A LOT OF RESEARCH AND HAVING A LOT OF

02:36PM 21  MEETINGS AND TRYING TO DO THAT, WEREN'T THEY?

02:36PM 22  A.  CORRECT.  BUT THAT'S WHY WE ASKED ABOUT IT WHEN WE WENT

02:36PM 23  THERE ON THE 14TH OF WHAT IS GOING ON?  WHERE ARE YOU USING IT?

02:36PM 24      AND WE TALKED ABOUT IT BEING USED WITH THE GOVERNMENT.

02:36PM 25  Q.  RIGHT.  I -- IT WASN'T -- I THOUGHT YOU SAID IT WAS IN THE

02:36PM   1    OCTOBER 3RD CALL?

02:36PM   2    A.   BOTH.

02:36PM   3    Q.   IT WAS IN BOTH?

02:36PM   4    A.   WE DEFINITELY TALKED ABOUT -- WE DEFINITELY ASKED THE

02:36PM   5    QUESTION WHEN WE WERE THERE AROUND THIS WHOLE CONVERSATION

02:36PM   6    WHETHER IT WAS BEING USED.

02:36PM   7         WE WERE ASKING ABOUT WHETHER THAT WAS TRUE OR NOT.

02:36PM   8    Q.   RIGHT.

02:36PM   9    A.   ON THE 14TH.

02:36PM  10    Q.   AND THEY SAID IT WAS POSSIBLE IN THE ARTICLE; CORRECT?

02:36PM  11    A.   CORRECT.  AND THAT'S WHAT IT SAYS.  IT SAYS MAKING IT

02:37PM  12    POSSIBLE TO PLACE A THERANOS LAB.  I DIDN'T SAY THAT THEY WERE.

02:37PM  13    Q.   RIGHT.  AND, IN FACT --

02:37PM  14    A.   BUT THIS WAS SOMETHING THAT WE ASKED ABOUT.

02:37PM  15    Q.   MY APOLOGIES FOR INTERRUPTING.

02:37PM  16         I BELIEVE IN YOUR DIRECT TESTIMONY YOU DID SAY THAT THEY

02:37PM  17    WERE, BUT THAT'S NOT WHAT THE ARTICLE SAYS; RIGHT?

02:37PM  18    A.   I'M MAYBE MIXING THE CALL WITH THE MEETING.

02:37PM  19    Q.   OKAY.  THE ARTICLE DOES NOT SAY THAT; CORRECT?  IT SAYS

02:37PM  20    IT'S POSSIBLE; RIGHT?

02:37PM  21    A.   CORRECT, AND SO DO MY NOTES.

02:37PM  22    Q.   AND YOUR STATEMENT SAYS THAT IT'S POSSIBLE; CORRECT?

02:37PM  23    A.   CORRECT.

02:37PM  24    Q.   OKAY.  AND, IN FACT, THEY TOLD YOU IN THE MEETING THAT

02:37PM  25    THEY WERE PAUSING THEIR WORK WITH THE MILITARY AND PHARMA AND

02:37PM  1    FOCUSSING ALL OF THEIR EFFORTS ON RETAIL; CORRECT?

02:37PM  2    A.   I DON'T RECALL THEM SAYING THAT THEY PAUSED IT.

02:37PM  3    Q.   YOU DON'T REMEMBER WRITING THAT IN YOUR MEMO?

02:37PM  4    A.   I DON'T RECALL THEM SAYING THAT THEY PAUSED DOING THAT.

02:37PM  5         THEY WERE FOCUSSING THEIR EFFORTS ON WALGREENS AND MOVING

02:37PM  6    FORWARD.  THAT WAS THE DIRECTION THAT THEY WERE GOING TO TAKE.

02:37PM  7         BUT IT WAS IMPORTANT TO US WHAT THEY WERE DOING

02:38PM  8    HISTORICALLY, WHICH WAS WORKING WITH THE MILITARY AND WORKING

02:38PM  9    WITH PHARMACEUTICAL COMPANIES.

02:38PM  10        THAT WAS IMPORTANT TO VALIDATE THE ACCURACY OF THE MACHINE

02:38PM  11   AND THEIR TESTING.

02:38PM  12        ALL OF THAT WAS IMPORTANT.

02:38PM  13   Q.   UNDERSTOOD.  LET ME GO TO THE NEXT BULLET POINT.

02:38PM  14        THIS PARAGRAPH IS FROM THE "FORTUNE" ARTICLE AS WELL;

02:38PM  15   CORRECT?

02:38PM  16   A.   UH-HUH.

02:38PM  17   Q.   RIGHT?

02:38PM  18   A.   YES.

02:38PM  19   Q.   OKAY.  ON YOUR DIRECT TESTIMONY YOU SAID IT WAS FROM

02:38PM  20   MS. HOLMES AND IN THE MEETING, RIGHT?  BUT IT WAS ACTUALLY

02:38PM  21   ALMOST VERBATIM FROM THE "FORTUNE" ARTICLE; RIGHT?

02:38PM  22   A.   NO.  I SAID THAT SOME OF THE SKEPTICISM I PULLED FROM OUT

02:38PM  23   OF THE INTERNET, AND THAT'S WHAT THIS IS, INCUMBENT PLAYERS

02:38PM  24   CRITICIZED THERANOS.

02:38PM  25        THIS DIDN'T COME FROM THERANOS SAYING THIS.

02:38PM  1          I WAS TRYING TO GIVE THE FAMILY MEMBERS AN IDEA OF WHAT

02:39PM  2     THE MARKET WAS SAYING ABOUT THEM, WHICH PART OF IT DID COME

02:39PM  3     FROM ARTICLES THAT I HAD READ.

02:39PM  4     Q.   RIGHT.

02:39PM  5     A.   MORE THAN JUST THIS ONE.

02:39PM  6     Q.   AND, IN FACT, IT'S IN THIS, IN THIS PARAGRAPH RIGHT HERE

02:39PM  7     IN THE ARTICLE; CORRECT?

02:39PM  8     A.   CORRECT.

02:39PM  9     Q.   AND THE NEXT PARAGRAPH IS FROM THE "FORTUNE" ARTICLE THAT

02:39PM  10    YOU GOT FROM MR. MOSLEY AS WELL; CORRECT?

02:39PM  11    A.   CORRECT.

02:39PM  12    Q.   OKAY.  YOU RECALL THAT ONE?

02:39PM  13    A.   I DO RECALL THE BOTTOM PART OF THAT AND I -- WE DID NOT

02:39PM  14    HEAR FROM HER WHAT HER SKEPTICS WERE.  YOU KNOW, THAT WAS STUFF

02:39PM  15    THAT I WAS PULLING OUT OF THE INTERNET IN CERTAIN THINGS LIKE

02:39PM  16    THIS AND OTHER THINGS THAT I HAD READ, YES.

02:39PM  17    Q.   OKAY.  AND YOU MENTIONED THE -- YOU MENTIONED THAT THE

02:39PM  18    WALGREENS RELATIONSHIP WAS IMPORTANT TO --

02:39PM  19    A.   VERY.

02:39PM  20    Q.   -- YOU, OR RELEVANT TO YOU; CORRECT?

02:39PM  21    A.   YES.

02:39PM  22    Q.   LET'S GO TO PAGE 5 OF YOUR MEMO AND HIGHLIGHT THE FIRST

02:40PM  23    HALF OF THAT DOWN TO "ALLIANCE BOOTS."

02:40PM  24         YOU SEE THAT'S FROM YOUR MEMO; RIGHT?

02:40PM  25    A.   YES.

02:40PM 1    Q.   EXHIBIT 5; RIGHT?

02:40PM 2    A.   YES.

02:40PM 3    Q.   PAGE 2 OF THE MEMO?

02:40PM 4    A.   YES.

02:40PM 5    Q.   AND YOU MENTION BEFORE 44 LOCATIONS, BUT HERE YOU HAVE 22

02:40PM 6    LOCATIONS; RIGHT?

02:40PM 7    A.   YES.

02:40PM 8    Q.   AND THAT'S BECAUSE YOU GOT THE WALGREENS INFORMATION FROM

02:40PM 9    THE "FORTUNE" ARTICLE; RIGHT?

02:40PM 10   A.   IT COULD BE, YES.  THE 40 CAME FROM THE MEETING TOGETHER.

02:40PM 11   Q.   AND IF WE JUST GO DOWN TO THE KEY OBJECTIVES, IF WE JUST

02:41PM 12   GO BACK TO YOUR MEMO, THE BOTTOM, WE CAN BRING THE "FORTUNE"

02:41PM 13   ARTICLE DOWN.

02:41PM 14       THESE WERE WHAT YOU IDENTIFIED AS THE KEY OBJECTIVES FOR

02:41PM 15   THE MEETING IN YOUR MEMO?

02:41PM 16   A.   YES.

02:41PM 17   Q.   YEAH.  AND WAS THAT ACCURATE AT THE TIME TO THE BEST OF

02:41PM 18   YOUR KNOWLEDGE?

02:41PM 19   A.   YES.

02:42PM 20   Q.   OKAY.  AND YOU ASKED MR. TUBERGEN --

02:42PM 21   A.   CAN I SAY ONE OTHER THING?  THIS IS THERANOS --

02:42PM 22   Q.   THERE'S NO QUESTION PENDING.  SO THE WAY THIS GENERALLY

02:42PM 23   WORKS IS THAT THE GOVERNMENT CAN DO FOLLOWUP WITH YOU, BUT --

02:42PM 24            THE COURT:  HE'LL ASK YOU ANOTHER QUESTION.

02:42PM 25            MR. WADE:  YEAH, I'LL ASK YOU ANOTHER QUESTION.

02:42PM  1              THE WITNESS:  OKAY.

02:42PM  2    BY MR. WADE:

02:42PM  3    Q.   THE -- MR. TUBERGEN -- YOU ASKED MR. TUBERGEN IN ADVANCE

02:42PM  4    WHETHER THERE WAS ANY SORT OF MODELING OR ANYTHING THAT SHOULD

02:42PM  5    BE DONE IN CONNECTION WITH THE THERANOS INVESTMENT; CORRECT?

02:42PM  6    A.   CORRECT.

02:42PM  7    Q.   AND HE TOLD YOU NO; RIGHT?

02:42PM  8    A.   HE JUST SAID THAT IT WASN'T NECESSARY FOR THIS.

02:42PM  9    Q.   OKAY.  BUT FINANCIAL MODELING IS SOMETHING THAT IS

02:42PM 10    FREQUENTLY DONE IN DUE DILIGENCE; RIGHT?

02:42PM 11    A.   IT'S -- YES.

02:42PM 12    Q.   OKAY.  BUT MR. TUBERGEN TOLD YOU NOT TO DO IT IN THIS

02:42PM 13    CASE; RIGHT?

02:42PM 14    A.   HE SAID WE WERE RELYING ON WHAT WE WERE GIVEN BY THE

02:43PM 15    COMPANY.

02:43PM 16    Q.   RIGHT.  AND YOU ACTUALLY RAISED A COUPLE OF POTENTIAL

02:43PM 17    TECHNICAL PEOPLE THAT YOU COULD TALK TO AS WELL.

02:43PM 18         DO YOU RECALL THAT?

02:43PM 19    A.   I DON'T RECALL WHAT YOU MEAN.

02:43PM 20    Q.   WERE YOU AWARE THAT MEMBERS OF THE DEVOS FAMILY RAISED

02:43PM 21    WITH MR. TUBERGEN THAT THERE MIGHT BE SOME TECHNICAL PEOPLE WHO

02:43PM 22    COULD BE USED TO CONSULT ON THIS RELATIONSHIP?

02:43PM 23    A.   I DON'T --

02:43PM 24    Q.   YOU DON'T?

02:43PM 25    A.   -- KNOW WHAT YOU'RE REFERRING TO.

02:43PM  1    Q.   I'M JUST WONDERING IF YOU RECALL THAT COMING UP IN ADVANCE

02:43PM  2    OF THE MEETING.

02:43PM  3    A.   NO.

02:43PM  4    Q.   OKAY.  YOU MENTIONED THAT YOU DID LOOK AT THE TWO BINDERS

02:43PM  5    OF MATERIALS; RIGHT?

02:43PM  6    A.   YES.

02:43PM  7    Q.   AND MR. LEACH SHOWED YOU, I DON'T KNOW, TWO INCHES OF THEM

02:43PM  8    MAYBE?  IS THAT FAIR?

02:43PM  9    A.   OKAY.

02:43PM  10   Q.   IS IT --

02:43PM  11   A.   YES.

02:43PM  12   Q.   OKAY.  I BELIEVE IN YOUR PRIOR TESTIMONY YOU SAID THERE

02:43PM  13   WERE ABOUT A FOOT OF MATERIALS.

02:43PM  14   A.   YES.

02:43PM  15   Q.   AND WHAT WERE THE OTHER MATERIALS IN THE BINDER?

02:43PM  16   A.   I CAN'T RECALL ALL OF THE SPECIFICS OF THAT, BUT IT WAS

02:44PM  17   VERY MUCH -- ONE BINDER WAS VERY MUCH THERANOS AND THE COMPANY

02:44PM  18   AND WHAT IT DOES AND WHAT IT HAD TO OFFER, AND THE SECOND

02:44PM  19   BINDER WAS VERY CLINICAL.

02:44PM  20   Q.   VERY CLINICAL.  WAS IT DATA?

02:44PM  21   A.   YES, YES.

02:44PM  22   Q.   OKAY.  SO THEY SENT YOU -- DID THEY SEND YOU LIKE A REAM

02:44PM  23   OF DATA BASICALLY?

02:44PM  24   A.   YES.

02:44PM  25   Q.   OKAY.  DID YOU ASK ANYONE TO LOOK AT THAT?

02:44PM  1    A.   NO.

02:44PM  2    Q.   OKAY.  SO THERE'S DATA.  WHAT ELSE DO YOU RECALL ABOUT

02:44PM  3    WHAT THEY SENT?

02:44PM  4    A.   THAT'S WHAT I RECALL.

02:44PM  5    Q.   OKAY.  DID YOU REVIEW THE DATA YOURSELF, OR TRY TO REVIEW

02:44PM  6    THE DATA?

02:44PM  7    A.   I FLIPPED THROUGH ALL OF THE PAGES OF BOTH BINDERS AND THE

02:44PM  8    KEY THINGS THAT WERE IMPORTANT TO US WAS THE WORK WITH THE

02:44PM  9    PHARMACEUTICAL COMPANIES AND THE FINANCIALS AND THE CONTRACTS

02:44PM 10    AND THE MANY TIMES THAT IT STATED THAT -- THE ACCURACY OF THE

02:44PM 11    TEST.

02:44PM 12    Q.   YEAH, I UNDERSTAND YOUR TESTIMONY.

02:44PM 13         BUT YOU ACTUALLY DIDN'T MAKE THE INVESTMENT DECISION;

02:45PM 14    RIGHT?

02:45PM 15    A.   CORRECT.

02:45PM 16    Q.   OKAY.  THE -- LET'S LOOK AT THE MATERIALS YOU WERE SENT.

02:45PM 17    IT'S 4858.

02:45PM 18         AND YOU'RE THE ONLY PERSON AT RDV WHO LOOKED AT THESE

02:45PM 19    MATERIALS; RIGHT?

02:45PM 20    A.   I DON'T KNOW.

02:45PM 21    Q.   OKAY.  YOU'RE NOT AWARE OF ANYONE ELSE LOOKING AT THOSE?

02:45PM 22    A.   I'M NOT AWARE, NO.

02:45PM 23    Q.   AND WHEN MR. TUBERGEN GOT THEM, HE ASKED YOU TO LOOK AT

02:45PM 24    THEM; RIGHT?

02:45PM 25    A.   CORRECT.

02:45PM 1    Q.   OKAY.  AND DO YOU RECALL PREVIOUSLY MAKING STATEMENTS TO

02:46PM 2    THE EFFECT OF YOU'RE THE ONLY ONE WHO DID A DETAILED REVIEW OF

02:46PM 3    THE BINDERS?

02:46PM 4    A.   YES.

02:46PM 5    Q.   OKAY.  THAT'S BECAUSE YOU DON'T KNOW OF ANYONE ELSE DOING

02:46PM 6    IT; RIGHT?

02:46PM 7    A.   CORRECT.

02:46PM 8    Q.   OKAY.  AND WITHIN THESE MATERIALS -- SO THEY SENT THE TWO

02:46PM 9    BINDERS.  DID YOU ASK IN FOLLOWUP FOR ANY ADDITIONAL

02:46PM 10   INFORMATION IN WRITING?

02:46PM 11   A.   NO.

02:46PM 12   Q.   OKAY.  AND --

02:46PM 13   A.   WE WERE GOING TO GO AND VISIT THEM, SO WE DIDN'T THINK IT

02:46PM 14   WAS NECESSARY TO ASK FOR MORE.

02:46PM 15   Q.   I UNDERSTAND.  BUT MY QUESTION WAS WHETHER -- YOU

02:46PM 16   UNDERSTAND THAT IN A TYPICAL DUE DILIGENCE PROCESS, FREQUENTLY

02:46PM 17   THERE ARE LISTS OF REQUESTS; RIGHT?

02:46PM 18   A.   UH-HUH.

02:46PM 19   Q.   OKAY.  AND THEN YOU SEND THAT TO THE OTHER SIDE, RIGHT, IN

02:46PM 20   A TYPICAL DUE DILIGENCE PROCESS; RIGHT?

02:46PM 21   A.   YES.

02:46PM 22   Q.   AND THEN THEY SEND YOU BACK MATERIALS; RIGHT?

02:46PM 23   A.   YES.

02:46PM 24   Q.   AND YOU DIDN'T DO THAT IN THIS CASE?

02:46PM 25   A.   WE WERE GOING TO SEE THEM PERSONALLY AND SPEND A DAY

02:46PM  1    THERE, SO WE WERE GOING TO HANDLE IT THEN.

02:46PM  2    Q.   I UNDERSTAND.  BUT WITH RESPECT TO WRITTEN MATERIALS OR

02:46PM  3    MORE DETAILED INFORMATION --

02:46PM  4    A.   NO, WE DID NOT ASK FOR MORE.

02:47PM  5    Q.   OKAY.  AND IS IT YOUR TESTIMONY THAT YOU DID REVIEW IN

02:47PM  6    DETAIL ALL OF THE MATERIAL WITHIN THE SUBGROUP?

02:47PM  7    A.   SUBGROUP?

02:47PM  8    Q.   WITHIN TWO -- 4858, DID YOU LOOK CAREFULLY AND REVIEW ALL

02:47PM  9    OF THIS MATERIAL?

02:47PM  10   A.   I HAVE A 4859 AND 4734.

02:47PM  11   Q.   I'M SORRY.  IT'S IN THE WHITE BINDER BECAUSE MR. LEACH

02:47PM  12   REFERRED TO IT EARLIER.

02:47PM  13   A.   WHAT NUMBER?

02:47PM  14   Q.   4858.

02:48PM  15   A.   YES.  AND ALL OF THE HIGHLIGHTING WAS DONE EARLY.

02:48PM  16   Q.   OKAY.  SO YOU'VE REVIEWED EVERYTHING IN THIS EXHIBIT IN

02:48PM  17   DETAIL?

02:48PM  18   A.   YES.

02:48PM  19   Q.   OKAY.  DO YOU SEE IN THE BACK THERE'S A VERY DETAILED LIST

02:48PM  20   OF INTELLECTUAL PROPERTY MATERIALS?

02:48PM  21   A.   YOU'LL HAVE TO GIVE ME A PAGE NUMBER.

02:48PM  22   Q.   SURE.  I BELIEVE IT'S 12805 IN THE BOTTOM RIGHT CORNER, OR

02:48PM  23   ON THE EXHIBIT IN THE MIDDLE IT'S 133.

02:48PM  24   A.   YES.

02:48PM  25   Q.   OKAY.  AND IN CONNECTION WITH THIS, THE GOVERNMENT -- OR,

02:48PM 1    I'M SORRY -- THE COMPANY SENT YOU A LIST OF ALL OF THEIR

02:48PM 2    INTELLECTUAL PROPERTY MATERIALS; CORRECT?

02:48PM 3    A.   YES.

02:48PM 4    Q.   AND DID YOU DO -- DID YOU REVIEW THIS AND LOOK AT THE

02:49PM 5    PATENTS THAT THE COMPANY HAD FILED?

02:49PM 6    A.   WE, WE KNEW THAT THEY HAD PATENTS.  I CAN'T SAY THAT I

02:49PM 7    REVIEWED THEM OR KNEW WHAT THE PATENTS WERE.

02:49PM 8    Q.   OKAY.  SO THIS WASN'T REVIEWED IN DETAIL?

02:49PM 9    A.   THIS LENDS CREDIBILITY TO THE FACT THAT IT WORKS.  YES, I

02:49PM 10   FLIPPED THROUGH EVERYTHING.

02:49PM 11   Q.   OKAY.

02:49PM 12   A.   BUT I'M NOT A SCIENTIST, SO I DON'T KNOW EXACTLY WHAT SOME

02:49PM 13   OF THESE ARE SAYING.

02:49PM 14        BUT I DO -- I CAN FIGURE OUT WHETHER THINGS ARE LENDING

02:49PM 15   CREDIBILITY TO WHAT THEY WERE TELLING US.

02:49PM 16   Q.   NO, I UNDERSTAND.  I JUST -- YOU UNDERSTAND THAT OFTEN IN

02:49PM 17   DUE DILIGENCE ON TECHNOLOGY COMPANIES THAT PEOPLE DO PRETTY

02:49PM 18   DETAILED REVIEWS OF INTELLECTUAL PROPERTY PORTFOLIOS; RIGHT?

02:49PM 19   A.   OKAY.

02:49PM 20   Q.   THEY'LL HIRE EXPERTS.  ARE YOU AWARE OF THAT?

02:49PM 21   A.   YES.

02:49PM 22   Q.   AND DID YOU DO THAT?

02:49PM 23   A.   NO.

02:49PM 24   Q.   AND YOU DIDN'T HIRE AN EXPERT; CORRECT?

02:49PM 25   A.   NO.

02:49PM  1   Q.   AND YOU DIDN'T, BY YOURSELF, LOOK UP ANY OF THESE

02:49PM  2   MATERIALS IN A PUBLIC RECORD OR ASK FOR ANY INFORMATION

02:50PM  3   RELATING TO THESE MATERIALS?

02:50PM  4   A.   NO.  WE TRUSTED WHAT WE READ.

02:50PM  5   Q.   WELL, BUT DID YOU WANT ANY MORE INFORMATION?  FOR EXAMPLE,

02:50PM  6   A LOT OF THESE --

02:50PM  7   A.   NO, NO.

02:50PM  8   Q.   -- SOME OF THESE PATENTS AND APPLICATIONS RELATE TO THE

02:50PM  9   USE OF SMALL SAMPLES ON COMMERCIAL DEVICES.

02:50PM  10  A.   NO.

02:50PM  11  Q.   DID YOU LOOK INTO THAT AT ALL?

02:50PM  12  A.   NO.  WHAT WAS RELEVANT TO US WAS THAT THEY SAID THAT'S

02:50PM  13  WHAT THEY WERE DOING.

02:50PM  14       AGAIN, IT GOES BACK TO THE KEY THINGS OF WHAT WE WERE

02:50PM  15  UNDERWRITING, WHICH WERE THE FINANCIALS, THE CONTRACTS, AND THE

02:50PM  16  VALIDITY OF THE ANALYZER WORKING BY ALL THE PHARMACEUTICAL

02:50PM  17  COMPANIES AND THE GOVERNMENT.

02:50PM  18  Q.   I'M GLAD YOU BROUGHT UP THE CONTRACTS.

02:50PM  19       WHAT WAS YOUR UNDERSTANDING OF THE WALGREENS CONTRACT?

02:51PM  20  A.   THAT IT WAS BEGINNING TO LAUNCH AND ROLL OUT IN ADDITIONAL

02:51PM  21  LOCATIONS.  THERE WAS NO SUGGESTION THAT THERE WAS ANYTHING

02:51PM  22  WRONG WITH THE WALGREENS CONTRACTS.

02:51PM  23  Q.   DID YOU LOOK --

02:51PM  24  A.   AND THAT SAFEWAY WAS GOING TO ROLL OUT AS WELL.

02:51PM  25  Q.   DID YOU LOOK AT THE CONTRACTS?

02:51PM 1    A.   NO.

02:51PM 2    Q.   OKAY.  YOU UNDERSTAND THAT'S A PRETTY TYPICAL THING TO

02:51PM 3    REQUEST IN DUE DILIGENCE?

02:51PM 4    A.   YES.

02:51PM 5    Q.   MATERIAL CONTRACTS?

02:51PM 6         YOU DIDN'T ASK FOR THEM?

02:51PM 7    A.   NO.

02:51PM 8    Q.   DID YOU ASK FOR A SUMMARY OF THE RELATIONSHIP?

02:51PM 9    A.   WE TALKED ABOUT THE WALGREENS RELATIONSHIP AND IT WAS ALL

02:51PM 10   VERY POSITIVE.

02:51PM 11   Q.   AND THEY TOLD YOU ABOUT THE PHASE I AND PHASE II OF THE

02:51PM 12   WALGREENS RELATIONSHIP?

02:51PM 13   A.   I DON'T RECALL THAT SPECIFICALLY.

02:51PM 14   Q.   DO YOU RECALL IT GENERALLY?

02:51PM 15   A.   IN GENERAL.  I MEAN, WE TALKED ABOUT, WE ASKED ABOUT

02:51PM 16   WHAT -- AGAIN, AT THE MEETING, WE WANTED TO KNOW WHERE THEY

02:51PM 17   WERE GOING TO GO NEXT, WHAT -- WERE THEY GOING TO BIG CITIES

02:51PM 18   AND HOW MANY CITIES AND HOW MANY LOCATIONS WERE THEY GOING TO

02:51PM 19   OPEN IN THE NEXT YEAR OR TWO?  AND THAT'S WHAT THE DISCUSSION

02:51PM 20   WAS AROUND.

02:51PM 21   Q.   WHAT WAS YOUR UNDERSTANDING OF THE PHASE I AND PHASE II OF

02:52PM 22   THE WALGREENS RELATIONSHIP?

02:52PM 23   A.   I DON'T KNOW WHAT YOU MEAN BY PHASE I AND PHASE II OF THE

02:52PM 24   WALGREENS RELATIONSHIP.  THEY WERE IN 40 STORES AT THE TIME,

02:52PM 25   AND THEY WERE GOING TO ROLL OUT TO 900 THE FOLLOWING YEAR.

1    Q.   OKAY.

2    A.   AND THEY WERE GOING TO ROLL INTO I WANT TO SAY FOUR

3    METROPOLITAN AREAS FIRST, AND THEY WERE VERY SPECIFIC ABOUT HOW

4    MANY LOCATIONS -- HOW MANY METROPOLITAN AREAS THEY WERE GOING

5    TO GO IN EACH YEAR.

6    Q.   RIGHT.  THEY HAD A PLAN --

7    A.   CORRECT.

8    Q.   -- THAT THEY WERE GOING TO IMPLEMENT; RIGHT?

9    A.   CORRECT.

10   Q.   THEY HAD THE EXECUTION LIST, BUT THEY HAD --

11   A.   THEY HAD A ROLLOUT PLAN.

12   Q.   THEY HAD A ROLLOUT PLAN?

13   A.   YES.

14   Q.   BUT MY QUESTION WAS MORE, DO YOU RECALL ANY DISCUSSION OR

15   ASKING ANY QUESTIONS ABOUT TWO DIFFERENT PHASES OF THE

16   WALGREENS RELATIONSHIP THAT WAS SET FORTH IN WALGREENS

17   CONTRACTS?

18   A.   THAT'S NOT HOW IT WAS CHARACTERIZED TO US.

19   Q.   OKAY.  THE DOCUMENT JUST PRIOR TO THIS IS THE PFIZER

20   THERANOS DOCUMENT THAT IF YOU LOOK ON PAGE --

21   A.   YES.

22   Q.   -- 104.  ACTUALLY, IF YOU CAN BRING UP 109, 109 OF THE

23   EXHIBIT, WHICH IS PAGE 6 OF THIS DOCUMENT.

24        (PAUSE IN PROCEEDINGS.)

25   BY MR. WADE:

02:53PM  1     Q.   DO YOU SEE THIS DOCUMENT?

02:53PM  2     A.   YES.

02:53PM  3     Q.   OKAY.  AND THIS SETS FORTH THE DETAILS OF THE

02:54PM  4     RELATIONSHIP, DO YOU SEE THAT, OF THE PROJECT THAT THEY WERE

02:54PM  5     DOING?

02:54PM  6     A.   WHERE ARE YOU LOOKING?

02:54PM  7     Q.   I'M JUST LOOKING AT PAGE 109.

02:54PM  8     A.   YES, ON THE PAGE.

02:54PM  9     Q.   AND DO YOU SEE -- IF YOU LOOK UP ON THE SCREEN, DO YOU SEE

02:54PM 10     THIS?

02:54PM 11     A.   YES.

02:54PM 12     Q.   IT SAYS "FOR THIS STUDY, AN INSTRUMENT WAS DEPLOYED IN THE

02:54PM 13     HOME OF EACH PATIENT."

02:54PM 14     A.   YES.

02:54PM 15     Q.   "FOUR OTHERS WERE INSTALLED AT THE CANCER CENTER."

02:54PM 16          DO YOU SEE THAT?

02:54PM 17     A.   YES.

02:54PM 18     Q.   OKAY.  AND DO YOU UNDERSTAND THAT THIS WAS A THERANOS

02:54PM 19     DEVICE?

02:54PM 20     A.   YES.

02:54PM 21     Q.   AND IT THEN TALKS ABOUT HOW THREE ASSAYS WERE PERFORMED

02:54PM 22     SIMULTANEOUSLY IN MULTIPLEX.

02:54PM 23          DO YOU SEE THAT?

02:54PM 24     A.   YES.

02:54PM 25     Q.   AND DO YOU KNOW WHAT THAT MEANS?

02:54PM 1    A.   NO.

02:54PM 2    Q.   IT MEANS THAT AT THE TIME THEY ARE RUNNING THE TESTS, THAT

02:55PM 3    THEY'RE RUNNING THREE DIFFERENT TESTS AT THE SAME TIME.

02:55PM 4         DID YOU UNDERSTAND THAT AT THE TIME?

02:55PM 5    A.   NO.

02:55PM 6    Q.   AND WAS THERE ANY DISCUSSION OF EXACTLY WHAT HAPPENED IN

02:55PM 7    CONNECTION WITH THIS?

02:55PM 8    A.   NO.  THE PAGES THAT WE WERE FOCUSSED IN ON ARE THE ONES

02:55PM 9    THAT SAY THAT THE THERANOS SYSTEM PERFORMED WITH SUPERIOR

02:55PM 10   PERFORMANCE TO REFERENCE ASSAYS WHILE RUNNING IN A COMPLEX

02:55PM 11   AMBULATORY ENVIRONMENT AND THINGS LIKE THAT.

02:55PM 12        WE WERE MUCH MORE AT THE SUMMARY LEVEL THAN GOING THROUGH

02:55PM 13   AND MAKING SURE THAT THE PROCESS THAT THEY USED OR WHAT THEY

02:55PM 14   WERE DOING WAS -- WE DIDN'T NEED TO UNDERSTAND THE PROCESS THAT

02:55PM 15   THEY WERE USING, JUST THE OUTCOME.

02:55PM 16   Q.   OKAY.  MY QUESTION THEN IS THIS:  WHAT DID THEY DO IN

02:55PM 17   THIS?  WHAT WAS THIS REPORT?

02:55PM 18   A.   THIS, THIS WAS -- THIS DEFINITELY TOLD US THAT, THAT

02:55PM 19   PFIZER WAS USING THEIR MACHINES AND IT WAS PERFORMING

02:55PM 20   EXCEPTIONALLY WELL IN THEIR TESTS.

02:55PM 21   Q.   DID YOU UNDERSTAND THAT PFIZER -- THAT THE MACHINES WERE

02:55PM 22   DEPLOYED IN THE HOME OF A NUMBER OF PATIENTS?

02:56PM 23   A.   I DON'T RECALL THAT.  IT WAS A LONG TIME AGO.

02:56PM 24   Q.   OKAY.

02:56PM 25   A.   THE SPECIFICS OF THE REPORT.

02:56PM  1    Q.  RIGHT.  YOU JUST RECALL THE SPECIFIC PARTS THAT THE

02:56PM  2    GOVERNMENT POINTED YOU TO?  IS THAT THE LIMIT OF YOUR

02:56PM  3    RECOLLECTION?

02:56PM  4    A.  NO, NO.  I COMPLETELY REMEMBER WHEN WE WERE DOING THIS

02:56PM  5    THAT THAT -- THE TAKE AWAY FROM THIS IS THAT LARGE

02:56PM  6    PHARMACEUTICAL BUSINESSES, COMPANIES, WERE USING THEIR ANALYZER

02:56PM  7    AND THEY WEREN'T HAVING ANY ISSUES WITH IT.

02:56PM  8    Q.  RIGHT.  NO.  I UNDERSTAND THAT POINT.

02:56PM  9    A.  THAT WAS THE TAKE AWAY.

02:56PM  10   Q.  I UNDERSTAND.

02:56PM  11       BUT YOU TALKED ABOUT HOW IT VALIDATED THE TECHNOLOGY, AND

02:56PM  12   TO VALIDATE THE TECHNOLOGY, YOU KIND OF NEED TO KNOW WHAT

02:56PM  13   HAPPENED AND HOW IT WORKED; RIGHT?

02:56PM  14   A.  NO.  I JUST NEED TO KNOW THAT THEY SAID IT WORKED.

02:56PM  15   Q.  OKAY.  AND YOU UNDERSTOOD THAT THEY WERE TESTING THIS IN

02:56PM  16   CONNECTION WITH THE USE OF -- THAT THIS WAS A THERANOS DEVICE;

02:56PM  17   RIGHT?

02:56PM  18   A.  YES.

02:56PM  19   Q.  AND THAT THIS WAS TESTED IN CONNECTION WITH A PFIZER DRUG;

02:56PM  20   RIGHT?

02:56PM  21   A.  YES.

02:56PM  22   Q.  OKAY.  THAT BOTH COMPANIES WERE INVOLVED IN THIS; RIGHT?

02:56PM  23   YOU KNEW THAT?

02:56PM  24   A.  THAT -- I DON'T RECALL THAT.  I DON'T RECALL EXACTLY.

02:57PM  25       I JUST KNOW THAT THEY WERE USING THEIR ANALYZERS IN

02:57PM 1  CLINICAL TRIALS.

02:57PM 2  Q.   OKAY.  AND IF YOU GO TO PAGE 8 -- I'M SORRY, ONE MORE

02:57PM 3  PAGE.

02:57PM 4       DO YOU HAVE ANY FAMILIARITY WITH CHARTS OF THIS KIND?

02:57PM 5  A.   NO.

02:57PM 6  Q.   OKAY.  THIS IS A MEASURE OF ACCURACY.  DO YOU HAVE ANY --

02:57PM 7  WAS THERE ANY DISCUSSION OF THE R SQUARED OF THIS PARTICULAR

02:57PM 8  ASSAY?

02:57PM 9  A.   NO.

02:57PM 10 Q.   OKAY.  LET'S GO BACK TO THE START OF THE DOCUMENT.  IF WE

02:57PM 11 GO TO -- LET'S GO TO PAGE 3.  OKAY.  HERE -- DO YOU SEE THE

02:58PM 12 REFERENCE TO THERANOS'S PROPRIETARY PATENTED TECHNOLOGY?

02:58PM 13 A.   YES.

02:58PM 14 Q.   OKAY.  AND THEY ATTENDED -- APPENDED ALL OF THE PATENTS TO

02:58PM 15 THIS PRESENTATION; RIGHT?

02:58PM 16 A.   THEY -- I'M SORRY?

02:58PM 17 Q.   THEY APPENDED A LIST OF ALL OF THEIR PATENTS?

02:58PM 18      DO YOU RECALL THAT?

02:58PM 19 A.   YES.

02:58PM 20 Q.   OKAY.  WHAT DO YOU UNDERSTAND TO BE THE BREADTH OF

02:58PM 21 THERANOS'S PROPRIETARY PATENTED TECHNOLOGY AS REFERENCED IN

02:58PM 22 THIS STATEMENT?

02:58PM 23 A.   THAT IT WAS CAPABLE OF DOING FINGERSTICK BLOOD TESTING --

02:58PM 24 Q.   AND WHAT IS "IT"?

02:58PM 25 A.   -- ON THEIR ANALYZER.

02:58PM 1    Q.   I'M SORRY, I THOUGHT YOU WERE DONE.

02:58PM 2         WHAT IS "IT"?

02:58PM 3    A.   "IT"?

02:58PM 4    Q.   YEAH, YOU SAID "IT IS CAPABLE."  WHAT IS "IT"?

02:58PM 5    A.   THAT THE ANALYZER IS CAPABLE OF DOING FINGERSTICK

02:58PM 6    TECHNOLOGY BECAUSE OF ITS IP --

02:58PM 7    Q.   NO.  MY QUESTION IS --

02:58PM 8    A.   -- AND IS DOING IT ACCURATELY.

02:58PM 9    Q.   MY QUESTION WAS, WHAT DOES THERANOS PROPRIETARY PATENTED

02:59PM 10   TECHNOLOGY REFER TO?  WHAT IS THE BREADTH OF THE TECHNOLOGY?

02:59PM 11   A.   THE WAY THAT THE ANALYZER WORKS AND RUNS FINGERSTICK BLOOD

02:59PM 12   TESTING ON IT.

02:59PM 13   Q.   SO IS IT YOUR TESTIMONY THAT THERANOS PROPRIETARY PATENTED

02:59PM 14   TECHNOLOGY REFERS TO JUST THE DEVICE?

02:59PM 15   A.   AND HOW IT DOES -- HOW IT DOES THE BLOOD TESTING WITHIN

02:59PM 16   THE DEVICE, YES.

02:59PM 17   Q.   OKAY.

02:59PM 18   A.   WITH THE ASSAYS.

02:59PM 19   Q.   OKAY.  IT DOESN'T SAY "DEVICE" THERE?  YOU'LL AGREE WITH

02:59PM 20   ME; RIGHT?

02:59PM 21   A.   I THINK IT'S IMPLIED.

02:59PM 22   Q.   OKAY.  AND THAT WAS YOUR UNDERSTANDING AT THE TIME;

02:59PM 23   CORRECT?

02:59PM 24   A.   YES.

02:59PM 25   Q.   OKAY.  YOU UNDERSTOOD THAT A LOT OF THESE SLIDES WERE

03:00PM 1     FORWARD LOOKING; RIGHT?

03:00PM 2     A.   NO.

03:00PM 3     Q.   YOU DIDN'T UNDERSTAND THAT?

03:00PM 4     A.   NO.

03:00PM 5     Q.   YOU THOUGHT THEY WERE ALL PRESENT?

03:00PM 6     A.   YES.

03:00PM 7     Q.   OKAY.  SO LET'S LOOK AT -- I KNOW MR. LEACH SHOWED YOU

03:00PM 8     SOME.

03:00PM 9          LET'S LOOK AT -- LET'S GO TO 19, WHICH IS -- YEAH, 19.

03:00PM 10    IT'S 19 ON BOTH DOCUMENTS.

03:00PM 11         DO YOU SEE THAT?

03:00PM 12    A.   YES.

03:00PM 13    Q.   NOW, THIS IS FORWARD LOOKING; RIGHT?

03:00PM 14    A.   CORRECT.

03:00PM 15    Q.   AND THIS IS TALKING ABOUT THE FUTURE; RIGHT?

03:00PM 16    A.   WITH HOW IT'S GOING TO SAVE THE GOVERNMENT MONEY.

03:00PM 17    Q.   RIGHT.  AND THIS IS A GOAL; RIGHT?

03:00PM 18    A.   CORRECT.

03:00PM 19    Q.   THIS IS IN PART THE VISION THAT MS. HOLMES HAD WAS TO TRY

03:01PM 20    TO CHANGE HEALTH CARE IN A WAY WHERE THERE WERE SAVINGS TO THE

03:01PM 21    WHOLE SYSTEM; RIGHT?

03:01PM 22    A.   CORRECT.

03:01PM 23    Q.   OKAY.  AND IF YOU LOOK AT THE NEXT SLIDE, IT'S SIMILAR;

03:01PM 24    RIGHT?

03:01PM 25    A.   YES.

03:01PM  1    Q.   AND IF YOU LOOK AT THE NEXT SLIDE, IT'S SIMILAR?

03:01PM  2    A.   YES.

03:01PM  3    Q.   AND IF WE CAN CLICK THROUGH A COUPLE MORE.

03:01PM  4         THESE ARE FORWARD LOOKING ITEMS; RIGHT?

03:01PM  5    A.   YES.

03:01PM  6    Q.   OKAY.  IF YOU WOULD LOOK AT 40, WHICH MR. LEACH TALKED TO

03:01PM  7    YOU ABOUT THIS.  THIS IS FORWARD LOOKING; RIGHT?

03:01PM  8    A.   YES.

03:01PM  9    Q.   AND THEY WEREN'T NATIONALLY DEPLOYED AT THIS TIME?

03:01PM 10    A.   NO.

03:01PM 11    Q.   THEY WERE TALKING ABOUT THE VISION THAT THEY HAD FOR THE

03:01PM 12    COMPANY; RIGHT?

03:02PM 13    A.   NO.  BUT IT WAS VERY CLEAR THAT THEY WERE GOING TO DO 900

03:02PM 14    THE NEXT YEAR.

03:02PM 15    Q.   AND THIS TALKS ABOUT 8,000; RIGHT?

03:02PM 16    A.   YES.

03:02PM 17    Q.   OKAY.  AND THAT HAD NOT HAPPENED YET; RIGHT?

03:02PM 18    A.   CORRECT.

03:02PM 19    Q.   AND MOST OF THE DOTS ON THIS WERE NOT THERE?

03:02PM 20    A.   CORRECT.

03:02PM 21    Q.   OKAY.  AND IF YOU LOOK AT THE NEXT SLIDE, THAT, TOO, THAT

03:02PM 22    TALKS ABOUT THE PROXIMITY OF THERANOS TO PATIENTS; RIGHT?

03:02PM 23    A.   YES.

03:02PM 24    Q.   AND HOW IT COMPARES TO OTHER LABS; RIGHT?

03:02PM 25    A.   YES.

03:02PM   1    Q.   BUT THAT WASN'T -- THAT DIDN'T HAPPEN YET; RIGHT?

03:02PM   2    A.   NO.  THAT WAS --

03:02PM   3    Q.   FORWARD LOOKING; RIGHT?

03:02PM   4    A.   THAT WAS HER VISION, YES.

03:02PM   5    Q.   ALL RIGHT.  AND IF YOU GO TO, IF YOU GO TO SLIDE 28, DO

03:03PM   6    YOU SEE THAT?  YOU WERE ASKED ABOUT THAT?

03:03PM   7    A.   YES.

03:03PM   8    Q.   YOU HIGHLIGHTED THAT?

03:03PM   9    A.   YES.

03:03PM   10   Q.   AND DO YOU SEE WHERE IT SAYS, "PROCESSES ALL SAMPLE

03:03PM   11   TYPES"?

03:03PM   12   A.   YES.

03:03PM   13   Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

03:03PM   14   A.   I'M FOCUSSED IN ON "THERANOS RUNS ANY TEST AVAILABLE IN

03:03PM   15   CENTER LABORATORIES," AND WE WERE TOLD THAT THEY COULD DO

03:03PM   16   HUNDREDS OF THEM, 2- TO 300 OF THEM.

03:03PM   17   Q.   MY QUESTION WAS ABOUT THE LANGUAGE "AND PROCESSES ALL

03:03PM   18   SAMPLE TYPES."

03:03PM   19        DO YOU SEE THAT?

03:03PM   20   A.   YES.

03:03PM   21   Q.   WHAT DOES THAT REFER TO?

03:03PM   22   A.   I DON'T KNOW WHAT THEY MEANT BY THAT.

03:03PM   23   Q.   DOES IT REFER TO VENOUS DRAWS?

03:03PM   24   A.   I DON'T KNOW.

03:03PM   25   Q.   OKAY.

03:03PM  1    A.   IT'S NOT IN THE PICTURE.

03:03PM  2    Q.   AND AGAIN, I BELIEVE IT WAS YOUR TESTIMONY THERE WERE NO

03:03PM  3    SLIDES AT THE MEETING THAT YOU WENT TO --

03:03PM  4    A.   CORRECT.

03:03PM  5    Q.   -- IN CALIFORNIA; CORRECT?

03:03PM  6         THESE WERE SENT TO YOU IN ADVANCE; RIGHT?

03:03PM  7    A.   CORRECT.

03:03PM  8    Q.   AND YOU DIDN'T BRING THESE SLIDES AND GO THROUGH A LIST OF

03:04PM  9    QUESTIONS ITEM BY ITEM; RIGHT?

03:04PM  10   A.   NO.

03:04PM  11   Q.   AND IN FACT, YOU DIDN'T TAKE ANY NOTES, OTHER THAN ON THE

03:04PM  12   FINANCIAL DOCUMENT, AT THE MEETING; RIGHT?

03:04PM  13   A.   NO, I TOOK NOTES.

03:04PM  14   Q.   DO YOU RECALL PREVIOUSLY TESTIFYING THAT YOU TOOK NO NOTES

03:04PM  15   BECAUSE IT WAS A HIGH LEVEL MEETING?

03:04PM  16   A.   I TOOK ENOUGH NOTES TO WRITE THE MEMO AFTERWARDS, YES.

03:04PM  17   Q.   AND SO IF YOU TESTIFIED PREVIOUSLY, THAT WAS MISTAKEN?

03:04PM  18   A.   I --

03:04PM  19              MR. LEACH:  OBJECTION.  ARGUMENTATIVE.

03:04PM  20              THE COURT:  OVERRULED.

03:04PM  21        YOU CAN ANSWER THE QUESTION.

03:04PM  22              THE WITNESS:  YES, MY MAIN JOB WAS TO SIT AND

03:04PM  23   LISTEN.  BUT I WAS TAKING NOTES, YES.

03:04PM  24   BY MR. WADE:

03:04PM  25   Q.   OKAY.  BUT AGAIN, NOT WITH RESPECT TO THIS POWERPOINT

03:04PM  1    BECAUSE IT WASN'T DISCUSSED; CORRECT?

03:04PM  2    A.   CORRECT.  THE PAGES THAT WERE PRESENTED WERE THE

03:04PM  3    FINANCIALS IN THE MEETING.

03:04PM  4    Q.   LET'S -- SINCE YOU BROUGHT IT UP, WHY DON'T WE TALK ABOUT

03:04PM  5    THE FINANCIALS.

03:04PM  6         I BELIEVE THAT'S ITEM 1853.

03:05PM  7         DO YOU SEE THAT?

03:05PM  8    A.   WHICH BINDER?

03:05PM  9    Q.   I'M SORRY.  THE WHITE BINDER, 1853.

03:05PM 10    A.   YES.

03:05PM 11    Q.   YOU WERE ASKED QUESTIONS ABOUT THIS DOCUMENT.

03:05PM 12         DO YOU RECALL THAT?

03:05PM 13    A.   YES.

03:05PM 14    Q.   AND YOU UNDERSTOOD -- JUST HIGHLIGHT THE LANGUAGE IN THE

03:05PM 15    UPPER LEFT-HAND CORNER.

03:05PM 16         AGAIN, YOU UNDERSTOOD THAT THESE WERE PROJECTIONS; RIGHT?

03:05PM 17    A.   YES.

03:05PM 18    Q.   AND IF YOU GO -- MR. LEACH DIDN'T FOCUS YOU I DON'T THINK

03:05PM 19    ON THE SECOND PAGE.  LET'S TAKE A LOOK AT THAT.

03:05PM 20         OKAY.  AND YOU SEE THIS WAS INCLUDED WITHIN THE MATERIALS

03:05PM 21    AS WELL.

03:05PM 22         DO YOU RECALL THAT?

03:05PM 23    A.   YES.

03:05PM 24    Q.   OKAY.  AND IT IDENTIFIES THAT THERE'S ALMOST $163 MILLION

03:05PM 25    IN CASH AT THE TIME.

03:05PM  1          DO YOU SEE THAT?

03:05PM  2     A.   YES.

03:05PM  3     Q.   AND YOU CIRCLED THAT; RIGHT?

03:05PM  4     A.   YES.

03:05PM  5     Q.   AND THEN DOWN BELOW THERE'S $168 MILLION IN -- ALMOST

03:05PM  6     $169 MILLION IN DEFERRED REVENUE AND CUSTOMER'S DEPOSITS;

03:06PM  7     RIGHT?

03:06PM  8     A.   YES.

03:06PM  9     Q.   AND YOU CIRCLED THAT; RIGHT?

03:06PM  10    A.   YES.

03:06PM  11    Q.   OKAY.  AND YOU SEE IN THE UPPER LEFT-HAND CORNER THAT

03:06PM  12    THESE FINANCIALS THAT YOU WERE PROVIDED WERE PREPARED FOR THE

03:06PM  13    PERIOD ENDING JULY 14TH, 2014?

03:06PM  14    A.   UH-HUH, YES.

03:06PM  15    Q.   AND DID YOU ASK FOR UPDATED FINANCIALS OR PROJECTIONS THAT

03:06PM  16    WERE BEYOND THAT DATE?

03:06PM  17    A.   WHAT, WHAT WE HAD IN THE BINDERS, THESE TWO PAGES IS WHAT

03:06PM  18    WE WERE GIVEN.

03:06PM  19    Q.   RIGHT.  SO AS OF JULY 14TH, 2014?

03:06PM  20    A.   YES.

03:06PM  21    Q.   MY QUESTION IS, DID YOU ASK FOR AN UPDATE IN OCTOBER?

03:06PM  22    A.   I DON'T RECALL IF WE ASKED FOR A SPECIFIC UPDATE.

03:06PM  23    Q.   OKAY.  I'M DONE WITH THE FINANCIAL DOCUMENT.

03:07PM  24          DID YOU ASK, DURING YOUR MEETING, WHETHER THE COMPANY USED

03:07PM  25    CASH OR ACCRUAL ACCOUNTING?

03:07PM    1    A.   I DON'T RECALL.

03:07PM    2    Q.   OKAY.  IS THAT SOMETHING THAT YOU THINK YOU WOULD HAVE

03:07PM    3    NOTED IN YOUR MEMO IF YOU HAD?

03:07PM    4    A.   I DON'T RECALL ASKING OR TALKING ABOUT THAT.

03:07PM    5    Q.   YOU TALKED A FAIR AMOUNT ABOUT THE "FORTUNE" ARTICLE;

03:08PM    6    RIGHT?

03:08PM    7    A.   UH-HUH.

03:08PM    8    Q.   AND THAT WAS -- THOSE WERE THE MATERIALS THAT MR. TUBERGEN

03:08PM    9    CAME BACK WITH; RIGHT?

03:08PM   10    A.   YES.

03:08PM   11    Q.   AND HE WAS VERY EXCITED; RIGHT?

03:08PM   12    A.   YES.

03:08PM   13    Q.   OKAY.  DID YOU READ THE WHOLE ARTICLE?

03:08PM   14    A.   I BELIEVE SO.

03:08PM   15    Q.   OKAY.  WE'LL COME BACK TO THAT IN A SECOND.

03:08PM   16         IN ADVANCE OF THE MEETING OUT THERE, OR IN THE MEETING OUT

03:08PM   17    THERE, DO YOU RECALL MAKING THE STATEMENT THAT THIS WAS NOT A

03:08PM   18    DUE DILIGENCE MEETING?

03:08PM   19    A.   I DON'T RECALL THAT.

03:08PM   20    Q.   OKAY.  DID YOU -- IN YOUR MIND THIS WAS NOT A DUE

03:08PM   21    DILIGENCE MEETING; CORRECT?

03:08PM   22    A.   THIS WAS AN OPPORTUNITY TO ASK QUESTIONS, YES.  WE WERE --

03:08PM   23    IT WAS AN ON SITE VISIT.

03:08PM   24    Q.   OKAY.  DO YOU RECALL TELLING THE GOVERNMENT THAT IN YOUR

03:08PM   25    VIEW THIS WAS NOT A DUE DILIGENCE MEETING?

03:08PM 1    A.   I DON'T RECALL SAYING THAT.

03:08PM 2    Q.   WHY DON'T YOU TAKE A LOOK AT EXHIBIT 11249 AT PAGE 6.

03:09PM 3    A.   OKAY.

03:09PM 4    Q.   DO YOU HAVE THAT IN FRONT OF YOU?

03:09PM 5    A.   YES.

03:09PM 6    Q.   IF YOU LOOK AT THE BOTTOM OF 6, DO YOU SEE THE LAST

03:09PM 7    SENTENCE ON THE PAGE?

03:09PM 8    A.   WHERE ARE THE PAGE NUMBERS?

03:09PM 9    Q.   GOOD QUESTION.  IN THE UPPER RIGHT-HAND CORNER.

03:09PM 10        AGAIN, THIS IS ONE OF THOSE DOCUMENTS WHERE YOU SHOULD

03:09PM 11   READ IT TO YOURSELF AND THEN I'LL ASK A QUESTION.  IF YOU COULD

03:09PM 12   READ THE LAST SENTENCE THERE.

03:09PM 13        (PAUSE IN PROCEEDINGS.)

03:10PM 14   BY MR. WADE:

03:10PM 15   Q.   DO YOU SEE THAT LAST SENTENCE?

03:10PM 16   A.   I'M STILL READING HERE.

03:10PM 17        (PAUSE IN PROCEEDINGS.)

03:10PM 18        THE WITNESS:  I DON'T RECALL -- I DIDN'T SAY THAT.

03:10PM 19   BY MR. WADE:

03:10PM 20   Q.   HERE'S MY QUESTION.  DOES THAT REFRESH YOUR RECOLLECTION

03:10PM 21   THAT YOU TOLD THE GOVERNMENT THAT YOU DID NOT VIEW THE MEETING

03:10PM 22   IN PALO ALTO AS A DUE DILIGENCE MEETING?

03:11PM 23   A.   I DON'T RECALL SAYING THAT.

03:11PM 24   Q.   OKAY.  DO YOU RECALL DURING THE MEETING THAT THERE WAS A

03:11PM 25   SIGNIFICANT AMOUNT OF DISCUSSION ABOUT MS. HOLMES'S VISION IN

03:11PM  1    THE MEETING?

03:11PM  2    A.   THERE WAS A LOT OF DISCUSSION ABOUT A LOT OF THINGS.

03:11PM  3    THERE WAS A LOT --

03:11PM  4    Q.   THAT WASN'T MY QUESTION.  MY QUESTION WAS, DO YOU RECALL

03:11PM  5    THAT THERE WAS A SIGNIFICANT AMOUNT OF DISCUSSION ABOUT

03:11PM  6    MS. HOLMES'S VISION IN THE MEETING?

03:11PM  7    A.   YES.

03:11PM  8    Q.   OKAY.  I BELIEVE YOU TESTIFIED ON CROSS BEFORE WE TOOK OUR

03:11PM  9    BREAK THAT YOU DIDN'T KNOW WHETHER THE WALTONS INVESTED?

03:11PM  10   A.   CORRECT.

03:11PM  11   Q.   OKAY.

03:12PM  12   A.   AT THE TIME OF THE INVESTMENT.

03:12PM  13   Q.   CAN I DRAW YOUR ATTENTION TO 14089?

03:12PM  14   A.   OKAY.

03:12PM  15   Q.   DO YOU HAVE THAT IN FRONT OF YOU?

03:12PM  16   A.   I DO.

03:12PM  17   Q.   AND THAT WAS AN EMAIL BETWEEN YOU AND MR. TUBERGEN AND THE

03:12PM  18   DEVOSES?

03:12PM  19   A.   YES.

03:12PM  20   Q.   ABOUT THE THERANOS INVESTMENT?

03:12PM  21   A.   YES.

03:12PM  22        MR. WADE:  I MOVE THE ADMISSION OF 14089.

03:12PM  23        MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:12PM  24        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:12PM  25        (DEFENDANT'S EXHIBIT 14089 WAS RECEIVED IN EVIDENCE.)

BY MR. WADE:

Q.   AND IF WE CAN JUST BLOW UP -- DO YOU SEE AT THE TOP THIS
IS AN EMAIL ON 10-24-2014?

A.   YES.

Q.   OKAY.  AND IF YOU GO TO THAT FIRST SENTENCE, DO YOU SEE
THAT?

A.   YES.

Q.   DO YOU SEE MR. TUBERGEN REPORTING THAT THE WALTON FAMILY
FOR SURE IS INVESTING?

A.   YES.

     I DON'T REMEMBER THIS.

Q.   WERE YOU A PART OF THE DISCUSSIONS THAT HE WAS HAVING WITH
REPRESENTATIVES OF THE WALTON FAMILY?

A.   NO.

Q.   WERE YOU A PART OF ANY DISCUSSIONS AFTER THE MEETING AT
THERANOS WITH MR. MOSLEY?

A.   SAY AGAIN.  I'M SORRY.

Q.   WITH MR. MOSLEY?  WERE YOU PART OF ANY DISCUSSIONS WITH
MR. MOSLEY?

A.   NO.

Q.   IN THAT FOLLOWING MONTH?

A.   NO.

Q.   AND WERE YOU INVOLVED IN ANY DISCUSSIONS AFTER THE VISIT
TO THERANOS WITH MR. TROTT?

A.   NO.

03:13PM   1    Q.   OKAY.

03:13PM   2    A.   MY BOSS WAS.

03:13PM   3    Q.   MR. DAMSTRA?

03:14PM   4    A.   YES.

03:14PM   5    Q.   AND ARE YOU AWARE THAT MR. TUBERGEN WAS TALKING WITH

03:14PM   6    MR. TROTT AS WELL?

03:14PM   7    A.   I ONLY HAD DISCUSSIONS WITH MR. DAMSTRA AROUND BDT.  I

03:14PM   8    KNEW THAT THEY WERE POTENTIALLY GOING TO LOOK AT THE INVESTMENT

03:14PM   9    AND MAYBE INVEST.

03:14PM  10    Q.   OKAY.  I THINK ON YOUR DIRECTION TESTIMONY YOU MADE A LOT

03:14PM  11    OF STATEMENTS RELATING TO INFORMATION THAT YOU LEARNED IN THAT

03:14PM  12    MEETING.

03:14PM  13         DO YOU RECALL THAT?

03:14PM  14    A.   WHICH MEETING?

03:14PM  15    Q.   IN THE MEETING IN PALO ALTO.

03:14PM  16    A.   YES.

03:14PM  17    Q.   HADN'T YOU PREVIOUSLY TESTIFIED THAT YOU DIDN'T RECALL THE

03:14PM  18    SPECIFICS OF THAT MEETING?

03:14PM  19    A.   I -- WE'VE HAD A LOT OF TIME TO THINK ABOUT IT.  WE'VE

03:15PM  20    TALKED ABOUT A LOT OF THINGS AND I HAD THE OPPORTUNITY TO READ

03:15PM  21    THROUGH ALL OF THE MEMOS THAT I DID, AND THERE'S -- AND WE DID

03:15PM  22    TALK ABOUT A LOT OF THINGS.

03:15PM  23    Q.   OKAY.  AND, AND YOU GAVE THAT DEPOSITION THAT WE TALKED

03:15PM  24    ABOUT BEFORE IN MARCH OF 2019; RIGHT?

03:15PM  25    A.   MARCH OF 2019?  OKAY, YES.

PETERSON CROSS BY MR. WADE                                                  4804

03:15PM  1    Q.   THAT'S WHEN YOU GAVE THE DEPOSITION.  THAT WAS A COUPLE

03:15PM  2    YEARS AGO, TWO AND A HALF YEARS AGO; RIGHT?

03:15PM  3    A.   YES.

03:15PM  4    Q.   THAT WAS CLOSER IN TIME TO THE MEETING; RIGHT?

03:15PM  5    A.   YES.

03:15PM  6    Q.   AND IN THE DEPOSITION YOU WERE SHOWN A LOT OF THE SAME

03:15PM  7    DOCUMENTS THAT YOU'VE LOOKED AT TODAY; RIGHT?

03:15PM  8    A.   YES, BUT I'VE HAD A LOT OF TIME TO REFLECT AND READ

03:15PM  9    THROUGH A LOT OF THINGS THAT WAS GOING ON AT THAT POINT IN

03:15PM 10    TIME.

03:15PM 11    Q.   OKAY.  AND SO YOU'RE NOT DISPUTING THAT YOU SAID THAT YOU

03:15PM 12    DON'T RECALL THE SPECIFICS IN THAT DEPOSITION?

03:15PM 13    A.   NOT AT THAT TIME, NO.

03:15PM 14    Q.   OKAY.  SO YOUR MEMORY HAS IMPROVED OVER TIME; IS THAT YOUR

03:15PM 15    TESTIMONY?

03:15PM 16    A.   I'VE, I'VE RECOLLECTED A LOT OF THINGS FROM WHAT I'VE

03:16PM 17    READ, YES.  I HAVE A TENDENCY TO WRITE A LOT DOWN.

03:16PM 18    Q.   OKAY.  THE RECOLLECTION THAT YOU GOT FROM REVIEWING A LOT

03:16PM 19    OF THINGS, IS THAT REVIEWING IT IN CONNECTION WITH YOUR

03:16PM 20    TESTIMONY HERE TODAY?

03:16PM 21    A.   YEAH.  I'VE REVIEWED ALL OF MY NOTES, YES.

03:16PM 22    Q.   AND YOU WERE ACTUALLY SHOWN ALL OF YOUR NOTES IN THAT

03:16PM 23    DEPOSITION; RIGHT?

03:16PM 24    A.   THERE WASN'T ANYTHING THAT HASN'T BEEN IN THESE BINDERS.

03:16PM 25    Q.   RIGHT.  AND MY POINT IS THAT IN THAT DEPOSITION YOU WERE

03:16PM 1    ACTUALLY SHOWN YOUR NOTES; RIGHT?

03:16PM 2    A.   I WAS TOLD NOT TO PREPARE AT ALL FOR ANY OF THOSE

03:16PM 3    DEPOSITIONS, TO WHICH I DIDN'T.  I DIDN'T GO BACK AND READ ANY

03:16PM 4    OF MY NOTES FROM BEFORE.

03:16PM 5    Q.   NOW, YOU ALSO TOLD THE GOVERNMENT IN 2017 THAT YOU DIDN'T

03:17PM 6    TAKE ANY NOTES DURING THAT MEETING.  WAS THAT -- ARE YOU -- DO

03:17PM 7    YOU BELIEVE THAT YOU DID NOT SAY THAT?

03:17PM 8              MR. LEACH:  OBJECTION, YOUR HONOR.  CALLS FOR

03:17PM 9    HEARSAY.

03:17PM 10             THE WITNESS:  YEAH, I --

03:17PM 11             THE COURT:  EXCUSE ME.  EXCUSE ME, MA'AM.

03:17PM 12             THE WITNESS:  I DON'T RECALL SAYING THAT.

03:17PM 13             THE COURT:  HANG ON A SECOND.

03:17PM 14        ARE YOU ABOUT DONE WITH THIS AREA, OR?

03:17PM 15             MR. WADE:  I'VE GOT A LITTLE MORE.

03:17PM 16             THE COURT:  OKAY.  SUSTAINED.

03:17PM 17   BY MR. WADE:

03:17PM 18   Q.   WELL, WHY DON'T YOU LOOK AT 11249, PAGE 7.

03:17PM 19        (PAUSE IN PROCEEDINGS.)

03:17PM 20   BY MR. WADE:

03:18PM 21   Q.   AND DOES THAT REFRESH YOUR RECOLLECTION WHETHER YOU TOOK

03:18PM 22   ANY NOTES?

03:18PM 23   A.   I'M SORRY.  IT'S A LONG MEMO.  WHAT AM I LOOKING AT?

03:18PM 24   Q.   PAGE 7.  PAGE 7.

03:18PM 25   A.   PAGE 7.

03:18PM  1                (PAUSE IN PROCEEDINGS.)

03:19PM  2    BY MR. WADE:

03:19PM  3    Q.   IF YOU LOOK AT THE FIRST FULL PARAGRAPH.

03:19PM  4    A.   I DON'T RECALL SAYING THAT.

03:19PM  5    Q.   AND DO YOU RECALL THAT -- TELLING THE GOVERNMENT THAT IT

03:19PM  6    ONLY CONTAINED HIGH LEVEL INFORMATION?

03:19PM  7    A.   I DO RECALL THAT, AND I DO RECALL -- IT SAYS PETERSON DID

03:19PM  8    NOT HEAR ANYTHING AT THE MEETING THAT CHANGED HER UNDERSTANDING

03:19PM  9    OF THERANOS.

03:19PM  10   Q.   OKAY.  SO YOU RECALL THAT THE DISCUSSION FOCUSSED ON HIGH

03:19PM  11   LEVEL INFORMATION?

03:19PM  12   A.   THE DISCUSSION FOCUSSED AROUND EVERYTHING THAT WE HAD READ

03:19PM  13   IN THE BINDERS AND QUESTIONS AROUND THE CONTRACTS AND THE

03:20PM  14   FINANCIALS AND WHERE THEY HAD DONE WORK PREVIOUSLY WITH THE

03:20PM  15   ANALYZER AND WHERE THEY WERE GOING TO ROLL OUT AND THE VISION

03:20PM  16   OF THE COMPANY, YES.

03:20PM  17   Q.   OKAY.  THAT WASN'T MY QUESTION.  MY QUESTION WAS, DO YOU

03:20PM  18   RECALL THAT THE MEETING FOCUSSED ON HIGH LEVEL INFORMATION?

03:20PM  19   YES OR NO?

03:20PM  20   A.   IT DEPENDS ON THE DEFINITION OF "HIGH LEVEL."  THOSE WERE

03:20PM  21   THE TOPICS THAT WE DISCUSSED THAT I JUST LISTED.

03:20PM  22   Q.   DO YOU RECALL ON DIRECT YOU GAVE TESTIMONY ABOUT THE FACT

03:20PM  23   THAT THE SIZE OF THE INVESTMENT INCREASED ON SITE?

03:20PM  24   A.   YES.

03:20PM  25   Q.   ISN'T IT THE CASE THAT ACTUALLY BEFORE THE DEVOSES AND

03:20PM  1     MR. TUBERGEN AND YOU WENT OUT THERE THAT THERE WAS DISCUSSION

03:21PM  2     AND A BELIEF THAT THEY SHOULD INCREASE THE INVESTMENT TO

03:21PM  3     $100 MILLION?

03:21PM  4     A.   NOT THAT I RECALL.

03:21PM  5     Q.   TAKE A LOOK AT 14106.

03:21PM  6          (PAUSE IN PROCEEDINGS.)

03:21PM  7               THE WITNESS:  OKAY.

03:21PM  8     BY MR. WADE:

03:21PM  9     Q.   DO YOU HAVE 14106 IN FRONT OF YOU?

03:21PM  10    A.   YES.

03:21PM  11    Q.   AND AGAIN, MR. SCHIERBEEK IS THE CONUMBER 2 PERSON WITHIN

03:22PM  12    THE RDV OFFICE; IS THAT RIGHT?

03:22PM  13    A.   YES.

03:22PM  14    Q.   OKAY.

03:22PM  15         MOVE THE ADMISSION OF 14106.

03:22PM  16              MR. LEACH:  OBJECTION.  HEARSAY, FOUNDATION.  SHE'S

03:22PM  17    NOT ON THIS.

03:22PM  18              MR. WADE:  WE'VE LET IN MANY DOCUMENTS THAT SHE'S

03:22PM  19    NOT ON.

03:22PM  20              THE COURT:  OKAY.  GIVE ME JUST A MOMENT, PLEASE.

03:22PM  21         (PAUSE IN PROCEEDINGS.)

03:22PM  22              MR. WADE:  AND FOR THE BENEFIT OF THE COURT, I'M

03:22PM  23    FOCUSSED ON NUMBER 2 WITHIN THAT COMMUNICATION.

03:22PM  24              THE WITNESS:  YES.  OH.

03:22PM  25              MR. WADE:  FOR THE JUDGE'S BENEFIT.  WE'LL WAIT FOR

| | | |
|---|---|---|
| 03:22PM | 1 | HIM. |
| 03:22PM | 2 | (PAUSE IN PROCEEDINGS.) |
| 03:22PM | 3 | THE COURT: DO YOU WANT TO JUST PROBE THIS THEN? IS |
| 03:23PM | 4 | THAT WHAT YOU WANT TO DO IS PROBE THIS? OR DID YOU -- |
| 03:23PM | 5 | BY MR. WADE: |
| 03:23PM | 6 | Q. ARE YOU AWARE THAT THERE WAS ACTUALLY DISCUSSION AND A |
| 03:23PM | 7 | BELIEF GOING INTO THE TRIP TO CALIFORNIA THAT MR. TUBERGEN WAS |
| 03:23PM | 8 | VERY BULLISH ON THE POTENTIAL INVESTMENT AND THAT THEY PROBABLY |
| 03:23PM | 9 | WOULD MAKE $100 MILLION INVESTMENT? |
| 03:23PM | 10 | A. HE WAS VERY BULLISH ON THE OPPORTUNITY. I DON'T RECALL |
| 03:23PM | 11 | CONVERSATION AROUND 100 MILLION UNTIL AFTER THE MEETING, AND |
| 03:23PM | 12 | BOB DIDN'T -- MR. SCHIERBEEK DIDN'T HAVE ANYTHING REALLY TO DO |
| 03:23PM | 13 | WITH THIS DEAL. |
| 03:23PM | 14 | Q. BUT HE'S A SENIOR OFFICER IN THE COMPANY; RIGHT? |
| 03:23PM | 15 | A. YES, BUT HE'S ON THE FAMILY SERVICES SIDE. HE'S NOT PART |
| 03:23PM | 16 | OF THE INVESTMENT GROUP. |
| 03:23PM | 17 | Q. I UNDERSTAND YOUR VIEW. BUT YOU WERE NOT A PART OF EVERY |
| 03:23PM | 18 | CONVERSATION THAT MR. TUBERGEN HAD WITH MR. SCHIERBEEK; RIGHT? |
| 03:23PM | 19 | A. CORRECT. BUT I DON'T KNOW -- I DON'T KNOW WHERE HE WOULD |
| 03:24PM | 20 | HAVE GOTTEN THAT PROBABLY 100 MILLION INVESTMENT. THAT WASN'T |
| 03:24PM | 21 | THE DISCUSSION THAT WE HAD HAD ON THE PLANE. |
| 03:24PM | 22 | Q. BUT YOU UNDERSTAND HE WAS OF THE VIEW THAT IT WAS PROBABLY |
| 03:24PM | 23 | A $100 MILLION INVESTMENT? |
| 03:24PM | 24 | A. HE WAS, RIGHT, BUT HE WASN'T WORKING ON THIS DEAL. |
| 03:24PM | 25 | Q. YOU UNDERSTOOD THAT HE COMMUNICATED WITH MR. TUBERGEN |

03:24PM  1    ABOUT THE THERANOS TRANSACTION; RIGHT?

03:24PM  2    A.   SURE.   THEY COMMUNICATED.   I DON'T KNOW IF THEY TALKED

03:24PM  3    ABOUT THERANOS.

03:24PM  4    Q.   HE'S ULTIMATELY THE GUY WHO SIGNED THE AGREEMENT; RIGHT?

03:24PM  5    A.   CORRECT.

03:24PM  6    Q.   HE'S THE GUY WHO AUTHORIZED THE WIRE; RIGHT?

03:24PM  7    A.   YES.   BUT HE WASN'T PART OF THE INVESTMENT COMMITTEE AND

03:24PM  8    HE'S NOT IN THE INVESTMENT GROUP.   HE CONTROLS THE CASH.

03:24PM  9         MR. WADE:   I MOVE THE ADMISSION OF THE DOCUMENT.

03:24PM  10        THE COURT:   WELL, THERE'S SOME OTHER INFORMATION ON

03:24PM  11   HERE -- THAT'S WHY I ALLOWED YOU TO PROBE.

03:24PM  12        MR. WADE:   I COULD REDACT -- I'D BE WILLING TO

03:24PM  13   REDACT EVERYTHING BUT THAT PARAGRAPH.

03:24PM  14        THE COURT:   OKAY.   I'LL ALLOW IT IN, JUST THAT

03:24PM  15   NUMBER 2 PARAGRAPH, AND I'M SURE YOUR TEAM CAN REDACT THAT.

03:24PM  16     (DEFENDANT'S EXHIBIT 14106, PARAGRAPH 2, REDACTED, WAS

03:25PM  17   RECEIVED IN EVIDENCE.)

03:25PM  18        MR. WADE:   YEAH.   CAN YOU GIVE ME ONE SECOND SO I

03:25PM  19   CAN LET MY COLLEAGUE WORK?

03:25PM  20        THE COURT:   OKAY.

03:25PM  21        MR. WADE:   OKAY.   LET ME KNOW WHEN YOU'RE READY,

03:25PM  22   MR. BENNETT.

03:25PM  23        THE COURT:   OKAY.   AND WHY DON'T YOU TAKE A LOOK AT

03:25PM  24   IT TO MAKE SURE THAT IT CONFORMS.   THAT WOULD PROBABLY BE A

03:25PM  25   GOOD IDEA.

03:25PM 1          MR. WADE:  THANK YOU, YOUR HONOR.

03:25PM 2          THE COURT:  FOLKS, WHY DON'T YOU STAND UP AND

03:25PM 3   STRETCH IF YOU WOULD LIKE.

03:25PM 4       (STRETCHING.)

03:25PM 5          MR. WADE:  JUST TO MAKE SURE WE'RE ON THE SAME PAGE,

03:25PM 6   WE'RE GOING TO INCLUDE THE HEADER AND THAT PARAGRAPH.

03:25PM 7          THE COURT:  RIGHT, UP TO SUBJECT AND NUMBER 2.

03:25PM 8          MR. WADE:  RIGHT.  EVERYTHING ELSE WILL BE REDACTED.

03:25PM 9          THE COURT:  GREAT.

03:26PM 10      WHILE THAT HAPPENING, CAN I JUST ASK A TIME ESTIMATE FOR

03:26PM 11  THIS WITNESS?  WILL WE CONCLUDE THIS WITNESS TODAY?

03:26PM 12         MR. WADE:  PROBABLY NOT.

03:26PM 13         THE COURT:  OKAY.

03:26PM 14         MR. WADE:  WE HAVE ANOTHER 30 MINUTES?

03:26PM 15         THE COURT:  THAT'S WHAT WE HAVE.  THAT'S WHAT I TOLD

03:26PM 16  THE JURY.

03:26PM 17         MR. WADE:  I DON'T THINK SO.

03:26PM 18         THE COURT:  OKAY.

03:26PM 19  BY MR. WADE:

03:26PM 20  Q.   OKAY.  DO YOU SEE THAT IN FRONT OF YOU ON THE SCREEN NOW?

03:26PM 21  A.   YES.

03:26PM 22  Q.   AND THIS IS -- 10-14, AGAIN, IS A COUPLE OF DAYS BEFORE

03:26PM 23  YOU, OR MAYBE THE DAY THAT YOU WERE HEADED OUT TO PALO ALTO;

03:26PM 24  CORRECT?

03:26PM 25  A.   YES.

03:26PM 1     Q.   OKAY.  AND IN THIS EMAIL THEY TALK ABOUT JERRY, AND THAT'S

03:26PM 2     JERRY TUBERGEN; RIGHT?

03:27PM 3     A.   YES.

03:27PM 4     Q.   AND HE'S TRAVELLING OUT TO MEET WITH THE FOUNDER,

03:27PM 5     ELIZABETH HOLMES.

03:27PM 6          DO YOU SEE THAT?

03:27PM 7     A.   YES.

03:27PM 8     Q.   AND HE'S BEEN VERY BULLISH ON THIS POTENTIAL

03:27PM 9     RELATIONSHIP/INVESTMENT.

03:27PM 10         DO YOU SEE THAT?

03:27PM 11    A.   YES.

03:27PM 12    Q.   AND THE FAMILY WAS TRAVELLING WITH HIM AND THAT IT WAS

03:27PM 13    PROBABLY A $100 MILLION INVESTMENT; CORRECT?  THAT'S WHAT HE

03:27PM 14    SAYS THERE?

03:27PM 15    A.   YES.

03:27PM 16    Q.   OKAY.  AND THE INVESTMENT -- THE DECISION TO -- OR THE

03:27PM 17    COMMITMENT TO INVEST WAS MADE ACTUALLY IN THE ROOM AT THERANOS;

03:27PM 18    CORRECT?

03:27PM 19    A.   WE TALKED ABOUT SIZING, AND ALONG WITH WHAT SOME OF THE

03:27PM 20    OTHER INVESTORS WERE GOING TO INVEST AT, AND, YES, WE DISCUSSED

03:27PM 21    LOOKING AT IT, OR CONSIDERING THE 100 MILLION INSTEAD OF THE

03:28PM 22    50 MILLION.

03:28PM 23    Q.   WELL, ACTUALLY, THERE WAS AN ACTUAL COMMITMENT MADE BY

03:28PM 24    MR. TUBERGEN AND MR. DEVOS TO A $100 MILLION COMMITMENT IN THE

03:28PM 25    MEETING WITH THERANOS; CORRECT?

03:28PM  1    A.   THERE WASN'T A COMMITMENT, NO.  THAT'S NOT HOW IT WORKS.

03:28PM  2    IT HAS TO GO THROUGH OUR INVESTMENT COMMITTEE PROCESS.

03:28PM  3         THEY MAY HAVE SAID THAT THEY WOULD LOOK AT 100 MILLION OR

03:28PM  4    WERE WILLING TO DO 100 MILLION, BUT IT STILL HAD TO BE -- IT

03:28PM  5    STILL HAD TO GO THROUGH THE PROCESS.  THERE WERE A NUMBER OF

03:28PM  6    PEOPLE NOT THERE THAT WERE ON THE INVESTMENT COMMITTEE, AND

03:28PM  7    JERRY IS NOT ON OUR INVESTMENT COMMITTEE.

03:28PM  8    Q.   DO YOU RECALL PREVIOUSLY TESTIFYING THAT THE COMMITMENT

03:28PM  9    WAS MADE IN THE ROOM?

03:28PM  10   A.   I DON'T RECALL.

03:28PM  11   Q.   OKAY.  WE'LL GO THROUGH THAT IN A SECOND, BUT BEFORE I DO,

03:29PM  12   LET'S LOOK AT THE -- LET'S LOOK AT 204 -- I'M SORRY, 2097.

03:29PM  13        DO YOU SEE THAT IN FRONT OF YOU?

03:29PM  14   A.   YES.

03:29PM  15   Q.   OKAY.  AND THAT'S AN EMAIL BETWEEN YOU AND ONE OF YOUR

03:29PM  16   COLLEAGUES THAT DISCUSSES THE THERANOS INVESTMENT.

03:29PM  17        DO YOU SEE THAT?

03:29PM  18   A.   YEAH, SHE'S A COWORKER, FRIEND.

03:29PM  19   Q.   OKAY.

03:29PM  20        MOVE THE ADMISSION OF 2097.

03:29PM  21            MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:30PM  22            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:30PM  23        (GOVERNMENT'S EXHIBIT 2097 WAS RECEIVED IN EVIDENCE.)

03:30PM  24   BY MR. WADE:

03:30PM  25   Q.   LET ME BLOW UP THE MIDDLE EMAIL.

03:30PM  1          THIS IS AN EMAIL THAT YOU WROTE ON OCTOBER 20TH, 2014;

03:30PM  2    RIGHT?

03:30PM  3    A.   YES.

03:30PM  4    Q.   THAT'S LESS THAN A WEEK AFTER THE DATE OF THE MEETING;

03:30PM  5    CORRECT?

03:30PM  6    A.   YES.

03:30PM  7    Q.   AND DO YOU SEE DOWN BELOW WHERE IT SAYS, "JERRY COMMITTED

03:30PM  8    ON THE SPOT $100 MILLION WITH DOUG AND CHERI IN COMPLETE

03:30PM  9    AGREEMENT"?

03:30PM 10          DO YOU SEE THAT?

03:30PM 11    A.   YES.

03:30PM 12    Q.   AND WAS THAT TRUE AT THE TIME?

03:30PM 13    A.   IT DOESN'T WORK THAT WAY.  I THINK THAT HE HAD SIGNALLED

03:30PM 14    AND DOUG AND CHERI WERE IN AGREEMENT TO DO THE 100 AND WE

03:30PM 15    TALKED ABOUT THE 100 AFTERWARD.  BUT IT STILL HAS TO GO THROUGH

03:30PM 16    THE PROCESS OF GOING THROUGH INVESTMENT COMMITTEE.

03:30PM 17          THAT'S JUST MY CHARACTERIZATION TO A FRIEND AND A

03:30PM 18    COWORKER.

03:30PM 19    Q.   OKAY.  SO YOU DON'T RECALL THEM COMMITTING IN THE ROOM TO

03:31PM 20    THE $100 MILLION INVESTMENT?

03:31PM 21    A.   WE TALKED ABOUT IT.  I DON'T -- THERE'S, THERE'S NOT A

03:31PM 22    COMMITMENT BECAUSE IT HAS TO GO THROUGH INVESTMENT COMMITTEE.

03:31PM 23    Q.   LET ME JUST ASK IF THE LANGUAGE -- IF THAT IS AN ACCURATE

03:31PM 24    STATEMENT AT THE TIME THAT YOU MADE IT.

03:31PM 25    A.   IT WAS MY CHARACTERIZATION OF WHAT I SAW GOING ON, YES.

03:31PM 1    Q.   AND LET ME GO TO 2098.

03:31PM 2    A.   YES.

03:31PM 3    Q.   OKAY.  THIS IS AN EMAIL RELATING TO THE THERANOS

03:31PM 4    INVESTMENT THAT YOU ARE ON; CORRECT?

03:31PM 5    A.   IT'S -- WHICH PART ARE YOU ON?  IT'S A FEW PAGES LONG.

03:31PM 6    Q.   THE BOTTOM PART OF THE EMAIL IS AN EMAIL BETWEEN

03:31PM 7    MR. TUBERGEN, MS. HOLMES, MR. BALWANI, AND MR. DEVOS, CORRECT,

03:32PM 8    THE LATER PART OF THE EMAIL?  AND THEN IT'S FORWARDED TO YOU;

03:32PM 9    CORRECT?

03:32PM 10   A.   YES.

03:32PM 11           MR. WADE:  I MOVE THE ADMISSION OF 2098.

03:32PM 12           MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:32PM 13           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:32PM 14        (GOVERNMENT'S EXHIBIT 2098 WAS RECEIVED IN EVIDENCE.)

03:32PM 15           MR. WADE:  IF WE CAN GO TO THE SECOND PAGE AND BLOW

03:32PM 16   UP THE BOTTOM EMAIL.  I'M SORRY.  ACTUALLY, LET'S GO TO THE

03:32PM 17   THIRD PAGE AND GET MR. TUBERGEN'S EMAIL.

03:32PM 18   Q.   DO YOU SEE THIS IS AN EMAIL FROM MR. TUBERGEN?

03:33PM 19   A.   YES.

03:33PM 20   Q.   TO MS. HOLMES AND MR. BALWANI COPYING DOUG DEVOS?

03:33PM 21        DO YOU SEE THAT?

03:33PM 22   A.   YES.

03:33PM 23   Q.   OKAY.  AND DO YOU SEE IN THE MIDDLE PARAGRAPH WHERE IT

03:33PM 24   SAYS, "WE WOULD LOVE TO MOVE FORWARD AND BE A PART OF THE NEW

03:33PM 25   SHAREHOLDER BASE YOU ARE ASSEMBLING.  AS WE DISCUSSED, AN

03:33PM  1    INVESTMENT OF $100 MILLION SEEMS TO FIT, IF THAT WORKS FOR YOU

03:33PM  2    AND THE COMPANY."  RIGHT?

03:33PM  3    A.   YES, THAT'S PRETTY MUCH HOW IT WAS DISCUSSED IN THE

03:33PM  4    MEETING.

03:33PM  5    Q.   RIGHT.  AND THAT'S FOUR DAYS AFTER THE MEETING THEY'RE

03:33PM  6    SAYING THEY MADE THE COMMITMENT; CORRECT?

03:33PM  7    A.   IT DOESN'T NECESSARILY SAY THEY MADE THE COMMITMENT, BUT

03:33PM  8    YES.

03:33PM  9    Q.   ALL RIGHT.  LET'S GO FORWARD AND LOOK AT MS. HOLMES'S

03:33PM 10    EMAIL.

03:33PM 11        DO YOU SEE THAT?  AND SHE SAYS, "WE HAVE RESERVED THE

03:33PM 12    $100 MILLION ALLOCATION FOR YOU AND THE FAMILY."

03:34PM 13        DO YOU SEE THAT?

03:34PM 14    A.   YES.

03:34PM 15    Q.   AND THEN THIS IS LATER FORWARDED TO YOU SO THAT SUNNY CAN

03:34PM 16    BE IN TOUCH ON THE DOCUMENTATION; RIGHT?

03:34PM 17    A.   YES.

03:34PM 18    Q.   OKAY.  LET'S GO TO 12856.

03:34PM 19        DO YOU SEE THAT?

03:34PM 20    A.   WHERE?  I'M SORRY?

03:34PM 21    Q.   DO YOU HAVE 12856 IN FRONT OF YOU, THAT EMAIL?

03:34PM 22    A.   THERE'S NOTHING ON MY SCREEN.  IS THERE SUPPOSED TO BE?

03:35PM 23    Q.   NO, NOT YET.

03:35PM 24    A.   OKAY.

03:35PM 25    Q.   I'M SORRY.  THE WAY IT WORKS IS THAT ONCE WE INTRODUCE IT,

03:35PM   1   WE CAN PUT IT UP ON THE SCREEN.  BUT UNTIL IT IS IN EVIDENCE,

03:35PM   2   WE CAN'T PUT IT UP ON THE SCREEN.

03:35PM   3       MY APOLOGIES.

03:35PM   4   A.   I DON'T -- I'M NOT SEEING 12856.  I'M SORRY.

03:35PM   5   Q.   YOU DON'T HAVE THAT IN THE BLACK BINDER?

03:35PM   6   A.   WHERE AM I LOOKING?

03:35PM   7   Q.   DO YOU SEE A TAB WITH 12856?

03:35PM   8   A.   I THOUGHT WE WERE STILL ON THAT SERIES OF EMAILS.  I'M

03:35PM   9   SORRY.

03:35PM  10   Q.   NO.

03:35PM  11   A.   12 --

03:35PM  12   Q.   I'M SORRY IF I --

03:35PM  13           MR. LEACH:  YOUR HONOR, I HAVE NO OBJECTION TO THIS

03:35PM  14   EXHIBIT IF YOU WANT TO JUST DISPLAY IT.

03:35PM  15           MR. WADE:  OKAY.

03:35PM  16           THE COURT:  DO YOU WANT TO INTRODUCE IT?

03:35PM  17           MR. WADE:  YES, PLEASE.

03:35PM  18           THE COURT:  ALL RIGHT.  IT'S ADMITTED, AND IT MAY BE

03:35PM  19   PUBLISHED.

03:35PM  20       (DEFENDANT'S EXHIBIT 12856 WAS RECEIVED IN EVIDENCE.)

03:35PM  21           MR. WADE:  IF WE CAN BLOW UP THE THIRD EMAIL DOWN.

03:35PM  22   YEAH, THE --

03:36PM  23   Q.   DO YOU SEE THAT THIS IS THAT EMAIL THAT WE WERE JUST

03:36PM  24   TALKING ABOUT WHERE MS. HOLMES RESPONDED IN THE SEPARATE CHAIN

03:36PM  25   THAT WAS FORWARDED TO YOU?

03:36PM 1    A.   YES, YES.

03:36PM 2    Q.   OKAY.  NOW, LET'S JUST GO UP THE CHAIN AND LOOK AT THE

03:36PM 3    NEXT EMAIL.

03:36PM 4         MR. TUBERGEN SAYS, "THANKS VERY MUCH."

03:36PM 5         AND THEN WE'LL KEEP WORKING UP.

03:36PM 6         THIS IS FOR -- HE THEN FORWARDS IT TO DOUG DEVOS?

03:36PM 7    A.   YES.

03:36PM 8    Q.   AND THERE'S A SEPARATE COMMUNICATION BETWEEN MR. DEVOS AND

03:36PM 9    MR. TUBERGEN.

03:36PM 10        DO YOU SEE THAT?

03:36PM 11   A.   YES.

03:36PM 12   Q.   AND HE SAYS, "WELL DONE, IT LOOKS LIKE WE'RE THERE."

03:36PM 13        DO YOU SEE THAT?

03:36PM 14   A.   YES.

03:36PM 15   Q.   "EXCITING TO BE A PART OF THIS TREMENDOUS EFFORT TO CHANGE

03:36PM 16   THE WORLD FOR THE BETTER."

03:36PM 17        DO YOU SEE THAT?

03:36PM 18   A.   YES.

03:36PM 19   Q.   THE LAST LANGUAGE WE REFLECTED WAS THE FORWARD LONG-TERM

03:36PM 20   FOCUS THAT THE DEVOS FAMILY HAD; CORRECT?

03:36PM 21   A.   YES.

03:36PM 22   Q.   OKAY.  LET'S LOOK UP THE CHAIN.

03:37PM 23        MR. TUBERGEN CONFIRMS, "THANKS, DOUG.  YUP, WE'RE THERE."

03:37PM 24        RIGHT?  DO YOU SEE THAT?

03:37PM 25   A.   YES.

03:37PM 1    Q.   THE -- YOU'VE TALKED A LITTLE BIT ABOUT THE MEMO THAT YOU

03:37PM 2    PREPARED.

03:37PM 3         DO YOU RECALL THAT?

03:37PM 4    A.   YES.   THE MEMO SUMMARIZED WHAT WAS DISCUSSED AT THE

03:37PM 5    MEETING --

03:37PM 6    Q.   RIGHT.

03:37PM 7    A.   -- ALONG WITH EVERYTHING ELSE.

03:37PM 8    Q.   I UNDERSTAND.   BUT THE INVESTMENT DECISION WAS PREPARED

03:37PM 9    BEFORE THE MEMO --

03:37PM 10        THE COURT:   LET HIM FINISH.

03:37PM 11   BY MR. WADE:

03:37PM 12   Q.   I APOLOGIZE.   NORMALLY WE HAVE CONVERSATIONS, BUT WE HAVE

03:37PM 13   TO LET ME FINISH, AND THEN I'LL TRY NOT TO INTERRUPT YOU, TOO.

03:37PM 14   I THINK I'VE DONE THAT A FEW TIMES.   I'M SORRY.

03:37PM 15   A.   OKAY.

03:37PM 16   Q.   THE INVESTMENT DECISION WAS MADE BEFORE THE MEMO WAS

03:38PM 17   PREPARED; CORRECT?

03:38PM 18   A.   IT STILL HAS TO GO TO INVESTMENT COMMITTEE, SO IN MY -- IN

03:38PM 19   MY FINISHING OF THIS, THE ONLY WAY THAT WE CAN FINALIZE

03:38PM 20   EVERYTHING IS IT HAS TO -- THE MEMO HAS TO GO OUT AND BE SIGNED

03:38PM 21   AND APPROVED THROUGH THE INVESTMENT COMMITTEE, BUT JERRY AND

03:38PM 22   DOUG WERE EMAILING THAT THEY WERE THERE.   SO YES.

03:38PM 23   Q.   SO THE -- AGAIN, I UNDERSTAND THAT YOU HAD SOME -- ON YOUR

03:38PM 24   END, YOU HAD SOME PROCESSING THAT YOU NEEDING TO PERFORM --

03:38PM 25   A.   CORRECT.

03:38PM  1    Q.   -- AND SOME LOGISTICAL ISSUES, BUT THE INVESTMENT WAS DONE

03:38PM  2    BEFORE THE MEMO WAS PREPARED; CORRECT?

03:38PM  3    A.   HMM -- THEY STILL -- WE STILL DIDN'T WIRE THE MONEY UNTIL

03:38PM  4    AFTER OUR PROCESS WAS COMPLETED.

03:38PM  5    Q.   BUT YOU SEE HERE THE COMMITMENT IS MADE; RIGHT?

03:38PM  6    A.   IT'S NOT REALLY A COMMITMENT UNTIL YOU SEND THE DOCUMENTS.

03:38PM  7    Q.   OKAY.  LET'S KEEP GOING.  2139.

03:39PM  8         DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?

03:39PM  9    A.   YES.

03:39PM 10    Q.   AND THIS IS A COMMUNICATION --

03:39PM 11         MOVE THE ADMISSION OF 2139.

03:39PM 12              MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:39PM 13              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:39PM 14         (GOVERNMENT'S EXHIBIT 2139 WAS RECEIVED IN EVIDENCE.)

03:39PM 15    BY MR. WADE:

03:39PM 16    Q.   THIS IS A COMMUNICATION BETWEEN YOU AND MR. BALWANI WHERE

03:39PM 17    YOU'RE WORKING TO PAPER THE DEAL AND GET SIGNATURES AND THE

03:39PM 18    LIKE; RIGHT?

03:39PM 19    A.   CORRECT.

03:39PM 20    Q.   OKAY.  AND THEN DO YOU RECALL THERE BEING WORD THAT THEY

03:39PM 21    WANTED TO FUND IT PRETTY QUICKLY AND IT WAS FUNDED WITHIN A

03:39PM 22    COUPLE OF DAYS AFTER THAT?

03:39PM 23    A.   AFTER THIS MEMO, OR AFTER WHAT?

03:39PM 24    Q.   AFTER THIS EMAIL.

03:39PM 25    A.   YES.

03:39PM   1    Q.   OKAY.  AND IF WE GO TO 14080.

03:40PM   2    A.   14080.  OKAY.  OKAY.

03:40PM   3    Q.   THIS IS A DOCUMENT CONFIRMING RECEIPT OF THE SIGNATURE

03:40PM   4    PAGE ON OCTOBER 31ST; CORRECT?

03:41PM   5    A.   CORRECT.

03:41PM   6         MR. WADE:  MOVE THE ADMISSION OF 14080.

03:41PM   7         MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:41PM   8         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:41PM   9         (DEFENDANT'S EXHIBIT 14080 WAS RECEIVED IN EVIDENCE.)

03:41PM  10    BY MR. WADE:

03:41PM  11    Q.   I JUST WANT TO FOCUS ON THE DATE.  THAT'S 10-31; CORRECT?

03:41PM  12    A.   CORRECT.

03:41PM  13    Q.   EXECUTED DOCUMENTS?

03:41PM  14    A.   YES.

03:41PM  15    Q.   OKAY.  NOW LET'S GO TO 13987.

03:41PM  16    A.   YES.

03:41PM  17    Q.   OKAY.  AND DO YOU SEE THIS IS AN EMAIL ABOUT THE THERANOS

03:42PM  18    INVESTMENT THAT YOU'RE ON?

03:42PM  19    A.   YES.

03:42PM  20         MR. WADE:  I MOVE THE ADMISSION OF 13987.

03:42PM  21         MR. LEACH:  NO OBJECTION.

03:42PM  22         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:42PM  23         (DEFENDANT'S EXHIBIT 13987 WAS RECEIVED IN EVIDENCE.)

03:42PM  24    BY MR. WADE:

03:42PM  25    Q.   AND IF YOU LOOK AT THE BOTTOM, YOU SEE THERE'S AN EMAIL

03:42PM   1    FROM YOU TO A GROUP OF PEOPLE WITHIN RDV?

03:42PM   2    A.   YES.

03:42PM   3    Q.   DO YOU SEE THAT?

03:42PM   4         ARE THOSE SORT OF ACCOUNTING AND FINANCIAL PEOPLE?

03:42PM   5    A.   YES, INTERNAL.

03:42PM   6    Q.   OKAY.  AND THERE IT SAYS, "JERRY WANTS TO BRING THERANOS

03:42PM   7    TO IC.  NOT SURE WHEN THAT WILL BE, NOR IS IT RELEVANT GIVEN

03:42PM   8    WE'VE FUNDED, BUT FYI I WON'T HAVE A SIGNATURE ON APPROVAL DOC

03:42PM   9    FOR A BIT."

03:42PM  10         DO YOU SEE THAT?

03:42PM  11    A.   YES.

03:42PM  12    Q.   OKAY.  AND THIS IS FIVE OR SIX DAYS AFTER THE MONEY WAS

03:42PM  13    WIRED AND THE DOCUMENTS WERE SIGNED; RIGHT?

03:42PM  14    A.   CORRECT.

03:42PM  15    Q.   OKAY.

03:43PM  16    A.   BUT THE MEMO HAD GONE OUT ON THE 23RD OF OCTOBER.

03:43PM  17    Q.   RIGHT.

03:43PM  18         DO YOU KNOW WHEN IT WAS SIGNED?  IT WASN'T SIGNED AS OF

03:43PM  19    NOVEMBER 5TH; RIGHT?

03:43PM  20    A.   CORRECT.

03:43PM  21    Q.   AND DO YOU KNOW WHEN THE INVESTMENT COMMITTEE GOT IT?

03:43PM  22    A.   ON THE 20 -- IT WAS DONE ON THE 23RD AND SENT TO JERRY.

03:43PM  23    Q.   RIGHT.  DO YOU KNOW WHEN THE INVESTMENT COMMITTEE GOT IT?

03:43PM  24    A.   I BELIEVE THEY GOT IT THEN.  I DON'T KNOW EXACTLY.

03:43PM  25    Q.   OKAY.  DO YOU KNOW WHEN THE NEXT INVESTMENT COMMITTEE

```
03:43PM   1    MEETING WAS?

03:43PM   2    A.   IN DECEMBER.

03:43PM   3    Q.   OKAY.  LET'S LOOK AT 14081.  IT WAS DECEMBER 17TH;

03:43PM   4    CORRECT?

03:43PM   5    A.   YES.

03:43PM   6    Q.   AND THESE ARE THE DEVOS FAMILY COUNCIL MINUTES; CORRECT?

03:43PM   7    A.   YES.

03:43PM   8         MR. WADE:  AND I'D MOVE THE ADMISSION.  I THINK

03:43PM   9    THEY'RE APPROPRIATELY REDACTED ALREADY, YOUR HONOR.

03:44PM  10       MAYBE WE CAN REDACT THE -- AFTER PETER EVANS NAMES.

03:44PM  11         THE COURT:  ON THE FRONT PAGE?

03:44PM  12         MR. WADE:  YES, IF THAT --

03:44PM  13         THE COURT:  MR. LEACH?

03:44PM  14         MR. LEACH:  I DON'T OBJECT TO THE EXHIBIT,

03:44PM  15    YOUR HONOR.  THE REDACTIONS SOUND APPROPRIATE.

03:44PM  16         THE COURT:  WITH THOSE REDACTIONS, THEN IT WILL BE

03:44PM  17    ADMITTED.

03:44PM  18       MR. LEACH, YOU HAVE NO OBJECTION?

03:44PM  19         MR. LEACH:  NO OBJECTION.

03:44PM  20         THE COURT:  ALL RIGHT.

03:44PM  21     (DEFENDANT'S EXHIBIT 14081 WAS RECEIVED IN EVIDENCE.)

03:44PM  22         MS. TREFZ:  MR. WADE, CAN YOU JUST COME AND SEE?

03:45PM  23    SORRY.

03:45PM  24    BY MR. WADE:

03:45PM  25    Q.   OKAY.  THIS IS THE DEVOS -- THESE ARE MINUTES OF THE DEVOS
```

03:45PM 1    FAMILY COUNCIL MEETING; CORRECT?

03:45PM 2    A.   YES.

03:45PM 3    Q.   AND THAT'S WHERE THEY ACT ON A VARIETY OF CORPORATE

03:45PM 4    MATTERS; CORRECT?

03:45PM 5    A.   YES.  THIS ISN'T THE INVESTMENT COMMITTEE.

03:45PM 6    Q.   RIGHT, I UNDERSTAND.

03:45PM 7         BUT FOR THE FAMILY OFFICE, THEY -- THEY'LL ACT OFTEN AT

03:45PM 8    THESE MEETINGS; CORRECT?

03:45PM 9    A.   THEY WHAT?

03:45PM 10   Q.   THEY'LL ACT OFTEN AT THESE MEETINGS; IS THAT RIGHT?

03:45PM 11   A.   ACT OFTEN?  I'M NOT SURE I'M FOLLOWING.

03:45PM 12   Q.   OKAY.  LET ME TRY AGAIN.  LIKE A CORPORATION SOMETIMES

03:45PM 13   ACTS THROUGH ITS BOARD OF DIRECTORS, THE DEVOS FAMILY WILL TAKE

03:45PM 14   CORPORATE ACTIONS AT MEETINGS OF THIS KIND; IS THAT RIGHT?

03:45PM 15   A.   FAMILY COUNCIL IS DIFFERENT THAN INVESTMENT COMMITTEE.

03:46PM 16        OFTENTIMES THERE WILL BE AN UPDATE ON THINGS, BUT IT'S NOT

03:46PM 17   A FORMAL INVESTMENT COMMITTEE MEETING.

03:46PM 18   Q.   OKAY.  SO DO YOU -- I'M SORRY.  I DIDN'T MEAN TO

03:46PM 19   INTERRUPT.

03:46PM 20   A.   THOSE, THOSE CAN OFTEN BE DONE VIA TELEPHONE, AND WE DO

03:46PM 21   HAVE TWO OR THREE A YEAR, FORMAL ONES.

03:46PM 22   Q.   OKAY.  AS YOU SIT HERE TODAY, DO YOU KNOW THE DATE ON

03:46PM 23   WHICH THE INVESTMENT COMMITTEE ACTED, OR IF THEY ACTED?

03:46PM 24   A.   IT WAS MY UNDERSTANDING THAT THERE WAS A PHONE CALL OR

03:46PM 25   DISCUSSION RIGHT AFTER -- BETWEEN THE 23RD AND THE 30TH, 31ST

03:46PM 1    WHEN WE WIRED THE MONEY, THAT ALL WAS GREEN LIGHTED TO GO.

03:46PM 2    Q.   AND HAVE YOU SEEN ANY DOCUMENTS TO THAT EFFECT?

03:46PM 3    A.   IT'S JUST JERRY TELLING ME.

03:46PM 4    Q.   OKAY.  JERRY TOLD YOU THAT?

03:46PM 5    A.   YES.

03:46PM 6    Q.   OKAY.  WERE YOU PRESENT FOR THE MEETING?

03:46PM 7    A.   NO.

03:47PM 8    Q.   OKAY.  IF I CAN PULL UP 13987, AND BRING UP THAT BOTTOM

03:47PM 9    EMAIL AGAIN.

03:47PM 10        IF YOUR RECOLLECTION IS RIGHT, WHY IS IT THAT THE DOCUMENT

03:47PM 11   WASN'T SIGNED ON NOVEMBER 5TH, 2014?

03:47PM 12   A.   I DON'T KNOW IF HE JUST HADN'T SIGNED IT YET.

03:47PM 13        BUT THERE HAD TO HAVE BEEN A DISCUSSION AROUND IT WITH THE

03:47PM 14   OTHER MEMBERS OF THE INVESTMENT COMMITTEE.  IT COULD HAVE

03:47PM 15   HAPPENED ON THE PLANE AS WELL.  I DON'T KNOW HOW MANY PEOPLE

03:47PM 16   HAD TO -- ON THE WAY HOME.  I DON'T KNOW HOW MANY HAD TO OKAY

03:47PM 17   THE INVESTMENT --

03:47PM 18   Q.   OKAY.

03:47PM 19   A.   -- AS PART OF THE INVESTMENT COMMITTEE.

03:48PM 20        (PAUSE IN PROCEEDINGS.)

03:48PM 21   BY MR. WADE:

03:48PM 22   Q.   AFTER YOUR INTERACTIONS IN THE MEETING WITH MS. HOLMES,

03:49PM 23   WERE YOUR NEXT INTERACTIONS WITH PEOPLE FROM THERANOS THE

03:49PM 24   INTERACTIONS WITH MR. BALWANI?

03:49PM 25   A.   THROUGH THE EMAILS AND A CONVERSATION ON THE TELEPHONE?

03:49PM  1    Q.   YES.

03:49PM  2    A.   YES.

03:49PM  3    Q.   AND WERE THOSE THE LAST COMMUNICATIONS THAT YOU HAD IN

03:49PM  4    2014 AND '15?

03:49PM  5    A.   YES.

03:49PM  6    Q.   OKAY.  AND COMMUNICATIONS THAT HAPPENED THEREAFTER WERE

03:49PM  7    COMMUNICATIONS THAT HAPPENED AFTER "THE WALL STREET JOURNAL"?

03:49PM  8    A.   CORRECT.

03:49PM  9    Q.   OKAY.  AND YOU TESTIFIED ON DIRECT THAT -- OR YOU WERE

03:50PM  10   SHOWN THE JIM CRAMER CLIP.

03:50PM  11        DO YOU RECALL THAT?

03:50PM  12   A.   YES.

03:50PM  13   Q.   AND WERE YOU SHOWN -- DID YOU WATCH THAT AT THE TIME?

03:50PM  14   A.   YES.

03:50PM  15   Q.   OKAY.  DO YOU RECALL OTHER -- YOU HAD OTHER INTERACTIONS

03:50PM  16   WITH MS. HOLMES IN THE PERIOD FOLLOWING THAT CLIP?  YOU TALKED

03:50PM  17   ABOUT SOME OF THEM.

03:50PM  18        DO YOU RECALL THAT?

03:50PM  19   A.   I DON'T RECALL THE EXACT DATE OF THAT CLIP.  THE NEXT TIME

03:50PM  20   THAT WE SAW ELIZABETH WAS APRIL -- LATE APRIL OF 2016.

03:50PM  21   Q.   AND THAT WAS THE MEETING THAT -- THAT WAS THE MEETING THAT

03:51PM  22   MR. LEACH ASKED YOU ABOUT?

03:51PM  23   A.   YES.

03:51PM  24   Q.   OKAY.  AND THAT WAS ATTENDED BY, I THINK YOU SAID,

03:51PM  25   MR. MOSLEY, MR. TUBERGEN, AND SOME OTHERS AT THERANOS?

03:51PM 1          DO YOU RECALL THAT?

03:51PM 2     A.   MYSELF AND LEGAL COUNSEL, HEATHER KING, AND DAN EDLIN, AND

03:51PM 3     ELIZABETH.

03:51PM 4     Q.   OKAY.  AND DO YOU RECALL THAT THEY GAVE YOU AN UPDATE ON

03:51PM 5     THE REGULATORY ISSUES AT THAT MEETING?

03:51PM 6     A.   YES.

03:51PM 7     Q.   AND THEY GAVE YOU AN UPDATE ON SOME CHANGES THAT WERE

03:51PM 8     BEING MADE WITHIN MANAGEMENT?

03:51PM 9          DO YOU RECALL THAT?

03:51PM 10    A.   YES.

03:51PM 11    Q.   AND THEY GAVE YOU AN UPDATE ABOUT CHANGES THAT WERE MADE

03:51PM 12    IN THE BOARD?

03:51PM 13    A.   YES.

03:51PM 14    Q.   AND SET FORTH WHAT THEY THOUGHT WAS THEIR STRATEGY GOING

03:51PM 15    FORWARD TO TRY TO REGAIN CREDIBILITY IN THE MARKETPLACE?

03:52PM 16         DO YOU RECALL THAT?

03:52PM 17    A.   YES.

03:52PM 18    Q.   AND ONE OF THOSE WAS TO TRY TO FOCUS ON, TRY TO WORK TO

03:52PM 19    GET SOME PEER REVIEW PUBLICATIONS.

03:52PM 20         DO YOU RECALL THAT?

03:52PM 21    A.   RIGHT.

03:52PM 22    Q.   AND THERE WAS ALSO A PLAN TO FORM SOME COMMITTEES TO GIVE

03:52PM 23    SCIENTIFIC AND TECHNICAL ADVICE TO THE COMPANY?

03:52PM 24         DO YOU RECALL THAT?

03:52PM 25    A.   YES.

03:52PM  1    Q.   AND THEY ALSO GAVE YOU A REPORT ON THE FINANCIAL STATE OF

03:52PM  2    THE COMPANY AT THAT TIME?

03:52PM  3    A.   NO.

03:52PM  4    Q.   YOU DON'T BELIEVE THEY DID?

03:52PM  5    A.   THEY DIDN'T GIVE US ANY PAPER AT THAT MEETING.

03:52PM  6    Q.   DID YOU --

03:52PM  7    A.   WE DIDN'T LEAVE WITH ANYTHING.  THERE MIGHT HAVE BEEN SOME

03:52PM  8    VERBAL AROUND WHERE THE CASH WAS OF THE COMPANY, BUT I DON'T

03:52PM  9    RECALL SPECIFICALLY.

03:52PM  10   Q.   OKAY.  DO YOU RECALL THAT THERE WAS DISCUSSION ABOUT HOW

03:52PM  11   THEY HAD ABOUT $375 MILLION IN CASH AT THAT TIME?

03:53PM  12   A.   I DON'T RECALL THE EXACT NUMBERS.

03:53PM  13   Q.   OKAY.

03:53PM  14   A.   YES, WE WERE TALKING ABOUT THE CASH POSITION OF THE

03:53PM  15   COMPANY.

03:53PM  16   Q.   AND --

03:53PM  17   A.   BUT THERE WERE NO FINANCIALS SHOWN.

03:53PM  18   Q.   UNDERSTOOD.  AND DID THEY TELL YOU THAT THEY WERE ACTUALLY

03:53PM  19   IN THE PROCESS OF TRYING TO IMPROVE THE FINANCIALS OF THE

03:53PM  20   COMPANY IN THAT TIME?

03:53PM  21   A.   I DON'T RECALL THAT PART OF THE CONVERSATION.

03:53PM  22   Q.   DO YOU RECALL THAT THEY WERE BRINGING IN NEW PEOPLE INTO

03:53PM  23   THE FINANCIAL OPERATIONS TO TRY TO IMPROVE THE ACCOUNTING

03:53PM  24   FUNCTION?

03:53PM  25   A.   I RECALL WE SENT AHEAD A LIST OF QUESTIONS THAT WE HAD,

03:53PM 1    AND A LOT OF IT WAS AROUND THE FINANCIALS AND EVERYTHING, AND

03:53PM 2    WE DIDN'T RECEIVE ANY HARD CORE -- ANYTHING TO TAKE BACK WITH

03:53PM 3    US.  THAT IS WHAT I REMEMBER.

03:53PM 4    Q.   OKAY.  DO YOU REMEMBER THAT, AS PART OF THAT, THE COMPANY

03:53PM 5    TOLD YOU THAT THEY -- PART OF THEIR STRATEGY FOR MOVING FORWARD

03:53PM 6    WAS TO INCREASE ENGAGEMENT WITH THE SCIENTIFIC COMMUNITY?

03:54PM 7         DO YOU RECALL THAT?

03:54PM 8    A.   YES.

03:54PM 9    Q.   AND TO BE MORE TRANSPARENT?

03:54PM 10   A.   YES.

03:54PM 11   Q.   OKAY.  AND THAT THEY WERE WORKING, THAT THEY HAD PLANNED

03:54PM 12   TO GIVE A PRESENTATION ABOUT THE TECHNOLOGY, THEIR TECHNOLOGY

03:54PM 13   AT THE AACC --

03:54PM 14   A.   YES.

03:54PM 15   Q.   -- MEETING?

03:54PM 16        DO YOU RECALL BEING TOLD THAT IN THAT APRIL MEETING?

03:54PM 17   A.   YES.  BUT WE WERE ALSO TOLD IN THAT MEETING -- MUCH OF

03:54PM 18   WHAT YOU HEARD IN THE TWO CLIPS THAT WERE SHOWN IS THE SAME

03:54PM 19   THING THAT SHE WAS SAYING IN THAT MEETING, THAT A LOT OF IT WAS

03:54PM 20   ERRONEOUS AND UNFOUNDED AND DONE BY A VERY OVERZEALOUS REPORTER

03:54PM 21   WHO WANTED TO WIN A PULITZER.

03:54PM 22        THERE WAS A LOT OF CONVERSATION AROUND WE WERE TRYING TO

03:54PM 23   UNDERSTAND WHAT WAS GOING ON IN THE NEWSPAPER AND TRYING TO GET

03:54PM 24   HER TO EXPLAIN A LOT OF IS IT TRUE OR IS IT NOT TRUE?

03:55PM 25        AND SHE DOWNPLAYED A LOT OF IT.

03:55PM 1          AND THAT WAS MUCH OF THE CONVERSATION, MUCH MORE SO AROUND

03:55PM 2     THAT NOT BEING BASED ON FACT OF WHAT WAS BEING WRITTEN IN THE

03:55PM 3     NEWSPAPER THAN THE CHANGING OF THE PEOPLE.

03:55PM 4          MR. WADE:  YOUR HONOR, I WOULD MOVE TO STRIKE

03:55PM 5     EVERYTHING AFTER THE IMMEDIATE ANSWER TO MY QUESTION.

03:55PM 6          (PAUSE IN PROCEEDINGS.)

03:55PM 7          THE COURT:  ALL RIGHT.  I'LL STRIKE -- EVERYTHING

03:55PM 8     AFTER "YES" IS STRICKEN AS NONRESPONSIVE.

03:55PM 9     BY MR. WADE:

03:55PM 10    Q.  AND ONE OF THE THINGS THAT YOU CAME AWAY FROM THAT MEETING

03:55PM 11    WAS A REQUEST TO GET -- YOU WANTED TO GET AN INVITE TO THE AACC

03:55PM 12    PRESENTATION?

03:55PM 13    A.  YES.

03:55PM 14    Q.  AND DID YOU GET SUCH AN INVITE?

03:56PM 15    A.  YES.

03:56PM 16    Q.  AND DID YOU GO TO THE PRESENTATION?

03:56PM 17    A.  YES.

03:56PM 18    Q.  AND THE AACC IS A PROFESSIONAL ORGANIZATION OF PEOPLE WHO

03:56PM 19    WORK IN CLINICAL CHEMISTRY?

03:56PM 20    A.  YES.

03:56PM 21    Q.  AND THERE WERE APPROXIMATELY 2500 PEOPLE AT THAT

03:56PM 22    CONFERENCE?

03:56PM 23    A.  YES.

03:56PM 24    Q.  DO YOU RECALL THAT?

03:56PM 25    A.  YES.

03:56PM 1    Q.   AND IT WAS A PRETTY HOSTILE ENVIRONMENT; RIGHT?

03:56PM 2    A.   YES.

03:56PM 3    Q.   AND THEY WERE VERY SKEPTICAL OF THERANOS GOING IN; RIGHT?

03:56PM 4    A.   YES.  THAT WAS MY VIEW OF THINGS, YES.

03:56PM 5    Q.   BUT THERANOS WENT IN AND GAVE -- A NUMBER OF PEOPLE GAVE A

03:56PM 6    PRESENTATION AND PARTICIPATED IN THE Q AND A WITH RESPECT TO

03:56PM 7    THEIR TECHNOLOGY; CORRECT?

03:56PM 8    A.   A NUMBER OF -- I'M SORRY, SAY AGAIN.

03:56PM 9    Q.   LET ME TAKE IT IN TWO STEPS.

03:56PM 10       DO YOU RECALL THAT THERE WERE SEVERAL PEOPLE FROM THERANOS

03:57PM 11   AT THAT MEETING, AT THAT CONFERENCE?

03:57PM 12   A.   I ONLY RECALL ELIZABETH TALKING.

03:57PM 13   Q.   OKAY.  YOU RECALL MS. HOLMES WAS THERE?

03:57PM 14   A.   YES.

03:57PM 15   Q.   AND SHE GAVE PART OF A PRESENTATION; RIGHT?

03:57PM 16   A.   YES.

03:57PM 17   Q.   OKAY.  AND DO YOU RECALL THAT AFTER HER PRESENTATION THERE

03:57PM 18   WAS A Q AND A WITH A PANEL OF PEOPLE?

03:57PM 19   A.   YES -- I DON'T RECALL EXACTLY, NO.

03:57PM 20   Q.   AND DO YOU RECALL THAT THERE WERE THREE PEOPLE FROM AACC

03:57PM 21   REPRESENTATIVES AND ABOUT FOUR PEOPLE FROM THERANOS?

03:57PM 22   A.   I DON'T REMEMBER THAT, NO.

03:57PM 23   Q.   OKAY.  DO YOU RECALL -- LET ME GIVE YOU NAMES AND SEE IF

03:57PM 24   YOU REMEMBER THAT.

03:57PM 25       DO YOU RECALL THAT DR. YOUNG WAS THERE?

03:57PM 1     A.   NO.

03:57PM 2     Q.   DO YOU RECALL THAT DR. PANGARKAR WAS THERE?

03:57PM 3     A.   NO.

03:57PM 4     Q.   DO YOU RECALL THAT DR. ANEKAL WAS THERE?

03:57PM 5     A.   NO.

03:57PM 6     Q.   OKAY.  AND YOU OBSERVED THE WHOLE PRESENTATION IN THE

03:57PM 7     Q AND A?

03:57PM 8     A.   I DON'T RECALL OBSERVING THAT PART OF IT.

03:58PM 9          I REMEMBER HER PRESENTING, YES.

03:58PM 10    Q.   OKAY.  AND YOU PREPARED A SUMMARY OF THAT PRESENTATION;

03:58PM 11    CORRECT?

03:58PM 12    A.   I JUST PREPARED A SUMMARY OF WHAT I OBSERVED.

03:58PM 13    Q.   AND YOU --

03:58PM 14    A.   I DIDN'T, I DIDN'T TRY TO SUMMARIZE WHAT SHE WAS TRYING TO

03:58PM 15    SAY.

03:58PM 16    Q.   UM --

03:58PM 17    A.   THE WHOLE PURPOSE OF GOING WAS TO TRY TO FIGURE OUT

03:58PM 18    WHETHER THE TECHNOLOGY WORKED OR NOT.  WE WERE STILL TRYING TO

03:58PM 19    FIGURE OUT WHAT WAS GOING ON.

03:58PM 20    Q.   I UNDERSTAND.  MY QUESTION WAS, YOU PREPARED A SUMMARY --

03:58PM 21    A.   YES.

03:58PM 22    Q.   -- OF WHAT YOU OBSERVED IN THAT MEETING; CORRECT?

03:58PM 23    A.   YES.

03:58PM 24    Q.   CAN YOU LOOK AT 5273.

03:59PM 25    A.   YES.

```
03:59PM   1    Q.   AND IS THIS THE SUMMARY THAT YOU PREPARED OF THAT MEETING?

03:59PM   2    A.   YES.

03:59PM   3              MR. WADE:  MOVE THE ADMISSION OF 5273.

03:59PM   4              MR. LEACH:  YOUR HONOR, RELEVANCE AND HEARSAY, 403.

04:00PM   5         (PAUSE IN PROCEEDINGS.)

04:01PM   6              THE COURT:  I'M JUST CURIOUS HERE ABOUT THE TIME

04:01PM   7    DIFFERENCE AND THE RELEVANCE.

04:01PM   8              MR. WADE:  WELL, I WONDER IF, GIVEN THE HOUR, MAYBE

04:01PM   9    WE CAN BREAK HERE AND THEN DISCUSS THIS WITHOUT BURDENING THE

04:01PM  10    JURY AND START BACK WITH THIS TOMORROW?

04:02PM  11              THE COURT:  LET'S DO THAT THEN.

04:02PM  12         LADIES AND GENTLEMEN, LET'S TAKE OUR RECESS FOR THE DAY.

04:02PM  13    WE'LL RESUME TOMORROW AT 9:00 O'CLOCK.

04:02PM  14         AGAIN, LET ME ADMONISH YOU TO CONTINUE YOUR VIGILANCE NOT

04:02PM  15    TO READ, LISTEN, OR DISCUSS THIS CASE IN ANY WAY WITH ANYONE OR

04:02PM  16    TO FORM ANY OPINIONS ABOUT THIS CASE UNTIL THE CASE HAS BEEN

04:02PM  17    DELIVERED TO YOU FOR YOUR DELIBERATIONS.  PLEASE CONTINUE TO DO

04:02PM  18    THAT.

04:02PM  19         I'LL ASK YOU TOMORROW IF ANY OF YOU HAVE INADVERTENTLY

04:02PM  20    COME ACROSS ANY SUBJECT MATTER.

04:02PM  21         LET ME ALSO TELL YOU ANOTHER SCHEDULING ISSUE.

04:02PM  22    NOVEMBER 4TH WE'RE IN SESSION, THAT'S NEXT THURSDAY, BUT WE

04:02PM  23    WON'T START UNTIL 9:30.  9:30 THAT MORNING I EXPECT IS WHEN OUR

04:02PM  24    START TIME WILL BE.  I JUST WANT TO LET YOU KNOW THAT FOR

04:02PM  25    PLANNING PURPOSES.
```

04:02PM 1          TOMORROW WE'LL GO UNTIL 4:00 O'CLOCK I HOPE.  IS THAT A

04:02PM 2     PROBLEM FOR ANYONE?

04:02PM 3          OKAY.  LET'S SHOOT FOR 4:00 O'CLOCK.

04:03PM 4          OTHER THAN THAT, WE'LL BE IN RECESS FOR THE DAY.  THANK

04:03PM 5     YOU VERY MUCH.

04:03PM 6          MS. PETERSON, YOU CAN STAND DOWN AS WELL.  THANK YOU.

04:03PM 7     WE'LL SEE YOU TOMORROW AT 9:00 O'CLOCK, PLEASE.

04:03PM 8          (JURY OUT AT 4:03 P.M.)

04:03PM 9             THE COURT:  PLEASE BE SEATED.  THANK YOU.

04:03PM 10         ALL RIGHT.  THANK YOU.  THE RECORD SHOULD REFLECT THAT THE

04:04PM 11    JURY HAS LEFT FOR THE DAY AND MS. PETERSON HAS LEFT THE

04:04PM 12    COURTROOM.  ALL COUNSEL AND MS. HOLMES ARE PRESENT.

04:04PM 13         ALL RIGHT.  THANK YOU.

04:04PM 14         THIS IS 5273.  THIS IS WHAT WE DISCUSSED THIS MORNING I

04:04PM 15    THINK AND --

04:04PM 16            MR. LEACH:  YES, YOUR HONOR.

04:04PM 17            THE COURT:  -- MY QUESTIONS ARE THE INVESTMENT WAS

04:04PM 18    IN 2014, I BELIEVE.  IS THAT RIGHT?

04:04PM 19            MR. LEACH:  YES, YOUR HONOR.

04:04PM 20            THE COURT:  AND SO WHAT IS THE RELEVANCE TIME-WISE

04:04PM 21    ABOUT HER OPINIONS?

04:04PM 22         AND I THINK WHAT WE'RE TALKING ABOUT IS EXPRESSED IN THE

04:04PM 23    LAST PARAGRAPH ON THIS PAGE.

04:04PM 24            MR. WADE:  THAT'S THE GIST OF IT, YOUR HONOR.

04:04PM 25         AND IT RELATES TO -- YOU KNOW, THE GOVERNMENT OPENED THE

04:04PM 1     DOOR ON THIS BY GOING INTO A NUMBER OF THESE INTERACTIONS AFTER

04:04PM 2     THE INVESTMENT PERIOD.  THEY WENT INTO BOTH THE REACTION TO THE

04:04PM 3     CRAMER PIECE, AND THEY WENT INTO THE REACTION TO -- IN APRIL,

04:04PM 4     THEY DECIDED THEY WANTED TO GO INTO THAT MEETING.

04:04PM 5          I EXPLAINED -- I THINK AT THE OUTSET I OBJECTED TO THE

04:05PM 6     ADMISSION OF EVIDENCE RELATING TO THAT.

04:05PM 7          THIS FLOWS DIRECTLY OUT OF THAT APRIL MEETING.  THEY HAD A

04:05PM 8     MEETING TO TRY TO FIGURE OUT WHAT IS GOING ON, TO TRY TO

04:05PM 9     UNDERSTAND THE TECHNOLOGY.

04:05PM 10         SHE'S -- SHE CHARACTERIZED THAT MEETING IN HER TESTIMONY,

04:05PM 11    AND THIS ACTUALLY REFLECTS HER ACTUAL CONTEMPORANEOUS

04:05PM 12    UNDERSTANDING OF IT.

04:05PM 13              THE COURT:  WELL, THIS IS IN AUGUST, NOT APRIL.

04:05PM 14              MR. WADE:  WELL, IT RELATES DIRECTLY TO THAT BECAUSE

04:05PM 15    ONE OF THE THINGS THEY WANTED TO ASSESS, SHE SAID, WAS THE

04:05PM 16    TECHNOLOGY AND THEY'RE TRYING TO FIGURE IT OUT AND THEY DID

04:05PM 17    THAT AT THIS MEETING AND IT'S REFLECTED IN THIS, IN THIS MEMO.

04:05PM 18         THERE'S A SIMILAR --

04:05PM 19              THE COURT:  SO WHAT -- I GUESS WHAT I'M -- AND HELP

04:05PM 20    ME OUT HERE, MR. WADE.

04:05PM 21         WHAT IS THE RELEVANCE OF THIS WITNESS'S OPINION ABOUT WHAT

04:05PM 22    WAS GOING ON AT THERANOS AFTER THE, AFTER THE DEAL?  WHAT IS

04:05PM 23    THE RELEVANCE OF THAT?

04:06PM 24              MR. WADE:  THAT'S WHY I OBJECTED TO THE EVIDENCE

04:06PM 25    COMING IN, YOUR HONOR.  THE GOVERNMENT OPENED THE DOOR.

04:06PM 1          THE COURT:  THAT CAME IN FOR A DIFFERENT PURPOSE.

04:06PM 2   THOSE WERE STATEMENTS, I THINK, OF YOUR CLIENT THAT THE

04:06PM 3   GOVERNMENT COULD GET IN.  THAT'S WHAT YOU'RE TALKING ABOUT.

04:06PM 4          MR. WADE:  NO, BUT THEY ALSO ASKED ABOUT THE MEETING

04:06PM 5   THAT THEY HAD AND THEY TRIED TO CONTRAST THE INTERACTIONS IN

04:06PM 6   THAT MEETING WITH THE STATEMENTS.

04:06PM 7          THE COURT:  THE APRIL MEETING?

04:06PM 8          MR. WADE:  YEAH.  AND PART OF THE INTERACTION, AND

04:06PM 9   MY CLIENT'S GOOD FAITH INTERACTION WITH THAT SHAREHOLDER AT

04:06PM 10  THAT TIME WAS TELLING THEM WHAT THEY WERE GOING TO DO TO TRY TO

04:06PM 11  ADDRESS THE SITUATION, TO SAY THAT THEY BELIEVED IN THE

04:06PM 12  TECHNOLOGY, THAT A LOT OF WHAT WAS BEING WRITTEN WAS NOT TRUE.

04:06PM 13         THE COURT:  OKAY.

04:06PM 14         MR. WADE:  AND THIS SPECIFIC EVENT WAS REFERENCED

04:06PM 15  AND THEY SAID SPECIFICALLY IN THAT MEETING THAT THEY WANTED TO

04:06PM 16  COME AND SEE IT, AND THEY DID.

04:06PM 17         THE COURT:  WELL, THAT WAS RAISED BY YOU, I THINK,

04:06PM 18  ON CROSS; RIGHT?  I DON'T THINK MR. LEACH TOUCHED ON THAT.

04:06PM 19  MAYBE HE DID.

04:06PM 20         MR. WADE:  WELL, MR. LEACH WENT INTO THE MEETING.

04:06PM 21      BUT ONCE -- HE GOES IN TO TRY TO CREATE A NEGATIVE

04:07PM 22  IMPLICATION WITH RESPECT TO MS. HOLMES, OVER MY OBJECTION.

04:07PM 23      SO ONCE HE GOES INTO THE MEETING AND THESE POST-INVESTMENT

04:07PM 24  ACTIVITIES, THE DOOR HAS BEEN OPENED AND IT'S ONLY FAIR IF YOU

04:07PM 25  GET THE FULL PICTURE OF HOW THIS INVESTOR FELT AFTER THE

MEETING.

RIGHT NOW THEY HAVE A PARTIAL PICTURE BASED UPON THE

INTERACTIONS THAT MR. LEACH ELICITED IN CONNECTION WITH VIDEO

CLIPS.

I WOULD HAVE PREFERRED THAT NONE OF IT COME IN THROUGH

THIS WITNESS, BUT IT HAS OVER OUR OBJECTION AND --

THE COURT:  WELL, LET ME HEAR FROM MR. LEACH AND

THEN I'LL HAVE AN OBSERVATION.

MR. LEACH:  YOUR HONOR, THE CRAMER PIECE WAS

RELEVANT BECAUSE THE DEFENDANT IS ASKED POINT-BLANK, HOW MANY

TESTS CAN YOUR EDISON RUN?

AND HER STATEMENTS, WHETHER IT'S MS. PETERSON LISTENING TO

IT OR SOMEBODY ELSE, ARE EVIDENCE OF THE DEFENDANT'S --

ADMISSIONS BY A DEFENDANT.

I ASKED NO QUESTION OF THIS WITNESS WHAT SHE THOUGHT ABOUT

THAT.

THE "TODAY SHOW" INTERVIEW WAS RELEVANT BECAUSE THIS

DEFENDANT, UNLIKE THE DEFENSE WE HEAR HERE THAT IT'S ALL THE

LAB DIRECTOR'S FAULT, WAS SAYING, I'M THE CEO OF THE COMPANY,

I'M RESPONSIBLE FOR THIS.

I ASKED A SINGLE QUESTION ABOUT THE -- LIMITED QUESTIONS

ABOUT THE APRIL MEETING 11 DAYS LATER ABOUT WHETHER OR NOT

MS. HOLMES TRIVIALIZED THE CMS INSPECTION, YOU KNOW, DAYS AFTER

SHE WAS SAYING, I FEEL DEVASTATED ABOUT THIS.

THAT DOES NOT OPEN -- AND ALL OF THIS IS TIED TO WHAT THE

04:08PM 1    DEFENDANT SAID.  YOU KNOW, IF THE DEFENDANT WANTS TO SAY WHAT

04:08PM 2    SHE SAID AT THE AACC CONFERENCE, SHE CAN TAKE THE STAND AND SAY

04:08PM 3    ALL OF THOSE THINGS.

04:08PM 4        ALL OF THIS IS ASKING FOR A REACTION TO SOMETHING THAT THE

04:08PM 5    DEFENDANT SAID IN AUGUST OF 2016.

04:08PM 6        AND IT'S ALL PREMISED ON HEARSAY, IT'S NOT RELEVANT.

04:08PM 7        AND IT DOESN'T STOP THERE, YOUR HONOR, BECAUSE THERE ARE

04:08PM 8    ADDITIONAL INTERACTIONS AFTERWARDS AND WE CAN ASK HER TODAY,

04:08PM 9    HOW DO YOU FEEL ABOUT THE TECHNOLOGY, AND SHE'LL GIVE ANSWERS,

04:08PM 10   YOU KNOW, I DON'T THINK MR. WADE WOULD LIKE.

04:08PM 11       SO THERE HAS TO BE A CUTOFF.  THE APRIL MEETING WAS

04:09PM 12   RELEVANT BECAUSE IT'S 11 DAYS TIED TO A PUBLIC STATEMENT THAT

04:09PM 13   I'M RESPONSIBLE FOR EVERYTHING IN THE LAB AND CMS -- WE TAKE

04:09PM 14   CMS REALLY, REALLY SERIOUSLY, AND 11 DAYS LATER SHE'S

04:09PM 15   TRIVIALIZING IT.

04:09PM 16       THAT DOESN'T OPEN THE DOOR TO EVERY STATEMENT THAT

04:09PM 17   MS. HOLMES MAKES AFTER THE FACT AND SOMEBODY'S REACTION TO IT.

04:09PM 18           THE COURT:  SO -- THANK YOU.  SO THAT'S ONE OF THE

04:09PM 19   CONCERNS THAT I HAVE AND IT IS -- I'M NOT CERTAIN OF THE

04:09PM 20   RELEVANCE OF IT.

04:09PM 21       I UNDERSTAND, MR. WADE, YOU'D LIKE TO GET A FULL PICTURE

04:09PM 22   OF THIS AND HAVE THIS WITNESS OFFER THIS PARAGRAPH, OR HER

04:09PM 23   MEMO, OBSERVATIONS IN 2016.

04:09PM 24       I STILL DON'T KNOW WHAT THE RELEVANCE OF THAT IS, HER

04:09PM 25   OPINION.  THE INVESTMENT'S DONE.  AS YOU POINT OUT, SHE WAS

04:09PM 1    NOT -- SHE DIDN'T WRITE THE CHECK, SHE DIDN'T SIGN IT.  YOU

04:09PM 2    CROSS-EXAMINED HER ON WHAT HER DUTIES AND LIMITATIONS WERE.

04:09PM 3         LET ME JUST MAKE AN OBSERVATION HERE.  IF THIS COMES IN,

04:10PM 4    IF SHE TESTIFIES ABOUT THIS, I'M GOING TO PERMIT THE

04:10PM 5    GOVERNMENT, IF THEY WANT TO, TO REHABILITATE, IN ESSENCE TO

04:10PM 6    BASICALLY GO THROUGH, THAT WAS YOUR OPINION THEN?  AND WHAT IS

04:10PM 7    YOUR OPINION TODAY?

04:10PM 8         AND AS MR. LEACH POINTS OUT, SHE MIGHT SAY SOMETHING THAT,

04:10PM 9    THAT MIGHT NOT BE HELPFUL, AND BECAUSE I THINK WHAT -- I'M JUST

04:10PM 10   SAYING WE CAN EXPECT THAT SHE'S GOING TO DEFEND HERSELF IN

04:10PM 11   THIS -- AS TO THIS STATEMENT.

04:10PM 12        YOU HAVE TO DECIDE THE VALUE OF WHETHER THIS COMES IN OR

04:10PM 13   NOT, AND THE COST/BENEFIT ANALYSIS FOR THIS, AND I'M NOT TRYING

04:10PM 14   TO STAND WHERE YOU'RE STANDING AND TRY TO RUN THE CASE.  IT'S

04:10PM 15   YOUR CASE.

04:10PM 16             MR. WADE:  I WISH YOU COULD SEE MY SMILE,

04:10PM 17   YOUR HONOR.

04:10PM 18        I DON'T THINK THIS -- I DON'T THINK THIS WITNESS HAS BEEN

04:10PM 19   RESTRAINED IN OFFERING HER CURRENT VIEWS OF THINGS.

04:10PM 20             THE COURT:  WELL, THAT'S WHAT I'M SAYING.

04:10PM 21             MR. WADE:  SO --

04:10PM 22             THE COURT:  YOU'RE GOING TO GET THAT, AREN'T YOU?

04:10PM 23             MR. WADE:  MY VIEW IS IT'S TUMBLED IN, WHETHER I'VE

04:11PM 24   ASKED THE QUESTION OR NOT, REPEATEDLY, WHETHER IT'S RESPONSIVE

04:11PM 25   OR NOT.

4839

04:11PM  1      IT DOESN'T ALIGN WITH WHAT SHE ACTUALLY SAID AT THE TIME

04:11PM  2  IN NUMEROUS DOCUMENTS.

04:11PM  3      THERE'S ANOTHER DOCUMENT THAT THE COURT WILL NOTE AT 14104

04:11PM  4  WHERE IT IS TOTALLY INCONSISTENT WITH, WITH THE CONCLUSIONS AND

04:11PM  5  HER TAKE AWAYS HERE.

04:11PM  6          THE COURT:  IS 14104 IN EVIDENCE?

04:11PM  7          MR. WADE:  IT'S NOT, BUT WE MIGHT AS WELL PREVIEW

04:11PM  8  TOMORROW'S 8:30 GIVEN THIS DISCUSSION.

04:11PM  9      AND I WASN'T NECESSARILY INTENDING TO OFFER THE DOCUMENT

04:11PM 10  BECAUSE THEY'RE NOTES, BUT I WAS -- UNLIKE --

04:11PM 11          THE COURT:  THESE ARE HER NOTES ALSO?

04:11PM 12          MR. WADE:  MY UNDERSTANDING IS THAT THESE ARE HER

04:11PM 13  NOTES.

04:11PM 14      THE OTHER, YOU'LL NOTE, IS A REPORT TO HER TWO

04:11PM 15  SUPERVISORS, HER TWO SUPERIORS, RIGHT?  SO THEY'RE NOT NOTES.

04:11PM 16  IT'S A COMMUNICATION, A PRETTY LENGTHY ONE, TO HER TWO

04:12PM 17  SUPERIORS.

04:12PM 18      THIS IS A DIFFERENT ONE.

04:12PM 19      BUT HER REACTION IN REALTIME PRIOR TO --

04:12PM 20          THE COURT:  IF YOU WANT TO TAKE YOUR MASK OFF, GO

04:12PM 21  AHEAD.

04:12PM 22          MR. WADE:  PRIOR TO EXTRAORDINARY AMOUNTS OF

04:12PM 23  NEGATIVE PUBLICITY, WHICH IS WHAT WE SAW TODAY, WAS

04:12PM 24  FUNDAMENTALLY DIFFERENT IN REALTIME.

04:12PM 25      AND SO I KNOW THAT I'M GOING TO GET -- I APPRECIATE THE

04:12PM 1    COURT'S CAUTION, BUT --

04:12PM 2            THE COURT:  I LOOK AT THIS AND I STILL HAVE SOME

04:12PM 3    PROBLEMS WITH THE RELEVANCE OF HER OPINION IS AFTER THE

04:12PM 4    INVESTMENT AND AFTER GOING AND HEARING A BUNCH OF HEARSAY.

04:12PM 5    IT'S -- WHAT SHE'S GOING TO TESTIFY ABOUT IS HER, AND WHAT SHE

04:12PM 6    TOLD US, I THINK, IS I DON'T REMEMBER THE PANEL, I DON'T

04:12PM 7    REMEMBER Q AND A.

04:12PM 8        I REMEMBER MS. HOLMES AND I REMEMBER WHAT SHE SAID.

04:13PM 9        THAT'S REFLECTED IN THE LAST PARAGRAPH, APPARENTLY, IN

04:13PM 10   THIS EMAIL.

04:13PM 11       AND I'M, I'M STRUGGLING TO FIND THE RELEVANCE OF THAT.

04:13PM 12       CONCURRENT WITH THAT, THOUGH, IF THIS COMES IN, I THINK

04:13PM 13   IT'S -- I DON'T WANT TO GET INTO MINI TRIALS, BUT YOU'LL HAVE

04:13PM 14   TO SIT ON YOUR HANDS WHILE I GIVE MR. LEACH LATITUDE TO

04:13PM 15   REHABILITATE WITH THIS.

04:13PM 16           MR. WADE:  NO, I UNDERSTAND, AND WE'LL TAKE THE

04:13PM 17   COURT'S COMMENTS OVERNIGHT.

04:13PM 18       I WILL NOTE, AGAIN, THE POST-INVESTMENT EVIDENCE CAME IN

04:13PM 19   OVER MY OBJECTION, SO IT'S NOT -- I DIDN'T OPEN THE DOOR.  I'M

04:13PM 20   JUST HAVING TO DEAL WITH IT GIVEN THAT THIS WITNESS HAS OFFERED

04:13PM 21   TESTIMONY ABOUT IT, AND, YOU KNOW, HAVING TO MEET THE

04:13PM 22   OBLIGATIONS.

04:13PM 23       THERE'S NO MAGIC TO APRIL.  HOW IS IT THAT THE GOVERNMENT

04:13PM 24   CAN PICK THE ONE INTERACTION AFTER THIS THAT THEY WANT TO

04:13PM 25   OFFER, BUT WE CAN'T PROBE --

04:13PM 1          THE COURT:  I'M SORRY, APRIL?  YOU MEAN THE MEETING

04:13PM 2     IN PALO ALTO?

04:13PM 3          MR. WADE:  NO, NO.  THE GOVERNMENT HAS CHOSEN A

04:14PM 4     POST-INVESTMENT INTERACTION TO QUESTION THE WITNESS ABOUT,

04:14PM 5     APRIL 2016.

04:14PM 6          THEY SHOWED VIDEO, I THINK THEY LIKED THE PROXIMITY OF

04:14PM 7     THAT INTERACTION TO THE VIDEO, THEY WANTED TO SHOW IT, THEY

04:14PM 8     WANTED TO PORTRAY MY CLIENT IN A CERTAIN LIGHT.  IN OUR VIEW IT

04:14PM 9     SHOULDN'T HAVE COME IN, IT WASN'T RELEVANT.

04:14PM 10         IT'S COME IN.

04:14PM 11         THERE'S NO MATERIAL DIFFERENCE BETWEEN AN APRIL

04:14PM 12    POST-INVESTMENT INTERACTION AND AN AUGUST ONE OR A

04:14PM 13    DECEMBER ONE.  AND SO --

04:14PM 14         THE COURT:  BUT I THINK MR. LEACH WOULD TELL US HE

04:14PM 15    INTRODUCED THOSE AND QUERIED WHETHER OR NOT THIS WAS THE

04:14PM 16    WITNESS -- HE COULD HAVE GOT THIS IN THROUGH ANY WITNESS,

04:14PM 17    CANDIDLY.  ANY WITNESS COULD HAVE COME IN AND SAID, YEAH, I SAW

04:14PM 18    IT, YEAH, THAT'S WHAT SHE SAID.  IT'S A STATEMENT, RIGHT?  IT'S

04:14PM 19    HER STATEMENT.

04:14PM 20         MR. WADE:  THE VIDEO, BUT NOT THE MEETING RELATED TO

04:14PM 21    IT.  HE DIDN'T JUST ASK ABOUT THE VIDEO.  IT WOULD BE A

04:14PM 22    DIFFERENT KETTLE OF FISH IF WE ASKED JUST ABOUT THE VIDEO.

04:14PM 23         THE COURT:  BUT HERE YOU'RE ASKING THIS WITNESS TO

04:15PM 24    COMMENT ON HER OPINIONS OF YOUR CLIENT'S STATEMENTS SOME MONTHS

04:15PM 25    AFTER THE INVESTMENT, AND I JUST -- WHAT IS THE RELEVANCE OF

04:15PM 1      HER -- OF THAT NOW?

04:15PM 2           MR. WADE:  WELL, IT, IT -- IT'S RELEVANT FOR THE

04:15PM 3      REASONS THAT WE'VE BEEN DISCUSSING.  I DON'T HAVE A LOT TO ADD

04:15PM 4      ABOUT IT.

04:15PM 5           AGAIN, IT'S -- WHAT MR. LEACH ASKED ABOUT WAS NOT

04:15PM 6      RELEVANT, BUT IT'S AS RELEVANT AS HIS IRRELEVANT STUFF, AND SO

04:15PM 7      AS A MATTER OF FAIRNESS AND TO NOT MISLEAD THE JURY, WE THINK

04:15PM 8      WE SHOULD BE ABLE TO PROBE IT.

04:15PM 9           I WOULD SAY THE OTHER POINT, YOUR HONOR, AS I NOTED I

04:15PM 10     THINK THIS MORNING, MAYBE I DIDN'T, THE STATEMENT AT THE BOTTOM

04:15PM 11     TIES THE OBSERVATIONS OF THE TECHNOLOGY AND ITS FUNCTIONALITY

04:15PM 12     BACK TO THE OBSERVATIONS THAT WERE MADE AT THE TIME OF THE

04:15PM 13     INVESTMENT.

04:15PM 14          THE COURT:  YOU KNOW, LET ME JUST BE CANDID SINCE

04:16PM 15     WE'RE DEAR FRIENDS HERE, ALL OF US, SINCE WE HAVE SPENT SOME

04:16PM 16     TIME TOGETHER.  SHE'S GOT -- TOMORROW SHE MAY VERY WELL, AND

04:16PM 17     NOBODY IS TALKING TO HER OF COURSE IN THE INTERIM, BUT SHE

04:16PM 18     COULD COME IN AND SHE COULD SAY SOMETHING, YEAH, I WAS FOOLED

04:16PM 19     AGAIN, AND ARE YOU GOING TO LIVE WITH THAT ANSWER?

04:16PM 20          YOU KNOW, PARDON ME, I DON'T MEAN TO BE FLIP HERE, BUT I'M

04:16PM 21     JUST -- YOU KNOW, YOU'RE EXPERIENCED TRIAL LAWYERS AND THERE'S

04:16PM 22     A RISK THERE.

04:16PM 23          MR. WADE:  AGAIN, I WOULD ANTICIPATE THAT,

04:16PM 24     NOTWITHSTANDING THE CONTEMPORANEOUS DOCUMENTS, I HAVE A SENSE

04:16PM 25     OF WHAT THE WITNESS IS GOING TO SAY.  I'VE HAD TO USE THE

04:16PM  1    CONTEMPORANEOUS DOCUMENTS TO DEAL WITH THAT, AND SO THAT'S THE

04:16PM  2    NATURE OF THE JOB.

04:16PM  3            THE COURT:  OKAY.

04:16PM  4            MR. LEACH:  I JUST WANT TO SAY ONE MORE THING ABOUT

04:16PM  5    OPENING THE DOOR, YOUR HONOR.

04:16PM  6        MY QUESTIONS TO THIS WITNESS WERE, WHAT DID THE DEFENDANT

04:16PM  7    SAY TO YOU ON THESE DATES?

04:16PM  8        THAT DOESN'T OPEN THE DOOR TO EVERY OTHER THING THAT THE

04:16PM  9    DEFENDANT SAID IN EVERY OTHER UNIVERSE.

04:16PM  10        I DID NOT ASK THE WITNESS, WHAT DID YOU THINK ABOUT THAT?

04:17PM  11    I DID NOT ASK THE WITNESS, WHAT WAS YOUR STATE OF MIND?

04:17PM  12        THEY WANT TO USE LISA PETERSON'S STATE OF MIND YEARS AFTER

04:17PM  13    THE INVESTMENT AS A SPRINGBOARD TO GET ALL OF THE DEFENDANT'S

04:17PM  14    HEARSAY STATEMENTS INTO EVIDENCE, AND IT MAY FEEL LIKE A

04:17PM  15    ONE-WAY STREET TO THE DEFENSE, BUT THAT'S BECAUSE OF THE

04:17PM  16    HEARSAY RULE.

04:17PM  17        AND SIMPLY BY ASKING, WHAT DID MS. HOLMES SAY ON

04:17PM  18    APRIL 28TH, 2016, DOESN'T MEAN THAT YOU GET TO ASK, WHAT DID

04:17PM  19    MS. HOLMES SAY AT THE AACC CONFERENCE AND WHAT DID YOU THINK

04:17PM  20    ABOUT THAT AFTER THE FACT, WITNESS?

04:17PM  21        AND IT IS NOT JUST A MINI TRIAL ON MS. PETERSON'S STATE OF

04:17PM  22    MIND, YOUR HONOR.  THERE'S TWO YEARS AFTER THIS OF RDV TRYING

04:17PM  23    TO GET INFORMATION FROM THE DEFENDANT, TRYING TO FIGURE OUT

04:17PM  24    WHAT IS GOING ON, LEARNING ABOUT LAWSUITS, S.E.C.

04:17PM  25    INVESTIGATIONS, DOJ INVESTIGATIONS, AND IF HER STATE OF MIND

04:17PM 1    REALLY MATTERS IN THIS TRIAL, WE'RE GOING TO HAVE TO EXPLORE

04:17PM 2    THAT.

04:17PM 3        AND I JUST DON'T THINK THAT YOU CAN USE THE DEFENDANT'S

04:17PM 4    HEARSAY OUT OF COURT STATEMENTS AS A SPRINGBOARD TO ASK ABOUT A

04:18PM 5    WITNESS'S STATE OF MIND YEARS AFTER THE INVESTMENT.

04:18PM 6            MR. WADE:  ONE FINAL POINT, YOUR HONOR.

04:18PM 7        THE GOVERNMENT WANTS TO HAVE THEIR CAKE AND EAT IT, TOO.

04:18PM 8    THEY WANT TO GET IN ALL OF THE POST "WALL STREET JOURNAL"

04:18PM 9    NEGATIVE EVIDENCE THAT THEY LIKE, ALL OF THE WAY THROUGH TO

04:18PM 10   MR. EDLIN OFFERING HIS VIEW OF THE TECHNOLOGY AT THE END OF

04:18PM 11   2016, BUT THEY DON'T WANT US TO HAVE ANY OF THE EVIDENCE THAT

04:18PM 12   IS ACTUALLY FAVORABLE AND CONSISTENT WITH THE CLIENT'S GOOD

04:18PM 13   FAITH AND INTENT.

04:18PM 14       SO IT'S NOT --

04:18PM 15           THE COURT:  YOU WILL HAVE A TIME TO PUT THAT ON IF

04:18PM 16   YOU WANT.

04:18PM 17           MR. WADE:  SURE.  BUT I THINK THIS WITNESS IS HERE

04:18PM 18   AND IT RELATES TO THE MEETING THAT SHE TALKED ABOUT.  THERE'S A

04:18PM 19   DIRECT LINE --

04:18PM 20           THE COURT:  LET ME ASK YOU THIS.  WHAT ABOUT -- IN

04:18PM 21   HER MEMO SHE'S QUOTING YOUR CLIENT.  ARE YOU ASKING THAT YOUR

04:18PM 22   CLIENT'S STATEMENTS BE ADMITTED AS WELL, OR JUST THIS WITNESS'S

04:18PM 23   OBSERVATION AND EVALUATION?

04:18PM 24       I THINK THOSE ARE TWO DIFFERENT THINGS.

04:18PM 25           MR. WADE:  I CAN LOOK AT THAT, YOUR HONOR.

04:19PM 1          THE COURT:  RIGHT.  SO I THINK WE WILL CONTINUE OUR

04:19PM 2     CONVERSATION ON THIS TOMORROW MORNING, BUT THOSE ARE THE -- AND

04:19PM 3     WE HAD A DISCUSSION ABOUT WHETHER OR NOT A DEFENDANT CAN

04:19PM 4     INTRODUCE STATEMENTS, UNLIKE THE PROSECUTION CAN, AND I THINK

04:19PM 5     THERE'S AN ISSUE HERE WITH THAT AS WELL, IF THAT'S WHAT YOU'RE

04:19PM 6     TRYING TO GET IN.

04:19PM 7          IF YOU WANT TO GET IN THE QUOTES HERE -- I TOOK SOME TIME

04:19PM 8     READING THIS WHEN IT WAS OFFERED IN, AND MAYBE WE'LL READ IT

04:19PM 9     AGAIN TONIGHT A LITTLE CLOSER.  BUT THERE CERTAINLY SEEM TO BE

04:19PM 10    SOME QUOTES HERE THAT I DON'T THINK WOULD COME IN.  YOU MIGHT

04:19PM 11    HAVE TO ASK YOUR I.T. SPECIALIST TO DO SOME REDACTION IF THIS

04:19PM 12    COMES IN AGAIN.

04:19PM 13         MR. WADE:  HE CAN WORK WONDERS.

04:19PM 14         SO WE'LL CONSIDER THE COURT'S COMMENTS AND MAYBE WE'LL

04:19PM 15    COME BACK AT 8:30 TOMORROW TO ADDRESS THIS, OR WHENEVER THE

04:19PM 16    COURT WOULD LIKE.

04:19PM 17         THE COURT:  I THINK SO.  I'LL DEFER THE 5:00 A.M.

04:19PM 18    START MY COURT REPORTER LIKES.  WE'LL STICK TO 8:00, 8:15,

04:20PM 19    SOMETHING LIKE THAT.

04:20PM 20         MR. WADE:  GOOD.

04:20PM 21         THE COURT:  ANYTHING YOU WANT TO SAY, MR. LEACH,

04:20PM 22    BEFORE WE END FOR THE DAY?

04:20PM 23         MR. LEACH:  NO, THANK YOU.

04:20PM 24         THE COURT:  AND FOR THE DEFENSE?

04:20PM 25         MR. WADE:  NO.  AND I DON'T THINK WE'LL BE MUCH

04:20PM 1    LONGER WITH THIS WITNESS.  I DON'T KNOW IF -- THERE WERE SOME

04:20PM 2    ISSUES AT THE BEGINNING OF THE DAY WITH RESPECT TO

04:20PM 3    MR. EISENMAN.  I DON'T KNOW IF --

04:20PM 4            MR. DOWNEY:  YOUR HONOR, I THINK IF I CAN IDENTIFY

04:20PM 5    THE ISSUES?

04:20PM 6            THE COURT:  SURE.  LET'S TALK ABOUT THOSE.

04:20PM 7        ANYTHING FURTHER, MR. WADE, ON THIS?

04:20PM 8        WE'LL CONTINUE OUR CONVERSATION ABOUT THIS TOMORROW,

04:20PM 9    MR. LEACH?

04:20PM 10           MR. WADE:  NO.  THANK YOU.

04:20PM 11           MR. DOWNEY:  LET ME JUST SAY THEM BY CATEGORY, AND

04:20PM 12   MR. BOSTIC AND I HAVE DISCUSSED THESE, AND IF I MISSTATE

04:20PM 13   ANYTHING HE'S SAID, I'M SURE HE'LL LET US KNOW.

04:20PM 14       I THINK THERE ARE REALLY BASICALLY A COUPLE OF ISSUES, AND

04:20PM 15   THEY MAY AFFECT BOTH THE TESTIMONY AND A FEW OF THE EXHIBITS

04:20PM 16   THAT THE GOVERNMENT INTENDS TO PROFFER WITH ALAN EISENMAN, WHO

04:20PM 17   IS AN INVESTOR WHOSE INVESTMENT DATE IS IN LATE 2013.

04:20PM 18       MR. EISENMAN HAS REALLY, THROUGHOUT THE 302'S, THROUGHOUT

04:21PM 19   THOSE INTERVIEWS WITH THE GOVERNMENT HAS MADE STATEMENTS ABOUT

04:21PM 20   THE EFFECT OF THE LOSS OF THE INVESTMENT ON HIS RETIREMENT, ON

04:21PM 21   HIS GRANDCHILDREN, ET CETERA.

04:21PM 22       HE DID SO IN REALTIME WHEN HE WAS UNABLE TO LIQUIDATE THE

04:21PM 23   INVESTMENT IN 2014 AND 2015 IN CONTEMPORANEOUS DOCUMENTS.

04:21PM 24       EVIDENCE ABOUT THE EFFECT OF THE INVESTMENT LOSS ON HIM IS

04:21PM 25   NOT RELEVANT TO WHAT WE'RE TRYING, AND IT MAY INDEED INTRODUCE

04:21PM 1    A SUBSTANTIAL AMOUNT OF PREJUDICE TO THE DEFENDANT.

04:21PM 2         THERE'S ALSO THE PROSPECT THAT IT WOULD INTRODUCE

04:21PM 3    UNPLEASANT AND IRRELEVANT MINI TRIALS.  THE GRANDCHILD THAT

04:21PM 4    HE'S WORRYING ABOUT IS THE GRANDDAUGHTER OF A BILLIONAIRE AND I

04:21PM 5    THINK SOME OF THE CONCERNS MAY HAVE LESS MERIT THAN HE

04:21PM 6    ARTICULATES.

04:21PM 7         I DON'T WANT TO GET INTO THAT.  I JUST WANT TO KEEP THAT

04:22PM 8    OUT OF THE CASE.

04:22PM 9         IT OCCURS -- COMMENTARY TO THAT EFFECT OCCURS IN THREE

04:22PM 10   DOCUMENTS IN A LIMITED WAY.  I THINK THE GOVERNMENT INTENDS TO

04:22PM 11   OFFER THOSE DOCUMENTS.

04:22PM 12        BUT I PROPOSE THAT THOSE BE REDACTED, AND I HAVE THE

04:22PM 13   PLACES WHERE IT WOULD GET REDACTED, AND I CAN GIVE YOUR HONOR A

04:22PM 14   COPY OF THAT AND MR. BOSTIC A COPY OF THAT TO LOOK AT

04:22PM 15   OVERNIGHT.  SO THAT'S ISSUE NUMBER ONE.

04:22PM 16        ISSUE NUMBER TWO IS THAT MR. EISENMAN HAS DISCUSSED, IN

04:22PM 17   HIS MOST RECENT 302 WITH THE GOVERNMENT, A NARRATIVE ABOUT

04:22PM 18   HAVING SEVERAL CONVERSATIONS WITH MS. HOLMES IN THE TIME PERIOD

04:22PM 19   BETWEEN 2006 AND 2010, THE POTENTIAL FOR AN INITIAL PUBLIC

04:22PM 20   OFFERING OF THERANOS STOCK.

04:22PM 21        TO BE CLEAR, I MENTIONED HIS 2013 INVESTMENT.  HE ALSO HAD

04:22PM 22   MADE AN INVESTMENT NEAR THE BIRTH OF THE COMPANY IN 2006.  SO

04:22PM 23   HE WAS AN INVESTOR IN THAT PERIOD, BUT OUTSIDE THE CONSPIRACY

04:23PM 24   PERIOD AND NOT THE SUBJECT OF THE COUNT IN THE INDICTMENT.

04:23PM 25        THE GIST OF HIS TESTIMONY IS, I KEPT BEING PUT OFF ABOUT

04:23PM 1    WHEN THERE WOULD BE AN IPO.

04:23PM 2         THAT UNTO ITSELF IS A LENGTHY SUBJECT FOR EXPLORATION.

04:23PM 3         THE TRUTH IS, AFTER HAVING ALL OF THOSE CONVERSATIONS AND

04:23PM 4    BEING FRUSTRATED THAT THERE WASN'T AN IPO, HE CHOSE TO INVEST

04:23PM 5    AGAIN IN 2013.  SO IT'S OF LIMITED RELEVANCE IN THE CASE.

04:23PM 6         IT, TOO, IS THE SUBJECT OF DISCUSSION IN SOME OF THE

04:23PM 7    DOCUMENTS, AGAIN, IN A VERY LIMITED WAY AND I THINK IT COULD BE

04:23PM 8    REDACTED -- YOU KNOW, THE DOCUMENTS COULD BE REDACTED TO CURE

04:23PM 9    THAT PROBLEM.

04:23PM 10        THE THIRD ISSUE IS ONE THAT MR. BOSTIC AND I HAVE TALKED

04:23PM 11   ABOUT.  I DON'T ANTICIPATE ISSUES WITH THIS, BUT JUST TO FLAG

04:23PM 12   IT FOR THE GOVERNMENT.  THERE'S A LONG COMPOSITE EXHIBIT OF

04:24PM 13   EMAILS AND NOTES AND SO FORTH THAT IS EXHIBIT 14.

04:24PM 14        I DON'T THINK MR. BOSTIC INTENDS TO OFFER THAT TO BE

04:24PM 15   ADMITTED IN THE CASE, AND I WOULD JUST ASK THAT IF THAT IS

04:24PM 16   ADMITTED, THAT HE CARVE THAT UP INTO SUBEXHIBITS BECAUSE IT'S

04:24PM 17   AN AGGREGATION OF MATERIAL THAT DOESN'T GO TOGETHER.  I'M

04:24PM 18   ACTUALLY NOT SURE WHY IT'S AGGREGATED IN THE WAY THAT IT IS.

04:24PM 19        BUT FOR PURPOSES OF THE RECORD, THE DOCUMENTS THAT RELATE

04:24PM 20   TO THE PERSONAL FINANCIAL SITUATION OF MR. EISENMAN ARE

04:24PM 21   EXHIBIT 2216, 2468, AND IN A LIMITED WAY 1371.

04:24PM 22        AND MY REQUEST, I SHOULD SAY, IN CONNECTION WITH THAT,

04:24PM 23   YOUR HONOR, IS NOT ONLY THAT THAT BE ADJUDGED NOT TESTIMONY OR

04:24PM 24   AN EXHIBIT THAT SHOULD COME IN, BUT ALSO THAT THE WITNESS BE

04:24PM 25   SPECIFICALLY ADMONISHED BECAUSE I THINK THERE'S A REAL DANGER

04:25PM 1    OF IT BASED ON WHAT IT APPEARS TO BE HIS BEHAVIOR IN THE CASE

04:25PM 2    TO DATE.

04:25PM 3            THE COURT:  THAT'S JUST RELATED TO NUMBER THREE,

04:25PM 4    YOUR --

04:25PM 5            MR. DOWNEY:  WELL, THAT RELATES TO NUMBERS ONE AND

04:25PM 6    TWO.

04:25PM 7            THE COURT:  I SEE, OKAY.

04:25PM 8            MR. DOWNEY:  THOSE ARE JUST TOPICS THAT HE HAS

04:25PM 9    BROUGHT UP WITH SOME FREQUENCY, AND I'LL LEAVE IT THAT.

04:25PM 10           THE COURT:  OKAY.  THANK YOU.

04:25PM 11           MR. DOWNEY:  SO I CAN HAND UP HOW THE EXHIBITS,

04:25PM 12   WHICH I THINK WOULD OTHERWISE BE ADMITTED, WOULD BE AFFECTED.

04:25PM 13           THE COURT:  MR. BOSTIC?

04:25PM 14           MR. DOWNEY:  AND I'LL GIVE MR. BOSTIC A COPY OF THE

04:25PM 15   SAME.

04:25PM 16       THAT'S FOR YOU (HANDING).

04:25PM 17       AND THIS IS WHAT THE DOCUMENT WOULD LOOK LIKE REDACTED.

04:25PM 18       DO YOU HAVE THE UNREDACTED VERSION?

04:25PM 19       THAT'S 2216, AND THIS IS 2468, AND THEN THERE IS 1371.

04:26PM 20           THE COURT:  THE HIGHLIGHTED PORTION, WHAT IS THAT?

04:26PM 21           MR. DOWNEY:  YEAH, THAT'S THE PROPOSED REDACTION.

04:26PM 22           THE COURT:  I SEE.

04:26PM 23           MR. DOWNEY:  I SHOULD SAY, I THINK ON 1371, THE

04:26PM 24   REDACTION MAY NOT BE NECESSARY BECAUSE MR. BOSTIC HAD INFORMED

04:26PM 25   ME THAT HE ONLY INTENDS TO OFFER REALLY THE FIRST FIVE PAGES,

04:26PM 1    SO IT MAY BE THAT OVERNIGHT HE CAN DIVIDE THAT EXHIBIT AND

04:26PM 2    WE'LL BE ABLE TO DO IT THAT WAY.

04:26PM 3              THE COURT:  OKAY.  THANK YOU.

04:26PM 4         MR. BOSTIC?

04:26PM 5              MR. BOSTIC:  YOUR HONOR, I'LL TRY TO TAKE THE ISSUES

04:26PM 6    FROM SIMPLEST TO MOST COMPLICATED.

04:26PM 7         FIRST, WHEN IT COMES TO EXHIBIT 14, WHICH IS MENTIONED

04:26PM 8    THIRD BY MR. DOWNEY, HE'S CORRECT THAT THE GOVERNMENT CURRENTLY

04:26PM 9    DOESN'T PLAN TO OFFER THAT INTO EVIDENCE.

04:26PM 10        IF IT DOES BECOME APPROPRIATE TO OFFER IT AT SOME POINT,

04:26PM 11   EITHER TO REPLACE THE WITNESS'S RECOLLECTION UNDER 803 OR FOR

04:26PM 12   SOME OTHER APPROPRIATE PURPOSE, THE GOVERNMENT WILL ATTEMPT TO

04:27PM 13   DO THAT IN A WAY THAT DOESN'T CREATE CONFUSION OR BURDEN THE

04:27PM 14   EVIDENCE RECORD.  BUT I THINK THAT IS A MOOT POINT.

04:27PM 15             THE COURT:  OKAY.  THANK YOU.

04:27PM 16             MR. BOSTIC:  ON POINT NUMBER ONE, I THINK THERE'S NO

04:27PM 17   DISAGREEMENT OVER THE PRINCIPLE THAT THE COURT HAS RULED ON THE

04:27PM 18   ADMISSIBILITY OF DOWNSTREAM EFFECTS, FINANCIAL EMOTIONAL HARM

04:27PM 19   SUFFERED BY VICTIMS IN THIS CASE.

04:27PM 20        THE GOVERNMENT HAS REVIEWED THAT ORDER, UNDERSTANDS IT.  I

04:27PM 21   WILL REVIEW IT AGAIN BEFORE MR. EISENMAN'S TESTIMONY TO MAKE

04:27PM 22   SURE WE COMPLY WITH IT IN ELICITING TESTIMONY FROM HIM, AND

04:27PM 23   IT'S ALSO OUR PRACTICE TO HAVE CONVERSATIONS WITH WITNESSES

04:27PM 24   ABOUT AREAS THAT NEED TO BE AVOIDED IN ORDER TO COMPLY WITH THE

04:27PM 25   COURT'S ORDERS.

04:27PM 1    BUT I WANT TO MAKE SURE THAT WE'RE ON THE SAME PAGE,

04:27PM 2  BECAUSE THE DEFENSE AND THE PROSECUTION DON'T ALWAYS AGREE ON

04:27PM 3  WHERE THE LINE IS WHEN IT COMES TO THAT DOWNSTREAM EFFECT

04:27PM 4  TESTIMONY.

04:27PM 5    I JUST RECEIVED DEFENSE COUNSEL'S PROPOSED REDACTIONS.  I

04:27PM 6  WOULD LIKE THE EVENING TO LOOK AT THOSE IF I COULD AND THEN

04:28PM 7  PERHAPS WE CAN FINISH THIS CONVERSATION TOMORROW MORNING IF THE

04:28PM 8  COURT IS AMENABLE.

04:28PM 9    FOR NOW I'LL JUST SAY THAT PART OF MR. EISENMAN'S

04:28PM 10  TESTIMONY IS GOING TO INVOLVE EFFORTS THAT HE MADE TO GET

04:28PM 11  INFORMATION FROM MS. HOLMES BEFORE AND AFTER HIS 2013

04:28PM 12  INVESTMENT.

04:28PM 13    THE WILLINGNESS OF AN ALLEGED FRAUDSTER TO PROVIDE

04:28PM 14  INFORMATION TO A VICTIM IS RELEVANT IN A CASE LIKE THIS.  TO

04:28PM 15  THE EXTENT THAT SOMEONE WHO HAS DECEIVED SOMEONE PREVIOUSLY IS

04:28PM 16  WILLING TO PROVIDE ADDITIONAL INFORMATION OR STONEWALLS THAT

04:28PM 17  PERSON, REFUSING TO PROVIDE THEM DETAIL IS RELEVANT TO THAT

04:28PM 18  INDIVIDUAL'S INTENT AND KNOWLEDGE.

04:28PM 19    IN THIS CASE, ONE OF THE TOPICS THAT MR. EISENMAN WAS

04:28PM 20  SEEKING INFORMATION ON WAS THE POTENTIAL FOR A LIQUIDITY EVENT

04:28PM 21  RELATING TO THERANOS, WHETHER THAT WAS AN IPO OR SOMETHING

04:29PM 22  ELSE.

04:29PM 23    SO WE SEE IN THE CONVERSATION BETWEEN MR. EISENMAN AND

04:29PM 24  MS. HOLMES THAT HE'S ASKING HER QUESTIONS ABOUT A POTENTIAL

04:29PM 25  LIQUIDITY EVENT, THE POSSIBILITY OF SELLING HIS SHARES EITHER

04:29PM   1    TO THERANOS OR TO A THIRD PARTY, AND IN CONNECTION WITH THAT,

04:29PM   2    HE EXPLAINS SOME LIFE CIRCUMSTANCES THAT CREATE, IN HIS MIND,

04:29PM   3    HIS NEED TO HAVE THAT INFORMATION IN ORDER TO WEIGH THINGS FOR

04:29PM   4    HIS RETIREMENT OR FAMILY OBLIGATIONS.

04:29PM   5         THOSE ARE THERE, IN MY VIEW, FOR CONTEXT RELATING TO HIS

04:29PM   6    REQUEST FOR MORE INFORMATION.  THEY'RE NOT CENTRAL TO HIS

04:29PM   7    TESTIMONY.  WE DON'T PLAN TO HIGHLIGHT THEM.

04:29PM   8         AND I DON'T BELIEVE THAT THE INFORMATION THAT HE DISCLOSES

04:29PM   9    IN THESE EXHIBITS RUNS AFOUL OF THE COURT'S ORDER, BUT I'M

04:29PM  10    SENSITIVE TO MR. DOWNEY'S CONCERNS, SO I WILL TAKE A CLOSER

04:29PM  11    LOOK.

04:29PM  12              THE COURT:  WELL, IF HE'S GOING TO TESTIFY IN THE

04:29PM  13    BROAD SCHEME, THIS WAS IMPORTANT TO MY FINANCIAL PLANNING, MY

04:30PM  14    RETIREMENT, MY WHATEVER IT IS, THAT GENERAL TYPE OF DESCRIPTION

04:30PM  15    I THINK IS APPROPRIATE.  IT'S PART OF HIS PLANNING, AND HE CAN

04:30PM  16    TALK ABOUT THAT.

04:30PM  17         IF HE -- AND I THINK WE START TO GET INTO GRAVEL WHEN HE

04:30PM  18    SAYS, WELL, THIS WAS CRITICAL FOR WHATEVER REASON AND GETS

04:30PM  19    TESTIMONY IN ABOUT, YOU KNOW, PERSONAL FEELINGS AND THOSE TYPES

04:30PM  20    OF THINGS, THAT'S WHERE WE'LL GET INTO THE WEEDS A LITTLE BIT I

04:30PM  21    THINK.

04:30PM  22         BUT GENERAL TOPICS ABOUT, WELL, IT'S IMPORTANT FOR MY

04:30PM  23    FINANCIAL PLANNING AND MY HEIRS, THOSE TYPES OF THING, AND

04:30PM  24    GENERALLY, I DON'T KNOW IF THAT'S WHAT HE'S GOING TO TALK

04:30PM  25    ABOUT, I DON'T HAVE A PROBLEM WITH THAT, AND I DON'T THINK

04:30PM  1      MR. DOWNEY WOULD EITHER, IF IT'S GENERAL ESTATE PLANNING AND

04:30PM  2  THE REASON AND THE IMPORTANCE OF IT, TO CARE FOR YOUR FAMILY OR

04:30PM  3  WHATEVER.

04:31PM  4      AND WHAT EXHIBIT GOES TO NUMBER ONE?  WHICH ONE OF THESE?

04:31PM  5          MR. DOWNEY:  IT'S THREE EXHIBITS.  IT'S 2468, 2216,

04:31PM  6  AND 1371.

04:31PM  7          THE COURT:  OH, ALL OF THESE WOULD GO TO --

04:31PM  8          MR. DOWNEY:  YEAH, THEY WILL ALL BE -- AND YOU'LL

04:31PM  9  SEE THE PROPOSED TEXT.

04:31PM  10          THE COURT:  OKAY.

04:31PM  11          MR. DOWNEY:  YOUR HONOR, I'M TEMPTED TO SAY I'M GLAD

04:31PM  12  THAT WE HAD THIS CONVERSATION, BECAUSE SOMETHING THAT

04:31PM  13  MR. BOSTIC SAID MADE ME WANT TO COMMENT.

04:31PM  14      THE PURPOSE FOR WHICH HE INTENDS TO PROFFER THAT EVIDENCE

04:31PM  15  IS TOTALLY INAPPROPRIATE.  THIS IS A SHAREHOLDER PROCEEDING

04:31PM  16  PURSUANT TO A SHAREHOLDER AGREEMENT WHICH DEFINES THE RIGHTS OF

04:31PM  17  HIM AND EVERY OTHER SHAREHOLDER.

04:31PM  18      HIS REQUEST FOR INFORMATION OR REQUEST FOR UNIQUE

04:31PM  19  INFORMATION THAT NO OTHER SHAREHOLDER HAD, TO PUT IN FRONT OF

04:31PM  20  THE JURY THAT THAT IS SOME OBFUSCATION BY THE DEFENDANT TO

04:31PM  21  INSIST THAT THE SHARING OF INFORMATION BE UNIFORM ACROSS ALL

04:31PM  22  SHAREHOLDERS AND TO IMPLY THAT THAT IS SOME FORM OF OBFUSCATION

04:32PM  23  IS TOTALLY INAPPROPRIATE.

04:32PM  24          MR. BOSTIC:  YOUR HONOR, HERE'S ANOTHER SITUATION

04:32PM  25  WHERE THE TWO PARTIES VIEW THE FACTS DIFFERENTLY.  THAT'S

04:32PM 1      CERTAINLY NOT HOW I WOULD DESCRIBE WHAT HAPPENED HERE.

04:32PM 2           MR. EISENMAN HAD A HISTORY OF QUARTERLY CALLS WITH

04:32PM 3      MS. HOLMES FOR A WHILE.  AT A CERTAIN POINT THOSE CALLS

04:32PM 4      STOPPED.

04:32PM 5           MR. EISENMAN WAS -- I THINK IN HIS COMMUNICATIONS AND IN

04:32PM 6      HIS TESTIMONY, IT WILL BE CLEAR THAT HE WAS NOT NECESSARILY

04:32PM 7      ASKING FOR INFORMATION BEYOND WHAT OTHER INVESTORS WERE

04:32PM 8      RECEIVING.  HE WANTED INFORMATION.  FULL STOP.

04:32PM 9           AND IF THAT MEANT THAT MS. HOLMES WOULD ENGAGE MORE WITH

04:32PM 10     ALL INVESTORS, THEN THAT WOULD HAVE SATISFIED HIM.

04:32PM 11          HE WASN'T ASKING FOR SPECIAL TREATMENT PER SE.  HE WANTED

04:32PM 12     TO KNOW WHAT WAS HAPPENING WITH THE COMPANY.  HE FELT THAT HIS

04:32PM 13     MILLION DOLLAR-PLUS INVESTMENT ENTITLED HIM -- ALTHOUGH HE

04:32PM 14     UNDERSTANDS THE LIMITATIONS TO HIS RIGHTS TO INFORMATION, HE

04:32PM 15     FELT THAT IT WAS APPROPRIATE FOR MS. HOLMES TO TELL HIM MORE

04:33PM 16     ABOUT WHAT WAS GOING ON WITH THE COMPANY SO THAT HE COULD

04:33PM 17     DECIDE WHAT TO DO WITH HIS INVESTMENT.

04:33PM 18          MR. DOWNEY:  IT'S TRUE THAT HE HAD A QUARTERLY

04:33PM 19     MEETING WITH MS. HOLMES FOR A PERIOD.  HE WAS UNIQUE IN THAT

04:33PM 20     REGARD AMONGST THE SCORES OF SHAREHOLDERS THAT ARE AT ISSUE

04:33PM 21     HERE.

04:33PM 22          IT'S CLEAR FROM WHAT MR. BOSTIC SAID THAT THEY WANT TO

04:33PM 23     CREATE AN IMPRESSION THAT EITHER WHAT MS. HOLMES SAID TURNED

04:33PM 24     OUT NOT TO EVENTUATE OR THAT BY FAILING TO PROVIDE COMPARABLE

04:33PM 25     INFORMATION LATER, THAT EVIDENCE IS SOME INTENT OF A CRIME.

04:33PM 1    UNDER THE DOCUMENTS THAT HE SIGNED, PLAIN AND SIMPLE ON

04:33PM 2    THE FACE OF THE AGREEMENT, HE AGREES THAT HE HAS NO ACCESS TO

04:33PM 3    DATA WHATSOEVER; AND, SECOND, ANY PLANNING THAT THE COMPANY

04:33PM 4    PROVIDES TO HIM IS CONDITIONAL SUBJECT TO CHANGE AND NOT

04:33PM 5    SOMETHING ON WHICH HE IS GOING TO RELY.

04:33PM 6    THE NOTION THAT DECLINING TO GIVE HIM THAT INFORMATION

04:33PM 7    DEMONSTRATES, YOU KNOW, GUILTY INTENT IN CONNECTION WITH

04:34PM 8    CHARGES LIKE THESE IS, I THINK, A TERRIBLE, UNFAIR, AND

04:34PM 9    PREJUDICIAL IMPLICATION TO CREATE IN FRONT OF THE JURY.

04:34PM 10    THE COURT:  IS IT, IS IT APPROPRIATE FOR THE JURY TO

04:34PM 11    LEARN THAT THERE WAS A HISTORY OF QUARTERLY MEETINGS THAT WAS

04:34PM 12    AFFORDED THIS INVESTOR AND THAT THEY STOPPED SOMEHOW?  I DON'T

04:34PM 13    KNOW WHO STOPPED IT, BUT THEY STOPPED.  SHOULDN'T THEY KNOW

04:34PM 14    THAT?

04:34PM 15    MR. DOWNEY:  I THINK WITHOUT GOING INTO THE CONTENT

04:34PM 16    OF THOSE MEETINGS TO IMPLY THAT EITHER NOT GETTING COMPARABLE

04:34PM 17    INFORMATION IS SOMEHOW SUSPICIOUS OR THAT, YOU KNOW, THEY

04:34PM 18    PROJECTED THERE WOULD BE AN IPO AT SOME POINT AND THEY DECIDED

04:34PM 19    TO REMAIN A PRIVATE COMPANY THEREAFTER, YOU KNOW, THE FACT THAT

04:34PM 20    THERE WERE QUARTERLY MEETINGS ALONE MIGHT BE CAPABLE OF BEING

04:34PM 21    ADMITTED, AS WOULD BE THE FACT THAT HE WAS UNIQUE WITH RESPECT

04:34PM 22    TO GETTING THESE QUARTERLY MEETINGS.

04:34PM 23    THE COURT:  WELL, IF HE HAD ACCESS TO A QUARTERLY

04:34PM 24    MEETING THAT NO ONE ELSE HAD, THAT MUST HAVE BEEN A MUTUAL

04:35PM 25    DECISION.  I DON'T KNOW.

04:35PM  1              MR. DOWNEY:  IT WAS PURSUANT TO HIS REQUEST AND IT

04:35PM  2       WAS STOPPED BECAUSE OF THE FEROCITY WITH WHICH HE WAS -- ON

04:35PM  3       SOME OCCASIONS, THE DOCUMENTS REFLECT DAILY CALLING THE COMPANY

04:35PM  4       AND ASKING FOR INFORMATION NOT IN THE PERIOD THAT IS THE

04:35PM  5       CONSPIRACY PERIOD THAT WE'RE DEALING WITH, AS BROAD AS THAT

04:35PM  6       PERIOD IS, NOT IN THE PERIOD AROUND HIS 2013 INVESTMENT, BUT

04:35PM  7       FOR THE ENTIRETY OF HIS INVOLVEMENT WITH THIS COMPANY AND

04:35PM  8       THEREAFTER.

04:35PM  9              SO I JUST -- I THINK IT'S AN IMPRESSION THAT -- THE

04:35PM  10      GOVERNMENT KNOWS THE RECORD.  THE GOVERNMENT, YOU KNOW, TO --

04:35PM  11      THERE'S PLENTY THAT THEY COULD DO WITH THIS WITNESS THAT

04:35PM  12      DOESN'T RELATE TO TRYING TO CREATE THAT IMPRESSION, WHICH IS

04:35PM  13      FALSE.

04:35PM  14              THE COURT:  MR. BOSTIC?

04:35PM  15              MR. BOSTIC:  YOUR HONOR, I THINK THE DEFENSE CAN

04:35PM  16      EXPLORE THIS IN CROSS-EXAMINATION TO THE EXTENT THAT THEY NEED

04:35PM  17      TO.

04:35PM  18              THE RECORD AND THE EVIDENCE REFLECT THE TRUTH HERE.  I

04:35PM  19      THINK THE PARTIES JUST SEE IT DIFFERENTLY.

04:35PM  20              WHEN IT COMES TO THE HISTORY OF COMMUNICATION HERE, I

04:35PM  21      THINK THE DEFENSE HAS ITS ARGUMENTS ABOUT WHAT THE CONTRACTS

04:36PM  22      REQUIRE.

04:36PM  23              BUT THIS WITNESS SHOULD BE ALLOWED TO EXPLAIN WHY HE TOOK

04:36PM  24      THE ACTIONS HE DID, WHY HE SOUGHT MORE INFORMATION FROM

04:36PM  25      MS. HOLMES AND FROM THERANOS, AND HIS EXPERIENCE, HIS FUTILE

04:36PM 1   EXPERIENCE IN MAKING THOSE ATTEMPTS TO TRY TO GET THAT

04:36PM 2   INFORMATION AND GET ANSWERS TO HIS QUESTIONS, SOME OF WHICH

04:36PM 3   BEAR -- OR MANY OF WHICH BEAR DIRECTLY ON THE SUBJECTS THAT

04:36PM 4   MS. HOLMES WAS DECEPTIVE ABOUT IN CONNECTION WITH NEWS ARTICLES

04:36PM 5   AND IN THE OTHER INVESTOR CONVERSATIONS THAT WE HAVE HEARD

04:36PM 6   ABOUT SO FAR IN TRIAL.

04:36PM 7        THE COURT:  AND ALL OF THIS WAS WITHIN THE CHARGED

04:36PM 8   PERIOD OF TIME?

04:36PM 9        MR. BOSTIC:  IT INCLUDES CONVERSATIONS DURING THE

04:36PM 10  CHARGED PERIOD OF TIME, YOUR HONOR.

04:36PM 11       THE HISTORY OF COMMUNICATION THAT WE'RE TALKING ABOUT

04:36PM 12  EXTENDS TO THE PAST ALSO.

04:36PM 13       AS WAS THE CASE WITH MR. TOLBERT'S TESTIMONY, WHICH I

04:36PM 14  BELIEVE ALSO COVERED SOME INTERACTION IN A PRE-2010 TIME

04:36PM 15  PERIOD, THE FACT THAT THE GOVERNMENT CHARGES A FRAUD SPANNING

04:36PM 16  FROM 2010 ON DOESN'T ERASE HISTORY BEFORE THAT.

04:36PM 17       I THINK THERE'S NOTHING WRONG WITH GIVING THE JURY THE

04:37PM 18  THREAD OF A CONVERSATION THAT CONTINUES INTO THE PAST, BUT THEN

04:37PM 19  HAS RELEVANT PORTIONS DURING THE TIME PERIOD ALLEGED IN THE

04:37PM 20  INDICTMENT.

04:37PM 21       AND I HAVEN'T ADDRESSED THE ISSUE OF THE IPO YET, BUT

04:37PM 22  THAT'S RELEVANT FOR SIMILAR REASONS.  IT'S PART OF

04:37PM 23  MR. EISENMAN'S CONVERSATIONS WITH THE DEFENDANT ABOUT WHETHER

04:37PM 24  THERE WAS GOING TO BE A LIQUIDITY EVENT OR NOT.

04:37PM 25       IN PARTICULAR, THAT CONVERSATION CONTINUED INTO THE

Case: 22-10338, 03/02/2023, DktEntry: 27.5, Page 278 of 290    Case 5:18-cr-00258-EJD Document 1745, Filed 01/18/23, Page 279 of 291

4858

04:37PM   1    POST-2010 TIME PERIOD.

04:37PM   2         AND I SHOULD POINT OUT, THIS ISN'T JUST, YOU KNOW, AN

04:37PM   3    UNRELATED TOPIC HERE.

04:37PM   4         AS MR. EISENMAN UNDERSTOOD IT, I EXPECT THAT HE'LL TESTIFY

04:37PM   5    THAT THERANOS'S WILLINGNESS OR INTENTION TO MOVE FORWARD WITH

04:37PM   6    AN IPO TOLD HIM SOMETHING ABOUT THE STATE OF THE COMPANY'S

04:37PM   7    FINANCIAL HEALTH, AND THE STATE OF THE TECHNOLOGY AS WELL.

04:37PM   8         SO REPRESENTATIONS MADE BY HOLMES TO HIM ABOUT THE

04:37PM   9    LIKELIHOOD OR THE TIMING OF AN IPO WERE NOT JUST ABOUT A

04:38PM  10    LIQUIDITY EVENT FOR HIM AND A CHANCE TO REALIZE GAIN ON HIS

04:38PM  11    INVESTMENT, BUT WERE ALSO IMPLICIT, CLEAR REPRESENTATIONS ABOUT

04:38PM  12    WHERE THE COMPANY STOOD IN TERMS OF ITS FINANCIAL GROWTH,

04:38PM  13    COMMERCIAL SUCCESS, AND THE DEVELOPMENT OF ITS TECHNOLOGY, AND

04:38PM  14    THAT'S WHY IT'S RELEVANT.

04:38PM  15              MR. DOWNEY:  WELL, TO BE CLEAR, YOUR HONOR, THIS IS

04:38PM  16    AN EFFORT TO INJECT ESSENTIALLY A DIFFERENT CONSPIRACY INTO

04:38PM  17    THIS CASE, AN UNCHARGED, UNNOTICED CONSPIRACY THAT THERE WERE

04:38PM  18    LIES ABOUT WHETHER OR NOT THE COMPANY COMMITTED TO CONDUCTING

04:38PM  19    AN IPO KNOWING IT WAS NOT GOING TO CONDUCT AN IPO, WHICH IN AND

04:38PM  20    OF ITSELF, IF THAT WERE CHARGED AND THAT'S WHAT WE WERE

04:38PM  21    DEBATING ABOUT, I WOULD BE QUITE COMFORTABLE WITH THAT CASE.

04:38PM  22         THE ISSUE IS THAT I SHOULD NOT HAVE TO TRY THAT CASE, AND

04:38PM  23    I PARTICULARLY SHOULD NOT HAVE TO TRY IT WHEN, AS THE

04:38PM  24    GOVERNMENT KNOWS, THIS DEFENDANT REPRESENTED THAT HE UNDERSTOOD

04:38PM  25    THERE WAS NOT A PUBLIC MARKET, HE UNDERSTOOD THAT THERE MAY

1    NEVER BE A PUBLIC MARKET, HE UNDERSTOOD THAT ANY PROJECTION OR

2    ESTIMATE OF THE COMPANY AS TO WHAT MIGHT HAPPEN IN THE FUTURE

3    WAS NOT RELIABLE.

4        I MEAN, THAT'S THE FRAMEWORK UNDER WHICH ALL OF THESE

5    INTERACTIONS THAT HE'S CHARACTERIZING HAPPENED.  THERE'S A

6    SIGNIFICANCE DISPUTE BETWEEN THE PARTIES IN REALTIME AS TO WHO

7    SAID WHAT, AND I THINK TO THROW THAT INTO THIS TRIAL WHEN ALL

8    OF THAT WITH MS. HOLMES IS YEARS BEFORE THE INVESTMENT DECISION

9    IN 2013.

10       THE PROBLEM THE GOVERNMENT HAS HERE IS THE OFFER TO

11   MR. EISENMAN TO INVEST IN 2013 IS IN A LIMITED WINDOW BETWEEN

12   DECEMBER 15TH AND DECEMBER 31ST.  MR. EISENMAN DOESN'T SPEAK TO

13   MS. HOLMES DURING THAT PERIOD.  HE HAS NOT SPOKEN TO HER FOR A

14   SUBSTANTIAL PERIOD PRIOR TO THAT TIME.  HE'S TAKEN NO

15   REPRESENTATIONS FROM HER ABOUT THIS PARTICULAR INVESTMENT

16   OPPORTUNITY OTHER THAN WHAT IS GENERALLY AVAILABLE TO

17   SHAREHOLDERS.

18       THEY, THEREFORE, WANT TO IMPORT ALL OF THESE PAST

19   INTERACTIONS FOR PURPOSES OF BOLSTERING, YOU KNOW, THE CLAIM

20   THAT SOMEHOW THE INVESTMENT LOSS OF MR. EISENMAN RELATES TO THE

21   DEFENDANT.

22       HE DOES HAVE INTERACTIONS WITH MR. BALWANI AND THEY CAN --

23   YOU KNOW, I UNDERSTAND MR. BALWANI IS ALLEGED TO BE A

24   COCONSPIRATOR AND THAT CAN COME IN.  BUT I'M NOT CONCERNED

25   ABOUT THAT.  THAT'S FAIR GAME.

04:40PM 1          MR. BOSTIC:  YOUR HONOR, JUST A COUPLE OF POINTS ON

04:40PM 2     THAT.

04:40PM 3          THE FACT IS THE STORY OF MR. EISENMAN'S INTERACTIONS WITH

04:40PM 4     THERANOS AND MS. HOLMES DID NOT START IN 2010.  IT WOULD BE

04:40PM 5     DECEPTIVE AND PRESENTING AN INCOMPLETE PICTURE TO THE JURY TO

04:40PM 6     BEGIN HIS TESTIMONY THERE WITHOUT, AGAIN, ALLOWING THE JURY TO

04:40PM 7     UNDERSTAND THE CONTEXT OF THOSE LATER INTERACTIONS, TO

04:40PM 8     UNDERSTAND WHAT MR. EISENMAN HAD PREVIOUSLY BEEN TOLD, AND WHAT

04:40PM 9     INFORMATION WAS AVAILABLE TO HIM IN FULL AT THE TIME THAT HE

04:40PM 10    MADE HIS DECISION TO INVEST IN 2013.

04:41PM 11         THE COURT:  WELL, IT SEEMS LIKE -- AND I DON'T

04:41PM 12    THINK, MR. DOWNEY, YOU ARE OBJECTING TO THE JURY KNOWING ABOUT

04:41PM 13    THE DURATION OF THE RELATIONSHIP.

04:41PM 14         MR. DOWNEY:  NO, I DON'T OBJECT TO THAT, AND I DON'T

04:41PM 15    OBJECT TO THE FACT THAT THEY KNOW THAT HE WAS AN INVESTOR.

04:41PM 16         BUT I DON'T SEE WHAT ELSE ABOUT THAT PERIOD -- IF THERE'S

04:41PM 17    ANYTHING, YOU KNOW, THAT IS DIRECTLY RELEVANT TO THE CONSPIRACY

04:41PM 18    ALLEGATIONS THAT HE WANTS TO TESTIFY TO THAT HE THINKS HE KNEW

04:41PM 19    ABOUT THE COMPANY, FOR EXAMPLE, HE MAKES SOME STATEMENTS ABOUT

04:41PM 20    WHAT HE THINKS HE KNEW ABOUT THE RELATIONSHIP BETWEEN THERANOS

04:41PM 21    AND PHARMACEUTICAL COMPANIES, I THINK THAT'S, YOU KNOW, FAIR

04:41PM 22    GAME.

04:41PM 23         THIS IS A DIFFERENT ISSUE.  THIS IS INJECTING A WHOLE NEW

04:41PM 24    THEORY OF LIABILITY INTO THE CASE.

04:41PM 25         WE'VE GOT PLENTY HERE TO DEAL WITH.

04:41PM 1               MR. BOSTIC:  YOUR HONOR, JUST ONE FINAL POINT.

04:41PM 2            MR. DOWNEY HAS REFERENCED SEVERAL TIMES LANGUAGE IN THE

04:41PM 3   STOCK PURCHASE AGREEMENT, A LEGAL DOCUMENT ENTERED INTO BETWEEN

04:41PM 4   MR. EISENMAN AND THERANOS.

04:42PM 5            LANGUAGE IN THAT CONTRACT WHERE THE INVESTOR SAID THAT

04:42PM 6   THEY HAVE ACCESS TO ALL OF THE INFORMATION THAT THEY NEED,

04:42PM 7   WHERE THEY SAY THAT THEY UNDERSTAND THE COMPANY'S HIGH RISK,

04:42PM 8   PROVISIONS LIKE THAT MIGHT HAVE A GREATER EFFECT WERE THIS A

04:42PM 9   CIVIL CASE BROUGHT BY THE INVESTOR AGAINST THE COMPANY WHERE

04:42PM 10   THE DECISION MIGHT TURN ON WHETHER THE INVESTOR HAD WAIVED

04:42PM 11   CERTAIN RIGHTS BY MAKING THOSE STATEMENTS.

04:42PM 12           THEY DO NOT, HOWEVER, RENDER INADMISSIBLE A VICTIM'S

04:42PM 13   STATEMENTS OR TESTIMONY ABOUT MISREPRESENTATIONS THAT A

04:42PM 14   FRAUDSTER MADE TO HIM BEFORE THE SIGNING OF THAT CONTRACT.

04:42PM 15           THEY CANNOT BE USED AS A SHIELD TO KEEP OUT TESTIMONY

04:42PM 16   ABOUT PREVIOUS MISREPRESENTATIONS.

04:42PM 17             THE COURT:  OKAY.

04:42PM 18             MR. DOWNEY:  YOUR HONOR, ONE OTHER THING.  I JUST

04:42PM 19   WANTED TO COMMENT ON YOUR HONOR'S COMMENT ABOUT TO CONSIDER,

04:42PM 20   NOT TO BELABOR THE COURT FOR THE COURT, BUT JUST WITH RESPECT

04:43PM 21   TO THE SCOPE ON THE EFFECT OF THE INVESTMENT ON HIS RETIREMENT

04:43PM 22   PLANNING AND SO FORTH, WITH RESPECT, I DISAGREE THAT COMMENTS

04:43PM 23   ABOUT HERE'S WHAT I WAS THINKING IN TERMS OF WHAT I WOULD DO

04:43PM 24   WITH THE MONEY, THAT HAS TO DO WITH HIS STATE OF MIND IF HE

04:43PM 25   REALIZES A RETURN.

04:43PM 1    IT DOESN'T HAVE TO DEAL -- IT HAS NOTHING TO DO WITH WHAT

04:43PM 2 IS MATERIAL IN HIS MAKING THE INVESTMENT DECISION OR THE STATE

04:43PM 3 OF MIND OF THE DEFENDANT.  THOSE ARE THE RELEVANT ISSUES.

04:43PM 4    SO HOW MONEY IS GOING TO BE USED, WHETHER IT'S LOST OR

04:43PM 5 REPRESENTS A SUBSTANTIAL GAIN, THAT'S NOT RELEVANT IN THE CASE.

04:43PM 6    SO I THINK THE SCOPE OF THE ADMONITION, YOU KNOW, SHOULD

04:43PM 7 INCLUDE THOSE ISSUES, AND I THINK THAT'S THE -- I THINK IT'S A

04:43PM 8 HELPFUL CONVERSATION.  THAT'S THE NUM OF OUR DISAGREEMENT.

04:43PM 9    THE COURT:  WELL, I THINK IT'S -- WHEN I SAID I

04:43PM 10 THINK HE CAN SAY, THIS IS PART OF MY PLANNING --

04:43PM 11    MR. DOWNEY:  YEAH.

04:43PM 12    THE COURT:  -- I DON'T SEE ANY HARM IN THAT.  THAT'S

04:44PM 13 COMMON KNOWLEDGE.  PEOPLE DO THAT.  AND THIS IS WHAT HE WAS

04:44PM 14 DOING AS PART OF HIS FINANCIAL PLANNING.

04:44PM 15    AND IT'S AN INVESTMENT.  WHATEVER IT IS, THAT'S FINE.

04:44PM 16    MR. DOWNEY:  I THINK THAT FAR IS FINE.  IT'S GOING

04:44PM 17 BEYOND THAT.

04:44PM 18    THE COURT:  WELL, I THINK THAT'S WHAT WE'RE TALKING

04:44PM 19 ABOUT, TOO.  IF HE TALKS ABOUT SOMETHING THAT IS REAL OR NOT

04:44PM 20 THAT SEEKS TO INJECT SYMPATHY OR SOMETHING LIKE THAT, IT MIGHT

04:44PM 21 NOT BE APPROPRIATE FOR THAT.  THAT'S WHAT I'M THINKING ABOUT.

04:44PM 22 THAT'S WHAT I HEARD.

04:44PM 23    BUT GENERAL TERMS ABOUT FINANCIAL PLANNING, I THINK

04:44PM 24 THAT'S -- WHY ELSE WOULD HE INVEST?  WHY DO PEOPLE DO THAT?

04:44PM 25    MR. DOWNEY:  HE HARDLY NEEDS TO SAY IT.

04:44PM 1          MR. BOSTIC:  YOUR HONOR, JUST ON THAT POINT, THE

04:44PM 2    LANGUAGE THAT WE'RE TALKING ABOUT -- AND I EXPECT THE LANGUAGE

04:44PM 3    THAT IS REDACTED IN THESE EMAILS -- IT ALL OCCURS BEFORE THE

04:44PM 4    ACTUAL LOSS IN THIS CASE, SO NONE OF IT IS OF THE SORT THAT I

04:44PM 5    THINK THE COURT WAS TARGETING IN ITS MOTION IN LIMINE ORDER --

04:44PM 6          THE COURT:  RIGHT.

04:44PM 7          MR. BOSTIC:  -- RELATING TO THE HARM AND THE

04:45PM 8    DOWNSTREAM EFFECTS THAT MIGHT HAVE FLOWED FROM THE LOSS.

04:45PM 9          THE COURT:  WELL, WE'LL ALL LOOK AT THIS.

04:45PM 10       SO WHAT IS THE SCHEDULE THEN?  WE'LL FINISH MS. PETERSON,

04:45PM 11   I THINK MR. WADE HAS ABOUT SEVEN MINUTES LEFT, AND THEN SOME

04:45PM 12   REDIRECT?

04:45PM 13         MR. DOWNEY:  I THINK DR. CULLEN, IT SOUNDS LIKE

04:45PM 14   SHE'LL BE AN HOUR IN TOTAL PERHAPS.

04:45PM 15         THE COURT:  AND THEN WE'RE GOING TO CALL THE DOCTOR

04:45PM 16   I GUESS; IS THAT RIGHT?

04:45PM 17         MR. SCHENK:  YOUR HONOR, I NEED TO SPEAK WITH THE

04:45PM 18   AGENTS.  THE DEFENSE ASKED US A COUPLE OF DAYS AGO FOR NAMES OF

04:45PM 19   WITNESSES AND WITNESS ORDER TODAY.  THEY ASKED FOR THREE NAMES

04:45PM 20   THAT DAY, INCLUDING MS. PETERSON.

04:45PM 21       SO WE WERE UNDER THE IMPRESSION THAT WE COULD ACCOMPLISH

04:45PM 22   MS. PETERSON'S TESTIMONY AND TWO OTHER WITNESSES TODAY.

04:45PM 23         THE COURT:  TODAY.

04:45PM 24         MR. SCHENK:  AGAIN, THAT WAS BASED ON ASKING FOR

04:45PM 25   ADDITIONAL NAMES, REQUESTS FROM THE DEFENSE FOR ADDITIONAL

04:45PM 1    NAMES.

04:45PM 2         WE HAD TO TAKE A WITNESS OUT OF ORDER.  WE CALLED

04:46PM 3    MS. PETERSON FIRST BECAUSE DR. CULLEN HAD TRAVEL ISSUES

04:46PM 4    PREVENTING HER FROM FLYING IN YESTERDAY.  SHE ARRIVED THIS

04:46PM 5    MORNING, AND SO WE PUT MS. PETERSON ON THE STAND FIRST.

04:46PM 6         I DO NOT KNOW -- MS. -- DR. CULLEN HAD A FLIGHT OUT

04:46PM 7    TONIGHT.  I TOLD HER SHE WOULD GET ON THE STAND TODAY AND SHE

04:46PM 8    WOULD GET OFF THE STAND TODAY BECAUSE THAT'S THE IMPRESSION I

04:46PM 9    WAS UNDER.

04:46PM 10        I DON'T KNOW WHETHER SHE'S GOING TO GET ON THAT FLIGHT AND

04:46PM 11   FLY HOME TONIGHT AND WE WILL BRING HER BACK NEXT WEEK OR AT

04:46PM 12   SOME OTHER POINT BECAUSE WE THOUGHT SHE WOULD FINISH TODAY.

04:46PM 13        SO I DON'T KNOW WHO THE NEXT WITNESS IS.  I'D LIKE TO

04:46PM 14   SPEND SOME TIME THIS EVENING INQUIRING ABOUT THAT.

04:46PM 15             THE COURT:  SURE.

04:46PM 16             MR. SCHENK:  IT WOULD BE VERY HELPFUL IF WE COULD

04:46PM 17   GET A REALISTIC ESTIMATE FROM THE DEFENSE ON THE LENGTH OF

04:46PM 18   CROSS REMAINING FOR PETERSON, AS WELL AS EISENMAN, BECAUSE

04:46PM 19   SOMETIMES WE'VE BROUGHT TOO MANY WITNESSES BECAUSE WE THOUGHT

04:46PM 20   THAT THE CROSSES WOULD END IN TIME, AND IT WOULD BE HELPFUL TO

04:46PM 21   PROVIDE ESTIMATES THAT WERE MORE REALISTIC.

04:47PM 22             THE COURT:  WELL, I'M SURE -- THANK YOU.

04:47PM 23        I'M SURE MR. WADE HAS MORE THAN SEVEN MINUTES TOMORROW.

04:47PM 24             MR. WADE:  I DON'T ANTICIPATE A LOT.  I ANTICIPATE A

04:47PM 25   VERY SHORT AMOUNT OF --

04:47PM 1          THE COURT:  WHAT I'VE LEARNED IS THAT THOSE TERMS

04:47PM 2  ARE QUITE RELATIVE IN THIS TRIAL.

04:47PM 3          MR. WADE:  YEAH.

04:47PM 4          THE COURT:  SO WHAT DO YOU THINK?  CAN WE FINISH TWO

04:47PM 5  WITNESSES?  CAN WE FINISH MS. PETERSON AND A WITNESS TOMORROW?

04:47PM 6          MR. WADE:  I THINK IT PROBABLY DEPENDS ON WHO THE

04:47PM 7  SECOND WITNESS IS.

04:47PM 8          MR. DOWNEY:  I THINK CERTAINLY DR. CULLEN.  MY

04:47PM 9  IMPRESSION IS THAT THAT'S A BRIEF WITNESS.

04:47PM 10         MR. SCHENK:  I DON'T THINK THERE'S ANY QUESTION THAT

04:47PM 11  DR. CULLEN WOULD FINISH IF SHE'S STILL IN TOWN.

04:47PM 12    I'M WONDERING IF EISENMAN, WHO IS IN TOWN, IF EISENMAN

04:47PM 13  FOLLOWS PETERSON, CAN -- WILL THE GOVERNMENT NEED A WITNESS

04:47PM 14  AFTER EISENMAN OR WILL EISENMAN NOT FINISH TOMORROW?

04:47PM 15         MR. DOWNEY:  THAT I DON'T KNOW, YOUR HONOR.  SOME OF

04:47PM 16  IT RELATES TO THE RULINGS ON THESE ISSUES BECAUSE THEY TAKE US

04:47PM 17  INTO COMPLEX AREAS.

04:47PM 18    BUT I WOULD -- I WOULD THINK WE WOULD GET VERY CLOSE WITH

04:48PM 19  EISENMAN IF NOT FINISH TOMORROW.

04:48PM 20         THE COURT:  DIRECT IS GOING TO BE AN HOUR OR SO WITH

04:48PM 21  HIM MAYBE?

04:48PM 22         MR. BOSTIC:  I'D ESTIMATE BETWEEN 60 AND 90 MINUTES,

04:48PM 23  YOUR HONOR.

04:48PM 24         MR. DOWNEY:  YEAH.  SO IT SOUNDS LIKE -- WELL, IT

04:48PM 25  SOUNDS LIKE WE WOULD ONLY HAVE ABOUT 90 MINUTES THEN.  I'M NOT

4866

```
04:48PM   1      SURE WE WOULD FINISH THAT.
04:48PM   2                THE COURT:  YEAH.  MR. WADE HAS SOME TIME TO GO IN
04:48PM   3      HIS REDIRECT AND THERE'S RECROSS, AND THAT'S TWO HOURS RIGHT
04:48PM   4      THERE I'M SURE.
04:48PM   5                MR. DOWNEY:  I'M SURE THAT'S TWO HOURS.
04:48PM   6                MR. SCHENK:  FOR PETERSON?
04:48PM   7                MR. WADE:  I WOULDN'T ANTICIPATE IT'S GOING TO BE
04:48PM   8      TWO HOURS, YOUR HONOR.  MY HOPE IS IT WOULD BE AN HOUR MAX.
04:48PM   9                THE COURT:  IN TOTAL?
04:48PM  10                MR. WADE:  I DON'T KNOW HOW MUCH MR. LEACH HAS,
04:48PM  11      BUT --
04:48PM  12                THE COURT:  YOU'RE GOING TO BE LESS THAN AN HOUR YOU
04:48PM  13      THINK?
04:48PM  14                MR. WADE:  I BELIEVE I WILL BE, YEAH.
04:48PM  15                THE COURT:  OKAY.  WELL, I DON'T KNOW IF THAT'S
04:48PM  16      HELPFUL TO YOU.
04:48PM  17                MR. SCHENK:  IF I COULD JUST CLARIFY?  IT SOUNDED
04:49PM  18      LIKE MR. DOWNEY WAS SAYING, EVEN WITH SIX HOURS REMAINING IN
04:49PM  19      THE DAY, IF PETERSON, LET'S SAY, TAKES TWO HOURS OR SO, MAYBE
04:49PM  20      AN HOUR, IF WE GO UNTIL 4:00, WE STILL MIGHT NOT FINISH AND THE
04:49PM  21      GOVERNMENT'S --
04:49PM  22                MR. DOWNEY:  I THOUGHT YOU WERE SAYING WITH CULLEN
04:49PM  23      IN BETWEEN.
04:49PM  24                MR. SCHENK:  CULLEN MAY GET ON A PLANE AND LEAVE
04:49PM  25      TONIGHT.  WE MAY HAVE TO GO DIRECTLY TO EISENMAN TOMORROW.  I
```

04:49PM 1     NEED TO WORK ON THAT WHEN WE LEAVE.

04:49PM 2              THE COURT:  RIGHT.

04:49PM 3              MR. SCHENK:  WHAT I'M WONDERING IS, CAN I TELL

04:49PM 4     CULLEN, YOU'RE GUARANTEED TO FINISH TOMORROW?  OR NOT?  AND I

04:49PM 5     HAVE SOME CONCERN.

04:49PM 6              MR. CLINE:  CULLEN OR EISENMAN?

04:49PM 7              THE COURT:  THIS IS CULLEN TOMORROW.

04:49PM 8              MR. DOWNEY:  GOING AFTER PETERSON?

04:49PM 9              MR. SCHENK:  GOING AFTER PETERSON OR GOING AFTER

04:49PM 10    EISENMAN DEPENDING ON THE LENGTH.

04:49PM 11             MR. CLINE:  I'M DOING CULLEN, DR. CULLEN.  I'M NOT

04:49PM 12    SURE HOW LONG THE DIRECT WILL BE, BUT MY CROSS WON'T BE MORE

04:49PM 13    THAN 20 MINUTES.  AND LET'S JUST SAY 30 TO BE ABSOLUTELY SAFE.

04:50PM 14    DEFINITELY NOT MORE THAN 30 MINUTES.

04:50PM 15             THE COURT:  CULLEN'S DIRECT I CAN'T IMAGINE WILL BE

04:50PM 16    MORE THAN AN HOUR.

04:50PM 17             MR. SCHENK:  CULLEN, IT SOUNDS LIKE, WILL CERTAINLY

04:50PM 18    FINISH AFTER PETERSON IF SHE STAYS IN TOWN.  JUST ONE MOMENT.

04:50PM 19             THE COURT:  SURE.

04:50PM 20        (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

04:50PM 21             MR. SCHENK:  SO FAR WHAT I WAS SUGGESTING IS

04:50PM 22    EISENMAN ALSO HAS TO FINISH.  HE HAS COMMITMENTS, AND WE'RE

04:50PM 23    DARK THURSDAY, FRIDAY.  HE CAN'T BE HERE NEXT WEEK.

04:50PM 24             THE COURT:  RIGHT.

04:50PM 25             MR. SCHENK:  SO I WAS TRYING TO FIGURE OUT IF CULLEN

| | | |
|---|---|---|
| 04:50PM | 1 | STAYS, DOES SHE TESTIFY BEFORE OR AFTER EISENMAN?  BECAUSE WE |
| 04:50PM | 2 | NEED TO FINISH BOTH OF THEM.  AND IF CULLEN JUST LEAVES TONIGHT |
| 04:50PM | 3 | AND WE PUT EISENMAN ON TOMORROW AND HE'S DONE AND WE DON'T HAVE |
| 04:50PM | 4 | A CARRY-OVER PROBLEM WITH CULLEN, OR IS THERE A CHANCE THEY |
| 04:50PM | 5 | BOTH FINISH SO WE DON'T HAVE TO CONCERN OURSELVES WITH THE |
| 04:50PM | 6 | ORDER? |
| 04:50PM | 7 | THE COURT:  IT SOUNDS TO ME LIKE IT'S GOING TO BE |
| 04:50PM | 8 | VERY DIFFICULT, IF NOT IMPOSSIBLE, TO FINISH TWO WITNESSES, TWO |
| 04:51PM | 9 | ADDITIONAL WITNESSES FROM MS. PETERSON'S FINISHING. |
| 04:51PM | 10 | SO IS THIS THEN A CHOICE -- IS IT EISENMAN?  IS THAT HIS |
| 04:51PM | 11 | NAME? |
| 04:51PM | 12 | MR. SCHENK:  EISENMAN. |
| 04:51PM | 13 | THE COURT:  HE'S NOT AVAILABLE NEXT WEEK? |
| 04:51PM | 14 | MR. SCHENK:  CORRECT. |
| 04:51PM | 15 | THE COURT:  SO MAYBE THAT'S -- WE NEED TO FOCUS ON |
| 04:51PM | 16 | HIM FOR TOMORROW AND HOPE THAT HE FINISHES TOMORROW. |
| 04:51PM | 17 | MR. SCHENK:  THAT'S WHAT IT IS SOUNDING LIKE TO ME. |
| 04:51PM | 18 | THE COURT:  YEAH. |
| 04:51PM | 19 | SORRY, MR. CLINE.  WE'LL HAVE TO DEFER. |
| 04:51PM | 20 | MR. CLINE:  I WAS SO READY FOR DR. CULLEN TO COME. |
| 04:51PM | 21 | THE COURT:  SHARPENING YOUR KNIVES ALL WEEKEND. |
| 04:51PM | 22 | MR. DOWNEY:  AND IT MAY EVENTUALLY.  WE'LL SEE WHAT |
| 04:51PM | 23 | HAPPENS. |
| 04:51PM | 24 | YOU'RE SENDING DR. CULLEN HOME THEN? |
| 04:51PM | 25 | MR. SCHENK:  I WOULD LIKE TO SPEND SOME TIME THIS |

04:51PM 1    EVENING FIGURING THAT OUT.

04:51PM 2            MR. DOWNEY:  I WOULD SAY THERE'S A DIFFERENCE

04:51PM 3    BETWEEN A BOSTIC HOUR AND A BOSTIC HOUR AND A HALF, TOO.  SO I

04:51PM 4    APPRECIATE YOUR COMMENTS ON THE CROSSES, BUT I -- AND WE'RE

04:52PM 5    DOING THE BEST WE CAN.

04:52PM 6            THE COURT:  BOTH SIDES, EVERYONE IS.  THAT INCLUDES

04:52PM 7    ME, TOO.

04:52PM 8            MR. DOWNEY:  I KNOW THAT.

04:52PM 9        AND MR. SCHENK IS RIGHT, WE ARE TRYING TO WORK WITH HIM SO

04:52PM 10   THAT HE CAN BE PREDICTIVE AS TO WHAT HAPPENS.

04:52PM 11           THE COURT:  ALL RIGHT.  WELL, IT SOUNDS LIKE -- IT

04:52PM 12   SOUNDS LIKE EISENMAN, MR. EISENMAN, WE NEED TO GET HIM DONE.

04:52PM 13   OTHERWISE HE'S GOING TO BE DRAGGED BACK IN WEEKS AFTER.

04:52PM 14           MR. SCHENK:  RIGHT.

04:52PM 15           THE COURT:  WELL, ALL RIGHT.  WE'LL LET YOU DISCUSS,

04:52PM 16   AND WE'LL LOOK AT THIS, AND WE'LL SEE YOU TOMORROW ABOUT 8:15.

04:52PM 17           MR. DOWNEY:  GREAT.  THANKS, JUDGE.

04:52PM 18           THE COURT:  THANK YOU.

04:52PM 19           MR. SCHENK:  THANK YOU.

04:52PM 20           THE COURT:  ALL RIGHT.

04:52PM 21           THE CLERK:  COURT IS ADJOURNED.

04:52PM 22       (COURT ADJOURNED AT 4:52 P.M.)

23

24

25

1

2

3                      CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16         _____
           IRENE RODRIGUEZ, CSR, CRR
17         CERTIFICATE NUMBER 8076

18

19         _____
           LEE-ANNE SHORTRIDGE, CSR, CRR
20         CERTIFICATE NUMBER 9595

21         DATED:  OCTOBER 26, 2021

22

23

24

25