LAW OFFICES

## WILLIAMS & CONNOLLY LLP®

AMY MASON SAHARIA
(202) 434-5847
asaharia@wc.com

680 MAINE AVENUE SW
WASHINGTON, DC 20024
(202) 434-5000
WWW.WC.COM

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

August 27, 2024

<u>Via ECF</u>

Molly C. Dwyer, Clerk of Court
James R. Browning Courthouse
95 Seventh Street
San Francisco, California 94103

     Re:   *United States v. Elizabeth Holmes*, No. 22-10312

Dear Ms. Dwyer:

Ms. Holmes respectfully submits this letter under Federal Rule of Appellate Procedure 28(j) and Circuit Rule 28-6 in response to the government's August 23, 2024 submission.

The Sixth Circuit's decision in *United States v. Betro*, --- F.4th ---, 2024 WL 3811838 (attached), provides no support for the government's arguments in this appeal. To the contrary, although not binding on this Court, *Betro* reinforces that the district court committed reversible error by admitting Kingshuk Das' expert opinions as lay testimony.

First, the opinion testimony that the Sixth Circuit held in *Betro* was properly admitted as lay testimony was based on the percipient observations of three doctors employed at the at-issue clinic during the charging period. 2:17-cr-20465, R.242, PageID.2030; R.437, PageID.4231; R.438, PageID4306, 4427-29, 4455-56. By contrast, Dr. Das started working at Theranos after it had ceased patient testing on the Edison device. Appellant Brief (AB) 32-33, 38-40; Reply Brief (RB) 4-5. His scientific data analysis of the Edison device's accuracy and reliability was retrospective—the kind a retained expert provides.

Second, the Sixth Circuit affirmed the admission of opinion testimony in *Betro* because the doctor-witnesses refrained from "broader medical judgments." Op. 16. One doctor offered opinions that "could be made using everyday reasoning without requiring specialized training or knowledge," and explained why he left the clinic. *Id.* Another doctor "assiduously refrain[ed] from offering medical judgments about which practice is objectively *correct*." *Id.* at 16-17. The third "merely testified to his first-hand

WILLIAMS & CONNOLLY LLP*
The Clerk of Court
August 27, 2024
Page 2

understanding" of whether "the shot that he was providing" was the injection-type billed to Medicare. *Id*. at 17. This case presents the opposite situation. Based on sophisticated data analysis, Das opined that the Edison was "not suitable for clinical use" and "there is a possible patient impact for every test reported." AB32-33, 35, 38-39; RB5-6. That is a "broader … judgment[]" requiring Rule 702 gatekeeping under *Betro*.

Third, the admission of Das' expert opinions was not harmless. In *Betro*, "other evidence established the same points." Op. 30 (White, J., concurring). Here, Das offered the only comprehensive, scientific evidence in the case. AB47-49; RB39-40.

Respectfully submitted,

*/s/ Amy Mason Saharia*

Amy Mason Saharia
Attorney for Appellant Elizabeth A. Holmes

cc:    All Counsel of Record (by ECF)

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0178p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

                                    *Plaintiff-Appellee*,

    *v.*

                                                ⎫

JOSEPH BETRO (22-1106); MOHAMMED ZAHOOR (22-1107);
TARIQ OMAR (22-1465); SPILIOS PAPPAS (22-1568),

                               *Defendants-Appellants*.

                                  ⟩ Nos. 22-1106/1107/1465/1568

_____

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:17-cr-20465—Denise Page Hood, District Judge.

Argued: October 24, 2023

Decided and Filed: August 14, 2024

Before: WHITE, NALBANDIAN, and MURPHY, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Edward Bajoka, BAJOKA LAW GROUP PLLC, Detroit, Michigan, for Appellant in 22-1106. Faisal Gill, GILL LAW FIRM, Washington, D.C., for Appellant in 22-1107. Kyle Singhal, HOPWOOD & SINGHAL PLLC, Washington, D.C., for Appellant in 22-1465. Ronald W. Chapman, II, CHAPMAN LAW GROUP, Troy, Michigan, for Appellant in 22-1568. Daniel N. Lerman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Edward Bajoka, BAJOKA LAW GROUP PLLC, Detroit, Michigan, for Appellant in 22-1106. Faisal Gill, GILL LAW FIRM, Washington, D.C., for Appellant in 22-1107. Kyle Singhal, Shon Hopwood, HOPWOOD & SINGHAL PLLC, Washington, D.C., for Appellant in 22-1465. Ronald W. Chapman, II, CHAPMAN LAW GROUP, Troy, Michigan, for Appellant in 22-1568. Daniel N. Lerman, Jeremy R. Sanders, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

NALBANDIAN, J., delivered the opinion of the court in which MURPHY, J., joined in full, and WHITE, J., joined in all but Section II.D. WHITE, J. (pp. 25–30), delivered a separate concurring opinion.

———————————

## OPINION

———————————

NALBANDIAN, Circuit Judge.   Joseph Betro, Mohammed Zahoor, Tariq Omar, and Spilios Pappas conspired to defraud Medicare by giving patients medically unnecessary back injections and bribing them with opioid prescriptions.  The defendants then fraudulently billed the injections through Medicare as "facet injections," because those would be reimbursed at a higher rate than the Marcaine injections that they provided.  To supplement their ill-gotten gains, they regularly ordered expensive and medically unnecessary urine-drug-testing panels and referred patients to ancillary services like home healthcare in exchange for kickbacks.

After trial, a jury convicted each of them of conspiracy to commit healthcare fraud and wire fraud under 18 U.S.C. § 1349 and healthcare fraud under 18 U.S.C. § 1347.  They each now raise various challenges to the validity of their individual convictions and the trial procedure.  We AFFIRM.

## I.

Betro, Zahoor, Omar, and Pappas participated in a fraudulent healthcare scheme headed by Mashiyat Rashid that subjected Medicare recipients to medically unnecessary back injections.  At their clinic, Tri-County, they falsely billed these injections to Medicare as "facet injections" to maximize their reimbursements.[1]  To achieve their scheme, they followed a predetermined protocol, luring patients with promises of large opioid prescriptions.  In return, the doctors received a percentage of whatever they billed in kickbacks.

And even though Medicare guidelines specified that patients should only receive facet injections *at most* four or five times a year, the doctors billed their facet injections *monthly*.  At the same time, Pappas, Zahoor, and Betro agreed to order unnecessary urine tests and got

———————————

[1]A facet injection uses a 3.5-to-4-inch needle to inject a spinal facet joint directly with a steroid and an anesthetic for the purpose of pain relief.  Tri-County, however, performed cheaper intramuscular back injections, using needles that were 1.5 inches long—too short to reach the facet joint—and injected only Marcaine, a numbing agent that lasts just a few hours, with no steroid.

kickbacks when they referred patients to ancillary services like home healthcare.  Then, to conceal the scale of their opiate prescriptions from the DEA, all four defendants conspired to drastically limit their working hours.  That way, their prescriptions wouldn't stand out from the other pain doctors (who were working full-time).

But soon enough, the government caught on and realized that Tri-County's injections were medically unnecessary, suspending the clinic from future Medicare reimbursements. Undeterred, the clinic reopened as "Tri-State" and picked up where it left off.  Pappas, Zahoor, and Betro each had patients complain that their Marcaine injections were painful and ineffective, but they continued the same course of "treatment," administering the same shots at the same monthly clip.  Omar, who left the clinic when it was still "Tri-County," had also continued giving injections in the face of similar patient complaints.

Yet, according to the patient charts, the shots were not so ineffective.  Routinely, the doctors at Tri-County ensured that they would "pass an audit" by following a "template," comprehensively reporting that every patient felt an "80 percent reduction in pain" because it "wouldn't . . . work to accurately record the amount of pain reduction the patient actually had." R. 439, Trial Tr. Vol. 4, p. 62, PageID 4548; R. 441, Trial Tr. Vol. 6, pp. 108–10, PageID 5061– 63.

For example, when recording the results of his treatment, Betro falsely reported that one "[p]atient felt instant relief and patient tolerated procedure well."  R. 440, Trial Tr. Vol. 5, pp. 223–24, PageID 4900–01.  And Zahoor's notes weren't much better, falsely and consistently characterizing one patient's pain as "elbow pain" and misrepresenting the duration of individual visits.  When the prospect of alternative treatments came up, Betro resisted them, noting that they would be "more of a one-time thing" and thus decrease revenue.  R. 441, pp. 147–48, PageID 5100–01.

All in all, Tri-County fraudulently billed over $132 million to Medicare.  When the authorities eventually caught up to the scheme, several of the defendants' co-conspirators, including Rashid, pleaded guilty.  Betro, Zahoor, Omar, and Pappas, however, went to trial. During the 15-day trial, the government presented the testimony of several cooperating witnesses

who had pleaded guilty, including Rashid, along with other witnesses.   The defendants all testified on their own behalf.   The jury eventually convicted them on all counts.

Zahoor, Omar, and Pappas filed motions for new trial, which Betro joined and the district court denied.   The four defendants now individually appeal their convictions and sentences, each raising various challenges to the prosecution, evidence admission and exclusion, jury instructions, and sentencing calculations.

## II.

We review a district court's "denial of a motion for a new trial for an abuse of discretion."   *United States v. Soto*, 794 F.3d 635, 645 (6th Cir. 2015).   And a "district court abuses its discretion when it relies on clearly erroneous findings of fact, uses an erroneous legal standard, or improperly applies the law."   *United States v. Dado*, 759 F.3d 550, 559 (6th Cir. 2014) (internal quotation marks omitted).

For instances when the defendant did not raise his claim below, "we review the record only for plain error."   *United States v. Coker*, 514 F.3d 562, 568 (6th Cir. 2008).   Plain error has four elements: (1) an error, (2) that is clear and obvious, (3) that affected the defendant's substantial rights, and (4) whose "adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings."   *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001).   But an error satisfies all four elements only "in exceptional circumstances" where it is "so plain that the trial judge and prosecutor were derelict in countenancing it."   *Id.*

## A.

First, Pappas, Zahoor, and Betro allege that the evidence of their knowledge and intent was insufficient to convict them.   When we review insufficiency challenges, we ask "whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"   *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).   Importantly, "[t]he appellate court must view all evidence and resolve all reasonable inferences in favor of the government."   *Id.*

Because Pappas, Zahoor, and Betro were convicted of conspiracy to commit healthcare fraud and wire fraud under 18 U.S.C. § 1349 and healthcare fraud under 18 U.S.C. § 1347, we look at the essential elements of these crimes.

First, § 1349 requires a finding that the defendants agreed to commit fraud and joined the conspiracy both knowingly and voluntarily. *United States v. Palma*, 58 F.4th 246, 249 (6th Cir. 2023). Second, § 1347 requires the government to prove that the defendants knowingly (1) devised and (2) executed a scheme to defraud a healthcare benefit program (3) with intent to defraud. *United States v. Anderson*, 67 F.4th 755, 770 (6th Cir. 2023). But "[d]irect evidence of fraudulent intent is not required." *Id.* "[A] jury may consider circumstantial evidence and infer intent from evidence of efforts to conceal the unlawful activity, from misrepresentations, from proof of knowledge, and from profits." *United States v. Persaud*, 866 F.3d 371, 380 (6th Cir. 2017) (quoting *United States v. Agbebiyi*, 575 F. App'x. 624, 634 (6th Cir. 2014)).

The prosecution's evidence was sufficient for a reasonable trier of fact to find that each element was met. At trial, Rashid testified that he had informed Pappas, Zahoor, and Betro before hiring them that the clinic "attracted patients" with opioid prescriptions and that they "would get a percentage of what they billed" as part of a "predetermined protocol." R. 441, pp. 28–29, PageID 4981–82. According to Rashid, the three of them, despite billing for facet injections, never actually performed them. But they billed Medicare for the injections because facet injections "gave us the highest reimbursement." *Id.* at 30, PageID 4983. Even though they knew facet injections were only supposed to be used at most four or five times a year, they each billed the injections monthly. A reasonable trier of fact could have found that all three of them agreed to commit fraud and joined Rashid's conspiracy both knowingly and voluntarily. *Palma*, 58 F.4th at 249; 18 U.S.C. § 1349.

As the scale of their conspiracy grew, Pappas, Zahoor, and Betro conspired to cut their shifts to conceal the volume of their opiate prescriptions and thus stay under the DEA's radar. Additionally, the three of them agreed to order unnecessary urine tests and received kickbacks for referring patients to ancillary services like home healthcare. And when Medicare eventually discovered their facet injections were medically unnecessary, it suspended the Tri-County clinic. But suspension would not halt their practice. They quickly resumed their operation under a new

name, "Tri-State." A reasonable jury could have taken this evidence to find that Pappas, Zahoor, and Betro each knowingly devised and executed a scheme to defraud Medicare with intent to defraud. *Anderson*, 67 F.4th at 770; 18 U.S.C. § 1347.

Defendants' arguments to the contrary are unavailing. Pappas argues that "the evidence was insufficient to prove that [he] knowingly conspired to submit medically unnecessary claims to Medicare for reimbursement, or that he devised a scheme and intended to submit medically unnecessary claims." Pappas Br. at 20. But there was ample evidence for a rational juror to find him guilty beyond a reasonable doubt.

Along with the evidence discussed above, Pappas himself testified that he knew he could be criminally prosecuted for healthcare fraud and nonetheless chose to flout Medicare's rules and submit fraudulent claims. R. 444, Trial Tr. Vol. 9, pp. 175–76, PageID 5735–36. Pappas also admitted that the number of urine drug tests he was ordering at Tri-County was "nuts." *Id.* at 120, PageID 5680. This Court has upheld convictions when evidence shows that defendants caused Medicare to be billed for treatments that "were not performed, or, if performed, were not medically necessary." *United States v. Martinez*, 588 F.3d 301, 315 (6th Cir. 2009).

And that is exactly what happened here. For example, one of Pappas's Medicare patients visited the clinic to receive injections 13 times in one year. Even knowing the patient complained that the injections didn't work and sometimes hurt, Pappas injected him 474 times over the course of 74 visits in only six and a half years. The government provided sufficient evidence for a jury to conclude that Pappas knew exactly what he was doing.

Next consider Zahoor. He argues that he "was merely trying to help his patients" and that the government failed to prove that he "acted with any intention other than good faith." Zahoor Br. at 27. But Zahoor admitted at trial that he promised Medicare he would become familiar with its rules and then violated those same rules every time he billed for more than five facet injections.

One of his patients complained that the injections hurt more than they helped, Zahoor nonetheless administered injections at 47 of her 48 visits. And when he composed his patient

notes, Zahoor failed to accurately describe the visits, repeatedly and falsely describing her pain as elbow pain while also misrepresenting the duration of individual visits.

Betro similarly challenges his conviction, but he admitted at trial that he submitted claims in violation of Medicare's policies on urine drug testing and facet joint injections. One of his patients complained that the shots hurt and were not getting better, but Betro kept administering them. Betro, however, falsely recorded on the patient chart that one "[p]atient felt instant relief and patient tolerated procedure well." R. 440, pp. 223–24, PageID 4900–01. When discussing the possibility of using a radio frequency machine at the clinic as an alternative treatment, Betro balked at the idea because it would be "more of a one-time thing," which meant it would decrease revenue compared to the monthly injections. R. 441, pp. 147–48, PageID 5100–01.

In sum, the government brought sufficient evidence against Pappas, Zahoor, and Betro. Resolving all reasonable inferences in favor of the government, a reasonable jury could have found all three of them guilty beyond a reasonable doubt.[2]

---

[2]At oral argument, Zahoor and Pappas's counsel claimed that the government needed expert testimony to prove that Tri-County's injections were medically unnecessary. This argument did not appear in their briefing, so it is plausibly forfeit. *Henricks v. Pickaway Corr. Inst.*, 782 F.3d 744, 751 n.3 (6th Cir. 2015) ("Because this argument was raised on appeal for the first time at oral argument, it has been forfeited on appeal."). That said, "while expert testimony as to 'legitimate medical purpose' . . . may be helpful to a jury, there are cases in which the lay testimony is so clear that no expert testimony is required to determine that the defendant's actions were not for a legitimate medical purpose." *United States v. Word*, 806 F.2d 658, 663 (6th Cir. 1986).

Here, as earlier discussed, Medicare conducted an audit of the Tri-County clinic, suspending it from further reimbursement after finding that the injections its doctors performed were "all medically unnecessary." R. 441, pp. 126–27, PageID 5079–80. Undaunted, Zahoor and Pappas rejoined forces with their fellow conspirators under the newly formed "Tri-State" clinic. R. 440, pp. 98, 108, PageID 4775, 4785. In addition, Rashid, the leader of the conspiracy, admitted that the defendants' scheme involved, in part, "medically unnecessary procedures, injections." R. 441, p. 22, PageID 4975. Omar also testified that the injections were "medically unnecessary." R. 448, Trial Tr. Vol. 13, p. 107, PageID 6329.

Moreover, the Fifth Circuit has held that no expert testimony is required where doctors bill for one thing but deliver something else that is less expensive. *See United States v. Ekanem*, 555 F.3d 172, 174–75 (5th Cir. 2009). In that case, the court required no expert testimony to show that a defendant had committed healthcare fraud when defendant had billed for an expensive motorized wheelchair but only delivered a cheaper scooter. Similarly, the government presented evidence that Zahoor and Pappas billed for expensive facet injections, despite knowing that they were not "actually giving facet injections" but were "actually doing trigger point injections." R. 441, pp. 50–52, PageID 5003–05. All said, even without expert testimony, there was ample evidence to convict them.

**B.**

Betro, Zahoor, and Omar each raise allegations of prosecutorial misconduct. This Court reviews properly preserved prosecutorial-misconduct claims de novo. *Coker*, 514 F.3d at 568. First, we "consider whether the prosecutor's conduct and remarks were improper." *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001). Then, if the prosecutor committed an impropriety, we "weigh four factors in determining whether the impropriety was flagrant and thus warrants reversal." *Id.* Here, we measure whether the conduct (1) "tended to mislead the jury or prejudice the defendant," (2) was "isolated or extensive," and (3) was deliberate or accidental, and, finally, (4) we see if "the evidence against the defendant was strong." *Id.*

Among other allegations, these three appellants contend that the prosecution (1) misled the jury by incorrectly treating the defendants as a collective, (2) used co-defendants' guilty pleas as substantive evidence, and (3) alluded to external evidence unavailable to the jury. We hold that there were no statements warranting reversal, so this claim fails.

First, Omar argues that the government "confuse[d] and prejudice[d] the jury" by treating "all four defendants as a single actor during questioning" and its closing argument. Omar Br. at 21–22.[3] Although it is true that witnesses lumped the four defendants together in testimony even after the district court sustained objections, the prosecutor often specified particular defendants.

The government's statements neither confused the jury nor prejudiced the defendants. For the most part, the prosecution's collective references to the defendants in closing argument accurately applied to *all four* defendants. Omar does identify one comment that inaccurately grouped him together with the other defendants. During its closing, the government told the jury that "these defendants and their other coconspirators had a meeting" in January 2017 to discuss finding ways to continue their injection and billing practices while "stay[ing] under the radar." R. 448, Trial Tr. Vol. 13, p. 153, PageID 6375. Omar, however, left Tri-County in 2016 and was not present at that meeting. Omar concedes that because he did not object to this statement during trial, we review for plain error. *United States v. Benson*, 591 F.3d 491, 499 (6th Cir. 2010).

---

[3]Zahoor, in passing, makes a similar argument.

The prosecution's references were otherwise not improper, and the district court's jury instructions properly cured any confusion caused by the reference to the 2017 meeting or imprecision in witness testimony. *See Emuegbunam*, 268 F.3d at 406. The court instructed, "It is your duty to separately consider the evidence against *each defendant* on each charge and to return *a separate verdict* for each one of them." R. 449, Trial Tr. Vol. 14, p. 195, PageID 6629 (emphases added). It further directed the jury to "make [its] decision based only on the evidence," which the court clarified did not include arguments made by counsel. *Id.* at 189–90, PageID 6623–24.

Omar also claims that the prosecution "appeal[ed] to class prejudice" by calling him "a man of expensive taste" and describing various lavish purchases made by the defendants. Omar Br. at 25. The district court, however, found the spending evidence relevant to Omar's motive and admitted it at trial. It is not improper for the government to use evidence that the district court expressly admitted.

Zahoor cites the government's closing rebuttal to accuse the prosecutor of "attempt[ing] to use the guilty pleas of the co-defendants as substantive evidence of guilt." Zahoor Br. at 21. He also argues that the prosecutor said he was guilty "because he was exercising his constitutional right to trial," calling the four defendants "unrepentant fraudsters." *Id.* at 22.

But the district court made it clear to the jury that closing arguments are not substantive evidence. Second, the defendants did not object to the government's comments at trial, so we review for plain error. *Benson*, 591 F.3d at 499. And here, counsel for each defendant arguably opened the door by first attacking witnesses' credibility in their own closing arguments. The government can use a co-conspirator's guilty plea to rebut challenges to the cooperating witness's credibility. *Id.* Additionally, after the government rehabilitated its witnesses' credibility, the district court instructed the jury that "[t]he fact that these witnesses have pleaded guilty to a crime is not evidence that the defendants are guilty, and you cannot consider this against the defendants in any way." R. 449, pp. 211–12, PageID 6645–46.

Nevertheless, whether the court erred here is a close issue. Although the defendants had first attacked the government witnesses' credibility in their own closing, the prosecution may well have taken the co-defendants' guilty pleas too far by telling the jury "the only question" to consider was whether the defendants were "doing the same thing" as co-defendants who "pled guilty to committing crimes" based on "the exact same" conduct. *Id.* at 147, PageID 6581. But these unobjected-to comments in isolation do not meet the level of flagrance justifying retrial, and the district court did not commit plain error by declining to grant a new trial on these grounds.

As to "unrepentant fraudsters," defendants opened the door there as well by using the same phrase to attack one of the government's witnesses. Before the prosecutor called the defendants "unrepentant fraudsters," Omar's counsel used the term at cross-examination, and Betro's counsel used it to describe Rashid at closing argument. R. 442, Trial Tr. Vol. 7, p. 24, PageID 5205; R. 449, p. 11, PageID 6445.

This Court has permitted prosecutors to make comments "in response 'to the argument and strategy of defense counsel.'" *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000) (quoting *Butler v. Rose*, 686 F.2d 1163, 1172 (6th Cir. 1982)). Here, the prosecution was responding to defense attempts to establish that the defendants were more credible than the government's cooperating witnesses. Besides, in a trial about *fraud*, it is not unduly prejudicial to use colorful pejoratives like "fraudster" in isolation. *See United States v. Branch*, 591 F.3d 602, 610 (8th Cir. 2009). And to the extent that characterizing defendants as "unrepentant" did draw an improper contrast, the comment does not warrant reversal given its isolated nature and the district court's instruction to the jury that the defendants' not-guilty pleas entitled them to the presumption of innocence. *See United States v. Lawrence*, 735 F.3d 385, 433 (6th Cir. 2013).

Zahoor also argues that it was improper for the government to "convey[] to the jury that there was evidence known to the government, but not known to the jury, which supported their argument." Zahoor Br. at 24. Specifically, he alleges that the government stated there were other patients it could have called in to testify. True, it is improper bolstering for a prosecutor to imply that witness "testimony is corroborated by evidence known to the government but not known to the jury." *United States v. Trujillo*, 376 F.3d 593, 608 (6th Cir. 2004) (quoting *United*

*States v. Martinez*, 253 F.3d 251, 254 (6th Cir. 2001)). But here, the prosecutor was responding to challenges from the defense and reminding the jury about the government's burden of proof.

It was Betro's counsel who had first highlighted the number of witnesses the prosecution called in to testify. R. 449, p. 37, PageID 6471 ("I would have expected the Government to bring in a parade of witnesses, a parade of patients. You heard that there were hundreds of patients in this clinic. They should have paraded them all up here and had them all take the stand."). And Zahoor's counsel similarly asked, "where are the patients," inviting the jury to "[i]magine how impactful it would have been . . . if there were ten patients sitting in that witness box" to testify against Zahoor. *Id.* at 76, PageID 6510. The government then replied, not by bolstering its case with evidence outside the record, but by reminding the jury of its own burden. It doesn't matter how many witnesses they call. The prosecution need only "prove its case beyond a reasonable doubt. We can prove that with one witness. We can prove it with 100 witnesses." *Id.* at 177, PageID 6611. The defendants did not object to the government's comments at trial, so we review for plain error and find none.

Similarly, Betro and Zahoor argue that the government's reference to "Magical Marcaine" in its closing argument misled the jury because there was no "evidence to corroborate or substantiate" its claim that any relief patients received from their treatment at Tri-County was "a lucky accident or caused by the oxycodone prescriptions." Betro Br. at 9–10; *see* Zahoor Br. at 22–23. Defendants did not object to the government's comments at trial, so we review for plain error.

In the face of conflicting testimony that Marcaine lasts no more than eight hours, Betro and Zahoor claimed that Marcaine used in *their* procedure has a much longer effect—up to a month. But witnesses for the prosecution testified that the Marcaine injections they received from Tri-County offered no relief. The defense's testimony about Marcaine directly conflicts with the prosecution. And when the prosecution brought up Marcaine at closing, it only invited the jury to resolve the conflicting testimony in its favor. *See Matthews v. Abramajtys*, 319 F.3d 780, 790 (6th Cir. 2003) (describing the resolution of conflicting evidence as "exactly the task to be performed by a rational jury"). It is not improper for the government to use "descriptive

phrases and colorful pejoratives" at closing.  *Branch*, 591 F.3d at 610 (internal quotation marks omitted).

Zahoor further argues that the government lacked evidence to support its claim that the defendants were among the top prescribers for opioids despite being "compared with pain doctors who worked 40 hours per week."  Zahoor Br. at 23.  But Rashid had testified that the doctors at Tri-County deliberately limited their work schedules, so their prescriptions would not stand out against doctors working five days a week.  Therefore, a jury could reasonably infer that most pain specialists were working 40-hour weeks and, at the very least, more hours than the doctors at Tri-County.  *See Byrd*, 209 F.3d at 535 ("[P]rosecutors must be given leeway to argue reasonable inferences from the evidence."  (internal quotation marks omitted)).

Finally, Betro and Zahoor argue that the government "made blatant appeals to the juror[s'] desire to hurry the process" by suggesting to the jury "the fastest way for you to go home," undermining each juror's duty to rigorously assess the evidence.  Betro Br. at 6–7; Zahoor Br. at 23.  The defendants did not object at trial, so we review for plain error.

Reading the comment in context, however, the government was not telling the jury to neglect its duty to the court.  Instead, the prosecution offered a question for the jury to ask itself in deliberation.  R. 449, p. 153, PageID 6587 ("[A]nd the fastest way for you to go home, the first question you could ask is . . . did [the defendants] know they were doing something wrong?")  There is no evidence that the jury abandoned the court's instructions to consider the evidence and determine whether the government proved its case beyond a reasonable doubt. And there is no evidence that the government directed the jurors to abandon their duty merely by giving them a place to start and simplifying the necessary findings at the end of a three-week trial.

In review, we find that the examples of alleged prosecutorial misconduct largely were not improper, and where the prosecution did commit passing improprieties, those instances do not meet the standard of flagrance justifying retrial.  They did not prejudice the defendants, they were relatively isolated in the context of a three-week trial, and the evidence was strong against

each defendant.  The district court therefore did not abuse its discretion by denying defendants' motions for new trial based on supposed prosecutorial misconduct.

## C.

Omar argues that the district court abused its discretion by admitting evidence of his spending and testimony that traced his spending "to money received from Tri-County."  Omar Br. at 35.  We review evidentiary rulings for abuse of discretion.  *United States v. Hazelwood*, 979 F.3d 398, 408 (6th Cir. 2020).

Under the Federal Rules, evidence is relevant if "it has any tendency to make a fact [of consequence] more or less probable than it would be without the evidence."  Fed. R. Evid. 401.  "This threshold is low, and evidence is relevant if it 'advance[s] the ball' one inch.'"  *United States v. Lang*, 717 F. App'x 523, 538 (6th Cir. 2017) (alteration in original) (quoting *Dortch v. Fowler*, 588 F.3d 396, 401 (6th Cir. 2009)).  A court, however, "*may* exclude relevant evidence if its probative value is substantially outweighed by . . . unfair prejudice."  Fed. R. Evid. 403 (emphasis added).

Here, the district court admitted evidence of Omar's spending to show motive to participate in the Tri-County conspiracy.  Omar himself admitted that his "taste in automobiles might be seen as some modest evidence of 'motive.'"  R. 398, Omar Evid. Obj., p. 13, PageID 3516.  Even though he bought his cars before joining Tri-County, Omar was still making payments, and revenues from his pulmonology practice had taken a dip.

When reviewing a district court's application of Rule 403, we review the court's balancing for abuse of discretion, "look[ing] at the evidence in the light most favorable to its proponent."  *United States v. Poulsen*, 655 F.3d 492, 509 (6th Cir. 2011) (quoting *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993)).  And we ask whether "the evidence would 'tend to suggest a decision on an improper basis.'"  *Id.* (quoting *United States v. Newsom*, 452 F.3d 593, 603 (6th Cir. 2006)).  The risk of unfair prejudice is "defined as the undue tendency to suggest a decision based on improper considerations."  *Hazelwood*, 979 F.3d at 412 (internal quotation marks omitted).  Considering its application to proving motive, it is unlikely that the evidence of Omar's spending would have led to a verdict based on improper considerations like seeing

"Omar as just another one of the bunch of rich, greedy doctors." Omar Br. at 38. Thus, viewing the evidence in light most favorable to the government, Omar's spending is relevant to his motive, and its relevance is not outweighed by a danger of unfair prejudice.

Finally, Omar contends that the evidence is inadmissible as evidence of specific conduct under Rule 404(b). *Id.* at 37. But Rule 404(b) only protects against evidence used "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). The government used Omar's to prove motive, not propensity, and Rule 404(b)(2) expressly lists "proving motive" as a permissible use of conduct evidence.

The district court did not abuse its discretion by admitting evidence of Omar's spending.

## D.

Betro argues that the district court erred by admitting the testimony of Ali Taqi, Anand Thakur, and Manish Bolina, three doctors who worked at Tri-County, without qualifying them as experts under Fed. R. Evid. 702 or testing their reasoning against the *Daubert* factors. As mentioned, we review evidentiary rulings for abuse of discretion. *Hazelwood*, 979 F.3d at 408. We reverse them "only where the district court's erroneous admission of evidence affects a substantial right of the party." *United States v. White*, 492 F.3d 380, 398 (6th Cir. 2007) (citing Fed. R. Evid. 103(a); *United States v. Whittington*, 455 F.3d 736, 738 (6th Cir. 2006)).

When witnesses offer lay testimony, they can give their opinions, so long as they are (1) "rationally based on the witness's perception," (2) "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and (3) "not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701. Treating physicians can pose some challenges on the line between lay and expert opinion testimony because they are percipient witnesses who also possess specialized knowledge.

In *United States v. Wells*, 211 F.3d 988, 998 (6th Cir. 2000), we concluded that treating physicians could testify "to their first-hand observations and treatment" of a patient without being qualified as experts. Two physicians in *Wells* testified about their treatment of a patient,

which included surgery and prescriptions. *Id.* at 997–98. In *Fielden v. CSX Transportation, Inc.*, 482 F.3d 866 (6th Cir. 2007), we determined that a treating physician could opine on the cause of the plaintiff's carpal tunnel syndrome without submitting an expert report. We noted, in part, that the physician's opinion was based on what he learned through actual treatment of the plaintiff and was based on his "ordinary medical training." *Id.* at 872.

We've also held that some opinion testimony of treating physicians needs to pass muster as expert testimony under Fed. R. Evid. 702. *See Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 426 (6th Cir. 2009). In *Fielden*, we suggested that a physician who "testifies to issues beyond those covered in ordinary medical training" may be acting more like a retained expert. 482 F.3d at 872.

Other courts have come to similar conclusions. The Tenth Circuit has said that "[a] treating physician is not considered an expert witness if he or she testifies about observations based on personal knowledge, including the treatment of the party." *Davoll v. Webb*, 194 F.3d 1116, 1138 (10th Cir. 1999). And the Eleventh Circuit held that "a physician may offer lay *opinion* testimony, consistent with Rule 701, when the opinion is 'based on his experience as a physician and [is] clearly helpful to an understanding of his decision making process in the situation.'" *Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312, 1317–18 (11th Cir. 2011) (alteration in original) (quoting *Weese v. Schukman*, 98 F.3d 542, 550 (10th Cir. 1996)). Although the line may be blurred at some point, what the Eleventh Circuit held is that a treating physician may not hypothesize, because that "crosses the line from lay to expert testimony, and . . . must comply with the requirements of Rule 702 and the strictures of *Daubert*." *Id.* To be fair, there are cases that will be close at the margins, but this case isn't one of those.[4]

---

[4]The concurrence suggests that we are overreading *Fielden* with regard to what kind of treating-physician testimony is permitted as "lay" testimony. It is true, as the concurrence points out, that *Fielden* was about whether a treating physician needed to file an expert report under Fed. R. Civ. P. 26(a)(2). The concurrence notes that under the rule in effect at the time, "retained" experts had to file reports but that other witnesses, like treating physicians, did not, even though they still offered expert testimony because they weren't "retained or specially employed to provide expert testimony." *See* Concurrence at 29 (citing Fed. R. Civ. P. 26(a)(2)(A)–(B) (2006)). So the suggestion is that *Fielden*'s conclusion that the treating physician there didn't have to file an expert report didn't implicate the question of whether that physician was offering expert testimony—only how it had to be disclosed.

On the contrary, here, Taqi, Thakur, and Bolina were treating physicians who offered opinions that are closely related to the course of treatment. Taqi, Thakur, and Bolina properly limited their lay testimony to their own first-hand observations and treatment—not broader medical judgments.

For example, the testimony Betro cites from Taqi contrasted the quantities and strength of the medications prescribed at Tri-County with the significantly different ones at his prior ER practice. Those comparisons were proper lay testimony because they could be made using everyday reasoning without requiring specialized training or knowledge. *See White*, 492 F.3d at 401. And when Taqi testified that he left Tri-County because he "didn't think the injections were doing anything for the patients," R. 437, p. 74, PageID 4232, it was founded in his personal experience treating *these* patients. *See Wells*, 211 F.3d at 998.[5]

Similarly, when Thakur testified that he thought the amount of opioids prescribed at Tri-County was "excessive" and "more . . . than I would prescribe," he made clear that his testimony was limited to "[t]he one or two patients that I saw" and how things worked "in my practice," assiduously refraining from offering medical judgments about which practice is objectively

---

The concurrence claims that the *Fielden* court "appeared to take it for granted" that the treating physician was an expert witness. *Id.* at 28–29 (citing *Fielden*, 482 F.3d at 869, 870 n.3, 872). But to the contrary, the *Fielden* court supported its conclusions not by calling treating physicians expert witnesses who were merely not retained to offer expert testimony but by alleviating concerns that parties might try to have "a treating physician testify on an issue *instead of having an expert do so*." *Fielden*, 482 F.3d at 870 (emphasis added). And where *Fielden* notes that the physicians were not retained experts, the opinion does not state or imply that they were nonetheless expert witnesses. *Cf.* Concurrence at 28–29 (citing *id.* at 869, 872). Lay witnesses are not retained to provide expert testimony either. We read *Fielden*'s conclusions about the nature of the treating physician's testimony as going to the question of whether it was "expert" testimony or not.

And that reading is bolstered by the out-of-circuit cases noted above. The concurrence says that those cases relied on an outdated version of Rule 701, which was amended in relevant part in 2000. Concurrence at 28 n.1. To be fair, the amendment post-dates *Davoll*, but it was explicitly discussed in *Williams*, 644 F.3d at 1317 & n.2, before the court distinguished opinions "based on a hypothesis" from those founded in "the experience of treating the patient," *id.* at 1317–18. As the concurrence notes, *Williams* cites *Davoll* and *Weese v. Schukman*, 98 F.3d 542 (10th Cir. 1996), but *Williams* also cites *United States v. Henderson*, 409 F.3d 1293 (11th Cir. 2005), *see* 644 F.3d at 1317–18 & n.4, which also explicitly discussed the 2000 amendment before explaining that "the ability to answer hypothetical questions is the *essential* difference between expert and lay witnesses," *Henderson*, 409 F.3d at 1300 (emphasis added).

As the concurrence points out, ultimate causation questions pose the greatest difficulty in this area. *See Gass*, 558 F.3d at 426; *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 982 (8th Cir. 2010). But this case does not present that issue.

[5]Betro cites this testimony in his brief but did not object to it at trial, meaning it is subject to plain-error review.

*correct*.  R. 438, pp. 161–63, PageID 4456–58.  And when the district court allowed Bolina to describe how to "appropriately" perform facet joint injections, he merely testified to his first-hand "understanding of the shot that he was providing at Tri-County" and how he did not believe that the shots were "actually facet joint injections."  *Id.* at 16, PageID 4311.  This too fell within "a permissive core on issues pertaining to treatment."  *Fielden*, 482 F.3d 866, 871 (6th Cir. 2007).[6]

Sometimes the physicians approached the line between lay and expert testimony, but in those moments, the district court quickly sustained objections from the defense, and the prosecution either rephrased its questions or posed new ones.  The district court did not abuse its discretion with the line it set between lay and expert testimony, and it did not erroneously admit evidence that substantially affected Betro's rights.  *White*, 492 F.3d at 398.

**E.**

Pappas argues that the district court violated his "Fifth and Sixth Amendment right to present a complete defense" by excluding patients he wanted to call as witnesses.  Pappas Br. at 33–34.  We review evidentiary rulings for abuse of discretion, but we review alleged constitutional violations de novo.  *United States v. Blackwell*, 459 F.3d 739, 752 (6th Cir. 2006).

"The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense."  *Washington v. Texas*, 388 U.S. 14, 19 (1967).  But that right to offer testimony does not extend to irrelevant testimony.  Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.");  *United States v. Lucas*, 357 F.3d 599, 606 (6th Cir. 2004) ("[A] complete defense does not imply a right to offer evidence that is otherwise inadmissible under the standard rules of evidence.").  At its core, "whether the exclusion of witnesses' testimony violated defendant's right to present a defense depends on whether the omitted evidence evaluated in the context of the entire record creates a reasonable doubt that did

---

[6]Separately, Betro makes a broad challenge to "any testimony pertaining to the half-life of Marcaine and how Marcaine is medically used," arguing that it "must be considered scientific and specialized knowledge."  Betro Reply Br. at 8.  But Betro failed to bring his challenge to Marcaine-related testimony in his opening brief, so the issue is forfeited.  *See United States v. Kalymon*, 541 F.3d 624, 632 (6th Cir. 2008).

not otherwise exist." *Blackwell*, 459 F.3d at 753 (quoting *Washington v. Schriver*, 255 F.3d 45, 57 (2d Cir. 2001)).

Pappas sought to introduce the testimony of one of his patients, Angela Vann, to rebut what he considered the government's "narrative that Dr. Pappas and the doctors at Tri-County treated patients uniformly, irrespective of their insurance." Pappas Br. at 36. Although Vann might have shown that Pappas did not treat *every* patient uniformly, the district court rightly excluded her testimony. The relevant question was not whether Pappas treated *every* patient uniformly. Instead, the case concerned "whether Pappas treated all *Medicare* patients the same," and Vann "was not a Medicare beneficiary," so her testimony was not probative. R. 694, Order Denying Mots. for New Trial, p. 42, PageID 9845 (emphasis added) (citing *United States v. Dimora*, 750 F.3d 619, 630 (6th Cir. 2014) ("[P]rior 'good acts' generally may not be used to show a predisposition not to commit crimes.")).

Pappas argues that his treatment of non-Medicare beneficiaries is "inextricably intertwined" with the charges against him. Pappas Br. at 40. But even if Vann's testimony is "inextricably intertwined" with Pappas's charges, that only gets around Rule 404(b). *See United States v. Churn*, 800 F.3d 768, 779 (6th Cir. 2015) ("Even if evidence is [inextricably intertwined], we 'must also find that the district court did not abuse its discretion in concluding that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice pursuant to Federal Rule of Evidence 403.'" (quoting *United States v. Joseph*, 270 F. App'x 399, 406 (6th Cir. 2008) (per curiam)).

Even if the district court erred by excluding Vann's testimony, it did not violate Pappas's constitutional right to present a defense. The bulk of her testimony would have shown that Pappas did not treat *every* patient the same. Pappas Br. at 41. And the district court already allowed Pappas to introduce a witness for just that rebuttal. At trial, he brought his Medicare patient, Shirley Norris, who testified that Pappas provided her with effective and individualized treatment, inquiring into her medical history, conducting a physical examination, and relieving her pain.

If Vann's testimony had been admitted, it would have covered largely the same ground as Norris's. It would not have undermined the government's case against Pappas. Therefore, even if the district court erred by excluding Vann's testimony, it did not violate Pappas's constitutional right to present a defense. *See Blackwell*, 459 F.3d at 753.

## F.

Pappas and Betro argue that the district court erred by instructing the jury on deliberate ignorance, claiming that the instruction was improper "given the lack of evidence" that they "acted with deliberate ignorance." Pappas Br. at 46; *see* Betro Br. at 24.

"We review challenges to a district court's jury instruction for abuse of discretion." *United States v. Geisen*, 612 F.3d 471, 485 (6th Cir. 2010). This Court may only reverse a conviction on these grounds "if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Id.* (quoting *United States v. Harrod*, 168 F.3d 887, 892 (6th Cir. 1999)).

A deliberate-ignorance instruction is appropriate when defendants claim to lack guilty knowledge, but "the facts and evidence support an inference of deliberate ignorance." *United States v. Mitchell*, 681 F.3d 867, 876 (6th Cir. 2012). Here, the government provided evidence to rebut Pappas and Betro's claims that they lacked guilty knowledge. For example, Rashid testified at trial that, before hiring Pappas and Betro, he had informed them that the clinic "attracted patients" with opioid prescriptions and that they "would get a percentage of what they billed" as part of a "predetermined protocol." R. 441, pp. 28–29, PageID 4981–82. Moreover, Pappas himself testified that he knew he could be criminally prosecuted for healthcare fraud but still flouted Medicare's rules and submitted fraudulent claims. And Betro testified that although Rashid told him Medicare did not allow facet injections to be billed more than five times a year, and those Medicare regulations were taped to a wall in the clinic, he continued to bill in excess of the guidelines. It was reasonable and proper for the district court to leave the question of deliberate ignorance to the jury.

## G.

Finally, Pappas, Omar, and Zahoor challenge the reasonableness of their sentences. "[W]e review a district court's sentencing determination, 'under a deferential abuse-of-discretion standard,' for reasonableness." *United States v. Bolds*, 511 F.3d 568, 578 (6th Cir. 2007) (quoting *Gall v. United States*, 552 U.S. 38, 41 (2007)). In so doing, we "first ensure that the district court committed no significant procedural error" and "then consider the substantive reasonableness of the sentence imposed." *Gall*, 552 U.S. at 51. We review a "factual amount of loss finding for clear error and consider the methodology behind it de novo." *United States v. Poulsen*, 655 F.3d 492, 512 (6th Cir. 2011) (internal quotation marks omitted). And when "a party has failed to object to a procedural defect, we review claims of procedural unreasonableness for plain error." *United States v. Wallace* 597 F.3d 794, 802 (6th Cir. 2010).

### 1.

Pappas, Omar, and Zahoor challenge their sentences as procedurally unreasonable, disputing the district court's method of calculating the amount of financial loss for which it held each conspirator responsible.

Under the Federal Sentencing Guidelines, we calculate loss as "the greater of actual or intended loss." *United States v. Wendlandt*, 714 F.3d 388, 393 (6th Cir. 2013) (citing U.S.S.G. § 2B1.1 cmt. n.3(A)). "'Intended loss' is 'the pecuniary harm that was intended to result from the offense,' including 'pecuniary harm that would have been impossible or unlikely to occur.'" *Id.* (quoting U.S.S.G. § 2B1.1 cmt. n.3(A)(ii)). In cases like this, "the aggregate dollar amount of fraudulent bills submitted to [a] Government health care program shall constitute prima facie evidence of the amount of the intended loss." *United States v. Patel*, 694 F. App'x 991, 996 (6th Cir. 2017) (quoting U.S.S.G. § 2B1.1 cmt. n.3(F)(viii)). And when calculating, "the district court need only make a reasonable estimate of the loss." *Wendlandt*, 714 F.3d at 393 (internal quotation marks omitted).

The district court determined at sentencing that the defendants' "intent was to get as much [of] what [they] billed as possible." R. 584, Rashid Sent. Hr'g, p. 17, PageID 7842; R. 736, Pappas Sent. Hr'g, p. 45, PageID 10093 (applying the quote from Rashid's sentencing to the

other defendants).  And when fraud is "pervasive," the entire amount billed counts toward the intended loss, and the burden then shifts to the defense "to prove the specific amount by which that amount should be reduced."  *United States v. Mehmood*, No. 19-1243, 2021 WL 2979591, at *6 (6th Cir. July 15, 2021) (internal quotation marks omitted).  Accordingly, the district court calculated the conspiracy's intended loss as $108,900,000—the full amount billed by the co-conspirators—and applied that figure to Betro, Pappas, and Zahoor.  Omar was held responsible for $77 million—the amount billed by the defendants during the period he participated in the conspiracy.

Pappas argues that the district court miscalculated the loss amount in two ways.  First, he argues that because the court made no explicit finding of pervasive fraud, the burden of proving the loss amount remained with the government.  Second, he argues that he nonetheless did prove the amount to which loss should have been reduced—the actual loss incurred after June 2016, or $3,782,323.48.  Because he did not raise this first argument at sentencing, we review for plain error.  *United States v. Sears*, 32 F.4th 569, 573 (6th Cir. 2022).

Although the district court did not explicitly find that Tri-County's billings resulted from pervasive fraud, its calculation of the loss amount was not plainly erroneous.  As the government reiterated during the sentencing hearing, the evidence at trial established that the clinic employed a predetermined "shots-for-pills protocol" designed to maximize profits above all else.  R. 736, p. 40, PageID 10088.  This evidence was sufficient to establish by a preponderance of the evidence that the fraud was pervasive—that is, "separating legitimate benefits from fraudulent ones [was] not reasonably practicable."  *United States v. Lovett*, 764 F. App'x 450, 460 (6th Cir. 2019) (quoting *United States v. Hebron*, 684 F.3d 554, 563 (5th Cir. 2012)).  As for Pappas's second argument, the district court correctly rejected his argument that the loss amount should be limited to actual loss, *see United States v. You*, 74 F.4th 378, 398 (6th Cir. 2023), and—as explained in Section II.A—his contention that he was not aware from the outset that Tri-County's practices were fraudulent.

Next, Omar argues that the district court erred in rejecting his argument that his loss amount should have been reduced by 31%, which he claims represents billing for services other than facet joint injections such as "office visits and other potentially non-fraudulent medical

treatment." Omar Br. at 39; *see* U.S.S.G. § 2B1.1, cmt. n.3(c)(i) (reducing loss by "the fair market value of . . . services rendered"). The district court concluded that those services could not be separated out from the fraudulent injections because they likely would not have been billed "but for the giving of the 69 percent that related to the injections." R. 749, Omar Sent. Hr'g Tr., p. 7, PageID 10276. As Omar provides no support for his contention that those services were legitimate and concedes they were merely "potentially" non-fraudulent, we find no error in the district court's determination.

Finally, Zahoor argues that he should not be held responsible for the amounts billed by other doctors because those amounts were not reasonably foreseeable to him. "Relevant conduct" for the purposes of calculating the loss amount includes the conduct of others if it "is 'within the scope' of, 'in furtherance' of, and 'reasonably foreseeable' in connection with jointly undertaken criminal activity." *United States v. Donadeo*, 910 F.3d 886, 894 (6th Cir. 2018) (quoting U.S.S.G. § 1B1.3(a)(1)(B)). Here, the government presented evidence that physicians at Tri-County applied a set "shots-for-pills" protocol and that Zahoor was aware of that practice, so the amounts billed by the other physicians were reasonably foreseeable. And although Zahoor cites his limited working hours to contend that he should not be held responsible for what his co-conspirators billed, any limits on his work hours came *in furtherance* of the conspiracy, and the district court rightly refrained from counting that in Zahoor's favor. Additionally, Zahoor's claim that his expertise in Medicare billing should reduce his loss calculation fails because (1) factual impossibility does not negate an intended loss calculation, *Wendlandt*, 714 F.3d at 393, and (2) Zahoor's claimed knowledge does not prove any *specific* reduction, *Mehmood*, 2021 WL 2979591, at \*6. In other parts of his own brief, he conceded that "[h]e did *not* know Medicare procedures and rules." Zahoor Br. at 6 (emphasis added). The district court committed no significant error in its loss calculation.

## 2.

Zahoor further challenged a two-level enhancement he received under U.S.S.G. § 2B1.1(b)(10)(C) for an offense involving sophisticated means, arguing that because his work was part-time and restricted to medicine, his role in the conspiracy was limited, and therefore the enhancement did not apply. *Id.* at 14–15. This Court defines "sophisticated means" as

"especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *United States v. Simmerman*, 850 F.3d 829, 833 (6th Cir. 2017) (quoting U.S.S.G. § 2B1.1 cmt. n.9). And a review of "the totality of a defendant's conduct—the entire scheme"—is sufficient for a determination of sophisticated means. *United States v. Masters*, 216 F. App'x 524, 526 (6th Cir. 2007).

In *Simmerman*, this Court affirmed a sophisticated-means enhancement when the defendant "essentially took money and put it in her purse," then concealed it by "manipulating the computer system and creating a dormant account to hide the stolen money." 850 F.3d at 833. And in *Masters*, this Court affirmed the same enhancement when the defendant used "publicly available reference materials" to "file[] false credit card applications" without "employ[ing] 'fictitious entities' or 'corporate shells.'" 216 F. App'x at 526.

Zahoor participated in a sophisticated fraud scheme in which the conspirators agreed to deliberately limit their shifts in order to conceal the volume of their opiate prescriptions compared to doctors working full-time and thereby stay under the DEA's radar. They also used template patient charts designed to pass a Medicare audit. Additionally, when Medicare eventually suspended the Tri-County clinic, Zahoor resumed the operation under a new name, "Tri-State." Viewed holistically, Zahoor's involvement with Tri-County justified his sentence enhancement for sophisticated means, and the district court did not abuse its discretion by properly applying it.

### 3.

Finally, Zahoor challenges his sentence as substantively unreasonable, arguing that it was "higher than it needed to be to punish [him] for [his] crimes," pointing to his cooperating co-defendants' sentences and contending that he received "a trial tax." Zahoor Br. at 17. The district court calculated his Guidelines range to be 262 to 327 months, but after considering 18 U.S.C. § 3553's sentencing factors, the judge sentenced him to only 96 months' incarceration.

When sentences are within the Guidelines, they are presumed to be reasonable. *United States v. Parrish*, 915 F.3d 1043, 1049 (6th Cir. 2019). And the burden of defendants challenging sentences that fall below the Guidelines range "is even more demanding."

*United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008). While a district judge might "determine a defendant's sentence in light of a co-defendant's sentence," that is a matter of discretion because "the district court is not *required* to consider that type of disparity under § 3553(a)(6)." *United States v. Simmons*, 501 F.3d 620, 624 (6th Cir. 2007). Discretionary factors like this "are not even appealable . . . so long as the judge appreciated h[er] discretion to downwardly depart." *Id.* And here, the district court already accounted for these disparities at sentencing.

Zahoor did not meet his enhanced burden, and his below-Guidelines sentence was substantively reasonable. The district court did not abuse its discretion by sentencing him 166 fewer months than the bottom of his Guidelines range.

## III.

For the reasons set forth above, we AFFIRM the district court's judgments with respect to all four defendants.

---

## CONCURRENCE

---

HELENE N. WHITE, Circuit Judge, concurring.  I join the majority opinion except as to Section II.D.  Because I conclude that some of the testimony of Drs. Taqi, Thakur, and Bolina crossed the line into expert testimony, I would instead affirm on this issue based on harmless error.

## I.

As the majority points out, treating-physician testimony implicates the murky lines between fact testimony by a witness with technical knowledge, lay opinion testimony, and expert opinion testimony.  A witness offers opinion testimony when he or she describes "an inference, belief, or conclusion," rather than merely recounting a factual observation.  1 *McCormick on Evidence* § 11 (8th ed. 2022); *see* 31A Am. Jur. 2d *Expert and Opinion Evidence* § 4 (2024) ("Opinion testimony draws from the given facts to reach a conclusion that cannot be tested directly and concerns what a witness thinks, believes, or infers in regard to the facts in dispute, as distinguished from the witness's personal knowledge of the facts themselves.").  Opinion testimony that "results from a process of reasoning familiar in everyday life" is lay opinion, admissible under Federal Rule of Evidence 701; opinion testimony derived from "a process of reasoning which can be mastered only by specialists in the field" is expert opinion, subject to the admissibility requirements of Federal Rule of Evidence 702.  *United States v. White*, 492 F.3d 380, 401 (6th Cir. 2007) (quoting *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992)).

Often, a treating physician's opinion testimony necessarily relies on specialized medical knowledge.  Therefore, contrary to the majority's suggestion, "[t]he opinion testimony of a doctor (whether an expert or a treating physician) generally must pass muster under Rule 702." *Madej v. Maiden*, 951 F.3d 364, 369 (6th Cir. 2020); *see Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 426 (6th Cir. 2009) ("Generally, a treating physician may provide expert testimony regarding a patient's illness, the appropriate diagnosis for that illness, and the cause of the illness.  However, a treating physician's testimony remains subject to the requirements in

*Daubert v. Merrell Dow Pharmaceuticals*[.]" (internal citations omitted)); *see also Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 704 (7th Cir. 2015) ("Treating physicians are no different than any other expert for purposes of Rule 702; before proffering expert testimony, they must withstand *Daubert* scrutiny like everyone else."); *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 982 (8th Cir. 2010) (A treating physician's "opinion on causation is subject to the same standards of scientific reliability that govern the expert opinions of physicians hired solely for the purpose of litigation." (quoting *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1207 (8th Cir. 2000)). A treating physician's opinion, although based on firsthand observations, might not meet Rule 702 and *Daubert*'s requirements, and the "trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702 advisory committee's note to 2000 amendments; *see, e.g.*, *Gass*, 558 F.3d at 428 (finding treating physicians competent to testify about diagnosis but not causation under Rule 702).

Given that framework, Betro is correct that some of Taqi, Thakur, and Bolina's testimony was expert opinion testimony, rather than fact testimony or lay opinion. First, Taqi testified that he left the Tri-County clinic because he "didn't think the injections were doing anything for the patients." R. 437, PID 4232. This was because, in Taqi's view, the Lidocaine used in the Tri-County injections is "supposed to be used as a diagnostic procedure, not as a therapeutic procedure, so to continue to inject these medications every month didn't make sense to [him]." *Id.* Taqi's testimony was that he believed or concluded that the injections were ineffective—*i.e.*, opinion testimony. And it was opinion testimony based on his specialized knowledge as a physician—*i.e.*, expert opinion.

Second, after Thakur was asked if he made any observations about the amount of opioids his Tri-County patients were taking, he testified he "thought [the opioid levels] were excessive." R. 438, PID 4456. Thakur later clarified that he meant that those patients, "in [his] opinion," were receiving "more opioids than [he] would prescribe." *Id.*, PID 4457. This testimony was a medical judgment, not a neutral observation; by characterizing the opioid prescriptions as "excessive," Thakur was weighing in on whether Tri-County's practices were medically appropriate. There is no indication that this opinion testimony was based on anything other than Thakur's knowledge, training, and experience as a "pain physician." *Id.*, PID 4454.

Finally, Bolina testified that the injections he performed at Tri-County were not actually facet-joint injections, but rather "[i]ntramusclar joint injections." *Id.*, PID 4312. To explain this conclusion, he provided a detailed technical explanation of how a facet-joint injection is performed "when . . . done appropriately," based on his "experience and knowledge and further learning [of] the procedure." *Id.*, PID 4311. This type of testimony—describing "an expert methodology (a technique or theory)" and "deriv[ing] an opinion by applying the methodology to a case-specific fact or facts"—is the prototypical "model of expert trial testimony" used "[i]n the overwhelming majority of cases." 1 *McCormick on Evidence* § 12 (8th ed. 2022). Even Bolina's explanation of proper injection procedure alone, separate from any further conclusions drawn from the facts of the case, was expert testimony subject to Rule 702. *Id.* (Expert testimony includes "a lecture or exposition about an expert methodology (a technique or theory) without attempting to apply the technique or theory to the facts."); *see* Fed. R. Evid. 702 ("A witness who is qualified as an expert . . . may testify in the form of an opinion or otherwise."); Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules ("The rule . . . recognizes that an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts.").

The cases the majority relies on do not change this analysis. *United States v. Wells*, 211 F.3d 988 (6th Cir. 2000), was decided shortly before Federal Rule of Evidence 701 was amended in December 2000. *White*, 492 F.3d at 401. That amendment added subsection (c) to the Rule, which "clarified that lay opinions or inferences cannot be based on 'scientific, technical, or other specialized knowledge within the scope of Rule 702.'" *United States v. Ganier*, 468 F.3d 920, 927 (6th Cir. 2006) (quoting Fed. R. Evid. 701(c)). In other words, the pre-amendment version of the Rule required only that lay witness testimony be rationally based on the witness's perception and helpful to the factfinder—a much lower bar. *See Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 928 (6th Cir. 1999). And the purpose of the amendment was to prevent the exact risk posed by Taqi, Thakur, and Bolina's testimony in this case—that a party might "surreptitiously circumvent[] 'the reliability requirements set forth in Rule 702 . . . through the simple expedient of proffering an expert in lay witness clothing.'"

*White*, 492 F.3d at 400–01 (quoting Fed. R. Evid. 701 advisory committee's note to 2000 amendments). *Wells* does not account for this later requirement.[1]

The second case, *Fielden v. CSX Transportation, Inc.*, 482 F.3d 866 (6th Cir. 2007), stands for a proposition distinct from and narrower than the one the majority suggests. *Fielden* did not hold that treating physicians do not offer expert opinion as long as they confine their testimony to the scope of their patients' treatment. Instead, *Fielden* concerned whether Federal Rule of Civil Procedure 26(a)(2) requires a treating physician to file an expert *report*. 482 F.3d at 869–72.

The version of Rule 26(a)(2) in effect when *Fielden* was decided required two categories of witness disclosures. Parties were required to "disclose . . . the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence"—that is, expert witnesses. Fed. R. Civ. P. 26(a)(2)(A) (2006). "[W]ith respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties . . . regularly involve giving expert testimony"—a subset of the witnesses subject to (a)(2)(A)—parties were further required to submit an expert report. Fed. R. Civ. P. 26(a)(2)(B) (2006).[2] The *Fielden* court concluded that treating physicians testifying to opinions formed while treating their patients do not fall within the latter category. 482 F.3d at 869–70. However, its analysis did not focus on the expert status of the challenged treating-physician witnesses, but instead on whether—as relevant to Rule 26(a)(2)(B)—they were retained witnesses. *See id.* at 869 ("Rule 26(a)(2)(B) by its terms provides that a party needs to file an expert report from a

---

[1]The out-of-circuit cases the majority cites similarly rely on the pre-amendment version of Rule 701. Although decided after and acknowledging the amendments, the Eleventh Circuit case *Williams v. Mast Biosurgery USA, Inc.*, cites two pre-amendment cases, *Davoll v. Webb*, 194 F.3d 1116 (10th Cir. 1999) and *Weese v. Schukman*, 98 F.3d 542 (10th Cir. 1996), for the proposition that a treating physician's testimony "crosses the line from lay to expert testimony" only when it "is based on a hypothesis, not the experience of treating the patient." 644 F.3d 1312, 1317–18 (11th Cir. 2011). *Davoll* and *Weese* both recite, and base their analysis on, the prior version of Rule 701, requiring only that lay witness testimony be "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding . . . of a fact in issue." *Davoll*, 194 F.3d at 1138 (quoting *Weese*, 98 F.3d at 550).

The Eleventh Circuit in *United States v. Henderson* likewise did not reconcile its reliance on *Davoll* and *Weese* with the 2000 amendments to Rule 701. 409 F.3d 1293, 1300 (11th Cir. 2005); *see Williams*, 644 F.3d at 1317 (citing *Henderson* for its "approval" of *Davoll* and *Weese*). And, under our post-amendment precedent, the ability to hypothesize is no longer the only essential difference between lay and expert opinion. *See White*, 492 F.3d at 400–01.

[2]The current version of Rule 26 also imposes these requirements. Fed. R. Civ. P. 26(a)(2)(A)–(B) (2023).

treating physician only if that physician was 'retained or specially employed to provide expert testimony.'  In this case, Fielden did not retain Dr. Fischer for the purposes of providing expert testimony."); *id.* at 872 ("[B]ecause there are no grounds to hold that Dr. Fischer functioned as a *retained* expert in this case, the district court should not have excluded Dr. Fischer's testimony on causation." (emphasis added)).  To the extent the witnesses' expert status was considered, the court appeared to take it for granted.  *See id.* at 870 n.3 ("Fielden disclosed the name of the treating physicians to CSXT, thus complying with Rule 26(a)(2)(A).").

*Fielden*, therefore, stops far short of creating a treating-physician carve-out to Federal Rule of Evidence 701(c)'s requirement that lay opinion testimony cannot be "based on scientific, technical, or other specialized knowledge."  *See White*, 492 F.3d at 401 ("[L]ay testimony is improper where it encompasses opinions that 'call[] for specialized skill or expertise.'" (quoting *Brown*, 836 S.W.2d at 550)).  Rule 26(a) expressly contemplates that a witness not required to submit an expert report may nonetheless offer expert testimony.  *See* Fed. R. Civ. P. 26(a)(2)(C)(i).[3]  And the advisory committee's notes identify "physicians and other health care professionals" as "[f]requent examples" of such witnesses.  Fed. R. Civ. P. 26 advisory committee's note to 2010 amendment.

## II.

Nevertheless, the district court's error in admitting this testimony does not warrant reversal.  The erroneous admission of evidence is harmless where "substantially equivalent evidence of the same facts had otherwise been admitted into evidence," *United States v. Robinson*, 389 F.3d 582, 593 (6th Cir. 2004), or the government otherwise established "overwhelming evidence of Defendants' guilt," *White*, 492 F.3d at 405.  Both occurred here.

---

[3]The advisory committee's commentary to Rule 26's 1993 amendments, which *Fielden* cites, also demonstrates that Rule 26(a)(2)(B) centers on distinctions between types of expert witnesses, rather than defining the category.  The 1993 commentary notes that, for purposes of Rule 26, experts are those "who will testify under Rule 702 of the Federal Rules of Evidence with respect to scientific, technical, and other specialized matters," but that the expert report requirement applies only to retained experts.  Fed. R. Civ. P. 26 advisory committee's note to 1993 amendment.  The commentary then contrasts retained experts (subject to the expert-report requirement) with treating physicians, who "can be deposed or called to testify at trial without any requirement for a written report." *Fielden*, 482 F.3d at 869 (quoting *id.*).

First, other evidence established the same points as the improperly admitted testimony. One of Betro's patients testified that the injections he received had no effect, as Taqi did. Beyond Thakur's testimony, the evidence that the Tri-County doctors were among the top opioid prescribers despite working reduced hours also established that the clinic's prescriptions were "excessive." And Bolina testified that the quantities prescribed at Tri-County were two to four times higher than CDC recommendations, testimony that also made that point without crossing into expert opinion. *See United States v. Kilpatrick*, 798 F.3d 365, 384–85 (6th Cir. 2015). Finally, regarding the testimony about facet-joint injections, Rashid testified that Dr. Frank Patino, another physician involved in the scheme, told him that the clinic physicians billed for facet-joint injections but actually performed trigger-point injections. Second, as laid out in Section II.A of the majority opinion, the evidence of Betro's guilt was otherwise overwhelming.

Therefore, I agree with the majority that the admission of the challenged testimony does not warrant reversal.