No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-258
Hon. Edward J. Davila

---

## PETITION FOR REHEARING EN BANC AND PANEL REHEARING

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
  *Counsel of Record*
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Avenue SW
  Washington, DC 20024
  (202) 434-5000
  asaharia@wc.com

# TABLE OF CONTENTS

Page

INTRODUCTION ...............................................................................1

STATEMENT ..................................................................................3

REASONS FOR GRANTING REHEARING ................................................9

I.    THE COURT SHOULD GRANT REHEARING EN BANC. ..............9

    A.    The Panel's Harmless-Error Analysis Confuses Harmlessness with Evidentiary Sufficiency in Conflict with Supreme Court and Ninth Circuit Precedent. ..................................................9

    B.    The Panel's Holding that Later Events Can Prove Earlier Knowledge Is Illogical and Contradicts Ninth Circuit Precedent. ........................................................13

    C.    The Panel's Holding Regarding the District Court's Curtailment of Cross-Examination Conflicts with Ninth Circuit Precedent...16

II.    AT A MINIMUM, PANEL REHEARING IS REQUIRED. ..............19

CONCLUSION.................................................................................21

CERTIFICATE OF COMPLIANCE ...................................................22

CERTIFICATE OF SERVICE ..........................................................23

i

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Caldwell v. Bell*, 288 F.3d 838 (6th Cir. 2002).....................................................10

*Horton v. Mayle*, 408 F.3d 570 (9th Cir. 2005)................................................1, 17

*Jensen v. Clements*, 800 F.3d 892 (7th Cir. 2015) ................................................9

*Kotteakos v. United States*, 328 U.S. 750 (1946) .....................................*passim*

*Phillips v. United States*, 356 F.2d 297 (9th Cir. 1965)................................1, 14

*Reisman v. United States*, 409 F.2d 789 (9th Cir. 1969)...................................14

*Sassounian v. Roe*, 230 F.3d 1097 (9th Cir. 2000) ...........................................11

*United States v. Alexius*, 76 F.3d 642 (5th Cir. 1996) ...........................1, 11, 12

*United States v. Bibo-Rodriguez*, 922 F.2d 1398 (9th Cir. 1991) ..............14, 15

*United States v. Bonanno*, 852 F.2d 434 (9th Cir. 1988)...................................18

*United States v. Brooke*, 4 F.3d 1480 (9th Cir. 1993)..................................10, 18

*United States v. Bruce*, 394 F.3d 1215 (9th Cir. 2005) .....................................10

*United States v. Brutzman*, 731 F.2d 1449 (9th Cir. 1984)...............................18

*United States v. Cantrell*, 433 F.3d 1269 (9th Cir. 2006) .................................18

*United States v. Escobar*, 674 F.2d 469 (5th Cir. 1982)....................................10

*United States v. Grinage*, 390 F.3d 746 (2d Cir. 2004).....................................10

*United States v. Ince*, 21 F.3d 576 (4th Cir. 1994) ...........................................10

*United States v. Jonnet*, 762 F.2d 16 (3d Cir. 1985) .........................................10

*United States v. Kohring*, 637 F.3d 895 (9th Cir. 2011) ...................................17

*United States v. Larson*, 495 F.3d 1094 (9th Cir. 2007) ..............................16, 17

ii

Page(s)

**Cases—continued:**

*United States v. Meserve*, 271 F.3d 314 (1st Cir. 2001) .......................................10

*United States v. Nelson*, 137 F.3d 1094 (9th Cir. 1998) ...............................14, 15

*United States v. Reagan*, 2009 WL 1185666 (9th Cir. May 4, 2009) ...............18

*United States v. Rodriguez*, 439 F.2d 782 (9th Cir. 1971) .................................18

*United States v. Shehadeh*, 848 F. App'x 271 (9th Cir. 2021) ...........................18

*United States v. Shih*, 73 F.4th 1077 (9th Cir. 2023) .................................16, 18

*United States v. Simtob*, 901 F.2d 799 (9th Cir. 1990) ......................................17

*United States v. Straughan*, 453 F.2d 422 (8th Cir. 1972) ...............................10

*United States v. Weiner*, 578 F.2d 757 (9th Cir. 1978) ...............................17, 18

*United States v. Williams*, 827 F.3d 1134 (D.C. Cir. 2016) ..............................10

*United States v. Willis*, 647 F.2d 54 (9th Cir. 1981) ..........................................18

*United States v. Wood*, 109 F.4th 1253 (10th Cir. 2024) ............................10, 11

*Vines v. United States*, 28 F.3d 1123 (11th Cir. 1994) .......................................10

**Rules:**

Fed. R. App. P. 40 .................................................................................................1

Fed. R. Evid.
    404 .................................................................................................................15
    702 ...................................................................................................................7

iii

Pursuant to Federal Rule of Appellate Procedure 40, Appellant Elizabeth Holmes respectfully requests rehearing en banc or panel rehearing. The panel's decision conflicts with the following precedents of the Supreme Court and this and other circuits: *Kotteakos v. United States*, 328 U.S. 750 (1946); *Horton v. Mayle*, 408 F.3d 570 (9th Cir. 2005); *United States v. Alexius*, 76 F.3d 642 (5th Cir. 1996); and *Phillips v. United States*, 356 F.2d 297 (9th Cir. 1965). The en banc Court's consideration is necessary to maintain uniformity of the Court's decisions.

## INTRODUCTION

This appeal arises from the criminal conviction of Elizabeth Holmes, former CEO of Theranos. The appeal raises important, recurring issues concerning the test for harmless error, the admissibility of subsequent events to prove prior knowledge and intent, and the Confrontation Clause. Across these issues, the panel's opinion creates new conflicts with precedent of the Supreme Court, this Court, and/or other circuits to reach an unjust result. The panel's flawed opinion calls out for en banc review.

*First*, the panel held that the district court's error in admitting the untested expert opinion of Theranos' laboratory director, Dr. Kingshuk Das, regarding the accuracy of Theranos' tests was harmless because it purportedly

1

affected only one category of alleged misrepresentations and the jury could have convicted Holmes based on other alleged misrepresentations. This holding defies the Supreme Court's repeated admonition that the harmless-error inquiry is not a sufficiency-of-the-evidence test. Where a jury returns a general verdict and one of multiple theories of culpability is undermined by error, an appellate court impermissibly speculates when it affirms on the basis of the untainted theories. Instead, as the Fifth Circuit has held, if the jury could have convicted based on the tainted error, the harmlessness inquiry focuses on the significance of the error to that theory.

_Second_, the panel affirmed the admission of a government report documenting a regulatory inspection of Theranos' laboratory that Holmes received in 2016 on a "knowledge" theory, concluding that the report was probative of her knowledge of issues in the laboratory during the alleged fraud scheme in 2010-2015. No court has endorsed this time-warping relevance theory, which conflicts with this Court's precedents recognizing that a fact must have reached the defendant while the asserted scheme was in progress to bear on knowledge. The district court's ruling severely prejudiced Holmes in a case that turned on Holmes' intent and knowledge when interacting with investors.

*Third*, the panel's perfunctory consideration of the prejudice Holmes suffered from the court-imposed limitations on the cross-examination of Theranos' former laboratory director, Dr. Adam Rosendorff, departs in several respects from this Court's precedents. The excluded testimony showed that laboratory issues like those Theranos experienced during Rosendorff's tenure recurred at three laboratories where he worked after Theranos, undermining his speculation that the issues at Theranos signified problems with the company's technology. The panel's conclusion that this testimony was cumulative defies this Court's prior holdings that impeachment evidence is not cumulative where it is of a different character than other evidence.

The Court should grant rehearing en banc or panel rehearing.

## STATEMENT

1. Holmes founded Theranos in 2004 with the goal of creating technology to run diagnostic tests on small samples of blood. 38-ER-10869-71. The company and its well-credentialed scientists developed hundreds of small-sample assays for testing blood, hardware for running the assays, and associated software. 38-ER-10870, 10887-88. Through 2016, Theranos obtained nearly 150 U.S. patents and, in 2015, secured FDA approval of its "miniLab" device for its HSV-1 assay. 53-ER-15333, 15490.

3

Theranos partnered with major pharmaceutical companies on projects reported internally to Holmes as "successes." 49-ER-14266. Theranos' technology generated lasting interest from the U.S. Department of Defense, and the company developed customized miniLabs for the military across multiple engagements. 28-ER-7762-64; 40-ER-11339; 52-ER-14952-81; 53-ER-15336. In 2010, Theranos contracted with Walgreens to provide blood-testing services in Walgreens stores. 45-ER-13006.

While working towards FDA approval to test individual samples at Walgreens stores, Theranos operated centralized laboratories to process high volumes of samples. 49-ER-14271-72. As Theranos told the FDA, during this interim "Phase I," the company ran tests on a mixture of hardware: a prior-generation proprietary device called "Edison," which ran a smaller number of small-sample tests than the miniLab; third-party machines modified to run proprietary small-sample assays; and unmodified third-party analyzers for traditional venous-blood tests. 49-ER-14271; 54-ER-15753-54.

The company periodically raised funds by selling shares. As relevant here, the "C-1" investment round occurred in late 2013; a "C-2" round occurred in 2014 and early 2015. 4-ER-844; 39-ER-11172-82. In October 2015, the *Wall Street Journal* began reporting on supposed accuracy problems with Edison

4

tests run in the clinical laboratory.  29-ER-8309-10.  Following these articles, in late 2015, the Centers for Medicare & Medicaid Services (CMS) inspected one of Theranos' clinical laboratories.  In January 2016, it issued a report finding Theranos to have violated certification conditions.  47-ER-13683.  In response, Holmes hired a new clinical laboratory director, Dr. Kingshuk Das, and other experts to improve laboratory operations.  *E.g.*, 33-ER-9487-93.  Holmes stepped down as Theranos CEO in 2018.

2.  The operative indictment charged Holmes and former Theranos President Sunny Balwani with two sets of charges:  (1) conspiracy to commit wire fraud against Theranos investors between 2010 and 2015, and wire fraud relating to certain C-1 and C-2 investments in 2013 and 2014; and (2) conspiracy to commit wire fraud, and wire fraud, against Theranos patients.  13-ER-3526.  The indictment alleged that Holmes and Balwani misled investors about the accuracy of Theranos' analyzer; Theranos' revenue; its relationships with Walgreens, the Department of Defense, and pharmaceutical companies; and its use of its proprietary analyzers to test clinical samples.  13-ER-3530-32.  Holmes and Balwani were tried separately.  In closing argument, the government characterized the alleged misrepresentations concerning the analyzer's

accuracy as the "thread" tying together these various statements and "the underlying false statement in the case." 44-ER-12538.

At trial, the government attempted to establish the falsity of that "underlying false statement"—a complex question in the field of medical testing—without properly noticed expert testimony or competent scientific proof. Theranos' Laboratory Information Systems (LIS) database containing historical patient and quality-control data had been lost through no fault of Holmes. 1-ER-246. The government disclosed in discovery a retained expert who purported to opine on the Edison's accuracy based on remaining snippets of data, customer complaints, and other anecdotal accounts, but abandoned him after the court ordered a *Daubert* hearing. 9-ER-2268-70, 2344-45.

To fill the gap in its proof, the government relied on three pieces of evidence from 2016 that the court admitted over Holmes' objection.

*First*, the government called Das to convey the conclusions of his comprehensive, *retrospective* analysis of Edison data (including the since-lost LIS data) in 2016 that led him to conclude and report to Holmes that the Edison exhibited accuracy problems and was not suitable for clinical use. 33-ER-9455-60. Because the government had belatedly (and inadequately) disclosed Das' testimony, *see* 8-ER-2232, it convinced the court to avoid a mid-trial *Daubert*

hearing by admitting his opinions as lay testimony, 1-ER-184, 13-ER-3507-08. The court's ruling denied Holmes the opportunity to challenge under Rule 702 the reliability of Das' opinion, which was premised on data that had been destroyed and thus were unavailable to Holmes. *Second*, the government offered excerpts from the 2016 CMS inspection report concerning Edison tests. Because the government declined to call the report's authors, the court admitted the report as evidence limited to Holmes' "knowledge and intent." 33-ER-9436. *Third*, the court admitted evidence that, as a result of Das' 2016 analysis, Theranos voluntarily and retrospectively voided Edison test results. 33-ER-9452-58.

The government also relied heavily on the testimony of Dr. Adam Rosendorff, Theranos' laboratory director from mid-2013 to November 2014. Rosendorff described certain incidents when the company investigated potentially erroneous results or other testing issues, *e.g.*, 20-ER-5482-530, but ultimately testified that he never validated tests he believed were inappropriate for patient use and never offered tests he thought were inaccurate or unreliable. 21-ER-5695-96, 5714; 23-ER-6368. Rosendorff, however, opined on direct examination that Theranos experienced more issues than other laboratories

7

where he had worked, which he attributed to failings with Theranos' technology. 20-ER-5480-81.

The court cut off Holmes' attempt to challenge that testimony on cross-examination with evidence that three laboratories that Rosendorff oversaw after leaving Theranos were investigated for issues involving improperly validated tests, "systemic testing error," and/or inadequate quality control—*i.e.*, the same types of issues the government cited as proof of Theranos' technological challenges. 8-ER-2157-64; 56-ER-16052 (sealed). The court permitted "limited" questioning on just one of these post-Theranos jobs confined to whether a then-pending CMS investigation of that laboratory by the same CMS employees who had inspected Theranos biased Rosendorff's testimony. 23-ER-6456-62.

Holmes testified in her defense. After deliberating for seven days, the jury acquitted Holmes of the patient-related counts, convicted Holmes of conspiracy to commit wire fraud as to investors and three wire-fraud counts related to C-2 investors, and hung on the wire-fraud counts related to C-1 investors. 6-ER-1471-73.

3. The panel affirmed Holmes' conviction and sentence. In relevant part, it held that portions of Das' testimony were expert opinion and

8

erroneously admitted. Op.20-21. Yet the panel concluded that this error was harmless because, in its view, Das' testimony was cumulative and was "not essential" to proving the falsity of certain categories of representations. Op.23. The panel held that the 2016 CMS Report was "probative of" Holmes' *prior* knowledge of the issues it catalogued. Op.31.[1] Finally, in a discussion spanning less than two pages, the panel held that the limits on Rosendorff's cross-examination were within the court's discretion because Holmes was able to probe his bias with respect to CMS' investigation into one post-Theranos laboratory and his competency during his tenure at Theranos. Op.36.

## REASONS FOR GRANTING REHEARING

## I.   THE COURT SHOULD GRANT REHEARING EN BANC.

### A.   The Panel's Harmless-Error Analysis Confuses Harmlessness with Evidentiary Sufficiency in Conflict with Supreme Court and Ninth Circuit Precedent.

1. "Time and again, the Supreme Court has emphasized that a harmless-error inquiry is not the same as a review for whether there was sufficient evidence at trial to support a verdict." *Jensen v. Clements*, 800 F.3d 892, 902 (7th Cir. 2015); *see, e.g.*, *Kotteakos v. United States*, 328 U.S. 750, 765 (1946) ("The

---

[1] The panel also affirmed the admission of the voiding evidence. Op.34-35. While that holding was erroneous, it is not itself a ground for rehearing. The voiding evidence would not have been admissible or meaningful to the jury without Das' improperly admitted expert opinion explaining the basis for it.

9

inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error."). The courts of appeals uniformly recognize this principle.[2]

This Court, too, has confirmed that it "adhere[s] to the analysis first provided by the Supreme Court in *Kotteakos*": "It is not the appellate court's function to determine guilt or innocence. Nor is it to speculate upon probable reconviction and decide according to how the speculation comes out." *United States v. Bruce*, 394 F.3d 1215, 1229 (9th Cir. 2005) (quoting *Kotteakos*, 328 U.S. at 763) (alteration omitted); *accord, e.g.*, *United States v. Brooke*, 4 F.3d 1480, 1488 (9th Cir. 1993) ("The Supreme Court established the applicable standard in [*Kotteakos*], and we … do not have the authority to modify it.").

2. The panel's harmless-error analysis with respect to Das' testimony violates these bedrock principles of appellate review. The panel concluded that the error was harmless "given the weight of other evidence against

---

[2] *See United States v. Meserve*, 271 F.3d 314, 329 (1st Cir. 2001); *United States v. Grinage*, 390 F.3d 746, 751 (2d Cir. 2004); *United States v. Jonnet*, 762 F.2d 16, 20 (3d Cir. 1985); *United States v. Ince*, 21 F.3d 576, 583 (4th Cir. 1994); *United States v. Escobar*, 674 F.2d 469, 475 & n.12 (5th Cir. 1982); *Caldwell v. Bell*, 288 F.3d 838, 842 (6th Cir. 2002); *United States v. Straughan*, 453 F.2d 422, 427 (8th Cir. 1972); *United States v. Wood*, 109 F.4th 1253, 1265-66 (10th Cir. 2024); *Vines v. United States*, 28 F.3d 1123, 1130 (11th Cir. 1994); *United States v. Williams*, 827 F.3d 1134, 1161 (D.C. Cir. 2016).

Holmes." Op.22. In particular, it reasoned that "Das's testimony was relevant to misrepresentations concerning the technological capabilities of the device," but not to representations on other topics such as "Theranos's financial status, its reliance on third-party testing devices, its partnerships with Walgreens and the military," and its work with pharmaceutical companies. Op.23. In other words, the panel concluded that aspects of the government's case supposedly untainted by the error were sufficient to sustain the conviction.

"This [reasoning] suffers from the very defect identified above: collapsing the concepts of evidentiary sufficiency and non-constitutional harmlessness without any effort to explore the significance of the erroneously" admitted evidence. *Wood*, 109 F.4th at 1266; *see Sassounian v. Roe*, 230 F.3d 1097, 1112 (9th Cir. 2000) (merely "reciting a list of 'evidence'" to support the verdict "not only improperly places [a court] in the role of the jury, it disregards *Kotteakos*'" articulation of the harmlessness test).

*Kotteakos*' prohibition on this type of speculation is paramount where the government urges conviction on multiple, factually independent grounds. *See United States v. Alexius*, 76 F.3d 642 (5th Cir. 1996). The defendant in *Alexius* was charged with a single perjury count premised on four statements. *Id.* at 644 n.5. The Fifth Circuit held that a Confrontation Clause violation

11

likely affected the jury's evaluation of just one of those statements, but, because the jury returned a general verdict, the error required reversing the conviction. *Id.* at 647 & n.11. As there was "no reason to suppose that the jury did not rest its guilty verdict" on the affected statement, the strength of the government's evidence on the other three was irrelevant. *Id.* The panel's reasoning directly conflicts with *Alexius*' holding, which faithfully applied *Kotteakos* in similar circumstances.

3. *Alexius* demonstrates the problems with the panel's retreat from *Kotteakos*. By focusing only on the parts of the government's case supposedly unaffected by the error, the panel avoided grappling with the government's jury argument that the alleged misrepresentations concerning the technology's accuracy—*i.e.*, those most affected by the Das error—were the "thread" tying together the alleged scheme and "the underlying false statement in the case." 44-ER-12538. Here, even more than in *Alexius*, there is "no reason to suppose" that the jury did not accept that argument and base its conviction on the statements regarding the technology's accuracy.

The panel's opinion creates a nearly insurmountable roadblock for defendants in cases where the government presents more than one factual basis for conviction. In these circumstances—common in fraud and false statement

12

cases, among others—the defendant must run the table on appeal by identifying errors cutting across all of the government's theories or by establishing separate errors going to each theory. The result is a game of prejudice whack-a-mole that transforms the harmless-error inquiry into a sufficiency test, in contravention of *Kotteakos*' clear command.

### B. The Panel's Holding that Later Events Can Prove Earlier Knowledge Is Illogical and Contradicts Ninth Circuit Precedent.

The panel held that the 2016 CMS Report was admissible because it was relevant to Holmes' knowledge of the state of Theranos' laboratory when she made representations to investors in 2010-2014. Op.31. In reaching this holding, the panel purported to apply a categorical rule that "subsequent acts may raise an inference of prior knowledge." *Id.* As applied here, that proposition is illogical and states a troubling new rule that conflicts with this Court's precedent.

Under the panel's rule, a defendant who learns of a fact after the conclusion of an alleged scheme can be deemed to have known that fact during the scheme. The panel is apparently the first court to ever so hold; the admissibility of the CMS Report was "extensively litigated" below, Op.11, and neither

13

the government nor the district court once cited a case supporting this theory. Holmes is aware of none.

This new rule defies logic, as this Court has repeatedly recognized. *See Reisman v. United States*, 409 F.2d 789 (9th Cir. 1969); *Phillips v. United States*, 356 F.2d 297 (9th Cir. 1965). In both cases, customer complaints were admitted as evidence that the defendants knew their businesses were operating in a fraudulent manner. This Court reversed the fraud convictions based on the straightforward rationale that the complaints were "relevant only on the theory that a defendant's actual knowledge of them shows that he must have realized the scheme was fraudulent," which required "that such defendant had actual knowledge of the documents *while the asserted scheme was in progress*." *Reisman*, 409 F.2d at 790 (quoting *Phillips*, 356 F.2d at 306) (emphasis added). That makes perfect sense: because a false statement is fraudulent only if the speaker knows it to be false when made, evidence purporting to prove that knowledge must be contemporaneous with the statement.

The panel cited two cases in defense of its rule, but neither supports it. *See* Op.31 (citing *United States v. Bibo-Rodriguez*, 922 F.2d 1398 (9th Cir. 1991) and *United States v. Nelson*, 137 F.3d 1094 (9th Cir. 1998)). In both cases, evidence that the defendants had subsequently committed crimes

14

similar to the charged offenses was deemed probative of their knowledge, intent, planning, preparation, and/or lack of mistake under Rule 404(b). *See Bibo-Rodriguez*, 922 F.2d at 1400-02 ("Here, the subsequent offense is relevant to show that the defendant could not have been duped in the first instance, because he repeated a similar, although not identical, action on a subsequent occasion."); *Nelson*, 137 F.3d at 1106-07 ("[E]vidence showed that Nelson planned and prepared the Tualatin robbery similarly to the San Diego robbery, including use of rental cars and guns, and attempted to sell the stolen jewelry after the robbery."). These Rule 404(b) cases provide no support for the panel's new rule because they involve subsequent conduct *by the defendant*—not, as here, subsequent events that provide notice *to the defendant*.

The panel's misguided rule risks turning fraud into a negligence-based offense. A CEO who makes a claim that later turns out to be incorrect will face the prospect of prosecution based on subsequent evidence undermining his prior statements, even if he did not know of that evidence in real time. As Holmes' case makes plain, this threat is real: the jury was instructed to consider the 2016 CMS Report solely as evidence of Holmes' "knowledge and intent." 33-ER-9436. Because it was undisputed that the CMS inspection and Report post-dated any alleged misrepresentations to investors (or any

15

representations to patients), *see infra* p.20, the court's instruction compelled the jury to view the evidence as something Holmes should have known during the alleged conspiracy. This Court should grant en banc review to correct this distortion in the law.

### C. The Panel's Holding Regarding the District Court's Curtailment of Cross-Examination Conflicts with Ninth Circuit Precedent.

This Court evaluates limits on cross-examination against established factors, asking whether: (a) "the excluded evidence was relevant"; (b) "there were other legitimate interests outweighing the defendant's interest"; and (c) "the exclusion of evidence left the jury with sufficient information to assess the credibility of the witness." *United States v. Larson*, 495 F.3d 1094, 1103 (9th Cir. 2007). The panel did not grapple with these factors. It instead rested its holding on the bare conclusion that the testimony would have been "cumulative." Op.36 (quoting *United States v. Shih*, 73 F.4th 1077, 1097 (9th Cir. 2023)).[3] The panel's truncated analysis conflicts with this Court's prior cases in several respects.

---

[3] The cited portion of *Shih* did not even concern a limitation on cross-examination but rather affirmed a decision to admit some but not all YouTube videos where "it was not clear that [the excluded videos] related" to the witness's testimony. 73 F.4th at 1097.

16

*First*, the panel ignored this Court's holdings that impeachment evidence is not cumulative where it is "of a different character," *Horton v. Mayle*, 408 F.3d 570, 579 (9th Cir. 2005) (citation omitted), or shows a "different bias or motive," *United States v. Kohring*, 637 F.3d 895, 904 (9th Cir. 2011), than other evidence. The excluded testimony clearly met both standards. Under the court's ruling, the jury was not permitted to hear *anything* about the serious laboratory performance issues that trailed Rosendorff. This evidence was necessarily "of a different character" than evidence about his tenure at Theranos. *See, e.g.*, *United States v. Simtob*, 901 F.2d 799, 805 (9th Cir. 1990) ("The statements in the tape went beyond anything already in evidence, and were therefore not merely cumulative."). And his motive to deflect blame onto the technology to hide his own shortcomings is an entirely "different bias or motive" than the motive to shade his testimony to obtain leniency in the then-pending CMS investigation at one of the laboratories.

*Second*, the panel's reliance on *United States v. Weiner*, 578 F.2d 757 (9th Cir. 1978) (per curiam), for the proposition that courts may "preclude repetitive questioning" underscores the panel's departure from the required analysis. Op.36. *Weiner* does not provide an alternative to the *Larson* test; rather, it concerns a narrow circumstance where the limitation on cross-

17

examination is of obviously *de minimis* importance. This Court has invoked *Weiner* only where the precise question was exhaustively explored and/or where the topic was of minimal relevance.[4] In contrast, where a court excludes new topics of inquiry (as happened here), this Court has observed that *Weiner* does not apply. *See United States v. Willis*, 647 F.2d 54, 57-58 (9th Cir. 1981).

<u>*Third*</u>, the panel's superficial engagement with the district court's ruling flies in the face of this Court's command that it "cannot overemphasize the importance of allowing full and fair cross-examination of government witnesses whose testimony is important to the outcome of the case." *Brooke*, 4 F.3d at 1489. That admonition applies with even more force in cases where, as here, the defendant testifies to matters that are "directly contrary" to the witness' recollection; in such cases, it is "essential that appellant be given a maximum opportunity to … explor[e] the witness' motivation for testifying." *United States v. Rodriguez*, 439 F.2d 782, 783 (9th Cir. 1971) (per curiam).

---

[4] *See Shih*, 73 F.4th at 1095 (defense counsel had "asked the question repeatedly"); *United States v. Shehadeh*, 848 F. App'x 271, 273 (9th Cir. 2021) ("defense counsel had established—approximately twenty times—that Wolf did not remember his discussion with State Farm"); *United States v. Cantrell*, 433 F.3d 1269, 1282 (9th Cir. 2006) ("counsel kept inquiring about the same details, … and Morales's responses were always the same"); *accord United States v. Reagan*, 2009 WL 1185666, at *2 (9th Cir. May 4, 2009); *United States v. Bonanno*, 852 F.2d 434, 439 (9th Cir. 1988); *United States v. Brutzman*, 731 F.2d 1449, 1452 (9th Cir. 1984).

Here, Holmes' account in her testimony of the issues that arose during Rosendorff's tenure and the circumstances of his departure—including whether he raised concerns about quality-control issues to her—were directly at odds with Rosendorff's testimony. *Compare* 40-ER-11398-402; 47-ER-13715, *with* 20-ER-5405, 5520, 5585; 21-ER-5655-56. In light of this dueling testimony, and Rosendorff's undisputed significance to the government's case, the panel's failure to engage seriously with the prejudice to Holmes is irreconcilable with this Court's precedent. The en banc Court should correct this notable departure that threatens to substantially diminish defendants' rights in this Circuit.

## II. AT A MINIMUM, PANEL REHEARING IS REQUIRED.

The reasons to grant rehearing en banc also support panel rehearing, both individually and cumulatively. In addition, the panel's opinion suffers from significant factual mistakes relevant to the issues raised above.

1. The panel's harmless-error analysis with respect to Das wrongly concluded that his testimony was cumulative of that of "[m]ultiple former Theranos employees." Op.23. The government charged a scientific case requiring expert testimony, and no other witness offered a comprehensive, scientific opinion that the Edison was inaccurate or unreliable. Surekha

19

Gangakhedkar left the company before it finished clinical validation on the Edison and began testing samples. 18-ER-4844. Erika Cheung was an entry-level technician whom the panel concluded did not testify based on "specialized knowledge." Op.29. And Rosendorff's testimony was mixed because he testified that he viewed the Edison tests (which he validated) as accurate and reliable. *Supra* p.7. These witnesses' testimony did not add up to persuasive proof that the Edison performed worse than other laboratory instruments.

2. Regarding the CMS Report, the panel noted that CMS' inspection began "in late 2015." Op.31. Any significance the panel assigned to the fact that the inspection began at the end of the "charging period" in 2015 is misplaced. The government did not prove (or identify on appeal) any alleged misrepresentation to any prospective investor after the CMS inspection in 2015.

3. Finally, with respect to Rosendorff, the panel placed undue weight on the length of cross-examination to support its conclusion that Holmes had sufficient opportunity to "attack[] Rosendorff's competence." Op.36. Rosendorff's cross-examination was lengthy because he repeatedly testified inaccurately. *See, e.g.*, 21-ER-5843-50 (agreeing that testimony about inspection was incomplete); 22-ER-5964-66 (agreeing that testimony regarding proficiency testing was "inaccurate"). And much of Holmes' cross-examination focused on

20

proving that company employees, including Rosendorff, thoroughly addressed the laboratory issues Rosendorff recalled. *See, e.g.*, 21-ER-5739-40, 5779-801, 5855-914.

## CONCLUSION

The Court should grant rehearing en banc or panel rehearing.

DATED: APRIL 9, 2025                   Respectfully submitted,

/s/ *Amy Mason Saharia*
KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue SW*
  *Washington, DC 20024*
  *(202) 434-5000*
  *asaharia@wc.com*

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  *600 Stewart Street*
  *Suite 400*
  *Seattle, WA  98101*
  *(360) 320-6435*

*Attorneys for Appellant*
*Elizabeth A. Holmes*

21

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* https://www.ca9.uscourts.gov/forms/form11instructions.pdf

**9th Cir. Case Number(s)** 22-10312

      I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel

rehearing/petition for rehearing en banc/response to petition is *(select one)*:

⦿    Prepared in a format, typeface, and type style that complies with Fed. R. App. P.
      32(a)(4)-(6) and **contains the following number of words:** 4,193   .
      *(Petitions and responses must not exceed 4,200 words)*

      **OR**

○    In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** s/Amy Mason Saharia    **Date** April 9, 2025
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 11**                                   *Rev. 12/01/24*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system on April 9, 2025.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Amy Mason Saharia*
AMY MASON SAHARIA

DATED: APRIL 9, 2025